# 23-753

IN THE

## United States Court of Appeals
## for the Second Circuit

---

ADRIAN THOMAS,
*Plaintiff-Appellant,*

— v. —

ADAM R. MASON, RONALD FOUNTAIN, TIM
COLANERI, AND MICHAEL SIKIRICA,
*Defendants-Appellee.*

---

On Appeal from the United States District Court
for the Northern District of New York
Case No. 1:17-cv-00626 (DJS)

---

## APPENDIX VOLUME 1 OF 3

# APPENDIX VOLUME 1 TABLE OF CONTENTS

Docket ........................................................................................ 1

ECF 142-1: Timothy Colaneri Affidavit ........................................ 30

ECF 142-2: Ronald Fountain Affidavit .......................................... 35

ECF 142-3: Exhibit "A" .............................................................. 42

ECF 142-4: Exhibit "B" .............................................................. 45

ECF 142-5: Exhibit "C" .............................................................. 47

ECF 142-6: Exhibit "D" .............................................................. 49

ECF 142-7: Adam R. Mason Affidavit ........................................... 53

ECF 142-8: Exhibit "A" .............................................................. 64

ECF 142-9: Exhibit "B" .............................................................. 66

ECF 142-10: Exhibit "C" ............................................................. 68

ECF 142-11: Exhibit "D" ............................................................. 70

ECF 142-12: Exhibit "E" ............................................................. 81

ECF 142-13: Exhibit "F" ............................................................. 83

ECF 142-14: Exhibit "G" ............................................................. 86

ECF 142-15: Exhibit "H" ............................................................. 93

ECF 142-17: Michael D. Ranalli Affidavit ..................................... 94

ECF 142-18: Exhibit "A" ............................................................. 97

ECF 142-19: Exhibit "B" ............................................................. 102

ECF 142-20: Rhiannon I. Spencer Attorney Declaration ............ 118

ECF 142-21: Exhibit "A" ............................................................. 121

ECF 142-22: Exhibit "B" ............................................................. 579

Case 23-753, Document 61, 04/17/2024, 3604336, Page3 of 1023

# APPENDIX

**Query**    **Reports**    **Utilities**    **Help**    **Log Out**

RECAP Actions

APPEAL,CLOSED,CONSENT

## U.S. District Court
## Northern District of New York - Main Office (Syracuse) [NextGen CM/ECF Release 1.7 (Revision 1.7.1.2)] (Albany)
## CIVIL DOCKET FOR CASE #: 1:17-cv-00626-DJS

Thomas v. City of Troy et al
Assigned to: Magistrate Judge Daniel J. Stewart
Cause: 42:1983 Civil Rights Act

Date Filed: 06/12/2017
Date Terminated: 03/30/2023
Jury Demand: Both
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Adrian Thomas**                                    represented by   **Brett H. Klein**
                                                                     Office of Brett H. Klein, Esq. PLLC
                                                                     305 Broadway
                                                                     Suite 600
                                                                     New York, NY 10007
                                                                     212-335-0132
                                                                     Email: bklein@kleincivilrights.com
                                                                     *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

V.

**Mediator (Mandatory Program)**

**David R. Homer**                                   represented by   **David R. Homer**
Capital District ADR, LLC                                            Carter, Conboy, Case, Blackmore, Maloney
20 Corporate Woods Blvd                                             & Laird, P.C.
Fifth Floor                                                          20 Corporate Woods Boulevard
Albany, NY 12211                                                     Albany, NY 12211
518-810-0507                                                         518-465-3484
                                                                     Email: dhomer@carterconboy.com
                                                                     *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**City of Troy**                                     represented by   **Donald J. Shanley**
*TERMINATED: 03/22/2018*                                             Pattison, Sampson Law Firm
                                                                     22 First Street
                                                                     P.O. Box 208
                                                                     Troy, NY 12181-0208
                                                                     518-266-1029

Fax: 518-274-6034
Email: yantz@psgglaw.com
*TERMINATED: 11/15/2019*

**Michael E. Ginsberg**
Pattison, Sampson Law Firm
P.O. Box 208
22 First Street
Troy, NY 12181-0208
518-266-1026
Fax: 518-274-6034
Email: mginsberg@psgglaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

| **Adam R. Mason** | | |
| *Individually* | represented by | **Joseph T. Perkins** |
| | | O'Connor First |
| | | 20 Corporate Woods Blvd. |
| | | P.O. Box 208 |
| | | Albany, NY 12211 |
| | | 518-465-0400 |
| | | Fax: 518-465-0015 |
| | | Email: perkins@oobf.com |
| | | *LEAD ATTORNEY* |

**Rhiannon Ineva Gifford**
Pattison Sampson Ginsberg & Griffin PLLC
P.O. Box 208
22 First Street
Troy, NY 12180
518-266-1001
Fax: 518-274-6034
Email: gifford@psgglaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donald J. Shanley**
(See above for address)
*TERMINATED: 11/15/2019*

**Michael E. Ginsberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

| **Ronald Fountain** | | |
| *Individually* | represented by | **Donald J. Shanley** |
| | | (See above for address) |
| | | *TERMINATED: 11/15/2019* |
| | | *LEAD ATTORNEY* |

**Joseph T. Perkins**
(See above for address)
*LEAD ATTORNEY*

Case 23-753, Document 61, 04/17/2024, 3604336, Page5 of 1023

# APPENDIX

**Rhiannon Ineva Gifford**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael E. Ginsberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Tim Colaneri**                    represented by   **Joseph T. Perkins**
*Individually*                                      (See above for address)
                                                     *LEAD ATTORNEY*

                                                     **Rhiannon Ineva Gifford**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Donald J. Shanley**
                                                     (See above for address)
                                                     *TERMINATED: 11/15/2019*

                                                     **Michael E. Ginsberg**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

**Defendant**

**Rensselaer County**               represented by   **Crystal R. Peck**
*TERMINATED: 03/22/2018*                             Bailey, Johnson & Peck, P.C.
                                                     5 Pine West Plaza, Suite 507
                                                     Washington Avenue Extension
                                                     Albany, NY 12205
                                                     518-456-0082
                                                     Fax: 518-456-4767
                                                     Email: crpeck@baileyjohnson.com
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **John W. Bailey**
                                                     Bailey, Johnson & Peck, P.C.
                                                     5 Pine West Plaza, Suite 507
                                                     Washington Avenue Extension
                                                     Albany, NY 12205
                                                     518-456-0082
                                                     Email: jwbailey@baileyjohnson.com
                                                     *ATTORNEY TO BE NOTICED*

**Defendant**

**Michael Sikirica**                represented by   **Crystal R. Peck**
*Individually*                                       (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**John W. Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**City of Troy**                           represented by   **Donald J. Shanley**
*TERMINATED: 03/22/2018*                                   (See above for address)
                                                           *TERMINATED: 11/15/2019*

V.

**Counter Defendant**

**Adrian Thomas**                          represented by   **Brett H. Klein**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Adam R. Mason**                          represented by   **Rhiannon Ineva Gifford**
*Individually*                                             (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Donald J. Shanley**
                                                           (See above for address)
                                                           *TERMINATED: 11/15/2019*

V.

**Counter Defendant**

**Adrian Thomas**                          represented by   **Brett H. Klein**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Tim Colaneri**                           represented by   **Rhiannon Ineva Gifford**
*Individually*                                             (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Donald J. Shanley**
                                                           (See above for address)
                                                           *TERMINATED: 11/15/2019*

V.

**Counter Defendant**

**Adrian Thomas**                          represented by   **Brett H. Klein**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

# APPENDIX

**5**

**Cross Claimant**

**City of Troy**
*TERMINATED: 03/22/2018*

represented by **Donald J. Shanley**
(See above for address)
*TERMINATED: 11/15/2019*

V.

**Cross Defendant**

**Rensselaer County**
*TERMINATED: 03/22/2018*

represented by **Crystal R. Peck**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Cross Defendant**

**Michael Sikirica**
*Individually*

represented by **Crystal R. Peck**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Cross Claimant**

**Adam R. Mason**
*Individually*

represented by **Rhiannon Ineva Gifford**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donald J. Shanley**
(See above for address)
*TERMINATED: 11/15/2019*

V.

**Cross Defendant**

**Rensselaer County**
*TERMINATED: 03/22/2018*

represented by **Crystal R. Peck**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Cross Defendant**

**Michael Sikirica**
*Individually*

represented by **Crystal R. Peck**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Cross Claimant**

**Tim Colaneri**
*Individually*

represented by **Rhiannon Ineva Gifford**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donald J. Shanley**
(See above for address)
*TERMINATED: 11/15/2019*

V.

**APPENDIX**

<u>**Cross Defendant**</u>

**Rensselaer County**
*TERMINATED: 03/22/2018*

represented by **Crystal R. Peck**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Cross Defendant**</u>

**Michael Sikirica**
*Individually*

represented by **Crystal R. Peck**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Cross Claimant**</u>

**Ronald Fountain**
*Individually*

represented by **Donald J. Shanley**
(See above for address)
*TERMINATED: 11/15/2019*
*LEAD ATTORNEY*

**Rhiannon Ineva Gifford**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

<u>**Cross Defendant**</u>

**Rensselaer County**
*TERMINATED: 03/22/2018*

represented by **Crystal R. Peck**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John W. Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Cross Defendant**</u>

**Michael Sikirica**
*Individually*

represented by **Crystal R. Peck**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John W. Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Counter Claimant**</u>

**Ronald Fountain**
*Individually*

represented by **Donald J. Shanley**
(See above for address)
*TERMINATED: 11/15/2019*
*LEAD ATTORNEY*

**Rhiannon Ineva Gifford**
(See above for address)

Case 23-753, Document 61, 04/17/2024, 3604336, Page9 of 1023

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Adrian Thomas**                    represented by    **Brett H. Klein**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Adam R. Mason**                    represented by    **Rhiannon Ineva Gifford**
*Individually*                                        (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Donald J. Shanley**
                                                      (See above for address)
                                                      *TERMINATED: 11/15/2019*

                                                      **Michael E. Ginsberg**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Adrian Thomas**                    represented by    **Brett H. Klein**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Ronald Fountain**                  represented by    **Donald J. Shanley**
*Individually*                                        (See above for address)
                                                      *TERMINATED: 11/15/2019*
                                                      *LEAD ATTORNEY*

                                                      **Rhiannon Ineva Gifford**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Michael E. Ginsberg**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

Case 23-753, Document 61-1, 04/17/2024, 3604336, Page10 of 1023

# APPENDIX

Adrian Thomas          represented by **Brett H. Klein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Tim Colaneri**          represented by **Rhiannon Ineva Gifford**
*Individually*          (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donald J. Shanley**
(See above for address)
*TERMINATED: 11/15/2019*

**Michael E. Ginsberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Adrian Thomas**          represented by **Brett H. Klein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Michael Sikirica**          represented by **Crystal R. Peck**
*Individually*          (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John W. Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Adrian Thomas**          represented by **Brett H. Klein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/12/2017 | 1 **R** | COMPLAINT WITH JURY DEMAND against City of Troy, Tim Colaneri, Ronald Fountain, Adam R. Mason, Rensselaer County, Michael Sikirica (Filing fee $400 receipt number 0206-4039627) filed by Adrian Thomas. (Attachments: # 1 Civil Cover Sheet) (khr) (Main Document 1 replaced on 6/16/2017) (khr, ). (Entered: 06/13/2017) |

| | | |
|---|---|---|
| 06/13/2017 | 2 | Summons Issued as to City of Troy. (Attachments: # 1 as to Adam R. Mason, # 2 as to Ronald Fountain, # 3 as to Tim Colaneri, # 4 s to Rensselaer County, # 5 as to Michael Sikirica) (khr) (Entered: 06/13/2017) |
| 06/13/2017 | 3 | G.O. 25 FILING ORDER ISSUED: Initial Conference set for 9/11/2017 09:00 AM in Albany before Magistrate Judge Daniel J. Stewart. Civil Case Management Plan must be filed and Mandatory Disclosures are to be exchanged by the parties on or before 9/5/2017. (Pursuant to Local Rule 26.2, mandatory disclosures are to be exchanged among the parties but are NOT to be filed with the Court.) (khr) (Entered: 06/13/2017) |
| 06/16/2017 | | CLERK'S CORRECTION OF DOCKET ENTRY re 1 R Complaint. The original Complaint had personal identifiers. Replaced Complaint without personal identifiers. (khr) (Entered: 06/16/2017) |
| 08/16/2017 | 4 | NOTICE of Appearance by Donald J. Shanley on behalf of City of Troy, Tim Colaneri, Adam R. Mason (Attachments: # 1 Certificate of Service)(Shanley, Donald) (Entered: 08/16/2017) |
| 08/21/2017 | 5 | ANSWER to 1 R Complaint, , COUNTERCLAIM against Adrian Thomas by City of Troy. (Attachments: # 1 Certificate of Service)(Shanley, Donald) Modified on 8/23/2017 to correct the docket text. (jmb) (Entered: 08/21/2017) |
| 08/21/2017 | 6 | ANSWER to 1 R Complaint, , COUNTERCLAIM against Adrian Thomas by Adam R. Mason. (Attachments: # 1 Certificate of Service)(Shanley, Donald) Modified on 8/23/2017 to correct the docket text. (jmb) (Entered: 08/21/2017) |
| 08/21/2017 | 7 | ANSWER to 1 R Complaint, , COUNTERCLAIM against Adrian Thomas by Tim Colaneri. (Attachments: # 1 Certificate of Service)(Shanley, Donald) Modified on 8/23/2017 to correct docket text. (jmb) (Entered: 08/21/2017) |
| 08/21/2017 | 8 | TEXT ORDER: Pursuant to N.D.N.Y.L.R. 4.1 (b), the 60 day time frame within which service of the Summons and Complaint upon the Defendants Ronald Fountain, Rensselaer County and Michael Sikirica was to be completed has expired. If service has been completed then proper proof of such service shall be filed on the case docket. Plaintiff is directed to advise the Court as to the status of these Defendants by August 28,2017. SO ORDERED by Magistrate Judge Daniel J. Stewart on 8/21/2017. (mab) (Entered: 08/21/2017) |
| 08/21/2017 | | CROSSCLAIM: against Rensselaer County and Michael Sikirica, filed by City of Troy. {The Cross claim is contained within the # 5 Answer & Counterclaim, however it was not selected in the docketing event} (jmb) (Entered: 08/23/2017) |
| 08/21/2017 | | CROSSCLAIM: against Rensselaer County and Michael Sikirica filed by Adam R. Mason. {The Cross claim is contained within the # 6 Answer & Counterclaim, however it was not selected in the docketing event} (jmb) (Entered: 08/23/2017) |
| 08/21/2017 | | CROSSCLAIM: against Rensselaer County and Michael Sikirica filed by Tim Colaneri. {The Cross claim is contained within the # 7 Answer & Counterclaim, however it was not selected in the docketing event} (jmb) (Entered: 08/23/2017) |
| 08/24/2017 | 9 | NOTICE of Appearance by Crystal R. Peck on behalf of Rensselaer County, Michael Sikirica (Peck, Crystal) (Entered: 08/24/2017) |
| 08/24/2017 | 10 | Letter Motion from Crystal R. Peck for Rensselaer County, Michael Sikirica requesting extension of time to Answer or otherwise Move submitted to Judge Stewart . (Peck, Crystal) (Entered: 08/24/2017) |
| 08/24/2017 | 11 | NOTICE of Appearance by John W. Bailey on behalf of Rensselaer County, Michael |

Case 23-753, Document 61, 04/17/2024, 3604836, Page12 of 1023

| | | Sikirica (Bailey, John) (Entered: 08/24/2017) |
|---|---|---|
| 08/24/2017 | [12](#) | MOTION to Dismiss for Failure to State a Claim Motion Hearing set for 10/5/2017 09:00 AM before Chief Judge Glenn T. Suddaby Response to Motion due by 9/18/2017 Reply to Response to Motion due by 9/25/2017. filed by Rensselaer County, Michael Sikirica. (Attachments: # [1](#) Declaration, # [2](#) Exhibit(s), # [3](#) Exhibit(s), # [4](#) Memorandum of Law, # [5](#) Cover Letter) (Peck, Crystal) (Entered: 08/24/2017) |
| 08/25/2017 | [13](#) | CERTIFICATE OF SERVICE by Rensselaer County, Michael Sikirica re [12](#) MOTION to Dismiss for Failure to State a Claim (Peck, Crystal) (Entered: 08/25/2017) |
| 08/25/2017 | | TEXT NOTICE of Hearing on # [12](#) MOTION to Dismiss for Failure to State a Claim filed by Defendants Rensselaer County and Michael Sikirica: Motion Hearing set for 10/5/2017 on submission of motion papers before Chief Judge Glenn T. Suddaby. No personal appearance. Response to Motion due by 9/18/2017. Reply to Response to Motion due by 9/25/2017. (lmw) (Entered: 08/25/2017) |
| 08/28/2017 | [14](#) | STATUS REPORT by Adrian Thomas. (Klein, Brett) (Entered: 08/28/2017) |
| 08/29/2017 | 15 | TEXT ONLY ORDER: Counsel for Defendants Rensselaer County and Michael Sikirica has asked the Court to extend the time for them to allow for a joint deadline to answer or otherwise move to dismiss. Dkt. No. [10](#) . However, that same date, Counsel also filed a Motion to Dismiss (Dkt. No. [12](#) ), thus the request for an extension of that deadline is moot. The Court has also received a Status Report from Plaintiff's Counsel regarding efforts undertaken to serve Defendant Ronald Fountain. Dkt. No. [14](#) . Although Plaintiff has not accomplished service on Defendant Fountain within the expedited term set by this District's Local Rule 4.1(b) and General Order 25, Plaintiff is still within the time-frame established by Federal Rule of Civil Procedure 4(m) and should continue such efforts to ensure Defendant Fountain is properly served within that time-frame. SO ORDERED. Signed by Magistrate Judge Daniel J. Stewart on 8/29/17.(rlh) (Entered: 08/29/2017) |
| 08/31/2017 | [16](#) | LETTER BRIEF by City of Troy, Tim Colaneri, Adam R. Mason. (Shanley, Donald) (Entered: 08/31/2017) |
| 09/01/2017 | [17](#) | Letter Motion from John W. Bailey for Rensselaer County, Michael Sikirica requesting adjournment of Rule 16 Conference and related deadlines submitted to Judge Stewart . (Bailey, John) (Entered: 09/01/2017) |
| 09/01/2017 | 18 | TEXT ONLY ORDER granting [17](#) Letter Request. In light of the pending Motion to Dismiss, and the fact that service on Defendant Fountain has not yet been accomplished, the Court ADJOURNS the Rule 16 Conference without date. SO ORDERED. Signed by Magistrate Judge Daniel J. Stewart on 9/1/17.(rlh) (Entered: 09/01/2017) |
| 09/08/2017 | [19](#) | SUMMONS Returned Executed by Adrian Thomas. Rensselaer County served on 8/3/2017, answer due 8/24/2017. (Klein, Brett) (Entered: 09/08/2017) |
| 09/08/2017 | [20](#) | SUMMONS Returned Executed by Adrian Thomas. Michael Sikirica served on 8/22/2017, answer due 9/12/2017. (Klein, Brett) (Entered: 09/08/2017) |
| 09/08/2017 | [21](#) | SUMMONS Returned Executed by Adrian Thomas. City of Troy served on 8/3/2017, answer due 8/24/2017. (Klein, Brett) (Entered: 09/08/2017) |
| 09/08/2017 | [22](#) | SUMMONS Returned Executed by Adrian Thomas. Adam R. Mason served on 8/10/2017, answer due 8/31/2017. (Klein, Brett) (Entered: 09/08/2017) |
| 09/08/2017 | [23](#) | SUMMONS Returned Executed by Adrian Thomas. Tim Colaneri served on 8/10/2017, answer due 8/31/2017. (Klein, Brett) (Entered: 09/08/2017) |

| 09/08/2017 | 24 | SUMMONS Returned Executed by Adrian Thomas. Ronald Fountain served on 8/31/2017, answer due 9/21/2017. (Klein, Brett) (Entered: 09/08/2017) |
|---|---|---|
| 09/13/2017 | 25 | Letter Motion from Brett H. Klein for Adrian Thomas requesting an enlargement of time for Plaintiff to respond to the County Defendants' motion to dismiss; and request submitted by Plaintiff on Behalf of Defendant Fountain setting forth said Defendant's consent motion for an extension to respond to the complaint submitted to Judge Daniel J. Stewart . (Klein, Brett) (Entered: 09/13/2017) |
| 09/14/2017 | 26 | TEXT ORDER granting # 25 Plaintiff's Letter Request for an extension to respond to # 12 Defendants' MOTION to Dismiss for Failure to State a Claim: Motion Hearing rescheduled for 11/2/2017 on submission of motion papers before Chief Judge Glenn T. Suddaby. Plaintiff's Response to Motion due by 10/16/2017. Defendant's Reply to Response to Motion due by 10/30/2017. Plaintiff's joint request for an extension for Ronald Fountain to respond to the answer until 10/13/17 is granted. SO ORDERED by Chief Judge Glenn T. Suddaby on 9/14/17. (lmw) (Entered: 09/14/2017) |
| 09/14/2017 | 27 | AFFIDAVIT IN OPPOSITION TO # 12 MOTION TO DISMISS filed by City of Troy, Tim Colaneri, Adam R. Mason. (Attachments: # 1 Exhibit(s) A, # 2 Exhibit(s) B, # 3 Certificate of Service)(Shanley, Donald) Modified on 10/17/2017 (lmw). (Entered: 09/14/2017) |
| 09/20/2017 | 28 | ANSWER to 1 ℝ Complaint, , CROSSCLAIM against Rensselaer County, Michael Sikirica, COUNTERCLAIM against Adrian Thomas by Ronald Fountain. (Attachments: # 1 Certificate of Service)(Shanley, Donald) (Entered: 09/20/2017) |
| 09/20/2017 | 29 | MOTION to Dismiss *crossclaims against Defendants Rensselaer County and Michael Sikirica* Motion Hearing set for 11/2/2017 09:00 AM in Albany before Chief Judge Glenn T. Suddaby Response to Motion due by 10/16/2017 Reply to Response to Motion due by 10/23/2017. filed by Rensselaer County, Michael Sikirica. (Attachments: # 1 Memorandum of Law) (Peck, Crystal) (Entered: 09/20/2017) |
| 09/21/2017 | | TEXT NOTICE of Hearing on # 29 MOTION to Dismiss *crossclaims against Defendants Rensselaer County and Michael Sikirica*: Motion Hearing set for 11/2/2017 on submission of motion papers before Chief Judge Glenn T. Suddaby. No personal appearance. Response to Motion due by 10/16/2017. Reply to Response to Motion due by 10/30/2017. (lmw) (Entered: 09/21/2017) |
| 09/21/2017 | 30 | CERTIFICATE OF SERVICE by Rensselaer County, Michael Sikirica re 29 MOTION to Dismiss *crossclaims against Defendants Rensselaer County and Michael Sikirica* (Peck, Crystal) (Entered: 09/21/2017) |
| 10/16/2017 | 31 ℝ | AMENDED COMPLAINT against All Defendants filed by Adrian Thomas.(Klein, Brett) (Entered: 10/16/2017) |
| 10/17/2017 | 32 | TEXT ORDER directing Defendants to advise the Court in writing by 10/25/17 of the following three facts: (1) whether they object to the filing of the Amended Complaint as violative of the 21-day deadline set forth in Fed.R.Civ.P. 15(a)(1)(B), given that the County Defendants' motion to dismiss was filed on 8/24/17 (and the remaining Defendants filed Answers on 8/21/17) but Plaintiff did not file his Amended Complaint until 10/16/17; (2) whether, alternatively, they consent to the filing of the Amended Complaint pursuant to Fed.R.Civ.P. 15(a)(2); and (3) in either event, what portions, if any, of the County Defendants' # 12 motion to dismiss of 8/24/17 they contend remain pending following the filing of the Amended Complaint. The Court notes that its # 26 Order of 9/14/17 extending Plaintiff's deadline for filing a response to the County Defendants' motion to dismiss did not extend the 21-day deadline by which they could file an Amended Complaint as a matter of course under Fed.R.Civ.P. 15(a)(1)(B). (Dkt. |

| | | |
|---|---|---|
| | | No. 26 ) *See also Webb v. Republic Bank & Trust Co.*, 11-CV-0423, 2012 WL 2254205, at *2 (W.D. Ky. June 15, 2012) (citing cases from the district courts for the District of Columbia and the Southern District of Florida); *accord, Faust v. Northfield Bd. of Educ.*, 12-CV-0274, 2012 WL 3821866, at *2, n.3 (D. N.J. Sept. 4, 2012). SO ORDERED by Chief Judge Glenn T. Suddaby on 10/17/17. (lmw) (Entered: 10/17/2017) |
| 10/23/2017 | 33 | RESPONSE in Opposition re 29 MOTION to Dismiss *crossclaims against Defendants Rensselaer County and Michael Sikirica* filed by City of Troy, Tim Colaneri, Ronald Fountain, Adam R. Mason. (Attachments: # 1 Exhibit(s) A, # 2 Exhibit(s) B, # 3 Memorandum of Law, # 4 Certificate of Service)(Shanley, Donald) (Entered: 10/23/2017) |
| 10/24/2017 | 34 | Letter Motion from Donald J. Shanley for City of Troy, Tim Colaneri, Ronald Fountain, Adam R. Mason requesting accept late filing of motion papers submitted to Judge Glenn T. Suddaby . (Shanley, Donald) (Entered: 10/24/2017) |
| 10/24/2017 | 35 | TEXT ORDER granting # 34 City of Troy Defendants' Letter Request for an extension to file a response to the # 29 MOTION to Dismiss *crossclaims against Defendants Rensselaer County and Michael Sikirica*. Defendants' # 33 Response in Opposition to the motion to dismiss cross-claims is accepted for filing. The Court sua sponte extends the deadline to file a reply. Reply to Response to Motion due by 11/1/2017. SO ORDERED by Chief Judge Glenn T. Suddaby on 10/24/17. (lmw) (Entered: 10/24/2017) |
| 10/25/2017 | 36 | RESPONSE to Discovery Request from Donald J. Shanley by City of Troy, Tim Colaneri, Ronald Fountain, Adam R. Mason. (Attachments: # 1 Certificate of Service)(Shanley, Donald) (Entered: 10/25/2017) |
| 10/25/2017 | 37 | LETTER BRIEF *in Response to Judge Suddaby's directive contained in Docket No. 32* by Rensselaer County, Michael Sikirica. (Peck, Crystal) (Entered: 10/25/2017) |
| 10/26/2017 | 38 | TEXT ORDER accepting for filing # 31 Ⓡ Plaintiff's Amended Complaint on the condition that, Plaintiff separately files by 10/30/17 a version of his Amended Complaint that indicates the language added to and deleted from the original Complaint (either through use of the redline/strikeout method or other equivalent means) so that the County Defendants will be able to properly supplement their motion to dismiss to address Plaintiff's newly raised factual allegations and causes of action. The deadline for the County Defendants' supplemental memorandum of law is 11/13/17. The page limitation for the County Defendants' supplemental memorandum of law (as distinct from their original memorandum of law) is twenty-five (25) pages. Also extended until 11/13/17 is the deadline for the County Defendants' to reply to the City Defendants' opposition to the County Defendants' motion to dismiss the counterclaims. The deadline for Plaintiff's opposition memorandum of law is 11/20/17. The deadline for the County Defendants' reply to Plaintiff's opposition to the County Defendants' motion to dismiss is 12/4/17. After 12/4/17, briefing on the above motions shall be complete. Plaintiff's counsel is respectfully cautioned to carefully comply with Fed.R.Civ.P. 15 and Local Rule 7.1(a)(4) going forward. This Text Order in no way expresses an opinion as to the futility prong of the standard governing motions to amend pleadings. SO ORDERED by Chief Judge Glenn T. Suddaby on 10/26/17. (lmw) (Entered: 10/26/2017) |
| 10/30/2017 | 39 | PROPOSED AMENDED COMPLAINT (*In Redline/Strikeout Format Filed In Response to the Court's Text Order Dated October 26, 2017*) against City of Troy, Tim Colaneri, Ronald Fountain, Adam R. Mason, Rensselaer County, Michael Sikirica filed |

| | | by Adrian Thomas.(Klein, Brett) Modified on 10/31/2017 (lmw). (Entered: 10/30/2017) |
|---|---|---|
| 10/31/2017 | | ***Answer due date updated for City of Troy answer due 11/13/2017; Tim Colaneri answer due 11/13/2017; Ronald Fountain answer due 11/13/2017; Adam R. Mason answer due 11/13/2017. (lmw) (Entered: 10/31/2017) |
| 11/13/2017 | 40 | MOTION to Dismiss *Amended Complaint* Motion Hearing set for 12/7/2017 09:30 AM in Albany before Chief Judge Glenn T. Suddaby Response to Motion due by 11/20/2017 Reply to Response to Motion due by 11/27/2017. filed by City of Troy, Tim Colaneri, Ronald Fountain, Adam R. Mason. (Attachments: # 1 Declaration, # 2 Memorandum of Law, # 3 Certificate of Service) (Shanley, Donald) (Entered: 11/13/2017) |
| 11/13/2017 | 41 | MEMORANDUM OF LAW re 12 Motion to Dismiss for Failure to State a Claim, filed by Rensselaer County, Michael Sikirica. (Attachments: # 1 Memorandum of Law Supplemental Memo of Law, # 2 Exhibit(s) Ex C, # 3 Exhibit(s) Ex D)(Peck, Crystal) (Entered: 11/13/2017) |
| 11/13/2017 | 42 | REPLY to Response to Motion re 29 MOTION to Dismiss *crossclaims against Defendants Rensselaer County and Michael Sikirica* filed by Rensselaer County, Michael Sikirica. (Peck, Crystal) (Entered: 11/13/2017) |
| 11/15/2017 | | TEXT NOTICE of Hearing on # 40 City Defendants' MOTION to Dismiss *Amended Complaint*: Motion Hearing set for 12/21/2017 on submission of motion papers before Chief Judge Glenn T. Suddaby. No personal appearance. Response to Motion due by 12/4/2017. Reply to Response to Motion due by 12/11/2017. (lmw) (Entered: 11/15/2017) |
| 11/15/2017 | 43 | CERTIFICATE OF SERVICE by Rensselaer County, Michael Sikirica re 41 Memorandum of Law, (Peck, Crystal) (Entered: 11/15/2017) |
| 11/15/2017 | 44 | CERTIFICATE OF SERVICE by Rensselaer County, Michael Sikirica re 42 Reply to Response to Motion (Peck, Crystal) (Entered: 11/15/2017) |
| 11/17/2017 | 45 | *Consent* Letter Motion from Brett H. Klein for Adrian Thomas requesting Extension of Time to Respond to County Defendants' Motion submitted to Judge Glenn T. Suddaby . (Klein, Brett) (Entered: 11/17/2017) |
| 11/20/2017 | 46 | TEXT ORDER granting # 45 Plaintiff's Letter Request for an extension to respond to # 40 Defendants' MOTION to Dismiss *Complaint*: Motion Hearing set for 1/4/2018 on submission of motion papers before Chief Judge Glenn T. Suddaby. Pursuant to the parties' agreement, Plaintiff's Response to Motion due by 12/4/2017, and Defendants' Reply to Response to Motion due by 12/18/2017. SO ORDERED by Chief Judge Glenn T. Suddaby on 11/20/17. (lmw) (Entered: 11/20/2017) |
| 11/29/2017 | | TEXT NOTICE of Hearing on # 12 County Defendants' MOTION to Dismiss for Failure to State a Claim , and # 40 City Defendants' MOTION to Dismiss *Complaint* : Motion Hearing set for 12/21/2017 on both motions on submission of motion papers before Chief Judge Glenn T. Suddaby. Plaintiff's Response to both Motions due by 12/4/2017. Defendants' replies to responses to both Motions due by 12/18/2017. (lmw) (Entered: 11/29/2017) |
| 12/04/2017 | 47 | RESPONSE in Opposition re 40 MOTION to Dismiss *Complaint (Memorandum of Law In Opposition to the Troy Defendants' Motion to Dismiss)* filed by Adrian Thomas. (Klein, Brett) (Entered: 12/04/2017) |
| 12/04/2017 | 48 | MEMORANDUM OF LAW re 41 Memorandum of Law, *(Plaintiff's Memorandum of Law In Opposition to the County Defendants' Motion for Partial Dismissal Pursuant* |

| | | *to Rule 12(b)(6)* filed by Adrian Thomas. (Klein, Brett) (Entered: 12/04/2017) |
|---|---|---|
| 12/13/2017 | 49 | Letter Motion from Donald J. Shanley, Esq. for City of Troy, Tim Colaneri, Ronald Fountain, Adam R. Mason requesting Extension of time submitted to Judge Glenn T. Suddaby . (Shanley, Donald) (Entered: 12/13/2017) |
| 12/14/2017 | 50 | TEXT ORDER granting # 49 Defendants' Letter Request for an extension to file a reply to their # 40 MOTION to Dismiss: Reply to Response to Motion due by 12/27/2017. SO ORDERED by Chief Judge Glenn T. Suddaby on 12/14/17. (lmw) (Entered: 12/14/2017) |
| 12/18/2017 | 51 | Letter Motion from Crystal R. Peck for Rensselaer County, Michael Sikirica requesting extension to file Reply to Opposition submitted to Judge Suddaby . (Peck, Crystal) (Entered: 12/18/2017) |
| 12/18/2017 | 52 | TEXT ORDER granting # 51 Letter Request filed by Defs. Rensselaer County and Sikirica for an extension until 12/21/17 to file a reply to their Motion to Dismiss. SO ORDERED by Chief Judge Glenn T. Suddaby on 12/18/17. (lmw) (Entered: 12/18/2017) |
| 12/19/2017 | 53 | MEMORANDUM OF LAW re 47 Response in Opposition to Motion filed by City of Troy, Tim Colaneri, Ronald Fountain, Adam R. Mason. (Attachments: # 1 Certificate of Service)(Shanley, Donald) (Entered: 12/19/2017) |
| 12/21/2017 | 54 | REPLY to Response to Motion re 12 MOTION to Dismiss for Failure to State a Claim filed by Rensselaer County, Michael Sikirica. (Peck, Crystal) (Entered: 12/21/2017) |
| 12/27/2017 | 55 | Letter Motion from Donald J. Shanley for City of Troy requesting Permission to file Addendum to defendent's Reply Memorandum of Law submitted to Judge Suddaby . (Shanley, Donald) (Entered: 12/27/2017) |
| 12/28/2017 | 56 | TEXT ORDER granting in part and denying in part # 55 the City Defendants' letter-request. The City Defendants have TEN (10) DAYS from the date of this Text Order to file a reply memorandum of law, of no more than 15 pages in length, that replaces in its entirety the City Defendants' current 17-page reply memorandum of law, which violates the 10-page limit imposed by Local Rule 7.1(b)(1) without prior leave, and which contains an omitted page (page "8"). No further page-limit enlargements or deadline extensions will be granted. SO ORDERED by Chief Judge Glenn T. Suddaby on 12/28/17. (lmw) (Entered: 12/28/2017) |
| 01/05/2018 | 57 | NOTICE of Appearance by Michael E. Ginsberg on behalf of City of Troy, Tim Colaneri, Ronald Fountain, Adam R. Mason (Ginsberg, Michael) (Entered: 01/05/2018) |
| 01/05/2018 | 58 | LETTER BRIEF by City of Troy, Tim Colaneri, Ronald Fountain, Adam R. Mason. (Ginsberg, Michael) (Entered: 01/05/2018) |
| 01/05/2018 | 59 | MEMORANDUM OF LAW re 53 Memorandum of Law filed by City of Troy, Tim Colaneri, Ronald Fountain, Adam R. Mason. (Ginsberg, Michael) (Entered: 01/05/2018) |
| 01/05/2018 | 60 | CERTIFICATE OF SERVICE by City of Troy, Tim Colaneri, Ronald Fountain, Adam R. Mason re 59 Memorandum of Law (Ginsberg, Michael) (Entered: 01/05/2018) |
| 03/22/2018 | 61 | DECISION AND ORDER granting in part and denying in part # 12 County Defendant's Motion to Dismiss Plaintiff's Amended Complaint; granting # 29 County Defendants' motion to dismiss City Defendants' cross-claims and City Defendant's cross-claims are dismissed; and granting in part and denying in part # 40 City Defendants' Motion to Dismiss Plaintiff's Amended Complaint. The following claims |

survive: Plaintiff's malicious prosecution claim against all defendants; and Plaintiff's claim for conspiracy against all defendants to the extent it contemplates an agreement to maliciously prosecute Plaintiff. All of Plaintiff's remaining claims are dismissed. Defendants are directed to file an answer to Plaintiff's [31] R Amended Complaint within 14 days of the date of this Decision and Order pursuant to Fed.R.Civ.P. Rule 12(a)(4)(a), and this case is referred back to Magistrate Judge Stewart for the setting of pretrial scheduling deadlines. Signed by Chief Judge Glenn T. Suddaby on 3/22/18. (lmw) (Entered: 03/22/2018)

| 03/30/2018 | 62 | NOTICE OF APPEAL as to 61 Order on Motion to Dismiss,,,,,,,,,, Order on Motion to Dismiss for Failure to State a Claim,,,, by Tim Colaneri, Ronald Fountain, Adam R. Mason. Filing fee $ 505, receipt number ANYNDC-4339905. (Attachments: # 1 Certificate of Service)(Ginsberg, Michael) (Entered: 03/30/2018) |
|---|---|---|
| 03/30/2018 | 63 | ELECTRONIC NOTICE AND CERTIFICATION sent to US Court of Appeals re 62 Notice of Appeal. (khr) (Entered: 03/30/2018) |
| 04/02/2018 | 64 | TEXT ORDER: The Rule 16 Initial Conference in this matter is scheduled for May 9, 2018 at 10:00 AM before the undersigned. Counsel are directed to appear IN PERSON at the James T. Foley US Courthouse, 445 Broadway, 4th Floor, Room 409, Albany, NY on the scheduled date and time. Counsel are also directed to submit a proposed Civil Case Management Plan and exchange Mandatory Disclosures on or before May 2, 2018. Pursuant to Local Rule 26.2, Mandatory Disclosures are to be exchanged among the parties but are NOT to be filed with the Court. SO ORDERED by Magistrate Judge Daniel J. Stewart on 4/2/2018. (mab) (Entered: 04/02/2018) |
| 04/03/2018 | 65 | TEXT ORDER advising the parties that the Court retains, and will continue to exercise, jurisdiction over this action, despite the fact that Defendants filed a Notice of Appeal with the Second Circuit on 3/30/18, because that appeal is clearly defective in that the Order appealed from is not final and has not been certified as an interlocutory appeal. *See Leonhard v. U.S.*, 633 F.2d 599, 610 (2d Cir. 1980); *In re Chateaugay Corp.*, 922 F.2d 86, 91 (2d Cir. 1990); *U.S. v. Rodgers*, 101 F.3d 247, 252 (2d Cir. 1996); *Burger King Crop. v. Horn & Hardart Co*., 893 F.2d 525, 527 (2d Cir. 1990); *U.S. vs. Zedner*, 555 F.2d 68 (2d Cir. 2008). For these reasons, all deadlines established by Magistrate Judge Stewart at the Rule 16 Initial Conference scheduled for 5/9/18 shall remain in effect. SO ORDERED by Chief Judge Glenn T. Suddaby on 4/3/18. (lmw) (Entered: 04/03/2018) |
| 04/04/2018 | 66 | ANSWER to 39 Amended Complaint, , COUNTERCLAIM against Adrian Thomas by Adam R. Mason. (Attachments: # 1 Certificate of Service)(Shanley, Donald) (Entered: 04/04/2018) |
| 04/04/2018 | 67 | ANSWER to 39 Amended Complaint, , COUNTERCLAIM against Adrian Thomas by Ronald Fountain. (Attachments: # 1 Certificate of Service)(Shanley, Donald) (Entered: 04/04/2018) |
| 04/04/2018 | 68 | ANSWER to 39 Amended Complaint, , COUNTERCLAIM against Adrian Thomas by Tim Colaneri. (Attachments: # 1 Certificate of Service)(Shanley, Donald) (Entered: 04/04/2018) |
| 04/05/2018 | 69 | ANSWER to 31 R Amended Complaint *with*, COUNTERCLAIM against Adrian Thomas by Michael Sikirica. (Attachments: # 1 Affidavit - Certificate of Service) (Peck, Crystal) (Entered: 04/05/2018) |
| 04/25/2018 | 70 R | ANSWER to 69 Answer to Amended Complaint, Counterclaim by Adrian Thomas. (Klein, Brett) (Entered: 04/25/2018) |

Case 23-753, Document 61, 04/17/2024, 3604836, Page18 of 1023

# APPENDIX

**16**

| | | |
|---|---|---|
| 04/25/2018 | 71 R | ANSWER to 67 Answer to Amended Complaint, Counterclaim, 68 Answer to Amended Complaint, Counterclaim, 66 Answer to Amended Complaint, Counterclaim by Adrian Thomas.(Klein, Brett) Modified on 4/26/2018 to remove duplicative text(jlb). (Entered: 04/25/2018) |
| 05/02/2018 | 72 R | *Consent* Letter Motion from Brett H. Klein for Adrian Thomas requesting Adjournment of Rule 16 Initial Conference submitted to Judge Daniel J. Stewart . (Klein, Brett) (Entered: 05/02/2018) |
| 05/03/2018 | 73 | TEXT ORDER: On May 2, 2018, Plaintiff filed a Letter Request, with the consent of Defendants, seeking an adjournment of the Rule 16 Initial Conference in this matter. Dkt. No. 72 R . Based upon the reasons set forth in Plaintiff's submission, the request is GRANTED and the Rule 16 Initial Conference is RESCHEDULED for May 24, 2018 at 10:00 AM before the undersigned. Counsel are directed to appear IN PERSON at the James T. Foley US Courthouse, 445 Broadway, 4th Floor, Room 409, Albany, NY on the scheduled date and time. Counsel are also directed to submit a proposed Civil Case Management Plan and exchange Mandatory Disclosures on or before May 17, 2018. Pursuant to Local Rule 26.2, Mandatory Disclosures are to be exchanged among the parties but are NOT to be filed with the Court. SO ORDERED by Magistrate Judge Daniel J. Stewart on 5/3/2018. (mab) (Entered: 05/03/2018) |
| 05/17/2018 | 74 | CIVIL CASE MANAGEMENT PLAN by Michael Sikirica. (Peck, Crystal) (Entered: 05/17/2018) |
| 05/24/2018 | | Text Minute Entry for proceedings held before Magistrate Judge Daniel J. Stewart: Rule 16 Initial Pretrial Conference held on 5/24/2018. Appearances: Brett Klein, Esq. for Plaintiff; Richard Burger, Esq. and Crystal Peck, Esq. for Defendants. The Court hears from counsel as to their positions and how they intend to proceed in this matter. Mandatory Disclosures have been exchanged. The Court discusses the Mandatory Mediation Program with counsel. Scheduling Order deadlines set. The Court advises that it will not likely extend deadlines in this matter given the amount of time already given to complete discovery. Counsel address the issue of personnel files. The Court directs that the entire personnel file for each individual Defendant be bates stamped and provided to the Court for an in camera review. Counsel also discuss the possibility of needing to obtain Grand Jury Minutes and other sealed documents from the State Court. Court directs that in order to keep this case moving accordingly, the requests for such documents shall be made to this Court. A Uniform Pretrial Order will be issued. (TIME: 9:58AM-10:24AM). (mab) (Entered: 05/24/2018) |
| 05/24/2018 | 75 | UNIFORM PRETRIAL SCHEDULING ORDER: Anticipated length of trial: 5-10 Days. Preferred Trial Location: Albany, NY. Joinder of Parties due by 7/24/2018. Amended Pleadings due by 7/24/2018. The Court has discussed Mandatory Mediation with the parties and will issue a separate Order referring this action into the Mandatory Mediation Program. The deadline to complete Mandatory Mediation is 12/15/2018. Discovery due by 3/25/2019. Motions to be filed by 5/6/2019. Status Report due by 8/30/2018. Signed by Magistrate Judge Daniel J. Stewart on 5/24/2018. (mab) (Entered: 05/24/2018) |
| 05/24/2018 | 76 | ORDER REFERRING CASE TO MANDATORY MEDIATION PROGRAM: This case is referred to participation in the Mandatory Mediation Program. The parties should refer to General Order #47. The deadline for completion of Mandatory Mediation is 12/15/2018. The deadline for the parties to select a Mediator is 6/21/2018. Signed by Magistrate Judge Daniel J. Stewart on 5/24/2018. (mab) (Entered: 05/24/2018) |

| 05/24/2018 | 77 | ORDER TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT OBTAIN SEPARATE COUNSEL as to Defendants Adam R. Mason, Ronald Fountain and Tim Colaneri. Signed by Magistrate Judge Daniel J. Stewart on 5/24/2018. (mab) (Entered: 05/24/2018) |
|---|---|---|
| 05/24/2018 | | Set Deadline: Response to 77 Order to Show Cause is due by 7/23/2018. (mab) (Entered: 05/24/2018) |
| 06/06/2018 | 78 | MANDATE of USCA issued on 6/6/2018 as to 62 Notice of Appeal, filed by Tim Colaneri, Adam R. Mason, Ronald Fountain. A notice of appeal was filed on March 30, 2018. Appellant's Form C and D were due April 13, 2018. The case is deemed in default. IT IS HEREBY ORDERED that the appeal will be dismissed effective April 30, 2018 if the forms are not filed by that date. (khr) (Entered: 06/06/2018) |
| 06/07/2018 | 79 | LETTER BRIEF *Withdrawing Appeal* by Tim Colaneri, Ronald Fountain, Adam R. Mason. (Shanley, Donald) (Entered: 06/07/2018) |
| 06/08/2018 | 80 | RESPONSE TO ORDER TO SHOW CAUSE filed by Tim Colaneri, Ronald Fountain, Adam R. Mason. (Attachments: # 1 Exhibit(s) A, # 2 Exhibit(s) B, # 3 Certificate of Service)(Shanley, Donald) Modified on 6/11/2018 to seal Defendants' Affidavits in response to the Court's Order to Show Cause. (mab) (Entered: 06/08/2018) |
| 06/08/2018 | 81 | LETTER BRIEF by Tim Colaneri, Ronald Fountain, Adam R. Mason. (Shanley, Donald) (Entered: 06/08/2018) |
| 06/08/2018 | 82 | MOTION to Unseal and for Disclosure of State Court Documents and Records. Motion Hearing set for 7/5/2018 09:30 AM in Albany before Magistrate Judge Daniel J. Stewart Response to Motion due by 6/18/2018 filed by Tim Colaneri, Ronald Fountain, Adam R. Mason. (Attachments: # 1 Exhibit(s) A, # 2 Certificate of Service) Motions referred to Daniel J. Stewart. (Shanley, Donald) Modified on 6/11/2018 (mab). (Entered: 06/08/2018) |
| 06/11/2018 | | TEXT NOTICE re Defendants' 82 MOTION to Unseal and for Disclosure of State Court Documents and Records. A response to the motion is due by 6/18/2018. The motion is returnable before Magistrate Judge Daniel J. Stewart and will be on SUBMIT only. No oral argument will be heard unless otherwise directed by the Court. (mab) (Entered: 06/11/2018) |
| 06/18/2018 | 83 | RESPONSE to Motion re 82 MOTION for Disclosure filed by Adrian Thomas. (Klein, Brett) (Entered: 06/18/2018) |
| 06/19/2018 | 84 | RESPONSE to Motion re 82 MOTION for Disclosure filed by Michael Sikirica. (Peck, Crystal) (Entered: 06/19/2018) |
| 06/25/2018 | 85 | LETTER BRIEF by Tim Colaneri, Ronald Fountain, Adam R. Mason. (Shanley, Donald) (Entered: 06/25/2018) |
| 06/25/2018 | 86 | ORDER: ORDERED that the application to unseal the criminal files in the matter of People v. Adrian Thomas 82 is DENIED. If he has not done so already, Plaintiff is directed to provide a designation under CPL § 160.50(1)(d) to defense counsel so as to allow them to obtain the necessary records. Signed by Magistrate Judge Daniel J. Stewart on 6/25/2018. (jlb) (Entered: 06/26/2018) |
| 06/28/2018 | 87 | Letter Motion from Crystal R. Peck for Michael Sikirica requesting extension to select mediator submitted to Judge Stewart . (Peck, Crystal) (Entered: 06/28/2018) |
| 06/28/2018 | 88 R | LETTER BRIEF by Tim Colaneri, Ronald Fountain, Adam R. Mason. (Shanley, Donald) (Entered: 06/28/2018) |

| 06/29/2018 | 89 | TEXT ORDER: On June 28, 2018, the Defendant, Dr. Michael Sikirica, filed a Letter Request, with the consent of all parties, seeking am extension of time to select a Mediator in this matter. Dkt. No. 87 . Based upon the reasons set forth in Defendant's submission, the request is GRANTED and the parties shall file a Stipulation Selecting a Mediator on or before July 13, 2018. SO ORDERED by Magistrate Judge Daniel J. Stewart on 6/29/2018. (mab) (Entered: 06/29/2018) |
|---|---|---|
| 06/29/2018 | | TEXT NOTICE: As previously directed, Magistrate Judge Stewart's Chambers has received personnel files from Defendants Tim Colaneri, Adam Mason and Ronald Fountain for an *in camera* review. (mab) (Entered: 06/29/2018) |
| 07/16/2018 | 90 | TEXT ORDER Regarding Selection of the Mediator: The Extended deadline for the parties to file the Stipulation Selecting a Mediator expired on July 13, 2018 after a 3-week extension of the original selection deadline. The Court hereby extends the deadline to file their selection to July 18, 2018. If a stipulation selecting a mediator is not filed by Wednesday, July 18, 2018, the Court shall select a Mediator pursuant to General Order 47, Section 5.4(C)(2), from the Courts Mediator listing and shall issue a text notice notifying the parties of the Mediators identity. The parties are again put on notice that these are court ordered deadlines and any request for an extension of a deadline in an action must be filed well in advance of its expiration. Any questions regarding selection of a mediator should be directed to: Judi L. McNicholas, ADR Administrator, at 315-234-8573. So Ordered by Magistrate Judge Daniel J. Stewart on 7/16/18. (jlm) (Entered: 07/16/2018) |
| 07/18/2018 | 91 | STIPULATION SELECTING MEDIATOR: IT IS HEREBY STIPULATED AND AGREED that David R. Homer has been selected, contacted and has agreed to serve as Mediator for this action. IT IS FURTHER STIPULATED AND AGREED, that counsel will participate in the mediation session in good faith and confer with the Mediator regarding the scheduling of additional conferences, bearing in mind the deadline for completion of Mediation set forth in the Court's Order Referring the Case to Mediation. Stipulation signed by: Brett Klein, Crystal Peck and Michael Ginsberg. Dated: July 17, 2018(Peck, Crystal) (Entered: 07/18/2018) |
| 08/30/2018 | 92 **R** | STATUS REPORT by Tim Colaneri, Ronald Fountain, Adam R. Mason. (Ginsberg, Michael) (Entered: 08/30/2018) |
| 08/30/2018 | 93 **R** | STATUS REPORT by Michael Sikirica. (Peck, Crystal) (Entered: 08/30/2018) |
| 08/31/2018 | 94 | ORDER: As part of the Court's previous directive, see Text Minute Entry dated May 24, 2018, Counsel for Defendants were instructed to provide to Chambers the personnel files for each of the Defendants. The personnel files of Defendants Mason, Fountain and Colaneri were submitted to the Court on June 28, 2018. The in camera review of those personnel files is now complete and did not reveal any relevant information. The Court therefore directs that the Counsel for the City of Troy Defendants immediately retrieve from the Court's Courtroom Deputy, Maria Blunt, the three personnel files referenced above. IT IS SO ORDERED. Signed by Magistrate Judge Daniel J. Stewart on 8/31/2018. (jlb) (Entered: 09/04/2018) |
| 09/06/2018 | 95 | TEXT ORDER: The Court is in receipt of the Status Reports filed on August 30, 2018 in this matter. Dkt. Nos. 92 **R** and 93 **R** . Counsel are directed to file a further Status Report by November 30, 2018. SO ORDERED by Magistrate Judge Daniel J. Stewart on 9/6/2018. (mab) (Entered: 09/06/2018) |
| 09/26/2018 | 96 **R** | Letter Motion from Crystal R Peck for Michael Sikirica requesting removal of matter from mediation program submitted to Judge Stewart . (Peck, Crystal) (Entered: 09/26/2018) |

Case 23-753, Document 61-4, 11/17/2024, 3604836, Page21 of 1023

| 09/28/2018 | 97 | TEXT ORDER: On September 26, 2018, Defendant, Dr. Sikirica, filed a Letter Request seeking to be excused from the Court's Mandatory Mediation Program. Dkt. No. 96 R . Based upon the reasons set forth in Defendant's submission, the request is GRANTED and this matter is excused from participating the Mandatory Mediation Program. SO ORDERED by Magistrate Judge Daniel J. Stewart on 9/28/2018. (mab) (Entered: 09/28/2018) |
| --- | --- | --- |
| 12/06/2018 | 98 R | LETTER BRIEF by Tim Colaneri, Ronald Fountain, Adam R. Mason. (Attachments: # 1 R Letter to all counsel)(Ginsberg, Michael) (Entered: 12/06/2018) |
| 03/25/2019 | 99 | Joint MOTION for Extension of Time to Complete Discovery filed by Adrian Thomas. Motions referred to Daniel J. Stewart. (Klein, Brett) (Entered: 03/25/2019) |
| 03/27/2019 | 100 | TEXT ORDER: On March 25, 2019, the parties filed a Joint Letter Request seeking an extension of the deadlines in this matter. Dkt. No. 99 . The Court is taking this request under advisement and directs counsel to participate in a Telephone Conference on April 2, 2019 at 11:00 AM before the undersigned. The Court will issue a separate notice setting forth the instructions to connect to the conference call. SO ORDERED by Magistrate Judge Daniel J. Stewart on 3/27/2019. (mab) (Entered: 03/27/2019) |
| 03/31/2019 | 101 | *Consent* Letter Motion from Brett H. Klein for Adrian Thomas requesting Adjournment of Status Conference Scheduled for April 2, 2019 at 11 a.m. submitted to Judge Daniel J. Stewart . (Klein, Brett) (Entered: 03/31/2019) |
| 04/01/2019 | 102 | Letter Motion from Crystal R. Peck for Michael Sikirica requesting discussion of disclosure of CPS records at conference submitted to Judge Stewart . (Peck, Crystal) (Entered: 04/01/2019) |
| 04/01/2019 | 103 | TEXT ORDER: On March 31, 2019, Plaintiff filed a Letter Request, with the consent of all parties, seeking an adjournment of the Discovery Telephone Conference in this matter. Dkt. No. 101 . Based upon the reasons set forth in Plaintiff's submission and upon the consent of the parties, the Discovery Telephone Conference is RESCHEDULED for April 12, 2019 at 11:00 AM before the undersigned. During that conference, the Court will address the issues raised by Defendant Sikirica's submission, Dkt. No. 102 , filed on April 1, 2019. SO ORDERED by Magistrate Judge Daniel J. Stewart on 4/1/2019. (mab) (Entered: 04/01/2019) |
| 04/05/2019 | 104 R | LETTER BRIEF by Tim Colaneri, Ronald Fountain, Adam R. Mason. (Attachments: # 1 R Subpoena)(Shanley, Donald) (Entered: 04/05/2019) |
| 04/12/2019 | | Text Minute Entry for proceedings held before Magistrate Judge Daniel J. Stewart: Discovery Telephone Conference held on 4/12/2019. Appearances: Brett Klein, Esq. for Plaintiff; Donald Shanley, Esq. and Crystal Peck, Esq. for Defendants. The Court held a conference to address the parties' request to extend the deadlines in this matter and to address outstanding discovery issues. After hearing from all counsel on the record, the Court grants a brief extension of the deadlines. Discovery due by 9/25/2019. Motions to be filed by 10/25/2019. The Court will sign the Subpoena to the Renss County DA's Office requested by Atty Shanley. CPS records to be provided to Chambers for an in camera review. The Court will issue an Order. (TIME: 11:01AM-11:38AM). (Court Reporter: Lisa Tennyson) (mab) (Entered: 04/15/2019) |
| 04/16/2019 | 105 | Letter Motion from Crystal R. Peck for Michael Sikirica requesting execution of subpoena submitted to Judge Stewart . (Attachments: # 1 Subpoena)(Peck, Crystal) (Entered: 04/16/2019) |
| 04/24/2019 | 106 | TEXT ORDER: The Court held a Telephone Conference on April 12, 2019 to address the parties' request for an extension of the deadlines in this matter and to discuss outstanding discovery issues. After hearing from all counsel, the Court grants a brief |

Case 23-753, Document 61-91, 11/13/2024, 3604836, Page22 of 1023

| | | |
|---|---|---|
| | | extension of the deadlines. Discovery is to be completed by September 25, 2019. Dispositive motions are to be filed by October 25, 2019. Defendants' request for a Subpoena to the Rensselaer County District Attorney's Office and to the New York State Office of Children and Family Services are granted and Judicial Subpoenas will be issued. SO ORDERED by Magistrate Judge Daniel J. Stewart on 4/24/2019. (mab) (Entered: 04/24/2019) |
| 04/24/2019 | 107 **R** | JUDICIAL SUBPOENA Issued to the Rensselaer County District Attorney. Signed by Magistrate Judge Daniel J. Stewart on 4/24/2019. (mab) (Entered: 04/24/2019) |
| 04/24/2019 | 108 | JUDICIAL SUBPEONA Issued to the New York State Office of Children and Family Services. Signed by Magistrate Judge Daniel J. Stewart on 4/24/2019. (mab) (Entered: 04/24/2019) |
| 05/01/2019 | 109 **R** | LETTER BRIEF by Tim Colaneri, Ronald Fountain, Adam R. Mason. (Shanley, Donald) (Entered: 05/01/2019) |
| 06/21/2019 | 110 | STIPULATION *Consent and reference of a civil action to a Magistrate Judge* by Michael Sikirica submitted to Judge Suddaby. (Peck, Crystal) (Entered: 06/21/2019) |
| 06/24/2019 | 111 | CONSENT to Jurisdiction by US Magistrate Judge. Case reassigned to Magistrate Judge Daniel J. Stewart for all further proceedings. Chief Judge Glenn T. Suddaby no longer assigned to this case. Signed by Chief Judge Glenn T. Suddaby on 06/24/2019. (lmw) (Entered: 06/24/2019) |
| 07/12/2019 | 112 | Joint MOTION for Extension of Time to Complete Discovery filed by Adrian Thomas. (Klein, Brett) (Entered: 07/12/2019) |
| 07/25/2019 | 113 | NOTICE of Appearance by Joseph T. Perkins on behalf of Tim Colaneri, Ronald Fountain, Adam R. Mason (Perkins, Joseph) (Entered: 07/25/2019) |
| 07/26/2019 | 114 | TEXT ORDER: On July 12, 2019, Plaintiff filed a Joint Motion for an extension of the deadlines in this matter. Dkt. No. 112 . The Court is taking this request under advisement and directs counsel to appear for a Telephone Status Conference on July 30, 2019 at 11:00 AM before the undersigned to address this request and all other pending discovery issues. A separate notice setting forth the instructions to connect to the conference call will be issued. Counsel for the Rensselaer County Defendants is directed to advise the Rensselaer County Attorney, Carl Kempf, that his appearance is requested at such conference and to provide him with the instructions to connect to the conference call. SO ORDERED by Magistrate Judge Daniel J. Stewart on 7/26/2019. (mab) (Entered: 07/26/2019) |
| 07/29/2019 | 115 | *Consent* Letter Motion from Brett H. Klein for Adrian Thomas requesting an Adjournment of the July 30, 2019 Telephone Conference . (Klein, Brett) (Entered: 07/29/2019) |
| 07/29/2019 | 116 | TEXT ORDER granting Plaintiff's 115 Letter Request seeking to reschedule the Status Telephone Conference in this matter. The Status Telephone Conference is RESCHEDULED for August 9, 2019 at 10:00 AM. Counsel are directed to use the instructions to connect to the conference call previously issued by the Court on July 26, 2019. SO ORDERED by Magistrate Judge Daniel J. Stewart on 7/29/2019. (mab) (Entered: 07/29/2019) |
| 08/09/2019 | 117 | TEXT ORDER. On August 8, 2019, a telephone conference was held with counsel and the Court to discuss outstanding discovery issues and deadlines. With regard to the CPS documents in question, and for the reasons set forth during the conference, the Court grants the parties request for production of those records, but because of their sensitive nature, the Court requires that the records only be provided pursuant to a duly |

Case 23-753, Document 61-1, 11/17/2023, 3604836, Page23 of 1023

executed protective order, and that any subsequent filing of the CPS records in connection with a motion be done, at least preliminarily, under seal. As to the District Attorney's records that had previously been provided for an *in camera* review, that review is now completed and the Court upholds the objections of the District Attorney's Office as set forth in the privilege log. In particular, the Court concludes that the notations and markings on the records represent attorney work product, and are therefore privileged and need not be disclosed. Further, the markings in question are not proportionally relevant to the needs of the case. Plaintiff's request to file a letter-motion for reconsideration of the District Courts ruling regarding the claim for deprivation of a fair trial in light of the recent Supreme Court decision in *McDonough v. Smith*, is granted. That letter-motion shall be filed by September 6, and Defendants response shall be due on or before September 13. Finally, the discovery deadlines in this case are extended one final time. The deadline for completion of fact discovery, and for Plaintiff's expert disclosures, is now set for December 31, 2019. Defendants' expert disclosure shall occur by February 14, 2020. The close of expert discovery, including expert depositions, shall be February 28, 2020. The deadline to submit dispositive motions is now set for March 6, 2020. SO ORDERED. Signed by Magistrate Judge Daniel J. Stewart on 8/9/2019. (Stewart, Daniel) (Entered: 08/09/2019)

| | | |
|---|---|---|
| 08/09/2019 | | Text Minute Entry for proceedings held before Magistrate Judge Daniel J. Stewart: Telephone Status Conference held on 8/9/2019,. Appearances: Brett Klein, Esq. for Plaintiff; Joseph Perkins, Esq. and Crystal Peck, Esq. for Defendants; Carl Kempf, Esq., Renss. County Attorney. The Court held a conference to address the status of this matter and the parties' request to extend deadlines. The Court first addresses the CPS documents in question. After hearing from counsel, the Courts grants the production of those documents, but requires that they be subject to a protective order. As to the District Attorney' records, the Court has reviewed the documents in camera and upholds the objections set forth in the privilege log. Plaintiff requests to brief the issue of reconsideration of the previous ruling on the deprivation of a fair trial claim. Plaintiff shall file his Letter Brief by 9/6/2019. Defendants to file a responsive Letter Brief by 9/13/2019. Fact discovery and Plaintiff's expert disclosure is extended to 12/31/2019. Defendants' expert disclosures due 2/14/2020. All expert discovery to be completed by 2/28/2020. Dispositive motions to be filed by 3/6/2020. (TIME: 10:03AM-10:38AM). (Court Reporter: Jacqueline Stroffolino). (mab) (Entered: 08/09/2019) |
| 08/28/2019 | [118](#) | Letter Motion from Crystal R. Peck for Michael Sikirica requesting an Order limiting duration of depositions or, in the alternative, a teleconference to discuss same submitted to Judge Stewart . (Peck, Crystal) (Entered: 08/28/2019) |
| 08/30/2019 | 119 | TEXT ORDER: On August 28, 2019, Defendants filed a Letter Request seeking an Order limiting the duration of depositions in this matter or, in the alternative, a conference address this issue. Dkt. No. [118](#) . The Court is taking the request for an Order limiting the duration of depositions under advisement, however, the request for a conference is GRANTED. Counsel are directed to participate in a Discovery Telephone Conference to address this issue on September 4, 2019 at 10:00 AM. The Court will issue a separate notice setting forth the instructions to connect to the conference call. SO ORDERED by Magistrate Judge Daniel J. Stewart on 8/30/2019. (mab) (Entered: 08/30/2019) |
| 09/04/2019 | 120 | TEXT ORDER. The Defendants, by Letter-Request, seek to limit the upcoming deposition of a party defendant to seven hours. Dkt. No. 118. Plaintiff's counsel objects to the request, and notes that while it is his intent to complete the deposition within the time period set forth by Fed R. Civ. Proc. 30, it is possible due to unforeseen circumstances that additional time may be necessary. The Court is confident that the |

| | | |
|---|---|---|
| | | parties will be able to resolve this matter by agreement amongst themselves. In the event that a dispute continues, the Court directs the parties to initiate a telephone conference with the Court and, once the necessary factors have been presented in a concrete fashion, a decision will be made. Signed by Magistrate Judge Daniel J. Stewart on 9/4/2018. (Stewart, Daniel) (Entered: 09/04/2019) |
| 09/04/2019 | | Text Minute Entry for proceedings held before Magistrate Judge Daniel J. Stewart: Discovery Telephone Conference held on 9/4/2019. Appearances: Brett Klein, Esq. for Plaintiff; Joseph Perkins, Esq. and Crystal Peck, Esq. for Defendants. The Court held a conference to address a dispute that has arisen with regard to the length of time of depositions in this matter. After hearing from counsel, the Court will not impose a time limit, however, counsel are encouraged to stay within the time frame in accordance with the Federal Rules. Counsel are also encouraged to go forward with the scheduled depositions and if there is a continued dispute, the Court may be reached by telephone during the deposition to issue a ruling at that time. (TIME: 10:03AM-10:11AM). (mab) (Entered: 09/05/2019) |
| 09/06/2019 | 121 | MOTION for Reconsideration re 61 Order on Motion to Dismiss,,,,,,,,,, Order on Motion to Dismiss for Failure to State a Claim,,,, filed by Adrian Thomas. (Klein, Brett) (Entered: 09/06/2019) |
| 09/13/2019 | 122 | RESPONSE in Opposition re 121 MOTION for Reconsideration re 61 Order on Motion to Dismiss,,,,,,,,,, Order on Motion to Dismiss for Failure to State a Claim,,,, filed by Michael Sikirica. (Peck, Crystal) (Entered: 09/13/2019) |
| 09/13/2019 | 123 | RESPONSE in Opposition re # 121 MOTION for Reconsideration re # 61 Order on Motion to Dismiss filed by Tim Colaneri, Ronald Fountain, Adam R. Mason (Perkins, Joseph) Modified on 9/16/2019 to link to the correct document # 121 Motion for Reconsideration. (pjh) (Entered: 09/13/2019) |
| 11/18/2019 | 124 R | DECISION AND ORDER: It is hereby ORDERED that Plaintiff's # 121 Motion for Reconsideration is GRANTED. Signed by Magistrate Judge Daniel J. Stewart on 11/18/2019. (pjh) (Entered: 11/18/2019) |
| 12/23/2019 | 125 | Letter Motion from Brett H. Klein for Adrian Thomas requesting Extension of Time to Complete Discovery submitted to Judge Daniel J. Stewart . (Klein, Brett) (Entered: 12/23/2019) |
| 01/02/2020 | 126 | TEXT ORDER: On December 23, 2019, Plaintiff filed a Letter Request, with the consent of all parties, seeking an extension of the deadlines in this matter. Dkt. No. 125 . Based upon the reasons set forth in Plaintiff's submission and upon the consent of the parties, the request is GRANTED and the deadlines are amended as follows: 1) Fact discovery to be completed by February 28, 2020; 2) Plaintiff's to serve expert disclosures by April 3, 2020; 3) Defendants to serve expert disclosures by May 18, 2020; 4) Expert discovery to be completed by June 1, 2020; and 5) Dispositive motions to be filed by June 8, 2020. SO ORDERED by Magistrate Judge Daniel J. Stewart on 1/2/2020. (mab) (Entered: 01/02/2020) |
| 02/05/2020 | 127 | NOTICE of Appearance by Rhiannon Ineva Spencer on behalf of Tim Colaneri, Ronald Fountain, Adam R. Mason (Spencer, Rhiannon) (Entered: 02/05/2020) |
| 02/21/2020 | 128 | Letter Motion from Joint Request for Tim Colaneri requesting Extension of Case Management Plan submitted to Judge Stewart . (Spencer, Rhiannon) (Entered: 02/21/2020) |
| 02/28/2020 | 129 | TEXT ORDER: On February 21, 2020, the City of Troy Defendants filed a Letter Request, with the consent of all parties, seeking an extension of the deadlines in this matter. Dkt. No. 128 . Based upon the reasons set forth in Defendants' submission and |

# APPENDIX

**23**

| | | |
|---|---|---|
| | | upon the consent of the parties, the request is GRANTED and the Scheduling Order is amended as follows: 1) Fact Discovery is extended to April 28, 2020 solely for the purpose of completing the depositions of two fact witnesses; 2) Plaintiff's expert disclosures due by May 18, 2020; 3) Defendants' expert disclosures due June 19, 2020; 4) All expert discovery to be completed by July 10, 2020; and 5) Dispositive motions to be filed by July 17, 2020. SO ORDERED by Magistrate Judge Daniel J. Stewart on 2/28/2020. (mab) (Entered: 02/28/2020) |
| 03/30/2020 | 130 | *Consent* Letter Motion from Brett H. Klein for Adrian Thomas requesting a Stay of the Proceedings Due to the Public Health Crisis submitted to Judge Stewart . (Klein, Brett) (Entered: 03/30/2020) |
| 04/17/2020 | 131 | TEXT ORDER: On March 30, 2020, Plaintiff filed a Letter Request, with the consent of all parties, seeking a stay of this matter in light of the public peath crisis. Dkt. No. 130 . The Court is taking this request under advisement and directs counsel to appear for a Status Telephone Conference on April 22, 2020 at 10:00 AM before the undersigned. The Court will issue a separate notice setting forth the instructions to connect to the conference call. SO ORDERED by Magistrate Judge Daniel J. Stewart on 4/17/2020. (mab) (Entered: 04/17/2020) |
| 04/22/2020 | 132 | TEXT ORDER granting in part and denying in part 130 Letter Request. Counsel for all the parties have made a joint request to stay all discovery in light of the COVID-19 pandemic. While the Court recognizes the difficulties created by the present circumstances in actively litigating civil actions in the Northern District of New York, the Court finds that the complete stay of all discovery is unwarranted. As an alternative, the Court hereby stays all discovery and motion deadlines, and directs counsel to appear at a conference be held on August 7, 2020, during which new deadlines will be set. The parties are directed to continue with discovery as best they can, including scheduling and completing video depositions. SO ORDERED. Signed by Magistrate Judge Daniel J. Stewart on 4/22/2020. (Stewart, Daniel) (Entered: 04/22/2020) |
| 04/22/2020 | | Text Minute Entry for proceedings held before Magistrate Judge Daniel J. Stewart: Status Telephone Conference held on 4/22/2020. Appearances: Brett Klein, Esq. for Plaintiff; Rhiannon Spencer, Esq. and Crystal Peck, Esq. for Defendants. The Court held a conference to address the parties' request to either stay this matter or extend the deadlines in light of the COVID-19 pandemic. After hearing from counsel as to the status of discovery, the Court does not believe that a stay is warranted at this time. However, given the current circumstances, the Court will stay the deadlines and schedule a further telephone conference for 8/7/2020. Counsel are directed to proceed with completing discovery and expert disclosures as best as possible. On August 7th, the Court will hear from counsel as to the progress made during this time period and discuss new deadlines. (TIME: 10:04AM-10:31AM). (Court Reporter: Theresa Casal). (mab) (Entered: 04/22/2020) |
| 08/07/2020 | | Text Minute Entry for proceedings held before Magistrate Judge Daniel J. Stewart: Telephone Status Conference held on 8/7/2020. Appearances: Brett Klein, Esq. for Plaintiff; Crystal Peck, Esq. and Rhiannon Spencer, Esq. for Defendants. The Court held a conference to address the status of this matter. Counsel advised that depositions have been conducted and the final depositions are scheduled for September 2020. After hearing from both counsel, the Court will extend deadlines for a final time. Fact discovery is closed. Plaintiff's Expert Disclosure Deadline is 10/14/2020. Defendants' Expert Disclosure Deadline is 11/30/2020. Rebuttal Expert Disclosure and deadline to complete expert depositions is 12/31/2020. Dispositive motions to be filed by 1/29/2021. (TIME: 10:03AM-10:24AM). (Court Reporter: Lisa Tennyson). (mab) (Entered: 08/10/2020) |

| | | |
|---|---|---|
| 10/01/2020 | 133 | *Consent* Letter Motion from Brett H. Klein for Adrian Thomas requesting an enlargement of the scheduling order submitted to Judge Daniel J. Stewart . (Klein, Brett) (Entered: 10/01/2020) |
| 10/05/2020 | 134 | TEXT ORDER granting the parties' 133 Letter Request seeking an extension of the deadlines in this matter. Plaintiff is to serve expert disclosures by November 16, 2020. Defendants are to serve expert disclosures by December 30, 2020. All expert discovery to be completed by January 29, 2021. Any dispositive motions are to be filed by February 16, 2021. SO ORDERED by Magistrate Judge Daniel J. Stewart on 10/2/2020. (mab) (Entered: 10/05/2020) |
| 12/28/2020 | 135 | Letter Motion from Crystal R. Peck for Michael Sikirica requesting extension of expert disclosure deadline submitted to Judge Stewart . (Peck, Crystal) (Entered: 12/28/2020) |
| 12/29/2020 | 136 | TEXT ORDER granting the parties' 135 Letter Request seeking an extension of the deadlines in this matter. Defendants are to serve expert disclosures by January 29, 2021. All expert discovery to be completed by March 1, 2021. Any dispositive motions are to be filed by March 31, 2021. SO ORDERED by Magistrate Judge Daniel J. Stewart on 12/29/2020. (mab) (Entered: 12/29/2020) |
| 03/01/2021 | 137 | *Consent* Letter Motion from Brett H. Klein for Adrian Thomas requesting An Enlargement of the Scheduling Order submitted to Judge Daniel J. Stewart . (Klein, Brett) (Entered: 03/01/2021) |
| 03/02/2021 | 138 | TEXT ORDER: On March 1, 2021, the parties filed a Letter Request seeking an extension of the deadlines in this matter. Dkt. No. 137 . The Court is taking this request under advisement and directs counsel to appear for a Discovery Telephone Conference on March 12, 2021 at 10:00 AM before the undersigned. The Court will issue a separate notice setting forth the instructions to connect to the conference call. SO ORDERED by Magistrate Judge Daniel J. Stewart on 3/2/2021. (mab) (Entered: 03/02/2021) |
| 03/12/2021 | | Text Minute Entry for proceedings held before Magistrate Judge Daniel J. Stewart: Discovery Telephone Conference held on 3/12/2021. Appearances: Brett Klein, Esq. for Plaintiff; Crystal Peck, Esq. and Rhiannon Spencer, Esq. for Defendants. The Court held a conference to address the parties' request for an extension of the deadlines in this matter. Counsel advise as to the status of discovery and expert disclosures. Atty Klein advised that his forensic neuropathology expert has passed away and the extension is requested so that he may find a replacement expert. After hearing from counsel, the Court will extend the deadline for discovery to 5/24/2021 for the sole purpose of Plaintiff hiring a replacement expert and serving a supplemental report. Fact discovery is closed. Dispositive motions to be filed by 6/7/2021. (TIME: 10:03AM-10:32AM). (Court Reporter: Jacqueline Stroffolino) (mab) (Entered: 03/17/2021) |
| 03/17/2021 | 139 | TEXT ORDER: On March 12, 2021, the Court held a conference to address the parties' request to the extend the deadlines in this matter. Dkt. No. 137 . Based upon the discussions held on the record, the request is granted. The deadline to complete discovery is extended to May 24, 2021 for the sole purpose of Plaintiff retaining a replacement forensic neuropathology expert, serving a supplemental expert report and completing expert discovery in this matter. Any dispositive motion shall be filed by June 7, 2021. SO ORDERED by Magistrate Judge Daniel J. Stewart on 3/17/2021. (mab) (Entered: 03/17/2021) |
| 06/02/2021 | 140 | Letter Motion from Crystal R. Peck for Michael Sikirica requesting brief extension for Defendants to file summary judgment motions submitted to Judge Stewart . (Peck, Crystal) (Entered: 06/02/2021) |

| 06/04/2021 | 141 | TEXT ORDER granting Defendants' [140] Letter Request seeking a one week extension of the deadline to file dispositive motions in this matter. Any dispositive motion shall be filed on or before June 14, 2021. SO ORDERED by Magistrate Judge Daniel J. Stewart on 6/4/2021. (mab) (Entered: 06/04/2021) |
|---|---|---|
| 06/14/2021 | [142] | MOTION for Summary Judgment filed by Tim Colaneri(Individually), Ronald Fountain, Adam R. Mason(Individually). Motion returnable before Judge Stewart. Response to Motion due by 7/6/2021. Reply to Response to Motion due by 7/12/2021 (Attachments: # [1] Affidavit, # [2] Affidavit, # [3] Exhibit(s), # [4] Exhibit(s), # [5] Exhibit(s), # [6] Exhibit(s), # [7] Affidavit, # [8] Exhibit(s), # [9] Exhibit(s), # [10] Exhibit(s), # [11] Exhibit(s), # [12] Exhibit(s), # [13] Exhibit(s), # [14] Exhibit(s), # [15] Exhibit(s), # [16] Memorandum of Law, # [17] Affidavit, # [18] Exhibit(s), # [19] Exhibit(s), # [20] Affirmation, # [21] Exhibit(s), # [22] Exhibit(s), # [23] Exhibit(s), # [24] Exhibit(s), # [25] Exhibit(s), # [26] Exhibit(s), # [27] Statement of Material Facts) (Spencer, Rhiannon) (Entered: 06/15/2021) |
| 06/15/2021 | [143] | MOTION for Summary Judgment filed by Michael Sikirica. Motion returnable before Judge Stewart. Response to Motion due by 7/6/2021. Reply to Response to Motion due by 7/13/2021 (Attachments: # [1] R Memorandum of Law, # [2] Statement of Material Facts, # [3] Affirmation, # [4] Declaration, # [5] Exhibit(s), # [6] Exhibit(s), # [7] Exhibit(s), # [8] Exhibit(s), # [9] Exhibit(s), # [10] Exhibit(s), # [11] Exhibit(s), # [12] Exhibit(s), # [13] Exhibit(s), # [14] Exhibit(s), # [15] Exhibit(s), # [16] R Exhibit(s), # [17] R Exhibit(s), # [18] R Exhibit(s), # [19] R Exhibit(s), # [20] R Exhibit(s), # [21] R Exhibit(s), # [22] R Exhibit(s), # [23] R Exhibit(s), # [24] R Exhibit(s), # [25] R Exhibit(s), # [26] R Exhibit(s), # [27] R Exhibit(s), # [28] R Exhibit(s), # [29] Exhibit(s), # [30] Exhibit(s), # [31] Exhibit(s), # [32] Exhibit(s), # [33] Exhibit(s), # [34] Exhibit(s), # [35] Affirmation, # [36] Affirmation, # [37] Affirmation, # [38] Affirmation) (Bailey, John) (Entered: 06/15/2021) |
| 06/15/2021 | [144] | Medical Records filed by Michael Sikirica. (Attachments: # [1] Exhibit to Dkt. No. 143 (Sikirica Aff), # [2] Exhibit to Dkt. No. 143 (Sikirica Aff))(Peck, Crystal) (Entered: 06/15/2021) |
| 06/15/2021 | [145] R | STATEMENT OF MATERIAL FACTS re [143] MOTION for Summary Judgment filed by Michael Sikirica. Motion returnable before Judge Stewart. *Amended* filed by Michael Sikirica. (Peck, Crystal) (Entered: 06/15/2021) |
| 06/30/2021 | [146] | Letter Motion from Crystal R. Peck for Michael Sikirica requesting signing of proposed Stipulation for Briefing Schedule submitted to Judge Stewart . (Attachments: # [1] Proposed Briefing Schedule)(Peck, Crystal) (Entered: 06/30/2021) |
| 07/06/2021 | 147 | TEXT ORDER: Based upon the agreement of the parties, the request to extend the briefing schedule with regard to Defendants' pending Motions for Summary Judgment is GRANTED. Plaintiff is directed to file a response to the motions on or before August 30, 2021. Defendants are directed to file their reply to the response on or before September 13, 2021. The motions are returnable before the undersigned and will be taken on SUBMIT only. There will be no oral argument unless otherwise directed by the Court. SO ORDERED by Magistrate Judge Daniel J. Stewart on 7/6/2021. (mab) (Entered: 07/06/2021) |
| 08/26/2021 | [148] | *Consent* Letter Motion from Brett H. Klein for Adrian Thomas requesting Enlargement of Summary Judgment Briefing Schedule submitted to Judge Daniel J. Stewart . (Klein, Brett) (Entered: 08/26/2021) |
| 08/27/2021 | 149 | TEXT ORDER granting Plaintiff's [148] Letter Request, filed on consent, seeking an extension of time to file a response to Defendants' Motions for Summary Judgment in this matter. Plaintiff shall file a response to the motions by September 7, 2021. |

| | | |
|---|---|---|
| | | Defendants shall file any reply to the response by September 28, 2021. SO ORDERED by Magistrate Judge Daniel J. Stewart on 8/27/2021. (mab) (Entered: 08/27/2021) |
| 09/07/2021 | 150 | *Consent* Letter Motion from Brett H. Klein for Adrian Thomas requesting a one week enlargement of the current summary judgment briefing schedule. submitted to Judge Daniel J. Stewart . (Klein, Brett) (Entered: 09/07/2021) |
| 09/08/2021 | 151 | TEXT ORDER granting Plaintiff's 150 Letter Request seeking an extension of the deadlines with regard to the pending Motions for Summary Judgment in this matter. Plaintiff shall file a response to the motions on or before September 20, 2021. Defendants are to file a reply to the response on or before October 5, 2021. The motions are returnable before the undersigned and will be taken on SUBMIT. No oral argument will be heard unless otherwise directed by the Court. SO ORDERED by Magistrate Judge Daniel J. Stewart on 9/8/2021. (mab) (Entered: 09/08/2021) |
| 09/20/2021 | 152 **R** | MEMORANDUM OF LAW re 142 Motion for Summary Judgment,,, *(Plaintiff's Memorandum of Law in Opposition)* filed by Adrian Thomas. (Klein, Brett) (Entered: 09/20/2021) |
| 09/20/2021 | 153 | STATEMENT OF MATERIAL FACTS re 142 MOTION for Summary Judgment filed by Tim Colaneri(Individually), Ronald Fountain, Adam R. Mason(Individually). Motion returnable before Judge Stewart. *(Plaintiff's Response to Defendants' Statement, and Plaintiff's Counter Statement)* filed by Adrian Thomas. (Attachments: # 1 Statement of Material Facts (Plaintiff's Local Rule 56.1 Counter Statement))(Klein, Brett) (Entered: 09/20/2021) |
| 09/20/2021 | 154 **R** | MEMORANDUM OF LAW re 143 Motion for Summary Judgment,,, *(Plaintiff's Memorandum of Law in Opposition)* filed by Adrian Thomas. (Klein, Brett) (Entered: 09/20/2021) |
| 09/20/2021 | 155 | STATEMENT OF MATERIAL FACTS re 143 MOTION for Summary Judgment filed by Michael Sikirica. Motion returnable before Judge Stewart. *(Plaintiff's Response to Defendant's Statement, and Plaintiff's Counter Statement)* filed by Adrian Thomas. (Attachments: # 1 Statement of Material Facts (Plaintiff's Local Rule 56.1 Counter Statement))(Klein, Brett) (Entered: 09/20/2021) |
| 09/20/2021 | 156 | AFFIDAVIT in Opposition re 142 MOTION for Summary Judgment filed by Tim Colaneri(Individually), Ronald Fountain, Adam R. Mason(Individually). Motion returnable before Judge Stewart., 143 MOTION for Summary Judgment filed by Michael Sikirica. Motion returnable before Judge Stewart. *(Declaration of Brett H. Klein)* filed by Adrian Thomas. (Attachments: # 1 Exhibit(s) 1, # 2 Exhibit(s) 2, # 3 Exhibit(s) 3, # 4 Exhibit(s) 4, # 5 Exhibit(s) 5, # 6 Exhibit(s) 6, # 7 Exhibit(s) 7, # 8 Exhibit(s) 8, # 9 Exhibit(s) 9, # 10 Exhibit(s) 10, # 11 Exhibit(s) 11, # 12 Exhibit(s) 12, # 13 Exhibit(s) 13, # 14 Exhibit(s) 14, # 15 Exhibit(s) 15, # 16 Exhibit(s) 16, # 17 Exhibit(s) 17, # 18 Exhibit(s) 18, # 19 Exhibit(s) 19, # 20 Exhibit(s) 20, # 21 Exhibit(s) 21, # 22 Exhibit(s) 22, # 23 Exhibit(s) 23, # 24 Exhibit(s) 24, # 25 Exhibit(s) 25, # 26 Exhibit(s) 26, # 27 Exhibit(s) 27, # 28 Exhibit(s) 28, # 29 Exhibit(s) 29, # 30 Exhibit(s) 30, # 31 Exhibit(s) 31, # 32 Exhibit(s) 32, # 33 Exhibit(s) 33, # 34 Exhibit(s) 34, # 35 Exhibit(s) 35, # 36 Exhibit(s) 36, # 37 Exhibit(s) 37)(Klein, Brett) (Entered: 09/20/2021) |
| 09/20/2021 | 157 | AFFIDAVIT in Opposition re 143 MOTION for Summary Judgment filed by Michael Sikirica. Motion returnable before Judge Stewart., 142 MOTION for Summary Judgment filed by Tim Colaneri(Individually), Ronald Fountain, Adam R. Mason(Individually). Motion returnable before Judge Stewart. *(Declaration of Matthew B. Johnson, Ph.D.)* filed by Adrian Thomas. (Attachments: # 1 Exhibit(s) 1, # 2 Exhibit(s) 2)(Klein, Brett) (Entered: 09/20/2021) |

| | | |
|---|---|---|
| 09/20/2021 | 158 | AFFIDAVIT in Opposition re 143 MOTION for Summary Judgment filed by Michael Sikirica. Motion returnable before Judge Stewart., 142 MOTION for Summary Judgment filed by Tim Colaneri(Individually), Ronald Fountain, Adam R. Mason(Individually). Motion returnable before Judge Stewart. (*Declaration of Katherine F. Maloney, M.D.*) filed by Adrian Thomas. (Attachments: # 1 Exhibit(s) 1, # 2 Exhibit(s) 2, # 3 Exhibit(s) 3)(Klein, Brett) (Entered: 09/20/2021) |
| 09/24/2021 | 159 | Letter Motion from Crystal R. Peck for Michael Sikirica requesting extension to file reply submitted to Judge Stewart . (Peck, Crystal) (Entered: 09/24/2021) |
| 09/30/2021 | 160 | TEXT ORDER granting Defendants' joint 159 Letter Request, filed on consent, seeking an extension of time to file a reply to Plaintiff's response to the pending Motions for Summary Judgment in this matter. Defendants shall file their reply on or before October 15, 2021. SO ORDERED by Magistrate Judge Daniel J. Stewart on 9/30/2021. (mab) (Entered: 09/30/2021) |
| 10/12/2021 | 161 | Letter Motion from Crystal R. Peck for Michael Sikirica requesting extension of time to reply to opposition submitted to Judge Stewart . (Peck, Crystal) (Entered: 10/12/2021) |
| 10/12/2021 | 162 | TEXT ORDER granting Defendant's 161 Letter Request, filed on consent, seeking an extension of time to file a reply to Plaintiff's response to the pending Motions for Summary Judgment in this matter. All Defendants shall file their reply on or before October 25, 2021. SO ORDERED by Magistrate Judge Daniel J. Stewart on 10/12/2021. (mab) (Entered: 10/12/2021) |
| 10/25/2021 | 163 | REPLY to Response to Motion re 142 MOTION for Summary Judgment filed by Tim Colaneri(Individually), Ronald Fountain, Adam R. Mason(Individually). Motion returnable before Judge Stewart. filed by Tim Colaneri, Ronald Fountain, Adam R. Mason. (Attachments: # 1 Declaration, # 2 Exhibit(s) A, # 3 Exhibit(s) B, # 4 Exhibit(s) C, # 5 Exhibit(s) D, # 6 Exhibit(s) E, # 7 Statement of Material Facts Response to Plaintiff's "Counter Statement")(Spencer, Rhiannon) (Entered: 10/25/2021) |
| 10/25/2021 | 164 | REPLY to Response to Motion re 143 MOTION for Summary Judgment filed by Michael Sikirica. Motion returnable before Judge Stewart. filed by Michael Sikirica. (Attachments: # 1 Declaration, # 2 Exhibit(s), # 3 Exhibit(s), # 4 Exhibit(s), # 5 Exhibit(s), # 6 Exhibit(s), # 7 Exhibit(s), # 8 Exhibit(s), # 9 Reply to Plaintiff's Rule 56.1 Counterstatement)(Peck, Crystal) (Entered: 10/25/2021) |
| 03/03/2022 | 165 | TEXT ORDER STAYING CASE. This matter is stayed pending full briefing of the Motions for Summary Judgment in *Davis-Guider v. City of Troy*, 17-CV-1290. Signed by Magistrate Judge Daniel J. Stewart on 3/3/2022. (gjr) (Entered: 03/03/2022) |
| 11/07/2022 | 166 | TEXT ORDER: The STAY previously issued in this matter is lifted. Oral Argument on the pending Motions for Summary Judgment is set for December 5, 2022 at 11:00 AM before the undersigned. Counsel are directed to appear IN-PERSON at the James T. Foley US Courthouse, 445 Broadway, 4th Floor, Courtroom No. 2, Albany, NY on the scheduled date and time. SO ORDERED by Magistrate Judge Daniel J. Stewart on 11/7/2022. (mab) (Entered: 11/07/2022) |
| 12/05/2022 | | Text Minute Entry for proceedings held before Magistrate Judge Daniel J. Stewart: Oral Argument held on 12/5/2022. Appearances: Brett Klein, Esq. for Plaintiff; Rhiannon Gifford, Esq., Michael Ginsberg, Esq. and William Firth, Esq. for Defendants. The Court heard oral argument from counsel with regard to Defendants' pending Motions for Summary Judgment. The Court reserves on a decision. Counsel are permitted to file supplemental submissions by 12/12/2022. A written order will be |

Case 23-753, Document 61-1, 11/17/2023, 3604836, Page30 of 1023

| | | |
|---|---|---|
| | | issued in due course. (TIME: 11:02AM-12:10PM) (Court Reporter: Lisa Tennyson) (mab) (Entered: 12/07/2022) |
| 12/09/2022 | 167 | *Consent* Letter Motion from Brett H. Klein for Adrian Thomas requesting An Enlargement of Time to File Supplemental Submissions submitted to Judge Daniel J. Stewart . (Klein, Brett) (Entered: 12/09/2022) |
| 12/12/2022 | 168 ℝ | RESPONSE in Support re 142 MOTION for Summary Judgment filed by Tim Colaneri(Individually), Ronald Fountain, Adam R. Mason(Individually). Motion returnable before Judge Stewart. filed by Tim Colaneri, Ronald Fountain, Adam R. Mason. (Gifford, Rhiannon) (Entered: 12/12/2022) |
| 12/13/2022 | 169 | Flash drive: Albany Clerk's Office received a Flash Drive containing digital media - Exhibit 15 to the # 142 Motion for Summary Judgment. Not available for public viewing. (khr) (Entered: 12/13/2022) |
| 12/14/2022 | 170 | TEXT ORDER granting Plaintiff's 167 Letter Request, filed on consent, seeking additional time to file any supplemental submissions with regard to the pending Motions for Summary Judgment in this matter. Plaintiff shall file any supplemental submissions on or before December 19, 2022. SO ORDERED by Magistrate Judge Daniel J. Stewart on 12/14/2022. (mab) (Entered: 12/14/2022) |
| 12/19/2022 | 171 ℝ | RESPONSE in Opposition re 142 MOTION for Summary Judgment filed by Tim Colaneri(Individually), Ronald Fountain, Adam R. Mason(Individually). Motion returnable before Judge Stewart. filed by Adrian Thomas. (Klein, Brett) (Entered: 12/19/2022) |
| 03/30/2023 | 172 ℝ | MEMORANDUM-DECISION AND ORDER: It is hereby ORDERED, that City Defendants' # 142 Motion for Summary Judgment is GRANTED; and it is further ORDERED, that Defendant Sikirica's # 143 Motion for Summary Judgment is GRANTED; and it is further ORDERED, that the Clerk is directed to enter judgment for Defendants, and it is further ORDERED, that the Clerk of the Court serve a copy of this Decision and Order upon the parties to this action. Signed by Magistrate Judge Daniel J. Stewart on 3/30/2023. (pjh, ) (Entered: 03/30/2023) |
| 03/30/2023 | 173 ℝ | JUDGMENT in favor of Adam R. Mason, Michael Sikirica, Ronald Fountain, Tim Colaneri against Adrian Thomas. (pjh, ) (Entered: 03/30/2023) |
| 04/28/2023 | 174 | NOTICE OF APPEAL as to 173 ℝ Judgment, 172 ℝ Order,,, Terminate Motions,, by Adrian Thomas. Filing fee $ 505, receipt number ANYNDC-6279135. (Klein, Brett) (Entered: 04/28/2023) |
| 05/02/2023 | 175 | ELECTRONIC NOTICE AND CERTIFICATION sent to US Court of Appeals re 174 Notice of Appeal. (hmr) (Entered: 05/02/2023) |
| 06/05/2023 | 176 | TRANSCRIPT REQUEST by Adrian Thomas for proceedings held on December 5, 2022 before Judge Daniel J. Stewart.. (Klein, Brett) (Entered: 06/05/2023) |
| 07/13/2023 | 177 | TRANSCRIPT of Proceedings: Oral Argument held on December 5, 2022, before Judge Daniel J. Stewart, Court Reporter: Lisa L. Tennyson, Telephone number: (518) 257-1823. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court |

public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 8/3/2023. Redacted Transcript Deadline set for 8/14/2023. Release of Transcript Restriction set for 10/11/2023. Notice of Intent to Redact due by 7/18/2023 (lt, ) (Entered: 07/13/2023)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/04/2023 14:54:42 | | | |
| **PACER Login:** | jbmarcus | **Client Code:** | Thomas Adrian |
| **Description:** | Docket Report | **Search Criteria:** | 1:17-cv-00626-DJS |
| **Billable Pages:** | 27 | **Cost:** | 2.70 |

# APPENDIX

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

ADRIAN THOMAS,

                    Plaintiff,

         -against-

ADAM R. MASON, RONALD FOUNTAIN,
TIM COLANERI, and MICHAEL SIKIRICA,

                    Defendants.

---

|                           |        |
|---------------------------|--------|
| STATE OF NEW YORK         | )      |
|                           | )ss.:  |
| COUNTY OF RENSSELAER      | )      |

**AFFIDAVIT**
Civil Action No.: 1:17-cv-626
(GTS/DJS)

**TIMOTHY COLANERI**, being duly sworn deposes and says:

1.      I am a defendant in the above-captioned matter and as such I am fully familiar with the facts and circumstances herein.  I make this Affidavit in support of my motion for summary judgment dismissing the complaint pursuant to F.R.C.P. 56(a).

2.      I did not become involved in the investigation into the death of Matthew Thomas ("M.T.") until the second day of September 22, 2008.

3.      On the morning of September 22, 2008, I went to Samaritan Hospital to obtain medical records and then Albany Medical Center to receive an update on M.T. in furtherance of the investigation into the injuries he sustained.

4.      At that point in time, it was my understanding based upon discussions with Captain Mason, that M.T. was suffering from severe head trauma which his treating physician explained could not have resulted accidentally and that M.T. had no brain activity.

# APPENDIX

5. Based upon my discussions with one of the lead detectives on the case, Adam Mason, the prior night September 21, 2008, M.T.'s father, Adrian Thomas, had made statements that indicated that at all relevant times M.T. had only been in the care of Mr. Thomas and M.T.'s mother, Wilhelmina Hicks and that Mr. Thomas had expressed that if any trauma had occurred, the trauma would have occurred while M.T. was in the care of Mr. Thomas.

6. After discussions with the treating physicians regarding M.T. I returned to Troy P.D. and discussed a search warrant application and a re-interview of Mr. Thomas with Captain Mason.

7. Based upon the developing circumstances of the investigation, Mr. Thomas remained a witness however, it appeared he was also a suspect.

8. On September 22, 2008, Mr. Thomas voluntarily agreed to go to the police department to continue the interview, which was conducted on September 21, 2008, regarding M.T.'s condition.

9. I was asked to observe the interview of Mr. Thomas being conducted by Captain Mason on September 21, 2008. I remained in a separate room and viewed the interview via the Troy P.D. monitoring system.

10. As I observed the interview, it was my opinion that Captain Mason acted with complete professionalism and his interview tactics were appropriate and reasonable under the circumstances.

11. As the interview proceeded, Mr. Thomas seemed alert and willing to engage in the voluntary interview. He was offered food, water and breaks numerous times.

12. Throughout the interview, Mr. Thomas made inculpatory statements indicating that

**APPENDIX**

he had caused the injuries to M.T.

13.  Mr. Thomas appeared calm throughout most of the interview and as if he was acknowledging that he had caused the injuries to M.T.

14.  At one point in the approximately seven-hour long interview, it was decided that I would assume the "bad cop" role so to speak and entered the interview room to challenge Mr. Thomas' statements that he "accidentally" caused the injuries to M.T.

15.  I was in the interview room very briefly, maybe five minutes, and asserted, in sum and substance that in my experience in Desert Storm it was not possible for M.T.'s injuries to have been caused by accident and that there must be more to Mr. Thomas' story based upon the treating physician's statement regarding M.T.'s prognosis.

16.  I did not serve in Desert Storm but was using such to bolster my interview based upon the medical information regarding M.T. that had been provided to us and based upon Mr. Thomas' statements and confessions at that point in the interview.

17.  After I left the interview room, I continued to observe Captain Mason and Mr. Thomas through the monitoring system.

18.  Thereafter, Mr. Thomas confessed to multiple instances of slamming M.T. on the bed within the prior week which provided probable cause to arrest Mr. Thomas.

19.  Mr. Thomas was subsequently arrested.

20.  While the second interview lasted approximately seven hours, there were multiple and lengthy breaks including breaks to write and read the ten-page confession that Mr. Thomas voluntarily signed.

21.  Based upon my involvement in watching and briefly participating in the interview,

it is my belief that the tactics and techniques being used were not unduly coercive or improper and that Mr. Thomas voluntarily confessed to causing M.T.'s death and voluntarily signed the ten-page confession.

22.    On September 23, 2008, I authored a Troy Police Department Investigation Report Narrative memorializing my involvement in the investigation.  A true and accurate copy of my Narrative that was made and kept in the ordinary course of business of the Troy Police Department is attached hereto as Exhibit "A".

23.    I do not recall having any additional substantive involvement in the investigation of the death of M.T.  I did not attend the autopsy, I did not testify at Grand Jury, I did not testify at any pre-trial hearings, I did not testify at either the 2009 or 2014 trial, and I did not author or sign any arresting report or search warrant application.

24.    I did not discuss or pressure Dr. Sikirica to render a specific determination regarding M.T.'s death.

25.    I did not discuss or pressure the Rensselaer County District Attorneys office to initiate or pursue criminal charges against Mr. Thomas. It was the District Attorneys sole discretion to initiate and continue prosecuting Mr. Thomas.

26.    I believe that my conduct and Captain Mason's conduct which I observed was reasonable and within the bounds of my training and experience at the time of the 2008 interview.

Case 1:17-cv-00626-DJS Document Doe.94 157/1424-3504-6-06/14/21 Page 2 of 5

**WHEREFORE**, Defendant prays for an Order granting the City Defendant's motion for summary judgment pursuant to F.R.C.P. 56(a) together with such other and further relief as this Court deems just and proper.

Timothy Colaneri

Sworn to before me this
14 day of June, 2021.

Notary Public, State of New York

LORAINE A. ROBICHAUD
Notary Public, State of New York
County of Rensselaer Reg. No.01RO6073427
Commission Expires 4/00/22

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ADRIAN THOMAS,

                Plaintiff,

      -against-

ADAM R. MASON, RONALD FOUNTAIN,
TIM COLANERI, and MICHAEL SIKIRICA,

            Defendants.

**AFFIDAVIT**
Civil Action No.: 1:17-cv-626
(GTS/DJS)

STATE OF NEW YORK     )
                      )ss.:
COUNTY OF RENSSELAER   )

      **RONALD FOUNTAIN**, being duly sworn deposes and says:

      1.    I am a defendant in the above-captioned matter and as such I am fully familiar with the facts and circumstances herein. I make this Affidavit in support of my motion for summary judgment dismissing the complaint pursuant to F.R.C.P. 56(a).

      2.    In September 2008, I was employed by the Troy Police Department ("TPD") as a detective assigned to the Juvenile Division.

      3.    In or about the afternoon of Sunday, September 21, 2008, I was on-call for the TPD and I received a call from the desk Sergeant who informed me that I needed to report to work for an incident.

      4.    I then went to TPD Central Station and met with then Detective Sergeant, Adam Mason, now Captain Mason, who informed me that we received a report from Albany Medical Center ("AMC") and Child Protective Services ("CPS") regarding an unresponsive four-month-old infant identified as Matthew Thomas ("M.T.").

# APPENDIX

5.     CPS reported to us that it had been informed by M.T.'s treating physician that M.T. had a skull fracture, subdural hematoma, bleeding on the brain and retinal hemorrhaging which was not consistent with a child his age. CPS requested our assistance with removing the other children from the Thomas household due to the unexplainable nature of the injuries to M.T.

6.     CPS informed Captain Mason and me of M.T.'s prognosis and at approximately 5:30 p.m. we reported to Samaritan Hospital, where M.T. was first transported by ambulance when 911 was called by the family and while there we spoke with an E.R. staff member regarding M.T,'s admittance.

7.     The E.R. staff member stated that M.T. arrived at the hospital at approximately 9:00 a.m. with his mother, Wilhelmina Hicks. Thereafter, Dr. Kardos had evaluated M.T. The nurse informed us that Ms. Hicks relayed that when she woke in the morning, M.T. was limp in his crib and was unresponsive. Due to the nature of M.T.'s injuries he was transferred to AMC's Intensive Care Unit ("PICU") around 11:50 a.m. on September 21, 2008.

8.     Thereafter, at approximately 6:00 p.m., Captain Mason, TPD Officer Buttofucco and I accompanied the CPS workers to the Thomas household for an unannounced visit to execute a removal order of the six other children residing therein.

9.     Upon arrival, I spoke with Mr. Thomas about why we were there including informing him that CPS and TPD were investigating the cause of M.T.'s injuries.

10.     I asked Mr. Thomas what happened that morning and he stated that M.T. had a fever and had been sick for the past couple days. Mr. Thomas said that he was awakened by Ms. Hicks at approximately 8:30 a.m. - 9:00 a.m. and she said M.T. was not alert. Mr. Thomas stated that M.T. had a light pulse, that he sprinkled water on M.T.'s face whose eyes were half open, and

**APPENDIX**

that M.T. was wheezing.

11. Mr. Thomas further informed me that at all relevant times the only two people who M.T. had been in the care of was himself and Ms. Hicks.

12. I asked if any child had played rough with M.T. and Mr. Thomas said no. I asked Mr. Thomas what happened and based upon my review of the records, Mr. Thomas stated "I don't know but whatever it was, I didn't do it."

13. We then executed the CPS removal notice.

14. After the children were removed from the household, Captain Mason and I reported to AMC where M.T. was then being treated.

15. While at AMC, I spoke with M.T.'s treating physician Dr. Edge who told me that M.T.'s injuries are typically caused by high-speed impact or by slamming a child very hard into a hard object. Dr. Edge further stated that "this is a murder".

16. Captain Mason also spoke with a treating nurse who explained the nature of M.T.'s injuries which included "old and new blood" on the brain which indicated an old injury and a new injury. The nurse further stated it was unlikely M.T. would survive.

17. Captain Mason and I also interviewed Ms. Hicks and I took two witness depositions of her statements at approximately 11:10 p.m. (True and accurate copies aside from the Bate Stamp are attached hereto as Exhibit "A").

18. Ms. Hicks stated that on the prior night, Saturday, September 20, 2008, Mr. Thomas was in the bedroom with M.T. alone while M.T. was crying. Ms. Hicks stated that she went into the bedroom to ask why the baby was crying but M.T., who had just been loudly crying "a minute before", had stopped crying and was laying on the bed.

# APPENDIX

19.     Ms. Hicks further informed us that a couple weeks prior to the incident, Mr. Thomas was in the bedroom with India Hicks "beating Ms. Hicks' child", who was 9, with a belt. Ms. Hicks stated that when CPS reported to the house due to a complaint, she told CPS that Mr. Thomas was only yelling at the 9-year-old child but she "didn't tell about the whooping".

20.     Ms. Hicks further provided us additional examples of Mr. Thomas' interactions regarding M.T. which included telling Ms. Hicks that she "better stop that baby from crying", expressing that he could not get M.T. to stop crying, and that he would hand M.T. "harshly" to Ms. Hicks in frustration.  Ms. Hicks further stated that "Adrian does have some anger issues when dealing with the kids." (Exhibit "A").

21.     Thereafter, Captain Mason and I returned to Mr. Thomas' house and asked him if he would voluntarily come down to the police station to answer some questions which he agreed to do.

22.     Captain Mason and I drove Mr. Thomas to the station and escorted him to the interview room to record the conversation.  Mr. Thomas appeared alert and awake.

23.     We offered Mr. Thomas food and water which he declined.  Mr. Thomas requested a cigarette which I left to get for him, and Captain Mason explained his Miranda Rights to Mr. Thomas.  At 12:08 a.m. on September 22, 2008, Mr. Thomas signed a Miranda Waiver.

24.     Thereafter, Captain Mason and I asked Mr. Thomas questions regarding M.T.'s injuries and such conversation was recorded in its entirety which took a little less than two hours.

25.     Throughout the interview, Mr. Thomas maintained that he did not harm M.T. and that he never intentionally harmed M.T.  He also stated that he never hit the children in contravention of what Ms. Hicks had told us.  Mr. Thomas appeared calm and not overly upset.

Case 1:17-cv-00626-DJS Document 91-17 Filed 06/14/21 Page 53 of 7

26.    Mr. Thomas stated that M.T.'s injuries probably occurred in his care and provided

potential explanations that he thought may have caused the injuries which included; another child

hitting M.T. on the head with a metal truck; an incident where M.T. was falling off the bed and

Mr. Thomas "snatched him up quick before he hit the ground", and another incident when Mr.

Thomas was putting M.T. in the crib and M.T. "smacked his head on the crib." The statements

were written on a Witness Deposition form which Mr. Thomas reviewed and voluntarily signed.

(A true and accurate copy of the Witness Deposition, aside from the Bate Stamp is attached hereto

as Exhibit "B").

27.    Prior to signing the Deposition Statement, Mr. Thomas expressed that if something

happened to M.T., he would jump off a bridge. Based upon his statement and the timing of it near

to the end of our interview I thought Mr. Thomas wanted to keep talking. After asking some

follow-up questions and signing the statement, we asked Mr. Thomas if he wanted to speak to

someone at the Samaritan Hospital Crisis Unit regarding his expression of self-harm and Mr.

Thomas said, yes.

28.    Mr. Thomas was transported to Samaritan Hospital at approximately 2:00 a.m. on

Monday, September 22, 2008. Pursuant to TPD policy, I completed a TPD Mental Hygiene Form.

(A true and accurate copy of the Form is attached hereto as Exhibit "C").

29.    Thereafter, in the afternoon of Monday, September 22, 2008, I reported to START

Children's Center in Troy, New York to observe the interviews CPS was conducting with the

Thomas/Hicks children.

30.    While observing the interview, the oldest child, India Hicks, Mr. Thomas'

stepchild, stated that on the morning of the incident Mr. Thomas "threw" M.T. into the crib very

# APPENDIX

roughly and M.T. went limp. She further stated that Mr. Thomas repeatedly beat her and the other children with a belt and had hit her on the head with a stick used to prop open the window.

31. I called Captain Mason who had gone to AMC to gather additional information and informed him of the information provided by the child.

32. After reporting back to the police station and discussing the developments of the case, I submitted a Search Warrant Application for the home. (A true and accurate copy of the Search Warrant Application is attached hereto as Exhibit "D").

33. I did not participate nor was I present during the second interview of Mr. Thomas on September 22, 2008.

34. I was subsequently informed that Mr. Thomas had confessed to causing the injuries to M.T. and that he was subsequently arrested.

35. I did not attend the autopsy of M.T. on September 25, 2008, nor did I speak with Dr. Sikirica. I never conspired with Dr. Sikirica or anyone in this investigation.

36. It was the Rensselaer County District Attorneys (RCDA) sole discretion to move forward with prosecuting Mr. Thomas. I did not pressure RCDA to prosecute Mr. Thomas.

37. I did not testify at the Grand Jury.

38. My role in the investigation transitioned to predominantly focus on certain allegations made by the children while Captain Mason continued to corroborate the confession of Adrian Thomas and to investigate the matter.

39. I testified at both the Huntley Hearing and at the 2009 trial.

40. I believe Captain Mason and I acted reasonably and within the then current accepted standards of interviewing and investigation during the investigation of the death of M.T.

**WHEREFORE**, Defendant prays for an Order granting the City Defendant's motion for summary judgment pursuant to F.R.C.P. 56(a) together with such other and further relief as this Court deems just and proper.

Ronald Fountain

Sworn to before me this
14 day of June, 2021.

Notary Public, State of New York

LORAINE A. ROBICHAUD
Notary Public, State of New York
County of Rensselaer Reg. No.01RO6073427
Commission Expires 4/22/22

# APPENDIX

# EXHIBIT "A"

# DEPOSITION OF A WITNESS

COURT

STATE OF NEW YORK
COUNTY OF RENSSELAER
CITY OF TROY

NAME  Wilahemina Hicks          DATE OF BIRTH _____

RESIDING AT ████████████████████          AGE  29

OCCUPATION  House wifer

DEPOSE AND SAY:  That I remember last night around 9 pm I was making dinner for my kids my husband Adrian was in our bedroom with our 4 month old son Matthew all of our other kids were out in the living room were I could see them, I heard my son crying he hadn't been feeling well they were together for about a half an hour, I opened the door and asked why the baby was crying and he said the baby was asleep and now the baby who I had just heard crying a minute before had stopped crying and was lying on the bed. This was on Saturday night around on 9-20-08. A couple weeks ago on a different occasion Adrian was in the bed room beating my daughter ████████ who is 9 years old he was hitting her on the but with a belt I was telling him to stop - Later Child protective came I told them my husband was yelling at her only I didn't tell about the whooping.

FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A CLASS "A" MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE PENAL LAW OF THE STATE OF NEW YORK.

DATE  9-21-08          TIME:  1310          SIGNED  _Wilhemina Hicks_

WITNESS: _____

TPD_118/82

P001407

Case 1:13-cv-00626-DJS Document 91-17 Filed 06/14/21 Page 3

CONTROL # _____

PHONE _____

HOME _____

WORK _____

COURT

**DEPOSITION OF A WITNESS**

STATE OF NEW YORK
COUNTY OF RENSSELAER
CITY OF TROY

NAME Wilchenina Hicks.

DATE OF BIRTH _____

RESIDING AT _____

AGE 29

OCCUPATION House Wife

DEPOSE AND SAY: I also remember about a week and a half ago Matthew was crying and I was holding him and Adrian said to me you better stop the baby from crying I said that baby can cry if he wants to and Adrian shot back you spoiled that boy. Adrian does have some anger issues when dealing with the kids, I also remember a week and a half ago or so the baby was crying in the bedroom it was Matthew again he yelled that I better take him their was nothing he could do with him. Also a month ago or so Matthew was crying and he handed the baby to me a little harshly saying for me to deal with it.

FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A CLASS "A" MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE PENAL LAW OF THE STATE OF NEW YORK.

DATE 9-21-08

TIME: 2310

SIGNED: _Wilchenina Hick_

WITNESS: _____

TPD 118/82

P001408

Case 1:17-cv-00626-DJS Document 91-13 / 14:34-3 Filed 06/14/21 Page 1 of 2

EXHIBIT "B"

**APPENDIX**

CONTROL # ~~96096-08~~     HOME _____     WORK _____     COURT

DEPOSITION OF A WITNESS

STATE OF NEW YORK
COUNTY OF RENSSELAER
CITY OF TROY

NAME Adrian Thomas     DATE OF BIRTH _____

RESIDING AT _____     AGE 26.

OCCUPATION   Unemployed

DEPOSE AND SAY: That about a week or so from today which now is 9-22-08 I remember while I was in the bathroom I had the door cracked my son Mathew was on the bed with _____ I dont no but _____ could have hit him in the head with a metal truck, another incident Mathew was falling off the bed couch and I snatched him up quick before he hit the ground. This was around a week ago. I also recall about 10 days or so putting Mathew in the crib and him smacking his head on the crib he started crying I picked him up and check checked his head, on all these occasions I was responsible for my kids at these times my wife was not home.

_Adrian Thomas_

FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A CLASS "A" MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE PENAL LAW OF THE STATE OF NEW YORK.

DATE: 9-22-08     TIME: 0141     SIGNED: X _Adrian Thomas_

WITNESS: _____

TPD 118/82

EXHIBIT "C"

Case 1:17-cv-00463-DTS Document 71-2024-350406-06/14/2150 Page 2 of 2

| Agency | Division/Prec. | ORI | | Incident No. |
|---|---|---|---|---|
| Troy PD | | NY 0410300 | | |
| Report Day | Date | Report Time | Occurred On | Day | Date | Time | Weapons Seized?  ☐ Yes  ☐ No  If "yes" TOT ( ) |
| Mon | 9-22-08 | 0200 | 9-2108 | Sun | — | 9P | |

| Incident Type | | Weapons Type: |
|---|---|---|
| 9.41 | | |

| Incident Address | Troy, NY | Location Code: 4202 |
|---|---|---|

Person Type: CO = complainant  OT=other  PI=person interviewed  PR=person reporting  WI=witness  NI=not interviewed  P=Patient

| Type | Name | DOB | Address | Telephone No. |
|---|---|---|---|---|
| P | Thomas, Adrian | | | |
| | | | | |
| | | | | |

Should police be contacted before patient release?  Yes ☑  No ☐  (518) 270-4421

Patient transported by  ☐ TPD  ☐ TFD  ☐ Other

Does patient have history of assault or violent behavior?  Is patient on probation ☐  parole ☐  Where?
Yes ☐  No ☐  Unknown ☑

Is a Controlled Restraint Report on File?  Yes ☐  No ☐

What behaviors or actions indicate the person might be a danger to self or others:  (check all that apply)

| ☐ Placed self in dangerous situation | ☐ Presence of weapons (specify) |
|---|---|
| ☐ Unable to care for self | ☐ Attempted to hurt/kill self/others |
| ☑ Verbal threats | ☐ Other (specify) |
| ☐ Physical threats | |

Narrative: Threatens to Jump off Bridge if Son dies. Son currently AMC with Life threatening injuries

## Emergency or C.P.E.P. Emergency Admission
### (Sections 9.41, 9.45, 9.55 and 9.57 Mental Hygiene Law)
### Custody/Transport Of A Person Alleged to be Mentally Ill To A Hospital
### Approved to Receive Emergency or C.P.E.P Emergency Admissions

**9.41 Mental Hygiene Law**  Custody/Transport By Police Officers

I, R. Fountain, a Police Officer of the City of Troy, NY, hereby acknowledge I have taken into custody Adrian Thomas, who appears to be mentally ill and is conducting him/herself in a manner which is likely to result in serious harm to him/herself or others.

A. I have removed or directed the removal of this person to Sam Hospital
   (name of 9.39 hospital/C.P.E.P)

B. I am temporarily detaining this person at _____, a safe and comfortable place, pending
   (location)

   examination or admission to _____, I am notifying _____
   (name of 9.39 hospital/C.P.E.P)   Director of Community Service

   or _____ of the City of Troy NY or County of Rensselaer of this detention or removal.
   (Health Officer)

| Reporting Officer Signature (include rank) | ID No. | Date | Supervisors Signature (include rank) | ID No. | Date |
|---|---|---|---|---|---|
| | 26(1 | 9-22-08 | | | |

White-Records          Yellow-Hospital          Pink-Officer's Copy

EXHIBIT "D"

STATE OF NEW YORK
COUNTY OF RENSSELAER
CITY COURT OF TROY, NEW YORK

I, Ron Fountain, a Police Officer in the City of Troy, State of New York do hereby make application for a search warrant pursuant to the provisions of article 690 of the Criminal Procedure Law and in connection therewith state as follows:

FIRST: That there is reasonable cause to believe that certain property, of a character described in section 690.10, subdivision (1) (2) (3) (4) of the Criminal Procedure Law, to wit:

    (1) Is stolen; or

    (2) Is unlawfully possessed; or

    (3) Has been used, or is possessed for the purpose of being used, to commit or conceal the commission of an offense; or

    (4) Constitutes evidence or tends to demonstrate that an offense has been committed or that a particular person participated in the commission of an offense.

APPLICANT MUST FULLY DESCRIBE (1) (2) (3) OR (4)

(4) Evidence of child abuse or child neglect, including but not limited to a baby crib, a metal truck, a black and brown belt, blood or any other evidence that child abuse or child neglect has ever taken place inside the residence.

MAY BE FOUND IN OR UPON THE FOLLOWING DESIGNATED PLACE, VEHICLE OR PERSON:

TO WIT:

█████████████████████████, City of Troy, County of Rensselaer, State of New York.

APPLICANT MUST FULLY DESCRIBE (a) PLACE (b) VEHICLE, or (c) PERSON:

The property located at ████████████████████████, Troy, NY, is a two-bedroom apartment inside a brick building at the Troy Garden Apartment complex.

SECOND: THE FOLLOWING ALLEGATION OF FACTS ARE SUBMITTED IN SUPPORT OF THE ABOVE STATEMENT:

     * (1) Are based upon personal knowledge of the applicant

     * (2) Are based upon information and belief, the sources of such information and the grounds for such belief are as follows:

On Sunday, September 21st, 2008 at about 8:30-9:00 A.M. Wilahemina Hicks called 911 from her apartment at ▓▓▓▓▓▓▓▓▓ , Troy, NY and reported that her 4-month old son, Matthew Thomas, was unresponsive. The child was brought by ambulance to Samaritan Hospital and later transported to Albany Medical Center. Examinations at Albany Medical Center indicated that Matthew suffered Bilateral Sub-Dural Hemotoma to the brain. Matthew had brain swelling and both old and new blood was present on the brain. Additionally, Matthew is completely brain dead and is not expected to survive.

Doctor Edge at AMC stated that this is typically a high impact injury possibly caused by violent shaking or severe acceleration and deceleration onto a hard object.

Matthews father, Adrian Thomas, stated that this injury probably occurred while in his care. Adrian stated that there was an occasion approximately ten days ago when he put Matthew into his crib and Matthew smacked his head on the side of the crib and this could possibly be the incident that caused the injury. Adrian also stated that it is possible that Matthew's brother Isiah hit Matthew in his head with a metal truck.

In an interview at the Start Children's Center in Troy, NY, monitored by Detective Ron Fountain, ▓▓▓ Hicks, Adrian's step-daughter, stated that on the morning of the incident Adrian threw Matthew into the crib very roughly and Matthew went limp. Matthew's mother Wilahemina Hicks then performed CPR on Matthew. ▓▓▓▓ also stated that Adrian repeatedly beat her and her sister ▓▓▓▓ with a black and brown belt that he kept inside the bedroom closet.

WHERETOFORE, the applicant requests that this Court issue a search warrant directing search for and a seizure of the above described property in or upon the above designated or described place, vehicle or person.

The applicant makes further request that such search warrant be executable at any time of the day or night, on the grounds that there is reasonable cause to believe:

*1) Such search warrant cannot be executed between the hours of 6:00 A.M. AND 9:00 P.M., or

*2) That the property sought will be removed or destroyed if not seized forthwith.

The basis for such belief is based on the following facts:

The applicant makes further request that such search warrant authorize the executing Police Officer to enter premises to be searched without giving notice of his authority and purpose on the grounds that there is reasonable cause to believe that:

*1) The property sought may be easily and quickly destroyed or disposed of,

*2) The giving of such notice may endanger the life or safety of the executing Police Officer or another person.

The basis for such belief is based on the following facts:

Subscribed and sworn to before

me this __22__ day of

__Sept.__, 2008

_____     _____
                                              POLICE OFFICER

Case 1:17-cv-00626-DJS Document 47-1 Filed 06/14/21 Page 2 of 11

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

ADRIAN THOMAS,

                              Plaintiff,

              -against-

ADAM R. MASON, RONALD FOUNTAIN,
TIM COLANERI, and MICHAEL SIKIRICA,

                              Defendants.

_____

**AFFIDAVIT**
Civil Action No.: 1:17-cv-626
(GTS/DJS)

STATE OF NEW YORK        )
                         )ss.:
COUNTY OF RENSSELAER     )

**ADAM R. MASON**, being duly sworn deposes and says:

1. I am a defendant in the above-captioned matter and as such I am fully familiar with the facts and circumstances herein. I make this Affidavit in support of my motion for summary judgment dismissing the complaint pursuant to F.R.C.P. 56(a).

2. In September 2008, I was employed by the Troy Police Department ("TPD") as a Detective-Sergeant.

3. I am currently a Captain with the TPD.

4. In or about the afternoon of Sunday, September 21, 2008, I was on-call for the TPD and I received a call from the desk Sergeant who informed me that I needed to report to work for an incident.

5. At about 5:30 p.m., I reported to TPD Central Station and met with Detective Ronald Fountain and a Child Protective Services ("CPS") worker who informed Detective Fountain and I that CPS received a report from Albany Medical Center ("AMC") regarding a 4-

month-old infant, identified as Matthew Thomas ("M.T.") who was transported from Samaritan Hospital. We were informed that the child was brought to Samaritan Hospital for reported respiratory problems and that hospital examinations revealed trauma to the head.

6. CPS requested assistance with an unannounced home visit due to concerns for the six other children residing therein.

7. Prior to going to the home, Detective Fountain, CPS worker, Noelle and I went to Samaritan Hospital to obtain additional information. While there, we were informed M.T. was brought to the hospital by ambulance at approximately 9:13 a.m. due to reported respiratory problems and he was unresponsive. The child was transported to AMC at approximately 11:50 a.m. due to his critical condition.

8. Thereafter we responded to the home with Officer Buttofucco and additional CPS workers to execute the removal order of the six other children in the household.

9. While executing the CPS removal order, Detective Fountain informed Mr. Thomas that CPS and TPD had both opened investigations into the cause of M.T.' injuries.

10. Mr. Thomas stated that M.T. had been sick for the previous two days with a fever and diarrhea and that at approximately 8:30 a.m. – 9:00 a.m. his wife had woken him up because M.T. was unresponsive. Mr. Thomas stated that he sprinkled water on M.T.'s face but he remained unresponsive and that 911 was called. CPS noted in their reports that Mr. Thomas had stated that he didn't know what happened to M.T. but whatever it is he didn't do it.

11. Thereafter, Detective Fountain and I reported to AMC around 9:00 p.m. to meet with M.T.'s mother, Wilhelmina Hicks, and to obtain additional information from M.T's treating physicians.

12.     I thereafter spoke with the charge nurse who stated that M.T. suffered a Bilateral Subdural Hematoma, a skull fracture and was not likely to survive.  She further stated that there appeared to be both old blood and new blood on the brain indicating that there was an old injury as well as a new injury to M.T.'s head.

13.     Detective Fountain spoke to the treating physician, Dr. Edge, who stated that the type of injury M.T. had was typically caused by a high-speed impact or by slamming the head very hard into a hard object; Dr. Edge further stated to Detective Fountain: "This is a murder."

14.     Detective Fountain and I then spoke to Ms. Hicks who provided witness depositions.  Ms. Hicks stated that on Saturday, September 20, 2008, Mr. Thomas was alone with M.T. in the bedroom and M.T. was crying and she went into the room to check on the baby and he was suddenly not crying anymore and was asleep.  She further stated that a couple of weeks prior to the incident, Mr. Thomas was "beating" Ms. Hicks 9-year-old child, "hitting [the child] on the butt with a belt" and Ms. Hicks was telling him to stop.

15.     Ms. Hicks further stated that a week and a half prior to the incident, M.T. was crying and Ms. Hicks was holding M.T. and Mr. Thomas told her that she "better stop the baby from crying" and she responded that the baby can cry if he wants to and Mr. Thomas "shot back" that she "spoiled that boy".

16.     Ms. Hicks further stated that Mr. Thomas got frustrated with M.T. about a week and a half prior to the incident due to the baby crying and Mr. Thomas expressed that Ms. Hicks "better take" the baby because there was nothing Mr. Thomas could do with M.T.  Ms. Hicks further stated that approximately one month prior to the incident M.T. was crying and Mr. Thomas handed him to Ms. Hicks "a little harshly" telling her to deal with it.

Case 1:17-cv-00626-DJS Document 47-2 Filed 06/14/21 Page 42 of 11

17.     Ms. Hicks further expressed that Mr. Thomas "does have some anger issues when dealing with the kids".

18.     Thereafter, that night Detective Fountain and I went to the Thomas household around 11:30 p.m. to speak with Mr. Thomas.  We asked Mr. Thomas if he would agree to go to Central Station with us and Mr. Thomas voluntarily agreed.

19.     We wanted to interview Mr. Thomas at Central Station to record the interview.

20.     Detective Fountain, Mr. Thomas and I went to Central Station.  While Mr. Thomas was not under arrest, I explained in detail his Miranda Rights and Mr. Thomas expressed that he understood his rights and voluntarily signed a waiver at approximately 12:08 a.m. (A copy of the Miranda Waiver is attached hereto as Exhibit "A").

21.     At the beginning of the interview, we offered Mr. Thomas food and a drink however, he declined and requested a cigarette.  While Detective Fountain left the room to search for a cigarette, I explained in detail how M.T.'s physician expressed that M.T. was significantly brain damaged and that someone had to have participated in causing his injuries and must know how they were caused.

22.     Detective Fountain and I interviewed Mr. Thomas for approximately one hour and forty-five minutes to two hours.  During the interview, Mr. Thomas expressed that he did not know what happened and that he did not do anything to harm M.T.  He further denied ever hitting any of the children in contravention to Ms. Hicks' statements.  Mr. Thomas did provide examples of potential scenarios of what could have caused the injuries to M.T. such as: a younger child may have hit him on the head with a metal truck; a prior incident where M.T. was falling off the couch and Mr. Thomas "snatched" him up quickly; or a prior incident when Mr. Thomas was placing

# APPENDIX

M.T. in the crib and he "smacked" M.T.'s head against the side of the crib. Detective Fountain wrote such scenarios on a witness deposition which Mr. Thomas reviewed and voluntarily signed.

23.  After signing the witness deposition, Detective Fountain and I continued conducting the interview when Mr. Thomas expressed that if something happened to M.T., he would jump off a bridge. We asked him if he wanted to speak to someone he said no, not tonight and we asked him if he was going to harm himself and he said no. Based upon the nature and timing of Mr. Thomas' statement I believe Mr. Thomas wanted to continue talking about the matter. Detective Fountain and I briefly continued the interview for approximately ten minutes.

24.  We again asked Mr. Thomas if he would like to speak with someone at Samaritan Hospital Crisis Unit and he expressed that he did and so Mr. Thomas was then driven to Samaritan Hospital based upon his request.

25.  A copy of the interview that occurred on the night of September 21, 2008, early morning of September 22, 2008, has been exchanged by the parties will be mailed to the Court as Exhibit "H".

26.  When Mr. Thomas was dropped off at Samaritan Hospital, on September 22, 2008, at approximately 2:00 a.m., he was informed that its likely we would want to talk to him again and he agreed.

27.  Late the following morning, September 22, 2008, Detective/Sergeant Colaneri, Detective Mason, and I went to Samaritan Hospital to talk to the doctor who first treated M.T. While there, Detective/Sergeant Colaneri went to the medical records department to obtain M.T.'s records.

28.     At that time, I spoke with Dr. Kardos at Samaritan Hospital who said that M.T. was brought to the hospital with a decreased respiratory rate and was ultimately transferred to AMC Pediatric Intensive Care Unit due to his condition.

29.     Detective/Sergeant Colaneri, Detective Mason and I then went to AMC to obtain an update on M.T.  We were informed that M.T.'s critical condition had not changed.

30.     We spoke to Dr. Edge again and at 1:12 p.m., I took a witness deposition from Dr. Edge.  (A true and accurate copy of the Witness Deposition, aside from the Bates Stamp, is attached hereto as Exhibit "B").  Dr. Edge stated that M.T. had a subdural hematoma on his head and that he had a concern of child abuse based on the family history.  Dr. Edge again stated that M.T.'s injury was typically caused by high velocity impact or other acceleration/deceleration or caused by violently shaking or forcing the head against a hard object. Dr. Edge stated that M.T. had brain swelling caused by severe trauma and that he was brain dead.  Dr. Edge stated that the type of injury M.T. had could not have been caused by merely bumping M.T.'s head against a hard object but that there needed to be severe acceleration prior to striking the hard object.

31.     After speaking with Dr. Edge, we spoke to AMC Neurologist, John Waldman who confirmed that M.T. did not have brain activity.  Dr. Waldman's opinion of how M.T.'s injuries were caused was consistent with Dr. Edge's opinion in that, M.T.'s injuries are typically caused by high impact or acceleration followed by rapid deceleration.

32.     While I was at the hospital, Detective Fountain was at the START Children's Center observing the interviews CPS was conducting with the children.  Detective Fountain contacted me and advised that the oldest child stated that on the morning of the incident, she observed Mr. Thomas "throw" M.T. into the crib and M.T. banged his head on the side of the crib

Case 1:17-cv-00626-DJS Document 42-2 Filed 06/14/21 Page 72 of 11

and he appeared limp. Detective Fountain also informed me that the child had stated that Mr. Thomas frequently hits the children with a belt and would hit her on the head with a stick.

33. Thereafter, a search warrant was prepared.

34. I was contacted by a nurse at Samaritan Hospital Crisis Unit about when Mr. Thomas would be released. At approximately 5:00 p.m., my colleague, Sergeant Centanni and I went to Samaritan Hospital and asked Mr. Thomas if he would voluntarily agree to go down to TPD to continue the interview. Mr. Thomas voluntarily agreed to do so.

35. Mr. Thomas was brought to the police station to record said interview. Although, Mr. Thomas was not under arrest, I again explained his Miranda Rights to him, and Mr. Thomas voluntarily waived his rights at approximately 6:00 p.m. (A true and accurate copy of the Miranda Waiver is attached hereto as Exhibit "C").

36. I conducted the interview of Mr. Thomas while Sergeant Colaneri observed the interview in a separate room on a monitoring system. The interview was approximately seven hours long; however, we took multiple breaks throughout the duration.

37. Throughout, Mr. Thomas appeared alert and coherent and as if he was fully capable of engaging in the voluntary interview.

38. I engaged in the interview for a couple of hours with Mr. Thomas and I had begun writing approximately six pages of a voluntary statement memorializing what Mr. Thomas had told me. Mr. Thomas was provided ample time to read and correct the statement and he voluntarily signed the statement. Mr. Thomas provided additional examples of incidents which could have caused injuries to M.T. such as: had dropped M.T. into his crib and M.T. hit his head pretty hard or Mr. Thomas leaned back and hit his head against M.T.'s.

Case 1:17-cv-00626-DJS Document 71-2 Filed 06/14/21 Page 62 of 11

39.    At one point during the interview, Sergeant Colaneri entered the room and told Mr. Thomas that his story did not add up and challenged his explanation as a tactic to see if Mr. Thomas was being truthful and if he would open up or confide in me since I was supportive during the interview.

40.    I believe that Sergeant Colaneri's ploy was appropriate and consistent with our experience and accepted interrogation techniques at the time of the interview.

41.    Thereafter, Mr. Thomas confessed to violently slamming M.T. onto the bed causing his injuries and death. His statements were memorialized on the voluntary statement which Mr. Thomas was provided the opportunity to review and make changes to prior to voluntarily signing it. (A true and accurate copy of the Statement is attached hereto as Exhibit "D").

42.    I believe my interview techniques and behavior during Mr. Thomas' interview were reasonable, accepted, appropriate and legal at the time.

43.    I did not believe that I was violating Mr. Thomas' constitutional rights.

44.    A copy of the second interview was obtained and provided in discovery in the matter and sent to the Court as Exhibit "H".

45.    After Mr. Thomas made his confession, I met with Sergeant Colaneri and it was determined that Mr. Thomas would be arrested and charged with attempted murder.

46.    I prepared the Arrest Report and the charging instruments to be sent to the Court for Mr. Thomas' arraignment. (A true and accurate copy of the Arrest Report is attached hereto as Exhibit "E").

47.    On September 23, 2008, I spoke with CPS worker, Noelle and informed her that Mr. Thomas had confessed.

# APPENDIX

48.   Additionally, on September 23, 2008, I spoke with Dr. Edge who confirmed that a second exam was conducted on M.T. and he had been declared dead that day.

49.   On September 23, 2008, I spoke with Ms. Hicks who gave a second Witness Deposition. (A true and accurate copy is attached hereto as Exhibit "F").

50.   A second search warrant was prepared to obtain additional items as a follow up to Mr. Thomas' confession.

51.   Throughout September 23, 2008, and September 24, 2008, I continued investigating and corroborating Mr. Thomas' confession.

52.   At approximately 8:30 a.m. on September 25, 2008, I attended M.T.'s autopsy that was conducted by Dr. Sikirica along with Officer Farley and members of the Rensselaer County District Attorney's office.

53.   It is typical for the police and the District Attorney's office to attend an autopsy if it is suspected that a crime was committed, or the death is suspicious.  This is done so evidence can be documented in accordance with legal standards and those investigating or potentially prosecuting, can have an understanding of the nature of the death.

54.   I did not in any way influence or encourage Dr. Sikirca to render specific findings of opinions regarding M.T.'s death.

55.   I did not conspire with anybody whatsoever to frame Mr. Thomas for M.T.'s death.

56.   On September 26, 2008, I testified at the Grand Jury and provided a copy of the ten-page confession voluntarily signed by Mr. Thomas after the second interview.

57.   Throughout the next month or two, I continued investigating the matter by interviewing witnesses, meeting with the crime lab regarding DNA/blood evidence and attending

Case 1:17-cv-00626-DJS Document 74-1 Filed 06/14/21 Page 103 of 11

child fatality meetings with Detective Fountain which pertained to the ongoing CPS investigation that Detective Fountain was further involved in.

58.     On October 2, 2008, I met with the Rensselaer County DA's office to watch and review Mr. Thomas' confession and at no point did any member of the DA's office express concern over the admissibility of the confession.

59.     I did not pressure the DA's office in any manner to pursue criminal charges against Mr. Thomas.

60.     I memorialized most of my activities regarding the investigation into M.T.'s death on a TPD Investigation Report. (A true and accurate copy of such Report is attached hereto as Exhibit "G").

61.      At some point, I learned that Mr. Thomas had also confessed to causing M.T.'s injuries to a CPS worker, Jasper Estaris, on September 24, 2008, one day before I testified at the Grand Jury.

62.     I met with the Rensselaer County DA's office on numerous occasions in preparation for the Huntley Hearing in 2009 and the Criminal Trial which I also testified at.

63.     These meeting were not to conspire or engage in any inappropriate conduct but instead are typical meetings conducted to prepare the evidence for a trial.

64.     At the time of the interviews and investigation, I reasonably believe that I was not violating Mr. Thomas' constitutional rights or that any of my conduct was inappropriate or illegal.

# APPENDIX

**WHEREFORE**, Defendant prays for an Order granting the City Defendants' motion for summary judgment pursuant to F.R.C.P. 56(a) together with such other and further relief as this Court deems just and proper.

_____
Adam Mason

Sworn to before me this
14th day of June , 2021.

_____
Notary Public, State of New York

RHIANNON I. SPENCER
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02SP6393260
Qualified in Albany County
Commission Expires June 10, 20 23

# APPENDIX

EXHIBIT "A"

YOUR RIGHTS EXPLAINED

Date 9/22/08

Time 12:08 AM

Before we ask you any questions, you must understand your rights. AT

You have the right to remain silent. AT

Anything you say can and will be used against you in court. AT

You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. AT

If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish. AT

If you decide to answer questions now without a lawyer present, you still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk with a lawyer. AT

## WAIVER OF RIGHTS

   I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me. AT

Signed: _____

Print Name Adrian Thomas SS

Witness: _____

Witness: _____

Time: 12:08 AM

Date: 9/22/08

TROY POLICE DEPARTMENT

Case 1:17-cv-00626-DJS Document 81-5 Filed 06/14/21 Page 1 of 2

EXHIBIT "B"

# APPENDIX

PHONE **67**

CONTROL # 86096-08

HOME _____

WORK _____

## DEPOSITION OF A WITNESS

COURT

STATE OF NEW YORK
COUNTY OF RENSSELAER
CITY OF TROY

NAME Walter Edge

DATE OF BIRTH _____

RESIDING AT _____, Albany, Ny

AGE 56

OCCUPATION Doctor

DEPOSE AND SAY On September 21st 2008 I was working at Albany Medical Center in the Pediatric Intensive Care Unit. A child named Matthew Thomas was brought into the unit. I examined Matthew and he had a subdural hematoma on his head. Based on the family history I was concerned that Matthew was a victim of child abuse. The injury that Matthew suffered is a high impact injury. This type of injury can be caused by very violent shaking or shaking and forced against a hard object. Matthew also has brain swelling caused by severe trauma. Matthew is currently brain dead and another brain death exam will be done tomorrow and Matthew will be pronounced dead. This type of injury could not have been caused by merely bumping Matthews head against a hard object, there needs to be severe acceleration prior to striking the hard object.

FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A CLASS "A" MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE PENAL LAW OF THE STATE OF NEW YORK.

DATE 09/21/08     TIME: 1312     SIGNED: _Edge_

WITNESS: Sgt. _____ Mann

P001413

**APPENDIX**

EXHIBIT "C"

CITY OF TROY POLICE DEPARTMENT

Control # _86095-08_

YOUR RIGHTS EXPLAINED

Place _55 State Street, Troy, NY_

Date _9/22/08_

Time _1800_

Before we ask you any questions, you must understand your rights. AT

You have the right to remain silent. AT

Anything you say can and will be used against you in court. AT

Your have a right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. AT

If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish. AT

If you decide to answer questions now without a lawyer present, you still the right to stop answering at any time. You also have the right to stop answering at any time until you talk with a lawyer. AT

<u>WAIVER OF RIGHTS</u>

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me. AT

Signed: _Adrian Thomas_

Print Name: _Adrian Thomas_

Witness: _Sgt. Adam Mason_

Witness: _____

Time: _1800_

Date: _9/22/08_

**TROY POLICE DEPARTMENT**

EXHIBIT "D"

Case 1:17-cv-00626-DJS Document 64-17/42/14 35d 06/14/2173 Page 23 of 11

STATE OF NEW YORK
COUNTY OF RENSSELAER
CITY OF TROY

DATE 09/22/08 TIME 2040 ~~AM~~/PM, PLACE 55 State Street, Troy, NY

I, Adrian P. Thomas , AM 26 YEARS OF AGE, BORN ON ▬▬▬ ,

MY ADDRESS IS ▬▬▬▬▬▬ , MY OCCUPATION IS Unemployed

I HAVE BEEN DULY WARNED BY Sgt. Adam Mason , WHO HAS IDENTIFIED HIMSELF/
HERSELF AS, A Police Officer with the Troy Police Department , THAT I DO NOT HAVE TO MAKE ANY
STATEMENT AT ALL, AND THAT ANY STATEMENT I MAKE WILL BE USED IN EVIDENCE AGAINST ME IN A COURT
OF LAW, AND THAT I HAVE THE RIGHT TO TALK TO A LAWYER FOR ADVICE BEFORE MAKING THIS STATEMENT
OR ANSWERING ANY QUESTIONS, AND THAT I HAVE THE RIGHT TO HAVE AN ATTORNEY APPOINTED TO
REPRESENT ME IF I CANNOT AFFORD ONE BEFORE MAKING THIS STATEMENT OR ANSWERING ANY QUESTIONS,
AND THAT I CAN STOP GIVING THE STATEMENT OR STOP THE QUESTIONING AT ANY TIME FOR THE PURPOSE OF
CONSULTING AN ATTORNEY. WITHOUT FEAR OR THREAT OF PHYSICAL HARM UPON ME OR ANOTHER PERSON,
I FREELY VOLUNTEER THE FOLLOWING STATEMENT TO THE AFORESAID PERSON. AT

About 10 or 15 days ago I was home with my children. My wife was not there. I was in the bathroom with the door closed. My son Matthew was in my bedroom lying on my bed. Matthew was crying. I finished using the bathroom and I went into my bedroom. Matthew was lying on the bed crying and Isiah, my other son, was on the bed also. The door to my bedroom was cracked a little and there was a blue and white toy truck on the floor. I picked Matthew up while he was crying and I put Matthew in his crib while he was still crying. When I put Matthew in his crib I accidentally dropped him about 5 or 6 inches into the crib and he hit his head against the side of the crib. When I dropped Matthew, he hit his head pretty hard. If there is an old injury on Matthews head and there is old blood on Matthews brain, I caused it when I accidentally dropped him. On

I have read this statement (had this statement read to me) consisting of 10 page(s) and the facts contained
herein are true and correct. I have also been told and I understand that making a false written statement is
punishable as a Class A misdemeanor pursuant to Section 210.45 of the Penal Law of the State of New York.

Signed: Adrian Thomas sr

Page 1 of 10 Page(s)

Witness: Sgt. Adam Mason

Witness: _____

# APPENDIX

## VOLUNTARY STATEMENT

Page 1

Saturday, September 20th, 2008 at about 8 or 9 pm I was in my bedroom with my son Matthew. I had the door closed and no one else was in the bed room with us. I was sitting on the bed and I forgot how close Matthew was behind me. I laid back and my head hit Matthews head. My head hit Matthews head pretty hard. Matthew started crying and weezing and he was having trouble breathing. I laid down on the bed next to him and rubbed his side to let him know that I didnt mean to cause damage to him. Matthew fell asleep. Matthew stayed in my bed until he woke up at about 12. My wife fed Matthew and put him back in the bed and he was still weezing a little and having a little bit of trouble breathing. Matthew slept in the bed with us until he woke up again at about 3 or 4 in the morning. My wife fed Matthew again. My other son ████ was also in the bed with us and I fed ████. Matthew's breathing was pretty bad now. My wife said that she was going to take him to the hospital in the morning. I started getting nervous

I have read this statement (had this statement read to me) consisting of __10__ page(s) and the facts contained herein are true and correct. I have also been told and I understand that making a false written statement is punishable as a Class A misdemeanor pursuant to section 210.45 of the Penal Law of the State of New York.

Signed  Adrian Thomas

Page __2__ of __10__ Page(s)

Witness  Sgt. Adam Mc-----

Witness _____

# APPENDIX

## VOLUNTARY STATEMENT

Page 3

because I thought that Matthew was having trouble breathing from me hitting him in his head. I was afraid to tell my wife about it, but I knew that Matthew was having trouble breathing from me hitting him in the head. I thought that Matthew would be alright until the morning when my wife brought him to the hospital. Matthew was running a fever over the past two days and he has had diarrhea. I figured that I wouldn't tell my wife about the accident in the bedroom and she would just think that his breathing trouble was from him being a little sick. I knew that I hit him hard but I did think that it would lead to a life threatening situation. I made a mistake. My wife got Matthew to fall back to sleep in the bed. He was weezing and his breathing was real noticeable that something was wrong. I went back to sleep because I figured Matthew would be alright until my wife took him to the hospital in the morning. At about 8:30 or 9 AM my wife started yelling in the bedroom. She was saying "Adrian get up, Matthew is not responding." There was

I have <u>read</u> this statement (had this statement read to me) consisting of ___10___ page(s) and the facts contained herein are true and correct. I have also been told and I understand that making a false written statement is punishable as a Class A misdemeanor pursuant to section 210.45 of the Penal Law of the State of New York.

Signed _Adrian Thomas Sr_

Page ___3___ of ___10___ Page(s)

Witness _Sgt. Adam Mason_

Witness _____

# APPENDIX

## VOLUNTARY STATEMENT

Page 4

real panic in the room. I got up and grabbed Matthew up from the bed real quick. I shook him up and down a little to see if he was going to wake up. Matthew was not responding. I looked at his stomach to see if he was breathing. I did not see his stomach move. I laid Matthew down on the bed and got some water from a jug and sprinkled some water on his face to see if he was going to wake up. Matthew was still not responding. I called 911 on the phone and gave it to my wife and told her to calm down and talk to the operator. I started to check for a pulse on Matthew and I did feel a slight pulse and I saw his chest moving. I also put my finger under his nose and I could feel a little bit of air coming from his nose. I told my daughter to come into the room to get Malachai off of the bed. I picked Matthew back up off of the bed real quick and I put him in the crib real fast. I was panicing and when I put Matthew in his crib I dropped him about 5 or 6 inches

I have <u>read</u> this statement (had this statement read to me) consisting of ___10___ page(s) and the facts contained herein are true and correct. I have also been told and I understand that making a false written statement is punishable as a Class A misdemeanor pursuant to section 210.45 of the Penal Law of the State of New York.

Signed _Adrian Thomas_

Page _4_ of _10_ Page(s)

Witness _Sgt. Adam M Mason_

Witness _____

# APPENDIX

## VOLUNTARY STATEMENT

Page 5

and he hit his head against the side of the crib. When I dropped Matthew into the crib he hit his head pretty hard against the side of the crib. I was panicing and it was an accident. I left the room to get a cloth for Matthew and when I came back in my wife was performing CPR on Matthew on our bed. Matthew was still not responding. When my wife hung up the phone I heard the sirens outside so I went to open the door for the EMT's. They took my wife and Matthew to the hospital. I believe that Matthew is in the hospital right now with injuries caused by me. I hurt Matthew about 10-15 days ago when I dropped him in the crib, I hurt Matthew on Saturday night when I struck his head with my head and I hurt Matthew when I dropped him in the crib on Sunday morning. This is hard for me. I love my children. I never expected these accidents to lead up to this, my children being taken away and Matthew being near death. I am very sorry for what I have done. I can barely live with

I have <u>read</u> this statement (had this statement read to me) consisting of ___10___ page(s) and the facts contained herein are true and correct. I have also been told and I understand that making a false written statement is punishable as a Class A misdemeanor pursuant to section 210.45 of the Penal Law of the State of New York.

Signed  Adrian Thomas

Page __5__ of __10__ Page(s)

Witness  Sgt. Adam Mason

Witness  _____

# APPENDIX

## VOLUNTARY STATEMENT

Page __6__

myself. I feel real bad. I am here today telling Sgt. Mason what had happened because I want to be a man and take responsibility. I am responsible for Matthews injuries. I am giving this statement voluntarily and Sgt. Mason has been fair with me while I was talking to him. (AT)

(AT) There are three other times that I hurt my son Matthew. I have been arguing with my wife alot lately. I am a little bit depressed, actually a whole lot depressed. I have low self esteeme. I havent worked since February. My wife has been telling me that she wants to find a new man. She makes me feel real low. I feel like nothing. The tension has been building up. Last Wednesday I was home arguing with my wife all day. The tension was building and I got real mad. I had Matthew in my arms and he was crying. I walked into my bedroom and I slammed Matthew down onto the bed. I was standing up and I slammed him on the bed pretty hard. Matthew continued crying and I realized that I messed up. I came back to

I have read this statement (had this statement read to me) consisting of __10__ page(s) and the facts contained herein are true and correct. I have also been told and I understand that making a false written statement is punishable as a Class A misdemeanor pursuant to section 210.45 of the Penal Law of the State of New York.

Signed __Adrian Thomas__
Page __6__ of __10__ Page(s)

Witness __Sgt. Adam Mason__

Witness _____

# APPENDIX

## VOLUNTARY STATEMENT

Page ___1___

my senses and I picked him up and calmed him down. The next day, Thursday, I was arguing with my wife all day again. I had Matthew in my arms again and he was crying again. It was about five o'clock in the evening. I was upset, I was real Teed off at my wife. I walked into the bedroom and slammed Matthew down onto my bed. I slammed him down pretty hard. If Matthew wasn't in my arms I probably would have punched a hole in the wall. I took my frustrations out on Matthew. As soon as I slammed Matthew on the bed I came to my senses. I was still upsed, I took a deep breath and I picked Matthew up. He was still crying so I gave him a bottle to calm him down. On Saturday, September 20th at 8:00 or 8:30 I was in the bedroom with Matthew. I had been arguing with my wife real bad. She told me that I had to find a job in two months or I have to go. I was feeling even worse. Matthew was not in my arms, he was lying on the bed. I sat down on the bed and

I have <u>read</u> this statement (had this statement read to me) consisting of ___10___ page(s) and the facts contained herein are true and correct. I have also been told and I understand that making a false written statement is punishable as a Class A misdemeanor pursuant to section 210.45 of the Penal Law of the State of New York.

Signed _Adrian Thomas_____

Page __7__ of __10__ Page(s)

Witness ___Andrew McKeMan_____

Witness _____

# APPENDIX
## VOLUNTARY STATEMENT

Page _8_

When I laid back my head struck Matthews head. He started crying and I was still upset. I had the door closed and I could still hear my wife low rate me through the door. It started elevating and I was real mad about what she was saying about me. Matthew was still crying and it really got to me. I stood up from the bed and I picked Matthew up from the bed and I threw Matthew down on the bed real hard. He started crying even harder. My mind just went blank like I was in shock. My wife had asked me what was going on in there. I told her nothing. I knew that I messed up and I didnt do it again. I picked Matthew back up and settled him down. I laid down with him and started rubbing him down and I let him know that daddy didnt mean that. My wife came into the room and I got up and left the room. Matthew was weezing and having difficulty breathing, but it wasnt bad enough to call a physician at the time. Matthew fell asleep and seemed fine for a while. He woke up at about

I have _read_ this statement (had this statement read to me) consisting of ___10___ page(s) and the facts contained herein are true and correct. I have also been told and I understand that making a false written statement is punishable as a Class A misdemeanor pursuant to section 210.45 of the Penal Law of the State of New York.

Signed _Adrian Thomas_

Page _8_ of _10_ Page(s)

Witness _Sgt. Adam Mann_

Witness _____

# APPENDIX
## VOLUNTARY STATEMENT

Page 9

midnight and took a bottle and went back to sleep. At about 3:30 or 4:00 in the morning my wife woke me up and told me to go make the babies bottles. I did and I fed ~~████~~ and my wife fed Matthew. Matthew usually takes 4 ounces but he only took about 3. He was weezing and having difficulty breathing. His breathing was bad enough to say that you got to take him to the hospital at 5th up. I didnt tell my wife about slamming Matthew down on the bed because I was afraid of going to jail or that she might get someone to kill me. Matthew fell back asleep. At about 8 or 9 AM my wif woke me up panicing like I already said. I thought that she was going to pass out. I grabbed Matthew off of the bed and I threw him into his crib. I was panicing too. When I threw Matthew into the crib I probable threw him 15 inches and he hit his head on the side of the crib. I was freaking out and I threw Matthew pretty hard into the crib. I am sorry for what I did

I have read this statement (had this statement read to me) consisting of ___10___ page(s) and the facts contained herein are true and correct. I have also been told and I understand that making a false written statement is punishable as a Class A misdemeanor pursuant to section 210.45 of the Penal Law of the State of New York.

Signed _Adrian Thomas_____
Page __9__ of _10_ Page(s)

Witness _Sgt. Adam Mann_____

Witness _____

# APPENDIX

## VOLUNTARY STATEMENT

Page 10

to Matthew. I never meant to hurt him. I want to get help. Give me anger management, depression, low self esteem, I want the help. I am willing to go to counseling so I dont hurt any one esle. I never intentionally meant to hurt my kid. I love my kids.

I have read this statement (had this statement read to me) consisting of 10 page(s) and the facts contained herein are true and correct. I have also been told and I understand that making a false written statement is punishable as a Class A misdemeanor pursuant to section 210.45 of the Penal Law of the State of New York.

Signed _Adria Thomas_

Page 10 of 10 Page(s)

Witness _Sgt. Asher Mann_

Witness _____

**APPENDIX**

EXHIBIT "E"

New York State

| | | |
|---|---|---|
| 1. NYSID No. | | 3. OBTS No. |
| 5. FBI No. | 6. Arrest No. **111955** | 7. Agency **Troy Police Bureau** |
| | 4. Division / Precinct **086095** | |

Troy City

**9. Name (Last, First, Middle)** Thomas, Adrian P

10. Alias / Nickname / Maiden Name (Last, First, Middle)

11. Phone Number

**12. Street Number and Name, Building No., Apt. No.**

13. City, State, Zip (C ☐ T ☐ V ☐) **Troy NY 12180**

14. Residence Status ☐ Resident ☐ Foreign Non-Resident ☐ Non-Resident ☒ Unk

15. Place of Birth **Douglas, GA**

16. Date of Birth

17. Age **26 YRS**

18. Sex ☒ M ☐ F ☐ U

19. Race ☐ White ☒ Black ☐ Asian ☐ Indian ☐ Other ☐ Unknown

20. Ethnic ☒ Non-Hispanic ☐ Hispanic ☐ Unknown

21. Skin ☐ Dark ☒ Light ☐ Medium ☐ Other ☐ Unknown

22. Height **5' 9"**

23. Weight **500**

24. Hair **BLK**

25. Eyes **BRO**

26. Glasses ☐ No ☐ Yes ☐ Contacts

27. Build ☐ Small ☐ Med ☐ Large

28. Marital Status ☒ Married ☐ Single ☐ Divorced ☐ Widowed ☐ Separated ☐ Comm Law ☐ Unk

29. U.S. Citizen ☒ Yes ☐ No

30. Citizen of **USA**

31. Social Security No.

32. Education **9**

33. Religion **Baptist**

34. Occupation **Unknown**

35. Employed ☒ Yes ☐ No

36. Scars / Marks / Tattoos (Describe)

**ARREST INFORMATION**

37. Arresting Officer **Mason, Adam R**

38. ID No. **272**

39. Assisting Officer

40. ID No.

41. Arrest Date **9/23/2008**

42. Time **01:41**

43. Location of Arrest (C ☐ T ☐ V ☐) **55 State ST Troy, NY 12180**

44. Juvenile ☐ Juv- No Further Process

45. Condition of Defendant at Arrest ☐ Impaired Drugs ☐ Mental Dis ☒ App Norm ☐ Impaired Alco ☐ Inj/Ill

46. Weapon(s) at Arrest

47. Co-defendants Arrest No.

48. Miranda ☐ Yes ☐ No

49. Miranda By **Mason, Adam R**

50. Miranda Date **9/22/2008**

51. Miranda Time **18:00**

52. Statements ☐ Written ☐ None ☐ Verbal

53. Status ☐ Bail / ROR ☐ Parole ☐ Probation

54. Search Warrant ☐ Yes ☐ No

55. ID Procedure ☐ Line-Up ☐ Show Up ☐ Photo

56. Arraignment Court **Troy City**

57. Arraignment Judge **Maier**

58. Date **9/23/08**

59. Time **0850**

60. Property ☐ Yes ☐ No

61. Evidence

61a. Processed By

61b. Disposition

62. Incident No. **1-08-36500**

63. Arrestee Status ☐ ROR ☐ Cash Bail ☐ Bail Bond ☐ Police Bail ☒ Held ☐ Rel to 3rd Party ☐ App Tkt

64. Bail Amount

65. Bondsman

66. Photo No.

67. Arrest Type ☐ OT ☐ PW ☐ IW ☐ SUM ☐ CIP ☐ COMP ☐ VOP ☐ BW ☐ AW ☐ OT

68. Warrant No.

69. Arrest POA

70. Other Agency

71. F / P Taken ☒ Yes ☐ No

72. Location of Offense (C ☒ T ☐ V ☐) **55 State ST Troy NY 12180**

73. Offense Date **9/23/2008**

74. No. Offenders

75. No. Victims **1**

76. Return Court

77. Return Judge

78. Return Date

79. Time

80. Defendant / Case TOT Agency

80a. Officer's Name

80b. ID No.

81. Time

82. Date

**CHARGE INFORMATION**

| 83. LAW | Article & Section | SUB | CL | CAT | DEG | ATT | NAME OF OFFENSE | CTS | NCIC code | VICTIM | ASSOC. NO. | TYPE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PL | 125.25 | 04 | A | F | 2 | A | MURDER 2ND-18 Under 11 R | 1 | 0 9 9 9 | | | ☐ AFF ☐ UTT ☐ OTH |
| | | | | | | | | | | | | ☐ AFF ☐ UTT ☐ OTH |
| | | | | | | | | | | | | ☐ AFF ☐ UTT ☐ REAL |
| | | | | | | | | | | | | ☐ AFF ☐ UTT ☐ OTH |
| | | | | | | | | | | | | ☐ AFF ☐ UTT ☐ OTH |

**ASSOCIATED PERSONS INFORMATION**

84. Person Type OT = Other SP = Spouse CD = Co-Defendant SC = School PO = Parole Officer VI = Victim RE = Relative RP = Religious Person EM = Employer CH = Child PA = Parent AS = Associate LA = Lawyer PR = Probation Officer WI = Witness CO = Complainant DR = Doctor

| TYPE | NAME (LAST, FIRST, MIDDLE, TITLE) | STREET NAME & NUMBER | CITY / STATE / ZIP | TELEPHONE NO. |
|---|---|---|---|---|
| EM | Unemployed | | | |

**NARRATIVE**

85.
On above date, time and location the above defendant was arrested for the above offense after an investigation. The defendant was held at CS pending arraignment.

File check negative.
Negative chronic offender.
EJustice paperwork filed.

86. Arresting Officer's Signature **Mason, Adam R**

87. ID No. **272**

88. Supervisor's Signature

89. ID No.

90. Arrest Made As A Result Of A SAFIS Latent Print Identification? ☐ Yes ☐ No ☒ Unknown

91.

91.

93.

94.
**1**
Page
of

P001391

EXHIBIT "F"

Case 1:23-cv-00626-DJS Document 61-7 Filed 06/24/26 Page 23 of 3

## DEPOSITION OF A WITNESS

COURT

STATE OF NEW YORK
COUNTY OF RENSSELAER
CITY OF TROY

NAME __Wilabemina Hicks__          DATE OF BIRTH _____

RESIDING AT _____ Troy, NY          AGE __19__

OCCUPATION __Unemployed__

DEPOSE AND SAY: Several years ago when I was living in Georgia I got into an argument with my husband, Adrian Thomas. During the argument Adrian put his hands around my neck and choked me. Adrian has not put his hands on me again since then. Adrians form of discipline with our children is to whip them with a belt. Adrian has whipped all of our children with a belt, except Matthew and Malachi. I have never seen Adrian physically discipline Matthew or I ... Adrian has said that I spoil Matthew and I ... and that I need to whip them with a belt, but then he said that he was just joking. On Saturday, September 20th of about 8 or 9 pm Adrian was in the bedroom with Matthew. I could hear Matthew crying and I yelled into the room "Adrian, why is Matthew crying." and he said "he is alright, he is asleep now" and I walked into the room and I saw Adrian and Matthew lying on the bed and Matthew was asleep. I did not notice anything wrong with Matthew until about 3 or 4 in the morning when he was running a fever of about 100.4. Matthew has had a slight fever and diareah since Friday night. I decided that I was going to bring Matthew to the hospital on Sunday morning. Matthew had been crying more that usual also. I woke up at around 8 am Sunday morning and I checked on Matthew. I picked Matthew up out of the crib and he was limp and he was having a problem breathing. I woke Adrian up and told him that something was wrong with Matthew and I told him to call 911. Adrian called 911 and gave me the phone. I handed Matthew to Adrian and talked to

FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A CLASS "A" MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE PENAL LAW OF THE STATE OF NEW YORK.

DATE __9/23/08__          TIME: __1407__          SIGNED _____

WITNESS: __Sgt. Adam Mason__

TPD 1-6/82

**APPENDIX**

PHONE _____

CONTROL # _____    HOME _____

WORK _____

DEPOSITION OF A WITNESS                                    COURT

STATE OF NEW YORK
COUNTY OF RENSSELAER
CITY OF TROY

NAME _Wilhemina Hicks_    DATE OF BIRTH _____

RESIDING AT _____ _Troy, NY_    AGE _28_

OCCUPATION _Unemployed_

DEPOSE AND SAY: the people on the phone. I told Adrian to put Matthew on the bed and I performed CPR on Matthew. A little while later the ambulance arrived. When I was up with Matthew at 3 or 4 AM I told Adrian that I was going to bring Matthew to the hospital in the morning and that I was going to call my mother. Adrian said " dont call her, she might think that I did something to the baby" Adrian has been acting different lately. His mood has been very bad lately and he has been making mean comments to me. Adrian told me that something had to change or he was out of here. Adrian told me that I pay too much attention to the kids and that I was not intimate with him enough. I think that Adrian was jealous of the kids and mostly the babies.

FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A CLASS "A" MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE PENAL LAW OF THE STATE OF NEW YORK.

DATE _9/25/08_    TIME: _1467_    SIGNED: _Wilhemina Hicks_

WITNESS: _Sgt. Adam Mason_

TPD 119F2

P001410

Case 1:17-cv-00626-DLS Document 6-7 Filed 06/14/28 Page 23 of 7

# EXHIBIT "G"

# APPENDIX

| VICTIM'S NAME | REPORT DATE | INCIDENT NUMBER | DB NUMBER |
|---|---|---|---|
| Matthew Thomas | 09/26/08 | 86095-08 | - |

## NARRATIVE

09/21/08

At about 1730 D/Sgt A. Mason and Detective R. Fountain were called in for a report of a baby at Albany Medical Center with head injuries possibly suffered in Troy. Upon arrival to Central Station, I/O's were briefed by Nicole Noel from Child Protective Services. Noel stated that they received the report from AMC at about 1400. The report was that a four-month old baby was transported from his residence at ~~~~~~~~~~~ (Cedar Park) to Samaritan Hospital and later transferred to AMC. The initial report was that the baby was having respiratory problems and hospital examinations revealed severe trauma to the head. CPS was concerned about child abuse and the fact that there were six other children inside the residence. CPS notified TPD at about 1720. I/O's responded to Samaritan ER. Hospital staff stated that the victim arrived with the mother, by ambulance at about 0913. The initial report was that the victim was having respiratory problems and was unresponsive. The victim left Samaritan and was transported to AMC at about 1150. The doctor who saw the victim at Samaritan was Katrina Kardos MD. She was off duty when I/O's arrived. The charge Nurse at the time the victim was seen was Ann Weber. I/O's then responded to the victim's residence along with CPS. Upon arrival, the victim's father, Adrian Thomas Sr., was inside the residence with the six other children. The victim's mother, Wilhemena Hicks, was at AMC with the victim. CPS informed Thomas Sr. of their intention to remove the six remaining children from the residence and place them in foster care, pending an investigation. The victim's maternal grandmother, Inga Hicks, arrived on scene to speak to CPS about placement of the children. At about 2015 CPS removed the children from the residence. At about 2026 I/O's interviewed Thomas Sr. and he stated the following:

- The victim had a fever and diarrhea for the past two days
- At about 0830-0900 his wife woke him up because the victim was not responding
- He sprinkled some water on the victim's face, but the victim was still unresponsive
- He called 911 from his cell phone and gave the phone to his wife
- His wife performed CPR and the ambulance arrived shortly after

I/O's then responded to AMC, arriving about 2130. The victim was in the Pediatric Intensive Care Unit (E Building/7th Floor). The charge nurse, Rebecca Peccano RN, stated that the victim suffered a Bilateral Sub Dural Hemotoma and is not likely to survive the injury. There appeared to be both old blood and new blood on the victim's brain indicating that there is an old injury as well as a new injury to the victim's head. The victim was initially diagnosed with a skull fracture, but that was later determined to be inaccurate. At about 2145 Detective Fountain spoke to the attending doctor, Walter Edge MD, who stated that this injury is typically caused by a high-speed impact or by slamming very hard into a hard object. Edge stated to Detective Fountain, "This is a murder."

| DETECTIVE ASSIGNED | SUPERVISOR APPROVAL | PAGE NUMBER |
|---|---|---|
| D/Sgt Adam Mason | | 1/6 |
| CASE STATUS/ OPEN | | |

P001398

| VICTIM'S NAME | REPORT DATE | | CASE NUMBER | |
|---|---|---|---|---|
| | | 86095-08 | | **88** |

# APPENDIX

## NARRATIVE

**09/21/08**(cont)

At about 2200 I/O's interviewed the victim's mother, Wilhemina Hicks at AMC. Also present for the interview was her mother, Inga Hicks, and her sister, Carla Hicks. Detective Fountain took a deposition from Wilhemina at about 2310. I/O's then left AMC and responded back to the victim's residence to speak to the victim's father, Adrian Thomas Sr., again. Thomas Sr. agreed to come to CS with I/O's for an interview. The interview was conducted in the third floor interview room and was recorded on one disc. Thomas Sr. waived his right to counsel at about 0008 on 08/22/08. Detective Fountain took a deposition from Thomas Sr. at about 0141. At the conclusion of the interview Thomas Sr. stated that he felt like he was going to jump off of a bridge if his son died. At about 0200 I/O's transported Thomas Sr. to Samaritan Hospital Crisis Unit and completed MHL 9.41 paperwork. Thomas Sr. agreed to talk to I/O's again at a later time.

Persons residing at 

Matthew Thomas B/M ████ (victim)
Adrian Thomas Sr. B/M ███ 2 (father)
Wilhemina Hicks B/F ████ (mother)
██████████ (sibling)
████████ (sibling)
████████ A (sibling)
██████ 6 (sibling)
██████ 5 (sibling)
██████ (sibling)

| DETECTIVE ASSIGNED | SUPERVISOR APPROVAL | PAGE NUMBER |
|---|---|---|
| D/Sgt Adam Mason | | 2/6 |
| CASE STATUS/ OPEN | | |

P001399

| VICTIM'S NAME | REPORT DATE | INCIDENT NUMBER | DR NUMBER |
| --- | --- | --- | --- |
| | | | **89** |

# APPENDIX

## NARRATIVE

09/22/08

I/O responded to Samaritan Hospital ER to interview Katrina Kardos MD, the attending doctor when the victim was brought in on 09/21/08. D/Sgt. T. Colaneri and Detective M. Mason were also present during the interview. Kardos stated the following:

- The victim was brought to the hospital for a decreased respiratory rate
- The paramedic bringing the victim in stated that the victim's respiratory rate was about 4-5 breaths per minute when they arrived on scene
- The victim was unresponsive
- The determination was made that the victim would be brought to AMC
- The victims mother stated that the victim was fine at about 0600
- She spoke to the victim's father on the phone and was asked if she thought that the victim was going to make it

I/O's then responded to AMC. I/O's spoke to Medical Social Worker Lisa Ditaggiani who stated that there was no change in the victim's condition. I/O's interviewed the attending Doctor when the victim was brought into AMC, Walter Edge MD. At about 1312 I/O recorded a deposition from Edge. I/O's also spoke to Neurologist John Waldman. Waldman stated that the victim had no brain activity. Waldman's opinion on how the injury was caused was consistent with that of Edge, that this is typically caused by high impact or over acceleration followed by rapid deceleration. I/O's received copies of the victim's AMC medical records. I/O's responded to CS to prepare a search warrant for the victim's residence. D/Sgt Epstein had received copies of the victim's medical records from Samaritan Hospital and turned them over to I/O. Detective Fountain was at the Start Children's Center to monitor interviews with India Hicks and Aaliyah Thomas. The interviews began at about 1536. Detective Fountain contacted I/O and advised that during the interview India Hicks stated that on the morning of the incident she observed Thomas Sr. throw the victim into his crib and bang his head off of the side of the crib and the victim appeared to be limp. I/O had been in contact with Maria Pellicano at the Samaritan Mental Health Unit regarding the time that Thomas Sr. was going to be released from the Hospital. At about 1700 I/O responded to Samaritan Hospital along with D/Sgt J. Centanni to meet Thomas Sr. as he was being released. I/O spoke to Thomas Sr. at the Hospital and he agreed to come to CS for an interview. I/O conducted the interview in the third floor interview room. The interview was monitored by D/Sgt T. Colaneri and was recorded on three discs. The interview began at about 1753 and Thomas Sr. waived his right to counsel at about 1800. The interview was concluded at about 0115 on 09/23/08. In addition to the video, I/O also took a ten page voluntary statement. During the interview Thomas Sr. described incidents when he harmed the victim and he stated that he was responsible for the victim's present injured condition. At the conclusion of the interview, Thomas Sr. was arrested for Attempted Murder 2nd. I/O seized Thomas Sr.'s belt as evidence. During the interview D/Sgt D. DeWolf, D/Sgt C. Kehn and ET A. Buttofucco executed the search warrant at the victim's residence and seized a crib and bedding as evidence.

| DETECTIVE ASSIGNED | SUPERVISOR APPROVAL | PAGE NUMBER |
| --- | --- | --- |
| D/Sgt Adam Mason | | 3/6 |
| CASE STATUS/ OPEN | | |

P001400

Case 1:17-cv-00626-DJS Document 72-14 Filed 06/14/22 Page 23 of 7

| VICTIM'S NAME | REPORT DATE | INCIDENT NUMBER | DB NUMBER |
|---|---|---|---|
| Matthew Thomas | 09/26/08 | 86095-08 | - |

## NARRATIVE

**09/23/08**

I/O spoke to Nicole Noel from CPS and was advised that a skeletal exam was performed on the victim's brother ████ and old rib fractures were observed. A CT scan was scheduled to follow. I/O responded to Albany Medical Center along with D/Sgt J. Centanni. I/O spoke to Doctor Edge who stated that a conformation brain death examination was performed and the victim was completely brain dead. The victim's mother, Wilhemena Hicks, gave consent to AMC to donate the victim's organs. The victim was being kept alive until the organ donation procedure could be set up. I/O's spoke to the victim's mother, Wilhemina Hicks, and the victim's grandmother, Inga Hicks. At about 1407 I/O deposed Wilhemina Hicks. Medical Social Worker Lisa Ditaggiani assisted I/O's when dealing with the doctor and the victim's family. I/O's returned to CS and prepared a search warrant for the victim's residence. At about 2045 I/O's and ET D. Marble executed the search warrant and seized a mattress, two box springs and bedding as evidence. I/O's observed what appeared to be bloodstains on the bedding.

**09/24/08**

The organ donation procedure took place in the early morning hours. At about 1100, I/O along with D/Sgt J. Centanni responded to the victim's residence to meet with the victim's mother, Wilhemina Hicks. No additional information was obtained. Nicole Noel CPS was also present at the residence. She advised that complete skeletal exams were ordered for all of the children and CT scans were scheduled for Israel, Isiah and Adrian Jr. I/O went to Seton Health Pediatrics on Federal Street with an authorized medical release form for records contained in the files of all of Wilhemina Hicks' children. I/O received the records for all of the children except Israel Thomas, who had never been seen there. I/O responded to the Rensselaer County Communications Office and requested a copy of the 911 call and radio transmissions for the incident. I/O received a cassette tape containing the requested information. I/O responded to TFD Central Station and requested all reports pertaining to the incident. I/O was denied the requested records and informed that a subpoena was required.

I/O made a copy of the disc containing the interview with Thomas Sr. beginning on 09/22/08 at about 0008 and a copy of the three discs containing the interview with Thomas Sr. beginning on 09/22/08 at about 1753. The copies are going to be turned over to the District Attorney's Office.

**09/25/08**

At about 0830 I/O attended the victim's autopsy at Albany Medical Center. The attending Medical Examiner was Michaek Sikirica MD. Also present were Officer D. Farley, District Attorney R. McNally and Assistant District Attorney C. Book.

| DETECTIVE ASSIGNED | SUPERVISOR APPROVAL | PAGE NUMBER |
|---|---|---|
| D/Sgt Adam Mason | | 4/6 |
| CASE STATUS/ OPEN | | |

P001401

**APPENDIX**

| VICTIM'S NAME | REPORT DATE | INCIDENT NUMBER | DB NUMBER |
|---|---|---|---|
| Matthew Thomas | 09/26/08 | 86095-08 | - |

## NARRATIVE

**09/26/08**

At about 1000 I/O responded to Rensselaer County Court to testify in front of the Grand Jury.

**09/29/08**

At about 1100 I/O went to the NYS Police Lab with Officer D. Farley, ADA A. Glass & ADA C. Book to attend a meeting regarding the evidence in this case. Personnel attending the meeting from the NYS Police Lab were J. Pizziketti, M. Heller, T. Goble & R. Gettig. At about 1500 I/O went to ~~████~~ with Officer D. Farley to collect a DNA specimen from the victim's twin brother, ~~████~~ Thomas. I/O received permission for the specimen from ~~████~~'s foster parent, ~~████~~ was in the care of ~~████~~ mother ~~████~~ ~~████~~ at the time the specimen was collected. I/O also took a deposition from ~~████~~

I/O made a copy of the disc containing the interview with Thomas Sr. beginning on 09/22/08 at about 0008 and a copy of the three discs containing the interview with Thomas Sr. beginning on 09/22/08 at about 1753. The copies are going to be turned over to the District Attorney's Office.

**09/30/08**

At about 1615 I/O went to 502 Stanton Hill Apartments with Officer D. Farley to collect a DNA specimen from the victim's mother, Wilhemina Hicks. I/O also took a deposition from Hicks. I/O set up an interview with Hicks for Friday, October 3rd at 1730.

**10/01/08**

At about 2300 I/O went to Samaritan Hospital ER with D/Sgt. Epstein to interview and depose Katrina Kardos MD, the attending doctor when the victim was brought in on 09/21/08.

**10/02/08**

At about 1000 I/O met with ADA Art Glass to review the discs containing the interviews with Thomas Sr. I/O turned over both copies of the discs containing the interviews to ADA Glass.

**10/03/08**

At about 1730 I/O and Detective R. Fountain interviewed Wilhemina Hicks. The interview took place in the third floor interview room and was recorded on one disc. The interview was monitored by D/Sgt. T. Colaneri.

| DETECTIVE ASSIGNED | SUPERVISOR APPROVAL | PAGE NUMBER |
|---|---|---|
| D/Sgt Adam Mason | | 5/6 |
| CASE STATUS/ **OPEN** | | |

P001402

# APPENDIX

| VICTIM'S NAME | REPORT DATE | INCIDENT NUMBER | DB NUMBER |
|---|---|---|---|
| Matthew Thomas | 09/26/08 | 86095-08 | - |

## NARRATIVE

**10/08/08**

At about 0830 I/O and Detective R. Fountain attended a meeting with the Rensselaer County Child Fatality Team. At about 1200 I/O's responded to Sam's Club in Latham to inquire about a friend that Adrian Thomas Sr. mentioned during his interview. Employees at Sam's Club informed I/O's that the person we were looking for was ▓▓▓▓▓▓▓▓ and we were provided with contact information for ▓▓▓▓▓▓▓. At about 1400 I/O's responded to ▓▓▓▓▓▓▓▓▓▓ Troy to interview ▓▓▓▓▓▓. Maynard stated that he was a close friend of Thomas Sr.'s and although he was at the apartment several times, he never observed Thomas Sr. interact with any of the children. He stated that whenever he was around, Wilhemina was always caring for the children. He further stated that he never observed any inappropriate behavior towards any of the children by either parent. At about 1430 I/O's responded to the Cedar Park Apartments. I/O's spoke to ▓▓▓▓▓▓▓▓▓▓▓▓. He stated that he never heard or observed any inappropriate behavior associated with the family at ▓▓▓▓▓ I/O's spoke to ▓▓▓ ▓▓▓▓▓ ▓▓▓▓▓▓▓▓. She stated that she could constantly hear the children at ▓ ▓▓▓▓▓ crying, but she never observed any inappropriate behavior with the family. I/O's spoke to the apartment Office ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. She stated that she was aware of complaints made about the yelling at ▓▓▓▓ where the Police responded to the apartment, but no further action was taken.

**10/14/08**

At about 1545 Wilhemina Hicks came to Central Station to speak to I/O. She received a letter from Adrian Thomas Sr. and she wanted to turn the letter over to the police. Hicks gave the letter to I/O.

**10/21/08**

I/O made two copies of the disc containing the interview with Wilhemina Hicks on 10/03/08 at about 1730. The copies are going to be turned over to the District Attorney's Office.

**11/05/08**

At about 0830 I/O and Detective R. Fountain attended a meeting with the Rensselaer County Child Fatality Team. At about 1230 I/O turned over both copies of the disc containing the interview with Wilhemina Hicks to ADA Art Glass.

| DETECTIVE ASSIGNED | SUPERVISOR APPROVAL | PAGE NUMBER |
|---|---|---|
| D/Sgt Adam Mason | | 6/6 |
| CASE STATUS/ OPEN | | |

Case 1:17-cv-00626-DJS Document 1 Filed 06/14/21 Page 23 of 1

# EXHIBIT "H"

CD(s) containing confessions mailed to the Court

# APPENDIX

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

ADRIAN THOMAS,

                    Plaintiff,                                    **AFFIDAVIT**
                                                    Civil Action No.: 1:17-cv-626
            -against-                                          (GTS/DJS)

CITY OF TROY, ADAM R. MASON, RONALD FOUNTAIN,
TIM COLANERI, COUNTY OF RENSSELAER and
MICHAEL SIKIRICA,

                    Defendants.

_____

STATE OF NEW YORK          )
                           )ss.:
COUNTY OF RENSSELAER       )

**MICHAEL D. RANALLI**, being duly sworn deposes and says:

1.      I have been retained by Adam R. Mason, Ronald Fountain, and Tim Colaneri ("City Defendants") as an expert witness in the above referenced matter and as such I am fully familiar with the facts and circumstances of this case.

2.      I am currently employed as a Program Manager with Lexipol, LLC and am a contract instructor/consultant who conducts training classes throughout New York State's Division of Criminal Justice Services on topics such as street encounters, use of force, legal aspects of interrogations and confessions and wrongful convictions among other topics.

3.      I am also a member of the New York State Bar and U.S. District Court, Northern District of New York.

4.      I was the Chief of Police of the Glenville Police Department from June 2006 to June 2016 and worked in various ranks with the Colonie Police Department from September 1984 to June 2006 including: Patrol Officer (1984-1992); Training/Administrative Officer (1992-1997);

which included a promotion to investigator (1995-1997); Police Sergeant (1997-2003); and Police

Lieutenant (2003-2006). A copy of my CV is attached hereto as Exhibit "A".

5.      I make this affidavit in support of the City Defendant's summary judgment motion

pursuant to F.R.C.P. 56(a).

6.   In preparation of this matter, I have reviewed the following documentation:

> **Videos:**
> Interview DVD's labeled as follows:
> Adrian Thomas Disc #1 1st Interview
> Adrian Thomas Disc #2 2nd Interview Part 1
> Adrian Thomas Disc #2 2nd Interview Part 2
> Adrian Thomas Disc #2 2nd Interview Part 3
>
> **Exhibits – PDF documents labeled as follows:**
> A Thomas DSS records 2-bates
> Amended Complaint
> Complaint
> Criminal Trial 1 – Court Decision Dunaway Huntley, MAPP
> Criminal Trial 1 – Sept. 9 Huntley, Dunaway, MAPP Hearing Transcript Volume I (Mason)
> Criminal Trial 1 – Sept. 9 Huntley, Dunaway, MAPP Hearing Transcript Vol. II (Mason, Susan Graham, Lori Matulewicz, Joseph Centanni, and Ronald Fountain)
> P1389-P1524-TPD Reports Pt. 1
> Police Interview of Plaintiff on 9.29.2008 Transcript
> Thomas – Plaintiff's Expert Disclosure
> *People v. Thomas*, 93 A.D.3d 1019 (3rd. Dept. 2012), *rev'd* 22 N.Y.3d 629 (2014)
> *People v. Thomas*, 22 N.Y.3d 629 (2014)

7.      After reviewing all of the relevant documentation, I authored a report summarizing

my opinions. A coy of my Report is attached hereto as Exhibit "B".

8.      At the time of the Thomas Interview (2008) and relevant Court of Appeals'

Decision (2014), I was employed as the Chief of Police for the Glenville Police Department.

9.      Based upon my review of the above cited documentation and for the reasons more

fully articulated in Exhibit "B", it is my opinion within a reasonable degree of certainty based upon

my training, experience, knowledge of the applicable laws, and my understanding of contemporary police training, that the City Defendants conducted the investigation and both interviews of Mr. Thomas in a manner that would be consistent with police training and procedures at the time the interview was conducted and acted reasonably in their use of interview techniques.

10. It is further my opinion within a reasonable degree of certainty in my field that the attendance of the officers at the autopsy of M.T. and the collection of photographic and physical evidence during it is entirely consistent with police training and protocols in death investigations.

11. All opinions expressed in my report and herein are based upon my experience, training, knowledge of the applicable laws and understanding of contemporary police training and are expressed within a reasonable degree of certainty.

Dated: June ___11___, 2021.

Michael D. Ranalli

Sworn to before me this
__11__ day of ___June___, 2021.

_____
Notary Public, State of New York

Oleg Chernyavsky
Notary Public
No. 02CH6095967
Richmond County
Exp. Jan. 18, 2024

Case 1:17-cv-00626-DJS Document 6-1 Filed 06/14/19 Page 23 of 5

# Exhibit "A"

# APPENDIX

*Addendum to Expert Witness Report Michael Ranalli – Rule 26 List of Publications for the last 10 years*

**Lexipol blog posts (most also appeared in the Counsels Corner of the NYSACOP Chiefs Chronicle**:

De-Escalation: A Commonsense Approach – December 2020

Above All Else: Why Officer Safety Must Be a Top Agency Priority – June 2020

Truth, Lies and Video: Reassessing the Brady/Giglio Rule in the Era of Video Evidence – March 2020

The Light Brigade: A Historic Battle Provides a New Twist on Law Enforcement Culture – February 2020

Learning from Tragedies: Police Risk Mitigation Through Root Cause Analysis – December 2019

Reasonableness and Reaction Time in Police Use of Force Incidents – June 2019

Conclusive Evidence? Some Thoughts on the Limitations and Influence of Video Evidence – April 2019

Do Police Officers Have a Legal Obligation to Use De-Escalation Tactics? – March 2019

Learning from Leeroy Jenkins: The Importance of a Law Enforcement Incident Action Plan – September 2018

Countering the Critics: Responses to Common Arguments about Police Use of Deadly Force – July 2018

Police Use of Force: Reality vs. Law – October 2017

Police Use of Force Policy: Civil vs. Criminal Liability Considerations – August 2017

Police Use of Force: The Need for the Objective Reasonableness Standard – March 2017

Shooting at Vehicles: Crafting a Workable Policy – March 2017

Why PERF's Prohibition on Shooting at Vehicles Sells Agencies Short – September 2016

The Legitimacy Test: A More Practical Approach to De-Escalation – August 2016

Above and Beyond Graham v. Connor? Examining PERF's Second Guiding Principle – July 2016

Priority of Life: Building a Better Model for PERF's First Guiding Principle – June 2016

**Webinars**:

Michigan Police Reform: Taking the Initiative and Doing it Right - 2020

Conclusive Evidence? Understanding the Limitations of Video Footage – 2020

New York Legislative Update: Understanding Recent Police Reform Legislation – 2020

Duty to Intercede: Conceptual, Cultural and Legal Aspects – 2020

Officer Use of Force Statements: Considerations to Support Investigative Priorities - 2020

Safe Street Encounters: Threats, Human Performance Dynamics and the Law – 2019

What's the Mission? Responding to Suicidal Subjects – 2018

# APPENDIX

De-Escalation: When & How to Make it Work - 2018

Priority of Life: A Model for Improving Officer Safety and Reducing Risk - 2017

**Chiefs Chronicle Articles (in addition to the Lexipol blog posts):**

Legal Issues: The Hazards of Becoming (And Remaining) a Police Chief – March 2014

The Impact of the Repeal of GML §207-m and the New York State Budget – a One-Two punch, Ultimately on the Taxpayers – June 2014

Presidents Report and: Limitations on Search Incident to Arrest – September 2014

Presidents Report and: Police Use of Deception – December 2014

Presidents Report and: Counsels Corner – *Terebesi v. Torreso* – March 2015

Presidents Report and: Complexities of Case Law – June 2015

Different Rules When Dealing with the Mentally Ill? – September 2015

New York Right to Counsel Rules and Entry of Counsel: Welcome to the Twilight Zone – December 2015

Penal Law Review: Disorderly Conduct – March 2016

Adding Perspective to the PERF Guiding Principles on Use of Force: What Police Administrators Should Consider – June 2016

Priority of Life and Crew Resource Management: Partners in Reducing Risk – September 2016

NYSACOP Legislative Agenda Discussion: Juvenile Justice and Marijuana – December 2016

# APPENDIX

# MICHAEL D. RANALLI

## EDUCATION

**1987-1991    Albany Law School, Albany NY**
*Juris Doctor*
**1981-1983    SUNY College of Technology @ Utica/Rome**
*Bachelor of Professional Studies in Criminal Justice*
**1979-1981    Hudson Valley Community College**
*Associate in Applied Science (Criminal Justice)*

## PROFESSIONAL EXPERIENCE

**February 2015 to Present, Lexipol LLC**
*Program Manager II*
- Assist clients in implementing the Lexipol law enforcement policy manual at their agencies.
- Provide content (e.g., webinars, white papers, articles and lectures) on law enforcement topics for Sales and Marketing Team.
- Served as primary subject matter expert during the development of Lexipol's New York State law enforcement policy manual.

**June 2006 to June 2016, Glenville (N.Y.) Police Department**
*Chief of Police*
- Responsible for the day-to-day operation of the 22 officer and 5 civilian member municipal police department protecting a community of 30,000 residents with a budget of $3.2 million. Specific responsibilities included budget planning and administration, policy development, purchasing, training and development of supervisors, interaction with town board, discipline, and other matters related to departmental operations.

**November 2005 to Present**
*Contract Instructor/Consultant*
- Conduct one- and two-day training classes across New York State New York State Division of Criminal Justice Services on topics such as street encounters, high stress encounters, search and seizure, use of force, legal aspects of interrogations and confessions, wrongful convictions, and school violence: causation, prevention and response.
- Provide consulting services on investigations and litigation involving police use of force and police practices.

**March 1992 – June 2006, Part time self-employed law practice**
*Practicing Attorney*
- Solo part-time law practice focused on real estate, estate planning and probate and administration of estates.

**September 1984-June 2006, Colonie (N.Y.) Police Department**
*Police Lieutenant, August 2003- June 2006*
- Responsible for day shift patrol, Training Division, Community Services Division, Colonie Youth Court, & SAFE Schools Initiative. Supervised 20 officers, 4 sergeants and 2 civilians and prepared the budget for all assignments.

*Police Sergeant, January 1997- August 2003*

# APPENDIX

- May 2002 – August 2003 served as an Investigative Sergeant overseeing day-to-day operations of the Investigations Division, including drug investigations, the evidence room and the juvenile unit.
- March 2000 – May 2002 assigned to Administrative Services, DARE/Community Services and Training Division, supervising 7 officers and 13 civilians.
- January 1997 – March 2000 assigned to road patrol as a Patrol Sergeant, supervising between 15 and 17 officers.

*Training/ Administrative Officer, January 1992 – January 1997 (Rank of Patrolman and then Investigator '95-'97)*

- Scheduled, coordinated and taught training classes, conducted legal research, served on accreditation committee, assisted on litigation involving the town, and developed departmental policies and procedures.

*Patrol Officer, September 1984 – January 1992*

- Assigned to road patrol.

---

## ADDITIONAL PROFESSIONAL ACTIVITIES

- Past President of the New York State Association of Chiefs of Police.
- Certified Force Science Analyst. Attended the Force Science Institute Certification class April 2012, Specialist class Spring 2017. Classes involving the study of human performance factors.
- Member of the IACP Professional Standards, Ethics and Image Committee.
- Advisory Board Member of the Association of Force Investigators
- Former Chairman of the New York State Law Enforcement Accreditation Council.
- Member of New York State Bar and U.S. District Court, Northern District of N.Y since January 1992.
- Certified Police General Topics Instructor since May 1992. Have been an instructor for the last 27 years and in that time have taught every police officer hired and every supervisor promoted who attended the Zone 5 Regional Law Enforcement Academy. Repeatedly lectured for the NYS Division of Criminal Justice Services, New York State Chief's Association, the Law Enforcement Training Directors Association of New York State, the New York State Probation Officers Association, the Juvenile Officers Association and the DARE Officers Association. All lesson plans were independently researched and developed in the following areas:
  - ➢ Search and seizure under the Fourth Amendment and Article 1 §12 of the N.Y. Constitution
  - ➢ Laws of arrest and accusatory instruments
  - ➢ Legal issues in interrogations and confessions
  - ➢ Use of force and human performance factors
  - ➢ Policy development and application
  - ➢ Civil liability for police and for departments with tactical teams
  - ➢ Tactical issues and critical incident management
  - ➢ Wrongful convictions, false confessions and case management
  - ➢ School violence: Causation, prevention and response (for civilian teachers, administrators and police officers)
  - ➢ Leadership and management issues
  - ➢ The impact of high-stress encounters for supervisors, investigators, trainers and officers of all ranks and assignments
- Author of a book entitled "Search and Seizure Law of NYS: Street Encounters, 3rd Edition," published by Looseleaf Law Publications, Inc. Also the editor of a book entitled "Civil Liabilities of New York State Law Enforcement Officers, 3rd Edition." This is also published by Looseleaf Law Publications, Inc.
- Member of the Colonie Police Special Services Tactical Team 1994-2003. Served as the tactical team commander from April 2003 to April 2005. Served as an Incident Commander until retirement from Colonie PD.
- Member of Colonie part-time Internal Affairs Unit for over seven years and served on the Colonie accreditation policy development committee from January of 1992 until retirement.

Case 1:17-cv-00626-DJS Document 31-4 Filed 06/14/21 Page 102 of 16

# Exhibit "B"

**Michael D. Ranalli**

*Attorney at Law*
*Law Enforcement Training and Consulting*
mranalli@nycap.rr.com | (518)378-8629
_____

January 27th, 2021

Rhiannon I. Spencer, ESQ.
Pattison Sampson Ginsberg & Griffin, PLLC
22 First Street
Troy, NY 12180

Re:      *Adrian Thomas v. City of Troy et al.* Case no. 1.17-CV-626 (GTS/DJS)

Dear Ms. Spencer:

Thank you for retaining me to review and render an opinion regarding the police practices in the above referenced incident. This report contains my findings and opinions as of today's date. I reserve the right to modify my findings and opinions should additional information become available.

INTRODUCTION AND QUALIFICATIONS (Rule 26)

I obtained a Bachelor of Professional Studies in Criminal Justice degree in 1983. I started my career in law enforcement with the New York Town of Colonie Police Department in September 1984. I was a patrol officer from 1984 until 1992. During that time I attended Albany Law School, graduating with a Juris Doctor degree in 1991. Upon passing the bar exam, I was admitted to the New York State Bar and the U.S. District Court, Northern District of New York in January 1992. Once admitted to the bar, I was reassigned to the department training unit and became a certified police instructor. I have remained as a police instructor for the past 29 years, researching and developing training classes.

In January 1997 I was promoted to sergeant and served as a patrol sergeant, an administrative sergeant and as an investigative sergeant. In the latter assignment I oversaw the juvenile unit and the special investigative unit, among other duties. I was promoted to lieutenant in August of 2003 and served in that capacity until June of 2006. From 1994 to 2003 I served as an active member of our tactical team and became the tactical team commander for an additional two years.

In June 2006 I retired from the Colonie Police Department and was appointed Chief of Police of the Town of Glenville Police Department, where I stayed until my retirement in 2016. I currently work for a company called Lexipol, specializing in law enforcement policy and training. My

employment with Lexipol is separate and is not related to my professional services in reviewing this incident.

I have lectured as a contract instructor for the New York State Division of Criminal Justice Services for over 15 years and have lectured for many other law enforcement related associations. I teach on a diverse number of topics with my primary focus on use of force, human performance factors, search and seizure, street encounters, civil liability, legal aspects of interrogations and confessions and leadership. During my 29 years as a police instructor I have taught over 15,000 police officers.

I am the author of a book entitled "Search and Seizure Law of NYS: Street Encounters, 3rd Edition," published by Looseleaf Law Publications, Inc. I am also the editor of a book entitled "Civil Liabilities of New York State Law Enforcement Officers, 3rd Edition", also published by Looseleaf Law Publications, Inc.

A more comprehensive list of my articles and my CV will be attached at the end of this report.

While I have consulted on a number of police matters and internal investigations, I have not testified at a trial in the last four years. I have recently testified in a criminal grand jury proceeding regarding a police shooting, which proceedings are sealed. In 2020, I testified in expert witness depositions in the following cases:

- *Scism v. City of Schenectady*   Case no. 1:18-CV-00672 (LEK/TWD) – Schenectady, NY
- *Reinella S. Kirilova, as Administratix of the Estate of William Allen Young, Jr. v. Russell Braun, et. al.,* Case no. 3:17-cv-481-DJH-DW – Louisville, KY

I am being compensated at a rate of $125 per hour for review, consultation and report preparation and $225 per hour for deposition and trial related time.

MATERIALS CONSIDERED AND/OR RELIED UPON IN THE PREPARATION OF THIS REPORT

**Videos:**
Interview DVD's labeled as follows:
Adrian Thomas Disc #1 1st Interview
Adrian Thomas Disc #2 2nd Interview Part 1
Adrian Thomas Disc #2 2nd Interview Part 2
Adrian Thomas Disc #2 2nd Interview Part 3

**Exhibits – PDF documents labeled as follows:**
A Thomas DSS records 2-bates
Amended complaint
Complaint
Criminal Trial 1 – Court Decision Dunaway Huntley, MAPP
Criminal Trial 1 – Sept. 9 Huntley, Dunaway, MAPP Hearing Transcript Volume I (Mason)
Criminal Trial 1 – Sept. 9 Huntley, Dunaway, MAPP Hearing Transcript Vol. II (Mason, Susan Graham. Lori Matulewicz, Joseph Centanni, Fountain)
P1389-P1524-TPD Reports Pt. 1

Police interview of Plaintiff on 9.29.2008 Transcript
Thomas – Plaintiff's Expert Disclosure
*People v. Thomas*, 93 A.D.3d 1019 (3rd. Dept. 2012), *rev'd* 22 N.Y.3d 629 (2014)
*People v. Thomas*, 22 N.Y.3d 629 (2014)

**REPORT**

**PART 1: PURPOSE & SCOPE**:

I was asked to utilize my fields of expertise in the law, policy and in contemporary police training and police practices to analyze the circumstances which form the basis of this case and to provide information and analysis that would be relevant to a finder of fact. In so doing, I have performed an objective review of all the information provided to me. To remain faithful to the requirement of objectivity, I have avoided subjective determinations of witness credibility.

Specifically, I was asked to render an opinion on three issues:

1. Whether the criminal investigation and interviews of Adrian Thomas were conducted in a manner that would be consistent with the law at the time of the interviews and therefore consistent with police training and procedures on legal aspects of investigation, interrogations and confessions, thereby causing a reasonable officer to believe probable cause to arrest Adrian Thomas existed. The law and police training in this area are intricately intertwined and therefore inseparable.
2. Whether any officers involved with the investigation and/or observing the interviews of Adrian Thomas had a duty to intervene.
3. Whether the procedures followed by the members of the Troy Police Department in conjunction with the medical examiner while investigating the death of Matthew Thomas were consistent with typical police training and protocol and not evidence of a conspiracy to violate the constitutional rights of Adrian Thomas.

**PART 2: SUMMARY OF EVENTS**

The following is a summary of the events occurring in the days after the investigation started. The information is taken from the various sources cited as the materials reviewed by me for this report. More detailed facts will be mentioned and discussed in Part 3 of this report.

On September 21, 2008, at approximately 9:00 am, four-month-old Matthew Thomas was brought to Samaritan Hospital in Troy in respiratory arrest. Medical staff there decided that, due to his condition, Matthew should be transferred to the Albany Medical Center (AMC) for treatment and, at approximately 11:50 am, such transfer occurred. According to CPS reports reviewed, at approximately 2:30 pm AMC staff contacted Child Protective Services (CPS) and reported that Matthew had injuries not consistent with a child of his age which included a possible skull fracture and bleeding on the brain.  At approximately 3:38 pm, CPS staff met with Dr. Dunnetz at AMC who informed CPS that further medical assessments revealed that Matthew had bilateral subdural hematomas, "some old and some new" and that Matthew had

older injuries to the left side of his brain and newer injuries on the right side of the brain. Dr. Dunnetz informed CPS that Matthews pupils were "blown and dilated, a sign he was going into brain death" and would most likely not survive his injuries. Dr. Dunnetz informed CPS that Matthews mother, Wilhelmina Hicks had not been spoken to yet. At approximately 4:00 pm, Dr. Dunnetz informed CPS that further medical assessment revealed that Matthew did have a skull fracture and, when asked to provide an explanation for the injuries in her professional opinion, Dr. Dunnetz said possible explanations included the baby being shaken, or by being in a severe motor vehicle accident, or by being hit on the head. At approximately 6:00 pm on September 21, 2008, CPS called Troy Police Department and reported Matthew's injury and requested assistance from Troy Police Department in removing the other 6 children in the Thomas/Hicks house due to CPS' documented concerns that an imminent risk to the children existed. Prior to executing the removal of the children, CPS met with Detective Mason, Detective Fountain, and Officer Buttafucco and informed them of the information received from the AMC treating medical professions regarding Matthew's critical condition. After meeting with staff from Child Protective Services (CPS), the officers responded to Samaritan Emergency Room where they interviewed some of the medical providers who initially treated Matthew.

After leaving Samaritan Hospital, members of CPS and the police department responded to the Thomas residence and executed the removal of the six children. Adrian Thomas, the father of all but one of the children, was at the residence at the time. Mr. Thomas advised the officers that Matthew had a fever and diarrhea for the past two days. His wife woke him when she found Matthew unresponsive. He sprinkled water on Matthews face with no reaction and they called 911. His wife, Wilhelmina Hicks, performed CPR on Matthew and then the ambulance arrived.

The officers left the residence and responded to AMC. The officers were then advised by the charge nurse, Rebecca Peccano, that Matthew suffered a bilateral sub dural hematoma and that it appeared there was both old and new blood on the brain, indicating an old injury to his head. This was confirmed to Det. Fountain by Dr. Walter Edge who also felt at the time that Matthew had a skull fracture, which turned out not to be the case. Dr. Edge further explained that this type of injury was typically caused by a high-speed impact or by slamming very hard into an object and even told the officers that "this was a murder". Wilhelmina Hicks was interviewed at the hospital and a supporting deposition taken from her.

The detectives then went back to the Thomas residence and asked Adrian Thomas ("Thomas") if he would respond to the Troy Police Department to be interviewed. He agreed and was transported by the detectives but was not handcuffed or otherwise restrained. At the station, Thomas was placed in an interview room equipped with a video recording system. Sgt. Mason ("Mason") read and explained Thomas's Miranda warnings and Thomas waived and acknowledged them in writing. During the subsequent approximately 1 hour and 45-minute interview, Thomas made statements and gave a supporting deposition indicating, among other things, that about 10 days before, he was putting Matthew in the crib and smacked his head on

# APPENDIX

the crib. During the latter part of the interview Thomas expressed a desire to harm himself. The detectives stopped the interview and transported him to Samaritan Hospital Mental Health at approximately 2:00 am on 9/22/08 for evaluation, where he stayed for about 15-16 hours.

Later that morning the investigation continued with more statements and interviews conducted with persons with knowledge of the case. Thomas was released from Samaritan and was met by Sgt. Mason and Sgt. Centanni. Thomas agreed to come back to the police station for another interview and was transported there by the detectives. Thomas again waived his rights in writing and willingly participated in the interview for the next 7 hours. During this interview Thomas admitted to throwing Matthew down on the bed several times and demonstrated how this occurred. A voluntary statement was completed, and Thomas was subsequently charged and arrested.

During the interviews of Thomas, Fountain and Mason used several common and accepted police interview tactics such as withholding known information and the use of deception. Specifically, Thomas was repeatedly told that the officers believed it was an accident, that Thomas would not be arrested, and that he would be going home that night. An evidentiary hearing was conducted by Judge Andrew Ceresia, and testimony taken from Mason and Fountain. Judge Ceresia also reviewed the full video of both interviews. The judge ruled that, among other things, Fountain and Mason administered Thomas his rights which were waived by Thomas in both interviews, that Thomas never requested counsel for the interviews, that Thomas was not in custody for the first nor initially for the second interview, a lengthy interview alone does not render a suspect's statement to be involuntary, and that the deceptions during the interviews did not create a risk that Thomas would falsely incriminate himself nor did the deceptions amount to coercive police tactics. Based upon Judge Ceresia's above findings, he denied the defense's motion to preclude the video-taped confession and held that under the totality of the circumstances, the People established, beyond a reasonable doubt, that Thomas' statements were voluntarily made.

**PART 3: Whether the criminal investigation and interviews of Adrian Thomas were conducted in a manner that would be consistent with the law at the time of the interviews and therefore consistent with police training and procedures on legal aspects of investigation, interrogations and confessions, thereby causing a reasonable officer to believe probable cause to arrest Adrian Thomas existed. The law and police training in this area are intricately intertwined and therefore inseparable.**

1. **General Considerations**

Investigations of suspected child abuse within a household are generally difficult and provide unique challenges. When presented with physical and medical opinion evidence of apparent physical abuse, the questions become how it could have happened and who could have done it. Both questions present initial problems that are heavily dependent upon the medical findings and diagnosis. As to how, the known medical evidence is key to either considering or ruling out

a possible accident. If the injury is of a nature that an accident is not probable, as asserted by treating medical professionals, the question of how then shifts to who injured the child. As to who, the answer must be by someone who has access to the victim. This is typically a parent or other caregiver, but the true difficulty with this question arises from the fact that the medical evidence may not be of any further assistance.

The interview of any given suspect in abuse cases, or in any criminal investigation, rarely results in anything as simple as "did you abuse this child?" and the response being "yes, I did". Suspect interviews evolve as they happen based upon many different factors and require constant adjustments to tone and tactics. Police training in interrogations and confessions include an acknowledgment of the fact that police deception is allowed during suspect interviews as long as the deceptive tactics do not rise to the level that they would create a substantial risk that the suspect would falsely incriminate him/herself.

The role of a suspect interview in abuse cases is but one piece of the total investigation and any resulting prosecution. The use of video recording technology in such interviews has become a critical tool in that it allows any prosecutor, defense attorney or finder of fact to see for themselves what happened during the interview. While written statements are still used, the best evidence of whether the officers respected the rights of the suspect and the suspect's veracity and voluntariness is the video itself. It is, however, as with all video of any kind, subject to a hindsight level of review and analysis that was not available to the officer conducting the interview. In other words, some subtle details may not have been picked up on by the officer during the emotion and stress of the interview. What was said an hour or two previously may no longer be completely within the memory of the officer conducting the interview.

Finally, child abuse cases arising within a household also complicate the ability for officers to protect against the possibility of a person admitting to something they did not do. Interview training includes the recommendation of keeping pieces of information about a crime and/or scene confidential. This would be the type of information that only the offender would know so it is used a means of identifying a potential false confession. With inter-household, inter-familial offenses this is typically not available or possible. With such cases it becomes even more important to accept that any admission or confession is only one part of the prosecution. Medical evidence, opportunity, corroborating information from other persons with knowledge, prior complaints and any other relevant information must be considered for any prosecution.

2. **The First Interview of Adrian Thomas**

The first interview was started the night of 09/21/2008 at the Troy Police Department. Thomas had voluntarily agreed to the interview and to accompany the officers to the station. He was not handcuffed or otherwise restrained. Mason appropriately and thoroughly explained Thomas's Fifth and Sixth Amendment rights, which Thomas read, acknowledged, and waived in writing. At this point in time, Mason and Fountain had the following information available to them going into the interview:

- Matthew had been taken to Samaritan Hospital and subsequently taken to Albany Medical Center for respiratory problems and, after examination, diagnosed with severe trauma to the head.
- Child Protective Services (CPS) had been to the residence previously for a complaint of potential abuse. They feared for the safety of the other six children and the officers and CPS workers responded to the familial home to remove the other children.
- After removing the other children, the officers left Thomas at the residence to gather more information. At AMC the officers were told by a nurse that Matthew had signs of both old and new injuries. Fountain was told by Dr. Edge that this type of injury is usually the result of a high-speed injury and that "this is murder". They were also told that Matthew had a fractured skull.
- Wilhelmina Hicks had given a statement indicating that Thomas was alone in their bedroom the night before and Matthew had been crying but then suddenly stopped. She also stated that Thomas had previously beat her daughter India (9 yoa) with a belt in the bedroom. When CPS investigated a complaint, she admitted she lied to CPS about the "whooping" and said that Thomas only yelled at India. She also stated that Thomas did have anger issues when dealing with the kids.

It should be noted that Fountain and Mason decided to bring Thomas from his home to the station for the interview primarily so they could memorialize the interview on video. This is a clear indication that the officer's intent was to attempt to attain the truth of what had occurred and to have it memorialized on video permanently. The door to the interview room was open and Thomas was given cigarettes and was even left alone at one point. At no time were the officers abusive or even rude to Thomas.

During this initial interview Thomas discussed how he would "whoop" or "pop" some of the children occasionally; that he had been unemployed since February and that he and his wife would argue about money and other issues. He also confirmed that he would be alone in the bedroom with Matthew. Late in the interview Thomas admitted to dropping Matthew, resulting in his hitting his head on the crib.

In these interviews it can be difficult to get someone to admit that they may have done something to injure a child so significantly. At this point in the investigation with the information known, it would still be possible that the injury did occur because of an accident. The information could also have supported a spontaneous act arising out of frustration. To propose possible scenarios would be appropriate under these circumstances. Further, indicating to Thomas that if he did not injure Matthew then his wife must have, is a fair and objective statement if they were the only people with access to him, as represented by both Thomas and Wilhelmina. During the interview Thomas did indicate that he would "take the blame for it" and "I will take the fall for my wife" while denying he did anything wrong. Each time Mason responded in conformance with appropriate police interview standards and told

Thomas he cannot just take the fall[1] but, instead, Thomas had to tell them what happened – which is the purpose of the interview, to determine the truth of what happened to Matthew. Once Thomas was told the police were not looking for him to take the fall and he admitted to dropping Matthew, resulting in his hitting his head on the crib, it would be reasonable for an officer to believe Thomas was being truthful about such admitted scenario.

Despite Thomas' admission, Fountain chose to document the results of this interview on a witness deposition as compared to a voluntary statement. The former is what officers would use when interviewing a person of knowledge of an incident and the latter would be used with a suspect. This choice of documentation helps to confirm the officer's statements that Thomas was not in custody and would be going home that night as opposed to simply being a form of deception regarding potential leniency.

Once Thomas confirmed that he was considering harming himself, the officers appropriately ended the interview and brought him to Samaritan Hospital for evaluation, which is consistent with police training and a recognition of Thomas's rights and well-being. It is important to note here that this appears to be a clear indication that the officers were not trying to force Thomas into any type of false confession or otherwise compromise his constitutional rights. They did not keep pushing Thomas while he was in a potentially vulnerable state of mind. Additionally, stopping the interview at this point could have led to the intervention of counsel on behalf of Thomas or he subsequently changing his mind about cooperating with the police. This could have effectively shut down the most important part of the investigation. Despite this risk the officers sought to protect Thomas' health and wellbeing.

**Conclusion regarding the first interview:** Assuming the factual accounts provided in the reviewed documents are found to be true, for the reasons stated throughout this report, and based upon my training, experience, knowledge of the applicable laws, and my understanding of contemporary training, I draw the following conclusion: The first interview of Adrian Thomas was conducted in a manner that would be consistent with the law at the time of the interviews and therefore consistent with police training and procedures on legal aspects of investigation, interrogations and confessions in such cases. It was early in the investigation and the officers did not jump to any conclusions. Thomas was not in custody and was not arrested solely based upon this initial admission that he had dropped Matthew, causing him to hit his head on the side of the crib, and the fact he had the opportunity by being alone with Matthew in the bedroom. Since the police officers' conduct during the first interview was in conformance with standard police training and procedures, there was no duty to intervene by observing officers. Based upon all the information available to the officers at the time it would have been inexplicable not to attempt to interview Thomas at this point in the investigation.

---

[1] Video segment Part 1 and PDF "Police Interview of Plaintiff on 9292008 – Transcript" pp.83-85/124

3. **The Second Interview of Adrian Thomas (9/22/2008)**

While Thomas was being evaluated at Samaritan for approximately the next 15 hours, the investigation continued. In addition to all the information available to the officers prior to the first interview, Mason also had additional information prior to the start of the second interview:

- Mason was now aware that Matthew's skull was not fractured, but he took a statement from Dr. Edge who indicated that Matthew had a subdural hematoma that was likely caused by violent shaking or other type of acceleration prior to striking an object or rapid deceleration such as being in a high-speed motor vehicle accident. Mason also spoke with Neurologist John Waldman whose opinion on the nature of the injury was consistent with Dr. Edge.
- Sgt. Colaneri saw Matthew in the hospital and noted significant swelling of his head and eyes but was unable to determine if he had any bruises.
- Fountain was monitoring the interview of the child India Hicks, who indicated that the morning Matthew was brought to the hospital she saw Thomas throw Matthew into his crib and bang his head off the side. After this Matthew was limp.

With all the information available at this time it would be reasonable for any officer to conclude that more happened to Matthew than indicated so far by Thomas in the first interview and that a follow up interview would be required. Specifically, Mason now had confirmation from two different medical doctors, who had additional time to conduct examinations, that Matthew was injured by some type of forcible trauma. Also significant was the fact that India reported seeing Thomas throw Matthew on the same day of the hospital admission, which was entirely consistent with what Thomas had already admitted to doing to Matthew previously.

Mason met Thomas as he was released from Samaritan and he once again agreed to be interviewed at the police station on video. Mason once again advised Thomas of his rights in writing and Thomas waived and acknowledged the waiver in writing. There was only one point in both interviews that Thomas ever even mentioned an attorney, and in the context of the conversation at the time it was regarding having an attorney for family court. Consistent with police training and legal precedent, Mason handled this appropriately by verifying that Thomas was in fact referring to the need for an attorney in family court as compared to the current interview.

Thomas made several additional admissions during this interview. He admitted to hitting Matthew's head on the crib on the day he went to the hospital. He also indicated that he slammed Matthew down on the bed with significant force on several occasions, which he demonstrated on video. Mr. Thomas had also confirmed again that he would periodically be alone with Matthew in the room. He also indicated that at one point his head impacted with Matthew's when Thomas leaned back on the bed where Matthew was laying. Thomas also elaborated on the difficulties he was having with his wife and her family which was a further indication of the frustrations he was facing. At one point in the interview Thomas gave details

that occurred before and after one of the times he stated he threw Matthew on the bed. Significantly he described how he had been fighting with his wife and threw Matthew down on the bed out of frustration. Under all these circumstances it would be reasonable for the officers to conclude this could have occurred.

While this interview did continue for over 7 hours, the overall tone was respectful and low key. There was only one point when Sgt. Colaneri came in and challenged Thomas's version of the events and then left. Mason did continue with this but soon reverted to the same tone and demeanor exhibited during the rest of the interview. Thomas was once again provided with cigarettes and was also offered bathroom breaks, drinks and snacks, which he declined. Thomas never asked to leave and although he possessed his cell phone, never asked to call anyone. Throughout the interview Thomas seemed alert and cooperative and willing to continue. While Mason was preparing the voluntary statement there were prolonged periods of time where there was no conversation at all, other than to occasionally verify specific details. Once the 10-page voluntary statement was completed, Thomas was given ample time to read it and was left alone to do so. There was no continuous and unrelenting pressure on Thomas and most of the interview could be described as conversational.

Mason did continue to mislead Thomas about the condition of Matthew and that the doctors needed to know exactly what happened to him so they could treat him. He also continued to reassure Thomas that what happened was an accident and that he would be going home. Consistent with police training in 2008, and still today, these individual deceptive techniques were permissible and still are. *People v. Thomas*, 22 N.Y.3d 629 (2014) expressly did not invalidate the use of these individual points of deception and this point is a component of current police training[2].

There did come a point in the interview, however, where Mason did stop telling Thomas that he would not be arrested and that he would be going home. Specifically, this occurred after Thomas admitted to throwing Matthew violently down on the bed as that changed the circumstances.

After Thomas was provided ample time to review the 10-page voluntary statement and he signed the same in agreement, he was arrested and charged with Murder in the 2nd degree.

**Conclusion regarding the second interview and the on-going investigation:** Assuming the factual accounts provided in the reviewed documents are found to be true, for the reasons stated throughout this report, and based upon my training, experience, knowledge of the applicable laws, and my understanding of contemporary training, I draw the following conclusion: The second interview of Adrian Thomas was conducted in a manner that would be

---

[2] "We do not decide whether these police techniques would themselves require suppression of defendant's statements, but that they, taken in combination with the threat to arrest his wife and the deception about the child, reinforce our conclusion that, as a matter of law, defendants statements were involuntary". *People v. Thomas*, 22 N.Y.3d 629, at 646.

# APPENDIX

consistent with the law at the time of the interview and therefore consistent with police training and procedures on legal aspects of investigation, interrogations and confessions thereby allowing for a reasonable officer to believe Thomas' confession was voluntary and true, causing a reasonable officer to believe probable cause to arrest Adrian Thomas existed. The law and police training in this area are intricately intertwined. Since the police officers' conduct during the investigation and second interview was in conformance with standard police training and procedures, there was no duty to intervene by observing officers. Mason had information from two separate doctors that Matthew was injured by some type of forcible trauma. The medical information in such cases is critical to establishing whether a crime was committed and the actions that Thomas admitted to could have conceivably caused the injuries. Thomas had opportunity to injure Matthew unobserved during the time he spent alone with him. He also discussed his multiple points of frustration he was facing with his wife and his unemployment which contributed to his taking those frustrations out on Matthew.

Subsequently, the initial medical findings were then confirmed by the autopsy conducted on September 25, 2008 by Dr. Michael Sikirica. The cause of death was listed at severe closed head injuries with cerebral edema due to blunt force trauma.

The investigation also did not solely rest on the interview and statements of Thomas. Search warrants were executed on the Thomas household in order to find additional evidence. Additional interviews were conducted, including the mother Wilhelmina Hicks, and additional follow up with CPS. CPS investigation notes also indicate that Thomas was interviewed at the Rensselaer County Jail by two CPS caseworkers and he repeated his admissions that he threw Matthew repeatedly on the bed and dropped him in the crib.

Additional support for my opinion and conclusion that a reasonable officer at the time would have believed the investigation was conducted in a manner that was consistent with law, training and procedures and that probable cause to believe Thomas committed a crime can be found in the decision issued on September 15, 2009 by the Honorable Andrew Ceresia, Rensselaer County Court Judge following a combined evidentiary hearing. Judge Ceresia ruled that Thomas was not in custody until he was ultimately arrested when probable cause did exist and his statements were, therefore, admissible; that Thomas's statements were voluntary, and the deceptive tactics were not unduly coercive to render the statements involuntary; that his constitutional Miranda rights were upheld; and that the search warrants were supported by reasonable cause. Thomas was then subsequently convicted after a jury trial. The findings of the hearing court were also supported by a unanimous panel of five judges of the Appellate Division after the conviction of Thomas at trial in *People v. Thomas*, 93 A.D.3d 1019 (3rd. Dept. 2012), *rev'd* 22 N.Y.3d 629 (2014). While the New York Court of Appeals ultimately found the statements of Thomas to have been involuntarily given, it would be impossible to conclude the officers did not act properly and did not have probable cause to arrest Thomas when a total of six judges and a jury came to that same conclusion.

**4.  Findings of Plaintiff's expert Matthew B. Johnson, Ph.D.**

Dr. Johnson concludes that "the police officers used a variety of illegal (*People v. Thomas*, 2014) deceptive, suggestive, and coercive methods to elicit incriminating statements from [Thomas] to correspond to a faulty medical assessment" and "several defendants knew, or should have known, the elevated risk of false incriminating statements in such a situation".

Dr. Johnson relies heavily on two factors: a flawed medical diagnosis and "illegal" police interview tactics. His reliance on these two factors is not supported by the materials that I have reviewed.

As to the "flawed medical diagnosis", it appears that the primary difference between all the medical experts on both sides of the case was that the People's experts testified the cause of death was the subdural hematomas caused by severe blunt force head trauma, and that sepsis and pneumonia were secondary contributing factors, but not the sole cause. One witness testified that the actions of throwing Matthew down on a mattress could result in the type of injuries suffered by Matthew. By contrast, the defendant's experts concluded that sepsis leading to meningitis and septic shock and not head trauma was the cause of death, and that throwing the child on a mattress would "probably not" result in severe head trauma (*People v. Thomas*, 2012).

Unless there have been additional findings outside of the material provided to me for review, the conflicting medical opinions during the investigation and the subsequent trials are not conclusive one way or another. The findings of Plaintiff Expert Dr. Leestma, 12 years after the incident, are not relevant to the actions and decisions of the officers while the case was active. I certainly cannot draw any conclusion as to Matthew's cause of death, but I can and do conclude that it was reasonable and appropriate at the time of the investigation for officers to rely on the medical conclusions of two different attending physicians, the hospital staff and the medical examiner.

As to Dr. Johnson's conclusion that the tactics were illegal, he is applying hindsight to judge the actions of the officers who would not have known their actions would be deemed to have produced an involuntary statement by an appellate court some six years later. As addressed previously in this report, the actions of the officers were upheld by two different courts prior to the ultimate decision by the Court of Appeals. And the Court of Appeals decision only concluded that, under all the facts of this case, the culmination of the tactics used led to the determination the statement was involuntary. The court did not invalidate the use of individual deceptive tactics in the 2014 decision.

Dr. Johnson cites numerous resources and reference articles pertaining to false confessions. These concepts are important, and I have incorporated content on the risks of false confessions within my training classes, but I do not agree with his conclusion that the officers knew or should have known the elevated risk of a false incriminating statements in this situation. Expecting officers to diagnose and understand in all cases why a person is willing to waive their

# APPENDIX

rights and eventually admit to certain acts would impose an unrealistic burden upon them. First, it needs to be noted that many of the research articles referenced by Dr. Johnson are dated after the date of this investigation. Also, under these specific facts, any isolation of Thomas was done by Thomas himself. I have already previously described the relaxed and non-custodial nature of the interviews, which is evident in the videos. Thomas never asked to leave or to call anyone and he certainly was not pressured by officers to stay. At several points while he was left alone in an unlocked room he could have simply walked out. Regarding "leading" questions, the officers were aware of the layout and furniture within the apartment after having been there when CPS took the other children. They also had reasonably reliable information from the doctors about how the injury could have occurred. Knowing the layout and furniture within the apartment, and where it would be likely that any abuse may have occurred, could reasonably result in an officer proposing a possible action or behavior that could have led to the injury. As stated previously, these are difficult cases to investigate. Someone who harmed a child is not likely to readily admit it. Without such tactics to start conversations it would be an incredibly quiet room.

On a final note, both interviews of Thomas were deliberately done in a room with video recording capability. In addition, there are no allegations in any of the provided documentation that alleges the officers conducted any part of the interview off-camera. This allowed for the memorializing of everything that occurred during the entire interview demonstrating no intent to conceal the interviews or obscure the interview tactics used by the officers. These conclusions can vary, but there has been, to my knowledge, no definitive finding that Thomas's admissions were false. Dr. Johnson's report is premised on the assumption they were. A legal ruling that a statement was involuntarily given does not automatically mean the content of the statement was false.

**Conclusions regarding the findings of Dr. Johnson**: Assuming the factual accounts provided in the reviewed documents are found to be true, for the reasons stated throughout this report, and based upon my training, experience, knowledge of the applicable laws, and my understanding of contemporary training, I draw the following conclusions: It was reasonable and appropriate at the time of the investigation for officers to rely on the medical conclusions of two different attending physicians, the hospital staff and then the medical examiner. The deceptive tactics used by the officers in the interviews of Adrian Thomas were legal and appropriate to use at the time of Thomas's interviews and the interviews themselves were deliberately memorialized by the officers on video for review and consideration of all involved in the case.

**PART 4: Whether the procedures followed by the members of the Troy Police Department in conjunction with the medical examiner while investigating the death of Matthew Thomas were consistent with typical police training and protocol and not evidence of a conspiracy to violate the constitutional rights of Adrian Thomas.**

In accordance with normal procedures surrounding a death investigation, an autopsy was performed on Matthew on September 25, 2008. Dr. Michael Sikirica conducted the procedure and in attendance were Mason and Officer D. Farley (forensic technician) along with members of the District Attorney's office. During the autopsy Officer Farley collected three items of evidence and took a series of photos. The photos and evidence were appropriately logged in as potential evidence and submitted with the case file.

**Conclusions regarding the protocols followed during the autopsy**: Assuming the factual accounts provided in the reviewed documents are found to be true, for the reasons stated throughout this report, and based upon my training, experience, knowledge of the applicable laws, and my understanding of contemporary training, I draw the following conclusion: The attendance of the officers at the autopsy and the collection of photographic and physical evidence during it is entirely consistent with police training and protocols in death investigations and is not evidence of a conspiracy to violate the constitutional rights of Adrian Thomas. In my 32 years of experience as an active police officer I cannot remember there ever being a suspicious or unattended death in which officers did not attend the autopsy. The only exception would be for persons under a doctor's care for an underlying health condition or elderly in non-suspicious circumstances and an autopsy was not even conducted. The role of the officers at an autopsy is to collect and document evidence. It is critical and typical practice for a police officer to attend an autopsy because, without such attendance and documentation of the pictures and evidence, then the chain of evidence and custody would not be established, and important evidence could be lost. If a picture taken or evidence collected by someone else at the autopsy were to be used at a trial, then the defense attorney could be able to get it suppressed if there was no documented record of its collection and chain of custody.

## PART 5: SUMMARY OF CONCLUSIONS

Assuming the factual accounts provided in the reviewed documents are found to be true, for the reasons stated throughout this report, and based upon my training, experience, knowledge of the applicable laws, and my understanding of contemporary training, I draw the following conclusions to a reasonable degree of certainty within my field:

1) The first interview of Adrian Thomas was conducted in a manner that would be consistent with the law at the time of the interview and therefore consistent with police training and procedures on legal aspects of investigation, interrogations and confessions in such cases. It was early in the investigation and the officers did not jump to any conclusions. Thomas was not in custody and was not arrested solely based upon this initial admission that he had dropped Matthew causing him to hit his head on the side of the crib and the fact he had the opportunity by being alone with Matthew in the bedroom. Based upon all the information available to the officers at the time it would have been inexplicable not to attempt to interview Thomas at this point in the investigation.

Case 1:23-cv-00626-DUS Document 64-12 02-26 Filed 06/14/2024 35 Filed 06/14/24 Page 163 of 16

2) The second interview of Adrian Thomas was conducted in a manner that would be consistent with the law at the time of the interview and therefore consistent with police training and procedures on legal aspects of investigation, interrogations and confessions thereby allowing for a reasonable officer to believe Thomas' confession was voluntary and true, causing a reasonable officer to believe to believe probable cause to arrest Adrian Thomas existed.

3) It was reasonable and appropriate at the time of the investigation for officers to rely on the medical conclusions of two different attending physicians, the hospital staff and then the medical examiner. The deceptive tactics used by the officers in the interviews of Adrian Thomas were legal and appropriate to use at the time of Thomas's interviews and the interviews themselves were deliberately memorialized by the officers on video for review and consideration of all involved in the case.

4) Since the police officers' conduct during the investigation and interviews of Thomas was in conformance with standard police training and procedures, there was no duty to intervene by observing officers.

5) The attendance of the officers at the autopsy and the collection of photographic and physical evidence during it is entirely consistent with police training and protocols in death investigations and is not evidence of a conspiracy to violate the constitutional rights of Adrian Thomas.

Attached are a list of my publications in addition to those cited within this report and my CV.

Submitted on January 27ᵗʰ, 2021 by:

*Michael D. Ranalli*

Michael D. Ranalli

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

ADRIAN THOMAS,

                              Plaintiff,

               -against-

ADAM R. MASON, RONALD FOUNTAIN,
TIM COLANERI, and MICHAEL SIKIRICA,

                          Defendants.

**ATTORNEY DECLARATION**
Civil Action No.: 1:17-cv-626
(GTS/DJS)

_____

**RHIANNON I. SPENCER, ESQ**., under penalty of perjury, sets forth the following:

1.      I am an attorney duly licensed and admitted to practice in all Courts of the State of New York and I am admitted to practice in the United States District Court for the Northern District of New York.  I am employed by the law firm of Pattison, Sampson Ginsberg & Griffin, PLLC who are the attorneys for the above-named defendants Adam R. Mason, Ronald Fountain and Tim Colaneri (hereinafter referred to as the "City defendants").

2.      I submit this Declaration, together with the accompanying Memorandum of Law in support of said defendants' Motion for Summary Judgement pursuant to Rule 56 of the Federal Rules of Civil Procedure seeking dismissal of the plaintiff's Amended Complaint in its entirety against these moving defendants.

3.      The instant action was commenced by plaintiff with the filing of his Complaint on or about the date of June 12, 2017.  With the permission of this Court the plaintiff filed an Amended Complaint on or about the date of October 30, 2017.  Plaintiff in said Amended Complaint alleged that these moving defendants maliciously prosecuted him; denied to him his right to a fair trial through the fabrication of evidence; failed to intervene to protect the plaintiff; engaged in a

# APPENDIX 119

conspiracy to deprive him of his constitutional right under the Fourth and Sixth Amendments to the U.S. Constitution; and that the defendant City of Troy was liable to him for money damage under the holding in Monell v. New York City Dept. of Social Services, 4136 U.S. 658.

4.      After due deliberation and consideration of a motion to reargue, the claims against the City of Troy were dismissed as well as Plaintiff's claim for failure to intervene.

5.      As discussed in the accompanying Memorandum of Law, the City defendants (movants) seek a dismissal of plaintiff's Amended Complaint on the grounds that there is no question of material facts that a jury ought to consider or, in the alternative, the City Defendants are entitled to qualified immunity.

6.      Depositions in this matter were conducted prior to the filing of the instant motion.

7.      On August 20, 2019, and August 21, 2019, the Plaintiff, Adrian Thomas, was deposed in this matter. (A true and accurate copy of the Plaintiff's redacted deposition is attached hereto as Exhibit "A").

8.      On September 5, 2019, and September 6, 2019, co-defendant Dr. Michael Sikirica was deposed. (A true and accurate copy of Dr. Sikirica's deposition is attached hereto as Exhibit "B").

9.      On August 21, 2019, and September 11, 2019, CPS worker Jasper Estaris was deposed. (A true and accurate copy of his depositions are attached as Exhibit "C" and "D" and are submitted under seal).

10.     On November 25, 2019, CPS worker Nicole Noel was deposed. (A true and accurate copy of Ms. Noel's deposition is attached hereto as Exhibit "E" and is submitted under seal).

11.     On June 20, 2020, Dr. Walter Edge, Matthew Thomas' treating physician at Albany Medical Hospital was deposed. (A true and accurate copy of Dr. Edge's deposition is attached hereto as Exhibit "F").

12.     On October 19, 2020, Dr. John Waldman, Matthew Thomas' treating neurosurgeon was deposed. (A true and accurate copy of Dr. Waldman's deposition is attached hereto as Exhibit "G").

13.     Throughout discovery, the co-defendant, Dr. Sikirica obtained an expert witness who provided an expert report in this matter a true and accurate copy of which is attached hereto as Exhibit "H").

14.     Relevant portions of Matthew Thomas' medical records obtained by a subpoena in the instant litigation and provided to all parties are attached here to as Exhibit "I").

Dated:  June 14, 2021.

*Rhiannon I. Spencer*

Rhiannon I. Spencer, Esq.
**Pattison, Sampson, Ginsberg & Griffin, PLLC**
Bar Roll No. 102582
*Attorneys for Defendants,*
*Adam R. Mason, Ronald Fountain, and*
*Tim Colaneri*
22 First Street - P. O. Box 208
Troy, New York 12181-0208
(518) 266-1001

Case 1:17-cv-00626-DLI-SMG Document 1-4 Filed 06/14/12 Page 123 of 458

# Exhibit "A"

```
 1   UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF NEW YORK
 2   - - - - - - - - - - - - - - - - - - - - - - - - - - - -

 3   ADRIAN THOMAS,

 4                         Plaintiff,

 5              - against -

 6   CITY OF TROY, ADAM R. MASON, RONALD FOUNTAIN,
     TIM COLANERI,
 7   RENSSELAER COUNTY, and MICHAEL SIKIRICA,

 8                         Defendants.
     - - - - - - - - - - - - - - - - - - - - - - - - - - - -
 9   NEW YORK STATE
     COURT OF CLAIMS
10   - - - - - - - - - - - - - - - - - - - - - - - - - - - -

11   ADRIAN P. THOMAS,

12                         Claimant,

13              - against -

14   THE STATE OF NEW YORK,

15                         Defendant.
     - - - - - - - - - - - - - - - - - - - - - - - - - - - -

16

17              DEPOSITION of Plaintiff/Claimant, ADRIAN P.

18   THOMAS, held on the 20th day of August 2019, commencing

19   at 9:26 a.m., at the Law Offices of Bailey, Johnson &

20   Peck, P.C., 5 Pine West Plaza, Washington Avenue

21   Extension, Albany, New York 12205, before Jeanne

22   O'Connell, Registered Professional Reporter and Notary

23   Public in and for the State of New York.
```

```
1    APPEARANCES:

2    Brett H. Klein, Esq.
     305 Broadway
3    Suite 600
     New York, New York  10007
4    Attorney for Plaintiff/Claimant

5    Pattison Sampson Ginsberg & Griffin, PLLC
     22 First Street
6    Troy, New York  12180
     By:  Joseph T. Perkins, Esq.
7    Attorneys for City of Troy, Adam R. Mason,
     Ronald Fountain and Tim Colaneri
8
     Bailey, Johnson & Peck, P.C.
9    5 Pine West Plaza
     Washington Avenue Extension
10   Albany, New York 12205
     By:  Crystal R. Peck, Esq.
11   Attorneys for Michael Sikirica

12   New York State Office of the Attorney General
     The Capitol
13   Albany, New York 12224
     By:  Christina M. Calabrese, Assistant Attorney General
14
     Also present:  Katherine Hamilton
15

16

17

18

19

20

21

22

23
```

```
 1              S T I P U L A T I O N S

 2    It is hereby stipulated and agreed by

 3    and between the attorneys for the respective

 4    parties hereto that, this examination may be signed and

 5    sworn to before any Notary Public of the State of New

 6    York.

 7

 8    It is further stipulated and agreed that the filing and

 9    certification of the said examination shall be waived.

10

11    It is further stipulated and agreed that all objections

12    to questions, except as to form, shall be reserved for

13    the trial of this action.

14

15    It is further stipulated and agreed that there are no

16    objections to Notice of this Examination Before Trial

17    and the qualifications of the court reporter to take

18    this deposition and administer an oath or affirmation.

19

20

21

22

23
```

1          MS. PECK:  The parties have agreed to

2      stipulate that any testimony relating to

3      child protective services investigation or

4      DSS or Department of Social Services records

5      that have been disclosed in the federal

6      action or pursuant to the subpoena in the

7      Court of Claims action are subject to a

8      protective order and will be treated as

9      confidential and sealed until such time as a

10     court order allows for them to be disclosed

11     publicly or the parties agree or the parties

12     otherwise so stipulate.

13         MS. CALABRESE:  And with the additional

14     understanding that there is no such

15     protective order in the Court of Claims

16     matter, but we're hereby acknowledging the

17     stipulation in federal court, and will agree

18     that any information elicited today with

19     regard to child protective caseworker notes

20     or conversations had with the claimant will

21     be unofficially sealed amongst the parties

22     until such time as it's agreed upon that one

23     or both of the parties seeks an order from

Case 1:17-cv-00626-DJS Document 104-17 Filed 06/14/21 Page 62 of 458

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2          the Court of Claims judge.

 3              And the further understanding with

 4          regard to the stipulation is that nothing in

 5          the stipulation prevents either claimant or

 6          defendant from using information gathered

 7          today in furtherance of any motion,

 8          practice, or testimony at trial.

 9              MR. PERKINS:  So stipulated.

10              ADRIAN PERONE THOMAS, after first

11          having been duly sworn, was examined and

12          testified as follows:

13  EXAMINATION

14  BY MS. CALABRESE:

15    Q.  Good morning, Mr. Thomas.

16          My name is Christina Calabrese.  I'm an attorney

17  with the New York State Office of the Attorney General.

18  I represent the defendant the State of New York in the

19  claim that you filed against the State of New York.

20          Also present in the room seated to your right is

21  your attorney, Mr. Brett Klein.  Also in the room is Joe

22  Perkins, who represents the City of Troy.  Also in the

23  room is Crystal Peck, who represents Dr. Sikirica.  And
```

Case 1:17-cv-00626-DJS Document 64-17/22-11 Filed 06/14/21 Page 2 of 458

```
 1              (Adrian P. Thomas - by Ms. Calabrese)
 2   also in the room is Katherine Hamilton, seated to my
 3   immediate left, who is a paralegal in the Office of the
 4   Attorney General.
 5         Do you know why you're here today?
 6      A.   Yes.
 7      Q.   You've been sworn in by the stenographer.  That
 8   means essentially taking an oath to swear to tell the
 9   truth today.  The stenographer is seated to your left.
10         As you can see, she's transcribing or writing
11   down everything that's said in this room unless we
12   direct her to go off the record.  Any conversation that
13   you and I have today will be on the record.
14         So we have to be mindful to speak up so that she
15   can hear us, to allow one person to finish speaking
16   before the other person speaks, and speak as slowly as
17   possible, okay?
18      A.   Okay.
19      Q.   And that reminds me.  Anything that we discuss or
20   say in this room has to be uttered through words.  Head
21   nods, hand gestures, cannot be transcribed by the
22   stenographer.  So when responding, we have to use words
23   rather than head shakes.  Yes, no, for example, okay?
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2       A.  Okay.

 3       Q.  If at any point in time you have any questions or

 4  concerns that you'd like to discuss with your attorney,

 5  please let me know.  If there's a question that's been

 6  presented to you, I would ask that you just answer that

 7  question before you move forward with your break with

 8  your attorney, okay?

 9       A.  Okay.

10       Q.  Similarly, if you need a break for any reason,

11  use the restroom, need a breath of fresh air, you need

12  to have lunch, or what have you, please just let me

13  know, and we can agree to have a recess, okay?

14       A.  Okay.

15       Q.  Now, have you taken any medications in the last

16  24 hours which affect your ability to think clearly and

17  rationally?

18       A.  Can you repeat that one more time?

19       Q.  Sure.

20           Have you taken any medications, any substances,

21  prescribed, illegal, or otherwise, which affect your

22  ability to think clearly and rationally today?

23       A.  No.
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.   Are you thinking clearly and rationally today?

 3      A.   Yes.

 4      Q.   Do you have any impairment, whether it be

 5   physiologically, physical, psychological, medically,

 6   emotional, or otherwise, which would affect your ability

 7   to understand the questions that I may ask or provide

 8   truthful responses?

 9      A.   Yes.

10      Q.   I see you're wearing glasses.

11           Are you able to see me clearly today?

12      A.   Yes.

13      Q.   If at any point in time you cannot, please let me

14   know and we'll make arrangements, okay?

15      A.   Okay.

16      Q.   Do you have any other limitations with any of

17   your senses, for example, hearing, speech, which would

18   prevent you from hearing questions I may pose or

19   responding truthfully?

20              MR. KLEIN:  Objection.

21              Can you just read that back?

22              (Question read by the reporter.)

23              MR. KLEIN:  You can answer.
```

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2               THE WITNESS:  No.

 3   BY MS. CALABRESE:

 4      Q.  Now, I know you provided your name to the

 5   stenographer, but I'm going to ask you to do that again,

 6   please.

 7           What is your full first, middle, and last name?

 8      A.  Adrian Perone Thomas.

 9      Q.  Can you spell that, sir?

10      A.  Adrian, A-D-R-I-A-N, Perone, P-E-R-O-N-E, Thomas,

11   T-H-O-M-A-S.

12      Q.  And where do you currently live?

13      A.  ███████, Georgia.

14      Q.  What is your address?

15      A.  █████████████████████.

16      Q.  In ████████

17      A.  Correct.

18      Q.  And what's the ZIP there?

19      A.  ███████.

20      Q.  How long have you resided at that address?

21      A.  Can you repeat the question?

22      Q.  Sure.

23           How long have you lived there?
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      A.   Before or after incarceration?

 3      Q.   I'm sorry?

 4      A.   Before or after incarceration?

 5              MR. KLEIN:  In total.  She wants to

 6          know how many years have you lived there,

 7          I'm assuming.

 8              THE WITNESS:  All the way up until 20

 9          years old.

10  BY MS. CALABRESE:

11      Q.   Is this your family home?

12      A.   Yes.

13      Q.   Do you live there with your family?

14      A.   Yes.

15      Q.   And who do you live there with?

16      A.   I live there with my mother.

17      Q.   And what is her name?

18      A.   Annipearl Black.

19      Q.   Can you spell that, please?

20      A.   Annipearl, A-N-N-I-P-E-A-R-L, Black, B-L-A-C-K.

21      Q.   And if I ask you to spell certain names or other

22  words it's for the benefit of the stenographer because

23  she's typing down everything that we're saying.  I want
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)
 2   to make sure the record is accurate, okay?
 3       A.   Okay.
 4       Q.   And do you live there with anybody else?
 5       A.   My adopted brother.  And my cousin also stay with
 6   us.
 7       Q.   What are their names?
 8       A.   His name is ███████████████.
 9       Q.   Can you spell ████████?
10       A.   ████████████, I believe.
11       Q.   Is that your adopted brother?
12       A.   No.
13       Q.   That's your cousin?
14       A.   That's my cousin.
15       Q.   And what's your adopted brother's name?
16       A.   █████████████.
17       Q.   Can you spell that, sir?
18       A.   ████████████████.
19       Q.   And how old is your brother?
20       A.   He is ██, I believe.
21       Q.   And how old is your cousin?
22       A.   He's ██ going on ██.
23       Q.   And how old, approximately, is your mother?
```

1           (Adrian P. Thomas - by Ms. Calabrese)

2     A.   My mother is 60.

3     Q.   And do you live in that home with anybody else?

4     A.   No.

5          MR. PERKINS:  Off the record.

6          (Discussion held off the record.)

7          MS. CALABRESE:  Back on.

8   BY MS. CALABRESE:

9     Q.   ███████  is his first name?

10    A.   Yes.

11    Q.   And how old are you, sir?

12         What's your date of birth?

13    A.   I'm 36 years old.

14         MR. KLEIN:  What's your date of birth?

15         THE WITNESS:  Date of birth is 9/███████

16  BY MS. CALABRESE:

17    Q.   And you said that you lived in that house for 20

18  years.

19         Since you've been released from custody, how long

20  have you lived there?

21    A.   Off and on again for about a year.

22    Q.   Do you recall the day that you were released from

23  custody, or year?

Case 1:17-cv-00625-DJS  Document 61  Filed 06/14/21  Page 136 of 458

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2      A.   Yes.

 3      Q.   What was that?

 4      A.   June 14th.  It was June 14, 2014.

 5      Q.   And you said that since 2014 you've been living

 6 at this address off and on.

 7           Where else have you lived?

 8      A.   ████████████

 9      Q.   And where in ████████████

10      A.   ████████████████.

11      Q.   For the record, you're talking about ████████,

12 Georgia?

13      A.   Yes.

14      Q.   ████████████████, when did you live there?

15      A.   I believe in January.  January of 2015.

16           MR. KLEIN:  She's asking the question,

17           I believe, is when did you live there, from

18           when to when?

19           Am I right?

20           Think to yourself.  When you're ready

21           to answer, give the answer.

22           THE WITNESS:  Okay.  From January of

23           2015 to August of last year.
```

Case 1:17-cv-00626-DJS Document 142-1 Filed 06/14/21 Page 152 of 458

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2  BY MS. CALABRESE:

 3      Q.  August of 2018?

 4      A.  That's correct.

 5      Q.  Where did you live for that year -- six months

 6  from release through January of 2015?

 7      A.  With other relatives.

 8      Q.  Who are they and where did you live?

 9      A.  ████████████████.

10      Q.  I'm sorry, what was that?

11      A.  ████████████  is his name.  They stayed at

12  ████████████████████ in ████████.

13      Q.  And who are they to you?

14      A.  My cousin.

15      Q.  How long did you live with ████████?

16      A.  A few months.

17      Q.  How many is a few to you?

18      A.  Two.

19      Q.  And after that?

20      A.  I stayed with my real mom.

21      Q.  Who is that?

22      A.  ████████████.

23      Q.  Where does she live, in ████████?
```

(Adrian P. Thomas - by Ms. Calabrese)

1           (Adrian P. Thomas - by Ms. Calabrese)

2    A.  She's staying in ████.  Yes.

3    Q.  How long did you stay with Ms. ████?

4    A.  I stayed with Ms. ████ for one month.

5    Q.  I think that leaves approximately two more months

6  before you moved into the ████████ddress.

7        Where did you stay?

8    A.  I was probably back and forth with my adoptive

9  mother's house.  Between these three addresses, I was

10  back and forth.

11    Q.  From 2018 of August through present day you've

12  been living with your -- is it your adoptive mother or

13  this other woman that you said is your mother?

14    A.  Repeat the question.

15    Q.  Sure.

16        You mentioned that today you live with another

17  woman who I think you described as your mom.

18        Is she your adopted mom?  Is she someone you call

19  mom?  What is her relation to you?

20    A.  My adopted mother.

21    Q.  Is she legally -- did she legally adopt you?

22    A.  Yes.

23    Q.  You've been living with her since August of 2018

Case 1:17-cv-00625-DJS Document 114-21 Filed 06/14/21 Page 17 of 458

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2   to present day?

 3       A.   Yes.

 4       Q.   And how come you -- there was so many moves?

 5            MR. KLEIN:   Objection.

 6   BY MS. CALABRESE:

 7       Q.   From June of 2014 through August of 2018, why

 8   were you moving around so much?

 9       A.   I just chose to.

10       Q.   Well, why?  What was the reason?

11       A.   Because my case was high profile even down south.

12       Q.   What do you mean by that?

13            I don't know what you mean.

14       A.   Because of the media attention that was given to

15   my case up here, it has reached down south where I stay

16   at, as well.

17       Q.   So what was happening that was causing you to

18   move so much?

19       A.   Threats, gang members.  That's it.

20       Q.   And what were those threats?

21       A.   If we see you, something bad gonna happen to you.

22       Q.   And did any of that happen?

23       A.   No.
```

Case 1:17-cv-00625-DJS Document 11-22 Filed 06/14/21 Page 18 of 458

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.  Have you ever been married?

 3      A.  Yes.

 4      Q.  To whom and when?

 5      A.  Wilahemina Hicks, ████████████s.

 6      Q.  Can you repeat the last name?

 7      A.  ███████, ███████████, █████.

 8      Q.  Is ██████████ any relation to the other ████

 9  you told us about earlier?

10      A.  Correct.

11      Q.  What's the relation there?

12      A.  That's her real brother.

13      Q.  And any other previous marriages?

14      A.  No.

15      Q.  When were you married to Wilahemina Hicks?

16          When were you married, date of marriage?

17      A.  I don't remember.

18      Q.  What year?

19      A.  I don't remember.

20      Q.  Well, if we're in 2019, was it five years from

21  today or sooner than that, further from that?

22          Can you give me an estimate?

23              MR. KLEIN:  Objection.
```

```
 1          (Adrian P. Thomas - by Ms. Calabrese)

 2   BY MS. CALABRESE:

 3      Q.   More than ten years from today, less than ten

 4   years from today?

 5          What decade?

 6      A.   The dates I don't actually remember.

 7      Q.   Decade, not days.

 8          So, for example, what I mean by that is, you were

 9   born in 19█.

10          Were you married in the '90s?  Were you married

11   in the 2000s?  Were you married before or after the

12   death of the infant child in this case?

13          Are there other points in your life that are

14   significant before or after those dates?

15      A.   It was before 2008.  I do remember that part.

16      Q.   Before 2008?

17      A.   Dates I don't remember.

18          MR. KLEIN:  She's not asking the dates.

19      She's asking the general time frame.

20          Was it before the birth of your kids or

21      after the birth of your kids?

22          THE WITNESS:  It was after ███████ was

23      born.
```

```
 1            (Adrian P. Thomas - by Ms. Calabrese)
 2   BY MS. CALABRESE:
 3       Q.   And ████████ was born on ██████████████.  Does that
 4   sound right to you?
 5       A.   (No response.)
 6       Q.   I can attest for the record that I received that
 7   date of birth from one of the records in the file.  I
 8   think it was -- I can't recall which record, but in a
 9   record contained in a file a date of birth for ████████
10   has been listed as ████████████████.
11            Does that sound about right?
12       A.   Yes.
13               (Recess taken.)
14   BY MS. CALABRESE:
15       Q.   You said before 2008.  So, ████████ was born on
16   ██████████████
17            Does that sound about right?
18       A.   Yes.
19       Q.   So you believe you were married to Ms. Hicks
20   after the date of birth of ████████?
21       A.   That's correct.
22       Q.   Now I have ████████'s date of birth as ██████████.
23            Does that sound about right?
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      A.  Give me that date again.

 3      Q.  Sure.  ████ --  █████████████

 4      A.  That's correct.

 5      Q.  Do you believe you were married to Ms. Hicks

 6  before or after  ██████  was born?

 7      A.  Before.

 8      Q.  So sometime between the birth of  ██████  and

 9  ████████  you were married to Ms. Hicks?

10      A.  Yes.

11      Q.  █████████████████  are your biological children?

12      A.  That's correct.

13      Q.  So, as you sit here today, are you legally

14  divorced from Ms. Hicks?

15      A.  Yes.

16      Q.  When did that occur, generally?

17          I won't hold you to the date.

18      A.  Between -- I think 2008.

19      Q.  You were divorced from Wilahemina Hicks in 2008?

20      A.  No.  2009.  I'm sorry.

21      Q.  2009?

22      A.  Yes.

23      Q.  So I have as a date of birth for the twins,
```

Case 1:17-cv-00625-DJS Document 114-21 Filed 06/14/21 Page 22 of 458

```
 1            (Adrian P. Thomas - by Ms. Calabrese)
 2    Matthew and ████, 5/████ is that correct?
 3            MR. KLEIN:  May ████████; is that
 4        correct?
 5            THE WITNESS:  I believe so.  Yes.
 6    BY MS. CALABRESE:
 7        Q.  I have a date of death of Matthew of 9/21/2009.
 8            Does that sound right?
 9        A.  Correct.
10            MR. KLEIN:  I'm sorry.  Are you sure
11        about the date?  I think you said 2009.
12            MS. CALABRESE:  Thank you.
13    BY MS. CALABRESE:
14        Q.  2008; is that correct?
15            MR. KLEIN:  To the best of your
16        knowledge.
17            THE WITNESS:  To the best of my
18        knowledge, yes.
19    BY MS. CALABRESE:
20        Q.  You said you were divorced from Wilahemina in
21    2009; is that right?
22        A.  That's correct.
23        Q.  If Matthew died in September of --
```

Case 1:17-cv-00625-DJS Document 147-21 Filed 06/14/21 Page 226 of 458

```
 1              (Adrian P. Thomas - by Ms. Calabrese)
 2              MR. KLEIN:  And just also -- I'm sorry
 3         to object.  I don't believe that's the
 4         actual date of death.
 5              MS. CALABRESE:  The 21st.
 6              MS. PECK:  Yeah.  I don't think,
 7         actually, it is.
 8              MR. KLEIN:  But the record and
 9         documents speak for itself.  I just wanted
10         to just alert you to that in case you wanted
11         to rephrase.
12              MS. CALABRESE:  Thank you.
13    BY MS. CALABRESE:
14       Q.  If Matthew died in September of 2008, when
15    after -- thereafter in 2009 were you divorced from
16    Wilahemina?
17              Was it a year after, meaning September of 2009?
18    Was it prior to that year anniversary?
19       A.  I don't recall.
20       Q.  You don't recall, period?
21       A.  I don't recall the actual dates.
22       Q.  Now, when did you marry ██████████?
23       A.  2015.
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.   Do you recall which month?

 3      A.   No.

 4      Q.   Had you known her prior to 2015?

 5      A.   Yes.

 6      Q.   How long have you known her?

 7      A.   Since we was younger.

 8      Q.   When you say younger, how young are we talking?

 9      A.   12.

10      Q.   Is she from your hometown in ████████, Georgia?

11      A.   She's not actually from my hometown.  She's from

12   ████████.

13      Q.   Did you live with her in ████████ when you were

14   released from custody in June of 2014?

15              MR. KLEIN:  Right away or at any time?

16              MS. CALABRESE:  At any time.

17              MR. KLEIN:  At any time, from your

18        release up until today, have you lived with

19        her?

20              THE WITNESS:  Yes.

21   BY MS. CALABRESE:

22      Q.   During which points?

23      A.   2015.
```

```
 1          (Adrian P. Thomas - by Ms. Calabrese)

 2     Q.   You're still married today or are you no longer

 3   married?

 4     A.   No longer married.

 5     Q.   When did you become divorced?

 6     A.   This year.

 7     Q.   2019?

 8     A.   Yes.

 9     Q.   What caused your divorce?

10     A.   We grew apart.

11     Q.   So, how long did you live with her?

12     A.   We actually moved in together when we was

13   married.

14          MR. KLEIN:  For how long she's asking.

15          If that's okay.

16          THE WITNESS:  Four years.

17   BY MS. CALABRESE:

18     Q.   Four?

19     A.   Yes.

20     Q.   Where were you married to Wilahemina Hicks, in

21   Georgia or the State of New York?

22     A.   State of Georgia.

23     Q.   And ████████████
```

Case 1:17-cv-00625-DJS Document 11-2 Filed 06/14/21 Page 26 of 458

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      A.   State of Georgia.

 3      Q.   If I asked you this previously, I apologize.

 4           Have you ever been married to anybody other than

 5   Ms. Hicks or Ms. ██████?

 6      A.   No.

 7      Q.   Now, we already discussed ████████████████

 8           ████████ and Matthew were born on May ████████  is

 9   that correct?

10      A.   Can you repeat the question?

11      Q.   Sure.

12           ████████ and Matthew were born on May ████████; is

13   that right?

14      A.   I believe so.  Yes.

15              MS. CALABRESE:  For the record,

16           incorrectly previous to this question stated

17           Matthew died on the 21st.  I think he was

18           brought to the hospital on the 21st.  To

19           clarify, he died technically on the 23rd.  I

20           just want to state that for the record.

21   BY MS. CALABRESE:

22      Q.   ████████ was born on ██████████████████

23           Does that sound correct?
```

Case 1:17-cv-00625-DJS Document 14-21 Filed 06/14/21 Page 27 of 458

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      A.   I believe so.

 3      Q.   Your namesake, ████████████████ was born on

 4   ██████████.

 5           Does that sound correct?

 6      A.   I think that's correct.

 7      Q.   And these children, ████████████████████

 8   ████████████████████ Matthew, and ████████, are all your

 9   biological children?

10      A.   Yes.

11      Q.   And the biological children of Ms. Wilahemina

12   Hicks?

13      A.   That's correct.

14      Q.   And ████████ Hicks, is she your biological child?

15      A.   No.

16      Q.   Is she Ms. Wilahemina Hicks' biological daughter?

17      A.   Yes.

18      Q.   Other than these six children that we just

19   discussed, do you have any other biological children?

20      A.   No.

21      Q.   Do you have any other children that you've raised

22   as if they were your biological children?

23      A.   Yes.
```

**APPENDIX**

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.   And how many?

 3      A.   It was just one.

 4      Q.   And who was that, sir?

 5      A.   ████████████

 6      Q.   Is that a child of Ms. ████████████?

 7      A.   That's correct.

 8      Q.   Do you know how to spell ████████?

 9      A.   Yes.

10      Q.   Can you spell that?

11      A.   ████████████

12      Q.   And as we sit here today, how old is ████████?

13      A.   She's ████

14      Q.   And did she live with you and Ms. ████ when you

15 lived together?

16      A.   Yes.

17      Q.   Did you provide for her at that time?

18      A.   Yes.

19      Q.   It was about a year I think you said you lived

20 with her and Ms. ████; is that right?

21           If I'm incorrect, correct me.

22              MR. KLEIN:  Objection.  Asked and

23         answered.
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)
 2                   Was it a year or was it something
 3              different that you lived with Ms. ███?
 4              That's the question.
 5                   THE WITNESS:  Yes.
 6    BY MS. CALABRESE:
 7         Q.  Yes to which part?
 8              Was it a year or longer or shorter?
 9         A.  Yes.  It was longer.
10         Q.  How long did you say?
11         A.  For the duration of marriage.
12         Q.  What is the time frame of that?
13              What is the number?
14         A.  About four years.
15         Q.  Four years, I apologize.
16              Did this child live with you for those four
17    years?
18         A.  Yes.
19         Q.  Did you take care of her financially during those
20    four years?
21         A.  That's correct.
22         Q.  Other than that girl, that little girl, are there
23    any other children that you've taken care of
```

Case 1:17-cv-00625-DJS Document 11-24 Filed 06/14/21 Page 302 of 458

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2   financially, emotionally, as if they were your own

 3   biological child?

 4      A.   No.

 5      Q.   Have you ever owned any businesses?

 6      A.   No.

 7      Q.   Have you ever been in the military?

 8      A.   No.

 9      Q.   What is your educational background?

10           Have you graduated from high school?

11      A.   No.

12      Q.   Did you receive your GED while incarcerated?

13      A.   No.

14      Q.   What is the highest grade of high school you

15   completed or primary school that you completed?

16      A.   Ninth.

17      Q.   Did you graduate the ninth grade?

18      A.   Yes.  I completed the ninth grade.

19      Q.   And where was that, sir?

20      A.   In Georgia.

21      Q.   What was the high school?

22      A.   ███████  High.

23      Q.   Can you spell that?
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)
 2      A.    ████████████.
 3      Q.    Like ██████?
 4      A.    Yes.
 5                  MR. KLEIN:  Off the record.
 6                  (Discussion held off the record.)
 7   BY MS. CALABRESE:
 8      Q.    So ninth grade, ██████ High.
 9            And so, you did not, then, receive any college
10   degrees or diplomas, correct?
11      A.    That's correct.
12      Q.    Have you received any certificates, trade
13   certificates, for example, or any other employment
14   certificates or educational certificates since then?
15      A.    Yes.
16      Q.    Tell me about that.
17      A.    I have a commercial motor vehicle trade.
18      Q.    What is that?
19      A.    CDL.
20      Q.    License, a CDL license?
21      A.    Yes.
22      Q.    Is that what you do primarily for work?
23      A.    Yes.
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.   Any other certificates or trade licenses that you

 3   may have?

 4      A.   No.

 5      Q.   Now, you mentioned your CDL license.

 6           Is that currently what you do for employment now?

 7      A.   That's correct.

 8      Q.   And who do you work for?

 9      A.   I drive for Buckley Trucking.

10      Q.   What does that entail?

11           What do you do for them?

12      A.   I'm a long-haul trucker.

13      Q.   And how long have you worked for Buckley?

14      A.   I've been trucking for them for more than --

15   about four months.

16      Q.   Do you leave, for example, early in the morning

17   and arrive later on that evening, or do you leave on a

18   Sunday and come back on a Saturday?

19           Tell us what your work shift is like.

20      A.   My work shift, I would leave home Monday, and I

21   would be rolling in eight to ten days later.

22      Q.   And generally, where do you travel and what do

23   you transport?
```

```
1              (Adrian P. Thomas - by Ms. Calabrese)

2       A.   I'm all over the United States.

3       Q.   What are you transporting?

4       A.   Dry and cold goods.

5       Q.   For a particular grocery store or other business,

6  or does it depend?

7       A.   Multiple businesses.

8       Q.   What is your current wage?

9       A.   My current wage is -- it's not based on -- it's

10 based on per mile, so -- and per diem.  So I'm actually

11 at 38 or 40 cents per mile.

12      Q.   How many miles do you average a week?

13      A.   It's different.  Between 1200 and 2500 miles for

14 the week.

15      Q.   And that's been for the last four months?

16      A.   Yes.

17      Q.   And when did you receive your CDL?

18      A.   I received my CDL back in 2016, I believe.

19      Q.   Did you work for anybody besides this place of

20 employment four months prior to today, or was Buckley

21 your first?

22      A.   There was other jobs that I had since my trucking

23 career started.
```

Case 1:17-cv-00625-DJS Document 142-1 Filed 06/14/21 Page 34 of 458

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2       Q.   So have you been working for a trucking company

 3   or agency since you received your CDL in 2014?

 4       A.   Not 2014.

 5       Q.   When was it, then?

 6       A.   I think it was 2016.

 7       Q.   So if you were released from custody in June of

 8   2014, about two years later you received your CDL?

 9       A.   Yes.

10       Q.   Tell us about the process that you had to go

11   through in order to get the license.

12       A.   I had to attend a trucking commercial motor

13   vehicle school.

14       Q.   How long was that?

15       A.   That's about four to five weeks at a time.

16       Q.   Since you received that license in 2016, have you

17   been working in trucking since 2016?

18       A.   Yes.

19       Q.   How many different employers have you worked for

20   since 2016?

21       A.   A lot.

22       Q.   What is a lot to you?

23       A.   A lot is more than four.
```

Case 1:17-cv-00625-DJS Document 117-1 Filed 06/14/21 Page 35 of 458

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.   Is a lot less than ten?

 3      A.   Yes.

 4      Q.   So between four and ten employers?

 5      A.   Yes.

 6      Q.   So, why the change?

 7      A.   There's different reasons for that.

 8      Q.   What are they?

 9      A.   Pay.  I had different areas of location of

10   driving.

11      Q.   And when you say pay, what do you mean by that?

12      A.   Sometimes I wasn't paid on time.

13      Q.   And that would cause you to leave an employer?

14      A.   At certain times.  Yes.

15      Q.   And when you say areas of location, what do you

16   mean by that?

17      A.   Parts of the United States.

18      Q.   Have you ever been terminated or fired from a

19   job?

20      A.   Yes.

21      Q.   And which jobs were those and for what reason?

22              MR. KLEIN:  Terminated -- I'm just

23          going to note an objection.
```

Case 1:17-cv-00626-DJS Document 114-21 Filed 06/14/21 Page 36 of 458

1           (Adrian P. Thomas - by Ms. Calabrese)

2             Do you mean terminated versus a layoff?

3            MS. CALABRESE: Whichever it was, what

4     have you.

5            THE WITNESS: CFI.

6 BY MS. CALABRESE:

7    Q. What's CFI stand for?

8    A. Contractor Freighters, Incorporated.

9    Q. Was that one of the jobs that you had with your

10 CDL?

11    A. Yes.

12    Q. Why did that employment end?

13    A. The truck navigation that comes along with the

14 truck put me down the wrong road in a residential area.

15 It was during the night. Visibility was low. I got

16 stuck in the mud.

17      I had to tow -- I had to be towed out of there

18 the following morning. And the tow bill was over

19 $5,000. And that was the reason why.

20    Q. They fired you?

21    A. Yes.

22    Q. Other than that instance, since you've had your

23 CDL, have you ever been fired or terminated?

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2     A.   No.

 3     Q.   Did you work in any other jobs from the time

 4  period when you were released from custody in 2014

 5  through the time period that you went to CDL school?

 6          Did you work anywhere else?

 7              MR. KLEIN:  So from '14 to '16.

 8              THE WITNESS:  Yes.

 9  BY MS. CALABRESE:

10     Q.   Where?

11     A.   I worked at Pilgrim's Pride in          ▉▉▉▉▉ .

12     Q.   What is Pilgrim's Pride?

13     A.   Chicken manufacturer.

14     Q.   What did you do there?

15     A.   I was a machine operator.

16     Q.   How long did you work there?

17     A.   Maybe three months.

18     Q.   Did you work anywhere else besides Pilgrim's

19  Pride?

20     A.   Yes.

21     Q.   Where?

22     A.   I worked -- actually, I worked at Derst Company.

23     Q.   And what did you do there?
```

Case 1:17-cv-00626-DJS Document 142-21 Filed 06/14/21 Page 38 of 458

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2       A.   I was a vacation relief operator.

 3       Q.   What did you do for them?

 4            What does that mean, vacation relief operator?

 5       A.   I was trying to learn how to run every machine

 6  from one side of the building to the other side.

 7       Q.   What was your wage at both the chicken company

 8  and Derst?

 9                MR. KLEIN:  Maybe take one at a time.

10                MS. CALABRESE:  Sure.

11  BY MS. CALABRESE:

12       Q.   What was your wage at the chicken company?

13       A.   It was 8.50 an hour.

14       Q.   Did it change significantly during the three

15  months that you worked there?

16       A.   No.

17       Q.   How long did you work at Derst?

18       A.   About two years.

19       Q.   Up until the time when you received your CDL?

20       A.   That's correct.

21       Q.   And what was your wage there?

22       A.   My wage was $18.75 started.

23       Q.   Did it change significantly during the two years
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)
 2   that you worked there?
 3       A.   That's correct.
 4       Q.   What did it change to?
 5       A.   18.90, I believe.
 6       Q.   $18.75 to 18.90 is what you made?
 7       A.   Yes.
 8       Q.   Now, you mentioned the mileage pay that you're
 9   currently receiving.
10            Is the rate of pay that you receive today
11   significantly different than the rate of pay you
12   received at the other places that you worked with your
13   CDL?
14       A.   Yes.
15       Q.   And tell me how.
16            Like, what's the range, the lowest to the
17   highest?
18       A.   I get -- I receive $1,000 a week.
19       Q.   I'm sorry?
20       A.   I receive $1,000 a week.
21       Q.   Currently.
22       A.   Yes.
23       Q.   What did you receive at the other places of
```

Case 1:17-cv-00625-DJS   Document 147-21   Filed 06/14/21   Page 40 of 458

 1          (Adrian P. Thomas - by Ms. Calabrese)

 2    employment?

 3              MR. KLEIN:  Meaning what, the other

 4         trucking or the chicken?

 5              MS. CALABRESE:  Yes.  Trucking.

 6              THE WITNESS:  Different.

 7    BY MS. CALABRESE:

 8       Q.  Well, what's the lowest, for example, so we have

 9    a range?

10       A.  $200.

11       Q.  How many other places did you work besides the

12    place you're working for now with your CDL?

13       A.  You mean before?

14       Q.  Yes.

15              MR. KLEIN:  From '14 to '16?

16              MS. CALABRESE:  Yes.

17              MR. KLEIN:  So other than the chicken

18         place?

19              MS. CALABRESE:  No.  I'm sorry.  Let me

20         restate the question.

21    BY MS. CALABRESE:

22       Q.  Since you had your CDL, how many places have you

23    worked with your CDL?

Case 1:17-cv-00626-DJS Document 114-2 Filed 06/14/21 Page 41 of 458

```
 1          (Adrian P. Thomas - by Ms. Calabrese)

 2              MR. KLEIN:  From '16 to the present,

 3          other than what you've said.

 4              THE WITNESS:  About five trucking

 5          companies.

 6   BY MS. CALABRESE:

 7      Q.  And during that time that you've worked for these

 8   five companies, your pay ranged from $200 to $1,000 a

 9   week?

10      A.  Between 2- and 800.

11      Q.  Between $2- and $800 a week?

12      A.  Right.

13      Q.  Is that before or after taxes?

14      A.  After taxes.

15      Q.  That's what you would take home?

16      A.  Yes.

17      Q.  Now, you said you were released from custody on

18   June 14, 2014.

19          Do you recall when you were placed into custody?

20      A.  Yes.

21      Q.  When was that?

22      A.  In 2008.

23      Q.  Was it shortly -- or was it around the date of
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2  Matthew's death of September 23, 2009?

 3     A.  Repeat that question.

 4     Q.  I'm sorry, 2008.

 5              MS. CALABRESE:  Did I say '9?

 6              MR. KLEIN:  Yes.

 7              THE WITNESS:  Yeah.

 8              MS. CALABRESE:  I'm sorry.

 9  BY MS. CALABRESE:

10     Q.  Was it around the date of Matthew's death of

11  September 23, 2008 that you were placed into custody?

12              MR. KLEIN:  Object to the form.

13              THE WITNESS:  I don't understand that.

14              MS. CALABRESE:  Sure.

15  BY MS. CALABRESE:

16     Q.  We're here to talk about what you're alleging is

17  your wrongful incarceration, correct?

18     A.  Correct.

19     Q.  When was the first day that you were

20  incarcerated?

21              MR. KLEIN:  I guess my objection is, do

22          you mean taken into custody by detectives to

23          be interrogated or arraigned and after the
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2         arraignment?

 3   BY MS. CALABRESE:

 4      Q.   What is your interpretation of that word,

 5   "custody"?

 6      A.   Arrested.

 7      Q.   So when was that?

 8      A.   September 22nd of 2008.

 9      Q.   Now, were you ever released prior to June 14th of

10   2014, or did you remain in custody that whole time?

11      A.   I remained in custody the whole time.

12      Q.   So, let's talk about September of 2008.

13           How old were you in September of 2008?

14               MR. KLEIN:  Do you mean on

15           September 22nd or September 21st?

16               MS. CALABRESE:  Right.

17   BY MS. CALABRESE:

18      Q.   On September 22nd of 2008, how old were you?

19      A.   I believe I was 25, I believe.

20      Q.   Now, do you recall when you moved to New York

21   from Georgia?

22      A.   Yes.

23      Q.   When was that?
```

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2       A.   I think it was 2001.

 3       Q.   So you lived in New York approximately seven

 4  years free prior to being placed in custody.

 5            Does that sound right?

 6       A.   That's correct.

 7       Q.   Did you work during those seven years while in

 8  New York State?

 9       A.   Yes.

10       Q.   And where did you work, starting from the

11  beginning?

12       A.   Worked at Wal-Mart.

13       Q.   Which one?

14       A.   On Hoosick Street in Troy.

15       Q.   What do you do for Wal-Mart on Hoosick Street?

16       A.   I was a stocker.

17       Q.   How long did you work there?

18            MS. CALABRESE:  Off the record.

19            (Discussion held off the record.)

20            MS. CALABRESE:  Back on the record.

21  BY MS. CALABRESE:

22       Q.   So you said you worked at Wal-Mart on Hoosick

23  Street as a stocker.
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2         How long did you work there for, sir?

 3    A.  The actual dates I don't remember.

 4    Q.  How long would you say, like three months, six

 5  months, a year?

 6         I'm not going to hold you to the dates.  I'm just

 7  trying to get an idea as to your employment history.

 8    A.  I think I was there for six months.

 9    Q.  And do you remember how much you were getting

10  paid?  Minimum wage, more than minimum wage?

11    A.  I think it was minimum wage.

12    Q.  And did you work anywhere else during that

13  seven-year time period besides Wal-Mart?

14    A.  I was at a place called Garelick Farms.

15    Q.  And what did you do for them?

16    A.  I worked in the production area.

17    Q.  Similar to your jobs at Derst and the Pilgrim,

18  kind of machine operating?

19    A.  Yes.

20    Q.  Minimum wage also?

21    A.  No.  More than minimum wage.

22    Q.  Do you remember how much more?

23    A.  I think it was 12:50, I believe.
```

Case 1:17-cv-00625-DJS Document 11-21 Filed 06/14/21 Page 46 of 458

```
 1           (Adrian P. Thomas - by Ms. Calabrese)

 2     Q.   And how long did you work at Garelick?

 3     A.   About two years, I believe.

 4     Q.   And anywhere else?

 5     A.   Yes.

 6     Q.   Where?

 7     A.   I worked at the Home Depo in Latham.

 8     Q.   And how long did you work there?

 9     A.   About four -- about four months.

10     Q.   And what did you do there?

11     A.   I was an overnight stocker, stock person.

12     Q.   What was the wage there?

13          That was probably a differential because you were

14  working nights, right?

15     A.   Yes.

16     Q.   A little higher.

17          What was that?

18     A.   I think 10.50 to $11 an hour.

19     Q.   And why did you leave each of those three places

20  of employment, Wal-Mart, Garelick, and Home Depot?

21          Why did you move from one place to the other?

22     A.   Can you repeat that question?

23     Q.   Sure.
```

1         (Adrian P. Thomas - by Ms. Calabrese)

2      We just talked about maybe a year and a half, two

3  years of employment at Wal-Mart, Garelick, and Home

4  Depot.

5      Why did you move from one to the other?

6    A.  For better pay.

7    Q.  And after Home Depot, where did you work, if

8  anywhere else?

9    A.  That was nowhere else.

10    Q.  Just those three places?

11    A.  Yes.

12    Q.  And so, was there a period of time that you did

13  not work in the seven years that you were a resident of

14  New York State prior to your incarceration?

15    A.  That's correct.

16    Q.  How long was that time, approximately?

17    A.  It was after the Home Depo all the way up to my

18  arrest.

19    Q.  How long would you say, five years, four years,

20  three years, approximately?

21      MR. KLEIN:  Less, more.

22      What was the amount of time, to the

23    best of your ability, to approximate?

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2                THE WITNESS:  It was more than a year.

 3    BY MS. CALABRESE:

 4       Q.   More than one year?

 5       A.   Yes.

 6       Q.   More than two years?

 7       A.   I can't actually recall the amount of time.

 8       Q.   You said you worked for six months at Wal-Mart,

 9    right, about, give or take?

10       A.   Yes.

11       Q.   And you said you worked for three months at Home

12    Depot, give or take?

13       A.   Yes.

14       Q.   How long did you say you worked at Garelick?

15       A.   For about two years.

16       Q.   So that leaves about four years of unemployment.

17            Does that sound about right?

18       A.   After Home Depot?

19       Q.   Yes.

20       A.   Yes.

21       Q.   And did you have any jobs, whether off the books

22    or on -- do you know what I mean by off the books?

23                MR. KLEIN:  Objection.
```

1          (Adrian P. Thomas - by Ms. Calabrese)

2    BY MS. CALABRESE:

3        Q.  Do you know what I mean by that term, "off the

4    books"?

5              MR. KLEIN:  Same objection.

6              THE WITNESS:  I don't understand.

7              MS. CALABRESE:  Sure.

8    BY MS. CALABRESE:

9        Q.  Have you ever heard the term "off the books"?

10       A.  Yes.

11       Q.  Do you know what I mean by that?

12           Do you know what that term means?

13       A.  No.  I've heard that, but I don't understand.  I

14    just heard the term being used loosely.

15       Q.  So you don't know what I mean when I say what

16    does off the books mean?

17              MR. KLEIN:  Objection, asked and

18         answered.

19    BY MS. CALABRESE:

20       Q.  Is that correct?

21       A.  Yeah.

22       Q.  So what I mean when I say off the books is side

23    jobs, jobs where you may not declare taxes.  That's what

Case 1:17-cv-00625-DJS Document 14-21 - Filed 06/14/21 Page 50 of 458

1           (Adrian P. Thomas - by Ms. Calabrese)

2    I mean.

3           Have you had any employment during that

4    approximate four-year time period after Home Depot until

5    the date of your incarceration --

6       A.   No.

7       Q.   -- whether on the books or off the books?

8       A.   No.

9       Q.   And prior to arriving in New York State in

10   approximately 2001, did you live in Georgia before that?

11      A.   Before 2001?

12      Q.   Yes.

13      A.   Only Georgia.

14      Q.   Only Georgia and only New York; is that right?

15      A.   Yes.

16      Q.   When you were in Georgia in 2001, how old were

17   you then?

18      A.   24 or 25.

19      Q.   So since you left school in the ninth grade to

20   the point in time you left Georgia to move to New York,

21   did you work?

22      A.   Yes.

23      Q.   And what types of jobs did you hold?

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      A.   Mostly restaurant.

 3      Q.   And what did you do in those restaurants?

 4      A.   Either washing dishes or I was a cook.

 5      Q.   And did you work straight from the time that you

 6  left school in the ninth grade or did you wait until you

 7  were 17, 18, 19 years old?

 8      A.   Repeat the question.

 9      Q.   Sure.

10           Did you start working right when you left school

11  in the ninth grade, or did you wait until and start

12  working, for example, at 18?

13      A.   I went to work right away.

14      Q.   In the ninth grade?

15      A.   Yes.

16      Q.   And did you maintain employment the entire time,

17  or did you work here and there?

18      A.   I worked here and there.

19      Q.   And who supplemented your employment?

20           MR. KLEIN:  What do you mean

21      supplemented?

22           MS. CALABRESE:  Sure.

23  BY MS. CALABRESE:
```

Case 1:17-cv-00626-DJS Document 114-21 Filed 06/14/21 Page 52 of 458

51

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.   When you weren't working, who paid the bills?

 3           Did your mom?

 4              MR. KLEIN:  Supplemented his income?

 5              MS. CALABRESE:  Yes.

 6  BY MS. CALABRESE:

 7      Q.   And when we say mom, who should we be referring

 8  to, your adoptive mom or your biological mom?

 9              MR. KLEIN:  The time he was working

10           after ninth grade in Georgia?

11              MS. CALABRESE:  Yes.

12              THE WITNESS:  My adoptive mother.

13  BY MS. CALABRESE:

14      Q.   You were living with her?

15      A.   Yes.

16      Q.   Did you ever live with your biological mother

17  other than after you were released from incarceration in

18  2014?

19           Growing up did you live with her?

20      A.   No.

21              MR. KLEIN:  Starting at birth?

22  BY MS. CALABRESE:

23      Q.   Did you ever live with her?
```

Case 1:17-cv-00626-DJS Document 11-2 Filed 06/14/21 Page 52 of 458

```
 1          (Adrian P. Thomas - by Ms. Calabrese)

 2     A.  No.

 3     Q.  Those restaurant jobs that you've had from

 4  approximately the ninth grade through when you left

 5  Georgia to move to New York, were they minimum wage,

 6  approximately, jobs?

 7     A.  Yes.

 8     Q.  How did you meet Wilahemina Hicks?

 9     A.  I met her at Pilgrim's Pride, the chicken plant.

10     Q.  She worked there, as well?

11     A.  Yes.

12     Q.  And when you lived in New York, where did you

13  live?  For the record, I have an address of ████████

14  ███████████████████, in Troy, New York.

15          Is that an address that you lived in with

16  Wilahemina Hicks and the children in Troy?

17     A.  That was one of the addresses.  Yes.

18     Q.  Were there others?

19     A.  Yes.

20     Q.  How many other places did you live?

21     A.  I think it was two other areas, one in Cohoes and

22  one in Troy.

23     Q.  How long did you live on ██████████t with
```

1          (Adrian P. Thomas - by Ms. Calabrese)

2    Wilahemina?

3        A.   Maybe a year and a half.

4        Q.   Now, the children -- and when I say children, I'm

5    referring to ████████████████████████████████████

6    ████████████████████████████████████████ and Matthew,

7    but we'll include them in the phrase the children.

8          Did the children call you dad or daddy or father

9    or a word of that nature?

10       A.   They called me both.

11       Q.   Dad?

12       A.   And daddy.

13       Q.   Dad and daddy?

14       A.   Yes.

15       Q.   Including ██████?

16       A.   Yes.

17       Q.   Did you ever formally adopt ██████?

18       A.   I'm not understanding the question.

19       Q.   Did you ever adopt ██████, make her your child in

20   the eyes of the law, versus a stepfather?

21       A.   Yes.

22       Q.   You did.  You adopted her legally?

23       A.   I didn't actually adopt her.  I signed her birth

Case 1:17-cv-00625-DJS Document 14-21 Filed 06/14/21 Page 55 of 458

1               (Adrian P. Thomas - by Ms. Calabrese)

2    certificate.  And her name is not Hicks.  It's Thomas

3    now.

4        Q.   Now?

5        A.   Ever since I signed the birth certificate.

6        Q.   Now, she was born, for the record, on ███████

7    █████

8             Does that sound about right?

9        A.   What was the year again?

10       Q.   █████

11       A.   I believe so.

12       Q.   Now, when you're saying you signed her birth

13   certificate, that would have been -- she would have been

14   born prior to you meeting Wilahemina; is that correct?

15       A.   That's correct.

16       Q.   So tell me what happened.  Did you sign and then

17   file after the fact?  What was the scoop?

18            Can I have the background on that?  How did that

19   come about?

20       A.   We was up here in New York when I signed the

21   birth certificate.  So that was -- it was a conversation

22   between Wilahemina and I.  And I -- because I love the

23   mother, of course I'm going to love the daughter.  So I

```
 1              (Adrian P. Thomas - by Ms. Calabrese)
 2    agreed.
 3        Q.   So sometime after 2001 you and Wilahemina had
 4    this conversation and you decided to sign          birth
 5    certificate.
 6        A.   Yes.
 7        Q.   So what did that mean to you that you were
 8    signing it?
 9             Did that change your role or responsibility at
10    all with regard to India?
11        A.   No.  It didn't change my role.
12        Q.   It didn't change your role, okay.  It was more
13    symbolic?
14             Do you know what I mean by that?
15        A.   I was very happy to sign her birth certificate.
16        Q.   Now, when Matthew and          were born, was
17    there an issue with the birth certificates being
18    switched or swapped?
19             MR. KLEIN:  Birth certificates or birth
20        records?
21             MS. CALABRESE:  Birth certificates.
22             MR. KLEIN:  If you know.
23             THE WITNESS:  I don't remember.
```

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2   BY MS. CALABRESE:

 3       Q.   How did you identify the twins?

 4            Did one have a birthmark on their face?

 5       A.   Yes.

 6       Q.   What did you call that birthmark, if anything?

 7       A.   It was more like freckles.

 8       Q.   Do you remember if there was an issue when they

 9   were born about the birth certificates not being

10   correct?

11       A.   Wilahemina mentioned that to me, but...

12       Q.   What did she say?

13       A.   She said -- she called me in the room and

14   mentioned that about the birth records wasn't correct on

15   the twins.

16       Q.   Did she say that the one that she called Matthew,

17   they had him down as ████, and vice versa?

18            MR. KLEIN:  Objection.

19   BY MS. CALABRESE:

20       Q.   Based upon the birthmark?

21            Do you remember that?

22       A.   I think it was more of that with Matthew.

23       Q.   What do you mean by that?
```

1           (Adrian P. Thomas - by Ms. Calabrese)

2      A.   Because he was -- he was the one with the

3  freckles.

4      Q.   So Matthew has the freckles?

5      A.   Right.

6      Q.   And that's how you and she knew that that baby

7  was Matthew.

8      A.   That's how we identified them together.

9      Q.   Because they were identical twins?

10     A.   And -- that's correct.

11     Q.   And what?

12     A.   One was heavier than the other one.

13     Q.   Which one?

14     A.   One was bigger than the other one.

15     Q.   Yeah.  Who was the bigger one?

16     A.   Matthew was.

17     Q.   So, the one that she and you knew to be Matthew,

18  the one with the freckles, the one that was a little

19  chunkier as a little baby, did they have him down as

20  being ██████?

21          MR. KLEIN:  Who's they?

22          MS. CALABRESE:  The hospital

23       administration, the people who issued you

```
 1              (Adrian P. Thomas - by Ms. Calabrese)
 2          the birth certificates.
 3              THE WITNESS:  She mentioned that.  I
 4          didn't notice it.
 5  BY MS. CALABRESE:
 6      Q.  So that wasn't really something you were
 7  concerned with or involved in; is that right?
 8      A.  It wasn't something I wasn't direct had an
 9  involvement in.
10      Q.  She just kind of told you about it.
11      A.  Yes.
12      Q.  And she had it under control.  She was dealing
13  with it.
14      A.  Yes.
15      Q.  And did Matthew also have -- do you know what the
16  phrase "Mongolian spot" means, like a birthmark?
17      A.  I've heard her tell me that.  Yes.
18      Q.  Which child had the birthmark or Mongolian spot?
19              MR. KLEIN:  If any of them had it.
20              THE WITNESS:  Outside of -- altogether,
21          all the children?
22              MS. CALABRESE:  I'm sorry.  The twins.
23              THE WITNESS:  It was Matthew.
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2    BY MS. CALABRESE:

 3        Q.   And where did he have it?

 4        A.   He had it on his cheek and -- on his cheek and on

 5    his parts of his nose.

 6        Q.   And also on his bottom?

 7        A.   I don't remember.

 8        Q.   You don't remember the bottom, but the cheek and

 9    the nose?

10        A.   Yes.

11        Q.   Is that another reason how you knew that that

12    infant was the child Matthew and not ████████?

13        A.   Yes.

14        Q.   Now, Matthew and ████████, how soon -- were they

15    born right after the other, or how far apart were they,

16    their time of birth?

17             Moments, hours, days?

18        A.   I don't remember.

19        Q.   Were you there when they were born?

20        A.   No.

21        Q.   How much time passed before you first saw them

22    after they were born?

23        A.   When she actually brought them home.
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.   So the first time you saw the twins was when they

 3  came home from the hospital?

 4      A.   Yes.

 5      Q.   When you went to the hospital -- or did you go to

 6  the hospital while Wilahemina was still a patient there

 7  after the birth of the children?

 8      A.   No.

 9      Q.   How long was it before Wilahemina came home from

10  the hospital after the birth of the children?

11           And, again, by children, I mean, right now we're

12  talking about Matthew and ██████████

13      A.   Repeat the question then.

14      Q.   Sure.

15           How long was Wilahemina in the hospital after the

16  birth of Matthew and ██████████?

17      A.   I don't recall.

18      Q.   And did the children come immediately home with

19  Wilahemina?

20      A.   No.

21      Q.   How long did they stay in the hospital for?

22                MR. KLEIN:  From birth until they came

23           home?
```

Case 1:17-cv-00625-DJS Document 47-21 Filed 06/14/21 Page 62 of 458

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2              MS. CALABRESE:  Yes.

 3              MR. KLEIN:  To the best of your

 4          knowledge, how long were they in the

 5          hospital for, how many days or weeks or

 6          whatever?

 7              THE WITNESS:  I believe it was more

 8          than a week.

 9  BY MS. CALABRESE:

10      Q.  Does a month sound about right?

11          I believe I read somewhere in the records I read

12  they were in the NICU, the neonatal intensive care unit,

13  for about a month.

14          Does that sound about right?

15      A.  I believe so.

16      Q.  Now, why was it that you did not visit Wilahemina

17  in the hospital after she gave birth to your two twin

18  children?

19      A.  Because I had to watch the other children we had

20  together.

21      Q.  Were any of those children in school?

22              MR. KLEIN:  At the time of the birth of

23          the twins?
```

Case 1:17-cv-00625-DJS Document 17-21 Filed 06/14/21 Page 62 of 458

1          (Adrian P. Thomas - by Ms. Calabrese)

2               MS. CALABRESE:  Yes.

3               THE WITNESS:  I don't remember if it

4          was summer break or it was school in or not.

5   BY MS. CALABRESE:

6     Q.  When they were born?

7          Did the kids go to public school?

8     A.  ███████████████     was starting school.  I don't

9   remember if it was when school was in or actually out

10  when the twins was in the hospital.

11    Q.  Did you attempt to get coverage, babysitters,

12  family members, to watch the children so that you could

13  go to the hospital?

14    A.  I remember asking Wilahemina's family.  I had no

15  family in New York.  So I asked Wilahemina's relatives,

16  but everybody had to work, so.

17    Q.  How many times did you ask them?

18    A.  Periodically.

19    Q.  What does that mean?

20    A.  They knew I was trying to go see the twins.

21    Q.  Now, when Wilahemina came home from the hospital,

22  did you go to see the twins and have her watch your

23  children at home?

Case 1:17-cv-00626-DJS Document 14-21 Filed 06/14/21 Page 64 of 458

1      (Adrian P. Thomas - by Ms. Calabrese)

2    A.   When she came home, it was late in the evening,

3  after her visits with the children, with the twins.

4    Q.   My question is:  Once she got home from the

5  hospital, once she was released as a patient back to

6  your home that you shared with her, did you then go to

7  see the twins at the hospital?

8    A.   No.

9    Q.   How come?

10    A.   I was out looking for work.

11    Q.   Was there an agreement between you and Wilahemina

12  about the division of labor in the household?

13      And what I mean by that is:  Was there an

14  agreement between the two of you about who would work

15  and who would stay home with the kids?

16    A.   Yes.

17    Q.   Tell me about that.

18    A.   I agreed to be the only income source in the

19  house due to the fact we had a lot of children.  And she

20  said okay.

21    Q.   So what does that mean that you were the only

22  income source?

23    A.   I was the only one working, bringing in monetary

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2    gains for the house so the rent can get paid, lights get

 3    paid, things of that nature.

 4        Q.   Did she not work at all?

 5        A.   Not after we got together.

 6        Q.   But there's a period of time of about four years

 7    we've agreed that you did not work; is that correct?

 8        A.   That's right.

 9        Q.   So during that four-year time period, she also

10    did not work?

11        A.   Once we got together and moved in together.

12        Q.   Once you got together and moved in together what?

13        A.   That's when she wasn't working.

14              MR. KLEIN:  I believe, if I may, she's

15              asking you that there -- I believe there was

16              testimony that you said you didn't work for

17              four years while you had the kids.

18              THE WITNESS:  Right.

19              MR. KLEIN:  So she's asking, did

20              Wilahemina work during that time that you

21              were out of work for four years having the

22              kids?

23              THE WITNESS:  No.
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2    BY MS. CALABRESE:

 3        Q.  So you were both unemployed?

 4        A.  Yes.

 5        Q.  How did you pay for the bills, as you described,

 6    the rent, the heat, lights, the food?

 7        A.  Family helped out.  And I was on social services

 8    at the time.

 9        Q.  Was she also?

10        A.  Yes.

11        Q.  And why was it that you couldn't find a job, you

12    said, for four years?

13        A.  I tried.  Nobody would hire me.

14        Q.  Where did you go to try?

15        A.  I went places in here, at Albany and Troy.

16        Q.  Did you work with any type of an agency to help

17    you obtain employment?

18        A.  I went to, I think, several agencies.  Yes.

19        Q.  I mean a government agency.

20             Was there anybody in DSS, for example, helping

21    you look for a job, keep track of where you were

22    applying, things of that nature?

23        A.  I don't remember.
```

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.  So, for the four years prior to the beginning of

 3   your incarceration, you and Wilahemina were both

 4   unemployed.

 5      A.  That's correct.

 6      Q.  Now, do you remember when ████████ and Matthew

 7   came home from the hospital?

 8      A.  Yes.

 9      Q.  Did they both come home together?

10      A.  Yes.

11      Q.  At the same time is what I mean.

12      A.  From my memory, yes.

13      Q.  Do you remember when that was that they came

14   home?

15            If they were born in May, on May ██████ did they

16   come home in June, July, August, September?

17      A.  I don't actually remember the dates, the time of

18   the month or what month it was.

19      Q.  Do you recall for how long they were home prior

20   to Matthew passing?

21      A.  I don't know how long it was.

22      Q.  Was it more than a month or less than a month, if

23   you recall?
```

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2       A.  I don't actually recall that.

 3       Q.  As you sit here today, does it seem like it was a

 4   long time that they were home?  Did it seem like a short

 5   time?

 6            What does your memory say?

 7       A.  It seemed like they was home a short time.

 8       Q.  A short time before Matthew passed?

 9       A.  Yes.

10       Q.  Now, during that period of time, what do you

11   recall about Matthew?

12            Did he appear healthy?  Did he appear unhealthy?

13   What kind of a baby was he?  And what I mean by that is,

14   did he cry a lot?  Was he content?

15            Let me state for the record you have I think six

16   children we've agreed to; is that right?

17       A.  Yes.

18       Q.  Each child has their own little personality.

19            Is that fair to say?

20       A.  Yes.

21       Q.  So what was Matthew like?

22            I did not know him so I want you to kind of

23   explain to me what he was like.
```

Case 1:17-cv-00626-DJS Document 147-21 Filed 06/14/21 Page 69 of 458

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2              MR. KLEIN:  Objection.

 3              You can answer.

 4              MS. CALABRESE:  You can answer.

 5              MR. KLEIN:  Describe what he was like

 6         to you as a baby.

 7              MS. CALABRESE:  And so, for the record,

 8         us attorneys may talk -- may place

 9         objections on the record.  Unless you're

10         told by Mr. Klein, you have to answer the

11         questions that I ask you, unless he tells

12         you not to.

13              So.  He may place objections on the

14         record.  It's not like court.  It's kind of

15         different where you're not waiting for a

16         judge to say, it's okay.  You can answer.

17         Just assume that, unless he tells you

18         otherwise, you'll answer, okay?

19   BY MS. CALABRESE:

20      Q.  So tell us about Matthew.

21          What was he like?

22      A.  They were -- he was a good child, a good baby.

23      Q.  What do you mean by that?
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)
 2         Describe him to me.
 3    A.   Didn't whine unless it was time for a diaper
 4    change or a feeding.
 5    Q.   Content baby?
 6    A.   Yes.
 7    Q.   Happy baby?
 8    A.   Yes.  I would say happy, very happy.
 9    Q.   Was ███████ the same or was he different?
10    A.   He was the same, as well.
11    Q.   Content?
12    A.   Yes.
13    Q.   And happy?
14    A.   They wouldn't be up all night.
15    Q.   They wouldn't?
16    A.   Yeah.
17    Q.   That's lucky.
18         Having six -- or at that point four other kids,
19    you know that sometimes there are late nights with
20    babies, right?
21    A.   Yes.
22    Q.   Were the other kids like that or were they
23    different as little babies?
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2    A.   They was similar.  Yes.

 3    Q.   Content, happy, slept through the night?

 4    A.   Yeah.

 5    Q.   That's very lucky, right?

 6    A.   Yeah.

 7    Q.   I mean, you've probably heard horror stories.

 8    A.   Yes.

 9    Q.   That's good.

10         No real health issues for Matthew or ███?

11    A.   Not in the beginning.

12    Q.   When you say the beginning, did that change?

13    A.   Yes.

14    Q.   Other than the incident which caused his death,

15    did Matthew have any other health issues?

16    A.   Not that I know of.

17    Q.   So, just normal well-baby checkups?

18    A.   From what I remember, yes.

19    Q.   Did you go on any of those appointments with the

20    twins for their well-baby checkups?

21    A.   No.

22    Q.   Were there any concerns that you had for their

23    health during that time?
```

Case 1:17-cv-00625-DJS Document 14-21 Filed 06/14/21 Page 72 of 458

```
 1              (Adrian P. Thomas - by Ms. Calabrese)
 2              MR. KLEIN:  Prior to the events leading
 3         to this incident?
 4              MS. CALABRESE:  Yes.
 5              THE WITNESS:  Yes.  I wanted to know
 6         how things came about.
 7    BY MS. CALABRESE:
 8       Q.  What I mean is:  Did you have any concerns that
 9    they were not healthy?
10              MR. KLEIN:  Any worries.
11    BY MS. CALABRESE:
12       Q.  Any worries.
13       A.  No.
14       Q.  And did Wilahemina tell you the results after the
15    checkups, everything was fine, for example?
16           Did she kind of tell you what the doctor said?
17       A.  Always.
18       Q.  She was good about communicating that information
19    to you?
20       A.  Yes.
21       Q.  Now, up until this point, tell us about the
22    household.  What was the household like when the twins
23    were home prior to Matthew's death?
```

Case 1:17-cv-00626-DJS Document 14-21 Filed 06/14/21 Page 72 of 458

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2        Was it stressful?  Was it normal?  What was it

 3   like at home?

 4        I mean, at that point you had six kids, two of

 5   which are infant newborns.  What's happening at home?

 6     A.   There'd be a lot of running around, playing.

 7     Q.   There's a lot of little kids, right?

 8     A.   Yes.

 9     Q.   I think one, two, three, four of them are five or

10   under, right, not including the twins.

11        There's a lot of little kids running around; is

12   that right?

13     A.   Yes.

14     Q.   That is stressful, isn't it?

15     A.   Not all the time.

16     Q.   Was it at times?

17     A.   Sometimes.

18     Q.   Tell us about the stressful times.

19     A.   Stressful times when they just get loud and

20   fighting among the other children.  So other than that,

21   everything was happy, all right.

22     Q.   And you and Wilahemina were responsible for their

23   care?
```

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2     A.   Yes.

 3     Q.   Did anybody else play a role in that?

 4     A.   The grandparents.  When I'm not around, the

 5  grandparents or one of her brothers.

 6     Q.   And the grandparents, you're talking about

 7  Wilahemina's parents?

 8     A.   Yes.

 9     Q.   And are they from Georgia or are they from New

10  York?

11     A.   One parent is from New York.  That's Inga.  And

12  the father, I think, is from Mississippi, I believe.

13     Q.   What caused Wilahemina to work at the chicken

14  factory in Georgia when you guys met?

15          Why was she there?

16     A.   The father moved to Georgia, so the family left

17  New York and came to Georgia to be close to one of his

18  relatives.

19     Q.   And what caused them -- and by them, I mean the

20  grandparents, Wilahemina's parents, to move back to New

21  York?

22     A.   I don't actually remember why.

23     Q.   Now, who was responsible for tending to the twins
```

Case 1:17-cv-00626-DJS Document 142-21 Filed 06/14/21 Page 75 of 458

1              (Adrian P. Thomas - by Ms. Calabrese)

2  primarily?

3          When I say tending, I mean changing, feeding,

4  doing those sorts of tasks.

5      A.  Wilahemina was.

6      Q.  She primarily took care of those functions or

7  tasks?

8      A.  Yes.

9      Q.  And where did the children, the twins, sleep?

10     A.  In the crib.

11     Q.  Where was that located?

12     A.  That was in our bedroom.

13     Q.  Whose bedroom?

14     A.  Our -- Wilahemina and mine.

15     Q.  And was it one crib or two cribs?

16     A.  It was only one.

17     Q.  And they slept together in the same crib?

18     A.  Yes.

19     Q.  Where did the other children sleep?

20     A.  They slept in the other bedroom.

21     Q.  How many?

22     A.  One.

23     Q.  All of the other four children slept in one

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2   bedroom?

 3       A.   Yes.

 4       Q.   Did you have more than two bedrooms in that house

 5   or just two?

 6       A.   It was just a two-bedroom apartment.

 7       Q.   And besides the two bedrooms, what other rooms

 8   did you have in that house?

 9       A.   A living room and a partial kitchen.

10       Q.   What is a partial kitchen?

11            What do you mean?

12       A.   It's not that wide and not that long.

13       Q.   And where did the family eat when they ate meals?

14       A.   We mostly ate in the living room together.

15       Q.   On the couch?

16       A.   Yes.

17       Q.   Describe your room.

18            What else besides the crib was in the room?

19       A.   There's a bed, table, and a TV.

20       Q.   When you say table, what do you mean?

21       A.   Not a kitchen table, but more like a coffee

22   table, a small one.

23       Q.   And what was that table used for?
```

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2      A.  It was just used for the TV to sit on.

 3      Q.  What size was the bed?

 4      A.  I think it was a queen size.

 5      Q.  Was it a mattress and a box spring or just a

 6  mattress?

 7      A.  I think a mattress and a box spring.

 8      Q.  And was it elevated or was it on the floor?

 9            MR. KLEIN:  In other words, was it on a

10         frame with wheels or some other platform or

11         was it just directly on the floor?

12            THE WITNESS:  I think it was directly

13         on the floor, if I remember correctly.

14  BY MS. CALABRESE:

15      Q.  Now, describe your relationship with Wilahemina,

16  your marriage.  Describe your marriage to her.

17            MR. KLEIN:  As of what point in time?

18            MS. CALABRESE:  During the entire time.

19            THE WITNESS:  We had our ups and downs.

20  BY MS. CALABRESE:

21      Q.  What were the ups like?

22      A.  It was good.  We communicated.  We did things

23  together.  We was an outgoing couple.
```

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.   What were the downs like?

 3      A.   Distant, somewhat separated.

 4      Q.   How do you mean?

 5      A.   We would be in different rooms mostly, not

 6  communicating.  Just that's what it was.

 7      Q.   Was it more ups, more downs, or describe that?

 8      A.   In between.  It was in between.

 9      Q.   You mean in between the ups and the downs, equal

10  number?

11      A.   Yeah.

12      Q.   Now, during the time when the twins were brought

13  home from the hospital and Matthew's death, describe

14  your relationship with Wilahemina.

15      A.   My relationship with Wilahemina at that time

16  was -- we were stressed out.

17      Q.   About what?

18      A.   Bills and doing things as a family.

19      Q.   What do you mean by that, doing things as a

20  family?

21      A.   Having the money to go to do things, like as a

22  family, like go to the movies, go bowling, anything of

23  that nature.
```

```
1              (Adrian P. Thomas - by Ms. Calabrese)

2      Q.   And how did that stress show?

3      A.   The stress showed -- it showed more body language

4  around company, you know.  Her relatives would come over

5  or when we together, she stayed more in the living room.

6  And that was it.

7      Q.   And where would you be?

8      A.   I would be in the room.

9      Q.   The bedroom?

10     A.   Yes.

11     Q.   Is that where you spent most of your time, and

12 she would spend most of her time in the living room or

13 kitchen?

14     A.   Yes.  Due to the other children in the house.

15     Q.   Where would the other children be?

16     A.   Be in the living room or back and forth in the

17 room where the toys was at.

18     Q.   Was that their bedroom where the toys were?

19     A.   Yes.

20     Q.   And was the fact that both of you were unemployed

21 stressful?

22     A.   Yes.

23     Q.   And was that something that caused problems or
```

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2    concerns or issues between you and her?

 3                 MR. KLEIN:  Objection.

 4                 You can answer.

 5                 THE WITNESS:  Repeat the question.

 6                 MS. CALABRESE:  Sure.

 7    BY MS. CALABRESE:

 8       Q.  Was the fact that you both were unemployed -- did

 9    that cause problems in your marriage?

10       A.  Yes.

11       Q.  And did you argue a lot because of that fact?

12       A.  Yes.

13       Q.  And would the arguments ever turn physical?

14       A.  No.  Wouldn't turn physical.

15       Q.  I'm sorry?

16       A.  No.

17       Q.  Never?

18       A.  Never.

19       Q.  Was your relationship ever physical?

20       A.  No.

21       Q.  Not one time?

22       A.  Not one time.

23       Q.  And so, when you would argue, would it just be
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2    verbal?

 3        A.   Yes.  We would have disagreements.  That's it.

 4        Q.   Would voices be raised?

 5        A.   Of course.

 6        Q.   And when I say physical, I'm going to ask a

 7    follow-up question.

 8             Would there ever be a time when objects would be

 9    thrown?

10        A.   She has thrown some things, but I haven't.

11        Q.   And who would she throw things at, if anybody?

12        A.   Throws things towards me in front of company, but

13    I just sit there.

14        Q.   Would they ever connect with you, whatever she

15    threw?

16        A.   No.

17        Q.   What would she throw?

18        A.   She threw a glass, a cup.  She threw a glass and

19    a cup.

20        Q.   A glass and a cup?

21        A.   Yes.

22        Q.   Were they two separate incidents or the same

23    incident?
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      A.   Different.

 3      Q.   When you said company was there, was it her

 4  family?

 5      A.   Yes.

 6      Q.   Was that stressful that her family spent a lot of

 7  time at your house?

 8      A.   No.

 9      Q.   You enjoyed their company?

10      A.   I enjoyed their company.

11      Q.   So other than the two times where the glass and

12  the cup were thrown, the arguments between you and her,

13  did they ever escalate besides just that, verbal

14  arguments?

15      A.   They would never escalate past that.

16      Q.   Were the police ever called because of this

17  arguing?

18      A.   Not to my knowledge.

19      Q.   You would know if the police showed up at your

20  house, right?

21      A.   Yes.

22      Q.   Did the police ever come to your house because of

23  the arguing?
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2       A.   No.

 3       Q.   And did you ever have any type of relationship

 4   with any woman where the police were called?

 5       A.   Yes.

 6       Q.   Have you ever had an order of protection issued

 7   against you --

 8                  MR. KLEIN:  Other than --

 9   BY MS. CALABRESE:

10       Q.   -- other than relating to the death of Matthew?

11       A.   No.

12       Q.   Have you ever been physically violent with any

13   girlfriend prior to Wilahemina?

14       A.   No.

15                  MR. KLEIN:  I'm just going to note an

16           objection to the form of the question.

17                  You're not suggesting that he was

18           violent with Wilahemina.  Just any

19           girlfriend that he was with prior to

20           Wilahemina.

21                  MS. CALABRESE:  Yes.

22                  MR. KLEIN:  Have you ever been violent

23           with any girlfriend?
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2                 THE WITNESS:  No.

 3    BY MS. CALABRESE:

 4       Q.  Did anybody babysit or watch Matthew during the

 5    time that Matthew was home from the hospital prior to

 6    his death?

 7       A.  Yes.

 8       Q.  Who?

 9       A.  Her mother, Inga Hicks, and her sister did maybe

10    two or three times.

11       Q.  Total?

12       A.  Total, yes.

13       Q.  So Inga and her sister watched Matthew two or

14    three times total?

15       A.  Yes.

16       Q.  And where were you at that time?

17       A.  Sometimes I would be with her.  We had to run and

18    cash a check and go, like, up to Wal-Mart together or

19    something like that.

20       Q.  The other times when you weren't with her?

21       A.  Other times I wasn't with her.

22       Q.  Where were you?

23       A.  I was with one of her brothers, Victor Hicks.
```

Case 1:17-cv-00626-DJS Document 14-21 Filed 06/14/21 Page 85 of 458

84

1          (Adrian P. Thomas - by Ms. Calabrese)

2     Q.   Where?

3     A.   Sometimes we would go to his house or go up to

4    Wal-Mart together.

5     Q.   Where was Wilahemina, if not at home with the

6    kids?

7     A.   She was sometimes at her mother's house, which is

8    in the same complex.  She would have go do something for

9    her mother and her mother watched the children.

10     Q.   How long did her mother and/or her sister watch

11    the children?

12          How long of a time period was it at most?

13     A.   Maybe an hour or two.  That's it.

14     Q.   Now, do you have any prior criminal convictions

15    in New York State, Georgia, or any other state?

16     A.   No.

17     Q.   Do you have any prior arrests in New York State,

18    Georgia, or any other state, an arrest that did not lead

19    to a conviction?

20     A.   No.

21     Q.   Have you had any family court cases in New York,

22    Georgia, or any other state, for example, where you were

23    charged with a family offense?

```
 1            (Adrian P. Thomas - by Ms. Calabrese)
 2      A.   No.
 3      Q.   Have you had any police involvement in your life
 4  other than this incident involving Matthew?
 5      A.   What do you mean?
 6      Q.   Sure.
 7           Have the police ever responded to your home or to
 8  you personally with regard to your behavior or the
 9  behavior of another person whom you were around?
10      A.   No.
11      Q.   Now, other than your adopted brother, do you have
12  any siblings?
13      A.   I have biological siblings.
14      Q.   What are their names and ages?
15      A.   I have a brother.  His name's ███████████
16      Q.   How old is he, approximately?
17      A.   He's 34 years old.
18      Q.   Any other siblings?
19      A.   I have an older sister, my biological sister.
20      Q.   And what's her name?
21      A.   ████████████.
22      Q.   How old is she?
23      A.   She's 39 or 40.
```

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.   Any other siblings?

 3      A.   I have a baby brother, who is my biological

 4  brother.

 5      Q.   And what's his name?

 6      A.   ███████████████

 7      Q.   How old is he?

 8      A.   He's 30 or 31.

 9      Q.   And did you grow up or live with those siblings?

10      A.   No.

11      Q.   Do you have any other siblings?

12      A.   No.

13      Q.   Did you ever spend time with them if you did not

14  live with them growing up?

15      A.   I spent time with them.  Yes.

16      Q.   Tell me about that.

17           When would you see them?

18      A.   I'd see them either on weekends in Georgia or

19  during family functions, social gatherings.

20      Q.   Now, the woman who you state as your adoptive

21  mother, was she related in any way to your biological

22  mother?

23      A.   Yes.
```

Case 1:17-cv-00626-DJS Document 14-21 Filed 06/14/21 Page 88 of 458

1              (Adrian P. Thomas - by Ms. Calabrese)

2       Q.   Tell me how.

3       A.   Sister, blood sister.

4       Q.   And why was it that your mother did not have you

5    live with her?

6       A.   My mother was young at the time and she was on

7    drugs.

8       Q.   And so, you were raised by your mother's sister?

9       A.   Yes.

10      Q.   And those siblings that you mentioned, where did

11   they live?

12      A.   With other people.

13      Q.   Not your mother?

14      A.   Not my mother.

15      Q.   And not your adoptive mother?

16      A.   No.

17      Q.   Were the four kids split up?

18      A.   Yes.

19      Q.   And do you have any nicknames or use any other

20   names?

21      A.   Do I have any other names?

22      Q.   Nicknames.

23           Do you have nicknames?  Let me ask you that.

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2      A.   In the past.  Yes.

 3      Q.   What are those names?

 4      A.   They used to call me Gig for like gigolo.

 5      Q.   Gig?

 6      A.   Yes.

 7      Q.   Why would they call you that?

 8      A.   Because I was a ladies' guy.

 9      Q.   When?

10      A.   In the past, before Wilahemina.

11      Q.   And what does that mean to be a ladies' guy?

12      A.   I was very popular with the ladies.

13      Q.   You had many girlfriends?

14      A.   Yes.

15      Q.   And did that all stop when you met Wilahemina?

16      A.   Yes.

17      Q.   Did you have any relationships with other women

18   while you were with Wilahemina?

19      A.   No.

20      Q.   That wasn't a source of problems between you and

21   her?

22            MR. KLEIN:  Objection, asked and

23         answered.
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2   BY MS. CALABRESE:

 3       Q.  Your past as a gig or being called Gig?

 4       A.  No.

 5       Q.  She wasn't upset at all about that?

 6              MR. KLEIN:  Objection.

 7              THE WITNESS:  No.

 8   BY MS. CALABRESE:

 9       Q.  What is your height and weight today?

10       A.  I'm six-one, 340 pounds.

11       Q.  What was your height and weight when Matthew

12   died?

13          The height is the same, I assume?

14       A.  Yes.

15       Q.  How about the weight, did you weigh about the

16   same?

17       A.  I weighed about 3- or 400 pounds at that time.

18       Q.  3- to 400 pounds?

19       A.  Yes.

20       Q.  That's a pretty big difference.

21          So, would you say 350, closer to 300, closer to

22   400?

23       A.  Closer to 400.
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.  Now, so, growing up your mother, you said, was

 3  into drugs and wasn't able to care for you?

 4      A.  That's correct.

 5      Q.  Is that still her lifestyle today?

 6      A.  No.

 7      Q.  She became clean?

 8      A.  Yes.

 9      Q.  And when was that?

10          How old were you, would you say?

11      A.  I think when I was 20 years old she was totally

12  off drugs.

13      Q.  And did you have a relationship with your father?

14      A.  I never knew who he was.

15      Q.  Now, how's your health today?

16      A.  It's okay.

17      Q.  Do you suffer from any physical ailments or

18  injuries?

19      A.  I have arthritis in my left foot and arthritis in

20  my right knee.

21      Q.  That has to be tough, one on each side?

22      A.  Yeah.

23      Q.  Does that hurt to walk?
```

Case 1:17-cv-00625-DJS Document 14-21 Filed 06/14/21 Page 92 of 458

```
 1              (Adrian P. Thomas - by Ms. Calabrese)
 2         How does that manifest?  How does that show up
 3  every single day?
 4     A.  If I sit for long period of time.
 5     Q.  It hurts?
 6     A.  It does.
 7     Q.  And we've been sitting for a long time and we
 8  will be sitting for a fairly long time after I'm done
 9  with this very long question.  If you need to get up for
10  any reason, like I said earlier, you can do that.  If
11  you want to walk around the building or whatever, if
12  your knee or ankle starts bothering you, you have to
13  tell me that because I'm not in your mind.  I won't know
14  your level of pain, okay?
15     A.  Okay.
16     Q.  Now, other than those two issues, do you have any
17  other health issues?
18     A.  I have high blood pressure.
19     Q.  Do you take medication for that?
20     A.  Yes.
21     Q.  Other than that, does it show up in any way?
22     A.  No.
23     Q.  Besides that, any other health issues?
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      A.   No other health issues.

 3      Q.   You're fairly healthy?

 4      A.   Yes.

 5      Q.   Have you always been fairly healthy for the

 6   majority of your life, or did you suffer from any type

 7   of health issues growing up or as a young man?

 8      A.   I've been fairly healthy all my life.

 9      Q.   Prior to the arrest in this case, were you

10   healthy?

11      A.   Yes.

12      Q.   Do you go to a regular doctor or dentist?

13              MR. KLEIN:  Did he before the incident

14          or --

15              MS. CALABRESE:  Yes.  Before the

16          incident.

17   BY MS. CALABRESE:

18      Q.   Did you see the doctor on an annual basis?

19      A.   No.

20      Q.   And since you've been released from custody, do

21   you see the doctor on an annual basis?

22      A.   Yes.

23      Q.   For what, arthritis?
```

```
 1          (Adrian P. Thomas - by Ms. Calabrese)

 2     A.   Yes.  For my arthritis and blood pressure.

 3     Q.   Other than that?

 4     A.   Other than that, no.

 5     Q.   Prior to your arrest, did you see the dentist on

 6  a biannual basis, twice a year?

 7     A.   No.

 8     Q.   After release from custody, have you seen a

 9  dentist on a biannual basis?

10     A.   Yes.

11     Q.   You go to the dentist twice a year?

12     A.   Yes.

13     Q.   So other than the blood pressure medication, do

14  you take any other medication?

15     A.   Those are the only two medications I take.

16     Q.   The blood pressure and something for arthritis?

17     A.   Yes.

18          (Recess taken.)

19  BY MS. CALABRESE:

20     Q.   Mr. Thomas, you said you're taking medication for

21  blood pressure.  And what are taking, arthritis

22  medication, or is it more a significant pain medication

23  for your arthritis?
```

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2     A.  I'm taking Ibuprofen 600 milligrams for my

 3  arthritis in my left foot and right knee.

 4     Q.  So over-the-counter medication?

 5     A.  Yes.

 6     Q.  Nothing prescribed besides the blood pressure

 7  medication?

 8     A.  No.  Both of them are prescribed.

 9     Q.  The 600 milligrams of Motrin?

10     A.  Yes.  No.  Not Motrin.  Ibuprofen.

11     Q.  You get that from a pharmacist?

12     A.  Yes.

13     Q.  Have you ever attended rehab for any reason?

14     A.  What type of rehab?

15     Q.  Any type of rehab.

16     A.  No.

17     Q.  Have you ever been diagnosed or treated for drug

18  or alcohol abuse or dependency?

19     A.  No.

20     Q.  Have you ever been on probation?

21     A.  No.

22     Q.  Or been provided with limitations about alcohol

23  use or drug use?
```

1          (Adrian P. Thomas - by Ms. Calabrese)

2     A.   No.

3     Q.   Have you ever been associated or affiliated with

4 any gangs?

5     A.   No.

6     Q.   Prior to your incarceration, during the period of

7 time you lived in New York with Wilahemina, what did you

8 do to socialize?

9     A.   I'm not understanding the question.

10    Q.   Sure.

11         When I say socialize, what I'm referring to is,

12 what you were referring to earlier, going to the movies,

13 bowling, clubs, hobbies.

14         What did you do for enjoyment, social,

15 entertainment, when you were living in New York with

16 Wilahemina?

17    A.   Her and I will go to her family's house.

18    Q.   To hang out?

19    A.   Yes.  Together.

20    Q.   What would you do there?

21    A.   We would talk.  We would walk around in front of

22 the apartment building where her mother and father were

23 staying.

Case 1:17-cv-00626-DJS Document 142-1 Filed 06/14/21 Page 97 of 458

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.   What was the name of that building?

 3      A.   I forgot.

 4      Q.   Were you a member of any clubs or participated in

 5    any group activities or sports?

 6      A.   No.

 7      Q.   Now, during the seven years that you lived with

 8    Wilahemina in New York, describe a usual day in your

 9    life at the house with the children.

10           What was it like?

11      A.   She would give them a bath.  I would take them to

12    the park.  Once she do their hair and dress them, I

13    would then take them to the park while she stayed home

14    get a nap and come back after an hour or two.  And we

15    would watch TV together, do things together like that.

16      Q.   What besides TV?

17      A.   We would play Monopoly.  We play Monopoly.  And

18    we would get on the phone and call the relatives and see

19    what's going on, things of that nature.

20      Q.   Did you have any hobbies?

21      A.   Yes.

22      Q.   What were your hobbies?

23      A.   I would go and play ball, play football.
```

```
1              (Adrian P. Thomas - by Ms. Calabrese)

2      Q.  With who?

3      A.  A guy name ███████.  He was a close friend

4  of mine.  Me and him met at -- I believe it was either

5  Wal-Mart or either Home Depot.  I'm not sure.

6      Q.  Do you still have a connection with █████████?

7      A.  We haven't spoke since the retrial.

8      Q.  How come?

9      A.  I lost his phone number.

10      Q.  But would you consider him a friend today?

11      A.  Yeah.  He was a good friend.

12      Q.  Now, while in New York for this purpose, do you

13  plan on engaging with any friends or relatives?

14      A.  No.

15      Q.  What did you do to prepare for this deposition

16  today?

17              MR. KLEIN:  She's not asking you to

18          divulge anything that you and I discussed.

19              But do you mean, did he meet with his

20          attorney?

21  BY MS. CALABRESE:

22      Q.  Did you meet with your attorney?

23              MR. KLEIN:  You can say yes or no but
```

```
 1          (Adrian P. Thomas - by Ms. Calabrese)

 2          not divulge anything that was discussed that

 3          would be covered by the attorney-client

 4          privilege.

 5               THE WITNESS:  Yes.

 6   BY MS. CALABRESE:

 7     Q.  Did you meet with anybody else?

 8     A.  Yes.

 9     Q.  Who did you meet with?

10     A.  I met with a friend.

11               MR. KLEIN:  She's saying to prepare for

12          the deposition.

13               THE WITNESS:  Not for a deposition.

14   BY MS. CALABRESE:

15     Q.  What were you talking about?

16     A.  A close friend.

17     Q.  That you met with?

18     A.  Yes.

19     Q.  Who was that?

20     A.  ███████████.

21     Q.  When did you meet with her?

22     A.  She picked me up from the airport.

23     Q.  Did you stay with her while you were here?
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)
 2      A.   No.
 3      Q.   How do you know ███████████?
 4      A.   That's my lawyer's daughter.
 5      Q.   Jerome Frost's daughter?
 6      A.   Yes.
 7      Q.   Did she stay with you at the hotel?
 8      A.   No.
 9      Q.   Are you friends?
10      A.   We're just friends.  That's it.
11      Q.   Do you hang out or socialize in any way?
12      A.   Yes.
13      Q.   On what basis?
14      A.   We just go get a bite to eat, go for a ride.
15   That's it.  Nothing major.
16      Q.   Have you had this relationship with her since you
17   met Mr. Frost for this case?
18      A.   Since I met Mr. Frost.
19      Q.   Was that for this case or did you know him before
20   this case?
21      A.   I haven't known him until this case.
22      Q.   Until this case?
23      A.   Yes.
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.   And how old is Ms. Frost, █████████

 3      A.   She's in her 40s.

 4      Q.   Do you have a romantic relationship with her?

 5      A.   No.

 6      Q.   Have you ever had a romantic relationship with

 7   her?

 8      A.   No.

 9      Q.   And what did you do with her to prepare for this?

10              MR. KLEIN:  Objection.

11              THE WITNESS:  Nothing.

12              MS. CALABRESE:  Nothing, okay.

13   BY MS. CALABRESE:

14      Q.   What did you do with her while you were here?

15      A.   We just talked and rode around.

16      Q.   Where did you talk?

17      A.   In a car.

18      Q.   What did you talk about?

19      A.   Talk about my relationship.

20      Q.   What relationship?

21      A.   My relationship with my ex-wife.

22      Q.   Wilahemina?

23      A.   No.
```

**APPENDIX** **222**

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.   Ms. ███?

 3      A.   Yes.

 4      Q.   What is that relationship?

 5      A.   Between me and my ex-wife?

 6      Q.   Yes.

 7      A.   We divorced.

 8      Q.   No longer have a relationship?

 9      A.   No.  We no longer have a relationship.

10      Q.   So what were you and Ms. Frost talking about?

11      A.   She just wanted to know was I still married.

12      Q.   Was she asking that because the two of you intend

13 on beginning a romantic relationship?

14              MR. KLEIN:  Ms. Frost?

15              MS. CALABRESE:  Yes.

16              MR. KLEIN:  Objection.

17 BY MS. CALABRESE:

18      Q.   Is she married?

19      A.   No.

20      Q.   Is she in a relationship now?

21      A.   No.

22      Q.   Are you platonic?

23           Do you know what I mean by that?
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2                   MR. KLEIN:  Objection.  Asked and

 3         answered.

 4    BY MS. CALABRESE:

 5      Q.  When I say platonic, I mean just friends.

 6      A.  Yeah.  Just friends.  That's it.

 7      Q.  Do you have any intention of having a romantic

 8    relationship with her?

 9                   MR. KLEIN:  Objection.  Asked and

10         answered.

11                   MS. CALABRESE:  You can answer it.

12                   THE WITNESS:  No.

13    BY MS. CALABRESE:

14      Q.  Has she told you that she wants to have a

15    romantic relationship with you?

16      A.  No.

17      Q.  Did you review any records in preparation of this

18    deposition?

19      A.  Say what, now?

20      Q.  Did you review any records in preparation for

21    this deposition?

22      A.  Yes.

23      Q.  What records did you review?
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      A.   Whatever my counsel showed me.

 3      Q.   By counsel, you mean Mr. Klein?

 4      A.   Yes.

 5      Q.   Anything else that you reviewed?

 6              MR. KLEIN:  Other than what we --

 7         during our meeting, have you done anything

 8         or looked at anything?

 9              THE WITNESS:  No.

10  BY MS. CALABRESE:

11      Q.   Now, during the time that you were living in New

12  York, did you have any -- prior to the incident which

13  caused Matthew's death, did you have any involvement

14  with child protective services?

15              MR. KLEIN:  I'm just going to note an

16         objection to the form of the question, that

17         there was an incident that caused his death.

18              Maybe you could say prior to his

19         passing or the events.

20  BY MS. CALABRESE:

21      Q.   Prior to the events leading up to Matthew's

22  death, did you have any involvement with child

23  protective services?
```

Case 1:17-cv-00626-DJS Document 44-2 Filed 06/14/21 Page 105 of 458



```
 1          (Adrian P. Thomas - by Ms. Calabrese)

 2      A.    ████

 3      █████████████████████████

 4      A.    ████████████████████████████████████

 5   ████████████████

 6             █████████████████████████████████████

 7          ██████████████

 8             ████████████████████████████████

 9        ████████████████████████████████████

10        ████████████████████████████████████

11        █████████████████████████████████████

12          ██████████

13   BY MS. CALABRESE:

14      Q.    ██████████

15      ██████████

16      ████████████████████████

17      A.    ██████████████████████████████████████

18   ████████████████████████████████████████████

19   ██████████████████

20      Q.    █████████████████████

21      ███████████████████████

22          ██████████████████████████████████

23   ████████████████████████████████████████████
```

1          (Adrian P. Thomas - by Ms. Calabrese)



Case 1:17-cv-00626-DJS Document 74-2 Filed 06/14/21 Page 107 of 458



1           (Adrian P. Thomas - by Ms. Calabrese)

Case 1:17-cv-00626-DJS Document 14-2 Filed 06/14/21 Page 108 of 453



```
 1          (Adrian P. Thomas - by Ms. Calabrese)

 2  ████████████████████████████████████████████

 3  ████████████████████████████████

 4          MR. KLEIN:  Just for the record, I

 5      think all of us agree that this line of

 6      questioning is going to be the confidential

 7      portion of the transcript.

 8              ██████████████████████

 9              ███████████████████████

10              ██████████████████████████████

11          █████

12              █████████████████████████

13  BY MS. CALABRESE:

14      █████████████████████████████████████████

15  ██████████████████████

16      ██████████████████████████████████████████

17  ██████████████████████████████████████

18  ███████████

19      █████████████████████████

20          ████████████████████

21      █████████████

22      ██████████████████████████████████████████

23  ██████████████████████████████████
```

Case 1:17-cv-00626-DJS Document 114-24 Filed 06/14/21 Page 109 of 458



(Adrian P. Thomas - by Ms. Calabrese)

Case 1:17-cv-00626-DJS Document 114-21 Filed 06/14/21 Page 110 of 458



(Adrian P. Thomas - by Ms. Calabrese)

Case 1:17-cv-00626-DJS Document 44-2 Filed 06/14/21 Page 113 of 458



(Adrian P. Thomas - by Ms. Calabrese)



232

(Adrian P. Thomas - by Ms. Calabrese)

Case 1:17-cv-00626-DJS Document 14-24 Filed 06/14/21 Page 113 of 458



(Adrian P. Thomas - by Ms. Calabrese)



1          (Adrian P. Thomas - by Ms. Calabrese)

Case 1:17-cv-00626-DJS Document 14-2 Filed 06/14/21 Page 103 of 458

114





1          (Adrian P. Thomas - by Ms. Calabrese)

1                (Adrian P. Thomas - by Ms. Calabrese)

2   ████████████████████████████████████████

3   ████████████

4   ██████████████████████████████████████████████████

5   ██████████████

6   █████████████████████████████

7   ████████████████████████████████████████

8   ████████████████████████████████████████████

9   ██████████████████████████████████████████

10  █████████████████████████████

11  ████████████████████████████████████████████

12  ████████

13              MS. CALABRESE:  We can go off the

14         record.

15              (Discussion held off the record.)

16  BY MS. CALABRESE:

17    Q.  Mr. Thomas, when was the first time you noticed

18  any issues with Matthew?

19              MR. KLEIN:  You mean -- just to be

20         clear, you mean around --

21              MS. CALABRESE:  Leading up to his

22         death.

23              MR. KLEIN:  The weekend that he ended

Case 1:17-cv-00626-DJS Document 14-2 Filed 06/14/21 Page 183 of 458

1          (Adrian P. Thomas - by Ms. Calabrese)

2          up in the hospital.

3               MS. CALABRESE:  Leading up to his

4          death.

5               THE WITNESS:  The only thing I remember

6          is that he was running a fever.

7     BY MS. CALABRESE:

8          Q.  When did that start?

9          A.  The actual day I don't remember.

10         Q.  Do you recall on what day he was brought to the

11    hospital, what day of the week it was?

12         A.  For a doctor's appointment?

13         Q.  No.  The first time he was brought to the

14    hospital when he never left.

15         A.  I don't remember what day.

16         Q.  You don't recall what day of the week it was?

17         A.  No.

18         Q.  And so, how far back prior in time did you notice

19    a fever, one day, two days, three days, more than that?

20         A.  I think it was more than two days he was running

21    a fever.

22         Q.  What was the fever?

23              What was the temperature?

1          (Adrian P. Thomas - by Ms. Calabrese)

2     A.  I don't remember.  Wilahemina performed that.

3  She's the one that checked the temperature.

4     Q.  Did she tell you what the temperature was?

5     A.  She said it was high.  I don't remember the

6  number.

7     Q.  When she told you that Matthew had a high

8  temperature, what, if anything, did you do?

9     A.  I was concerned.  I think I got a wet rag, a

10  cool, damp rag, and placed it over his body.

11     Q.  What, if anything, else did you do?

12     A.  Made his bottle.  That was it.

13     Q.  Was he eating normally?

14     A.  For the first few days, yes.

15     Q.  Did he appear normal, as you've described him

16  before, during that time?

17     A.  Yes.  At that time he was.

18     Q.  What, if any, medications did you or Wilahemina

19  give to him at that time?

20     A.  She went to Wal-Mart and bought Pedialyte and, I

21  think, Enfamil.

22     Q.  Was she breastfeeding at all when she brought the

23  twins home from the hospital?

```
 1              (Adrian P. Thomas - by Ms. Calabrese)
 2      A.   I don't recall.
 3      Q.   Did you or she speak to the doctor about the
 4  fever?
 5      A.   She did.
 6      Q.   What direction did the doctor give?
 7              MR. KLEIN:  If you know.
 8              THE WITNESS:  That part I don't know,
 9         because she went.  I didn't.
10              MS. CALABRESE:  I'm sorry?
11              THE WITNESS:  She went to the hospital
12         or doctor's visits.  I didn't -- I wasn't
13         able to attend.
14  BY MS. CALABRESE:
15      Q.   But did she tell you?
16      A.   I don't remember.
17      Q.   Did you ask?
18      A.   Of course I did.  I always asked.
19      Q.   So what did she say?
20      A.   I don't remember.
21      Q.   Is there --
22      A.   I always asked about, when she went to a doctor's
23  visit, how did it go always.
```

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.   Right, but as you sit here today you don't

 3   remember what that response was?

 4      A.   I just don't remember.

 5      Q.   Is there anything that can refresh your memory?

 6      A.   No.

 7      Q.   So, you said this happened over the course of a

 8   few days?

 9      A.   That he was running a fever, yes.

10      Q.   How many is a few to you?

11      A.   Two.

12      Q.   Did the fever ever break?

13      A.   No.

14      Q.   So he had a fever from the first time that you

15   noticed it until he was brought to the hospital?

16      A.   Yes.

17      Q.   Now, I'm going to state for the record that the

18   records that I've reviewed indicate that the fever

19   started on a Friday and he was brought to the hospital

20   on a Sunday.

21           Does that sound about right?

22      A.   If it's from the hospital, that would be right.

23      Q.   But does that sound right to you, that time
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2   frame?

 3       A.  Yes.

 4       Q.  So, during this time period from Friday, when the

 5   fever first starts, or you first notice the fever,

 6   through to the time when he was taken to the hospital on

 7   Sunday, you don't recall the temperature, correct?

 8       A.  I don't recall the temperature.

 9       Q.  The treatment that you and Wilahemina rendered to

10   him was Pedialyte; is that right?

11       A.  That's correct.

12       Q.  And Enfamil?

13       A.  Enfamil.

14       Q.  Anything else?

15       A.  I don't -- if it was, I don't remember.

16       Q.  The cold rag that you mentioned; is that right?

17       A.  Right.

18       Q.  And nothing else?

19       A.  Nothing else.

20       Q.  During this time you said he was eating normally?

21       A.  Yes.

22       Q.  He appeared to be his normal self as you've

23   described earlier?
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2       A.  Yes.

 3       Q.  Did you have any concerns during this period of

 4   time about his health, other than the fact that he had

 5   the fever?

 6       A.  Yes.  Of course.  That was my son.  I was very

 7   concerned about his health.

 8       Q.  What I mean is, were you worried about him being

 9   sick other than having a fever?

10          Were you worried about anything else being wrong

11   with him?

12       A.  Not other than -- other than him just having a

13   fever.

14       Q.  Having a fever?

15       A.  Right.

16       Q.  What did you attribute that to?  What did you

17   think?

18          For example, kids get fevers, or did you think

19   something else?  What were your -- what was going on in

20   your head at that time?

21              MR. KLEIN:  Objection.

22              You can answer.

23              Does he know why he had a fever?
```

Case 1:17-cv-00626-DJS Document 94-14 Filed 06/14/21 Page 124 of 458

```
 1          (Adrian P. Thomas - by Ms. Calabrese)

 2              MS. CALABRESE:  Yeah.

 3   BY MS. CALABRESE:

 4     Q.  What were you thinking?

 5          Like, for example, if it's January and your kid

 6   gets a fever, you may say, oh, maybe he has a cold.  If

 7   it's summer and the kids were swimming all summer and

 8   your child is sick, maybe he has an ear infection from

 9   swimming the last two weeks.

10          What was kind of going on in your head is what

11   I'm trying to understand.

12              MR. KLEIN:  Object to form.  Calls for

13          speculation.

14              You can answer.

15              THE WITNESS:  I didn't why he had a

16          fever.  I just knew that he had a fever.  I

17          was trying everything to get the fever out

18          of him.

19   BY MS. CALABRESE:

20     Q.  Were you and Wilahemina working together during

21   that time, trying to help him?

22     A.  Yes.  We were very concerned about his fever

23   because he was the only child in the house that have a
```

Case 1:17-cv-00626-DJS   Document 44-12   Filed 06/14/21   Page 125 of 458

```
 1          (Adrian P. Thomas - by Ms. Calabrese)
 2    fever.
 3        Q.   And why was that concerning?
 4        A.   Because he was a newborn.
 5        Q.   What I mean is, you said because he was the only
 6    child.
 7             Would the kids often get sick together or...
 8        A.   They very rarely got sick.
 9        Q.   Was he sleeping normally?
10        A.   Yes.  For the first two days that we knew that he
11    had a fever, yes.
12        Q.   He was sleeping regularly?
13        A.   Yes.
14        Q.   As he would as an infant?
15        A.   Yes.
16        Q.   I think earlier you said he slept pretty well at
17    night?
18        A.   Yes.
19        Q.   That was the same?
20        A.   That was the same for the first two days.
21        Q.   What happened to change that?
22        A.   His fever got worse, I believe.
23        Q.   When you say worse, what do you mean by that?
```

```
1          (Adrian P. Thomas - by Ms. Calabrese)

2     A.  He was starting to sweat more, and he was

3  starting to sweat more over time.  And from what I

4  remember, he was sweating more and was feeding, but he

5  wouldn't take the whole bottle.

6     Q.  How many ounces would he normally eat at one

7  sitting?

8     A.  I don't actually remember now.  I can't remember

9  back now.

10    Q.  You said he was sweating more.

11         Was he sweating beginning on Friday when he had

12  the fever?

13    A.  Not the first two days of what I can remember.

14  The first two days he didn't have a fever.  He didn't

15  start out that way.  He didn't start sweating until I

16  think maybe the fourth day of going into...

17    Q.  Sunday?

18    A.  Yeah.

19    Q.  When you say sweating, describe what you mean.

20         What was he doing?

21    A.  He was just very hot.  You could tell there was a

22  difference with him.

23    Q.  Besides the sweating -- when you say sweating, is
```

1          (Adrian P. Thomas - by Ms. Calabrese)

2    it sweating like you or I would do if we were working

3    out, if it's hot out, that kind of water perspiring on

4    your body?

5        A.   Yes.

6        Q.   That's what was happening to him?

7        A.   Yes.

8        Q.   For how long of a period of time did you observe

9    that, an hour, a day, a year, how long?

10       A.   I observed that more a day and a half.

11       Q.   Did you do anything different when you saw this?

12       A.   Only thing I did was trying to keep it down with

13   the cool rag.

14       Q.   And did you notice anything else?

15       A.   No.

16       Q.   Did he continue on in that way, or did something

17   else change?

18       A.   Continued on in that way.

19       Q.   And did he recover from the fever?

20       A.   No.

21       Q.   What happened?

22       A.   It stayed that way.  It didn't change.

23       Q.   And so, Friday he has the fever.  He has the

```
 1              (Adrian P. Thomas - by Ms. Calabrese)
 2    fever on Saturday.
 3              Sometime after Friday is when you notice the
 4    fever is getting worse, but you're not sure of the
 5    temperature; is that correct?
 6         A.   Right.
 7         Q.   Then you noticed the sweating, right?
 8         A.   Yes.
 9         Q.   Then what next happens?
10              Do you have to involve medical help at any point
11    in time besides the initial time Wilahemina took him in?
12                   MR. KLEIN:  What do you mean the
13              initial time she took him in?
14    BY MS. CALABRESE:
15         Q.   Earlier you mentioned Wilahemina took him in to
16    the doctor, but you did not go and you can't recall what
17    happened.
18              You just remember asking, correct?
19         A.   That's, I think, when she found out about the
20    Pedialyte.
21         Q.   Right.
22         A.   She took the twins.  She took both of them, not
23    just one.
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.   You just what?

 3      A.   I think she took both children to the -- I think,

 4   to the hospital, not just one.

 5      Q.   Not just one, okay.

 6           That was because of the fever?

 7      A.   Yes.

 8      Q.   Did she take him, Matthew, back to the doctor or

 9   hospital at any point in time during the course of that

10   weekend?

11      A.   I don't think so.  I don't remember.

12      Q.   So, tell me about the overnight on Saturday.

13      A.   It was feeding time.

14      Q.   What time was that?

15      A.   I don't remember what time it was.

16      Q.   Was it in the middle of the night?

17      A.   It was in the middle of the night.

18      Q.   Okay.

19      A.   It was feeding time.  She handed ████████ to me.

20   She had Matthew because he was more ill at the time

21   because of the fever.  We fed both children.

22      Q.   And you're not sure how much you fed them?

23      A.   Not sure.
```

```
 1           (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.   Was Matthew still not taking full dose, as you

 3  mentioned earlier?

 4      A.   Wasn't taking the whole bottle.

 5      Q.   Go ahead.

 6      A.   After that, she changed both children's diapers,

 7  and she tried feeding Matthew again.  And then he still

 8  was rejecting a full bottle.  So, she laid ██████ back

 9  into the crib, and she kept Matthew.  She was more

10  attentive to Matthew.  And then she laid him back down

11  in the crib.  Then she said about 20 minutes later he

12  finally went to sleep.  And then I laid down.  And that

13  was it.  We went to bed.

14      Q.   And where was ██████?

15      A.   He was in the crib, as well.

16      Q.   So you went to bed.

17           And what happens next?

18      A.   She woke me up, shaking me to get up, and she

19  said, Matthew's not breathing.  So I got up.  I picked

20  him up, checked his pulse.  And I checked his pulse.  I

21  dialed 911.

22      Q.   What caused you to dial 911?

23      A.   Because he wasn't actually breathing like he
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2    normally would.

 3        Q.   What was he breathing like?

 4        A.   Like he was clinging on to life.

 5        Q.   How do you mean?

 6             What does that mean?

 7        A.   His stomach was barely moving.

 8        Q.   When you say you checked his pulse, what did you

 9    observe, if anything?

10        A.   I checked his pulse.

11        Q.   What was the result of that?

12        A.   I could barely feel the heartbeat.

13             After that, I ran and put some water on my hands,

14    sprinkle it over his face, and it -- it would blink, but

15    it was almost like a stare.

16        Q.   You said it would blink?

17        A.   It would blink, but it was almost like a stare.

18        Q.   And by it, you mean the baby?

19        A.   Yes.  Matthew.  Yes.

20             EMT guy come up.

21        Q.   Who called 911?

22        A.   I did.

23        Q.   Did you speak to them?
```

```
1              (Adrian P. Thomas - by Ms. Calabrese)

2       A.   No.  I handed the phone to her.

3       Q.   How come?

4       A.   Because I wanted to grab -- put my hand in some

5  water.  And when I put my hand in some water, I came

6  back to Matthew and I was sprinkling some water over his

7  eyes, and it would barely blink.  When his eyes barely

8  blinked, I almost started panicking.  So, I just fan

9  him, trying to give him air until the EMT arrived.

10      Q.   And what happened then?

11      A.   EMT came in.  When they arrived, I ran outside.

12  They came inside.  They checked Matthew out.  Then they

13  took him.

14      Q.   Where?

15      A.   To the hospital.

16      Q.   And what did you do?

17      A.   I couldn't do nothing but stay there with the

18  children.

19      Q.   And how long did you stay there before that

20  changed?

21      A.   I'm not understanding the question.

22      Q.   Sure.

23           Did you just stay at the house indefinitely, or
```

Case 1:17-cv-00626-DJS Document 84-4 12/31 Filed 06/14/21 Page 183 of 458

1            (Adrian P. Thomas - by Ms. Calabrese)

2   did you end up leaving the house at some point in time?

3       A.  All the children was there.

4            MR. KLEIN:  At any time.

5            THE WITNESS:  I stayed with the

6       children when she left with the paramedics.

7   BY MS. CALABRESE:

8       Q.  At what point in time do you speak to members of

9   law enforcement?

10      A.  When CPS came to the house.

11      Q.  And they came to your house?

12      A.  Yes.

13      Q.  How long was it after Matthew left the house did

14  they come to your house?

15      A.  It was some hours.

16      Q.  A day, less than a day?

17      A.  No.  It was some hours.

18      Q.  Hours.  So less than a day?

19      A.  Yes.

20      Q.  Did you have a conversation with them?

21      A.  Yes.

22      Q.  At the house?

23      A.  Yes.

(Adrian P. Thomas - by Ms. Calabrese)

Q.   Do you recall who you spoke to at the house?

A.   It was two ladies.  I don't remember their name.

Q.   What did they say and what did you say?

A.   They said they had a court order to remove the children as of right now.  Either I can sign the paper and agree to the court order, or they can take the children, and it'll be good for me to receive the children back when it's time for court.

Q.   And what did you do?

A.   I signed the paper.

Q.   Did you ask them why?

A.   They didn't say why.

Q.   Did you ask them why?

A.   No.

Q.   So they were coming to remove the children from your home.

A.   Right.

Q.   And you did not ask them why?

A.   No.

Q.   Why did you think they were doing that?

A.   I didn't know at the time.

Q.   You had no idea?

1      (Adrian P. Thomas - by Ms. Calabrese)

2    A.   No.   They just said the children are being

3  removed at this time.   There is a court order.   There

4  was a piece of paper.   I read it, but just a lot was

5  going through my mind.   I was concerned about my son.

6  There was a cop standing there, Troy police officer and

7  it was two ladies.   And I signed the paper, and they

8  took them.

9    Q.   What happened after they took them?

10    A.   My mother-in-law came after that.

11    Q.   You said, at this point in time, you were

12  concerned for your son.

13      What were you doing about that?

14    A.   I was getting ready to take a shower.   While the

15  water was running, my mother-in-law came while they was

16  still outside with the children hysterical.   She was

17  crying, upset.   And she came inside the house, and she

18  said -- she came inside to get something for Wilahemina,

19  and she just said I was in a lot of trouble.

20    Q.   So during that time that Matthew leaves the house

21  and prior to CPS coming, what were you doing?

22    A.   I was getting ready to take a shower, but I was

23  waiting on her to leave.

1          (Adrian P. Thomas - by Ms. Calabrese)

2     Q.   You mean her by Wilahemina's mom?

3     A.   Yes.

4     Q.   Prior to that time, before CPS comes to the

5 house --

6     A.   I just got through feeding the children.

7     Q.   Breakfast?

8     A.   No, I was feeding them dinner that she had

9 cooked.  I remember dinner -- she cooked dinner.  It was

10 leftovers from the night before.

11    Q.   What, besides feeding them dinner, did you do at

12 home before CPS came, after Matthew left?

13    A.   I was cleaning up the house, vacuuming, washing

14 dishes.  And that was it.

15    Q.   Did you do anything else during that time?

16    A.   No.

17    Q.   Did you speak to anybody on the telephone?

18    A.   No.

19    Q.   Did you call Wilahemina?

20    A.   I called her, but I couldn't make contact with

21 her through her personal phone, cell phone, that she

22 had.

23    Q.   Why?

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2     A.   It was -- she had it off.

 3     Q.   Did you call anybody else?

 4     A.   No.

 5     Q.   So the only call that you made during that time

 6   was to Wilahemina and it didn't go through?

 7     A.   That's correct.

 8     Q.   How many times did you call her?

 9     A.   Numerous times.  I was concerned about Matthew.

10     Q.   How many times is numerous to you?

11     A.   More than five.

12     Q.   And she did not return any of those calls?

13     A.   No.  I would have passed by this time.

14     Q.   She did not return any of those calls?

15     A.   No.

16     Q.   So, is Wilahemina mother's last name Hicks?

17     A.   Yes.

18     Q.   So Mrs. Hicks is there, right?

19          You said that she was acting hysterical, I think,

20   was your term.

21     A.   Yes.

22     Q.   What does that mean?

23          What was she doing?
```

1          (Adrian P. Thomas - by Ms. Calabrese)

2     A.   She was crying.  She was crying and yelling

3     outside.  You could hear her outside yelling.

4     Q.   What was she yelling?

5     A.   They -- they done took the children, is what I

6     remember.

7     Q.   Was she yelling anything else?

8     A.   I don't remember as of now.

9     Q.   Is there anything that could refresh your memory?

10    A.   No.

11    Q.   You said then she came into the apartment and

12    spoke to you?

13    A.   She came into the apartment to get something for

14    Wilahemina.

15    Q.   What?

16    A.   I'm trying -- I think it was -- no.  Not her

17    purse.  I think it was some shirts.

18    Q.   And then what happened?

19    A.   And she told me -- she said, you in some trouble.

20    Q.   What did you say?

21    A.   I said, trouble about what?  She just said,

22    you're in trouble.  And she walked out.

23    Q.   What did you think at that time?

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      A.  I didn't know what to think.

 3      Q.  You didn't know what she meant?

 4      A.  No.

 5      Q.  Did she tell you what she meant?

 6      A.  No.

 7      Q.  Did you ask her what she meant?

 8              MR. KLEIN:  Objection, asked and

 9          answered.

10              You can answer.

11              Did you ask her what she meant?

12              THE WITNESS:  No.

13  BY MS. CALABRESE:

14      Q.  And then what did you do?

15      A.  I was getting ready to proceed into the shower.

16  I closed the door.

17      Q.  Why did you go in the shower at that time?

18      A.  Because I haven't had a shower all day.

19      Q.  Well, why at that time?

20          Why not earlier?

21      A.  Because I had to keep an eye on the children.

22      Q.  So the children are gone now.  You're taking a

23  shower?
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2       A.   After my mother-in-law just left.

 3       Q.   And what door did you say you locked?

 4       A.   I locked the front door.

 5       Q.   Tell us -- then what happens, you go in the

 6  shower?

 7       A.   I was taking my clothes off, just hopped in the

 8  shower.  Before I could lather the soap in, I started

 9  washing my body.  I heard a knock on the door.  I dried

10  back off, put my clothes back on.  And I answered the

11  door, and it was two detectives there.

12       Q.   And who were they?

13       A.   They introduced themselves as Adam Mason.

14       Q.   And who was the other one?

15       A.   The other guy with him was named Ronald Fountain.

16       Q.   And what did they say?

17       A.   They said, we're here to talk with you about your

18  son.

19       Q.   And what did you think at that time?

20       A.   My mind was blank.

21       Q.   What do you mean?

22       A.   I didn't know what to think.

23       Q.   And did you say anything in response to them?
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2       A.  I said, come in.  I told them to come in.

 3       Q.  Then what happened?

 4       A.  I told them about -- about I was awakened by my

 5   wife and about his breathing, about his condition that

 6   he was in from what I saw.  And I told them about

 7   everything that happened from that moment all the way up

 8   to the paramedics came.

 9       Q.  Just the way you described it to me today?

10       A.  Yes.

11       Q.  And what, if anything, did they say?

12       A.  They asked me what happened before.  I said, we

13   gave him a bottle that -- that night when we fed him,

14   and they had that -- he had a fever over a few days.

15   And that was it.

16       Q.  And what did they say?

17       A.  They said, okay, we'll be back.  We're going to

18   the hospital.

19       Q.  And did they leave?

20       A.  Yes.

21       Q.  Did you go with them?

22       A.  No.

23       Q.  What did you do?
```

```
1              (Adrian P. Thomas - by Ms. Calabrese)

2        A.   I got into the shower and washed.

3        Q.   You continued with your shower?

4        A.   Yes.

5        Q.   Did you complete your shower?

6        A.   Yes.

7        Q.   What then happened?

8        A.   They came back.

9        Q.   How long of a time passed?

10       A.   About 30 minutes later.

11       Q.   What did you do during that time?

12       A.   In 30 minutes, I -- I took a shower.  And I was

13   calling, trying to get ahold of my wife, and she would

14   never answer her cell phone.  So what I did was, I made

15   some contacts with her brother, Victor Hicks.

16       Q.   And did you speak to him?

17       A.   Yes.

18       Q.   And what did you say to him?

19       A.   I told him I need to speak to Wilahemina, and he

20   said no.

21       Q.   What did you say?

22       A.   I said -- I told him, put her on the phone and

23   stop playing.  And he said no, that I'm in trouble.  And
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2    he hung up the phone on the second call.

 3         Q.  What do you mean on the second call?

 4         A.  I called twice.

 5         Q.  Did you speak to him the first time?

 6         A.  Yes.

 7         Q.  And how did that call end?

 8         A.  The first time?

 9         Q.  Yes.

10         A.  He just said no and hung up.

11         Q.  And the second time?

12         A.  I called right back and just said, hey, stop

13    playing.

14         Q.  And then?

15         A.  He said no, you're in trouble.  And then he hung

16    up.

17         Q.  And did you call him again?

18         A.  No.

19         Q.  What, if anything, did you do at that point?

20         A.  I was getting ready to go to the hospital, and

21    the cops came back.  This time it was just Adam Mason

22    and it was him and Ronald Fountain again.  And they

23    asked me to go with them to talk about -- just have a
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2   talk with them.

 3        Q.   Go where?

 4        A.   Down to the station.

 5        Q.   Did you agree?

 6        A.   Yes.

 7        Q.   And so, prior to that happening, prior to -- you

 8   said it was both Adam Mason and Ronald Fountain who

 9   arrived at your apartment?

10        A.   Yes.

11        Q.   Prior to that, during the time that you were

12   calling your wife, are you leaving voicemail messages?

13        A.   I don't remember.  I don't remember.  I don't

14   know if I did or didn't.

15        Q.   And did you leave any voicemail messages on

16   anybody else's phone?

17        A.   No.

18        Q.   Did you call anybody other than her brother, as

19   you've described, and her?

20        A.   No.

21        Q.   Now, during the time period from when the twins

22   came home from the hospital and this weekend that we've

23   just been talking about, was it common for you and any
```

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2    one of the children to be alone in the bedroom?

 3        A.  No.

 4        Q.  No?

 5        A.  No.

 6        Q.  Was it common for you to tend to the twins in the

 7    bedroom while Wilahemina was tending to the other

 8    children and cooking, cleaning, and so forth in the

 9    other rooms?

10        A.  Sometimes.  Not all the times.

11        Q.  How often would that be, the breakdown of the

12    responsibility, where you would tend to the kids in the

13    bedroom and she would tend to the rest of the household?

14        A.  Only when she's cleaning the house or mopping the

15    floor with bleach.

16        Q.  Now, would the twins often be on the bed rather

17    than the crib?

18        A.  Not all the time.

19        Q.  How often?

20        A.  Half the time.

21        Q.  So half the time that they were in the bedroom

22    they would be in the crib and the other half they would

23    be on the bed?
```

Case 1:17-cv-00626-DJS Document 14-2 Filed 06/14/21 Page 146 of 458

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      A.   Yes.

 3      Q.   And would they sleep on the bed?

 4      A.   I'm not understanding the question.

 5      Q.   Would the twins ever sleep on the bed?

 6      A.   By their self?

 7      Q.   Or with anybody.

 8      A.   Yeah.

 9      Q.   They would do both, sleep on the bed alone?

10      A.   Yes.

11      Q.   With each other?

12      A.   Right.

13      Q.   And also with you and/or Wilahemina?

14      A.   Yes.

15      Q.   And this happened regularly in the house; is that

16  right?

17      A.   Ever since they came home from the hospital.

18      Q.   And did you and Wilahemina do the nighttime

19  feedings every night or just one of you or just both of

20  you?

21           What was the breakdown?

22      A.   It was always both of us.

23      Q.   Now, you said you were leaving the apartment with
```

Case 1:17-cv-00626-DJS Document 14-2 Filed 06/14/21 Page 147 of 458

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2   the two police officers; is that right?

 3      A.  Yes.

 4      Q.  And where did you go?

 5      A.  Went down to the police station.

 6      Q.  And where in the police station were you?

 7      A.  Don't exactly remember.  I was in a room

 8   somewhere inside.

 9      Q.  And do you know what the room was called or where

10   you were?

11      A.  He said the interview room.

12      Q.  And who was in there with you?

13      A.  It was me and Ronald Fountain.

14      Q.  And did anybody else ever come into that room?

15      A.  During that day, week, what?

16      Q.  At any point in time.

17      A.  Not during that day.

18      Q.  How long were you in that room prior to leaving

19   that room the first time?

20      A.  Some hours.

21      Q.  How many hours is some hours?

22      A.  I'm not exactly sure how many hours.  For some

23   time.
```

```
 1          (Adrian P. Thomas - by Ms. Calabrese)

 2     Q.   A day, two days, three days, less than a day?

 3     A.   I'm not understanding.

 4     Q.   Sure.

 5          I'm trying to understand how long of a time

 6     period you were in that room the first period of time.

 7          Was it longer than a day, shorter than a day, a

 8     couple of days?

 9     A.   It was just -- I was in that room for one day,

10     for my first day of questionings, for some hours.  I

11     don't remember how many hours.

12     Q.   And did you go anywhere after that?

13          What caused you to leave that room?

14     A.   I remember telling them, if my son died, I would

15     jump off the bridge, and they took me to the hospital.

16     Q.   Which hospital?

17     A.   I think Samaritan.  I'm not sure.

18     Q.   And what happened there?

19     A.   When they took me to the hospital, they took me

20     on the third-floor psych ward.  They met with some

21     doctors, talked to some doctors, without me being

22     present.  And I was in a room being watched by a guard.

23     And they left.
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.  And who's they?

 3      A.  Adam Mason and Ronald Fountain.

 4      Q.  And how long did you stay there at Samaritan?

 5      A.  I stayed there maybe two days.  24 to 48 hours, I

 6  believe.

 7      Q.  And did you speak to anybody while you were

 8  there?

 9      A.  I was escorted into a room.

10              MR. KLEIN:  She's not asking where you

11          went.  She's asking:  Did you speak to

12          anyone while you were there?

13              THE WITNESS:  Yes.

14  BY MS. CALABRESE:

15      Q.  Tell me about that.

16      A.  I talked with a guy that was watching me.

17      Q.  The guard?

18      A.  Yes.

19      Q.  What did you talk about?

20          Tell us about that conversation.

21      A.  He just asked me what did I do.  What did I do to

22  be -- to come there.  He asked me was I working anywhere

23  before I came there.  I told him no.  That was it.
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.  What did you tell him when he said, what did you

 3    do to have to come there?

 4      A.  I told him, I don't know what happened.  I just

 5    was being brought by the police.  And that was it.

 6      Q.  That's all you said to him?

 7      A.  Yes.

 8      Q.  And did you speak to anybody else when you were

 9    there, doctors, nurses, anybody?

10      A.  Yes.  I was brought into another room after -- I

11    think it was the next morning.

12      Q.  Tell me about that.

13      A.  And there was a group of people on the inside of

14    a room.  And one doctor had spoke and asked me what was

15    going on.  And I told him what had happened.  I told him

16    about the morning that my son -- I was awaked to my

17    son's condition and told him what happened all the way

18    to the cops came and CPS workers came.

19              And they listened.  He told me to step back

20    outside.  From there, I went back to that same room

21    where I was being watched.  And that was it.

22      Q.  And what did you do in there?

23      A.  Just looked out of a window.
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.   For how long?

 3      A.   For hours.

 4      Q.   And then what happened?

 5      A.   I was taken to the front door of the place, and I

 6  was greeted by Adam Mason.

 7      Q.   And what was your understanding about what was

 8  happening?

 9      A.   My understanding was, he was taking me back down

10  to the station to talk.

11      Q.   And did you agree to go?

12      A.   Yes.

13      Q.   And did you go back to the station?

14      A.   Yes.

15      Q.   And tell us what happened when you got there.

16      A.   He led me to a hallway and told me, when I got in

17  the room and sit down, if I get up and go towards the

18  door, I would be charged with escape.  And then I was

19  brought into the room.

20      Q.   And at that point, when he's telling you this,

21  what are you thinking?

22      A.   My mind went blank.

23      Q.   It went blank again?
```

1              (Adrian P. Thomas - by Ms. Calabrese)

2      A.  Yes.

3      Q.  So you didn't have --

4      A.  I didn't know what to think.

5      Q.  You didn't have any thoughts in your head?

6      A.  No.

7      Q.  And so, what did you do?

8      A.  I walked in the room and sat down and waited for

9  him to come inside.

10     Q.  But earlier, prior to you being brought to what

11 you are calling Samaritan, why didn't you leave at that

12 time during your conversation?

13          How come you didn't leave before you made those

14 threats to self-harm?

15     A.  I thought I couldn't leave.

16     Q.  Well, if they said, come on, I want you to come

17 down, you said yes, why did you think you couldn't

18 leave?

19     A.  I just thought I couldn't leave.

20     Q.  They never told you you couldn't leave, correct?

21     A.  Not at that time.  No.

22     Q.  So they never said, you have to stay here, right?

23     A.  Correct.

Case 1:17-cv-00626-DJS Document 44-12021 Filed 06/14/21 Page 153 of 458

1          (Adrian P. Thomas - by Ms. Calabrese)

2     Q.   And so, you were there.  In your own mind, you

3   thought you couldn't leave.

4          And you made the threats and went to the

5   hospital, correct?

6     A.   Yes.

7     Q.   And then agreed to go back, correct?

8     A.   No.  I was met at the door --

9     Q.   Right.

10    A.   -- of the hospital.

11    Q.   The hospital.

12         And they asked you to come back to the station,

13   correct?

14    A.   Yes.

15    Q.   And you agreed to go back?

16    A.   Right.

17    Q.   During that time of the ride from the hospital to

18   the station, did you have a conversation with them?

19    A.   No.  They was quiet.

20    Q.   Were you quiet?

21    A.   I was quiet, as well.

22    Q.   Did you ask them any questions about why you were

23   there, what you were doing?

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      A.   No.

 3      Q.   And then you went back to the station.  This is

 4  when you say they told you about escaping.  You said,

 5  when you went to the room --

 6      A.   They told me in the hallway.

 7      Q.   -- that, if you were to leave, it would be

 8  considered escape?

 9      A.   If I get up from the chair and go towards the

10  door of that room, I would be charged with escape.

11      Q.   And you had no thoughts in your head at this

12  point?

13      A.   Right.  They told me, go in there and sit down.

14  And that was it.

15      Q.   Did you think you were in trouble in any way?

16      A.   I didn't know what to think.

17      Q.   At any point in time prior to this moment, did

18  you think you were in trouble?

19              MR. KLEIN:  Objection to form.

20              THE WITNESS:  My mind was blank.

21  BY MS. CALABRESE:

22      Q.   So you said earlier that you had never had any

23  interaction with law enforcement where you were in
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)
 2    trouble, correct?
 3        A.   Correct.
 4        Q.   Prior to this period in your life, correct?
 5        A.   Right.
 6        Q.   And so, for the first time ever you're having
 7    this confrontation or whatever it was with law
 8    enforcement, and you don't have any thoughts in your
 9    mind?
10        A.   I just went blank.  I didn't know what to think.
11        Q.   And so, you're in the room.
12             How long were you waiting before the police
13    arrive, back into the room?
14        A.   A few minutes.  It only took a minute or two.
15        Q.   And then what happens?
16        A.   That's when they was telling me about my son must
17    have been hit in the head, or they was stating that he
18    was going to die, telling me all sorts of stuff.
19        Q.   And you had a very long conversation with them;
20    is that right?
21        A.   Yes.
22        Q.   And that conversation was recorded?
23        A.   Yes.
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.  And you've seen that video before today, correct?

 3      A.  Yes.

 4      Q.  And you've watched it?

 5      A.  Yes.

 6      Q.  And you've also seen a copy of the transcript of

 7  that conversation?

 8      A.  Yes.

 9      Q.  And the video -- I'm not asking if it's -- if

10  what you said was true.

11          What I'm asking is:  The video accurately depicts

12  the conversation that you had with them and that what

13  they had with you, correct?

14          It shows what it shows.

15      A.  Yes.

16      Q.  And so, does the transcript, it accurately

17  depicts that conversation that you had with them?

18      A.  Yes.

19              MS. CALABRESE:  I'm just going to mark

20          the transcript as Defendant's A.

21              (Short break.)

22              (Defendant's Exhibit A marked for

23          identification.)
```

1      (Adrian P. Thomas - by Ms. Calabrese)

2          MS. CALABRESE:  Back on the record.

3          I have what's been marked as

4     Defendant's Exhibit A.  It's a certified

5     copy of a transcript of what's entitled

6     "Police Interview," dated September 29,

7     2008.

8          I'm handing a copy -- I'm handing the

9     exhibit to Mr. Klein for review with his

10    client.

11         MR. KLEIN:  Off the record.

12         (Discussion held off the record.)

13         MR. KLEIN:  By counsel, we've been --

14    had a chance to look at Defendant's

15    Exhibit A.  There's no Bates numbers on it,

16    but it appears to be the 124-page transcript

17    with a certification, dated August 9, 2009,

18    of an interview -- I believe the date of the

19    interview is wrong.

20         MS. CALABRESE:  I agree.

21         MR. KLEIN:  It says September 29, 2008,

22    but it appears to be the interview from

23    September 22nd.

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2                 (Discussion held off the record.)

 3              MR. KLEIN:  Well, in any event, I think

 4         we all agree that there were two interviews

 5         that were videotaped, and that there were

 6         transcripts generated of.  And this appears

 7         to us to be a true copy of the transcript of

 8         the second interview.

 9              MS. CALABRESE:  Thank you.

10  BY MS. CALABRESE:

11    Q.  And so, Mr. Thomas, you had a very long

12  conversation that we've agreed is transcribed in

13  Defendant's A with officers Sergeant Mason and Detective

14  Fountain; is that right?

15              MR. KLEIN:  Objection to form to the

16         extent you're saying it's a conversation.

17              MR. PERKINS:  Well, is this marked, the

18         second interview?

19              MS. CALABRESE:  Yes.

20              MR. PERKINS:  It's my understanding

21         Detective Fountain --

22              MS. CALABRESE:  Was not present.  It

23         was just Mason.  That's right.  That's what
```

Case 1:17-cv-00626-DJS Document 14-2 Filed 06/14/21 Page 159 of 458

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2         your objection was.

 3              So I'll ask the question again.  I'll

 4         strike my previous question.

 5  BY MS. CALABRESE:

 6     Q.  You agree that Defendant's A shows -- is a

 7  transcript of the conversation that you had with

 8  Sergeant Mason the second time after you arrived back

 9  from the hospital; is that right?

10              MR. KLEIN:  I would note an objection.

11              Among other people, because Sergeant

12         Colaneri was there, as well.

13  BY MS. CALABRESE:

14     Q.  Is that right?

15     A.  Yes.

16     Q.  And what you said in here -- I'm not asking if

17  it's true or not.

18         What I'm asking you is:  What you said in here is

19  written down, correct?

20         When I say in here I mean, the conversation that

21  you had with police is written down in here, correct?

22              MR. KLEIN:  So by counsel, we'll

23         stipulate that this was the transcript
```

1          (Adrian P. Thomas - by Ms. Calabrese)

2          generated and used in the course of the

3          underlying criminal case.  I'll say that

4          Mr. Thomas has not reviewed this in years to

5          say whether it's a true and complete

6          printout of the whole thing.  But we would

7          agree that it's the transcript that was

8          relied on by the prosecution and defense.

9   BY MS. CALABRESE:

10     Q.  Prior to today, back when you were proceeding

11   through the criminal trials, you saw a copy of that

12   transcript, correct?

13     A.  Yes.

14     Q.  You had no question about the authentication or

15   the accuracy of what was written down, correct?

16          MR. KLEIN:  Without waiving any

17          objection that his counsel may have had, are

18          you aware of whether you had any objections

19          to the transcript?

20          THE WITNESS:  I wasn't aware of...

21   BY MS. CALABRESE:

22     Q.  Any issues with the transcript?

23     A.  With the transcript.

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.  The transcript was a correct -- I don't want to

 3  say recitation -- but a correct duplicate of the words

 4  that were used during the video, correct?

 5      A.  Yes.

 6      Q.  During the second conversation that you had, the

 7  one that I'm referencing in Defendant's A, what did you

 8  tell the police -- what did you eventually tell the

 9  police happened with Matthew?

10      A.  Repeat that question.

11      Q.  Sure.

12          During the conversation that you had with the

13  police, the second conversation, when you came back from

14  the hospital, what did you eventually tell them happened

15  to Matthew to cause him to be in the hospital?

16      A.  What did I eventually tell them?

17      Q.  Yes.  What did you say?

18      A.  I said so much.  I don't remember word-for-word.

19      Q.  So I'll go through this transcript line-by-line

20  if you'd like me to do.  What I'm trying to understand

21  is what you finally told them which caused them to

22  arrest you.

23              MR. KLEIN:  And we would refer you to
```

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2       the transcript.

 3  By MS. CALABRESE:

 4    Q.  I'm not going to allow you to refer me to the

 5  transcript.  I want your words as to what you told them

 6  which caused you to be arrested.

 7       So if you don't remember that, that's fine.  I'll

 8  have you read this transcript to refresh your memory or,

 9  if you don't require refreshing, just tell me now what

10  it was that you told them which caused them to arrest

11  you.

12            MR. KLEIN:  Object to the form as to

13       what caused him to be arrested.  You're

14       asking for operation of someone else's mind.

15       Just ask him what he said.  That's fine.

16  BY MS. CALABRESE:

17    Q.  What did you say which led to your arrest?

18            MR. KLEIN:  Objection as to --

19            MS. CALABRESE:  Fine.

20            You have to answer the question.

21            THE WITNESS:  When?  What are you

22       talking about?

23  BY MS. CALABRESE:
```

(Adrian P. Thomas - by Ms. Calabrese)

Q. This whole time, what did you tell them?

A. On that second day?

Q. Yes.

A. I don't exactly remember everything.

Q. So then I'll give you the transcript. I'll show you what's been marked as Defendant's A. I'll ask you to go into the conference room next door because I think it's going to take a pretty lengthy period of time. And I'll ask you to read it and have your recollection refreshed about what it was that you said to them about what happened to your son, okay?

So I'm handing it to you now.

MR. KLEIN: Do you want to direct him to some pages --

MS. CALABRESE: I want an answer. So whatever in there is going to give him an answer, I'd like that to be refreshed.

MR. KLEIN: And the question is what did he tell the police.

MS. CALABRESE: About how Matthew died.

MS. PECK: That resulted in the arrest.

MR. KLEIN: I'm going to object to the

1              (Adrian P. Thomas - by Ms. Calabrese)

2          form of the question and I may direct him

3          not to answer that.  I think it's an proper

4          question.  But we'll allow it.  We'll take

5          it under advisement.

6                   (Recess taken.)

7                   MS. CALABRESE:  Back on the record.

8                   For the record, we've additionally

9          marked Defendant's B, which is entitled

10         "Voluntary Statement," dated 9/22/08, and

11         Defendant's C, which is entitled "Deposition

12         of a Witness," dated 9/22/08, one page.  On

13         Defendant's B is ten pages.

14                  (Defendant's Exhibits B and C marked

15         for identification.)

16     BY MS. CALABRESE:

17        Q.  Mr. Thomas, have you had an opportunity to review

18     specifically Defendant's B and C?

19                  MR. KLEIN:  The two statements.

20                  THE WITNESS:  Yes.

21     BY MS. CALABRESE:

22        Q.  Now, I'll go back to the question that I asked

23     you before we took a recess for you to review these

```
 1          (Adrian P. Thomas - by Ms. Calabrese)
 2   documents.
 3          Do you recall what you told the police was the
 4   reason for Matthew's illness at that time?
 5      A.  Yes.
 6      Q.  What did you tell them happened?
 7      A.  I was coerced into telling them that I bumped the
 8   baby's head on three separate occasions, also that I lay
 9   my head back and bumped his head, and that I slammed
10   Matthew down onto the bed.
11      Q.  So you told them that you caused the injuries
12   which led to Matthew's death?
13      A.  I was coerced into telling them that.
14      Q.  I recognize that -- and your position is what you
15   told them was not true.  So I'll state that for the
16   record.
17          My question is:  According to the statements that
18   you provided to the police, you told them that you were
19   the reason why his injuries resulted in death, correct?
20      A.  I repeated the suggestions.  Yes.
21      Q.  Yes.
22      A.  He wrote those statements.
23      Q.  I understand that, but my question is:  You told
```

                    (Adrian P. Thomas - by Ms. Calabrese)

1    them on video, which was codified in Defendant's A, B,

2    and C, that the reason why Matthew was sick or and then

3    died was because of your actions, correct?

4                    MR. KLEIN:  I believe he has answered.

5             He said, I repeated the suggestions.  Yes.

6    BY MS. CALABRESE:

7        Q.  Is that correct?

8        A.  Yes.

9        Q.  I want to go through some of the things that you

10   said occurred.

11            Isn't it true that you told them a week before

12   Matthew died you threw him into the crib hard?  Isn't

13   that true?

14       A.  Repeat that one more time.

15       Q.  Sure.

16            Isn't it true that you told them approximately a

17   week before Matthew died you threw him into the crib and

18   he hit his head?

19       A.  He bumped his head.  Yes.

20       Q.  What's the difference between a bump and hit,

21   from your perspective?

22       A.  Hit is intentional.  Bump is accidental.

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.  So you're saying in your statement you told them

 3   it was an accident?

 4      A.  That's what was told to me, it was an accident.

 5      Q.  So you told the police it was an accident?

 6              MR. KLEIN:  Objection.

 7              He's saying they told him it was an

 8          accident.

 9              MS. CALABRESE:  I understand what he's

10          saying.

11   BY MS. CALABRESE:

12      Q.  My question to you is:  Isn't it true that you

13   told them that you intentionally did these things?

14      A.  Correct.

15      Q.  And then, after you dropped him in the crib, he

16   started screaming really loudly?

17              MR. KLEIN:  Is this about a week

18          before?

19              MS. CALABRESE:  Yes.

20              THE WITNESS:  Yes.

21   BY MS. CALABRESE:

22      Q.  And that you just left him in the crib.  You

23   walked away?
```

Case 1:17-cv-00626-DJS Document 94-14 Filed 06/14/21 Page 168 of 458

1              (Adrian P. Thomas - by Ms. Calabrese)

2      A.   That part I don't remember.

3      Q.   And this behavior of yours where you bumped or

4   hit or caused him to bump or hit his head, that happened

5   several times leading up to September 21st, correct?

6              MR. KLEIN:  Objection.

7              You're asking if that actually happened

8         or if he --

9              MS. CALABRESE:  I'm just going to ask

10         the question and if he doesn't understand,

11         he can tell me.

12   BY MS. CALABRESE:

13      Q.   Isn't that true?

14              MR. KLEIN:  Objection to the form.

15              THE WITNESS:  Repeat the question.

16              MS. CALABRESE:  Sure.

17   BY MS. CALABRESE:

18      Q.   Isn't it true that leading up to September 21st,

19   on several different occasions, you told the police that

20   you caused Matthew's head to be bumped or hit on several

21   occasions?

22      A.   Yes.  After the suggestions was given to me and

23   the promise that I wasn't going to be going to jail.

Case 1:17-cv-00626-DJS Document 44-2 Filed 06/14/21 Page 169 of 458

1          (Adrian P. Thomas - by Ms. Calabrese)

2     Q.  And so, you're saying that this entire statement

3  that you gave to the police was a lie; is that right?

4     A.  Yes, of course that's a lie.

5     Q.  You're saying that they coerced you into making

6  this statement?

7     A.  Yes.

8     Q.  Tell me about your mindset that allows you to say

9  things that are not true about the injuries to your son.

10         What were you thinking at that time?

11    A.  I was thinking about my son's condition.  I

12  didn't know -- I didn't know how he got into that

13  condition.  All I remember is that we, Wilahemina and I,

14  laid down and I was awakened to his condition.  I had

15  never been in trouble before.  I was worried about him.

16  I was worried about my children after they was taken in

17  front of my eyes.  I couldn't do nothing as a man to

18  hold on to my children.  So I couldn't sleep.

19  Everything was going through my mind at the time.

20    Q.  So how does that relate to you making up this

21  story about how he died?

22    A.  I felt I had no other choice.  That's what he

23  really wanted me to say.  That's the reason why I

1          (Adrian P. Thomas - by Ms. Calabrese)

2  repeated those suggestions in that type of order.

3     Q.  So you're saying all the words that you wrote in

4  Defendant's B, the ten-page statement, were comprised of

5  suggestions that were given to you.  The words that

6  police used were the words you repeated.

7          Is that what you're saying?

8              MR. KLEIN:  I'm just going to note an

9          objection.

10             He didn't write the statement.

11             MS. CALABRESE:  I understand that.

12  BY MS. CALABRESE:

13     Q.  Is that true?

14     A.  Is what part true?

15     Q.  The question is, the statement that you gave

16  that's audio taped --

17     A.  Okay.

18     Q.  -- and videotaped, those words that you used to

19  describe what happened to Matthew, you're saying that

20  the police provided those words to you, that they were

21  not your own words?

22     A.  The suggestions on the bumping and throwings, the

23  slamming, all that, yes.

1          (Adrian P. Thomas - by Ms. Calabrese)

2     Q.   And as you sit here today you're saying that

3   never occurred?

4     A.   I'm not saying it -- no.  Yeah.  That never

5   occurred.  Yeah.  No.

6     Q.   So you never slammed him?

7     A.   No.  I never slammed him.

8     Q.   You never bumped his head?

9     A.   No.

10     Q.   You never threw him in the crib?

11     A.   No.

12     Q.   You never bumped your head onto his head?

13     A.   No.

14     Q.   None of that occurred?

15     A.   None of that.

16     Q.   It's all not true?

17     A.   That's not true.

18     Q.   It's all a lie that you stated on the record?

19     A.   Yes.

20     Q.   Now, are you aware that ██████ had multiple rib

21   fractures?

22     A.   When?

23     Q.   He was discovered to have multiple rib fractures

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2   on or about September 21st.

 3      A.   No.  I didn't know about that.

 4      Q.   Do you know that, as you sit here today?

 5      A.   Until a ███████ court.

 6      Q.   So as we sit here today, you're aware that

 7   Michael -- excuse me -- ████████ad multiple rib

 8   fractures?

 9            MR. KLEIN:  Objection as to whether or

10         not he had them.  I think you should ask if

11         there was a report.

12   BY MS. CALABRESE:

13      Q.   Are you aware, as you sit here today, that it was

14   reported that ███████ had multiple rib fractures?

15      A.   Not at that time.  Until ██████ court.

16            MR. KLEIN:  As you sit here today.

17            So is the answer yes?

18            THE WITNESS:  Yes.

19   BY MS. CALABRESE:

20      Q.   Those fractures were dated to be between a week

21   and two weeks old from September 21st, correct?

22            MR. KLEIN:  According to the report.

23            THE WITNESS:  Yes.
```

Case 1:17-cv-00626-DJS Document 94-1 42/21 Filed 06/14/21 Page 173 of 458

1         (Adrian P. Thomas - by Ms. Calabrese)

2  BY MS. CALABRESE:

3    Q.  How did he get those fractures?

4    A.  I don't know.

5    Q.  Isn't it true that you would often squeeze him

6  when you were upset because he was crying?

7    A.  No.

8    Q.  You would also discipline Matthew and ███ in

9  the same way that you did with the other children,

10  correct?

11    A.  That's false.

12    Q.  After you provided these statements to the

13  police, you were arrested?

14    A.  That's a question?

15    Q.  Yes.

16    A.  Yes, I was arrested.

17    Q.  Placed in Rensselaer County jail?

18    A.  Yes.

19    Q.  Shortly thereafter, members of the child

20  protective services department came to interview you,

21  correct?

22    A.  Yes.

23    Q.  Do you recall who they were?

1          (Adrian P. Thomas - by Ms. Calabrese)

2     A.   I spoke with a guy named Jasper.

3     Q.   ████████████████████████████████

4  ████████████████████████████████████

5  ██████████████████████████

6     A.   ██████████

7     Q.   So you were familiar with Jasper?

8     A.   I only seen him one time before.  Yes.

9     Q.   So you knew who he was.  He wasn't a stranger?

10     A.   Correct.

11     Q.   You knew why he and the other person -- was the

12  other person male or female?

13     A.   I only met with Jasper.

14     Q.   At the jail?

15     A.   Yes.

16     Q.   So, you know why he was there, to talk to you

17  about the allegations?

18     A.   Yes.

19  ████████████████████████████████████

20  ████████████████████████████████████████

21  ██████████████

22          MR. KLEIN:  Objection.

23          THE WITNESS:  No.

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2    BY MS. CALABRESE:

 3        Q.  You didn't know the consequences?

 4        A.  No.  I was just meeting him inside of the county

 5    jail when I was already arrested.

 6        Q.  Well, what did you think he was there to do?

 7        A.  He just told me he was coming to talk.

 8        Q.  About what?

 9        A.  About what happened to Matthew.

10        Q.  Right.  So did you talk to him about what

11    happened to Matthew?

12        A.  I told him about -- yes.  I told him about the

13    morning that I was awakened by my wife.

14        Q.  And did you tell him what you did to Matthew?

15            And I'm not asking you if what you said was true.

16    What I'm asking you is:  Did you relate to him the same

17    series of events that you related to the police?

18        A.  No.  I only -- he only asked me about what --

19    how --

20        Q.  Matthew got hurt?

21        A.  No.  He only asked me about the morning of when

22    the paramedics came.

23        Q.  Isn't it true that you told Jasper that there
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2   were four separate times where you hurt Matthew?

 3      A.  No.

 4      Q.  You're saying you never said that?

 5              MR. KLEIN:  Objection, asked and

 6         answered.

 7              You can answer.

 8              THE WITNESS:  I never said that.

 9   BY MS. CALABRESE:

10      Q.  Isn't it true that you told him that, on one

11   occasion, you took Matthew, and you dropped him into the

12   crib, and he hit his head on the side?

13              Isn't it true that you told Jasper that?

14      A.  No.

15      Q.  Isn't it true that there were two other times

16   where you took Matthew and threw him on the bed because

17   you were angry with Wilahemina?

18              Didn't you tell Jasper that?

19      A.  No.  I never told Jasper any of that.

20      Q.  Isn't it true that you told Jasper on Saturday,

21   September 20th, that you banged your head back and hit

22   Matthew in the front of his head with the back of your

23   head?
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2         Isn't that true that you told Jasper that?

 3    A.  No.

 4    Q.  Isn't it true that you told Jasper that, when

 5  Matthew was crying, you picked him up and threw him from

 6  the end of the bed to the middle of the bed because you

 7  were angry because he was crying?

 8    A.  No.

 9    Q.  And isn't it true that you noticed him wheezing

10  prior to September 21st, that Sunday, but you didn't

11  notice any physical injuries.

12         Isn't it true that you told him that?

13    A.  No.

14    Q.  And isn't it true that you told Jasper that

15  Wilahemina wanted to bring Matthew to the hospital?

16    A.  No.

17    Q.  And isn't it true that you told Jasper that you

18  panicked and threw Matthew into his crib and, again, he

19  hit the side of the crib, and that happened on

20  September 21st?

21    A.  No.

22    Q.  So what did you tell Jasper?

23    A.  I told him about the morning that Wilahemina woke
```

1       (Adrian P. Thomas - by Ms. Calabrese)

2  me up.  That's what he asked me.  How did the

3  paramedics --

4    Q.  So tell me what you said to him.

5    A.  I told him that I was awakened by my wife, and

6  she was panicking.  And I got up, checked his breathing,

7  checked his stomach out, checked his heart rate out.

8  His stomach barely moved.  And that I went -- I dialed

9  911, hand her the phone.  I ran to the sink, put my hand

10  under the faucet, came back, put some water over his

11  face.  His eyes barely moved with a blank stare.  And

12  when I heard the sirens coming, I went outside.

13    Q.  Go ahead.

14    A.  I went outside when I heard the paramedics

15  coming.  And once they came inside, I went back inside

16  the house.

17    Q.  Is that everything?

18    A.  Yes.

19    Q.  So this statement that I just reviewed with you,

20  all the things that I asked you about you telling

21  Jasper, none of that is true, correct?

22    A.  Correct.

23    Q.  So, did he make it up?

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      A.  Of course.

 3      Q.  So that he lied about the statement that he says

 4  he took from you?

 5      A.  Of course, he did.

 6      Q.  Why would he do that?

 7          What is your understanding -- what is your belief

 8  about why he would do that?

 9      A.  I would never do no harm to my son.

10      Q.  No.  My question is:  Why would this person that

11  you don't know make up all of these lies about you?

12              MR. KLEIN:  Object to the form.

13              MS. CALABRESE:  You can answer.

14              THE WITNESS:  I don't know why he's

15          making up the lies at the time.  I don't

16          know why.

17  BY MS. CALABRESE:

18      Q.  But it's your belief and position that this is

19  all untrue?

20      A.  Belief and position that what I just told you was

21  really video recorded and audio recorded by the county

22  jail, and that some kind of way, on that particular day,

23  it wasn't recorded.
```

```
 1            (Adrian P. Thomas - by Ms. Calabrese)
 2              MR. KLEIN:  But she's asking you a
 3         different question.
 4              Are you saying it's not true, what he
 5         said?
 6              THE WITNESS:  That's what I'm saying.
 7         It's not true.  I would never do that to my
 8         son.
 9    BY MS. CALABRESE:
10      Q.  So Jasper -- just so I'm clear, the statement
11    that Jasper took from you you're saying is a complete
12    fabrication?
13              MR. KLEIN:  Object to the term
14         "statement."
15              You mean that he attributes to him.
16         There's no written statement.
17              MS. CALABRESE:  Yes.
18    BY MS. CALABRESE:
19      Q.  Is that correct?
20      A.  That's totally false about what Jasper stated in
21    whatever.
22      Q.  So the statement he took from you you're saying
23    is false.  The words that he's saying you said are not
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2   true?

 3       A.  That's correct.

 4       Q.  So how did Matthew die?

 5       A.  I don't know.

 6       Q.  How did Matthew die?

 7       A.  I don't know.

 8       Q.  What is your understanding -- what is your belief

 9   about how he died?

10       A.  During the time he left or today?

11       Q.  Both.

12       A.  He died ill.

13       Q.  What does that mean, he died ill?

14       A.  He died sickly.

15       Q.  What caused him to die?

16       A.  I don't know.  I'm not a doctor.

17       Q.  As you sit here today, what do you believe is the

18   reason why he died?

19              MR. KLEIN:  Other than what he just

20         said?  Objection.

21              MS. CALABRESE:  Because I think he says

22         he has two different opinions.  That's why I

23         asked him the follow up.
```

181

1        (Adrian P. Thomas - by Ms. Calabrese)

2             MR. KLEIN:  I disagree.

3    BY MS. CALABRESE:

4        Q.  So as you sit here today, what is your belief

5    about what caused him to die?

6        A.  I don't know exactly what.

7        Q.  Why did he die?

8             As you sit here, what is your belief, because you

9    mentioned you had --

10       A.  I said then and now.

11       Q.  Then and now, right.

12            So my follow-up is:  What is your belief now

13   about why he died?

14       A.  He died from a bacterial infection.

15       Q.  And how did you come to that conclusion?

16       A.  From finding out everything at trial, the first

17   trial.

18       Q.  So let's talk about that, the trial.

19            Where did it take place, the first trial?

20       A.  In Troy.

21       Q.  In Rensselaer County?

22       A.  Yes.

23       Q.  Who was your attorney?

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      A.   Jerry Frost.

 3      Q.   And who testified for you at that trial?

 4           What witnesses did you and Mr. Frost present?

 5      A.   I forgot their names.

 6      Q.   You don't know who testified?

 7      A.   I forgot the doctor's specifics.

 8      Q.   Who testified against you for the prosecution?

 9      A.   Wilahemina.

10      Q.   What did Wilahemina say?

11      A.   She said I was in the room with the children

12  while she was present.

13      Q.   And what else did she say?

14      A.   I don't remember everything else.

15      Q.   What did she say with regard to you hitting the

16  children, including Matthew?

17              MR. KLEIN:  At trial?

18              MS. CALABRESE:  At trial or to the

19       police.

20              MR. KLEIN:  That you know of.

21              THE WITNESS:  Repeat that question.

22              MS. CALABRESE:  Sure.

23  BY MS. CALABRESE:
```

Case 1:17-cv-00626-DJS   Document 44-2   Filed 06/14/21   Page 184 of 458

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.  What did Wilahemina tell the police or the court

 3   about your behavior with the kids?

 4          What did she say you did?

 5              MR. KLEIN:  Well, with the kids or with

 6          Matthew?

 7              MS. CALABRESE:  With Matthew and the

 8          other kids.

 9   BY MS. CALABRESE:

10      Q.  What did she say?

11      A.  She said I was spanking the children.

12      Q.  Go ahead.

13      A.  She said I was spanking the children, and she

14   said I was being, I think, verbally abusive towards her.

15   That's all I remember.

16      Q.  And what did she say about your behavior with

17   Matthew?

18      A.  She said that -- she said that my behavior

19   towards Matthew, like I was jealous.  That's from my

20   understanding.

21      Q.  You were jealous of Matthew?

22      A.  No.

23      Q.  Jealous of what?
```

1            (Adrian P. Thomas - by Ms. Calabrese)

2      A.   I think she was spending more time with the

3   children.

4      Q.   Jealous of not receiving her attention.

5           Is that what you're saying?

6      A.   That's from my perception of...

7      Q.   Was that happening?

8           Did you feel jealous that she was devoting time

9   to the kids and not to you and your relationship with

10  you?

11     A.   No.

12     Q.   You never felt that way?

13     A.   I never felt that way.

14     Q.   Was she spending more time with the kids than you

15  at the time?

16     A.   Yes.

17     Q.   And you guys were, like you mentioned, were

18  living separate lives?

19            MR. KLEIN:  Objection.

20            THE WITNESS:  We wasn't living separate

21        lives.  We were just a normal couple that

22        had more children than the average couple.

23  BY MS. CALABRESE:

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.  Six?

 3      A.  Of course.

 4          And we was on hardship.

 5      Q.  You mean financially?

 6      A.  Yes.  And that's it.  That's...

 7      Q.  And so, that was a strain?

 8      A.  Yes.

 9      Q.  And it was a strain on your relationship with

10  her.  It was difficult?

11              MR. KLEIN:  Objection, asked and

12          answered.

13              MS. CALABRESE:  Go ahead.

14              MR. KLEIN:  Was it difficult?

15              THE WITNESS:  Yes.

16  BY MS. CALABRESE:

17      Q.  And she related those problems that you had with

18  her when she testified against you?

19              MR. KLEIN:  Did she testify about those

20          problems?

21              THE WITNESS:  Yes.

22  BY MS. CALABRESE:

23      Q.  And she stated, whether to the police or to the
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2   court, that you were rough in your handling with

 3   Matthew, correct?

 4      A.   That's what she said, but that wasn't the case.

 5      Q.   Right.  So she's also lying?

 6      A.   Of course.

 7              MR. KLEIN:  Just yes or no.

 8   BY MS. CALABRESE:

 9      Q.   So she's lying, right?

10      A.   Yes.

11      Q.   And Jasper's lying?

12      A.   Yes.

13      Q.   ███████████████████████

14           ████████████████████████████████████

15   ████████████

16      ██████████

17   ██████████████████

18      ████████████████████████████████████████

19   ████████████████

20                ██████████████████████

21        ████████████████████████████████████████

22        ██████████████████████████████████

23             ██████████████████████████████
```

Case 1:17-cv-00626-DJS Document 44-4  Filed 06/14/21 Page 183 of 458



(Adrian P. Thomas - by Ms. Calabrese)

Case 1:17-cv-00626-DJS Document 94-17/24-1 Filed 06/14/21 Page 189 of 458



Case 1:17-cv-00626-DJS Document 114-2 Filed 06/14/21 Page 190 of 458



(Adrian P. Thomas - by Ms. Calabrese)

Case 1:17-cv-00626-DJS Document 114-2 Filed 06/14/21 Page 192 of 458





1          (Adrian P. Thomas - by Ms. Calabrese)

1          (Adrian P. Thomas - by Ms. Calabrese)

2 ███████████████████████████████████████████████

3 █████

4       ███████████████████████████

5    ████████████████████████████

6    ████████████████████████████

7    █████████

8    Q.   And did you testify at the first trial?

9    A.   Yes.

10   Q.   What did you say?

11   A.   I said that I was awakened by my wife, and that I

12 jumped up, dialed 911, and gave her the phone.  Once I

13 gave her the phone, I proceeded forth into the kitchen,

14 put the faucet on, put my hand under the faucet, came

15 back, dropped a few drops of water over Matthew's face,

16 and continued to check his breathing, starting fanning

17 him until I heard the paramedics coming up the street.

18 And then I went outside, and then I followed them in.

19          MR. KLEIN:  Before you ask your next

20          question, I just want to note for the record

21          the line of questioning about ███████ should

22          be marked confidential.  If it's not being

23          done realtime, maybe we can --

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2              MS. CALABRESE:  I think we can get

 3         together and decide on the transcript what

 4         we need to redact.

 5              MR. KLEIN:  I think we should treat the

 6         transcript as attorney's eyes only and come

 7         to an agreement about redaction about

 8         confidentiality.

 9              MS. CALABRESE:  I agree.

10              MS. PECK:  That's fine.

11              MR. KLEIN:  Thank you.

12              MS. CALABRESE:  It's kind of a

13         difficult spot we're putting ourselves in

14         with all this information, but I think we're

15         doing the best we can.

16    BY MS. CALABRESE:

17      Q.  Did you say anything else, or was that the entire

18    testimony you provided?

19      A.  I told them about the feeding of the children

20    before Wilahemina woke me up.

21      Q.  And did you discuss your conversation with the

22    police during your testimony?

23      A.  Yes.  I was cross-examined.
```

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2       Q.   About what you told the police?

 3       A.   Yes.

 4       Q.   And did you discuss your demonstrations of how

 5   you slammed Matthew?

 6       A.   Yes.  I was asked that by the prosecutor.

 7       Q.   I'm sorry, I didn't hear that.

 8       A.   Yes.  I was asked that by the prosecutors.

 9       Q.   What did you tell them about how you

10   demonstrated -- how you slammed Matthew?

11       A.   I was asked, and I told them why I demonstrated

12   that.

13       Q.   What did you say?  What was the why?

14       A.   I told them I felt like I had no choice.

15       Q.   When you were speaking to the police?

16       A.   Yes.

17       Q.   Describe for me how you demonstrated how you

18   slammed him.

19            What did you say?

20               MR. KLEIN:  What did he say at trial?

21   BY MS. CALABRESE:

22       Q.   When you were speaking to Detective Mason --

23   Sergeant Mason, tell me what you did, how you
```

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2   demonstrated how you slammed him.

 3            MR. KLEIN:  Objection.

 4            THE WITNESS:  He asked me to stand up

 5        and demonstrate how did I slam him.

 6   BY MS. CALABRESE:

 7     Q.  Prior to that, did he say anything about how you

 8   slammed him to you?

 9     A.  Yes.

10     Q.  What did he say?

11     A.  He said it was an accident.

12     Q.  So he told you he believed what you did was an

13   accident?

14     A.  Yes.

15     Q.  Then after he said that is when you demonstrated

16   how you slammed him?

17     A.  He asked me to stand up and demonstrate for him.

18     Q.  I would like you to do the same thing.

19            MR. KLEIN:  To demonstrate --

20   BY MS. CALABRESE:

21     Q.  Show me how you demonstrated on video how you

22   slammed Matthew right now.

23            MR. KLEIN:  I'm going to note an
```

Case 1:17-cv-00626-DJS Document 44-2 Filed 06/14/21 Page 1923 of 458

```
 1              (Adrian P. Thomas - by Ms. Calabrese)
 2         objection.
 3              I think you can ask him questions.  I
 4         don't think you can ask him to do this.
 5              MS. CALABRESE:  I absolutely can ask
 6         him to do this.
 7     Q.  I'd like you to show me how you slammed him, how
 8   you said you slammed him.
 9              MR. KLEIN:  I think we're going to mark
10         it for a ruling.
11              MS. CALABRESE:  And then we'll call the
12         court, because this is totally proper.
13              MR. KLEIN:  You're asking him to
14         demonstrate what you could show him on the
15         video and ask him if the video is accurate.
16              MS. CALABRESE:  No.
17   BY MS. CALABRESE:
18     Q.  I'm asking you to show me how you demonstrated
19   for Sergeant Mason how you slammed him.
20         So please do that now.
21              MR. KLEIN:  We're going to mark it for
22         a ruling.
23              MS. CALABRESE:  That's fine.
```

```
 1          (Adrian P. Thomas - by Ms. Calabrese)

 2          Go ahead.

 3          MR. KLEIN:  Well, I'm going to direct

 4     him not to answer.

 5          We're going to mark for a ruling.

 6          MS. CALABRESE:  Then let's call the

 7     court.

 8          MR. KLEIN:  Okay.

 9          MS. CALABRESE:  For the record, I'm

10     calling Judge Debow in chambers on my cell

11     phone on speaker.

12          (Discussion held off the record.)

13          You are on speaker.  We're in the

14     course of a deposition of Adrian Thomas,

15     who's the claimant in the case of Thomas

16     versus the State of New York.  Also here in

17     the room are several people, so you know

18     who's on the other line.  It's myself, my

19     paralegal, Katherine Hamilton.  I also have

20     Crystal Peck, who represents Dr. Sikirica in

21     the federal action.  I also have Joe

22     Perkins, who represents the police officers

23     in the separate action.  I have the
```

Case 1:17-cv-00626-DJS Document 74-2 Filed 06/14/21 Page 199 of 458

```
 1          (Adrian P. Thomas - by Ms. Calabrese)

 2     claimant, Mr. Thomas, his attorney, Brett

 3     Klein, and our stenographer.

 4          We are in an impasse.  I've asked Mr.

 5     Thomas a question.  His attorney is refusing

 6     to allow him to answer.  And so, we need the

 7     judge to intercede, if he's available.

 8          MS. BROAD:  Absolutely.  Let me put you

 9     on hold for one second.

10          MS. CALABRESE:  Thank you.

11          It's myself, Christina Calabrese, from

12     the Attorney General's Office, Katherine

13     Hamilton, who is a paralegal with my office,

14     Joe Perkins, who represents the Troy Police

15     Department in the separate action, Crystal

16     Peck, who represents Dr. Sikirica in the

17     separate action, you have Brett Klein, who

18     represents the claimant, Mr. Thomas, and

19     Mr. Adrian Thomas is here, along with our

20     stenographer.

21          We're in the process of deposing

22     Mr. Thomas.  We started early this morning.

23     We're at the offices of Crystal Peck.  And
```

1    (Adrian P. Thomas - by Ms. Calabrese)

2    we've kind of reached an impasse with regard

3    to questioning of Mr. Thomas.  Mr. Klein and

4    I reached an impasse and we need an

5    intervention.

6        JUDGE DEBOW:  What's the question and

7    what's the objection?

8        MS. CALABRESE:  So I've been asking him

9    now about the first trial, and I've asked

10   him to demonstrate how he slammed Matthew

11   Thomas in the way that he described it on

12   video to Sergeant Mason.

13       And I'll hand the over to Mr. Klein for

14   the objection.

15       MR. KLEIN:  So, Judge, there's no

16   question for a verbal, audible answer.

17       This is Brett Klein, for the claimant.

18       There's a request for a physical

19   demonstration.

20       Now, if you remember, Judge, just by

21   way of context, after the first -- there was

22   an interrogation that was videotaped where

23   at the -- after the officer suggested

```
 1          (Adrian P. Thomas - by Ms. Calabrese)
 2     slamming to the ground, he told Mr. Thomas
 3     to get up and slam a folder to the ground as
 4     if it was the child.
 5          This was introduced at trial.
 6     Mr. Thomas was convicted at trial.  He
 7     testified and said this was not true, that
 8     he was basically coerced to do this.
 9          His conviction was overturned in a
10     landmark decision, the People versus Thomas,
11     by the Court of Appeals, as a coerced, false
12     confession that violated due process.  So he
13     was then retried without the confession and
14     found not guilty, based on the medical
15     evidence that this child died of a toxic
16     bacterial infection, sepsis, rather than any
17     physical trauma.
18          And the only thing linking him to this
19     case was this coerced false confession that,
20     as a matter of law, we're going to ask that
21     you -- that that finding is -- that
22     collaterally estopped the state from arguing
23     it's not coerced and false in this case.
```

Case 1:17-cv-00626-DJS Document 44-1 Filed 06/14/21 Page 202 of 458

```
 1          (Adrian P. Thomas - by Ms. Calabrese)
 2      But, in any event, that's a question for
 3      trial.
 4          At this deposition, Counsel is now
 5      asking the witness, who denies doing the
 6      slamming, to reenact what he did on the
 7      video, when the video could be shown to him.
 8      He doesn't dispute what's in the video, but
 9      he's being asked not for a verbal or audible
10      answer.  He's being asked to conduct a
11      physical demonstration of something that he
12      did on a video in 2008 and we object.
13          It's not a request for a verbal answer.
14      It's a palpably improper question in our
15      view.
16          JUDGE DEBOW:  You've got a copy of the
17      video, right?
18          MS. CALABRESE:  Yes.
19          JUDGE DEBOW:  You got a video, right?
20          MS. CALABRESE:  I do.
21          JUDGE DEBOW:  And what's the purpose in
22      asking him to reenact it?
23          MS. CALABRESE:  Because I want him to
```

```
1          (Adrian P. Thomas - by Ms. Calabrese)
2     describe to me what he said he did to the
3     child to the police officers.
4          It's one thing for him to say it's on
5     the video, but I want him to show me what he
6     showed them.
7          And it's absolutely relevant.  It goes
8     to the cause of death of a child, which goes
9     to whether or not he's innocent of the crime
10    that's charged, which is one of the elements
11    of the cause of action.
12         So having him show me what he said he
13    did to the child is 100 percent relevant and
14    squarely within all of the rules of
15    deposition practice and what I'm permitted
16    to ask him and what I'm not permitted to ask
17    him.
18         As you know, Judge, discovery rules are
19    very broad.  This is well within the scope
20    of relevance.  And so I really see no issue
21    with it at all.
22         MR. KLEIN:  I would just say, Judge, if
23    I may have just a brief rebuttal.  We've
```

1       (Adrian P. Thomas - by Ms. Calabrese)

2    allowed every question to go, but this is

3    not a question for a verbal answer.  It's a

4    question of physical conduct.  And as you

5    said, there's a video.  He could be asked

6    about the video.  He doesn't dispute the

7    video.  He didn't dispute the existence of

8    the video at trial, just the motivations

9    behind why he did what he did.  And that's

10   been resolved by the Court of Appeals.

11       So there's no proper basis to ask him

12   to reenact it other than to annoy or harass

13   the witness.  And it's otherwise improper,

14   Judge.

15       Thank you.  We ask that you sustain the

16   objection.

17       JUDGE DEBOW:  I've heard argument from

18   both parties.  As the parties know, the

19   purpose of discovery is for the purpose of

20   leading to discoverable information.  The

21   Court of Appeals has ruled that the

22   questions asked at a deposition, including

23   questions asking an individual to reenact a

```
 1           (Adrian P. Thomas - by Ms. Calabrese)

 2      certain movement, are permissible.

 3           The objection is overruled.  The

 4      witness is directed to answer the question

 5      and provide the demonstration.

 6           Certainly with regard to whether the

 7      witness's testimony and demonstration is

 8      admissible at trial, we'll cross that bridge

 9      when we get to it, but the objection is

10      overruled.

11           MS. CALABRESE:  Thank you.

12           MR. KLEIN:  Thank you, Judge.

13           Have a nice day.

14           JUDGE DEBOW:  Anything further?

15           MS. CALABRESE:  No.  Not from the

16      defendant.

17           MR. KLEIN:  Thank you, Judge.  Thank

18      you for your time.

19           MS. CALABRESE:  So back on the record

20      after our conference with the Court

21      regarding an objection that Mr. Klein had to

22      my question.

23           I'll ask Mr. Thomas please show us what
```

```
 1          (Adrian P. Thomas - by Ms. Calabrese)

 2      you showed to Sergeant Mason about how you

 3      slammed Matthew.

 4          Do you need more room?  Do you want me

 5      to move that chair?

 6          THE WITNESS:  I just need something to

 7      pick up, a pillow.

 8          MS. CALABRESE:  A pillow, I don't have

 9      a pillow, but I can give you a soft laptop

10      bag that doesn't have anything in it.

11          Is that what you want?  This is as best

12      as I can do.  For the record, I'm handing to

13      Mr. Thomas my laptop bag that is empty,

14      without a strap, on request.

15          THE WITNESS:  Move the chair.

16          MS. CALABRESE:  Move the chair.  I have

17      now moved the chair.

18          For the record, we're in Bailey Johnson

19      conference room.  Mr. Thomas is in the

20      corner of the room.

21              What size is that space would you

22      say?

23          MR. KLEIN:  That he's standing in in
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2         the corner of the room?

 3              MS. CALABRESE:  Yeah.

 4              MR. KLEIN:  Three by four, three by

 5         three.  I don't know.

 6              MS. CALABRESE:  And he has a laptop

 7         bag.

 8              Please show us.

 9              (Witness complies.)

10    BY MS. CALABRESE:

11       Q.  And so what you've done, for the record, is you

12    lifted your two hands over your head with the laptop bag

13    in your hand and you've thrown it to the floor.

14       A.  Yes.

15       Q.  Is that the way you showed Sergeant Mason you

16    slammed Matthew?

17       A.  Yes.

18       Q.  And what did you tell him?

19              Where were you slamming him into or what was he

20    falling into?

21       A.  To the bed.

22       Q.  Into the bed or the crib?

23       A.  Into the bed.
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.  And when did that occur?

 3          When did you tell Sergeant Mason that occurred?

 4      A.  That night, on the second --

 5      Q.  On Saturday night?

 6      A.  Yes.

 7      Q.  The 20th?

 8      A.  Yes.  After I came back from the hospital.

 9              MR. KLEIN:  No.  She's saying not at

10          what interview did you tell him.  She's

11          saying -- I'm going move to strike that

12          answer and maybe you can re-ask the

13          question.

14              She's asking at what point -- not at

15          what interview did you tell the detective

16          that, but when, before Matthew got sick, did

17          you tell the detective that you did that,

18          the day that he woke up sick, the weekend,

19          the week before, something else?

20              When was it that you said that you did

21          that?

22              THE WITNESS:  The week before.

23      BY MS. CALABRESE:
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.  So not the weekend that he had the fever, the

 3   week prior to that?

 4      A.  Yes.

 5      Q.  And as you sit here today, you're saying that

 6   that demonstration that you did was false.

 7          That never occurred; is that right?

 8      A.  That's correct.

 9      Q.  And at the trial, was the statement that you gave

10   to the police department, was that admitted into

11   evidence against you?

12      A.  Yes.

13      Q.  And was it a jury trial?

14      A.  Yes.

15      Q.  And did the jury reach a verdict?

16      A.  Yes.

17      Q.  And what was the verdict?

18      A.  Guilty.

19      Q.  And what occurred after that?

20      A.  That day?

21      Q.  Yes.

22      A.  I went back to the county jail.

23      Q.  And how long did you stay there?
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)
 2              MR. KLEIN:  You mean until he went
 3         someplace else, to a different location?
 4              MS. CALABRESE:  Thank you.
 5              MR. KLEIN:  You can answer the
 6         question.
 7              Where did you go after that?
 8              THE WITNESS:  I went to prison.
 9    BY MS. CALABRESE:
10      Q.  And prior to that, did you go back to Rensselaer
11    Court to be sentenced?
12              MR. KLEIN:  After the guilty verdict,
13         did you have sentencing?
14              THE WITNESS:  Yes.
15    BY MS. CALABRESE:
16      Q.  And prior to being sentenced, on the day you were
17    sentenced, did you talk to the Rensselaer County
18    probation department?
19         Did they interview you for the purpose of a
20    presentence investigation report?
21      A.  Yes.
22      Q.  And what did you tell them?
23      A.  I forgot what I told them.
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.  Did you relate to them what occurred as you've

 3  described to Sergeant Mason, or did you relate to them

 4  what occurred as described to me today?

 5              MR. KLEIN:  In other words, did he say

 6          he did nothing wrong, or did he say what you

 7          said in the statement, that you slammed the

 8          baby?

 9              Did you tell him you did anything

10          wrong.

11              THE WITNESS:  I don't remember being

12          asked anything.

13  BY MS. CALABRESE:

14      Q.  You don't remember providing a statement to them

15  about what occurred?

16      A.  The post release supervision people, no.

17      Q.  And you said then you went to the department of

18  corrections?

19      A.  Yes.

20              MS. CALABRESE:  For the record,

21          Mr. Klein and I had a conversation with the

22          Court regarding the structure of the trial.

23          I've requested a bifurcated trial.
```

1    (Adrian P. Thomas - by Ms. Calabrese)

2    Mr. Klein requested a unified trial.  And

3    the judge said it's his preference to have a

4    bifurcated trial.

5        Based upon that statement, I'm not

6    going to go into damages for the purpose of

7    brevity.

8        So I would ask Mr. Klein to agree that,

9    in the event the Court later decides that

10   the trial will be unified, that I have an

11   opportunity to re-depose Mr. Thomas on

12   damages.

13       MR. KLEIN:  I'll have to take it under

14   advisement and let you know, Christina.  We

15   discussed that I felt the deposition should

16   be one deposition and the judge said that

17   made sense.  He didn't realize that all

18   counsel were doing damages today.  So, I

19   think it should be done today.  It's

20   difficult for the witness to get here.

21       MS. CALABRESE:  You want me to go

22   through damages?

23       MR. KLEIN:  We want to be cooperative

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2         with you, but we also want to be practical.

 3              MS. CALABRESE:  I understand.

 4              MR. KLEIN:  So I think that asking

 5         about it today, as well.  I don't think it

 6         makes sense to have piecemeal.

 7              MS. CALABRESE:  So I will go through

 8         damages, then.

 9              (Recess taken.)

10              MS. CALABRESE:  Back on the record

11         after a recess.

12  BY MS. CALABRESE:

13     Q.  Now, Mr. Thomas, we left off before our recess

14  with you being transported from the Rensselaer County

15  jail to the department of corrections.

16         What was the first facility you were sent to?

17     A.  Downstate.

18     Q.  For processing?

19     A.  Yes.

20     Q.  And how long were you at Downstate?

21     A.  I'm not -- I don't exactly remember how long

22  there.

23     Q.  Short time, right, would you say?
```

```
  1              (Adrian P. Thomas - by Ms. Calabrese)

  2      A.   Yes.

  3      Q.   And where were you then transported, to which

  4  facility?

  5      A.   Auburn correctional facility.

  6      Q.   And how long were you there?

  7      A.   For some years.

  8      Q.   You were at Auburn for a considerable period of

  9  time?

 10      A.   Yes.

 11      Q.   And were you transported anywhere else?

 12      A.   No.

 13      Q.   So you went to Downstate for processing, and then

 14  you were housed at Auburn correctional facility for the

 15  balance of your incarceration?

 16      A.   Until it was time for me to go back.

 17      Q.   Rensselaer County?

 18      A.   Rensselaer County jail.

 19      Q.   And how many years were you incarcerated between

 20  the time you went to Downstate and Auburn?

 21              MR. KLEIN:  Do you want to be more

 22         specific?

 23              In other words, was it from the date of
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)
 2          your sentencing or shortly thereafter to
 3          date of the Court of Appeals decision?
 4              MS. CALABRESE:  Yeah.
 5   BY MS. CALABRESE:
 6     Q.  Approximately how long were you in state
 7   custody -- by state, I mean the department of
 8   corrections, not the Rensselaer County jail -- between
 9   Downstate and Auburn?
10     A.  Four to five years.
11     Q.  I don't think I asked you this.
12          What was the sentence that you received?
13     A.  25 to life.
14     Q.  You were incarcerated with the department of
15   corrections for four to five years.
16          Tell us about that period of incarceration with
17   the department of corrections.
18          I'm going to use the term "DOCCS."  Do you know
19   what I mean by that?
20     A.  Yes.
21     Q.  New York State Department of Corrections and
22   Community Supervision.
23     A.  Yes.
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.  So while you were incarcerated at the two DOCCS

 3   facilities, tell us about that experience.

 4      A.  It was tough.  It was tough because I was

 5   convicted of murder of my son.  Faced threats every day.

 6   I ended up in fights.  I wasn't able to see or have

 7   visits with any of my children.  I wasn't able to

 8   communicate with my -- Wilahemina.  I wasn't able to

 9   communicate with Wilahemina about the progress of my

10   children.  I wasn't able to attend my son's funeral.

11              MR. KLEIN:  She's asking not about

12         those.  What it was like being in prison.

13              THE WITNESS:  It was a living hell.  I

14         had a lot of threats every day.  Got into

15         fights.  Couldn't go nowhere without being

16         escorted.  I ended up in protective custody

17         because of fights and threats for my life.

18   BY MS. CALABRESE:

19      Q.  And you said fights.

20         How many fights did you get into?

21      A.  I got into two overall.

22      Q.  Overall?

23      A.  Over time.  Yes.
```

1          (Adrian P. Thomas - by Ms. Calabrese)

2     Q.   And tell me what happened in those fights.

3          The first one?

4     A.   I got in a fight with a guy who heard about my

5     case, because they read it in the newspaper.  You can

6     get the *Times Union* newspaper in prison.  So, they read

7     about it and heard about it.  So, they knew who I was.

8     They knew the charge and everything.  I didn't know at

9     the time that everybody was able to receive newspapers

10    inside of prison.  So they caught me off guard.  I

11    didn't know they knew about my charge and conviction.

12    Q.   So what happened in the fight?

13    A.   I got hit.  And when I got hit, I tried to

14    protect myself.  So we fought back.  And the COs broke

15    it up, and they put me in the cell and locked me in.

16    They took him and locked him in.  And that was it.

17    Q.   Did you receive any injuries?

18    A.   To my face.  Yes.

19    Q.   What happened?

20    A.   My face was swollen.

21    Q.   And other than swelling, did you receive any

22    other injuries?

23    A.   No.

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2       Q.   And did you receive medical care?

 3       A.   I needed medical care, but I wasn't -- they

 4  didn't give it to me, even though I requested it.

 5       Q.   What medical care did you think you needed?

 6       A.   Some Ibuprofen to take the swelling, Advil,

 7  Tylenol.  I had headaches.  So it was -- didn't get

 8  medical care.

 9       Q.   And the headaches were from that fight?

10       A.   Yes.

11       Q.   Other than swelling on your face, did you receive

12  any other injuries from that fight?

13       A.   No.

14       Q.   And did you receive a misbehavior report, which

15  resulted in a tier hearing for that fight?

16       A.   No.  Nothing happened.

17       Q.   During the course of your incarceration with

18  DOCCS, did you ever receive a misbehavior report?

19       A.   Yes.

20       Q.   How many?

21       A.   I only received one.  It was for the smoking.

22            MR. KLEIN:  She's just asking how many.

23            THE WITNESS:  Just one.
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2    BY MS. CALABRESE:

 3        Q.  Cigarettes or marijuana?

 4        A.  Cigarettes.

 5        Q.  And did that result in a tier?

 6        A.  Yes.

 7        Q.  Were you found guilty?

 8        A.  Yes.

 9        Q.  And what was the punishment?

10        A.  Got locked in my cell for three days.

11        Q.  Keep locked in your cell?

12        A.  Yes.

13        Q.  Other than that, did you receive any other

14    punishment while at DOCCS?

15        A.  No.

16        Q.  Tell us about the second fight.

17        A.  Second fight, I was coming from the yard, a small

18    yard on the south end.

19        Q.  There were two yards there?

20        A.  Yes.

21        Q.  A big yard and a small yard?

22        A.  Big yard and there's another yard in the back.

23            As I was coming back from the smaller yard going
```

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2   into the building, got to walk up the stairs.  There was

 3   inmates coming down.  And one tried to cut me.  And he

 4   actually missed me.  Tried to cut me in my stomach, but

 5   he missed maybe by an inch.  And he dropped the blade.

 6   When the blade dropped, they seen us over there

 7   fighting.

 8            And so, we tumbled down part of the stairs.  And

 9   the inmate, he stopped after they came -- an officer

10   came from up at the top.  Another officer was blowing

11   his whistle and running over from the bottom.  And they

12   broke us up.

13      Q.   Did you receive any injuries?

14      A.   Yes.

15      Q.   What were your injuries?

16      A.   My face and head was swollen.  Parts of my arms

17   were bruised.  I requested to go to the hospital and

18   nothing ever happened.

19            MR. KLEIN:  Just listen to the

20        question.

21            What were the injuries?  Just take one

22        step at a time, okay?

23            THE WITNESS:  Okay.
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2    BY MS. CALABRESE:

 3        Q.   So swelling to your side and swelling to your

 4    face and bruises to your side and bruises to your face?

 5        A.   Yes.

 6        Q.   But you did not receive any medical care.

 7             Is that what you're saying?

 8        A.   That's correct.

 9        Q.   Other than those two incidents, did you receive

10    any other physical injuries while incarcerated at DOCCS?

11        A.   No.

12        Q.   Now, you mentioned being placed in protective

13    custody?

14        A.   Correct.

15        Q.   And how long into your incarceration did that

16    occur?

17        A.   About a month after I got...

18        Q.   To Auburn?

19        A.   Yes.

20        Q.   Were you in protective custody for the rest of

21    that time?

22        A.   Until I went back to...

23        Q.   Rensselaer County?
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2       A.   Rensselaer County.

 3       Q.   And tell us about protective custody.

 4            How is that different than general population?

 5       A.   You're on a unit with everyone else that has got

 6   similar charges or ex-gang members or people had threats

 7   made against their life.  Wouldn't be able to live in

 8   general population.

 9              MR. KLEIN:  Is your question what were

10              restrictions in protective custody, not who

11              was there?

12              That answer can stand, but what were

13              the limitations in protective custody that

14              were different from general population?

15              THE WITNESS:  We was locked on the unit

16              24 hours, seven days a week.  And we

17              couldn't leave without an escort.  And we

18              was locked in our cell maybe three times a

19              day and overnight.

20   BY MS. CALABRESE:

21       Q.   You mentioned being estranged from your children

22   and your wife.  Tell me about that.

23            Why were you not able to see your children and
```

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2    your wife?

 3      A.   I had an order of protection. ██████████████

 4    █████████████████████████████████████

 5      Q.   Against you?

 6      A.   Yes.  Against me.

 7      Q.   To protect all of the children?

 8      A.   All of the children.

 9      Q.   And Wilahemina?

10      A.   Wilahemina, yes.

11      Q.   And did you attempt to have that modified through

12    family court at any point in time?

13      A.   Not during...

14      Q.   During your incarceration with DOCCS?

15            MR. KLEIN:  Yes or no?

16            THE WITNESS:  Not to my knowledge.  No.

17    BY MS. CALABRESE:

18      Q.   Well, you would know, right, because you would

19    have brought that petition?

20      A.   I would have filed it myself.

21      Q.   So you did not do that?

22      A.   No.

23      Q.   How come?
```

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2       A.   Because of the convictions.  To my belief, that

 3   the convictions stand, and it wouldn't be altered in no

 4   way.

 5       Q.   But you did not try, correct?

 6       A.   I didn't try.  No.

 7       Q.   And tell me how that affected you, your inability

 8   to see your children and Wilahemina.

 9       A.   How did it affect my inability?

10       Q.   How did you feel because you couldn't see them?

11       A.   I was upset.  I was frustrated.  I was hurt.  It

12   hurt me because I couldn't be around my children.  I

13   couldn't talk to Wilahemina.  I couldn't ask my children

14   how was their day.  I couldn't have visits with my

15   children just to know what's going on in their daily

16   lives.  And it just affected me in very bad way.

17       Q.   And on the daily, on the day-to-day, how did that

18   affect you?

19            How was your life different then compared to

20   before when you were in the house with the children and

21   your wife?

22       A.   I was at my lowest.  I was very depressed and

23   stressed out.
```

**APPENDIX**

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.  So your life, other than feeling depressed and

 3  stressed out, was the same?

 4                MR. KLEIN:  In prison as opposed to out

 5         of prison?

 6                MS. CALABRESE:  Yes.

 7                THE WITNESS:  No.  It was worse in

 8         prison.

 9  BY MS. CALABRESE:

10      Q.  But you were able to attend to your daily living.

11  You were able to wake up every day, perform whatever

12  tasks you were going to perform that day?

13                MR. KLEIN:  In prison?

14                MS. CALABRESE:  Yes.

15  BY MS. CALABRESE:

16      Q.  Is that right?

17      A.  Yes.

18      Q.  And you were able to recreate in the yard?

19      A.  Yes.  I was able to recreate in the yard.

20      Q.  And were you able to participate in programming?

21      A.  What do you mean?

22      Q.  In DOCCS, when you were there, were you able to

23  participate in programming?
```

1          (Adrian P. Thomas - by Ms. Calabrese)

2     A.   I couldn't go to programs because I was in

3  protective custody.

4     Q.   And so, besides recreating in the yard, what did

5  you do during the day?

6     A.   Come out the cell and watch TV.  And we was able

7  to use the phone.  If the unit wasn't on lock down we

8  was able to use the phone.  When I wasn't on lockdown, I

9  was able to use the phone.  I used most of my time

10  writing.

11     Q.   To?

12     A.   My mother.

13     Q.   And what were you doing?

14     A.   Explaining to her that my life is a living hell.

15     Q.   And while you were there, did you receive any

16  treatment for mental health?

17     A.   Yes.

18     Q.   Who did you see?

19     A.   I saw my counselor.

20     Q.   In the department of corrections?

21     A.   Yes.

22     Q.   How often would you see a counselor?

23     A.   I would see him weekly.

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.   And did you receive any medication while there?

 3      A.   Yes.

 4      Q.   What did you receive?

 5      A.   I was prescribed Zoloft.

 6      Q.   Did you take that?

 7      A.   Yes.

 8      Q.   While you were incarcerated?

 9      A.   Yes.

10      Q.   For the full five and a half years?

11      A.   The whole time I was in Auburn.

12      Q.   Any other medication besides Zoloft?

13      A.   Not at the time.  No.

14      Q.   Had you taken that medication prior to your

15  incarceration?

16      A.   No.

17      Q.   Once released, have you taken that medication

18  since?

19              MR. KLEIN:  Since the acquittal?

20              MS. CALABRESE:  Yes.

21              THE WITNESS:  No.

22  BY MS. CALABRESE:

23      Q.   So you stopped taking the Zoloft once you were
```

Case 1:17-cv-00626-DJS Document 84-14 2021 Filed 06/14/21 Page 228 of 458

```
 1              (Adrian P. Thomas - by Ms. Calabrese)
 2    released from Auburn?
 3        A.   That's correct.
 4        Q.   Other than seeing your -- so did you see your
 5    therapist every week while you were at Auburn?
 6        A.   They only come through once a week.
 7        Q.   And you would see him once a week?
 8        A.   Yes.
 9        Q.   For how long?
10        A.   Maybe 15 minutes.  He don't stay that long for
11    each.  Too many people to see him.
12        Q.   And that occurred during your entire time while
13    incarcerated at Auburn?
14              MR. KLEIN:  15 minutes with you or 15
15         minutes for the whole block?
16              THE WITNESS:  For both sides of the
17         whole block.
18    BY MS. CALABRESE:
19        Q.   So only a couple minutes with you?
20        A.   Yes.
21        Q.   Now, other than taking Zoloft and seeing the
22    therapist for a couple minutes once a week, did you
23    receive any other treatment for mental health while in
```

Case 1:17-cv-00626-DJS Document 44-2 Filed 06/14/21 Page 229 of 458

1        (Adrian P. Thomas - by Ms. Calabrese)

2   Auburn?

3     A.  No.

4     Q.  Once you were released from Auburn and went to

5   Rensselaer County, did you receive any treatment for

6   mental health?

7           MR. KLEIN:  In the county jail, between

8        the time you went there and your acquittal?

9           THE WITNESS:  No.

10  BY MS. CALABRESE:

11    Q.  Once you were released from custody from

12  Rensselaer County, did you receive any mental health

13  treatment since then?

14    A.  From Rensselaer County?

15    Q.  Yeah.  Once you were acquitted, through the time

16  period to today, have you received any treatment for the

17  depression that you spoke about that you received Zoloft

18  for?

19    A.  No.

20    Q.  Have you gone to any treatment whatsoever for

21  mental health since you've been released from Rensselaer

22  County?

23    A.  No.

Case 1:17-cv-00626-DJS Document 94-14 2024 Filed 06/14/21 Page 2303 of 458

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.   No therapist, talk therapy?

 3      A.   No therapy.

 4      Q.   No medication?

 5      A.   No medication.

 6      Q.   Well, let me go back.

 7           Is there anything else that I did not mention

 8   with regard to your mental health that you experienced

 9   in the department of corrections that relates to this

10   case and the psychological effects of this conviction

11   and acquittal?

12           Did we speak about everything, or is there

13   something else?

14              MR. KLEIN:  Objection to the form.

15              THE WITNESS:  I don't understand.

16              MS. CALABRESE:  Sure.

17   BY MS. CALABRESE:

18      Q.   We've talked about your isolation.  We've talked

19   about your inability to see your children.  We've talked

20   about you feeling depressed and receiving the treatment

21   from the therapist and Zoloft while incarcerated at the

22   department of corrections.

23           Do you recall all that?
```

Case 1:17-cv-00626-DJS Document 114-2 Filed 06/14/21 Page 231 of 458

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      A.   Yes.

 3      Q.   Is there anything else that we did not discuss

 4  that relates to the psychological effects that you say

 5  you have because of this case while incarcerated with

 6  DOCCS?

 7      A.   No.

 8      Q.   So we've covered everything?

 9      A.   We covered everything.

10      Q.   Other than the physical -- the injuries you

11  received from the two physical fights, did you have any

12  other physical injuries, ailments, conditions, while

13  incarcerated with DOCCS?

14      A.   No.

15      Q.   You were healthy otherwise?

16      A.   Otherwise, yes.

17      Q.   Was there any treatment that we did not discuss

18  relating to your incarceration that led to the

19  psychological effects you have because of this case?

20              MR. KLEIN:  Can you read that back?

21              MS. CALABRESE:  I'll rephrase it.

22  BY MS. CALABRESE:

23      Q.   Are there any other psychological conditions that
```

1          (Adrian P. Thomas - by Ms. Calabrese)

2    you experienced while incarcerated at DOCCS because of

3    this case?

4       A.  Yes.

5       Q.  What?

6       A.  I can't be in crowds.  I don't like being in

7    crowds.

8       Q.  Why?

9       A.  It just triggers my mind back to prison, having

10   threats.  I was always threatened in crowds.  So I don't

11   like being in crowds.

12      Q.  Is there anything else?

13      A.  I didn't sleep at night.

14      Q.  When you were in prison?

15      A.  Right.

16      Q.  Are you sleeping fine now?

17      A.  I am now because I work alone, because of my

18   lifestyle now and the truck, so.

19      Q.  Is there anything else?

20      A.  No.  That's it.

21      Q.  And then you were transferred to Rensselaer

22   County because your conviction was overturned; is that

23   right?

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      A.   That's right.

 3      Q.   Do you recall why your conviction was overturned?

 4      A.   Yes.

 5      Q.   Why?

 6      A.   Due to the videotape.

 7      Q.   What do you mean?

 8           What was your understanding?

 9              MR. KLEIN:  Objection.

10              THE WITNESS:  Repeat the question.

11   BY MS. CALABRESE:

12      Q.   What was your understanding as to why your

13   conviction was overturned?

14           You said due to the videotape and what do you

15   mean by that?

16      A.   Statements.

17      Q.   What statements?

18      A.   The police interrogation.

19      Q.   Then you were sent to Rensselaer County?

20      A.   Yes.

21      Q.   How long were you there?

22      A.   For the retrial.

23      Q.   Right.  How long were you incarcerated in
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)
 2   Rensselaer County, do you recall?
 3       A.  Before or after the conviction?
 4       Q.  After the conviction was overturned, prior to the
 5   second trial.
 6       A.  Not really sure on how long I was there.
 7       Q.  And the second trial occurred; is that right?
 8       A.  Yes.
 9       Q.  Who was your attorney?
10       A.  Steve Coffey.
11       Q.  Was he assigned to represent you?
12              MR. KLEIN:  Did you pay him, or was he
13          court appointed, if I may?
14              THE WITNESS:  He was court appointed.
15              MR. KLEIN:  Do you want to take a
16          break?
17              THE WITNESS:  No.
18              MR. KLEIN:  If you need a break, let us
19          know.
20              THE WITNESS:  Okay.
21   BY MS. CALABRESE:
22       Q.  Who testified at that trial, do you recall?
23       A.  Who testified at the trial?
```

```
1              (Adrian P. Thomas - by Ms. Calabrese)

2      Q.   Yes.

3      A.   Defense.

4      Q.   Well, what do you remember?

5      A.   That trial lasted awhile.

6              MR. KLEIN:  Not asking that.  She's

7          asking who testified that you remember.

8              THE WITNESS:  I don't exactly remember

9          all the names.

10  BY MS. CALABRESE:

11     Q.   And were you eventually acquitted?

12     A.   Yes.

13     Q.   And were you released?

14     A.   Yes.

15     Q.   Now, you mentioned that you suffered additional

16  losses.  I want you to describe what you mean by that.

17  You mentioned you suffered a loss to your diet.

18         What do you mean by that?

19     A.   My religion, I wasn't able to -- I wasn't able to

20  do a lot of things with my religion.

21             MR. KLEIN:  She's asking about diet.

22             The question is, did you eat the way

23          you did in prison or as you would out of
```

```
1              (Adrian P. Thomas - by Ms. Calabrese)
2          prison or was there something that affected
3          it?
4               THE WITNESS:  No.  I wasn't able to eat
5          like I would out in the street.
6   BY MS. CALABRESE:
7     Q.  How so, just because the diet is different?
8     A.  No.  Not only that.  I just wasn't -- I didn't
9   really have a lot of choices in the commissary.
10    Q.  Did you use commissary?
11    A.  When I was able to receive commissary.
12    Q.  Who provided money to you for commissary?
13    A.  My family.
14    Q.  You were in contact with them.  You mentioned you
15  talked to -- you wrote letters to them?
16    A.  To my mother.
17    Q.  And you talked on the phone?
18    A.  Yes.
19    Q.  So there were no restrictions with your contact
20  with your family other than seeing them in person?
21    A.  Right.
22    Q.  Did you see them in person?
23        Did they visit you?
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      A.   No.

 3      Q.   Did you have any visitors?

 4      A.   Not in Auburn.

 5      Q.   Somewhere else?

 6      A.   At county jail.

 7      Q.   Who visited you there?

 8      A.   My mother.

 9      Q.   She came up from Georgia?

10      A.   Yes.

11      Q.   How many times did she visit you there?

12      A.   Around the trial part.

13      Q.   The second trial?

14           MR. KLEIN:  She asked you how many

15         times.

16           THE WITNESS:  I'm not sure how many

17         times she was able to come to me.

18  BY MS. CALABRESE:

19      Q.   For the second trial?

20      A.   Yes.

21      Q.   And you conversed with her on the phone and in

22  letters while incarcerated?

23         There were no restrictions on that access,
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)
 2    correct?
 3        A.   Correct.
 4        Q.   And other than the diet being different because
 5    you're receiving a planned meal while incarcerated, was
 6    there any other restrictions to your diet while
 7    incarcerated?
 8        A.   No.
 9        Q.   And you mentioned sleep.
10             How was your sleep different?
11        A.   I wasn't able to sleep at night.
12        Q.   Did you sleep at all?
13        A.   During the mornings.
14             MR. KLEIN:  The answer is yes.  You
15          have to answer the question she's asking.
16             THE WITNESS:  Yes.
17    BY MS. CALABRESE:
18        Q.   What is your sleep schedule now?
19        A.   I sleep mostly during the day.
20        Q.   Because you drive at night?
21        A.   Right.
22        Q.   How many hours do you sleep generally a day?
23        A.   Eight hours.
```

Case 1:17-cv-00626-DJS Document 114-2 Filed 06/14/21 Page 293 of 458

```
 1          (Adrian P. Thomas - by Ms. Calabrese)

 2     Q.  The normal sleep schedule, as far as hours?

 3     A.  Yes.

 4     Q.  And how is that different in the department of

 5  corrections?

 6          How many hours did you sleep there?

 7     A.  Maybe four hours, five hours a day.

 8     Q.  Did you nap throughout the day besides that?

 9     A.  Yes.  A lot of times I nap.

10     Q.  So four to five hours in the morning and then

11  additionally you would nap throughout the day?

12     A.  Yes.

13     Q.  For a total of how many hours a day, would you

14  say?

15     A.  Maybe together five and a half.

16     Q.  And you mentioned that you had a loss of personal

17  contact.

18          What do you mean by that?

19     A.  I was separated from my family.  So they mean the

20  world to me.  And because I wasn't able to have visits.

21  I wasn't able to attend my son's funeral.  I wasn't able

22  to know anything else about them or their whereabouts or

23  anything.  That's what I meant.
```

Case 1:17-cv-00626-DJS Document 44-14 2021-cv-00626-DJS Document 04/14/2021 Filed 06/14/21 Page 240 of 458

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.  When you say you weren't able to have visits,

 3  what do you mean by that?

 4          Because you were permitted to have visits while

 5  in protective custody, correct?

 6      A.  Wasn't able to have visits with the children

 7  because of the condition.

 8      Q.  Because of order of protection?

 9      A.  Yes.

10      Q.  But you were permitted to have visits from other

11  people not prohibited by the order of protection,

12  correct?

13      A.  Other people.

14      Q.  Right.

15      A.  But not my children.

16      Q.  So that's correct, you were able to have visits

17  from other people?

18              MR. KLEIN:  Objection.

19              THE WITNESS:  Yes.

20  BY MS. CALABRESE:

21      Q.  So when you say you had limitations on personal

22  contact, you're talking about the order of protection

23  limitations with regard to your children and Wilahemina?
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2       A.   Yes.

 3       Q.   But nobody else, correct?

 4       A.   Nobody else.

 5       Q.   And you mentioned educational opportunity.

 6            What do you mean by that?

 7       A.   Because I wasn't able to attend GED classes.  I

 8  wasn't able to get the adequate help I needed.

 9       Q.   Because you were in protective custody?

10       A.   That's correct.

11       Q.   But prior to that, you had no desire or goal to

12  get your GED.

13            You weren't going to school or looking for a

14  school, correct?

15       A.   I was going to go to school and get my GED.  I

16  just wasn't able to do it because I had to have a job to

17  pay -- keep paying bills and stay afloat.

18       Q.   So you did not, for example, apply to a school or

19  acquire about getting a GED before you were

20  incarcerated, correct?

21       A.   Correct.

22       Q.   And you mentioned vocational opportunity and

23  athletic opportunity.
```

Case 1:17-cv-00626-DJS   Document 114-2   Filed 06/14/21   Page 243 of 458

1          (Adrian P. Thomas - by Ms. Calabrese)

2       Are you talking about the fact that you weren't

3 able to program because you were in protective custody?

4    A.   That, and I had my CDL.  I eventually had my CDL

5 before I got arrested.  So I wasn't able to use that to

6 have an adequate source of income because of the arrest

7 and situation that took place.

8    Q.   Earlier we were talking about your CDL.  You

9 mentioned that you received your CDL in 2016.

10       Is that not correct?

11    A.   2016, that's after conviction.

12    Q.   Right, but now you're saying you also had a CDL

13 prior to your conviction?

14    A.   Yes.

15    Q.   You didn't mention that earlier.

16       MR. KLEIN:  Objection.  I don't think

17     you asked him that.

18       MS. CALABRESE:  I did ask.

19 BY MS. CALABRESE:

20    Q.   I asked when you first received your CDL and you

21 said in 2016; is that right?

22    A.   That's after the conviction.

23    Q.   So you had a CDL prior to the conviction?

```
1              (Adrian P. Thomas - by Ms. Calabrese)

2     A.  Yes.  I testified to that at trial.

3     Q.  I'm asking about now.

4     A.  Yes.

5     Q.  So when did you first receive your CDL?

6     A.  Before or after?

7     Q.  Period.

8              MR. KLEIN:  First ever.

9              THE WITNESS:  Before that situation

10         took place.

11    BY MS. CALABRESE:

12    Q.  When?  What year?

13    A.  Same year.  2008.

14    Q.  So in 2008, you went to school to receive your

15    CDL and received your CDL license.

16         Is that what you're saying?

17    A.  Yes.  I went to school.

18             MR. KLEIN:  Yes.  Objection.  You have

19         to let her ask the questions.

20    BY MS. CALABRESE:

21    Q.  Go ahead.

22         You went to school where?

23    A.  In Menands.
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.   And you received your license?

 3      A.   Yes.

 4      Q.   And that was prior to Matthew dying?

 5      A.   That was before that took place.

 6      Q.   But you did not ever work with the CDL prior to

 7 being incarcerated, correct?

 8      A.   Correct.

 9      Q.   Why not?

10      A.   Because that took place.

11      Q.   Then you said you got a CDL again.  Is it because

12 the certificate of license expired?

13           Is that what you mean by again?

14      A.   Well, I got it again after I got released.

15      Q.   Right.  So you had to go to school again?

16      A.   Yes.

17      Q.   And why was that?

18      A.   Commercial license only lasts for eight years.

19      Q.   And you couldn't renew it.  You had to go back to

20 school?

21      A.   Yes.

22      Q.   Do you recall the date you received the license?

23 Because you weren't incarcerated for a full eight years,
```

Case 1:17-cv-00626-DJS   Document 44-12   Filed 06/14/21   Page 245 of 458

```
 1              (Adrian P. Thomas - by Ms. Calabrese)
 2  so why did you not renew it when you were released
 3  rather than allowing it to expire?
 4      A.   Well, when I tried in the State of Georgia,
 5  because that's when I came back to New York, the license
 6  through New York didn't -- some kind of way it didn't
 7  register with Georgia.
 8      Q.   So when you were released you went back to
 9  Georgia?
10      A.   Yes.
11      Q.   Your CDL that you received prior to Matthew dying
12  was in New York?
13      A.   Right.
14      Q.   So you had to go back to school because the CDL
15  was not honored in Georgia?
16      A.   Right.
17      Q.   Why did you go back to Georgia?
18           Was that your choice?
19      A.   Yes.
20      Q.   Rather than to stay in New York?
21      A.   Correct.
22      Q.   Where did your children reside once you were
23  released?
```

1          (Adrian P. Thomas - by Ms. Calabrese)

2     A.   They stayed here in New York.

3     Q.   At that time the order of protection was vacated,

4  correct?

5     A.   Temporarily.

6     Q.   Once you were acquitted the order was vacated?

7     A.   Not to my knowledge.

8     Q.   So as you understand it, when you were released

9  from custody, there was still an order of protection?

10    A.   Yes.

11    Q.   Did you do anything to have that modified so that

12  you can have contact with the children?

13    A.   Not at the time.

14    Q.   And why not?

15    A.   ███████████████████████████████████████████████

16  █████████

17  ████████████████████████████████

18  ██████████████████████████████████████████████

19  ███████████████████████████

20  ██████████████

21  ████████████████████████████████████████

22  ███████████████████████████████████

23  ████████████████



(Adrian P. Thomas - by Ms. Calabrese)

Q. █████████████████████████████████

████████

██████████████████

███████████████████

█████████████████

███████████████████████████████████████

████████████████

██   ███

██   ████████

██████████████████████████████████████████

████████████████████████████████████

████████████

██████████████████████████████████

███████████████████████████████████

███████

████████████████████████████████████████

███████

████████████████████████████████████████

████

Q. You mentioned earlier and also in your claim that there was a loss of religious fulfillment.

What do you mean by that?

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      A.   Holidays and attending church together as a

 3  family.

 4      Q.   What is it you practice?

 5           What is your religious faith?

 6      A.   Baptist.

 7      Q.   Were you not able to practice the Baptist faith

 8  in prison?

 9      A.   In prison, only solitude.

10      Q.   Meaning?

11      A.   By myself.

12      Q.   You weren't able to attend services?

13      A.   No.  I wasn't able to attend services in

14  protective custody.

15      Q.   Prior to being incarcerated, did you attend

16  services?

17      A.   Yes.

18      Q.   When?  On what basis?

19      A.   Only in the south.  We didn't do anything up

20  north.

21      Q.   So when you say in the south, you're talking

22  about when you lived Georgia?

23      A.   Yes.  When we lived together in Georgia.
```

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2       Q.  When you were in New York for that approximately

 3   seven years, you did not attend services?

 4       A.  That's correct.

 5       Q.  In your claim, you mentioned a loss of sexual

 6   activity and marital relations.

 7            What do you mean by that, with regard to your

 8   loss of contact with Wilahemina?

 9       A.  Yes.

10       Q.  Prior to being incarcerated, we've discussed your

11   hobbies and your relationship with Wilahemina.

12            Do you remember that?

13       A.  Yes.

14       Q.  You mentioned that for hobbies you would go -- I

15   think we discussed going to cash the check; is that

16   right?

17       A.  Correct.  And Wal-Mart.

18       Q.  And also going to a brother's house to hang out?

19       A.  Yes.

20       Q.  And is that what was different, you weren't able

21   to do that because of the incarceration and order of

22   protection?

23       A.  Correct.
```

Case 1:17-cv-00626-DJS Document 44-12/24/21 Filed 06/14/21 Page 250 of 458

1          (Adrian P. Thomas - by Ms. Calabrese)

2     Q.   And prior to being incarcerated, what was your

3  level of sexual activity with Wilahemina?

4     A.   We had sexual activity three times a week.

5     Q.   And was that consistent for the seven years you

6  were in New York?

7     A.   Yes.

8     Q.   And when you say you had a loss of sexual

9  activity, are you relating the fact that, once

10  incarcerated and thereafter, you had no contact with

11  her?

12     A.   Correct.

13     Q.   To this day, do you have contact with Wilahemina?

14     A.   No.

15     Q.   And why is that?

16     A.   Because of the order of protection.

17     Q.   And to this day, do you have contact with any of

18  the children?

19     A.   None whatsoever.

20     Q.   And why is that?

21     A.   Because of the order of protection.

22     Q.   And since the ruling in family court with regard

23  to the order of protection, have you petitioned the

```
 1          (Adrian P. Thomas - by Ms. Calabrese)
 2   court for contact with the children or Wilahemina?
 3      A.  No.
 4      Q.  Why not?
 5      A.  I didn't have the money for a lawyer.
 6      Q.  In the claim you mentioned that you have a loss
 7   of leisure activities, travel, driving, enjoyment, and
 8   expression.
 9          What do you mean by that?
10              MR. KLEIN:  Due to the time that he was
11          in prison.
12              When you were in prison, explain what
13          you would have done.
14              THE WITNESS:  Well, we could have -- I
15          would have still been able to work and
16          provide if I wasn't locked up.
17   BY MS. CALABRESE:
18      Q.  But you didn't work prior to going into prison,
19   correct?
20      A.  Correct.
21      Q.  It was about five and a half years where you
22   didn't work?
23      A.  And I also had my CDL.  I wasn't able to do
```

Case 1:17-cv-00626-DJS Document 84-1 04/12/2024 Filed 06/14/21 Page 252 of 458

1         (Adrian P. Thomas - by Ms. Calabrese)

2  nothing with it because that happened right after.

3    Q.  And so, tell me how your life is different now

4  compared to prior to being incarcerated.

5    A.  My life is different because I'm constantly

6  reminded that my children is growing up without me

7  present in their life, with the lies of the media, the

8  conviction, birthdays, holidays.  On a regular day, the

9  average Monday through Friday that goes by, that they

10  can't contact me and I can't contact them.  I can't even

11  have a simple conversation, hi, how you doing?

12       So, my life is reminded of total loneliness that

13  was -- that came upon from all of this taking place.

14    Q.  So other than these experiences that you're

15  talking about, is your life different in any other way?

16    A.  Yes.

17    Q.  How?

18    A.  I fear to be in crowds.  I hate going into

19  crowds.  Like, I don't like socializing and parties.  I

20  become somewhat antisocial.  I'm depressed.  I'm

21  stressed out because of my children are growing up to

22  know about this conviction and the media attention that

23  surrounded it, the possibility of them hating me.

1    (Adrian P. Thomas - by Ms. Calabrese)

2   If you only hear one side as a child growing up,

3 how is it possible that you will take out the time and

4 listen to your father or the man that you came from.  So

5 that bothers me a lot.

6 Q.  So other than the estrangement and the issue you

7 have with crowds and isolating yourself, is there

8 anything else that's different today than it was prior

9 to your incarceration?

10 A.  No.

11 Q.  And you're not seeking any treatment today for

12 any of the things you just mentioned, correct?

13 A.  Correct.

14 Q.  And you mentioned loss of income; however, it

15 seems like now your employment status is well improved

16 compared to before.

17   Wouldn't you agree?

18    MR. KLEIN:  Objection.

19    MS. CALABRESE:  You can answer that.

20 BY MS. CALABRESE:

21 Q.  You're doing better now economically than you

22 were prior to being incarcerated; is that right?

23 A.  Yes.

```
 1          (Adrian P. Thomas - by Ms. Calabrese)

 2     Q.   You're making, you said, at best $1,000 a week?

 3     A.   Yes.

 4     Q.   And prior to being incarcerated you were making

 5  nothing?

 6     A.   Right.

 7     Q.   Mr. Thomas, the protective custody that you

 8  entered into, was that voluntary or involuntary, did you

 9  mention?

10     A.   I didn't hear the first part of the sentence.

11     Q.   The protective custody, you were in protective

12  custody in the department of corrections?

13     A.   Yes.

14     Q.   Was that voluntary or involuntary, do you recall?

15          MR. KLEIN:  Would you know?

16          THE WITNESS:  I don't -- I don't

17     recall.

18  BY MS. CALABRESE:

19     Q.   Did you ask to be placed in protective custody?

20     A.   No.

21     Q.   Did you ask to come out of protective custody?

22     A.   No.

23     Q.   And how come?
```

Case 1:17-cv-00626-DJS Document 42-2 Filed 06/14/21 Page 253 of 458

254

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2      A.   I thought once -- my belief was, you come out

 3   when you go to another prison.

 4      Q.   So you did not petition or ask the department to

 5   be released from protective custody?

 6      A.   No.

 7              MS. CALABRESE:   Thank you.

 8              I think I'm done.  Give me a minute.

 9   EXAMINATION

10   BY MR. PERKINS:

11      Q.   Ready, Mr. Thomas?

12      A.   Yes.

13      Q.   Mr. Thomas, my name is Joe Perkins.  I represent

14   the defendants City of Troy, Adam Mason, Officer

15   Colaneri, and Officer Fountain.

16              I've got a few questions here.  The same rules

17   apply, okay?

18      A.   (No verbal response.)

19      Q.   Your responses have to be verbal.

20      A.   All right.  Okay.

21      Q.   Mr. Thomas, to your knowledge, does Wilahemina

22   Hicks want to be in contact with you?

23      A.   As of today?
```

1          (Adrian P. Thomas - by Mr. Perkins)

2     Q.  Yes.

3     A.  I don't know.

4     Q.  Since you were arrested, have you spoken with

5 Wilahemina?

6     A.  No.  Not at all.

7     Q.  And that's sometime in the year 2008, right?

8     A.  Correct.

9     Q.  And she testified for the prosecution in both of

10 your trials, correct?

11    A.  Correct.

12    Q.  Now, I know there's been some conversations about

13 things that were true or things that weren't true.  At

14 one point, I believe you made some comments to Officer

15 Mason about, my wife might want to have me killed or

16 someone in her family.

17         Do you remember saying anything like that?

18    A.  Yes.

19    Q.  Was it true?

20    A.  No.

21    Q.  Do you know why Wilahemina hasn't spoken to you

22 since your arrest?

23    A.  My belief is based off the interrogation or what

Case 1:17-cv-00626-DJS Document 94-1 Filed 06/14/21 Page 253 of 458

```
 1              (Adrian P. Thomas - by Mr. Perkins)
 2   they may have told her before the trial.
 3      Q.   Right.  So let's talk about before the criminal
 4   trial, before your first criminal trial.
 5           Is it your understanding that Wilahemina thought
 6   you caused harm to Matthew?
 7               MR. KLEIN:  I'm just going to note,
 8           rather than objecting to every question, a
 9           standing objection to the operation of some
10           someone else's mind.
11               MR. PERKINS:  Yes.
12               MR. KLEIN:  Objection to the form of
13           the question.
14               MR. PERKINS:  No problem.
15               Off the record.
16               (Discussion held off the record.)
17               MR. KLEIN:  Do you remember the
18           question or do you want it read back?
19               THE WITNESS:  Repeat it, please.
20               MR. PERKINS:  I'll ask a new one.
21   BY MR. PERKINS:
22      Q.   Is it your understanding that Wilahemina blames
23   you for the death of Matthew?
```

1             (Adrian P. Thomas - by Mr. Perkins)

2            MR. KLEIN:  Do you know if she does, if

3      you know?

4            THE WITNESS:  I have no idea.

5  BY MR. PERKINS:

6    Q.  Are you aware that the police took a statement

7  from Wilahemina on the date that Matthew was taken to

8  the hospital the first time?

9    A.  I believe that was mentioned to me.  Yes.

10    Q.  Have you ever seen it, the statement?

11          MR. KLEIN:  At any time from 2008 up

12      until today have you seen it?

13          MR. PERKINS:  Yeah.

14          THE WITNESS:  I don't actually

15      remember.

16          (City Exhibit 1 marked for

17      identification.)

18  BY MR. PERKINS:

19    Q.  Mr. Thomas, I'm going to show you what's been

20  marked as City Exhibit No. 1 with today's date on it for

21  identification.  It appears to be a written statement

22  taken of Wilahemina Hicks on September 21, 2008.

23    Just take a minute and look that over.

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2     A.  (Witness complies.)

 3     Q.  You've read the document?

 4     A.  Yes.

 5              MR. KLEIN:  Can I see it?

 6              MR. PERKINS:  Yeah.  Sure.  I'm sorry.

 7   BY MR. PERKINS:

 8     Q.  Mr. Thomas, City Exhibit 1 for identification, it

 9   indicates that Ms. Hicks was stating that you had beaten

10   your daughter █████ with a belt on a separate occasion,

11   right?

12     A.  That's what it shows.  Yes.

13     Q.  Is that accurate?

14     A.  To my knowledge, no.

15     Q.  Prior to September of 2008, had you ever hit

16   India with a belt?

17     A.  Yes.

18     Q.  But you disagree with what your wife said here

19   about the time you were in another room whipping India

20   with a belt?

21     A.  Correct.

22     Q.  Do you know why your wife provided an inaccurate

23   statement to the Troy Police Department?
```

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2              MR. KLEIN:  Object to form.

 3              THE WITNESS:  I don't know.  I don't

 4         know why she would say that.

 5   BY MR. PERKINS:

 6      Q.  You don't know why she did that?

 7      A.  No.

 8              (City Exhibit 2 marked for

 9         identification.)

10   BY MR. PERKINS:

11      Q.  Mr. Thomas, I'd like to show you what's been

12   marked as City No. 2 for identification with today's

13   date.  I'm going to provide that to you and to your

14   attorney and just ask you to -- it's a two-page

15   document.  Just take a quick look at it.

16      A.  (Witness complies.)

17              MS. PECK:  Joe, what are the exhibits?

18              MR. PERKINS:  City 2 is a

19         September 23rd statement of Wilahemina Hicks

20         to the Troy Police Department.  City 1 was a

21         September 21st statement executed by

22         Wilahemina Hicks to the Troy Police

23         Department.
```

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2   BY MR. PERKINS:

 3       Q.  Mr. Thomas, have you now reviewed City Exhibit 2

 4   for identification?

 5       A.  Yes.

 6       Q.  In this written statement, Wilahemina Hicks

 7   indicates that years ago, when she was living in

 8   Georgia, she got into an argument with you and you put

 9   your hands around her neck and choked her, correct?

10       A.  That's false.

11       Q.  That's what I was going to ask you.  That's

12   false.

13           Do you know why Wilahemina would tell that to the

14   Troy Police Department if it was false?

15       A.  I have no idea.

16       Q.  Mr. Thomas, you were aware that the Troy city

17   police were in communication with CPS about the

18   situation with Matthew at the time it occurred, correct?

19       A.  Once he showed up to the county jail.  Yes.

20       Q.  But at one point in time CPS workers came to your

21   house with representatives of the Troy City Police

22   Department, right?

23               MR. KLEIN:  After Matthew went to the
```

```
 1                (Adrian P. Thomas - by Mr. Perkins)

 2          hospital?

 3               MR. PERKINS:  Yes.

 4               MR. KLEIN:  You mean the day Matthew

 5          went to the hospital?

 6               MR. PERKINS:  Yes, I do.

 7               MR. KLEIN:  Do you understand the

 8          question?

 9               On the day Matthew came to the

10          hospital, did CPS come with the police?

11               THE WITNESS:  To the house?

12               MR. PERKINS:  Yes.

13               THE WITNESS:  Yes.

14     BY MR. PERKINS:

15        Q.  Was that the time your children were taken away?

16        A.  Yes.

17        Q.  Were you told why your children were being

18     removed from your house?

19        A.  I don't remember.  I just remember they said it

20     was a court order and there was an officer standing

21     there.

22        Q.  Did you call your wife at the time?

23        A.  I tried to contact her, but I was unable to reach
```

```
 1              (Adrian P. Thomas - by Mr. Perkins)
 2   her.
 3       Q.  Did you leave a voicemail for her?
 4       A.  I couldn't.  I guess her phone wasn't on.
 5              MR. KLEIN:  Just yes or no.
 6              THE WITNESS:  Yes.
 7              MR. KLEIN:  Did you leave a voicemail?
 8              THE WITNESS:  No.  Because I wasn't
 9          able to.
10   BY MR. PERKINS:
11       Q.  So, once you were convicted, is it my
12   understanding that there was an automatic order of
13   protection placed into effect so that you could not
14   contact your wife and your children?
15       A.  Yes.  Right at sentencing.
16       Q.  And that was sentencing for your conviction,
17   correct?
18       A.  Correct.
19       Q.  While you were in jail, did you write a letter to
20   Wilahemina?
21       A.  Yes.
22       Q.  Did that violate the order of protection or no?
23       A.  I only wrote her while I was in the county jail,
```

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2    before the order of protection.

 3        Q.  So that was before the conviction?

 4        A.  Yes.

 5        Q.  Did Wilahemina ever write back to you?

 6        A.  No.

 7        Q.  So since the time you were arrested, have you

 8    spoken to Wilahemina Hicks since September 2008?

 9        A.  Before trial I haven't spoke to her.  I tried to

10    reach out to her one time with a letter.

11        Q.  And there was no response?

12        A.  There was no response.

13        Q.  Do you currently know where your children live?

14        A.  I don't recall.

15        Q.  And is September 2008 the last time that you've

16    ever had any communication with any of your children?

17        A.  That's correct.

18        Q.  Mr. Thomas, as you sit here today, you've heard

19    of Dr. Walter Edge, correct?

20        A.  Yes.

21        Q.  Do you have an understanding that Dr. Walter Edge

22    was employed by Albany Medical Center on the date that

23    Matthew was injured?
```

Case 1:17-cv-00626-DJS Document 14-2 Filed 06/14/21 Page 263 of 458

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2       A.  Yes.

 3       Q.  Were you present in the courtroom when Dr. Edge

 4   testified at your first criminal trial?

 5       A.  Yes.

 6       Q.  Is it your understanding that Dr. Edge told the

 7   Troy Police Department that the injuries to Matthew were

 8   murder?

 9       A.  Yes.

10              MR. KLEIN:  Just objection to form.

11              I think the injuries were -- I think

12          you can use words to that effect.

13              MR. PERKINS:  He did.  The note of Ron

14          Fountain, this is a murder.

15              MR. KLEIN:  Right.  But the objection

16          is just to the phrase "the injuries were

17          murder", using the phrase "murder".

18              MR. PERKINS:  That's fine.

19   BY MR. PERKINS:

20       Q.  Are you aware Dr. Edge called CPS and told them,

21   on the day he saw Matthew, that he wanted the Troy

22   Police Department contacted immediately?

23              MR. KLEIN:  Do you know either way?
```

1               (Adrian P. Thomas - by Mr. Perkins)

2                    THE WITNESS:  No.

3    BY MR. PERKINS:

4       Q.  Do you know if the Troy police officers went and

5    spoke with Dr. Edge?

6       A.  I don't.

7       Q.  You don't know that?

8                    MR. KLEIN:  His answer was no.

9                    THE WITNESS:  No.

10   BY MR. PERKINS:

11      Q.  Have you ever heard of Dr. John Waldman?

12      A.  Yes.

13      Q.  Did he testify for the prosecution at your first

14   trial, only if you know?

15      A.  I don't remember.

16      Q.  Do you know that Dr. John Waldman was a doctor at

17   Albany Medical Center?

18      A.  I don't remember that, either.

19      Q.  Are you aware that Dr. Edge told the Troy City

20   Police Department that Matthew had sustained a brain

21   injury?

22                    MR. KLEIN:  Objection.

23                    Do you know whether he said that to

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2         them or what he said to them?

 3              THE WITNESS:  No.

 4   BY MR. PERKINS:

 5      Q.  Are you aware that Dr. Edge advised the Troy

 6   Police Department that the type of brain injury

 7   sustained by Matthew would either be a severe shaking or

 8   a large acceleration deceleration-type of injury?

 9      A.  Yes.

10      Q.  And you knew that, correct?

11      A.  Yes.

12      Q.  So when you were being questioned later on by the

13   Troy City Police Department, is it your understanding

14   that that's why they were questioning you regarding

15   those types of injuries?

16              MR. KLEIN:  I'm sorry, is it his

17         understanding at the time?

18              MR. PERKINS:  I don't know.  I got to

19         hear it.  I can't remember what I said.

20              (Question read by reporter.)

21              MR. KLEIN:  Objection as to what they

22         were thinking when they were asking him

23         stuff, but if you know what they were.
```

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2              MR. PERKINS:  I'm asking as to what

 3         your thoughts were, so.

 4              THE WITNESS:  I only knew about it

 5         because Mason said it.

 6   BY MR. PERKINS:

 7     Q.  Mason said what?

 8     A.  About the deceleration and...

 9              MR. KLEIN:  Mason used those words to

10         you?

11              THE WITNESS:  Yes.  He used those words

12         to me.

13   BY MR. PERKINS:

14     Q.  Do you know if Mason got that information from

15   Mr. Edge?

16              MR. KLEIN:  As opposed to some other

17         doctor or anyone else.

18              Do you know who he got that information

19         from, if anyone?

20              THE WITNESS:  No.

21   BY MR. PERKINS:

22     Q.  We're going to look at some things from the

23   amended complaint, okay?
```

1          (Adrian P. Thomas - by Mr. Perkins)

2          Paragraph five of your amended complaint says,

3     "based solely on Dr. Edge's initial misdiagnosis, the

4     defendant City of Troy detectives from the Troy Police

5     Department falsely arrested Mr. Thomas, conceding that,

6     when they first took him into their custody, they did

7     not have probable cause to arrest him."

8          Does that sound familiar to you?

9     A.   Yes.

10    Q.   Now, after speaking with Dr. Edge, City of Troy

11    Police Department did not arrest you at that time,

12    correct?

13              MR. KLEIN:  Objection.  It calls for a

14         legal conclusion.

15              Do you mean, did they charge him with

16         something or was he free to leave?

17              MR. PERKINS:  Did they arrest him?  Did

18         they place him under arrest?

19              MR. KLEIN:  Did they handcuff you after

20         the first interview?

21              Is that what you're saying?

22              MR. PERKINS:  Yes.

23              MR. KLEIN:  Did they take you to the

Case 1:17-cv-00626-DJS Document 44-21 Filed 06/14/21 Page 270 of 458

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2         hospital?

 3              THE WITNESS:  They took me to the

 4         hospital.

 5   BY MR. PERKINS:

 6      Q.  Well, they took you down to the police station

 7   first, correct?

 8      A.  That's correct.

 9      Q.  So, we know that the City of Troy police officers

10   had spoken to Dr. Edge, correct?

11              MR. KLEIN:  Objection.

12         I think he said he didn't know.

13              THE WITNESS:  I didn't know.

14   BY MR. PERKINS:

15      Q.  You know they had spoken to Wilahemina, though,

16   correct?

17              MR. KLEIN:  Objection.

18              THE WITNESS:  That's not what they

19         said.

20   BY MR. PERKINS:

21      Q.  And you knew they had been in contact with CPS

22   because they were with CPS when they took the children

23   away, correct?
```

1          (Adrian P. Thomas - by Mr. Perkins)

2     A.  Yes.

3     Q.  And although they had all that information at

4  that time, they still did not say, you're under arrest,

5  and place you in handcuffs, correct?

6     A.  When?

7     Q.  When they were there with CPS and took your

8  children away and after the first interview of

9  approximately two hours, they still had not placed you

10  under arrest; is that correct?

11     A.  That's correct.

12     Q.  Now, after the children were taken away by CPS,

13  the Troy police left your apartment after speaking with

14  you for some time, correct?

15     A.  Correct.

16     Q.  And they didn't place you under arrest, correct,

17  at that time?

18     A.  At that time, yes.

19     Q.  And they didn't place you in handcuffs, correct?

20     A.  At that time, yes.

21     Q.  Just to save us a whole lot of time, it wasn't

22  until after you signed that ten-page statement, after

23  the second interview with Adam Mason, that you were

Case 1:17-cv-00626-DJS Document 114-2 Filed 06/14/21 Page 273 of 458

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2   arrested, correct?

 3      A.   Correct.

 4            MR. KLEIN:  I'm just going to object to

 5            the line of questioning to the extent it

 6            calls for a legal conclusion.

 7            MR. PERKINS:  Maybe I can clean it up.

 8            I mean, they were talking to somebody

 9            that they were getting this information on.

10            Am I using the term "arrest" correctly?

11            Was he under arrest?

12            MR. KLEIN:  I think there's a

13            difference between an administrative

14            decision to charge him versus his ability to

15            leave, whether he felt that he couldn't

16            leave.

17            MS. CALABRESE:  In custody versus

18            arrest.

19            MR. KLEIN:  I'm still objecting for the

20            record.

21            MR. PERKINS:  Sure.

22   BY MR. PERKINS:

23      Q.   So it was only after the second interview that
```

1              (Adrian P. Thomas - by Mr. Perkins)

2     you were placed under arrest -- and I'm using the term

3     like a layman would -- that you were told you were under

4     arrest and you were placed in handcuffs, right?

5         A.   Repeat that one more time.

6         Q.   Sure.  It was only after your second

7     interrogation, the longer one, that you were ever told

8     you're being placed under arrest and we're going to

9     handcuff you?

10        A.   Correct.

11        Q.   Now, do you know, after CPS left with the

12    children, were the Troy Police Department still at your

13    apartment on that Sunday evening?

14        A.   I'm not understanding.

15        Q.   Well, the Troy police showed up with CPS and they

16    took the kids away, correct?

17        A.   Correct.

18        Q.   And when CPS left, did the Troy police officers

19    leave with them or did they stay behind and speak with

20    you not in the presence of CPS?

21        A.   They came back without CPS, after they left.

22        Q.   Yeah.  Right.  I'm not -- not the second time,

23    though, that first time.

```
 1              (Adrian P. Thomas - by Mr. Perkins)
 2         Do you know how long the Troy police officers
 3    spoke to you the first time they were at your apartment,
 4    the initial time that they came with CPS?
 5         A.   I don't even remember.
 6         Q.   And then ultimately they left, correct?
 7         A.   Yes.
 8         Q.   Did they provide you with any instructions when
 9    they left?
10         A.   No.
11         Q.   And did you have a working cell phone in the
12    apartment?
13         A.   Yes, I did.
14         Q.   Did you make any phone calls to anybody to
15    discuss the conversation you had had with the City of
16    Troy police?
17         A.   No.
18         Q.   Did you attempt to call Wilahemina again?
19         A.   Yes.
20         Q.   You were not able to leave a voicemail for her;
21    is that correct?
22         A.   That's correct.
23         Q.   What hospital was Matthew in at that point in
```

```
 1            (Adrian P. Thomas - by Mr. Perkins)
 2   time, to your knowledge?
 3      A.  I thought he was still at Samaritan.
 4      Q.  Did you call Samaritan Hospital at that point in
 5   time?
 6      A.  No.  I was too distraught, concerned what was
 7   going on.
 8      Q.  Concerned about Matthew's health?
 9      A.  Matthew's health and my children being taken,
10   what made me distraught because of my love for them.
11      Q.  You knew Matthew was in tough shape, correct?
12      A.  Yes.
13      Q.  And you couldn't get ahold of Wilahemina, right?
14      A.  Correct.
15      Q.  Did you consider calling Samaritan to say, I'm
16   Matthew's dad, can you tell me how he's doing?
17      A.  It didn't even cross my mind at the time.
18      Q.  By the way, you spoke to somebody -- I believe it
19   was Wilahemina's brother.  His name started with a V, I
20   think.
21          What was his name?
22      A.  Victor Hicks.
23      Q.  Now, prior to this incident with Matthew, did you
```

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2    get along well with Victor?

 3       A.  Yes.

 4       Q.  And at some point after what happened with

 5    Matthew, Victor Hicks said something to you like, you're

 6    in trouble, correct?

 7       A.  Over the phone.  Yes.

 8       Q.  When was that?

 9              Was that on the Sunday where everything happened

10    and Matthew was taken to the hospital, or was that

11    later?

12       A.  That was later that evening after Matthew was

13    taken to the hospital.

14       Q.  Have you spoken to Victor Hicks since that time?

15       A.  Up to this present day?

16       Q.  Yes.

17       A.  No.

18       Q.  How about Inga Hicks, when's the last time you

19    spoke with her?

20       A.  To this present day, I haven't.

21       Q.  So is it some point back in 2008?

22       A.  When I spoke with Inga?

23       Q.  Yes.
```

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2      A.  When I last seen her or what?

 3      Q.  When you last spoke with her.

 4      A.  Yes.

 5      Q.  Was 2008?

 6      A.  Yes.

 7      Q.  I think you mentioned that you had been out of

 8  work for a little bit of time prior to Matthew's

 9  injuries, correct?

10      A.  Yes.

11      Q.  And you were receiving some type of public

12  assistance?

13      A.  Yes.  That was based for about a year, about a

14  year.

15      Q.  What was it?  Was it SSI?

16      A.  No.  Not SSI.

17      Q.  I'm sorry, what was it?

18      A.  I was receiving public assistance.

19      Q.  Is that from the City of Troy, if you know?

20      A.  I have no idea about how social service works.

21      Q.  The question was or is:  How much were you

22  receiving?

23      A.  I don't even remember.
```

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2      Q.   Was it at least $1,000 a month or was it less?

 3      A.   I don't even remember.

 4      Q.   Did your wife also receive public assistance?

 5      A.   Yes.

 6      Q.   Do you know how much she received?

 7      A.   I don't even remember.

 8      Q.   Do you know how much income was coming into the

 9  household in the month prior to Matthew's injuries?

10      A.   I have no knowledge of that.

11      Q.   Aside from the public assistance, was there any

12  other source of income coming into the household in the

13  month prior to Matthew's injuries?

14      A.   Yes.

15      Q.   What?

16      A.   My family used to send money up.

17      Q.   Now, was that your adoptive mother or someone

18  else?

19      A.   My adopted mother, sometimes my brother.

20      Q.   I know I have these, but maybe you can help me.

21           What was the name of the adoptive mother again?

22      A.   Annipearl Black.

23      Q.   And your brother's name is?
```

```
 1            (Adrian P. Thomas - by Mr. Perkins)

 2     A.   ████████████.

 3     Q.   How often was Annipearl sending you money?

 4     A.   She would send me money every two to three

 5   months.

 6     Q.   And on those occasions she sent you money, do you

 7   know approximately how much money she sent you?

 8     A.   Not offhand now.

 9     Q.   And how often would you say that ████████████

10   provided you with some money?

11     A.   About every two or three months, as well.

12     Q.   And on those occasions ████████████ provided you

13   with money, do you know how much he would provide you

14   with?

15     A.   Not offhand.  No.

16     Q.   The money that Annie and ██████ sent you, what was

17   it going toward?

18     A.   Rent and other -- like, light bills.

19     Q.   So, aside from the public assistance and the

20   occasional money which would be sent by Annipearl and

21   Ricky, is there any other source of income that was

22   coming into the household?

23     A.   No.
```

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2     Q.  After Matthew was taken to the hospital that

 3   first time, were you aware that X-rays of Malakai were

 4   ordered?

 5     A.  No.

 6     Q.  When did you become aware that the X-rays taken

 7   of Malakai showed that he had healing fractured ribs?

 8     A.  I first heard about that right before trial.

 9     Q.  Had you or your wife taken ██████ to be treated

10   for injured ribs prior to the occurrence with Matthew?

11     A.  No.  Not at all.

12     Q.  Do you have any idea why ██████ would have had

13   broken ribs?

14     A.  I have no idea.

15     Q.  Now, I think you testified a little bit earlier

16   about an incident on August 18th where somebody in the

17   apartment complex had complained about you.

18          Do you remember that?

19     A.  Repeat that one more time.

20     Q.  Yeah.  I'm going to mark it.

21              (City Exhibit 3 marked for

22          identification.)

23              (Deposition adjourned at 4:38 p.m.)
```

```
 1                    INDEX OF EXHIBITS

 2

 3    Defendant's                                        Marked

 4

 5    A        Police Interview dated 9/29/08              155

 6    B        Voluntary Statement dated 9/22/08           163

 7    C        Deposition of a Witness dated 9/22/08       163

 8

 9    City's

10

11    1        Statement of Wilahemina Hicks 9/28/08       257

12    2        Statement of Wilahemina Hicks 9/23/08       259

13    3        Statement of Rebecca Cruse                  279

14

15

16

17

18

19

20

21

22

23
```

```
 1   STATE OF NEW YORK      )

 2   COUNTY OF

 3

 4   I, ADRIAN P. THOMAS, do hereby certify that I have read

 5   the foregoing record of my testimony taken at the time

 6   and place noted in the heading hereof and that it is

 7   a true and correct transcript of the same and the whole

 8   thereof.

 9

10

11

12

13                  _____
                                  ADRIAN P. THOMAS
14   Subscribed and sworn to

15   before me this _____ day

16   of _____, 2019

17

18

19

20

21   _____

22

23
```

```
 1                    C E R T I F I C A T I O N

 2

 3

 4    I, Jeanne O'Connell, Registered Professional Reporter

 5    and Notary Public in and for the State of New York, do

 6    hereby certify that the foregoing to be a true and

 7    accurate transcription of the stenographic notes as

 8    taken by me of the aforesaid proceedings.

 9

10

11

12    _____          _____

13       Date                             Jeanne O'Connell

14

15

16

17

18

19

20

21

22

23
```

# APPENDIX



9:15, 13:10



103:20, 104:13, 106:16, 107:13, 108:23, 109:11, 110:14, 116:16, 117:7, 119:14, 123:3, 123:19, 127:14, 132:7, 138:13, 148:14, 153:21, 157:10, 158:5, 158:13, 159:9, 159:21, 161:16, 161:23, 163:16, 163:21, 165:7, 166:11, 166:21, 167:12, 167:17, 169:12, 171:12, 171:19, 172:2, 174:2, 175:9, 178:17, 179:9, 179:18, 181:3, 182:23, 183:9, 184:23, 185:16, 185:22, 186:8, 187:3, 187:11, 187:18, 188:18, 189:3, 189:6, 190:9, 191:16, 193:16, 194:21, 195:6, 195:20, 196:17, 206:10, 207:23, 209:9, 209:15, 210:13, 212:12, 214:5, 215:18, 218:2, 220:2, 221:20, 222:17, 224:9, 224:15, 226:22, 227:18, 228:10, 229:17, 230:22, 232:11, 233:21, 234:10, 235:6, 236:18, 237:17, 239:20, 241:19, 242:11, 242:20, 250:17, 252:20, 253:18, 254:10, 256:21, 257:5, 257:18, 258:7, 259:5, 259:10, 260:2, 261:14, 262:10, 264:19, 265:3, 265:10, 266:4, 267:6, 267:13, 267:21, 269:5, 269:14, 269:20, 271:22

**C**

▮▮▮▮▮▮ - 30:2

**CALABRESE** [270] - 4:13, 5:14, 9:3, 10:10, 12:7, 12:8, 12:16, 14:2, 16:6, 18:2, 19:2, 19:14, 21:6, 21:12, 21:13, 21:19, 22:5, 22:12, 22:13, 23:16, 23:21, 24:17, 25:15, 25:21, 28:6, 30:7, 35:3, 35:6, 36:9, 37:10, 37:11, 39:5, 39:7, 39:16, 39:19, 39:21, 40:6, 41:5, 41:8, 41:9, 41:14, 41:15, 42:3, 42:16, 42:17, 43:18, 43:20, 43:21, 47:3, 48:2, 48:7, 48:8, 48:19, 50:22, 50:23, 51:5, 51:6, 51:11, 51:13, 51:22, 55:21, 56:2, 56:19, 57:22, 58:5, 58:22, 59:2, 61:2, 61:9, 62:2, 62:5, 65:2, 68:4, 68:7, 68:19, 71:4, 71:7, 71:11, 76:14, 76:18, 76:20, 79:6, 79:7, 82:9, 82:21, 83:3, 89:2, 89:8, 92:15, 92:17, 93:19, 97:21, 98:6, 98:14, 100:12, 100:13, 101:15, 101:17, 102:4, 102:11, 102:13, 103:10, 103:20, 104:13, 106:16, 107:8, 107:12, 107:13, 108:17, 108:23, 109:6, 109:11, 110:13, 110:14, 116:13, 116:16, 116:21, 117:3, 117:7, 119:10, 119:14, 123:2, 123:3, 123:19, 127:14, 132:7, 138:13, 148:14, 153:21, 155:19, 156:2, 156:20, 157:9, 157:10, 157:19, 157:22, 158:5, 158:13, 159:9, 159:21, 161:3, 161:16, 161:19, 161:23, 162:16, 162:21, 163:7, 163:16, 163:21, 165:7, 166:9,

166:11, 166:19, 166:21, 167:9, 167:12, 167:16, 167:17, 169:11, 169:12, 171:12, 171:19, 172:2, 174:2, 175:9, 178:13, 178:17, 179:9, 179:17, 179:18, 180:21, 181:3, 182:18, 182:22, 182:23, 183:7, 183:9, 184:23, 185:13, 185:16, 185:22, 186:8, 187:3, 187:11, 187:17, 187:18, 188:18, 189:3, 189:6, 190:6, 190:9, 190:14, 190:17, 190:19, 191:3, 191:16, 193:2, 193:9, 193:12, 193:16, 194:21, 195:6, 195:20, 196:5, 196:11, 196:16, 196:17, 196:23, 197:6, 197:9, 198:10, 199:8, 201:18, 201:20, 201:23, 204:11, 204:15, 204:19, 205:8, 205:16, 206:3, 206:6, 206:10, 207:23, 209:4, 209:9, 209:15, 210:13, 210:20, 211:21, 212:3, 212:7, 212:10, 212:12, 214:4, 214:5, 215:18, 218:2, 220:2, 221:20, 222:17, 224:6, 224:9, 224:14, 224:15, 226:20, 226:22, 227:18, 228:10, 229:16, 229:17, 230:21, 230:22, 232:11, 233:21, 234:10, 235:6, 236:18, 237:17, 239:20, 241:18, 241:19, 242:11, 242:20, 250:17, 252:19, 252:20, 253:18, 254:7, 271:17

**Calabrese** [3] - 2:13, 5:16, 198:11

**cannot** [2] - 6:21, 8:13
**Capitol** [1] - 2:12
**car** [1] - 100:17
**care** [11] - 28:19, 28:23, 61:12, 72:23, 74:6, 90:3, 217:2, 217:3, 217:5, 217:8, 220:6
**career** [1] - 32:23
**carrying** [1] - 113:9
**case** [20] - 16:11, 16:15, 18:12, 22:10, 92:9, 99:17, 99:19, 99:20, 99:21, 99:22, 159:3, 186:4, 197:15, 200:19, 200:23, 216:5, 229:10, 230:5, 230:19, 231:3
**cases** [1] - 84:21
**caseworker** [1] - 4:19
**caseworkers** [4] - 108:2, 113:13, 113:19, 113:21
**cash** [2] - 83:18, 248:15
**caught** [1] - 216:10
**caused** [24] - 24:9, 70:14, 73:13, 73:19, 78:23, 103:13, 103:17, 129:22, 147:13, 160:21, 161:6, 161:10, 161:13, 164:11, 167:4, 167:20, 180:15, 181:5, 256:6
**causing** [1] - 16:17
**CDL** [30] - 30:19, 30:20, 31:5, 32:17, 32:18, 33:3, 33:8, 35:10, 35:23, 36:5, 37:19, 38:13, 39:12, 39:22, 39:23, 241:4, 241:8, 241:9, 241:12, 241:20, 241:23, 242:5, 242:15, 243:6, 243:11, 244:11, 244:14, 250:23
**cell** [9] - 135:21, 141:14, 197:10, 216:15, 218:10, 218:11, 221:18, 225:6, 273:11
**Center** [2] - 263:22, 265:17
**cents** [1] - 32:11
**certain** [3] - 10:21, 34:14, 204:2
**certainly** [1] - 204:6

**certificate** [7] - 54:2, 54:5, 54:13, 54:21, 55:5, 55:15, 243:12
**certificates** [10] - 30:12, 30:13, 30:14, 31:2, 55:17, 55:19, 55:21, 56:9, 58:2
**certification** [2] - 3:9, 156:17
**certified** [1] - 156:4
**certify** [2] - 281:4, 282:6
**CFI** [2] - 35:5, 35:7
**chair** [5] - 153:9, 205:5, 205:15, 205:16, 205:17
**chambers** [1] - 197:10
**chance** [1] - 156:14
**change** [12] - 34:6, 37:14, 37:23, 38:4, 55:9, 55:11, 55:12, 69:4, 70:12, 124:21, 126:17, 126:22
**changed** [2] - 129:6, 131:20
**changing** [2] - 74:3, 105:10
**characterization** [1] - 191:15
**charge** [4] - 216:8, 216:11, 268:15, 271:14
**charged** [4] - 84:23, 150:18, 153:10, 202:10
**charges** [1] - 221:6
**check** [3] - 83:18, 192:16, 248:15
**checked** [9] - 118:3, 129:20, 130:8, 130:10, 131:12, 177:6, 177:7
**checkups** [3] - 70:17, 70:20, 71:15
**cheek** [3] - 59:4, 59:8
**chicken** [7] - 36:13, 37:7, 37:12, 39:4, 39:17, 52:9, 73:13
**child** [35] - 4:3, 4:19, 18:12, 26:14, 27:6, 28:16, 29:3, 53:19, 58:18, 59:12, 67:18, 68:22, 103:14, 103:22, 107:23, 108:4, 108:10, 109:3, 113:12, 113:16, 113:18, 115:17, 123:8, 123:23, 124:6, 172:19, 188:7,

# APPENDIX

192:2, 200:4,
200:15, 202:3,
202:8, 202:13, 252:2
**children** [106] - 20:11,
26:7, 26:9, 26:11,
26:18, 26:19, 26:21,
26:22, 28:23, 52:16,
53:4, 53:7, 53:8,
58:21, 60:7, 60:10,
60:11, 60:18, 61:18,
61:19, 61:21, 62:12,
62:23, 63:3, 63:19,
67:16, 72:20, 74:9,
74:19, 74:23, 78:14,
78:15, 84:9, 84:11,
96:9, 105:8, 105:13,
108:7, 108:8,
109:17, 111:12,
111:22, 113:22,
116:11, 128:3,
128:21, 131:18,
132:3, 132:6, 133:6,
133:8, 133:9,
133:16, 134:2,
134:16, 135:6,
137:5, 138:21,
138:22, 144:2,
144:8, 168:16,
168:18, 172:9,
182:11, 182:16,
183:11, 183:13,
184:3, 184:22,
189:17, 193:19,
215:7, 215:10,
221:21, 221:23,
222:7, 222:8, 223:8,
223:12, 223:13,
223:15, 223:20,
229:19, 239:6,
239:15, 239:23,
244:22, 245:12,
246:7, 246:15,
249:18, 250:2,
251:6, 251:21,
261:15, 261:17,
262:14, 263:13,
263:16, 269:22,
270:8, 270:12,
272:12, 274:9
**children's** [1] - 129:6
**choice** [3] - 168:22,
194:14, 244:18
**choices** [1] - 235:9
**choked** [1] - 260:9
**chose** [2] - 16:9,
246:17
**Christina** [6] - 2:13,
5:16, 188:14,
190:12, 198:11,
211:14

**chunkier** [1] - 57:19
**church** [1] - 247:2
**cigarettes** [2] - 218:3,
218:4
**Circle** [1] - 14:12
**CITY** [1] - 1:6
**city** [2] - 259:18,
260:16
**City** [19] - 2:7, 5:22,
254:14, 257:16,
257:20, 258:8,
259:8, 259:12,
259:20, 260:3,
260:21, 265:19,
266:13, 268:4,
268:10, 269:9,
273:15, 276:19,
279:21
**City's** [1] - 280:9
**civil** [1] - 191:9
**claim** [4] - 5:19,
246:21, 248:5, 250:6
**Claimant** [1] - 1:12
**claimant** [6] - 4:20,
5:5, 197:15, 198:2,
198:18, 199:17
**CLAIMS** [1] - 1:9
**Claims** [3] - 4:7, 4:15,
5:2
**clarify** [2] - 25:19,
109:7
**classes** [1] - 240:7
**clean** [2] - 90:7, 271:7
**cleaning** [3] - 135:13,
144:8, 144:14
**clear** [2] - 116:20,
179:10
**clearly** [4] - 7:16, 7:22,
8:2, 8:11
**client** [4] - 98:3,
156:10, 187:16,
189:2
**clinging** [1] - 130:4
**close** [3] - 73:17, 97:3,
98:16
**closed** [2] - 114:12,
138:16
**closer** [3] - 89:21,
89:23
**clothes** [2] - 139:7,
139:10
**clubs** [2] - 95:13, 96:4
**codified** [1] - 165:2
**coerced** [7] - 164:7,
164:13, 168:5,
200:8, 200:11,
200:19, 200:23
████████ - 29:22,
30:8
**coffee** [1] - 30:3,

75:21
████████ ] - 233:10
**Cohoes** [1] - 52:21
**Colaneri** [3] - 2:7,
158:12, 254:15
**COLANERI** [1] - 1:6
**cold** [3] - 32:4, 121:16,
123:6
**collaterally** [1] -
200:22
**college** [1] - 30:9
**colloquy** [1] - 191:18
**coming** [12] - 133:16,
134:21, 174:7,
177:12, 177:15,
192:17, 218:17,
218:23, 219:3,
277:8, 277:12,
278:22
**commencing** [1] -
1:18
**comments** [1] -
255:14
**commercial** [3] -
30:17, 33:12, 243:18
**commissary** [2] -
235:9, 235:10,
235:11, 235:12
**common** [2] - 143:23,
144:6
**communicate** [2] -
215:8, 215:9
**communicated** [1] -
76:22
**communicating** [2] -
71:18, 77:6
**communication** [3] -
189:2, 260:17,
263:16
**Community** [1] -
214:22
**companies** [2] - 40:5,
40:8
**company** [8] - 33:2,
37:7, 37:12, 78:4,
80:12, 81:3, 81:9,
81:10
**Company** [1] - 36:22
**compared** [3] -
223:19, 251:4,
252:16
**complained** [1] -
279:17
**complaint** [2] -
267:23, 268:2
**complete** [3] - 141:5,
159:5, 179:11
**completed** [3] - 29:15,
29:18
**complex** [2] - 84:8,

279:17
**complies** [3] - 206:9,
258:2, 259:16
**comprised** [1] - 169:4
**conceding** [1] - 268:5
**concerned** [9] - 58:7,
118:9, 122:7,
123:22, 134:5,
134:12, 136:9,
274:6, 274:8
**concerning** [1] - 124:3
**concerns** [5] - 7:4,
70:22, 71:8, 79:2,
122:3
**conclusion** [3] -
181:15, 268:14,
271:6
**condition** [6] - 140:5,
149:17, 168:11,
168:13, 168:14,
239:7
**conditions** [2] -
230:12, 230:23
**conduct** [2] - 201:10,
203:4
**conference** [3] -
162:8, 204:20,
205:19
**confession** [3] -
200:12, 200:13,
200:19
**confidential** [3] - 4:9,
107:6, 192:22
**confidentiality** [1] -
193:8
**confrontation** [1] -
154:7
**connect** [1] - 80:14
**connection** [1] - 97:6
**consequences** [2] -
173:19, 174:3
**consider** [2] - 97:10,
274:15
**considerable** [1] -
213:8
**considered** [1] - 153:8
**consistent** [1] - 249:5
**constantly** [1] - 251:5
**contact** [18] - 135:20,
235:14, 235:19,
238:17, 239:22,
245:12, 246:15,
248:8, 249:10,
249:13, 249:17,
250:2, 251:10,
254:22, 261:23,
262:14, 269:21
**contacted** [1] - 264:22
**contacts** [1] - 141:15
**contained** [1] - 19:9

**content** [4] - 67:14,
69:5, 69:11, 70:3
**context** [1] - 199:21
**continue** [1] - 126:16
**continued** [3] -
126:18, 141:3,
192:16
**contractor** [1] - 35:8
**control** [1] - 58:12
**conversation** [24] -
6:12, 54:21, 55:4,
113:12, 132:20,
148:20, 151:12,
152:18, 154:19,
154:22, 155:7,
155:12, 155:17,
157:12, 157:16,
158:7, 158:20,
160:6, 160:12,
160:13, 193:21,
210:21, 251:11,
273:15
**conversations** [5] -
4:20, 186:21, 187:7,
187:21, 255:12
**conversed** [1] -
236:21
**convicted** [2] - 200:6,
215:5, 262:11
**conviction** [18] -
84:19, 200:9,
216:11, 222:4,
229:10, 231:22,
232:3, 232:13,
233:3, 233:4,
241:11, 241:13,
241:22, 241:23,
251:8, 251:22,
262:16, 263:3
**convictions** [3] -
84:14, 223:2, 223:3
**cook** [1] - 50:4
**cooked** [2] - 135:9
**cooking** [1] - 144:8
**cool** [2] - 118:10,
126:13
**cooperative** [1] -
211:23
**cop** [1] - 134:6
**cops** [2] - 142:21,
149:18
**copy** [6] - 155:6,
156:5, 156:8, 157:7,
159:11, 201:16
**corner** [2] - 205:20,
206:2
**correct** [143] - 9:17,
14:4, 17:10, 19:21,
20:4, 20:12, 21:2,
21:4, 21:9, 21:14,

21:22, 25:9, 25:23, 26:5, 26:6, 26:13, 27:7, 27:21, 28:21, 30:10, 30:11, 31:7, 37:20, 38:3, 41:17, 41:18, 43:6, 46:15, 48:20, 54:14, 54:15, 56:10, 56:14, 57:10, 64:7, 66:5, 90:4, 111:21, 121:7, 121:11, 127:5, 127:18, 136:7, 151:20, 151:23, 152:5, 152:7, 152:13, 154:2, 154:3, 154:4, 155:2, 155:13, 158:19, 158:21, 159:12, 159:15, 160:2, 160:3, 160:4, 164:19, 165:4, 165:8, 166:14, 167:5, 171:21, 172:10, 172:21, 173:10, 177:21, 177:22, 179:19, 180:3, 186:3, 191:22, 208:8, 220:8, 220:14, 223:5, 227:3, 237:2, 237:3, 239:5, 239:12, 239:16, 240:3, 240:10, 240:14, 240:20, 240:21, 241:10, 243:7, 243:8, 244:21, 245:4, 245:23, 246:12, 246:13, 248:4, 248:17, 248:23, 249:12, 250:19, 250:20, 252:12, 252:13, 255:8, 255:10, 255:11, 258:21, 260:9, 260:18, 262:17, 262:18, 263:17, 263:19, 266:10, 268:12, 269:7, 269:8, 269:10, 269:16, 269:23, 270:5, 270:10, 270:11, 270:14, 270:15, 270:16, 270:19, 271:2, 271:3, 272:10, 272:16, 272:17, 273:6, 273:21, 273:22, 274:11, 274:14, 275:6, 276:9, 281:7

**correctional** [2] - 213:5, 213:14
**corrections** [10] - 210:18, 212:15, 214:8, 214:15, 214:17, 225:20, 229:9, 229:22, 238:5, 253:12
**Corrections** [1] - 214:21
**correctly** [2] - 76:13, 271:10
**COs** [1] - 216:14
**couch** [1] - 75:15
**Counsel** [1] - 201:4
**counsel** [8] - 103:2, 103:3, 156:13, 158:22, 159:17, 187:7, 187:9, 211:18
**counselor** [2] - 225:19, 225:22
**counter** [1] - 94:4
**County** [16] - 172:17, 181:21, 209:17, 212:14, 213:17, 213:18, 214:8, 220:23, 221:2, 228:5, 228:12, 228:14, 228:22, 231:22, 232:19, 233:2
**COUNTY** [2] - 1:7, 281:2
**county** [7] - 174:4, 178:21, 208:22, 228:7, 236:6, 260:19, 262:23
**couple** [6] - 76:23, 147:8, 184:21, 184:22, 227:19, 227:22
**course** [16] - 54:23, 80:5, 119:18, 120:7, 122:6, 128:9, 159:2, 168:4, 178:2, 178:5, 185:3, 186:6, 188:2, 189:23, 197:14, 217:17
**court** [24] - 3:17, 4:10, 4:17, 68:14, 84:21, 133:5, 133:7, 133:9, 134:3, 171:5, 171:15, 183:2, 186:2, 196:12, 197:7, 222:12, 233:13, 233:14, 245:16, 245:17, 246:11, 249:22, 250:2, 261:20
**COURT** [2] - 1:1, 1:9

**Court** [11] - 4:7, 4:15, 5:2, 200:11, 203:10, 203:21, 204:20, 209:11, 210:22, 211:9, 214:3
**courtroom** [1] - 264:3
**cousin** [5] - 11:5, 11:13, 11:14, 11:21, 14:14
**coverage** [1] - 62:11
**covered** [3] - 98:3, 230:8, 230:9
**CPS** [25] - 104:5, 104:17, 105:2, 109:9, 109:15, 132:10, 134:21, 135:4, 135:12, 149:18, 260:17, 260:20, 261:10, 264:20, 269:21, 269:22, 270:7, 270:12, 272:11, 272:15, 272:18, 272:20, 272:21, 273:4
**crib** [19] - 74:10, 74:15, 74:17, 75:18, 129:9, 129:11, 129:15, 144:17, 144:22, 165:13, 165:18, 166:15, 166:22, 170:10, 175:12, 176:18, 176:19, 192:3, 206:22
**cribs** [1] - 74:15
**crime** [1] - 202:9
**criminal** [6] - 84:14, 159:3, 159:11, 256:3, 256:4, 264:4
**cross** [3] - 193:23, 204:8, 274:17
**cross-examined** [1] - 193:23
**crossed** [4] - 106:4, 106:14, 106:17, 106:19
**crowds** [7] - 231:6, 231:7, 231:10, 231:11, 251:18, 251:19, 252:7
**Cruse** [1] - 280:13
**cry** [1] - 67:14
**crying** [8] - 108:8, 113:9, 134:17, 137:2, 172:6, 176:5, 176:7
**Crystal** [5] - 2:10, 5:23, 197:20, 198:15, 198:23

**cup** [4] - 80:18, 80:19, 80:20, 81:12
**current** [2] - 32:8, 32:9
**custody** [37] - 12:19, 12:23, 23:14, 33:7, 36:4, 40:17, 40:19, 41:11, 41:22, 42:5, 42:10, 42:11, 43:4, 92:20, 93:8, 214:7, 215:16, 220:13, 220:20, 221:3, 221:10, 221:13, 225:3, 228:11, 239:5, 240:9, 241:3, 245:9, 247:14, 253:7, 253:11, 253:12, 253:19, 253:21, 254:5, 268:6, 271:17
**cut** [2] - 219:3, 219:4

**D**

**dad** [4] - 53:8, 53:11, 53:13, 274:16
**daddy** [3] - 53:8, 53:12, 53:13
**daily** [4] - 108:10, 223:15, 223:17, 224:10
**damages** [5] - 211:6, 211:12, 211:18, 211:22, 212:8
**damp** [1] - 118:10
**Date** [1] - 282:12
**date** [27] - 12:12, 12:14, 12:15, 17:16, 19:7, 19:9, 19:20, 19:22, 20:2, 20:17, 20:23, 21:7, 21:11, 22:4, 40:23, 41:10, 49:5, 115:16, 115:17, 156:18, 213:23, 214:3, 243:22, 257:7, 257:20, 259:13, 263:22
**dated** [8] - 156:6, 156:17, 163:10, 163:12, 171:20, 280:5, 280:6, 280:7
**dates** [8] - 18:6, 18:14, 18:17, 18:18, 22:21, 44:3, 44:6, 66:17
**daughter** [7] - 26:16, 54:23, 99:4, 99:5, 189:21, 189:23, 258:10
**Dave** [2] - 97:3, 97:6
**day-to-day** [1] -

223:17
**days** [21] - 18:7, 31:21, 59:17, 61:5, 112:7, 117:19, 117:20, 118:14, 120:8, 124:10, 124:20, 125:13, 125:14, 140:14, 147:2, 147:8, 148:5, 218:10, 221:16
**deal** [1] - 111:16
**dealing** [1] - 58:12
**death** [18] - 18:12, 21:7, 22:4, 41:2, 41:10, 70:14, 71:23, 77:13, 82:10, 83:6, 103:13, 103:17, 103:22, 109:12, 109:13, 109:14, 115:6, 115:17, 116:22, 117:4, 164:12, 164:19, 202:8, 256:23
**Debow** [1] - 197:10
**DEBOW** [6] - 199:6, 201:16, 201:19, 201:21, 203:17, 204:14
**decade** [2] - 18:5, 18:7
**deceleration** [2] - 266:8, 267:8
**deceleration-type** [1] - 266:8
**December** [1] - 25:22
**decide** [2] - 112:7, 193:3
**decided** [1] - 55:4
**decides** [1] - 211:9
**decision** [2] - 200:10, 214:3, 271:14
**declare** [1] - 48:23
**Defendant** [1] - 1:15
**defendant** [4] - 5:6, 5:18, 204:16, 268:4
**Defendant's** [16] - 155:20, 155:22, 156:4, 156:14, 157:13, 158:6, 160:7, 162:7, 163:9, 163:11, 163:13, 163:14, 163:18, 165:2, 169:4, 280:3
**Defendants** [1] - 1:8
**defendants** [1] - 254:14
**defense** [2] - 159:8, 234:3
**degrees** [1] - 30:10
**demonstrate** [5] - 195:5, 195:17,

195:19, 196:14, 199:10

**demonstrated** [7] - 194:10, 194:11, 194:17, 195:2, 195:15, 195:21, 196:18

**demonstration** [5] - 199:19, 201:11, 204:5, 204:7, 208:6

**demonstrations** [1] - 194:4

**denies** [1] - 201:5

**denting** [1] - 112:11

**dentist** [4] - 92:12, 93:5, 93:9, 93:11

**department** [14] - 172:20, 208:10, 209:18, 210:17, 212:15, 214:7, 214:14, 214:17, 225:20, 229:9, 229:22, 238:4, 253:12, 254:4

**Department** [16] - 4:4, 198:15, 214:21, 258:23, 259:20, 259:23, 260:14, 260:22, 264:7, 264:22, 265:20, 266:6, 266:13, 268:5, 268:11, 272:12

**dependency** [1] - 94:18

**depicts** [2] - 155:11, 155:17

**Depo** [2] - 45:7, 46:17

**depose** [1] - 211:11

**deposing** [1] - 198:21

**deposition** [12] - 3:18, 97:15, 98:12, 98:13, 102:18, 102:21, 197:14, 201:4, 202:15, 203:22, 211:15, 211:16

**Deposition** [3] - 163:11, 279:23, 280:7

**DEPOSITION** [1] - 1:17

**Depot** [7] - 45:20, 46:4, 46:7, 47:12, 47:18, 49:4, 97:5

**depressed** [4] - 223:22, 224:2, 229:20, 251:20

**depression** [1] - 228:17

**Derst** [4] - 36:22, 37:8,

37:17, 44:17

**describe** [14] - 68:5, 69:2, 75:17, 76:15, 76:16, 77:7, 77:13, 96:8, 110:3, 125:19, 169:19, 194:17, 202:2, 234:16

**described** [12] - 15:17, 65:5, 109:23, 111:20, 118:15, 121:23, 140:9, 143:19, 191:23, 199:11, 210:3, 210:4

**desire** [1] - 240:11

**detective** [2] - 207:15, 207:17

**Detective** [3] - 157:13, 157:21, 194:22

**detectives** [3] - 41:22, 139:11, 268:4

**devoting** [1] - 184:8

**diagnosed** [1] - 94:17

**dial** [1] - 129:21

**dialed** [3] - 129:21, 177:8, 192:12

**diaper** [1] - 69:3

**diapers** [1] - 129:6

**die** [6] - 154:18, 180:4, 180:6, 180:15, 181:5, 181:7

**died** [19] - 21:23, 22:14, 25:17, 25:19, 89:12, 147:14, 162:21, 165:4, 165:13, 165:18, 168:21, 180:9, 180:12, 180:13, 180:14, 180:18, 181:13, 181:14, 200:15

**diem** [1] - 32:10

**diet** [5] - 234:17, 234:21, 235:7, 237:4, 237:6

**difference** [4] - 89:20, 125:22, 165:21, 271:13

**different** [29] - 28:3, 32:13, 33:19, 34:7, 34:9, 38:11, 39:6, 68:15, 69:9, 69:23, 77:5, 81:2, 126:11, 169:11, 179:3, 180:22, 209:3, 221:4, 221:14, 223:19, 235:7, 237:4, 237:10, 238:4, 248:20, 251:3, 251:5, 251:15, 252:8

**differential** [1] - 45:13

**difficult** [4] - 185:10, 185:14, 193:13, 211:20

**dinner** [4] - 135:8, 135:9, 135:11

**diplomas** [1] - 30:10

**direct** [5] - 6:12, 58:8, 162:14, 163:2, 197:3

**directed** [1] - 204:4

**direction** [1] - 119:6

**directly** [2] - 76:11, 76:12

**disagree** [3] - 181:2, 191:14, 258:18

**disagreement** [1] - 115:21

**disagreements** [1] - 80:3

**disciplinary** [1] - 115:22

**discipline** [7] - 109:17, 111:12, 111:18, 113:6, 116:7, 116:9, 172:8

**disciplined** [4] - 109:22, 115:19, 116:8, 116:10

**disciplining** [1] - 113:22

**disclosed** [2] - 4:5, 4:10

**discoverable** [1] - 203:20

**discovered** [1] - 170:23

**discovered..** [1] - 107:18

**discovery** [2] - 202:18, 203:19

**discuss** [5] - 6:19, 7:4, 193:21, 194:4, 230:3, 230:17, 273:15

**discussed** [7] - 25:7, 26:19, 97:18, 98:2, 211:15, 248:10, 248:15

**discussing** [3] - 113:13, 113:18, 113:21

**discussion** [8] - 12:6, 30:6, 43:19, 116:15, 156:12, 157:2, 197:12, 256:16

**dishes** [2] - 50:4, 135:14

**dispute** [3] - 201:8, 203:6, 203:7

**distant** [1] - 77:3

**distraught** [2] - 274:6, 274:10

**DISTRICT** [2] - 1:1, 1:1

**division** [1] - 63:12

**divorce** [1] - 24:9

**divorced** [6] - 20:14, 20:19, 21:20, 22:15, 24:5, 101:7

**divulge** [3] - 97:18, 98:2, 187:8

**DOCCS** [10] - 214:18, 215:2, 217:18, 218:14, 220:10, 222:14, 224:22, 230:6, 230:13, 231:2

**doctor** [12] - 71:16, 92:12, 92:18, 92:21, 119:3, 119:6, 127:16, 128:8, 149:14, 180:16, 265:16, 267:17

**doctor's** [4] - 117:12, 119:12, 119:22, 182:7

**doctors** [3] - 147:21, 149:9

**document** [2] - 258:3, 259:15

**documents** [2] - 22:9, 164:2

**done** [8] - 91:8, 103:7, 137:5, 192:23, 206:11, 211:19, 250:13, 254:8

**door** [15] - 104:5, 104:18, 104:22, 105:11, 105:12, 138:16, 139:3, 139:4, 139:9, 139:11, 150:5, 150:18, 152:8, 153:10, 162:8

**dose** [1] - 129:2

**Douglas** [7] - 9:13, 9:16, 14:12, 14:23, 15:2, 23:10, 36:11

**down** [29] - 6:11, 10:23, 16:11, 16:15, 35:14, 56:17, 57:19, 105:13, 105:23, 106:3, 126:12, 129:10, 129:12, 143:4, 146:5, 150:9, 150:17, 151:8, 151:17, 153:13, 158:19, 158:21, 159:15, 164:10, 168:14, 219:3, 219:8, 225:7, 269:6

**downs** [4] - 76:19,

77:2, 77:7, 77:9

**downstate** [1] - 212:17

**Downstate** [4] - 212:20, 213:13, 213:20, 214:9

**Dr** [16] - 5:23, 197:20, 198:16, 263:19, 263:21, 264:3, 264:6, 264:20, 265:5, 265:11, 265:16, 265:19, 266:5, 268:3, 268:10, 269:10

**dress** [1] - 96:12

**dried** [1] - 139:9

**drive** [2] - 31:9, 237:20

**driving** [2] - 34:10, 250:7

**dropped** [5] - 166:15, 175:11, 192:15, 219:5, 219:6

**drops** [1] - 192:15

**drug** [2] - 94:17, 94:23

**drugs** [3] - 87:7, 90:3, 90:12

**dry** [1] - 32:4

**DSS** [2] - 4:4, 65:20

**due** [7] - 63:19, 78:14, 105:6, 200:12, 232:6, 232:14, 250:10

**Dukes** [15] - 11:16, 11:18, 17:5, 17:7, 17:8, 22:22, 24:23, 25:5, 27:5, 27:6, 27:14, 27:20, 28:3, 101:2

**duly** [1] - 5:11

**duplicate** [1] - 160:3

**duration** [1] - 28:11

**during** [50] - 23:22, 28:19, 35:15, 37:14, 37:23, 40:7, 43:7, 44:12, 49:3, 64:9, 64:20, 67:10, 70:23, 76:18, 77:12, 83:4, 86:19, 95:6, 96:7, 103:7, 103:11, 115:5, 115:16, 118:16, 121:4, 121:20, 122:3, 123:20, 128:9, 134:20, 135:15, 136:5, 141:11, 143:11, 143:21, 146:15, 146:17, 151:12, 152:17, 160:4, 160:6, 160:12, 180:10,

# APPENDIX

193:22, 217:17, 222:14, 225:5, 227:12, 237:13, 237:19
**during..** [1] - 222:13
**dying** [2] - 243:4, 244:11

## E

**ear** [1] - 123:8
**early** [2] - 31:16, 198:22
**eat** [5] - 75:13, 99:14, 125:6, 234:22, 235:4
**eating** [2] - 118:13, 121:20
**economic** [1] - 246:17
**economically** [1] - 252:21
**Edge** [11] - 263:19, 263:21, 264:3, 264:6, 264:20, 265:5, 265:19, 266:5, 267:15, 268:10, 269:10
**edge's** [1] - 268:3
**educational** [3] - 29:9, 30:14, 240:5
**effect** [2] - 262:13, 264:12
**effects** [3] - 229:10, 230:4, 230:19
**eight** [5] - 31:21, 108:10, 237:23, 243:18, 243:23
**eight-year-old** [1] - 108:10
**either** [10] - 5:5, 50:4, 86:18, 97:4, 97:5, 109:21, 133:6, 264:23, 265:18, 266:7
**elements** [1] - 202:10
**elevated** [1] - 76:8
**elicited** [1] - 4:18
**emotional** [1] - 8:6
**emotionally** [1] - 29:2
**employed** [1] - 263:22
**employer** [1] - 34:13
**employers** [2] - 33:19, 34:4
**employment** [13] - 30:13, 31:6, 32:20, 35:12, 39:2, 44:7, 45:20, 46:3, 49:3, 50:16, 50:19, 65:17, 252:15
**empty** [1] - 205:13

**EMT** [3] - 130:20, 131:9, 131:11
**end** [7] - 35:12, 115:10, 115:13, 132:2, 142:7, 176:6, 218:18
**ended** [3] - 116:23, 215:6, 215:16
**ending** [1] - 115:7
**Enfamil** [3] - 118:21, 121:12, 121:13
**enforcement** [3] - 132:9, 153:23, 154:8
**engaging** [1] - 97:13
**Englewood** [1] - 14:12
**enjoyed** [2] - 81:9, 81:10
**enjoyment** [2] - 95:14, 250:7
**entail** [1] - 31:10
**entered** [1] - 253:8
**entertainment** [1] - 95:15
**entire** [5] - 50:16, 76:18, 168:2, 193:17, 227:12
**entitled** [3] - 156:5, 163:9, 163:11
**equal** [1] - 77:9
**escalate** [2] - 81:13, 81:15
**escape** [3] - 150:18, 153:8, 153:10
**escaping** [1] - 153:4
**escort** [1] - 221:17
**escorted** [2] - 148:9, 215:16
**Esq** [3] - 2:2, 2:6, 2:10
**essentially** [1] - 6:8
**estimate** [1] - 17:22
**estopped** [1] - 200:22
**estranged** [1] - 221:21
**estrangement** [1] - 252:6
**evening** [4] - 31:17, 63:2, 272:13, 275:12
**event** [3] - 157:3, 201:2, 211:9
**events** [4] - 71:2, 103:19, 103:21, 174:17
**eventually** [5] - 160:8, 160:14, 160:16, 234:11, 241:4
**evidence** [2] - 200:15, 208:11
**ex** [3] - 100:21, 101:5, 101:6
**ex-gang** [1] - 221:6
**ex-wife** [2] - 100:21,

101:5
**exact** [1] - 104:9
**exactly** [6] - 146:7, 146:22, 162:5, 181:6, 212:21, 234:8
**EXAMINATION** [2] - 5:13, 254:9
**Examination** [1] - 3:16
**examination** [2] - 3:4, 3:9
**examined** [2] - 5:11, 193:23
**example** [13] - 6:23, 8:17, 18:8, 30:13, 31:16, 39:8, 50:12, 65:20, 71:15, 84:22, 122:18, 123:5, 240:18
**except** [3] - 3:12, 190:20, 191:6
**excuse** [2] - 171:7, 187:13
**executed** [1] - 259:21
**exhibit** [1] - 156:9
**Exhibit** [9] - 155:22, 156:4, 156:15, 257:16, 257:20, 258:8, 259:8, 260:3, 279:21
**EXHIBITS** [1] - 280:1
**Exhibits** [1] - 163:14
**exhibits** [1] - 259:17
**existence** [1] - 203:7
**experience** [1] - 215:3
**experienced** [2] - 229:8, 231:2
**experiences** [1] - 251:14
**expire** [1] - 244:3
**expired** [1] - 243:12
**explain** [2] - 67:23, 250:12
**explaining** [1] - 225:14
**expression** [1] - 250:8
**Extension** [2] - 1:21, 2:9
**extent** [2] - 157:16, 271:5
**eye** [1] - 138:21
**eyes** [6] - 53:20, 131:7, 168:17, 177:11, 193:6

## F

**fabrication** [1] - 179:12
**face** [10] - 56:4,

130:14, 177:11, 192:15, 216:18, 216:20, 217:11, 219:16, 220:4
**faced** [1] - 215:5
**facilities** [1] - 215:3
**facility** [4] - 212:16, 213:4, 213:5, 213:14
**fact** [8] - 54:17, 63:19, 78:20, 79:8, 79:11, 122:4, 241:2, 249:9
**factory** [1] - 73:14
**fair** [1] - 67:19
**fairly** [4] - 91:8, 92:3, 92:5, 92:8
**faith** [2] - 247:5, 247:7
**falling** [1] - 206:20
**false** [10] - 172:11, 179:20, 179:23, 200:11, 200:19, 200:23, 208:6, 260:10, 260:12, 260:14
**falsely** [1] - 268:5
**familiar** [3] - 173:7, 268:8
**family** [30] - 10:11, 10:13, 62:12, 62:14, 62:15, 65:7, 73:16, 75:13, 77:18, 77:20, 77:22, 81:4, 81:6, 84:21, 84:23, 86:19, 108:5, 171:5, 171:15, 222:12, 235:13, 235:20, 238:19, 245:15, 245:17, 246:11, 247:3, 249:22, 255:16, 277:16
**family's** [1] - 95:17
**fan** [1] - 131:8
**fanning** [1] - 192:16
**far** [3] - 59:15, 117:18, 238:2
**Farms** [1] - 44:14
**father** [7] - 53:8, 73:12, 73:16, 90:13, 95:22, 113:4, 252:4
**faucet** [3] - 177:10, 192:14
**fear** [1] - 251:18
**fed** [1] - 128:21, 128:22, 140:13
**federal** [3] - 4:5, 4:17, 197:21
**feeding** [10] - 69:4, 74:3, 125:4, 128:13, 128:19, 129:7, 135:6, 135:8, 135:11, 193:19

**feedings** [1] - 145:19
**felt** [6] - 168:22, 184:12, 184:13, 194:14, 211:15, 271:15
**female** [1] - 173:12
**fever** [34] - 117:6, 117:19, 117:21, 117:22, 119:4, 120:9, 120:12, 120:14, 120:18, 121:5, 122:5, 122:9, 122:12, 122:14, 122:23, 123:6, 123:16, 123:17, 123:22, 124:2, 124:11, 124:22, 125:12, 125:14, 126:19, 126:23, 127:2, 127:4, 128:6, 128:21, 140:14, 208:2
**fevers** [1] - 122:18
**few** [9] - 14:16, 14:17, 118:14, 120:8, 120:10, 140:14, 154:14, 192:15, 254:16
**fight** [7] - 216:4, 216:12, 217:9, 217:12, 217:15, 218:16, 218:17
**fighting** [2] - 72:20, 219:7
**fights** [7] - 215:6, 215:15, 215:17, 215:19, 215:20, 216:2, 230:11
**file** [3] - 19:7, 19:9, 54:17
**filed** [2] - 5:19, 222:20
**filing** [1] - 3:8
**finally** [2] - 129:12, 160:21
**financially** [3] - 28:19, 29:2, 185:5
**fine** [8] - 71:15, 161:7, 161:15, 161:19, 193:10, 196:23, 231:16, 264:18
**fingers** [2] - 114:15, 114:18
**finish** [1] - 6:15

**fired** [3] - 34:18, 35:20, 35:23
**First** [1] - 2:5
**first** [47] - 5:10, 9:7, 12:9, 32:21, 41:19,

59:21, 60:2, 116:17, 117:13, 118:14, 120:14, 121:5, 124:10, 124:20, 125:13, 125:14, 142:5, 142:8, 146:19, 147:6, 147:10, 154:6, 181:16, 181:19, 190:19, 192:8, 199:9, 199:21, 212:16, 216:3, 241:20, 242:5, 242:8, 253:10, 256:4, 257:8, 264:4, 265:13, 268:6, 268:20, 269:7, 270:8, 272:23, 273:3, 279:3, 279:8
**fist** [1] - 114:12
**five** [15] - 17:20, 33:15, 40:4, 40:8, 46:19, 72:9, 136:11, 214:10, 214:15, 226:10, 238:7, 238:10, 238:15, 250:21, 268:2
**floor** [6] - 76:8, 76:11, 76:13, 144:15, 147:20, 206:13 ▆▆▆▆▆10, 13:14, 15:6
**folder** [1] - 200:3
**follow** [3] - 80:7, 180:23, 181:12
**follow-up** [2] - 80:7, 181:12
**followed** [1] - 192:18
**following** [1] - 35:18
**follows** [1] - 5:12
**food** [1] - 65:6
**foot** [2] - 90:19, 94:3
**football** [1] - 96:23
**force** [1] - 108:7
**foregoing** [2] - 281:5, 282:6
**forgot** [4] - 96:3, 182:5, 182:7, 209:23
**form** [18] - 3:12, 41:12, 82:16, 103:16, 123:12, 153:19, 157:15, 161:12, 163:2, 167:14, 178:12, 190:20, 191:6, 191:15, 229:14, 256:12, 259:2, 264:10
**formally** [1] - 53:17
**forth** [5] - 15:8, 15:10, 78:16, 144:8, 192:13

**forward** [3] - 7:7, 105:18, 191:13
**fought** [1] - 216:14
**founded** [1] - 190:13
**FOUNTAIN** [1] - 1:6
**Fountain** [10] - 2:7, 139:15, 142:22, 143:8, 146:13, 148:3, 157:14, 157:21, 254:15, 264:14
**four** [36] - 24:16, 24:18, 28:14, 28:15, 28:16, 28:20, 31:15, 32:15, 32:20, 33:15, 33:23, 34:4, 45:9, 46:19, 47:16, 49:4, 64:6, 64:9, 64:17, 64:21, 65:12, 66:2, 69:18, 72:9, 74:23, 87:17, 106:5, 106:6, 106:14, 175:2, 206:4, 214:10, 214:15, 238:7, 238:10
**four-lane** [3] - 106:5, 106:6, 106:14
**four-year** [2] - 49:4, 64:9
**fourth** [1] - 125:16
**fractured** [1] - 279:7
**fractures** [6] - 170:21, 170:23, 171:8, 171:14, 171:20, 172:3
**frame** [4] - 18:19, 28:12, 76:10, 121:2
**freckles** [4] - 56:7, 57:3, 57:4, 57:18
**free** [2] - 43:4, 268:16
**Freighters** [1] - 35:8
**frequency** [1] - 110:8
**frequently** [1] - 115:7
**fresh** [1] - 7:11
**Friday** [6] - 120:19, 121:4, 125:11, 126:23, 127:3, 251:9
**friend** [5] - 97:3, 97:10, 97:11, 98:10, 98:16
**friends** [5] - 97:13, 99:9, 99:10, 102:5, 102:6
**front** [8] - 80:12, 95:21, 106:6, 106:8, 139:4, 150:5, 168:17, 175:22
**Frost** [10] - 98:20, 99:3, 99:17, 99:18, 100:2, 101:10,

101:14, 182:2, 182:4
**Frost's** [1] - 99:5
**frustrated** [1] - 223:11
**fulfillment** [1] - 246:22
**full** [5] - 9:7, 129:2, 129:8, 226:10, 243:23
**functions** [2] - 74:6, 86:19
**funeral** [2] - 215:10, 238:21
**furtherance** [1] - 5:7

## G

**gains** [1] - 64:2
**gang** [2] - 16:19, 221:6
**gangs** [1] - 95:4
**Garelick** [5] - 44:14, 45:2, 45:20, 46:3, 47:14
**gathered** [2] - 5:6, 188:2
**gatherings** [1] - 86:19
**GED** [5] - 29:12, 240:7, 240:12, 240:15, 240:19
**General** [4] - 2:12, 2:13, 5:17, 6:4
**general** [4] - 18:19, 221:4, 221:8, 221:14
**General's** [1] - 198:12
**generally** [3] - 20:16, 31:22, 237:22
**generated** [2] - 157:6, 159:2
**Georgia** [33] - 9:13, 13:12, 23:10, 24:21, 24:22, 25:2, 29:20, 42:21, 49:10, 49:13, 49:14, 49:16, 49:20, 51:10, 52:5, 73:9, 73:14, 73:16, 73:17, 84:15, 84:18, 84:22, 86:18, 236:9, 244:4, 244:7, 244:9, 244:15, 244:17, 245:22, 247:22, 247:23, 260:8
**gestures** [1] - 6:21
**Gig** [3] - 88:4, 88:5, 89:3
**gig** [1] - 89:3
**gigolo** [1] - 88:4
**Ginsberg** [1] - 2:5
**girl** [1] - 88:4
**girlfriend** [3] - 82:13, 82:19, 82:23

**girlfriends** [1] - 88:13
**given** [3] - 16:14, 167:22, 169:5
**glass** [5] - 80:18, 80:20, 81:11, 112:14
**glasses** [1] - 8:10
**goal** [1] - 240:11
**gonna** [1] - 16:21
**goods** [1] - 32:4
**got..** [1] - 220:17
**government** [1] - 65:19
**grab** [1] - 131:4
**grade** [10] - 29:14, 29:17, 29:18, 30:8, 49:19, 50:6, 50:11, 50:14, 51:10, 52:4
**graduate** [1] - 29:17
**graduated** [1] - 29:10
**grandparents** [4] - 73:4, 73:5, 73:6, 73:20
**greeted** [1] - 150:6
**grew** [1] - 24:10
**Griffin** [1] - 2:5
**grocery** [1] - 32:5
**ground** [2] - 200:2, 200:3
**group** [2] - 96:5, 149:13
**grow** [1] - 86:9
**growing** [7] - 51:19, 86:14, 90:2, 92:7, 251:6, 251:21, 252:2
**guard** [3] - 147:22, 148:17, 216:10
**guess** [2] - 41:21, 262:4
**guilty** [4] - 200:14, 208:18, 209:12, 218:7
**guy** [11] - 88:8, 88:11, 97:3, 104:4, 104:22, 130:20, 139:15, 148:16, 173:2, 173:3, 216:4
**guys** [2] - 73:14, 184:17

## H

**hair** [1] - 96:12
**half** [9] - 46:2, 53:3, 126:10, 144:20, 144:21, 144:22, 226:10, 238:15, 250:21
**hallway** [2] - 150:16, 153:6

6:2, 86:6, 197:19, 198:13
**hand** [23] - 6:21, 109:21, 111:20, 111:23, 112:8, 112:16, 113:23, 114:3, 114:5, 114:7, 114:8, 114:10, 114:13, 114:14, 114:18, 131:4, 131:5, 177:9, 192:14, 199:13, 206:13
**handcuff** [2] - 268:19, 272:9
**handcuffs** [3] - 270:5, 270:19, 272:4
**handed** [2] - 128:19, 131:2
**handing** [4] - 156:8, 162:13, 205:12
**handling** [1] - 186:2
**hands** [3] - 130:13, 206:12, 260:9
**hang** [3] - 95:18, 99:11, 248:18
**happy** [5] - 55:15, 69:7, 69:8, 69:13, 70:3, 72:21
**harass** [1] - 203:12
**hard** [2] - 165:13, 187:20
**hardship** [1] - 185:4
**harm** [3] - 151:14, 178:9, 256:6
**hate** [1] - 251:18
**hating** [1] - 251:23
**haul** [1] - 31:12
**head** [25] - 6:20, 6:23, 116:11, 122:20, 123:10, 151:5, 153:11, 154:17, 164:8, 164:9, 165:19, 165:20, 167:4, 167:20, 170:8, 170:12, 175:12, 175:21, 175:22, 175:23, 187:21, 206:12, 219:16
**headaches** [2] - 217:7, 217:9
**heading** [1] - 281:6
**healing** [1] - 279:7
**health** [18] - 70:10, 70:15, 70:23, 90:15, 91:17, 91:23, 92:2, 92:7, 122:4, 122:7, 225:16, 227:23,

# APPENDIX

228:6, 228:12, 228:21, 229:8, 274:8, 274:9
**healthier** [1] - 111:5
**healthy** [7] - 67:12, 71:9, 92:3, 92:5, 92:8, 92:10, 230:15
**hear** [6] - 6:15, 137:3, 194:7, 252:2, 253:10, 266:19
**heard** [17] - 48:9, 48:13, 48:14, 58:17, 70:7, 104:18, 108:6, 139:9, 177:12, 177:14, 192:17, 203:17, 216:4, 216:7, 263:18, 265:11, 279:8
**hearing** [3] - 8:17, 8:18, 217:15
**heart** [1] - 177:7
**heartbeat** [1] - 130:12
**heat** [1] - 65:6
**heavier** [1] - 57:12
**height** [3] - 89:9, 89:11, 89:13
**held** [10] - 1:18, 12:6, 30:6, 43:19, 116:15, 156:12, 157:2, 197:12, 246:2, 256:16
**hell** [2] - 215:13, 225:14
**help** [5] - 65:16, 123:21, 127:10, 240:8, 277:20
**helped** [1] - 65:7
**helping** [1] - 65:20
**hereby** [4] - 3:2, 4:16, 281:4, 282:6
**hereof** [1] - 281:6
**hereto** [1] - 3:4
**hi** [1] - 251:11
**Hicks** [33] - 17:5, 17:15, 19:19, 20:5, 20:9, 20:14, 20:19, 24:20, 25:5, 26:12, 26:14, 52:8, 52:16, 54:2, 83:9, 83:23, 113:5, 136:16, 136:18, 141:15, 254:22, 257:22, 258:9, 259:19, 259:22, 260:6, 263:8, 274:22, 275:5, 275:14, 275:18, 280:11, 280:12
**Hicks'** [1] - 26:16
**High** [2] - 29:22, 30:8

**high** [7] - 16:11, 29:10, 29:14, 29:21, 91:18, 118:5, 118:7
**higher** [1] - 45:16
**highest** [2] - 29:14, 38:17
**highway** [3] - 106:5, 106:6, 106:15
**himself** [1] - 105:3
**hire** [1] - 65:13
**history** [1] - 44:7
**hit** [16] - 108:8, 114:20, 116:11, 154:17, 165:19, 165:21, 165:23, 167:4, 167:20, 175:12, 175:21, 176:19, 216:13, 258:15
**hitting** [3] - 108:7, 113:14, 182:15
**hobbies** [5] - 95:13, 96:20, 96:22, 248:11, 248:14
**hold** [6] - 20:17, 44:6, 49:23, 114:8, 168:18, 198:9
**holidays** [2] - 247:2, 251:8
**home** [36] - 10:11, 12:3, 31:20, 40:15, 59:23, 60:3, 60:9, 60:18, 60:23, 62:21, 62:23, 63:2, 63:4, 63:6, 63:15, 66:7, 66:9, 66:14, 66:16, 66:19, 67:4, 67:7, 71:23, 72:3, 72:5, 77:13, 83:5, 84:5, 85:7, 96:13, 115:5, 118:23, 133:17, 135:12, 143:22, 145:17
**Home** [9] - 45:7, 45:20, 46:3, 46:7, 46:17, 47:11, 47:18, 49:4, 97:5
**hometown** [2] - 23:10, 23:11
**honored** [1] - 244:15
**Hoosick** [7] - 43:14, 43:15, 43:22, 106:11, 106:17, 106:20, 106:21
**hopped** [1] - 139:7
**horror** [1] - 70:7
**Hospital** [1] - 274:4
**hospital** [58] - 25:18, 57:22, 60:3, 60:5, 60:6, 60:10, 60:15,

60:21, 61:5, 61:17, 62:10, 62:13, 62:21, 63:5, 63:7, 66:7, 77:13, 83:5, 115:6, 117:2, 117:11, 117:14, 118:23, 119:11, 120:15, 120:19, 120:22, 121:6, 128:4, 128:9, 131:15, 140:18, 142:20, 143:22, 145:17, 147:15, 147:16, 147:19, 152:5, 152:10, 152:11, 152:17, 158:9, 160:14, 160:15, 176:15, 207:8, 219:17, 257:8, 261:2, 261:5, 261:10, 269:2, 269:4, 273:23, 275:10, 275:13, 279:2
**hot** [2] - 125:21, 126:3
**hotel** [2] - 99:7, 246:19
**hour** [5] - 37:13, 45:18, 84:13, 96:14, 126:9
**hours** [23] - 7:16, 59:17, 132:15, 132:17, 132:18, 146:20, 146:21, 146:22, 147:10, 147:11, 148:5, 150:3, 221:16, 237:22, 237:23, 238:2, 238:6, 238:7, 238:10, 238:13, 270:9
**house** [46] - 12:17, 15:9, 63:19, 64:2, 75:4, 75:8, 78:14, 81:7, 81:20, 81:22, 84:3, 84:7, 95:17, 96:9, 104:17, 105:8, 105:9, 105:14, 105:22, 106:7, 106:8, 107:3, 107:15, 107:16, 123:23, 131:23, 132:2, 132:10, 132:11, 132:13, 132:14, 132:22, 133:2, 134:17, 134:20, 135:5, 135:13, 144:14, 145:15, 173:5, 177:16, 223:20, 248:18, 260:21,

261:11, 261:18
**housed** [1] - 213:14
**household** [7] - 63:12, 71:22, 144:13, 277:9, 277:12, 278:22
**hung** [1] - 142:2, 142:10, 142:15
**hurt** [5] - 90:23, 174:20, 175:2, 223:11, 223:12
**hurts** [1] - 91:5
**hysterical** [2] - 134:16, 136:19

## I

**Ibuprofen** [3] - 94:2, 94:10, 217:6
**idea** [8] - 44:7, 133:23, 190:7, 257:4, 260:15, 276:20, 279:12, 279:14
**identical** [1] - 57:9
**identification** [9] - 155:23, 163:15, 257:17, 257:21, 258:8, 259:9, 259:12, 260:4, 279:22
**identified** [1] - 57:8
**identify** [1] - 56:3
**ill** [3] - 128:20, 180:12, 180:13
**illegal** [1] - 7:21
**illness** [1] - 164:4
**immediate** [1] - 6:3
**immediately** [2] - 60:18, 264:22
**impairment** [1] - 8:4
**impasse** [3] - 198:4, 199:2, 199:4
**improper** [5] - 190:23, 191:5, 191:9, 201:14, 203:13
**improved** [1] - 252:15
**inability** [3] - 223:7, 223:9, 229:19
**inaccurate** [1] - 258:22
**incarcerated** [26] - 29:12, 41:20, 213:19, 214:14, 215:2, 220:10, 226:8, 227:13, 229:21, 230:5, 230:13, 231:2, 232:23, 236:22, 237:5, 237:7,

240:20, 243:7, 243:23, 247:15, 248:10, 249:2, 249:10, 251:4, 252:22, 253:4
**incarceration** [17] - 10:2, 10:4, 41:17, 46:14, 49:5, 51:17, 66:3, 95:6, 213:15, 214:16, 217:17, 220:15, 222:14, 226:15, 230:18, 248:21, 252:9
**inch** [1] - 219:5
**incident** [16] - 70:14, 71:3, 80:23, 85:4, 92:13, 92:16, 103:12, 103:17, 105:21, 105:22, 108:4, 109:4, 109:10, 109:12, 274:23, 279:16
**incidents** [3] - 80:22, 109:13, 220:9
**include** [1] - 53:7
**including** [4] - 53:15, 72:10, 182:16, 203:22
**income** [8] - 51:4, 63:18, 63:22, 241:6, 252:14, 277:8, 277:12, 278:21
**Incorporated** [1] - 35:8
**incorrect** [1] - 27:21
**incorrectly** [1] - 25:16
**indefinitely** [1] - 131:23
**INDEX** [1] - 280:1



**indicate** [1] - 120:18
**indicates** [2] - 258:9, 260:7
**individual** [1] - 203:23
**infant** [4] - 18:12, 59:12, 72:5, 124:14
**infection** [3] - 123:8, 181:14, 200:16
**information** [15] - 4:18, 5:6, 71:18,

# APPENDIX

106:4, 106:14, 108:12, 187:23, 188:3, 188:19, 193:14, 203:20, 267:14, 267:18, 270:3, 271:9
**Inga** [5] - 73:11, 83:9, 83:13, 275:18, 275:22
**initial** [4] - 127:11, 127:13, 268:3, 273:4
**injured** [2] - 263:23, 279:10
**injuries** [21] - 90:18, 164:11, 164:19, 168:9, 176:11, 216:17, 216:22, 217:12, 219:13, 219:15, 219:21, 220:10, 230:10, 230:12, 264:7, 264:11, 264:16, 266:15, 276:9, 277:9, 277:13
**injury** [3] - 265:21, 266:6, 266:8
**inmate** [1] - 219:9
**inmates** [1] - 219:3
**innocent** [1] - 202:9
**inside** [14] - 104:19, 104:20, 104:21, 107:16, 131:12, 134:17, 134:18, 146:8, 149:13, 151:9, 174:4, 177:15, 216:10
**instance** [1] - 35:22
**instructions** [1] - 273:8
**intend** [1] - 101:12
**intensive** [1] - 61:12
**intention** [1] - 102:7
**intentional** [1] - 165:23
**intentionally** [1] - 166:13
**interaction** [1] - 153:23
**intercede** [1] - 198:7
**interested** [2] - 187:21, 187:23
**interpretation** [1] - 42:4
**interrogated** [1] - 41:23
**interrogation** [4] - 199:22, 232:18, 255:23, 272:7
**intervention** [1] - 199:5

**interview** [14] - 146:11, 156:18, 156:19, 156:22, 157:8, 157:18, 172:20, 207:10, 207:15, 209:19, 268:20, 270:8, 270:23, 271:23
**Interview** [2] - 156:6, 280:5
**interviewed** [3] - 109:2, 109:9, 109:15
**interviews** [1] - 157:4
**into..** [1] - 125:16
**introduced** [3] - 105:3, 139:13, 200:5
**investigation** [2] - 4:3, 209:20
**invited** [1] - 105:2
**involuntary** [2] - 253:8, 253:14
**involve** [1] - 127:10
**involved** [3] - 58:7, 105:22, 108:5
**involvement** [6] - 58:9, 85:3, 103:13, 103:22, 104:3, 107:23
**involving** [1] - 85:4

**isolating** [1] - 252:7
**isolation** [1] - 229:18

**issue** [4] - 55:17, 56:8, 202:20, 252:6
**issued** [2] - 57:23, 82:6
**issues** [10] - 70:10, 70:15, 79:2, 91:16, 91:17, 91:23, 92:2, 92:7, 116:18, 159:22
**it'll** [1] - 133:8
**itself** [1] - 22:9

## J

[1] - 27:11
**jail** [14] - 167:23, 172:17, 173:14, 174:5, 178:22, 208:22, 212:15, 213:18, 214:8, 228:7, 236:6,

260:19, 262:19, 262:23

:22, 27:6

**Jasper** [18] - 104:23, 173:2, 173:7, 173:13, 174:23, 175:13, 175:18, 175:19, 175:20, 176:2, 176:4, 176:14, 176:17, 176:22, 177:21, 179:10, 179:11, 179:20
**Jasper's** [1] - 186:11
**jealous** [5] - 183:19, 183:21, 183:23, 184:4, 184:8
**Jeanne** [3] - 1:21, 282:4, 282:12
**Jerome** [1] - 99:5
**Jerry** [1] - 182:2
**job** [4] - 34:19, 65:11, 65:21, 240:16
**jobs** [11] - 32:22, 34:21, 35:9, 36:3, 44:17, 47:21, 48:23, 49:23, 52:3, 52:6
**Joe** [5] - 5:21, 197:21, 198:14, 254:13, 259:17
**John** [2] - 265:11, 265:16
**Johnson** [3] - 1:19, 2:8, 205:18
**Joseph** [1] - 2:6
**Jr** [4] - 26:3, 26:8, 53:6, 105:15
**judge** [5] - 5:2, 68:16, 198:7, 211:3, 211:16
**Judge** [8] - 197:10, 199:15, 199:20, 202:18, 202:22, 203:14, 204:12, 204:17
**JUDGE** [6] - 199:6, 201:16, 201:19, 201:21, 203:17, 204:14
**July** [4] - 26:4, 66:16, 104:10, 104:11
**jump** [1] - 147:15
**jumped** [1] - 192:12
**June** [13] - 13:4, 16:7,

19:3, 19:10, 19:16, 23:14, 33:7, 40:18, 42:9, 66:16, 104:10, 105:21
**jury** [2] - 208:13, 208:15

## K

**keep** [5] - 65:21, 126:12, 138:21, 218:11, 240:17
**kept** [2] - 110:17, 129:9
**kid** [1] - 123:5
**kids** [26] - 18:20, 18:21, 62:7, 63:15, 64:17, 64:22, 69:18, 69:22, 72:4, 72:7, 72:11, 84:6, 87:17, 113:9, 115:19, 122:18, 123:7, 124:7, 144:12, 173:21, 183:3, 183:5, 183:8, 184:9, 184:14, 272:16
**killed** [1] - 255:15
**kind** [13] - 44:18, 58:10, 67:13, 67:22, 68:14, 71:16, 123:10, 126:3, 178:22, 187:20, 193:12, 199:2, 244:6
**kitchen** [5] - 75:9, 75:10, 75:21, 78:13, 192:13
**KLEIN** [222] - 8:20, 8:23, 10:5, 12:14, 13:16, 16:5, 17:23, 18:18, 21:3, 21:10, 21:15, 22:2, 22:8, 23:15, 23:17, 24:14, 27:22, 30:5, 34:22, 36:7, 37:9, 39:3, 39:15, 39:17, 40:2, 41:6, 41:12, 41:21, 42:14, 46:21, 47:23, 48:5, 48:17, 50:20, 51:4, 51:9, 51:21, 55:19, 55:22, 56:18, 57:21, 58:19, 60:22, 61:3, 61:22, 64:14, 64:19, 68:2, 68:5, 71:2, 71:10, 76:9, 76:17, 79:3, 82:8, 82:15, 82:22, 88:22, 89:6, 92:13, 97:17, 97:23, 98:11,

100:10, 101:14, 101:16, 102:2, 102:9, 103:6, 103:15, 104:6, 106:12, 107:4, 108:13, 108:19, 109:5, 110:9, 116:19, 116:23, 119:7, 122:21, 123:12, 127:12, 132:4, 138:8, 148:10, 153:19, 156:11, 156:13, 156:21, 157:3, 157:15, 158:10, 158:22, 159:16, 160:23, 161:12, 161:18, 162:14, 162:19, 162:23, 163:19, 165:5, 166:6, 166:17, 167:6, 167:14, 169:8, 171:9, 171:16, 171:22, 173:22, 175:5, 178:12, 179:2, 179:13, 180:19, 181:2, 182:17, 182:20, 183:5, 184:19, 185:11, 185:14, 185:19, 186:7, 186:20, 187:6, 187:13, 188:8, 188:12, 188:22, 189:5, 190:3, 190:11, 190:16, 190:18, 190:22, 191:14, 192:19, 193:5, 193:11, 194:20, 195:3, 195:19, 195:23, 196:9, 196:13, 196:21, 197:3, 197:8, 199:15, 202:22, 204:12, 204:17, 205:23, 206:4, 207:9, 209:2, 209:5, 209:12, 210:5, 211:13, 211:23, 212:4, 213:21, 215:11, 217:22, 219:19, 221:9, 222:15, 224:4, 224:13, 226:19, 227:14, 228:7, 229:14, 230:20, 232:9, 233:12, 233:15, 233:18, 234:6, 234:21, 236:14, 237:14,

239:18, 241:16,
242:8, 242:18,
250:10, 252:18,
253:15, 256:7,
256:12, 256:17,
257:2, 257:11,
258:5, 259:2,
260:23, 261:4,
261:7, 262:5, 262:7,
264:10, 264:15,
264:23, 265:8,
265:22, 266:16,
266:21, 267:9,
267:16, 268:13,
268:19, 268:23,
269:11, 269:17,
271:4, 271:12,
271:19
**Klein** [15] - 2:2, 5:21,
68:10, 103:3, 156:9,
191:18, 198:3,
198:17, 199:3,
199:13, 199:17,
204:21, 210:21,
211:2, 211:8
**knee** [3] - 90:20,
91:12, 94:3
**knock** [2] - 104:18,
139:9
**knocked** [1] - 104:4
**knowledge** [10] -
21:16, 21:18, 61:4,
81:18, 222:16,
245:7, 254:21,
258:14, 274:2,
277:10
**known** [3] - 23:4, 23:6,
99:21

**L**

**labor** [1] - 63:12
**ladies** [3] - 88:12,
133:3, 134:7
**ladies'** [2] - 88:8,
88:11
**laid** [4] - 129:8,
129:10, 129:12,
168:14
**landmark** [1] - 200:10
**lane** [3] - 106:5, 106:6,
106:14
**language** [1] - 78:3
**laptop** [4] - 205:9,
205:13, 206:6,
206:12
**large** [1] - 266:8
**larger** [1] - 111:10
**last** [12] - 7:15, 9:7,

13:23, 17:6, 32:15,
123:9, 136:16,
191:17, 263:15,
275:18, 276:2, 276:3
**lasted** [1] - 234:5
**lasts** [1] - 243:18
**late** [2] - 63:2, 69:19
**Latham** [1] - 45:7
**lather** [1] - 139:8
**Law** [1] - 1:19
**law** [8] - 53:20, 132:9,
134:10, 134:15,
139:2, 153:23,
154:7, 200:20
**lawyer** [3] - 187:10,
188:20, 250:5
**lawyer's** [1] - 99:4
**lay** [1] - 164:8
**layman** [1] - 272:3
**layoff** [1] - 35:2
**lead** [1] - 84:18
**leading** [8] - 71:2,
103:21, 109:13,
116:21, 117:3,
167:5, 167:18,
203:20
**learn** [4] - 37:5,
106:17, 107:2,
107:14
**least** [1] - 277:2
**leave** [25] - 31:16,
31:17, 31:20, 34:13,
45:19, 134:23,
140:19, 143:15,
147:13, 151:11,
151:13, 151:15,
151:18, 151:19,
151:20, 152:3,
153:7, 221:17,
262:3, 262:7,
268:16, 271:15,
271:16, 272:19,
273:20
**leaves** [3] - 15:5,
47:16, 134:20
**leaving** [5] - 132:2,
143:12, 145:23,
146:18, 173:5
**led** [4] - 150:16,
161:17, 164:12,
230:18
**left** [27] - 6:3, 6:9,
49:19, 49:20, 50:6,
50:10, 52:4, 73:16,
90:19, 94:3, 105:12,
105:22, 117:14,
132:6, 132:13,
135:12, 139:2,
147:23, 166:22,
180:10, 212:13,

270:13, 272:11,
272:18, 272:21,
273:6, 273:9
**leftovers** [1] - 135:10
**legal** [2] - 268:14,
271:6
**legally** [4] - 15:21,
20:13, 53:22
**leisure** [1] - 250:7
**lengthy** [1] - 162:9
**less** [8] - 18:3, 34:2,
46:21, 66:22,
132:16, 132:18,
147:2, 277:2
**letter** [2] - 262:19,
263:10
**letters** [2] - 235:15,
236:22
**level** [2] - 91:14, 249:3
**license** [11] - 30:20,
31:5, 33:11, 33:16,
242:15, 243:2,
243:12, 243:18,
243:22, 244:5
**licenses** [1] - 31:2
**lie** [3] - 168:3, 168:4,
170:18
**lied** [1] - 178:3
**lies** [2] - 178:11,
178:15, 251:7
**life** [18] - 18:13, 85:3,
92:6, 92:8, 96:9,
130:4, 154:4,
214:13, 215:17,
221:7, 223:19,
224:2, 225:14,
251:3, 251:5, 251:7,
251:12, 251:15
**lifestyle** [2] - 90:5,
231:18
**lifetime** [1] - 222:3
**lifted** [1] - 206:12
**light** [1] - 278:18
**lights** [2] - 64:2, 65:6
**limitations** [5] - 8:16,
94:22, 221:13,
239:21, 239:23
**limiting** [1] - 187:15
**Linda** [1] - 14:22
**line** [6] - 107:5,
160:19, 192:21,
197:18, 271:5
**line-by-line** [1] -
160:19
**linking** [1] - 200:18
**listed** [2] - 19:10,
105:21
**listen** [2] - 219:19,
252:4
**listened** [1] - 149:19

**live** [30] - 9:12, 10:13,
10:15, 10:16, 11:4,
12:3, 13:14, 13:17,
14:5, 14:8, 14:15,
14:23, 15:16, 23:13,
24:11, 27:14, 28:16,
49:10, 51:16, 51:19,
51:23, 52:13, 52:20,
52:23, 86:9, 86:14,
87:5, 87:11, 221:7,
263:13
**lived** [16] - 9:23, 10:6,
12:17, 12:20, 13:7,
23:18, 27:15, 27:19,
28:3, 43:3, 52:12,
52:15, 95:7, 96:7,
247:22, 247:23
**lives** [3] - 184:18,
184:21, 223:16
**living** [18] - 13:5,
15:12, 15:23, 51:14,
75:9, 75:14, 78:5,
78:12, 78:16, 95:15,
103:11, 105:14,
184:18, 184:20,
215:13, 224:10,
225:14, 260:7
**located** [1] - 74:11
**location** [3] - 34:9,
34:15, 209:3
**lock** [1] - 225:7
**lockdown** [1] - 225:8
**locked** [9] - 139:3,
139:4, 216:15,
216:16, 218:10,
218:11, 221:15,
221:18, 250:16
**loneliness** [1] -
251:12
**long-haul** [1] - 31:12
**look** [6] - 65:21, 116:4,
156:14, 257:23,
259:15, 267:22
**looked** [2] - 103:8,
149:23
**looking** [2] - 63:10,
240:13
**loosely** [1] - 48:14
**loss** [8] - 234:17,
238:16, 246:22,
248:5, 248:8, 249:8,
250:6, 252:14
**losses** [1] - 234:16
**lost** [1] - 97:9
**loud** [2] - 72:19, 113:8
**loudly** [1] - 166:16
**love** [3] - 54:22, 54:23,
274:10
**low** [1] - 35:15
**lowest** [3] - 38:16,

39:8, 223:22
**lucky** [2] - 69:17, 70:5
**lunch** [1] - 7:12
**lying** [3] - 186:5,
186:9, 186:11

**M**

**machine** [3] - 36:15,
37:5, 44:18
**maintain** [1] - 50:16
**major** [1] - 99:15
**majority** [1] - 92:6



**male** [1] - 173:12
**man** [3] - 92:7, 168:17,
252:4

**manifest** [1] - 91:2
**manner** [1] - 111:13
**manufacturer** [1] -
36:13
**marijuana** [1] - 218:3
**marital** [1] - 248:6
**mark** [5] - 155:19,
196:9, 196:21,
197:5, 279:20
**Marked** [1] - 280:3
**marked** [12] - 155:22,
156:3, 157:17,
162:7, 163:9,
163:14, 192:22,
257:16, 257:20,
259:8, 259:12,
279:21
**marriage** [5] - 17:16,
28:11, 76:16, 79:9
**marriages** [1] - 17:13
**married** [17] - 17:2,
17:15, 17:16, 18:10,
18:11, 19:19, 20:5,
20:9, 24:2, 24:3,
24:4, 24:13, 24:20,
25:4, 101:11, 101:18
**marry** [1] - 22:22
**Mart** [12] - 43:12,
43:15, 43:22, 44:13,
45:20, 46:3, 47:8,

83:18, 84:4, 97:5, 118:20, 248:17
**Mason** [24] - 2:7, 139:13, 142:21, 143:8, 148:3, 150:6, 157:13, 157:23, 158:8, 194:22, 194:23, 196:19, 199:12, 205:2, 206:15, 207:3, 210:3, 254:14, 255:15, 267:5, 267:7, 267:9, 267:14, 270:23
**MASON** [1] - 1:6
**matter** [2] - 4:16, 200:20
**Matthew** [111] - 21:2, 21:7, 21:23, 22:14, 25:8, 25:12, 25:17, 26:8, 53:6, 55:16, 56:16, 56:22, 57:4, 57:7, 57:16, 57:17, 58:15, 58:23, 59:12, 59:14, 60:12, 60:16, 66:6, 66:20, 67:8, 67:11, 67:21, 68:20, 70:10, 70:15, 82:10, 83:4, 83:5, 83:13, 85:4, 89:11, 116:9, 116:18, 118:7, 128:8, 128:20, 129:2, 129:7, 129:9, 129:10, 130:19, 131:6, 131:12, 132:13, 134:20, 135:12, 136:9, 160:9, 160:15, 162:21, 164:10, 165:3, 165:13, 165:18, 169:19, 172:8, 174:9, 174:11, 174:14, 174:20, 175:2, 175:11, 175:16, 175:22, 176:5, 176:15, 176:18, 180:4, 180:6, 182:16, 183:6, 183:7, 183:17, 183:19, 183:21, 186:3, 192:2, 194:5, 194:10, 195:22, 199:10, 205:3, 206:16, 207:16, 243:4, 244:11, 256:6, 256:23, 257:7, 260:18, 260:23, 261:4, 261:9, 263:23, 264:7, 264:21,

265:20, 266:7, 273:23, 274:11, 274:23, 275:5, 275:10, 275:12, 279:2, 279:10
**Matthew's** [22] - 41:2, 41:10, 71:23, 77:13, 103:13, 103:21, 109:12, 109:13, 109:14, 115:6, 115:17, 129:19, 164:4, 164:12, 167:20, 192:15, 274:8, 274:9, 274:16, 276:8, 277:9, 277:13
**mattress** [3] - 76:5, 76:6, 76:7
**meal** [1] - 237:5
**meals** [1] - 75:13
**mean** [88] - 16:12, 16:13, 18:8, 34:11, 34:16, 35:2, 37:4, 39:13, 41:22, 42:14, 47:22, 48:3, 48:11, 48:15, 48:16, 48:22, 49:2, 50:20, 55:7, 55:14, 56:23, 60:11, 62:19, 63:13, 63:21, 65:19, 66:11, 67:13, 68:23, 70:7, 71:8, 72:4, 73:19, 74:3, 75:11, 75:20, 77:4, 77:9, 77:19, 85:5, 88:11, 97:19, 101:23, 102:5, 103:3, 104:20, 109:19, 112:10, 112:13, 114:7, 116:19, 116:20, 122:8, 124:5, 124:23, 125:19, 127:12, 130:5, 130:6, 130:18, 135:2, 136:22, 139:21, 142:3, 158:20, 179:15, 180:13, 185:5, 192:2, 209:2, 214:7, 214:19, 224:21, 232:7, 232:15, 234:16, 234:18, 238:18, 238:19, 239:3, 240:6, 243:13, 246:23, 248:7, 250:9, 261:4, 268:15, 271:8
**meaning** [3] - 22:17, 39:3, 247:10
**means** [3] - 6:8, 48:12,

58:16
**meant** [5] - 138:3, 138:5, 138:7, 138:11, 238:23
**media** [3] - 16:14, 251:7, 251:22
**Medical** [2] - 263:22, 265:17
**medical** [7] - 127:10, 200:14, 217:2, 217:3, 217:5, 217:8, 220:6
**medically** [1] - 8:5
**medication** [14] - 91:19, 93:13, 93:14, 93:20, 93:22, 94:4, 94:7, 226:2, 226:12, 226:14, 226:17, 229:4, 229:5
**medications** [4] - 7:15, 7:20, 93:15, 118:18
**meet** [6] - 52:8, 97:19, 97:22, 98:7, 98:9, 98:21
**meeting** [3] - 54:14, 103:7, 174:4
**member** [2] - 96:4, 109:2
**members** [5] - 16:19, 62:12, 132:8, 172:19, 221:6
**memory** [5] - 66:12, 67:6, 120:5, 137:9, 161:8
**Menands** [1] - 242:23
**mental** [6] - 225:16, 227:23, 228:6, 228:12, 228:21, 229:8
**mention** [3] - 229:7, 241:15, 253:9
**mentioned** [32] - 15:16, 31:5, 38:8, 56:11, 56:14, 58:3, 87:10, 121:16, 127:15, 129:3, 173:3, 181:9, 184:17, 188:19, 220:12, 221:21, 234:15, 234:17, 235:14, 237:9, 238:16, 240:5, 240:22, 241:9, 246:21, 248:5, 248:14, 250:6, 252:12, 252:14, 257:9, 276:7
**messages** [2] - 143:12, 143:15

**met** [11] - 52:9, 73:14, 88:15, 97:4, 98:10, 98:17, 99:17, 99:18, 147:20, 152:8, 173:13
**Michael** [2] - 2:11, 171:7
**MICHAEL** [1] - 1:7
**middle** [4] - 9:7, 128:16, 128:17, 176:6
**might** [1] - 255:15
**mile** [2] - 32:10, 32:11
**mileage** [1] - 38:8
**miles** [2] - 32:12, 32:13
**military** [1] - 29:7
**milligrams** [2] - 94:2, 94:9
**mind** [12] - 91:13, 134:5, 139:20, 150:22, 152:2, 153:20, 154:9, 161:14, 168:19, 231:9, 256:10, 274:17
**mindful** [1] - 6:14
**mindset** [1] - 168:8
**mine** [3] - 74:14, 97:4, 110:16
**minimum** [6] - 44:10, 44:11, 44:20, 44:21, 52:5
**minute** [3] - 154:14, 254:8, 257:23
**minutes** [10] - 107:20, 129:11, 141:10, 141:12, 154:14, 227:10, 227:14, 227:15, 227:19, 227:22
**misbehavior** [2] - 217:14, 217:18
**misdiagnosis** [1] - 268:3
**missed** [2] - 219:4, 219:5
**missing** [1] - 107:2
**Mississippi** [1] - 73:12
**mistreated** [1] - 190:8
**modified** [2] - 222:11, 245:11
**mom** [9] - 14:20, 15:17, 15:18, 15:19, 51:3, 51:7, 51:8, 135:2
**moment** [3] - 140:7, 153:17, 186:17
**moments** [1] - 59:17
**Monday** [2] - 31:20,

251:9
**monetary** [1] - 63:23
**money** [14] - 77:21, 235:12, 245:21, 246:19, 250:5, 277:16, 278:3, 278:4, 278:6, 278:7, 278:10, 278:13, 278:16, 278:20
**Mongolian** [2] - 58:16, 58:18
**Monopoly** [2] - 96:17
**month** [13] - 15:4, 23:2, 61:10, 61:13, 66:18, 66:22, 110:7, 220:17, 277:2, 277:9, 277:13
**months** [17] - 14:5, 14:16, 15:5, 31:15, 32:15, 32:20, 36:17, 37:15, 44:4, 44:5, 44:8, 45:9, 47:8, 47:11, 104:11, 278:5, 278:11
**mopping** [1] - 144:14
**morning** [10] - 5:15, 31:16, 35:18, 149:11, 149:16, 174:13, 174:21, 176:23, 198:22, 238:10
**mornings** [1] - 237:13
**most** [4] - 78:11, 78:12, 84:12, 225:9
**mostly** [4] - 50:2, 75:14, 77:5, 237:19
**mother** [32] - 10:16, 11:23, 12:2, 15:12, 15:13, 15:20, 51:12, 51:16, 54:23, 83:9, 84:9, 84:10, 86:21, 86:22, 87:4, 87:6, 87:13, 87:14, 87:15, 90:2, 95:22, 113:4, 134:10, 134:15, 139:2, 225:12, 235:16, 236:8, 277:17, 277:19, 277:21
**mother's** [4] - 15:9, 84:7, 87:8, 136:16
**mother-in-law** [3] - 134:10, 134:15, 139:2
**motion** [1] - 5:7
**motivations** [1] - 203:8
**motor** [2] - 30:17, 33:12
**Motrin** [2] - 94:9,

# APPENDIX

94:10

**move** [12] - 7:7, 16:18, 45:21, 46:5, 49:20, 52:5, 73:20, 191:13, 205:5, 205:15, 205:16, 207:11

**moved** [9] - 15:6, 24:12, 42:20, 64:11, 64:12, 73:16, 177:8, 177:11, 205:17

**movement** [1] - 204:2

**moves** [1] - 16:4

**movies** [2] - 77:22, 95:12

**moving** [3] - 16:8, 130:7, 188:23

**MR** [264] - 5:9, 8:20, 8:23, 10:5, 12:5, 12:14, 13:16, 16:5, 17:23, 18:18, 21:3, 21:10, 21:15, 22:2, 22:8, 23:15, 23:17, 24:14, 27:22, 30:5, 34:22, 36:7, 37:9, 39:3, 39:15, 39:17, 40:2, 41:6, 41:12, 41:21, 42:14, 46:21, 47:23, 48:5, 48:17, 50:20, 51:4, 51:9, 51:21, 55:19, 55:22, 56:18, 57:21, 58:19, 60:22, 61:3, 61:22, 64:14, 64:19, 68:2, 68:5, 71:2, 71:10, 76:9, 76:17, 79:3, 82:8, 82:15, 82:22, 88:22, 89:6, 92:13, 97:17, 97:23, 98:11, 100:10, 101:14, 101:16, 102:2, 102:9, 103:6, 103:15, 104:6, 106:12, 107:4, 108:13, 108:19, 109:5, 110:9, 116:19, 116:23, 119:7, 122:21, 123:12, 127:12, 132:4, 138:8, 148:10, 153:19, 156:11, 156:13, 156:21, 157:3, 157:15, 157:17, 157:20, 158:10, 158:22, 159:16, 160:23, 161:12, 161:18, 162:14, 162:19, 162:23, 163:19, 165:5, 166:6, 166:17,

167:6, 167:14, 169:8, 171:9, 171:16, 171:22, 173:22, 175:5, 178:12, 179:2, 179:13, 180:19, 181:2, 182:17, 182:20, 183:5, 184:19, 185:11, 185:14, 185:19, 186:7, 186:20, 187:6, 187:13, 188:8, 188:12, 188:22, 189:5, 190:3, 190:11, 190:16, 190:18, 190:22, 191:14, 192:19, 193:5, 193:11, 194:20, 195:3, 195:19, 195:23, 196:9, 196:13, 196:21, 197:3, 197:8, 199:15, 202:22, 204:12, 204:17, 205:23, 206:4, 207:9, 209:2, 209:5, 209:12, 210:5, 211:13, 211:23, 212:4, 213:21, 215:11, 217:22, 219:19, 221:9, 222:15, 224:4, 224:13, 226:19, 227:14, 228:7, 229:14, 230:20, 232:9, 233:12, 233:15, 233:18, 234:6, 234:21, 236:14, 237:14, 239:18, 241:16, 242:8, 242:18, 250:10, 252:18, 253:15, 254:10, 256:7, 256:11, 256:12, 256:14, 256:17, 256:20, 256:21, 257:2, 257:5, 257:11, 257:13, 257:18, 258:5, 258:6, 258:7, 259:2, 259:5, 259:10, 259:18, 260:2, 260:23, 261:3, 261:4, 261:6, 261:7, 261:12, 261:14, 262:5, 262:7, 262:10, 264:10, 264:13, 264:15, 264:18, 264:19, 264:23,

265:3, 265:8, 265:10, 265:22, 266:4, 266:16, 266:18, 266:21, 267:2, 267:6, 267:9, 267:13, 267:16, 267:21, 268:13, 268:17, 268:19, 268:22, 268:23, 269:5, 269:11, 269:14, 269:17, 269:20, 271:4, 271:7, 271:12, 271:19, 271:21, 271:22

**MS** [276] - 4:1, 4:13, 5:14, 9:3, 10:10, 12:7, 12:8, 12:16, 14:2, 16:6, 18:2, 19:2, 19:14, 21:6, 21:12, 21:13, 21:19, 22:5, 22:6, 22:12, 22:13, 23:16, 23:24, 24:17, 25:15, 25:21, 28:6, 30:7, 35:3, 35:6, 36:9, 37:10, 37:11, 39:5, 39:7, 39:16, 39:19, 39:21, 40:6, 41:5, 41:8, 41:9, 41:14, 41:15, 42:3, 42:16, 42:17, 43:18, 43:20, 43:21, 47:3, 48:2, 48:7, 48:8, 48:19, 50:22, 50:23, 51:5, 51:6, 51:11, 51:13, 51:22, 55:21, 56:2, 56:19, 57:22, 58:5, 58:22, 59:2, 61:2, 61:9, 62:2, 62:5, 65:2, 68:4, 68:7, 68:19, 71:4, 71:7, 71:11, 76:14, 76:18, 76:20, 79:6, 79:7, 82:9, 82:21, 83:3, 89:2, 89:8, 92:15, 92:17, 93:19, 97:21, 98:6, 98:14, 100:12, 100:13, 101:15, 101:17, 102:4, 102:11, 102:13, 103:10, 103:20, 104:13, 106:16, 107:8, 107:12, 107:13, 108:17, 108:23, 109:6, 109:11, 110:13, 110:14, 116:13, 116:16, 116:21, 117:3, 117:7, 119:10, 119:14,

123:2, 123:3, 123:19, 127:14, 132:7, 138:13, 148:14, 153:21, 155:19, 156:2, 156:20, 157:9, 157:10, 157:19, 157:22, 158:5, 158:13, 159:9, 159:21, 161:3, 161:16, 161:19, 161:23, 162:16, 162:21, 162:22, 163:7, 163:16, 163:21, 165:7, 166:9, 166:11, 166:19, 166:21, 167:9, 167:12, 167:16, 167:17, 169:11, 169:12, 171:12, 171:19, 172:2, 174:2, 175:9, 178:13, 178:17, 179:9, 179:17, 179:18, 180:21, 181:3, 182:18, 182:22, 182:23, 183:7, 183:9, 184:23, 185:13, 185:16, 185:22, 186:8, 187:3, 187:11, 187:17, 187:18, 188:18, 189:3, 189:6, 190:6, 190:9, 190:14, 190:17, 190:19, 191:3, 191:16, 193:2, 193:9, 193:10, 193:12, 193:16, 194:21, 195:6, 195:20, 196:5, 196:11, 196:16, 196:17, 196:23, 197:6, 197:9, 198:8, 198:10, 199:8, 201:18, 201:20, 201:23, 204:11, 204:15, 204:19, 205:8, 205:16, 206:3, 206:6, 206:10, 207:23, 209:4, 209:9, 209:15, 210:13, 210:20, 211:21, 212:3, 212:7, 212:10, 212:12, 214:4, 214:5, 215:18, 218:2, 220:2, 221:20, 222:17, 224:6,

224:9, 224:14, 224:15, 226:20, 226:22, 227:18, 228:10, 229:16, 229:17, 230:21, 230:22, 232:11, 233:21, 234:10, 235:6, 236:18, 237:17, 239:20, 241:18, 241:19, 242:11, 242:20, 250:17, 252:19, 252:20, 253:18, 254:7, 259:17, 271:17

**mud** [1] - 35:16

**multiple** [6] - 32:7, 109:23, 170:20, 170:23, 171:7, 171:14

**murder** [4] - 215:5, 264:8, 264:14, 264:17

**murder"** [1] - 264:17

**must** [1] - 154:16

## N

**name** [23] - 5:16, 9:4, 9:7, 10:17, 11:8, 11:15, 12:9, 14:11, 17:6, 54:2, 85:20, 86:5, 96:2, 97:3, 104:23, 105:4, 133:3, 136:16, 254:13, 274:19, 274:21, 277:21, 277:23

**name's** [1] - 85:15

**named** [2] - 139:15, 173:2

**names** [8] - 10:21, 11:7, 85:14, 87:20, 87:21, 88:3, 182:5, 234:9

**namesake** [1] - 26:3

**nap** [4] - 96:14, 238:8, 238:9, 238:11

**nature** [5] - 53:9, 64:3, 65:22, 77:23, 96:19

**navigation** [1] - 35:13

**near** [1] - 106:6

**neck** [1] - 260:9

**need** [11] - 7:10, 7:11, 91:9, 141:19, 193:4, 198:6, 199:4, 205:4, 205:6, 233:18

**needed** [3] - 217:3, 217:5, 240:8

**needs** [1] - 113:16
**neonatal** [1] - 61:12
**never** [34] - 79:17, 79:18, 81:15, 90:14, 109:8, 110:4, 111:18, 115:21, 115:23, 116:8, 116:10, 117:14, 141:14, 151:20, 151:22, 153:22, 168:15, 170:3, 170:4, 170:6, 170:7, 170:8, 170:10, 170:12, 175:4, 175:8, 175:19, 178:9, 179:7, 184:12, 184:13, 186:23, 190:7, 208:7
**NEW** [4] - 1:1, 1:9, 1:14, 281:1
**new** [1] - 256:20
**New** [49] - 1:21, 1:23, 2:3, 2:6, 2:10, 2:12, 2:13, 3:5, 5:17, 5:18, 5:19, 24:21, 42:20, 43:3, 43:8, 46:14, 49:9, 49:14, 49:20, 52:5, 52:12, 52:14, 54:20, 62:15, 73:9, 73:11, 73:17, 73:20, 84:15, 84:17, 84:21, 95:7, 95:15, 96:8, 97:12, 103:11, 197:16, 214:21, 244:5, 244:6, 244:12, 244:20, 245:2, 245:22, 246:12, 248:2, 249:6, 282:5
**newborn** [1] - 124:4
**newborns** [1] - 72:5
**newspaper** [2] - 216:5, 216:6
**newspapers** [1] - 216:9
**next** [5] - 127:9, 129:17, 149:11, 162:8, 192:19
**nice** [1] - 204:13
**nicknames** [3] - 87:19, 87:22, 87:23
**NICU** [1] - 61:12
**night** [14] - 35:15, 69:14, 70:3, 124:17, 128:16, 128:17, 135:10, 140:13, 145:19, 207:4, 207:5, 231:13, 237:11, 237:20
**nights** [2] - 45:14,

69:19
**nighttime** [1] - 145:18
**ninth** [10] - 29:16, 29:17, 29:18, 30:8, 49:19, 50:6, 50:11, 50:14, 51:10, 52:4
**nobody** [3] - 65:13, 240:3, 240:4
**none** [4] - 170:14, 170:15, 177:21, 249:19
**normal** [6] - 70:17, 72:2, 118:15, 121:22, 184:21, 238:2
**normally** [5] - 118:13, 121:20, 124:9, 125:6, 130:2
**north** [1] - 247:20
**NORTHERN** [1] - 1:1
**nose** [2] - 59:5, 59:9
**Notary** [3] - 1:22, 3:5, 282:5
**note** [11] - 34:23, 82:15, 103:15, 106:12, 108:13, 158:10, 169:8, 192:20, 195:23, 256:7, 264:13
**noted** [1] - 281:6
**notes** [3] - 4:19, 108:18, 282:7
**nothing** [14] - 5:4, 94:6, 99:15, 100:11, 100:12, 121:18, 121:19, 131:17, 168:17, 210:6, 217:16, 219:18, 251:2, 253:5
**notice** [6] - 58:4, 117:18, 121:5, 126:14, 127:3, 176:11
**Notice** [1] - 3:16
**noticed** [4] - 116:17, 120:15, 127:7, 176:9
**nowhere** [2] - 46:9, 215:15
**number** [4] - 28:13, 77:10, 97:9, 118:6
**numbers** [1] - 156:15
**numerous** [2] - 136:9, 136:10
**nurses** [1] - 149:9

**O**

▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮

**oath** [2] - 3:18, 6:8
**object** [10] - 22:3, 41:12, 123:12, 161:12, 162:23, 178:12, 179:13, 201:12, 259:2, 271:4
**objecting** [4] - 188:22, 191:15, 256:8, 271:19
**objection** [65] - 8:20, 16:5, 17:23, 27:22, 34:23, 41:21, 47:23, 48:5, 48:17, 56:18, 68:2, 79:3, 82:16, 88:22, 89:6, 100:10, 101:16, 102:2, 102:9, 103:16, 106:13, 108:14, 122:21, 138:8, 153:19, 157:15, 158:2, 158:10, 159:17, 161:18, 166:6, 167:6, 167:14, 169:9, 171:9, 173:22, 175:5, 180:20, 184:19, 185:11, 190:3, 190:11, 195:3, 196:2, 199:7, 199:14, 203:16, 204:3, 204:9, 204:21, 229:14, 232:9, 239:18, 241:16, 242:18, 252:18, 256:9, 256:12, 264:10, 264:15, 265:22, 266:21, 268:13, 269:11, 269:17
**objections** [9] - 3:11, 3:16, 68:9, 68:13, 159:18, 190:15, 190:20, 191:5, 191:6
**objects** [1] - 80:8
**observe** [2] - 126:8, 130:9
**observed** [1] - 126:10
**obtain** [1] - 65:17
**occasion** [2] - 175:11, 258:10
**occasional** [1] - 278:20
**occasions** [5] - 164:8, 167:19, 167:21, 278:6, 278:12
**occur** [3] - 20:16, 207:2, 220:16
**occurred** [14] - 165:11, 170:3, 170:5, 170:14,

207:3, 208:7, 208:19, 210:2, 210:4, 210:15, 227:12, 233:7, 246:11, 260:18
**occurrence** [1] - 279:10
**October** [1] - 54:6
**OF** [7] - 1:1, 1:6, 1:9, 1:14, 280:1, 281:1, 281:2
**of..** [2] - 159:20, 184:6
**offense** [1] - 84:23
**offhand** [2] - 278:8, 278:15
**Office** [4] - 2:12, 5:17, 6:3, 198:12
**office** [1] - 198:13
**officer** [5] - 134:6, 199:23, 219:9, 219:10, 261:20
**Officer** [3] - 254:14, 254:15, 255:14
**officers** [8] - 146:2, 157:13, 197:22, 202:3, 265:4, 269:9, 272:18, 273:2
**Offices** [1] - 1:19
**offices** [1] - 198:23
**often** [16] - 109:22, 110:5, 110:6, 110:8, 113:8, 114:23, 115:2, 124:7, 144:11, 144:16, 144:19, 172:5, 225:22, 278:3, 278:9
**old** [20] - 10:9, 11:19, 11:21, 11:23, 12:11, 12:13, 27:12, 42:13, 42:18, 49:16, 50:7, 85:16, 85:17, 85:22, 86:7, 90:10, 90:11, 100:2, 108:10, 171:21
**older** [1] - 85:19
**once** [29] - 63:4, 63:5, 64:11, 64:12, 96:12, 110:6, 110:7, 110:9, 110:12, 110:13, 115:4, 177:15, 192:12, 226:17, 226:23, 227:6, 227:7, 227:22, 228:4, 228:11, 228:15, 244:22, 245:6, 249:9, 254:2, 260:19, 262:11
**one** [82] - 4:22, 6:15, 7:18, 15:4, 19:7, 27:3, 35:9, 37:6,

37:9, 43:13, 45:21, 46:5, 47:4, 52:17, 52:21, 52:22, 56:4, 56:16, 57:2, 57:12, 57:13, 57:14, 57:15, 57:17, 57:18, 63:23, 72:9, 73:5, 73:11, 73:17, 74:15, 74:16, 74:22, 74:23, 75:22, 79:21, 79:22, 83:23, 89:10, 90:21, 105:7, 105:10, 107:10, 114:9, 117:19, 118:3, 125:6, 127:23, 128:4, 128:5, 139:14, 144:2, 145:19, 147:9, 149:14, 160:7, 163:12, 165:15, 173:4, 173:8, 175:10, 198:9, 202:4, 202:10, 211:16, 216:3, 217:21, 217:23, 219:3, 219:21, 246:8, 252:2, 255:14, 256:20, 260:20, 263:10, 272:5, 272:7, 279:19
**ones** [1] - 173:4
**open** [4] - 114:12, 114:13, 114:16
**opened** [1] - 105:12
**operating** [1] - 44:18
**operation** [2] - 161:14, 256:9
**operator** [3] - 36:15, 37:2, 37:4
**opinions** [1] - 180:22
**opportunity** [5] - 163:17, 211:11, 240:5, 240:22, 240:23
**opposed** [2] - 224:4, 267:16
**or..** [1] - 124:7
**order** [26] - 4:8, 4:10, 4:15, 4:23, 33:11, 82:6, 133:5, 133:7, 134:3, 169:2, 222:3, 222:4, 239:8, 239:11, 239:22, 245:3, 245:6, 245:9, 248:21, 249:16, 249:21, 249:23, 261:20, 262:12, 262:22, 263:2
**ordered** [1] - 279:4
**otherwise** [7] - 4:12,

7:21, 8:6, 68:18, 203:13, 230:15, 230:16

**ounces** [1] - 125:6

**ourselves** [1] - 193:13

**outgoing** [1] - 76:23

**outside** [12] - 58:20, 107:3, 107:14, 108:6, 131:11, 134:16, 137:3, 149:20, 177:12, 177:14, 192:18

**over-the-counter** [1] - 94:4

**overall** [2] - 215:21, 215:22

**overnight** [3] - 45:11, 128:12, 221:19

**overruled** [2] - 204:3, 204:10

**overturned** [5] - 200:9, 231:22, 232:3, 232:13, 233:4

**own** [4] - 29:2, 67:18, 152:2, 169:21

**owned** [1] - 29:5

**P**

**P.C** [2] - 1:20, 2:8

**p.m** [1] - 279:23

**page** [4] - 163:12, 169:4, 259:14, 270:22

**pages** [2] - 162:15, 163:13

**paid** [5] - 34:12, 44:10, 51:2, 64:2, 64:3

**pain** [2] - 91:14, 93:22

**palpably** [2] - 190:23, 201:14

**panicked** [1] - 176:18

**panicking** [2] - 131:8, 177:6

**pants** [1] - 111:2

**paper** [4] - 133:6, 133:11, 134:4, 134:7

**paragraph** [1] - 268:2

**paralegal** [3] - 6:3, 197:19, 198:13

**paramedics** [6] - 132:6, 140:8, 174:22, 177:3, 177:14, 192:17

**parent** [1] - 73:11

**parents** [2] - 73:7, 73:20

**park** [2] - 96:12, 96:13

**part** [8] - 18:15, 28:7,

119:8, 167:2, 169:14, 219:8, 236:12, 253:10

**partial** [2] - 75:9, 75:10

**participate** [2] - 224:20, 224:23

**participated** [1] - 96:4

**particular** [2] - 32:5, 178:22

**parties** [9] - 3:4, 4:1, 4:11, 4:21, 4:23, 203:18, 251:19

**parts** [3] - 34:17, 59:5, 219:16

**passed** [4] - 59:21, 67:8, 136:13, 141:9

**passing** [2] - 66:20, 103:19

**past** [4] - 81:15, 88:2, 88:10, 89:3

**patient** [2] - 60:6, 63:5

**Pattison** [1] - 2:5

**pay** [10] - 34:9, 34:11, 38:8, 38:10, 38:11, 40:8, 46:6, 65:5, 233:12, 240:17

**paying** [1] - 240:17

**Pearl** [1] - 9:15

**Peck** [7] - 1:20, 2:8, 2:10, 5:23, 197:20, 198:16, 198:23

**PECK** [5] - 4:1, 22:6, 162:22, 193:10, 259:17

**Pedialyte** [3] - 118:20, 121:10, 127:20

**People** [1] - 200:10

**people** [11] - 57:23, 87:12, 149:13, 158:11, 197:17, 210:16, 221:6, 227:11, 239:11, 239:13, 239:17

**per** [3] - 32:10, 32:11

**percent** [1] - 202:13

**perception** [1] - 184:6

**perform** [2] - 224:11, 224:12

**performed** [1] - 118:2

**period** [25] - 22:20, 36:4, 36:5, 44:13, 46:12, 49:4, 64:6, 64:9, 67:10, 84:12, 91:4, 95:6, 115:16, 121:4, 122:3, 126:8, 143:21, 147:6, 154:4, 162:9, 213:8, 214:16, 228:16, 242:7

**periodically** [1] - 62:18

**PERKINS** [42] - 5:9, 12:5, 157:17, 157:20, 254:10, 256:11, 256:14, 256:20, 256:21, 257:5, 257:13, 257:18, 258:6, 258:7, 259:5, 259:10, 259:18, 260:2, 261:3, 261:6, 261:12, 261:14, 262:10, 264:13, 264:18, 264:19, 265:3, 265:10, 266:4, 266:18, 267:2, 267:6, 267:13, 267:21, 268:17, 268:22, 269:5, 269:14, 269:20, 271:7, 271:21, 271:22

**Perkins** [5] - 2:6, 5:22, 197:22, 198:14, 254:13

**permissible** [1] - 204:2

**permitted** [4] - 202:15, 202:16, 239:4, 239:10

**permitting** [1] - 191:8

**Perone** [2] - 9:8, 9:10

**PERONE** [2] - 5:10, 9:10

**person** [10] - 6:15, 6:16, 45:11, 85:9, 173:11, 173:12, 178:10, 188:19, 235:20, 235:22

**personal** [3] - 135:21, 238:16, 239:21

**personality** [1] - 67:18

**personally** [1] - 85:8

**perspective** [1] - 165:22

**perspiring** [1] - 126:3

**petition** [2] - 222:19, 254:4

**petitioned** [1] - 249:23

**pharmacist** [1] - 94:11

**Phillip** [1] - 11:8

**phone** [22] - 96:18, 97:9, 131:2, 135:21, 141:14, 141:22, 142:2, 143:16, 177:9, 192:12, 192:13, 197:11, 225:7, 225:8, 225:9, 235:17, 236:21,

262:4, 273:11, 273:14, 275:7

**phrase** [4] - 53:7, 58:16, 264:16, 264:17

**physical** [15] - 8:5, 79:13, 79:14, 79:19, 80:6, 90:17, 176:11, 199:18, 200:17, 201:11, 203:4, 220:10, 230:10, 230:11, 230:12

**physically** [1] - 82:12

**physiologically** [1] - 8:5

**pick** [1] - 205:7

**picked** [3] - 98:22, 129:19, 176:5

**piece** [1] - 134:4

**piecemeal** [1] - 212:6

**Pilgrim** [1] - 44:17

**Pilgrim's** [4] - 36:11, 36:12, 36:18, 52:9

**pillow** [3] - 205:7, 205:8, 205:9

**Pine** [2] - 1:20, 2:9

**place** [20] - 32:19, 39:12, 39:18, 44:14, 45:21, 68:8, 68:13, 109:16, 150:5, 181:19, 241:7, 242:10, 243:5, 243:10, 251:13, 268:18, 270:5, 270:16, 270:19, 281:6

**placed** [12] - 40:19, 41:11, 43:4, 118:10, 172:17, 220:12, 253:19, 262:13, 270:9, 272:2, 272:4, 272:8

**places** [8] - 38:12, 38:23, 39:11, 39:22, 45:19, 46:10, 52:20, 65:15

**Plaintiff** [1] - 1:4

**Plaintiff/Claimant** [2] - 1:17, 2:4

**plan** [1] - 97:13

**planned** [1] - 237:5

**plant** [1] - 52:9

**platform** [1] - 76:10

**platonic** [2] - 101:22, 102:5

**play** [5] - 73:3, 96:17, 96:23

**playing** [5] - 72:6, 105:10, 112:18, 141:23, 142:13

Plaza [2] - 1:20, 2:9

**PLLC** [1] - 2:5

**point** [25] - 7:3, 8:13, 49:20, 69:18, 71:21, 72:4, 76:17, 127:10, 128:9, 132:2, 132:8, 134:11, 142:19, 146:16, 150:20, 153:12, 153:17, 207:14, 222:12, 255:14, 260:20, 273:23, 274:4, 275:4, 275:21

**points** [2] - 18:13, 23:22

**Police** [16] - 156:6, 198:14, 258:23, 259:20, 259:22, 260:14, 260:21, 264:7, 264:22, 265:20, 266:6, 266:13, 268:4, 268:11, 272:12, 280:5

**police** [48] - 81:16, 81:19, 81:22, 82:4, 85:3, 85:7, 134:6, 146:2, 146:5, 146:6, 149:5, 154:12, 158:21, 160:8, 160:9, 160:13, 162:20, 164:3, 164:18, 166:5, 167:19, 168:3, 169:6, 169:20, 172:13, 174:17, 182:19, 183:2, 185:23, 186:18, 193:22, 194:2, 194:15, 197:22, 202:3, 208:10, 232:18, 257:6, 260:17, 261:10, 265:4, 269:6, 269:9, 270:13, 272:15, 272:18, 273:2, 273:16

**pop** [4] - 114:3, 114:5, 114:7, 114:8

**popping** [1] - 113:22

**popular** [1] - 88:12

**population** [3] - 221:4, 221:8, 221:14

**portion** [1] - 107:7

**pose** [1] - 8:18

**position** [3] - 164:14, 178:18, 178:20

**possibility** [2] - 106:19, 251:23

**possible** [2] - 6:17,

252:3
**post** [1] - 210:16
**pounds** [3] - 89:10, 89:17, 89:18
**practical** [1] - 212:2
**practice** [4] - 5:8, 202:15, 247:4, 247:7
**preference** [1] - 211:3
**preparation** [2] - 102:17, 102:20
**prepare** [3] - 97:15, 98:11, 100:9
**prescribed** [4] - 7:21, 94:6, 94:8, 226:5
**presence** [1] - 272:20
**present** [13] - 2:14, 5:20, 15:11, 16:2, 40:2, 147:22, 157:22, 182:4, 182:12, 251:7, 264:3, 275:15, 275:20
**presented** [1] - 7:6
**presentence** [1] - 209:20
**pressure** [6] - 91:18, 93:2, 93:13, 93:16, 93:21, 94:6
**pretty** [3] - 89:20, 124:16, 162:9
**prevent** [1] - 8:18
**prevents** [1] - 5:5
**previous** [4] - 17:13, 25:16, 158:4, 173:20
**previously** [1] - 25:3
**Pride** [4] - 36:11, 36:12, 36:19, 52:9
**primarily** [3] - 30:22, 74:2, 74:6
**primary** [1] - 29:15
**printout** [1] - 159:6
**prison** [18] - 209:8, 215:12, 216:6, 216:10, 224:4, 224:5, 224:8, 224:13, 231:9, 231:14, 234:23, 235:2, 247:8, 247:9, 250:11, 250:12, 250:18, 254:3
**privilege** [1] - 98:4
**probable** [1] - 268:7
**probation** [2] - 94:20, 209:18
**problem** [1] - 256:14
**problems** [5] - 78:23, 79:9, 88:20, 185:17, 185:20
**proceed** [1] - 138:15
**proceeded** [1] -

192:13
**proceeding** [1] - 159:10
**proceedings** [1] - 282:8
**process** [3] - 33:10, 198:21, 200:12
**processing** [2] - 212:18, 213:13
**production** [1] - 44:16
**Professional** [2] - 1:22, 282:4
**profile** [1] - 16:11
**program** [1] - 241:3
**programming** [2] - 224:20, 224:23
**programs** [1] - 225:2
**progress** [1] - 215:9
**prohibited** [1] - 239:11
**promise** [1] - 167:23
**proper** [4] - 163:3, 190:18, 196:12, 203:11
**prosecution** [4] - 159:8, 182:8, 255:9, 265:13
**prosecutor** [1] - 194:6
**prosecutors** [1] - 194:8
**protect** [2] - 216:14, 222:7
**protection** [15] - 82:6, 222:3, 222:4, 239:8, 239:11, 239:22, 245:3, 245:9, 248:22, 249:16, 249:21, 249:23, 262:13, 262:22, 263:2
**protective** [29] - 4:3, 4:8, 4:15, 4:19, 103:14, 103:23, 107:23, 108:4, 109:3, 113:13, 113:18, 172:20, 215:16, 220:12, 220:20, 221:3, 221:10, 221:13, 225:3, 239:5, 240:9, 241:3, 247:14, 253:7, 253:11, 253:19, 253:21, 254:5
**provide** [7] - 8:7, 27:17, 204:5, 250:16, 259:13, 273:8, 278:13
**provided** [10] - 9:4, 94:22, 164:18,

169:20, 172:12, 193:18, 235:12, 258:22, 278:10, 278:12
**providing** [1] - 210:14
**psych** [1] - 147:20
**psychological** [5] - 8:5, 229:10, 230:4, 230:19, 230:23
**public** [6] - 62:7, 276:11, 276:18, 277:4, 277:11, 278:19
**Public** [3] - 1:23, 3:5, 282:5
**publicly** [1] - 4:11
**pulse** [1] - 129:20, 130:8, 130:10
**punishment** [2] - 218:9, 218:14
**purpose** [6] - 97:12, 201:21, 203:19, 209:19, 211:6
**purse** [1] - 137:17
**pursuant** [1] - 4:6
**put** [13] - 35:14, 130:13, 131:4, 131:5, 139:10, 141:22, 177:9, 177:10, 192:14, 198:8, 216:15, 260:8
**putting** [1] - 193:13

**Q**

**qualifications** [1] - 3:17
**queen** [1] - 76:4
**questioned** [1] - 266:12
**questioning** [5] - 107:6, 192:21, 199:3, 266:14, 271:5
**questionings** [1] - 147:10
**questions** [14] - 3:12, 7:3, 8:7, 8:18, 68:11, 106:13, 152:22, 188:23, 190:23, 196:3, 203:22, 203:23, 242:19, 254:16
**quick** [1] - 259:15
**quiet** [3] - 152:19, 152:20, 152:21
**quote** [1] - 108:7

169:20, 172:12,

**R**

**rag** [4] - 118:9, 118:10, 121:16, 126:13
**raised** [2] - 26:21, 80:4, 87:8
**ran** [4] - 105:8, 130:13, 131:11, 197:2
**range** [2] - 38:16, 39:9
**ranged** [1] - 40:8
**rarely** [1] - 124:8
**rate** [3] - 38:10, 38:11, 177:7
**rather** [7] - 6:23, 109:3, 144:16, 200:16, 244:3, 244:20, 256:8
**rationally** [3] - 7:17, 7:22, 8:2
**rays** [2] - 279:3, 279:6
**re** [2] - 207:12, 211:11
**re-ask** [1] - 207:12
**re-depose** [1] - 211:11
**reach** [3] - 208:15, 261:23, 263:10
**reached** [3] - 16:15, 199:2, 199:4
**read** [14] - 8:21, 8:22, 61:11, 134:4, 161:8, 162:10, 216:5, 216:6, 230:20, 256:18, 258:3, 266:20, 281:4
**reading** [2] - 108:15, 108:17
**ready** [6] - 13:20, 134:14, 134:22, 138:15, 142:20, 254:11
**real** [4] - 14:20, 17:12, 70:10
**realize** [2] - 107:2, 211:17
**really** [7] - 58:6, 166:16, 168:23, 178:21, 202:20, 233:6, 235:9
**realtime** [1] - 192:23
**reason** [13] - 7:10, 16:10, 34:21, 35:19, 59:11, 91:10, 94:13, 105:5, 164:4, 164:19, 165:3, 168:23, 180:18
**reasons** [2] - 34:7, 246:18
**Rebecca** [1] - 280:13

**rebuttal** [1] - 202:23
**receive** [29] - 29:12, 30:9, 32:17, 38:10, 38:18, 38:20, 38:23, 133:8, 216:9, 216:17, 216:21, 217:2, 217:11, 217:14, 217:18, 218:13, 219:13, 220:6, 220:9, 225:15, 226:2, 226:4, 227:23, 228:5, 228:12, 235:11, 242:5, 242:14, 277:4
**received** [21] - 19:6, 30:12, 32:18, 33:3, 33:8, 33:16, 37:19, 38:12, 188:3, 214:12, 217:21, 228:16, 228:17, 230:11, 241:9, 241:20, 242:15, 243:2, 243:22, 244:11, 277:6
**receiving** [7] - 38:9, 184:4, 229:20, 237:5, 276:11, 276:18, 276:22
**recently** [3] - 189:9, 189:10, 192:5
**recess** [4] - 7:13, 163:23, 212:11, 212:13
**Recess** [4] - 19:13, 93:18, 163:6, 212:9
**recitation** [1] - 160:3
**recognize** [1] - 164:14
**recollection** [1] - 162:10
**record** [49] - 6:12, 6:13, 11:2, 12:5, 12:6, 13:11, 19:6, 19:8, 19:9, 22:8, 25:15, 25:20, 30:5, 30:6, 43:18, 43:19, 43:20, 52:13, 54:6, 67:15, 68:7, 68:9, 68:14, 107:4, 108:15, 116:14, 116:15, 120:17, 156:2, 156:11, 156:12, 157:2, 163:7, 163:8, 164:16, 170:18, 192:20, 197:9, 197:12, 204:19, 205:12, 205:18, 206:11, 210:20, 212:10, 256:15,

# APPENDIX

256:16, 271:20, 281:5

**recorded** [4] - 154:22, 178:21, 178:23

**records** [9] - 4:4, 19:7, 55:20, 56:14, 61:11, 102:17, 102:20, 102:23, 120:18

**recover** [1] - 126:19

**recreate** [2] - 224:18, 224:19

**recreating** [1] - 225:4

**redact** [1] - 193:4

**redaction** [1] - 193:7

**reenact** [4] - 201:6, 201:22, 203:12, 203:23

**refer** [4] - 105:15, 105:18, 160:23, 161:4

**referencing** [1] - 160:7

**referring** [4] - 51:7, 53:5, 95:11, 95:12

**refresh** [3] - 120:5, 137:9, 161:8

**refreshed** [2] - 162:11, 162:18

**refreshing** [1] - 161:9

**refusing** [1] - 198:5

**regard** [11] - 4:19, 5:4, 55:10, 85:8, 182:15, 199:2, 204:6, 229:8, 239:23, 248:7, 249:22

**regarding** [4] - 109:3, 204:21, 210:22, 266:14

**register** [1] - 244:7

**Registered** [2] - 1:22, 282:4

**regular** [2] - 92:12, 251:8

**regularly** [2] - 124:12, 145:15

**rehab** [3] - 94:13, 94:14, 94:15

**rejecting** [1] - 129:8

**relate** [5] - 168:20, 174:16, 188:23, 210:2, 210:3

**related** [4] - 86:21, 174:17, 185:17, 246:14

**relates** [2] - 229:9, 230:4

**relating** [6] - 4:2, 82:10, 108:11, 109:12, 230:18, 249:9

**relation** [3] - 15:19,

17:8, 17:11

**relations** [1] - 248:6

**relationship** [25] - 76:15, 77:14, 77:15, 79:19, 82:3, 90:13, 99:16, 100:4, 100:6, 100:19, 100:20, 100:21, 101:4, 101:8, 101:9, 101:13, 101:20, 102:8, 102:15, 115:8, 115:11, 115:14, 184:9, 185:9, 248:11

**relationships** [1] - 88:17

**relatives** [6] - 14:7, 62:15, 73:18, 78:4, 96:18, 97:13

**release** [4] - 14:6, 23:18, 93:8, 210:16

**released** [22] - 12:19, 12:22, 23:14, 33:7, 36:4, 40:17, 42:9, 51:17, 63:5, 92:20, 226:17, 227:2, 228:4, 228:11, 228:21, 234:13, 243:14, 244:2, 244:8, 244:23, 245:8, 254:5

**relevance** [1] - 202:20

**relevant** [2] - 202:7, 202:13

**relied** [1] - 159:8

**relief** [2] - 37:2, 37:4

**religion** [2] - 234:19, 234:20

**religious** [2] - 246:22, 247:5

**remain** [1] - 42:10

**remained** [1] - 42:11

**remember** [80] - 17:17, 17:19, 18:6, 18:15, 18:17, 44:3, 44:9, 44:22, 55:23, 56:8, 56:21, 59:7, 59:8, 59:18, 62:3, 62:9, 62:14, 65:23, 66:6, 66:13, 66:17, 70:18, 73:22, 76:13, 104:9, 106:23, 117:5, 117:9, 117:15, 118:2, 118:5, 119:16, 119:20, 120:3, 120:4, 121:15, 125:4, 125:8, 125:13, 127:18, 128:11, 128:15,

133:3, 135:9, 137:6, 137:8, 143:13, 146:7, 147:11, 147:14, 160:18, 161:7, 162:5, 167:2, 168:13, 182:14, 183:15, 199:20, 210:11, 210:14, 212:21, 234:4, 234:7, 234:8, 248:12, 255:17, 256:17, 257:15, 261:19, 265:15, 265:18, 266:19, 273:5, 276:23, 277:3, 277:7, 279:18

**reminded** [2] - 251:6, 251:12

**reminds** [1] - 6:19

**remove** [2] - 133:5, 133:16

**removed** [1] - 134:3, 261:18

**rendered** [1] - 121:9

**renew** [2] - 243:19, 244:2

**Rensselaer** [17] - 172:17, 181:21, 209:10, 209:17, 212:14, 213:17, 213:18, 214:8, 220:23, 221:2, 228:5, 228:12, 228:14, 228:21, 231:21, 232:19, 233:2

**RENSSELAER** [1] - 1:7

**rent** [3] - 64:2, 65:6, 278:18

**repeat** [19] - 7:18, 9:21, 15:14, 17:6, 25:10, 41:3, 45:22, 50:8, 60:13, 79:5, 107:10, 160:10, 165:15, 167:15, 182:21, 232:10, 256:19, 272:5, 279:19

**repeated** [4] - 164:20, 165:6, 169:2, 169:6

**rephrase** [2] - 22:11, 230:21

**report** [10] - 105:7, 108:6, 108:11, 108:16, 108:20, 171:11, 171:22, 209:20, 217:14, 217:18

**reported** [1] - 171:14

**reporter** [3] - 3:17, 8:22, 266:20

**Reporter** [2] - 1:22, 282:4

**represent** [3] - 5:18, 233:11, 254:13

**representatives** [1] - 260:21

**represents** [7] - 5:22, 5:23, 197:20, 197:22, 198:14, 198:16, 198:18

**request** [3] - 199:18, 201:13, 205:14

**requested** [4] - 210:23, 211:2, 217:4, 219:17

**require** [1] - 161:9

**reserved** [1] - 3:12

**reside** [1] - 244:22

**resided** [1] - 9:20

**resident** [1] - 46:13

**residential** [1] - 35:14

**resolved** [1] - 203:10

**resources** [1] - 245:21

**respective** [1] - 3:3

**responded** [1] - 85:7

**responding** [2] - 6:22, 8:19

**response** [6] - 19:5, 120:3, 139:23, 254:18, 263:11, 263:12

**responses** [2] - 8:8, 254:19

**responsibility** [2] - 55:9, 144:12

**responsible** [2] - 72:22, 73:23

**rest** [2] - 144:13, 220:20

**restate** [1] - 39:20

**restaurant** [2] - 50:2, 52:3

**restaurants** [1] - 50:3

**restrictions** [4] - 221:10, 235:19, 236:23, 237:6

**restroom** [1] - 7:11

**result** [2] - 130:11, 218:5

**resulted** [3] - 162:22, 164:19, 217:15

**results** [1] - 71:14

**retrial** [2] - 97:7, 232:22

**retried** [1] - 200:13

**return** [2] - 136:12, 136:14

**returned** [1] - 115:5

**review** [6] - 102:17, 102:20, 102:23, 156:9, 163:17, 163:23

**reviewed** [5] - 103:5, 120:18, 159:4, 177:19, 260:3

**rib** [4] - 170:20, 170:23, 171:7, 171:14

**ribs** [3] - 279:7, 279:10, 279:13

**Ricky** [6] - 85:15, 278:2, 278:9, 278:12, 278:16, 278:21

**ride** [2] - 99:14, 152:17

**road** [3] - 35:14, 105:23, 106:3

**rode** [1] - 100:15

**role** [4] - 55:9, 55:11, 55:12, 73:3

**rolling** [1] - 31:21

**romantic** [5] - 100:4, 100:6, 101:13, 102:7, 102:15

**Ron** [1] - 264:13

**Ronald** [5] - 2:7, 139:15, 142:22, 143:8, 146:13, 148:3

**RONALD** [1] - 1:6

**room** [47] - 5:20, 5:21, 5:23, 6:2, 6:11, 6:20, 56:13, 75:9, 75:14, 75:17, 75:18, 78:5, 78:8, 78:12, 78:16, 78:17, 104:18, 105:14, 146:7, 146:9, 146:11, 146:14, 146:18, 146:19, 147:6, 147:9, 147:13, 147:22, 148:9, 149:10, 149:14, 149:20, 150:17, 150:19, 151:8, 153:5, 153:10, 154:11, 154:13, 162:8, 182:11, 197:17, 205:4, 205:19, 205:20, 206:2, 258:19

**rooms** [3] - 75:7, 77:5, 144:9

**rough** [2] - 112:18, 186:2

**roughly** [1] - 191:23

**ruled** [1] - 203:21

**rules** [3] - 202:14,



# APPENDIX



**tasks** [3] - 74:4, 74:7, 224:12
**taxes** [3] - 40:13, 40:14, 48:23
**technically** [1] - 25:19
**telephone** [1] - 135:17
**temperature** [7] - 117:23, 118:3, 118:4, 118:8, 121:7, 121:8, 127:5
**temporarily** [1] - 245:5
**ten** [8] - 18:3, 31:21, 34:2, 34:4, 163:13, 169:4, 270:22
**ten-page** [2] - 169:4, 270:22
**tend** [3] - 144:6, 144:12, 144:13
**tending** [3] - 73:23, 74:3, 144:7
**term** [10] - 48:3, 48:9, 48:12, 48:14, 109:20, 136:20, 179:13, 214:18, 271:10, 272:2
**terminated** [4] - 34:18, 34:22, 35:2, 35:23
**testified** [13] - 5:12, 182:3, 182:6, 182:8, 185:18, 200:7, 233:22, 233:23, 234:7, 242:2, 255:9, 264:4, 279:15
**testify** [3] - 185:19, 192:8, 265:13
**testimony** [7] - 4:2, 5:8, 64:16, 193:18, 193:22, 204:7, 281:5
**that's..** [1] - 185:6
**THE** [118] - 1:14, 9:2, 10:8, 12:15, 13:22, 18:22, 21:5, 21:17, 23:20, 24:16, 28:5, 35:5, 36:8, 39:6, 40:4, 41:7, 41:13, 47:2, 48:6, 51:12, 55:23, 58:3, 58:20, 58:23, 61:7, 62:3, 64:18, 64:23, 71:5, 76:12, 76:19, 79:5, 83:2, 89:7, 98:5, 98:13, 100:11, 102:12, 103:9, 104:8, 107:10, 108:22, 109:8, 110:12, 117:5, 119:8, 119:11, 123:15, 132:5, 138:12, 148:13, 153:20, 159:20,

161:21, 163:20, 166:20, 167:15, 171:18, 171:23, 173:23, 175:8, 178:14, 179:6, 182:21, 184:20, 185:15, 185:21, 186:23, 187:10, 188:11, 188:17, 190:7, 195:4, 205:6, 205:15, 207:22, 209:8, 209:14, 210:11, 215:13, 217:23, 219:23, 221:15, 222:16, 224:7, 226:21, 227:16, 228:9, 229:15, 232:10, 233:14, 233:17, 233:20, 234:8, 235:4, 236:16, 237:16, 239:19, 242:9, 250:14, 253:16, 256:19, 257:4, 257:14, 259:3, 261:11, 261:13, 262:6, 262:8, 265:2, 265:9, 266:3, 267:4, 267:11, 267:20, 269:3, 269:13, 269:18
**themselves** [1] - 139:13
**therapist** [4] - 227:5, 227:22, 229:2, 229:21
**therapy** [2] - 229:2, 229:3
**there'd** [1] - 72:6
**thereafter** [4] - 22:15, 172:19, 214:2, 249:10
**thereof** [1] - 281:8
**thinking** [6] - 8:2, 123:4, 150:21, 168:10, 168:11, 266:22
**third** [1] - 147:20
**third-floor** [1] - 147:20
**THOMAS** [6] - 1:3, 1:11, 1:18, 5:10, 281:4, 281:13
**Thomas** [47] - 5:15, 9:8, 9:10, 26:3, 26:8, 53:6, 54:2, 85:15, 86:6, 93:20, 105:4, 105:15, 116:17, 157:11, 159:4, 163:17, 197:14,

197:15, 198:2, 198:5, 198:18, 198:19, 198:22, 199:3, 199:11, 200:2, 200:6, 200:10, 204:23, 205:13, 205:19, 211:11, 212:13, 253:7, 254:11, 254:13, 254:21, 257:19, 258:8, 259:11, 260:3, 260:16, 263:18, 268:5, 278:2, 278:9, 278:12
**thoughts** [4] - 151:5, 153:11, 154:8, 267:3
**threatened** [1] - 231:10
**threats** [9] - 16:19, 16:20, 151:14, 152:4, 215:5, 215:14, 215:17, 221:6, 231:10
**three** [23] - 15:9, 36:17, 37:14, 44:4, 45:19, 46:10, 46:20, 47:11, 72:9, 83:10, 83:14, 104:11, 117:19, 147:2, 164:8, 206:4, 206:5, 218:10, 221:18, 249:4, 278:4, 278:11
**threw** [9] - 80:15, 80:18, 165:13, 165:18, 170:10, 175:16, 176:5, 176:18
**throughout** [2] - 238:8, 238:11
**throw** [2] - 80:11, 80:17
**throwing** [2] - 112:11, 191:23
**throwings** [1] - 169:22
**thrown** [4] - 80:9, 80:10, 81:12, 206:13
**throws** [1] - 80:12
**tier** [2] - 217:15, 218:5
**Tim** [1] - 2:7
**TIM** [1] - 1:6
**to..** [1] - 220:22
**today** [51] - 4:18, 5:7, 6:5, 6:9, 6:13, 7:22, 8:2, 8:11, 15:16, 17:21, 18:3, 18:4, 20:13, 23:18, 24:2, 27:12, 32:20, 38:10, 67:3, 89:9, 90:5, 90:15, 97:10, 97:16,

120:2, 140:9, 155:2, 159:10, 170:2, 171:4, 171:6, 171:13, 171:16, 180:10, 180:17, 181:4, 187:4, 187:19, 188:4, 191:20, 208:5, 210:4, 211:18, 211:19, 212:5, 228:16, 252:8, 252:11, 254:23, 257:12, 263:18
**today's** [2] - 257:20, 259:12
**together** [25] - 24:12, 27:15, 57:8, 61:20, 64:5, 64:11, 64:12, 66:9, 74:17, 75:14, 76:23, 78:5, 83:18, 84:4, 95:19, 96:15, 123:20, 124:7, 193:3, 238:15, 247:2, 247:23
**took** [36] - 74:6, 109:16, 127:11, 127:13, 127:15, 127:22, 128:3, 131:13, 134:8, 134:9, 137:5, 141:12, 147:15, 147:19, 154:14, 163:23, 173:20, 175:11, 175:16, 178:4, 179:11, 179:22, 216:16, 241:7, 242:10, 243:5, 243:10, 257:6, 268:6, 269:3, 269:6, 269:22, 270:7, 272:16
**top** [1] - 219:10
**total** [6] - 10:5, 83:11, 83:12, 83:14, 238:13, 251:12
**totally** [3] - 90:11, 179:20, 196:12
**tough** [4] - 90:21, 215:4, 274:11
**tow** [2] - 35:17, 35:18
**toward** [1] - 278:17
**towards** [5] - 80:12, 150:17, 153:9, 183:14, 183:19
**towed** [1] - 35:17
**toxic** [1] - 200:15
**toys** [2] - 78:17, 78:18
**track** [1] - 65:21
**trade** [3] - 30:12, 30:17, 31:2

**transcribed** [2] - 6:21, 157:12
**transcribing** [1] - 6:10
**transcript** [23] - 107:7, 155:6, 155:16, 155:20, 156:5, 156:16, 157:7, 158:7, 158:23, 159:7, 159:12, 159:19, 159:22, 159:23, 160:2, 160:19, 161:2, 161:5, 161:8, 162:6, 193:3, 193:6, 281:7
**transcription** [1] - 282:7
**transcripts** [1] - 157:6
**transferred** [1] - 231:21
**transport** [1] - 31:23
**transported** [3] - 212:14, 213:3, 213:11
**transporting** - 32:3
**trauma** [1] - 200:17
**travel** [2] - 31:22, 250:7
**treat** [1] - 193:5
**treated** [3] - 4:8, 94:17, 279:9
**treatment** [10] - 121:9, 225:16, 227:23, 228:5, 228:13, 228:16, 228:20, 229:20, 230:17, 252:11
**tremendous** [1] - 108:7
**Trial** [1] - 3:16
**trial** [42] - 3:13, 5:8, 181:16, 181:17, 181:18, 181:19, 182:3, 182:17, 182:18, 192:8, 194:20, 199:9, 200:5, 200:6, 201:3, 203:8, 204:8, 208:9, 208:13, 210:22, 210:23, 211:2, 211:4, 211:10, 233:5, 233:7, 233:22, 233:23, 234:5, 236:12, 236:13, 236:19, 242:2, 245:18, 246:2, 256:2, 256:4, 263:9, 264:4, 265:14, 279:8
**trials** [3] - 159:11, 188:2, 255:10

**tried** [8] - 65:13, 129:7, 216:13, 219:3, 219:4, 244:4, 261:23, 263:9
**triggers** [1] - 231:9
**trouble** [11] - 134:19, 137:19, 137:21, 137:22, 141:23, 142:15, 153:15, 153:18, 154:2, 153:16, 275:6
**TROY** [1] - 1:6
**Troy** [35] - 2:6, 2:7, 5:22, 43:14, 52:14, 52:16, 52:22, 65:15, 134:6, 181:20, 198:14, 254:14, 258:23, 259:20, 259:22, 260:14, 260:16, 260:21, 264:7, 264:21, 265:4, 265:19, 266:5, 266:13, 268:4, 268:10, 269:9, 270:13, 272:12, 272:15, 272:18, 273:2, 273:16, 276:19
**truck** [3] - 35:13, 35:14, 231:18
**trucker** [1] - 31:12
**Trucking** [1] - 31:9
**trucking** [8] - 31:14, 32:22, 33:2, 33:12, 33:17, 39:4, 39:5, 40:4
**true** [42] - 155:10, 157:7, 158:17, 159:5, 164:15, 165:12, 165:14, 165:17, 166:12, 167:13, 167:18, 168:9, 169:13, 169:14, 170:16, 170:17, 172:5, 174:15, 174:23, 175:10, 175:13, 175:15, 175:20, 176:2, 176:4, 176:9, 176:12, 176:14, 176:17, 177:21, 179:4, 179:7, 180:2, 186:18, 190:2, 192:6, 200:7, 255:13, 255:19, 281:7, 282:6
**truth** [1] - 6:9
**truthful** [1] - 8:8
**truthfully** [1] - 8:19
**try** [3] - 65:14, 223:5,

223:6
**trying** [14] - 37:5, 44:7, 62:20, 123:11, 123:17, 123:21, 126:12, 131:9, 137:16, 141:13, 147:5, 160:20, 189:4, 191:8
**tumbled** [1] - 219:8
**turn** [3] - 79:13, 79:14, 113:8
**turned** [1] - 108:8
**turns..** [1] - 246:8
**TV** [7] - 75:19, 76:2, 96:15, 96:16, 108:8, 113:8, 225:6
**twice** [3] - 93:6, 93:11, 142:4
**twin** [1] - 61:17
**twins** [28] - 20:23, 56:3, 56:15, 57:9, 58:22, 60:2, 61:23, 62:10, 62:20, 62:22, 63:3, 63:7, 70:20, 71:22, 72:10, 73:23, 74:9, 77:12, 105:10, 107:17, 112:18, 115:5, 118:23, 127:22, 143:21, 144:6, 144:16, 145:5
**two** [65] - 14:18, 15:5, 33:8, 37:18, 37:23, 45:3, 46:2, 47:6, 47:15, 52:21, 61:17, 63:14, 72:4, 72:9, 74:15, 75:4, 75:5, 75:6, 75:7, 80:22, 81:11, 83:10, 83:13, 84:13, 91:16, 93:15, 96:14, 101:12, 106:13, 112:2, 112:3, 112:5, 112:6, 114:9, 117:19, 117:20, 120:11, 123:9, 124:10, 124:20, 125:13, 125:14, 133:3, 134:7, 139:11, 146:2, 147:2, 148:5, 154:14, 157:4, 163:19, 171:21, 175:15, 180:22, 188:2, 206:12, 215:2, 215:21, 218:19, 220:9, 230:11, 259:14, 270:9, 278:4, 278:11
**two-bedroom** [1] - 75:6
**two-page** [1] - 259:14

**Tylenol** [1] - 217:7
**type** [10] - 65:16, 82:3, 92:6, 94:14, 94:15, 112:17, 169:2, 266:6, 266:8, 276:11
**types** [2] - 49:23, 266:15
**typing** [1] - 10:23
**Tywobie** [2] - 11:16, 12:9
**TYWOBIE** [1] - 11:18

## U

**ultimately** [1] - 273:6
**unable** [1] - 261:23
**under** [14] - 58:12, 72:10, 163:5, 177:10, 192:14, 211:13, 268:18, 270:4, 270:10, 270:16, 271:11, 272:2, 272:3, 272:8
**underlying** [1] - 159:3
**unemployed** [4] - 65:3, 66:4, 78:20, 79:8
**unemployment** [1] - 47:16
**unhealthy** [1] - 67:12
**unified** [2] - 211:2, 211:10
**Union** [1] - 216:6
**unit** [4] - 61:12, 221:5, 221:15, 225:7
**United** [2] - 32:2, 34:17
**UNITED** [1] - 1:1
**unless** [5] - 6:11, 68:9, 68:11, 68:17, 69:3
**unlocked** [1] - 105:11
**unofficially** [1] - 4:21
**unsupervised** [2] - 107:3, 173:5
**untrue** [1] - 178:19
**up** [84] - 6:14, 10:8, 16:15, 23:18, 37:19, 46:17, 51:19, 54:20, 69:14, 71:21, 80:7, 81:19, 83:18, 84:3, 86:9, 86:14, 87:17, 90:2, 91:2, 91:9, 91:21, 92:7, 98:22, 103:21, 108:8, 109:13, 113:8, 115:23, 116:21, 117:2, 117:3, 129:18, 129:19, 129:20, 130:20,

132:2, 135:13, 140:7, 142:2, 142:10, 142:16, 150:17, 153:9, 167:5, 167:18, 168:20, 176:5, 177:2, 177:6, 177:23, 178:11, 178:15, 180:23, 181:12, 188:12, 189:19, 192:12, 192:17, 193:20, 195:4, 195:17, 200:3, 205:7, 207:18, 215:6, 215:16, 216:15, 219:2, 219:10, 219:12, 224:11, 236:9, 247:19, 250:16, 251:6, 251:21, 252:2, 257:11, 260:19, 271:7, 272:15, 275:15, 277:16
**ups** [4] - 76:19, 76:21, 77:7, 77:9
**upset** [4] - 89:5, 134:17, 172:6, 223:11
**usual** [1] - 96:8
**uttered** [1] - 6:20

## V

**vacated** [2] - 245:3, 245:6
**vacation** [2] - 37:2, 37:4
**vacuuming** [1] - 135:13
**vehicle** [2] - 30:17, 33:13
**verbal** [8] - 80:2, 81:13, 199:16, 201:9, 201:13, 203:3, 254:18, 254:19
**verbally** [1] - 183:14
**verdict** [3] - 208:15, 208:17, 209:12
**versa** [1] - 56:17
**versus** [7] - 35:2, 53:20, 112:8, 197:16, 200:10, 271:14, 271:17
**vice** [1] - 56:17
**Victor** [7] - 83:23, 113:5, 141:15, 274:22, 275:2, 275:5, 275:14

**video** [21] - 155:2, 155:9, 155:11, 160:4, 165:2, 178:21, 195:21, 196:15, 199:12, 201:7, 201:8, 201:12, 201:17, 201:19, 202:5, 203:5, 203:6, 203:7, 203:8
**videotape** [2] - 232:6, 232:14
**videotaped** [3] - 157:5, 169:18, 199:22
**view** [1] - 201:15
**violate** [1] - 262:22
**violated** [1] - 200:12
**violent** [3] - 82:12, 82:18, 82:22
**visibility** [1] - 35:15
**visit** [4] - 61:16, 119:23, 235:23, 236:11
**visited** [1] - 236:7
**visitors** [1] - 236:3
**visits** [10] - 63:3, 119:12, 215:7, 223:14, 238:20, 239:2, 239:4, 239:6, 239:10, 239:16
**vocational** [1] - 240:22
**voicemail** [5] - 143:12, 143:15, 262:3, 262:7, 273:20
**voices** [1] - 80:4
**volume** [2] - 108:9, 113:8
**Voluntary** [2] - 163:10, 280:6
**voluntary** [2] - 253:8, 253:14

## W

**wage** [13] - 32:8, 32:9, 37:7, 37:12, 37:21, 37:22, 44:10, 44:11, 44:20, 44:21, 45:12, 52:5
**waist** [3] - 110:18, 110:19, 111:8
**wait** [2] - 50:6, 50:11
**waited** [1] - 151:8
**waiting** [4] - 68:15, 134:23, 154:12
**waived** [4] - 3:9, 190:20, 190:22,

191:6
**waiving** [2] - 159:16, 187:15
**wake** [1] - 224:11
**Wal** [12] - 43:12, 43:15, 43:22, 44:13, 45:20, 46:3, 47:8, 83:18, 84:4, 97:5, 118:20, 248:17
**Wal-Mart** [12] - 43:12, 43:15, 43:22, 44:13, 45:20, 46:3, 47:8, 83:18, 84:4, 97:5, 118:20, 248:17
**Waldman** [2] - 265:11, 265:16
**walk** [4] - 90:23, 91:11, 95:21, 219:2
**walked** [4] - 105:23, 137:22, 151:8, 166:23
**wall** [2] - 112:11, 187:20
**Walter** [1] - 263:19, 263:21
**wandered** [1] - 105:23
**wants** [2] - 10:5, 102:14
**ward** [1] - 147:20
**washed** [1] - 141:2
**washing** [3] - 50:4, 135:13, 139:9
**Washington** [2] - 1:20, 2:9
**watch** [7] - 61:19, 62:12, 62:22, 83:4, 84:10, 96:15, 225:6
**watched** [5] - 83:13, 84:9, 147:22, 149:21, 155:4
**watching** [1] - 148:16
**water** [8] - 126:3, 130:13, 131:5, 131:6, 134:15, 177:10, 192:15
**wear** [2] - 111:6, 111:7
**wearing** [3] - 8:10, 110:21, 111:2
**week** [29] - 32:12, 32:14, 38:18, 38:20, 40:9, 40:11, 61:8, 110:7, 110:12, 110:13, 115:4, 117:11, 117:16, 146:15, 165:12, 165:18, 166:17, 171:20, 207:19, 207:22, 208:3, 221:16, 227:5, 227:6, 227:7,

227:22, 249:4, 253:2
**weekend** [5] - 116:23, 128:10, 143:22, 207:18, 208:2
**weekends** [1] - 86:18
**weekly** [1] - 225:23
**weeks** [4] - 33:15, 61:5, 123:9, 171:21
**weigh** [1] - 89:15
**weighed** [1] - 89:17
**weight** [3] - 89:9, 89:11, 89:15
**Weldon** [2] - 14:9, 14:11
**well-baby** [2] - 70:17, 70:20
**West** [2] - 1:20, 2:9
**wet** [1] - 118:9
**whatsoever** [2] - 228:20, 249:19
**wheels** [1] - 76:10
**wheezing** [1] - 176:9
**whereabouts** [1] - 238:22
**whichever** [1] - 35:3
**whine** [1] - 69:3
**whipping** [1] - 258:19
**whistle** [1] - 219:11
**whole** [11] - 42:10, 42:11, 125:5, 129:4, 159:6, 162:2, 226:11, 227:15, 227:17, 270:21, 281:7
**whooped** [1] - 190:10
**wide** [1] - 75:12
**wife** [18] - 100:21, 101:5, 140:5, 141:13, 143:12, 174:13, 177:5, 192:11, 221:22, 222:2, 223:21, 255:15, 258:18, 258:22, 261:22, 262:14, 277:4, 279:9
**Wilahemina** [102] - 17:5, 17:15, 20:19, 21:20, 22:16, 24:20, 26:11, 26:16, 52:8, 52:16, 53:2, 54:14, 54:22, 55:3, 56:11, 60:6, 60:9, 60:15, 60:19, 61:16, 62:21, 63:11, 64:20, 66:3, 71:14, 72:22, 73:13, 74:5, 74:14, 76:15, 77:14, 77:15, 82:13, 82:18, 82:20, 84:5, 88:10, 88:15, 88:18, 95:7, 95:16, 96:8,

100:22, 104:18, 111:16, 112:21, 115:7, 115:18, 118:2, 118:18, 121:9, 123:20, 127:11, 127:15, 134:18, 135:19, 136:6, 136:16, 137:14, 141:19, 144:7, 145:13, 145:18, 168:13, 175:17, 176:15, 176:23, 182:9, 182:10, 183:2, 193:20, 215:8, 215:9, 222:9, 222:10, 223:8, 223:13, 239:23, 248:8, 248:11, 249:3, 249:13, 250:2, 254:21, 255:5, 255:21, 256:5, 256:22, 257:7, 257:22, 259:19, 259:22, 260:6, 260:13, 262:20, 263:5, 263:8, 269:15, 273:18, 274:13, 280:11, 280:12
**Wilahemina's** [6] - 62:14, 62:15, 73:7, 73:20, 135:2, 274:19
**window** [2] - 112:14, 149:23
**witness** [8] - 191:11, 201:5, 203:13, 204:4, 206:9, 211:20, 258:2, 259:16
**WITNESS** [117] - 9:2, 10:8, 12:15, 13:22, 18:22, 21:5, 21:17, 23:20, 24:16, 28:5, 35:5, 36:8, 39:6, 40:4, 41:7, 41:13, 47:2, 48:6, 51:12, 55:23, 58:3, 58:20, 58:23, 61:7, 62:3, 64:18, 64:23, 71:5, 76:12, 76:19, 79:5, 83:2, 89:7, 98:5, 98:13, 100:11, 102:12, 103:9, 104:8, 107:10, 108:22, 109:8, 110:12, 117:5, 119:8, 119:11, 123:15, 132:5, 138:12, 148:13, 153:20, 159:20,

161:21, 163:20, 166:20, 167:15, 171:18, 171:23, 173:23, 175:8, 178:14, 179:6, 182:21, 184:20, 185:15, 185:21, 186:23, 187:10, 188:11, 188:17, 190:7, 195:4, 205:6, 205:15, 207:22, 209:8, 209:14, 210:11, 215:13, 217:23, 219:23, 221:15, 222:16, 224:7, 226:21, 227:16, 228:9, 229:15, 232:10, 233:14, 233:17, 233:20, 234:8, 235:4, 236:16, 237:16, 239:19, 242:9, 250:14, 253:16, 256:19, 257:4, 257:14, 259:3, 261:11, 261:13, 262:6, 262:8, 265:2, 265:9, 266:3, 267:4, 267:11, 267:20, 269:3, 269:13, 269:18
**Witness** [2] - 163:12, 280:7
**witness's** [1] - 204:7
**witnesses** [1] - 182:4
**woke** [4] - 129:18, 176:23, 193:20, 207:18
**woman** [4] - 15:13, 15:17, 82:4, 86:20
**women** [1] - 88:17
**word** [4] - 42:4, 53:9, 160:18
**word-for-word** [1] - 160:18
**words** [18] - 6:20, 6:22, 10:22, 76:9, 160:3, 161:5, 169:3, 169:5, 169:6, 169:18, 169:20, 169:21, 179:23, 210:5, 213:23, 264:12, 267:9, 267:11
**worker** [2] - 104:17, 105:2
**workers** [2] - 149:18, 260:20
**works** [1] - 276:20

**world** [1] - 238:20
**worried** [4] - 122:8, 122:10, 168:15, 168:16
**worries** [2] - 71:10, 71:12
**worse** [4] - 124:22, 124:23, 127:4, 224:7
**write** [3] - 169:10, 262:19, 263:5
**writing** [2] - 6:10, 225:10
**written** [6] - 158:19, 158:21, 159:15, 179:16, 257:21, 260:6
**wrongful** [1] - 41:17
**wrote** [4] - 164:22, 169:3, 235:15, 262:23

---

### X

**X-rays** [2] - 279:3, 279:6

---

### Y

**yard** [10] - 218:17, 218:18, 218:21, 218:22, 218:23, 224:18, 224:19, 225:4
**yards** [2] - 105:23, 218:19
**year** [30] - 12:21, 12:23, 13:23, 14:5, 17:18, 22:17, 22:18, 24:6, 27:19, 28:2, 28:8, 44:5, 44:13, 46:2, 47:2, 47:4, 49:4, 53:3, 54:9, 64:9, 93:6, 93:11, 108:10, 110:9, 126:9, 242:12, 242:13, 255:7, 276:13, 276:14
**years** [47] - 10:6, 10:9, 12:13, 12:18, 17:20, 18:3, 18:4, 24:16, 28:14, 28:15, 28:17, 28:20, 33:8, 37:18, 37:23, 43:4, 43:7, 45:3, 46:3, 46:13, 46:19, 46:20, 47:6, 47:15, 47:16, 50:7, 64:6, 64:17, 64:21, 65:12, 66:2, 85:17, 90:11, 96:7, 159:4,

213:7, 213:19,
214:10, 214:15,
226:10, 243:18,
243:23, 248:3,
249:5, 250:21, 260:7

**yelling** [4] - 137:2,
137:3, 137:4, 137:7

**YORK** [4] - 1:1, 1:9,
1:14, 281:1

**York** [49] - 1:21, 1:23,
2:3, 2:6, 2:10, 2:12,
2:13, 3:6, 5:17, 5:18,
5:19, 24:21, 42:20,
43:3, 43:8, 46:14,
49:9, 49:14, 49:20,
52:5, 52:12, 52:14,
54:20, 62:15, 73:10,
73:11, 73:17, 73:21,
84:15, 84:17, 84:21,
95:7, 95:15, 96:8,
97:12, 103:12,
197:16, 214:21,
244:5, 244:6,
244:12, 244:20,
245:2, 245:22,
246:12, 248:2,
249:6, 282:5

**young** [3] - 23:8, 87:6,
92:7

**younger** [2] - 23:7,
23:8

**yourself** [2] - 13:20,
252:7

# Z

**ZIP** [1] - 9:18
**Zoloft** [6] - 226:5,
226:12, 226:23,
227:21, 228:17,
229:21

```
1   UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF NEW YORK
2   - - - - - - - - - - - - - - - - - - - - - - - - - - -

3   ADRIAN THOMAS,

4                        Plaintiff,

5            - against -

6   CITY OF TROY, ADAM R. MASON, RONALD FOUNTAIN,
    TIM COLANERI,
7   RENSSELAER COUNTY, and MICHAEL SIKIRICA,

8                        Defendants.
    - - - - - - - - - - - - - - - - - - - - - - - - - - -
9   NEW YORK STATE
    COURT OF CLAIMS
10  - - - - - - - - - - - - - - - - - - - - - - - - - - -

11  ADRIAN P. THOMAS,

12                       Claimant,

13           - against -

14  THE STATE OF NEW YORK,

15                       Defendant.
    - - - - - - - - - - - - - - - - - - - - - - - - - - -

16

17           CONTINUED DEPOSITION of Plaintiff/Claimant,

18  ADRIAN P. THOMAS, held on the 21st day of August 2019,

19  commencing at 9:11 a.m., at the Law Offices of Bailey,

20  Johnson & Peck, P.C., 5 Pine West Plaza, Washington

21  Avenue Extension, Albany, New York 12205, before Jeanne

22  O'Connell, Registered Professional Reporter and Notary

23  Public in and for the State of New York.
```

```
1    APPEARANCES:

2    Brett H. Klein, Esq.
     305 Broadway
3    Suite 600
     New York, New York  10007
4    Attorney for Plaintiff/Claimant

5    Pattison Sampson Ginsberg & Griffin, PLLC
     22 First Street
6    Troy, New York  12180
     By:  Joseph T. Perkins, Esq.
7    Attorneys for City of Troy, Adam R. Mason,
     Ronald Fountain and Tim Colaneri
8
     Bailey, Johnson & Peck, P.C.
9    5 Pine West Plaza
     Washington Avenue Extension
10   Albany, New York 12205
     By:  Crystal R. Peck, Esq.
11   Attorneys for Michael Sikirica

12   New York State Office of the Attorney General
     The Capitol
13   Albany, New York 12224
     By:  Christina M. Calabrese, Assistant Attorney General
14
     Also present:  Katherine Hamilton
15

16

17

18

19

20

21

22

23
```

1               S T I P U L A T I O N S

2    It is hereby stipulated and agreed by

3    and between the attorneys for the respective

4    parties hereto that, this examination may be signed and

5    sworn to before any Notary Public of the State of New

6    York.

7

8    It is further stipulated and agreed that the filing and

9    certification of the said examination shall be waived.

10

11   It is further stipulated and agreed that all objections

12   to questions, except as to form, shall be reserved for

13   the trial of this action.

14

15   It is further stipulated and agreed that there are no

16   objections to Notice of this Examination Before Trial

17   and the qualifications of the court reporter to take

18   this deposition and administer an oath or affirmation.

19

20

21

22

23

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2              ADRIAN PERONE THOMAS, after first

 3         having been duly sworn, was examined and

 4         testified as follows:

 5   EXAMINATION

 6   BY MR. PERKINS:

 7      Q.  Mr. Thomas, once again, I'm Joe Perkins.  I

 8   represent the City of Troy, Ronald Fountain, Tim

 9   Colaneri, and Adam Mason in this action.

10          Same rules as yesterday.  Any time you want to

11   take a break, let me know.  I'll be happy to give you a

12   break, okay?

13      A.  Okay.

14   █████████████████████████████████████████████████████

15   ████████████████████████████████████████████

16      ███████████████████████████████████████████████████

17   ██████████

18      █    ████████████████████

19   █████████████████████████████████████████████████████

20   ██████████████

21      █████████

22   ███████████████████████████████████

23      █████████
```



1          (Adrian P. Thomas - by Mr. Perkins)

19    Q.   Now, Mr. Thomas, there came a time when you were

20    taken to the City of Troy Police Department for the

21    first interview.

22         Do you know what I mean when I say that?

23    A.   Yes.

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2     Q.  You were interviewed on two occasions.  The first

 3   one was about two, two and a half hours.  The second one

 4   was seven, seven and a half hours.

 5         Is that about right?

 6     A.  I believe so.  Yes.

 7              MR. KLEIN:  Just note my objection.

 8              I believe the first one was more like

 9         an hour and a half, but I accept that

10         there's a first interview and a second

11         interview.

12              MR. PERKINS:  There's a short interview

13         and a long interview.

14              MR. KLEIN:  Okay.

15   BY MR. PERKINS:

16     Q.  In the short interview, who were you speaking to

17   from the Troy City Police Department?

18     A.  In the first interview?

19     Q.  Yes.

20     A.  I was speaking with Ronald Fountain and Adam

21   Mason.

22     Q.  Did you provide a statement during the first

23   interview?
```

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2     A.  Yes.

 3     Q.  Before I get to this, I want to go back to

 4  City 3.

 5          You're not aware that the CPS, the Rensselaer

 6  County CPS, obtained this statement from Rebecca Cruse

 7  on the morning of September 22, 2008, correct?

 8     A.  Not to my knowledge.  No.

 9              (City Exhibit 4 marked for

10          identification.)

11  BY MR. PERKINS:

12     Q.  You didn't know about that, okay.

13          I'm going to show you what's been marked as City

14  Exhibit 4 for identification and I'm going to ask you to

15  take a look at that, please.

16     A.  (Witness complies.)

17     Q.  Now, before the first interview, Mr. Thomas, did

18  you receive your Miranda warnings?

19     A.  I don't remember.

20              (City Exhibits 5 and 6 marked for

21          identification.)

22  BY MR. PERKINS:

23     Q.  Mr. Thomas, I'm going to show you what's been
```

```
 1            (Adrian P. Thomas - by Mr. Perkins)

 2   marked as City Exhibit 5 and City Exhibit 6 for

 3   identification.

 4        I'll just ask you to take a quick look at that.

 5   A.  (Witness complies.)

 6   Q.  Mr. Thomas, I'm wondering if these refresh your

 7   recollection as to whether or not each time you did an

 8   interview at the City of Troy Police Department, if you

 9   were provided with your Miranda rights.

10   A.  Yes.

11   Q.  Are those your initials on City 5 and City 6?

12   A.  Yes.

13   Q.  And is that your signature on City 5 and City 6?

14   A.  That's correct.

15   Q.  Now, with respect to City Exhibit 4, is the

16   information in this statement accurate or not accurate?

17   A.  City 4?

18   Q.  Yeah.  This is the one-page statement.

19            MR. KLEIN:  Show it to him.

20            MR. PERKINS:  Why don't we get copies?

21        It'll just take a second.

22            Off the record.

23            (Recess taken.)
```

```
 1              (Adrian P. Thomas - by Mr. Perkins)
 2    BY MR. PERKINS:
 3       Q.   Mr. Thomas, actually, first of all, it's
 4    approximately a one-and-a-half-hour interview the first
 5    time with the City of Troy Police Department; is that
 6    correct?
 7       A.   Approximately.  Yes.
 8       Q.   Detective Fountain and Detective Mason were
 9    there, right?
10       A.   Correct.
11       Q.   Who was asking more of the questions?
12            Was it Detective Fountain or Detective Mason?
13       A.   Actually, I don't actually remember --
14       Q.   That's fine.
15       A.   -- who gave most of the questions.
16       Q.   Looking at City Exhibit 4, the statement starts
17    out, it says, "about a week or so from today, which is
18    now 9/22/08, I remember while I was in the bathroom, I
19    had the door cracked, my son Matthew was on the bed with
20    ██████   I don't know, but ██████ could have hit him in
21    the head with a metal truck."
22            So when you provided that -- first of all, did
23    you say that to the detectives?
```

```
 1           (Adrian P. Thomas - by Mr. Perkins)

 2    A.   Yes.

 3    Q.   Is it true?

 4    A.   No.

 5    Q.   Why did you say it if it wasn't true?

 6    A.   I only gave that based on what was suggested to

 7  me.

 8    Q.   And how come?  So it was suggested to you and you

 9  provided the information, but if it wasn't true why did

10  you do that?

11        Why did you go along with that if it wasn't true?

12    A.   I felt like I had no choice.

13    Q.   So, if you didn't do that then what was the

14  consequence?

15    A.   I didn't know at the time what was the

16  consequence.

17             MR. KLEIN:  Were they telling you

18        things about your son, your wife, yourself?

19             Were they telling you anything about

20        that?

21             MS. PECK:  Objection.

22             You can't essentially lead him.

23             MR. KLEIN:  I'm not doing anything.
```

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2        I'm --

 3              MS. PECK:  Well, still, I think that's

 4        improper.

 5              MR. KLEIN:  I'm just trying to help

 6        move it along.  I think he's already said --

 7   BY MR. PERKINS:

 8     Q.  Were you afraid you would be arrested if you

 9   didn't provide inaccurate information?

10     A.  I believe so.

11     Q.  Was there any other concern about the concern for

12   getting arrested which was allowing you to give

13   inaccurate information?

14     A.  Repeat that question.

15     Q.  Yeah.  Yeah, I will.

16          It's my understanding you felt like you had no

17   choice but to sign something which was inaccurate,

18   correct?

19     A.  Correct.

20     Q.  Was at least a part of that because you were

21   afraid you were going to get arrested?

22     A.  Yes.

23     Q.  Aside from being concerned that you might get
```

```
 1              (Adrian P. Thomas - by Mr. Perkins)
 2   arrested, was there anything else you were afraid of
 3   which would explain why you signed something which was
 4   inaccurate?
 5      A.   I believe I wasn't going to be able to go in and
 6   see my son.
 7      Q.   Did you know where your son was at that time?
 8      A.   I knew he was in the hospital.  No.
 9      Q.   By the way, during this time period, did you ever
10   hear that your son had been transferred from Samaritan
11   Hospital to Albany Medical Center?
12      A.   I don't recall.
13      Q.   Going back to the statement.
14           It says, "there's another incident Matthew was
15   falling off the couch.  I snatched him up quick before
16   he hit the ground.  This was around a week ago."
17           Was that true or false?
18      A.   It was false.
19      Q.   "I also recall about ten days ago putting Matthew
20   in the crib and him smacking his head on the crib and he
21   started crying."
22           Was that true or was that false?
23      A.   That was false.
```

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2       Q.   Now, at the time of the first interview with the

 3    City of Troy police, you mentioned something about, "if

 4    my son passes away, I feel like I might jump off a

 5    bridge," correct?

 6       A.   Correct.

 7       Q.   Was it true that you were feeling possibly

 8    suicidal at that time?

 9       A.   Yes.

10       Q.   And then you were taken to Samaritan mental

11    health, correct?

12       A.   Yes.

13       Q.   Do you know how long you were there for?

14       A.   Throughout from the time they brought me in to

15    the time I left?

16       Q.   Yeah.

17       A.   I believe maybe a day.

18       Q.   Did you have your cell phone with you?

19       A.   My cell phone was taken as soon as I got to the

20    room.

21       Q.   Did you have phone privileges?

22            Could you have made a phone call if you had

23    wanted to?
```

1            (Adrian P. Thomas - by Mr. Perkins)

2    A.  I'm not sure.  It was never provided.

3    Q.  Did you ever ask anybody, do you have a phone I

4  could use?

5    A.  No.

6    Q.  Did you ever ask anybody to get information on

7  how your wife or your child Matthew were doing?

8    A.  No.

9    Q.  What did Detective Fountain do, if anything, that

10  would make you sign City Exhibit 4, if there were

11  inaccuracies in there?

12    A.  Repeat that to me one more time.

13    Q.  City Exhibit 4 has some inaccurate statements in

14  there that you signed, correct?

15    A.  Correct.

16    Q.  What did Detective Fountain do that would cause

17  you to do that?

18    A.  I don't remember exactly.

19    Q.  Well, you understand he's a defendant in this

20  action, correct?

21    A.  Yes.

22    Q.  I'm going to move on now to the second interview.

23        Now, you were picked up from Samaritan mental

```
 1             (Adrian P. Thomas - by Mr. Perkins)

 2    health by who, do you remember?

 3       A.  Adam Mason.

 4       Q.  Detective Mason picked you up?

 5       A.  Yes.

 6       Q.  Was he alone?

 7       A.  He was alone when he came to the floor.  I don't

 8    remember nobody else being there with him.

 9       Q.  How about at the hospital when he picked you up

10    from Samaritan, do you know if he had anybody with him,

11    if it was him who picked you up?

12            I can't recall at the moment.

13       A.  I don't remember if anybody else was with him

14    when I got to the car.

15       Q.  By the way, when you were dropped off at mental

16    health Samaritan, Detective Fountain was there, correct?

17       A.  I believe so.

18       Q.  Did you ever see Detective Fountain again after

19    that day?

20       A.  After I was dropped off to the hospital?

21       Q.  So Detective Fountain was with you when you drove

22    to Samaritan mental health, correct?

23       A.  Yes.
```

1              (Adrian P. Thomas - by Mr. Perkins)

2      Q.   And then you went into the facility.

3           You were checked in, right?

4      A.   Right.

5      Q.   Do you ever see Detective Fountain again?

6      A.   From that moment, no.

7      Q.   So, Detective Fountain wasn't there at all for

8  the second interview, correct?

9              MR. KLEIN:  You're just asking him that

10         day?

11             MR. PERKINS:  Yeah.

12 BY MR. PERKINS:

13     Q.   Well, until the time you get arrested, was

14 Detective Fountain there when you got arrested?

15     A.   Not to my knowledge.  No.

16     Q.   Was Detective Fountain there during your second

17 interview?

18             MR. KLEIN:  That you saw.

19             THE WITNESS:  No.

20 BY MR. PERKINS:

21     Q.   Now, you get picked up from Samaritan and were

22 brought back to the Troy police station for interview

23 number two, correct?

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2     A.  Correct.

 3     Q.  Now, you were brought up to the third floor of

 4  the Troy Police Department; is that accurate?

 5         Only if you recall.

 6     A.  I don't recall what floor.

 7     Q.  But before you were taken into the interview

 8  room, is it my understanding that you had a conversation

 9  with Detective Mason about escape?

10              MR. KLEIN:  Objection.

11              You can answer.

12              THE WITNESS:  Yes.

13  BY MR. PERKINS:

14     Q.  Can you tell me what that conversation was again,

15  as closely as you can recall?

16     A.  I remember being told, when I go in the room and

17  sit down in the chair, if I get up and go towards the

18  door of that room, I would be charged with escape.

19     Q.  Did that make you suspicious at all?

20     A.  It made me afraid.

21     Q.  And what were you afraid of?

22     A.  Just being in that building, period.

23     Q.  Were you ultimately afraid of getting arrested?
```

1                (Adrian P. Thomas - by Mr. Perkins)

2     A.  Yes.

3     Q.  Did you think of asking for an attorney at that

4  time?

5     A.  I don't remember.

6     Q.  Did you have any conversation with Detective

7  Mason about, okay, so am I being held, am I under

8  arrest, because you're telling me if I try and leave

9  it's an escape?

10        Was there any conversation about that?

11    A.  I said nothing after that.

12            MR. KLEIN:  Just yes or no.

13            THE WITNESS:  No.

14  BY MR. PERKINS:

15    Q.  So during the second interview, is it my

16  understanding you didn't feel like you were free to

17  leave?

18    A.  Correct.

19    Q.  After you got in the room for the second

20  interview, it was after you got in the room and after

21  you were told of the escape comment by Detective Mason

22  that you signed City Exhibit 6 for identification,

23  correct?

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2      A.  Yes.

 3              MR. PERKINS:  Now, Brett, do you have

 4          Defendant's Exhibit C for identification,

 5          which was marked yesterday, the ten-page

 6          statement?

 7              MR. KLEIN:  I believe so.

 8              MR. PERKINS:  Could I have Mr. Thomas

 9          take a quick look at that?

10              MR. KLEIN:  This is a long statement so

11          you should read through it.

12              MR. PERKINS:  Yeah.  No matter -- he

13          should.

14              MR. KLEIN:  You're asking general

15          questions?

16              MR. PERKINS:  Yeah.  I'm not going to

17          go line-by-line, but there's certain lines

18          I'll ask about.  That's between you and your

19          client.

20              (Recess taken.)

21      BY MR. PERKINS:

22      Q.  Mr. Thomas, first of all, have you reviewed the

23      ten-page statement that you provided to the Troy police?
```

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2      A.  Yes.

 3              MR. PERKINS:  For the record, I

 4         previously misidentified it as Defendant's

 5         Exhibit C.  It's actually Defendant's

 6         Exhibit B.

 7   BY MR. PERKINS:

 8      Q.  Mr. Thomas, in that statement there is some

 9   indication that there was marital tension with

10   Wilahemina Hicks due to the fact that you were

11   unemployed at the time; is that accurate?

12      A.  Correct.

13      Q.  Was that true?

14      A.  Yes.

15      Q.  And in looking at Defendant's Exhibit B, did you

16   sign every page of that written statement?

17      A.  Yes.

18      Q.  And in Defendant's Exhibit B, the ten-page

19   statement, there's a description of ways in which you

20   hurt Matthew, correct?

21      A.  Yes.  Well, that's what it was written.

22      Q.  And those are false?

23      A.  Those are false.
```

```
 1            (Adrian P. Thomas - by Mr. Perkins)

 2    Q.  Now, by the time you gave this statement, had you

 3  already done the reenactment that you did here

 4  yesterday, where you threw -- was it a clipboard on the

 5  videotape that you threw onto the ground?

 6    A.  I believe it was a clipboard.

 7    Q.  So you had done the reenactment, right?

 8         And by the time you signed this statement you had

 9  already thrown the clipboard?

10    A.  I believe so.  Yes.

11    Q.  Then you read this, and you signed it on every

12  page, correct?

13    A.  Yes.

14    Q.  Now, same question as before.

15         If there are inaccuracies in here, I want you to

16  tell me, to the best of your ability, why you signed

17  this statement.

18    A.  On the second?

19    Q.  Yes.

20         MR. KLEIN:  This statement, the

21      ten-page statement, why did you sign it?

22         THE WITNESS:  I was tired.  I was

23      frustrated.  I was afraid.  I wanted to see
```

```
 1            (Adrian P. Thomas - by Mr. Perkins)

 2            my children, my son Matthew.  I didn't want

 3            Wilahemina to get scooped up by Troy Police

 4            Department.  I just would have said anything

 5            to get out of there.  That's the reason I

 6            didn't get up and go for the door, because I

 7            was afraid.

 8   BY MR. PERKINS:

 9      Q.  Were you afraid of being arrested?

10      A.  I was afraid of being arrested and for my wife to

11   be arrested.

12      Q.  We'll get back to that in a second.

13          You put in the statement -- it lists multiple

14   times that you hurt Matthew, and you had already done

15   the depiction with the clipboard, correct?

16      A.  Repeat the question.

17      Q.  Sure.  By the time you signed this statement you

18   had already thrown the clipboard onto the floor, right?

19            MR. KLEIN:  Objection.  Asked and

20       answered.

21            You can answer.

22            THE WITNESS:  Yes.

23   BY MR. PERKINS:
```

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2       Q.  How long after signing this statement were you

 3  arrested?

 4       A.  I'm not -- I can't recall that.

 5       Q.  It was the same night, right?

 6              MR. KLEIN:  I believe it was morning,

 7          but...

 8              MR. PERKINS:  Morning.

 9              THE WITNESS:  I don't remember what day

10          I got -- what time I got arrested.

11  BY MR. PERKINS:

12       Q.  Do you remember being arrested?

13       A.  Yes.

14       Q.  Who advised you you were under arrest?

15       A.  I believe Adam Mason.

16       Q.  When Adam Mason advised you you were under

17  arrest, were you surprised?

18       A.  Yes.

19       Q.  And tell me about that.

20       A.  I was surprised because I was told that I wasn't

21  going to be arrested.  I was told on numerous occasions

22  I wasn't going to be arrested.

23       Q.  Now, Wilahemina Hicks, Wilahemina was not
```

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2    arrested, correct?

 3       A.  To my knowledge.

 4       Q.  Now, you had been told during these

 5    interrogations that the police thought it was an adult

 6    in the apartment who had caused the injuries to Matthew,

 7    correct?

 8       A.  Yes.  That's what I was told.

 9       Q.  And you and Wilahemina were the only adults

10    around them during that time, the kids, correct?

11       A.  On what days?

12       Q.  On the days leading up to Matthew going into the

13    hospital.

14       A.  Her relatives was coming by.  So I can't just say

15    me and her were the only two.

16       Q.  What relatives were coming by?

17       A.  My mother-in-law.

18       Q.  Inga?

19       A.  Yes.

20       Q.  Anybody else?

21       A.  Her sister Carla and her brother Victor.

22       Q.  Did you ever think that one of them could have

23    hurt Matthew?
```

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2     A.   I don't believe so.  No.

 3     Q.   Do you feel you were targeted by the city police

 4   department in the investigation?

 5     A.   Yes.

 6     Q.   Tell me about that.

 7     A.   I feel I was targeted because I wasn't working.

 8   So I believe that, because I wasn't working and because

 9   CPS previously had came by the house from the time that

10   AJ left the apartment, I believe that gave them a

11   possible motive that things wasn't right at the house,

12   plus we wasn't getting along at the time.  So I believe

13   that had something to do.

14          Other than the doctor saying there was some type

15   of force.

16     Q.   Right.  Is there anything else you can think of?

17     A.   Not at the moment.  No.

18     Q.   So, we knew that the doctor told the police that

19   they thought the injuries to Matthew were caused by

20   force, correct?

21              MR. KLEIN:  Objection.

22              Do you know if that's what the doctors

23          told the police?
```

```
1              (Adrian P. Thomas - by Mr. Perkins)
2                   THE WITNESS:  I don't know everything.
3              I just know what I was told by my attorneys
4              at the time.
5                   MR. PERKINS:  Don't say that.  Don't
6              say that.
7     BY MR. PERKINS:
8        Q.  But you were unemployed, ██████████████
9     ████████████████  and things weren't going great with
10    Wilahemina, and then it was your understanding that the
11    doctor had told the police that the child had been
12    injured, right?
13                  MR. KLEIN:  Objection.
14                  THE WITNESS:  That's what I was told.
15    BY MR. PERKINS:
16       Q.  Do you think there's any other reason that you
17    felt targeted by the City of Troy Police Department?
18                  MR. KLEIN:  Objection.
19                  THE WITNESS:  Not at this time.  That's
20              all I -- from my understanding.
21                  MR. PERKINS:  Thank you.
22    BY MR. PERKINS:
23       Q.  During the second interview, do you remember
```

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2   another detective coming into the room and saying, I

 3   served in Desert Storm and I don't think you're telling

 4   the truth about how Matthew got hurt?

 5      A.   During the second interview, yes.

 6      Q.   Do you know how long that detective was in the

 7   room?

 8      A.   I don't recall how long he was there.

 9      Q.   Do you know that detective's name?

10      A.   Colaneri, I believe.

11      Q.   Yes, Detective Tim Colaneri.

12           Did Detective Tim Colaneri come in the room and

13   he said some things, you remember that, correct?

14      A.   Yes.

15      Q.   He said, I was in Desert Storm and medical

16   background, etc., right?

17      A.   Yes.

18      Q.   Did that cause you to confess?

19      A.   Not exactly.  No.

20      Q.   When you say not exactly, if you could just --

21      A.   He came off aggressive, but that didn't -- that

22   didn't cause me to sign or anything like that.

23                MR. KLEIN:  Note an objection to the
```

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2         form of the last two questions.

 3    BY MR. PERKINS:

 4       Q.  After you were arrested you went to the

 5    Rensselaer County jail, correct?

 6       A.  Yes.

 7       Q.  How long after that was it that you were met by a

 8    representative of Rensselaer County CPS?

 9       A.  Not too long.

10       Q.  Do you know if it was one person or two people?

11       A.  That I met with from CPS at the county?

12       Q.  Yes.

13       A.  It was just one.

14       Q.  Now, you mentioned something about -- let me ask

15    you this:  Do you know where they interviewed you?

16       A.  Yes.

17       Q.  Where was it?

18       A.  In the law library at the county jail.

19       Q.  Did they tell you what the purpose of the

20    interview was?

21       A.  He only stated to me that he was there to find

22    out what happened to Matthew.

23       Q.  To your knowledge, had Matthew passed away at
```

Case 1:17-cv-00626-DJS Document 14-2 Filed 06/14/21 Page 386 of 458

```
 1            (Adrian P. Thomas - by Mr. Perkins)

 2   that point?

 3      A.  I didn't have any knowledge.

 4      Q.  You didn't know at that point, right?

 5      A.  No.  I didn't know.

 6            MR. KLEIN:  I'm sorry, can you read

 7         back the question and answer?

 8            (Question and answer read by reporter.)

 9            MR. KLEIN:  What was the question

10         before that?

11            (Question and answer read by reporter.)

12   BY MR. PERKINS:

13      Q.  Were there any video cameras in the room in the

14   law library where the interview was going on?

15      A.  Yes.

16      Q.  You mentioned that there was no tape of this

17   conversation between you and the CPS representative?

18            MR. KLEIN:  Did he mention that there's

19         no tape?

20            MR. PERKINS:  Yes.  I think he said

21         that.

22            MS. PECK:  He said it yesterday.

23            MR. KLEIN:  I think he said there would
```

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2         be a tape.

 3    BY MR. PERKINS:

 4       Q.  Well, let me ask you now:  Do you think there was

 5    a tape of that conversation?

 6              MR. KLEIN:  Do you know either way

 7          whether it recorded or not, the cameras?

 8              THE WITNESS:  I don't exactly know.

 9          But from the memory of trial, I don't think

10          it was, because we tried to get it.

11    BY MR. PERKINS:

12       Q.  Did you see a camera while you were being

13    interviewed?

14       A.  Yes.

15       Q.  Was it more than one or just the one?

16       A.  It was four inside and one at the door, on the

17    outside.

18       Q.  During your time in jail, it's my understanding

19    that that caused you some psychological mental anguish;

20    is that correct?

21       A.  Yes.

22       Q.  Does that continue to this day?

23       A.  Yes.
```

```
 1            (Adrian P. Thomas - by Mr. Perkins)

 2     Q.  Are you seeing a therapist?

 3     A.  No.

 4     Q.  Why not?

 5     A.  I just feel speaking with someone would not

 6  exactly help me.  So I just deal with it the best way I

 7  know how, from what I've been through for the past five

 8  and a half years.  I dealt with it by myself in

 9  solitude.

10     Q.  Is it that you don't think that therapy will help

11  you?

12     A.  That's correct.

13     Q.  You've heard of antidepressant medication,

14  correct?

15     A.  Yes.

16     Q.  Have you ever taken one?

17     A.  Yes.

18     Q.  You were on Zoloft, I believe?

19     A.  I was on Zoloft.

20     Q.  Did the Zoloft help?

21     A.  I don't believe it did.

22     Q.  Is it my understanding you don't think an

23  antidepressant medication would help your psychological
```

```
 1          (Adrian P. Thomas - by Mr. Perkins)

 2  suffering?

 3              MR. KLEIN:  Objection to form.

 4              Do you know if it would help your

 5       suffering?

 6              THE WITNESS:  I wouldn't know.

 7  BY MR. PERKINS:

 8     Q.  Do you have a regular physician, somebody you go

 9  see for a checkup once in a while?

10     A.  Yes.

11     Q.  What's that doctor's name?

12     A.  His name is Dr. -- I got it in my wallet.

13              MR. KLEIN:  You don't remember?

14              THE WITNESS:  I don't remember.

15              MR. PERKINS:  He's got it in his

16       wallet.

17              MR. KLEIN:  We'll leave a space.

18              _____

19  BY MR. PERKINS:

20     Q.  Is he in Georgia?

21     A.  Yes.

22     Q.  Do you know what city in Georgia?

23     A.  ██████████.
```

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2      Q.   How often would you say you see that doctor?

 3      A.   I haven't seen him in a while.

 4              MR. KLEIN:  And how often?  What was

 5         the last time?

 6              THE WITNESS:  Maybe a year.

 7              MR. KLEIN:  Once a year, is that what

 8         you said?

 9              THE WITNESS:  Yes.

10  BY MR. PERKINS:

11      Q.   Have you ever told that doctor about your

12  psychological suffering?

13      A.   No.

14      Q.   Why not?

15      A.   Because he was a primary care physician.

16      Q.   Right.

17      A.   Health-wise, not psychologically.

18      Q.   Do you know that sometimes, when you tell things

19  to your primary care physician, then they refer you to

20  specialists in certain types of fields?

21      A.   I didn't know that.

22      Q.   Mr. Thomas, have you read your complaint -- I'm

23  not going to ask you to read them, but have you read
```

```
 1              (Adrian P. Thomas - by Mr. Perkins)
 2    your complaint and amended complaint in this action at
 3    any point in time?
 4              MR. KLEIN:  Meaning in the federal
 5         case.
 6              THE WITNESS:  To my knowledge, I
 7         believe so.  Yes.
 8    BY MR. PERKINS:
 9       Q.  So there are some allegations in there that the
10    Troy city police somehow conspired with the county
11    medical examiner, Dr. Sikirica, right?
12       A.  Right.
13       Q.  What's the basis of that allegation?
14              MR. KLEIN:  Objection to the extent it
15         calls for a legal conclusion.
16              You can answer, if you know.
17              THE WITNESS:  Repeat the question.
18              MR. PERKINS:  Sure.
19    BY MR. PERKINS:
20       Q.  There's an allegation in your complaint that
21    there was a conspiracy against you between the City of
22    Troy and the county medical examiner, Dr. Sikirica.
23              Why do you think that?
```

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2              MR. KLEIN:  Objection.

 3              THE WITNESS:  Because my opinion is

 4         because he put blunt force trauma on the

 5         death certificate.

 6  BY MR. PERKINS:

 7     Q.  Meaning Dr. Sikirica?

 8     A.  Right.

 9     Q.  Well, and you sat through both the trials,

10  correct?

11     A.  Yes.

12     Q.  You know that Matthew did sustain bilateral

13  subdural hematomas, right?

14     A.  That's what was stated.

15     Q.  Do you believe that the Troy police officers were

16  able to have any role in what Dr. Sikirica, the county

17  coroner, wrote on his autopsy report?

18     A.  I believe, to my perception, he had some

19  knowledge of the statements.

20     Q.  Dr. Sikirica had some knowledge, and you said of

21  the statements?

22     A.  Statements that were signed.

23     Q.  The ten-page statement?
```

Case 1:17-cv-00626-DJS Document 44-12 Filed 06/14/21 Page 343 of 458

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2      A.   Correct.

 3      Q.   Is that the reason you think there was a

 4   conspiracy between the City of Troy police and

 5   Dr. Sikirica?

 6              MR. KLEIN:  Same objection.

 7              You can answer.  Is that the reason why

 8        you think?

 9              THE WITNESS:  Yes.

10   BY MR. PERKINS:

11      Q.   Is there anything more than that?

12              MR. KLEIN:  That you can think of.

13              MR. PERKINS:  That you can think of,

14        but if you can, now's the time.

15              MR. KLEIN:  Same objection.

16              THE WITNESS:  I believe it started with

17        Edge to the cops, then CPS, then to the

18        medical examiner.  It all started from the

19        doctor's mouth.  My perception is it all

20        started from Edge.

21              MR. PERKINS:  That's all I have right

22        now.

23              (Recess taken.)
```

1             (Adrian P. Thomas - by Ms. Peck)

2    EXAMINATION

3    BY MS. PECK:

4        Q.   Mr. Thomas, my name is Crystal Peck.  I'm the

5    attorney that represents Dr. Sikirica in the federal

6    lawsuit that you brought.

7            I'm actually going to go over some preliminary

8    questions first.  And I should say before that that the

9    ground rules from yesterday still apply today.  So if

10   you don't understand any of the questions that I'm

11   asking, just tell me and I'll rephrase.  If you need to

12   take a break at any time, you can take a break.  Just

13   let me know.

14           I would ask that, if there's any question

15   pending, you answer that before we take a break, and

16   that any responses have to be verbal, yes, no.  No

17   shaking of the head, that sort of thing.

18       A.   Okay.

19       Q.   Have you taken any medication today, whether it

20   is prescribed or unprescribed, that would affect your

21   memory or your ability to testify in this matter?

22       A.   No.

23       Q.   Have you consumed any alcoholic beverages today?

```
 1              (Adrian P. Thomas - by Ms. Peck)

 2      A.   No.

 3      Q.   Did you review any documents to prepare for

 4  today's deposition or yesterday's deposition?

 5           And to be clear, I don't want to know about

 6  discussions you may have had with your attorney, but if

 7  you've looked at any paper, I want to know what

 8  documents you looked at, not letters from attorney or

 9  anything like that, nothing that comes from your

10  attorney.

11      A.   No.

12      Q.   So you didn't review any testimony or anything

13  like that before today?

14      A.   No.

15      Q.   I want to follow up on some of the testimony that

16  you gave yesterday, so I apologize because it's going to

17  be -- seem like I'm skipping around a bit, and it's

18  because I don't want to ask all of the same questions

19  that you were asked yesterday.  So I'm really just going

20  to hit some of the follow-up questions that I had.

21           You lived in Georgia before -- I think you

22  testified yesterday that you lived in Georgia before you

23  moved to New York in the early 2000s; is that accurate?
```

```
 1              (Adrian P. Thomas - by Ms. Peck)

 2     A.   That's correct.

 3     Q.   Did you have any interactions with the police in

 4  Georgia?

 5     A.   Not to my remembrance.  No.

 6     Q.   Were you ever arrested in Georgia?

 7     A.   No.

 8     Q.   After your incarceration, you testified that you

 9  moved back to Georgia.

10          That's correct, right?

11     A.   That's correct.

12     Q.   And that you had received some threats when you

13  initially went back to Georgia; is that true?

14     A.   Yes.

15     Q.   Did you say that those threats were coming from

16  gang members?

17     A.   Yes.

18     Q.   Your testimony is that you believe those threats

19  were a result or related to your conviction regarding

20  your son Matthew.

21          Why did you have that belief?

22     A.   Some of Wilahemina's relatives on her father's

23  side heard about the case.  So I'm assuming, from that,
```

```
 1              (Adrian P. Thomas - by Ms. Peck)
 2   that they heard a lot about the case.
 3      Q.   Were Wilahemina's relatives involved in gangs in
 4   Georgia?
 5      A.   I wouldn't know if every single one of them is
 6   involved in gangs.  I just know that, because of talk,
 7   it was -- I was taunted.
 8      Q.   Well, what were the threats?
 9      A.   We see you somewhere by yourself, we gonna kill
10   you.
11      Q.   But anything specific about what happened with
12   Matthew or just generally, if we see you we're going to
13   kill you?
14      A.   It was due because a lot of them were saying I
15   was a child killer.
16      Q.   So they were calling you a child killer?
17      A.   Yes.
18      Q.   Did you have any interactions with gangs in
19   Georgia, either before or after your incarceration,
20   other than those threats?
21      A.   No.
22      Q.   How did you know the threats were coming from
23   gang members?
```

```
 1              (Adrian P. Thomas - by Ms. Peck)

 2    A.   Because they was wearing gang signs and wearing

 3   red.  So it was an indication of blood members.

 4    Q.   And you're able to identify, based on clothing or

 5   types of clothing, whether it would be gang affiliated?

 6    A.   Yes.  Not just gang signs or tattoos.  The

 7   bandanas represent affiliation.

 8    Q.   I want to talk a little bit about your employment

 9   both in New York and in Georgia.

10        So, in 2008, when you received your commercial

11   driver's license -- or, actually, I should clarify.

12        Did you receive your commercial driver's license

13   in 2008 the first time?

14    A.   Yes.

15    Q.   Do you know about how many months you received it

16   before Matthew had passed away?

17    A.   I don't exactly know what month and date.

18    Q.   Would it have been one month or two months, six

19   months, just approximate?

20    A.   I'm not exactly sure.  I just remember that, when

21   I graduated, Wilahemina's family threw a celebration

22   party for me I believe within three to four months

23   before or around the time of Matthew going to the
```

```
 1              (Adrian P. Thomas - by Ms. Peck)
 2    hospital, between that time frame.
 3       Q.  And the second time that you got your commercial
 4    driver's license down in Georgia, where did you go for
 5    training for that?
 6       A.  I went to training in Florida.
 7       Q.  The training was in Florida?
 8       A.  Yes.
 9       Q.  And how did you end up paying for that course?
10       A.  I got pre-qualified.
11       Q.  And I guess I assumed something.  I assumed that
12    the course had a tuition fee that was associated with
13    it?
14       A.  That's correct.
15       Q.  And how much did the course cost?
16       A.  Between 75- to $8500.
17       Q.  And you said you got pre-qualified.
18           What does that mean?
19       A.  Pre-qualified based on credit score, I believe.
20       Q.  So you essentially took out like a loan or credit
21    for that?
22       A.  I don't think I took out a loan.  I think I was
23    pre-qualified for the loan at the time.
```

```
 1            (Adrian P. Thomas - by Ms. Peck)

 2     Q.   Did you pay for it through payment plan?

 3          Is that how that happened?

 4     A.   It would be through a payment plan.  Yes.

 5     Q.   Then you had testified that you had worked for

 6  approximately five trucking companies since 2016; is

 7  that accurate?

 8     A.   Yes.

 9     Q.   Can you list for me the names of the trucking

10  companies that you had worked for?

11               MR. KLEIN:  Starting with the 2016 to

12          the present, whatever order you want.

13  BY MS. PECK:

14     Q.   The first one that you were employed by down in

15  Georgia all the way up until present.

16     A.   Swift was number one, US Express, Rohel Trucking,

17  CFI, Buckley Trucking.  I'm trying to remember what

18  else.  I don't exactly remember all of that.

19     Q.   That's okay.

20     A.   My MVR could be pulled.  It could be told through

21  that.

22     Q.   And that would list the trucking companies that

23  you worked for?
```

```
 1              (Adrian P. Thomas - by Ms. Peck)

 2     A.  Yes.  They do that.

 3     Q.  When did you work for Swift?

 4     A.  Swift was right after -- after truck driving

 5   school.

 6     Q.  How long did you work for Swift?

 7     A.  Six to eight months, I believe.

 8     Q.  Why did you leave Swift?

 9     A.  The pay wasn't enough for me and my family at the

10   time.

11     Q.  Then did you leave Swift and go to US Express?

12     A.  I believe so.  Yes.

13     Q.  How long were you at US Express?

14     A.  Maybe three to four weeks, I believe.  I'm not

15   even sure.

16     Q.  And why did you leave --

17             MR. KLEIN:  Don't guess.  If you don't

18         know, say you don't know.

19             THE WITNESS:  Okay.

20   BY MS. PECK:

21     Q.  You approximate maybe three to four weeks, under

22   a month?

23     A.  I believe so.  I'm not sure.
```

1          (Adrian P. Thomas - by Ms. Peck)

2     Q.   Why did you leave US Express?

3     A.   Because I was waiting on a training.  And when I

4  finally received the training, he picked me up and took

5  me to a truck shop where he proceeded to resign, clean

6  out the truck.  So I was not able to operate the

7  commercial vehicle at that time directly by myself under

8  the company policy.

9     Q.   I think I'm a little confused about what had

10 happened.

11    A.   So, in other words, he picked me up, took me to

12 the truck stop.  After the truck stop, we got back

13 together.  He cleaned out the truck.  Once he cleaned

14 out the truck, I was then told to get in the car with

15 him.  And he took me back to the hotel, dropped me off.

16         So I notified the company of what just happened,

17 and they told me I would have to wait again for another

18 trainer.  So, therefore, I couldn't afford to keep

19 waiting.

20    Q.   And after US Express, did you go to Rohel

21 Trucking?

22    A.   I don't know if I went directly to Rohel Trucking

23 or not, but I do know I went there.

```
 1              (Adrian P. Thomas - by Ms. Peck)

 2      Q.   How long did you work at Rohel Trucking?

 3      A.   I'm not even sure.

 4      Q.   Would it be more than a month or less than a

 5   month?

 6      A.   I can't remember.

 7      Q.   Why did you leave Rohel Trucking?

 8      A.   Me and the dispatcher had words.  I was being

 9   micromanaged, and me and him had words about certain

10   things at the time.

11      Q.   Can you give me a little bit more details about

12   the words you and the dispatcher had?

13      A.   We was having a discussion about the destination

14   and a few routes.  He was frustrated about something

15   else, and I could already tell through the conversation

16   where I was headed.  So I just told him I'm going get it

17   there, get it there on time.  And they wanted me to stop

18   at a certain truck stop to get fuel, and I didn't.  I

19   choose not to.

20      Q.   Were you terminated or did you leave voluntarily?

21      A.   I left voluntarily.

22      Q.   What about CFI, how long were you at CFI?

23      A.   I was there for about six -- between six to eight
```

Case 1:17-cv-00626-DJS Document 112-4 Filed 06/14/21 Page 354 of 458

```
 1              (Adrian P. Thomas - by Ms. Peck)
 2   months.
 3       Q.   Why did you leave CFI?
 4       A.   I was terminated by CFI.
 5       Q.   Was that the termination where you ended up in
 6   the residential neighborhood and had to be towed?
 7       A.   Yes.
 8       Q.   And then Buckley Trucking, how long were you at
 9   Buckley Trucking?
10       A.   I'm still with them right now.
11       Q.   You had mentioned you worked for Pilgrim Pride
12   for three months; is that accurate -- for about three
13   months?
14       A.   What year was that?
15              MR. KLEIN:  Just whenever you worked
16          for them.
17   BY MS. PECK:
18       Q.   Well, what year did you work -- I don't know.
19          What year did you work at Pilgrim's Pride?
20       A.   It was -- it had to be right after I got released
21   from incarceration.
22       Q.   Pilgrim's Pride I thought was -- and correct me
23   if I'm wrong -- I thought that that was the chicken
```

```
 1              (Adrian P. Thomas - by Ms. Peck)
 2   plant that you had met Wilahemina at.
 3       A.  Yes, but it was under the name of Gokiss at the
 4   time.
 5       Q.  So then you had worked there before your
 6   incarceration, correct?
 7       A.  Yes.
 8       Q.  Did you work there again after you were -- after
 9   your release?
10       A.  Yes.
11       Q.  So why did you leave there after you were
12   released?
13           When you worked there at the time that you worked
14   there after your release, why did you leave?
15       A.  I got into a relationship and moved to Savannah.
16       Q.  Before your incarceration, when you worked at
17   Pilgrim's Pride, why did you leave there?
18       A.  Me and Wilahemina got together and became very
19   close, and we decided to come -- I decided to come to
20   New York with her because that's where she's from.
21       Q.  I think there was a company called the Derst
22   Company.  That also, I believe, was before your
23   incarceration.
```

```
 1              (Adrian P. Thomas - by Ms. Peck)

 2         Does that sound accurate?

 3     A.  No.  Not before my incarceration.

 4     Q.  It was after?

 5     A.  After my incarceration.

 6     Q.  Why did you end up leaving there?

 7     A.  I got laid off.

 8     Q.  Now, discussing your employment in New York

 9  before Matthew went to the hospital.  You mentioned

10  three places that you had worked, Wal-Mart, Garelick

11  Farms, and Home Depo.

12         Does that sound accurate?

13     A.  Yes.  That's what I said.

14     Q.  Why did you leave Garelick Farms?

15     A.  I was terminated by Garelick Farms.

16     Q.  Why were you terminated?

17     A.  Supervisor and I got in -- exchanged words.

18     Q.  Did it get physical?

19     A.  No.

20     Q.  When you say exchanged words, did you raise

21  voices at each other?

22     A.  No.  Him and I didn't agree.  We just didn't

23  agree.
```

1          (Adrian P. Thomas - by Ms. Peck)

2     Q.   When you left Home Depo, why did you leave Home

3  Depo?

4     A.   I don't remember what happened with Home Depo.

5     Q.   I want to jump to when Matthew and ███████ were

6  born.

7          You had stated that the first time that you had

8  met Matthew and ██████ was when they were brought home

9  from the hospital; is that accurate?

10    A.   Yes.

11    Q.   Did you go with Wilahemina at all when she was in

12 labor, when she went to go give birth to Matthew and

13 Malakai?

14    A.   I was unable to.

15    Q.   Why weren't you able?

16    A.   I had to stay home and watch the other children

17 there.

18    Q.   How did she get to the hospital?

19          MR. KLEIN:  When she went into labor?

20          MS. PECK:  Yes.

21          THE WITNESS:  Her mother took her.

22 BY MS. PECK:

23    Q.   Did you ask her mother if her mother could stay

```
 1            (Adrian P. Thomas - by Ms. Peck)
 2   with the children so that you could go to the hospital
 3   with Wilahemina?
 4       A.  I asked them on numerous occasions.
 5       Q.  I mean when Wilahemina was in labor, though, not
 6   visiting the twins afterwards.
 7       A.  Yes.  I asked her.
 8       Q.  And what was her response?
 9       A.  She said no.  You can stay with the other
10   children.  I need to go with her.
11       Q.  Did anyone else go with Wilahemina?
12       A.  Not to my knowledge.
13       Q.  Can you describe for me your relationship with
14   Inga, your former mother-in-law?
15           What was that relationship like back in 2008
16   before Matthew went to the hospital?
17       A.  It was okay.
18       Q.  Did she ever talk to you about how you
19   disciplined the kids?
20       A.  No.
21       Q.  Did she ever talk to you about wanting to take
22   India out of the house because she didn't like how she
23   was being disciplined?
```

```
 1              (Adrian P. Thomas - by Ms. Peck)

 2      A.   No.

 3      Q.   Did Wilahemina ever talk to you about that?

 4      A.   No.

 5      Q.   Did Wilahemina ever talk to you about concerns

 6   that her mother may have raised to her about how the

 7   kids were being disciplined?

 8      A.   No.

 9      Q.   Was there a time in August of 2008 that ██████

10   went to go live with your mother-in-law for any portion

11   of time?

12      A.   There was never a time.

13      Q.   Your mother-in-law, did she live in the same

14   complex as you or did she live somewhere else?

15      A.   Lived in the same complex.  That's what I said

16   yesterday.

17      Q.   So, India never went to stay with your

18   mother-in-law at any time during that summer?

19      A.   No.

20      Q.   She always stayed every night at your house.

21   That's where she would stay?

22      A.   That's right.

23      Q.   You had been asked by Mr. Perkins about whether
```

```
 1              (Adrian P. Thomas - by Ms. Peck)
 2    you had been aware of a report being made to the Troy
 3    police by a Rebecca Cruse.
 4         Do you recall discussing that with Mr. Perkins
 5    this morning?
 6    A.   Yes.
 7    Q.   ███████████████████████████████████████████
 8    ██████████████████████████████████████████
 9    ████████████████████████████████████████████
10    ████████████████████████████████████████
11    ████████████████████████████████████████████
12    ███████████████████████████████████████
13    █████████████████
14    A.   Not to my knowledge.  No.
15    Q.   Did you ever receive a letter from anyone at CPS
16    during that time saying that they wanted to talk to you
17    because -- for anything?
18    A.   I never received no letter.
19    Q.   How about any voicemails, telephone calls, did
20    you receive any voicemails from anyone at CPS --
21    A.   No.
22    Q.   -- saying they wanted to talk to you --
23              MR. KLEIN:  Let her finish.
```

```
1              (Adrian P. Thomas - by Ms. Peck)
2              MS. PECK:  And part of that is because
3         the stenographer will have a hard time if
4         we're talking over each other.
5              THE WITNESS:  I apologize.
6    BY MS. PECK:
7    ████████████████████████████████████████████
8   ██████████████████████████████████████████████
9   ██████████████████████████████████████████████
10   ██████████████
11      A.  No.
12      Q.  Did you have a cell phone in August of 2008?
13      A.  Yes.
14      Q.  Did you have a home phone, like a landline, in
15   2008, as well?
16      A.  Yes.
17      Q.  Wilahemina had a cell phone, too, in 2008; is
18   that true?
19      A.  Yes.
20      Q.  Do you know whose number is ███████████
21      A.  No.
22      Q.  Do you recall your phone number, your cell phone
23   number, in August of 2008?
```

Case 1:17-cv-00626-DJS  Document 44-2  Filed 06/14/21  Page 362 of 458

```
 1              (Adrian P. Thomas - by Ms. Peck)

 2     A.  No.

 3     Q.  Do you recall Wilahemina's cell phone number from

 4  August of 2008?

 5     A.  As of today, no.

 6     Q.  Is there anywhere that you could look to find out

 7  what your cell phone number was back in August of 2008,

 8  any record that might exist?

 9              MR. KLEIN:  Without guessing, do you

10         know of anything?

11              THE WITNESS:  No.

12  BY MS. PECK:

13     Q.  Did you have a monthly plan where you were paying

14  a cell phone provider, or was it what they call like a

15  "pay as you go" phone where you upload a certain amount

16  of minutes to it?

17     A.  I don't even remember.

18              MR. KLEIN:  Off the record.

19              (Recess taken.)

20  BY MS. PECK:

21     Q.  In the month before Matthew went to the hospital,

22  did Troy police -- did any officer from Troy Police

23  Department come to your house?
```

1          (Adrian P. Thomas - by Ms. Peck)

2     A.   You said the month that --

3     Q.   The month before.

4 ████████████████████████████████████████████

5 ████████████████████████████████████████████

6 ███████

7      ████████████████████████████████████████████

8 ███████ and Troy PD came knocking on your door on

9 September 21st, at any time before that -- between those

10 two times, did anyone from Troy police department come

11 to your house?

12          MR. KLEIN:  Either when he was there or

13     that he learned about from others?

14          MS. PECK:  Yes.

15          To your knowledge.

16          THE WITNESS:  Not to my knowledge.

17 BY MS. PECK:

18 ██████████████████████████████████████

19 ██████████████████████████████████████████

20   ████████████████████████████████████

21 ████████████████████████████████████████████

22 ████████████████████████████████████████████

23 ████████████████████████████████████████████

1          (Adrian P. Thomas - by Ms. Peck)

2

3

4

5          MS. PECK:  I'm going to mark -- well,

6      it was marked yesterday as Defendant's A.

7      I'm actually going to mark it as Sikirica 1.

8          MS. CALABRESE:  The transcript that we

9      marked yesterday as Defendant's A was

10     inadvertently incorrectly marked.  So we've

11     remarked A, which is entitled "Police

12     Interview December 22, 2008."  And I will

13     provide a copy to the parties prior to

14     leaving today.

15          (Sikirica 1 marked for identification.)

16  BY MS. PECK:

17     Q.  Did any officers from the Troy PD ever come to

18  your house at any time when you lived in New York about

19  complaints they had received regarding anything,

20  regarding any of the people in your home?

21     A.  While I was there, while I was not, or what?

22     Q.  I mean --

23     A.  To my knowledge, no.

Case 1:17-cv-00626-DJS Document 44-2 Filed 06/14/21 Page 363 of 458

1          (Adrian P. Thomas - by Ms. Peck)

2     Q.  Whether you were there or whether you were not

3   there, did the Troy PD, before September 21st, ever come

4   to your house responding to any complaints, either

5   complaints made by any family members or made by anyone

6   not in your family?

7     A.  To my knowledge, no.

8     Q.  I'm going to show you what's been marked as

9   Sikirica 1 and it is a transcript of a police interview.

10  I know the date on it is September 29, 2008.  I believe

11  that the accurate date should have been September 21,

12  2008.

13          MS. PECK:  Does that sound right to

14      you, Brett?

15          MR. KLEIN:  Yes.  And I believe we all

16      agree that this is the transcript of the

17      second interview.

18          MS. PECK:  No, no, no.  This is now the

19      transcript of the first interview.  We just

20      switched the --

21          MR. KLEIN:  Yes.  We'll accept that

22      representation.

23          MS. PECK:  Okay.

```
 1              (Adrian P. Thomas - by Ms. Peck)

 2    BY MS. PECK:

 3      Q.  You reviewed this transcript yesterday, didn't

 4    you?  I know that it was marked technically as

 5    Defendant's A and we thought it was the actual

 6    transcript of the September 22nd interview, but you

 7    reviewed this transcript yesterday, correct?

 8      A.  Yes.

 9              MR. KLEIN:  I don't think so.

10              MS. PECK:  Didn't we take a break to

11         have him review the transcript?

12              MR. KLEIN:  She came in with the

13         ten-page statement.  He looked at that.

14              THE WITNESS:  Yeah, ten-page statement.

15              MR. KLEIN:  You want to refer him to a

16         page or something?

17              MS. PECK:  Yeah, I do.

18    BY MS. PECK:

19      Q.  You told the police, when you were interviewed on

20    September 21st, ███████████████████████████████

21    █████████████████████████  isn't that accurate?

22      A.  Is that what I said?  Because I don't remember

23    saying that.
```

Case 1:17-cv-00626-DJS Document 14-2 Filed 06/14/21 Page 362 of 458    Case 1:17-cv-00626-DJS Document 14-2 Filed 06/14/21 Page 362 of 458

**APPENDIX**    **487**

343

```
 1              (Adrian P. Thomas - by Ms. Peck)

 2              MR. KLEIN:  If you show him the

 3         transcript, if it's in there.

 4              MS. PECK:  Yeah.  I'm going to show him

 5         the transcript.  Just give me a minute.

 6   BY MS. PECK:

 7      Q.  You told the police, when you were being

 8   interviewed on September 21, 2008, ████████████████

 9   ████████████████████████████████████████████████████

10   ██████████████████████████████████████████████

11   ████████████████████████████████████████████████████

12      A.  Yes.  Because that's what I was told by my wife.

13      Q.  But you're not sure whether -- I'm going to do

14   this.  I'm going to have you take a look at this

15   transcript, and then I want to ask you a couple

16   questions about it.

17              You might want to take a few minutes.

18              MR. KLEIN:  Is there a particular

19         section on there?

20              MS. PECK:  They're flagged.

21              (Recess taken.)

22   BY MS. PECK:

23      Q.  Mr. Thomas, you took a minute to review what's
```

```
 1              (Adrian P. Thomas - by Ms. Peck)

 2   been marked as Sikirica 1, correct?

 3      A.   Correct.

 4      Q.   That's the transcript of your interview with the

 5   police on September 21, 2008?

 6      A.   Yes.

 7      Q.   In your interview with the police on

 8   September 21st you had told the police that the cops had

 9   come to your house before because of complaints; is that

10   correct?

11      A.   That's what I stated.  Yes.

12      Q.   And is that true?

13      A.   From what my wife had told me, yes.

14      Q.   Well, in the transcript of your testimony, you

15   had said that you had actually been there on one of the

16   occasions when the police had come to your home; isn't

17   that correct?

18              MR. KLEIN:  I didn't see that.

19              MS. PECK:  Yeah.  I can point it out.

20              I'm going to show you page 33.  There's

21          a flag on the section.

22              MS. CALABRESE:  Can I have the line and

23          page number?
```

```
 1              (Adrian P. Thomas - by Ms. Peck)

 2              MR. KLEIN:  Page 33, line 3 through,

 3         looks like, line -- through 10.

 4              So should I read it, or do you want to

 5         let him read it to himself?

 6              Can you read those.

 7              (Witness complies.)

 8    BY MS. PECK:

 9    Q.  So, you had told the police, during your

10    interview on September 21st, that you had actually

11    talked to the cops when they came to your house at one

12    occasion, correct?

13    A.  Yes.

14    ████████████████████████████████████████████

15    ████████████████████████████

16       ███████████████████████████████████

17    ████████████████████████████████████

18       ███████

19              (Sikirica Exhibit 2 marked for

20         identification.)

21    BY MS. PECK:

22    Q.  I'm going to show you what's been marked as

23    Sikirica 2.  Take a couple minutes, if you want to, to
```

```
 1              (Adrian P. Thomas - by Ms. Peck)
 2    take a look at it.
 3              MS. PECK:  It's the claim in the Court
 4         of Claims action.
 5              MR. KLEIN:  Do you have a specific area
 6         you want us to look?
 7              MS. PECK:  I will.
 8    BY MS. PECK:
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

1          (Adrian P. Thomas - by Ms. Peck)

11  BY MS. PECK:

12    Q.  So what you said to the police on September 21st

13  during your interrogation, that would have been

14  accurate, to the best of your knowledge then, correct?

15        So you might not remember now, but if you told

16  the police that on September 21st it would have been

17  accurate then?

18            MR. KLEIN:  About that topic.

19            MS. PECK:  About that topic, yes.

20            THE WITNESS:  I believe so.  Yes.

21  BY MS. PECK:

22    Q.  Can you just take a look at the last page on the

23  verified claim for damages with exhibits.

```
 1              (Adrian P. Thomas - by Ms. Peck)

 2          There's a signature here above "Adrian Thomas."

 3    Is that your signature?

 4       A.  Yes.

 5       Q.  This is a verification page, correct?

 6          So this says here that you reviewed this claim,

 7    and that everything, to the best of your knowledge, is

 8    accurate in it.

 9          And you might just want to talk to your attorney,

10    if you want, about that section, the verification on it.

11              (Recess taken.)

12    BY MS. PECK:

13       Q.  So, that's your signature on the verification

14    page, correct?

15       A.  Correct.

16       Q.  That verification says that you reviewed that

17    document, and that, to the best of your knowledge, it

18    was true, correct?

19       A.  Correct.

20       Q.  You did review the document?

21       A.  Yes.

22       Q.  Everything in the document is accurate?

23       A.  That's right.
```

1          (Adrian P. Thomas - by Ms. Peck)

2     Q.   That's what you're saying.

3          I'm going to read this to you, but I'm also going

4     to give it to you, as well, so you can see that what I'm

5     reading is accurate.

6     A.   What section is that?

7          MR. KLEIN:  She'll tell you.

8          MS. PECK:  I'm about to tell you.

9     Sure.

10    BY MS. PECK:

11    ████████████████████████████  ████████████

12    ██████████  ██████████████████████████████

13    ██████████████████████  ██████████████████

14    ███████████████████████████████████

15    ███████████████████████████████████

16    ████████████████████ ▌

17        ███████████████████████

18      █████████

19      ████████████████████████

20    ██████████████████████████████████

21    █████████████████████████

22    ██████████████████████████████████████

23    ██████████████████████████

Case 1:17-cv-00626-DJS Document 14-24 Filed 06/14/21 Page 374 of 458

1    (Adrian P. Thomas - by Ms. Peck)





(Adrian P. Thomas - by Ms. Peck)

Case 1:17-cv-00626-DJS Document 44-2 Filed 06/14/21 Page 376 of 458



(Adrian P. Thomas - by Ms. Peck)



(Adrian P. Thomas - by Ms. Peck)

Case 1:17-cv-00626-DJS Document 14-24 Filed 06/14/21 Page 373 of 458

354



(Adrian P. Thomas - by Ms. Peck)

Case 1:17-cv-00626-DJS Document 14-2 Filed 06/14/21 Page 373 of 458

355





1          (Adrian P. Thomas - by Ms. Peck)

21     Q.   Have you ever met Dr. Sikirica?

22     A.   In person?

23     Q.   Sure.

Case 1:17-cv-00626-DJS Document 14-2 Filed 06/14/21 Page 381 of 452

```
 1              (Adrian P. Thomas - by Ms. Peck)

 2              MR. KLEIN:  Have you met him.

 3              THE WITNESS:  No.

 4    BY MS. PECK:

 5       Q.  Have you met him -- I mean, had you talked to him

 6    on the phone or otherwise?

 7       A.  No.

 8       Q.  You observed his testimony at your criminal

 9    trial, though; is that correct?

10              MR. KLEIN:  Trials.

11              MS. PECK:  Trials.

12              THE WITNESS:  Yes.

13    BY MS. PECK:

14       Q.  You're aware that there was an autopsy that was

15    performed on Matthew, correct?

16       A.  That's correct.

17       Q.  Are you aware that Dr. Sikirica performed that

18    autopsy on Matthew?

19       A.  From what I was told, yes.

20       Q.  What is your understanding of Dr. Sikirica's

21    findings?

22              MR. KLEIN:  Objection.

23    BY MS. PECK:
```

```
 1              (Adrian P. Thomas - by Ms. Peck)

 2      Q.   From the autopsy?

 3      A.   What was his conclusion, basically, stated on the

 4   death certificate?

 5      Q.   What's your understanding of what he concluded as

 6   a result of the autopsy, what he found when he did the

 7   autopsy of Matthew?

 8      A.   Trauma.

 9      Q.   Trauma?

10      A.   Was what was stated.

11      Q.   When you say trauma, do you mean head trauma?

12      A.   Trauma, period.

13      Q.   Trauma, period, okay.

14           Mr. Thomas, is it fair to say that your

15   allegations against Dr. Sikirica are that he fabricated

16   his autopsy report, that essentially that his

17   conclusions are false?

18      A.   Yes.

19              MR. KLEIN:  To the best of your

20         knowledge.

21   BY MS. PECK:

22      Q.   Why do you make that allegation?

23           What's the basis for that?
```

```
 1              (Adrian P. Thomas - by Ms. Peck)

 2              MR. KLEIN:  Objection.

 3              THE WITNESS:  Why would I feel that

 4         way?

 5              MS. PECK:  Yes.

 6              THE WITNESS:  I feel that way because

 7         he said trauma during the first trial, and I

 8         believe he testified at the retrial.  But

 9         trauma was never involved.

10    BY MS. PECK:

11      Q.  Is it your testimony today, then, that

12    Dr. Sikirica did not actually see any indications of

13    trauma, that he just made it up?

14              MR. KLEIN:  Objection.

15              THE WITNESS:  I can't say that he

16         didn't see trauma.  Only thing I can say is,

17         I believe he saw those statements before he

18         made a conclusion of how he came to a

19         conclusion of how my son died without seeing

20         him first.

21    BY MS. PECK:

22      Q.  And when you say statements, you're talking about

23    the -- your statements to the Troy police?
```

```
 1              (Adrian P. Thomas - by Ms. Peck)

 2      A.   Correct.

 3      Q.   On September 21st and the 22nd?

 4      A.   Correct.

 5      Q.   But do you have any reason to believe that he did

 6   not actually see any indications of trauma when he did

 7   the autopsy of Matthew?

 8      A.   He testified he said he saw the statements.

 9      Q.   But I'm not talking about the statements now.

10           I'm saying that, is it your testimony or your

11   allegations that Dr. Sikirica did not actually see any

12   indications of trauma when he did the autopsy?

13           MR. KLEIN:  Objection as to what the

14      operation is of someone else's mind.

15           THE WITNESS:  I don't actually know.  I

16      can't sit here and say I was there with him.

17   BY MS. PECK:

18      Q.   So it's fair to say that Dr. Sikirica may have

19   actually seen indications of trauma, and that that might

20   have been accurately reported on his autopsy, correct?

21           MR. KLEIN:  Objection.

22           THE WITNESS:  I can't say that he did

23      or didn't.  But, to my belief, he didn't.
```

```
 1                (Adrian P. Thomas - by Ms. Peck)

 2   BY MS. PECK:

 3      Q.  But you don't know one way or the other, then,

 4   whether there were actually indications of trauma that

 5   were observed during the autopsy?

 6      A.  No.

 7               MR. KLEIN:  Just note my objection to

 8          the question.

 9   BY MS. PECK:

10      Q.  If I were to represent to you that Dr. Sikirica,

11   when he conducted the autopsy of Matthew, found physical

12   evidence of subdural hematomas in Matthew, bruising

13   inside his skull, how would you -- how would Matthew, to

14   your knowledge, have obtained that bruising?

15               MR. KLEIN:  Objection.

16               MS. PECK:  Let me rephrase.

17   BY MS. PECK:

18      Q.  If there actually was trauma to Matthew, to his

19   head, if that was found in the autopsy, how would that

20   have been caused, if you know?

21      A.  I would have no idea.

22      Q.  Well, you said that it was you and Wilahemina

23   that would watch the children, and that Wilahemina's
```

Case 1:17-cv-00626-DJS Document 14-2 Filed 06/14/21 Page 386 of 452

1                    (Adrian P. Thomas - by Ms. Peck)

2      relatives, her mother-in-law, her sister, and her

3      brother, would also spend some time with them, maybe an

4      hour or two; is that correct?

5          A.   That's what I said.  Yes.

6          Q.   You had testified you didn't think that

7      Wilahemina's mother-in-law or sister or brother would

8      have harmed or injured the children; is that correct?

9               That was your testimony?

10         A.   That's correct.

11         Q.   So, then, how would Matthew have sustained a head

12     injury?

13                   MR. KLEIN:  Objection.

14                   THE WITNESS:  I have no idea.

15     BY MS. PECK:

16         Q.   You were advised at some point that your other

17     son Malakai had rib fractures that were diagnosed

18     following Matthew's death, that they had seen evidence

19     of old rib fractures; is that correct?

20         A.   I found out about that.

21         Q.   And I'm going to ask the same question, then.

22              Do you have any idea of how those rib fractures

23     would have been caused?

```
 1              (Adrian P. Thomas - by Ms. Peck)

 2      A.   No.

 3      Q.   Do you know who would have caused those?

 4      A.   No.

 5              MR. KLEIN:  Objection to the form.

 6  BY MS. PECK:

 7      Q.   Did you cause them?

 8      A.   No.  I love my children.  I would never do harm

 9  to break ribs or cause death or break bones or anything,

10  punch them.

11      Q.   Do you believe that Wilahemina caused them?

12      A.   No.  I don't know who caused it.

13      Q.   When a CPS worker came and visited you at the

14  Rensselaer County jail, was there any discussion about

15  the finding of the rib fractures regarding ████ at

16  that time?

17      A.   I was never told about rib fractures until my

18  hearings before trial.  So I didn't know about that

19  period at that time.

20      Q.   Was there any discussion about statements that

21  India had made about being beaten with a belt?

22      A.   No.

23      Q.   It's your testimony that you never told that CPS
```

```
 1              (Adrian P. Thomas - by Ms. Peck)
 2    worker how Matthew was harmed or went through any of the
 3    statements with him about throwing him on the bed or
 4    injuring Matthew at all?
 5      A.  He only mentioned statements.  He didn't go into
 6    specifics.  He only asked me what happened from the time
 7    I was awakened by my wife.
 8      Q.  Did you talk to him or provide -- did you tell
 9    him what you had told the Troy police in those signed
10    statements?
11      A.  No.  I only told him about the morning that she
12    waked me up.  That's what he asked me.
13              MS. PECK:  I don't think I have any
14         other questions.
15              MS. CALABRESE:  I have some follow-up.
16              (Recess taken.)
17              MS. CALABRESE:  Back on the record.
18              Christine Calabrese, AAG for the
19         defendant State of New York in the Court of
20         Claims action.
21              I have follow-up questions to ask
22         Mr. Thomas.
23    FURTHER EXAMINATION
```

1            (Adrian P. Thomas - by Ms. Calabrese)

2    BY MS. CALABRESE:





Case 1:17-cv-00626-DJS Document 44-2 Filed 06/14/21 Page 391 of 452
Case 1:17-cv-00626-DJS Document 44-2 Filed 06/14/21 Page 391 of 452



Case 1:17-cv-00626-DJS Document 14-2 Filed 06/14/21 Page 392 of 452

368



(Adrian P. Thomas - by Ms. Calabrese)



(Adrian P. Thomas - by Ms. Calabrese)



1          (Adrian P. Thomas - by Ms. Calabrese)

2

3

4

5

6

7

8

9

10

11

12

13

14     Q.   The first.  I'm going to read the statement, and

15  I want you to tell me which part of the statement is

16  false, okay?

17          At the top it says your name, date of birth,

18

19          occupation, unemployed.

20          Is that all true at the time that you wrote this

21  statement?

22     A.   Yes.

23     Q.   And the phone number is listed as              .

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2         Was that true at the time of this statement?

 3     A.  Yes.

 4     Q.  And at the bottom, there's a signature here.

 5  That's your signature?

 6     A.  Yes.  That's my signature.  Yes.

 7     Q.  And in the body of the statement, there's a

 8  vertical -- or there's a line with your signature.

 9         Is that your signature?

10     A.  Yes.

11     Q.  I want you to initial both of your signatures so

12  that we know, when we look at this another time, that

13  you verified that those two are your signatures.

14     A.  (Witness complies.)

15             MS. CALABRESE:  So the record should

16         reflect that Mr. Thomas just initialed both

17         of his signatures on Exhibit C with his

18         initials, AT.

19  BY MS. CALABRESE:

20     Q.  And then the statement goes on to say that "about

21  a week or so from today, which is now 9/28/08, I

22  remember, while I was in the bathroom, I had the door

23  cracked, my son Matthew was on the bed with ████ "
```

```
 1          (Adrian P. Thomas - by Ms. Calabrese)

 2          Is that true?

 3     A.   False.

 4     Q.   That's not true?

 5     A.   Right.

 6     Q.   Which part of that is not true?

 7     A.   All of that is false.

 8     Q.   So, when you say, "I remember, while I was in the

 9  bathroom, I had the door cracked, my son Matthew was on

10  the bed with ████████" none of that is true?

11     A.   That's correct.

12     Q.   It goes on, "I don't know, but ██████ could have

13  hit him in the head with a metal truck," is that true?

14     A.   That's false.

15          MS. CALABRESE:  And for the record, I'm

16          going to put a line after each time I stop

17          because it's kind of a run-on paragraph.

18          There aren't any periods.  So in order to

19          kind of make this effective, I'm going to

20          put a line after the name ██████

21  BY MS. CALABRESE:

22     Q.   Do you see that there?

23     A.   Yes.
```

```
1              (Adrian P. Thomas - by Ms. Calabrese)

2       Q.  Acknowledge that?  Okay.

3            Then I'm going to put a line after the word

4    "metal truck."  Do you see that there?

5            Do you acknowledge that I put a line there?

6       A.  Yes.

7       Q.  Then it goes on, "another incident, Matthew was

8    falling off the couch and I snatched him up quick before

9    he hit the ground"; is that true?

10      A.  That's false.

11      Q.  I'm going to put a line after the word "ground."

12           Do you see that line?

13      A.  Okay.  Yes.

14      Q.  "This was around a week ago.  I also recall about

15   ten days or so putting Matthew in the crib and him

16   smacking his head on the crib.  He started crying.  I

17   picked him up and checked his head"; is that true?

18      A.  False.

19      Q.  I'm going to put a line there.

20           See that line after the word "head"?

21      A.  Okay.  Yeah.

22      Q.  "On all of those occasions, I was responsible for

23   my kids at these times my wife was not home"; is that
```

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2   true?

 3      A.  False.

 4      Q.  So we went through the whole statement.

 5          Other than the pedigree information about who you

 6   are, your address, your date of birth, this entire

 7   statement is false?

 8      A.  Yes.

 9      Q.  So, why did you write this statement, then?

10             MR. KLEIN:  Objection to him writing

11          it.

12   BY MS. CALABRESE:

13      Q.  Did you write this statement?

14          Take a look at it.  I'll show you.  It looks like

15   your handwriting.

16      A.  I think I believe -- I believe I did write this

17   one.

18      Q.  And so, you wrote this statement, yes?

19      A.  I believe I wrote that statement.

20      Q.  So why did you write information in here, all of

21   it being false?

22      A.  Because it was suggested to me about bumping,

23   dropping, and memory.  So I just made it up.
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.  So you just thought in your head about what maybe

 3  happened to Matthew and put words down?

 4      A.  I can't say maybe it happened to Matthew because

 5  that didn't happen to Matthew.

 6      Q.  So my question is:  Where did you get this

 7  information from?

 8              If you made it up, where did it come from?  How

 9  did you think of these exact words?

10              MR. KLEIN:  Objection.

11              THE WITNESS:  It was suggested to me.

12  BY MS. CALABRESE:

13      Q.  Which part of it was suggested to you?

14      A.  I told you.

15      Q.  Bumping the head?

16      A.  Bumping.

17      Q.  When you say, "I remember, while I was in the

18  bathroom, I had the door cracked, my son Matthew was on

19  the bed with ███████" was that suggested to you, those

20  words?

21      A.  Repeat that again.

22      Q.  Sure.  The part of the statement that reads --

23  the first paragraph that reads, "I remember, while I was
```

1      (Adrian P. Thomas - by Ms. Calabrese)

2   in the bathroom, I had the door cracked, my son Matthew

3   was on the bed with ████████ "

4        Was that suggested to you?

5   A.  No.

6   Q.  So where did you come up with that information if

7   was not true?

8   A.  I made it up.

9   Q.  And you just created it?

10   A.  Yes.

11   Q.  The statement that says, "I don't know, but

12   ████████ could have hit him in the head with a metal

13   truck," was that suggested to you?

14   A.  No.

15   Q.  And you made that up?

16   A.  I made that up.

17   Q.  The statement goes on to say, "another incident,

18   Matthew was falling off the couch, and I snatched him up

19   quick before he hit the ground," was that suggested to

20   you or did you make that up?

21   A.  Made that up.

22   Q.  And then you say, "this was around a week ago.  I

23   also recall about ten days or so putting Matthew in his

Case 1:17-cv-00626-DJS Document 44 Filed 06/14/21 Page 402 of 452

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2   crib and him smacking his head on crib.  He started

 3   crying.  I picked him up and checked his head."

 4         Was that suggested to you?

 5     A.   That was made up.

 6     Q.   You made it up?

 7     A.   Yes.

 8     Q.   And then it goes on to say, "on all of these

 9   occasions, I was responsible for my kids at these times.

10   My wife was not home."

11         That part is true, though, right?

12              MR. KLEIN:  Objection.

13   BY MS. CALABRESE:

14     Q.   That part is true.

15         You were responsible for the kids when your wife

16   was not home, correct?

17     A.   For when she's not home and it's just me there,

18   yes.

19     Q.   So when you say on all these occasions that

20   you're talking about" --

21     A.   Indicating --

22              MR. KLEIN:  Can you just let him

23         finish?
```

Case 1:17-cv-00626-DJS Document 42-41 Filed 06/14/21 Page 402 of 452

1          (Adrian P. Thomas - by Ms. Calabrese)

2               MS. CALABRESE:  Sure.

3               THE WITNESS:  Indicating harm coming to

4        my son is false.

5    BY MS. CALABRESE:

6        Q.  However, when you say -- when you're talking

7    about a period of time about a week ago, when your wife

8    is not home, you would be responsible for the kids?

9        A.  Yeah.  If no other adult is watching them, yes.

10       Q.  And so, this statement, Defendant's C, is

11   information you obtained from your own self that you

12   made up, correct?

13       A.  Correct.

14       Q.  And not information that was suggested to you,

15   correct?

16       A.  Correct.  The crib was suggested to me and I

17   think he didn't say smacking.  I think he said bump.

18       Q.  And you used the word "smack"?

19       A.  An accident.

20       Q.  So the part that says smacking his head on the

21   crib, that part you're saying is suggested to you, but

22   the police used the word "bump" and you chose the word

23   "smack"?

```
 1          (Adrian P. Thomas - by Ms. Calabrese)

 2     A.  Yes.

 3     Q.  And so, if this statement, Exhibit C, is

 4  information that you derived by making it up, why would

 5  you choose those words?

 6          Why would you make up a story about Matthew

 7  either possibly being hurt or being hurt?  Why would you

 8  make that up?

 9     A.  I would have said anything to get out of there.

10  I was in a closed environment.  I was scared.  I was

11  tired.  I was worried about the rest of my children that

12  I just seen taken away from me and right in front of my

13  face.  I loved them.  There was nothing I could do.  I

14  was worried about what was the situation with my son

15  Matthew.  And Wilahemina, I didn't know what was going

16  on.  So I would have said anything to get out of there.

17     Q.  But why would you think that saying something

18  that could get you in trouble like "I hurt my baby"

19  would get you out of there?

20     A.  Because they said it was an accident and I would

21  go home.

22     Q.  So that's why you said it?

23     A.  Yes.  The only way out was for me to say -- out
```

```
 1          (Adrian P. Thomas - by Ms. Calabrese)
 2   of that room at that time was that I was -- if he would
 3   have died, I was going to jump off a bridge, and that's
 4   the only reason I got out of there.
 5      Q.  So you said, I'm going to jump off a bridge, but
 6   you didn't really mean that?
 7      A.  I meant it.  At that time I meant it.  But the
 8   only way I got out of there was saying that.
 9      Q.  Saying jump off a bridge?
10      A.  Yes.
11      Q.  So did you say it because you wanted to leave the
12   room and get out of the police station, or did you say
13   it you because you really did want to jump off the
14   bridge?
15      A.  Both.
16      Q.  Now, moving to the next statement, Defendant's B.
17   I want to go through the same thing.
18          So the top portion has your name, your age, your
19   date of birth, your occupation being unemployed, your
20   address.
21          Is that all correct?
22              MS. CALABRESE:  For the record, I'm
23          looking at the original.  Claimant is
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)
 2         looking at a copy of Defendant's D.
 3  BY MS. CALABRESE:
 4     Q.  So that top portion, is that all correct?
 5             MR. KLEIN:  I don't think he remembers
 6         the question.
 7  BY MS. CALABRESE:
 8     Q.  Is the top portion all correct with the pedigree
 9  information?
10             MR. KLEIN:  Meaning the section that
11         says date, race, name, age, etc., is that
12         correct?
13             THE WITNESS:  Yes.
14  BY MS. CALABRESE:
15     Q.  So, let's go through it.
16         The part that says you were at 55 State Street,
17  Troy, which I'll attest that's the address of the police
18  department.
19         Is that all correct, you were at the police
20  department?
21     A.  Yes.
22     Q.  It says you were interviewed by Sergeant Adam
23  Mason, who's a police officer with the Troy Police
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)
 2    Department.
 3            Is that all correct, Adam Mason interviewed you?
 4       A.  Yes.
 5       Q.  Did you handwrite this statement?
 6       A.  No.
 7       Q.  But at the bottom of every page --
 8                MS. CALABRESE:  For the record, this is
 9            a ten-page statement.
10    BY MS. CALABRESE:
11       Q.  -- there's a signature that says the words
12    "Adrian Thomas."
13            That's your signature, correct?
14                MR. KLEIN:  Asked and answered,
15            objection.
16            Is that your signature on every page?
17                THE WITNESS:  Yes.
18    BY MS. CALABRESE:
19       Q.  You acknowledge that you signed every single page
20    of this statement, correct?
21       A.  That's correct.
22       Q.  At the top of the statement there's some
23    typewritten information.  I'm going to state for the
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2   record that those are your Miranda warnings.

 3        There's an initial there AT.  Those are your

 4   initials that you initialed, correct?

 5      A.   That's correct.

 6      Q.   At that time this statement is we're calling the

 7   second statement, right?

 8      A.   Yes.

 9      Q.   That you gave after you returned from Samaritan,

10   from when you received mental health?

11      A.   Yes.

12      Q.   And B -- or excuse me -- C is the first statement

13   that you wrote prior to leaving the police department to

14   go to Samaritan or wherever it was you went to receive

15   mental health treatment, correct?

16      A.   Yes.

17      Q.   And I think we said with the first statement, you

18   agreed that you were not in custody and you were not

19   under arrest, correct?

20              MR. KLEIN:  Objection.

21              THE WITNESS:  No. I was not arrested.

22   BY MS. CALABRESE:

23      Q.   You were not arrested and you were not in
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)
 2    custody, either.  You were free to leave, correct?
 3            And in fact, you did leave.  You went to
 4    Samaritan.
 5        A.  I was escorted to Samaritan.
 6        Q.  My question is:  When you wrote this statement
 7    you were not in custody, in the police custody?
 8            And by that I mean you were free to leave.
 9        A.  I didn't feel like I was free to leave.
10        Q.  Tell me why.
11                MR. KLEIN:  During the first --
12                MS. CALABRESE:  First statement.
13                THE WITNESS:  I didn't feel like I was
14            free to leave because, if he was going to
15            ask me just general questions, could have
16            asked at my house.  Why did I need to go
17            down to the police station to give it to
18            you?
19    BY MS. CALABRESE:
20        Q.  So you felt because of the sole reason you were
21    in the police station you weren't free to leave?
22        A.  Correct.
23        Q.  And you weren't in handcuffs when you made that
```

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2    statement?

 3       A.  No.

 4       Q.  And you weren't restrained in any way when you

 5    made that statement?

 6       A.  No, but I was at the police station.

 7       Q.  I mean restrained physically.

 8       A.  No.

 9       Q.  You didn't ask to leave, correct?

10            MR. KLEIN:  I think that was asked and

11         answered yesterday.

12    BY MS. CALABRESE:

13       Q.  You didn't ask to leave, did you?

14       A.  No.

15       Q.  The police didn't say you had to stay there,

16    correct?

17       A.  That's correct.  Yes.

18       Q.  You did not ask for a lawyer, correct?

19       A.  I think -- I didn't demand for lawyer, but I

20    think I asked them did I need a lawyer.

21       Q.  But you did not say, I want a lawyer?

22       A.  Well, that's a statement of a demand.  I didn't

23    demand it.
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.  So moving on to the second statement,

 3  Defendant's D.

 4          This is the statement that you gave when you say

 5  you felt like you couldn't leave, correct?

 6                  MR. KLEIN:  Objection.

 7                  He couldn't leave the first time, too.

 8          So is this the second statement?

 9                  MS. CALABRESE:  I'll ask the question

10          again.

11                  MR. KLEIN:  Okay.

12  BY MS. CALABRESE:

13      Q.  So with regard to Defendant's D, this is the

14  statement that you gave after you came back from the

15  hospital, correct?

16      A.  Yes.

17      Q.  When you said you felt you couldn't leave because

18  of what you're saying is a threat of the escape charge,

19  right?

20      A.  Yes.

21      Q.  And this statement you gave after what we're

22  calling Miranda warnings in the typewritten part on top

23  was provided to you, correct?
```

1          (Adrian P. Thomas - by Ms. Calabrese)

2     A.  Yes.

3     Q.  You gave this statement, and after you gave the

4  statement or during the time you gave the statement, you

5  did not demand a lawyer, correct?

6     A.  Correct.

7     Q.  I want you to go through it and I want you to

8  tell me what is true and what is not true, all right?

9          You say -- I'm going to try to do it by paragraph

10  or what makes sense.

11          You say, "about 10 or 15 days ago I was home with

12  my children."

13          That part is true, right, because you were always

14  home with the kids.

15     A.  I'm not always home with the children.

16     Q.  You're a caregiver for them, right?

17          You stayed with them most times, if not

18  Wilahemina?

19     A.  Correct.

20     Q.  So when you say, "about 10 or 15 days ago I was

21  home with my children," that part is true.

22          Wouldn't you agree?

23               MR. KLEIN:  Objection.

1        (Adrian P. Thomas - by Ms. Calabrese)

2            THE WITNESS:  I don't know what I was

3        doing 10 or 15 days ago when I gave that

4        statement right there.

5   BY MS. CALABRESE:

6     Q.  So as you sit here today you're saying, "about 10

7   or 15 days ago when I was home with my children," that

8   part is not true?

9            MR. KLEIN:  Objection.  That's not what

10       he said.

11           THE WITNESS:  I'm saying I can't

12       confirm or deny.

13  BY MS. CALABRESE:

14    Q.  So as you sit here today you're saying, where the

15  statement says, "about 10 or 15 days ago I was home with

16  my children," you don't know if that's true or not?

17    A.  I don't -- I can't remember when I --

18    Q.  Gave that information?

19    A.  Gave the information.

20    Q.  So isn't that what happened, you were sitting

21  down and telling Sergeant Mason, as he was writing, you

22  were having a conversation with him and he was writing

23  down the information?

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      A.   I wrote that.

 3      Q.   What I mean is this:  He's sitting like we're

 4  sitting, and you're sitting like we're sitting today,

 5  and you were talking to him, having a conversation, and

 6  as you're talking, he's writing this information down on

 7  a statement.

 8           Isn't that what happened?

 9               MR. KLEIN:  Objection.

10               MS. CALABRESE:  You can answer that.

11               THE WITNESS:  I didn't tell him

12           word-for-word.

13               MS. CALABRESE:  Right.  I agree.  I

14           agree.

15  BY MS. CALABRESE:

16      Q.   But my question is:  You were having a

17  conversation with him like you and I are right now;

18  isn't that true?

19      A.   Yes.

20      Q.   As you're having this conversation he's writing

21  down information, right?

22      A.   Yes.

23      Q.   That's in this statement, Defendant's D, correct?
```

1          (Adrian P. Thomas - by Ms. Calabrese)

2     A.   Yes.

3     Q.   So, when it says, "about 10 or 15 days ago I was

4    home with my children," as you're sitting here today

5    you're saying, I don't know if that's true or not,

6    correct?

7     A.   That's correct.

8     Q.   And you say, "my wife was not there."  Would the

9    same answer apply, you don't know if that's true or not?

10         You know what?  Let me do this a different way.

11   Let me read a paragraph that -- I think it will make

12   more sense.

13         "About 10 or 15 days ago I was home with my

14   children.  My wife was not there.  I was in the bathroom

15   with the door closed.  My son Matthew was in my bedroom

16   lying on my bed.  Matthew was crying.  I finished using

17   the bathroom and I went into my bedroom.  Matthew was

18   lying on the bed crying, and ███████ my other son, was

19   on the bed also.  The door to my bedroom was cracked a

20   little and there was a blue-and-white toy truck on the

21   floor.  I picked up Matthew while he was crying and I

22   put Matthew in his crib while he was still crying.  When

23   I put Matthew in his crib, I accidentally dropped him

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2   about five inches into the crib and he hit his head

 3   against the side of the crib.  When I dropped Matthew,

 4   he hit his head pretty hard.  If there is an old injury

 5   on Matthew's head and there is old blood on Matthew's

 6   brain, I caused it when I accidentally dropped him."

 7        So that appears to be one incident.  So let's

 8   talk about that.

 9        Is that recitation of events, is that true?  Did

10   that occur?

11     A.  No.

12     Q.  What part of that statement is true?

13     A.  None of it.

14     Q.  All of that is false.

15     A.  All of that's false.

16     Q.  And so, this first page, page 1 --

17     A.  Anything that has to do with accident, bumping,

18   throwing, all that, that's stating that I did something

19   to Matthew, is totally false.

20     Q.  But did that event happen where you were in the

21   bathroom, Matthew was on the bed, ██████ was on the bed,

22   you came in, put Matthew in the crib, did that happen?

23     A.  No.
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.   So none of that happened.  You were never in the

 3   bathroom with the boys on the bed?

 4      A.   How can I be in the bathroom with the boys on the

 5   bed?

 6      Q.   I'm asking you, because I think it said --

 7              MR. KLEIN:  Just yes or no.

 8   BY MS. CALABRESE:

 9      Q.   It said you were in the bathroom, and the boys

10   were on the bed, lying on the bed and when you went into

11   the bedroom Matthew was crying.

12           So, none of that happened?

13      A.   No.

14      Q.   Now, where did you come up with this information?

15      A.   From a suggestion of the cop.

16      Q.   So did Sergeant Mason suggest to you that you

17   were in the bathroom with the door closed, and the boys

18   were on the bed, and Matthew was crying?

19           Did he suggest that or did you come up with that?

20      A.   I came up with that.

21      Q.   The part that says you left the bathroom, went

22   into the bedroom, saw Matthew lying on the bed crying,

23   and Isaiah was also on the bed, did you come up with
```

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2    that or are you stating Sergeant Mason did?

 3        A.  I came up with that.

 4        Q.  You're saying the door to the bathroom was

 5    cracked a little and there was a blue-and-white toy

 6    truck on the floor.

 7            Did you come up with that or did Sergeant Mason

 8    come up with that?

 9        A.  I think I came up with that.

10        Q.  And you picked up Matthew while he was crying and

11    put Matthew in his crib while he was still crying, did

12    you come up with that or did Sergeant Mason come up with

13    that?

14        A.  I think I came up with that.

15        Q.  You did?

16        A.  Yes.

17        Q.  And you put Matthew in his crib, you accidentally

18    dropped him about five or six inches into the crib and

19    he hit his head on the side of the crib, did you come up

20    with that or did Sergeant Mason come up with that?

21        A.  I came up with that after the dropping was

22    suggested.

23        Q.  So, you're saying that the dropping was suggested
```

Case 1:17-cv-00626-DJS Document 74-2 Filed 06/14/21 Page 403 of 452

1      (Adrian P. Thomas - by Ms. Calabrese)

2   and that then made you come up with this one sentence?

3      A.  I didn't know what happened to my son.  I just

4   made it up after it was repeatedly suggested dropping,

5   slamming, bumping.

6      Q.  So that statement -- that sentence, "when I put

7   Matthew in his crib, I accidentally dropped him about

8   five or six inches into the crib, and he hit his head

9   against the side of the crib, that, you're saying, you

10  came up with based upon the suggestions that the officer

11  made to you?

12     A.  Correct.

13     Q.  Then the next sentence, "when I dropped Matthew

14  he hit his head pretty hard.  If there's an old injury

15  on Matthew's head and there's old blood on Matthew's

16  brain, I caused it when I accidentally dropped him."

17        Did you come up with those two sentences or did

18  the officer?

19           MR. KLEIN:  You're going very fast.

20           MS. CALABRESE:  I'm sorry.

21           MR. KLEIN:  Can we read it back?

22           MS. CALABRESE:  I apologize.  I'll

23        repeat the question.

```
 1          (Adrian P. Thomas - by Ms. Calabrese)

 2   BY MS. CALABRESE:

 3     Q.  The next question is, when you say, "when I

 4   dropped Matthew, he hit his head pretty hard.  If there

 5   is an old injury on Matthew's head and there is old

 6   blood on Matthew's brain, I caused it when I

 7   accidentally dropped him."

 8          Did you come up with that or did the sergeant

 9   come up with that?

10     A.  The sergeant came up with that.

11     Q.  So that last sentence out of this whole first

12   page is the only sentence that the sergeant came up

13   with, correct?

14               MR. KLEIN:  Objection.

15               THE WITNESS:  Other than the dropping.

16   BY MS. CALABRESE:

17     Q.  Other than the dropping, because you're saying

18   the dropping was suggested to you?

19     A.  Correct.

20     Q.  But that sentence in the dropping, "when I put

21   Matthew in his crib, I accidentally dropped him five or

22   six inches into the crib, and he hit his head against

23   the side of the crib", you came up with that sentence
```

1          (Adrian P. Thomas - by Ms. Calabrese)

2    with the dropping being suggested to you?

3        A.   Dropping and hitting, too.  Yes.

4        Q.   The last sentence that I read already that

5    begins, "when I dropped Matthew," and it goes on, and

6    that final sentence, "I caused it when I accidentally

7    dropped him," those two sentences you're saying the

8    sergeant came up with; is that right?

9        A.   Yes.

10       Q.   The second page goes on to say, "Saturday,

11   September 20, 2008, at about 8:00 or 9:00 p.m., I was in

12   my bedroom with my son Matthew.  I had the door closed,

13   and no one else was in the bedroom with us.  I was

14   sitting on the bed and I forgot how close Matthew was

15   behind me.  I laid back, and my head hit Matthew's head.

16   My head hit Matthew's head pretty hard.  Matthew started

17   crying and wheezing and he was having trouble breathing.

18   I laid down on the bed next to him and rubbed his side

19   to let him know that I didn't mean to cause damage to

20   him.  Matthew fell asleep.  Matthew stayed in my bed and

21   he woke up about 12:00."

22          We're going to stop right there.

23              MS. CALABRESE:  Just for the record, I

<pre>
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2        just drew a line right there.

 3   BY MS. CALABRESE:

 4      Q.   Can you see that, Mr. Thomas, just to separate

 5   the paragraph?

 6      A.   Okay.

 7      Q.   Let's talk about that first part.

 8           What part of that is untrue?

 9      A.   That's false.

10      Q.   That entire paragraph is false?

11      A.   Yes.

12      Q.   You were not in the bedroom with Matthew on

13   September 20, 2008, around 8:00 or 9:00 p.m., or is that

14   part true?

15      A.   That part is false.

16      Q.   And so, you were not in the bedroom with him at

17   that time on that date and bumped your head on to his.

18   That's not true?

19      A.   I did not bump my head on his.

20      Q.   Were you ever in the bed with him at that time?

21           Is the only part that's not true the bumping of

22   the head?  Did any of this happen, or did none of this

23   happen?
</pre>

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2                   MR. KLEIN:  I think she's asking you

 3              were you in the bed with him, you just

 4              didn't bump your head, or none of it's true,

 5              at 8:00?

 6                   THE WITNESS:  I might have was in the

 7              room with him, but I know I didn't bump his

 8              head.

 9     BY MS. CALABRESE:

10         Q.  So you were in the room with him like on a normal

11     evening.  Is that part true?

12         A.  On an average day, probably.  Yes.

13         Q.  I mean, specifically on September 20, 2008 around

14     8:00 or 9:00 p.m., were you in the room with him at that

15     time, on the bed with him?

16                   MR. KLEIN:  The night before he didn't

17              wake up.

18                   THE WITNESS:  Yes, I was in the room.

19     BY MS. CALABRESE:

20         Q.  On the bed with him?

21         A.  Not on the bed with him.  No.

22         Q.  You weren't on the bed with him as it's described

23     here?
```

1          (Adrian P. Thomas - by Ms. Calabrese)

2     A.   No.

3     Q.   You said you didn't bump your head on his head.

4    That is all false?

5     A.   That is false.

6     Q.   So where did you get the information, then, to

7    make up this paragraph that we're talking about that's

8    false?

9     A.   Where did I get that information?

10    Q.   Yes.

11    A.   I got the information from me being around my

12   son.

13    Q.   What do you mean?

14    A.   Being around him on an afternoon day.

15          MR. KLEIN:  I think you're saying where

16       did he get the information that he banged

17       his head?

18          MS. CALABRESE:  Yes.

19          MR. KLEIN:  I think -- I'm going to

20       object to the form of the question because I

21       think it's confusing.

22          MS. CALABRESE:  I'll rephrase it.

23   BY MS. CALABRESE:

```
 1          (Adrian P. Thomas - by Ms. Calabrese)

 2     Q.  So this paragraph that we're talking about right

 3   now, did you make it up in your head?

 4     A.  About the bumping, yes.

 5     Q.  So that's something you came up with on your own?

 6     A.  It was suggested about the hitting or bumping.

 7   It didn't come from me.  I just made it up to formulate

 8   what was suggested to me.

 9     Q.  So I'm trying to understand.

10          So is it fair to say that you believe that the

11   officer suggested to you that Matthew bumped his head

12   and that caused his death?

13     A.  Yes.

14     Q.  And because of that suggestion, you, then, came

15   up with the situations --

16     A.  Right.

17     Q.  -- where you say, yes, I bumped Matthew's head in

18   different ways because of those suggestions?

19     A.  Yes.

20     Q.  So this paragraph where you discuss laying down,

21   bumping your head, is something you came up with in your

22   head?

23     A.  Right.
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.   You made up?

 3      A.   After it was suggestions about bumping and

 4  hitting, the accident.

 5      Q.   So the officers didn't sit down and say --

 6  suggest to you this scenario.  What I mean by that is,

 7  the officers did not suggest you laying down in your

 8  bed, bumping your back of your head on the front of his

 9  head.

10         They did not suggest that specific information,

11  correct?  You came up with it in your head.

12      A.   I came up with it in my head after the

13  suggestions of bumping and stuff.

14      Q.   And then it goes on to say, "my wife fed Matthew

15  and put him back in the bed and he was still wheezing a

16  little and having a little bit trouble believing.

17  Matthew slept in the bed with us until he woke up again

18  at about 3:00 or 4:00 in the morning.  My wife fed

19  Matthew again.  My other son Malakai was also in the bed

20  with us and I fed Malakai.  Matthew's breathing was

21  pretty bad now.  My wife said that she was going to take

22  him to the hospital in the morning."

23         I'm going to stop right there.  Is that true?
```

Case 1:17-cv-00626-DJS  Document 44  Filed 06/14/21  Page 426 of 452

1          (Adrian P. Thomas - by Ms. Calabrese)

2               MR. KLEIN:  That was very fast.  If you

3          can do it again.

4               MS. CALABRESE:  Sure.

5               And just for the record, Mr. Thomas,

6          can you see I'm just putting a line right

7          after the word "morning" on the last line of

8          the statement so that we can break it up.

9               (Discussion held off the record.)

10               (Recess taken.)

11     BY MS. CALABRESE:

12     Q.   To try to be more effective, Mr. Thomas, relating

13     to Exhibit B, is it true to say that the information in

14     here, all of the stories about how Matthew was injured,

15     is information that you created or made up?

16     A.   Yes.

17     Q.   Based upon what you're saying is the suggestion

18     of Matthew being injured by hitting his head?

19     A.   Say that one more time.

20     Q.   Sure.  Based on the suggestion that you said, the

21     suggestion by the police of Matthew hitting his head?

22     A.   You said the suggestion.

23     Q.   Yes.  So what I'm saying is, the way in which

1           (Adrian P. Thomas - by Ms. Calabrese)

2   Matthew was injured is information that you created and

3   made up?

4       A.  Yes.  I came up with a story.

5       Q.  Because they suggested that he hit his head?

6       A.  Yes.

7       Q.  And so, all of that, the stories of how he was

8   hurt, none of that's true?

9       A.  That's correct.

10      Q.  However, you signed this statement and attested

11  to the accuracy and truthfulness of the statement; isn't

12  that right?

13      A.  That's correct.

14      Q.  Recognizing that you could be charged with a

15  misdemeanor for writing a false statement and alleged

16  perjury?

17      A.  I just signed it.  I didn't state the intentions

18  of what I wrote.

19      Q.  So you knew that writing a false statement would

20  be a crime?

21      A.  I knew that I was told I wasn't going to be

22  arrested a few times over.

23      Q.  Whether or not you were going to be arrested --

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      A.   I took that to be the truth.

 3      Q.   But you knew that writing a false statement would

 4  be a crime.  Giving the police false information and

 5  writing a false statement would be a crime; isn't that

 6  true?

 7           You knew that.

 8                MR. KLEIN:  Objection.

 9                If you know.

10                THE WITNESS:  I didn't know that.

11  BY MS. CALABRESE:

12      Q.   Well, it says it on this document that you signed

13  that, if you write a false statement, you could be

14  charged with a crime.

15           You knew that because it was on the statement,

16  right?

17      A.   It was on the statement.

18      Q.   And you gave this false statement anyway, right?

19      A.   I gave the false statement.  I felt like I had no

20  choice, but I didn't do anything to my son.

21      Q.   You knew that giving a false statement wasn't

22  something you should have done, correct?

23      A.   I felt like I had no choice.
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.  And earlier you mentioned -- you responded to a

 3  question, I think, asked by Ms. Peck with regard to how

 4  Matthew received his injuries and you said you love your

 5  children.  You would never break their bones

 6  intentionally.

 7          Do you remember saying that?

 8      A.  Yes.

 9      Q.  You do love your children, correct?

10      A.  Yes.

11      Q.  And you would never intentionally hurt them,

12  correct?

13      A.  Correct.

14      Q.  But you have hurt them by disciplining them

15  inappropriately, correct?

16      A.  I have disciplined them.  Yes.

17      Q.  Inappropriately, correct?

18      A.  Yes.

19      Q.  And isn't it possible, then, that the injuries

20  that Matthew received you caused accidentally through

21  inappropriate discipline?

22      A.  That's not correct.  I've never disciplined a

23  child -- a baby, a newborn baby.
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2       Q.  But squeezing him?

 3       A.  I never squeezed Matthew.

 4       Q.  Or dropped him down because you were frustrated?

 5       A.  I never did any of that.

 6       Q.  And as you sit here today, I think you said

 7   earlier there is nobody that you can think who had

 8   access to Matthew who would have caused the injuries

 9   that are related in the autopsy?

10       A.  Can you repeat that one more time?

11       Q.  Sure.  As you sit here today, there is nobody

12   that you can think of that would have caused the

13   injuries that Matthew had as they're related in the

14   autopsy?

15       A.  That's correct.

16       Q.  And when was it that you found out that Matthew

17   died?

18           How did you find that out?  Who told you?

19       A.  I'm not sure who actually told me.  I think it

20   was my -- one of my attorneys at that time.

21       Q.  Where were you?

22       A.  I was at the county jail.

23       Q.  So while in the county jail, was it that first
```

Case 1:17-cv-00626-DJS   Document 94-1   Filed 06/14/21   Page 481 of 452

```
 1          (Adrian P. Thomas - by Ms. Calabrese)

 2   day you were in the jail, the second day, the third day?

 3          When was it?

 4      A.  Not absolutely sure.

 5      Q.  Was it several days, do you remember, hours?

 6      A.  I don't remember.

 7      Q.  So you were in the county jail.

 8          What was the charge?

 9              MR. KLEIN:  Initially?

10              THE WITNESS:  At the county jail?

11   BY MS. CALABRESE:

12      Q.  Murder in the Second Degree?

13      A.  I think so.

14      Q.  And who did you think you murdered at that point?

15              MR. KLEIN:  Objection.

16              THE WITNESS:  I didn't murder no one.

17              MS. CALABRESE:  I think it was

18          attempted murder, let's say, initially.

19   BY MS. CALABRESE:

20      Q.  Well, who did you think they said you murdered or

21   tried to murder?

22      A.  The judge said at the time it was Matthew.

23      Q.  Is that when you found out that Matthew died?
```

```
 1            (Adrian P. Thomas - by Ms. Calabrese)
 2                MR. KLEIN:  Well, you just asked him
 3           who told him he attempted to murder, and
 4           then I think he said he found out from his
 5           lawyer.
 6                Can you separate the questions?
 7    BY MS. CALABRESE:
 8       Q.  Do you understand what I'm saying?
 9       A.  When I was brought in front of a judge.
10       Q.  What did the judge say?
11       A.  He asked me who I was.  I told him Adrian Thomas.
12    And then he stated the charge.  I think it was murder.
13       Q.  At your arraignment?
14       A.  When I was at the county court.  I think so.
15       Q.  And is that the first time you heard the word
16    "murder"?
17       A.  I spoke with a lawyer first.
18                MR. KLEIN:  Don't say what was said.
19    BY MS. CALABRESE:
20       Q.  And did you have a conversation with that person?
21       A.  Yes.
22       Q.  Is that the first time you learned that Matthew
23    had died?
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      A.   I think so.  I'm not sure.

 3      Q.   And what was your reaction?

 4      A.   I was hurt, frustrated, and mad.

 5      Q.   Why were you mad?

 6      A.   Because of being charged with a crime that I

 7  didn't commit.

 8      Q.   Why were you hurt and frustrated, for the same

 9  reasons?

10              MR. KLEIN:  Objection.

11              THE WITNESS:  Because I wasn't able to

12          see my son and my children and my wife at

13          the time.

14  BY MS. CALABRESE:

15      Q.   And so isn't it true that you knew that Matthew

16  was dying or going to die when he left your house in the

17  ambulance?

18      A.   I didn't know he was going to die.

19      Q.   You didn't have that feeling that he was going to

20  die?

21      A.   I didn't.

22      Q.   You just knew he was in serious condition?

23      A.   That's correct.
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.  And when he left and when the children were taken

 3   away, at that point you knew that you were going to be

 4   talked to by the police?

 5              MR. KLEIN:  Objection.

 6              THE WITNESS:  Yes.

 7   BY MS. CALABRESE:

 8      Q.  And that's why you took a shower, to get yourself

 9   ready, because you knew you were going to have to leave

10   the house?

11              MR. KLEIN:  Objection.

12              THE WITNESS:  No.  Not initially.  I

13          was going to see my son and my wife at the

14          hospital.

15   BY MS. CALABRESE:

16      Q.  That's why you took a shower?

17      A.  Because I was going to see my wife and son at the

18   hospital.

19      Q.  Did you also eat and clean up the house first?

20      A.  The house was already cleaned up by me before the

21   children was taken away.

22      Q.  And did you eat before you left?

23      A.  No.
```

1           (Adrian P. Thomas - by Ms. Calabrese)

2     Q.  Did you straighten up your own personal items in

3   the house before you left?

4     A.  I cleaned up the house.  Yes.

5     Q.  And so, as we sit here today, you're aware of the

6   autopsy.  You're aware of the injuries which caused

7   Matthew's death.

8           Who do you think killed Matthew?

9     A.  I have no idea.  I don't think Matthew was

10  killed.  I think that he died sickly.

11    Q.  So you think that he died not by any person

12  causing the death.  You think he died because of

13  something in his body?

14    A.  I think it was a medical issue.  Yes.

15    Q.  Not related to the physical injuries he received?

16          MR. KLEIN:  Object to the fact that he

17      did receive injuries.

18  BY MS. CALABRESE:

19    Q.  Not related to the physical injuries that were

20  listed on the autopsy?

21          MR. KLEIN:  Or the physical condition

22      he was in.

23  BY MS. CALABRESE:

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.  Do you need me to repeat the question?

 3      A.  Yes.

 4      Q.  And so, you do not think he died because -- based

 5  upon the physical injuries that are written down in the

 6  autopsy.  You don't think that caused his death?

 7      A.  I don't believe trauma was the conclusion of his

 8  death.  I don't think trauma -- trauma could never have

 9  been involved because I made the story up under the

10  suggestions that was given.

11      Q.  I'm sorry, I didn't get the last words.

12      A.  I said, trauma could never be involved if I made

13  the story up under the suggestions that were given to

14  me.

15      Q.  I don't understand what you mean.  I'm sorry.

16      A.  Said that the medical examiner came into the

17  injuries that the medical examiner stated.

18      Q.  Right.

19      A.  I said that could never be the conclusion if I

20  made the story up under the suggestions that were given

21  to me repeatedly.

22      Q.  So you believe that the diagnoses at the autopsy

23  of the medical examiner -- and I'm relating to you
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)
 2   what's been marked as Defendant's D.
 3                 MS. CALABRESE:  Off the record.
 4                 (Discussion held off the record.)
 5   BY MS. CALABRESE:
 6      Q.  Relating to Defendant's D, which is the final
 7   autopsy report -- and I'm reading from page 12 --
 8   there's a list of anatomic diagnoses, which include
 9   physical injury to Matthew.
10          So you're saying if you never gave that statement
11   that you injured him this would not be the diagnosis.
12          Is that what you're saying?
13      A.  That's correct.
14      Q.  So, are you also saying, then, that the diagnoses
15   of physical injury, for example, the subdural hematomas,
16   are not true, that they did not occur?
17                 MR. KLEIN:  If you know.
18                 THE WITNESS:  I don't know if they
19          occurred or not.  I was there when --
20   BY MS. CALABRESE:
21      Q.  But he's saying in this report that it was there.
22          So are you saying that -- are you challenging
23   that this report is just not accurate?
```

```
1              (Adrian P. Thomas - by Ms. Calabrese)

2      A.  Yes.

3      Q.  So you're saying he never had a subdural

4  hematoma?

5              MR. KLEIN:  Objection.

6              THE WITNESS:  I can't actually

7          physically say that they wasn't there.  I'm

8          not a medical expert.

9  BY MS. CALABRESE:

10     Q.  But you don't believe what the medical examiner

11 said is true?

12     A.  That's correct.

13     Q.  So knowing that, are you saying, then, that the

14 diagnoses on page 12 are also not true?

15             MR. KLEIN:  If you know what they are.

16             THE WITNESS:  I never seen page 12.

17             MS. CALABRESE:  Here you go.  Page 12.

18 BY MS. CALABRESE:

19     Q.  Are you done reading page 12?

20     A.  Yes.

21     Q.  So I'll ask you the question again.

22         Are you saying that, because you don't believe

23 what the medical examiner said is true, that is page 12
```

```
1              (Adrian P. Thomas - by Ms. Calabrese)

2   also not true?

3      A.  I believe that's false.

4      Q.  And so, for the Court of Claims action, you're

5   stating that you have a right to sue New York State

6   under section 8B because you were wrongfully

7   incarcerated and convicted, right?

8              MR. KLEIN:  Objection.

9   BY MS. CALABRESE:

10     Q.  That's why you're suing?

11     A.  Yes.

12     Q.  So, then, the standard involves you proving

13  innocence.

14         So, tell me, as you sit here today, how that

15  applies.

16     A.  I don't know what happened to my son, because

17  they said -- the officers said in the first interview

18  that they were going to scoop up my wife.  I said I

19  would take the fall for my wife.

20     Q.  But you didn't think Wilahemina did anything to

21  hurt him, right?

22     A.  No.  So I said I will take the fall for my wife.

23     Q.  And I'm sorry, when you say no, you mean correct,
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)
 2   right?
 3          You did not believe Wilahemina did anything to
 4   hurt him, correct?
 5      A.   I don't believe she did anything.
 6      Q.   Go ahead.
 7      A.   And they said, no, you can't take the fall.  You
 8   got to tell us what happened.
 9      Q.   And that's when you came up with the story that's
10   the ten-page statement?
11      A.   Yes.  After I was suggested that I was -- about
12   the bumping, dropping, or anything of that nature, and
13   that I wouldn't be arrested, and that it was an
14   accident.
15      Q.   Do you have any remorse about any of this?
16              MR. KLEIN:  Objection.
17              What do you mean by remorse?
18              MS. CALABRESE:  Sorrow.
19              THE WITNESS:  I'm sad that my ex-wife,
20          Wilahemina, and my children believe I did
21          this.  And I'm saddened because I feel like
22          I was taken advantage of, and that the
23          conviction has been a ghost that's been
```

Case 1:17-cv-00626-DJS Document 142-24 Filed 06/14/21 Page 4 of 13

```
 1            (Adrian P. Thomas - by Ms. Calabrese)
 2       riding my back for quite some years now, and
 3       that I don't -- I can't have anything to do
 4       with or be involved with my children and
 5       their life or whatever.  And I'm hurt
 6       because I never grieved over my son's death,
 7       and it hurts me bad.
 8            MS. CALABRESE:  We're all set.
 9            Thank you.
10            MR. KLEIN:  Can you just tell me what
11       the last question was?  I'm sorry.
12            (Question read by reporter.)
13            MR. KLEIN:  No questions.
14            MS. CALABRESE:  That concludes the
15       deposition of Adrian Thomas for the State of
16       New York.
17            I'll defer to other counsel.
18            MS. PECK:  That concludes it for us, at
19       least for me for Dr. Sikirica.
20            MR. PERKINS:  No questions.
21            (Deposition concluded at 2:33 p.m.)
22
23
```

```
 1                    INDEX OF EXHIBITS

 2   City                                        Marked

 3   4  Statement of Adrian Thomas                  290

 4   5  Statement of Adrian Thomas                  290

 5   6  Statement of Adrian Thomas                  290

 6

 7   Sikirica

 8   1  Transcript of police interview              340

 9   2  Claim in Court of Claims action             345

10   3  Order of Fact Finding and Disposition

11      Before the Family Court of Rensselaer County   352

12

13

14

15

16

17

18

19

20

21

22

23
```

```
 1   STATE OF NEW YORK     )

 2   COUNTY OF

 3

 4   I, ADRIAN P. THOMAS, do hereby certify that I have read

 5   the foregoing record of my testimony taken at the time

 6   and place noted in the heading hereof and that it is

 7   a true and correct transcript of the same and the whole

 8   thereof.

 9

10

11

12

13                    _____

14   Subscribed and sworn to            ADRIAN  P.  THOMAS

15   before me this _____ day

16   of _____, 2019

17

18

19

20

21   _____

22

23
```

420

1     C E R T I F I C A T I O N

2

3

4     I, Jeanne O'Connell, Registered Professional Reporter

5     and Notary Public in and for the State of New York, do

6     hereby certify that the foregoing to be a true and

7     accurate transcription of the stenographic notes as

8     taken by me of the aforesaid proceedings.

9

10

11

12    _____          _____

13        Date                              Jeanne O'Connell

14

15

16

17

18

19

20

21

22

23

# APPENDIX

| $ | | | | |
|---|---|---|---|---|



# APPENDIX







Case 1:17-cv-00626-DJS Document 44-1 Filed 06/14/21 Page 450 of 452



Case 1:17-cv-00626-DJS Document 112-4 Filed 06/14/21 Page 451 of 452



# APPENDIX



# APPENDIX









Case 1:17-cv-00626-DJS Document 14-21 Filed 06/14/21 Page 453 of 452



# APPENDIX



Case 1:17-cv-00626-DJS Document 84-17/22-22 Filed 06/14/21-58 Page 123 of 443

# Exhibit "B"

```
 1   UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF NEW YORK
 2   - - - - - - - - - - - - - - - - - - - - - - - - - - - -

 3   ADRIAN THOMAS,

 4                          Plaintiff,

 5            - against -

 6   CITY OF TROY, ADAM R. MASON, RONALD FOUNTAIN,
     TIM COLANERI,
 7   RENSSELAER COUNTY, and MICHAEL SIKIRICA,

 8                          Defendants.
     - - - - - - - - - - - - - - - - - - - - - - - - - - - -
 9   NEW YORK STATE
     COURT OF CLAIMS
10   - - - - - - - - - - - - - - - - - - - - - - - - - - - -

11   ADRIAN P. THOMAS,

12                          Claimant,

13            - against -

14   THE STATE OF NEW YORK,

15                          Defendant.
     - - - - - - - - - - - - - - - - - - - - - - - - - - - -

16

17              DEPOSITION of Defendant, MICHAEL SIKIRICA,

18   held on the 5th day of September 2019, commencing at

19   9:30 a.m., at the Law Offices of Bailey, Johnson & Peck,

20   P.C., 5 Pine West Plaza, Washington Avenue Extension,

21   Albany, New York 12205, before Jeanne O'Connell,

22   Registered Professional Reporter and Notary Public in

23   and for the State of New York.
```

```
 1    APPEARANCES:

 2    Brett H. Klein, Esq.
      305 Broadway
 3    Suite 600
      New York, New York  10007
 4    Attorney for Plaintiff/Claimant

 5    Pattison Sampson Ginsberg & Griffin, PLLC
      22 First Street
 6    Troy, New York  12180
      By:  Joseph T. Perkins, Esq.
 7    Attorneys for City of Troy, Adam R. Mason,
      Ronald Fountain and Tim Colaneri

 8
      Bailey, Johnson & Peck, P.C.
 9    5 Pine West Plaza
      Washington Avenue Extension
10    Albany, New York 12205
      By:  Crystal R. Peck, Esq.
11    Attorneys for Michael Sikirica

12    New York State Office of the Attorney General
      The Capitol
13    Albany, New York 12224
      By:  Christina M. Calabrese, Assistant Attorney General

14
      Also present:  Katherine Hamilton
15

16

17

18

19

20

21

22

23
```

```
 1              S T I P U L A T I O N S
 2    It is hereby stipulated and agreed by
 3    and between the attorneys for the respective
 4    parties hereto that, this examination may be signed and
 5    sworn to before any Notary Public of the State of New
 6    York.
 7
 8    It is further stipulated and agreed that the filing and
 9    certification of the said examination shall be waived.
10
11    It is further stipulated and agreed that all objections
12    to questions, except as to form, shall be reserved for
13    the trial of this action.
14
15    It is further stipulated and agreed that there are no
16    objections to Notice of this Examination Before Trial
17    and the qualifications of the court reporter to take
18    this deposition and administer an oath or affirmation.
19
20
21
22
23
```

```
1              (Michael Sikirica - by Ms. Calabrese)

2                MS. CALABRESE:  Usual stipulations.

3                MS. PECK:  Yes.

4                MR. PERKINS:  Yes.

5                MR. KLEIN:  Yes.

6                MICHAEL SIKIRICA, M.D., after first having

7    been duly sworn, was examined and testified as follows:

8    EXAMINATION

9    BY MS. CALABRESE:

10      Q.  Good morning, Dr. Sikirica.

11      A.  Good morning.

12      Q.  My name is Christina Calabrese.  I am Assistant

13   Attorney General with the Office of New York State

14   Attorney General.

15           We're here today for two reasons.  The first is I

16   am going to be asking you questions relating to a claim

17   filed by Adrian Thomas against the State of New York

18   alleging wrongful incarceration.

19           And you're also here to answer questions in a

20   companion matter which is entitled...

21                MS. PECK:  Thomas versus City of Troy.

22      Q.  And in that case, Mr. Thomas is alleging various

23   torts against the City of Troy.
```

Case 1:17-cv-00626-DJS Document 61-17 Filed 06/14/22 Page 62 of 443

```
 1          (Michael Sikirica - by Ms. Calabrese)

 2          When I say "Adrian Thomas", I'm relating his case

 3    to the death of his son Matthew Thomas in which you

 4    performed the autopsy.

 5          Do you know what I'm referring to?

 6     A.   Yes.

 7     Q.   So I'll ask you several questions today relating

 8    to your work on that case.

 9          Have you ever been deposed before?

10     A.   Yes.

11     Q.   So you're familiar with the rules, to speak

12    slowly, use words rather than head nods or gestures.  If

13    you have any questions of your attorney, who is seated

14    to your right, Crystal Peck, please feel free to ask her

15    anything at any time.  If you need a break for any

16    reason, just let me know and we will take one, okay?

17     A.   Yes.

18     Q.   Now, if you can for me, please, go through your

19    educational background starting with college.

20     A.   Yes.  I graduated from college, the State

21    University of New York at Oneonta.  I graduated from

22    medical school...

23     Q.   What year was that, Doc?
```

1       (Michael Sikirica - by Ms. Calabrese)

2    A.   That would have been about 1984, '83, excuse me,

3    '83.

4         Then I graduated from the State University of New

5    York at Buffalo in 1989 School of Medicine.  I did a

6    general pathology residency at the Berkshire Medical

7    Center, Pittsfield, Massachusetts.  I did a fellowship

8    in forensic pathology in San Antonio, Texas, and a

9    fellowship in neuropathology at Brown University, Rhode

10   Island Hospital, before I eventually went to work for

11   the State of Rhode Island.

12   Q.   How long did you work for the State of Rhode

13   Island?

14   A.   Approximately seven years.

15   Q.   In what capacity?

16   A.   I started as an assistant medical examiner and

17   then I became deputy chief medical examiner.

18   Q.   What's the difference between the two?

19   A.   Well, the deputy chief has more of an

20   administrative function in managing the office as

21   opposed to simply doing the autopsies.

22   Q.   At that point in time, when you began your work

23   for the State of Rhode Island, were you board certified

1          (Michael Sikirica - by Ms. Calabrese)

2     in any fields?

3        A.   I became board certified -- I was board eligible

4     but I became board certified within one or two years of

5     my employment with them.

6        Q.   Approximately when was that?

7        A.   That would be approximately '95.

8        Q.   Since then have you maintained your board

9     certification?

10       A.   Yes.

11       Q.   I didn't ask you.  In what field was that,

12    pathology?

13       A.   Well, I'm board certified in anatomic pathology,

14    clinical pathology, forensic pathology and

15    neuropathology.

16       Q.   Those four fields?

17       A.   Yes.

18       Q.   You continue to maintain those certifications?

19       A.   Yes.

20       Q.   Are you grandfathered into any of them or do you

21    continue to take your boards?

22       A.   No.  I was board certified by taking the exam and

23    doing a fellowship in each of them.  I've never been

1          (Michael Sikirica - by Ms. Calabrese)

2    grandfathered into anything.

3      Q.   Can you, for the record, describe what it means

4    to be grandfathered in?

5      A.   Grandfathered means that you were there at the

6    beginning of the board accreditation program.  You may

7    have been practicing before the boards even began.

8          So, they look at your record and they would allow

9    you to become a board member without a fellowship or any

10   examination.  Presently, you would have to take a

11   fellowship now to be board eligible for any field.

12     Q.   What do you do for, if anything, to maintain your

13   board certifications in those areas?

14     A.   Well, I just keep my certification as an MD.

15   There's no requirement to do any more certification in

16   those fields particularly, so I just keep my medical

17   boards at that point.

18     Q.   What if anything do you have to do to keep your

19   certification as an MD?

20     A.   You have continuing education credits, which I

21   attend conferences and apply for the credits.

22     Q.   After working for the State of Rhode Island,

23   where else did you work, if anywhere?

```
 1            (Michael Sikirica - by Ms. Calabrese)

 2      A.   I came here in 2001, September 1, 2001, and

 3   assumed the position as the Rensselaer County medical

 4   examiner.  And also took over a private practice that

 5   was run by Dr. Barbara Wolfe, who provided services to

 6   many other counties, providing autopsies.

 7      Q.   Barbara Wolfe, she no longer practices?

 8      A.   She had moved to Florida.

 9      Q.   Have you maintained your work with Rensselaer

10   County medical examiner's office since 2001?

11      A.   Yes.

12      Q.   And what title, if any, have you carried?

13      A.   I am the one and only medical examiner.

14      Q.   Do you have a staff that works for you?

15      A.   Yes.  They are health department employees, yes.

16      Q.   For the New York State Department of Health or

17   the Rensselaer County?

18      A.   The Rensselaer County Department of Health.

19      Q.   How many people comprise your staff?

20      A.   Presently we have two full-timers and three

21   part-timers.

22      Q.   What do they do?

23      A.   They work as medical legal death investigators.
```

Case 1:17-cv-00625-DJS Document 142-2 Filed 06/14/21 Page 112 of 443

```
 1            (Michael Sikirica - by Ms. Calabrese)
 2    They act as the eyes and the scene investigators for
 3    deaths in the county.
 4       Q.   Do you work for any other counties other than
 5    Rensselaer County?
 6       A.   I have no other position with any other counties,
 7    but I do work for the county coroners when they request
 8    an autopsy.
 9       Q.   How does that work?
10            Give us example if you can.
11       A.   Well, many of the counties in this area are
12    coroner counties.  They don't really have medical
13    examiner systems.  They have elected coroners.  The
14    elected coroners don't do autopsies, so they don't have
15    the qualifications or the training to do autopsies.
16            So, what they would do is they would call a
17    person like myself, or another physician in the area, to
18    do the autopsies and determine the cause and manner of
19    death.
20       Q.   Is Albany County one of our sister counties in
21    this area, one of those counties that have elected
22    coroners?
23       A.   Yes.
```

1          (Michael Sikirica - by Ms. Calabrese)

2      Q.  So, for example, if there was a death in Albany

3  County that required an autopsy, you may be one of those

4  physicians called upon to conduct that autopsy?

5      A.  Yes.

6      Q.  Do you have any publications that you've

7  authored?

8      A.  Yes.  I have six or seven publications when I was

9  a fellow and a resident, and the more recent one in

10  terms of toxicology several years ago.

11      Q.  Do you have any specialties?

12      A.  Well, my specialties would be forensic and

13  neuropathology.

14      Q.  Let's start with forensic pathology.

15          Can you tell us what that is?

16      A.  Yes.  Forensic pathology is the medical legal

17  investigation of death.

18      Q.  Who, if anybody, other than your office, do you

19  work with in that field?  For example, local law

20  enforcement?

21      A.  Yes.  We work with a myriad of people, local law

22  enforcement, sometimes local coroners, of course.  We

23  may work with local health departments at times.  Local

Case 1:17-cv-00625-DJS   Document 147-22   Filed 06/14/21   Page 12 of 443

1          (Michael Sikirica - by Ms. Calabrese)

2   police.  Sometimes the state police.  Local district

3   attorney's office if the case goes to prosecution.

4   Q.  And can you describe what neuropathology is?

5   A.  Yes.  Neuropathology is a subspecialty in

6   pathology that deals with the diseases of the brain,

7   muscle, nerves, and the spinal cord, and also injury of

8   those organs and systems.

9   Q.  Doctor, since beginning your work as a

10  pathologist in the State of Rhode Island, approximately

11  -- and I won't hold you to the exact number -- how many

12  autopsies have you conducted?

13  A.  It would be over 12,000, but that would include

14  my training as well.

15  Q.  And that number 12,000, would that include

16  decedents of all ages?

17  A.  Yes.

18  Q.  Birth to geriatric?

19  A.  Even a few stillborns, yes.

20  Q.  Now, can you describe for us what your process is

21  once you begin your day and have to conduct an autopsy.

22      Can you take us through?

23  A.  Yes.  It varies considerably from day to day.

```
 1          (Michael Sikirica - by Ms. Calabrese)

 2     Q.   How so?

 3     A.   Well, some days I may not have a single autopsy.

 4     Q.   That's a lucky day.

 5     A.   Yes.  Some days I may have to coordinate three or

 6   four autopsies or even more.

 7          So, I would be notified by either one of the

 8   MLDIs, medical legal death investigators.

 9     Q.   In your office?

10     A.   One of the ones that work for Rensselaer County.

11     Q.   Okay.

12     A.   One of my five.  And the number has varied over

13   the years.  It's five presently, but there may have been

14   more or less in the past.

15          Or receive a call from a coroner.  Occasionally

16   the police will call me directly, especially the state

17   police.

18     Q.   Why especially the state police?

19     A.   Because they have my contact information, and the

20   coroners may not really understand how to get in touch

21   with me.

22     Q.   Okay.

23     A.   So, then, I would get the call and I would
```

1           (Michael Sikirica - by Ms. Calabrese)

2    arrange to do the autopsy, the location where I would do

3    it.  Primarily at Albany Medical Center, but there are

4    other locations as well.

5           And I would get the initial information, prepare

6    a paperwork file, and then go to the site and meet

7    either the coroners or the coroners and the police to

8    perform the autopsy.

9    Q.  When you say get the particular information, whom

10   are you getting that from, the person who called you?

11   A.  Primarily the person who called me would give me

12   some initial information.

13   Q.  Background as to day of death, cause of death,

14   what they believe to be the cause of death or what

15   happened?

16   A.  Correct.

17   Q.  After that first kind of background step, what is

18   your next step?

19   A.  I would call the hospital and schedule the

20   autopsy.  And then I would go to the hospital.  It may

21   not be the same day, it may be the next day or several

22   days later, to do -- perform the autopsy.

23   Q.  Is there any reason why you may have an occasion

```
 1          (Michael Sikirica - by Ms. Calabrese)

 2  to conduct an autopsy quicker than another one, or is it

 3  just really scheduling?

 4     A.  We try to conduct the autopsies quicker on cases

 5  where we may not know the identity of the victim,

 6  because we'd like to get the identity confirmed and the

 7  family notified as quickly as possible.

 8          Of course, anything that's highly suspicious, we

 9  try to get to quicker.

10     Q.  And so, upon arrival at, for example, Albany

11  Medical Center, can you take us through the process once

12  you arrive?

13     A.  Yes.  Once I arrive, the coroners may or may not

14  be there, the police may or may not be there, but my

15  assistants will be there and have the body on the table

16  in a pouch.  We will go ahead and I will look over any

17  information that I have at the time on the case, any

18  paperwork.

19          Proceed to open the pouch.  Record the decedent

20  with photographs.  Usually, I may take the photographs,

21  but if it's a case that is going to be police

22  involvement, serious police involvement, I will let the

23  police take all the photographs.
```

```
 1              (Michael Sikirica - by Ms. Calabrese)

 2         And then we will go ahead, take some preliminary

 3    measurements of the decedent.  This can be a height and

 4    a weight.  In a child it may be more detailed, things

 5    like head circumference, chest circumference.

 6         We will do an external examination, recording any

 7    evidence of medical intervention, any evidence of

 8    significant injury or findings on the body, and then we

 9    would proceed to do the internal examination.

10    Q.   Where would that begin?

11    A.   Typically it begins with an incision across the

12    chest and down along the abdomen, that would be extended

13    upward to involve the neck, structures of the neck.

14    Q.   Is that commonly referred to as a Y incision?

15    A.   Yes.

16         And then we would continue on to make an incision

17    across the scalp, behind the level of the ears, retract

18    the scalp -- we may take additional photographs during

19    any portion of this -- and remove the brain for

20    examination.

21    Q.   Is that the first step of removing organs, you

22    remove the brain first?

23    A.   No.  The first step would be to remove the lower
```

1          (Michael Sikirica - by Ms. Calabrese)

2  organs.  They would be coming out first and individually

3  be examined, weighed.  If necessary, microscopic

4  sections would be taken.

5     Q.  You do that for all those organs not withstanding

6  whether, to your naked eye, they looked healthy or

7  unhealthy?

8     A.  Yeah.  Sometimes if we have a solid cause of

9  death, we may not examine the remaining organs.  We may

10  just examine them in situ without removing.

11     Q.  Would an example of that be, for example, a

12  bullet to the heart, when you see the heart is destroyed

13  you don't necessarily need to remove and weigh and take

14  a section of the liver.

15     A.  If it was a suicidal thing I would not.  If I

16  believed it was suicidal and classify as a suicide, I

17  would not go much further than the heart, perhaps the

18  lungs and chest cavity.

19     Q.  So, you remove the lower organs, weigh them, and

20  you said take a cutting for pathology?

21     A.  Well, we always preserve pieces of tissue on

22  pretty much every case.  In some cases tissue is taken

23  for microscopic examination.

Case 1:17-cv-00625-DJS Document 117-22 Filed 06/14/21 Page 19 of 443

1          (Michael Sikirica - by Ms. Calabrese)

2     Q.   And then, after the lower portion of the body,

3   you move to the brain?

4     A.   Yes.

5     Q.   And you said you retract the skin?

6     A.   Yes.

7     Q.   And does that mean taking the back of the scalp

8   and pushing it or bringing it over the face,

9   essentially?

10    A.   Well, the frontal portion of the scalp is pulled

11  over the face, and the rear is pulled over the back of

12  the neck.

13    Q.   How do you remove the brain?

14    A.   We use a bone saw to make a circumferential cut

15  across the skull, and then we remove the skullcap and we

16  cut the dura, which is the coating inside the brain or

17  the lining inside -- excuse me -- the skull.  We would

18  cut that free and then basically remove the brain by

19  cutting the brainstem and any nerves attached.

20    Q.   As you're doing this, are you making

21  observations?

22    A.   Yes.

23    Q.   How are you dictating these observations?

```
1              (Michael Sikirica - by Ms. Calabrese)

2      A.   By a series of notes at the time of the autopsy.

3      Q.   That you take or that one of your medical legal

4  death investigators take?

5      A.   It may be a combination of both.  I may be giving

6  them weights of the different organs, and then later on

7  I would go in and fill in the details.

8      Q.   After removing the brain, what is the next step?

9      A.   Well, to examine the brain at the time, or to

10 preserve the brain for further examination.  The brain

11 may be very compromised.  In some cases the brain is

12 very soft, especially in children.  And the brain may

13 have to be fixed for a period of time before it can be

14 examined properly and sectioned.

15     Q.   How do you do that, fix a soft brain?

16     A.   It would go into a surgical container, a specimen

17 container, and be immersed in formalin or formaldehyde.

18 And periodically three or four times that formaldehyde

19 would be changed to put fresh formaldehyde in, and then

20 that would stiffen up the brain enough to take sections.

21     Q.   So, in either case, one where the brain needs to

22 be stiffened or one where the brain is not so soft, what

23 would the next step be?
```

```
 1              (Michael Sikirica - by Ms. Calabrese)

 2      A.   Well, it would be examination of the brain.   If

 3   it was crucial to the case, the findings were crucial to

 4   the case, it would involve microscopic sections of the

 5   brain.

 6           Sometimes the injury may be in the brain and be

 7   obvious, such as a gunshot wound to the head.   I may

 8   simply take pieces of the brain and store them in what

 9   we call a stock jar for further evaluation, if needed.

10   And other cases, I may actually preserve the brain at a

11   later date, cut the brain, and then process particular

12   sections and portions of it.

13      Q.   After that process, what if anything is your next

14   step?

15      A.   Well, during that process, too, we may take

16   samples for toxicology fluids typically.

17      Q.   What is the best method or your preferred method

18   of taking fluids from which organs, if anywhere, or

19   which part of the body I should say?

20      A.   We try to attempt to take blood from the femoral

21   vein.   We take urine if it's present in the bladder.   We

22   may take fluid from the eye called vitreous fluid.   We

23   may take bile from the gallbladder, and we may take the
```

1           (Michael Sikirica - by Ms. Calabrese)

2    contents of the stomach.  And they would be sent to a

3    toxicology laboratory.

4       Q.  Are you sending those samples out as you go, or

5    is that done at the conclusion of the autopsy?

6       A.  It would be -- the paperwork for the toxicology

7    studies would be done.  At the conclusion of the

8    autopsy, I would sit down and fill out the toxicology

9    requisition form, and then that would be taken up with

10   the samples at the time to the laboratory at Albany

11   Medical Center.

12      Q.  When you say samples, you're referring to the

13   sections that you took from various organs?

14      A.  No.  I'm referring to the toxicology samples.

15      Q.  And do you send all -- let's say in a particular

16   case you took vitreous fluid, bile, urine and a sample

17   from a stomach.  Would you send all of it?

18      A.  It would all depend on the individual.  I would

19   send all the samples that I drew, but there may be more

20   available.  If a person is an adult that weighs 300

21   pounds, I only send up two or three tubes of blood, but

22   there's plenty of blood to be had.  Sometimes in an

23   infant or child I will send up all the blood I can

Case 1:17-cv-00625-DJS Document 147-22 Filed 06/14/21 Page 22 of 443

1              (Michael Sikirica - by Ms. Calabrese)

2      extract or all the fluid I can extract.

3         Q.  So, after taking samples for toxicology, what is

4      the next step of your process?

5         A.  Well, the next step would be to complete my notes

6      and do a death certificate at the time, or pen the case

7      if necessary on a death certificate and then communicate

8      with other people if information was required.

9              If I was looking for more information on the

10     case, I would request that from either the MLDI, the

11     medical legal death investigator, or the police, to

12     continue to work on the case.

13        Q.  And so when you took -- and correct me if I'm not

14     using the appropriate term -- but when you took samples

15     or cuttings from various organs, what would you do with

16     those?

17        A.  Those get processed for microscopic slides.

18     These are small pieces about the size of a postage stamp

19     that are then sectioned very finely in a histology

20     laboratory.  They're stained with stains to bring out

21     the features of the tissues and then they're given back

22     for examination.

23        Q.  Are those gram positive stains?

```
 1                (Michael Sikirica - by Ms. Calabrese)

 2      A.   A gram staining is a type of stain that's used to

 3   detect bacteria.  These are called H and E.

 4                MR. KLEIN:  What's that stand for?

 5                THE WITNESS:  Hematoxylin and eosin.

 6   BY MS. CALABRESE:

 7      Q.   How are they different from gram slides?

 8      A.   Well, a gram stain is a particular stain that is

 9   done to identify bacteria, and it is done for the

10   purpose of identifying if a bacteria is a gram positive

11   or gram negative bacteria.

12      Q.   Would positive mean positive for bacteria,

13   negative negative, or are they the opposite?

14      A.   No.  It doesn't imply positive or negative.  It

15   just stains the capsules of the bacteria different, so

16   we can identify different sorts of bacteria based on the

17   stain and characteristics.

18           Gram positive bacteria will stain red.  Gram

19   negative bacteria will stain purple.  Excuse me.  I have

20   that wrong.  I have that exactly reversed.  Gram

21   negative bacteria will stain red and gram positive will

22   stain purple.

23      Q.   Do you conduct any examination on any of those
```

1          (Michael Sikirica - by Ms. Calabrese)

2    slides, or is that for your pathology department to do

3    that?

4          Do you look at them, I guess is what I am asking.

5      A.   Yes.   The slides are given back to me when

6    they're processed and I will later look at them and

7    incorporate them into my autopsy report.

8      Q.   Is it commonplace, when conducting an autopsy, to

9    liaise and gather information from local law enforcement

10   or other sources?

11     A.   Yes.

12     Q.   Why is that so?

13     A.   Well, an autopsy by itself is not complete.   An

14   autopsy involves external and internal examination of

15   the decedent combined with the analysis of other things

16   that could be relevant.

17         These could be a whole list of things.   They

18   could be photographs, videos, police reports, hospital

19   records, the eventual toxicology findings, analysis of

20   statements, analysis of any other thing that could be

21   really relevant, to a reasonable degree, to determine

22   the cause and the manner of death.

23         So, just the physical findings of an autopsy

```
 1            (Michael Sikirica - by Ms. Calabrese)

 2    really don't stand by themselves.  It's the job of the

 3    forensic pathologist, as opposed to the hospital

 4    pathologist, to put these findings all together and

 5    determine the cause and manner.

 6        Q.   The hospital pathologist will look solely at the

 7    body, for example?

 8        A.   Well, the hospital pathologist will look at the

 9    medical records and the body because he is relegated to

10    the type of case that involves a death at a hospital

11    that has no forensic indication.

12        Q.   And the forensic indication is what is the

13    difference between somebody like you conducting an

14    autopsy and somebody like the hospital pathologist

15    conducting an autopsy.

16        A.   Correct.

17        Q.   And homicide would be something that would be

18    considered a forensic indication?

19        A.   Suspicion of a homicide would be a forensic

20    indication, a suicide, an accident, a sudden unexpected

21    death in a younger person.  Any kind of

22    toxicology-related death should fall under the

23    jurisdiction of a coroner or medical examiner.
```

```
 1              (Michael Sikirica - by Ms. Calabrese)

 2      Q.   Thank you, Doctor.

 3           Now, I have what I premarked on 8/21/2019 as

 4    Defendant's Exhibit D.  It's a copy of your final

 5    autopsy report for Matthew Thomas, whose date of death

 6    was September 23, 2008.  It includes toxicology reports

 7    on the final three pages.

 8           I'm going to hand it to you and give you a moment

 9    to take a look at that, Doctor.

10      A.   Yes.

11      Q.   On the cover page it lists Mr. Michael Bourdon

12    and Ms. Sarah Christian and Ms. Jennifer Alibozek.

13           Are they MLDIs?

14      A.   No.  Assisting was Michael Bourdon and Sarah

15    Christian.  They are employees of Albany Medical Center

16    who are the autopsy technicians.

17           Jennifer Alibozek was the MLDI for Rensselaer

18    County involved in this case.

19      Q.   And so, what would Michael Bourdon and Sarah

20    Christian do to assist you, or what did they do to

21    assist you in this autopsy?

22      A.   Well, they would help with presenting the body.

23    They would put the body on the table from the cooler.
```

1          (Michael Sikirica - by Ms. Calabrese)

2   They would also assist in the autopsy.  They may

3   actually perform the Y-shape incision.  They may remove

4   portions or all of the organs for my examination.  They

5   would open the skull.

6       Q.   Retract the head?

7       A.   Retract the scalp.

8            They would mark the examples for toxicology.

9   They would retain the stock specimens and send the

10  histology specimens to the appropriate laboratory.  They

11  would clean up afterwards and then prepare the body for

12  release.

13      Q.   Now, as you sit here today, do you recall the

14  autopsy of Matthew Thomas?

15      A.   Portions of it, yes.

16      Q.   Let's start from the beginning.  Page two lists

17  the external description.  I don't need you to read from

18  the document because we have it marked as an exhibit,

19  but if you need to, feel free to do that.

20           What do you recall about the external body in

21  this case?

22      A.   Well, he was -- Matthew was an infant, black

23  male.  Appeared somewhat small for the reported age.  He

```
 1              (Michael Sikirica - by Ms. Calabrese)
 2   was between four and five months of age.  He had come
 3   into the hospital at Albany Medical Center on the 21st.
 4        The autopsy was the 25th at 8:00 in the morning.
 5   He came in a body pouch.  He was a Rensselaer County
 6   case.  And that pouch was locked with a blue plastic
 7   lock for security purposes.
 8   Q.   Who would have locked that case, the coroner?
 9   A.   That would have been locked by the morgue
10   attendants, the technicians.
11   Q.   In the hospital?
12   A.   In the hospital or the MLDI herself.
13   Q.   Now, when looking at the body itself before
14   performing any other tasks, did the body appear to be in
15   good health?
16   A.   Yes.
17   Q.   Did you notice anything of concern, bruises,
18   discoloration?
19   A.   If I could refer to my report.
20   Q.   Please.
21   A.   There was no evidence of any injury, but there
22   was evidence that there was medical intervention and
23   evidence of an organ donation procedure.
```

Case 1:17-cv-00625-DJS Document 142-22 Filed 06/14/21 Page 30 of 443

1          (Michael Sikirica - by Ms. Calabrese)

2     Q.   How did you know that?

3     A.   There was already an incision extending down the

4     abdomen where the liver and kidneys and adrenal glands

5     had been donated.

6     Q.   This may sound like a silly question, but bear

7     with me.  I just want the record to be clear.

8          When harvesting for organs, in this case the

9     liver, kidney and adrenal glands, the body must stay

10    alive in order to make a successful transplantation; is

11    that right?

12    A.   Yes.

13    Q.   So, is it fair to say that oftentimes in this

14    circumstance, when preparing a body for autopsy, you may

15    see portions of the body, specifically organs, already

16    removed because they were transplanted or, rather,

17    harvested?

18    A.   Correct.

19    Q.   That's commonplace and practice?

20    A.   Correct.

21    Q.   Are you familiar at all with the standards of

22    review when the transplantation team determines whether

23    or not an organ is ripe for harvesting?

```
 1              (Michael Sikirica - by Ms. Calabrese)

 2      A.   I am not familiar with all the standards that

 3   they look at, no.

 4      Q.   Are you familiar with any standards?

 5      A.   Not particularly, no.

 6      Q.   Is it fair to say that the organs must, at the

 7   very least, be healthy?

 8      A.   They must be viable, yes.  They must be able to

 9   be transplanted without evidence of malignancy or

10   serious infection.

11      Q.   Would sepsis be considered a serious infection

12   that would preclude viability for transplantation or

13   harvesting?

14      A.   It may be, yes.

15      Q.   Would those tests be conducted in the hospital

16   prior to the declaration of death of that person?

17      A.   Yes.

18      Q.   So, after making a visual observation of the

19   decedent, tell us what you next did with regard to

20   Matthew's autopsy.

21      A.   Well, the police were present at the time.  There

22   were two police officers present, Mr. Mason, Mr. Farley.

23   They took photographs of the scene before the procedure
```

1      (Michael Sikirica - by Ms. Calabrese)

2  began.

3      We also took some additional measurements of the

4  decedent.  Things routinely done on an infant would

5  include head circumference, chest circumference, length

6  of each foot, abdominal circumference, and some other

7  measurements.

8      Then we would proceed to record the evidence of

9  medical intervention, the IV lines, the catheters.

10  There was an identification bracelet also noted on the

11  right ankle with the date and time of death listed.  And

12  then we would proceed to do the internal examination by

13  extension of the incision that was already made to a Y

14  that extended up along the left and right shoulders.

15  And then we would proceed to the examination of the head

16  and the brain.

17  Q.  And were the measurements that you did, head

18  circumference, for example, within normal limits?

19  A.  They were on the small side of normal, but they

20  were in the normal range.

21  Q.  You mentioned that the soft tissues of the facial

22  bones were boggy due to edema.

23      Did you attribute that to fluids being provided

1          (Michael Sikirica - by Ms. Calabrese)

2    to the infant while hospitalized?

3    A.   Yes.

4    Q.   When you say you picked up the incision, are you

5    referring to the incision that was due to organ

6    harvesting?

7    A.   Yes.

8    Q.   After making that incision, tell us -- and I

9    think you stopped at the head.

10         Did you already tell us that you made the

11   incision on the back of the skull, scalp?

12   A.   Yes.

13         After the internal organs from the lower portion

14   of the body were removed, we proceeded to the head.

15   That was photographed as we retracted the scalp.  We

16   opened the skull.  I removed the brain, which was

17   extremely soft, and then went ahead and photographed the

18   dura, which is the lining of the skull.

19   Q.   Sorry, Doctor.  I apologize.  We should probably

20   back up.

21         You said you removed the lower organs.  Did you

22   examine those organs?

23   A.   Yes.

```
 1            (Michael Sikirica - by Ms. Calabrese)

 2      Q.   Did you find any deficits or injury?

 3      A.   There was -- when I sectioned through the heart,

 4   there was evidence of infarction on the lining of the

 5   heart involving the left ventricle.

 6      Q.   Can you, in lay terms, describe what that means.

 7      A.   This was, in lay terms, a heart attack that

 8   occurred beneath the surface of the left chamber of the

 9   heart.

10            There was also accumulation of some mucoid

11   material in the trachea, and the lungs were quite

12   collapsed in the pleural cavities.  There was also fluid

13   consistent with the organ removal in the abdominal

14   cavity.

15      Q.   Were you concerned with the fluid that was

16   consistent with the organ removal in the abdominal

17   cavity?

18      A.   No.

19      Q.   Were you concerned with the collapsed lungs in

20   the pleural cavity?

21      A.   No.

22      Q.   Why not?

23      A.   That would be an artifact caused by the procedure
```

Case Case 17-cv-00625-DJS Document 147-22 Filed 06/14/21 Page 35 of 443

1         (Michael Sikirica - by Ms. Calabrese)

2  where the liver was removed.

3    Q.  For harvesting?

4    A.  Yes.

5    Q.  Were you concerned with the mucoid material in

6  the trachea?

7    A.  Yes.

8    Q.  Tell us why.

9    A.  That could be indicative of pneumonia.

10    Q.  Were you concerned with the heart attack that you

11  noted beneath the surface of the left chamber of the

12  heart?

13    A.  I was not concerned particularly with that

14  finding.

15    Q.  Why?

16    A.  It's a finding that is commonly seen in a person

17  that's preserved on a ventilator, in a person that

18  suffers anoxia, or possibility of a clotting disorder.

19    Q.  Did you learn that he had been placed on a

20  ventilator for a significant period of time?

21    A.  Yes.

22    Q.  Prior to you receiving him?

23    A.  Yes.

Case 1:17-cv-00625-DJS  Document 142-2  Filed 06/14/21  Page 36 of 443

1          (Michael Sikirica - by Ms. Calabrese)

2     Q.   Were there any other injuries or portions of any

3  organ that you noticed that were injured or damaged or

4  of concern to you?

5     A.   Not in the lower portion of the body.

6     Q.   So let's move to the head.  If you can take me

7  through that process again, the process that you

8  conducted on Matthew.

9     A.   Yes.  The scalp was retracted and there was

10  evidence that the normal sutures or the normal joints

11  between the bones of the skull were splitting, they were

12  opening up, and there was hemorrhage overlying the

13  splitting sites.

14          This is consistent with severe edema or swelling

15  of the brain that splits the sutures that had not yet

16  calcified.

17     Q.   Just for lay purposes, when you say sutures, when

18  we're looking at the picture, the autopsy picture of

19  this portion of the autopsy, it looks like a zigzaggy

20  kind of line?

21     A.   Correct.

22          So, they had been split with evidence of

23  hemorrhage overlying them.  And the hemorrhage is

1          (Michael Sikirica - by Ms. Calabrese)

2   commonly seen when the sutures split.  It doesn't

3   reflect damage by itself.  And there were also two areas

4   of what we describe as subgaleal hemorrhage.

5       Q.  In addition to the edema on the sutures?

6       A.  In addition to the hemorrhage on the sutures.

7   One was an area of pink bruising beneath the scalp,

8   along the right parietal region.  And the second was

9   more greenish in color and located lower along the right

10  portion of the skull.

11      Q.  What is the difference in color?

12      A.  The difference in color reflects the healing

13  process.  The pink lesion was younger, newer, than the

14  older green lesion.

15      Q.  Are you able to date those?

16      A.  Not to a reasonable degree of certainty.

17      Q.  So you noticed the hemorrhage on the sutures and

18  the subgaleal hemorrhage on the right periorbital

19  region?

20      A.  Yes.

21      Q.  And the green hemorrhage on the right side of the

22  skull?

23      A.  Yes.

Case 1:17-cv-00625-DJS Document 142-22 Filed 06/14/21 Page 382 of 443

```
 1              (Michael Sikirica - by Ms. Calabrese)

 2      Q.   As you're noticing these things at autopsy, are

 3   you making any notes?  Are you making any assessments

 4   towards your conclusion?  What are you thinking of as

 5   you're seeing these things?

 6      A.   Well, I am making notes.  I am directing the

 7   police to photograph the sites.  And I am documenting

 8   them on a diagram.

 9      Q.   At this point in time, does the combination of

10   these things mean anything to you?

11      A.   It's highly suspicious for trauma-inflicted

12   injury.

13      Q.   Notwithstanding the fact that you're noticing

14   these three things, and these three things in

15   combination are a sign of trauma or suspicious injury --

16              MR. KLEIN:  Objection.  I think he said two

17   things.  One of them he said was not.

18              Can we just clarify?

19              MS. CALABRESE:  Sure.

20              MR. KLEIN:  I think he said that the pink

21   and the green were, but I think he said the suture

22   splitting was not.

23   BY MS. CALABRESE:
```

Case 1:17-cv-00625-DJS Document 142-2 Filed 06/14/16 Page 392 of 443

1          (Michael Sikirica - by Ms. Calabrese)

2     Q.   Let me ask you this:  The combination of those

3  three -- the combination of these three things that you

4  noticed, the hemorrhaging on the sutures, the

5  hemorrhaging on the right periorbital region, and the

6  hemorrhaging on the right side of the skull, are those

7  three items indicative of trauma and/or suspicious

8  injury together?

9     A.   Well, I should clarify.  It wasn't the right

10  periorbital.  It was the right parietal.

11     Q.   Parietal, sorry.

12     A.   The presence of the subgaleal hemorrhages are

13  consistent with trauma, but the edema and the splitting

14  of the sutures may be caused by other things than

15  trauma, other reasons for the brain to swell.

16     Q.   Like what, for example?

17     A.   Infection.  Anoxia or lack of oxygen to the

18  brain.  A metabolic disease.  There could be a host of

19  other reasons.

20     Q.   Notwithstanding that, could it also be indicative

21  of trauma?

22     A.   Yes.

23     Q.   Now that you've noticed these three items, are

1          (Michael Sikirica - by Ms. Calabrese)

2    you still moving forward with the balance of your

3    autopsy, or have you already made your conclusion?

4        A.   No.   I have not made the conclusion at that

5    point.

6        Q.   You have to continue.

7        A.   Correct.

8        Q.   And continue going through the parts of the

9    autopsy that you previously placed on the record to come

10   to a conclusion?

11       A.   Yes, and not only that, but I have to examine the

12   medical records and the information that's provided to

13   me.

14       Q.   So after you noticed these three areas -- can I

15   call them or would I call them injury?

16       A.   I would call two injury and the other...

17       Q.   Abnormality?

18       A.   Abnormality.

19       Q.   So, the hemorrhage of the sutures would be the

20   abnormality.

21       A.   Yes.

22       Q.   After you noticed the two areas of injury and the

23   abnormality, what do you do with them?  What is the next

```
 1              (Michael Sikirica - by Ms. Calabrese)

 2   step?

 3      A.  Well, I took microscopic sections of the

 4   bruising.  I then went ahead and opened the skull

 5   itself.

 6      Q.  The way you described earlier?

 7      A.  Yes, with a circumferential cut mark using an

 8   autopsy saw.

 9           And then I noted there was an accumulation of

10   blood beneath the dura, along the right side of the

11   brain, what we call the middle cerebral fossa, and I

12   collected some of that blood.  The blood totaled

13   approximately 60 MLs.

14      Q.  Would you expect any collection of blood in a

15   healthy person when conducting an autopsy in the area of

16   the middle cerebral fossa?

17      A.  No.

18      Q.  None whatsoever.

19      A.  No.

20      Q.  So you said there would be -- no blood would be

21   normal --

22      A.  Correct.

23      Q.  -- to be found in that area?
```

Case 1:17-cv-00625-DJS Document 114-22 Filed 06/14/21 Page 42 of 443

1          (Michael Sikirica - by Ms. Calabrese)

2     A.   Yes.

3     Q.   So you noticed this accumulation of blood and you

4  said you found 60 MLs.

5          Did you remove all 60 MLs?

6     A.   As much as possible, yes.

7     Q.   You said that is unusual or abnormal.

8          What does that mean to you?

9     A.   Well, that is indicative of an acute subdural

10  hemorrhage.

11     Q.   Can you describe what the word "acute" means?

12     A.   Acute would mean less than three days, typically.

13     Q.   Can we call that an injury?

14     A.   Yes.

15     Q.   After observing -- the brain is still within the

16  skull when you make this observation, correct?

17     A.   Yes.

18     Q.   You remove as much as you can of that blood.

19          What is the next step?

20     A.   Well, because the child had been hospitalized --

21  the blood that I had taken at the time of autopsy was

22  not optimal to be used because the child had been

23  hospitalized for several days.  So, I wanted to

1        (Michael Sikirica - by Ms. Calabrese)

2   determine if there were any substances that could

3   contribute to the child's death, and samples of blood

4   that could still reflect the time of his injury.

5        So, I sent a portion of that to the toxicology

6   laboratory for testing.  That blood is removed from the

7   circulation.  So, any substances where that bleeding

8   occurred would have been preserved in that blood clot.

9   Q.  Is that the blood that you described earlier

10  taking from one of the veins?

11  A.  No.  That is the blood that I actually drew from

12  the subdural clot.  I took that blood, the portion of

13  that blood, and submitted it to the toxicology

14  laboratory.

15       Then I requested that any bloods from the time of

16  admission, when he came into the hospital, be sent for

17  toxicology.

18  Q.  What were you looking for?

19  A.  Routinely, any substances that could affect the

20  child, any pharmaceuticals, any drugs of abuse, that may

21  have been passed onto the child by one means or another.

22  It's done quite routinely.  I had no suspicion of any

23  sort of pharmacology issue at this point, but I had to

1        (Michael Sikirica - by Ms. Calabrese)

2   rule that out.

3      Q.   After you remove the blood, what do you next do?

4      A.   Then we remove the brain.  The brain was

5   photographed.  It was extremely soft.  We removed the

6   dura.  There was a layer of blood clot on the surface of

7   the dura several millimeters thick, indicating that

8   there was an older subdural hemorrhage below the fresher

9   hemorrhage.

10      Q.   How did you make that determination older?

11      A.   It was still adherent to the dura.  It was still

12   stuck to the dura.  It was brown in color.

13      Q.   As opposed to the pinkish color on the parietal?

14      A.   Well, it was more of a brown, a light brown

15   coloration, where the blood had previously clotted, and

16   it was overlaid by the fresher blood.

17      Q.   And you said the brain was soft?

18      A.   The brain was extremely soft.

19      Q.   What did you attribute that to?

20      A.   That was a combination of the cerebral edema and

21   the volume of fluids that they had to put into the child

22   to maintain his blood pressure.

23      Q.   After you removed the brain, did you place it in

1              (Michael Sikirica - by Ms. Calabrese)

2   formaldehyde, as you described earlier, to stiffen it

3   up?

4      A.   Yes.

5      Q.   How long did it remain in formaldehyde?

6      A.   It remained in formaldehyde for several months

7   before I eventually cut the brain and took additional

8   sections.

9      Q.   That's how long it needed to stay there in order

10  for it to become firm enough for you to examine it?

11     A.   I may have been able to examine it within a month

12  or so, but by the time I got back to it to formally do

13  it, it was I believe January or February of next year.

14     Q.   Does the fact that it's in formaldehyde, does

15  that affect any diseases or injury that may be present

16  in the brain?

17     A.   Microscopically it would have no effect.  The

18  formalin was changed several times because the brain had

19  been so soft.  But it has no significant effect on the

20  examination of it.

21     Q.   So, after removing the brain, what if any was

22  your next step prior to later on examining the brain?

23     A.   Well, then we basically return the organs to the

1          (Michael Sikirica - by Ms. Calabrese)

2    body.   The body was sewn up and the body was released.

3          There was an additional finding.  I did take the

4    child's testicles.  And when I looked at the sections of

5    the lower organs, there was not only hemorrhage in the

6    heart, but a small amount of hemorrhage in one testicle.

7    Q.   Would you consider that an injury?

8    A.   It may be injury or a reflection of the anoxia or

9    possible clotting disorder.

10   Q.   Let's move to the point in time when you examine

11   the brain.

12         Do you recall that time?  I think it's reflected

13   in your report.

14   A.   Yes.

15   Q.   Did you find any injury inside of the brain?

16   A.   Yes.  The brain was extremely swollen and

17   edematous.  There was loss of the differentiation

18   between the gray and the white matter of the brain.

19         The ventricles were tight, which indicates

20   significant edema.  There was a portion of dura that I

21   included for examination that contained the older

22   subdural clot that was three to four millimeters in

23   thickness.

```
 1            (Michael Sikirica - by Ms. Calabrese)

 2      Q.   The clot that we described as brown earlier?

 3      A.   Yes.

 4           And then there was additional brown staining on

 5      the back of the brain on the right and left occipital

 6      regions.  If I could refer to my notes.

 7      Q.   Please.

 8               MR. KLEIN:  What page are you looking at,

 9      sir?

10               THE WITNESS:  I was looking at page 9 and

11      10.

12               THE WITNESS:  That was the extent of the

13      brain damage.

14      BY MS. CALABRESE:

15      Q.   Were there any other areas of injury or concern

16      that you noted other than what you've already placed on

17      the record?

18      A.   Not to my recollection, no.

19      Q.   Did you observe or examine the microscopic

20      sections that were taken?

21      A.   Yes.

22      Q.   What did you find in those examinations?

23      A.   Well, the microscopic examination of the lower
```

1          (Michael Sikirica - by Ms. Calabrese)

2    organs showed evidence of what I would call severe

3    atelectasis or collapse of the lung tissues with

4    pneumonia.

5          There was evidence of infarction of the heart.

6    The testes did show the small area of hemorrhage.  The

7    sections of the subgaleal hemorrhages showed acute and

8    more chronic hemorrhage with extensive acute and chronic

9    inflammation.

10   Q.  The subgaleal hemorrhage is the hemorrhage we

11   described earlier as being acute, less than three days

12   old, and you're saying that this microscopic section

13   further described what again?

14   A.  No.  The subgaleal hemorrhage was --

15              MR. KLEIN:  Objection.

16   Q.  You can continue.

17   A.  -- was not the less than three days old.  That

18   was the subdural.

19   Q.  Subdural, I'm sorry.

20   A.  The subdural hemorrhage that was in the range of

21   three days old.

22          Acute is considered to be less than three days

23   but it's variable.  Subacute would be three days to two

```
1              (Michael Sikirica - by Ms. Calabrese)

2    weeks.

3       Q.  The subgaleal hemorrhage was the hemorrhage you

4    described on the right side of the parietal region being

5    pink and fairly new, as you described?

6       A.  Yes.

7       Q.  And then, so, knowing that, what did the section

8    show?

9       A.  The section of the subgaleal hemorrhage showed

10   acute and more chronic inflammation and hemorrhage, and

11   the section of the right temporal parietal region did

12   show degeneration of the blood cells consistent with the

13   more recent hemorrhage.

14      Q.  What does that mean?  We know what acute means.

15          What does that mean when you say more chronic

16   appearing?

17      A.  That means that the hemorrhage was starting to

18   resolve.  The acute hemorrhage had more intact red

19   cells, erythrocytes, indicating it was a fresher wound.

20      Q.  Are you able to date that?

21      A.  Not to a reasonable degree of certainty, simply

22   to say that it was fresher than the green injury.

23      Q.  What does it mean when you say -- when you use
```

**APPENDIX**

```
 1          (Michael Sikirica - by Ms. Calabrese)
 2   the term "chronic inflammation"?
 3       A.  Chronic inflammation indicates that there are
 4   cells associated with a longer term inflammation or
 5   event.  These would be cells like macrophages and
 6   lymphocytes, as opposed to acute inflammatory cells,
 7   which would be neutrophils.
 8       Q.  Now --
 9       A.  Can I add also.
10       Q.  Please.
11       A.  I also did remove the eyes of the child at the
12   time we removed the brain, and these were also sectioned
13   later at the time of the brain examination.
14       Q.  What were your findings?
15       A.  They were both retinal hemorrhages in the retina
16   of each eye, and hemorrhages along the optic nerve
17   sheaths.
18       Q.  Would that be considered an injury?
19       A.  It could be, yes.
20       Q.  Retinal hemorrhaging in both eyes?
21       A.  Yes.
22       Q.  Bilateral retinal hemorrhaging?
23       A.  Yes.
```

1    (Michael Sikirica - by Ms. Calabrese)

2  Q. After conducting the autopsy as you just

3 described, and doing all the examination as you've just

4 described, I'd like to talk about your anatomic

5 diagnoses on page 12. Can you go through them for us

6 beginning with roman numeral I.

7  A. Yes. Roman numeral I, severe closed head

8 injuries with cerebral edema due to blunt force trauma.

9  Q. You determined at roman numeral I that Matthew

10 Thomas suffered from severe closed head injuries with

11 cerebral edema due to blunt force trauma?

12  A. Yes.

13  Q. Was that your primary diagnosis?

14  A. Yes.

15  Q. How do you determine what is a primary and a

16 secondary and a tertiary diagnosis?

17  A. Well, I tried, to the best of my ability, to list

18 things on the anatomic diagnosis in a priority manner.

19    So, I list the first item, and then I list

20 underneath that first item corresponding information to

21 justify that diagnosis, to make a statement so people

22 will understand, reading the report, why I came to that

23 diagnosis.

Case 1:17-cv-00625-DJS Document 114-22 Filed 06/14/21 Page 52 of 443

1          (Michael Sikirica - by Ms. Calabrese)

2     Q.   Can you explain how it was you came to the

3  diagnosis, the primary diagnosis, of severe closed head

4  injuries with cerebral edema due to blunt force trauma.

5     A.   Well, it involved both the autopsy and the

6  evaluation of other items that were provided to me,

7  which I had responsibility to look at.

8     Q.   Which were?

9     A.   The medical records, a statement from the child's

10 father or stepfather.  I'm not quite sure.  Also a

11 police report.

12         So, I looked at that, in combination with the

13 autopsy itself, and listed those items as best to my

14 ability as supportive information in regards to the

15 cause of death.

16    Q.   Why would you have a duty to also review those

17 items of evidence?

18    A.   Well, unlike many other physicians, a forensic

19 pathologist has both a medical and a legal -- I won't

20 say responsibility, but it's expectational to look at

21 the whole picture behind a death.  We're not simply

22 charged with the cause of death, but we're charged with

23 the manner of death.

Case 1:17-cv-00625-DJS Document 11-22 Filed 06/14/21 Page 53 of 443

1          (Michael Sikirica - by Ms. Calabrese)

2          We have to establish a manner of death that has

3     to be consistent with the cause of death, which is --

4     many pathologists and many physicians simply will have a

5     natural manner of death, but as forensic pathologists we

6     are often called to look at other manners of death

7     besides natural.  We look at things like accident,

8     suicide and homicide.

9          Sometimes the term "undetermined" is also used

10    when we can't make that kind of decision because the

11    body may be so decomposed or we may not have the right

12    information or correct information to determine the

13    cause and manner.

14          So, we're in a very unique position.  We're

15    expected by our position to look at things that the

16    average physician will not look at or doesn't have to

17    look at.  The average physician is simply assigning a

18    death to a natural category.

19          It could be something like pneumonia, metastatic

20    cancer, and that's what they would put on the death

21    certificate and sign it as a natural.  But we see a

22    whole spectrum of other kinds of death.  And we're the

23    ones who are expected to look at the whole circumstances

Case 1:17-cv-00626-DJS Document 142-2 Filed 06/14/21 Page 542 of 443

1          (Michael Sikirica - by Ms. Calabrese)

2     surrounding the case and determine, to the best of our

3     ability, not only the cause but the manner of death.

4          So, that is why I try to explain on the

5     provisional -- or the anatomic diagnosis, I explain --

6     try to explain my reasoning to support my final

7     conclusion.

8     Q.   So, can you go through A through H and describe

9     for us how they support the conclusion in roman numeral

10    I.

11    A.   Yes.  A lists clinical history of subdural

12    hematoma with severe cerebral edema.  This is based on

13    the hospital records, the radiographic study that showed

14    that there was a collection of fluid consistent with a

15    subdural hemorrhage along the right side of Matthew's

16    skull, as well as a possibility of a hemorrhage on the

17    left side.

18         So, there was clinical diagnosis of this done by

19    radiographic studies and interpreted by the radiologist

20    and the other people involved in Matthew's care.  So, I

21    had a clinical history of this.

22         Not to say that that was the only thing I

23    depended on.  I do not simply depend on the clinical

1          (Michael Sikirica - by Ms. Calabrese)

2   history.  I consider it very strongly, but it may be an

3   error.

4       Q.  On their part.

5       A.  On their part.

6       Q.  Was that clinical history of the subdural

7   hematoma with severe cerebral edema supported with what

8   you found at autopsy?

9       A.  Yes.

10      Q.  How so?

11      A.  Well, the brain had been very swollen, and I did

12   recover approximately 60 MLs of blood along the right

13   portion of the skull and brain that was a subdural

14   hematoma, and there was an older hematoma beneath it as

15   well.

16      Q.  Is there anything else that we need to discuss

17   with regard to A?

18      A.  The other findings on the subdural hematoma were

19   listed by other physicians who made the diagnosis of the

20   subdural hematoma, including the pediatric intensivist,

21   Dr. Edge, and the neurosurgeon, Dr. Woldman, but I did a

22   complete autopsy, and their findings were consistent

23   with mine.

1          (Michael Sikirica - by Ms. Calabrese)

2     Q.  So essentially we're calling this an injury,

3   correct?

4     A.  Yes.

5     Q.  This injury was triple verified by you, Dr. Edge,

6   and Dr. Woldman?

7          MR. KLEIN:  Objection.

8     A.  And the radiologist as well.

9     Q.  So four.  Four different ways this injury was

10  verified or found.

11    A.  Found, correct.

12    Q.  Found, okay.

13    A.  Yes.

14    Q.  By the radiologist, by you, by Dr. Edge and by

15  Dr. Woldman.

16    A.  Yes.

17    Q.  Was this injury found independently by each

18  provider independently of the other?

19          MR. KLEIN:  Objection.  If you know.

20    A.  Well, I don't know about the other doctors, but

21  mine was independent.  There are cases where they

22  diagnose something that I don't find.

23    Q.  Okay.

1          (Michael Sikirica - by Ms. Calabrese)

2     A.   But this was not one of them.

3     Q.   Is there anything else we need to discuss with

4    regard to A?

5     A.   No.

6     Q.   Now B, you describe a radiographic evidence of

7    bilateral subdural hematomas.

8          Can you tell us what that means?

9     A.   Yes.  That reflects the diagnosis by the

10   radiologist, which I did examine those films at the time

11   of autopsy as well, that showed bilateral subdural

12   hematomas.

13    Q.   Was that radiographic evidence, the films, what

14   you saw on the films, consistent with what you saw when

15   you examined the brain?

16    A.   The collection on the right side was consistent.

17    Q.   And the right side is the side that had the pink

18   or newer hemorrhage?

19    A.   The right side had the subgaleal hemorrhages,

20   correct.

21    Q.   On the left side?

22    A.   I did not appreciate any hemorrhage on the left

23   side.

1          (Michael Sikirica - by Ms. Calabrese)

2     Q.   The right side you mentioned -- that's right.

3          On the right side you mentioned the pink and the

4     green.

5     A.   Well, they were the subgaleal hemorrhages and

6     they're listed on item G.

7     Q.   So, when we say the radiographic evidence of

8     bilateral subdural hematomas, I am talking about

9     something different when I mentioned the subgaleal

10    hemorrhage, to make the record clear.

11    A.   Yes.

12    Q.   Upon examining the brain itself, you did observe

13    the bilateral subdural hematomas as they appeared on the

14    radiographic films.

15         MR. KLEIN:  Objection.  That's not what he

16    said.

17    A.   No.  I didn't see them bilaterally.  I only saw

18    the right sided subdural hemorrhage.  The subdural

19    hemorrhage was the 60 ML hemorrhage.

20    Q.   Was that consistent with what you observed on the

21    radiographic films?

22    A.   Yes.

23    Q.   Did you observe anything else with regard to B?

Case 1:17-cv-00625-DJS   Document 114-22   Filed 06/14/21   Page 59 of 443

1    (Michael Sikirica - by Ms. Calabrese)

2  A. Well, I realized in the record and analysis of

3 the record there was some mention of a skull fracture,

4 but I did not see that on the initial radiologist report

5 and I found no fracture at the time of the autopsy.

6  Q. That was an error of the hospitalist?

7  A. Or an error of the transcriptionist.

8  Q. The transcriptionist, the one who would

9 transcribe the radiologist notes?

10  A. Or the notes of the attending physicians.

11  Q. And C.  I'm sorry.

12    Is there anything else we didn't mention with

13 regard to B?

14  A. No.

15  Q. C.

16  A. C is medical evidence of brain death, which is

17 simply that the child had been declared brain dead in

18 the hospital prior to the donation of the organs.

19  Q. Were you able to observe that upon autopsy?

20  A. Well, I did end up autopsying the unfortunately

21 dead child.

22  Q. That's an explanation of that, right?

23  A. Correct.

```
 1            (Michael Sikirica - by Ms. Calabrese)

 2      Q.  And D.

 3      A.  D was splitting of the sutures of the skull.

 4          And that I have described as a result of the

 5  cerebral edema that I observed at the autopsy.

 6      Q.  Which we said is not necessarily an injury.

 7      A.  Correct.

 8      Q.  Did you determine the origin of that cerebral

 9  edema?

10      A.  It would be consistent with the injury that he

11  had sustained.

12      Q.  What specific injury is that that you're

13  referring to?

14      A.  The subdural hematomas.

15      Q.  That would be the cause of the cerebral edema.

16      A.  Yes.

17      Q.  Is there anything else that we should discuss

18  with regard to D --

19      A.  No.

20      Q.  -- that we haven't already?

21      A.  No.

22      Q.  E, extensive acute and resolving subarachnoid

23  hemorrhage.
```

Case 1:17-cv-00625-DJS Document 141-22 Filed 06/14/21 Page 812 of 443

1    (Michael Sikirica - by Ms. Calabrese)

2    A.   Yes.   That indicates that there was a hemorrhage

3  on the surface of the brain itself that was seen under

4  microscopic examination, and a portion of the hemorrhage

5  seemed to be resolving or breaking down.   And that would

6  be also consistent with both the edema and traumatic

7  injury.

8    Q.   And F.

9    A.   Those are the hemorrhages in the optic nerve

10  sheaths and the retinal hemorrhage bilateral which could

11  be consistent with trauma and may also be consistent

12  with cerebral edema.

13    Q.   So far we've discussed A through F.

14         Other than E, which of those sub or explanatory

15  diagnoses would you say are consistent with injury?   You

16  said E.

17         MR. KLEIN:   Objection to the form of the

18  question of the word "injury".

19    Q.   What else, if anything, did you say were

20  consistent with injury?

21    A.   Well, everything except the medical evidence of

22  brain death would be consistent with injury, the brain

23  death from any reason.

Case 1:17-cv-00625-DJS Document 142-2 Filed 06/14/21 Page 62 of 443

1          (Michael Sikirica - by Ms. Calabrese)

2     Q.  F you said may be consistent with injury.

3     A.  Yes.

4     Q.  Is there anything that we haven't already

5  discussed with regard to F?

6     A.  No.

7     Q.  Now, G, fresher and older appearing areas of

8  subgaleal hemorrhage.

9     A.  Yes.

10    Q.  Tell us about that.  I know you went over it

11 earlier.

12    A.  Those are the two areas of bruising along the

13 right portion of the skull consistent with some sort of

14 impact injury.

15    Q.  And I think one you said was fresher.  Earlier

16 you described it as being pink in color.  The other you

17 said was older, earlier describing it as green in color;

18 is that correct?

19    A.  Yes.

20    Q.  Is there anything that we haven't previously

21 discussed about G?

22    A.  No.

23    Q.  Now you have H, which relates to reported history

Case 1:17-cv-00626-DJS Document 17-2 Filed 06/14/21 Page 63 of 443

1        (Michael Sikirica - by Ms. Calabrese)

2    of decedent thrown forcibly downward on a mattress on

3    several instances before eventually being found

4    nonresponsive.

5        Where did you gather that information from?

6    A.   That came from a statement by Adrian Thomas.

7    Q.   He's the person that you described earlier as the

8    child's father or stepfather?

9    A.   Correct.

10   Q.   Other than this statement, is there anything else

11   that you learned about the statement from Adrian Thomas?

12   A.   That I learned -- could you clarify that

13   question.

14   Q.   Sure.  Other than this information, reported

15   history of decedent thrown forcibly downward on a

16   mattress and so on, did you learn anything else about

17   any reported history of maltreatment?

18   A.   Yes.

19   Q.   Tell us about that.

20   A.   I was able to review the social worker note at

21   Albany Medical Center that had interviewed Wilahemina,

22   the companion of Adrian, and also an eventual report

23   generated by the child fatality review team.

```
 1           (Michael Sikirica - by Ms. Calabrese)

 2      Q.   Is that common practice for your role as a

 3  medical legal examiner?

 4      A.   It often is, yes.

 5      Q.   Would you be doing your duty as a medical legal

 6  examiner if you weren't gathering information from these

 7  sources?

 8      A.   Correct.  The medical legal death investigation

 9  also involves -- some analysis of the scene is required,

10  and the circumstances around the death, and the history

11  provided by the people who are taking care of the child,

12  or the people in contact with anyone around the time of

13  an injury or death.

14      Q.   Is that history or information that you gather

15  from outside sources -- when I say outside sources I

16  mean anything other than what is on your autopsy table

17  -- is that information dispositive for your anatomic

18  diagnosis?

19           I'll repeat the question.

20      A.   Yes.

21      Q.   When you gather this type of information from

22  outside sources, from law enforcement, from friends,

23  loved ones, guardians of the decedent, do you take that
```

1          (Michael Sikirica - by Ms. Calabrese)

2     information and make a conclusion right there?

3     A.   Well, I will compare that information with the

4     findings and see if it is consistent with the findings.

5     Many times it is.  Some times it isn't consistent with

6     those findings.  If it's supportive of the findings, I

7     will incorporate that into my diagnosis.

8     Q.   Now, earlier you mentioned that you had members

9     of law enforcement.  I think you mentioned Adam Mason?

10    A.   Yes.

11    Q.   Anybody else?

12    A.   I believe Investigator Farley.

13    Q.   And possibly others?

14    A.   Yes.  There were Christa Book, she was an ADA for

15    Rensselaer County, and DA McNally.

16    Q.   He was at that time the DA of Rensselaer County?

17    A.   Yes.

18    Q.   District attorney.

19         As you're conducting your autopsy, are they

20    providing verbal information to you or are they

21    observing and you're working?

22    A.   Well, they're doing both.  I may be asking them

23    questions -- not particularly to the district attorney

1          (Michael Sikirica - by Ms. Calabrese)

2    or attorney side of this equation, but the police are

3    there to learn and provide me any information that they

4    have.  It may be limited.  It may be more complete.

5          I am free to ask them questions.  They are free

6    to ask me questions.  It's not uncommon the police are

7    there at all.  Almost every potential homicide or

8    anything unusual they will be there, not only to

9    photograph, sometimes to collect evidence and to give me

10   their portion of the story.  Not assuming that I -- that

11   they know the whole story or I'm going to accept their

12   whole story.

13   Q.  At the end of the day your judgment is based on

14   gathering all of the information, not information solely

15   from one party or another.

16   A.   Correct.

17   Q.   And roman numeral II.

18        Did I cover everything that you determined with

19   regard to H?

20   A.   Yes.

21   Q.   Roman numeral II, blood culture was positive for

22   streptococcus pneumonia on initial presentation to the

23   hospital.

1          (Michael Sikirica - by Ms. Calabrese)

2          Tell us about that.

3     A.   Yes.   When Matthew first came to Samaritan

4     Hospital on the morning of the 23rd of September --

5     excuse me -- the 21st, blood cultures were drawn because

6     Matthew appeared at the hospital totally unresponsive.

7          Blood cultures were drawn and a workup was begun

8     at Samaritan Hospital, and one of the tentative

9     diagnosis would be sepsis.   So, the blood was drawn and

10    sent for analysis, and cultures did grow back several

11    days later showing that it was streptococcus pneumoniae

12    bacteria in his bloodstream.

13         So, he, at that point, had at least what we call

14    bacteremia and possibly sepsis at that point when he

15    came in.   And that was a significant finding indicating

16    that his blood was infected.   That was not contributory

17    toward his -- was contributory toward his death but, in

18    my medical opinion, not the cause of his death.

19    Q.   How so?

20    A.   Well, Matthew had developed pneumonia, and the

21    pneumonia had progressed into an infection of the

22    bloodstream.

23    Q.   Sepsis?

```
 1              (Michael Sikirica - by Ms. Calabrese)

 2      A.   Yes.

 3           And that blood had travelled all over his body to

 4      some degree, including into his brain where I --

 5      Q.   And his internal organs.

 6      A.   Yes.

 7           -- where I noticed a large number of inflammatory

 8      cells in his brain.  It would be an unusual finding with

 9      trauma alone.  So, there was an element of sepsis in

10      this picture, but the story provided by Adrian Thomas

11      did indicate that Matthew has aspirated during these

12      events, when Matthew had been -- at least one of them,

13      Matthew had been thrown down on a mattress.

14           And Adrian had described that Matthew seemed to

15      have difficulty breathing after that.  He was wheezing.

16      Now, this is very consistent with the diagnosis of

17      aspiration.

18      Q.   What is that?

19      A.   That's swallowing secretions or fluids perhaps

20      from your stomach or your own secretions down into your

21      lung that would lead to an infection.

22      Q.   Like pneumonia?

23      A.   Yes.
```

Case 1:17-cv-00625-DJS Document 11-22 Filed 06/14/21 Page 69 of 443

```
 1          (Michael Sikirica - by Ms. Calabrese)

 2          So, he did have the acute and chronic pneumonia

 3   under the microscopic examination, and I relate that all

 4   to the fact that he had aspirated, possibly more than

 5   once, while he was under the care of family members.

 6      Q.   And then under subsection A, acute and chronic

 7   pneumonia with severe atelectasis.

 8          What is that?

 9      A.   That is the collapse of the lung tissues

10   themselves.  It can be due to inflammation.  It could

11   also be due to the fact that Matthew had been a donor

12   and his chest cavity had been opened.

13      Q.   And then III, severe anoxic type changes in the

14   heart (gross and microscopic).

15          What is anoxia, Doctor?

16      A.   It would be lack of oxygen.

17      Q.   This is to the heart?

18      A.   Yes.

19      Q.   To the brain?

20      A.   Yes.

21      Q.   Describe this diagnosis for us.

22          What does that mean?

23      A.   Well, that is an agonal event, indicating that it
```

1              (Michael Sikirica - by Ms. Calabrese)

2    occurred secondary to severe derangement of his normal

3    oxygenation and normal circulation.

4       Q.   And that's common with respiratory issues?

5       A.   It can be common with respiratory issues,

6    bleeding, trauma.  It's a very nonspecific finding.

7       Q.   And then you mentioned status post donation of

8    multiple internal organs.

9            That's what you previously covered.

10      A.   Yes.

11      Q.   Based upon all of the reasons you list in your

12   anatomic diagnoses, what was his cause of death?

13           What was Matthew's cause of death?

14      A.   The cause of death was severe closed head

15   injuries with cerebral edema due to blunt force trauma.

16      Q.   All of the other reasons you list on page 12

17   support that diagnosis?

18      A.   Yes.

19      Q.   That diagnosis is based upon what you observed in

20   the actual autopsy of the body, as well as information

21   that you gathered?

22      A.   Yes.

23      Q.   Now, are you aware that other doctors have opined

1          (Michael Sikirica - by Ms. Calabrese)

2    that Matthew died of a bacterial infection and sepsis?

3      A.  Yes.

4      Q.  Based upon your review of Matthew's body, your

5    examination of him and all the information you gathered,

6    do you take issue with those opinions?

7      A.  Yes.

8      Q.  Tell us why.

9      A.  Well, the diagnosis of sepsis is legitimate,

10   Matthew did have sepsis, but the causality of the sepsis

11   is related to, in my medical opinion, pneumonia.

12          The pneumonia occurred due to at least one bout

13   of aspiration that Matthew had aspirated fluids down

14   into his lungs, causing pneumonia, and that had seeded

15   into the bloodstream.

16     Q.  If I can just stop you right there.

17          When you say he aspirated fluid, would he then

18   have aspirated some type of bacteria to cause the

19   pneumonia?

20     A.  Yes.

21     Q.  Go ahead.

22     A.  That strep pneumoniae is a common bacteria in the

23   oral pharynx in children.

Case 1:17-cv-00626-DJS Document 147-22 Filed 06/14/21 Page 72 of 443

1        (Michael Sikirica - by Ms. Calabrese)

2   Q.  And in adults.

3   A.  And in adults.  Pneumoniae is a common bacteria

4 that we often carry without symptoms.

5   Q.  Just to stop you there again.

6       Is it true that most adults carry that bacteria

7 but aren't necessarily infected because we have

8 antibodies to protect us from that pneumonia?

9   A.  Correct.

10   Q.  Children, typically of Matthew's age, they do not

11 have those antibodies because they haven't received the

12 necessary vaccinations?

13   A.  Well, there are vaccinations, but the vaccination

14 schedule is at two months, four months, six months and

15 one year.

16       From the medical records, with evaluation of

17 Matthew's pediatric records, he had only received one

18 set of vaccinations.

19   Q.  Which is really just the first one.  That doesn't

20 really prepare him to fight such a bacteria.

21   A.  Correct.

22   Q.  Please continue.

23   A.  The bacteria seeded into Matthew's brain where

1          (Michael Sikirica - by Ms. Calabrese)

2     there was -- where there had been bleeding, so I was not

3     surprised to see inflammatory cells in the brain tissue,

4     acute inflammatory cells.

5        Q.   You mentioned earlier the levocytes?

6        A.   The neutrophils.

7        Q.   The neutrophils that you mentioned seeing

8     earlier.

9        A.   Yes.

10          So, these were there.  I attribute these to the

11    fact that Matthew had bled into that area, and in his

12    blood were the bacteria and the inflammatory cells

13    fighting that bacteria.

14          So, sepsis is a contributing factor to his death,

15    but the primary factor that caused his death so suddenly

16    is the subdural hematoma and the cerebral edema

17    secondary to that.

18       Q.   Now, could the sepsis cause the subdural hematoma

19    and the cerebral edema on its own?

20       A.   Sepsis could cause cerebral edema, but it would

21    not cause subdural hemorrhage.

22       Q.   It would not cause a subdural hemorrhage.

23       A.   Correct.

Case Case 1:17-cv-00625-DJS Document 114-22 33 Filed 06/14/21 65 Page 72 6 of 443

```
 1              (Michael Sikirica - by Ms. Calabrese)

 2                 MR. KLEIN:  I'm sorry.  The answer is sepsis

 3      could cause?

 4                 Ms. CALABRESE:  Cerebral edema but would not

 5      cause a subdural hemorrhage.

 6         Q.  Could sepsis cause the subgaleal hemorrhage that

 7      you described earlier?

 8         A.  No.

 9         Q.  The subgaleal hemorrhage, the old and the new,

10      and the subdural hematoma that we said was bilateral,

11      would not be caused by sepsis.

12         A.  Well, I only found one subdural hematoma along

13      the right portion and that's not caused by sepsis.

14         Q.  I thought we in B discussed the bilateral

15      subdural hematomas.

16         A.  That was seen radiographically, but I did not

17      appreciate that.  Did not see that.

18         Q.  On autopsy.

19         A.  On autopsy.

20         Q.  Those items, the subgaleal hemorrhaging old and

21      new, and subdural hematoma that you observed at autopsy,

22      could not have been caused by sepsis?

23         A.  Correct.
```

1          (Michael Sikirica - by Ms. Calabrese)

2     Q.   But rather by the injury that you determined.

3     A.   Yes.

4     Q.   You had a history of injury provided to you by

5 the police as deposed through Adrian Thomas?

6     A.   Yes.

7     Q.   Which you felt was consistent with your finding.

8     A.   Yes.  It's consistent with my finding.

9     Q.   Had you not had that history from Adrian Thomas,

10 would you still have found that this child died of blunt

11 force trauma due to the subdural hematoma and the

12 subgaleal hematoma?

13    A.   Well, the subgaleal hematoma did not cause his

14 death.  It was an indicator of some sort of impact

15 injury.

16    Q.   Okay.

17    A.   The subdural hematoma caused his death, with the

18 associated cerebral edema.  So, without his confession,

19 the cause of death would have been the same.

20    Q.   It would have been the same notwithstanding --

21 so, for, example, H on this anatomic diagnoses, page 12

22 of your report, would not be listed because you would

23 not have a mechanism of injury.

```
 1              (Michael Sikirica - by Mr.  Klein)

 2      A.   I would simply have put mechanism of injury

 3    unknown.

 4      Q.   However, your diagnoses that the injury that you

 5    found, the hematoma and the cerebral edema, would still

 6    be determined to be from blunt force trauma?

 7      A.   Yes.

 8      Q.   Regardless of the sepsis.

 9      A.   Correct.

10      Q.   Because the sepsis would not have caused those

11    items.

12      A.   Correct.

13              MS. CALABRESE:   I just need a moment.

14              (Recess taken.)

15              I have no further questions.

16    EXAMINATION

17    BY MR. KLEIN:

18      Q.   Good morning, Dr. Sikirica.  My name is Brett

19    Klein and I represent Adrian Thomas in these

20    proceedings.  I'm here to ask you questions under oath

21    as well as about your involvement in the autopsy of

22    Matthew Thomas and your involvement in the criminal

23    proceedings against Adrian Thomas.
```

                    (Michael Sikirica - by Mr.  Klein)

1        You understand that's why you're here today?

2   A.  Yes.

3   Q.  Is there any reason why you can't testify fully

4   and accurately today?

5   A.  No.

6   Q.  Like, in other words, do you suffer from any

7   memory issues or are you on any medications that would

8   affect your ability to remember things or any other

9   reason that we should know about?

10  A.  No.

11  Q.  Other than today, and two criminal trials, one in

12  '09, one in 2014, and other than the grand jury shortly

13  after the autopsy in 2008, have you given testimony

14  under oath at any other time in connection with this

15  matter?

16  A.  No.

17  Q.  Other than today, the aforementioned court

18  proceedings, and conversations with your attorney,

19  either Ms. Peck or any other attorneys representing you,

20  have you given statements, depositions in writing, or

21  other communications, to anyone else regarding this

22  matter?

1    (Michael Sikirica - by Mr. Klein)

2  A. No.

3  Q. Like, in other words, you did communicate with

4 the district attorney's office in relation to your

5 prospective testimony in 2009 and again in 2014,

6 correct?

7  A. Yes.

8  Q. In connection with those matters, were you ever

9 asked to create a summary or report or other notes that

10 were not part of your autopsy?

11  A. No.

12  Q. Or not part of your official file?

13  A. Correct.

14  Q. Have you spoken publicly about these matters at

15 any time to any media, filmmakers, or anyone else?

16  A. No.

17  Q. Prior to today, have you ever spoken with any

18 counsel here other than Ms. Peck?

19  A. No.

20  Q. You haven't spoken with Ms. Calabrese prior to

21 today?

22  A. Not that I can ever recall.

23    MS. CALABRESE: Not on this case I'll attest

```
 1              (Michael Sikirica - by Mr.  Klein)
 2    for the record.
 3                   MR. KLEIN:  Okay.
 4       Q.  Earlier you said that, in addition to today,
 5    you've been deposed on other occasions.
 6            How many other times have you been deposed in
 7    civil lawsuits?
 8       A.  I believe it would be three or four.
 9       Q.  Can you, to the best of your ability, try to
10    break them down for us.  One was two years in a case in
11    Albany County, another was five years in federal court,
12    or something.  However you could best describe them.
13       A.  One had to do with a malpractice case in Ulster
14    County.  One had to do with -- that was actually a
15    trial.  I don't believe it was a deposition.
16            One had to do with a trial on an inmate who died
17    of an overdose in Herkimer County.  Recently, I was in
18    court just last week on a family court matter in
19    Schenectady County.  And I believe I've had one or two
20    other family court testimonies.
21            And a deposition when I was a fellow involving a
22    fire in San Antonio, Texas.  That's all I can really
23    remember at the moment.
```

Case 1:17-cv-00625-DJS Document 142-22 Filed 06/14/21 Page 80 of 443

1              (Michael Sikirica - by Mr. Klein)

2      Q.   Do you have copies of any of the transcripts of

3   those testimonies?

4      A.   No.

5      Q.   The malpractice deposition in Ulster County, who

6   were you testifying on behalf of in that case?

7      A.   That was a trial, it wasn't a deposition, and I

8   was testifying to the fact that I performed an autopsy,

9   and I presented the findings at that autopsy.

10     Q.   Who was accused of malpractice?

11     A.   It was several physicians.

12     Q.   So, I was asking you about depositions in civil

13  cases like today.  The malpractice case was a civil

14  trial that you testified in?

15     A.   Yes.

16     Q.   The inmate in Herkimer was a lawsuit relating to

17  an overdose of the inmate?

18     A.   That was a deposition for sure.

19     Q.   Did that case ever go to trial?

20     A.   No.

21     Q.   Were you testifying in your capacity as a medical

22  examiner in that case?

23     A.   As -- yes.

Case 1:17-cv-00625-DJS Document 142-22 Filed 06/14/21 Page 81 of 443

```
 1              (Michael Sikirica - by Mr.  Klein)

 2      Q.   And the family court case in Schenectady, that

 3  was testimony in out of court deposition or was that in

 4  court testimony?

 5      A.   That was in court testimony.

 6      Q.   Was that regarding allegations of alleged child

 7  abuse?

 8      A.   It was a custody issue, yes.

 9      Q.   So, what was your role in that?

10           Was there a death?

11      A.   It was a death resulting and I was explaining the

12  autopsy findings.

13      Q.   Then the deposition when you were a fellow, that

14  was how many years ago?

15      A.   20 odd years ago.  That involved a man who left

16  his vehicle unattended and ran into a gas pump causing a

17  huge fire.

18      Q.   Other than those four proceedings and today, did

19  your other testimonies involve criminal matters?

20      A.   The vast majority of my work is in criminal

21  matters.

22           MS. PECK:  Dr. Sikirica also provided

23  deposition testimony in a federal lawsuit brought by
```

```
 1              (Michael Sikirica - by Mr.  Klein)

 2    Edson Thevenin.

 3                THE WITNESS:  Yes.

 4                MR. KLEIN:  Was that a wrongful death action

 5    against law enforcement officers?

 6                MS. PECK:  It's a federal, I think a 1983

 7    case.

 8                MR. KLEIN:  Was he represented by you?

 9                MS. PECK:  John Bailey.

10    BY MR. KLEIN:

11       Q.  Did that case go to trial as well or is it still

12    pending or was it dismissed, if you know?

13       A.  I don't know the status of that.  It never went

14    to trial.

15                MS. PECK:  It's still pending.

16    BY MR. KLEIN:

17       Q.  Did that case involve an infant death?

18       A.  No.

19       Q.  Other than the Thomas matter, how many other

20    cases involving infant deaths have you dealt with?

21       A.  I would say at least a hundred or more.

22       Q.  With regard to your process of taking photos,

23    taking measurements, etc., you also look at background
```

Case 1:17-cv-00625-DJS Document 117-2 Filed 06/14/21 Page 83 of 443

1          (Michael Sikirica - by Mr. Klein)

2    information, correct?

3          You indicated that you would look at the

4    statements, videos and things of that nature, correct?

5      A.   Correct.

6          That may not be complete on every case.  It may

7    be sometimes I have a statement.  Sometimes I have a

8    police report.  Sometimes I may not have -- I may have

9    very little except a coroner's report.

10     Q.   Let me move on to this first.

11         Ms. Calabrese asked you about your opinions and

12   your diagnoses that were set forth in your autopsy

13   report.

14         Do you recall that testimony?

15     A.   Yes.

16     Q.   Do you have any new opinions about the death, the

17   circumstance, whether it's manner or cause or anything

18   else of Matthew Thomas' death, since you've testified in

19   2014?

20     A.   No.

21     Q.   Are there any new developments in the field of

22   medicine in any regard that have affected any of your

23   opinions that were previously rendered in this case?

1          (Michael Sikirica - by Mr.  Klein)

2     A.   No.

3     Q.   You gave your opinions back originally in 2008.

4          The autopsy was conducted in 2008 and you

5     prepared your report in 2009, correct?

6     A.   Correct.

7     Q.   Have you learned or researched or become aware of

8     any matters that would have impacted your opinions that

9     were rendered?

10     A.   No.

11     Q.   Or that would impact the findings that you made?

12     A.   No.

13     Q.   Since creating the autopsy report in 2009, did

14     you become aware that the New York Court of Appeals

15     found that Mr. Thomas' confession, both video and the

16     ten-page confession, were obtained in violation of his

17     due process rights, that they were coerced, false

18     confession?

19     A.   Yes.

20     Q.   Once you became aware that this was a coerced,

21     false confession, did that change your view of any of

22     the findings or conclusions that you rendered in your

23     autopsy?

```
 1              (Michael Sikirica - by Mr.  Klein)

 2      A.   No.

 3      Q.   Is that for the reasons you stated in response to

 4   Ms. Calabrese's question that even if you didn't have

 5   his confession your findings would still be the same?

 6      A.   Well, my findings would be the same.  The cause

 7   of death would be the same.

 8      Q.   But the manner --

 9      A.   The manner would be the same.

10      Q.   Right, but it was an answer that you said would

11   be unknown rather than with blunt force trauma, right?

12      A.   Correct.

13      Q.   Did you ever read the Court of Appeals decision?

14      A.   No.

15      Q.   Did anyone ever explain that to you other than

16   any attorney representing you?

17      A.   Ms. Peck described it to me, yes.

18      Q.   I don't want to know what she said to you about

19   it.

20           Back when the decision came down in 2014, I

21   believe it was January or February, right before the

22   retrial, did anyone from the district attorney's office

23   talk to you about the impact of that Court of Appeals
```

```
 1            (Michael Sikirica - by Mr.  Klein)

 2  decision on your findings?

 3      A.  I believe so, yes.

 4      Q.  Who was that?

 5      A.  That would have been Christa Book, the ADA.

 6      Q.  What was discussed?

 7      A.  Just the upcoming trial, the second trial, and

 8  the confession, which would not be incorporated in that

 9  trial.

10      Q.  Did you discuss whether your opinion was the same

11  or whether your opinion would be different in any way or

12  your findings?

13      A.  I said my findings would be the same.

14      Q.  So, other than discussing that you couldn't

15  mention the confession as it related to your findings

16  and opinions, was anything else discussed in that regard

17  that you can recall?

18      A.  Not that I recall.

19      Q.  You indicated previously that the finding,

20  initial finding or diagnosis of a purported skull

21  fracture, is something that was later concluded by you

22  to be incorrect, right?

23      A.  Yes.
```

```
 1              (Michael Sikirica - by Mr.  Klein)

 2     Q.  Were there any other findings or other

 3  conclusions that you disagreed with of any witnesses or

 4  medical providers, including any prosecution witnesses,

 5  not previously stated on the record?

 6         In other words, other than that possible skull

 7  fracture not being true, are there any other prosecution

 8  witnesses or findings in the medical records that you

 9  disagree with?

10              MR. PERKINS:  Object to form.

11              MS. PECK:  Objection to form.

12              THE WITNESS:  Well, I disagreed with the

13  radiographic suggestion that there was a left-sided

14  subdural hematoma.  I disagreed with that.

15              And I disagreed with the cause of death

16  postulated by Dr. Leestma and Dr. Klein.

17  BY MR. KLEIN:

18     Q.  Those are the defense witnesses.

19     A.  Yes.

20     Q.  So, dealing with prosecution witnesses, whether

21  it's Dr. Woldman, Dr. Edge, or any of the expert

22  witnesses, did you have any disagreements with any of

23  their testimonies or statements?
```

1          (Michael Sikirica - by Mr.  Klein)

2               MS. PECK:  Objection.  In so far as you

3      recall testimony and statements.

4      BY MR. KLEIN:

5          Q.  Right.

6          A.  I don't recall any major disagreement.

7          Q.  How about any disagreements whatsoever, even if

8      they were minor?

9          A.  I can't recall any.  I never spoke with either of

10     those doctors, though.

11         Q.  You never spoke with any of the prosecution

12     experts?

13         A.  No.

14         Q.  In terms of the bilateral subdural hematomas,

15     that was a finding on a CT?

16         A.  Yes.

17         Q.  On autopsy, you only concluded that there was a

18     right-sided hematoma, correct?

19         A.  Yes.

20         Q.  When you say subdural hematoma right-sided, also

21     could that be referred to as a collection, subdural

22     collection, fluid collection?

23         A.  Yes.

1              (Michael Sikirica - by Mr.  Klein)

2    Q.  So, what is the difference between a subdural

3  hematoma and a subdural fluid collection, if any?

4    A.  Well, a subdural fluid accumulation could be

5  called a subdural hygroma, which is simply an

6  accumulation of fluid for some reason underneath the

7  meninges or beneath the dura, along the portion of the

8  brain.

9    Q.  The CT in this case shows -- and I can show it to

10  you if you need it, I think it's in your file -- in

11  fact, said subdural fluid collection.

12      It didn't say the word "hematoma", correct?

13    A.  Correct.

14    Q.  It recommended further correlation or follow up

15  with an MRI so that the findings could be more specific,

16  correct?

17    A.  Correct.

18    Q.  Did you have the authority to order an MRI or the

19  ability to have one taken as the medical examiner

20  assigned to this case?

21    A.  No.  I don't have any authority to order an MRI.

22    Q.  The child was deceased.  You wouldn't do it on a

23  deceased person?

1               (Michael Sikirica - by Mr. Klein)

2      A.  No.

3      Q.  Did you ever inquire -- would an MRI have been

4  helpful in this case to your autopsy?

5      A.  No, not necessarily, because I was going to be

6  doing the internal examination myself.

7      Q.  Do you believe an MRI more likely than not would

8  have revealed just a right-sided subdural fluid

9  collection, or do you not know?

10              MS. PECK:  Objection.

11              THE WITNESS:  I don't.

12 BY MR. KLEIN:

13     Q.  Is there a possible explanation of how there

14 could have been a bilateral fluid collection at the time

15 of the CT but a few days later it only appeared on the

16 right side that you could --

17     A.  The cerebral edema could have basically displaced

18 it.

19     Q.  What is the medical term for that?  It's like the

20 -- it takes up the space.  What is that?  Is it called

21 replacement when the fluid -- like when blood spreads to

22 -- takes up other spaces.

23     A.  I don't know of a specific term for that.

1              (Michael Sikirica - by Mr.  Klein)

2      Q.   Okay.  So, is it your opinion that there was not

3  a bilateral subdural hematoma at any time in this case?

4              MS. PECK:  Objection.

5              THE WITNESS:  I did not see one at the

6  autopsy.  I can't verify there was one or not.

7  BY MR. KLEIN:

8      Q.   But is the CT, in your view, conclusive evidence

9  that there was one, or it's just it was indicative of

10  something and the autopsy was conclusive that there was

11  not a left-sided subdural fluid collection?

12     A.   Correct.

13     Q.   Would an MRI have been helpful in determining

14  whether there was other changes to the brain, such as

15  white matter changes, stroke, or other things, that were

16  not determined before your autopsy?

17     A.   Yes.  It may have been, yes.

18     Q.   Would those things have been helpful in

19  determining whether there was trauma versus some

20  nontraumatic cause of death?

21     A.   That would be outside the scope of my expertise,

22  the indication for an MRI.  And I don't know if it would

23  be possible to do an MRI on the child in this condition.

Case 1:17-cv-00626-DJS Document 14-22 Filed 06/14/21 Page 92 of 443

1         (Michael Sikirica - by Mr. Klein)

2    Q. Other than Matthew Thomas, had you ever dealt

3  with a child in this condition?

4    A. Yes.

5    Q. How many other occasions?

6    A. Dozens.

7    Q. When we say "this condition", how do you

8  understand that question?

9    A. A child with abusive head trauma or accidental

10  head trauma, both.

11    Q. How many other cases have you dealt with cases of

12  abusive or accidental head trauma of young children?

13    A. Dozens.

14    Q. Did any of them go to trial other than Matthew

15  Thomas or the case of Adrian Thomas involving Matthew

16  Thomas?

17    A. Yes.

18    Q. How many of them, if you know?

19    A. Probably in the range of 10 to 20.

20    Q. Do you know the outcomes of those?

21    Did any of them result in acquittals?

22    A. Not that I recall.

23    Q. Do you recall if they resulted in convictions?

1                 (Michael Sikirica - by Mr.  Klein)

2      A.   Some did, but I don't recall the exact numbers.

3      Q.   Do you have the names of all the cases you've

4    testified in written down somewhere?

5      A.   No.

6      Q.   Is that something you could find out?

7      A.   It would be possible, but extremely difficult.

8      Q.   These approximately 10 cases involving head

9    trauma of young children, were they in the last 10

10   years, 20 years?

11     A.   I would say at least 10.  They would be over --

12   since the start of my career.

13     Q.   Have any of them taken place in the last five

14   years since the Adrian Thomas trial?

15     A.   I would assume yes.

16     Q.   Can you recall any of them?

17     A.   No.

18               MR. KLEIN:  I would ask that a search be

19   made for the criminal matter and the docket number, the

20   name of the case, so that we can determine whether we

21   want to make any subsequent requests.

22               MS. PECK:  I think it would depend on the

23   status of those because there is a privilege that is

1           (Michael Sikirica - by Mr. Klein)

2   associated with autopsy. So, if it has not been part of

3   a public record or if there's an acquittal, I don't know

4   if we can go ahead and provide it.

5           You can make a demand and we can go to the

6   court if that ends up being the case.

7   BY MR. KLEIN:

8     Q. So, in this case there was a lab report

9   confirming the bacterial infection, correct?

10    A. Yes.

11    Q. And that didn't come back until September 25th of

12  2008.

13        Do you recall that?

14    A. Yes.

15    Q. It was ordered on September 21st of 2008 when the

16  patient was first brought to Samaritan, correct?

17    A. Correct.

18    Q. Did you have that lab report confirming positive

19  for strep at the time of the autopsy?

20    A. No.

21    Q. Do you know when you received it?

22    A. It would have been included in the records

23  sometime after the autopsy.

1              (Michael Sikirica - by Mr. Klein)

2      Q.   Meaning sometime up until the following May or

3   whenever it was that you issued your report?

4      A.   It would have been received when I received the

5   records from Samaritan Hospital within a week or two of

6   the death.

7      Q.   Do you know if you looked at it, though, until

8   you did your report several months later?

9      A.   I wouldn't have looked at it until I sat down to

10  complete the report.

11     Q.   Had you looked at it prior to or at the time of

12  the autopsy, would it have impacted the findings or

13  manner of which you conducted this examination?

14     A.   No.

15     Q.   Do you know if you had the benefit of looking at

16  that lab confirming strep when you did the brain study

17  some months later in January or February of '09?

18     A.   Yes.

19     Q.   You did have it.

20     A.   Yes.

21     Q.   Did you have the ability to request gram staining

22  if you wanted to?

23     A.   Yes.

1          (Michael Sikirica - by Mr. Klein)

2     Q.  Did you make a conscious choice not to request

3  gram staining?

4     A.  Yes.

5     Q.  What was the reason for that choice?

6     A.  I knew that the bacteria had seeded the blood.  I

7  knew it would be there.  There was no practical sense to

8  doing it.

9     Q.  Was there any practical sense in knowing the

10  extent of the infection, whether that could have been a

11  primary -- such as whether that could have been a

12  primary cause of death?

13          MS. PECK:  Object to form.

14          THE WITNESS:  I don't quite understand.

15  BY MR. KLEIN:

16     Q.  Can you imagine a scenario where sepsis was the

17  primary cause of death and hypothetically secondary to

18  sepsis there might have been trauma, but the trauma

19  wouldn't have been the cause of death?

20          MS. PECK:  Objection to form.

21          THE WITNESS:  I could imagine that, yes, if

22  there was minor trauma.

23     Q.  So, would it have been helpful to know -- just so

```
1              (Michael Sikirica - by Mr.  Klein)

2   you had all the information available -- when there was

3   an infection, such as a strep infection in a

4   four-month-old like this, for your autopsy?

5              MS. PECK:  Objection to form.

6              THE WITNESS:  I pretty much assumed that by

7   the time Matthew had expired that it was going to be an

8   infection in his system, so I'm not surprised that the

9   strep was there when he first came in on the 21st.

10              I knew they drew the blood cultures at 9:40

11   in the morning.  I'm not surprised at all that Matthew

12   was infected and the extent of it.  Could very easily be

13   exaggerated by his immobility while he was being

14   ventilated and hospitalized.

15   BY MR. KLEIN:

16     Q.  Still would be, I mean, the amount of fluid in

17   the brain, the 60 -- was it 60 ML?

18     A.  Yes.

19     Q.  Was different than the amount of fluid in the

20   brain when he presented at the hospital a few days

21   earlier, right?

22     A.  I'm not sure they quantitated the amount of fluid

23   in the brain when he presented at the first CT, but it
```

1            (Michael Sikirica - by Mr.  Klein)

2  was a significant amount of blood in the brain.

3     Q.  Significantly more than when he presented

4  initially or you don't know?

5     A.  Again, I don't know, because it was never

6  quantitated on the CT.

7     Q.  My point is, even though things may change over

8  the course of his hospital treatment through his

9  passing, it still would be pertinent to your forensic

10  investigation, wouldn't it, to know the extent of the

11  sepsis?

12            MS. PECK:  Objection.

13     Q.  To do the gram staining?

14     A.  No.  I don't think gram staining was necessary.

15     Q.  Were you aware that Dr. Leestma did his own gram

16  staining in connection with the trial?

17     A.  Yes.

18     Q.  Did you look at his gram stains?

19     A.  I saw photographs.

20     Q.  Did you draw any opinions with regard to his gram

21  stains?

22     A.  They looked like they were well done.  It looked

23  like it's positive gram stains.  Gram positive cocci.

1          (Michael Sikirica - by Mr. Klein)

2     Q.   Did they tell you anything else that you didn't

3   know previously that informed your thinking about this

4   case?

5     A.   No.

6     Q.   Are you familiar with the term group B

7   streptococcal disease?

8     A.   Yes.

9     Q.   Is that what this tested positive for?

10    A.   It tested positive for strep pneumo, which would

11   be a group A, yes.  A group B.  I'm sorry.

12    Q.   Group B.

13         Group A would be like a skin type, right?

14    A.   Yes.

15    Q.   Group B is more of an airway type of strep.

16    A.   Correct.

17    Q.   Which relates to pneumonia and other things which

18   we'll talk about in a little bit, correct?

19    A.   Yes.

20    Q.   Were you familiar -- let me call it GBS?  Are you

21   familiar with that acronym GBS?  Group B streptococcal?

22    A.   Yes.

23    Q.   Can we refer to it in this deposition for the

```
 1              (Michael Sikirica - by Mr.  Klein)

 2   sake of the reporter as GBS?

 3      A.  Sure.

 4      Q.  Were you familiar with GBS as of the time that

 5   you conducted the autopsy in September of 2008?

 6              MS. PECK:  Objection to form.

 7              THE WITNESS:  Was I familiar with the fact

 8   that Matthew had it?

 9   BY MR. KLEIN:

10      Q.  No.  Were you familiar with it as a medical

11   diagnosis as the type of infection that it was --

12   withdrawn.

13          Would you agree that GBS is a common cause of

14   neonatal early onset sepsis?

15              MS. PECK:  Objection.

16              THE WITNESS:  I'm not an infectious disease

17   specialist, but I would say it is seen.  I don't know

18   how common it is.

19   BY MR. KLEIN:

20      Q.  Are you aware that it's also a significant cause

21   of late onset sepsis among young infants?  That it was

22   as of 2008.

23      A.  It could be, yes.
```

Case 1:17-cv-00626-DJS Document 142-2 Filed 06/14/21 Page 1023 of 442

1          (Michael Sikirica - by Mr. Klein)

2     Q.  And that this is something that was -- there were

3   guidelines for treating this and identifying it and

4   monitoring this by the CDC.

5     A.  Yes.

6     Q.  And those were in effect in -- 2002 were the most

7   recent before this incident.  Were you familiar

8   generally with those guidelines?

9     A.  I don't know when the guidelines were published,

10  but I understand there are guidelines on treating sepsis

11  of all sorts.

12    Q.  In your capacity as the medical examiner for

13  Rensselaer County, were you generally responsible for

14  being up to date on these types of guidelines?

15    A.  I have no responsibility in terms of treatment

16  guidelines.

17    Q.  But being up on the current state of the pure

18  knowledge of this condition and how it may impact a

19  death?

20    A.  I would be more responsible for epidemic

21  outbreaks of something than actually the individual

22  occurrence of something like that.

23    Q.  Have you ever had any other case involving GBS?

```
 1              (Michael Sikirica - by Mr.  Klein)

 2         Have you ever had a case involving GBS?

 3    A.  Yes.

 4    Q.  How many other cases?

 5    A.  I would say at least two or three.

 6    Q.  In those cases, was GBS the cause of death?

 7    A.  Yes.

 8    Q.  Did any of those cases involve allegations of

 9  abuse?

10    A.  No.

11    Q.  In this case, did Matthew Thomas meet all the --

12  some or all of the characteristics of having GBS, such

13  that if there was no allegation of trauma you might have

14  concluded the cause of death was GBS?

15              MS. PECK:  Objection to form.

16              THE WITNESS:  If there was no trauma on

17  Matthew at all, I would have concluded that he died of

18  sepsis.

19  BY MR. KLEIN:

20    Q.  Would that be related to GBS?

21    A.  It could be, yes.

22    Q.  How could that be related to GBS?

23    A.  Well, it would be related to pneumonia that's
```

1                (Michael Sikirica - by Mr. Klein)

2      spreading to the bloodstream.

3         Q.  Just circling back though, are you familiar with

4      late onset GBS as compared to early onset GBS?

5         A.  I've heard the terms, but I don't know the

6      demarcation between the early and late.

7         Q.  According to the CDC, early onset is -- according

8      to the CDC, this is from their website, I'll represent

9      that -- there are two syndromes that exist for group B

10     strep GBS disease.  Early onset, which is less than

11     seven days old.

12             Does that sound about right to you?

13        A.  Yes.

14        Q.  And then there's late onset, which is seven to 90

15     days old, which would be the time frame that Matthew

16     passed away.

17             Do you agree?

18        A.  Yes.  I agree there's an early onset.  Usually

19     it's associated with birth.

20             MR. KLEIN:  I'm going to mark this

21     printout, which is a three page document which is a

22     printout from the CDC website.  Says group B strep

23     clinical review.

```
 1              (Michael Sikirica - by Mr.  Klein)

 2               (Thomas Exhibit 3 marked for

 3   identification.)

 4      Q.  So, according to this there is a syndrome for

 5   group B strep disease referred to as late onset that

 6   affects children seven to 90 days old.

 7          Do you have any reason to dispute that?

 8              MS. PECK:  Take a couple minutes to look at

 9   it.

10   BY MR. KLEIN:

11      Q.  According to this, late onset GBS can manifest as

12   bacteremia, correct?

13      A.  Yes.

14      Q.  That's what Matthew Thomas presented with in this

15   case, correct?

16      A.  Yes.

17      Q.  It could manifest as sepsis, which Matthew Thomas

18   presented with in this case, correct?

19      A.  Yes.

20      Q.  Late onset GBS could present as pneumonia, which

21   Matthew, you believe, presented with as well, correct?

22      A.  Yes.

23      Q.  And late onset GBS could present itself or
```

```
1          (Michael Sikirica - by Mr. Klein)

2     manifest as meningitis, correct?

3        A.  Yes.

4        Q.  Now, you've previously testified, I believe, that

5     you didn't see meningitis in this case; is that correct,

6     or am I incorrect about that?

7        A.  Correct.

8        Q.  But you were confronted with your testimony about

9     the green coloration possibly being pus on the brain.

10          Do you recall that generally?  If not, I could

11    show you the testimony.

12       A.  Perhaps if you could show me that testimony that

13    would be helpful.  But I think we have to clarify the

14    GBS question.

15          Now, GBS is gram -- group B streptococcus.  Now,

16    when you talk about this GBS in reference to this paper,

17    they're talking about streptococcus agalactiae or group

18    B streptococci.  Streptococcus pneumoniae is a group B

19    streptococcus but it's not considered in the category of

20    this paper.  This has to do with the strep agalactiae

21    which is the dangerous group B strep that occurs in

22    infants.

23       Q.  Well, this says agalactiae or group B cause GBS
```

Case 1:17-cv-00626-DJS Document 44-2 Filed 06/14/21 Page 106 of 442

1                  (Michael Sikirica - by Mr.  Klein)

2    disease.  It's just talking about the etiologic agent in

3    that one section.

4          But that's not what this is talking about.  This

5    is talking about GBS generally.

6       A.  Yes, but that organism was not detected in

7    Matthew.

8       Q.  Right.  Group B was.

9       A.  But group B is a large group that includes strep

10   pneumoniae and this microorganism and many others.

11      Q.  Right, but it is included in what's being

12   discussed in this article, you would agree?

13      A.  I would agree the group B strep is discussed in

14   this article, but there is no specific mention of the

15   strep pneumoniae, which is a group B strep.

16      Q.  It's a subset of group B, correct?

17      A.  Yes.

18      Q.  And this just talks about group B generally.

19      A.  Yes.

20      Q.  What are other subsets of group B?

21      A.  Well, I believe there would be streptococcus

22   modus and there may be some others as well.

23      Q.  You are not aware of them?

```
 1              (Michael Sikirica - by Mr.  Klein)

 2      A.   No.

 3      Q.   This is not your specialty, infectious disease.

 4      A.   Correct.

 5      Q.   So, in terms of the meningitis, do you recall

 6  generally what the debate was about meningitis in this

 7  case?

 8      A.   Yes.  The debate was whether the meningitis was

 9  the primary event was that it occurred and basically

10  caused the sepsis and caused the subdural hematoma.

11      Q.   Is it your opinion that there was meningitis

12  present in Matthew's system?

13      A.   It's my opinion that there was inflammation, but

14  meningitis by definition is a primary infection of the

15  covering of the brain.

16           Now, inflammation in the brain can occur from

17  meningitis or it could be occurring from sepsis.  That

18  sepsis was documented in Matthew and it seeded the

19  vessels in the brain and the meninges to resemble

20  meningitis, but it's not primary meningitis.

21      Q.   But there is meningitis.

22           MS. PECK:  Objection.  Asked and answered.

23      Q.   You can answer.
```

```
 1              (Michael Sikirica - by Mr.  Klein)

 2      A.   No.  I would not call it meningitis.

 3      Q.   So there are findings that resemble meningitis

 4  but are not meningitis?

 5      A.   Yes.

 6      Q.   From what you know about group B strep, GBS, it

 7  doesn't have to manifest as bacteremia, sepsis,

 8  pneumonia and meningitis.  It just may manifest as some

 9  or all of those, correct?

10      A.   Correct.

11      Q.   Meningitis would be a cause of increased

12  intracranial pressure that would explain the hemorrhages

13  behind Matthew's eyes.

14           Would you agree with that?

15      A.   I would agree.

16      Q.   So is it your testimony that the what appear to

17  be meningitis could also have caused that intracranial

18  pressure behind Matthew's eyes in this case, or you

19  don't know?

20      A.   It could have caused it, yes.

21      Q.   Now, GBS is a type of bacteria that I think we

22  discussed earlier is very common, correct?

23      A.   Correct.
```

```
 1              (Michael Sikirica - by Mr.  Klein)

 2      Q.  It's common in that I think one in four women

 3  carry it?

 4      A.  Yes.

 5      Q.  It's a type of bacteria that may not be serious

 6  for adults, but could be harmful, perhaps deadly, to

 7  newborns, correct?

 8      A.  Yes.  They acquire it by passage through the

 9  birth canal if the woman is infected.

10      Q.  Many people who carry group B strep don't even

11  know it, correct?

12      A.  I would say that's correct.

13      Q.  As an adult, you may not have any symptoms of

14  group B strep.

15      A.  Correct.

16      Q.  Did you ever come to learn whether or not

17  Wilahemina Hicks had GBS at the time of her delivery of

18  Matthew Thomas?

19      A.  I did review her pediatric records, but I don't

20  recall if she did or not.

21      Q.  And to know if she did present with that, she

22  would have had to have been tested for that, correct?

23      A.  Yes.
```

1          (Michael Sikirica - by Mr. Klein)

2     Q.  Do you know whether or not she was tested for

3  GBS?

4     A.  I would only assume she would have had to be

5  tested because it's a routine test today, but I don't

6  remember the positivity or not.

7     Q.  Now, you didn't obtain her delivery records in

8  connection with her autopsy, did you?

9     A.  Yes.

10     Q.  You did obtain them?

11     A.  Yes.

12     Q.  I believe you testified at trial that you had not

13  looked at them, but I'll put a pin in that and we'll go

14  back to that.

15     A.  Okay.

16     Q.  My understanding is you looked at Matthew's

17  records going back to birth.

18     A.  Yes.

19     Q.  But my question is:  Would Wilahemina have had a

20  separate OB record?

21     A.  No.  I did not review her OB record.  I only

22  reviewed Matthew's birth records.

23     Q.  Would those records have indicated -- would it be

1            (Michael Sikirica - by Mr. Klein)

2    Wilahemina Hicks' personal records or her OB records

3    that would have indicated whether she had been tested

4    for GBS or not?

5        A.  It would probably be a combination of both.  It

6    would probably be included in both records, yes.

7        Q.  In terms of GBS being I guess transmitted to a

8    child, right, that happens during childbirth?

9        A.  Yes.

10        Q.  With regard to early onset versus late onset,

11    sometimes it may manifest itself right away with labored

12    breathing or other systems when the child is in the

13    nursery?

14        A.  Yes.

15        Q.  That would be in the nature of early onset,

16    correct?

17        A.  Yes.

18        Q.  Other times, and it may be rare, it could be one,

19    two or three months later, that there could be late

20    onset, to your knowledge, correct?

21        A.  Correct.

22        Q.  There may not be symptoms, outward symptoms, of

23    GBS until this period -- until there's some event or

```
 1              (Michael Sikirica - by Mr.  Klein)

 2   distress months later, correct?

 3      A.  Yes.

 4      Q.  So, the risk factors, or the chances of a mother

 5   transmitting GBS to a child, are higher if a baby is

 6   premature, correct?

 7                MS. PECK:  Objection.

 8      Q.  To your knowledge.

 9      A.  Yes.

10      Q.  In this case, is it your understanding that

11   Matthew was delivered premature?

12      A.  Yes.

13      Q.  Do you remember how many weeks?

14      A.  33.

15      Q.  So that would -- so anything before 37, is that

16   considered premature?

17      A.  Yes.

18      Q.  If there were ruptured membranes, that would also

19   increase the chances of GBS being transmitted from a

20   mother to a newborn; is that your understanding?

21      A.  Yes, but there was never any GBS in Matthew's

22   system.  There never the bacteria associated with

23   GBS.
```

1          (Michael Sikirica - by Mr. Klein)

2     Q.  Based on what?

3     A.  Based on the findings.  They never detected

4  anything except the strep pneumoniae.  That is a type of

5  group B streptococcus.

6     Q.  That was in his system.

7     A.  Yes, but it's not the bacteria that's associated

8  with GBS with neonatal gram positive sepsis.  That's a

9  different bacteria entirely.

10    Q.  So, what is it associated with, the bacteria that

11 Matthew had?

12    A.  It's associated with pneumonia and respiratory

13 infection.

14    Q.  So, in your view, that would not have been

15 transmitted to him from the mother?

16    A.  No.

17    Q.  How is the type of pneumoniae, bacterial

18 pneumonia that Matthew had, transmitted, in your

19 knowledge?

20    A.  Well, it's a community acquired infection and it

21 could be latent and asymptomatic.  It's in the air

22 between people.

23    Q.  Others may not catch it necessarily around

```
 1            (Michael Sikirica - by Mr.  Klein)
 2   someone with that, right?  It just depends.  Sometimes
 3   people in close proximity would get it.  Other times
 4   they may not, correct?
 5      A.  Yes.  It would depend on your immune status.  And
 6   Matthew would be more susceptible to it because he
 7   hasn't finished his immunization protocol for it.  He's
 8   only got one shot.
 9      Q.  Given your lack of expertise in infectious
10   disease, are you testifying with medical certainty that
11   the bacterial pneumoniae that Matthew had, group B, is
12   absolutely different than GBS and not transmitted during
13   labor, possibly?
14      A.  Yes.  This is not the bacteria that's transmitted
15   during labor or that is described in this paper by the
16   CDC.  This is a different bacterium.  This is a
17   bacterium that's seen in adults and seen in children.
18           This strep agalactiae is the type of bacteria
19   that causes neonatal infection.  It's a risk to newborns
20   and it can occur later on in a child in several months
21   old, but it's not the agent, it's not the etiological
22   agent, of what Matthew had in his system.
23      Q.  The vaccine, the two-month vaccine and the four-
```

1          (Michael Sikirica - by Mr. Klein)

2  month vaccine, what are those called, if you know?

3    A. Pneumo vaccine.

4    Q. Would those help fight -- help an infant fight

5  against group B, GBS, as well as the pneumoniae bacteria

6  that you described?

7    A. No. I'm very certain that they are effective

8  against the pneumo, strep pneumo. That's why they're

9  called pneumo vacs, pneumococcal pneumonia.

10    Q. So, babies with -- I think we discussed, just to

11  circle back, with GBS, which you're saying doesn't apply

12  here, can have one or more of the following illnesses:

13  Meningitis, pneumonia, sepsis, correct?

14    A. Yes.

15    Q. How about babies with bacterial pneumoniae, could

16  they also have meningitis, pneumonia and sepsis?

17    A. Yes.

18    Q. That can exist in the absence of any trauma.

19    A. Yes.

20    Q. When we talk about the word trauma and injuries,

21  I just want to be clear with you about what's been

22  discussed. Counsel asked you a lot of questions about

23  injury.

1    (Michael Sikirica - by Mr. Klein)

2    An injury can be spontaneously occurring,

3 correct, like nontraumatic?

4    A.  No.  An injury by definition is caused by some

5 sort of trauma.

6    Q.  Well, there could be bleeds.  There could be like

7 a subgaleal hemorrhage could occur spontaneously,

8 correct, or on its own?

9    A.  Not without trauma.

10    Q.  When you say trauma, what do you mean?

11    Could then be from like birth trauma?

12    A.  It would be an impact trauma of some sort.

13    Q.  Forceps?

14    A.  That could be.

15    Q.  In this case is it your understanding that there

16 were forceps used in the delivery?

17    A.  Yes.

18    Q.  Do you know if there was any vacuum suction, I

19 believe it's called, used in the delivery here?

20    A.  I can't recall if there was vacuum or not.

21    Q.  Is that another common cause of subgaleal

22 hemorrhages?

23    A.  It can be, yes.

1           (Michael Sikirica - by Mr. Klein)

2      Q.  For the record, can we call them SGHs?

3      A.  Sure.

4      Q.  So, subgaleal hemorrhages can occur from trauma

5  that's not necessarily someone hitting a bed or a crib,

6  correct?

7      A.  Correct.

8      Q.  They're commonly seen as a result of delivery

9  complications, correct?

10           MS. PECK:  Objection.

11      A.  I don't know if they're commonly seen, but they

12  can be seen, yes.

13           (Recess taken.)

14  BY MR. KLEIN:

15      Q.  So, I'm going to get back to some of these

16  questions about SGH and streptococcal pneumoniae in a

17  bit.  I just want to get back to your testimony in this

18  case.

19      Before coming here today to testify, whether in

20  the last days or weeks or so, did you have a chance to

21  review your prior testimony in this matter?

22      A.  Yes.

23      Q.  Did you review your grand jury testimony?

1      (Michael Sikirica - by Mr.  Klein)

2    A.  Yes.

3          MR. KLEIN:  I'm going to mark this as Thomas

4    4.

5          (Thomas Exhibit 4 marked for

6    identification.)

7    Q.  This is a document that was produced in discovery

8    that's one I'll represent is your grand jury testimony.

9    Take a moment and look at it.

10         Does that appear to be all of it?

11   A.  Yes.

12   Q.  Sitting here today, do you stand by everything

13   you said in the grand jury?

14   A.  To the best of my recollection, yes.

15   Q.  Is there anything that you said in the grand jury

16   that you wish to change or correct for any reason, the

17   passage of time, changes in medicine, changes in your

18   knowledge of the facts of the case, or anything else?

19   A.  Not that I'm aware of, no.

20              (Recess taken.)

21   BY MR. KLEIN:

22   Q.  In the grand jury testimony you stated, among

23   other things, that you didn't see any gross injury on

```
 1            (Michael Sikirica - by Mr.  Klein)

 2   Matthew's body.

 3           That refers to any outward injuries, correct?

 4      A.   Yes.

 5      Q.   That you confirmed in your testimony today as

 6   well, correct?

 7      A.   Yes.

 8      Q.   I just have questions about some specific things

 9   that you said.  I'll pose them to you and I'll give you

10   a page if that helps.

11           In your testimony on page 14 you say that the

12   green bruising was considerably older than the fresher

13   bruising.  I would estimate at least five to seven days.

14      A.   Yes.

15      Q.   Would you change that testimony today given that

16   you can't gauge the bruising to a degree of medical

17   certainty?

18      A.   Well, I could say that it's at least five to

19   seven days.  I can't tell you if it's eight, nine or 10

20   or 12 days, but I would say at least five to seven.

21      Q.   So, if you had to bracket it, would it be between

22   five days and three weeks or what would the outer end of

23   that be?
```

```
 1              (Michael Sikirica - by Mr. Klein)

 2      A.  The outer would be two to three weeks.

 3             MS. CALABRESE:  Of the pink bruising we're

 4   talking about?

 5             THE WITNESS:  This is the green bruising.

 6   BY MR. KLEIN:

 7      Q.  That green bruising was associated with some type

 8   of bleed in the brain?

 9      A.  It was not in the brain, but it was on the

10   surface of the skull.

11      Q.  That's the subgaleal.

12      A.  Yes.

13      Q.  So that very well could have been a fresh injury,

14   correct?

15             MS. PECK:  Objection.

16             THE WITNESS:  No.  It was an older injury

17   because it already turned green.

18      Q.  That's where you get the between five days or so

19   and two and three weeks, correct?

20      A.  Yes.

21      Q.  But it also could have been a rebleed of an even

22   older injury, correct?

23      A.  No.  The rebleeding phenomena, when it's
```

```
 1            (Michael Sikirica - by Mr.  Klein)

 2   described, occurs in subdural hematomas, not in

 3   subgaleal hematomas.

 4     Q.  So, when you said you would estimate at least

 5   five to seven days, a better answer would have been at

 6   least five to seven days, but possibly more, you're not

 7   sure.

 8            MS. PECK:  Object to the form.

 9            MR. PERKINS:  Objection.

10            THE WITNESS:  Correct.

11   BY MR. KLEIN:

12     Q.  That answer wasn't completely accurate?

13            MS. PECK:  Objection to form.

14            THE WITNESS:  Well, I just said it was at

15   least five to seven days.  I don't think that I had to

16   clarify it.  Nobody asked me to bracket it any further

17   than that.

18     Q.  Then you said that there was evidence of subdural

19   hematoma, but you knew when you went to the grand jury

20   that it was evidence of subdural fluid collection,

21   correct?

22            MS. PECK:  Objection.

23            THE WITNESS:  Well, at the time of the grand
```

Case 1:17-cv-00626-DJS Document 44-3 Filed 06/14/21 Page 123 of 442

1              (Michael Sikirica - by Mr. Klein)

2     jury I was able to see that it was, in fact, a hematoma.

3     BY MR. KLEIN:

4        Q.  Because it was after the autopsy?

5        A.  Yes.

6        Q.  How long after the autopsy did you testify?

7            Was it later that same day or the next day?

8        A.  I believe it might have been the very next day or

9     so.

10       Q.  So, based on your exam at autopsy, you testified

11    in the grand jury that it was a subdural hematoma

12    notwithstanding the report that said subdural fluid

13    collection?

14            MS. PECK:  Objection.

15            THE WITNESS:  Correct.

16            MS. PECK:  Can we just clarify, because I

17    know you don't have the first page on the grand jury,

18    but the date on the grand jury testimony, if the caption

19    had been printed, was September 26, 2008.

20    BY MR. KLEIN:

21       Q.  So, based on that, is it fair to say that that

22    would -- would that refresh your recollection that your

23    grand jury was given the day after the autopsy was

1          (Michael Sikirica - by Mr. Klein)

2    conducted?

3    A.  I believe I did the autopsy on the 25th.

4    Q.  And the grand jury was the 26th?

5    A.  26th, yes.

6    Q.  Now, on page 16 you say, in sum and substance,

7    that the injuries were consistent with the baby being

8    slammed on a mattress and consistent with a head hitting

9    a hard surface railing or crib.

10         Do you recall that generally?

11   A.  Where on page 16?  Point that out.

12   Q.  I'm just representing to you --

13         MR. PERKINS:  Line 19.

14   A.  Yes.  It is consistent with the baby being

15   slammed down on a mattress, yes.

16   Q.  In light of Mr. Thomas' confession being found as

17   a matter of law to be a coerced, false confession, you

18   would not give that same testimony today, would you?

19         MS. PECK:  Objection.

20         THE WITNESS:  Well, if they gave me a

21   question to speculate on, or use my hypotheses or

22   theory, and they presented this as a theory could it

23   have been due to being slammed on a mattress, even if I

```
1              (Michael Sikirica - by Mr.  Klein)
2    didn't know or was aware that there was a confession of
3    a mattress, I would have said it's consistent.
4    BY MR. KLEIN:
5       Q.  Was it consistent with any nontraumatic cause of
6    death?
7       A.  No.
8       Q.  Not at all?
9       A.  No.
10      Q.  And the sepsis, as of the date of your grand jury
11   testimony or any time thereafter, didn't become an
12   increased factor on the list of causes of death?
13      A.  No.
14      Q.  Never crossed your mind that that might be the
15   primary cause of death.
16      A.  It crossed my mind, but I ruled that out.
17      Q.  When did you rule it out, when you did the report
18   the following spring?
19      A.  When I did the microscopic examination and was
20   able to sit down and look at everything, yes.
21      Q.  Do you know if you knew that the labs came back
22   as streptococcal pneumoniae on the 25th when you
23   testified in the grand jury on the 26th?
```

Case 1:17-cv-00626-DJS Document 44-2 Filed 06/14/21 Page 125 of 442

1              (Michael Sikirica - by Mr. Klein)

2      A.  I didn't know at that time.  I don't know if I

3  was aware.

4      Q.  You don't know or to the best of your knowledge

5  you weren't aware?

6      A.  I don't recall if I was aware or not.

7      Q.  If you wouldn't have gotten those records until

8  you got the Samaritan records, more likely than not you

9  wouldn't have been aware that next day, correct?

10     A.  Correct.

11     Q.  You say in your testimony that this could not

12  have been an accidental fall from a crib.

13          What did you mean by that, that it had to have

14  been -- he had to have fallen with some force?

15     A.  Yes.

16     Q.  Well, could a baby have fallen off a bed on his

17  own and that would not have been caused by another

18  person?

19     A.  Yes.  Babies can roll at that point in time.

20     Q.  In this case, were you aware that there were

21  several other children in the home?

22     A.  Yes.

23     Q.  Could there have been injuries to the head from

Case 1:17-cv-00626-DJS Document 44-2 Filed 08/14/21 Page 126 of 442

1          (Michael Sikirica - by Mr. Klein)

2    hitting the infant child with a toy or other objects by

3    other kids that could have caused the trauma that you

4    attribute to the death?

5          MS. PECK:  Objection.

6          THE WITNESS:  There could have been other

7    sources for the trauma to the head, yes.

8    BY MR. KLEIN:

9       Q.  Do you have any knowledge, other than the

10   statement attributed to Adrian Thomas, that he had any

11   connection with any trauma to the child?

12      A.  No.

13      Q.  You don't know who caused this death.

14      A.  Without the statement, I would not know.

15      Q.  So sitting here today, do you know who caused his

16   death from your investigation?

17      A.  Yes.

18      Q.  Who is that?

19      A.  That would have been Adrian Thomas.

20      Q.  You've learned that the statement was deemed to

21   be a coerced, false confession, right?

22      A.  That is the definition that you're using.  Yes.

23      Q.  Well, that's what the court said.

```
 1              (Michael Sikirica - by Mr.  Klein)
 2         So, assuming the highest court of New York State
 3    said that, and he denies all of this, and the wife --
 4    you're aware that Ms. Hicks denied that there was trauma
 5    inflicted by Mr. Thomas to the child.
 6         Are you aware of that as well?
 7              MS. PECK:  Objection.
 8              MR. PERKINS:  Objection.
 9              MS. CALABRESE:  Objection.
10              THE WITNESS:  I was aware that Mrs. Hicks
11    lied repeatedly to many people who interviewed her.
12    BY MR. KLEIN:
13      Q.  So, she was not a reliable informant?
14      A.  No.
15      Q.  You're still crediting his statements even though
16    you've been informed that they've been found to have
17    been false and coerced?
18              MR. PERKINS:  Object to the form.
19              MS. PECK:  Objection.
20              THE WITNESS:  I'm not necessarily aware that
21    they're false.  If they're coerced that doesn't
22    necessarily mean they're false to me.  I'm still looking
23    at his statement and I'm saying that it made perfect
```

Case 1:17-cv-00626-DJS Document 84-14 2021-T Filed 06/14/21 Page 128 of 442

1          (Michael Sikirica - by Mr.  Klein)

2    sense about pattern of injury that the child had.  So

3    whether -- how it was obtained was irrelevant to me.

4    BY MR. KLEIN:

5        Q.  Well, without his statements, how would this

6    child have sustained the injuries that you attribute to

7    his death?

8        A.  From blunt force trauma.

9        Q.  Can you be more specific?  Is this just regard to

10   the one subdural hematoma that you observed?  Is that

11   the blow, the site of the blow that caused the death?

12             MS. PECK:  Objection.

13             THE WITNESS:  Yes.

14       Q.  And that's the one on the right side.

15       A.  Correct.

16       Q.  You didn't see one on the left side.

17       A.  Correct.

18       Q.  So, other than the subdural hematoma on the right

19   side as the site of a traumatic blow of some sort that

20   caused the death, is there any other location on the

21   brain that was the subject of the trauma that lead to

22   death or is it just that one spot?

23       A.  Well, the subgaleal hemorrhage doesn't

```
 1              (Michael Sikirica - by Mr.  Klein)
 2   necessarily have to occur at the site of trauma.  It
 3   could be actually on the opposite side of trauma.  It's
 4   not mappable in a sense that you can say that the injury
 5   occurred right there.
 6       Q.   The subgaleal hemorrhage.
 7       A.   The subdural hemorrhage I'm referring to.
 8       Q.   Okay.
 9       A.   The subgaleal hemorrhages are different because
10   they are actually indicators of the point of impact.
11       Q.   So, there's one point of impact that you're
12   relying on in this case that lead to ultimately
13   Matthew's death, correct?
14       A.   There could be more than one, yes.
15       Q.   Well, one that you saw.
16       A.   Yes.
17       Q.   You didn't see any others?
18       A.   Correct.
19       Q.   In your experience, what other mechanisms or
20   causes of the injury could there be for the subdural
21   hematoma that you observed at autopsy if you take Adrian
22   Thomas' conduct out of this?
23              MR. PERKINS:  Object to the form.
```

Case 1:17-cv-00626-DJS Document 84-14 2021 Filed 06/14/21 Page 180 of 442

```
 1              (Michael Sikirica - by Mr.  Klein)

 2              MS. PECK:  Objection.

 3              THE WITNESS:  I'm not quite sure I

 4   understand the question, if you could kind of repeat it

 5   in a different manner.

 6   BY MR. KLEIN:

 7      Q.  Sure.  There's no statement whatsoever, pretend

 8   it doesn't exist, from Adrian Thomas?

 9      A.  Yes.

10      Q.  There is a child who presented, as Matthew did,

11   at Samaritan, then presented to Albany, who then ended

12   up on your table.

13      A.  Yes.

14      Q.  Given everything you knew, minus Adrian Thomas'

15   statement and what the detectives told you that he told

16   them --

17      A.  Yes.

18      Q.  -- what if any findings would you have made that

19   could have caused this death to a degree of certainty?

20      A.  Well, the cause of death is still going to be

21   closed head injury with severe cerebral edema due to

22   blunt force trauma.  That would be the cause of death.

23   The mechanism I would not know.
```

1          (Michael Sikirica - by Mr. Klein)

2     Q.  So would you have said inconclusive or unknown?

3     A.  Without explanation I would call it homicide.

4          If somebody were to give me a reasonable

5     explanation for what happened, reasonable explanation,

6     perhaps with witnesses, and a mechanism that would

7     explain it, I may change the diagnosis, but I had no

8     such thing.

9     Q.  The subdural hematoma that you saw on the right

10    side, is that the type of subdural fluid collection or

11    hematoma that could be present as a result of delivery

12    or birth?

13    A.  No.

14    Q.  In the grand jury you said that there were no

15    indentations on the skull to suggest a cause of an

16    injury other than from a mattress.

17         Do you remember saying that, words to that

18    effect?

19              MS. PECK:  Do you have a page?

20              MR. KLEIN:  18, but I'm just asking him

21    generally do you recall it.

22              MS. CALABRESE:  What line?

23              MR. PERKINS:  18.

1          (Michael Sikirica - by Mr. Klein)

2          THE WITNESS: Yes. What I -- that was a

3 question from the juror, and that was a question that I

4 interpreted to mean, did you see any pattern injury that

5 something had struck Matthew, or something had been --

6 Matthew had struck, that would leave a specific mark on

7 his skull or his brain, and I said no.

8 BY MR. KLEIN:

9     Q. But you didn't know at that point about the

10 positive strep findings, correct?

11    A. Correct.

12    Q. The positive strep, streptococcal pneumoniae,

13 could have been a cause of the subdural fluid

14 collection; isn't that true?

15    A. It could cause meningitis and that can cause a

16 subdural fluid accumulation, but it won't cause a

17 subdural hematoma.

18    Q. The subdural hematoma, did you photograph that in

19 this case?

20    A. Yes.

21    Q. I'm going to ask that you show that to us in a

22 few minutes.

23         What are the other causes of subdural hematomas

```
 1             (Michael Sikirica - by Mr.  Klein)

 2  like the one you saw in this case other than a physical

 3  trauma?

 4             MR. PERKINS:  Object to form.

 5             THE WITNESS:  There could be a subdural

 6  hematoma from a stroke.  Rupture of a vessel could lead

 7  to that.

 8  BY MR. KLEIN:

 9    Q.  Could that be a result of intracranial pressure?

10    A.  No.  No.  The stroke could be a result of

11  intracranial pressure, yes, but that would be seen in

12  more of an adult situation where a person has a very

13  large hemorrhage in his brain and it bursts into the

14  subdural space.  That would be one cause of subdural

15  hematoma.

16    Q.  There was a buildup of fluid in Matthew's brain,

17  correct?

18    A.  Yes.  In the brain itself, yes, but there was no

19  discrete hemorrhage in his brain.  His hemorrhage was in

20  the subdural space.

21    Q.  Do you know whether it collected there, you know,

22  or was displaced to that area, the subdural space?

23    A.  It had collected there and displaced the brain.
```

```
 1          (Michael Sikirica - by Mr.  Klein)
 2    It pushed the brain.
 3       Q.  But it could have emanated from the brain,
 4    correct?
 5       A.  Not in this case.
 6       Q.  How do you know?
 7       A.  Because I saw nothing when I sectioned the brain
 8    indicating that there was any hemorrhage in the brain
 9    itself.  So, it did not hemorrhage outside the brain
10    into the subdural space.  It was blood that accumulated
11    in that subdural space and then pushed on the brain and
12    caused swelling of the brain.
13       Q.  Now, in your testimony you talk about the older
14    event -- which was the greenest discoloration?
15       A.  Yes.
16       Q.  Probably at least five to seven days old, which
17    you now say maybe more than that, correct?
18       A.  Yes.
19       Q.  Then there was a newer, fresher stuff -- you used
20    that word stuff -- probably that occurred around the
21    time that he came to Samaritan.
22          Do you recall that?
23       A.  Yes.
```

1          (Michael Sikirica - by Mr. Klein)

2     Q.  You say you're not sure of damage from the first

3   event, but there were two events of blunt force trauma

4   to the head.

5          What did you mean that you were not sure of the

6   damage from the first event?

7     A.  Could I see that.

8     Q.  Page 20, line 8.

9     A.  Yes.  That indicating that that first event may

10  have caused a subdural hematoma by itself, and now the

11  older event may have caused a subdural hematoma, but the

12  fresher subgaleal hemorrhage would be the one that's

13  consistent with the recent subdural hematoma.

14    Q.  The subgaleal hemorrhage could also be consistent

15  with nontraumatic injuries as well, correct?

16    A.  Well, the subgaleal hemorrhage is always due to

17  trauma of some sort.  There was no explanation for

18  subgaleal hemorrhage other than trauma of some sort.

19    Q.  Well, but the trauma could be, as we discussed

20  earlier, after a vacuum assisted birth, correct?

21    A.  You can see a subgaleal hemorrhage after a vacuum

22  assisted birth, but I would not see it in a four and a

23  half month old child at that point.

Case 1:17-cv-00626-DJS Document 94-12 Filed 06/14/21 Page 136 of 442

1          (Michael Sikirica - by Mr.  Klein)

2     Q.   Could be after a forceps assisted birth as well,

3   correct?

4     A.   Again, but it would have resolved by that time.

5     Q.   I've seen literature that says they could occur

6   spontaneously and can be further compromised by DIC,

7   which Matthew had, right?

8          Matthew had DIC?

9              MS. PECK:  Objection.

10             THE WITNESS:  Matthew had some indications

11  of DIC later in his hospital stay.

12             MS. CALABRESE:  Can you define DIC for the

13  record.

14             MR. KLEIN:  What is DIC?

15             THE WITNESS:  Disseminated intravascular

16  coagulopathy.

17  BY MR. KLEIN:

18    Q.   So, explain for the record what extent or

19  evidence of DIC you saw in Matthew or you became aware

20  of.

21    A.   Well, when Matthew first came into Samaritan, his

22  platelets were reduced.  They were 115,000 at Samaritan.

23  Normally they should be over 150 in a child.

1                (Michael Sikirica - by Mr. Klein)

2        His clotting factors were also somewhat abnormal,

3 but still within a range that he should be able to clot

4 his blood correctly.

5        So, there was no evidence of a significant DIC

6 when he first arrived, but by the time he was in

7 extremis, there was indications that his platelets had

8 fallen precipitously, he had required platelet

9 transfusions, and his clotting times had also increased,

10 requiring that he receive fresh, frozen plasma.

11        But these events were downstream considerably

12 from the time of his presentation.

13  Q.  Well, do you agree that subgaleal hemorrhages can

14 occur spontaneously in addition to from trauma?

15         MS. PECK:  Objection.

16         THE WITNESS:  I would not agree with that

17 without trauma.

18 BY MR. KLEIN:

19  Q.  Do you agree that subgaleal hemorrhages can be

20 further compromised by DIC?

21  A.  Yes.

22  Q.  The DIC in this case was evidenced in the

23 testicle, the heart, the brain.  There was hemorrhaging

1         (Michael Sikirica - by Mr. Klein)

2  and bleeding in different organs, correct?

3     A.   That could be associated with the DIC or just the

4  global anoxia, the lack of oxygen to the tissues,

5  because of the pneumonia and the state of his health.

6     Q.   Right, but do you know which it's more consistent

7  with?

8     A.   Which one is what?

9     Q.   Anoxia or DIC.

10    A.   I would say more consistent with anoxia.

11    Q.   Based on what?

12    A.   Based on my experience.  I've seen many people

13  dying from a variety of causes, including homicides,

14  stab wounds.  When they make it to the hospital and live

15  for several hours, they will develop a subendocardial

16  infarction of the heart.  That's because they lost so

17  much blood.  There's no oxygen left in their blood

18  because they've lost so much, and they develop this

19  anoxic change.

20    Q.   So, based on your grand jury testimony, there was

21  an older event, five to seven days or more, and then a

22  newer, fresher event closer to the time he came to

23  Samaritan, correct?

Case 1:17-cv-00626-DJS Document 84-14/2021 Filed 06/14/21 Page 189 of 442

1                   (Michael Sikirica - by Mr. Klein)

2        A.   Yes.

3        Q.   But there was no outward evidence of any blunt

4   force in this case, correct?

5        A.   Correct.

6        Q.   Typically, you would expect to see some bump or

7   bruising or something on the outer skin; isn't that

8   right?

9                   MS. PECK:  Objection to form.

10                  THE WITNESS:  No.  In children, you often

11  don't because the skull is so malleable, it's still

12  pretty flexible so it can bend.  You may simply see the

13  bruising under the scalp.  You may not see anything

14  externally on the infant.  It's a phenomenon that most

15  forensic pathologists are aware of.

16  BY MR. KLEIN:

17       Q.   Now, there was talk about the organ donation at

18  the grand jury.

19            That was cleared on September 23rd by you,

20  correct?

21       A.   Yes.

22       Q.   That was before you got the labs back confirming

23  the streptococcal pneumoniae, correct?

Case 1:17-cv-00626-DJS Document 84-12 Filed 06/14/21 Page 140 of 442

1    (Michael Sikirica - by Mr. Klein)

2  A. Correct.

3  Q. You were asked earlier about standards for organ

4 harvesting. Had you known about the streptococcal

5 pneumoniae, would you have authorized the harvesting of

6 the organs?

7  A. Well, I don't make the call about the viability

8 of the organs. That's done by the heart or donation

9 team. That's a clinical judgment that they have to

10 make.

11  When I restrict an autopsy it's due to the fact

12 that there may be some forensic aspect of the case that

13 would be disturbed by the donation. So, it's up to the

14 donation people to really make that call, and not

15 myself.

16  Q. Well, there was an initial differential diagnosis

17 of septic shock, right?

18  A. Yes.

19  Q. Would that have impacted your determination or

20 authority to clear the organs for donation?

21  A. No.

22  Q. Do you know if the recipient physicians were

23 aware of the septic shock differential diagnosis?

1                (Michael Sikirica - by Mr.  Klein)

2       A.  Yes, they would be.

3                MR. KLEIN:  Now I'm going to mark as Thomas

4    5 your 2009 trial testimony.

5                (Thomas Exhibit 5 marked for

6    identification.)

7       Q.  This is testimony that's been produced in

8    discovery, marked with Bates numbers P4955 through

9    P45594.  I'll represent to you that, to my knowledge,

10   this is the entirety of your 2009 testimony.

11          Just flip through it and let me know if you've

12   had a chance to review that testimony before testifying

13   today.

14      A.  Yes.

15      Q.  Did you review it in the past few days or week?

16      A.  Last few weeks, yeah.

17      Q.  Is there anything in your 2009 trial testimony

18   that you recall that you testified to that you would

19   change, clarify or otherwise wish to explain on the

20   record today?

21      A.  Not that I can recall at this point.

22      Q.  Was everything that you said at trial true and

23   correct?

1           (Michael Sikirica - by Mr. Klein)

2     A.   To the best of my recollection.

3              (Recess taken.)

4   BY MR. KLEIN:

5     Q.   Take a look at Exhibit 5, which is your 2009

6   testimony.  When you've had a chance to flip through it,

7   let me know.

8     A.   Okay.

9     Q.   Does that appear to be the testimony from your

10  2009 trial that you reviewed --

11    A.   Yes.

12    Q.   -- recently?

13         Did you testify truthfully and accurately as to

14  all matters in that trial?

15    A.   Yeah.

16    Q.   Is there anything that, given the passage of

17  time, changes in medicine, changes in facts that you've

18  learned, that you wish to change, correct or amend in

19  that testimony?

20    A.   Not to my recollection.

21              (Thomas Exhibit 6 marked for

22  identification.)

23    Q.   Then I'm going to show you what's been marked as

```
 1              (Michael Sikirica - by Mr.  Klein)

 2    Thomas Exhibit 6.  Same questions.  When you have had a

 3    chance to review that, let me know.

 4       A.  Yes.  Thomas Number 6 is the transcript of my

 5    2014 testimony.

 6       Q.  Was everything that you said at that trial true

 7    and correct?

 8       A.  Best of my recollection.

 9       Q.  Anything from 2014 that stands out that you wish

10    to change, clarify or correct for the record?

11       A.  Not to my recollection.

12       Q.  So, with regard to the autopsy here, you did not

13    review the Samaritan records from Matthew's visit to

14    Samaritan Hospital from several days before the events

15    leading to his death.

16          He was there on September 13th.  You didn't

17    review those records.

18       A.  Not at the time of the autopsy.

19       Q.  Did you ever look at them after?

20       A.  Yes.

21       Q.  Are they in your file?  You have his full record

22    from Samaritan?

23       A.  Yes.
```

1        (Michael Sikirica - by Mr. Klein)

2    Q.  Did that impact any of your opinions?

3    A.  No.

4    Q.  You would agree that babies can experience

5  intracranial bleeding during a vaginal birth.

6    A.  Yes.

7    Q.  Pregnancy complications increase the risk of

8  intracranial bleeding especially during a vaginal birth,

9  correct?

10   A.  Yes.

11   Q.  A birth complication can increase the risk of an

12  intracranial bleed, correct?

13   A.  Yes.

14   Q.  Preeclampsia is a pregnancy complication,

15  correct?

16   A.  Yes.

17   Q.  Did you confirm at some point that Ms. Hicks had

18  preeclampsia?

19   A.  Yes.

20   Q.  Did that factor into any of your opinions at all,

21  or just that related to infection which in your view was

22  not a cause of death here?

23   A.  The preeclampsia did not explain the subdural

```
 1            (Michael Sikirica - by Mr.  Klein)

 2   hematoma in Matthew, yes.

 3       Q.  So, what significance, if any, did that have?  Is

 4   that just a predisposing factor to the pneumococcal

 5   pneumonia that contributed to the sepsis which

 6   contributed to the death?

 7       A.  No.  I don't think it had any relationship based

 8   on the time interval between death and birth in this

 9   case.

10       Q.  Preeclampsia is hypertension accompanying the

11   pregnancy that creates a risk to the mother and the

12   infant, correct?

13       A.  Yes.

14       Q.  Premature rupture of membranes is a complication,

15   correct?

16       A.  Yes.

17       Q.  Did you confirm that Ms. Hicks had premature

18   rupture of the membranes as well?

19       A.  Yes.

20       Q.  Did that have any significance to you, your

21   findings in this case?

22       A.  No.

23       Q.  There was a pregnancy of twins, twin births here.
```

```
 1              (Michael Sikirica - by Mr.  Klein)

 2      A.   Right.

 3      Q.   That's also considered a complication, correct?

 4      A.   I'm not sure it would be considered a -- it would

 5  be an unusual pregnancy being a twin, but I'm not sure

 6  if it's considered a complication unless it was related

 7  to prematurity.

 8      Q.   Did that have any impact on your decisions in

 9  this case?

10      A.   No.

11      Q.   There was a prolonged labor for the twins.

12           Did you come to learn that?

13      A.   Yes.

14      Q.   Is that a complication of -- a pregnancy

15  complication?

16      A.   Yes, it can be.

17      Q.   Did that factor into any of your findings or

18  opinions in this case?

19      A.   No.

20      Q.   A breach is a complication, correct?

21      A.   Yes.

22      Q.   And use of forceps is a complication, correct?

23      A.   Yes.
```

Case 1:17-cv-00626-DJS Document 94-1 Filed 06/14/21 Page 147 of 442

```
 1              (Michael Sikirica - by Mr.  Klein)

 2      Q.  Is it your understanding that there was both a

 3  breach and use of forceps in the births in this case?

 4      A.  In terms of Matthew, twin A, yes.

 5      Q.  Did those complications, breach and use of

 6  forceps, factor into your findings and opinions in any

 7  way?

 8      A.  No.

 9      Q.  Use of forceps is something that could cause an

10  SGH, correct?

11      A.  No.  SGH is subgaleal hemorrhage.

12      Q.  Yeah.

13      A.  Yes, it could.

14      Q.  In your view that was absolutely not a cause of

15  it in this case or it was low probability.

16      A.  It would not have been causative in this case.

17      Q.  How do you know?

18      A.  Because the timing interval here.  Matthew, when

19  he died, was four and a half months old.  Any kind of

20  subgaleal hemorrhage would have been long gone by that

21  time.

22      Q.  There was mention of pulmonary stenosis -- which

23  is a congenital complication, correct?
```

(Michael Sikirica - by Mr. Klein)

A.  Yes.

Q.  Is there any significance to pulmonary stenosis in this case?

A.  No.  He was described as having trivalvular pulmonary stenosis.  I don't even know what that means.  I looked at his pulmonary valve.  It looked totally fine.  It was an echo radiographic diagnosis.

I'm not familiar with the term.  It doesn't even make sense to me, the term.  So, I didn't find any complications in his pulmonic valve.

Q.  Did you confirm that or come to learn that Ms. Hicks was considered morbidly obese during the pregnancy?

A.  I knew that she was overweight, but I didn't know the term morbid.

Q.  That would be a complication, correct?

A.  Could be.

Q.  Did that fact impact your findings or opinions in any way?

A.  No.

Q.  Would you agree that premature babies have lower immunity because they have less time to get the full

```
1              (Michael Sikirica - by Mr.  Klein)

2   antibodies from the mother?

3      A.  Yes.

4      Q.  So, Matthew was more vulnerable to infection

5   overwhelming his entire system and potentially killing

6   him, correct, as a premie?

7              MS. PECK:  Objection.

8              THE WITNESS:  He may have been, yes.

9   BY MR. KLEIN:

10     Q.  You were aware that Matthew had his first shot

11  but was not eligible at the time of his death for the

12  second dose, correct, of the vaccine?

13     A.  Well, I knew he had his first shot and he would

14  have been in the time frame to get his second shot at

15  four months, but I don't think he received the second

16  shot.

17     Q.  Would you agree, based on your extensive

18  experience, that one dose of that vaccine is not

19  sufficient to fight off a very strong streptococcal

20  pneumonia infection?

21     A.  Yes.

22     Q.  The vaccines work in a -- how would you describe

23  that -- successive way?  They build on each other,
```

Case 1:17-cv-00626-DJS Document 94-14 2021 Filed 06/14/21 Page 150 of 442

1        (Michael Sikirica - by Mr.  Klein)

2    correct?

3        A.   They're cumulative.

4        Q.   Now, the organs that were donated could have been

5    infected by the streptococcal pneumoniae, correct?

6        A.   Yes.

7        Q.   They also could have been okay because Matthew

8    was given high doses of medication, like antibiotics, in

9    the ER, correct?

10       A.   He was started in the ER and continued, yes.

11       Q.   So there was a possibility of a likelihood that

12   that could have protected those organs.

13            MS. PECK:  Objection.

14            THE WITNESS:  To some degree, yes.

15   BY MR. KLEIN:

16       Q.   Did you ever learn how those transplants resolved

17   over time?  Were they rejected?

18       A.   To the best of my knowledge, at the time of the

19   testimony I gave, they were transplanted successfully

20   without rejection.

21       Q.   In 2009, but did you ever follow up after 2009?

22       A.   No.

23       Q.   Now, in terms of doing your report several months

```
 1              (Michael Sikirica - by Mr.  Klein)

 2    later, you said you could have done it within a month

 3    theoretically but you were very busy, correct?

 4              MS. PECK:  Objection.

 5              THE WITNESS:  Well, I could have done the

 6    brain cutting within a month, but I did not get to the

 7    brain cutting for months afterwards.

 8    BY MR. KLEIN:

 9      Q.  Is there anything in the file that documents the

10    date of the brain cutting?

11      A.  It would have been in -- not in the autopsy

12    report, but it is in my file.  And I believe the brain

13    cutting, if I have notes here, was done February 26th.

14      Q.  Now, in terms of -- I think you said a couple

15    times you had a very busy schedule and that's a

16    contributing reason of why it took so long to get to the

17    report, correct?

18      A.  Yes.

19      Q.  So, are there standards with regard to how many

20    autopsies a medical examiner should conduct within a

21    year?  Is it something like 250 per year?

22              MS. PECK:  Objection.

23              THE WITNESS:  Well, there are standards for
```

1          (Michael Sikirica - by Mr.  Klein)

2     facilities.  There are no standards for medical

3     examiners personally.

4     BY MR. KLEIN:

5          Q.  What is a facility and how is that different from

6     a medical examiner personally?

7          A.  A facility would be a government institution that

8     is a center of medical examiners system.  So, the

9     facility would involve multiple medical examiners,

10    staff, secretarial staff, administrative staff, and the

11    National Association of Medical Examiners has guidelines

12    for the facility to maintain its accreditation.

13         And for the accreditation they don't want a

14    pathologist to do more than 250, but doesn't prevent a

15    pathologist from going out and doing as many as he

16    wants.  It just may mean that the pathologists in that

17    facility should not do more than 250 to maintain the

18    accreditation.

19         The pathologist is free to go out and testify as

20    much as he wants for the defense, or to do consulting

21    work or whatever, but there's no personal number that

22    they ascribe to being too many.

23         Q.  How many did you do a year in 2008?

Case 1:17-cv-00626-DJS Document 142-2 Filed 06/14/21 Page 153 of 442

1        (Michael Sikirica - by Mr. Klein)

2   A.  I would say in the range of 600.

3   Q.  So that would be, just by sheer math which I'm

4  not good at, almost two a day every day of the year.

5   A.  Yes.

6   Q.  And they take two or three hours each.

7   A.  Correct.

8   Q.  That's just to do the actual autopsy procedure,

9  correct?

10   A.  Yes.

11   Q.  You may do cutting and other examination of

12  organs later on like you did in this case?

13   A.  Well, the neuropathology examination would be a

14  rarity.  I probably only do five to ten or less brain

15  examinations.

16   Q.  Then you do your report, which must take how

17  long, an hour or two?

18   A.  An hour or two.

19   Q.  So, how many have you done in the 11 -- in the 10

20  years since 2008?

21       Approximately 500 a year give or take?

22   A.  500 to 600 a year.  Yes.

23   Q.  How do you fit that into your schedule?

Case 1:17-cv-00626-DJS Document 84-14 2021 Filed 06/14/21 Page 154 of 442

1          (Michael Sikirica - by Mr.  Klein)

2     A.  Well, my situation is a little bit unique.  I

3  have an office which I maintain in Waterford, New York.

4  I have an apartment in the office, so I'm able to work

5  any hours I choose.  I have no family to deal with.  I

6  have no children, no wife, so I'm free to really

7  concentrate on my work more so than the vast majority of

8  other pathologists in my profession.

9     Q.  Your testimony is you're working all the time and

10  you have very little distraction --

11          MS. PECK:  Objection.

12     Q.  -- outside distraction so you're able to handle

13  the load?

14     A.  Yes.

15     Q.  Has the number of cases that you take on impacted

16  the results in your work, in your experience?

17     A.  The impact in my work has been delaying getting

18  the cases out.  It hasn't impacted the quality of my

19  workmanship.  Simply taking more time to get them done.

20     Q.  Are there any cases in the last ten years where

21  you simply got it wrong?  You learned after the fact

22  that you got it wrong either because you relied on the

23  police mistakenly, or some medical professionals, or for

Case 1:17-cv-00626-DJS Document 94-12 2021 Filed 06/14/21 Page 153 of 442

```
 1              (Michael Sikirica - by Mr. Klein)

 2  any other reason, whether it's due to culpable mistake

 3  or inadvertent mistake, or happenstance, but have you

 4  gotten it wrong in any of these cases in your opinion?

 5              MS. PECK:  Objection to the form.

 6              MS. CALABRESE:  Objection.

 7              MR. PERKINS:  Objection.

 8              THE WITNESS:  Well, I won't say wrong.

 9  There are cases that I have probably -- there are cases

10  where I have filled out a death certificate, and then

11  later, when additional information comes in, I have to

12  go back and change the death certificate.  That occurs

13  fairly often.

14  BY MR. KLEIN:

15     Q.  Have you ever had to amend an autopsy report?

16     A.  Yes.

17     Q.  Did you ever consider amending the autopsy in

18  this case?

19     A.  No.

20     Q.  Were you ever asked by the district attorney to

21  amend the autopsy to excise Adrian Thomas' statements?

22     A.  No.

23     Q.  So, do you feel that there's any issue with your
```

```
 1           (Michael Sikirica - by Mr.  Klein)
 2    caseload, or you feel it's an appropriate caseload?
 3               MS. PECK:  Objection to form.
 4       Q.  In terms of the integrity of your work.
 5       A.  It's a very heavy caseload that most people or
 6    most physicians could not handle.  It's a heavy
 7    caseload, but there's a national shortage of forensic
 8    pathologists.  Except for Dr. Hubbard and myself, who
 9    are the only board certified in the area.
10           So, we do a large number of cases.  And that is a
11    national problem.
12       Q.  Do you take on private consulting work as well?
13       A.  No.
14       Q.  Not ever or just not...
15       A.  Very, very, very rarely.
16       Q.  When was the last time you did?
17       A.  I consulted for a district attorney in the fall
18    of last year on a case in Steuben County where it was an
19    apparent suicide that actually turned into a homicide.
20       Q.  Other than that, can you recall any others in
21    recent years?
22       A.  Another case I consulted on with a gentleman who
23    did not die, but suffered a supposed beating that was
```

Case 1:17-cv-00626-DJS Document 142-1 Filed 06/14/21 Page 157 of 442

1          (Michael Sikirica - by Mr. Klein)

2    fabricated.

3          And I consulted on a case from Michigan where a

4    young man had been found in a pond, and that was related

5    to the -- supposedly related to the smiley face killer,

6    if such a thing exists.

7      Q.   Did you testify in that case?

8      A.   No.

9      Q.   Do you investigate deaths at New York State

10   Department of Corrections and Community Supervision

11   facilities?

12     A.   Yes.

13     Q.   What are the counties that you have jurisdiction

14   over other than Rensselaer?

15     A.   I have no jurisdiction really over any county

16   except for Rensselaer, the medical examiner.  The other

17   counties, I simply work at the bequest of the coroners

18   who are elected officials.  So, I don't have

19   jurisdiction over the other counties.

20     Q.   Going back to Matthew Thomas.

21          Matthew, you would agree, had a dangerously low

22   white blood cell count when he arrived at Samaritan,

23   correct?

```
 1              (Michael Sikirica - by Mr.  Klein)

 2      A.  Correct.

 3      Q.  White blood cells are important to fight off

 4  infections, correct?

 5      A.  Yes.

 6      Q.  His white blood cell count was a thousand?

 7      A.  Correct.

 8      Q.  When a healthy child is 5,000 to 10,000, correct?

 9      A.  Yes.

10      Q.  Would you call that in extremis in terms of his

11  white blood cell count?

12      A.  Yes.

13      Q.  Was that indicative of septic shock at that

14  point?

15      A.  It could be indicative of sepsis, yes.

16      Q.  To go from sepsis to septic shock, is that

17  something that cascades in a matter of hours or does it

18  take days or weeks?

19      A.  It could occur in a matter of hours.

20      Q.  In terms of getting sepsis initially, how long

21  does that take to develop?

22      A.  Again, that can occur within a matter of hours if

23  there was a predisposing condition.
```

1          (Michael Sikirica - by Mr. Klein)

2     Q.  Correct me if I'm wrong, but the predisposing

3  condition that you cite in this case as leading to

4  sepsis is the aspiration on something that caused

5  pneumonia that lead to sepsis, correct?

6     A.  Yes.

7     Q.  Now, when you talk about aspiration, there was no

8  evidence of aspiration found on autopsy, correct?

9     A.  There was no evidence of any food aspiration,

10  correct.

11     Q.  In term of any saliva aspiration, you wouldn't

12  see that or know that, correct?

13     A.  You wouldn't detect that.

14     Q.  Would you agree that it's speculation on your

15  part that there was aspiration.

16          MS. PECK:  Objection.

17          THE WITNESS:  Well, it was speculation on my

18  part, and confirmed by the statement of Adrian Thomas

19  that after Matthew, for whatever reason, had these

20  impacts, he had difficulty breathing and was wheezing.

21  BY MR. KLEIN:

22     Q.  The detectives were on video.

23          Did you ever watch the video of the

1              (Michael Sikirica - by Mr.  Klein)

2   interrogation?

3      A.  No.

4      Q.  They were telling him certain things that doctors

5   told them, and we need to have answers.  Was he

6   wheezing, was he this.  He was thrown down like this,

7   can you show us, and so forth.

8              So my question to you is this:  If you take

9   Adrian Thomas' statement of wheezing out of the

10  equation, is your answer, yes, the fact of aspiration is

11  speculation on your report?

12     A.  It would be a reasonable speculation based on the

13  organism that was recovered.

14     Q.  But it's speculation.

15     A.  Medical speculation.  Yes.

16     Q.  What's the difference between medical speculation

17  -- it's not an opinion to a degree of medical certainty,

18  is it?

19     A.  No.

20             MS. PECK:  Objection.

21     A.  It's not.

22     Q.  It's like a hunch.

23     A.  More than a hunch.  It's looking at your entire

Case 1:17-cv-00626-DJS Document 94-14/2021 Filed 06/14/21 Page 161 of 442

1          (Michael Sikirica - by Mr.  Klein)

2   history and the medical records and coming up with a

3   conclusion that would make sense.

4      Q.  You're trying to find a mechanism that fits the

5   cause of death.

6      A.  A medical --

7      Q.  An event that lead to what you determined to be

8   the cause of death.

9      A.  Yes.  That's true, yes.

10     Q.  Without there being aspiration, can you think of

11  anything else, given Matthew's presentation and

12  everything you know about his condition and his

13  infections and all of that, that could have caused the

14  sepsis?

15     A.  No.  There was no other reason for him to have

16  sepsis.  There was no infection in his intestines.

17  There was no infection other than that in the lungs.

18  When he came into Samaritan Hospital, they described him

19  having copious green secretions which are consistent

20  with pneumonia and bronchopneumonia that was documented

21  in his medical records.

22          There was no reason for him to have any source of

23  sepsis except due to a lung source.

1      (Michael Sikirica - by Mr. Klein)

2    Q.  Well, the lung source could be this airway based

3  pneumococcal bacterial pneumonia, correct?

4    A.  Yes.

5    Q.  So, that's a non-aspiration based cause of that,

6  correct?

7    A.  That could be caused, yes, by aspiration, or it

8  could be a natural cause.

9    Q.  Right.

10    A.  Yes.

11    Q.  So, that would be another cause other than

12  aspiration.

13    A.  Yes.

14    Q.  Of his condition.

15    A.  Correct.

16    Q.  And would you say that that cause is, in your

17  mind, equally a cause of Matthew's death as this

18  medically speculated aspiration, could be one or the

19  other?

20      MS. PECK:  Objection.

21    Q.  Given Adrian's statement you went with the

22  aspiration.

23    A.  Given the findings that Matthew had head trauma,

```
 1              (Michael Sikirica - by Mr.  Klein)
 2   I would expect him to be very prone to aspiration.  And
 3   any repeated head trauma would increase his chance of
 4   aspiration.
 5         Aspiration is very common when people have loss
 6   of consciousness or head trauma when they swallow their
 7   own secretions.
 8      Q.   There was no reported loss of consciousness in
 9   this case, right?
10      A.   When he came into the hospital he was
11   unconscious.
12      Q.   The trauma would have preceded that.
13      A.   The trauma would have preceded loss of
14   consciousness, yes.
15      Q.   So, that wouldn't have been a factor -- his loss
16   of consciousness when he woke up in the morning, he
17   already had signs of sepsis when he got to the hospital,
18   correct?
19      A.   He had blood cultures positive for sepsis.  He
20   had a low white count, yes.  And he never woke up in the
21   morning because he was never responsive in the morning.
22      Q.   So this had to have been brewing in his system
23   for a few days, correct?
```

```
1          (Michael Sikirica - by Mr.  Klein)

2     A.   It could have been, yes.

3     Q.   Now, when you say there were no bacteria found in

4  his intestines, did you ever gram stain the intestines?

5     A.   Well, I never said there were no bacteria.  I

6  said there was no source of the sepsis.  There was no

7  ulcerations.  There was no abscess.  There was no

8  obvious infection anywhere in his body except for the

9  lungs.

10    Q.   Well, there was the coagulopathy which could be

11 consistent with the sepsis manifesting itself that way,

12 correct?

13          MS. PECK:  Objection to form.

14          THE WITNESS:  Yes.  The coagulopathy could

15 be secondary to sepsis, but it wasn't obvious from the

16 hospital testing when he came in that there was a

17 serious coagulopathy.

18 BY MR. KLEIN:

19    Q.   But whether it's obvious or not, looking back at

20 this case, there were signs of sepsis throughout his

21 system, including his testicles, his heart, his brain,

22 correct?

23          MS. PECK:  Objection.
```

1          (Michael Sikirica - by Mr. Klein)

2          THE WITNESS: Well, there were signs of

3  either coagulopathy or anoxia in the heart or the

4  testes.

5    Q. So, taking Adrian's statement out of the equation

6  that he heard wheezing, how would you weigh those out on

7  a scale anoxia -- that this is anoxia versus sepsis?

8    A. I would say that it's more likely anoxia because

9  of the respiratory problems he was having with

10  pneumonia, the lack of oxygen getting into his blood,

11  and that is a good cause of the hemorrhage in his heart

12  and hemorrhage in his testicles.

13    Q. Would your opinion be different if you knew that

14  that infection was brewing in his bloodstream and in his

15  brain, given, for example, the layers of blood in his

16  brain, for weeks or months?

17    A. I don't understand the question. If you could

18  rephrase that, please.

19    Q. There were layers of blood in his brain that were

20  seen on --

21    A. Yes, there were two layers, yes.

22    Q. And the older -- there was one layer that had

23  been there for at least some period of weeks or months,

```
 1            (Michael Sikirica - by Mr.  Klein)
 2    correct?
 3        A.   Correct.
 4        Q.   That's a sign of an infection, correct?
 5        A.   That is a sign of trauma.  That first layer of
 6    subdural hematoma is traumatic.
 7        Q.   When you say trauma, that, again, just to be
 8    clear for the record, that can be birth trauma, that
 9    could be trauma from a sibling or natural -- some other
10    cause, or it could be child abuse?
11            You don't know what trauma that caused that.
12        A.   Well, it's not natural if it's trauma.  So I
13    can't explain the source of the trauma, but I can say
14    that it's consistent with Matthew's father's statement.
15            The subdural hematoma is secondary to trauma.
16    It's not secondary to a natural event.  When you have a
17    subdural hematoma, often you become unconscious or you
18    have partial loss of consciousness, and it's very likely
19    that you're going to aspirate.
20        Q.   If you take his statement out of it, what is it
21    consistent with, if anything?
22        A.   It's consistent with nonaccidental or accidental
23    injury, but I would have to have a reason to call it an
```

Case 1:17-cv-00626-DJS Document 84-14 Filed 06/14/21 Page 162 of 442

```
 1            (Michael Sikirica - by Mr.  Klein)

 2    accident to make it an accident.

 3        Q.   Before you conducted your autopsy exam, you have

 4    a sign in sheet with the DA employees and the police

 5    officers there, correct?

 6        A.   Yes.

 7        Q.   Is there a pre-autopsy meeting where you go over

 8    with them the statement from Adrian -- because I see

 9    that's in your file -- or what transpires, what

10    communication do you have with the police about what

11    they have gathered so far?

12        A.   Well, it tends to be an informal conversation

13    that goes on at the time of the autopsy.  It's not

14    necessarily a meeting, a sit down meeting.  I will

15    basically say to them, tell me what you think you have

16    got and I will look at the medical records.  I may

17    review the statements if there are any.

18        Q.   Do you remember who you asked that to and what,

19    if anything, you were told?

20             Did you speak with Detective Mason about that?

21        A.   It would have been the detectives who I spoke

22    with.  I can't remember which one.

23        Q.   Did they tell you that we have a homicide here,
```

1          (Michael Sikirica - by Mr.  Klein)

2    we have a blunt force trauma?

3          When you met with them Mr. Thomas had already

4    been arraigned in court, correct?

5      A.  Yes.  Yes.

6      Q.  So they already went on record and had given

7    their ten-page statement that they obtained and gave you

8    a copy of it, right?

9      A.  Yes.

10     Q.  So they told you that this guy's being charged

11   with attempted murder.  Now that the baby is dead he's

12   going to be upgraded to homicide, correct?

13             MS. PECK:  Objection.

14             THE WITNESS:  I don't know if they said

15   that.

16   BY MR. KLEIN:

17     Q.  Was there any chance that you were going to find

18   that this was not a homicide given the statement?

19             MS. PECK:  Objection.

20             THE WITNESS:  Was there any chance that I

21   would find it's not a homicide?  I don't know about

22   that.

23     Q.  Was Mr. Thomas' ten-page statement a substantial

1          (Michael Sikirica - by Mr. Klein)

2     factor in your findings and diagnoses in this case?

3          A.   It was an explanation for how it occurred, but I

4     can't say that it was substantial.  It was only an

5     explanation for the mechanism of how it occurred.

6               The finding of the subdural hematoma, by finding

7     that alone, indicates that there was trauma to Matthew,

8     and that would have made it a homicide.

9          Q.   Do you know if the single subdural hematoma you

10    found is consistent with the location of the alleged

11    trauma that the police had Adrian state in his

12    statement?

13         A.   I can't remember the exact side of the head that

14    Matthew impacted with.  I don't know if that was ever

15    specified.  All I can say is a subdural hematoma is

16    consistent with the type trauma that Matthew admitted to

17    performing.

18         Q.   Who, if you know, concluded or diagnosed

19    bilateral subdural hematomas?  Was that Dr. Edge, was it

20    a radiologist, or someone else?

21         A.   I believe it was Dr. Edge.

22         Q.   So, Dr. Edge was wrong, and who if anyone

23    diagnosed potential skull fracture?

```
 1            (Michael Sikirica - by Mr.  Klein)

 2      A.   I believe that skull fracture was an error in the

 3   transcription because I only found it in several places

 4   and I never saw a radiographic report of that.

 5      Q.   Was it Dr. Edge, though, who reported a skull

 6   fracture?

 7      A.   I believe it was, but I think it was not -- I

 8   think it was an error in the transcription of that.

 9      Q.   Regardless of the transcription or whether it

10   came directly from his mouth, are you aware of any other

11   errors attributed to Dr. Edge other than skull fracture

12   and bilateral subdural hematomas?

13      A.   No.

14      Q.   Now, Matthew's white blood cell count -- going

15   back to that -- it did not get better upon his arrival

16   at Albany, correct?

17      A.   Correct.

18      Q.   Then it dropped to 500, correct?

19      A.   Yes.

20      Q.   That's a life threatening level, correct?

21      A.   Yes.

22      Q.   At Albany, his platelet count dropped dangerously

23   low, correct?
```

1            (Michael Sikirica - by Mr. Klein)

2     A.   It was dropping precipitously low.  Dangerous at

3     the final readings, yes.

4     Q.   That can cause spontaneous bleeding in organs,

5     correct?

6     A.   Correct.

7     Q.   His temperature was below normal and continued to

8     drop at Samaritan despite warm blankets and a maternity

9     warmer, correct?

10    A.   Correct.

11    Q.   He was hypothermic, in other words, he was having

12    problems maintaining his body temperature?

13    A.   Yes.

14    Q.   He was in respiratory distress, correct?

15    A.   Yes.

16    Q.   He was on a bed mask and respirator at Samaritan,

17    correct?

18    A.   Yes.

19    Q.   His blood pressure dropped into the 50s and 40s

20    at Samaritan -- which was life threatening, correct?

21    A.   Correct.

22    Q.   They gave him Dopamine to get his blood pressure

23    up, but he was unable to breathe on his own and had to

1          (Michael Sikirica - by Mr.  Klein)

2   use a ventilator, correct?

3      A.  Yes.

4      Q.  Without the Dopamine he could have died at

5   Samaritan.

6      A.  Yes.

7      Q.  He was given treatment consisting of, among other

8   things, ceftriaxone, which is a common antibiotic that

9   treats meningitis, correct?

10     A.  Yes.

11     Q.  And he was treated for sepsis as well early on.

12     A.  Yes.

13     Q.  So, were you aware, as of the autopsy, that there

14  was suspicion of meningitis and sepsis?

15     A.  Yes.

16     Q.  Did either of those facts impact your findings in

17  this case?

18     A.  No.

19     Q.  You didn't even put the word "sepsis" in your

20  autopsy, correct?

21     A.  Correct.

22     Q.  Why not?

23     A.  Because sepsis is described in my autopsy.  I

Case 1:17-cv-00626-DJS Document 84-14/2021 Filed 06/14/21 Page 173 of 442

1        (Michael Sikirica - by Mr. Klein)

2 don't use the word "sepsis". I use the words "positive

3 cultures for strep pneumoniae". I could have used the

4 word "sepsis" but I did not.

5        My final diagnosis on item number two, blood

6 culture positive for strep pneumoniae on initial

7 presentation to the hospital on 9/21/08. And I didn't

8 know on the initial presentation if it was really sepsis

9 that was causing all this problem or it was head trauma.

10   Q. But you confirmed it before April of 2009 when

11 you did your written report, correct?

12   A. Yes.

13   Q. So, why didn't you put it -- the question is for

14 the record: If there is a reason, what if any reason is

15 there that you did not refer to "sepsis" in your report?

16       Strep pneumonia is not sepsis, right?

17   A. Correct.

18   Q. Did you inadvertently omit it, did you

19 intentionally omit it, or is there some other reason, if

20 any?

21   A. I don't know exactly why I left it out. I didn't

22 consider it to be the real cause of death.

23   Q. But you did testify under oath, I believe maybe

Case 1:17-cv-00626-DJS   Document 114-2   Filed 06/14/21   Page 173 of 442

1     (Michael Sikirica - by Mr. Klein)

2 twice, that it was a contributing factor to his death,

3 correct?

4     A.  Yes.

5     Q.  As a medical examiner, is it your practice or is

6 it appropriate to leave out a contributing factor to a

7 death at an autopsy?

8          MS. PECK:  Objection.

9          THE WITNESS:  Not typically, no.

10 BY MR. KLEIN:

11    Q.  Was it a substantial contributing factor to his

12 death even though it's your opinion that it's not the

13 primary cause of death?

14    A.  No.

15    Q.  How would you characterize it or quantify it?

16    A.  I would say it was sequelae of the injury that he

17 received.

18    Q.  So, if someone is hypothetically strangled or put

19 in a choke hold and that leads to cardiac arrest, is

20 that something that can happen as a result of being put

21 in a choke hold?

22    A.  Yes.

23    Q.  Strangulation?

Case 1:17-cv-00626-DJS Document 84-14-2021 Filed 06/14/21 Page 175 of 442

1          (Michael Sikirica - by Mr. Klein)

2     A.  Yes.

3     Q.  Ultimately it's the cardiac arrest that arose due

4  to the choke hold being placed on the person that -- the

5  cardiac arrest is what caused the death, in your view,

6  in that hypothetical, assuming no other facts

7  complicated it, is it the choke hold that caused his

8  death or is it the heart attack, natural causes?

9     A.  No.  It would be -- I would classify it as

10 asphyxia due to strangulation.  The heart attack would

11 be secondary to that.

12    Q.  Have you been involved in any cases like that

13 where there's a cause of death that's secondary to an

14 underlying physical trauma, but you attribute to the

15 later natural cause of death?

16          MS. PECK:  Objection.

17          THE WITNESS:  If you could rephrase that.  I

18 don't think I'm following the question.

19 BY MR. KLEIN:

20    Q.  In other words, here you're saying that the

21 trauma lead to the pneumonia, lead to the sepsis,

22 correct?

23    A.  Yes.

1          (Michael Sikirica - by Mr. Klein)

2      Q.  Is it plausible, if you take Adrian Thomas'

3   statement out of this, that the sepsis lead to the

4   pneumonia.

5      A.  I think I can answer where you're going.

6      Q.  Yeah.

7      A.  Yeah.  The sepsis has to be coming from

8   somewhere.  Sepsis is not a spontaneous thing.  Sepsis

9   has to be acquired from some source of infection in the

10  body.

11     Q.  As you said, it can come from the streptococcal

12  pneumoniae, correct?

13     A.  Yes, it did.  There was no other source of the

14  sepsis.  I could find no other source of the sepsis at

15  the time of autopsy.

16     Q.  But the streptococcal pneumoniae, your sole basis

17  for opining that that was due to trauma, is this medical

18  speculation of aspiration, correct?

19     A.  And the finding of trauma that would cause

20  aspiration.

21     Q.  Which is the right subdural hematoma.

22     A.  Correct.

23     Q.  But there are nontraumatic causes of

```
 1              (Michael Sikirica - by Mr.  Klein)
 2   streptococcal pneumoniae?
 3                   MS. PECK:  Objection.
 4      A.  Yes.
 5      Q.  In other words, could it be naturally occurring
 6   or occurring from some other cause other than a physical
 7   trauma or an aspiration?
 8      A.  Yes.
 9      Q.  What are those ways?
10      A.  Well, you can have a community acquired pneumonia
11   just walking down the street passing somebody that's
12   coughing out the organism.  That would be a possibility.
13      Q.  What if any other possibilities are there?
14      A.  I suppose you could get...
15      Q.  In other words, if you didn't have Adrian Thomas'
16   statement, and you were conducting your autopsy and you
17   were going to engage in further medical speculation of
18   all the possibilities other than trauma that could have
19   caused the pneumococcal pneumoniae, what would they be?
20      A.  It would be community acquired pneumonia from
21   some other person.
22      Q.  Any other possible causes?
23      A.  I can't think of one right now.
```

1          (Michael Sikirica - by Mr.  Klein)

2     Q.  So, it's an airborne type of transmission?

3     A.  Yes.

4     Q.  But again, that's not your area of expertise, so

5  there might be others, you're just not aware of them?

6     A.  Correct.

7     Q.  Would you agree that streptococcal pneumoniae --

8  which you said before is a gram positive bacteria,

9  correct?

10     A.  Yes.

11     Q.  That's the number one cause of pneumonia.

12          Would you agree with that?

13     A.  I would say that's the number one cause of

14  bacterial pneumonia.

15     Q.  That's what Matthew had, correct?

16     A.  He had bacterial pneumonia.

17     Q.  So, even though streptococcus pneumoniae is the

18  number one cause of bacterial pneumonia, your --

19  withdrawn.

20          You would agree that Matthew had a bacterial

21  infection upon his arrival at Samaritan.

22     A.  Yes.

23     Q.  And the bacterial infection can lead -- can cause

1          (Michael Sikirica - by Mr. Klein)

2    pneumonia, correct?

3       A.  Yes.

4             MS. PECK:  Objection.

5       Q.  And that bacteria then could get into the blood

6    and go into the other organs, correct?

7       A.  Yes.

8       Q.  So, therefore, that's how someone could get --

9    could present with bacteremia, which is bacteria in the

10   blood, or how they could have sepsis, correct?

11      A.  Yes.

12      Q.  Matthew had both of those.

13      A.  Yes.

14      Q.  Now, meningitis can also be secondary to

15   bloodborne bacteria, correct, which Matthew had?

16      A.  Yes.

17             MS. PECK:  Objection.  You just said Matthew

18   had.

19   BY MR. KLEIN:

20      Q.  Matthew had bloodborne bacteria, correct?

21      A.  Yes, he did.

22      Q.  Meningitis can be secondary to bloodborne

23   bacteria.

1           (Michael Sikirica - by Mr. Klein)

2      A.   Well, I wouldn't call it meningitis.  I would

3  call it a secondary infection of the meninges from

4  bacteria that's already in the blood.

5      Q.   Which you saw here.

6      A.   Yes.  Meningitis, by definition, is a primary

7  infection of the meninges of the brain.  That usually

8  happens from other sources.

9      Q.   So the proper terminology is a secondary

10  infection of the meninges is what Matthew presented

11  with?

12      A.   Yes.

13      Q.   And you would agree, to a degree of certainty,

14  that that secondary infection of the meninges can be

15  caused by the bloodborne bacteria.

16      A.   Yes.

17      Q.   And that secondary meninges infection can cause

18  increased intracranial pressure, correct?

19      A.   Yes.

20      Q.   And that can cause retinal hemorrhages such as

21  the type that Matthew presented with?

22      A.   Absolutely, yes.

23      Q.   A sign of meningitis in an infant would be

1              (Michael Sikirica - by Mr. Klein)

2    bulging of the fontanel, correct?

3        A.  Yes.

4        Q.  And Albany Medical noted bulging of Matthew's

5    fontanel at arrival, correct?

6        A.  Yes.  They described it as being boggy.

7        Q.  That's consistent with a symptom of the secondary

8    meningitis, correct?

9              MS. PECK:  Objection.

10              THE WITNESS:  It would be infection.  It

11    would be a sign of --

12    BY MR. KLEIN:

13        Q.  A secondary meninges infection?

14        A.  Yes, or the edema itself.  It can be from any

15    sort of swelling in the brain.

16        Q.  And the test to confirm if this is meninges

17    infection would have been a lumbar puncture to withdraw

18    CSF, cerebral spinal fluid, correct?

19        A.  In Matthew's case it wouldn't have been

20    recommended.

21        Q.  Because of what, his condition?

22        A.  Because any drawing of that CSF would have made

23    his brain even swell worse.

1          (Michael Sikirica - by Mr. Klein)

2     Q.  What if anything could that CSF have informed you

3  of in your autopsy?  Would that have confirmed the

4  existence of trauma or that it was an overwhelming

5  bacterial infection?

6     A.  It would have confirmed that there was a presence

7  of the bacteria in the cerebral spinal fluid.  It may

8  have been blood that would be present from the trauma,

9  but it wouldn't have been a recommended procedure

10  because Matthew would risk herniation, which means his

11  brain would -- after you took the excess fluid off for

12  your tap, his brain would have even pushed further down

13  into the frame and magnum, and that could have caused

14  very sudden death.

15     Q.  Now, Dr. Kardos put septic shock first on her

16  list of differential diagnoses.

17          Do you disagree with that?

18     A.  I don't disagree with that.  I didn't see any

19  trauma on Matthew.  If she didn't see any trauma, that

20  would probably be the first diagnosis in a differential

21  diagnosis.

22     Q.  And you agree that septic shock is a collapse of

23  the circulatory and respiratory symptoms from

```
 1              (Michael Sikirica - by Mr.  Klein)

 2    overwhelming infection in the bloodstream.

 3        A.  Yes.

 4        Q.  And that could cause blood pressure to drop

 5    significantly like Matthew's did?

 6        A.  Yes.

 7        Q.  And cause body systems to shut down like

 8    Matthew's did?

 9        A.  Yes.

10        Q.  Could also cause coagulopathy like Matthew had?

11        A.  Yes.

12        Q.  When the body's ability to clot doesn't work, it

13    could cause bleeding in multiple places in the body,

14    such as Matthew had, correct?

15        A.  Yes.

16        Q.  Bleeding could be in the brain like Matthew had,

17    correct?

18        A.   Not like Matthew had.  Matthew had a subdural

19    hematoma, which is a collection of blood.  When you have

20    coagulopathy you tend to have bleeding in multiple small

21    areas of the brain, not a large collection like a

22    subdural hematoma.

23        Q.  So, was there any bleeding in the brain
```

1          (Michael Sikirica - by Mr. Klein)

2  consistent with the widespread infection?

3    A.  Yes.  There were --

4    Q.  Distinct from the subdural hematoma?

5    A.  Yes.  There was beginning of bleeding in small

6  portions of the brain.

7    Q.  Do you remember which parts?

8    A.  It would be microscopically, the capillaries and

9  small vessels.

10    Q.  Did you say there were chronic and acute bleeding

11  in the brain in those areas?

12    A.  No.  There was acute bleeding in the brain

13  itself.

14    Q.  And blood was found in his myocardium, correct?

15    A.  Yes.

16    Q.  And testes?

17    And blood was in the pleural cavity, but that you

18  believe was due to the surgical harvesting?

19    A.  Yes.

20    Q.  Do you know if that had to do with the bacterial

21  infection as well?

22    A.  No.  I would assume it's mostly due to the

23  surgical intervention when they took his organs.

1          (Michael Sikirica - by Mr.  Klein)

2   There's always a little bit of blood that's left behind.

3      Q.   The blood in the testes was consistent with

4   coagulopathy?

5      A.   Or anoxia.  Yes.

6      Q.   At trial you said coagulopathy.

7      A.   Could be consistent with that, yes.

8      Q.   Coagulopathy could be a factor in the heart

9   hemorrhage that he had as well, correct?

10      A.   Yes.

11      Q.   Now, Matthew had what people describe as acute

12   respiratory distress, right?

13      A.   ARDS, correct.

14      Q.   There's a host of nontraumatic reasons why a

15   patient could develop ARDS, correct?

16      A.   Yes.

17      Q.   Pneumonia, sepsis, too much oxygen, things like

18   that.

19      A.   Aspiration, yes.

20      Q.   Being on a ventilator?

21      A.   Yes.

22      Q.   And aspiration could be, as you've said,

23   traumatic, but it also could be nontraumatic as well?

1        (Michael Sikirica - by Mr. Klein)

2    A.  Yes.

3    Q.  Matthew was hypoglycemic when he got to Samaritan

4    as well, correct?

5    A.  Yes.

6    Q.  25 on the finger prick, right?

7    A.  Yes.

8    Q.  That's very low.  What was the significance of

9    that?

10   A.  I don't put much on the finger stick, because

11   often that's a very rough.  In an emergency situation,

12   it's not taken properly like it should be sometimes.

13   Q.  Is decreased glucose in the blood something that

14   can lead to a complication like a seizure or comatose

15   condition, something like that?

16   A.  Yes.

17   Q.  Matthew was tachycardic at Samaritan, correct?

18   A.  Yes.

19   Q.  That is a common symptom of many things that

20   include nontraumatic causes, correct?

21   A.  Yes.

22   Q.  Like sepsis could cause him to be tachycardic,

23   correct?

1          (Michael Sikirica - by Mr. Klein)

2     A.   Yes.

3     Q.   He had pancytopenia, correct?

4     A.   Yes.  That means all of his cells were decreased

5   in numbers.  His white count was very low.  His red cell

6   numbers were quite low.  His platelets were low.  But

7   still within the range to work.

8     Q.   Sepsis is known to cause that, correct?

9     A.   Yes.

10    Q.   He had leukopenia at Albany and Samaritan, right?

11    A.   Yes.  That would be classified as involving the

12  pancytopenia.

13    Q.   And that's also known to be caused by sepsis.

14    A.   Correct.

15    Q.   He had hypothermia and hypotension as well,

16  correct?

17    A.   Yes.

18    Q.   Also both consistent with sepsis, correct?

19    A.   Yes.

20    Q.   Just to be clear:  There were no external bruises

21  on Matthew's body, correct?

22    A.   Yes.

23    Q.   No external contusions?

Case 1:17-cv-00626-DJS Document 142-21 Filed 06/14/21 Page 188 of 442

```
 1            (Michael Sikirica - by Mr.  Klein)

 2     A.   No.

 3     Q.   No marks on his neck?

 4     A.   Correct.

 5     Q.   No soft tissue injuries.

 6     A.   Well, the soft tissue injury would be the

 7  subgaleal hemorrhages.  That would be considered soft

 8  tissue.

 9     Q.   Those were not from trauma, though, correct?

10            MS. PECK:  Objection.

11            THE WITNESS:  They were from trauma.

12  BY MR. KLEIN:

13     Q.   Well, the subdural hematoma was the site of the

14  trauma that -- and they lead, according -- I believe, if

15  I understand you correctly, those lead to the SGHs?

16     A.   The subgaleal hemorrhages were the bruises under

17  the scalp and they were due to some sort of impact

18  injury.  So, they were due to trauma.  They were not due

19  to sepsis or coagulopathy.

20     Q.   Isn't one of them, in your view, noncontributory

21  in this case?

22     A.   Yes.

23     Q.   Which one?
```

1          (Michael Sikirica - by Mr. Klein)

2     A.   The older greenish one is not contributory to the

3   acute cause of death.

4     Q.   Why not?

5     A.   Because it's older.  It occurred at an older

6   interval.  It could be five days or more, seven days

7   older.

8     Q.   You didn't see any injury to the disks that

9   support his head, correct?

10    A.   No.

11    Q.   No indication of inflammation to the neck or

12  cervical tissues?

13    A.   None.

14    Q.   And no evidence of new or old fractures anywhere

15  in his entire skeletal system, correct?

16    A.   That is correct.

17    Q.   Once there is a chronic subdural collection or

18  hematoma it can rebleed with no apparent trauma,

19  correct?

20    A.   That is correct.

21    Q.   So, could that rebleed cause the subgaleal

22  hemorrhage or would that be a different?

23          MR. PECK:  Objection to the form.

Case 1:17-cv-00626-DJS Document 84-12 Filed 06/14/21 Page 190 of 442

1    (Michael Sikirica - by Mr. Klein)

2    THE WITNESS: The subgaleal hemorrhage is

3 outside the skull, so the bleeding on the subdural

4 hemorrhage is inside the skull. So, they're not really

5 connected in a way.

6 BY MR. KLEIN:

7  Q. With a subdural, that's where we have the layers

8 of a chronic subdural hematoma in this case, correct?

9  A. Yes.

10  Q. Would you agree that there was a process of

11 repair and rebleeds evident on Matthew's skull exam?

12  A. Well, I won't say there was rebleeding, but there

13 was a process of repair. The clot material is going to

14 be eventually absorbed, and that process had been going

15 on in the older portion of the subdural hematoma.

16  Q. And that could have been going on for months.

17 You don't know. You can't age that to a degree of

18 certainty, can you?

19  A. Not to a degree of certainty.

20  Q. It could have been -- I mean he was four months

21 old. It could have been two or three months old.

22  A. Correct.

23  Q. So, that first subdural hematoma that lead to the

Case 1:17-cv-00626-DJS Document 94-14 2021-17-07 06-14-2021 Page 1921 of 442

```
 1            (Michael Sikirica - by Mr.  Klein)

 2   layers and possible rebleeds or repairs could have been

 3   from a trauma in June.

 4      A.   Possibly, yes.

 5      Q.   You just don't know.

 6      A.   Correct.

 7      Q.   How would the SGHs relate temporally to the

 8   subdural hematoma?  They're just separate evidence of a

 9   separate trauma from a separate time?

10      A.   Yes.  The pink one was related to the time of his

11   admission to Samaritan.  The older one, as I said, could

12   be weeks old.  Could be related to the original subdural

13   hematoma.

14      Q.   The pink one that you believe is trauma related.

15      A.   Well, they're both trauma related, but the pink

16   one is the acute trauma related that occurred around the

17   time of the acute subdural hematoma.

18            (Recess taken.)

19   BY MR. KLEIN:

20      Q.   So, was it your understanding that the subdural

21   on the right side, which is the only one you saw, could

22   have been weeks to months old, correct?

23      A.   The older portion of the subdural hematoma, but
```

Case 1:17-cv-00626-DJS Document 84-14 2021 Filed 06/14/21 Page 192 of 442

```
 1            (Michael Sikirica - by Mr.  Klein)

 2    the fresh one was only a few days old.

 3        Q.  A few days.

 4        A.  Yes.

 5        Q.  So that's -- when you talk about layers, there

 6    were two layers and it's the most recent, freshest

 7    layer?

 8        A.  Freshest layer, and beneath that freshest layer

 9    was an older layer that could be weeks old, possibly

10    months.

11        Q.  And then the SGH, one was also weeks old and

12    clinically insignificant to you?

13        A.  Yes.

14        Q.  The pink one was within a couple of days?

15        A.  Yes.

16        Q.  If those two events, the most recent SDH and the

17    most recent SGH, did not correlate with the baby being

18    thrown to a bed or a mattress or a crib, what if

19    anything else could have caused those conditions?

20        A.  Well, they're caused by impact injuries, and I

21    can't be more specific than that.  They're simply impact

22    injuries where Matthew's head hit something or something

23    hit Matthew in the head.
```

```
 1              (Michael Sikirica - by Mr.  Klein)

 2      Q.  I believe you testified that external swelling is

 3   a way to determine how fresh an SGH is, correct?

 4      A.  It's mostly the coloration of the swelling that

 5   matters to determine how fresh they are.

 6      Q.  But you would see -- did you testify that you

 7   should see external swelling if there's a fresh trauma?

 8      A.  You should see, if it's large enough to produce

 9   swelling, you should see it.

10      Q.  What is your testimony in this case, that it

11   wasn't large enough or you just can't explain why there

12   was no external swelling?

13      A.  There weren't particularly large lesions.  I

14   would say I wouldn't expect to see them.

15      Q.  I believe you also said that you couldn't

16   determine the degree of blunt force trauma with regard

17   to the subgaleal hemorrhage, correct?

18      A.  Correct.

19      Q.  So, I think you testified it could have been a

20   metal truck or any number of things.

21      A.  Could have been anything.

22      Q.  Meaning like a toy?

23      A.  It could have been, absolutely.
```

Case 1:17-cv-00626-DJS Document 114-2 Filed 06/14/21 Page 194 of 442

1          (Michael Sikirica - by Mr. Klein)

2     Q.  So, there could have been accidental or

3  nonaccidental trauma, you don't know what caused that?

4               MS. PECK:  Objection.

5               THE WITNESS:  Correct.

6  BY MR. KLEIN:

7     Q.  Did you know, from your knowledge of the family,

8  that there was a three year old child who was later

9  found to be severely autistic?

10    A.  Yes.

11    Q.  And that he would abuse the other kids, make them

12 eat feces, and things like that?

13              MS. PECK:  Objection.

14              THE WITNESS:  I didn't know the extent of

15 the autism, how it related to his interaction with the

16 other kids, but I knew he was an autistic special needs

17 child.

18 BY MR. KLEIN:

19    Q.  Did you know anything about him allegedly causing

20 injuries or battering the other kids?

21    A.  No.

22    Q.  Is that something that you could have inquired

23 into further in your capacity as a forensic pathologist?

1                    (Michael Sikirica - by Mr. Klein)

2        A.   I would have directly asked those questions.  I

3    would have informed the police to do it, but I did not

4    do that.

5        Q.   Do you recall agreeing that the subgaleal

6    hemorrhage had a chronic inflammation which could have

7    been there for several weeks?

8        A.   Yes.

9        Q.   So, how did that jive with your testimony today

10   that the pink subgaleal hemorrhage was there for just

11   within a couple of days?

12       A.   Well, the greenish subgaleal hemorrhage I

13   testified to was that could have been there several

14   weeks, but the fresher pink did not appear to be several

15   weeks old.  It appeared to be contemporaneous with the

16   subdural.

17       Q.   The area of hemorrhage on the fontanel in this

18   case was not caused by blunt force trauma.

19            Do you agree with that?

20       A.   I would agree with that.

21       Q.   It had nothing to do with the sutures splitting,

22   correct?

23       A.   No.  It did have to do with the sutures

```
 1              (Michael Sikirica - by Mr.  Klein)

 2   splitting.  It was due to the sutures splitting.  When

 3   the sutures split, because the brain was swelling, what

 4   happens is the small capillaries across the sutures

 5   start to rupture and get torn, and that's where the

 6   bleeding comes from, but it's a common occurrence any

 7   time there's a splitting of those sutures in an infant.

 8       Q.  The splitting of the sutures was due to

 9   intracranial swelling?

10       A.  Yes.

11       Q.  In your autopsy report, one of your conclusions

12   was acute and chronic pneumonia, correct?

13       A.  Yes.

14       Q.  In other words, the pneumonia was not recent.

15           It persisted over a period of time.

16       A.  Portions of it did, yes.

17       Q.  Took weeks to develop.

18               MS. PECK:  Objection.

19               THE WITNESS:  I wouldn't classify it as

20   weeks.  It could be only days.

21   BY MR. KLEIN:

22       Q.  But also could be weeks.

23       A.  Yes.
```

Case 1:17-cv-00626-DJS Document 144-2021 Filed 06/14/21 Page 1923 of 442

1          (Michael Sikirica - by Mr. Klein)

2    Q. And the lung sections revealed evidence of acute

3 and chronic pneumonia, correct?

4    A. Yes.

5    Q. He had severe acute sinus congestion, correct?

6    A. Severely acute sinus congestion?

7    Q. Do you recall that?

8    A. I don't recall the sinus congestion.

9    Q. Is sinus congestion a sign of sickness?

10    A. It can be, yes, but I don't recall that in my

11 report or testifying about sinuses.

12    Q. We'll put a pin on that and I'll come back to it.

13       What are macrophages?

14    A. Macrophages are a type of chronic inflammatory

15 cells that move in to clear up debris typically after

16 there are injuries or damage to tissues.

17    Q. He had those in many parts of his brain, correct?

18    A. Yes.

19    Q. Do you agree that he had pus on top of his brain?

20    A. He had some degree of inflammation on top of the

21 brain, yes.

22    Q. At trial you confirmed that it was pus, correct?

23    A. Yes.

Case 1:17-cv-00626-DJS Document 94-14 Filed 06/14/21 Page 198 of 442

1           (Michael Sikirica - by Mr.  Klein)

2      Q.  There was also evidence of macrophages in his

3  right eye?

4      A.  Yes.

5      Q.  And in the area surrounding the optic nerve.

6      A.  Yes.

7      Q.  That's essentially pus around the optic nerve,

8  correct?

9      A.  It's an older form of inflammation.  The pus is

10  usually due to the neutrophils which were also there.

11  The macrophages typically don't produce the same kind of

12  what we would call pus or exudate.

13      Q.  But this could be a sign of infection behind --

14  in the area behind the right eye, correct?

15      A.  Yes.

16      Q.  So, there was evidence in this case of infection

17  in a number of parts of his brain, covering the brain

18  with this pus, and there was what could be pus around

19  the right eye, correct?

20      A.  Yes.

21      Q.  Now, you've confirmed you're not a pediatric

22  infectious disease specialist.  What knowledge does a

23  pediatrician infectious disease specialist have that you

Case 1:17-cv-00626-DJS Document 84-1 Filed 06/14/21 Page 199 of 442

```
 1              (Michael Sikirica - by Mr.  Klein)

 2   don't?

 3          In other words, what limitations do you have on

 4   your ability to evaluate sepsis and the pneumococcal

 5   pneumoniae in this case, if any, because you're not a

 6   pediatric infectious disease specialist?

 7     A.   Well, when it comes to the clinician specialist,

 8   I have no experience at all in the treatment of things.

 9   So that's where he would be outstanding in the treatment

10   of this.

11          I think I have an advantage in some regards

12   because I am seeing the dead decedent, and even though I

13   may not diagnose it while the decedent is alive, I'm

14   diagnosing things that he doesn't see in the dead

15   individual.

16          But I have no real significant knowledge of the

17   treatment of these cases and that's where they shine.

18     Q.   You said that if you hadn't read Thomas' ten-page

19   statement you wouldn't know when the sepsis began.

20          Do you recall saying something to that effect,

21   that that informed your timeline of this?

22     A.   Yes, I did.

23     Q.   But if you hadn't read his statement, based on
```

```
 1              (Michael Sikirica - by Mr.  Klein)

 2   the coagulopathy, the tachycardia, the hypothermia, the

 3   hypotension, the acute respiratory distress,

 4   pancytopenia, leukopenia, those are all things

 5   consistent with sepsis and other things, possibly not

 6   trauma, correct?

 7              MS. PECK:  Objection.

 8              THE WITNESS:  What other things would you be

 9   considering?  If you could tell me that.

10   BY MR. KLEIN:

11     Q.  Those are all things that develop through

12   infection, not through...

13     A.  Not all of them.  Some of them can be the direct

14   result of the head trauma.  The respiratory arrest, that

15   can be secondary to head trauma or any source of trauma.

16     Q.  But without trauma, without his statement, that

17   can be consistent with a nontraumatic cause, correct?

18              MR. PERKINS:  Objection to the form.

19     Q.  Like an infection?

20              MS. PECK:  Objection to form.

21     Q.  The infection can cause acute respiratory

22   distress, correct?

23     A.  Yes.
```

Case 1:17-cv-00626-DJS Document 84-1 12/2021 Filed 06/14/21 Page 201 of 442

```
 1              (Michael Sikirica - by Mr.  Klein)

 2    BY MR. KLEIN:

 3       Q.  That's all I'm trying to ask.

 4       A.  Yes.

 5       Q.  Just so we're on the same page.

 6            Do we agree that pneumonia precedes sepsis, not

 7    the other way around?

 8       A.  Yes.

 9       Q.  So, your opinion is that trauma lead to

10    aspiration, which lead to pneumonia, which lead to

11    sepsis?

12       A.  Yes.

13       Q.  But it's the trauma that you find is the primary

14    cause of the death.

15       A.  Yes.

16                MS. PECK:  Objection.

17       Q.  And what is your understanding of the defense in

18    the criminal case, what their theory was?

19                MS. PECK:  Objection.

20       Q.  That there was an infection without trauma that

21    lead to -- that was caused by pneumonia?

22       A.  Well, in terms of the --

23                MS. PECK:  Object to the form.
```

1                    (Michael Sikirica - by Mr. Klein)

2       A.   In terms of the defense and the infectious

3    disease portion of it, he never -- Dr. Klein never

4    explained anything to do with the trauma.  He didn't

5    consider the trauma.  He saw the trauma as outside of

6    his expertise, and didn't even consider that trauma

7    could be related in any way to sepsis.  He basically

8    said that trauma never causes sepsis.

9          And I remember, from some of my testimony, that I

10   did try and illustrate it, that trauma can cause sepsis

11   in a variety of ways.

12      Q.   Could lead to sepsis.

13      A.   Yes.  Can lead to sepsis, yes.

14      Q.   Well, Dr. Klein was saying that it's not what

15   lead to the sepsis in this case.  That's all.  He wasn't

16   opining on the trauma; isn't that true?

17                MS. PECK:  Objection, form.

18                THE WITNESS:  He has not opined on anything

19   to do with trauma.  He did not talk about trauma at all.

20   So, I can't see how he would rule out trauma if he

21   doesn't consider it.

22   BY MR. KLEIN:

23      Q.   Things other than trauma can cause intracranial

```
 1              (Michael Sikirica - by Mr.  Klein)

 2   bleeds.

 3         Do you agree with that?

 4      A.  Yes.

 5      Q.  And then chronic rebleeds can happen after

 6   there's an initial bleed, correct?

 7      A.  Yes.

 8      Q.  Is that a potential explanation for any of the

 9   conditions that you noted, the subdural hematoma or the

10   subgaleal hematomas?

11      A.  The subdural hematoma could be caused by a

12   rebleeding of an existing subdural hematoma, which would

13   have to be there as a result of trauma.

14         The subgaleal hemorrhages have no relationship to

15   a rebleed.

16      Q.  The spreading of the sutures in this case -- is

17   that what you call it, spreading?

18         What would you describe the condition of the

19   sutures?

20      A.  I would say they're splitting.

21      Q.  Were they split due to trauma or due to an

22   intracranial pressure or bleed arising from the

23   infection?
```

```
1              (Michael Sikirica - by Mr.  Klein)

2      A.  They can be split by either one.

3      Q.  So you don't know which one.

4      A.  Don't know which one or a combination of both.

5      Q.  Did you have an opinion either way or you don't

6  know?

7      A.  I don't know.  The cerebral edema was caused by

8  the trauma, but it could have been accelerated by the

9  infection.

10     Q.  When you talk about the subdural hematoma being

11  potentially a couple months old, it could be something

12  that arose from the delivery, correct?

13     A.  No.  No.  The child had been scanned for any kind

14  of intracranial hemorrhage after he was admitted for

15  growth development to Samaritan Hospital.  They did an

16  echo through the anterior fontanel and did not detect

17  any intracranial bleeding.

18     Q.  Earlier in his life you're talking about?

19     A.  Yes.

20     Q.  Was that with the ultrasound?

21     A.  Yes.

22     Q.  That was not a CT or something more sensitive,

23  though, correct?
```

Case 1:17-cv-00626-DJS Document 74-2 Filed 06/14/21 Page 205 of 442

1          (Michael Sikirica - by Mr. Klein)

2     A.  Correct.

3     Q.  So it could have missed an intracranial bleed.

4     A.  That's a possibility.

5     Q.  Sometimes intracranial bleeds in a newborn may

6  not be apparent for days or potentially more, correct?

7     A.  So, he was scanned before he was discharged from

8  the Samaritan Hospital pediatric unit, where he was

9  admitted to -- he was failing to thrive, so he was put

10  in the hospital after his birth at Albany Med several

11  days after he was admitted to Samaritan Hospital, where

12  he stayed for many days to get his growth back on track,

13  and before he was discharged he was given an echo...

14     Q.  Ultrasound.

15     A.  Ultrasound, and they did not detect any bleeding

16  at that point.

17     Q.  And again, that could be because they missed it

18  or because there was none.  You don't know either way.

19     A.  Correct.

20     Q.  There was mention in his early records about

21  intracranial bleed, correct?  Or was there concern about

22  bleeding in the brain?

23     A.  No.  It was done routinely, that they do this

Case 1:17-cv-00626-DJS Document 44-2 Filed 06/14/21 Page 206 of 442

```
 1            (Michael Sikirica - by Mr.  Klein)

 2    routinely.  When they have somebody -- child that comes

 3    in, they will look for an intracranial hemorrhage.

 4        Q.  Do you recall there being suspicion of

 5    intracranial hemorrhage with Matthew?

 6        A.  I don't recall a suspicion of that.

 7        Q.  With regard to the edema on the brain, the

 8    swelling, the cerebral edema, that could be due to

 9    trauma, correct?

10        A.  Yes.

11        Q.  But that could also be due to something like an

12    infection of the meninges, correct?

13        A.  Yes.

14        Q.  I think the word I was looking for before was

15    there was organization of the portions of the subdural

16    hemorrhage giving it a layered effect; is that true?

17        A.  That is correct.

18        Q.  Organization of it.

19        A.  Organization.

20        Q.  They fill in spaces, correct, or they create a

21    pattern?

22            What does that mean, organization?

23        A.  It means that reactive cells from their own body
```

1          (Michael Sikirica - by Mr. Klein)

2    have gone into the clot and are trying to dissolve the

3    clot away, and as they do, they may build up layers.

4    Q.  So the chronic subdural in this case I think you

5    said at trial could be up to several months old.

6         Do you recall saying that?

7    A.  Yes.

8    Q.  So that could go back to birth.

9         He was only four months old.

10   A.  Correct.

11   Q.  So that could be -- and that chronic subdural is

12   the one that you believe was related to the trauma that

13   lead to the death here, correct?

14   A.  No.  The actual trauma that lead to the death was

15   the acute subdural hematoma.  The 60 MLs of blood that I

16   recovered from the right middle cerebral fossa.

17   Q.  If there was less than 60 MLs of blood when he

18   got to Samaritan on the 21st than there were on the 25th

19   when you did the autopsy, would that affect your opinion

20   in any way?

21   A.  No.  60 MLs of blood is a large amount.  It could

22   have been 30 or 20 in a child still causing significant

23   problems.

1        (Michael Sikirica - by Mr. Klein)

2    Q.  What would explain -- let's say there were 30, 20

3  or 30 on Sunday when he got there. What would explain

4  the increase to 60, being on a ventilator, plasma, other

5  things?

6    A.  It could simply be the volume overload he was

7  experiencing in general that built it up so much.

8    Q.  Volume overload being what?

9    A.  The fluid they were giving him.

10    Q.  So that 60 may have been an artificially or

11  somehow increased from his normal levels due to the

12  treatment he got.

13    A.  It could have been, yes.

14    Q.  With regard to coagulopathy or DIC, do you agree

15  that that has only a small association with head trauma.

16  It's more associated, in other words, with other causes.

17    A.  I would say that I agree with that, but the topic

18  hasn't been fully researched yet.

19    Q.  To the best of your knowledge, that's an accurate

20  statement?

21    A.  Yes.

22    Q.  So, you were asked earlier questions about the

23  causes of death, and sepsis is not listed, right?

1              (Michael Sikirica - by Mr.  Klein)

2      A.   Correct.

3      Q.   Sepsis is a cause of death in this case, correct?

4      A.   It's a contributory cause of death.

5      Q.   That makes it a cause of death, correct?

6              MS. PECK:  Objection.

7      Q.   It's not really meant to be a trick question.

8           It's a cause of death.

9      A.   In this case, no.  It's a contributory factor to

10   the cause of death.

11     Q.   What's the difference?

12          So, is blunt force trauma a contributory factor

13   as well?

14     A.   Blunt force trauma is the cause of death.

15     Q.   That's based on your determination.

16     A.   Correct.

17     Q.   That other doctors could disagree.

18     A.   Absolutely.

19     Q.   When you talk about your findings, you typically

20   try to make them based on objective findings on autopsy

21   or in your exam, correct?

22          You try to base your opinions on objective

23   findings.

1                    (Michael Sikirica - by Mr.  Klein)

2        A.  Findings that I see and evaluate, yes.

3        Q.  The link here to the trauma, to the sepsis,

4    pneumonia then sepsis, is the aspiration, correct?

5        A.  Yes.

6        Q.  That's something that there is no objective

7    evidence of, correct, the aspiration?

8        A.  There is no objective evidence of the aspiration,

9    but I wouldn't expect to find it.

10        Q.  Sometimes you do though, correct?

11        A.  There are occasions you do, yes.

12        Q.  Do you feel that in retrospect you should have

13    listed sepsis in the death certificate as a contributing

14    cause of death?

15        A.  No.

16        Q.  Why not?

17        A.  Because I think it's confusing.  I think it

18    unnecessarily diverts the real cause of death from what

19    is going to be the closed head injury with cerebral

20    edema.

21        Q.  Such that you would keep it out of the autopsy

22    and the death certificate.  Even as of today you would

23    stand by that?

```
 1              (Michael Sikirica - by Mr.  Klein)

 2    A.   I might put it in the anatomic diagnosis.  I

 3  would probably put that in the anatomic diagnosis.  I

 4  would list it under the category of roman number II,

 5  blood culture positive for streptococcus pneumoniae on

 6  initial presentation.

 7          Under that I have A, acute and chronic pneumonia

 8  with severe atelectasis; and then B, I would put

 9  clinical history of sepsis.

10    Q.   Can you state on the record today that it was a

11  mistake not to put that in there initially?

12              MS. PECK:  Objection.

13              THE WITNESS:  I overlooked it, but I

14  wouldn't call it a mistake.

15  BY MR. KLEIN:

16    Q.   Was it a significant oversight on your part?

17    A.   No.

18    Q.   Well, the question comes up because you

19  understand that the second trial Mr. Thomas was

20  acquitted, correct?

21    A.   Yes.

22    Q.   So, his defense rested in part on the fact that

23  there was overwhelming sepsis that caused the death, not
```

Case 1:17-cv-00626-DJS Document 114-2 Filed 06/14/21 Page 2023 of 442

```
 1              (Michael Sikirica - by Mr.  Klein)

 2    trauma.

 3                 MS. PECK:  Objection.

 4      Q.  Is that your understanding generally, a bacterial

 5    infection that caused the death?

 6      A.  That was an argument made by the defense that a

 7    bacterial infection did cause the death.

 8    BY MR. KLEIN:

 9      Q.  Would it have been more transparent if you had

10    put sepsis in your report?

11                 MS. PECK:  Objection.

12                 THE WITNESS:  A medical professional would

13    have read my report and understood that the positive

14    cultures indicated that he did have sepsis.  I didn't

15    use the word "sepsis", but I did describe the positive

16    cultures which are synonymous with sepsis.

17    BY MR. KLEIN:

18      Q.  Well, I understood your answer before to be

19    different, so correct me if I'm wrong.  I thought the

20    positive cultures are synonymous with streptococcus

21    pneumoniae which is not in and of itself sepsis.

22      A.  No.  It is sepsis.

23      Q.  So, strep --
```

```
1              (Michael Sikirica - by Mr.  Klein)

2     A.   Positive blood cultures are synonymous with

3  either two things, bacteremia or sepsis.

4     Q.   So streptococcus pneumoniae is bacteremia and

5  sepsis both?

6     A.   Streptococcus pneumoniae is the organism that was

7  identified in his blood that was the cause of his sepsis

8  that caused the blood to be infected with strep

9  pneumoniae.

10     Q.   So, given that that was the cause of his sepsis,

11  saying he had streptococcus pneumoniae, does someone who

12  has streptococcus pneumoniae necessarily have sepsis?

13     A.   No.

14     Q.   So, then, it would not be accurate that just

15  putting the streptococcus pneumoniae in the report would

16  lead someone to conclude that he had sepsis, is it?

17     A.   If I said it was isolated from the blood it would

18  be the same as saying he had sepsis.

19     Q.   But you didn't say that.

20     A.   Correct.  I simply said it was isolated from the

21  blood.

22              MS. CALABRESE:  You did say that?

23              THE WITNESS:  Streptococcus pneumoniae was
```

1          (Michael Sikirica - by Mr. Klein)

2    isolated from the blood.  Blood culture positive for

3    streptococcus pneumoniae on initial presentation.

4          MS. PECK:  So, you did say that.

5          THE WITNESS:  I did say that it was in his

6    blood.  It is equivalent to sepsis.

7    BY MR. KLEIN:

8      Q.  That is the equivalent of saying he had sepsis?

9      A.  Yeah.

10     Q.  Now, you indicated earlier that you had read Dr.

11   Klein's testimony at some point; is that right?

12     A.  Yes.

13     Q.  Did you hear it in court live, or have you --

14     A.  No.  I didn't hear it in court, no.

15     Q.  Did you read his testimony in advance of the 2014

16   trial?

17     A.  I may have.  I don't recall.

18     Q.  Have you read any of his testimony, either from

19   '09 or '14, from the 2014 trial, up until today?

20     A.  Yes.  I read them both last week or the week

21   before.

22     Q.  Did you read Dr. Leestma's last week as well?

23     A.  Yes.

1          (Michael Sikirica - by Mr. Klein)

2      Q.   Did you read Dr. Barnes as well?

3      A.   Dr. Barnes is?

4      Q.   The radiologist.

5      A.   No, I did not.

6      Q.   Do you remember Dr. Barnes' testimony generally?

7      A.   I believe it was Skyped in and I don't recall

8   what it was about.

9      Q.   So, you then touched briefly on how Dr. Klein

10   didn't address trauma.  What, if any, other critique do

11   you have of Dr. Klein's testimony having recently read

12   it?

13      A.   His testimony reminded me of Dancing with the

14   Stars.  You couldn't pin this guy down to anything.  He

15   wouldn't even admit surgery was trauma to the body.  He

16   wouldn't concede that trauma can cause sepsis.

17          I found it very elusive, very strange, very

18   myopic.

19      Q.   Other than that, what if any critique do you have

20   of his testimony, whether it's on the merits of the

21   medicine or --

22      A.   I have great respect for his authority, his

23   publications, his experience, but I thought the

1          (Michael Sikirica - by Mr. Klein)

2  testimony was misleading.

3     Q.  In what way?

4     A.  In that he would not admit that trauma could

5  cause sepsis.  He would not admit that even surgery was

6  trauma to the body.  He was viewing it in a very myopic,

7  very focused, microscopic way.

8     Q.  Is there anything else that you would critique

9  about his testimony, whether about him or the substance

10  of what he said, or anything else?

11     A.  No.  I just had an issue with the testimony

12  itself.  I have no -- nothing but respect for Dr. Klein.

13  He's a very accomplished infectious disease

14  pediatrician, but I don't think he made a very

15  informative testimony.

16     Q.  Do you believe he mis -- you said the word

17  "misleading".  Do you believe he mislead the jury in

18  this case?

19          MS. PECK:  Object to the form.

20          MR. PERKINS:  Objection.

21          THE WITNESS:  I don't think he intentionally

22  mislead the jury, but I think the jury would be easily

23  mislead.

Case 1:17-cv-00626-DJS Document 44-12 Filed 06/14/21 Page 203 of 442

1           (Michael Sikirica - by Mr.  Klein)

2    BY MR. KLEIN:

3       Q.  Have you ever worked with him or spoken with him

4    on any occasion in your career?

5       A.  Never.

6       Q.  With regard to Dr. Leestma's testimony, same

7    question.

8           What if any critique do you have of the

9    testimony?  What if anything of his testimony do you

10   agree with?

11      A.  Well, I agree that the possibility is there for

12   any subdural hematoma to rebleed, but I believe that the

13   description of this as being meningitis was erroneous

14   because the inflammation came not from a primary

15   meningitis, but from the sepsis that Matthew had been

16   suffering.

17      Q.  If he had said meninges infection, would that

18   have been more accurate in your mind?

19      A.  Yes.

20      Q.  Do you think he was using the word "meningitis"

21   loosely?

22      A.  Yes.

23      Q.  So that the jury could understand it?

```
 1              (Michael Sikirica - by Mr.  Klein)

 2      A.  Yes.

 3      Q.  Do you think he probably meant meninges

 4   infection?

 5              MS. PECK:  Objection.

 6              MS. CALABRESE:  Objection.

 7              THE WITNESS:  I can't really say what he

 8   meant.

 9   BY MR. KLEIN:

10      Q.  Other than that, do you have any other comments

11   or criticisms or things that you credit about his

12   testimony?

13      A.  No.  I think he's a well respected

14   neuropathologist, just as Dr. Klein is very well

15   respected.  I appreciate their dedication and I think we

16   just have a medical disagreement.

17      Q.  Do you think he was misleading as well to the

18   jury?

19      A.  No.

20      Q.  So, how was Klein misleading but Leestma was not,

21   just so that I can understand.

22      A.  Well, it was very difficult for Dr. Klein to even

23   admit that sepsis can be caused by trauma.  Dr. Klein
```

Case 1:17-cv-00626-DJS Document 114-2 Filed 06/14/21 Page 219 of 442

1          (Michael Sikirica - by Mr.  Klein)

2    refused to answer any question that had to do with any

3    sort of trauma or evaluation, which I found unusual as a

4    pediatrician who should be very comfortable dealing with

5    traumatic injury to children.

6          So, he had become so specialized, I think, in his

7    field of pediatric infectious disease, that he sort of

8    overlooked the other portions of being a pediatrician,

9    which may often include evaluation of trauma in

10   children.

11     Q.   The aspects of his testimony about pediatric

12   infectious disease, specifically sepsis being a

13   potential independent cause of death here, do you take

14   that to -- take issue with that in any regard?

15     A.   Yes.  I don't think the sepsis was an independent

16   cause of death.

17     Q.   Given his testimony, do you -- and your respect

18   for him, do you believe sepsis was a more significant

19   factor, contributing factor, in the death than you

20   previously gave weight to?

21     A.   No.

22     Q.   He dedicated his career to pediatric infectious

23   disease from what you know, correct?

```
 1              (Michael Sikirica - by Mr.  Klein)

 2     A.  Yes.

 3     Q.  What incentive or motivation would he have to

 4  testify --

 5              MS. PECK:  Objection.

 6     Q.  -- that sepsis can be independently the cause of

 7  death in a case like this if it wasn't part of his

 8  expertise?

 9              MS. PECK:  Objection.

10              THE WITNESS:  I'm not saying that he did

11  deliberately.  I think Dr. Klein is very, very focused

12  on the field of infectious disease.  It's similar to

13  being a hammer.  When you're a hammer, everything is a

14  nail.

15              So, Dr. Klein was very focused on the idea

16  of sepsis as being the only thing that this child was

17  suffering from.  I think his training and expertise lead

18  him in that direction.

19              As a forensic pathologist, we're not able to

20  do that.  We have to look at a broader picture.  We

21  can't be myopic and only focus on what we're trained to

22  do.

23  BY MR. KLEIN:
```

1              (Michael Sikirica - by Mr. Klein)

2      Q.  Weren't you lead in the direction of this being a

3    homicide from the initial meeting with police and the

4    district attorney's office?

5              MS. PECK:  Objection.

6              THE WITNESS:  They may have said that, but I

7    don't get lead by anyone.

8    BY MR. KLEIN:

9      Q.  Well, they engaged in misconduct.  The Court of

10   Appeals found that they violated Mr. Thomas' due process

11   rights.

12             MS. CALABRESE:  Objection and I'm going to

13   make a report.  I think that's a misstatement of fact.

14   The Court of Appeals said that the police engaged in

15   misconduct with regard to their conversation with Adrian

16   Thomas --

17             MR. KLEIN:  I didn't finish my question.

18             MS. CALABRESE:  -- not with regard to any

19   conversations they may or may not have had with this

20   witness, Dr. Sikirica.

21             MR. KLEIN:  I never suggested otherwise.

22     Q.  They engaged in misconduct with regard to their

23   procurement of the statement that you relied on, and

Case 1:17-cv-00626-DJS Document 84-12 Filed 06/14/21 Page 222 of 443

```
 1              (Michael Sikirica - by Mr.  Klein)

 2    they're the ones who came to you with this potential

 3    homicide investigation after he was already arraigned

 4    for attempted murder, correct?

 5      A.  Yes.

 6      Q.  So, weren't you being lead down the road of -- in

 7    a strong way with a strong push -- that this is more

 8    likely than not a homicide?

 9              MS. PECK:  Objection.

10              MR. PERKINS:  Objection to form.

11              THE WITNESS:  Well, as a forensic

12    pathologist we don't get lead down the road by police or

13    other physicians or anything else.  We perform our own

14    function.  We look at the evidence and we look at the

15    surrounding information, and we come to our own

16    independent conclusion.

17              We're not pushed by the police.  I've never

18    been pushed by the police.  I've never been told by the

19    police to do something.  I'm the one who tells them what

20    to do, what I need to make a diagnosis.  So, the idea

21    that I'm being lead by anything is erroneous.

22    BY MR. KLEIN:

23      Q.  Would you agree that a closed head injury never
```

1    (Michael Sikirica - by Mr. Klein)

2  directly causes sepsis?

3    A.  I would agree with that, yes.

4    Q.  What you describe Matthew presenting with is a

5  closed head injury, correct?

6    A.  Correct.

7    Q.  So, what is your explanation?  Your explanation

8  would be that the closed head injury caused the

9  pneumonia which caused sepsis; is that your explanation?

10    A.  Yes.

11    MS. PECK:  Objection.  Asked and answered.

12    A.  My explanation for that -- closed head injury by

13  itself doesn't cause sepsis, but the complications of

14  closed head injuries are very commonly associated with

15  infection and sepsis.

16    Q.  Isn't it true that DIC without trauma, with

17  sepsis, can cause a subgaleal hemorrhage like the kind

18  Matthew had?

19    A.  No.  The subgaleal hemorrhage is caused by

20  trauma.

21    Q.  But didn't you testify that it's not impossible,

22  although very unlikely, but not impossible, that that

23  could happen?  Rare case?

Case 1:17-cv-00626-DJS Document 104-14 2/21 Filed 06/14/21 Page 223 of 443

1                    (Michael Sikirica - by Mr.  Klein)

2        A.   I don't recall testifying to that.  I may have.

3   But it would be very, very unlikely that it would occur

4   without trauma.  It may be aggravated by trauma, but

5   it's not going to cause that injury.

6        Q.   The marks associated with the splitting of the

7   sutures were not a direct cause of the trauma, correct?

8        A.   A direct cause of the trauma or were caused

9   directly by the trauma?

10       Q.   In your view, are they related to the trauma?

11       A.   They're a downstream effect of the trauma because

12  the suture splitting is due to the edema and there may

13  be contributory swelling of the brain due to the

14  infection that seeded into there, but they're not

15  directly related to the trauma.

16       Q.   Well, is the suture splitting related in your

17  view, if you know, to the subdural hematoma or to the

18  subgaleal hemorrhage?

19       A.   It would be much more related to the subdural

20  hematoma and the effects of that on causing the brain to

21  swell and split the sutures.

22       Q.   The subdural hematoma, that was several days to

23  several weeks old, correct?

1                (Michael Sikirica - by Mr.  Klein)

2     A.   There was an acute subdural hematoma and an older

3  subdural hematoma, so there were two.  We can definitely

4  differentiate between the two of them.

5     Q.   You were asked earlier about bilateral subdural

6  hematomas, and you said they weren't bilateral, just one

7  on the right side?

8     A.   Correct.

9     Q.   Now you're saying there are two.

10         Can you explain what you mean.

11     A.   There are two in the same roughly location.  The

12  one was older, and that was the one that would be

13  susceptible to rebleeding.  And then there was a fresh

14  clot that was still liquified that I drew off that

15  totalled approximately 60 ML.  So, there were, in

16  essence, the two subdural hematomas, but they were in

17  the same location.

18     Q.   And the one that was fresher, was that chronic or

19  acute?

20     A.   That would have been acute.

21     Q.   So there was an acute subdural hematoma as well

22  as an acute subgaleal hemorrhage?

23     A.   Correct.

Case 1:17-cv-00626-DJS Document 114-2 Filed 06/14/21 Page 226 of 443

1        (Michael Sikirica - by Mr.  Klein)

2    Q.  Do you say that in your report?  Take a look at

3 your autopsy report.  Can you point out where you say

4 that.

5        Would that be microscopic sections or which part?

6    A.  That would be in the microscopic sections under

7 section B10, this is the sections on the brain, acute

8 and more chronic subdural hemorrhage; B9 says,

9 predominantly acute subdural hemorrhage.

10       Those are sections taken of the dura or lining of

11 the inside of the skull to illustrate the subdural

12 hemorrhage.

13   Q.  Do you use the word "subdural hemorrhage"

14 interchangeably with "subdural hematoma"?

15   A.  Yes.

16   Q.  Is that interchangeable with the word collection,

17 fluid collection, or is that different?

18   A.  I don't think I used the word "fluid collection".

19   Q.  I don't know if you did.  I'm just asking you.

20   A.  That would be different because a hematoma or

21 hemorrhage would imply that it's red blood cells.

22   Q.  Whereas fluid collection would imply what?

23   A.  It could be serum or CSF or any other type of

```
 1            (Michael Sikirica - by Mr.  Klein)

 2   fluid.

 3      Q.   Does your exhibit have the drawings?

 4      A.   No.  It's simply the autopsy and the toxicology.

 5      Q.   The drawings that I will mark in a moment are

 6   like diagrams of the infant's body and notes taken

 7   apparently during the autopsy; is that right?

 8      A.   Correct.

 9      Q.   Is this part of the autopsy report or this is a

10   separately maintained...

11      A.   This is separately maintained.  I don't release

12   that with the autopsy report.

13      Q.   Doctor, have you ever had a case where someone

14   was in custody or already arraigned for homicide charges

15   and you determine post that the death was not a

16   homicide?

17      A.   Yes.

18            MR. PERKINS:  Object to the form.

19   BY MR. KLEIN:

20      Q.   What did you do in that situation?

21            How many times did that happen and what did you

22   do?

23      A.   Well, I would inform the district attorney that
```

1          (Michael Sikirica - by Mr.  Klein)

2     the conclusions they made were not proven at the

3     autopsy.  And I can't remember all the cases, but I do

4     remember one particular where a child had been

5     reportedly overlain by the mother, and they were

6     prosecuted as a homicide before the autopsy was even

7     started.

8          I said, you cannot do that.  This will be an

9     undetermined cause of death most likely.

10     Q.  Was she prosecuted after that or was she let go?

11     A.  No.  I don't know if she was let go or the

12     charges may have been downgraded to something like

13     reckless endangerment.

14     Q.  Was that within the last 10 or 20 years?

15     A.  Yes.

16     Q.  What county was that?

17     A.  It was up north I believe in Warren County and it

18     was Kate Hogan who was the district attorney.

19     Q.  Other than that, can you think of any other

20     situations where that arose?

21     A.  Well I've had cases come to me as possible

22     homicides -- it happens quite often -- that then are

23     ruled as a suicide.

1          (Michael Sikirica - by Mr. Klein)

2      Q.  Are you called upon to investigate allegations of

3   inmate deaths by correction officers?

4      A.  Well, the...

5      Q.  -- or police officers?

6      A.  Yes.  The state corrections demands that anybody

7   who dies in prison or under medical care, even in a

8   hospital situation, that was a prisoner was mandated to

9   have an autopsy.

10          So, I do autopsies of prisoners.

11      Q.  Do you have an affirmative obligation, as a

12   medical examiner in Rensselaer County, to intervene or

13   otherwise notify police and prosecutors if you think

14   that the manner or cause of death is inconsistent with

15   the charges they're bringing?

16          MS. PECK:  Objection.  And I'm going as far

17   as to say that would call for a legal conclusion.

18      Q.  You can answer.

19          MS. PECK:  If you know.

20      A.  Yes.  I would notify any prosecutor if I thought

21   the evidence was not sufficient to bring charges against

22   someone.

23      Q.  In this case, did you consider yourself, based on

```
 1              (Michael Sikirica - by Mr.  Klein)
 2   your duties and responsibility and given all of your
 3   experience, as part of the law enforcement team here
 4   with prosecutors, police and anyone else investigating
 5   this?
 6              MS. PECK:  Objection.
 7              THE WITNESS:  I am part of no team.
 8   BY MR. KLEIN:
 9      Q.  Are you considered law enforcement, though --
10              MS. PECK:  Objection.
11      A.  No.
12      Q.  Do you undertake an autopsy like this knowing
13   that police and/or prosecutors will rely on it in
14   criminal proceedings?
15      A.  Yes, I do.  I do every autopsy with the
16   expectation that some day, even though it may seem to be
17   natural at the time, or an accident, somewhere, somehow,
18   it may come into a medical legal case and be brought up
19   for charges or could be brought to an attorney.
20      Q.  So, when you in this case made the determination
21   at some point not to document sepsis in the autopsy and
22   the death certificate, you did that knowing that
23   prosecutors would rely on your findings and the lack
```

```
 1              (Michael Sikirica - by Mr.  Klein)
 2    thereof of any other findings, correct?
 3                   MS. PECK:  Objection to the form.
 4                   MR. PERKINS:  Objection.
 5                   MS. CALABRESE:  Objection.
 6                   MS. PECK:  That wasn't his testimony.
 7                   MR. KLEIN:  I'm asking him if it is.
 8                   MS. PECK:  That was not your question.  That
 9    was a mischaracterization of testimony.
10                   MR. KLEIN:  I'm asking him -- it's a yes or
11    no, so.
12                   Let's not have speaking objections.  I'll
13    rephrase the question if you want me to do that, but
14    let's not accuse people of mischaracterizing, because
15    I'm asking him.  I'm not telling him anything.
16       Q.  When you at some point receive the results
17    confirming pneumococcal pneumoniae --
18       A.  In the bloodstream.
19       Q.  -- you knew -- did that make sepsis more of a
20    contributory issue in his death?
21       A.  No.
22       Q.  When you made the decision to put the finding of
23    pneumococcal pneumoniae in your report but not the word
```

1          (Michael Sikirica - by Mr. Klein)

2    "sepsis" as being indicated in any of the records or in

3    his blood, did you do so knowing that prosecutors would

4    rely on that not being in there?

5          MS. PECK:  Objection.

6          THE WITNESS:  No.  No.  I put that his blood

7    was infected with streptococcal pneumoniae, which is

8    synonymous with sepsis, but I didn't give it much

9    emphasis because I did not think it was really related

10   to the ultimate cause of death, which was severe closed

11   head injury from cerebral edema due to blunt force

12   trauma.

13          I thought it was a complication of this

14   cerebral edema and blunt force trauma.

15   BY MR. KLEIN:

16     Q.  An example of someone who is asphyxiated, like

17   maintained in a prone position, pressure on their back

18   and they're obese, obesity is a complicating factor but

19   not the cause of death, correct?

20     A.  Correct.

21     Q.  But you would put obesity in the autopsy as a

22   secondary cause, complications from obesity.

23     A.  I might put complications.  I might explain the

```
 1              (Michael Sikirica - by Mr.  Klein)
 2   whole thing as a positional asphyxia due to compression
 3   of the chest with severe underlying cardiomegaly,
 4   obesity, diabetes, hypertension, and wrap that in there.
 5   Yes.
 6      Q.  So, my question is in this case:  Isn't the
 7   sepsis and the impact of it on Matthew's system
 8   significant enough to warrant more of a discussion in
 9   your autopsy?
10              MS. PECK:  Objection.
11              THE WITNESS:  No.
12      Q.  Even if not required under medical examiner
13   standards, I just want to know in retrospect if you
14   think you should have been more descriptive about it --
15              MS. PECK:  Objection.  Asked and answered.
16      Q.  -- in terms of its materiality?
17      A.  Well, I should have probably used the word
18   "sepsis" instead of "blood cultures positive" because I
19   can understand now that people don't understand the
20   connection between the two and that they are synonymous.
21      Q.  Well, you acknowledge that you didn't put sepsis
22   in your report at trial.  You never said, I did with
23   synonymous words.  You just acknowledged that you didn't
```

```
 1              (Michael Sikirica - by Mr.  Klein)

 2    put it in, correct?

 3        A.  Yes.

 4        Q.  So, is this the first time you're saying on the

 5    record that it's synonymous so you didn't put it in

 6    publicly?

 7        A.  It may be.

 8        Q.  So, why didn't you say it at two trials?

 9              MS. PECK:  Object to the form.

10              MR. PERKINS:  Objection.

11              MS. PECK:  Is there a portion of his

12    testimony that you want to point to that you're talking

13    about?

14    BY MR. KLEIN:

15        Q.  You recall that -- you acknowledge that you

16    didn't use the word "sepsis" in your report, correct?

17        A.  Correct.

18        Q.  My question is, and you also recall that you

19    didn't clarify at either trial that by stating

20    pneumococcal pneumoniae I said the equivalent of sepsis.

21          You never said words to that effect either,

22    correct?

23              MS. PECK:  Objection.
```

Case 1:17-cv-00626-DJS Document 84-14/2/2021 Filed 08/14/21 Page 235 of 442

```
 1              (Michael Sikirica - by Mr.  Klein)

 2                MR. PERKINS:  Objection.

 3                MS. CALABRESE:  Objection.

 4                THE WITNESS:  I was never asked the

 5   question, Doctor, is that the same as sepsis?  I was

 6   never asked that question that I can recall.

 7   BY MR. KLEIN:

 8      Q.  Had you been asked you would have said yes?

 9      A.  Yes.

10      Q.  You don't list the mother's statement as

11   something that you considered in your report, do you, as

12   a source of information?  But you testified that you did

13   consider it.

14      A.  No.  I don't have the mother's statement listed

15   in this report.

16      Q.  Was that another oversight?

17                MS. PECK:  Objection.

18                MS. CALABRESE:  Object to the form.

19                THE WITNESS:  No.  I don't know if I had the

20   mother's statement at the time I did this autopsy.

21   BY MR. KLEIN:

22      Q.  If you did have it but it's not in the report

23   would that have been an inadvertent oversight?
```

Case 1:17-cv-00626-DJS Document 141-2 Filed 06/14/21 Page 236 of 442

```
 1              (Michael Sikirica - by Mr.  Klein)

 2      A.  Yes.

 3      Q.  Anything else that you looked at that's not in

 4  the report?

 5      A.  Not that I'm aware of.  I try to list everything

 6  that I look at, so if anyone needs to go back and

 7  reference how I came to my conclusion, it's there.

 8      Q.  Other than this case, have you worked with

 9  Detective Mason on other investigations?

10              MS. PECK:  Objection to form.

11              THE WITNESS:  Yes.

12  BY MR. KLEIN:

13      Q.  How many others?

14      A.  I would say 10 to 20.

15      Q.  One of them was Michael Davis, correct?

16      A.  Michael Davis was.

17              MS. PECK:  Off the record.

18              (Discussion held off the record.)

19              MR. KLEIN:  I'm aware of a matter in which

20  you worked on with Sergeant Mason involving an infant

21  death, but we won't get into the names on the record

22  today.

23      Q.  Do any of the other cases involving Sergeant
```

```
 1              (Michael Sikirica - by Mr.  Klein)
 2   Mason involve infant and/or deaths of young children
 3   homicides?
 4       A.  Yes.
 5       Q.  How many others?
 6       A.  I couldn't give you a number.  I would say at
 7   least several.
 8       Q.  Did any of them result in convictions or pleas of
 9   guilty, to your knowledge?
10       A.  I can't recall exactly.  I would have to have
11   those in front of me to even remember the cases.
12              MR. KLEIN:  I'm going to ask to leave a
13   space in the record and ask that you give us the names
14   of the cases that you worked on with Sergeant Mason that
15   are not otherwise immune from disclosure because of the
16   under the state law or because there's been sealing.
17   _____
18              THE WITNESS:  I don't know if I can give you
19   those cases, because I don't know if -- Sergeant Mason,
20   he may have come to the autopsy and he may not come to
21   the autopsy.  So, the cases may have involved him, but
22   if he's not at the autopsy I wouldn't know.
23              MR. KLEIN:  Ones that you know.
```

```
 1              (Michael Sikirica - by Mr.  Klein)

 2                THE WITNESS:  The only one I can recall is

 3   Davis.

 4   BY MR. KLEIN:

 5      Q.  Without stating names, other than Davis, are

 6   there any other cases involving infant deaths where you

 7   opine there was a homicide where the defendant was found

 8   not guilty?

 9      A.  There may be.  I can't recall.  There very well

10   may be.

11      Q.  You can't think of one of them?

12          Did you work on the McElaney case?

13      A.  Could you refresh.  You're using names.

14      Q.  I don't want to use infant names.  I want to know

15   if you remember any.

16                MS. PECK:  Off the record for a second.

17                (Discussion held off the record.)

18                MR. KLEIN:  I'll ask to leave a space in the

19   record.  If you can think of any cases that resulted in

20   acquittals, I would ask that they be provided either in

21   the transcript, that can remain confidential, or that we

22   mark it for a ruling with the court.

23   _____
```

1          (Michael Sikirica - by Mr. Klein)

2     Q.  How about former officer Fountain, Ronald

3  Fountain, have you worked with him on any cases other

4  than this case?

5     A.  Yes, several.

6     Q.  Can you remember any specifics?

7     A.  No.  I can't remember specifics because, often,

8  they will come to the autopsy or they may not come to

9  the autopsy, and we may have a meeting later on.  They

10  could be there.  They could not be there.  So, I don't

11  pay any particular attention to who's running the case.

12          Usually these cases are collaborative things

13  among the police.  I find that some police officers will

14  come to the autopsy, others will be interviewing family

15  members or witnesses.  So, I may indirectly work with a

16  whole spectrum of police in a case, but not necessarily

17  interact with them personally.

18     Q.  Have you worked with sergeant, maybe now

19  Lieutenant Colaneri --

20     A.  Yes.

21     Q.  -- on other cases?

22     A.  Yes.

23     Q.  Can you recall approximately how many?  Is it

Case 1:17-cv-00626-DJS Document 114-2021 Filed 06/14/21 Page 240 of 442

1        (Michael Sikirica - by Mr.  Klein)

2    also about ten or is it different?

3        A.   It would be the same number, and I worked with

4    him on one particular case I recall.

5        Q.   Did it involve an infant homicide, an infant

6    death?

7        A.   Well, it involved a college student who was found

8    shot in his apartment in Troy, and I ruled it a homicide

9    and they believed it to be a suicide.

10       Q.   Was the defendant convicted or acquitted, if you

11   know?

12       A.   They never found the defendant.

13       Q.   I see.

14       A.   Never found a defendant.

15       Q.   You were involved in an investigation that, to

16   your knowledge, didn't lead to any prosecution?

17       A.   In this case, no.  There was never any

18   prosecution because they never found...

19       Q.   A suspect?

20       A.   A suspect.

21       Q.   In your file is a sign-in sheet for a meeting on

22   September 16 of '09 with ADA Book and ADA Glass.

23            Would that have been like a trial prep for the

1          (Michael Sikirica - by Mr. Klein)

2   '09 trial?

3     A.  Yes.

4     Q.  And there's a sign-in sheet for 9/25/08, which we

5   discussed earlier, that includes Jennifer Alibozek,

6   David Carly, Christa Book, Richard McNally, and Adam

7   Mason.

8        If those are the only two sign-in sheets for this

9   case, does that mean that those are the only times you

10  met with -- like, didn't you prep before the June '14

11  trial?  Would there a sign-in sheet for that?

12    A.  There should have been, but sometimes we forget

13  to do them and they don't get done.

14    Q.  Okay.  I want to ask you some questions about

15  your file.

16    A.  Sure.

17    Q.  Do you have it with you?  Do you have the

18  original?

19    A.  Yes.

20    Q.  Let me ask you this:  What I have here is all the

21  photos on top of what you scanned and gave to me.  It

22  looks a lot thicker than that.

23        MS. PECK:  Doctor, is the file also in your

```
 1              (Michael Sikirica - by Mr.  Klein)

 2   Redwell?

 3              THE WITNESS:  Yes.

 4              (Off the record.)

 5              (Thomas Exhibits 7A and 7B marked for

 6   identification.)

 7   BY MR. KLEIN:

 8     Q.  Doctor, I've shown you what's been marked as

 9   Thomas Exhibits 7A and 7B, which are two binders which

10   collectively contain your file that was given to us by

11   your counsel, Ms. Peck.

12          Off the record, I had asked that you identify,

13   using green stickers, the photos and slides that you

14   think are pertinent to the significant clinical findings

15   in this case of trauma, or that are otherwise

16   significant as in you might mention them at trial in

17   this case.

18          Can you walk us through?  We'll do our best to

19   identify them.  We'll mark each particular page with an

20   exhibit sticker.

21          So, we're looking at the first photo in the first

22   binder 7A, and it's a photo of the child's skull?

23     A.  Yes.  This is a photograph with an evidence
```

```
 1              (Michael Sikirica - by Mr.  Klein)

 2   ruler.  Depicts the skull after it had been retracted,

 3   showing the pressure in the older areas of the bruising

 4   among the right parietal region.

 5      Q.  So, for purposes of identification, does this

 6   have a photo number we can refer to?

 7      A.  I think you should mark it at this point if you

 8   want to refer to it in the future.

 9                  (Thomas Exhibit 7A1 marked for

10   identification.)

11      Q.  Directing your attention to 7A1.  I ask that you

12   circle the significant clinical findings on that page or

13   things you think are significant.

14      A.  (Witness complies.)

15      Q.  You made two circles on the page, correct?

16      A.  Yes.

17      Q.  The one that's adjacent to the yellow ruler,

18   that's looking at the page to the lower left, correct?

19      A.  Yes.

20      Q.  What is that?

21      A.  That is the older subgaleal hemorrhage I

22   described with a greenish coloration.

23      Q.  Would you mind writing "older SGH"?
```

1          (Michael Sikirica - by Mr. Klein)

2     A.  (Witness complies.)

3     Q.  The one that's in the top center, what is that?

4     A.  This is the fresher.

5     Q.  And the fresher is the one that you believe is

6  significant in this case in that it's happened a few

7  days before the hospitalization?

8     A.  Yes.

9     Q.  And the one closer to the ruler that's older is

10  of no clinical significance to you in this case.

11     A.  Well, it could be significant clinical importance

12  because it could be associated with the older subdural

13  hemorrhage that was found when I opened the skull.

14     Q.  And you're indicating on this document with your

15  pen an area where there is a subdural hemorrhage

16  underneath when you opened it up?

17     A.  Yes.

18     Q.  Where would that -- can you just write the

19  letters SDH in the general vicinity of where the lower

20  subdural hemorrhage is.

21     A.  (Witness complies.)

22     Q.  Is there anything else significant about this

23  photo?

```
 1            (Michael Sikirica - by Mr.  Klein)

 2      A.   It does show some additional hemorrhage around

 3   the suture sites that have split.

 4      Q.   For the record, you just put your pen around an

 5   area -- looking at the page on the lower right part of

 6   the skull, correct?

 7      A.   Correct.

 8      Q.   Can you maybe make a more pronounced mark around

 9   that and maybe just write suture site or suture?

10      A.   Split.

11      Q.   Does that part of the picture literally show the

12   suture split or what does that show, exactly?

13      A.   You can see some of the features of the suture

14   that run into this area right where the fontanel is.

15      Q.   The area in the middle that looks like there's a

16   hole or a circle, is that the fontanel?

17      A.   Yes.

18      Q.   Can you just put a big F in the center of the

19   fontanel?

20      A.   (Witness complies.)

21      Q.   Is there anything else in this photo that is of

22   significance such that you might mention at a trial in

23   this case?
```

Case 1:17-cv-00626-DJS Document 14-2 Filed 06/14/21 Page 246 of 443

```
 1              (Michael Sikirica - by Mr.  Klein)

 2     A.  No.

 3              MS. PECK:  Before you go on, because you

 4    didn't clarify, the witness also marked "fresher SGH" on

 5    the top.

 6              MR. KLEIN:  Right.

 7     Q.  So these are the two subgaleal hemorrhages that

 8    you spoke about earlier.

 9     A.  Yes.

10     Q.  There are no others?

11     A.  No.

12              (Thomas Exhibit 7A2 marked for

13    identification.)

14     Q.  Looking at page 7A2.  Can you tell us what the

15    picture shows and make any markings of whatever you

16    think is pertinent.

17     A.  7A2 depicts the area of the older subdural

18    hemorrhage in the right middle cerebral fossa, and also

19    shows some residual clotted blood after we removed the

20    brain from the fresh subdural hemorrhage.

21     Q.  Is that 60 MLs that you removed?

22     A.  60 ML, yes.  So, that's already been removed.

23     Q.  So, this is remaining after you removed it?
```

Case 1:17-cv-00626-DJS Document 142-21 Filed 06/14/21 Page 247 of 443

```
 1              (Michael Sikirica - by Mr.  Klein)

 2      A.   Yes.

 3      Q.   Did you remove a portion of the 60 MLs?

 4      A.   I removed the majority of the clot which totalled

 5   60 MLs.

 6      Q.   Is that the remainder of the clot?

 7      A.   Yes.

 8      Q.   So, literally, the part of the clot that you

 9   removed was attached to that existing clot that we see

10   in this photo?

11      A.   Yes.

12      Q.   Can you mark the two areas, the best way that you

13   think would be clear, top one with a line around it, and

14   indicate what it is with an arrow coming from it maybe?

15      A.   This is the older subdural hemorrhage and this is

16   a few MLs of newer subdural hemorrhage.

17      Q.   For the record, you wrote SDH for subdural

18   hemorrhage, correct?

19      A.   Correct.

20      Q.   Does this photo have any other significance other

21   than what you've said in this case?

22      A.   Yes.  It does show in this area, in the posterior

23   fossa, that the brain is very much -- almost liquified
```

Case 1:17-cv-00626-DJS   Document 142-1   Filed 06/14/21   Page 248 of 443

1          (Michael Sikirica - by Mr.  Klein)

2    and just turning into a milky dead tissue.

3       Q.  Is that where the gray matter and the white

4    matter kind of...

5       A.  Mix.

6       Q.  Mix?

7       A.  Yes.

8       Q.  Is that an indication of severe infection or just

9    the brain death, or what is that?

10      A.  It's an indicator of the brain death.

11      Q.  That's not directly related to trauma.

12      A.  Not directly related to the trauma.

13      Q.  Given your findings, it ended up that way due to

14   trauma.

15      A.  Yes.

16      Q.  But others think that it may have ended that way

17   due to sepsis.

18      A.  Correct.

19      Q.  For the record, that's on the -- looking at the

20   page on the lower left side of the open skull.

21      A.  Yes.

22      Q.  Is there anything else on this photo that's of

23   significance in this case?

Case 1:17-cv-00626-DJS Document 14-2 Filed 06/14/21 Page 249 of 442

```
 1          (Michael Sikirica - by Mr. Klein)

 2     A.  No.

 3             (Thomas Exhibit 7A3 marked for

 4  identification.)

 5     Q.  The next page I think that you marked is 7A3.

 6     A.  Yes.

 7     Q.  What is that?

 8     A.  This is the brain in the condition that it came

 9  out of the skull.  I'll write in here "brain in

10  measuring dish", just illustrating that the brain is

11  very much liquified at this point.

12     Q.  And the significance of that, just for the

13  record, is what?

14     A.  Again, the severe edema and anoxia of the brain.

15     Q.  That in and of itself doesn't speak to trauma

16  verus infection.  It just speaks to the condition of the

17  brain.

18     A.  Correct.

19     Q.  Is there anything else in that photo that's of

20  any significance?

21     A.  No.  The brain has been totally removed at that

22  point.

23             And then there is an additional photograph from
```

1            (Michael Sikirica - by Mr.  Klein)

2    the time of the brain cutting that was taken by myself.

3            (Thomas Exhibit 7A4 marked for

4    identification.)

5        Q.   That's been marked as Exhibit 7A4, correct?

6        A.   Yes.

7        Q.   This looks like a series of slides, correct?

8        A.   Correct.

9        Q.   Or thumbnails?

10       A.   Yes.

11       Q.   Who took these?

12       A.   I took these.

13       Q.   Were they taken on the date of the autopsy or

14    some other time?

15       A.   These were taken at the time of the brain

16    cutting.

17       Q.   February of 2009.

18       A.   Yes.

19       Q.   Okay.

20       A.   There are two pictures here that illustrate the

21    dura with the membrane, the hematoma attached to it.

22    That would be pictures 4357 and 4358 that show the dura

23    that I removed.

Case 1:17-cv-00626-DJS Document 142-2 Filed 06/14/21 Page 251 of 443

1      (Michael Sikirica - by Mr. Klein)

2    Q.   What is the significance of the dura with the

3  membrane attached to the findings in this case?

4    A.   It just shows that there's evidence of an older

5  subdural hematoma in addition to the newer subdural

6  hematoma.

7    Q.   Would that correlate to the area where there was

8  the remainder of the 60 MLs of blood that we looked at

9  in an earlier photo?

10   A.   Yes.

11   Q.   You refer to that as the older subdural hematoma.

12   A.   Yes.

13   Q.   Are any of these other photos on this page of any

14  significance?

15   A.   They just reflect that the brain has been fixed,

16  and there is still a lot of evidence of edema and

17  swelling of the brain.  There are also photographs of

18  the eyes.  And the photograph -- 4373 is a picture of

19  the left eye that shows the optic nerve sheath

20  hemorrhage.  I will write that down.

21   Q.   Was there a hemorrhage in the right eye as well?

22   A.   Yes.

23   Q.   Is there a photo of that, too?

1              (Michael Sikirica - by Mr. Klein)

2        A.   Yes.  That would be 370.

3        Q.   Thank you.  Can I take a look at that?

4        A.   (Handing.)

5        Q.   Thanks.

6              So, in the two photos of the dura that showed the

7        older subdural hematoma, is this like a photo with

8        someone's hand with gloves on touching the area in the

9        brain, or what it does it show in those two photos?

10       A.   It shows that -- those are my hands with the

11       dura, holding the dura, which is like a piece of

12       washcloth almost at this point, with the older clot on

13       it.

14       Q.   So, you're literally holding the clot in the

15       material?

16       A.   And the dura itself, yes.

17       Q.   So, in your photos are a number of slides or

18       stains.

19             Are these stains that you took or are these...

20       A.   These are done by Dr. Leestma.

21       Q.   Dr. Leestma's stains were in your file because

22       you reviewed them?

23       A.   Yes.

Case 1:17-cv-00626-DJS Document 142-21 Filed 06/14/21 Page 253 of 442

1          (Michael Sikirica - by Mr. Klein)

2     Q.  Is there any clinical significance to these as it

3  relates to sepsis?  I know you think that sepsis is not

4  the primary cause of death here, but is there something

5  in these slides that was informative to you about the

6  nature or extent of the bacterial infection?

7     A.  Well, they do confirm the presence of bacteria.

8  They do show the bacteria on a gram stain.  The small

9  what we call diplococci which are consistent with

10  pneumococcus.

11     Q.  So, his photos were, in your opinion,

12  professional opinion, they were good photos?

13     A.  Well, they depicted everything, yes.

14     Q.  They told you what you expected they would say.

15     A.  Yes.

16     Q.  That there was a widespread bacterial infection.

17     A.  Yes.

18     Q.  There are also photos in here that look like

19  crime scene photos of the home.

20          I think you mentioned earlier that those were

21  part of your file as well, correct?

22     A.  Yes.

23     Q.  In the first photo, which I can mark but it's

Case 1:17-cv-00626-DJS Document 142-2 Filed 06/14/21 Page 254 of 442

1              (Michael Sikirica - by Mr.  Klein)

2    literally the first photo, so just to try to save time,

3    there's redness on the back of the child's head.

4          Is that related to the redness in the fontanel

5    that we talked about earlier or is this related to

6    procedures, medical procedures, that were done?

7       A.  It was not a traumatic injury.  It seemed to be

8    an area of irritation of the back of the scalp.

9       Q.  So, the sites of the trauma, just again so we're

10   on the same page, that you attribute in this case as

11   being the cause of the blunt force trauma that caused

12   the death, are depicted in Thomas 7A1, the two subgaleal

13   hemorrhages, I'm sorry, one is a subgaleal hemorrhage

14   and one is an older subgaleal hemorrhage, correct?

15      A.  Yes.

16      Q.  The one that's the newer one, on top of the

17   photo, the fresher one, that's the one that you think

18   was the trauma close in time to the hospitalization,

19   correct?

20      A.  Yes.

21      Q.  Where is that on the infant's head?

22      A.  It would be up higher on the right side above the

23   ear.

Case 1:17-cv-00626-DJS Document 14-2021-Filed 06/14/21 Page 253 of 442

```
 1              (Michael Sikirica - by Mr.  Klein)

 2      Q.   The older one would be...

 3      A.   Closer down toward the ear.

 4      Q.   The right ear or left ear?

 5      A.   The right ear.

 6      Q.   The other photo that sets forth what, in your

 7  view, reflects a site of trauma that lead to the death

 8  is Thomas 7A2, which depicts the two subdural hematomas

 9  that you referenced earlier, the older and the newer

10  one, correct?

11      A.   Yes.

12      Q.   What part of the head would you correlate to the

13  newer subdural hematoma?

14      A.   That is liquid that has leaked down into the

15  posterior portion of the skull.

16      Q.   So, do you have an opinion as to where the

17  subdural hematoma that that liquid leaked from is

18  located?

19      A.   It was originally located along the middle

20  portion of the right skull.

21      Q.   Were you able to see that in any other photos or

22  slides?

23      A.   I don't see them in those photos.
```

```
 1              (Michael Sikirica - by Mr.  Klein)

 2    Q.   How do you know that it came from the middle

 3  right portion of the skull?

 4        Is that what you said?

 5    A.   Because when I retracted the skull, the clot was

 6  collected in the middle portion of the right middle

 7  cerebral fossa.

 8    Q.   That's the area on the right side of the head

 9  above the ear?

10    A.   Yes.

11    Q.   Is it similar to where the SGH was, on that side

12  of the head?

13    A.   Yes.

14    Q.   Are they related or are they separate trauma

15  sites in your opinion?

16    A.   Well, they're contemporaneous in terms of

17  coloration and development.  That fresh hemorrhage is

18  contemporaneous with the fresher subgaleal site, and the

19  organizing subdural hematoma could be contemporaneous

20  with the older subgaleal site.

21    Q.   So, you remain unconvinced that a bacterial

22  infection could cause a bleed that would cause this

23  intracranial pooling --
```

1              (Michael Sikirica - by Mr. Klein)

2    A.  Correct.

3    Q.  -- that would lead to the other subgaleal

4 hemorrhages.

5        You don't subscribe to that theory.

6    A.  Well...

7    Q.  In other words, my question is this:  Do you

8 think that the older SDH is somehow related to the older

9 SGH?

10   A.  Yes.

11   Q.  In what way?

12   A.  They both appear to be contemporaneous in terms

13 of development, color and organization.

14   Q.  Have you ever said that in any trial or on the

15 record?

16   A.  Not that I recall.

17   Q.  Any particular reason, that did not occur to you

18 or is it not of significance?

19   A.  The questioning may not have been focused that

20 way.

21   Q.  The fresher SDH and the fresher or pink SGH,

22 right?

23   A.  Yes.

Case 1:17-cv-00626-DJS Document 114-2 Filed 06/14/21 Page 258 of 442

1          (Michael Sikirica - by Mr.  Klein)

2     Q.  Do you have an opinion about whether or not they

3  have a relation in terms of temporal or occurred at the

4  same time or something to that effect?

5     A.  They appear to have occurred around the same

6  time.

7     Q.  And the basis for that opinion is what, their

8  location?

9     A.  The coloration of the fresher subgaleal

10 hemorrhage and the organization or lack of organization

11 of the right subdural hemorrhage.

12    Q.  I don't know if this is too simplistic of a way

13 to say it, but is -- the SGH is closer to the surface of

14 the scull -- of the scalp, correct?

15    A.  The SGH is outside of the scalp.

16    Q.  Right.

17    A.  Outside of the skull.  Excuse me.

18    Q.  And the SDH is inside the skull?

19    A.  Yes.

20    Q.  Is the older SGH on top of the -- outside the

21 skull located directly above or somehow related to the

22 location of the older SDH, or do you not know?

23    A.  They're both in close proximity to each other,

```
 1          (Michael Sikirica - by Mr.  Klein)
 2   and the older SGH is located lower down along the right
 3   portion above the ear.
 4          And that's where the large portion of membrane
 5   was.  The older organizing subdural hematoma was in that
 6   location, but it's not necessarily indicative that
 7   that's the exact site where the subdural hematoma began.
 8      Q.  Why not?  It may have moved somehow, the pooling?
 9      A.  It may, yes.  It may have moved somewhat.  It may
10   also occur at a site that is not directly underneath the
11   point of impact.
12      Q.  Assuming there was some impact.
13      A.  Yes.
14      Q.  I believe I just asked you about the older SGH
15   and the older SDH, correct?
16      A.  Yes.
17      Q.  How about the fresher SGH as it relates to the
18   older SDH?
19      A.  They were both in very close proximity.
20      Q.  Towards the --
21      A.  Towards the sides -- up a little bit higher on
22   the right side of the skull and scalp.
23      Q.  So, what you refer to as the "older" injuries
```

```
 1              (Michael Sikirica - by Mr.  Klein)

 2    would be closer to the right ear?

 3        A.  Yes.

 4        Q.  And above the right ear?

 5        A.  Yes.

 6        Q.  What you refer to as the "fresher" injuries are

 7    above the right ear but closer to the upper right side

 8    of the scalp?

 9        A.  Yes.  Toward the upper portion of the midline of

10    the skull and scalp.

11        Q.  So, 7A1 and 7A2 are the two photos that, in your

12    view, the only two photos that I believe you can point

13    to that show what you believe to be the trauma in this

14    case, correct?

15        A.  Yes, the best photographs of the bunch.

16        Q.  Just to summarize, the photo 7A3 just shows the

17    condition of the brain, but doesn't speak to whether

18    there was trauma or not, correct?

19        A.  Correct.

20        Q.  And the slides that you showed us on 7A4 show the

21    condition of the dura?

22        A.  Yes.

23        Q.  And the orbits, the eyes, but don't necessarily
```

```
 1              (Michael Sikirica - by Mr.  Klein)
 2   speak to whether there was trauma versus some other
 3   cause, they just show the condition of those orbits,
 4   correct?
 5     A.  Well, the pictures of the dura do indicate the
 6   trauma that is a subdural hematoma, and that would be
 7   caused by the trauma.  The eye hemorrhages could be
 8   caused very easily by trauma or some other source.
 9              MS. PECK:  Just to clarify something.
10              I think the first question you asked him was
11   if they were the only photographs to show the trauma.
12   He said, yes, they are the best photographs of the
13   bunch.  I want to make sure that we are clear as to
14   whether they are the only photographs that show the
15   trauma and the best photographs that show the trauma.
16              MR. KLEIN:  Well, I asked only because my
17   initial question -- so, you can talk to your client if
18   you want, but my question, just so we're all clear, is
19   please identify all photos that show evidence of trauma
20   in this case, or that you might rely on to show there's
21   evidence of trauma.
22              MS. PECK:  Not just the best photographs.  I
23   want to make sure that's -- what you were responding...
```

1          (Michael Sikirica - by Mr. Klein)

2              THE WITNESS:  I was picking out the best

3    photographs.

4              MS. PECK:  So that there may be other

5    photographs in there that show trauma then.

6              THE WITNESS:  Yes.

7              MR. KLEIN:  There's not that many of these

8    photos.  I think you should tell us which other ones do.

9              THE WITNESS:  Yes.

10   BY MR. KLEIN:

11      Q.  Let me just ask you another question before you

12   do that.

13          There are photos, black and white photos, of CT

14   slides?

15      A.  Yes.

16      Q.  Are those from Samaritan?

17      A.  Albany Medical.

18      Q.  These are the CTs that, in the CT report, that

19   stated bilateral subdural hematoma.

20      A.  Right.

21      Q.  Do you see that on any of these CTs or is it hard

22   to tell from these?

23      A.  I'm not an expert on evaluation of radiography,

Case 1:17-cv-00626-DJS Document 44-2021-72 Filed 06/14/21 Page 263 of 442

```
 1           (Michael Sikirica - by Mr.  Klein)

 2   but from my experience, I can see a right sided subdural

 3   hematoma.

 4      Q.  Let us know where you see it and we'll mark that

 5   as 7A5.

 6      A.  It's visible on multiple slices.  This will be

 7   the first slice, the second, the third, the fourth, and

 8   possibly the fifth of these.  All of these pictures do

 9   depict, in my evaluation at least, a right-sided

10   subdural.

11      Q.  Would there typically be many more slices or many

12   more slides, or this appears to be a selection of the

13   ones that show it, or is this possibly all that you

14   received?

15      A.  These are cut coronally, so, I would expect that

16   these would be the full series going through the child's

17   head.

18           (Thomas Exhibits 7A5 through 7A11 marked for

19   identification.)

20   BY MR. KLEIN:

21      Q.  So Doctor, looking at what's been marked as pages

22   7A5, 6, 7, 8 and 9, can you just circle on each page

23   what you've indicated as the -- is it the right-sided
```

```
1              (Michael Sikirica - by Mr.  Klein)

2    SDH?

3        A.  Yes.

4        Q.  Is there any possibility that you see a

5    left-sided SDH on those photos, or just not at all?

6        A.  I'm not qualified to go to that detail.

7            I would perhaps believe that on this one there

8    may be a little bit a left-sided, on A9.

9        Q.  Can you put an L in that section for left-sided?

10       A.  (Witness complies.)

11       Q.  Going back to those photos, can you let us know

12   if there are any other photos that are --

13       A.  No.  There are no other photos that really show

14   the trauma by themselves.

15           MS. PECK:  Other than the two additional

16   ones you marked.

17           THE WITNESS:  Correct.

18   BY MR. KLEIN:

19       Q.  Let's talk about those.

20           Is the first one 7A10?

21       A.  Looks like, yes.

22       Q.  What does 7A10 show?

23       A.  7A10 depicts the back of the skull, showing that
```

Case 1:17-cv-00626-DJS Document 44-2 Filed 06/14/21 Page 265 of 442

```
 1            (Michael Sikirica - by Mr.  Klein)

 2    fresher subgaleal hemorrhage that I previously

 3    described.

 4       Q.  That's on the right side, looking at the photo

 5    actually on the bottom, and you just drew a circle right

 6    near what looks like a finger and a glove, correct?

 7       A.  Yes.

 8       Q.  You wrote next to it "SGH newer"?

 9       A.  Correct.

10       Q.  What's the redness on the right side of the

11    skull, looking at the photo?

12       A.  The right side?

13       Q.  What is -- I see redness on there.

14       A.  That is the region of the sutures that have

15    split.  So, these would be the suture areas.

16       Q.  For the record, you're writing "suture area".

17            Now, looking at the next photo, which is 7A11.

18       A.  7A11 is a photograph that depicts the older

19    subgaleal hemorrhage close up.

20       Q.  And you wrote "SGH close up".

21            Can you just write "older"?

22       A.  Yes.

23       Q.  That's essentially what it shows that's
```

```
1              (Michael Sikirica - by Mr.  Klein)

2    significant?

3       A.  Yes.

4       Q.  Thank you for that.  I will take that back.

5       A.  (Handing.)

6       Q.  In your file, there are Albany Medical records

7    that have been redacted I believe by counsel.

8              MS. PECK:  This is the first disclosure,

9    second disclosure, where we had talked about that.  You

10   called me about the redactions.  The second disclosure

11   had no redactions.  Everything was handed over.  There

12   was confusion as to whether it included both kids or

13   not.

14   BY MR. KLEIN:

15      Q.  So, there's a set of records from Albany Medical

16   Center.  These are the records presumably that you

17   reviewed at some point in the course of your

18   investigation?

19      A.  Yes.

20              (Thomas Exhibit 7A12 marked for

21   identification.)

22      Q.  On a page that I'm marking 7A12 from Matthew's

23   records, it says -- dated May 4th of 2008.  It says at
```

1          (Michael Sikirica - by Mr.  Klein)

2     risk for sepsis.

3          Is that something that you presumably looked at?

4     A.   Yes.

5     Q.   What if any significance did that have?

6          Is that something that's...

7     A.   It's understandable, being a premie, that he

8     would be at risk for sepsis.

9               MS. CALABRESE:  Where is that in the record?

10              MR. KLEIN:  After the photos.  It's the AMC

11    records and it's like the eighth page.

12    Q.   So, was there any indication that he was at

13    extreme risk other than -- or significant risk other

14    than being a premie, or was that just a prophylactic

15    note?

16    A.   That was a prophylactic note.

17    Q.   In the file, as the Albany records continue, are

18    records from Matthew's admission to Albany.  And there

19    appears to be some highlighting.  Says twin gestation,

20    subdural hematoma, on a page dated 9/22/08, as a for

21    example.

22         Would that be your handwriting that you did as

23    you reviewed the file?

```
 1              (Michael Sikirica - by Mr.  Klein)

 2              MS. CALABRESE:  Can you mark that page?

 3              MR. KLEIN:  I'm just asking generally about

 4  the highlighting.

 5              MS. CALABRESE:  When we review the record

 6  we're not going to know what we're talking about.

 7              THE WITNESS:  I don't know who highlighted

 8  that.  I might have.  I'm not sure, tell you the truth.

 9              (Thomas Exhibit 7A13 marked for

10  identification.)

11              MR. KLEIN:  We'll call this 7A13.

12     Q.  On another page, it's highlighted "denied by mom"

13  where it says "trauma"?

14         Is that something that you would have flagged as

15  significant?

16     A.  I might have highlighted that.

17              (Thomas Exhibit 7A14 marked for

18  identification.)

19     Q.  So, there's other highlighting in this medical

20  file, I'm not going to go through all of it, but is it

21  safe to say that's either you or someone in your office?

22     A.  Yes, sir.

23         It would have been myself.  No one else in the
```

```
 1              (Michael Sikirica - by Mr.  Klein)
 2    office would highlight anything.
 3       Q.  So, I'm going to pass the Albany Medical records
 4    unless there's anything else significant.
 5            Have you reviewed them in preparation for this
 6    deposition?
 7       A.  Yes.
 8       Q.  Is there anything else in the Albany Medical
 9    records that stands out in your mind as being
10    significant to your opinions or findings in this case?
11            Do you want to look at them?
12       A.  I would say nothing else.  There was a finding in
13    the Samaritan records that was significant for my
14    decision making process.
15       Q.  What was that?
16       A.  That was a description of copious green
17    secretions coming out of the lungs.
18       Q.  Did you mention those at the first trial or was
19    that only for the second trial?
20       A.  I don't recall.
21       Q.  Do you remember getting a fax of the findings of
22    the green secretions from the DA to you that's in your
23    file before the second trial?
```

1       (Michael Sikirica - by Mr. Klein)

2    A.   I don't recall.

3    Q.   Do you know if that had to be brought to your

4  attention before the second trial?

5    A.   It may have been -- my mind may have been

6  refreshed on that, yes.

7    Q.   Did that become more important to focus on for

8  you after you knew that Adrian's statement was not going

9  to be admissible?

10    A.   It would have been important either way.

11         (Thomas Exhibit 7A15 marked for

12  identification.)

13    Q.   So, in your file -- I guess I will have to mark

14  it.  I'll mark as 7A15 a printout of what looks like an

15  online article, actually maybe two different articles,

16  about the trial.

17         The first one is dated October 10, 2009 and

18  mentions the trial and your testimony, and the second

19  one is dated November 13, 2009 and it looks like it

20  relates to the sentencing.

21         Is this something that you or someone in your

22  office printed out for the file?

23    A.   Yes.

Case 1:17-cv-00626-DJS Document 94-12 Filed 06/14/21 Page 271 of 442

```
 1            (Michael Sikirica - by Mr.  Klein)

 2     Q.  Who would have done that?

 3         You would have done that?

 4     A.  I wouldn't have.  One of the secretaries in my

 5  office.

 6     Q.  Is that standard or was it just?

 7     A.  It was a fluke.  They usually don't do that.

 8     Q.  Someone came across it online and thought they

 9  would throw it in the file?

10     A.  Yes.

11     Q.  Is there any other significance to this being in

12  your file?

13     A.  No.

14            (Thomas Exhibit 7A16 marked for

15  identification.)

16     Q.  I'm going to mark as 7A16 what I believe is the

17  ten-page statement from Adrian Thomas given to the Troy

18  police that was then given to you.

19         Does this appear to be the purported confession

20  that the detectives gave you?

21            MS. PECK:  Objection to form.

22            THE WITNESS:  Yes.

23  BY MR. KLEIN:
```

Case 1:17-cv-00626-DJS Document 84-14 2021-07-06/14/21 Page 2023 of 442

1                    (Michael Sikirica - by Mr.  Klein)

2       Q.  And the highlighting in it, is that done by you?

3       A.  Yes.

4       Q.  Do you know if you read this before you did the

5    autopsy or whether you would have reviewed it after or

6    do you know either way?

7       A.  I would have read it before the autopsy.  I may

8    not have highlighted it at that time.  I would have

9    reread it during the rest of the procedure.

10      Q.  Then you have what looks like the organ donation

11   paperwork in here?

12      A.  Yes.

13      Q.  That's pertinent because you authorized a release

14   of the organs so you kept a record of that?

15      A.  Yes.

16      Q.  Is there any other reason why it's pertinent?

17      A.  It does condense some of the laboratory findings

18   during hospitalization, and puts it in a more easily

19   found location.

20      Q.  There's a letter in the file from Mr. Thomas'

21   public defender asking for a meeting with you.

22           Did you ever have a meeting with the public

23   defender?

1              (Michael Sikirica - by Mr. Klein)

2      A.  I do not believe so.

3      Q.  There's a letter in the file from the public

4  defender requesting a copy of the autopsy.

5          Did you provide it to them?

6      A.  The only people that get the copy of the autopsy

7  are the immediate family and the district attorney.  So,

8  he would have had to get it from the district attorney.

9              (Thomas Exhibit 7A17 marked for

10  identification.)

11      Q.  I'm going to mark as 7A17 what I will call

12  collectively four pages of -- what would you call this,

13  diagrams of the corpse?

14      A.  Autopsy diagrams and organ inventory sheet.

15      Q.  Could you just maybe with a different color pen,

16  because that's in black --

17              MS. CALABRESE:  I have a orange highlighter

18  that I'm handing to the witness.

19  BY MR. KLEIN:

20      Q.  Similarly to the prior question.  Areas that

21  indicate trauma or sequelae of trauma that you felt are

22  clinically significant in this case to you.

23      A.  (Witness complies.)

```
 1              (Michael Sikirica - by Mr.  Klein)

 2      Q.  So, looking at the first page, nothing is

 3   highlighted, correct?

 4      A.  Yes.

 5      Q.  Looking at the second page, nothing is

 6   highlighted, correct?

 7      A.  Yes.

 8      Q.  Looking at the third page on the lower left

 9   diagram are two circular marks that are highlighted by

10   you in orange, correct?

11      A.  Yes.

12      Q.  Are those the SGHs?

13      A.  Yes.

14      Q.  The one closer to the ear is the fresher one, and

15   the one higher up towards the middle is the older one?

16      A.  Just the opposite.

17      Q.  The one closer to the ear area or closer to the

18   eye would be the fresher?

19      A.  That is the older.

20      Q.  I'm sorry.  The older injury.  Let me withdraw

21   the question and re-ask it in a sane way.

22              Is the circle that's highlighted closer to the

23   ear or eye area, is that the --
```

Case 1:17-cv-00626-DJS Document 84-14 Filed 06/14/21 Page 273 of 442

1            (Michael Sikirica - by Mr. Klein)

2     A. That is the older greenish, discolored, subgaleal

3 hemorrhage.

4     Q. The one that's closer to the top of the head

5 would be the --

6     A. The fresher subgaleal hemorrhage.

7     Q. You highlighted something on the right side of

8 the page.

9       Can you just tell us what that says and what it

10 means.

11     A. That says, 60 ML liquid SDH, slight clot right

12 MCF. That stands for middle cerebral fossa.

13     Q. And that refers to the 60 ML collection of blood

14 that you referenced earlier.

15     A. Yes.

16     Q. What, if anything else, does this mean that I am

17 missing, if anything?

18     A. Nothing.

19     Q. In your opinion, that's evidence of a traumatic

20 subdural hematoma.

21     A. Yes.

22     Q. Looking at the fourth and last page, starting on

23 the lower left, can you tell us what that says?

Case 1:17-cv-00626-DJS Document 44-2 Filed 06/14/21 Page 276 of 442

1           (Michael Sikirica - by Mr. Klein)

2      Lower left diagram that's highlighted.

3   A. This is the diagram that I did on the 26th of

4 '09. This is the brain examination diagram. The lower

5 left portion says hemorrhage optic N, which stands for

6 nerve, left greater than right.

7      Then there's a listing of...

8   Q. Before you go to the next thing, what does that

9 mean, more hemorrhaging behind the left eye than the

10 right eye?

11   A. Yes.

12   Q. Okay.

13   A. And then, in the center of the diagram is a

14 series of numbers, running 1 through 18, B1 through 18.

15 And these are the individual slides locations where I

16 took specimens from the brain and the dura.

17   Q. And 9 and 10, which are highlighted, reflect

18 what?

19   A. Reflect that the dura has a three to four

20 millimeter adherent clot, and that was sampled in slides

21 9 and 10, which are labeled "dura".

22      And the last feature was a small area of brown

23 discoloration I saw in the back of the brain which I

1          (Michael Sikirica - by Mr.  Klein)

2     basically labeled "hemorrhage occipital right and left".

3          Q.  Does it have any other significance?

4          A.  No.

5               (Thomas Exhibit 7A18 marked for

6     identification.)

7          Q.  So, the next exhibit is 7A18.  It starts with a

8     cover page from the Office of the District Attorney of

9     Rensselaer County dated June 2nd of 2014.  It says that

10    there are seven pages including the cover sheet.

11          The following pages and what I was given say 2

12    through 8, 3 through 8, 4 through 8, 5 through 8, and

13    then I don't have 6, 7 or 8.  So, just make a note that

14    we may have it.  I would just ask counsel to confirm.

15          I'm going to show you what appears to be the

16    pages of this fax that I received.  Does that appear to

17    be a fax to you with a message on the cover reminding

18    you that these studies were taken on 9/21 of '08?

19          A.  Yes.

20          Q.  Does this jog your memory that at or right before

21    the June '14 trial you had to be refreshed about this

22    information?

23          A.  Well, these are copies of the radiology reports

1        (Michael Sikirica - by Mr. Klein)

2   from the time of autopsy. I wanted to make sure that I

3   had copies of all the radiology reports, because I had

4   said that the radiology reports may be important at

5   trial.

6      Q. So, after this in the file that I have is the

7   Samaritan Hospital medical records. It also says

8   Northeast Health EDM. Is Northeast Health EDM

9   Samaritan?

10     A. Yes. Northeast Health is a conglomerate of St.

11  Peter's, Samaritan, St. Mary's, and Memorial Hospital.

12     Q. This is apparently the Samaritan emergency room

13  records related to Matthew's admission?

14     A. Yes.

15     Q. In Exhibit 7B, Doctor, it's the second binder of

16  two binders, there's a section that we have labeled

17  "blood work"?

18     A. Yes.

19     Q. These were requested at Samaritan or Albany or

20  what are these?

21     A. These, from my vantage point, look to be the

22  Albany Medical Center laboratory results.

23     Q. The child fatality report you have is an

```
 1              (Michael Sikirica - by Mr.  Klein)

 2   incomplete draft.  To what extent did you factor this

 3   into your conclusions, your findings?

 4      A.  It was supportive of my conclusions and findings,

 5   but I did not make my conclusions based on that.  That

 6   did not come until quite a bit later.

 7      Q.  So, you didn't factor that into your autopsy

 8   findings?

 9      A.  No.

10      Q.  Contact sheets, is that another term for these CT

11   slides?

12          What are contact sheets?  That's what they're

13   labeled.

14      A.  Contact sheets would be simply a collection of

15   photographs.

16      Q.  So we have had some CT slides that we talked

17   about, and then these color slides would be Dr.

18   Leestma's slides that you obtained for your file?

19      A.  Yes.

20      Q.  You didn't create any slides like these?

21      A.  No.

22      Q.  These are referred to as gram stains?

23      A.  They're H&E, hematoxylin and eosin slides, and
```

Case 1:17-cv-00626-DJS Document 44-2 Filed 06/14/21 Page 280 of 442

```
 1            (Michael Sikirica - by Mr.  Klein)

 2   several gram stains.

 3      Q.  For the record, these are the color photos with

 4   four JPG files per page, and there's seven pages.  One

 5   page has one photo on it.

 6            There's no dispute that these are Dr. Leestma's

 7   slides?

 8      A.  Yes.  I did not take any of those in my

 9   photographs.

10      Q.  Then we have organ donor records.  Again, these

11   are in your file because of your role in releasing the

12   organs, correct?

13      A.  Yes.

14      Q.  They consolidate some of the lab reports?

15      A.  Yes.

16      Q.  There's a note in your file on your notepad --

17      A.  Yes.

18      Q.  -- that says that Jerry Frost called and Art

19   Glass notified your office of switched identity at

20   birth?

21      A.  Yes.

22      Q.  What significance, if any, did that have to you?

23      A.  Well, we had some question at birth.  There was a
```

Case 1:17-cv-00626-DJS Document 44-12 Filed 06/14/21 Page 281 of 442

280

1        (Michael Sikirica - by Mr.  Klein)

2    twin birth between Matthew and Malakai, and there was

3    some discussion of the identity possibly being switched

4    at birth accidentally in the hospital, but we were able

5    to later identify that Matthew was considered to be twin

6    A and Malakai was twin B.

7        So, the children had not been named immediately

8    upon birth, so they were considered twin A and twin B.

9    And we found, by analysis of the records, that Matthew

10   was synonymous with twin A.

11   Q.  Did it have any other significance or that was

12   it?

13       It was sorted out?

14   A.  It was sorted out.

15            (Thomas Exhibit 7B1 marked for

16   identification.)

17   Q.  I'm going to mark as 7B1 what looks like a cover

18   page to a file.

19   A.  It was the inside of a file.

20   Q.  I'll flag it as well.

21       It looks like it's got a case notification note

22   on it?

23   A.  Yes.

```
 1              (Michael Sikirica - by Mr.  Klein)
 2     Q.  Is that the form that your office would use when
 3  it got referred a new...
 4     A.  Yes.
 5     Q.  It says PSIS -- looks like maybe it's cut off.
 6          What word would be at the bottom here?
 7              MS. PECK:  If you need to refer to your
 8  original file for it, that's fine.
 9  BY MR. KLEIN:
10     Q.  Yeah.
11     A.  I don't see it cut off anywhere.
12          Oh, synopsis, question shaken baby.
13     Q.  Who wrote that?
14          Who wrote question shaken baby?
15     A.  Would have been one of my staff.
16     Q.  That's not your handwriting?
17     A.  No.
18     Q.  Was this ever a shaken baby case in your view?
19     A.  No.
20     Q.  Do you know why someone wrote that?
21     A.  That may have been the information that came from
22  the investigator.
23     Q.  Meaning the detectives, the Troy PD?
```

Case 1:17-cv-00626-DJS   Document 14-2   Filed 06/14/21   Page 283 of 442

1          (Michael Sikirica - by Mr. Klein)

2      A.   No.  The MLI investigator.

3           Alibozek was her last name.

4      Q.   Where would Alibozek have obtained preliminary

5  information from?  Would it have been from the PD or

6  from the DA?

7      A.   From the hospital.

8      Q.   In May of 2014, no bill but approximately 30

9  hours spent with ADA Book.

10          So, this was trial prep?

11     A.   Does it say 30?

12     Q.   Says 30.  Could it be 3.0?

13     A.   3.0 probably.

14     Q.   Why was there no bill?

15          Was there any kind of arrangement where you

16  didn't get paid as a courtesy in this case?

17     A.   No.  I don't get paid for a case that deals with

18  Rensselaer County because I'm the Rensselaer County

19  medical examiner.  It wouldn't be fair for me to charge

20  the county for my time.

21          In other counties I charge a fee for testifying

22  and preparation.

23               (Deposition adjourned at 5:02 p.m.)

```
 1              List of requests:

 2  1.  Names of cases Dr. Sikirica testified and docket no.

 3

 4              INDEX OF EXHIBITS

 5  Thomas                                              Marked

 6      3        CDC printout on group B strep          103

 7      4        Grand jury testimony                   117

 8      5        Transcript of 2009 testimony           140

 9      6        Transcript of 2014 testimony           141

10  7A,7B        Dr. Sikirica's file                    241

11  7A1          Photograph of skull                    242

12  7A2          Photograph                             245

13  7A3          Photograph of brain                    248

14  7A4          Slides taken at brain cutting          249

15  7A5-7A11     Slides of right-sided SDH              262

16  7A12         Page from AMC records                  265

17  7A13         9/22/08 AMC record                     267

18  7A14         Page from AMC records                  267

19  7A15         Articles from trial dated              269
                 10/10/09 and 11/13/09
20
    7A16         Ten-page statement from
21               Adrian Thomas                          270

22  7A17         Autopsy diagrams and
                 organ inventory sheet                  272
23
    7A18         Copies of radiology reports            276
```

```
1    STATE OF NEW YORK      )

2    COUNTY OF

3

4    I, MICHAEL SIKIRICA, do hereby certify that I have read

5    the foregoing record of my testimony taken at the time

6    and place noted in the heading hereof and that it is

7    a true and correct transcript of the same and the whole

8    thereof.

9

10

11

12

13            _____
                            MICHAEL SIKIRICA
14   Subscribed and sworn to

15   before me this _____ day

16   of _____, 2019

17

18

19

20

21   _____

22

23
```

1          <u>C E R T I F I C A T I O N</u>

2

3

4    I, Jeanne O'Connell, Registered Professional Reporter

5    and Notary Public in and for the State of New York, do

6    hereby certify that the foregoing to be a true and

7    accurate transcription of the stenographic notes as

8    taken by me of the aforesaid proceedings.

9

10

11

12   _____          _____

13      Date                                  Jeanne O'Connell

14

15

16

17

18

19

20

21

22

23

**'08** [1] - 276:18
**'09** [6] - 76:13, 94:17, 213:19, 239:22, 240:2, 275:4
**'14** [3] - 213:19, 240:10, 276:21
**'83** [2] - 6:2, 6:3
**'95** [1] - 7:7

## 1

**1** [3] - 9:2, 275:14, 283:2
**10** [12] - 46:11, 91:19, 92:8, 92:9, 92:11, 118:19, 152:19, 227:14, 235:14, 269:17, 275:17, 275:21
**10,000** [1] - 157:8
**10/10/09** [1] - 283:19
**10007** [1] - 2:3
**103** [1] - 283:6
**11** [1] - 152:19
**11/13/09** [1] - 283:19
**115,000** [1] - 135:22
**117** [1] - 283:7
**12** [4] - 50:5, 69:16, 74:21, 118:20
**12,000** [2] - 12:13, 12:15
**12180** [1] - 2:6
**12205** [2] - 1:21, 2:10
**12224** [1] - 2:13
**13** [1] - 269:19
**13th** [1] - 142:16
**14** [1] - 118:11
**140** [1] - 283:8
**141** [1] - 283:9
**150** [1] - 135:23
**16** [3] - 122:6, 122:11, 239:22
**18** [4] - 130:20, 130:23, 275:14
**19** [1] - 122:13
**1983** [1] - 81:6
**1984** [1] - 6:2
**1989** [1] - 6:5

## 2

**2** [1] - 276:11
**20** [8] - 80:15, 91:19, 92:10, 134:8, 206:22, 207:2, 227:14, 235:14

**2001** [3] - 9:2, 9:10
**2002** [1] - 100:6
**2008** [12] - 26:6, 76:14, 83:3, 83:4, 93:12, 93:15, 99:5, 99:22, 121:19, 151:23, 152:20, 265:23
**2009** [15] - 77:5, 83:5, 83:13, 140:4, 140:10, 140:17, 141:5, 141:10, 149:21, 172:10, 249:17, 269:17, 269:19, 283:8
**2014** [11] - 76:13, 77:5, 82:19, 84:20, 142:5, 142:9, 213:15, 213:19, 276:9, 282:8, 283:9
**2019** [2] - 1:18, 284:16
**21st** [5] - 28:3, 66:5, 93:15, 96:9, 206:18
**22** [1] - 2:5
**23** [1] - 26:6
**23rd** [2] - 66:4, 138:19
**241** [1] - 283:10
**242** [1] - 283:11
**245** [1] - 283:12
**248** [1] - 283:13
**249** [1] - 283:14
**25** [1] - 185:6
**250** [3] - 150:21, 151:14, 151:17
**25th** [5] - 28:4, 93:11, 122:3, 123:22, 206:18
**26** [1] - 121:19
**262** [1] - 283:15
**265** [1] - 283:16
**267** [2] - 283:17, 283:18
**269** [1] - 283:19
**26th** [5] - 122:4, 122:5, 123:23, 150:13, 275:3
**270** [1] - 283:21
**272** [1] - 283:22
**276** [1] - 283:23
**2nd** [1] - 276:9

## 3

**3** [1] - 103:2, 276:12, 283:6
**3.0** [2] - 282:12, 282:13
**30** [6] - 206:22, 207:2, 207:3, 282:8, 282:11, 282:12

**300** [1] - 21:20
**305** [1] - 2:2
**33** [1] - 111:14
**37** [1] - 111:15
**370** [1] - 251:2

## 4

**4** [4] - 117:4, 117:5, 276:12, 283:7
**40s** [1] - 170:19
**4357** [1] - 249:22
**4358** [1] - 249:22
**4373** [1] - 250:18
**4th** [1] - 265:23

## 5

**5** [7] - 1:20, 2:9, 140:4, 140:5, 141:5, 276:12, 283:8
**5,000** [1] - 157:8
**500** [3] - 152:21, 152:22, 169:18
**50s** [1] - 170:19
**5:02** [1] - 282:23
**5th** [1] - 1:18

## 6

**6** [6] - 141:21, 142:2, 142:4, 262:22, 276:13, 283:9
**60** [20] - 40:13, 41:4, 41:5, 54:12, 57:19, 96:17, 206:15, 206:17, 206:21, 207:4, 207:10, 224:15, 245:21, 245:22, 246:3, 246:5, 250:8, 274:11, 274:13
**600** [3] - 2:3, 152:2, 152:22

## 7

**7** [2] - 262:22, 276:13
**7A** [3] - 241:5, 241:9, 241:22
**7A,7B** [1] - 283:10
**7A1** [5] - 242:9, 242:11, 253:12, 259:11, 283:11
**7A10** [3] - 263:20, 263:22, 263:23
**7A11** [3] - 262:18,

264:17, 264:18
**7A12** [3] - 265:20, 265:22, 283:16
**7A13** [3] - 267:9, 267:11, 283:17
**7A14** [2] - 267:17, 283:18
**7A15** [3] - 269:11, 269:14, 283:19
**7A16** [3] - 270:14, 270:16, 283:20
**7A17** [3] - 272:9, 272:11, 283:22
**7A18** [3] - 276:5, 276:7, 283:23
**7A2** [6] - 245:12, 245:14, 245:17, 254:8, 259:11, 283:12
**7A3** [4] - 248:3, 248:5, 259:16, 283:13
**7A4** [4] - 249:3, 249:5, 259:20, 283:14
**7A5** [3] - 262:5, 262:18, 262:22
**7A5-7A11** [1] - 283:15
**7B** [3] - 241:5, 241:9, 277:15
**7B1** [2] - 280:15, 280:17

## 8

**8** [7] - 134:8, 262:22, 276:12, 276:13
**8/21/2019** [1] - 26:3
**8:00** [1] - 28:4

## 9

**9** [4] - 46:10, 262:22, 275:17, 275:21
**9/21** [1] - 276:18
**9/21/08** [1] - 172:7
**9/22/08** [2] - 266:20, 283:17
**9/25/08** [1] - 240:4
**90** [2] - 102:14, 103:6
**9:30** [1] - 1:19
**9:40** [1] - 96:10

## A

**a.m** [1] - 1:19
**A9** [1] - 263:8
**abdomen** [2] - 16:12, 29:4
**abdominal** [3] - 31:6,

33:13, 33:16
**ability** [9] - 50:17, 51:14, 53:3, 76:9, 78:9, 88:19, 94:21, 182:12, 198:4
**able** [14] - 30:8, 36:15, 44:11, 48:20, 58:19, 62:20, 121:2, 123:20, 136:3, 153:4, 153:12, 219:19, 254:21, 280:4
**abnormal** [2] - 41:7, 136:2
**abnormality** [4] - 39:17, 39:18, 39:20, 39:23
**abscess** [1] - 163:7
**absence** [1] - 114:18
**absolutely** [5] - 113:12, 146:14, 179:22, 192:23, 208:18
**absorbed** [1] - 189:14
**abuse** [5] - 42:20, 80:7, 101:9, 165:10, 193:11
**abusive** [2] - 91:9, 91:12
**accelerated** [1] - 203:8
**accept** [1] - 65:11
**accident** [5] - 25:20, 52:7, 166:2, 229:17
**accidental** [5] - 91:9, 91:12, 124:12, 165:22, 193:2
**accidentally** [1] - 280:4
**accompanying** [1] - 144:10
**accomplished** [1] - 215:13
**according** [5] - 102:7, 103:4, 103:11, 187:14
**accreditation** [4] - 8:6, 151:12, 151:13, 151:18
**accumulated** [1] - 133:10
**accumulation** [6] - 33:10, 40:9, 41:3, 88:4, 88:6, 131:16
**accurate** [5] - 120:12, 207:19, 212:14, 216:18, 285:7
**accurately** [2] - 76:5, 141:13
**accuse** [1] - 230:14

Case 1:17-cv-00626-DJS Document 94-14 Filed 08/14/21 Page 2883 of 443

accused [1] - 79:10
acknowledge [2] - 232:21, 233:15
acknowledged [1] - 232:23
acquire [1] - 108:8
acquired [4] - 112:20, 175:9, 176:10, 176:20
acquittal [1] - 93:3
acquittals [2] - 91:21, 237:20
acquitted [2] - 210:20, 239:10
acronym [1] - 98:21
act [1] - 10:2
action [2] - 3:13, 81:4
actual [5] - 69:20, 152:8, 206:14
acute [36] - 41:9, 41:11, 41:12, 47:7, 47:8, 47:11, 47:22, 48:10, 48:14, 48:18, 49:6, 59:22, 68:2, 68:6, 72:4, 183:10, 183:12, 184:11, 188:3, 190:16, 190:17, 195:12, 196:2, 196:5, 196:6, 199:3, 199:21, 206:15, 210:7, 224:2, 224:19, 224:20, 224:21, 224:22, 225:7, 225:9
ADA [5] - 64:14, 85:5, 239:22, 282:9
ADAM [1] - 1:6
Adam [3] - 2:7, 64:9, 240:6
add [1] - 49:9
addition [5] - 36:5, 36:6, 78:4, 136:14, 250:5
additional [9] - 16:18, 31:3, 44:7, 45:3, 46:4, 154:11, 244:2, 248:23, 263:15
address [1] - 214:10
adherent [2] - 43:11, 275:20
adjacent [1] - 242:17
adjourned [1] - 282:23
administer [1] - 3:18
administrative [2] - 6:20, 151:10
admissible [1] - 269:9
admission [4] - 42:16, 190:11, 266:18, 277:13
admit [4] - 214:15,

215:4, 215:5, 217:23
admitted [4] - 168:16, 203:14, 204:9, 204:11
adrenal [2] - 29:4, 29:9
ADRIAN [2] - 1:3, 1:11
Adrian [28] - 4:17, 5:2, 62:6, 62:11, 62:22, 67:10, 67:14, 74:5, 74:9, 75:19, 75:23, 91:15, 92:14, 125:10, 125:19, 128:21, 129:8, 129:14, 154:21, 158:18, 159:9, 166:8, 168:11, 175:2, 176:15, 220:15, 270:17, 283:21
Adrian's [3] - 161:21, 164:5, 269:8
adult [3] - 21:20, 108:13, 132:12
adults [5] - 71:2, 71:3, 71:6, 108:6, 113:17
advance [1] - 213:15
advantage [1] - 198:11
affect [4] - 42:19, 44:15, 76:9, 206:19
affected [1] - 82:22
affects [1] - 103:6
affirmation [1] - 3:18
aforementioned [1] - 76:18
aforesaid [1] - 285:8
afterwards [2] - 27:11, 150:7
agalactiae [4] - 104:17, 104:20, 104:23, 113:18
age [4] - 27:23, 28:2, 71:10, 189:17
agent [3] - 105:2, 113:21, 113:22
ages [1] - 12:16
aggravated [1] - 223:4
ago [3] - 11:10, 80:14, 80:15
agonal [1] - 68:23
agree [32] - 99:13, 102:17, 102:18, 105:12, 105:13, 107:14, 107:15, 136:13, 136:16, 136:19, 143:4, 147:22, 148:17, 156:21, 158:14, 177:7, 177:12,

177:20, 179:13, 181:22, 189:10, 194:19, 194:20, 196:19, 200:6, 202:3, 207:14, 207:17, 216:10, 216:11, 221:23, 222:3
agreed [4] - 3:2, 3:8, 3:11, 3:15
agreeing [1] - 194:5
ahead [6] - 15:16, 16:2, 32:17, 40:4, 70:21, 93:4
air [1] - 112:21
airborne [1] - 177:2
airway [2] - 98:15, 161:2
Albany [27] - 1:21, 2:10, 2:13, 10:20, 11:2, 14:3, 15:10, 21:10, 26:15, 28:3, 62:21, 78:11, 129:11, 169:16, 169:22, 180:4, 186:10, 204:10, 261:17, 265:6, 265:15, 266:17, 266:18, 268:3, 268:8, 277:19, 277:22
Alibozek [5] - 26:12, 26:17, 240:5, 282:3, 282:4
alive [2] - 29:10, 198:13
allegation [1] - 101:13
allegations [3] - 80:6, 101:8, 228:2
alleged [2] - 80:6, 168:10
allegedly [1] - 193:19
alleging [2] - 4:18, 4:22
allow [1] - 8:8
almost [4] - 65:7, 152:4, 246:23, 251:12
alone [2] - 67:9, 168:7
AMC [4] - 266:10, 283:16, 283:17, 283:18
amend [3] - 141:18, 154:15, 154:21
amending [1] - 154:17
amount [6] - 45:6, 96:16, 96:19, 96:22, 97:2, 206:21
analysis [7] - 24:15, 24:19, 24:20, 58:2,

63:9, 66:10, 280:9
anatomic [9] - 7:13, 50:4, 50:18, 53:5, 63:17, 69:12, 74:21, 210:2, 210:3
ankle [1] - 31:11
anoxia [13] - 34:18, 38:17, 45:8, 68:15, 137:4, 137:9, 137:10, 164:3, 164:7, 164:8, 184:5, 248:14
anoxic [2] - 68:13, 137:19
answer [11] - 4:19, 73:2, 84:10, 106:23, 120:5, 120:12, 159:10, 175:5, 211:18, 218:2, 228:18
answered [3] - 106:22, 222:11, 232:15
answers [1] - 159:5
anterior [1] - 203:16
antibiotic [1] - 171:8
antibiotics [1] - 149:8
antibodies [3] - 71:8, 71:11, 148:2
Antonio [2] - 6:8, 78:22
apartment [2] - 153:4, 239:8
apologize [1] - 32:19
apparent [3] - 155:19, 188:18, 204:6
Appeals [5] - 83:14, 84:13, 84:23, 220:10, 220:14
appear [9] - 28:14, 107:16, 117:10, 141:9, 194:14, 256:12, 257:5, 270:19, 276:16
APPEARANCES [1] - 2:1
appeared [5] - 27:23, 57:13, 66:6, 89:15, 194:15
appearing [2] - 48:16, 61:7
apply [2] - 8:21, 114:11
appreciate [3] - 56:22, 73:17, 217:15
appropriate [4] - 22:14, 27:10, 155:2, 173:6
April [1] - 172:10
ARDS [2] - 184:13,

184:15
area [27] - 10:11, 10:17, 10:21, 36:7, 40:15, 40:23, 47:6, 72:11, 132:22, 155:9, 177:4, 194:17, 197:5, 197:14, 243:15, 244:5, 244:14, 244:15, 245:17, 246:22, 250:7, 251:8, 253:8, 255:8, 273:17, 273:23, 275:22
area" [1] - 264:16
areas [13] - 8:13, 36:3, 39:14, 39:22, 46:15, 61:7, 61:12, 182:21, 183:11, 242:3, 246:12, 264:15, 272:20
argument [1] - 211:6
arising [1] - 202:22
arose [3] - 174:3, 203:12, 227:20
arraigned [3] - 167:4, 221:3, 226:14
arrange [1] - 14:2
arrangement [1] - 282:15
arrest [4] - 173:19, 174:3, 174:5, 199:14
arrival [4] - 15:10, 169:15, 177:21, 180:5
arrive [2] - 15:12, 15:13
arrived [2] - 136:6, 156:22
arrow [1] - 246:14
Art [1] - 279:18
article [2] - 105:12, 105:14, 269:15
Articles [1] - 283:19
articles [1] - 269:15
artifact [1] - 33:23
artificially [1] - 207:10
ascribe [1] - 151:22
aspect [1] - 139:12
aspects [1] - 218:11
asphyxia [2] - 174:10, 232:2
asphyxiated [1] - 231:16
aspirate [1] - 165:19
aspirated [5] - 67:11, 68:4, 70:13, 70:17, 70:18
aspiration [27] - 67:17, 70:13, 158:4,

158:7, 158:8, 158:9,
158:11, 158:15,
159:10, 160:10,
161:5, 161:7,
161:12, 161:18,
161:22, 162:2,
162:4, 162:5,
175:18, 175:20,
176:7, 184:19,
184:22, 200:10,
209:4, 209:7, 209:8
**assessments** [1] -
37:3
**assigned** [1] - 88:20
**assigning** [1] - 52:17
**assist** [3] - 26:20,
26:21, 27:2
**assistant** [1] - 6:16
**Assistant** [2] - 2:13,
4:12
**assistants** [1] - 15:15
**assisted** [3] - 134:20,
134:22, 135:2
**assisting** [1] - 26:14
**associated** [14] - 49:4,
74:18, 93:2, 102:19,
111:22, 112:7,
112:10, 112:12,
119:7, 137:3,
207:16, 222:14,
223:6, 243:12
**association** [1] -
207:15
**Association** [1] -
151:11
**assume** [3] - 92:15,
109:4, 183:22
**assumed** [2] - 9:3,
96:6
**assuming** [4] - 65:10,
126:2, 174:6, 258:12
**asymptomatic** [1] -
112:21
**atelectasis** [3] - 47:3,
68:7, 210:8
**attached** [4] - 18:19,
246:9, 249:21, 250:3
**attack** [4] - 33:7,
34:10, 174:8, 174:10
**attempt** [1] - 20:20
**attempted** [2] -
167:11, 221:4
**attend** [1] - 8:21
**attendants** [1] - 28:10
**attending** [1] - 58:10
**attention** [3] - 238:11,
242:11, 269:4
**attest** [1] - 77:23
**attorney** [13] - 5:13,
64:18, 64:23, 65:2,

76:19, 84:16,
154:20, 155:17,
226:23, 227:18,
229:19, 272:7, 272:8
**Attorney** [6] - 2:4,
2:12, 2:13, 4:13,
4:14, 276:8
**attorney's** [4] - 12:3,
77:4, 84:22, 220:4
**Attorneys** [2] - 2:7,
2:11
**attorneys** [2] - 3:3,
76:20
**attribute** [7] - 31:23,
43:19, 72:10, 125:4,
127:6, 174:14,
253:10
**attributed** [2] -
125:10, 169:11
**authored** [1] - 11:7
**authority** [4] - 88:18,
88:21, 139:20,
214:22
**authorized** [2] - 139:5,
271:13
**autism** [1] - 193:15
**autistic** [2] - 193:9,
193:16
**autopsies** [10] - 6:21,
9:6, 10:14, 10:15,
10:18, 12:12, 13:6,
15:4, 150:20, 228:10
**autopsy** [131] - 5:4,
10:8, 11:3, 11:4,
12:21, 13:3, 14:2,
14:8, 14:20, 14:22,
15:2, 19:2, 21:5,
21:8, 24:7, 24:8,
24:13, 24:14, 24:23,
25:14, 25:15, 26:5,
26:16, 26:21, 27:2,
27:14, 28:4, 29:14,
30:20, 35:18, 35:19,
37:2, 39:3, 39:9,
40:8, 40:15, 41:21,
50:2, 51:5, 51:13,
54:8, 54:22, 56:11,
58:5, 58:19, 59:5,
63:16, 64:19, 69:20,
73:18, 73:19, 73:21,
75:21, 76:14, 77:10,
79:8, 79:9, 80:12,
82:12, 83:4, 83:13,
83:23, 87:17, 89:4,
90:6, 90:10, 90:16,
93:2, 93:19, 93:23,
94:12, 96:4, 99:5,
109:8, 121:4, 121:6,
121:10, 121:23,
122:3, 128:21,

139:11, 142:12,
142:18, 150:11,
152:8, 154:15,
154:17, 154:21,
158:8, 166:3, 166:7,
166:13, 171:13,
171:20, 171:23,
173:7, 175:15,
176:16, 181:3,
195:11, 206:19,
208:20, 209:21,
225:3, 226:4, 226:7,
226:9, 226:12,
227:3, 227:6, 228:9,
229:12, 229:15,
229:21, 231:21,
232:9, 234:20,
236:20, 236:21,
236:22, 238:8,
238:9, 238:14,
249:13, 271:5,
271:7, 272:4, 272:6,
272:14, 277:2, 278:7
**Autopsy** [1] - 283:22
**autopsying** [1] - 58:20
**available** [1] - 21:20,
96:2
**Avenue** [1] - 1:20, 2:9
**average** [2] - 52:16,
52:17
**aware** [27] - 69:23,
83:7, 83:14, 83:20,
97:15, 99:20,
105:23, 117:19,
123:2, 124:3, 124:5,
124:6, 124:9,
124:20, 126:4,
126:6, 126:10,
126:20, 135:19,
138:15, 139:23,
148:10, 169:10,
171:13, 177:5,
235:5, 235:19

**B**

**B1** [1] - 275:14
**B10** [1] - 225:7
**B9** [1] - 225:8
**babies** [5] - 114:10,
114:15, 124:19,
143:4, 147:22
**baby** [9] - 111:5,
122:7, 122:14,
124:16, 167:11,
191:17, 281:12,
281:14, 281:18
**background** [4] -
5:19, 14:13, 14:17,
81:23

**bacteremia** [6] -
66:14, 103:12,
107:7, 178:9, 212:3,
212:4
**bacteria** [42] - 23:3,
23:9, 23:10, 23:11,
23:12, 23:15, 23:16,
23:18, 23:19, 23:21,
66:12, 70:18, 70:22,
71:3, 71:6, 71:20,
71:23, 72:12, 72:13,
95:6, 107:21, 108:5,
111:22, 112:7,
112:9, 112:10,
113:14, 113:18,
114:5, 163:3, 163:5,
177:8, 178:5, 178:9,
178:15, 178:20,
178:23, 179:4,
179:15, 181:7,
252:7, 252:8
**bacterial** [18] - 70:2,
93:9, 112:17,
113:11, 114:15,
161:3, 177:14,
177:16, 177:18,
177:20, 177:23,
181:5, 183:20,
211:4, 211:7, 252:6,
252:16, 255:21
**bacterium** [2] -
113:16, 113:17
**Bailey** [3] - 1:19, 2:8,
81:9
**balance** [1] - 39:2
**Barbara** [2] - 9:5, 9:7
**Barnes** [2] - 214:2,
214:3
**Barnes'** [1] - 214:6
**base** [1] - 208:22
**based** [23] - 23:16,
53:12, 65:13, 69:11,
69:19, 70:4, 112:2,
112:3, 121:10,
121:21, 137:11,
137:12, 137:20,
144:7, 148:17,
159:12, 161:2,
161:5, 198:23,
208:15, 208:20,
228:23, 278:5
**basis** [2] - 175:16,
257:7
**Bates** [1] - 140:8
**battering** [1] - 193:20
**be..** [1] - 254:2
**bear** [1] - 29:6
**beating** [1] - 155:23
**became** [5] - 6:17, 7:3,
7:4, 83:20, 135:19

**become** [8] - 8:9,
44:10, 83:7, 83:14,
123:11, 165:17,
218:6, 269:7
**bed** [4] - 116:5,
124:16, 170:16,
191:18
**began** [5] - 6:22, 8:7,
31:2, 198:19, 258:7
**begin** [2] - 12:21,
16:10
**beginning** [5] - 8:6,
12:9, 27:16, 50:6,
183:5
**begins** [1] - 16:11
**begun** [1] - 66:7
**behalf** [1] - 79:6
**behind** [8] - 16:17,
51:21, 107:13,
107:18, 184:2,
197:13, 197:14,
275:9
**below** [2] - 43:8, 170:7
**bend** [1] - 138:12
**beneath** [7] - 33:8,
34:11, 36:7, 40:10,
54:14, 88:7, 191:8
**benefit** [1] - 94:15
**bequest** [1] - 156:17
**Berkshire** [1] - 6:6
**best** [19] - 20:17,
50:17, 51:13, 53:2,
78:9, 78:12, 117:14,
124:4, 141:2, 142:8,
149:18, 207:19,
241:18, 246:12,
259:15, 260:12,
260:15, 260:22,
261:2
**better** [2] - 120:5,
169:15
**between** [16] - 3:3,
6:18, 25:13, 28:2,
35:11, 45:18, 88:2,
102:6, 112:22,
118:21, 119:18,
144:8, 159:16,
224:4, 232:20, 280:2
**big** [1] - 244:18
**bilateral** [16] - 49:22,
56:7, 56:11, 57:8,
57:13, 60:10, 73:10,
73:14, 87:14, 89:14,
90:3, 168:19,
169:12, 224:5,
224:6, 261:19
**bilaterally** [1] - 57:17
**bile** [2] - 20:23, 21:16
**bill** [2] - 282:8, 282:14
**binder** [2] - 241:22,

# APPENDIX

277:15

**binders** [2] - 241:9, 277:16

**birth** [22] - 12:18, 102:19, 108:9, 109:17, 109:22, 115:11, 130:12, 134:20, 134:22, 135:2, 143:5, 143:8, 143:11, 144:8, 165:8, 204:10, 206:8, 279:20, 279:23, 280:2, 280:4, 280:8

**births** [2] - 144:23, 146:3

**bit** [7] - 98:18, 116:17, 153:2, 184:2, 258:21, 263:8, 278:6

**black** [3] - 27:22, 261:13, 272:16

**bladder** [1] - 20:21

**blankets** [1] - 170:8

**bled** [1] - 72:11

**bleed** [7] - 119:8, 143:12, 202:6, 202:22, 204:3, 204:21, 255:22

**bleeding** [19] - 42:7, 69:6, 72:2, 137:2, 143:5, 143:8, 170:4, 182:13, 182:16, 182:20, 182:23, 183:5, 183:10, 183:12, 189:3, 195:6, 203:17, 204:15, 204:22

**bleeds** [3] - 115:6, 202:2, 204:5

**blood** [84] - 20:20, 21:21, 21:22, 21:23, 40:10, 40:12, 40:14, 40:20, 41:3, 41:18, 41:21, 42:3, 42:6, 42:8, 42:9, 42:11, 42:12, 42:13, 43:3, 43:6, 43:15, 43:16, 43:22, 48:12, 54:12, 65:21, 66:5, 66:7, 66:9, 66:16, 67:3, 72:12, 89:21, 95:6, 96:10, 97:2, 133:10, 136:4, 137:17, 156:22, 157:3, 157:6, 157:11, 162:19, 164:10, 164:15, 164:19, 169:14, 170:19, 170:22, 172:5, 178:5, 178:10,

179:4, 181:8, 182:4, 182:19, 183:14, 183:17, 184:2, 184:3, 185:13, 206:15, 206:17, 206:21, 210:5, 212:2, 212:7, 212:8, 212:17, 212:21, 213:2, 213:6, 225:21, 231:3, 231:6, 232:18, 245:19, 250:8, 274:13, 277:17

**bloodborne** [4] - 178:15, 178:20, 178:22, 179:15

**bloods** [1] - 42:15

**bloodstream** [7] - 66:12, 66:22, 70:15, 102:2, 164:14, 182:2, 230:18

**blow** [3] - 127:11, 127:19

**blue** [1] - 28:6

**blunt** [19] - 50:8, 50:11, 51:4, 69:15, 74:10, 75:6, 84:11, 127:8, 129:22, 134:3, 138:3, 167:2, 192:16, 194:18, 208:12, 208:14, 231:11, 231:14, 253:11

**board** [12] - 6:23, 7:3, 7:4, 7:8, 7:13, 7:22, 8:6, 8:9, 8:11, 8:13, 155:9

**boards** [3] - 7:21, 8:7, 8:17

**body** [36] - 15:15, 16:8, 18:2, 20:19, 25:7, 25:9, 26:22, 26:23, 27:11, 27:20, 28:5, 28:13, 28:14, 29:9, 29:14, 29:15, 32:14, 35:5, 45:2, 52:11, 67:3, 69:20, 70:4, 118:2, 163:8, 170:12, 175:10, 182:7, 182:13, 186:21, 205:23, 214:15, 215:6, 226:6

**body's** [1] - 182:12

**boggy** [2] - 31:22, 180:6

**bone** [1] - 18:14

**bones** [2] - 31:22, 35:11

**Book** [5] - 64:14, 85:5, 239:22, 240:6, 282:9

**bottom** [2] - 264:5, 281:6

**Bourdon** [3] - 26:11, 26:14, 26:19

**bout** [1] - 70:12

**bracelet** [1] - 31:10

**bracket** [2] - 118:21, 120:16

**brain** [142] - 12:6, 16:19, 16:22, 18:3, 18:13, 18:16, 18:18, 19:8, 19:9, 19:10, 19:11, 19:12, 19:15, 19:20, 19:21, 19:22, 20:2, 20:5, 20:6, 20:8, 20:10, 20:11, 31:16, 32:16, 35:15, 38:15, 38:18, 40:11, 41:15, 43:4, 43:17, 43:18, 43:23, 44:7, 44:16, 44:18, 44:21, 44:22, 45:11, 45:15, 45:16, 45:18, 46:5, 46:13, 49:12, 49:13, 54:11, 54:13, 56:15, 57:12, 58:16, 58:17, 60:3, 60:22, 67:4, 67:8, 68:19, 71:23, 72:3, 88:8, 90:14, 94:16, 96:17, 96:20, 96:23, 97:2, 104:9, 106:15, 106:16, 106:19, 119:8, 119:9, 127:21, 131:7, 132:13, 132:16, 132:18, 132:19, 132:23, 133:2, 133:3, 133:7, 133:8, 133:9, 133:11, 133:12, 136:23, 150:6, 150:7, 150:10, 150:12, 152:14, 163:21, 164:15, 164:16, 164:19, 179:7, 180:15, 180:23, 181:11, 181:12, 182:16, 182:21, 182:23, 183:6, 183:11, 183:12, 195:3, 196:17, 196:19, 196:21, 197:17, 204:22, 205:7, 223:13, 223:20, 225:7, 245:20, 246:23, 247:9, 247:10, 248:8, 248:9, 248:10, 248:14, 248:17,

248:21, 249:2, 249:15, 250:15, 250:17, 251:9, 259:17, 275:4, 275:16, 275:23, 283:13, 283:14

**brainstem** [1] - 18:19

**breach** [2] - 145:20, 146:3, 146:5

**break** [2] - 5:15, 78:10

**breaking** [1] - 60:5

**breathe** [1] - 170:23

**breathing** [3] - 67:15, 110:12, 158:20

**Brett** [2] - 2:2, 75:18

**brewing** [2] - 162:22, 164:14

**briefly** [1] - 214:9

**bring** [2] - 22:20, 228:21

**bringing** [2] - 18:8, 228:15

**broader** [1] - 219:20

**Broadway** [1] - 2:2

**bronchopneumonia** [1] - 160:20

**brought** [5] - 80:23, 93:16, 229:18, 229:19, 269:3

**brown** [6] - 43:12, 43:14, 46:2, 46:4, 275:22

**Brown** [1] - 6:9

**bruises** [3] - 28:17, 186:20, 187:16

**bruising** [12] - 36:7, 40:4, 61:12, 118:12, 118:13, 118:16, 119:3, 119:5, 119:7, 138:7, 138:13, 242:3

**Buffalo** [1] - 6:5

**build** [2] - 148:23, 206:3

**buildup** [1] - 132:16

**built** [1] - 207:7

**bulging** [2] - 180:2, 180:4

**bullet** [1] - 17:12

**bump** [1] - 138:6

**bunch** [2] - 259:15, 260:13

**bursts** [1] - 132:13

**busy** [2] - 150:3, 150:15

**BY** [81] - 4:9, 23:6, 37:23, 46:14, 75:17, 81:10, 81:16, 86:17, 87:4, 89:12, 90:7, 93:7, 95:15, 96:15, 99:9, 99:19, 101:19,

103:10, 116:14, 117:21, 119:6, 120:11, 121:3, 121:20, 123:4, 125:8, 126:12, 127:4, 129:6, 131:8, 132:8, 135:17, 136:18, 138:16, 141:4, 148:9, 149:15, 150:8, 151:4, 154:14, 158:21, 163:18, 167:16, 173:10, 174:19, 179:19, 180:12, 187:12, 189:6, 190:19, 193:6, 193:18, 195:21, 199:10, 200:2, 201:22, 210:15, 211:8, 211:17, 213:7, 216:2, 217:9, 219:23, 220:8, 221:22, 226:19, 229:8, 231:15, 233:14, 234:7, 234:21, 235:12, 237:4, 241:7, 261:10, 262:20, 263:18, 265:14, 270:23, 272:19, 281:9

---

## C

**Calabrese** [4] - 2:13, 4:12, 77:20, 82:11

**CALABRESE** [25] - 4:2, 4:9, 23:6, 37:19, 37:23, 46:14, 73:4, 75:13, 77:23, 119:3, 126:9, 130:22, 135:12, 154:6, 212:22, 217:6, 220:12, 220:18, 230:5, 234:3, 234:18, 266:9, 267:2, 267:5, 272:17

**Calabrese's** [1] - 84:4

**calcified** [1] - 35:16

**canal** [1] - 108:9

**cancer** [1] - 52:20

**cannot** [1] - 227:8

**capacity** [4] - 6:15, 79:21, 100:12, 193:23

**capillaries** [2] - 183:8, 195:4

**Capitol** [1] - 2:12

**capsules** [1] - 23:15

**caption** [1] - 121:18
**cardiac** [3] - 173:19, 174:3, 174:5
**cardiomegaly** [1] - 232:3
**care** [4] - 53:20, 63:11, 68:5, 228:7
**career** [3] - 92:12, 216:4, 218:22
**Carly** [1] - 240:6
**carried** [1] - 9:12
**carry** [4] - 71:4, 71:6, 108:3, 108:10
**cascades** [1] - 157:17
**case** [128] - 4:22, 5:2, 5:8, 12:3, 15:17, 15:21, 17:22, 19:21, 20:3, 20:4, 21:16, 22:6, 22:10, 22:12, 25:10, 26:18, 27:21, 28:6, 28:8, 29:8, 53:2, 77:23, 78:10, 78:13, 79:6, 79:13, 79:19, 79:22, 80:2, 81:7, 81:11, 81:17, 82:6, 82:23, 88:9, 88:20, 89:4, 90:3, 91:15, 92:20, 93:6, 93:8, 98:4, 100:23, 101:2, 101:11, 103:15, 103:18, 104:5, 106:7, 107:18, 111:10, 115:15, 116:18, 117:18, 124:20, 128:12, 131:19, 132:2, 133:5, 136:22, 138:4, 139:12, 144:9, 144:21, 145:9, 145:18, 146:3, 146:15, 146:16, 147:4, 152:12, 154:18, 155:18, 155:22, 156:3, 156:7, 158:3, 162:9, 163:20, 168:2, 171:17, 180:19, 187:21, 189:8, 192:10, 194:18, 197:16, 198:5, 200:18, 201:15, 202:16, 206:4, 208:3, 208:9, 215:18, 219:7, 222:23, 226:13, 228:23, 229:18, 229:20, 232:6, 235:8, 237:12, 238:4, 238:11,

238:16, 239:4, 239:17, 240:9, 241:15, 241:17, 243:6, 243:10, 244:23, 246:21, 247:23, 250:3, 253:10, 259:14, 260:20, 268:10, 272:22, 280:21, 281:18, 282:16, 282:17
**caseload** [4] - 155:2, 155:5, 155:7
**cases** [36] - 15:4, 17:22, 19:11, 20:10, 81:19, 81:13, 81:20, 91:11, 92:3, 92:8, 101:4, 101:6, 101:8, 153:15, 153:18, 153:20, 154:4, 154:9, 155:10, 174:12, 198:17, 227:3, 227:21, 235:23, 236:11, 236:14, 236:19, 236:21, 237:6, 237:19, 238:3, 238:12, 238:21, 283:2
**catch** [1] - 112:23
**category** [3] - 52:18, 104:19, 210:4
**catheters** [1] - 31:9
**causality** [1] - 70:10
**causative** [1] - 146:16
**caused** [51] - 33:23, 38:14, 72:15, 73:11, 73:13, 73:22, 74:17, 75:10, 106:10, 107:17, 107:20, 115:4, 124:17, 125:3, 125:13, 125:15, 127:11, 127:20, 129:19, 133:12, 134:10, 134:11, 158:4, 160:13, 161:7, 165:11, 174:5, 174:7, 176:19, 179:15, 181:13, 186:13, 191:19, 191:20, 193:3, 194:18, 200:21, 202:11, 203:7, 210:23, 211:5, 212:8, 217:23, 222:8, 222:9, 222:19, 223:8, 253:11, 260:7, 260:8
**causes** [13] - 113:19,

123:12, 128:20, 131:23, 137:13, 174:8, 175:23, 176:22, 185:20, 201:8, 207:16, 207:23, 222:17
**causing** [6] - 70:14, 80:16, 172:9, 193:19, 206:22, 223:20
**cavities** [1] - 33:12
**cavity** [6] - 17:18, 33:14, 33:17, 33:20, 68:12, 183:17
**CDC** [6] - 100:4, 102:7, 102:8, 102:22, 113:16, 283:6
**ceftriaxone** [1] - 171:8
**cell** [5] - 156:22, 157:6, 157:11, 169:14, 186:5
**cells** [14] - 48:12, 48:19, 49:4, 49:5, 49:6, 67:8, 72:3, 72:4, 72:12, 157:3, 186:4, 196:15, 205:23, 225:21
**center** [4] - 151:8, 243:3, 244:18, 275:13
**Center** [9] - 6:7, 14:3, 15:11, 21:11, 26:15, 28:3, 62:21, 265:16, 277:22
**cerebral** [32] - 40:11, 40:16, 43:20, 50:8, 50:11, 51:4, 53:12, 54:7, 59:5, 59:8, 59:15, 60:12, 69:15, 72:16, 72:19, 72:20, 73:4, 74:18, 75:5, 89:17, 129:21, 180:18, 181:7, 203:7, 205:8, 206:16, 209:19, 231:11, 231:14, 245:18, 255:7, 274:12
**certain** [2] - 114:7, 159:4
**certainty** [9] - 36:16, 48:21, 113:10, 118:17, 129:19, 159:17, 179:13, 189:18, 189:19
**certificate** [8] - 22:6, 22:7, 52:21, 154:10, 154:12, 209:13, 209:22, 229:22

**certification** [5] - 3:9, 7:9, 8:14, 8:15, 8:19
**certifications** [2] - 7:18, 8:13
**certified** [6] - 6:23, 7:3, 7:4, 7:13, 7:22, 155:9
**certify** [2] - 284:4, 285:6
**cervical** [1] - 188:12
**chamber** [2] - 33:8, 34:11
**chance** [7] - 116:20, 140:12, 141:6, 142:3, 162:3, 167:17, 167:20
**chances** [2] - 111:4, 111:19
**change** [80] - 83:21, 97:7, 117:16, 118:15, 130:7, 137:19, 140:19, 141:18, 142:10, 154:12
**changed** [2] - 19:19, 44:18
**changes** [7] - 68:13, 90:14, 90:15, 117:17, 141:17
**characteristics** [2] - 23:17, 101:12
**characterize** [1] - 173:15
**charge** [2] - 282:19, 282:21
**charged** [3] - 51:22, 167:10
**charges** [5] - 226:14, 227:12, 228:15, 228:21, 229:19
**chest** [6] - 16:5, 16:12, 17:18, 31:5, 68:12, 232:3
**chief** [2] - 6:17, 6:19
**child** [40] - 16:4, 21:23, 41:20, 41:22, 42:20, 42:21, 43:21, 49:11, 58:17, 58:21, 62:23, 63:11, 74:10, 80:6, 88:22, 90:23, 91:3, 91:9, 110:8, 110:12, 111:5, 113:20, 125:2, 125:11, 126:5, 127:2, 127:6, 129:10, 134:23, 135:23, 157:8, 165:10, 193:8, 193:17, 203:13, 205:2, 206:22,

219:16, 227:4, 277:23
**child's** [7] - 42:3, 45:4, 51:9, 62:8, 241:22, 253:3, 262:16
**childbirth** [1] - 110:8
**children** [14] - 19:12, 70:23, 71:10, 91:12, 92:9, 103:6, 113:17, 124:21, 138:10, 153:6, 218:5, 218:10, 236:2, 280:7
**choice** [2] - 95:2, 95:5
**choke** [4] - 173:19, 173:21, 174:4, 174:7
**choose** [1] - 153:5
**Christa** [3] - 64:14, 85:5, 240:6
**Christian** [3] - 26:12, 26:15, 26:20
**Christina** [2] - 2:13, 4:12
**chronic** [21] - 47:8, 48:10, 48:15, 49:2, 49:3, 68:2, 68:6, 183:10, 188:17, 189:8, 194:6, 195:12, 196:3, 196:14, 202:5, 206:4, 206:11, 210:7, 224:18, 225:8
**circle** [6] - 114:11, 242:12, 244:16, 262:22, 264:5, 273:22
**circles** [1] - 242:15
**circling** [1] - 102:3
**circular** [1] - 273:9
**circulation** [2] - 42:7, 69:3
**circulatory** [1] - 181:23
**circumference** [6] - 16:5, 31:5, 31:6, 31:18
**circumferential** [2] - 18:14, 40:7
**circumstance** [2] - 29:14, 82:17
**circumstances** [2] - 52:23, 63:10
**cite** [1] - 158:3
**City** [3] - 2:7, 4:21, 4:23
**CITY** [1] - 1:6
**civil** [3] - 78:7, 79:12, 79:13
**claim** [1] - 4:16
**Claimant** [1] - 1:12
**CLAIMS** [1] - 1:9

**clarify** [11] - 37:18, 38:9, 62:12, 104:13, 120:16, 121:16, 140:19, 142:10, 233:19, 245:4, 260:9
**classified** [1] - 186:11
**classify** [3] - 17:16, 174:9, 195:19
**clean** [1] - 27:11
**clear** [10] - 29:7, 57:10, 114:21, 139:20, 165:8, 186:20, 196:15, 246:13, 260:13, 260:18
**cleared** [1] - 138:19
**client** [1] - 260:17
**clinical** [14] - 7:14, 53:11, 53:18, 53:21, 53:23, 54:6, 102:23, 139:9, 210:9, 241:14, 242:12, 243:10, 243:11, 252:2
**clinically** [2] - 191:12, 272:22
**clinician** [1] - 198:7
**close** [6] - 113:3, 253:18, 257:23, 258:19, 264:19, 264:20
**closed** [12] - 50:7, 50:10, 51:3, 69:14, 129:21, 209:19, 221:23, 222:5, 222:8, 222:12, 222:14, 231:10
**closer** [11] - 137:22, 243:9, 254:3, 257:13, 259:2, 259:7, 273:14, 273:17, 273:22, 274:4
**clot** [20] - 42:8, 42:12, 43:6, 45:22, 46:2, 136:3, 182:12, 189:13, 206:2, 206:3, 224:14, 246:4, 246:6, 246:8, 246:9, 251:12, 251:14, 255:5, 274:11, 275:20
**clotted** [2] - 43:15, 245:19
**clotting** [4] - 34:18, 45:9, 136:2, 136:9
**coagulopathy** [13] - 135:16, 163:10, 163:14, 163:17, 164:3, 182:10,

182:20, 184:4, 184:6, 184:8, 187:19, 199:2, 207:14
**coating** [1] - 18:16
**cocci** [1] - 97:23
**coerced** [6] - 83:17, 83:20, 122:17, 125:21, 126:17, 126:21
**Colaneri** [2] - 2:7, 238:19
**COLANERI** [1] - 1:6
**collaborative** [1] - 238:12
**collapse** [3] - 47:3, 68:9, 181:22
**collapsed** [2] - 33:12, 33:19
**collect** [1] - 65:9
**collected** [4] - 40:12, 132:21, 132:23, 255:6
**collection** [23] - 40:14, 53:14, 56:16, 87:21, 87:22, 88:3, 88:11, 89:9, 89:14, 90:11, 120:20, 121:13, 130:10, 131:14, 182:19, 182:21, 188:17, 225:16, 225:17, 225:22, 274:13, 278:14
**collection"** [1] - 225:18
**collectively** [2] - 241:10, 272:12
**college** [3] - 5:19, 5:20, 239:7
**color** [11] - 36:9, 36:11, 36:12, 43:12, 43:13, 61:16, 61:17, 256:13, 272:15, 278:17, 279:3
**coloration** [6] - 43:15, 104:9, 192:4, 242:22, 255:17, 257:9
**comatose** [1] - 185:14
**combination** [7] - 19:5, 37:9, 37:15, 38:2, 38:3, 43:20, 51:12, 110:5, 203:4
**combined** [1] - 24:15
**comfortable** [1] - 218:4
**coming** [6] - 17:2, 116:19, 160:2, 175:7, 246:14, 268:17

**commencing** [1] - 1:18
**comments** [1] - 217:10
**common** [14] - 63:2, 69:4, 69:5, 70:22, 71:3, 99:13, 99:18, 107:22, 108:2, 115:21, 162:5, 171:8, 185:19, 195:6
**commonly** [6] - 16:14, 34:16, 36:2, 116:8, 116:11, 222:14
**commonplace** [2] - 24:8, 29:19
**communicate** [2] - 22:7, 77:3
**communication** [1] - 166:10
**communications** [1] - 76:22
**Community** [1] - 156:10
**community** [3] - 112:20, 176:10, 176:20
**companion** [2] - 4:20, 62:22
**compare** [1] - 64:3
**compared** [1] - 102:4
**complete** [6] - 22:5, 24:13, 54:22, 65:4, 82:6, 94:10
**completely** [1] - 120:12
**complicated** [1] - 174:7
**complicating** [1] - 231:18
**complication** [13] - 143:11, 143:14, 144:14, 145:3, 145:6, 145:14, 145:15, 145:20, 145:22, 146:23, 147:17, 185:14, 231:13
**complications** [7] - 116:9, 143:7, 146:5, 147:11, 222:13, 231:22, 231:23
**complies** [6] - 242:14, 243:2, 243:21, 244:20, 263:10, 272:23
**compression** [1] - 232:2
**comprise** [1] - 9:19
**compromised** [3] - 19:11, 135:6, 136:20

**concede** [1] - 214:16
**concentrate** [1] - 153:7
**concern** [4] - 28:17, 35:4, 46:15, 204:21
**concerned** [5] - 33:15, 33:19, 34:5, 34:10, 34:13
**conclude** [1] - 212:16
**concluded** [5] - 85:21, 87:17, 101:14, 101:17, 168:18
**conclusion** [13] - 21:5, 21:7, 37:4, 39:3, 39:4, 39:10, 53:7, 53:9, 64:2, 160:3, 221:16, 228:17, 235:7
**conclusions** [7] - 83:22, 86:3, 195:11, 227:2, 278:3, 278:4, 278:5
**conclusive** [2] - 90:8, 90:10
**condense** [1] - 271:17
**condition** [16] - 90:23, 91:3, 91:7, 100:18, 157:23, 158:3, 160:12, 161:14, 180:21, 185:15, 202:18, 248:8, 248:16, 259:17, 259:21, 260:3
**conditions** [2] - 191:19, 202:9
**conduct** [7] - 11:4, 12:21, 15:2, 15:4, 23:23, 128:22, 150:20
**conducted** [8] - 12:12, 30:15, 35:8, 83:4, 94:13, 99:5, 122:2, 166:3
**conducting** [7] - 24:8, 25:13, 25:15, 40:15, 50:2, 64:19, 176:16
**conferences** [1] - 8:21
**confession** [13] - 74:18, 83:15, 83:16, 83:18, 83:21, 84:5, 85:8, 85:15, 122:16, 122:17, 123:2, 125:21, 270:19
**confidential** [1] - 237:21
**confirm** [6] - 143:17, 144:17, 147:12, 180:16, 252:7, 276:14
**confirmed** [8] - 15:6,

118:5, 158:18, 172:10, 181:3, 181:6, 196:22, 197:21
**confirming** [5] - 93:9, 93:18, 94:16, 138:22, 230:17
**confronted** [1] - 104:8
**confusing** [1] - 209:17
**confusion** [1] - 265:12
**congenital** [1] - 146:23
**congestion** [4] - 196:5, 196:6, 196:8, 196:9
**conglomerate** [1] - 277:10
**connected** [1] - 189:5
**connection** [6] - 76:15, 77:8, 97:16, 109:8, 125:11, 232:20
**conscious** [1] - 95:2
**consciousness** [5] - 162:6, 162:8, 162:14, 162:16, 165:18
**consider** [9] - 45:7, 54:2, 154:17, 172:22, 201:5, 201:6, 201:21, 228:23, 234:13
**considerably** [3] - 12:23, 118:12, 136:11
**considered** [15] - 25:18, 30:11, 47:22, 49:18, 104:19, 111:16, 145:3, 145:4, 145:6, 147:13, 187:7, 229:9, 234:11, 280:5, 280:8
**considering** [1] - 199:9
**consistent** [49] - 33:13, 33:16, 35:14, 38:13, 48:12, 52:3, 53:14, 54:22, 56:14, 56:16, 57:20, 59:10, 60:6, 60:11, 60:15, 60:20, 60:22, 61:2, 61:13, 64:4, 64:5, 67:16, 74:7, 74:8, 122:7, 122:8, 122:14, 123:3, 123:5, 134:13, 134:14, 137:6, 137:10, 160:19, 163:11, 165:14,

165:21, 165:22,
168:10, 168:16,
180:7, 183:2, 184:3,
184:7, 186:18,
199:5, 199:17, 252:9
**consisting** [1] - 171:7
**consolidate** [1] -
279:14
**consulted** [3] -
155:17, 155:22,
156:3
**consulting** [2] -
151:20, 155:12
**contact** [5] - 13:19,
63:12, 278:10,
278:12, 278:14
**contain** [1] - 241:10
**contained** [1] - 45:21
**container** [2] - 19:16,
19:17
**contemporaneous** [5]
- 194:15, 255:16,
255:18, 255:19,
256:12
**contents** [1] - 21:2
**continue** [9] - 7:18,
7:21, 16:16, 22:12,
39:6, 39:8, 47:16,
71:22, 266:17
**continued** [2] -
149:10, 170:7
**continuing** [1] - 8:20
**contribute** [1] - 42:3
**contributed** [2] -
144:5, 144:6
**contributing** [7] -
72:14, 150:16,
173:2, 173:6,
173:11, 209:13,
218:19
**contributory** [8] -
66:16, 66:17, 188:2,
208:4, 208:9,
208:12, 223:13,
230:20
**contusions** [1] -
186:23
**conversation** [2] -
166:12, 220:15
**conversations** [2] -
76:19, 220:19
**convicted** [1] - 239:10
**convictions** [2] -
91:23, 236:8
**cooler** [1] - 26:23
**coordinate** [1] - 13:5
**Copies** [1] - 283:23
**copies** [3] - 79:2,
276:23, 277:3
**copious** [1] - 160:19,

268:16
**copy** [4] - 26:4, 167:8,
272:4, 272:6
**cord** [1] - 12:7
**coronally** [1] - 262:15
**coroner** [4] - 10:12,
13:15, 25:23, 28:8
**coroner's** [1] - 82:9
**coroners** [10] - 10:7,
10:13, 10:14, 10:22,
11:22, 13:20, 14:7,
15:13, 156:17
**corpse** [1] - 272:13
**correct** [300] - 14:16,
22:13, 25:16, 29:18,
29:20, 35:21, 39:7,
40:22, 41:16, 52:12,
55:3, 55:11, 56:20,
58:23, 59:7, 61:18,
62:9, 63:8, 65:16,
71:9, 71:21, 72:23,
73:23, 75:9, 75:12,
77:6, 77:13, 82:2,
82:4, 82:5, 83:5,
83:6, 84:12, 87:18,
88:12, 88:13, 88:16,
88:17, 90:12, 93:9,
93:16, 93:17, 98:18,
103:12, 103:15,
103:18, 103:21,
104:2, 104:5, 104:7,
105:16, 106:4,
107:9, 107:10,
107:22, 107:23,
108:7, 108:11,
108:12, 108:15,
108:22, 110:16,
110:20, 110:21,
111:2, 111:6, 113:4,
114:13, 115:3,
115:8, 116:6, 116:7,
116:9, 117:16,
118:3, 118:6,
119:14, 119:19,
119:22, 120:10,
120:21, 121:15,
124:9, 124:10,
127:15, 127:17,
128:13, 128:18,
131:10, 131:11,
132:17, 133:4,
133:17, 134:15,
134:20, 135:3,
137:2, 137:23,
138:4, 138:5,
138:20, 138:23,
139:2, 140:23,
141:18, 142:7,
142:10, 143:9,
143:12, 143:15,

144:12, 144:15,
145:3, 145:20,
145:22, 146:10,
146:23, 147:17,
148:6, 148:12,
149:2, 149:5, 149:9,
150:3, 150:17,
152:7, 152:9,
156:23, 157:4,
157:7, 157:8, 158:2,
158:5, 158:8,
158:10, 158:12,
161:3, 161:6,
161:15, 162:18,
162:23, 163:12,
163:22, 165:2,
165:3, 165:4, 166:5,
167:4, 167:12,
169:16, 169:17,
169:18, 169:20,
169:23, 170:5,
170:6, 170:9,
170:10, 170:14,
170:17, 170:20,
170:21, 171:2,
171:9, 171:20,
171:21, 172:11,
172:17, 173:3,
174:22, 175:12,
175:18, 175:22,
177:6, 177:9,
177:15, 178:2,
178:6, 178:10,
178:15, 178:20,
179:18, 180:2,
180:5, 180:8,
180:18, 182:14,
182:17, 183:14,
184:9, 184:13,
184:15, 185:4,
185:17, 185:20,
185:23, 186:3,
186:8, 186:14,
186:16, 186:18,
186:21, 187:4,
187:9, 188:9,
188:15, 188:16,
188:19, 188:20,
189:8, 189:22,
190:6, 190:22,
192:3, 192:17,
192:18, 193:5,
194:22, 195:12,
196:3, 196:5,
196:17, 196:22,
197:8, 197:14,
197:19, 199:6,
199:17, 199:22,
202:6, 203:12,
203:23, 204:2,
204:6, 204:19,

204:21, 205:9,
205:12, 205:17,
205:20, 206:10,
206:13, 208:2,
208:3, 208:5,
208:16, 208:21,
209:4, 209:7,
209:10, 210:20,
211:19, 212:20,
218:23, 221:4,
222:5, 222:6, 223:7,
223:23, 224:8,
224:23, 226:8,
230:2, 231:19,
231:20, 233:2,
233:16, 233:17,
233:22, 235:15,
242:15, 242:18,
244:6, 244:7,
246:18, 246:19,
247:18, 248:18,
249:5, 249:7, 249:8,
252:21, 253:14,
253:19, 254:10,
256:2, 257:14,
258:15, 259:14,
259:18, 259:19,
260:4, 263:17,
264:6, 264:9, 273:3,
273:6, 273:10,
279:12, 284:7
**Correct** [2] - 98:16,
157:2
**correction** [1] - 228:3
**Corrections** [1] -
156:10
**corrections** [1] - 228:6
**correctly** [2] - 136:4,
187:15
**correlate** [3] - 191:17,
250:7, 254:12
**correlation** [1] - 88:14
**corresponding** [1] -
50:20
**coughing** [1] - 176:12
**counsel** [5] - 77:18,
114:22, 241:11,
265:7, 276:14
**count** [7] - 156:22,
157:6, 157:11,
162:20, 169:14,
169:22, 186:5
**counties** [11] - 9:6,
10:4, 10:6, 10:11,
10:12, 10:20, 10:21,
156:13, 156:17,
156:19, 282:21
**COUNTY** [1] - 1:7,
284:2
**county** [5] - 10:3,

10:7, 156:15,
227:16, 282:20
**County** [24] - 9:3,
9:10, 9:17, 9:18,
10:5, 10:20, 11:3,
13:10, 26:18, 28:5,
64:15, 64:16, 78:11,
78:14, 78:17, 78:19,
79:5, 100:13,
155:18, 227:17,
228:12, 276:9,
282:18
**couple** [5] - 103:8,
150:14, 191:14,
194:11, 203:11
**course** [4] - 11:22,
15:8, 97:8, 265:17
**Court** [5] - 83:14,
84:13, 84:23, 220:9,
220:14
**court** [17] - 3:17,
76:18, 78:11, 78:18,
78:20, 80:2, 80:3,
80:4, 80:5, 93:6,
125:23, 126:2,
167:4, 213:13,
213:14, 237:22
**COURT** [1] - 1:1, 1:9
**courtesy** [1] - 282:16
**cover** [6] - 26:11,
65:18, 276:8,
276:10, 276:17,
280:17
**covered** [1] - 69:9
**covering** [2] - 106:15,
197:17
**create** [3] - 77:9,
205:20, 278:20
**creates** [1] - 144:11
**creating** [1] - 83:13
**credit** [1] - 217:11
**crediting** [1] - 126:15
**credits** [2] - 8:20, 8:21
**crib** [4] - 116:5, 122:9,
124:12, 191:18
**crime** [1] - 252:19
**criminal** [7] - 75:22,
76:12, 80:19, 80:20,
92:19, 200:18,
229:14
**criticisms** [1] - 217:11
**critique** [4] - 214:10,
214:19, 215:8, 216:8
**crossed** [2] - 123:14,
123:16
**crucial** [1] - 20:3
**Crystal** [2] - 2:10, 5:14
**CSF** [4] - 180:18,
180:22, 181:2,
225:23

**CT** [11] - 87:15, 88:9, 89:15, 90:8, 96:23, 97:6, 203:22, 261:13, 261:18, 278:10, 278:16

**CTs** [2] - 261:18, 261:21

**culpable** [1] - 154:2

**culture** [4] - 65:21, 172:6, 210:5, 213:2

**cultures** [11] - 66:5, 66:7, 66:10, 96:10, 162:19, 172:3, 211:14, 211:16, 211:20, 212:2, 232:18

**cumulative** [1] - 149:3

**current** [1] - 100:17

**custody** [2] - 80:8, 226:14

**cut** [9] - 18:14, 18:16, 18:18, 20:11, 40:7, 44:7, 262:15, 281:5, 281:11

**cutting** [10] - 17:20, 18:19, 150:6, 150:7, 150:10, 150:13, 152:11, 249:2, 249:16, 283:14

**cuttings** [1] - 22:15

---

**D**

---

**DA** [5] - 64:15, 64:16, 166:4, 268:22, 282:6

**damage** [5] - 36:3, 46:13, 134:2, 134:6, 196:16

**damaged** [1] - 35:3

**Dancing** [1] - 214:13

**dangerous** [2] - 104:21, 170:2

**dangerously** [2] - 156:21, 169:22

**Date** [1] - 285:12

**date** [10] - 20:11, 26:5, 31:11, 36:15, 48:20, 100:14, 121:18, 123:10, 150:10, 249:13

**dated** [6] - 265:23, 266:20, 269:17, 269:19, 276:9, 283:19

**David** [1] - 240:6

**Davis** [4] - 235:15, 235:16, 237:3, 237:5

**days** [43] - 13:3, 13:5, 14:22, 41:12, 41:23,

47:11, 47:17, 47:21, 47:22, 47:23, 66:11, 89:15, 96:20, 102:11, 102:15, 103:6, 116:20, 118:13, 118:19, 118:20, 118:22, 119:18, 120:5, 120:6, 120:15, 133:16, 137:21, 140:15, 142:14, 157:18, 162:23, 188:6, 191:2, 191:3, 191:14, 194:11, 195:20, 204:6, 204:11, 204:12, 223:22, 243:7

**dead** [6] - 58:17, 58:21, 167:11, 198:12, 198:14, 247:2

**deadly** [1] - 108:6

**deal** [1] - 153:5

**dealing** [2] - 86:20, 218:4

**deals** [2] - 12:6, 282:17

**dealt** [3] - 81:20, 91:2, 91:11

**death** [136] - 5:3, 9:23, 10:19, 11:2, 11:17, 13:8, 14:13, 14:14, 17:9, 19:4, 22:6, 22:7, 22:11, 24:22, 25:10, 25:21, 25:22, 26:5, 30:16, 31:11, 42:3, 51:15, 51:21, 51:22, 51:23, 52:2, 52:3, 52:5, 52:6, 52:18, 52:20, 52:22, 53:3, 58:16, 60:22, 60:23, 63:8, 63:10, 63:13, 66:17, 66:18, 69:12, 69:13, 69:14, 72:14, 72:15, 74:14, 74:17, 74:19, 80:10, 80:11, 81:4, 81:17, 82:16, 82:18, 84:7, 86:15, 90:20, 94:6, 95:12, 95:17, 95:19, 100:19, 101:6, 101:14, 123:6, 123:12, 123:15, 125:4, 125:13, 125:16, 127:7, 127:11, 127:20, 127:22, 128:13, 129:19, 129:20, 129:22, 142:15, 143:22, 144:6,

144:8, 148:11, 154:10, 154:12, 160:5, 160:8, 161:17, 172:22, 173:2, 173:7, 173:12, 173:13, 174:5, 174:8, 174:13, 174:15, 181:14, 188:3, 200:14, 206:13, 206:14, 207:23, 208:3, 208:4, 208:5, 208:8, 208:10, 208:14, 209:13, 209:14, 209:18, 209:22, 210:23, 211:5, 211:7, 218:13, 218:16, 218:19, 219:7, 226:15, 227:9, 228:14, 229:22, 230:20, 231:10, 231:19, 235:21, 239:6, 247:9, 247:10, 252:4, 253:12, 254:7

**deaths** [6] - 10:3, 81:20, 156:9, 228:3, 236:2, 237:6

**debate** [2] - 106:6, 106:8

**debris** [1] - 196:15

**deceased** [2] - 88:22, 88:23

**decedent** [10] - 15:19, 16:3, 24:15, 30:19, 31:4, 62:2, 62:15, 63:23, 198:12, 198:13

**decedents** [1] - 12:16

**decision** [6] - 52:10, 84:13, 84:20, 85:2, 230:22, 268:14

**decisions** [1] - 145:8

**declaration** [1] - 30:16

**declared** [1] - 58:17

**decomposed** [1] - 52:11

**decreased** [2] - 185:13, 186:4

**dedicated** [1] - 218:22

**dedication** [1] - 217:15

**deemed** [1] - 125:20

**Defendant** [2] - 1:15, 1:17

**defendant** [4] - 237:7, 239:10, 239:12, 239:14

**Defendant's** [1] - 26:4

**Defendants** [1] - 1:8

**defender** [3] - 271:21, 271:23, 272:4

**defense** [6] - 86:18, 151:20, 200:17, 201:2, 210:22, 211:6

**deficits** [1] - 33:2

**define** [1] - 135:12

**definitely** [1] - 224:3

**definition** [4] - 106:14, 115:4, 125:22, 179:6

**degeneration** [1] - 48:12

**degree** [13] - 24:21, 36:16, 48:21, 67:4, 118:16, 129:19, 149:14, 159:17, 179:13, 189:17, 189:19, 192:16, 196:20

**delaying** [1] - 153:17

**deliberately** [1] - 219:11

**delivered** [1] - 111:11

**delivery** [7] - 108:17, 109:7, 115:16, 115:19, 116:8, 130:11, 203:12

**demand** [1] - 93:5

**demands** [1] - 228:6

**demarcation** [1] - 102:6

**denied** [2] - 126:4, 267:12

**denies** [1] - 126:3

**department** [2] - 9:15, 24:2

**Department** [3] - 9:16, 9:18, 156:10

**departments** [1] - 11:23

**depended** [1] - 53:23

**depict** [1] - 262:9

**depicted** [2] - 252:13, 253:12

**depicts** [5] - 242:2, 245:17, 254:8, 263:23, 264:18

**deposed** [4] - 5:9, 74:5, 78:5, 78:6

**Deposition** [1] - 282:23

**DEPOSITION** [1] - 1:17

**deposition** [11] - 3:18, 78:15, 78:21, 79:5, 79:7, 79:18, 80:3, 80:13, 80:23, 98:23, 268:6

**depositions** [2] -

76:21, 79:12

**deputy** [2] - 6:17, 6:19

**derangement** [1] - 69:2

**describe** [15] - 8:3, 12:4, 12:20, 33:6, 36:4, 41:11, 53:8, 56:6, 68:21, 78:12, 148:22, 184:11, 202:18, 211:15, 222:4

**described** [25] - 40:6, 42:9, 44:2, 46:2, 47:11, 47:13, 48:4, 48:5, 50:3, 50:4, 59:4, 61:16, 62:7, 67:14, 73:7, 84:17, 113:15, 114:6, 120:2, 147:5, 160:18, 171:23, 180:6, 242:22, 264:3

**describing** [1] - 61:17

**description** [3] - 27:17, 216:13, 268:16

**descriptive** [1] - 232:14

**despite** [1] - 170:8

**destroyed** [1] - 17:12

**detail** [1] - 263:6

**detailed** [1] - 16:4

**details** [1] - 19:7

**detect** [4] - 23:3, 158:13, 203:16, 204:15

**detected** [2] - 105:6, 112:3

**Detective** [1] - 166:20, 235:9

**detectives** [5] - 129:15, 158:22, 166:21, 270:20, 281:23

**determination** [4] - 43:10, 139:19, 208:15, 229:20

**determine** [13] - 10:18, 24:21, 25:5, 42:2, 50:15, 52:12, 53:2, 59:8, 92:20, 192:3, 192:5, 192:16, 226:15

**determined** [6] - 50:9, 65:18, 74:2, 75:6, 90:16, 160:7

**determines** [1] - 29:22

**determining** [2] - 90:13, 90:19

**develop** [6] - 137:15, 137:18, 157:21,

Case 1:17-cv-00626-DJS Document 84-14 2021 Filed 06/14/21 Page 295 of 442

184:15, 195:17, 199:11
**developed** [1] - 66:20
**development** [2] - 203:15, 255:17, 256:13
**developments** [1] - 82:21
**diabetes** [1] - 232:4
**diagnose** [2] - 55:22, 198:13
**diagnosed** [2] - 168:18, 168:23
**diagnoses** [8] - 50:5, 60:15, 69:12, 74:21, 75:4, 82:12, 168:2, 181:16
**diagnosing** [1] - 198:14
**diagnosis** [31] - 50:13, 50:16, 50:18, 50:21, 50:23, 51:3, 53:5, 53:18, 54:19, 56:9, 63:18, 64:7, 66:9, 67:16, 68:21, 69:17, 69:19, 70:9, 85:20, 99:11, 130:7, 139:16, 139:23, 147:8, 172:5, 181:20, 181:21, 210:2, 210:3, 221:20
**diagram** [6] - 37:8, 273:9, 275:2, 275:3, 275:4, 275:13
**diagrams** [4] - 226:6, 272:13, 272:14, 283:22
**DIC** [13] - 135:6, 135:8, 135:11, 135:12, 135:14, 135:19, 136:5, 136:20, 136:22, 137:3, 137:9, 207:14, 222:16
**dictating** [1] - 18:23
**die** [1] - 155:23
**died** [6] - 70:2, 74:10, 78:16, 101:17, 146:19, 171:4
**dies** [1] - 228:7
**difference** [7] - 6:18, 25:13, 36:11, 36:12, 88:2, 159:16, 208:11
**different** [23] - 19:6, 23:7, 23:15, 23:16, 55:9, 57:9, 85:11, 96:19, 112:9, 113:12, 113:16, 128:9, 129:5, 137:2, 151:5, 164:13,

188:22, 211:19, 225:17, 225:20, 239:2, 269:15, 272:15
**differential** [4] - 139:16, 139:23, 181:16, 181:20
**differentiate** [1] - 224:4
**differentiation** [1] - 45:17
**difficult** [2] - 92:7, 217:22
**difficulty** [2] - 67:15, 158:20
**diplococci** [1] - 252:9
**direct** [3] - 199:13, 223:7, 223:8
**directing** [2] - 37:6, 242:11
**direction** [2] - 219:18, 220:2
**directly** [10] - 13:16, 169:10, 194:2, 222:2, 223:9, 223:15, 247:11, 247:12, 257:21, 258:10
**disagree** [4] - 86:9, 181:17, 181:18, 208:17
**disagreed** [2] - 86:3, 86:12, 86:14, 86:15
**disagreement** [2] - 87:6, 217:16
**disagreements** [2] - 86:22, 87:7
**discharged** [2] - 204:7, 204:13
**disclosure** [4] - 236:15, 265:8, 265:9, 265:10
**discoloration** [3] - 28:18, 133:14, 275:23
**discolored** [1] - 274:2
**discovery** [2] - 117:7, 140:8
**discrete** [1] - 132:19
**discuss** [4] - 54:16, 56:3, 59:17, 85:10
**discussed** [13] - 60:13, 61:5, 61:21, 73:14, 85:6, 85:16, 105:12, 105:13, 107:22, 114:10, 114:22, 134:19, 240:5
**discussing** [1] - 85:14
**discussion** [2] -

232:8, 280:3
**Discussion** [2] - 235:18, 237:17
**disease** [17] - 38:18, 98:7, 99:16, 102:10, 103:5, 105:2, 106:3, 113:10, 197:22, 197:23, 198:6, 201:3, 215:13, 218:7, 218:12, 218:23, 219:12
**diseases** [2] - 12:6, 44:15
**dish** [1] - 248:10
**disks** [1] - 188:8
**dismissed** [1] - 81:12
**disorder** [2] - 34:18, 45:9
**displaced** [3] - 89:17, 132:22, 132:23
**dispositive** [1] - 63:17
**dispute** [2] - 103:7, 279:6
**disseminated** [1] - 135:15
**dissolve** [1] - 206:2
**distinct** [1] - 183:4
**distraction** [2] - 153:10, 153:12
**distress** [5] - 111:2, 170:14, 184:12, 199:3, 199:22
**DISTRICT** [2] - 1:1, 1:1
**district** [12] - 12:2, 64:18, 64:23, 77:4, 84:22, 154:20, 155:17, 220:4, 226:23, 227:18, 272:7, 272:8
**District** [1] - 276:8
**disturbed** [1] - 139:13
**diverts** [1] - 209:18
**Doc** [1] - 5:23
**docket** [2] - 92:19, 283:2
**Doctor** [7] - 26:2, 26:9, 32:19, 68:15, 234:5, 262:21, 277:15
**doctor** [4] - 12:9, 226:13, 240:23, 241:8
**doctors** [5] - 55:20, 69:23, 87:10, 159:4, 208:17
**document** [5] - 27:18, 102:21, 117:7, 229:21, 243:14
**documented** [2] - 106:18, 160:20

**documenting** [1] - 37:7
**documents** [1] - 150:9
**donated** [2] - 29:5, 149:4
**donation** [9] - 28:23, 58:18, 69:7, 138:17, 139:8, 139:13, 139:14, 139:20, 271:10
**done** [21] - 21:5, 21:7, 23:9, 31:4, 42:22, 53:18, 97:22, 139:8, 150:2, 150:5, 150:13, 152:19, 153:19, 204:23, 240:13, 251:20, 253:6, 270:2, 270:3, 271:2
**donor** [2] - 68:11, 279:10
**Dopamine** [2] - 170:22, 171:4
**dose** [2] - 148:12, 148:18
**doses** [1] - 149:8
**down** [25] - 16:12, 21:8, 29:3, 60:5, 67:13, 67:20, 70:13, 78:10, 84:20, 92:4, 94:9, 122:15, 123:20, 159:6, 166:14, 176:11, 181:12, 182:7, 214:14, 221:6, 221:12, 250:20, 254:3, 254:14, 258:2
**downgraded** [1] - 227:12
**downstream** [2] - 136:11, 223:11
**downward** [2] - 62:2, 62:15
**dozens** [2] - 91:6, 91:13
**Dr** [45] - 4:10, 9:5, 54:21, 55:5, 55:6, 55:14, 55:15, 75:18, 80:22, 86:16, 86:21, 97:15, 155:8, 168:19, 168:21, 168:22, 169:5, 169:11, 181:15, 201:3, 201:14, 213:10, 213:22, 214:2, 214:3, 214:6, 214:9, 214:11, 215:12, 216:6, 217:14, 217:22, 217:23, 219:11,

219:15, 220:20, 251:20, 251:21, 278:17, 279:6, 283:2, 283:10
**draft** [1] - 278:2
**draw** [1] - 97:20
**drawing** [1] - 180:22
**drawings** [2] - 226:3, 226:5
**drawn** [3] - 66:5, 66:7, 66:9
**drew** [5] - 21:19, 42:11, 96:10, 224:14, 264:5
**drop** [2] - 170:8, 182:4
**dropped** [3] - 169:18, 169:22, 170:19
**dropping** [1] - 170:2
**drugs** [1] - 42:20
**due** [40] - 31:22, 32:5, 50:8, 50:11, 51:4, 68:10, 68:11, 69:15, 70:12, 74:11, 83:17, 122:23, 129:21, 134:16, 139:11, 154:2, 160:23, 174:3, 174:10, 175:17, 183:18, 183:22, 187:17, 187:18, 195:2, 195:8, 197:10, 202:21, 205:8, 205:11, 207:11, 220:10, 223:12, 223:13, 231:11, 232:2, 247:13, 247:17
**duly** [1] - 4:7
**dura** [21] - 18:16, 32:18, 40:10, 43:6, 43:7, 43:11, 43:12, 45:20, 88:7, 225:10, 249:21, 249:22, 250:2, 251:6, 251:11, 251:16, 259:21, 260:5, 275:16, 275:19
**dura"** [1] - 275:21
**during** [16] - 16:18, 20:15, 67:11, 110:8, 113:12, 113:15, 143:5, 143:8, 147:13, 226:7, 271:9, 271:18
**duties** [1] - 229:2
**duty** [2] - 51:16, 63:5
**dying** [1] - 137:13

# APPENDIX

## E

**ear** [13] - 253:23, 254:3, 254:4, 254:5, 255:9, 258:3, 259:2, 259:4, 259:7, 273:14, 273:17, 273:23
**early** [10] - 99:14, 102:4, 102:6, 102:7, 102:10, 102:18, 110:10, 110:15, 171:11, 204:20
**ears** [1] - 16:17
**easily** [4] - 96:12, 215:22, 260:8, 271:18
**eat** [1] - 193:12
**echo** [2] - 147:8, 203:16
**echo..** [1] - 204:13
**edema** [35] - 31:22, 35:14, 36:5, 38:13, 43:20, 45:20, 50:8, 50:11, 51:4, 53:12, 54:7, 59:5, 59:9, 59:15, 60:6, 60:12, 69:15, 72:16, 72:19, 72:20, 73:4, 74:18, 75:5, 89:17, 129:21, 180:14, 203:7, 205:7, 205:8, 209:20, 223:12, 231:11, 231:14, 248:14, 250:16
**edematous** [1] - 45:17
**Edge** [9] - 54:21, 55:5, 55:14, 86:21, 168:19, 168:21, 168:22, 169:5, 169:11
**EDM** [2] - 277:8
**Edson** [1] - 81:2
**education** [1] - 8:20
**educational** [1] - 5:19
**effect** [9] - 44:17, 44:19, 100:6, 130:18, 198:20, 205:16, 223:11, 233:21, 257:4
**effective** [1] - 114:7
**effects** [1] - 223:20
**eight** [1] - 118:19
**eighth** [1] - 266:11
**either** [20] - 13:7, 14:7, 19:21, 22:10, 76:20, 87:9, 153:22, 164:3, 171:16, 203:2, 203:5, 204:18,

212:3, 213:18, 233:19, 233:21, 237:20, 267:21, 269:10, 271:6
**elected** [4] - 10:13, 10:14, 10:21, 156:18
**element** [1] - 67:9
**eligible** [3] - 7:3, 8:11, 148:11
**elusive** [1] - 214:17
**emanated** [1] - 133:3
**emergency** [2] - 185:11, 277:12
**emphasis** [1] - 231:9
**employees** [3] - 9:15, 26:15, 166:4
**employment** [1] - 7:5
**end** [3] - 58:20, 65:13, 118:22
**endangerment** [1] - 227:13
**ended** [3] - 129:11, 247:13, 247:16
**ends** [1] - 93:6
**enforcement** [8] - 11:20, 11:22, 24:9, 63:22, 64:9, 81:5, 229:3, 229:9
**engage** [1] - 176:17
**engaged** [3] - 220:9, 220:14, 220:22
**entire** [3] - 148:5, 159:23, 188:15
**entirely** [1] - 112:9
**entirety** [1] - 140:10
**entitled..** [1] - 4:20
**eosin** [2] - 23:5, 278:23
**epidemic** [1] - 100:20
**equally** [1] - 161:17
**equation** [3] - 65:2, 159:10, 164:5
**equivalent** [3] - 213:6, 213:8, 233:20
**ER** [2] - 149:9, 149:10
**erroneous** [2] - 216:13, 221:21
**error** [5] - 54:3, 58:6, 58:7, 169:2, 169:8
**errors** [1] - 169:11
**erythrocytes** [1] - 48:19
**especially** [4] - 13:16, 13:18, 19:12, 143:8
**Esq** [3] - 2:2, 2:6, 2:10
**essence** [1] - 224:16
**essentially** [4] - 18:9, 55:2, 197:7, 264:23
**establish** [1] - 52:2
**estimate** [2] - 118:13,

120:4
**etc** [1] - 81:23
**etiologic** [1] - 105:2
**etiological** [1] - 113:21
**evaluate** [2] - 198:4, 209:2
**evaluation** [7] - 20:9, 51:6, 71:16, 218:3, 218:9, 261:23, 262:9
**event** [13] - 49:5, 68:23, 106:9, 110:23, 133:14, 134:3, 134:6, 134:9, 134:11, 137:21, 137:22, 160:7, 165:16
**events** [5] - 67:12, 134:3, 136:11, 142:14, 191:16
**eventual** [2] - 24:19, 62:22
**eventually** [4] - 6:10, 44:7, 62:3, 189:14
**evidence** [42] - 16:7, 28:21, 28:22, 28:23, 30:9, 31:8, 33:4, 35:10, 35:22, 47:2, 47:5, 51:17, 56:6, 56:13, 57:7, 58:16, 60:21, 65:9, 90:8, 120:18, 120:20, 135:19, 136:5, 138:3, 158:8, 158:9, 188:14, 190:8, 196:2, 197:2, 197:16, 209:7, 209:8, 221:14, 228:21, 241:23, 250:4, 250:16, 260:19, 260:21, 274:19
**evidenced** [1] - 136:22
**evident** [1] - 189:11
**exact** [4] - 12:11, 92:2, 168:13, 258:7
**exactly** [4] - 23:20, 172:21, 236:10, 244:12
**exaggerated** [1] - 96:13
**exam** [5] - 7:22, 121:10, 166:3, 189:11, 208:21
**Examination** [1] - 3:16
**examination** [29] - 3:4, 3:9, 8:10, 16:6, 16:9, 16:20, 17:23, 19:10, 20:2, 22:22, 23:23, 24:14, 27:4, 31:12,

31:15, 44:20, 45:21, 46:23, 49:13, 50:3, 60:4, 68:3, 70:5, 89:6, 94:13, 123:19, 152:11, 152:13, 275:4
**EXAMINATION** [2] - 4:8, 75:16
**examinations** [2] - 46:22, 152:15
**examine** [10] - 17:9, 17:10, 19:9, 32:22, 39:11, 44:10, 44:11, 45:10, 46:19, 56:10
**examined** [4] - 4:7, 17:3, 19:14, 56:15
**examiner** [18] - 6:16, 6:17, 9:4, 9:13, 10:13, 25:23, 63:3, 63:6, 79:22, 88:19, 100:12, 150:20, 151:6, 156:16, 173:5, 228:12, 232:12, 282:19
**examiner's** [1] - 9:10
**examiners** [3] - 151:3, 151:8, 151:9
**Examiners** [1] - 151:11
**examining** [2] - 44:22, 57:12
**example** [13] - 10:10, 11:2, 11:19, 15:10, 17:11, 25:7, 31:18, 38:16, 74:21, 164:15, 231:16, 266:21
**examples** [1] - 27:8
**except** [8] - 3:12, 60:21, 82:9, 112:4, 155:8, 156:16, 160:23, 163:8
**excess** [1] - 181:11
**excise** [1] - 154:21
**excuse** [5] - 6:2, 18:17, 23:19, 66:5, 257:17
**Exhibit** [21] - 26:4, 103:2, 117:5, 140:5, 141:5, 141:21, 142:2, 242:9, 245:12, 248:3, 249:3, 249:5, 265:20, 267:9, 267:17, 269:11, 270:14, 272:9, 276:5, 277:15, 280:15
**exhibit** [4] - 27:18, 226:3, 241:20, 276:7

**EXHIBITS** [1] - 283:4
**Exhibits** [3] - 241:5, 241:9, 262:18
**exist** [3] - 102:9, 114:18, 129:8
**existence** [1] - 181:4
**existing** [2] - 202:12, 246:9
**exists** [1] - 156:6
**expect** [6] - 40:14, 138:6, 162:2, 192:14, 209:9, 262:15
**expectation** [1] - 229:16
**expectational** [1] - 51:20
**expected** [3] - 52:15, 52:23, 252:14
**experience** [9] - 128:19, 137:12, 143:4, 148:18, 153:16, 198:8, 214:23, 229:3, 262:2
**experiencing** [1] - 207:7
**expert** [2] - 86:21, 261:23
**expertise** [6] - 90:21, 113:9, 177:4, 201:6, 219:8, 219:17
**experts** [1] - 87:12
**expired** [1] - 96:7
**explain** [16] - 51:2, 53:4, 53:5, 53:6, 84:15, 107:12, 130:7, 135:18, 140:19, 143:23, 165:13, 192:11, 207:2, 207:3, 224:10, 231:23
**explained** [1] - 201:4
**explaining** [1] - 80:11
**explanation** [13] - 58:22, 89:13, 130:3, 130:5, 134:17, 168:3, 168:5, 202:8, 222:7, 222:9, 222:12
**explanatory** [1] - 60:14
**extended** [2] - 16:12, 31:14
**extending** [1] - 29:3
**extension** [1] - 31:13
**Extension** [2] - 1:20, 2:9
**extensive** [3] - 47:8, 59:22, 148:17
**extent** [8] - 46:12, 95:10, 96:12, 97:10,

135:18, 193:14, 252:6, 278:2
**external** [9] - 16:6, 24:14, 27:17, 27:20, 186:20, 186:23, 192:2, 192:7, 192:12
**externally** [1] - 138:14
**extract** [2] - 22:2
**extreme** [1] - 266:13
**extremely** [5] - 32:17, 43:5, 43:18, 45:16, 92:7
**extremis** [2] - 136:7, 157:10
**exudate** [1] - 197:12
**eye** [13] - 17:6, 20:22, 49:16, 197:3, 197:14, 197:19, 250:19, 250:21, 260:7, 273:18, 273:23, 275:9, 275:10
**eyes** [7] - 10:2, 49:11, 49:20, 107:13, 107:18, 250:18, 259:23

**F**

**fabricated** [1] - 156:2
**face** [3] - 18:8, 18:11, 156:5
**facial** [1] - 31:21
**facilities** [2] - 151:2, 156:11
**facility** [5] - 151:5, 151:7, 151:9, 151:12, 151:17
**fact** [15] - 37:13, 44:14, 68:4, 68:11, 72:11, 79:8, 88:11, 99:7, 121:2, 139:11, 147:19, 153:21, 159:10, 210:22, 220:13
**factor** [20] - 72:14, 72:15, 123:12, 143:20, 144:4, 145:17, 146:6, 162:15, 168:2, 173:2, 173:6, 173:11, 184:8, 208:9, 208:12, 218:19, 231:18, 278:2, 278:7
**factors** [2] - 111:4, 136:2
**facts** [4] - 117:18, 141:17, 171:16,

174:6
**failing** [1] - 204:9
**fair** [4] - 29:13, 30:6, 121:21, 282:19
**fairly** [2] - 48:5, 154:13
**fall** [3] - 25:22, 124:12, 155:17
**fallen** [3] - 124:14, 124:16, 136:8
**false** [7] - 83:17, 83:21, 122:17, 125:21, 126:17, 125:21, 126:22
**familiar** [13] - 5:11, 29:21, 30:2, 30:4, 98:6, 98:20, 98:21, 99:4, 99:7, 99:10, 100:7, 102:3, 147:9
**family** [9] - 15:7, 68:5, 78:18, 78:20, 80:2, 153:5, 193:7, 238:14, 272:7
**far** [4] - 60:13, 87:2, 166:11, 228:16
**Farley** [2] - 30:22, 64:12
**fatality** [2] - 62:23, 277:23
**father** [2] - 51:10, 62:8
**father's** [1] - 165:14
**fax** [2] - 268:21, 276:16, 276:17
**feature** [1] - 275:22
**features** [2] - 22:21, 244:13
**February** [5] - 44:13, 84:21, 94:17, 150:13, 249:17
**feces** [1] - 193:12
**federal** [3] - 78:11, 80:23, 81:6
**fee** [1] - 282:21
**fellow** [3] - 11:9, 78:21, 80:13
**fellowship** [5] - 6:7, 6:9, 7:23, 8:9, 8:11
**felt** [2] - 74:7, 272:21
**femoral** [1] - 20:20
**few** [11] - 12:19, 89:15, 96:20, 131:22, 140:15, 140:16, 162:23, 191:2, 191:3, 243:6, 246:16
**field** [6] - 7:11, 8:11, 11:19, 82:21, 218:7, 219:12
**fields** [3] - 7:2, 7:16, 8:16
**fifth** [1] - 262:8
**fight** [5] - 71:20,

114:4, 148:19, 157:3
**fighting** [1] - 72:13
**file** [32] - 14:6, 77:12, 88:10, 142:21, 150:9, 150:12, 166:9, 239:21, 240:15, 240:23, 241:10, 251:21, 252:21, 265:6, 266:17, 266:23, 267:20, 268:23, 269:13, 269:22, 270:9, 270:12, 271:20, 272:3, 277:6, 278:18, 279:11, 279:16, 280:18, 280:19, 281:8, 283:10
**filed** [1] - 4:17
**files** [1] - 279:4
**filing** [1] - 3:8
**fill** [3] - 19:7, 21:8, 205:20
**filled** [1] - 154:10
**filmmakers** [1] - 77:15
**films** [5] - 56:10, 56:13, 56:14, 57:14, 57:21
**final** [6] - 26:4, 26:7, 53:6, 170:3, 172:5
**findings** [53] - 16:8, 20:3, 24:19, 24:23, 25:4, 49:14, 54:18, 54:22, 64:4, 64:6, 79:9, 80:12, 83:11, 83:22, 84:5, 84:6, 85:2, 85:12, 85:13, 85:15, 86:2, 86:8, 88:15, 94:12, 107:3, 112:3, 129:18, 131:10, 144:21, 145:17, 146:6, 147:19, 161:23, 168:2, 171:16, 208:19, 208:20, 208:23, 209:2, 229:23, 230:2, 241:14, 242:12, 247:13, 250:3, 268:10, 268:21, 271:17, 278:3, 278:4, 278:8
**fine** [2] - 147:8, 281:8
**finely** [1] - 22:19
**finger** [3] - 185:6, 185:10, 264:6
**finish** [1] - 220:17
**finished** [1] - 113:7
**fire** [2] - 78:22, 80:17
**firm** [1] - 44:10

**first** [39] - 4:6, 4:15, 14:17, 16:21, 16:22, 16:23, 17:2, 50:19, 50:20, 66:3, 71:19, 82:10, 93:16, 96:9, 96:23, 121:17, 134:2, 134:6, 134:9, 135:21, 136:6, 148:10, 148:13, 165:5, 181:15, 181:20, 189:23, 233:4, 241:21, 252:23, 253:2, 260:10, 262:7, 263:20, 265:8, 268:18, 269:17, 273:2
**First** [1] - 2:5
**fit** [1] - 152:23
**fits** [1] - 160:4
**five** [17] - 13:12, 13:13, 28:2, 78:11, 92:13, 118:13, 118:18, 118:20, 118:22, 119:18, 120:5, 120:6, 120:15, 133:16, 137:21, 152:14, 188:6
**fix** [1] - 19:15
**fixed** [2] - 19:13, 250:15
**flag** [1] - 280:20
**flagged** [1] - 267:14
**flexible** [1] - 138:12
**flip** [2] - 140:11, 141:6
**Florida** [1] - 9:8
**fluid** [34] - 20:22, 21:16, 22:2, 33:12, 33:15, 53:14, 70:17, 87:22, 88:3, 88:4, 88:6, 88:11, 89:8, 89:14, 89:21, 90:11, 96:16, 96:19, 96:22, 120:20, 121:12, 130:10, 131:13, 131:16, 132:16, 180:18, 181:7, 181:11, 207:9, 225:17, 225:18, 225:22, 226:2
**fluids** [6] - 20:16, 20:18, 31:23, 43:21, 67:19, 70:13
**fluke** [1] - 270:7
**focus** [2] - 219:21, 269:7
**focused** [4] - 215:7, 219:11, 219:15, 256:19

**follow** [2] - 88:14, 149:21
**following** [5] - 94:2, 114:12, 123:18, 174:18, 276:11
**follows** [1] - 4:7
**fontanel** [8] - 180:2, 180:5, 194:17, 203:16, 244:14, 244:16, 244:19, 253:4
**food** [1] - 158:9
**foot** [1] - 31:6
**force** [20] - 50:8, 50:11, 51:4, 69:15, 74:11, 75:6, 84:11, 124:14, 127:8, 129:22, 134:3, 138:4, 167:2, 192:16, 194:18, 208:12, 208:14, 231:11, 231:14, 253:11
**forceps** [7] - 115:13, 115:16, 135:2, 145:22, 146:3, 146:6, 146:9
**forcibly** [2] - 62:2, 62:15
**foregoing** [2] - 284:5, 285:6
**forensic** [19] - 6:8, 7:14, 11:12, 11:14, 11:16, 25:3, 25:11, 25:12, 25:18, 25:19, 51:18, 52:5, 97:9, 138:15, 139:12, 155:7, 193:23, 219:19, 221:11
**forget** [1] - 240:12
**form** [34] - 3:12, 21:9, 60:17, 86:10, 86:11, 95:13, 95:20, 96:5, 99:6, 101:15, 120:8, 120:13, 126:18, 128:23, 132:4, 138:9, 154:5, 155:3, 163:13, 188:23, 197:9, 199:18, 199:20, 200:23, 201:17, 215:19, 221:10, 226:18, 230:3, 233:9, 234:18, 235:10, 270:21, 281:2
**formaldehyde** [7] - 19:17, 19:18, 19:19, 44:2, 44:5, 44:6, 44:14
**formalin** [2] - 19:17,

frozen [1] - 136:10
full [4] - 9:20, 142:21, 147:23, 262:16
full-timers [1] - 9:20
fully [2] - 76:4, 207:18
function [2] - 6:20, 221:14
future [1] - 242:8

## G

gallbladder [1] - 20:23
gas [1] - 80:16
gather [4] - 24:9, 62:5, 63:14, 63:21
gathered [3] - 69:21, 70:5, 166:11
gathering [2] - 63:6, 65:14
gauge [1] - 118:16
GBS [38] - 98:20, 98:21, 99:2, 99:4, 99:13, 100:23, 101:2, 101:6, 101:12, 101:14, 101:20, 101:22, 102:4, 102:10, 103:11, 103:20, 103:23, 104:14, 104:15, 104:16, 104:23, 105:5, 107:6, 107:21, 108:17, 109:3, 110:4, 110:7, 110:23, 111:5, 111:19, 111:21, 111:23, 112:8, 113:12, 114:5, 114:11
General [4] - 2:12, 2:13, 4:13, 4:14
general [3] - 6:6, 207:7, 243:19
generally [11] - 100:8, 100:13, 104:10, 105:5, 105:18, 106:6, 122:10, 130:21, 211:4, 214:6, 267:3
generated [1] - 62:23
gentleman [1] - 155:22
geriatric [1] - 12:18
gestation [1] - 266:19
gestures [1] - 5:12
get.. [1] - 176:14
Ginsberg [1] - 2:5
given [26] - 22:21, 24:5, 76:14, 76:21,

113:9, 118:15, 121:23, 129:14, 141:16, 149:8, 160:11, 161:21, 161:23, 164:15, 167:6, 167:18, 171:7, 204:13, 212:10, 218:17, 229:2, 241:10, 247:13, 270:17, 270:18, 276:11
glands [2] - 29:4, 29:9
Glass [2] - 239:22, 279:19
global [1] - 137:4
glove [1] - 264:6
gloves [1] - 251:8
glucose [1] - 185:13
government [1] - 151:7
graduated [3] - 5:20, 5:21, 6:4
gram [26] - 22:23, 23:2, 23:7, 23:8, 23:10, 23:11, 23:18, 23:20, 23:21, 94:21, 95:3, 97:13, 97:14, 97:15, 97:18, 97:20, 97:23, 104:15, 112:8, 163:4, 177:8, 252:8, 278:22, 279:2
grand [18] - 76:13, 116:23, 117:8, 117:13, 117:15, 117:22, 120:19, 120:23, 121:11, 121:17, 121:18, 121:23, 122:4, 123:10, 123:23, 130:14, 137:20, 138:18
Grand [1] - 283:7
grandfathered [4] - 7:20, 8:2, 8:4, 8:5
gray [2] - 45:18, 247:3
great [1] - 214:22
greater [1] - 275:6
green [15] - 36:14, 36:21, 37:21, 48:22, 57:4, 61:17, 104:9, 118:12, 119:5, 119:7, 119:17, 160:19, 241:13, 268:16, 268:22
greenest [1] - 133:14
greenish [5] - 36:9, 188:2, 194:12, 242:22, 274:2
Griffin [1] - 2:5
gross [2] - 68:14,

117:23
group [28] - 98:6, 98:11, 98:12, 98:15, 102:9, 102:22, 103:5, 104:15, 104:17, 104:18, 104:21, 104:23, 105:8, 105:9, 105:13, 105:15, 105:16, 105:18, 105:20, 107:6, 108:10, 108:14, 112:5, 113:11, 114:5, 283:6
Group [2] - 98:13, 98:21
grow [1] - 66:10
growth [2] - 203:15, 204:12
guardians [1] - 63:23
guess [3] - 24:4, 110:7, 269:13
guidelines [7] - 100:3, 100:8, 100:9, 100:10, 100:14, 100:16, 151:11
guilty [2] - 236:9, 237:8
gunshot [1] - 20:7
guy [1] - 214:14

## H

H&E [1] - 278:23
half [2] - 134:23, 146:19
Hamilton [1] - 2:14
hammer [1] - 219:13
hand [2] - 26:8, 251:8
handed [1] - 265:11
handing [3] - 251:4, 265:5, 272:18
handle [2] - 153:12, 155:6
hands [1] - 251:10
handwriting [2] - 266:22, 281:16
happenstance [1] - 154:3
hard [2] - 122:9, 261:21
harmful [1] - 108:6
harvested [1] - 29:17
harvesting [8] - 29:8, 29:23, 30:13, 32:6, 34:3, 139:4, 139:5, 183:18
head [48] - 5:12, 16:5, 20:7, 27:6, 31:5,

31:15, 31:17, 32:9, 32:14, 35:6, 50:7, 50:10, 51:3, 69:14, 91:9, 91:10, 91:12, 92:8, 122:8, 124:23, 125:7, 129:21, 134:4, 161:23, 162:3, 162:6, 168:13, 172:9, 188:9, 191:22, 191:23, 199:14, 199:15, 207:15, 209:19, 221:23, 222:5, 222:8, 222:12, 222:14, 231:11, 253:3, 253:21, 254:12, 255:8, 255:12, 262:17, 274:4
heading [1] - 284:6
healing [1] - 36:12
Health [5] - 9:16, 9:18, 277:8, 277:10
health [4] - 9:15, 11:23, 28:15, 137:5
healthy [4] - 17:6, 30:7, 40:15, 157:8
hear [2] - 213:13, 213:14
heard [2] - 102:5, 164:6
heart [22] - 17:12, 17:17, 33:3, 33:5, 33:7, 33:9, 34:10, 34:12, 45:6, 47:5, 68:14, 68:17, 136:23, 137:16, 139:8, 163:21, 164:3, 164:11, 174:8, 174:10, 184:8
heavy [2] - 155:5, 155:6
height [1] - 16:3
held [3] - 1:18, 235:18, 237:17
help [3] - 26:22, 114:4
helpful [5] - 89:4, 90:13, 90:18, 95:23, 104:13
helps [1] - 118:10
hematoma [87] - 53:12, 54:7, 54:14, 54:18, 54:20, 72:16, 72:18, 73:10, 73:12, 73:21, 74:11, 74:12, 74:13, 74:17, 75:5, 86:14, 87:18, 87:20, 88:3, 88:12, 90:3, 106:10, 120:19, 121:2, 121:11,

---

44:18
formally [1] - 44:12
former [1] - 238:2
forth [3] - 82:12, 159:7, 254:6
forward [1] - 39:2
fossa [7] - 40:11, 40:16, 206:16, 245:18, 246:23, 255:7, 274:12
found.. [1] - 239:18
FOUNTAIN [1] - 1:6
Fountain [2] - 2:7, 238:2, 238:3
four [21] - 7:16, 13:6, 19:18, 28:2, 45:22, 55:9, 71:14, 78:8, 80:18, 96:4, 108:2, 113:23, 134:22, 146:19, 148:15, 189:20, 206:9, 272:12, 275:19, 279:4
four-month-old [1] - 96:4
fourth [2] - 262:7, 274:22
fracture [8] - 58:3, 58:5, 85:21, 86:7, 168:23, 169:2, 169:6, 169:11
fractures [1] - 188:14
frame [3] - 102:15, 148:14, 181:13
free [7] - 5:14, 18:18, 27:19, 65:5, 151:19, 153:6
fresh [10] - 19:19, 119:13, 136:10, 191:2, 192:3, 192:5, 192:7, 224:13, 245:20, 255:17
fresher [2] - 43:8, 43:16, 48:19, 48:22, 61:7, 61:15, 118:12, 133:19, 134:12, 137:22, 194:14, 224:18, 243:4, 243:5, 245:4, 253:17, 255:18, 256:21, 257:9, 258:17, 259:6, 264:2, 273:14, 273:18, 274:6
freshest [3] - 191:6, 191:8
friends [1] - 63:22
front [1] - 236:11
frontal [1] - 18:10
Frost [1] - 279:18

Case 1:17-cv-00626-DJS Document 84-14/2021 Filed 06/14/21 Page 2993 of 442

127:10, 127:18, 128:21, 130:9, 130:11, 131:17, 131:18, 132:6, 132:15, 134:10, 134:11, 134:13, 144:2, 165:6, 165:15, 165:17, 168:6, 168:9, 168:15, 175:21, 182:19, 182:22, 183:4, 187:13, 188:18, 189:8, 189:15, 189:23, 190:8, 190:13, 190:17, 190:23, 202:9, 202:11, 202:12, 203:10, 206:15, 216:12, 223:17, 223:20, 223:22, 224:2, 224:3, 224:21, 225:14, 225:20, 249:21, 250:5, 250:6, 250:11, 251:7, 254:13, 254:17, 255:19, 258:5, 258:7, 260:6, 261:19, 262:3, 266:20, 274:20

**hematomas** [16] - 56:7, 56:12, 57:8, 57:13, 59:14, 73:15, 87:14, 120:2, 120:3, 131:23, 168:19, 169:12, 202:10, 224:6, 224:16, 254:8

**Hematoxylin** [1] - 23:5

**hematoxylin** [1] - 278:23

**hemorrhage** [108] - 35:12, 35:23, 36:4, 36:6, 36:17, 36:18, 36:21, 39:19, 41:10, 43:8, 43:9, 45:5, 45:6, 47:6, 47:8, 47:10, 47:14, 47:20, 48:3, 48:9, 48:10, 48:13, 48:17, 48:18, 53:15, 53:16, 56:18, 56:22, 57:10, 57:18, 57:19, 59:23, 60:2, 60:4, 60:10, 61:8, 72:21, 72:22, 73:5, 73:6, 73:9, 115:7, 127:23, 128:6, 128:7, 132:13, 132:19, 133:8, 133:9, 134:12, 134:14, 134:16, 134:18, 134:21,

146:11, 146:20, 164:11, 164:12, 184:9, 188:22, 189:2, 189:4, 192:17, 194:6, 194:10, 194:12, 194:17, 203:14, 205:3, 205:5, 205:16, 222:17, 222:19, 223:18, 224:22, 225:8, 225:9, 225:12, 225:13, 225:21, 242:21, 243:13, 243:15, 243:20, 244:2, 245:18, 245:20, 246:15, 246:16, 246:18, 250:20, 250:21, 253:13, 253:14, 255:17, 257:10, 257:11, 264:2, 264:19, 274:3, 274:6, 275:5, 276:2

**hemorrhages** [21] - 38:12, 47:7, 49:15, 49:16, 56:19, 57:5, 60:9, 107:12, 115:22, 116:4, 128:9, 136:13, 136:19, 179:20, 187:7, 187:16, 202:14, 245:7, 253:13, 256:4, 260:7

**hemorrhaging** [8] - 38:4, 38:5, 38:6, 49:20, 49:22, 73:20, 136:23, 275:9

**hereby** [3] - 3:2, 284:4, 285:6

**hereof** [1] - 284:6

**hereto** [1] - 3:4

**Herkimer** [2] - 78:17, 79:16

**herniation** [1] - 181:10

**herself** [1] - 28:12

**Hicks** [6] - 108:17, 126:4, 126:10, 143:17, 144:17, 147:13

**Hicks'** [1] - 110:2

**high** [1] - 149:8

**higher** [4] - 111:5, 253:22, 258:21, 273:15

**highest** [1] - 126:2

**highlight** [1] - 268:2

**highlighted** [11] - 267:7, 267:12, 267:16, 271:8,

273:3, 273:6, 273:9, 273:22, 274:7, 275:2, 275:17

**highlighter** [1] - 272:17

**highlighting** [4] - 266:19, 267:4, 267:19, 271:2

**highly** [2] - 15:8, 37:11

**histology** [2] - 22:19, 27:10

**history** [13] - 53:11, 53:21, 54:2, 54:6, 61:23, 62:15, 62:17, 63:10, 63:14, 74:4, 74:9, 160:2, 210:9

**hit** [1] - 191:22, 191:23

**hitting** [3] - 116:5, 122:8, 125:2

**Hogan** [1] - 227:18

**hold** [5] - 12:11, 173:19, 173:21, 174:4, 174:7

**holding** [2] - 251:11, 251:14

**hole** [1] - 244:16

**home** [2] - 124:21, 252:19

**homicide** [20] - 25:17, 25:19, 52:8, 65:7, 130:3, 155:19, 166:23, 167:12, 167:18, 167:21, 168:8, 220:3, 221:3, 221:8, 226:14, 226:16, 227:6, 237:7, 239:5, 239:8

**homicides** [3] - 137:13, 227:22, 236:3

**Hospital** [11] - 6:10, 66:4, 66:8, 94:5, 142:14, 160:18, 203:15, 204:8, 204:11, 277:7, 277:11

**hospital** [29] - 14:19, 14:20, 24:18, 25:3, 25:6, 25:8, 25:10, 25:14, 28:3, 28:11, 28:12, 30:15, 42:16, 53:13, 58:18, 65:23, 66:6, 96:20, 97:8, 135:11, 137:14, 162:10, 162:17, 163:16, 172:7, 204:10, 228:8, 280:4, 282:7

**hospitalist** [1] - 58:6

**hospitalization** [3] - 243:7, 253:18, 271:18

**hospitalized** [4] - 32:2, 41:20, 41:23, 96:14

**host** [2] - 38:18, 184:14

**hour** [2] - 152:17, 152:18

**hours** [7] - 137:15, 152:6, 153:5, 157:17, 157:19, 157:22, 282:9

**Hubbard** [1] - 155:8

**huge** [1] - 80:17

**hunch** [2] - 159:22, 159:23

**hundred** [1] - 81:21

**hygroma** [1] - 88:5

**hypertension** [2] - 144:10, 232:4

**hypoglycemic** [1] - 185:3

**hypotension** [2] - 186:15, 199:3

**hypothermia** [2] - 186:15, 199:2

**hypothermic** [1] - 170:11

**hypotheses** [1] - 122:21

**hypothetical** [1] - 174:6

**hypothetically** [2] - 95:17, 173:18

**I**

**idea** [2] - 219:15, 221:20

**identification** [20] - 31:10, 103:3, 117:6, 140:6, 141:22, 241:6, 242:5, 242:10, 245:13, 248:4, 249:4, 262:19, 265:21, 267:10, 267:18, 269:12, 270:15, 272:10, 276:6, 280:16

**identified** [1] - 212:7

**identify** [6] - 23:9, 23:16, 241:12, 241:19, 260:19, 280:5

**identifying** [2] - 23:10, 100:3

**identity** [4] - 15:5, 15:6, 279:19, 280:3

**II** [3] - 65:17, 65:21, 210:4

**III** [1] - 68:13

**illnesses** [1] - 114:12

**illustrate** [3] - 201:10, 225:11, 249:20

**illustrating** [1] - 248:10

**imagine** [2] - 95:16, 95:21

**immediate** [1] - 272:7

**immediately** [1] - 280:7

**immersed** [1] - 19:17

**immobility** [1] - 96:13

**immune** [2] - 113:5, 236:15

**immunity** [1] - 147:23

**immunization** [1] - 113:7

**impact** [19] - 61:14, 74:14, 83:11, 84:23, 100:18, 115:12, 128:10, 128:11, 143:2, 145:8, 147:19, 153:17, 171:16, 187:17, 191:20, 191:21, 232:7, 258:11, 258:12

**impacted** [6] - 83:8, 94:12, 139:19, 153:15, 153:18, 168:14

**impacts** [1] - 158:20

**imply** [3] - 23:14, 225:21, 225:22

**importance** [1] - 243:11

**important** [4] - 157:3, 269:7, 269:10, 277:4

**impossible** [2] - 222:21, 222:22

**inadvertent** [2] - 154:3, 234:23

**inadvertently** [1] - 172:18

**incarceration** [1] - 4:18

**incentive** [1] - 219:3

**incident** [1] - 100:7

**incision** [10] - 16:11, 16:14, 16:16, 27:3, 29:3, 31:13, 32:4, 32:5, 32:8, 32:11

**include** [5] - 12:13, 12:15, 31:5, 185:20, 218:9

**included** [5] - 45:21, 93:22, 105:11, 110:6, 265:12
**includes** [3] - 26:6, 105:9, 240:5
**including** [6] - 54:20, 67:4, 86:4, 137:13, 163:21, 276:10
**incomplete** [1] - 278:2
**inconclusive** [1] - 130:2
**inconsistent** [1] - 228:14
**incorporate** [2] - 24:7, 64:7
**incorporated** [1] - 85:8
**incorrect** [2] - 85:22, 104:6
**increase** [5] - 111:19, 143:7, 143:11, 162:3, 207:4
**increased** [5] - 107:11, 123:12, 136:9, 179:18, 207:11
**indentations** [1] - 130:15
**independent** [4] - 55:21, 218:13, 218:15, 221:16
**independently** [3] - 55:17, 55:18, 219:6
**INDEX** [1] - 283:4
**indicate** [4] - 67:11, 246:14, 260:5, 272:21
**indicated** [8] - 82:3, 85:19, 109:23, 110:3, 211:14, 213:10, 231:2, 262:23
**indicates** [4] - 45:19, 49:3, 60:2, 168:7
**indicating** [7] - 43:7, 48:19, 66:15, 68:23, 133:8, 134:9, 243:14
**indication** [8] - 25:11, 25:12, 25:18, 25:20, 90:22, 188:11, 247:8, 266:12
**indications** [2] - 135:10, 136:7
**indicative** [8] - 34:9, 38:7, 38:20, 41:9, 90:9, 157:13, 157:15, 258:6
**indicator** [2] - 74:14, 247:10
**indicators** [1] - 128:10

**indirectly** [1] - 238:15
**individual** [4] - 21:18, 100:21, 198:15, 275:15
**individually** [1] - 17:2
**infant** [18] - 21:23, 27:22, 31:4, 32:2, 81:17, 81:20, 114:4, 125:2, 138:14, 144:12, 179:23, 195:7, 235:20, 236:2, 237:6, 237:14, 239:5
**infant's** [2] - 226:6, 253:21
**infants** [2] - 99:21, 104:22
**infarction** [3] - 33:4, 47:5, 137:16
**infected** [7] - 66:16, 71:7, 96:12, 108:9, 149:5, 212:8, 231:7
**infection** [59] - 30:10, 30:11, 38:17, 66:21, 67:21, 70:2, 93:9, 95:10, 96:3, 96:8, 99:11, 106:14, 112:13, 112:20, 113:19, 143:21, 148:4, 148:20, 160:16, 160:17, 163:8, 164:14, 165:4, 175:9, 177:21, 177:23, 179:3, 179:7, 179:10, 179:14, 179:17, 180:10, 180:13, 180:17, 181:5, 182:2, 183:2, 183:21, 197:13, 197:16, 199:12, 199:19, 199:21, 200:20, 202:23, 203:9, 205:12, 211:5, 211:7, 216:17, 217:4, 222:15, 223:14, 247:8, 248:16, 252:6, 252:16, 255:22
**infections** [2] - 157:4, 160:13
**infectious** [12] - 99:16, 106:3, 113:9, 197:22, 197:23, 198:6, 201:2, 215:13, 218:7, 218:12, 218:22, 219:12
**inflammation** [13] -

47:9, 48:10, 49:2, 49:3, 49:4, 68:10, 106:13, 106:16, 188:11, 194:6, 196:20, 197:9, 216:14
**inflammatory** [6] - 49:6, 67:7, 72:3, 72:4, 72:12, 196:14
**inflicted** [2] - 37:11, 126:5
**inform** [1] - 226:23
**informal** [1] - 166:12
**informant** [1] - 126:13
**information** [35] - 13:19, 14:5, 14:9, 14:12, 15:17, 22:8, 22:9, 24:9, 39:12, 50:20, 51:14, 52:12, 62:5, 62:14, 63:6, 63:14, 63:17, 63:21, 64:2, 64:3, 64:20, 65:3, 65:14, 69:20, 70:5, 82:2, 96:2, 154:11, 221:15, 234:12, 276:22, 281:21, 282:5
**informative** [2] - 215:15, 252:5
**informed** [5] - 98:3, 126:16, 181:2, 194:3, 198:21
**initial** [13] - 14:5, 14:12, 58:4, 65:22, 85:20, 139:16, 172:6, 172:8, 202:6, 210:6, 213:3, 220:3, 260:17
**injured** [1] - 35:3
**injuries** [19] - 35:2, 50:8, 50:10, 51:4, 69:15, 114:20, 118:3, 122:7, 124:23, 127:6, 134:15, 187:5, 191:20, 191:22, 193:20, 196:16, 222:14, 258:23, 259:6
**injury** [68] - 12:7, 16:8, 20:6, 28:21, 33:2, 37:12, 37:15, 38:8, 39:15, 39:16, 39:22, 41:13, 42:4, 44:15, 45:7, 45:8, 45:15, 46:15, 48:22, 49:18, 55:2, 55:5, 55:9, 55:17, 59:6, 59:10, 59:12, 60:7, 60:15, 60:20, 60:22, 61:2,

61:14, 63:13, 74:2, 74:4, 74:15, 74:23, 75:2, 75:4, 114:23, 115:2, 115:4, 117:23, 119:13, 119:16, 119:22, 127:2, 128:4, 128:20, 129:21, 130:16, 131:4, 165:23, 173:16, 187:6, 187:18, 188:8, 209:19, 218:5, 221:23, 222:5, 222:8, 222:12, 223:5, 231:11, 253:7, 273:20
**injury"** [1] - 60:18
**inmate** [4] - 78:16, 79:16, 79:17, 228:3
**inquire** [1] - 89:3
**inquired** [1] - 193:22
**inside** [8] - 18:16, 18:17, 45:15, 189:4, 225:11, 257:18, 280:19
**insignificant** [1] - 191:12
**instances** [1] - 62:3
**instead** [1] - 232:18
**institution** [1] - 151:7
**intact** [1] - 48:18
**integrity** [1] - 155:4
**intensivist** [1] - 54:20
**intentionally** [2] - 172:19, 215:21
**interact** [1] - 238:17
**interaction** [1] - 193:15
**interchangeable** [1] - 225:16
**interchangeably** [1] - 225:14
**internal** [7] - 16:9, 24:14, 31:12, 32:13, 67:5, 69:8, 89:6
**interpreted** [2] - 53:19, 131:4
**interrogation** [1] - 159:2
**interval** [3] - 144:8, 146:18, 188:6
**intervene** [1] - 228:12
**intervention** [4] - 16:7, 28:22, 31:9, 183:23
**interviewed** [2] - 62:21, 126:11
**interviewing** [1] - 238:14

**intestines** [3] - 160:16, 163:4
**intracranial** [19] - 107:12, 107:17, 132:9, 132:11, 143:5, 143:8, 143:12, 179:18, 195:9, 201:23, 202:22, 203:14, 203:17, 204:3, 204:5, 204:21, 205:3, 205:5, 255:23
**intravascular** [1] - 135:15
**inventory** [2] - 272:14, 283:22
**investigate** [2] - 156:9, 228:2
**investigating** [1] - 229:4
**investigation** [7] - 11:17, 63:8, 97:10, 125:16, 221:3, 239:15, 265:18
**investigations** [1] - 235:9
**Investigator** [1] - 64:12
**investigator** [3] - 22:11, 281:22, 282:2
**investigators** [4] - 9:23, 10:2, 13:8, 19:4
**involve** [8] - 16:13, 20:4, 80:19, 81:17, 101:8, 151:9, 236:2, 239:5
**involved** [8] - 26:18, 51:5, 53:20, 80:15, 174:12, 236:21, 239:7, 239:15
**involvement** [4] - 15:22, 75:21, 75:22
**involves** [3] - 24:14, 25:10, 63:9
**involving** [11] - 33:5, 78:21, 81:20, 91:15, 92:8, 100:23, 101:2, 186:11, 235:20, 235:23, 237:6
**irrelevant** [1] - 127:3
**irritation** [1] - 253:8
**Island** [6] - 6:10, 6:11, 6:13, 6:23, 8:22, 12:10
**isolated** [3] - 212:17, 212:20, 213:2
**issue** [7] - 42:23, 70:6, 80:8, 154:23, 215:11, 218:14,

230:20
**issued** [1] - 94:3
**issues** [3] - 69:4, 69:5, 76:8
**item** [4] - 50:19, 50:20, 57:6, 172:5
**items** [7] - 38:7, 38:23, 51:6, 51:13, 51:17, 73:20, 75:11
**itself** [20] - 24:13, 28:13, 36:3, 40:5, 51:13, 57:12, 60:3, 103:23, 110:11, 132:18, 133:9, 134:10, 163:11, 180:14, 183:13, 211:21, 215:12, 222:13, 248:15, 251:16
**IV** [1] - 31:9

## J

**January** [3] - 44:13, 84:21, 94:17
**jar** [1] - 20:9
**Jeanne** [3] - 1:21, 285:4, 285:12
**Jennifer** [3] - 26:12, 26:17, 240:5
**Jerry** [1] - 279:18
**jive** [1] - 194:9
**job** [1] - 25:2
**jog** [1] - 276:20
**John** [1] - 81:9
**Johnson** [2] - 1:19, 2:8
**joints** [1] - 35:10
**Joseph** [1] - 2:6
**JPG** [1] - 279:4
**judgment** [2] - 65:13, 139:9
**June** [4] - 190:3, 240:10, 276:9, 276:21
**jurisdiction** [4] - 25:23, 156:13, 156:15, 156:19
**juror** [1] - 131:3
**jury** [24] - 76:13, 116:23, 117:8, 117:13, 117:15, 117:22, 120:19, 121:2, 121:11, 121:17, 121:18, 121:23, 122:4, 123:10, 123:23, 130:14, 137:20, 138:18, 215:17,

215:22, 216:23, 217:18, 283:7
**justify** [1] - 50:21

## K

**Kardos** [1] - 181:15
**Kate** [1] - 227:18
**Katherine** [1] - 2:14
**keep** [4] - 8:14, 8:16, 8:18, 209:21
**kept** [1] - 271:14
**kidney** [1] - 29:9
**kidneys** [1] - 29:4
**kids** [5] - 125:3, 193:11, 193:16, 193:20, 265:12
**killer** [1] - 156:5
**killing** [1] - 148:5
**kind** [11] - 14:17, 25:21, 35:20, 52:10, 129:4, 146:19, 197:11, 203:13, 222:17, 247:4, 282:15
**kinds** [1] - 52:22
**Klein** [13] - 2:2, 75:19, 86:16, 201:3, 201:14, 214:9, 215:12, 217:14, 217:20, 217:22, 217:23, 219:11, 219:15
**KLEIN** [111] - 4:5, 23:4, 37:16, 37:20, 46:8, 47:15, 55:7, 55:19, 57:15, 60:17, 73:2, 75:17, 78:3, 81:4, 81:8, 81:10, 81:16, 86:17, 87:4, 89:12, 90:7, 92:18, 93:7, 95:15, 96:15, 99:9, 99:19, 101:19, 102:20, 103:10, 116:14, 117:3, 117:21, 119:6, 120:11, 121:3, 121:20, 123:4, 125:8, 126:12, 127:4, 129:6, 130:20, 131:8, 132:8, 135:14, 135:17, 136:18, 138:16, 140:3, 141:4, 148:9, 149:15, 150:8, 151:4, 154:14, 158:21, 163:18, 167:16, 173:10, 174:19, 178:19,

180:12, 187:12, 189:6, 190:19, 193:6, 193:18, 195:21, 199:10, 200:2, 201:22, 210:15, 211:8, 211:17, 213:7, 216:2, 217:9, 219:23, 220:8, 220:17, 220:21, 221:22, 226:19, 229:8, 230:7, 230:10, 231:15, 233:14, 234:7, 234:21, 235:12, 235:19, 236:12, 236:23, 237:4, 237:18, 241:7, 245:6, 260:16, 261:7, 261:10, 262:20, 263:18, 265:14, 266:10, 267:3, 267:11, 270:23, 272:19, 281:9
**Klein's** [2] - 213:11, 214:11
**knowing** [5] - 48:7, 95:9, 229:12, 229:22, 231:3
**knowledge** [15] - 100:18, 110:20, 111:8, 112:19, 117:18, 124:4, 125:9, 140:9, 149:18, 193:7, 197:22, 198:16, 207:19, 236:9, 239:16
**known** [3] - 139:4, 186:8, 186:13

## L

**lab** [4] - 93:8, 93:18, 94:16, 279:14
**labeled** [4] - 275:21, 276:2, 277:16, 278:13
**labor** [3] - 113:13, 113:15, 145:11
**laboratory** [8] - 21:3, 21:10, 22:20, 27:10, 42:6, 42:14, 271:17, 277:22
**labored** [1] - 110:11
**labs** [2] - 123:21, 138:22
**lack** [7] - 38:17, 68:16, 113:9, 137:4,

164:10, 229:23, 257:10
**large** [10] - 67:7, 105:9, 132:13, 155:10, 182:21, 192:8, 192:11, 192:13, 206:21, 258:4
**last** [14] - 78:18, 92:9, 92:13, 116:20, 140:16, 153:20, 155:16, 155:18, 213:20, 213:22, 227:14, 274:22, 275:22, 282:3
**late** [10] - 99:21, 102:4, 102:6, 102:14, 103:5, 103:11, 103:20, 103:23, 110:10, 110:19
**latent** [1] - 112:21
**Law** [1] - 1:19
**law** [10] - 11:19, 11:21, 24:9, 63:22, 64:9, 81:5, 122:17, 229:3, 229:9, 236:16
**lawsuit** [2] - 79:16, 80:23
**lawsuits** [1] - 78:7
**lay** [3] - 33:6, 33:7, 35:17
**layer** [7] - 43:6, 164:22, 165:5, 191:7, 191:8, 191:9
**layered** [1] - 205:16
**layers** [8] - 164:15, 164:19, 164:21, 189:7, 190:2, 191:5, 191:6, 206:3
**lead** [33] - 67:21, 127:21, 128:12, 132:6, 158:5, 160:7, 174:21, 175:3, 177:23, 185:14, 187:14, 187:15, 189:23, 200:9, 200:10, 200:21, 201:12, 201:13, 201:15, 206:13, 206:14, 212:16, 219:17, 220:2, 220:7, 221:6, 221:12, 221:21, 239:16, 254:7, 256:3
**leading** [2] - 142:15, 158:3
**leads** [1] - 173:19
**leaked** [2] - 254:14, 254:17

**learn** [7] - 34:19, 62:16, 65:3, 108:16, 145:12, 147:12, 149:16
**learned** [6] - 62:11, 62:12, 83:7, 125:20, 141:18, 153:21
**least** [17] - 30:7, 66:13, 67:12, 70:12, 81:21, 92:11, 101:5, 118:13, 118:18, 118:20, 120:4, 120:6, 120:15, 133:16, 164:23, 236:7, 262:9
**leave** [4] - 131:6, 173:6, 236:12, 237:18
**Leestma** [4] - 86:16, 97:15, 217:20, 251:20
**Leestma's** [5] - 213:22, 216:6, 251:21, 278:18, 279:6
**left** [28] - 31:14, 33:5, 33:8, 34:11, 46:5, 53:17, 56:21, 56:22, 80:15, 86:13, 90:11, 127:16, 137:17, 172:21, 184:2, 242:18, 247:20, 250:19, 254:4, 263:5, 263:8, 263:9, 273:8, 274:23, 275:2, 275:5, 275:6, 275:9
**left"** [1] - 276:2
**left-sided** [5] - 86:13, 90:11, 263:5, 263:8, 263:9
**legal** [11] - 9:23, 11:16, 13:8, 19:3, 22:11, 51:19, 63:3, 63:5, 63:8, 228:17, 229:18
**legitimate** [1] - 70:9
**length** [1] - 31:5
**lesion** [2] - 36:13, 36:14
**lesions** [1] - 192:13
**less** [9] - 13:14, 41:12, 47:11, 47:17, 47:22, 102:10, 147:23, 152:14, 206:17
**letter** [2] - 271:20, 272:3
**letters** [1] - 243:19
**leukopenia** [2] - 186:10, 199:4

# APPENDIX

**level** [2] - 16:17, 169:20
**levels** [1] - 207:11
**levocytes** [1] - 72:5
**liaise** [1] - 24:9
**lied** [1] - 126:11
**Lieutenant** [1] - 238:19
**life** [3] - 169:20, 170:20, 203:18
**light** [2] - 43:14, 122:16
**likelihood** [1] - 149:11
**likely** [6] - 89:7, 124:8, 164:8, 165:18, 221:8, 227:9
**limitations** [1] - 198:3
**limited** [1] - 65:4
**limits** [1] - 31:18
**line** [5] - 35:20, 122:13, 130:22, 134:8, 246:13
**lines** [1] - 31:9
**lining** [4] - 18:17, 32:18, 33:4, 225:10
**link** [1] - 209:3
**liquid** [3] - 254:14, 254:17, 274:11
**liquified** [3] - 224:14, 246:23, 248:11
**list** [11] - 24:17, 50:17, 50:19, 69:11, 69:16, 123:12, 181:16, 210:4, 234:10, 235:5
**List** [1] - 283:1
**listed** [8] - 31:11, 51:13, 54:19, 57:6, 74:22, 207:23, 209:13, 234:14
**listing** [1] - 275:7
**lists** [3] - 26:11, 27:16, 53:11
**literally** [4] - 244:11, 246:8, 251:14, 253:2
**literature** [1] - 135:5
**live** [2] - 137:14, 213:13
**liver** [4] - 17:14, 29:4, 29:9, 34:2
**load** [1] - 153:13
**local** [7] - 11:19, 11:21, 11:22, 11:23, 12:2, 24:9
**located** [5] - 36:9, 254:18, 254:19, 257:21, 258:2
**location** [9] - 14:2, 127:20, 168:10, 224:11, 224:17, 257:8, 257:22,

258:6, 271:19
**locations** [2] - 14:4, 275:15
**lock** [1] - 28:7
**locked** [3] - 28:6, 28:8, 28:9
**look** [35] - 8:8, 15:16, 24:4, 24:6, 25:6, 25:8, 26:9, 30:3, 51:7, 51:20, 52:6, 52:7, 52:15, 52:16, 52:17, 52:23, 81:23, 82:3, 97:18, 103:8, 117:9, 123:20, 141:5, 142:19, 166:16, 205:3, 219:20, 221:14, 225:2, 235:6, 251:3, 252:18, 268:11, 277:21
**looked** [15] - 17:6, 45:4, 51:12, 94:7, 94:9, 94:11, 97:22, 109:13, 109:16, 147:7, 235:3, 250:8, 266:3
**looking** [24] - 22:9, 28:13, 35:18, 42:18, 46:8, 46:10, 94:15, 126:22, 159:23, 163:19, 205:14, 241:21, 242:18, 244:5, 245:14, 247:19, 262:21, 264:4, 264:11, 264:17, 273:2, 273:5, 273:8, 274:22
**looks** [12] - 35:19, 240:22, 244:15, 249:7, 263:21, 264:6, 269:14, 269:19, 271:10, 280:17, 280:21, 281:5
**loosely** [1] - 216:21
**loss** [6] - 45:17, 162:5, 162:8, 162:13, 162:15, 165:18
**lost** [2] - 137:16, 137:18
**loved** [1] - 63:23
**low** [9] - 146:15, 156:21, 162:20, 169:23, 170:2, 185:8, 186:5, 186:6
**lower** [19] - 16:23, 17:19, 18:2, 32:13, 32:21, 35:5, 36:9, 45:5, 46:23, 147:22, 242:18, 243:19,

244:5, 247:20, 258:2, 273:8, 274:23, 275:2, 275:4
**lucky** [1] - 13:4
**lumbar** [1] - 180:17
**lung** [6] - 47:3, 67:21, 68:9, 160:23, 161:2, 196:2
**lungs** [7] - 17:18, 33:11, 33:19, 70:14, 160:17, 163:9, 268:17
**lymphocytes** [1] - 49:6

## M

**M.D** [1] - 4:6
**macrophages** [5] - 49:5, 196:13, 196:14, 197:2, 197:11
**magnum** [1] - 181:13
**maintain** [6] - 7:18, 8:12, 43:22, 151:12, 151:17, 153:3
**maintained** [4] - 7:8, 9:9, 226:11, 231:17
**maintained..** [1] - 226:10
**maintaining** [1] - 170:12
**major** [1] - 87:6
**majority** [3] - 80:20, 153:7, 246:4
**Malakai** [2] - 280:2, 280:6
**male** [1] - 27:23
**malignancy** [1] - 30:9
**malleable** [1] - 138:11
**malpractice** [4] - 78:13, 79:5, 79:10, 79:13
**maltreatment** [1] - 62:17
**man** [2] - 80:15, 156:4
**managing** [1] - 6:20
**mandated** [1] - 228:8
**manifest** [6] - 103:11, 103:17, 104:2, 107:7, 107:8, 110:11
**manifesting** [1] - 163:11
**manner** [15] - 10:18, 24:22, 25:5, 50:18, 51:23, 52:2, 52:5, 52:13, 53:3, 82:17, 84:8, 84:9, 94:13, 129:5, 228:14

**manners** [1] - 52:6
**mappable** [1] - 128:4
**mark** [20] - 27:8, 40:7, 102:20, 117:3, 131:6, 140:3, 226:5, 237:22, 241:19, 242:7, 244:8, 246:12, 252:23, 262:4, 267:2, 269:13, 269:14, 270:16, 272:11, 280:17
**marked** [27] - 27:18, 103:2, 117:5, 140:5, 140:8, 141:21, 141:23, 241:5, 241:8, 242:9, 245:4, 245:12, 248:3, 248:5, 249:3, 249:5, 262:18, 262:21, 263:16, 265:20, 267:9, 267:17, 269:11, 270:14, 272:9, 276:5, 280:15
**Marked** [1] - 283:5
**marking** [1] - 265:22
**markings** [1] - 245:15
**marks** [3] - 187:3, 223:6, 273:9
**Mary's** [1] - 277:11
**mask** [1] - 170:16
**mason** [1] - 30:22
**MASON** [1] - 1:6
**Mason** [9] - 2:7, 64:9, 166:20, 235:9, 235:20, 236:2, 236:14, 236:19, 240:7
**Massachusetts** [1] - 6:7
**material** [4] - 33:11, 34:5, 189:13, 251:15
**materiality** [1] - 232:16
**maternity** [1] - 170:8
**math** [1] - 152:3
**matter** [16] - 4:20, 45:18, 76:16, 76:23, 78:18, 81:19, 90:15, 92:19, 116:21, 122:17, 157:17, 157:19, 157:22, 235:19, 247:3, 247:4
**matters** [7] - 77:8, 77:14, 80:19, 80:21, 83:8, 141:14, 192:5
**Matthew** [88] - 5:3, 26:5, 27:14, 27:22, 35:8, 50:9, 66:3, 66:6, 66:20, 67:11,

67:12, 67:13, 67:14, 68:11, 70:2, 70:10, 70:13, 72:11, 75:22, 82:18, 91:2, 91:14, 91:15, 96:7, 96:11, 99:8, 101:11, 101:17, 102:15, 103:14, 103:17, 103:21, 105:7, 106:18, 108:18, 111:11, 112:11, 112:18, 113:6, 113:11, 113:22, 129:10, 131:5, 131:6, 135:7, 135:8, 135:13, 135:19, 135:21, 144:2, 146:4, 146:18, 148:4, 148:10, 149:7, 156:20, 156:21, 158:19, 161:23, 168:7, 168:14, 168:16, 177:15, 177:20, 178:12, 178:15, 178:17, 178:20, 179:10, 179:21, 181:10, 181:19, 182:10, 182:14, 182:16, 182:18, 184:11, 185:3, 185:17, 191:23, 205:5, 216:15, 222:4, 222:18, 280:2, 280:5, 280:9
**Matthew's** [33] - 30:20, 53:15, 53:20, 69:13, 70:4, 71:10, 71:17, 71:23, 106:12, 107:13, 107:18, 109:16, 109:22, 111:21, 118:2, 128:13, 132:16, 142:13, 160:11, 161:17, 165:14, 169:14, 180:4, 180:19, 182:5, 182:8, 186:21, 189:11, 191:22, 232:7, 265:22, 266:18, 277:13
**mattress** [9] - 62:2, 62:16, 67:13, 122:8, 122:15, 122:23, 123:3, 130:16, 191:18
**McElaney** [1] - 237:12
**MCF** [1] - 274:12
**McNally** [2] - 64:15,

240:6

**MD** [2] - 8:14, 8:19

**mean** [23] - 18:7, 23:12, 37:10, 41:8, 41:12, 48:14, 48:15, 48:23, 63:16, 68:22, 96:16, 115:10, 124:13, 126:22, 131:4, 134:5, 151:16, 189:20, 205:22, 224:10, 240:9, 274:16, 275:9

**meaning** [3] - 94:2, 192:22, 281:23

**means** [13] - 8:3, 8:5, 33:6, 41:11, 42:21, 48:14, 48:17, 56:8, 147:6, 181:10, 186:4, 205:23, 274:10

**meant** [3] - 208:7, 217:3, 217:8

**measurements** [5] - 16:3, 31:3, 31:7, 31:17, 81:23

**measuring** [1] - 248:10

**mechanism** [6] - 74:23, 75:2, 129:23, 130:6, 160:4, 168:5

**mechanisms** [1] - 128:19

**Med** [1] - 204:10

**media** [1] - 77:15

**medical** [65] - 5:22, 6:16, 6:17, 8:16, 9:3, 9:10, 9:13, 9:23, 10:12, 11:16, 13:8, 16:7, 19:3, 22:11, 25:9, 25:23, 28:22, 31:9, 39:12, 51:9, 51:19, 58:16, 60:21, 63:3, 63:5, 63:8, 66:18, 70:11, 71:16, 79:21, 86:4, 86:8, 88:19, 89:19, 99:10, 100:12, 113:10, 118:16, 150:20, 151:2, 151:6, 151:8, 151:9, 153:23, 156:16, 159:15, 159:16, 159:17, 160:2, 160:6, 160:21, 166:16, 173:5, 175:17, 176:17, 211:12, 217:16, 228:7, 228:12, 229:18, 232:12, 253:6, 267:19, 277:7,

282:19

**Medical** [15] - 6:6, 14:3, 15:11, 21:11, 26:15, 28:3, 62:21, 151:11, 180:4, 261:17, 265:6, 265:15, 268:3, 268:8, 277:22

**medically** [1] - 161:18

**medication** [1] - 149:8

**medications** [1] - 76:8

**Medicine** [1] - 6:5

**medicine** [4] - 82:22, 117:17, 141:17, 214:21

**meet** [2] - 14:6, 101:11

**meeting** [8] - 166:7, 166:14, 220:3, 238:9, 239:21, 271:21, 271:22

**member** [1] - 8:9

**members** [3] - 64:8, 68:5, 238:15

**membrane** [3] - 249:21, 250:3, 258:4

**membranes** [3] - 111:18, 144:14, 144:18

**Memorial** [1] - 277:11

**memory** [2] - 76:8, 276:20

**meninges** [2] - 88:7, 106:19, 179:3, 179:7, 179:10, 179:14, 179:17, 180:13, 180:16, 205:12, 216:17, 217:3

**meningitis** [31] - 104:2, 104:5, 106:5, 106:6, 106:8, 106:11, 106:14, 106:17, 106:20, 106:21, 107:2, 107:3, 107:4, 107:8, 107:11, 107:17, 114:13, 114:16, 131:15, 171:9, 171:14, 178:14, 178:22, 179:2, 179:6, 179:23, 180:8, 216:13, 216:15, 216:20

**mention** [9] - 58:3, 58:12, 85:15, 105:14, 146:22, 204:20, 241:16, 244:22, 268:18

**mentioned** [10] - 31:21, 57:2, 57:3,

57:9, 64:8, 64:9, 69:7, 72:5, 72:7, 252:20

**mentions** [1] - 269:18

**merits** [1] - 214:20

**message** [1] - 276:17

**met** [2] - 167:3, 240:10

**metabolic** [1] - 38:18

**metal** [1] - 192:20

**metastatic** [1] - 52:19

**method** [2] - 20:17

**Michael** [6] - 2:11, 26:11, 26:14, 26:19, 235:15, 235:16

**MICHAEL** [5] - 1:7, 1:17, 4:6, 284:4, 284:13

**Michigan** [1] - 156:3

**microorganism** [1] - 105:10

**microscopic** [14] - 17:3, 17:23, 20:4, 22:17, 40:3, 46:19, 46:23, 47:12, 60:4, 68:3, 123:19, 215:7, 225:5, 225:6

**microscopic)** [1] - 68:14

**microscopically** [2] - 44:17, 183:8

**middle** [11] - 40:11, 40:16, 206:16, 244:15, 245:18, 254:19, 255:2, 255:6, 273:15, 274:12

**midline** [1] - 259:9

**might** [13] - 95:18, 101:13, 121:8, 123:14, 177:5, 210:2, 231:23, 241:16, 244:22, 260:20, 267:8, 267:16

**milky** [1] - 247:2

**millimeter** [1] - 275:20

**millimeters** [2] - 43:7, 45:22

**mind** [7] - 123:14, 123:16, 161:17, 216:18, 242:23, 268:9, 269:5

**mine** [2] - 54:23, 55:21

**minor** [2] - 87:8, 95:22

**minus** [1] - 129:14

**minutes** [2] - 103:8, 131:22

**mis** [1] - 215:16

**mischaracterization** [1] - 230:9

**mischaracterizing** [1] - 230:14

**misconduct** [3] - 220:9, 220:15, 220:22

**mislead** [3] - 215:17, 215:22, 215:23

**misleading** [3] - 215:2, 217:17, 217:20

**misleading"** [1] - 215:17

**missed** [2] - 204:3, 204:17

**missing** [1] - 274:17

**misstatement** [1] - 220:13

**mistake** [4] - 154:2, 154:3, 210:11, 210:14

**mistakenly** [1] - 153:23

**mix** [2] - 247:5, 247:6

**ML** [6] - 57:19, 96:17, 224:15, 245:22, 274:11, 274:13

**MLDI** [3] - 22:10, 26:17, 28:12

**MLDIs** [2] - 13:8, 26:13

**MLI** [1] - 282:2

**MLs** [12] - 40:13, 41:4, 41:5, 54:12, 206:15, 206:17, 206:21, 245:21, 246:3, 246:5, 246:16, 250:8

**modus** [1] - 105:22

**mom** [1] - 267:12

**moment** [5] - 26:8, 75:13, 78:23, 117:9, 226:5

**monitoring** [1] - 100:4

**month** [7] - 44:11, 96:4, 113:23, 114:2, 134:23, 150:2, 150:6

**months** [24] - 28:2, 44:6, 71:14, 94:8, 94:17, 110:19, 111:2, 113:20, 146:19, 148:15, 149:23, 150:7, 164:16, 164:23, 189:16, 189:20, 189:21, 190:22, 191:10, 203:11, 206:5, 206:9

**morbid** [1] - 147:16

**morbidly** [1] - 147:13

**morgue** [1] - 28:9

**morning** [9] - 4:10,

4:11, 28:4, 66:4, 75:18, 96:11, 162:16, 162:21

**most** [9] - 71:6, 100:6, 138:14, 155:5, 155:6, 191:6, 191:16, 191:17, 227:9

**mostly** [2] - 183:22, 192:4

**mother** [6] - 111:4, 111:20, 112:15, 144:11, 148:2, 227:5

**mother's** [3] - 234:10, 234:14, 234:20

**motivation** [1] - 219:3

**mouth** [1] - 169:10

**move** [5] - 18:3, 35:6, 45:10, 82:10, 196:15

**moved** [3] - 9:8, 258:8, 258:9

**moving** [1] - 39:2

**MR** [129] - 4:4, 4:5, 23:4, 37:16, 37:20, 46:8, 47:15, 55:7, 55:19, 57:15, 60:17, 73:2, 75:17, 78:3, 81:4, 81:8, 81:10, 81:16, 86:10, 86:17, 87:4, 89:12, 90:7, 92:18, 93:7, 95:15, 96:15, 99:9, 99:19, 101:19, 102:20, 103:10, 116:14, 117:3, 117:21, 119:6, 120:9, 120:11, 121:3, 121:20, 122:13, 123:4, 125:8, 126:8, 126:12, 126:18, 127:4, 128:23, 129:6, 130:20, 130:23, 131:8, 132:4, 132:8, 135:14, 135:17, 136:18, 138:16, 140:3, 141:4, 148:9, 149:15, 150:8, 151:4, 154:7, 154:14, 158:21, 163:18, 167:16, 173:10, 174:19, 178:19, 180:12, 187:12, 188:23, 189:6, 190:19, 193:6, 193:18, 195:21, 199:10, 199:18, 200:2, 201:22, 210:15, 211:8, 211:17,

213:7, 215:20, 216:2, 217:9, 219:23, 220:8, 220:17, 220:21, 221:10, 221:22, 226:18, 226:19, 229:8, 230:4, 230:7, 230:10, 231:15, 233:10, 233:14, 234:2, 234:7, 234:21, 235:12, 235:19, 236:12, 236:23, 237:4, 237:18, 241:7, 245:6, 260:16, 261:7, 261:10, 262:20, 263:18, 265:14, 266:10, 267:3, 267:11, 270:23, 272:19, 281:9

**MRI** [8] - 88:15, 88:18, 88:21, 89:3, 89:7, 90:13, 90:22, 90:23

**MS** [130] - 4:2, 4:3, 4:9, 4:21, 23:6, 37:19, 37:23, 46:14, 75:13, 77:23, 80:22, 81:6, 81:9, 81:15, 86:11, 87:2, 89:10, 90:4, 92:22, 95:13, 95:20, 96:5, 97:12, 99:6, 99:15, 101:15, 103:8, 106:22, 111:7, 116:10, 119:3, 119:15, 120:8, 120:13, 120:22, 121:14, 121:16, 122:19, 125:5, 126:7, 126:9, 126:19, 127:12, 129:2, 130:19, 130:22, 135:9, 135:12, 136:15, 138:9, 148:7, 149:13, 150:4, 150:22, 153:11, 154:5, 154:6, 155:3, 158:16, 159:20, 161:20, 163:13, 163:23, 167:13, 167:19, 173:8, 174:16, 176:3, 178:4, 178:17, 180:9, 187:10, 193:4, 193:13, 195:18, 199:7, 199:20, 200:16, 200:19, 200:23, 201:17, 208:6, 210:12, 211:3,

211:11, 212:22, 213:4, 215:19, 217:5, 217:6, 219:5, 219:9, 220:5, 220:12, 220:18, 221:9, 222:11, 228:16, 228:19, 229:6, 229:10, 230:3, 230:5, 230:6, 230:8, 231:5, 232:10, 232:15, 233:9, 233:11, 233:23, 234:3, 234:17, 234:18, 235:10, 235:17, 237:16, 240:23, 245:3, 260:9, 260:22, 261:4, 263:15, 265:8, 266:9, 267:2, 267:5, 270:21, 272:17, 281:7

**mucoid** [2] - 33:10, 34:5

**multiple** [5] - 69:8, 151:9, 182:13, 182:20, 262:6

**murder** [2] - 167:11, 221:4

**muscle** [1] - 12:7

**must** [5] - 29:9, 30:6, 30:8, 152:16

**myocardium** [1] - 183:14

**myopic** [3] - 214:18, 215:6, 219:21

**myriad** [1] - 11:21

## N

**nail** [1] - 219:14

**naked** [1] - 17:6

**name** [4] - 4:12, 75:18, 92:20, 282:3

**named** [1] - 280:7

**names** [6] - 92:3, 235:21, 236:13, 237:5, 237:13, 237:14

**Names** [1] - 283:2

**national** [2] - 155:7, 155:11

**National** [1] - 151:11

**natural** [11] - 52:5, 52:7, 52:18, 52:21, 161:8, 165:9, 165:12, 165:16, 174:8, 174:15, 229:17

**naturally** [1] - 176:5

**nature** [3] - 82:4, 110:15, 252:6

**near** [1] - 264:6

**necessarily** [14] - 17:13, 59:6, 71:7, 89:5, 112:23, 116:5, 126:20, 126:22, 128:2, 166:14, 212:12, 238:16, 258:6, 259:23

**necessary** [4] - 17:3, 22:7, 71:12, 97:14

**neck** [5] - 16:13, 18:12, 187:3, 188:11

**need** [11] - 5:15, 17:13, 27:17, 27:19, 54:16, 56:3, 75:13, 88:10, 159:5, 221:20, 281:7

**needed** [2] - 20:9, 44:9

**needs** [3] - 19:21, 193:16, 235:6

**negative** [6] - 23:11, 23:13, 23:14, 23:19, 23:21

**neonatal** [3] - 99:14, 112:8, 113:19

**nerve** [6] - 49:16, 60:9, 197:5, 197:7, 250:19, 275:6

**nerves** [2] - 12:7, 18:19

**neuropathologist** [1] - 217:14

**neuropathology** [6] - 6:9, 7:15, 11:13, 12:4, 12:5, 152:13

**neurosurgeon** [1] - 54:21

**neutrophils** [4] - 49:7, 72:6, 72:7, 197:10

**never** [29] - 7:23, 81:13, 87:9, 87:11, 97:5, 111:21, 111:22, 112:3, 123:14, 162:20, 162:21, 163:5, 169:4, 201:3, 201:8, 216:5, 220:21, 221:17, 221:18, 221:23, 232:22, 233:21, 234:4, 234:6, 239:12, 239:14, 239:17, 239:18

**NEW** [4] - 1:1, 1:9, 1:14, 284:1

**new** [6] - 48:5, 73:9,

73:21, 82:16, 82:21, 188:14

**New** [19] - 1:21, 1:23, 2:3, 2:6, 2:10, 2:12, 2:13, 3:5, 4:13, 4:17, 5:21, 6:4, 9:16, 83:14, 126:2, 153:3, 156:9, 285:5

**new..** [1] - 281:3

**newborn** [2] - 111:20, 204:5

**newborns** [2] - 108:7, 113:19

**newer** [10] - 36:13, 56:18, 133:19, 137:22, 246:16, 250:5, 253:16, 254:9, 254:13, 264:8

**next** [21] - 14:18, 14:21, 19:8, 19:23, 20:13, 22:4, 22:5, 30:19, 39:23, 41:19, 43:3, 44:13, 44:22, 121:7, 121:8, 124:9, 248:5, 264:8, 264:17, 275:8, 276:7

**nine** [1] - 118:19

**nobody** [1] - 120:16

**non** [1] - 161:5

**non-aspiration** [1] - 161:5

**nonaccidental** [2] - 165:22, 193:3

**noncontributory** [1] - 187:20

**none** [3] - 40:18, 188:13, 204:18

**nonresponsive** [1] - 62:4

**nonspecific** [1] - 69:6

**nontraumatic** [9] - 90:20, 115:3, 123:5, 134:15, 175:23, 184:14, 184:23, 185:20, 199:17

**normal** [10] - 31:18, 31:19, 31:20, 35:10, 40:21, 69:2, 69:3, 170:7, 207:11

**normally** [1] - 135:23

**north** [1] - 227:17

**Northeast** [3] - 277:8, 277:10

**NORTHERN** [1] - 1:1

**not..** [1] - 155:14

**Notary** [3] - 1:22, 3:5, 285:5

**note** [6] - 62:20, 266:15, 266:16, 276:13, 279:16,

280:21

**noted** [7] - 31:10, 34:11, 40:9, 46:16, 180:4, 202:9, 284:6

**notepad** [1] - 279:16

**notes** [11] - 19:2, 22:5, 37:3, 37:6, 46:6, 58:9, 58:10, 77:9, 150:13, 226:6, 285:7

**nothing** [7] - 133:7, 194:21, 215:12, 268:12, 273:2, 273:5, 274:18

**Notice** [1] - 3:16

**notice** [1] - 28:17

**noticed** [8] - 35:3, 36:17, 38:4, 38:23, 39:14, 39:22, 41:3, 67:7

**noticing** [2] - 37:2, 37:13

**notification** [1] - 280:21

**notified** [3] - 13:7, 15:7, 279:19

**notify** [2] - 228:13, 228:20

**notwithstanding** [4] - 37:13, 38:20, 74:20, 121:12

**November** [1] - 269:19

**Number** [1] - 142:4

**number** [19] - 12:11, 12:15, 13:12, 67:7, 92:19, 151:21, 153:15, 155:10, 172:5, 177:11, 177:13, 177:18, 192:20, 197:17, 210:4, 236:6, 239:3, 242:6, 251:17

**numbers** [5] - 92:2, 140:8, 186:5, 186:6, 275:14

**numeral** [1] - 50:6, 50:7, 50:9, 53:9, 65:17, 65:21

**nursery** [1] - 110:13

## O

**O'Connell** [3] - 1:21, 285:4, 285:12

**oath** [4] - 3:18, 75:20, 76:15, 172:23

**OB** [3] - 109:20, 109:21, 110:2

**obese** [2] - 147:13, 231:18

**obesity** [4] - 231:18, 231:21, 231:22, 232:4

**object** [11] - 86:10, 95:13, 120:8, 126:18, 128:23, 132:4, 200:23, 215:19, 226:18, 233:9, 234:18

**objection** [95] - 37:16, 47:15, 55:7, 55:19, 57:15, 60:17, 86:11, 87:2, 89:10, 90:4, 95:20, 96:5, 97:12, 99:6, 99:15, 101:15, 106:22, 111:7, 116:10, 119:15, 120:9, 120:13, 120:22, 121:14, 122:19, 125:5, 126:7, 126:8, 126:9, 126:19, 127:12, 129:2, 135:9, 136:15, 138:9, 148:7, 149:13, 150:4, 150:22, 153:11, 154:5, 154:6, 155:3, 158:16, 159:20, 161:20, 163:13, 163:23, 167:13, 167:19, 173:8, 174:16, 176:3, 178:4, 178:17, 180:9, 187:10, 188:23, 193:4, 193:13, 195:18, 199:7, 199:18, 199:20, 200:16, 200:19, 201:17, 208:6, 210:12, 211:3, 211:11, 217:5, 217:6, 219:5, 219:9, 220:5, 220:12, 221:9, 221:10, 222:11, 228:16, 229:6, 229:10, 230:3, 230:5, 231:5, 232:10, 232:15, 233:10, 233:23, 234:2, 234:3, 234:17, 235:10, 270:21

**Objection** [3] - 154:7, 215:20, 230:4

**objections** [3] - 3:11, 3:16, 230:12

**objective** [4] - 208:20, 208:22, 209:6, 209:8

**objects** [1] - 125:2

**obligation** [1] - 228:11

**observation** [2] - 30:18, 41:16

**observations** [2] - 18:21, 18:23

**observe** [4] - 46:19, 57:12, 57:23, 58:19

**observed** [6] - 57:20, 59:5, 69:19, 73:21, 127:10, 128:21

**observing** [2] - 41:15, 64:21

**obtain** [2] - 109:7, 109:10

**obtained** [5] - 83:16, 127:3, 167:7, 278:18, 282:4

**obvious** [4] - 20:7, 163:8, 163:15, 163:19

**occasion** [2] - 14:23, 216:4

**occasionally** [1] - 13:15

**occasions** [3] - 78:5, 91:5, 209:11

**occipital** [2] - 46:5, 276:2

**occur** [12] - 106:16, 113:20, 115:7, 116:4, 128:2, 135:5, 136:14, 157:19, 157:22, 223:3, 256:17, 258:10

**occurred** [13] - 33:8, 42:8, 69:2, 70:12, 106:9, 128:5, 133:20, 168:3, 168:5, 188:5, 190:16, 257:3, 257:5

**occurrence** [2] - 100:22, 195:6

**occurring** [4] - 106:17, 115:2, 176:5, 176:6

**occurs** [3] - 104:21, 120:2, 154:12

**October** [1] - 269:17

**odd** [1] - 80:15

**OF** [7] - 1:1, 1:6, 1:9, 1:14, 283:4, 284:1, 284:2

**of..** [2] - 247:4, 275:7

**Office** [3] - 2:12, 4:13, 276:8

**office** [16] - 6:20, 9:10, 11:18, 12:3, 13:9, 77:4, 84:22, 153:3, 153:4, 220:4,

267:21, 268:2, 269:22, 270:5, 279:19, 281:2

**officer** [1] - 238:2

**officers** [6] - 30:22, 81:5, 166:5, 228:3, 228:5, 238:13

**Offices** [1] - 1:19

**official** [1] - 77:12

**officials** [1] - 156:18

**often** [10] - 52:6, 63:4, 71:4, 138:10, 154:13, 165:17, 185:11, 218:9, 227:22, 238:7

**oftentimes** [1] - 29:13

**old** [27] - 47:12, 47:17, 47:21, 73:9, 73:20, 96:4, 102:11, 102:15, 103:6, 113:21, 133:16, 134:23, 146:19, 188:14, 189:21, 190:12, 190:22, 191:2, 191:9, 191:11, 193:8, 194:15, 203:11, 206:5, 206:9, 223:23

**older** [56] - 36:14, 43:8, 43:10, 45:21, 54:14, 61:7, 61:17, 118:12, 119:16, 119:22, 133:13, 134:11, 137:21, 164:22, 188:5, 188:7, 189:15, 190:11, 190:23, 191:9, 197:9, 224:2, 224:12, 242:3, 242:21, 242:23, 243:9, 243:12, 245:17, 246:15, 250:4, 250:11, 251:7, 251:12, 253:14, 254:2, 254:9, 255:20, 256:8, 257:20, 257:22, 258:2, 258:5, 258:14, 258:15, 258:18, 258:23, 264:18, 264:21, 273:15, 273:19, 273:20, 276:2

**omit** [2] - 172:18, 172:19

**once** [6] - 12:21, 15:11, 15:13, 68:5, 83:20, 188:17

**one** [120] - 5:16, 7:4, 9:13, 10:20, 10:21, 11:3, 11:9, 13:7, 13:10, 13:12, 15:2, 19:3, 19:21, 19:22, 36:7, 37:17, 42:10, 42:21, 45:6, 56:2, 58:8, 61:15, 65:15, 66:8, 67:12, 70:12, 71:15, 71:17, 71:19, 73:12, 76:12, 76:13, 78:10, 78:13, 78:14, 78:16, 78:19, 88:19, 90:5, 90:6, 90:9, 105:3, 108:2, 110:18, 113:8, 114:12, 117:8, 127:10, 127:14, 127:16, 127:22, 128:11, 128:14, 128:15, 132:2, 132:14, 134:12, 137:8, 148:18, 161:18, 164:22, 166:22, 176:23, 177:11, 177:13, 177:18, 187:20, 187:23, 188:2, 190:10, 190:11, 190:14, 190:16, 190:21, 191:2, 191:11, 191:14, 195:11, 203:2, 203:3, 203:4, 206:12, 221:19, 224:6, 224:12, 224:18, 227:4, 235:15, 237:2, 237:11, 239:4, 242:17, 243:3, 243:5, 243:9, 246:13, 253:13, 253:14, 253:16, 253:17, 254:2, 254:10, 263:7, 263:20, 267:23, 269:17, 269:19, 270:4, 273:14, 273:15, 273:17, 274:4, 279:4, 279:5, 281:15

**Oneonta** [1] - 5:21

**ones** [8] - 13:10, 52:23, 63:23, 221:2, 236:23, 261:8, 262:13, 263:16

**online** [2] - 269:15, 270:8

**onset** [16] - 99:14, 99:21, 102:4, 102:7,

102:10, 102:14, 102:18, 103:5, 103:11, 103:20, 103:23, 110:10, 110:15, 110:20

**open** [3] - 15:19, 27:5, 247:20

**opened** [5] - 32:16, 40:4, 68:12, 243:13, 243:16

**opening** [1] - 35:12

**opine** [1] - 237:7

**opined** [2] - 69:23, 201:18

**opining** [2] - 175:17, 201:16

**opinion** [21] - 66:18, 70:11, 85:10, 85:11, 90:2, 106:11, 106:13, 154:4, 159:17, 164:13, 173:12, 200:9, 203:5, 206:19, 252:11, 252:12, 254:16, 255:15, 257:2, 257:7, 274:19

**opinions** [15] - 70:6, 82:11, 82:16, 82:23, 83:3, 83:8, 85:16, 97:20, 143:2, 143:20, 145:18, 146:6, 147:19, 208:22, 268:10

**opposed** [4] - 6:21, 25:3, 43:13, 49:6

**opposite** [3] - 23:13, 128:3, 273:16

**optic** [6] - 49:16, 60:9, 197:5, 197:7, 250:19, 275:5

**optimal** [1] - 41:22

**oral** [1] - 70:23

**orange** [2] - 272:17, 273:10

**orbits** [2] - 259:23, 260:3

**order** [4] - 29:10, 44:9, 88:18, 88:21

**ordered** [1] - 93:15

**organ** [12] - 28:23, 29:23, 32:5, 33:13, 33:16, 35:3, 138:17, 139:3, 271:10, 272:14, 279:10, 283:22

**organism** [4] - 105:6, 159:13, 176:12, 212:6

**organization** [7] - 205:15, 205:18,

205:19, 205:22, 256:13, 257:10
**organizing** [2] - 255:19, 258:5
**organs** [35] - 12:8, 16:21, 17:2, 17:5, 17:9, 17:19, 19:6, 20:18, 21:13, 22:15, 27:4, 29:8, 29:15, 30:6, 32:13, 32:21, 32:22, 44:23, 45:5, 47:2, 58:18, 67:5, 69:8, 137:2, 139:6, 139:8, 139:20, 149:4, 149:12, 152:12, 170:4, 178:6, 183:23, 271:14, 279:12
**origin** [1] - 59:8
**original** [3] - 190:12, 240:18, 281:8
**originally** [2] - 83:3, 254:19
**other..** [1] - 39:16
**otherwise** [5] - 140:19, 220:21, 228:13, 236:15, 241:15
**outbreaks** [1] - 100:21
**outcomes** [1] - 91:20
**outer** [3] - 118:22, 119:2, 138:7
**outside** [11] - 63:15, 63:22, 90:21, 133:9, 153:12, 189:3, 201:5, 257:15, 257:17, 257:20
**outstanding** [1] - 198:9
**outward** [3] - 110:22, 118:3, 138:3
**overdose** [2] - 78:17, 79:17
**overlaid** [1] - 43:16
**overlain** [1] - 227:5
**overload** [2] - 207:6, 207:8
**overlooked** [2] - 210:13, 218:8
**overlying** [2] - 35:12, 35:23
**oversight** [3] - 210:16, 234:16, 234:23
**overweight** [1] - 147:15
**overwhelming** [4] - 148:5, 181:4, 182:2, 210:23
**own** [10] - 67:20, 72:19, 97:15, 115:8,

124:17, 162:7, 170:23, 205:23, 221:13, 221:15
**oxygen** [6] - 38:17, 68:16, 137:4, 137:17, 164:10, 184:17
**oxygenation** [1] - 69:3

---

# P

**P.C** [2] - 1:20, 2:8
**p.m** [1] - 282:23
**P45594** [1] - 140:9
**P4955** [1] - 140:8
**page** [47] - 26:11, 27:16, 46:8, 46:10, 50:5, 69:16, 74:21, 83:16, 102:21, 118:10, 118:11, 121:17, 122:6, 122:11, 130:19, 134:8, 167:7, 167:23, 198:18, 200:5, 241:19, 242:12, 242:15, 242:18, 244:5, 245:14, 247:20, 248:5, 250:13, 253:10, 262:22, 265:22, 266:11, 266:20, 267:2, 267:12, 270:17, 273:2, 273:5, 273:8, 274:8, 274:22, 276:8, 279:4, 279:5, 280:18, 283:20
**Page** [2] - 283:16, 283:18
**pages** [7] - 26:7, 262:21, 272:12, 276:10, 276:11, 276:16, 279:4
**paid** [2] - 282:16, 282:17
**pancytopenia** [3] - 186:3, 186:12, 199:4
**paper** [3] - 104:16, 104:20, 113:15
**paperwork** [4] - 14:6, 15:18, 21:6, 271:11
**parietal** [7] - 36:8, 38:10, 38:11, 43:13, 48:4, 48:11, 242:4
**part** [21] - 9:21, 20:19, 54:4, 54:5, 77:10, 77:12, 93:2, 158:15, 158:18, 210:16, 210:22, 219:7, 225:5, 226:9, 229:3,

229:7, 244:5, 244:11, 246:8, 252:21, 254:12
**part-timers** [1] - 9:21
**partial** [1] - 165:18
**particular** [9] - 14:9, 20:11, 21:15, 23:8, 227:4, 238:11, 239:4, 241:19, 256:17
**particularly** [5] - 8:16, 30:5, 34:13, 64:23, 192:13
**parties** [1] - 3:4
**parts** [4] - 39:8, 183:7, 196:17, 197:17
**party** [1] - 65:15
**pass** [1] - 268:3
**passage** [3] - 108:8, 117:17, 141:16
**passed** [2] - 42:21, 102:16
**passing** [2] - 97:9, 176:11
**past** [2] - 13:14, 140:15
**pathologist** [13] - 12:10, 25:3, 25:4, 25:6, 25:8, 25:14, 51:19, 151:14, 151:15, 151:19, 193:23, 219:19, 221:12
**pathologists** [6] - 52:4, 52:5, 138:15, 151:16, 153:8, 155:8
**pathology** [11] - 6:6, 6:8, 7:12, 7:13, 7:14, 11:14, 11:16, 12:6, 17:20, 24:2
**patient** [2] - 93:16, 184:15
**pattern** [3] - 127:2, 131:4, 205:21
**Pattison** [1] - 2:5
**pay** [1] - 238:11
**PD** [2] - 281:23, 282:5
**PECK** [107] - 4:3, 4:21, 80:22, 81:6, 81:9, 81:15, 86:11, 87:2, 89:10, 90:4, 92:22, 95:13, 95:20, 96:5, 97:12, 99:6, 99:15, 101:15, 103:8, 106:22, 111:7, 116:10, 119:15, 120:8, 120:13, 120:22, 121:14, 121:16, 122:19, 125:5, 126:7,

126:19, 127:12, 129:2, 130:19, 135:9, 136:15, 138:9, 148:7, 149:13, 150:4, 150:22, 153:11, 154:5, 155:3, 158:16, 159:20, 161:20, 163:13, 163:23, 167:13, 167:19, 173:8, 174:16, 176:3, 178:4, 178:17, 180:9, 187:10, 188:23, 193:4, 193:13, 195:18, 199:7, 199:20, 200:16, 200:19, 200:23, 201:17, 208:6, 210:12, 211:3, 211:11, 213:4, 215:19, 217:5, 219:5, 219:9, 220:5, 221:9, 222:11, 228:16, 228:19, 229:6, 229:10, 230:3, 230:6, 230:8, 231:5, 232:10, 232:15, 233:9, 233:11, 233:23, 234:17, 235:10, 235:17, 237:16, 240:23, 245:3, 260:9, 260:22, 261:4, 263:15, 265:8, 270:21, 281:7
**Peck** [8] - 1:19, 2:8, 2:10, 5:14, 76:20, 77:18, 84:17, 241:11
**pediatric** [9] - 54:20, 71:17, 108:19, 197:21, 198:6, 204:8, 218:7, 218:11, 218:22
**pediatrician** [4] - 197:23, 215:14, 218:4, 218:8
**pen** [4] - 22:6, 243:15, 244:4, 272:15
**pending** [2] - 81:12, 81:15
**people** [19] - 9:19, 11:21, 22:8, 50:21, 53:20, 63:11, 63:12, 108:10, 112:22, 113:3, 126:11, 137:12, 139:14, 155:5, 162:5, 184:11, 230:14,

232:19, 272:6
**per** [2] - 150:21, 279:4
**perfect** [1] - 126:23
**perform** [4] - 14:8, 14:22, 27:3, 221:13
**performed** [2] - 5:4, 79:8
**performing** [2] - 28:14, 168:17
**perhaps** [6] - 17:17, 67:19, 104:12, 108:6, 130:6, 263:7
**period** [5] - 19:13, 34:20, 110:23, 164:23, 195:15
**periodically** [1] - 19:18
**periorbital** [3] - 36:18, 38:5, 38:10
**Perkins** [1] - 2:6
**PERKINS** [17] - 4:4, 86:10, 120:9, 122:13, 126:8, 126:18, 128:23, 130:23, 132:4, 154:7, 199:18, 215:20, 221:10, 226:18, 230:4, 233:10, 234:2
**persisted** [1] - 195:15
**person** [15] - 10:17, 14:10, 14:11, 21:20, 25:21, 30:16, 34:16, 34:17, 40:15, 62:7, 88:23, 124:18, 132:12, 174:4, 176:21
**personal** [2] - 110:2, 151:21
**personally** [3] - 151:3, 151:6, 238:17
**pertinent** [5] - 97:9, 241:14, 245:16, 271:13, 271:16
**Peter's** [1] - 277:11
**pharmaceuticals** [1] - 42:20
**pharmacology** [1] - 42:23
**pharynx** [1] - 70:23
**phenomena** [1] - 119:23
**phenomenon** [1] - 138:14
**photo** [10] - 241:21, 241:22, 242:6, 243:23, 244:21, 246:10, 246:20, 247:22, 248:19, 250:9, 250:23,

# APPENDIX

251:7, 252:23, 253:2, 253:17, 254:6, 259:16, 264:4, 264:11, 264:17, 279:5
**photograph** [7] - 37:7, 65:9, 131:18, 241:23, 248:23, 250:18, 264:18
**Photograph** [3] - 283:11, 283:12, 283:13
**photographed** [3] - 32:15, 32:17, 43:5
**photographs** [18] - 15:20, 15:23, 16:18, 24:18, 30:23, 97:19, 250:17, 259:15, 260:11, 260:12, 260:14, 260:15, 260:22, 261:3, 261:5, 278:15, 279:9
**photos** [25] - 81:22, 240:21, 241:13, 250:13, 251:6, 251:9, 251:17, 252:11, 252:12, 252:18, 252:19, 254:21, 254:23, 259:11, 259:12, 260:19, 261:8, 261:13, 263:5, 263:11, 263:12, 263:13, 266:10, 279:3
**physical** [4] - 24:23, 132:2, 174:14, 176:6
**physician** [3] - 10:17, 52:16, 52:17
**physicians** [5] - 11:4, 51:18, 52:4, 54:19, 58:10, 79:11, 139:22, 155:6, 221:13
**picked** [1] - 32:4
**picking** [1] - 261:2
**picture** [8] - 35:18, 51:21, 67:10, 219:20, 244:11, 245:15, 250:18
**pictures** [4] - 249:20, 249:22, 260:5, 262:8
**piece** [1] - 251:11
**pieces** [3] - 17:21, 20:8, 22:18
**pin** [3] - 109:13, 196:12, 214:14
**Pine** [2] - 1:20, 2:9
**pink** [15] - 36:7, 36:13, 37:20, 48:5, 56:17,

57:3, 61:16, 119:3, 190:10, 190:14, 190:15, 191:14, 194:10, 194:14, 256:21
**pinkish** [1] - 43:13
**Pittsfield** [1] - 6:7
**place** [3] - 43:23, 92:13, 284:6
**placed** [4] - 34:19, 39:9, 46:16, 174:4
**places** [2] - 169:3, 182:13
**Plaintiff** [1] - 1:4
**Plaintiff/Claimant** [1] - 2:4
**plasma** [2] - 136:10, 207:4
**plastic** [1] - 28:6
**platelet** [2] - 136:8, 169:22
**platelets** [3] - 135:22, 136:7, 186:6
**plausible** [1] - 175:2
**Plaza** [2] - 1:20, 2:9
**pleas** [1] - 236:8
**plenty** [1] - 21:22
**pleural** [3] - 33:12, 33:20, 183:17
**PLLC** [1] - 2:5
**pneumo** [5] - 98:10, 114:3, 114:8, 114:9
**pneumococcal** [8] - 114:9, 144:4, 161:3, 176:19, 198:4, 230:17, 230:23, 233:20
**pneumococcus** [1] - 252:10
**pneumonia** [50] - 34:9, 47:4, 52:19, 65:22, 66:20, 66:21, 67:22, 68:2, 68:7, 70:11, 70:12, 70:14, 70:19, 71:8, 98:17, 101:23, 103:20, 107:8, 112:12, 112:18, 114:9, 114:13, 114:16, 137:5, 144:5, 148:20, 158:5, 160:20, 161:3, 164:10, 172:16, 174:21, 175:4, 176:10, 176:20, 177:11, 177:14, 177:16, 177:18, 178:2, 184:17, 195:12, 195:14, 196:3, 200:6,

200:10, 200:21, 209:4, 210:7, 222:9
**pneumoniae** [39] - 66:11, 70:22, 71:3, 104:18, 105:10, 105:15, 112:4, 112:17, 113:11, 114:5, 114:15, 116:16, 123:22, 131:12, 138:23, 139:5, 149:5, 172:6, 175:12, 175:16, 176:2, 176:19, 177:7, 177:17, 198:5, 210:5, 211:21, 212:4, 212:6, 212:9, 212:11, 212:12, 212:15, 212:23, 213:3, 230:17, 230:23, 231:7, 233:20
**pneumoniae"** [1] - 172:3
**point** [32] - 6:22, 8:17, 37:9, 39:5, 42:23, 45:10, 66:13, 66:14, 97:7, 122:11, 124:19, 128:10, 128:11, 131:9, 134:23, 140:21, 143:17, 157:14, 204:16, 213:11, 225:3, 229:21, 230:16, 233:12, 242:7, 248:11, 248:22, 251:12, 258:11, 259:12, 265:17, 277:21
**police** [39] - 12:2, 13:16, 13:17, 13:18, 14:7, 15:14, 15:21, 15:22, 15:23, 22:11, 24:18, 30:21, 30:22, 37:7, 51:11, 65:2, 65:6, 74:5, 82:8, 153:23, 166:4, 166:10, 168:11, 194:3, 220:3, 220:14, 221:12, 221:17, 221:18, 221:19, 228:5, 228:13, 229:4, 229:13, 238:13, 238:16, 270:18
**pond** [1] - 156:4
**pooling** [2] - 255:23, 258:8
**portion** [29] - 16:19, 18:2, 18:10, 32:13,

35:5, 35:19, 36:10, 42:5, 42:12, 45:20, 54:13, 60:4, 61:13, 65:10, 73:13, 88:7, 189:15, 190:23, 201:3, 233:11, 246:3, 254:15, 254:20, 255:3, 255:6, 258:3, 258:4, 259:9, 275:5
**portions** [9] - 20:12, 27:4, 27:15, 29:15, 35:2, 183:6, 195:16, 205:15, 218:8
**pose** [1] - 118:9
**position** [5] - 9:3, 10:6, 52:14, 52:15, 231:17
**positional** [1] - 232:2
**positive** [27] - 22:23, 23:10, 23:12, 23:14, 23:18, 23:21, 65:21, 93:18, 97:23, 98:9, 98:10, 112:8, 131:10, 131:12, 162:19, 172:2, 172:6, 177:8, 210:5, 211:13, 211:15, 211:20, 212:2, 213:2, 232:18
**positivity** [1] - 109:6
**possibilities** [2] - 176:13, 176:18
**possibility** [7] - 34:18, 53:16, 149:11, 176:12, 204:4, 216:11, 263:4
**possible** [10] - 15:7, 41:6, 45:9, 86:6, 89:13, 90:23, 92:7, 176:22, 190:2, 227:21
**possibly** [12] - 64:13, 66:14, 68:4, 104:9, 113:13, 120:6, 190:4, 191:9, 199:5, 262:8, 262:13, 280:3
**post** [2] - 69:7, 226:15
**postage** [1] - 22:18
**posterior** [2] - 246:22, 254:15
**postulated** [1] - 86:16
**potential** [5] - 65:7, 168:23, 202:8, 218:13, 221:2
**potentially** [3] - 148:5, 203:11, 204:6
**pouch** [5] - 15:16, 15:19, 28:5, 28:6
**pounds** [1] - 21:21

**practical** [2] - 95:7, 95:9
**practice** [4] - 9:4, 29:19, 63:2, 173:5
**practices** [1] - 9:7
**practicing** [1] - 8:7
**pre** [1] - 166:7
**pre-autopsy** [1] - 166:7
**preceded** [2] - 162:12, 162:13
**precedes** [1] - 200:6
**precipitously** [2] - 136:8, 170:2
**preclude** [1] - 30:12
**predisposing** [1] - 144:4, 157:23, 158:2
**predominantly** [1] - 225:9
**preeclampsia** [4] - 143:14, 143:18, 143:23, 144:10
**preferred** [1] - 20:17
**pregnancy** [7] - 143:7, 143:14, 144:11, 144:23, 145:5, 145:14, 147:14
**preliminary** [2] - 16:2, 282:4
**premarked** [1] - 26:3
**premature** [6] - 111:6, 111:11, 111:16, 144:14, 144:17, 147:22
**prematurity** [1] - 145:7
**premie** [3] - 148:6, 266:7, 266:14
**prep** [3] - 239:23, 240:10, 282:10
**preparation** [2] - 268:5, 282:22
**prepare** [3] - 14:5, 27:11, 71:20
**prepared** [1] - 83:5
**preparing** [1] - 29:14
**presence** [3] - 38:12, 181:6, 252:7
**present** [12] - 2:14, 20:21, 30:21, 30:22, 44:15, 103:20, 103:23, 106:12, 108:21, 130:11, 178:9, 181:8
**presentation** [7] - 65:22, 136:12, 160:11, 172:7, 172:8, 210:6, 213:3
**presented** [12] - 79:9, 96:20, 96:23, 97:3,

# APPENDIX

103:14, 103:18, 103:21, 122:22, 129:10, 129:11, 179:10, 179:21

**presenting** [2] - 26:22, 222:4

**presently** [3] - 8:10, 9:20, 13:13

**preserve** [3] - 17:21, 19:10, 20:10

**preserved** [2] - 34:17, 42:8

**pressure** [12] - 43:22, 107:12, 107:18, 132:9, 132:11, 170:19, 170:22, 179:18, 182:4, 202:22, 231:17, 242:3

**presumably** [2] - 265:16, 266:3

**pretend** [1] - 129:7

**pretty** [3] - 17:22, 96:6, 138:12

**prevent** [1] - 151:14

**previously** [11] - 39:9, 43:15, 61:20, 69:9, 82:23, 85:19, 86:5, 98:3, 104:4, 218:20, 264:2

**prick** [1] - 185:6

**primarily** [2] - 14:3, 14:11

**primary** [16] - 50:13, 50:15, 51:3, 72:15, 95:11, 95:12, 95:17, 106:9, 106:14, 106:20, 123:15, 173:13, 179:6, 200:13, 216:14, 252:4

**printed** [2] - 121:19, 269:22

**printout** [4] - 102:21, 102:22, 269:14, 283:6

**priority** [1] - 50:18

**prison** [1] - 228:7

**prisoner** [1] - 228:8

**prisoners** [1] - 228:10

**private** [2] - 9:4, 155:12

**privilege** [1] - 92:23

**probability** [1] - 146:15

**problem** [2] - 155:11, 172:9

**problems** [3] - 164:9, 170:12, 206:23

**procedure** [6] - 28:23,

30:23, 33:23, 152:8, 181:9, 271:9

**procedures** [2] - 253:6

**proceed** [5] - 15:19, 16:9, 31:8, 31:12, 31:15

**proceeded** [1] - 32:14

**proceedings** [6] - 75:20, 75:23, 76:19, 80:18, 229:14, 285:8

**process** [16] - 12:20, 15:11, 20:11, 20:13, 20:15, 22:4, 35:7, 36:13, 81:22, 83:17, 189:10, 189:13, 189:14, 220:10, 268:14

**processed** [2] - 22:17, 24:6

**procurement** [1] - 220:23

**produce** [2] - 192:8, 197:11

**produced** [2] - 117:7, 140:7

**profession** [1] - 153:8

**Professional** [2] - 1:22, 285:4

**professional** [2] - 211:12, 252:12

**professionals** [1] - 153:23

**program** [1] - 8:6

**progressed** [1] - 66:21

**prolonged** [1] - 155:11

**prone** [2] - 162:2, 231:17

**pronounced** [1] - 244:8

**proper** [1] - 179:9

**properly** [2] - 19:14, 185:12

**prophylactic** [2] - 266:14, 266:16

**prosecuted** [2] - 227:6, 227:10

**prosecution** [7] - 12:3, 86:4, 86:7, 86:20, 87:11, 239:16, 239:18

**prosecutor** [1] - 228:20

**prosecutors** [5] - 228:13, 229:4, 229:13, 229:23, 231:3

**prospective** [1] - 77:5

**protect** [1] - 71:8

**protected** [1] - 149:12

**protocol** [1] - 113:7

**proven** [1] - 227:2

**provide** [3] - 65:3, 93:4, 272:5

**provided** [9] - 9:5, 31:23, 39:12, 51:6, 63:11, 67:10, 74:4, 80:22, 237:20

**provider** [1] - 55:18

**providers** [1] - 86:4

**providing** [2] - 9:6, 64:20

**provisional** [1] - 53:5

**proximity** [3] - 113:3, 257:23, 258:19

**PSIS** [1] - 281:5

**public** [4] - 93:3, 271:21, 271:22, 272:3

**Public** [3] - 1:22, 3:5, 285:5

**publications** [3] - 11:6, 11:8, 214:23

**publicly** [1] - 77:14, 233:6

**published** [1] - 100:9

**pulled** [2] - 18:10, 18:11

**pulmonary** [4] - 146:22, 147:3, 147:6, 147:7

**pulmonic** [1] - 147:11

**pump** [1] - 80:16

**puncture** [1] - 180:17

**pure** [1] - 100:17

**purple** [2] - 23:19, 23:22

**purported** [2] - 85:20, 270:19

**purpose** [1] - 23:10

**purposes** [3] - 28:7, 35:17, 242:5

**pus** [8] - 104:9, 196:19, 196:22, 197:7, 197:9, 197:12, 197:18

**push** [1] - 221:7

**pushed** [5] - 133:2, 133:11, 181:12, 221:17, 221:18

**pushing** [1] - 18:8

**put** [30] - 19:19, 25:4, 26:23, 43:21, 52:20, 75:2, 109:13, 171:19, 172:13, 173:18, 173:20, 181:15, 185:10, 196:12, 204:9, 210:2, 210:3, 210:8, 210:11, 211:10,

230:22, 231:6, 231:21, 231:23, 232:21, 233:2, 233:5, 244:4, 244:18, 263:9

**puts** [1] - 271:18

**putting** [1] - 212:15

## Q

**qualifications** [2] - 3:17, 10:15

**qualified** [1] - 263:6

**quality** [1] - 153:18

**quantify** [1] - 173:15

**quantitated** [2] - 96:22, 97:6

**questioning** [1] - 256:19

**questions** [17] - 3:12, 4:16, 4:19, 5:7, 5:13, 64:23, 65:5, 65:6, 75:15, 75:20, 114:22, 116:16, 118:8, 142:2, 194:2, 207:22, 240:14

**quicker** [2] - 15:2, 15:4, 15:9

**quickly** [1] - 15:7

**quite** [8] - 33:11, 42:22, 51:10, 95:14, 129:3, 186:6, 227:22, 278:6

## R

**radiographic** [10] - 53:13, 53:19, 56:6, 56:13, 57:7, 57:14, 57:21, 86:13, 147:8, 169:4

**radiographically** [1] - 73:16

**radiography** [1] - 261:23

**radiologist** [8] - 53:19, 55:8, 55:14, 56:10, 58:4, 58:9, 168:20, 214:4

**radiology** [4] - 276:23, 277:3, 277:4, 283:23

**railing** [1] - 122:9

**ran** [1] - 80:16

**range** [6] - 31:20, 47:20, 91:19, 136:3, 152:2, 186:7

**rare** [2] - 110:18, 222:23

**rarely** [1] - 155:15

**rarity** [1] - 152:14

**rather** [4] - 5:12, 29:16, 74:2, 84:11

**re** [1] - 273:21

**re-ask** [1] - 273:21

**reactive** [1] - 205:23

**read** [15] - 27:17, 84:13, 198:18, 198:23, 211:13, 213:10, 213:15, 213:18, 213:20, 213:22, 214:2, 214:11, 271:4, 271:7, 284:4

**reading** [1] - 50:22

**readings** [1] - 170:3

**real** [3] - 172:22, 198:16, 209:18

**realized** [1] - 58:2

**really** [17] - 10:12, 13:20, 15:3, 24:21, 25:2, 71:19, 71:20, 78:22, 139:14, 153:6, 156:15, 172:8, 189:4, 208:7, 217:7, 231:9, 263:13

**rear** [1] - 18:11

**reason** [20] - 5:16, 14:23, 60:23, 76:4, 76:10, 88:6, 95:5, 103:7, 117:16, 150:16, 154:2, 158:19, 160:15, 160:22, 165:23, 172:14, 172:19, 256:17, 271:16

**reasonable** [6] - 24:21, 36:16, 48:21, 130:4, 130:5, 159:12

**reasoning** [1] - 53:6

**reasons** [7] - 4:15, 38:15, 38:19, 69:11, 69:16, 84:3, 184:14

**rebleed** [1] - 119:21, 188:18, 188:21, 202:15, 216:12

**rebleeding** [4] - 119:23, 189:12, 202:12, 224:13

**rebleeds** [3] - 189:11, 190:2, 202:5

**receive** [2] - 13:15, 136:10, 230:16

**received** [9] - 71:11, 71:17, 93:21, 94:4, 148:15, 173:17, 262:14, 276:16

**receiving** [1] - 34:22

**recent** [9] - 11:9, 48:13, 100:7,

134:13, 155:21, 191:6, 191:16, 191:17, 195:14
**recently** [3] - 78:17, 141:12, 214:11
**Recess** [5] - 75:14, 116:13, 117:20, 141:3, 190:18
**recipient** [1] - 139:22
**reckless** [1] - 227:13
**recollection** [7] - 46:18, 117:14, 121:22, 141:2, 141:20, 142:8, 142:11
**recommended** [3] - 88:14, 180:20, 181:9
**record** [47] - 8:3, 8:8, 15:19, 29:7, 31:8, 39:9, 46:17, 57:10, 58:2, 58:3, 78:2, 86:5, 93:3, 109:20, 109:21, 116:2, 135:13, 135:18, 140:20, 142:10, 142:21, 165:8, 167:6, 172:14, 210:10, 233:5, 235:17, 235:18, 235:21, 236:13, 237:16, 237:17, 237:19, 241:4, 241:12, 244:4, 246:17, 247:19, 248:13, 256:15, 264:16, 266:9, 267:5, 271:14, 279:3, 283:17, 284:5
**recording** [1] - 16:6
**records** [43] - 24:19, 25:9, 39:12, 51:9, 53:13, 71:16, 71:17, 86:8, 93:22, 94:5, 108:19, 109:7, 109:17, 109:22, 109:23, 110:2, 110:6, 124:7, 124:8, 142:13, 142:17, 160:2, 160:21, 166:16, 204:20, 231:2, 265:6, 265:15, 265:16, 265:23, 266:11, 266:17, 266:18, 268:3, 268:9, 268:13, 277:7, 277:13, 279:10, 280:9, 283:16, 283:18
**recover** [1] - 54:12

**recovered** [2] - 159:13, 206:16
**red** [5] - 23:18, 23:21, 48:18, 186:5, 225:21
**redacted** [1] - 265:7
**redactions** [2] - 265:10, 265:11
**redness** [4] - 253:3, 253:4, 264:10, 264:13
**reduced** [1] - 135:22
**Redwell** [1] - 241:2
**refer** [10] - 28:19, 46:6, 98:23, 172:15, 242:6, 242:8, 250:11, 258:23, 259:6, 281:7
**reference** [1] - 104:16, 235:7
**referenced** [2] - 254:9, 274:14
**referred** [5] - 16:14, 87:21, 103:5, 278:22, 281:3
**referring** [6] - 5:5, 21:12, 21:14, 32:5, 59:13, 128:7
**refers** [2] - 118:3, 274:13
**reflect** [5] - 36:3, 42:4, 250:15, 275:17, 275:19
**reflected** [1] - 45:12
**reflection** [1] - 45:8
**reflects** [3] - 36:12, 56:9, 254:7
**refresh** [2] - 121:22, 237:13
**refreshed** [2] - 269:6, 276:21
**refused** [1] - 218:2
**regard** [24] - 30:19, 54:17, 56:4, 57:23, 58:13, 59:18, 61:5, 65:19, 81:22, 82:22, 85:16, 97:20, 110:10, 127:9, 142:12, 150:19, 192:16, 205:7, 207:14, 216:6, 218:14, 220:15, 220:18, 220:22
**regarding** [2] - 76:22, 80:6
**regardless** [2] - 75:8, 169:9
**regards** [2] - 51:14, 198:11
**region** [7] - 36:8, 36:19, 38:5, 48:4,

48:11, 242:4, 264:14
**regions** [1] - 46:6
**Registered** [2] - 1:22, 285:4
**rejected** [1] - 149:17
**rejection** [1] - 149:20
**relate** [2] - 68:3, 190:7
**related** [31] - 25:22, 70:11, 85:15, 101:20, 101:22, 101:23, 143:21, 145:6, 156:4, 156:5, 190:10, 190:12, 190:14, 190:15, 190:16, 193:15, 201:7, 206:12, 223:10, 223:15, 223:16, 223:19, 231:9, 247:11, 247:12, 253:4, 253:5, 255:14, 256:8, 257:21, 277:13
**relates** [5] - 61:23, 98:17, 252:3, 258:17, 269:20
**relating** [4] - 4:16, 5:2, 5:7, 79:16
**relation** [2] - 77:4, 257:3
**relationship** [2] - 144:7, 202:14
**release** [3] - 27:12, 226:11, 271:13
**released** [1] - 45:2
**releasing** [1] - 279:11
**relegated** [1] - 25:9
**relevant** [2] - 24:16, 24:21
**reliable** [1] - 126:13
**relied** [2] - 153:22, 220:23
**rely** [4] - 229:13, 229:23, 231:4, 260:20
**relying** [1] - 128:12
**remain** [3] - 44:5, 237:21, 255:21
**remainder** [2] - 246:6, 250:8
**remained** [1] - 44:6
**remaining** [2] - 17:9, 245:23
**remember** [18] - 76:9, 78:23, 109:6, 111:13, 130:17, 166:18, 166:22, 168:13, 183:7, 201:9, 214:6, 227:3, 227:4, 236:11,

237:15, 238:6, 238:7, 268:21
**reminded** [1] - 214:13
**reminding** [1] - 276:17
**removal** [2] - 33:13, 33:16
**remove** [1] - 16:19, 16:22, 16:23, 17:13, 17:19, 18:13, 18:15, 18:18, 27:3, 41:5, 41:18, 43:3, 43:4, 49:11, 246:3
**removed** [17] - 29:16, 32:14, 32:16, 32:21, 34:2, 42:6, 43:5, 43:23, 49:12, 245:19, 245:21, 245:22, 245:23, 246:4, 246:9, 248:21, 249:23
**removing** [4] - 16:21, 17:10, 19:8, 44:21
**rendered** [2] - 82:23, 83:9, 83:22
**RENSSELAER** [1] - 1:7
**Rensselaer** [17] - 9:3, 9:9, 9:17, 9:18, 10:5, 13:10, 26:17, 28:5, 64:15, 64:16, 100:13, 156:14, 156:16, 228:12, 276:9, 282:18
**repair** [2] - 189:11, 189:13
**repairs** [1] - 190:2
**repeat** [2] - 63:19, 129:4
**repeated** [1] - 162:3
**repeatedly** [1] - 126:11
**rephrase** [3] - 164:18, 174:17, 230:13
**replacement** [1] - 89:21
**report** [50] - 24:7, 26:5, 28:19, 45:13, 50:22, 51:11, 58:4, 62:22, 74:22, 77:9, 82:8, 82:9, 82:13, 83:5, 83:13, 93:8, 93:18, 94:3, 94:8, 94:10, 121:12, 123:17, 149:23, 150:12, 150:17, 152:16, 154:15, 159:11, 169:4, 172:11, 172:15, 195:11, 196:11, 211:10, 211:13,

212:15, 220:13, 225:2, 225:3, 226:9, 226:12, 230:23, 232:22, 233:16, 234:11, 234:15, 234:22, 235:4, 261:18, 277:23
**reported** [6] - 27:23, 61:23, 62:14, 62:17, 162:8, 169:5
**reportedly** [1] - 227:5
**Reporter** [2] - 1:22, 285:4
**reporter** [2] - 3:17, 99:2
**reports** [7] - 24:18, 26:6, 276:23, 277:3, 277:4, 279:14, 283:23
**represent** [4] - 75:19, 102:8, 117:8, 140:9
**represented** [1] - 81:8
**representing** [3] - 76:20, 84:16, 122:12
**request** [4] - 10:7, 22:10, 94:21, 95:2
**requested** [2] - 42:15, 277:19
**requesting** [1] - 272:4
**requests** [2] - 92:21, 283:1
**required** [5] - 11:3, 22:8, 63:9, 136:8, 232:12
**requirement** [1] - 8:15
**requiring** [1] - 136:10
**requisition** [1] - 21:9
**reread** [1] - 271:9
**researched** [2] - 83:7, 207:18
**resemble** [2] - 106:19, 107:3
**reserved** [1] - 3:12
**residency** [1] - 6:6
**resident** [1] - 11:9
**residual** [1] - 245:19
**resolve** [1] - 48:18
**resolved** [2] - 135:4, 149:16
**resolving** [1] - 59:22, 60:5
**respect** [3] - 214:22, 215:12, 218:17
**respected** [2] - 217:13, 217:15
**respective** [1] - 3:3
**respirator** [1] - 170:16
**respiratory** [10] - 69:4, 69:5, 112:12, 164:9, 170:14, 181:23,

# APPENDIX

184:12, 199:3, 199:14, 199:21
**responding..** [1] - 260:23
**response** [1] - 84:3
**responsibility** [4] - 51:7, 51:20, 100:15, 229:2
**responsible** [2] - 100:13, 100:20
**responsive** [1] - 162:21
**rest** [1] - 271:9
**rested** [1] - 210:22
**restrict** [1] - 139:11
**result** [10] - 59:4, 91:21, 116:8, 130:11, 132:9, 132:10, 173:20, 199:14, 202:13, 236:8
**resulted** [2] - 91:23, 237:19
**resulting** [1] - 80:11
**results** [3] - 153:16, 230:16, 277:22
**retain** [1] - 27:9
**retina** [1] - 49:15
**retinal** [5] - 49:15, 49:20, 49:22, 60:10, 179:20
**retract** [4] - 16:17, 18:5, 27:6, 27:7
**retracted** [4] - 32:15, 35:9, 242:2, 255:5
**retrial** [1] - 84:22
**retrospect** [2] - 209:12, 232:13
**return** [1] - 44:23
**revealed** [2] - 89:8, 196:2
**reversed** [1] - 23:20
**review** [7] - 29:22, 51:16, 62:20, 62:23, 70:4, 102:23, 108:19, 109:21, 116:21, 116:23, 140:12, 140:15, 142:3, 142:13, 142:17, 166:17, 267:5
**reviewed** [7] - 109:22, 141:10, 251:22, 265:17, 266:23, 268:5, 271:5
**Rhode** [6] - 6:9, 6:11, 6:12, 6:23, 8:22, 12:10
**Richard** [1] - 240:6
**right-sided** [6] -

87:18, 87:20, 89:8, 262:9, 262:23, 283:15
**rights** [2] - 83:17, 220:11
**ripe** [1] - 29:23
**risk** [10] - 111:4, 113:19, 143:7, 143:11, 144:11, 181:10, 266:2, 266:8, 266:13
**road** [2] - 221:6, 221:12
**role** [3] - 63:2, 80:9, 279:11
**roll** [1] - 124:19
**roman** [7] - 50:6, 50:7, 50:9, 53:9, 65:17, 65:21, 210:4
**Ronald** [2] - 2:7, 238:2
**RONALD** [1] - 1:6
**room** [1] - 277:12
**rough** [1] - 185:11
**roughly** [1] - 224:11
**routine** [1] - 109:5
**routinely** [5] - 31:4, 42:19, 42:22, 204:23, 205:2
**rule** [3] - 43:2, 123:17, 201:20
**ruled** [3] - 123:16, 227:23, 239:8
**ruler** [3] - 242:2, 242:17, 243:9
**rules** [1] - 5:11
**ruling** [1] - 237:22
**run** [2] - 9:5, 244:14
**running** [2] - 238:11, 275:14
**rupture** [4] - 132:6, 144:14, 144:18, 195:5
**ruptured** [1] - 111:18

---

## S

**safe** [1] - 267:21
**sake** [1] - 99:2
**saliva** [1] - 158:11
**Samaritan** [35] - 66:3, 66:8, 93:16, 94:5, 124:8, 129:11, 133:21, 135:21, 135:22, 137:23, 142:13, 142:14, 142:22, 156:22, 168:18, 170:8, 170:16, 170:20, 171:5, 177:21,

185:3, 185:17, 186:10, 190:11, 203:15, 204:8, 204:11, 206:18, 261:16, 268:13, 277:7, 277:9, 277:11, 277:12, 277:19
**sample** [1] - 21:16
**sampled** [1] - 275:20
**samples** [9] - 20:16, 21:4, 21:10, 21:12, 21:14, 21:19, 22:3, 22:14, 42:3
**Sampson** [1] - 2:5
**San** [2] - 6:8, 78:22
**sane** [1] - 273:21
**Sarah** [3] - 26:12, 26:14, 26:19
**sat** [1] - 94:9
**save** [1] - 253:2
**saw** [12] - 18:14, 40:8, 56:14, 57:17, 97:19, 128:15, 130:9, 132:2, 133:7, 135:19, 169:4, 179:5, 190:21, 201:5, 275:23
**scale** [1] - 164:7
**scalp** [17] - 16:17, 16:18, 18:7, 18:10, 27:7, 32:11, 32:15, 35:9, 36:7, 138:13, 187:17, 253:8, 257:14, 257:15, 258:22, 259:8, 259:10
**scanned** [3] - 203:13, 204:7, 240:21
**scenario** [1] - 95:16
**scene** [4] - 10:2, 30:23, 63:9, 252:19
**schedule** [4] - 14:19, 71:14, 150:15, 152:23
**scheduling** [1] - 15:3
**Schenectady** [2] - 78:19, 80:2
**School** [1] - 6:5
**school..** [1] - 5:22
**scope** [1] - 90:21
**scull** [1] - 257:14
**SDH** [13] - 191:16, 243:19, 246:17, 256:8, 256:21, 257:18, 257:22, 258:15, 258:18, 263:2, 263:5, 274:11, 283:15
**sealing** [1] - 236:16

**search** [1] - 92:18
**seated** [1] - 5:13
**second** [16] - 36:8, 85:7, 148:12, 148:14, 148:15, 210:19, 237:16, 262:7, 265:9, 265:10, 268:19, 268:23, 269:4, 269:18, 273:5, 277:15
**secondary** [19] - 50:16, 69:2, 72:17, 95:17, 163:15, 165:15, 165:16, 174:11, 174:13, 178:14, 178:22, 179:3, 179:9, 179:14, 179:17, 180:7, 180:13, 195:15, 231:22
**secretarial** [1] - 151:10
**secretaries** [1] - 270:4
**secretions** [6] - 67:19, 67:20, 160:19, 162:7, 268:17, 268:22
**section** [9] - 17:14, 47:12, 48:7, 48:9, 48:11, 105:3, 225:7, 263:9, 277:16
**sectioned** [5] - 19:14, 22:19, 33:3, 49:12, 133:7
**sections** [15] - 17:4, 19:20, 20:4, 20:12, 21:13, 40:3, 44:8, 45:4, 46:20, 47:7, 196:2, 225:5, 225:6, 225:7, 225:10
**security** [1] - 28:7
**see** [45] - 17:12, 29:15, 52:21, 57:17, 58:4, 64:4, 72:3, 73:17, 90:5, 104:5, 117:23, 121:2, 127:16, 128:17, 131:4, 134:7, 134:21, 134:22, 138:6, 138:12, 138:13, 158:12, 166:8, 181:18, 181:19, 188:8, 192:6, 192:7, 192:8, 192:9, 192:14, 198:14, 201:20, 209:2, 239:13, 244:13, 246:9, 254:21, 254:23, 261:21,

262:2, 262:4, 263:4, 264:13, 281:11
**seeded** [5] - 70:14, 71:23, 95:6, 106:18, 223:14
**seeing** [3] - 37:5, 72:7, 198:12
**seem** [1] - 229:16
**seizure** [1] - 185:14
**selection** [1] - 262:12
**send** [6] - 21:15, 21:17, 21:19, 21:21, 21:23, 27:9
**sending** [1] - 21:4
**sense** [6] - 95:7, 95:9, 127:2, 128:4, 147:10, 160:3
**sensitive** [1] - 203:22
**sent** [4] - 21:2, 42:5, 42:16, 66:10
**sentencing** [1] - 269:20
**separate** [5] - 109:20, 190:8, 190:9, 255:14
**separately** [2] - 226:10, 226:11
**sepsis** [135] - 30:11, 66:9, 66:14, 66:23, 67:9, 70:2, 70:9, 70:10, 72:14, 72:18, 72:20, 73:2, 73:6, 73:11, 73:13, 73:22, 75:8, 75:10, 95:16, 95:18, 97:11, 99:14, 99:21, 100:10, 101:18, 103:17, 106:10, 106:17, 106:18, 107:7, 112:8, 114:13, 114:16, 123:10, 144:5, 157:15, 157:16, 157:20, 158:4, 158:5, 160:14, 160:16, 160:23, 162:17, 162:19, 163:6, 163:11, 163:15, 163:20, 164:7, 171:11, 171:14, 171:19, 171:23, 172:4, 172:8, 172:15, 172:16, 174:21, 175:3, 175:7, 175:8, 175:14, 178:10, 184:17, 185:22, 186:8, 186:13, 186:18, 187:19, 198:4, 198:19, 199:5, 200:6,

Case 1:17-cv-00626-DJS Document 91-1 Filed 06/14/21 Page 301 of 442

200:11, 201:7, 201:8, 201:10, 201:12, 201:13, 201:15, 207:23, 208:3, 209:3, 209:4, 209:13, 210:9, 210:23, 211:10, 211:14, 211:15, 211:16, 211:21, 211:22, 212:3, 212:5, 212:7, 212:10, 212:12, 212:16, 212:18, 213:6, 213:8, 214:16, 215:5, 216:15, 217:23, 218:12, 218:15, 218:18, 219:6, 219:16, 222:2, 222:9, 222:13, 222:15, 222:17, 229:21, 230:19, 231:2, 231:8, 232:7, 232:18, 232:21, 233:16, 233:20, 234:5, 247:17, 252:3, 266:2, 266:8

**sepsis"** [1] - 172:2

**September** [11] - 1:18, 9:2, 26:6, 66:4, 93:11, 93:15, 99:5, 121:19, 138:19, 142:16, 239:22

**septic** [6] - 139:17, 139:23, 157:13, 157:16, 181:15, 181:22

**sequelae** [2] - 173:16, 272:21

**Sergeant** [4] - 235:20, 235:23, 236:14, 236:19

**sergeant** [1] - 238:18

**series** [4] - 19:2, 249:7, 262:16, 275:14

**serious** [5] - 15:22, 30:10, 30:11, 108:5, 163:17

**serum** [1] - 225:23

**services** [1] - 9:5

**set** [3] - 71:18, 82:12, 265:15

**sets** [1] - 254:6

**seven** [16] - 6:14, 11:8, 102:11, 102:14, 103:6, 118:13, 118:19, 118:20, 120:5, 120:6, 120:15,

133:16, 137:21, 188:6, 276:10, 279:4

**several** [27] - 5:7, 11:10, 14:21, 41:23, 43:7, 44:6, 44:18, 62:3, 66:10, 79:11, 94:8, 113:20, 124:21, 137:15, 142:14, 149:23, 169:3, 194:7, 194:13, 194:14, 204:10, 206:5, 223:22, 223:23, 236:7, 238:5, 279:2

**severe** [18] - 35:14, 47:2, 50:7, 50:10, 51:3, 53:12, 54:7, 68:7, 68:13, 69:2, 69:14, 129:21, 196:5, 210:8, 231:10, 232:3, 247:8, 248:14

**severely** [2] - 193:9, 196:6

**sewn** [1] - 45:2

**SGH** [19] - 116:16, 146:10, 146:11, 191:11, 191:17, 192:3, 242:23, 245:4, 255:11, 256:9, 256:21, 257:13, 257:15, 257:20, 258:2, 258:14, 258:17, 264:8, 264:20

**SGHs** [4] - 116:2, 187:15, 190:7, 273:12

**shaken** [3] - 281:12, 281:14, 281:18

**shall** [2] - 3:9, 3:12

**shape** [1] - 27:3

**sheath** [1] - 224:7

**sheaths** [2] - 49:17, 60:10

**sheer** [1] - 152:3

**sheet** [7] - 166:4, 239:21, 240:4, 240:11, 272:14, 276:10, 283:22

**sheets** [4] - 240:8, 278:10, 278:12, 278:14

**shine** [1] - 198:17

**shock** [6] - 139:17, 139:23, 157:13, 157:16, 181:15, 181:22

**shortage** [1] - 155:7

**shortly** [1] - 76:13

**shot** [6] - 113:8, 148:10, 148:13, 148:14, 148:16, 239:8

**shoulders** [1] - 31:14

**show** [29] - 47:6, 48:8, 48:12, 88:9, 104:11, 104:12, 131:21, 141:23, 159:7, 244:2, 244:11, 244:12, 246:22, 249:22, 251:9, 252:8, 259:13, 259:20, 260:3, 260:11, 260:14, 260:15, 260:19, 260:20, 261:5, 262:13, 263:13, 263:22, 276:15

**showed** [7] - 47:2, 47:7, 48:9, 57:3, 56:11, 251:6, 259:20

**showing** [3] - 66:11, 242:3, 263:23

**shown** [1] - 241:8

**shows** [8] - 88:9, 245:15, 245:19, 250:4, 250:19, 251:10, 259:16, 264:23

**shut** [1] - 182:7

**sibling** [1] - 165:9

**sickness** [1] - 196:9

**side** [35] - 31:19, 36:21, 38:6, 40:10, 48:4, 53:15, 53:17, 56:16, 56:17, 56:19, 56:21, 56:23, 57:2, 57:3, 65:2, 89:16, 127:14, 127:16, 127:19, 128:3, 130:10, 168:13, 190:21, 224:7, 247:20, 253:22, 255:8, 255:11, 258:22, 259:7, 264:4, 264:10, 264:12, 274:7

**sided** [13] - 57:18, 86:13, 87:18, 87:20, 89:8, 90:11, 262:2, 262:9, 262:23, 263:5, 263:8, 263:9, 283:15

**sides** [1] - 258:21

**sign** [13] - 37:15, 52:21, 165:4, 165:5, 166:4, 179:23, 180:11, 196:9, 197:13, 239:21,

240:4, 240:8, 240:11

**sign-in** [4] - 239:21, 240:4, 240:8, 240:11

**signed** [1] - 3:4

**significance** [19] - 144:3, 144:20, 147:3, 185:8, 243:10, 244:22, 246:20, 247:23, 248:12, 248:20, 250:2, 250:14, 252:2, 256:18, 266:5, 270:11, 276:3, 279:22, 280:11

**significant** [27] - 16:8, 34:20, 44:19, 45:20, 66:15, 97:2, 99:20, 136:5, 198:16, 206:22, 210:16, 218:18, 232:8, 241:14, 241:16, 242:12, 242:13, 243:6, 243:11, 243:22, 265:2, 266:13, 267:15, 268:4, 268:10, 268:13, 272:22

**significantly** [2] - 97:3, 182:5

**signs** [3] - 162:17, 163:20, 164:2

**Sikirica** [6] - 2:11, 4:10, 75:18, 80:22, 220:20, 283:2

**SIKIRICA** [5] - 1:7, 1:17, 4:6, 284:4, 284:13

**Sikirica's** [1] - 283:10

**silly** [1] - 29:6

**similar** [2] - 219:12, 255:11

**similarly** [1] - 272:20

**simplistic** [1] - 257:12

**simply** [19] - 6:21, 20:8, 48:21, 51:21, 52:4, 52:17, 53:23, 58:17, 75:2, 88:5, 138:12, 153:19, 153:21, 156:17, 191:21, 207:6, 212:20, 226:4, 278:14

**single** [2] - 13:3, 168:9

**sinus** [4] - 196:5, 196:6, 196:8, 196:9

**sinuses** [1] - 196:11

**sister** [1] - 10:20

**sit** [4] - 21:8, 27:13, 123:20, 166:14

**site** [11] - 14:6, 127:11, 127:19, 128:2, 187:13, 244:9, 254:7, 255:18, 255:20, 258:7, 258:10

**sites** [5] - 35:13, 37:7, 244:3, 253:9, 255:15

**sitting** [2] - 117:12, 125:15

**situ** [1] - 17:10

**situation** [5] - 132:12, 153:2, 185:11, 226:20, 228:8

**situations** [1] - 227:20

**six** [2] - 11:8, 71:14

**size** [1] - 22:18

**skeletal** [1] - 188:15

**skin** [3] - 18:5, 98:13, 138:7

**skull** [49] - 18:15, 18:17, 27:5, 32:11, 32:16, 32:18, 35:11, 36:10, 36:22, 38:6, 40:4, 41:16, 53:16, 54:13, 58:3, 59:3, 61:13, 85:20, 86:6, 119:10, 130:15, 131:7, 138:11, 168:23, 169:2, 169:5, 169:11, 189:3, 189:4, 189:11, 225:11, 241:22, 242:2, 243:13, 244:6, 247:20, 248:9, 254:15, 254:20, 255:3, 255:5, 257:17, 257:18, 257:21, 258:22, 259:10, 263:23, 264:11, 283:11

**skullcap** [1] - 18:15

**Skyped** [1] - 214:7

**slammed** [3] - 122:8, 122:15, 122:23

**slice** [1] - 262:7

**slices** [2] - 262:6, 262:11

**slides** [21] - 22:17, 23:7, 24:2, 24:5, 241:13, 249:7, 251:17, 252:5, 254:22, 259:20, 261:14, 262:12, 275:15, 275:20, 278:11, 278:16, 278:17, 278:18, 278:20, 278:23, 279:7

**Slides** [2] - 283:14, 283:15
**slight** [1] - 274:11
**slowly** [1] - 5:12
**small** [12] - 22:18, 27:23, 31:19, 45:6, 47:6, 182:20, 183:5, 183:9, 195:4, 207:15, 252:8, 275:22
**smiley** [1] - 156:5
**social** [1] - 62:20
**soft** [12] - 19:12, 19:15, 19:22, 31:21, 32:17, 43:5, 43:17, 43:18, 44:19, 187:5, 187:6, 187:7
**sole** [1] - 175:16
**solely** [2] - 25:6, 65:14
**solid** [1] - 17:8
**someone** [14] - 113:2, 116:5, 168:20, 173:18, 178:8, 212:11, 212:16, 226:13, 228:22, 231:16, 267:21, 269:21, 270:8, 281:20
**sometime** [2] - 93:23, 94:2
**sometimes** [16] - 11:22, 12:2, 17:8, 20:6, 21:22, 52:9, 65:9, 82:7, 82:8, 110:11, 113:2, 185:12, 204:5, 209:10, 240:12
**somewhat** [3] - 27:23, 136:2, 258:9
**somewhere** [3] - 92:4, 175:8, 229:17
**son** [1] - 5:3
**sorry** [8] - 32:19, 38:11, 47:19, 58:11, 73:2, 98:11, 253:13, 273:20
**sort** [12] - 42:23, 61:13, 74:14, 115:5, 115:12, 127:19, 134:17, 134:18, 180:15, 187:17, 218:3, 218:7
**sorted** [2] - 280:13, 280:14
**sorts** [2] - 23:16, 100:11
**sound** [2] - 29:6, 102:12
**source** [11] - 160:22, 160:23, 161:2,

163:6, 165:13, 175:9, 175:13, 175:14, 199:15, 234:12, 260:8
**sources** [7] - 24:10, 63:7, 63:15, 63:22, 125:7, 179:8
**space** [8] - 89:20, 132:14, 132:20, 132:22, 133:10, 133:11, 236:13, 237:18
**spaces** [2] - 89:22, 205:20
**speaking** [1] - 230:12
**speaks** [1] - 248:16
**special** [1] - 193:16
**specialist** [5] - 99:17, 197:22, 197:23, 198:6, 198:7
**specialized** [1] - 218:6
**specialties** [2] - 11:11, 11:12
**specialty** [1] - 106:3
**specific** [8] - 59:12, 88:15, 89:23, 105:14, 118:8, 127:9, 131:6, 191:21
**specifically** [2] - 29:15, 218:12
**specifics** [2] - 238:6, 238:7
**specified** [1] - 168:15
**specimen** [1] - 19:16
**specimens** [3] - 27:9, 27:10, 275:16
**spectrum** [2] - 52:22, 238:16
**speculate** [1] - 122:21
**speculated** [1] - 161:18
**speculation** [9] - 158:14, 158:17, 159:11, 159:12, 159:14, 159:15, 159:16, 175:18, 176:17
**spent** [1] - 282:9
**spinal** [3] - 12:7, 180:18, 181:7
**split** [10] - 35:22, 36:2, 195:3, 202:21, 203:2, 223:21, 244:3, 244:10, 244:12, 264:15
**splits** [1] - 35:15
**splitting** [14] - 35:11, 35:13, 37:22, 38:13, 59:3, 194:21, 195:2, 195:7, 195:8,

202:20, 223:6, 223:12, 223:16
**spoken** [4] - 77:14, 77:17, 77:20, 216:3
**spontaneous** [2] - 170:4, 175:8
**spontaneously** [4] - 115:2, 115:7, 135:6, 136:14
**spot** [1] - 127:22
**spreading** [3] - 102:2, 202:16, 202:17
**spreads** [1] - 89:21
**spring** [1] - 123:18
**St** [2] - 277:10, 277:11
**stab** [1] - 137:14
**staff** [6] - 9:14, 9:19, 151:10, 281:15
**stain** [10] - 23:2, 23:8, 23:17, 23:18, 23:19, 23:21, 23:22, 163:4, 252:8
**stained** [1] - 22:20
**staining** [7] - 23:2, 46:4, 94:21, 95:3, 97:13, 97:14, 97:16
**stains** [11] - 22:20, 22:23, 23:15, 97:18, 97:21, 97:23, 251:18, 251:19, 251:21, 278:22, 279:2
**stamp** [1] - 22:18
**stand** [4] - 23:4, 25:2, 117:12, 209:23
**standard** [1] - 270:6
**standards** [8] - 29:21, 30:2, 30:4, 139:3, 150:19, 150:23, 151:2, 232:13
**stands** [4] - 142:9, 268:9, 274:12, 275:5
**Stars** [1] - 214:14
**start** [4] - 11:14, 27:16, 92:12, 195:5
**started** [3] - 6:16, 149:10, 227:7
**starting** [3] - 5:19, 48:17, 274:22
**starts** [1] - 276:7
**STATE** [3] - 1:9, 1:14, 284:1
**state** [9] - 12:2, 13:16, 13:18, 100:17, 137:5, 168:11, 210:10, 228:6, 236:16
**State** [1] - 1:23, 2:12, 3:5, 4:13, 4:17, 5:20, 6:4, 6:11, 6:12, 6:23,

8:22, 9:16, 12:10, 126:2, 156:9, 285:5
**statement** [36] - 50:21, 51:9, 62:6, 62:10, 62:11, 82:7, 125:10, 125:14, 125:20, 126:23, 129:7, 129:15, 158:18, 159:9, 161:21, 164:5, 165:14, 165:20, 166:8, 167:7, 167:18, 167:23, 168:12, 175:3, 176:16, 198:19, 198:23, 199:16, 207:20, 220:23, 234:10, 234:14, 234:20, 269:8, 270:17, 283:20
**statements** [9] - 24:20, 76:21, 82:4, 86:23, 87:3, 126:15, 127:5, 154:21, 166:17
**STATES** [1] - 1:1
**stating** [2] - 233:19, 237:5
**status** [4] - 69:7, 81:13, 92:23, 113:5
**stay** [3] - 29:9, 44:9, 135:11
**stayed** [1] - 204:12
**stenographic** [1] - 285:7
**stenosis** [3] - 146:22, 147:3, 147:6
**step** [12] - 14:17, 14:18, 16:21, 16:23, 19:8, 19:23, 20:14, 22:4, 22:5, 40:2, 41:19, 44:22
**stepfather** [2] - 51:10, 62:8
**Steuben** [1] - 155:18
**stick** [1] - 185:10
**sticker** [1] - 241:20
**stickers** [1] - 241:13
**stiffen** [2] - 19:20, 44:2
**stiffened** [1] - 19:22
**still** [21] - 39:2, 41:15, 42:4, 43:11, 74:10, 75:5, 81:11, 81:15, 84:5, 96:16, 97:9, 126:15, 126:22, 129:20, 136:3, 138:11, 186:7, 206:22, 224:14, 250:16

**stillborns** [1] - 12:19
**stipulated** [4] - 3:2, 3:8, 3:11, 3:15
**stipulations** [1] - 4:2
**stock** [2] - 20:9, 27:9
**stomach** [3] - 21:2, 21:17, 67:20
**stop** [2] - 70:16, 71:5
**stopped** [1] - 32:9
**store** [1] - 20:8
**story** [4] - 65:10, 65:11, 65:12, 67:10
**strange** [1] - 214:17
**strangled** [1] - 173:18
**Strangulation** [1] - 173:23
**strangulation** [1] - 174:10
**Street** [1] - 2:5
**street** [1] - 176:11
**strep** [30] - 70:22, 93:19, 94:16, 96:3, 96:9, 98:10, 98:15, 102:10, 102:22, 103:5, 104:20, 104:21, 105:9, 105:13, 105:15, 107:6, 108:10, 108:14, 112:4, 113:18, 114:8, 131:10, 131:12, 172:3, 172:6, 172:16, 211:23, 212:8, 283:6
**streptococcal** [14] - 98:7, 98:21, 116:16, 123:22, 131:12, 138:23, 139:4, 148:19, 149:5, 175:11, 175:16, 176:2, 177:7, 231:7
**streptococci** [1] - 104:18
**streptococcus** [18] - 65:22, 66:11, 104:15, 104:17, 104:18, 104:19, 105:21, 112:5, 177:17, 210:5, 211:20, 212:4, 212:6, 212:11, 212:12, 212:15, 212:23, 213:3
**stroke** [3] - 90:15, 132:6, 132:10
**strong** [3] - 148:19, 221:7
**strongly** [1] - 54:2
**struck** [2] - 131:5, 131:6

structures [1] - 16:13
stuck [1] - 43:12
student [1] - 239:7
studies [3] - 21:7,
53:19, 276:18
study [2] - 53:13,
94:16
stuff [2] - 133:19,
133:20
sub [1] - 60:14
subacute [1] - 47:23
subarachnoid [1] -
59:22
subdural [143] - 41:9,
42:12, 43:8, 45:22,
47:18, 47:19, 47:20,
53:11, 53:15, 54:6,
54:13, 54:18, 54:20,
56:7, 56:11, 57:8,
57:13, 57:18, 59:14,
72:16, 72:18, 72:21,
72:22, 73:5, 73:10,
73:12, 73:15, 73:21,
74:11, 74:17, 86:14,
87:14, 87:20, 87:21,
88:2, 88:3, 88:4,
88:5, 88:11, 89:8,
90:3, 90:11, 106:10,
120:2, 120:18,
120:20, 121:11,
121:12, 127:10,
127:18, 128:7,
128:20, 130:9,
130:10, 131:13,
131:16, 131:17,
131:18, 131:23,
132:5, 132:14,
132:20, 132:22,
133:10, 133:11,
134:10, 134:11,
134:13, 143:23,
165:6, 165:15,
165:17, 168:6,
168:9, 168:15,
168:19, 169:12,
175:21, 182:18,
182:22, 183:4,
187:13, 188:17,
189:3, 189:7, 189:8,
189:15, 189:23,
190:8, 190:12,
190:17, 190:20,
190:23, 194:16,
202:9, 202:11,
202:12, 203:10,
205:15, 206:4,
206:11, 206:15,
216:12, 223:17,
223:19, 223:22,
224:2, 224:3, 224:5,
224:16, 224:21,
225:8, 225:9,
225:11, 225:13,
225:14, 243:12,
243:15, 243:20,
245:17, 245:20,
246:15, 246:16,
246:17, 250:5,
250:11, 251:7,
254:8, 254:13,
254:17, 255:19,
257:11, 258:5,
258:7, 260:6,
261:19, 262:2,
262:10, 266:20,
274:20
subendocardial [1] -
137:15
subgaleal [61] - 36:4,
36:18, 38:12, 47:7,
47:10, 47:14, 48:3,
48:9, 56:19, 57:5,
57:9, 61:8, 73:6,
73:9, 73:20, 74:12,
74:13, 115:7,
115:21, 116:4,
119:11, 120:3,
127:23, 128:6,
128:9, 134:12,
134:14, 134:16,
134:18, 134:21,
136:13, 136:19,
146:11, 146:20,
187:7, 187:16,
188:21, 189:2,
192:17, 194:5,
194:10, 194:12,
202:10, 202:14,
222:17, 222:19,
223:18, 224:22,
242:21, 245:7,
253:12, 253:13,
253:14, 255:18,
255:20, 256:3,
257:9, 264:2,
264:19, 274:2, 274:6
subject [1] - 127:21
submitted [1] - 42:13
subscribe [1] - 256:5
Subscribed [1] -
284:14
subsection [1] - 68:6
subsequent [1] -
92:21
subset [1] - 105:16
subsets [1] - 105:20
subspecialty [1] -
12:5
substance [2] - 122:6,
215:9

substances [3] - 42:2,
42:7, 42:19
substantial [3] -
167:23, 168:4,
173:11
successful [1] - 29:10
successfully [1] -
149:19
successive [1] -
148:23
suction [1] - 115:18
sudden [2] - 25:20,
181:14
suddenly [1] - 72:15
suffer [1] - 76:7
suffered [2] - 50:10,
155:23
suffering [2] - 216:16,
219:17
suffers [1] - 34:18
sufficient [2] - 148:19,
228:21
suggest [1] - 130:15
suggested [1] -
220:21
suggestion [1] - 86:13
suicidal [2] - 17:15,
17:16
suicide [6] - 17:16,
25:20, 52:8, 155:19,
227:23, 239:9
Suite [1] - 2:3
sum [1] - 122:6
summarize [1] -
259:16
summary [1] - 77:9
Sunday [1] - 207:3
Supervision [1] -
156:10
support [4] - 53:6,
53:9, 69:17, 188:9
supported [1] - 54:7
supportive [2] - 51:14,
64:6, 278:4
suppose [1] - 176:14
supposed [1] - 155:23
supposedly [1] -
156:5
surface [7] - 33:8,
34:11, 43:6, 60:3,
119:10, 122:9,
257:13
surgery [2] - 214:15,
215:5
surgical [3] - 19:16,
183:18, 183:23
surprised [3] - 72:3,
96:8, 96:11
surrounding [3] -
53:2, 197:5, 221:15

susceptible [2] -
113:6, 224:13
suspect [2] - 239:19,
239:20
suspicion [5] - 25:19,
42:22, 171:14,
205:4, 205:6
suspicious [4] - 15:8,
37:11, 37:15, 38:7
sustained [2] - 59:11,
127:6
suture [10] - 37:21,
223:12, 223:16,
244:3, 244:9,
244:12, 244:13,
264:15, 264:16
sutures [23] - 35:10,
35:15, 35:17, 36:2,
36:5, 36:6, 36:17,
38:4, 38:14, 39:19,
59:3, 194:21,
194:23, 195:2,
195:3, 195:4, 195:7,
195:8, 202:16,
202:19, 223:7,
223:21, 264:14
swallow [1] - 162:6
swallowing [1] - 67:19
swell [3] - 38:15,
180:23, 223:21
swelling [3] - 35:14,
133:12, 180:15,
192:2, 192:4, 192:7,
192:9, 192:12,
195:3, 195:9, 205:8,
223:13, 250:17
switched [2] - 279:19,
280:3
swollen [2] - 45:16,
54:11
sworn [3] - 3:5, 4:7,
284:14
symptom [2] - 180:7,
185:19
symptoms [5] - 71:4,
108:13, 110:22,
181:23
syndrome [1] - 103:4
syndromes [1] - 102:9
synonymous [8] -
211:16, 211:20,
212:2, 231:8,
232:20, 232:23,
233:5, 280:10
synopsis [1] - 281:12
system [11] - 96:8,
106:12, 111:22,
112:6, 113:22,
148:5, 151:8,
162:22, 163:21,

188:15, 232:7
systems [4] - 10:13,
12:8, 110:12, 182:7

## T

table [4] - 15:15,
26:23, 63:16, 129:12
tachycardia [1] -
199:2
tachycardic [2] -
185:17, 185:22
talks [1] - 105:18
tap [1] - 181:12
tasks [1] - 28:14
team [5] - 29:22,
62:23, 139:9, 229:3,
229:7
technicians [1] -
26:16, 28:10
temperature [2] -
170:7, 170:12
temporal [2] - 48:11,
257:3
temporally [1] - 190:7
Ten [1] - 283:20
ten [8] - 83:16, 152:14,
153:20, 167:7,
167:23, 198:18,
239:2, 270:17
Ten-page [1] - 283:20
ten-page [5] - 83:16,
167:7, 167:23,
198:18, 270:17
tend [1] - 182:20
tends [1] - 166:12
tentative [1] - 66:8
term [12] - 22:14, 49:2,
49:4, 52:9, 89:19,
89:23, 98:6, 147:9,
147:10, 147:16,
158:11, 278:10
terminology [1] -
179:9
terms [20] - 11:10,
33:6, 33:7, 87:14,
100:15, 102:5,
106:5, 110:7, 146:4,
149:23, 150:14,
155:4, 157:10,
157:20, 200:22,
201:2, 232:16,
255:16, 256:12,
257:3
tertiary [1] - 50:16
test [2] - 109:5, 180:16
tested [6] - 98:9,
98:10, 108:22,
109:2, 109:5, 110:3

**testes** [4] - 47:6, 164:4, 183:16, 184:3

**testicle** [2] - 45:6, 136:23

**testicles** [3] - 45:4, 163:21, 164:12

**testified** [14] - 4:7, 79:14, 82:18, 92:4, 104:4, 109:12, 121:10, 123:23, 140:18, 192:2, 192:19, 194:13, 234:12, 283:2

**testify** [10] - 76:4, 116:19, 121:6, 141:13, 151:19, 156:7, 172:23, 192:6, 219:4, 222:21

**testifying** [8] - 79:6, 79:8, 79:21, 113:10, 140:12, 196:11, 223:2, 282:21

**testimonies** [4] - 78:20, 79:3, 80:19, 86:23

**testimony** [65] - 76:14, 77:5, 80:3, 80:4, 80:5, 80:23, 82:14, 87:3, 104:8, 104:11, 104:12, 107:16, 116:17, 116:21, 116:23, 117:8, 117:22, 118:5, 118:11, 118:15, 121:18, 122:18, 123:11, 124:11, 133:13, 137:20, 140:4, 140:7, 140:10, 140:12, 140:17, 141:6, 141:9, 141:19, 142:5, 149:19, 153:9, 192:10, 194:9, 201:9, 213:11, 213:15, 213:18, 214:6, 214:11, 214:13, 214:20, 215:2, 215:9, 215:11, 215:15, 216:6, 216:9, 217:12, 218:11, 218:17, 230:6, 230:9, 233:12, 269:18, 283:7, 283:8, 283:9, 284:5

**testing** [2] - 42:6, 163:16

**tests** [1] - 30:15

**Texas** [2] - 6:8, 78:22

**that's..** [1] - 266:6

**THE** [76] - 1:14, 23:5, 46:10, 46:12, 81:3, 86:12, 89:11, 90:5, 95:14, 95:21, 96:6, 99:7, 99:16, 101:16, 119:5, 119:16, 120:10, 120:14, 120:23, 121:15, 122:20, 125:6, 126:10, 126:20, 127:13, 129:3, 131:2, 132:5, 135:10, 135:15, 136:16, 138:10, 148:8, 149:14, 150:5, 150:23, 154:8, 158:17, 163:14, 164:2, 167:14, 167:20, 173:9, 174:17, 180:10, 187:11, 189:2, 193:5, 193:14, 195:19, 199:8, 201:18, 210:13, 211:12, 212:23, 213:5, 215:21, 217:7, 219:10, 220:6, 221:11, 229:7, 231:6, 232:11, 234:4, 234:19, 235:11, 236:18, 237:2, 241:3, 261:2, 261:6, 261:9, 263:17, 267:7, 270:22

**the..** [1] - 228:4

**themselves** [3] - 25:2, 68:10, 263:14

**theoretically** [1] - 150:3

**theory** [4] - 122:22, 200:18, 256:5

**thereafter** [1] - 123:11

**therefore** [1] - 178:8

**thereof** [2] - 230:2, 284:8

**these..** [1] - 251:19

**Thevenin** [1] - 81:2

**they've** [2] - 126:16, 137:18

**thick** [1] - 43:7

**thicker** [1] - 240:22

**thickness** [1] - 45:23

**thinking** [2] - 37:4, 98:3

**third** [2] - 262:7, 273:8

**Thomas** [63] - 4:17, 4:21, 4:22, 5:2, 5:3,

26:5, 27:14, 50:10, 62:6, 62:11, 67:10, 74:5, 74:9, 75:19, 75:22, 75:23, 81:19, 91:2, 91:15, 91:16, 92:14, 101:11, 103:2, 103:14, 103:17, 108:18, 117:3, 117:5, 125:10, 125:19, 126:5, 129:8, 140:3, 140:5, 141:21, 142:2, 142:4, 156:20, 158:18, 167:3, 210:19, 220:16, 241:5, 241:9, 242:9, 245:12, 248:3, 249:3, 253:12, 254:8, 262:18, 265:20, 267:9, 267:17, 269:11, 270:14, 270:17, 272:9, 276:5, 280:15, 283:5, 283:21

**THOMAS** [2] - 1:3, 1:11

**Thomas'** [13] - 82:18, 83:15, 122:16, 128:22, 129:14, 154:21, 159:9, 167:23, 175:2, 176:15, 198:18, 220:10, 271:20

**thousand** [1] - 157:6

**threatening** [2] - 169:20, 170:20

**three** [30] - 9:20, 13:5, 19:18, 21:21, 26:7, 37:14, 38:3, 38:7, 38:23, 39:14, 41:12, 45:22, 47:11, 47:17, 47:21, 47:22, 47:23, 78:8, 101:5, 102:21, 110:19, 118:22, 119:2, 119:19, 152:6, 189:21, 193:8, 275:19

**thrive** [1] - 204:9

**through..** [1] - 199:12

**throughout** [1] - 163:20

**throw** [1] - 270:9

**thrown** [5] - 62:2, 62:15, 67:13, 159:6, 191:18

**thumbnails** [1] - 249:9

**tight** [1] - 45:19

**TIM** [1] - 1:6

**Tim** [1] - 2:7

**timeline** [1] - 198:21

**timers** [2] - 9:20, 9:21

**timing** [1] - 146:18

**tissue** [7] - 17:21, 17:22, 72:3, 187:5, 187:6, 187:8, 247:2

**tissues** [7] - 22:21, 31:21, 47:3, 68:9, 137:4, 188:12, 196:16

**title** [1] - 9:12

**today** [26] - 4:15, 5:7, 27:13, 76:2, 76:5, 76:12, 76:18, 77:17, 77:21, 78:4, 79:13, 80:18, 109:5, 116:19, 117:12, 118:5, 118:15, 122:18, 125:15, 140:13, 140:20, 194:9, 209:22, 210:10, 213:19, 235:22

**together** [2] - 25:4, 38:8

**took** [18] - 9:4, 21:13, 21:16, 22:13, 22:14, 30:23, 31:3, 40:3, 42:12, 44:7, 150:16, 181:11, 183:23, 195:17, 249:11, 249:12, 251:19, 275:16

**top** [9] - 196:19, 196:20, 240:21, 243:3, 245:5, 246:13, 253:16, 257:20, 274:4

**topic** [1] - 207:17

**torn** [1] - 195:5

**torts** [1] - 4:23

**totaled** [1] - 40:12

**totalled** [2] - 224:15, 246:4

**totally** [3] - 66:6, 147:7, 248:21

**touch** [1] - 13:20

**touched** [1] - 214:9

**touching** [1] - 251:8

**toward** [4] - 66:17, 254:3, 259:9

**towards** [4] - 37:4, 258:20, 258:21, 273:15

**toxicology** [15] - 11:10, 20:16, 21:3, 21:6, 21:8, 21:14, 22:3, 24:19, 25:22, 26:6, 27:8, 42:5,

42:13, 42:17, 226:4

**toxicology-related** [1] - 25:22

**toy** [2] - 125:2, 192:22

**trachea** [2] - 33:11, 34:6

**track** [1] - 204:12

**trained** [1] - 219:21

**training** [3] - 10:15, 12:14, 219:17

**transcribe** [1] - 58:9

**transcript** [3] - 142:4, 237:21, 284:7

**Transcript** [2] - 283:8, 283:9

**transcription** [4] - 169:3, 169:8, 169:9, 285:7

**transcriptionist** [2] - 58:7, 58:8

**transcripts** [1] - 79:2

**transfusions** [1] - 136:9

**transmission** [1] - 177:2

**transmitted** [6] - 110:7, 111:19, 112:15, 112:18, 113:12, 113:14

**transmitting** [1] - 111:5

**transparent** [1] - 211:9

**transpires** [1] - 166:9

**transplantation** [3] - 29:10, 29:22, 30:12

**transplanted** [3] - 29:16, 30:9, 149:19

**transplants** [1] - 149:16

**trauma** [168] - 37:11, 37:15, 38:7, 38:13, 38:15, 38:21, 50:8, 50:11, 51:4, 60:11, 67:9, 69:6, 69:15, 74:11, 75:6, 84:11, 90:19, 91:9, 91:10, 91:12, 92:9, 95:18, 95:22, 101:13, 101:16, 114:18, 114:20, 115:5, 115:9, 115:10, 115:11, 115:12, 116:4, 125:3, 125:7, 125:11, 126:4, 127:8, 127:21, 128:2, 128:3, 129:22, 132:3, 134:3, 134:17, 134:18, 134:19,

136:14, 136:17,
161:23, 162:3,
162:6, 162:12,
162:13, 165:5,
165:7, 165:8, 165:9,
165:11, 165:12,
165:13, 165:15,
167:2, 168:7,
168:11, 168:16,
172:9, 174:14,
174:21, 175:17,
175:19, 176:7,
176:18, 181:4,
181:8, 181:19,
187:9, 187:11,
187:14, 187:18,
188:18, 190:3,
190:9, 190:14,
190:15, 190:16,
192:7, 192:16,
193:3, 194:18,
199:6, 199:14,
199:15, 199:16,
200:9, 200:13,
200:20, 201:4,
201:5, 201:6, 201:8,
201:10, 201:16,
201:19, 201:20,
201:23, 202:13,
202:21, 203:8,
205:9, 206:12,
206:14, 207:15,
208:12, 208:14,
209:3, 211:2,
214:10, 214:15,
214:16, 215:4,
215:6, 217:23,
218:3, 218:9,
222:16, 222:20,
223:4, 223:7, 223:8,
223:9, 223:10,
223:11, 223:15,
231:12, 231:14,
241:15, 247:11,
247:12, 247:14,
248:15, 253:9,
253:11, 253:18,
254:7, 255:14,
259:13, 259:18,
260:2, 260:6, 260:7,
260:8, 260:11,
260:15, 260:19,
260:21, 261:5,
263:14, 267:13,
272:21
**trauma-inflicted** [1] -
37:11
**traumatic** [7] - 60:6,
127:19, 165:6,
184:23, 218:5,
253:7, 274:19

**travelled** [1] - 67:3
**treated** [1] - 171:11
**treating** [2] - 100:3,
100:10
**treatment** [7] - 97:8,
100:15, 171:7,
198:8, 198:9,
198:17, 207:12
**treats** [1] - 171:9
**Trial** [1] - 3:16
**trial** [45] - 3:13, 78:15,
78:16, 79:7, 79:14,
79:19, 81:11, 81:14,
85:7, 85:9, 91:14,
92:14, 97:16,
109:12, 140:4,
140:17, 140:22,
141:10, 141:14,
142:6, 184:6,
196:22, 206:5,
210:19, 213:16,
213:19, 232:22,
233:19, 239:23,
240:2, 240:11,
241:16, 244:22,
256:14, 268:18,
268:19, 268:23,
269:4, 269:16,
269:18, 276:21,
277:5, 282:10,
283:19
**trials** [2] - 76:12,
233:8
**trick** [1] - 208:7
**tried** [1] - 50:17
**triple** [1] - 55:5
**trivalvular** [1] - 147:5
**Troy** [7] - 2:6, 2:7,
4:21, 4:23, 239:8,
277:17, 281:23
**TROY** [1] - 1:6
**truck** [1] - 192:20
**true** [11] - 71:6, 86:7,
131:14, 140:22,
142:6, 160:9,
201:16, 205:16,
222:16, 284:7, 285:6
**truth** [1] - 100:14
**truthfully** [1] - 141:13
**try** [11] - 15:4, 15:9,
20:20, 53:4, 53:6,
78:9, 201:10,
208:20, 208:22,
235:5, 253:2
**trying** [3] - 160:4,
200:3, 206:2
**tubes** [1] - 21:21
**turned** [2] - 119:17,
155:19
**turning** [1] - 247:2

**twice** [1] - 173:2
**twin** [10] - 144:23,
145:5, 146:4,
266:19, 280:2,
280:5, 280:6, 280:8,
280:10
**twins** [2] - 144:23,
145:11
**two** [58] - 4:15, 6:18,
7:4, 9:20, 21:21,
27:16, 30:22, 36:3,
37:16, 39:16, 39:22,
47:23, 61:12, 71:14,
76:12, 78:10, 78:19,
94:5, 101:5, 102:9,
110:19, 113:23,
119:2, 119:19,
134:3, 152:4, 152:6,
152:17, 152:18,
164:21, 172:5,
189:21, 191:6,
191:16, 212:3,
224:3, 224:4, 224:9,
224:11, 224:16,
232:20, 233:8,
240:8, 241:9,
242:15, 245:7,
246:12, 249:20,
251:6, 251:9,
253:12, 254:8,
259:11, 259:12,
263:15, 269:15,
273:9, 277:16
**two-month** [1] -
113:23
**type** [20] - 23:2, 25:10,
63:21, 68:13, 70:18,
98:13, 98:15, 99:11,
107:21, 108:5,
112:4, 112:17,
113:18, 119:7,
130:10, 168:16,
177:2, 179:21,
196:14, 225:23
**types** [1] - 100:14
**typically** [10] - 16:11,
20:16, 41:12, 71:10,
138:6, 173:9,
196:15, 197:11,
208:19, 262:11

**U**

**ulcerations** [1] - 163:7
**Ulster** [2] - 78:13, 79:5
**ultimate** [1] - 231:10
**ultimately** [2] -
128:12, 174:3
**ultrasound** [3] -
203:20, 204:14,

204:15
**unable** [1] - 170:23
**unattended** [1] - 80:16
**uncommon** [1] - 65:6
**unconscious** [2] -
162:11, 165:17
**unconvinced** [1] -
255:21
**under** [16] - 25:22,
60:3, 68:3, 68:5,
68:6, 75:20, 76:15,
138:13, 172:23,
187:16, 210:4,
210:7, 225:6, 228:7,
232:12, 236:16
**underlying** [2] -
174:14, 232:3
**underneath** [4] -
50:20, 88:6, 243:16,
258:10
**understandable** [1] -
266:7
**understood** [2] -
211:13, 211:18
**undertake** [1] - 229:12
**undetermined** [2] -
52:9, 227:9
**unexpected** [1] -
25:20
**unfortunately** [1] -
58:20
**unhealthy** [1] - 17:7
**unique** [2] - 52:14,
153:2
**unit** [1] - 204:8
**UNITED** [1] - 1:1
**University** [3] - 5:21,
6:4, 6:9
**unknown** [3] - 75:3,
84:11, 130:2
**unless** [2] - 145:6,
268:4
**unlike** [1] - 51:18
**unlikely** [2] - 222:22,
223:3
**unnecessarily** [1] -
209:18
**unresponsive** [1] -
66:6
**unusual** [5] - 41:7,
65:8, 67:8, 145:5,
218:3
**up** [40] - 19:20, 21:9,
21:21, 21:23, 27:11,
31:14, 32:4, 32:20,
35:12, 44:3, 45:2,
58:20, 88:14, 89:20,
89:22, 93:6, 94:2,
100:14, 100:17,
129:12, 139:13,

149:21, 160:2,
162:16, 162:20,
170:23, 196:15,
206:3, 206:5, 207:7,
210:18, 213:19,
227:17, 229:18,
243:16, 247:13,
253:22, 258:21,
264:19, 273:15
**up"** [1] - 264:20
**upcoming** [1] - 85:7
**upgraded** [1] - 167:12
**upper** [2] - 259:7,
259:9
**upward** [1] - 16:13
**urine** [2] - 20:21,
21:16
**usual** [1] - 4:2

**V**

**vaccination** [1] -
71:13
**vaccinations** [3] -
71:12, 71:13, 71:18
**vaccine** [6] - 113:23,
114:2, 114:3,
148:12, 148:18
**vaccines** [1] - 148:22
**vacs** [1] - 114:9
**vacuum** [4] - 115:18,
115:20, 134:20,
134:21
**vaginal** [2] - 143:5,
143:8
**valve** [2] - 147:7,
147:11
**vantage** [1] - 277:21
**variable** [1] - 47:23
**varied** [1] - 13:12
**varies** [1] - 12:23
**variety** [2] - 137:13,
201:11
**various** [4] - 4:22,
21:13, 22:15
**vast** [2] - 80:20, 153:7
**vehicle** [1] - 80:16
**vein** [1] - 20:21
**veins** [1] - 42:10
**ventilated** [1] - 96:14
**ventilator** [5] - 34:17,
34:20, 171:2,
184:20, 207:4
**ventricle** [1] - 33:5
**ventricles** [1] - 45:19
**verbal** [1] - 64:20
**verified** [2] - 55:5,
55:10
**verify** [1] - 90:6

Case 1:17-cv-00626-DJS Document 94-12 Filed 06/14/21 Page 316 of 442

**versus** [5] - 4:21, 90:19, 110:10, 164:7, 260:2
**verus** [1] - 248:16
**vessel** - 132:6
**vessels** [2] - 106:19, 183:9
**viability** [2] - 30:12, 139:7
**viable** [1] - 30:8
**vicinity** [1] - 243:19
**victim** [1] - 15:5
**video** [3] - 83:15, 158:22, 158:23
**videos** [2] - 24:18, 82:4
**view** [12] - 83:21, 90:8, 112:14, 143:21, 146:14, 174:5, 187:20, 223:10, 223:17, 254:7, 259:12, 281:18
**viewing** [1] - 215:6
**violated** [1] - 220:10
**violation** [1] - 83:16
**visible** [1] - 262:6
**visit** [1] - 142:13
**visual** - 30:18
**vitreous** [2] - 20:22, 21:16
**volume** [3] - 43:21, 207:6, 207:8
**vulnerable** [1] - 148:4

**W**

**waived** [1] - 3:9
**walk** [1] - 241:18
**walking** [1] - 176:11
**wants** [2] - 151:16, 151:20
**warm** [1] - 170:8
**warmer** [1] - 170:9
**warrant** [1] - 232:8
**Warren** [1] - 227:17
**washcloth** [1] - 251:12
**Washington** [2] - 1:20, 2:9
**watch** [1] - 158:23
**Waterford** [1] - 153:3
**ways** [3] - 55:9, 176:9, 201:11
**website** [2] - 102:8, 102:22
**week** [6] - 78:18, 94:5, 140:15, 213:20, 213:22
**weeks** [21] - 48:2,

111:13, 116:20, 118:22, 119:2, 119:19, 140:16, 157:18, 164:16, 164:23, 190:12, 190:22, 191:9, 191:11, 194:7, 194:14, 194:15, 195:17, 195:20, 195:22, 223:23
**weigh** [3] - 17:13, 17:19, 164:6
**weighed** [1] - 17:3
**weighs** [1] - 21:20
**weight** [2] - 16:4, 218:20
**weights** [1] - 19:6
**well..** [1] - 256:6
**West** [2] - 1:20, 2:9
**whatsoever** [3] - 40:18, 87:7, 129:7
**wheezing** [5] - 67:15, 158:20, 159:6, 159:9, 164:6
**whereas** [1] - 225:22
**white** [11] - 45:18, 90:15, 156:22, 157:3, 157:6, 157:11, 162:20, 169:14, 186:5, 247:3, 261:13
**whole** [9] - 24:17, 51:21, 52:22, 52:23, 65:11, 65:12, 232:2, 238:16, 284:7
**widespread** [2] - 183:2, 252:16
**wife** [1] - 126:3, 153:6
**Wilahemina** [4] - 62:21, 108:17, 109:19, 110:2
**wish** [4] - 117:16, 140:19, 141:18, 142:9
**withdraw** [2] - 180:17, 273:20
**withdrawn** [1] - 99:12, 177:19
**withstanding** [1] - 17:5
**Witness** [2] - 242:14, 244:20
**WITNESS** [75] - 23:5, 46:10, 46:12, 81:3, 86:12, 89:11, 90:5, 95:14, 95:21, 96:6, 99:7, 99:16, 101:16, 119:5, 119:16, 120:10, 120:14, 120:23, 121:15,

122:20, 125:6, 126:10, 126:20, 127:13, 129:3, 131:2, 132:5, 135:10, 135:15, 136:16, 138:10, 148:8, 149:14, 150:5, 150:23, 154:8, 158:17, 163:14, 164:2, 167:14, 167:20, 173:9, 174:17, 180:10, 187:11, 189:2, 193:5, 193:14, 195:19, 199:8, 201:18, 210:13, 211:12, 212:23, 213:5, 215:21, 217:7, 219:10, 220:6, 221:11, 229:7, 231:6, 232:11, 234:4, 234:19, 235:11, 236:18, 237:2, 241:3, 261:2, 261:6, 261:9, 263:17, 267:7, 270:22
**witness** [7] - 220:20, 243:2, 243:21, 245:4, 263:10, 272:18, 272:23
**witnesses** [8] - 86:3, 86:4, 86:8, 86:18, 86:20, 86:22, 130:6, 238:15
**woke** [2] - 162:16, 162:20
**Woldman** [4] - 54:21, 55:6, 55:15, 86:21
**Wolfe** [2] - 9:5, 9:7
**woman** [1] - 108:9
**women** [1] - 108:2
**word** [19] - 41:11, 60:18, 88:12, 114:20, 133:20, 171:19, 172:2, 172:4, 205:14, 211:15, 215:16, 216:20, 225:13, 225:16, 225:18, 230:23, 232:17, 233:16, 281:6
**words** [16] - 5:12, 76:7, 77:3, 86:6, 130:17, 170:11, 172:2, 174:20, 176:5, 176:15, 195:14, 198:3, 207:16, 232:23,

233:21, 256:7
**worker** [1] - 62:20
**workmanship** [1] - 153:19
**works** [1] - 9:14
**workup** [1] - 66:7
**worse** [1] - 180:23
**wound** [2] - 20:7, 48:19
**wounds** [1] - 137:14
**wrap** [1] - 232:4
**write** [5] - 243:18, 244:9, 248:9, 250:20, 264:21
**writing** [3] - 76:21, 242:23, 264:16
**written** [2] - 92:4, 172:11
**wrongful** [2] - 4:18, 81:4
**wrote** [4] - 246:17, 264:8, 264:20, 281:13, 281:14, 281:20

**Y**

**Y-shape** [1] - 27:3
**year** [11] - 5:23, 44:13, 71:15, 150:21, 151:23, 152:4, 152:21, 152:22, 155:18, 193:8
**years** [15] - 6:14, 7:4, 11:10, 13:13, 78:10, 78:11, 80:14, 80:15, 92:10, 92:14, 152:20, 153:20, 155:21, 227:14
**yellow** [1] - 242:17
**YORK** [4] - 1:1, 1:9, 1:14, 284:1
**York** [19] - 1:21, 1:23, 2:3, 2:6, 2:10, 2:12, 2:13, 3:6, 4:13, 4:17, 5:21, 6:5, 9:16, 83:14, 126:2, 153:3, 156:9, 285:5
**young** [5] - 91:12, 92:9, 99:21, 156:4, 236:2
**younger** [2] - 25:21, 36:13
**yourself** [1] - 228:23

**Z**

**zigzaggy** [1] - 35:19

```
 1   UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF NEW YORK
 2   - - - - - - - - - - - - - - - - - - - - - - - - - - - -

 3   ADRIAN THOMAS,

 4                       Plaintiff,

 5           - against -

 6
     CITY OF TROY, ADAM R. MASON, RONALD FOUNTAIN,
 7   TIM COLANERI,
     RENSSELAER COUNTY, and MICHAEL SIKIRICA,

 8
                         Defendants.
 9   - - - - - - - - - - - - - - - - - - - - - - - - - - - -

10   NEW YORK STATE
     COURT OF CLAIMS
11   - - - - - - - - - - - - - - - - - - - - - - - - - - - -

12   ADRIAN P. THOMAS,

13                       Claimant,

14           - against -

15   THE STATE OF NEW YORK,

16                         Defendant.
     - - - - - - - - - - - - - - - - - - - - - - - - - - - -
17             DEPOSITION of Defendant, MICHAEL SIKIRICA,

18   held on the 6th day of September 2019, commencing at

19   9:00 a.m., at the Law Offices of Bailey, Johnson & Peck,

20   P.C., 5 Pine West Plaza, Washington Avenue Extension,

21   Albany, New York 12205, before Jeanne O'Connell,

22   Registered Professional Reporter and Notary Public in

23   and for the State of New York.
```

```
 1   APPEARANCES:

 2   Brett H. Klein, Esq.
     305 Broadway
 3   Suite 600
     New York, New York  10007
 4   Attorney for Plaintiff/Claimant

 5   Pattison Sampson Ginsberg & Griffin, PLLC
     22 First Street
 6   Troy, New York  12180
     By:  Joseph T. Perkins, Esq.
 7   Attorneys for City of Troy, Adam R. Mason,
     Ronald Fountain and Tim Colaneri
 8
     Bailey, Johnson & Peck, P.C.
 9   5 Pine West Plaza
     Washington Avenue Extension
10   Albany, New York 12205
     By:  Crystal R. Peck, Esq.
11   Attorneys for Michael Sikirica

12   New York State Office of the Attorney General
     The Capitol
13   Albany, New York 12224
     By:  Christina M. Calabrese, Assistant Attorney General
14
     Also present:  Katherine Hamilton
15

16

17

18

19

20

21

22

23
```

```
 1              S T I P U L A T I O N S

 2    It is hereby stipulated and agreed by

 3    and between the attorneys for the respective

 4    parties hereto that, this examination may be signed and

 5    sworn to before any Notary Public of the State of New

 6    York.

 7

 8    It is further stipulated and agreed that the filing and

 9    certification of the said examination shall be waived.

10

11    It is further stipulated and agreed that all objections

12    to questions, except as to form, shall be reserved for

13    the trial of this action.

14

15    It is further stipulated and agreed that there are no

16    objections to Notice of this Examination Before Trial

17    and the qualifications of the court reporter to take

18    this deposition and administer an oath or affirmation.

19

20

21

22

23
```

```
 1              (Michael Sikirica - by Mr. Klein)

 2   MICHAEL SIKIRICA, after first having been duly sworn,

 3   was examined and testified as follows:

 4   EXAMINATION

 5   BY MR. KLEIN:

 6      Q.   Good morning, Dr. Sikirica.

 7      A.   Good morning.

 8      Q.   How are you feeling today?

 9      A.   Very good.

10      Q.   Get enough rest last night?

11      A.   Yes.

12      Q.   You feel well to testify today?

13      A.   Yes.

14      Q.   Before we proceed further, given the passage of

15   an evening, is there anything you wish to change,

16   correct, or amend in your testimony that you gave

17   yesterday?

18      A.   Yes.  I would like to amend the discussion that

19   we had about the group B strep, the GBS.  The strep

20   pneumonia does not fall into the category of group B

21   strep so it's not included in the family of group B

22   strep.

23           So that is an important correction I have to
```

1          (Michael Sikirica - by Mr. Klein)

2     make.

3     Q.   Anything else?

4     A.   Not that I recall.

5     Q.   It's considered streptococcus pneumoniae.

6          Is that the type of strep it is?

7     A.   Yes.

8     Q.   Did you do any research on streptococcus

9     pneumoniae last night?

10    A.   I looked up to see what classification it was,

11    but I didn't do any extensive research, no.

12    Q.   So, streptococcus pneumoniae is what's present in

13    this case?

14    A.   Yes.

15    Q.   And streptococcus pneumoniae can cause serious

16    infections such as pneumonia, correct?

17    A.   Yes.

18    Q.   Meningitis?

19    A.   Yes.

20    Q.   Could it cause a secondary meninges infection we

21    have in this case?

22    A.   Yes.

23    Q.   And it could cause bloodstream infection such as

1           (Michael Sikirica - by Mr. Klein)

2    sepsis, correct?

3        A.   Yes.

4        Q.   Based on my research from the CDC, streptococcus

5    pneumoniae, like we have in this case, kills close to

6    half a million children under five years old worldwide

7    every year.

8            Does that sound like it's possible to you?

9        A.   Yes, it does.

10       Q.   It's a very serious disease.

11       A.   Yes, it can be.

12       Q.   The streptococcus pneumoniae that presents in

13   this case can be transmitted as a result of direct

14   person-to-person contact, correct?

15       A.   Yes.

16       Q.   Based on what I gathered from the CDC -- let me

17   know if you disagree -- these are lancet shaped gram

18   positive facultative, anaerobic bacteria?

19       A.   Yes.

20       Q.   They're common inhabitants, these pneumococci are

21   common inhabitants of the respiratory tract, correct?

22       A.   Yes.

23       Q.   While they are most commonly presented clinically

1              (Michael Sikirica - by Mr. Klein)

2     among adults.

3             Do you agree with that?

4        A.   Yes.  I see quite a bit of it among adults,

5     especially adult alcoholics.

6        Q.   The literature does say that children under two

7     are particularly prone to it.

8        A.   Yes.

9        Q.   That would apply in this case particularly to

10    someone like Matthew with a compromised immune system,

11    correct?

12       A.   Yes.

13       Q.   Given the factors that we discussed, the

14    premature birth, the one vaccine, and all of the other

15    complications, correct?

16       A.   Correct.

17       Q.   From the literature I read and from the CDC, it

18    appears that the incubation period of pneumococcal

19    pneumonia is short, correct?

20       A.   Yes.

21       Q.   Could be one to three days.

22       A.   Correct.

23       Q.   Matthew may have plausibly been exposed to

1          (Michael Sikirica - by Mr. Klein)

2    pneumococcal pneumonia the Friday before the Sunday that

3    he ended up in the hospital when he started presenting

4    with fever and acting lethargic.

5        A.   Yes.

6        Q.   That could have been transmitted to him from a

7    sibling, from a relative, or any other person?

8        A.   Yes.

9        Q.   These symptoms generally include an abrupt onset

10   of fever and other symptoms, correct?

11       A.   Yes.

12       Q.   So Matthew, even if you take any purported trauma

13   out of this, Matthew meets some of the tick marks for

14   the pneumococcal disease infecting his system starting

15   on Friday or Saturday of that weekend.

16          Would you agree?

17       A.   Yes.

18       Q.   According to the CDC, there are as many as

19   400,000 hospitalizations from pneumococcal pneumonia

20   annually in the US?

21          Does that sound like it could be right?

22       A.   Sounds reasonable.

23       Q.   The fatality rate is 5 to 7 percent, but may be

```
 1            (Michael Sikirica - by Mr. Klein)

 2    much higher for elderly and for those under two,

 3    correct?

 4        A.  Correct.

 5        Q.  Complications from pneumococcal pneumonia, among

 6    those other things that we talked about, meningitis,

 7    bacteria, etc., could include respiratory failure.

 8        A.  Yes.

 9        Q.  So, bacteremia is something that could be a

10    direct result of pneumococci streptococcus pneumoniae,

11    correct?

12        A.  Yes.

13        Q.  Matthew had that.

14        A.  Yes.

15        Q.  From what you could tell, you can't date when he

16    got that, can you?

17        A.  No.

18        Q.  The secondary meninges infection, pneumococci,

19    according to the CDC, causes over 50 percent of all

20    cases of bacterial meningitis in the US.

21            Does that sound like it may be right?

22        A.  That sounds like it's in the ballpark, yes.

23        Q.  So, would the streptococcus pneumoniae in
```

1          (Michael Sikirica - by Mr. Klein)

2     Matthew's case explain the secondary meninges infection?

3          A.   Yes.

4          Q.   You can't date that either.

5          A.   No.

6          Q.   The blood infection or sepsis.

7          A.   Yes.

8          Q.   That is a result of the pneumococcal disease

9     infecting his system, correct?

10         A.   Yes.

11         Q.   You can't date when he had sepsis, when it set

12    in, but it appeared to be cascading to the point where

13    he went into shock by Sunday and Monday when he was at

14    Samaritan and then at Albany, correct?

15         A.   Well, I'm not sure that the shock is attributable

16    to the strep pneumoniae or the traumatic head injury.

17         Q.   You don't know either way.

18         A.   Correct.

19         Q.   It would be frank speculation for you to point to

20    one as opposed to the other; is that correct?

21              MS. PECK:   Objection to form.

22              THE WITNESS:   I would tend to point, in my

23    medical opinion, to the traumatic injury to the head

```
 1              (Michael Sikirica - by Mr. Klein)

 2    causing this abrupt.

 3    BY MR. KLEIN:

 4       Q.  But he may have had the traumatic injury to the

 5    head for days or weeks.  You don't know.

 6       A.  No.  The fresh injury was within a day or so.

 7       Q.  Now it's a day or so.

 8           Didn't you previously say you couldn't date it

 9    but it was a few days?

10                MS. PECK:  Objection.

11       A.  A few days.

12       Q.  You were previously asked about whether dropping

13    someone on a mattress could cause the injury that you

14    are referring to within a day or two of the

15    hospitalization.

16       A.  Yes.

17       Q.  You said it needed to be more force than that.

18       A.  Yes.

19       Q.  Dropping someone, as stated in Mr. Thomas'

20    statement, a day or two or the morning of the

21    hospitalization, accidentally hitting -- bumping his

22    head on the side bar of a crib, assuming that were true,

23    there would need to be more force than that.
```

```
 1              (Michael Sikirica - by Mr. Klein)

 2      A.  Yes.

 3              MS. PECK:  Objection to form.

 4      Q.  Is it fair to say that none of the mechanisms of

 5   force that were set forth in Mr. Thomas' statement were

 6   significant enough to cause the injury that you saw in

 7   the brain within the days before the incident?

 8          Something may have caused it but just not what he

 9   described.

10              MS. PECK:  Objection.

11              MS. CALABRESE:  Objection.

12              MR. PERKINS:  Objection.

13              THE WITNESS:  The first explanation for the

14   dropping of Matthew under the crib is not sufficient,

15   but the other explanation of being forcibly thrown on

16   the mattress are sufficient.

17   BY MR. KLEIN:

18      Q.  That was specifically found to have been

19   suggested to him by the detectives and that he adopted

20   it due to coercion.  That was why that was thrown out.

21   The court found as a matter of law.

22              MS. PECK:  Objection.

23              MS. CALABRESE:  Objection.  It's not a
```

```
 1              (Michael Sikirica - by Mr. Klein)

 2  question.

 3              MR. PERKINS:  Objection.

 4              MR. KLEIN:  I didn't ask my question.

 5      Q.  Given that premise, if it were not true that

 6  Matthew was thrown down with the baby being over his

 7  head as described and slammed forcibly down, just that

 8  he was dropped or his head bumped the crib, would those

 9  matters of mechanisms of force be insufficient to cause

10  the injuries that we have seen on exam?

11              MS. PECK:  Objection.

12              MS. CALABRESE:  Objection.

13              THE WITNESS:  Could you rephrase that,

14  please.  I'm not quite following the question.

15  BY MR. KLEIN:

16      Q.  Other than the throwing from over his head down

17  to the bed or the floor, as you described, that's with

18  the hands over the head?

19      A.  Yes.

20      Q.  That was explained to you that he admitted to

21  doing that?

22      A.  Yes.

23      Q.  If that was not true, assume hypothetically for
```

```
 1              (Michael Sikirica - by Mr. Klein)
 2   this question that that was not true.  If the baby was,
 3   for whatever reason, dropped on a mattress but not in
 4   that manner of being thrown, or on a floor, or
 5   alternatively bumped his head on a crib when he was
 6   being laid in the crib, would any of those mechanisms of
 7   force be sufficient to cause the injuries that you see?
 8              MS. PECK:  Objection.
 9              MS. CALABRESE:  Objection.
10              MR. PERKINS:  Objection.
11              THE WITNESS:  No.
12   BY MR. KLEIN:
13     Q.  So, it was only the significant impact from
14   holding the baby up over the head and throwing it down
15   with great force.
16          That would cause like a sheering injury?
17     A.  Yes, but if I could elucidate on that a little
18   bit.
19          The short fall on to the mattress, the impact
20   with the head with the crib, are not sufficient to cause
21   these kind of injuries.
22          Now, there could be other mechanisms of this
23   injury other than Matthew throwing the child down from
```

Case 1:17-cv-00626-DJS Document 44-12 Filed 06/14/21 Page 383 of 442

1          (Michael Sikirica - by Mr. Klein)

2    above his head.

3        Q.  Adrian you mean.

4        A.  I'm sorry, Adrian.

5          I mean, there could be an element of shaking in

6    this case.  I can't determine that.  I can only

7    determine that the explanation first given by Adrian of

8    dropping the kid a little forcibly on the mattress from

9    three feet or less is not sufficient.

10       Q.  Similarly, bumping the head into the crib was

11   insufficient.

12       A.  Correct.

13       Q.  Is there anything else about streptococcus

14   pneumoniae, now that I think we are on the same page

15   about the type of bacterial infection, that is

16   significant in this case?

17       A.  No.  It was identified under the gram stain

18   streptococcus in the meninges.

19       Q.  It's alternatively referred to as pneumococcal

20   disease?

21       A.  Yes.

22       Q.  So this pneumococcal disease is a cause, a direct

23   cause, of pneumonia, correct?

(Michael Sikirica - by Mr. Klein)

1

2    A.   The pneumococcus does cause pneumonia, correct.

3    Q.   So, an alternative explanation to your statement

4    that some sort of aspiration must have caused the

5    pneumonia would be that the pneumococcal disease caused

6    the pneumonia?

7        Would you agree with that?

8    A.   Yes.  The pneumococcal disease caused the

9    pneumonia.

10   Q.   That's independent of whether or not there was

11   aspiration from a trauma.

12   A.   In my opinion, it was secondary to the traumatic

13   injury.

14   Q.   I understand that, but the presence of

15   pneumococcal disease in Matthew may very well have been

16   a cause of his pneumonia, even assuming you believe

17   there was trauma?

18       MS. PECK:  Objection to form.

19       THE WITNESS:  Yes.

20   BY MR. KLEIN:

21   Q.   You can't say, to a degree of certainty, whether

22   the pneumococcal disease caused the pneumonia or whether

23   an aspiration resulting from trauma caused pneumonia,

```
 1            (Michael Sikirica - by Mr. Klein)

 2   can you?

 3      A.  I can say, based on the head injury, it's most

 4   consistent with aspiration causing the pneumonia.

 5      Q.  But you can't say that to a degree of medical

 6   certainty, can you?

 7            MS. PECK:  Objection to form.

 8            THE WITNESS:  Yes, I think I can say that

 9   based on the head trauma and the presence of the

10   pneumonia.  Especially when Matthew came to the

11   emergency room at Samaritan and already had copious

12   green exudate in his lungs, that the head trauma lead to

13   the pneumonia which lead to the sepsis.

14   BY MR. KLEIN:

15      Q.  The green exudate in his lung was not aspiration,

16   correct?

17      A.  No.

18      Q.  Or aspirated material?

19      A.  It would be pussy material.

20      Q.  So, how is that significant?

21          How does that support your argument?

22      A.  Because it's starting to -- we have a history of

23   Matthew vomiting.  We have a history of mucoid material
```

1              (Michael Sikirica - by Mr. Klein)

2    in his lungs.  It's medically consistent with

3    aspiration.

4       Q.  Vomiting is a sign, is a symptom of pneumococcal

5    disease as well, correct?

6       A.  There are many causes, but pneumococcal disease

7    could be one, yes.

8       Q.  So, it's more likely right than wrong that he

9    could have been vomiting, if he did, as much from

10   pneumococcal disease as he was from any possible trauma?

11              MS. PECK:  Objection to form.

12              MR. PERKINS:  Objection to the form.

13              THE WITNESS:  It would be more likely that

14   he would be vomiting from the severe edema in his head,

15   causing swelling of the brain, which would cause the

16   vomiting.

17   BY MR. KLEIN:

18      Q.  And the severe swelling in his head could be a

19   direct result of the blood infection, correct?

20      A.  It could be contributory to the swelling, yes.

21      Q.  Right.  So, the pneumococcal disease could point

22   to the pneumonia, correct?

23      A.  Yes.

1              (Michael Sikirica - by Mr. Klein)

2     Q.   It could also point to the blood infection which

3     caused the severe edema in the brain, correct?

4     A.   It was one of the causes.

5     Q.   And so the pneumococcal disease could be the

6     starting point of what lead him to vomit, in addition to

7     your theory of trauma, correct?

8              MS. PECK:  Objection to form.

9              THE WITNESS:  Without the head trauma that

10    was evident, pneumococcal could cause him to vomit, yes.

11    BY MR. KLEIN:

12    Q.   And without the head trauma he could have

13    developed pneumonia?

14    A.   Anyone could, yes.

15    Q.   But especially him in the state that he was in.

16              MS. PECK:  Objection to form.

17    A.   Yes.

18    Q.   And without the head trauma he could have

19    developed the secondary meninges infection?

20              MS. CALABRESE:  Objection.

21              THE WITNESS:  Yes.  That would be a

22    possibility.

23    BY MR. KLEIN:

Case 1:17-cv-00626-DJS Document 84-14/2021 Filed 06/14/21 Page 306 of 442

1        (Michael Sikirica - by Mr. Klein)

2    Q.  So Doctor, let's say hypothetically one of the

3   other children struck him with -- I think you used the

4   term a truck or a toy earlier in the week, unbeknownst

5   to the parents, and then Friday into Sunday, when he

6   went to the hospital, he became infected with the

7   pneumococcal disease.

8        There could have been trauma, but isn't it true

9   that the pneumococcal disease may very well have caused

10  the death, even though there might be trauma presented

11  in the brain.

12            MS. PECK:  Objection to the form.

13            THE WITNESS:  No.  The cause of death was

14  the large subdural hematoma that caused the cerebral

15  edema, and the pneumococcal disease was contributory to

16  the cerebral edema, but the primary cause, if you wrap

17  it all together, is the head trauma.

18  BY MR. KLEIN:

19    Q.  What are the potential causes of the subdural

20  hematoma?

21    A.  That would be blunt force injury of some sort.

22    Q.  Anything else?

23    A.  It could be, as we discussed yesterday, a rupture

Case 1:17-cv-00626-DJS Document 94-1 Filed 06/14/21 Page 383 of 442

```
 1            (Michael Sikirica - by Mr. Klein)

 2   from inside the brain.

 3            It could be...

 4      Q.  Could be like a stroke?

 5      A.  Stroke, yes.  It could be a malformation of the

 6   vessels on the surface of the brain.  That would be

 7   another source.

 8      Q.  Is a stroke something that could flow from the

 9   pneumococcal disease?

10      A.  It would be unlikely, but possible.

11      Q.  It could, right?

12            What would be the chain of events?

13      A.  Well, the vessels would have to be severely

14   inflamed in the brain due to the pneumococcal disease to

15   the point that they would rupture, but in examination of

16   the brain I did not see any evidence of anything that

17   would indicate a stroke.

18      Q.  Well, an MRI would have confirmed that if that

19   was done before the baby passed, correct?

20      A.  An MRI may have missed it and I may have found it

21   at autopsy just as likely.

22      Q.  Given the condition of the brain, you would have

23   been able to see it?
```

Case 1:17-cv-00626-DJS Document 1:17-cv-00626-DJS Document 44 Filed 06/14/21 Page 383 of 442

1             (Michael Sikirica - by Mr. Klein)

2       A.   Yes.

3       Q.   Pneumococcal disease is not caused by trauma,

4  right?

5       A.   Correct.

6       Q.   So, when Dr. Klein testified at trial that the

7  bacterial infection present in this case that he opined

8  caused the death was independent of trauma, that was a

9  correct statement of medical fact.

10      A.   Well, that was his medical opinion of it, looking

11  at his definition of trauma.

12      Q.   Well, it is true that pneumococcal disease is not

13  caused by trauma.

14      A.   Pneumococcal disease is typically not caused by

15  trauma.

16      Q.   Pneumococcal disease, in the manner and state

17  Matthew was infected with it, can cause the death of

18  someone like Matthew.

19            MS. PECK:  Objection to form.

20            THE WITNESS:  Yes.

21  BY MR. KLEIN:

22      Q.   And if there were no signs of trauma, would it

23  have been your opinion that the pneumococcal disease was

Case 1:17-cv-00626-DJS   Document 114-2   Filed 06/14/21   Page 393 of 442

```
 1              (Michael Sikirica - by Mr. Klein)

 2    the primary -- would have been the primary cause of

 3    death, if there was no trauma, if there were no SDHs and

 4    SGHs?

 5        A.  If there were no SDHs.

 6              MS. CALABRESE:  I'm sorry.  I'm placing an

 7    objection on the record.  I apologize.

 8              MS. PECK:  Objection.

 9        Q.  In the absence of trauma in this case,

10    hypothetically, would you have found that the

11    pneumococcal disease would have been the cause of the

12    death?

13        A.  Yes.

14        Q.  Did you pull any scholarly articles or anything

15    like that last night about pneumococcal disease?

16        A.  No, I did not.

17        Q.  Did you look at any?

18        A.  No.

19        Q.  I may have asked you this, but were you aware

20    children who are African American are at higher risk for

21    pneumococcal disease?

22              MS. PECK:  Objection to form.

23              THE WITNESS:  I was not aware of that, no.
```

```
 1              (Michael Sikirica - by Mr. Klein)

 2   BY MR. KLEIN:

 3      Q.  With pneumococcal disease, is it fair to say that

 4   some patients may present with pneumonia, sepsis or a

 5   meninges infection, they don't necessarily have to have

 6   all of them, correct?

 7      A.  Correct.

 8      Q.  Matthew had a severe presentation of the

 9   pneumococcal disease, correct?

10      A.  Yes.

11      Q.  Other than the signs of trauma which are, correct

12   me if I'm wrong, are the SDHs, two of them, and the two

13   SGHs, one of them more particular than the other,

14   correct, the fresher one?

15      A.  The correction is there was only one subdural

16   hematoma.  There was two noticed on the CT scan, but I

17   only appreciated one when I did the autopsy.

18      Q.  Other than the signs of trauma -- which were the

19   SDH and the SGH?

20      A.  Yeah.

21      Q.  Were all of Matthew's symptoms consistent with

22   pneumococcal disease?

23      A.  They could be at a certain point in time, yes.
```

1          (Michael Sikirica - by Mr. Klein)

2     Q.  Well, did he have any other symptoms -- we talked

3   about that there were no marks and bruises and

4   fractures.

5          So my question is as follows:  Were there any

6   other signs of trauma other than the SDH and the SGHs?

7     A.  No.

8     Q.  Were all of the indications, other than those

9   symptoms of trauma, related or traceable to the

10  pneumococcal disease?

11    A.  Could you repeat that question.

12    Q.  Were all of his symptoms causally connected to

13  the pneumococcal disease other than the signs of trauma?

14          MS. PECK:  Objection.

15          MS. CALABRESE:  Objection.

16          MR. PERKINS:  Objection.

17          THE WITNESS:  That would be a tough question

18  to answer because there is a time element here, and I

19  believe that the pneumococcal sepsis was only starting

20  to brew when Matthew came into the hospital.  I believe

21  that his main derangement was the growing cerebral edema

22  due to subdural hematoma and the blunt force trauma.

23  BY MR. KLEIN:

```
 1              (Michael Sikirica - by Mr. Klein)

 2      Q.  In the absence of the blunt force trauma and the

 3   related subdural hematoma, could he have presented with

 4   all of the symptoms that he had presented with in his

 5   hospital stay through his death due to bacterial

 6   infection?

 7      A.  It would be unlikely that they would all be there

 8   simultaneously.

 9      Q.  Why?

10      A.  Usually, the pneumococcal sepsis begins with

11   pneumococcal pneumonia, and that takes a little time to

12   develop, and then the sepsis occurs, and then it will

13   seed into the brain.

14          I'm not sure if I can make a real determination

15   of how quickly this all went down, but without -- he may

16   have survived the pneumococcal sepsis with antibiotics.

17      Q.  He may have, but when there's a mix of

18   pneumococcal pneumonia, meninges infection, and

19   bacteremia as well, that's a toxic brew, right?

20      A.  Yes.

21          MS. PECK:  Objection to the form.

22      Q.  Are you aware that there are cases where children

23   are treated with the antibiotics but nonetheless don't
```

```
 1              (Michael Sikirica - by Mr. Klein)

 2    survive?

 3       A.  That is correct.

 4       Q.  It's really not clear why in the medical field,

 5    but it doesn't work, the antibiotics don't work on all

 6    children.

 7                 MS. PECK:  Objection to form.

 8                 THE WITNESS:  Correct.

 9    BY MR. KLEIN:

10       Q.  This incubation period of this pneumococcal

11    disease, to whatever extent that it is here, it was the

12    pneumonia, the meninges infection, the bacteremia and

13    the sepsis, correct?

14       A.  Yes.

15       Q.  That incubation period could be within one to

16    three days, correct?

17       A.  Well, typically not.  Typically, the incubation

18    period is for pneumonia, one to three days to develop

19    pneumonia.  Then it could be several days to develop the

20    sepsis and relatively quickly to develop the meninges

21    inflammation and infection.

22            So, it tends to work in a stepwise fashion.

23       Q.  But it could be very rapid.
```

```
 1              (Michael Sikirica - by Mr. Klein)

 2      A.   It could still be very rapid.

 3      Q.   And it could be within a couple of days in an

 4   extreme case.

 5                   MS. PECK:  Objection.

 6                   MS. CALABRESE:  What could be in a couple of

 7   days?

 8                   MR. KLEIN:  The incubation of all of these

 9   conditions.

10                   MS. CALABRESE:  Each or total, in toto?

11                   MR. KLEIN:  You can object to form.

12                   MS. CALABRESE:  I have to understand the

13   question.

14                   MR. KLEIN:  No.  The witness does.

15      Q.   You just said that the pneumonia may take longer

16   or the meninges infection may take longer, correct?

17      A.   Well, the sepsis may take -- not all children who

18   develop pneumonia develop sepsis from it.  Those are the

19   children that are debilitated or have immune problems

20   that develop the sepsis particularly.

21           And then, the sepsis, once it begins, will seed

22   into all the vascular tree of the body, including the

23   brain, which we saw.  So, it tends to be a stepwise
```

1          (Michael Sikirica - by Mr. Klein)

2    procession, starting with pneumonia, going to sepsis,

3    and not all cases, again, go to sepsis.  And then going

4    to the overwhelming sepsis with involvement of all the

5    organs, including the brain.  So, that whole process

6    could take considerably longer than three days.

7      Q.   It also could take around three days in a severe

8    case.

9      A.   That would be possible, but unlikely.

10     Q.   Matthew met all the tick marks for someone who

11   would be vulnerable to that, right?

12     A.   Yes.

13     Q.   Just so I'm clear:  Is it the sepsis that would

14   cause a subdural, could cause the subdural collection of

15   fluid and the hematoma, or is it the bacteremia or both?

16          MS. PECK:  Objection to form.

17          THE WITNESS:  No.  The collection of the

18   blood in the subdural hematoma was a traumatic event

19   that was not related to the sepsis.

20   BY MR. KLEIN:

21     Q.   I understand that's in your opinion, but may

22   sepsis also cause that condition?

23     A.   That would be very, very, very unlikely.

Case 1:17-cv-00626-DJS Document 142-21 Filed 06/14/21 Page 346 of 442

```
 1              (Michael Sikirica - by Mr. Klein)

 2     Q.  But is it possible?

 3           MS. PECK:  Objection.

 4     A.  Anything is possible.

 5     Q.  I mean, in other words -- I'm not asking you if

 6  it's -- you'd be able -- do you know whether it's -- in

 7  other words, like trauma does not cause pneumococcal

 8  disease.

 9       You could say that definitively?

10     A.  Not directly.  It does not directly cause

11  pneumococcal disease directly, but indirectly it surely

12  can.

13     Q.  But the severe infection of the blood going into

14  the brain can cause subdural hematoma, correct?

15           MS. PECK:  Objection.

16           THE WITNESS:  No.  It would cause a

17  globalized bleeding over the surface of the brain.  It

18  wouldn't cause a collection in one spot like a subdural

19  hematoma.

20  BY MR. KLEIN:

21     Q.  In your opinion, in the absence of a trauma,

22  hypothetically, could any of the pneumococcal disease

23  sequelae, could they cause a subdural hematoma like the
```

Case 1:17-cv-00626-DJS Document 114-2 Filed 06/14/21 Page 343 of 442

```
 1              (Michael Sikirica - by Mr. Klein)

 2    type in this case?

 3        A.   No.

 4        Q.   Were there any colleagues of yours that had

 5    expertise in infectious disease that you could have

 6    consulted with at the time of autopsy or prior to

 7    issuing your report or even up until and through trial?

 8        A.   I'm sure there were.

 9        Q.   Do you know any by name?

10        A.   No.

11        Q.   How would you quantify the pneumococcal disease

12    in Matthew's system?

13             Was it overwhelming?

14        A.   No.  I wouldn't qualify it as overwhelming.  It

15    was a significant, but not overwhelming, source of

16    pneumonia.

17        Q.   As well as the sepsis?

18        A.   The sepsis would be more overwhelming.

19        Q.   Would you say that the pneumococcal disease was a

20    significant cause of the sepsis?

21        A.   Yes.

22        Q.   Would you say that the pneumococcal disease was a

23    significant cause of the secondary meninges infection?
```

```
1              (Michael Sikirica - by Mr. Klein)

2      A.   Yes.

3      Q.   Would you say that the pneumococcal disease was a

4  significant cause of the bacteremia?

5      A.   Yes.

6      Q.   Would you say that all of this, more likely than

7  not, was a significant cause of the injury to the eye,

8  to the orbits?

9      A.   The injury to the eye was due to cerebral edema,

10  which was primarily due to the traumatic head injury

11  accelerated by the sepsis.

12     Q.   If the sepsis was caused by the pneumococcal

13  disease, that may be a substantial contributing factor

14  to the injury to the eyes separate from any trauma?

15     A.   Yes.

16          MS. PECK:  Objection to form.

17     Q.   Is there any other significance or information

18  about pneumococcal disease that you think is pertinent

19  to this case?

20     A.   No.

21     Q.   Did we exhaust it?

22     A.   I believe so.

23     Q.   Those questions that I just asked you about the
```

```
1              (Michael Sikirica - by Mr. Klein)

2    pneumococcal disease was the cause of the pneumonia,

3    secondary meninges infection, the bacteremia, and the

4    sepsis, you hold all of those opinions to a degree of

5    medical certainty?

6        A.  Yes.

7        Q.  I believe yesterday you mentioned that you had

8    reviewed Dr. Klein's testimony before testifying

9    yesterday?

10       A.  Yes.

11       Q.  And Dr. Leestma's testimony?

12       A.  Correct.

13       Q.  Other than their testimonies and your file, what

14   if anything else did you review in anticipation of the

15   deposition?

16       A.  I reviewed my testimonies from both trials, my

17   grand jury testimony, the medical records from

18   Samaritan, Albany Medical Center, the birth records on

19   Matthew from Albany Med, the several days he was in the

20   hospital at Samaritan when he was admitted for growth,

21   to promote his growth basically, the police report, the

22   child fatality review report, and the statement by

23   Adrian Thomas.
```

```
 1              (Michael Sikirica - by Mr. Klein)

 2     Q.   Anything else?

 3     A.   I did review the radiographic films, the CT of

 4  Matthew's head, and I believe that is it.

 5              (Recess taken.)

 6  BY MR. KLEIN:

 7     Q.   Doctor, have you ever heard it said that an

 8  infection, like the streptococcus pneumococcal disease

 9  here, could mimic child abuse because it can lead to big

10  collections of blood in the brain?

11              MS. PECK:   Objection to form.

12     A.   I have never heard that.

13     Q.   Infections like Matthew had can cause bleeding in

14  the brain, like clots or thromboses, correct?

15     A.   That is possible.

16     Q.   And they could cause like what seem like mini

17  strokes, areas that don't get enough oxygen in the

18  brain, correct?

19     A.   Yes.

20     Q.   The blood in that SDH, the 60 MLs, was consistent

21  with sepsis, correct?

22     A.   No.  It was consistent with a subdural hematoma.

23     Q.   Well, the sepsis and combined with the DIC and
```

```
1              (Michael Sikirica - by Mr. Klein)
2    the coagulopathy, that could lead to the bleeding that
3    was observed in Matthew's brain, correct?
4              MS. PECK:  Objection.
5    A.   Well, the coagulopathy was not really apparent
6    until Matthew had already been hospitalized for a day.
7    Then the symptoms -- the signs of it began to develop.
8         When Matthew came to the hospital, there was no
9    evidence of the significant coagulopathy.  His clotting
10   times were relatively normal, elevated slightly.  His
11   platelets were still sufficient and his fibrinogen was
12   over 300.  So, there was no evidence of a disseminated
13   intravascular coagulopathy when he first arrived.
14   Q.   What is the peritoneal cavity of the brain?
15   A.   There is no peritoneal cavity of the brain.
16        Peritoneal cavity is the abdominal cavity.
17   Q.   The DIC condition that he had could account for
18   the bleeding in the brain, correct?
19   A.   No.
20   Q.   Not at all?
21   A.   No.
22   Q.   He was given heparin, correct?
23   A.   Yes.
```

```
 1              (Michael Sikirica - by Mr. Klein)

 2      Q.   That could increase or accelerate DIC, correct?

 3      A.   Heparin may, yes.

 4      Q.   That could cause or further cause bleeding,

 5  correct?

 6      A.   It can cause bleeding at other sites, yes.

 7      Q.   But not the brain.

 8      A.   It could cause bleeding in the brain, but the

 9  heparin wasn't given until he was already hospitalized

10  at Albany Med, and it had no effect on the subdural

11  hematoma.

12      Q.   The ARDS, that's associated with shock, correct?

13      A.   Yeah.  That is acute respiratory distress

14  syndrome.  It can be associated with many things,

15  including pneumonia, shock, trauma.

16      Q.   The ARDS, when did that -- when was the onset of

17  that, if you remember?

18      A.   It was diagnosed later in the course of Matthew's

19  hospitalization at Albany Med, and it was a clinical

20  diagnosis that his lungs were not receiving enough

21  oxygen, even with the high levels of the oxygen they

22  were giving him, was 90 to a hundred percent pure

23  oxygen, it wasn't oxygenating very well.  That's one of
```

1      (Michael Sikirica - by Mr. Klein)

2  the definitions of ARDS.

3    Q.  Would you agree that that was more likely than

4  not a sign that he was going from sepsis into septic

5  shock?

6    A.  He was going -- I won't say going into septic

7  shock.  He was deteriorating rapidly.  I would say it

8  was more like an agonal event.

9    Q.  Do you know whether he went into septic shock?

10   A.  I would say he did not.

11   Q.  Why not?

12   A.  Because he didn't have any massive bleeding or

13  massive extravasation of blood, or he went into shock.

14  I'm not sure it was septic shock.

15   Q.  What's the difference between shock and septic

16  shock?

17   A.  Shock can be defined as many things.  It can be

18  defined as a loss of blood, the inability to oxygenate

19  your blood.  It can have many causes.  Shock due to

20  toxicology issues.  You can have shock from many things.

21  It's a very general term.

22        So, just to attribute Matthew's decline and at

23  the terminal event to call it septic shock, I'm not sure

Case 1:17-cv-00626-DJS Document 142-21 Filed 06/14/21 Page 354 of 442

```
 1              (Michael Sikirica - by Mr. Klein)
 2    I would go that far.
 3        Q.  Do you have an opinion as to what lead him to go
 4    into shock?
 5        A.  I'm not sure I would define it as shock.
 6        Q.  You said you wouldn't define it as septic shock,
 7    but you would say shock.
 8        A.  Yes.  I would say shock in the end, but that's
 9    just a very general term I don't even use.
10        Q.  He just deteriorated to such an extent that he
11    passed away?
12        A.  Yes.  That's what happened in the end.  It was an
13    overwhelming shutdown of his system.
14        Q.  If he was not thrown down, as you described, with
15    the hands over the head, throwing him down with such
16    force to cause the types of injuries that you think are
17    consistent with the ones that you saw on the brain, what
18    are the other potential causes of those -- of the
19    subdural hematoma and SGHs?
20              Nonaccidental trauma?
21              MS. PECK:  Objection.
22        A.  Well, there are other ways to inflict those
23    traumas than throwing him over your head.  I mean, he
```

Case 1:17-cv-00626-DJS Document 84-14 Filed 08/14/21 Page 353 of 442

1                (Michael Sikirica - by Mr. Perkins)

2    could be struck forcibly.  He could be shaken with some

3    element of impact injury as well to explain the

4    subgaleal hemorrhage.

5         So, the throwing over the head is not the only

6    mechanism for him to suffer these kind of injuries.  It

7    doesn't necessarily mean he has to be thrown over the

8    head.  He could be thrown from shoulder height.  He

9    could be thrown like a baseball.  He could be impacted

10   and shaken.

11        There's no way to tell.

12   Q.  Falling off a bed on to the floor, falling from

13   the mattress, or hitting your head on a crib, those

14   things are not sufficient.

15   A.  Correct.

16             MR. KLEIN:  I think that's all the questions

17   I have now.  Others may ask you some questions, and I

18   may have some followup, but I want to thank you for your

19   time.

20             (Recess taken.)

21   EXAMINATION

22   BY MR. PERKINS:

23   Q.  Dr. Sikirica, my name is Joe Perkins.  Same rules

1          (Michael Sikirica - by Mr. Perkins)

2    apply.  I represent the City of Troy, and I represent

3    police representatives Adam Mason, Tim Colaneri and

4    Ronald Fountain.  Like I said, same rules apply.

5          I made some notes of some of the things you said

6    yesterday.  One of the things you said yesterday was you

7    make your own independent conclusions as the Rensselaer

8    County medical examiner, correct?

9    A.  Yes.

10   Q.  Could you explain that to me, the independent

11   nature of your position.

12   A.  Well, I work for the county health department, so

13   I'm not employed by law enforcement.  I'm not employed

14   technically even by Albany Medical Center.  I receive my

15   salary from Rensselaer County Department of Health,

16   where I've been since 2001.

17         So, I work with officers.  I know officers, not

18   significantly socially, I know the names of many of

19   them.  Some I could recognize, but I don't know their

20   names.  I listen to what they tell me.  I consider this

21   information provided me when they come to the autopsies.

22   I often ask them to obtain other information so I can

23   make my own judgment.

Case 1:17-cv-00626-DJS Document 84-12 Filed 06/14/21 Page 352 of 442

1          (Michael Sikirica - by Mr. Perkins)

2     Q.  So, as part of your job as the Rensselaer County

3 medical examiner, are there times when you work with the

4 City of Troy police?

5     A.  Yes.

6     Q.  Are there also times you work with the Rensselaer

7 County District Attorney's Office?

8     A.  Yes.

9     Q.  On those occasions where you work with the

10 Rensselaer County DA and the City of Troy, can you

11 characterize what types of situations those usually are?

12     A.  Well, they can be a variety of cases.  They could

13 be anything from a traffic accident, where they may be

14 charged and involved, to an infant who ends up coming to

15 autopsy, to an obvious homicide where a person is shot

16 multiple times.

17          There's a wide variety of things.  And sometimes

18 there are cases where we don't have any idea why the

19 person died.

20     Q.  And you conduct autopsies, correct?

21     A.  Yes.

22     Q.  Sometimes you conduct them in the presence of

23 people from the Rensselaer County DA's office.

1              (Michael Sikirica - by Mr. Perkins)

2      A.   Yes.

3      Q.   Why is that?

4      A.   Well, they ask to attend the autopsies to learn

5  what the findings are going to be, to understand what

6  the nature of the case is.

7      Q.   How about the police officers, they attend also

8  sometimes, correct?

9      A.   Yes.   They attend many cases, and we often have

10  one police officer attend for photography, and he will

11  be dedicated to photographing the body.   Sometimes we

12  have the photographer and investigators present.

13      Q.   When representatives of the Rensselaer County DA

14  and the Troy city police go to an autopsy, is it usually

15  something because there's suspicion about a death?

16      A.   Suspicious, or they simply have to document the

17  findings, perhaps because it may go to court some day.

18      Q.   Can you explain the latter part of that to me.

19  It's not a suspicious death but they may want to

20  document the findings for the death.

21      A.   Yes.   They'll come in and they will -- on the

22  case of a drug overdose, they will come in to follow up

23  on the cause of death, especially if there's a

1          (Michael Sikirica - by Mr. Perkins)

2    possibility we may recover any evidence which could be

3    turned over to them right at the time of the autopsy.

4          They will want to photograph anything that could

5    be significant related to drug trafficking.  And look at

6    the person's personal effects, review any medications

7    they might be on.  So, there is a myriad of reasons for

8    them to be there in many cases.

9    Q.  Has anyone from the City of Troy Police

10   Department ever asked you to change your autopsy report?

11   A.  No.

12   Q.  That wouldn't be taken well by you, correct?

13        MR. KLEIN:  Objection.

14        THE WITNESS:  It would be very

15   unprofessional for them to do it, and I would be very

16   unprofessional to take that advice.

17   BY MR. PERKINS:

18   Q.  They don't have authority to do that, do they?

19   A.  No.  They have no authority over me whatsoever.

20   Q.  Correct.  That's what I was going for.

21        Same thing with the Rensselaer County DA?

22   A.  Exactly.  They have no authority.

23        The medical examiners in this county and anywhere

Case 1:17-cv-00626-DJS Document 94-14 Filed 06/14/21 Page 360 of 443

1          (Michael Sikirica - by Mr. Perkins)

2    I have ever worked are totally independent from law

3    enforcement and the district attorney's office.

4        Q.   Usually people in the DA's office don't have

5    extensive medical knowledge, correct?

6        A.   Correct.

7        Q.   Would it be fair to say the same about the City

8    of Troy police officers?

9        A.   Yeah.

10       Q.   In this case, you realize there's been some

11   allegations that you took part in a conspiracy with the

12   Rensselaer County DA's Office and the City of Troy

13   Police Department.

14            MR. KLEIN:   Objection to the extent that it

15   calls for legal conclusion and terms of art, but you can

16   answer.

17       Q.   Are you aware of the allegations?

18       A.   Yes.

19       Q.   Did anybody from the Rensselaer County DA's

20   Office tell you not to use the word "sepsis" in your

21   autopsy report?

22       A.   No.

23       Q.   Same question.

```
 1              (Michael Sikirica - by Mr. Perkins)
 2         Did anybody from the City of Troy Police
 3    Department ask you that?
 4      A.  No.
 5      Q.  Isn't it true that the sepsis topic as a cause of
 6    death came up later during the criminal trial of Adrian
 7    Thomas, correct?
 8              MR. KLEIN:  Objection.
 9      A.  Yes.
10      Q.  That was something raised after the arrest,
11    correct?
12      A.  Yes.
13              MR. KLEIN:  Objection to the form of the
14    question.
15      Q.  Now, you mentioned that at some points in time
16    you asked the City of Troy police for things, materials,
17    correct?
18      A.  Yes.
19      Q.  Now, is there some power in the county law for
20    the medical examiner to do that?  I've read a little bit
21    about it.
22              MR. KLEIN:  Objection.
23      Q.  As a medical examiner for the County of
```

Case 1:17-cv-00626-DJS Document 142-21 Filed 06/14/21 Page 362 of 442

1         (Michael Sikirica - by Mr. Perkins)

2 Rensselaer, do you have certain powers when you conduct

3 an autopsy?

4   A.  Yes.  We have very extensive powers to request

5 anything that could be related to the death.  We can go

6 into a scene where there's a body because we don't even

7 need a search warrant.  The county law does give us the

8 authority to do that.

9       We can collect anything from the body that could

10 be related to that, or anything from the scene that

11 could be related to the death.  So, we have powers

12 independent of anyone else.

13       We can request any records, any statements, any

14 studies, that could be helpful to determine the cause of

15 death.  That is our task, and we're obligated to do that

16 to a reasonable degree of investigation.

17       If a person gets shot and is 21 years old, I'm

18 not going to ask for his kindergarten records, but I may

19 ask for the records of where he was.  I want the police

20 report.  I am entitled to the photographs of the scene.

21       Those are all things that the medical examiner

22 has to rely on to come to a diagnosis.

23   Q.  That's where I was heading.

1          (Michael Sikirica - by Mr. Perkins)

2      You have the right to request police records,

3  right?

4    A.  Yes.

5    Q.  Now, in this case you were provided with the

6  ten-page written confession of Adrian Thomas, correct?

7    A.  Yes.

8    Q.  How did that come about you that got that

9  document?

10    A.  I simply tell them to bring everything that they

11  have, any statements, any police report, any scene

12  photographs, to bring them to the autopsy.

13    Q.  Do you know what photographs that the City of

14  Troy police brought you that you reviewed prior to doing

15  the autopsy?

16    A.  Sometimes I review the photographs during the

17  autopsy, and I can't exactly remember at this point in

18  time, but scene photographs are almost always brought by

19  Troy Police Department.

20    Q.  Did you get those in this case?

21    A.  Eventually I did at one time.

22    Q.  Now, is there a list of things you reviewed on

23  your autopsy report?

1         (Michael Sikirica - by Mr. Perkins)

2    A.  Yes.

3    Q.  Can you just tell me the things that are listed

4  on your autopsy report, which ones were provided by the

5  City of Troy Police Department.

6         Is that something you can do?

7    A.  I should be able to.

8    Q.  Doctor, what do you recall as you sit here that

9  was provided to you by the Troy Police Department?

10   A.  The police report, the crime scene photographs,

11  and the statement by Mr. Thomas.

12   Q.  Did you engage in any conspiracy to take away the

13  civil rights of Adrian Thomas?

14             MR. KLEIN:  Objection.

15             MS. PECK:  Objection.

16             THE WITNESS:  No.  Not in any way, shape or

17  form.

18  BY MR. PERKINS:

19   Q.  Sometimes you have different opinions than a

20  police officer may have regarding the cause of death,

21  correct?

22   A.  Yes.

23   Q.  Now, I think you mentioned one disagreement you

1            (Michael Sikirica - by Mr. Perkins)

2    had with Tim Colaneri of the City of Troy Police

3    Department, correct?

4        A.   Yes.

5        Q.   Can you describe that situation for us.

6        A.   Yes.  It involved an RPI student when he was

7    living in Troy in a small apartment in a -- not to be

8    inflammatory, but a crime ridden area.

9        Q.   Okay.

10       A.   He had suffered quite a bit of difficulty with

11   his academic achievements and he was failing out, and he

12   was not truthful with his family about what was going on

13   academically in his career.

14           He was found dead of a gunshot wound in his

15   residence.  And when I evaluated the scene -- I actually

16   went to the scene -- and I did the autopsy, it was my

17   conclusion that he had died as a result of a homicide.

18   The investigation from the Troy PD, their conclusion was

19   that he had died of a suicide.

20           I followed that up with some interviewing with

21   family members, and the family had hired their own

22   private investigators to come and review the case as

23   well.  They were ex-New Jersey state troopers.  And

 1              (Michael Sikirica - by Mr. Perkins)

 2    whether their conclusion was bought by the family, their

 3    conclusion was the same as mine, but I can't guarantee

 4    that they weren't swayed a little bit by the employment

 5    with the family.

 6              I believe that and still believe and classified

 7    it as a homicide.

 8       Q.  So, despite the difference of opinion between you

 9    and Officer Colaneri, you exercised your own independent

10    judgment, correct?

11       A.  Yes.

12       Q.  You wrote the autopsy report as you saw fit,

13    correct?

14       A.  Yes.

15       Q.  That's what you do, correct, Doctor?

16       A.  Yes.

17       Q.  Doctor, you review materials and then you do the

18    autopsy and you see what kind of stories fit together,

19    right?

20       A.  Well, sometimes it takes awhile to review the

21    materials, so I may not get the materials all at the

22    time of autopsy.  It may take days or weeks to get some

23    materials.

1      (Michael Sikirica - by Mr. Perkins)

2      Sometimes there is opposition from hospitals or

3  other institutions.  They don't like to release it

4  because they don't understand the law.

5      Q.  But when you go in and do the autopsy, you see

6  things that other people don't see, correct?

7      A.  Correct.

8      Q.  For example, there was a radiographic image which

9  was reported to show bilateral subdural hematomas,

10  correct?

11      A.  Correct.

12      Q.  Then you went in, as the guy who went into the

13  brain, and you said, I see one of these, correct?

14      A.  Yes.

15      Q.  Then there was a report at some point, which may

16  have been a transcription error, but there was a report

17  at one point that Matthew had sustained a fractured

18  skull, correct?

19      A.  Yes.

20      Q.  You went in there as the medical examiner and

21  said, there's no fracture here, correct?

22      A.  Yes.

23      Q.  So, as part of your investigation is that how it

Case 1:17-cv-00626-DJS Document 114-2 Filed 06/14/21 Page 368 of 442

1              (Michael Sikirica - by Mr. Perkins)

2    works?  You may have a report of something but then once

3    you cut inside the body and take a look you can now see

4    for yourself, correct?

5        A.  Yes.  It's the idea that the autopsy has to be

6    the gold standard.  The autopsy really has to be the

7    final word to verify these things.

8              I know modalities for testing have become much,

9    much better with CAT scans and MRIs, but the gold

10   standard still is to open up the body and see what is

11   actually there and document.

12       Q.  Now, here there was some question about whether

13   an additional MRI should have been done of Matthew,

14   correct?

15       A.  Correct.

16       Q.  First of all, he probably wasn't in any condition

17   to undergo an MRI, correct?

18       A.  Correct.

19       Q.  Would the MRI have shown anything that you didn't

20   see when you conducted your autopsy?

21       A.  No.

22       Q.  Did you review any materials generated by Dr.

23   Edge in this matter?

1          (Michael Sikirica - by Mr. Perkins)

2     A.  Only the police -- excuse me -- the hospital

3  records.  I never saw anything else done by Dr. Edge,

4  only what was in the hospital records.

5     Q.  Is that the same with Dr. Woldman?

6     A.  Yes.

7     Q.  I can't recall.  Did you ever review statements

8  of Wilahemina Hicks in this matter?

9     A.  No.  I didn't see statements.  I only reviewed

10  her conversation or notes to the social worker at Albany

11  Medical Center, because there are social worker entries

12  in the medical records, and the report from the child

13  fatality review team also provided information about

14  Wilahemina.

15     Q.  CPS did perform an interview with Mr. Thomas

16  after he was in jail.

17          Were you aware of that?

18     A.  Yes.

19     Q.  Did you ever see that?

20     A.  No.

21     Q.  To this day have you seen it?

22     A.  No.

23     Q.  Did you have any reason to target Mr. Thomas and

1              (Michael Sikirica - by Mr. Perkins)

2    engage in a conspiracy against him?

3                  MR. KLEIN:  Objection.

4                  THE WITNESS:  No.  I do not know Mr. Thomas.

5    I have no reason to do that.

6    BY MR. PERKINS:

7      Q.  There is no financial or professional benefit

8    from you writing your autopsy report a certain way, is

9    there?

10                 MR. KLEIN:  Objection.

11     A.  No.  It's quite the opposite.

12          For me to call this case a homicide, takes a lot

13   more time to testify, to prepare for testimonies, to go

14   to court.  And my salary from Rensselaer County does not

15   increase a bit from that.

16     Q.  The position of Rensselaer County medical

17   examiner, is that an appointed position?

18     A.  Yes, it is.

19     Q.  How long does the appointment last for, until you

20   and Rensselaer County don't want to work together

21   anymore?

22     A.  Yes.

23     Q.  You've been working there since 2001?

```
1              (Michael Sikirica - by Ms. Calabrese)

2       A.  18 years, yes.

3              MR. PERKINS:  Thank you.  I have nothing

4   further.

5   FURTHER EXAMINATION

6   BY MS. CALABRESE:

7       Q.  Good morning again, Doctor.

8              I just want to ask you some followup questions

9   based upon questions you were asked by Mr. Klein and

10  Mr. Perkins.

11             All of the responses that you gave both to me or

12  all to me, Mr. Klein and Mr. Perkins, were based upon

13  your training and education, background, and to a

14  reasonable degree of medical certainty; is that right?

15      A.  Yes.

16      Q.  Now, the cause of death, as you listed on your

17  autopsy, is unequivocally severe closed head injuries

18  with cerebral edema due to blunt force trauma; is that

19  correct?

20             MR. KLEIN:  Objection.

21      A.  Yes.

22      Q.  Not sepsis.

23      A.  Correct.
```

```
 1              (Michael Sikirica - by Ms. Calabrese)

 2      Q.   And in lay terms, does that mean that Matthew

 3   died of the impact injury that he received to his head,

 4   the subgaleal and the subdural hematomas?

 5      A.   Well, he didn't die from the subgaleal hematoma.

 6   They were relatively by themselves innocuous.  They're

 7   only indicators that there was trauma applied to that

 8   portion of the head.

 9           He died as a result of the subdural hematoma, the

10   space occupying the collection of blood.

11      Q.   The 60 MLs we discussed.

12      A.   Yes.

13      Q.   So, to state again, Matthew died of an impact

14   injury to his head that was present in the form of the

15   subdural hematoma.

16      A.   Yes, and the results of the subdural hematoma.

17      Q.   Which would have been the edema?

18      A.   The edema.

19           Without sepsis, Matthew would be dead anyway.

20      Q.   Because of those two, the subdural hematoma and

21   the edema.

22      A.   Yes.

23      Q.   So, alternatively, if Matthew did not receive
```

1          (Michael Sikirica - by Ms. Calabrese)

2    trauma, blunt force trauma, to his head resulting in the

3    subdural hematoma and the edema, while still having the

4    sepsis, could he have lived?

5       A.   Yes.

6       Q.   So, to state it another way, if there was no

7    closed head injury due to blunt force trauma Matthew

8    would have lived.

9       A.   He would have a...

10      Q.   Better chance?

11      A.   A better chance of living.  I can't guarantee you

12   he would live, but he would have a better chance.

13      Q.   Better chance, okay.

14          You were asked a lot of questions about potential

15   birth-related injuries due to forceps being used, as

16   well as low birth weight, prematurity, and conditions

17   which may or may not have affected the mother, like

18   group B strep.

19          Did any of those conditions or outcomes of birth

20   cause Matthew to die?

21      A.   No.

22      Q.   And would meningitis, infection of the meninges,

23   sepsis, or any other bacterial infection cause the

1        (Michael Sikirica - by Ms. Calabrese)

2  subgaleal or subdural hematoma in this case?

3    A.  No.

4    Q.  There was a lot of talk about how trauma would

5  lead to sepsis.

6       Can you describe for us how trauma could lead to

7  sepsis?

8    A.  Well, trauma can lead to sepsis in many ways.

9  There can be direct, penetrating trauma where a wound

10  occurs to the body, sent into the body, carries bacteria

11  and dirt with it.

12    Q.  Like a gunshot wound, would that be an example of

13  that?

14    A.  That would be an example of one.

15       Another could be a motorcycle accident, a person

16  breaks his leg with an open wound.  Dirt and gravel and

17  such are impacted into the wound, along with the

18  bacteria.

19       Another one could be a person is strongly punched

20  in the stomach, ruptures an intestine, leading to

21  sepsis.

22       So, there are multiple ways to develop sepsis.

23  Sepsis can also develop in the context of a hospitalized

Case 1:17-cv-00626-DJS Document 84-14/12021 Filed 06/14/21 Page 373 of 442

1              (Michael Sikirica - by Ms. Calabrese)

2     individual who is dependent on ventilators to keep him

3     breathing, and keep his lungs functioning.  Or he can

4     develop a pneumonia because his lungs are not

5     functioning properly.  It can also occur if a person

6     were to aspirate material down into their lungs, whether

7     it would be vomitus or normal just aspirated material

8     from the throat.  Sets up a chain of events with

9     pneumonia, leading to sepsis, leading to possible death.

10    So, sepsis has a variety of reasons.

11         I don't agree with Dr. Klein that sepsis is never

12    caused by trauma.  In a sense he's correct in that the

13    bacteria are what cause sepsis, but what causes the

14    bacteria to enter your bloodstream is usually trauma.

15    Q.  So, for lay people, the bacteria enters the body

16    in some way, shape or form, as you described, in your

17    opinion, through trauma.

18         And that bacteria is what could cause sepsis.

19    A.  Yes.

20    Q.  In this case, it's your position and belief --

21    again, like all of your responses -- to a reasonable

22    degree of medical certainty that sepsis entered --

23    excuse me -- bacteria, in the form of pneumococci

1          (Michael Sikirica - by Ms. Calabrese)

2    pneumonia, entered Matthew's lungs due to aspiration

3    from the trauma.

4       A.   Yes.   The trauma reduces your ability to clear

5    your secretions.   You lose consciousness.   In happens

6    often in alcoholics.   This is a special bacteria that we

7    often see in alcoholics that have lost consciousness and

8    aspirate their own secretions.

9          Strep B is a common pneumonia that I find.   So,

10   any time a person has an altered mentition or

11   consciousness, and are subject to aspiration -- we know

12   that Matthew had been vomiting for other reasons as

13   well.   Vomiting could be associated with pneumonia, but

14   it could also be associated with the head trauma and the

15   severe swelling of the brain.

16      Q.   Because for infants, after receiving trauma of

17   one form and another, whether it's being shaken or

18   slammed or a combination of both, or are struck, will

19   often -- one of the signs and symptoms of damage or

20   injury to the brain could be vomiting.

21      A.   Yes.

22      Q.   As well as petechiae hemorrhaging.

23      A.   Not so much petechial hemorrhages.   Those are a

1          (Michael Sikirica - by Ms. Calabrese)

2     different mechanism of formation.  It would be vomiting.

3     Sometimes a person that vomits can develop petechial

4     hemorrhages in their eye, but it's due to the increased

5     pressure in their abdomen and chest.

6     Q.   To further this hypothetical, in this event where

7     the infant received some type of trauma and is vomiting

8     due to a head injury, at that point yet unknown or

9     undiagnosed, could also take in milk protein or formula.

10         They could feed normally.

11    A.   Yes.

12    Q.   And birth-related injury, should Matthew or if

13    Matthew had received that, which is an unknown to us,

14    would not have been present upon your autopsy due to the

15    timing; is that right?

16              MR. KLEIN:  Objection.

17              THE WITNESS:  It may have been present.  On

18    examination, I might see staining, but I would not find

19    a subdural hematoma at the time of autopsy of the size

20    that was there.

21    BY MS. CALABRESE:

22    Q.   So, that subdural hematoma of the size that was

23    there, the clotting and the 60 MLs, was not due to any

1     (Michael Sikirica - by Ms. Calabrese)

2   birth-related injury.

3       A.   No.

4       Q.   Here the cerebral edema that you found was caused

5   by trauma and not an infection of the meninges; is that

6   right?

7               MR. KLEIN:  Objection.

8       A.   Well, the cerebral edema is a common consequence

9   of trauma, but it can also be caused by infection,

10  accelerated and made worse by the infection.  So, it

11  could be either one or both.

12      Q.   Now, going back to your analysis of Dr. Klein's

13  testimony.  You mentioned that Dr. Klein wouldn't commit

14  to anything relating, really, to the word "trauma".

15          Do you recall those portions of his testimony?

16      A.   Yes.

17      Q.   Didn't he even testify that, after surgical

18  operations, surgical procedures, the patient would never

19  be required to receive antibiotics outside of the OR

20  because they just wouldn't need it.

21      A.   Correct.

22              MR. KLEIN:  Objection.

23      Q.   Is that a little crazy, frankly?

1          (Michael Sikirica - by Ms. Calabrese)

2     A.   That's insane.

3     Q.   Tell us why.

4     A.   I know that Dr. Klein was trying to make a point

5  that there is overuse of antibiotics, but antibiotics

6  have reduced mortality tremendously from these

7  surgeries.

8          If a surgeon is going in to do a procedure, no

9  matter how good he is and how technically astute he is,

10  there's always a risk for infection.  So, it's wise to

11  put these patients, depending on the nature of the

12  surgery of course, on some prophylactics to keep the

13  possibility of infection at a minimum.

14          So, it's one of the benefits of the antibiotic

15  generation that we have some protection from things that

16  would have killed us before.  Even dental surgeons

17  sometimes use antibiotics if they do a dental implant.

18          I mean, it's very, very common to have

19  antibiotics after especially major surgery.  And some

20  people are more susceptible, like diabetics and some

21  children, so they're going to be covered with

22  antibiotics.

23     Q.   I think you testified that the closed head injury

1           (Michael Sikirica - by Ms. Calabrese)

2    is what lead to the pneumonia, which is what lead to the

3    sepsis; is that right?

4      A.  Yes.

5      Q.  That is to a reasonable degree of medical

6    certainty based upon your training, education and

7    experience.

8      A.  Yes.

9      Q.  Unequivocally.

10              MR. KLEIN:  Objection.

11     A.  Yes.

12     Q.  And there was a lot of discussion about you not

13   using the word "sepsis" in your autopsy report.

14         Do you recall that conversation?

15     A.  Yes.

16     Q.  Although you did not use the word "sepsis", you

17   did, in fact, write in your report that there were

18   positive blood cultures that, in laymen's terms, are

19   synonymous with sepsis?

20     A.  Yes.

21     Q.  So, a lay person may not have read this report

22   and seen the word "sepsis", but anybody with any type of

23   advanced degree or education in your field would have

```
1              (Michael Sikirica - by Ms. Calabrese)
2    known what those words meant.
3          They meant that this child suffered from sepsis.
4                MR. KLEIN:  Objection.
5                THE WITNESS:  They would mean either it was
6    bacteremia, bacteria in the bloodstream, or sepsis.  It
7    would be almost interchangeable.
8    BY MS. CALABRESE:
9      Q.  No hiding that fact from anybody; is that right?
10               MR. KLEIN:  Objection.
11     A.  No.
12     Q.  You were asked a lot of questions about responses
13   that you gave in the grand jury, when you testified
14   twice, and at both trials.
15         Do you recall that conversation?
16     A.  Yes.  I only did the grand jury once.
17     Q.  Once.
18     A.  And two trials.
19     Q.  Is it true that you are asked questions at trial
20   directly by an attorney?
21     A.  Yes.
22     Q.  And you are to respond to the questions that
23   you're asked.
```

Case 1:17-cv-00626-DJS Document 114-2 Filed 06/14/21 Page 382 of 442

1          (Michael Sikirica - by Ms. Calabrese)

2     A.  Yes.

3     Q.  Are you allowed, through the rules of evidence,

4  based upon your years of experience in providing

5  testimony in criminal court, to just sit on the witness

6  stand and give a narrative of what your opinions and

7  beliefs are?

8     A.  No.  It's a little bit different than I see right

9  here today.  Today, I have more of an opportunity to

10  expand on my opinions.  But in a trial, it's very

11  focused and I answer the questions specifically asked by

12  the attorneys.

13          I do not wander into areas with abandonment.  I

14  answer the questions the attorneys want, and if the

15  attorneys don't ask the right questions, that's their

16  problem.

17     Q.  So this is more like a conversation, this

18  deposition.

19     A.  Yes.

20     Q.  You're speaking, I'm speaking, you're adding on

21  to my question, maybe being -- giving an answer that may

22  be more responsive than what I think I'm asking.

23          We're kind of having a little bit of a tango

1          (Michael Sikirica - by Ms. Calabrese)

2     here; is that right?

3               MR. KLEIN:  Objection.

4        A.  Well, it's --

5        Q.  Or a dance, a delicate dance.

6        A.  Yes.  I would say that it gives me an opportunity

7     now to explain things in a more open context.

8        Q.  At trial, if you answer a question beyond the

9     scope, if you provide a response beyond the scope of a

10    question, you've had experience in the past where a

11    judge will stop you and/or strike that portion of your

12    response that is nonresponsive to the question.

13              MR. KLEIN objection.

14       A.  Yes, that if I go beyond the scope of the

15    question it is going to be objected to.

16       Q.  If the question is:  You did not put the word

17    "sepsis" in your report, your response would have to be

18    no, correct?

19       A.  Correct.

20       Q.  Even though a proper followup response would be,

21    well, that word wasn't in there; however, it does say

22    that there was a bacteremia, which is the same thing?

23              MR. KLEIN:  Objection.

1          (Michael Sikirica - by Ms. Calabrese)

2      A.  Correct.

3      Q.  You would not have been allowed to provide that

4  followup.

5              MR. KLEIN:  Objection.

6      Q.  In your own mind.

7      A.  Correct.

8  BY MS. CALABRESE:

9      Q.  Now, 7A and 7B, what is this?

10          Is this a copy of your entire medical examiner

11  file?

12     A.  Well, I didn't provide those, but I brought my

13  entire medical examiner file with me, and that was

14  returned to me from Mrs. Peck.  So, that should be my

15  entire file if it was copied correctly.  I can't verify

16  every page that's in there.

17              MS. PECK:  I want to clarify, too, there

18  were two disclosures of the medical examiner file

19  because initially there were some records withheld while

20  we were trying to figure out the mix up of the children.

21              My understanding is that that was from the

22  first disclosure and not from the second disclosure,

23  which is a Bates stamped copy of the entire medical

1          (Michael Sikirica - by Ms. Calabrese)

2    examiner's file, but I have not gone through that to

3    compare that with the second disclosure.

4          MS. CALABRESE:  Has Mr. Klein received the

5    second Bates stamped copy?

6          MS. PECK:  Yes.  It should be nearly

7    complete, but without going through and comparing page

8    by page I do not know.

9    BY MS. CALABRESE:

10   Q.  Have you had an opportunity to review every

11   single page in what's listed as 7A and 7B?

12   A.  No, I haven't.

13   Q.  So, there could be items in here, other pictures,

14   other scans, other records, that you did not discuss

15   yesterday that would have been relevant to your autopsy

16   in this case.

17         MR. KLEIN:  Objection.

18   Q.  You can answer that.

19         MR. KLEIN:  I ask he look at all the photos.

20   Q.  You can answer that.

21   A.  Yes, there could be materials in there, but the

22   medical records were in my possession, copies, and I

23   reviewed those.  I reviewed both Samaritan and Albany

Case 1:17-cv-00626-DJS Document 94-14/2021 Filed 06/14/21 Page 386 of 442

```
 1            (Michael Sikirica - by Ms. Calabrese)
 2   Med medical records, and all my prior testimony and the
 3   photographs, and I expect they would all be in that
 4   package.
 5       Q.  I ask that because there are lots of photos in
 6   here, I mean maybe upwards of a hundred, and you've
 7   marked only a few of them and lots of them are
 8   duplicates.
 9            So my question is:  It would appear that some of
10   these photos, because they were taken, would have been
11   important to you in the process of taking your autopsy
12   and creating your report, not just the few that you
13   marked; isn't that right?
14       A.  Yes.  I would have reviewed all the photos, but
15   the most probative ones are the ones that I marked.
16       Q.  The most probative.
17       A.  Yeah.
18       Q.  The ones that you marked were not solely
19   probative, they were just the most probative.
20       A.  Yes.
21       Q.  What is DIC again?
22       A.  DIC is disseminated intravascular coagulopathy.
23       Q.  What does that mean?
```

1          (Michael Sikirica - by Ms. Calabrese)

2     A.   It means that your blood is clotting in your

3  blood vessels for an abnormal reason.

4     Q.   Would infection be one of those reasons?

5     A.   It could be one of the reasons.

6     Q.   Could trauma be one of those reasons?

7     A.   That could be another reason.

8     Q.   Did you determine or did a doctor determine if

9  Matthew was suffering from DIC?

10     A.   In my medical opinion, based on the laboratory

11  results, he was not initially suffering from DIC.

12     Q.   How so?

13     A.   Again, his platelets were on the low normal side,

14  his clotting time was mildly elevated, and his

15  fibrinogen level was over 300, which indicates that he

16  was not forming good clot material in his bloodstream.

17     Q.   Now, you discussed a contemporaneous subdural

18  hematoma and a subgaleal hematoma.

19     A.   Yes.

20     Q.   Based upon that, isn't it true that the trauma

21  likely occurred at the same time to those two areas, the

22  subgaleal and the subdural?

23     A.   It would be reasonably likely that it occurred at

1          (Michael Sikirica - by Ms. Calabrese)

2     the same time.

3        Q.   It appears that the older subdural and the older

4     subgaleal were also in the same location.

5              And isn't it true that those older injuries would

6     have occurred at the same time?

7        A.   They were in the approximate same locations.  Not

8     exactly, but it's very feasible they occurred at the

9     same time.

10       Q.   If you consider Mr. Thomas' theory of this case,

11    which is the child died of sepsis and not of closed head

12    injuries due to blunt force trauma, wouldn't it be

13    incredibly odd that both head injuries, the old and the

14    new, were in the same place?

15             MR. KLEIN:  Objection.

16    BY MS. CALABRESE:

17       Q.   The new subgaleal and the new subdural were one

18    right above the other, right?

19       A.   Yes.

20       Q.   The old subgaleal and the old subdural were one

21    right above the other, right?

22             MR. KLEIN:  Objection.  That's not what he

23    said.

1              (Michael Sikirica - by Ms. Calabrese)

2      A.   They were in close proximity.

3      Q.   In close proximity.

4      A.   Yes.

5      Q.   So, wouldn't it be incredibly odd that the sepsis

6   caused those bleeds in exactly the same place?

7              MR. KLEIN:  Objection.

8      Q.   Wouldn't that be like a medical miracle or

9   something?

10     A.   Yes.  The sepsis wouldn't have caused the

11  subgaleals or the subdural period, and then to find that

12  they aligned like they did, it would be very, very, very

13  remarkable.

14     Q.   Incredibly remarkable.

15             MR. KLEIN:  Objection.

16     A.   Yes.

17  BY MS. CALABRESE:

18     Q.   Then you went through what you called -- or I

19  think Mr. Klein may have called a stepwise procession of

20  when the pneumococcus would appear and when the next

21  step, which I think you said was the sepsis would

22  appear, and then the next step which was -- I forget.

23          Do you remember going through that?

Case 1:17-cv-00626-DJS Document 84-14 2021 Filed 06/14/21 Page 390 of 442

1          (Michael Sikirica - by Ms. Calabrese)

2     A.   The inflammation of the meninges.

3     Q.   Yes.  What was that, you said one to three days.

4     Can you go through that again for me?

5     A.   Well, typically, the incubation period for the

6     pneumococcus in the lungs is one to three days.  Then,

7     that may stop at that point, or it may gradually

8     progress into the sepsis, or on rare occasions, as

9     Mr. Klein said, it could effectively burst into the

10    sepsis fairly quickly, but there is typically a

11    progression.

12          You don't start with sepsis and go backwards, in

13    this case, to pneumonia.  You begin with pneumonia and

14    you develop sepsis from the pneumonia.

15    Q.   And so the pneumonia incubation is one to three

16    days?

17    A.   Yes.

18    Q.   And then the sepsis incubation is one to three

19    days.

20          MR. KLEIN:  Objection.

21    A.   It could be variable.

22    Q.   Could be variable?

23    A.   Could be variable.  Could be relatively quick,

```
 1            (Michael Sikirica - by Ms. Calabrese)
 2   but more than likely, again, several more days.
 3      Q.  And then to go from sepsis to septic shock, would
 4   that also be the incubation of one to three days?
 5            MR. KLEIN:  Objection.
 6      A.  That could occur relatively quickly.
 7      Q.  So at the high end we're looking between six plus
 8   days and the low end we're looking at two plus days; is
 9   that...
10      A.  I would say that's reasonable.
11            MR. KLEIN:  Objection.
12   BY MS. CALABRESE:
13      Q.  The growing cerebral edema was due to the
14   subdural hematoma which was due to the trauma, and not
15   because of any -- not independently because of any
16   bacterial infection; is that right?
17      A.  Well, the bacterial infection, by the time of
18   autopsy, may have contributed to the edema, the cerebral
19   edema.
20      Q.  Contributed?
21      A.  Yes.
22      Q.  But not caused outright.
23            MS. PECK:  Objection.
```

Case 1:17-cv-00626-DJS Document 84-14 Filed 06/14/21 Page 392 of 442

```
 1            (Michael Sikirica - by Ms. Calabrese)

 2      A.   But the cerebral edema by itself could be totally

 3   caused by the subdural hematoma and the injury.

 4      Q.   So, now, as you've discussed, one of the things

 5   that you rely on in conducting your medical legal

 6   examination at autopsy, including this one, is by fact

 7   gathering from any and all sources available.

 8      A.   Yes, to a reasonable degree of expectations.

 9      Q.   In this case, you had the benefit of a statement

10   from the child's father --

11      A.   Yes.

12      Q.   -- which described, by his own words, how the

13   child was injured.

14      A.   Yes.

15      Q.   He described forcibly slamming the child on to a

16   mattress.

17      A.   Yes.

18      Q.   As well as throwing the child into a crib,

19   causing injury to -- what he believed to be injury to

20   his head?

21      A.   Yes.

22      Q.   And also bumping his own head into the child's

23   head.
```

1           (Michael Sikirica - by Ms. Calabrese)

2      A.   Yes.

3      Q.   Based upon that information and the facts that

4  you gathered at autopsy, specifically a severe closed

5  head injury with cerebral edema due to blunt force

6  trauma, you declared this case a homicide.

7      A.   Based on the autopsy findings, the medical

8  records, and the radiographic reports, I classified it

9  as a homicide.

10     Q.   And that would include Thomas' statement about

11 the mechanism of injury.

12     A.   No.  Not necessarily.

13          The mechanism of injury was only provided by Mr.

14 Thomas.  If that had not been there, this would still be

15 a homicide.

16     Q.   How so?

17     A.   Because I have no explanation for how these

18 injuries occurred on a four month old child.  So, this

19 is a homicide, whether Mr. Thomas had done it, or

20 whether some other person had done it because I have no

21 explanation otherwise as to how it occurred.

22     Q.   If you were provided information that the child's

23 head was struck in an accidental way, would this case

1    (Michael Sikirica - by Ms. Calabrese)

2    have been a homicide?

3    A.   It would have to be a reasonable accident.  It

4    would have to be a witnessed accident.  The people who

5    were involved in this accident would have to have a very

6    good explanation of how it occurred that made sense,

7    that correlated with the injury I found.

8         So, then, I may call it an accident, or if I

9    didn't believe them, I would call it a homicide.

10   Q.   In making that analysis whether the closed head

11   injury due to blunt force trauma was a homicide versus

12   an accident, did Thomas' statement factor into that?

13   A.   Yes, I mean, but as I said, it would be a

14   homicide anyway.

15   Q.   Because of the injury?

16   A.   Now I think with the statement I simply have a

17   mechanism to explain the injury.  That's how it factors

18   into it.

19   Q.   If you didn't have his statement would then a

20   further inquiry be had?  For example, this person is

21   saying nothing occurred, that there was no -- that he

22   did not cause any injury to this child.  Could it have

23   been an accident?

1      (Michael Sikirica - by Ms. Calabrese)

2      And potentially additional interviews could be

3 conducted through the mother, through adult children, to

4 find out how did this child get these injuries.  Is that

5 something that would likely happen?

6                MR. KLEIN:  Objection.

7                THE WITNESS:  Yes.  That would be pressed

8 upon to do that, to look for any other reasonable

9 explanation how these injuries occurred.

10                Until I read the statement, I didn't know

11 how they occurred.  So, when I read Matthew's statement

12 --

13   Q.  Adrian's.

14   A.  I'm sorry.  I'm confusing the two.

15      When I read Adrian's statement, it was consistent

16 with the injury pattern, but had I not had the statement

17 it would still be a homicide because I have no other

18 explanation for it.

19   Q.  So, let's say we're at the point where you don't

20 have Adrian's statement and you have these injuries.

21 You would then continue to conduct an investigation to

22 determine how these injuries were created.

23      If there even was an answer that could be found

1           (Michael Sikirica - by Ms. Calabrese)

2    you would look for that answer.

3       A.   Yes.  This is a four month old child, so the

4    child could not accidentally fall down the stairs or do

5    anything of the sort, so there had to be somebody

6    responsible for these injuries.

7       Q.   Whether it was a sibling causing the injuries, or

8    dropping the child, or something like that, we wouldn't

9    know until that independent investigation could be

10   conducted.

11      A.   And if it was fruitful.

12      Q.   Yes, if it was fruitful.

13      A.   Then we would know.

14      Q.   Receiving that statement from Adrian gave you a

15   mechanism for the injuries that you observed upon

16   autopsy.

17           MR. KLEIN:  Objection.

18      A.   Yes.  It gave a mechanism that would account for

19   the injuries at the autopsy.

20      Q.   That mechanism of injury that he provided in his

21   written statement that you reviewed was part of your

22   anatomic diagnoses.

23      A.   Yes, it was.

```
 1              (Michael Sikirica - by Ms. Peck)

 2      Q.  That was what you testified to at both trials and

 3   in the grand jury.

 4      A.  Yes.

 5              MS. CALABRESE:  I have no further questions.

 6   EXAMINATION

 7   BY MS. PECK:

 8      Q.  Doctor, we know each other.  My name is Crystal

 9   Peck.  I represent you in this litigation.

10          I just have a couple questions that I want to

11   follow up based on the testimony that you gave to the

12   Assistant Attorney General Calabrese, plaintiff's

13   attorney Brett Klein, and Joe Perkins, counsel for the

14   City of Troy police officers.

15          First of all, I wanted to just go over your

16   training real quick with respect to being a forensic

17   pathologist.

18          There's a difference between you being a treating

19   physician and a forensic pathologist, correct?

20      A.  Yes.

21      Q.  So, what training did you receive that was

22   specific to your role as a forensic pathologist or as a

23   medical examiner?
```

1          (Michael Sikirica - by Ms. Peck)

2    A.  Yes.  Forensic pathologists have to complete at

3  least a residency in anatomic pathology to obtain a

4  fellowship in forensic pathology.  And the forensic

5  pathology fellowship is typically a year, and it's

6  totally devoted to autopsy evaluation of victims who

7  typically die outside of the hospital environment.

8  These would be things like accidents, suicides,

9  homicides.

10       And even if they do die in the hospital, those

11  patients from the accidents, suicides or homicides would

12  fall into the jurisdiction of the ME.  So, we're trained

13  to evaluate injury patterns, to evaluate the cause and

14  manner of death, and to understand how they could be

15  related, and to make the connections between the cause

16  and the manner.

17    Q.  So, what would you be looking at that would be

18  different than a treating physician in, say, an

19  emergency room when you're doing your autopsy and you're

20  making your opinions?

21    A.  Well, the treating physician is, number one,

22  concerned with the preservation of the person's life.

23  They're going to be doing everything they can to save

```
 1              (Michael Sikirica - by Ms. Peck)
 2   the individual if they're in extremis.
 3        They may not understand the nature of many
 4   injuries.  They may not understand how to properly fill
 5   out a death certificate.  That is a constant problem.
 6   They don't understand sometimes the difference between
 7   the cause and the manner of death.  So, that's where we
 8   have specialized training.
 9     Q.  There's actually been quite a bit of discussion
10   in the last day and a half where the terms "cause" and
11   "manner" have been used.
12        Can you explain to me how those -- the causation
13   and manner of death are different in your mind.
14     A.  Yes.  The cause of death is the biological reason
15   the person had expired.  The medical terminology would
16   describe the cause of death.
17        That could be a whole gamut of things and
18   thousands of different causes of death.  These could be
19   things like HIV infection, metastatic prostate
20   carcinoma, gallbladder rupture, gunshot wound to the
21   head with skull fractures and brain injuries.  It could
22   be asphyxiation due to hanging, but those are all
23   causes.
```

```
 1              (Michael Sikirica - by Ms. Peck)

 2         The manner of death is only limited in this state

 3    to six items.

 4         Q.  Okay.

 5         A.  This would be accident, suicide, homicide,

 6    natural, pending and undetermined.

 7         Q.  So if I said, if I asked you what then would the

 8    difference between the causation of death and the

 9    mechanism of death be, what does that mean to you?

10         A.  Well, the mechanism of death is not used even by

11    forensic pathologists very often.  But it would imply

12    the physiological or the physical way the death may have

13    occurred, whether it's an impact, whether it's a fall,

14    whether it's a specialized form of trauma.

15         So, the mechanism we don't use very often.  We

16    pretty much stick to the manner and the cause of death.

17    We may consider the mechanism of death, but we don't

18    usually document the mechanism of death.

19         Q.  The confession that you reviewed, or the

20    statement that you reviewed of Adrian Thomas, did that

21    provide you any insight on either the manner or

22    mechanism of death in this instance?

23         A.  Yes.
```

1          (Michael Sikirica - by Ms. Peck)

2      Q.   And how so?

3      A.   Well, the statement is consistent with the

4   mechanism of death about how Matthew sustained the

5   injury to his head, and it's also consistent with the

6   manner of death that would be homicide.

7      Q.   To be clear, then, the difference is that the

8   cause -- your opinion on what caused the death was a

9   blunt force trauma, and then the manner and mechanism of

10  death involve how that trauma occurred; is that

11  accurate?

12     A.   Well, the mechanism would involve how the trauma

13  occurred.  The manner would be a description of how it

14  occurred.

15     Q.   That's where you said it would either be

16  accidental, homicide, suicide.

17          Was there a fourth one?

18     A.   Natural, pending and undetermined.

19     Q.   Going back to your training for a minute.

20          The training that you receive as a forensic

21  pathologist, what items are you trained to look at,

22  materials, are you trained to look at in order to make

23  these types of determinations as to both causation,

Case 1:17-cv-00626-DJS Document 142-3 Filed 06/14/21 Page 402 of 442

1        (Michael Sikirica - by Ms. Peck)

2   manner and/or mechanism?

3       A.  Well, the training in forensic pathology involves

4   looking at as much as reasonably possible and reasonably

5   practical.  So, we're looking at medical records.  We're

6   looking at police statements.  We're talking to people

7   if necessary.  We're even sometimes talking to families

8   to try and determine the cause and manner of death.

9           So, we have a broad outlook on what we look at.

10  We can't do an autopsy by itself and just rely on those

11  findings, because they could be caused by a myriad of

12  ways.  If we don't know the ways those injuries could

13  have occurred or did occur, we can't assign a manner of

14  death.

15      Q.  Now, it's not unusual to see a verbal history

16  taken from either a patient himself or a patient's

17  family members or EMS and medical records, accurate?

18      A.  Yes.

19      Q.  Treating physicians, to an extent, they rely on

20  those histories that are taken to help diagnose the

21  patient.

22          Would that be accurate?

23      A.  Yes.  Absolutely.

Case 1:17-cv-00626-DJS Document 147-12/2021 Filed 08/14/21 Page 403 of 442

1    (Michael Sikirica - by Ms. Peck)

2    Q.  Do you also look at those histories that are

3    taken when you're looking at the autopsy, when you're

4    conducting an autopsy?

5    A.  Yes.  If they are part of the medical records I

6    would.  There may be some rare instances when I have to

7    call a family and get more information.

8    Q.  And those histories, how do they aid you in

9    performing your job as a medical examiner in making your

10   determinations as part of the autopsy?

11   A.  Well, the histories should be consistent with the

12   findings at the autopsy and the other things we

13   evaluate.  That's where we look for the inconsistencies.

14       So, we always have a significant degree of

15   suspicion with any statements.  So, we want to make sure

16   the statements from the individuals, or even the police,

17   are consistent with the findings at the autopsy.  That

18   is the specialty we are involved with.

19   Q.  And there had been some discussion with respect

20   to aspiration and whether you speculated whether there

21   was aspiration here.

22       Do you recall that testimony?

23   A.  Yes.

```
 1              (Michael Sikirica - by Ms. Peck)

 2     Q.   You would use the term medical speculation.

 3          There were indications in multiple records that

 4     you reviewed of aspiration; is that correct?

 5     A.   There was indication that there was a potential

 6     for aspiration, yes.  And there was vomitus reported by

 7     the family member, by the decedent's mother, that the

 8     child had been vomiting.

 9              MR. KLEIN:  I'm going to object and move to

10     strike as nonresponsive.

11     BY MS. PECK:

12     Q.   Where did you see indications of speculation in

13     the records when you were doing the autopsy, when you

14     were preparing your opinions for autopsy?

15              MR. KLEIN:  Objection.

16     A.   There wasn't any indication of speculation.

17     Q.   I meant to say aspiration.  I apologize.

18     A.   Well, there was mention of a possibility of

19     aspiration when the child was reportedly vomiting over

20     several days' duration.  That would be a very high risk

21     of aspiration in an infant.

22          There was also mention in Matthew's statement.

23     Q.   Adrian's statement.
```

1              (Michael Sikirica - by Ms. Peck)

2       A.   I'm sorry, again.

3            In Adrian's statement that the child was

4    breathing funny after the incidents of being tossed.

5    The child had been wheezing and breathing abnormally.

6    The only reason he would be breathing abnormally would

7    be he was having trouble to clear his airways, which

8    would be consistent with aspiration.

9       Q.   The evidence that you saw of trauma on Matthew's

10   skull and Matthew's brain, would those have been

11   consistent with aspiration, that type of trauma?

12      A.   That type of trauma would be recognized as being

13   -- as leading to a higher risk of aspiration.

14      Q.   So, it would not be unusual to see someone

15   aspirate when they have experienced that type of trauma.

16      A.   Correct.

17      Q.   You were asked some questions by plaintiff's

18   attorney regarding whether you used the term "sepsis" in

19   your autopsy report.  You were asked again by Ms.

20   Calabrese a few moments ago.

21           You recall that testimony, correct?

22      A.   Yes.

23      Q.   It is correct that you didn't use the term

1              (Michael Sikirica - by Ms. Peck)

2    "sepsis" in your autopsy report, correct?

3        A.    Correct.

4        Q.    You did not omit the term "sepsis" with the

5    purpose of misleading anyone, though, did you?

6        A.    No.

7        Q.    You were not asked by anyone to omit the term

8    "sepsis", were you?

9        A.    Never.

10       Q.    Do you have any say in whether a specific

11   individual is arrested by the police --

12              MR. KLEIN:  Objection.

13       Q.    -- in your role as medical examiner for the

14   Department of Health?

15       A.    No.  I cannot tell the police to do anything

16   except provide me with the records that I require.  I

17   have no authority to order them to do anything except to

18   provide me with the information that I need.

19       Q.    You wouldn't be able to tell the police to or to

20   not arrest anyone, either tell them go after someone and

21   arrest them, or not do it.

22              That's up to the police completely, correct?

23       A.    I have never told the police to arrest anyone.

1        (Michael Sikirica - by Mr. Klein)

2    Q.  What about in prosecuting an individual, I know

3  that you had mentioned you have gone to the district

4  attorney before and said, my autopsy findings are not

5  showing this is a homicide.

6        Have you ever directed the district attorney to

7  prosecute a specific individual?

8    A.  No.

9    Q.  Do you have that authority?

10    A.  No.

11    Q.  When you go to the district attorney and you say,

12  my findings are not consistent with a homicide, you

13  don't have any authority to tell them not to prosecute

14  someone, do you?

15    A.  No.

16        MS. PECK:  I have no further questions.

17  FURTHER EXAMINATION

18  BY MR. KLEIN:

19    Q.  Good morning again, Doctor.

20    A.  Yes, Mr. Klein.

21    Q.  While you don't have a say in whether someone is

22  arrested, is it fair to say that it is foreseeable that,

23  when you say that there is a finding of blunt force

1          (Michael Sikirica - by Mr. Klein)

2    trauma in a case like this, that it would result in an

3    arrest?

4       A.   Sure.

5       Q.   Is it foreseeable to you that, when you say

6    there's blunt force trauma as you did in this case, as

7    opposed to some accidental trauma, that it would result

8    in a prosecution?

9       A.   Well, even accidental trauma could result in a

10   prosecution, so I don't make the differentiation at that

11   point in time.

12      Q.   In this case it was fairly obvious to you that

13   there would be a resulting arrest and prosecution,

14   correct?

15               MS. PECK:  Objection.

16               MR. PERKINS:  Objection to the form.

17               THE WITNESS:  Yes.  I didn't know who it

18   would be.

19   BY MR. KLEIN:

20      Q.   You were talking about how the Adrian Thomas

21   statement didn't change your conclusion of homicide, you

22   would have found that anyway, but it gave you insight

23   into the mechanism, correct?

1              (Michael Sikirica - by Mr. Klein)

2     A.   Correct.

3     Q.   If that statement was false, you don't know who

4  caused the trauma that you observed, do you?

5     A.   Correct.

6     Q.   Even with that statement being true, you don't

7  know if the trauma admitted to in that statement is what

8  caused the trauma in this case.

9          Much of it involves being thrown on a mattress

10  and things that you said would not be consistent with

11  the subdural, correct?

12              MS. PECK:  Objection to form.

13              MR. PERKINS:  Object to form.

14              THE WITNESS:  No.  The subdural was caused

15  -- would be very consistent with being thrown down hard

16  on a mattress, yes.

17  BY MR. KLEIN:

18     Q.   But it's the throwing from over the head with

19  extreme force that you pointed to.

20              MS. PECK:  Objection.

21              MR. PERKINS:  Objection.

22              THE WITNESS:  Not necessarily.  I mean, any

23  sort of throwing of the child.  Doesn't necessarily have

```
 1            (Michael Sikirica - by Mr. Klein)
 2   to be over the head.  The child could be thrown many
 3   different ways.  Child could have also been shaken and
 4   had a minor impact.
 5            So, there's really no way to exactly say how
 6   it occurred.  All I can say is it's consistent with the
 7   story that Adrian provided.
 8   BY MR. KLEIN:
 9     Q.  That's my question.  So, there's no way to say
10   how it occurred; is that right?
11     A.  Correct.
12     Q.  Without that statement from Adrian, you would not
13   have had insight into how it occurred that would have
14   informed your autopsy, correct?
15     A.  Correct.
16     Q.  I want to step back for a second.
17            Mr. Perkins asked you a question about sepsis not
18   coming up until the time of trial.  Do you recall that?
19     A.  Yes.
20     Q.  Sepsis was in the initial Samaritan records; was
21   it not?
22     A.  It was suggested, yes, in the differential
23   diagnosis.
```

1              (Michael Sikirica - by Mr. Klein)

2     Q.   I think it was a vague question in terms of it

3   coming up.  It certainly came up in testimony at trial,

4   correct?

5              MS. PECK:  Objection.

6     A.   Yes.

7     Q.   But it came up in the medical records as a

8   potential issue as early as the Samaritan records,

9   correct?

10     A.   Yes.

11     Q.   You were aware of that at the time of autopsy if

12   not during your investigation before your report.

13     A.   Yes.

14     Q.   You were asked if you knew about the jail

15   interview conducted by CPS.

16          You said you knew about it, correct?

17              MS. PECK:  Objection.  That was not his

18   testimony.

19              MR. KLEIN:  I believe he said he knew about

20   it.

21              MS. PECK:  I apologize.

22              THE WITNESS:  I knew that it was done but I

23   never saw it.

Case 1:17-cv-00626-DJS Document 44-2 Filed 06/14/21 Page 412 of 442

```
 1              (Michael Sikirica - by Mr. Klein)

 2   BY MR. KLEIN:

 3       Q.  How did you know about it?

 4       A.  I heard it somewhere between the first and second

 5   trial.

 6       Q.  There was a jailhouse interview conducted of Mr.

 7   Thomas after he was arraigned and had a right to counsel

 8   by CPS without any counsel being present the day before

 9   the autopsy.

10           Did you know that on the day of the autopsy,

11   assuming what I said was true?

12               MS. PECK:  Objection to form and calls for a

13   legal conclusion.

14       Q.  I'll just say it simply.

15           Assuming it's true that there was a jailhouse

16   interview of Mr. Thomas by CPS on the 24th of September,

17   and your autopsy was on the 25th.

18       A.  Correct.

19       Q.  Do you recall whether or not you knew about the

20   jailhouse interview?

21       A.  I don't recall if I knew about that interview.

22       Q.  You don't believe you knew about it until the

23   trial.
```

1          (Michael Sikirica - by Mr. Klein)

2     A.   Correct, or when I received the child fatality

3   review report.

4     Q.   With regard to Ms. Calabrese's questions about

5   the cause of death, to be clear, sepsis was a

6   contributing cause of death in your opinion, correct?

7     A.   Yes.

8     Q.   So, there can be more than one cause of death,

9   correct?

10    A.   There can be a major cause of death and

11  contributory cause of death.  Yes.

12    Q.   Here, that was the case.

13    A.   Yes.

14    Q.   What were the other contributing causes of death,

15  if any?

16    A.   Well, in the end, he was developing multisystem

17  organ failure.  His organs were shutting down.

18  Respiratory failure was occurring.  He was anemic.  He

19  had lost significant amount of blood.  Those would be

20  other accessory contributing factors.

21    Q.   Were those things that you just said all

22  derivative of the pneumococcal disease?

23    A.   Derivative of that and primarily the head trauma

Case 1:17-cv-00626-DJS Document 114-2 Filed 06/14/21 Page 413 of 442

1          (Michael Sikirica - by Mr. Klein)

2   which lead to the pneumococcal disease.

3       Q.   In your opinion.

4       A.   In my opinion.

5       Q.   You said he didn't die from the SGH, either SGH,

6   as they were relatively innocuous; is that right?

7       A.   Yes.  They're only markers that there was impact

8   injury there.  They don't particularly themselves cause

9   death because they're relatively small.

10      Q.   Now, the question that you were asked and

11  answered, I believe, was without sepsis Matthew would

12  still be dead in your opinion, correct?

13      A.   Yes.

14      Q.   Then you were asked without trauma.

15           I believe you said he could have lived, correct?

16      A.   Yes.

17      Q.   It's also fair to say that he could have died

18  without trauma.

19      A.   Yes.

20      Q.   You don't know either way.

21      A.   Correct.

22      Q.   Ms. Calabrese reupped the questions about the

23  pregnancy complications and such.

1              (Michael Sikirica - by Mr. Klein)

2        Do you recall that?

3    A.   Yes.

4    Q.   Those are all risk factors that contributed to

5    Matthew's weakened immune state.

6         Would you agree with that?

7    A.   Yes.

8    Q.   That's why we had asked you about it.

9         So, given the CDC statement about those under two

10   being more prone to death from pneumococcal disease,

11   Matthew's African American race, and the conditions of

12   birth which resulted in a weakened immune system, is it

13   more likely than not that he could have died without the

14   trauma?

15              MS. PECK:  Objection to form.

16              MR. PERKINS:  Objection to form.

17              THE WITNESS:  That would be a question for

18   Dr. Klein to answer rather than myself, being I'm not a

19   treating physician or infectious disease pediatrician.

20   BY MR. KLEIN:

21   Q.   Now, with regard to aspiration, you were asked

22   about that and the different causes of aspiration, and

23   that would have caused the bacteria, correct?

Case 1:17-cv-00626-DJS Document 84-1 Filed 06/14/21 Page 416 of 442

1              (Michael Sikirica - by Mr. Klein)

2      A.   The aspiration caused the pneumonia.

3      Q.   But the pneumococcal bacteria that is airborne in

4  and of itself can be a direct cause of pneumonia,

5  correct?

6      A.   Yes.

7      Q.   So, if Matthew had somehow ingested or breathed

8  in or been exposed to pneumococcal bacteria, and let's

9  say that hit his salivary glands, he could have

10  aspirated on his pneumococcal bacteria as opposed to

11  some vomitus substance that caused his pneumonia.

12      A.   Yes.

13      Q.   Or he could have just gotten pneumonia as a

14  direct result of the pneumococcal bacteria without

15  aspiration.

16      A.   Possibly.  Yes.

17      Q.   You don't know which scenario caused the

18  pneumonia in this case, do you?

19      A.   My medical opinion, it came from the aspiration.

20      Q.   It's your opinion, but you don't know.  You can't

21  state which one actually caused it.

22      A.   To a reasonable degree of medical certainty, I

23  would say the aspiration caused it.

```
 1              (Michael Sikirica - by Mr. Klein)

 2      Q.  Given the statistics on pneumococcal disease

 3   leading to pneumonia, how could you rule that out?

 4      A.  Well, the pneumococcus does cause the pneumonia.

 5   That's the source of pneumonia, that's the cause of the

 6   pneumonia.

 7          The question I think you're presenting is why did

 8   pneumococcus get down into the lungs.  You're

 9   postulating that it came from the air, which is

10   reasonable, but I find a mechanism that's even more

11   reasonable that it came because he aspirated because he

12   was not clearing his airways because he had been

13   traumatized.

14      Q.  If he had been traumatized.

15      A.  He was traumatized.

16      Q.  Well, to be clear, you don't know whether he was

17   traumatized by Adrian Thomas or some child or someone

18   else.

19      A.  I have no clue who did this.

20      Q.  While the physical trauma -- you could say a few

21   days to several days; is that fair to say for the most

22   recent physical trauma?

23      A.  I think the acute hemorrhage occurred -- the
```

1           (Michael Sikirica - by Mr. Klein)

2  subdural hemorrhage -- within a day or two, yes.

3    Q.  But also you would agree that the pneumococcal

4  disease occurred within a day or two as well.

5    A.  I would say the beginning of it could be, a day

6  or two, yes.

7    Q.  So, would it be your opinion that there was a

8  coincidence in the timing of the onset of or incubation

9  of the pneumococcal disease and the trauma that lead to

10  the subdural hematoma which lead to the edema and the

11  death.

12    A.  Yes.

13    Q.  You were asked by Ms. Calabrese with regard to

14  the bacterial infection sepsis, right?

15    A.  Yes.

16    Q.  Whether the cerebral edema could be caused by the

17  subdural hematoma and the injury.

18        The bacterial infection could also be caused by

19  the streptococcus?

20    A.  Yes.  I think I can clarify what you're asking.

21        Yes, the edema could be caused by the

22  streptococcus in the bloodstream.

23    Q.  And not trauma.

1          (Michael Sikirica - by Mr. Klein)

2   A.  And not trauma.  Correct.  That is correct.

3   Q.  You were asked questions about what you relied on

4 to arrive at the cause and manner of death.

5      In sum and substance, correct me if I'm wrong, it

6 was the Thomas statement, plus the autopsy, plus the

7 medical records, plus the radiographic reports, lead you

8 to conclude homicide, correct?

9   A.  Well, the Thomas statement explained how the

10 homicide occurred, explained where the aspiration and

11 sepsis came from, but it would have been a homicide even

12 without the statement.

13   Q.  So, Mr. Thomas did not bring about your

14 conclusions in this case that it was a homicide.  He did

15 not contribute to your conclusions in this case.

16      In other words, his statement, true or false, did

17 not contribute to your conclusions ultimately in this

18 case of homicide.

19   A.  Yes.  His conclusion, to my medical opinion,

20 correlated with the diagnosis of homicide.

21   Q.  Without Mr. Thomas' written statement which was

22 obtained by the police, whether false or not, you would

23 have arrived at the same conclusion of a homicide in

1        (Michael Sikirica - by Mr. Klein)

2    this case.

3        A.   Yes.

4        Q.   So, Mr. Thomas, for whatever motivation caused

5    him to write out that ten-page statement, it's not for

6    discussion now, but for whatever reason that statement

7    was written, the fact that it was written did not lead

8    you to conclude homicide as opposed to some other cause

9    of death.

10       A.   Correct.

11       Q.   Now, there was a video of the interrogation that

12   included the time that that ten-page statement was

13   written.

14           Were you aware of that?

15       A.   Yes.

16       Q.   In the video, Mr. Thomas did a physical

17   demonstration with the hands over the head, two hands

18   over the head, slamming like a folder or something down

19   on the ground.

20           MS. PECK:  Objection.

21       A.   Yes.

22       Q.   Have you ever seen that before?

23       A.   I can't recall.  I may have seen a small portion

Case 1:17-cv-00626-DJS Document 147-22 Filed 06/14/21 Page 426 of 443

1          (Michael Sikirica - by Mr. Klein)

2     of that.  I may have not.  I can't recall.

3        Q.   In what context?  Was it at trial, at prep, at

4     home on the internet, or something else?

5        A.   It would have been around the time of the

6     autopsy.

7        Q.   So, do you know whether or not Detective Sergeant

8     Mason or anyone else had a copy of the video to show you

9     as it may have been pertinent to your investigation?

10       A.   I simply can't recall, sir.

11       Q.   Do you have an image in your mind of seeing Mr.

12    Thomas on video with the hands over the head slamming

13    the folder?

14       A.   I can't recall to that degree with the hands over

15    the head, but I vaguely recall, to the best of my

16    knowledge, seeing a short interval, a short segment of

17    the video.

18       Q.   In your testimony today, you did put your hands

19    over your head when you described the trauma that you

20    felt was significant to cause the SDH as compared to the

21    less significant trauma that wouldn't have caused it.

22          Do you recall that?

23             MS. PECK:  Objection to form.

Case 1:17-cv-00625-DJS Document 147-33 Filed 06/14/21 Page 422 of 442

```
 1              (Michael Sikirica - by Mr. Klein)

 2              MR. PERKINS:  Objection.

 3              THE WITNESS:  Yes.  Because you used your

 4   hands over your head.  I was replicating what you did.

 5      Q.  That's why you did it, okay.

 6      A.  Yes.

 7      Q.  It wasn't from your own recollection then?

 8      A.  No. No.

 9      Q.  Now, Ms. Peck asked you questions about the

10   indications of the potential for aspiration.  That's all

11   there were in the records.  There was no evidence of

12   aspiration in the records, correct?

13      A.  Correct, but you may not see evidence of

14   aspiration.

15      Q.  That's fine.  I just wanted to know.

16      A.  Yeah.

17      Q.  He may have been --

18              MS. CALABRESE:  Can he finish his response?

19              MR. KLEIN:  I believe he did, but if he

20   didn't, feel free.

21              THE WITNESS:  Yes.  I'm okay.  Thank you.

22   BY MR. KLEIN:

23      Q.  In terms of Matthew breathing funny or wheezing,
```

```
 1              (Michael Sikirica - by Mr. Klein)
 2    if it's true that he was, it's more likely right than
 3    wrong that that may have been a result of having
 4    bacterial pneumonia, correct?
 5              MS. PECK:  Objection.
 6              MR. PERKINS:  Object to the form.
 7              THE WITNESS:  No.  It would be result of
 8    aspiration, because he's not going to be wheezing
 9    directly after an impact like that from preexisting
10    pneumonia.  He would be wheezing all the time from
11    pneumonia or something.
12              It's very enlightening that Adrian mentioned
13    this unusual breathing pattern after the impact injury.
14    That is significant in my mind to indicate that the
15    child was aspirating.
16    BY MR. KLEIN:
17      Q.  You don't know whether the detectives presented
18    that term to him or whether he came up with it on his
19    own, do you?
20      A.  I don't know.
21              MR. KLEIN:  That's all the questions I have.
22              MS. CALABRESE:  One follow up.
23    FURTHER EXAMINATION
```

Case 1:17-cv-00625-DJS Document 61-1 Filed 06/14/21 Page 422 of 442

1          (Michael Sikirica - by Ms. Calabrese)

2    BY MS. CALABRESE:

3       Q.  I think, Doctor, you just testified that the

4    statement given by Adrian Thomas, that you had available

5    to you, may not have contributed to you stating that

6    these injuries related to a homicide because it would

7    have been a homicide to you either way, correct?

8       A.  Yes.  Without a reasonable explanation, a

9    believable, reasonable explanation for these injuries,

10   it would have to be classified as a homicide.

11      Q.  Because at that point in time you did not have a

12   reasonable alternative explanation for the injuries.

13      A.  Correct.

14      Q.  However, at trial, Thomas' statement, in

15   conjunction with your findings at autopsy, is that you

16   testified to was the mechanism of injury, the recitation

17   that was provided to you by Thomas.

18      A.  Yes.

19          MS. CALABRESE:  Thank you.

20          MS. PECK:  One or two.

21   FURTHER EXAMINATION

22   BY MS. PECK:

23      Q.  I want to go back to yesterday's testimony real

Case 1:17-cv-00626-DJS Document 74-33 Filed 06/14/21 Page 425 of 442

1            (Michael Sikirica - by Ms. Peck)

2    quick when you were asked about having reviewed a

3    statement of Wilahemina Hicks.

4            There was a question, I think that Mr. Klein had

5    asked, about whether you had reviewed a statement of

6    Wilahemina Hicks and it was not represented in your

7    autopsy report that you had reviewed it.

8            Was that an independent statement that was taken

9    by the police?  Where did the statement of Wilahemina

10   Hicks come from, to your recollection, that you

11   reviewed?

12      A.  Yes.  The statements of Wilahemina Hicks were

13   from the social worker at Albany Medical Center who had

14   contacted the family in terms of their welfare.

15      Q.  So, how did you see that statement?

16          What was in it?

17      A.  It was in part of the Albany Medical Center

18   medical records.

19      Q.  You did document in your autopsy report that you

20   had reviewed the Albany Medical Center medical records,

21   correct?

22      A.  Yes.

23      Q.  You wouldn't have felt the need to separate the

Case 1:17-cv-00625-DJS Document 91-1 47933 Filed 06/14/21 Page 426 of 442

```
 1                (Michael Sikirica - by Mr. Klein)

 2    specific parts of those records out as having

 3    independently reviewed them.

 4         You would just put in, I reviewed all the records

 5    from Albany Medical Center?

 6      A.  Yes.  The interview with the social worker was

 7    done at Albany Medical Center and was part of their

 8    record package.

 9                MS. PECK:  Thank you.

10    FURTHER EXAMINATION

11    BY MR. KLEIN:

12      Q.  Doctor, just a follow up to Ms. Calabrese's

13    question.

14         So, you testified at the first trial that Mr.

15    Thomas' statement informed you on the manner of death,

16    correct, but not at the second trial?

17      A.  Yes.

18      Q.  So, even without the statement, it didn't prevent

19    you from giving your opinion that this was a homicide,

20    as you said earlier, correct?

21      A.  Correct.

22                MR. KLEIN:  That's all I have.  Thank you.

23                (Deposition concluded at 11:24 a.m.)
```

```
1   STATE OF NEW YORK    )

2   COUNTY OF

3

4   I, MICHAEL SIKIRICA, do hereby certify that I have read

5   the foregoing record of my testimony taken at the time

6   and place noted in the heading hereof and that it is

7   a true and correct transcript of the same and the whole

8   thereof.

9

10

11

12

13                          _____
                                         MICHAEL SIKIRICA
14  Subscribed and sworn to

15  before me this _____ day

16  of _____, 2019

17

18

19

20

21  _____

22

23
```

```
 1               C E R T I F I C A T I O N

 2

 3

 4   I, Jeanne O'Connell, Registered Professional Reporter

 5   and Notary Public in and for the State of New York, do

 6   hereby certify that the foregoing to be a true and

 7   accurate transcription of the stenographic notes as

 8   taken by me of the aforesaid proceedings.

 9

10

11

12   _____        _____

13     Date                              Jeanne O'Connell

14

15

16

17

18

19

20

21

22

23
```

## 1

**10007** [1] - 287:3
**11:24** [1] - 395:23
**12180** [1] - 287:6
**12205** [2] - 286:21, 287:10
**12224** [1] - 287:13
**18** [1] - 340:2

## 2

**2001** [2] - 325:16, 339:23
**2019** [2] - 286:18, 396:16
**21** [1] - 331:17
**22** [1] - 287:5
**24th** [1] - 381:16
**25th** [1] - 381:17

## 3

**300** [2] - 320:12, 356:15
**305** [1] - 287:2

## 4

**400,000** [1] - 293:19

## 5

**5** [3] - 286:20, 287:9, 293:23
**50** [1] - 294:19

## 6

**60** [3] - 319:20, 341:11, 346:23
**600** [1] - 287:3
**6th** [1] - 286:18

## 7

**7** [1] - 293:23
**7A** [2] - 353:9, 354:11
**7B** [2] - 353:9, 354:11

## 9

**90** [1] - 321:22
**9:00** [1] - 286:19

## A

**a..** [1] - 342:9
**a.m** [2] - 286:19, 395:23
**abandonment** [1] - 351:13
**abdomen** [1] - 346:5
**abdominal** [1] - 320:16
**ability** [1] - 345:4
**able** [4] - 306:23, 315:6, 333:7, 375:19
**abnormal** [1] - 356:3
**abnormally** [2] - 374:5, 374:6
**abrupt** [2] - 293:9, 296:2
**absence** [3] - 308:9, 311:2, 315:21
**absolutely** [1] - 371:23
**abuse** [1] - 319:9
**academic** [1] - 334:11
**academically** [1] - 334:13
**accelerate** [1] - 321:2
**accelerated** [2] - 317:11, 347:10
**accessory** [1] - 382:20
**accident** [9] - 326:13, 343:15, 363:3, 363:4, 363:5, 363:8, 363:12, 363:23, 369:5
**accidental** [4] - 362:23, 370:16, 377:7, 377:9
**accidentally** [2] - 296:21, 365:4
**accidents** [2] - 367:8, 367:11
**according** [2] - 293:18, 294:19
**account** [2] - 320:17, 365:18
**accurate** [4] - 370:11, 371:17, 371:22, 397:7
**achievements** [1] - 334:11
**acting** [1] - 293:4
**action** [1] - 288:13
**acute** [2] - 321:13, 386:23
**ADAM** [1] - 286:6
**Adam** [2] - 287:7, 325:3
**adding** [1] - 351:20

**addition** [1] - 304:6
**additional** [2] - 337:13, 364:2
**administer** [1] - 288:18
**admitted** [3] - 298:20, 318:20, 378:7
**adopted** [1] - 297:19
**Adrian** [15] - 300:3, 300:4, 300:7, 318:23, 330:6, 332:6, 333:13, 365:14, 369:20, 377:20, 379:7, 379:12, 386:17, 392:12, 393:4
**ADRIAN** [2] - 286:3, 286:12
**Adrian's** [5] - 364:13, 364:15, 364:20, 373:23, 374:3
**adult** [2] - 292:5, 364:3
**adults** [2] - 292:2, 292:4
**advanced** [1] - 349:23
**advice** [1] - 328:16
**affected** [1] - 342:17
**affirmation** [1] - 288:18
**aforesaid** [1] - 397:8
**African** [2] - 308:20, 384:11
**ago** [1] - 374:20
**agonal** [1] - 322:8
**agree** [7] - 292:3, 293:16, 301:7, 322:3, 344:11, 384:6, 387:3
**agreed** [4] - 288:2, 288:8, 288:11, 288:15
**aid** [1] - 372:8
**air** [1] - 386:9
**airborne** [1] - 385:3
**airways** [2] - 374:7, 386:12
**Albany** [16] - 286:21, 287:10, 287:13, 295:14, 318:18, 318:19, 321:10, 321:19, 325:14, 338:10, 354:23, 394:13, 394:17, 394:20, 395:5, 395:7
**alcoholics** [2] - 292:5, 345:6, 345:7
**aligned** [1] - 358:12
**allegations** [2] - 329:11, 329:17

**allowed** [2] - 351:3, 353:3
**almost** [2] - 332:18, 350:7
**altered** [1] - 345:10
**alternative** [2] - 301:3, 393:12
**alternatively** [3] - 299:5, 300:19, 341:23
**amend** [2] - 289:16, 289:18
**American** [2] - 308:20, 384:11
**amount** [1] - 382:19
**anaerobic** [1] - 291:18
**analysis** [2] - 347:12, 363:10
**anatomic** [2] - 365:22, 367:3
**anemic** [1] - 382:18
**annually** [1] - 293:20
**answer** [11] - 310:18, 329:16, 351:11, 351:14, 351:21, 352:8, 354:18, 354:20, 364:23, 365:2, 384:18
**answered** [1] - 383:11
**antibiotic** [1] - 348:14
**antibiotics** [9] - 311:16, 311:23, 312:5, 347:19, 348:5, 348:17, 348:19, 348:22
**anticipation** [1] - 318:14
**anyway** [3] - 341:19, 363:14, 377:22
**apartment** [1] - 334:7
**apologize** [3] - 308:7, 373:17, 380:21
**apparent** [1] - 320:5
**appear** [3] - 355:9, 358:20, 358:22
**APPEARANCES** [1] - 287:1
**appeared** [1] - 295:12
**applied** [1] - 341:7
**apply** [3] - 292:9, 325:2, 325:4
**appointed** [1] - 339:17
**appointment** [1] - 339:19
**appreciated** [1] - 309:17
**approximate** [1] - 357:7
**ARDS** [3] - 321:12, 321:16, 322:2

**area** [1] - 334:8
**areas** [3] - 319:17, 351:13, 356:21
**argument** [1] - 302:21
**arraigned** [1] - 381:7
**arrest** [6] - 330:10, 375:20, 375:21, 375:23, 377:3, 377:13
**arrested** [2] - 375:11, 376:22
**arrive** [1] - 388:4
**arrived** [2] - 320:13, 388:23
**art** [1] - 329:15
**articles** [1] - 308:14
**asphyxiation** [1] - 368:22
**aspirate** [3] - 344:6, 345:8, 374:15
**aspirated** [2] - 302:18, 344:7, 385:10, 386:11
**aspirating** [1] - 392:15
**aspiration** [29] - 301:4, 301:11, 301:23, 302:4, 302:23, 303:3, 345:2, 345:11, 372:20, 372:21, 373:4, 373:6, 373:17, 373:19, 373:21, 374:8, 374:11, 374:13, 384:21, 384:22, 385:2, 385:15, 385:19, 385:23, 388:10, 391:10, 391:12, 391:14, 392:8
**assign** [1] - 371:13
**Assistant** [2] - 287:13, 366:12
**associated** [4] - 321:12, 321:14, 345:13, 345:14
**assume** [1] - 298:23
**assuming** [4] - 296:22, 301:16, 381:11, 381:15
**astute** [1] - 348:9
**attend** [4] - 327:4, 327:7, 327:9, 327:10
**attorney** [6] - 350:20, 366:13, 374:18, 376:4, 376:6, 376:11
**Attorney** [5] - 287:4, 287:12, 287:13, 366:12
**Attorney's** [1] - 326:7

306:19

**attorney's** [1] - 329:3
**Attorneys** [2] - 287:7,
287:11
**attorneys** [4] - 288:3,
351:12, 351:14,
351:15
**attributable** [1] -
295:15
**attribute** [1] - 322:22
**authority** [7] - 328:18,
328:19, 328:22,
331:8, 375:17,
376:9, 376:13
**autopsies** [3] -
325:21, 326:20,
327:4
**autopsy** [58] - 306:21,
309:17, 316:6,
326:15, 327:14,
328:3, 328:10,
329:21, 331:3,
332:12, 332:15,
332:17, 332:23,
333:4, 334:16,
335:12, 335:18,
335:22, 336:5,
337:5, 337:6,
337:20, 339:8,
340:17, 346:14,
346:19, 349:13,
354:15, 355:11,
360:18, 361:6,
362:4, 362:7,
365:16, 365:19,
367:6, 367:19,
371:10, 372:3,
372:4, 372:10,
372:12, 372:17,
373:13, 373:14,
374:19, 375:2,
376:4, 379:14,
380:11, 381:9,
381:10, 381:17,
388:6, 390:6,
393:15, 394:7,
394:19
**available** [2] - 361:7,
393:4
**Avenue** [2] - 286:20,
287:9
**aware** [7] - 308:19,
308:23, 311:22,
329:17, 338:17,
380:11, 389:14
**awhile** [1] - 335:20

**B**

**baby** [4] - 298:6,
299:2, 299:14,

**background** [1] -
340:13
**backwards** [1] -
359:12
**bacteremia** [8] -
294:9, 311:19,
312:12, 314:15,
317:4, 318:3, 350:6,
352:22
**bacteria** [16] - 291:18,
294:7, 343:10,
343:18, 344:13,
344:14, 344:15,
344:18, 344:23,
345:6, 350:6,
384:23, 385:3,
385:8, 385:10,
385:14
**bacterial** [10] - 294:20,
300:15, 307:7,
311:5, 342:23,
360:16, 360:17,
387:14, 387:18,
392:4
**Bailey** [2] - 286:19,
287:8
**ballpark** [1] - 294:22
**bar** [1] - 296:22
**baseball** [1] - 324:9
**based** [13] - 291:4,
291:16, 302:3,
302:9, 340:9,
340:12, 349:6,
351:4, 356:10,
356:20, 362:3,
362:7, 366:11
**Bates** [2] - 353:23,
354:5
**be..** [1] - 306:3
**became** [1] - 305:6
**become** [1] - 337:8
**bed** [2] - 298:17,
324:12
**began** [1] - 320:7
**begin** [1] - 359:13
**beginning** [1] - 387:5
**begins** [2] - 311:10,
313:21
**belief** [1] - 344:20
**beliefs** [1] - 351:7
**believable** [1] - 393:9
**benefit** [2] - 339:7,
361:9
**benefits** [1] - 348:14
**best** [1] - 390:15
**better** [5] - 337:9,
342:10, 342:11,
342:12, 342:13
**between** [9] - 288:3,

322:15, 335:8,
360:7, 366:18,
367:15, 368:6,
369:8, 381:4
**beyond** [3] - 352:8,
352:9, 352:14
**big** [1] - 319:9
**bilateral** [1] - 336:9
**biological** [1] - 368:14
**birth** [8] - 292:14,
318:18, 342:15,
342:16, 342:19,
346:12, 347:2,
384:12
**birth-related** [3] -
342:15, 346:12,
347:2
**bit** [9] - 292:4, 299:18,
330:20, 334:10,
335:4, 339:15,
351:8, 351:23, 368:9
**bleeding** [8] - 315:17,
319:13, 320:2,
320:18, 321:4,
321:6, 321:8, 322:12
**bleeds** [1] - 358:6
**blood** [15] - 295:6,
303:19, 304:2,
314:18, 315:13,
319:10, 319:20,
322:13, 322:18,
322:19, 341:10,
349:18, 356:2,
356:3, 382:19
**bloodstream** [5] -
290:23, 344:14,
350:6, 356:16,
387:22
**blunt** [12] - 305:21,
310:22, 311:2,
340:18, 342:2,
342:7, 357:12,
362:5, 363:11,
370:9, 376:23, 377:6
**body** [9] - 313:22,
327:11, 331:6,
331:9, 337:3,
337:10, 343:10,
344:15
**bought** [1] - 335:2
**brain** [29] - 297:7,
303:15, 304:3,
305:11, 306:2,
306:6, 306:14,
306:16, 306:22,
311:13, 313:23,
314:5, 315:14,
315:17, 319:10,
319:14, 319:18,
320:3, 320:14,

320:15, 320:18,
321:7, 321:8,
323:17, 336:13,
345:15, 345:20,
368:21, 374:10
**breaks** [1] - 343:16
**breathed** [1] - 385:7
**breathing** [6] - 344:3,
374:4, 374:5, 374:6,
391:23, 392:13
**Brett** [2] - 287:2,
366:13
**brew** [2] - 310:20,
311:19
**bring** [3] - 332:10,
332:12, 388:13
**broad** [1] - 371:9
**Broadway** [1] - 287:2
**brought** [2] - 332:14,
332:18, 353:12
**bruises** [1] - 310:3
**bumped** [2] - 298:8,
299:5
**bumping** [3] - 296:21,
300:10, 361:22
**burst** [1] - 359:9
**BY** [43] - 289:5, 296:3,
297:17, 298:15,
299:12, 301:20,
302:14, 303:17,
304:11, 304:23,
305:18, 307:21,
309:2, 310:23,
312:9, 314:20,
315:20, 319:6,
324:22, 328:17,
333:18, 339:6,
340:6, 346:21,
350:8, 353:8, 354:9,
357:16, 358:17,
360:12, 366:7,
373:11, 376:18,
377:19, 378:17,
379:8, 381:2,
384:20, 391:22,
392:16, 393:2,
393:22, 395:11

**C**

**Calabrese** [5] -
287:13, 366:12,
374:20, 383:22,
387:13
**CALABRESE** [24] -
297:11, 297:23,
298:12, 299:9,
304:20, 308:6,
310:15, 313:6,
313:10, 313:12,

340:6, 346:21,
350:8, 353:8, 354:4,
354:9, 357:16,
358:17, 360:12,
366:5, 391:18,
392:22, 393:2,
393:19
**Calabrese's** [2] -
382:4, 395:12
**cannot** [1] - 375:15
**Capitol** [1] - 287:12
**carcinoma** [1] -
368:20
**career** [1] - 334:13
**carries** [1] - 343:10
**cascading** [1] -
295:12
**case** [39] - 290:13,
290:21, 291:5,
291:13, 292:9,
295:2, 300:6,
300:16, 307:7,
308:9, 313:4, 314:8,
316:2, 317:19,
327:6, 327:22,
329:10, 332:5,
332:20, 334:22,
339:12, 343:2,
344:20, 354:16,
357:10, 359:13,
361:9, 362:6,
362:23, 377:2,
377:6, 377:12,
378:8, 382:12,
385:18, 388:14,
388:15, 388:18,
389:2
**cases** [2] - 294:20,
311:22, 314:3,
326:12, 326:18,
327:9, 328:8
**CAT** [1] - 337:9
**category** [1] - 289:20
**causally** [1] - 310:12
**causation** [3] -
368:12, 369:8,
370:23
**caused** [37] - 297:8,
301:4, 301:5, 301:8,
301:22, 301:23,
304:3, 305:9,
305:14, 307:3,
307:8, 307:13,
307:14, 317:12,
344:12, 347:4,
347:9, 358:6,
358:10, 360:22,
361:3, 370:8,
371:11, 378:4,
378:8, 378:14,

384:23, 385:2, 385:11, 385:17, 385:21, 385:23, 387:16, 387:18, 387:21, 389:4, 390:21

**causes** [11] - 294:19, 303:6, 304:4, 305:19, 322:19, 323:18, 344:13, 368:18, 368:23, 382:14, 384:22

**causing** [5] - 296:2, 302:4, 303:15, 361:19, 365:7

**cavity** [4] - 320:14, 320:15, 320:16

**CDC** [6] - 291:4, 291:16, 292:17, 293:18, 294:19, 384:9

**Center** [8] - 318:18, 325:14, 338:11, 394:13, 394:17, 394:20, 395:5, 395:7

**cerebral** [12] - 305:14, 305:16, 310:21, 317:9, 340:18, 347:4, 347:8, 360:13, 360:18, 361:2, 362:5, 387:16

**certain** [3] - 309:23, 331:2, 339:8

**certainly** [1] - 380:3

**certainty** [7] - 301:21, 302:6, 318:5, 340:14, 344:22, 349:6, 385:22

**certificate** [1] - 368:5

**certification** [1] - 288:9

**certify** [2] - 396:4, 397:6

**chain** [2] - 306:12, 344:8

**chance** [4] - 342:10, 342:11, 342:12, 342:13

**change** [3] - 289:15, 328:10, 377:21

**characterize** [1] - 326:11

**charged** [1] - 326:14

**chest** [1] - 346:5

**child** [25] - 299:23, 318:22, 319:9, 338:12, 350:3, 357:11, 361:13, 361:15, 361:18, 362:18, 363:22,

---

364:4, 365:3, 365:4, 365:8, 373:8, 373:19, 374:3, 374:5, 378:23, 379:2, 379:3, 382:2, 386:17, 392:15

**child's** [3] - 361:10, 361:22, 362:22

**children** [11] - 291:6, 292:6, 305:3, 308:20, 311:22, 312:6, 313:17, 313:19, 348:21, 353:20, 364:3

**Christina** [1] - 287:13

**city** [1] - 327:14

**CITY** [1] - 286:6

**City** [13] - 287:7, 325:2, 326:4, 326:10, 328:9, 329:7, 329:12, 330:2, 330:16, 332:13, 333:5, 334:2, 366:14

**civil** [1] - 333:13

**Claimant** [1] - 286:13

**CLAIMS** [1] - 286:10

**clarify** [2] - 353:17, 387:20

**classification** [1] - 290:10

**classified** [3] - 335:6, 362:8, 393:10

**clear** [7] - 312:4, 314:13, 345:4, 370:7, 374:7, 382:5, 386:16

**clearing** [1] - 386:12

**clinical** [1] - 321:19

**clinically** [1] - 291:23

**close** [3] - 291:5, 358:2, 358:3

**closed** [6] - 340:17, 342:7, 348:23, 357:11, 362:4, 363:10

**clot** [1] - 356:16

**clots** [1] - 319:14

**clotting** [4] - 320:9, 346:23, 356:2, 356:14

**clue** [1] - 386:19

**coagulopathy** [5] - 320:2, 320:5, 320:9, 320:13, 355:22

**coercion** [1] - 297:20

**coincidence** [1] - 387:8

**COLANERI** [1] - 286:7

**Colaneri** [4] - 287:7,

---

325:3, 334:2, 335:9

**colleagues** [1] - 316:4

**collect** [1] - 331:9

**collection** [4] - 314:14, 314:17, 315:18, 341:10

**collections** [1] - 319:10

**combination** [1] - 345:18

**combined** [1] - 319:23

**coming** [3] - 326:14, 379:18, 380:3

**commencing** [1] - 286:18

**commit** [1] - 347:13

**common** [5] - 291:20, 291:21, 345:9, 347:8, 348:18

**commonly** [1] - 291:23

**compare** [1] - 354:3

**compared** [1] - 390:20

**comparing** [1] - 354:7

**complete** [2] - 354:7, 367:2

**completely** [1] - 375:22

**complications** [3] - 292:15, 294:5, 383:23

**compromised** [1] - 292:10

**concerned** [1] - 367:22

**conclude** [2] - 388:8, 389:8

**concluded** [1] - 395:23

**conclusion** [9] - 329:15, 334:17, 334:18, 335:2, 335:3, 377:21, 381:13, 388:19, 388:23

**conclusions** [4] - 325:7, 388:14, 388:15, 388:17

**condition** [4] - 306:22, 314:22, 320:17, 337:16

**conditions** [4] - 313:9, 342:16, 342:19, 384:11

**conduct** [4] - 326:20, 326:22, 331:2, 364:21

**conducted** [5] - 337:20, 364:3, 365:10, 380:15,

---

381:6

**conducting** [2] - 361:5, 372:4

**confession** [2] - 332:6, 369:19

**confirmed** [1] - 306:18

**confusing** [1] - 364:14

**conjunction** [1] - 393:15

**connected** [1] - 310:12

**connections** [1] - 367:15

**consciousness** [3] - 345:5, 345:7, 345:11

**consequence** [1] - 347:8

**consider** [3] - 325:20, 357:10, 369:17

**considerably** [1] - 314:6

**considered** [1] - 290:5

**consistent** [17] - 302:4, 303:2, 309:21, 319:20, 319:22, 323:17, 364:15, 370:3, 370:5, 372:11, 372:17, 374:8, 374:11, 376:12, 378:10, 378:15, 379:6

**conspiracy** [3] - 329:11, 333:12, 339:2

**constant** [1] - 368:5

**consulted** [1] - 316:6

**contact** [1] - 291:14

**contacted** [1] - 394:14

**contemporaneous** [1] - 356:17

**context** [3] - 343:23, 352:7, 390:3

**continue** [1] - 364:21

**contribute** [2] - 388:15, 388:17

**contributed** [4] - 360:18, 360:20, 384:4, 393:5

**contributing** [4] - 317:13, 382:6, 382:14, 382:20

**contributory** [3] - 303:20, 305:15, 382:11

**conversation** [4] - 338:10, 349:14, 350:15, 351:17

**copied** [1] - 353:15

**copies** [1] - 354:22

---

**copious** [1] - 302:11

**copy** [4] - 353:10, 353:23, 354:5, 390:8

**correct** [131] - 289:16, 290:16, 291:2, 291:21, 292:1, 292:11, 292:15, 292:16, 292:19, 292:22, 293:10, 294:3, 294:4, 294:11, 295:9, 295:14, 295:18, 295:20, 300:12, 300:23, 301:2, 302:16, 303:5, 303:19, 303:22, 304:3, 304:7, 306:19, 307:5, 307:9, 309:6, 309:7, 309:9, 309:11, 309:14, 312:3, 312:8, 312:13, 312:16, 313:16, 315:14, 318:12, 319:14, 319:18, 319:21, 320:3, 320:18, 320:22, 321:2, 321:5, 321:12, 324:15, 325:8, 326:20, 327:8, 328:12, 328:20, 329:5, 329:6, 330:7, 330:11, 330:17, 332:6, 333:21, 334:3, 335:10, 335:13, 335:15, 336:6, 336:7, 336:10, 336:11, 336:13, 336:18, 336:21, 337:4, 337:14, 337:15, 337:17, 337:18, 340:19, 340:23, 344:12, 347:21, 352:18, 352:19, 353:2, 353:7, 366:19, 373:4, 374:16, 374:21, 374:23, 375:2, 375:3, 375:22, 377:14, 377:23, 378:2, 378:5, 378:11, 379:11, 379:14, 379:15, 380:4, 380:9, 380:16, 381:18, 382:2, 382:6, 382:9, 383:12, 383:15, 383:21, 384:23, 385:5, 388:2, 388:5,

388:8, 389:10, 391:12, 391:13, 392:4, 393:7, 393:13, 394:21, 395:16, 395:20, 395:21, 396:7
**correction** [2] - 289:23, 309:15
**correctly** [1] - 353:15
**correlated** [2] - 363:7, 388:20
**counsel** [3] - 366:13, 381:7, 381:8
**COUNTY** [2] - 286:7, 396:2
**County** [14] - 325:8, 325:15, 326:2, 326:7, 326:10, 326:23, 327:13, 328:21, 329:12, 329:19, 330:23, 339:14, 339:16, 339:20
**county** [4] - 325:12, 328:23, 330:19, 331:7
**couple** [3] - 313:3, 313:6, 366:10
**course** [2] - 321:18, 348:12
**court** [5] - 288:17, 297:21, 327:17, 339:14, 351:5
**COURT** [2] - 286:1, 286:10
**covered** [1] - 348:21
**CPS** [4] - 338:15, 380:15, 381:8, 381:16
**crazy** [1] - 347:23
**created** [1] - 364:22
**creating** [1] - 355:12
**crib** [9] - 296:22, 297:14, 298:8, 299:5, 299:6, 299:20, 300:10, 324:13, 361:18
**crime** [2] - 333:10, 334:8
**criminal** [2] - 330:6, 351:5
**Crystal** [1] - 287:10, 366:8
**CT** [2] - 309:16, 319:3
**cultures** [1] - 349:18
**cut** [1] - 337:3

---

### D

**DA** [3] - 326:10, 327:13, 328:21
**DA's** [4] - 326:23, 329:4, 329:12, 329:19
**damage** [1] - 345:19
**dance** [2] - 352:5
**date** [4] - 294:15, 295:4, 295:11, 296:8
**Date** [1] - 397:12
**days** [24] - 292:21, 296:5, 296:9, 296:11, 297:7, 312:16, 312:18, 312:19, 313:3, 313:7, 314:6, 314:7, 318:19, 335:22, 359:3, 359:6, 359:16, 359:19, 360:2, 360:4, 360:8, 386:21
**days'** [1] - 373:20
**dead** [3] - 334:14, 341:19, 383:12
**death** [52] - 305:10, 305:13, 307:8, 307:17, 308:3, 308:12, 311:5, 327:15, 327:19, 327:20, 327:23, 330:6, 331:5, 331:11, 331:15, 333:20, 340:16, 344:9, 367:14, 368:5, 368:7, 368:13, 368:14, 368:16, 368:18, 369:2, 369:8, 369:9, 369:10, 369:12, 369:16, 369:17, 369:18, 369:22, 370:4, 370:6, 370:8, 370:10, 371:8, 371:14, 382:5, 382:6, 382:8, 382:10, 382:11, 382:14, 383:9, 384:10, 387:11, 388:4, 389:9, 395:15
**debilitated** [1] - 313:19
**decedent's** [1] - 373:7
**declared** [1] - 362:6
**decline** [1] - 322:22
**dedicated** [1] - 327:11
**Defendant** [2] - 286:16, 286:17

**Defendants** [1] - 286:8
**define** [2] - 323:5, 323:6
**defined** [2] - 322:17, 322:18
**definition** [1] - 307:11
**definitions** [1] - 322:2
**definitively** [1] - 315:9
**degree** [12] - 301:21, 302:5, 318:4, 331:16, 340:14, 344:22, 349:5, 349:23, 361:8, 372:14, 385:22, 390:14
**delicate** [1] - 352:5
**demonstration** [1] - 389:17
**dental** [2] - 348:16, 348:17
**department** [1] - 325:12
**Department** [9] - 325:15, 328:10, 329:13, 330:3, 332:19, 333:5, 333:9, 334:3, 375:14
**dependent** [1] - 344:2
**DEPOSITION** [1] - 286:17
**deposition** [3] - 288:18, 318:15, 351:18
**Deposition** [1] - 395:23
**derangement** [1] - 310:21
**derivative** [2] - 382:22, 382:23
**describe** [3] - 334:5, 343:6, 368:16
**described** [8] - 297:9, 298:7, 298:17, 323:14, 344:16, 361:12, 361:15, 390:19
**description** [1] - 370:13
**despite** [1] - 335:8
**Detective** [1] - 390:7
**detectives** [2] - 297:19, 392:17
**deteriorated** [1] - 323:10
**deteriorating** [1] - 322:7
**determination** [1] - 311:14
**determinations** [1] -

**Defendants** 370:23, 372:10
**determine** [7] - 300:6, 300:7, 331:14, 356:8, 364:22, 371:8
**develop** [13] - 311:12, 312:18, 312:19, 312:20, 313:18, 313:20, 320:7, 343:22, 343:23, 344:4, 346:3, 359:14
**developed** [2] - 304:13, 304:19
**developing** [1] - 382:16
**devoted** [1] - 367:6
**diabetics** [1] - 348:20
**diagnose** [1] - 371:20
**diagnosed** [1] - 321:18
**diagnoses** [1] - 365:22
**diagnosis** [4] - 321:20, 331:22, 379:23, 388:20
**DIC** [7] - 319:23, 320:17, 321:2, 355:21, 355:22, 356:9, 356:11
**die** [5] - 341:5, 342:20, 367:7, 367:10, 383:5
**died** [9] - 326:19, 334:17, 334:19, 341:3, 341:9, 341:13, 357:11, 383:17, 384:13
**difference** [6] - 322:15, 335:8, 366:18, 368:6, 369:8, 370:7
**different** [8] - 333:19, 346:2, 351:8, 367:18, 368:13, 368:18, 379:3, 384:22
**differential** [1] - 379:22
**differentiation** [1] - 377:10
**difficulty** [1] - 334:10
**direct** [7] - 291:13, 294:10, 300:22, 303:19, 343:9, 385:4, 385:14
**directed** [1] - 376:6
**directly** [5] - 315:10, 315:11, 350:20, 392:9
**dirt** [2] - 343:11, 343:16
**disagree** [1] - 291:17

**disagreement** [1] - 333:23
**disclosure** [3] - 353:22, 354:3
**disclosures** [1] - 353:18
**discuss** [1] - 354:14
**discussed** [5] - 292:13, 305:23, 341:11, 356:17, 361:4
**discussion** [5] - 289:18, 340:12, 368:9, 372:19, 389:6
**disease** [52] - 291:10, 293:14, 295:8, 300:20, 300:22, 301:5, 301:8, 301:15, 301:22, 303:5, 303:6, 303:10, 303:21, 304:5, 305:7, 305:9, 305:15, 306:9, 306:14, 307:3, 307:12, 307:14, 307:16, 307:23, 308:11, 308:15, 308:21, 309:3, 309:9, 309:22, 310:10, 310:13, 312:11, 315:8, 315:11, 315:22, 316:5, 316:11, 316:19, 316:22, 317:3, 317:13, 317:18, 318:2, 319:8, 382:22, 383:2, 384:10, 384:19, 386:2, 387:4, 387:9
**disseminated** [2] - 320:12, 355:22
**distress** [1] - 321:13
**District** [1] - 326:7
**DISTRICT** [2] - 286:1, 286:1
**district** [4] - 329:3, 376:3, 376:6, 376:11
**doctor** [6] - 319:7, 333:8, 335:17, 356:8, 366:8, 395:12
**Doctor** [5] - 305:2, 335:15, 340:7, 376:19, 393:3
**document** [6] - 327:16, 327:20, 332:9, 337:11, 369:18, 394:19
**done** [7] - 306:19, 337:13, 338:3,

Case 1:17-cv-00626-DJS Document 11-6 Filed 06/14/21 Page 433 of 442

362:19, 362:20, 380:22, 395:7
**down** [14] - 298:6, 298:7, 298:16, 299:14, 299:23, 311:15, 323:14, 323:15, 344:6, 365:4, 378:15, 382:17, 386:8, 389:18
**Dr** [13] - 289:6, 307:6, 318:8, 318:11, 324:23, 337:22, 338:3, 338:5, 344:11, 347:12, 347:13, 348:4, 384:18
**dropped** [2] - 298:8, 299:3
**dropping** [5] - 296:12, 296:19, 297:14, 300:8, 365:8
**drug** [2] - 327:22, 328:5
**due** [21] - 297:20, 306:14, 310:22, 311:5, 317:9, 317:10, 322:19, 340:18, 342:7, 342:15, 345:2, 346:4, 346:8, 346:14, 346:23, 357:12, 360:13, 360:14, 362:5, 363:11, 368:22
**duly** [1] - 289:2
**duplicates** [1] - 355:8
**duration** [1] - 373:20
**during** [3] - 330:6, 332:16, 380:12

**E**

**early** [1] - 380:8
**edema** [21] - 303:14, 304:3, 305:15, 305:16, 310:21, 317:9, 340:18, 341:17, 341:18, 341:21, 342:3, 347:4, 347:8, 360:13, 360:18, 360:19, 361:2, 362:5, 387:10, 387:16, 387:21
**Edge** [2] - 337:23, 338:3
**education** [3] - 340:13, 349:6, 349:23

**effect** [1] - 321:10
**effectively** [1] - 359:9
**effects** [1] - 328:6
**either** [11] - 295:4, 295:17, 347:11, 350:5, 369:21, 370:15, 371:16, 375:20, 383:5, 383:20, 393:7
**elderly** [1] - 294:2
**element** [3] - 300:5, 310:18, 324:3
**elevated** [2] - 320:10, 356:14
**elucidate** [1] - 299:17
**emergency** [2] - 302:11, 367:19
**employed** [2] - 325:13
**employment** [1] - 335:4
**EMS** [1] - 371:17
**end** [5] - 323:8, 323:12, 360:7, 360:8, 382:16
**ended** [1] - 293:3
**ends** [1] - 326:14
**enforcement** [2] - 325:13, 329:3
**engage** [2] - 333:12, 339:2
**enlightening** [1] - 392:12
**enter** [1] - 344:14
**entered** [2] - 344:22, 345:2
**enters** [1] - 344:15
**entire** [4] - 353:10, 353:13, 353:15, 353:23
**entitled** [1] - 331:20
**entries** [1] - 338:11
**environment** [1] - 367:7
**error** [1] - 336:16
**especially** [5] - 292:5, 302:10, 304:15, 327:23, 348:19
**Esq** [3] - 287:2, 287:6, 287:10
**etc** [1] - 294:7
**evaluate** [3] - 367:13, 372:13
**evaluated** [1] - 334:15
**evaluation** [1] - 367:6
**evening** [1] - 289:15
**event** [4] - 314:18, 322:8, 322:23, 346:6
**events** [2] - 306:12, 344:8
**eventually** [1] - 332:21

**evidence** [8] - 306:16, 320:9, 320:12, 328:2, 351:3, 374:9, 391:11, 391:13
**evident** [1] - 304:10
**ex** [1] - 334:23
**ex-New** [1] - 334:23
**exactly** [5] - 328:22, 332:17, 357:8, 358:6, 379:5
**exam** [1] - 298:10
**Examination** [1] - 288:16
**examination** [5] - 288:4, 288:9, 306:15, 346:18, 361:6
**EXAMINATION** [8] - 289:4, 324:21, 340:5, 366:6, 376:17, 392:23, 393:21, 395:10
**examined** [1] - 289:3
**examiner** [13] - 325:8, 326:3, 330:20, 330:23, 331:21, 336:20, 339:17, 353:10, 353:13, 353:18, 366:23, 372:9, 375:13
**examiner's** [1] - 354:2
**examiners** [1] - 328:23
**example** [4] - 336:8, 343:12, 343:14, 363:20
**except** [3] - 288:12, 375:16, 375:17
**excuse** [2] - 338:2, 344:23
**exercised** [1] - 335:9
**exhaust** [1] - 317:21
**expand** [1] - 351:10
**expect** [1] - 355:3
**expectations** [1] - 361:8
**experience** [3] - 349:7, 351:4, 352:10
**experienced** [1] - 374:15
**expertise** [1] - 316:5
**expired** [1] - 368:15
**explain** [7] - 295:2, 324:3, 325:10, 327:18, 352:7, 363:17, 368:12
**explained** [3] - 298:20, 388:9, 388:10
**explanation** [12] -

297:13, 297:15, 300:7, 301:3, 362:17, 362:21, 363:6, 364:9, 364:18, 393:8, 393:9, 393:12
**exposed** [2] - 292:23, 385:8
**Extension** [2] - 286:20, 287:9
**extensive** [3] - 290:11, 329:5, 331:4
**extent** [4] - 312:11, 323:10, 329:14, 371:19
**extravasation** [1] - 322:13
**extreme** [2] - 313:4, 378:19
**extremis** [1] - 368:2
**exudate** [2] - 302:12, 302:15
**eye** [3] - 317:7, 317:9, 346:4
**eyes** [1] - 317:14

**F**

**fact** [5] - 307:9, 349:17, 350:9, 361:6, 389:7
**factor** [2] - 317:13, 363:12
**factors** [4] - 292:13, 363:17, 382:20, 384:4
**facts** [1] - 362:3
**facultative** [1] - 291:18
**failing** [1] - 334:11
**failure** [3] - 294:7, 382:17, 382:18
**fair** [6] - 297:4, 309:3, 329:7, 376:22, 383:17, 386:21
**fairly** [2] - 359:10, 377:12
**fall** [5] - 289:20, 299:19, 365:4, 367:12, 369:13
**falling** [1] - 324:12
**false** [3] - 378:3, 388:16, 388:22
**families** [1] - 371:7
**family** [10] - 289:21, 334:12, 334:21, 335:2, 335:5, 371:17, 372:7, 373:7, 394:14

**far** [1] - 323:2
**fashion** [1] - 312:22
**fatality** [4] - 293:23, 318:22, 338:13, 382:2
**father** [1] - 361:10
**feasible** [1] - 357:8
**feed** [1] - 346:10
**feet** [1] - 300:9
**fellowship** [2] - 367:4, 367:5
**felt** [2] - 390:20, 394:23
**fever** [2] - 293:4, 293:10
**few** [6] - 296:9, 296:11, 355:7, 355:12, 374:20, 386:20
**fibrinogen** [2] - 320:11, 356:15
**field** [2] - 312:4, 349:23
**figure** [1] - 353:20
**file** [6] - 318:13, 353:11, 353:13, 353:15, 353:18, 354:2
**filing** [1] - 288:8
**fill** [1] - 368:4
**films** [1] - 319:3
**final** [1] - 337:7
**financial** [1] - 339:7
**findings** [10] - 327:5, 327:17, 327:20, 362:7, 371:11, 372:12, 372:17, 376:4, 376:12, 393:15
**fine** [1] - 391:15
**finish** [1] - 391:18
**first** [9] - 289:2, 297:13, 300:7, 320:13, 337:16, 353:22, 366:15, 381:4, 395:14
**First** [1] - 287:5
**fit** [2] - 335:12, 335:18
**five** [1] - 291:6
**floor** [3] - 298:17, 299:4, 324:12
**flow** [1] - 306:8
**fluid** [1] - 314:15
**focused** [1] - 351:11
**folder** [2] - 389:18, 390:13
**follow** [4] - 327:22, 366:11, 392:22, 395:12
**followed** [1] - 334:20

Case 1:17-cv-00625-DJS Document 60-11 Filed 06/14/21 Page 432 of 442

following [1] - 298:14
follows [2] - 289:3, 310:5
followup [4] - 324:18, 340:8, 352:20, 353:4
force [20] - 296:17, 296:23, 297:5, 298:9, 299:7, 299:15, 305:21, 310:22, 311:2, 323:16, 340:18, 342:2, 342:7, 357:12, 362:5, 363:11, 370:9, 376:23, 377:6, 378:19
forceps [1] - 342:15
forcibly [5] - 297:15, 298:7, 300:8, 324:2, 361:15
foregoing [2] - 396:5, 397:6
forensic [9] - 366:16, 366:19, 366:22, 367:2, 367:4, 369:11, 370:20, 371:3
foreseeable [2] - 376:22, 377:5
forget [1] - 358:22
form [33] - 288:12, 295:21, 297:3, 301:18, 302:7, 303:11, 303:12, 304:8, 304:16, 305:12, 307:19, 308:22, 311:21, 312:7, 313:11, 314:16, 317:16, 319:11, 330:13, 333:17, 341:14, 344:16, 344:23, 345:17, 369:14, 377:16, 378:12, 378:13, 381:12, 384:15, 384:16, 390:23, 392:6
formation [1] - 346:2
forming [1] - 356:16
formula [1] - 346:9
forth [1] - 297:5
FOUNTAIN [1] - 286:6
Fountain [2] - 287:7, 325:4
four [2] - 362:18, 365:3
fourth [1] - 370:17
fracture [1] - 336:21
fractured [1] - 336:17
fractures [2] - 310:4,

368:21
frank [1] - 295:19
frankly [1] - 347:23
free [1] - 391:20
fresh [1] - 296:6
fresher [1] - 309:14
Friday [3] - 293:2, 293:15, 305:5
fruitful [2] - 365:11, 365:12
functioning [1] - 344:3, 344:5
funny [2] - 374:4, 391:23
FURTHER [5] - 340:5, 376:17, 392:23, 393:21, 395:10

## G

gallbladder [1] - 368:20
gamut [1] - 368:17
gathered [2] - 291:16, 362:4
gathering [1] - 361:7
GBS [1] - 289:19
General [3] - 287:12, 287:13, 366:12
general [2] - 322:21, 323:9
generally [1] - 293:9
generated [1] - 337:22
generation [1] - 348:15
Ginsberg [1] - 287:5
given [10] - 289:14, 292:13, 298:5, 300:7, 306:22, 320:22, 321:9, 384:9, 386:2, 393:4
glands [1] - 385:9
globalized [1] - 315:17
gold [2] - 337:6, 337:9
gradually [1] - 359:7
gram [2] - 291:17, 300:17
grand [4] - 318:17, 350:13, 350:16, 366:3
gravel [1] - 343:16
great [1] - 299:15
green [2] - 302:12, 302:15
Griffin [1] - 287:5
ground [1] - 389:19
group [4] - 289:19, 289:20, 289:21,

342:18
growing [2] - 310:21, 360:13
growth [2] - 318:20, 318:21
guarantee [2] - 335:3, 342:11
gunshot [3] - 334:14, 343:12, 368:20
guy [1] - 336:12

## H

half [2] - 291:6, 368:10
Hamilton [1] - 287:14
hands [8] - 298:18, 323:15, 389:17, 390:12, 390:14, 390:18, 391:4
hanging [1] - 368:22
hard [1] - 378:15
head [57] - 295:16, 295:23, 296:5, 296:22, 298:7, 298:8, 298:16, 298:18, 299:5, 299:14, 299:20, 300:2, 300:10, 302:3, 302:9, 302:12, 303:14, 303:18, 304:9, 304:12, 304:18, 305:17, 317:10, 319:4, 323:15, 323:23, 324:5, 324:8, 324:13, 340:17, 341:3, 341:8, 341:14, 342:2, 342:7, 345:14, 346:8, 348:23, 357:11, 357:13, 361:20, 361:22, 361:23, 362:5, 362:23, 363:10, 368:21, 370:5, 378:18, 379:2, 382:23, 389:17, 389:18, 390:12, 390:15, 390:19, 391:4
heading [2] - 331:23, 396:6
health [1] - 325:12
Health [2] - 325:15, 375:14
heard [3] - 319:7, 319:12, 381:4
height [2] - 324:8
held [1] - 286:18

help [1] - 371:20
helpful [1] - 331:14
hematoma [28] - 305:14, 305:20, 309:16, 310:22, 311:3, 314:15, 314:18, 315:14, 315:19, 315:23, 319:22, 321:11, 323:19, 341:5, 341:9, 341:15, 341:16, 341:20, 342:3, 343:2, 346:19, 346:22, 356:18, 360:14, 361:3, 387:10, 387:17
hematomas [2] - 336:9, 341:4
hemorrhage [3] - 324:4, 386:23, 387:2
hemorrhages [2] - 345:23, 346:4
hemorrhaging [1] - 345:22
heparin [3] - 320:22, 321:3, 321:9
hereby [3] - 288:2, 396:4, 397:6
hereof [1] - 396:6
hereto [1] - 288:4
Hicks [5] - 338:8, 394:3, 394:6, 394:10, 394:12
hiding [1] - 350:9
high [3] - 321:21, 360:7, 373:20
higher [3] - 294:2, 308:20, 374:13
himself [1] - 371:16
hired [1] - 334:21
histories [4] - 371:20, 372:2, 372:8, 372:11
history [3] - 302:22, 302:23, 371:15
hit [1] - 385:9
hitting [2] - 296:21, 324:13
HIV [1] - 368:19
hold [1] - 318:4
holding [1] - 299:14
home [1] - 390:4
homicide [31] - 326:15, 334:17, 335:7, 339:12, 362:6, 362:9, 362:15, 362:19, 363:2, 363:9, 363:11, 363:14, 364:17, 369:5,

370:6, 370:16, 376:5, 376:12, 377:21, 388:8, 388:10, 388:11, 388:14, 388:18, 388:20, 388:23, 389:8, 393:6, 393:7, 393:10, 395:19
homicides [2] - 367:9, 367:11
hospital [10] - 293:3, 305:6, 310:20, 311:5, 318:20, 320:8, 338:2, 338:4, 367:7, 367:10
hospitalization [3] - 296:15, 296:21, 321:19
hospitalizations [1] - 293:19
hospitalized [3] - 320:6, 321:9, 343:23
hospitals [1] - 336:2
hundred [2] - 321:22, 355:6
hypothetical [1] - 346:6
hypothetically [4] - 298:23, 305:2, 308:10, 315:22

## I

idea [2] - 326:18, 337:5
identified [1] - 300:17
image [4] - 292:10, 313:19, 384:5, 384:12
immune [2] - 313:19, 384:12
impact [10] - 299:13, 299:19, 324:3, 341:3, 341:13, 369:13, 379:4, 383:7, 392:9, 392:13
impacted [2] - 324:9, 343:17
implant [1] - 348:17
imply [1] - 369:11
important [2] - 289:23, 355:11
inability [1] - 322:18
incident [1] - 297:7
incidents [1] - 374:4
include [3] - 293:9, 294:7, 362:10
included [2] - 289:21, 389:12

# APPENDIX

**including** [4] - 313:22, 314:5, 321:15, 361:6
**inconsistencies** [1] - 372:13
**increase** [2] - 321:2, 339:15
**increased** [1] - 346:4
**incredibly** [3] - 357:13, 358:5, 358:14
**incubation** [10] - 292:18, 312:10, 312:15, 312:17, 313:8, 359:5, 359:15, 359:18, 360:4, 387:8
**independent** [9] - 301:10, 307:8, 325:7, 325:10, 329:2, 331:12, 335:9, 365:9, 394:8
**independently** [2] - 360:15, 395:3
**indicate** [2] - 306:17, 392:14
**indicates** [1] - 356:15
**indication** [2] - 373:5, 373:16
**indications** [4] - 310:8, 373:3, 373:12, 391:10
**indicators** [1] - 341:7
**indirectly** [1] - 315:11
**individual** [5] - 344:2, 368:2, 375:11, 376:2, 376:7
**individuals** [1] - 372:16
**infant** [3] - 326:14, 346:7, 373:21
**infants** [1] - 345:16
**infected** [2] - 305:6, 307:17
**infecting** [1] - 293:14, 295:9
**infection** [33] - 290:20, 290:23, 294:18, 295:2, 295:6, 300:15, 303:19, 304:2, 304:19, 307:7, 309:5, 311:6, 311:18, 312:12, 312:21, 313:16, 315:13, 316:23, 318:3, 319:8, 342:22, 342:23, 347:5, 347:9, 347:10, 348:10, 348:13, 356:4, 360:16, 360:17,

368:19, 387:14, 387:18
**infections** [2] - 290:16, 319:13
**infectious** [2] - 316:5, 384:19
**inflamed** [1] - 306:14
**inflammation** [2] - 312:21, 359:2
**inflammatory** [1] - 334:8
**inflict** [1] - 323:22
**information** [8] - 317:17, 325:21, 325:22, 338:13, 362:3, 362:22, 372:7, 375:18
**informed** [2] - 379:14, 395:15
**ingested** [1] - 385:7
**inhabitants** [2] - 291:20, 291:21
**initial** [1] - 379:20
**injured** [1] - 361:13
**injuries** [25] - 298:10, 299:7, 299:21, 323:16, 324:6, 340:17, 342:15, 357:5, 357:12, 357:13, 362:18, 364:4, 364:9, 364:20, 364:22, 365:6, 365:7, 365:15, 365:19, 368:4, 368:21, 371:12, 393:6, 393:9, 393:12
**injury** [43] - 295:16, 295:23, 296:4, 296:6, 296:13, 297:6, 299:16, 299:23, 301:13, 302:3, 305:21, 317:7, 317:9, 317:10, 317:14, 324:3, 341:3, 341:14, 342:7, 345:20, 346:8, 346:12, 347:2, 342:23, 361:3, 361:19, 362:5, 362:11, 362:13, 363:7, 363:11, 363:15, 363:17, 363:22, 364:16, 365:20, 367:13, 370:5, 383:8, 387:17, 392:13, 393:16
**innocuous** [2] - 341:6,

383:6
**inquiry** [1] - 363:20
**insane** [1] - 348:2
**inside** [2] - 306:2, 337:3
**insight** [3] - 369:21, 377:22, 379:13
**instance** [1] - 369:22
**instances** [1] - 372:6
**institutions** [1] - 336:3
**insufficient** [2] - 298:9, 300:11
**interchangeable** [1] - 350:7
**internet** [1] - 390:4
**interrogation** [1] - 389:11
**interval** [1] - 390:16
**interview** [7] - 338:15, 380:15, 381:6, 381:16, 381:20, 381:21, 395:6
**interviewing** [1] - 334:20
**interviews** [1] - 364:2
**intestine** [1] - 343:20
**intravascular** [2] - 320:13, 355:22
**investigation** [7] - 331:16, 334:18, 336:23, 364:21, 365:9, 380:12, 390:9
**investigators** [1] - 327:12, 334:22
**involve** [2] - 370:10, 370:12
**involved** [4] - 326:14, 334:6, 363:5, 372:18
**involvement** [1] - 314:4
**involves** [1] - 371:3, 378:9
**issue** [1] - 380:8
**issues** [1] - 322:20
**issuing** [1] - 316:7
**items** [1] - 354:13, 369:3, 370:21
**itself** [3] - 361:2, 371:10, 385:4

## J

**jail** [2] - 338:16, 380:14
**jailhouse** [3] - 381:6, 381:15, 381:20
**Jeanne** [3] - 286:21, 397:4, 397:12
**Jersey** [1] - 334:23

**job** [2] - 326:2, 372:9
**Joe** [2] - 324:23, 366:13
**Johnson** [2] - 286:19, 287:8
**Joseph** [1] - 287:6
**judge** [1] - 352:11
**judgment** [2] - 325:23, 335:10
**jurisdiction** [1] - 367:12
**jury** [4] - 318:17, 350:13, 350:16, 366:3

## K

**Katherine** [1] - 287:14
**keep** [3] - 344:2, 344:3, 348:12
**kid** [1] - 300:8
**killed** [1] - 348:16
**kills** [1] - 291:5
**kind** [4] - 299:21, 324:6, 335:18, 351:23
**kindergarten** [1] - 331:18
**Klein** [14] - 287:2, 307:6, 340:9, 340:12, 344:11, 347:13, 348:4, 354:4, 358:19, 359:9, 366:13, 376:20, 384:18, 394:4
**KLEIN** [69] - 289:5, 296:3, 297:17, 298:4, 298:15, 299:12, 301:20, 302:14, 303:17, 304:11, 304:23, 305:18, 307:21, 309:2, 310:23, 312:9, 313:8, 313:11, 313:14, 314:20, 315:20, 319:6, 324:16, 328:13, 329:14, 330:8, 330:13, 330:22, 333:14, 339:3, 339:10, 340:20, 346:16, 347:7, 347:22, 349:10, 350:4, 350:10, 352:3, 352:13, 352:23, 353:5, 354:17, 354:19, 357:15,

357:22, 358:7, 358:15, 359:20, 360:5, 360:11, 364:6, 365:17, 373:9, 373:15, 375:12, 376:18, 377:19, 378:17, 379:8, 380:19, 381:2, 384:20, 391:19, 391:22, 392:16, 392:21, 395:11, 395:22
**Klein's** [2] - 318:8, 347:12
**knowledge** [2] - 329:5, 360:16
**known** [1] - 350:2

## L

**laboratory** [1] - 356:10
**laid** [1] - 299:6
**lancet** [1] - 291:17
**large** [1] - 305:14
**last** [5] - 289:10, 290:9, 308:15, 339:19, 368:10
**latter** [1] - 327:18
**Law** [1] - 286:19
**law** [6] - 297:21, 325:13, 329:2, 330:19, 331:7, 336:4
**lay** [3] - 341:2, 344:15, 349:21
**laymen's** [1] - 349:18
**lead** [16] - 302:12, 302:13, 304:6, 319:9, 320:2, 323:3, 343:5, 343:6, 343:8, 349:2, 383:2, 387:9, 387:10, 388:7, 389:7
**leading** [5] - 343:20, 344:9, 374:13, 386:3
**learn** [1] - 327:4
**least** [1] - 367:3
**Leestma's** [1] - 318:11
**leg** [1] - 343:16
**legal** [3] - 329:15, 361:5, 381:13
**less** [2] - 300:9, 390:21
**lethargic** [1] - 293:4
**level** [1] - 356:15
**levels** [1] - 321:21
**life** [1] - 367:22
**likely** [11] - 303:8, 303:13, 306:21, 317:6, 322:3, 356:21, 356:23,

360:2, 364:5, 384:13, 392:2
**limited** [1] - 369:2
**list** [1] - 332:22
**listed** [3] - 333:3, 340:16, 354:11
**listen** [1] - 325:20
**literature** [2] - 292:6, 292:17
**litigation** [1] - 366:9
**live** [1] - 342:12
**lived** [3] - 342:4, 342:8, 383:15
**living** [2] - 334:7, 342:11
**location** [1] - 357:4
**locations** [1] - 357:7
**look** [11] - 308:17, 328:5, 337:3, 354:19, 364:8, 365:2, 370:21, 370:22, 371:9, 372:2, 372:13
**looked** [1] - 290:10
**looking** [8] - 307:10, 360:7, 360:8, 367:17, 371:4, 371:5, 371:6, 372:3
**lose** [1] - 345:5
**loss** [1] - 322:18
**lost** [2] - 345:7, 382:19
**low** [3] - 342:16, 356:13, 360:8
**lung** [1] - 302:15
**lungs** [9] - 302:12, 303:2, 321:20, 344:3, 344:4, 344:6, 345:2, 359:6, 386:8

**M**

**main** [1] - 310:21
**major** [2] - 348:19, 382:10
**malformation** [1] - 306:5
**manner** [18] - 299:4, 307:16, 367:14, 367:16, 368:7, 368:11, 368:13, 369:2, 369:16, 369:21, 370:6, 370:9, 370:13, 371:2, 371:8, 371:13, 388:4, 395:15
**marked** [4] - 355:7, 355:13, 355:15, 355:18

**markers** [1] - 383:7
**marks** [3] - 293:13, 310:3, 314:10
**Mason** [3] - 287:7, 325:3, 390:8
**MASON** [1] - 286:6
**massive** [2] - 322:12, 322:13
**material** [6] - 302:18, 302:19, 302:23, 344:6, 344:7, 356:16
**materials** [8] - 330:16, 335:17, 335:21, 335:23, 337:22, 354:21, 370:22
**matter** [4] - 297:21, 337:23, 338:8, 348:9
**matters** [1] - 298:9
**Matthew** [36] - 292:10, 292:23, 293:12, 293:13, 294:13, 297:14, 298:6, 299:23, 301:15, 302:10, 302:23, 307:17, 307:18, 309:8, 310:20, 314:10, 318:19, 319:13, 320:6, 320:8, 336:17, 337:13, 341:2, 341:13, 341:19, 341:23, 342:7, 342:20, 345:12, 346:12, 346:13, 356:9, 370:4, 383:11, 385:7, 391:23
**Matthew's** [14] - 295:2, 309:21, 316:12, 319:4, 320:3, 321:18, 322:22, 345:2, 364:11, 373:22, 374:9, 374:10, 384:5, 384:11
**mattress** [9] - 296:13, 297:16, 299:3, 299:19, 300:8, 324:13, 361:16, 378:9, 378:16
**ME** [1] - 367:12
**mean** [13] - 300:3, 300:5, 315:5, 323:23, 324:7, 341:2, 348:18, 350:5, 355:6, 355:23, 363:13, 369:9, 378:22
**means** [1] - 356:2
**meant** [3] - 350:2,

350:3, 373:17
**mechanism** [21] - 324:6, 346:2, 362:11, 362:13, 363:17, 365:15, 365:18, 365:20, 369:9, 369:10, 369:15, 369:17, 369:18, 369:22, 370:4, 370:9, 370:12, 371:2, 377:23, 386:10, 393:16
**mechanisms** [4] - 297:4, 298:9, 299:6, 299:22
**Med** [4] - 318:19, 321:10, 321:19, 355:2
**medical** [45] - 295:23, 302:5, 307:9, 307:10, 312:4, 318:5, 318:17, 325:8, 326:3, 328:23, 329:5, 330:20, 330:23, 331:21, 336:20, 338:12, 339:16, 340:14, 344:22, 349:5, 353:10, 353:13, 353:18, 353:23, 354:22, 355:2, 356:10, 358:8, 361:5, 362:7, 366:23, 368:15, 371:5, 371:17, 372:5, 372:9, 373:2, 373:13, 380:7, 385:19, 385:22, 388:7, 388:19, 394:18, 394:20
**Medical** [8] - 318:18, 325:14, 338:11, 394:13, 394:17, 394:20, 395:5, 395:7
**medically** [1] - 303:2
**medications** [1] - 328:6
**meets** [1] - 293:13
**member** [1] - 373:7
**members** [2] - 334:21, 371:17
**meninges** [15] - 290:20, 294:18, 295:2, 300:18, 304:19, 309:5, 311:18, 312:12, 312:20, 313:16, 316:23, 318:3, 342:22, 347:5, 359:2

**meningitis** [4] - 290:18, 294:6, 294:20, 342:22
**mention** [2] - 373:18, 373:22
**mentioned** [6] - 318:7, 330:15, 333:23, 347:13, 376:3, 392:12
**mention** [1] - 345:10
**met** [1] - 314:10
**metastatic** [1] - 368:19
**MICHAEL** [5] - 286:7, 286:17, 289:2, 396:4, 396:13
**Michael** [1] - 287:11
**might** [3] - 305:10, 328:7, 346:18
**mildly** [1] - 356:14
**milk** [1] - 346:9
**million** [1] - 291:6
**mimic** [1] - 319:9
**mind** [4] - 353:6, 368:13, 390:11, 392:14
**mine** [1] - 335:3
**mini** [1] - 319:16
**minimum** [1] - 348:13
**minor** [1] - 379:4
**minute** [1] - 370:19
**miracle** [1] - 358:8
**misleading** [1] - 375:5
**missed** [1] - 306:20
**mix** [2] - 311:17, 353:20
**MLs** [3] - 319:20, 341:11, 346:23
**modalities** [1] - 337:8
**moments** [1] - 374:20
**Monday** [1] - 295:13
**month** [2] - 362:18, 365:3
**morning** [5] - 289:6, 289:7, 296:20, 340:7, 376:19
**mortality** [1] - 348:6
**most** [6] - 291:23, 302:3, 355:15, 355:16, 355:19, 386:21
**mother** [3] - 342:17, 364:3, 373:7
**motivation** [1] - 389:4
**motorcycle** [1] - 343:15
**move** [1] - 373:9
**MR** [85] - 289:5, 296:3, 297:12, 297:17, 298:3, 298:4,

298:15, 299:10, 299:12, 301:20, 302:14, 303:12, 303:17, 304:11, 304:23, 305:18, 307:21, 309:2, 310:16, 310:23, 312:9, 313:8, 313:11, 313:14, 314:20, 315:20, 319:6, 324:16, 324:22, 328:13, 328:17, 329:14, 330:8, 330:13, 330:22, 333:14, 333:18, 339:3, 339:6, 339:10, 340:3, 340:20, 346:16, 347:7, 347:22, 349:10, 350:4, 350:10, 352:3, 352:13, 352:23, 353:5, 354:17, 354:19, 357:15, 357:22, 358:7, 358:15, 359:20, 360:5, 360:11, 364:6, 365:17, 373:9, 373:15, 375:12, 376:18, 377:16, 377:19, 378:13, 378:17, 378:21, 379:8, 380:19, 381:2, 384:16, 384:20, 391:2, 391:19, 391:22, 392:6, 392:16, 392:21, 395:11, 395:22
**MRI** [5] - 306:18, 306:20, 337:13, 337:17, 337:19
**MRIs** [1] - 337:9
**MS** [72] - 295:21, 296:10, 297:3, 297:10, 297:11, 297:22, 297:23, 298:11, 298:12, 299:8, 299:9, 301:18, 302:7, 303:11, 304:8, 304:16, 304:20, 305:12, 307:19, 308:6, 308:8, 308:22, 310:14, 310:15, 311:21, 312:7, 313:5, 313:6, 313:10, 313:12, 314:16, 315:3, 315:15, 317:16,

319:11, 320:4, 323:21, 333:15, 340:6, 346:21, 350:8, 353:8, 353:17, 354:4, 354:6, 354:9, 357:16, 358:17, 360:12, 360:23, 366:5, 366:7, 373:11, 376:16, 377:15, 378:12, 378:20, 380:5, 380:17, 380:21, 381:12, 384:15, 389:20, 390:23, 391:18, 392:5, 392:22, 393:2, 393:19, 393:20, 393:22, 395:9
**mucoid** [1] - 302:23
**multiple** [3] - 326:16, 343:22, 373:3
**multisystem** [1] - 382:16
**must** [1] - 301:4
**myriad** [2] - 328:7, 371:11

## N

**name** [3] - 316:9, 324:23, 366:8
**names** [2] - 325:18, 325:20
**narrative** [1] - 351:6
**natural** [2] - 369:6, 370:18
**nature** [4] - 325:11, 327:6, 348:11, 368:3
**nearly** [1] - 354:6
**necessarily** [5] - 309:5, 324:7, 362:12, 378:22, 378:23
**necessary** [1] - 371:7
**need** [5] - 296:23, 331:7, 347:20, 375:18, 394:23
**needed** [1] - 296:17
**never** [7] - 319:12, 338:3, 344:11, 347:18, 375:9, 375:23, 380:23
**new** [3] - 357:14, 357:17
**NEW** [4] - 286:1, 286:10, 286:15, 396:1
**New** [11] - 286:21,

286:23, 287:3, 287:6, 287:10, 287:12, 287:13, 288:5, 334:23, 397:5
**next** [2] - 358:20, 358:22
**night** [3] - 289:10, 290:9, 308:15
**nonaccidental** [1] - 323:20
**none** [1] - 297:4
**nonetheless** [1] - 311:23
**nonresponsive** [2] - 352:12, 373:10
**normal** [2] - 320:10, 344:7, 356:13
**normally** [1] - 346:10
**NORTHERN** [1] - 286:1
**Notary** [3] - 286:22, 288:5, 397:5
**noted** [1] - 396:6
**notes** [3] - 325:5, 338:10, 397:7
**nothing** [2] - 340:3, 363:21
**Notice** [1] - 288:16
**noticed** [1] - 309:16
**number** [1] - 367:21

## O

**O'Connell** [3] - 286:21, 397:4, 397:12
**oath** [1] - 288:18
**object** [4] - 313:11, 373:9, 378:13, 392:6
**objected** [1] - 352:15
**objection** [82] - 295:21, 296:10, 297:3, 297:10, 297:11, 297:22, 297:23, 298:11, 298:12, 299:8, 299:9, 301:18, 302:7, 303:11, 303:12, 304:8, 304:16, 304:20, 305:12, 307:19, 308:7, 308:8, 308:22, 310:14, 310:15, 311:21, 312:7, 313:5, 314:16, 315:3, 315:15, 317:16, 319:11, 320:4, 323:21, 328:13,

329:14, 330:8, 330:13, 330:22, 333:14, 333:15, 339:3, 339:10, 340:20, 346:16, 347:7, 347:22, 349:10, 350:4, 350:10, 352:3, 352:13, 352:23, 353:5, 354:17, 357:15, 357:22, 358:7, 358:15, 359:20, 360:5, 360:11, 360:23, 364:6, 365:17, 373:15, 375:12, 377:15, 377:16, 378:12, 378:20, 378:21, 380:5, 380:17, 381:12, 384:15, 384:16, 389:20, 390:23, 391:2, 392:5
**Objection** [4] - 297:12, 298:3, 299:10, 310:16
**objections** [2] - 288:11, 288:16
**obligated** [1] - 331:15
**observed** [3] - 320:3, 365:15, 378:4
**obtain** [2] - 325:22, 367:3
**obtained** [1] - 388:22
**obvious** [2] - 326:15, 377:12
**occasions** [2] - 326:9, 359:8
**occupying** [1] - 341:10
**occur** [3] - 344:5, 360:6, 371:13
**occurred** [21] - 356:21, 356:23, 357:6, 357:8, 362:18, 362:21, 363:6, 363:21, 364:9, 364:11, 369:13, 370:10, 370:13, 370:14, 371:13, 379:6, 379:10, 379:13, 386:23, 387:4, 388:10
**occurring** [1] - 382:18
**occurs** [2] - 311:12, 343:10
**odd** [2] - 357:13, 358:5
**OF** [6] - 286:1, 286:6,

286:10, 286:15, 396:1, 396:2
**Office** [4] - 287:12, 326:7, 329:12, 329:20
**office** [3] - 326:23, 329:3, 329:4
**Officer** [1] - 335:9
**officer** [2] - 327:10, 333:20
**officers** [5] - 325:17, 327:7, 329:8, 366:14
**Offices** [1] - 286:19
**often** [7] - 325:22, 327:9, 345:6, 345:7, 345:19, 369:11, 369:15
**old** [7] - 291:6, 331:17, 357:13, 357:20, 362:18, 365:3
**older** [3] - 357:3, 357:5
**omit** [2] - 375:4, 375:7
**once** [4] - 313:21, 337:2, 350:16, 350:17
**one** [44] - 292:14, 292:21, 295:20, 303:7, 304:4, 305:2, 309:13, 309:14, 309:15, 309:17, 312:15, 312:18, 315:18, 321:23, 325:6, 327:10, 332:21, 333:23, 336:13, 336:17, 343:14, 343:19, 345:17, 345:19, 347:11, 348:14, 356:4, 356:5, 356:6, 357:17, 357:20, 359:3, 359:6, 359:15, 359:18, 360:4, 361:4, 361:6, 367:21, 370:17, 382:8, 385:21, 392:22, 393:20
**ones** [5] - 323:17, 333:4, 355:15, 355:18
**onset** [3] - 293:9, 321:16, 387:8
**open** [3] - 337:10, 343:16, 352:7
**operations** [1] - 347:18
**opined** [1] - 307:7
**opinion** [20] - 295:23, 301:12, 307:10, 307:23, 314:21,

286:10, 286:15, 396:1, 396:2
**opinions** [6] - 318:4, 333:19, 351:6, 351:10, 367:20, 373:14
**opportunity** [3] - 351:9, 352:6, 354:10
**opposed** [4] - 295:20, 377:7, 385:10, 389:8
**opposite** [1] - 339:11
**opposition** [1] - 336:2
**OR** [1] - 347:19
**orbits** [1] - 317:8
**order** [2] - 370:22, 375:17
**organ** [1] - 382:17
**organs** [2] - 314:5, 382:17
**otherwise** [1] - 362:21
**outcomes** [1] - 342:19
**outlook** [1] - 371:9
**outright** [1] - 360:22
**outside** [2] - 347:19, 367:7
**overdose** [1] - 327:22
**overuse** [1] - 348:5
**overwhelming** [6] - 314:4, 316:13, 316:14, 316:15, 316:18, 323:13
**own** [10] - 325:7, 325:23, 334:21, 335:9, 345:8, 353:6, 361:12, 361:22, 391:7, 392:19
**oxygen** [4] - 319:17, 321:21, 321:23
**oxygenate** [1] - 322:18
**oxygenating** [1] - 321:23

## P

**P.C** [2] - 286:20, 287:8
**package** [2] - 355:4, 395:8
**page** [8] - 300:14, 332:6, 353:16, 354:7, 354:8, 354:11, 389:5, 389:12
**parents** [1] - 305:5

Case 1:17-cv-00625-DJS Document 60-1 Filed 06/14/21 Page 438 of 442

**part** [9] - 326:2, 327:18, 329:11, 336:23, 365:21, 372:5, 372:10, 394:17, 395:7
**particular** [1] - 309:13
**particularly** [4] - 292:7, 292:9, 313:20, 383:8
**parties** [1] - 288:4
**parts** [1] - 395:2
**passage** [1] - 289:14
**passed** [2] - 306:19, 323:11
**past** [1] - 352:10
**pathologist** [4] - 366:17, 366:19, 366:22, 370:21
**pathologists** [2] - 367:2, 369:11
**pathology** [4] - 367:3, 367:4, 367:5, 371:3
**patient** [3] - 347:18, 371:16, 371:21
**patient's** [1] - 371:16
**patients** [3] - 309:4, 348:11, 367:11
**pattern** [2] - 364:16, 392:13
**patterns** [1] - 367:13
**Pattison** [1] - 287:5
**PD** [1] - 334:18
**PECK** [48] - 295:21, 296:10, 297:3, 297:10, 297:22, 298:11, 299:8, 301:18, 302:7, 303:11, 304:8, 304:16, 305:12, 307:19, 308:8, 308:22, 310:14, 311:21, 312:7, 313:5, 314:16, 315:3, 315:15, 317:16, 319:11, 320:4, 323:21, 333:15, 353:17, 354:6, 360:23, 366:7, 373:11, 376:16, 377:15, 378:12, 378:20, 380:5, 380:17, 380:21, 381:12, 384:15, 389:20, 390:23, 392:5, 393:20, 393:22, 395:9
**Peck** [6] - 286:19, 287:8, 287:10, 353:14, 366:9, 391:9

**pediatrician** [1] - 384:19
**pending** [2] - 369:6, 370:18
**penetrating** [1] - 343:9
**people** [7] - 326:23, 329:4, 336:6, 344:15, 348:20, 363:4, 371:6
**percent** [3] - 293:23, 294:19, 321:22
**perform** [1] - 338:15
**performing** [1] - 372:9
**perhaps** [1] - 327:17
**period** [6] - 292:18, 312:10, 312:15, 312:18, 358:11, 359:5
**peritoneal** [3] - 320:14, 320:15, 320:16
**Perkins** [1] - 287:6, 324:23, 340:10, 340:12, 366:13, 379:17
**PERKINS** [16] - 297:12, 298:3, 299:10, 303:12, 310:16, 324:22, 328:17, 333:18, 339:6, 340:3, 377:16, 378:13, 378:21, 384:16, 391:2, 392:6
**person** [15] - 291:14, 293:7, 326:15, 326:19, 331:17, 343:15, 343:19, 344:5, 345:10, 346:3, 349:21, 362:20, 363:20, 368:15
**person's** [2] - 328:6, 367:22
**person-to-person** [1] - 291:14
**personal** [1] - 328:6
**pertinent** [2] - 317:18, 390:9
**petechiae** [1] - 345:22
**petechial** [2] - 345:23, 346:3
**photograph** [1] - 328:4
**photographer** [1] - 327:12
**photographing** [1] - 327:11
**photographs** [7] -

331:20, 332:12, 332:13, 332:16, 332:18, 333:10, 355:3
**photography** [1] - 327:10
**photos** [4] - 354:19, 355:5, 355:10, 355:14
**physical** [4] - 369:12, 386:20, 386:22, 389:16
**physician** [4] - 366:19, 367:18, 367:21, 384:19
**physicians** [1] - 371:19
**physiological** [1] - 369:12
**pictures** [1] - 354:13
**Pine** [2] - 286:20, 287:9
**place** [3] - 357:14, 358:6, 396:6
**placing** [1] - 308:6
**Plaintiff** [1] - 286:4
**plaintiff's** [2] - 366:12, 374:17
**Plaintiff/Claimant** [1] - 287:4
**platelets** [2] - 320:11, 356:13
**plausibly** [1] - 292:23
**Plaza** [2] - 286:20, 287:9
**PLLC** [1] - 287:5
**plus** [5] - 360:7, 360:8, 388:6, 388:7
**pneumococcal** [63] - 292:18, 293:2, 293:14, 293:19, 294:5, 295:8, 300:19, 300:22, 301:5, 301:8, 301:15, 301:22, 303:4, 303:6, 303:10, 303:21, 304:5, 304:10, 305:7, 305:9, 305:15, 306:9, 306:14, 307:3, 307:12, 307:14, 307:16, 307:23, 308:11, 308:15, 308:21, 309:3, 309:9, 309:22, 310:10, 310:13, 310:19, 311:10, 311:11, 311:16, 311:18, 312:10,

315:7, 315:11, 315:22, 316:11, 316:19, 316:22, 317:3, 317:12, 317:18, 318:2, 319:8, 382:22, 383:2, 384:10, 385:3, 385:8, 385:10, 385:14, 386:2, 387:3, 387:9
**pneumococci** [4] - 291:20, 294:10, 294:18, 344:23
**pneumococcus** [5] - 301:2, 358:20, 359:6, 386:4, 386:8
**pneumonia** [53] - 289:20, 290:16, 292:19, 293:2, 293:19, 294:5, 300:23, 301:2, 301:5, 301:6, 301:9, 301:16, 301:22, 301:23, 302:4, 302:10, 302:13, 303:22, 304:13, 309:4, 311:11, 311:18, 312:12, 312:18, 312:19, 313:15, 313:18, 314:2, 316:16, 318:2, 321:15, 344:4, 344:9, 345:2, 345:9, 345:13, 349:2, 359:13, 359:14, 359:15, 385:2, 385:4, 385:11, 385:13, 385:18, 386:3, 386:4, 386:5, 386:6, 392:4, 392:10, 392:11
**pneumoniae** [10] - 290:5, 290:9, 290:12, 290:15, 291:5, 291:12, 294:10, 294:23, 295:16, 300:14
**point** [17] - 295:12, 295:19, 295:22, 303:21, 304:2, 304:6, 306:15, 309:23, 332:17, 336:15, 336:17, 346:8, 348:4, 359:7, 364:19, 377:11, 393:11
**pointed** [1] - 378:19
**points** [1] - 330:15
**police** [25] - 318:21,

325:3, 326:4, 327:7, 327:10, 327:14, 329:8, 330:16, 331:19, 332:2, 332:11, 332:14, 333:10, 333:20, 338:2, 366:14, 371:6, 372:16, 375:11, 375:15, 375:19, 375:22, 375:23, 388:22, 394:9
**Police** [7] - 328:9, 329:13, 330:2, 332:19, 333:5, 333:9, 334:2
**portion** [2] - 341:8, 352:11, 389:23
**portions** [1] - 347:15
**position** [4] - 325:11, 339:16, 339:17, 344:20
**positive** [2] - 291:18, 349:18
**possession** [1] - 354:22
**possibility** [4] - 304:22, 328:2, 348:13, 373:18
**possible** [9] - 291:8, 303:10, 306:10, 314:9, 315:2, 315:4, 319:15, 344:9, 371:4
**possibly** [1] - 385:16
**postulating** [1] - 386:9
**potential** [6] - 305:19, 323:18, 342:14, 373:5, 380:8, 391:10
**potentially** [1] - 364:2
**power** [1] - 330:19
**powers** [3] - 331:2, 331:4, 331:11
**practical** [1] - 371:5
**preexisting** [1] - 392:9
**pregnancy** [1] - 383:23
**premature** [1] - 292:14
**prematurity** [1] - 342:16
**premise** [1] - 298:5
**prep** [1] - 390:3
**prepare** [1] - 339:13
**preparing** [1] - 373:14
**presence** [3] - 301:14, 302:9, 326:22
**present** [9] - 287:14, 290:12, 307:7, 309:4, 327:12, 341:14, 346:14, 346:17, 381:8

Case 1:17-cv-00626-DJS Document 71 Filed 06/14/21 Page 439 of 442

**presentation** [1] - 309:8
**presented** [5] - 291:23, 305:10, 311:3, 311:4, 392:17
**presenting** [2] - 293:3, 386:7
**presents** [1] - 291:12
**preservation** [1] - 367:22
**pressed** [1] - 364:7
**pressure** [1] - 346:5
**pretty** [1] - 369:16
**prevent** [1] - 395:18
**previously** [2] - 296:8, 296:12
**primarily** [2] - 317:10, 382:23
**primary** [3] - 305:16, 308:2
**private** [1] - 334:22
**probative** [4] - 355:15, 355:16, 355:19
**problem** [2] - 351:16, 368:5
**problems** [1] - 313:19
**procedure** [1] - 348:8
**procedures** [1] - 347:18
**proceed** [1] - 289:14
**proceedings** [1] - 397:8
**process** [2] - 314:5, 355:11
**procession** [2] - 314:2, 358:19
**Professional** [2] - 286:22, 397:4
**professional** [1] - 339:7
**progress** [1] - 359:8
**progression** [1] - 359:11
**promote** [1] - 318:21
**prone** [2] - 292:7, 384:10
**proper** [1] - 352:20
**properly** [2] - 344:5, 368:4
**prophylactics** [1] - 348:12
**prosecute** [2] - 376:7, 376:13
**prosecuting** [1] - 376:2
**prosecution** [3] - 377:8, 377:10, 377:13
**prostate** [1] - 368:19
**protection** [1] -

388:7
**protein** [1] - 346:9
**provide** [2] - 352:9, 353:3, 353:12, 369:21, 375:16, 375:18
**provided** [10] - 325:21, 332:5, 333:4, 333:9, 338:13, 362:13, 362:22, 365:20, 379:7, 393:17
**providing** [1] - 351:4
**proximity** [2] - 358:2, 358:3
**Public** [3] - 286:22, 288:5, 397:5
**pull** [1] - 308:14
**punched** [1] - 343:19
**pure** [1] - 321:22
**purported** [1] - 293:12
**purpose** [1] - 375:5
**pussy** [1] - 302:19
**put** [4] - 348:11, 352:16, 390:18, 395:4

**Q**

**qualifications** [1] - 288:17
**qualify** [1] - 316:14
**quantify** [1] - 316:11
**questions** [22] - 288:12, 317:23, 324:16, 324:17, 340:8, 340:9, 342:14, 350:12, 350:19, 350:22, 351:11, 351:14, 351:15, 366:5, 360:10, 374:17, 376:16, 382:4, 383:22, 388:3, 391:9, 392:21
**quick** [1] - 359:23, 366:16, 394:2
**quickly** [4] - 311:15, 312:20, 359:10, 360:6
**quite** [5] - 292:4, 298:14, 334:10, 339:11, 368:9

**R**

**race** [1] - 384:11
**radiographic** [4] - 319:3, 336:8, 362:8,

388:7
**raised** [1] - 330:10
**rapid** [2] - 312:23, 313:2
**rapidly** [1] - 322:7
**rare** [2] - 359:8, 372:6
**rate** [1] - 293:23
**rather** [1] - 384:18
**read** [7] - 292:17, 330:20, 349:21, 364:10, 364:11, 364:15, 396:4
**real** [3] - 311:14, 366:16, 393:23
**realize** [1] - 329:10
**really** [5] - 312:4, 320:5, 337:6, 347:14, 379:5
**reason** [8] - 299:3, 338:23, 339:5, 356:3, 356:7, 368:14, 374:6, 389:6
**reasonable** [15] - 293:22, 331:16, 340:14, 344:21, 349:5, 360:10, 361:8, 363:3, 364:8, 385:22, 386:10, 386:11, 393:8, 393:9, 393:12
**reasonably** [3] - 356:23, 371:4
**reasons** [6] - 328:7, 344:10, 345:12, 356:4, 356:5, 356:6
**receive** [4] - 314:9, 341:23, 347:19, 366:21, 370:20
**received** [5] - 341:3, 346:7, 346:13, 354:4, 382:2
**receiving** [3] - 321:20, 345:16, 365:14
**recent** [1] - 386:22
**Recess** [2] - 319:5, 324:20
**recitation** [1] - 393:16
**recognize** [1] - 325:19
**recognized** [1] - 374:12
**recollection** [2] - 391:7, 394:10
**record** [3] - 308:7, 395:8, 396:5
**records** [30] - 318:17, 318:18, 331:13, 331:18, 331:19, 332:2, 338:3, 338:4, 338:12, 353:19, 354:14, 354:22,

355:2, 362:8, 371:5, 371:17, 372:5, 373:3, 373:13, 375:16, 379:20, 380:7, 380:8, 388:7, 391:11, 391:12, 394:18, 394:20, 395:2, 395:4
**recover** [1] - 328:2
**reduced** [1] - 348:6
**reduces** [1] - 345:4
**referred** [1] - 300:19
**referring** [1] - 296:14
**regard** [3] - 382:4, 384:21, 387:13
**regarding** [2] - 333:20, 374:18
**Registered** [2] - 286:22, 397:4
**related** [12] - 310:9, 311:3, 314:19, 328:5, 331:5, 331:10, 331:11, 342:15, 346:12, 347:2, 367:15, 393:6
**relating** [1] - 347:14
**relative** [1] - 293:7
**relatively** [7] - 312:20, 320:10, 341:6, 359:23, 360:6, 383:6, 383:9
**release** [1] - 336:3
**relevant** [1] - 354:15
**relied** [1] - 388:3
**rely** [4] - 331:22, 361:5, 371:10, 371:19
**remarkable** [2] - 358:13, 358:14
**remember** [3] - 321:17, 332:17, 358:23
**RENSSELAER** [1] - 286:7
**Rensselaer** [14] - 325:7, 325:15, 326:2, 326:6, 326:10, 326:23, 327:13, 328:21, 329:12, 329:19, 331:2, 339:14, 339:16, 339:20
**repeat** [1] - 310:11
**rephrase** [1] - 298:13
**replicating** [1] - 391:4
**report** [27] - 316:7, 318:21, 318:22, 328:10, 329:21, 331:20, 332:11, 332:23, 333:4,

333:10, 335:12, 336:15, 336:16, 337:2, 338:12, 339:8, 349:13, 349:17, 349:21, 352:17, 355:12, 374:19, 375:2, 380:12, 382:3, 394:7, 394:19
**reported** [2] - 336:9, 373:6
**reportedly** [1] - 373:19
**reporter** [1] - 288:17
**Reporter** [2] - 286:22, 397:4
**reports** [2] - 362:8, 388:7
**represent** [3] - 325:2, 366:9
**representatives** [2] - 325:3, 327:13
**represented** [1] - 394:6
**request** [3] - 331:4, 331:13, 332:2
**require** [1] - 375:16
**required** [1] - 347:19
**research** [3] - 290:8, 290:11, 291:4
**reserved** [1] - 288:12
**residence** [1] - 334:15
**residency** [1] - 367:3
**respect** [2] - 366:16, 372:19
**respective** [1] - 288:3
**respiratory** [4] - 291:21, 294:7, 321:13, 382:18
**respond** [1] - 350:22
**response** [5] - 352:9, 352:12, 352:17, 352:20, 391:18
**responses** [3] - 340:11, 344:21, 350:12
**responsible** [1] - 365:6
**responsive** [1] - 351:22
**rest** [1] - 289:10
**result** [12] - 291:13, 294:10, 295:8, 303:19, 334:17, 341:9, 377:2, 377:7, 377:9, 385:14, 392:3, 392:7
**resulted** [1] - 384:12
**resulting** [3] - 301:23, 342:2, 377:13
**results** [2] - 341:16,

356:11
**returned** [1] - 353:14
**reupped** [1] - 383:22
**review** [13] - 318:14, 318:22, 319:3, 328:6, 332:16, 334:22, 335:17, 335:20, 337:22, 338:7, 338:13, 354:10, 382:3
**reviewed** [19] - 318:8, 318:16, 332:14, 332:22, 338:9, 354:23, 355:14, 365:21, 369:19, 369:20, 373:4, 394:2, 394:5, 394:7, 394:11, 394:20, 395:3, 395:4
**ridden** [1] - 334:8
**rights** [1] - 333:13
**risk** [5] - 308:20, 348:10, 373:20, 374:13, 384:4
**role** [2] - 366:22, 375:13
**RONALD** [1] - 286:4
**Ronald** [2] - 287:7, 325:4
**room** [2] - 302:11, 367:19
**RPI** [1] - 334:6
**rule** [1] - 386:3
**rules** [3] - 324:23, 325:4, 351:3
**rupture** [3] - 305:23, 306:15, 368:20
**ruptures** [1] - 343:20

## S

**salary** [2] - 325:15, 339:14
**salivary** [1] - 385:9
**Samaritan** [7] - 295:14, 302:11, 318:18, 318:20, 354:23, 379:20, 380:8
**Sampson** [1] - 287:5
**Saturday** [1] - 293:15
**save** [1] - 367:23
**saw** [7] - 297:6, 313:23, 323:17, 335:12, 338:3, 374:9, 380:23
**scan** [1] - 309:16
**scans** [2] - 337:9, 354:14

**scenario** [1] - 385:17
**scene** [8] - 331:6, 331:10, 331:20, 332:11, 332:18, 333:10, 334:15, 334:16
**scholarly** [1] - 308:14
**scope** [3] - 352:9, 352:14
**SDH** [4] - 309:19, 310:6, 319:20, 390:20
**SDHs** [3] - 308:3, 308:5, 309:12
**search** [1] - 331:7
**second** [6] - 353:22, 354:3, 354:5, 379:16, 381:4, 395:16
**secondary** [7] - 290:20, 294:18, 295:2, 301:12, 304:19, 316:23, 318:3
**secretions** [2] - 345:5, 345:8
**see** [22] - 290:10, 292:4, 299:7, 306:16, 306:23, 335:18, 336:5, 336:6, 336:13, 337:3, 337:10, 337:20, 338:9, 338:19, 345:7, 346:18, 351:8, 371:15, 373:12, 374:14, 391:13, 394:15
**seed** [2] - 311:13, 313:21
**seeing** [2] - 390:11, 390:16
**seem** [1] - 319:16
**segment** [1] - 390:16
**sense** [2] - 344:12, 363:6
**sent** [1] - 343:10
**separate** [2] - 317:14, 394:23
**sepsis** [76] - 291:2, 295:6, 295:11, 302:13, 309:4, 310:19, 311:10, 311:12, 311:16, 312:13, 312:20, 313:17, 313:18, 313:20, 313:21, 314:2, 314:3, 314:4, 314:13, 314:19, 314:22, 316:17,

316:18, 316:20, 317:11, 317:12, 318:4, 319:21, 319:23, 322:4, 329:20, 330:5, 340:22, 341:19, 342:4, 342:23, 343:5, 343:7, 343:8, 343:21, 343:22, 343:23, 344:9, 344:10, 344:11, 344:13, 344:18, 344:22, 349:3, 349:13, 349:16, 349:19, 349:22, 350:3, 350:6, 352:17, 357:11, 358:5, 358:10, 358:21, 359:8, 359:10, 359:12, 359:14, 359:18, 360:3, 374:18, 375:2, 375:4, 375:8, 379:17, 379:20, 382:5, 383:11, 387:14, 388:11
**September** [2] - 286:18, 381:16
**septic** [8] - 322:4, 322:6, 322:9, 322:14, 322:15, 322:23, 323:6, 360:3
**sequelae** [1] - 315:23
**Sergeant** [1] - 390:7
**serious** [2] - 290:15, 291:10
**set** [2] - 295:11, 297:5
**sets** [1] - 344:8
**several** [5] - 312:19, 318:19, 360:2, 373:20, 386:21
**severe** [9] - 303:14, 303:18, 304:3, 309:8, 314:7, 315:13, 340:17, 345:15, 362:4
**severely** [1] - 306:13
**SGH** [1] - 309:19, 383:5
**SGHs** [4] - 308:4, 309:13, 310:6, 323:19
**shaken** [4] - 324:2, 324:10, 345:17, 379:3
**shaking** [1] - 300:5
**shall** [2] - 288:9, 288:12
**shape** [2] - 333:16, 344:16

**shaped** [1] - 291:17
**sheering** [1] - 299:16
**shock** [21] - 295:13, 295:15, 321:12, 321:15, 322:5, 322:7, 322:9, 322:13, 322:14, 322:15, 322:16, 322:17, 322:19, 322:20, 322:23, 323:4, 323:5, 323:6, 323:7, 323:8, 360:3
**short** [4] - 292:19, 299:19, 390:16
**shot** [2] - 326:15, 331:17
**shoulder** [1] - 324:8
**show** [2] - 336:9, 390:8
**showing** [1] - 376:5
**shown** [1] - 337:19
**shutdown** [1] - 323:13
**shutting** [1] - 382:17
**sibling** [2] - 293:7, 365:7
**side** [2] - 296:22, 356:13
**sign** [2] - 303:4, 322:4
**signed** [1] - 288:4
**significance** [1] - 317:17
**significant** [16] - 297:6, 299:13, 300:16, 302:20, 316:15, 316:20, 316:23, 317:4, 317:7, 320:9, 328:5, 372:14, 382:19, 390:20, 390:21, 392:14
**significantly** [1] - 325:18
**signs** [7] - 307:22, 309:11, 309:18, 310:6, 310:13, 320:7, 345:19
**Sikirica** [3] - 287:11, 289:6, 324:23
**SIKIRICA** [5] - 286:7, 286:17, 289:2, 396:4, 396:13
**similarly** [1] - 300:10
**simply** [5] - 327:16, 332:10, 363:16, 381:14, 390:10
**simultaneously** [1] - 311:8
**single** [1] - 354:11
**sit** [2] - 333:8, 351:5
**sites** [1] - 321:6

**situation** [1] - 334:5
**situations** [1] - 326:11
**six** [2] - 360:7, 369:3
**size** [2] - 346:19, 346:22
**skull** [3] - 336:18, 368:21, 374:10
**slammed** [2] - 298:7, 345:18
**slamming** [3] - 361:15, 389:18, 390:12
**slightly** [1] - 320:10
**small** [3] - 334:7, 383:9, 389:23
**social** [4] - 338:10, 338:11, 394:13, 395:6
**socially** [1] - 325:18
**solely** [1] - 355:18
**someone** [10] - 292:10, 296:13, 296:19, 307:18, 314:10, 374:14, 375:20, 376:14, 376:21, 386:17
**sometimes** [12] - 326:17, 326:22, 327:8, 327:11, 332:16, 333:19, 335:20, 336:2, 346:3, 348:17, 368:6, 371:7
**somewhere** [1] - 381:4
**sorry** [4] - 300:4, 308:6, 364:14, 374:2
**sort** [4] - 301:4, 305:21, 365:5, 378:23
**sound** [3] - 291:8, 293:21, 294:21
**sounds** [2] - 293:22, 294:22
**source** [3] - 306:7, 316:15, 386:5
**sources** [1] - 361:7
**space** [1] - 341:10
**speaking** [2] - 351:20
**special** [1] - 345:6
**specialized** [2] - 368:8, 369:14
**specialty** [1] - 372:18
**specific** [4] - 366:22, 375:10, 376:7, 395:2
**specifically** [3] - 297:18, 351:11, 362:4
**speculated** [1] - 372:20

**speculation** [4] -
295:19, 373:2,
373:12, 373:16
**spot** [1] - 315:18
**stain** [1] - 300:17
**staining** [1] - 346:18
**stairs** [1] - 365:4
**stamped** [2] - 353:23,
354:5
**stand** [1] - 351:6
**standard** [2] - 337:6,
337:10
**start** [1] - 359:12
**started** [1] - 293:3
**starting** [5] - 293:14,
302:22, 304:6,
310:19, 314:2
**state** [8] - 304:15,
307:16, 334:23,
341:13, 342:6,
369:2, 384:5, 385:21
**STATE** [3] - 286:10,
286:15, 396:1
**State** [4] - 286:23,
287:12, 288:5, 397:5
**statement** [46] -
296:20, 297:5,
301:3, 307:9,
318:22, 333:11,
361:9, 362:10,
363:12, 363:16,
363:19, 364:10,
364:11, 364:15,
364:16, 364:20,
365:14, 365:21,
369:20, 370:3,
373:22, 373:23,
374:3, 377:21,
378:3, 378:6, 378:7,
379:12, 384:9,
388:6, 388:9,
388:12, 388:16,
388:21, 389:5,
389:6, 389:12,
393:4, 393:14,
394:3, 394:5, 394:8,
394:9, 394:15,
395:15, 395:18
**statements** [8] -
331:13, 332:11,
338:7, 338:9, 371:6,
372:15, 372:16,
394:12
**STATES** [1] - 286:1
**stating** [1] - 393:5
**statistics** [1] - 386:2
**stay** [1] - 311:5
**stenographic** [1] -
397:7
**step** [3] - 358:21,

358:22, 379:16
**stepwise** [3] - 312:22,
313:23, 358:19
**stick** [1] - 369:16
**still** [8] - 313:2,
320:11, 335:6,
337:10, 342:3,
362:14, 364:17,
383:12
**stipulated** [4] - 288:2,
288:8, 288:11,
288:15
**stomach** [1] - 343:20
**stop** [2] - 352:11,
359:7
**stories** [1] - 335:18
**story** [1] - 379:7
**Street** [1] - 287:5
**strep** [8] - 289:19,
289:21, 289:22,
290:6, 295:16,
342:18, 345:9
**streptococcus** [13] -
290:5, 290:8,
290:12, 290:15,
291:4, 291:12,
294:10, 294:23,
300:13, 300:18,
319:8, 387:19,
387:22
**strike** [2] - 352:11,
373:10
**stroke** [4] - 306:4,
306:5, 306:8, 306:17
**strokes** [1] - 319:17
**strongly** [1] - 343:19
**struck** [4] - 305:3,
324:2, 345:18,
362:23
**student** [1] - 334:6
**studies** [1] - 331:14
**subdural** [37] -
305:14, 305:19,
309:15, 310:22,
311:3, 314:14,
314:18, 315:14,
315:18, 315:23,
319:22, 321:10,
323:19, 336:9,
341:4, 341:9,
341:15, 341:16,
341:20, 342:3,
343:2, 346:19,
346:22, 356:17,
356:22, 357:3,
357:17, 357:20,
358:11, 360:14,
361:3, 378:11,
378:14, 387:2,
387:10, 387:17

**subgaleal** [9] - 324:4,
341:4, 341:5, 343:2,
356:18, 356:22,
357:4, 357:17,
357:20
**subgaleals** [1] -
358:11
**subject** [1] - 345:11
**Subscribed** [1] -
396:14
**substance** [2] -
385:11, 388:5
**substantial** [1] -
317:13
**suffer** [1] - 324:6
**suffered** [2] - 334:10,
350:3
**suffering** [2] - 356:9,
356:11
**sufficient** [7] - 297:14,
297:16, 299:7,
299:20, 300:9,
320:11, 324:14
**suggested** [2] -
297:19, 379:22
**suicide** [3] - 334:19,
369:5, 370:16
**suicides** [2] - 367:8,
367:11
**Suite** [1] - 287:3
**sum** [1] - 388:5
**Sunday** [3] - 293:2,
295:13, 305:5
**support** [1] - 302:21
**surely** [1] - 315:11
**surface** [2] - 306:6,
315:17
**surgeon** [1] - 348:8
**surgeons** [1] - 348:16
**surgeries** [1] - 348:7
**surgery** [2] - 348:12,
348:19
**surgical** [2] - 347:17,
347:18
**survive** [1] - 312:2
**survived** [1] - 311:16
**susceptible** [1] -
348:20
**suspicion** [2] -
327:15, 372:15
**suspicious** [2] -
327:16, 327:19
**sustained** [2] -
336:17, 370:4
**swayed** [1] - 335:4
**swelling** [5] - 303:15,
303:18, 303:20,
345:15
**sworn** [3] - 288:5,
289:2, 396:14

**symptom** [1] - 303:4
**symptoms** [9] - 293:9,
293:10, 309:21,
310:2, 310:9,
310:12, 311:4,
320:7, 345:19
**syndrome** [1] - 321:14
**synonymous** [1] -
349:19
**system** [6] - 292:10,
293:14, 295:9,
316:12, 323:13,
384:12

---

**T**

**tango** [1] - 351:23
**target** [1] - 338:23
**task** [1] - 331:15
**team** [1] - 338:13
**technically** [2] -
325:14, 348:9
**ten** [2] - 332:6, 389:5,
389:12
**ten-page** [3] - 332:6,
389:5, 389:12
**tend** [1] - 295:22
**tends** [2] - 312:22,
313:23
**term** [9] - 305:4,
322:21, 323:9,
373:2, 374:18,
374:23, 375:4,
375:7, 392:18
**terminal** [1] - 322:23
**terminology** [1] -
368:15
**terms** [5] - 329:15,
341:2, 349:18,
368:10, 380:2,
391:23, 394:14
**testified** [8] - 289:3,
307:6, 348:23,
350:13, 366:2,
393:3, 393:16,
395:14
**testify** [3] - 289:12,
339:13, 347:17
**testifying** [1] - 318:8
**testimonies** [3] -
318:13, 318:16,
339:13
**testimony** [16] -
289:16, 318:8,
318:11, 318:17,
347:13, 347:15,
351:5, 355:2,
366:11, 372:22,
374:21, 380:3,

380:18, 390:18,
393:23, 396:5
**testing** [1] - 337:8
**that..** [1] - 360:9
**THE** [31] - 286:15,
295:22, 297:13,
298:13, 299:11,
301:19, 302:8,
303:13, 304:9,
304:21, 305:13,
307:20, 308:23,
310:17, 312:8,
314:17, 315:16,
328:14, 333:16,
339:4, 346:17,
350:5, 364:7,
377:17, 378:14,
378:22, 380:22,
384:17, 391:3,
391:21, 392:7
**themselves** [2] -
341:6, 383:8
**theory** [2] - 304:7,
357:10
**thereof** [1] - 396:8
**THOMAS** [2] - 286:3,
286:12
**Thomas** [23] - 318:23,
330:7, 332:6,
333:11, 333:13,
338:15, 338:23,
339:4, 362:14,
362:19, 369:20,
377:20, 381:7,
381:16, 386:17,
388:6, 388:9,
388:13, 389:4,
389:16, 390:12,
393:4, 393:17
**Thomas'** [8] - 296:19,
297:5, 357:10,
362:10, 363:12,
388:21, 393:14,
395:15
**thousands** [1] -
368:18
**three** [11] - 292:21,
300:9, 312:16,
312:18, 314:6,
314:7, 359:3, 359:6,
359:15, 359:18,
360:4
**throat** [1] - 344:8
**thromboses** [1] -
319:14
**throwing** [9] - 298:16,
299:14, 299:23,
323:15, 323:23,
324:5, 361:18,
378:18, 378:23

**thrown** [11] - 297:15, 297:20, 298:6, 299:4, 323:14, 324:7, 324:8, 324:9, 378:9, 378:15, 379:2

**tick** [2] - 293:13, 314:10

**Tim** [3] - 287:7, 325:3, 334:2

**TIM** [1] - 286:7

**timing** [2] - 346:15, 387:8

**today** [5] - 289:8, 289:12, 351:9, 390:18

**together** [3] - 305:17, 335:18, 339:20

**took** [1] - 329:11

**topic** [1] - 330:5

**tossed** [1] - 374:4

**total** [1] - 313:10

**totally** [3] - 329:2, 361:2, 367:6

**toto** [1] - 313:10

**tough** [1] - 310:17

**toxic** [1] - 311:19

**toxicology** [1] - 322:20

**toy** [1] - 305:4

**traceable** [1] - 310:9

**tract** [1] - 291:21

**traffic** [1] - 326:13

**trafficking** [1] - 328:5

**trained** [3] - 367:12, 370:21, 370:22

**training** [8] - 340:13, 349:6, 366:16, 366:21, 368:8, 370:19, 370:20, 371:3

**transcript** [1] - 396:7

**transcription** [2] - 336:16, 397:7

**transmitted** [2] - 291:13, 293:6

**trauma** [85] - 293:12, 301:11, 301:17, 301:23, 302:9, 302:12, 303:10, 304:7, 304:9, 304:12, 304:18, 305:8, 305:10, 305:17, 307:3, 307:8, 307:11, 307:13, 307:15, 307:22, 308:3, 308:9, 309:11, 309:18, 310:6, 310:9, 310:13, 310:22, 311:2,

315:7, 315:21, 317:14, 321:15, 323:20, 340:18, 341:7, 342:2, 342:7, 343:4, 343:6, 343:8, 343:9, 344:12, 344:14, 344:17, 345:3, 345:4, 345:14, 345:16, 346:7, 347:5, 347:9, 356:6, 356:20, 357:12, 360:14, 362:6, 363:11, 369:14, 370:9, 370:10, 370:12, 374:9, 374:11, 374:12, 374:15, 377:2, 377:6, 377:7, 377:9, 378:4, 378:7, 378:8, 382:23, 383:14, 383:18, 384:14, 386:20, 386:22, 387:9, 387:23, 388:2, 390:19, 390:21

**trauma"** [1] - 347:14

**traumas** [1] - 323:23

**traumatic** [6] - 295:16, 295:23, 296:4, 301:12, 314:18, 317:10

**traumatized** [4] - 386:13, 386:14, 386:15, 386:17

**treated** [1] - 311:23

**treating** [5] - 366:18, 367:18, 367:21, 371:19, 384:19

**tree** [1] - 313:22

**tremendously** [1] - 348:6

**Trial** [1] - 288:16

**trial** [15] - 288:13, 307:6, 316:7, 330:6, 350:19, 351:10, 352:8, 379:18, 380:3, 381:5, 381:23, 390:3, 393:14, 395:14, 395:16

**trials** [4] - 318:16, 350:14, 350:18, 366:2

**troopers** [1] - 334:23

**trouble** [1] - 374:7

**TROY** [1] - 286:6

**Troy** [19] - 287:6, 287:7, 325:2, 326:4, 326:10, 327:14, 328:9, 329:8,

329:12, 330:2, 330:16, 332:14, 332:19, 333:5, 333:9, 334:2, 334:7, 334:18, 366:14

**truck** [1] - 305:4

**true** [17] - 296:22, 298:5, 298:23, 299:2, 305:8, 307:12, 330:5, 350:19, 356:20, 357:5, 378:6, 381:11, 381:15, 388:16, 392:2, 396:7, 397:6

**truthful** [1] - 334:12

**try** [1] - 371:8

**trying** [2] - 348:4, 353:20

**turned** [1] - 328:3

**twice** [1] - 350:14

**two** [19] - 292:6, 294:2, 296:14, 296:20, 309:12, 309:16, 341:20, 350:18, 353:18, 356:21, 360:8, 364:14, 384:9, 387:2, 387:4, 387:6, 389:17, 393:20

**type** [6] - 290:6, 300:15, 316:2, 346:7, 349:22, 374:11, 374:12, 374:15

**types** [3] - 323:16, 326:11, 370:23

**typically** [7] - 307:14, 312:17, 359:5, 359:10, 367:5, 367:7

**U**

**ultimately** [1] - 388:17

**unbeknownst** [1] - 305:4

**under** [6] - 291:6, 292:6, 294:2, 297:14, 300:17, 384:9

**undergo** [1] - 337:17

**undetermined** [2] - 369:6, 370:18

**undiagnosed** [1] - 346:9

**unequivocally** [2] - 340:17, 349:9

**UNITED** [1] - 286:1

**unknown** [2] - 346:8,

346:13

**unlikely** [4] - 306:10, 311:7, 314:9, 314:23

**unprofessional** [2] - 328:15, 328:16

**unusual** [3] - 371:15, 374:14, 392:13

**up** [20] - 290:10, 293:3, 299:14, 316:7, 326:14, 327:22, 330:6, 334:20, 337:10, 344:8, 353:20, 366:11, 375:22, 379:18, 380:3, 380:7, 392:18, 392:22, 395:12

**upwards** [1] - 355:6

**US** [2] - 293:20, 294:20

**V**

**vaccine** [1] - 292:14

**vague** [1] - 380:2

**vaguely** [1] - 390:15

**variable** [3] - 359:21, 359:22, 359:23

**variety** [3] - 326:12, 326:17, 344:10

**vascular** [1] - 313:22

**ventilators** [1] - 344:2

**verbal** [1] - 371:15

**verify** [2] - 337:7, 353:15

**versus** [1] - 363:11

**vessels** [3] - 306:6, 306:13, 356:3

**victims** [1] - 367:6

**video** [5] - 389:11, 389:16, 390:8, 390:12, 390:17

**vomit** [2] - 304:6, 304:10

**vomiting** [12] - 302:23, 303:4, 303:9, 303:14, 303:16, 345:12, 345:13, 345:20, 346:2, 346:7, 373:8, 373:19

**vomits** [1] - 346:3

**vomitus** [3] - 344:7, 373:6, 385:11

**vulnerable** [1] - 314:11

**W**

**waived** [1] - 288:9

**wander** [1] - 351:13

**warrant** [1] - 331:7

**Washington** [2] - 286:20, 287:9

**ways** [6] - 323:22, 343:8, 343:22, 371:12, 379:3

**weakened** [2] - 384:5, 384:12

**week** [1] - 305:4

**weekend** [1] - 293:15

**weeks** [2] - 296:5, 335:22

**weight** [1] - 342:16

**welfare** [1] - 394:14

**West** [2] - 286:20, 287:9

**whatsoever** [1] - 328:19

**wheezing** [4] - 374:5, 391:23, 392:8, 392:10

**whole** [3] - 314:5, 368:17, 396:7

**wide** [1] - 326:17

**Wilahemina** [6] - 338:8, 338:14, 394:3, 394:6, 394:9, 394:12

**wise** [1] - 348:10

**wish** [1] - 289:15

**withheld** [1] - 353:19

**witness** [2] - 313:14, 351:5

**WITNESS** [30] - 295:22, 297:13, 298:13, 299:11, 301:19, 302:8, 303:13, 304:9, 304:21, 305:13, 307:20, 308:23, 310:17, 312:8, 314:17, 315:16, 328:14, 333:16, 339:4, 346:17, 350:5, 364:7, 377:17, 378:14, 378:22, 380:22, 384:17, 391:3, 391:21, 392:7

**witnessed** [1] - 363:4

**Woldman** [1] - 338:5

**word** [8] - 329:20, 337:7, 347:14, 349:13, 349:16, 349:22, 352:16, 352:21

**words** [5] - 315:5, 315:7, 350:2, 361:12, 388:16

**worker** [4] - 338:10, 338:11, 394:13, 395:6

**works** [1] - 337:2

**worldwide** [1] - 291:6

**worse** [1] - 347:10

**wound** [6] - 334:14, 343:9, 343:12, 343:16, 343:17, 368:20

**wrap** [1] - 305:16

**write** [2] - 349:17, 389:5

**writing** [1] - 339:8

**written** [6] - 332:6, 365:21, 388:21, 389:7, 389:13

**wrote** [1] - 335:12

## Y

**year** [2] - 291:7, 367:5

**years** [4] - 291:6, 331:17, 340:2, 351:4

**yesterday** [7] - 289:17, 305:23, 318:7, 318:9, 325:6, 354:15

**yesterday's** [1] - 393:23

**YORK** [4] - 286:1, 286:10, 286:15, 396:1

**York** [10] - 286:21, 286:23, 287:3, 287:6, 287:10, 287:12, 287:13, 288:6, 397:5

**yourself** [1] - 337:4