# 23-753

IN THE

# United States Court of Appeals
# for the Second Circuit

———————————

ADRIAN THOMAS,
*Plaintiff-Appellant,*

— v. —

ADAM R. MASON, RONALD FOUNTAIN, TIM
COLANERI, AND MICHAEL SIKIRICA,
*Defendants-Appellee.*

———————————

On Appeal from the United States District Court
for the Northern District of New York
Case No. 1:17-cv-00626 (DJS)

———————————

## APPENDIX VOLUME 2 OF 3

———————————

# APPENDIX VOLUME 2 TABLE OF CONTENTS

ECF 142-23: Exhibit "F" ................................................................. 1022

ECF 142-24: Exhibit "G" ............................................................... 1291

ECF 142-25: Exhibit "H" ............................................................... 1480

ECF 142-26: Exhibit "I" ................................................................. 1547

ECF 142-27: Statement of Material Facts ................................. 1551

ECF 153: Plaintiff's Response to the Troy Defendants'

Statement Pursuant to Rule 7.1 ................................................. 1558

ECF 153-1: Plaintiff's Local Rule 56.1 Counter Statement ...... 1563

ECF 156: Declaration of Brett H. Klein ..................................... 1580

ECF 156-1: Exhibit 1 .................................................................... 1586

ECF 156-2: Exhibit 2 .................................................................... 1599

ECF 156-3: Exhibit 3 .................................................................... 1606

ECF 156-4: Exhibit 4 .................................................................... 1627

ECF 156-5: Exhibit 5 .................................................................... 1660

ECF 156-6: Exhibit 6 .................................................................... 1673

ECF 156-7: Exhibit 7 .................................................................... 1706

ECF 156-8: Exhibit 8 .................................................................... 1710

ECF 156-9: Exhibit 9 .................................................................... 1720

ECF 156-10: Exhibit 10 ................................................................ 1725

ECF 156-11: Exhibit 11 ................................................................ 1746

ECF 156-12: Exhibit 12 ................................................................ 1754

ECF 156-13: Exhibit 13 ................................................................ 1757

## APPENDIX VOLUME 2 TABLE OF CONTENTS

ECF 156-14: Exhibit 14.............................................................. 1795

ECF 156-15: Exhibit 15.............................................................. 1797

ECF 156-16: Exhibit 16.............................................................. 1823

ECF 156-17: Exhibit 17.............................................................. 1830

ECF 156-18: Exhibit 18.............................................................. 1833

ECF 156-19: Exhibit 19.............................................................. 1835

ECF 156-20: Exhibit 20.............................................................. 1836

ECF 156-21: Exhibit 21.............................................................. 1846

ECF 156-22: Exhibit 22.............................................................. 1847

ECF 156-23: Exhibit 23.............................................................. 1859

ECF 156-24: Exhibit 24.............................................................. 1871

ECF 156-25: Exhibit 25.............................................................. 1878

ECF 156-26: Exhibit 26.............................................................. 1884

ECF 156-27: Exhibit 27.............................................................. 1893

ECF 156-28: Exhibit 28.............................................................. 1894

ECF 156-29: Exhibit 29.............................................................. 1909

ECF 156-30: Exhibit 30.............................................................. 1914

EXHIBIT "F"

Page 1

Thomas v City of Troy et al - 7-30-2020 - Walter Edge

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ADRIAN THOMAS,

Plaintiff,
          v     17-CV-626

CITY OF TROY, ADAM R. MASON,
RONALD FOUNTAIN, TIM COLANERI,
COUNTY OF RENSSELAER &
MICHAEL SIKIRICA,

Defendants.

_____/

              NON-PARTY
              DEPOSITION OF:     WALTER EDGE, M.D.

              DATE:              July 30, 2020

              TIME:              10:07 a.m. to 4:05 p.m.

              LOCATION:          Webex

Page 2

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

 2    APPEARANCES:

 3        FOR THE PLAINTIFF:
          KLEIN CIVIL RIGHTS
 4        BY:   BRETT KLEIN
          305 Broadway, #600
 5        NEW YORK, NEW YORK 10007

 6        FOR THE CITY OF TROY AND POLICE OFFICERS:
          PATTISON, SAMPSON, GINSBERG & GRIFFIN:
 7        BY:  MICHAEL E. GINSBERG
               RHIANNON SPENCER
 8
          22 First Street
          Troy, New YORK 12180
 9

10        FOR THE STATE OF NEW YORK
          OFFICE OF THE NY STATE ATTORNEY GENERAL
11        BY:  CHRISTINE CALABRESE
          The Capitol
12        Albany, New York  12224-0341

13        FOR THE WITNESS:
          MAYNARD, O'CONNOR, SMITH & CATALINOTTO, LLP
14        BY:  LEAH MITCHELL
          6 Tower Plaza
15
          Albany, New York 12203
16
          FOR MICHAEL SIKIRICA, M.D.:
          BAILEY JOHNSON & PECK, P.C.
17
          BY:  CRYSTAL PECK
18        Five Pine West Plaza, Suite 507
          Albany, New York 12205
19

20

21

22

23

24

25
```

Case 1:17-cv-00626-DJS  Document 64-1  Filed 06/14/21  Page 7 of 260

800.523.7887                              Associated Reporters Int'l., Inc.

Page 3

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

 2                         STIPULATIONS

 3        It is HEREBY STIPULATED by and among the attorneys

 4   for the respective parties, in accordance with the Federal

 5   Rules of Civil Procedure, that this deposition may be

 6   taken by the Defendant at this time, pursuant to subpoena;

 7        FURTHER STIPULATED, that all objections except as to

 8   the form of the questions and responsiveness of the

 9   answers, be reserved until trial;

10        FURTHER STIPULATED, that the witness may read and

11   sign the deposition and make any corrections to same

12   before any Notary Public;

13        AND FURTHER STIPULATED, that if the original

14   deposition has not been duly signed by the witness and

15   returned to the attorney taking the deposition by the time

16   of trial or any hearing in this cause, a certified copy of

17   the deposition may be used as though it were the original

18

19

20

21

22

23

24

25
```

ARII@courtsteno.com                              www.courtsteno.com

Associated Reporters Int'l., Inc.

Page 4

1     Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        I N D E X   O F   P R O C E E D I N G S

3                WALTER EDGE; Sworn

4     Direct Examination by Mr. Ginsberg              6
      Cross Examination by Mr. Klein                 68
5     Cross Examination by Ms. Peck                 163
      Cross Examination by Ms. Calabrese            169
6     Redirect Examination by M. Ginsberg           203
      Recross Examination by Mr. Klein              206
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

 2                   E X H I B I T   I N D E X

 3     Marked as

 4     Description

 5     A                                                    17

 6     86 pages of medical records

 7     B                                                    67

 8     Deposition of a witness

 9     Plaintiff

10     One

11     Entire medical record

12     Two

13     Troy police department  investigation report

14     Three

15     Video 1

16     Four

17                         Video 2

18

19

20

21

22

23

24

25
```

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                      (On the record; 10:07 a.m.)
 3                           MR. GINSBERG:  If you would swear the
 4        witness.
 5                           THE REPORTER:  Okay.  We're on the
 6        record.  Doctor, if you could please raise your right
 7        hand.  Do you swear or affirm the testimony you're
 8        going to give is the truth, the whole truth, and
 9        nothing but the truth?
10                           THE WITNESS:  Yes.
11                           THE REPORTER:  Could you please state
12        and spell your name for the record please?
13                           THE WITNESS:  Walter Edge, W-A-L-T-E-R
14        E-D-G-E.
15                           THE REPORTER:  Okay.  The witness has
16        been sworn.  I'm all set.
17                           MR. GINSBERG:  Right, thank you.
18                           DIRECT EXAMINATION
19                           BY MR. GINSBERG:
20                           Q.   Doctor, before we get started,
21        have you received a package of materials for today's
22        deposition which includes a chart from -- with regard
23        to the treatment of Matthew Thomas?
24                           A.   Yes, I reviewed the chart and at
25        least part of it that was relevant.  I also received
```

Page 7

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        a copy of a deposition, earlier deposition and also

3        the transcript of the earlier trial.

4                    Q.    Perfect.  So, do you have a copy

5        of the chart there with you if we need to refer to

6        it?

7                    A.    Yes.

8                    Q.    Okay.  Wonderful.  Doctor, my

9        name is Michael Ginsberg.  I'm the attorney for the

10       City of Troy and the Troy police officers, defendants

11       in the Thomas versus City of Troy et al matter.  And

12       I'm going to ask you a series of questions that

13       require a verbal response so that we can keep the

14       record clear.  Okay.

15                   A.    Yes.

16                   Q.    And could you tell us, again,

17       your full name?

18                   A.    Walter Edge.

19                   Q.    And Dr. Edge, can you describe

20       for us briefly your educational background, the

21       beginning of college?

22                   A.    I graduated from SUNY Albany in

23       1980, no '76.  I went to med school in '76 to '80 at

24       Albany Med.  I went to -- I was in residency at

25       Albany Med from '80 to '84.  I practiced out of

Associated Reporters Int'l., Inc.

Page 8

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      Albany Med and elsewhere until '89 at which point I

3      went to Toronto, Ontario to do a fellowship in

4      pediatric I.C.U. for six months.  And then I returned

5      to Albany Med and have been there ever since.

6                    Q.   And, doctor, are you currently

7      employed at Albany Med?

8                    A.   I am.

9                    Q.   And do you hold a title?

10                   A.   I am a full professor in

11     pediatric and attending physician.

12                   Q.   And do you work with any

13     particular specialty within the field of medicine?

14                   A.   I work in pediatric intensive

15     care.

16                   Q.   And what does pediatric intensive

17     care entail?

18                   A.   Taking care of children in an

19     I.C.U. setting.

20                   Q.   And are these extremely ailing

21     children?

22                   A.   Yeah.

23                   Q.   Intensive Care Unit, correct?

24                   A.   I work in a pediatric intensive

25     care unit, yes.

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                       Q.   And is there a short name for the
 3        pediatric intensive care unit, is it sometimes
 4        referred to as the PIC-U?
 5                       A.   Yes, P-I-C-U.
 6                       Q.   And, doctor, have you been
 7        involved in or authored any publications over the
 8        course of your history?
 9                       A.   Yes.
10                       Q.   Could you briefly describe them?
11                       A.   Not really.  There's about
12        twenty.
13                       Q.   And in what fields -- in what
14        fields were they?
15                       A.   There's a far range.  Pediatrics,
16        I have a paper -- three papers I think and four
17        publications, perhaps on transport between hospitals
18        of critically ill children and the list goes on.
19                       Q.   Okay.  And are you a current
20        member of any professional organization?
21                       A.   Yes, the Society of Critical Care
22        Medicine and the American Academy of Pediatrics.
23                       Q.   And do you currently hold any
24        board certification?
25                       A.   Yes, I am board certified in
```

Page 10

```
1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2        pediatric critical care.  I'm also board certified in
3        internal medicine.
4                      Q.   And, doctor, if I draw your
5        attention to September 21st of 2008, were you
6        employed at that time period -- at that time?
7                      A.   Yes.
8                      Q.   And where were you employed?
9                      A.   At Albany Med.
10                     Q.   And did you hold a title at that
11       time?
12                     A.   The same - well, I'm not sure if
13       it was the same title, but, I was an attending
14       physician in the PIC-U.  I'm not sure -- I think -- I
15       think, I was full professor at that point.  I'm not
16       positive.
17                     Q.   At that time period, were you
18       effectively in charge of the Pediatric Intensive Care
19       Unit?
20                     MS. MITCHELL:  Object to form.
21                     BY MR. GINSBERG: (Cont'g.)
22                     Q.   You can answer that.
23                     A.   Okay.  I -- I don't understand
24       your question.  What does in charge mean?
25                     Q.   What I mean, were you -- were you
```

Case 1:13-cv-00626-DJS Document 172-34 Filed 06/14/21 Page 823 of 269

Page 11

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      the physician in charge of that unit in September of

3      2008?

4                    A.   I still -- in charge could mean a

5      lot of things.  It could mean administratively in

6      charge.  It could mean that I was on call.  It could

7      mean any number of things.  I don't know what in

8      charge actually means.

9                    Q.   Did the other doctors and staff

10     assigned to the Pediatric Intensive Care Unit report

11     to you at that time?

12                   A.   At least for part of the day, I

13     can't tell you for the twenty-four hours, but I was

14     in -- yeah.  I was there --.

15                   Q.   Who is the highest ranking

16     physician within Pediatric Intensive Care Unit in

17     September of 2008?

18                   A.   On duty or in general?

19                   Q.   In general.

20                   A.   Well, we had the -- I was the

21     chief of the Division of Pediatric Critical Care

22     Medicine and then Dr. Sanchez was the Director of the

23     Pediatric I.C.U.  So we share chieftain, we were both

24     in charge.  I -- I was more the academic because

25     we're part of Albany Medical College.  I was the

Case 1:13-cv-00626-DJS Document 172-1 Filed 06/14/21 Page 893 of 269

```
 1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2      academic chief, Division chief and Dr. Sanchez was
 3      the Administrative Director of the Intensive Care
 4      Unit, the nursing unit.
 5                  Q.   In September of 2008, were your
 6      duties with regard to the PICU different than they
 7      are currently?
 8                  A.   I mean, there's -- there's
 9      schedule differences, but I'm generally doing the
10      same job I was doing then.
11                  Q.   And what does that entail?  What
12      were your daily responsibilities in September of 2008
13      in the PICU?
14                  A.   Well, we had multiple
15      responsibilities.  Besides, we have -- we cover the
16      PICU.  We usually split it up between days and
17      nights.  So there is different people there,
18      different times of day.  In addition, we have an
19      active service doing sedations.
20                  Q.   Doctor, what were your specific
21      responsibilities in September of 2008?
22                  A.   I did all -- we also attended at
23      different -- at a nursing home that takes care of
24      chronically ventilated patients.  So I had
25      responsibilities in all of those things.  So I, you
```

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      know, I can give you much greater detail.  If you

3      wanted to focus in on the day in particular, I'd be

4      glad to tell you what I was doing that day.

5                    Q.   We'll get to that afterward.

6      Doctor, drawing your attention to September 21st,

7      2008.  Did there come a time when you first came into

8      contact with a patient named Matthew Thomas?

9                    A.   Yes.

10                   Q.   And do you recall approximately

11     what time that was?

12                   A.   No.

13                   Q.   Would it help you if you referred

14     to the chart?

15                   A.   Yes.

16                   Q.   Would you do that?

17     MR. GINSBERG:  And while he is doing

18     that, do we have this chart marked?  How are we going

19     to do that remotely?

20     MS. MITCHELL:  It has to be marked in

21     order for him to refresh his memory and use it.

22     MR. GINSBERG:  I'm working on it,

23     Christina.

24     THE REPORTER:  I do have the exhibits.

25     Is it the chart, it's like eighty pages, I believe.

Case 1:13-cv-00626-DJS  Document 172-34  Filed 06/14/21  Page 895 of 269

Page 14

1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                       MS. MITCHELL:  Are we off the record?

3                       MR. GINSBERG:  Yeah, let's go off the

4       record for a moment.

5                       THE REPORTER:  Off the record.

6                       (Off the record)

7                       (On the record)

8                       BY MR. GINSBERG:  (Cont'g.)

9                       Q.   Are you ready, Doctor?

10                      A.   Yes.

11                      Q.   Okay.  I believe that the

12      question was, do you recall what time approximately

13      you first came into contact with Matthew Thomas on

14      September 21st, 2008?

15                      A.   A physical contact occurred at

16      12:06.  However, I had contact by telephone with

17      Samaritan Hospital before that and had arranged for

18      the transport team to go from Albany Med to Samaritan

19      to pick up the child on my recommendation that they

20      should do that.  And I do not have the exact time

21      that the Samaritan contact was made.  I -- I do have

22      the time that the transport team departed.  Okay.

23      Here's the initial time of the call.  I'm sorry, I do

24      have the initial time of the call from Samaritan was

25      -- it's hard to read 9:52 a.m.

Page 15

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    Q.    Would that have been a.m.?

3                    A.    Yes.

4                    Q.    Okay.  And you --

5                    A.    With the team, leaving at 10:18

6      and arriving at Samaritan at 10:53, leaving Samaritan

7      11:55 and arriving at 12:06 and I saw the child as

8      soon as the child arrived.

9                    Q.    That would have been shortly

10     after noon, correct?

11                   A.    Correct.

12                   Q.    And, Doctor, what was the sum and

13     substance of the discussion if any that you had with

14     the folks at Samaritan Hospital before the patient

15     arrived at Albany Med?

16                   A.    I don't remember exactly.  But,

17     in summary, I knew that there was a four-month old

18     child who was unresponsive, neurologically showing

19     limited neural -- neurologic activity, who was having

20     trouble breathing, who was therefore intubated and

21     put on a ventilator and we discussed the history

22     which was of some vomiting apparently, and diarrhea

23     and increasing lethargy which had occasioned the

24     parents to call EMS and bring the child to Samaritan.

25                   Q.    And Doctor --

Page 16

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    A.    In addition, the child had very

3      low blood pressure and was requiring pressure

4      medication to keep the blood pressure to an

5      acceptable level.

6                    Q.    And Doctor, is the chart and the

7      records that have been marked as

8                    City of Troy A for today's deposition,

9      were they made and kept in the ordinary course of

10     business of Albany Medical Center Hospital?

11                   A.    I don't understand your question.

12                   MS. MITCHELL:  I'm going to object

13     just because I --I don't know what has been marked as

14     A, if - is -- are you able to pull that up on the

15     screen for us?  I mean, he can --

16                   MR. GINSBERG:  It's on the screen now.

17                   MS. MITCHELL:  Okay.

18                   THE WITNESS:  That's a consultation to

19     ophthalmology.  Is that what you want to talk about?

20                   MR. GINSBERG:  No, we're just -- we're

21     just talking about the records.  Doctor, we'll sort -

22     we'll sort this out.

23                   BY MR. GINSBERG:  (Cont'g.)

24                   Q.    Is it the business of Albany

25     Medical Center Hospital to make and keep medical

Case 1:13-cv-00626-DJS Document 172-34 Filed 06/14/21 Page 88 of 269

Page 17

1     Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2     records?

3                          A.    Yes.

4                          Q.    And were these medical records

5     that are in front of you and that have been marked as

6     C.O.T. Exhibit A for today's date made and kept in

7     the ordinary course of business on Albany Medical

8     Center Hospital?

9                          MS. MITCHELL:  I object.  I -- he

10    can't answer that because what hasn't been marked.

11                         BY MR. GINSBERG:  (Cont'g.)

12                         Q.    You can answer, Doctor.

13                         MS. MITCHELL:  No, I'm going to direct

14    him not to answer, he can't --.

15                         MR. GINSBERG:  You cannot direct him

16    not to answer.  Those are --

17                         MS. MITCHELL:  He can -- he --.

18                         MR. GINSBERG:  -- standing objections,

19    you are not permitted at a deposition.

20                         MS. MITCHELL:  Will you stop --.

21                         MR. GINSBERG:  Take it up in court.

22                         MS. MITCHELL:  Excuse me.

23                         MR. GINSBERG:  All of those will be

24    sorted out later at trial.

25                         MS. MITCHELL:  Sir.

Page 18

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                      MR. GINSBERG:  Save it for the court.

3      Why don't we just move ahead with the deposition?

4                      MS. MITCHELL:  Okay.

5                      MR. GINSBERG:  Is the foundation

6      directly for the record.

7                      MS. MITCHELL:  I am objecting and

8      directing him not to answer.  You can't ask him to

9      confirm the authenticity of a document, he doesn't

10     have in front of him.  If it was marked and up on the

11     screen, that would be one thing.

12                     MR. GINSBERG:  We can sort it out

13     later.

14                     MS. MITCHELL:  So I certainly direct

15     him not to answer.  We can't sort it out later

16     because you're asking him to attest to it now.

17                     MR. GINSBERG:  Okay.  It's a

18     foundation question for the record.  The records are

19     going to be certified in it anyway.  I don't know --

20     I don't know why you are objecting.

21                     MS. MITCHELL:  So, then you don't need

22     him to answer it.

23                     MR. GINSBERG:  Are you going to make

24     the doctor come back and testify again, after a

25     motion?

Page 19

```
 1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                  MS. MITCHELL:  Look, just because you
 3      did not do your job in getting all the exhibits
 4      marked and to us doesn't mean I'm going to allow the
 5      doctor to answer a question that he is not capable of
 6      answering.  So maybe we can try to work this out so
 7      that you can get what you need, but the doctor is not
 8      put in an unfair position.  Do you want to go through
 9      certain pages?
10                  MR. GINSBERG:  Who is speaking please?
11                  MS. MITCHELL:  Leah Mitchell, the
12      attorney representing Dr. Edge.
13                  BY MR. GINSBERG:  (Cont'g.)
14                  Q.   Okay.  You can go ahead and
15      answer, Doctor.  She cannot advise you not to answer
16      the question.
17                  A.   I don't understand your question.
18                  Q.   All right.  We'll save that for
19      --.
20                  A.   Can you rephrase it?.
21                  Q.   We'll save that for the next
22      deposition.
23                  MS. MITCHELL:  I am not going to--  if
24      you want to make a motion to bring him back, fine,
25      but I will not agree to him coming back and I
```

# APPENDIX

**1042**

Page 20

```
1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2      certainly can direct him not to answer a question
3      that is completely improper.
4                      MR. GINSBERG:  What is the purpose of
5      your --?
6                      MS. MITCHELL:  If you want dig in your
7      heels and waste more time, that's your choice.  But
8      --
9                      MR. GINSBERG:  Why don't -- why don't
10     you state --
11                     MS. MITCHELL:  It hasn't --
12                     MR. GINSBERG:  -- why don't you state
13     for the record --.
14                     MS. MITCHELL:  -- on the record.  You
15     have been given --.
16                     MR. GINSBERG:  Why don't you state for
17     the record the basis of your objection and let's see
18     if it's privileged.
19                     MS. CALABRESE:  Can I speak for one
20     moment?
21                     MS. MITCHELL:  Yeah.
22                     MS. CALABRESE:  I think the exhibit is
23     on the screen.  And I thought the stenographer just
24     marked it as -- as number one.  Or Ginsberg Number
25     One, is that correct, Adriana (phonetic spelling)?
```

Page 21

1    Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    THE REPORTER:  Yes.

3                    MS. CALABRESE:  Adriana.  Is that

4    correct, Annette?

5                    THE REPORTER:  Yes, it is, and I can

6    scroll down if you need me to.

7                    MS. CALABRESE:  Okay.

8                    MS. MITCHELL:  Okay.

9                    MS. CALABRESE:  Okay, sir can you see

10   this?

11                   MS. MITCHELL:  And how many pages is

12   this?

13                   MS. CALABRESE:  Is that the whole

14   chart?

15                   MS. MITCHELL:  Annette, how many pages

16   is this?

17                   THE REPORTER:  I believe it's eighty

18   something.

19                   MR. GINSBERG:  Eighty something.

20                   MS. CALABRESE:  Okay.  So --.

21                   THE REPORTER:  Eighty-six.

22                   MS. CALABRESE:  So I forget the name

23   of Dr. Edge's attorney.  What is your name again,

24   ma'am?

25                   MS. MITCHELL:  Leah Mitchell.  And I

Page 22

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        think this is an incomplete chart.  I'm not sure but

3        it's not --

4                    MR. GINSBERG:  Because of my error.

5                    MS. MITCHELL:  -- the complete --

6                    MS. CALABRESE:  Okay.  Hold on, hold

7        on, hold on.  Hold on, guys, I'm still talking.  But

8        Ms. Mitchell, would you like a moment to scroll

9        through Ginsberg One to see if that would appease you

10       as far as allowing Dr. Edge to answer this question?

11       I think that maybe is the best way to get over this.

12                   MS. MITCHELL:  Well, can I just get

13       clarification?  Is that the complete chart that was

14       submitted?

15                   MS. CALABRESE:  This is the

16       supplemental.

17                   MR. GINSBERG:  It doesn't matter.

18                   MS. CALABRESE:  Hold on, Michael.

19       Hold on.  This is the chart that we -- we received

20       from Albany Med.  That's my -- that's my

21       understanding of what Ginsberg One is.  I can tell

22       you, to be perfectly honest, that the four of us

23       attorneys received -- I mean, I have ten banker boxes

24       full of documents.  Many of them are medical records.

25       So I can't with a hundred percent certainty affirm

Case 1:13-cv-00626-DJS Document 172-34 Filed 06/14/21 Page 248 of 269

Page 23

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        that this is everything.  But it's my understanding

3        that Ginsberg One is the chart that we received from

4        Albany Med.  So why don't you just take a look at it.

5        See if you know this -- you know, this would satisfy

6        you and then just, you know, when you're finished,

7        come back on.  And we'll just go off the record and

8        take a minute -- a moment break.

9                    THE WITNESS:  Are you asking me -- us

10       to see if it satisfies --?

11                   MS. CALABRESE:  I'm asking your

12       attorney to take a little bit with you.  And you may

13       want to just mute yourself.  So we don't hear your

14       conversation.

15                   THE WITNESS:  What is that?  What am I

16       looking at?  I don't understand.

17                   MS. CALABRESE:  She can explain it to

18       you, Doctor.

19                   THE WITNESS:  This is all -- that --

20       that this is all --.

21                   MS. CALABRESE:  If you refer to the

22       screen, Ms. Mitchell, you'll be able to scroll on the

23       actual exhibit that was marked.

24                   MS. MITCHELL:  Okay.

25                   MS. CALABRESE:  Go ahead and look at

Page 24

```
 1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2      the one.
 3                    MS. MITCHELL:  I know the chart is
 4      more than eighty-six pages.
 5                    MR. GINSBERG:  It doesn't matter.
 6                    MS. CALABRESE:  Hold on, Michael.
 7                    MR. GINSBERG:  It's doesn't matter.
 8                    MS. CALABRESE:  I don't know.  Hold
 9      on.  I don't know.
10                    MR. GINSBERG:  No, no, no.
11                    MS. CALABRESE:  Okay.  Hold on one
12      second, Michael.  I don't know what you have, Ms.
13      Mitchell.  What you have on paper, all I -- all I can
14      see is what's up on the screen.  So if you can --
15                    MS. MITCHELL:  Yeah.
16                    MS. CALABRESE:  -- look at that
17      exhibit, just so we know we're looking at the same
18      thing.  So just take a quick look at that.  And then
19      you'll want to mute it so that we don't hear your
20      conversations with Dr. Edge and then just come back
21      to us.
22                    THE REPORTER:  Do you want me to go
23      off the record?
24                    MS. CALABRESE:  Off the record for a
25      moment until she's done.
```

Page 25

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                         (Off the record)
 3                         (On the record)
 4                         THE REPORTER:  We're back on the
 5        record.
 6                         MR. GINSBERG:  Thank you.
 7                         BY MR. GINSBERG:  (Cont'g.)
 8                         Q.   Doctor, you recognize City of
 9        Troy Exhibit A of today's date as Albany Medical
10        Center Hospital records?
11                         A.   Yes.
12                         Q.   And were those records made and
13        kept in the ordinary course of Albany Medical Center
14        Hospital business?
15                         MS. MITCHELL:  I'm going to object to
16        form.
17                         A.   I don't understand -- I don't
18        understand the question.  Can you restate it?
19                         BY MR. GINSBERG:  (Cont'g.)
20                         Q.   Okay.  Were they made during the
21        course of business of the hospital?
22                         A.   Yes.  Yes.
23                         Q.   Thank you.  Doctor, drawing your
24        attention to September 24th, 2008 and when you first
25        saw the patient, Matthew Thomas, can you describe to
```

Page 26

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2     us how he presented?
 3                    A.    Yes, he was minimally reactive.
 4     He was --.
 5                    Q.    What exactly was minimally
 6     reactive?
 7                    A.    He was -- he was not opening his
 8     eyes.  He was comatose.  He would only move his
 9     extremities to deep -- to -- to painful stimuli, his
10     pupils were not reactive.  He was on a ventilator
11     with a breathing tube in place.  He had I.V.'s in
12     place, which were being used to administer
13     medication.  His -- the remainder of the exam, I
14     don't recall exactly.  And when I was looking for
15     that page in my admission note, it is not -- it's not
16     included.  I have the admission note, which is a
17     combined note that the resident and I do -- I have
18     the first page which is the title, position,
19     admission history and physical with reconciliation.
20     I have the first page that has the history on it.
21     The second page which has laboratories on it, a third
22     page which is a family social history and reviewed
23     systems.  I have another page which shows an R.N.
24     assessment, but the last pages which show my physical
25     exam and my assessment are missing from this
```

Case 1:13-cv-00626-DJS Document 172-1 Filed 06/14/21 Page 33 of 269

Page 27

1    Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2    particular document.
3                    Q.   Do you have another document
4    there, Doctor, that would refresh your recollection
5    with regard to what your initial impression was?
6                    A.   Well, I've just told you my
7    initial impression, which was -- which I would be
8    glad to repeat, but I have nothing to add to that.
9                    Q.   Okay.  And, Doctor, what did you
10   do at that time for Matthew Thomas if anything?
11                   A.   We were working.  If I could use
12   the vernacular, a full court press to try to keep
13   Matthew alive.  His blood pressure was dangerously
14   low.  We had to titrate, adjust the dopamine
15   medication to try to keep his blood pressure and to
16   keep him from dying.  He was very, very close to --
17   to death from a cardiovascular point of view.  To say
18   nothing about the fact that he neurologically
19   appeared to be severely brain -- in several paths
20   because his brain was clearly not functioning and
21   making it impossible for him to breathe on his own
22   adequately.  So we were basically in constant
23   interaction with the patient to try to keep him from
24   -- from dying and needing C.P.R.
25                   Q.   And Doctor, do you recall whether

Page 28

1    Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2    any family members were with Matthew Thomas at the

3    time that he arrived at the hospital that you saw

4    him?

5                     A.   I don't recall.  I -- I -- I know

6    from reviewing the chart that they were there

7    eventually, but at what time I do not know.

8                     Q.   And over the course of your

9    career, approximately how many pediatric patients

10   have you cared for in the Intensive Care Unit?

11                    A.   Pretty tough -- thousands.

12                    MS. MITCHELL:  You can give the

13   approximate estimate.

14                    THE WITNESS:  Three thousand, five

15   thousand.

16                    BY MR. GINSBERG:  (Cont'g.)

17                    Q.   Thank you.  Doctor, as -- well,

18   pursuant to the treatment of Matthew Thomas on or

19   about September 21st, 2008, were consultations

20   requested?

21                    A.   Did I ever -- did I ever make a

22   consult?

23                    Q.   No, were consultations requested

24   of other physicians with regard to Matthew's

25   treatment?

Page 29

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                         A.   Yes.
 3                         Q.   All right.  And who requested
 4          those consultations?
 5                         A.   I did.
 6                         Q.   Can you tell us what a
 7          consultation is?
 8                         A.   That's asking an attending
 9          physician to give their opinion regarding a patient.
10                         Q.   And that would be a physician in
11          a different practice area or focus, correct?
12                         A.   Correct.
13                         Q.   Someone who had a different skill
14          set than you, correct?
15                         MS. MITCHELL:  Form.
16                         A.   I can't say they have a different
17          skill set -- necessarily that varies, but it's
18          definitely a different point of view, and a different
19          set of credentials.
20                         BY MR. GINSBERG:  (Cont'g.)
21                         Q.   Different specialties, correct?
22                         A.   Correct.
23                         Q.   And do you recall what would have
24          been the consultations you requested with regard to
25          Matthew Thomas?
```

Case 1:13-cv-00626-DJS Document 172-34 Filed 06/14/21 Page 38 of 269

Page 30

1    Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2              A.   Ophthalmology, neurosurgery.  I

3    think those might be the only two.

4              Q.   And why --?

5              A.   And hematology.

6              Q.   And Doctor, why did you call for

7    ophthalmology consult?

8              A.   To look for the possibility of

9    there being a traumatic brain injury that would be

10   reflected in a retinal hemorrhage.

11             Q.   And at that point in time, was

12   there any medical evidence which indicated to you

13   that there was a potential for traumatic brain

14   injury?

15             A.   There was no physical trauma

16   except for a scratch that -- that was on the

17   transport record.  However, in my experience a four-

18   month-old who's unresponsive without clear

19   explanation, trauma, and particularly non-accidental

20   trauma needs to be in the differential.

21             Q.   Now, when you say differential,

22   what are you referring to?

23             A.   A physician when they evaluate

24   any patient creates a list of possible diagnoses and

25   that list of possible diagnoses is called a

Page 31

1     Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2     differential diagnosis.

3                    Q.   All right.  And Doctor, on

4     occasion we see in medical chart an entry R/O and

5     then there's a list of ailments, is that a

6     differential diagnosis?

7                    A.   It could be, you know, the R/O

8     means rule out.  So it may not be a complete

9     differential diagnosis, it might be only referring to

10    one particular diagnosis.

11                   Q.   But that -- that's the basic

12    structure where the physician is attempting to

13    determine what the cause of the ailment is by ruling

14    out certain conditions, correct?

15                   A.   Correct.

16                   Q.   And Doctor, you also indicated

17    that you had called for a neurosurgery consult.  Why

18    was that requested?

19                   A.   For the same reasons as the

20    ophthalmology, I was concerned that there may be

21    trauma.  There was also a C.T. scan that showed

22    subdural fluid --

23                   Q.   Well that --

24                   A.   -- collect -- a collection of

25    fluid in the -- in the subdural space in the brain

Page 32

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      and that would be consistent with a traumatic brain

3      injury.

4                    Q.   And Doctor, you also indicated

5      that you called for a hematology consult, what was

6      the purpose of that?

7                    A.   The patient had problems with

8      bleeding, with elevated clotting times and that was

9      -- that was the reason for that.

10                   Q.   And Doctor, if I could draw your

11     attention to COT Exhibit A of today's date and ask

12     you to review the ophthalmology consult report.  I'll

13     put that up next.

14                   A.   Yes.

15                   Q.   And, Doctor, drawing your

16     attention to the report.  This is the report from the

17     ophthalmologist?

18                   A.   Yes.

19                   Q.   And there's an entry -- it's all

20     handwritten, correct?

21                   A.   Yes.

22                   Q.   And there's an entry under C.P.

23     head, do you to see that?  It's in the middle of the

24     page.

25                   A.   Yes.

Page 33

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                        Q.    And can you read that to us?
 3                        A.    Large bilateral, extra axial,
 4        fluid collections hyphen possibly subdural.
 5                        Q.    And what did you understand that
 6        to mean?
 7                        A.    That there was fluid outside of
 8        the brain, outside of the brain matter -- well,
 9        actually extra axial would be in the parenchyma.  But
10        they say possibly subdural.  So they're describing
11        fluid between the brain and the dura, which is the
12        lining of the brain.
13                        Q.    And is the -- is the existence of
14        fluid in that portion of the skull consistent with
15        head trauma?
16                        A.    Yes, it could be.  It's not the
17        only thing it could be but sometimes -- it does not
18        say blood.  So, sometimes blood depending on the age,
19        as I understand it, is easier to -- it's -- it's
20        sometimes difficult on C.T. scans to differentiate
21        blood from old blood from a collection of spinal
22        fluid.
23                        Q.    And those are findings that are
24        made by either radiologists or neurosurgeons
25        reviewing CAT scans, correct?
```

Page 34

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                        A.   Correct.  I -- I rely on the

3        neurosurgeons and the radiologists to make those

4        determinations.

5                        Q.   And, Doctor, on the page of the

6        document, the ophthalmologist consult report.  At the

7        bottom of the page, there are pictures or sketches of

8        eyes, correct?  They're up on the screen --

9                        A.   At the back of the eye -- of the

10       retina.

11                       Q.   And the report indicates that in

12       one of the eyes there was macular hemorrhage, is that

13       correct?

14                       A.   Correct.

15                       Q.   Can you tell which eye that was?

16                       A.   I am not positive about how they

17       set this up, which is the right and which is the

18       left.  I'm sure they have a convention but I'm not

19       familiar with it.

20                       Q.   And with regard to the -- to the

21       other eye, can you read what the -- what the entries

22       are?

23                       A.   I'm not sure which is -- the left

24       hand image --

25                       Q.   Just the one farthest to the

Page 35

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2          right.  I just read the one on the left.

3                      A.   The one on the right reads "inter

4          retinal hemorrhage next to optic nerve" and then

5          under that it says, hypo pigmented mass, and I can't

6          read under that something rupture.

7                      Q.   And what if any significance did

8          that finding have?

9                      A.   May I -- may I add?

10                     Q.   Of course.

11                     A.   May I read as well their

12         conclusion under retinal hemorrhage?

13                     Q.   Yes.

14                     A.   There they say there is evidence

15         of extensive retinal hemorrhage, intraretinal and

16         possible subretinal and that would indicate --

17         hemorrhage as you know means bleeding.  That would be

18         -- to answer your next question which is what does

19         that signify, that is a finding that's significant

20         for violent -- for trauma to the brain.

21                     Q.   And, Doctor, the macular

22         hemorrhaging, the bleeding in the back of the eyes

23         and the collection of fluid on the brain.  Those are

24         both symptoms of Shaken Baby Syndrome, correct?

25                     A.   The -- I would suggest that that

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2        we would shy away from that term, and that my -- I
3        don't use that term anymore.  I can only talk about
4        it historically as you -- as you know probably better
5        than I.  That particular term has been very
6        controversial in the last ten years.  What I can say
7        is that this is a significant finding, indicating, in
8        almost all cases, that there's been trauma.
9                        Q.   What --
10                       MS. CALABRESE:  Can I -- I'm sorry,
11       Michael, can I interrupt for a moment?  Can we use
12       the term abusive head trauma, so that we all know
13       what we're talking about?  Is that -- is that
14       satisfactory to you, Doctor?
15                       THE WITNESS:  No because I don't know
16       that there's abuse.  All I know is that there's
17       trauma.
18                       MS. CALABRESE:  Okay.  Thank you.
19                       THE WITNESS:  I don't know what caused
20       it.
21                       MS. CALABRESE:  Okay. Thank you.
22                       THE WITNESS:  You know, if this child
23       was in a, you know, high speed motor vehicle accident
24       that could have caused it, and I don't have those
25       details to determine if this is abusive, accidental,

Page 37

1    Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2    or non-accidental as we refer to it in -- in the

3    medical field.

4                    BY MR. GINSBERG:  (Cont'g.)

5                    Q.   Doctor, what type of head trauma

6    would cause these conditions?

7                    A.   The -- these conditions would be

8    caused --

9                    MR. KLEIN:  I'm just going to object

10   to form.  You can answer.

11                   A.   -- by the standard teaching and

12   again, I point out that there's been controversy in

13   the last ten years, the standard teaching and

14   practice has been that this is caused by rapid --

15   what we call acceleration-deceleration injury,

16   whether it involves actually hitting something or

17   not, it's something that doctors are -- are

18   continuing to argue among themselves.  I -- the

19   preponderance of -- of data at this point though,

20   indicates that in order to cause this kind of

21   acceleration, deceleration, there has to be impact as

22   well.

23                   BY MR. GINSBERG:  (Cont'g.)

24                   Q.   Thank you, Doctor.  Doctor, was

25   there anything else of significance within the

Page 38

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      ophthalmology consult report with regard to Matthew

3      Thomas's condition at that time, anything that you

4      consider important?

5                    A.   Well, I didn't -- some of the

6      details of the neuro exam are important.  That I

7      didn't mention that they're -- under E.O.M.s in the

8      middle of the page.  They say there's no doll's eyes,

9      that is a very abnormal finding, which we had noted

10     earlier.

11                   Q.   What if anything did that

12     indicate to you?

13                   A.   That would indicate that there is

14     severe injury to the brain stem.  And it's one of the

15     things that we evaluate when we're determining

16     whether the child is brain dead.  It was in our -- it

17     was our concern and apparently shared.  Well, I won't

18     go that far.  I misspoke.  I would be concerned about

19     brain death or impending brain death, that absence of

20     doll's eyes.

21                   Q.   And then if we could move to the

22     next page.  And Doctor, if we look at the next page

23     of COT Exhibit A of today's date, this is the

24     neurosurgery consult report, correct?

25                   A.   Correct.

```
 1            Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                        Q.   And could you tell us what the
 3       report indicates, the reason for the request was?
 4                        A.   It's very hard to read.
 5                        Q.   It says bilateral subdural
 6       hematoma, doesn't it?
 7                        A.   C.T. head with I don't -- I don't
 8       know that could be -- S.D.H. would be subdural
 9       hematoma. Yes, I agree with you.  That's what that
10       says.
11                        Q.   Can you scroll down on the next
12       -- the next document.  There we go.
13                        MR. KLEIN:  The reason for the
14       referral.
15                        MS. CALABRESE:  Okay.
16                        BY MR. GINSBERG:  (Cont'g.)
17                        Q.   And then, where it says reason
18       for request?
19                        A.   Yes.
20                        Q.   At the top.  Is that bilateral
21       subdural hematoma acronym?
22                        A.   I think S.P. status post S.D.H.,
23       subdural hematoma.  But it could be the -- I don't
24       know B.L. or S.P.
25                        Q.   And then -- and then if we go
```

Case 1:13-cv-00626-DJS  Document 172-34  Filed 06/14/21  Page 44 of 269

Page 40

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      down to the first portion of the report, is that the

3      history?

4                    A.    There's a brief history which I

5      just reviewed with you at the top.  Do you want me to

6      try to read it?

7                    Q.    Yes, please, if you can.

8                    A.    Four-month-old with -- I can't

9      read.  Six weeks transferred from O.S.H. outside

10     hospital with -- I can't read, diarrhea, vomiting and

11     intubated period.  I can't read, to A.M.C., I can't

12     read and then the third line C.T. head with, and I --

13     I guess that's D/L S.D.H. subdural hematoma.

14                   Q.    Okay.  And this -- and this

15     report was signed by the neurosurgeon, correct?

16                   A.    Yes.

17                   Q.    And do you know who that was?

18                   A.    Dr. Jermaine is --.

19                   Q.    Well, it's not what that looks

20     like in there.

21                   A.    Doctor -- it says -- it says that

22     the transact consult was to Dr. Jermaine they put the

23     -- and the resident's note say D/U Dr. Jermaine,

24     those bottom line on the left.  However, the actual

25     attending signature is difficult to read.

# APPENDIX

## 1063

Page 41

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                          Q.   Thank you, Doctor.  And if we go
 3          now to -- to the resident progress note E720 up in
 4          the top right-hand corner?
 5                          A.   Yes.
 6                          Q.   If you would just scroll down.
 7          Right there's fine.  Thank you.  And Doctor, drawing
 8          your attention to the resident progress note for
 9          Matthew Thomas, there's a section that says
10          assessment and plans, correct?
11                          A.   Yes.
12                          Q.   And could you read to us what
13          that states, just the typewriting portion?
14                          A.   Assessment and plan four-month
15          old male with bilateral subdural hematoma.
16                          Q.   Can you tell us what a subdural
17          hematoma is?
18                          A.   It's a collection of blood
19          between the brain and the dura which is the lining of
20          the brain.
21                          Q.   And is a subdural hematoma
22          consistent with a traumatic brain injury?
23                          A.   Yes.
24                          MR. KLEIN:  Stating an objection to
25          that question.
```

Page 42

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                      BY MR. GINSBERG:  (Cont'g.)

3                      Q.   And again if we can go to the

4      next page.

5                      A.   I probably don't need to

6      volunteer this.  Here that is not the only part.

7                      MS. CALABRESE:  Michael, can I just

8      --.

9                      MR. GINSBERG:  Yes?

10                     MS. CALABRESE:  Michael, can I just

11     ask for it -- for the basis of his objection?

12                     MR. GINSBERG:  Doesn't matter.

13                     MS. CALABRESE:  I'm sorry?

14                     MR. GINSBERG:  You can do anything you

15     like, but it doesn't matter.

16                     MR. KLEIN:  Yeah.  And --.

17                     MS. CALABRESE:  I know.

18                     MR. KLEIN:  For what it's worth.  It's

19     what -- it's what Dr. Edge's counsel suggested that

20     there are -- there are multiple things that is

21     consistent with not just that -- so it's an objection

22     to the form of the question.

23                     MS. CALABRESE:  Objection to the form.

24                     MR. KLEIN:  So I'm sorry.

25                     MS. CALABRESE:  Okay.

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    MR. KLEIN:  Yeah.
 3                    MS. CALABRESE:  Thank you.  I just
 4        wanted to know what, so to the form, thank you.
 5                    MR. KLEIN:  Yeah, all other objections
 6        is reserved for trials, it's my understanding.
 7                    MR. GINSBERG:  Yes, let's just go off
 8        the record for a second but I wasn't trying to insult
 9        you.
10                    (Off the record)
11                    THE REPORTER:  We're back on the
12        record.
13                    MR. GINSBERG:  All right.  Thank you.
14                    BY MR. GINSBERG:  (Cont'g.)
15                    Q.   And Doctor, we're now looking at
16        the PICU attending note for date of service,
17        9/22/2018, you see that?
18                    A.   Yes, I have -- I have that.
19                    Q.   And on that form, there's an
20        identified problem list, correct?
21                    A.   There's a what?
22                    Q.   An identified problem list.
23                    A.   Yes.
24                    Q.   And can you read to us item
25        number three on that list?
```

Page 44

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    A.    C.T. scan shows bilateral

3        subdural hematomas of varying age.

4                    Q.    And can you also read entry eight

5        in that list for us?

6                    A.    A skull fracture noted on C.T.

7        scan.

8                    Q.    And Doctor, looking down at the

9        neurologic under the assessment and plan, was it your

10       opinion at that time that Matthew Thomas was brain

11       dead?

12                   A.    I wrote that he appears to be

13       brain dead.  We did apnea testing this morning which

14       showed no breathing despite a $CO_2$ of ninety, repeat

15       apnea testing tomorrow morning, but the patient

16       appears to be brain dead, so yes.

17                   Q.    Thank you.  Can we move on to the

18       next page in that, the patient progress sheet?

19                   MR. KLEIN:  I'm sorry, Michael, did

20       you -- if I -- if -- if you didn't, it's fine, I just

21       -- did you ask  for the doctor's skull fracture

22       finding or -- or you didn't?

23                   MR. GINSBERG:  I did not.

24                   MR. KLEIN:  Okay.

25                   MR. GINSBERG:  Only that one.

Page 45

1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                       MR. KLEIN:  Thank you.

3                       BY MR. GINSBERG:  (Cont'g.)

4                       Q.   And can we scroll down just a

5       little bit to the middle of the page in that?  Thank

6       you.  And Doctor, showing you the patient progress

7       sheet contained within COT Exhibit A of today's date,

8       do you have that in front of you?

9                       A.   I'm looking.

10                      MS. MITCHELL:  Yeah, his next pages,

11      PICU resident progress note, so we've got to search

12      for what you want.

13                      MR. GINSBERG:  Okay.

14                      BY MR. GINSBERG:  (Cont'g.)

15                      Q.   Look at -- it's a note from Dr.

16      Waldman?

17                      A.   Yeah, I can -- I see it there.  I

18      -- I don't see it here.  I can -- I can read off --.

19                      Q.   Okay.

20                      A.   Read off --.

21                      Q.   The screen  --read off the

22      screen?  All right.  Doctor, do you see the notes in

23      the 9/22/08?

24                      A.   Yes.

25                      Q.   And in the middle of the page,

1    Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2    there's an entry right there, A slash P, do you see

3    that right in the middle?

4              A.    Yes.

5              Q.    What did --

6              A.    I -- I don't see who wrote it.

7              Q.    What does A slash P stand for?

8              A.    Assessment and Plan, but we need

9    to see who -- who wrote that.  We need to go the top

10   of that note or you don't care about that, who wrote

11   it.

12             Q.    Let's scroll up for a second to

13   the doctor note.

14             A.    Okay.  Neurosurgery.  Okay.

15             Q.    Okay.  Is this a neurosurgery

16   note based on Doctor Waldman?

17             A.    It looks like it's the

18   neurosurgery resident note, and the attending note is

19   the next one.

20             Q.    Okay.  Looking at the Assessment

21   slash Plan A/P entry, can you read the -- the first

22   line, Doc?

23             A.    Can you go up further so I can --

24   I can read more?  Up all the way please.  Thank you.

25   The Assess -- A slash P assessment plan four-month-

Page 47

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        old male with bilateral subdural hematoma and
 3        evidence of increased I.C.P.
 4                       A.    What's I.C.P.?
 5                       Q.    Intracranial Pressure.
 6                       And what -- what is the significance
 7        --?
 8                       A.    You -- you don't want me to read
 9        the rest of the note?
10                       Q.    Sure, go ahead.
11                       A.    Evaluate for possible brain death
12        today.  No neuroso -- no neuro -- neurosurgical at
13        this point -- it must be no neurosurgical
14        intervention at this point.
15                       Q.    Doctor, what if any significance
16        did the finding of intracranial pressure have?
17                       A.    It can be any number of -- of
18        things.  It could be blood collecting in the brain.
19        It could be swelling of the brain itself.  It could
20        be increase in the size of the ventricles from spinal
21        fluid.
22                       Q.    And could the intracranial
23        pressure have been caused by the subdural hematomas?
24                       A.    Yes.
25                       Q.    As fluid collects in that area
```

Page 48

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        --.

3                        MR. KLEIN:  I'm just going to -- I'm

4        sorry I'm just going to note an objection to form to

5        that question, sorry I'm doing it after the question.

6                        BY MR. GINSBERG:  (Cont'g.)

7                        Q.   Doctor, as fluid collects in that

8        area of the skull and near the brain, that puts

9        additional pressure on the brain, correct?

10                       A.   Yes.

11                       Q.   All right.  And Doctor, if we

12       look at the next entry, can you scroll down a little

13       bit so we can see this whole entry at the bottom,

14       pause it, thank you.

15                       Can you see the 9/22/08 N.S. attending

16       note, Doctor?

17                       A.   Yes.

18                       Q.   And do you know who the -- strike

19       that, please.  And twelve thirty, in the left-hand

20       column would be the time that PICU would have been

21       entered into the chart, correct?

22                       A.   Yes.

23                       Q.   And can you read the first

24       sentence?

25                       A.   Four-month-old, maybe B --.

Page 49

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                          Q.    Male?  Male symbol?

3                          A.    There's a male -- before the male

4      symbol, there's a B, I'm not -- I'm not sure, ad --

5      admitted and transferred from Samaritan Hospital in

6      deep coma, history (from chart) of several days,

7      watery diarrhea, worsening over two-day period, mom

8      noted unresponsiveness on day of admission and called

9      E.M.S.  Past medical history of NICU stay at A.M.C.H.

10     Secondary, something birth --.

11                         MS. MITCHELL:  Is that twin?

12                         THE WITNESS:  Oh, twin birth and

13     waking issues.  Exam, no bruises, scalp swelling seen

14     -- no bruising, scalp swelling seen, pupils mid

15     position and fixed, corneal, gag absent, no

16     spontaneous respirations, no movement to deep vein

17     stimulus.

18                         BY MR. GINSBERG:  (Cont'g.)

19                         Q.    Okay.  And thank you, Doctor.  In

20     that can you scroll down to the next page?  That's

21     it, thank you.  And Doctor, the note continues on and

22     indicates retinal hemorrhages, correct?

23                         A.    Yes.

24                         Q.    As you indicated they were

25     demonstrating on the -- the ophthalmic consult,

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2     correct?

3                    A.    Yes.

4                    Q.    And there is a C.T. entry,

5     correct?

6                    A.    Yes.

7                    Q.    And what does that refer to?

8                    A.    Bilateral --.

9                    Q.    What does -- what does the C.T.

10    refer to?  CAT scan?

11                   A.    CAT scan.

12                   Q.    Okay.  And what -- what did the

13    entry say?

14                   A.    Bilateral -- I'm not sure

15    hemispheric S.T.H.s subdural hematoma.

16                   Q.    Well now, bilateral means it's on

17    both sides of the child's head, correct?

18                   A.    Yes.  Marked separation of

19    sutures, no fracture seen.

20                   Q.    What if any import does the

21    marked separation of suture indicate?

22                   A.    With increasing of -- of the

23    brain size, the places where the different bones in

24    the brain can -- can pull apart.

25                   Q.    And doctor, the next entry is

Page 51

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2      impression, correct?
3                      A.    Yes.
4                      Q.    And can you read for us the
5      second entry in there in that entry beginning with,
6      looks like bilateral?
7                      A.    Bilateral subdural hematomas
8      without explanation.
9                      Q.    Is there any significance to the
10     reference to without explanation?
11                     A.    I -- I don't think I can comment
12     on that, that would be Dr. Waldman.
13                     Q.    But to you what, if any import
14     would a bilateral subdural hematoma without
15     explanation be?
16                     A.    My concern would be that of a
17     child abuse.
18                     Q.    And who signed this 9/22/08 note
19     entered at twelve thirty in patient progress sheet of
20     COT Exhibit A of today's date?
21                     A.    Who signed the note?
22                     Q.    Yes, who entered that?
23                     A.    I believe that's Dr. Waldman.
24                     Q.    And Dr. Waldman was at that time
25     a neurosurgeon, correct?

Page 52

```
1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                       A.   Yes.

3                       Q.   And you previously told us that

4        neurosurgeons -- strike that.

5                       Doctor, if I can draw your attention

6        to the physician admission history and physical with

7        medication reconciliation document, it looks like

8        this in that.

9                       A.   I got it.

10                      Q.   Perhaps -- why don't we go off

11       the record for a second while we find that?

12                      (Off the record, 11:21 a.m. to 11:21

13       a.m.)

14                      THE REPORTER:  Okay.  We're on the

15       record.

16                      BY MR. GINSBERG:  (Cont'g.)

17                      Q.   Are you all set, Doctor?

18                      A.   Yes.

19                      Q.   Doctor, showing you this page of

20       the physician admission history and physical with

21       medication reconciliation with the 9/21/08 fourteen-

22       hundred-hour entry at the bottom of it.  You see

23       that?

24                      A.   Yes, I -- we don't have that

25       here, but I -- I can see it up there.
```

Page 53

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                        Q.    See at the screen?
 3                        A.    Yes.
 4                        Q.    Can we scroll down a little bit
 5        in that?  Thank you.  All right.  There is a neuro
 6        entry here, correct?
 7                        A.    Yes.
 8                        Q.    Can you read that neuro entry?
 9                        A.    Bilateral subdural hematoma on
10        head C.T. read by radiology just called in and --.
11                        Q.    Do you understand that to mean
12        that radiology called in with that report?
13                        A.    Yes.
14                        Q.    And who signed this note?
15                        A.    Well, there's two parts, the --
16        the left side is signed by the resident, Doctor -- it
17        looks like Dr. Valliani, and the right side is signed
18        by me.
19                        Q.    So it was Dr. Valliani who
20        received the call from neurologist?
21                        A.    I don't know.
22                        Q.    But it's his note, correct?
23                        A.    It's his note.
24                        Q.    Okay.
25                        A.    It's -- it's both of our notes.
```

Case 1:13-cv-00626-DJS Document 172-1 Filed 06/14/21 Page 58 of 269

Page 54

1    Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2              Q.   Okay.

3              A.   I'll -- my attestation on the

4    right means that I've read his note and -- and I'm

5    agreeing with what's in it.

6              Q.   And can we go to this C.T. scan

7    report?  Six -- I thought it's the fifth page from a

8    doc -- oh, no, it's not it's the third page from a

9    doc.  Yeah, this one.  Doctor, drawing your attention

10   to the C.T. scan report.

11             A.   No, it's the same.

12             Q.   Looks like it is dated 9/21/08 at

13   twelve forty-eight, you see that?  It's on the screen

14   if you can't find it?

15             A.   Yes, I have -- I have it.

16             Q.   And under discharge planning, you

17   can scroll down a little in that.

18             A.   I mean I -- I don't know.  I

19   thought -- I thought you're looking at the C.T. scan,

20   you're looking at discharge planning?

21             Q.   It's a C.T. scan report, it's on

22   the screen.

23             MR. GINSBERG:  Annette, can you scroll

24   up to the top so the doctor can see the document?

25             MS. MITCHELL:  Yes, sorry, --

Page 55

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    BY MR. GINSBERG:  (Cont'g.)

3                    Q.   Can you identify what the

4        document is, Doctor?

5                    A.   No, I -- I can't.  I do not know.

6                    Q.   It's a laboratory -- it's a

7        laboratory result.

8                    A.   Actually that -- it -- the actual

9        result -- C.T. scan results looks different than

10       that.  This looks like it's been -- has the actual

11       resort -- report lifted and placed and -- and perhaps

12       a social worker report, but the actual C.T. report

13       has a title on it and radiology.  I can hold it up if

14       you wanted to see it, but it --.

15                   Q.   No, no Doctor, drawing -- drawing

16       your attention to --.

17                   A.   It looks -- it looks like this.

18                   Q.   Drawing your attention to the

19       document that's on the screen, the upper right-hand

20       corner says, laboratory results report, correct?

21                   A.   Yes.

22                   Q.   Okay.

23                   MR. GINSBERG:  And Annette if you

24       would just scroll down to the bottom.

25                   Q.   (Cont'g.)  This one says page

Page 56

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        twenty-two of twenty-three, correct?
 3                    A.   It says that it's a -- a report
 4        from case management.
 5                    Q.   Okay.  Now down at the very
 6        bottom, it says, page twenty-two of twenty-three,
 7        correct?
 8                    A.   Yes.
 9                    Q.   Okay.  And under the discharge
10        planning entry, there's an interaction entry,
11        correct?
12                    A.   Yes.
13                    Q.   9/21/08 at fifteen zero four?
14                    A.   Yes.
15                    Q.   Could you read that for us?
16                    A.   Called to PICU by peds M.D.
17        Daniel Dunnett regarding this baby.  He was
18        apparently transferred from Samaritan Hospital, has
19        had C.T. here which showed a bleed, possible skull
20        fracture (awaiting confirmation of this).
21                    Q.   But that --.
22                    A.   This is assess --.
23                    Q.   Go ahead.
24                    A.   Per M.D., this is a suspect
25        injury, period.  Patient's mother -- (Wilhemina Hicks
```

Page 57

1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2       accompanied patient then apparently fainted and was

3       sent to the E.D. for evaluation, limited info

4       available.  Per report there are six other children

5       in the home including this baby's twin.  C.P.S.

6       contacted and the case was taken by a worker, Zewdie

7       Tibebu).  Will have S.W. follow up in a.m.

8                   Q.   Doctor, were you the quote, M.D.

9       who indicated that this is a suspect injury?

10                  A.   Was I the doctor that indicated

11      what?

12                  Q.   That this was a suspect injury?

13                  A.   I -- I'm not -- I don't know if I

14      used that -- that language as -- as we just read in

15      my admission, I was concerned about non-accidental or

16      accidental trauma.

17                  Q.   And Doctor, at the time when you

18      were caring for Matthew Thomas, did you, yourself,

19      render a diagnosis that resulted in suspect injury?

20                  A.   I -- I gave my diagnosis which we

21      just read a few minutes ago, yes, in the admission.

22                  Q.   Okay.  Could you tell us again

23      what it was?

24                  A.   I would like to read it rather

25      than --

```
1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2                    Q.    Sure.
3                    A.    -- try to remember exactly.
4                    Q.    Sure.
5                    A.    I don't have that sheet, so you'd
6        have to go back to that, the last one that you had
7        which was the history and physical and medical.  I do
8        have from the next day that -- that gave my
9        assessment.
10                   Q.    Okay.  We don't -- we don't need
11       to specifically respond to it in the document.  If
12       you could tell us what your impression was.
13                   A.    My impression was that that there
14       was subdural hematomas, perhaps of different ages in
15       -- indicative of rapid acceleration, deceleration
16       injury, perhaps hitting a object causing subdural --
17       cause of which could be either at an accident or
18       child abuse.
19                   Q.    And did you also consider the
20       retinal bleeding in formulating a diagnosis?
21                   A.    Yes, and -- and the state of the
22       patient's mental state.  But again, to say whether
23       this was accidental or non-accidental, I -- I -- I
24       wasn't able to do.  I am the physician.  I could only
25       say that I was suspicious of trauma because I don't
```

Page 59

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      know.  But I do have the history that there was not

3      any accident reported, that it was not in a motor

4      vehicle accident.

5                So the preponderance of evidence would

6      be that this was not an accidental, but again -- and

7      that's -- that would be something that is not in my

8      area of expertise, that would be the police.

9                Q.   Dr. Edge, prior to treating

10     Matthew Thomas, had you ever treated a -- a child who

11     had been the victim of child abuse wherein the parent

12     or care -- or caregiver denied causing any injury to

13     the child?

14                A.   Yes.

15                Q.   I didn't hear what your response

16     was, I'm sorry.

17                A.   Yes, I've cared for children with

18     child abuse where parents denied abuse.

19                Q.   Now, Doctor, drawing your

20     attention in that if we could, discharge transmission

21     plan, it's about seventeen pages from the front in

22     that.  Perfect, thank you.  Okay.  And Doctor, I'd

23     like to ask you if you would read to yourself the

24     initial assessment slash comment portion.

25                A.   Initial assessment comment

Page 60

1     Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2     portion, you want me to read that?

3             Q.   Yes.

4             A.   DeLameter, Adair, social worker,

5     9/21/08, twenty-three forty-four, more numbers S.W.

6     social worker was called by PICU staff to meet with

7     patient's mother to provide emotional support.

8     Patient is a four-month-old boy transferred to PICU

9     from Samaritan Hospital on full life support.

10             His mother stated she found him limp

11     when she got up this a.m. and patient was taken to Sa

12     -- Samaritan with complaint of respiratory distress.

13     Patient has bilateral subdural hematomas and is in

14     extremely critical condition, a report to C.P.S. was

15     made ear -- earlier.

16             Social worker met with patient's

17     mother and her brother and the on-duty chaplain

18     responded also.   Social worker stayed with patient's

19     mother when Dr. Edge met with her to explain that

20     patient's injuries are life threatening and he does

21     not believe patient will live.

22             At the request of Dr. Edge, social

23     worker contacted the Troy Police and at twenty-one

24     ten Detective Ron Fountain responded to the PICU desk

25     phone numbers.   Social worker also spoke twice to on-

# APPENDIX

**1083**

Associated Reporters Int'l., Inc.

Page 61

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        call C.P.S. worker, Andrea Fandholt to explain
 3        patient's grave condition and extremely poor
 4        prognosis.
 5                    She confirmed that patient's six sib
 6        -- siblings, including his twin brother had been
 7        removed from the home and explained that there was an
 8        open C.P.S. case on patient.  She said the case
 9        worker is Jasper Esposito, phone number.
10                    Social worker met with charge nurse
11        and peds resident.  There is to be no visitation
12        other than immediate family and that visitation must
13        be supervised.  Social worker explained to charge
14        nurse and nurse caring for patient that a report must
15        be made to New York State Child Abuse and Neglect
16        Hotline, phone number, if patient expires, the phone
17        and form were left on the front of patient's chart.
18        Adair DeLamater.
19                    Q.   Doctor, was -- well, C.P.S
20        referred to in that entry is Child Protective
21        Services, correct?
22                    A.   Yes.
23                    Q.   And did you direct that Albany
24        Medical Center Hospital personnel contact C.P.S. with
25        regard to this matter?
```

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                      A.   I don't remember if I made the
 3     original referral or if it was done earlier.
 4                      Q.   Okay.  Do you feel that it was
 5     appropriate to report this matter to C.P.S.?
 6                      A.   It's -- it's required, yes.
 7                      Q.   And Doctor, the -- the entry also
 8     indicates that at your request, Troy Police
 9     Department was contacted with regard to this matter,
10     correct?
11                      A.   Yes.
12                      Q.   And why was that, Doctor?
13                      A.   With the concern of child abuse,
14     that would be assault and that is a police matter.
15                      Q.   And Doctor, prior to formulating
16     the diagnosis, and directing that Troy Police being
17     contacted, did you have any discussion with regard to
18     Matthew Thomas's condition with any member of the
19     Troy Police?
20                      A.   I don't remember.
21                      Q.   If you did, would it have been in
22     any note or record?
23                      MR. KLEIN:  Objection to form.  You
24     can answer.
25                      A.   I don't know.
```

Page 63

1    Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    BY MR. GINSBERG:  (Cont'g.)

3                    Q.   Doctor, did any discussion or

4    interaction you had with any member of the Troy

5    Police Department influence the diagnosis that you

6    rendered in any way?

7                    A.   I don't know the answer to that.

8                    Q.   Who would have known the answer

9    to that if you don't?

10                   A.   Who would know whether what I

11   said to the police influence them?

12                   Q.   That -- that wasn't my question.

13   Let -- let me ask the question again, Doctor.  The

14   question was prior to rendering your diagnosis with

15   regard to Matthew Thomas, did any member of the Troy

16   Police Department influence you in rendering that

17   finding?

18                   A.   Not that I can recall.  I -- I

19   don't recall any contact before the discussion

20   referred to on this discharge transition plan.

21                   Q.   So am I correct in my

22   understanding that you rendered your diagnosis and

23   findings and then after the Troy Police Department

24   will be contacted, is that correct?

25                   A.   Yes, and -- and -- that's what it

Page 64

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      says, that I wouldn't -- I've asked them to contact

3      the police that the police had -- had already been

4      contacted.

5                    MS. SPENCER:  Michael, how much longer

6      do you have?  I just want to see if -- now would be a

7      good time for a restroom break?

8                    MR. GINSBERG:  Why don't just give me

9      another five minutes or so and I think I'll be done.

10                   MS. SPENCER:  Okay.  Thank you.

11                   BY MR. GINSBERG:  (Cont'g.)

12                   Q.  All right.  Doctor, do you know

13     if the Troy Police Department was contacted by Child

14     Protective Services with regard to Matthew Thomas's

15     condition?

16                   A.  I -- I don't know anything that's

17     not in that note.

18                   Q.  All right.  Did there come a time

19     when you advised the -- any member of the Troy Police

20     Department as to your diagnosis and findings with

21     regard to Matthew Thomas?

22                   A.  I met with the -- I met with

23     them, yes.

24                   Q.  And -- and what's the sum and

25     substance --?

Page 65

```
1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2                    A.   And -- and not -- not today --
3        what's that?
4                    Q.   Do you recall the sum and
5        substance of what was said?
6                    A.   Not word for word.
7                    Q.   Did you advise them of your
8        findings?
9                    A.   Yes.
10                   Q.   And at any time, did any member
11       of the Troy Police Department attempt to get you to
12       change your -- either your diagnosis or findings with
13       regard to Matthew Thomas?
14                   A.   No.
15                   Q.   And Doctor, did you ever have any
16       discussions with a Dr. Sikirica with regard to
17       Matthew Thomas's condition?
18                   A.   I don't recall.
19                   Q.   Do you know who Dr. Sikirica is?
20                   A.   I believe he's a pathologist
21       working for the -- working for the Attorney --
22       Attorney General's Office, I'm not -- I don't know
23       for sure.  But I -- I -- I -- I know that he is a
24       pathologist.  I -- I have had interactions with him
25       in the past.
```

Page 66

1    Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    Q.   And Doctor, did you have any

3    discussions with Dr. Waldman, with regard to the care

4    and treatment of Matthew Thomas when he was at Albany

5    Medical Center Hospital?

6                    A.   Yes.  I -- I don't recall the

7    exact, but I -- I did talk to all of the consultants

8    that I consult.

9                    Q.   And can we just bring up last --

10   last couple questions, Doctor..  Can we bring up on

11   that the deposition of a witness slip of Dr. Edge?

12                   THE REPORTER:  Yes.

13                   MR. GINSBERG:  I believe the date at

14   the bottom is 9/22/08.

15                   THE REPORTER:  Is it -- yes, he --.

16                   MR. GINSBERG:  I don't -- they may be

17   a separate -- there we go, thank you.  Is it part of?

18                   THE REPORTER:  No, it's -- it's

19   different.

20                   MR. GINSBERG:  Okay.  Can we mark this

21   as COT Exhibit B for today's date?

22                   THE REPORTER:  Yes.

23                   BY MR. GINSBERG:  (Cont'g.)

24                   Q.   And Doctor, drawing your

25   attention to what's been marked as COT Exhibit B with

Page 67

```
1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      today's date.  I ask you if that's the deposition of

3      a witness that you signed on or about September 22nd,

4      2008?

5                      A.   Yes, I have it.

6                      Q.   And Doctor, is the information

7      that's contained in that deposition of a witness

8      accurate as far as you know?

9                      A.   Yes.

10                     Q.   I have no further questions,

11     thank you.

12                     MR. GINSBERG:  You want to take a

13     quick break?

14                     MS. SPENCER:  Can you just -- on that,

15     can you just allow us to view that entire exhibit,

16     please?  I don't know if you can make that screen

17     bigger, oh, that's fine, that's fine.  What number

18     did you put on it?

19                     MR. GINSBERG:  B.

20                     THE REPORTER:  It's B.

21                     MS. SPENCER:  You're calling it Troy

22     E?

23                     MR. GINSBERG:  C -- COT the Troy COT

24     Exhibit B of today's date.

25                     THE REPORTER:  B as in boy.
```

Page 68

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    MS. SPENCER:  B as in boy, thank you.

3      Are we taking a short break?

4                    MR. GINSBERG:  Yeah, I think -- I

5      think Christina had wanted to take a quick break.

6                    MS. SPENCER:  Yes, please.  Just, you

7      know, ten minutes to use the restroom.  Who's up

8      next?

9                    MR. KLEIN:  You are.  Why don't we

10     come back at noon?  Does that make sense for

11     everybody?

12                   MS. SPENCER:  Yeah, you -- you -- you

13     can skip me.

14                   THE REPORTER:  Okay.  I'm going to go

15     off the record.  We're off the record.

16                        (Off the record, 11:46 a.m.)

17                        (On the record, 12:11 p.m.)

18                   THE REPORTER:  We're on the record.

19                   CROSS EXAMINATION

20                   BY MR. KLEIN:

21                   Q.   Good afternoon, Dr. Edge, and

22     counsel.  I'm Brett Klein and I represent Adrian

23     Thomas in both the Court of Claims and in the

24     District Court Action surrounding the prosecutions

25     that were brought against him.

Page 69

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                      And I just want to -- we're going to
 3      ask you some additional questions today.  Try not to
 4      ask you what you've already been asked, at least too
 5      much, about your involvement in this matter.
 6                      You understand that you took an oath
 7      to tell the truth today and as you would take in a
 8      court of law.  Are you aware of that?
 9                      A.   Yes.
10                      Q.   Is there any reason why you can't
11      testify fully and accurately today?
12                      A.   No.
13                      Q.   Okay.  Do you remember your
14      involvement in this incident?
15                      A.   Yes.
16                      Q.   And have you had an opportunity
17      to refresh your recollection of anything that you may
18      not have remembered by looking at the Albany Medical
19      Center chart among other things?
20                      A.   Yes.
21                      Q.   What else have you looked at to
22      refresh your recollection of -- of this incident?
23                      A.   The two documents.  One is the --
24      the deposition -- the transcript of the 2009 trial
25      and the other is that statement, that we just went
```

```
1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2       over, which was a deposition, I believe.  The voice
3       and handwritten one.
4                   Q.   The supporting deposition that
5       you signed for the police.  Is that what you're
6       referring to?
7                   A.   I'm not sure.  The one that we
8       just went over last.  It doesn't say anything about
9       police.  It says that deposition of a witness, State
10      of New York, County of Rensselaer, City of Troy
11      Court.
12                  Q.   Did you see at the bottom it's --
13      indicates a police -- that it was signed for a police
14      officer?
15                  A.   Is that -- is that the sergeant?
16                  Q.   Yes.
17                  MR. GINSBERG:  Please note my
18      objection to the form of that last question.
19                  BY MR. KLEIN:  (Cont'g.)
20                  Q.   Let me -- do you have any doubt
21      that you -- you prepared this at the request of a --
22      of a Troy Police Officer?
23                  A.   I don't independently remember
24      and the -- and -- and it was actually written, it's
25      not my handwriting.  I signed it, which means I agree
```

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        with it.
 3                        It looks like the social worker or
 4        that was -- in the office was -- was the one that
 5        actually wrote that out and then I made corrections
 6        and signed it.
 7                        I can't tell you that I'm -- that --
 8        that it was for the police.  But I take your word for
 9        it.
10                   Q.   Okay.
11                        MS. CALABRESE:  Please have that
12        exhibit displayed for me.
13                        MR. KLEIN:  I'm not getting into it
14        right now.  I'm just reviewing the universe of
15        documents he's looked at and then at some point I'll
16        put it up and we'll ask questions about it.
17                        MS. CALABRESE:  Okay.
18                        BY MR. KLEIN:  (Cont'g.)
19                   Q.   Other than your -- with -- object
20        -- withdrawn, I'm sorry.
21                        You said that you reviewed your
22        testimony.  Would that be your testimony from the
23        trial of Adrian Thomas from 2009?
24                   A.   Yes.
25                   Q.   Other than that testimony and
```

Page 72

1              Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2       other than today, have you given any other testimony

3       related to this matter?

4                          A.    Not that I know of.  Not that I

5       can remember, I should say.

6                          Q.    And just for the avoidance of

7       doubt, are you aware that there was a retrial of

8       Adrian Thomas in 2014 or around that time?

9                          MR. GINSBERG:  Object to the form.

10                         A.    I -- I wasn't aware of that.

11                         BY MR. KLEIN:  (Cont'g.)

12                         Q.    Okay.  Did -- did you know that

13      he was retried after the 2009 trial, even if you

14      don't know when it was?

15                         A.    This one is 2009.  The one you

16      showed me.

17                         MS. MITCHELL:  Yes.  Your testimony.

18                         THE WITNESS:  I -- I was not aware of

19      that.

20                         BY MR. KLEIN:  (Cont'g.)

21                         Q.    So you didn't know that he had a

22      retrial and he was found not guilty of all charges.

23      You didn't know that until I --.

24                         MR. GINSBERG:  Object to the form.

25                         A.    No, I -- my counsel told me that

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        he had been released.

3                          BY MR. KLEIN:  (Cont'g.)

4                          Q.    Okay.  Without divulging what

5        you've discussed with counsel, until I posited it in

6        -- in these questions, were you aware that there was

7        a trial after the one you testified that -- that led

8        to his release?

9                          MR. GINSBERG:  Object to the form.

10                         A.    I had -- I-- I actually, I don't

11       know how that works exactly.  Would that -- would

12       require a trial or not?

13                         So I have to -- all I know is what

14       counsel told me leading up to this, that he had been

15       released.

16                         MS. MITCHELL:  Okay.  You don't have

17       to provide him information as to what we talked

18       about.

19                         BY MR. KLEIN:  (Cont'g.)

20                         Q.    What I'm trying to get at is,

21       were you ever called into the D.A.'s office or to any

22       -- or any other place to meet with attorneys to talk

23       about testifying at a second time, even if you didn't

24       testify?

25                         A.    I don't remember that.

    1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

    2                    Q.    Okay.  So to your knowledge, the

    3     only time you were asked to give testimony and to

    4     testify in terms of any trials was 2009?

    5                    A.    Yes -- yeah.

    6                    Q.    Okay.  Other than the supporting

    7     deposition or deposition of a witness form that we

    8     discussed, the 2009 testimony and the Albany Medical

    9     Center chart, that's about two hundred and twelve

   10     pages.  Have you reviewed anything else to refresh

   11     your recollection for that?

   12                    A.    No.

   13                    MS. MITCHELL:  If I can jump in, we

   14     did receive exhibits of police narratives that the

   15     witness briefly reviewed in preparation for

   16     testimony.

   17                    MR. KLEIN:  Okay.

   18                    BY MR. KLEIN:  (Cont'g.)

   19                    Q.    Did you review the police

   20     narratives, approximately two of them?

   21                    A.    Yes.

   22                    Q.    One of them was by an officer

   23     named Sergeant Colaneri.

   24                    A.    Yes.

   25                    Q.    Do you agree with that?

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    A.   Yes.
 3                    Q.   And another one was by an officer
 4        named Mason?
 5                    A.   Yes.
 6                    Q.   Okay.  Other than what we've
 7        discussed, have you look at or discussed this case
 8        with anyone else to prepare for today's deposition
 9        other than conversations with your attorney?
10                    A.   No.
11                    Q.   Okay.  Did you know Adrian
12        Thomas, Wilhemina Hicks, or anyone in this family
13        prior to the events of September 21st, 2008?
14                    A.   No, no.
15                    Q.   Have you had any involvement with
16        the family, in your capacity as a physician since
17        those -- the day or two starting on September 21st,
18        2008 other than testifying at the criminal trial and
19        testifying today?
20                    A.   No, no.
21                    Q.   There was a Sergeant Adam Mason
22        who was involved in this case.  Do you know who he is
23        sitting here today?
24                    A.   No, no.
25                    Q.   Okay.  Do you -- there's a
```

                                                                     Page 76

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        Detective Ronald Fountain, Former Detective Ronald

3        Fountain, who was involved in this investigation.  Do

4        you know who that is?

5                    A.   No.

6                    Q.   Okay.  Did you speak with police,

7        at the time, you just don't recall who they are by

8        name?

9                    A.   Yes.

10                   Q.   Okay.  Have you ever testified in

11       any civil trial in your capacity as a physician from

12       Albany Medical Center?

13                   A.   A civil trial, meaning --?

14                   Q.   Yeah.  A trial, whether --

15       whether you were accused of some type of malpractice

16       with the hospital or in the course of some -- someone

17       else -- some other type of case like a personal

18       injury lawsuit or any other circumstance?

19                   A.   The -- no.

20                   Q.   Okay.  Have you ever been sued

21       for malpractice?

22                   A.   Not in a professional --.

23                   MS. CALABRESE:  Objection, objection.

24       Thank you.

25                   BY MR. KLEIN:  (Cont'g.)

Page 77

1                  Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                              Q.    Okay.  You can answer.

3                              A.    No.

4                              Q.    Okay.

5                              A.    Not at this point.

6                              Q.    Okay.  Has the hospital or any

7       entity that you've worked for been sued for

8       malpractice based on conduct attributed to you, even

9       if you dispute it?

10                             MS. CALABRESE:  Objection.

11                             MS. MITCHELL:  Objection, same

12      objection.

13                             MS. CALABRESE:  Same objection.

14                             BY MR. KLEIN:  (Cont'g.)

15                             Q.    You can answer.

16                             A.    Can you repeat the question?

17                             Q.    Sure.  Has any hospital or entity

18      that you've worked for been sued for malpractice, for

19      conduct alleged to have committed -- been committed

20      by you, even if you dispute that conduct and even if

21      you weren't the named party in the case?

22                             A.    Yes, yes.

23                             MS. PECK:  Object to form.

24                             BY MR. KLEIN:  (Cont'g.)

25                             Q.    On how many occasions?

Page 78

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    MS. PECK:  Same objection.  Object to
 3        form.
 4                    MS. CALABRESE:  Same objection.
 5                    A.   I -- I -- twice, I think.
 6                    BY MR. KLEIN:  (Cont'g.)
 7                    Q.   Okay.  Did those cases go to
 8        trial, either of them?
 9                    MS. CALABRESE:  I would ask the
10        stenographer to note a standing objection to this
11        line of questioning for the Defendant, the State of
12        New York.
13                    MS. PECK:  The same, please, for Dr.
14        Sikirica.
15                    MS. CALABRESE:  Agree.  Well, for the
16        Defendant.
17                    MS. MITCHELL:  Same for -- attorney
18        for the witness.
19                    BY MR. KLEIN:  (Cont'g.)
20                    Q.   You can answer.  Did any of those
21        cases go to trial?
22                    A.   I don't think -- no.
23                    Q.   Okay.  Were you deposed in either
24        or both of those cases?
25                    A.   Yes.
```

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                        Q.   Okay.  On how many of them?

3                        A.   I remember only one.

4                        Q.   Do you remember when it was?  In

5     other words, was it within the last few years?  Was

6     it two decades ago or something else that you could

7     -- you could specify?

8                        A.   Approximately -- approximately

9     five years ago.

10                       Q.   Okay.  And can you briefly

11    describe the allegations in the case?  What I'm

12    trying to get at is, is there anything similar to the

13    -- the facts of this case in any way?

14                       MR. GINSBERG:  Object to the form.

15                       A.   There was nothing similar.  It

16    was about -- I should keep talking?

17                       BY MR. KLEIN:  (Cont'g.)

18                       Q.   Yes.

19                       A.   Yeah.  The -- it was regarding a

20    child who had a puncture in the stomach.

21                       Q.   And was there an alleged

22    misdiagnosis about that?

23                       A.   Delay.

24                       Q.   Okay.  And did the child -- did

25    the child die?

Page 80

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    A.   No.
 3                    Q.   Did that case -- is that case --
 4        do you know in what venue that case was pending?
 5                    A.   I don't.  I think the case is all
 6        settled.
 7                    Q.   You think it was settled?  Was --
 8        do you know if there was an actual --?
 9                    MS. MITCHELL:  Do you know if the
10        matter settled or how it was resolved?  Or you just
11        know it's done?
12                    A.   I know it's done.
13                    MS. MITCHELL:  Okay.
14                    BY MR. KLEIN:  (Cont'g.)
15                    Q.   Do you know if it was done by a
16        settlement or some other disposition?
17                    A.   No.
18                    Q.   Do you have a copy of your
19        deposition transcript from that case?
20                    A.   No.
21                    Q.   Do you have -- did you have an
22        attorney representing you in that case?
23                    A.   The hospital attorney.  I did not
24        have a personal attorney.
25                    Q.   Can you state --?
```

Page 81

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                      MR. GINSBERG:  Note my objection to
 3        the form of the last question.
 4                      BY MR. KLEIN:  (Cont'g.)
 5                      Q.   Can you state the name of the
 6        hospital attorney or attorneys that represented you?
 7                      A.   If I remember the name?
 8                      Q.   Yes.
 9                      A.   No.
10                      Q.   Okay.  Do you know if that case
11        was pending in State Court or a Federal Court?
12                      A.   No.
13                      Q.   Do you know the name of the claim
14        of the plaintiff or claimants in that case or the
15        patient?
16                      A.   I don't remember.
17                      Q.   Okay.  In the course of the
18        criminal trial, you were asked about a matter
19        involving, Blaine Bryce.
20                      Do you recall a series of questions
21        about a matter involving Blaine Bryce?
22                      A.   Yes.
23                      MR. GINSBERG:  Object to the form.
24                      BY MR. KLEIN:  (Cont'g.)
25                      Q.   And that's the case -- did you
```

Page 82

```
 1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2    agree that in that case there were mistakes made by
 3    the radiologist?
 4                    MR. GINSBERG:  Object to the form.
 5                    MS. CALABRESE:  Object.  Again, for
 6    the --
 7                    MS. PECK:  Object to form.
 8                    MS. CALABRESE:  -- for the Defendant,
 9    the State of New York, I just want to reaffirm our
10    standing objection to any line of questioning
11    relating to any malfeasance or any allegations of
12    malfeasance, malpractice or anything related to the
13    personnel or employment records of this witness.
14    Thank you.
15                    MR. KLEIN:  You could just -- you
16    could just state the objection.
17                    MR. GINSBERG:  Objection.
18                    MS. PECK:  Object to the form for Dr.
19    Sikirica.
20                    MR. KLEIN:  I think -- I think the
21    appropriate is just to state the word objection.
22    Christina, just -- just so you know, you're super
23    loud or at least on my end, so.
24                    MS. MITCHELL:  Okay.  I'm going to
25    object to form.  And are you asking him if there were
```

Page 83

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        allegations that the radiologist had made some type
 3        of error or are you asking him to give his opinion
 4        about that?
 5                    MR. KLEIN:  I didn't get there yet.
 6        I'm just asking if he recalls that line of
 7        questioning and then I'm going to go from there.
 8                    MS. MITCHELL:  Okay.  Can you state
 9        the question again?
10                    BY MR. KLEIN:  (Cont'g.)
11                    Q.  Sure.  Was that -- can you
12        describe for me briefly about the Blaine Bryce
13        treatment and what mistakes were made?
14                    MS. PECK:  Object to form.
15                    A.  I -- I would have --
16                    MR. GINSBERG:  Object to the form.
17                    A.  -- I would have to review the
18        case.  I -- I remember a few questions from 2009 but
19        beyond that, I can't answer your question.  I don't
20        know.
21                    BY MR. KLEIN:  (Cont'g.)
22                    Q.  Okay.  Was that a case where you
23        -- where you and other doctors said there was a skull
24        fracture but after the -- the body of the deceased
25        patient was exhumed, it was determined, it was, in
```

1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2       fact, no skull fracture in sum and substance.  Is

3       that what happened?

4                   A.  I -- I only know that from what I

5       learned yesterday.  I -- I have -- and I have some

6       vague recollection but I certainly can't tell you if

7       that's really what happened or not.

8                   Q.  Okay.  Do you have any documents

9       related to that incident in your personal -- strike

10      that.

11                  What -- did any lawsuit or other

12      litigation such as in the criminal litigation against

13      Mr. Bry -- against Bryce?

14                  Was there any litigation in that case

15      that you were called to testify in?

16                  A.  No, no.  I don't -- I don't think

17      so.

18                  Q.  Okay.  Do you know why you were

19      not asked to testify?  Withdrawn.

20                  Were you asked to testify in the

21      subsequent trial of Adrian Thomas by the District

22      Attorney's Office?

23                  Were you -- did you ever have a

24      discussion about testifying a second time in this

25      case?

Page 85

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    A.   No, not that I can remember.

3                    Q.   Did you know that your -- some of

4      your colleagues like Dr. Waldman, did testify at a

5      second trial?

6                    A.   No, no.

7                    MS. CALABRESE:  I'm sorry.  I'm sorry,

8      Brett.  Can I ask the stenographer to please repeat

9      the last question and answer?

10                   MR. KLEIN:  Does he know if Dr.

11     Waldman testified at the second trial and he said,

12     no.

13                   MS. CALABRESE:  Thank you.

14                   BY MR. KLEIN:  (Cont'g.)

15                   Q.   Have you ever seen the autopsy of

16     Matthew Thomas?

17                   A.   No.

18                   Q.   Well, did you testify at the

19     criminal trial that you -- you -- did you have access

20     to it before that trial to review it?

21                   A.   I don't remember.

22                   Q.   Okay.  Directing your attention

23     to September 21st, 2008, when you became involved in

24     this incident.  When this matter came to your

25     attention, it was in the course of a request for

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      transfer from Samaritan, is that right?

3                      A.   Yes, yeah.

4                      Q.   And did you have a chance to look

5      at the Samaritan paperwork in the two hundred and

6      twelve page medical record that you reviewed for

7      today?

8                      A.   I did not review that.

9                      Q.   Okay.  Do you recall the

10     differential diagnosis either -- either specifically

11     or in sum and substance?

12                     A.   In sum and/or substance, I

13     remember that Dr. Carlos was concerned about sepsis,

14     but that she could not rule out trauma.

15                     Q.   Right.  And she started treating

16     -- she took -- withdrawn.

17                     She -- she drew blood so that the

18     blood could be tested for bacterial -- bacteria,

19     correct?

20                     A.   Yes.

21                     Q.   And then started the -- and

22     started the patient on a course of antibiotics after

23     that, correct?

24                     A.   Yes.  And we continued that in my

25     office.

1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                       Q.    Okay.  Did you ever become aware

3       of the results of the blood -- of the blood cultures?

4                       A.    No.

5                       Q.    Okay.  Did you ever come to learn

6       from a review of your file or from any other source

7       that the child had a pervasive bacterial infection?

8                       A.    I did not.  I was questioned

9       about that in 2009 and I can't remember if that's in

10      my -- nor do I remember in a review whether they told

11      me that at that time.

12                      So I don't want to say I didn't know

13      if, in fact, I was told in 2009 but other than that,

14      I would not -- I did not know.

15                      Q.    Okay.

16                      A.    Other than the fact that it was

17      brought up in the 2009 trial.  Should I speak up?

18                      Q.    Yeah.  Do you want to change or

19      amend your answer?

20                      A.    Yeah, I need to make a correction

21      because I -- I now have my discharge summary which

22      does state on September 23rd, the patient's blood

23      culture came back negative and the second brain death

24      exam was performed.

25                      Q.    Okay.  Did you ever come to learn

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      that that was wrong, that the -- the culture came

3      back positive in fact?

4                    A.    No.

5                    Q.    So when this child presented from

6      doctor -- from Samaritan to your hospital, it's fair

7      to say that the concern was primarily sepsis at that

8      time, correct?

9                    MS. MITCHELL:  Object to form.

10                   A.    Sepsis was definitely a concern

11     but the fact that the -- the C.T. findings of a

12     subdural fluid -- and the degree of neurologic

13     deficit were not easily explained by sepsis alone.

14                   BY MR. KLEIN:  (Cont'g.)

15                   Q.    Okay.

16                   A.    You say nothing -- of what --

17     I'll stop there.

18                   Q.    Well, he presented with low blood

19     pressure, correct?

20                   A.    Yes, sir.

21                   Q.    Unresponsiveness?

22                   A.    Yes.

23                   Q.    Lethargy and other symptoms that

24     gave us a concern that he had a serious blood-borne

25     infection that was causing shock.  Is that -- would

Page 89

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2     you agree with that?
 3                    MS. MITCHELL:  Are you reading from
 4     something?
 5                    MR. KLEIN:  No, I'm just asking.
 6                    A.    Those things can all be part of
 7     sepsis, yes.
 8                    BY MR. KLEIN:  (Cont'g.)
 9                    Q.    Okay.  And so he did present with
10     low blood pressure, which is a symptom of severe
11     sepsis, correct?
12                    A.    Yes.
13                    Q.    And -- go ahead.
14                    A.    Volunteering too much.  I -- it
15     would be extraordinarily unusual for a patient with
16     sepsis to present with pupils that are fixed and with
17     a neuro exam close to brain death.
18                    Q.    Okay.  But --
19                    MS. CALABRESE:  Doctor, I didn't hear
20     your answer.  Did you say unusual?
21                    A.    That would be very unusual for --
22                    MS. CALABRESE:  Unusual, thank you.
23                    A.    -- a child who was --
24                    MS. CALABRESE:  No, you don't have to
25     repeat it.
```

Page 90

1     Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    THE WITNESS:  Okay.

3                    MS. CALABRESE:  I just didn't hear the

4     word unusual.  Thank you.

5                    THE WITNESS:  The low blood pressure,

6     yes.  Decreased mental status, yes.  But brain death

7     or near brain death, no.

8                    BY MR. KLEIN:  (Cont'g.)

9                    Q.   But severe sepsis can cause brain

10    death, correct?

11                   A.   Yes.

12                   Q.   And in fact, did the trial get

13    into that -- if I, correct me, if I'm wrong.  You

14    said you couldn't rule out sepsis as being part of

15    the contributing cause of the death here?

16                   A.   Yes.

17                   Q.   Okay.  So you don't know from

18    your limited involvement in this case whether trauma

19    or abuse or non -- or accidental trauma caused a

20    death or whether a bacterial infection that

21    overwhelmed this child's system had caused the death,

22    do you?

23                   MR. GINSBERG:  Objection to form.

24                   MS. PECK:  Object to form.

25                   A.   Well, first of all.  I -- I -- I

**APPENDIX** **1113**

```
1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2        don't know that I had a limited that, I guess, I
3        shouldn't quibble over that.
4                    I -- I was at this kid's bedside
5        saving his life from low blood pressure, put in
6        multiple lines, made adjusted pressures, worked very
7        hard to -- to make sure this kid did very well, as
8        well as possible.
9                    And I don't know the cause of death,
10       but I have a hard time explaining it all by sepsis.
11                   BY MR. KLEIN:  (Cont'g.)
12                   Q.   But you -- you -- you currently
13       are -- you're not an infectious disease specialist.
14       Would -- would you agree with that?
15                   A.   Yes.
16                   Q.   Okay.  And you would -- would you
17       -- you would agree that it's -- it's possible that it
18       could have been sepsis but you have -- you personally
19       have a hard time explaining it as that.  Is that your
20       testimony?
21                   MS. MITCHELL:  Wait, are you asking
22       him for his  --
23                   MR. GINSBERG:  Object to form.
24                   MS. CALABRESE:  Can you repeat it?
25                   MS. MITCHELL:  -- opinion as to
```

Page 92

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      whether sepsis was the cause of death?  I just don't

3      understand what you're asking him.

4                     BY MR. KLEIN:  (Cont'g.)

5                     Q.   I'll rephrase it.  Just because

6      you have a hard time explaining that it's -- it was

7      sepsis that would have caused the death, doesn't mean

8      that sepsis didn't cause the death.  You don't know

9      either way, do you?

10                    MS. MITCHELL:  Object to form.

11                    MR. GINSBERG:  Object.

12                    MS. CALABRESE:  Same objection.

13                    MS. PECK:  Same objection.

14                    A.   I --

15                    MR. GINSBERG:  Objection.

16                    A.   -- have evidence from my

17     colleagues in neurosurgery and radiology and -- that

18     point to a cause of death as I've previously

19     discussed, that is trauma.

20                    Whether there was sepsis as well, I --

21     I can't say.  That's certainly possible but I -- my

22     professional opinion and that of the other physicians

23     taking care of this child, was that there was trauma

24     involved.

25                    BY MR. KLEIN:  (Cont'g.)

Page 93

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    Q.   Well, you can't -- you can't say

3      whether it was accidental trauma or non-accidental

4      trauma, correct?

5                    A.   Correct.

6                    Q.   And when you say trauma, would

7      you -- was it your observation that the bilateral

8      fluid collections were aged?  In other words, the

9      trauma could have gone back some weeks or months.

10                   A.   I -- there was a reading of --

11     that the fluid was in different ages.  So it is

12     possible that the trauma was a combination of

13     something recent and something old.

14                   Or at least something of different

15     ages.  Exactly what ages those are, are beyond my

16     area of expertise.

17                   Q.   Okay.  Are you aware of there

18     being birth-related trauma that could result in

19     subdural fluid collections?

20                   A.   Yes.

21                   Q.   Okay.  And that could happen in

22     complicated deliveries.  Would you agree with it?

23                   A.   Yes.

24                   Q.   Okay.  And those birth related

25     traumatic subdural hematomas, that could be birth

1     Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2     related, may not always reveal themselves for some

3     time, or unless something else happens to the child,

4     correct?

5                   A.    Yes.

6                   Q.    And those subdural hematomas that

7     could be birth related can have different layers of

8     bleeding, settling in, you know, drying up and then

9     we have re-bleeds.  Would you agree with that concept

10    generally?

11                  A.    I'm not familiar with that.

12                  Q.    Okay.  Have you ever heard of the

13    concept of re-bleeds of subdural hematomas?

14                  A.    Yes.

15                  Q.    Okay.  What is -- what does it

16    mean, could you -- can you explain what re-bleeding

17    in -- in -- in this context means?

18                  A.    I -- I really don't feel that I

19    know enough about it to comment.

20                  Q.    Okay.  So when you say there is

21    older blood, older -- did you say older blood or

22    older injury, what exactly did you say?

23                  A.    There was -- there was evidence

24    of -- of subdurals of varying age, which I think is

25    pretty much the exact words on the radiology report.

Case 1:13-cv-00626-DJS Document 172-3 Filed 06/14/21 Page 98 of 269

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                        Q.    Okay.  The radiology report -- go

3        ahead, I'm sorry.

4                        A.    So whenever I speak about, you

5        know, findings on a brain, I am relying on a

6        radiology report.

7                        Q.    Okay.  So I'm going to ask that

8        we put up that exhibit and we put up that radiology

9        report.  Well, let me ask you this.  Do you -- do --

10       you recently looked at the radiology report a little

11       earlier in this deposition today, correct?

12                       A.    Yes.

13                       Q.    Okay.  It doesn't say anything

14       about subdural hematoma, correct?

15                       MS. MITCHELL:  So he is talking about

16       the former report.

17                       MR. KLEIN:  Yes.  Why don't -- if --

18       can -- Annette, can you put up that exhibit that I

19       emailed to you?  There we go.  Okay.  And I'll tell

20       you where to scroll down to.

21                       THE WITNESS:  It says fluid

22       collection.  It does not say hematoma.

23                       MR. KLEIN:  Okay.  And why don't we

24       just pull up that page so we could just reference it

25       for the record and the exhibit that's on the screen?

# APPENDIX

**1118**

```
 1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                       Is there like a -- I'm going to see if
 3       I could find that in reference to page number of --
 4       of the P.D.F. for everybody.
 5                       THE WITNESS:  Is this Plaintiff's One?
 6                       MR. KLEIN:  Sure.
 7                       THE WITNESS:  Hang on.
 8                       THE REPORTER:  Why do you -- do you
 9       want this marked as C?  Oh, no.  You want it mark as
10       -- do you want it marked as One?
11                       MR. KLEIN:  What?  That's fine.
12                       THE REPORTER:  Okay.
13                       MR. GINSBERG:  Plaintiff's One.
14                       THE REPORTER:  Yes.
15                       MR. GINSBERG:  The entire record?
16                       MR. KLEIN:  Yes.
17                       MR. GINSBERG:  The entire medical
18       record?
19                       MR. KLEIN:  Yeah.
20                       MS. MITCHELL:  If-- if we could note,
21       I know there were pages the City of Troy had marked
22       earlier that we haven't been able to locate in -- in
23       the chart that's being marked now.
24                       MR. KLEIN:  Okay.  Can you describe
25       what they are?
```

800.523.7887                              Associated Reporters Int'l., Inc.

Page 97

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    MS. MITCHELL:  Well, you don't have to
 3        pull them back up, but I believe there was a history
 4        and physical -- there was a progress sheet that we
 5        have not been able to find in the chart that we were
 6        provided by counsel.  Is it Rhiannon Spencer?
 7                    MR. KLEIN:  Yeah.  Okay.  So maybe
 8        we'll put a pin in that and go back to that.  But for
 9        now, I'm just going to try to find the radiology
10        report while we're on that topic and ask --.
11                    MS. MITCHELL:  Okay.  He has the C.T.
12        report.
13                    MR. KLEIN:  Yeah.  I'm just trying to
14        scroll through.  Do you -- can you tell us is that
15        where it is in the packet -- it's the middle or the
16        back?
17                    MS. MITCHELL:  You know, it's not page
18        numbered.  It's not quite halfway through.  That's
19        the best I can describe for now.
20                    THE WITNESS:  I can read it to you if
21        you'd like.
22                    MR. KLEIN:  Sure.
23                    THE WITNESS:  September 21st exam C.T.
24        had clinical history, findings are large bilateral
25        extra axial fluid collections slightly larger on the
```

```
1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2        right -- posteriorly on the right and over the upper
3        aspect of the right convexity, the fluid is
4        distinctly denser than on the left.
5                        Which probably indicates a large
6        subdural collection on the right; it's unclear
7        whether the fluid is subdural or merely subarachnoid.
8        The distinction can be made with M.R.I. -- M.R.I.
9                        The brain parenchyma in particular
10       system appeared normal.  The calvarium appears
11       intact.
12                       Impression: Large bilateral, extra
13       axial fluid collections, probably subdural on the
14       right and possibly the same on the left.  M.R.I. is
15       recommended to distinguish between subdural
16       collections and enlargement of subarachnoid spaces.
17       So as you heard, it does not mention blood.
18                       BY MR. KLEIN:  (Cont'g.)
19               Q.   Okay.  Now, I'm going to ask you
20       in reviewing your trial testimony, do you recall
21       being asked questions and giving answers about there
22       being some other report about there being blood
23       and/or hematoma.  Do you recall that?
24               A.   I don't recall.
25               Q.   Okay.  Would -- did you give
```

Page 99

1    Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2    testimony at the trial that there was some other

3    report that turned out you were mistaken or incorrect

4    about that?

5                    MR. GINSBERG:  Object to the form.

6                    BY MR. KLEIN:  (Cont'g.)

7                    Q.   Is this the only report, the only

8    C.T. of the head?

9                    A.   There is the skull fracture.

10                   MS. CALABRESE:  Object to form.

11                   MS. MITCHELL:  Are you talking about a

12   formal typewritten report or are you talking about if

13   there's any reports in the record or references to

14   finding?

15                   MR. KLEIN:  I'm talking about actual

16   findings on a radiology exam.

17                   BY MR. KLEIN:  (Cont'g.)

18                   Q.   Did you testify that there were

19   additional findings other than what you just read in

20   this C.T. of the head with regard to head injuries?

21                   A.   I don't remember that.

22                   Q.   Okay.

23                   A.   I mean I do know that they are --

24   neurosurgery consult used the word hematoma and

25   blood.

Page 100

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                          Q.    Okay.   Do you know where they got

3        that from?

4                          A.    I don't.

5                          Q.    Okay.   Do you know how this went

6        from large bilateral, extra axial fluid collections

7        to -- or subdural hematoma, if you know?

8                          MR. GINSBERG:   Object to the form.

9                          BY MR. KLEIN:   (Cont'g.)

10                         Q.    Do you know how the -- the

11       findings of the actual report of the C.T. morphed

12       into a subdural hematoma being referenced in the

13       record?

14                         MR. GINSBERG:   Object to the form.

15                         MS. PECK:   Object to the form.

16                         MS. CALABRESE:   Objection to the form.

17                         A.    No, I don't.

18                         BY MR. KLEIN:   (Cont'g.)

19                         Q.    You don't.   Okay.   Would you

20       agree that there's no report that finds that or has

21       an impression of a subdural hematoma?

22                         MR. GINSBERG:   Object to the form.

23                         MS. CALABRESE:   Same objection.

24                         A.    I don't -- I have not seen a

25       radiology report.   I've seen multiple references in

Page 101

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        neurosurgery note about hematoma.

3                        BY MR. KLEIN:   (Cont'g.)

4                        Q.   Okay.  But they -- what is your

5        understanding of where neurosurgery got that

6        information from other than the C.T., if that's a

7        part of that?

8                        A.   Neurosurgery often -- since it's

9        what they do, often will have a interpretation of a

10       C.T. that's not identical to radiology, extremely

11       common, I'd say, difference.

12                       Q.   I'm sorry.

13                       A.   Can I answer my question -- the

14       question?

15                       Q.   Yeah.

16                       A.   The -- in addition, we get

17       reports on several levels that are verbal, as well as

18       the final written report.  So I think this was a

19       Sunday, but any time of day, a resident reads the

20       film first and then talks to us.

21                       And then a -- someone reviews that.

22       So there could be another phone conversation with the

23       attending after the review and then the written thing

24       is usually -- the written report doesn't happen until

25       sometime later.

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                        So there are -- there are multiple,

3        you know, verbal interactions that happen.  In

4        addition, the neurosurgeon also has their own

5        interpretation, which can also be verbally added.

6                        So there are many occasionings for

7        that idea that a subdural lead was present, despite

8        the fact that the final report does not state that.

9                        Q.   Okay.  And is the final report,

10       ultimately, the controlling conclusions of -- of the

11       clinicians that reviewed the scans?

12                       A.   I don't know.

13                       Q.   In other words, like, I think in

14       the record shown to you earlier, it said initial

15       impression subject to final review.  Is the -- is the

16       final report controlling or are different opinions

17       not stated in the report also the -- the findings as

18       well?

19                       In other words, are there subdural

20       hematomas here or -- or subdural collections or

21       bilateral collections of fluid?  What is there to

22       base the finding of subdural hematoma if it's on the

23       report?

24                       MR. GINSBERG:  Object to form.

25                       MS. CALABRESE:  Objection to form.

Case 1:17-cv-00626-DJS Document 66-91 1/12/2024 Filed 06/14/21 Page 108 of 269

Page 103

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    MS. PECK:  Object to form.
 3                    MS. MITCHELL:  Yeah.  Object to form.
 4        There's -- there's a lot of substance in there.  Can
 5        you just narrow down the question?
 6                    BY MR. KLEIN:  (Cont'g.)
 7                    Q.   Yeah.  It's the -- is the
 8        definitive final opinion here what's contained in the
 9        C.T. report that you just read?
10                    MS. MITCHELL:  And you're talking
11        specifically about the radiologists that are
12        identified on the report?
13                    MR. KLEIN:  Yeah.
14                    MS. MITCHELL:  Their opinions?
15                    A.   That's the final opinion of the
16        radiologist.
17                    BY MR. KLEIN:  (Cont'g.)
18                    Q.   Did the neurologist have
19        different opinions or would their opinions be based
20        on the radiologist's findings?
21                    MR. GINSBERG:  Object to the form.
22                    A.   I can't answer that.
23                    BY MR. KLEIN:  (Cont'g.)
24                    Q.   Okay.  When -- when Matthew
25        presented at Albany Medical, he -- his white blood
```

Page 104

1    Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2    cell count was one -- was one, which is very low,

3    correct?

4                    A.   Yes.

5                    Q.   Okay.

6                    A.   Was that from Albany Medical or

7    was that from Samaritan?

8                    Q.   I don't know where it was.  But

9    is it your understanding, it was extremely low?

10                   A.   Yes.

11                   Q.   Okay.

12                   A.   Right.  You saw that.  Right.

13                   Q.   Okay.  And when it's below five

14   --

15                   A.   I also remember that from my

16   review of the case.

17                   Q.   Right.  And so when -- when the

18   white -- when the white blood cell count is below

19   five thousand, would you agree the concern is that

20   the immune system is not functioning -- functioning

21   properly or is at least suppressed?

22                   A.   Yes.

23                   Q.   And that could be from bone

24   marrow suppression.  That could be a cause of that,

25   correct?

Case 1:17-cv-00626-DJS Document 66-31 1/22/24 Filed 06/14/21 Page 106 of 269

Page 105

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    A.   Yes.
 3                    Q.   Okay.  You learned that Matthew
 4        was hypothermic, correct, from Dr. Carlos at
 5        Samaritan?
 6                    A.   I -- I think so, yes.
 7                    Q.   Okay.  And he was -- did you --
 8        do you recall learning that he was experiencing
 9        tachycardia?
10                    A.   Yes.
11                    Q.   And that he was -- leukopenia.
12                    A.   That's the same as low white
13        count.
14                    Q.   Right.  And also had low blood
15        pressure?
16                    A.   Yes.
17                    Q.   And those are all signs of a
18        pervasive bacterial infection or could be, would you
19        agree?
20                    A.   Could be -- it could be.
21                    Q.   Now, do you have an understanding
22        of whether a bacterial infection that goes into the
23        meninges can result in coagulopathy?
24                    A.   Well, it's not specifically
25        meningitis, any bacterial infection can affect
```

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2     clotting --
 3                    Q.    Okay.
 4                    A.    -- and cause of coagulopathy.
 5                    Q.    So --
 6                    A.    But I'm not aware of anything
 7     specific about meningitis.
 8                    Q.    So was that in your mind -- so --
 9     and Matthew presented with clotting or coagulopathy
10     issues, correct?
11                    A.    Yes.
12                    Q.    And so was that in your mind as
13     well?  So were you thinking about sep -- withdrawn.
14                    Did that -- did all of these factors
15     cause you to think about sepsis as well or did you
16     immediately turn to trauma, in terms of your working
17     diagnosis?
18                    MS. PECK:  Object to form.
19                    MS. MITCHELL:  Object to form.
20                    A.    I treated this patient as septic
21     from the beginning.  All courts -- in a full court
22     press, absolutely.
23                    No holds barred and antibiotics were
24     continued.  I put lines in this kid.  I -- I
25     manipulated blood pressure, all which are treatment
```

```
 1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2       for sepsis.
 3                    BY MR. KLEIN:  (Cont'g.)
 4                    Q.   I get that.  But I guess what I'm
 5       asking you is the record really from -- from -- from
 6       Samaritan seemed to have a focus of sepsis.
 7                    When Matthew got to Albany Medical,
 8       there's -- the focus really turns to like a trauma or
 9       head injury, you know, abuse.  Is that a term that
10       you focus on and -- and that you've made that
11       determination that this was more likely abuse than
12       sepsis?
13                    MR. GINSBERG:  object to the form.
14                    MS. PECK:  object to the form.
15                    A.   Absolutely not.  And I -- I -- I
16       treat this kid like a full blown sepsis and save --
17       and saved his life from the period of time because of
18       it and I'm mad and -- that's what I've told him, yes.
19                    MS. MITCHELL:  I'm going to object to
20       form and request a five-minute break.
21                    MR. KLEIN:  Sure.
22                    THE REPORTER:  Sure.  Can we take --
23       it's twelve fifty-three, can we go until one ten?
24                    MR. KLEIN:  Right.  How long are we
25       going to be?  Are we going to take a break for lunch?
```

```
1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2                    MS. CALABRESE:  Hold on a second.
3        Well, I also -- I'm going to have a few follow-up
4        questions after Crystal in the event that she
5        doesn't.  So we may want to take a break for lunch
6        now.
7                    THE REPORTER:  Yeah.  How -- do you
8        guys expect to be going all day?
9                    MR. KLEIN:  I don't.  I don't have
10       that much but certainly at least another, I would say
11       forty-five minutes to an hour, I would think because
12       it's going slower than it does, I think in person.
13                   And so I don't want it down, you know,
14       I'm hoping it'll be quicker than that but I think if
15       -- if people need lunch, maybe now is a good time to
16       do it.
17                   I'm willing to work through it.  But
18       if everyone wants to take a break, that's fine with
19       me as well.
20                   MS. CALABRESE:  I don't need a lunch
21       but I wasn't sure about the witness and the
22       stenographer.
23                   THE REPORTER:  I'm fine.
24                   MS. CALABRESE:  I said, I don't need a
25       lunch break but I wasn't sure about the witness --
```

Page 109

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2     how Dr. Edge feels and how the stenographer feels.
 3                    THE REPORTER:  I'm fine.
 4                    MS. CALABRESE:  Okay.  Hold on.  Let
 5     me check.
 6                    THE REPORTER:  I'm going to go off the
 7     record.
 8                    (Off the record 12:54 p.m.)
 9                    (On the record 1:18 p.m.)
10                    THE REPORTER:  We're on the record.
11                    BY MR. KLEIN:  (Cont'g.)
12             Q.   Okay.  So we've just have taken a
13     break.  Now, we're going to continue. Is there
14     anything about your testimony so far you wish to
15     revise? If not, we'll move forward.
16                    A.   Only to say, which we're saying
17     at the very end that, you know, my responsibility was
18     to treat this, you know, child with sepsis, with no
19     holds barred in the best possible way possible,
20     holding nothing back and I am proud that we did that.
21                    I also am responsible to have a
22     question marked when trauma might exist and it's my
23     legal responsibility to bring up that question and --
24     and not to miss that.
25                    Q.   Okay.  Are you aware of
```

Page 110

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        stipulations similar to this in your per -- personal
 3        experience or three years studies or as noting from
 4        college where young children under the age of two die
 5        from sepsis without -- in the absence of trauma?
 6                      MR. GINSBERG:  Object to the form.
 7                      A.    Okay.  Yes, it happens all the
 8        time but, you know, the professor in me wants to give
 9        you the collar -- corollary as well.
10                      BY MR. KLEIN:  (Cont'g.)
11                      Q.    Can you give it to us?
12                      A.    Can I give it?
13                      MS. MITCHELL:  Yes.  That was
14        acceptable.
15                      A.    (Cont'g.)  I teach, you know, I'm
16        a professor, I teach and one of the things I teach is
17        that if you have a three, four-month-old baby who
18        you're concerned about sepsis then you have to ask
19        the question is there trauma?
20                      Because this is the age that babies
21        start to cry and be hard to console and -- and so
22        that part of my training as an I.C.U. doctor is that,
23        you know, a three, four-month-old baby that comes to
24        you with sepsis, I ask the question, is there trauma?
25                      BY MR. KLEIN:  (Cont'g.)
```

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2                      Q.   And I don't think about -- I
3      certainly don't take any issue with that and I'm
4      grateful that you ask all the right questions.
5                      In this case, was it also important to
6      ask questions about the history of the -- to
7      determine whether those types of things could have
8      led to trauma that was, you know, not an accidental,
9      that was accidental trauma or some other type of
10     trauma that could have led to the -- either a
11     subdural hematoma or other portion of a bacterial
12     infection, in fact?
13                     A.   Yes.
14                     Q.   And in this case --?
15                     A.   You know that -- you know -- I --
16     I -- I -- I know I'm going beyond the question again.
17     So I might -- I can feel my attorney, but the reason
18     we can't solve this hematology was in part say, you
19     know, is there an underlying, you know, bleeding
20     problem here that could explain this that's not
21     trauma.
22                     So in a sense that's doing what you
23     just suggested.
24                     Q.   Okay.  And wasn't there, in fact,
25     an underlying bleeding problem that could -- that was

Page 112

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        not traumatic in explanation?
 3                      A.   I don't know that.
 4                      Q.   Okay.
 5                      A.   The hematologist -- the
 6        hematologist felt that this was consistent with --
 7        with -- with -- with a trauma and that we're -- this
 8        could be all from sepsis but it could -- it could
 9        also be from a very severe brain injury.
10                      Q.   Okay.
11                      A.   And I'm not sure that that was
12        ever resolved.
13                      Q.   Right.  And that's what I want to
14        establish and I think you just did that.  When you
15        talk about the retinal hemorrhaging, that could be
16        from coagulopathy?
17                      A.   You're -- you sound like you're
18        underwater.
19                      Q.   Okay.  I have to switch
20        microphone so off the record.  I'm -- I'm going to
21        need to log back in again.
22                      MR. KLEIN:  I'm going to leave and
23        then come back in because I think my -- well, one
24        second.
25                      THE REPORTER:  I'll pause the record.
```

1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                       (Off the record 1:22 p.m. to 1:23

3       p.m.)

4                       THE REPORTER:  We're back on.

5                       BY MR. KLEIN:  (Cont'g.)

6                       Q.   So -- so did I ask you the

7       question whether -- whether the -- the orbital -- the

8       -- no the -- the orbital -- the retinal hemorrhaging

9       in this case could be from -- related to the

10      coagulopathy, correct, and not trauma?

11                      A.   It is extraordinarily rare for

12      the -- the most common cause of retinal hemorrhage is

13      trauma.

14                      Q.   But there are other causes,

15      correct?

16                      A.   Yes.  And although I'm not an

17      expert on -- on -- on that and some of that is still

18      quite controversial.

19                      Q.   If I told you that it was

20      determined that there were Gram stains done of the --

21      of the cultures in this case and that the cells and

22      the -- behind the -- of the eye were full of

23      bacteria.

24                      Would that influence your -- assuming

25      that was true, I'll represent to you that -- that was

1    Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2    the finding of one of the experts and for purposes of

3    this question assuming that's a fact would that --

4    would that in your mind contribute to whether this

5    was -- sepsis contributed to the -- to the -- the --

6    the orbital -- the -- I'm sorry, the --

7                    MS. CALABRESE:  Cause of death?

8                    MR. KLEIN:  -- the retinal hemorrhage?

9                    MR. GINSBERG:  Object to the form.  He

10   is not -- this is not an expert witness.  He has not

11   been identified as an expert.  He can't be compelled

12   to give an opinion.

13                   MR. KLEIN:  Okay.  You know, you could

14   just say objection, Mike, as you said before.

15                   A.    Well, sepsis by definition means

16   that there's bacteria in -- in all the cells.  I --

17   I've treated many -- thousands of kids with sepsis

18   and -- and read many many scholarly articles and have

19   never heard of retinal hemorrhage being associated

20   with a fatal sepsis.  I'm sure there are cases but

21   --.

22                   BY MR. KLEIN:  (Cont'g.)

23                   Q.   And when this kid's father went

24   to trial, did you follow the testimony of the various

25   doctors on each side and did you hear that theory put

Page 115

1    Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2    out there as a possibility in this case or were you

3    not aware of that?

4                    A.   I was not aware.

5                    MR. GINSBERG:  Object to the form.

6                    BY MR. KLEIN:  (Cont'g.)

7                    Q.   Now, were you aware that that on

8    autopsy there were blood and the other organs the --

9    the testes, I believe the heart or the lungs which

10   were signs of overwhelming sepsis.  Were you aware of

11   that?

12                   MS. CALABRESE:  Object -- Objection to

13   form.

14                   MS. PECK:  Objection.

15                   MS. CALABRESE:  This is Christina.

16   Object to the form.

17                   MS. MITCHELL:  Is -- is there going to

18   be a marked exhibit of the autopsy report?  Is that

19   something that we haven't gotten to see?

20                   MR. KLEIN:  I'm just asking if he was

21   aware of that.  I wasn't planning on marking it but,

22   you know, that would take longer but I don't have any

23   questions about that.

24                   A.   As I said, I'm not aware of that

25   if I -- if I -- if I had to swear, you know, whether

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2     or not I saw it in '09, I -- I could not answer that.

3                    BY MR. KLEIN:  (Cont'g.)

4                    Q.   Okay.  So can we put the --

5     withdrawn.

6                    So if I can just sum up what I think

7     you said about two answers back.  You -- you didn't

8     know and don't know today whether this was -- whether

9     this child died from sepsis or from trauma or some

10    combination.

11                   You're just recalling what you saw at

12    that time, is that a fair characterization?

13                   A.   Yes.

14                   Q.   Okay.  Can we -- did you ever say

15    that this child was murdered?  Ever used that word

16    murdered to any police officers?

17                   A.   I don't recall saying that.  That

18    would have been very unusual.

19                   Q.   So that's -- that was my next

20    question.  How many years have you been an emergency

21    room physician?

22                   A.   Zero.  I'm an I.C.U. --.

23                   Q.   I.C. -- I'm so sorry, I.C.U.

24    physician, sorry.

25                   A.   Yeah.

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

 2                    Q.   How many years?

 3                    A.   Actually, I did have a year.

 4        Yeah, what was -- what's the question?  I -- I -- I

 5        --.

 6                    Q.   How many -- how many years -- how

 7        many years have you been in this business?

 8                    A.    Thirty.

 9                    Q.   Okay.  In this type of scenario,

10        can you recall -- can you recall any situation where

11        you would have in this type of situation under these

12        facts said to the responding police, this is murder?

13        Words literally to that effect based on what you knew

14        in this case?

15                    MR. GINSBERG:  Object to the form.

16                    A.   I can't imagine saying that.

17                    MR. GINSBERG:  That -- that was the

18        entire question?

19                    MS. PECK:  Yes, just object to form.

20                    MR. GINSBERG:  Now, this a two-part

21        question.  Do you hear the entire question?

22                    THE WITNESS:  I was -- I was upset.

23                    MS. MITCHELL:  Okay.  Can we -- you

24        said it was a two-part question.  Can we hear the

25        question again?
```

Page 118

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                        MR. KLEIN:  Can you read -- can you

3        read it back, please?

4                        THE REPORTER:  Yeah, I can read back

5        the question.

6                        MR. KLEIN:  I think he -- I think he

7        answered it but it -- it started confusing with all

8        the objections.  I think the best thing to do is to

9        read it back.

10                        THE REPORTER:  Okay.  Just give me a

11        second.

12                        (Off the record 1:30 p.m.)

13                        MS. MITCHELL:  It might be easier if

14        you just -- if you just ask the question again.  The

15        doctor is ready to answer.

16                        THE REPORTER:  Okay.  We're back --.

17                        MS. MITCHELL:  If that's okay with

18        everyone.

19                        THE REPORTER:  We're back on.

20                        BY MR. KLEIN:  (Cont'g.)

21                        Q.   Doctor, do you recall saying to

22        the responding police officers in this case that this

23        was a murder or words to that effect?

24                        A.   I do not.

25                        Q.   In speaking to the responding

Page 119

```
 1         Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2         police officers, do you recall whether you said that
 3         this was possible abuse or possible sepsis or both or
 4         words to that effect?  Would you have told them
 5         everything?
 6                         MS. MITCHELL:  Object to form.
 7                         BY MR. KLEIN:  (Cont'g.)
 8                         Q.   Would you have explained all of
 9         it to them?
10                         MR. GINSBERG:  Object to the form.
11                         A.   Yes.
12                         BY MR. KLEIN:  (Cont'g.)
13                         Q.   Okay.  Yes, you would have
14         explained sepsis and -- and possible abuse as
15         potential causes of the injuries?
16                         A.   Yes.
17                         Q.   Okay.  Are you aware that the
18         Troy detectives said that you used the word murder in
19         saying this was a murder when they met with you at
20         Albany Medical Center on September 21st, 2008?
21                         MR. GINSBERG:  Object to the form.
22                         A.   Yes.
23                         BY MR. KLEIN:  (Cont'g.)
24                         Q.   Okay.  And do you -- do you
25         dispute that account by the police officer?
```

Page 120

1         Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                          A.   Yes.

3                          MR. GINSBERG:  Object to the form.

4                          BY MR. KLEIN:  (Cont'g.)

5                          Q.   Why don't we -- withdrawn.

6                          What, if anything, did you tell the

7         Troy police officers on September 21st, 2008?

8                          A.   I don't remember the words.

9                          Q.   How about in sum and substance?

10                         A.   That I was very concerned about

11        this being acceleration, deceleration injury, that

12        this fit a pattern consistent with that.

13                         And that in the absence of a motor

14        vehicle accident or other accident that child abuse

15        was the top of my list.

16                         Q.   Did you talk about the other

17        things on the list as well?

18                         A.   My job would be to give as broad

19        a picture as I can.

20                         Q.   Okay.  Did you ever confront any

21        of the police officers who attributed the word murder

22        to you as to why they said that in this case?

23                         MS. MITCHELL:  Object to form.

24                         A.   No.

25                         MR. GINSBERG:  Note my objection as

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        well.
 3                        THE WITNESS: I saw that yesterday for
 4        the first time.
 5                        BY MR. KLEIN:  (Cont'g.)
 6                        Q.   Well, in this case, the -- the
 7        detectives went on to interrogate Mr. Thomas after
 8        they spoke with you.
 9                        MR. GINSBERG:  Object to form.
10                        BY MR. KLEIN:  (Cont'g.)
11                        Q.   And then they came back and spoke
12        with you again on the 22nd when you gave your
13        deposition.  I'm directing your attention to
14        September 22nd, 2008 when you gave your -- your
15        deposition.
16                        Do you recall being informed that they
17        were in the middle of interrogating him when they
18        spoke with you?
19                        A.   I don't remember.
20                        Q.   Since 2008, when this happens --
21        when this case presented -- was presented to you at
22        Albany Medical Center, have your views on the symptom
23        on the medicine here changed or evolved over the
24        years with developments in -- in -- in -- you know,
25        standards of looking at these cases?
```

```
 1           Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                          Do you think this was more sepsis now
 3           given all of the symptoms than abuse?  Do you not
 4           know or something else?
 5                          MS. PECK:  Object to form.
 6                          MS. MITCHELL:  Object to form.
 7                          A.   That's a really tough question.
 8           I don't know what's the best answer.
 9                          BY MR. KLEIN:  (Cont'g.)
10                          Q.   Okay.  I think you said things,
11           the medicine has changed or views in the field have
12           changed about shaken baby, have you asked that kind
13           of -- that term before.  What -- what did you mean by
14           that that -- that the --?
15                          A.   I -- I know that I -- I -- only
16           what I read in the newspaper.  What -- what I still
17           stick to and which is -- hasn't changed is that
18           acceleration, deceleration injury, hitting a child, a
19           baby against a soft object or sofa or bed, with
20           enough force can cause subdural hematoma.
21                          So to me that's -- and whatever is
22           changed in court, et cetera, et cetera, you know,
23           I've never used the -- used the term shaken baby,
24           partly because I thought -- I thought it was
25           confusing.
```

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    But the fact that, you know, that kind
 3        of rapid movement hitting something and the brain
 4        going back and forth in the skull can tear small
 5        blood vessels and can cause subdural bleeding.
 6                    Q.   The -- the intracranial --
 7        withdrawn.  The -- the blood seen on the C.T. was
 8        older than a few days though, correct?  You -- you
 9        couldn't put an age on that.  Is that right?
10                    MS. MITCHELL:  Object to form.
11                    A.   I can't I --
12                    MS. CALABRESE:  Objection.
13                    A.   -- I am not an --
14                    MS. PECK:  Object.
15                    MR. KLEIN:  You can answer.
16                    A.   -- I'm not, I -- I -- I don't
17        know, I rely on neurosurgery and radiology for
18        information.
19                    MR. KLEIN:  Okay.
20                    BY MR. KLEIN:  (Cont'g.)
21                    Q.   So can we put the record back up
22        in that -- the two hundred and twelve page record?
23        Can you scroll down to -- I want you to do this.
24                    I want to refer you to the -- to the
25        PICU where that you signed, the PICU attending note,
```

# APPENDIX

# 1146

Page 124

1     Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2     page sixty-one of the document.

3                    THE REPORTER:  Okay.

4                    BY MR. KLEIN:  (Cont'g.)

5                    Q.   Take a moment, Doctor, and review

6     that page if you could and let me know when you've

7     had a chance to look at it.

8                    MS. MITCHELL:  Okay.

9                    A.   I see it.

10                   BY MR. KLEIN:  (Cont'g.)

11                   Q.   Okay.  Is that your signature at

12    the bottom?

13                   A.   Yes.

14                   Q.   And was it some --?

15                   MS. CALABRESE:  I'm sorry.  I'm sorry.

16    Can we see the bottom?  I can't see the bottom.

17    Thank you.

18                   BY MR. KLEIN:  (Cont'g.)

19                   Q.   Next to the signature, it says

20    10/24.  Is that right?

21                   A.   Yes.

22                   Q.   And then -- and then below the

23    signature --

24                   A.   I don't see that.

25                   MS. MITCHELL:  Yeah, the -- the

Page 125

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      hardcopy we have, doesn't have --.

3                    THE WITNESS:  Is that a different

4      date?  What date is that?

5                    MR. KLEIN:  I've seen different copies

6      of it.  But in this record though --.

7                    MS. MITCHELL:  Let me see the date

8      above.  No, it's a different note.  Yeah, there you

9      go.

10                   THE WITNESS:  Yes.

11                   BY MR. KLEIN:  (Cont'g.)

12                   Q.   Okay.  So that's your signature,

13     correct?

14                   A.   Yes.

15                   Q.   Okay.  What is the significance

16     of 10/24 at the bottom?  Is that when you read it and

17     signed it?

18                   A.   Yes.

19                   Q.   So that was signed almost a month

20     after the September 21st, 2008 admission?

21                   A.   Yes.

22                   Q.   Okay.  And looking at the report

23     -- well, withdrawn.

24                   What -- what is a PICU attending note?

25     Can you just explain for the record what it is?

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    A.   It's a report of my findings of
 3          the day in combination with a resident note.
 4                    Q.   And was it prepared on or close
 5          to the date in question and it was just signed by you
 6          at a later time or --?
 7                    A.   Yes.
 8                    Q.   Okay.
 9                    A.   The top of the note said that the
10          time of dictation it was ten fifty-five on 9/23.
11                    Q.   So at number three, it says at
12          probable list, it says C.T. scan shows bilateral
13          subdural hematomas of varying age.  Do you see that?
14                    A.   Yes, yeah.
15                    Q.   That -- based on what -- how you
16          describe the C.T. report that is not what -- would
17          you agree that is not what it showed?
18                    MS. MITCHELL:  Object to form.
19                    MR. GINSBERG:  Object to the form.
20                    MS. CALABRESE:  Can you read that
21          back?
22                    MR. KLEIN:  It's very hard for her to
23          read back, Christina.  If you want, I could rephrase
24          -- I can ask it again.  But --
25                    THE REPORTER:  He said number?  He
```

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2      read off what number three said.
 3                    MR. KLEIN:  Yeah.
 4                    MS. CALABRESE:  If you can read the
 5      question, Brett, I just want to determine if I'm
 6      objecting.
 7                    MR. KLEIN:  Just say objection then
 8      I'm sure and then all your objections are reserved
 9      for trial so --.
10                    MS. CALABRESE:  No, I understand.
11                    MR. KLEIN:  My question is this.
12                    BY MR. KLEIN:  (Cont'g.)
13                    Q.   Number three says, C.T. scan
14      shows bilateral subdural hematomas at varying age,
15      correct?
16                    MS. CALABRESE:  You can answer.
17                    A.   Yes.
18                    BY MR. KLEIN:  (Cont'g.)
19                    Q.   Okay.  Is that -- isn't that
20      different than the C.T. report that you read earlier
21      into the record?
22                    A.   Yes.
23                    Q.   Okay.  Can you explain how you
24      arrived at number three given the -- the disparity
25      with the C.T. report?
```

800.523.7887                      Associated Reporters Int'l., Inc.

Page 128

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    A.    Because my conclusions are

3        derived from multiple sources.  One being the

4        official reading of the C.T. scan.  One being

5        discussion with the neurosurgery attending.

6                    One being discussion -- personal

7        discussions -- well, this -- this was still the --

8        this was the 23rd.  So yeah, my discussions involve

9        -- my conclusions are based on more than the reading

10       of the X-ray, the CAT scan, but also on my discussion

11       with my consultant.

12                    Q.    But isn't it true that the CAT

13       scan did not show bilateral subdural hematomas?

14                    A.    It showed bilateral fluid

15       collections, that does not rule out hematoma.

16                    MS. MITCHELL:  Okay.  And I'm going to

17       object to the form because you keep mixing up what

18       the scan shows versus what the report documents.

19                    MR. KLEIN:  Well, the report shows --

20       is a document what the scan shows, correct,

21       typically?

22                    THE WITNESS:  As I mentioned earlier,

23       neurosurgery -- neurosurgeons will often not agree

24       with the report and there will be multiple

25       conclusions.

                                                        Page 129

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    BY MR. KLEIN:  (Cont'g.)
 3               Q.   Isn't it more fair to say that
 4      there would be initial impressions, but ultimately
 5      there will be a final report that is signed off on?
 6               A.   Yes, that's right.  The
 7      neurosurgeon does not sign off on the neuro -- on the
 8      radiology report.  They are entitled to their own
 9      opinion.
10               Q.   Okay.  So you're basing -- so am
11      I correct that you're basing this statement in number
12      three of the problem list based on the neurosurgeon,
13      but technically not on the plain language of the
14      report itself?
15                    MS. MITCHELL:  Object to form.
16               A.   Again, as I understand it the
17      report saying that there is fluid collection does not
18      rule out hematoma.
19                    BY MR. KLEIN:  (Cont'g.)
20               Q.   Do you recall that the report
21      also said an M.R.I. would be helpful?
22               A.   Yes, yeah.
23               Q.   Did you or anyone ever prescribe
24      an M.R.I.?
25               A.   No.
```

Page 130

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                        Q.    Why not?

3                        A.    I would not have changed the

4        treatment and the child was too sick to go to the

5        M.R.I. scanner, which requires time in the O.R. of

6        two and it could lead to death in an unstable

7        patient.

8                        Q.    Now --.

9                        A.    But most importantly -- most

10       importantly, it would not change treatment.

11                       Q.    It might change the diagnosis,

12       but not ultimately the treatment?

13                       A.    Yes, it would -- it would confirm

14       whether or not this was blood or not.

15                       Q.    And if it wasn't blood, what are

16       the other options, intraspinal fluid?

17                       A.    Intraspinal fluid, pus, old blood

18       that breaks down into plasma and red cells.

19                       Q.    Did you -- do know or do you --

20       did you ever come to learn that pus was evident on

21       the brain?

22                       A.    No.

23                       Q.    Looking at number eight, a skull

24       fracture noted on C.T. scan.  What was that based on?

25                       A.    I don't -- I don't remember who

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      -- who told me that.  I can only assure you that I

3      was -- had verbal communication that there was a

4      skull fracture that was later found not to be true

5      and it was on my problem list and, you know, again,

6      there is -- the patient was only there for a day.

7                       I was, you know, a day-and-a-half and

8      I would have deleted that in the -- my next

9      dictation, but these are dictated notes.

10                      Q.   How about when you signed off on

11     it.  Did you have the opportunity if you wanted to

12     strike it or delete it or make a, you know, a line

13     through with your signature -- with your initials?

14                      A.   I did have opportunity.

15                      Q.   Okay.  Can you state today why --

16     why you didn't do that in this case?

17                      A.   I missed -- I missed the -- I

18     missed it.  I didn't --

19                      Q.   Okay.

20                      A.   -- I didn't.

21                      Q.   So that -- so that problem listed

22     in number eight was we now know to be untrue,

23     correct?

24                      A.   Correct.

25                      Q.   Okay.  And how did it come to

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        your attention that that was untrue or incorrect?

3                    A.   I -- I don't remember.  It may

4        have been the -- the C.T. report reported no skull

5        fracture.

6                    Q.   Who was it who -- if you could

7        narrow it down, who -- who -- I'd like to know the

8        universe of individuals who would have reported a

9        skull fracture.

10                   Would it be neurosurgery, radiology,

11       or some other individual or individuals that you

12       could think of?  Who would have told you that?

13                   A.   Radiology resident, my resident,

14       the covering attending, radiology attending.  The

15       final radiology attending, the neurosurgery resident,

16       the covering neurosurgery attending, the final

17       neurosurgery attending.

18                   Q.   So you're getting information

19       from a lot of different specialists or other

20       providers and colleagues that you work with and

21       you're putting them all together in your problem

22       list.  Is that fair to say?

23                   A.   Yes, yeah.

24                   Q.   And with regard to the skull

25       fracture, that initial impression or assessment

```
1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2        changed in the course of the treatment, correct?
3                      A.   Yes.
4                      Q.   Were there any other mistakes in
5        the -- in the -- in the paperwork that you've seen,
6        or any other assessments that changed that were not
7        updated that you're aware of other than that?
8                      MS. MITCHELL:  Object to form.
9                      MS. CALABRESE:  Object to form.
10                     THE REPORTER:  Sorry.  Who is
11       objecting?
12                     MS. CALABRESE:  Christina.
13                     THE REPORTER:  Thank you.  I can't --
14       I can't see everyone with this up on the screen.
15                     MR. GINSBERG:  We're all on board with
16       the objection.
17                     MS. MITCHELL:  Do you mean when he --
18       he looked through the chart obviously, he didn't, you
19       know, quickly -- closely look at every single page.
20                     Do you mean when he reviewed the chart
21       if he noticed anything that was incorrect or you're
22       talking about something else?
23                     BY MR. KLEIN:  (Cont'g.)
24                     Q.   At any time, up until today, have
25       you become aware that anything else that you've
```

1     Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2     written or that's otherwise in the chart written by

3     someone else is incorrect?

4               A.    No.

5               Q.    Okay.  The -- the district

6     attorney at the time, do you remember his name who

7     handled the case?  Art, he went on record and said

8     that this was a problem --.

9               MR. GINSBERG:  Object to form.

10              BY MR. KLEIN:  (Cont'g.)

11              Q.   I didn't finish the question.  Do

12    you recall the district attorney ever stating

13    publicly that this was problematic that your report

14    said that there was a skull fracture when there

15    wasn't a skull fracture?

16              MR. GINSBERG:  Object to the form.

17              MS. MITCHELL:  Object to form.

18              MS. CALABRESE:  Christina, object to

19    form.

20              A.   I don't remember him saying that.

21              BY MR. KLEIN:  (Cont'g.)

22              Q.   Okay.  Or anyone from the D.A.'s

23    office, do -- do you remember this being an issue

24    that that the report stated there was a skull

25    fracture, when in fact there was no skull fracture?

Page 135

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    MR. GINSBERG:  Object to the form.
 3                    A.   I don't remember that.
 4                    BY MR. KLEIN:  (Cont'g.)
 5                    Q.   In retrospect, should you have
 6        corrected that report?
 7                    MS. MITCHELL:  Object to form.
 8                    A.   Yes.
 9                    MR. KLEIN:  Okay.
10                    MS. MITCHELL:  Are we done with this
11        line of questioning especially since other records
12        show that it had been considered and ruled out, and
13        that was communicated.  Can we just move on now?
14                    MR. KLEIN:  I'm looking at my notes to
15        move on, but I don't think it's appropriate --
16                    MS. MITCHELL:  Okay.  Great.
17                    MR. KLEIN:  -- to really enter a
18        speaking objection on the record like that -- that --
19        .
20                    MS. MITCHELL:  Noted.
21                    MR. KLEIN:  I'm just trying to not go
22        over things that have already been covered, so maybe
23        it's taking longer to do that, but I'll try to get
24        through it.
25                    MS. MITCHELL:  Okay.
```

1     Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    BY MR. KLEIN:  (Cont'g.)

3                    Q.   Okay.  So one of the police

4     officers stated that he had to follow you down the

5     hall to get your attention when he initially spoke

6     with you on September 21st, 2008.  Do you recall any

7     such situation like that?

8                    MR. GINSBERG:  Object to the form.

9                    BY MR. KLEIN:  (Cont'g.)

10                   Q.   No?

11                   A.   No.

12                   Q.   Okay.  The police officer, one of

13    the investigating officers also said that you stated

14    that you had been up for days as of that time.  Do

15    you recall anything like that?

16                   MR. GINSBERG:  Object to the form.

17                   MS. MITCHELL:  Object to form.

18                   A.   No.

19                   BY MR. KLEIN:  (Cont'g.)

20                   Q.   Have you been up for days prior

21    to your interactions with Matthew Thomas?

22                   A.   I don't know.

23                   Q.   Is that something that did happen

24    during that time in -- in  -- given your work

25    schedule, would there be days where you worked for

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        days in a row?
 3                    MS. MITCHELL:  Object to form.
 4                    A.   Yes.
 5                    MS. MITCHELL:  Well, do you mean days
 6        in a row without a break?
 7                    MR. KLEIN:  I'm asking him.
 8                    MS. MITCHELL:  Let's be clear.
 9                    MR. KLEIN:  There was a statement
10        made, I -- I can play it for you, but they -- I'm
11        telling you in sum and substance --.
12                    MS. MITCHELL:  But I'm just saying I'm
13        working days in a row.  I'm not on twenty-four/seven.
14        So I just want the record to be clear.
15                    THE WITNESS:  I was never on a shift
16        where I couldn't rest during the -- during the day.
17                    MR. KLEIN:  Okay.
18                    THE WITNESS:  There is always other
19        doctors and very competent nurses there to take care
20        of patients.  But even at best, the I.C.U. is --
21        pediatric I.C.U. is a stressful -- a stressful place.
22                    BY MR. KLEIN:  (Cont'g.)
23                    Q.   Okay.  I've just got to move on
24        here.  I think you said in response to earlier
25        questions that with regard to this whether this was a
```

Page 138

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2     suspect injury, you wouldn't use that language you
 3     were more concerned about non-accidental or
 4     accidental trauma.  Do you recall that?
 5                    A.   I -- I don't understand your
 6     question.
 7                    Q.   Is it fair, were -- were your
 8     concerns about whether this was accidental or non-
 9     accidental trauma, was that something you were
10     concerned with?
11                    A.   My medical findings can -- can
12     only diagnose problem.  It's not I -- I -- it's not
13     part of my job to decide or figure out if it's
14     accidental or non-accidental.
15                    Q.   Okay.  And you didn't do that in
16     this case, right?  You didn't determine that in this
17     case.
18                    A.   I -- I did not.
19                    Q.   Okay.  And did you ever
20     communicate to police -- to the police officers from
21     Troy Police Department who came to the hospital,
22     whether this was accidental or non-accidental?
23                    A.   I had him telling me that there
24     was no accident identified and that that would lead
25     me to not tell to them, but they would tell me that
```

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        there was no accident identified.  So again, it's --
 3        it's a decision made by the investigating
 4        professionals, not the medical professionals.
 5                    Q.   Okay.  Can we put up the
 6        deposition of a witness exhibit signed by Walter
 7        Edge.
 8                    Dr. Edge, can you just read us the
 9        narrative where it says after the words depose and
10        say.
11                    A.   Can I just read from the whole
12        thing?  I don't -- I don't know what you mean.
13                    Q.   Yeah, I just want to -- just it's
14        hard for me to -- to understand, especially with the
15        cross outs.  So if you could just read through it and
16        indicate if there's a cross out if that's something
17        that you changed and what it says.
18                    A.    I examined Matthew and he had a
19        subdural hematoma on his head.  Based on the family
20        history, I was concerned that Matthew was a victim of
21        child abuse.
22                    The injury that Matthew suffered
23        typically is a high impact injury, or other
24        acceleration, deceleration.  This type of injury can
25        be caused by very violent shaking or shaking and
```

Page 140

```
1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2     forced against a hard object.
3                   Matthew also has brain swelling caused
4     by severe trauma.  Matthew is currently brain dead
5     and another confirmation exam will be done tomorrow.
6                   This type of injury could not have
7     been caused by merely bumping Matthew against a hard
8     object.  This needs to be a severe acceleration prior
9     to striking the object, the hard object.
10                  Q.   And then -- and then you signed
11    that at the bottom, correct?
12                  A.   Yes.
13                  Q.   Okay.  So is -- are these your
14    words that you discussed with them and then they
15    wrote it down?  Or did you dictate this to someone
16    else?
17                  In other words, let me rephrase it,
18    withdrawn.
19                  Can you explain the circumstances of
20    how the statement became written out?
21                  A.   I can't exactly.  It was written
22    by a social worker based on the history that we have
23    discussed in the past.
24                  Q.   How do you know it's written --
25    Sorry.
```

Page 141

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    A.   Because --.

3                    Q.   My question is how do you know

4        it's written by a social worker as opposed to the

5        investigating officer whose name is at the bottom?

6                    A.   Maybe it's by him, yeah.  It

7        looks like his handwriting, yes.

8                    Q.   Okay.  So -- and -- and I'll show

9        you another document where that sergeant says he took

10       a deposition from you.  So do you -- do you know now,

11       does that refresh your recollection?

12                   MR. GINSBERG:  Object to the form.

13                   BY MR. KLEIN:  (Cont'g.)

14                   Q.   Does this refresh your

15       recollection of who -- how this was written?  Did the

16       -- did the sergeant or police officer write it out?

17                   A.   I don't remember the details, no.

18                   MS. MITCHELL:  Let him finish his

19       question before you answer.  It just helps the

20       record.

21                   BY MR. KLEIN:  (Cont'g.)

22                   Q.   Does this -- does this deposition

23       -- withdrawn.  This deposition -- withdrawn.

24                   Going to the sentence where you have a

25       first edit.  It says the injury that Matthew suffered

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        and then you add something.  What does that say?  May
 3        have -- may have been?
 4                    A.    Typically.
 5                    Q.    Typically.  Do -- do you remember
 6        if the police were pushing you to say that this was a
 7        high impact trauma, not accidental injury versus an
 8        accidental injury or was this coming from you?
 9                    A.    I don't remember.
10                    Q.    Okay.  As of -- as of the date
11        when you wrote this, which was on the 22nd of
12        September, did you know at that time whether this was
13        a traumatic death or some perhaps non-traumatic from
14        a set -- from septic shock?  Did you know either way?
15                    A.    Well, it wasn't a death at this
16        time, so you're asking me a question that --
17                    Q.    Did you examine -- you had said
18        -- you said he would be pronounced dead.  Do you --
19        you were just waiting for the second evaluation to
20        pronounce him dead, correct?
21                    But he was essentially brain dead at
22        that point, wasn't he?
23                    A.    Yes.
24                    Q.    Okay.  So my question is this,
25        you talk about he -- he also has brain swelling
```

Page 143

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        caused by severe trauma.  Were the police officers
 3        suggesting this trauma-centric deposition from you or
 4        did you -- were these your own words?
 5                    And in other words, did you -- would
 6        you have mentioned sepsis as a possible cause of
 7        death if you were writing this yourself, not them?
 8                    MR. GINSBERG:  Object to the form.
 9                    MS. CALABRESE:  Object to form.
10                    MS. PECK:  Object to form.
11                    MS. MITCHELL:  He wasn't dead.
12                    MR. KLEIN:  Okay.
13                    BY MR. KLEIN:  (Cont'g.)
14                    Q.  Would you have mentioned sepsis
15        as a contributing factor here at the time you wrote
16        the report, if -- if you were writing it rather than
17        them writing it for you?
18                    MR. GINSBERG:  Object to the form.
19                    MS. PECK:  Object to the form.
20                    MS. CALABRESE:  Christina, objection
21        to form.
22                    MR. KLEIN:  You can answer.
23                    A.  I really can't remember my state
24        of mind exactly and at that time of writing the
25        deposition, and exactly in what order my concerns
```

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2     were.

3                    MS. MITCHELL:  Yes, don't -- don't

4     guess, don't speculate.  It's only what you know now.

5                    MS. CALABRESE:  I'm going to ask that

6     you not coach the witness or make speaking

7     objections.  Thank you.

8                    MS. MITCHELL:  Okay.  Well, I'm going

9     to repeat that I told him not to guess or speculate,

10    which is appropriate because nobody wants a witness

11    doing that.

12                   So I'm not coaching him.  I'm

13    reminding him of the procedure.

14                   MR. GINSBERG:  Agreed.

15                   MS. CALABRESE:  But I would ask you to

16    not do that during the course of the deposition.

17    It's against the very concrete rules of trial

18    practice as outlined in the uniform court rules of

19    trial practice.

20                   So again, you know, this has been

21    going on the entire deposition.  I haven't said

22    anything up to this point.  But I think at this

23    point, it's important to make a record that you have

24    been making speaking objections at length.

25                   And you have been speaking for the

Page 145

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        witness prior to him asking questions during the
 3        pendency of the answer.  So I'm just going to make a
 4        record of that, ask you to not do that.
 5                    If you continue to do that I will move
 6        for sanctions based upon that behavior, which again,
 7        is clearly against the uniform rules of trial
 8        practice and procedure.  And if you need me to
 9        provide you with a cite to that I certainly can.
10                    MS. MITCHELL:  Well, I'm going to note
11        that I -- I don't know what you're talking about that
12        this has been happening all along.
13                    This was the first time I reminded the
14        witness not to guess or speculate.  I don't see how
15        that would be sanctionable.  I've been trying to
16        assist the process because we don't have proper
17        exhibits to help him find things to move it along.
18                    If you want to email me the site,
19        that's fine.  But I'm going to do what's appropriate
20        for the witness and in my role as his attorney.
21                    BY MR. KLEIN:  (Cont'g.)
22                    Q.   Okay.  So looking at the
23        document, it says based on the family history, I was
24        concerned that Matthew was a victim of child abuse.
25                    Do you know who conveyed that family
```

Page 146

1            Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2       history to you?  In other words, did the detectives

3       provide history to you?

4                     A.   I don't remember.

5                     Q.   Okay.  Now, I'd like to show the

6       witness the exhibit entitled -- one second please.

7       Mason narrative.

8                     A.   Is this -- is this document one?

9                     Q.   I -- I believe so.

10                    THE REPORTER:  It is not marked yet.

11      Do you want to mark it as number two?

12                    MR. KLEIN:  Sure.

13                    MS. CALABRESE:  Is it a three-page

14      document?

15                    MR. KLEIN:  It is.  Bates number

16      thirteen ninety-eight, fourteen hundred and fourteen

17      zero one.

18                    MS. CALABRESE:  Okay.

19                    BY MR. KLEIN:  (Cont'g.)

20                    Q.   Just show him the first page

21      actually.

22                    A.   Yes.

23                    THE REPORTER:  Do you need me to go to

24      another page?

25                    A.   No.

Page 147

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    BY MR. KLEIN:  (Cont'g.)

3                    Q.   Looking at the bottom of the

4        first page under the head section that says 9/21/08.

5        It says --.

6                    A.   It's not 9/21.  It says 9/26.

7                    Q.   Bates number thirteen ninety-

8        eight at the bottom.

9                    A.   Okay.

10                    Q.   Yeah.  Okay.

11                    MS. CALABRESE:  Can you scroll down,

12        take us the entire way so I can see what he's talking

13        about.  Okay, thank you.

14                    MR. GINSBERG:  Is it three pages or

15        six pages?

16                    MR. KLEIN:  Three pages.

17                    MS. CALABRESE:  Yeah, it does say page

18        one of six, page three of six, and page four of six.

19                    MR. KLEIN:  Right.  But this document

20        is three pages scanned, I guess that this is how it

21        was scanned.  I'm not sure why.

22                    BY MR. KLEIN:  (Cont'g.)

23                    Q.   In the last sentence it says,

24        Edge stated to detective Fountain, "This is a

25        murder." And that's -- I just wanted to show that to

Page 148

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      you that this was put in a report and just for the

3      record you dispute saying, "This is murder."  Is that

4      right?

5                    MR. GINSBERG:  Object -- object to the

6      form.  Please note the standing objection to any

7      questions with regard to this document.

8                    BY MR. KLEIN:  (Cont'g.)

9                    Q.   Okay.  And the answer was that's

10     correct.  Right, Doctor?

11                   A.   Yes.

12                   Q.   Okay.  Would you agree that it

13     was possible that the patient had an infection plus

14     some trauma?

15                   A.   Yes.

16                   Q.   And is that something that you

17     would necessarily have told the police?  In other

18     words, it's not that it was just trauma but that

19     there was an infection plus some trauma?

20                   A.   I can only speculate.

21                   Q.   Okay.  Well, in general -- just

22     speaking generally and if you want to refer to any of

23     the pages we can, but would you agree that your --

24     your -- your findings don't talk about sepsis?

25                   A.   Yes.

```
 1            Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                     MS. CALABRESE:  I'm sorry.  Did you
 3      say sexist?
 4                     MR. KLEIN:  Sepsis.
 5                     MS. CALABRESE:  I didn't hear that.
 6                     MR. KLEIN:  Sepsis.
 7                     MS. CALABRESE:  Sepsis, thank you.
 8                     BY MR. KLEIN:  (Cont'g.)
 9                     Q.   They don't mention, you're -- so
10      -- so if you --.
11                     MS. MITCHELL:  Can I just say -- just
12      to jump in, maybe get exposed to sanctions but when
13      you say findings, are you talking about what's
14      contained in the deposition or are you talking about
15      the findings in the medical report?
16                     MR. KLEIN:  In the medical report such
17      as the PICU attending note, such as the discharge
18      summary.  Anywhere in your record, you don't -- you
19      don't --.
20                     MS. MITCHELL:  Okay.
21                     BY MR. KLEIN:  (Cont'g.)
22                     Q.   You don't -- you don't -- is it
23      fair to say that you don't have any findings in your
24      -- in your -- in your records where you talk about
25      sepsis as being a possible contributing issue here.
```

Page 150

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    A.    That's not true.
 3                    MS. CALABRESE:  So I'm sorry.  I have
 4        to stop you, Brett right there.  This is an example
 5        of the back and forth communication, the
 6        inappropriate back and forth communication that
 7        you've been having with your client.
 8                    There was a question pending and you
 9        were having a discussion with him.  It's not
10        appropriate.  You cannot speak to the witness while a
11        question is pending.
12                    And that's what I'm trying to, which
13        was happening throughout the -- I'm sorry, I'm still
14        talking.  That's what I'm referring to, which has
15        been happening throughout the course of this
16        deposition.
17                    Earlier, you said you didn't know what
18        I was talking about.  So I thought it was incumbent
19        upon me to illustrate for you what I meant earlier
20        and this is what I'm talking about.
21                    MS. MITCHELL:  I was asking for
22        clarification because he asked if there were any
23        findings of sepsis.
24                    MS. CALABRESE:  I'm not talking about
25        what you were talking to Brett about.  I'm talking
```

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2     about what you were talking to your client about.

3                    You can't have a conversation with

4     your client when the question is pending because that

5     implies that you're coaching the response.

6                    So that is what I was referring to

7     earlier what you just suggested now.

8                    MS. MITCHELL:  I don't know what

9     communication you're talking about that I had with

10    the client.  Can you tell me what was said?

11                   MS. CALABRESE:  Are you --?

12                   MS. MITCHELL:  Because I'm trying to

13    help and look through the chart.

14                   MS. CALABRESE:  That's what you cannot

15    have a verbal communication with him while a question

16    is pending.

17                   MS. MITCHELL:  Okay.  What is the

18    verbal communication that you've heard that is at

19    issue?

20                   MS. CALABRESE:  I couldn't hear what

21    you were saying.  But I did observe you talking to

22    him.  Are you denying the fact that you did that?

23                   MS. MITCHELL:  I did not.  You're

24    saying that you did not hear anything, but you saw a

25    communication.  I am wearing a mask.

Page 152

1    Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    MS. CALABRESE:  I heard -- I heard you

3    -- I heard a mumble.  I heard a mumble.  Are you on

4    the record as an officer of the court saying that you

5    did not just say something to your client while the

6    question is pending?

7                    Because I -- just so you know, before

8    you answer, I'm going to ask the doctor under oath,

9    if you just spoke to him, so be careful how you

10   respond here.  Are you -- are you referring to your

11   client --.

12                   MS. MITCHELL:  Okay.  First of all, I

13   don't -- are you speaking to me at all?  You said you

14   were going to get a motion for sanctions because I

15   asked my client not to guess.  If you want to end --

16                   MR. GINSBERG:  Let's just settle back

17   --

18                   MS. MITCHELL:  -- this deposition now

19   --

20                   MR. GINSBERG:  -- for a second.

21                   MS. CALABRESE:  If you want to end it,

22   that's fine.  But we're not coming back.

23                   MR. GINSBERG:  The problem I have --

24   that the concerns are we have to come back for a

25   second.

Page 153

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    MS. MITCHELL:  Yeah, we're taking a
 3        break.
 4                    MR. KLEIN:  Christina, I think you
 5        made your point.  I think we should try to finish the
 6        deposition.
 7                    MS. CALABRESE:  I -- I don't think
 8        that -- I don't think there's any reason to stop.
 9        But I'm not going to allow somebody to imply that I
10        didn't see what I -- what I very distinctly saw.
11                    MR. GINSBERG:  Christina, it's not
12        wrong.
13                    MS. CALABRESE:  What's that, Michael?
14                    MR. GINSBERG:  I said you're not
15        wrong.
16                    MS. CALABRESE:  No, I know I'm not.
17        I'm trying to be judicious and -- and polite about
18        it, you know, but I'm getting a lot of pushback
19        rather than -- you know --.
20                    MR. GINSBERG:  She -- she appeared --
21        she appears to be a young attorney, let's -- you
22        know, let's try to cover a little snag on that.
23                    (Off the record 2:14 p.m.)
24                    (On the record, 2:25 p.m.)
25                    THE REPORTER:  We are on the record.
```

Page 154

```
 1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2     We can't hear you.
 3                   MS. SPENCER:  Brett, you're muted.
 4                   BY MR. KLEIN:  (Cont'g.)
 5                   Q.   Dr. Edge, based on your training
 6     and experience, is there evidence that you're aware
 7     of or developments in medicine over the last twelve
 8     years that suggests that subdural hematomas can incur
 9     from birth?
10                   A.   I haven't reviewed that
11     literature recently.  Certainly, it is -- I think
12     pretty much any hematoma can cause it -- can cause it
13     by birth trauma.  I don't think that's new like the
14     last twelve years that's --.
15                   Q.   This case involves a forceps
16     delivery.  I don't know, did you know that?
17                   A.   No.
18                   Q.   There was toxemia, did you know
19     that?
20                   MR. GINSBERG:  Objection to form.
21     Please note my objection to the form of the last
22     question.
23                   BY MR. KLEIN:  (Cont'g.)
24                   Q.   Did you know that there was
25     toxemia at birth?
```

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                          MR. GINSBERG:  Object to form.
 3                          BY MR. KLEIN:  (Cont'g.)
 4                          Q.   No?
 5                          A.   No.
 6                          Q.   Okay.  Did you know that there
 7          was -- the mother had, I believe, a bacterial
 8          infection?
 9                          MR. GINSBERG:  Object to the form.
10                          A.   No.
11                          BY MR. KLEIN:  (Cont'g.)
12                          Q.   There was -- I think the word is
13          merc -- meconium.  Did you hear anything about that
14          being present?
15                          A.   I -- I don't recall, to be
16          honest.  That -- that should be the answer to all of
17          the last three questions.
18                          Q.   So all the related birth
19          difficulties with Matthew, if you had had this case
20          today would that be something based on the -- where
21          medicine is on this today that you would have asked
22          to look into?
23                          MR. GINSBERG:  Object to the form.
24                          MS. PECK:  Object to form.
25                          BY MR. KLEIN:  (Cont'g.)
```

800.523.7887                    Associated Reporters Int'l., Inc.

Page 156

1    Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    Q.   Not saying -- not saying whether

3    or not you had anything to do with that.  I'm just

4    saying based on how the medicine has advanced on what

5    we know about bacterial infections.

6                    A.   I got three questions there.

7    You're asking whether birth history is an important

8    part of my history.  It's always been and always will

9    be and is part of -- part of the admission process

10   for any patient.  And second question was, has

11   anything changed in the last twelve years, no, not --

12   that's always been an important question.

13                   Q.   Okay.  I want to play a video.

14   Can I do a screen share from my computer, Annette?

15                   THE REPORTER:  Let me give you

16   permission.

17                   MR. KLEIN:  You got to see my old

18   desktop.  It's just --.

19                   THE REPORTER:  Brett, you should be

20   able to do it now.

21                   MR. KLEIN:  Okay.  So then do you guys

22   just see doctor -- a picture of Dr. Edge and that's

23   it?  Just want to make sure you don't see my old

24   computer.

25                   MS. CALABRESE:  I don't see anything.

ARII@courtsteno.com                    www.courtsteno.com

Page 157

1    Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    MR. KLEIN:  Okay.  How do we present,

3    how do we do that that?

4                    THE REPORTER:  Go to share.

5                    MS. CALABRESE:  If you go to that top

6    and hit share.

7                    MR. KLEIN:  Yeah.

8                    MS. CALABRESE:  And then you see share

9    content.

10                   MR. KLEIN:  I see.  There you go.  Got

11   it.  Perfect.

12                   BY MR. KLEIN:  (Cont'g.)

13                   Q.  Okay.  Doctor, I'm just going to

14   play you a short clip and let me -- I just want to

15   know your response to whether you -- your response to

16   the clip.  Have you ever seen --?

17                   MR. GINSBERG:  Object to the form.

18   Object to the presentation.  Object to the

19   foundation.

20                   BY MR. KLEIN:  (Cont'g.)

21                   Q.  Dr. Edge, have you ever seen the

22   documentary of the -- of Adrian Thomas' case?

23                   A.  No.

24                   Q.  Okay.  I'm going to play this --

25                   MS. CALABRESE:  Can we mark this?

1     Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    MR. KLEIN:  Sure.  We can mark it

3     after.  I'll send it to the reporter.

4                    MS. CALABRESE:  Okay.  Thank you.

5                    BY MR. KLEIN:  (Cont'g.)

6                    Q.   This is part of the documentary

7     that just references you and I'm just going to ask

8     you some questions about it on the other side, okay?

9                    [Video being played]

10                   MS. CALABRESE:  That's better, but can

11    you restart it though because we couldn't hear it in

12    the beginning?

13                   MR. KLEIN:  I'm going to restart it.

14                   [Video being played]

15                   MR. KLEIN:  Okay.  Dr. Edge.

16                   MS. MITCHELL:  The audio was cutting

17    in and out a little just so you know.

18                   MR. KLEIN:  I hear you. Did you ever

19    --?

20                   BY MR. KLEIN:  (Cont'g.)

21                   Q.   Okay.  Have you ever seen that

22    before?

23                   A.   No.

24                   Q.   Okay.  If you need me to play it

25    back in snippets let me know, but can you tell us if

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      -- if that's accurate, if that's an accurate

3      portrayal or if in your view that's inaccurate?

4                      MS. MITCHELL:  Object to form.

5                      A.   Do I think it was accurate?  Was

6      I very concerned about this child having a massive

7      head trauma?  Yes.  And did I do my best to

8      communicate that to the police?  Yes.  Did I tell

9      them that I was busy or I couldn't talk to them more?

10     I really can't remember.

11                     BY MR. KLEIN:  (Cont'g.)

12                     Q.   Did you tell them that this was

13     -- about -- that this was a murder?

14                     A.   I don't remember using that word.

15     As I said to you a little while ago, I have no

16     recollection of saying that word nor would that be my

17     usual practice.

18                     Q.   Thank you.

19                     MR. GINSBERG:  Can you -- sorry Brett,

20     can you again share your screen?

21                     MR. KLEIN:  Yeah.  I'm going to play

22     one more.  Just one more and then I think I'm just

23     about done with my questions.  It's going to load it

24     up.

25                     [Video being played]

800.523.7887                    Associated Reporters Int'l., Inc.

Page 160

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    MS. MITCHELL:  Just so it's clear, I'm

3        just asking my client -- his phone went off.  I'm

4        asking if he needs to take the call.

5                    THE WITNESS:  I need a break.  I have

6        to respond to a patient question.

7                    MR. KLEIN:  Sure.  Do you want to --

8        do you want us to mute you or you want to step out or

9        are you okay?

10                   THE WITNESS:  No, no, I can do it

11       right here.  I'm texting.

12                   MS. MITCHELL:  Christina, I just need

13       to ask, you're on mute.

14                   MS. CALABRESE:  I don't need to

15       explain, you know, make a record for my benefit when

16       you speak to Dr. Edge.  It -- just to be perfectly

17       frank, it's difficult during remote depositions to

18       make sure that everything is go -- you know,

19       everything is copacetic.  And so that's why, you

20       know, I said what I said.  I honestly didn't mean to

21       give you a hard time, so I don't want you to feel

22       like you need to cut your way to appease me.  All

23       right.

24                   MS. MITCHELL:  Well, you did threaten

25       to bring a motion for sanctions so --

ARII@courtsteno.com                    www.courtsteno.com

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                   MS. CALABRESE:  I did.
 3                   MS. MITCHELL:  -- of course I will
 4        take, you know, this tone from now on and I certainly
 5        don't want there to be any confusion.  I think it's
 6        really unfortunate that we were not given marked
 7        exhibits in advance because I think this remote
 8        process has been hard enough for the doctor.
 9                   And now, we're trying to work off of
10        stuff that's very confusing but again, when you throw
11        out a motion for sanctions I understand now you're
12        saying I shouldn't appease you, but I'm going to go
13        above and beyond because now you've attacked my
14        efforts.  But I'd like to just move on so the doctor
15        can wrap it up.
16                   THE WITNESS:  I'm all set.
17                   MR. KLEIN:  Okay.  Great.  I'm going
18        to show the next clip and I think I'm pretty much
19        done.  Just going to double-check that but here's the
20        other clip I want to play for you and talk to you
21        about it on the other side.  Hold on a sec.  That's
22        not what I wanted to share.  That didn't work right.
23        Hold on one second.
24                   [Video being played]
25                   MR. KLEIN:  Okay.  Thanks for bearing
```

```
 1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2   with me.
 3                   BY MR. KLEIN:  (Cont'g.)
 4              Q.   Do you see the video?  No?
 5              A.   No.
 6              Q.   Okay.  I'm going to try it one
 7   more time and if I don't get it, I'm going to give
 8   up, sorry.
 9                   [Video being played]
10                   BY MR. KLEIN:  (Cont'g.)
11              Q.   Okay.  So Dr. Edge, have you ever
12   seen that clip or footage before?
13              A.   No.
14              Q.   Okay.  Let me just get back to my
15   screen here.  Do you recall that -- I'll represent to
16   you that the gentleman who said that this is
17   problematic was the District Attorney who tried the
18   case?  Do you recognize him now that you've seen him?
19              A.   No.
20              Q.   Okay.  Do you remember anyone
21   telling you that it was prob -- that your findings
22   were problematic?
23              A.   I don't, no.
24              Q.   Okay.  This idea that you were
25   telling the police, this is a murder, this is a
```

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      murder.  Is that something that you think, based on

3      your experience and your recollections of this

4      incident, came from the police and not from you?

5                        MR. GINSBERG:  Object to the form.

6                        MS. MITCHELL:  Object to form.

7                        A.  It did not come from me.

8                        MR. KLEIN:  That's good.  Thanks so

9      much.  I think that's all I have.  I'm just going to

10     take one moment to look at my notes and I believe

11     that's about it.

12                       I believe that's all I have.  Subject

13     to any follow-up after Christine -- Christina or

14     anyone else.  Dr. Edge, thank you for your time

15     today.  We appreciate it and thanks for what you do,

16     stay safe.

17                       THE WITNESS:  Thank you.

18                       MS. PECK:  Christina, do you want me

19     to go next?

20                       CROSS EXAMINATION

21                       BY MS. PECK:

22                       Q.  Dr. Edge, my name is Crystal

23     Peck.  I'm with Bailey, Johnson & Peck.  We are

24     attorneys for Dr. Michael Sikirica, medical examiner

25     in this case.  I only have a few questions for you so

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      I'm really hoping that we can keep this pretty short.

3      Most of them are going to be following up on some of

4      the questions that were asked of you by Mr. Klein.

5                    You were asked questions about

6      subdural hematomas being caused by birth.  When you

7      have a patient like Matthew Thomas, four months old,

8      is there a way to definitively say whether a subdural

9      hematoma that's found in a patient like him is caused

10     by birth or in subsequent trauma?  Is there a way to

11     definitively diagnose where and when -- where it came

12     from?

13                    A.   That's not my area of expertise.

14     I -- I believe that the radiologist can make an

15     estimate of how old blood is and I've seen them do

16     that before and the neurosurgeons.  Those are the

17     people who have expertise in that area.

18                    Q.   Okay.  And then --?

19                    A.   So my -- my job was to -- to --

20     to take what was reported to me.

21                    Q.   Okay.  You were asked questions

22     about the -- the C.T. report and the fact that it

23     said an M.R.I. would be helpful.  What exactly does

24     an M.R.I. show that the C.T. is not showing?

25                    A.   It gives you a better picture of

Page 165

1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2       the density of different things and would help give

3       some definition of how old this blood was.  Also,

4       whether there was other injury to the brain.  The --

5       the CAT scan is good for showing, you know,

6       fractures, for showing that there is some fluid but

7       exactly what the fluid is, it's not very good at.

8                    Q.   Okay.  So if an M.R.I. would be

9       better than a CAT scan to be able to show what you

10      had just described, taking it a step further, which I

11      know you can't do when you're treating live patients.

12      But an autopsy being able to look actually in the

13      brain itself, would that really be the best evidence

14      of finding out what is going on with the patient or

15      what happened with the patient?

16                    A.   An M.R.I.?

17                    Q.   No, what I'm saying is that if an

18      -- if an M.R.I. was better than a CAT scan when you

19      have to -- when you have to do an autopsy, would that

20      be able to reveal to you better than, say, given an

21      M.R.I. or a CAT scan as to what was going on in the

22      brain about, if there was injury, if there was blood,

23      how much injury?

24                    A.   Yeah.  An autop -- an autopsy is

25      better than anything.

Page 166

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                        MR. KLEIN:  Objection.

3                        THE WITNESS:  It's actually by looking

4        at -- looking at the brain is better than, you know,

5        getting any picture of the brain.  There are changes

6        that happen after death however, that can make it

7        confusing and this is a question that a pathologist

8        would need to address.

9                        BY MS. PECK:  (Cont'g.)

10                       Q.   So a pathologist would be able to

11       say what kind of changes might have occurred after

12       death that might have changed whether -- affected how

13       they would be able to diagnose this?

14                       A.   Yes, I believe so, yes.

15                       Q.   Okay.  Matthew Thomas had both a

16       subdural hematoma and retinal hemorrhage --

17       hemorrhages.  Was it your -- is it your opinion that

18       those are not necessarily consistent with sepsis when

19       you're seeing them together like this -- that they

20       would be consistent with trauma?

21                       MR. KLEIN:  Objection to form.

22                       A.   I -- I have never seen subdural

23       hematoma or retinal hemorrhages with severe sepsis in

24       the many thousands of cases, nor have I read about

25       that.  I'm sure the cases exist but I'm not -- that

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2     is a rarity.

3                    BY MS. PECK:  (Cont'g.)

4                    Q.   And sepsis can't cause subdural

5     hematomas, can it?

6                    A.   I -- I've never seen it.  As I

7     said before, I -- I'm not aware of that being, you

8     know, we -- I see a lot of subdural hematomas.  They

9     are, you know, ninety-nine point ninety-nine percent

10    of the time they're trauma.  I've had -- there's been

11    a few cases where there was an inborn birth issue

12    with -- with like a patient with, what's the word

13    called, hemophilia, that can get bleeding everywhere.

14    But other than that, I've not seen subdurals outside

15    of trauma.

16                   MS. PECK:  I'm going to ask you and I

17    will, again, I think I'll need to have this marked.

18    The 2009 trial testimony that was, I think, was

19    emailed over to you.

20                   THE REPORTER:  Yes.

21                   MS. PECK:  If you could just mark that

22    as a Sikirica One.

23                   THE REPORTER:  Okay.

24                   MS. PECK:  All right.  And I'll ask

25    you to go to page twenty-six, Ms. Annette.  Can you

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        pull down towards the bottom, please?
 3                        THE REPORTER:  Sure.
 4                        BY MS. PECK:  (Cont'g.)
 5                        Q.   Doctor, I'd like to bring your
 6        attention to page twenty-four of this transcript.
 7        You were asked if you had an opinion as to what
 8        caused the death of Matthew Thomas.  And your
 9        response was that, I have the opinion, my opinion was
10        trauma and I can't rule out sepsis as being
11        contributing to that.  Does that remain your opinion
12        today, Doctor?
13                        A.   Yes.
14                        MS. PECK:  I have no further
15        questions.
16                        MS. CALABRESE:  I just need one
17        moment, please.
18                        MR. GINSBERG:  Crystal, what was that
19        -- what was that the transcript of?
20                        MS. PECK:  It was the 2009 trial
21        testimony.  I think Brett had emailed a link over to
22        Rhiannon with it.
23                        MR. GINSBERG:  Okay.  I'm just -- I'm
24        just keeping my -- my evidence list.
25                        MS. PECK:  Sure.
```

800.523.7887                                  Associated Reporters Int'l., Inc.

Page 169

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    MR. GINSBERG:  So testimony of Dr.
 3     Edge?
 4                    MS. PECK:  Dr. Edge, yes.
 5                    MR. GINSBERG:  Okay.  Thank you.
 6                    MS. PECK:  It's page nine seventy-
 7     five, I want to say of the transcript itself.
 8                    MR. GINSBERG:  Okay.  Thank you.
 9                    MS. CALABRESE:  Okay.  Thank you.  Are
10     we still on, Annette?
11                    THE REPORTER:  Okay.
12                    CROSS EXAMINATION
13                    BY MS. CALABRESE:
14                    Q.   Dr. Edge, my name is Christina
15     Calabrese.  I'm an attorney with the Office of the
16     New York State, Attorney General to represent the
17     State of New York in the action of Adrian Thomas
18     versus the State of New York.  In our claim, he's
19     alleging that he was wrongfully imprisoned over a
20     course of period of time.
21                    Throughout the course of the
22     investigation we've learned that the allegations
23     generally relate to actions of police conduct or
24     misconduct and investigation and determination made
25     in autopsy by Dr. Sikirica, okay.  So I'm just going
```

ARII@courtsteno.com                          www.courtsteno.com

# APPENDIX

# 1192

Page 170

```
1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2     to follow-up with some questions that mostly Mr.
3     Klein asked you.  You used the term dolls' eye.  Can
4     you explain to me what that means?
5                   A.   Normally, when you have a patient
6     lying on their back and you move, their -- their
7     eyes, their -- the eyes go to the middle so they --
8     they move.  And a patient who's dead, they don't
9     move.  They just keep looking straight ahead.
10                  Q.   And did you say that Matthew
11    Thomas presented with dolls' eye or did not?
12                  A.   He had all the signs -- many
13    signs of brain death including an abnormal response
14    to moving the head with the eyes.
15                  Q.   Or dolls' eye?
16                  A.   Oculocephalic response is the --
17                  Q.   Okay.
18                  A.   -- medical term.
19                  Q.   Thank you.  And you were asked
20    several questions about conversations that you may
21    have had with the Troy Police Department.  Do you
22    remember those questions?
23                  A.   I remember something about that.
24                  Q.   And I'm not asking -- I'm not
25    asking if you remember the questions between you and
```

Page 171

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      the Troy Police.  I'm asking you to remember the

3      questions that the attorneys here asked you today.

4                    A.   Yeah.  I remember some of them.

5      I'm not sure I remember every one.

6                    Q.   Okay.  Is it fair to say that if

7      -- let me ask you this, withdrawn.  Would it be

8      appropriate for a doctor to -- would it be

9      appropriate and ethical for a doctor to tailor his or

10     her medical diagnosis and treatment plan to the whims

11     or wishes of a police agency?

12                   A.   Oh!  No, it would be unethical to

13     tailor your professional response to police or anyone

14     else.

15                   Q.   And so in response to questions

16     relating to conversations that you may have had with

17     the Troy Police Department, several of your responses

18     were, I don't remember.  As you sit here today, would

19     you remember if you tailored your diagnosis and

20     treatment of Matthew Thomas to the wishes of the Troy

21     Police Department?

22                   A.   I --.

23                   MR. KLEIN:  Objection.

24                   A.   I can't really answer that

25     question directly.  I can answer directly --

Page 172

```
1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      indirectly about how I've dealt with patients like

3      this in the past.

4                      BY MS. CALABRESE:  (Cont'g.)

5                      Q.   I guess -- I guess the broader

6      question Doctor is, do you alter or change what the

7      factual -- what the facts allowed you to come up with

8      a medical diagnosis and treatment -- treatment of

9      Matthew.  Did you tailor that or alter it because of

10     what the police wanted you to do?

11                     A.   Absolutely not.

12                     Q.   And that would never be something

13     you would do?

14                     A.   I -- can I ask my attorney a

15     question --

16                     Q.   Absolutely.

17                     A.   -- off the record?

18                     Q.   Yes.  just make sure you hit

19     mute, so we don't hear you.

20                     MR. KLEIN:  Did I -- did I notice on

21     your wall, Mike, is that like a great granddad or

22     something?

23                     MR. GINSBERG:  That's my grandfather,

24     yes.

25                     MR. KLEIN:  All right.
```

Page 173

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                        MR. GINSBERG:  In lieu of a wheel, but

3        -- yes, my father was even in that, so.

4                        MS. CALABRESE:  Hey, Brett, since

5        we're waiting, are you -- did you say you were going

6        to provide those two video exhibits to Ms. Steno and

7        have her mark them.

8                        MR. KLEIN:  I could, sure.

9                        MS. CALABRESE:  That'd be great.

10       Thank you.  So Annette, I would ask that you not

11       circulate the transcripts until you have those.

12                       THE WITNESS:  Okay.  I'm ready, go

13       ahead.

14                       BY MS. CALABRESE:  (Cont'g.)

15                       Q.   Okay.  Do you remember the

16       question?

17                       A.   I have said something in order to

18       -- with altering medical facts in order to

19       accommodate the police requests.

20                       Q.   Yes.  Essentially, my question

21       is, would you change your opinion as to diagnosis and

22       treatment of a patient to align it with what

23       perspective the police department determine --

24       determined they wanted you to have?

25                       A.   I -- absolutely not.  I would not

```
1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2       alter -- my job is to try to get the most balanced
3       complete picture.  I'm -- however, and when I -- when
4       I talk to my attorney about there's something I want
5       to add that I think is really important and that's --
6       that I've actually found myself on the other side.
7       Where I find officers, particularly from counties
8       that are, you know, outside of the city areas, where
9       when a child is -- a baby is assaulted, they actually
10      underplay and they get, oh, that's just shaken baby.
11                   I've heard that before and I've found
12      myself in the situation on multiple occasions needing
13      to make it very clear that it's not just shaken baby,
14      that this is  -- can be and I'm not talking about
15      Michael Thomas.  I'm saying in general that, you
16      know, that shaking -- shaking a baby is assault.  And
17      these kinds of injuries are results of assault so
18      that's the point I wanted to say.
19                   Q.   Thank you, Doctor.  Thank you.
20      And would you agree with -- with me when I say that
21      your main duty and priority is to the patients?
22                   A.   Absolutely.
23                   Q.   And you will -- would you agree
24      with me when I say you will and it's important --
25      strike that.  It's important for you to liaise with
```

1    Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2    police departments in this -- in these types of cases

3    in order to gain background information so that you

4    can, in some cases, thoroughly diagnose and treat a

5    patient?

6                    A.    Yes, I mean --

7                    Q.    Sometimes?

8                    A.    -- our taking a -- our taking a

9    history is getting as much social history as possible

10   and --.

11                   Q.    Thank you.  That -- that was my

12   question.  Would that be considered history, a

13   history in the course of your initial medical exam of

14   a patient?

15                   A.    Yes.  In fact, I think I

16   mentioned in my original history that there was this

17   -- he has history.  That's not making a judgment

18   about what happened.  I'm just saying that's an

19   important part of the constellation of findings here

20   that helped me make a diagnosis.

21                   Q.    And would you agree with me when

22   I say whether or not a person is investigated or

23   prosecuted for child abuse is of no relevance to you?

24                   A.    I have -- that is not my job.  My

25   job is my patients.  And making sure my -- (a) that

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        I'm taking good care of that patient, the best care
 3        possible, best care they could get anywhere in the
 4        world.  Number two, my responsibility is to that
 5        family.  And three, if there is a concern about child
 6        abuse, I need to let C.P.S. know and make sure that
 7        other children are not at risk.
 8                    Q.   And that was my follow-up
 9        question, Doctor.  I would ask that, would you agree
10        with me that kind of an asterisk to the statement
11        that you just gave or an exception would be in the
12        event that you're protecting your patient from
13        potential either continued abuse or follow-up abuse
14        in certain circumstances.
15                    That would be something that you would
16        want to -- information that you would want to obtain
17        in taking the history to ensure that your patient
18        when leaving your hospital would -- is going into a
19        safe place or a safe location?
20                    A.   That's a very big part of what I
21        do and very important.
22                    Q.   Particularly because your --
23        excuse my terminology but your client base are
24        children and oftentimes children can't advocate for
25        themselves, particularly infants?
```

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                      A.   Yes.

3                      Q.   Now, there was a lot of

4      conversation that you had with some of the attorneys

5      with regard to the -- that part of your record or

6      your report that discusses the skull fracture.  Do

7      you remember the -- the conversations that you had

8      with the attorneys?

9                      A.   Yes.

10                     Q.   Okay.  I'd like you to explain

11     for me because it was kind of choppy back and forth;

12     how you came to the conclusion of the skull fracture

13     and then why the report was not changed by you?

14                     A.   I don't remember the exact times

15     that I was told that there was a skull fracture or

16     who told that to me.  But I do know that I would not

17     write that there was a skull fracture unless I'd been

18     told that by either radiology or neurosurgery.  I

19     don't remember in this situation where I heard that.

20                     And the fact that -- that the second

21     day that that after we had ruled that out that I

22     didn't -- it was a month later -- sometimes I -- I

23     did not think to cross that out.  And it was -- it

24     was an error on my part not remembering what had --

25     what had happened exactly one month ago.

Page 178

1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                       Q.   And so it wouldn't be typical for

3       you to when -- well, first let me ask you this.

4       Strike that.

5                       Why -- what would explain you signing

6       that page a month after the event?

7                       A.   The -- the record particularly, a

8       patient that dies, the record is taken away very

9       quickly.  And the notes sometimes -- my notes are

10      transcribed, they don't make it back into the chart

11      for several hours after I dictated them.  So there's

12      an excellent chance that this child had already been

13      transferred to the morgue or wherever before the note

14      came back.

15                      So the note, therefore, went to

16      medical records and then I would have gotten the

17      notice a week or so down the road that there's an

18      unsigned note and then I need to go to medical --

19      medical records and take care of that.

20                      Q.   And is it fair to say that in

21      that circumstance that you're describing where you

22      get some type of communication from medical record

23      saying, hey, you forgot to sign this page.  Please

24      come here and do that.  You would not be going

25      through the report line for line to check for

Page 179

     1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

     2        accuracy and/or check that the recitation of the

     3        facts as within the report was akin to what you

     4        remember it, you wouldn't have been doing that,

     5        correct?

     6                          MR. KLEIN:  Objection.

     7                          A.   I mean, I'm signing it so that I

     8        am saying that I've gone through it and agree with

     9        what's in it.  Am I always very good at reading every

    10        line when I -- no, I -- I'm not.  All right.  There

    11        have been times where I've missed things and signed

    12        it a month later.

    13                          BY MS. CALABRESE:  (Cont'g.)

    14                          Q.   Okay.  And you were asked several

    15        questions by the other attorneys about statements

    16        that the Troy Police Department, claim you made with

    17        regard to the term "murder."  Do you recall using

    18        that term?

    19                          A.   No.

    20                          Q.   Would that be something you would

    21        say?

    22                          A.   As I testified here on several

    23        occasions, I can't imagine saying that.  I can

    24        imagine as I just said, saying, explaining to police

    25        that this is a serious injury involving a lot of

Associated Reporters Int'l., Inc.

Page 180

1     Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2     trauma.

3                    Q.    And frankly, saying this --.

4                    A.    I -- I would have -- I would have

5     emphasized that because as I said to you a few

6     minutes ago, I find it -- it's been necessary to

7     emphasize that to believe that it takes a serious

8     amount of -- of violence to cause a subdural

9     hematoma.

10                   Q.    And frankly, you would be remiss

11    in your duty to the patients and your duties under

12    the Hippocratic Oath if you didn't flag a law

13    enforcement authority in the event that you believe

14    child abuse is prevalent in one of your cases?

15                   MR. KLEIN:  Objection.

16                   A. In fact, you know, it's -- again,

17    it's for reasons we just talked about protecting

18    other children as my duty to protect children in

19    general.  It's very important that I educate law

20    enforcement and anyone else as to the -- the amount

21    of violence it takes for there to be bleeding in the

22    brain.

23                   BY MS. CALABRESE:  (Cont'g.)

24                   Q.    And you were asked questions

25    about the prevalence of subdural hematoma -- subdural

Page 181

```
1         Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2         hematomas and retinal hem -- hemorrhages and sepsis.
3         You stated that it would be incredibly rare to find
4         retinal hemorrhages in cases of sepsis, is that
5         correct?
6                        A.   I think that in my -- in my
7         experience I'm sure that it has -- it has occurred
8         but I -- I have not seen that.
9                        Q.   And just to recap your
10        experience, Doctor, how long have you practiced
11        medicine in the area of pediatrics?
12                       A.    Thirty years.
13                       Q.    And during that time, you have
14        probably treated hundreds of thousands of pediatric
15        patients, is that fair to say?
16                       MR. KLEIN:  Objection.  Objection to
17        form.
18                       A.   I don't know about hundreds of
19        thousands but thousands for sure.
20                       MS. CALABRESE:  Thousands.
21                       BY MS. CALABRESE:  (Cont'g.)
22                       Q.   And in fact, you've developed an
23        expertise in the area which led to your supervisory
24        roles in Albany Medical Center?
25                       MR. KLEIN:  Standing objection to
```

Case 1:17-cv-00626-DJS Document 66-91/142024 Filed 06/14/21 Page 183 of 269

Page 182

1    Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2    leading questions rather than objecting to each one,

3    if you could just note that, Ms. Reporter, thanks.

4              A.   I -- I -- I can't say that I have

5    particular expertise in -- in child abuse but I am a

6    professor and I've been lecturing and -- medical

7    students and residents for that whole thirty years of

8    all the aspects of pediatric intensive care including

9    child abuse.

10             BY MS. CALABRESE:   (Cont'g.)

11             Q.   Including authoring journal

12   entries or writings with regard to ped -- your

13   pediatric care of patients?

14             A.   In -- yeah, intensive care, yes.

15             Q.   You said, based upon your

16   experience in handling pediatric patients, retinal

17   hemorrhaging has been ninety-nine point nine nine

18   percent due to trauma, in your experience?

19             A.   Yes.

20             Q.   And you were asked questions, I

21   believe, by Mr. Klein about the term Shaken Baby

22   Syndrome.  Is it your understanding in reading the

23   literature that that term is passé and the preferred

24   term is abusive head trauma?

25             A.   Yes.

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                Q.   And generally, is that due to the

3      fact that subdural hematomas and retinal hemorrhaging

4      can be caused by, as you've described, acceleration/

5      deceleration injuries rather than just shaking an

6      infant?

7                A.   Correct.   That's my

8      understanding.   I -- I do not have that particular

9      expertise in the area.

10               Q.   And you responded to a question

11      that you do, in fact, remember your involvement in --

12      in this case and as you know, you treated baby Thomas

13      many years ago.   Why is it that you particularly

14      remember this case?

15               A.   Well, there's more than one that

16      I remember, but I -- I was aware that there's been

17      some national news involved, although as I testified

18      to Mr. Klein, I -- I have never seen those clips

19      before.   I -- I -- I -- I knew that there was

20      something out there.

21               Q.   I don't mean to put you on any

22      other thoughts there.

23               A.   I have a funny but -- I have a

24      funny story for why I remember it, but I don't know

25      that it's appropriate for -- for here but just

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2     briefly that somebody's telephone went off in the

3     audience and the -- the Judge made a stern

4     announcement that that could not happen and then

5     twenty seconds later my phone went off.  And -- but

6     he ignored it.

7                    Q.   Oh, good.  Very good.  So could

8     that be why you remember this case?

9                    A.   I know I told that story.  It

10    makes it even more particularly interesting now even

11    though Michael Jackson is -- it was a Michael Jackson

12    clip that my kids has put on as the phone ringtone.

13                   Q.   Okay.

14                   A.   It was sort of embarrassing.

15                   Q.   Okay.  Now, you mentioned the

16    term per -- strike that.  The term pervasive

17    bacterial infection was used, and I just can't recall

18    if you used it or one of the attorneys used it.  Is

19    that a term you used to describe the diagnosis of

20    baby Thomas?

21                   A.   Persuasive bacterial infection?

22                   Q.   Pervasive.

23                   A.   I -- I -- I didn't use that term.

24                   Q.   Okay.  Would you say that baby

25    Thomas had a pervasive bacterial infection?

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 185

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                        A.   I'm only gathering that now.  I
 3        -- at the time I was treating him for pervasive
 4        bacterial infection.  He was on the appropriate
 5        antibiotic and I was giving the support both to his
 6        clotting system and to his blood pressure that
 7        pervasive bacterial infection would cause.  So I was
 8        treating that with all the ways available to me.  But
 9        I did not know at the time that that was indeed what
10        was indeed going on which I -- I understand from Mr.
11        Klein was -- was found later.
12                        Q.   Okay.  And you're assuming what
13        Mr. Klein said is an accurate recitation of the facts
14        in that response?
15                        A.   I don't know anything other than
16        what Mr. Klein told me.
17                        Q.   Okay.  Can you describe what you
18        mean by pervasive bacterial infection?
19                        A.   I didn't use that term.
20                        Q.   What would that mean in medical
21        lingo or speak, or does it not mean anything?
22                        A.   Bacteria everywhere.
23                        Q.   Okay.  Fair enough.
24                        A.   Bacteria all the way through the
25        body.
```

Page 186

1    Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                    Q.   Fair enough.  And in talking

3    about this issue of sepsis and subdural hematomas,

4    you mentioned that you would not expect to find the

5    level or the degree of neurological deficit that you

6    found in baby Thomas if the diagnosis was by sepsis

7    alone.  Do you remember saying that?

8                    A.   Yes.

9                    Q.   Can you explain what you meant by

10   that?

11                   A.   The fact that when -- when the

12   patient presented at Samaritan that the baby was

13   already showing many signs of brain, you know, near

14   brain death.  That would be an unusual way for, you

15   know, we see severely septic patients come in, you

16   know, many times a -- a month.

17                   But to have a severely septic baby

18   present with almost no brain activity is unusual and

19   would raise questions of whether there's been a delay

20   in treatment for that -- for there to be such a

21   problem with circulation which is what happens in

22   sepsis.

23                   There's not enough circulation, not

24   enough oxygen getting into the brain but that would

25   have had to have been going on for some time for the

```
1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2       patient to -- to present with very little or no
3       neurologic function.
4                        And by the time the patient arrived at
5       Albany Med, no question about what we considered
6       brain death.  Initially, there was description of
7       withdrawal to pain, but the first neuro exam that I
8       can find after arriving from Samaritan to Albany Med
9       showed that there was no withdrawal to pain.
10                       So basically, the -- the first exams
11      at Albany Med showed no function at all.  So it takes
12      some -- some time with low blood pressure for there
13      to be enough brain damage that the brain is actually
14      to a point that it can't recover any function.
15                       Q.   And if you had to quantify some
16      time, Doctor, could you provide me with an estimate?
17                       For example, one, you know, one week
18      to two weeks, one to two days, what would a general
19      estimate be so we can have an understanding of what
20      you mean by the term some time?
21                       A.   Hours.
22                       Q.   Thank you.
23                       A.   Not days.  I mean, you wouldn't
24      survive days but if there were, you know, four, five,
25      six hours or more of profound low blood pressure then
```

1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2       you might start to see more severe brain damage.
3                   Q.   And in one of your responses, you
4       stated that your colleagues in neurology and
5       radiology point to the cause of death as trauma.  And
6       therefore, that led to your professional opinion that
7       the primary diagnosis in this case was trauma
8       related.  Do you recall saying that?
9                   A.   Yeah.  So although it was
10      neurosurgery not neurology.
11                  Q.   Oh, I'm sorry.  Thank you.
12      Neurosurgery.  Is that appropriate in your field to
13      rely on doctors and other specialties in making your
14      primary diagnosis?
15                  A.   Well, the bottom line is -- is --
16      is mine.  I mean, I -- I use my consultants for help.
17      When we're talking about the diagnosis of subdural
18      hematoma and retinal hemorrhage then, you know,
19      obviously, I think those are very important consults
20      for me.  And but as I said to doctor -- to Mr. Klein
21      and I greatly iterated again and again here, I, in no
22      way, decreased my treatment for sepsis or the --
23                  Q.   Yes.
24                  A.   -- possibility of sepsis at any
25      time during the patient's stay in the hospital and my

Page 189

```
 1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2      -- even if trauma had not been on the board at all,
 3      the patient would have received exactly the same
 4      level of treatment for possible sepsis.
 5                      Q.   And frankly, it appears that
 6      notwithstanding a -- a Glasgow Coma score of zero or
 7      one upon arrival and no brain activity, you still
 8      treated this patient --?
 9                      A.   The -- the -- the lowest score is
10      three by the way.
11                      Q.   I'm sorry, is it five?
12                      A.   Three is the lowest score you can
13      get.
14                      Q.   Sorry.  Three.  And
15      notwithstanding the fact that -- I'll repeat.  Strike
16      that.  I'll repeat the question.  Notwithstanding the
17      fact that baby Thomas arrived with a Glasgow Coma
18      score of three and no signs of brain activity.  You
19      treated him with regard to a potential diagnosis of
20      sepsis as if he had a chance to make a recovery?
21                      A.   Yes.
22                      Q.   And -- and talking about your
23      earlier opinion that you relied on the neurosurgeons
24      and radiology, do you recall as you sit here today
25      without looking at the chart what their opinions
```

Page 190

```
1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2       were, or what their -- and/or what their diagnosis
3       were?
4                      A.   Dr. Waldman and Dr. German from
5       neurosurgery and the neurosurgery resident all have
6       notes that state subdural hematoma.  The radiology
7       note in the chart as we discussed earlier does not
8       mention hematoma, only describes a fluid collection
9       and then there are -- not everything that was -- the
10      set is documented in the chart.
11                     Q.   And is it -- is it true that you
12      wouldn't expect the radiology report to diagnose a
13      subdural hematoma because -- as that imaging does not
14      have the ability to show what the fluid is?
15                     A.   Usually, they will make that
16      diagnosis on the CT scan, but we do, however, rely on
17      an MRI to better -- to better get an idea.  But those
18      are the better questions for radiology and for
19      neurosurgery.
20                     Q.   Okay.  Thank you.  And did you
21      have any reason to question the radiologist's and
22      neurosurgeon's reports of subdural hematomas?
23                     A.   Well, again, the -- the radiology
24      final report did not mention the word hematoma and I
25      did not have reason to question the neurosurgeon
```

Case 1:17-cv-00626-DJS Document 66-91/142334, D804065.4721e Page 192 3 of 269

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        saying it's hematoma.  I try to keep -- as open

3        minded as I can, and I -- one of my notes does talk

4        about subdural hematomas of varying ages.

5                    I -- it's in one of my notes which

6        would be indicative that I was entertaining the idea

7        that this is not in one event but that there had been

8        more than one episode of bleeding.

9                    Q.   And in one of your responses, you

10       stated that although you cannot opine to baby

11       Thomas's cause of death, you have a hard time

12       explaining that all of his injuries relate to sepsis.

13       Can you explain what you meant by that?

14                   A.   It's -- it's -- the hematomas as

15       we've talked about repeatedly here would be an

16       unusual finding in sepsis as are the retinal

17       hemorrhages.

18                   Q.   Okay.  And an increased -- would

19       an increased white blood cell count be expected in an

20       infant such as baby Thomas when he is presented with

21       a subdural hematoma?

22                   A.   Yes, we can see -- we can see

23       counts go down with a subdural hematoma.  It's

24       interesting if the white blood cell counts went up

25       afterwards though, before the patient died.

Page 192

```
1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2                        Q.    What do you relate -- okay.  And
3        do you attribute that to the medication that you
4        provided?
5                        A.    No, I'm not sure why that was.
6                        Q.    And you were asked questions
7        earlier about an opinion that Samaritan Hospital
8        focused on a sepsis diagnosis and Albany Medical
9        Center focused on a diagnosis relating to trauma or
10       abuse.  Are you aware if Samaritan conducted all of
11       the imaging that Albany Medical Center conducted?
12                       A.    They did not.  I think the -- the
13       patient was too sick to do any imaging at Samaritan.
14                       Q.    You were asked questions about
15       whether or not the subdural hematomas that you were
16       made aware of, as being present in the brain of baby
17       Thomas, whether or not that could be related to birth
18       trauma.  Could that be related to trauma at birth
19       knowing that at the time of death Baby Thomas was
20       more than three months' old?
21                       A.    It would depend on how old the
22       subdural hematoma is if they're -- you should be able
23       to date, not me, but a radiologist or perhaps a
24       neurosurgeon would be able to or pathologists would
25       be able to date how old the blood is.  And -- and/or
```

Page 193

1    Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2    whether there were multiple episodes of bleeding.

3    Was there just evidence of one bleed at birth or were

4    there episodes -- is there blood of different ages.

5    That would demonstrate a reoccurrence of breeding --

6    bleeding.

7                    Q.   In this case, it's been noted

8    that Baby Thomas had two subdural hematomas.  One on

9    each side or bilateral and one was older, and the

10   other was newer or fresher.  Do you remember that

11   from reviewing your chart in treating Baby Thomas?

12                   A.   Yes.

13                   Q.   Now, knowing that and knowing

14   what you know with regard to the subdurals, if you

15   are able to answer this question please do.  If

16   you're not just tell me.  Are you able to say whether

17   or not the newer subdural could be related to birth

18   -- both locations?

19                   A.   I -- I -- I can't answer that.

20                   Q.   Okay.  Thank you.  And I believe

21   that you said and I'm asking you this to confirm, the

22   radiologists in this case believed that the injuries

23   were consistent with trauma, is that right?

24                   A.   I -- I couldn't hear you.

25                   Q.   I'm sorry.  The -- is it --

1    Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2    withdrawn.

3                    In this case, the radio -- did the

4    radiologist say that the injuries were consistent

5    with trauma?

6                    A.   Oh, you have the same report I

7    have, I -- I -- I -- I don't believe so, no.

8                    Q.   You don't have to look for it,

9    Doctor.  The radiologist said that the injuries were

10   not consistent with trauma?

11                   A.   He did not address whether it was

12   or wasn't.

13                   Q.   And in this case -- withdrawn.

14   And you were asked questions about the results of

15   investigation of Gram stain cultures.  Did you have

16   an opportunity to review any work that was conducted

17   by another doctor with regard to Gram stain cultures

18   of the -- of the eyes?

19                   A.   I -- I -- I don't know anything

20   about that.

21                   Q.   And you had stated in response to

22   a question that severe sepsis can cause brain death,

23   but it appeared to me and again, this could be a

24   fallacy of the electronic deposition process.  It

25   appeared to me that you were going to elaborate on

Page 195

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      your response, but another question was asked.  Can

3      severe sepsis cause brain death?

4                    A.   Well, that's what we were talking

5      about when you -- when we're -- you'd asked me to put

6      a time on it and I told you hours.

7                    Q.   Uh-huh.  Yes.

8                    A.   So severe sepsis causes low blood

9      pressure.  And if there's persistent low blood

10     pressure then the brains didn't get enough oxygen.

11     And over time that can cause global injury to the

12     brain and loss of function of the brain.  I -- I am

13     reluctant to try to put a time on that but I -- you

14     asked me to go ahead and put a ballpark and I would

15     -- and I said there would -- would have to be hours

16     of significant low blood pressure for there to be a

17     patient presenting in brain death.

18                    Q.   And would that include within

19     this ballpark of hours the brain either sending or

20     failing to send a signal to the body to cease or halt

21     respirations, meaning that the patient would stop

22     respirating?

23                    A.   A severe brain injury would

24     affect a patient's ability to breathe, yes.

25                    Q.   Okay.

Case 1:17-cv-00626-DJS Document 66-31 142934 Filed 06/11/21 Page 197 of 260

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                         A.    That -- that's a good point.  We

3          have many septic patients, severely septic patients

4          who are breathing -- who breathe fine.  It takes time

5          with sepsis and low blood pressure for there to be

6          that kind of injury to the brain.

7                         Q.    And you had spoken and given your

8          opinion about the fact that there was an autopsy

9          conducted in this case.  Would you agree with the

10         statement that an autopsy would be the best method to

11         determine injury to a patient?

12                        A.    I -- I would defer that question

13         to a pathologist.

14                        Q.    Okay.  Would you agree with the

15         statement that an autopsy would be considered in your

16         field or in your profession a definitive exam to

17         determine injuries if they're present?

18                        A.    Yeah.

19                        MR. KLEIN:  Objection.

20                        THE WITNESS:  As I answered a few

21         minutes ago, you know, pictures of the brain are

22         always second best to actually looking at the brain.

23         So ideally, you would actually have a -- a live

24         brain.  The problem with a dead brain, as I said a

25         few minutes ago, is that changes can occur that may

800.523.7887                    Associated Reporters Int'l., Inc.

Page 197

1    Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2    confound your findings.  And again, I'd ask you to
3    talk to an expert in this for that answer.
4                   BY MS. CALABRESE:  (Cont'g.)
5                   Q.   Okay.  Thank you.  In the absence
6    of a motor vehicle crash or crash in a different
7    vehicle and in your -- based upon your experience in
8    the field of pediatrics, what would be another
9    explanation for an acceleration deceleration injury
10   other than trauma?
11                  MS. MITCHELL:  Object to form.
12                  A.   There is always hematoma with
13   trauma.  The question is is it accidental or non-
14   accidental?
15                  MR. KLEIN:  Object to the form.
16                  BY MS. CALABRESE:  (Cont'g.)
17                  Q.   Other than -- other than non-
18   accidental trauma.  That was kind of a hinky
19   question.  Do you want me to rephrase it?
20                  A.   No, it depends on what you're
21   saying.  For this to be accidental trauma, it would
22   involve very high energy movement and then hitting an
23   object.  So, however, you can imagine that accident
24   happening, be it a fall, motor vehicle, pedestrian,
25   bicycle, it takes that -- that sudden violent

ARII@courtsteno.com                          www.courtsteno.com

**APPENDIX** **1220**

Page 198

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2          movement of the brain within the skull -- the skull

3          shearing little blood vessels and to allow bleeding.

4                    Q.   And you had provided your opinion

5          or given an answer with regard to the fact that

6          hitting a baby against a soft object with enough

7          force can cause a subdural hematoma.  That may be

8          contrary to a layman's understanding of this -- the

9          mechanics of this type of an injury.  Can you explain

10         why this would be true with regard to a soft object?

11                   MR. KLEIN:  Objection.

12                   A.   It doesn't -- using a hard

13         surface that you hit against there's -- there is

14         definitely a skull fracture.  So for there not to be

15         a skull fracture, that -- that -- that can happen and

16         in my experience has happened with a very high force.

17         Hitting up a baby's head against a soft object where

18         there's no obvious trauma, but that brain has moved

19         back and forth enough to shear those blood vessels

20         and cause subdural hematoma.

21                   BY MS. CALABRESE:  (Cont'g.)

22                   Q.   And isn't that what we're talking

23         about here the shearing of the blood vessel is

24         because the head is moving back and forth and the

25         concurrent -- concurrently or at the same time with

Associated Reporters Int'l., Inc.

1    Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2    the brain moving back and forth?

3              A.  Or --

4              MR. KLEIN:  Objection.

5              A.   -- because the brain is -- is

6    hitting something the -- the -- I mean, the skull is

7    hitting something and the brain does that and

8    recoils.  So it's that acceleration/deceleration that

9    causes the shearing of blood vessels.

10             BY MS. CALABRESE:  (Cont'g.)

11             Q.  And with regard to your opinion

12   that this is likely contacts between Baby Thomas and

13   a soft object, would that also explain why he did not

14   present with any bruising above his head?

15             A.  Yes.

16             Q.  And you had answered questions

17   with regard to working several days in a row.  Is it

18   common practice for doctors to work extended hours?

19             A.  Well, for attending doctors it

20   is.  We're getting better at it and it's taken a long

21   time.

22             Q.  And that's common knowledge

23   within your field that doctors unfortunately, for

24   various reasons tend to work very long shifts?

25             A.  There were -- there weren't

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      enough of us for a long, long time.  Finally -- it's

3      finally changed.  I've fought my whole career to get

4      more docs in there and now I'm ready to retire.  Go

5      figure.

6                 Q.   And not with -- are you there

7      because you froze on my end?  There you are.  Okay.

8      And notwithstanding this fact that doctors generally

9      work very long hours, is it fair or -- and true to

10     state that you would never put yourself in a position

11     to be unable to render proper treatment to a patient

12     because of the fact that you worked long shifts?

13                MR. KLEIN:  Objection.

14                A.   Absolutely.  I -- I would do

15     everything to avoid not getting the best care

16     possible.  We always have backup doctors, several

17     levels of backup doctors so that if you're too tired

18     and you want to go -- or you need a break, or a nap

19     you have a way to do that.

20                As I said, we're -- we're never on

21     call or on duty by ourselves.  There's always

22     resident doctors available.  So to give us breaks if

23     necessary, for -- for a nap or even more sleep.

24                Q.   And you were asked questions

25     about the written statement that you provided to the

Page 201

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2     Troy Police Department.  To clarify, did you write
 3     that statement?
 4                    A.   No, I made the corrections.
 5                    Q.   Okay.  And did you read the
 6     statement for accuracy prior to signing it?
 7                    A.   Yes.  And made corrections.
 8                    Q.   I believe -- And made
 9     corrections.  And I believe the statement was if it
10     were to be divided into paragraphs, approximately two
11     paragraphs.  Would you agree with that?
12                    A.   I -- I don't know how many
13     paragraphs.
14                    Q.   It was one -- on one page.
15                    A.   It's -- it was one page, yeah.
16                    Q.   One page.  And the record, the
17     medical record is at least two hundred -- the medical
18     record of Baby Thomas is at least two-hundred pages.
19     Is that your understanding of the length of the
20     record?
21                    A.   I don't know how long it is.  I
22     heard a lot of numbers.
23                    Q.   Okay, was two hundred pages one
24     of the numbers that you heard?
25                    A.   I mostly heard eighty something
```

Page 202

```
 1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2      and then I don't remember two hundred, no.
 3                  Q.   Okay.  And is it -- okay.  Is it
 4      fair to say that the one-page statement that you
 5      provided to the Troy Police Department is not
 6      inclusive of all of the diagnoses and treatments that
 7      you provided to baby Thomas?
 8                  A.   That's correct.
 9                  Q.   Thank you, Doctor, I appreciate
10      your time and attention today.  I recognize this day
11      was very long and this is a difficult process because
12      it's electronic.  But again, I do appreciate your
13      willingness to be here today, and your honesty in
14      going forward.  So thank you for that.  And I'm all
15      set.
16                  A.   Thank you.
17                  THE REPORTER:  We can't hear you.
18                  MS. CALABRESE:  Anybody have anything
19      else for doc?  You're muted, Brett.
20                  MR. KLEIN:  I do.  I'll let Michael go
21      first.
22                  MS. CALABRESE:  You're muted, Michael.
23      Michael, you're muted.
24                  MR. GINSBERG:  Not yet.  You said that
25      Klein said the first time and then.  Yes, if anybody
```

Page 203

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        wants to take a break for a minute, I think we should

3        just continue with the same progression and now since

4        we're back into the rebuttal questions.

5                         MR. KLEIN:  It won't be forever.

6                         THE WITNESS:  Keep going, keep going.

7                         MS. CALABRESE:  It won't be forever.

8        I'm sorry.  It won't be forever.

9                         MR. GINSBERG:  I only have a few more

10       questions.  Thank you.

11                        REDIRECT EXAMINATION

12                        BY MR. GINSBERG:  (Cont'g.)

13                        Q.   Doctor, there's been testimony

14       and questions with regard to a statement that was in

15       one of the police, the Troy police officers' records

16       where it indicated that you had stated this is a

17       murder.  And do you recall testifying upon

18       examination by Mr. Klein that you do not recall

19       making that statement?

20                        A.   I -- I mean, yes, I don't recall

21       making that statement.

22                        Q.   And you also testified that it

23       would not be within your normal pattern of behavior

24       to make such a statement, correct?

25                        A.   Correct.

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                          Q.    But you, as you sit here, right
 3          now, you can't definitively say that you, in fact,
 4          did not make that statement either, correct?
 5                          A.    I cannot.
 6                          Q.    Doctor, drawing your attention
 7          back to the deposition of a witness on C.O.T. Exhibit
 8          B of today's date.  You had the opportunity to review
 9          that record before you signed it, correct?
10                          A.    Before --.
11                          Q.    Why don't we wait for her to put
12          it up?  There we go.
13                          A.    Yes.  I reviewed that statement
14          and I made some changes.
15                          Q.    Right.  So you -- you had the
16          opportunity to review the statement, correct?
17                          A.    Yes.  I reviewed the statement
18          and made some changes.
19                          Q.    Okay.  And what was the reason
20          that you made the changes?
21                          A.    I was trying to improve the
22          accuracy of the statement.
23                          Q.    And the statement does not
24          mention sepsis, correct?
25                          A.    Yes.  It's not -- It's not meant
```

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      to be, it does not mention sepsis.  That's correct.

3                    Q.   And Doctor, you signed the

4      deposition, correct?

5                    A.   Yes.

6                    Q.   And could you read the last

7      sentence -- the last printed sentence above the

8      signature line?

9                    A.   There needs to be se -- severe

10     acceleration prior to hitting the hard object.

11                   Q.   Thank you.  I'm referring to the

12     one right above the signature line that begins with

13     false statements.

14                   I'm sorry, please scroll down Annette,

15     right there.

16                   MR. KLEIN:  Objection.  The sentence

17     speaks for itself.  The document says what it says,

18     but if you want him to read it.

19                   MS. MITCHELL:  Are you talking about

20     the typewritten portion?

21                   MR. GINSBERG:  Yes, the typewritten

22     portion that begins with false statement.

23                   BY MR. GINSBERG:  (Cont'g.)

24                   Q.   Could you read that portion,

25     Doctor?

Page 206

```
1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2                       A.   False statements made herein are
3        punishable with Class A misdemeanors pursuant to
4        Section 210.45 of the Penal Law, the State of New
5        York.
6                       Q.   And Doctor, to your knowledge,
7        did you put any false statements into this signed
8        deposition of a witness?
9                       A.   No false statements, no.
10                      Q.   Thank you.  I have no further
11       questions.
12                      RECROSS EXAMINATION
13                      BY MR. KLEIN:  (Cont'g.)
14                      Q.   Doctor, going back to your
15       transcript from 2009.  I don't know that anyone's
16       asked you this, so I wanted to.  You've -- you did
17       review it in preparation for today's testimony,
18       correct?
19                      A.   Yes.
20                      Q.   So was your testimony -- was your
21       testimony in 2009 true and correct to the best of
22       your recollection?
23                      A.   I did not go through it
24       carefully, I can do that now if you want me to.
25                      Q.   Well, I want to know if you
```

Case 1:17-cv-00626-DJS Document 66-91/14/2334 Filed 06/14/21 Page 208 of 269

Page 207

```
1         Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2         adopted or if there's anything about it that was --

3         do you wish to change or correct and so I was hoping

4         you would have gone through that.

5                     A.   I -- I read through it very

6         quickly.  I can read through it more slowly if you'd

7         like me to.

8                     MR. GINSBERG:  Objection to the form

9         of the question.

10                    MR. KLEIN:  Or maybe we could do it at

11        the -- at the end.  Then I'll finish the questions

12        now.

13                    BY MR. KLEIN:  (Cont'g.)

14                    Q.   So next question.  In terms of

15        Ms. Peck asked you about your -- your testimony that

16        this was trauma, but you couldn't rule out sepsis.

17        And then you asked -- answered questions from Ms.

18        Calabrese about what you knew in terms of the

19        culture, isn't that you -- you -- I didn't mean to

20        suggest strongly that you didn't do a lot.  You did a

21        lot in the two days but your role in this case was --

22        was just that it was over two days or so, correct?

23                    A.   Yes, I'm quite sure it was a full

24        two days, yes.

25                    Q.   Correct.  Correct.  So -- so what
```

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      I was getting at and what I want to confirm now is,

3      you don't know what the culture showed, correct?

4                      A.   No, in fact, I --

5                      Q.   Yeah.

6                      A.   -- stated that they were negative

7      although I -- I -- I'm not sure --there was never

8      negative culture.  Does anyone know?

9                      Q.   The autopsy I have in front of

10     me, says, blood culture positive for Streptococcus

11     pneumonia on initial presentation at the hospital

12     parenthesis nine twenty-one zero eight.  That's one

13     of the anatomic diagnosis.  I'll represent that

14     that's what Dr. Sikirica put in his report.

15                     MR. GINSBERG:  Object to the form.

16                     BY MR. KLEIN:  (Cont'g.)

17                     Q.   And -- and then Sub A, it says,

18     acute and chronic pneumonia with severe -- severe

19     microscopic --.

20                     A.   Uh-huh.

21                     Q.   So as -- for instance, you -- you

22     didn't know about those findings in the approximately

23     day or so that you were involved in the case,

24     correct?

25                     A.   I did not.

Associated Reporters Int'l., Inc.

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

 2                    Q.   So when you give an -- an opinion

 3         about trauma, you're just talking about what you knew

 4         in your snippet of time in this case, notwithstanding

 5         that you did a lot.

 6                    A.   Absolutely.

 7                    Q.   Okay.

 8                    A.   Absolutely -- absolutely with the

 9         caveat that I treated this as sepsis and did not

10         compromise that in any way because of the trauma

11         diagnosis --

12                    Q.   Correct.

13                    A.   -- or trauma concern.

14                    Q.   This is so -- so -- and the

15         reason why we're asking you all these questions is

16         this case is about whether or not the police acted,

17         violated Mr. Thomas's rights when they coerced a

18         false confession out of him, which was subsequently

19         thrown out by the Court of Appeals and not allowed

20         --.

21                    MR. GINSBERG:  Object to -- object to

22         the form.  Object to the prior charge.

23                    MR. KLEIN:  Let me finish the

24         question, right.  Let me finish first.

25                    BY MR. KLEIN:  (Cont'g.)
```

Case 1:17-cv-00626-DJS Document 66-91 14/23/24 Filed 06/14/21 Page 298 of 269

Page 210

1     Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2                         Q.   And so no one's questioning your,

3        that you did what you could during that time.  But

4        you also didn't know so -- so when you talk about

5        whether you believe this was trauma or not, you're --

6        you're -- you're limited to what you knew and what

7        you know.  You don't know what those -- that this --

8        you didn't know that Matthew was severely infected.

9        You may have suspected it, but you didn't know,

10       correct?

11                        MR. GINSBERG:  Object to the form.

12                        MR. KLEIN:  Okay.

13                        BY MR. KLEIN:  (Cont'g.)

14                        Q.   Now, with pneumococcal disease in

15       children under two like Matthew that didn't have his

16       four-month vaccine.  Are you aware of cases where the

17       -- the pneumococcal disease can progress to death --

18       to death in a matter of forty-eight hours or so?

19                        A.   Yes, yeah.

20                        Q.   Okay, and that would be without

21       trauma, is your answer still a yes?

22                        A.   Yes, yes.

23                        Q.   Okay.  Now, with regard to the

24       questions about the subdural hematoma that was in the

25       records, not in the radiology report.  Is it your

Case 1:17-cv-00626-DJS Document 66-31/172334 Filed 06/14/21 Page 212 of 269

Page 211

1     Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2     understanding that this mention or finding in the

3     records of a -- of an S.D.H. is based on opinion but

4     not based on any objective radiograph?

5                    MS. MITCHELL:  Object to the form.

6                    A.   I don't think that I'm -- since

7     we're talking about the neurosurgical opinion, I -- I

8     don't think I can comment on that, you know, Dr.

9     Waldman, Dr. German are, you know, thorough good

10    physicians, and would never give an opinion without

11    looking at the CAT scan.  So -- so to say it's

12    something separate from their -- from the CAT scan, I

13    think it would be misleading.

14                    BY MR. KLEIN:  (Cont'g.)

15                    Q.   So -- so it would be fair to say

16    that you would think it's more likely than not that

17    they would have reviewed the CAT scan before opining

18    that there was an S.D.H., but you're not sure.

19                    MR. GINSBERG:  Object to the form.

20                    THE WITNESS:  Absolutely no, I have no

21    question that they would review the CAT scan before

22    writing an opinion in the chart.

23                    BY MR. KLEIN:  (Cont'g.)

24                    Q.   Okay.  You talked about some

25    patients you've seen with severe sepsis.  Have --

Page 212

1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2          don't have difficulty breathing.  Do you recall that

3          line of questioning?

4                      A.   We have a lot of patients with

5          sepsis and -- and initially, they -- they breathe

6          very well on their own.  That depends on their age.

7          We have patients that we get through sepsis without

8          putting on a breathing machine.

9                      BY MR. KLEIN:  (Cont'g.)

10                     Q.   Okay.  Matthew had -- had

11         pneumonia, acute and chronic pneumonia.  Those

12         patients have difficulty breathing, correct?

13                     A.   Yes.

14                     Q.   Okay.

15                     A.   By definition, yes.

16                     Q.   Now, you were asked questions

17         about your statement --?

18                     A.   Can I -- can I -- can I comment

19         on this?

20                     Q.   Sure.

21                     A.   I want to go back, but I -- but I

22         believe that the -- maybe one of you know this off

23         the top of your head that they described apnea as --

24         as one of the reasons for intubation.

25                     Q.   At Samaritan?

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    A.   Yeah.  Okay, I thought I saw that
 3          something more, that it wasn't just respiratory
 4          distress, but they also described apnea.  Maybe I'm
 5          wrong on that.
 6                    Q.   I thought it was lethargy but if
 7          you want to take a look please do.
 8                    A.   No, I just see the apnea test
 9          that we did for -- for brain death.
10                    Q.   Okay.  Are you familiar with the
11          Neuropathologist Jan Leestma?
12                    A.   No.
13                    Q.   Okay.  Were you aware that a -- a
14          neuropathologist testified in this case that, and in
15          this, a death was due to the overwhelming bacterial
16          infection and not due to trauma?
17                    MS. CALABRESE:  This is Christina,
18          objection.
19                    THE WITNESS:  I -- I was not aware of
20          that particular pathologist relaying.
21                    BY MR. KLEIN:  (Cont'g.)
22                    Q.   Okay.  Now, you were asked a
23          bunch of questions that -- about whether you would
24          alter your opinion for the police.  And I would just
25          say from our perspective, that is not what we've
```

Page 214

```
 1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2      suggested.
 3                  My question to you is whether you
 4      think, based on hearing these statements attributed
 5      to you by the police, that you think the police
 6      skewed or exaggerated what you told them to suit the
 7      direction of the law enforcement investigation.
 8                  MS. CALABRESE:  This is Christina,
 9      objection.
10                  MR. GINSBERG:  Object to the form.
11                  MS. PECK:  Objection.
12                  A.   I really, I can't answer that.  I
13      don't know why the police would have gotten --
14      exaggerated what I said to them, I really -- it's
15      hard to understand.  Excuse me, Mr. Klein?
16                  BY MR. KLEIN:  (Cont'g.)
17                  Q.   Yes.
18                  A.   I did find a note -- a note from
19      Samaritan.  I don't know how to identify it for you.
20                  Q.   Can you just tell us what it
21      says?
22                  A.   So the note -- a note from Dr.
23      Kardos as part of her transfer note.  And she says he
24      -- he had for a few days and she was -- he was -- had
25      some vomiting, temperature a hundred point four this
```

Page 215

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2        a.m., was well and then had rapid decline with

3        increased respiratory effort and decreased

4        responsiveness.

5                    Per E.M.S. patient with agonal

6        respirations, four to five per minute.  So that would

7        be severe bradycardia and would be atypical of

8        respiratory distress from pneumonia and more typical

9        of -- of the respiratory distress based on a brain

10       injury.

11                   That's not to say that the problem

12       wasn't pulmonary pneumonia, but it would have had

13       like I spoke to -- said earlier, there would have

14       been enough ongoing decrease circulation to the brain

15       from sepsis, that the brain was starting to show

16       signs of brain damage.

17                   Q.   But you -- you're not saying

18       that, you know whether the brain injury was from

19       trauma, there could be an old S.D.H. that had re-

20       bleeds that got infected because of the meningitis

21       and other aspects of the sepsis, correct?

22                   A.   Well, that would be --.

23                   MS. CALABRESE:  Objection to form.

24                   THE WITNESS:  I -- I think --.

25                   MS. CALABRESE:  It's Christina,

 1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

 2      objection to form.

 3                    BY MR. KLEIN:   (Cont'g.)

 4                    Q.   You can answer.

 5                    A.   First -- first and second on the

 6      list would be, you know, that this was, you know,

 7      streptococcal -- streptococcal sepsis and meningitis,

 8      causing enough circulatory problems to the brain that

 9      there was global brain injury, would be one of the

10      top two and the other would be the trauma.  I think

11      number three would be old trauma and re-bleed.

12                    Q.   But the -- the -- in terms of the

13      -- the collections of blood being of indeterminate

14      age one newer, one older, I think it was determined

15      that the newer one was not consistent with trauma.

16      Do you -- do you recall that?  Any -- any anything to

17      that effect?

18                    A.   No.

19                    Q.   Okay.  So the older one -- the

20      older one.  Yeah.

21                    MS. MITCHELL:  I just need to put an

22      objection out there.  Would you -- would you like me

23      to have the witness step out so there's no charge of

24      coaching or can I just make a quick statement?

25                    MR. KLEIN:  I'm fine with it.

800.523.7887                    Associated Reporters Int'l., Inc.

1       Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2       Christina, are you okay with it?

3                    MS. CALABRESE:  Of course.

4                    MS. MITCHELL:  Okay, I -- just for a

5       standing objection.  I think the witness has been put

6       in a very difficult position because there are a lot

7       of facts that are being presented to him of diagnosis

8       and -- and conclusions after the fact, he wasn't

9       involved reading from things that he doesn't have.

10                   You know, so I just feel that that has

11      colored everything, and I'd just like to put that out

12      there.  It's very hard for him to respond when you

13      keep bringing up things that he has no personal

14      knowledge of.

15                   MR. KLEIN:  We -- we could pose

16      hypotheticals to the witness based on the facts.  And

17      I don't think any of us are disputing the -- the

18      facts, even if or -- or the presentation of disputed

19      facts in this case.

20                   MR. GINSBERG:  I'd like to -- I'd like

21      to go on record and -- and dispute that just the last

22      statement from Mr. Klein.  You are not permitted to

23      give hypotheticals to anyone unless they're an expert

24      witness.  So let's just go ahead with the question.

25                   MR. KLEIN:  Yeah, I don't think -- I

# APPENDIX

**1240**

Page 218

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        don't think that I will -- it's neither here nor
 3        there.  Okay.  Okay, that's all I have, Dr. -- Dr.
 4        Edge, thank you very much.
 5                        THE WITNESS:  Thank you.
 6                        MR. KLEIN:  Anyone else?
 7                        MS. CALABRESE:  None for the State of
 8        New York.  Thank you.
 9                        MS. PECK:  No questions.  Thank you.
10                        MR. GINSBERG:  I have no further
11        questions.  Doctor, thank you very much for your
12        time.  I know it's been a long haul today.
13                        THE WITNESS:  Thank you.
14                        MR. KLEIN:  Yeah.  Good luck, again,
15        sir.  Stay safe.
16                        THE WITNESS:  You too.
17                        MR. KLEIN:  Okay.  Thanks, everybody.
18        See you soon.
19                        MR. GINSBERG:  Okay.  Thank you.
20        Thank you, Annette.
21                        (Off the record, 3:39 p.m.)
22
23
24
25
```

Page 219

```
 1              Thomas v City of Troy et al - 7-30-2020 - Walter Edge

 2

 3      STATE OF              )
        COUNTY OF             )
 4
                I, WALTER EDGE, M.D., have read the foregoing
 5      record of my testimony taken at the time and place noted
        in the heading hereof and do hereby acknowledge:
 6      (Please check one)
                     ( ) That it is a true and correct transcript of
 7      same.
                     ( ) With the exceptions noted in the attached
 8
        errata sheet, it is a true and correct transcript of same.
 9
                                   X
10                                  WALTER EDGE, M.D.

11      Sworn to before me this
        _____day of _____, 2020.
12      X_____
        NOTARY PUBLIC
13      My Commission Expires:
        _____
14

15

16

17

18

19

20

21

22

23

24

25
```

Page 220

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

 2

 3        I, ANNETTE LAINSON, do hereby certify that the

 4   foregoing testimony of WALTER EDDGE was taken by me, in

 5   the cause, at the time and place, and in the presence of

 6   counsel, as stated in the caption hereto, at Page 1

 7   hereof; that before giving testimony said witness(es) was

 8   (were) duly sworn to testify the truth, the whole truth

 9   and nothing but the truth; that the foregoing typewritten

10   transcription, consisting of pages number 1 to 218,

11   inclusive, is a true record prepared by me and completed

12   by Associated Reporters Int'l., Inc. from materials

13   provided by me.

14

15   ANNETTE LAINSON, Reporter

16

17

18

19

20

21

22

23

24

25
```

Case 1:17-cv-00626-DJS Document 66-9 1/14/2024 Filed 06/14/21 Page 223 of 260

Page 221

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

 2           ASSOCIATED REPORTERS INTERNATIONAL, INC.
                         (800) 523-7887
 3
         Date:
 4       Case Name:  Thomas v City of Troy
         Index Number:  17-CV-626
 5       Deponent:  Walter Edge, M.D.
         Deposition Date:  7-30-2020
 6       Examining Attorney:  Mr. Ginsberg

 7       Dear Dr. Edge:

 8
         Please read and make any changes and/or corrections in
         your testimony and sign the transcript in the presence of
 9
         a notary public.  Please do so within thirty (30) days.
10       If you fail to sign the transcript within thirty (30)
         days, it will be delivered to the appropriate parties
11       without signature.  Return the transcript with
         corrections, if any, to:
12           PATTISON, SAMPSON, GINSBERG & GRIFFIN:
             BY:  MICHAEL E. GINSBERG
13               RHIANNON SPENCER
         22 First Street
14       Troy, New YORK 12180
         CORRECTIONS:
15
_____        Word or phrase:  _____
16
                Corrected to:   _____
_____        Word or phrase:  _____
17
                Corrected to:   _____
18      _____        Word or phrase:  _____
                Corrected to:   _____
19      _____        Word or phrase:  _____
                Corrected to:   _____
20      _____        Word or phrase:  _____
                Corrected to:   _____
21      _____        Word or phrase:  _____
                Corrected to:   _____
22      _____        Word or phrase:  _____
                Corrected to:   _____
23
_____
         Date Signed
24                                      _____
                                        WALTER EDGE
25
```

Page 222

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

800.523.7887

Associated Reporters Int'l., Inc.

## A

**a.m** 1:13 6:2 14:25 15:2 52:12 52:13 57:7 60:11 68:16 215:2
**A.M.C** 40:11
**A.M.C.H** 49:9
**A/P** 46:21
**ability** 190:14 195:24
**able** 16:14 23:22 58:24 96:22 97:5 156:20 165:9,12,20 166:10,13 192:22,24,25 193:15 193:16
**abnormal** 38:9 170:13
**absence** 38:19 110:5 120:13 197:5
**absent** 49:15
**absolutely** 106:22 107:15 172:11 172:16 173:25 174:22 200:14 209:6,8,8 211:20
**abuse** 36:16 51:17 58:18 59:11 59:18,18 61:15 62:13 90:19 107:9,11 119:3,14 120:14 122:3 139:21 145:24 175:23 176:6,13,13 180:14 182:5,9 192:10
**abusive** 36:12,25 182:24
**academic** 11:24 12:2
**Academy** 9:22
**acceleration** 37:21 58:15 120:11 122:18 139:24 140:8 197:9 205:10
**acceleration-deceleration** 37:15
**acceleration/** 183:4
**acceleration/deceleration** 199:8
**acceptable** 16:5 110:14
**access** 85:19
**accident** 36:23 58:17 59:3,4 120:14,14 138:24 139:2 197:23
**accidental** 36:25 57:16 58:23 59:6 90:19 93:3 111:8,9 138:4 138:8,9,14,22 142:7,8 197:13 197:14,18,21
**accommodate** 173:19
**accompanied** 57:2
**account** 119:25
**accuracy** 179:2 201:6 204:22
**accurate** 67:8 159:2,2,5 185:13
**accurately** 69:11
**accused** 76:15
**acknowledge** 219:5

**acronym** 39:21
**acted** 209:16
**action** 68:24 169:17
**actions** 169:23
**active** 12:19
**activity** 15:19 186:18 189:7,18
**actual** 23:23 40:24 55:8,10,12 80:8 99:15 100:11
**acute** 208:18 212:11
**ad** 49:4
**Adair** 60:4 61:18
**Adam** 1:6 75:21
**add** 27:8 35:9 142:2 174:5
**added** 102:5
**addition** 12:18 16:2 101:16 102:4
**additional** 48:9 69:3 99:19
**address** 166:8 194:11
**adequately** 27:22
**adjust** 27:14
**adjusted** 91:6
**administer** 26:12
**Administrative** 12:3
**administratively** 11:5
**admission** 26:15,16,19 49:8 52:6 52:20 57:15,21 125:20 156:9
**admitted** 49:5
**adopted** 207:2
**Adrian** 1:3 68:22 71:23 72:8 75:11 84:21 157:22 169:17
**Adriana** 20:25 21:3
**advance** 161:7
**advanced** 156:4
**advise** 19:15 65:7
**advised** 64:19
**advocate** 176:24
**affect** 105:25 195:24
**affirm** 6:7 22:25
**afternoon** 68:21
**afterward** 13:5
**age** 33:18 44:3 94:24 110:4,20 123:9 126:13 127:14 212:6 216:14
**aged** 93:8
**agency** 171:11
**ages** 58:14 93:11,15,15 191:4 193:4
**ago** 57:21 79:6,9 159:15 177:25 180:6 183:13 196:21,25

800.523.7887

Associated Reporters Int'l., Inc.

**agonal** 215:5
**agree** 19:25 39:9 70:25 74:25
 78:15 82:2 89:2 91:14,17
 93:22 94:9 100:20 104:19
 105:19 126:17 128:23 148:12
 148:23 174:20,23 175:21 176:9
 179:8 196:9,14 201:11
**Agreed** 144:14
**agreeing** 54:5
**ahead** 18:3 19:14 23:25 47:10
 56:23 89:13 95:3 170:9 173:13
 195:14 217:24
**ailing** 8:20
**ailment** 31:13
**ailments** 31:5
**akin** 179:3
**al** 1:1 2:1 3:1 4:1 5:1 6:1 7:1
 7:11 8:1 9:1 10:1 11:1 12:1
 13:1 14:1 15:1 16:1 17:1 18:1
 19:1 20:1 21:1 22:1 23:1 24:1
 25:1 26:1 27:1 28:1 29:1 30:1
 31:1 32:1 33:1 34:1 35:1 36:1
 37:1 38:1 39:1 40:1 41:1 42:1
 43:1 44:1 45:1 46:1 47:1 48:1
 49:1 50:1 51:1 52:1 53:1 54:1
 55:1 56:1 57:1 58:1 59:1 60:1
 61:1 62:1 63:1 64:1 65:1 66:1
 67:1 68:1 69:1 70:1 71:1 72:1
 73:1 74:1 75:1 76:1 77:1 78:1
 79:1 80:1 81:1 82:1 83:1 84:1
 85:1 86:1 87:1 88:1 89:1 90:1
 91:1 92:1 93:1 94:1 95:1 96:1
 97:1 98:1 99:1 100:1 101:1
 102:1 103:1 104:1 105:1 106:1
 107:1 108:1 109:1 110:1 111:1
 112:1 113:1 114:1 115:1 116:1
 117:1 118:1 119:1 120:1 121:1
 122:1 123:1 124:1 125:1 126:1
 127:1 128:1 129:1 130:1 131:1
 132:1 133:1 134:1 135:1 136:1
 137:1 138:1 139:1 140:1 141:1
 142:1 143:1 144:1 145:1 146:1
 147:1 148:1 149:1 150:1 151:1
 152:1 153:1 154:1 155:1 156:1
 157:1 158:1 159:1 160:1 161:1
 162:1 163:1 164:1 165:1 166:1
 167:1 168:1 169:1 170:1 171:1
 172:1 173:1 174:1 175:1 176:1
 177:1 178:1 179:1 180:1 181:1
 182:1 183:1 184:1 185:1 186:1

 187:1 188:1 189:1 190:1 191:1
 192:1 193:1 194:1 195:1 196:1
 197:1 198:1 199:1 200:1 201:1
 202:1 203:1 204:1 205:1 206:1
 207:1 208:1 209:1 210:1 211:1
 212:1 213:1 214:1 215:1 216:1
 217:1 218:1 219:1 220:1 221:1
 222:1
**Albany** 2:12,15,18 7:22,24,25
 8:2,5,7 10:9 11:25 14:18
 15:15 16:10,24 17:7 22:20
 23:4 25:9,13 61:23 66:4 69:18
 74:8 76:12 103:25 104:6 107:7
 119:20 121:22 181:24 187:5,8
 187:11 192:8,11
**align** 173:22
**alive** 27:13
**allegations** 79:11 82:11 83:2
 169:22
**alleged** 77:19 79:21
**alleging** 169:19
**allow** 19:4 67:15 153:9 198:3
**allowed** 172:7 209:19
**allowing** 22:10
**alter** 172:6,9 174:2 213:24
**altering** 173:18
**amend** 87:19
**American** 9:22
**amount** 180:8,20
**anatomic** 208:13
**and/or** 86:12 98:23 179:2 190:2
 192:25 221:8
**Andrea** 61:2
**Annette** 21:4,15 54:23 55:23
 95:18 156:14 167:25 169:10
 173:10 205:14 218:20 220:3,15
**announcement** 184:4
**answer** 10:22 17:10,12,14,16
 18:8,15,22 19:5,15,15 20:2
 22:10 35:18 37:10 62:24 63:7
 63:8 77:2,15 78:20 83:19 85:9
 87:19 89:20 101:13 103:22
 116:2 118:15 122:8 123:15
 127:16 141:19 143:22 145:3
 148:9 152:8 155:16 171:24,25
 193:15,19 197:3 198:5 210:21
 214:12 216:4
**answered** 118:7 196:20 199:16
 207:17

**answering** 19:6
**answers** 3:9 98:21 116:7
**antibiotic** 185:5
**antibiotics** 86:22 106:23
**anybody** 202:18,25
**anymore** 36:3
**anyone's** 206:15
**anyway** 18:19
**apart** 50:24
**apnea** 44:13,15 212:23 213:4,8
**apparently** 15:22 38:17 56:18
  57:2
**Appeals** 209:19
**APPEARANCES** 2:2
**appeared** 27:19 98:10 153:20
  194:23,25
**appears** 44:12,16 98:10 153:21
  189:5
**appease** 22:9 160:22 161:12
**appreciate** 163:15 202:9,12
**appropriate** 62:5 82:21 135:15
  144:10 145:19 150:10 171:8,9
  183:25 185:4 188:12 221:10
**approximate** 28:13
**approximately** 13:10 14:12 28:9
  74:20 79:8,8 201:10 208:22
**area** 29:11 47:25 48:8 59:8
  93:16 164:13,17 181:11,23
  183:9
**areas** 174:8
**argue** 37:18
**arranged** 14:17
**arrival** 189:7
**arrived** 15:8,15 28:3 127:24
  187:4 189:17
**arriving** 15:6,7 187:8
**Art** 134:7
**articles** 114:18
**asked** 64:2 69:4 74:3 81:18
  84:19,20 98:21 122:12 150:22
  152:15 155:21 164:4,5,21
  168:7 170:3,19 171:3 179:14
  180:24 182:20 192:6,14 194:14
  195:2,5,14 200:24 206:16
  207:15,17 212:16 213:22
**asking** 18:16 23:9,11 29:8 82:25
  83:3,6 89:5 91:21 92:3 107:5
  115:20 137:7 142:16 145:2
  150:21 156:7 160:3,4 170:24
  170:25 171:2 193:21 209:15

**aspect** 98:3
**aspects** 182:8 215:21
**assault** 62:14 174:16,17
**assaulted** 174:9
**assess** 46:25 56:22
**assessment** 26:24,25 41:10,14
  44:19 46:8,20,25 58:9 59:24,25
  132:25
**assessments** 133:6
**assigned** 11:10
**assist** 145:16
**associated** 114:19 220:12 221:2
**assuming** 113:24 114:3 185:12
**assure** 131:2
**asterisk** 176:10
**attached** 219:7
**attacked** 161:13
**attempt** 65:11
**attempting** 31:12
**attended** 12:22
**attending** 8:11 10:13 29:8 40:25
  43:16 46:18 48:15 101:23
  123:25 125:24 128:5 132:14,14
  132:15,16,17 149:17 199:19
**attention** 10:5 13:6 25:24 32:11
  32:16 41:8 52:5 54:9 55:16,18
  59:20 66:25 85:22,25 121:13
  132:2 136:5 168:6 202:10
  204:6
**attest** 18:16
**attestation** 54:3
**attorney** 2:10 3:15 7:9 19:12
  21:23 23:12 65:21,22 75:9
  78:17 80:22,23,24 81:6 111:17
  134:6,12 145:20 153:21 162:17
  169:15,16 172:14 174:4 221:6
**Attorney's** 84:22
**attorneys** 3:3 22:23 73:22 81:6
  163:24 171:3 177:4,8 179:15
  184:18
**attribute** 192:3
**attributed** 77:8 120:21 214:4
**atypical** 215:7
**audience** 184:3
**audio** 158:16
**authenticity** 18:9
**authored** 9:7
**authoring** 182:11
**authority** 180:13

**autop** 165:24
**autopsy** 85:15 115:8,18 165:12
  165:19,24 169:25 196:8,10,15
  208:9
**available** 57:4 185:8 200:22
**avoid** 200:15
**avoidance** 72:6
**awaiting** 56:20
**aware** 69:8 72:7,10,18 73:6 87:2
  93:17 106:6 109:25 115:3,4,7
  115:10,21,24 119:17 133:7,25
  154:6 167:7 183:16 192:10,16
  210:16 213:13,19
**axial** 33:3,9 97:25 98:13 100:6

**B**

**B** 5:2,7 48:25 49:4 66:21,25
  67:19,20,24,25 68:2 204:8
**B.L** 39:24
**babies** 110:20
**baby** 35:24 56:17 110:17,23
  122:12,19,23 174:9,10,13,16
  182:21 183:12 184:20,24 186:6
  186:12,17 189:17 191:10,20
  192:16,19 193:8,11 198:6
  199:12 201:18 202:7
**baby's** 57:5 198:17
**back** 18:24 19:24,25 23:7 24:20
  25:4 34:9 35:22 43:11 58:6
  68:10 87:23 88:3 93:9 97:3,8
  97:16 109:20 112:21,23 113:4
  116:7 118:3,4,9,16,19 121:11
  123:4,21 126:21,23 150:5,6
  152:16,22,24 158:25 162:14
  170:6 177:11 178:10,14 198:19
  198:24 199:2 203:4 204:7
  206:14 212:21
**background** 7:20 175:3
**backup** 200:16,17
**bacteria** 86:18 113:23 114:16
  185:22,24
**bacterial** 86:18 87:7 90:20
  105:18,22,25 111:11 155:7
  156:5 184:17,21,25 185:4,7,18
  213:15
**Bailey** 2:16 163:23
**balanced** 174:2
**ballpark** 195:14,19
**banker** 22:23
**barred** 106:23 109:19

**base** 102:22 176:23
**based** 46:16 77:8 103:19 117:13
  126:15 128:9 129:12 130:24
  139:19 140:22 145:6,23 154:5
  155:20 156:4 163:2 182:15
  197:7 211:3,4 214:4 215:9
  217:16
**basic** 31:11
**basically** 27:22 187:10
**basing** 129:10,11
**basis** 20:17 42:11
**Bates** 146:15 147:7
**bearing** 161:25
**bed** 122:19
**bedside** 91:4
**beginning** 7:21 51:5 106:21
  158:12
**begins** 205:12,22
**behavior** 145:6 203:23
**believe** 13:25 14:11 21:17 51:23
  60:21 65:20 66:13 70:2 97:3
  115:9 146:9 155:7 163:10,12
  164:14 166:14 180:7,13 182:21
  193:20 194:7 201:8,9 210:5
  212:22
**believed** 193:22
**benefit** 160:15
**best** 22:11 97:19 109:19 118:8
  122:8 137:20 159:7 165:13
  176:2,3 196:10,22 200:15
  206:21
**better** 36:4 158:10 164:25 165:9
  165:18,20,25 166:4 190:17,17
  190:18 199:20
**beyond** 83:19 93:15 111:16
  161:13
**bicycle** 197:25
**big** 176:20
**bigger** 67:17
**bilateral** 33:3 39:5,20 41:15
  44:2 47:2 50:8,14,16 51:6,7
  51:14 53:9 60:13 93:7 97:24
  98:12 100:6 102:21 126:12
  127:14 128:13,14 193:9
**birth** 49:10,12 93:24,25 94:7
  154:9,13,25 155:18 156:7
  164:6,10 167:11 192:17,18
  193:3,17
**birth-related** 93:18

800.523.7887                                      Associated Reporters Int'l., Inc.

**bit** 23:12 45:5 48:13 53:4
**Blaine** 81:19,21 83:12
**bleed** 56:19 193:3
**bleeding** 32:8 35:17,22 58:20
  94:8 111:19,25 123:5 167:13
  180:21 191:8 193:2,6 198:3
**bleeds** 215:20
**blood** 16:3,4 27:13,15 33:18,18
  33:21,21 41:18 47:18 86:17,18
  87:3,3,22 88:18 89:10 90:5
  91:5 94:21,21 98:17,22 99:25
  103:25 104:18 105:14 106:25
  115:8 123:5,7 130:14,15,17
  164:15 165:3,22 185:6 187:12
  187:25 191:19,24 192:25 193:4
  195:8,9,16 196:5 198:3,19,23
  199:9 208:10 216:13
**blood-borne** 88:24
**blown** 107:16
**board** 9:24,25 10:2 133:15 189:2
**body** 83:24 185:25 195:20
**bone** 104:23
**bones** 50:23
**bottom** 34:7 40:24 48:13 52:22
  55:24 56:6 66:14 70:12 124:12
  124:16,16 125:16 140:11 141:5
  147:3,8 168:2 188:15
**boxes** 22:23
**boy** 60:8 67:25 68:2
**bradycardia** 215:7
**brain** 27:19,20 30:9,13 31:25
  32:2 33:8,8,11,12 35:20,23
  38:14,16,19,19 41:19,20,22
  44:10,13,16 47:11,18,19 48:8
  48:9 50:23,24 87:23 89:17
  90:6,7,9 95:5 98:9 112:9
  123:3 130:21 140:3,4 142:21
  142:25 165:4,13,22 166:4,5
  170:13 180:22 186:13,14,18,24
  187:6,13,13 188:2 189:7,18
  192:16 194:22 195:3,12,12,17
  195:19,23 196:6,21,22,24,24
  198:2,18 199:2,5,7 213:9
  215:9,14,15,16,18 216:8,9
**brains** 195:10
**break** 23:8 64:7 67:13 68:3,5
  107:20,25 108:5,18,25 109:13
  137:6 153:3 160:5 200:18
  203:2

**breaks** 130:18 200:22
**breathe** 27:21 195:24 196:4
  212:5
**breathing** 15:20 26:11 44:14
  196:4 212:2,8,12
**breeding** 193:5
**Brett** 2:4 68:22 85:8 127:5
  150:4,25 154:3 156:19 159:19
  168:21 173:4 202:19
**brief** 40:4
**briefly** 7:20 9:10 74:15 79:10
  83:12 184:2
**bring** 15:24 19:24 66:9,10
  109:23 160:25 168:5
**bringing** 217:13
**broad** 120:18
**broader** 172:5
**Broadway** 2:4
**brother** 60:17 61:6
**brought** 68:25 87:17
**bruises** 49:13
**bruising** 49:14 199:14
**Bry** 84:13
**Bryce** 81:19,21 83:12 84:13
**bumping** 140:7
**bunch** 213:23
**business** 16:10,24 17:7 25:14,21
  117:7
**busy** 159:9

---

### C

**C** 4:2 67:23 96:9
**C.O.T** 17:6 204:7
**C.P** 32:22
**C.P.R** 27:24
**C.P.S** 57:5 60:14 61:2,8,19,24
  62:5 176:6
**C.T** 31:21 33:20 39:7 40:12 44:2
  44:6 50:4,9 53:10 54:6,10,19
  54:21 55:9,12 56:19 88:11
  97:11,23 99:8,20 100:11 101:6
  101:10 103:9 123:7 126:12,16
  127:13,20,25 128:4 130:24
  132:4 164:22,24
**Calabrese** 2:11 4:5 20:19,22
  21:3,7,9,13,20,22 22:6,15,18
  23:11,17,21,25 24:6,8,11,16
  24:24 36:10,18,21 39:15 42:7
  42:10,13,17,23,25 43:3 71:11
  71:17 76:23 77:10,13 78:4,9

78:15 82:5,8 85:7,13 89:19,22
89:24 90:3 91:24 92:12 99:10
100:16,23 102:25 108:2,20,24
109:4 114:7 115:12,15 123:12
124:15 126:20 127:4,10,16
133:9,12 134:18 143:9,20
144:5,15 146:13,18 147:11,17
149:2,5,7 150:3,24 151:11,14
151:20 152:2,21 153:7,13,16
156:25 157:5,8,25 158:4,10
160:14 161:2 168:16 169:9,13
169:15 172:4 173:4,9,14
179:13 180:23 181:20,21
182:10 197:4,16 198:21 199:10
202:18,22 203:7 207:18 213:17
214:8 215:23,25 217:3 218:7

**call** 11:6 14:23,24 15:24 30:6
37:15 53:20 61:2 160:4 200:21

**called** 30:25 31:17 32:5 49:8
53:10,12 56:16 60:6 73:21
84:15 167:13

**calling** 67:21

**calvarium** 98:10

**capable** 19:5

**capacity** 75:16 76:11

**Capitol** 2:11

**caption** 220:6

**cardiovascular** 27:17

**care** 8:15,17,18,23,25 9:3,21
10:2,18 11:10,16,21 12:3,23
28:10 46:10 59:12 66:3 92:23
137:19 176:2,2,3 178:19 182:8
182:13,14 200:15

**cared** 28:10 59:17

**career** 28:9 200:3

**careful** 152:9

**carefully** 206:24

**caregiver** 59:12

**caring** 57:18 61:14

**Carlos** 86:13 105:4

**case** 56:4 57:6 61:8,8 75:7,22
76:17 77:21 79:11,13 80:3,3,4
80:5,19,22 81:10,14,25 82:2
83:18,22 84:14,25 90:18
104:16 111:5,14 113:9,21
115:2 117:14 118:22 120:22
121:6,21 131:16 134:7 138:16
138:17 154:15 155:19 157:22
162:18 163:25 183:12,14 184:8
188:7 193:7,22 194:3,13 196:9

207:21 208:23 209:4,16 213:14
217:19 221:4

**cases** 36:8 78:7,21,24 114:20
121:25 166:24,25 167:11 175:2
175:4 180:14 181:4 210:16

**CAT** 33:25 50:10,11 128:10,12
165:5,9,18,21 211:11,12,17,21

**CATALINOTTO** 2:13

**cause** 3:16 31:13 37:6,20 58:17
90:9,15 91:9 92:2,8,18 104:24
106:4,15 113:12 114:7 122:20
123:5 143:6 154:12,12 167:4
180:8 185:7 188:5 191:11
194:22 195:3,11 198:7,20
220:5

**caused** 36:19,24 37:8,14 47:23
90:19,21 92:7 139:25 140:3,7
143:2 164:6,9 168:8 183:4

**causes** 113:14 119:15 195:8
199:9

**causing** 58:16 59:12 88:25 216:8

**caveat** 209:9

**cease** 195:20

**cell** 104:2,18 191:19,24

**cells** 113:21 114:16 130:18

**Center** 16:10,25 17:8 25:10,13
61:24 66:5 69:19 74:9 76:12
119:20 121:22 181:24 192:9,11

**certain** 19:9 31:14 176:14

**certainly** 18:14 20:2 84:6 92:21
108:10 111:3 145:9 154:11
161:4

**certainty** 22:25

**certification** 9:24

**certified** 3:16 9:25 10:2 18:19

**certify** 220:3

**cetera** 122:22,22

**chance** 86:4 124:7 178:12 189:20

**change** 65:12 87:18 130:10,11
172:6 173:21 207:3

**changed** 121:23 122:11,12,17,22
130:3 133:2,6 139:17 156:11
166:12 177:13 200:3

**changes** 166:5,11 196:25 204:14
204:18,20 221:8

**chaplain** 60:17

**characterization** 116:12

**charge** 10:18,24 11:2,4,6,8,24
61:10,13 209:22 216:23

**charges** 72:22
**chart** 6:22,24 7:5 13:14,18,25
  16:6 21:14 22:2,13,19 23:3
  24:3 28:6 31:4 48:21 49:6
  61:17 69:19 74:9 96:23 97:5
  133:18,20 134:2 151:13 178:10
  189:25 190:7,10 193:11 211:22
**check** 109:5 178:25 179:2 219:6
**chief** 11:21 12:2,2
**chieftain** 11:23
**child** 14:19 15:7,8,18,24 16:2
  36:22 38:16 51:17 58:18 59:10
  59:11,13,18 61:15,20 62:13
  64:13 79:20,24,25 87:7 88:5
  89:23 92:23 94:3 109:18 116:9
  116:15 120:14 122:18 130:4
  139:21 145:24 159:6 174:9
  175:23 176:5 178:12 180:14
  182:5,9
**child's** 90:21
**child's** 50:17
**children** 8:18,21 9:18 57:4
  59:17 110:4 176:7,24,24
  180:18,18 210:15
**choice** 20:7
**choppy** 177:11
**Christina** 13:23 68:5 82:22
  115:15 126:23 133:12 134:18
  143:20 153:4,11 160:12 163:13
  163:18 169:14 213:17 214:8
  215:25 217:2
**Christine** 2:11 163:13
**chronic** 208:18 212:11
**chronically** 12:24
**circulate** 173:11
**circulation** 186:21,23 215:14
**circulatory** 216:8
**circumstance** 76:18 178:21
**circumstances** 140:19 176:14
**cite** 145:9
**city** 1:1,6 2:1,6 3:1 4:1 5:1
  6:1 7:1,10,11 8:1 9:1 10:1
  11:1 12:1 13:1 14:1 15:1 16:1
  16:8 17:1 18:1 19:1 20:1 21:1
  22:1 23:1 24:1 25:1,8 26:1
  27:1 28:1 29:1 30:1 31:1 32:1
  33:1 34:1 35:1 36:1 37:1 38:1
  39:1 40:1 41:1 42:1 43:1 44:1
  45:1 46:1 47:1 48:1 49:1 50:1
  51:1 52:1 53:1 54:1 55:1 56:1

57:1 58:1 59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1 67:1 68:1
69:1 70:1,10 71:1 72:1 73:1
74:1 75:1 76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1 96:1,21
97:1 98:1 99:1 100:1 101:1
102:1 103:1 104:1 105:1 106:1
107:1 108:1 109:1 110:1 111:1
112:1 113:1 114:1 115:1 116:1
117:1 118:1 119:1 120:1 121:1
122:1 123:1 124:1 125:1 126:1
127:1 128:1 129:1 130:1 131:1
132:1 133:1 134:1 135:1 136:1
137:1 138:1 139:1 140:1 141:1
142:1 143:1 144:1 145:1 146:1
147:1 148:1 149:1 150:1 151:1
152:1 153:1 154:1 155:1 156:1
157:1 158:1 159:1 160:1 161:1
162:1 163:1 164:1 165:1 166:1
167:1 168:1 169:1 170:1 171:1
172:1 173:1 174:1,8 175:1
176:1 177:1 178:1 179:1 180:1
181:1 182:1 183:1 184:1 185:1
186:1 187:1 188:1 189:1 190:1
191:1 192:1 193:1 194:1 195:1
196:1 197:1 198:1 199:1 200:1
201:1 202:1 203:1 204:1 205:1
206:1 207:1 208:1 209:1 210:1
211:1 212:1 213:1 214:1 215:1
216:1 217:1 218:1 219:1 220:1
221:1,4 222:1
**civil** 2:3 3:5 76:11,13
**claim** 81:13 169:18 179:16
**claimants** 81:14
**Claims** 68:23
**clarification** 22:13 150:22
**clarify** 201:2
**Class** 206:3
**clear** 7:14 30:18 137:8,14 160:2
  174:13
**clearly** 27:20 145:7
**client** 150:7 151:2,4,10 152:5
  152:11,15 160:3 176:23
**clinical** 97:24
**clinicians** 102:11
**clip** 157:14,16 161:18,20 162:12
  184:12

Case 1:17-cv-00626-DLS Doc 06-31/122334 File 06/13/21 Page 231 of 269

800.523.7887                                          Associated Reporters Int'l., Inc.

**clips** 183:18
**close** 27:16 89:17 126:4
**closely** 133:19
**clotting** 32:8 106:2,9 185:6
**CO2** 44:14
**coach** 144:6
**coaching** 144:12 151:5 216:24
**coagulopathy** 105:23 106:4,9
  112:16 113:10
**coerced** 209:17
**Colaneri** 1:6 74:23
**collar** 110:9
**colleagues** 85:4 92:17 132:20
  188:4
**collect** 31:24
**collecting** 47:18
**collection** 31:24 33:21 35:23
  41:18 95:22 98:6 129:17 190:8
**collections** 33:4 93:8,19 97:25
  98:13,16 100:6 102:20,21
  128:15 216:13
**collects** 47:25 48:7
**college** 7:21 11:25 110:4
**colored** 217:11
**column** 48:20
**coma** 49:6 189:6,17
**comatose** 26:8
**combination** 93:12 116:10 126:3
**combined** 26:17
**come** 13:7 18:24 23:7 24:20
  64:18 68:10 87:5,25 112:23
  130:20 131:25 152:24 163:7
  172:7 178:24 186:15
**comes** 110:23
**coming** 19:25 142:8 152:22
**comment** 51:11 59:24,25 94:19
  211:8 212:18
**Commission** 219:13
**committed** 77:19,19
**common** 101:11 113:12 199:18,22
**communicate** 138:20 159:8
**communicated** 135:13
**communication** 131:3 150:5,6
  151:9,15,18,25 178:22
**compelled** 114:11
**competent** 137:19
**complaint** 60:12
**complete** 22:5,13 31:8 174:3
**completed** 220:11

**completely** 20:3
**complicated** 93:22
**compromise** 209:10
**computer** 156:14,24
**concept** 94:9,13
**concern** 38:17 51:16 62:13 88:7
  88:10,24 104:19 176:5 209:13
**concerned** 31:20 38:18 57:15
  86:13 110:18 120:10 138:3,10
  139:20 145:24 159:6
**concerns** 138:8 143:25 152:24
**conclusion** 35:12 177:12
**conclusions** 102:10 128:2,9,25
  217:8
**concrete** 144:17
**concurrent** 198:25
**concurrently** 198:25
**condition** 38:3 60:14 61:3 62:18
  64:15 65:17
**conditions** 31:14 37:6,7
**conduct** 77:8,19,20 169:23
**conducted** 192:10,11 194:16
  196:9
**confession** 209:18
**confirm** 18:9 130:13 193:21
  208:2
**confirmation** 56:20 140:5
**confirmed** 61:5
**confound** 197:2
**confront** 120:20
**confusing** 118:7 122:25 161:10
  166:7
**confusion** 161:5
**consider** 38:4 58:19
**considered** 135:12 175:12 187:5
  196:15
**consistent** 32:2 33:14 41:22
  42:21 112:6 120:12 166:18,20
  193:23 194:4,10 216:15
**consisting** 220:10
**console** 110:21
**constant** 27:22
**constellation** 175:19
**consult** 28:22 30:7 31:17 32:5
  32:12 34:6 38:2,24 40:22
  49:25 66:8 99:24
**consultant** 128:11
**consultants** 66:7 188:16
**consultation** 16:18 29:7

**consultations** 28:19,23 29:4,24
**consults** 188:19
**Cont'g** 10:21 14:8 16:23 17:11
 19:13 25:7,19 28:16 29:20
 37:4,23 39:16 42:2 43:14 45:3
 45:14 48:6 49:18 52:16 55:2
 63:2 64:11 66:23 70:19 71:18
 72:11,20 73:3,19 74:18 76:25
 77:14,24 78:6,19 79:17 80:14
 81:4,24 83:10,21 85:14 88:14
 89:8 90:8 91:11 92:4,25 98:18
 99:6,17 100:9,18 101:3 103:6
 103:17,23 107:3 109:11 110:10
 110:25 113:5 114:22 115:6
 116:3 118:20 119:7,12,23
 120:4 121:5,10 122:9 123:20
 124:4,10,18 125:11 127:12,18
 129:2,19 133:23 134:10,21
 135:4 136:2,9,19 137:22
 141:13,21 143:13 145:21
 146:19 147:2,22 148:8 149:8
 149:21 154:4,23 155:3,11,25
 157:12,20 158:5,20 159:11
 162:3,10 166:9 167:3 168:4
 172:4 173:14 179:13 180:23
 181:21 182:10 197:4,16 198:21
 199:10 203:12 205:23 206:13
 207:13 208:16 209:25 210:13
 211:14,23 212:9 213:21 214:16
 216:3
**Cont'g** 55:25 110:15
**contact** 13:8 14:13,15,16,21
 61:24 63:19 64:2
**contacted** 57:6 60:23 62:9,17
 63:24 64:4,13
**contacts** 199:12
**contained** 45:7 67:7 103:8
 149:14
**content** 157:9
**context** 94:17
**continue** 109:13 145:5 203:3
**continued** 86:24 106:24 176:13
**continues** 49:21
**continuing** 37:18
**contrary** 198:8
**contribute** 114:4
**contributed** 114:5
**contributing** 90:15 143:15
 149:25 168:11

**controlling** 102:10,16
**controversial** 36:6 113:18
**controversy** 37:12
**convention** 34:18
**conversation** 23:14 101:22 151:3
 177:4
**conversations** 24:20 75:9 170:20
 171:16 177:7
**convexity** 98:3
**conveyed** 145:25
**copacetic** 160:19
**copies** 125:5
**copy** 3:16 7:2,4 80:18
**corneal** 49:15
**corner** 41:4 55:20
**corollary** 110:9
**correct** 8:23 15:10,11 20:25
 21:4 29:11,12,14,21,22 31:14
 31:15 32:20 33:25 34:2,8,13
 34:14 35:24 38:24,25 40:15
 41:10 43:20 48:9,21 49:22
 50:2,5,17 51:2,25 53:6,22
 55:20 56:2,7,11 61:21 62:10
 63:21,24 86:19,23 88:8,19
 89:11 90:10,13 93:4,5 94:4
 95:11,14 104:3,25 105:4
 106:10 113:10,15 123:8 125:13
 127:15 128:20 129:11 131:23
 131:24 133:2 140:11 142:20
 148:10 179:5 181:5 183:7
 202:8 203:24,25 204:4,9,16,24
 205:2,4 206:18,21 207:3,22,25
 207:25 208:3,24 209:12 210:10
 212:12 215:21 219:6,8
**corrected** 135:6 221:16,17,18,19
 221:20,21,22
**correction** 87:20
**corrections** 3:11 71:5 201:4,7,9
 221:8,11,14
**COT** 32:11 38:23 45:7 51:20
 66:21,25 67:23,23
**counsel** 42:19 68:22 72:25 73:5
 73:14 97:6 220:6
**count** 104:2,18 105:13 191:19
**counties** 174:7
**counts** 191:23,24
**County** 1:7 70:10 219:3
**couple** 66:10
**course** 9:8 16:9 17:7 25:13,21
 28:8 35:10 76:16 81:17 85:25

86:22 133:2 144:16 150:15
161:3 169:20,21 175:13 217:3
**court** 1:2 17:21 18:2 27:12
68:23,24 69:8 70:11 81:11,11
106:21 122:22 144:18 152:4
209:19
**courts** 106:21
**cover** 12:15 153:22
**covered** 135:22
**covering** 132:14,16
**crash** 197:6,6
**creates** 30:24
**credentials** 29:19
**criminal** 75:18 81:18 84:12
85:19
**critical** 9:21 10:2 11:21 60:14
**critically** 9:18
**cross** 4:4,5,5 68:19 139:15,16
163:20 169:12 177:23
**cry** 110:21
**Crystal** 2:17 108:4 163:22
168:18
**CT** 190:16
**culture** 87:23 88:2 207:19 208:3
208:8,10
**cultures** 87:3 113:21 194:15,17
**current** 9:19
**currently** 8:6 9:23 12:7 91:12
140:4
**cut** 160:22
**cutting** 158:16

---

**D**

**D** 4:2,2 5:2
**D.A.'s** 73:21 134:22
**D/L** 40:13
**D/U** 40:23
**daily** 12:12
**damage** 187:13 188:2 215:16
**dangerously** 27:13
**Daniel** 56:17
**data** 37:19
**date** 1:12 17:6 25:9 32:11 38:23
43:16 45:7 51:20 66:13,21
67:2,24 125:4,4,7 126:5
142:10 192:23,25 204:8 221:3
221:5,23
**dated** 54:12
**day** 11:12 12:18 13:3,4 49:8
58:18 75:17 101:19 108:8 126:3

131:6 137:16 177:21 202:10
208:23 219:11
**day-and-a-half** 131:7
**days** 12:16 49:6 123:8 136:14,20
136:25 137:2,5,13 187:18,23
187:24 199:17 207:21,22,24
214:24 221:9,10
**dead** 38:16 44:11,13,16 140:4
142:18,20,21 143:11 170:8
196:24
**dealt** 172:2
**Dear** 221:7
**death** 27:17 38:19,19 47:11
87:23 89:17 90:6,7,10,15,20
90:21 91:9 92:2,7,8,18 114:7
130:6 142:13,15 143:7 166:6
166:12 168:8 170:13 186:14
187:6 188:5 191:11 192:19
194:22 195:3,17 210:17,18
213:9,15
**decades** 79:6
**deceased** 83:24
**deceleration** 37:21 58:15 120:11
122:18 139:24 183:5 197:9
**decide** 138:13
**decision** 139:3
**decline** 215:2
**decrease** 215:14
**decreased** 90:6 188:22 215:3
**deep** 26:9 49:6,16
**Defendant** 3:6 78:11,16 82:8
**defendants** 1:8 7:10
**defer** 196:12
**deficit** 88:13 186:5
**definitely** 29:18 88:10 198:14
**definition** 114:15 165:3 212:15
**definitive** 103:8 196:16
**definitively** 164:8,11 204:3
**degree** 88:12 186:5
**DeLamater** 61:18
**DeLameter** 60:4
**delay** 79:23 186:19
**delete** 131:12
**deleted** 131:8
**delivered** 221:10
**deliveries** 93:22
**delivery** 154:16
**demonstrate** 193:5
**demonstrating** 49:25

800.523.7887                                        Associated Reporters Int'l., Inc.

**denied** 59:12,18
**denser** 98:4
**density** 165:2
**denying** 151:22
**departed** 14:22
**department** 5:13 62:9 63:5,16,23
  64:13,20 65:11 138:21 170:21
  171:17,21 173:23 179:16 201:2
  202:5
**departments** 175:2
**depend** 192:21
**depending** 33:18
**depends** 197:20 212:6
**Deponent** 221:5
**depose** 139:9
**deposed** 78:23
**deposition** 1:11 3:5,11,14,15,17
  5:8 6:22 7:2,2 16:8 17:19
  18:3 19:22 66:11 67:2,7 69:24
  70:2,4,9 74:7,7 75:8 80:19
  95:11 121:13,15 139:6 141:10
  141:22,23 143:3,25 144:16,21
  149:14 150:16 152:18 153:6
  194:24 204:7 205:4 206:8
  221:5
**depositions** 160:17
**derived** 128:3
**describe** 7:19 9:10 25:25 79:11
  83:12 96:24 97:19 126:16
  184:19 185:17
**described** 165:10 183:4 212:23
  213:4
**describes** 190:8
**describing** 33:10 178:21
**description** 5:4 187:6
**desk** 60:24
**desktop** 156:18
**despite** 44:14 102:7
**detail** 13:2
**details** 36:25 38:6 141:17
**detective** 60:24 76:2,2 147:24
**detectives** 119:18 121:7 146:2
**determination** 107:11 169:24
**determinations** 34:4
**determine** 31:13 36:25 111:7
  127:5 138:16 173:23 196:11,17
**determined** 83:25 113:20 173:24
  216:14
**determining** 38:15

**developed** 181:22
**developments** 121:24 154:7
**diagnose** 138:12 164:11 166:13
  175:4 190:12
**diagnoses** 30:24,25 202:6
**diagnosis** 31:2,6,9,10 57:19,20
  58:20 62:16 63:5,14,22 64:20
  65:12 86:10 106:17 130:11
  171:10,19 172:8 173:21 175:20
  184:19 186:6 188:7,14,17
  189:19 190:2,16 192:8,9
  208:13 209:11 217:7
**diarrhea** 15:22 40:10 49:7
**dictate** 140:15
**dictated** 131:9 178:11
**dictation** 126:10 131:9
**die** 79:25 110:4
**died** 116:9 191:25
**dies** 178:8
**difference** 101:11
**differences** 12:9
**different** 12:6,17,18,23 29:11
  29:13,16,18,18,21 50:23 55:9
  58:14 66:19 93:11,14 94:7
  102:16 103:19 125:3,5,8
  127:20 132:19 165:2 193:4
  197:6
**differential** 30:20,21 31:2,6,9
  86:10
**differentiate** 33:20
**difficult** 33:20 40:25 160:17
  202:11 217:6
**difficulties** 155:19
**difficulty** 212:2,12
**dig** 20:6
**direct** 4:4 6:18 17:13,15 18:14
  20:2 61:23
**directing** 18:8 62:16 85:22
  121:13
**direction** 214:7
**directly** 18:6 171:25,25
**Director** 11:22 12:3
**discharge** 54:16,20 56:9 59:20
  63:20 87:21 149:17
**discussed** 15:21 73:5 74:8 75:7
  75:7 92:19 140:14,23 190:7
**discusses** 177:6
**discussion** 15:13 62:17 63:3,19
  84:24 128:5,6,10 150:9

ARII@courtsteno.com                                        www.courtsteno.com

**discussions** 65:16 66:3 128:7,8
**disease** 91:13 210:14,17
**disparity** 127:24
**displayed** 71:12
**disposition** 80:16
**dispute** 77:9,20 119:25 148:3
217:21
**disputed** 217:18
**disputing** 217:17
**distinction** 98:8
**distinctly** 98:4 153:10
**distinguish** 98:15
**distress** 60:12 213:4 215:8,9
**district** 1:2,2 68:24 84:21
134:5,12 162:17
**divided** 201:10
**Division** 11:21 12:2
**divulging** 73:4
**doc** 46:22 54:8,9 202:19
**docs** 200:4
**doctor** 6:6,20 7:8 8:6 9:6 10:4
12:20 13:6 14:9 15:12,25 16:6
16:21 17:12 18:24 19:5,7,15
23:18 25:8,23 27:4,9,25 28:17
30:6 31:3,16 32:4,10,15 34:5
35:21 36:14 37:5,24,24 38:22
40:21 41:2,7 43:15 44:8 45:6
45:22 46:13,16 47:15 48:7,11
48:16 49:19,21 50:25 52:5,17
52:19 53:16 54:9,24 55:4,15
57:8,10,17 59:19,22 61:19
62:7,12,15 63:3,13 64:12
65:15 66:2,10,24 67:6 88:6
89:19 110:22 118:15,21 124:5
148:10 152:8 156:22 157:13
161:8,14 168:5,12 171:8,9
172:6 174:19 176:9 181:10
187:16 188:20 194:9,17 202:9
203:13 204:6 205:3,25 206:6
206:14 218:11
**doctor's** 44:21
**doctors** 11:9 37:17 83:23 114:25
137:19 188:13 199:18,19,23
200:8,16,17,22
**document** 18:9 27:2,3 34:6 39:12
52:7 54:24 55:4,19 58:11
124:2 128:20 141:9 145:23
146:8,14 147:19 148:7 205:17
**documentary** 157:22 158:6

**documented** 190:10
**documents** 22:24 69:23 71:15
84:8 128:18
**doesn't** 22:17 24:5 39:6
**doing** 12:9,10,19 13:4,17 48:5
111:22 144:11 179:4
**doll's** 38:8,20
**dolls** 170:3,11,15
**don't** 18:20,21 20:9,9,12 23:16
24:8 25:17 42:5 124:24 130:25
**dopamine** 27:14
**double-check** 161:19
**doubt** 70:20 72:7
**Dr** 7:19 11:22 12:2 19:12 21:23
22:10 24:20 40:18,22,23 42:19
45:15 51:12,23,24 53:17,19
59:9 60:19,22 65:16,19 66:3
66:11 68:21 78:13 82:18 85:4
85:10 86:13 105:4 109:2 139:8
154:5 156:22 157:21 158:15
160:16 162:11 163:14,22,24
169:2,4,14,25 190:4,4 208:14
211:8,9 214:22 218:3,3 221:7
**draw** 10:4 32:10 52:5
**drawing** 13:6 25:23 32:15 41:7
54:9 55:15,15,18 59:19 66:24
204:6
**drew** 86:17
**drying** 94:8
**due** 182:18 183:2 213:15,16
**duly** 3:14 220:8
**Dunnett** 56:17
**dura** 33:11 41:19
**duties** 12:6 180:11
**duty** 11:18 174:21 180:11,18
200:21
**dying** 27:16,24

| E |
|---|

**E** 2:7 4:2,2,2 5:2,2 67:22
221:12
**E-D-G-E** 6:14
**E.D** 57:3
**E.M.S** 49:9 215:5
**E.O.M.s** 38:7
**E720** 41:3
**ear** 60:15
**earlier** 7:2,3 38:10 60:15 62:3
95:11 96:22 102:14 127:20
128:22 137:24 150:17,19 151:7

800.523.7887                                    Associated Reporters Int'l., Inc.

189:23 190:7 192:7 215:13
**easier** 33:19 118:13
**easily** 88:13
**EDDGE** 220:4
**Edge** 1:1,11 2:1 3:1 4:1,3 5:1
  6:1,13 7:1,18,19 8:1 9:1 10:1
  11:1 12:1 13:1 14:1 15:1 16:1
  17:1 18:1 19:1,12 20:1 21:1
  22:1,10 23:1 24:1,20 25:1
  26:1 27:1 28:1 29:1 30:1 31:1
  32:1 33:1 34:1 35:1 36:1 37:1
  38:1 39:1 40:1 41:1 42:1 43:1
  44:1 45:1 46:1 47:1 48:1 49:1
  50:1 51:1 52:1 53:1 54:1 55:1
  56:1 57:1 58:1 59:1,9 60:1,19
  60:22 61:1 62:1 63:1 64:1
  65:1 66:1,11 67:1 68:1,21
  69:1 70:1 71:1 72:1 73:1 74:1
  75:1 76:1 77:1 78:1 79:1 80:1
  81:1 82:1 83:1 84:1 85:1 86:1
  87:1 88:1 89:1 90:1 91:1 92:1
  93:1 94:1 95:1 96:1 97:1 98:1
  99:1 100:1 101:1 102:1 103:1
  104:1 105:1 106:1 107:1 108:1
  109:1,2 110:1 111:1 112:1
  113:1 114:1 115:1 116:1 117:1
  118:1 119:1 120:1 121:1 122:1
  123:1 124:1 125:1 126:1 127:1
  128:1 129:1 130:1 131:1 132:1
  133:1 134:1 135:1 136:1 137:1
  138:1 139:1,7,8 140:1 141:1
  142:1 143:1 144:1 145:1 146:1
  147:1,24 148:1 149:1 150:1
  151:1 152:1 153:1 154:1,5
  155:1 156:1,22 157:1,21 158:1
  158:15 159:1 160:1,16 161:1
  162:1,11 163:1,14,22 164:1
  165:1 166:1 167:1 168:1 169:1
  169:3,4,14 170:1 171:1 172:1
  173:1 174:1 175:1 176:1 177:1
  178:1 179:1 180:1 181:1 182:1
  183:1 184:1 185:1 186:1 187:1
  188:1 189:1 190:1 191:1 192:1
  193:1 194:1 195:1 196:1 197:1
  198:1 199:1 200:1 201:1 202:1
  203:1 204:1 205:1 206:1 207:1
  208:1 209:1 210:1 211:1 212:1
  213:1 214:1 215:1 216:1 217:1
  218:1,4 219:1,4,10 220:1
  221:1,5,7,24 222:1

**Edge's** 21:23 42:19
**edit** 141:25
**educate** 180:19
**educational** 7:20
**effect** 117:13 118:23 119:4
  216:17
**effectively** 10:18
**effort** 215:3
**efforts** 161:14
**eight** 44:4 130:23 131:22 147:8
  208:12
**eighty** 13:25 21:17,19 201:25
**eighty-six** 21:21 24:4
**either** 33:24 58:17 65:12 78:8
  78:23 86:10,10 92:9 111:10
  142:14 176:13 177:18 195:19
  204:4
**elaborate** 194:25
**electronic** 194:24 202:12
**elevated** 32:8
**email** 145:18
**emailed** 95:19 167:19 168:21
**embarrassing** 184:14
**emergency** 116:20
**emotional** 60:7
**emphasize** 180:7
**emphasized** 180:5
**employed** 8:7 10:6,8
**employment** 82:13
**EMS** 15:24
**energy** 197:22
**enforcement** 180:13,20 214:7
**enlargement** 98:16
**ensure** 176:17
**entail** 8:17 12:11
**enter** 135:17
**entered** 48:21 51:19,22
**entertaining** 191:6
**entire** 5:11 67:15 96:15,17
  117:18,21 144:21 147:12
**entitled** 129:8 146:6
**entity** 77:7,17
**entries** 34:21 182:12
**entry** 31:4 32:19,22 44:4 46:2
  46:21 48:12,13 50:4,13,25
  51:5,5 52:22 53:6,8 56:10,10
  61:20 62:7
**episode** 191:8
**episodes** 193:2,4

ARII@courtsteno.com                                    www.courtsteno.com

800.523.7887                                    Associated Reporters Int'l., Inc.

**errata** 219:8
**error** 22:4 83:3 177:24
**especially** 135:11 139:14
**Esposito** 61:9
**essentially** 142:21 173:20
**establish** 112:14
**estimate** 28:13 164:15 187:16,19
**et** 1:1 2:1 3:1 4:1 5:1 6:1 7:1
  7:11 8:1 9:1 10:1 11:1 12:1
  13:1 14:1 15:1 16:1 17:1 18:1
  19:1 20:1 21:1 22:1 23:1 24:1
  25:1 26:1 27:1 28:1 29:1 30:1
  31:1 32:1 33:1 34:1 35:1 36:1
  37:1 38:1 39:1 40:1 41:1 42:1
  43:1 44:1 45:1 46:1 47:1 48:1
  49:1 50:1 51:1 52:1 53:1 54:1
  55:1 56:1 57:1 58:1 59:1 60:1
  61:1 62:1 63:1 64:1 65:1 66:1
  67:1 68:1 69:1 70:1 71:1 72:1
  73:1 74:1 75:1 76:1 77:1 78:1
  79:1 80:1 81:1 82:1 83:1 84:1
  85:1 86:1 87:1 88:1 89:1 90:1
  91:1 92:1 93:1 94:1 95:1 96:1
  97:1 98:1 99:1 100:1 101:1
  102:1 103:1 104:1 105:1 106:1
  107:1 108:1 109:1 110:1 111:1
  112:1 113:1 114:1 115:1 116:1
  117:1 118:1 119:1 120:1 121:1
  122:1,22,22 123:1 124:1 125:1
  126:1 127:1 128:1 129:1 130:1
  131:1 132:1 133:1 134:1 135:1
  136:1 137:1 138:1 139:1 140:1
  141:1 142:1 143:1 144:1 145:1
  146:1 147:1 148:1 149:1 150:1
  151:1 152:1 153:1 154:1 155:1
  156:1 157:1 158:1 159:1 160:1
  161:1 162:1 163:1 164:1 165:1
  166:1 167:1 168:1 169:1 170:1
  171:1 172:1 173:1 174:1 175:1
  176:1 177:1 178:1 179:1 180:1
  181:1 182:1 183:1 184:1 185:1
  186:1 187:1 188:1 189:1 190:1
  191:1 192:1 193:1 194:1 195:1
  196:1 197:1 198:1 199:1 200:1
  201:1 202:1 203:1 204:1 205:1
  206:1 207:1 208:1 209:1 210:1
  211:1 212:1 213:1 214:1 215:1
  216:1 217:1 218:1 219:1 220:1
  221:1 222:1

**ethical** 171:9
**evaluate** 30:23 38:15 47:11
**evaluation** 57:3 142:19
**event** 108:4 176:12 178:6 180:13
  191:7
**events** 75:13
**eventually** 28:7
**everybody** 68:11 96:4 218:17
**evidence** 30:12 35:14 47:3 59:5
  92:16 94:23 154:6 165:13
  168:24 193:3
**evident** 130:20
**evolved** 121:23
**exact** 14:20 66:7 94:25 177:14
**exactly** 15:16 26:5,14 58:3
  73:11 93:15 94:22 140:21
  143:24,25 164:23 165:7 177:25
  189:3
**exaggerated** 214:6,14
**exam** 26:13,25 38:6 49:13 87:24
  89:17 97:23 99:16 140:5
  175:13 187:7 196:16
**examination** 4:4,4,5,5,6,6 6:18
  68:19 163:20 169:12 203:11,18
  206:12
**examine** 142:17
**examined** 139:18
**examiner** 163:24
**Examining** 221:6
**example** 150:4 187:17
**exams** 187:10
**excellent** 178:12
**exception** 176:11
**exceptions** 219:7
**excuse** 17:22 176:23 214:15
**exhibit** 17:6 20:22 23:23 24:17
  25:9 32:11 38:23 45:7 51:20
  66:21,25 67:15,24 71:12 95:8
  95:18,25 115:18 139:6 146:6
  204:7
**exhibits** 13:24 19:3 74:14
  145:17 161:7 173:6
**exhumed** 83:25
**exist** 109:22 166:25
**existence** 33:13
**expect** 108:8 186:4 190:12
**expected** 191:19
**experience** 30:17 110:3 154:6
  163:3 181:7,10 182:16,18
  197:7 198:16

ARII@courtsteno.com                                    www.courtsteno.com

**experiencing** 105:8
**expert** 113:17 114:10,11 197:3
 217:23
**expertise** 59:8 93:16 164:13,17
 181:23 182:5 183:9
**experts** 114:2
**expires** 61:16 219:13
**explain** 23:17 60:19 61:2 94:16
 111:20 125:25 127:23 140:19
 160:15 170:4 177:10 178:5
 186:9 191:13 198:9 199:13
**explained** 61:7,13 88:13 119:8
 119:14
**explaining** 91:10,19 92:6 179:24
 191:12
**explanation** 30:19 51:8,10,15
 112:2 197:9
**exposed** 149:12
**extended** 199:18
**extensive** 35:15
**extra** 33:3,9 97:25 98:12 100:6
**extraordinarily** 89:15 113:11
**extremely** 8:20 60:14 61:3
 101:10 104:9
**extremities** 26:9
**eye** 34:9,15,21 113:22 170:3,11
 170:15
**eyes** 26:8 34:8,12 35:22 38:8,20
 170:7,7,14 194:18

---

**F**

**F** 4:2
**fact** 27:18 84:2 87:13,16 88:3
 88:11 90:12 102:8 111:12,24
 114:3 123:2 134:25 151:22
 164:22 175:15 177:20 180:16
 181:22 183:3,11 186:11 189:15
 189:17 196:8 198:5 200:8,12
 204:3 208:4 217:8
**factor** 143:15
**factors** 106:14
**facts** 79:13 117:12 172:7 173:18
 179:3 185:13 217:7,16,18,19
**factual** 172:7
**fail** 221:10
**failing** 195:20
**fainted** 57:2
**fair** 88:6 116:12 129:3 132:22
 138:7 149:23 171:6 178:20
 181:15 185:23 186:2 200:9

 202:4 211:15
**fall** 197:24
**fallacy** 194:24
**false** 205:13,22 206:2,7,9
 209:18
**familiar** 34:19 94:11 213:10
**family** 26:22 28:2 61:12 75:12
 75:16 139:19 145:23,25 176:5
**Fandholt** 61:2
**far** 9:15 22:10 38:18 67:8
 109:14
**farthest** 34:25
**fatal** 114:20
**father** 114:23 173:3
**Federal** 3:4 81:11
**feel** 62:4 94:18 111:17 160:21
 217:10
**feels** 109:2,2
**fellowship** 8:3
**felt** 112:6
**field** 8:13 37:3 122:11 188:12
 196:16 197:8 199:23
**fields** 9:13,14
**fifteen** 56:13
**fifth** 54:7
**fifty-five** 126:10
**fifty-three** 107:23
**figure** 138:13 200:5
**file** 87:6
**film** 101:20
**final** 101:18 102:8,9,15,16
 103:8,15 129:5 132:15,16
 190:24
**finally** 200:2,3
**find** 52:11 54:14 96:3 97:5,9
 145:17 174:7 180:6 181:3
 186:4 187:8 214:18
**finding** 35:8,19 36:7 38:9 44:22
 47:16 63:17 99:14 102:22
 114:2 165:14 191:16 211:2
**findings** 33:23 63:23 64:20 65:8
 65:12 88:11 95:5 97:24 99:16
 99:19 100:11 102:17 103:20
 126:2 138:11 148:24 149:13,15
 149:23 150:23 162:21 175:19
 197:2 208:22
**finds** 100:20
**fine** 19:24 41:7 44:20 67:17,17
 96:11 108:18,23 109:3 145:19
 152:22 196:4 216:25

**finish** 134:11 141:18 153:5
  207:11 209:23,24
**finished** 23:6
**first** 2:8 13:7 14:13 25:24
  26:18,20 40:2 46:21 48:23
  90:25 101:20 121:4 141:25
  145:13 146:20 147:4 152:12
  178:3 187:7,10 202:21,25
  209:24 216:5,5 221:13
**fit** 120:12
**five** 2:18 28:14 64:9 79:9
  104:13,19 169:7 187:24 189:11
  215:6
**five-minute** 107:20
**fixed** 49:15 89:16
**flag** 180:12
**fluid** 31:22,25 33:4,7,11,14,22
  35:23 47:21,25 48:7 88:12
  93:8,11,19 95:21 97:25 98:3,7
  98:13 100:6 102:21 128:14
  129:17 130:16,17 165:6,7
  190:8,14
**focus** 13:3 29:11 107:6,8,10
**focused** 192:8,9
**folks** 15:14
**follow** 57:7 114:24 136:4
**follow-up** 108:3 163:13 170:2
  176:8,13
**following** 164:3
**footage** 162:12
**force** 122:20 198:7,16
**forced** 140:2
**forceps** 154:15
**foregoing** 219:4 220:4,9
**forever** 203:5,7,8
**forget** 21:22
**forgot** 178:23
**form** 3:8 10:20 25:16 29:15
  37:10 42:22,23 43:4,19 48:4
  61:17 62:23 70:18 72:9,24
  73:9 74:7 77:23 78:3 79:14
  81:3,23 82:4,7,18,25 83:14,16
  88:9 90:23,24 91:23 92:10
  99:5,10 100:8,14,15,16,22
  102:24,25 103:2,3,21 106:18
  106:19 107:13,14,20 110:6
  114:9 115:5,13,16 117:15,19
  119:6,10,21 120:3,23 121:9
  122:5,6 123:10 126:18,19
  128:17 129:15 133:8,9 134:9

134:16,17,19 135:2,7 136:8,16
  136:17 137:3 141:12 143:8,9
  143:10,18,19,21 148:6 154:20
  154:21 155:2,9,23,24 157:17
  159:4 163:5,6 166:21 181:17
  197:11,15 207:8 208:15 209:22
  210:11 211:5,19 214:10 215:23
  216:2
**formal** 99:12
**former** 76:2 95:16
**formulating** 58:20 62:15
**forth** 123:4 150:5,6 177:11
  198:19,24 199:2
**forty-eight** 54:13 210:18
**forty-five** 108:11
**forty-four** 60:5
**forward** 109:15 202:14
**fought** 200:3
**found** 60:10 72:22 131:4 164:9
  174:6,11 185:11 186:6
**foundation** 18:5,18 157:19
**Fountain** 1:6 60:24 76:2,3
  147:24
**four** 5:16 9:16 22:22 56:13
  147:18 164:7 187:24 214:25
  215:6
**four-** 30:17
**four-month** 15:17 41:14 210:16
**four-month-** 46:25
**four-month-old** 40:8 48:25 60:8
  110:17,23
**fourteen** 146:16,16
**fourteen-** 52:21
**fracture** 44:6,21 50:19 56:20
  83:24 84:2 99:9 130:24 131:4
  132:5,9,25 134:14,15,25,25
  177:6,12,15,17 198:14,15
**fractures** 165:6
**frank** 160:17
**frankly** 180:3,10 189:5
**fresher** 193:10
**front** 17:5 18:10 45:8 59:21
  61:17 208:9
**froze** 200:7
**full** 7:17 8:10 10:15 22:24
  27:12 60:9 106:21 107:16
  113:22 207:23
**fully** 69:11
**function** 187:3,11,14 195:12

**functioning** 27:20 104:20,20
**funny** 183:23,24
**further** 3:7,10,13 46:23 67:10
  165:10 168:14 206:10 218:10

---

**G**

**G** 4:2
**gag** 49:15
**gain** 175:3
**gathering** 185:2
**general** 2:10 11:18,19 148:21
  169:16 174:15 180:19 187:18
**General's** 65:22
**generally** 12:9 94:10 148:22
  169:23 183:2 200:8
**gentleman** 162:16
**German** 190:4 211:9
**getting** 19:3 71:13 132:18
  153:18 166:5 175:9 186:24
  199:20 200:15 208:2
**Ginsberg** 2:6,7 4:4,6 6:3,17,19
  7:9 10:21 13:17,22 14:3,8
  16:16,20,23 17:11,15,18,21,23
  18:2,5,12,17,23 19:10,13 20:4
  20:9,12,16,24 21:19 22:4,9,17
  22:21 23:3 24:5,7,10 25:6,7
  25:19 28:16 29:20 37:4,23
  39:16 42:2,9,12,14 43:7,13,14
  44:23,25 45:3,13,14 48:6
  49:18 52:16 54:23 55:2,23
  63:2 64:8,11 66:13,16,20,23
  67:12,19,23 68:4 70:17 72:9
  72:24 73:9 79:14 81:2,23 82:4
  82:17 83:16 90:23 91:23 92:11
  92:15 96:13,15,17 99:5 100:8
  100:14,22 102:24 103:21
  107:13 110:6 114:9 115:5
  117:15,17,20 119:10,21 120:3
  120:25 121:9 126:19 133:15
  134:9,16 135:2 136:8,16
  141:12 143:8,18 144:14 147:14
  148:5 152:16,20,23 153:11,14
  153:20 154:20 155:2,9,23
  157:17 159:19 163:5 168:18,23
  169:2,5,8 172:23 173:2 202:24
  203:9,12 205:21,23 207:8
  208:15 209:21 210:11 211:19
  214:10 217:20 218:10,19 221:6
  221:12,12
**give** 6:8 13:2 28:12 29:9 64:8

74:3 83:3 98:25 110:8,11,12
  114:12 118:10 120:18 156:15
  160:21 162:7 165:2 200:22
  209:2 211:10 217:23
**given** 20:15 72:2 122:3 127:24
  136:24 161:6 165:20 196:7
  198:5
**gives** 164:25
**giving** 98:21 185:5 220:7
**glad** 13:4 27:8
**Glasgow** 189:6,17
**global** 195:11 216:9
**go** 14:3,18 19:8,14 23:7,25
  24:22 38:18 39:12,25 41:2
  42:3 43:7 46:9,23 47:10 52:10
  54:6 56:23 58:6 66:17 68:14
  78:7,21 83:7 89:13 95:2,19
  97:8 107:23 109:6 125:9 130:4
  135:21 146:23 157:4,5,10
  160:18 161:12 163:19 167:25
  170:7 173:12 178:18 191:23
  195:14 200:4,18 202:20 204:12
  206:23 212:21 217:21,24
**goes** 9:18 105:22
**going** 6:8 7:12 13:18 16:12
  17:13 18:19,23 19:4,23 25:15
  37:9 48:3,4 68:14 69:2 82:24
  83:7 95:7 96:2 97:9 98:19
  107:19,25,25 108:3,8,12 109:6
  109:13 111:16 112:20,22
  115:17 123:4 128:16 141:24
  144:5,8,21 145:3,10,19 152:8
  152:14 153:9 157:13,24 158:7
  158:13 159:21,23 161:12,17,19
  162:6,7 163:9 164:3 165:14,21
  167:16 169:25 173:5 176:18
  178:24 185:10 186:25 194:25
  202:14 203:6,6 206:14
**good** 64:7 68:21 108:15 163:8
  165:5,7 176:2 179:9 184:7,7
  196:2 211:9 218:14
**gotten** 115:19 178:16 214:13
**graduated** 7:22
**Gram** 113:20 194:15,17
**granddad** 172:21
**grandfather** 172:23
**grateful** 111:4
**grave** 61:3
**great** 135:16 161:17 172:21
  173:9

Case 1:17-cv-00626-DJS Document 66-91/172934 Filed 06/01/721 Page 291 of 269
APPENDIX 1262
800.523.7887     Associated Reporters Int'l., Inc.

Page 240

**greater** 13:2
**greatly** 188:21
**GRIFFIN** 2:6 221:12
**guess** 40:13 91:2 107:4 144:4,9
  145:14 147:20 152:15 172:5,5
**guilty** 72:22
**guys** 22:7 108:8 156:21

### H

**H** 5:2
**halfway** 97:18
**hall** 136:5
**halt** 195:20
**hand** 6:7 34:24
**handled** 134:7
**handling** 182:16
**handwriting** 70:25 141:7
**handwritten** 32:20 70:3
**Hang** 96:7
**happen** 93:21 101:24 102:3
  136:23 166:6 184:4 198:15
**happened** 84:3,7 165:15 175:18
  177:25 198:16
**happening** 145:12 150:13,15
  197:24
**happens** 94:3 110:7 121:20
  186:21
**hard** 14:25 39:4 91:7,10,19 92:6
  110:21 126:22 139:14 140:2,7
  140:9 160:21 161:8 191:11
  198:12 205:10 214:15 217:12
**hardcopy** 125:2
**hasn't** 20:11
**haul** 218:12
**head** 32:23 33:15 36:12 37:5
  39:7 40:12 50:17 53:10 99:8
  99:20,20 107:9 139:19 147:4
  159:7 170:14 182:24 198:17,24
  199:14 212:23
**heading** 219:5
**hear** 23:13 24:19 59:15 89:19
  90:3 114:25 117:21,24 149:5
  151:20,24 154:2 155:13 158:11
  158:18 172:19 193:24 202:17
**heard** 94:12 98:17 114:19 151:18
  152:2,2,3,3 174:11 177:19
  201:22,24,25
**hearing** 3:16 214:4
**heart** 115:9
**heels** 20:7

**help** 13:13 145:17 151:13 165:2
  188:16
**helped** 175:20
**helpful** 129:21 164:23
**helps** 141:19
**hem** 181:2
**hematologist** 112:5,6
**hematology** 30:5 32:5 111:18
**hematoma** 39:6,9,21,23 40:13
  41:15,17,21 47:2 50:15 51:14
  53:9 95:14,22 98:23 99:24
  100:7,12,21 101:2 102:22
  111:11 122:20 128:15 129:18
  139:19 154:12 164:9 166:16,23
  180:9,25 188:18 190:6,8,13,24
  191:2,21,23 192:22 197:12
  198:7,20 210:24
**hematomas** 44:3 47:23 51:7 58:14
  60:13 93:25 94:6,13 102:20
  126:13 127:14 128:13 154:8
  164:6 167:5,8 181:2 183:3
  186:3 190:22 191:4,14 192:15
  193:8
**hemispheric** 50:15
**hemophilia** 167:13
**hemorrhage** 30:10 34:12 35:4,12
  35:15,17 113:12 114:8,19
  166:16 188:18
**hemorrhages** 49:22 166:17,23
  181:2,4 191:17
**hemorrhaging** 35:22 112:15 113:8
  182:17 183:3
**hereof** 219:5 220:7
**hereto** 220:6
**hey** 173:4 178:23
**Hicks** 56:25 75:12
**high** 36:23 139:23 142:7 197:22
  198:16
**highest** 11:15
**hinky** 197:18
**Hippocratic** 180:12
**historically** 36:4
**history** 9:8 15:21 26:19,20,22
  40:3,4 49:6,9 52:6,20 58:7
  59:2 97:3,24 111:6 139:20
  140:22 145:23 146:2,3 156:7,8
  175:9,9,12,13,16,17 176:17
**hit** 157:6 172:18 198:13
**hitting** 37:16 58:16 122:18
  123:3 197:22 198:6,17 199:6,7

205:10
**hold** 8:9 9:23 10:10 22:6,6,7,7
22:18,19 24:6,8,11 55:13
108:2 109:4 161:21,23
**holding** 109:20
**holds** 106:23 109:19
**home** 12:23 57:5 61:7
**honest** 22:22 155:16
**honestly** 160:20
**honesty** 202:13
**hoping** 108:14 164:2 207:3
**hospital** 14:17 15:14 16:10,25
17:8 25:10,14,21 28:3 40:10
49:5 56:18 60:9 61:24 66:5
76:16 77:6,17 80:23 81:6 88:6
138:21 176:18 188:25 192:7
208:11
**hospitals** 9:17
**Hotline** 61:16
**hour** 108:11
**hours** 11:13 178:11 187:21,25
195:6,15,19 199:18 200:9
210:18
**hundred** 22:25 74:9 86:5 123:22
146:16 201:17,23 202:2 214:25
**hundred-hour** 52:22
**hundreds** 181:14,18
**hyphen** 33:4
**hypo** 35:5
**hypothermic** 105:4
**hypotheticals** 217:16,23

---

**I**

**I--** 73:10
**I.C** 116:23
**I.C.P** 47:3,4
**I.C.U** 8:4,19 11:23 110:22
116:22,23 137:20,21
**I.V.'s** 26:11
**I'd** 217:11
**I'll** 32:12 113:25
**I'm** 7:12 13:22 37:9 42:24
115:24 127:8
**idea** 102:7 162:24 190:17 191:6
**ideally** 196:23
**identical** 101:10
**identified** 43:20,22 103:12
114:11 138:24 139:2
**identify** 55:3 214:19
**If--** 96:20

**ignored** 184:6
**ill** 9:18
**illustrate** 150:19
**image** 34:24
**imagine** 117:16 179:23,24 197:23
**imaging** 190:13 192:11,13
**immediate** 61:12
**immediately** 106:16
**immune** 104:20
**impact** 37:21 139:23 142:7
**impending** 38:19
**implies** 151:5
**imply** 153:9
**import** 50:20 51:13
**important** 38:4,6 111:5 144:23
156:7,12 174:5,24,25 175:19
176:21 180:19 188:19
**importantly** 130:9,10
**impossible** 27:21
**impression** 27:5,7 51:2 58:12,13
98:12 100:21 102:15 132:25
**impressions** 129:4
**imprisoned** 169:19
**improper** 20:3
**improve** 204:21
**inaccurate** 159:3
**inappropriate** 150:6
**inborn** 167:11
**incident** 69:14,22 84:9 85:24
163:4
**include** 195:18
**included** 26:16
**includes** 6:22
**including** 57:5 61:6 170:13
182:8,11
**inclusive** 202:6 220:11
**incomplete** 22:2
**incorrect** 99:3 132:2 133:21
134:3
**increase** 47:20
**increased** 47:3 191:18,19 215:3
**increasing** 15:23 50:22
**incredibly** 181:3
**incumbent** 150:18
**incur** 154:8
**independently** 70:23
**indeterminate** 216:13
**Index** 221:4
**indicate** 35:16 38:12,13 50:21
139:16

800.523.7887                                Associated Reporters Int'l., Inc.

**indicated** 30:12 31:16 32:4
  49:24 57:9,10 203:16
**indicates** 34:11 37:20 39:3
  49:22 62:8 70:13 98:5
**indicating** 36:7
**indicative** 58:15 191:6
**indirectly** 172:2
**individual** 132:11
**individuals** 132:8,11
**infant** 183:6 191:20
**infants** 176:25
**infected** 210:8 215:20
**infection** 87:7 88:25 90:20
  105:18,22,25 111:12 148:13,19
  155:8 184:17,21,25 185:4,7,18
  213:16
**infections** 156:5
**infectious** 91:13
**influence** 63:5,11,16 113:24
**info** 57:3
**information** 67:6 73:17 101:6
  123:18 132:18 175:3 176:16
**informed** 121:16
**initial** 14:23,24 27:5,7 59:24
  59:25 102:14 129:4 132:25
  175:13 208:11
**initially** 136:5 187:6 212:5
**initials** 131:13
**injuries** 60:20 99:20 119:15
  174:17 183:5 191:12 193:22
  194:4,9 196:17
**injury** 30:9,14 32:3 37:15 38:14
  41:22 56:25 57:9,12,19 58:16
  59:12 76:18 94:22 107:9 112:9
  120:11 122:18 138:2 139:22,23
  139:24 140:6 141:25 142:7,8
  165:4,22,23 179:25 195:11,23
  196:6,11 197:9 198:9 215:10
  215:18 216:9
**instance** 208:21
**insult** 43:8
**Int'l** 220:12
**intact** 98:11
**intensive** 8:14,16,23,24 9:3
  10:18 11:10,16 12:3 28:10
  182:8,14
**inter** 35:3
**interaction** 27:23 56:10 63:4
**interactions** 65:24 102:3 136:21

**interesting** 184:10 191:24
**internal** 10:3
**INTERNATIONAL** 221:2
**interpretation** 101:9 102:5
**interrogate** 121:7
**interrogating** 121:17
**interrupt** 36:11
**intervention** 47:14
**intracranial** 47:5,16,22 123:6
**intraretinal** 35:15
**intraspinal** 130:16,17
**intubated** 15:20 40:11
**intubation** 212:24
**investigated** 175:22
**investigating** 136:13 139:3
  141:5
**investigation** 5:13 76:3 169:22
  169:24 194:15 214:7
**involve** 128:8 197:22
**involved** 9:7 75:22 76:3 85:23
  92:24 183:17 208:23 217:9
**involvement** 69:5,14 75:15 90:18
  183:11
**involves** 37:16 154:15
**involving** 81:19,21 179:25
**issue** 111:3 134:23 149:25
  151:19 167:11 186:3
**issues** 49:13 106:10
**it'll** 108:14
**it's** 33:19 42:21 54:8 70:12
  98:6 211:11 218:2
**item** 43:24
**iterated** 188:21

─────────────────────────
**J**

**Jackson** 184:11,11
**Jan** 213:11
**Jasper** 61:9
**Jermaine** 40:18,22,23
**job** 12:10 19:3 120:18 138:13
  164:19 174:2 175:24,25
**Johnson** 2:16 163:23
**journal** 182:11
**Judge** 184:3
**judgment** 175:17
**judicious** 153:17
**July** 1:12
**jump** 74:13 149:12

─────────────────────────
**K**

**Kardos** 214:23
**keep** 7:13 16:4,25 27:12,15,16
  27:23 79:16 128:17 164:2
  170:9 191:2 203:6,6 217:13
**keeping** 168:24
**kept** 16:9 17:6 25:13
**kid** 91:7 106:24 107:16
**kid's** 91:4
**kid's** 114:23
**kids** 114:17 184:12
**kind** 37:20 122:12 123:2 166:11
  176:10 177:11 196:6 197:18
**kinds** 174:17
**Klein** 2:3,4 4:4,6 37:9 39:13
  41:24 42:16,18,24 43:2,5
  44:19,24 45:2 48:3 62:23 68:9
  68:20,22 70:19 71:13,18 72:11
  72:20 73:3,19 74:17,18 76:25
  77:14,24 78:6,19 79:17 80:14
  81:4,24 82:15,20 83:5,10,21
  85:10,14 88:14 89:5,8 90:8
  91:11 92:4,25 95:17,23 96:6
  96:11,16,19,24 97:7,13,22
  98:18 99:6,15,17 100:9,18
  101:3 103:6,13,17,23 107:3,21
  107:24 108:9 109:11 110:10,25
  112:22 113:5 114:8,13,22
  115:6,20 116:3 118:2,6,20
  119:7,12,23 120:4 121:5,10
  122:9 123:15,19,20 124:4,10
  124:18 125:5,11 126:22 127:3
  127:7,11,12,18 128:19 129:2
  129:19 133:23 134:10,21 135:4
  135:9,14,17,21 136:2,9,19
  137:7,9,17,22 141:13,21
  143:12,13,22 145:21 146:12,15
  146:19 147:2,16,19,22 148:8
  149:4,6,8,16,21 153:4 154:4
  154:23 155:3,11,25 156:17,21
  157:2,7,10,12,20 158:2,5,13
  158:15,18,20 159:11,21 160:7
  161:17,25 162:3,10 163:8
  164:4 166:2,21 170:3 171:23
  172:20,25 173:8 179:6 180:15
  181:16,25 182:21 183:18
  185:11,13,16 188:20 196:19
  197:15 198:11 199:4 200:13
  202:20,25 203:5,18 205:16
  206:13 207:10,13 208:16
  209:23,25 210:12,13 211:14,23

212:9 213:21 214:15,16 216:3
216:25 217:15,22,25 218:6,14
218:17
**knew** 15:17 117:13 183:19 207:18
209:3 210:6
**know** 11:7 13:2 16:13 18:19,20
23:5,5,6 24:3,8,9,12,17 28:5
28:7 31:7 35:17 36:4,12,15,16
36:19,22,23 39:8,24 40:17
42:17 43:4 48:18 53:21 54:18
55:5 57:13 59:2 62:25 63:7,10
64:12,16 65:19,22,23 67:8,16
68:7 72:4,12,14,21,23 73:11
73:13 75:11,22 76:4 80:4,8,9
80:11,12,15 81:10,13 82:22
83:20 84:4,18 85:3,10 87:12
87:14 90:17 91:2,9 92:8 94:8
94:19 95:5 96:21 97:17 99:23
100:2,5,7,10 102:3,12 104:8
107:9 108:13 109:17,18 110:8
110:15,23 111:8,15,15,16,19
111:19 112:3 114:13 115:22,25
116:8,8 121:24 122:4,8,15,22
123:2,17 124:6 130:19 131:5,7
131:12,22 132:7 133:19 136:22
139:12 140:24 141:3,10 142:12
142:14 144:4,20 145:11,25
150:17 151:8 152:7 153:16,18
153:19,22 154:16,16,18,24
155:6 156:5 157:15 158:17,25
160:15,18,20 161:4 165:5,11
166:4 167:8,9 174:8,16 176:6
177:16 180:16 181:18 183:12
183:24 184:9 185:9,15 186:13
186:15,16 187:17,24 188:18
193:14 194:19 196:21 201:12
201:21 206:15,25 208:3,8,22
210:4,7,7,8,9 211:8,9 212:22
214:13,19 215:18 216:6,6
217:10 218:12
**knowing** 192:19 193:13,13
**knowledge** 74:2 199:22 206:6
217:14
**known** 63:8

| L |
| --- |

**laboratories** 26:21
**laboratory** 55:6,7,20
**LAINSON** 220:3,15
**language** 57:14 129:13 138:2

800.523.7887

Associated Reporters Int'l., Inc.

**large** 33:3 97:24 98:5,12 100:6
**larger** 97:25
**law** 69:8 180:12,19 206:4 214:7
**lawsuit** 76:18 84:11
**layers** 94:7
**layman's** 198:8
**lead** 102:7 130:6 138:24
**leading** 73:14 182:2
**Leah** 2:14 19:11 21:25
**learn** 87:5,25 130:20
**learned** 84:5 105:3 169:22
**learning** 105:8
**leave** 112:22
**leaving** 15:5,6 176:18
**lecturing** 182:6
**led** 73:7 111:8,10 181:23 188:6
**Leestma** 213:11
**left** 34:18,23 35:2 40:24 53:16
  61:17 98:4,14
**left-hand** 48:19
**legal** 109:23
**length** 144:24 201:19
**let's** 14:3 20:17 43:7 46:12
  137:8 152:16 153:21,22 217:24
**lethargy** 15:23 88:23 213:6
**leukopenia** 105:11
**level** 16:5 186:5 189:4
**levels** 101:17 200:17
**liaise** 174:25
**lieu** 173:2
**life** 60:9,20 91:5 107:17
**lifted** 55:11
**limited** 15:19 57:3 90:18 91:2
  210:6
**limp** 60:10
**line** 40:12,24 46:22 78:11 82:10
  83:6 131:12 135:11 178:25,25
  179:10 188:15 205:8,12 212:3
**lines** 91:6 106:24
**lingo** 185:21
**lining** 33:12 41:19
**link** 168:21
**list** 9:18 30:24,25 31:5 43:20
  43:22,25 44:5 120:15,17
  126:12 129:12 131:5 132:22
  168:24 216:6
**listed** 131:21
**literally** 117:13
**literature** 154:11 182:23

**litigation** 84:12,12,14
**little** 23:12 45:5 48:12 53:4
  54:17 95:10 153:22 158:17
  159:15 187:2 198:3
**live** 60:21 165:11 196:23
**LLP** 2:13
**load** 159:23
**locate** 96:22
**location** 1:14 176:19
**locations** 193:18
**log** 112:21
**long** 107:24 181:10 199:20,24
  200:2,2,9,12 201:21 202:11
  218:12
**longer** 64:5 115:22 135:23
**look** 19:2 23:4,25 24:16,18 30:8
  38:22 45:15 48:12 75:7 86:4
  124:7 133:19 151:13 155:22
  163:10 165:12 194:8 213:7
**looked** 69:21 71:15 95:10 133:18
**looking** 23:16 24:17 26:14 43:15
  44:8 45:9 46:20 54:19,20
  69:18 121:25 125:22 130:23
  135:14 145:22 147:3 166:3,4
  170:9 189:25 196:22 211:11
**looks** 40:19 46:17 51:6 52:7
  53:17 54:12 55:9,10,17,17
  71:3 141:7
**loss** 195:12
**lot** 11:5 103:4 132:19 153:18
  167:8 177:3 179:25 201:22
  207:20,21 209:5 212:4 217:6
**loud** 82:23
**low** 16:3 27:14 88:18 89:10 90:5
  91:5 104:2,9 105:12,14 187:12
  187:25 195:8,9,16 196:5
**lowest** 189:9,12
**luck** 218:14
**lunch** 107:25 108:5,15,20,25
**lungs** 115:9
**lying** 170:6

---

**M**

**M** 4:6
**M.D** 1:11 2:16 56:16,24 57:8
  219:4,10 221:5
**M.R.I** 98:8,8,14 129:21,24 130:5
  164:23,24 165:8,16,18,21
**ma'am** 21:24
**machine** 212:8

800.523.7887

Associated Reporters Int'l., Inc.

**macular** 34:12  35:21
**mad** 107:18
**main** 174:21
**making** 27:21  144:24  175:17,25
  188:13  203:19,21
**male** 41:15  47:2  49:2,2,3,3
**malfeasance** 82:11,12
**malpractice** 76:15,21  77:8,18
  82:12
**management** 56:4
**manipulated** 106:25
**mark** 66:20  96:9  146:11  157:25
  158:2  167:21  173:7
**marked** 5:3  13:18,20  16:7,13
  17:5,10  18:10  19:4  20:24
  23:23  50:18,21  66:25  96:9,10
  96:21,23  109:22  115:18  146:10
  161:6  167:17
**marking** 115:21
**marrow** 104:24
**mask** 151:25
**Mason** 1:6  75:4,21  146:7
**mass** 35:5
**massive** 159:6
**materials** 6:21  220:12
**matter** 7:11  22:17  24:5,7  33:8
  42:12,15  61:25  62:5,9,14  69:5
  72:3  80:10  81:18,21  85:24
  210:18
**Matthew** 6:23  13:8  14:13  25:25
  27:10,13  28:2,18  29:25  38:2
  41:9  44:10  57:18  59:10  62:18
  63:15  64:14,21  65:13,17  66:4
  85:16  103:24  105:3  106:9
  107:7  136:21  139:18,20,22
  140:3,4,7  141:25  145:24
  155:19  164:7  166:15  168:8
  170:10  171:20  172:9  210:8,15
  212:10
**Matthew's** 28:24
**MAYNARD** 2:13
**mean** 10:24,25  11:4,5,6,7  12:8
  16:15  19:4  22:23  33:6  53:11
  54:18  92:7  94:16  99:23  122:13
  133:17,20  137:5  139:12  160:20
  175:6  179:7  183:21  185:18,20
  185:21  187:20,23  188:16  199:6
  203:20  207:19
**meaning** 76:13  195:21

**means** 11:8  31:8  35:17  50:16
  54:4  70:25  94:17  114:15  170:4
**meant** 150:19  186:9  191:13
  204:25
**mechanics** 198:9
**meconium** 155:13
**med** 7:23,24,25  8:2,5,7  10:9
  14:18  15:15  22:20  23:4  187:5
  187:8,11
**medical** 5:6,11  11:25  16:10,25
  16:25  17:4,7  22:24  25:9,13
  30:12  31:4  37:3  49:9  58:7
  61:24  66:5  69:18  74:8  76:12
  86:6  96:17  103:25  104:6  107:7
  119:20  121:22  138:11  139:4
  149:15,16  163:24  170:18
  171:10  172:8  173:18  175:13
  178:16,18,19,22  181:24  182:6
  185:20  192:8,11  201:17,17
**medication** 16:4  26:13  27:15
  52:7,21  192:3
**medicine** 8:13  9:22  10:3  11:22
  121:23  122:11  154:7  155:21
  156:4  181:11
**meet** 60:6  73:22
**member** 9:20  62:18  63:4,15  64:19
  65:10
**members** 28:2
**memory** 13:21
**meninges** 105:23
**meningitis** 105:25  106:7  215:20
  216:7
**mental** 58:22  90:6
**mention** 38:7  98:17  149:9  190:8
  190:24  204:24  205:2  211:2
**mentioned** 128:22  143:6,14
  175:16  184:15  186:4
**merc** 155:13
**merely** 98:7  140:7
**met** 60:16,19  61:10  64:22,22
  119:19
**method** 196:10
**Michael** 1:7  2:7,16  7:9  22:18
  24:6,12  36:11  42:7,10  44:19
  64:5  153:13  163:24  174:15
  184:11,11  202:20,22,23  221:12
**microphone** 112:20
**microscopic** 208:19
**mid** 49:14

ARII@courtsteno.com

www.courtsteno.com

**middle** 32:23 38:8 45:5,25 46:3
  97:15 121:17 170:7
**Mike** 114:14 172:21
**mind** 106:8,12 114:4 143:24
**minded** 191:3
**mine** 188:16
**minimally** 26:3,5
**minute** 23:8 203:2 215:6
**minutes** 57:21 64:9 68:7 108:11
  180:6 196:21,25
**misconduct** 169:24
**misdemeanors** 206:3
**misdiagnosis** 79:22
**misleading** 211:13
**missed** 131:17,17,18 179:11
**missing** 26:25
**misspoke** 38:18
**mistaken** 99:3
**mistakes** 82:2 83:13 133:4
**Mitchell** 2:14 10:20 13:20 14:2
  16:12,17 17:9,13,17,20,22,25
  18:4,7,14,21 19:2,11,11,23
  20:6,11,14,21 21:8,11,15,25
  21:25 22:5,8,12 23:22,24 24:3
  24:13,15 25:15 28:12 29:15
  45:10 49:11 54:25 72:17 73:16
  74:13 77:11 78:17 80:9,13
  82:24 83:8 88:9 89:3 91:21,25
  92:10 95:15 96:20 97:2,11,17
  99:11 103:3,10,14 106:19
  107:19 110:13 115:17 117:23
  118:13,17 119:6 120:23 122:6
  123:10 124:8,25 125:7 126:18
  128:16 129:15 133:8,17 134:17
  135:7,10,16,20,25 136:17
  137:3,5,8,12 141:18 143:11
  144:3,8 145:10 149:11,20
  150:21 151:8,12,17,23 152:12
  152:18 153:2 158:16 159:4
  160:2,12,24 161:3 163:6
  197:11 205:19 211:5 216:21
  217:4
**mixing** 128:17
**mom** 49:7
**moment** 14:4 20:20 22:8 23:8
  24:25 36:11 124:5 163:10
  168:17
**month** 125:19 177:22,25 178:6
  179:12 186:16

**month-old** 30:18
**months** 8:4 93:9 164:7
**months'** 192:20
**morgue** 178:13
**morning** 44:13,15
**morphed** 100:11
**mother** 56:25 60:7,10,17,19
  155:7
**motion** 18:25 19:24 152:14
  160:25 161:11
**motor** 36:23 59:3 120:13 197:6
  197:24
**move** 18:3 26:8 38:21 44:17
  109:15 135:13,15 137:23 145:5
  145:17 161:14 170:6,8,9
**moved** 198:18
**movement** 49:16 123:3 197:22
  198:2
**moving** 170:14 198:24 199:2
**MRI** 190:17
**multiple** 12:14 42:20 91:6
  100:25 102:2 128:3,24 174:12
  193:2
**mumble** 152:3,3
**murder** 117:12 118:23 119:18,19
  120:21 147:25 148:3 159:13
  162:25 163:2 179:17 203:17
**murdered** 116:15,16
**mute** 23:13 24:19 160:8,13
  172:19
**muted** 154:3 202:19,22,23

---

**N**

**N** 4:2,2 5:2
**N.S** 48:15
**name** 6:12 7:9,17 9:2 21:22,23
  76:8 81:5,7,13 134:6 141:5
  163:22 169:14 221:4
**named** 13:8 74:23 75:4 77:21
**nap** 200:18,23
**narrative** 139:9 146:7
**narratives** 74:14,20
**narrow** 103:5 132:7
**national** 183:17
**near** 48:8 90:7 186:13
**necessarily** 29:17 148:17 166:18
**necessary** 180:6 200:23
**need** 7:5 18:21 19:7 21:6 42:5
  46:8,9 58:10 87:20 108:15,20
  108:24 112:21 145:8 146:23

158:24 160:5,12,14,22 166:8
167:17 168:16 176:6 178:18
200:18 216:21
**needing** 27:24 174:12
**needs** 30:20 140:8 160:4 205:9
**negative** 87:23 208:6,8
**Neglect** 61:15
**neither** 218:2
**nerve** 35:4
**neural** 15:19
**neuro** 38:6 47:12 53:5,8 89:17
129:7 187:7
**neurologic** 15:19 44:9 88:12
187:3
**neurological** 186:5
**neurologically** 15:18 27:18
**neurologist** 53:20 103:18
**neurology** 188:4,10
**neuropathologist** 213:11,14
**neuroso** 47:12
**neurosurgeon** 40:15 51:25 102:4
129:7,12 190:25 192:24
**neurosurgeon's** 190:22
**neurosurgeons** 33:24 34:3 52:4
128:23 164:16 189:23
**neurosurgery** 30:2 31:17 38:24
46:14,15,18 92:17 99:24 101:2
101:5,8 123:17 128:5,23
132:10,15,16,17 177:18 188:10
188:12 190:5,5,19
**neurosurgical** 47:12,13 211:7
**never** 114:19 122:23 137:15
166:22 167:6 172:12 183:18
200:10,20 208:7 211:10
**new** 1:2 2:5,5,8,10,12,15,18
61:15 70:10 78:12 82:9 154:13
169:16,17,18 206:4 218:8
221:14
**newer** 193:10,17 216:14,15
**news** 183:17
**newspaper** 122:16
**NICU** 49:9
**nights** 12:17
**nine** 169:6 182:17,17 208:12
**ninety** 44:14
**ninety-** 147:7
**ninety-eight** 146:16
**ninety-nine** 167:9,9 182:17
**non** 90:19

**non-** 138:8 197:13,17
**non-accidental** 30:19 37:2 57:15
58:23 93:3 138:3,14,22
**NON-PARTY** 1:10
**non-traumatic** 142:13
**noon** 15:10 68:10
**normal** 98:10 203:23
**Normally** 170:5
**NORTHERN** 1:2
**notary** 3:12 219:12 221:9
**note** 26:15,16,17 40:23 41:3,8
43:16 45:11,15 46:10,13,16,18
46:18 47:9 48:4,16 49:21
51:18,21 53:14,22,23 54:4
62:22 64:17 70:17 78:10 81:2
96:20 101:2 120:25 123:25
125:8,24 126:3,9 145:10 148:6
149:17 154:21 178:13,15,18
182:3 190:7 214:18,18,22,22
214:23
**noted** 38:9 44:6 49:8 130:24
135:20 193:7 219:5,7
**notes** 45:22 53:25 131:9 135:14
163:10 178:9,9 190:6 191:3,5
**notice** 172:20 178:17
**noticed** 133:21
**noting** 110:3
**notwithstanding** 189:6,15,16
200:8 209:4
**number** 11:7 20:24,24 43:25
47:17 61:9,16 67:17 96:3
126:11,25 127:2,13,24 129:11
130:23 131:22 146:11,15 147:7
176:4 216:11 220:10 221:4
**numbered** 97:18
**numbers** 60:5,25 201:22,24
**nurse** 61:10,14,14
**nurses** 137:19
**nursing** 12:4,23
**NY** 2:10

---

O

**O** 4:2,2
**O.R** 130:5
**O.S.H** 40:9
**O'CONNOR** 2:13
**oath** 69:6 152:8 180:12
**object** 10:20 16:12 17:9 25:15
37:9 58:16 71:19 72:9,24 73:9
77:23 78:2 79:14 81:23 82:4,5

800.523.7887                                    Associated Reporters Int'l., Inc.

82:7,18,25 83:14,16 88:9
90:24 91:23 92:10,11 99:5,10
100:8,14,15,22 102:24 103:2,3
103:21 106:18,19 107:13,14,19
110:6 114:9 115:5,12,16
117:15,19 119:6,10,21 120:3
120:23 121:9 122:5,6,19
123:10,14 126:18,19 128:17
129:15 133:8,9 134:9,16,17,18
135:2,7 136:8,16,17 137:3
140:2,8,9,9 141:12 143:8,9,10
143:18,19 148:5,5 155:2,9,23
155:24 157:17,18,18 159:4
163:5,6 197:11,15,23 198:6,10
198:17 199:13 205:10 208:15
209:21,21,22 210:11 211:5,19
214:10
**objecting** 18:7,20 127:6 133:11
182:2
**objection** 20:17 41:24 42:11,21
42:23 48:4 62:23 70:18 76:23
76:23 77:10,11,12,13 78:2,4
78:10 81:2 82:10,16,17,21
90:23 92:12,13,15 100:16,23
102:25 114:14 115:12,14
120:25 123:12 127:7 133:16
135:18 143:20 148:6 154:20,21
166:2,21 171:23 179:6 180:15
181:16,16,25 196:19 198:11
199:4 200:13 205:16 207:8
213:18 214:9,11 215:23 216:2
216:22 217:5
**objections** 3:7 17:18 43:5 118:8
127:8 144:7,24
**objective** 211:4
**observation** 93:7
**observe** 151:21
**obtain** 176:16
**obvious** 198:18
**obviously** 133:18 188:19
**occasion** 31:4
**occasioned** 15:23
**occasionings** 102:6
**occasions** 77:25 174:12 179:23
**occur** 196:25
**occurred** 14:15 166:11 181:7
**Oculocephalic** 170:16
**office** 2:10 65:22 71:4 73:21
84:22 86:25 134:23 169:15

**officer** 70:14,22 74:22 75:3
119:25 136:12 141:5,16 152:4
**officers** 2:6 7:10 116:16 118:22
119:2 120:7,21 136:4,13
138:20 143:2 174:7
**officers'** 203:15
**official** 128:4
**oftentimes** 176:24
**oh** 49:12 54:8 67:17 96:9 171:12
174:10 184:7 188:11 194:6
**okay** 6:5,15 7:8,14 9:19 10:23
14:11,22 15:4 16:17 18:4,17
19:14 21:7,8,9,20 22:6 23:24
24:11 25:20 27:9 36:18,21
39:15 40:14 42:25 44:24 45:13
45:19 46:14,14,15,20 49:19
50:12 52:14 53:24 54:2 55:22
56:5,9 57:22 58:10 59:22 62:4
64:10 66:20 68:14 69:13 71:10
71:17 72:12 73:4,16 74:2,6,17
75:6,11,25 76:6,10,20 77:2,4
77:6 78:7,23 79:2,10,24 80:13
81:10,17 82:24 83:8,22 84:8
84:18 85:22 86:9 87:2,5,15,25
88:15 89:9,18 90:2,17 91:16
93:17,21,24 94:12,15,20 95:2
95:7,13,19,23 96:12,24 97:7
97:11 98:19,25 99:22 100:2,5
100:19 101:4 102:9 103:24
104:5,11,13 105:3,7 106:3
109:4,12,25 110:7 111:24
112:4,10,19 114:13 116:4,14
117:9,23 118:10,16,17 119:13
119:17,24 120:20 122:10
123:19 124:3,8,11 125:12,15
125:22 126:8 127:19,23 128:16
129:10 131:15,19,25 134:5,22
135:9,16,25 136:3,12 137:17
137:23 138:15,19 139:5 140:13
141:8 142:10,24 143:12 144:8
145:22 146:5,18 147:9,10,13
148:9,12,21 149:20 151:17
152:12 155:6 156:13,21 157:2
157:13,24 158:4,8,15,21,24
160:9 161:17,25 162:6,11,14
162:20,24 164:18,21 165:8
166:15 167:23 168:23 169:5,8
169:9,11,25 170:17 171:6
173:12,15 177:10 179:14
184:13,15,24 185:12,17,23

ARII@courtsteno.com                                    www.courtsteno.com

800.523.7887          Associated Reporters Int'l., Inc.

190:20 191:18 192:2 193:20
195:25 196:14 197:5 200:7
201:5,23 202:3,3 204:19 209:7
210:12,20,23 211:24 212:10,14
213:2,10,13,22 216:19 217:2,4
218:3,3,17,19
**old** 15:17 33:21 41:15 47:2
93:13 130:17 156:17,23 164:7
164:15 165:3 192:20,21,25
215:19 216:11
**older** 94:21,21,21,22 123:8
193:9 216:14,19,20
**on-** 60:25
**on-duty** 60:17
**one-page** 202:4
**one's** 210:2
**ongoing** 215:14
**Ontario** 8:3
**open** 61:8 191:2
**opening** 26:7
**ophthalmic** 49:25
**ophthalmologist** 32:17 34:6
**ophthalmology** 16:19 30:2,7
31:20 32:12 38:2
**opine** 191:10
**opining** 211:17
**opinion** 29:9 44:10 83:3 91:25
92:22 103:8,15 114:12 129:9
166:17 168:7,9,9,11 173:21
188:6 189:23 192:7 196:8
198:4 199:11 209:2 211:3,7,10
211:22 213:24
**opinions** 102:16 103:14,19,19
189:25
**opportunity** 69:16 131:11,14
194:16 204:8,16
**opposed** 141:4
**optic** 35:4
**options** 130:16
**orbital** 113:7,8 114:6
**order** 13:21 37:20 143:25 173:17
173:18 175:3
**ordinary** 16:9 17:7 25:13
**organization** 9:20
**organs** 115:8
**original** 3:13,17 62:3 175:16
**outlined** 144:18
**outs** 139:15
**outside** 33:7,8 40:9 167:14
174:8

**overwhelmed** 90:21
**overwhelming** 115:10 213:15
**oxygen** 186:24 195:10

---

**P**

**P** 4:2 46:2,7,25
**P-I-C-U** 9:5
**P.C** 2:16
**P.D.F** 96:4
**p.m** 1:13 68:17 109:8,9 113:2,3
118:12 153:23,24 218:21
**package** 6:21
**packet** 97:15
**page** 26:15,18,20,21,22,23 32:24
34:5,7 38:8,22,22 42:4 44:18
45:5,25 49:20 52:19 54:7,8
55:25 56:6 86:6 95:24 96:3
97:17 123:22 124:2,6 133:19
146:20,24 147:4,17,18,18
167:25 168:6 169:6 178:6,23
201:14,15,16 220:6
**pages** 5:6 13:25 19:9 21:11,15
24:4 26:24 45:10 59:21 74:10
96:21 147:14,15,16,20 148:23
201:18,23 220:10
**pain** 187:7,9
**painful** 26:9
**paper** 9:16 24:13
**papers** 9:16
**paperwork** 86:5 133:5
**paragraphs** 201:10,11,13
**parenchyma** 33:9 98:9
**parent** 59:11
**parenthesis** 208:12
**parents** 15:24 59:18
**part** 6:25 11:12,25 42:6 66:17
89:6 90:14 101:7 110:22
111:18 138:13 156:8,9,9 158:6
175:19 176:20 177:5,24 214:23
**particular** 8:13 13:3 27:2 31:10
36:5 98:9 182:5 183:8 213:20
**particularly** 30:19 174:7 176:22
176:25 178:7 183:13 184:10
**parties** 3:4 221:10
**partly** 122:24
**parts** 53:15
**party** 77:21
**passé** 182:23
**pathologist** 65:20,24 166:7,10
196:13 213:20

**pathologists** 192:24
**paths** 27:19
**patient** 13:8 15:14 25:25 27:23
  29:9 30:24 32:7 44:15,18 45:6
  51:19 57:2 60:8,11,13,21 61:8
  61:14,16 81:15 83:25 86:22
  89:15 106:20 130:7 131:6
  148:13 156:10 160:6 164:7,9
  165:14,15 167:12 170:5,8
  173:22 175:5,14 176:2,12,17
  178:8 186:12 187:2,4 189:3,8
  191:25 192:13 195:17,21
  196:11 200:11 215:5
**patient's** 56:25 58:22 60:7,16
  60:18,20 61:3,5,17 87:22
  188:25 195:24
**patients** 12:24 28:9 137:20
  165:11 172:2 174:21 175:25
  180:11 181:15 182:13,16
  186:15 196:3,3 211:25 212:4,7
  212:12
**pattern** 120:12 203:23
**PATTISON** 2:6 221:12
**pause** 48:14 112:25
**Peck** 2:16,17 4:5 77:23 78:2,13
  82:7,18 83:14 90:24 92:13
  100:15 103:2 106:18 107:14
  115:14 117:19 122:5 123:14
  143:10,19 155:24 163:18,21,23
  163:23 166:9 167:3,16,21,24
  168:4,14,20,25 169:4,6 207:15
  214:11 218:9
**ped** 182:12
**pedestrian** 197:24
**pediatric** 8:4,11,14,16,24 9:3
  10:2,18 11:10,16,21,23 28:9
  137:21 181:14 182:8,13,16
**pediatrics** 9:15,22 181:11 197:8
**peds** 56:16 61:11
**Penal** 206:4
**pendency** 145:3
**pending** 80:4 81:11 150:8,11
  151:4,16 152:6
**people** 12:17 108:15 164:17
**percent** 22:25 167:9 182:18
**Perfect** 7:4 59:22 157:11
**perfectly** 22:22 160:16
**performed** 87:24
**period** 10:6,17 40:11 49:7 56:25
  107:17 169:20

**permission** 156:16
**permitted** 17:19 217:22
**persistent** 195:9
**person** 108:12 175:22
**personal** 76:17 80:24 84:9 110:2
  128:6 217:13
**personally** 91:18
**personnel** 61:24 82:13
**perspective** 173:23 213:25
**Persuasive** 184:21
**pervasive** 87:7 105:18 184:16,22
  184:25 185:3,7,18
**phone** 60:25 61:9,16,16 101:22
  160:3 184:5,12
**phonetic** 20:25
**phrase** 221:15,16,18,19,20,21,22
**physical** 14:15 26:19,24 30:15
  52:6,20 58:7 97:4
**physician** 8:11 10:14 11:2,16
  29:9,10 30:23 31:12 52:6,20
  58:24 75:16 76:11 116:21,24
**physicians** 28:24 92:22 211:10
**PIC-U** 9:4 10:14
**pick** 14:19
**picture** 120:19 156:22 164:25
  166:5 174:3
**pictures** 34:7 196:21
**PICU** 12:6,13,16 43:16 45:11
  48:20 56:16 60:6,8,24 123:25
  123:25 125:24 149:17
**pigmented** 35:5
**pin** 97:8
**Pine** 2:18
**place** 26:11,12 73:22 137:21
  176:19 219:5 220:5
**placed** 55:11
**places** 50:23
**plain** 129:13
**plaintiff** 1:4 2:3 5:9 81:14
**Plaintiff's** 96:5,13
**plan** 41:14 44:9 46:8,21,25
  59:21 63:20 171:10
**planning** 54:16,20 56:10 115:21
**plans** 41:10
**plasma** 130:18
**play** 137:10 156:13 157:14,24
  158:24 159:21 161:20
**played** 158:9,14 159:25 161:24
  162:9

**Plaza** 2:14,18
**please** 6:6,11,12 19:10 40:7 46:24 48:19 67:16 68:6 70:17 71:11 78:13 85:8 118:3 146:6 148:6 154:21 168:2,17 178:23 193:15 205:14 213:7 219:6 221:8,9
**plus** 148:13,19
**pneumococcal** 210:14,17
**pneumonia** 208:11,18 212:11,11 215:8,12
**point** 8:2 10:15 27:17 29:18 30:11 37:12,19 47:13,14 71:15 77:5 92:18 142:22 144:22,23 153:5 167:9 174:18 182:17 187:14 188:5 196:2 214:25
**police** 2:6 5:13 7:10 59:8 60:23 62:8,14,16,19 63:5,11,16,23 64:3,3,13,19 65:11 70:5,9,13 70:13,22 71:8 74:14,19 76:6 116:16 117:12 118:22 119:2,25 120:7,21 136:3,12 138:20,20 138:21 141:16 142:6 143:2 148:17 159:8 162:25 163:4 169:23 170:21 171:2,11,13,17 171:21 172:10 173:19,23 175:2 179:16,24 201:2 202:5 203:15 203:15 209:16 213:24 214:5,5 214:13
**polite** 153:17
**poor** 61:3
**portion** 33:14 40:2 41:13 59:24 60:2 111:11 205:20,22,24
**portrayal** 159:3
**pose** 217:15
**posited** 73:5
**position** 19:8 26:18 49:15 200:10 217:6
**positive** 10:16 34:16 88:3 208:10
**possibility** 30:8 115:2 188:24
**possible** 30:24,25 35:16 47:11 56:19 91:8,17 92:21 93:12 109:19,19 119:3,3,14 143:6 148:13 149:25 175:9 176:3 189:4 200:16
**possibly** 33:4,10 98:14
**post** 39:22
**posteriorly** 98:2

**potential** 30:13 119:15 176:13 189:19
**practice** 29:11 37:14 144:18,19 145:8 159:17 199:18
**practiced** 7:25 181:10
**preferred** 182:23
**preparation** 74:15 206:17
**prepare** 75:8
**prepared** 70:21 126:4 220:11
**preponderance** 37:19 59:5
**prescribe** 129:23
**presence** 220:5 221:8
**present** 89:9,16 102:7 155:14 157:2 186:18 187:2 192:16 196:17 199:14
**presentation** 157:18 208:11 217:18
**presented** 26:2 88:5,18 103:25 106:9 121:21,21 170:11 186:12 191:20 217:7
**presenting** 195:17
**press** 27:12 106:22
**pressure** 16:3,3,4 27:13,15 47:5 47:16,23 48:9 88:19 89:10 90:5 91:5 105:15 106:25 185:6 187:12,25 195:9,10,16 196:5
**pressures** 91:6
**pretty** 28:11 94:25 154:12 161:18 164:2
**prevalence** 180:25
**prevalent** 180:14
**previously** 52:3 92:18
**primarily** 88:7
**primary** 188:7,14
**printed** 205:7
**prior** 59:9 62:15 63:14 75:13 136:20 140:8 145:2 201:6 205:10 209:22
**priority** 174:21
**privileged** 20:18
**prob** 162:21
**probable** 126:12
**probably** 36:4 42:5 98:5,13 181:14
**problem** 43:20,22 111:20,25 129:12 131:5,21 132:21 134:8 138:12 152:23 186:21 196:24 215:11
**problematic** 134:13 162:17,22

800.523.7887

Associated Reporters Int'l., Inc.

**problems** 32:7 216:8
**procedure** 3:5 144:13 145:8
**process** 145:16 156:9 161:8
  194:24 202:11
**profession** 196:16
**professional** 9:20 76:22 92:22
  171:13 188:6
**professionals** 139:4,4
**professor** 8:10 10:15 110:8,16
  182:6
**profound** 187:25
**prognosis** 61:4
**progress** 41:3,8 44:18 45:6,11
  51:19 97:4 210:17
**progression** 203:3
**pronounce** 142:20
**pronounced** 142:18
**proper** 145:16 200:11
**properly** 104:21
**prosecuted** 175:23
**prosecutions** 68:24
**protect** 180:18
**protecting** 176:12 180:17
**Protective** 61:20 64:14
**proud** 109:20
**provide** 60:7 73:17 145:9 146:3
  173:6 187:16
**provided** 97:6 192:4 198:4
  200:25 202:5,7 220:13
**providers** 132:20
**public** 3:12 219:12 221:9
**publications** 9:7,17
**publicly** 134:13
**pull** 16:14 50:24 95:24 97:3
  168:2
**pulmonary** 215:12
**puncture** 79:20
**punishable** 206:3
**pupils** 26:10 49:14 89:16
**purpose** 20:4 32:6
**purposes** 114:2
**pursuant** 3:6 28:18 206:3
**pus** 130:17,20
**pushback** 153:18
**pushing** 142:6
**put** 15:21 19:8 32:13 40:22
  67:18 71:16 91:5 95:8,8,18
  97:8 106:24 114:25 116:4
  123:9,21 139:5 148:2 183:21
  184:12 195:5,13,14 200:10

  204:11 206:7 208:14 216:21
  217:5,11
**puts** 48:8
**putting** 132:21 212:8

---

**Q**

**quantify** 187:15
**question** 10:24 14:12 16:11
  18:18 19:5,16,17 20:2 22:10
  25:18 35:18 41:25 42:22 48:5
  48:5 63:12,13,14 70:18 77:16
  81:3 83:9,19 85:9 101:13,14
  103:5 109:22,23 110:19,24
  111:16 113:7 114:3 116:20
  117:4,18,21,21,24,25 118:5,14
  122:7 126:5 127:5,11 134:11
  138:6 141:3,19 142:16,24
  150:8,11 151:4,15 152:6
  154:22 156:10,12 160:6 166:7
  171:25 172:6,15 173:16,20
  175:12 176:9 183:10 187:5
  189:16 190:21,25 193:15
  194:22 195:2 196:12 197:13,19
  207:9,14 209:24 211:21 214:3
  217:24
**questioned** 87:8
**questioning** 78:11 82:10 83:7
  135:11 210:2 212:3
**questions** 3:8 7:12 66:10 67:10
  69:3 71:16 73:6 81:20 83:18
  98:21 108:4 111:4,6 115:23
  137:25 145:2 148:7 155:17
  156:6 158:8 159:23 163:25
  164:4,5,21 168:15 170:2,20,22
  170:25 171:3,15 179:15 180:24
  182:2,20 186:19 190:18 192:6
  192:14 194:14 199:16 200:24
  203:4,10,14 206:11 207:11,17
  209:15 210:24 212:16 213:23
  218:9,11
**quibble** 91:3
**quick** 24:18 67:13 68:5 216:24
**quicker** 108:14
**quickly** 133:19 178:9 207:6
**quite** 97:18 113:18 207:23
**quote** 57:8

---

**R**

**R** 1:6 4:2
**R.N** 26:23

800.523.7887
Associated Reporters Int'l., Inc.

**R/O** 31:4, 7
**radio** 194:3
**radiograph** 211:4
**radiologist** 82:3 83:2 103:16
  164:14 192:23 194:4, 9
**radiologist's** 103:20 190:21
**radiologists** 33:24 34:3 103:11
  193:22
**radiology** 53:10, 12 55:13 92:17
  94:25 95:2, 6, 8, 10 97:9 99:16
  100:25 101:10 123:17 129:8
  132:10, 13, 14, 15 177:18 188:5
  189:24 190:6, 12, 18, 23 210:25
**raise** 6:6 186:19
**range** 9:15
**ranking** 11:15
**rapid** 37:14 58:15 123:3 215:2
**rare** 113:11 181:3
**rarity** 167:2
**re-** 215:19
**re-bleed** 216:11
**re-bleeding** 94:16
**re-bleeds** 94:9, 13
**reactive** 26:3, 6, 10
**read** 3:10 14:25 33:2 34:21 35:2
  35:6, 11 39:4 40:6, 9, 10, 11, 12
  40:25 41:12 43:24 44:4 45:18
  45:20, 21 46:21, 24 47:8 48:23
  51:4 53:8, 10 54:4 56:15 57:14
  57:21, 24 59:23 60:2 97:20
  99:19 103:9 114:18 118:2, 3, 4
  118:9 122:16 125:16 126:20, 23
  127:2, 4, 20 139:8, 11, 15 166:24
  201:5 205:6, 18, 24 207:5, 6
  219:4 221:8
**reading** 89:3 93:10 128:4, 9
  179:9 182:22 217:9
**reads** 35:3 101:19
**ready** 14:9 118:15 173:12 200:4
**reaffirm** 82:9
**really** 9:11 84:7 94:18 107:5, 8
  122:7 135:17 143:23 159:10
  161:6 164:2 165:13 171:24
  174:5 214:12, 14
**reason** 32:9 39:3, 13, 17 69:10
  111:17 153:8 190:21, 25 204:19
  209:15
**reasons** 31:19 180:17 199:24
  212:24

**rebuttal** 203:4
**recall** 13:10 14:12 26:14 27:25
  28:5 29:23 63:18, 19 65:4, 18
  66:6 76:7 81:20 86:9 98:20, 23
  98:24 105:8 116:17 117:10, 10
  118:21 119:2 121:16 129:20
  134:12 136:6, 15 138:4 155:15
  162:15 179:17 184:17 188:8
  189:24 203:17, 18, 20 212:2
  216:16
**recalling** 116:11
**recalls** 83:6
**recap** 181:9
**receive** 74:14
**received** 6:21, 25 22:19, 23 23:3
  53:20 189:3
**recitation** 179:2 185:13
**recognize** 25:8 162:18 202:10
**recoils** 199:8
**recollection** 27:4 69:17, 22
  74:11 84:6 141:11, 15 159:16
  206:22
**recollections** 163:3
**recommendation** 14:19
**recommended** 98:15
**reconciliation** 26:19 52:7, 21
**record** 5:11 6:2, 6, 12 7:14 14:2
  14:4, 5, 6, 7 18:6, 18 20:13, 14
  20:17 23:7 24:23, 24 25:2, 3, 5
  30:17 43:8, 10, 12 52:11, 12, 15
  62:22 68:15, 15, 16, 17, 18 86:6
  95:25 96:15, 18 99:13 100:13
  102:14 107:5 109:7, 8, 9, 10
  112:20, 25 113:2 118:12 123:21
  123:22 125:6, 25 127:21 134:7
  135:18 137:14 141:20 144:23
  145:4 148:3 149:18 152:4
  153:23, 24, 25 160:15 172:17
  177:5 178:7, 8, 22 201:16, 17, 18
  201:20 204:9 217:21 218:21
  219:5 220:11
**records** 5:6 16:7, 21 17:2, 4
  18:18 22:24 25:10, 12 82:13
  135:11 149:24 178:16, 19
  203:15 210:25 211:3
**recover** 187:14
**recovery** 189:20
**Recross** 4:6 206:12
**red** 130:18

800.523.7887                                          Associated Reporters Int'l., Inc.

**Redirect** 4:6 203:11
**refer** 7:5 23:21 37:2 50:7,10
  123:24 148:22
**reference** 51:10 95:24 96:3
**referenced** 100:12
**references** 99:13 100:25 158:7
**referral** 39:14 62:3
**referred** 9:4 13:13 61:20 63:20
**referring** 30:22 31:9 70:6
  150:14 151:6 152:10 205:11
**reflected** 30:10
**refresh** 13:21 27:4 69:17,22
  74:10 141:11,14
**regard** 6:22 12:6 27:5 28:24
  29:24 34:20 38:2 61:25 62:9
  62:17 63:15 64:14,21 65:13,16
  66:3 99:20 132:24 137:25
  148:7 177:5 179:17 182:12
  189:19 193:14 194:17 198:5,10
  199:11,17 203:14 210:23
**regarding** 29:9 56:17 79:19
**relate** 169:23 191:12 192:2
**related** 72:3 82:12 84:9 93:24
  94:2,7 113:9 155:18 188:8
  192:17,18 193:17
**relating** 82:11 171:16 192:9
**relaying** 213:20
**release** 73:8
**released** 73:2,15
**relevance** 175:23
**relevant** 6:25
**relied** 189:23
**reluctant** 195:13
**rely** 34:2 123:17 188:13 190:16
**relying** 95:5
**remain** 168:11
**remainder** 26:13
**remember** 15:16 58:3 62:2,20
  69:13 70:23 72:5 73:25 79:3,4
  81:7,16 83:18 85:2,21 86:13
  87:9,10 99:21 104:15 120:8
  121:19 130:25 132:3 134:6,20
  134:23 135:3 141:17 142:5,9
  143:23 146:4 159:10,14 162:20
  170:22,23,25 171:2,4,5,18,19
  173:15 177:7,14,19 179:4
  183:11,14,16,24 184:8 186:7
  193:10 202:2
**remembered** 69:18

**remembering** 177:24
**reminded** 145:13
**reminding** 144:13
**remiss** 180:10
**remote** 160:17 161:7
**remotely** 13:19
**removed** 61:7
**render** 57:19 200:11
**rendered** 63:6,22
**rendering** 63:14,16
**Rensselaer** 1:7 70:10
**reoccurrence** 193:5
**repeat** 27:8 44:14 77:16 85:8
  89:25 91:24 144:9 189:15,16
**repeatedly** 191:15
**rephrase** 19:20 92:5 126:23
  140:17 197:19
**report** 5:13 11:10 32:12,16,16
  34:6,11 38:2,24 39:3 40:2,15
  53:12 54:7,10,21 55:11,12,12
  55:20 56:3 57:4 60:14 61:14
  62:5 94:25 95:2,6,9,10,16
  97:10,12 98:22 99:3,7,12
  100:11,20,25 101:18,24 102:8
  102:9,16,17,23 103:9,12
  115:18 125:22 126:2,16 127:20
  127:25 128:18,19,24 129:5,8
  129:14,17,20 132:4 134:13,24
  135:6 143:16 148:2 149:15,16
  164:22 177:6,13 178:25 179:3
  190:12,24 194:6 208:14 210:25
**reported** 59:3 132:4,8 164:20
**reporter** 6:5,11,15 13:24 14:5
  21:2,5,17,21 24:22 25:4 43:11
  52:14 65:12,15,18,22 67:20,25
  68:14,18 96:8,12,14 107:22
  108:7,23 109:3,6,10 112:25
  113:4 118:4,10,16,19 124:3
  126:25 133:10,13 146:10,23
  153:25 156:15,19 157:4 158:3
  167:20,23 168:3 169:11 182:3
  202:17 220:15
**Reporters** 220:12 221:2
**reports** 99:13 101:17 190:22
**represent** 68:22 113:25 162:15
  169:16 208:13
**represented** 81:6
**representing** 19:12 80:22
**request** 39:3,18 60:22 62:8
  70:21 85:25 107:20

ARII@courtsteno.com                                   www.courtsteno.com

**requested** 28:20,23 29:3,24
  31:18
**requests** 173:19
**require** 7:13 73:12
**required** 62:6
**requires** 130:5
**requiring** 16:3
**reserved** 3:9 43:6 127:8
**residency** 7:24
**resident** 26:17 41:3,8 45:11
  46:18 53:16 61:11 101:19
  126:3 132:13,13,15 190:5
  200:22
**resident's** 40:23
**residents** 182:7
**resolved** 80:10 112:12
**resort** 55:11
**respective** 3:4
**respirating** 195:22
**respirations** 49:16 195:21 215:6
**respiratory** 60:12 213:3 215:3,8
  215:9
**respond** 58:11 152:10 160:6
  217:12
**responded** 60:18,24 183:10
**responding** 117:12 118:22,25
**response** 7:13 59:15 137:24
  151:5 157:15,15 168:9 170:13
  170:16 171:13,15 185:14
  194:21 195:2
**responses** 171:17 188:3 191:9
**responsibilities** 12:12,15,21,25
**responsibility** 109:17,23 176:4
**responsible** 109:21
**responsiveness** 3:8 215:4
**rest** 47:9 137:16
**restart** 158:11,13
**restate** 25:18
**restroom** 64:7 68:7
**result** 55:7,9 93:18 105:23
**resulted** 57:19
**results** 55:9,20 87:3 174:17
  194:14
**retina** 34:10
**retinal** 30:10 35:4,12,15 49:22
  58:20 112:15 113:8,12 114:8
  114:19 166:16,23 181:2,4
  182:16 183:3 188:18 191:16
**retire** 200:4

**retrial** 72:7,22
**retried** 72:13
**retrospect** 135:5
**Return** 221:11
**returned** 3:15 8:4
**reveal** 94:2 165:20
**review** 32:12 74:19 83:17 85:20
  86:8 87:6,10 101:23 102:15
  104:16 124:5 194:16 204:8,16
  206:17 211:21
**reviewed** 6:24 26:22 40:5 71:21
  74:10,15 86:6 102:11 133:20
  154:10 204:13,17 211:17
**reviewing** 28:6 33:25 71:14
  98:20 193:11
**reviews** 101:21
**revise** 109:15
**Rhiannon** 2:7 97:6 168:22 221:13
**right** 6:6,17 19:18 29:3 31:3
  34:17 35:2,3 41:7 43:13 45:22
  46:2,3 48:11 53:5,17 54:4
  64:12,18 71:14 86:2,15 98:2,2
  98:3,6,14 104:12,12,17 105:14
  107:24 111:4 112:13 123:9
  124:20 129:6 138:16 147:19
  148:4,10 150:4 160:11,23
  161:22 167:24 172:25 179:10
  193:23 204:2,15 205:12,15
  209:24
**right-hand** 41:4 55:19
**rights** 2:3 209:17
**ringtone** 184:12
**risk** 176:7
**road** 178:17
**role** 145:20 207:21
**roles** 181:24
**Ron** 60:24
**Ronald** 1:6 76:2,2
**room** 116:21
**row** 137:2,6,13 199:17
**rule** 31:8 86:14 90:14 128:15
  129:18 168:10 207:16
**ruled** 135:12 177:21
**rules** 3:5 144:17,18 145:7
**ruling** 31:13
**rupture** 35:6

---

**S**

**S** 4:2
**S.D.H** 39:8,22 40:13 211:3,18

800.523.7887

Associated Reporters Int'l., Inc.

215:19
**S.P** 39:22,24
**S.T.H.s** 50:15
**S.W** 57:7 60:5
**Sa** 60:11
**safe** 163:16 176:19,19 218:15
**Samaritan** 14:17,18,21,24 15:6,6
  15:14,24 49:5 56:18 60:9,12
  86:2,5 88:6 104:7 105:5 107:6
  186:12 187:8 192:7,10,13
  212:25 214:19
**SAMPSON** 2:6 221:12
**Sanchez** 11:22 12:2
**sanctionable** 145:15
**sanctions** 145:6 149:12 152:14
  160:25 161:11
**satisfactory** 36:14
**satisfies** 23:10
**satisfy** 23:5
**save** 18:2 19:18,21 107:16
**saved** 107:17
**saving** 91:5
**saw** 15:7 25:25 28:3 104:12
  116:2,11 121:3 151:24 153:10
  213:2
**saying** 109:16 116:17 117:16
  118:21 119:19 129:17 134:20
  137:12 148:3 151:21,24 152:4
  156:2,2,4 159:16 161:12
  165:17 174:15 175:18 178:23
  179:8,23,24 180:3 186:7 188:8
  191:2 197:21 215:17
**says** 35:5 39:5,10,17 40:21,21
  41:9 55:20,25 56:3,6 64:2
  70:9 95:21 124:19 126:11,12
  127:13 139:9,17 141:9,25
  145:23 147:4,5,6,23 205:17,17
  208:10,17 214:21,23
**scalp** 49:13,14
**scan** 31:21 44:2,7 50:10,11 54:6
  54:10,19,21 55:9 126:12
  127:13 128:4,10,13,18,20
  130:24 165:5,9,18,21 190:16
  211:11,12,17,21
**scanned** 147:20,21
**scanner** 130:5
**scans** 33:20,25 102:11
**scenario** 117:9
**schedule** 12:9 136:25

**scholarly** 114:18
**school** 7:23
**score** 189:6,9,12,18
**scratch** 30:16
**screen** 16:15,16 18:11 20:23
  23:22 24:14 34:8 45:21,22
  53:2 54:13,22 55:19 67:16
  95:25 133:14 156:14 159:20
  162:15
**scroll** 21:6 22:8 23:22 39:11
  41:6 45:4 46:12 48:12 49:20
  53:4 54:17,23 55:24 95:20
  97:14 123:23 147:11 205:14
**se** 205:9
**search** 45:11
**sec** 161:21
**second** 24:12 26:21 43:8 46:12
  51:5 52:11 73:23 84:24 85:5
  85:11 87:23 108:2 112:24
  118:11 142:19 146:6 152:20,25
  156:10 161:23 177:20 196:22
  216:5
**Secondary** 49:10
**seconds** 184:5
**section** 41:9 147:4 206:4
**sedations** 12:19
**see** 20:17 21:9 22:9 23:5,10
  24:14 31:4 32:23 43:17 45:17
  45:18,22 46:2,6,9 48:13,15
  52:22,25 53:2 54:13,24 55:14
  64:6 70:12 96:2 115:19 124:9
  124:16,16,24 125:7 126:13
  133:14 145:14 147:12 153:10
  156:17,22,23,25 157:8,10
  162:4 167:8 186:15 188:2
  191:22,22 213:8 218:18
**seeing** 166:19
**seen** 49:13,14 50:19 85:15
  100:24,25 123:7 125:5 133:5
  157:16,21 158:21 162:12,18
  164:15 166:22 167:6,14 181:8
  183:18 211:25
**send** 158:3 195:20
**sending** 195:19
**sense** 68:10 111:22
**sent** 57:3
**sentence** 48:24 141:24 147:23
  205:7,7,16
**sep** 106:13

800.523.7887

Associated Reporters Int'l., Inc.

**separate** 66:17 211:12
**separation** 50:18,21
**sepsis** 86:13 88:7,10,13 89:7,11
  89:16 90:9,14 91:10,18 92:2,7
  92:8,20 106:15 107:2,6,12,16
  109:18 110:5,18,24 112:8
  114:5,15,17,20 115:10 116:9
  119:3,14 122:2 143:6,14
  148:24 149:4,6,7,25 150:23
  166:18,23 167:4 168:10 181:2
  181:4 186:3,6,22 188:22,24
  189:4,20 191:12,16 192:8
  194:22 195:3,8 196:5 204:24
  205:2 207:16 209:9 211:25
  212:5,7 215:15,21 216:7
**September** 10:5 11:2,17 12:5,12
  12:21 13:6 14:14 25:24 28:19
  67:3 75:13,17 85:23 87:22
  97:23 119:20 120:7 121:14
  125:20 136:6 142:12
**septic** 106:20 142:14 186:15,17
  196:3,3
**sergeant** 70:15 74:23 75:21
  141:9,16
**series** 7:12 81:20
**serious** 88:24 179:25 180:7
**service** 12:19 43:16
**Services** 61:21 64:14
**set** 6:16 29:14,17,19 34:17
  52:17 142:14 161:16 190:10
  202:15
**setting** 8:19
**settle** 152:16
**settled** 80:6,7,10
**settlement** 80:16
**settling** 94:8
**seventeen** 59:21
**seventy-** 169:6
**severe** 38:14 89:10 90:9 112:9
  140:4,8 143:2 166:23 188:2
  194:22 195:3,8,23 205:9
  208:18,18 211:25 215:7
**severely** 27:19 186:15,17 196:3
  210:8
**sexist** 149:3
**shaken** 35:24 122:12,23 174:10
  174:13 182:21
**shaking** 139:25,25 174:16,16
  183:5

**share** 11:23 156:14 157:4,6,8
  159:20 161:22
**shared** 38:17
**shear** 198:19
**shearing** 198:3,23 199:9
**sheet** 44:18 45:7 51:19 58:5
  97:4 219:8
**shift** 137:15
**shifts** 199:24 200:12
**shock** 88:25 142:14
**short** 9:2 68:3 157:14 164:2
**shortly** 15:9
**show** 26:24 128:13 135:12 141:8
  146:5,20 147:25 161:18 164:24
  165:9 190:14 215:15
**showed** 31:21 44:14 56:19 72:16
  126:17 128:14 187:9,11 208:3
**showing** 15:18 45:6 52:19 164:24
  165:5,6 186:13
**shown** 102:14
**shows** 26:23 44:2 126:12 127:14
  128:18,19,20
**shy** 36:2
**sib** 61:5
**siblings** 61:6
**sick** 130:4 192:13
**side** 53:16,17 114:25 158:8
  161:21 174:6 193:9
**sides** 50:17
**sign** 3:11 129:7 178:23 221:8,10
**signal** 195:20
**signature** 40:25 124:11,19,23
  125:12 131:13 205:8,12 221:11
**signed** 3:14 40:15 51:18,21
  53:14,16,17 67:3 70:5,13,25
  71:6 123:25 125:17,19 126:5
  129:5 131:10 139:6 140:10
  179:11 204:9 205:3 206:7
  221:23
**significance** 35:7 37:25 47:6,15
  51:9 125:15
**significant** 35:19 36:7 195:16
**signify** 35:19
**signing** 178:5 179:7 201:6
**signs** 105:17 115:10 170:12,13
  186:13 189:18 215:16
**Sikirica** 1:7 2:16 65:16,19
  78:14 82:19 163:24 167:22
  169:25 208:14

800.523.7887                                    Associated Reporters Int'l., Inc.

**similar** 79:12,15 110:2
**single** 133:19
**sir** 17:25 21:9 88:20 218:15
**sit** 171:18 189:24 204:2
**site** 145:18
**sitting** 75:23
**situation** 117:10,11 136:7
174:12 177:19
**six** 8:4 40:9 54:7 57:4 61:5
147:15,18,18,18 187:25
**sixty-one** 124:2
**size** 47:20 50:23
**sketches** 34:7
**skewed** 214:6
**skill** 29:13,17
**skip** 68:13
**skull** 33:14 44:6,21 48:8 56:19
83:23 84:2 99:9 123:4 130:23
131:4 132:4,9,24 134:14,15,24
134:25 177:6,12,15,17 198:2,2
198:14,15 199:6
**slash** 46:2,7,21,25 59:24
**sleep** 200:23
**slightly** 97:25
**slip** 66:11
**slower** 108:12
**slowly** 207:6
**small** 123:4
**SMITH** 2:13
**snag** 153:22
**snippet** 209:4
**snippets** 158:25
**social** 26:22 55:12 60:4,6,16,18
60:22,25 61:10,13 71:3 140:22
141:4 175:9
**Society** 9:21
**sofa** 122:19
**soft** 122:19 198:6,10,17 199:13
**solve** 111:18
**somebody** 153:9
**somebody's** 184:2
**soon** 15:8 218:18
**sorry** 14:23 36:10 42:13,24
44:19 48:4,5 54:25 59:16
71:20 85:7,7 95:3 101:12
114:6 116:23,24 124:15,15
133:10 140:25 149:2 150:3,13
159:19 162:8 188:11 189:11,14
193:25 203:8 205:14

**sort** 16:21,22 18:12,15 184:14
**sorted** 17:24
**sound** 112:17
**source** 87:6
**sources** 128:3
**space** 31:25
**spaces** 98:16
**speak** 20:19 76:6 87:17 95:4
150:10 160:16 185:21
**speaking** 19:10 118:25 135:18
144:6,24,25 148:22 152:13
**speaks** 205:17
**specialist** 91:13
**specialists** 132:19
**specialties** 29:21 188:13
**specialty** 8:13
**specific** 12:20 106:7
**specifically** 58:11 86:10 103:11
105:24
**specify** 79:7
**speculate** 144:4,9 145:14 148:20
**speed** 36:23
**spell** 6:12
**spelling** 20:25
**Spencer** 2:7 64:5,10 67:14,21
68:2,6,12 97:6 154:3 221:13
**spinal** 33:21 47:20
**split** 12:16
**spoke** 60:25 121:8,11,18 136:5
152:9 215:13
**spoken** 196:7
**spontaneous** 49:16
**staff** 11:9 60:6
**stain** 194:15,17
**stains** 113:20
**stand** 46:7
**standard** 37:11,13
**standards** 121:25
**standing** 17:18 78:10 82:10
148:6 181:25 217:5
**start** 110:21 188:2
**started** 6:20 86:15,21,22 118:7
**starting** 75:17 215:15
**state** 2:10,10 6:11 20:10,12,16
58:21,22 61:15 70:9 78:11
80:25 81:5,11 82:9,16,21 83:8
87:22 102:8 131:15 143:23
169:16,17,18 190:6 200:10
206:4 218:7 219:3

ARII@courtsteno.com                                    www.courtsteno.com

**stated** 60:10 102:17 134:24
136:4,13 147:24 181:3 188:4
191:10 194:21 203:16 208:6
220:6
**statement** 69:25 129:11 137:9
140:20 176:10 196:10,15
200:25 201:3,6,9 202:4 203:14
203:19,21,24 204:4,13,16,17
204:22,23 205:22 212:17
216:24 217:22
**statements** 179:15 205:13 206:2
206:7,9 214:4
**states** 1:2 41:13
**stating** 41:24 134:12
**status** 39:22 90:6
**stay** 49:9 163:16 188:25 218:15
**stayed** 60:18
**stem** 38:14
**Steno** 173:6
**stenographer** 20:23 78:10 85:8
108:22 109:2
**step** 160:8 165:10 216:23
**stern** 184:3
**stick** 122:17
**stimuli** 26:9
**stimulus** 49:17
**STIPULATED** 3:3,7,10,13
**stipulations** 3:2 110:2
**stomach** 79:20
**stop** 17:20 88:17 150:4 153:8
195:21
**story** 183:24 184:9
**straight** 170:9
**Street** 2:8 221:13
**streptococcal** 216:7,7
**Streptococcus** 208:10
**stressful** 137:21,21
**strike** 48:18 52:4 84:9 131:12
174:25 178:4 184:16 189:15
**striking** 140:9
**strongly** 207:20
**structure** 31:12
**students** 182:7
**studies** 110:3
**stuff** 161:10
**Sub** 208:17
**subarachnoid** 98:7,16
**subdural** 31:22,25 33:4,10 39:5
39:8,21,23 40:13 41:15,16,21
44:3 47:2,23 50:15 51:7,14

53:9 58:14,16 60:13 88:12
93:19,25 94:6,13 95:14 98:6,7
98:13,15 100:7,12,21 102:7,19
102:20,22 111:11 122:20 123:5
126:13 127:14 128:13 139:19
154:8 164:6,8 166:16,22 167:4
167:8 180:8,25,23 183:3 186:3
188:17 190:6,13,22 191:4,21
191:23 192:15,22 193:8,17
198:7,20 210:24
**subdurals** 94:24 167:14 193:14
**subject** 102:15 163:12
**submitted** 22:14
**subpoena** 3:6
**subretinal** 35:16
**subsequent** 84:21 164:10
**subsequently** 209:18
**substance** 15:13 64:25 65:5 84:2
86:11,12 103:4 120:9 137:11
**sudden** 197:25
**sued** 76:20 77:7,18
**suffered** 139:22 141:25
**suggest** 35:25 207:20
**suggested** 42:19 111:23 151:7
214:2
**suggesting** 143:3
**suggests** 154:8
**suit** 214:6
**Suite** 2:18
**sum** 15:12 64:24 65:4 84:2 86:11
86:12 116:6 120:9 137:11
**summary** 15:17 87:21 149:18
**Sunday** 101:19
**SUNY** 7:22
**super** 82:22
**supervised** 61:13
**supervisory** 181:23
**supplemental** 22:16
**support** 60:7,9 185:5
**supporting** 70:4 74:6
**suppressed** 104:21
**suppression** 104:24
**sure** 10:12,14 22:2 34:18,23
47:10 49:4 50:14 58:2,4 65:23
70:7 77:17 83:11 91:7 96:6
97:22 107:21,22 108:21,25
112:11 114:20 127:8 146:12
147:21 156:23 158:2 160:7,18
166:25 168:3,25 171:5 172:18
173:8 175:25 176:6 181:7,19

800.523.7887       Associated Reporters Int'l., Inc.

192:5 207:23 208:7 211:18
212:20
**surface** 198:13
**surrounding** 68:24
**survive** 187:24
**suspect** 56:24 57:9,12,19 138:2
**suspected** 210:9
**suspicious** 58:25
**suture** 50:21
**sutures** 50:19
**swear** 6:3,7 115:25
**swelling** 47:19 49:13,14 140:3
142:25
**switch** 112:19
**sworn** 4:3 6:16 219:11 220:8
**symbol** 49:2,4
**symptom** 89:10 121:22
**symptoms** 35:24 88:23 122:3
**Syndrome** 35:24 182:22
**system** 90:21 98:10 104:20 185:6
**systems** 26:23

**T**

**T** 5:2
**tachycardia** 105:9
**tailor** 171:9,13 172:9
**tailored** 171:19
**take** 17:21 23:4,8,12 24:18
67:12 68:5 69:7 71:8 107:22
107:25 108:5,18 111:3 115:22
124:5 137:19 147:12 160:4
161:4 163:10 164:20 178:19
203:2 213:7
**taken** 3:6 57:6 60:11 109:12
178:8 199:20 219:5 220:4
**takes** 12:23 180:7,21 187:11
196:4 197:25
**talk** 16:19 36:3 66:7 73:22
112:15 120:16 142:25 148:24
149:24 159:9 161:20 174:4
191:3 197:3 210:4
**talked** 73:17 180:17 191:15
211:24
**talking** 16:21 22:7 36:13 79:16
95:15 99:11,12,15 103:10
133:22 145:11 147:12 149:13
149:14 150:14,18,20,24,25,25
151:2,9,21 174:14 186:2
188:17 189:22 195:4 198:22
205:19 209:3 211:7

**talks** 101:20
**teach** 110:15,16,16
**teaching** 37:11,13
**team** 14:18,22 15:5
**tear** 123:4
**technically** 129:13
**telephone** 14:16 184:2
**tell** 7:16 11:13 13:4 22:21 29:6
34:15 39:2 41:16 57:22 58:12
69:7 71:7 84:6 95:19 97:14
120:6 138:25,25 151:10 158:25
159:8,12 193:16 214:20
**telling** 137:11 138:23 162:21,25
**temperature** 214:25
**ten** 22:23 36:6 37:13 60:24 68:7
107:23 126:10
**tend** 199:24
**term** 36:2,3,5,12 107:9 122:13
122:23 170:3,18 179:17,18
182:21,23,24 184:16,16,19,23
185:19 187:20
**terminology** 176:23
**terms** 74:4 106:16 207:14,18
216:12
**test** 213:8
**tested** 86:18
**testes** 115:9
**testified** 73:7 76:10 85:11
179:22 183:17 203:22 213:14
**testify** 18:24 69:11 73:24 74:4
84:15,19,20 85:4,18 99:18
220:8
**testifying** 73:23 75:18,19 84:24
203:17
**testimony** 6:7 71:22,22,25 72:2
72:17 74:3,8,16 91:20 98:20
99:2 109:14 114:24 167:18
168:21 169:2 203:13 206:17,20
206:21 207:15 219:5 220:4,7
221:8
**testing** 44:13,15
**texting** 160:11
**thank** 6:17 25:6,23 28:17 36:18
36:21 37:24 41:2,7 43:3,4,13
44:17 45:2,5 46:24 48:14
49:19,21 53:5 59:22 64:10
66:17 67:11 68:2 76:24 82:14
85:13 89:22 90:4 124:17
133:13 144:7 147:13 149:7
158:4 159:18 163:14,17 169:5

ARII@courtsteno.com       www.courtsteno.com

800.523.7887                                        Associated Reporters Int'l., Inc.

```
169:8,9 170:19 173:10 174:19          66:1,4 67:1 68:1,23 69:1 70:1
174:19 175:11 187:22 188:11           71:1,23 72:1,8 73:1 74:1 75:1
190:20 193:20 197:5 202:9,14          75:12 76:1 77:1 78:1 79:1
202:16 203:10 205:11 206:10           80:1 81:1 82:1 83:1 84:1,21
218:4,5,8,9,11,13,19,20               85:1,16 86:1 87:1 88:1 89:1
thanks 161:25 163:8,15 182:3          90:1 91:1 92:1 93:1 94:1 95:1
218:17                                96:1 97:1 98:1 99:1 100:1
That'd 173:9                          101:1 102:1 103:1 104:1 105:1
That's 97:18                          106:1 107:1 108:1 109:1 110:1
theory 114:25                         111:1 112:1 113:1 114:1 115:1
they're 217:23                        116:1 117:1 118:1 119:1 120:1
thing 18:11 24:18 33:17 101:23        121:1,7 122:1 123:1 124:1
118:8 139:12                          125:1 126:1 127:1 128:1 129:1
things 11:5,7 12:25 38:15 42:20       130:1 131:1 132:1 133:1 134:1
47:18 69:19 89:6 110:16 111:7         135:1 136:1,21 137:1 138:1
120:17 122:10 135:22 145:17           139:1 140:1 141:1 142:1 143:1
165:2 179:11 217:9,13                 144:1 145:1 146:1 147:1 148:1
think 9:16 10:14,15 20:22 22:2        149:1 150:1 151:1 152:1 153:1
22:11 30:3 39:22 51:11 64:9           154:1 155:1 156:1 157:1 158:1
68:4,5 78:5,22 80:5,7 82:20           159:1 160:1 161:1 162:1 163:1
82:20 84:16 94:24 101:18              164:1,7 165:1 166:1,15 167:1
102:13 105:6 106:15 108:11,12         168:1,8 169:1,17 170:1,11
108:14 111:2 112:14,23 116:6          171:1,20 172:1 173:1 174:1,15
118:6,6,8 122:2,10 132:12             175:1 176:1 177:1 178:1 179:1
135:15 137:24 144:22 153:4,5          180:1 181:1 182:1 183:1,12
153:7,8 154:11,13 155:12              184:1,20,25 185:1 186:1,6
159:5,22 161:5,7,18 163:2,9           187:1 188:1 189:1,17 190:1
167:17,18 168:21 174:5 175:15         191:1,20 192:1,17,19 193:1,8
177:23 181:6 188:19 192:12            193:11 194:1 195:1 196:1
203:2 211:6,8,13,16 214:4,5           197:1 198:1 199:1,12 200:1
215:24 216:10,14 217:5,17,25          201:1,18 202:1,7 203:1 204:1
218:2                                 205:1 206:1 207:1 208:1 209:1
thinking 106:13                       210:1 211:1 212:1 213:1 214:1
third 26:21 40:12 54:8                215:1 216:1 217:1 218:1 219:1
thirteen 146:16 147:7                 220:1 221:1,4 222:1
thirty 48:19 51:19 117:8 181:12       Thomas' 157:22
182:7 221:9,10                        Thomas's 38:3 64:14 65:17
Thomas 1:1,3 2:1 3:1 4:1 5:1          191:11 209:17
6:1,23 7:1,11 8:1 9:1 10:1            Thomas's 62:18
11:1 12:1 13:1,8 14:1,13 15:1         thorough 211:9
16:1 17:1 18:1 19:1 20:1 21:1         thoroughly 175:4
22:1 23:1 24:1 25:1,25 26:1           thought 20:23 54:7,19,19 122:24
27:1,10 28:1,2,18 29:1,25             122:24 150:18 213:2,6
30:1 31:1 32:1 33:1 34:1 35:1         thoughts 183:22
36:1 37:1 38:1 39:1 40:1 41:1         thousand 28:14,15 104:19
41:9 42:1 43:1 44:1,10 45:1           thousands 28:11 114:17 166:24
46:1 47:1 48:1 49:1 50:1 51:1         181:14,19,19,20
52:1 53:1 54:1 55:1 56:1 57:1         threaten 160:24
57:18 58:1 59:1,10 60:1 61:1          threatening 60:20
62:1 63:1,15 64:1,21 65:1,13
```

ARII@courtsteno.com                                        www.courtsteno.com

**three** 5:14 9:16 28:14 43:25
   110:3,17,23 126:11 127:2,13
   127:24 129:12 147:14,16,18,20
   155:17 156:6 176:5 189:10,12
   189:14,18 192:20 216:11
**three-page** 146:13
**throw** 161:10
**thrown** 209:19
**Tibebu** 57:7
**TIM** 1:6
**time** 1:13 3:6,15 10:6,6,11,17
   11:11 13:7,11 14:12,20,22,23
   14:24 20:7 27:10 28:3,7 30:11
   38:3 44:10 48:20 51:24 57:17
   64:7,18 65:10 72:8 73:23 74:3
   76:7 84:24 87:11 88:8 91:10
   91:19 92:6 94:3 101:19 107:17
   108:15 110:8 116:12 121:4
   126:6,10 130:5 133:24 134:6
   136:14,24 142:12,16 143:15,24
   145:13 160:21 162:7 163:14
   167:10 169:20 181:13 185:3,9
   186:25 187:4,12,16,20 188:25
   191:11 192:19 195:6,11,13
   196:4 198:25 199:21 200:2
   202:10,25 209:4 210:3 218:12
   219:5 220:5
**times** 12:18 32:8 177:14 179:11
   186:16
**tired** 200:17
**title** 8:9 10:10,13 26:18 55:13
**titrate** 27:14
**to--** 19:23
**today** 47:12 65:2 69:3,7,11 72:2
   75:19,23 86:7 95:11 116:8
   131:15 133:24 155:20,21
   163:15 168:12 171:3,18 189:24
   202:10,13 218:12
**today's** 16:8 17:6 25:9 32:11
   38:23 45:7 51:20 66:21 67:2
   67:24 75:8 204:8 206:17
**today's** 6:21
**told** 27:6 52:3 72:25 73:14
   87:10,13 107:18 113:19 119:4
   131:2 132:12 144:9 148:17
   177:15,16,18 184:9 185:16
   195:6 214:6
**tomorrow** 44:15 140:5
**tone** 161:4

**top** 39:20 40:5 41:4 46:9 54:24
   120:15 126:9 157:5 212:23
   216:10
**topic** 97:10
**Toronto** 8:3
**tough** 28:11 122:7
**Tower** 2:14
**toxemia** 154:18,25
**training** 110:22 154:5
**transact** 40:22
**transcribed** 178:10
**transcript** 7:3 69:24 80:19
   168:6,19 169:7 206:15 219:6,8
   221:8,10,11
**transcription** 220:10
**transcripts** 173:11
**transfer** 86:2 214:23
**transferred** 40:9 49:5 56:18
   60:8 178:13
**transition** 63:20
**transmission** 59:20
**transport** 9:17 14:18,22 30:17
**trauma** 30:15,19,20 31:21 33:15
   35:20 36:8,12,17 37:5 57:16
   58:25 86:14 90:18,19 92:19,23
   93:3,4,6,9,12,18 106:16 107:8
   109:22 110:5,19,24 111:8,9,10
   111:21 112:7 113:10,13 116:9
   138:4,9 140:4 142:7 143:2
   148:14,18,19 154:13 159:7
   164:10 166:20 167:10,15
   168:10 180:2 182:18,24 188:5
   188:7 189:2 192:9,18,18
   193:23 194:5,10 197:10,13,18
   197:21 198:18 207:16 209:3,10
   209:13 210:5,21 213:16 215:19
   216:10,11,15
**trauma-centric** 143:3
**traumatic** 30:9,13 32:2 41:22
   93:25 112:2 142:13
**treat** 107:16 109:18 175:4
**treated** 59:10 106:20 114:17
   181:14 183:12 189:8,19 209:9
**treating** 59:9 86:15 165:11
   185:3,8 193:11
**treatment** 6:23 28:18,25 66:4
   83:13 106:25 130:4,10,12
   133:2 171:10,20 172:8,8
   173:22 186:20 188:22 189:4
   200:11

800.523.7887 Associated Reporters Int'l., Inc.

**treatments** 202:6
**trial** 3:9,16 7:3 17:24 69:24
 71:23 72:13 73:7,12 75:18
 76:11,13,14 78:8,21 81:18
 84:21 85:5,11,19,20 87:17
 90:12 98:20 99:2 114:24 127:9
 144:17,19 145:7 167:18 168:20
**trials** 43:6 74:4
**tried** 162:17
**trouble** 15:20
**Troy** 1:1,6 2:1,6,8 3:1 4:1 5:1
 5:13 6:1 7:1,10,10,11 8:1 9:1
 10:1 11:1 12:1 13:1 14:1 15:1
 16:1,8 17:1 18:1 19:1 20:1
 21:1 22:1 23:1 24:1 25:1,9
 26:1 27:1 28:1 29:1 30:1 31:1
 32:1 33:1 34:1 35:1 36:1 37:1
 38:1 39:1 40:1 41:1 42:1 43:1
 44:1 45:1 46:1 47:1 48:1 49:1
 50:1 51:1 52:1 53:1 54:1 55:1
 56:1 57:1 58:1 59:1 60:1,23
 61:1 62:1,8,16,19 63:1,4,15
 63:23 64:1,13,19 65:1,11 66:1
 67:1,21,23 68:1 69:1 70:1,10
 70:22 71:1 72:1 73:1 74:1
 75:1 76:1 77:1 78:1 79:1 80:1
 81:1 82:1 83:1 84:1 85:1 86:1
 87:1 88:1 89:1 90:1 91:1 92:1
 93:1 94:1 95:1 96:1,21 97:1
 98:1 99:1 100:1 101:1 102:1
 103:1 104:1 105:1 106:1 107:1
 108:1 109:1 110:1 111:1 112:1
 113:1 114:1 115:1 116:1 117:1
 118:1 119:1,18 120:1,7 121:1
 122:1 123:1 124:1 125:1 126:1
 127:1 128:1 129:1 130:1 131:1
 132:1 133:1 134:1 135:1 136:1
 137:1 138:1,21 139:1 140:1
 141:1 142:1 143:1 144:1 145:1
 146:1 147:1 148:1 149:1 150:1
 151:1 152:1 153:1 154:1 155:1
 156:1 157:1 158:1 159:1 160:1
 161:1 162:1 163:1 164:1 165:1
 166:1 167:1 168:1 169:1 170:1
 170:21 171:1,2,17,20 172:1
 173:1 174:1 175:1 176:1 177:1
 178:1 179:1,16 180:1 181:1
 182:1 183:1 184:1 185:1 186:1
 187:1 188:1 189:1 190:1 191:1
 192:1 193:1 194:1 195:1 196:1

197:1 198:1 199:1 200:1 201:1
 201:2 202:1,5 203:1,15 204:1
 205:1 206:1 207:1 208:1 209:1
 210:1 211:1 212:1 213:1 214:1
 215:1 216:1 217:1 218:1 219:1
 220:1 221:1,4,14 222:1
**true** 113:25 128:12 131:4 150:2
 190:11 198:10 200:9 206:21
 219:6,8 220:11
**truth** 6:8,8,9 69:7 220:8,8,9
**try** 19:6 27:12,15,23 40:6 58:3
 69:3 97:9 135:23 153:5,22
 162:6 174:2 191:2 195:13
**trying** 43:8 73:20 79:12 97:13
 135:21 145:15 150:12 151:12
 153:17 161:9 204:21
**tube** 26:11
**turn** 106:16
**turned** 99:3
**turns** 107:8
**twelve** 48:19 51:19 54:13 74:9
 86:6 107:23 123:22 154:7,14
 156:11
**twenty** 9:12 184:5
**twenty-four** 11:13 168:6
**twenty-four/seven** 137:13
**twenty-one** 60:23 208:12
**twenty-six** 167:25
**twenty-three** 56:2,6 60:5
**twenty-two** 56:2,6
**twice** 60:25 78:5
**twin** 49:11,12 57:5 61:6
**two** 5:12 30:3 53:15 69:23 74:9
 74:20 75:17 79:6 86:5 110:4
 116:7 123:22 130:6 146:11
 173:6 176:4 187:18,18 193:8
 201:10,17,23 202:2 207:21,22
 207:24 210:15 216:10
**two-day** 49:7
**two-hundred** 201:18
**two-part** 117:20,24
**type** 37:5 76:15,17 83:2 111:9
 117:9,11 139:24 140:6 178:22
 198:9
**types** 111:7 175:2
**typewriting** 41:13
**typewritten** 99:12 205:20,21
 220:9
**typical** 178:2 215:8

800.523.7887                    Associated Reporters Int'l., Inc.

**typically** 128:21 139:23 142:4,5

**U**

**Uh-huh** 195:7 208:20
**ultimately** 102:10 129:4 130:12
**unable** 200:11
**unclear** 98:6
**underlying** 111:19,25
**underplay** 174:10
**understand** 10:23 16:11 19:17
  23:16 25:17,18 33:5,19 53:11
  69:6 92:3 127:10 129:16 138:5
  139:14 161:11 185:10 214:15
**understanding** 22:21 23:2 43:6
  63:22 101:5 104:9 105:21
  182:22 183:8 187:19 198:8
  201:19 211:2
**underwater** 112:18
**unethical** 171:12
**unfair** 19:8
**unfortunate** 161:6
**unfortunately** 199:23
**uniform** 144:18 145:7
**unit** 8:23,25 9:3 10:19 11:2,10
  11:16 12:4,4 28:10
**UNITED** 1:2
**universe** 71:14 132:8
**unresponsive** 15:18 30:18
**unresponsiveness** 49:8 88:21
**unsigned** 178:18
**unstable** 130:6
**untrue** 131:22 132:2
**unusual** 89:15,20,21,22 90:4
  116:18 186:14,18 191:16
**updated** 133:7
**upper** 55:19 98:2
**upset** 117:22
**use** 13:21 27:11 36:3,11 68:7
  138:2 184:23 185:19 188:16
**usual** 159:17
**usually** 12:16 101:24 190:15

**V**

**v** 1:1,5 2:1 3:1 4:1 5:1 6:1 7:1
  8:1 9:1 10:1 11:1 12:1 13:1
  14:1 15:1 16:1 17:1 18:1 19:1
  20:1 21:1 22:1 23:1 24:1 25:1
  26:1 27:1 28:1 29:1 30:1 31:1
  32:1 33:1 34:1 35:1 36:1 37:1
  38:1 39:1 40:1 41:1 42:1 43:1

44:1 45:1 46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1 96:1 97:1
98:1 99:1 100:1 101:1 102:1
103:1 104:1 105:1 106:1 107:1
108:1 109:1 110:1 111:1 112:1
113:1 114:1 115:1 116:1 117:1
118:1 119:1 120:1 121:1 122:1
123:1 124:1 125:1 126:1 127:1
128:1 129:1 130:1 131:1 132:1
133:1 134:1 135:1 136:1 137:1
138:1 139:1 140:1 141:1 142:1
143:1 144:1 145:1 146:1 147:1
148:1 149:1 150:1 151:1 152:1
153:1 154:1 155:1 156:1 157:1
158:1 159:1 160:1 161:1 162:1
163:1 164:1 165:1 166:1 167:1
168:1 169:1 170:1 171:1 172:1
173:1 174:1 175:1 176:1 177:1
178:1 179:1 180:1 181:1 182:1
183:1 184:1 185:1 186:1 187:1
188:1 189:1 190:1 191:1 192:1
193:1 194:1 195:1 196:1 197:1
198:1 199:1 200:1 201:1 202:1
203:1 204:1 205:1 206:1 207:1
208:1 209:1 210:1 211:1 212:1
213:1 214:1 215:1 216:1 217:1
218:1 219:1 220:1 221:1,4
222:1
**vaccine** 210:16
**vague** 84:6
**Valliani** 53:17,19
**varies** 29:17
**various** 114:24 199:24
**varying** 44:3 94:24 126:13
  127:14 191:4
**vehicle** 36:23 59:4 120:14 197:6
  197:7,24
**vein** 49:16
**ventilated** 12:24
**ventilator** 15:21 26:10
**ventricles** 47:20
**venue** 80:4

800.523.7887                                                    Associated Reporters Int'l., Inc.

**verbal** 7:13 101:17 102:3 131:3
  151:15,18
**verbally** 102:5
**vernacular** 27:12
**versus** 7:11 128:18 142:7 169:18
**vessel** 198:23
**vessels** 123:5 198:3,19 199:9
**victim** 59:11 139:20 145:24
**video** 5:15,17 156:13 158:9,14
  159:25 161:24 162:4,9 173:6
**view** 27:17 29:18 67:15 159:3
**views** 121:22 122:11
**violated** 209:17
**violence** 180:8,21
**violent** 35:20 139:25 197:25
**visitation** 61:11,12
**voice** 70:2
**volunteer** 42:6
**Volunteering** 89:14
**vomiting** 15:22 40:10 214:25

---

**W**

**W-A-L-T-E-R** 6:13
**wait** 91:21 204:11
**waiting** 142:19 173:5
**waking** 49:13
**Waldman** 45:16 46:16 51:12,23,24
  66:3 85:4,11 190:4 211:9
**wall** 172:21
**Walter** 1:1,11 2:1 3:1 4:1,3 5:1
  6:1,13 7:1,18 8:1 9:1 10:1
  11:1 12:1 13:1 14:1 15:1 16:1
  17:1 18:1 19:1 20:1 21:1 22:1
  23:1 24:1 25:1 26:1 27:1 28:1
  29:1 30:1 31:1 32:1 33:1 34:1
  35:1 36:1 37:1 38:1 39:1 40:1
  41:1 42:1 43:1 44:1 45:1 46:1
  47:1 48:1 49:1 50:1 51:1 52:1
  53:1 54:1 55:1 56:1 57:1 58:1
  59:1 60:1 61:1 62:1 63:1 64:1
  65:1 66:1 67:1 68:1 69:1 70:1
  71:1 72:1 73:1 74:1 75:1 76:1
  77:1 78:1 79:1 80:1 81:1 82:1
  83:1 84:1 85:1 86:1 87:1 88:1
  89:1 90:1 91:1 92:1 93:1 94:1
  95:1 96:1 97:1 98:1 99:1
  100:1 101:1 102:1 103:1 104:1
  105:1 106:1 107:1 108:1 109:1
  110:1 111:1 112:1 113:1 114:1
  115:1 116:1 117:1 118:1 119:1

120:1 121:1 122:1 123:1 124:1
125:1 126:1 127:1 128:1 129:1
130:1 131:1 132:1 133:1 134:1
135:1 136:1 137:1 138:1 139:1
139:6 140:1 141:1 142:1 143:1
144:1 145:1 146:1 147:1 148:1
149:1 150:1 151:1 152:1 153:1
154:1 155:1 156:1 157:1 158:1
159:1 160:1 161:1 162:1 163:1
164:1 165:1 166:1 167:1 168:1
169:1 170:1 171:1 172:1 173:1
174:1 175:1 176:1 177:1 178:1
179:1 180:1 181:1 182:1 183:1
184:1 185:1 186:1 187:1 188:1
189:1 190:1 191:1 192:1 193:1
194:1 195:1 196:1 197:1 198:1
199:1 200:1 201:1 202:1 203:1
204:1 205:1 206:1 207:1 208:1
209:1 210:1 211:1 212:1 213:1
214:1 215:1 216:1 217:1 218:1
219:1,4,10 220:1,4 221:1,5,24
222:1
**want** 16:19 19:8,24 20:6 23:13
  24:19,22 40:5 45:12 47:8 60:2
  64:6 67:12 69:2 82:9 87:12,18
  96:9,9,10 108:5,13 112:13
  123:23,24 126:23 127:5 137:14
  139:13 145:18 146:11 148:22
  152:15,21 156:13,23 157:14
  160:7,8,8,21 161:5,20 163:18
  169:7 174:4 176:16,16 197:19
  200:18 205:18 206:24,25 208:2
  212:21 213:7
**wanted** 13:3 43:4 55:14 68:5
  131:11 147:25 161:22 172:10
  173:24 174:18 206:16
**wants** 108:18 110:8 144:10 203:2
**wasn't** 43:8 58:24 63:12 72:10
  108:25 111:24 115:21 130:15
  134:15 142:15,22 143:11
  194:12 213:3 215:12 217:8
**wasn't** 108:21
**waste** 20:7
**watery** 49:7
**way** 22:11 46:24 63:6 79:13 92:9
  109:19 142:14 147:12 160:22
  164:8,10 185:24 186:14 188:22
  189:10 200:19 209:10
**ways** 185:8

ARII@courtsteno.com                                            www.courtsteno.com

Case 1:17-cv-00626-DLS Document 66-9 Filed 04/11/21 Page 267 of 269

APPENDIX

**1288**

800.523.7887

Associated Reporters Int'l., Inc.

Page 266

**we'll** 13:5 19:18 23:7 71:16
  97:8 109:15
**we're** 6:5 11:25 16:20,20 24:17
  25:4 36:13 38:15 43:11,15
  52:14 68:15,18 69:2 97:10
  109:10,13,16 112:7 113:4
  118:16,19 133:15 153:2 161:9
  173:5 188:17 195:5 198:22
  199:20 200:20,20 203:4 209:15
  211:7
**we've** 75:6 109:12 169:22 191:15
  213:25
**we'll** 16:21,22 19:21
**we're** 152:22
**we've** 45:11
**wearing** 151:25
**Webex** 1:14
**week** 178:17 187:17
**weeks** 40:9 93:9 187:18
**went** 7:23,24 8:3 69:25 70:8
  100:5 114:23 121:7 134:7
  160:3 178:15 184:2,5 191:24
**weren't** 77:21 199:25
**West** 2:18
**wheel** 173:2
**whims** 171:10
**white** 103:25 104:18,18 105:12
  191:19,24
**Wilhemina** 56:25 75:12
**willing** 108:17
**willingness** 202:13
**wish** 109:14 207:3
**wishes** 171:11,20
**withdrawal** 187:7,9
**withdrawn** 71:20 84:19 86:16
  106:13 116:5 120:5 123:7
  125:23 140:18 141:23,23 171:7
  194:2,13
**witness** 2:13 3:10,14 5:8 6:4,10
  6:13,15 16:18 23:9,15,19
  28:14 36:15,19,22 49:12 66:11
  67:3,7 70:9 72:18 74:7,15
  78:18 82:13 90:2,5 95:21 96:5
  96:7 97:20,23 108:21,25
  114:10 117:22 121:3 125:3,10
  128:22 137:15,18 139:6 144:6
  144:10 145:2,14,20 146:6
  150:10 160:5,10 161:16 163:17
  166:3 173:12 196:20 203:6
  204:7 206:8 211:20 213:19

  215:24 216:23 217:5,16,24
  218:5,13,16
**witness(es)** 220:7
**Wonderful** 7:8
**word** 65:6,6 71:8 82:21 90:4
  99:24 116:15 119:18 120:21
  155:12 159:14,16 167:12
  190:24 221:15,16,18,19,20,21
  221:22
**words** 79:5 93:8 94:25 102:13,19
  117:13 118:23 119:4 120:8
  139:9 140:14,17 143:4,5 146:2
  148:18
**work** 8:12,14,24 19:6 108:17
  132:20 136:24 161:9,22 194:16
  199:18,24 200:9
**worked** 77:7,18 91:6 136:25
  200:12
**worker** 55:12 57:6 60:4,6,16,18
  60:23,25 61:2,9,10,13 71:3
  140:22 141:4
**working** 13:22 27:11 65:21,21
  106:16 137:13 199:17
**works** 73:11
**world** 176:4
**worsening** 49:7
**worth** 42:18
**wouldn't** 64:2 138:2 178:2 179:4
  187:23 190:12
**wrap** 161:15
**write** 141:16 177:17 201:2
**writing** 143:7,16,17,24 211:22
**writings** 182:12
**written** 70:24 101:18,23,24
  134:2,2 140:20,21,24 141:4,15
  200:25
**wrong** 88:2 90:13 153:12,15
  213:5
**wrongfully** 169:19
**wrote** 44:12 46:6,9,10 71:5
  140:15 142:11 143:15

---

**X**

**X** 4:2 5:2,2 219:9,12
**X-ray** 128:10

---

**Y**

**yeah** 8:22 11:14 14:3 20:21
  24:15 42:16 43:2,5 45:10,17
  54:9 68:4,12 74:5 76:14 79:19

86:3 87:18,20 96:19 97:7,13
101:15 103:3,7,13 108:7
116:25 117:4 118:4 124:25
125:8 126:14 127:3 128:8
129:22 132:23 139:13 141:6
147:10,17 153:2 157:7 159:21
165:24 171:4 182:14 188:9
196:18 201:15 208:5 210:19
213:2 216:20 217:25 218:14
**year** 117:3
**years** 36:6 37:13 79:5,9 110:3
116:20 117:2,6,7 121:24 154:8
154:14 156:11 181:12 182:7
183:13
**yesterday** 84:5 121:3
**York** 1:2 2:5,5,8,10,12,15,18
61:15 70:10 78:12 82:9 169:16
169:17,18 206:5 218:8 221:14
**you'd** 195:5
**you've** 124:6
**young** 110:4 153:21

---
**Z**
---

**zero** 56:13 116:22 146:17 189:6
208:12
**Zewdie** 57:6

---
**0**
---

**09** 116:2

---
**1**
---

**1** 5:15 220:6,10
**1:18** 109:9
**1:22** 113:2
**1:23** 113:2
**1:30** 118:12
**10/24** 124:20 125:16
**10:07** 1:13 6:2
**10:18** 15:5
**10:53** 15:6
**10007** 2:5
**11:21** 52:12,12
**11:46** 68:16
**11:55** 15:7
**12:06** 14:16 15:7
**12:11** 68:17
**12:54** 109:8
**12180** 2:8 221:14
**12203** 2:15
**12205** 2:18

**12224-0341** 2:12
**163** 4:5
**169** 4:5
**17** 5:5
**17-CV-626** 1:5 221:4
**1980** 7:23

---
**2**
---

**2** 5:17
**2:14** 153:23
**2:25** 153:24
**2008** 10:5 11:3,17 12:5,12,21
13:7 14:14 25:24 28:19 67:4
75:13,18 85:23 119:20 120:7
121:14,20 125:20 136:6
**2009** 69:24 71:23 72:13,15 74:4
74:8 83:18 87:9,13,17 167:18
168:20 206:15,21
**2014** 72:8
**2020** 1:12 219:11
**203** 4:6
**206** 4:6
**210.45** 206:4
**218** 220:10
**21st** 10:5 13:6 14:14 28:19
75:13,17 85:23 97:23 119:20
120:7 125:20 136:6
**22** 2:8 221:13
**22nd** 67:3 121:12,14 142:11
**23rd** 87:22 128:8
**24th** 25:24

---
**3**
---

**3:39** 218:21
**30** 1:12 221:9,10
**305** 2:4

---
**4**
---

**4:05** 1:13

---
**5**
---

**507** 2:18
**523-7887** 221:2

---
**6**
---

**6** 2:14 4:4
**600** 2:4
**67** 5:7
**68** 4:4

800.523.7887

Associated Reporters Int'l., Inc.

---

**7**

**7-30-2020** 1:1  2:1  3:1  4:1  5:1
6:1  7:1  8:1  9:1  10:1  11:1
12:1  13:1  14:1  15:1  16:1  17:1
18:1  19:1  20:1  21:1  22:1  23:1
24:1  25:1  26:1  27:1  28:1  29:1
30:1  31:1  32:1  33:1  34:1  35:1
36:1  37:1  38:1  39:1  40:1  41:1
42:1  43:1  44:1  45:1  46:1  47:1
48:1  49:1  50:1  51:1  52:1  53:1
54:1  55:1  56:1  57:1  58:1  59:1
60:1  61:1  62:1  63:1  64:1  65:1
66:1  67:1  68:1  69:1  70:1  71:1
72:1  73:1  74:1  75:1  76:1  77:1
78:1  79:1  80:1  81:1  82:1  83:1
84:1  85:1  86:1  87:1  88:1  89:1
90:1  91:1  92:1  93:1  94:1  95:1
96:1  97:1  98:1  99:1  100:1
101:1  102:1  103:1  104:1  105:1
106:1  107:1  108:1  109:1  110:1
111:1  112:1  113:1  114:1  115:1
116:1  117:1  118:1  119:1  120:1
121:1  122:1  123:1  124:1  125:1
126:1  127:1  128:1  129:1  130:1
131:1  132:1  133:1  134:1  135:1
136:1  137:1  138:1  139:1  140:1
141:1  142:1  143:1  144:1  145:1
146:1  147:1  148:1  149:1  150:1
151:1  152:1  153:1  154:1  155:1
156:1  157:1  158:1  159:1  160:1
161:1  162:1  163:1  164:1  165:1
166:1  167:1  168:1  169:1  170:1
171:1  172:1  173:1  174:1  175:1
176:1  177:1  178:1  179:1  180:1
181:1  182:1  183:1  184:1  185:1
186:1  187:1  188:1  189:1  190:1
191:1  192:1  193:1  194:1  195:1
196:1  197:1  198:1  199:1  200:1
201:1  202:1  203:1  204:1  205:1
206:1  207:1  208:1  209:1  210:1
211:1  212:1  213:1  214:1  215:1
216:1  217:1  218:1  219:1  220:1
221:1,5  222:1
**76** 7:23,23

---

**8**

**80** 7:23,25
**800** 221:2
**84** 7:25

---

**86** 5:6
**89** 8:2

---

**9**

**9/21** 147:6
**9/21/08** 52:21  54:12  56:13  60:5
147:4
**9/22/08** 45:23  48:15  51:18  66:14
**9/22/2018** 43:17
**9/23** 126:10
**9/26** 147:6
**9:52** 14:25

Case 1:17-cv-00625-DJS Document #: 14-234 Filed 06/14/21 Page 896 of 180

EXHIBIT "G"

Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

ADRIAN THOMAS,

    Plaintiff,

       v                         17-CV-626

CITY OF TROY, ADAM R. MASON,

RONALD FOUNTAIN, TIM COLANERI,

COUNTY OF RENSSELAER &

MICHAEL SIKIRICA,

    Defendants.

_____/

ADRIAN P. THOMAS,

    Claimant,

v

THE STATE OF NEW YORK,

    Defendant.

_____/

        NON-PARTY

        DEPOSITION OF:    JOHN WALDMAN, M.D.

        DATE:          October 19, 2020

        TIME:          10:14 a.m. to 2:01 p.m.

        LOCATION:      WebEx

# APPENDIX

# 1293

Page 2

```
 1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

 2    APPEARANCES:

 3        FOR THE PLAINTIFF:
          KLEIN CIVIL RIGHTS
 4        BY:    BRETT KLEIN
          305 Broadway, #600
 5        NEW YORK, NEW YORK 10007

 6        FOR THE CITY OF TROY AND POLICE OFFICERS:
          PATTISON, SAMPSON, GINSBERG & GRIFFIN:
 7        BY:  MICHAEL E. GINSBERG
          22 First Street
 8
          Troy, New YORK 12180
 9
          FOR THE STATE OF NEW YORK
10        OFFICE OF THE NY STATE ATTORNEY GENERAL
          BY:  CHRISTINA CALABRESE
11        The Capitol
          Albany, New York  12224-0341
12
          FOR MICHAEL SIKIRICA, M.D.:
13        BAILEY JOHNSON & PECK, P.C.
          BY:  CRYSTAL PECK
14        Five Pine West Plaza, Suite 507
          Albany, New York 12205
15

16

17

18

19

20

21

22

23

24

25
```

Case 1:17-cv-00625-DJS Document 147-24 Filed 06/14/21 Page 496 of 189

Page 3

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2       I N D E X  O F  P R O C E E D I N G S

3    JOHN WALDMAN; Sworn

4    Direct Examination by Mr. Ginsberg        9

5    Cross Examination by Mr. Klein        40

6    Cross Examination by Ms. Peck        96

7    Cross Examination by Ms. Calabrese    117

8    Redirect Examination by Mr. Ginsberg    139

9    Recross Examination by Mr. Klein    140

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 4

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2              E X H I B I T   I N D E X

3    Marked as

4    Description

5    Defendant

6    A

7    Autopsy report, April 22, 2019

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ARII@courtsteno.com                              www.courtsteno.com

                                                                 Page 5

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                        STIPULATIONS

3        It is HEREBY STIPULATED by and among the attorneys

4    for the respective parties, in accordance with the Federal

5    Rules of Civil Procedure, that this deposition may be

6    taken by the Defendant at this time, pursuant to subpoena;

7        FURTHER STIPULATED, that all objections except as to

8    the form of the questions and responsiveness of the

9    answers, be reserved until trial;

10       FURTHER STIPULATED, that the witness may read and

11   sign the deposition and make any corrections to same

12   before any Notary Public;

13       AND FURTHER STIPULATED, that if the original

14   deposition has not been duly signed by the witness and

15   returned to the attorney taking the deposition by the time

16   of trial or any hearing in this cause, a certified copy of

17   the deposition may be used as though it were the original

18

19

20

21

22

23

24

25

                                                    Page 6

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2

3                    (On the record, 10:14 a.m.)

4                    THE REPORTER:  Okay.  First of all,

5    sir, do you have a I.D. you can hold up for me to see

6    to keep me in good graces with the Department of

7    State.

8                    MS. CALABRESE: So you can see it.

9                    THE REPORTER:  Almost.

10                   MS. CALABRESE:  So you can see.

11                   MR. WALDMAN:  I'm looking.  There we

12   go.  It's backward, sir.

13                   THE REPORTER:  A little more.  There

14   we go and beautiful.  Thank you.  Thank you.  You can

15   put that down now.  Okay.

16                   MR. WALDMAN:  How are you?

17                   THE REPORTER:  I'm great.  Okay.  One

18   moment.  Raise your right hand. Mr. Walden --

19   Waldman.  Raise your right hand, sir.  Do you swear

20   or affirm that the testimony you're about to give

21   will be the truth, the whole truth and nothing but

22   the truth?

23                   MR. WALDMAN:  I do.

24                   WITNESS; JOHN WALDMAN; Sworn.

25                   MS. PECK:  And does everybody agree to

Page 7

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2         usual stipulations?  Brett?

3                         MR. KLEIN:  Yes.

4                         MS. CALABRESE:  Yes.

5                         MS. PECK:  And Leah?

6                         MS. MITCHELL:  Yes.

7                         MS. PECK:  Michael?

8                         MR. GINSBERG:  Yes.

9                         MS. PECK:  Thank you.

10                        THE REPORTER:  Again, the witness has

11        been sworn.

12                        MS. PECK:  Actually before we proceed,

13        Brett, you raised a question as to whether we don't

14        have any objections to you recording the deposition,

15        is that something we all want to discuss publicly.

16        Is that what I am talking about?

17                        MR. KLEIN:  So my -- my -- yeah.  It's

18        my request is that if it's the same cost and you can

19        just hit the record button, Howard, I'm going to ask

20        that it would be recorded, do the video option of the

21        deponent so that we avoid any misunderstandings like

22        you discussed earlier, about what exhibits are being

23        looked at as such.

24                        THE REPORTER:  It is being recorded.

25                        MS. PECK:  Well --

Page 8

1     Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                    MR. KLEIN:  Video?

3                    THE REPORTER:  Yes.

4                    MR. KLEIN:  Okay.

5                    MS. PECK:  Dr. -- Dr. Waldman was not

6          subpoenaed for video recorded testimony.

7                    MS. CALABRESE:  We --.

8                    MS. PECK:  Is this --- is this being

9          recorded just for purposes of the court reporter to

10         be able to go through everything?

11                   MR. GINSBERG:  Well, we have the --

12         the real issue with the recording is that when we go

13         to trial, we can play the video or portions of it

14         without having to bring the doctor back in.  And I,

15         you know, that maybe a lot more convenient.  I don't

16         know that that actually was going to transpire but is

17         that option.

18                   MS. MITCHELL:  Well, Dr. Waldman's

19         indicating he's comfortable with that.  So I'll waive

20         the objection in terms of not getting notice.

21                   MS. PECK:  Thank you, Leah.

22                   MR. KLEIN:  Thank you.

23                   MR. GINSBERG:  Okay.  Can I start with

24         my spiel again now?

25                   DIRECT EXAMINATION

Page 9

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                    BY MR. GINSBERG:

3                    Q.   Doctor, thank you for joining us

4    today.  As I stated earlier, we appreciate your

5    taking time out of your busy schedule to attend to

6    this matter.  My name is Michael Ginsberg, I'm the

7    attorney for the City of Troy and the Troy Police

8    Officers, Defendants.  And I believe that's the

9    Federal matter, isn't it correct?

10                   A.   Yeah.

11                   Q.   And I'm going to ask you a series

12   of questions that require verbal response so that

13   Howard can keep the record, okay.

14                   A.   Yes.

15                   Q.   All right.  If we ask you a

16   question or I ask you a question that you don't

17   understand, please let me know and I'll rephrase it.

18   Otherwise we're going to assume that you're answering

19   the question that's been posed.  Fair enough?

20                   A.   Yes.

21                   Q.   Doctor, could you tell us your

22   full name?

23                   A.   John Bernard Waldman.

24                   Q.   And could you give us your

25   educational background, starting with college?

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                    A.    I went to Yale University.  I

3    graduated with a B.A. in psychology in 1969.  I then

4    went to the Albany Medical College, graduated in 1973

5    with an M.D. degree.  Following that, I entered a

6    neurosurgical residency training program that

7    included one year of general surgery.

8                    And I don't remember now, it was five

9    years of neurosurgery.  I then was employed on the

10   staff of the Albany Medical College in Albany

11   Hospital.  But I went to Toronto, to The Hospital of

12   Sick Children to do a pediatric neurosurgery

13   fellowship.

14                   And I also then went to Children's

15   Hospital Medical Center in Boston to continue my

16   training in pediatric neurosurgery.  And after that I

17   joined -- I started practicing at Albany Medical

18   Center Hospital and teaching at the Albany Medical

19   College.  And I was there my entire career.

20                   Q.    Thank you, Doctor.  With regard

21   to your employment, do you currently hold a title?

22                   A.    Yes, my title is retired.

23                   Q.    Prior to the current title that

24   you hold, did you previously hold a title?

25                   A.    Yes, I was professor of surgery,

Page 11

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2        neurosurgery, and an attending physician at the

3        Albany Medical Center.

4                    Q.    And for how long a time period

5        did you serve Albany Medical in that capacity?

6                    A.    Well, I didn't start initially as

7        a full professor, I was assistant professor, then

8        associate professor, and then full professor.  I

9        don't remember the years, I have no recollection of

10       the years, when I transitioned from one to the other.

11       But I began my employment as an attending in 1979.

12       And I continued it until I retired in 2012.

13                   Q.    And Doctor, what position, or

14       title if any did you hold in September of 2008?

15                   A.    I believe I was a full professor

16       at the Albany Medical College and attending physician

17       at the Albany Medical Center Hospital.

18                   Q.    Well, as a attending physician,

19       what duties, and responsibilities that you have at

20       that time in September 2008?

21                   A.    I had an active practice, I saw

22       patients, did surgeries, took care of patients in the

23       hospital.  And then as part of my academic

24       requirements, I taught medical students and residents

25       and did the usual things that academics do, write

Page 12

```
 1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD
 2         papers.  And that's -- that was enough.
 3                        Q.   And Doctor, did you practice in
 4         any specialty areas in September of 2008?
 5                        A.   Yes, as I mentioned, I was
 6         pediatric neurosurgery.
 7                        Q.   And what is pediatric
 8         neurosurgery?
 9                        A.   Well, neurosurgeons, in general,
10         take care of patients who have neurological problems
11         or problems that relate to the nervous system,
12         including the brain, spinal cord, and peripheral
13         nerves.  Mostly that require surgical interventions.
14         But we do non-surgical treatments also.
15                        For example, in trauma, not every
16         patient requires an operation.  As in many diseases,
17         we try to manage patients without surgery if we can.
18         And if not, then a neurosurgeon would operate.  And
19         in my case, my practice was pretty much limited to
20         children, except for adult patients that I would pick
21         up when I was on call.
22                        And also, there are some adult
23         patients who have problems that are much more common
24         in pediatric populations.  So I might be asked by my
25         partners to take care of those patients as well.  But
```

Page 13

```
1      Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2          predominantly, pediatric patients, say under the age

3          of eighteen.

4                      Q.   And Doctor, were you involved in

5          the writing or publishing random professional

6          publications over the course of your career?

7                      A.   Yes.

8                      Q.   Could you describe some of them

9          for us?

10                     A.   Well, later in my career, they

11         are mostly case reports, you know, an interesting

12         patient or an interesting trick -- treatment, we

13         might write-up an individual case.  During my early

14         years, we were involved in trauma research.  We did

15         research and developing medications, in conjunction

16         with Merck Sharp & Dohme, a pharmaceutical company,

17         to develop treatments for cerebral swelling, brain,

18         you know, edema in trauma patients.

19                     That was the -- most of my -- my basic

20         research was related to understanding and developing

21         treatments for cerebral edema or brain swelling.

22                     Q.   And Doctor, are you a member of

23         any professional organization?

24                     A.   I don't know my status, current

25         status, but yes, I was involved in a number of
```

Page 14

```
 1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

 2         organizations.  The American Association of

 3         Neurological Surgeons, Pediatric Neurosurgery.  At

 4         one point, I probably was a member of the A.M.A.  But

 5         yeah, most of the -- the Congress of Neurological

 6         Surgeons, that's enough or probably more.

 7                    Q.   And Doctor, in September of 2008,

 8         did you hold any board certification?

 9                    A.   Yes.

10                    Q.   Could you describe those for us?

11                    A.   I was board certified in

12         neurosurgery.  And I was board certified in pediatric

13         neurosurgery.

14                    Q.   And Doctor, did there come a time

15         when you first learned of the existence of a patient

16         named Matthew Thomas?

17                    A.   Yes.

18                    Q.   And that --?

19                    A.   I believe it was --.

20                    Q.   Go ahead.  If you know the --

21                    A.   I think it was September 22nd,

22         2008.

23                    Q.   And how is it that Matthew

24         Thomas, that his medical case became known to you?

25                    A.   My understanding is, he was seen
```

Page 15

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2        at Samaritan Hospital in Troy, New York and then

3        transferred to the Albany Medical Center Hospital and

4        was admitted under the care of a pediatric

5        intensivist, to the pediatric intensive care unit.

6                      Q.    Would that have been Dr. Edge?

7                      A.    Among others, I'm not sure if Dr.

8        Edge was on the night of the 21st when he came in.

9        But ultimately, yes, Dr. Edge took care of him.

10                     Q.    He became Dr. Edge's patient,

11       correct?

12                     A.    I think so, yes.  You know, they

13       -- they're a bunch of intensivists and they rotate.

14       So I'm not sure if he took care of Matthew every day.

15       But I guess, he was identified as the -- as Matthew's

16       primary physician.

17                     And Dr. Edge consulted neurosurgery

18       because there was a concern about Matthew having

19       sustained a head injury.

20                     Q.    Okay.  Doctor, when you say he

21       consulted neurosurgery, are you indicating that he

22       asked for a neurosurgical consult?

23                     A.    Yes.

24                     Q.    All right.  And did you perform

25       that consult?

Page 16

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                    A.   Well, I was not on call the day

3        that Matthew came in.  So one of my partners Dr.

4        German saw Matthew, on that day, I think that, I

5        don't know if it was in the evening or what time it

6        was.  But it was on the 21st.  And then on the 22nd,

7        Dr. German asked me to take care of Matthew, since he

8        was a pediatric patient and Dr. German doesn't care

9        generally for pediatric patients.

10                    Q.   And did you have an opportunity

11        to physically evaluate Matthew Thomas yourself?

12                    A.   I did, yes, on the 22nd.

13                    Q.   And can you tell us how Matthew

14        presented at that time?

15                    A.   Do you mean, what was his exam or

16        what I knew about it?

17                    Q.   What were -- what were your

18        observations based upon your viewing of the patient

19        and the patient's chart, of course?

20                    A.   May I look at the chart?

21                    Q.   Of course.  Doctor, if you look

22        at the chart itself, it's Bates stamped upper left-

23        hand corner and bottom right-hand corner of every

24        document.

25                    A.   Okay.  Give me the number.

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2              Q.   Do you want --?

3              A.   Give me the numbers of the pages

4    you want.

5              Q.   I don't -- I don't know where --.

6              A.   You want me to find my -- my note

7    and then give you that.  Is that -- is that what

8    you're saying?

9              Q.   I think -- I think you're looking

10   for page one sixty -- sorry, one eighty-six, one

11   eighty-seven.  That would be your note, is that what

12   you're looking for?

13             A.   Yes, I think I have two notes in

14   the chart so.  Well, I have Dr. German's consult

15   that's one eighty-five.

16             Q.   Okay.  What --?

17             A.   And I have my notes one eighty-

18   six and one eighty-seven.

19             Q.   Okay.  Let's start with one

20   eighty-five, Dr. German's note.

21             A.   Okay.

22             Q.   Can you describe for us what Dr.

23   German found with regard to his examination as

24   reflected in the note identified as Bates stamp one

25   eight five?

Associated Reporters Int'l., Inc.

Page 18

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2              A.   Well, let me just say to make it

3    clear, the -- when a neurosurgery consultation is

4    called the -- one of the -- one of the neurosurgical

5    residents will see the patient.  And then write a

6    note and then call the attending on call, who was Dr.

7    German.

8              So most of the note is written by the

9    resident, but there is a small section down in the

10   bottom right corner of Dr. German's itself.  So do

11   you want me to refer to just Dr. German's part?

12             Q.   No, Doctor, would you -- would

13   you tell us what the findings of the resident were?

14   And then I'll ask you a follow-up question with

15   regard to Dr. German?

16             A.   Okay.  That depends on whether or

17   not I can read his handwriting, which is going to be

18   problematic.  Can I read it?

19             Q.   Sure.

20             A.   Would that be -- okay.  It says

21   H.P.I. History of Present Illness, four months old,

22   thirty-six week, which is incorrect.  I think he was

23   thirty-two week preemie, just as an -- as an aside

24   for early in the admission, probably one of the

25   pediatric residents wrote that he was thirty-six

Page 19

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2         weeks post, you know, premium -- premature and then

3         crossed it out and put thirty-two.

4                   So that my resident must have seen it

5         before it was corrected.

6                   Q.   Okay.

7                   A.   Transferred from outside, O.S.H.,

8         that's outside hospital.  Something I can't read.

9         Presenting with --?

10                  Q.   If you can't read it, it's okay.

11                  A.   Well, it is, and it isn't.

12        Transferred to A.M.C., C.T., something with --

13                  Q.   That says --

14                  A.    -- something -- something slash

15        S.D.H. which is subdural hematoma.

16                  Q.   It's bilateral isn't it, B.I.L.

17        --

18                  A.   Yes.

19                  Q.    -- bilateral subdural hematoma.

20                  A.   Oh, yes, bilateral subdural

21        hematoma.  Yes.  Then there's past medical history.

22        Nothing of significance until the exam, can I skip to

23        that?

24                  Q.   Yes, please.

25                  A.   Blood pressure fifty over seventy

Page 20

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2        slash thirty over forty, flat.  All right.  I'll read

3        what I can.  G.C.S., which is Glasgow Coma Score,

4        E.M.V.T., those are the various components eye

5        opening, movement, verbal response.  And the T means

6        the patient is intubated.  So patient can't talk even

7        if the patient could so --.

8                    Q.   So that note indicates that there

9        were no such responses?

10                   A.   Right, the Glasgow Coma Score was

11       three T.  In other words, one is the lowest possible

12       score you can get in any of those components.  And so

13       one plus one plus one equals three.  So that's the

14       lowest score you can get.

15                   Q.   And what if anything does that

16       indicate?

17                   A.   That indicates the fact the

18       patient is in deep coma, at best, possibly brain

19       dead.  And then it says something I can't read, then

20       no cough, questionable something.  I can't read that.

21       Anterior -- A.F. stands for anterior fontanelle,

22       that's the soft spot on the top of the baby's head,

23       bulging full intense.

24                   Q.   What -- can you tell me --

25                   A.   Suture.

Page 21

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                Q.    -- full intense does that have,

3    Doctor.

4                A.    That is certainly suggestive that

5    there's a very significant increase.  And that goes

6    along with the next line which is it says sutures

7    splayed.  That goes along with increased intracranial

8    pressure.  The baby's brain is swollen and/or there's

9    additional mass like subdural, which we know which

10   has pushed the bone, the bones apart and caused the

11   fontanelle to be tense and the sutures to be spread

12   apart abnormally.

13               So that's all indication of increased

14   intracranial pressure from some cause.

15               Q.  What are they referring to when

16   they mentioned suture?  There is no stitches,

17   correct?

18               A.    Yeah, correct.  The cranial

19   sutures are the term used to define where the baby's

20   bone plates come together.  In a baby, they're open.

21   So the head -- so the brain can grow rapidly during

22   infancy.

23               And in adults and in older children,

24   they become inactive and they are together, they sort

25   of knit together like -- like, you're -- I'm showing

Associated Reporters Int'l., Inc.

Page 22

1   Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2        with my fingers.  So in a baby's case that they're

3        open.  And in this particular baby's case, they're

4        spread.

5                    That's as far as I can get spread them

6        because of the screen.  But they're spread apart,

7        normally say they were like this.  In this case, they

8        were splayed or spread apart.

9                    Q.   All right.

10                   A.   So something -- something is

11       pushing them apart either brain swelling or some

12       other mass inside the head.

13                   Q.   And that condition can be caused

14       from the swelling associated with trauma to the brain

15       and head?

16                   A.   Well, it can be caused by a

17       number of things.  Brain swelling can occur in many

18       different scenarios, stroke, brain -- brain tumors,

19       subdurals, epidural hematomas.  A variety of

20       different things poisoning --.

21                   Q.   Including trauma, correct?

22                   A.   Yes, including trauma.

23                   Q.   Okay.  Thank you, Doctor, can we

24       move on to the rest of the note?

25                   A.   We can, then it says imaging

Page 23

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD
2    C.T., head, large b slash l which again is bilateral,
3    mixed density subdural collections.
4                    Q.   What if any significance does the
5    mixed density finding have?
6                    A.   It -- in the past, it was used in
7    an attempt to try to age the subdurals, but we've
8    subsequently learned that it's not quite so simple.
9    I assume at some point, I'm going to look at the C.T.
10   scan, is that right?
11                   Q.   Yes.  We can -- we can put that
12   up for you.  Once we get along a little more.
13                   A.   So it might be better to discuss
14   it with -- with the images up.  But basically he's
15   describing a -- what he saw on the C.T. scan.  He is
16   not -- so a C.T. scan is an x-ray, and x-rays measure
17   differences in density.  So for example, blood has a
18   certain density, cerebral spinal fluid has a certain
19   density, the brain has a certain density.
20                   So what he's describing is that he's
21   seeing a collection or a space outside the brain that
22   has within it different densities.  Maybe some
23   density that's greater than the brain, some that's
24   the same as the brain, some is less than the brain,
25   you know, he doesn't specify but it's mixed.  There's

Page 24

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2    not just a single density in the space outside the

3    brain.

4              Q.   And is that an abnormal finding?

5              A.   Absolutely.

6              Q.   Doctor, can you go on and --

7              A.   Yes.

8              Q.   -- describe any other significant

9    items that are identified in the note which you have

10    Bates stamped one eight five.  I think we may have

11    lost him.  And we -- we lost you there, Doctor.

12              A.   Okay.  Poor chronological exam

13    and something that I can't read.  Oh, and evidence of

14    increased I.C.P., that's increased intracranial

15    pressure on exam.  Emergency subdural tap ending

16    coax, coagulation studies.

17              C.P.S. workup, something ophthalmology

18    consult, skeletal survey discussed with Dr. German.

19              Q.   What's referred to by C.P.S.

20    workup, is that Child Protective Services?

21              A.   Yes.

22              Q.   Would that have indicated that

23    Child Protective Services was contacted by the

24    hospital?

25              A.   I don't know whether he knew

1  Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2       C.P.S. was previously called or if they were, I don't

3       know that he's just saying there's -- this is

4       potentially an injury to a child.  You know, there

5       wasn't a car accident -- trauma event.  So that we

6       use the --

7                    Q.    Doctor, did you --

8                    A.    -- possibility that requires

9       C.P.S.

10                   Q.    You keep breaking up and we can't

11      hear quite your testimony and we only caught a

12      portion of what you just said.

13                   A.    Okay.  Is that better?

14                   Q.    That is, yes.

15                   A.    All right.  So I'm not certain

16      whether he knew C.P.S. had previously been called or

17      whether they had been called.  He was just saying if

18      it hasn't already been done, consults C.P.S. as well

19      as do a skeletal survey, which is to look for

20      fractures and also to call ophthalmology to get an

21      expert opinion about the -- if there is retinal

22      injury.

23                   Q.    Okay.  Doctor, why don't we move

24      on to your note, which is --

25                   A.    Okay.

Page 26

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                    Q.    -- one eight six.

3                    A.    One eight six, one eight seven.

4         All right.  So --.

5                    Q.    And can -- can you tell us what

6         your impression was on Matthew's presentation?

7                    A.    You want me to skip to my

8         impression?

9                    Q.    I would like you to go over the

10        entire note, but you know that's where I started with

11        my question.

12                   A.    Well, and why don't we -- all

13        right, I don't mean, it's up to you.

14                   Q.    Describe Matthew's condition as

15        you found it when he presented to you, if you would?

16                   A.    Okay.  I saw him on the 22nd of

17        September 2008 at twelve thirty.  I found him to be a

18        four months old, black male, admitted and transferred

19        from Samaritan Hospital in deep coma.  Then I say,

20        history, parenthesis from the chart end parenthesis,

21        of several days -- day history of watery diarrhea,

22        worsening over two day -- over a two-day period.

23        Mom, noted unresponsiveness on the day of admission

24        and called emergency services.  There was a past

25        medical history of a NICU stay at A.M.C.H., that's

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2        the Albany Medical Center Hospital secondary to twin

3        birth and weight gain issues.

4                        And then I have in parenthesis

5        question mark.  My exam, no bruising of a scalp or

6        swelling seen.  Pupils mid position and fixed,

7        corneal and gag absent, no spontaneous respirations,

8        no movement of deep pains -- painful stimulation.

9                        Retinal hemorrhages for ophthalmology.

10       So ophthalmology consult was called, and they had

11       seen the patient before I did.  A reflexive, C.T.

12       scan, I then referred to bilateral hemispheric

13       subdural hematomas marked separation of sutures, no

14       fractures seen.

15                       Impression.  Patient has no evidence

16       of brain activity parenthesis since admission end

17       parenthesis, bilateral subdural hematomas without

18       explanation.  Plan, no neurosurgical intervention.

19       Indicators suggest skeletal survey.  Consider he --

20       he in consult.  And I signed my name.

21                       Q.   Okay.  Doctor, what was your

22       impression with regard to this patient after your

23       examination?

24                       A.   And I thought the patient was

25       likely brain dead from bilateral subdural hematomas.

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2            And we didn't have a history to suggest how they

3            occurred.  So under those circumstances, we

4            considered that this might be non-accidental trauma.

5                         Q.   And what if anything did you do

6            for Matt, after your examination?

7                         A.   Nothing, he was essentially brain

8            dead.  There was no point in doing anything at that

9            time.

10                        Q.   And Doctor, did you yourself

11           render a diagnosis?

12                        A.   My impression was bilateral

13           subdural hematomas without explanation.

14                        Q.   And what was the basis of your

15           finding of the subdural hematomas?

16                        A.   My review of the CAT scan and my

17           examination of the patient.  And my understanding

18           from the chart of the history.

19                        Q.   What specific items led you to

20           that conclusion?

21                        A.   Well, the history provided no

22           evidence of a traumatic event.  He didn't fall out of

23           a second story window; he wasn't in a car accident.

24           His neurologic exam revealed no function.  So that's

25           where the brain dead comes from.

Page 29

1   Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                    And the CAT scan revealed, and his

3       exam was consistent with, traumatic subdural

4       hematomas.  That and his extensive retinal

5       hemorrhaging as identified by the ophthalmologist.

6                    Q.   What significance, if any, did

7       the retinal hemorrhaging indicate?

8                    A.   Well, first, let me say that

9       there are retinal hemorrhages and there are retinal

10      hemorrhages.  They're all different kinds and to

11      different extents.  It's been shown over and over

12      again in the literature that very extensive retinal

13      hemorrhages that extend to the periphery of the

14      retina associated with profound neurological deficit

15      and subdural hematomas is not pathognomonic, but

16      extremely likely to be associated with non-accidental

17      trauma.

18                   Q.   Is that an element --?

19                   A.   So that -- that's one of the --

20      that's one of the components that we see extremely

21      commonly, bilateral extensive retinal hemorrhages in

22      non-accidental trauma.

23                   Q.   What type of behavior is caused

24      by a type of non-accidental trauma, Doctor?

25                   A.   Well, it's hard to know

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2        absolutely precisely because most of these events are

3        unwitnessed.  But --.

4                      MR. KLEIN:  Objection to form.  Thank

5        you.

6                      BY MR. GINSBERG:  (Cont'g.)

7                      Q.   Go ahead, Doctor.

8                      MR. KLEIN:  You could go ahead, sorry

9        to interrupt.

10                     THE WITNESS:  That's okay.  So

11       certainly, acceleration/deceleration injuries.

12                     BY MR. GINSBERG:  (Cont'g.)

13                     Q.   What -- what type of behavior

14       causes an acceleration/deceleration type of injury in

15       an infant?

16                     A.   In an infant?

17                     Q.   For a child of Matthew's age?

18                     A.   Well, it might be, you know, an

19       adult picking a child up and smashing them down on a

20       flat surface.  It might be rapid, violent shaking.

21       So the brain accelerates and then rapidly

22       decelerates.

23                     Q.   Very similar to concussion?

24                     A.   Well, --.

25                     MR. KLEIN:  Objection.

Page 31

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                    MR. GINSBERG:  Withdrawn, it doesn't

3        matter.

4                    BY MR. GINSBERG:  (Cont'g.)

5                    Q.   All right.  Doctor, did there

6        come a time when you determined what the cause of

7        Matthew's brain injury was?

8                    A.   I don't think I ever -- that's

9        not something that the doctor does.  It's something

10       that I guess the police do and, you know, potential

11       criminal case there's an investigation.  I don't -- I

12       have no idea.

13                   Q.   Did you ever have a discussion

14       with Dr. Edge regarding the causation for Matthew's

15       condition?

16                   A.   I have no specific recollection

17       of this whole thing, really.  So I can't say for

18       sure.  But I wrote a note on the chart and minimum,

19       I'm certain Dr. Edge, looked at my note but I

20       probably spoke with him and I think it's reasonable

21       to believe I did.

22                   He's is in the PICU and then I was in

23       the PICU, so we shared the patient, he consulted me.

24       So I'm certain I spoke to him, but I have no

25       recollection of it.

Page 32

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                        Q.   Did there come a time when a

3         request that Troy Police Department be called with

4         regard to the Matthew Thomas matter?

5                        A.   Again, I didn't -- I didn't call

6         the police.  I have no idea who did, and I have no

7         recollection of speaking to the police officers.  So

8         I really can't answer the question.  I know there was

9         a time that the police were involved, whether it was

10        through C.P.S. intervention, or I don't know what the

11        process was.

12                       Q.   Doctor, did you ever have a

13        discussion with any member from the Troy Police

14        Department during either September 21st through the

15        23rd?

16                       A.   I have no recollection of it.

17        But if you -- if there was some documentation that I

18        did, then I wouldn't dispute that.

19                       Q.   And Doctor, drawing your

20        attention to the document Bates stamp two fifteen,

21        this chart transition plans.

22                       A.   Okay.  I have that.  Yes.

23                       Q.   And Doctor, it states in the

24        third line, not sentence but the third line.  Patient

25        has b slash l bilateral subdural hematomas.  And he

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2    is an extremely critical condition, is that correct?

3                    A.   Yes.

4                    Q.   And it states a report to C.P.S.

5    was made earlier, is that correct?

6                    A.   Yes.

7                    Q.   And do you see a little further

8    in the paragraph where it states at request of Dr.

9    Edge, S.W. contacted the Troy Police and at 2110,

10   Detective Ron Fountain responded to the PICU?

11                   A.   I see that, yes.

12                   Q.   All right.  S.W. is social

13   worker, correct?

14                   A.   That's what I interpreted it to

15   mean.  Yes.

16                   Q.   And that would be a hospital

17   staff member, correct?

18                   A.   Yes.

19                   Q.   And down just before the last

20   line.

21                   A.   In that first section there,

22   yeah.

23                   Q.   Yeah.  In the first section S.W.

24   explained to charge nurse and nurse caring for

25   patient, that a report must be made to the New York

Page 34

```
 1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD
 2         State child abuse and neglect hotline, if patient
 3         expired, correct?
 4                        A.   Yes.
 5                        Q.   And down in the patient family
 6         interaction section.
 7                        A.   Okay.  Yeah.
 8                        Q.   It states he was apparently
 9         transferred from Samaritan Hospital, has head C.T.
10         that's a CAT scan, correct?
11                        A.   Correct.  C.T. stands for CAT
12         scan.
13                        Q.   Here which showed a bleed,
14         possible skull fracture period.  Per M.D. this is a
15         suspect injury, correct?
16                        A.   Correct.
17                        Q.   And Doctor, what was your opinion
18         that there existed subdural hematomas in Matthew's
19         brain during the time period of your examine, you, on
20         September 22nd of 2008?
21                        A.   Can you repeat the first part of
22         your question?
23                        Q.   Sure.
24                        MR. GINSBERG:  Can we have it read
25         back, Howard?
```

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                   THE REPORTER:  Yeah.  Yes, I can.

3    Hang on.

4                   (Reporter complied with request)

5                   THE WITNESS:  It's not helping, it's

6    not helping.

7                   MR. GINSBERG:  We can't hear very

8    well, Howard.

9                   MR. KLEIN:  I can remember it.  Can't

10   you just repeat it?  What was your opinion that there

11   was a subdural hematoma upon his admission to Albany

12   Med on 9/21/08.  Isn't that the question?

13                  MR. GINSBERG:  What -- what was the

14   basis of your opinion?  That there was a subdural

15   hematoma?

16                  THE WITNESS:  Okay.  Yes.  All right.

17   That -- that I understand.  The basis was his

18   clinical exam and the C.T. scans.

19                  BY MR. GINSBERG:  (Cont'g.)

20                  Q.   And what specifically did the

21   C.T. scan indicate to you, Doctor?

22                  A.   It indicated that he had

23   bilateral subdural hematomas of mixed density,

24   increased intracranial pressure as evidenced by the

25   splayed spread sutures.  So that's the C.T. -- that's

Case 1:17-cv-00626-DJS Document 68-1 Filed 06/14/21 Page 878 of 189

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2         the C.T. component of it, of my impression.

3                   Q.   And you -- you put that

4    information in Matthew's chart, correct?

5                   A.   Yes, yes.

6                   Q.   And it was available to Dr. Edge.

7    Is that correct?

8                   A.   Yes.

9                   Q.   And Doctor, prior to formulating

10   your diagnosis of subdural hematomas bilaterally, you

11   didn't consult with any members of the Troy Police

12   Department.  Is that correct?

13                  A.   Prior to my impression and my

14   note, no.  I'm certain that even though I have no --

15   no direct recollection.  Definitely not.

16                  Q.   Did you have any discussion with

17   the Troy Police Department members with regards to

18   the impressions and diagnosis?

19                  A.   Again, I have no recollection of

20   discussing it with the police department.  If they

21   have a record stating I did, I wouldn't dispute it.

22   But I have no recollection of it.  And I have -- I

23   haven't seen any documentation that I did.  That I --

24   I don't know.

25                  Q.   Do you recall whether any member

1   Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2       of the Troy Police Department attempted to influence

3       you in rendering your opinion with regards to this

4       matter?

5                   A.   No.  I have no recollect --

6       again, I have no recollection of discussing anything

7       with them.  But I can't conceive of -- of anyone, I

8       had put my opinion down before I spoke to anybody,

9       though, even Dr. Edge.

10                  Q.   And the determinations that you

11      made with regard to Matthew's condition, those were

12      your findings, correct?

13                  A.   Yes.

14                  Q.   And they were not presented to

15      you by any member of the Troy Police Department?

16                  A.   No.

17                  Q.   Doctor, with regard to Matthew's

18      condition, you provided testimony in criminal matters

19      against Adrian Thomas, Matthew's father.  Is that

20      correct?

21                  A.   Yes.

22                  Q.   And do you recall testifying in

23      sum and substance that subdural hematomas in infants

24      with rare exception are caused by injury, injury that

25      is very significant and severe?

1   Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                   A.   Well, I'd have to review my

3       testimony.  But I -- sounds like a reasonable thing

4       to say, yes.

5                   Q.   Is it -- is that statement

6       accurate?

7                   A.   I'd have to review the record.  I

8       don't have any direct recollection of it.

9                   Q.   I don't mean accurate, whether

10      you stated it at the trial, is it accurate in

11      general?

12                  A.   Yes.

13                  Q.   And with regard to the Matthew

14      Thomas matter, do you recall stating at his -- at the

15      trial of Adrian Thomas?  So we are talking about a

16      serious application of force to an infant's skull to

17      cause this injury?

18                  A.   Again, I don't have a direct

19      recollection of my -- of my testimony.  But it sounds

20      like what I might have said, yes.

21                  Q.   Would that statement be

22      consistent with your knowledge and understanding of

23      this matter --

24                  A.   Yes.

25                  Q.   -- involving Matthew Thomas?

Page 39

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                    A.   Yes.

3                    Q.   Okay.  Thank you, Doctor.  I have

4        no further questions at the moment.

5                    MR. KLEIN:  Are you going to ask any

6        questions, Christina?

7                    MS. CALABRESE:  Haven't decided, so

8        I'll wait to the next person.

9                    MR. KLEIN:  Ms. MITCHELL?

10                   MS. MITCHELL:  Do you want to --?

11                   MS. CALABRESE:  I'll tell you that

12       Michael covered the bases as far as I'm concerned, I

13       would just ask a couple of follow-up questions, you

14       know, based upon, I have only one now that's why I'd

15       rather wait until the end to ask mine.

16                   MS. PECK:   But I may have some

17       follow-up.  So if you want to go first I can go after

18       that, it doesn't matter.

19                   CROSS EXAMINATION

20                   BY MR. KLEIN:

21                   Q.   Good morning, Dr. Waldman.  As

22       stated earlier -- as stated earlier, I'm Brett Klein

23       and I represent Adrian Thomas in these civil actions.

24       Thank you for your time today.

25                   A.   Sure.

```
1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                    Q.   You've had a sufficient time to

3    look at -- for today's deposition with your attorney?

4                    A.   I'm not sure what you mean by

5    sufficient time.

6                    Q.   Well, did you have an opportunity

7    to review for today's -- did you have an opportunity

8    to review your prior testimony from both 2009 and

9    2014 in the criminal trials?

10                   A.   Yes, yes.

11                   MR. KLEIN:  And do we want to offer

12   them as an exhibit everybody or can we just ask him

13   generally if he acknowledges that the testimony was

14   -- if he's standing by it or if he's got any issues

15   with what he said?

16                   MR. GINSBERG:  I want to ask just in a

17   general sense.

18                   MR. KLEIN:  Sure.

19                   BY MR. KLEIN:  (Cont'g.)

20                   Q.   The testimony that you were

21   provided to review from the 2009 trial, did you have

22   a chance to review it?

23                   A.   Yes, I did.

24                   Q.   And to the best of your

25   knowledge, did you testify truthfully and accurately
```

Page 41

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2        in that trial?

3                    A.   Yes, yes.

4                    Q.   Is there anything in regards to

5        the 2009 trial, that you can recall that you wish to

6        correct, clarify, or change today for whatever

7        reason, if any?

8                    A.   Not that I can think of at this

9        time.

10                   Q.   Okay.  You were also given a copy

11       of the 2014 criminal trial testimony, correct?

12                   A.   Yes, yes.

13                   Q.   And was every -- did you have a

14       chance to review it?

15                   A.   Yes, yes.

16                   Q.   And was everything that you

17       stated under oath at that trial true and accurate to

18       the best of your recollection?

19                   A.   Yes.

20                   Q.   And is there anything that came

21       up in the second trial, either that you were asked or

22       that you said that you wish to change, clarify, or

23       correct, if any?

24                   A.   Not that I can recall at this

25       point.

```
1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD
2                    Q.   Okay.  And you've had a chance to
3    look at the Albany Medical Center chart, including
4    the two pages that you wrote and the one page that
5    Dr. German wrote, correct?
6                    A.   Yes.
7                    Q.   Among others, okay.  You've
8    looked at the C.T. scan, correct?
9                    A.   I have, yes.
10                   Q.   And the -- and the relevant
11   report that goes along with it?
12                   A.   Yes.
13                   Q.   Have you reviewed any other
14   documents or testimony to prepare for today's
15   deposition?
16                   A.   I believe, although I can't
17   recall much of it.  I believe I had reviewed Dr.
18   Edge's, testimony -- deposition.
19                   Q.   Okay.  His deposition from a few
20   weeks ago in the civil case?
21                   A.   I believe that's correct.  Yes.
22                   Q.   Okay.  And did that refresh your
23   recollection of events that you didn't previously
24   recall before reading his deposition?
25                   A.   I don't think so.
```

Page 43

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                    Q.   Okay.  There are certain things

3    that -- certain involvement that Dr. Edge had in this

4    case that you were not involved in, correct?

5                    A.   I'm certain of that, yes.

6                    Q.   You had one consult on September

7    22nd, as previously noted and that exam and the

8    review of the C.T. it's fair to say that's the extent

9    of your involvement with this case, correct?

10                   A.   Not quite.  I saw him a second

11   time, I believe the next day.

12                   Q.   Okay.  And was that --

13                   A.   I have no reason to --.

14                   Q.   -- is that after the skeletal

15   survey was reviewed?

16                   A.   I'd have to go back and see if

17   that was after -- that was one eighty --.

18                   MR. GINSBERG:  One eight seven.

19                   THE WITNESS:  Yes, it was after the

20   skeletal survey.

21                   BY MR. KLEIN:  (Cont'g.)

22                   Q.   Okay.  And what -- what -- can

23   you just describe the nature of that exam or what you

24   did and what you found?

25                   A.   Well, it was on 9/23/08 at eight

```
 1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD
 2         in the morning, exam consistent with brain death,
 3         skeletal survey negative for fractures foraminal test
 4         today.  And that's it.
 5                    Q.   Okay.  So -- so just trying to
 6         just confirm that I'm aware of the full universe or
 7         involvement here.  Is it accurate to say that you
 8         reviewed the C.T., personally, you did an exam, you
 9         did a -- you had an interaction with the patient on
10         September 22nd.
11                    And then another one on September --
12         I'm sorry, September 22nd and then another one on
13         September 23rd.  Is that correct?
14                    A.   The best of my recollection,
15         that's the only written documented involvement I had.
16                    Q.   Okay.  You have no reason to
17         think there was any other, correct?
18                    A.   Well, I -- well, I don't have any
19         recollection whether I ever talked to anybody else
20         about it, you know, for example, Dr. Edge or one of
21         the other doctors or anyone else I --.
22                    Q.   Okay.  And you reviewed your
23         testimony from 2009 and 2014.  That didn't refresh
24         your memory as to any such conversations, correct?
25                    A.   I believe that is true.  Yes.
```

Page 45

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2              Q.   Okay.  So with regard to your --

3    you testified in the first criminal trial that you

4    had never seen a subdural hematoma resembling Matthew

5    Thomas's scan associated with a vaginal birth.  Do

6    you recall giving testimony to that effect?

7              A.   Yes.

8              Q.   Isn't it true that you only --

9    you only see -- isn't it true that you don't see

10   apparently normal newborns.  So you wouldn't have an

11   opportunity to see such scans associated with that in

12   newborns?

13              MS. CALABRESE:  Object to form.

14              MS. PECK:  Same objection.

15              MR. KLEIN:  You can answer.

16              A.   Well, if -- it's inconceivable to

17   me that a newborn would have a C.T. scan, first of

18   all, that showed something like this that I wouldn't

19   recall.  I mean, no neonatologist is going to get a

20   report that there are massive bilateral subdural

21   hematomas on a neonate's CAT scan and not call

22   neurosurgery.  So correct.

23              BY MR. KLEIN:  (Cont'g.)

24              Q.   The Albany medical records

25   indicated that Matthew Thomas was suffering from

Page 46

1     Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2          coagulopathy while they're in part due to low

3          platelet count.  Did you recall that?

4                    A.   I do recall that.

5                    Q.   Now here, coagulopathy makes it

6          more likely that any blood in the subdural collection

7          was due to -- was due to fluid from an effusion due

8          to infection.  Wouldn't you agree with that?

9                    A.   Could you please say that one

10         more time?  I didn't --

11                   Q.   Sure.

12                   A.    -- quite get it.

13                   Q.   Would it be fair to say that due

14         to the fact that there was coagulopathy present, that

15         it's more likely than not that any fluid in this

16         subdural collection was due to fluid from effusion

17         due to infection rather than from blood --

18                   MS. CALABRESE:  Object to form.

19                   MS. PECK:  Object to form.

20                   BY MR. KLEIN:  (Cont'g.)

21                   Q.    -- rather than from -- due to a

22         subdural hematoma?

23                   MS. PECK:  Same objection.

24                   A.   Again, I'm not sure I understand

25         what you're asking, if you're asking --.

Page 47

```
1     Thomas v City of Troy et al - 10-19-20 - John Waldman, MD
2                    BY MR. KLEIN:  (Cont'g.)
3                    Q.   The C.T. scan shows, subdural
4     collection of -- of some type of fluid, correct?
5                    A.   Yes.
6                    Q.   And the -- that could be blood,
7     it could be -- it could be other things as well
8     though, correct?
9                    A.   Right.  So you're -- you're
10    asking me if this were an effusion and then the
11    patient developed a coagulopathy, could their blood
12    enter into the effusion, is that the question you're
13    trying to ask me?
14                   Q.   Sure.  Let's go with that.
15                   MS. PECK:  Object to form.
16                   A.   Okay.  Anything is possible.
17                   BY MR. KLEIN:  (Cont'g.)
18                   Q.   On the C.T. in this case, the --
19    withdrawn, I'm sorry, one second please.
20                   Did the C.T. in this case indicate
21    that evidence by a shade of grey that -- that there
22    was white blood cells mix with pus and protein in the
23    collection, which would be due to infection?
24                   MS. CALABRESE:  Objection to form.
25                   MS. PECK:  Same objection.
```

800.523.7887                                Associated Reporters Int'l., Inc.

Page 48

1     Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                    A.   As I've stated, this was a mixed

3     density collection.  When you look at the C.T. scan,

4     you're looking at various densities, you're not

5     looking at white blood cells or pus or red blood

6     cells and blood.  You're looking at densities and

7     putting together the history and the exam and the

8     scan and trying to come up with the best explanation.

9                    Could there have been some -- an

10    effusion or pus in that collection, I can't say yes

11    or no based on the C.T. scan.

12                   BY MR, KLEIN:  (Cont'g.)

13                   Q.   Right.  And you can't say based

14    on the C.T., whether any blood was due to infection

15    rather than due to a subdural hematoma, can you?

16                   A.   No, the C.T. scan doesn't --

17    doesn't determine what the mechanism of the injury or

18    disease is, it's just a reflection of the tissues.

19                   Q.   Now, you looked at some of the

20    C.T. images at the trial.  Do you recall that?

21                   A.   I don't recall it.  But I did.

22    Yes.

23                   Q.   It was in your testimony?

24                   A.   I reviewed the testimony.  Yes.

25                   Q.   And if you need to pull them up,

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2    we can.  But you talked about image five of twenty-

3    eight, showing abnormalities in the frontal areas.

4    And in particular, you said the right side appeared a

5    little lighter and denser than the left, showed more

6    dark around the temporal lobe and also some fluid.

7                    Do you remember generally giving

8    testimony to that effect, about those findings?

9                    A.   Again, based on reviewing my

10   testimony, I vaguely remember that, yes.

11                   Q.   Okay.  Nothing abnormal about

12   those findings, correct?

13                   A.   Nothing abnormal?

14                   Q.   Correct.

15                   A.   That's entirely abnormal.

16                   Q.   What's abnormal about it?

17                   A.   Well, you normally don't see

18   those fluid collections in a normal infant scan.

19                   Q.   But they're not indicative of

20   what -- well, withdrawn.

21                   You talked about image six and nine

22   showing more fluid surrounding the brain that does

23   not resemble the normal C.S.F., Cerebral Spinal Fluid

24   that usually occupies the area.  Isn't it true that

25   the only place where the fluid looks abnormal was at

Associated Reporters Int'l., Inc.

                                                              Page 50

1      Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2          the top left?

3                      A.   That's not my recollection.  But

4          --.

5                      Q.   Did you look at the C.T. before

6          -- before testifying today?

7                      A.   Yes.  But it was, you know,

8          almost weeks, weeks ago, I don't have it.  And I

9          don't think I have the availability unless you

10         project it to see it where I am now.

11                     Q.   Okay.

12                     A.   We got to see them, but we don't

13         have -- we don't have, you know, a slide and the --

14         and the computers to see it.

15                     Q.   I hear you.  But just -- just in

16         terms of that question, just in terms of your

17         recollection, your best recollection, isn't it true

18         -- true that the only place where the fluid looked

19         abnormal was at the top left?  The fluid was a higher

20         density there.  And those would be due to cell

21         changes due to meningitis and infection on any

22         subdural?

23                     MS. CALABRESE:  Object to form.

24                     MS. PECK:  Object to form.

25                     THE WITNESS:  The document --.

Page 51

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                    MR. GINSBERG:  Object to the form.

3                    THE WITNESS:  -- that's definitely not

4        my recollection.  No.

5                    BY MR. KLEIN:  (Cont'g.)

6                    Q.   Okay.  Do you know whether there

7        was pneumococcal disease, meningitis, and evidence of

8        that -- those types of infection in this infant?

9                    A.   Not at the time I was caring for

10       the child.

11                   Q.   Okay.

12                   A.   That --.

13                   Q.   You just come to learn afterwards

14       that he -- that he was positive for pneumococcal

15       disease?

16                   A.   No, that's not my recollection.

17       My recollection is that prior to his transfer to the

18       Albany Medical Center Hospital, a blood culture was

19       drawn at Samaritan Hospital.  And it's my

20       recollection that it's subsequently proved

21       streptococcus.

22                   I know that he had blood cultures at

23       the Albany Medical Center Hospital, that, if I'm

24       correct, the final report after five days was

25       negative.  That's -- that's -- pneumococcal, I don't

Page 52

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2        remember seeing that anywhere.  That's not my

3        recollection.

4                    MS. PECK:  Howard, can you please

5        repeat his last response?

6                    THE REPORTER:  Yeah.  One moment.

7                    (Reporter complied with request)

8                    MS. PECK:  Thank you.

9                    THE REPORTER:  You're welcome.

10                   BY MR. KLEIN:  (Cont'g.)

11                   Q.  If you knew that the patient had

12       pneumococcal disease, including evidence of a

13       meningitis infection, would that change your opinion

14       about anything with regard to the cause of the fluid

15       collection?

16                   MS. CALABRESE:  Object to form.

17                   MS. PECK:  Object to form.

18                   A.  Well, based on just that, I would

19       say no, I -- I would still believe that this was a

20       trauma case.  Children who were in deep coma, can't

21       protect their airways.  And this child then had

22       multiple organ failure, respiratory problems,

23       required ventilation, was alive for several days in

24       that state and secondary infections can occur.

25                   So that's one thing, but we don't know

Page 53

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2         the onset of the infection.  Number two, it's

3         certainly possible that a child can have two

4         problems.  In other words, the child may have been

5         sick before any injury.  But because of the illness

6         him screaming, inconsolable crying, and in my

7         experience with these types of cases, that sometimes

8         can precipitate a parent to act violently towards the

9         -- toward the infant.

10                   I'm just obviously speculating, but

11        the child may have had an infection before, may have

12        had an infection after.  But my primary concern was

13        that this child had traumatic subdural hematomas.

14                   BY MR. KLEIN:  (Cont'g.)

15                   Q.   When you say traumatic -- when

16        you say traumatic, you don't know for a fact whether

17        he did or didn't, correct?

18                   A.   I don't know for a fact, what?

19                   Q.   Whether there was in fact, a

20        traumatically -- when you say trauma, it could be

21        birth-related trauma, it could be trauma other than

22        by abuse, correct?

23                   MR. GINSBERG:  Object to the form.

24                   BY MR. KLEIN:  (Cont'g.)

25                   Q.   You don't know what -- what form

Page 54

1      Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2          of mechanism caused what you determine -- what you

3          believed to be a traumatic subdural hematoma?

4                       A.   It's true.  I didn't witness any

5          trauma.  But just to clarify your question, that it

6          included birth trauma.  This had nothing to do with

7          birth trauma.

8                       Q.   Image ten showed, according to

9          your testimony, subdural space, and subarachnoid

10         space, one side appeared denser and had darker fluid

11         than the other.  Do you recall that generally?

12                      A.   Generally, yes.

13                      Q.   Isn't it true that that is the

14         characteristic appearance of effusion that would

15         occur in infection and would not be characteristic of

16         blood in the space?

17                      A.   No, no, you can't -- you can't --

18         you can't look at a scan in isolation and say that --

19         what it is in the subdural space.  The subdural

20         effusions typically are high protein, so they do

21         change the density, they make it less dark and more

22         gray.

23                      In my experience with subdural

24         effusions, I've never seen any, that are remotely

25         this size.  And effusion, clinically, it's -- it's

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2         very different.  I don't believe that.  Although, I

3         mean, I don't know what the autopsy showed, I don't

4         know whether something grew from the subdural fluid.

5              But my immediate inference that this

6         was predominantly and certainly it was at that time

7         that this was a subdural hematoma.

8              Q.    Now as you just alluded to on

9         C.T. scans, acute clotting of blood is typically

10        bright white and -- correct?

11             A.    Yes.

12             Q.    And blood, I think you said old

13        blood can resemble cerebral spinal fluid, do you

14        recall saying something like that?

15             A.    I'm sorry, we're having a little

16        difficulty.  Could you repeat that one?

17             Q.    Do you recall saying that blood

18        can resemble cerebral spinal fluid on the C.T.?

19             A.    Blood can resemble -- yes, very

20        old -- old blood can -- approaches the appearance of

21        cerebral spinal fluid.

22             Q.    Right.  So here, it -- if it was

23        an acute subdural here, it should look bright white

24        at the time you saw it, correct?

25             A.    Not necessarily no.

Associated Reporters Int'l., Inc.

1     Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                     Q.   Well, if we're talking about an

3     acute subdural that was inflicted within a week or

4     days or couple of weeks of the -- of the C.T., it

5     should look bright white, would you agree with that

6     or not?

7                     A.   No.

8                     Q.   Why not?

9                     A.   Okay.  It's common, particularly

10    in infants, children, that the trauma tears the

11    arachnoid, which is the outer membrane that contains

12    the cerebral spinal fluid.  As well as a vein --

13    veins that pass through the subdural space to the

14    dura.

15                    So you can get acute blood mixing with

16    cerebral spinal fluid.  And that reduces the overall

17    density, it dilutes, if you will, the blood.  So it

18    doesn't always look bright.  There may be bright

19    components or maybe gray components there may be

20    darker components.

21                    Years ago, we were classically taught

22    that acute blood and this is still true for the most

23    part in most adult's subdural hematomas, that an

24    acute subdural hematoma is bright, it's white.

25    Subacute subdural hematomas are more gray closer to

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2         the -- the density of a normal brain.

3                        And chronic subdurals are dark, more

4         closely resembling C.S.F.  But again, in infants,

5         it's not uncommon for this to get mixed that the --

6         to blood to get mixed with the cerebral spinal fluid,

7         thereby reducing the density of the fluid.  And it

8         makes it impossible to age it.

9                        Q.   What's your basis of saying it's

10        acute blood in this case?

11                       A.   The bright white portion of the

12        subdural is certainly suggestive of acute blood.

13                       Q.   Okay.  But isn't it true it

14        doesn't look bright white in this case?

15                       A.   No, there's some components of it

16        that look bright white.

17                       Q.   So we'll actually show that in a

18        few moments if we can get -- if we can work that out.

19                       A.   Okay.

20                       Q.   Now in terms of the subdural

21        hematoma, we're talking about here, are you positing

22        that there must be -- I think you just said tears of

23        the -- of the arachnoid membrane.  Is that your

24        theory?

25                       A.   Yes.

Page 58

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                    Q.   What evidence do you have of that

3         here?

4                    A.   What evidence do I have?

5                    Q.   Yeah, if any?

6                    A.   The only evidence I have is the

7         appearance of the C.T. scan.  You can't image the

8         arachnoid.

9                    Q.   Right.  So an acute subdural

10        hematoma due to child abuse looks like a big white

11        thing on a C.T., correct?

12                   MS. CALABRESE:  Object to form.

13                   MR. PECK:  Object to form.

14                   A.   I have testified to this just a

15        minute ago, that it may, but it may also mix with the

16        cerebral spinal fluid and be diluted.

17                   BY MR. KLEIN:  (Cont'g.)

18                   Q.   Okay.  You said at trial that the

19        majority of patients who die from short falls die

20        from epidural hematomas.  Do you recall saying that?

21                   A.   That's not what I said.

22                   Q.   What do you recall you said?

23                   A.   You mean, I'm sorry, the majority

24        of patients who die from short falls, is that the

25        question, the majority of patients --

Page 59

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                    Q.   That's my understanding of what

3    you've testified to, yeah.

4                    A.   I thought you said the majority

5    of patients who have short falls die from -- yes,

6    short falls defined as three or four feet.

7                    Q.   And this is not a case involving

8    an epidural hematoma, correct?

9                    A.   That's correct.

10                   Q.   Okay.  Now with regard to the

11   retinal hemorrhage and other neurological conditions,

12   they're not specific to child abuse, correct?  You

13   talk about retinal hemorrhage, but we know that it

14   can be due to infection as well, correct?

15                   MS. PECK:  Object to form.

16                   A.   Retinal hemorrhages can take many

17   forms.  And one form may suggest Diagnosis A, another

18   form may suggest Diagnosis B.  Extensive bilateral

19   subdural hematomas are, I think, I'm not sure if I

20   used the word exclusively.  Nothing is a hundred

21   percent.

22                   But the vast, vast majority of

23   patients who have bilateral extensive retinal

24   hemorrhages have traumatic subdural hematomas.  You

25   can have less -- much -- less extensive in different

Page 60

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2         shapes and involvement of the retinal layers with

3         hemorrhage in other kinds of diseases.

4                        But what we saw in Matthew Thomas's

5         retinas is seen almost exclusively on subdural

6         hematomas.  I hope Mr. Ginsberg doesn't have COVID-

7         19.

8                        MR. GINSBERG:  I do not.  But if you

9         watch I keep sanitizing my hands and occasionally my

10        face.

11                       THE WITNESS:  Okay.  I'm glad to hear

12        that.

13                       MR. GINSBERG:  Well, thank you for

14        your concern, Doctor.

15                       THE WITNESS:  That's what doctors do.

16                       BY MR. KLEIN:  (Cont'g.)

17                       Q.   The bulging of the sutures, isn't

18        it fair to say that that's consistent with infection?

19                       A.   Say that again, bulging of --.

20                       Q.   Of sutures that you described

21        earlier.  Isn't it fair to say that that's consistent

22        with infection?

23                       A.   Well, first of all, I didn't use

24        the term bulging of the sutures, bulging of the

25        anterior fontanelle.  And spreading or splaying of

Page 61

```
1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD
2        the sutures --
3                    Q.   Okay.
4                    A.   -- is a -- is a sign of swelling
5        of the brain or the presence of a intracranial mass,
6        taking up space and causing an increased intracranial
7        pressure of it from any -- any cause.
8                    MS. CALABRESE:  Can we --
9                    BY MR. KLEIN:  (Cont'g.)
10                   Q.   That can be from infection,
11       correct?
12                   A.   Yes, I mean, you -- you can, in
13       certain circumstances, get increased -- certainly,
14       increased intracranial pressure from an infection of
15       the brain or the meninges.  Yes.
16                   MR. KLEIN:  Sorry, Christina, what's
17       up?
18                   MS. CALABRESE:  Can we go off the
19       record for a quick moment?
20                   MR. KLEIN:  Sure.
21                   THE REPORTER:  Okay.  One moment.
22                   (Off the record, 11:30 a.m.)
23                   (On the record, 12:00 p.m.)
24                   MR. KLEIN:  Is everyone ready to
25       proceed?
```

Page 62

```
 1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

 2                    MR. GINSBERG:  Yes.

 3                    MR. KLEIN:  Okay.  I'm going to ask

 4    that the court reporter just read back the last

 5    substantive question and the answer, please?

 6                    THE REPORTER:  All right.  Just one

 7    moment.

 8                    (Reporter complied with request

 9    played)

10                    THE REPORTER:  That was the last

11    question and answer.

12                    MR. KLEIN:  I think -- I think I went

13    a little further than that.  Because I -- when

14    Christina spoke, I still continued the follow-up part

15    of the question, and then we broke.

16                    THE REPORTER:  Okay.  Give me just a

17    second.

18                    (Reporter complied with request)

19                    THE REPORTER:  Was that what you

20    needed to hear, sir?

21                    MR. KLEIN:  Yes, thank you.

22                    THE REPORTER:  You're welcome.

23                    BY MR. KLEIN:  (Cont'g.)

24                    Q.   So Doctor, I just want to follow-

25    up to that last answer and then I'll let you clarify
```

Page 63

```
 1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD
 2         anything you want to clarify?
 3                    A.    Fine.
 4                    Q.    In this case, did you come to
 5         learn, up until today, from any source that there
 6         was, in fact, a meningeal infection found by Dr.
 7         Sikirica, the medical examiner?
 8                    A.    Well, I did not have Dr.
 9         Sikirica's autopsy findings.  I requested them but
10         never received them.  So --
11                    Q.    Well --
12                    A.    -- I'm not sure I did, and I
13         have no recollection of knowing that.
14                    Q.    If you knew that, would that have
15         changed your opinion as to the potential causes here
16         of the subdural collection?
17                    A.    I would have to know the -- the
18         details, you know, it's not a yes or no question.  I
19         have -- I'd have to -- I'd have to see what in detail
20         he reported.
21                    Q.    Okay.  He -- he finds in his
22         anatomic diagnosis, I'll -- I'll represent this, I'm
23         reading from it.  Blood culture positive for
24         streptococcus pneumonia on initial presentation to
25         hospital nine twenty-one zero eight  So even though
```

Page 64

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD
2         you said that you -- your understanding is the
3         cultures came back negative, does this -- does this
4         suggest otherwise, taking my representation as
5         accurate?
6                        MR. GINSBERG:  Object to the form.
7                        A.   Well, that -- that's what I
8         wanted to correct.  I said streptococcus, but my
9         recollection was, I should have said staphylococcal.
10        There was a -- there was a blood culture from Albany
11        Med that was negative after five days for strep or
12        staph aureus.
13                        That -- that was my correction.  And
14        your -- your question is, could you please repeat it?
15                        BY MR. KLEIN:  (Cont'g.)
16                        Q.   Did you -- did you come -- did
17        you know or come to learn that he tested positive the
18        patient for streptococcus pneumonia?
19                        A.   I have no recollection of that.
20        I don't -- I don't recall.
21                        Q.   Okay.  Assuming for purposes of
22        this question, that Dr. Sikirica found that there was
23        sepsis, including strep pneumonia and meningeal
24        infection.  Would that impact your opinion as to the
25        cause of the subdural collection of fluid, had you

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2         known that?

3                        MR. GINSBERG:  Object to the form.

4                        MS. CALABRESE:  Object to the form.

5                        MS. PECK:  Object to the form.

6                        A.   Based on just what you just said,

7         that's not enough information for me to change my

8         opinion.  As I -- I think I testified a little bit

9         earlier that the child may have had an infection

10        and/or the child developed an infection subsequent to

11        being unconscious.  So what --.

12                        BY MR. KLEIN:  (Cont'g.)

13                        Q.   I mean, the child may have had an

14        infection, correct?

15                        A.   Whether or not the child --

16                        MS. CALABRESE:  Hold on, object to the

17        form.

18                        A.   (Cont'g.) -- had an infection

19        before or after, doesn't necessarily mean the child

20        died because of those actions.  The child still may

21        have died and in my opinion died from increased

22        intracranial pressure due to the subdural hematomas.

23                        BY MR. KLEIN:  (Cont'g.)

24                        Q.   Okay.  And you don't know for a

25        fact either way, correct?  What caused the death?

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                    MS. CALABRESE:  Object to the form.

3                    A.   What -- what factor you --.

4                    BY MR. KLEIN:  (Cont'g.)

5                    Q.   Well, you don't know whether

6    sepsis caused the death or the subdural hematoma.

7    You just know -- based on your limited interactions,

8    of seeing the patient two times and in looking at the

9    C.T., correct?

10                   A.   It's my opinion that that child

11   died from increased intracranial pressure related to

12   the subdural collections.

13                   Q.   Now, looking at the C.T. report

14   itself, that was prepared by a radiologist, correct?

15                   A.   Yes, Dr. Eric Hoover.

16                   Q.   Okay.  And you're not a

17   radiologist, you're a neurosurgeon, correct?

18                   A.   Correct.

19                   Q.   Typically, when there's a consult

20   in a case like this, would there typically be a

21   neurology consult, rather than neurosurgery consult

22   for a patient like Matthew Thomas?

23                   A.   Typically, it would be

24   neurosurgical, because oftentimes subdurals require

25   surgical intervention.  Neurologists, in this case, I

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2         believe, was consulted to do the -- I think the --

3         the brain death determination.

4                        Q.   And do you know who that was?

5                        A.   No.  I don't know, no.

6                        Q.   Okay.  Was there a pediatric

7         neurologist on call at that time or available at that

8         time that you can remember?

9                        A.   There always is, but I don't know

10        specifically --

11                       Q.   Okay.

12                       A.    -- who -- who that might have

13        been.

14                       Q.   Things like subdural brain

15        effects, those are the kind of things that are

16        usually dealt with between radiology and neurology,

17        maybe infectious disease, correct?  But not typically

18        neurosurgery, would you agree with that?

19                       MS. CALABRESE:  Object to the form.

20                       A.   No, I don't agree with that at

21        all.

22                       BY MR. KLEIN:  (Cont'g.)

23                       Q.   Okay.  Now, the -- the C.T.

24        report, in this case, it's -- it's part of that

25        document that you were looking at before, let's turn

1   Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2        to that page.

3                    A.   The -- the chart you mean?

4                    Q.   Yes.  And if you could -- well I

5        guess let's  say the page number for the record, I

6        think I have it here.  It's eight T three twenty-

7        eight.

8                    A.   Okay, I have it.

9                    Q.   Okay.  I was getting to it.  Do

10       you agree it doesn't say subdural hematoma, correct?

11                   A.   Correct.

12                   Q.   And that's a specific term of art

13       that -- it's like radiology one zero one, you know,

14       what you -- you describe something as a subdural

15       hematoma or you don't, right?

16                   MR. GINSBERG:  Object to the form.

17                   MS. CALABRESE:  Object to form.

18                   A,   Well, on the one hand you're

19       trying to say I'm not a radiologist and you're trying

20       to tell me how they are supposed to write their --

21       their report.  So I can't --.

22                   BY MR. KLEIN:  (Cont'g.)

23                   Q.   No, I'm not trying to say you're

24       not a -- your -- your training, you certainly read

25       C.T.'s correct?  You have a lot of experience with

Page 69

```
 1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD
 2        that.
 3                    A.   I don't -- I don't read them
 4        officially, I read them for my purposes --
 5                    Q.   Right.
 6                    A.    -- and decisions regarding
 7        patients I'm caring for.
 8                    Q.   Okay.
 9                    A.   So the radiologist's report
10        describes what he sees anatomically, not
11        physiologically.  In other words, he's saying there
12        are collections of fluid.  He's not describing what
13        that fluid is, although -- I'm -- I'm done, yes.
14                    Q.   Right.  And the fluid of
15        collection could be effusion related to infection,
16        correct?
17                    A.   He doesn't say, but could it be?
18        Again, I -- as I testified earlier, I've never seen a
19        fluid -- a fluid collection just from an effusion --
20                    Q.   Well --
21                    A.    -- remotely that size, so --.
22                    Q.   Okay.  Doesn't mean --?
23                    A.   It's unlikely but possible.
24                    Q.   Right.  And this patient had
25        coagulopathy, correct?
```

Page 70

```
1     Thomas v City of Troy et al - 10-19-20 - John Waldman, MD
2                     A.   This patient had coagulopathy but
3          had no signs of bleeding.
4                     Q.   Couldn't that fluid have had some
5          blood in it, and it has -- thus had the appearance in
6          the C.T.?
7                     MS. CALABRESE:  Objection.
8                     A.   You asked -- you asked me that
9          question right at the beginning, and my answer was
10         anything is possible.
11                    BY MR. KLEIN:  (Cont'g.)
12                    Q.   Okay. The radiologist doesn't
13         call it a subdural hematoma here.  Do you know why
14         they didn't specifically call it a subdural hematoma?
15                    A.   I have no idea what goes on in
16         Eric Hoover's mind.
17                    Q.   Do you believe that it's more
18         likely than not because he wasn't sure based on the
19         C.T., whether it was a subdural hematoma?
20                    MS. CALABRESE:  Object to the form --
21                    MR. GINSBERG:  Object to the form.
22                    MS. CALABRESE:  -- that is -- yeah,
23         that's not a proper question.
24                    BY MR. KLEIN:  (Cont'g.)
25                    Q.   How do you -- how do you -- how
```

Page 71

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2        do you jump to the conclusion that this is an acute

3        subdural hematoma from the findings of this radiology

4        report?

5                        MR. GINSBERG:  Object to the form.

6                        MS. CALABRESE:  Join.

7                        A.   It was my interpretation of the

8        scan that this was a subdural hematoma.  I'm not sure

9        that I ever -- at the time I was involved with the

10       case, I seriously doubt I ever saw the final report

11       of Dr. Hoover's.  Typically, what happens is whoever

12       -- there's usually a resident radiologist on call,

13       there might be an attending also, it depends on the

14       time of day who would do a preliminary report, would

15       be handwritten usually.

16                        And if there's an issue that they may

17       or maybe even always contact the ordering physician

18       to tell them of an abnormality.  The official reading

19       occurs sometimes later -- sometime later, it's

20       dictated and then transcribed.

21                        And then sometimes after that it's

22       printed out, sent to the -- whatever the charges, or

23       it could be even after the child expired or was

24       discharged.  It would -- and the chart then goes to

25       medical records that may end up in medical records.

Page 72

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2              So none -- none of the physicians

3    actually caring for the patient may not -- may ever

4    have seen the official report, that's the way it

5    works.  And it would take some amount of time, so I

6    don't -- I doubt I ever saw Dr. Hoover's actual

7    report.

8              BY MR. KLEIN:  (Cont'g.)

9         Q.   Okay.  So what -- how -- what was

10   your basis of concluding it was a subdural hematoma

11   during the treatment of the patient?  Was it based on

12   your review of the C.T., or was it based on

13   conversations with your colleagues?

14             A.   It was based on my review of the

15   cranial CAT scan and my examination and the -- the

16   other findings, the retinal findings, et cetera.

17             Yes, predominantly it is not

18   exclusively based on the scan.

19             Q.   And do you know -- do you think

20   -- do you draw any significance to the finding of

21   large bilateral extra-axial fluid collections,

22   slightly larger on the right versus the verbiage of

23   bilateral subdural hematoma in the report?  What

24   significance do you draw from that distinction?

25             MS. CALABRESE:  Objection to the form.

Page 73

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                    A.    Well, all I can say is some

3    radiologists are reluctant to make specific

4    diagnoses.  They view it as their -- they don't

5    typically have a history -- let -- let me just --

6    just restart this.

7                    When you order a radiological test,

8    CAT scan, X-ray, you're actually ordering a

9    consultation with a radiologist, at-- just like a

10   neurosurgery consultation.

11                   So theoretically, you felt in making

12   the request, you fill out a form requesting a

13   consultation, we put the history down and you put the

14   pertinent findings down.  The vast majority of people

15   who order a cranial CAT scan will just say -- won't

16   give any history at all, they'll just say rule out

17   subdural.

18                   The radiologist has no idea what the

19   history is, doesn't know if this patient came in with

20   a raging infection or was in a high speed motor

21   vehicle accident or whatever.  They don't -- they

22   typically don't know.  So they're loathe to actually

23   make a specific diagnosis unless they, you know, it's

24   completely obvious based on the scan.

25                   So they describe what they see

Page 74

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2         anatomically based on the different densities.  And

3         because -- so what he's describing is the anatomical

4         location of the abnormality and the different

5         densities, but he's not saying this is infection,

6         he's not saying this is subdural hematoma.  He's not

7         saying it's a brain tumor, he's just describing the

8         anatomical features.  And the -- and the difference

9         in densities.  He's -- he's not drawing any

10        conclusions in other words, because he doesn't take

11        care of the patient.  He doesn't have to.  I'm taking

12        care of the patient.  I have to make decisions about,

13        you know, interpreting the findings.

14                   BY MR. KLEIN:  (Cont'g.)

15                   Q.   You look at the same -- you look

16        at the same scan that he did, so other than having a

17        bedside visit with the patient and looking at the

18        chart -- and -- and looking at the same scan, what if

19        anything else informed your decision, your

20        determination that this was a subdural hematoma, as

21        compared to a large bilateral extra-axial fluid

22        collection?

23                   MS. CALABRESE:  Object to form.  And

24        this question has been asked over and over and over

25        again.  Can we move on soon?

Page 75

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                    MS. PECK:  Object to the form.

3                    BY MR. KLEIN:  (Cont'g.)

4                    Q.   You can answer, Doctor.

5                    A.   I -- I don't think we're saying

6        anything different.  We're describing it the same

7        way.  I'm just going a step further and saying what I

8        believe the anatomical findings relate to clinically,

9        because I'm caring for the patient, he isn't.

10                   Q.   Okay.  And did you notice in the

11       Albany medical record in preparation for this

12       deposition, that it said in some -- at least a place

13       or so skull fracture?

14                   A.   I think on the initial admission,

15       there was some evidence of skull fracture, whether it

16       was in with -- with question mark, I don't remember.

17       But there was some quali -- qualifying adjective

18       associated with it.  It turns out -- and I personally

19       didn't think there was a skull fracture.

20                   And I've also reviewed the skull --

21       well, I don't know whether I personally reviewed the

22       skeletal survey, but I know the report was no -- no

23       fractures, and that includes the skull.

24                   Q.   Right.  So did you have an

25       understanding of how that came to pass in the record

Page 76

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2        that someone thought there may have been a skull

3        fracture.  Was that a mistake, was it someone's

4        belief that was later determined to be unfounded, or

5        do you not know?

6                    A.   Well, I don't know.  I can

7        surmise that it was pediatric residents who maybe it

8        came from the hospital record, I have no idea.

9                    Q.   You don't know, okay.

10                   A.   I don't know.

11                   Q.   In terms of the bilateral extra-

12       axial fluid collection referenced in this report,

13       just for the record, we may have said it, but I just

14       want to be clear.  This fluid collection can be

15       blood, correct?

16                   A.   Correct.

17                   Q.   It could be cerebrospinal fluid,

18       correct?

19                   A.   Not normal, cerebrospinal fluid,

20       no.

21                   Q.   Okay.  It could be evidence of

22       infection or pus?

23                   A.   Possibly.

24                   Q.   And the C.T. doesn't

25       differentiate between one or the other, correct?

1　Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2　　　　　　　　　A.　No, the C -- a C.T. is showing

3　you the anatomical space that this fluid is in --

4　　　　　　　　　Q.　Right.

5　　　　　　　　　A.　-- and -- and the density of the

6　fluid.  It's not, you know -- you know, it's not like

7　-- it says subdural hematoma.  That's -- that's what

8　the -- that's what the interpretation, my

9　interpretation of what I saw on the scan is that it

10　was a mixed density, component of acute blood,

11　probably mixed with cerebrospinal fluid.  That was my

12　interpretation of it at the time.  I --.

13　　　　　　　　　Q.　When you say mixed density -- I'm

14　sorry to interrupt.  Go ahead and finish, I'm sorry

15　to interrupt.

16　　　　　　　　　A.　I --I -- at the time I was caring

17　for the child, I believed that this was a -- a

18　subdural hematoma.

19　　　　　　　　　Q.　When you -- when you use the term

20　mixed density, is that because it doesn't -- it --

21　the fluid looks dirty?  For lack of a better word?

22　　　　　　　　　A.　No, they are different densities.

23　　　　　　　　　Q.　Okay.

24　　　　　　　　　A.　If there were a piece of bone

25　floating around in there, there would be, you know,

Page 78

```
1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD
2         the density of bone.  If there's cerebrospinal fluid
3         in there, without any other issue, it would be a
4         certain -- another density.  If it was acute blood
5         clump of clotted blood, it would be another density.
6                   Q.   So here it wasn't the density
7         characteristic of subdural effusion from infection?
8                   MS. MITCHELL:  Object to form.
9                   A.   It is my interpretation at the
10        time that this was a subdural hematoma with a mixture
11        of separate -- C.S.F.  Could it have been in a
12        mixture with some infection?  Yes, but I -- my
13        impression at the time was this was a subdural
14        hematoma.  I didn't entertain that this was
15        predominantly a subdural effusion due to an
16        infection.
17                  BY MR. KLEIN:  (Cont'g.)
18                  Q.   Which doesn't mean that it
19        wasn't, it's just not what you entertained at the
20        time, correct?
21                  A.   Correct.  And that's what I wrote
22        in the chart, and that's what I -- I believed at the
23        time.
24                  Q.   Right.  But has your belief
25        changed since then, with the understanding that there
```

Case 1:17-cv-00626-DJS Document 142-11 Filed 06/14/21 Page 808 of 189

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2         was overwhelming sepsis in this case?

3                     MR. MITCHELL:  Object to form.

4                     A.   Based on that information alone,

5         I can't.  There's not enough information to change my

6         opinion.

7                     BY MR. KLEIN:  (Cont'g.)

8                     Q.   Okay.  What information would --

9         would change that?

10                    A.   I -- I would like to see Dr.

11        Sikirica's or any other pathologists who may have

12        reviewed this case.  I'd like to see their report and

13        read it.

14                    Q.   Okay.

15                    A.   See what exactly they found.

16                    Q.   Okay.  Dr. Sikirica didn't find a

17        subdural hematoma on both bilateral lobes, correct,

18        he saw one on one side, that would be --.

19                    MS. PECK:  That's not -- that's not

20        accurate.

21                    MR. KLEIN:  That's my recollection of

22        his testimony.

23                    MS. CALABRESE:  And if you want to

24        question him, or provide information, can you please

25        pull up -- can you show the autopsy report, share

Page 80

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2       this --

3                    MS. PECK:  Yes.

4                    MS. CALABRESE:  -- so the doctor can

5       have this information.  And just for the record, it's

6       my understanding that doctor -- and Crystal, you can

7       correct me if I'm wrong.  But it's my understanding

8       that Dr. Sikirica found what he called a new or acute

9       subdural on one side, and the older subdural on the

10      other side.

11                   And I could be missing words, so I

12      apologize for interrupting you.  That was my

13      recollection of the testimony.

14                   MR. KLEIN:  I just read it.

15                   MS. PECK:  If you are going to

16      question the witness and reference this testimony, if

17      you question this witness it would be beneficial to

18      bring up the testimony that you're referencing so

19      that the witness can see what you're are referencing.

20                   MR. KLEIN:  Okay, well I understand if

21      I want to pull up the testimony.

22                   MS. CALABRESE:  You want me to pull it

23      up.  I have it handy, but you let me know.

24                   MR. KLEIN:  You know, let me just see

25      what I have here.  Hold on one second.

Page 81

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                    BY MR. KLEIN:  (Cont'g.)

3              Q.   Let me just move on and we'll

4    circle back to showing you other exhibits, whether it

5    be the scan itself, Dr. Sikirica's testimony or

6    whatnot.

7              Dr. Waldman, typically is a neuron --

8    neurosurgeon brought in to determine if there's any

9    surgical option?

10             A.   I would say yes, but not only for

11   those conditions.  We take care of non-surgical

12   problems too.  For example, there are many kinds of

13   head injuries that aren't surgical, and then many --

14   so it was not just for surgical things.  But I would

15   say close to a hundred percent for problems that are

16   potentially that involve the nervous system that are

17   potentially surgical.  With --

18             Q.   In terms of the workup -- I'm

19   sorry.

20             A.   -- with the exception of spinal

21   cord issues, because increasingly orthopedic surgeons

22   are inserting themselves into the treatment of spinal

23   problems also.  But generally, surgical problems, but

24   not exclusively surgical problems to answer your

25   question.

Page 82

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                  Q.   In terms of suspected child abuse

3    isn't that something that neurosurgeons are typically

4    not involved with?

5                  A.   Yes.

6                  Q.   In other words, that's between

7    neurology and radiology?

8                  A.   Absolutely not.

9                  Q.   So you're involved or not?

10                 A.   Neurologist are rarely -- in the

11    circumstance that a child abuse case, patient has

12    seizures or maybe some other problems there -- there

13    might -- there would be a neurology consult.  I

14    mentioned brain-death determination, some protocols

15    require neurologists to perform the brain-death

16    determinations.

17                  I honestly can't remember now whether

18    that's -- was required at the time at the Medical

19    Center or whether the intensivist could do it.  But

20    typically, no, they are not involved in trauma.  They

21    don't take care of trauma patients; they don't see

22    trauma patients as a rule.

23                  Q.  Dr. Waldman, the extra-axial

24    fluid collection that's present -- present in this

25    case, can you have that type of fluid collection

Page 83

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2         related to infection?

3              A.   Well, as I mentioned, I've never

4    seen a subdural effusion following -- central

5    effusions can occur after meningitis.  And they're

6    usually, they're -- they're nowhere near the size.

7    As I've mentioned, I've never seen something like

8    that.  So it's my opinion that there may have been a

9    secondary infection in this case.

10             Again, you know, the definitive answer

11   to all these questions is the autopsy, you know, I --

12   I -- I didn't tap the subdural space because the

13   child was dead at the time.  We could have done it

14   for diagnostic purposes, but the child was not alive.

15             So you know, it's -- it doesn't seem

16   it -- it's not appropriate to -- to do invasive -- an

17   invasive procedure on someone who's not alive, we

18   can't do anything.

19             Q.   Thank you.  I want to take a

20   moment and just see if I could follow-up what I need

21   from Dr. Sikirica.

22             A.   Fine, thank you.

23             MS. CALABRESE:  What was the name of

24   the doctor you said?

25             MR. KLEIN:  Sikirica.

Associated Reporters Int'l., Inc.

Page 84

```
1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD
2                     MS. CALABRESE:  Yeah, it was Sikirica.
3                     MR. KLEIN:  Christina, do you have a
4         testimony where he says it's on one side or not both?
5         Because I believe I just read it earlier, I'm just
6         trying to find it.  There was a subgaleal, but that's
7         not it.  I believe, he says from trauma, subdural
8         then he says is on one side not both even though the
9         C.T. said both, off the record.
10                    MS. MITCHELL:  The witness was hoping
11        to see the actual autopsy report not a transcript of
12        testimony.
13                    MS. CALABRESE:  Are you reading from
14        the transcript, Brett, what you just said?
15                    MR. KLEIN:  No, I'm not reading, I
16        just recently read it.  And so -- like today or
17        yesterday, and so if you had that, that's -- he
18        clarifies  what's in the autopsy, I could give you
19        the autopsy if you guys want to see that.  I could
20        email the joint the email that's here.
21                    MS. CALABRESE:  Yeah, we could -- we
22        should just publish it for him to read and then mark
23        it.
24                    MR. KLEIN:  Obviously --
25                    MS. CALABRESE:  I'll -- I'll look in
```

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2        --

3                    MR. KLEIN:  -- I can put it on the

4        screen.

5                    MS. CALABRESE:   -- transcript while

6        we're doing that.

7                    MR. KLEIN:  I'll put it up on the

8        screen.

9                    MS. CALABRESE:  I think we're talking

10       about page seventy-three, Brett.

11                   MR. KLEIN:  Yes.

12                   MS. CALABRESE:  Where -- you're right,

13       he's talking about the sub -- dural -- old and the

14       new and then section B subdural is wrong.

15                   MS. PECK:  Okay.  I was wrong, I

16       apologize.

17                   MS. CALABRESE:  No, I -- I have the

18       same memory.

19                   MR. KLEIN:  So could -- so how do we

20       want to go about this?  Do we want to just -- I just

21       want to pose -- posit that statement of Dr. Sikirica

22       to the witness and asked if that -- if he agrees or

23       disagrees with this position of what Dr. Sikirica

24       found on his autopsy.

25                   MS. PECK:  Do you want a second to

```
 1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD
 2         review the autopsy report?
 3                   MR. KLEIN:  Sure.  I'll post the
 4         autopsy on the screen; I'll share that screen.
 5                   MS. PECK:  Okay.
 6                   MR. KLEIN:  Just going to make sure I
 7         get the right one, I don't want to give you all my
 8         work product here.
 9                   BY MR. KLEIN:  (Cont'g.)
10                   Q.   Do you see that the M.S.L.A. Four
11         zero nine?
12                   A.   Yes.
13                   Q.   Okay.  So I'm going to -- so if
14         you'd like I could scroll down first is the photos.
15         Then the final autopsy report.
16                   A.   Yeah but go back.  I'm going to
17         have to enlarge it somehow.  Maybe you -- it's very
18         small, I'm not on a computer.  I'm on an iPad,
19         because --.
20                   Q.   Do you want to see the photos, or
21         do you want to see the brain section?
22                   A.   I want to see the whole thing,
23         more --
24                   Q.   Sure.
25                   A.    -- more accurate I can be.
```

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                    Q.   Okay.  So let's see how we can

3    enlarge this.

4                    A.   Can you do full screen?

5                    Q.   I have it as full screen, maybe

6    you can do something on your end and make it full

7    screen.  But each little -- these are like thumbnail

8    photos.

9                    A.   Yeah, hang on because you just

10   switched.  Okay, I -- I can, you know, or I can --

11   the pictures are hard to --.

12                   Q.   It's more like a -- it's more

13   like a PDF; we can't enlarge anything or do anything

14   to the screen.

15                   A.   Yeah, well, I can -- I can, you

16   know, spread my fingers and it gets bigger.  But it

17   -- I'm going to have to go from the -- from the

18   written description rather than -- or we can skip the

19   pictures.  It does a little bit of what's standing on

20   both sides, but that's all right.

21                   Q.   So this is where it says -- do

22   you know where it says --?

23                   A.   Can I -- is it possible for me to

24   scroll, or do you have to do that I guess, right?

25                   Q.   I could email to your counsel if

1      Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2          you want, but --

3                          A.    Yeah.

4                          Q.     -- but otherwise I'll -- up here

5          I have to do it.

6                          MS. MITCHELL:  Okay.

7                          A.    Well, you keep doing it, but if

8          you can also send it that would be good too.

9                          BY MR. KLEIN:  (Cont'g.)

10                         Q.    So -- so this is -- this is the

11         first written page, and you let me know if you want

12         to read this page external description or if I should

13         move on to the next page?

14                         A.    Well, I could read the cause of

15         death, severe closed-head injuries.

16                         Q.    It's all right.

17                         A.    You didn't want me to read that,

18         I guess.

19                         Q.    All right.  So what I want to

20         show you is the brain, the brain section because I

21         think that's what we're talking about here.

22                         A.    Well, what --

23                         MS. MITCHELL:  Did you email it,

24         Brett, because once you do then I'll --

25                         MR. KLEIN:  I'll send them right now.

Page 89

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                  MS. MITCHELL:  Thanks.

3                  THE WITNESS:  The pic -- the pictures

4        are not adequate because they're -- they're tiny,

5        like when I enlarged them they're -- they're too dark

6        and grainy.

7                  BY MR. KLEIN:  (Cont'g.)

8                  Q.   Well, I'll -- I'll tell you this.

9        I mean, you -- you didn't review the autopsy until

10       today, correct?  You have up until today, you have

11       not reviewed this autopsy, correct?

12                 A.   I requested to but yes, I did

13       not.

14                 Q.   So -- so my question I think

15       which -- I think now is that --.

16                 MR. KLEIN:  I think you guys are going

17       to withdraw the objection to the premise of my

18       question.  I just want to ask that question about Dr.

19       Sikirica opining in his testimony that the subdural

20       hemorrhage was on one side, not both?  Are you guys

21       objecting to that premise?  Christina and -- and

22       Crystal?

23                 MS. PECK:  I -- I don't think we've

24       gotten to look through this report all the way yet.

25                 MR. KLEIN:  Well, I'm not asking about

Page 90

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2        the reports.  I'm just asking about that testimony

3        given by Dr. Sikirica.

4                    MS. PECK:  But I can -- I mean, I'll

5        go as far as saying that Doctor -- Sikirica testified

6        that he found one subdural hematoma along the right

7        portions of the brain and that was on page seventy-

8        three of his testimony of January 10th, 2019 or

9        October 1st, 2019, I might be reading my date

10        incorrectly.

11                    MR. KLEIN:  Dr. Sikirica found one

12        subdural hematoma where, Crystal?  What did you say?

13                    MS. PECK:  He testified that he found

14        once only -- I only found one subdural hematoma along

15        the right portion.

16                    MR. KLEIN:  Okay.

17                    BY MR. KLEIN:  (Cont'g.)

18                    Q.   So Dr. Waldman, I'm going to

19        withdraw the question about the autopsy given that

20        you haven't reviewed it.  But I'll posit to you that

21        Dr. Sikirica testified that he only saw one subdural

22        -- Crystal?

23                    MR. GINSBERG:  Object to the form.

24                    MS. PECK:  On the right portion.

25                    MR. KLEIN:  Is that inconsistent with

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2        what -- with what -- with what you saw on the C.T.?

3                    MR. GINSBERG:  Object to the form.

4                    MS. PECK:  Object to the form.

5                    A.   Well, if I remember correctly,

6        and again, I'm not looking at the C.T. scan.  The

7        right -- the -- the collection on the right was

8        larger, there was more acute blood on that side.  But

9        I don't -- I don't quite -- I don't quite remember

10       whether there was a -- what I would have interpreted

11       as acute blood on the left.

12                   I will say also that anatomically, the

13       subdural space is one space.  So if there's a

14       subdural hematoma on one side, and there's a subdural

15       fluid collection found on the other side, they're

16       continuous with each other, okay?  Maybe the way the

17       child was lying, most of the blood achieved --

18       accumulated and clotted on that side.

19                   It may be that the -- the blood vessel

20       that was injured and bled that was on the right side,

21       but ultimately there would be blood on both sides.

22       But there could be --

23                   BY MR. KLEIN:  (Cont'g.)

24                   Q.   So --.

25                   A.    -- if there was more acute blood

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2        on one side than the other side.

3                    Q.   Well, it doesn't say acute blood,

4        it just says, you know, it's fluid is all you know

5        that it is, correct?  Some sort of fluid.

6                    MR. GINSBERG:  Object to the form.

7                    MS. PECK:  Object to the form.

8                    BY MR. KLEIN:  (Cont'g.)

9                    Q.   You don't know that it's blood on

10       both sides?

11                   MS. PECK:  Object to the form.

12                   A.   Again, if I, you know, if you

13       want to ask me about the autopsy, then I should have

14       an opportunity to look at the autopsy.  For example,

15       if you had part of the autopsy on the screen, and I

16       saw other information on there, that's pertinent that

17       you haven't asked me about.

18                   BY MR. KLEIN:  (Cont'g.)

19                   Q.   Yeah, but it's not what you knew

20       at the time.  So we want to know what you saw in the

21       C.T. --

22                   A.   Yes, yeah.

23                   Q.   -- so -- so --

24                   A.   That at -- at the time, my

25       impression was the bilateral subdural hematomas.

1   Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2        More -- more -- larger on the right than the left,

3        and there was a -- there was -- in -- in my

4        recollection, there was more of a bright signal on

5        the right, which would indicate clotted blood on the

6        right side.

7                    But my impression was bilateral

8        subdural hematomas at the time that happened.

9                    Q.   Does -- does anyone intend to put

10       up the C.T. on the screen?

11                   MS. CALABRESE:  I guess, it depends on

12       whether or not the doctor thinks that it would be

13       helpful in his description of his treatment in this

14       case.  So I would have to defer to him about that.

15                   MR. KLEIN:  There was no treatment

16       other -- other than seeing the patient and

17       determining no surgery, but --.

18                   MS. CALABRESE:  Well, right, you're

19       talking about his conclusions and his opinion about

20       the treatment that he rendered and even that others

21       rendered and his findings on the C.T. scan

22       particularly so he feels that seeing those again

23       would be helpful in his recitation of the events

24       relative to this case, and I would probably want him

25       to see them.

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                    MR. KLEIN:  So --.

3                    MS. CALABRESE:  Again that was my

4        charge to speak.

5                    MS. PECK:  Agreed.

6                    A.   Well, my -- my feeling is this.

7        My recollection is at the time, I felt there were

8        bilateral subdural hematomas, at the time.  So

9        whether I change my mind now is, to me not

10       particularly relevant.  So I don't think I have to

11       see them at this time.

12                   At the time, as I indicated in my

13       note, I believed there were bilateral subdural

14       hematomas whether right or left.

15                   BY MR. KLEIN:  (Cont'g.)

16                   Q.   I am asking you if, based on your

17       review of the C.T. in the last week or so, as you

18       said you've done.  Has your opinion changed?

19                   A.   No, not -- not -- my opinion

20       hasn't changed pending my review of the autopsy

21       report.

22                   MR. GINSBERG:  Please note my

23       objection to the form of the last question.

24                   MR. KLEIN:  Okay.  Well you're not --

25       I don't believe anyone's calling you as a -- as an

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2         expert.  We're just asking you about your treatment

3         in this case.

4                        MS. CALABRESE:  You're asking --

5                        MR. GINSBERG:  If you're not going to

6         call in an expert, you can't have the opinion

7         question.

8                        MR. KLEIN:  I have subpoenaed, and he

9         did.

10                       MS. MITCHELL:  How about we just move

11        forward with questions, that if the doctor feels he

12        needs to see the C.T. in order to answer, he can let

13        us know that.

14                       MR. KLEIN:  Sure.  I -- I think that's

15        all I have for now.  Let's see what the follow-up is,

16        and -- and we'll see if we need to show the C.T.

17        otherwise, I think, I'm done with my, you know, in-

18        chief questions.

19                       THE WITNESS:  Thank you.

20                       MR. KLEIN:  Thank you, Doctor, yeah.

21                       MS. CALABRESE:  Christina, do you want

22        to go next, or do you want me to?

23                       MS. PECK:  Thanks, I will.

24                       MR. GINSBERG:  I'll wait for the last

25        people.

Page 96

1      Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                    CROSS EXAMINATION

3                    BY MS. PECK:

4                    Q.    Doctor, I introduced myself in

5      the beginning.  My name is Crystal Peck and I present

6      Dr. Sikirica in a lawsuit that was brought in Federal

7      District Court.  I only have a -- just a few follow-

8      up questions.

9                    And I might seem like I'm jumping a

10     little bit because I'm filling in some minor holes

11     from some of the prior testimony that you've given

12     today.  I want to discuss on your training and your

13     background a little bit as, particularly when it

14     comes to reading C.T. scans.

15                   And you had said, when I go through

16     what you said in your testimony in 2009 and 2014, in

17     both of those trials, you did testify that you have

18     training in reading C.T. scans.  And that you

19     frequently do so as part of your practice.  Is that

20     accurate?

21                   A.    Yes, every new -- part of neuro

22     -- at least at the time, my neurosurgical training,

23     there was a specific period of time where we actually

24     rotated on neuro -- neuroradiology.  But let me state

25     that when I started my training, there was no such

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2         thing as, at least at Albany Med, there was no such

3         thing as neuroradiology, it was pre-C.T. scan days.

4                   The way we made diagnosis at that time

5         was to -- was based on neural -- history, neurologic

6         examination, and skull x-rays.  And if we needed more

7         information about what was happening inside the head,

8         we did cerebral angiography or pneumoencephalography.

9                   Those two procedures were done by the

10        resident staff, so my first year at neurosurgical

11        training, I did a minimum of a thousand, if not

12        several thousand, angiograms and pneumoencephalo --

13        cephalograms and myelograms for spinal problems.

14                  So there was no such thing as

15        neuroradiology.  Once CAT scan came, and I can't tell

16        you the exact year CAT scans appeared at the Medical

17        Center, it was either my second or third year of

18        training.

19                  As the technology developed,

20        neuroradiology came into being and they also -- that

21        -- that was coincident with the time when they

22        stopped doing direct stick -- I'm getting at the

23        details, I'm sorry, but new techniques to do

24        angiography were also to that -- that were specific

25        to the radiology -- radiology training.

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                        And so the radiologists did all the --

3    what we would now call interventional radiology.

4                        Now, neurosurgery has gotten into it

5    also, but suffice it to say that neuroradiology

6    developed during the course of my training.  So

7    initially, and then subsequently, I did lots of what

8    now would be considered neuroradiology.

9                        And then on top of that, every single

10   day, every scan that's done on any one of my

11   patients, I personally review it.  If I have some

12   questions about what I'm seeing, I may walk down to

13   the radiology department, find the radiologist who is

14   reading the facts and go over it with him.

15                       That is maybe one -- one -- two

16   percent of the cases.  If I'm uncomfortable with what

17   I'm seeing, I would consult the neuroradiologist and

18   we would discuss it.  Sometimes they come over to my

19   way of looking at it, sometimes I go over to their

20   way of looking at it.  But the vast majority of

21   times, I'm reading my own -- so --

22                       Q.   In this case --

23                       A.   -- so we're talking about

24   thousands upon thousands of -- of scans that I've

25   reviewed.

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2              Q.    Thank you.  In this case, do you

3    recall feeling uncomfortable about what you were

4    seeing, knowing, and having a conversation with the

5    radiologist about the C.T. scans?

6              A.    I have no recollection of that.

7              Q.    Okay.  Would there be any

8    notation if that was the case, if you were going back

9    and re-discussing it with radiologists, or would it

10   just be something that's essentially done without

11   having any -- any record of it?

12             A.    Well, as I've mentioned, I -- I

13   think the very likely scenario is that -- let me just

14   say that I am not a hundred percent, because it

15   happened so long ago.  But I believe at that point in

16   time, every I.C.U. patient had a computer at the

17   bedside, so you could pull up and it was -- of

18   course, all digital, you could pull up the scan at

19   the bedside and look at it.

20             So I -- I think the very likely thing

21   is when I went in to see Matthew the first time, I

22   pulled up his scan and looked at it there, if -- if

23   that weren't in place at that time, then the

24   likelihood is, I would have gone to see the scan

25   first down in the radiology department, use their

Page 100

```
1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD
2         computers to look at it.
3                   And then I would have come up to see
4         the patient, it could have been the other way around.
5         But most likely, I would have seen the scan first.
6         Otherwise, I'd have to make two trips to the -- to
7         the I.C.U.
8                   Q.    Okay.
9                   A.    So now, if I did it that way, if
10        I actually went down, and it might have been a
11        radiologist right there, and we might have discussed
12        it.  But again, I have absolutely no recollection.
13        Typically and in this case, I think it's a very
14        likely, that I saw the scan on my own and never
15        relied on the radiologist's report.  I probably never
16        saw the radiologist's report until after the fact.
17        There's a long answer.
18                   Q.    Appreciate it.  There's been
19        several questions about whether the C.T. scan was
20        showing blood or possibly pus from an infection.  How
21        -- you know, how are you able to determine that?  Can
22        you tell me is there a way to differentiate by
23        looking at a C.T. scan whether you're looking at pus
24        from an infection or you're looking at blood?
25                   A.    Well, I think it's a combination
```

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2       of history, physical examination and the scan.  In

3       this case, I can tell you that when you put the whole

4       thing together, it was my impression that this was a

5       traumatic subdural hematoma.

6                       Q.   Do you have --?

7                       A.   I don't -- I -- I don't recall

8       and I know I didn't enter it in my notes that I was

9       considering subdural effusions at the time.  I

10      believed these were subdural hematomas.

11                      Q.   You had mentioned that you didn't

12      tap the space, the subdural space because you

13      wouldn't do it because essentially Matthew was brain

14      dead, right.

15                      What information would you have gotten

16      to have in the subdural tap to expect to be able to

17      get diagnostically?

18                      A.   Well, first, let me say that

19      doctor -- somebody just disappeared.  Dr. German saw

20      the patient initially, and if -- if you read the

21      resident's note, they were planning to do subdural

22      taps, pending the coag studies.  The coags came back

23      abnormal, that the -- I don't remember the full

24      extent of the coagulation studies.

25                      But I know that the platelet count was

# APPENDIX

**1393**

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2        a hundred and fifteen thousand, which is low, but

3        it's not extremely low.  I honestly can't say whether

4        I -- if I had seen that child at that point in time

5        that I would not have done a subdural taps, I might

6        have, but that -- that's not the question you're

7        asking me.

8                    If we had done subdural taps, we would

9        have seen what the fluid looked like directly.  We

10       would have sent it to the lab for analysis, and we

11       would have sent it for cultures.  So we would have

12       done those -- those three things.  And, you know,

13       yeah, so we would know if there's bacteria growing in

14       the space, we would know if there's blood in the

15       space, we would know what the protein concentration

16       was.

17                    So we would have -- and we'd have

18       known with cells and we would have much more

19       information.  But it's not information that would be

20       different from what would be available at autopsy.  I

21       don't think.

22                    Q.   And that was going to be my next

23       question.  So the information that you would be able

24       to get from the subdural tap then is something that

25       you would expect to see -- got it from the autopsy?

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                        A.    Well, the only caveat I would say

3         would be the duration between the time you do the tap

4         and the time the autopsy was done.

5                        In other words, if the child had been

6         kept alive for a week, the infection might have

7         occurred, maybe even as a result of the tap, after

8         all, you're putting a needle through the skin, which

9         is potentially contaminated.

10                       Q.    Uh-huh.

11                       A.    You try to sterilize it, but you

12        could introduce infection by tapping.  So you know,

13        what the close proximity between the time we would

14        have tapped and the time the autopsy was done,

15        although I don't remember the exact date, probably

16        you would have gotten the same -- same information.

17                       Q.    So in this case, there wasn't a

18        tap, and would you expect any changes between death

19        and autopsy with the fluid that's collected?

20                       A.    Well again, the child is, you

21        know, in extremis, and, you know, his body functions

22        are starting to fail.  He's on a ventilator, he's

23        getting stuck multiple times and lots of things are

24        happening.  So infection can occur secondarily.

25                       Q.    Okay.

Case 1:17-cv-00626-DJS Document 66-31 Filed 06/14/2024 Page 105 of 189

# APPENDIX

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                        A.   You know, again, depending upon

3         the length of time from admittance at the Medical

4         Center and the time he expires, and the autopsy is

5         done, things can change, yes.

6                        Q.   In this case, there was the date

7         of death -- the date of death -- the date of death

8         pronouncement was September 23rd, and the autopsy was

9         performed on September 25th.  Would you expect any

10        significant changes between the 23rd and the 25th?

11                       MR. KLEIN:  Objection, calls for

12        speculation.

13                       MS. PECK:  Howard, do you mind if I

14        could have the question read back to me, please?

15                       THE REPORTER:  Yeah, one moment.

16                       (Reporter complied with the request)

17                       MS. CALABRESE:  So do you remember

18        that last part, I couldn't quite hear it on the -- on

19        the playback?

20                       MS. PECK:  Yeah, I was asking if there

21        would be any, if he would expect any significant

22        changes between September 23rd, the date of death and

23        September 25th, the date of autopsy.

24                       MS. CALABRESE:  Okay, thank you.

25                       BY MS. PECK:  (Cont'g.)

Case 1:17-cv-00626-DJS Document 66-91 1/2024 Filed 06/14/21 Page 178 of 189

Page 105

```
 1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD
 2                    Q.   The date of collection.
 3                    A.   No.
 4                    Q.   Can subdural hematoma occur
 5    without trauma?
 6                    A.   Yes.
 7                    Q.   How's that?
 8                    A.   How?
 9                    Q.   Yes.
10                    A.   Well -- well, let me -- let me
11    restate that.  It can occur in certain circumstances,
12    very rarely with minimal trauma.  And what I -- the
13    way I like to describe minimal trauma is if you or I
14    witnessed, it -- we wouldn't raise an eyebrow about
15    it like sneezing or coughing.
16                    Elderly patients get subdural
17    hematomas.  Usually, they're not symptomatic until
18    they're chronic.  And they've grown slowly over time,
19    but -- and it's somewhat different from this.  But
20    nevertheless, it can occur after sneezing.
21                    The reason is as you get older, your
22    brain shrinks and the C.S.F. spaces between the
23    surface of the brain and the inside of the skull gets
24    greater and the veins that connect from the brain to
25    the in -- to the dura which is adhering to the skull
```

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2        can stretch.

3                          And if they're stretched and you

4        shake, you know, as with a sneeze or a cough, it can

5        sometimes tear up blood vessels -- blood vessel and

6        can get subdural hematomas.  Also, if you have a

7        coagulopathy, again with minimal trauma, you can get

8        subdural hematomas.

9                          I am not aware of subdural hematomas

10       occurring as a result of subdural -- meningitis or

11       subdural effusions.  That's not to say that it's

12       never been reported, but I'm unaware of that.

13                         Q.   Can sepsis cause a subdural

14       hematoma?

15                         A.   Well, that -- that's what I just

16       referred to,

17                         Q.   Okay.

18                         A.   You know, at -- at an end stage,

19       if there's an associated coagulopathy and the child

20       is getting bounced around in the hospital bed, or

21       something like that, I suppose it's possible.  But I

22       don't think that has a bearing based on what I know

23       of this case that -- that was the cause.

24                         Q.   You had -- Doctor, you testified

25       a little bit on the short falls versus falls from a

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2         higher elevation.  I know you just mentioned the

3         sneeze could technically cause a subdural hematoma,

4         in the elderly and I'm never going to look at my

5         grandmother sneezing the same way.

6                   But for an infant, can have a

7         shortfall cause a subdural hematoma, is that a

8         possibility?  And we should define short, when I say

9         short, what do you think when I say short?

10                  A.   Well, the literature usually is

11        talking somewhere between three and five feet,

12        usually three feet or four feet.  In other words, the

13        height of a crib --

14                  Q.   Uh-huh.

15                  A.   -- or, you know, furniture,

16        sofa, something like that, that's, you know,

17        realistically what we're talking about.  Now, the

18        literature is confusing because -- think about it,

19        most non-accidental forms of subdural hematomas,

20        we're talking about child abuse are unwitnessed.

21                  So how do you, you know, you can't do

22        a study where you drop kids out on -- on purpose out

23        of cribs to see whether they get subdural hematomas.

24        But there have been studies of children who fall out

25        of cribs in a hospital, and those kids do not get

```
1       Thomas v City of Troy et al - 10-19-20 - John Waldman, MD
2           subdural hematomas.
3                           And from other large studies of kids
4           who have had shortfalls, they kind of -- they
5           typically have minimal injuries.  There have been
6           reports, a small number but still happens and
7           reported of skull fractures.  You know -- you know,
8           you fall down, you could stick your arm out and break
9           your arm too, you just fall down and hit your head
10          first.
11                          You can particularly, if you hit a,
12          you know, the corner of a table or a toy lying in the
13          ground with a sharp edge, you might get a skull
14          fracture.  Skull fractures are sometimes associated
15          with epidural hematomas.  Epidural hematomas occurred
16          in the space between the skull and the dura, subdural
17          hematomas occurred between the dura and the brain,
18          it's a different space.
19                          And the mechanism of the -- of the
20          cause of bleeding is also a difference which is
21          significant.  There are arteries that are embedded in
22          the outer layer of the dura.  And if the fracture
23          crosses one of those arteries, it could tear the
24          artery and cause arterial bleeding as opposed to most
25          subdural hematomas which are caused by venous
```

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2         bleeding.

3                        So they are usually occluded, and they

4         occur rapidly and can lead to death before

5         intervention is available.  So the children who have

6         died with witnessed shortfalls who have developed, go

7         on to die -- those patients are dying of acute

8         epidural hematomas, not from subdural hematomas.

9                   Q.   Which --?

10                  A.   We don't see subdural -- people

11        fall down or incidents of roll down a flight of

12        stairs don't get subdural hematomas typically.  The

13        forces are not typically sufficient.  I'm not saying

14        it's never happened, but it's extremely rare.

15                  Q.   And that's where the -- it was

16        the force that I was going to follow-up and have a

17        question with that.

18                       So a difference between -- would you

19        expect there to be a difference between falling from

20        a crib versus, say, being thrown onto a surface, or

21        the difference in force between a fall and -- and a

22        throw create a subdural hematoma.

23                  MR. KLEIN:  Objection.

24                  A.   Yes, it depends on the -- again,

25        the amount of force, if you take a kid by the -- by

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2         the ankles and swing them around and bash them into

3         the wall, certainly.

4                        BY MS. PECK:  (Cont'g.)

5                        Q.   Okay -- okay.  That's an extreme

6         scenario.  I'm looking -- I'm wondering between, you

7         know, the fall is taking a kid by his ankles and

8         smashing him into a wall.

9                        A.   You're not going to --

10                       Q.   No problem --.

11                       A.    -- by holding a kid by the ankle

12        is the same way either.

13                       Q.   That's something I know.

14                       A.   I'm sorry, repeat -- could you

15        repeat your question?

16                       Q.   Just a middle ground between the

17        two.  So is there any defined -- I guess, is there

18        any defined amount of force that goes from a simple

19        fall that is not going to cause a subdural hematoma,

20        to a fall, or a push, or a force that does cause one?

21        Has that ever been measured?

22                       A.   Has it ever been measured?

23        That's not something you can study.  Because you

24        can't do that to babies.

25                       Q.   True.

Page 111

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2              A.    Okay.    Now, I do know that there

3    are engineers who claim -- mechanical engineers or

4    whatever, who claim to measure forces that are

5    required to cause these changes.    And honestly, it's

6    bogus, in my opinion.    They are using models, there

7    are many -- many assumptions there.

8                    They're just not accurate enough, and

9    -- and I know that sometimes in these cases, these

10   people testify.    There are a certain number who go

11   around the country testifying about the amount of

12   force that's necessary, but the bottom line is in --

13   in human babies, we -- we don't know.

14                   I generally like to think of it this

15   way.    If you or I -- and I've mentioned this before,

16   if you or I witness someone doing something to a

17   child that was sufficient to cause a subdural

18   hematoma, we would be alarmed, and hopefully call the

19   police.

20                   MR. KLEIN:    Objection to the line of

21   questioning.

22                   BY MS. PECK:    (Cont'g.)

23              Q.    You mentioned -- you used the

24   word mechanism as part of your testimony.    In 2014,

25   there was a question and answer, and you were asked

Case 1:17-cv-00626-DJS Document 66-21 Filed 06/17/2024 Page 113 of 189

Page 112

```
1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD
2        -- and you believed at the time that he, Matthew
3        being four years -- four months old had suffered
4        trauma at the hands of somebody else, and we didn't
5        know at the time, correct?
6                    And you answered, well, I had no
7        history of the mechanism of injury.  And that's on
8        page five eighteen of the 2014 testimony.  When you
9        say you are doing history of mechanism of the injury,
10       can you tell me why that's significant?
11                   A.   Well, I didn't know how it
12       happened.
13                   Q.   So --.
14                   A.   It was my belief that the child
15       had subdural hematomas, caused by trauma.  I had no
16       idea.  I never -- to my recollection spoke to the
17       mother.  There was minimal history in the chart about
18       what happened, except to say the mother was not --
19       unaware of any trauma at least, that's what was
20       reported in the chart.
21                   So we didn't have a history, but we
22       had a kid who was dead.  And had, you know, severe --
23       had bilateral subdural hematomas that -- in my
24       opinion, caused death and extensive retinal
25       hemorrhages.  So we didn't have a history.  I didn't
```

Page 113

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2         know who or how the child was injured.

3                   Q.   So is it fair to say then that

4         mechanism in order to determine the mechanism of an

5         injury, you would need to get a history from the

6         parents, have seen how the injury occurred something

7         to that nature?

8                   MR. KLEIN:  Object to the form.

9                   A.   Well, yes, I mean, you can -- you

10        can make a better guess, for example.  If there is an

11        associated skull fracture and/or old healing

12        fractures and the long bone fractures, you know, you

13        can make a better guess.  That -- but without that,

14        you know, you don't know.

15                  I didn't witness it, and there was no

16        report in the chart of anybody witnessing an injury,

17        so I have no idea.

18                  BY MS. PECK:  (Cont'g.)

19                  Q.   Dr. Waldman, have you ever spoken

20        with my client Dr. Sikirica about Matthew Thomas?

21                  A.   I have no recollection of

22        speaking to him about it.  I don't know where there

23        are -- I -- I'd have to guess -- did Dr. Sikirica

24        testify at the trial?  He probably did.  If he did,

25        it's conceivable that our paths crossed, I doubt we

Page 114

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2         would have discussed the case.

3                        I seriously doubt it, but I certainly

4         have no recollection of ever discussing it with him.

5                        Q.   And your -- your diagnosis

6         occurred before the autopsy, correct?

7                        A.   Yes.

8                        Q.   So Dr. Sikirica wouldn't have had

9         any input or influence over the diagnosis you came to

10        prior to the autopsy, correct?

11                       A.   Absolutely correct.  And I would

12        assume the other way around without Dr. Sikirica.

13        He's looking at the subdural -- what's in the

14        subdural space, he doesn't -- he made a guess about

15        it based on that -- on the C.T. scan.  So it goes

16        both ways, he's not influenced necessarily, by what I

17        said either.

18                       Q.   So a C.T scan may be indicative

19        of a diagnosis like subdural hematoma, but that

20        really can be confirmed with an autopsy, correct?

21                       A.   Yes.

22                       Q.   Mr. Ginsburg had asked you a

23        question early on, in the beginning of your testimony

24        today as to whether you have -- if you know the cause

25        of Matthew Thomas's injury.  And I believe that you

Case 1:17-cv-00626-DJS Document 66-9 1/17/2024 Filed 06/14/21 Page 116 of 189

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2         testified that what caused the injury, that's really

3         out of place, that's not a doctor  doing or something

4         to that -- something to that --

5                   MR. KLEIN:  Object to the form.

6                   A.   Right.  I didn't witness it.

7         There was nothing in the history to lead -- to lead

8         me to believe there was a known mechanism.  So I have

9         no idea.

10                  BY MS. PECK:  (Cont'g.)

11                  Q.   So then, I just want to clarify

12        that.  So when we're talking about, you know, what

13        caused the injury.  You did have opinions at the 2009

14        and 2014 trials that there -- and I'm trying to pull

15        up the specific word here, sorry.

16                  That you believed that Matthew Thomas

17        had suffered from trauma causing subdural hematoma,

18        and that the infection -- with any infection of

19        substance it may have been secondary, but it was not

20        the cause of Matthew Thomas's death.  Do you recall

21        that testimony?

22                  A.   Yeah, I believe that's -- yes.

23                  Q.   Okay.  And do you continue to

24        have that belief today?

25                  A.   Right.  I -- I think I testified

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2        even today that I would not dispute that the child

3        had some kind of infection, possibly even before or

4        after.  But it's my belief that what caused the

5        child's death was subdural hematomas.

6                    Q.   I don't have any other questions

7        at this time.

8                    MS. PECK:  Christina, do you have any

9        questions?

10                   CROSS EXAMINATION

11                   BY MS. CALABRESE:

12                   Q.   Doctor, what is the basis for

13       that opinion the death of the child, Matthew Thomas

14       was due to subdural hematoma?

15                   MR. KLEIN:  Objection to form.

16                   A.   Because the constellation of

17       findings in the C.T. scan indicated that the child

18       had subdural hematomas, he had increased intracranial

19       pressure, and that causes death.  That's why he died.

20                   BY MS. CALABRESE:  (Cont'g.)

21                   Q.   And do you believe his death was

22       caused by sepsis?

23                   A.   I think it certainly could have

24       been a secondary contributing factor.  For example,

25       the coagulopathy, when at -- at the -- at the end

1   Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2          stage, when the brain is dead, the blood -- the --

3          the brain injury can cause coagulopathy.  It can

4          cause blood pressure abnormalities, heart

5          abnormalities, it can cause a lot of things.

6                     Potentially, you know, the kidneys

7          fail, liver fails, you know, the brain controls

8          everything.

9                Q.   Uh-huh.

10               A.   Sepsis can also cause some of

11         these things.  So I can't -- you can't say -- if you

12         have both, for instance, let's -- you know, take the

13         situation where you know you have trauma and subdural

14         hematomas and you know you have sepsis also.  The

15         sepsis can cause blood pressure abnormalities, and

16         coagulopathies.

17                     So how do you differentiate between

18         the process, I -- I --I can't do that, so that's all

19         I'm saying.  I don't know --

20               Q.   And do you --?

21               A.    -- when that --.

22               Q.   I'm sorry, go ahead.

23               A.   It -- it could have been -- if

24         the coagulopathy was the result of the sepsis, it

25         could have been a contributing factor.  But I do --

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 118

1      Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2          what I don't believe is that the sepsis and the

3          subsequent coagulopathy caused the subdural hematoma,

4          I think trauma caused subdural hematoma.

5                    And I think if I were able to read the

6          Dr. Sikirica's autopsy report, I could provide

7          additional information that would confirm my opinion

8          about it.

9                    Q.   Okay.  Well, let's give you an

10         opportunity to do that right now.  Let me --.

11                   MR. KLEIN:  I'm going to just start an

12         objection because he's not an expert, and he wasn't

13         aware of the findings, which are disputed in this

14         case.  Having said that I'll lodge a standing

15         objection, if you're going to continue to ask about

16         stuff that he wasn't aware of until today.

17                   BY MS. CALABRESE:   (Cont'g.)

18                   Q.   Bear with me, Doctor.

19                   MS. CALABRESE:  Howard, can you give

20         me the ability to share my screen, please?  Or can I

21         do that myself?

22                   THE REPORTER:  I believe -- I believe

23         you're all set to do it.

24                   MS. CALABRESE:  Yup, I can do it.

25                   THE WITNESS:  That remains to be seen.

Page 119

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                    MS. CALABRESE:  And for the record,

3    I'm showing the witness as well as the other

4    attorneys what is known as the autopsy report.  This

5    report has been previously marked in prior

6    depositions.  So I do not believe it needs to be

7    again marked, does anybody disagree -- and would the

8    attorneys like me to mark it today?

9                    MR. KLEIN:  Christina, let -- let's

10   mark it for today's deposition as well so we keep the

11   evidence straight.

12                   MS. CALABRESE:  Okay.  So then I'll

13   mark it as Defendant's A.  And Howard, I'll -- I'll

14   email this to you, I would ask if you could include

15   it in the trans -- the back of the transcript?

16                   THE REPORTER:  Absolutely.

17                   BY MS. CALABRESE:  (Cont'g.)

18                   Q.   Okay.  So I'll just show you

19   again, doctor, the first page, essentially

20   certifications page?

21                   A.   Yeah.

22                   Q.   Is that large enough, or would

23   you like me to enlarge it more?

24                   A.   It's fine.

25                   Q.   Okay.  So I'm going to scroll to

Page 120

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2          the second page.  And you'll just tell me when you

3          want me to stop scrolling?

4                        A.   Absolutely.

5                        Q.   Please take your time.

6                        A.   Keep going.

7                        Q.   Okay.

8                        A.   Keep going, yeah, keep going.

9          I'm in landscape mode, so I don't -- I only see part

10         of each page.

11                       Q.   Oh.

12                       A.   Okay.  It's just so -- this whole

13         thing, let me look at it.  Okay, move on.  I just

14         would mention here that the head circumference is

15         forty-nine point five.  And that -- after that age,

16         particularly, if you correct for gestational age,

17         that head circumference is well above the ninety-

18         fifth percentile, way above.

19                       Q.   And does that suggest anything to

20         you with regard to your position and opinion of

21         subdural hematomas?

22                       A.   Well, I will say this, I do

23         recollect from reviewing the neo -- his neonatal

24         record at Albany Med.  That his head circumference

25         was something like thirty-two centimeters, which was

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2        normal at birth.  I don't know whether he had any

3        pediatric visits subsequent to his discharge.  I

4        suspect he did.

5                    Part of the pediatric record should

6        include a head circumference.  So let's say that he

7        was seen at two months of age, but I'm just

8        speculating now, of course.  If the child was seen at

9        two months of age, and had a pediatric visit, then

10       and the head circumference measured and it was still

11       normal, following the normal curve.

12                   That would imply for me that the child

13       did not have subdural hematomas at that point in

14       time.  You see what I mean?  In other words, he -- at

15       one point, he went from being having a normal head

16       circumference to having one that's well above the

17       nine -- the ninety-fifth percentile.

18                   Q.   Okay.

19                   A.   So if -- if he had his head

20       circumference measured every day, you could probably

21       see when he -- when the subdural hematomas developed.

22                   Q.   Developed, okay.

23                   A.   But we don't have that

24       intervening information.  So in essence, it doesn't

25       -- doesn't -- doesn't help me at this point.

Page 122

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                    Q.    Okay.

3                    A.    He wasn't born -- I'll say that.

4                    Q.    He wasn't born with the

5        subdurals?

6                    A.    Yeah.  Okay.  Scroll, please?

7        More -- more -- more, okay -- okay.  Scroll, please.

8        Put evidence of recent medical therapy at the top,

9        yeah, there we go.  Okay.

10                   Well, the only significance here is

11       what's not said, and the general evaluation is

12       there's no evidence of abnormal bleeding from, you

13       know, ecchymosis or, you know, bruise -- bruises from

14       -- from bleeding.

15                   So in terms of the coagulopathy, you

16       know, if you're going to -- if you're going to have

17       bleeding in the brain, why don't you have bleeding in

18       the skin, where you had needle punctures and people

19       grabbing this in and moving the child around, et

20       cetera.

21                   So there was no evidence or petechial

22       hemorrhages or there's no evidence of abnormal

23       bleeding in the skin.  So that -- that's a permanent

24       negative regarding the coagulopathy.

25                   Q.   And can you define for the record

Page 123

1      Thomas v City of Troy et al - 10-19-20 - John Waldman, MD
2          coagulopathy?
3                          A.   Abnormal clotting, the child --
4          again, I don't remember whether it's the -- the
5          different ways you can assess this P.T. and proteome
6          there -- there are different tests you can do inside
7          the blood.  All I remember is the platelet count was
8          lower, you know, it was abnormally low.
9                          But it wasn't low enough that I would
10         have expected -- necessarily expected bleeding and
11         that's why I said possible that I would have done
12         subdural test when I had seen this kid initially.  My
13         --
14                          Q.   Okay.
15                          A.   -- my partner didn't feel
16         comfortable doing it with a platelet of a hundred and
17         fifteen.  I probably would have done it.  But again,
18         that's total conjecture.  I can't say what I would
19         have done absolutely.  Anyway, go ahead.  Okay, more.
20         Go ahead, scroll -- scroll -- scroll, okay.  Hang on,
21         all right, next page.
22                          Hang on now, hang on.  Okay, move
23         along.  Keep going, scroll please?  Scroll -- scroll
24         -- scroll.  All right, hang on.  Yeah, okay, what's
25         happened?

Page 124

1      Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                        Q.    What's happened?

3                        A.    You went too far.

4                        Q.    Okay, want to go back.

5                        A.    I want to get to the scalp,

6      because I know there was an abnormality there.

7      Because I saw it when you moved -- put up initially.

8      No -- no, now we're back to the lungs. It's --.

9                        Q.    Further down?

10                       A.    Yeah, it's past -- it's past that

11     page.  Next page, all right.  Hang on, let me -- let

12     me --.

13                       Q.    Subgaleal.

14                       A.    It's gone too far.  All right.

15     Here you go, slide twelve A, section frontal scalp,

16     subgaleal hemorrhage, acute and more chronic

17     appearing subgaleal hemorrhage with extensive acute

18     and chronic inflammation.  All right, that's

19     abnormal.  And that is an indication of trauma.

20                       That implies blunt force trauma to the

21     scalp.  And would -- I believe -- and would be

22     additional information that there -- this was a

23     traumatic event.

24                       Q.    And that would be contrary to a

25     finding that sepsis caused the trauma that's noted in

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2        slide A twelve, correct?

3                    A.    Correct.  In fact, it implies

4        that there were repeated traumas over different

5        periods, it says acute and more chronic.  So --.

6                    MR. KLEIN:  Objection -- objection to

7        the extent that this is contradicted by Dr.

8        Sikirica's testimony about the subgaleal hemorrhages.

9        I would just note a standing objection.

10                   THE WITNESS:  I'm just --.

11                   BY MS. CALABRESE:  (Cont'g.)

12                   Q.    Go ahead, Doctor.  No -- no,

13       please continue your thought.

14                   Q.    Yeah, I'm just going based on

15       what I'm reading here.

16                   Q.    Yes.

17                   A.    It says acute and more chronic

18       appearing subgaleal hematomas.  So if you're -- if

19       you're trying to make the case, in my opinion, that

20       this is due to sepsis, there had to have been chronic

21       sepsis and that there was no indication that there

22       was, you know, the kid's not going to be sick with

23       meningitis and subdural -- infected subdural

24       effusions for a long time without treatment.

25                   So I -- I don't know how you get

Page 126

1      Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2          chronic subgaleal hematomas based on infection, it

3          just doesn't hang together.  I think this is clear

4          evidence of trauma -- blunt force trauma to the scalp

5          and -- and the brain, okay?

6                    Q.   Okay.

7                    A.   All right.  Let's just put gross

8          pathology exam on the top -- yeah, okay.  Hold on,

9          hang on.  All right.  Portions of the dura are

10         included with moderate amount of adherent brown

11         subdural clot measuring three to four millimeters in

12         thickness.

13                   There is a several centimeters zone of

14         hemorrhage along the occipital cortex bilaterally but

15         no other foci of parenchymal hemorrhage.  So that's

16         abnormal, and he doesn't describe it as one side or

17         the other.  Okay, so I don't know whether it's

18         bilateral or on one side.

19                   Oh, no it does say bilaterally, so

20         there's evidence of bilateral subdurals, according to

21         this exam.  Next -- the next page, go up a little

22         bit.  Yeah, okay.  Oh, oh, oh.  Back down a little

23         bit I'm not sure that you -- we're all right, okay.

24         Okay.  Okay.  So he does -- he refers to his

25         tightening of the ventricles so that I believe what

```
1     Thomas v City of Troy et al - 10-19-20 - John Waldman, MD
2          he means is the ventricles are compressed.
3                         This is due to the subdural
4          collections and, you know, is another reflection of
5          increased intracranial pressure, okay.  Splitting of
6          the sutures he defines, that's again another
7          indication of increased intracranial pressure, but
8          not the cause, okay.
9                         Slide B one, resolving subarachnoid
10         hemorrhage with large numbers of macrophages,
11         occasional acute inflammatory cells, and lymphocytes.
12         Hemorrhage extends down into the Virchow Robin
13         spaces.  Those are spaces in the subarachnoid space
14         at the subdural place -- space the subarachnoid space
15         that follows blood vessels into the brain.  So there
16         was subarachnoid blood is all -- also.
17                        Okay.  So now slide B three, he's
18         describing in the midbrain as part of the brainstem,
19         severe cerebral edema, and foci of intraparenchymal
20         hemorrhage.  Okay, now that usually means that there
21         was so much pressure from above that it squished the
22         brainstem down through what's called the tentorium
23         and caused hemorrhages to stretch the blood vessels
24         that surprised -- that supply the midbrain and
25         brainstem and caused hemorrhage within the brainstem.
```

Page 128

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                    This is -- again, what we see with

3    severe subdural hematomas that cause death, there's

4    secondary hemorrhage into the brain stem which is

5    basically fatal.  It's an indication of a fatal

6    injury, not caused by the injury but secondary to the

7    buildup of the sub -- the subdural spaces and pushing

8    the brain down through a narrow opening, which tears

9    more blood vessels and causes hemorrhage, if that

10   makes sense.

11                   Okay, scroll please --.

12                   Q.   And Doctor, what -- what you just

13   described occur due -- due solely to sepsis in your -

14   - in your experience --?

15                   A.   No, in my appearance -- in my --

16   in my experience, this is caused by trauma, but it

17   can be caused by other things.  If there's increased

18   intracranial pressure from whatever cause, a large

19   stroke or cerebral edema.

20                   This is a finding you see when the

21   brain has herniated through the dura opening of the

22   tentorium with injury to the brainstem, and it's

23   irreversible.  So it's a secondary effect related to

24   severe increased intracranial pressure and what we

25   would call central herniation syndrome.

Page 129

```
 1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD
 2                      Q.   I just -- I just -- the other
 3        way.
 4                      A.   You know, it's --.
 5                      Q.   I know, I'm sorry.
 6                      A.   It's -- it's a reflection of the
 7        fact that he had no neurological function.  I -- I
 8        lost the screen now, by the way.
 9                      Q.   It -- it should be back.
10                      A.   Okay.  Okay, scroll, please.
11        Hold on.  Again, there are more deep-seated
12        hemorrhages related to herniation, in my opinion.
13                      Q.   And when you say herniation
14        consistent with blunt force trauma?
15                      A.   Well, no, as a result of
16        increased intracranial --
17                      MR. KLEIN:  Objection.
18                      A.   (Cont'g.) -- pressure, which in
19        my opinion was related to blunt force trauma, yeah.
20                      BY MS. CALABRESE:  (Cont'g.)
21                      Q.   Okay.  Thank you.
22                      A.   We can --
23                      MR. KLEIN:  It can also be related to
24        sepsis, right, Doctor?
25                      THE WITNESS:  It's related to
```

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2         increased intracranial pressure from whatever cause.

3         Can we then --?

4                        BY MS. CALABRESE:   (Cont'g.)

5                        Q.   However, in your opinion, in this

6         case, the intracranial -- the increased intracranial

7         pressure related to the subdural hematoma that was

8         due to blunt force trauma?

9                        A.   That's my opinion.  All right

10        now, with slide B ten, I want to see.  B nine and B

11        ten, all right.  All right.  B nine, and again, I

12        don't know where this is.  It says predominantly

13        acute subdural hematoma, B nine, whatever that is.  B

14        ten, acute and more chronic subdural hematoma.

15                        Okay.  Now B twelve through fourteen

16        describe the retina.  Severe acute retinal

17        hemorrhages with predominantly chronic inflammation

18        surrounding the optic nerve with abundant

19        macrophages, severe acute retinal hemorrhage of the

20        left eye now foci has severe and acute inflammation,

21        older appearing hemorrhages and infarct in the optic

22        nerve.

23                        Okay.  Again, to me, totally

24        consistent with severe blunt force trauma to the

25        head.  Next?  Yeah, okay.  So the conclusions we can

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD
2         read.  Severe closed head injuries with cerebral
3         edema due to blunt force trauma.  Clinical history of
4         subdural hematoma with severe cerebral edema,
5         radiological evidence of bilateral subdural
6         hematomas.
7                    The medical evidence of brain death,
8         splitting of the sutures of the skull consistent with
9         cerebral edema, extensive acute and resolving
10        subarachnoid hemorrhage, extensive acute and
11        resolving hemorrhage of the optic nerve sheaths, and
12        acute retinal hemorrhage, bilaterally fresher and
13        older appearing areas of sub -- subgaleal hematoma.
14                   Again, this is information that we
15        didn't have and discussed before I read the autopsy.
16        To me, this is conclu -- to me conclusive evidence of
17        blunt force trauma to the head.  Okay.  Now, I'm --
18        I'm not going to read past that, because he's making
19        -- he's made -- he's referring to additional
20        information that I didn't have available to me.
21                   Q.   Okay.
22                   A.   Blood -- oh, there's more.  Blood
23        culture pos for strep pneumonia, an initial
24        presentation to hospital.  Okay.  So that -- that's
25        -- okay.  It's not unexpected, the child was comatose

Case 1:17-cv-00626-DJS Document 66-91 1/22/24 Filed 06/11/24 Page 133 of 189

Page 132

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2         for a period of time.  And you know, the lungs and

3         the upper airways have bacteria in them.  And --.

4                   Q.   Aspiration?

5                   A.   Yeah, there's that aspiration,

6         the child was actually fat, if I remember correctly

7         in the mother's --

8                   Q.   Yes.

9                   A.   -- report.  So it doesn't

10        surprise me that the child had some areas develop

11        pneumonia, and then over time developed positive

12        blood culture.  And it was -- okay.  Do you want to

13        scroll just to be complete?  See if there's anything

14        more.

15                  Q.   No toxicology.

16                  A.   Yeah.  Okay.  And I -- I guess

17        that's enough for me.

18                  Q.   Let me just make sure, Doc, that

19        we're not missing anything.  Again, negative for

20        toxicology.

21                  A.   Yeah.

22                  Q.   Which you would explore you would

23        hope to expect, and that concludes the autopsy

24        report.  I'm going to stop sharing my screen now.

25        Doctor, I know earlier when responding to questions

Page 133

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2        there was an effort to show you the C.T. scans.

3        Would you like to see them now?

4                    I want to ensure that you have an

5        opportunity to complete responding to questions that

6        you were unable to respond to earlier, due to your

7        inability to see the C.T. scan, would you like to see

8        them?

9                    THE REPORTER:  Hang on, this is -- go

10       ahead.  Sorry.

11                   THE WITNESS:  I -- I mean, if you all

12       want me to, I will.  But I don't think it's

13       absolutely --

14                   BY MS. CALABRESE:  (Cont'g.)

15                   Q.  I don't feel I need to show them

16       to you, but I know that that was an issue that arose

17       earlier.  So I wanted to give you an opportunity to

18       see them, should you feel the need -- should you feel

19       the need to.

20                   A.  Well, again, the autopsy was

21       clear, there was bilateral subdural hematomas.  It's

22       my recollection and my -- at the time and my

23       impression that the child had bilateral subdural

24       hematoma.  So I don't think -- I -- I did review the

25       C.T. scan in preparation for the deposition, so I'm

Page 134

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2        okay.

3                        Q.   Okay.  All right.  So just some

4        follow-up questions then, Doctor.  In -- earlier this

5        morning, the beginning of your testimony, you make --

6        made a statement and you said most of these events

7        are unwitnessed.  What did you mean by that?

8                        A.   Well --

9                        MS. CALABRESE:  Michael, would you

10       mind muting, because I'm hearing an echo.  Thank you.

11                       A. -- what I mean by that is a

12       perpetrator of child abuse usually does it without

13       witnesses appearing -- present.  So it is -- so you

14       don't have an accurate history, and that's a problem

15       with the literature too.  That's why I didn't quote

16       many -- I actually didn't reference specific

17       articles.

18                       But many articles on child abuse

19       report a series from, you know, one day to another,

20       county or state or something like that.  And they

21       include, you know, most -- most of the cases are

22       unwitnessed so you -- you never know.  There are --

23       there are -- again, I can't give you a specific

24       article, but I know I've reviewed articles in the

25       past of the cases where there were confessions.

Page 135

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                    But again, confessions aren't

3        necessarily accurate either.  So --.

4                    BY MS. CALABRESE:  (Cont'g.)

5                    Q.   Mr. Klein, would agree with you

6        on that.

7                    A.   Yeah, but even -- even someone --

8                    Q.   Many of us would too.

9                    A.    -- when you're absolutely,

10       positively know that someone did something, the

11       perpetrator tries to minimize it.  I threw him

12       against the wall, but I didn't do it that hard, you

13       know, that kind of thing.  So overall, these studies

14       aren't -- are difficult to evaluate regarding the

15       mechanisms of injury.

16                    Q.   And you said that the findings

17       that you now know to be true based upon what you saw

18       in the autopsy report, as well as how the patient

19       presented to you.  And all of the reports that you

20       reviewed and the history that you reviewed in the

21       records.  You stated that this has nothing to do with

22       birth trauma.  Can you explain that?

23                    A.   Well, this -- this was a twin

24       birth, vaginal delivery as I remem -- as I recall.

25       There were no issues regarding the early life of this

Page 136

```
 1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD
 2         child in the -- in the medical center after delivery.
 3         The Apgar scores were six and nine, it mean five
 4         minutes, nine is normal.
 5                        The child received some oxygen -- flow
 6         by oxygen for a few minutes only.  It was then
 7         observed in the NICU and had no problems.  There was
 8         no concern -- the head circumference is now normal,
 9         there was no concern about any injury, so -- or
10         clinical history to suggest a problem, I don't
11         believe it was seizures or anything else that would
12         have prompted a -- typically you wouldn't do a CAT
13         scan on a neonate, you'd do an ultrasound to indicate
14         that there was a subdural hematoma.
15                        So there's zero indication that the
16         child had subdural hematoma.  I know that in the past
17         I testified that there have been studies done on
18         normal deliveries where children were imaged and
19         there's a percentage of children after a normal
20         vaginal delivery would have teensy tiny acute
21         subdural hematomas.
22                        In a hundred percent of those cases,
23         it resolved without any treatment on its own, nor
24         with any symptoms within -- I believe a month.  So
25         there's -- there's no supporting evidence or any
```

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2         indication or anything in the literature which would

3         suggest that what happened to this child later was

4         related to anything that happened at birth, to me

5         that's nonsense.

6                        Q.    Okay.    I have no further

7         questions.    Thank you, Doctor.

8                        MS. CALABRESE:  Howard, did you have

9         something to say earlier, I think you --

10                       THE REPORTER:  No, we -- what it was

11        -- I've lost Mr. Waldman's video and there is a -- a

12        little caution --

13                       MS. CALABRESE:  Dr. Waldman.

14                       THE REPORTER:  -- Dr. Waldman and I

15        just wanted to alert everybody to it, but he came

16        back on right -- as soon as I was saying it.

17                       MS. CALABRESE:  Okay.  Thank you.

18                       THE REPORTER:  That's all that was.

19                       MR. KLEIN:  Does anyone have any

20        follow-up, because I would have a few questions.

21                       MS. CALABRESE:  Can we take a five-

22        minute restroom break, please?

23                       MS. GINSBERG:  Well, I have one

24        question.

25                       MS. CALABRESE:  You're going to --

Page 138

```
1     Thomas v City of Troy et al - 10-19-20 - John Waldman, MD
2         you're going to -- you're going to tell a lady
3         Michael, that she cannot use the restroom?
4                     MR. GINSBERG:  I would not -- I would
5         not have the answer to that.
6                     MS. CALABRESE:  Okay.  Because I would
7         like to -- I would like to use the restroom.
8                     MR. GINSBERG:  I live -- I live with a
9         couple of women at home, I know better.
10                    MS. CALABRESE:  Well, I -- I knew you
11        were a man of substance, so I was sure that I was
12        mistaken.
13                    MR. GINSBERG:  All right.
14                    MS. CALABRESE:  All right.  Just five
15        minutes, if that -- is fine.
16                    MR. GINSBERG:  It's fine.
17                    MS. CALABRESE:  Thank you.
18                    THE REPORTER:  Okay.  We're off the
19        record.
20                    (Off the record, 1:40 p.m.)
21                    (On the record, 1:48 p.m.)
22                    THE REPORTER:  We're all set.  We're
23        on the record.
24                    MR. GINSBERG:  Great, thank you.
25                    REDIRECT EXAMINATION
```

                                                        Page 139

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                        BY MR. GINSBERG:

3                        Q.   Doctor, in the previous section

4        you were just asked a bunch of questions about the

5        autopsy findings.  Do you recall that?

6                        A.   Yes.

7                        Q.   And are the autopsy findings

8        consistent with your diagnosis of subdural hematoma

9        and the ophthalmic diagnosis of retinal hemorrhages?

10                       A.   Yes.

11                       MR. GINSBERG:  I have no further

12       questions.  Thank you.

13                       RECROSS EXAMINATION

14                       BY MR. KLEIN:

15                       Q.   Doctor, you -- had you been aware

16       of the autopsy findings prior to today?

17                       A.   As I sit here today, I have no

18       recollection of them.  But I can't say for sure that

19       I didn't know before my testimony at trial, either

20       the first or the second, I don't know.

21                       Q.   Do you recall --?

22                       A.   I would -- I would guess that I

23       did, but I don't know for sure.

24                       Q.   Do you recall preparing for trial

25       with Dr. Sikirica, whether by phone or in person?

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                    A.   Whether I spoke?

3                    Q.   Yeah, whether you are present

4         during prep -- yeah, whether you were present during

5         prep with the District Attorney's Office with Dr.

6         Sikirica with -- whether personally or by phone?

7                    MR. GINSBERG:  Objection to form.

8         Wasn't that covered under attorney-client privilege?

9                    MR. KLEIN:  No.  There's no attorney-

10        client privilege at the prosecutor's office.

11                   A.   Right.  Zero recollection of

12        that.  I don't remember.

13                   BY MR. KLEIN:  (Cont'g.)

14                   Q.   Okay.  In terms of your testimony

15        about the swelling of a skull, do you recall that?

16                   A.   It's not swelling, you mean the

17        subdural hematoma?

18                   Q.   No, the -- you said there was an

19        autopsy measurement of the skull, if I can just find

20        it.

21                   A.   The head circumference in the

22        autopsy report.

23                   Q.   You made a comment about the --

24        the head measurement.

25                   A.   Head circumference, yes, sir.

Page 141

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                        Q.    Right.  You had testified that in

3        the criminal trial, do you recall that?

4                        A.    I do not.  I don't -- and I don't

5        even recall it after reviewing the testimony.

6                        Q.    Okay.  Oh, isn't -- isn't the --

7        the -- the head circumference totally non-specific in

8        this case, the fact that there was swelling?

9                        A.    Well, it's not a swell, it's --

10       it's a measurement in inches or centimeters.  And

11       it's a reflection of -- it's just the size of the

12       head and they're normal measurements within, you

13       know, to standard deviations of how -- at a certain

14       age, whether you're male or female, what your head

15       circumference is and --.

16                       Q.    And I understand -- I understand

17       in the front the head bulges over time, isn't that

18       correct?  It's not instantaneous?

19                       A.    Well, it can be pretty acute in a

20       -- in a very young child.  In an older person,

21       absolutely it doesn't happen -- may not have-- you

22       know, if I had subdural hematomas, my head wouldn't

23       get bigger, my --.

24                       Q.    It could be, it -- my -- my point

25       is that this could be suggestive of sepsis.

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                    A.   It -- it's simply a reflection of

3       the fact that the intracranial space is abnormally,

4       you know, large.  Something is causing the head to

5       get bigger.  It could be anything that takes up

6       space.  It could be the brain itself due to cerebral

7       edema, it could be the hydrocephalus with enlargement

8       of the ventricles, which are the C.S.S. spaces inside

9       the brain.

10                   It could be due to subdural hematomas;

11      it could be due to a brain tumor.   I mean there's

12      lots of things.  Anything that takes up space can --

13      if it's big enough, accelerate the growth of that.

14                   Q.   Okay.  Thank you.

15                   A.   That's -- and that is why at

16      every pediatric visit up to the age of three head

17      circumference measurements are standards of care.

18      And you have to plot them so you can actually look

19      and see what's happening.

20                   For example, if someone's head

21      circumference is growing at a twenty-fifth percentile

22      and you know, after multiple visits and then suddenly

23      it's at the fiftieth percentile, it is still within

24      the normal range.  But the rate of change suggests

25      something is happening.

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                    You don't have to wait until it's

3        above the ninety-fifth percentile before

4        investigating, so that's what I mean.

5                    Q.   With regards to the line of

6        questioning with Ms. Peck about studies regarding

7        drops or throws of babies, isn't it true that there

8        are biomechanical studies of modeling drop score,

9        throws of baby models to surfaces?

10                   A.   Yes, yes.

11                   Q.   Okay.  You don't have to throw

12       babies to do a biomechanical study?  You could -- you

13       can have a model.

14                   A.   Yeah, but I mean, any reasonable

15       person would understand that acquired -- acquired

16       mechanical model is not a baby.

17                   Q.   Right.  With those studies --.

18                   A.   There are so many differences

19       that make the studies almost irrelevant in my

20       opinion.

21                   Q.   Okay.  But those studies -- study

22       or note the -- the -- the G -- the level of G is like

23       enough to cause a fracture or subdural, correct?  The

24       G-force.

25                   A.   You know, again --.

Page 144

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                    MS. MITCHELL:  Object to form.

3                    A.   --  (Cont'g.)  I -- I don't

4        recall details of any specific study, I know they're

5        done.  I -- in the past I've reviewed some -- I'm

6        sure some discuss G-forces.  But it's -- you know,

7        it's -- it's not real life.  And that this has been

8        discussed in the literature over and over and over

9        again, and most neurosurgeons don't put a whole lot

10       of credence to these biomechanical studies.

11                   BY MR. KLEIN:  (Cont'g.)

12                   Q.   And you're not an expert in that?

13                   A.   I am not an engineer, correct.

14                   Q.   Okay.  So -- so the -- the idea

15       that -- would you agree with the idea that a throw or

16       drop of a baby to a bed surface might reach ten Gs.

17       Does that sound something that you would -- would

18       sound realistic?

19                   A.   I do not --.

20                   MS. MITCHELL:  Object to form.

21                   A.   (Cont'g.)  I have no idea.

22                   BY MR. KLEIN:  (Cont'g.)

23                   Q.   Okay.  Have you -- are you aware

24       of studies that say that such a drop would not be

25       enough to cause a fracture or subdural hematoma?

```
 1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

 2                    MS. MITCHELL:  Object to the form.

 3                    BY MR. KLEIN:  (Cont'g.)

 4                    Q.   That you need something more like

 5    fifty Gs?

 6                    A.   Again, I can't -- in the past, I

 7    reviewed this, you know, years and years and years

 8    ago.  I don't remember the details of any of the

 9    studies, so I don't know.

10                    Q.   And on that note, I just want to

11    discuss --.

12                    A.   That's the same as the last

13    question you asked.

14                    Q.   And on that note, I wanted to

15    just follow-up on -- on what you're doing now.

16    You're retired currently and you were retired as of

17    the 2014 trial, correct?

18                    A.   Correct.  I retired -- my last

19    day of work was June 30th, 2012.

20                    Q.   Okay.  Have you practiced

21    medicine since then?

22                    A.   I have hardly thought about

23    medicine since, no.

24                    Q.   Okay.

25                    A.   I have --
```

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                    Q.   You continue --.

3                    A.   -- a full life now.

4                    Q.   Good for you.  And -- and have

5       you -- it sounds nice.  And have you continued your

6       studies to the extent that separate from practicing

7       medicine?

8                    A.   That's a -- do  I continue

9       reading literature or whatever?  No, as I mentioned,

10      I rarely even think about medicine these days.

11                   Q.   Okay.  That is all I have.  Thank

12      you, Doctor.

13                   A.   Thank you.

14                   MS. MITCHELL:  I do not have follow up

15      questions.

16                   MS. PECK:  I do not have any follow up

17      questions.  Thank you, Doctor.  Nice to meet you.

18                   MR. KLEIN:  Thank you, Doctor.

19                   THE WITNESS:  Thank you very much.

20      Thank you, everyone.

21                   THE REPORTER:  Before everybody

22      leaves, I've got to have some spellings.  There was a

23      Dr. Germaine -- German?

24                   THE WITNESS:  German, G-E-R-M-A-N.

25                   THE REPORTER:  Okay.

Page 147

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2                      THE WITNESS:   John German.

3                      THE REPORTER:  Okay.  Thank you.

4                      THE WITNESS:   I think that's the name,

5    but I'm not sure.

6                      THE REPORTER:  And there was a

7    detective, Ron Sutton, S-U-T-T-O-N.  Does anybody

8    know?

9                      THE WITNESS:   Fountain, F-O-U-N-T-A --

10   T-A-I-N.

11                     THE REPORTER:  Say again?

12                     THE WITNESS:   Fountain, F-O-U-N-T-A-I-

13   N.

14                     THE REPORTER:  I was way off, there we

15   go.  A Dr. Eric Hoover, which form of Eric would that

16   be?

17                     THE WITNESS:   E-R-I-C.

18                     THE REPORTER:  I-C, okay.

19                     THE WITNESS:   I-C, okay.

20                     THE REPORTER:  And Hoover, just like

21   the traditional?

22                     THE WITNESS:   Yes.

23                     THE REPORTER:  Okay.  And you have an

24   attorney's sitting here with you, Dr. Waldman.

25                     THE WITNESS:   Yes.

Page 148

```
 1   Thomas v City of Troy et al - 10-19-20 - John Waldman, MD
 2                    THE REPORTER:  Can I get that person's
 3        name?
 4                    MS. MITCHELL:   Yes, Lia.
 5                    THE WITNESS:  L-I-A.
 6                    MS. MITCHELL:  You got it right.
 7                    THE REPORTER:  Okay.
 8                    MS. MITCHELL:  M-I-T-C-H-E-L-L.
 9                    THE REPORTER:  M-I-C-C-H-E-L-L you
10        said, correct?
11                    MS. MITCHELL:  No, M-I-T-C-H-E-L-L,
12        Mitchell.
13                    THE REPORTER:  Oh, okay.  And I need
14        the -- the venue, which court is this in?
15                    MS. MITCHELL:  Two different courts.
16        This is a -- a two-captioned deposition.
17                    MR. KLEIN:  Do you want to know the
18        caption?
19                    THE REPORTER:  Yes.  If you -- if you
20        could email us the caption.
21                    MS. MITCHELL:  I don't have -- I have
22        the court of claims caption, I don't have the other
23        caption.
24                    THE REPORTER:  Okay.
25                    MR. KLEIN:  We'll give it to you,
```

Page 149

1     Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2          Howard, we'll get --

3                         THE REPORTER:  Okay.

4                         MR. KLEIN:  Okay.

5                         THE REPORTER:  And -- hang on, and

6       transcripts, who's -- who's getting transcripts?

7                         MR. KLEIN:  We're all getting

8       transcripts.

9                         THE REPORTER:  And the bill goes to?

10                        MS. MITCHELL:  We're splitting it.

11                        MR. KLEIN:  It goes to those who have

12      asked questions.

13                        THE REPORTER:  Okay.

14                        MS. MITCHELL:  Howard, what is your

15      email address?

16                        THE REPORTER:  It would be

17      arii portsteno.com.

18                        MS. MITCHELL:  Okay.

19                        (Off the record, 2:01 p.m.)

20

21

22

23

24

25

800.523.7887                      Associated Reporters Int'l., Inc.

Page 150

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2

3    STATE OF              )
     COUNTY OF             )

4

5            I, JOHN WALDMAN, have read the foregoing record
     of my testimony taken at the time and place noted in the
     heading hereof and do hereby acknowledge:

6    (Please check one)
             ( ) That it is a true and correct transcript of

7    same.
             ( ) With the exceptions noted in the attached

8
     errata sheet, it is a true and correct transcript of same.

9
                             X

10                            JOHN WALDMAN

11   Sworn to before me this
     _____day of _____, 2020.

12   X_____
     NOTARY PUBLIC

13   My Commission Expires:
     _____

14

15

16

17

18

19

20

21

22

23

24

25

Associated Reporters Int'l., Inc.

Page 151

1  Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2

3      I, HOWARD HUBBARD, do hereby certify that the

4  foregoing testimony of JOHN WALDMAN was taken by me, in

5  the cause, at the time and place, and in the presence of

6  counsel, as stated in the caption hereto, at Page 1

7  hereof; that before giving testimony said witness(es) was

8  (were) duly sworn to testify the truth, the whole truth

9  and nothing but the truth; that the foregoing typewritten

10  transcription, consisting of pages number 1 to 151,

11  inclusive, is a true record prepared by me and completed

12  by Associated Reporters Int'l., Inc. from materials

13  provided by me.

14

15  HOWARD HUBBARD, Reporter

16

17

18

19

20

21

22

23

24

25

Case 1:17-cv-00626-DJS Document 66-91-172924 Filed 06/14/21 Page 153 of 189

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 152

```
 1     Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

 2          ASSOCIATED REPORTERS INTERNATIONAL, INC.
                     (800) 523-7887
 3
       Date:
 4     Case Name:  Thomas v City of Troy et al
       Index Number:
 5     Deponent:  John Waldman, M.D.
       Deposition Date:  10-19-20
 6     Examining Attorney:  Michael Ginsberg

 7     Dear Dr. John Waldman:

 8
       Please read and make any changes and/or corrections in
       your testimony and sign the transcript in the presence of
 9
       a notary public.  Please do so within thirty (30) days.
10     If you fail to sign the transcript within thirty (30)
       days, it will be delivered to the appropriate parties
11     without signature.  Return the transcript with
       corrections, if any, to:
12          PATTISON, SAMPSON, GINSBERG & GRIFFIN:
            BY:  MICHAEL E. GINSBERG
13          22 First Street
            Troy, New YORK 12180
14     CORRECTIONS:

15
       _____     Word or phrase: _____
                    Corrected to:  _____
16
       _____     Word or phrase: _____
                    Corrected to:  _____
17
       _____     Word or phrase: _____
18                  Corrected to:  _____
                    Word or phrase: _____
19                  Corrected to:  _____
       _____     Word or phrase: _____
20                  Corrected to:  _____
       _____     Word or phrase: _____
21                  Corrected to:  _____
       _____     Word or phrase: _____
22                  Corrected to:  _____

23     _____

       Date Signed
                                    _____
24                                  John Waldman, M.D.
```

```
25
```

## A

**A.F** 20:21
**a.m** 1:22 6:3 61:22
**A.M.A** 14:4
**A.M.C** 19:12
**A.M.C.H** 26:25
**ability** 118:20
**able** 8:10 100:21 101:16 102:23 118:5
**abnormal** 24:4 49:11,13,15,16,25 50:19 101:23 122:12,22 123:3 124:19 126:16
**abnormalities** 49:3 117:4,5,15
**abnormality** 71:18 74:4 124:6
**abnormally** 21:12 123:8 142:3
**absent** 27:7
**absolutely** 24:5 30:2 82:8 100:12 114:11 119:16 120:4 123:19 133:13 135:9 141:21
**abundant** 130:18
**abuse** 34:2 53:22 58:10 59:12 82:2,11 107:20 134:12,18
**academic** 11:23
**academics** 11:25
**accelerate** 142:13
**accelerates** 30:21
**acceleration/deceleration** 30:11 30:14
**accident** 25:5 28:23 73:21
**accumulated** 91:18
**accurate** 38:6,9,10 41:17 44:7 64:5 79:20 86:25 96:20 111:8 134:14 135:3
**accurately** 40:25
**achieved** 91:17
**acknowledge** 150:5
**acknowledges** 40:13
**acquired** 143:15,15
**act** 53:8
**actions** 39:23 65:20
**active** 11:21
**activity** 27:16
**actual** 72:6 84:11
**acute** 55:9,23 56:3,15,22,24 57:10,12 58:9 71:2 77:10 78:4 80:8 91:8,11,25 92:3 109:7 124:16,17 125:5,17 127:11 130:13,14,16,19,20 131:9,10 131:12 136:20 141:19

**ADAM** 1:7
**additional** 21:9 118:7 124:22 131:19
**address** 149:15
**adequate** 89:4
**adherent** 126:10
**adhering** 105:25
**adjective** 75:17
**admission** 18:24 26:23 27:16 35:11 75:14
**admittance** 104:3
**admitted** 15:4 26:18
**Adrian** 1:4,13 37:19 38:15 39:23
**adult** 12:20,22 30:19
**adult's** 56:23
**adults** 21:23
**affirm** 6:20
**age** 13:2 23:7 30:17 57:8 120:15 120:16 121:7,9 141:14 142:16
**ago** 42:20 50:8 56:21 58:15 99:15 145:8
**agree** 6:25 46:8 56:5 67:18,20 68:10 135:5 144:15
**Agreed** 94:5
**agrees** 85:22
**ahead** 14:20 30:7,8 77:14 117:22 123:19,20 125:12 133:10
**airways** 52:21 132:3
**al** 1:1 2:1 3:1 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1

800.523.7887                    Associated Reporters Int'l., Inc.

128:1 129:1 130:1 131:1 132:1
133:1 134:1 135:1 136:1 137:1
138:1 139:1 140:1 141:1 142:1
143:1 144:1 145:1 146:1 147:1
148:1 149:1 150:1 151:1 152:1
152:4
**alarmed** 111:18
**Albany** 2:11,14 10:4,10,10,17,18
11:3,5,16,17 15:3 27:2 35:11
42:3 45:24 51:18,23 64:10
75:11 97:2 120:24
**alert** 137:15
**alive** 52:23 83:14,17 103:6
**alluded** 55:8
**American** 14:2
**amount** 72:5 109:25 110:18
111:11 126:10
**analysis** 102:10
**anatomic** 63:22
**anatomical** 74:3,8 75:8 77:3
**anatomically** 69:10 74:2 91:12
**and/or** 21:8 65:10 113:11 152:8
**angiograms** 97:12
**angiography** 97:8,24
**ankle** 110:11
**ankles** 110:2,7
**answer** 32:8 45:15 62:5,11,25
70:9 75:4 81:24 83:10 95:12
100:17 111:25 138:5
**answered** 112:6
**answering** 9:18
**answers** 5:9
**anterior** 20:21,21 60:25
**anybody** 37:8 44:19 113:16 119:7
147:7
**anyone's** 94:25
**Anyway** 123:19
**apart** 21:10,12 22:6,8,11
**Apgar** 136:3
**apologize** 80:12 85:16
**apparently** 34:8 45:10
**appearance** 54:14 55:20 58:7
70:5 128:15
**APPEARANCES** 2:2
**appeared** 49:4 54:10 97:16
**appearing** 124:17 125:18 130:21
131:13 134:13
**application** 38:16
**appreciate** 9:4 100:18

**approaches** 55:20
**appropriate** 83:16 152:10
**April** 4:7
**arachnoid** 56:11 57:23 58:8
**area** 49:24
**areas** 12:4 49:3 131:13 132:10
**arii portsteno.com** 149:17
**arm** 108:8,9
**arose** 133:16
**art** 68:12
**arterial** 108:24
**arteries** 108:21,23
**artery** 108:24
**article** 134:24
**articles** 134:17,18,24
**aside** 18:23
**asked** 12:24 15:22 16:7 41:21
70:8,8 74:24 85:22 92:17
111:25 114:22 139:4 145:13
149:12
**asking** 46:25,25 47:10 89:25
90:2 94:16 95:2,4 102:7
104:20
**aspiration** 132:4,5
**assess** 123:5
**assistant** 11:7
**associate** 11:8
**associated** 22:14 29:14,16 45:5
45:11 75:18 106:19 108:14
113:11 151:12 152:2
**Association** 14:2
**assume** 9:18 23:9 114:12
**Assuming** 64:21
**assumptions** 111:7
**at--** 73:9
**attached** 150:7
**attempt** 23:7
**attempted** 37:2
**attend** 9:5
**attending** 11:2,11,16,18 18:6
71:13
**attention** 32:20
**attorney** 2:10 5:15 9:7 40:3
152:6
**attorney's** 140:5 147:24
**attorney-** 140:9
**attorney-client** 140:8
**attorneys** 5:3 119:4,8
**aureus** 64:12

ARII@courtsteno.com                    www.courtsteno.com

Case 1:17-cv-00626-DJS-Doc #: 69-11 Filed 11/23/21 Page 156 of 189
Case 1:13-cv-30626-DJS Document 66-91 11/12/21 Filed 06/14/21 Page 156 of 189

800.523.7887                                                           Associated Reporters Int'l., Inc.

Page 155

**autopsy** 4:7 55:3 63:9 79:25
83:11 84:11,18,19 85:24 86:2
86:4,15 89:9,11 90:19 92:13
92:14,15 94:20 102:20,25
103:4,14,19 104:4,8,23 114:6
114:10,20 118:6 119:4 131:15
132:23 133:20 135:18 139:5,7
139:16 140:19,22
**availability** 50:9
**available** 36:6 67:7 102:20
109:5 131:20
**avoid** 7:21
**aware** 44:6 106:9 118:13,16
139:15 144:23
**axial** 76:12

---

**B**

**b** 4:2 23:2 32:25 59:18 85:14
127:9,17 130:10,10,11,13
130:13,15
**B.A** 10:3
**B.I.L** 19:16
**babies** 110:24 111:13 143:7,12
**baby** 21:20 143:9,16 144:16
**baby's** 20:22 21:8,19 22:2,3
**back** 8:14 34:25 43:16 62:4 64:3
81:4 86:16 99:8 101:22 104:14
119:15 124:4,8 126:22 129:9
137:16
**background** 9:25 96:13
**backward** 6:12
**bacteria** 102:13 132:3
**BAILEY** 2:13
**based** 16:18 39:14 48:11,13 49:9
52:18 65:6 66:7 70:18 72:11
72:12,14,18 73:24 74:2 79:4
94:16 97:5 106:22 114:15
125:14 126:2 135:17
**bases** 39:12
**bash** 110:2
**basic** 13:19
**basically** 23:14 128:5
**basis** 28:14 35:14,17 57:9 72:10
116:12
**Bates** 16:22 17:24 24:10 32:20
**Bear** 118:18
**bearing** 106:22
**beautiful** 6:14
**bed** 106:20 144:16
**bedside** 74:17 99:17,19

**began** 11:11
**beginning** 70:9 96:5 114:23
134:5
**behavior** 29:23 30:13
**belief** 76:4 78:24 112:14 115:24
116:4
**believe** 9:8 11:15 14:19 31:21
42:16,17,21 43:11 44:25 52:19
55:2 67:2 70:17 75:8 84:5,7
94:25 99:15 114:25 115:8,22
116:21 118:2,22,22 119:6
124:21 126:25 136:11,24
**believed** 54:3 77:17 78:22 94:13
101:10 112:2 115:16
**beneficial** 80:17
**Bernard** 9:23
**best** 20:18 40:24 41:18 44:14
48:8 50:17
**better** 23:13 25:13 77:21 113:10
113:13 138:9
**big** 58:10 142:13
**bigger** 87:16 141:23 142:5
**bilateral** 19:16,19,20 23:2
27:12,17,25 28:12 29:21 32:25
35:23 45:20 59:18,23 72:21,23
74:21 76:11 79:17 92:25 93:7
94:8,13 112:23 126:18,20
131:5 133:21,23
**bilaterally** 36:10 126:14,19
131:12
**bill** 149:9
**biomechanical** 143:8,12 144:10
**birth** 27:3 45:5 54:6,7 121:2
135:22,24 137:4
**birth-related** 53:21
**bit** 65:8 87:19 96:10,13 106:25
126:22,23
**black** 26:18
**bled** 91:20
**bleed** 34:13
**bleeding** 70:3 108:20,24 109:2
122:12,14,17,23 123:10
**blood** 19:25 23:17 46:6,17 47:6
47:11,22 48:5,5,6,14 51:18,22
54:16 55:9,12,13,17,19,20
56:15,17,22 57:6,10,12 63:23
64:10 70:5 76:15 77:10 78:4,5
91:8,11,17,19,21,25 92:3,9
93:5 100:20,24 102:14 106:5,5
117:2,4,15 123:7 127:15,16,23

128:9 131:22,22 132:12
**blunt** 124:20 126:4 129:14,19
  130:8,24 131:3,17
**board** 14:8,11,12
**body** 103:21
**bogus** 111:6
**bone** 21:10,20 77:24 78:2 113:12
**bones** 21:10
**born** 122:3,4
**Boston** 10:15
**bottom** 16:23 18:10 111:12
**bounced** 106:20
**brain** 12:12 13:17,21 20:18 21:8
  21:21 22:11,14,17,18,18 23:19
  23:21,23,24,24 24:3 27:16,25
  28:7,25 30:21 31:7 34:19 44:2
  49:22 57:2 61:5,15 67:3,14
  74:7 86:21 88:20,20 90:7
  101:13 105:22,23,24 108:17
  117:2,3,7 122:17 126:5 127:15
  128:4,8,21 131:7 142:6,9,11
**brain-death** 82:14,15
**brainstem** 127:18,22,25,25
  128:22
**break** 108:8 137:22
**breaking** 25:10
**Brett** 2:4 7:2,13 39:22 84:14
  85:10 88:24
**bright** 55:10,23 56:5,18,18,24
  57:11,14,16 93:4
**bring** 8:14 80:18
**Broadway** 2:4
**broke** 62:15
**brought** 81:8 96:6
**brown** 126:10
**bruise** 122:13
**bruises** 122:13
**bruising** 27:5
**buildup** 128:7
**bulges** 141:17
**bulging** 20:23 60:17,19,24,24
**bunch** 15:13 139:4
**busy** 9:5
**button** 7:19

---

**C**

**C** 3:2 77:2
**C.P.S** 24:17,19 25:2,9,16,18
  32:10 33:4
**C.S.F** 49:23 57:4 78:11 105:22

**C.S.S** 142:8
**C.T** 19:12 23:2,9,15,16 27:11
  34:9,11 35:18,21,25 36:2 42:8
  43:8 44:8 45:17 47:3,18,20
  48:3,11,14,16,20 50:5 55:9,18
  56:4 58:7,11 66:9,13 67:23
  70:6,19 72:12 76:24 77:2 84:9
  91:2,6 92:21 93:10,21 94:17
  95:12,16 96:14,18 99:5 100:19
  100:23 114:15,18 116:17 133:2
  133:7,25
**C.T.'s** 68:25
**Calabrese** 2:10 3:7 6:8,10 7:4
  8:7 39:7,11 45:13 46:18 47:24
  50:23 52:16 58:12 61:8,18
  65:4,16 66:2 67:19 68:17 70:7
  70:20,22 71:6 72:25 74:23
  79:23 80:4,22 83:23 84:2,13
  84:21,25 85:5,9,12,17 93:11
  93:18 94:3 95:4,21 104:17,24
  116:11,20 118:17,19,24 119:2
  119:12,17 125:11 129:20 130:4
  133:14 134:9 135:4 137:8,13
  137:17,21,25 138:6,10,14,17
**call** 12:21 16:2 18:6,6 25:20
  32:5 45:21 67:7 70:13,14
  71:12 95:6 98:3 111:18 128:25
**called** 18:4 25:2,16,17 26:24
  27:10 32:3 80:8 127:22
**calling** 94:25
**calls** 104:11
**capacity** 11:5
**Capitol** 2:11
**caption** 148:18,20,22,23 151:6
**car** 25:5 28:23
**care** 11:22 12:10,25 15:4,5,9,14
  16:7,8 74:11,12 81:11 82:21
  142:17
**career** 10:19 13:6,10
**caring** 33:24 51:9 69:7 72:3
  75:9 77:16
**case** 12:19 13:11,13 14:24 22:2
  22:3,7 31:11 42:20 43:4,9
  47:18,20 52:20 57:10,14 59:7
  63:4 66:20,25 67:24 71:10
  79:2,12 82:11,25 83:9 93:14
  93:24 95:3 98:22 99:2,8
  100:13 101:3 103:17 104:6
  106:23 114:2 118:14 125:19
  130:6 141:8 152:4

APPENDIX **1448**
800.523.7887                                    Associated Reporters Int'l., Inc.

Page 157

**cases** 53:7 98:16 111:9 134:21
134:25 136:22
**CAT** 28:16 29:2 34:10,11 45:21
72:15 73:8,15 97:15,16 136:12
**caught** 25:11
**causation** 31:14
**cause** 5:16 21:14 31:6 38:17
52:14 61:7 64:25 88:14 106:13
106:23 107:3,7 108:20,24
110:19,20 111:5,17 114:24
115:20 117:3,4,5,10,15 127:8
128:3,18 130:2 143:23 144:25
151:5
**caused** 21:10 22:13,16 29:23
37:24 54:2 65:25 66:6 108:25
112:15,24 115:2,13 116:4,22
118:3,4 124:25 127:23,25
128:6,16,17
**causes** 30:14 63:15 116:19 128:9
**causing** 61:6 115:17 142:4
**caution** 137:12
**caveat** 103:2
**cell** 50:20
**cells** 47:22 48:5,6 102:18
127:11
**center** 10:15,18 11:3,17 15:3
27:2 42:3 51:18,23 82:19
97:17 104:4 136:2
**centimeters** 120:25 126:13
141:10
**central** 83:4 128:25
**cephalograms** 97:13
**cerebral** 13:17,21 23:18 49:23
55:13,18,21 56:12,16 57:6
58:16 97:8 127:19 128:19
131:2,4,9 142:6
**cerebrospinal** 76:17,19 77:11
78:2
**certain** 23:18,18,19 25:15 31:19
31:24 36:14 43:2,3,5 61:13
78:4 105:11 111:10 141:13
**certainly** 21:4 30:11 53:3 55:6
57:12 61:13 68:24 110:3 114:3
116:23
**certification** 14:8
**certifications** 119:20
**certified** 5:16 14:11,12
**certify** 151:3
**cetera** 72:16 122:20

**chance** 40:22 41:14 42:2
**change** 41:6,22 52:13 54:21 65:7
79:5,9 94:9 104:5 142:24
**changed** 63:15 78:25 94:18,20
**changes** 50:21 103:18 104:10,22
111:5 152:8
**characteristic** 54:14,15 78:7
**charge** 33:24 94:4
**charges** 71:22
**chart** 16:19,20,22 17:14 26:20
28:18 31:18 32:21 36:4 42:3
68:3 71:24 74:18 78:22 112:17
112:20 113:16
**check** 150:6
**chief** 95:18
**child** 24:20,23 25:4 30:17,19
34:2 51:10 52:21 53:3,4,11,13
58:10 59:12 65:9,10,13,15,19
65:20 66:10 71:23 77:17 82:2
82:11 83:13,14 91:17 102:4
103:5,20 106:19 107:20 111:17
112:14 113:2 116:2,13,17
121:8,12 122:19 123:3 131:25
132:6,10 133:23 134:12,18
136:2,5,16 137:3 141:20
**child's** 116:5
**children** 10:12 12:20 21:23
52:20 56:10 107:24 109:5
136:18,19
**Children's** 10:14
**Christina** 2:10 39:6 61:16 62:14
84:3 89:21 95:21 116:8 119:9
**chronic** 57:3 105:18 124:16,18
125:5,17,20 126:2 130:14,17
**chronological** 24:12
**circle** 81:4
**circumference** 120:14,17,24
121:6,10,16,20 136:8 140:21
140:25 141:7,15 142:17,21
**circumstance** 82:11
**circumstances** 28:3 61:13 105:11
**City** 1:1,7 2:1,6 3:1 4:1 5:1
6:1 7:1 8:1 9:1,7 10:1 11:1
12:1 13:1 14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1 52:1 53:1

54:1 55:1 56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1 100:1
101:1 102:1 103:1 104:1 105:1
106:1 107:1 108:1 109:1 110:1
111:1 112:1 113:1 114:1 115:1
116:1 117:1 118:1 119:1 120:1
121:1 122:1 123:1 124:1 125:1
126:1 127:1 128:1 129:1 130:1
131:1 132:1 133:1 134:1 135:1
136:1 137:1 138:1 139:1 140:1
141:1 142:1 143:1 144:1 145:1
146:1 147:1 148:1 149:1 150:1
151:1 152:1,4
**civil** 2:3 5:5 39:23 42:20
**claim** 111:3,4
**Claimant** 1:14
**claims** 148:22
**clarifies** 84:18
**clarify** 41:6,22 54:5 62:25 63:2
 115:11
**classically** 56:21
**clear** 18:3 76:14 126:3 133:21
**client** 113:20 140:10
**clinical** 35:18 131:3 136:10
**clinically** 54:25 75:8
**close** 81:15 103:13
**closed** 131:2
**closed-head** 88:15
**closely** 57:4
**closer** 56:25
**clot** 126:11
**clotted** 78:5 91:18 93:5
**clotting** 55:9 123:3
**clump** 78:5
**coag** 101:22
**coags** 101:22
**coagulation** 24:16 101:24
**coagulopathies** 117:16
**coagulopathy** 46:2,5,14 47:11
 69:25 70:2 106:7,19 116:25
 117:3,24 118:3 122:15,24
 123:2
**coax** 24:16

**coincident** 97:21
**COLANERI** 1:8
**colleagues** 72:13
**collected** 103:19
**collection** 23:21 46:6,16 47:4
 47:23 48:3,10 52:15 63:16
 64:25 69:15,19 74:22 76:12,14
 82:24,25 91:7,15 105:2
**collections** 23:3 49:18 66:12
 69:12 72:21 127:4
**college** 9:25 10:4,10,19 11:16
**coma** 20:3,10,18 26:19 52:20
**comatose** 131:25
**combination** 100:25
**come** 14:14 21:20 31:6 32:2 48:8
 51:13 63:4 64:16,17 98:18
 100:3
**comes** 28:25 96:14
**comfortable** 8:19 123:16
**comment** 140:23
**Commission** 150:13
**common** 12:23 56:9
**commonly** 29:21
**company** 13:16
**compared** 74:21
**complete** 132:13 133:5
**completed** 151:11
**completely** 73:24
**complied** 35:4 52:7 62:8,18
 104:16
**component** 36:2 77:10
**components** 20:4,12 29:20 56:19
 56:19,20 57:15
**compressed** 127:2
**computer** 86:18 99:16
**computers** 50:14 100:2
**conceivable** 113:25
**conceive** 37:7
**concentration** 102:15
**concern** 15:18 53:12 60:14 136:8
 136:9
**concerned** 39:12
**conclu** 131:16
**concludes** 132:23
**concluding** 72:10
**conclusion** 28:20 71:2
**conclusions** 74:10 93:19 130:25
**conclusive** 131:16
**concussion** 30:23

800.523.7887

Associated Reporters Int'l., Inc.

**condition** 22:13 26:14 31:15
  33:2 37:11,18
**conditions** 59:11 81:11
**confessions** 134:25 135:2
**confirm** 44:6 118:7
**confirmed** 114:20
**confusing** 107:18
**Congress** 14:5
**conjecture** 123:18
**conjunction** 13:15
**connect** 105:24
**Consider** 27:19
**considered** 28:4 98:8
**considering** 101:9
**consistent** 29:3 38:22 44:2
  60:18,21 129:14 130:24 131:8
  139:8
**consisting** 151:10
**constellation** 116:16
**consult** 15:22,25 17:14 24:18
  27:10,20 36:11 43:6 66:19,21
  66:21 82:13 98:17
**consultation** 18:3 73:9,10,13
**consulted** 15:17,21 31:23 67:2
**consults** 25:18
**Cont'g** 30:6,12 31:4 35:19 40:19
  43:21 45:23 46:20 47:2,17
  48:12 51:5 52:10 53:14,24
  58:17 60:16 61:9 62:23 64:15
  65:12,23 66:4 67:22 68:22
  70:11,24 72:8 74:14 75:3
  78:17 79:7 81:2 86:9 88:9
  89:7 90:17 91:23 92:8,18
  94:15 104:25 110:4 111:22
  113:18 115:10 116:20 118:17
  119:17 125:11 129:20 130:4
  133:14 135:4 140:13 144:11,22
  145:3
**Cont'g** 65:18 129:18 144:3,21
**contact** 71:17
**contacted** 24:23 33:9
**contains** 56:11
**contaminated** 103:9
**continue** 10:15 115:23 118:15
  125:13 146:2,8
**continued** 11:12 62:14 146:5
**continuous** 91:16
**contradicted** 125:7
**contrary** 124:24

**contributing** 116:24 117:25
**controls** 117:7
**convenient** 8:15
**conversation** 99:4
**conversations** 44:24 72:13
**copy** 5:16 41:10
**cord** 12:12 81:21
**corneal** 27:7
**corner** 16:23,23 18:10 108:12
**correct** 9:9 15:11 21:17,18
  22:21 33:2,5,13,17 34:3,10,11
  34:15,16 36:4,7,12 37:12,20
  41:6,11,23 42:5,8,21 43:4,9
  44:13,17,24 45:22 47:4,8
  49:12,14 51:24 53:17,22 55:10
  55:24 58:11 59:8,9,12,14
  61:11 64:8 65:14,25 66:9,14
  66:17,18 67:17 68:10,11,25
  69:16,25 76:15,16,18,25 78:20
  78:21 79:17 80:7 89:10,11
  92:5 112:5 114:6,10,11,20
  120:16 125:2,3 141:18 143:23
  144:13 145:17,18 148:10 150:6
  150:8
**corrected** 19:5 152:15,16,18,19
  152:20,21,22
**correction** 64:13
**corrections** 5:11 152:8,11,14
**correctly** 91:5 132:6
**cortex** 126:14
**cost** 7:18
**cough** 20:20 106:4
**coughing** 105:15
**counsel** 87:25 151:6
**count** 46:3 101:25 123:7
**country** 111:11
**county** 1:9 134:20 150:3
**couple** 39:13 56:4 138:9
**course** 13:6 16:19,21 98:6 99:18
  121:8
**court** 1:2 8:9 62:4 96:7 148:14
  148:22
**courts** 148:15
**covered** 39:12 140:8
**COVID-** 60:6
**cranial** 21:18 72:15 73:15
**create** 109:22
**credence** 144:10
**crib** 107:13 109:20

cribs 107:23,25
criminal 31:11 37:18 40:9 41:11
 45:3 141:3
critical 33:2
Cross 3:5,6,7 39:19 96:2 116:10
crossed 19:3 113:25
crosses 108:23
crying 53:6
Crystal 2:13 80:6 89:22 90:12
 90:22 96:5
culture 51:18 63:23 64:10
 131:23 132:12
cultures 51:22 64:3 102:11
current 10:23 13:24
currently 10:21 145:16
curve 121:11

**D**

D 3:2,2 4:2
dark 49:6 54:21 57:3 89:5
darker 54:10 56:20
date 1:21 90:9 103:15 104:6,7,7
 104:22,23 105:2 152:3,5,23
day 15:14 16:2,4 26:21,22,23
 43:11 71:14 98:10 121:20
 134:19 145:19 150:11
days 26:21 51:24 52:23 56:4
 64:11 97:3 146:10 152:9,10
dead 20:19 27:25 28:8,25 83:13
 101:14 112:22 117:2
dealt 67:16
Dear 152:7
death 44:2 65:25 66:6 67:3
 88:15 103:18 104:7,7,7,22
 109:4 112:24 115:20 116:5,13
 116:19,21 128:3 131:7
decelerates 30:22
decided 39:7
decision 74:19
decisions 69:6 74:12
deep 20:18 26:19 27:8 52:20
deep-seated 129:11
Defendant 1:17 4:5 5:6
Defendant's 119:13
Defendants 1:11 9:8
defer 93:14
deficit 29:14
define 21:19 107:8 122:25
defined 59:6 110:17,18
defines 127:6

definitely 36:15 51:3
definitive 83:10
degree 10:5
delivered 152:10
deliveries 136:18
delivery 135:24 136:2,20
denser 49:5 54:10
densities 23:22 48:4,6 74:2,5,9
 77:22
density 23:3,5,17,18,19,19,23
 24:2 35:23 48:3 50:20 54:21
 56:17 57:2,7 77:5,10,13,20
 78:2,4,5,6
department 6:6 32:3,14 36:12,17
 36:20 37:2,15 98:13 99:25
depending 104:2
depends 18:16 71:13 93:11
 109:24
deponent 7:21 152:5
deposition 1:20 5:5,11,14,15,17
 7:14 40:3 42:15,18,19,24
 75:12 119:10 133:25 148:16
 152:5
depositions 119:6
describe 13:8 14:10 17:22 24:8
 26:14 43:23 68:14 73:25
 105:13 126:16 130:16
described 60:20 128:13
describes 69:10
describing 23:15,20 69:12 74:3
 74:7 75:6 127:18
description 4:4 87:18 88:12
 93:13
detail 63:19
details 63:18 97:23 144:4 145:8
detective 33:10 147:7
determination 67:3 74:20 82:14
determinations 37:10 82:16
determine 48:17 54:2 81:8
 100:21 113:4
determined 31:6 76:4
determining 93:17
develop 13:17 132:10
developed 47:11 65:10 97:19
 98:6 109:6 121:21,22 132:11
developing 13:15,20
deviations 141:13
diagnoses 73:4
diagnosis 28:11 36:10,18 59:17
 59:18 63:22 73:23 97:4 114:5

Case 1:17-cv-00626-DJS Document 66-9 Filed 06/14/21 Page 162 of 189

APPENDIX

1452

800.523.7887

Associated Reporters Int'l., Inc.

Page 161

114:9,19 139:8,9
**diagnostic** 83:14
**diagnostically** 101:17
**diarrhea** 26:21
**dictated** 71:20
**die** 58:19,19,24 59:5 109:7
**died** 65:20,21,21 66:11 109:6
116:19
**difference** 74:8 108:20 109:18
109:19,21
**differences** 23:17 143:18
**different** 22:18,20 23:22 29:10
29:11 55:2 59:25 74:2,4 75:6
77:22 102:20 105:19 108:18
123:5,6 125:4 148:15
**differentiate** 76:25 100:22
117:17
**difficult** 135:14
**difficulty** 55:16
**digital** 99:18
**diluted** 58:16
**dilutes** 56:17
**direct** 3:4 8:25 36:15 38:8,18
97:22
**directly** 102:9
**dirty** 77:21
**disagree** 119:7
**disagrees** 85:23
**disappeared** 101:19
**discharge** 121:3
**discharged** 71:24
**discuss** 7:15 23:13 96:12 98:18
144:6 145:11
**discussed** 7:22 24:18 100:11
114:2 131:15 144:8
**discussing** 36:20 37:6 114:4
**discussion** 31:13 32:13 36:16
**disease** 48:18 51:7,15 52:12
67:17
**diseases** 12:16 60:3
**dispute** 32:18 36:21 116:2
**disputed** 118:13
**distinction** 72:24
**District** 1:2,3 96:7 140:5
**Doc** 132:18
**doctor** 8:14 9:3,21 10:20 11:13
12:3 13:4,22 14:7,14 15:20
16:21 18:12 21:3 22:23 24:6
24:11 25:7,23 27:21 28:10
29:24 30:7 31:5,9 32:12,19,23

34:17 35:21 36:9 37:17 39:3
60:14 62:24 75:4 80:4,6 83:24
90:5 93:12 95:11,20 96:4
101:19 106:24 115:3 116:12
118:18 119:19 125:12 128:12
129:24 132:25 134:4 137:7
139:3,15 146:12,17,18
**doctors** 44:21 60:15
**document** 16:24 32:20 50:25
67:25
**documentation** 32:17 36:23
**documented** 44:15
**documents** 42:14
**Dohme** 13:16
**doing** 28:8 85:6 88:7 97:22
111:16 112:9 115:3 123:16
145:15
**doubt** 71:10 72:6 113:25 114:3
**Dr** 8:5,5,18 15:6,7,9,10,17 16:3
16:7,8 17:14,20,22 18:6,10,11
18:15 24:18 31:14,19 33:8
36:6 37:9 39:21 42:5,17 43:3
44:20 63:6,8 64:22 66:15
71:11 72:6 79:10,16 80:8 81:5
81:7 82:23 83:21 85:21,23
89:18 90:3,11,18,21 96:6
101:19 113:19,20,23 114:8,12
118:6 125:7 137:13,14 139:25
140:5 146:23 147:15,24 152:7
**draw** 72:20,24
**drawing** 32:19 74:9
**drawn** 51:19
**drop** 107:22 143:8 144:16,24
**drops** 143:7
**due** 46:2,7,7,7,13,16,17,21
47:23 48:14,15 50:20,21 58:10
59:14 65:22 78:15 116:14
125:20 127:3 128:13,13 130:8
131:3 133:6 142:6,10,11
**duly** 5:14 151:8
**dura** 56:14 105:25 108:16,17,22
126:9 128:21
**dural** 85:13
**duration** 103:3
**duties** 11:19
**dying** 109:7

---

**E**

**E** 2:7 3:2,2,2 4:2,2 152:12
**E-R-I-C** 147:17

**E.M.V.T** 20:4
**earlier** 7:22 9:4 33:5 39:22,22
  60:21 65:9 69:18 84:5 132:25
  133:6,17 134:4 137:9
**early** 13:13 18:24 114:23 135:25
**ecchymosis** 122:13
**echo** 134:10
**edema** 13:18,21 127:19 128:19
  131:3,4,9 142:7
**edge** 15:6,8,9,17 31:14,19 33:9
  36:6 37:9 43:3 44:20 108:13
**Edge's** 15:10 42:18
**educational** 9:25
**effect** 45:6 49:8 128:23
**effects** 67:15
**effort** 133:2
**effusion** 46:7,16 47:10,12 48:10
  54:14,25 69:15,19 78:7,15
  83:4
**effusions** 54:20,24 83:5 101:9
  106:11 125:24
**eight** 17:25 24:10 26:2,3,3
  43:18,25 49:3 63:25 68:6,7
**eighteen** 13:3 112:8
**eighty** 43:17
**eighty-** 17:17
**eighty-five** 17:15,20
**eighty-seven** 17:11,18
**eighty-six** 17:10
**either** 22:11 32:14 41:21 65:25
  97:17 110:12 114:17 135:3
  139:19
**elderly** 105:16 107:4
**element** 29:18
**elevation** 107:2
**email** 84:20,20 87:25 88:23
  119:14 148:20 149:15
**embedded** 108:21
**emergency** 24:15 26:24
**employed** 10:9
**employment** 10:21 11:11
**engineer** 144:13
**engineers** 111:3,3
**enlarge** 86:17 87:3,13 119:23
**enlarged** 89:5
**enlargement** 142:7
**ensure** 133:4
**enter** 47:12 101:8
**entered** 10:5

**entertain** 78:14
**entertained** 78:19
**entire** 10:19 26:10
**entirely** 49:15
**epidural** 22:19 58:20 59:8
  108:15,15 109:8
**equals** 20:13
**Eric** 66:15 70:16 147:15,15
**errata** 150:8
**essence** 121:24
**essentially** 28:7 99:10 101:13
  119:19
**et** 1:1 2:1 3:1 4:1 5:1 6:1 7:1
  8:1 9:1 10:1 11:1 12:1 13:1
  14:1 15:1 16:1 17:1 18:1 19:1
  20:1 21:1 22:1 23:1 24:1 25:1
  26:1 27:1 28:1 29:1 30:1 31:1
  32:1 33:1 34:1 35:1 36:1 37:1
  38:1 39:1 40:1 41:1 42:1 43:1
  44:1 45:1 46:1 47:1 48:1 49:1
  50:1 51:1 52:1 53:1 54:1 55:1
  56:1 57:1 58:1 59:1 60:1 61:1
  62:1 63:1 64:1 65:1 66:1 67:1
  68:1 69:1 70:1 71:1 72:1,16
  73:1 74:1 75:1 76:1 77:1 78:1
  79:1 80:1 81:1 82:1 83:1 84:1
  85:1 86:1 87:1 88:1 89:1 90:1
  91:1 92:1 93:1 94:1 95:1 96:1
  97:1 98:1 99:1 100:1 101:1
  102:1 103:1 104:1 105:1 106:1
  107:1 108:1 109:1 110:1 111:1
  112:1 113:1 114:1 115:1 116:1
  117:1 118:1 119:1 120:1 121:1
  122:1,19 123:1 124:1 125:1
  126:1 127:1 128:1 129:1 130:1
  131:1 132:1 133:1 134:1 135:1
  136:1 137:1 138:1 139:1 140:1
  141:1 142:1 143:1 144:1 145:1
  146:1 147:1 148:1 149:1 150:1
  151:1 152:1,4
**evaluate** 16:11 135:14
**evaluation** 122:11
**evening** 16:5
**event** 25:5 28:22 124:23
**events** 30:2 42:23 93:23 134:6
**everybody** 6:25 40:12 137:15
  146:21
**evidence** 24:13 27:15 28:22
  47:21 51:7 52:12 58:2,4,6
  75:15 76:21 119:11 122:8,12

122:21,22 126:4,20 131:5,7,16
136:25
**evidenced** 35:24
**exact** 97:16 103:15
**exactly** 79:15
**exam** 16:15 19:22 24:12,15 27:5
28:24 29:3 35:18 43:7,23 44:2
44:8 48:7 126:8,21
**examination** 3:4,5,6,7,8,9 8:25
17:23 27:23 28:6,17 39:19
72:15 96:2 97:6 101:2 116:10
138:25 139:13
**examine** 34:19
**examiner** 63:7
**Examining** 152:6
**example** 12:15 23:17 44:20 81:12
92:14 113:10 116:24 142:20
**exception** 37:24 81:20
**exceptions** 150:7
**exclusively** 59:20 60:5 72:18
81:24
**exhibit** 40:12
**exhibits** 7:22 81:4
**existed** 34:18
**existence** 14:15
**expect** 101:16 102:25 103:18
104:9,21 109:19 132:23
**expected** 123:10,10
**experience** 53:7 54:23 68:25
128:14,16
**expert** 25:21 95:2,6 118:12
144:12
**expired** 34:3 71:23
**expires** 104:4 150:13
**explain** 135:22
**explained** 33:24
**explanation** 27:18 28:13 48:8
**explore** 132:22
**extend** 29:13
**extends** 127:12
**extensive** 29:4,12,21 59:18,23
59:25 112:24 124:17 131:9,10
**extent** 43:8 101:24 125:7 146:6
**extents** 29:11
**external** 88:12
**extra-** 76:11
**extra-axial** 72:21 74:21 82:23
**extreme** 110:5
**extremely** 29:16,20 33:2 102:3
109:14

**extremis** 103:21
**eye** 20:4 130:20
**eyebrow** 105:14

**F**

**F** 3:2
**F-O-U-N-T-A** 147:9
**F-O-U-N-T-A-I** 147:12
**face** 60:10
**fact** 20:17 46:14 53:16,18,19
63:6 65:25 100:16 125:3 129:7
141:8 142:3
**factor** 66:3 116:24 117:25
**facts** 98:14
**fail** 103:22 117:7 152:10
**fails** 117:7
**failure** 52:22
**fair** 9:19 43:8 46:13 60:18,21
113:3
**fall** 28:22 107:24 108:8,9
109:11,21 110:7,19,20
**falling** 109:19
**falls** 58:19,24 59:5,6 106:25,25
**family** 34:5
**far** 22:5 39:12 90:5 124:3,14
**fat** 132:6
**fatal** 128:5,5
**father** 37:19
**features** 74:8
**Federal** 5:4 9:9 96:6
**feel** 123:15 133:15,18,18
**feeling** 94:6 99:3
**feels** 93:22 95:11
**feet** 59:6 107:11,12,12
**fellowship** 10:13
**felt** 73:11 94:7
**female** 141:14
**fifteen** 32:20 102:2 123:17
**fifth** 120:18
**fiftieth** 142:23
**fifty** 19:25 145:5
**fill** 73:12
**filling** 96:10
**final** 51:24 71:10 86:15
**find** 17:6 79:16 84:6 98:13
140:19
**finding** 23:5 24:4 28:15 72:20
124:25 128:20
**findings** 18:13 37:12 49:8,12
63:9 71:3 72:16,16 73:14

74:13 75:8 93:21 116:17
118:13 135:16 139:5,7,16
**finds** 63:21
**fine** 63:3 83:22 119:24 138:15
138:16
**fingers** 22:2 87:16
**finish** 77:14
**first** 2:7 6:4 14:15 29:8 33:21
33:23 34:21 39:17 45:3,17
60:23 86:14 88:11 97:10 99:21
99:25 100:5 101:18 108:10
119:19 139:20 152:13
**five** 2:14 10:8 17:25 24:10 49:2
51:24 64:11 107:11 112:8
120:15 136:3 138:14
**five-** 137:21
**fixed** 27:6
**flat** 20:2 30:20
**flight** 109:11
**floating** 77:25
**flow** 136:5
**fluid** 23:18 46:7,15,16 47:4
49:6,18,22,23,25 50:18,19
52:14 54:10 55:4,13,18,21
56:12,16 57:6,7 58:16 64:25
69:12,13,14,19,19 70:4 72:21
74:21 76:12,14,17,19 77:3,6
77:11,21 78:2 82:24,25 91:15
92:4,5 102:9 103:19
**foci** 126:15 127:19 130:20
**follow** 146:14,16
**follow-** 62:24 96:7
**follow-up** 18:14 39:13,17 62:14
83:20 95:15 109:16 134:4
137:20 145:15
**following** 10:5 83:4 121:11
**follows** 127:15
**fontanelle** 20:21 21:11 60:25
**foraminal** 44:3
**force** 38:16 109:16,21,25 110:18
110:20 111:12 124:20 126:4
129:14,19 130:8,24 131:3,17
**forces** 109:13 111:4
**foregoing** 150:4 151:4,9
**form** 5:8 30:4 45:13 46:18,19
47:15,24 50:23,24 51:2 52:16
52:17 53:23,25 58:12,13 59:15
59:17,18 64:6 65:3,4,5,17
66:2 67:19 68:16,17 70:20,21
71:5 72:25 73:12 74:23 75:2

78:8 79:3 90:23 91:3,4 92:6,7
92:11 94:23 113:8 115:5
116:15 140:7 144:2,20 145:2
147:15
**forms** 59:17 107:19
**formulating** 36:9
**forty** 20:2
**forty-nine** 120:15
**forward** 95:11
**found** 17:23 26:15,17 43:24 63:6
64:22 79:15 80:8 85:24 90:6
90:11,13,14 91:15
**Fountain** 1:8 33:10 147:9,12
**four** 18:21 26:18 59:6 86:10
107:12 112:3,3 126:11
**fourteen** 130:15
**fracture** 34:14 75:13,15,19 76:3
108:14,22 113:11 143:23
144:25
**fractures** 25:20 27:14 44:3
75:23 108:7,14 113:12,12
**frequently** 96:19
**fresher** 131:12
**front** 141:17
**frontal** 49:3 124:15
**full** 9:22 11:7,8,15 20:23 21:2
44:6 87:4,5,6 101:23 146:3
**function** 28:24 129:7
**functions** 103:21
**furniture** 107:15
**further** 5:7,10,13 33:7 39:4
62:13 75:7 124:9 137:6 139:11

---

**G**

**G** 3:2 143:22,22
**G-E-R-M-A-N** 146:24
**G-force** 143:24
**G-forces** 144:6
**G.C.S** 20:3
**gag** 27:7
**gain** 27:3
**general** 2:10 10:7 12:9 38:11
40:17 122:11
**generally** 16:9 40:13 49:7 54:11
54:12 81:23 111:14
**Germaine** 146:23
**German** 16:4,7,8 17:23 18:7,15
24:18 42:5 101:19 146:23,24
147:2
**German's** 17:14,20 18:10,11

800.523.7887

Associated Reporters Int'l., Inc.

**gestational** 120:16
**getting** 8:20 68:9 97:22 103:23
  106:20 149:6,7
**Ginsberg** 2:6,7 3:4,8 7:8 8:11
  8:23 9:2,6 30:6,12 31:2,4
  34:24 35:7,13,19 40:16 43:18
  51:2 53:23 60:6,8,13 62:2
  64:6 65:3 68:16 70:21 71:5
  90:23 91:3 92:6 94:22 95:5,24
  137:23 138:4,8,13,16,24 139:2
  139:11 140:7 152:6,12,12
**Ginsburg** 114:22
**give** 6:20 9:24 16:25 17:3,7
  62:16 73:16 84:18 86:7 118:9
  118:19 133:17 134:23 148:25
**given** 41:10 90:3,19 96:11
**giving** 45:6 49:7 151:7
**glad** 60:11
**Glasgow** 20:3,10
**go** 6:12,14 8:10,12 14:20 24:6
  26:9 30:7,8 39:17,17 43:16
  47:14 61:18 77:14 85:20 86:16
  87:17 90:5 95:22 96:15 98:14
  98:19 109:6 111:10 117:22
  122:9 123:19,20 124:4,15
  125:12 126:21 133:9 147:15
**goes** 21:5,7 42:11 70:15 71:24
  110:18 114:15 149:9,11
**going** 7:19 8:16 9:11,18 18:17
  23:9 39:5 45:19 62:3 75:7
  80:15 86:6,13,16 87:17 89:16
  90:18 95:5 99:8 102:22 107:4
  109:16 110:9,19 118:11,15
  119:25 120:6,8,8 122:16,16
  123:23 125:14,22 131:18
  132:24 137:25 138:2,2
**good** 6:6 39:21 88:8 146:4
**gotten** 89:24 98:4 101:15 103:16
**grabbing** 122:19
**graces** 6:6
**graduated** 10:3,4
**grainy** 89:6
**grandmother** 107:5
**gray** 54:22 56:19,25
**great** 6:17 138:24
**greater** 23:23 105:24
**grew** 55:4
**grey** 47:21
**GRIFFIN** 2:6 152:12

**gross** 126:7
**ground** 108:13 110:16
**grow** 21:21
**growing** 102:13 142:21
**grown** 105:18
**growth** 142:13
**Gs** 144:16 145:5
**guess** 15:15 31:10 68:5 87:24
  88:18 93:11 110:17 113:10,13
  113:23 114:14 132:16 139:22
**guys** 84:19 89:16,20

## H

**H** 4:2
**H.P.I** 18:21
**hand** 6:18,19 16:23 68:18
**hands** 60:9 112:4
**handwriting** 18:17
**handwritten** 71:15
**handy** 80:23
**hang** 35:3 87:9 123:20,22,22,24
  124:11 126:3,9 133:9 149:5
**happen** 141:21
**happened** 93:8 99:15 109:14
  112:12,18 123:25 124:2 137:3
  137:4
**happening** 97:7 103:24 142:19,25
**happens** 71:11 108:6
**hard** 29:25 87:11 135:12
**have--** 141:21
**head** 15:19 20:22 21:21 22:12,15
  23:2 34:9 81:13 97:7 108:9
  120:14,17,24 121:6,10,15,19
  130:25 131:2,17 136:8 140:21
  140:24,25 141:7,12,14,17,22
  142:4,16,20
**heading** 150:5
**healing** 113:11
**hear** 25:11 35:7 50:15 60:11
  62:20 104:18
**hearing** 5:16 134:10
**heart** 117:4
**height** 107:13
**help** 121:25
**helpful** 93:13,23
**helping** 35:5,6
**hematoma** 19:15,19,21 35:11,15
  45:4 46:22 48:15 54:3 55:7
  56:24 57:21 58:10 59:8 66:6
  68:10,15 70:13,14,19 71:3,8

72:10,23 74:6,20 77:7,18
78:10,14 79:17 90:6,12,14
91:14 101:5 105:4 106:14
107:3,7 109:22 110:19 111:18
114:19 115:17 116:14 118:3,4
130:7,13,14 131:4,13 133:24
136:14,16 139:8 140:17 144:25
**hematomas** 22:19 27:13,17,25
28:13,15 29:4,15 32:25 34:18
35:23 36:10 37:23 45:21 53:13
56:23,25 58:20 59:19,24 60:6
65:22 92:25 93:8 94:8,14
101:10 105:17 106:6,8,9
107:19,23 108:2,15,15,17,25
109:8,8,12 112:15,23 116:5,18
117:14 120:21 121:13,21
125:18 126:2 128:3 131:6
133:21 136:21 141:22 142:10
**hemispheric** 27:12
**hemorrhage** 59:11,13 60:3 89:20
124:16,17 126:14,15 127:10,12
127:20,25 128:4,9 130:19
131:10,11,12
**hemorrhages** 27:9 29:9,10,13,21
59:16,24 112:25 122:22 125:8
127:23 129:12 130:17,21 139:9
**hemorrhaging** 29:5,7
**hereof** 150:5 151:7
**hereto** 151:6
**herniated** 128:21
**herniation** 128:25 129:12,13
**high** 54:20 73:20
**higher** 50:19 107:2
**history** 18:21 19:21 26:20,21,25
28:2,18,21 48:7 73:5,13,16,19
97:5 101:2 112:7,9,17,21,25
113:5 115:7 131:3 134:14
135:20 136:10
**hit** 7:19 108:9,11
**hold** 6:5 10:21,24,24 11:14 14:8
65:16 80:25 126:8 129:11
**holding** 110:11
**holes** 96:10
**home** 138:9
**honestly** 82:17 102:3 111:5
**Hoover** 66:15 147:15,20
**Hoover's** 70:16 71:11 72:6
**hope** 60:6 132:23
**hopefully** 111:18

**hoping** 84:10
**hospital** 10:11,11,15,18 11:17
11:23 15:2,3 19:8 24:24 26:19
27:2 33:16 34:9 51:18,19,23
63:25 76:8 106:20 107:25
131:24
**hotline** 34:2
**How's** 105:7
**Howard** 7:19 9:13 34:25 35:8
52:4 104:13 118:19 119:13
137:8 149:2,14 151:3,15
**HUBBARD** 151:3,15
**human** 111:13
**hundred** 59:20 81:15 99:14 102:2
123:16 136:22
**hydrocephalus** 142:7

———————— I ————————

**I-C** 147:18,19
**I.C.P** 24:14
**I.C.U** 99:16 100:7
**I.D** 6:5
**idea** 31:12 32:6 70:15 73:18
76:8 112:16 113:17 115:9
144:14,15,21
**identified** 15:15 17:24 24:9
29:5
**illness** 18:21 53:5
**image** 49:2,21 54:8 58:7
**imaged** 136:18
**images** 23:14 48:20
**imaging** 22:25
**immediate** 55:5
**impact** 64:24
**implies** 124:20 125:3
**imply** 121:12
**impossible** 57:8
**impression** 26:6,8 27:15,22
28:12 36:2,13 78:13 92:25
93:7 101:4 133:23
**impressions** 36:18
**in-** 95:17
**inability** 133:7
**inactive** 21:24
**inches** 141:10
**incidents** 109:11
**include** 119:14 121:6 134:21
**included** 10:7 54:6 126:10
**includes** 75:23
**including** 12:12 22:21,22 42:3

800.523.7887                                                    Associated Reporters Int'l., Inc.

52:12 64:23
**inclusive** 151:11
**inconceivable** 45:16
**inconsistent** 90:25
**inconsolable** 53:6
**incorrect** 18:22
**incorrectly** 90:10
**increase** 21:5
**increased** 21:7,13 24:14,14
35:24 61:6,13,14 65:21 66:11
116:18 127:5,7 128:17,24
129:16 130:2,6
**increasingly** 81:21
**Index** 152:4
**indicate** 20:16 29:7 35:21 47:20
93:5 136:13
**indicated** 24:22 35:22 45:25
94:12 116:17
**indicates** 20:8,17
**indicating** 8:19 15:21
**indication** 21:13 124:19 125:21
127:7 128:5 136:15 137:2
**indicative** 49:19 114:18
**Indicators** 27:19
**individual** 13:13
**infancy** 21:22
**infant** 30:15,16 49:18 51:8 53:9
107:6
**infant's** 38:16
**infants** 37:23 56:10 57:4
**infarct** 130:21
**infected** 125:23
**infection** 46:8,17 47:23 48:14
50:21 51:8 52:13 53:2,11,12
54:15 59:14 60:18,22 61:10,14
63:6 64:24 65:9,10,14,18
69:15 73:20 74:5 76:22 78:7
78:12,16 83:2,9 100:20,24
103:6,12,24 115:18,18 116:3
126:2
**infections** 52:24
**infectious** 67:17
**inference** 55:5
**inflammation** 124:18 130:17,20
**inflammatory** 127:11
**inflicted** 56:3
**influence** 37:2 114:9
**influenced** 114:16
**information** 36:4 65:7 79:4,5,8
79:24 80:5 92:16 97:7 101:15

102:19,19,23 103:16 118:7
121:24 124:22 131:14,20
**informed** 74:19
**initial** 63:24 75:14 131:23
**initially** 11:6 98:7 101:20
123:12 124:7
**injured** 91:20 113:2
**injuries** 30:11 81:13 88:15
108:5 131:2
**injury** 15:19 25:4,22 30:14 31:7
34:15 37:24,24 38:17 48:17
53:5 112:7,9 113:5,6,16
114:25 115:2,13 117:3 128:6,6
128:22 135:15 136:9
**input** 114:9
**inserting** 81:22
**inside** 22:12 97:7 105:23 123:6
142:8
**instance** 117:12
**instantaneous** 141:18
**Int'l** 151:12
**intend** 93:9
**intense** 20:23 21:2
**intensive** 15:5
**intensivist** 15:5 82:19
**intensivists** 15:13
**interaction** 34:6 44:9
**interactions** 66:7
**interesting** 13:11,12
**INTERNATIONAL** 152:2
**interpretation** 71:7 77:8,9,12
78:9
**interpreted** 33:14 91:10
**interpreting** 74:13
**interrupt** 30:9 77:14,15
**interrupting** 80:12
**intervening** 121:24
**intervention** 27:18 32:10 66:25
109:5
**interventional** 98:3
**interventions** 12:13
**intracranial** 21:7,14 24:14
35:24 61:5,6,14 65:22 66:11
116:18 127:5,7 128:18,24
129:16 130:2,6,6 142:3
**intraparenchymal** 127:19
**introduce** 103:12
**introduced** 96:4
**intubated** 20:6

APPENDIX

Case 1:17-cv-00626-DJS  Document 172-24  Filed 06/14/21  Page 169 of 189

1459

800.523.7887

Associated Reporters Int'l., Inc.

Page 168

| | |
|---|---|
| **invasive** 83:16,17 | **joining** 9:3 |
| **investigating** 143:4 | **joint** 84:20 |
| **investigation** 31:11 | **jump** 71:2 |
| **involve** 81:16 | **jumping** 96:9 |
| **involved** 13:4,14,25 32:9 43:4 | **June** 145:19 |
| 71:9 82:4,9,20 | |

| **K** |
|---|

| | |
|---|---|
| **involvement** 43:3,9 44:7,15 60:2 | **keep** 6:6 9:13 25:10 60:9 88:7 |
| **involving** 38:25 59:7 | 119:10 120:6,8,8 123:23 |
| **iPad** 86:18 | **kept** 103:6 |
| **irrelevant** 143:19 | **kid** 109:25 110:7,11 112:22 |
| **irreversible** 128:23 | 123:12 |
| **isolation** 54:18 | **kid's** 125:22 |
| **issue** 8:12 71:16 78:3 133:16 | **kidneys** 117:6 |
| **issues** 27:3 40:14 81:21 135:25 | **kids** 107:22,25 108:3 |
| **items** 24:9 28:19 | **kind** 67:15 108:4 116:3 135:13 |
| | **kinds** 29:10 60:3 81:12 |

| **J** |
|---|

| | |
|---|---|
| **January** 90:8 | **Klein** 2:3,4 3:5,9 7:3,17 8:2,4 |
| **John** 1:1,20 2:1 3:1,3 4:1 5:1 | 8:22 30:4,8,25 35:9 39:5,9,20 |
| 6:1,24 7:1 8:1 9:1,23 10:1 | 39:22 40:11,18,19 43:21 45:15 |
| 11:1 12:1 13:1 14:1 15:1 16:1 | 45:23 46:20 47:2,17 48:12 |
| 17:1 18:1 19:1 20:1 21:1 22:1 | 51:5 52:10 53:14,24 58:17 |
| 23:1 24:1 25:1 26:1 27:1 28:1 | 60:16 61:9,16,20,24 62:3,12 |
| 29:1 30:1 31:1 32:1 33:1 34:1 | 62:21,23 64:15 65:12,23 66:4 |
| 35:1 36:1 37:1 38:1 39:1 40:1 | 67:22 68:22 70:11,24 72:8 |
| 41:1 42:1 43:1 44:1 45:1 46:1 | 74:14 75:3 78:17 79:7,21 |
| 47:1 48:1 49:1 50:1 51:1 52:1 | 80:14,20,24 81:2 83:25 84:3 |
| 53:1 54:1 55:1 56:1 57:1 58:1 | 84:15,24 85:3,7,11,19 86:3,6 |
| 59:1 60:1 61:1 62:1 63:1 64:1 | 86:9 88:9,25 89:7,16,25 90:11 |
| 65:1 66:1 67:1 68:1 69:1 70:1 | 90:16,17,25 91:23 92:8,18 |
| 71:1 72:1 73:1 74:1 75:1 76:1 | 93:15 94:2,15,24 95:8,14,20 |
| 77:1 78:1 79:1 80:1 81:1 82:1 | 104:11 109:23 111:20 113:8 |
| 83:1 84:1 85:1 86:1 87:1 88:1 | 115:5 116:15 118:11 119:9 |
| 89:1 90:1 91:1 92:1 93:1 94:1 | 125:6 129:17,23 135:5 137:19 |
| 95:1 96:1 97:1 98:1 99:1 | 139:14 140:9,13 144:11,22 |
| 100:1 101:1 102:1 103:1 104:1 | 145:3 146:18 148:17,25 149:4 |
| 105:1 106:1 107:1 108:1 109:1 | 149:7,11 |
| 110:1 111:1 112:1 113:1 114:1 | **knew** 16:16 24:25 25:16 52:11 |
| 115:1 116:1 117:1 118:1 119:1 | 63:14 92:19 138:10 |
| 120:1 121:1 122:1 123:1 124:1 | **knit** 21:25 |
| 125:1 126:1 127:1 128:1 129:1 | **know** 8:15,16 9:17 13:11,18,24 |
| 130:1 131:1 132:1 133:1 134:1 | 14:20 15:12 16:5 17:5 19:2 |
| 135:1 136:1 137:1 138:1 139:1 | 21:9 23:25 24:25 25:3,4 26:10 |
| 140:1 141:1 142:1 143:1 144:1 | 29:25 30:18 31:10 32:8,10 |
| 145:1 146:1 147:1,2 148:1 | 36:24 39:14 44:20 50:7,13 |
| 149:1 150:1,4,10 151:1,4 | 51:6,22 52:25 53:16,18,25 |
| 152:1,5,7,23 | 55:3,4 59:13 63:17,18 64:17 |
| **JOHNSON** 2:13 | 65:24 66:5,7 67:4,5,9 68:13 |
| **Join** 71:6 | 70:13 72:19 73:19,22,23 74:13 |
| **joined** 10:17 | 75:21,22 76:5,6,9,10 77:6,6 |

Associated Reporters Int'l., Inc.

77:25 80:23,24 83:10,11,15
87:10,16,22 88:11 92:4,4,9,12
92:20 95:13,17 100:21 101:8
101:25 102:12,13,14,15 103:12
103:21,21 104:2 106:4,18,22
107:2,15,16,21 108:7,7,12
110:7,13 111:2,9,13 112:5,11
112:22 113:2,12,14,14,22
114:24 115:12 117:6,7,12,13
117:14,19 121:2 122:13,13,16
123:8 124:6 125:22,25 126:17
127:4 129:4,5 130:12 132:2,25
133:16 134:19,21,22,24 135:10
135:13,17 136:16 138:9 139:19
139:20,23 141:13,22 142:4,22
143:25 144:4,6 145:7,9 147:8
148:17
**knowing** 63:13 99:4
**knowledge** 38:22 40:25
**known** 14:24 65:2 102:18 115:8
119:4

---

**L**

**l** 23:2 32:25
**L-I-A** 148:5
**lab** 102:10
**lack** 77:21
**lady** 138:2
**landscape** 120:9
**large** 23:2 72:21 74:21 108:3
119:22 127:10 128:18 142:4
**larger** 72:22 91:8 93:2
**lawsuit** 96:6
**layer** 108:22
**layers** 60:2
**lead** 109:4 115:7,7
**Leah** 7:5 8:21
**learn** 51:13 63:5 64:17
**learned** 14:15 23:8
**leaves** 146:22
**led** 28:19
**left** 49:5 50:2,19 91:11 93:2
94:14 130:20
**left-** 16:22
**length** 104:3
**let's** 17:19 47:14 67:25 68:5
87:2 95:15 117:12 118:9 119:9
121:6 126:7
**level** 143:22
**Lia** 148:4

**life** 135:25 144:7 146:3
**lighter** 49:5
**likelihood** 99:24
**limited** 12:19 66:7
**line** 21:6 32:24,24 33:20 111:12
111:20 143:5
**literature** 29:12 107:10,18
134:15 137:2 144:8 146:9
**little** 6:13 23:12 33:7 49:5
55:11 62:13 65:8 87:7,19
96:10,13 106:25 126:21,22
137:12
**live** 138:8,8
**liver** 117:7
**loathe** 73:22
**lobe** 49:6
**lobes** 79:17
**location** 1:23 74:4
**lodge** 118:14
**long** 11:4 99:15 100:17 113:12
125:24
**look** 16:20,21 23:9 25:19 40:3
42:3 48:3 50:5 54:18 55:23
56:5,18 57:14,16 74:15,15
84:25 89:24 92:14 99:19 100:2
107:4 120:13 142:18
**looked** 7:23 31:19 42:8 48:19
50:18 99:22 102:9
**looking** 6:11 17:9,12 48:4,5,6
66:8,13 67:25 74:17,18 91:6
98:19,20 100:23,23,24 110:6
114:13
**looks** 49:25 58:10 77:21
**lost** 24:11,11 129:8 137:11
**lot** 8:15 68:25 117:5 144:9
**lots** 98:7 103:23 142:12
**low** 46:2 102:2,3 123:8,9
**lower** 123:8
**lowest** 20:11,14
**lungs** 124:8 132:2
**lying** 91:17 108:12
**lymphocytes** 127:11

---

**M**

**M-I-C-C-H-E-L-L** 148:9
**M-I-T-C-H-E-L-L** 148:8,11
**M.D** 1:20 2:12 10:5 34:14 152:5
152:23
**M.S.L.A** 86:10
**macrophages** 127:10 130:19

**majority** 58:19,23,25 59:4,22
  73:14 98:20
**making** 73:11 131:18
**male** 26:18 141:14
**man** 138:11
**manage** 12:17
**mark** 27:5 75:16 84:22 119:8,10
  119:13
**marked** 4:3 27:13 119:5,7
**MASON** 1:7
**mass** 21:9 22:12 61:5
**massive** 45:20
**materials** 151:12
**Matt** 28:6
**matter** 9:6,9 31:3 32:4 37:4
  38:14,23 39:18
**matters** 37:18
**Matthew** 14:16,23 15:14,18 16:3
  16:4,7,11,13 32:4 38:13,25
  45:4,25 60:4 66:22 99:21
  101:13 112:2 113:20 114:25
  115:16,20 116:13
**Matthew's** 15:15 26:6,14 30:17
  31:7,14 34:18 36:4 37:11,17
  37:19
**MD** 1:1 2:1 3:1 4:1 5:1 6:1 7:1
  8:1 9:1 10:1 11:1 12:1 13:1
  14:1 15:1 16:1 17:1 18:1 19:1
  20:1 21:1 22:1 23:1 24:1 25:1
  26:1 27:1 28:1 29:1 30:1 31:1
  32:1 33:1 34:1 35:1 36:1 37:1
  38:1 39:1 40:1 41:1 42:1 43:1
  44:1 45:1 46:1 47:1 48:1 49:1
  50:1 51:1 52:1 53:1 54:1 55:1
  56:1 57:1 58:1 59:1 60:1 61:1
  62:1 63:1 64:1 65:1 66:1 67:1
  68:1 69:1 70:1 71:1 72:1 73:1
  74:1 75:1 76:1 77:1 78:1 79:1
  80:1 81:1 82:1 83:1 84:1 85:1
  86:1 87:1 88:1 89:1 90:1 91:1
  92:1 93:1 94:1 95:1 96:1 97:1
  98:1 99:1 100:1 101:1 102:1
  103:1 104:1 105:1 106:1 107:1
  108:1 109:1 110:1 111:1 112:1
  113:1 114:1 115:1 116:1 117:1
  118:1 119:1 120:1 121:1 122:1
  123:1 124:1 125:1 126:1 127:1
  128:1 129:1 130:1 131:1 132:1
  133:1 134:1 135:1 136:1 137:1
  138:1 139:1 140:1 141:1 142:1

  143:1 144:1 145:1 146:1 147:1
  148:1 149:1 150:1 151:1 152:1
**mean** 16:15 26:13 33:15 38:9
  40:4 45:19 55:3 58:23 61:12
  65:13,19 68:3 69:22 78:18
  89:9 90:4 113:9 121:14 133:11
  134:7,11 136:3 140:16 142:11
  143:4,14
**means** 20:5 127:2,20
**measure** 23:16 111:4
**measured** 110:21,22 121:10,20
**measurement** 140:19,24 141:10
**measurements** 141:12 142:17
**measuring** 126:11
**mechanical** 111:3 143:16
**mechanism** 48:17 54:2 108:19
  111:24 112:7,9 113:4,4 115:8
**mechanisms** 135:15
**Med** 35:12 64:11 97:2 120:24
**medical** 10:4,10,15,17,18 11:3,5
  11:16,17,24 14:24 15:3 19:21
  26:25 27:2 42:3 45:24 51:18
  51:23 63:7 71:25,25 75:11
  82:18 97:16 104:3 122:8 131:7
  136:2
**medications** 13:15
**medicine** 145:21,23 146:7,10
**meet** 146:17
**member** 13:22 14:4 32:13 33:17
  36:25 37:15
**members** 36:11,17
**membrane** 56:11 57:23
**memory** 44:24 85:18
**meningeal** 63:6 64:23
**meninges** 61:15
**meningitis** 50:21 51:7 52:13
  83:5 106:10 125:23
**mention** 120:14
**mentioned** 12:5 21:16 82:14 83:3
  83:7 99:12 101:11 107:2
  111:15,23 146:9
**Merck** 13:16
**Michael** 1:10 2:7,12 7:7 9:6
  39:12 134:9 138:3 152:6,12
**mid** 27:6
**midbrain** 127:18,24
**middle** 110:16
**millimeters** 126:11
**mind** 70:16 94:9 104:13 134:10

**mine** 39:15
**minimal** 105:12,13 106:7 108:5 112:17
**minimize** 135:11
**minimum** 31:18 97:11
**minor** 96:10
**minute** 58:15 137:22
**minutes** 136:4,6 138:15
**missing** 80:11 132:19
**mistake** 76:3
**mistaken** 138:12
**misunderstandings** 7:21
**Mitchell** 7:6 8:18 39:9,10 78:8 79:3 84:10 88:6,23 89:2 95:10 144:2,20 145:2 146:14 148:4,6 148:8,11,12,15,21 149:10,14 149:18
**mix** 47:22 58:15
**mixed** 23:3,5,25 35:23 48:2 57:5 57:6 77:10,11,13,20
**mixing** 56:15
**mixture** 78:10,12
**mode** 120:9
**model** 143:13,16
**modeling** 143:8
**models** 111:6 143:9
**moderate** 126:10
**Mom** 26:23
**moment** 6:18 39:4 52:6 61:19,21 62:7 83:20 104:15
**moments** 57:18
**month** 136:24
**months** 18:21 26:18 112:3 121:7 121:9
**morning** 39:21 44:2 134:5
**mother** 112:17,18
**mother's** 132:7
**motor** 73:20
**move** 22:24 25:23 74:25 81:3 88:13 95:10 120:13 123:22
**moved** 124:7
**movement** 20:5 27:8
**moving** 122:19
**multiple** 52:22 103:23 142:22
**muting** 134:10
**myelograms** 97:13

---

**N**

**N** 3:2,2 4:2 147:13
**name** 9:6,22 27:20 83:23 96:5

147:4 148:3 152:4
**named** 14:16
**narrow** 128:8
**nature** 43:23 113:7
**near** 83:6
**necessarily** 55:25 65:19 114:16 123:10 135:3
**necessary** 111:12
**need** 48:25 83:20 95:16 113:5 133:15,18,19 145:4 148:13
**needed** 62:20 97:6
**needle** 103:8 122:18
**needs** 95:12 119:6
**negative** 44:3 51:25 64:3,11 122:24 132:19
**neglect** 34:2
**neo** 120:23
**neonatal** 120:23
**neonate** 136:13
**neonate's** 45:21
**neonatologist** 45:19
**nerve** 130:18,22 131:11
**nerves** 12:13
**nervous** 12:11 81:16
**neural** 97:5
**neuro** 96:21,24
**neurologic** 28:24 97:5
**neurological** 12:10 14:3,5 29:14 59:11 129:7
**neurologist** 67:7 82:10
**neurologists** 66:25 82:15
**neurology** 66:21 67:16 82:7,13
**neuron** 81:7
**neuroradiologist** 98:17
**neuroradiology** 96:24 97:3,15,20 98:5,8
**neurosurgeon** 12:18 66:17 81:8
**neurosurgeons** 12:9 82:3 144:9
**neurosurgery** 10:9,12,16 11:2 12:6,8 14:3,12,13 15:17,21 18:3 45:22 66:21 67:18 73:10 98:4
**neurosurgical** 10:6 15:22 18:4 27:18 66:24 96:22 97:10
**never** 45:4 54:24 63:10 69:18 83:3,7 100:14,15 106:12 107:4 109:14 112:16 134:22
**nevertheless** 105:20
**new** 1:3,16 2:5,5,8,9,11,14 15:2 33:25 80:8 85:14 96:21 97:23

152:13
**newborn** 45:17
**newborns** 45:10,12
**nice** 146:5,17
**NICU** 26:25 136:7
**night** 15:8
**nine** 49:21 63:25 86:11 121:17
  130:10,11,13 136:3,4
**ninety-** 120:17
**ninety-fifth** 121:17 143:3
**non-accidental** 28:4 29:16,22,24
  107:19
**NON-PARTY** 1:19
**non-specific** 141:7
**non-surgical** 12:14 81:11
**nonsense** 137:5
**normal** 45:10 49:18,23 57:2
  76:19 121:2,11,11,15 136:4,8
  136:18,19 141:12 142:24
**normally** 22:7 49:17
**NORTHERN** 1:3
**notary** 5:12 150:12 152:9
**notation** 99:8
**note** 17:6,11,20,24 18:6,8 20:8
  22:24 24:9 25:24 26:10 31:18
  31:19 36:14 94:13,22 101:21
  125:9 143:22 145:10,14
**noted** 26:23 43:7 124:25 150:5,7
**notes** 17:13,17 101:8
**notice** 8:20 75:10
**number** 13:25 16:25 22:17 53:2
  68:5 108:6 111:10 151:10
  152:4
**numbers** 17:3 127:10
**nurse** 33:24,24
**NY** 2:10

---

**O**

**O** 3:2,2
**O.S.H** 19:7
**oath** 41:17
**object** 45:13 46:18,19 47:15
  50:23,24 51:2 52:16,17 53:23
  58:12,13 59:15 64:6 65:3,4,5
  65:16 66:2 67:19 68:16,17
  70:20,21 71:5 74:23 75:2 78:8
  79:3 90:23 91:3,4 92:6,7,11
  113:8 115:5 144:2,20 145:2
**objecting** 89:21
**objection** 8:20 30:4,25 45:14

46:23 47:24,25 70:7 72:25
  89:17 94:23 104:11 109:23
  111:20 116:15 118:12,15 125:6
  125:6,9 129:17 140:7
**objections** 5:7 7:14
**observations** 16:18
**observed** 136:7
**obvious** 73:24
**obviously** 53:10 84:24
**occasional** 127:11
**occasionally** 60:9
**occipital** 126:14
**occluded** 109:3
**occupies** 49:24
**occur** 22:17 52:24 54:15 83:5
  103:24 105:4,11,20 109:4
  128:13
**occurred** 28:3 103:7 108:15,17
  113:6 114:6
**occurring** 106:10
**occurs** 71:19
**October** 1:21 90:9
**offer** 40:11
**office** 2:10 140:5,10
**officers** 2:6 9:8 32:7
**official** 71:18 72:4
**officially** 69:4
**oftentimes** 66:24
**oh** 19:20 24:13 120:11 126:19,22
  126:22,22 131:22 141:6 148:13
**okay** 6:4,15,17 8:4,23 9:13
  15:20 16:25 17:16,19,21 18:16
  18:20 19:6,10 22:23 24:12
  25:13,23,25 26:16 27:21 30:10
  32:22 34:7 35:16 39:3 41:10
  42:2,7,19,22 43:2,12,22 44:5
  44:16,22 45:2 47:16 49:11
  50:11 51:6,11 56:9 57:13,19
  58:18 59:10 60:11 61:3,21
  62:3,16 63:21 64:21 65:24
  66:16 67:6,11,23 68:8,9 69:8
  69:22 70:12 72:9 75:10 76:9
  76:21 77:23 79:8,14,16 80:20
  85:15 86:5,13 87:2,10 88:6
  90:16 91:16 94:24 99:7 100:8
  103:25 104:24 106:17 110:5,5
  111:2 115:23 118:9 119:12,18
  119:25 120:7,12,13 121:18,22
  122:2,6,7,7,9 123:14,19,20,22
  123:24 124:4 126:5,6,8,17,22

126:23,24,24 127:5,8,17,20
128:11 129:10,10,21 130:15,23
130:25 131:17,21,24,25 132:12
132:16 134:2,3 137:6,17 138:6
138:18 140:14 141:6 142:14
143:11,21 144:14,23 145:20,24
146:11,25 147:3,18,19,23
148:7,13,24 149:3,4,13,18
**old** 18:21 26:18 55:12,20,20
85:13 112:3 113:11
**older** 21:23 80:9 105:21 130:21
131:13 141:20
**once** 23:12 88:24 90:14 97:15
**onset** 53:2
**open** 21:20 22:3
**opening** 20:5 128:8,21
**operate** 12:18
**operation** 12:16
**ophthalmic** 139:9
**ophthalmologist** 29:5
**ophthalmology** 24:17 25:20 27:9
27:10
**opining** 89:19
**opinion** 25:21 34:17 35:10,14
37:3,8 52:13 63:15 64:24 65:8
65:21 66:10 79:6 83:8 93:19
94:18,19 95:6 111:6 112:24
116:13 118:7 120:20 125:19
129:12,19 130:5,9 143:20
**opinions** 115:13
**opportunity** 16:10 40:6,7 45:11
92:14 118:10 133:5,17
**opposed** 108:24
**optic** 130:18,21 131:11
**option** 7:20 8:17 81:9
**order** 73:7,15 95:12 113:4
**ordering** 71:17 73:8
**organ** 52:22
**organization** 13:23
**organizations** 14:2
**original** 5:13,17
**orthopedic** 81:21
**outer** 56:11 108:22
**outside** 19:7,8 23:21 24:2
**overall** 56:16 135:13
**overwhelming** 79:2
**oxygen** 136:5,6

**P**

**P** 1:13 3:2

**P.C** 2:13
**p.m** 1:22 61:23 138:20,21 149:19
**P.T** 123:5
**page** 17:10 42:4 68:2,5 85:10
88:11,12,13 90:7 112:8 119:19
119:20 120:2,10 123:21 124:11
124:11 126:21 151:6
**pages** 17:3 42:4 151:10
**painful** 27:8
**pains** 27:8
**papers** 12:2
**paragraph** 33:8
**parenchymal** 126:15
**parent** 53:8
**parenthesis** 26:20,20 27:4,16,17
**parents** 113:6
**part** 11:23 18:11 34:21 46:2
56:23 62:14 67:24 92:15 96:19
96:21 104:18 111:24 120:9
121:5 127:18
**particular** 22:3 49:4
**particularly** 56:9 93:22 94:10
96:13 108:11 120:16
**parties** 5:4 152:10
**partner** 123:15
**partners** 12:25 16:3
**pass** 56:13 75:25
**pathognomonic** 29:15
**pathologists** 79:11
**pathology** 126:8
**paths** 113:25
**patient** 12:16 13:12 14:15 15:10
16:8,18 18:5 20:6,6,7,18
27:11,15,22,24 28:17 31:23
32:24 33:25 34:2,5 44:9 47:11
52:11 64:18 66:8,22 69:24
70:2 72:3,11 73:19 74:11,12
74:17 75:9 82:11 93:16 99:16
100:4 101:20 135:18
**patient's** 16:19
**patients** 11:22,22 12:10,17,20
12:23,25 13:2,18 16:9 58:19
58:24,25 59:5,23 69:7 82:21
82:22 98:11 105:16 109:7
**PATTISON** 2:6 152:12
**PDF** 87:13
**Peck** 2:13,13 3:6 6:25 7:5,7,9
7:12,25 8:5,8,21 39:16 45:14
46:19,23 47:15,25 50:24 52:4
52:8,17 58:13 59:15 65:5 75:2

79:19 80:3,15 85:15,25 86:5
89:23 90:4,13,24 91:4 92:7,11
94:5 95:23 96:3,5 104:13,20
104:25 110:4 111:22 113:18
115:10 116:8 143:6 146:16
**pediatric** 10:12,16 12:6,7,24
13:2 14:3,12 15:4,5 16:8,9
18:25 67:6 76:7 121:3,5,9
142:16
**pending** 94:20 101:22
**people** 73:14 95:25 109:10
111:10 122:18
**percent** 59:21 81:15 98:16 99:14
136:22
**percentage** 136:19
**percentile** 120:18 121:17 142:21
142:23 143:3
**perform** 15:24 82:15
**performed** 104:9
**period** 11:4 26:22 34:14,19
96:23 132:2
**periods** 125:5
**peripheral** 12:12
**periphery** 29:13
**permanent** 122:23
**perpetrator** 134:12 135:11
**person** 39:8 139:25 141:20
143:15
**person's** 148:2
**personally** 44:8 75:18,21 98:11
140:6
**pertinent** 73:14 92:16
**petechial** 122:21
**pharmaceutical** 13:16
**phone** 139:25 140:6
**photos** 86:14,20 87:8
**phrase** 152:15,16,17,18,19,20,21
**physical** 101:2
**physically** 16:11
**physician** 11:2,16,18 15:16
71:17
**physicians** 72:2
**physiologically** 69:11
**pic** 89:3
**pick** 12:20
**picking** 30:19
**pictures** 87:11,19 89:3
**PICU** 31:22,23 33:10
**piece** 77:24

**Pine** 2:14
**place** 49:25 50:18 75:12 99:23
115:3 127:14 150:5 151:5
**Plaintiff** 1:5 2:3
**Plan** 27:18
**planning** 101:21
**plans** 32:21
**platelet** 46:3 101:25 123:7,16
**plates** 21:20
**play** 8:13
**playback** 104:19
**played** 62:9
**Plaza** 2:14
**please** 9:17 19:24 46:9 47:19
52:4 62:5 64:14 79:24 94:22
104:14 118:20 120:5 122:6,7
123:23 125:13 128:11 129:10
137:22 150:6 152:8,9
**plot** 142:18
**plus** 20:13,13
**pneumococcal** 51:7,14,25 52:12
**pneumoencephalo** 97:12
**pneumoencephalography** 97:8
**pneumonia** 63:24 64:18,23 131:23
132:11
**point** 14:4 23:9 28:8 41:25
99:15 102:4 120:15 121:13,15
121:25 141:24
**poisoning** 22:20
**police** 2:6 9:7 31:10 32:3,6,7,9
32:13 33:9 36:11,17,20 37:2
37:15 111:19
**Poor** 24:12
**populations** 12:24
**portion** 25:12 57:11 90:15,24
**portions** 8:13 90:7 126:9
**pos** 131:23
**pose** 85:21
**posed** 9:19
**posit** 85:21 90:20
**positing** 57:21
**position** 11:13 27:6 85:23
120:20
**positive** 51:14 63:23 64:17
132:11
**positively** 135:10
**possibility** 25:8 107:8
**possible** 20:11 34:14 47:16 53:3
69:23 70:10 87:23 106:21
123:11

Case 1:17-cv-00626-DJS Document 66-31/12/2024 Filed 06/14/21 Page 176 of 189

**possibly** 20:18 76:23 100:20
 116:3
**post** 19:2 86:3
**potential** 31:10 63:15
**potentially** 25:4 81:16,17 103:9
 117:6
**practice** 11:21 12:3,19 96:19
**practiced** 145:20
**practicing** 10:17 146:6
**pre-C.T** 97:3
**precipitate** 53:8
**precisely** 30:2
**predominantly** 13:2 55:6 72:17
 78:15 130:12,17
**preemie** 18:23
**preliminary** 71:14
**premature** 19:2
**premise** 89:17,21
**premium** 19:2
**prep** 140:4,5
**preparation** 75:11 133:25
**prepare** 42:14
**prepared** 66:14 151:11
**preparing** 139:24
**presence** 61:5 151:5 152:8
**present** 18:21 46:14 82:24,24
 96:5 134:13 140:3,4
**presentation** 26:6 63:24 131:24
**presented** 16:14 26:15 37:14
 135:19
**Presenting** 19:9
**pressure** 19:25 21:8,14 24:15
 35:24 61:7,14 65:22 66:11
 116:19 117:4,15 127:5,7,21
 128:18,24 129:18 130:2,7
**pretty** 12:19 141:19
**previous** 139:3
**previously** 10:24 25:2,16 42:23
 43:7 119:5
**primary** 15:16 53:12
**printed** 71:22
**prior** 10:23 36:9,13 40:8 51:17
 96:11 114:10 119:5 139:16
**privilege** 140:8,10
**probably** 14:4,6 18:24 31:20
 77:11 93:24 100:15 103:15
 113:24 121:20 123:17
**problem** 110:10 134:14 136:10
**problematic** 18:18

**problems** 12:10,11,23 52:22 53:4
 81:12,15,23,23,24 82:12 97:13
 136:7
**procedure** 5:5 83:17
**procedures** 97:9
**proceed** 7:12 61:25
**process** 32:11 117:18
**product** 86:8
**professional** 13:5,23
**professor** 10:25 11:7,7,8,8,15
**profound** 29:14
**program** 10:6
**project** 50:10
**prompted** 136:12
**pronouncement** 104:8
**proper** 70:23
**prosecutor's** 140:10
**protect** 52:21
**Protective** 24:20,23
**protein** 47:22 54:20 102:15
**proteome** 123:5
**protocols** 82:14
**proved** 51:20
**provide** 79:24 118:6
**provided** 28:21 37:18 40:21
 151:13
**proximity** 103:13
**psychology** 10:3
**public** 5:12 150:12 152:9
**publications** 13:6
**publicly** 7:15
**publish** 84:22
**publishing** 13:5
**pull** 48:25 79:25 80:21,22 99:17
 99:18 115:14
**pulled** 99:22
**punctures** 122:18
**Pupils** 27:6
**purpose** 107:22
**purposes** 8:9 64:21 69:4 83:14
**pursuant** 5:6
**pus** 47:22 48:5,10 76:22 100:20
 100:23
**push** 110:20
**pushed** 21:10
**pushing** 22:11 128:7
**put** 6:15 19:3 23:11 36:3 37:8
 73:13,13 85:3,7 93:9 101:3
 122:8 124:7 126:7 144:9

800.523.7887 Associated Reporters Int'l., Inc.

**putting** 48:7 103:8

---

**Q**

**quali** 75:17
**qualifying** 75:17
**question** 7:13 9:16,16,19 18:14
  26:11 27:5 32:8 34:22 35:12
  47:12 50:16 54:5 58:25 62:5
  62:11,15 63:18 64:14,22 70:9
  70:23 74:24 75:16 79:24 80:16
  80:17 81:25 89:14,18,18 90:19
  94:23 95:7 102:6,23 104:14
  109:17 110:15 111:25 114:23
  137:24 145:13
**questionable** 20:20
**questioning** 111:21 143:6
**questions** 5:8 9:12 39:4,6,13
  83:11 95:11,18 96:8 98:12
  100:19 116:6,9 132:25 133:5
  134:4 137:7,20 139:4,12
  146:15,17 149:12
**quick** 61:19
**quite** 23:8 25:11 43:10 46:12
  91:9,9 104:18
**quote** 134:15

---

**R**

**R** 1:7 3:2
**radiological** 73:7 131:5
**radiologist** 66:14,17 68:19
  70:12 71:12 73:9,18 98:13
  99:5 100:11
**radiologist's** 69:9 100:15,16
**radiologists** 73:3 98:2 99:9
**radiology** 67:16 68:13 71:3 82:7
  97:25,25 98:3,13 99:25
**raging** 73:20
**raise** 6:18,19 105:14
**raised** 7:13
**random** 13:5
**range** 142:24
**rapid** 30:20
**rapidly** 21:21 30:21 109:4
**rare** 37:24 109:14
**rarely** 82:10 105:12 146:10
**rate** 142:24
**re-discussing** 99:9
**reach** 144:16
**read** 5:10 18:17,18 19:8,10 20:2
  20:19,20 24:13 34:24 62:4

68:24 69:3,4 79:13 80:14 84:5
84:16,22 88:12,14,17 101:20
104:14 118:5 131:2,15,18
150:4 152:8
**reading** 42:24 63:23 71:18 84:13
  84:15 90:9 96:14,18 98:14,21
  125:15 146:9
**ready** 61:24
**real** 8:12 144:7
**realistic** 144:18
**realistically** 107:17
**really** 31:17 32:8 114:20 115:2
**reason** 41:7 43:13 44:16 105:21
**reasonable** 31:20 38:3 143:14
**recall** 36:25 37:22 38:14 41:5
  41:24 42:17,24 45:6,19 46:3,4
  48:20,21 54:11 55:14,17 58:20
  58:22 64:20 99:3 101:7 115:20
  135:24 139:5,21,24 140:15
  141:3,5 144:4
**received** 63:10 136:5
**recitation** 93:23
**recollect** 37:5 120:23
**recollection** 11:9 31:16,25 32:7
  32:16 36:15,19,22 37:6 38:8
  38:19 41:18 42:23 44:14,19
  50:3,17,17 51:4,16,17,20 52:3
  63:13 64:9,19 79:21 80:13
  93:4 94:7 99:6 100:12 112:16
  113:21 114:4 133:22 139:18
  140:11
**record** 6:3 7:19 9:13 36:21 38:7
  61:19,22,23 68:5 75:11,25
  76:8,13 80:5 84:9 99:11 119:2
  120:24 121:5 122:25 138:19,20
  138:21,23 149:19 150:4 151:11
**recorded** 7:20,24 8:6,9
**recording** 7:14 8:12
**records** 45:24 71:25,25 135:21
**Recross** 3:9 139:13
**red** 48:5
**Redirect** 3:8 138:25
**reduces** 56:16
**reducing** 57:7
**refer** 18:11
**reference** 80:16 134:16
**referenced** 76:12
**referencing** 80:18,19
**referred** 24:19 27:12 106:16

**referring** 21:15 131:19
**refers** 126:24
**reflected** 17:24
**reflection** 48:18 127:4 129:6
  141:11 142:2
**reflexive** 27:11
**refresh** 42:22 44:23
**regard** 10:20 17:23 18:15 27:22
  32:4 37:11,17 38:13 45:2
  52:14 59:10 120:20
**regarding** 31:14 69:6 122:24
  135:14,25 143:6
**regards** 36:17 37:3 41:4 143:5
**relate** 12:11 75:8
**related** 13:20 66:11 69:15 83:2
  128:23 129:12,19,23,25 130:7
  137:4
**relative** 93:24
**relevant** 42:10 94:10
**relied** 100:15
**reluctant** 73:3
**remains** 118:25
**remem** 135:24
**remember** 10:8 11:9 35:9 49:7,10
  52:2 67:8 75:16 82:17 91:5,9
  101:23 103:15 104:17 123:4,7
  132:6 140:12 145:8
**remotely** 54:24 69:21
**render** 28:11
**rendered** 93:20,21
**rendering** 37:3
**RENSSELAER** 1:9
**repeat** 34:21 35:10 52:5 55:16
  64:14 110:14,15
**repeated** 125:4
**rephrase** 9:17
**report** 4:7 33:4,25 42:11 45:20
  51:24 66:13 67:24 68:21 69:9
  71:4,10,14 72:4,7,23 75:22
  76:12 79:12,25 84:11 86:2,15
  89:24 94:21 100:15,16 113:16
  118:6 119:4,5 132:9,24 134:19
  135:18 140:22
**reported** 63:20 106:12 108:7
  112:20
**reporter** 6:4,9,13,17 7:10,24
  8:3,9 35:2,4 52:6,7,9 61:21
  62:4,6,8,10,16,18,19,22
  104:15,16 118:22 119:16 133:9
  137:10,14,18 138:18,22 146:21

146:25 147:3,6,11,14,18,20,23
  148:2,7,9,13,19,24 149:3,5,9
  149:13,16 151:15
**Reporters** 151:12 152:2
**reports** 13:11 90:2 108:6 135:19
**represent** 39:23 63:22
**representation** 64:4
**request** 7:18 32:3 33:8 35:4
  52:7 62:8,18 73:12 104:16
**requested** 63:9 89:12
**requesting** 73:12
**require** 9:12 12:13 66:24 82:15
**required** 52:23 82:18 111:5
**requirements** 11:24
**requires** 12:16 25:8
**research** 13:14,15,20
**resemble** 49:23 55:13,18,19
**resembling** 45:4 57:4
**reserved** 5:9
**residency** 10:6
**resident** 18:9,13 19:4 71:12
  97:10
**resident's** 101:21
**residents** 11:24 18:5,25 76:7
**resolved** 136:23
**resolving** 127:9 131:9,11
**respective** 5:4
**respirations** 27:7
**respiratory** 52:22
**respond** 133:6
**responded** 33:10
**responding** 132:25 133:5
**response** 9:12 20:5 52:5
**responses** 20:9
**responsibilities** 11:19
**responsiveness** 5:8
**rest** 22:24
**restart** 73:6
**restate** 105:11
**restroom** 137:22 138:3,7
**result** 103:7 106:10 117:24
  129:15
**retina** 29:14 130:16
**retinal** 25:21 27:9 29:4,7,9,9
  29:12,21 59:11,13,16,23 60:2
  72:16 112:24 130:16,19 131:12
  139:9
**retinas** 60:5
**retired** 10:22 11:12 145:16,16
  145:18

**Return** 152:11
**returned** 5:15
**revealed** 28:24 29:2
**review** 28:16 38:2,7 40:7,8,21
  40:22 41:14 43:8 72:12,14
  86:2 89:9 94:17,20 98:11
  133:24
**reviewed** 42:13,17 43:15 44:8,22
  48:24 75:20,21 79:12 89:11
  90:20 98:25 134:24 135:20,20
  144:5 145:7
**reviewing** 49:9 120:23 141:5
**right** 6:18,19 9:15 15:24 18:10
  20:2,10 22:9 23:10 25:15 26:4
  26:13 31:5 33:12 35:16 47:9
  48:13 49:4 55:22 58:9 62:6
  68:15 69:5,14,24 70:9 72:22
  75:24 77:4 78:24 85:12 86:7
  87:20,24 88:16,19,25 90:6,15
  90:24 91:7,7,20 93:2,5,6,18
  94:14 100:11 101:14 115:6,25
  118:10 123:21,24 124:11,14,18
  126:7,9,23 129:24 130:9,11,11
  134:3 137:16 138:13,14 140:11
  141:2 143:17 148:6
**right-hand** 16:23
**RIGHTS** 2:3
**Robin** 127:12
**roll** 109:11
**Ron** 33:10 147:7
**RONALD** 1:8
**rotate** 15:13
**rotated** 96:24
**rule** 73:16 82:22
**Rules** 5:5

---

**S**

**S** 3:2
**S-U-T-T-O-N** 147:7
**S.D.H** 19:15
**S.W** 33:9,12,23
**Samaritan** 15:2 26:19 34:9 51:19
**SAMPSON** 2:6 152:12
**sanitizing** 60:9
**saw** 11:21 16:4 23:15 26:16
  43:10 55:24 60:4 71:10 72:6
  77:9 79:18 90:21 91:2 92:16
  92:20 100:14,16 101:19 124:7
  135:17
**saying** 17:8 25:3,17 55:14,17

57:9 58:20 69:11 74:5,6,7
  75:5,7 90:5 109:13 117:19
  137:16
**says** 18:20 19:13 20:19 21:6
  22:25 77:7 84:4,7,8 87:21,22
  92:4 125:5,17 130:12
**scalp** 27:5 124:5,15,21 126:4
**scan** 23:10,15,16 27:12 28:16
  29:2 34:10,12 35:21 42:8 45:5
  45:17,21 47:3 48:3,8,11,16
  49:18 54:18 58:7 71:8 72:15
  72:18 73:8,15,24 74:16,18
  77:9 81:5 91:6 93:21 97:3,15
  98:10 99:18,22,24 100:5,14,19
  100:23 101:2 114:15,18 116:17
  133:7,25 136:13
**scans** 35:18 45:11 55:9 96:14,18
  97:16 98:24 99:5 133:2
**scenario** 99:13 110:6
**scenarios** 22:18
**schedule** 9:5
**score** 20:3,10,12,14 143:8
**scores** 136:3
**screaming** 53:6
**screen** 22:6 85:4,8 86:4,4 87:4
  87:5,7,14 92:15 93:10 118:20
  129:8 132:24
**scroll** 86:14 87:24 119:25 122:6
  122:7 123:20,20,20,23,23,23
  123:24 128:11 129:10 132:13
**scrolling** 120:3
**second** 28:23 41:21 43:10 47:19
  62:17 80:25 85:25 97:17 120:2
  139:20
**secondarily** 103:24
**secondary** 27:2 52:24 83:9
  115:19 116:24 128:4,6,23
**section** 18:9 33:21,23 34:6
  85:14 86:21 88:20 124:15
  139:3
**see** 6:5,8,10 18:5 29:20 33:7,11
  43:16 45:9,9,11 49:17 50:10
  50:12,14 63:19 73:25 79:10,12
  79:15 80:19,24 82:21 83:20
  84:11,19 86:10,20,21,22 87:2
  93:25 94:11 95:12,15,16 99:21
  99:24 100:3 102:25 107:23
  109:10 120:9 121:14,21 128:2
  128:20 130:10 132:13 133:3,7
  133:7,18 142:19

Case 1:17-cv-00626-DLS Document 66-9 Filed 08/17/2024 Page 180 of 189

**APPENDIX**

**1470**

800.523.7887

Associated Reporters Int'l., Inc.

Page 179

**seeing** 23:21 52:2 66:8 93:16,22 98:12,17 99:4

**seen** 14:25 19:4 27:6,11,14 36:23 45:4 54:24 60:5 69:18 72:4 83:4,7 100:5 102:4,9 113:6 118:25 121:7,8 123:12

**sees** 69:10

**seizures** 82:12 136:11

**send** 88:8,25

**sense** 40:17 128:10

**sent** 71:22 102:10,11

**sentence** 32:24

**separate** 78:11 146:6

**separation** 27:13

**sepsis** 64:23 66:6 79:2 106:13 116:22 117:10,14,15,24 118:2 124:25 125:20,21 128:13 129:24 141:25

**September** 11:14,20 12:4 14:7,21 26:17 32:14 34:20 43:6 44:10 44:11,12,13 104:8,9,22,23

**series** 9:11 134:19

**serious** 38:16

**seriously** 71:10 114:3

**serve** 11:5

**services** 24:20,23 26:24

**set** 118:23 138:22

**seven** 26:3 43:18

**seventy** 19:25

**seventy-** 90:7

**seventy-three** 85:10

**severe** 37:25 88:15 112:22 127:19 128:3,24 130:16,19,20 130:24 131:2,4

**shade** 47:21

**shake** 106:4

**shaking** 30:20

**shapes** 60:2

**share** 79:25 86:4 118:20

**shared** 31:23

**sharing** 132:24

**sharp** 13:16 108:13

**sheaths** 131:11

**sheet** 150:8

**short** 58:19,24 59:5,6 106:25 107:8,9,9

**shortfall** 107:7

**shortfalls** 108:4 109:6

**show** 57:17 79:25 88:20 95:16 119:18 133:2,15

**showed** 34:13 45:18 49:5 54:8 55:3

**showing** 21:25 49:3,22 77:2 81:4 100:20 119:3

**shown** 29:11

**shows** 47:3

**shrinks** 105:22

**sick** 10:12 53:5 125:22

**side** 49:4 54:10 79:18 80:9,10 84:4,8 89:20 91:8,14,15,18,20 92:2,2 93:6 126:16,18

**sides** 87:20 91:21 92:10

**sign** 5:11 61:4 152:8,10

**signal** 93:4

**signature** 152:11

**signed** 5:14 27:20 152:23

**significance** 19:22 23:4 29:6 72:20,24 122:10

**significant** 21:5 24:8 37:25 104:10,21 108:21 112:10

**signs** 70:3

**Sikirica** 1:10 2:12 63:7 64:22 79:16 80:8 83:21,25 84:2 85:21,23 89:19 90:3,5,11,21 96:6 113:20,23 114:8,12 139:25 140:6

**Sikirica's** 63:9 79:11 81:5 118:6 125:8

**similar** 30:23

**simple** 23:8 110:18

**simply** 142:2

**single** 24:2 98:9

**sir** 6:5,12,19 62:20 140:25

**sit** 139:17

**sitting** 147:24

**situation** 117:13

**six** 17:18 26:2,3 49:21 136:3

**sixty** 17:10

**size** 54:25 69:21 83:6 141:11

**skeletal** 24:18 25:19 27:19 43:14,20 44:3 75:22

**skin** 103:8 122:18,23

**skip** 19:22 26:7 87:18

**skull** 34:14 38:16 75:13,15,19 75:20,23 76:2 97:6 105:23,25 108:7,13,14,16 113:11 131:8 140:15,19

**slash** 19:14 20:2 23:2 32:25

**slide** 50:13 124:15 125:2 127:9 127:17 130:10

800.523.7887

Associated Reporters Int'l., Inc.

slightly 72:22
slowly 105:18
small 18:9 86:18 108:6
smashing 30:19 110:8
sneeze 106:4 107:3
sneezing 105:15,20 107:5
social 33:12
sofa 107:16
soft 20:22
solely 128:13
somebody 101:19 112:4
someone's 76:3 142:20
somewhat 105:19
soon 74:25 137:16
sorry 17:10 30:8 44:12 47:19
  55:15 58:23 61:16 77:14,14
  81:19 97:23 110:14 115:15
  117:22 129:5 133:10
sort 21:24 92:5
sound 144:17,18
sounds 38:3,19 146:5
source 63:5
space 23:21 24:2 54:9,10,16,19
  56:13 61:6 77:3 83:12 91:13
  91:13 101:12,12 102:14,15
  108:16,18 114:14 127:13,14,14
  142:3,6,12
spaces 105:22 127:13,13 128:7
  142:8
speak 94:4
speaking 32:7 113:22
specialty 12:4
specific 28:19 31:16 59:12
  68:12 73:3,23 96:23 97:24
  115:15 134:16,23 144:4
specifically 35:20 67:10 70:14
specify 23:25
speculating 53:10 121:8
speculation 104:12
speed 73:20
spellings 146:22
spiel 8:24
spinal 12:12 23:18 49:23 55:13
  55:18,21 56:12,16 57:6 58:16
  81:20,22 97:13
splayed 21:7 22:8 35:25
splaying 60:25
splitting 127:5 131:8 149:10
spoke 31:20,24 37:8 62:14
  112:16 140:2

spoken 113:19
spontaneous 27:7
spot 20:22
spread 21:11 22:4,5,6,8 35:25
  87:16
spreading 60:25
squished 127:21
staff 10:10 33:17 97:10
stage 106:18 117:2
stairs 109:12
stamp 17:24 32:20
stamped 16:22 24:10
standard 141:13
standards 142:17
standing 40:14 87:19 118:14
  125:9
stands 20:21 34:11
staph 64:12
staphylococcal 64:9
start 8:23 11:6 17:19 118:11
started 10:17 26:10 96:25
starting 9:25 103:22
state 1:16 2:9,10 6:7 34:2
  52:24 96:24 134:20 150:3
stated 9:4 38:10 39:22,22 41:17
  48:2 135:21 151:6
statement 38:5,21 85:21 134:6
states 1:2 32:23 33:4,8 34:8
stating 36:21 38:14
status 13:24,25
stay 26:25
stem 128:4
step 75:7
sterilize 103:11
stick 97:22 108:8
stimulation 27:8
STIPULATED 5:3,7,10,13
stipulations 5:2 7:2
stitches 21:16
stop 120:3 132:24
stopped 97:22
story 28:23
straight 119:11
Street 2:7 152:13
strep 64:11,23 131:23
streptococcus 51:21 63:24 64:8
  64:18
stretch 106:2 127:23
stretched 106:3

ARII@courtsteno.com

www.courtsteno.com

800.523.7887
Associated Reporters Int'l., Inc.

**stroke** 22:18 128:19
**stuck** 103:23
**students** 11:24
**studies** 24:16 101:22,24 107:24
  108:3 135:13 136:17 143:6,8
  143:17,19,21 144:10,24 145:9
  146:6
**study** 107:22 110:23 143:12,21
  144:4
**stuff** 118:16
**sub** 85:13 128:7 131:13
**Subacute** 56:25
**subarachnoid** 54:9 127:9,13,14
  127:16 131:10
**subdural** 19:15,19,20 21:9 23:3
  24:15 27:13,17,25 28:13,15
  29:3,15 32:25 34:18 35:11,14
  35:23 36:10 37:23 45:4,20
  46:6,16,22 47:3 48:15 50:22
  53:13 54:3,9,19,19,23 55:4,7
  55:23 56:3,13,23,24,25 57:12
  57:20 58:9 59:19,24 60:5
  63:16 64:25 65:22 66:6,12
  67:14 68:10,14 70:13,14,19
  71:3,8 72:10,23 73:17 74:6,20
  77:7,18 78:7,10,13,15 79:17
  80:9,9 83:4,12 84:7 85:14
  89:19 90:6,12,14,21 91:13,14
  91:14 92:25 93:8 94:8,13
  101:5,9,10,12,16,21 102:5,8
  102:24 105:4,16 106:6,8,9,10
  106:11,13 107:3,7,19,23 108:2
  108:16,25 109:8,10,12,22
  110:19 111:17 112:15,23
  114:13,14,19 115:17 116:5,14
  116:18 117:13 118:3,4 120:21
  121:13,21 123:12 125:23,23
  126:11 127:3,14 128:3,7 130:7
  130:13,14 131:4,5 133:21,23
  136:14,16,21 139:8 140:17
  141:22 142:10 143:23 144:25
**subdurals** 22:19 23:7 57:3 66:24
  122:5 126:20
**subgaleal** 84:6 124:13,16,17
  125:8,18 126:2 131:13
**subpoena** 5:6
**subpoenaed** 8:6 95:8
**subsequent** 65:10 118:3 121:3
**subsequently** 23:8 51:20 98:7

**substance** 37:23 115:19 138:11
**substantive** 62:5
**suddenly** 142:22
**suffered** 112:3 115:17
**suffering** 45:25
**suffice** 98:5
**sufficient** 40:2,5 109:13 111:17
**suggest** 27:19 28:2 59:17,18
  64:4 120:19 136:10 137:3
**suggestive** 21:4 57:12 141:25
**suggests** 142:24
**Suite** 2:14
**sum** 37:23
**supply** 127:24
**supporting** 136:25
**suppose** 106:21
**supposed** 68:20
**sure** 15:7,14 18:19 31:18 34:23
  39:25 40:4,18 46:11,24 47:14
  59:19 61:20 63:12 70:18 71:8
  86:3,6,24 95:14 126:23 132:18
  138:11 139:18,23 144:6 147:5
**surface** 30:20 105:23 109:20
  144:16
**surfaces** 143:9
**surgeons** 14:3,6 81:21
**surgeries** 11:22
**surgery** 10:7,25 12:17 93:17
**surgical** 12:13 66:25 81:9,13,14
  81:17,23,24
**surmise** 76:7
**surprise** 132:10
**surprised** 127:24
**surrounding** 49:22 130:18
**survey** 24:18 25:19 27:19 43:15
  43:20 44:3 75:22
**suspect** 34:15 121:4
**suspected** 82:2
**sustained** 15:19
**Sutton** 147:7
**suture** 20:25 21:16
**sutures** 21:6,11,19 27:13 35:25
  60:17,20,24 61:2 127:6 131:8
**swear** 6:19
**swell** 141:9
**swelling** 13:17,21 22:11,14,17
  27:6 61:4 140:15,16 141:8
**swing** 110:2
**switched** 87:10

swollen 21:8
sworn 3:3 6:24 7:11 150:11
 151:8
symptomatic 105:17
symptoms 136:24
syndrome 128:25
system 12:11 81:16

## T

T 4:2 20:5,11 68:6
T-A-I-N 147:10
table 108:12
take 12:10,25 16:7 59:16 72:5
 74:10 81:11 82:21 83:19
 109:25 117:12 120:5 137:21
taken 5:6 150:5 151:4
takes 142:5,12
talk 20:6 59:13
talked 44:19 49:2,21
talking 7:16 38:15 56:2 57:21
 85:9,13 88:21 93:19 98:23
 107:11,17,20 115:12
tap 24:15 83:12 101:12,16
 102:24 103:3,7,18
tapped 103:14
tapping 103:12
taps 101:22 102:5,8
taught 11:24 56:21
teaching 10:18
tear 106:5 108:23
tears 56:10 57:22 128:8
technically 107:3
techniques 97:23
technology 97:19
teensy 136:20
tell 9:21 16:13 18:13 20:24
 26:5 39:11 68:20 71:18 89:8
 97:15 100:22 101:3 112:10
 120:2 138:2
temporal 49:6
ten 54:8 130:10,11,14 144:16
tense 21:11
tentorium 127:22 128:22
term 21:19 60:24 68:12 77:19
terms 8:20 50:16,16 57:20 76:11
 81:18 82:2 122:15 140:14
test 44:3 73:7 123:12
tested 64:17
testified 45:3 58:14 59:3 65:8
 69:18 90:5,13,21 106:24 115:2

115:25 136:17 141:2
testify 40:25 96:17 111:10
 113:24 151:8
testifying 37:22 50:6 111:11
testimony 6:20 8:6 25:11 37:18
 38:3,19 40:8,13,20 41:11
 42:14,18 44:23 45:6 48:23,24
 49:8,10 54:9 79:22 80:13,16
 80:18,21 81:5 84:4,12 89:19
 90:2,8 96:11,16 111:24 112:8
 114:23 115:21 125:8 134:5
 139:19 140:14 141:5 150:5
 151:4,7 152:8
tests 123:6
thank 6:14,14 7:9 8:21,22 9:3
 10:20 22:23 30:4 39:3,24 52:8
 60:13 62:21 83:19,22 95:19,20
 99:2 104:24 129:21 134:10
 137:7,17 138:17,24 139:12
 142:14 146:11,13,17,18,19,20
 147:3
Thanks 89:2 95:23
theoretically 73:11
theory 57:24
therapy 122:8
they're 46:2
thickness 126:12
thing 31:17 38:3 52:25 58:11
 86:22 97:2,3,14 99:20 101:4
 120:13 135:13
things 11:25 22:17,20 43:2 47:7
 67:14,15 81:14 102:12 103:23
 104:5 117:5,11 128:17 142:12
think 14:21 15:12 16:4 17:9,9
 17:13 18:22 24:10 31:8,20
 41:8 42:25 44:17 50:9 55:12
 57:22 59:19 62:12,12 65:8
 67:2 68:6 72:19 75:5,14,19
 85:9 88:21 89:14,15,16,23
 94:10 95:14,17 99:13,20
 100:13,25 102:21 106:22 107:9
 107:18 111:14 115:25 116:23
 118:4,5 126:3 133:12,24 137:9
 146:10 147:4
thinks 93:12
third 32:24,24 97:17
thirty 20:2 26:17 152:9,10
thirty-six 18:22,25
thirty-two 18:23 19:3 120:25

800.523.7887

Associated Reporters Int'l., Inc.

**Thomas** 1:1,4,13 2:1 3:1 4:1 5:1
  6:1 7:1 8:1 9:1 10:1 11:1
  12:1 13:1 14:1,16,24 15:1
  16:1,11 17:1 18:1 19:1 20:1
  21:1 22:1 23:1 24:1 25:1 26:1
  27:1 28:1 29:1 30:1 31:1 32:1
  32:4 33:1 34:1 35:1 36:1 37:1
  37:19 38:1,14,15,25 39:1,23
  40:1 41:1 42:1 43:1 44:1 45:1
  45:25 46:1 47:1 48:1 49:1
  50:1 51:1 52:1 53:1 54:1 55:1
  56:1 57:1 58:1 59:1 60:1 61:1
  62:1 63:1 64:1 65:1 66:1,22
  67:1 68:1 69:1 70:1 71:1 72:1
  73:1 74:1 75:1 76:1 77:1 78:1
  79:1 80:1 81:1 82:1 83:1 84:1
  85:1 86:1 87:1 88:1 89:1 90:1
  91:1 92:1 93:1 94:1 95:1 96:1
  97:1 98:1 99:1 100:1 101:1
  102:1 103:1 104:1 105:1 106:1
  107:1 108:1 109:1 110:1 111:1
  112:1 113:1,20 114:1 115:1,16
  116:1,13 117:1 118:1 119:1
  120:1 121:1 122:1 123:1 124:1
  125:1 126:1 127:1 128:1 129:1
  130:1 131:1 132:1 133:1 134:1
  135:1 136:1 137:1 138:1 139:1
  140:1 141:1 142:1 143:1 144:1
  145:1 146:1 147:1 148:1 149:1
  150:1 151:1 152:1,4
**Thomas's** 45:5 60:4 114:25
  115:20
**thought** 27:24 59:4 76:2 125:13
  145:22
**thousand** 97:11,12 102:2
**thousands** 98:24,24
**three** 20:11,13 59:6 68:6 90:8
  102:12 107:11,12 126:11
  127:17 142:16
**threw** 135:11
**throw** 109:22 143:11 144:15
**thrown** 109:20
**throws** 143:7,9
**thumbnail** 87:7
**tightening** 126:25
**TIM** 1:8
**time** 1:22 5:6,15 9:5 11:4,20
  14:14 16:5,14 28:9 31:6 32:2
  32:9 34:19 39:24 40:2,5 41:9
  43:11 46:10 51:9 55:6,24 67:7

  67:8 71:9,14 72:5 77:12,16
  78:10,13,20,23 82:18 83:13
  92:20,24 93:8 94:7,8,11,12
  96:22,23 97:4,21 99:16,21,23
  101:9 102:4 103:3,4,13,14
  104:3,4 105:18 112:2,5 116:7
  120:5 121:14 125:24 132:2,11
  133:22 141:17 150:5 151:5
**times** 66:8 98:21 103:23
**tiny** 89:4 136:20
**tissues** 48:18
**title** 10:21,22,23,24 11:14
**today** 9:4 39:24 41:6 44:4 50:6
  63:5 84:16 89:10,10 96:12
  114:24 115:24 116:2 118:16
  119:8 139:16,17
**today's** 40:3,7 42:14 119:10
**top** 20:22 50:2,19 98:9 122:8
  126:8
**Toronto** 10:11
**total** 123:18
**totally** 130:23 141:7
**toxicology** 132:15,20
**toy** 108:12
**traditional** 147:21
**training** 10:6,16 68:24 96:12,18
  96:22,25 97:11,18,25 98:6
**trans** 119:15
**transcribed** 71:20
**transcript** 84:11,14 85:5 119:15
  150:6,8 152:8,10,11
**transcription** 151:10
**transcripts** 149:6,6,8
**transfer** 51:17
**transferred** 15:3 19:7,12 26:18
  34:9
**transition** 32:21
**transitioned** 11:10
**transpire** 8:16
**trauma** 12:15 13:14,18 22:14,21
  22:22 25:5 28:4 29:17,22,24
  52:20 53:20,21,21 54:5,6,7
  56:10 82:20,21,22 84:7 105:5
  105:12,13 106:7 112:4,15,19
  115:17 117:13 118:4 124:19,20
  124:25 126:4,4 128:16 129:14
  129:19 130:8,24 131:3,17
  135:22
**traumas** 125:4

ARII@courtsteno.com

www.courtsteno.com

**traumatic** 28:22 29:3 53:13,15
  53:16 54:3 59:24 101:5 124:23
**traumatically** 53:20
**treatment** 13:12 72:11 81:22
  93:13,15,20 95:2 125:24
  136:23
**treatments** 12:14 13:17,21
**trial** 5:9,16 8:13 38:10,15
  40:21 41:2,5,11,17,21 45:3
  48:20 58:18 113:24 139:19,24
  141:3 145:17
**trials** 40:9 96:17 115:14
**trick** 13:12
**tries** 135:11
**trips** 100:6
**Troy** 1:1,7 2:1,6,8 3:1 4:1 5:1
  6:1 7:1 8:1 9:1,7,10 10:1 11:1
  12:1 13:1 14:1 15:1,2 16:1
  17:1 18:1 19:1 20:1 21:1 22:1
  23:1 24:1 25:1 26:1 27:1 28:1
  29:1 30:1 31:1 32:1,3,13 33:1
  33:9 34:1 35:1 36:1,11,17
  37:1,2,15 38:1 39:1 40:1 41:1
  42:1 43:1 44:1 45:1 46:1 47:1
  48:1 49:1 50:1 51:1 52:1 53:1
  54:1 55:1 56:1 57:1 58:1 59:1
  60:1 61:1 62:1 63:1 64:1 65:1
  66:1 67:1 68:1 69:1 70:1 71:1
  72:1 73:1 74:1 75:1 76:1 77:1
  78:1 79:1 80:1 81:1 82:1 83:1
  84:1 85:1 86:1 87:1 88:1 89:1
  90:1 91:1 92:1 93:1 94:1 95:1
  96:1 97:1 98:1 99:1 100:1
  101:1 102:1 103:1 104:1 105:1
  106:1 107:1 108:1 109:1 110:1
  111:1 112:1 113:1 114:1 115:1
  116:1 117:1 118:1 119:1 120:1
  121:1 122:1 123:1 124:1 125:1
  126:1 127:1 128:1 129:1 130:1
  131:1 132:1 133:1 134:1 135:1
  136:1 137:1 138:1 139:1 140:1
  141:1 142:1 143:1 144:1 145:1
  146:1 147:1 148:1 149:1 150:1
  151:1 152:1,4,13
**true** 41:17 44:25 45:8,9 49:24
  50:17,18 54:4,13 56:22 57:13
  110:25 135:17 143:7 150:6,8
  151:11
**truth** 6:21,21,22 151:8,8,9

**truthfully** 40:25
**try** 12:17 23:7 103:11
**trying** 44:5 47:13 48:8 68:19,19
  68:23 84:6 115:14 125:19
**tumor** 74:7 142:11
**tumors** 22:18
**turn** 67:25
**turns** 75:18
**twelve** 26:17 124:15 125:2
  130:15
**twenty-** 49:2 68:6
**twenty-fifth** 142:21
**twenty-one** 63:25
**twin** 27:2 135:23
**two** 17:13 26:22 32:20 42:4 53:2
  53:3 66:8 97:9 98:15 100:6
  110:17 121:7,9 148:15
**two-captioned** 148:16
**two-day** 26:22
**type** 29:23,24 30:13,14 47:4
  82:25
**types** 51:8 53:7
**typewritten** 151:9
**typically** 54:20 55:9 66:19,20
  66:23 67:1 71:11 73:5,22
  81:7 82:3,20 100:13 108:5
  109:12,13 136:12

---

**U**

**Uh-huh** 103:10 107:14 117:9
**ultimately** 15:9 91:21
**ultrasound** 136:13
**unable** 133:6
**unaware** 106:12 112:19
**uncomfortable** 98:16 99:3
**uncommon** 57:5
**unconscious** 65:11
**understand** 9:17 35:17 46:24
  80:20 141:16,16 143:15
**understanding** 13:20 14:25 28:17
  38:22 59:2 64:2 75:25 78:25
  80:6,7
**unexpected** 131:25
**unfounded** 76:4
**unit** 15:5
**UNITED** 1:2
**universe** 44:6
**University** 10:2
**unresponsiveness** 26:23
**unwitnessed** 30:3 107:20 134:7

134:22
**upper** 16:22 132:3
**use** 25:6 60:23 77:19 99:25
138:3,7
**usual** 7:2 11:25
**usually** 49:24 67:16 71:12,15
83:6 105:17 107:10,12 109:3
127:20 134:12

## V

**v** 1:1,6,15 2:1 3:1 4:1 5:1 6:1
7:1 8:1 9:1 10:1 11:1 12:1
13:1 14:1 15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1 35:1 36:1
37:1 38:1 39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1 65:1 66:1
67:1 68:1 69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1 77:1 78:1
79:1 80:1 81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1 95:1 96:1
97:1 98:1 99:1 100:1 101:1
102:1 103:1 104:1 105:1 106:1
107:1 108:1 109:1 110:1 111:1
112:1 113:1 114:1 115:1 116:1
117:1 118:1 119:1 120:1 121:1
122:1 123:1 124:1 125:1 126:1
127:1 128:1 129:1 130:1 131:1
132:1 133:1 134:1 135:1 136:1
137:1 138:1 139:1 140:1 141:1
142:1 143:1 144:1 145:1 146:1
147:1 148:1 149:1 150:1 151:1
152:1,4
**vaginal** 45:5 135:24 136:20
**vaguely** 49:10
**variety** 22:19
**various** 20:4 48:4
**vast** 59:22,22 73:14 98:20
**vehicle** 73:21
**vein** 56:12
**veins** 56:13 105:24
**venous** 108:25
**ventilation** 52:23
**ventilator** 103:22
**ventricles** 126:25 127:2 142:8

**venue** 148:14
**verbal** 9:12 20:5
**verbiage** 72:22
**versus** 72:22 106:25 109:20
**vessel** 91:19 106:5
**vessels** 106:5 127:15,23 128:9
**video** 7:20 8:2,6,13 137:11
**view** 73:4
**viewing** 16:18
**violent** 30:20
**violently** 53:8
**Virchow** 127:12
**visit** 74:17 121:9 142:16
**visits** 121:3 142:22

## W

**wait** 39:8,15 95:24 143:2
**waive** 8:19
**Walden** 6:18
**Waldman** 1:1,20 2:1 3:1,3 4:1
5:1 6:1,11,16,19,23,24 7:1
8:1,5 9:1,23 10:1 11:1 12:1
13:1 14:1 15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1 35:1 36:1
37:1 38:1 39:1,21 40:1 41:1
42:1 43:1 44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1,7 82:1,23
83:1 84:1 85:1 86:1 87:1 88:1
89:1 90:1,18 91:1 92:1 93:1
94:1 95:1 96:1 97:1 98:1 99:1
100:1 101:1 102:1 103:1 104:1
105:1 106:1 107:1 108:1 109:1
110:1 111:1 112:1 113:1,19
114:1 115:1 116:1 117:1 118:1
119:1 120:1 121:1 122:1 123:1
124:1 125:1 126:1 127:1 128:1
129:1 130:1 131:1 132:1 133:1
134:1 135:1 136:1 137:1,13,14
138:1 139:1 140:1 141:1 142:1
143:1 144:1 145:1 146:1 147:1
147:24 148:1 149:1 150:1,4,10
151:1,4 152:1,5,7,23
**Waldman's** 8:18 137:11

800.523.7887                                    Associated Reporters Int'l., Inc.

**walk** 98:12
**wall** 110:3,8 135:12
**want** 7:15 17:2,4,6 18:11 26:7
  39:10,17 40:11,16 62:24 63:2
  76:14 79:23 80:21,22 83:19
  84:19 85:20,20,21,25 86:7,20
  86:21,22 88:2,11,17,19 89:18
  92:13,20 93:24 95:21,22 96:12
  115:11 120:3 124:4,5 130:10
  132:12 133:4,12 145:10 148:17
**wanted** 64:8 133:17 137:15
  145:14
**wasn't** 25:5 28:23 70:18 78:6,19
  103:17 118:12,16 122:3,4
  123:9 140:8
**watch** 60:9
**watery** 26:21
**way** 65:25 72:4 75:7 89:24 91:16
  97:4 98:19,20 100:4,9,22
  105:13 107:5 110:12 111:15
  114:12 120:18 129:3,8 147:14
**ways** 114:16 123:5
**we'll** 57:17 81:3 95:16 148:25
  149:2
**we're** 9:18 55:15 56:2 57:21
  75:5,6 85:6,9 88:21 95:2
  98:23 107:17,20 115:12 124:8
  126:23 132:19 138:18,22,22
  149:7,10
**we've** 23:7 89:23
**WebEx** 1:23
**week** 18:22,23 56:3 94:17 103:6
**weeks** 19:2 42:20 50:8,8 56:4
**weight** 27:3
**welcome** 52:9 62:22
**went** 10:2,4,11,14 62:12 99:21
  100:10 121:15 124:3
**weren't** 99:23
**West** 2:14
**whatnot** 81:6
**white** 47:22 48:5 55:10,23 56:5
  56:24 57:11,14,16 58:10
**window** 28:23
**wish** 41:5,22
**withdraw** 89:17 90:19
**withdrawn** 31:2 47:19 49:20
**witness** 5:10,14 6:24 7:10 30:10
  35:5,16 43:19 50:25 51:3 54:4
  60:11,15 80:16,17,19 84:10
  85:22 89:3 95:19 111:16

  113:15 115:6 118:25 119:3
  125:10 129:25 133:11 146:19
  146:24 147:2,4,9,12,17,19,22
  147:25 148:5
**witness(es)** 151:7
**witnessed** 105:14 109:6
**witnesses** 134:13
**witnessing** 113:16
**women** 138:9
**wondering** 110:6
**word** 59:20 77:21 111:24 115:15
  152:15,16,17,18,19,20,21
**words** 20:11 53:4 69:11 74:10
  80:11 82:6 103:5 107:12
  121:14
**work** 57:18 86:8 145:19
**worker** 33:13
**works** 72:5
**workup** 24:17,20 81:18
**worsening** 26:22
**wouldn't** 32:18 36:21 45:10,18
  46:8 101:13 105:14 114:8
  136:12 141:22
**write** 11:25 18:5 68:20
**write-up** 13:13
**writing** 13:5
**written** 18:8 44:15 87:18 88:11
**wrong** 80:7 85:14,15
**wrote** 18:25 31:18 42:4,5 78:21

|  | X |  |
|---|---|---|

**X** 3:2 4:2,2 150:9,12
**x-ray** 23:16 73:8
**x-rays** 23:16 97:6

|  | Y |  |
|---|---|---|

**Yale** 10:2
**yeah** 7:17 9:10 14:5 21:18 33:22
  33:23 34:7 35:2 52:6 58:5
  59:3 70:22 84:2,21 86:16 87:9
  87:15 88:3 92:19,22 95:20
  102:13 104:15,20 115:22
  119:21 120:8 122:6,9 123:24
  124:10 125:14 126:8,22 129:19
  130:25 132:5,16,21 135:7
  140:3,4 143:14
**year** 10:7 97:10,16,17
**years** 10:9 11:9,10 13:14 56:21
  112:3 145:7,7,7
**yesterday** 84:17

ARII@courtsteno.com                                www.courtsteno.com

800.523.7887

Associated Reporters Int'l., Inc.

**York** 1:3,16  2:5,5,8,9,11,14
  15:2  33:25  152:13
**young** 141:20
**Yup** 118:24

**Z**

**zero** 63:25  68:13  86:11  136:15
  140:11
**zone** 126:13

**0**

**1**

**1** 151:6,10
**1:40** 138:20
**1:48** 138:21
**10-19-20** 1:1  2:1  3:1  4:1  5:1
  6:1  7:1  8:1  9:1  10:1  11:1
  12:1  13:1  14:1  15:1  16:1  17:1
  18:1  19:1  20:1  21:1  22:1  23:1
  24:1  25:1  26:1  27:1  28:1  29:1
  30:1  31:1  32:1  33:1  34:1  35:1
  36:1  37:1  38:1  39:1  40:1  41:1
  42:1  43:1  44:1  45:1  46:1  47:1
  48:1  49:1  50:1  51:1  52:1  53:1
  54:1  55:1  56:1  57:1  58:1  59:1
  60:1  61:1  62:1  63:1  64:1  65:1
  66:1  67:1  68:1  69:1  70:1  71:1
  72:1  73:1  74:1  75:1  76:1  77:1
  78:1  79:1  80:1  81:1  82:1  83:1
  84:1  85:1  86:1  87:1  88:1  89:1
  90:1  91:1  92:1  93:1  94:1  95:1
  96:1  97:1  98:1  99:1  100:1
  101:1  102:1  103:1  104:1  105:1
  106:1  107:1  108:1  109:1  110:1
  111:1  112:1  113:1  114:1  115:1
  116:1  117:1  118:1  119:1  120:1
  121:1  122:1  123:1  124:1  125:1
  126:1  127:1  128:1  129:1  130:1
  131:1  132:1  133:1  134:1  135:1
  136:1  137:1  138:1  139:1  140:1
  141:1  142:1  143:1  144:1  145:1
  146:1  147:1  148:1  149:1  150:1
  151:1  152:1,5
**10:14** 1:22  6:3
**10007** 2:5
**10th** 90:8
**11:30** 61:22
**117** 3:7
**12:00** 61:23

**12180** 2:8  152:13
**12205** 2:14
**12224-0341** 2:11
**139** 3:8
**140** 3:9
**151** 151:10
**17-CV-626** 1:6
**19** 1:21  60:7
**1969** 10:3
**1973** 10:4
**1979** 11:11
**1st** 90:9

**2**

**2:01** 1:22  149:19
**2008** 11:14,20  12:4  14:7,22
  26:17  34:20
**2009** 40:8,21  41:5  44:23  96:16
  115:13
**2012** 11:12  145:19
**2014** 40:9  41:11  44:23  96:16
  111:24  112:8  115:14  145:17
**2019** 4:7  90:8,9
**2020** 1:21  150:11
**2110** 33:9
**21st** 15:8  16:6  32:14
**22** 2:7  4:7  152:13
**22nd** 14:21  16:6,12  26:16  34:20
  43:7  44:10,12
**23rd** 32:15  44:13  104:8,10,22
**25th** 104:9,10,23

**3**

**30** 152:9,10
**305** 2:4
**30th** 145:19

**4**

**40** 3:5

**5**

**507** 2:14
**523-7887** 152:2

**6**

**600** 2:4

**7**

**8**

800.523.7887

Associated Reporters Int'l., Inc.

**800** 152:2

---

**9**

**9** 3:4
**9/21/08** 35:12
**9/23/08** 43:25
**96** 3:6

EXHIBIT "H"

# APPENDIX

RECEIVED

FEB 08 2021

By

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ADRIAN THOMAS,

                Plaintiff,

    -against-

CITY OF TROY, ADAM R. MASON,
RONALD FOUNTAIN, TIM COLANERI,
RENSSELAER COUNTY, and MICHAEL SIKIRICA,

                Defendants.

**EXPERT WITNESS
DISCLOSURE**

Civil Case No.:  1:17-cv-626
(GTS/DJS)

       Defendant, Michael Sikirica, by and through his attorneys, Bailey, Johnson & Peck, P.C.,

as and for his Expert Witness Disclosure pursuant to Federal Rule of Civil Procedure

26(a)(2)(B), sets forth the following:

       1.     At the time of trial, Defendant Sikirica may call Michael M. Baden, MD, as an

expert witness to give testimony in this matter.  A copy of Dr. Baden's *curriculum vitae* is

annexed hereto as **Exhibit "A"** and is incorporated herein by reference.

       2.     It is expected that Dr. Baden's testimony at trial will be based upon his

background and education, as well as his experience and medical expertise and review of the

materials as outlined in the report authored by Dr. Baden which is annexed hereto as **Exhibit

"B"**.

       3.     Pursuant to F.R.C.P. 26(a)(2)(B)(6), Dr. Baden's statement of compensation to be

paid for the study and testimony in the case is as follows:  $8,500 for review of all materials and

preparation of report.  Thereafter, Dr. Baden charges an hourly rate of $850 for deposition, court

room testimony, and other out of court work.

       4.     Cases in which Dr. Baden has testified in the last four years are attached hereto as

**Exhibit "C"**.

# APPENDIX

**1482**

5. At the time of trial, Defendant may call Rudy V. Nydegger, Ph.D., ABPP, FNAP, PLLC, as a rebuttal expert witness to give testimony in this matter. A copy of Dr. Nydegger's *curriculum vitae* is annexed hereto as **Exhibit "D"** and is incorporated herein by reference.

6. It is expected that Dr. Nydegger's testimony at trial will be based upon his background and education, as well as his experience in the area of clinical psychology along with the materials he reviewed as outlined in the report authored by Dr. Nydegger which is annexed hereto as **Exhibit "E"**.

7. Pursuant to F.R.C.P. 26(a)(2)(B)(6), Dr. Nydegger's statement of compensation to be paid for the study and testimony in the case is as follows: $300 per hour inclusive of document review, report preparation, and deposition and court testimony.

8. Cases in which Dr. Nydegger has provided deposition or court testimony in the last four year include: *People v. Valdez*, New York State County Court, Fulton County (2018); Defense expert.

Dated: January 29, 2021

Bailey, Johnson & Peck, P.C.

By: *Crystal R. Peck*

Crystal R. Peck
*Attorneys for Defendant, Michael Sikirica*
5 Pine West Plaza, Suite 507
Washington Avenue Extension
Albany, NY 12205
(518) 456-0082

TO: Brett H. Klein
Brett H. Klein, Esq., PLLC
*Attorneys for Plaintiff*
305 Broadway, Suite 600
New York, NY 10007
(212) 335-0132
bklein@kleincivilrights.com

Rhiannon I. Spencer
Pattison, Sampson, Ginsberg & Griffin
*Attorneys for Defendants, City of Troy, Adam R. Mason, Ronald Fountain, Tim Colaneri*
22 First St.
P.O. Box 208
Troy, New York 12180
(518) 266-1001
Spencer@psgglaw.com

Case 1:17-cv-00626-DJS Document 34-17/4225-35 Filed 06/14/2146 Page 358 of 67

EXHIBIT "A"

## MICHAEL M. BADEN, M.D.

15 West 53rd Street, New York, New York 10019
Telephone: (212) 397-2732 • Facsimile: (212) 397-2754 • Email: mbaden@mac.com

### CURRICULUM VITAE

### EDUCATION

- The City College of New York      (1955) B.S. Degree
- New York University School of Medicine      (1959) M.D. Degree

### POST-GRADUATE TRAINING

| | |
|---|---|
| 1959-1960 | Intern, First (Columbia) Medical Division, Bellevue Hospital |
| 1960-1961 | Resident, First (Columbia) Medical Division, Bellevue Hospital |
| 1961-1963 | Resident, Pathology, Bellevue Hospital |
| 1963-1964 | Chief Resident, Pathology, Bellevue Hospital |

### LICENSURE

- New York State Medical License      (1960)
- Diplomate, National Board of Medical Examiner's      (1960)
- Diplomate, American Board of Pathology:
  - Anatomic Pathology      (1965)
  - Clinical Pathology      (1966)
  - Forensic Pathology      (1966)

12.9.2020

# APPENDIX

**1486**

## PROFESSIONAL POSITIONS

| | |
|---|---|
| 1985-2011 | Director, Medicolegal Investigations Unit, New York State Police |
| 1961-1985 | Office of Chief Medical Examiner, New York City; Chief Medical Examiner (1978-1979) |
| 1981-1983 | Deputy Chief Medical Examiner, Suffolk County, New York; Director of Laboratories, Suffolk County, New York |

## TEACHING APPOINTMENTS

| | |
|---|---|
| 1961-1989 | New York University School of Medicine, Associate Professor, Forensic Medicine |
| 1975-2001 | Visiting Professor of Pathology, Albert Einstein School of Medicine |
| 1975-1988 | Adjunct Professor of Law, New York Law School |
| 1975-1978 | Lecturer in Pathology, College of Physicians and Surgeons of Columbia University |
| 1986, 1989 | Visiting Professor, John Jay College of Criminal Justice |
| 1965-1978 | Assist Visiting Pathologist, Bellevue Hospital, New York |
| 2002 | Adjunct Lecturer, The Cyril H. Wecht Institute of Forensic Science and Law, Duquesne University School of Law |
| 2002 | Distinguished Professor/Adjunct Lecturer, Henry C. Lee Institute, University of New Haven (Connecticut) |

## GOVERNMENTAL APPOINTMENTS

| | |
|---|---|
| 1977-1979 | Chairman, Forensic Pathology Panel, United States Congress, Select Committee on Assassinations, Investigations into the deaths of President John F. Kennedy and Dr. Martin Luther King |
| 1973-Present | Member, New York State Correction Medical Review Board |
| 2015-Present | Member, New York State Justice Center for the Protection of People with Special Needs |

12.9.2020

# APPENDIX

1487

| | |
|---|---|
| 1976-2014 | Member, New York State Mental Hygiene Medical Review Board (*renamed* Justice Center for the Protection of People with Special Needs in 2015) |
| 1983-1986 | Member, National Crime Information Center, Committee on Missing Children, United States Department of Justice (F.B.I.) |
| 1971-1975 | Special Forensic Pathology Consultant, New York State Organized Crime Task Force (investigation of deaths at Attica Prison) |
| 1974-2006 | Director and/or Moderator, Annual Northeastern Seminar in Forensic Medicine, Colby College, Maine |
| 1973-1987 | Lecturer, Drug Enforcement Administration, Drug Law Enforcement Training School, United States Department of Justice |

## PROFESSIONAL ORGANIZATIONS

| | |
|---|---|
| 1966-Present | American Academy of Forensic Sciences; Fellow Vice President and Program Chairman (1982-1983) |
| 1965-Present | The Society of Medical Jurisprudence; Fellow, President (1981-1985) |
| 1966-Present | College of American Pathologist; Fellow, Chairman, Toxicology Subcommittee (1972-1974) |
| 1971-1975 | College of American Pathologists Foundation; Forensic Pathology Seminar Faculty |
| 1973-1976 | American Board of Pathology; Forensic Pathology Board Test Committee (1973-1976) |
| 1966-1986 | American Society of Clinical Pathologist; Fellow Member, Drug Abuse Task Force (1973-1977) |
| 1965-1978 | New York State Medical Society; Chairman, Section of Medicolegal and Workers' Compensation Matters (1972) |
| 1965-Present | Medical Society of the County of New York |

12.9.2020

| 1969-1978 | National Association of Medical Examiner's |
| 1965-Present | American Medical Association |

## HONORS

- The City College of New York: Senior Class President; Editor-in-Chief of The Campus (newspaper); Phi Beta Kappa

- Honor Legion, New York City Police Department, 1969

- College of American Pathologists, Certificate of Appreciation (Chairman, Toxicology Resource Committee, 1972-1975)

- American Academy of Forensic Sciences, Award of Merit, 1974 and 1983

- Drug Enforcement Administration, United States Department of Justice, Certificate of Appreciation, 1982

- New Jersey Narcotic Enforcement Officers Association, Certificate of Appreciation, 1977

- Fire Department of the City of New York, Certificate of Appreciation, 1978

- New York State Bar Association, Certificate of Appreciation, 1980

- New York City Health and Hospitals Corporation, Certificate of Appreciation for participation in development of emergency facilities for Emergency Medical Services for the City of New York, 1980

- New York University, Great Teacher, 1980

- First Fellow in Forensic Science of the University of New Haven, Henry C. Lee Institute, (Connecticut), 2002

- The City College of New York, Alumni Association, 2019 Townsend Harris Medalist Society

12.9.2020

PROFESSIONAL PUBLICATIONS AND PRESENTATIONS

1. M. Helpern and M. Baden; Editors: Atlas of Legal Medicine by Tomio Watanabe, Lippincott, 1968

2. D. Louria, M. Baden, et al.: The Dangerous Drug Problem. New York Medicine, 22:3, May 1966

3. D. Gold, P. Henkind, W. Sturner and M. Baden: Occulodermal Melanocytosis and Retinitis Pigmentosa. Am. J. of Ophthalmology, 63:271, 1967

4. B. Van Duuren, L. Lanseth, L. Orris, M. Baden and M. Kuschner: Carcinogenicity of Expoxides Lactones and Peroxy Compounds v. Subcutaneous Injection of Rats. J. Nat. Cancer Institute, 39:1213, 1967

5. M. Helpern and M. Baden: Patterns of Suicides and Homicides in New York City, Proceedings of the Seventh International Meeting of Legal Medicine (Budapest); October 1967

6. M. Baden: Pathology of Narcotic Addiction, Proceedings of the Sixth Latin American Congress of Pathology (San Juan, Puerto Rico); December 1967

7. M. Baden: The Diagnosis of Narcotism at Autopsy, Proceedings of the American Academy of Forensic Sciences (Chicago); February 1968

8 M. Baden: Medical Aspects of Drug Abuse, New York Medicine, 24:464, 1968

9. C. Cherubin, M. Baden, et al.: Infective Endocarditis in Narcotic Addicts. Ann. Int. Med., 69:1091, 1968.

10. M. Baden: Pathologic Aspects of Drug Abuse, Proceedings of the Committee on Problems of Drug Dependence, National Academy of Sciences, National Research Council, 1969.

11. W. Matusiak, L. Dal Cortivo and M. Baden: Analytical Problems on a Narcotic Addiction Laboratory, Proceedings of the American Academy of Forensic Sciences (Chicago), February 1969

12. M. Baden, P. Hushins and M. Helpern: The Laboratory for Addictive Drugs of the Office of Chief Medical Examiner of New York City, Proceedings of the International Conference on Poison Control (New York City), June 1969

12.9.2020

13. M. Baden, S. Hofstetter and T. Smith: Patterns of Suicide in New York City, Proceedings of the Fifth International Meeting of Forensic Sciences (Toronto), June 1969

14. R.W. Richter and M. Baden: Neurological Aspects of Heroin Addiction, Proceedings of the Ninth International Congress of Neurology (New York City), September 1969

15. R.W. Richter and M. Baden: Neurological Complications of Heroin Addiction. Transactions of the American Neurological Association

16. M. Baden: Of Drugs and Urine, Editorial, Medical Tribune

17. M. Baden: Methadone-Related Deaths in New York City, Proceedings of the Second National Conference on Methadone Treatment (New York City), October 1969. Int. J. Addictions.

18. M. Baden: Chairman, Workshop on Techniques for Detecting Drugs of Abuse, Proceedings of the Statewide Conference on Prevention Aspects of Treatment and Research in Drug Abuse. New York City Narcotics Addiction Control Commission, 1969.

19. M. Baden: Investigation of Deaths of Persons Using Methadone, Proceedings of the Committee on Problems on Drug Dependence. National Academy of Sciences National Research Council, 1970.

20. M. Baden: The Changing Role of the Medical Examiner, Proceedings of the American Academy of Forensic Sciences (Chicago), February 1970, Med. Op. 7:64-68, 1971

21. N. Valanju, M. Baden, S.K. Verma and C.J. Umberger: Analytical Toxicological Determination of Drugs in Biological Material. I. Acidic Drugs. Acta Pharmaceutica Jugoslavica 20:11, 1970

22. M. Baden: Deaths from Heroin Addiction Among Teenagers in New York City, Proceedings of the Second World Meeting on Medical Law (Washington, D.C.), August 1970

23. M. Baden: Bullous Skin Lesions in Barbiturate Overdosage and Carbon Monoxide Poisoning (letter) JAMA 213:2271, 1970

24. M. Baden and J. Foley: Heroin Deaths in New York City during the 1960's. Int. M.J. of Legal Medicine, 5:1970

25. N. Valanju, M. Baden, S. Valanju and S. Verma: Rapid Isolation and Detection of Free and Bound Morphine from Human Urine. Int. M. J. of Legal Medicine, 5:1970

26. M. Baden: Angitis in Drug Abusers (letter), NEJM 264:11, 1971

# APPENDIX

**1491**

27. M. Baden, et al.: Methadone Maintenance – Pro and Con. Contemporary Drug Problems, 1:17-152, 1971

28. M. Baden: Changing Patterns of Drug Abuse. Proceedings of Committee On Problems of Drug Dependence. NAS-NRC, 1971

29. M. Baden: Narcotic Abuse: A Medical Examiner's View. In: Wecht, C., Editor, Legal Medicine Annual, 1971 (Appleton-Century-Crofts, New York State) Reprinted New York State J. Med. 72:834-40, 1972

30. Y. Challenor, R. Richter, B. Bruun, M. Baden and M. Pearson: Neuromuscular Complications of Heroin Addiction. Proc. Am. Coll. Phys., 1971

31. C. Cherubin, M. Baden, et al.: Studies of Chronic Liver Disease in Narcotic Addicts. Proc. Am. Coll. Phys., 1971

32. M. Baden: Fatalities Due to Alcoholism. In: Keup, W., edit., Drug Abuse – Current Concepts and Research. Charles C. Thomas, Springfield, Illinois, 1972

33. L. Roizin, M. Helpern, M. Baden, M. Kaufman and K. Skai: Toxo-synpathys (a multifactor pathogenic concept) In: Keup, W., edit.,: Drug Abuse – Current Concepts and Research. Charles C. Thomas, Springfield, Illinois, 1972

34. M. Baden, N. Valanju, S. Verma and S. Valanju: Confirmed Identification Biotransformed Drugs of Abuse in Urine. Am. J. Clin. Path. 57:43-51, 1972. Reprinted: Yearbook of Path. And Clin. Path., 1973, 357-361 (Yearbook Medical Publishers)

35. M. Baden: Homicide, Suicide and Accidental Death Among Narcotic Addicts. Human pathology 3:91-96, 1972

36. J. Pearson, R. Richter, M. Baden, Y. Challenor and B. Bruun: Transverse Myelopathy as an Illustration of the Neurologic and Neuropathologic Features of Heroin Addiction. Human Pathology, 3:107-112, 1972

37. B. Bruun, M. Baden, Y. Challenor, J. Pearson and R. Richter: De-neurologic Kimplikationer Ved Heroinmisbrug Ureakuift. F. Leeger, 134:89-93

38. C. Cherubin, W. Rosenthal, R. Stenger, A. Prince, M. Baden, R. Strauss and T. McGinn: Chronic Liver Disease in Asymptomatic Narcotic Addicts. Ann. Int. Med., 76:391-395, 1972

12.9.2020

# APPENDIX

39. M. Baden, N. Valanju, S. Verma and S. Valanju: Identification and Excretion Patterns of Propoxyphene and Its Metabolites in Urine. Proc. Comm. Prob. Drug Depend., National Academy of Sciences – National Research Council, 1972

40. R. Richter, J. Pearson, B. Bruun, Y. Challenor, J. Brust and M. Baden: Neurological Complications of Heroin Addiction. Proc. Comm. Prob. Drug Depend., National Academy of Sciences – National Research Council, 1972

41. M. Baden and B. Lutz: Preliminary Analysis of 128 Methadone-Related Deaths in New York City. Proc. Com. Prob. Drug Depend., National Academy of Sciences – National Research Council, 1972

42. L. Roizin, M. Helpern, M. Baden, M. Kaufman, S. Hashimoti, J. C. Liu and B. Eisenberg: Neuropathology of Drugs of Dependence, In: Drugs of Dependence (Mule, J.C. and Brill, H., edit.) Uniscience Series, CRC (Chemical Rubber Co.), Cleveland, Ohio 1972

43. C. Cherubin, J. McCusker, M. Baden, F. Kavaler and Z. Amzel: The Epidemiology of Death in Narcotic Addicts. Am. J. Epid., 96:11-22

44. M. Baden: Narcotic Antagonists (letter) Science 177:1152, 1972

45. M. Baden: Investigation of Deaths From Drug Abuse. Chapter in: Spitz, W.U. and Fisher, R.W., edit.: Medicolegal Investigation of Death, 1972, (Charles C. Thomas, Springfield, Illinois)

46. L. Roizin, M. Helpern, M. Baden, et al.: Methadone Fatalities in Heroin Addicts. Psych. Quarterly, 46:393-410, 1972

47. M. Baden: Suicide in Prison, Proceedings of the American Academy of Forensic Sciences, March 1973

48. L. R. Reichman, C. S. Shim, M. Baden and R. Richter: Development of Tolerance to Street Heroin in Addicted and Non-Addicted Primates. Am. J. Public Health, 63:81-803, 1973

49. M. Baden and R. S. Turoff: Deaths of Persons Using Methadone in New York City, 1971, Proceedings of the Comm. On Problems of Drug Depend., Nat. Acad. Of Sci. Nat. Res. Council, 1973

50. J. C. Huang and M. Baden: Rapid Methods of Screening Micro-Quantities of Abused Drugs from Urine Samples for Micro-Crystal Tests. Clinical Toxicology, 6:325-350, 1973

51. P. Haberman and M. Baden: Alcoholism and Violent Death. Quarterly Journal of Studies on Alcohol, 35:221-231, 1974

52. P. Haberman and M. Baden: Drinking, Drugs and Death. International Journal of the Addictions, 9:761-773, 1974

53. D. C. Wise, M. Baden and L. Stein: Postmortem Measurement of Enzymes in Human Brain: Evidence of a Central Noradrenergic Deficit in Schizophrenia (submitted for publication)

54. R. Richter, J. Pearson, M. Baden, et al.: Neurological Complications of Addiction to Heroin. Bulletin of the New York Academy of Medicine, 49:3-21, 1973

55. M. Baden and D. Ottenberg: Alcohol – The All-American Drug of Choice. Contemporary Drug Problems, 3:101-126, 1974

56. M. Baden: Pathology of the Addictive States. Chapter in: Medical Aspects of Drug Abuse, Richter, R., edit. 1975 (Harper & Row)

57. M. Baden, N. Valanju, S. Verma and S. Valanju: Detection of Drugs of Abuse in Urine. Chapter in: Medical Aspects of Drug Abuse, Richter, R., edit., 1975 (Harper & Row)

58. D. Sohn and M. Baden: The First Year of the College of American Pathologists Toxicology Survey Program, Amer. J. of Clin. Path., 1975

59. M. Baden: Narcotics and Drug Dependence by J. B. Williams, Book Review, Journal of Forensic Sciences, 1975

60. M. Baden: Drug Abuse, author and narrator, audio-visual presentation produced by the College of American Pathologists, 1974

61. J. Pearson, R. Richter, M. Baden, E. Simon, et al.: Studies on Sites of Binding and Effects of Narcotics in the Human Brain. International Congress of Neuropathology Proceedings, Budapest, Hungary. Excerpta Medica, 1975

62. M. Baden and J. Devlin: Child Abuse Deaths in New York City, Proceedings of the American Academy of Forensic Sciences (Chicago) 1975

63. M. Baden: Mortality from Alcoholism and Drug Abuse, Proceedings of the Second National Drug Abuse Conference, (New Orleans) 1975

64. R. W. Richter, M. Baden, P. H. Shively, N. M. Valanju and J. Pearson: Neuromedical Aspects of Methadone Abuse (abstract). Neurology 4:373-379, 1975 (presented at the Annual Meeting of the American Academy of Neurology, May 3, 1975)

65. R. W. Richter, M. Baden and J. Pearson: Neuromedical Aspects of Narcotic Addiction. Audio-visual presentation produced and distributed by Columbia University College of Physicians and Surgeons, 1975

66. M. Baden: Basic Pathology for Criminal Lawyers, Proceedings of the Virginia Trial Lawyers Association, 16:22-41, 1975

67. M. Baden: Contributor, Forensic Pathology, A Handbook for Pathologists; R. Fisher and C. Petty, Editors. College of American Pathologists and National Institute of Law Enforcement and Criminal Justice, United States Government Printing Office, 1977

68. M. Baden: Alcohol and Violence. Chapter in: The Professional and Community Role of the Pathologist in Alcohol Abuse, G. Lundberg, Edit., United States Department of Transportation, National Highway Traffic Safety Administration, 1976

69. M. Baden: Treating the Patient in Suicide Attempts and Abused Drug Overdoses. Physicians Assistant, 1:18-20, 1976

70. P. Haberman and M. Baden: Alcohol, Other Drugs and Violent Death. Oxford University Press, 1978

71. M. Baden: Medical Aspects of Child Maltreatment; the Abused and Neglected Child: Multi-Disciplinary Court Practice. The Practicing Law Institute, 1978

72. M. Baden: Evaluation of Deaths in Methadone Users. Legal Medicine Annual 1978 (Appleton-Century-Crofts)

73. O. Bubschmann, M. Baden, et al.: Craniocerebral Gunshot Injuries in Civilian Practice – Prognostic Criteria and Surgical Management: Experience with 82 cases. Journal of Trauma, 19:6-12, 1979

74. M. Fellner, M. Baden, et al.: Patterns of Autofluorescence in Skin and Hair. International Journal of Dermatology, 1980

75. S. Mackauf, M. Baden, et al.: Anatomy for Lawyers. New York State Bar Association Committee on Continuing Legal Education, 1981

76. M. Baden: The Lindbergh Kidnapping Revisited: Forensic Sciences, Then and Now. Journal of Forensic Sciences, 28:1035-1037, 1983

77. M. Baden: The Lindbergh Kidnapping: Review of the Autopsy Evidence. Journal of Forensic Sciences, 28:1071-1075, 1983

78. M. Baden: Investigation of Deaths in Custody, Proceedings of the American Academy of Forensic Sciences (New Orleans), 1985

79. M. Baden: Embalmed and Exhumed Bodies, in Handbook for Postmortem Examination of Unidentified Remains, M. Fierro, M.D., Ed. College of American Pathologists (in press)

80. M. Baden, J. A. Hennessee: Unnatural Death, Confessions of a Medical Examiner, Random House, New York 1989

81. M. Baden, M. Roach: Dead Reckoning, The New Science of Catching Killers, Simon & Schuster, New York 2001

82. M. Baden: The Role of the Medical Examiner and Coroner in the Investigation of Terrorism in Forensic Aspects of Chemical and Biological Terrorism, Lawyers & Judges Publishing Company, Inc., Tuscon, Arizona 2004.

83. M. Baden, L. Kenney Baden: "Remains Silent," Alfred A. Knopf, August 2005.

84. M. Baden: Preface in Forensic Nursing by Virginia A. Lynch. Elsevier/Mosby, St. Louis, Missouri 2006.

85. M. Baden: Exhumation in Spitz and Fisher's Medicolegal Investigation of Death, 4th Edition, Charles C. Thomas, Springfield, Illinois 2006.

86. M. Baden: Encyclopedia of Legal Medicine, Book Review, New England Journal of Medicine, 2006.

87. M. Baden, L. Kenney Baden: Scientific Evidence in Civil and Criminal Cases, 5th Edition, Contributor, Foundation Press, 2007.

88. M. Baden, L. Kenney Baden: "Skeleton Justice," Alfred A. Knopf, June 2009.

89. R. Williams (with M. Baden, H. Lee and C. Wecht): Sherlock Holmes and the Autumn of Terror, Rukia Publishing, 2016.

## LECTURES

- Presenter, CrimeCon 2021: House Arrest, "I Can't Breathe," November 21, 2020

- Lecturer, Henry Lee Symposium, "Cause and Manner of Death from Falls:  The Medical Examiner's Role in Staircase Injury and Death Investigation," October 19, 2020

- Co-Chairman, Bring your Own Slides, American Academy of Forensic Sciences, Anaheim, California, February 19, 2020

- Speaker, American Academy of Forensic Sciences, "Deaths During Law Enforcement Encounters," Anaheim, California, February 20, 2020

- Speaker, American Academy of Forensic Sciences, "Investigation and Analysis of Health Care Serial Killers "The Medical Examiner Perspective," Anaheim, California, February 17, 2020

- Joint Lecturer, Henry F. Williams Seminar, "Medgar Evers Cold Case," Albany, New York, September 24, 2019

- Speaker, New York Legal Aid Homicide Defense Task Force (Terri Rosenblatt, Esq.), Brooklyn, New York, June 12, 2019

- Speaker, University of Rhode Island Forensic Science Partnership Seminar (Dennis Hillard 401-874-5056) "What the Dead Have to Tell," April 26, 2019

- Co-Chairman, Bring Your Own Slides, American Academy of Forensic Sciences, Baltimore, Maryland, February 20, 2019

- Speaker, "Old and New Opioids and Designer Drugs" and "Expanded Crime Scene," NYSACCME Fall Conference, Rock Hill, New York, September 2018

- Speaker, "Mass Disasters and Medical Legal Cases," Wayne State University, Dearborn, Michigan, May 2018

- Co-Chairman, Bring Your Own Slides, American Academy of Forensic Sciences, Seattle, Washington, February, 2018

- Speaker and Panelist, Pioneers of Forensic Science, The Cyril H. Wecht Institute of Forensic Science and Law, Pittsburgh, Pennsylvania, June 1-2, 2017

- Speaker, "Drug Related Death" and "Death Harvester," Medicolegal Investigation of Death, Wayne State University, Dearborn, Michigan, May 4, 2017

- Keynote Speaker, On the Front Line: New Frontiers in Forensics, Crime and Security, New York City, April 4, 2017

- Speaker, National Medical Services speaker series, "Forensic Pathology for Toxicologists," March 2, 2017

- Speaker, New York State Bar Association, "Forensic Pathology Perspectives on Questioned Diagnoses," February 28, 2017

- Co-Chairman, Bring Your Own Slides, American Academy of Forensic Sciences, New Orleans, Louisiana, February 15, 2017

- Lecturer, Henry F. Williams Seminar, "Medgar Evers Case," Albany, New York, September 20, 2016

- Kentucky Funeral Director's Annual Meeting, "Determining Cause of Death," Louisville, Kentucky, June 30, 2016

- Mississippi Coroner's Conference, "Death Investigation," Biloxi, Mississippi, June 23, 2016

- Medicolegal Investigation of Death, Wayne State University, "Controversies in Medicolegal Cases," Dearborn, Michigan, April 28, 2016

- Keynote Speaker, Forensic Nursing Conference, Drexel University, Philadelphia, Pennsylvania, April 16, 2016

- American Academy of Forensic Sciences, Co-Chairman, Bring Your Own Slides, Las Vegas, Nevada, February 26, 2016

- American Academy of Forensic Sciences, "Good Cop, Bad Cop," Las Vegas, Nevada, February 25, 2016

- Speaker, New York State Bar Association Fall Program on Forensics, "Time of Death," November 14, 2015

- Lecturer, Henry F. Williams Seminar, "Medgar Evers Case," Albany, New York, October 5, 2015

- Speaker, Markel Symposium, "Medical Examiner's Perspective in Police Shooting Incidents," West Haven, Connecticut, October 20, 2015

Case 1:17-cv-00625-DJS Document 174-25 Filed 06/14/21 Page 89 of 67

- NACDL/National Forensic College, "Special Problems in Forensic Pathology: Discovery, Time of Death Determinations and Cognitive Bias," Benjamin N Cardozo School of Law Cordozo Law School, New York, New York, June 8, 2015

- Medicolegal Investigation of Death, Wayne State University, "Asphyxial Deaths: Chokeholds, Sleeperholds and Back Pressure," Dearborn, Michigan, May 20, 2015

- "Confessions of a Medical Examiner," The Lotus Club, New York, New York, May 11, 2015

- Medicolegal Investigation of Death, "Asphyxial Deaths: Chokeholds, Sleeperholds and Back Pressure," Wayne State University, Dearborn, Michigan, April 30, 2015

- American Academy of Forensic Science, "Prosecution Expert for Death in a Bathtub - Drew Peterson case," Orlando, Florida, February 17, 2015

- American Academy of Forensic Sciences, Co-Chairman, Bring Your Own Slides, Seattle, Washington, February 17-21, 2014

- American Academy of Forensic Sciences, "Plausible Deniability The Ethics of Inconsistent Consistency," Seattle, Washington, February 17-21, 2014

- Keynote Speaker, Baruch Biomedical Society, New York, New York, October 17, 2013

- Speaker, Markle Symposium, "Medical Examiner Perspective on the Death of JFK," October 15, 2013

- Speaker, NAMFCU Annual Training, "Use of a Medical Examiner in a Nursing Home," Mobile, Alabama, October 7, 2013

- Speaker, Northeastern Association of Forensic Scientists, Cromwell, "Medical Evidence in the JFK Assassination," Connecticut, September 27, 2013

- Lecturer, Henry F. Williams Seminar, "Cold Cases with Dr. Baden," New York State Police, September 24, 2013

- "Use of a Medical Examiner in a Nursing Home Death Investigation," Resident Abuse Training Program, Virginia Beach, Virginia, June 6, 2013

- "Medicolegal Investigation of Death, "Investigating the Scene of Mass Disasters: What to Look for with Fire, Explosion or Terrorist Attack," Wayne State University, Dearborn, Michigan, May 1-3, 2012

12.9.2020

- Children's Law Topical Conference, "When 'Abuse' is Not Abuse," Albany, New York, April 19, 2013

- "Determining Cause of Death," Making Sense of Science VI: Forensic Science and the Law, NACDL & CACJ's 6th Annual Conference, Las Vegas, Nevada April 5-6, 2013

- American Academy of Forensic Science, Panelist, "150 Years — Does Time Bring Agreement? The H.L. Hunley, the R.M.S. Titanic, and the Assassination of John F. Kennedy," Washington, D.C., February 17-24, 2013

- American Academy of Forensic Sciences, Co-Chairman, Bring Your Own Slides, February 17-24, 2013

- Speaker, Corrections and Youth Services Association Annual Meeting, Saratoga Springs, New York, October 31, 2012

- Lecturer, 21st Annual Arnold Markle Symposium, "Sexually Related Homicides," October 9, 2012

- Lecturer, Henry F. Williams Seminar, New York State Police, "Forensic Pathology," September 18-19, 2012

- Society of Professional Investigators, "Current Status of the Forensic Sciences," New York, New York, September 12, 2012

- Speaker, New York State Police Sexual Abuse Seminar, Albany, New York, May 21, 2012

- "Medicolegal Investigation of Death, "Problems in Forensic Pathology," Wayne State University, Dearborn, Michigan, May 1-3, 2012

- 2012 NASDEA Spring Conference, "Drug Deaths: Homicide v. Overdose," The Roosevelt Hotel, New York City, NY, April 24, 2012

- Concord Seminars for the Dental and Medical Professions, "Forensic Odontology," Manchester, New Hampshire and Bangor, Maine, April 20-21, 2011

- Emory School of Medicine, Grand Rounds, "Forensic Pathology: The Good, The Bad, The Ugly," Atlanta, Georgia, March 3, 2012

- Major Case Squad of Greater St. Louis Annual Retraining Conference, "Forensic Pathology," St. Louis, Missouri, March 4-5, 2012

- American Academy of Forensic Sciences, "Conflicting and Misleading Testimony in the Forensic Pathology Community," February 19-25, 2012

- American Academy of Forensic Sciences, Co-Chairman, Bring Your Own Slides, February 19-25, 2012

- Lecturer, 20th Annual Arnold Markle Symposium, "Investigation of Sex Crime: Forensic Investigation of Sexual Assault, Serial Offenders, and Sexual Abuse," October 10, 2011

- Lecturer, Henry F. Williams Seminar, New York State Police, "Forensic Pathology," September 18-21, 2011

- Speaker, Annual Investigation for Identification, New Orleans, Louisiana, August 25-26, 2011

- Lenox Hill Hospital, Medical Grand Rounds, "Controversies in Forensic Medicine," New York City, March 11, 2011

- Valley Forge Dental Conference, Keynote Speaker, "Justice Through Science," Valley Forge, Pennsylvania, March 4, 2011

- American Academy of Forensic Sciences, Communications in Forensics, "In My Experience ..." February 21, 2011

- American Academy of Forensic Sciences, A Multidisciplinary Look into Forensic Science: Perspectives, Views and Experiences, "Forensic Pathology Perspectives," February 22, 2011

- American Academy of Forensic Sciences, Co-Chairman, Bring Your Own Slides, February 23, 2011

- Lecturer, "CSI: Dartmouth," University of Massachusetts/Dartmouth Law School, Dartmouth, Massachusetts, November 18, 2010

- Guest Forensic Lecturer (4 lectures), Transatlantic Crossing of the Queen Elizabeth II, November 1-8, 2010

- Lecturer, Henry F. Williams Seminar, New York State Police, "Forensic Pathology," September 27-30, 2010

- Speaker, 13th Annual Investigation for Identification, New Orleans, Louisiana, "A History of Forensic Science from Cain and Abel Through Katrina," August 27-28, 2010

- Speaker, Brigham & Women's 2010 Master Clinician Section, August 1, 2010

- Speaker, "Post-Mortem with Dr. Michael Baden," Kentucky Funeral Director's Association, Louisville, Kentucky, June 30, 2010

12.9.2020

- Speaker, Northeast College and Universities Security Association, 57th Annual Conference, Skidmore College, Saratoga Springs, New York, June 28, 2010

- Speaker, 13th Annual Investigation for Identification, New Orleans, Louisiana, "A History of Forensic Science from Cain and Abel Through Katrina," August 27-28, 2010

- Speaker, Brigham & Women's 2010 Master Clinician Section, August 1, 2010

- Speaker, "Post-Mortem with Dr. Michael Baden," Kentucky Funeral Director's Association, Louisville, Kentucky, June 30, 2010

- Speaker, Northeast College and Universities Security Association, 57th Annual Conference, Skidmore College, Saratoga Springs, New York, June 28, 2010
*
- Lecturer, New York Prosecutor's Training Institute, Westchester, New York, June 8, 2010

- SELETS 14th Annual Law Enforcement Training Seminar, Lawrenceberg, Tennessee, June 1, 2010

- New York State Police Sex Offense Seminar, "The Forensic Sciences," Albany, New York, May 24-28-2010

- Society of Professional Investigator's Meeting, New York City, May 20, 2010

- Wayne State University, Medicolegal Investigation of Death, "Exhumation and Time of Death," and "Fire, Explosion and Mass Casualty," April 21-22, 2010

- Oswego University, "History of Forensic Science," March 25, 2010

- American Academy of Forensic Sciences, "Bring Your Own Slides," Seattle, Washington, February 22-26, 2010

- 2010 Forensic Seminar for Capital Defense Attorneys, DePaul University College of Law, February 18-19, 2010

- CSI Symposium, Norwich University, "Forensic Pathology," January 29, 2010

- NYSP Child Physical Abuse and Neglect Seminar, November 18, 2009

- New York Council of Defense Lawyers, Rye, New York, November 7, 2009

- FBI/IT Exchange Conference, Keynote Speaker, Seattle, Washington, September 20-21, 2009

- Henry F. Williams Seminar, New York State Police, "Forensic Pathology and Child Deaths," Albany, New York, September 14-17, 2009

- New York State Funeral Director's Association, Saratoga, New York, September 1, 2009

- Cabell Sheriff's Department, West Virginia (Marshall University in Huntingdon, West Virginia), August 25, 2009

- NCSTL Conference, Tampa, Florida, May 20-21, 2009

- Wayne State University, Medicolegal Investigation of Death, "Exhumation and Time of Death," and "Forensic Questions: The Experts Answer," with Werner Spitz, M.D., Dearborn, Michigan, April 22-24, 2009

- Bronx High School of Science, March 11, 2009

- American Academy of Forensic Sciences, "Bring Your Own Slides," Denver, Colorado, February 16-21, 2009

- American Academy of Forensic Sciences, "New Investigative Techniques and Scientific Advancement for Forensic Scientists in the Future," Denver, Colorado, February 16-21, 2009

- South Carolina Funeral Director's Association, "Post Mortem with Dr. Michael Baden," Columbia, South Carolina, February 4, 2009

- CSI Symposium, "Forensic Pathology," Norwich, Connecticut, January 29-30, 2009

- New York State CASA DNA Initiative Conference, Albany, New York, January 28, 2009

- Medicolegal Investigation of Death Conference, "Exhumation and Time of Death," Las Vegas, Nevada, January 5-6, 2009

- Mattapoisett (Massachusetts) Police Department, Forensic lecture, November 25, 2008

- George Mason University, "Sexually Violent Crime: the Body as Evidence," November 10-11, 2008

- Hofstra University, "An Evening of Crime and Wine," October 29, 2008

- New Jersey State Funeral Director's Association, "Post Mortem with Dr. Michael Baden," September 17, 2008

12.9.2020

- SPIAA 57th Annual Retraining Conference, July 23, 2008

- NY Cops Foundation Annual Dinner Gala, Keynote Speaker, June 2, 2008

- New York State Police Sex Offense Seminar "The Forensic Sciences," May 2008

- Keynote Speaker, National Council of Investigation & Security Services annual meeting, May 2, 2008

- Medicolegal Investigation of Death Conference, Wayne State University, "Terrorism," April 23, 2008

- Medicolegal Investigation of Death Conference, Wayne State University, "Exhumation and Time of Death," April 23, 2008

- 17th Annual Arnold Markle Symposium, Connecticut State Police, March 23-24, 2008

- "Forensic Pathology and Living/Injured Victims," Academy for BCI Basic School (NYSP), March 11, 2008

- Lecturer, New Jersey Chapter of Int'l Assn of Arson Investigators, March 5, 2008

- American Academy of Forensic Sciences, Young Forensic Scientists Forum "Death is My Teacher," February 19, 2008

- American Academy of Forensic Sciences, "Healthcare Serial Killer Workshop," February 19, 2008

- American Academy of Forensic Sciences, "Significant Achievements and Contributions by Forensic Scientists to the International Community," February 19, 2008

- Medicolegal Investigation of Death Conference, "Postmortem Changes & Time of Death," and "Forensic Questions: The Experts Answer," Las Vegas, Nevada, December 4-6, 2007

- 33rd Annual Arson Seminar, NYS Fire Academy, "The Role of the Forensic Pathologist in Fire Investigation," November 7, 2007

- 12th Annual Investigation for Identification Educational Conference, Pensacola, Florida, October 19-20, 2007

- Penn State University, Forensic Sciences Seminar, September 24, 2007

12.9.2020

# APPENDIX

**1504**

- Col. Henry F. Williams Homicide Seminar, "Forensic Pathology," September 17-20, 2007

- Harvard Medical School, Intensive Review of Internal Medicine Course, "CSI Meets IRIM — The New Science of Catching Killers," Boston, Massachusetts, July 2007

- Arizona Judicial Conference: Forensic Pathology, 2007

- New York State Police Sex Offense Seminar "The Forensic Sciences," May 2007

- Smithsonian Associates, "Murder Investigation with Forensics: The Good, the Bad, and the Ugly," May 2007

- Medicolegal Investigation of Death Conference, "Death Investigation" and "Fire, Explosions and Terrorism," April 24-26, 2007

- Louisiana Judicial College, "CSI Effect," April 19-20, 2007

- 16th Annual Arnold Markle Symposium 2007, "Parents who Kill: Muchausen's by Proxy," April 9, 2007

- Harvard Medical School "Brigham Master Clinician: Update in Medicine," "The Forensic Sciences: From Cain and Abel to JFK to OJ Simpson," March 29, 2007

- American Academy of Forensic Sciences, "Bring Your Own Slides," February 21, 2007

- American Academy of Forensic Sciences, "Police Use of Force: Where is the Line and When is it Crossed" February 22, 2007

- Medicolegal Investigation of Death Homicide Conference, "Asphyxias, Serial Murders and Sexual Assaults," "Death Investigations: Fire, Explosions and Terrorism," Las Vegas, Nevada, November 29-30, 2006

- American College of Trust and Estate Counsel, Westin Providence, Rhode Island, October 12, 2006

- Col. Henry F. Williams Homicide Seminar, "Forensic Pathology," September 19-21, 2006

- 57th Annual Harvard Associates in Police Science Conference, Vermont Criminal Justice Training Council, Burlington, Vermont, June 27, 2006

- SEAK National Expert Witness, "The Role of the Expert Witness: from the Expert's Perspective," Cape Cod, Massachusetts, June 23, 2006

# APPENDIX

- Mississippi Coroner's Association, Vicksburg, Mississippi, June 15, 2006

- Monmouth University, "Time of Death Determination" and "Electrocution, Explosives, and Fire-Related Deaths," Oceanport, New Jersey, June 13, 2006

- SELETS Homicide Conference, Lawrenceberg, Tennessee, June 7-8, 2006

- NYSP Sex Crimes Seminar "The Forensic Sciences," May 22, 2006

- Fermilab National Accelerator Laboratory, Colloquium, "How Long Has Grandpa Been Dead and Other Forensic Mysteries," Chicago, Illinois, May 17, 2006

- AtlantiCare Regional Medical Center, New Jersey, Keynote Speaker, 8th Annual Trauma Symposium, "Forensic Sciences, Trauma & Mass Disasters," May 2, 2006

- Medicolegal Investigation of Death Homicide Conference: "The Asphyxias, Serial Murders and Sexual Assaults," Detroit, Michigan, April 26-28, 2006

- Albany, New York, Area Association of Certified Fraud Examiners, keynote speaker, March 30, 2006

- American Academy of Forensic Sciences, "Victims & Defendants: Clinical Aspects of Their Death," February 21, 2006

- American Academy of Forensic Sciences, "The Role of the Forensic Scientist in the Investigation of Police-Related Deaths - A Current Dilemma," February 22, 2006

- American Academy of Forensic Sciences, ""Shaken Baby Syndrome: Medical Myth or Medical Fact?" February 24, 2006

- Clinical Forensic Nursing, Veterans Administration, Phoenix, Arizona, Impacting Patient Care Delivery, Quality Management and Investigations in Healthcare Settings, January 23, 2006

- Advanced Practical Homicide Seminar, "Modes of Death Involving Firearms, Knives, Blunt Force and Child Abuse," November 8-9, 2005

- Monmouth University, Oceanport, New Jersey, "Determining Time of Death" and "Fire-related Death and Electrocution and Explosions," June, 2005

- New York State Police, Sex Offense Seminar, "The Forensic Sciences," May 23, 2005

- New York State Association of County Coroners & Medical Examiners, "Violence Among Children," April 30-May 1, 2005

- Medicolegal Investigation of Death Conference, "Serial Killers, Autoerotic Asphyxias, Sexual Assault or Accident," and "Death by Fire and Explosion," Wayne State University, School of Medicine, April 20-22, 2005

- College of Mt. Saint Vincent, Department of Nursing, "Unraveling the Mystery of the Nurse Investigator," April 14, 2005.

- The National Clearinghouse for Science, Technology and the Law at Stetson University College of Law, "Forensic Pathology on Both Sides of the Pond," April 4, 2005

- Markle Symposium, Connecticut State Police Homicide Conference, Foxwoods Lodge, Connecticut, March 27-28, 2005

- The Learning Annex, "Revealing the Mysteries of Forensic Science," March 10, 2005

- American Academy of Forensic Sciences, "Complex Forensic Science Issues on Highly Controversial Cases," February 21-26, 2005

- Quinnipiac University, Law and Forensic Sciences, Hamden, Connecticut, February 5, 2005

- Duquesne University, The Cyril H. Wecht Institute of Forensic Science and Law, "Tracking Terrorism in the 21st Century," October 21-23, 2004

- Greater Cincinnati Regional Arson and Fire Investigators Seminar, "The Death Detective," October 14, 2004

- Col. Henry F. Williams Homicide Seminar, "Forensic Pathology," October 5, 2004

- Associated Licensed Detectives of New York State, Keynote speaker, October 1, 2004

- Nebraska Institute of Forensic Sciences, "Crime & Death Scene Reconstruction: Utilizing Bloodstain Pattern Analysis," September 15-17, 2004

- Southeast Law Enforcement Seminar, "Fascinating Cases of Death," June 9, 2004

- Florida Coastal School of Law, "Role of Forensic Pathology in Criminal and Civil Litigation," Jacksonville, Florida, May 7, 2004

- Wayne State University, "Medicolegal Investigation of Death," Dearborn, Michigan, April 21-23, 2004

- The Three Sleuths (with Drs. Cyril Wecht and Henry Lee), The Rio Suite, Hotel & Casino, Las Vegas, Nevada, April 17, 2004

- Annual SleuthFest Meeting, Exhumation Session, "Famous Cases," March 20, 2004

- 44th Annual American College of Legal Medicine, "The Role of the Forensic Pathologist in Medical Malpractice Cases," Las Vegas, Nevada, March 5-7, 2004

- Stetson University College of Law, "The Complete History of Murder and Science in One Hour," Gulfport, Florida, January 29, 2004

- Quinnipiac Law School, Law and Forensic Science, January 24, 2004

- The City University of New York, Graduate School and University Center, "Forensic Series," December 2, 2003

- Testified before the United States Senate Committee on the Judiciary Department of Justice Oversight: "Funding Forensic Sciences, DNA and Beyond" 2003

- Duquesne University, National Symposium on the 40th Anniversary of the JFK Assassination, "Solving the Great American Murder Mystery," November 20-23, 2003

- Smithsonian Associates, Educational and Cultural Programs, "Murder, Mystery and the New Forensics," November 1, 2003

- Association of Inspectors General, John Jay College of Criminal Justice, "Non-Traditional OIG Investigations," October 17, 2003

- Colorado Association of Sex Crimes Investigator's Annual Conference, Snowmass, Colorado, August 20-22, 2003

- 31st Annual Florida Medical Examiner Educational Conference, F.A.M.E. 2003, "The History of Forensic Science from Cain & Abel to O.J. Simpson," Ponte Vedra Beach, Florida, August 6-8, 2003

- Washington County Prosecutors Office, "Dead Man Talking: Forensic Science and Homicide Investigation," May 5 and 6, 2003

- Medicolegal Investigation of Death, Wayne State University, "Adult Sexual Assault & The Asphyxias" and "Child Sexual Assault/Abuse Myths Dearborn, Michigan, April 2-4, 2003

- New York State Trial Lawyer's Association, Wrongful Death Seminar, "Using Medical Science to Prove the Cause of Death and Conscious Pain and Suffering," March 25, 2003

- DNA Symposium, The State College of Pennsylvania, "The Role of the Forensic Pathologist regarding DNA Evidence: From Autopsy to Courtroom," March 2003

- American Academy of Forensic Sciences, "Overview of the Legal Issues Concerning the Discovery and Investigation and Prosecution of the Abuse of Elderly Patients in Healthcare Facilities and the Homicide of All Patients in Various Medical Treatment Facilities," Chicago, Illinois, February 17-22, 2003

- American Academy of Forensic Sciences, "Presentation of Specific Cases through the Initial Contact by Prosecutors Concerning Suspected Criminal Deaths through the Exhumation and the Trial" Chicago, Illinois, February 17-22, 2003

- 1st Eastern Analytical Symposium & Exposition, Somerset, New Jersey, November 18-21, 2002

- Utah County Police Officer's Workshop, November 2002

- 10th Annual Investigation for Identification Educational Conference, "New Concepts in Forensic Pathology," Pensacola, Florida, September 20-21, 2002

- Singapore Government Ministry of Health Services Administration, Centre for Forensic Medicine, August 17-31, 2002

- State of New York, Office of the Attorney General, Medicaid Fraud Control Unit, 2002 Training Conference, June 10-13, 2002, Lake Placid, New York

- Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, International Postblast Investigation Class, May 8, 2002, Brunswick, Georgia

- American Academy of Forensic Sciences, Addressing Social and Legal Issues Associated with Police Involved Shooting Incidents Through Forensic Investigation & Shooting Scene Reconstruction, February 11-15, 2002, Atlanta, Georgia

- American Academy of Forensic Sciences, Bring Your Own Slides, February 11-15, 2002, Atlanta, Georgia

- The UMKC School of Law, The History of Murder Investigation and Forensic Science, University of Missouri, Kansas City, January 24, 2002

- DNA and the Law: Reining in the Revolution, "The Role of the Forensic Pathologist in DNA Use: From Autopsy to Courtroom," Duquesne University, November 30, 2001, Pittsburgh, Pennsylvania

- New Technologies and the Proof of Guilt & Innocence, Court TV, October 25, 2001

- 2001 Ohio Attorney General's Conference on Law Enforcement, Plenary Speaker, October 11, 2001

- The Second European-American Intensive Course in Clinical and Forensic Genetics, September 3-14, 2001, Dubrovik, Croatia

- Forensic Nursing Clinical Update, "Death Investigation, Adverse Patient Events and Evidence Collection in the Hospital Setting," August 27 and 28, 2001, Phoenix, Arizona

- Harvard Associates In Police Science, Keynote Speaker, August 20-23, 2001, 52nd Annual Conference, Annapolis, Maryland

- The Boston Strangler Case: A High Tech Hearing on the Murder of Mary Sullivan, August 4, 2001, American Bar Association Annual Meeting, Chicago, Illinois

- Emerging Technologies in Forensic Investigation, June 1-3, 2001, Nova Southeastern University, Fort Lauderdale, Florida

- The Forensic Investigation of Child Abuse and Neglect, May 30, 2001, The Family Partnership Center

- Making Communities Safer, May 21-22, 2001, New York State Alliance of Sex Offender Service Providers, Sixth Annual Training Conference, Albany, New York

- Practical Homicide and Medicolegal Death Investigation, April 9-11, 2001, Beaumont, Texas

- Police Liability in New York, May 2, 2001, Albany, New York

- Symposium on Forensic Medicine, Kuwait Institute for Medical Specialization, January 27-29, 2001, Kuwait

- Forensic Science and the Law, October 27-28, 2000, Duquesne University, Pittsburgh, Pennsylvania

- 8th Annual Investigation for Identification Educational Conference, Speaker, September 22-23, 2000, Pensacola Beach, Florida

- Advanced Practical Homicide Investigation, September 11-15, 2000, Southern Law Enforcement Foundation, Irving, Texas

- Vision 2000: Together We Can, Funeral Service Conference of the Northwest, August 27-29, 2000, Coeur d'Alene Resort, Idaho

- Mississippi Attorney General Prosecutor's Annual Training Conference, April 26-28, 2000, Gulfport, Mississippi

- Forensic Crime Scene Analysis Training, April 28, 2000, Union County Police Chief's Association, Cranford, New Jersey

- At the Heart of the Matter: The Medicolegal Aspects of Organ and Tissue Donation, May 4, 2000, New York Organ Donor Network, Poughkeepsie, New York

- NYSBA Criminal Justice Section Spring Meeting, May 19-21, 2000, The Ethics of Scientific Evidence, Chautauqua, New York

- 2000 Dodge Seminar, March 20-23, 2000, Clearwater Beach, Florida

- Medicolegal Investigation of Death, March 16 and 17, 2000, Wayne State University School of Medicine and Michigan State Police

12.9.2020

EXHIBIT "B"

**APPENDIX**

**1512**

# MICHAEL M. BADEN, M.D.

15 West 53rd Street, Suite 18
New York, New York 10019

Telephone: (212) 397-2732

Facsimile: (212) 397-2754
E-mail: MBaden@mac.com

28 January 2021

*Via e-mail to Christina.Calabrese@ag.ny.gov*

Christina Calabrese
Assistant Attorney General,
Claims Bureau Office of the
New York State Attorney General
The Capitol
Albany, New York 12224

*Via e-mail to crpeck@baileyjohnson.com*

Crystal R. Peck, Esq.
Bailey, Johnson & Peck, P.C.
Five Pine West Plaza, Suite 507
Washington Avenue Extension
Albany, New York 12205

Re:  *Matthew Thomas, deceased*

Dear Attorneys Calabrese and Peck:

I have reviewed the autopsy report, autopsy photographs, death certificate,
and microscopic slides; the ambulance report and Samaritan Hospital, Albany Medical
Center and Seton Health records; criminal trial transcripts of Adrian Thomas, Dr.
Jerome Klein, Dr. Jan Leestma, Paramedic Michael Bayly, Dr. Walter Edge, Dr. John
Waldman, Dr. Ifeoma Ojukwu and Dr. Carole Jenny; trial and deposition transcripts
of Dr. Michael Sikirica's testimony; the draft report of the Renssalaer County Child

APPENDIX

**1513**

Baden/Thomas
28 January 2021
Page -2-

Case 1:17-cv-00626-DJS Document 142-25 Filed 06/14/21 Page 2 of 67

Fatality Review team; expert reports of Dr. Jan Leestma and Matthew Johnson, Ph.D.; and the deposition testimonies of Wilhelmina Hicks and India Hicks that you sent to me relative to the death of Matthew Thomas.

Matthew was a twin born on May 4, 2008 after 33 weeks gestation, seven weeks premature. He was treated at Albany Medical Center, Samaritan Hospital and then Seton Health for five weeks because of his prematurity before being discharged home. There was no medical evidence that he had suffered any head or brain injury during the birthing process. A routine ultrasound examination ten days after birth confirmed that Matthew's brain was normal without any evidence of trauma and that there was no subdural hemorrhage; that there was no birth injury.

On September 13, 2008 at age four months and nine days, he was brought to the Samaritan Hospital Emergency Room with a discoloration and swelling on the right side of his face. The ER doctor wrote that "After exhaustive discussions with the family, it seems that the agent that led to this rash was a cloth irritant used to wash the child ... There was no evidence of infection." Matthew's mother thought that the baby had been physically abused by her husband. The doctor did not report the injury to Child Protective Services (CPS) even though there was a hospital record stating that there was a "family history of CPS involvement and violence on the part of the father."

Case Case 17-cv-00625-DJS Document 60-3 141335-5 Filed 06/14/21 49 Page 35 of 67

Eight days after the ER visit, in the early morning of September 21, EMS was called and found Matthew unconscious and unresponsive with agonal breathing in bed at home. He was comatose when he arrived at Samaritan Hospital and was quickly transferred to Albany Medical Center. He was in coma with a bulging anterior fontanelle – evidence of increased intracranial pressure due to fresh subdural bleeding around the brain – and his pupils were fixed and dilated indicative of severe brain damage. An emergency CT scan showed that there were bilateral subdural hemorrhages of varying ages, indicating that there had been multiple traumas occurring at different times. This evidence of child abuse was reported by the hospital to Child Protective Service and to the New York State Child Abuse and Neglect Hotline. Matthew did not respond to medical treatment and was pronounced dead at Albany Medical Center on September 23rd.

The hospital diagnosis was that Matthew died of complications from multiple blunt force head injuries that caused subdural hemorrhages and direct brain damage, and that he developed an aspiration bronchopneumonia while dying from the brain injuries. A single positive blood culture drawn during his brief stay at Samaritan Hospital on September 21st was returned as positive for Streptococcus pneumoniae on September 25th after he had died. It may have been a contaminant since a confirmatory repeat culture was not done and there was no infection elsewhere in the

Case 1:17-cv-00625-DJS Document 14-3 Filed 06/14/21 Page 36 of 67

body. Bacteria in the blood that do not cause an infection elsewhere in the body is referred to as bacteremia and not sepsis.

The autopsy was performed by Dr. Michael Sikirica, a Board-certified forensic pathologist. He found large bilateral fresh and older hemorrhages in the skin of the scalp caused by multiple blunt impact blows. The brain was severely swollen, there were subdural hemorrhages of varying ages, and there were direct fresh hemorrhages in the brain. Dr. Sikirica concluded that the cause of Matthew's death was "Severe head injuries with cerebral edema due to blunt force trauma. Homicide … Assaulted by another repeatedly."

Forensic pathology standards require the medical examiner to make conclusions as to cause and manner of death. According to the National Association of Medical Examiners, the forensic pathologist should take into consideration all of available autopsy findings, laboratory reports, medical records and police investigative reports when determining cause and manner of death. There are five classifications as to manner of death: natural, accident, suicide, homicide or undetermined. DiMaio & DiMaio in Forensic Pathology, 2nd Ed., states that the forensic pathologist must include "information from witnesses, relatives of the deceased, police agencies, treating physicians and/or records (medical, non-medical, police, governmental, etc.)" in arriving at the cause and manner of death. Dr. Sikirica's conclusions and procedures abided by all forensic pathology standards of practice.

Case Case 1:17-cv-00625-DJS Document 114-235 Filed 06/14/21 Page 377 of 67 **1516**

Dr. Leestma dismissed the hemorrhagic blows to the scalp, the subdural hemorrhages and the direct brain injuries as birthing injuries which did not cause or contribute to the death. He concluded that Matthew "Died from a natural disease process which was orbital bacterial (streptococcus pneumoniae) cellulitis and attendant septic shock, disseminated intravascular coagulation, and pneumonia." I must disagree. Dr. Leestma in his report lists the records and materials that he examined. He did not examine Matthew's September 13th visit to the Samaritan Hospital Emergency Room and does not refer to that visit in his report. He apparently did not know that Matthew had been treated for a recent traumatic injury to the right side of his face, near to the right eye which the emergency room doctor described as "It seems to be in a healing mode ... no evidence of infection." In my opinion Dr. Leestma misinterpreted the swelling and the microscopic inflammatory changes from the healing traumatic injury as due to an infection that caused an abscess around the eye and sepsis that resulted in Matthew's death. Dr. Sikirica did remove and examine both eyes and both orbital areas and found no evidence of infection or cellulitis which he documented with multiple photographs; this confirmed the hospital doctors' findings. I have reviewed the same materials and agree with Dr. Sikirica's opinion.

The doctors at Samaritan Hospital and Albany Medical Center and Dr. Sikirica all separately concluded that there was no orbital abscess or infection or sepsis or

APPENDIX

Case 1:17-cv-00625-DJS Document 1425-3 Filed 06/14/21 Page 33 of 67

**1517**

Baden/Thomas
28 January 2021
Page -6-

meningitis that could have caused or contributed to Matthew's death. They each
concluded that his death was due to the complications from multiple abusive head
injuries. I also agree.

    Wilhelmina Hicks, Adrian's wife and Matthew's mother, testified at a
deposition on November 20, 2020, that Adrian was often physically aggressive to
her and to the children, especially to Matthew; that police and Child Protective
Services had been to their home a number of times; that when she brought Matthew
to Samaritan Hospital on September 13th because of a black and blue mark on his face,
the doctor said "I could have kissed him too hard ... Are you using a new soap or harsh
chemical? I knew that wasn't the case and took Matthew home" and told Adrian that
he had two weeks to get out of the house. She testified that during the next few days,
Adrian was rough with the twins throwing them into the bed and that he was alone
with Matthew a number of times; that on September 21st when she awoke she saw
that Matthew was not breathing and Adrian was near him. India, the oldest child,
testified in 2020, when she was 21-years-old, that she remembered waking up that
morning when she heard her mother screaming that the baby was not breathing. Ms.
Hicks testified that she performed CPR until the paramedics came and took him to
Samaritan Hospital; and also that Matthew had been very alert and smiling before
the injury to his face; and that she brought him to Samaritan Emergency

Case 1:17-cv-00625-DJS Document 74-25 Filed 06/14/21 Page 39 of 67

Department because "something isn't right," "was not the same baby," "there was a change in him."

The Rensselaer County Child Fatality Review Team concluded in December 2008 that "The father admitted that on four different occasions over two weeks he slammed the baby hitting his head on the crib, on his head or on the bed. The surviving twin was observed to have old rib fractures and the mother and nine-year-old daughter reported to observe the father squeezing the child with his hands."

It is my opinion, to a reasonable degree of medical certainty, based on my education, training and experience, and on the above materials that I have reviewed, that Dr. Sikirica's performance of the autopsy, determination of the cause and manner of Matthew's death, and his testimony were within the standards of practice of a Board-certified forensic pathologist; that he did not deviate from forensic pathology standards; that he properly considered the history, the scene findings, the circumstances of death, the medical findings, and the autopsy results before reaching his conclusions that Matthew did die of "Severe closed head injuries with cerebral edema and blunt force trauma. Homicide."

It is also my opinion that Matthew did not incur any head or brain trauma or subdural hemorrhages during his birth; that he did incur multiple blunt force impacts with resulting subdural hemorrhages after he came home when he was five weeks old; that his twin brother had also suffered bilateral rib fractures at the hands of

APPENDIX

Case 1:17-cv-00625-DJS Document 74-5 Filed 06/14/21 Page 40 of 67

1519

Baden/Thomas
28 January 2021
Page -8-

another; that Matthew's death was caused by multiple homicidal blunt force impacts to his head that caused subdural hemorrhages and cerebral edema, and direct brain damage; that Matthew developed terminal pneumonia as a direct consequence of his traumatic head injuries; that a single positive unconfirmed blood culture is not sufficient evidence of sepsis; that the clinical history, medical records and autopsy findings, autopsy photographs and microscopic slides, show that Matthew did not have an orbital bacterial infection, meningitis or sepsis as Dr. Leestma asserted; that Matthew's organs would not have been used for transplantation to other babies if there was any evidence that he died of sepsis; and that my opinion is that Matthew was a battered child and a victim of child abuse. These are my opinions without any reliance on the defendant's confession.

My opinions are subject to modification should additional information become available to me.

Very truly yours,

Michael M. Baden, M.D.
Former Chief Medical Examiner,
New York City
Former Chief Forensic Pathologist,
New York State Police

MMB:ph

Case 1:17-cv-00626-DJS Document 14/2/25 Filed 06/14/21 Page 42 of 67

EXHIBIT "C"

# Michael M. Baden, M.D.

15 West 53rd Street, Suite 18
New York, New York 10019

Telephone: (212) 397-2732
Facsimile: (212) 397-2754

E-mail: kenneybaden@msn.com

## DR. MICHAEL M. BADEN
## TESTIMONIES AT TRIAL AND DEPOSITION
## 2015 TO 2020

### 2020

Daniel Niamehr, Esq. (Plaintiff)
*Estate of Michael Mannarino v. FCA USA LLC*
Deposition, July 2020
**New York**

Olivia Simkins, Esq. (Plaintiff)
*Monteria Robinson for the Estate of Jamarion Robinson v. William Sulls*
Deposition, June 2020
**Georgia**

Frederick Hasty, III, Esq. (Defendant)
*Fernandez v. Francisco Cruz, et al.*
Deposition, February 2020
**Florida**

Michael Cardoza, Esq. (for the minor)
*In the matte of Axel L.*
Trial, February 2020
**California**

### 2019

Stanley King, Esq. (Plaintiff)
*Higgenbotham v. Vineland Police department et al*
Deposition, September 2019
**New Jersey**

Matthew Vitucci, Esq. (Defendant)
*Feiner v. LD Transport*
Mediation, July 2019
**New York**

Joseph Messa, Esq. (Plaintiff)
*Kathleen Johnson, deceased v. Kennedy University Hospital*
Deposition, June 2019
**Pennsylvania**

Karen Gold, Esq. (Plaintiff)
*Dugas v. Hi-Land Mountain*
Deposition, June 2019
**California**

Josh Morrison, Esq. (Plaintiff)
*Godinez v. City of Chicago, et al.*
Deposition, June 2019
**Illinois**

Sharon King, Esq. (Plaintiff)
*White v. City of Vineland*
Deposition, May 2019
**New Jersey**

Randall Robbins, Esq. (Plaintiff)
*McInnis v. UHS of Rockford*
Deposition, January 2019
**Delaware**

Ben Morelli, Esq. (Plaintiff)
*Estate of Rongxin Wu et al v. the NYC Transit Authority et al.*
Trial, January 2019
**New York**

<u>2018</u>

Ben Nisenbaum, Esq. (Plaintiff)
*Hernandez v. City of Sacramento, et al.*
Deposition, December 2018
**California**

Sam Shapiro, Esq.
*Collado v. City of New York, et al.* (Plaintiff)
Trial, November 2018
**New York**

Michael Oppenheimer, Esq.
*Joseph v. Bartlett, et al.* (Plaintiff)
Deposition, August 2018
**Louisiana**

# APPENDIX

Sam Shapiro, Esq.
*Collado v. City of New York* (Plaintiff)
Trial, August 2018
**New York**

Adam Leatherwood, Esq.
*Hammers v. Douglas County, Kansas et al.* (Plaintiff)
Trial, June 2018
**Kansas**

Matthew Vitucci, Esq.
*Lee v. Vasquez et al.* (Defendant)
Trial, June 2018
**New Jersey**

Adam Leatherwood, Esq.
*Hammers v. Douglas County, Kansas et al.* (Plaintiff)
Deposition, May 2018
**Kansas**

John Bruno, Esq.
*State of New Jersey v. Marrara* (Defense)
Trial, May 2018
**New Jersey**

Martin Phipps, Esq.
*Hoyt v. David Kim, et al.* (Plaintiff)
Deposition, April 2018
**Texas**

Matthew Vitucci, Esq.
*Lee v. Vasquez, et al.* (Defense)
Deposition, March 2018
**New York**

Michael Maizes, Esq.
*Powers v. Min et al.* (Plaintiff)
Trial, March 2018
**New York**

Lee Roberts, Esq.
*Khaibani v. MCI et al.* (Defense)
Trial, March 2018
**Nevada**

Damon Vespi, Esq. (Plaintiff)
*Edgar Smith v. Clara Maas Hospital et al.*
Deposition, February 2018
**New Jersey**

Julia Sherwin, Esq. (Plaintiff)
*Neuroth v. Mendocino County*
Deposition, February 2018
**California**

David C. Dziengowski, Esq. (Defense)
*State of Florida v. Clemente Aguirre*
Deposition, January 2018
**Florida**

<u>**2017**</u>

Danielle Sullivan, Esq. (Plaintiff)
*Bah v. City of New York*
Trial, November 2017
**New York**

Robert Del Col, Esq. (Plaintiff)
*Estate of Lana Keenan v. Dr. Jamie Hoffman-Rosenfeld, et al.*
Deposition, October 2017
**New York**

Bryce Benjet, Esq.
*Ex Parte Rodney Reed, Appellant – Writ of Habeas Corpus*
Testimony, October 2017
**Texas**

Charla Aldous, Esq.
*Onie Jane Pena, et al. v. Dallas County Hospital District, et al.* (Plaintiff)
Deposition, September 2017
**Texas**

Robert Meade, Esq.
*Global Energy Holdings et al v. William Penn Life Insurance Company of New York* (Plaintiff)
Deposition, September 2017
**New York**

Mark Jicca, Esq.
*State of Mississippi v. Jeffrey Havard* (Defense)
Trial, August 2017
**Mississippi**

Michael Oppenheimer, Esq.
*Curry v. Burns, et al.* (Plaintiff)
Deposition, July 2017
**Illinois**

# APPENDIX

Michael Oppenheimer, Esq.
*People v. Devell Johnson* (Defense)
Trial, July 2017
**Illinois**

Spencer Bryan, Esq.
*Estate of Patrick Murphy v. Backwoods* (Plaintiff)
Deposition, July 2017
**Oklahoma**

Philip Smallman, Esq.
*Keston Charles v. City of New York* (Plaintiff)
Trial, July 2017
**New York**

Eric Hecker, Esq.
*Dainall Simmons, deceased v. County of Suffolk* (Plaintiff)
Deposition, May 2017
**New York**

Arthur Benson, Esq.
*Estate of Rachel Hammers v. Douglas County, Kansas et al.* (Plaintiff)
Deposition, March 2017
**Kansas**

Earl Ward, Esq.
*People v. Cesar Villavicencio* (Defense)
Trial, January 2017
**New York**

Roger Jordan, Esq.
*State of LA v Victor Becnel* (Defense)
Trial, January 2017
**Louisiana**

Karen Evans, Esq.
*Estate of Robin Andrews v. National Rehabilitation Hospital et al.* (Plaintiff)
Deposition, January 2017
**Washington, D.C.**

## 2016

Brett Pinion, Asst. D.A.
*Estate of Towns v. East Point Police Department, et al.*
Trial, December 2016
**Georgia**

Daniel Rotko, Esq.
*Lincoln Benefit v. Bowman*
Deposition, October 2016
**Pennsylvania**

William Darrow, USAVT
*U.S. v. Donald Fell* (Prosecution)
Daubert hearing, September 2016
**Vermont**

Peter Neufeld, Esq. (Defense)
*Commonwealth of PA v. Anthony Wright*
Trial, August 2016
**Pennsylvania**

John DeRosier, D.A. (Prosecution)
*State of LA v. Felix Vail*
Trial, August 2016
**Louisiana**

Amy Rameau, Esq. (Defense)
*People of the State of New York v. Eryk Ford*
Trial, July 2016
**New York**

Edward Capozzi, Esq. (Plaintiff)
*Chique v. Marano*
Trial, April 2016
**New Jersey**

Paul Slager, Esq. (Plaintiff)
*Le v. Yale University*
Deposition, April 2016
**Connecticut**

Robert Reardon, Esq. (Plaintiff)
*Robert Bergeson deceased v. Hawes, et al.*
Deposition, February 2016
**Connecticut**

Ed Parkinson, Special Prosecutor (Prosecution)
*State v. Curtis Lovelace*
Trial, February 2016
**Illinois**

## 2015

Mauricio Padilla, Esq. (Defense)
*State of Florida v. Derek Medina*
Trial, November 2015
**Florida**

Martin Solomon, Esq. (Plaintiff)
*Estate of Chester Brackeen v. KC Homes*
Deposition, October 2015
**Arizona**

Mauricio Padilla, Esq. (Defense)
*State of Florida v. Derek Medina*
Deposition, October 2015
**Florida**

Martin Phipps, Esq. (Plaintiff)
*Estate of Kristine Hoyt v. David Kim, M.D., et al*
Trial, September 2015
**Texas**

Christopher Chestnut, Esq. (Plaintiff)
*Champion v. Florida Agricultural and Mechanical Univ. Board of Trustees, et al.*
Deposition, September 2015
**Florida**

Jeremy Thompson, Esq. (Defense)
*State of South Carolina v. Hillerby*
Trial, September 2015
**South Carolina**

Christopher Campbell, Esq. (Defense)
*Litle, et al. v. Arab Bank*
Deposition, August 2015
**New York**

Veronica E. Bindrim-MacDevitt, Special Asst. Attorney General (Prosecution)
*Long Island Nursing Home death*
Trial, June 2015
**New York**

William Fitzpatrick, District Attorney (Prosecution)
*People v. Neulander*
Trial, March 2015
**New York**

# APPENDIX

Michael David, Esq. (Plaintiff)
*Bornstein v. County of Monmouth, et al.*
Trial, February 2015
**New Jersey**

Lt. Det. Gary Capitano (Prosecution)
*Commonwealth of PA v. Hugo Selenski*
Trial, February 2015
**Pennsylvania**

Robert Ryder, Esq. (Defense)
*Purton v. Marriott Corp.*
Deposition, January 2015
**California**

EXHIBIT "D"

**APPENDIX** **1531**

## CURRICULUM VITA

*RUDY V. NYDEGGER PH.D., ABPP, FNAP, PLLC*
*2317 Balltown Road, Suite 203*
*Niskayuna, NY 12309*
*Phone: 518-377-4398*
*Fax: 518-309-4420*
*Email: Nydegger@union.edu*
*Website: rudynydegger.com*

### EDUCATION

*National Science Foundation, Summer Course in Gerontology, Washington University, St. Louis, 1981.*

*Baylor Medical School, Houston, Texas, 1970-72. Post-Doctoral Fellowship in Child and Adolescent Clinical Psychology.*

*John Cochran Hospital, St. Louis, 1968-69. Clinical Internship in Psychology.*

*Washington University (St. Louis), 1967-70. Ph.D. in Clinical Psychology.*

*Wichita State University, 1966-67. M.A. in Psychology with Emphasis on Clinical Psychology.*

*Wichita State University, 1962-66. B.A., cum laude, with Departmental and University Honors in Psychology. Minor subjects: Sociology, Anthropology, and Chemistry.*

*Kansas State University, 1961-62. Chemistry Major.*

### EMPLOYMENT EXPERIENCE

*Chief, Division of Psychology, Ellis Hospital, 1997-present.*

*President, Psychological & Management Resources; Clinical Psychology and Management Consulting Firm, 1984-present.*

*Instructor, Cornell University Institute of Industrial and Labor Relations, 1992-1996.*

*Professor of Management, School of Management, Union Graduate College, 1986-2015*

*Professor Emeritus of Psychology, Union College, 2015-present*

*Professor of Psychology, Union College, 1977-2015*

*Chairman, Department of Psychology, Union College, 1978-1985*

*Acting Dean of Students at Union College, 1977-78*

*Assistant Professor of Psychology, Union College, Schenectady, NY, 1977-78*

*Child Psychologist in the Child Study Clinic, Texas Research Institute, Houston, TX., 1975-76*

*Adjunct Assistant Professor of Psychology, University of Houston, 1974-76*

*Child Psychologist at the Child and Adolescent Psychiatry Clinic, Texas Children's Hospital, Houston, TX., 1974-76*

*Adjunct Assistant Professor of Obstetrics and Gynecology, Baylor College of Medicine, 1973-76*

*Adjunct Assistant Professor of Psychology, Department of Psychiatry, University of Texas College of Medicine at Houston, 1972-76*

*Clinical Assistant Professor of Psychology, Department of Psychiatry, Baylor College of Medicine, Houston, TX., 1972-76*

*Acting Head Child Psychologist, Child Psychologist, Child Study Clinic, Texas Research Institute, Houston, TX., 1971*

*Child Psychologist at the Child Study Clinic, Texas Research Institute, Houston, TX., 1970-74*

*Assistant Professor at Rice University, Houston, W, 1970-76*

*Post-Doctoral Clinical Psychologist, Baylor Medical School, Houston, TX., 1970-72*

*Instructor in Psychology at Maryville College, St. Louis, MO., 1969-70*

*Research Associate at the Child Development Research Center, Washington University School of Medicine, Division of Child Psychiatry, 1968-69*

# APPENDIX

**1533**

### *AWARDS & HONORS*

*Second Prize in the Marion E. Bunch Creative Awards Contest, for Outstanding Research in Psychology, Washington University, 1968.*

*Third Prize in the James McKeen Cattell Fund Award for Research in Psychology. Division of Consulting Psychology, American Psychological Association, 1968.*

*Member, Sigma Xi Honorary, 1970-present.*

*Invited Participant in the International Conference on Problems in Game Theory, Bielefeld, West Germany, 1974.*

*Honorable Mention Award for Research, New York Psychological Association, 1980.*

*President's Award for Education and Outreach Programs, National Hospice Organization, 1984.*

*Hans M. Rozendaal Award for Service and Leadership, Hospice of Schenectady, 1985.*

*Founder's Award, Community Hospice, 1996.*

*Member, Beta Gamma Sigma, Honorary Society for Business, 2001-present*

*Best Paper Award, European Applied Business Research Conference, Rothenburg ob der Tauber, Germany, 2002.*

*Faculty Recognition Award, presented by the coaches and players of the Union College Football Team, 2002.*

*Invited Lecturer, First Annual Allan Geis, M.D. Memorial Lecture, Department of Pediatrics, Albany Medical College, March, 2004.*

*Distinguished Psychologist, presented by the Psychological Association of Northeastern New York, 2005.*

*Distinguished Service Award, presented by the New York State Psychological Association, 2005.*

*The David Mitchell Award for Contributions to Academic Psychology, presented by the New York State Psychological Association, 2006.*

*Best Paper Award, Management Section, Southwest Academy of Management Annual Convention, San Diego, CA, April, 2006.*

*Invited Lecturer, Tolstoy State University Tula, Russia, October, 2008.*

*Invited Lecturer, Tula State Polytechnical University, Tula, Russia, October, 2008.*

*Best Paper Award, Management Section, International Business and Economic Research Conference, Las Vegas, October, 2009.*

*Distinguished Fellow, National Academies of Practice, 2016.*

*Best Paper Award, Management Section, International Business and Economics Research Conference, Las Vegas, October, 2016.*

*Distinguished Fellow, New York State Psychological Association, 2018.*

### *SCHOLARSHIP*

### *Refereed Journal Articles, Books, and Chapters in Books:*

*Nydegger, R. (2019). <u>Understanding Therapy</u>. Santa Barbara, CA: Greenwood Press.*

*Nydegger, R. (2018). <u>Clocking In: The Psychology of</u> Work. Santa Barbara, CA: Greenwood.*

Nydegger, *R. and Enides, C.* (2017). The psychology of work: Changes in the 21st century. *International Business and Economic Research Journal, 16*(3), 197-298.

*Nydegger, R. (2016). <u>Dealing with Anxiety</u>. Santa Barbara, CA: Praeger.*

*Nydegger, R. (2016). <u>Understanding Depression</u>. Santa Barbara, CA: Praeger.*

*Nydegger, R. (2014). <u>Suicide and Mental Health</u>. Santa Barbara, CA: Greenwood.*

*Nydegger, R., Nydegger, L., and Basile, F. (2011).   Posttraumatic stress and coping among career professional firefighters. <u>American Journal of Health Sciences</u>, 2 (1), 11-20.*

*Nydegger, R. (2012).  <u>Dealing with Anxiety and Related Disorders</u>. New York: Praeger*

*R.V. (2011). Virtual organizational behavior. In T. Tuten, Ed., <u>Enterprise 2.0</u>. New York: Praeger.*

Nydegger, R.V. and Nydegger, L.A. (2010). *Challenges in managing virtual teams. Journal of Business and Economic Research, 8 (3), 69-82.*

Nydegger, R. V. (2009). *Psychologists and hospice: Opportunities and Needs. The Register Report, National Register of Health Service Providers in Psychology, Spring, 2009 edition.*

Nydegger, R.V. (2008). *Psychologists and hospice: Where we are and where we can be. Professional Psychology: Research and Practice, 39(4), 459-463.*

Nydegger, R.V. (2008). *Understanding Depression: Ways to Get Hope and Help. New York: Praeger.*

Paludi, M., Nydegger, R.V., and Paludi, C. *Violence in the Workplace: A Resource for Employees and Managers. (2006), New York: Praeger.*

Paludi, M., Nydegger, R.V., DeSouza, E., Nydegger, L.A., & Dicker, K.A. (2006). *International perspectives on sexual harassment of college students: The sounds of silence. Annals of the New York Academy of Science, (1087), 103-120.*

Nydegger, R.V., Paludi, M., DeSouza, E., and Paludi, C. (2006). *Incivility, sexual harassment, aggression, and violence in the workplace. In M. Haber, Ed. Sexual Harassment in the Workplace. New York: Praeger.*

Nydegger, R.V. Postpartum Depression. (2006). *In T. Plante, Ed., Mental Disorders of the New Millenium. New York Praeger.*

Nydegger, R.V. & Paludi, M. Obsessive-Compulsive Disorder. (2006). *In T. Plante, Ed. Mental Disorders of the New Millenium. New York: Praeger.*

Nydegger, R.V. *Gender and Mental Health. (2004). In M. Paludi, Ed., The Gender Handbook. New York: Praeger,.*

McEvoy, B., Nydegger, R. V., & Williams, G. H. (2002). *Factors Related to Keeping Appointments in Patients with Acne Vulgaris. , International Journal of Dermatology, 42, 274-280.*

Nydegger, R. V. (2002). *Stress and Job Satisfaction in White- and Blue-Collar Workers. International Business and Research Journal, 1(12), 35-44.*

Kent, D. D., Arnold, D. F., Sr., & Nydegger, R. V. (2002). *Effects of selected psychological characteristics upon choice shift patterns found within hierarchical groups of public accountants. Psychological Reports, 91, 85-104.*

Nydegger, R. V. (2000). Violence, aggression, and passive-aggression in the workplace: Some causes and potential remedies. <u>Management Development Forum</u>, <u>3</u> (1), 121-141.

Bernardi, R. A., & Nydegger, R. V. (1999). Changes in distribution of mean scores on locus of control by staff status of public accounting. <u>Psychological Reports</u>, <u>85</u>, 1081-1087.

Nydegger, R. V. Dealing with managerial peers. In, <u>Management Resource Guide</u>. <u>Capital Business Review</u>, April 2, 1990.

Nydegger, R. V., Williams, G. H., Lipton, J. P., and Greenberg, S. N. The social psychology of programming teams. <u>USE, Inc.</u> <u>Technical</u> <u>Papers</u>, 1983, 717-736.

Bashore, T. R., Nydegger, R. V., and Miller, H. Left visual field superiority in a vocal-naming task by both right- and left-handers. (1982), <u>Cortex</u>, <u>18</u>, 245-256.

Nydegger, R. V. The effects of information processing complexity and interpersonal cue availability on strategic play in a mixed-motive game. <u>Journal of Personality</u> 1980, <u>48</u>, 38-53.

Nydegger, R. V. The use of independently scaled utility functions in the experimental applications of game theory. In V. Smith, (Ed.), <u>Research in Experimental Economics</u> 1979, <u>1</u>, 361-374, Greenwich, CT: JAI Press.

Nydegger, R. V. Independent utility scaling and the Nash Bargaining model. <u>Behavioral Science</u> 1977, <u>22</u>, 283-289.

Nydegger, R. V. and Owen, G. The norm of equity in a three-person majority game. <u>Behavioral Science</u> 1977, <u>22</u>, 32-37.

Monts, J. K., Zurcher, L. A., and Nydegger, R. V. Interpersonal self-deception and personality correlates. <u>Journal of Social Psychology</u>, 1977, <u>103</u>, 91-99.

Nydegger, R. V., and Owen, G. Two-person bargaining: An experimental test of the Nash Axioms. <u>International Journal of Game Theory</u>, 1975, <u>3</u>, 239-249.

Nydegger, R. V., Leadership status in small groups: A rewards/cost analysis. <u>Small Group Behavior</u>, 1975, <u>6</u>, 353-367.

Nydegger, R. V. Information processing complexity and leadership status. <u>Journal Of Experimental Social Psychology</u>, 1975, <u>11</u>, 317-328.

*Nydegger, R. V.  Information processing complexity and gaming behavior: The Prisoner's Dilemma.  <u>Behavioral Science</u> 1973, <u>19</u>, 204-210.*

*Nydegger, R. V. and Brelsford, J. W.  Psychology Today Films: An educational upper, <u>Contemporary Psychology</u>, 1972, <u>17</u>, 286-288.*

*Nydegger, R. V., The elimination of delusional and hallucinatory behavior by use of verbal conditioning and assertive training.  <u>Journal of Behavioral Therapy and Experimental Psychiatry</u> 1972, <u>17</u>, 286-288.*

*Nydegger, R. V., Leadership status and verbal behavior in small groups as a function of schedule of reinforcement and level of information processing complexity.  <u>APA Proceedings,</u> 1971, 293-294.*

*Leff, H. S., Nydegger, R. V., and Buck, M.  The effects of nurses' mode of dress on behavior of psychiatric patients differing information processing complexity.  <u>Journal of Consulting and Clinical Psychology</u>, 1970, <u>34</u>, 72-73.*

### *Other Journal Articles*

*Nydegger, R. V., and Halpern, S.  CE Questionnaire Results.  <u>NYSPA Notebook</u>, <u>X</u>, 5, September, 1998.*

*Nydegger, R. V.  <u>Psychological and psychiatric therapies:</u> <u>A brief introduction</u>. Mental Health Association, 1981.*

*Nydegger, R. V.  The devil you say: Demonic intrigue/audience response. <u>Opera</u>, April 1974, 1-7.*

***Presentations, Lectures, And Conference Papers***: *Dr. Nydegger has over 100 presentations to professional groups and conferences.*

### *Journal Referee and Editorial Board Activities*

*Consulting Editor, <u>Management Development Forum</u>, 1997-2006.*

*Consulting Editor, <u>Journal of Personality and Social Psychology</u>, 1977-1984.*

*<u>Ad hoc</u> reviewer, <u>Journal of Clinical and Consulting Psychology</u>, 1980-present.*

# APPENDIX

**1538**

## CONSULTING EXPERIENCE

*Dr. Nydegger has provided consulting services in the private (e.g., General Electric, Unisys, Ford Motor Company), public (e.g., NY State Department of Parks and Recreation, NY State Office for Technology, Veteran's Administration Information Technology Services), Veteran's Administration Clinical Evaluations of Veterans, Department of Energy Evaluations Regarding Security Clearance, many medical and educational organizations. He has consulted with dozens of organizations over that past few decades.*

## MEMBERSHIP IN PROFESSIONAL ORGANIZATIONS

*Distinguished Fellow, New York Psychological Association*

*Distinguished Fellow, National Academies of Practice*

*Fellow, Psychology Academy, National Academies of Practice*

*Board Certified in Clinical Psychology by the American Board of Professional Psychology, Diplomate*

*American Academy of Clinical Psychology, Fellow*

*Executive Board of the National Register of Health Service Psychology, Past-President and Chair of the Board, Past Secretary of the Board, Member of Finance Committee, Member, Chair of Strategic Planning Task Force*

*American Psychological Association, Member in Divisions of Clinical Psychology, Social Psychology, and Psychologists in Private Practice*

*Member, New York State Psychological Association, Chair of Continuing Education, 1998-2002; Member, Committee on Mandatory CE, President-Elect, 2002, President, 2003, Past-President, 2004, Chair, Program Committee, 2004-2006, State Advocacy Coordinator, 2005-2006, Chair, Legal & Legislative Committee, 2006-2008.*

*Member, Psychological Association of Northeastern New York, Vice President, 1997-98; President, 1998-99, Chair of Ethics Committee, 1999-2000.*

*Licensed and Certified as a Psychologist in New York*

*Certified by the National Register of Health Care Providers in Psychology, 1981-present.*

*Member, New York Academy of Sciences*

Member, New York State Board of Psychology (Member, 1986-1991; Panel
   Member for Licensure and Disciplinary Hearings, 1986-1996)

Member, American Association of State Psychology Boards, 1986-1991

National Hospice Organization, Member, Chair of Professional Liaison
   Committee (1986-1988)

New York State Hospice Association, Member, 1980-present.

Prescribing Psychologists Register, Charter Listed Member, 1999-present.

Professional member, New York State United Teachers.

### SERVICE

Dr. Nydegger has decades of experience providing service in the community
   and in his departments, colleges, hospitals, and universities.

### MEDIA INVOLVEMENT

I am frequently interviewed and quoted by local TV (WRGB, WNYT, WXXA,
   News Channel 9, WMHT), and radio (81-WGY), and have been on many
   call-in, and in-studio programs.

I am frequently interviewed and quoted by local newspapers (Albany Times
   Union; Daily Gazette)

I have been interviewed and quoted by many newspapers around the country
   including the Houston Chronicle, the Wall Street Journal (three times),
   and the New York Times (three times).

I have been interviewed and quoted several times by the New York State
   Teacher.

I have been interviewed by many magazines and journals over the years.

Case 1:17-cv-00626-DJS Document 60-1 Filed 06/14/21 Page 818 of 67

EXHIBIT "E"

Case 1:17-cv-00625-DJS Document 143-25 Filed 06/14/21 Page 523 of 67

*Rudy Nydegger, Ph. D., ABPP, PLLC*
2317 Balltown Road, Suite 203
Schenectady, New York 12309
Phone: 518-309-4409
Fax: 518-309-4420
Email: Nydegger@union.edu

January 27, 2021


Crystal R. Peck, Esq.
Bailey, Johnson & Peck, P.C.
5 Pine West Plaza, Suite 507
Washington Avenue Extension
Albany, New York 12205

Dear Ms. Peck:

I reviewed the deposition testimony of Adrian Thomas taken on August 20 and 21, 2019, Rensselaer County Probation Records relative to Adrian Thomas, New York State Department of Corrections and Community Supervision records relative to Adrian Thomas, Samaritan Hospital records relative to Adrian Thomas (DOB: 9/22/1982), and the psychological evaluation of him that was prepared by Matthew B. Johnson, Ph.D. a licensed psychologist. After reviewing all of the information, I have some concerns about Dr. Johnson's report and will address these issues individually. The opinions I render in my report are within the bounds of reasonable psychological certainty.

According to Dr. Johnson's report dated 11/16/2020, he based his findings on the amended complaint, plaintiff's affidavit, police and medical records, an interview with the plaintiff, and an interview with the plaintiff's aunt who had cared for him for most of his life since his mother was reported to be a "drug addict" and was not able to care for the young boy, and his father was apparently not in the picture.

Dr. Johnson's report stated that during the plaintiff's interrogation following his arrest for allegedly having abused and mortally injured his son, the plaintiff complained of being depressed and made a suicidal threat. It was reported that the plaintiff was "clinically depressed" and was taken to Samaritan Hospital for evaluation. There were no indications in the materials that I read as to who made the judgment that the plaintiff was "clinically depressed." He was evaluated at Samaritan Hospital and diagnosed with an Adjustment Disorder With Depressed Mood (DSM-5—309.00). This disorder is based on the development of emotional or behavioral symptoms in response to an identifiable stressor(s) occurring within three months of the onset of the stressor (DSM-5). He was kept and observed for 16 hours and then released back to the police.

Neither Mr. Thomas (the plaintiff) nor his aunt report any psychological problems in Mr. Thomas (including depression) prior to his arrest, and I did not find any evidence of medical records indicating a history of depression or psychological problems prior to his arrest. It was

also stated that he has not sought mental health treatment since his acquittal. In his deposition, Mr. Thomas stated that following his arrest and interrogation he felt depressed and suicidal and was given Zoloft (an SSRI antidepressant) which he felt did not help him at all and he stopped taking it. When asked about whether counseling would be helpful, he stated that he could see no benefit in talking to someone about his problems and denied the need for any mental health treatment. It was noted in Dr. Johnson's report that Mr. Thomas reported his depression and suicidality while in prison, but the plaintiff stated that while he still deals with depression when he was acquitted the suicidality remitted.

Dr. Johnson stated that Mr. Thomas' arrest, interrogation, imprisonment, and other outcomes of his having been convicted were the proximate causes of his suffering and adversity. While these factors may well have negatively impacted his mood and psychological condition, there are factors that suggest that depression may have been an issue during other parts of his life as well. For example, we know from research and clinical experience that parental abandonment and child abuse, which the plaintiff reports in his history, are factors that are frequently found to be related to depression in adulthood (Cukor & McGinn, 2006). Mr. Thomas also reports that he drinks alcohol in ways that appear to be abusive, and there is high comorbidity between alcohol abuse and depression (Fergusson, et al., 2009). Further, he reports being morbidly obese for most of his life, and there is evidence and clinical experience of a high comorbidity between morbid obesity and depression (Markowitz, et al., 2008). While we do not have any records or reports of depression prior to his arrest, he does report that had conditions that are risk factors for depression, including child abuse and neglect, witnessing domestic abuse, dropping out of school (Dupere, et al., 2018), morbid obesity, and possible alcohol abuse. He also indicates that he did not pursue and mental health assistance in the past nor did he report discussing depression with his Primary Care Physician prior to his arrest.

It is also noteworthy that there is no mention of any difficulties with substance use prior to his arrest although in his medical records from Samaritan Hospital he reports that he started drinking alcohol at age 15 and mentions occasional binge drinking, although in his evaluation with Dr. Johnson, Mr. Thomas and his aunt both deny that he had used alcohol or drugs as a youth and before his arrest. He reports that he completed the tenth grade, although in his deposition he says he completed the ninth grade, but he admittedly did not finish high school and he said that was because he was running with "the wrong group." He does not mention alcohol use with this group of friends, and he and his aunt deny and difficulties with the law prior to his arrest although they did mention that he had been a suspect in a robbery in the neighborhood although they also report that the charges were dropped. While the only evidence that we have of his alcohol use is the testimony of Mr. Thomas and his aunt, he did report that he drinks 4-5 beers per day and more on the weekends; occasionally he will drink hard liquor as well. Dr. Johnson diagnoses Mr. Thomas with: R/O (rule out) Alcohol Abuse. Clearly, if Mr. Thomas' self-report of his drinking is accurate, alcohol abuse is likely to be an issue, although there is no evidence that Mr. Thomas has had a formal alcohol evaluation prior to or following his arrest.

# APPENDIX

Dr. Johnson diagnoses Mr. Thomas as suffering from PTSD and states that the proximate cause of his suffering and adversity is based on the interrogation and outcomes of his trial. However, he does not evaluate the possibility of any trauma occurring during his childhood or youth, and yet he has a history of abandonment by his mother, and in his medical records from Samaritan Hospital he reports that he witnessed domestic abuse as a child. Some other indications of the possibility of trauma include dropping out of school because he ran with "the wrong crowd" and having been a suspect in a robbery all of which may have had trauma associated with these events. However, there is no record of such trauma, although this should have been further evaluated. Without evaluating these events one cannot opine with any degree of medical certainty that PTSD is caused exclusively by the alleged wrongful incarceration.

Dr. Johnson's report indicates that Mr. Thomas did present with many symptoms consistent with the diagnosis of PTSD. However, one of the criteria that is necessary for the diagnosis of PTSD is that "The disturbance is not attributable to the physiological effects of a substance (e.g., medication or alcohol) or another medical condition" (DSM-5). Since no formal alcohol evaluation was apparently ever done on Mr. Thomas then there is no way to confidently assert than none of his symptoms are caused by alcohol abuse and therefore the diagnosis of PTSD can only be used provisionally, and while Dr. Johnson did not qualify his diagnosis as provisional, he did state that alcohol abuse should be ruled out, and in this case it was not.

The diagnosis of Enduring Personality Changes After Catastrophic Experience (EPCACE; ICD-10 F62.0) is also concerning. First, this is not a diagnosis that is used in the DSM-5 and most psychologists and psychiatrists use the DSM-5 for diagnostic codes and labels except when an agency or insurance company prefers to use the IDC-10 codes. However, since the only diagnoses that Dr. Johnson uses for Mr. Thomas are clinical (not personality) disorders, and the symptoms that are listed are those associated with his diagnoses and there are neither diagnoses of a Personality Disorder or indications of an evaluation of Mr. Thomas' personality, then there is no way to know what the "enduring changes" resulted in Mr. Thomas' personality. Further, since there are no indications of any evaluation of Mr. Thomas' personality prior to his arrest, other than what his aunt reports, there is no baseline upon which to evaluate what the changes in Mr. Thomas' personality may have been. Since there is no personality baseline and no evaluation of Mr. Thomas' personality that would indicate the nature of his personality or what the changes may have been, then this diagnostic label should not be used.

Although many feel that EPCACE is a justifiable diagnostic issue, "…yet many aspects of the diagnosis remain contentious. Criticisms leveled at EPCACE raised issues that question the reliability, validity, and clinical utility of this diagnostic category" (Beltrain, et al., 2008). Consequently, even if it is felt that the diagnosis is justifiable as an indication of changes in Mr. Thomas' personality, there is question as to whether or not this diagnosis is even appropriate under any circumstances, and many professionals and researchers, me included, feel that there is not enough information or clear diagnostic criteria to warrant using this diagnosis until further work and clarification have been done.

In any forensic or clinical evaluation, care is usually taken to ensure that there is sufficient information upon which to base clinical or forensic judgments. In Mr. Thomas' case there is little information available either medically or psychologically either before or following his arrest, nor has he pursued any help or assistance following his acquittal. Consequently, most of the information that we have about Mr. Thomas' medical and psychological conditions come from his self-report, his aunt's report, police reports, legal records, and his medical records from Samaritan Hospital. When there is such a paucity of background information, it is common practice to use psychological testing to provide more substantive information, and in this case a more in-depth evaluation, including psychological testing, would have been appropriate and warranted.

Since so much of the background information came from Mr. Thomas and his aunt, one must keep in mind that in forensic settings it is common for the person being evaluated (or his/her friends or family) to present themselves in a way that they feel is in their best interests. Many psychological tests are constructed to detect issues of answering in ways to present themselves in a particular fashion and this can even be corrected for in the test evaluation. If the answers are skewed in a manner that is too extreme, then the test would be invalidated. Consequently, testing would not only have provided more and valid information, but it might also have even been more advantageous for Mr. Thomas by clarifying the diagnostic issues and possibly recommending meaningful treatment . Further, since we have so little information about Mr. Thomas' mental condition before and after his arrest, testing would also provide a way to assess his current mental state and psychological symptoms but could also help understand how long and persistent some of his symptoms had prevailed.

Finally, as mentioned above, a thorough evaluation would have included a systematic and professional evaluation of Mr. Thomas' alcohol use patterns. Not only could this have provided information that would have helped understand the source of some of his symptoms, but it would also have allowed an unqualified diagnosis of PTSD which now should only be used provisionally until the alcohol abuse has been evaluated and fully understood.

Rudy Nydegger, Ph.D., ABPP, FNAP, PLLC
Board Certified in Clinical Psychology
Professor Emeritus, Union College & Union Graduate College
Chief, Division of Psychology, Ellis Hospital

ATT: References

4

**References**

American Psychiatric Association: Desk Reference to the Diagnostic Criteria From DSM-5, Arlington, VA, American Psychiatric Association, 2013.

Beltrain, R.O., Llewellyn, G.M., and Silove, D. (2008). Clinicians' understanding of *International Statistical Classification of Diseases and Related Health Problems, 10th Revision* diagnostic criteria: F62.0 enduring personality change after catastrophic experience. *Comprehensive Psychiatry, 49(6),* pp. 593-602.

Cukor, D. & McGinn, L.K. (2006). History of child abuse and severity of adult depression: The mediating role of cognitive schema. *Journal of Child Sexual Abuse, 15*(3). https//: doi.org/10.1300/J070v15n03-02.

Dupere, V., Dion, E., Nault-Briere, F., Archambault, I., Leventhal, T., & Lesage, A. (2018). Revisiting the link between depressive symptoms and high school dropout: Timing of exposure matters. *Journal of Adolescent Health, 62*(2), pp. 205-211.

Fergusson, D.M., Boden, J.M., & Horwood, L.J. (2009). Tests of causal links between alcohol abuse or dependence and major depression. *Archives of General Psychiatry, 66*(3), pp. 260-266.

Markowitz, S., Friedman, M.A., & Arent, S.M. (2008). Understanding the relation between obesity and depression: Causal mechanisms and implications for treatment. *Clinical Psychology: Science and Practice.* https//: doi.org/10.1111/j.1468.2850.2008.00106.x.

Russell, D., Springer, K.W., & Greenfield, E.D. (2009). Witnessing domestic abuse in childhood as an independent risk factor for depressive symptoms in young adulthood, *Child Abuse and Neglect, 34*(6), pp. 448-453.

Materials Provided for Review from Ms. Peck's Office
- Matthew B. Johnson, Ph.D., Curriculum Vita
- Psychological Report prepared by Matthew B. Johnson, Ph.D. and submitted to Mr. Brett H. Klein, Esq.; report dated November 16, 2020
- Northeast Health EDM Behavioral Crisis Chart Medrec; dated 9/22/2008
- Reception/Classification System, Classification Analysis; Intake Interview, 11/23/2009
- Reception/Classification System, Classification Analysis; Description of Criminal Behavior; dated 11/23/2009
- Prisoner Information from Auburn dated 11/20/2009
- Presentence Investigation, Rensselaer County Court, 11/12/2009

- The Plaintiffs's disposition testimony

Case 1:17-cv-00626-DJS Document 61-9 Filed 06/14/21 Page 1 of 4

EXHIBIT "I"

APPENDIX

**1548**

ALBANY MEDICAL CENTER HOSPITAL
NEW SCOTLAND AVENUE
ALBANY, NY 12208

## TRANSFER DISCHARGE SUMMARY

**NAME:** THOMAS, MATTHEW

**MED. REC#:** 2257912
**ADMIT SOURCE:**

**ATTENDING MD:** WALTER E. EDGE, MD
**DATE OF BIRTH:** 05
**ED RESIDENT:**

**ADMISSION DATE:** 09/21/2008
**DISCHARGE DATE:** 09/23/2008

### DEATH SUMMARY

**DATE OF EXPIRATION:** September 23, 2008.

### ADMISSION DIAGNOSIS
1. Deep coma.
2. Bilateral hemispheral subdural hematomas.
3. Hypotension.

### DEATH DIAGNOSES
1. Deep coma.
2. Bilateral hemispheral subdural hematomas.
3. Hypotension, resolved.
4. Disseminated intravascular coagulation.
5. Bilateral retinal hemorrhages.
6. Evidence of nonaccidental trauma.
7. Evidence of shaken baby syndrome or child abuse.
8. Brain death.

**REFERRING PHYSICIAN:** Dr. Kardos from Northeast Health at Samaritan Hospital.

**SERVICE:** Pediatric intensive care unit.

**RESIDENT:** Dr. Weinstein.

### CONSULTS
1. Ophthalmology saw the patient on September 21, 2008.
2. Neurosurgery saw the patient on September 21, 2008, and September 22, 2008, throughout the stay.
3. Hematology/Oncology, saw the patient on September 22, 2008. Heme/Onc was Dr. Kanwar.

**PROCEDURES:** Left femoral central line.

**HISTORY AND PHYSICAL EXAM:** Pertinent history and physical from admission: The patient is a 4-month-old ex-32 weeker who presented to outside hospital Samaritan Hospital with diarrhea, vomiting, and poor respiratory effort with progression of foul-smelling watery green diarrhea. On the day of admission in the morning, the mom noticed the patient was "breathing strangely" and unresponsive and called the EMS and was brought to Samaritan Hospital. EMS noted that he was not spontaneously breathing as well, required a bag mask ventilation and moved to Samaritan. At Samaritan, the patient was intubated requiring 100% FiO2 and O2 saturations were approximately 70%. With suction, O2 saturations improved to 95% and suction fluid revealed greenish copious discharge. At Samaritan, the patient was intubated with etomidate. IV access was obtained and was given vancomycin and ceftriaxone. He received IV fluids boluses x3, started on a dopamine drip due to hypotension, and was transferred to Albany Med.

**BIRTH HISTORY:** Child is a product of a twin gestation at 32 weeks, stayed in the NICU for

**PATIENT:** THOMAS, MATTHEW                MR#: 2257912
**DOB:** 05/04/2008

Page 2 of 3

approximately 5 weeks.

**PAST MEDICAL HISTORY:** Premature at 32 weeks and NICU stay.

**HOSPITALIZATIONS:** May 2008 NICU at AMC.

**PAST SURGICAL HISTORY:** None.

**DEVELOPMENTAL HISTORY:** Trauma denied by mom. Nutrition on Enfamil Preemie Formula.

**FAMILY AND SOCIAL HISTORY:** Lives with mom, dad, and six siblings; oldest is 9 years ago. No pets in the home.

**IMMUNIZATIONS:** up-to-date per mom.

**REVIEW OF SYSTEMS:** See HPI.

**PHYSICAL EXAMINATION:** On presentation to Albany Med, temperature 94 degrees, heart rate 158, respiratory rate 46, blood pressure 89/50, O2 saturation 98% with FiO2 of 100% on ventilator support, and weight 7 kg. General appearance: The patient nonresponsive, not sedated, but he is intubated. HEENT: Anterior fontanelle was boggy. The patient was intubated. Pupils were dilated, nonreactive. The patient had a _____ bite on his right eyelid. Respiratory: Bilateral air entry was equal and symmetric. Breast exam was symmetric. Cardiovascular: Regular rate and rhythm, positive S1 and S2, no murmur, weak bilateral femoral pulses, capillary refill is 4 seconds. Abdomen/GI was soft, nondistended, no masses. GU: Tanner I, circumcised, bilateral descended testicles. Musculoskeletal: No bruising. Skin: Mongolian spots bilateral buttocks, excoriated blisters on right cheek. Neurological exam: Unresponsive, dilated and fixed pupils. No upper extremity withdrawal, mild lower extremity withdrawal.

**LABORATORY DATA:** On presentation, white count was 1.0, hemoglobin was 10, hematocrit was 29.9, platelets 115,000 with 5 neutrophils, 1 band. Profile 1: Sodium 137, potassium 3.7, chloride 104, bicarb 19, BUN 7, creatinine 0.4, glucose 124, calcium 8.7, T protein 4.1, alkaline phosphatase 180, ALT 56, AST 41. Blood gas: pH 7.125, pCO2 of 59, pO2 of 45, bicarb 18.6, base excess negative 10. Blood cultures were pending at the outside hospital. Chest x-ray was within normal limits. ET tube at carina was pulled back.

**PLAN:** So plan at this time, this is a 4-month-old ex-preemie unresponsive, intubated at outside hospital and hypothermic. For respiratory, he was continued on ventilator support with increasing FiO2 requirements and respiratory acidosis. Cardiovascular: Central line was obtained. He was maintained on dopamine and epinephrine drip due to hypotension. Infectious disease: No evidence of infection, but was continued on antibiotics empirically. Neuro: The patient had bilateral subdural hematomas on head CT. Social work was notified. CPS was involved.

**HOSPITAL COURSE:** On September 21, 2008, Ophthalmology was called to evaluate the patient. Their assessment was retinal hemorrhages bilaterally, extensive retinal hemorrhages noted on exam. On September 21, 2008, Neurosurgery was also consulted, Dr. German, to see the patient. His assessment was 4-month-old with bilateral subdural hemorrhage. Poor neurological exam, increased ICP. Their plan was emergency subdural tap pending coags, CPS workup, skeletal survey, and Ophthalmology consult which occurred. Subdural tap was not done due to evidence of DIC and elevated coags. The patient per Neurosurgery had evidence of brain death. No neurological intervention secondary to presence of DIC. Neurosurgery saw the patient again on September 22, 2008. Their assessment was no evidence of brain activity since admission, bilateral subdural hematomas without explanation. Plan: No neurosurgical

ALBANY MEDICAL CENTER HOSPITAL
TRANSFER DISCHARGE SUMMARY

**PATIENT:** THOMAS, MATTHEW                    **MR#:** 2257912
**DOB:** 05/04/2008

Page 3 of 3

intervention indicated, so just skeletal survey and Heme consult. Skeletal survey was done with no evidence of further fracture. First brain death exam was done on September 22, 2008; apnea test was done on morning of September 22, 2008, which showed no breathing despite $CO_2$ of 90. Plan was to repeat apnea test and brain death exam on September 23, 2008. On September 22, 2008, the patient was pancytopenic requiring multiple transfusions of PRBCs, platelets, and FFP. On September 22, 2008, the patient respiratory-wise had ARDS symptoms required high ventilator settings probably secondary to neurogenic pulmonary edema and prolonged hypotension, hypoxia. For infections, he was on ceftriaxone which was continued. Blood cultures are pending. Cardiovascular: He had a sinus rhythm. He was on a dopamine drip and epinephrine drip and a vasopressin drip with attempts to wean based on blood pressure. Hematologic: Heme/Onc did see the patient. Metabolic: He had ongoing metabolic acidosis and the patient received bicarb. He was alimentary NPO. Neurologic once again appeared brain dead, had failed apnea test for repeat apnea test next day. Heme/Onc did see the patient on September 22, 2008. Their impression was coagulopathy associated with history of subdural hemorrhages. Plan: Quantically, most consistent with trauma secondary to abuse, also cited a paper from 1997 stating the same. They recommend documenting factors VIII, IX, and XI to exclude congenital abnormalities; these were done and were normal or are pending. On September 23, 2008, the patient's blood cultures came back negative and a second brain death exam was performed. On that second brain death exam, the patient was in a deep coma. He was unresponsive to any painful stimuli, immediately above the level of spinal cord. He had absent corneal reflexes. Pupils were fixed and unresponsive to light. He had respiratory paralysis and had apnea test for 8 minutes with no spontaneous respiratory effort and his $CO_2$ rose from 50 to 98% off the ventilator. He had part of doll's eyes and he had no response to "calorics". His time of breath death was declared at 11 o'clock.

**DISCHARGE CONDITION:** Deceased, brain dead at 11 o'clock.

**DISPOSITION:** The time of brain death was 11 o'clock. Attending, Dr. Edge is speaking with family.

WALTER E. EDGE, MD

JW/acu/naseema.taj
Dict: Weinstein MD, Jody
Job ID: 23001819

D: 09/23/2008 11:32:19
T: 09/23/2008 14:31

DOC ID: 26534320

**DRAFT REPORT**

# APPENDIX

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

ADRIAN THOMAS,

                                   Plaintiff,

                -against-

ADAM R. MASON, RONALD FOUNTAIN,
TIM COLANERI, and MICHAEL SIKIRICA,

                              Defendants.

_____

**STATEMENT PURSUANT
TO RULE 7.1(a)**
Civil Action No.: 1:17-cv-626
(GTS/DJS)

Pursuant to Rule 7.1(a)3 of the Local Rules of this Court, the above-named defendants, Adam R. Mason, Ronald Fountain, and Tim Colaneri contend that as to the following material facts, no genuine issue exists:

1.     At all relevant times herein, defendant Adam R. Mason was a duly sworn police officer/detective of the Troy Police Department ("TPD"). (Amended Complaint, E.C.F. Doc. No. 31, ¶18).

2.     At all relevant times herein, defendant Ronald Fountain was a duly sworn police officer/detective of the TPD. (E.C.F. Doc. No. 31, ¶19).

3.     At all relevant times herein, defendant Tim Colaneri was a duly sworn police officer/detective of the TPD. (E.C.F. Doc. No. 31, ¶20).

4.     In September 2008, Plaintiff Adrian Thomas lived with his then-wife, Wilhelmina Hicks, and their seven children (one of which was Ms. Hicks' child from a prior relationship) in the City of Troy, State of New York. (E.C.F. Doc. No. 31, ¶¶ 24, 25).

5.     Ms. Hicks and Mr. Thomas had twin boys who were born in May of 2008. (E.C.F. Doc. No. 31, ¶26).

Case 1:17-cv-00626-DJS Document 41-23 Filed 06/14/21 Page 2 of 7

6.      On the morning of September 21, 2008, at approximately 9:00 a.m., one twin, Matthew Thomas ("M.T.") was transported to Samaritan Hospital in Troy, New York after the family called 911 when M.T. was found to be limp and unresponsive. (E.C.F. Doc. No. 31, ¶29).

7.      Ms. Hicks reported to the hospital staff that M.T. had been sick with a fever and experienced diarrhea and vomiting for a couple days preceding September 21, 2008. (E.C.F. Doc. No. 31, ¶29).

8.      Initial assessment at Samaritan Hospital revealed that M.T. was unresponsive, neurologically showing limited neurologic activity, had a low white blood count, had low blood pressure, had increased lethargy, was dehydrated and that he was in respiratory failure. (E.C.F. Doc. No. 31, ¶30; Edge EBT attached to Spencer Aff. as Exhibit "F", p. 13, L. 12).

9.      Due to M.T.'s critical condition, he was transported to Albany Medical Center's ("AMC") Pediatric Intensive Care Unit ("PICU") to be treated by Dr. Walter Edge ("Dr. Edge") and arrived at approximately 12:06 p.m. on September 21, 2008. (E.C.F. Doc. No. 31, ¶31; Edge EBT attached to Spencer Aff. as Exhibit "F", p. 14, L. 11).

10.     Upon arrival at AMC, Dr. Edge observed that M.T. was minimally reactive in that he was not opening his eyes and was essentially comatose. Dr. Edge testified that M.T. would only move his extremities to deep painful stimuli and his pupils were not reactive. (Edge EBT, Exhibit "F" to Spencer Aff., p. 25, L. 23).

11.     Dr. Edge requested consultations from ophthalmology and neurosurgery. (Edge EBT, Exhibit "F" to Spencer Aff., p. 29, L. 23).

12.     As reported on the Albany Medical Central Hospital Transfer Discharge Summary obtained by a subpoena in this matter, on September 21, 2008, the ophthalmologist's assessment

was that M.T. had retinal hemorrhages bilaterally and extensive retinal hemorrhages were noted on the exam. (Subpoenaed Medical Records attached as Exhibit "I" to Spencer Aff. bates stamp "AT0129).

13.     The neurosurgeon's assessment was that M.T. was suffering from a bilateral subdural hemorrhage and that M.T. had suffered a skull fracture. (Id.; *see also*, E.C.F. Doc. No. 31, ¶33).

14.     Due to the nature of the M.T.'s unexplained injuries, Dr. Edge requested that the social worker assigned to the case contact Troy Police. (Edge EBT, Exhibit "F" to Spencer Aff., p. 60, L. 22).

15.     After such contact was made to Troy Police, the police assisted child protective services with removal of the other children at the Thomas household and Defendants Fountain and Mason reported to AMC at approximately 9:00 p.m. on September 21, 2008. (Mason Aff. ¶¶ 8-9; 11; E.C.F. Doc. No. 31, ¶36).

16.     Defendants Mason and Fountain obtained two witness depositions from Wilhelmina Hicks at approximately 11:10 p.m. on September 21, 2008. (Exhibit "A" to Fountain Aff.).

17.     After obtaining the witness depositions from Ms. Hicks, Defendants Mason and Fountain returned to the Thomas household at approximately 11:30 p.m. and requested that Mr. Thomas accompany them to the police station for an interview which Mr. Thomas agreed to do. (Mason Aff. ¶ 18).

18.     Mr. Thomas was interviewed for approximately two hours. (E.C.F. Doc. No. 31, ¶37).

19. During the interview, Mr. Thomas expressed suicidal thoughts and was hospitalized at Samaritan Hospital for approximately 15 hours in the psychiatric unit. (E.C.F. Doc. No. 31, ¶37).

20. On September 22, 2008, Defendant Mason obtained a witness deposition from Dr. Edge at approximately 1:12 p.m. (Exhibit "B" to Mason Aff.).

21. In such witness deposition, Dr. Edge stated that he had examined M.T. who had a subdural hematoma on his head and that such injury was typically considered a high impact injury or other acceleration/deceleration injury which can be caused by very violent shaking or shaking and force against a hard object. (Exhibit "B" to Mason Aff.).

22. Once Mr. Thomas was released from Samaritan Hospital's psychiatric unit, Defendant Mason and a colleague met him at the hospital and asked if he would return to the police station to continue the interview which had concluded in the early morning of September 22, 2008. (Mason Aff. ¶ 34; E.C.F. Doc. No. 31, ¶ 39).

23. The interview lasted for approximately 7.5 hours. (E.C.F. Doc. No. 31, ¶37).

24. Defendant Colaneri observed the interview being conducted by Defendant Mason through the recorded monitoring system at the TPD and entered the room for only a brief period of time during the interview. (Colaneri ¶¶ 10, 15).

25. At the end of the interview, Mr. Thomas signed a 10-page document that was labeled as a "voluntary statement" that contained inculpatory statements made during the interview. (Exhibit "D" to Mason Aff.).

26. Both the first and second interview of Mr. Thomas were recorded on video. (E.C.F. Doc. No. 31, ¶58).

27.     On September 23, 2008, at approximately 1:30 a.m., Mr. Thomas was arrested and charged with attempted murder in the second degree. (E.C.F. Doc. No. 31, ¶51; Arrest Report attached as Exhibit "E" to Mason Aff.).

28.     On September 23, 2008, at approximately 11:00 a.m., M.T. was pronounced dead. (Medical Records attached as Exhibit "I" to Spencer Aff. bates stamp "AT0129).

29.     On September 25, 2008, Dr. Sikrica performed M.T.'s autopsy in the presence of Defendant Mason and members of the Rensselaer County District Attorney's office. (E.F.C. Doc. No. 31, ¶52).

30.     After the autopsy was completed, Dr. Sikirica reported that the cause of M.T.'s death was severe closed head injuries with cerebral edema due to blunt force trauma and the manner of death was homicide. (E.F.C. Doc. No. 31, ¶54).

31.     On September 26, 2008, Defendant Mason testified before the Grand Jury and presented the 10-page statement obtained after Mr. Thomas' second interview. (Mason Aff. ¶56).

32.     On September 26, 2008, Mr. Thomas was indicted for the charge of murder in the second degree. (E.F.C. Doc. No. 31, ¶¶51, 56).

33.     Mr. Thomas' criminal case proceeded to trial in October 2009. (E.F.C. Doc. No. 31, ¶57).

34.     The jury found Mr. Thomas guilty of second-degree murder and he was sentenced to 25 years to life in prison. (E.F.C. Doc. No. 31, ¶61).

35.     Mr. Thomas' criminal defense attorney filed motions to suppress the confessions obtained and to set aside the verdict and such were denied by both the trial court and the Appellate Division Third Department. (People v. Thomas, 93 A.D.3d 1019 (3rd Dep't 2012)).

# APPENDIX

36.     The Third Department's five-Judge panel unanimously held that "the strategies and tactics employed by the officers during the [two] interviews were not of the character as to induce a false confession and were not so deceptive that they were fundamentally unfair and deprived him of due process. (<u>People v. Thomas</u>, 93 A.D.3d 1019, 1027 (3rd Dep't 2012)).

37.     In 2014, the Court of Appeals reversed the lower courts' denial of the Thomas defense's motion to suppress the confession obtained and remanded the case for a new trial. (<u>People v. Thomas</u>, 22 N.Y.3d 629 (2014).

38.     In May 2014, Mr. Thomas was retried without use of the confession or testimony from the police officers. (E.F.C. Doc. No. 31, ¶63; *see* <u>Id.</u>).

39.     Mr. Thomas was acquitted on June 12, 2014. (E.F.C. Doc. No. 31, ¶66).

40.     Mr. Thomas commenced suit against the City of Troy, Adam Mason, Ronald Fountain, Tim Colaneri, ("City Defendants") Rensselaer County and Michael Sikirica ("County Defendants") by a Complaint filed on June 12, 2017. (E.C.F. Doc. No. 1).

41.     The Complaint alleged malicious prosecution, violation of his right to a fair trial and failure to intervene pursuant 42 U.S.C. §1983, conspiracy to maliciously prosecute and conspiracy to violate his right to a fair trial pursuant to 42 U.S.C. §1983 and §1985 and a claim of *Monell* liability as against the City of Troy and County of Rensselaer.

42.     The City Defendants moved to dismiss the Complaint pursuant to F.R.C.P. 12(b) and, in a Decision dated March 22, 2018, the Court granted in part and denied in part the City Defendants' motion. Specifically, the Court dismissed the following claims: (1) violation of a right to a fair trial; (2) the failure to intervene claims; (3) conspiracy to violate Plaintiff's right to a fair trial; and (4) Plaintiff's *Monell* claim against the City. (E.C.F. Doc. No. 61).

43.   The Plaintiff filed a motion for reconsideration and, in a Decision and Order dated November 18, 2019, the Court granted Plaintiff's motion and reinstated Plaintiff's claim of a violation of his right to a fair trial and conspiracy of the same. (E.C.F. Doc. No. 124).

Dated: June 14, 2021.

_____
Rhiannon I. Spencer, Esq.
**PATTISON, SAMPSON, GINSBERG & GRIFFIN, PLLC**
*Attorneys for Defendants*
*Adam Mason, Ronald Fountain, & Tim Colaneri*
22 First Street, P.O. Box 208
Troy, New York 12181-0208
(518) 266-1001

# APPENDIX

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------X

ADRIAN THOMAS,

              Plaintiff,

    -against-

ADAM R. MASON, RONALD FOUNTAIN,
TIM COLANERI, and MICHAEL SIKIRICA,

             Defendants.

--------------------------------------------------------------------------------X

**PLAINTIFF'S RESPONSE TO THE TROY DEFENDANTS' STATEMENT PURSUANT TO RULE 7.1(a)**

17 CV 626 (DJS)

    Plaintiff respectfully submits this response to defendants Adam R. Mason, Ronald Fountain and Tim Colaneri's statement submitted pursuant to Local Rule 7.1(a).[1]

    1.   Not disputed.

    2.   Not disputed.

    3.   Not disputed.

    4.   Not disputed.

    5.   Not disputed.

    6.   Not disputed.

    7.   Not disputed.

    8.   Not disputed.

    9.   Not disputed.

    10.   Not disputed.

    11.   Not disputed.

---

[1] Although defendants styled their submission under former Local Rule 7.1(a)(3), this rule has been superseded by Local Rule 56.1.

Case 1:17-cv-00626-DJS Document 205-3 Filed 09/20/21 Page 296 of 5

12.     Not disputed.

13.     Not disputed that this was the neurosurgeon's assessment, but disputed that M.T. had bilateral subdural hemorrhages or that he had suffered a skull fracture.  Klein Decl. Ex. 6, Sikirica Dep. I 56:6-23, 57:12-19, 85:19-86:14; Ex. 10, Edge Dep. 130:23-131:24.

14.     Not disputed.

15.     Not disputed.

16.     Not disputed.

17.     Not disputed.

18.     Not disputed.

19.     Not disputed.

20.     Not disputed.

21.     Not disputed that Dr. Edge signed the witness deposition, but disputed that he personally wrote it or determined its contents, or that it was accurate.  *Id.* at Ex. 10, Edge Dep. 139:5-141:7, 200:24-202:8; Ex. 21, Edge Statement P001413.  Maloney Decl. Ex. 2.

22.     Not disputed except as to any suggestion or inference that plaintiff had a voluntary choice to return to the police station, insofar as plaintiff did not feel he had a choice regarding complying with the officers, and prior to entering the room was told that if he tried to leave, he would be charged with escape.  Klein Decl. Ex. 4, Thomas Dep. I 150:15-153:14.

23.     Not disputed.

24.     Not disputed that Colaneri entered the interview room one time, but disputed as to any inference that Colaneri did not play an important role and was otherwise personally involved in eliciting or procuring the false confession.  *People v. Thomas*, 22 N.Y.3d 629, 639 (N.Y. 2014); Klein Decl. Ex. 22, Colaneri Dep. I 93:17-22, 97:18-104:13.

25.     Not disputed that Thomas signed the written statement or that it was on a Troy

Police Department form entitled "Voluntary Statement", but disputed that the statement was in fact voluntary, as this was litigated and decided otherwise by the New York State Court of Appeals. *See Thomas*, 22 N.Y.3d at 646.

26. Not disputed.

27. Not disputed.

28. Not disputed.

29. Not disputed.

30. Not disputed these were his findings, but disputed that his findings were accurate. *See* Maloney Decl. Ex. 2.

31. Not disputed.

32. Not disputed.

33. Not disputed.

34. Not disputed.

35. Not disputed as to the procedural history recited, but disputed that the holdings were correct, as they were finally decided otherwise by the New York State Court of Appeals. *Thomas*, 22 N.Y.3d 629.

36. Not disputed that the Third Department decided the matter as recited therein, but disputed that the holding was correct, insofar as it was reversed in a final and binding decision by the New York State Court of Appeals. *Thomas*, 22 N.Y.3d 629.

37. Not disputed.

38. Not disputed, except disputed as to any inference that the TPD defendants were not responsible for Thomas' retrial, insofar as it was the TPD defendants conduct in assuming Thomas' guilt and thereafter coercing Thomas' confession that created the cascade effect that carried through to Thomas being tried a second time, despite any objective evidence to suggest

that Thomas had subjected M.T. to any trauma absent the confession, or that M.T. had suffered

any non-accidental trauma in the first instance. *See* Klein Decl. Ex. 15, Fountain Dep. 96:18-

97:8; *Thomas*, 22 N.Y.3d at 646; Maloney Decl. Ex. 2; Johnson Decl. Ex. 2, Johnson Rpt. p. 11.

    39.      Not disputed.

    40.      Not disputed.

    41.      Not disputed.

    42.      Not disputed.

    43.      Not disputed.

Dated: September 20, 2021
      New York, New York

                        BRETT H. KLEIN, ESQ., PLLC
                        Attorneys for the Plaintiff
                        305 Broadway, Suite 600
                        New York, New York 10007
                        (212) 335-0132

              By:    _____
                        BRETT H. KLEIN
                        LISSA GREEN-STARK

# APPENDIX

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------X

ADRIAN THOMAS,

                                        Plaintiff,

                                                                                17 CV 626 (DJS)

                -against-

ADAM R. MASON, RONALD FOUNTAIN,
TIM COLANERI, and MICHAEL SIKIRICA,

                                        Defendant.

--------------------------------------------------------------------------------X

**PLAINTIFF'S RESPONSE TO THE TROY DEFENDANTS' STATEMENT
PURSUANT TO RULE 7.1**

**BRETT H. KLEIN, ESQ., PLLC**
Attorneys for the Plaintiff
305 Broadway, Suite 600
New York, New York 10007
(212) 335-0132

# APPENDIX

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------X

ADRIAN THOMAS,                                          **PLAINTIFF'S
                                                        LOCAL RULE 56.1**
                                        Plaintiff,      **COUNTER
            -against-                                   STATEMENT**

ADAM R. MASON, RONALD FOUNTAIN,                          17 CV 626 (DJS)
TIM COLANERI, and MICHAEL SIKIRICA,

                                        Defendants.

--------------------------------------------------------------------------------X

Plaintiff respectfully submits this Local Rule 56.1 Counter Statement in support of both
plaintiff's opposition to defendants Adam R. Mason, Ronald Fountain, and Tim Colaneri's motion
for summary judgment, and to defendant Michael Sikirica's motion for summary judgment.[1]

1.      M.T., the four month old son of Adrian Thomas and Wilhelmina Hicks, was
pronounced dead on September 23, 2008.  *See* Klein Decl. Ex. 1, Hicks 2009 Trial 877:16-878:22;
Ex. 9, Samaritan ER Rpt.; Ex. 27, Death Certificate.

2.      M.T. died from a streptococcus pneumoniae infection causing sepsis and
meningitis.  Maloney Decl. Ex. 2, Maloney Rpt. pp. 2, 4.

3.      M.T.'s death was erroneously labeled a crime, resulting in the wrongful conviction
of Mr. Thomas.  Johnson Decl. Ex. 2, Johnson Rpt. pp. 11-12.

4.      M.T. was a twin, born prematurely at 33 weeks on May 4, 2008, during a
complicated birth which necessitated the use of forceps.  *See* Klein Decl. Ex. 1, Hicks 2009 Trial
879:3-25, 912:10-14; Ex. 2, Ojukwu 2009 Trial 1461:2-11.

---

[1] Although defendants submitted their statements of material fact under former Local Rule 7.1(a)(3), given that Local
Rule 7.1(a)(3) was amended January 1, 2021, plaintiff submits his statement under the superseding Local Rule 56.1(b).

5.      During her pregnancy, Ms. Hicks, had gestational diabetes, high blood pressure, and pre-eclampsia.  *Id.* at Ex. 1, Hicks 2009 Trial 879:11-13, 910:11-16.

6.      Hicks was admitted to the hospital on May 1, 2008, where her water broke and showed evidence of meconium.  *Id.* at Ex. 1, Hicks 2009 Trial 911:1-22; Ex. 3, Leestma 2009 Tr. 2122:2-7.

7.      The foregoing issues placed M.T. at risk for subdural bleeds.  *Id.* at Ex. 3, Leestma 2009 Trial 2121:11-2125:13.

8.      After birth, M.T. was admitted to the neonatal intensive care unit at Albany Medical Center (hereinafter "AMC") and then transferred to St. Mary's Hospital, where he remained hospitalized until May 22, 2008.  *Id.* at Ex. 2, Ojukwu 2009 Trial 1460:23-1461:24, 1464:2-3.

9.      As of September 2008, M.T. had only 1 of 4 pneumococcal vaccinations, and due to this and premature birth, was more susceptible to infections, including bacterial pneumoniae. *Id.* at Ex. 2, Ojukwu 2009 Trial 1468:9-1469:23; Ex. 6, Sikirica Dep. I, 112:17-114:3; Ex. 8, Klein 2009 Trial 1986:3-1988:11.

10.      After M.T. came home from the hospital, M.T. was primarily cared for by Ms. Hicks.  *Id.* at Ex. 4, Thomas Dep. I 73:25-74:8.

11.      On or about September 19, 2008, M.T. developed a fever with diarrhea, which lasted through Sunday.  *Id.* at Ex. 1, Hicks 2009 Trial 919:8-923:18.

12.      In the morning of September 21, 2008, Hicks discovered M.T. barely breathing in his crib.  *Id.* at Ex. 1, Hicks 2009 Trial 924:2-5; Ex. 4, Thomas Dep. I 129:16-21.

13.      Prior to that morning, M.T. had not exhibited any problems with his breathing.  *Id.* at Ex. 1, Hicks 2009 Trial 924:2-5.

14.     Thomas called 911 and M.T. was transported to Samaritan hospital where he presented with symptoms of sepsis, and a blood culture was taken to confirm whether M.T. had a bacterial infection. *Id.* at Ex. 4, Thomas Dep. I 129:16-21; Ex. 9, Samaritan ER Report; Ex. 10, Edge Dep. 86:4-25.

15.     M.T. was transferred to the care of Dr. Walter Edge at AMC. *Id.* at Ex. 9, Samaritan ER Report; Ex. 11, Kardos 2009 Trial 849:9-850:14.

16.     Dr. Edge requested a neurology and an ophthalmology consult to look for a possible traumatic brain injury. *Id.* at Ex. 10, Edge Dep. 29:23-30:20; Ex. 12, Waldman Dep. 15:11-23.

17.     Dr. Edge was erroneously informed by the AMC neurosurgery consult that M.T.'s C.T. showed bilateral subdural hematomas and a skull fracture. *Id.* at Ex. 6, Sikirica Dep. I 56:6-23, 57:12-19, 85:19-86:14; Ex. 10, Edge Dep. 127:13-131:24.

18.     It was later determined that the diagnosis of a skull fracture was plainly incorrect while M.T. was still at AMC, and the CT results in fact showed bilateral "fluid collections", not hematomas. *Id.* at Ex. 10, Edge Dep. 127:13-131:24. Later, at autopsy, only a right sided hematoma was observed. *Id.* at Ex. 6, Sikirica Dep. I 56:6-23, 57:12-19, 85:19-86:14.

19.     Nonetheless, based on the reported evidence of head trauma, both Child Protective Services (hereinafter "CPS") and the Troy Police Department (hereinafter "TPD") were notified out of a concern for possible child abuse. *Id.* at Ex. 10, Edge Dep. 61:19-62:14.

20.     Defendants Mason and Fountain were assigned the case and shared the role of lead investigator for the case. *Id.* at Ex. 13, Mason Dep. 37:18-19.

21.     Defendants Mason and Fountain first responded to Samaritan Hospital, where they were informed that the initial report at Samaritan was that M.T. was having respiratory problems

and was unresponsive, and that M.T. had been transferred to AMC. *Id.* at Ex. 14, TPD Rpt. P001398.

22.    Defendants Mason and Fountain escorted a CPS worker to Thomas' home for the purpose of removing Thomas and Hicks' other children from the home. *Id.* at Ex. 14, TPD Rpt. P001398.

23.    Defendants Mason and Fountain learned from Thomas that M.T. had been sick with a fever and diarrhea for the past two days. *Id.* at Ex. 4, Thomas Dep. I 139:5-140:18; Ex. 14, TPD Rpt. P001398.

24.    Defendants Mason and Fountain next went to AMC. *Id.* at Ex. 14, TPD Rpt. P001398.

25.    Defendant Fountain spoke to Dr. Edge.  The conversation lasted only three to four minutes, during which Dr. Edge conveyed that M.T.'s head injury was the type typically caused by a high-speed impact or by slamming very hard into a hard object. *Id.* at Ex. 14, TPD Rpt. P001398; Ex. 15, Fountain Dep. 60:10-62:12.

26.    During the first visit to AMC, defendants Fountain and Mason were also incorrectly informed M.T. had a skull fracture. *Id.* at Ex. 15, TPD Rpt. P001398; Ex. 16, Tr. Interrogation I, P000299-P000300.

27.    Defendant Fountain falsely claimed that during this conversation, Dr. Edge also told him that M.T. had been murdered. *Id.* at Ex. 15, TPD Rpt. P001398.

28.    Dr. Edge denied making any such statement regarding a murder. *Id.* at Ex. 10, Edge Dep. 117:6-120:2.

29.    Per Dr. Edge, his role as a physician is to diagnose, not determine a cause, or determine whether an injury is accidental or non-accidental. *Id.* at Ex. 10, Edge Dep. 138:7-139:4

30.     Defendant Fountain and Mason obtained a statement from Wilhelmina Hicks, which corroborated Adrian Thomas' claim that M.T. had been sick for the past few days, and did not contain any statements alleging abuse of M.T. by Mr. Thomas.  *Id.* at Ex. 14, TPD Rpt. P001399; Ex. 15, Fountain Dep. 63:11-20; Ex. 18, Hicks Statement P001409-P001410.

31.     Defendant Mason never inquired with doctors about M.T.'s illness or whether there could be a non-trauma related cause of death.  *Id.* at Ex. 13, Mason Dep. 168:12-169:19.

32.     Defendants Fountain and Mason returned to Mr. Thomas' home and asked him to accompany them to the Troy Police Department headquarters.  *Id.* at Ex. 14 TPD Rpt. P001399; Ex. 15, Fountain Dep. 64:13-65:6.

33.     Going into the questioning, defendant Fountain believed that Mr. Thomas had done something to M.T.  *Id.* at Ex. 15, Fountain Dep. 96:18-97:8.

34.     During the questioning, Mr. Thomas thought he could not leave, and repeatedly stated that he felt like he was in jail.  *Id.* at Ex. 4, Thomas Dep. I 151:10-19; Ex. 5, Thomas Dep. II 384:6-22; Ex. 16, Tr. Interrogation I P000367-P000369, P000403.

35.     Mr. Thomas was initially questioned for about two hours.  *Id.* at Ex. 14, TPD Rpt. P001399.

36.     Defendant Mason and Fountain's interrogation technique of Mr. Thomas was based on their own instinct and was not based on any specific training.  *Id.* at Ex. 13, Mason Dep. 54:13-55:7; Ex. 15, Fountain Dep. 32:5-12.

37.     During the first interrogation, Fountain suggested to Mr. Thomas that he may have bumped M.T.'s head on the crib with the hope that Mr. Thomas would adopt this false suggestion. *Id.* at Ex. 15, Fountain 82:14-21, 89:23-90:10.

38.     During the interrogation, Mr. Thomas stated, in sum and substance, that if his son died, he would jump off a bridge.  *Id.* at Ex. 4, Thomas Dep. I 147:12-15.

39.     Defendants Mason and Fountain continued to question Mr. Thomas after he made this statement.  *Id.* at Ex. 13, Mason Dep. 99:17-20; Ex. 15, Fountain Dep. 83:6-10.

40.     After repeated denials that he had done anything to M.T., in a state of duress and emotional turmoil, and in response to threats that his wife would be arrested, Mr. Thomas eventually adopted defendant Fountain's false suggestion that he had bumped M.T.'s head on the crib, and agreed to sign a statement written by Fountain, which he in fact signed on September 22, 2008, at 1:41 a.m.  *Id.* at Ex. 5, Thomas Dep. II 415:14-416:14; Ex. 13, Mason Dep. 104:9-14; Ex. 15, Fountain Dep. 79:15-18; Ex. 19, Thomas Statement I P001404.

41.     The first interview did not yield any statements or evidence that gave Mason and Fountain probable cause to arrest Mr. Thomas for any crime, or which were consistent with the information Fountain had learned from Dr. Edge.  *Id.* at Ex. 13, Mason Dep. 100:21-101:8.

42.     As a result of Mr. Thomas' statement regarding jumping off a bridge, defendants Mason and Fountain brought Mr. Thomas to Samaritan Hospital for a mental health evaluation, where he remained under observation for fifteen hours.  *Id.* at Ex. 4, Thomas Dep. I 147:12-148:3; Ex. 5, Thomas Dep. II 383:23-384:5; *People v. Thomas*, 22 N.Y.3d 629, 646 (N.Y. 2014).

43.     Defendant Mason requested that Samaritan notify him when Mr. Thomas was ready to be released.  Klein Decl., Ex. 13, Mason Dep. 106:11-14.

44.     On September 22, 2008, defendant Mason returned to AMC and spoke to Dr. Edge, obtaining a statement from him that M.T.'s injury would have required more than a bump on a crib.  *Id.* at Ex. 21, Edge Statement P001413.

Case 1:17-cv-00626-DJS Document 107-1 Filed 09/20/21 Page 796 of 17

45.     Defendant Mason learned at this time that M.T. did not actually have a skull fracture.  *Id.* at Ex. 17, Tr. Interrogation II, P000455-P000456.

46.     In the afternoon of September 22, 2008, Mr. Thomas, who was distraught and sleep deprived, was met and picked up from the hospital by defendant Mason.  *Id.* at Ex. 4, Thomas Dep. I 149:8-150:6, 168:8-19; Ex. 13, Mason 106:4-17.

47.     Defendant Mason brought Mr. Thomas back to the Troy Police Department headquarters for further questioning.  *Id.* at Ex. 13, Mason Dep. 106:18-107:2.

48.     On the way to the interview room, defendant Mason told Mr. Thomas that once in the interview room, if he were to get up and go towards the door, he would be charged with escape. *Id.* at Ex. 4, Thomas Dep. I 150:13-19.

49.     Defendant Mason interrogated Mr. Thomas for approximately 7 ½ hours.  *Id.* at Ex. 13, Mason Dep. 21:6-22.

50.     Mr. Thomas had not slept since he was awoken by his wife on September 21, 2008, at approximately 8:00 a.m.  *Id.* at Ex. 4, Thomas Dep. I 168:8-19.

51.     Mr. Thomas did not feel he was free to leave during the interrogation.  *Id.* at Ex. 5, Thomas Dep. II 301:15-18.

52.     Defendant Colaneri watched and otherwise monitored the interview from a separate room and entered the room on one occasion.  *Id.* at Ex. 22, Colaneri Dep. I, 93:20-93:22, 96:23-97:21.

53.     Prior to defendant Colaneri entering the room, defendant Mason did not have probable cause to arrest Mr. Thomas for any crime.  *Id.* at Ex. 13, Mason Dep. 113:15-114:19, 167:2-13; Ex. 23, Colaneri Dep. II 21:3-22:5.

54.     During the second interrogation, defendants Mason and Colaneri jointly introduced the concept of M.T. being slammed.  *Id.* at Ex. 13, Mason Dep. 114:4-115:6, 171:9-172:10, 195:21-196:8; Ex. 23, Colaneri Dep. II 6:5-19, 17:9-18:16.

55.     All of the statements made by Mr. Thomas regarding bumping, throwing, or slamming M.T. were first suggested to him by the defendants.  *Id.* at Ex. 4, Thomas Dep. I 169:17-170:19; *Thomas*, 22 N.Y.3d at 646.

56.     Mr. Thomas made the involuntary statements because he was, without limitation, tired, afraid, wanted to see his children and particularly his son, M.T., was afraid if he did not make the statement he or his wife would be arrested, and based on the false promise by the defendants that he would be released if he made the statement.  *See* Klein Decl. Ex. 5, Thomas Dep. II 304:20-305:11; *Thomas*, 22 N.Y.3d 629.

57.     Defendant Fountain participated in the first two-hour interrogation and was personally involved in conduct which the Court of Appeals found to be coercive.  *See* Klein Decl. Ex. 15, Fountain Dep. 37:16-38:8; *Thomas*, 22 N.Y.3d at 637-38.

58.     Defendant Colaneri was personally involved in the second seven-hour interview. *See* Klein Decl. Ex. 22, Colaneri Dep. I 93:17-22, 97:10-104:8.

59.     Defendant Colaneri's conduct during the interrogation made Thomas give more information and contributed to Thomas's coerced false confession.  *Id.* at Ex. 22, Colaneri Dep. I 102:21-104:13; *Thomas*, 22 N.Y.3d at 639.

60.     Although Thomas told the TPD defendants many times that he didn't do anything, neither officer documented such in the statements they wrote for Mr. Thomas to sign.  *See* Klein Decl. Ex. 13, Mason Dep. 171:18-10; Ex. 15, Fountain Dep. 79:15-21; Ex. 19, Thomas Statement I P001404; Ex. 20, Thomas Statement II P001415-P001424.

61.    Purported probable cause to arrest Thomas was not established until the moment Thomas involuntarily adopted the TPD defendants' suggested and false narrative that he had slammed Matthew on the bed three times. *Id.* at Ex. 4, Thomas Dep. I 169:3-170:19; Ex. 13, Mason Dep. 112:19-116:4; *Thomas*, 22 N.Y.3d at 646.

62.    In the early hours of September 23, 2008, after Mr. Thomas signed a second 10-page coerced false statement, he was arrested by defendant Mason. Klein Decl. Ex. 4, Thomas Dep. I 172:12-16; Ex. 13, Mason Dep. 107:3-107:13, 115:20-116:4; Ex. 20, Thomas Statement II.

63.    The decision to arrest Thomas was made by defendants Mason and Colaneri jointly. *Id.* at Ex. 13, Mason Dep. 109:22-111:6.

64.    Defendant Mason prepared a criminal court information charging Mr. Thomas with attempted murder and attached only the second coerced false statement to it, leaving out the first inconsistent and non-incriminating statement. *Id.* at Ex. 13, Mason Dep. 117:15-118:20; Ex. 19, Thomas Statement I P001404; Ex. 20, Thomas Statement II P001415-P001424.

65.    Mr. Thomas was arraigned based on the documents submitted by defendant Mason, and consequently imprisoned in the Rensselaer County Jail. *Id.* at Ex. 4, Thomas Dep. I 172:17-18; Ex. 5, Thomas Dep. II 407:7-408:21; Ex. 13, Mason Dep. 122:7-22.

66.    After Mr. Thomas had been arraigned and was represented by counsel, CPS worker Jasper Estaris met with Mr. Thomas in the Rensselaer County Jail. *Id.* at Ex. 4, Thomas Dep. I 172:17-173:2; Ex. 5, Thomas Dep. II 407:7-408:21. In this jail setting, where Mr. Thomas was upset after, among reasons, being for the first time informed by Estaris of the death of M.T., Mr. Thomas was questioned by Estaris without being offered an attorney and outside the presence of his attorney, and purportedly made statements about hurting M.T. Ex. 5, Thomas Dep. II 408:13-

409:4; Ex. 37, Estaris Dep. 72:22-76:20, 81:20-82:4, 91:23-92:7.  Thomas denies having ever made any such statements.  *Id.* at Ex. 4, Thomas Dep. I 172:19-177:18.

67.     CPS and TPD were working cooperatively and sharing information during the M.T. investigation, and notes from CPS confirm that defendant Mason informed CPS supervisor Nicole Noel of the coerced false admissions by Thomas regarding slamming M.T., and provided Thomas' statement, among other police documents, to Ms. Noel, who would have shared it with Estaris prior to CPS interviewing Thomas in jail without counsel.  *Id.* at Ex. 23, Mason Dep. 128:3-132:17; Ex. 24, Noel Dep. 44:14-48:23.

68.     On September 25, 2008, Dr. Sikirica performed the autopsy of M.T.  *Id.* at Ex. 6, Sikirica Dep. I 121:21-122:3.

69.     Dr. Sikirica consulted with TPD Sergeant Mason, who was present during the autopsy, reviewed Thomas' coerced false statements that were provided to him by the TPD defendants, and was aware that Thomas had already been arraigned on attempted murder charges, and that his autopsy was being done in conjunction with a homicide investigation at the time he conducted the autopsy.  *Id.* at Ex. 6, Sikirica Dep. I 166:3-167:22; Ex. 13, Mason Dep. 8:5-9:19; Ex. 26, Sikirica 2014 Trial 847:23-850:6.

70.     Defendant Sikirica neither took gram stains nor examined M.T.'s sinuses during the autopsy, forensic evaluations which would have been relevant to determining the cause and extent of M.T.'s infection and cause of death.  *Id.* at Ex. 3, Leestma 2009 Trial 2118:13-2120:12, 2158:8-2159:1.

71.     On September 25, 2008, the lab results came back from the swabs taken at Samaritan Hospital, confirming that M.T. had a bacterial infection.  *Id.* at Ex. 6, Sikirica Dep. I 93:8-17.

72. Sikirica issued a death certificate on September 25, 2008, which listed the immediate cause of death as "severe closed head injuries with cerebral edema due to blunt force trauma" and further stated the cause of injury to be: "assaulted by another (repeatedly)." *Id.* at Ex. 27, Death Certificate P001394.

73. Despite the positive lab test and other evidence of overwhelming sepsis including, without limitation, that M.T. presented at the hospital with low white blood cell count, low platelet count, hypothermia, respiratory distress, low blood pressure, coagulopathy, hypoglycemia, tachycardia, and pancytopenia, Dr. Sikirica neither listed sepsis as a contributory cause of death on the death certificate, nor as a finding in the later completed autopsy report which was prepared after the receipt of the positive lab report. *Id.* at Ex. 6, Sikirica Dep. I 111:8-23, 169:14-173:4, 181:15-182:11, 185:3-188:19.

74. On September 26, 2008, defendants Mason and Sikirica testified in the grand jury. *Id.* at Ex. 6, Sikirica Dep. I 121:4-19; Ex. 13; Mason Dep. 150:14-16.

75. During his grand jury testimony, defendant Sikirica testified to some evidence of developing pneumonia, despite later admitting that the same bacteria that was found in M.T.'s bloodstream causes pneumonia, and that the pneumonia had advanced to sepsis by the time of M.T.'s death. *Id.* at Ex. 25, Sikirica 2009 Trial 1495:10-25 (P004969), 1519:8-23 (P004523); Ex. 29, Sikirica Grand Jury Tr. 11:20-12:2, 17:14-19.

76. The 10-page coerced false confession was also introduced into evidence at the grand jury. *Id.* at Ex. 30, Mason Grand Jury Tr. 33:6-23; *Thomas*, 22 N.Y.3d 629.

77. On April 22, 2009, Dr. Sikirica issued an autopsy report in which he reported only that M.T.'s blood was positive for streptococcus pneumoniae. *Id.* at Ex. 28, Autopsy Rpt. The report never mentioned sepsis. *Id.*

78.     Defendant Sikirica admits that streptococcus pneumoniae can cause pneumonia, meningitis, and sepsis. *Id.* at Ex. 7, Sikirica Dep. II 290:12-291:3.

79.     Defendant Sikirica admits that sepsis is more serious than the mere presence of the bacteria—which is all he listed in his autopsy report—and that it is an actual infection that leads to organ damage throughout the body, and that these conditions can cause death. *Id.* at Ex. 6, Sikirica Dep. I 172:13-17; Ex. 7, Sikirica Dep. II 290:12-291:11; Ex. 25, Sikirica 2009 Trial 1489:1-15 (P004963), 1547:20-24 (P004551).

80.     Dr. Sikirica knew that his autopsy results would be relied on by police and prosecutors. *Id.* at Ex. 6, Sikirica Dep. I 229:12-19.

81.     Dr. Sikirica omitted the word sepsis from his report because he thought including the diagnosis would divert from what he assessed was the real cause of death. *Id.* at Ex. 6, Sikirica Dep. I 209:12-20.

82.     Dr. Sikirica, however, now concedes that while he listed the cause of M.T.'s death to be only blunt force trauma, that sepsis was a contributory cause of death, and that doctors could disagree as to his assessment as to the actual cause of death. *Id.* at Ex. 6, Sikirica Dep. I 207:22-208:18.

83.     Other than Mr. Thomas' coerced false confession, and Dr. Sikirica's flawed findings, there was no other evidence linking Thomas to any crime. *Id.* at Ex. 13, Mason Dep. 154:16-155:8, Ex. 15, Fountain 104:7-11.  Maloney Decl. Ex. 2, Maloney Rpt.; Ex. 3, Maloney Rebuttal Rpt.  Johnson Decl. Ex. 2, Johnson Rpt. 11-12.

84.     Defendant Fountain met with the District Attorney's Office, testified at a *Huntley* hearing, and his involvement in the first interrogation was part of the chain of events that led to

Thomas' prosecution and conviction.  *Id.* at Ex. 13, Mason Dep. 217:2-11; Ex. 15, Fountain Dep. 12:15-19, 13:4-7, 77:15-78:13, 102:12-104:6; *Thomas*, 22 N.Y.3d at 637-38.

85.     Thomas was tried and convicted by a jury in 2009 on charges of murder of his son. Klein Decl. Ex. 4, Thomas Dep. I 208:9-18.

86.     Defendant Mason testified at the 2009 trial and evidence including Thomas' statement and portions of the second videotaped coerced confession were introduced into evidence. *Id.* at Ex. 13, Mason Dep. 6:20-7:13; *Thomas*, 22 N.Y.3d at 635.

87.     Defendant Sikirica testified during the first trial that based on his experience and participation in the autopsy and microscopic examinations of M.T., that M.T.'s injuries were consistent with having been slammed down on a mattress at a great force, and that the subgaleal hematoma was consistent with being slammed into a wooden rail of a crib.  *Id.* at Ex. 25, Sikirica 2009 Trial 1582:13-24 (P004586).

88.     Thomas was sentenced to 25 years to life in prison, and thereafter transferred to Downstate Correctional Facility, and then to Auburn Correctional Facility.  *Id.* at Ex. 4, Thomas Dep. I 208:19-209:14, 212:13-213:16, 214:11-13.

89.     Thomas filed post-conviction motions to suppress his confession and to set aside the verdict rendered against him, a remedy that was ultimately granted by the Court of Appeals on February 20, 2014.  *Thomas*, 22 N.Y.3d 629.

90.     The Court of Appeals found that defendants Mason, Fountain, and Colaneri had engaged in coercive behavior, including *inter alia*, threatening that if Thomas continued to deny responsibility for M.T.'s injury his wife would be arrested and removed from his ailing child's bedside, repeating 21 times during the course of the interrogation "that his disclosure of the circumstance under which he injured his child was essential to assist the doctors attempting to save

the child's life," and "the ubiquitous assurances offered by defendant's interrogators, that whatever had happened was an accident, that he could be helped if he disclosed all, and that, once he had done so, he would not be arrested, but would be permitted to return home" which included telling Thomas "67 times that what had been done to his son was an accident, 14 times that he would not be arrested, and eight times that he would be going home." *Id.* at 643-646.

91. The Court of Appeals further recognized that Thomas' "subsequent confession provided no independent confirmation that he had in fact caused the child's fatal injuries" and that "[e]very scenario of trauma induced head injury equal to explaining the infant's symptoms was suggested to defendant by his interrogators" that that "not a single inculpatory fact in defendant's confession that was not suggested to him." *Id.* at 646.

92. After the Court of Appeals remanded Thomas' case for retrial, Thomas was again imprisoned at the Rensselaer County Jail. Klein Decl. Ex. 4, Thomas Dep. I 231:21-232:20.

93. Thomas was retried in 2014. *Id.* at Ex. 4, Thomas Dep. I 233:7-8.

94. Defendant Sikirica testified at Thomas' second trial. *Id.* at Ex. 26, Sikirica 2014 Trial.

95. At the second trial, Sikirica testified that in his experience, the injuries could be consistent with a moderate amount of force, and that M.T.'s injuries were consistent with M.T. being bounced hard off of a bed and onto the ground. *Id.* at Ex. 26, Sikirica 2014 Trial 837:14-18, 840:17-841:20.

96. Defendant Sikirica continued to attribute M.T.s death to Thomas even after Thomas' confession had been suppressed and despite the suppressed statement being the only link between Thomas and M.T.'s death. *Id.* at Ex. 6, Sikirica Dep. I 125:9-19, 129:7-23.

97.     At the conclusion of Thomas' second trial, Thomas was acquitted, and the matter was dismissed and sealed. Klein Decl. Ex. 4, Thomas Dep. I 234:11.

98.     Plaintiff's expert in false confessions, Matthew B. Johnson, Ph.D., associate professor in the Department of Psychology at John Jay College of Criminal Justice-CUNY, whose work focuses on the interface of psychology and the legal system, opined, in relevant part, that plaintiff's malicious prosecution resulted from a process commonly referred to as "a mis-information effect (also called an 'anchoring effect', or a process of 'forensic confirmation bias', or 'bias cascade'), where an initial erroneous assumption or report is accepted as factual and misguides the ensuing investigation." Johnson Decl. ¶¶ 1-2; Ex. 2, Johnson Rpt. p. 11. Johnson further opined that in the case of plaintiff, the initial mistaken assessment by Albany Medical Center led the police to subject Thomas to a "prolonged, coercive, interrogation to confirm the erroneous medical assessment" and that "[t]he coerced false confession then influenced the medical examiner's autopsy report." *Id.* at Ex. 2, p. 11. Johnson also cited research recognizing that when an event is mislabeled a crime, "forward momentum often fueled by circular reasoning takes over" resulting in individuals being convicted of crimes that never occurred in the first place, as was the case here. *Id.* at Ex. 2, p. 3.

99.     Plaintiff's medical expert, forensic pathologist Katherine F. Maloney, M.D., determined that M.T. died exclusively from streptococcus pneumoniae meningitis. *See* Maloney Decl., Ex. 2, Maloney Rpt. p. 3. She further found that the scalp and subgaleal hemorrhages, retinal hemorrhages, and subdural hemorrhage were not due to violent trauma, were not fatal injuries, and did not explain the cause of death. *Id.* Rather the retinal hemorrhages were due to increased intracranial pressure caused by the cerebral edema, and the subgaleal and subdural hemorrhages resulted from coagulopathy due to the Streptococcus pneumoniae infection and from brain swelling due to the loss

# **APPENDIX**

of oxygen to the brain caused by the infection, which led to an accumulation of fluid surrounding the

brain. *Id.* at pp. 2-3.

Dated: September 20, 2021
      New York, New York

                            BRETT H. KLEIN, ESQ., PLLC
                            Attorneys for the Plaintiff
                            305 Broadway, Suite 600
                            New York, New York 10007
                            (212) 335-0132

                By:        _____

                            BRETT H. KLEIN
                            LISSA GREEN-STARK

# APPENDIX

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------X

ADRIAN THOMAS,

                                 Plaintiff,

                                                                17 CV 626 (DJS)

                -against-

ADAM R. MASON, RONALD FOUNTAIN,
TIM COLANERI, and MICHAEL SIKIRICA,

                                   Defendant.

--------------------------------------------------------------------------------X

## PLAINTIFF'S LOCAL RULE 56.1 COUNTER STATEMENT

**BRETT H. KLEIN, ESQ., PLLC**
Attorneys for the Plaintiff
305 Broadway, Suite 600
New York, New York 10007
(212) 335-0132

# APPENDIX

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------X

ADRIAN THOMAS,

                                   Plaintiff,          **DECLARATION**
                                                       **OF BRETT H.**
        -against-                                      **KLEIN**

ADAM R. MASON, RONALD FOUNTAIN,                        17 CV 626 (DJS)
TIM COLANERI, and MICHAEL SIKIRICA,

                            Defendants.

--------------------------------------------------------------------------------X

BRETT H. KLEIN, declares under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.    My firm represents plaintiff, ADRIAN THOMAS, in the above-captioned action. I make this declaration in support of plaintiff's memoranda of law, responses to defendants' 7.1 statements, and plaintiff's Local Rule 56.1 counter statement, which are all respectfully submitted in opposition to defendants Adam R. Mason, Ronald Fountain, and Tim Colaneri's motion for summary judgment, and defendant Michael Sikirica's motion for summary judgment.

2.    Attached hereto as Exhibit 1 are excerpts from the testimony of Wilhelmina Hicks given during the 2009 criminal trial of Adrian Thomas.

3.    Attached hereto as Exhibit 2 are excerpts from the testimony of Dr. Ifeoma Ojukwu given during the 2009 criminal trial of Adrian Thomas.

4.    Attached hereto as Exhibit 3 are excerpts from the testimony of Dr. Jan E. Leestma given during the 2009 criminal trial of Adrian Thomas.

5.    Attached hereto as Exhibit 4 are excerpts from the deposition of plaintiff Adrian Thomas (Thomas Dep. I) conducted on August 20, 2019.

6.      Attached hereto as Exhibit 5 are excerpts from the deposition of plaintiff Adrian Thomas (Thomas Dep. II) conducted on August 21, 2019.

7.      Attached hereto as Exhibit 6 are excerpts from the deposition of defendant Michael Sikirica (Sikirica Dep. I) conducted on September 5, 2019.

8.      Attached hereto as Exhibit 7 are excerpts from the deposition of defendant Michael Sikirica (Sikirica Dep. II) conducted on September 6, 2019.

9.      Attached hereto as Exhibit 8 are excerpts from the testimony of Dr. Jerome Klein given during the 2009 trial of Adrian Thomas.

10.     Attached hereto as Exhibit 9 is a copy of the emergency room report dictated by Dr. Katrina Kardos relating to M.T.'s treatment and diagnosis at Samaritan Hospital on September 21, 2008.

11.     Attached hereto as Exhibit 10 are excerpts from the deposition of Dr. Walter Edge conducted on July 30, 2020.

12.     Attached hereto as Exhibit 11 are excerpts from the testimony of Dr. Katrina Kardos given during the 2009 criminal trial of Adrian Thomas.

13.     Attached hereto as Exhibit 12 are excerpts from the deposition of Dr. John Waldman conducted on October 19, 2020.

14.     Attached hereto as Exhibit 13 are excerpts from the deposition of defendant Adam R. Mason conducted on September 12, 2019.

15.     Attached hereto as Exhibit 14 are copies of Troy Police Department's (hereinafter "TPD") investigative reports, Bates numbered P001398-P001399.

16.     Attached hereto as Exhibit 15 are excerpts from the deposition of defendant Ronald Fountain conducted on September 13, 2019.

Case 1:17-cv-00626-DJS Document 175-5 Filed 09/25/21 Page 396 of 6

17.     Attached hereto as Exhibit 16 are excerpts of the transcript of the first interrogation of plaintiff Adrian Thomas conducted on September 21, 2008.[1]

18.     Attached hereto as Exhibit 17 are excerpts of the transcript of the second interrogation of plaintiff Adrian Thomas conducted on September 22, 2008.

19.     Attached hereto as Exhibit 18 is a copy of a statement entitled deposition of a witness signed by Wilhelmina Hicks on September 23, 2008, Bates numbered P001409-P001410.

20.     Attached hereto as Exhibit 19 is a copy of a statement entitled deposition of a witness signed by Adrian Thomas on September 22, 2008 at 1:41 a.m., Bates numbered P001404.

21.     Attached hereto as Exhibit 20 is a copy of a statement entitled deposition of a witness signed by Adrian Thomas on September 22, 2008 at 8:40 p.m., Bates numbered P001415-P001424.

22.     Attached hereto as Exhibit 21 is a copy of a statement entitled deposition of a witness signed by Walter Edge on September 22, 2008, Bates numbered P001413.

23.     Attached hereto as Exhibit 22 are excerpts of the deposition of Tim Colaneri (Colaneri Dep. I) conducted on September 11, 2019.

24.     Attached hereto as Exhibit 23 are excerpts of the deposition of Tim Colaneri (Colaneri Dep. II) conducted on September 12, 2019.

25.     Attached hereto as Exhibit 24 are excerpts of the deposition of Nicole Noel conducted on November 25, 2019.

---

[1] The transcript was produced in discovery as received and, while it appears to have the wrong date noted on the cover page, the parties have not disputed that it is otherwise accurate.

# APPENDIX

26.     Attached hereto as Exhibit 25 are excerpts from the testimony of defendant Michael Sikirica given during the 2009 criminal trial of Adrian Thomas.

27.     Attached hereto as Exhibit 26 are excerpts from the testimony of defendant Michael Sikirica given during the 2014 criminal trial of Adrian Thomas.

28.     Attached hereto as Exhibit 27 is a copy of the death certificate for M.T. which was signed by defendant Michael Sikirica, Bates numbered P001394.

29.     Attached hereto as Exhibit 28 is a copy of the final Autopsy Report issued by defendant Michael Sikirica on April 22, 2008, Bates numbered P001530-P001544.

30.     Attached hereto as Exhibit 29 are excerpts of the testimony of defendant Michael Sikirica given during the grand jury proceedings held on September 26, 2008.

31.     Attached hereto as Exhibit 30 are excerpts of the testimony of defendant Adam R. Mason given during the grand jury proceedings held on September 26, 2008.

32.     Attached hereto as Exhibit 31 are excerpts from the testimony of Dr. Jerome Klein given during the 2014 criminal trial of Adrian Thomas.

33.     Attached hereto as Exhibit 32 are excerpts from the testimony of India Hicks given during the 2009 criminal trial of Adrian Thomas.

34.     Attached hereto as Exhibit 33 are excerpts from the deposition of India Hicks conducted on November 30, 2020.

35.     Attached hereto as Exhibit 34 are excerpts from the testimony of Katrina Kardos given during the 2014 criminal trial of Adrian Thomas.

36.     Attached hereto as Exhibit 35 are excerpts from the testimony of Dr. Walter Edge given during the 2009 criminal trial of Adrian Thomas.

37.     Attached hereto as Exhibit 36 are excerpts from the testimony of Dr. Jan E. Leestma given during the 2014 criminal trial of Adrian Thomas.

38.     Attached hereto as Exhibit 37 are excerpts from the deposition of Jaspar Estaris conducted on August 21, 2019.

Dated: New York, New York
        September 20, 2021

                        BRETT H. KLEIN, ESQ., PLLC
                        Attorneys for the Plaintiff
                        305 Broadway, Suite 600
                        New York, New York 10007
                        (212) 335-0132

        By:     _____
                        BRETT H. KLEIN

# APPENDIX

# 1585

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------X

ADRIAN THOMAS,

                               Plaintiff,                17 CV 626 (DJS)

       -against-

ADAM R. MASON, RONALD FOUNTAIN,
TIM COLANERI, and MICHAEL SIKIRICA,

                           Defendants.

-------------------------------------------------------------------------------X

## DECLARATION OF BRETT H. KLEIN

**BRETT H. KLEIN, ESQ., PLLC**
Attorneys for the Plaintiff
305 Broadway, Suite 600
New York, New York 10007
(212) 335-0132

1    him at grave risk of death; correct?

2         A.   Yes.

3              MS. EFFMAN:  No further questions.

4              MS. BOOK:  Can I have one moment, Your Honor?

5              THE COURT:  Certainly.

6              MS. BOOK:  Nothing further, Your Honor.  Thank

7    you.

8              THE COURT:  Doctor, thank you very much for your

9    time.  You are all set.  The People may call their next

10   witness.

11             MS. BOOK:  The People call Wilhemina Hicks.

12             MS. EFFMAN:  Your Honor, may we approach

13   briefly?

14             THE COURT:  Yes.

15             (Sidebar discussion held as follow:)

16             MS. EFFMAN:  Your Honor, I would just ask the

17   witness be reminded, as this is close in time to the

18   testimony, that she be advised about the discipline issue.

19             MS. BOOK:  I reminded her.

20             THE COURT:  Thank you.

21   (Photographs marked People's Exhibits 2 through 10 for

22   identification.)

23   **WILHEMINA HICKS**, after first having been duly sworn by the

24   Clerk of the Court, was examined and testified as follows:

25             THE CLERK:  The sworn witness is Wilhemina

1        Hicks, W-I-L-H-E-M-I-N-A  H-I-C-K-S.

2  **DIRECT EXAMINATION**

3  BY MS. BOOK:

4        Q.   Good afternoon.

5        A.   Hi.

6        Q.   Could you please spell your name for the record,

7  first and last?

8        A.   Yes.  Wilhemina Hicks, W-I-L-H-E-M-I-N-A, Hicks,

9  H-I-C-K-S.

10        Q.   Thank you.  Where do you live, ma'am?

11        A.   In Troy.

12        Q.   Do you have any children?

13        A.   Yes.

14        Q.   How many?

15        A.   Six living.

16        Q.   Okay.  And did you have a child that passed away?

17        A.   Yes.

18        Q.   What was that child's name?

19        A.   Ma███ Da███ T███.

20        Q.   Can you tell us the names and ages of your other

21  children that are living?

22        A.   Yes.  India Hicks, ███████.  Aaliyah Thomas, her

23  birth date is ██████.  Ad██ T███, Jr., his birthday is

24  ██████.  I████ T███, his birth date is ██████.  And

25  Ma███ -- yes.

Case 1:17-cv-00626-DJS   Document 156-1   Filed 09/20/21   Page 8 of 13
Case 2:3-v-09520-   Document 156-1   Filed 09/20/21   Page 8 of 13
APPENDIX                                              1588

*(W. Hicks - People - Direct)*                                     878

1          Q.   That's okay.  Take your time.

2          A.   I███ T█████, his birth date is ████████; and Ma█

3     Simon Thomas, his birth date is ████████

4          Q.   Thank you.  Do you know someone by the name of Adrian

5     Thomas?

6          A.   Yes.

7          Q.   Do you see Mr. Thomas in the courtroom today?

8          A.   Yes.

9          Q.   Could you please point him out and describe something

10    that he's wearing?

11         A.   He's wearing a white shirt.

12         Q.   Okay.  Could you point in his direction?

13         A.   There (indicating).

14              MS. BOOK:  Thank you.  Could the record please

15    indicate that the witness has identified the Defendant?

16              THE COURT:  It's noted.

17         Q.   How do you know Mr. Thomas?

18         A.   I am married to him.

19         Q.   And what is the current state of your marriage?

20         A.   I'm going through a divorce.

21         Q.   Is he the father of all of your children?

22         A.   Except India.

23         Q.   Can we talk about your twin sons for a minute?

24         A.   Uh-huh.

25         Q.   Okay.  When did you find out you were pregnant with

Judy A. DelCogliano
*Official Senior Court Reporter*

S014115

1    twins?

2        A.    When I was, like, five months pregnant.

3        Q.    Okay.  And when were your sons born?

4        A.    They were born on ▮▮▮▮▮▮▮

5        Q.    Is that the date that they were due?

6        A.    No.

7        Q.    Were they early or late?

8        A.    They were early.

9        Q.    How early were they?

10       A.    They were a month and a half early.

11       Q.    How was your delivery?

12       A.    I had gestational diabetes and my blood pressure was

13   elevated.

14       Q.    Did you have a difficult delivery?

15       A.    Yes.

16       Q.    Who was born first?

17       A.    Ma▮▮▮▮ Da▮▮ T▮▮▮▮.

18       Q.    Was he born through regular vaginal delivery or was a

19   special --

20       A.    Yes, right.

21       Q.    And who was born next?

22       A.    Ma▮▮▮▮.

23       Q.    How was he born?  Was he also born through a regular

24   vaginal delivery?

25       A.    They had to use forceps with him.

1    Q.   During your pregnancy, you had some problems with

2    high blood pressure?

3    A.   Yes.

4    Q.   And you have -- during your other pregnancies, have

5    you ever had a problem with your water breaking, your membranes

6    rupturing early on, before the due date?

7    A.   Um, no.

8    Q.   So, prior to this pregnancy, did your water ever

9    break early before your due date?

10   A.   No.

11   Q.   The doctors put you on some medications for the high

12   blood pressure?

13   A.   Yes.

14   Q.   And during the time you saw the doctors, they told

15   you you had preeclampsia?

16   A.   Yes.

17   Q.   Right?  Do you remember that?

18   A.   Uh-huh.

19   Q.   And they told you that was something they really

20   wanted to keep an eye on and monitor; right?

21   A.   Right.

22   Q.   And the doctors told you that's a -- that condition

23   is important to monitor for the sake of your health and the

24   babies' health?

25   A.   Right.

1     Q. Right. Early around May 1st or so of 2008, the

2 doctors at OB/GYN Health Center Associates on Fifth Avenue

3 there, they sent you over to Samaritan Hospital because your

4 blood pressure was high; right?

5     A. No. They sent me over there because I had um -- in

6 my urine, I had the -- um, calcium in my urine.

7     Q. And they wanted you to go get it checked out?

8     A. Right.

9     Q. And when you went over there, they decided to admit

10 you as a patient there?

11     A. Right.

12     Q. And you stayed there for a few days; right?

13     A. Right.

14     Q. And while you were there, your water broke; right?

15     A. Right.

16     Q. Did they ever tell you when you were at Samaritan

17 Hospital that there was a green stain in your water that broke?

18 They call that meconium. Did they ever tell you that?

19     A. Uh-huh.

20     Q. And did they tell you that means the baby had a bowel

21 movement while he was in your uterus; correct?

22     A. Right.

23     Q. And they told you they were going to move you from

24 there to Albany Med to better take care of your pregnancy;

25 right?

*(W. Hicks - People - Cross)* 912

1    A.    Right.

2    Q.    Because you had twins coming along?

3    A.    Right.

4    Q.    And you were probably going to deliver early?

5    A.    Right.

6    Q.    Samaritan Hospital doesn't have an emergency neonatal

7    unit or is not equipped to handle premature babies like Albany

8    Med is; right?

9    A.    Right.

10    Q.    They moved you over there, and that's where you

11    delivered the babies; right?

12    A.    Yes.

13    Q.    And they were delivered in about 33 weeks or so?

14    A.    Yes.

15    Q.    The first -- when you got to Albany Med, you were in

16    labor about 11, 12 hours.  Does that sound about right?

17    A.    Not that long.

18    Q.    Once you got over there, things went quickly?

19    A.    Yes.

20    Q.    And when you had -- the babies were delivered.  The

21    first baby, Twin A, came out.  He had trivalvular pulmonary

22    stenosis, which is this heart murmur you talked about today;

23    right?

24    A.    I wasn't aware of that at that time; that he even had

25    that.

*Judy A. DelCogliano*
*Official Senior Court Reporter*

S014149

1   fever when you brought him there from the day before, in

2   addition to or along with the complaint about the rash on his

3   face?

4       A.   I don't remember making a complaint about that.

5       Q.   And when you took his temperature at home, did you

6   usually take it rectally?

7       A.   Yes.

8       Q.   Let's talk about the weekend of September 19, 20, 21.

9   On that Friday, the 19th, you noticed that your son had a

10  fever; right?

11      A.   Yes.

12      Q.   What was his temperature on Friday?

13      A.   It was 100.4.

14      Q.   And he had some diarrhea then, too?

15      A.   Um, yeah.

16      Q.   And you gave him some Pedialyte on Friday?

17      A.   Yes.

18      Q.   And the next day, Saturday, he still had some

19  diarrhea on Saturday, right, which would have been the 20th of

20  September?

21      A.   Not really.  Like I said, he had got a little bit

22  better that day.

23      Q.   And in the evening, the fever came back?

24      A.   Right, around 11:00.

25      Q.   11:00 at night, did you take his temperature

(W. Hicks - People - Cross)                                920

1    rectally?

2         A.   Yes.

3         Q.   And what was his temperature at 11:00 at night?

4         A.   It was back at 104 -- I mean 100.4.

5         Q.   Did the diarrhea come back Saturday night?

6         A.   No.

7         Q.   Now, on Saturday night when you were home, you were

8    talking about cooking dinner.  All your other children were at

9    home; right?

10        A.   Yes.

11        Q.   All nine people that live in the apartment were home

12   that night?

13        A.   Yes.

14        Q.   And Saturday evening, you didn't hear or see Matthew

15   have any problems breathing; correct?

16        A.   No.

17        Q.   You testified that you heard him cry a little bit

18   that evening?

19        A.   Right.

20        Q.   You would agree, Wilhemina - you are a mother of

21   several children - sometimes babies who are sick cry; right?

22        A.   Right.

23        Q.   When you saw Ma███████ around 11:00 at night when you

24   checked his temperature, did you give him a bottle then, too?

25        A.   No.  He had a bottle around four o'clock that

Judy A. DelCogliano
Official Senior Court Reporter

S014157

*(W. Hicks ~ People ~ Cross)* 921

1  morning. He --

2      Q.   When was he last given a bottle before four o'clock

3  in the night, in the early morning hours?

4      A.   After, when we were having dinner, I fed him a

5  bottle, and then he had a bottle again around, I would say, two

6  hours later but -- two hours later.

7      Q.   Did he take his bottle Saturday evening when you were

8  having your supper?

9      A.   Yes.

10      Q.   And around what time was that, Wilhemina?

11      A.   I would say, like, about a little before we -- a

12  little before I went to bed.

13      Q.   And what time was that?

14      A.   That was, like, around 11:00; I went and laid down.

15      Q.   So, the same time you checked his temperature, around

16  then, you gave him a bottle?

17      A.   Yes.

18      Q.   He took the bottle, no problem?

19      A.   Yes.

20      Q.   And the next time, after 11:00, the next time he had

21  a bottle was around three or four o'clock in the morning;

22  correct?

23      A.   Right.

24      Q.   And at that time, you woke up Adrian, too; right?

25      A.   Yes.

*Judy A. DelCogliano*
*Official Senior Court Reporter*

S014158

*(W. Hicks - People - Cross)* 922

1    Q.    Because both babies were awake?

2    A.    Right.

3    Q.    And so both of you -- each one took a baby and fed a

4    baby a bottle; correct?

5    A.    Right.

6    Q.    Adrian gave Ma███████ a bottle; right?

7    A.    Yes.

8    Q.    And you gave Ma██████ his bottle?

9    A.    Right.

10   Q.    And Ma██████ took his bottle; right?

11   A.    Yes, yes.

12   Q.    Did you check his temperature at four o'clock in the

13   morning?

14   A.    Yes.

15   Q.    And did he have a temperature?

16   A.    No.

17   Q.    When you saw him at 4:00 in the morning, N████████

18   didn't have any problems breathing; did he?

19   A.    No.

20   Q.    Wilhemina, do you remember telling the Troy Police on

21   September 23, 2008, that "I didn't notice anything wrong with

22   Ma██████until about three or 4:00 in the morning when he was

23   running a fever of about 100.4. Ma██████ has had a fever and

24   diarrhea since Friday night." Do you remember telling the Troy

25   Police that on September 23rd?

Judy A. DelCogliano
Official Senior Court Reporter

S014159

(W. Hicks - People - Cross)                                923

1       A.    Yes.

2       Q.    And when you told them that, that was close in time

3   or close to the time of this weekend, the event we are here

4   about today?

5       A.    Right.

6       Q.    So, Ma███ did have a temperature at four o'clock in

7   the morning when you got up to give him his bottle?

8       A.    Right.  I can't -- the thing is, when you are in that

9   kind of state, you know, when you are being in front of police

10  officers asking you questions, you are not just going to get

11  everything out the -- out just correctly, just the way it

12  happened.  I was under a lot of pressure at that time.

13      Q.    I understand, Wilhemina.  So, if you told the police

14  on the 23rd of September that at about -- you didn't notice

15  anything wrong with Ma███ until about three or 4:00 in the

16  morning when he was running a fever, that was the truth; right?

17  He had a fever at 4:00 in the morning?

18      A.    Yes.

19      Q.    And when you saw him at four o'clock in the morning

20  or so, you didn't notice any problems with his breathing;

21  right?

22      A.    No.

23      Q.    And, in fact, if you had noticed a problem with his

24  breathing, you certainly would have called 911 or taken him to

25  a hospital?

Judy A. DelCogliano
Official Senior Court Reporter

A000000794

S014160

(W. Hicks - People - Cross)                    924

1    A.   Yes, right.

2    Q.   The first time you noticed any strange breathing on

3    Ma▮▮▮▮ was Sunday morning after eight o'clock when you got up

4    that morning; right?

5    A.   Right.

6    Q.   And at that time, you woke Adrian up?

7    A.   Yes.

8    Q.   Probably really panicky and stressful in your house

9    at that time; right?

10   A.   Right, uh-huh.

11   Q.   He calls 911; right?

12   A.   No.  I called them.

13   Q.   You called 911.  And you did CPR on the baby; right?

14   A.   Right.

15   Q.   And that morning when you left the house, you left

16   with your son in the ambulance to go to Samaritan Hospital;

17   right?

18   A.   Right.

19   Q.   And Adrian stayed home with the rest of the children?

20   A.   Right.

21        MS. EFFMAN:  One moment, Your Honor.  No further

22   questions.

23        THE COURT:  Before you continue, do the People

24   have any further witnesses after this witness is done for

25   today?

Judy A. DelCogliano
Official Senior Court Reporter

S014161

# APPENDIX

**1599**

226868

1  STATE OF NEW YORK

2  COUNTY COURT                    COUNTY OF RENSSELAER

3  - - - - - - - - - - - - - - - - - - - - - - -- - - - X

4  THE PEOPLE OF THE STATE OF NEW YORK

5  - against -                    Indictment #08-1074

6  ADRIAN THOMAS,

7           Defendant.

8  - - - - - - - - - - - - - - - - - - - - - - - - - - X

9  *JURY TRIAL - VOLUME IX*

10                         County Courthouse
                           Congress and Second Streets
11                         Troy, New York 12180
                           October 9, 2009.
12
   B e f o r e:
13
           HONORABLE ANDREW G. CERESIA,
14         County Court Judge.

15  A p p e a r a n c e s:

16           **For the People:**
             RICHARD J. MC NALLY, JR., ESQ.,
17           District Attorney, Rensselaer County,
             By:  ARTHUR F. GLASS, JR., ESQ.,
18           and CHRISTA M. BOOK, ESQ., Assistant
             District Attorneys, of counsel,
19           Rensselaer County Courthouse,
             Troy, New York.
20
             **For the Defendant:**
21           JEROME K. FROST, ESQ.,
             Public Defender, Rensselaer County,
22           and INGRID EFFMAN, ESQ., Assistant Public
             Defender, of counsel,
23           Rensselaer County Courthouse,
             Troy, New York.
24
             ADRIAN THOMAS, Defendant, in person.
25

Case 1:17-cv-00626-DJS   Document 156-2   Filed 09/20/21   Page 2 of 7
Case 23-753, Document 62, 06/14/2023, 3504338, Page582 of 898

1600        1455

# APPENDIX

1

### INDEX TO WITNESSES

2

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

3

4  **For the People:**

5

| IFEOMA OJUKWU | 1456 | 1468 | 1478 | 1481 |
|---|---|---|---|---|
| MICHAEL SIKIRICA | 1482 | 1529 | 1577 | 1584 |
|  |  |  | 1586 | 1587 |
|  |  |  | 1589 |  |

6

7

8

9            *            *            *

10

### INDEX TO EXHIBITS

11

|  | Identification | Evidence |
|---|---|---|

12

13  **For the People:**

14

| 27.  Seton Pediatrics Medical Records (Ma█████) | 1456 | 1460 |
|---|---|---|
| 28.  Seton Pediatrics Medical Records (N█████) | 1456 | 1460 |
| 29.  Seton Pediatrics Medical Records (█████i) | 1456 | 1460 |
| 30.  Seton Pediatrics Medical Records (Ma████) | 1456 | 1460 |
| 31.  St. Mary's Hospital Medical Records (Ma████) | 1456 | 1460 |
| 32.  St. Mary's Hospital Medical Records (Ma███i) | 1456 | 1460 |
| 33.  Photograph | 1481 | 1511 |
| 34.  Death Certificate | 1481 | 1525 |
| 35.  Autopsy Report | 1491 | 1527 |

15

16

17

18

19

20

21

22

23

24

25

*Judy A. DelCogliano*
*Official Senior Court Reporter*

# APPENDIX

*(Ojukwu - People - Direct)*                                        1460

1   offer on stipulation People's Exhibit Number 27, which is

2   the Seton Pediatric records of M████ Thomas; People's 28

3   for identification, Seton Pediatric records of M████

4   T████; People's 29 for identification, which is more

5   Seton Pediatric records of M████ T████; People's 30 for

6   identification, which is more Seton Pediatric records of

7   M████ T████; People's 31 for identification, which is

8   St. Mary's records of M████ T████; and People's 32,

9   which is St. Mary's records of M████ T████.

10              THE COURT:  Ms. Effman?

11              MS. EFFMAN:  No objection, subject to our prior

12   bench conference regarding certain portions that are --

13   their relevancy to be determined at a later date, Judge.

14              THE COURT:  Okay.  People's 27, 28, 29, 30, 31

15   and 32?  Is that correct?

16              MS. BOOK:  Yes, Your Honor.

17              THE COURT:  And 32 are received in evidence upon

18   stipulation of the parties subject to the previously

19   mentioned subject.

20   (People's Exhibits 27 through 32 marked for identification

21   received in evidence and marked People's Exhibits 27 through 32

22   in evidence.)

23       Q.   Doctor, I'm going to leave these records up here with

24   you.  Okay.  So, you just said that you first met M████ when

25   he was admitted.  Admitted where?

*Judy A. DelCogliano*
*Official Senior Court Reporter*

Case 23-753, Document 62, 01/17/2024, 3604338, Page583 of 898

Case 23-753, Document 62, 01/17/2024, 3604338, Page584 of 898

APPENDIX

(by *Zina* - People - Direct)   **1602**   146

```
 1          A.   At St. Mary's Hospital in Troy, New York.

 2          Q.   Okay.  Do you know what day M████ T████ was born?

 3          A.   He was born ████████.

 4          Q.   And what hospital was he born at?

 5          A.   At Albany Med Hospital in Albany.

 6          Q.   Was M███ T███ born premature?

 7          A.   Yes.  He was born premature.

 8          Q.   Do you know at what week he was born?

 9          A.   He was 33 weeks premature.

10          Q.   Okay.  And how long is a normal pregnancy?

11          A.   Forty weeks.

12          Q.   And you stated that he came to St. Mary's Hospital?

13          A.   Yes.

14          Q.   Do you know what day he came to St. Mary's?

15          A.   May 9, 2008.

16          Q.   Why was he transferred from Albany Medical Center to

17     St. Mary's Hospital?

18          A.   He was transferred to St. Mary's Hospital from Albany

19     Med just for convenience of the parents.

20          Q.   Okay.  And did you meet him on May the 9th, 2008?

21          A.   Yes, I did.

22          Q.   What condition was M████ T███ in when he was

23     transferred on May the 9th to St. Mary's Hospital?

24          A.   He was pretty good.  He was stable.  He was stable.

25          Q.   And do you know how M████ was delivered?
```

Judy A. **DelCogliano**
*Official Senior Court Reporter*

# APPENDIX

**1603**

*(Ojukwu - People - Direct)*

1464

1  A. Yes, they were.

2  Q. On what date were they discharged?

3  A. May 22, 2008.

4  Q. Did Matthew come to Seton Pediatrics for regular

5 checkups after being discharged from St. Mary's?

6  A. Yes, he did.

7  Q. And as of September of 2008, was M████ up to date

8 on all of his immunizations?

9  A. Yeah.  He got his immunizations.

10  Q. Okay.  Drawing your attention to May 27, 2008, did

11 M████ come to Seton Pediatrics on that date?

12  A. Yes, he did.

13  Q. And why did he come to Seton Pediatrics on that date?

14  A. Just for his routine physical, because he had been

15 discharged from the hospital.

16  Q. And how was his health on that date?

17  A. His health was fine.

18  Q. Did you have any concerns or problems?

19  A. No, no concerns or problems.

20  Q. Drawing your attention to June 10, 2008, did M████

21 come to Seton Pediatrics on that date?

22  A. Yes, he did.

23  Q. What was the reason for that visit?

24  A. For his one-month visit.

25  Q. How was his health on that date?

Judy A. DelCogliano
*Official Senior Court Reporter*

P004938

Case 23-753, Document 62, 01/17/2024, 3604338, Page585 of 898

Case 23-753, Document 62, 01/17/2024, 3604338, Page586 of 898

```
 1              THE COURT:  Thank you.  Ms. Effman?

 2  CROSS-EXAMINATION

 3  BY MS. EFFMAN:

 4       Q.  Good morning, Doctor.

 5       A.  Good morning.

 6       Q.  Now, the child that you first saw at St. Mary's

 7  Hospital was nearly -- born nearly two months early?

 8       A.  Uh-huh.

 9       Q.  And isn't it true, Doctor, that children that aren't

10  delivered at full term don't have the full benefit of

11  antibodies to protect themselves against illnesses as a child

12  who was carried to full term?

13       A.  The immune system has not yet developed, yes.

14       Q.  And that's because they haven't had the full benefit

15  of being inside the mother for the full 40 weeks; correct?

16       A.  Yes.

17       Q.  So, an infant who is born, you know, a month or two

18  early would have a lower ability or lower immune system than

19  someone who's carried to full term; correct?

20       A.  Yes.

21       Q.  And in terms of your care of M████ T████, the

22  records reflect that on July 23, 2008, he had a shot,

23  pneumococcal shot.  Is that correct?

24       A.  Yes.

25       Q.  And Doctor, what is that pneumococcal shot?  What is
```

Judy A. DelCogliano
*Official Senior Court Reporter*

(Ojukwu - People - Cross)

1    it supposed to do?  What does it relate to, Doctor?

2         A.   Specifically, it is a streptococcal pneumoniae

3    vaccine, which is supposed to prevent pneumococcal meningitis

4    or bacteremia.

5         Q.   And how many shots -- I take it that is a series of

6    shots that's given to every newborn child that comes to your

7    office; correct?

8         A.   Yes.

9         Q.   And how many series of shots is recommended for a

10   child to have in order for them to have the benefit of full

11   protection against pneumococcal -- streptococcus pneumoniae?

12        A.   Four shots.

13        Q.   And M████ was -- had one shot July 23rd; correct?

14        A.   Yes.

15        Q.   And, obviously, because of his age, he didn't have

16   any more shots in the months that followed; correct?

17        A.   Yes.

18        Q.   He wouldn't have been due for another shot until some

19   time later on at the end of September, early October; correct?

20        A.   Yes, two months.

21        Q.   Doctor, you just talked about M████ going for a

22   cardiac follow-up.  Isn't it accurate that M███ obviously

23   couldn't have gone for a cardiac follow-up, because M██████

24   passed away in late September of '08?

25        A.   Yes.

Judy A. DelCogliano
Official Senior Court Reporter

Case 23-753, Document 62, 01/17/2024, 3604338, Page587 of 898

```
 1    STATE OF NEW YORK

 2    COUNTY COURT              COUNTY OF RENSSELAER

 3    - - - - - - - - - - - - - - - - - - - - - - - - - X

 4    THE PEOPLE OF THE STATE OF NEW YORK

 5    - against -              Indictment #08-1074

 6    ADRIAN THOMAS,

 7              Defendant.

 8    - - - - - - - - - - - - - - - - - - - - - - - - - X

 9    JURY TRIAL - VOLUME XIII

10                           County Courthouse
                             Congress and Second Streets
11                           Troy, New York 12180
                             October 16, 2009.
12
      B e f o r e:
13
                HONORABLE ANDREW G. CERESIA,
14              County Court Judge.

15    A p p e a r a n c e s:

16              For the People:
                RICHARD J. MC NALLY, JR., ESQ.,
17              District Attorney, Rensselaer County,
                By:  ARTHUR F. GLASS, JR., ESQ.,
18              and CHRISTA M. BOOK, ESQ., Assistant
                District Attorneys, of counsel,
19              Rensselaer County Courthouse,
                Troy, New York.
20
                For the Defendant:
21              JEROME K. FROST, ESQ.,
                Public Defender, Rensselaer County,
22              and INGRID EFFMAN, ESQ., Assistant Public
                Defender, of counsel,
23              Rensselaer County Courthouse,
                Troy, New York.
24
                ADRIAN THOMAS, Defendant, in person.
25
```

Judy A. DelCogliano
Official Senior Court Reporter

# APPENDIX

INDEX TO WITNESSES

|                       | Direct       | Cross | Redirect             | Recross      |
|-----------------------|--------------|-------|----------------------|--------------|
| **For the Defendant:** |              |       |                      |              |
| JAN E. LEESTMA        | 2064<br>2097 | 2166  | 2212<br>2225<br>2228 | 2221<br>2225 |
| (Voir Dire - 2085)    |              |       |                      |              |

INDEX TO EXHIBITS

|                                       | Identification | Evidence |
|---------------------------------------|----------------|----------|
| **For the Defendant:**                |                |          |
| P.  Medical Records                   |                | 2064     |
| R.  Slides                            |                | 2064     |
| U.  Curriculum Vitae<br>    Dr. Leestma | 2063         | 2079     |
| V.  Compact Disc                      | 2063           | 2064     |
| W.  Chart                             | 2231           |          |

Judy A. DelCogliano
Official Senior Court Reporter

A000001933

APPENDIX **1608**

*(Leestma - Defendant - Redirect)*                                    2229

1    based on the other objective evidence you saw in the records,

2    the slides and the autopsy report?

3         A.   I could find no benefit in that, because it would be

4    playing on impressions, rather than science and method.

5    Biomechanics individuals would be able to evaluate those

6    things, demonstration, whether I know them to be true or not.

7    All I can say is against the testing that I'm aware of and

8    seen, got all the data on, it doesn't appear that those injury

9    scenarios reach an injury threshold.  And to look at a

10   demonstration or something like that, how could I -- how could

11   I impugn what G-forces are there.  I don't have instruments.

12   It would be a totally unprofessional exercise.

13        Q.   In fact, does the objective medical evidence in those

14   records support your opinion as to cause of death, Doctor?

15        A.   The objective evidence in the autopsy, which can't be

16   fudged.  I'm just saying, as I said before, the end point is,

17   if allegations -- and allegations are made that this was a

18   traumatic death.  Show me the trauma.  I don't see it.  I can't

19   see it through the overwhelming pathology due to infection.

20                    MS. EFFMAN:  Thank you, Doctor.

21                    MS. BOOK:  Nothing further.

22                    THE COURT:  Doctor, you may step down.  Thank

23             you.  Okay.  Members of the jury, we are going to break

24             for the day at this time.  As I was telling you yesterday

25             or the day before, sometimes the need arises for the Court

Case 23-753, Document 62, 01/17/2024, 3604338, Page590 of 898

# APPENDIX 1609

*(Leestma - Defendant - Direct)* 2118

1  and septic shock, Doctor?

2      A.  I believe that's the pathway that got us to this

3  place.  I should point out, also, if I moved this field up and

4  had taken a picture of the surface of the brain, I would have

5  found inflammatory cells there and with the gram stained

6  bacteria.

7      Q.  Doctor, can you explain to the jury what's depicted

8  on this particular slide?

9      A.  Okay.  On the left panel, what we have is a section

10  of tissue in the fat and muscle area surrounding the eye.  That

11  is -- the eye is, of course, enclosed in bone, and that's what

12  we call the orbit, and there's soft tissues surrounding the

13  eye, and that's where this section has been made.  There are

14  lots of blood vessels, which are normally present.  Many of

15  them are thrombosed, that is clotting, and have inflammation in

16  the wall.  We have this area of necrosis, where tissue has

17  died, and I had a gram stain, or had one made of this tissue.

18  And what I'm pointing out here, these dark big globs here, are

19  the nuclei of inflammatory cells.  All the little dark dots,

20  like grains of rice all over the place, are the streptococcal

21  bacteria, gram-positive bacteria that are in this dead and

22  dying tissue around the eye.

23      Q.  Did you request that certain slides from the autopsy

24  be gram stained for your review of this case?

25      A.  I did.

*Judy A. DelCogliano*
*Official Senior Court Reporter*

Case 23-753, Document 62, 01/17/2024, 3604338, Page591 of 898

2119

*(Leestma - Defendant - Direct)*

1    Q.   Doctor, can you tell the jury, what is gram staining?

2    A.   What you basically do -- and you can do it with a

3    smear; in other words, a cotton swab of some secretion

4    somewhere, put it out under a glass slide, and then stain it

5    with these reagents called the gram stain, and look at it under

6    a microscope, and they will -- these reagents will stain

7    certain bacteria dark like this.  Typical would be

8    streptococcus, staphylococcus and some others.  And then if it

9    didn't, they would have a pink color, like the bacteria that

10   inhabits the gut, like E. coli.  Those germs will have a pink

11   color, so they are gram negative.  And the form, or the way

12   these two dots are together, that's typical for streptococcus

13   and particularly strep pneumoniae.

14   Q.   Why is it important to gram stain a body slide?

15   A.   It tells you that there's bugs there.  I mean, if you

16   look at this, you say there has to be something there because

17   of the cellular reaction and the way the tissue is dead.

18   Although you have a positive culture, it's not the same as

19   saying, "There it is.  We have closed the loop on it."

20   Q.   And did you gram stain any other slides, besides the

21   slide of the orbital tissues, as we talked about here?

22   A.   Again, I wanted to be sure.  Are there bugs in the

23   subarachnoid space over the brain?  Yes.  Are there bugs in

24   this tissue around the eye?  Yes.  There should be no doubt as

25   to what the cause of death is.

Case 23-753, Document 62, 01/17/2024, 3604338, Page592 of 898

# APPENDIX

*(Leestma - Defendant - Direct)*                                    2120

1      Q.   Basically, all the gram staining you did showed that

2      the brain and the area behind the orbital tissues had evidence

3      of this bacteria, streptococcus pneumoniae?

4      A.   Right.

5      Q.   What is the significance of that?

6      A.   It just closes the loop on the reason.  Why is this

7      necrotic?  Why are the inflammatory cells there?  It's there

8      because there's bugs, and it tells you, when you have this kind

9      of perfusion and distribution of a serious infectious organism,

10     that's -- it's an advanced and disseminated disease.  That's

11     very, very, very serious.  There's the cause of death sitting

12     right there looking at you.

13     Q.   Doctor, going back to the previous slide, please, for

14     a moment.  You talked about there was evidence of clotting

15     problems.  Can you point for the jury with the pointer or the

16     pen where --

17     A.   These blood vessels are distended with blood clots,

18     and there's reaction in the wall of the blood vessel, and that

19     would be typical for coagulopathy and so forth.

20     Q.   And that's consistent with coagulopathy related to

21     sepsis or overwhelming sepsis?

22     A.   Sure.  You have sepsis here and you've got it right

23     next door.  You've got the whole story right there.

24     Q.   Can you go back a moment to the two prior slides with

25     the chronic subdural hematoma?  Thank you, Doctor.  Based on

Case 23-753, Document 62, 01/17/2024, 3604338, Page593 of 898

*(Leestma - Defendant - Direct)*

Case 23-753, Document 62, 01/17/2024, 3604338, Page594 of 898

1    the number of layers - you testified seven or eight layers - do

2    you have an opinion, to a reasonable degree of medical

3    certainty, as to the age of this chronic subdural?

4        A.  Yes.  In its totality -- I mean, we have to start

5    from the surface down here and move down, but the oldest

6    material probably goes back -- this child is only four months

7    old, and it certainly could go into that time frame; not all of

8    this.  Maybe we are looking at a four-month-old, a

9    three-month-old, a one-month-old, a two-week-old, that kind of

10   thing (indicating).

11       Q.  And Doctor, in terms of risk factors, did you review

12   the mother's obstetrical records in this case to determine

13   whether she had any risk factors during pregnancy and during

14   childbirth?

15       A.  Yes.  There were a number.  This child -- when we

16   take a look at children that have bleeding in the dura and

17   bleeding in the brain and then go back, there have been a

18   number of studies that have looked at that.  What factors are

19   around that could correlate with those things?  And there's a

20   bunch of them.  This child had at least a half dozen of these;

21   being early delivery, twins, the presence of toxemia during the

22   pregnancy in the mother.  The presence of premature rupture of

23   membranes is potential for bacterial infection.

24           Let me think.  They go on, but these would be all

25   things that could put stress upon the baby and produce bleeding

*Judy A. DelCogliano*
*Official Senior Court Reporter*

APPENDIX **1613**

*(Leestma - Defendant - Direct)*                    2122

1    in the brain in conjunction with birth.

2          Q.   Would meconium stained membranes - that is, a baby

3    having a bowel movement in utero - would that be a pregnancy or

4    birth complication factor?

5          A.   It's an indicator of fetal distress, and I suppose

6    just any indicator of fetal distress would be another box that

7    you would check off on that risk profile.

8          Q.   Would preeclampsia be a risk factor?

9          A.   Yes.

10         Q.   High blood pressure, would that be a factor?

11         A.   Well, that's part of the preeclampsia complication,

12   high blood pressure in the mom.

13         Q.   What about obesity on the part of the mother?

14         A.   That's another one.  Overweight is something that

15   adds risk.  I'm not exactly sure where in the alphabet it

16   comes, but it's there.

17         Q.   And what about breach presentation for vaginal

18   delivery?

19         A.   That's another one.  If the presentation is anything

20   other than the usual head down situation, if there's any

21   problem with delivery, and there often is with twins, that's

22   another risk factor.

23         Q.   What about use of forceps during delivery?  Would

24   that be a birth complication factor?

25         A.   True, forceps, anything else that indicates that it

Judy A. DelCogliano
*Official Senior Court Reporter*

A000001993                    P005271

1    was difficult to get the babies out, or they just popped out.

2    There's good news and bad news.  A precipitous delivery is also

3    connected with brain bleeding and so forth.

4         Q.  What about a bacterial diagnosis of a vaginal

5    infection of the mother at the time of delivery?  Would that be

6    a risk factor?

7         A.  Absolutely.

8         Q.  What about the fact that one child, Twin A, was born

9    with pulmonary stenosis?  Does that have any host in the risk

10   factors of the birth process?

11        A.  That departs a little bit.  I'm not sure what role

12   that would particularly play.

13        Q.  What percentage of normal pregnancies experience

14   intracranial bleeding during childbirth?

15        A.  This has been studied.  It used to be thought it was

16   quite rare, a few percent.  Now it turns out that normal,

17   presumably normal vaginal deliveries, 25 to 40 percent or more

18   may have some evidence of bleeding in the brain.

19        Q.  And if you had any of these pregnancy or birth

20   complications, Doctor, that we talked about, how does that

21   impact, this 25 or 40 percent, the number you have given us

22   that have babies that experience intracranial bleeding?

23        A.  It would probably shift those babies further and

24   further into the 25 to 40 percent rate.  I don't know what the

25   exact number correlations are, but that clearly increases the

Case 23-753, Document 62, 01/17/2024, 3604338, Page596 of 898

                          Judy A. DelCogliano
                       Official Senior Court Reporter

# APPENDIX                          1615

*(Leestma - Defendant - Direct)*                    2124

1    risk for bleeding.

2         Q.   Can you explain to the jury how bleeding can occur

3    during childbirth?

4         A.   Sure.  The head has to conform to the anatomy of the

5    birth canal; namely, it has to elongate.  It has to move and

6    twist and turn and so forth, although the -- birth is not for

7    sissies.  It's a traumatic process.  And in the course of that,

8    the intracranial structures have to be capable of moving and

9    being stretched and strained, as well.  And part of the problem

10   with that is, with molding of the head, that the dura,

11   especially near the back of the brain and the tentorium, it's

12   called, may be stretched and produce bleeding in those

13   locations.

14        Q.   So, in terms of areas that you can have bleeding

15   during childbirth, what would those areas be?

16        A.   Well, it can occur anywhere in the dura, but

17   classically, where all of the components of the dura come

18   together, more or less, near the base of the skull and the

19   cerebellum.  The dura there is very vascular, and it

20   experiences, from a mechanical point of view, more stresses

21   placed upon it during birth than other areas, and it's

22   reasonable, therefore, that blood does occur there, which it

23   does.

24        Q.   So, you can have bleeding anywhere in the dura as a

25   result of childbirth?

Case 23-753 Document 62, 01/17/2024, 3604338, Page597 of 898

1     A.   You can, sure.

2     Q.   And if you have bleeding in the dura, can that flow

3     to the posterior fossa?

4     A.   Well, once you have bleeding that goes into the

5     subdural, quote, space, it's a potential space, but it can be

6     actualized very easily.  It can respond to gravity and can

7     redistribute itself in different parts inside the head.

8     Q.   And during your review of the autopsy report in this

9     case, was there evidence that there was blood in the posterior

10    fossa of this child?

11    A.   Well, we can see it on the CT scan.  There clearly

12    was this process, an old one, with some recent bleeding back

13    there, yes.

14    Q.   Doctor, before I stop you there, do you have

15    additional slides that you would like to demonstrate for the

16    jury, Doctor?

17    A.   Yes, this one.

18    Q.   Can you describe for the jury what is pictured on

19    this slide?

20    A.   This is lung, section from the lung which shows

21    virtually no air in it.  It's all completely collapsed.  And if

22    you look - you can't really see it with this section here -

23    there are acute inflammatory cells scattered through this and

24    evidence of pneumonia, but this is primarily collapse of lung

25    tissue, most likely because air didn't reach it through the

Case 23-753, Document 62, 01/17/2024, 3604338, Page598 of 898

(Leestma - Defendant - Direct)                    2127

Case 23-753, Document 62, 01/17/2024, 3604338, Page599 of 898

1    how many of these scarred areas were there.  If there was some

2    element of pulmonary stenosis, the heart has to work harder to

3    pump blood, and that is reflected in a nonspecific way in

4    another section of the heart.  So, this child came into this

5    situation with a damaged heart for a variety of reasons, and

6    that's the load this child has to deal with.

7          Q.   You can take the stand again, Doctor, please.

8    Doctor, you just touched upon earlier that you have experience

9    in reading CAT scans and ultrasounds.  How many years have you

10   been interpreting these things?

11         A.   Oh, a long, long time.

12         Q.   Not to date your age, Doctor.

13         A.   I'm 70 years old.  But anyway, for 40 years or so.

14         Q.   And as part of this case, did you have a chance to

15   review an ultrasound from St. Mary's Hospital from May 14,

16   2008, approximately ten days after these children were born?

17   draw your attention to that, Doctor.  Can you rule out the

18   existence of a subdural hematoma based simply on that

19   ultrasound?

20         A.   No, I can't.

21         Q.   And can you explain that position to the jury?

22         A.   Ultrasound, it's a wonderful technology that seems to

23   be getting better and better and better all the time.  It's

24   noninvasive.  It doesn't produce radiation or damage anything,

25   as far as we know, and it's a good way if you have worries

*Judy A. DelCogliano*
*Official Senior Court Reporter*

# APPENDIX                                                    1618

*(Leestma - Defendant - Direct)*                                2128

1    about bleeding or some process inside the head, especially with

2    a baby, because the skull isn't very thick, you can do an

3    ultrasound.  But like any other sort of screening test, it's

4    not as sensitive as other methods, and you can get false

5    negatives, and I would say the incidence of false negative

6    exams - that is, when there's really nothing there but you pick

7    it up - is probably higher with an ultrasound than false

8    positives.  So, if you have a lesion that you can see with an

9    ultrasound, it's probably there, and then you may want to do

10   some other studies to define further what it is.  So, a

11   negative study, you cannot necessarily go home with a

12   comfortable feeling that there's nothing there.  Probably more

13   likely than not, there's nothing there, but you can't be sure.

14        Q.   And might a small amount of a bleed not appear on an

15   ultrasound?

16        A.   Yes.  That happens.  I have encountered that

17   situation where, by extrapolating back, where there should have

18   been something there, and then reviewing the studies --

19   sometimes there's technical reasons; the study wasn't very good

20   or the technician didn't have the magic in the fingers to make

21   things come out right.  And by all rights, the study is

22   negative, but there had to be something there, but it was below

23   the level of detection of the instrument.

24        Q.   Might there be any lag time in the appearance of a

25   subdural hematoma such that it may not appear on an ultrasound

Case 23-753, Document 62, 01/17/2024, 3604338, Page600 of 898

Case 23-753, Document 62, 01/17/2024, 3604338, Page601 of 898

1  performed ten days after a premature birth of 33 weeks?

2       A.   Yes.   That doesn't mean the birth is the only thing

3  that's going on.  This child is trying to adapt to be a full

4  newborn.  Other things can occur.  And who knows?  A process

5  may have begun after the ultrasound was taken.  It's just --

6  you can certainly have processes that have a beginning but are

7  small and minimal, I guess, that do evolve into something like

8  what we see here in this child, and you see that all the time.

9       Q.   And what's the most diagnostic way to -- I guess --

10 strike that.  Is a CAT scan more -- a better way to take a look

11 at the -- that particular area of the body?

12      A.   Sure.  A CT scan is a good technology.  MR is better.

13 The trick with these things is you get radiation from a CT

14 scan, a lot more than you get from a chest film, and a

15 developing brain is something you don't necessarily want to

16 irradiate if you don't have to.  So, consequently, there's a

17 cost benefit.  There are risk benefit equations you have to

18 work on.

19           An MR, on the other hand, is much more expensive.

20 You probably have to sedate the child in order to do that, and

21 then you can really get information.  But, you know, how badly

22 do you need that information?  Do you have reason to go there?

23 Maybe not.

24      Q.   Which is the least expensive means of doing the

25 imaging?

Case 23-753, Document 62, 01/17/2024, 3604338, Page602 of 898

1    of it.

2        Q.    And in terms of the subarachnoid hemorrhage mentioned

3    in the autopsy report, how serious is that, Doctor?

4        A.    I think that is strictly incidental.  This child was

5    on a respirator, had virtually no circulation going to the

6    brain because of the vast intracranial pressure.  And in the

7    course of this brain sitting there without any blood pressure

8    in it for two days, basically -- all of these brains that come

9    to autopsy have subarachnoid hemorrhage.  So, it has no

10   particular meaning.

11       Q.    And do you have an opinion as to the cause of this

12   child's coagulopathy problems, Doctor?

13       A.    Sure, sepsis.

14       Q.    Doctor, perhaps the next question, if I could ask you

15   to come down.  We are going to need the easel, please.

16            (Discussion off the record at the bench.)

17            THE COURT:  Members of the jury, we are actually

18       going to break for lunch at this point.  We are going to

19       stop until quarter of two.  We will break until 1:45.  I

20       ask you, please do not discuss this case among yourselves

21       or with anyone else.  Do not read or listen to any

22       accounts of this case.  Do not visit any premises involved

23       in this matter.  Do not conduct any research involving

24       this case.  Do not request or accept any payment in return

25       for supplying any information regarding this trial.  Do

APPENDIX                                          1621

(Leestma - Defendant - Direct)                        2158

1        Q.   Besides the microscopic slides, did you see any --

2   based on your review in this case, did you see any evidence of

3   any external problems within the child's eyes that indicated to

4   you an infection?

5        A.   Yes.  In the tissues of the orbit surrounding the

6   eye, that's primarily where the worst infection and abscess

7   formation was.

8        Q.   As part of your review of the autopsy report, was

9   there an examination done of the sinuses as part of the autopsy

10  report?

11       A.   No.  By that, I mean when the brain is taken out,

12  then you have the empty skull base, and there are a number of

13  paranasal sinuses that are reachable through bone of that skull

14  base, and none of those were opened or examined.

15       Q.   And what is the significance -- or what would you

16  look for, Doctor, if you are doing an examination, what would

17  you look for in doing an examination of the sinuses?

18       A.   Well, in the face of sepsis due to this particular

19  organism, sinus infection would be way high on the list for a

20  locus where this whole thing began, and it would be appropriate

21  to open those - it takes just a few minutes - to see what's in

22  there.  And if you find pus in one of the sinuses, by direct

23  extension, that's probably how it got into the brain.  And it's

24  incumbent upon you, if you are there to try to find out what

25  went on with the child like this, you've got to collect the

Judy A. DelCogliano
Official Senior Court Reporter

Case 23-753, Document 62, 01/17/2024, 3604338, Page603 of 898

1    evidence, and it wasn't.

2         Q.   The autopsy report refers to macrophages being on the

3    brain.  Is that the same thing as pus?

4         A.   Yes and no.  Macrophages are scavenger cells that

5    take a few days to reach a site of injury.  There are other

6    cells that get there first called polys.  They come from the

7    blood.  And, so, the pus is really the collective of dead

8    cells, whatever they are, inflammatory cells.  There might be

9    some blood.  There's necrotic or dead tissue, fluid and

10   organisms.  So, it's the gunk that builds up in the gutters, so

11   to speak.

12        Q.   In which eye did you find evidence of bacterial

13   infection?

14        A.   I think it's in both of them, actually; more on the

15   right, tissues around the right eye that I found that.

16        Q.   Doctor, can you tell us, what is bacterial

17   meningitis?  What is meningitis first?

18        A.   Well, meningitis is an inflammation of the coverings

19   of the brain.

20        Q.   And what is bacterial meningitis?

21        A.   If it's bacteria, that's the thing that caused it.

22        Q.   Can you please explain the natural progression of

23   bacterial meningitis?

24        A.   Sure.  The process -- bacteria don't just usually get

25   there unless there's an open head wound; sometimes with gunshot

Case 23-753, Document 62, 01/17/2024, 3604338, Page604 of 898

*Judy A. DelCogliano*
*Official Senior Court Reporter*

APPENDIX   (Defendant - Direct)   **1623**   2161

Case 23-753, Document 62, 01/17/2024, 3604338, Page605 of 898

1   in the coverings of the brain.  It looked creamy and green, and

2   that's the first tip off.  It isn't the end of it.  Then you go

3   to the microscopic, and there it is.  And the further

4   explanation or nail down of that fact is the fact there is

5   organisms there.  So, it looks like it, smells like it, tastes

6   like it.  I mean, that's pretty gross, but never mind.  We have

7   at least three levels of proof of meningitis in this case.

8        Q.   And how serious is a bacterial meningitis infection

9   in a four-month-old premature baby?

10       A.   Very serious.  In real young ones -- well, babies of

11   this age that are not infected with pneumococcus, but a more

12   common organism called H flu -- H flu is a more benign form of

13   meningitis that not many kids die of because it gets diagnosed

14   and is easily treatable.  Pneumococcal meningitis, on the other

15   hand, is a worse actor, and the whole survivability depends on

16   discovery and treatment.

17       Q.   Doctor, do you have an opinion, to a reasonable

18   degree of medical certainty, if trauma caused sepsis,

19   overwhelming sepsis in the case of this baby?

20       A.   Is trauma related to the sepsis?  I would say not.

21       Q.   Can you explain your opinion, Doctor?

22       A.   Well, first of all, how would a traumatic episode,

23   whatever it is, to be defined, produce bacteria?  It can't

24   produce bacteria.  How does it help to introduce bacteria into

25   a system, the blood or the brain or whatever?  Now, if you had

*Judy A. DelCogliano*
*Official Senior Court Reporter*

A000002032           P005310

1    an open head injury, that's trauma, and there's contamination.

2    That's how it could get in there.  That's the easiest way.  In

3    terms of just some traumatic episode, blows and compression to

4    the bowel and the abdomen can open up bacteria into the

5    bloodstream from the gut.  But in terms of just -- or a

6    fracture going through a sinus.  Those are about the only ways

7    that I would imagine making sense.

8         Q.   And in this case, was there any evidence of any skull

9    or nasal fracture, Doctor?

10        A.   No, no.

11        Q.   Do you have an opinion, Doctor, as to whether

12   repeated bouts of head trauma could cause this baby to

13   aspirate, therefore causing pneumonia leading to sepsis?

14        A.   Many things are possible.  It just doesn't -- the

15   evidence isn't there to enable me to start going down that kind

16   of a scenario.  It doesn't make a lot of sense to me.

17        Q.   Was there any evidence in the records you reviewed

18   that this child had any evidence of aspiration; that he had

19   aspirated?

20        A.   I couldn't find anything, and I don't think it's

21   written in the autopsy.

22        Q.   Did you find any evidence in the case of this child

23   that supports the prosecution's theory that blunt force trauma

24   caused this baby's problems?

25             MS. BOOK:  Objection, Your Honor.

Judy A. DelCogliano
Official Senior Court Reporter

(Defendant - Direct) **1625**    2163

Case 23-753, Document 62, 01/17/2024, 3604338, Page607 of 898

```
 1                    THE COURT:  Basis?

 2                    MS. BOOK:  Your Honor, he's already given his

 3          opinion many times.  This has been asked and answered.

 4                    THE COURT:  Overruled.

 5          A.   Blunt force trauma is a notoriously fuzzy, gray

 6     description, but we are basically talking about an impact of

 7     some sort that's not sharp and cutting and that could be

 8     inflicted or accidental.  The important part of an impact

 9     injury scenario is where is the impact?  What are the effects

10     of it?  And in this particular case, I'm not at all convinced

11     that there is an impact site that is a good candidate on the

12     head.  The only one that might be is this right parietal thing

13     that doesn't have any associated deep scalp bleeding to it.

14               The other things are, if it's an impact injury to the

15     head, then where is the brain injury?  This child had chronic

16     fluid collections on both sides of the brain.  The amount of

17     acute bleeding in this process is minimal; mostly posterior.

18     So, if there's a great big subdural hematoma caused by trauma,

19     where is the acute bleeding?  I don't see it.  So, we have an

20     ongoing process.  Could trauma have occurred?  I suppose so,

21     but I can't find a great big headline here in the evidence to

22     help me take that path.

23          Q.   Doctor, can you rule out, to a reasonable degree of

24     medical certainty, that trauma caused this child's death?

25          A.   I could say yes, and on the other side of it, I don't
```

(Leestma - Defendant - Direct)                                    2164

Case 23-753, Document 62, 01/17/2024, 3604338, Page608 of 898

1    find any persuasive evidence that head trauma was important in

2    this child's demise.

3         Q.    And Doctor, what caused the death of this child?

4         A.    What does what?

5         Q.    What was the cause of death of this child?

6         A.    Sepsis and bacterial infection that led to meningitis

7    and abscess around the eyes and bacteremia.

8              MS. EFFMAN:  No further questions.

9    CROSS-EXAMINATION

10   BY MS. BOOK:

11        Q.    Hello again, Doctor.

12        A.    Good afternoon.

13        Q.    Let's talk about --

14             THE COURT:  Do you have an issue?

15             MR. FROST:  I'm sorry to interrupt, but Ms.

16   Effman asked if she could have a couple seconds to consult

17   with me.  We are consulting.

18             THE COURT:  I thought she said no more

19   questions.

20             MS. EFFMAN:  I apologize.  I may have one or two

21   more questions.

22   BY MS. EFFMAN:  (Continuing)

23        Q.    Doctor, do you have an opinion, to a reasonable

24   degree of medical certainty, as to what caused the increased

25   intracranial pressure that caused the retinal hemorrhages in

1   UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF NEW YORK
2   - - - - - - - - - - - - - - - - - - - - - - - - - - - -

3   ADRIAN THOMAS,

4                       Plaintiff,

5           - against -

6   CITY OF TROY, ADAM R. MASON, RONALD FOUNTAIN,
    TIM COLANERI,
7   RENSSELAER COUNTY, and MICHAEL SIKIRICA,

8                       Defendants.
    - - - - - - - - - - - - - - - - - - - - - - - - - - - -
9   NEW YORK STATE
    COURT OF CLAIMS
10  - - - - - - - - - - - - - - - - - - - - - - - - - - - -

11  ADRIAN P. THOMAS,

12                      Claimant,

13          - against -

14  THE STATE OF NEW YORK,

15                      Defendant.
    - - - - - - - - - - - - - - - - - - - - - - - - - - - -

16

17              DEPOSITION of Plaintiff/Claimant, ADRIAN P.

18  THOMAS, held on the 20th day of August 2019, commencing

19  at 9:26 a.m., at the Law Offices of Bailey, Johnson &

20  Peck, P.C., 5 Pine West Plaza, Washington Avenue

21  Extension, Albany, New York 12205, before Jeanne

22  O'Connell, Registered Professional Reporter and Notary

23  Public in and for the State of New York.

```
 1   APPEARANCES:

 2   Brett H. Klein, Esq.
     305 Broadway
 3   Suite 600
     New York, New York  10007
 4   Attorney for Plaintiff/Claimant

 5   Pattison Sampson Ginsberg & Griffin, PLLC
     22 First Street
 6   Troy, New York  12180
     By:  Joseph T. Perkins, Esq.
 7   Attorneys for City of Troy, Adam R. Mason,
     Ronald Fountain and Tim Colaneri
 8
     Bailey, Johnson & Peck, P.C.
 9   5 Pine West Plaza
     Washington Avenue Extension
10   Albany, New York 12205
     By:  Crystal R. Peck, Esq.
11   Attorneys for Michael Sikirica

12   New York State Office of the Attorney General
     The Capitol
13   Albany, New York 12224
     By:  Christina M. Calabrese, Assistant Attorney General
14
     Also present:  Katherine Hamilton
15

16

17

18

19

20

21

22

23
```

1               (Adrian P. Thomas - by Ms. Calabrese)

2       A.   Yes.

3       Q.   Did anybody else play a role in that?

4       A.   The grandparents.  When I'm not around, the

5   grandparents or one of her brothers.

6       Q.   And the grandparents, you're talking about

7   Wilahemina's parents?

8       A.   Yes.

9       Q.   And are they from Georgia or are they from New

10  York?

11      A.   One parent is from New York.  That's Inga.  And

12  the father, I think, is from Mississippi, I believe.

13      Q.   What caused Wilahemina to work at the chicken

14  factory in Georgia when you guys met?

15           Why was she there?

16      A.   The father moved to Georgia, so the family left

17  New York and came to Georgia to be close to one of his

18  relatives.

19      Q.   And what caused them -- and by them, I mean the

20  grandparents, Wilahemina's parents, to move back to New

21  York?

22      A.   I don't actually remember why.

23      Q.   Now, who was responsible for tending to the twins

Case 1:17-cv-00626-DJS Document 66-6 Filed 09/20/21 Page 496 of 33

```
 1              (Adrian P. Thomas - by Ms. Calabrese)
 2    primarily?
 3          When I say tending, I mean changing, feeding,
 4    doing those sorts of tasks.
 5       A.   Wilahemina was.
 6       Q.   She primarily took care of those functions or
 7    tasks?
 8       A.   Yes.
 9       Q.   And where did the children, the twins, sleep?
10       A.   In the crib.
11       Q.   Where was that located?
12       A.   That was in our bedroom.
13       Q.   Whose bedroom?
14       A.   Our -- Wilahemina and mine.
15       Q.   And was it one crib or two cribs?
16       A.   It was only one.
17       Q.   And they slept together in the same crib?
18       A.   Yes.
19       Q.   Where did the other children sleep?
20       A.   They slept in the other bedroom.
21       Q.   How many?
22       A.   One.
23       Q.   All of the other four children slept in one
```

1        (Adrian P. Thomas - by Ms. Calabrese)

2    Q.   Was M█████ still not taking full dose, as you

3    mentioned earlier?

4    A.   Wasn't taking the whole bottle.

5    Q.   Go ahead.

6    A.   After that, she changed both children's diapers,

7    and she tried feeding M█████ again.  And then he still

8    was rejecting a full bottle.  So, she laid M█████ back

9    into the crib, and she kept M█████.  She was more

10   attentive to M███w.  And then she laid him back down

11   in the crib.  Then she said about 20 minutes later he

12   finally went to sleep.  And then I laid down.  And that

13   was it.  We went to bed.

14   Q.   And where was M█████?

15   A.   He was in the crib, as well.

16   Q.   So you went to bed.

17        And what happens next?

18   A.   She woke me up, shaking me to get up, and she

19   said, M█████'s not breathing.  So I got up.  I picked

20   him up, checked his pulse.  And I checked his pulse.  I

21   dialed 911.

22   Q.   What caused you to dial 911?

23   A.   Because he wasn't actually breathing like he

```
 1          (Adrian P. Thomas - by Ms. Calabrese)

 2     A.   After my mother-in-law just left.

 3     Q.   And what door did you say you locked?

 4     A.   I locked the front door.

 5     Q.   Tell us -- then what happens, you go in the

 6  shower?

 7     A.   I was taking my clothes off, just hopped in the

 8  shower.  Before I could lather the soap in, I started

 9  washing my body.  I heard a knock on the door.  I dried

10  back off, put my clothes back on.  And I answered the

11  door, and it was two detectives there.

12     Q.   And who were they?

13     A.   They introduced themselves as Adam Mason.

14     Q.   And who was the other one?

15     A.   The other guy with him was named Ronald Fountain.

16     Q.   And what did they say?

17     A.   They said, we're here to talk with you about your

18  son.

19     Q.   And what did you think at that time?

20     A.   My mind was blank.

21     Q.   What do you mean?

22     A.   I didn't know what to think.

23     Q.   And did you say anything in response to them?
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      A.   I said, come in.  I told them to come in.

 3      Q.   Then what happened?

 4      A.   I told them about -- about I was awakened by my

 5  wife and about his breathing, about his condition that

 6  he was in from what I saw.  And I told them about

 7  everything that happened from that moment all the way up

 8  to the paramedics came.

 9      Q.   Just the way you described it to me today?

10      A.   Yes.

11      Q.   And what, if anything, did they say?

12      A.   They asked me what happened before.  I said, we

13  gave him a bottle that -- that night when we fed him,

14  and they had that -- he had a fever over a few days.

15  And that was it.

16      Q.   And what did they say?

17      A.   They said, okay, we'll be back.  We're going to

18  the hospital.

19      Q.   And did they leave?

20      A.   Yes.

21      Q.   Did you go with them?

22      A.   No.

23      Q.   What did you do?
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      Q.   A day, two days, three days, less than a day?

 3      A.   I'm not understanding.

 4      Q.   Sure.

 5           I'm trying to understand how long of a time

 6  period you were in that room the first period of time.

 7           Was it longer than a day, shorter than a day, a

 8  couple of days?

 9      A.   It was just -- I was in that room for one day,

10  for my first day of questionings, for some hours.  I

11  don't remember how many hours.

12      Q.   And did you go anywhere after that?

13           What caused you to leave that room?

14      A.   I remember telling them, if my son died, I would

15  jump off the bridge, and they took me to the hospital.

16      Q.   Which hospital?

17      A.   I think Samaritan.  I'm not sure.

18      Q.   And what happened there?

19      A.   When they took me to the hospital, they took me

20  on the third-floor psych ward.  They met with some

21  doctors, talked to some doctors, without me being

22  present.  And I was in a room being watched by a guard.

23  And they left.
```

Case 1:17-cv-00626-DJS Document 41-34 Filed 09/20/21 Page 96 of 33

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2       Q.   And who's they?

 3       A.   Adam Mason and Ronald Fountain.

 4       Q.   And how long did you stay there at Samaritan?

 5       A.   I stayed there maybe two days.  24 to 48 hours, I

 6  believe.

 7       Q.   And did you speak to anybody while you were

 8  there?

 9       A.   I was escorted into a room.

10              MR. KLEIN:  She's not asking where you

11         went.  She's asking:  Did you speak to

12         anyone while you were there?

13              THE WITNESS:  Yes.

14  BY MS. CALABRESE:

15       Q.   Tell me about that.

16       A.   I talked with a guy that was watching me.

17       Q.   The guard?

18       A.   Yes.

19       Q.   What did you talk about?

20              Tell us about that conversation.

21       A.   He just asked me what did I do.  What did I do to

22  be -- to come there.  He asked me was I working anywhere

23  before I came there.  I told him no.  That was it.
```

1         (Adrian P. Thomas - by Ms. Calabrese)

2     Q.  What did you tell him when he said, what did you

3  do to have to come there?

4     A.  I told him, I don't know what happened.  I just

5  was being brought by the police.  And that was it.

6     Q.  That's all you said to him?

7     A.  Yes.

8     Q.  And did you speak to anybody else when you were

9  there, doctors, nurses, anybody?

10    A.  Yes.  I was brought into another room after -- I

11  think it was the next morning.

12    Q.  Tell me about that.

13    A.  And there was a group of people on the inside of

14  a room.  And one doctor had spoke and asked me what was

15  going on.  And I told him what had happened.  I told him

16  about the morning that my son -- I was awaked to my

17  son's condition and told him what happened all the way

18  to the cops came and CPS workers came.

19         And they listened.  He told me to step back

20  outside.  From there, I went back to that same room

21  where I was being watched.  And that was it.

22    Q.  And what did you do in there?

23    A.  Just looked out of a window.

```
1              (Adrian P. Thomas - by Ms. Calabrese)

2       Q.   For how long?

3       A.   For hours.

4       Q.   And then what happened?

5       A.   I was taken to the front door of the place, and I

6   was greeted by Adam Mason.

7       Q.   And what was your understanding about what was

8   happening?

9       A.   My understanding was, he was taking me back down

10  to the station to talk.

11      Q.   And did you agree to go?

12      A.   Yes.

13      Q.   And did you go back to the station?

14      A.   Yes.

15      Q.   And tell us what happened when you got there.

16      A.   He led me to a hallway and told me, when I got in

17  the room and sit down, if I get up and go towards the

18  door, I would be charged with escape.  And then I was

19  brought into the room.

20      Q.   And at that point, when he's telling you this,

21  what are you thinking?

22      A.   My mind went blank.

23      Q.   It went blank again?
```

1           (Adrian P. Thomas - by Ms. Calabrese)

2      A.   Yes.

3      Q.   So you didn't have --

4      A.   I didn't know what to think.

5      Q.   You didn't have any thoughts in your head?

6      A.   No.

7      Q.   And so, what did you do?

8      A.   I walked in the room and sat down and waited for

9  him to come inside.

10     Q.   But earlier, prior to you being brought to what

11 you are calling Samaritan, why didn't you leave at that

12 time during your conversation?

13          How come you didn't leave before you made those

14 threats to self-harm?

15     A.   I thought I couldn't leave.

16     Q.   Well, if they said, come on, I want you to come

17 down, you said yes, why did you think you couldn't

18 leave?

19     A.   I just thought I couldn't leave.

20     Q.   They never told you you couldn't leave, correct?

21     A.   Not at that time.  No.

22     Q.   So they never said, you have to stay here, right?

23     A.   Correct.

1          (Adrian P. Thomas - by Ms. Calabrese)

2     Q.  And so, you were there.  In your own mind, you

3  thought you couldn't leave.

4          And you made the threats and went to the

5  hospital, correct?

6     A.  Yes.

7     Q.  And then agreed to go back, correct?

8     A.  No.  I was met at the door --

9     Q.  Right.

10    A.  -- of the hospital.

11    Q.  The hospital.

12         And they asked you to come back to the station,

13  correct?

14    A.  Yes.

15    Q.  And you agreed to go back?

16    A.  Right.

17    Q.  During that time of the ride from the hospital to

18  the station, did you have a conversation with them?

19    A.  No.  They was quiet.

20    Q.  Were you quiet?

21    A.  I was quiet, as well.

22    Q.  Did you ask them any questions about why you were

23  there, what you were doing?

1        (Adrian P. Thomas - by Ms. Calabrese)

2    A.  No.

3    Q.  And then you went back to the station.  This is

4  when you say they told you about escaping.  You said,

5  when you went to the room --

6    A.  They told me in the hallway.

7    Q.  -- that, if you were to leave, it would be

8  considered escape?

9    A.  If I get up from the chair and go towards the

10  door of that room, I would be charged with escape.

11    Q.  And you had no thoughts in your head at this

12  point?

13    A.  Right.  They told me, go in there and sit down.

14  And that was it.

15    Q.  Did you think you were in trouble in any way?

16    A.  I didn't know what to think.

17    Q.  At any point in time prior to this moment, did

18  you think you were in trouble?

19        MR. KLEIN:  Objection to form.

20        THE WITNESS:  My mind was blank.

21  BY MS. CALABRESE:

22    Q.  So you said earlier that you had never had any

23  interaction with law enforcement where you were in

Case 1:17-cv-00626-DJS  Document 17-39  Filed 09/20/21  Page 198 of 33

1          (Adrian P. Thomas - by Ms. Calabrese)

2     Q.  And so, you're saying that this entire statement

3  that you gave to the police was a lie; is that right?

4     A.  Yes, of course that's a lie.

5     Q.  You're saying that they coerced you into making

6  this statement?

7     A.  Yes.

8     Q.  Tell me about your mindset that allows you to say

9  things that are not true about the injuries to your son.

10         What were you thinking at that time?

11    A.  I was thinking about my son's condition.  I

12  didn't know -- I didn't know how he got into that

13  condition.  All I remember is that we, Wilahemina and I,

14  laid down and I was awakened to his condition.  I had

15  never been in trouble before.  I was worried about him.

16  I was worried about my children after they was taken in

17  front of my eyes.  I couldn't do nothing as a man to

18  hold on to my children.  So I couldn't sleep.

19  Everything was going through my mind at the time.

20    Q.  So how does that relate to you making up this

21  story about how he died?

22    A.  I felt I had no other choice.  That's what he

23  really wanted me to say.  That's the reason why I

1        (Adrian P. Thomas - by Ms. Calabrese)

2    repeated those suggestions in that type of order.

3    Q.  So you're saying all the words that you wrote in

4    Defendant's B, the ten-page statement, were comprised of

5    suggestions that were given to you.  The words that

6    police used were the words you repeated.

7        Is that what you're saying?

8            MR. KLEIN:  I'm just going to note an

9        objection.

10           He didn't write the statement.

11           MS. CALABRESE:  I understand that.

12   BY MS. CALABRESE:

13   Q.  Is that true?

14   A.  Is what part true?

15   Q.  The question is, the statement that you gave

16   that's audio taped --

17   A.  Okay.

18   Q.  -- and videotaped, those words that you used to

19   describe what happened to M███████ , you're saying that

20   the police provided those words to you, that they were

21   not your own words?

22   A.  The suggestions on the bumping and throwings, the

23   slamming, all that, yes.

1           (Adrian P. Thomas - by Ms. Calabrese)

2      Q.  And as you sit here today you're saying that

3    never occurred?

4      A.  I'm not saying it -- no.  Yeah.  That never

5    occurred.  Yeah.  No.

6      Q.  So you never slammed him?

7      A.  No.  I never slammed him.

8      Q.  You never bumped his head?

9      A.  No.

10     Q.  You never threw him in the crib?

11     A.  No.

12     Q.  You never bumped your head onto his head?

13     A.  No.

14     Q.  None of that occurred?

15     A.  None of that.

16     Q.  It's all not true?

17     A.  That's not true.

18     Q.  It's all a lie that you stated on the record?

19     A.  Yes.

20     Q.  Now, are you aware that M█████ had multiple rib

21   fractures?

22     A.  When?

23     Q.  He was discovered to have multiple rib fractures

Case 1:17-cv-00626-DJS Document 47-3 Filed 09/20/21 Page 188 of 33

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2    BY MS. CALABRESE:

 3        Q.  How did he get those fractures?

 4        A.  I don't know.

 5        Q.  Isn't it true that you would often squeeze him

 6    when you were upset because he was crying?

 7        A.  No.

 8        Q.  You would also discipline M████  and M████   in

 9    the same way that you did with the other children,

10    correct?

11        A.  That's false.

12        Q.  After you provided these statements to the

13    police, you were arrested?

14        A.  That's a question?

15        Q.  Yes.

16        A.  Yes, I was arrested.

17        Q.  Placed in Rensselaer County jail?

18        A.  Yes.

19        Q.  Shortly thereafter, members of the child

20    protective services department came to interview you,

21    correct?

22        A.  Yes.

23        Q.  Do you recall who they were?
```

1        (Adrian P. Thomas - by Ms. Calabrese)

2    A.  I spoke with a guy named Jasper.

3    Q.  Was that the same guy who you mentioned earlier

4 who came to talk to you about one of the little ones

5 leaving the house unsupervised?

6    A.  AJ.  Yes.

7    Q.  So you were familiar with Jasper?

8    A.  I only seen him one time before.  Yes.

9    Q.  So you knew who he was.  He wasn't a stranger?

10    A.  Correct.

11    Q.  You knew why he and the other person -- was the

12 other person male or female?

13    A.  I only met with Jasper.

14    Q.  At the jail?

15    A.  Yes.

16    Q.  So, you know why he was there, to talk to you

17 about the allegations?

18    A.  Yes.

19    Q.  You knew what the consequences would be of

20 talking to him, because previous to that they took your

21 kids away, right?

22        MR. KLEIN:  Objection.

23        THE WITNESS:  No.

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2     BY MS. CALABRESE:

 3        Q.  You didn't know the consequences?

 4        A.  No.  I was just meeting him inside of the county

 5     jail when I was already arrested.

 6        Q.  Well, what did you think he was there to do?

 7        A.  He just told me he was coming to talk.

 8        Q.  About what?

 9        A.  About what happened to M█████.

10        Q.  Right.  So did you talk to him about what

11     happened to M████?

12        A.  I told him about -- yes.  I told him about the

13     morning that I was awakened by my wife.

14        Q.  And did you tell him what you did to M████?

15            And I'm not asking you if what you said was true.

16     What I'm asking you is:  Did you relate to him the same

17     series of events that you related to the police?

18        A.  No.  I only -- he only asked me about what --

19     how --

20        Q.  M████ got hurt?

21        A.  No.  He only asked me about the morning of when

22     the paramedics came.

23        Q.  Isn't it true that you told Jasper that there
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)
 2     were four separate times where you hurt M████?
 3        A.  No.
 4        Q.  You're saying you never said that?
 5              MR. KLEIN:  Objection, asked and
 6           answered.
 7              You can answer.
 8              THE WITNESS:  I never said that.
 9     BY MS. CALABRESE:
10        Q.  Isn't it true that you told him that, on one
11     occasion, you took M████, and you dropped him into the
12     crib, and he hit his head on the side?
13              Isn't it true that you told Jasper that?
14        A.  No.
15        Q.  Isn't it true that there were two other times
16     where you took M████ and threw him on the bed because
17     you were angry with Wilahemina?
18              Didn't you tell Jasper that?
19        A.  No.  I never told Jasper any of that.
20        Q.  Isn't it true that you told Jasper on Saturday,
21     September 20th, that you banged your head back and hit
22     M████ in the front of his head with the back of your
23     head?
```

1     (Adrian P. Thomas - by Ms. Calabrese)

2          Isn't that true that you told Jasper that?

3     A.  No.

4     Q.  Isn't it true that you told Jasper that, when

5  M███████  was crying, you picked him up and threw him from

6  the end of the bed to the middle of the bed because you

7  were angry because he was crying?

8     A.  No.

9     Q.  And isn't it true that you noticed him wheezing

10 prior to September 21st, that Sunday, but you didn't

11 notice any physical injuries.

12          Isn't it true that you told him that?

13    A.  No.

14    Q.  And isn't it true that you told Jasper that

15 Wilahemina wanted to bring M██████  to the hospital?

16    A.  No.

17    Q.  And isn't it true that you told Jasper that you

18 panicked and threw M██████  into his crib and, again, he

19 hit the side of the crib, and that happened on

20 September 21st?

21    A.  No.

22    Q.  So what did you tell Jasper?

23    A.  I told him about the morning that Wilahemina woke

```
1              (Adrian P. Thomas - by Ms. Calabrese)

2    me up.  That's what he asked me.  How did the

3    paramedics --

4        Q.  So tell me what you said to him.

5        A.  I told him that I was awakened by my wife, and

6    she was panicking.  And I got up, checked his breathing,

7    checked his stomach out, checked his heart rate out.

8    His stomach barely moved.  And that I went -- I dialed

9    911, hand her the phone.  I ran to the sink, put my hand

10   under the faucet, came back, put some water over his

11   face.  His eyes barely moved with a blank stare.  And

12   when I heard the sirens coming, I went outside.

13       Q.  Go ahead.

14       A.  I went outside when I heard the paramedics

15   coming.  And once they came inside, I went back inside

16   the house.

17       Q.  Is that everything?

18       A.  Yes.

19       Q.  So this statement that I just reviewed with you,

20   all the things that I asked you about you telling

21   Jasper, none of that is true, correct?

22       A.  Correct.

23       Q.  So, did he make it up?
```

1              (Adrian P. Thomas - by Ms. Calabrese)

2      Q.   So not the weekend that he had the fever, the

3   week prior to that?

4      A.   Yes.

5      Q.   And as you sit here today, you're saying that

6   that demonstration that you did was false.

7           That never occurred; is that right?

8      A.   That's correct.

9      Q.   And at the trial, was the statement that you gave

10  to the police department, was that admitted into

11  evidence against you?

12     A.   Yes.

13     Q.   And was it a jury trial?

14     A.   Yes.

15     Q.   And did the jury reach a verdict?

16     A.   Yes.

17     Q.   And what was the verdict?

18     A.   Guilty.

19     Q.   And what occurred after that?

20     A.   That day?

21     Q.   Yes.

22     A.   I went back to the county jail.

23     Q.   And how long did you stay there?

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2              MR. KLEIN:  You mean until he went

 3          someplace else, to a different location?

 4              MS. CALABRESE:  Thank you.

 5              MR. KLEIN:  You can answer the

 6          question.

 7              Where did you go after that?

 8              THE WITNESS:  I went to prison.

 9   BY MS. CALABRESE:

10      Q.  And prior to that, did you go back to Rensselaer

11   Court to be sentenced?

12              MR. KLEIN:  After the guilty verdict,

13          did you have sentencing?

14              THE WITNESS:  Yes.

15   BY MS. CALABRESE:

16      Q.  And prior to being sentenced, on the day you were

17   sentenced, did you talk to the Rensselaer County

18   probation department?

19          Did they interview you for the purpose of a

20   presentence investigation report?

21      A.  Yes.

22      Q.  And what did you tell them?

23      A.  I forgot what I told them.
```

```
 1            (Adrian P. Thomas - by Ms. Calabrese)
 2        with you, but we also want to be practical.
 3              MS. CALABRESE:  I understand.
 4              MR. KLEIN:  So I think that asking
 5        about it today, as well.  I don't think it
 6        makes sense to have piecemeal.
 7              MS. CALABRESE:  So I will go through
 8        damages, then.
 9              (Recess taken.)
10              MS. CALABRESE:  Back on the record
11        after a recess.
12  BY MS. CALABRESE:
13     Q.  Now, Mr. Thomas, we left off before our recess
14  with you being transported from the Rensselaer County
15  jail to the department of corrections.
16          What was the first facility you were sent to?
17     A.  Downstate.
18     Q.  For processing?
19     A.  Yes.
20     Q.  And how long were you at Downstate?
21     A.  I'm not -- I don't exactly remember how long
22  there.
23     Q.  Short time, right, would you say?
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2       A.   Yes.

 3       Q.   And where were you then transported, to which

 4  facility?

 5       A.   Auburn correctional facility.

 6       Q.   And how long were you there?

 7       A.   For some years.

 8       Q.   You were at Auburn for a considerable period of

 9  time?

10       A.   Yes.

11       Q.   And were you transported anywhere else?

12       A.   No.

13       Q.   So you went to Downstate for processing, and then

14  you were housed at Auburn correctional facility for the

15  balance of your incarceration?

16       A.   Until it was time for me to go back.

17       Q.   Rensselaer County?

18       A.   Rensselaer County jail.

19       Q.   And how many years were you incarcerated between

20  the time you went to Downstate and Auburn?

21              MR. KLEIN:  Do you want to be more

22          specific?

23              In other words, was it from the date of
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2          your sentencing or shortly thereafter to

 3          date of the Court of Appeals decision?

 4              MS. CALABRESE:  Yeah.

 5  BY MS. CALABRESE:

 6      Q.  Approximately how long were you in state

 7  custody -- by state, I mean the department of

 8  corrections, not the Rensselaer County jail -- between

 9  Downstate and Auburn?

10      A.  Four to five years.

11      Q.  I don't think I asked you this.

12          What was the sentence that you received?

13      A.  25 to life.

14      Q.  You were incarcerated with the department of

15  corrections for four to five years.

16          Tell us about that period of incarceration with

17  the department of corrections.

18          I'm going to use the term "DOCCS."  Do you know

19  what I mean by that?

20      A.  Yes.

21      Q.  New York State Department of Corrections and

22  Community Supervision.

23      A.  Yes.
```

1          (Adrian P. Thomas - by Ms. Calabrese)

2    you experienced while incarcerated at DOCCS because of

3    this case?

4         A.   Yes.

5         Q.   What?

6         A.   I can't be in crowds.  I don't like being in

7    crowds.

8         Q.   Why?

9         A.   It just triggers my mind back to prison, having

10   threats.  I was always threatened in crowds.  So I don't

11   like being in crowds.

12        Q.   Is there anything else?

13        A.   I didn't sleep at night.

14        Q.   When you were in prison?

15        A.   Right.

16        Q.   Are you sleeping fine now?

17        A.   I am now because I work alone, because of my

18   lifestyle now and the truck, so.

19        Q.   Is there anything else?

20        A.   No.  That's it.

21        Q.   And then you were transferred to Rensselaer

22   County because your conviction was overturned; is that

23   right?

# APPENDIX 1656

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2       A.   That's right.

 3       Q.   Do you recall why your conviction was overturned?

 4       A.   Yes.

 5       Q.   Why?

 6       A.   Due to the videotape.

 7       Q.   What do you mean?

 8            What was your understanding?

 9                 MR. KLEIN:  Objection.

10                 THE WITNESS:  Repeat the question.

11  BY MS. CALABRESE:

12       Q.   What was your understanding as to why your

13  conviction was overturned?

14            You said due to the videotape and what do you

15  mean by that?

16       A.   Statements.

17       Q.   What statements?

18       A.   The police interrogation.

19       Q.   Then you were sent to Rensselaer County?

20       A.   Yes.

21       Q.   How long were you there?

22       A.   For the retrial.

23       Q.   Right.  How long were you incarcerated in
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2   Rensselaer County, do you recall?

 3       A.  Before or after the conviction?

 4       Q.  After the conviction was overturned, prior to the

 5   second trial.

 6       A.  Not really sure on how long I was there.

 7       Q.  And the second trial occurred; is that right?

 8       A.  Yes.

 9       Q.  Who was your attorney?

10       A.  Steve Coffey.

11       Q.  Was he assigned to represent you?

12              MR. KLEIN:  Did you pay him, or was he

13          court appointed, if I may?

14              THE WITNESS:  He was court appointed.

15              MR. KLEIN:  Do you want to take a

16          break?

17              THE WITNESS:  No.

18              MR. KLEIN:  If you need a break, let us

19          know.

20              THE WITNESS:  Okay.

21   BY MS. CALABRESE:

22       Q.  Who testified at that trial, do you recall?

23       A.  Who testified at the trial?
```

```
 1          (Adrian P. Thomas - by Ms. Calabrese)

 2     Q.  Yes.

 3     A.  Defense.

 4     Q.  Well, what do you remember?

 5     A.  That trial lasted awhile.

 6          MR. KLEIN:  Not asking that.  She's

 7       asking who testified that you remember.

 8          THE WITNESS:  I don't exactly remember

 9       all the names.

10  BY MS. CALABRESE:

11     Q.  And were you eventually acquitted?

12     A.  Yes.

13     Q.  And were you released?

14     A.  Yes.

15     Q.  Now, you mentioned that you suffered additional

16  losses.  I want you to describe what you mean by that.

17  You mentioned you suffered a loss to your diet.

18       What do you mean by that?

19     A.  My religion, I wasn't able to -- I wasn't able to

20  do a lot of things with my religion.

21          MR. KLEIN:  She's asking about diet.

22          The question is, did you eat the way

23        you did in prison or as you would out of
```

```
 1          (Adrian P. Thomas - by Ms. Calabrese)
 2   custody, either.  You were free to leave, correct?
 3          And in fact, you did leave.  You went to
 4   Samaritan.
 5      A.  I was escorted to Samaritan.
 6      Q.  My question is:  When you wrote this statement
 7   you were not in custody, in the police custody?
 8          And by that I mean you were free to leave.
 9      A.  I didn't feel like I was free to leave.
10      Q.  Tell me why.
11              MR. KLEIN:  During the first --
12              MS. CALABRESE:  First statement.
13              THE WITNESS:  I didn't feel like I was
14          free to leave because, if he was going to
15          ask me just general questions, could have
16          asked at my house.  Why did I need to go
17          down to the police station to give it to
18          you?
19   BY MS. CALABRESE:
20      Q.  So you felt because of the sole reason you were
21   in the police station you weren't free to leave?
22      A.  Correct.
23      Q.  And you weren't in handcuffs when you made that
```

```
 1   UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF NEW YORK
 2   - - - - - - - - - - - - - - - - - - - - - - - - - - -

 3   ADRIAN THOMAS,

 4                       Plaintiff,

 5          - against -

 6   CITY OF TROY, ADAM R. MASON, RONALD FOUNTAIN,
     TIM COLANERI,
 7   RENSSELAER COUNTY, and MICHAEL SIKIRICA,

 8                       Defendants.
     - - - - - - - - - - - - - - - - - - - - - - - - - - -
 9   NEW YORK STATE
     COURT OF CLAIMS
10   - - - - - - - - - - - - - - - - - - - - - - - - - - -

11   ADRIAN P. THOMAS,

12                       Claimant,

13          - against -

14   THE STATE OF NEW YORK,

15                       Defendant.
     - - - - - - - - - - - - - - - - - - - - - - - - - - -
16

17             CONTINUED DEPOSITION of Plaintiff/Claimant,

18   ADRIAN P. THOMAS, held on the 21st day of August 2019,

19   commencing at 9:11 a.m., at the Law Offices of Bailey,

20   Johnson & Peck, P.C., 5 Pine West Plaza, Washington

21   Avenue Extension, Albany, New York 12205, before Jeanne

22   O'Connell, Registered Professional Reporter and Notary

23   Public in and for the State of New York.
```

Case 1:17-cv-00626-DJS Document 66-6 Filed 09/20/21 Page 296 of 13

```
 1   APPEARANCES:

 2   Brett H. Klein, Esq.
     305 Broadway
 3   Suite 600
     New York, New York  10007
 4   Attorney for Plaintiff/Claimant

 5   Pattison Sampson Ginsberg & Griffin, PLLC
     22 First Street
 6   Troy, New York  12180
     By:  Joseph T. Perkins, Esq.
 7   Attorneys for City of Troy, Adam R. Mason,
     Ronald Fountain and Tim Colaneri

 8
     Bailey, Johnson & Peck, P.C.
 9   5 Pine West Plaza
     Washington Avenue Extension
10   Albany, New York 12205
     By:  Crystal R. Peck, Esq.
11   Attorneys for Michael Sikirica

12   New York State Office of the Attorney General
     The Capitol
13   Albany, New York 12224
     By:  Christina M. Calabrese, Assistant Attorney General

14
     Also present:  Katherine Hamilton
15

16

17

18

19

20

21

22

23
```

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2      A.   Yes.

 3      Q.   Did you think of asking for an attorney at that

 4   time?

 5      A.   I don't remember.

 6      Q.   Did you have any conversation with Detective

 7   Mason about, okay, so am I being held, am I under

 8   arrest, because you're telling me if I try and leave

 9   it's an escape?

10           Was there any conversation about that?

11      A.   I said nothing after that.

12              MR. KLEIN:   Just yes or no.

13              THE WITNESS:   No.

14   BY MR. PERKINS:

15      Q.   So during the second interview, is it my

16   understanding you didn't feel like you were free to

17   leave?

18      A.   Correct.

19      Q.   After you got in the room for the second

20   interview, it was after you got in the room and after

21   you were told of the escape comment by Detective Mason

22   that you signed City Exhibit 6 for identification,

23   correct?
```

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2      Q.   Now, by the time you gave this statement, had you

 3   already done the reenactment that you did here

 4   yesterday, where you threw -- was it a clipboard on the

 5   videotape that you threw onto the ground?

 6      A.   I believe it was a clipboard.

 7      Q.   So you had done the reenactment, right?

 8           And by the time you signed this statement you had

 9   already thrown the clipboard?

10      A.   I believe so.  Yes.

11      Q.   Then you read this, and you signed it on every

12   page, correct?

13      A.   Yes.

14      Q.   Now, same question as before.

15           If there are inaccuracies in here, I want you to

16   tell me, to the best of your ability, why you signed

17   this statement.

18      A.   On the second?

19      Q.   Yes.

20              MR. KLEIN:  This statement, the

21         ten-page statement, why did you sign it?

22              THE WITNESS:  I was tired.  I was

23         frustrated.  I was afraid.  I wanted to see
```

```
 1              (Adrian P. Thomas - by Mr. Perkins)

 2          my children, my son M███████.  I didn't want

 3          Wilahemina to get scooped up by Troy Police

 4          Department.  I just would have said anything

 5          to get out of there.  That's the reason I

 6          didn't get up and go for the door, because I

 7          was afraid.

 8    BY MR. PERKINS:

 9       Q.  Were you afraid of being arrested?

10       A.  I was afraid of being arrested and for my wife to

11    be arrested.

12       Q.  We'll get back to that in a second.

13          You put in the statement -- it lists multiple

14    times that you hurt M██████, and you had already done

15    the depiction with the clipboard, correct?

16       A.  Repeat the question.

17       Q.  Sure.  By the time you signed this statement you

18    had already thrown the clipboard onto the floor, right?

19              MR. KLEIN:  Objection.  Asked and

20          answered.

21              You can answer.

22              THE WITNESS:  Yes.

23    BY MR. PERKINS:
```

1           (Adrian P. Thomas - by Ms. Calabrese)

2    record that those are your Miranda warnings.

3           There's an initial there AT.  Those are your

4    initials that you initialed, correct?

5      A.   That's correct.

6      Q.   At that time this statement is we're calling the

7    second statement, right?

8      A.   Yes.

9      Q.   That you gave after you returned from Samaritan,

10   from when you received mental health?

11     A.   Yes.

12     Q.   And B -- or excuse me -- C is the first statement

13   that you wrote prior to leaving the police department to

14   go to Samaritan or wherever it was you went to receive

15   mental health treatment, correct?

16     A.   Yes.

17     Q.   And I think we said with the first statement, you

18   agreed that you were not in custody and you were not

19   under arrest, correct?

20           MR. KLEIN:  Objection.

21           THE WITNESS:  No. I was not arrested.

22   BY MS. CALABRESE:

23     Q.   You were not arrested and you were not in

Case 1:17-cv-00626-DJS Document 61-4 Filed 09/20/21 Page 796 of 13

```
 1           (Adrian P. Thomas - by Ms. Calabrese)
 2   custody, either.  You were free to leave, correct?
 3           And in fact, you did leave.  You went to
 4   Samaritan.
 5       A.   I was escorted to Samaritan.
 6       Q.   My question is:  When you wrote this statement
 7   you were not in custody, in the police custody?
 8           And by that I mean you were free to leave.
 9       A.   I didn't feel like I was free to leave.
10       Q.   Tell me why.
11               MR. KLEIN:  During the first --
12               MS. CALABRESE:  First statement.
13               THE WITNESS:  I didn't feel like I was
14           free to leave because, if he was going to
15           ask me just general questions, could have
16           asked at my house.  Why did I need to go
17           down to the police station to give it to
18           you?
19   BY MS. CALABRESE:
20       Q.   So you felt because of the sole reason you were
21   in the police station you weren't free to leave?
22       A.   Correct.
23       Q.   And you weren't in handcuffs when you made that
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2    statement?

 3       A.   No.

 4       Q.   And you weren't restrained in any way when you

 5    made that statement?

 6       A.   No, but I was at the police station.

 7       Q.   I mean restrained physically.

 8       A.   No.

 9       Q.   You didn't ask to leave, correct?

10              MR. KLEIN:  I think that was asked and

11         answered yesterday.

12    BY MS. CALABRESE:

13       Q.   You didn't ask to leave, did you?

14       A.   No.

15       Q.   The police didn't say you had to stay there,

16    correct?

17       A.   That's correct.  Yes.

18       Q.   You did not ask for a lawyer, correct?

19       A.   I think -- I didn't demand for lawyer, but I

20    think I asked them did I need a lawyer.

21       Q.   But you did not say, I want a lawyer?

22       A.   Well, that's a statement of a demand.  I didn't

23    demand it.
```

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2  day you were in the jail, the second day, the third day?

 3         When was it?

 4     A.   Not absolutely sure.

 5     Q.   Was it several days, do you remember, hours?

 6     A.   I don't remember.

 7     Q.   So you were in the county jail.

 8         What was the charge?

 9            MR. KLEIN:  Initially?

10            THE WITNESS:  At the county jail?

11  BY MS. CALABRESE:

12     Q.   Murder in the Second Degree?

13     A.   I think so.

14     Q.   And who did you think you murdered at that point?

15            MR. KLEIN:  Objection.

16            THE WITNESS:  I didn't murder no one.

17            MS. CALABRESE:  I think it was

18         attempted murder, let's say, initially.

19  BY MS. CALABRESE:

20     Q.   Well, who did you think they said you murdered or

21  tried to murder?

22     A.   The judge said at the time it was M███████.

23     Q.   Is that when you found out that M██████ died?
```

```
 1          (Adrian P. Thomas - by Ms. Calabrese)

 2              MR. KLEIN:  Well, you just asked him

 3          who told him he attempted to murder, and

 4          then I think he said he found out from his

 5          lawyer.

 6              Can you separate the questions?

 7  BY MS. CALABRESE:

 8      Q.  Do you understand what I'm saying?

 9      A.  When I was brought in front of a judge.

10      Q.  What did the judge say?

11      A.  He asked me who I was.  I told him Adrian Thomas.

12  And then he stated the charge.  I think it was murder.

13      Q.  At your arraignment?

14      A.  When I was at the county court.  I think so.

15      Q.  And is that the first time you heard the word

16  "murder"?

17      A.  I spoke with a lawyer first.

18              MR. KLEIN:  Don't say what was said.

19  BY MS. CALABRESE:

20      Q.  And did you have a conversation with that person?

21      A.  Yes.

22      Q.  Is that the first time you learned that M█████

23  had died?
```

```
 1              (Adrian P. Thomas - by Ms. Calabrese)

 2      A.   I think so.  I'm not sure.

 3      Q.   And what was your reaction?

 4      A.   I was hurt, frustrated, and mad.

 5      Q.   Why were you mad?

 6      A.   Because of being charged with a crime that I

 7   didn't commit.

 8      Q.   Why were you hurt and frustrated, for the same

 9   reasons?

10              MR. KLEIN:  Objection.

11              THE WITNESS:  Because I wasn't able to

12          see my son and my children and my wife at

13          the time.

14   BY MS. CALABRESE:

15      Q.   And so isn't it true that you knew that M█████

16   was dying or going to die when he left your house in the

17   ambulance?

18      A.   I didn't know he was going to die.

19      Q.   You didn't have that feeling that he was going to

20   die?

21      A.   I didn't.

22      Q.   You just knew he was in serious condition?

23      A.   That's correct.
```

```
 1          (Adrian P. Thomas - by Ms. Calabrese)

 2   also not true?

 3      A.  I believe that's false.

 4      Q.  And so, for the Court of Claims action, you're

 5   stating that you have a right to sue New York State

 6   under section 8B because you were wrongfully

 7   incarcerated and convicted, right?

 8              MR. KLEIN:  Objection.

 9   BY MS. CALABRESE:

10      Q.  That's why you're suing?

11      A.  Yes.

12      Q.  So, then, the standard involves you proving

13   innocence.

14          So, tell me, as you sit here today, how that

15   applies.

16      A.  I don't know what happened to my son, because

17   they said -- the officers said in the first interview

18   that they were going to scoop up my wife.  I said I

19   would take the fall for my wife.

20      Q.  But you didn't think Wilahemina did anything to

21   hurt him, right?

22      A.  No.  So I said I will take the fall for my wife.

23      Q.  And I'm sorry, when you say no, you mean correct,
```

```
 1            (Adrian P. Thomas - by Ms. Calabrese)

 2   right?

 3            You did not believe Wilahemina did anything to

 4   hurt him, correct?

 5       A.   I don't believe she did anything.

 6       Q.   Go ahead.

 7       A.   And they said, no, you can't take the fall.  You

 8   got to tell us what happened.

 9       Q.   And that's when you came up with the story that's

10   the ten-page statement?

11       A.   Yes.  After I was suggested that I was -- about

12   the bumping, dropping, or anything of that nature, and

13   that I wouldn't be arrested, and that it was an

14   accident.

15       Q.   Do you have any remorse about any of this?

16            MR. KLEIN:  Objection.

17            What do you mean by remorse?

18            MS. CALABRESE:  Sorrow.

19            THE WITNESS:  I'm sad that my ex-wife,

20        Wilahemina, and my children believe I did

21        this.  And I'm saddened because I feel like

22        I was taken advantage of, and that the

23        conviction has been a ghost that's been
```

1   UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF NEW YORK

2   - - - - - - - - - - - - - - - - - - - - - - - - - - -

3   ADRIAN THOMAS,

4                   Plaintiff,

5        - against -

6   CITY OF TROY, ADAM R. MASON, RONALD FOUNTAIN,
     TIM COLANERI,

7   RENSSELAER COUNTY, and MICHAEL SIKIRICA,

8                 Defendants.
     - - - - - - - - - - - - - - - - - - - - - - - - - - -

9   NEW YORK STATE
     COURT OF CLAIMS

10  - - - - - - - - - - - - - - - - - - - - - - - - - - -

11  ADRIAN P. THOMAS,

12                Claimant,

13       - against -

14  THE STATE OF NEW YORK,

15                Defendant.
    - - - - - - - - - - - - - - - - - - - - - - - - - - -

16

17          DEPOSITION of Defendant, MICHAEL SIKIRICA,

18  held on the 5th day of September 2019, commencing at

19  9:30 a.m., at the Law Offices of Bailey, Johnson & Peck,

20  P.C., 5 Pine West Plaza, Washington Avenue Extension,

21  Albany, New York 12205, before Jeanne O'Connell,

22  Registered Professional Reporter and Notary Public in

23  and for the State of New York.

```
 1   APPEARANCES:

 2   Brett H. Klein, Esq.
     305 Broadway
 3   Suite 600
     New York, New York  10007
 4   Attorney for Plaintiff/Claimant

 5   Pattison Sampson Ginsberg & Griffin, PLLC
     22 First Street
 6   Troy, New York  12180
     By:  Joseph T. Perkins, Esq.
 7   Attorneys for City of Troy, Adam R. Mason,
     Ronald Fountain and Tim Colaneri
 8
     Bailey, Johnson & Peck, P.C.
 9   5 Pine West Plaza
     Washington Avenue Extension
10   Albany, New York 12205
     By:  Crystal R. Peck, Esq.
11   Attorneys for Michael Sikirica

12   New York State Office of the Attorney General
     The Capitol
13   Albany, New York 12224
     By:  Christina M. Calabrese, Assistant Attorney General
14
     Also present:  Katherine Hamilton
15

16

17

18

19

20

21

22

23
```

Case 1:17-cv-00626-DSD Document 141-76 Filed 05/20/21 Page 376 of 313

56

1          (Michael Sikirica - by Ms. Calabrese)

2     A.  But this was not one of them.

3     Q.  Is there anything else we need to discuss with

4  regard to A?

5     A.  No.

6     Q.  Now B, you describe a radiographic evidence of

7  bilateral subdural hematomas.

8          Can you tell us what that means?

9     A.  Yes.  That reflects the diagnosis by the

10  radiologist, which I did examine those films at the time

11  of autopsy as well, that showed bilateral subdural

12  hematomas.

13     Q.  Was that radiographic evidence, the films, what

14  you saw on the films, consistent with what you saw when

15  you examined the brain?

16     A.  The collection on the right side was consistent.

17     Q.  And the right side is the side that had the pink

18  or newer hemorrhage?

19     A.  The right side had the subgaleal hemorrhages,

20  correct.

21     Q.  On the left side?

22     A.  I did not appreciate any hemorrhage on the left

23  side.

Case 1:17-cv-00626-DSC Document 427-26 Filed 06/11/2021 Page 596 of 843

1          (Michael Sikirica - by Ms. Calabrese)

2     Q.   The right side you mentioned -- that's right.

3          On the right side you mentioned the pink and the

4   green.

5     A.   Well, they were the subgaleal hemorrhages and

6   they're listed on item G.

7     Q.   So, when we say the radiographic evidence of

8   bilateral subdural hematomas, I am talking about

9   something different when I mentioned the subgaleal

10   hemorrhage, to make the record clear.

11     A.   Yes.

12     Q.   Upon examining the brain itself, you did observe

13   the bilateral subdural hematomas as they appeared on the

14   radiographic films.

15               MR. KLEIN:  Objection.  That's not what he

16   said.

17     A.   No.  I didn't see them bilaterally.  I only saw

18   the right sided subdural hemorrhage.  The subdural

19   hemorrhage was the 60 ML hemorrhage.

20     Q.   Was that consistent with what you observed on the

21   radiographic films?

22     A.   Yes.

23     Q.   Did you observe anything else with regard to B?

Case 1:17-cv-00162-DJS Document 141-76 Filed 06/20/21 Page 856 of 843

```
 1            (Michael Sikirica - by Mr.  Klein)

 2   decision on your findings?

 3       A.  I believe so, yes.

 4       Q.  Who was that?

 5       A.  That would have been Christa Book, the ADA.

 6       Q.  What was discussed?

 7       A.  Just the upcoming trial, the second trial, and

 8   the confession, which would not be incorporated in that

 9   trial.

10       Q.  Did you discuss whether your opinion was the same

11   or whether your opinion would be different in any way or

12   your findings?

13       A.  I said my findings would be the same.

14       Q.  So, other than discussing that you couldn't

15   mention the confession as it related to your findings

16   and opinions, was anything else discussed in that regard

17   that you can recall?

18       A.  Not that I recall.

19       Q.  You indicated previously that the finding,

20   initial finding or diagnosis of a purported skull

21   fracture, is something that was later concluded by you

22   to be incorrect, right?

23       A.  Yes.
```

Case 1:17-cv-00626-DSD Document 74-3 Filed 06/29/21 Page 86 of 313

1          (Michael Sikirica - by Mr. Klein)

2    Q.  Were there any other findings or other

3    conclusions that you disagreed with of any witnesses or

4    medical providers, including any prosecution witnesses,

5    not previously stated on the record?

6          In other words, other than that possible skull

7    fracture not being true, are there any other prosecution

8    witnesses or findings in the medical records that you

9    disagree with?

10          MR. PERKINS:  Object to form.

11          MS. PECK:  Objection to form.

12          THE WITNESS:  Well, I disagreed with the

13    radiographic suggestion that there was a left-sided

14    subdural hematoma.  I disagreed with that.

15          And I disagreed with the cause of death

16    postulated by Dr. Leestma and Dr. Klein.

17    BY MR. KLEIN:

18    Q.  Those are the defense witnesses.

19    A.  Yes.

20    Q.  So, dealing with prosecution witnesses, whether

21    it's Dr. Woldman, Dr. Edge, or any of the expert

22    witnesses, did you have any disagreements with any of

23    their testimonies or statements?

Case 1:17-cv-00626-DNH-CFH Document 447-37 Filed 06/28/22 Page 96 of 313

```
 1              (Michael Sikirica - by Mr.  Klein)

 2   associated with autopsy.  So, if it has not been part of

 3   a public record or if there's an acquittal, I don't know

 4   if we can go ahead and provide it.

 5              You can make a demand and we can go to the

 6   court if that ends up being the case.

 7   BY MR. KLEIN:

 8      Q.  So, in this case there was a lab report

 9   confirming the bacterial infection, correct?

10      A.  Yes.

11      Q.  And that didn't come back until September 25th of

12   2008.

13          Do you recall that?

14      A.  Yes.

15      Q.  It was ordered on September 21st of 2008 when the

16   patient was first brought to Samaritan, correct?

17      A.  Correct.

18      Q.  Did you have that lab report confirming positive

19   for strep at the time of the autopsy?

20      A.  No.

21      Q.  Do you know when you received it?

22      A.  It would have been included in the records

23   sometime after the autopsy.
```

Case 1:17-cv-07026-DJS Document 94-1 Filed 09/27/21 Page 112 of 112

1          (Michael Sikirica - by Mr.  Klein)

2     Q.   Based on what?

3     A.   Based on the findings.  They never detected

4  anything except the strep pneumoniae.  That is a type of

5  group B streptococcus.

6     Q.   That was in his system.

7     A.   Yes, but it's not the bacteria that's associated

8  with GBS with neonatal gram positive sepsis.  That's a

9  different bacteria entirely.

10     Q.   So, what is it associated with, the bacteria that

11  M█████  had?

12     A.   It's associated with pneumonia and respiratory

13  infection.

14     Q.   So, in your view, that would not have been

15  transmitted to him from the mother?

16     A.   No.

17     Q.   How is the type of pneumoniae, bacterial

18  pneumonia that M█████  had, transmitted, in your

19  knowledge?

20     A.   Well, it's a community acquired infection and it

21  could be latent and asymptomatic.  It's in the air

22  between people.

23     Q.   Others may not catch it necessarily around

1            (Michael Sikirica - by Mr. Klein)

2    someone with that, right?  It just depends.  Sometimes

3    people in close proximity would get it.  Other times

4    they may not, correct?

5      A.  Yes.  It would depend on your immune status.  And

6    M█████ would be more susceptible to it because he

7    hasn't finished his immunization protocol for it.  He's

8    only got one shot.

9      Q.  Given your lack of expertise in infectious

10   disease, are you testifying with medical certainty that

11   the bacterial pneumoniae that M█████ had, group B, is

12   absolutely different than GBS and not transmitted during

13   labor, possibly?

14     A.  Yes.  This is not the bacteria that's transmitted

15   during labor or that is described in this paper by the

16   CDC.  This is a different bacterium.  This is a

17   bacterium that's seen in adults and seen in children.

18          This strep agalactiae is the type of bacteria

19   that causes neonatal infection.  It's a risk to newborns

20   and it can occur later on in a child in several months

21   old, but it's not the agent, it's not the etiological

22   agent, of what M█████ had in his system.

23     Q.  The vaccine, the two-month vaccine and the four-

Case 1:17-cv-00163-DJS Document 142-1 Filed 09/20/21 Page 115 of 342

1          (Michael Sikirica - by Mr. Klein)

2    month vaccine, what are those called, if you know?

3        A.  Pneumo vaccine.

4        Q.  Would those help fight -- help an infant fight

5    against group B, GBS, as well as the pneumoniae bacteria

6    that you described?

7        A.  No.  I'm very certain that they are effective

8    against the pneumo, strep pneumo.  That's why they're

9    called pneumo vacs, pneumococcal pneumonia.

10       Q.  So, babies with -- I think we discussed, just to

11   circle back, with GBS, which you're saying doesn't apply

12   here, can have one or more of the following illnesses:

13   Meningitis, pneumonia, sepsis, correct?

14       A.  Yes.

15       Q.  How about babies with bacterial pneumoniae, could

16   they also have meningitis, pneumonia and sepsis?

17       A.  Yes.

18       Q.  That can exist in the absence of any trauma.

19       A.  Yes.

20       Q.  When we talk about the word trauma and injuries,

21   I just want to be clear with you about what's been

22   discussed.  Counsel asked you a lot of questions about

23   injury.

Case 1:17-cv-00626-DSLE Document 142-1 Filed 09/29/21 Page 122 of 312

```
 1              (Michael Sikirica - by Mr. Klein)
 2   jury I was able to see that it was, in fact, a hematoma.
 3   BY MR. KLEIN:
 4      Q.  Because it was after the autopsy?
 5      A.  Yes.
 6      Q.  How long after the autopsy did you testify?
 7          Was it later that same day or the next day?
 8      A.  I believe it might have been the very next day or
 9   so.
10      Q.  So, based on your exam at autopsy, you testified
11   in the grand jury that it was a subdural hematoma
12   notwithstanding the report that said subdural fluid
13   collection?
14              MS. PECK:  Objection.
15              THE WITNESS:  Correct.
16              MS. PECK:  Can we just clarify, because I
17   know you don't have the first page on the grand jury,
18   but the date on the grand jury testimony, if the caption
19   had been printed, was September 26, 2008.
20   BY MR. KLEIN:
21      Q.  So, based on that, is it fair to say that that
22   would -- would that refresh your recollection that your
23   grand jury was given the day after the autopsy was
```

Case 1:17-cv-00645-DJS Document 142-31 Filed 09/29/21 Page 123 of 312

1    (Michael Sikirica - by Mr. Klein)

2  conducted?

3    A.  I believe I did the autopsy on the 25th.

4    Q.  And the grand jury was the 26th?

5    A.  26th, yes.

6    Q.  Now, on page 16 you say, in sum and substance,

7  that the injuries were consistent with the baby being

8  slammed on a mattress and consistent with a head hitting

9  a hard surface railing or crib.

10    Do you recall that generally?

11    A.  Where on page 16?  Point that out.

12    Q.  I'm just representing to you --

13    MR. PERKINS:  Line 19.

14    A.  Yes.  It is consistent with the baby being

15  slammed down on a mattress, yes.

16    Q.  In light of Mr. Thomas' confession being found as

17  a matter of law to be a coerced, false confession, you

18  would not give that same testimony today, would you?

19    MS. PECK:  Objection.

20    THE WITNESS:  Well, if they gave me a

21  question to speculate on, or use my hypotheses or

22  theory, and they presented this as a theory could it

23  have been due to being slammed on a mattress, even if I

```
 1              (Michael Sikirica - by Mr. Klein)

 2    hitting the infant child with a toy or other objects by

 3    other kids that could have caused the trauma that you

 4    attribute to the death?

 5              MS. PECK:  Objection.

 6              THE WITNESS:  There could have been other

 7    sources for the trauma to the head, yes.

 8    BY MR. KLEIN:

 9       Q.  Do you have any knowledge, other than the

10    statement attributed to Adrian Thomas, that he had any

11    connection with any trauma to the child?

12       A.  No.

13       Q.  You don't know who caused this death.

14       A.  Without the statement, I would not know.

15       Q.  So sitting here today, do you know who caused his

16    death from your investigation?

17       A.  Yes.

18       Q.  Who is that?

19       A.  That would have been Adrian Thomas.

20       Q.  You've learned that the statement was deemed to

21    be a coerced, false confession, right?

22       A.  That is the definition that you're using.  Yes.

23       Q.  Well, that's what the court said.
```

1              (Michael Sikirica - by Mr.  Klein)

2                MS. PECK:  Objection.

3                THE WITNESS:  I'm not quite sure I

4     understand the question, if you could kind of repeat it

5     in a different manner.

6     BY MR. KLEIN:

7        Q.  Sure.  There's no statement whatsoever, pretend

8     it doesn't exist, from Adrian Thomas?

9        A.  Yes.

10       Q.  There is a child who presented, as M███████ did,

11    at Samaritan, then presented to Albany, who then ended

12    up on your table.

13       A.  Yes.

14       Q.  Given everything you knew, minus Adrian Thomas'

15    statement and what the detectives told you that he told

16    them --

17       A.  Yes.

18       Q.  -- what if any findings would you have made that

19    could have caused this death to a degree of certainty?

20       A.  Well, the cause of death is still going to be

21    closed head injury with severe cerebral edema due to

22    blunt force trauma.  That would be the cause of death.

23    The mechanism I would not know.

1          (Michael Sikirica - by Mr. Klein)

2     Q.   Correct me if I'm wrong, but the predisposing

3  condition that you cite in this case as leading to

4  sepsis is the aspiration on something that caused

5  pneumonia that lead to sepsis, correct?

6     A.   Yes.

7     Q.   Now, when you talk about aspiration, there was no

8  evidence of aspiration found on autopsy, correct?

9     A.   There was no evidence of any food aspiration,

10  correct.

11     Q.   In term of any saliva aspiration, you wouldn't

12  see that or know that, correct?

13     A.   You wouldn't detect that.

14     Q.   Would you agree that it's speculation on your

15  part that there was aspiration.

16          MS. PECK:  Objection.

17          THE WITNESS:  Well, it was speculation on my

18  part, and confirmed by the statement of Adrian Thomas

19  that after M█████, for whatever reason, had these

20  impacts, he had difficulty breathing and was wheezing.

21  BY MR. KLEIN:

22     Q.   The detectives were on video.

23          Did you ever watch the video of the

1          (Michael Sikirica - by Mr.  Klein)

2    interrogation?

3       A.   No.

4       Q.   They were telling him certain things that doctors

5    told them, and we need to have answers.  Was he

6    wheezing, was he this.  He was thrown down like this,

7    can you show us, and so forth.

8          So my question to you is this:  If you take

9    Adrian Thomas' statement of wheezing out of the

10   equation, is your answer, yes, the fact of aspiration is

11   speculation on your report?

12      A.   It would be a reasonable speculation based on the

13   organism that was recovered.

14      Q.   But it's speculation.

15      A.   Medical speculation.  Yes.

16      Q.   What's the difference between medical speculation

17   -- it's not an opinion to a degree of medical certainty,

18   is it?

19      A.   No.

20            MS. PECK:  Objection.

21      A.   It's not.

22      Q.   It's like a hunch.

23      A.   More than a hunch.  It's looking at your entire

1              (Michael Sikirica - by Mr.  Klein)

2    accident to make it an accident.

3       Q.   Before you conducted your autopsy exam, you have

4    a sign in sheet with the DA employees and the police

5    officers there, correct?

6       A.   Yes.

7       Q.   Is there a pre-autopsy meeting where you go over

8    with them the statement from Adrian -- because I see

9    that's in your file -- or what transpires, what

10   communication do you have with the police about what

11   they have gathered so far?

12      A.   Well, it tends to be an informal conversation

13   that goes on at the time of the autopsy.  It's not

14   necessarily a meeting, a sit down meeting.  I will

15   basically say to them, tell me what you think you have

16   got and I will look at the medical records.  I may

17   review the statements if there are any.

18      Q.   Do you remember who you asked that to and what,

19   if anything, you were told?

20           Did you speak with Detective Mason about that?

21      A.   It would have been the detectives who I spoke

22   with.  I can't remember which one.

23      Q.   Did they tell you that we have a homicide here,

Case 1:17-cv-00645-DJS Document 142-3 Filed 09/29/21 Page 188 of 312

```
 1              (Michael Sikirica - by Mr.  Klein)

 2   we have a blunt force trauma?

 3        When you met with them Mr. Thomas had already

 4   been arraigned in court, correct?

 5     A.  Yes.  Yes.

 6     Q.  So they already went on record and had given

 7   their ten-page statement that they obtained and gave you

 8   a copy of it, right?

 9     A.  Yes.

10     Q.  So they told you that this guy's being charged

11   with attempted murder.  Now that the baby is dead he's

12   going to be upgraded to homicide, correct?

13              MS. PECK:  Objection.

14              THE WITNESS:  I don't know if they said

15   that.

16   BY MR. KLEIN:

17     Q.  Was there any chance that you were going to find

18   that this was not a homicide given the statement?

19              MS. PECK:  Objection.

20              THE WITNESS:  Was there any chance that I

21   would find it's not a homicide?  I don't know about

22   that.

23     Q.  Was Mr. Thomas' ten-page statement a substantial
```

1            (Michael Sikirica - by Mr. Klein)

2      A.   I believe that skull fracture was an error in the

3  transcription because I only found it in several places

4  and I never saw a radiographic report of that.

5      Q.   Was it Dr. Edge, though, who reported a skull

6  fracture?

7      A.   I believe it was, but I think it was not -- I

8  think it was an error in the transcription of that.

9      Q.   Regardless of the transcription or whether it

10  came directly from his mouth, are you aware of any other

11  errors attributed to Dr. Edge other than skull fracture

12  and bilateral subdural hematomas?

13      A.   No.

14      Q.   Now, M████'s white blood cell count -- going

15  back to that -- it did not get better upon his arrival

16  at Albany, correct?

17      A.   Correct.

18      Q.   Then it dropped to 500, correct?

19      A.   Yes.

20      Q.   That's a life threatening level, correct?

21      A.   Yes.

22      Q.   At Albany, his platelet count dropped dangerously

23  low, correct?

1                 (Michael Sikirica - by Mr.  Klein)

2      A.   It was dropping precipitously low.  Dangerous at

3   the final readings, yes.

4      Q.   That can cause spontaneous bleeding in organs,

5   correct?

6      A.   Correct.

7      Q.   His temperature was below normal and continued to

8   drop at Samaritan despite warm blankets and a maternity

9   warmer, correct?

10     A.   Correct.

11     Q.   He was hypothermic, in other words, he was having

12  problems maintaining his body temperature?

13     A.   Yes.

14     Q.   He was in respiratory distress, correct?

15     A.   Yes.

16     Q.   He was on a bed mask and respirator at Samaritan,

17  correct?

18     A.   Yes.

19     Q.   His blood pressure dropped into the 50s and 40s

20  at Samaritan -- which was life threatening, correct?

21     A.   Correct.

22     Q.   They gave him Dopamine to get his blood pressure

23  up, but he was unable to breathe on his own and had to

1           (Michael Sikirica - by Mr.  Klein)

2   use a ventilator, correct?

3       A.  Yes.

4       Q.  Without the Dopamine he could have died at

5   Samaritan.

6       A.  Yes.

7       Q.  He was given treatment consisting of, among other

8   things, ceftriaxone, which is a common antibiotic that

9   treats meningitis, correct?

10      A.  Yes.

11      Q.  And he was treated for sepsis as well early on.

12      A.  Yes.

13      Q.  So, were you aware, as of the autopsy, that there

14  was suspicion of meningitis and sepsis?

15      A.  Yes.

16      Q.  Did either of those facts impact your findings in

17  this case?

18      A.  No.

19      Q.  You didn't even put the word "sepsis" in your

20  autopsy, correct?

21      A.  Correct.

22      Q.  Why not?

23      A.  Because sepsis is described in my autopsy.  I

1              (Michael Sikirica - by Mr.  Klein)

2  don't use the word "sepsis".  I use the words "positive

3  cultures for strep pneumoniae".  I could have used the

4  word "sepsis" but I did not.

5        My final diagnosis on item number two, blood

6  culture positive for strep pneumoniae on initial

7  presentation to the hospital on 9/21/08.  And I didn't

8  know on the initial presentation if it was really sepsis

9  that was causing all this problem or it was head trauma.

10  Q.  But you confirmed it before April of 2009 when

11  you did your written report, correct?

12  A.  Yes.

13  Q.  So, why didn't you put it -- the question is for

14  the record:  If there is a reason, what if any reason is

15  there that you did not refer to "sepsis" in your report?

16        Strep pneumonia is not sepsis, right?

17  A.  Correct.

18  Q.  Did you inadvertently omit it, did you

19  intentionally omit it, or is there some other reason, if

20  any?

21  A.  I don't know exactly why I left it out.  I didn't

22  consider it to be the real cause of death.

23  Q.  But you did testify under oath, I believe maybe

1          (Michael Sikirica - by Mr. Klein)

2    twice, that it was a contributing factor to his death,

3    correct?

4        A.  Yes.

5        Q.  As a medical examiner, is it your practice or is

6    it appropriate to leave out a contributing factor to a

7    death at an autopsy?

8              MS. PECK:  Objection.

9              THE WITNESS:  Not typically, no.

10   BY MR. KLEIN:

11       Q.  Was it a substantial contributing factor to his

12   death even though it's your opinion that it's not the

13   primary cause of death?

14       A.  No.

15       Q.  How would you characterize it or quantify it?

16       A.  I would say it was sequelae of the injury that he

17   received.

18       Q.  So, if someone is hypothetically strangled or put

19   in a choke hold and that leads to cardiac arrest, is

20   that something that can happen as a result of being put

21   in a choke hold?

22       A.  Yes.

23       Q.  Strangulation?

1         (Michael Sikirica - by Mr. Klein)

2   Q. What if anything could that CSF have informed you

3 of in your autopsy? Would that have confirmed the

4 existence of trauma or that it was an overwhelming

5 bacterial infection?

6   A. It would have confirmed that there was a presence

7 of the bacteria in the cerebral spinal fluid. It may

8 have been blood that would be present from the trauma,

9 but it wouldn't have been a recommended procedure

10 because M████ would risk herniation, which means his

11 brain would -- after you took the excess fluid off for

12 your tap, his brain would have even pushed further down

13 into the frame and magnum, and that could have caused

14 very sudden death.

15   Q. Now, Dr. Kardos put septic shock first on her

16 list of differential diagnoses.

17     Do you disagree with that?

18   A. I don't disagree with that. I didn't see any

19 trauma on M████. If she didn't see any trauma, that

20 would probably be the first diagnosis in a differential

21 diagnosis.

22   Q. And you agree that septic shock is a collapse of

23 the circulatory and respiratory symptoms from

1           (Michael Sikirica - by Mr. Klein)

2    overwhelming infection in the bloodstream.

3         A.  Yes.

4         Q.  And that could cause blood pressure to drop

5    significantly like M█████'s did?

6         A.  Yes.

7         Q.  And cause body systems to shut down like

8    M█████'s did?

9         A.  Yes.

10        Q.  Could also cause coagulopathy like M█████ had?

11        A.  Yes.

12        Q.  When the body's ability to clot doesn't work, it

13   could cause bleeding in multiple places in the body,

14   such as M█████ had, correct?

15        A.  Yes.

16        Q.  Bleeding could be in the brain like M█████ had,

17   correct?

18        A.  Not like M█████ had.  M█████ had a subdural

19   hematoma, which is a collection of blood.  When you have

20   coagulopathy you tend to have bleeding in multiple small

21   areas of the brain, not a large collection like a

22   subdural hematoma.

23        Q.  So, was there any bleeding in the brain

 1          (Michael Sikirica - by Mr.  Klein)

 2     A.  Yes.

 3     Q.  M███████  was hypoglycemic when he got to Samaritan

 4  as well, correct?

 5     A.  Yes.

 6     Q.  25 on the finger prick, right?

 7     A.  Yes.

 8     Q.  That's very low.  What was the significance of

 9  that?

10     A.  I don't put much on the finger stick, because

11  often that's a very rough.  In an emergency situation,

12  it's not taken properly like it should be sometimes.

13     Q.  Is decreased glucose in the blood something that

14  can lead to a complication like a seizure or comatose

15  condition, something like that?

16     A.  Yes.

17     Q.  M███████  was tachycardic at Samaritan, correct?

18     A.  Yes.

19     Q.  That is a common symptom of many things that

20  include nontraumatic causes, correct?

21     A.  Yes.

22     Q.  Like sepsis could cause him to be tachycardic,

23  correct?

```
 1              (Michael Sikirica - by Mr.  Klein)

 2      A.  Yes.

 3      Q.  He had pancytopenia, correct?

 4      A.  Yes.  That means all of his cells were decreased

 5  in numbers.  His white count was very low.  His red cell

 6  numbers were quite low.  His platelets were low.  But

 7  still within the range to work.

 8      Q.  Sepsis is known to cause that, correct?

 9      A.  Yes.

10      Q.  He had leukopenia at Albany and Samaritan, right?

11      A.  Yes.  That would be classified as involving the

12  pancytopenia.

13      Q.  And that's also known to be caused by sepsis.

14      A.  Correct.

15      Q.  He had hypothermia and hypotension as well,

16  correct?

17      A.  Yes.

18      Q.  Also both consistent with sepsis, correct?

19      A.  Yes.

20      Q.  Just to be clear:  There were no external bruises

21  on M██████'s body, correct?

22      A.  Yes.

23      Q.  No external contusions?
```

Case 1:17-cv-00625-DSD Document 14-236-4 Filed 09/20/21 Page 188 of 342

1        (Michael Sikirica - by Mr. Klein)

2    A.  No.

3    Q.  No marks on his neck?

4    A.  Correct.

5    Q.  No soft tissue injuries.

6    A.  Well, the soft tissue injury would be the

7  subgaleal hemorrhages.  That would be considered soft

8  tissue.

9    Q.  Those were not from trauma, though, correct?

10        MS. PECK:  Objection.

11        THE WITNESS:  They were from trauma.

12  BY MR. KLEIN:

13    Q.  Well, the subdural hematoma was the site of the

14  trauma that -- and they lead, according -- I believe, if

15  I understand you correctly, those lead to the SGHs?

16    A.  The subgaleal hemorrhages were the bruises under

17  the scalp and they were due to some sort of impact

18  injury.  So, they were due to trauma.  They were not due

19  to sepsis or coagulopathy.

20    Q.  Isn't one of them, in your view, noncontributory

21  in this case?

22    A.  Yes.

23    Q.  Which one?

1              (Michael Sikirica - by Mr. Klein)

2      A.  The older greenish one is not contributory to the

3   acute cause of death.

4      Q.  Why not?

5      A.  Because it's older.  It occurred at an older

6   interval.  It could be five days or more, seven days

7   older.

8      Q.  You didn't see any injury to the disks that

9   support his head, correct?

10     A.  No.

11     Q.  No indication of inflammation to the neck or

12  cervical tissues?

13     A.  None.

14     Q.  And no evidence of new or old fractures anywhere

15  in his entire skeletal system, correct?

16     A.  That is correct.

17     Q.  Once there is a chronic subdural collection or

18  hematoma it can rebleed with no apparent trauma,

19  correct?

20     A.  That is correct.

21     Q.  So, could that rebleed cause the subgaleal

22  hemorrhage or would that be a different?

23             MR. PECK:  Objection to the form.

1     (Michael Sikirica - by Mr. Klein)

2     Q.  What would explain -- let's say there were 30, 20

3     or 30 on Sunday when he got there.  What would explain

4     the increase to 60, being on a ventilator, plasma, other

5     things?

6     A.  It could simply be the volume overload he was

7     experiencing in general that built it up so much.

8     Q.  Volume overload being what?

9     A.  The fluid they were giving him.

10    Q.  So that 60 may have been an artificially or

11    somehow increased from his normal levels due to the

12    treatment he got.

13    A.  It could have been, yes.

14    Q.  With regard to coagulopathy or DIC, do you agree

15    that that has only a small association with head trauma.

16    It's more associated, in other words, with other causes.

17    A.  I would say that I agree with that, but the topic

18    hasn't been fully researched yet.

19    Q.  To the best of your knowledge, that's an accurate

20    statement?

21    A.  Yes.

22    Q.  So, you were asked earlier questions about the

23    causes of death, and sepsis is not listed, right?

Case 1:17-cv-00651-DNH-CFH   Document 142-21   Filed 09/12/2021   Page 209 of 342

```
 1                  (Michael Sikirica - by Mr.  Klein)

 2      A.   Correct.

 3      Q.   Sepsis is a cause of death in this case, correct?

 4      A.   It's a contributory cause of death.

 5      Q.   That makes it a cause of death, correct?

 6                  MS. PECK:  Objection.

 7      Q.   It's not really meant to be a trick question.

 8           It's a cause of death.

 9      A.   In this case, no.  It's a contributory factor to

10  the cause of death.

11      Q.   What's the difference?

12           So, is blunt force trauma a contributory factor

13  as well?

14      A.   Blunt force trauma is the cause of death.

15      Q.   That's based on your determination.

16      A.   Correct.

17      Q.   That other doctors could disagree.

18      A.   Absolutely.

19      Q.   When you talk about your findings, you typically

20  try to make them based on objective findings on autopsy

21  or in your exam, correct?

22           You try to base your opinions on objective

23  findings.
```

Case 1:17-cv-00625-DNH-ML Document 142-35 Filed 09/29/21 Page 210 of 342

1      (Michael Sikirica - by Mr. Klein)

2    A.  Findings that I see and evaluate, yes.

3    Q.  The link here to the trauma, to the sepsis,

4  pneumonia then sepsis, is the aspiration, correct?

5    A.  Yes.

6    Q.  That's something that there is no objective

7  evidence of, correct, the aspiration?

8    A.  There is no objective evidence of the aspiration,

9  but I wouldn't expect to find it.

10    Q.  Sometimes you do though, correct?

11    A.  There are occasions you do, yes.

12    Q.  Do you feel that in retrospect you should have

13  listed sepsis in the death certificate as a contributing

14  cause of death?

15    A.  No.

16    Q.  Why not?

17    A.  Because I think it's confusing.  I think it

18  unnecessarily diverts the real cause of death from what

19  is going to be the closed head injury with cerebral

20  edema.

21    Q.  Such that you would keep it out of the autopsy

22  and the death certificate.  Even as of today you would

23  stand by that?

```
 1              (Michael Sikirica - by Mr.  Klein)
 2   your duties and responsibility and given all of your
 3   experience, as part of the law enforcement team here
 4   with prosecutors, police and anyone else investigating
 5   this?
 6                  MS. PECK:  Objection.
 7                  THE WITNESS:  I am part of no team.
 8   BY MR. KLEIN:
 9      Q.  Are you considered law enforcement, though --
10                  MS. PECK:  Objection.
11      A.  No.
12      Q.  Do you undertake an autopsy like this knowing
13   that police and/or prosecutors will rely on it in
14   criminal proceedings?
15      A.  Yes, I do.  I do every autopsy with the
16   expectation that some day, even though it may seem to be
17   natural at the time, or an accident, somewhere, somehow,
18   it may come into a medical legal case and be brought up
19   for charges or could be brought to an attorney.
20      Q.  So, when you in this case made the determination
21   at some point not to document sepsis in the autopsy and
22   the death certificate, you did that knowing that
23   prosecutors would rely on your findings and the lack
```

```
 1   UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF NEW YORK
 2   - - - - - - - - - - - - - - - - - - - - - - - - - -

 3   ADRIAN THOMAS,

 4                     Plaintiff,

 5          - against -

 6
     CITY OF TROY, ADAM R. MASON, RONALD FOUNTAIN,
 7   TIM COLANERI,
     RENSSELAER COUNTY, and MICHAEL SIKIRICA,
 8
                     Defendants.
 9   - - - - - - - - - - - - - - - - - - - - - - - - - -

10   NEW YORK STATE
     COURT OF CLAIMS
11   - - - - - - - - - - - - - - - - - - - - - - - - - -

12   ADRIAN P. THOMAS,

13                     Claimant,

14          - against -

15   THE STATE OF NEW YORK,

16                     Defendant.
     - - - - - - - - - - - - - - - - - - - - - - - - - -
17              DEPOSITION of Defendant, MICHAEL SIKIRICA,

18   held on the 6th day of September 2019, commencing at

19   9:00 a.m., at the Law Offices of Bailey, Johnson & Peck,

20   P.C., 5 Pine West Plaza, Washington Avenue Extension,

21   Albany, New York 12205, before Jeanne O'Connell,

22   Registered Professional Reporter and Notary Public in

23   and for the State of New York.
```

RECEIVED
NYS OFFICE OF THE
OCT 02 2019
ATTORNEY GENERAL
CLAIMS BUREAU

ORIGINAL

```
 1   APPEARANCES:

 2   Brett H. Klein, Esq.
     305 Broadway
 3   Suite 600
     New York, New York  10007
 4   Attorney for Plaintiff/Claimant

 5   Pattison Sampson Ginsberg & Griffin, PLLC
     22 First Street
 6   Troy, New York  12180
     By:  Joseph T. Perkins, Esq.
 7   Attorneys for City of Troy, Adam R. Mason,
     Ronald Fountain and Tim Colaneri
 8
     Bailey, Johnson & Peck, P.C.
 9   5 Pine West Plaza
     Washington Avenue Extension
10   Albany, New York 12205
     By:  Crystal R. Peck, Esq.
11   Attorneys for Michael Sikirica

12   New York State Office of the Attorney General
     The Capitol
13   Albany, New York 12224
     By:  Christina M. Calabrese, Assistant Attorney General
14
     Also present:  Katherine Hamilton
15

16

17

18

19

20

21

22

23
```

Case 1:17-cv-00626-DJS Document 69-4 Filed 09/20/21 Page 898 of 4

1          (Michael Sikirica - by Mr. Klein)

2    make.

3      Q.   Anything else?

4      A.   Not that I recall.

5      Q.   It's considered streptococcus pneumoniae.

6           Is that the type of strep it is?

7      A.   Yes.

8      Q.   Did you do any research on streptococcus

9    pneumoniae last night?

10     A.   I looked up to see what classification it was,

11   but I didn't do any extensive research, no.

12     Q.   So, streptococcus pneumoniae is what's present in

13   this case?

14     A.   Yes.

15     Q.   And streptococcus pneumoniae can cause serious

16   infections such as pneumonia, correct?

17     A.   Yes.

18     Q.   Meningitis?

19     A.   Yes.

20     Q.   Could it cause a secondary meninges infection we

21   have in this case?

22     A.   Yes.

23     Q.   And it could cause bloodstream infection such as

Case 1:17-cv-00626-DJS Document 86-7 Filed 09/20/21 Page 848 of 4

1          (Michael Sikirica - by Mr. Klein)

2    sepsis, correct?

3      A.   Yes.

4      Q.   Based on my research from the CDC, streptococcus

5    pneumoniae, like we have in this case, kills close to

6    half a million children under five years old worldwide

7    every year.

8           Does that sound like it's possible to you?

9      A.   Yes, it does.

10     Q.   It's a very serious disease.

11     A.   Yes, it can be.

12     Q.   The streptococcus pneumoniae that presents in

13   this case can be transmitted as a result of direct

14   person-to-person contact, correct?

15     A.   Yes.

16     Q.   Based on what I gathered from the CDC -- let me

17   know if you disagree -- these are lancet shaped gram

18   positive facultative, anaerobic bacteria?

19     A.   Yes.

20     Q.   They're common inhabitants, these pneumococci are

21   common inhabitants of the respiratory tract, correct?

22     A.   Yes.

23     Q.   While they are most commonly presented clinically

# APPENDIX

1710

ZZ6 868

STATE OF NEW YORK

COUNTY COURT                    COUNTY OF RENSSELAER

- - - - - - - - - - - - - - - - - - - - - - - -- - - - X

THE PEOPLE OF THE STATE OF NEW YORK

- against -                    Indictment #08-1074

ADRIAN THOMAS,

             Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

*JURY TRIAL - VOLUME XII*

                              County Courthouse
                              Congress and Second Streets
                              Troy, New York 12180
                              October 15, 2009.

B e f o r e:

             HONORABLE ANDREW G. CERESIA,
             County Court Judge.

A p p e a r a n c e s:

             **For the People:**
             RICHARD J. MC NALLY, JR., ESQ.,
             District Attorney, Rensselaer County,
             By:  ARTHUR F. GLASS, JR., ESQ.,
             and CHRISTA M. BOOK, ESQ., Assistant
             District Attorneys, of counsel,
             Rensselaer County Courthouse,
             Troy, New York.

             **For the Defendant:**
             JEROME K. FROST, ESQ.,
             Public Defender, Rensselaer County,
             and INGRID EFFMAN, ESQ., Assistant Public
             Defender, of counsel,
             Rensselaer County Courthouse,
             Troy, New York.

             ADRIAN THOMAS, Defendant, in person.

*Judy A. DelCogliano*
*Official Senior Court Reporter*

# APPENDIX

1

## INDEX TO WITNESSES

2

3

4                    Direct    Cross    Redirect    Recross

5

6

7    For the Defendant:

8

     JEROME O. KLEIN        1954      2001       2047

9

     BRUCE USHKOW          2049      2054       2057

10

11

12

13

14

15                    INDEX TO EXHIBITS

16

17                              Identification        Evidence

18

19    For the Defendant:

20

     Q.  Curriculum Vitae              1954              1968

21        Dr. Klein

22    R.  Slide                        1954

23    S.  Chart                        1985

24    T.  Report                       1985

25

Judy A. DelCogliano
*Official Senior Court Reporter*

Case 23-753, Document 62, 01/17/2024, 3604338, Page694 of 898

APPENDIX

*(Klein - Defendant - Direct)*

1970

A.   Yes.

Q.   Doctor, do you have an opinion, to a reasonable degree of medical certainty, as to the cause of death of the Thomas baby?

A.   I do.

MR. GLASS:   Objection, no foundation.

THE COURT:   Overruled.

Q.   You may answer the question, Doctor.

A.   I do.

Q.   And, Doctor, what is your opinion?

A.   The child died of overwhelming pneumococcal sepsis and septic shock.

Q.   Can you explain to the jury the basis of your opinion?

A.   The child had an acute infection due to this organism, the pneumococcus, and the other term that you will here is streptococcus pneumoniae, and it probably began with an acquisition of the organisms from another human, presumably in the household, that infected the upper respiratory tract; the nose and throat.  This is very common.  If you went into a day-care center for infants, you might find a third of them in the winter would have the organism in the upper respiratory tract.  But in some infants, it will cause disease, and it can cause disease in two ways.

One, it can spread directly.  And, so, from the upper

Judy A. DelCogliano
*Official Senior Court Reporter*

P005112

Case 23-753, Document 62, 01/17/2024, 3604338, Page695 of 898

```
 1    respiratory tract, it can go through the eustachian tube int[
 2    the ear and cause ear infections.  It can also be swallowed.
 3    So, it gets into the lung and can cause pneumonia; or from th
 4    respiratory site, it can gain access to the bloodstream and
 5    cause bacteremia, as happened in M███████.  In many cases, eve
 6    when it causes bacteremia, it's relatively benign.  About a
 7    third of the children, their host offenses, their immune
 8    system, their spleen, will get the organism out of the
 9    bloodstream and, even without antibiotics, the infection will
10    be contained.  But in a very small number, the infection will
11    multiply and progress with its -- the bacteria and its toxins
12    and result in sepsis, and sepsis is a term that implies a
13    systemic infection involving the whole body, and that can
14    result in consequences, including shock.  And once you get to
15    that point, death is -- there's a high probability of death,
16    and I believe that's what happened with M██████.
17         Q.   Can you tell the jury, what is pneumococcal sepsis?
18         A.   Pneumococcal sepsis is sepsis due to this organism,
19    the pneumococcus.  So, the implication is that it's not a
20    localized infection, like an ear infection or a pneumonia, but
21    it's gotten into the system through the bloodstream and is
22    giving generalized signs and symptoms.
23         Q.   Doctor, can you tell the jury what is septic shock?
24         A.   Septic shock is when the sepsis progresses to the
25    point where bodily functions are impaired, and it may be -- th
```

Judy A. DelCogliano
*Official Senior Court Reporter*

Case 23-753, Document 62, 01/17/2024, 3604338, Page696 of 898

1    microscopic examinations, heart and testes, but also could be,

2    where there was examination by the ophthalmologist, in the

3    retina, as well as the bleeding in the brain.

4        Q.   Doctor, is there, in fact, association between

5    coagulopathy or disseminated intravascular coagulopathy and

6    overwhelming sepsis?

7        A.   Yes.  This is usually a result of overwhelming

8    sepsis.  There may be other reasons.  I don't know them.  But

9    the vast majority of DIC will be due to an infection.

10       Q.   Do you have an opinion, to a reasonable degree of

11   medical certainty, as to what caused the coagulopathy problem

12   in this child?

13       A.   Yes.

14       Q.   And what is your opinion?

15       A.   It's the pneumococcal bacteremia, sepsis and septic

16   shock.

17       Q.   If there's bleeding in the heart and the testes due

18   to coagulopathy, is it possible to have bleeding in the brain

19   due to coagulopathy?

20       A.   You can have bleeding in any organ.  It can go

21   anywhere, because the same phenomena is occurring throughout

22   the body.  It can occur in the brain, the eye, heart and

23   testes, as was identified at autopsy.

24       Q.   And why was it occurring everywhere or anywhere?

25       A.   Because it's general.  All these clotting factors are

# APPENDIX                                      1715

*(Klein - Defendant - Direct)*                      1986

1    groups more prone to sepsis?

2         A.   Yes.

3         Q.   Can you tell the jury about what, if any, impact age

4    has on sepsis?

5         A.   Infants are at highest risk, and the first year of

6    life is the highest among that age group, and that's why

7    physicians are usually very alert for any signs that might

8    suggest sepsis, to begin antibiotics very early.

9         Q.   Why are infants more susceptible to the pneumococcal

10   organism?

11        A.   Well, it's not only pneumococcal.  The other bacteria

12   is important, too; the streptococcal, staphylococcal,

13   meningococcal infections, and it's probably because their

14   immune systems are not yet mature enough to develop protection

15   against those organisms.  That's why we begin immunizations at

16   two months of age, to try to bolster their immune protection.

17        Q.   Doctor, assuming -- you are aware from the records

18   that M█████ T█████ was born at 33 weeks.  Would you consider

19   that as premature?

20        A.   Yes.

21        Q.   And when a child is born premature, is there any

22   impact on the child's immune system or their ability to fight

23   off infection based on their being born premature?

24        A.   Well, there are two issues.  One is, during

25   pregnancy, the mother delivers antibodies to the baby that are

Case 23-753, Document 62, 01/17/2024, 3604338, Page697 of 898

Case 23-753, Document 62, 01/17/2024, 3604338, Page698 of 898

1  accentuated during the last weeks.  So, if you are born at

2  33 weeks, rather than 38 weeks, you are not getting the

3  mother's passively transmitted antibodies across the placenta

4  into the baby, into the fetus.  That's one element, that

5  prematures are more acceptable to infection.

6         The second is that the immunity system, immunologic

7  system, has to be prepped and built up, and the infant,

8  particularly the premature infant, has a relatively immature

9  immune system, and it's not until months later that they are

10  able to get an immune system that is more protective.  So, the

11  first year of life is really a vulnerable period in terms of

12  the pneumococcus and these other organisms.

13     Q.   What, if anything, do pediatricians do to help

14  protect a child against this?

15             MR. GLASS:  Objection, Your Honor, unless the

16        doctor knows what happened in this case.

17             THE COURT:  Sustained.

18     Q.   Doctor, did you examine the pediatrician records for

19  the Thomas baby?

20     A.   I did.

21     Q.   And are you aware of whether or not this child

22  received any shots to help protect him from infections?

23     A.   I did see that.

24     Q.   Tell the jury what you saw.

25     A.   In terms of the pneumococcus, we now have a very

# APPENDIX

*(Klein - Defendant - Direct)*                                    1988

```
 1    effective vaccine that's cut down on problems such as M██████
 2    had by substantially, by about 80 percent, but you need vaccine
 3    to be given at two, four, six months, and then a booster dose
 4    at 12 months.  That's the regular schedule.  The reason we do
 5    it at two, four, six months is because the first one has a
 6    relatively modest effect, very little, but it has a so-called
 7    memory, so that when you give the four-month dose, you get a
 8    boost.  The body remembers that you got the two-month dose.
 9    Unfortunately, M██████ had the two-month dose, but had not yet
10    gotten the four-month dose.  So, the protection afforded by the
11    vaccine was minimal.
12         Q.   Are there any factors that make recovery from
13    overwhelming sepsis difficult?
14         A.   In the sense that if it's -- if you reach the point
15    where the sepsis as progressed to septic shock, then the
16    attempt to manage the infection often fails.  As we know in
17    this case, the baby is treated appropriately and aggressively
18    at both Samaritan Hospital and Albany Medical Center and
19    doesn't survive.  So, this infection has overwhelmed the baby
20    at that time, when the baby is admitted to Samaritan Hospital;
21    and unfortunately, those cases will continue to occur, and we
22    will hope that we can get enough doses of the vaccine in to get
23    to the four-month and the six-month, where the baby will be
24    protected.  But in this interval, the baby is still highly
25    vulnerable, and the vaccines will not yet be sufficiently
```

Judy A. DelCogliano
Official Senior Court Reporter

Case 23-753, Document 62, 01/17/2024, 3604338, Page699 of 898

# APPENDIX                                              1718

*(Klein - Defendant - Direct)*                    1990

1        Q.   Doctor, do you have an opinion as to whether --

2   strike that.  Do you have an opinion as to the state of health

3   of M████ upon his arrival to Samaritan Hospital and during

4   his stay there?

5        A.   Well, we know that he wasn't survivable when he

6   arrives at Samaritan Hospital.

7        Q.   Doctor, do you have an opinion whether sepsis can be

8   caused by trauma?

9        A.   Yes.

10        Q.   What is your opinion?

11        A.   I know of no reason why trauma would cause sepsis.

12        Q.   And can you please explain your opinion for the jury?

13        A.   Well, we are dealing with an infectious organism and

14   its consequences, and if you get a bruise or a head trauma, it

15   has nothing to do with the immune system or the progression of

16   the infection from the throat to the lungs or the bloodstream.

17   So, any attempt to make a connection between head trauma and

18   the progression of the infection would be highly speculative.

19        Q.   Do you have an opinion as to whether streptococcus

20   pneumoniae can be caused by trauma, Doctor?

21        A.   Streptococcus pneumoniae is a microorganism.  It's

22   acquired via the respiratory tract by droplets from another

23   human and has nothing to do with trauma.

24        Q.   And how many years have you been studying,

25   researching, teaching and writing about streptococcus

Case 23-753, Document 62, 01/17/2024, 3604338, Page700 of 898

*Judy A. DelCogliano*
*Official Senior Court Reporter*

(Allen - Defendant - Direct)          **1719**          1995

Case 23-753, Document 62, 01/17/2024, 3604338, Page701 of 898

1      Q.   If there had been aspiration due to alleged head

2  trauma, would you expect to see evidence of that in the first

3  x-ray done at Samaritan Hospital?

4      A.   Well, you might.  I'm not sure it's absolute, but if

5  there was significant aspiration, one would think it would show

6  up.

7      Q.   Doctor, did alleged head trauma have anything to do

8  with this child developing pneumococcal sepsis?

9      A.   No.

10     Q.   Can you explain that opinion for the jury?

11     A.   This child dies of an infectious disease.  He dies of

12 overwhelming pneumococcal sepsis and septic shock.  There's no

13 relationship with trauma and this infectious process.

14     Q.   Doctor, did alleged head trauma have anything to do

15 with this child developing septic shock?

16     A.   No.  The septic shock is a consequence of the

17 infection.  So, the issue is, the tragedy is that this child

18 developed an infection that progressed and was so overwhelming

19 that he couldn't survive.  He dies of pneumococcal septic

20 shock.

21     Q.   Doctor, assuming that CT scans taken at Albany

22 Medical Center on 9/21/08 report bilateral subdural fluid

23 collections, does that have any impact on your opinion as to

24 the cause of death of this baby?

25     A.   No.

*Judy A. DelCogliano*
*Official Senior Court Reporter*

# APPENDIX                                                1720

**SAMARITAN HOSPITAL**
MEDICAL RECORD DEPT.
2215 BURDETT AVE.
TROY, NY 12180

**EMERGENCY ROOM REPORT**

ACCOUNT NO.    0042310703                MED REC NO.   01209357
T████S,N█████                            PHYSICIAN:  Kardos MD,Katri
2441 21ST STREET                         AGE:   04M 17D    SEX:   M
TROY                                     DOB:   ████████
NY              12180                     STATUS:  DEP ER
ADMISSION DATE:   09/21/08               LOC:   ER

---

DICTATED BY:  Katrina Kardos, MD

The patient was seen in the ER upon arrival in room #3, arrival
  time was 0912.

HISTORY OF PRESENT ILLNESS: This is a 4-month-17-day-old male
  patient who was twin who was born at 36 weeks gestation via
  vaginal delivery at Albany Medical Center.  According to mom,
  he spent approximately 2 weeks in the NICU at Albany Medical
  Center and then was transferred to Seton Health for a step down
  unit and spent approximately 3 weeks there.  The patient was
  brought in by EMS today for evaluation of decreased respiratory
  rate, bradycardia and tachycardia.  The mom states the patient
  has been having diarrhea for "a few days" and "some vomiting".
  She reports that his temperature was 100.4 rectally this
  morning.  She states that this morning he appeared well at 6:00
  a.m. and then he had a rapid decline over the morning hours.
  She reports that his respiratory effort increased, he was not
  acting himself, he became more lethargic and more limp.  EMS
  reported that when they arrived the patient was on the bed with
  agonal respirations at about 4-5 respirations per minute.  They
  report he was also bradycardia.  They began to bag him and got
  IV access.  They report once they started to bag him, he seemed
  to improve, his saturations increased and his heart rate went
  up to the 200s.  The patient arrived to the ER, he was
  minimally responsive, he was being bagged.  He was transferred
  to our stretcher for further care.  Mom reports there are
  multiple children at home, he does have a twin, the twin has
  been well today.  Please see the Emergency Department Physician
  Form for further details of the history and review of systems.

PHYSICAL EXAMINATION: His vital signs were reviewed and in the
  chart, heart rate is 182, respiratory rate was 30 being bagged,
  temperature was 97.2 rectally.  In general, this is an ill
  appearing male patient who appears to be in severe respiratory
  distress and is minimally responsive.  HEENT: Normocephalic,
  atraumatic.  Lids and lashes are normal, he does have an area
  of erythema on his right eyelid which mom reports is a birth
  mark, anicteric sclerae, no conjunctival injection. His pupils
  are approximately 1-2 mm and nonreactive when I initially
  evaluated him.  No nasal discharge, no epistaxis.  Moist oral
  mucosa and no obvious malocclusion visualized in the oral
  airway.  Respiratory: He has significant intercostal
  retractions, he is moving very little air on his own and when

he is not being bagged he is breathing very slow and grunts
with each breath. Cardiac: He is tachycardic, regular rhythm,
normal S1, S2, no murmurs, rubs or gallops appreciated.
Abdomen: Soft, slightly distended, most likely due to the air
from bagging him, no peritoneal signs at this time. He is a
circumcised male. Neurologic: He flexes his pain to painful
stimuli. EMS reported that he was actually looking around a
little bit when they were bagging him, however, here he does
not do that for us. Skin: He has an area of mongolian spot on
his buttocks, no contusions, abrasions or deformities are noted
on the anterior or posterior aspect of his body.

DIFFERENTIAL DIAGNOSIS:
1. Septic shock.
2. Intracranial abnormality/intracranial injury.
3. Profound dehydration.

ASSESSMENT AND PLAN: This is a 4-month-17-day-old male patient
who is a twin, he was born at 36 weeks gestation via vaginal
delivery at Albany Medical Center. The patient has been doing
well at home. Mom reports he has had some recent diarrhea and
some vomiting. His temperature was 100.4 rectally this
morning. Mom reports he was doing well at 6:00 a.m. and had a
rapid decline. Once the patient was transferred to our
stretcher, he was intubated. I attempted intubation once and
was unsuccessful and the respiratory therapist was able to
intubate the patient using a 31/2 uncuffed endotracheal tube
initially put in approximately 11 at the lip line. He had good
breath sounds bilaterally, no sounds over the epigastrium and
good color change on the CO2 detector. The tube was secured
using tape and a one view chest x-ray was also obtained. When
the patient first arrived, the Broselow tape was used to
estimate his weight and to assist in drug dosing, he was in the
pink scale on the Broselow tape which put him at approximately
7 kg. The patient, prior to intubation, was being bagged and
his saturations were very labile unless he was being bagged
well. Before the intubation he did receive etomidate 2 mg IV
which helped to relax his jaw enough to allow for better
visualization of his posterior pharynx. The patient, from EMS,
received a total of approximately 300 cc of normal saline.
Once he arrived to the ER, he was placed on a pump and 2
received boluses of 20 cc per kg of normal saline. Prior to
him being intubated, we also did a fingerstick glucose which
was 50 and as a result he received 3.2 gm of dextrose and his
fingerstick increased to the 130s. Once the airway was
secured, his fluid boluses were being placed and his heart rate
was somewhat stabilized and his saturations were stable. He
received antibiotics including ceftriaxone 100 mg per kg IV x
one for a total of 700 mg IV x one and vancomycin 15 mg per kg
for a total of 105 mg IV x one. Please note, during my
intubation attempt the patient had copious amounts of green
secretions in his posterior pharynx that were suctioned out.
His initial chest x-ray showed no evidence of pneumonia, but
did show the endotracheal tube sitting right at the level of
the carina, and as a result the endotracheal tube was pulled
back. A Foley catheter was also placed, blood cultures were
drawn and sent and labs were drawn and sent.

During this whole process, the mother was made aware of what we
were finding, what our concerns were and of the severity of the

Case 1:17-cv-00626-DJS Document 156-9 Filed 09/20/21 Page 3 of 5
Case 23-v-33, Document 22, 04/04/2024, 3504938, Page704 of 898
**APPENDIX** 1722

patient's illness at this time.  Another family member arrived
and I also called and spoke to the mother's husband for her.
After the patient was intubated, his antibiotics were running
and he was fluid bolused, he suddenly began to have
significantly difficulties maintaining his saturations.  He was
taken off the ventilator and was bagged and he was initially
running in the high 90s, he then dropped down to the 70s and
even with bagging it was difficult to keep him up toward the
80s.  When this happened, he still had bilateral breath sounds.
 A second x-ray was done which showed the endotracheal tube in
good placement, no evidence of pneumothorax, it did show some
increased congestion.  This was felt possibly to be due to ARDS
versus aspiration.  We thought of fluid overload, it is
somewhat unlikely given that he did not receive an excessive
amount of IV fluids, enough that we thought would put him into
fluid overload and he was having good urine output.  After the
patient had been here for 34 minutes, after he was intubated
and the antibiotics were ordered, I did call and speak to the
transfer center.  I spoke to Dr. Edge, the PICU attending, and
he accepted the patient for transfer and we discussed further
care of the patient.  It was then, after this conversation,
that I went in to reevaluate the patient and we noticed he was
having difficulty with the saturations as mentioned above.  He
was being bagged at this point and the second chest x-ray was
obtained, we continued to bag him and I did speak to Dr. Edge
again and he just said the PICU team would be leaving Albany
Medical Center soon and to continue and try to increase PEEP,
whether it be via ventilator or via BVM.  The patient seemed to
be responding better to the bag valve mask, which I did
increase PEEP with the bag valve mask and we actually gave him
slower but longer respirations and this brought his saturations
up to 100% and stabilized his heart rate as well.  His pressure
was running initially in the 80s systolic, it did drop down
into the 70s and at one point came down to the 60s as well.  I
spoke to Dr. Edge and he had suggested that if the systolic
blood pressure remained below 60, to start dopamine at 5.

Some of his blood work had come back while he was here and his
CBC showed a white count of 1.00, hemoglobin of 10.1,
hematocrit 29.9 and a platelet count of 115,000.  His initial
ABG showed a pH of 7.125, PCO2 of 59.2, PO2 of 45.1,
bicarbonate of 18.6.  His comprehensive metabolic panel was
essentially unremarkable except for a glucose of 124,
creatinine 0.4, bicarbonate 19, corrected calcium 10.2, total
protein 4.1, albumin 2.1, AST 41, alkaline phosphatase 180.
His urinalysis showed 100 glucose, trace blood, negative
nitrites, negative leukocyte esterase.

The patient continued to have some fluctuations in his vital
signs and they resolved with slight alterations in bagging him.
 However, the patient's rectal temperature, although he was
covered in warm blankets, continued to decrease down to the
lowest point of 94 rectally.  He was placed under a warmer that
we got from maternity to help encourage increasing his
temperature.  His history was concerning for sepsis given his
low white count, his hypothermia and respiratory distress.
However, the thought of doing a CT scan to evaluate for
intracranial abnormality/trauma did cross through my mind,
however, the patient was not stable enough while here at
Samaritan to put him through the CT scanner, particularly as it

would not have changed our management here at S. aritan, he was
still to be transferred to the PICU at Albany Medical Center.
Dr. Edge discussed with me trying to put a central line in him
because the patient was not ready to take the patient yet as
they were still trying to stabilize him.  I did attempt to do a
right femoral central line and was unsuccessful in doing that.
The patient does have 2 working peripheral lines.  Once the
PICU team did arrive, the patient had been here approximately 2
hours and 20 minutes, his blood pressure at that point did drop
down to the 50s and then to the 40s and in the 40s for multiple
readings in a row.  At that time, we did start the dopamine and
had to increase it from 5 to 7 and his pressures did start to
come up.  His heart rate remained stable and his saturations
remained 100% being bagged by the respiratory therapist.  They
were made aware of the findings and our treatment at that point
and they resumed care of the patient and brought him to Albany
Medical Center.  The patient was stabilized here in the ER but
he was sent to Albany Medical Center in critical condition.
Upon reassessing the patient, I did attempt to test for corneal
reflexes, on multiple attempts he had very slight corneal
reflexes bilaterally and his pupils were small but nonreactive.
 He did respond to pain, particularly in the lower extremities,
when you squeezed his toes he would withdraw from pain and flex
his legs upward.  He did not appear to have any response when
his upper extremities were stimulated.  The Albany Medical
Center PICU team also performed a second arterial blood gas as
we were trying to continue to stabilize the patient given his
ongoing hypotension.  Their ABG showed a pH of 7.472, PCO2 of
22.5, bicarbonate 16.2, PO2 of 140.

PROVISIONAL DIAGNOSIS:
1. Respiratory failure.
2. Leukopenia.
3. Hypotension.
4. Tachycardia and bradycardia.

Critical care time was provided, between 120-130 minutes,
 excluding separately billable procedures.  The critical care
time was provided as the patient was being evaluated for
possible sepsis, respiratory failure and intracranial injury.
He was mildly hypoglycemic, he was hypotensive, his vital signs
were very labile including saturations down to 60% despite
being intubated and ventilated with BVM by respiratory therapy.
 He was tachycardic/bradycardic at times, he was leukopenic.
He received IV antibiotics.  The transfer call was made after
the patient was here for 34 minutes and he required constant
care and reassessment until he left our emergency department.

D:  09/21/2008 16:48:36 T: 09/23/2008 07:50:06

kp      Job #: 1847997

cc:

_____/KJP

cc:

**Draft**

Case 1:17-cv-00626-DJS eDocument 143-30 Filed 03/29/17 Page 206 of 260

Thomas v City of Troy et al - 7-30-2020 - Walter Edge

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ADRIAN THOMAS,

Plaintiff,
                v       17-CV-626

CITY OF TROY, ADAM R. MASON,
RONALD FOUNTAIN, TIM COLANERI,
COUNTY OF RENSSELAER &
MICHAEL SIKIRICA,

Defendants.

_____/

                    NON-PARTY
                    DEPOSITION OF:       WALTER EDGE, M.D.

                    DATE:                July 30, 2020

                    TIME:                10:07 a.m. to 4:05 p.m.

                    LOCATION:            Webex

Page 2

1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2     APPEARANCES:

3          FOR THE PLAINTIFF:
           KLEIN CIVIL RIGHTS
4          BY:   BRETT KLEIN
           305 Broadway, #600
5          NEW YORK, NEW YORK 10007

6          FOR THE CITY OF TROY AND POLICE OFFICERS:
            PATTISON, SAMPSON, GINSBERG & GRIFFIN:
7          BY:  MICHAEL E. GINSBERG
                RHIANNON SPENCER
8
           22 First Street
           Troy, New YORK 12180
9

10         FOR THE STATE OF NEW YORK
           OFFICE OF THE NY STATE ATTORNEY GENERAL
11         BY:  CHRISTINE CALABRESE
           The Capitol
12         Albany, New York  12224-0341

13         FOR THE WITNESS:
           MAYNARD, O'CONNOR, SMITH & CATALINOTTO, LLP
14         BY:  LEAH MITCHELL
           6 Tower Plaza
15
           Albany, New York 12203
16
           FOR MICHAEL SIKIRICA, M.D.:
           BAILEY JOHNSON & PECK, P.C.
17
           BY:  CRYSTAL PECK
18         Five Pine West Plaza, Suite 507
           Albany, New York 12205
19

20

21

22

23

24

25

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    A.   Yes.
 3                    Q.   All right.  And who requested
 4        those consultations?
 5                    A.   I did.
 6                    Q.   Can you tell us what a
 7        consultation is?
 8                    A.   That's asking an attending
 9        physician to give their opinion regarding a patient.
10                    Q.   And that would be a physician in
11        a different practice area or focus, correct?
12                    A.   Correct.
13                    Q.   Someone who had a different skill
14        set than you, correct?
15                    MS. MITCHELL:  Form.
16                    A.   I can't say they have a different
17        skill set -- necessarily that varies, but it's
18        definitely a different point of view, and a different
19        set of credentials.
20                    BY MR. GINSBERG:  (Cont'g.)
21                    Q.   Different specialties, correct?
22                    A.   Correct.
23                    Q.   And do you recall what would have
24        been the consultations you requested with regard to
25        M██████  T█████?
```

Page 30

1    Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2              A.   Ophthalmology, neurosurgery.  I

3    think those might be the only two.

4              Q.   And why --?

5              A.   And hematology.

6              Q.   And Doctor, why did you call for

7    ophthalmology consult?

8              A.   To look for the possibility of

9    there being a traumatic brain injury that would be

10   reflected in a retinal hemorrhage.

11             Q.   And at that point in time, was

12   there any medical evidence which indicated to you

13   that there was a potential for traumatic brain

14   injury?

15             A.   There was no physical trauma

16   except for a scratch that -- that was on the

17   transport record.  However, in my experience a four-

18   month-old who's unresponsive without clear

19   explanation, trauma, and particularly non-accidental

20   trauma needs to be in the differential.

21             Q.   Now, when you say differential,

22   what are you referring to?

23             A.   A physician when they evaluate

24   any patient creates a list of possible diagnoses and

25   that list of possible diagnoses is called a

Page 61

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      call C.P.S. worker, Andrea Fandholt to explain

3      patient's grave condition and extremely poor

4      prognosis.

5                   She confirmed that patient's six sib

6      -- siblings, including his twin brother had been

7      removed from the home and explained that there was an

8      open C.P.S. case on patient.  She said the case

9      worker is Jasper Esposito, phone number.

10                   Social worker met with charge nurse

11     and peds resident.  There is to be no visitation

12     other than immediate family and that visitation must

13     be supervised.  Social worker explained to charge

14     nurse and nurse caring for patient that a report must

15     be made to New York State Child Abuse and Neglect

16     Hotline, phone number, if patient expires, the phone

17     and form were left on the front of patient's chart.

18     Adair DeLamater.

19                   Q.   Doctor, was -- well, C.P.S

20     referred to in that entry is Child Protective

21     Services, correct?

22                   A.   Yes.

23                   Q.   And did you direct that Albany

24     Medical Center Hospital personnel contact C.P.S. with

25     regard to this matter?

Page 62

1    Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2              A.   I don't remember if I made the

3    original referral or if it was done earlier.

4              Q.   Okay.  Do you feel that it was

5    appropriate to report this matter to C.P.S.?

6              A.   It's -- it's required, yes.

7              Q.   And Doctor, the -- the entry also

8    indicates that at your request, Troy Police

9    Department was contacted with regard to this matter,

10   correct?

11             A.   Yes.

12             Q.   And why was that, Doctor?

13             A.   With the concern of child abuse,

14   that would be assault and that is a police matter.

15             Q.   And Doctor, prior to formulating

16   the diagnosis, and directing that Troy Police being

17   contacted, did you have any discussion with regard to

18   M██████ T█████'s condition with any member of the

19   Troy Police?

20             A.   I don't remember.

21             Q.   If you did, would it have been in

22   any note or record?

23             MR. KLEIN:  Objection to form.  You

24   can answer.

25             A.   I don't know.

Page 86

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2         transfer from Samaritan, is that right?

3                          A.    Yes, yeah.

4                          Q.    And did you have a chance to look

5         at the Samaritan paperwork in the two hundred and

6         twelve page medical record that you reviewed for

7         today?

8                          A.    I did not review that.

9                          Q.    Okay.  Do you recall the

10        differential diagnosis either -- either specifically

11        or in sum and substance?

12                         A.    In sum and/or substance, I

13        remember that Dr. Carlos was concerned about sepsis,

14        but that she could not rule out trauma.

15                         Q.    Right.  And she started treating

16        -- she took -- withdrawn.

17                         She -- she drew blood so that the

18        blood could be tested for bacterial -- bacteria,

19        correct?

20                         A.    Yes.

21                         Q.    And then started the -- and

22        started the patient on a course of antibiotics after

23        that, correct?

24                         A.    Yes.  And we continued that in my

25        office.

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    Q.   How many years?
 3                    A.   Actually, I did have a year.
 4        Yeah, what was -- what's the question?  I -- I -- I
 5        --.
 6                    Q.   How many -- how many years -- how
 7        many years have you been in this business?
 8                    A.   Thirty.
 9                    Q.   Okay.  In this type of scenario,
10        can you recall -- can you recall any situation where
11        you would have in this type of situation under these
12        facts said to the responding police, this is murder?
13        Words literally to that effect based on what you knew
14        in this case.
15                    MR. GINSBERG:  Object to the form.
16                    A.   I can't imagine saying that.
17                    MR. GINSBERG:  That -- that was the
18        entire question?
19                    MS. PECK:  Yes, just object to form.
20                    MR. GINSBERG:  Now, this a two-part
21        question.  Do you hear the entire question?
22                    THE WITNESS:  I was -- I was upset.
23                    MS. MITCHELL:  Okay.  Can we -- you
24        said it was a two-part question.  Can we hear the
25        question again?
```

Page 118

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                        MR. KLEIN:  Can you read -- can you
 3        read it back, please?
 4                        THE REPORTER:  Yeah, I can read back
 5        the question.
 6                        MR. KLEIN:  I think he -- I think he
 7        answered it but it -- it started confusing with all
 8        the objections.  I think the best thing to do is to
 9        read it back.
10                        THE REPORTER:  Okay.  Just give me a
11        second.
12                        (Off the record 1:30 p.m.)
13                        MS. MITCHELL:  It might be easier if
14        you just -- if you just ask the question again.  The
15        doctor is ready to answer.
16                        THE REPORTER:  Okay.  We're back --.
17                        MS. MITCHELL:  If that's okay with
18        everyone.
19                        THE REPORTER:  We're back on.
20                        BY MR. KLEIN:  (Cont'g.)
21                        Q.   Doctor, do you recall saying to
22        the responding police officers in this case that this
23        was a murder or words to that effect?
24                        A.   I do not.
25                        Q.   In speaking to the responding
```

Page 119

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      police officers, do you recall whether you said that

3      this was possible abuse or possible sepsis or both or

4      words to that effect?  Would you have told them

5      everything?

6                      MS. MITCHELL:  Object to form.

7                      BY MR. KLEIN:  (Cont'g.)

8                      Q.   Would you have explained all of

9      it to them?

10                      MR. GINSBERG:  Object to the form.

11                      A.   Yes.

12                      BY MR. KLEIN:  (Cont'g.)

13                      Q.   Okay.  Yes, you would have

14      explained sepsis and -- and possible abuse as

15      potential causes of the injuries?

16                      A.   Yes.

17                      Q.   Okay.  Are you aware that the

18      Troy detectives said that you used the word murder in

19      saying this was a murder when they met with you at

20      Albany Medical Center on September 21st, 2008?

21                      MR. GINSBERG:  Object to the form.

22                      A.   Yes.

23                      BY MR. KLEIN:  (Cont'g.)

24                      Q.   Okay.  And do you -- do you

25      dispute that account by the police officer?

Page 120

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                          A.    Yes.
 3                          MR. GINSBERG:  Object to the form.
 4                          BY MR. KLEIN:  (Cont'g.)
 5                          Q.    Why don't we -- withdrawn.
 6                          What, if anything, did you tell the
 7          Troy police officers on September 21st, 2008?
 8                          A.    I don't remember the words.
 9                          Q.    How about in sum and substance?
10                          A.    That I was very concerned about
11          this being acceleration, deceleration injury, that
12          this fit a pattern consistent with that.
13                          And that in the absence of a motor
14          vehicle accident or other accident that child abuse
15          was the top of my list.
16                          Q.    Did you talk about the other
17          things on the list as well?
18                          A.    My job would be to give as broad
19          a picture as I can.
20                          Q.    Okay.  Did you ever confront any
21          of the police officers who attributed the word murder
22          to you as to why they said that in this case?
23                          MS. MITCHELL:  Object to form.
24                          A.    No.
25                          MR. GINSBERG:  Note my objection as
```

Associated Reporters Int'l., Inc.

Page 129

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                  BY MR. KLEIN:  (Cont'g.)
 3                  Q.   Isn't it more fair to say that
 4        there would be initial impressions, but ultimately
 5        there will be a final report that is signed off on?
 6                  A.   Yes, that's right.  The
 7        neurosurgeon does not sign off on the neuro -- on the
 8        radiology report.  They are entitled to their own
 9        opinion.
10                  Q.   Okay.  So you're basing -- so am
11        I correct that you're basing this statement in number
12        three of the problem list based on the neurosurgeon,
13        but technically not on the plain language of the
14        report itself?
15                  MS. MITCHELL:  Object to form.
16                  A.   Again, as I understand it the
17        report saying that there is fluid collection does not
18        rule out hematoma.
19                  BY MR. KLEIN:  (Cont'g.)
20                  Q.   Do you recall that the report
21        also said an M.R.I. would be helpful?
22                  A.   Yes, yeah.
23                  Q.   Did you or anyone ever prescribe
24        an M.R.I.?
25                  A.   No.
```

Page 130

```
 1          Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                     Q.   Why not?
 3                     A.   I would not have changed the
 4          treatment and the child was too sick to go to the
 5          M.R.I. scanner, which requires time in the O.R. of
 6          two and it could lead to death in an unstable
 7          patient.
 8                     Q.   Now --.
 9                     A.   But most importantly -- most
10          importantly, it would not change treatment.
11                     Q.   It might change the diagnosis,
12          but not ultimately the treatment?
13                     A.   Yes, it would -- it would confirm
14          whether or not this was blood or not.
15                     Q.   And if it wasn't blood, what are
16          the other options, intraspinal fluid?
17                     A.   Intraspinal fluid, pus, old blood
18          that breaks down into plasma and red cells.
19                     Q.   Did you -- do know or do you --
20          did you ever come to learn that pus was evident on
21          the brain?
22                     A.   No.
23                     Q.   Looking at number eight, a skull
24          fracture noted on C.T. scan.  What was that based on?
25                     A.   I don't -- I don't remember who
```

```
1         Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2      -- who told me that.  I can only assure you that I
3      was -- had verbal communication that there was a
4      skull fracture that was later found not to be true
5      and it was on my problem list and, you know, again,
6      there is -- the patient was only there for a day.
7                      I was, you know, a day-and-a-half and
8      I would have deleted that in the -- my next
9      dictation, but these are dictated notes.
10                     Q.   How about when you signed off on
11     it.  Did you have the opportunity if you wanted to
12     strike it or delete it or make a, you know, a line
13     through with your signature -- with your initials?
14                     A.   I did have opportunity.
15                     Q.   Okay.  Can you state today why --
16     why you didn't do that in this case?
17                     A.   I missed -- I missed the -- I
18     missed it.  I didn't --
19                     Q.   Okay.
20                     A.   -- I didn't.
21                     Q.   So that -- so that problem listed
22     in number eight was we now know to be untrue,
23     correct?
24                     A.   Correct.
25                     Q.   Okay.  And how did it come to
```

```
1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
2    suspect injury, you wouldn't use that language you
3    were more concerned about non-accidental or
4    accidental trauma.  Do you recall that?
5                    A.   I -- I don't understand your
6    question.
7                    Q.   Is it fair, were -- were your
8    concerns about whether this was accidental or non-
9    accidental trauma, was that something you were
10   concerned with?
11                   A.   My medical findings can -- can
12   only diagnose problem.  It's not I -- I -- it's not
13   part of my job to decide or figure out if it's
14   accidental or non-accidental.
15                   Q.   Okay.  And you didn't do that in
16   this case, right?  You didn't determine that in this
17   case.
18                   A.   I -- I did not.
19                   Q.   Okay.  And did you ever
20   communicate to police -- to the police officers from
21   Troy Police Department who came to the hospital,
22   whether this was accidental or non-accidental?
23                   A.   I had him telling me that there
24   was no accident identified and that that would lead
25   me to not tell to them, but they would tell me that
```

Associated Reporters Int'l., Inc.

Page 139

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2        there was no accident identified.  So again, it's --
 3        it's a decision made by the investigating
 4        professionals, not the medical professionals.
 5                        Q.   Okay.  Can we put up the
 6        deposition of a witness exhibit signed by Walter
 7        Edge.
 8                        Dr. Edge, can you just read us the
 9        narrative where it says after the words depose and
10        say.
11                        A.   Can I just read from the whole
12        thing?  I don't -- I don't know what you mean.
13                        Q.   Yeah, I just want to -- just it's
14        hard for me to -- to understand, especially with the
15        cross outs.  So if you could just read through it and
16        indicate if there's a cross out if that's something
17        that you changed and what it says.
18                        A.   I examined M█████ and he had a
19        subdural hematoma on his head.  Based on the family
20        history, I was concerned that M█████ was a victim of
21        child abuse.
22                        The injury that M█████ suffered
23        typically is a high impact injury, or other
24        acceleration, deceleration.  This type of injury can
25        be caused by very violent shaking or shaking and
```

Page 140

```
 1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2     forced against a hard object.
 3                        M█████ also has brain swelling caused
 4     by severe trauma.  M█████ is currently brain dead
 5     and another confirmation exam will be done tomorrow.
 6                        This type of injury could not have
 7     been caused by merely bumping M█████ against a hard
 8     object.  This needs to be a severe acceleration prior
 9     to striking the object, the hard object.
10                        Q.   And then -- and then you signed
11     that at the bottom, correct?
12                        A.   Yes.
13                        Q.   Okay.  So is -- are these your
14     words that you discussed with them and then they
15     wrote it down?  Or did you dictate this to someone
16     else?
17                        In other words, let me rephrase it,
18     withdrawn.
19                        Can you explain the circumstances of
20     how the statement became written out?
21                        A.   I can't exactly.  It was written
22     by a social worker based on the history that we have
23     discussed in the past.
24                        Q.   How do you know it's written --
25     Sorry.
```

Case 1:17-cv-00026-DLB Document 145-10 Filed 09/27/21 Page 143 of 269

Page 141

```
 1        Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2                    A.    Because --.
 3                    Q.    My question is how do you know
 4        it's written by a social worker as opposed to the
 5        investigating officer whose name is at the bottom?
 6                    A.    Maybe it's by him, yeah.  It
 7        looks like his handwriting, yes.
 8                    Q.    Okay.  So -- and -- and I'll show
 9        you another document where that sergeant says he took
10        a deposition from you.  So do you -- do you know now,
11        does that refresh your recollection?
12                    MR. GINSBERG:  Object to the form.
13                    BY MR. KLEIN:  (Cont'g.)
14                    Q.    Does this refresh your
15        recollection of who -- how this was written?  Did the
16        -- did the sergeant or police officer write it out?
17                    A.    I don't remember the details, no.
18                    MS. MITCHELL:  Let him finish his
19        question before you answer.  It just helps the
20        record.
21                    BY MR. KLEIN:  (Cont'g.)
22                    Q.    Does this -- does this deposition
23        -- withdrawn.  This deposition -- withdrawn.
24                    Going to the sentence where you have a
25        first edit.  It says the injury that M█████ suffered
```

800.523.7887                                  Associated Reporters Int'l., Inc.

Page 200

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      enough of us for a long, long time.  Finally -- it's

3      finally changed.  I've fought my whole career to get

4      more docs in there and now I'm ready to retire.  Go

5      figure.

6                     Q.   And not with -- are you there

7      because you froze on my end?  There you are.  Okay.

8      And notwithstanding this fact that doctors generally

9      work very long hours, is it fair or -- and true to

10     state that you would never put yourself in a position

11     to be unable to render proper treatment to a patient

12     because of the fact that you worked long shifts?

13                     MR. KLEIN:  Objection.

14                     A.   Absolutely.  I -- I would do

15     everything to avoid not getting the best care

16     possible.  We always have backup doctors, several

17     levels of backup doctors so that if you're too tired

18     and you want to go -- or you need a break, or a nap

19     you have a way to do that.

20                     As I said, we're -- we're never on

21     call or on duty by ourselves.  There's always

22     resident doctors available.  So to give us breaks if

23     necessary, for -- for a nap or even more sleep.

24                     Q.   And you were asked questions

25     about the written statement that you provided to the

ARII@courtsteno.com                                      www.courtsteno.com

Page 201

```
 1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge
 2   Troy Police Department.  To clarify, did you write
 3   that statement?
 4                  A.   No, I made the corrections.
 5                  Q.   Okay.  And did you read the
 6   statement for accuracy prior to signing it?
 7                  A.   Yes.  And made corrections.
 8                  Q.   I believe -- And made
 9   corrections.  And I believe the statement was if it
10   were to be divided into paragraphs, approximately two
11   paragraphs.  Would you agree with that?
12                  A.   I -- I don't know how many
13   paragraphs.
14                  Q.   It was one -- on one page.
15                  A.   It's -- it was one page, yeah.
16                  Q.   One page.  And the record, the
17   medical record is at least two hundred -- the medical
18   record of Baby Thomas is at least two-hundred pages.
19   Is that your understanding of the length of the
20   record?
21                  A.   I don't know how long it is.  I
22   heard a lot of numbers.
23                  Q.   Okay, was two hundred pages one
24   of the numbers that you heard?
25                  A.   I mostly heard eighty something
```

Page 202

1      Thomas v City of Troy et al - 7-30-2020 - Walter Edge

2      and then I don't remember two hundred, no.

3                    Q.    Okay.  And is it -- okay.  Is it

4      fair to say that the one-page statement that you

5      provided to the Troy Police Department is not

6      inclusive of all of the diagnoses and treatments that

7      you provided to baby Thomas?

8                    A.    That's correct.

9                    Q.    Thank you, Doctor, I appreciate

10     your time and attention today.  I recognize this day

11     was very long and this is a difficult process because

12     it's electronic.  But again, I do appreciate your

13     willingness to be here today, and your honesty in

14     going forward.  So thank you for that.  And I'm all

15     set.

16                    A.    Thank you.

17                    THE REPORTER:  We can't hear you.

18                    MS. CALABRESE:  Anybody have anything

19     else for doc?  You're muted, Brett.

20                    MR. KLEIN:  I do.  I'll let Michael go

21     first.

22                    MS. CALABRESE:  You're muted, Michael.

23     Michael, you're muted.

24                    MR. GINSBERG:  Not yet.  You said that

25     Klein said the first time and then.  Yes, if anybody

```
 1          lunch.  We will see you back here in about an hour.

 2                    (A luncheon recess was taken.)

 3                    THE COURT:  Please be seated.  Are the parties

 4          ready to proceed?

 5                    MS. BOOK:  Yes, Your Honor.

 6                    THE COURT:  Defense ready to proceed?

 7                    MS. EFFMAN:  Yes.

 8                    THE COURT:  Bring the jury in, please.

 9                    (Whereupon, the jury entered the courtroom.)

10                    COURT OFFICER:  Jury is entering.

11                    THE COURT:  Please be seated.  The People may

12          call their next witness.

13                    MS. BOOK:  Thank you, Your Honor.  The People

14          call Dr. Katrina Kardos to the stand.

15   KATRINA KARDOS, M.D., after first having been duly sworn by the

16   Clerk of the Court, was examined and testified as follows:

17                    THE CLERK:  The sworn witness is Katrina Kardos,

18          K-A-R-D-O-S.

19                    THE COURT:  You may proceed.

20                    MS. BOOK:  Thank you, Your Honor.

21   DIRECT EXAMINATION

22   BY MS. BOOK:

23          Q.   Good afternoon, Doctor.

24          A.   Hi.

25          Q.   Would you please introduce yourself to the jury?
```

Case 23-753, Document 62, 01/17/2024, 3604338, Page729 of 898

1    scanner, which is in a different area of the hospital, to get

2    this done.

3            And second of all, we don't have the pediatric

4    neurosurgeons or neurologists to deal with the potential for

5    there being a positive finding on the CAT scan.  So, it's in

6    the child's best interest to be stabilized and not be moved

7    around the ER and get to the -- get to Albany Medical Center

8    quicker.

9        Q.    And was M█████ transferred to Albany Medical Center?

10       A.    He was.

11       Q.    How do you go about doing this transfer?

12       A.    Once you get a chance where you can actually step

13   away from the patient for a moment, you make a phone call to

14   Albany Medical Center's Transfer Line, and it's people that are

15   trained to accept transfers to the hospital.  I called and

16   spoke to the person at the Transfer Center, and then she spoke

17   to Dr. Edge, the PICU, or Pediatric Intensive Care Unit,

18   attending physician, and he actually got on the phone with me

19   and we discussed the case.  He accepted the patient for

20   transfer to his hospital, and he sent his PICU team or team of

21   people from Albany Med that come in the ambulance to pick up

22   the patient and bring them back to their hospital.

23       Q.    And when you were speaking to Dr. Edge on the phone,

24   were you sharing information back and forth?

25       A.    Yes.

*Judy A. DelCogliano*
*Official Senior Court Reporter*

Case 23-753, Document 62, 01/17/2024, 3604338, Page730 of 898

**APPENDIX**                                                    **1748**

*(Kardos - People - Direct)*                                    850

1    Q.   In what way?

2              MS. EFFMAN:  Objection, hearsay, Judge.

3              THE COURT:  Ms. Book?

4              MS. BOOK:  Your Honor, hearsay can come in for

5         purposes of medical diagnosis or treatment, which is what

6         it is coming in for the purpose of here.

7              THE COURT:  Overruled.

8    A.   So, yes.  I informed Dr. Edge of everything I knew

9    about the child, his history, and we reviewed his vital signs

10   and we discussed further care of the patient.  During the stay

11   at the hospital, he was very unstable, and his blood pressure

12   kept dropping, and he was being given fluids, and we discussed

13   giving him additional medications to stabilize his blood

14   pressure.

15   Q.   So, did you share with Dr. Edge his entire medical

16   history as you took it?

17   A.   To my knowledge, yes.

18   Q.   Okay.  And were you also following some of the advice

19   of Dr. Edge in treating M█████ that morning?

20   A.   Yes.

21             MS. EFFMAN:  Objection, goes to hearsay, Judge.

22             THE COURT:  Overruled.

23   Q.   Who was with M█████ that morning, if you remember?

24   A.   His mother arrived with him.

25   Q.   And was M█████'s father there?

*Judy A. DelCogliano*
*Official Senior Court Reporter*

*(Kardos - People - Cross)*                                              866

1    Q.   You did a differential diagnosis for this baby as

2   part of your job as an emergency room doctor.  And in your

3   differential diagnosis, you listed septic shock as a potential

4   cause of this baby's problems; correct?

5    A.   Correct.

6    Q.   In fact, that's the first thing you listed on your

7   report as a possible cause of the baby's problems; correct?

8    A.   Yes.

9    Q.   Can you tell the jury, first of all, what is septic

10  shock?

11   A.   A sepsis in general is whole body inflammatory state,

12  and it's classically characterized by the presence of an

13  infection or the -- that you suspect an infection.  With this,

14  there's different signs and symptoms you get with sepsis.

15   Q.   What are some typical signs that come along with

16  sepsis?

17   A.   Rapid heart rate, low blood pressure, hypothermia.

18  You can get a low glucose level, as well.

19   Q.   And what is septic shock?

20   A.   Septic shock, per se, is when your body isn't able to

21  maintain perfusion to your organs because of the overwhelming

22  infection.

23   Q.   What is the word perfusion?

24   A.   I'm sorry, improper blood flow to the organs.  For

25  example, if your body can't supply -- if you don't have a well

Case 23-753, Document 62, 01/17/2024, 3604338, Page732 of 898

1   enough blood pressure, your body can't get blood and nutrients

2   and oxygen to your kidneys, heart, lungs and brain.

3       Q.   During the course of time that this baby was at

4   Samaritan Hospital, you felt that his heart rate at times was

5   tachycardic; correct?

6       A.   Correct.

7       Q.   Can you tell the jury what tachycardia or tachycardic

8   means?

9       A.   Tachycardia is an elevated or high heart rate.

10      Q.   And what happens to your body if you are experiencing

11  septic shock?

12      A.   Your body tries to compensate for the shock.  When

13  your blood pressure goes down, your body compensates by

14  increasing its heart rate to try to push whatever blood and

15  oxygen and nutrients it has around the organs.  If it gets to a

16  point where that's not successful, your body will start to shut

17  down certain organs.

18      Q.   And when your body begins to shut down, your body

19  systems stop working properly; correct?

20      A.   Correct.

21      Q.   Your body loses its ability to control its

22  temperature?

23      A.   Yes.

24      Q.   Respiratory system would shut down?

25      A.   Correct.

Case 23-753, Document 62, 01/17/2024, 3604338, Page733 of 898

# APPENDIX

*(Kardos - People - Cross)*

868

1    Q.   Circulatory system would shut down?

2    A.   Correct.

3    Q.   And your body's ability to protect itself from

4    infection, like your immune system, that would shut down, too?

5    A.   Correct.

6    Q.   How do you treat septic shock?

7    A.   Septic shock is initially treated with IV fluids and

8    an IV antibiotic.

9    Q.   It's actually a life-threatening condition; isn't it,

10   Doctor?

11   A.   Yes.

12   Q.   If not treated quickly, it can result in death;

13   correct?

14   A.   Correct.

15   Q.   And especially so for those who are elderly and the

16   very young; correct?

17   A.   Correct.

18   Q.   Dr. Kardos, this baby had a number of signs that are

19   consistent with sepsis; correct?

20   A.   Correct.

21   Q.   The baby had respiratory distress; correct?

22   A.   Correct.

23   Q.   And that's a sign of sepsis?

24   A.   Yes.

25   Q.   The baby had trouble maintaining his heart rate and

Case 23-753, Document 62, 01/17/2024, 3604338, Page734 of 898

1  was tachycardic or suffering from tachycardia, and that's a

2  sign of sepsis; correct?

3       A.  Correct.

4       Q.  The baby had an abnormally low body temperature;

5  correct?

6       A.  Correct.

7       Q.  And that is a sign of sepsis?

8       A.  Yes.

9       Q.  The baby had a low white blood cell count, and that's

10  a sign of sepsis, as well; correct?

11       A.  Yes.

12       Q.  The baby had low blood sugar, was hypoglycemic, and

13  that is a sign of sepsis, too; correct?

14       A.  Yes.

15       Q.  And the baby also had low blood pressure,

16  hypotension; correct?

17       A.  Correct.

18       Q.  And that's a sign of sepsis, as well?

19       A.  Correct.

20       Q.  And in fact, this baby showed numerous signs

21  consistent with sepsis; correct?

22       A.  Correct.

23       Q.  When you did your provisional -- you did a

24  provisional diagnosis, Doctor.  What is a provisional

25  diagnosis?

Judy A. DelCogliano
Official Senior Court Reporter

**APPENDIX** **1753**

870

Case 23-753, Document 62, 01/17/2024, 3604338, Page735 of 898

1    A.    It's a diagnosis that we can come up with in the

2    brief period of time that we take care of a patient in the

3    Emergency Department.  There are times when we can't determine

4    the exact diagnosis, given that we don't have the patient to

5    care for them long enough for all their diagnoses to become

6    evident.

7    Q.    Your provisional diagnosis for this baby was

8    respiratory failure, leukopenia, hypotension, tachycardia and

9    bradycardia; correct?

10    A.    Correct.

11    Q.    And those are all conditions that are caused by

12    sepsis; correct?

13    A.    Correct.

14    Q.    Isn't it true, Doctor, the likely cause of this

15    baby's problems was sepsis?

16    A.    Yes.

17            MS. EFFMAN:  At this time, Judge, I'd move into

18    evidence a certified copy of the Samaritan Hospital blood

19    records, as well as a certified copy of the records that

20    Dr. Kardos has for this baby.

21            THE COURT:  What are they marked for ID?

22            MS. EFFMAN:  Defendant's B and C, and subject to

23    any redactions we may need to discuss concerning any

24    hearsay in those documents.

25            THE COURT:  People's position?

Judy A. DelCogliano
*Official Senior Court Reporter*

Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

ADRIAN THOMAS,

     Plaintiff,

        v                        17-CV-626

CITY OF TROY, ADAM R. MASON,

RONALD FOUNTAIN, TIM COLANERI,

COUNTY OF RENSSELAER &

MICHAEL SIKIRICA,

     Defendants.

_____/

ADRIAN P. THOMAS,

     Claimant,

v

THE STATE OF NEW YORK,

     Defendant.

_____/

        NON-PARTY

        DEPOSITION OF:    JOHN WALDMAN, M.D.

        DATE:           October 19, 2020

        TIME:           10:14 a.m. to 2:01 p.m.

        LOCATION:      WebEx

Page 2

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2    APPEARANCES:

3        FOR THE PLAINTIFF:
         KLEIN CIVIL RIGHTS
4        BY:    BRETT KLEIN
         305 Broadway, #600
5        NEW YORK, NEW YORK 10007

6        FOR THE CITY OF TROY AND POLICE OFFICERS:
         PATTISON, SAMPSON, GINSBERG & GRIFFIN:
7        BY:  MICHAEL E. GINSBERG
         22 First Street
8
         Troy, New YORK 12180
9
         FOR THE STATE OF NEW YORK
10       OFFICE OF THE NY STATE ATTORNEY GENERAL
         BY:  CHRISTINA CALABRESE
11       The Capitol
         Albany, New York  12224-0341
12
         FOR MICHAEL SIKIRICA, M.D.:
13       BAILEY JOHNSON & PECK, P.C.
         BY:  CRYSTAL PECK
14       Five Pine West Plaza, Suite 507
         Albany, New York 12205
15

16

17

18

19

20

21

22

23

24

25

800.523.7887                              Associated Reporters Int'l., Inc.

Page 15

1    Thomas v City of Troy et al - 10-19-20 - John Waldman, MD

2         at Samaritan Hospital in Troy, New York and then

3         transferred to the Albany Medical Center Hospital and

4         was admitted under the care of a pediatric

5         intensivist, to the pediatric intensive care unit.

6                        Q.    Would that have been Dr. Edge?

7                        A.    Among others, I'm not sure if Dr.

8         Edge was on the night of the 21st when he came in.

9         But ultimately, yes, Dr. Edge took care of him.

10                       Q.    He became Dr. Edge's patient,

11        correct?

12                       A.    I think so, yes.  You know, they

13        -- they're a bunch of intensivists and they rotate.

14        So I'm not sure if he took care of M█████ every day.

15        But I guess, he was identified as the -- as M█████'s

16        primary physician.

17                       And Dr. Edge consulted neurosurgery

18        because there was a concern about M█████ having

19        sustained a head injury.

20                       Q.    Okay.  Doctor, when you say he

21        consulted neurosurgery, are you indicating that he

22        asked for a neurosurgical consult?

23                       A.    Yes.

24                       Q.    All right.  And did you perform

25        that consult?

ARII@courtsteno.com                              www.courtsteno.com

Case 1:17-cv-00626-DJS Document 63-4 Filed 09/20/24 Page 818 of 38

```
 1   UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF NEW YORK
 2   - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

 3   ADRIAN THOMAS,

 4                      Plaintiff,

 5            - against -

 6   CITY OF TROY, ADAM R. MASON, RONALD FOUNTAIN,
     TIM COLANERI,
 7   RENSSELAER COUNTY, and MICHAEL SIKIRICA,

 8                      Defendants.
     - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
 9   NEW YORK STATE
     COURT OF CLAIMS
10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

11   ADRIAN P. THOMAS,

12                      Claimant,

13            - against -

14   THE STATE OF NEW YORK,

15                      Defendant.
     - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
16

17           DEPOSITION of Defendant, ADAM R. MASON,

18   held on the 12th day of September 2019, commencing at

19   9:04 a.m., at the Law Offices of Pattison Sampson

20   Ginsberg & Griffin, PLLC, 22 First Street,

21   Troy, New York, before Jeanne O'Connell, Registered

22   Professional Reporter and Notary Public in and for the

23   State of New York.
```

COPY

```
1   APPEARANCES:

2   Brett H. Klein, Esq.
    305 Broadway
3   Suite 600
    New York, New York  10007
4   Attorney for Plaintiff/Claimant

5   Pattison Sampson Ginsberg & Griffin, PLLC
    22 First Street
6   Troy, New York  12180
    By:  Joseph T. Perkins, Esq.
7   Attorneys for City of Troy, Adam R. Mason,
    Ronald Fountain and Tim Colaneri
8
    Bailey, Johnson & Peck, P.C.
9   5 Pine West Plaza
    Washington Avenue Extension
10  Albany, New York 12205
    By:  Crystal R. Peck, Esq.
11  Attorneys for Michael Sikirica

12  New York State Office of the Attorney General
    The Capitol
13  Albany, New York 12224
    By:  Christina M. Calabrese, Assistant Attorney General

14
    Also present:  Katherine Hamilton
15

16

17

18

19

20

21

22

23
```

1                    (Adam Mason - by Mr. Klein)

2        A.   Yes.

3        Q.   And then also I ask that you continue to answer

4   with a verbal response rather than a gesture or a shake

5   of the head or an uh-huh, again, so the reporter can

6   take a clean record, okay?

7        A.   Okay.

8        Q.   If you don't understand a question I ask, will

9   you let me know?

10       A.   Yes.

11       Q.   If you don't understand but you don't let me know

12   and you give an answer, it will be assumed for the

13   record that you understood the question at the time of

14   trial, okay?

15       A.   Okay.

16       Q.   Finally, if you need a break, just let me know.

17   We'll just ask that you a take break after any pending

18   question has been answered, okay?

19       A.   Okay.

20       Q.   It's my understanding that you have given a

21   number of -- there have been a number of occasions where

22   you've given sworn testimony related to this case,

23   correct?

Case 1:17-cv-00626-DJS Document 63-17 Filed 09/20/21 Page 84 of 38

1              (Adam Mason - by Mr. Klein)

2    A.   Yes.

3    Q.   One would be the grand jury?

4    A.   Yes.

5    Q.   Second would be the pre-2009 trial Huntley

6  hearing?

7    A.   Yes.

8    Q.   And then approximately two different dates when

9  you testified at trial on the direct case for the

10  prosecution?

11    A.   That's correct.

12    Q.   Then one day for rebuttal for the prosecution.

13    A.   Yes.

14    Q.   Other than those occasions and today, have you

15  given any sworn testimony about the Adrian Thomas

16  matter?

17    A.   No.

18    Q.   Did you ever testify in any other courts, such as

19  family court?

20    A.   No.

21    Q.   Other than today, and other than statements or

22  conversations with your attorneys which you should not

23  divulge, have you discussed the facts and circumstances

1              (Adam Mason - by Mr. Klein)

2    of your role in this investigation with anyone else?

3        A.   I've had casual conversations with other members

4    of the police department at various times.

5        Q.   Well, let's talk about the more formal

6    conversations.

7             You did have meetings with medical examiner,

8    Michael Sikirica, correct?

9             Did you attend the autopsy?

10       A.   I did.

11       Q.   There were inevitably, I would think, discussions

12   about the investigation?

13       A.   During the autopsy?

14            MS. PECK:   Objection.

15   BY MR. KLEIN:

16       Q.   Were there discussions about the investigation?

17            You can answer.

18       A.   Yes.   There was discussions about the autopsy.

19       Q.   So we'll get into these conversations.   I just

20   want to identify them.

21            And also for the record, in terms of

22   instructions, you may hear objections.   Lawyers will say

23   "objection" from time-to-time to preserve objections for

1              (Adam Mason - by Mr. Klein)

2    trial or to note certain objections, but unless you're

3    told not to answer, you should give an answer.

4       A.   Okay.

5       Q.   If you need a question read back because there

6    was so much talking and you got distracted, you can ask

7    the reporter.  I think she can do that for you.

8       A.   Okay.

9       Q.   So, how many meetings did you have with the

10   medical examiner, Michael Sikirica, including the

11   autopsy?

12      A.   I wouldn't describe the autopsy as a meeting.

13           And to the best of my recollection, that's the

14   only time that I encountered him during this

15   investigation.  And as you said, there were discussions

16   about the investigation, about the autopsy, during that

17   autopsy.  And to the best of my recollection, that's the

18   only time that I encountered him during this

19   investigation.

20      Q.   For purposes of this question of who you've

21   spoken with about the case, it doesn't need to be a

22   formal meeting.  Just any encounter with anyone where

23   you've been asked or you've given information about this

1                    (Adam Mason - by Mr. Klein)

2         A.   That's correct.

3         Q.   Do you understand the first video to be about two

4    hours?

5         A.   Yes.

6         Q.   The second video to be how long, about seven or

7    seven and a half hours?

8         A.   Yes.

9         Q.   Can we call the first one video one?

10        A.   Yes.

11        Q.   And the second one video two?

12        A.   Yes.

13        Q.   The video that we've been given is the video that

14   I believe was used in the criminal case, the video

15   one -- well, withdrawn.

16             The video that we've referred to as video one,

17   were there any parts of that interview, that first

18   interview with Adrian Thomas, that were not depicted --

19   parts of your meeting with him that were not depicted on

20   that video, or did that video encompass the entire

21   interview with him?

22        A.   It did.

23        Q.   And video two, did that video record the entire

Case 1:17-cv-00626-DJS Document 84-17 Filed 09/20/24 Page 888 of 38

1           (Adam Mason - by Mr. Klein)

2    A.  Yes.

3    Q.  Is that around the time that you went back to

4 patrol?

5    A.  I don't recall which part of November, but it was

6 somewhere in that month.

7    Q.  So when you say that you continued to maintain

8 responsibilities for the case after you were on patrol,

9 other than meeting with the DA, preparing for Huntley

10 hearing, and trial, what, if anything else, did you do?

11    A.  I don't recall if there was anything else that I

12 did.

13    Q.  But it was your case?

14    A.  Correct.

15    Q.  For purposes of dealing with the district

16 attorney and any issues that came up?

17    A.  Yes.

18    Q.  Were you the lead investigator on this case?

19    A.  I shared that role with Detective Fountain.

20    Q.  Whose determination was it that you would be

21 assigned to this investigation with Detective Fountain,

22 if you know?

23    A.  It just happened that we were the two detectives

1              (Adam Mason - by Mr. Klein)

2    conscious choice to employ them based on your own

3    instincts and experience, correct?

4        A.   Yes.

5        Q.   No one told you to approach it a certain way.

6             That was your own decision, correct?

7        A.   Yes.

8        Q.   There was no supervisor or detective captain or

9    colleague that said, Adam, why don't you go in there and

10   demonstrate slamming a folder to the ground.

11            That was your conscious choice to do that?

12       A.   That's correct.

13       Q.   We'll get into the interview later.  I wanted to

14   ask you more about this training and how that impacted

15   your technique.

16            So it's fair to say that training did not impact

17   your technique as of September of 2008?

18            MR. PERKINS:  Object to the form.

19   BY MR. KLEIN:

20       Q.   In terms of interrogation practice, correct?

21            MR. PERKINS:  Objection.

22            Go ahead.

23            THE WITNESS:  I agree that I didn't go

Case 1:17-cv-00625-DJS Document 175-13 Filed 09/20/21 Page 810 of 38

1                 (Adam Mason - by Mr. Klein)

2        into that interview with some preconceived,

3        this is going to be my form because I was

4        taught this.  I don't know that at any point

5        in time did some portion of my training kick

6        in, but for the most part, the interview was

7        conducted based on my instincts.

8  BY MR. KLEIN:

9    Q.  At some point in your career did you learn,

10  whether from this case, from the Court of Appeals

11  decision, or from any other training or information you

12  received in your career, that there's risk in

13  interrogation practice that a confession can be coerced,

14  whether it's true or false, based on the tactics of the

15  questioner?

16          MR. PERKINS:  Object to the form.

17          You can answer.

18          THE WITNESS:  I have not learned that.

19  BY MR. KLEIN:

20    Q.  Well, is it your understanding, from reading the

21  Court of Appeals decision, that the court found that the

22  confession in this case was coerced?

23    A.  Yes.

1                   (Adam Mason - by Mr. Klein)

2  headquarters, correct?

3    A.  Yes.

4    Q.  That's when he was brought to the third floor

5  interrogation room?

6    A.  Yes.

7    Q.  That's when you read him his Miranda rights and

8  he signed them in your presence?

9    A.  Yes.

10    Q.  And that's when you and Detective Fountain spoke

11  with him for about two hours and obtained video one,

12  correct?

13    A.  That's correct.

14    Q.  And as well as the first written statement, which

15  was a short written statement, correct?

16    A.  Yes.

17    Q.  That interview ended when he said he was going to

18  jump off a bridge if his son died, correct?

19    A.  Yes.

20    Q.  With that said, the interview continued after he

21  said that for a little bit, but then it was

22  discontinued, correct?

23    A.  So, we had planned to end the interview, and we

1          (Adam Mason - by Mr. Klein)

2    were prepared to get up and leave when he made the

3    comment about jumping off a bridge if his son were to

4    die.  So, yeah, at that point there was a further

5    discussion.  Yes.

6    Q.  But there was further discussion about -- there

7    were further questions asked about how Ma███████ may have

8    been injured after he said he felt like he wanted to

9    hurt himself.

10   A.  Yes.

11   Q.  Why did you guys continue to ask questions after

12   he said he needed -- he felt suicidal?

13   A.  The fact that he felt suicidal, I thought maybe

14   there was more that he wanted to talk about.  So we

15   continued the discussion in an attempt to see, number

16   one, why he felt that way and if there was anything else

17   that he wanted to discuss.

18        We were attempting to end the interview when he

19   said that, so it sent a message to us that he wanted to

20   continue to talk about something.

21   Q.  During that interview, did anything he say give

22   you probable cause to arrest him?

23   A.  No.

1          (Adam Mason - by Mr. Klein)

2     Q.   Is it fair to say that anything he said in that

3  interview in terms of -- anything he said in that

4  interview with regard to possible injuries to Ma█████

5  was not consistent with what you were informed by

6  medical personnel and that Detective Fountain was

7  informed by medical personnel?

8     A.   Yes.

9     Q.   In terms of Adrian Thomas' demeanor, by the time

10  you spoke with him it was after midnight, correct?

11     A.   Yes.

12     Q.   To your knowledge, he had been up since 8:00 that

13  morning when the baby got up to go to the hospital,

14  correct?

15     A.   That's not an accurate statement.  I wasn't with

16  him that entire time.  So, to my knowledge, he could

17  have slept for the four hours.

18     Q.   You don't know either way.

19     A.   I don't know either way.

20     Q.   Did you have a sense of his level of education?

21     A.   I didn't have a -- I didn't know for a fact what

22  his education was, but he appeared that he could carry

23  on a conversation with us, an intelligent conversation.

1                   (Adam Mason - by Mr. Klein)

2        A.   Yes.

3        Q.   Do you remember her statement?

4        A.   I don't remember what it says.

5        Q.   She didn't incriminate Adrian in her statement,

6   though, generally.

7             Do you recall that?

8        A.   I don't -- I recall that she did not.

9        Q.   Then the next statement in the file is one from

10  Adrian Thomas dated 9/22/08, at 0141 hours, correct?

11       A.   Yes.

12       Q.   And that would be the written statement that

13  arose out of interview one, correct?

14       A.   Yes.

15       Q.   There's a related Miranda page, waiver page,

16  correct?

17       A.   Yes.

18       Q.   So Defendant's Exhibit C from August 20th, 2019,

19  is that the first statement?

20       A.   Yes.

21       Q.   Was that written -- the body of the statement,

22  was that written by Detective Fountain?

23       A.   Yes.

1          (Adam Mason - by Mr. Klein)

2     Q.   And then did you come back to work on the 22nd?

3     A.   Yes.

4     Q.   And then what did you do?

5     A.   On the 22nd, I went to Samaritan Hospital and

6  spoke to the doctor there, I believe.  I went to Albany

7  Medical Center and spoke to the doctor there.

8          And then ultimately, in the afternoon on the

9  22nd, I went back to Samaritan Hospital and spoke to

10 Adrian Thomas again.

11    Q.   You had arranged with the hospital staff for them

12 to notify you when he was ready to be discharged,

13 correct?

14    A.   Yes.

15    Q.   You got a phone call and you went there, and you

16 were there to meet him when he was walking out.

17    A.   Yes.

18    Q.   From there, you brought him right back to the

19 headquarters, correct?

20    A.   Yes.

21    Q.   That's when you conducted -- you took him right

22 to the third floor interrogation room, Mirandized him,

23 and then started interview two, correct.

Case 17-2-00625 DJS Document 175-13 Filed 09/20/21 Page 816 of 38

(Adam Mason - by Mr. Klein)

A.   Yes.

Q.   What's been marked as Defendant's Exhibit B on August 20th, 2019, is this the ten-page statement that arose out of interview two?

A.   Yes.

Q.   We'll get into the conduct of the interview in a little bit, but in terms of after the interview was completed, you then placed him under arrest, correct?

A.   Yes.

Q.   That was into the early morning of September 23rd, correct?

A.   Yes.

Q.   Did you then go home or did you book him?

Were you involved in the arrest processing through the early morning hours of the 23rd?

A.   I was involved in the arrest process.

Q.   What did that entail?

A.   That entailed getting his pedigree information into the computer for an arrest sheet and fingerprint, photograph, and securing property, and putting him in the holding cell.

Q.   Did you do that alone or were you assisted by

Case 1:17-cv-00625-DJS Document 15-3 Filed 09/20/21 Page 897 of 38

1          (Adam Mason - by Mr. Klein)

2     A.   I don't recall where it was.

3     Q.   While you were getting pedigree from him, do you

4 know if you informed him of the fact that he was under

5 arrest, or did you say, I just need to get some

6 information from you?

7     A.   Well, at the point where I was getting the

8 pedigree information and completing the arrest sheet on

9 my computer, he was informed that he was under arrest.

10    Q.   And what was his reaction, if any, to that?

11    A.   I don't recall any significant reaction.

12    Q.   Did you have a colleague or colleagues with you

13 to assist you, whether for security or for any other

14 reason, while you were getting this information from

15 him?

16    A.   I know that, during the course of the interview,

17 Sergeant Colaneri was next door monitoring the

18 interview.  So, I don't specifically recall him being

19 there during the booking process, but I don't believe he

20 would have just left at that point in time.  I believe

21 he would have stayed with me and saw that through.

22    Q.   Before placing Adrian under arrest, did you have

23 to get approval or authorization from your captain, or

1            (Adam Mason - by Mr. Klein)

2   was it your own independent determination to place him

3   under arrest?

4       A.   It was a determination that was made by myself

5   and Sergeant Colaneri jointly.

6       Q.   From looking at the video, it basically comes to

7   an end, and Adrian is escorted out of the room.

8            Is that fair to say?

9       A.   Yes.

10      Q.   Is there a point in time where you and Colaneri

11  have a discussion where that determination is jointly

12  made to place Adrian under arrest?

13      A.   Yes.  Up until the point where the incriminating

14  statements were made by Adrian Thomas, I had no

15  intention of arresting him.  And when we completed --

16  because the statement was done in two parts, so it was

17  six pages.  And then, when the last four pages were

18  done, while he was reviewing those last four pages, I

19  left and went into the room next door where Sergeant

20  Colaneri was monitoring the interview.

21           And in sum and substance, my words to him were,

22  do I have to arrest him now?  Because that was not my

23  intention throughout that entire interview, to arrest

(Adam Mason - by Mr. Klein)

1    him.  And he looked at me, and he said, yeah, you have

2    to.

3         I knew I had to once he said that.  I didn't know

4    that it was going to come to that.  And so, that was the

5    conversation him and I had.

6    Q.  Do you recall that Sergeant Colaneri made one

7    appearance during the interview two where he started by

8    saying he was in the Corps and then introduced the

9    concept of Adrian slamming Ma██████ to the ground?

10   A.  Yes.

11   Q.  Was that conversation with Sergeant Colaneri

12   about, do I have to arrest him now, after Sergeant

13   Colaneri came into the room?

14   A.  Yes.

15   Q.  So, prior to Sergeant Colaneri coming in, did you

16   already have the six-page statement, six pages out of

17   the ten, approximately?

18   A.  I don't recall.

19   Q.  But you had a partial statement before Sergeant

20   Colaneri came in?

21   A.  I don't recall if he came in in between the two

22   statements or if -- I don't recall exactly which point

Case 1:17-cv-00625-DJS Document 175-13 Filed 09/20/21 Page 20 of 38

1                 (Adam Mason - by Mr. Klein)

2 that was.

3    Q.  But is it your testimony that Adrian didn't make

4 incriminating statements until after Sergeant Colaneri

5 said what he said in the room and then left?

6               MR. PERKINS:  Object to the form.

7               You can answer.

8               THE WITNESS:  I think, in the first six

9         and a half pages, if Sergeant Colaneri came

10        in after that, I don't know that -- I don't

11        know -- I don't know if there were

12        incriminating statements made in those first

13        six and a half pages or not.

14          I guess it would have been -- if it

15        ended there, those actions would have had to

16        have been further investigated to determine

17        if there was a criminal act committed there.

18 BY MR. KLEIN:

19    Q.  Well, my question is -- I think you said that up

20 until the time that Colaneri came in you didn't have

21 probable cause.

22        Is that right in your mind?

23    A.  Up until the time -- no.  That's not what I said.

1              (Adam Mason - by Mr. Klein)

2        What I said was, up until the time, the

3   conversation between Adrian Thomas and myself where he

4   told me that he slammed Ma█████ on the bed three times,

5   that's when I knew probable cause had been established.

6   And that's when I knew that things had taken a turn.

7   Q.  But those statements weren't made until after

8   Colaneri introduced the concept of Ma████ being

9   slammed; is that right?

10             MR. PERKINS:  Object to the form.

11             You can answer.

12             THE WITNESS:  That is correct.  It

13        occurred afterwards.

14  BY MR. KLEIN:

15  Q.  I'm just trying to understand generally in the

16  temporal time frame of the interview.

17        It was after Colaneri came in and introduced the

18  concept of Ma████ being slammed that you spoke with

19  Adrian further and then spoke with Colaneri and said,

20  now I have to arrest him; is that right?

21  A.  Yes.

22  Q.  Prior to Colaneri coming in you didn't think you

23  were going to arrest him.

1               (Adam Mason - by Mr. Klein)

2    A.  Prior to him coming in I didn't think I was going

3 to arrest him. That's correct.

4    Q.  Is the reason because, prior to Colaneri coming

5 in, the concept of M████ being slammed had not been

6 uttered or discussed by Adrian up to that point?

7           MR. PERKINS: Object to the form.

8           You can answer.

9           THE WITNESS: The reason is because

10        Adrian hadn't told me that he slammed

11        M██████ on the bed three times prior to

12        that.

13 BY MR. KLEIN:

14    Q.  Would you agree that it was Sergeant Colaneri and

15 yourself who jointly introduced the concept of M████

16 being slammed into the conversation?

17           MR. PERKINS: Object to the form.

18           Go ahead.

19           THE WITNESS: Yes.

20 BY MR. KLEIN:

21    Q.  Once Sergeant Colaneri first and then you

22 introduced that concept of M█████ being slammed, that's

23 when Adrian made statements about slamming M█████,

1                 (Adam Mason - by Mr. Klein)

2 correct?

3    A.  He made comments about slamming M███████ after

4 that was introduced to him by myself and Sergeant

5 Colaneri.  Yes.

6    Q.  Correct.

7       And he did other things after they were

8 introduced by yourself as well, like the slamming of the

9 folder, correct?

10    A.  There were other things that he did that were

11 introduced by myself, and there were things that he

12 stated that were not introduced by myself, as well.

13    Q.  Right.

14       The slamming of the folder as a demonstration was

15 introduced by yourself?

16    A.  Yes.

17    Q.  After Adrian admitted -- I think you said it was

18 three instances of slamming or four?

19    A.  Three.

20    Q.  That's when you then sat down and wrote the

21 remaining balance of the second part of the interview,

22 which is about four pages?

23    A.  That's correct.

1      (Adam Mason - by Mr. Klein)

2      Q.   Once that was done, that's when he was placed

3   under arrest.

4      A.   Yes.

5      Q.   I'll get more into the interview, but I want to

6   get through your investigation on a macro level.

7           So, he goes to your office so you can take

8   pedigree and book him, correct?

9      A.   Yes.

10     Q.   Where does he go after that?

11     A.   Then we went down to the first floor, in the

12  back, where the detention area is.

13     Q.   He was lodged in a cell.

14     A.   Yes.

15     Q.   He was searched, presumably.

16     A.   Likely.

17     Q.   Did you confirm during that process that he had

18  no prior criminal record or history?

19     A.   We would have done a criminal history during the

20  booking process.

21     Q.   Do you recall that he had no history?

22     A.   I don't recall any criminal history.

23     Q.   And what else happened in terms of the booking

1          (Adam Mason - by Mr. Klein)

2  process, if anything?

3    A.  Fingerprinting, photographing.

4    Q.  You were involved with that?

5    A.  Yes.

6    Q.  Then what happened next?

7    A.  Then he would have been ultimately placed in a

8  cell.

9    Q.  Then, from there, what did you do?

10     This is already on the 23rd, right?

11    A.  Yes.

12    Q.  What happened next?

13    A.  After he was placed in a cell on that evening, I

14  don't recall what else I did.

15    Q.  Is that when you would have prepared the criminal

16  court information or complaint?

17    A.  Yes.

18    Q.  That was for attempted murder?

19    A.  Yes.

20    Q.  Did you do that in consultation with a DA or

21  ADAs, or would you have done that in the office first

22  and then forwarded it to them for review?

23    A.  After he was placed in a cell, I would have went

1                    (Adam Mason - by Mr. Klein)

2   back to my office and typed that up.

3      Q.   What else would you have typed up, or what else

4   did you type up in this case or otherwise prepare

5   related to the arrest, the arrest report?

6      A.   Yup.

7      Q.   What else?

8      A.   Accusatory instrument.

9            And I would have made photocopies of the

10  statement and attached that to go to court in the

11  morning.

12     Q.   Would that have been both statements or just the

13  second statement?

14     A.   The full ten pages.

15     Q.   In terms of statement one, which is Defendant's

16  Exhibit C, is it fair to say that one was not

17  incriminating or useful to you in terms of charging him

18  with attempted murder?

19     A.   That would not have been something that I

20  attached to the paperwork.

21     Q.   The basis of you charging him was what was said

22  in the second half of the interview, as we said earlier,

23  after Colaneri introduced the concept of slamming,

1               (Adam Mason - by Mr. Klein)

2       release.

3   BY MR. KLEIN:

4     Q.  That was dated September 23rd, which is the same

5   day that you processed Adrian Thomas' arrest, correct?

6     A.  Yes.

7     Q.  Do you know if he was arraigned in Troy City

8   Court on the 23rd, or was that on the 24th?

9     A.  I believe he would have been arraigned on the

10   23rd.

11     Q.  You didn't go to court that day for the

12   arraignment?

13     A.  No.

14     Q.  At some point prior to Adrian going to court, did

15   you or anyone at your office speak with the prosecutors,

16   or does he get arraigned based on police documents

17   submitted to the court?

18     A.  He does get arraigned based on the documents

19   submitted to the court, but I don't recall specifically

20   meeting with someone that day, but I imagine that I

21   probably did meet with someone from the DA's office on

22   that day to talk about the case.

23     Q.  And then what was your next steps in the

1        (Adam Mason - by Mr. Klein)

2    Q.   Do you remember, did he explain why the brain had

3   become liquified?

4    A.   I don't recall.

5    Q.   What else do you remember, if anything?

6    A.   I don't recall anything else specific.

7    Q.   How about generally?

8    A.   I believe that he would have dictated certain

9   things throughout the autopsy, but I just can't recall

10  anything that he would have said.

11   Q.   Do you recall anything else that you did on the

12  26th as it relates to this case?

13   A.   I do not.

14   Q.   On the 26th, at around 10:00 a.m., you testified

15  in the grand jury, correct?

16   A.   Yes.

17   Q.   Prior to going to the grand jury, was there some

18  meeting with the DA's office to prepare you for your

19  testimony?

20   A.   Yes.

21   Q.   Was it that morning or would it have been on a

22  prior day?

23   A.   I don't recall.

1                    (Adam Mason - by Mr. Klein)

2    you went to meet with -- to obtain a DNA specimen from

3    Wilahemina Hicks.

4          What was the purpose of that?

5     A.   I don't recall.

6     Q.   Did anything ever come from that as it related to

7    this investigation?

8     A.   Nothing that I can remember.

9     Q.   In terms of the serology testing, the testing --

10   there was testing done of the blankets and sheets and

11   such, was there any of that evidence that bore any fruit

12   as related to the murder charges against Adrian Thomas?

13    A.   I don't remember.

14    Q.   Not that you recall?

15    A.   Right.

16    Q.   Other than Adrian Thomas' statement, and

17   particularly in the last four pages and what was said

18   related to that in the last four pages of the written

19   statement, was there anything else -- any other

20   evidence, any physical evidence, linking him to the

21   crime?

22                    MR. PERKINS:  Object to the form.

23                    You can answer.

1    (Adam Mason - by Mr. Klein)

2    BY MR. KLEIN:

3       Q.  Or the alleged crime.

4       A.  Not that I can remember.

5       Q.  In other words, there were no fingerprints or

6    blood work or anything else that incriminated

7    Mr. Thomas, to your knowledge?

8       A.  Correct.

9       Q.  On October -- it says on that date you set up an

10   interview with Ms. Hicks for Friday, October 3rd, at

11   5:30, and that was setting up the interview that you

12   recorded, correct?

13      A.  Yes.

14      Q.  Now, what was the reason for having her come to

15   the office?

16          Was it so that it could be videotaped?

17      A.  Yes.

18      Q.  When you set it up with her on the 30th for

19   Friday, October 3rd, did you let her know that you

20   wanted it to be done there so it could be videotaped or

21   just that you prefer that it be more generally in the

22   office?

23      A.  I don't recall if I gave her that information or

                    (Adam Mason - by Mr. Klein)

1

2      Q.  Well, is it true that you said that you didn't

3  have probable cause before Colaneri was in the room?

4      A.  Correct.

5      Q.  So it's different in that you felt that there

6  was -- the facts after Colaneri came in gave you

7  probable cause, the additional facts?

8      A.  I don't know that's when I meant, but yes.  That

9  is the fact that the second part of that statement

10  provided probable cause for an arrest, whereas the first

11  part didn't.

12      Q.  In your view.

13      A.  Yes.

14      Q.  During the first interview with Adrian Thomas,

15  you would agree that you told him repeatedly that he was

16  not under arrest?

17      A.  Yes.

18      Q.  And that he would not be arrested.

19      A.  Yes.

20      Q.  I believe you said at the pretrial Huntley

21  hearing that there came a time when the actions went

22  from accidental to criminal, and that's when probable

23  cause was established.

1           (Adam Mason - by Mr. Klein)

2           Do you recall generally saying that?

3      A.   Yes.

4      Q.   And that would be after Colaneri -- the

5    post-Colaneri part of the interview, correct?

6      A.   Yes.

7      Q.   And the first time you heard Adrian Thomas say

8    that he slammed M█████, in sum and substance, out of

9    frustration was five hours into the interview,

10   approximately, correct?

11     A.   Yes.

12     Q.   There was some questions in the hearing about

13   whether you knew that M█████ Thomas had been sick since

14   the Friday before the Sunday that he woke up

15   unresponsive.

16           Did you know that at the time you were

17   questioning Adrian?

18     A.   I don't recall exactly when I became aware of

19   that.  He may have told me that the first night.

20   Wilahemina may have mentioned it at the hospital.  I

21   don't recall exactly when I became aware of that.

22           Are you asking me if I was aware of it during the

23   second interview with him?

```
 1              (Adam Mason - by Mr. Klein)

 2    Q.   Yes.

 3         In other words, did you speak with any -- were

 4    you aware of it and, relatedly, did you speak with any

 5    doctors about the cause of fevers and vomiting, fevers

 6    and diarrhea?

 7    A.   I did not.

 8              MS. CALABRESE:   Objection.

 9              MR. PERKINS:   You can answer.

10              THE WITNESS:   I did not speak to any

11         doctors about that, but either Adrian or

12         Wilahemina, I believe, had informed me that

13         M██████ had a fever at some point between

14         Friday and Sunday.

15    BY MR. KLEIN:

16    Q.   Did you ever inquire with any doctors as to

17    whether there was some nontrauma possible cause of

18    death?

19    A.   I did not.

20    Q.   Now, from the time of the first interview to the

21    time of the second interview, you learned that the

22    initial report of there being a skull fracture was

23    incorrect?
```

# APPENDIX

1        (Adam Mason - by Mr. Klein)

2    skull fracture, I didn't look at that as a reason for me

3    to further inquire about other things that I was told.

4        Q.   When CPS was removing the kids and you were

5    there, do you recall that Adrian told you that M██████

6    had fever and diarrhea for two days?

7        A.   At some point I became aware of that.  I don't

8    know if it was at that point.  It could have been.

9        Q.   The story that he told you at the apartment was,

10   in sum and substance, that he was woken up by his wife

11   at 8:30 to 9:00 a.m. because the child was not

12   responding.  He sprinkled water on the face.  911 was

13   call.  The wife performed CPR.  And an ambulance

14   arrived.

15       Was that generally his explanation of what he

16   knew about this incident?

17       A.   Yes.

18       Q.   He was consistently telling you that he didn't

19   know anything else until different scenarios were

20   introduced by you or Detective Fountain in the first

21   interview, correct?

22            MR. PERKINS:  Object to the form.

23            You can answer.

```
 1              (Adam Mason - by Mr. Klein)

 2              THE WITNESS:  Yes.

 3    BY MR. KLEIN:

 4        Q.   Even into the second interview, he continually

 5    would say he didn't do anything or he just -- all he

 6    knew was that he woke up and the child wasn't responding

 7    during the second interview, and only said other things

 8    when additional scenarios were introduced into the

 9    conversation by you and/or Colaneri, correct?

10        A.   Yes.

11        Q.   You would agree that, when you went to the

12    apartment on September 21st of 2008, it was in very good

13    condition?

14        A.   Yes.

15        Q.   Especially for a house that had several children

16    in it?

17        A.   Yes.

18        Q.   And was very small?

19        A.   Yes.

20        Q.   When you saw M██████ T██████ -- I think I asked

21    you a little bit about this, so forgive me if I did.

22             But when you saw him in the hospital -- I believe

23    it was on the 22nd, after Adrian went to the Samaritan
```

1           (Adam Mason - by Mr. Klein)

2  donation at that point?

3    A.  That's not correct.

4           MR. PERKINS:  Object to the form.

5           THE WITNESS:  There was a second brain

6      death contamination that was going to be

7      conducted still.

8  BY MR. KLEIN:

9    Q.  But you knew he was not likely to be

10  resuscitated.

11    A.  I'm not a doctor.  I can't answer that question.

12    Q.  I think you've testified that you believe he

13  wasn't, though.

14    A.  I didn't believe he was going to survive, but we

15  prayed for a miracle.  And that would have been a

16  miracle had he survived.

17    Q.  When you told Adrian that Dr. Edge said that a

18  child couldn't have caused this, only an adult could

19  have caused this, that was a lie, correct?

20    A.  Yes.

21    Q.  When Fountain suggested in interview one, you put

22  him down in the crib half awake and could have whacked

23  his head off the edge of the crib, that was the first

1           (Adam Mason - by Mr. Klein)

2  mention of M█████ T████ possibly hitting his head on

3  the crib from Fountain.

4        That didn't come from Adrian, correct?

5  A.  Yes.

6  Q.  And you made the first mention of M█████ being

7  slammed on the bed, not Adrian?

8  A.  Yes.

9  Q.  In statement one, I think it's clear that not

10  everything is in that statement just like in statement

11  two, in particular Adrian's repeated denial of

12  responsibility.

13        You didn't put that in the statements, correct?

14  A.  Correct.

15  Q.  Any particular reason why not?

16  A.  No.

17  Q.  Is there, like, some sort of technique or

18  practice where you only put in what's potentially bad,

19  or are you required to put in the witness's full

20  statement?

21  A.  There's no requirement.  The video spoke for

22  itself.  And I think that what was documented on paper

23  were aspects that could have potentially put M█████

1            (Adam Mason - by Mr. Klein)

2      Q.   Next page is a note that you were going through

3  the file with A. Glass, ADA regarding discovery needs

4  and you turned over to him the 911 tapes?

5      A.   Yes.

6      Q.   Is this your handwriting?

7      A.   It appears to be Detective Fountain's

8  handwriting.

9      Q.   And this is just that, on January 8th of 2009,

10 Detective Fountain met with Art Glass, correct?

11     A.   Yes.

12     Q.   Do you know if you were present at that meeting?

13     A.   I don't recall.

14     Q.   Next is the discharge transition plan for M█████

15 ██████ from Albany Med.

16          Are these, like, social worker notes?

17     A.   I don't know.

18     Q.   But these are records that made it into your

19 file.

20     A.   Yes.

21     Q.   Going next to the next handwritten notes,

22 starting with, "homicide meeting," 9/29/08, at NYSPFIC?

23     A.   Forensic investigation center.

# APPENDIX

## TROY POLICE DEPARTMENT
## INVESTIGATION REPORT

| VICTIM'S NAME | | REPORT DATE | INCIDENT NUMBER | DB NUMBER |
|---|---|---|---|---|
| M███████ | | 09/26/08 | 86095-08 | - |

## NARRATIVE

**09/21/08**

At about 1730 D/Sgt A. Mason and Detective R. Fountain were called in for a report of a baby at Albany Medical Center with head injuries possibly suffered in Troy. Upon arrival to Central Station, I/O's were briefed by Nicole Noel from Child Protective Services. Noel stated that they received the report from AMC at about 1400. The report was that a four-month old baby was transported from his residence at 2441 21st Street, Apartment 1-C (Cedar Park) to Samaritan Hospital and later transferred to AMC. The initial report was that the baby was having respiratory problems and hospital examinations revealed severe trauma to the head. CPS was concerned about child abuse and the fact that there were six other children inside the residence. CPS notified TPD at about 1720. I/O's responded to Samaritan ER. Hospital staff stated that the victim arrived with the mother, by ambulance at about 0913. The initial report was that the victim was having respiratory problems and was unresponsive. The victim left Samaritan and was transported to AMC at about 1150. The doctor who saw the victim at Samaritan was Katrina Kardos MD. She was off duty when I/O's arrived. The charge Nurse at the time the victim was seen was Ann Weber. I/O's then responded to the victim's residence along with CPS. Upon arrival, the victim's father, Adrian Thomas Sr., was inside the residence with the six other children. The victim's mother, Wilhemena Hicks, was at AMC with the victim. CPS informed Thomas Sr. of their intention to remove the six remaining children from the residence and place them in foster care, pending an investigation. The victim's maternal grandmother, Inga Hicks, arrived on scene to speak to CPS about placement of the children. At about 2015 CPS removed the children from the residence. At about 2026 I/O's interviewed Thomas Sr. and he stated the following:

- The victim had a fever and diarrhea for the past two days
- At about 0830-0900 his wife woke him up because the victim was not responding
- He sprinkled some water on the victim's face, but the victim was still unresponsive
- He called 911 from his cell phone and gave the phone to his wife
- His wife performed CPR and the ambulance arrived shortly after

I/O's then responded to AMC, arriving about 2130. The victim was in the Pediatric Intensive Care Unit (E Building/7th Floor). The charge nurse, Rebecca Peccano RN, stated that the victim suffered a Bilateral Sub Dural Hemotoma and is not likely to survive the injury. There appeared to be both old blood and new blood on the victim's brain indicating that there is an old injury as well as a new injury to the victim's head. The victim was initially diagnosed with a skull fracture, but that was later determined to be inaccurate. At about 2145 Detective Fountain spoke to the attending doctor, Walter Edge MD, who stated that this injury is typically caused by a high-speed impact or by slamming very hard into a hard object. Edge stated to Detective Fountain, "This is a murder."

| DETECTIVE ASSIGNED | SUPERVISOR APPROVAL | |
|---|---|---|
| D/Sgt Adam Mason | | PAGE NUMBER |
| | | 1/6 |
| CASE STATUS/ OPEN | | |

# APPENDIX
**TROY POLICE DEPARTMENT**
**INVESTIGATION REPORT**

| VICTIM'S NAME | | REPORT DATE | INCIDENT NUMBER | DB NUMBER |
|---|---|---|---|---|
| M███████ | | 09/26/08 | 86095-08 | – |

## NARRATIVE

**09/21/08**(cont)

At about 2200 I/O's interviewed the victim's mother, Wilhemina Hicks at AMC. Also present for the interview was her mother, Inga Hicks, and her sister, Carla Hicks. Detective Fountain took a deposition from Wilhemina at about 2310. I/O's then left AMC and responded back to the victim's residence to speak to the victim's father, Adrian Thomas Sr., again. Thomas Sr. agreed to come to CS with I/O's for an interview. The interview was conducted in the third floor interview room and was recorded on one disc. Thomas Sr. waived his right to counsel at about 0008 on 08/22/08. Detective Fountain took a deposition from Thomas Sr. at about 0141. At the conclusion of the interview Thomas Sr. stated that he felt like he was going to jump off of a bridge if his son died. At about 0200 I/O's transported Thomas Sr. to Samaritan Hospital Crisis Unit and completed MHL 9.41 paperwork. Thomas Sr. agreed to talk to I/O's again at a later time.

Persons residing at 2441 21st Street, #1-C, Troy, NY:

M█████████ B/M ████████ (victim)
Adrian Thomas Sr. B/M ████ (father)
Wilhemina Hicks B/F (████ (mother)
India Hicks B/F ████████ (sibling)
A███████ B/F ████████ (sibling)
Ad██████ Jr. B/M ████████ (sibling)
I████████ B/M ████ (sibling)
I████████ B/M ████ (sibling)
M████████ B/M ████ (sibling)

| DETECTIVE ASSIGNED | SUPERVISOR APPROVAL | PAGE NUMBER |
|---|---|---|
| D/Sgt Adam Mason | | 2/6 |
| CASE STATUS/ **OPEN** | | |

Case 1:17-cv-00626-DJS Document 63-24 Filed 09/20/21 Page 8 of 26

```
 1    UNITED STATES DISTRICT COURT
      NORTHERN DISTRICT OF NEW YORK
 2    - - - - - - - - - - - - - - - - - - - - - - - - - - - -

 3    ADRIAN THOMAS,

 4                         Plaintiff,

 5             - against -

 6    CITY OF TROY, ADAM R. MASON, RONALD FOUNTAIN,
      TIM COLANERI,
 7    RENSSELAER COUNTY, and MICHAEL SIKIRICA,

 8                         Defendants.
      - - - - - - - - - - - - - - - - - - - - - - - - - - - -
 9    NEW YORK STATE
      COURT OF CLAIMS
10    - - - - - - - - - - - - - - - - - - - - - - - - - - - -

11    ADRIAN P. THOMAS,

12                         Claimant,

13             - against -

14    THE STATE OF NEW YORK,

15                         Defendant.
      - - - - - - - - - - - - - - - - - - - - - - - - - - - -
16

17             DEPOSITION of Defendant, RONALD FOUNTAIN,

18    held on the 13th day of September 2019, commencing at

19    8:59 a.m., at the Law Offices of Pattison Sampson

20    Ginsberg & Griffin, PLLC, 22 First Street, Troy, New

21    York, before Jeanne O'Connell, Registered Professional

22    Reporter and Notary Public in and for the State of New

23    York.
```

COPY

```
 1   APPEARANCES:

 2   Brett H. Klein, Esq.
     305 Broadway
 3   Suite 600
     New York, New York  10007
 4   Attorney for Plaintiff/Claimant

 5   Pattison Sampson Ginsberg & Griffin, PLLC
     22 First Street
 6   Troy, New York  12180
     By:  Joseph T. Perkins, Esq.
 7   Attorneys for City of Troy, Adam R. Mason,
     Ronald Fountain and Tim Colaneri
 8
     Bailey, Johnson & Peck, P.C.
 9   5 Pine West Plaza
     Washington Avenue Extension
10   Albany, New York 12205
     By:  Crystal R. Peck, Esq.
11   Attorneys for Michael Sikirica

12   New York State Office of the Attorney General
     The Capitol
13   Albany, New York 12224
     By:  Christina M. Calabrese, Assistant Attorney General
14
     Also present:  Katherine Hamilton
15

16

17

18

19

20

21

22

23
```

# APPENDIX                    1799

1                    (Ronald Fountain - by Mr. Klein)

2    what went on.

3        Q.   They were in favor of doing it, to the best of

4    your recollection, meaning Ms. Book and Mr. Glass?

5        A.   Yes.

6        Q.   Were they present when you gave your interviews?

7        A.   No.

8        Q.   Did you testify in the grand -- during this case?

9        A.   Yes.   I believe so.   Maybe I didn't.

10       Q.   You're not sure?

11       A.   I am not sure.

12       Q.   You haven't looked at the grand jury testimony.

13       A.   I believe just my trial testimony is what I

14   looked at.

15       Q.   You did testify at a Huntley hearing, correct, a

16   pretrial Huntley hearing?

17       A.   Probably.   I don't recall.

18       Q.   You did testify at trial in 2009?

19       A.   I did testify at trial.   I recall that.

20       Q.   After the 2009 trial and up until today, have you

21   given any sworn testimony in this case?

22       A.   No.

23       Q.   You didn't testify in connection with the

1    (Ronald Fountain - by Mr. Klein)

2 retrial, correct?

3  A. No, I did not.

4  Q. In connection with the first prosecution leading

5 to the conviction, did you have meetings with the

6 district attorney's office for prep?

7  A. Yes.

8  Q. Those are standard when you're getting ready for

9 trial, correct?

10  A. Correct.

11  Q. Did you attend the autopsy in this case?

12  A. I don't believe so. I'm not sure.

13  Q. Have you ever spoken with Dr. Sikirica about his

14 findings in this case?

15  A. Maybe with Mr. Mason, Adam Mason, but I don't

16 recall. I'm sure Adam was in charge, so.

17  Q. So, what we don't want you to do is speculate.

18    So, if you don't remember --

19  A. I don't recall.

20  Q. And so, I'm just trying to gather who you've

21 given statements or spoken to in terms of the universe

22 of statements out there.

23    So, other than speaking with the DA, doing trial

1          (Ronald Fountain - by Mr. Klein)

2   how you conducted this interrogation with Adrian Thomas,

3   correct?

4          MR. PERKINS:  Objection to the form.

5   Q.  When you conducted your interrogation of Adrian

6   Thomas, interview one, you acted based on your

7   instincts, not with regard to any specific training that

8   you learned, correct?

9          MS. CALABRESE:  Objection.

10          MR. PERKINS:  Object to the form.

11          You can answer.

12   A.  Yes.

13   BY MR. KLEIN:

14   Q.  Were you guided by any training or experience in

15   that interview, or was it just kind of you and Mason

16   went in and were kind of riffing off each other about

17   who would ask what about what to ask next?

18          MR. PERKINS:  Object to the form.

19          You can answer.

20   A.  I believe we were just bouncing off of each

21   other.

22   Q.  Had you ever had that type of interaction with

23   Mason before?

1        (Ronald Fountain - by Mr. Klein)

2  the statement wasn't coming in, did you know anything in

3  the nature of what I just read to you now, before now?

4  A.   To the best of my understanding, there was a

5  problem with the eight- or nine-hour interview that Adam

6  Mason did with Mr. Thomas and that was the reason it

7  came back, but I never read the entire thing and I don't

8  believe anyone ever read it to me like that, no.

9  Q.   You were present during the first interview when

10  he was told his wife would be arrested if he continued

11  to deny responsibility.

12       Do you recall that?

13  A.   No, I don't, but I believe you.

14  Q.   And I'll show you the testimony of you.

15  A.   That's fine.

16  Q.   He ultimately agreed to quote "take the fall" in

17  response to what the court called a threat during your

18  interview.

19       Do you recall that he said the word "I'll take

20  the fall"?

21  A.   I do.

22  Q.   He was told, during your first interview, that

23  the disclosure of the circumstances under which he

1                    (Ronald Fountain - by Mr. Klein)

2      injured the child were essential to assist the doctors

3      to save M██████'s life, correct?

4          A.  I believe either myself or Mason said that.  I

5      don't know which one.

6          Q.  You were present when either you or Mason or both

7      assured him that whatever had happened was an accident.

8          A.  Yes.

9          Q.  I just recently reviewed that first statement.

10     There were numerous times where Mason said, it's an

11     accident, and if it's an accident you're going to go

12     home.

13          Do you recall that or words to that effect?

14          A.  Yes.

15          Q.  So, do you know who told you that it was the

16     second interview only that was a problem and not

17     starting with the first interview?

18          A.  I don't recall.

19          Q.  So, until now, you didn't know that it was the

20     whole chain of events that the court considered in its

21     decision that the statement was not voluntary?

22                    MR. PERKINS:  Objection.

23                    You may answer.

1           (Ronald Fountain - by Mr. Klein)

2    this incident?

3        A.  I don't remember.

4        Q.  He stated to you that the injuries were typically

5    caused by a high speed impact or by slamming a very hard

6    object.

7            That's what this report says.  Is that what he

8    told you?

9        A.  Yes.

10       Q.  So what were the circumstances of your meeting

11   with Dr. Edge?  Where was it?  How long did you speak to

12   him for?  How did it go down?

13       A.  I believe it was the hallway.  It was very brief.

14   He said he was very busy.  I asked him if he could

15   conclude what happened.  I recall him saying this is a

16   homicide and telling me about the injury, and how the

17   speed of the impact would have had to have happened to

18   make this injury.

19       Q.  Did he also tell you that he hadn't slept for two

20   days?

21       A.  Yes.

22       Q.  Was he kind of walking or rushing around to get

23   out of there while you were speaking with him?

# APPENDIX

1         (Ronald Fountain - by Mr. Klein)

2    A.  He was definitely trying to get out.

3    Q.  Tell me more about that.

4        Did he seem harried or exhausted or what?

5        MR. PERKINS:  Object to the form.

6        You can answer.

7    A.  He seemed very busy.

8    Q.  What do you mean by "very busy"?

9    A.  He had other matters involving very sick children

10  that he had to attend to and didn't have time to talk to

11  me.

12    Q.  So, how much of his time did he give you?

13        Was it like within a minute that he kind of

14  rolled off his opinions and you guys went separate ways?

15    A.  Maybe three or four minutes.

16    Q.  But you felt like it was hard to get his

17  attention.

18        MR. PERKINS:  Object to the form.

19        You can answer.

20    A.  I thought I had his attention.

21    Q.  How did you learn that he hadn't slept for two

22  days?

23        Did he volunteer that?

1                    (Ronald Fountain - by Mr. Klein)

2        A.   Yes.

3        Q.   How did it come up?  Was he saying, look, I'm not

4    sure about this?  Did he say, I'm just exhausted?  Or

5    how did he -- what were the circumstances in which he

6    told you that?

7                    MR. PERKINS:  Object to the form.

8                    You can answer.

9        A.   To the best of my current recollection, he said

10   he was very busy.  He hadn't slept in a couple days.

11   This was a homicide.  He had other matters to attend to

12   and he didn't have time to talk to me.

13       Q.   Do you recall anything else about that meeting

14   with him?

15       A.   No.

16       Q.   Then, at 10 p.m., do you recall interviewing

17   Wilahemina Hicks?

18       A.   Yes.

19       Q.   And that was at Albany Med.

20       A.   Yes.

21       Q.   Do you recall her relatives were there, her

22   mother and her sister?

23       A.   Yes.

1    (Ronald Fountain - by Mr. Klein)

2 Q. According to this, you took a deposition from her

3 at around 11:10 p.m.

4   Do you recall that?

5 A. Yes.

6 Q. Was her mother and her sister present when you

7 took the deposition from her, or would you have spoken

8 with her just you and her privately or you and/or Mason

9 and her privately?

10 A. I don't recall.

11 Q. Do you recall what she told you, in sum and

12 substance?

13 A. That the baby had been sick, about the vomiting,

14 about waking up in the morning and trying CPR, about

15 going to Samaritan Hospital a couple days before.  In

16 sum and substance, that was about it.

17 Q. She didn't know, she wasn't aware of anything

18 that Adrian did to hurt the child.  She didn't tell you

19 anything about that, right?

20 A. She did not.

21 Q. Thomas Exhibit 19 is a two-page deposition of a

22 witness, of Wilahemina Hicks, dated 9/21/08 at 23:10.

23   Is that your signature at the bottom as a

Case 1:17-cv-00625-DJS Document 15-35 Filed 09/20/17 Page 82 of 26

1                (Ronald Fountain - by Mr. Klein)

2   witness?

3       A.  Yes.

4       Q.  Is this the two-page statement that you obtained

5   from Wilahemina Hicks at the hospital?

6       A.  Yes.

7       Q.  Did you write out the narrative or did she write

8   it out?

9       A.  The narrative I wrote out.

10      Q.  From there, you went back to Adrian Thomas'

11  house, correct?

12      A.  Correct.

13      Q.  What was the reason you went directly from the

14  hospital back to Adrian at that time rather than waiting

15  to the next day or something else?

16          Was there some urgency to it, or was it just that

17  you guys were on the job and you were going to continue

18  plugging away?

19      A.  Yes.  Continue plugging away.

20      Q.  And so when you went back to the home, did you

21  know if Adrian was there?

22          Did you call first?

23      A.  I don't believe so.  I don't recall.

1       (Ronald Fountain - by Mr. Klein)

2       Q.   What happened when you got back to the Thomas

3   household?

4       A.   We knocked on the door and asked Adrian if he

5   would come with us down to the police station to talk

6   for a little while.

7       Q.   Did you go into the apartment at all?

8       A.   I don't recall.

9       Q.   Other than telling him you wanted him to come

10  with you, do you recall anything else?

11      A.   I don't recall.

12      Q.   Was there a particular reason or reasons why he

13  was asked to come to the precinct rather than speaking

14  with him at his home given that he was alone?

15      A.   Just that's where we did our interviews, at the

16  police station on videotape, so that was where he was

17  brought.

18      Q.   So, at that time did you make a determination

19  that you wanted to videotape this next statement from

20  him, or was it Mason or was it a joint decision?

21      A.   I'll say it was Mason because he was in charge,

22  but I don't recall.

23      Q.   When you say Mason was in charge, just tell me

Case 1:17-cv-00626-DJS Document 175-15 Filed 09/20/21 Page 89 of 26

1          (Ronald Fountain - by Mr. Klein)

2    which is in the paperwork, are there any other

3    interviews that you attended, even if you don't remember

4    them but you know from looking at the paperwork?

5        A.   I don't recall.

6        Q.   I'm showing you Thomas 21.

7             This is the pretrial Huntley hearing transcript.

8        A.   Yes.

9        Q.   If you haven't seen it, I'm just going to ask you

10   to take a few minutes to take a look at it.  If you have

11   seen it, just breeze through it.  If you didn't, in

12   fact, look at before today, in preparation for today,

13   let me know.

14       A.   (Witness complies.)

15       Q.   So I will represent to you Exhibit 21, which you

16   just looked at briefly, is your pretrial Huntley hearing

17   testimony.

18            Do you recall generally testifying in court at a

19   pretrial hearing?

20       A.   Not really.

21       Q.   Did you testify truthfully to all matters before

22   the court?

23       A.   Yes.

Case 17-2-00625-DJS Document 175-3 Filed 09/20/17 Page 85 of 26

1    (Ronald Fountain - by Mr. Klein)

2  Q. Is there anything that you recall that you

3 testified to the court that was not accurate or you wish

4 to clarify today?

5  A. Not that I recall. No.

6  Q. Thomas 22 is, I'll represent to you, your 2009

7 trial testimony.

8    Have you had a chance to skim through that before

9 coming here today?

10  A. I did.

11  Q. Was everything that you said before the court

12 accurate in that transcript?

13  A. As far as I can recall, yes.

14  Q. At the pretrial Huntley hearing, not only did

15 Edge tell you he was tired, but I think you testified

16 that he said he had to go to sleep and that's why he

17 couldn't spend much time talking to you.

18    Do you recall words to that effect?

19  A. Yes.

20  Q. I believe you said that you saw the baby at the

21 hospital.

22    Do you recall that?

23  A. Yes.

Case 1:17-cv-00625-DJS Document 175-15 Filed 09/20/21 Page 86 of 26

1        (Ronald Fountain - by Mr. Klein)

2    Q.   And that you were six to eight feet away, about?

3    A.   Yes.

4    Q.   That there were no signs, outward signs, of

5    trauma to the baby that you saw.

6    A.   That I recall, yes.

7    Q.   You testified at the hearing that when there are

8    high speed crashes, like the type of impact that Dr.

9    Edge talked about, in your experience with like high

10    speed accident, there would be bleeding, broken bones,

11    marks and scratches and things like that.

12        But you didn't see any things like that in this

13    case to your eye.

14    A.   Correct.

15    Q.   During the interview -- and you testified to this

16    -- Adrian Thomas told you many, many times that he

17    didn't do anything, correct?

18    A.   Correct.

19    Q.   You didn't put that in the Thomas deposition of a

20    witness that was written out, did you?

21    A.   Not that I recall.

22    Q.   So, in that regard, in Thomas Exhibit 19 there's

23    a deposition of a witness of Adrian Thomas dated 9/22/08

1          (Ronald Fountain - by Mr. Klein)

2     A.   I'm going with a conscious decision.

3     Q.   It wasn't like some type of guidance that you

4  got.

5     A.   No.

6     Q.   Now, in that interview, the first video

7  interview, you told Adrian Thomas that a child couldn't

8  have done it, that Dr. Edge said it couldn't have been

9  by a child, it had to have been done by an adult,

10 correct?

11    A.   Correct.

12    Q.   That was a lie, correct?

13    A.   Correct.

14    Q.   Do you agree that you were the first person to

15 suggest that Thomas could have bumped the baby, perhaps

16 by bumping his head into the crib?

17    A.   Correct.

18    Q.   You are the one that suggested that scenario of

19 bumping before it was ever brought up by Adrian,

20 correct?

21    A.   Correct.

22    Q.   As we touched on earlier, Mason, I believe, kept

23 telling Thomas multiple times that you guys thought it

1          (Ronald Fountain - by Mr. Klein)

2     was an accident and that, in sum and substance, you guys

3     were on his side.

4          Do you remember that?

5       A.   Correct.

6       Q.   At the point in the interview where Adrian said

7     he wanted to jump off the bridge, he felt bad, you

8     continued to ask him questions like did his head bounce

9     and other things like that, correct?

10      A.   Correct.

11      Q.   Did you do that because he was particularly

12    vulnerable at that point?

13         What was the reason you did that?

14          MR. PERKINS:  Object to form.

15          You can answer.

16      A.   Just going on with the interview.

17      Q.   Even though he said he wanted to jump off a

18    bridge.

19         In other words, was there any -- looking back at

20    that, would you have gone about it differently later in

21    your career?

22          MR. PERKINS:  Object to form.

23          You can answer.

1  (Ronald Fountain - by Mr. Klein)

2  to have to scoop up his wife because he was saying he

3  didn't do anything, so therefore she must have done

4  something?

5  A.  I don't recall if I said that or not.

6  Q.  Do you recall it being said in your presence,

7  either you said it or your partner said it?

8  A.  Yes.

9  Q.  You testified at trial that you really didn't

10  think Thomas was a danger to himself when you took him

11  to Samaritan.

12  Do you recall giving that testimony?

13  A.  Vaguely.

14  Q.  Is that your recollection?  You didn't think he

15  was a danger to himself?

16  A.  I don't recall.

17  Q.  Just to be more particular, in terms of

18  suggesting first to Thomas that the baby was slammed, as

19  opposed to Adrian saying it first, either you or Mason

20  suggested during the interview first that the baby had

21  been slammed on the bed or thrown on the bed, right?

22  A.  Yes.

23  Q.  I believe it was you that suggested multiple

```
 1              (Ronald Fountain - by Mr. Klein)
 2    times that the baby had to have been whacked on the side
 3    of the crib, right?
 4       A.  As far as I can recall, yes.
 5       Q.  You were throwing out possible scenarios to see
 6    if Adrian would adopt them.
 7            Is that what you were doing?
 8                MR. PERKINS:  Object to the form.
 9                You can answer.
10       A.  Yes.
11    BY MR. KLEIN:
12       Q.  Your testimony is that -- correct me if I'm wrong
13    -- that Adrian wasn't in custody at the time?
14       A.  Correct.
15       Q.  Do you remember Adrian Thomas saying, on at least
16    one or two occasions, that he felt like he was in jail
17    at the time?
18       A.  I don't recall.
19       Q.  That he said, I'm in jail here.
20            He wanted to be with his son but he was in jail
21    here?
22       A.  I don't know.
23                MR. PERKINS:  Object to the form.
```

1          (Ronald Fountain - by Mr. Klein)

2     A.   He might have said murder.   Whatever I wrote down

3 is what he said.

4     Q.   Well, if murder and homicide were interchangeable

5 to you, would you have written "murder"?

6     A.   I believe I wrote this child was murdered because

7 that's exactly what he told me.

8     Q.   But you're not sure.

9     A.   I am not sure exactly without looking at my

10 notes, which you have somewhere.

11     Q.   Okay, we will go through them.

12       Your notes say, quote, high speed impact.   Quote,

13 slamming very hard into a hard object.   Quote, this is a

14 murder.

15       Is it your belief that you wrote verbatim what he

16 told you?

17     A.   Yes.

18     Q.   During the first interview, was it your belief or

19 your focus that Adrian Thomas had done something to

20 M█████?

21     A.   Yes.

22     Q.   So you went into that first recorded interview

23 that led to the one-page statement not knowing what

1          (Ronald Fountain - by Mr. Klein)

2 happened but believing he did something?

3    A.   Yes.

4    Q.   Why did you believe he did something as opposed

5 to Wilahemina or someone else or the kids or some other

6 person?

7    A.   Just the way everything came together, it seemed

8 like it was him.

9    Q.   Other than it seeming like it was him, is there

10 any factual basis for that other than your gut feeling?

11         MR. PERKINS:   Object to the form.

12         You can answer.

13    A.   The doctor said it was a murder.   Wilahemina was

14 very credible.   The kids probably couldn't have caused

15 that much damage according to what the doctor was

16 telling us.   Adrian seemed like the likely suspect in

17 the house.

18    Q.   You kind of -- is it called deduction?

19         You ruled out people who were less likely to have

20 done it and were left with Adrian?

21         MR. PERKINS:   Object to the form.

22         You can answer.

23    A.   I didn't rule anybody out, but Adrian was our

1                    (Ronald Fountain - by Mr. Klein)

2    answer.

3                    MR. PERKINS:  I did.

4                    MR. KLEIN:  Mark that one for a ruling as

5    well as the prior question.

6    BY MR. KLEIN:

7      Q.  Do you believe that anything you did was improper

8    during the interrogation?

9                    MR. PERKINS:  Object to the form.

10                   You can answer.

11     A.  No.

12     Q.  Did you testify at the first trial essentially

13   regarding your role in the events of Sunday the 21st and

14   your involvement in the interview early into the morning

15   hours of the 22nd?

16     A.  Yes.

17     Q.  So, your conduct in investigating this case and

18   speaking to Adrian Thomas during the first recorded

19   interview, that was information that was given to

20   prosecutors and that you testified at the trial,

21   correct?

22     A.  Correct.

23     Q.  You knew that even though the first interview

1            (Ronald Fountain - by Mr. Klein)

2    didn't lead to, in your view, fruit that Adrian

3    committed the murder, it was a part of a process that

4    lead ultimately to the second interview.

5        Is that your understanding?

6    A.   Yes.

7    Q.   So, you were part of the chain of events that

8    lead to Adrian ultimately giving a confession that was

9    used by prosecutors to prosecute; is that right?

10         MS. PECK:  Objection.

11         MR. PERKINS:  Object to the form.

12         You can answer.

13    A.   If you say so.

14    Q.   Well, I'm asking you.  I mean, you testified, you

15    were called to testify about your role in the first

16    interview?

17    A.   Correct.

18    Q.   So, it was relevant in the prosecution as far as

19    you know, correct?

20    A.   Correct.

21         MS. CALABRESE:  Object to the form.

22    Q.   You knew that, when you testified against Adrian,

23    even though you weren't present for the second

1          (Ronald Fountain - by Mr. Klein)

2    interview, you were part of a case that was with the

3    goal of convicting him of murder, correct?

4              MR. PERKINS:  Object to the form.

5              You can answer.

6    A.   Yes.

7    Q.   Other than his statements in police custody, plus

8    the findings of Dr. Sikirica, are you aware of any other

9    evidence that linked Adrian to the death of M██████

10   T██████?

11   A.   Not that I know of.

12   Q.   In terms of the criminal court information in

13   this case, that's how the criminal case was started, to

14   your knowledge; is that right?

15   A.   If you say so.

16   Q.   Well, do you know that in the file is a criminal

17   court information that Sergeant Mason drafted charging

18   Adrian?

19   A.   I never read it, but yes, okay.

20   Q.   Only one person could be the officer that signs

21   off on the arrest paperwork, right?

22         Typically one arresting officer for the

23   paperwork?

# TROY POLICE DEPARTMENT
## INVESTIGATION REPORT

| VICTIM'S NAME | | | |
|---|---|---|---|
| Matthew Thomas | REPORT DATE 09/26/08 | INCIDENT NUMBER 86095-08 | DB NUMBER - |

## NARRATIVE

**09/21/08**

At about 1730 D/Sgt A. Mason and Detective R. Fountain were called in for a report of a baby at Albany Medical Center with head injuries possibly suffered in Troy. Upon arrival to Central Station, I/O's were briefed by Nicole Noel from Child Protective Services. Noel stated that they received the report from AMC at about 1400. The report was that a four-month old baby was transported from his residence at 2441 21st Street, Apartment 1-C (Cedar Park) to Samaritan Hospital and later transferred to AMC. The initial report was that the baby was having respiratory problems and hospital examinations revealed severe trauma to the head. CPS was concerned about child abuse and the fact that there were six other children inside the residence. CPS notified TPD at about 1720. I/O's responded to Samaritan ER. Hospital staff stated that the victim arrived with the mother, by ambulance at about 0913. The initial report was that the victim was having respiratory problems and was unresponsive. The victim left Samaritan and was transported to AMC at about 1150. The doctor who saw the victim at Samaritan was Katrina Kardos MD. She was off duty when I/O's arrived. The charge Nurse at the time the victim was seen was Ann Weber. I/O's then responded to the victim's residence along with CPS. Upon arrival, the victim's father, Adrian Thomas Sr., was inside the residence with the six other children. The victim's mother, Wilhemena Hicks, was at AMC with the victim. CPS informed Thomas Sr. of their intention to remove the six remaining children from the residence and place them in foster care, pending an investigation. The victim's maternal grandmother, Inga Hicks, arrived on scene to speak to CPS about placement of the children. At about 2015 CPS removed the children from the residence. At about 2026 I/O's interviewed Thomas Sr. and he stated the following:

- The victim had a fever and diarrhea for the past two days
- At about 0830-0900 his wife woke him up because the victim was not responding
- He sprinkled some water on the victim's face, but the victim was still unresponsive
- He called 911 from his cell phone and gave the phone to his wife
- His wife performed CPR and the ambulance arrived shortly after

I/O's then responded to AMC, arriving about 2130. The victim was in the Pediatric Intensive Care Unit (E Building/7th Floor). The charge nurse, Rebecca Peccano RN, stated that the victim suffered a Bilateral Sub Dural Hemotoma and is not likely to survive the injury. There appeared to be both old blood and new blood on the victim's brain indicating that there is an old injury as well as a new injury to the victim's head. The victim was initially diagnosed with a skull fracture, but that was later determined to be inaccurate. At about 2145 Detective Fountain spoke to the attending doctor, Walter Edge MD, who stated that this injury is typically caused by a high-speed impact or by slamming very hard into a hard object. Edge stated to Detective Fountain, "This is a murder."

| DETECTIVE ASSIGNED D/Sgt Adam Mason | SUPERVISOR APPROVAL | |
|---|---|---|
| | | PAGE NUMBER 1/6 |
| CASE STATUS/ **OPEN** | | |

P001398

STATE OF NEW YORK

COUNTY OF RENSSELAER

PEOPLE OF THE STATE OF NEW YORK,

       Versus

ADRIAN THOMAS,

               Defendant.

POLICE INTERVIEW

**DATES:**    September 29, 2008

**PLACE:**    Troy Police Department
         Troy, New York

Interview of Defendant by:

Sergeant Adam Mason
Troy Police Department

Unidentified Officer
Troy Police Department

This proceeding was recorded via electronic sound recording and this transcript was provided by:

**BHI Business Services**
24 Indian Pipe Drive
Wynantskill, New York 12198
518-283-8888
email: bhitranscripts@gmail.com

Case 1:7-cv-00626-DJS en Document 6 of 71 531636 File 09/20/2306 Page 23 of 7

1          MR. THOMAS: (Reading)

2          SERGEANT MASON: You can read it to yourself or

3    out loud it's up to you.

4          MR. THOMAS: Do I sign there?

5          SERGEANT MASON: Sign there and print there.

6    As long as you read the bottom part put your

7    initials on that period too that you read the

8    bottom part.

9          MR. THOMAS: Okay. Is the doctor like 99

10    percent sure my son is not going to make it

11    tonight?

12          SERGEANT MASON: He didn't give a percentage.

13    Basically what the doctor said is that he doesn't

14    think your son is going to make it through the

15    night and if your son does make it through the

16    night he has suffered brain damage and he will

17    never be a normal person, okay. So if your son

18    doesn't die, he's not going to be, he's not going

19    to talk, he's not going to see, he's not going to

20    hear, he's not going to have a normal life while

21    he's alive and he doesn't expect him to live

22    through the night is what he said.

23          Like the officer explained to you there's

1    damage on the brain.  There's a fracture on the

2    back of his skull.  That's not something that

3    happens - - it just doesn't happen without someone

4    being involved and someone knowing that it

5    happened, you follow me?

6          MR. THOMAS: Yeah, but I never - -

7          SERGEANT MASON: However it happened, somebody

8    knows. If you don't know then your wife knows, but

9    somebody in that house knows how that happened

10   because somebody had to participate in injuring

11   that child.  Now, like I told you at the house, we

12   don't think that whoever did it did it on purpose.

13   You guys seem like a nice loving caring family.

14   You got a great family.  You and your wife are nice

15   people the kids are very well behaved, very happy

16   nice kids.  We don't think that you're the type of

17   people that go around hurting your kids, but your

18   kids suffered an injury and somebody knows how it

19   happened so that's what we need to figure out.

20         MR. THOMAS: I mean like, you know, like I said

21   you know I'm not there, most of the time I'm out

22   looking for work.  I've been a lot of places I was

23   looking for work most of the day, you know.  Kids

P000300

1      SERGEANT MASON: You're convinced in your head

2      that somebody intentionally tried to kill your son

3      we don't believe that to be true. We think it was

4      an accident. We think the person that did it is

5      afraid to tell us because they're afraid of what's

6      going to happen to them if they tell us. You know

7      what we're here to tell you that whoever that

8      person is if they talk to us about it, we are going

9      to work with them to make sure that this doesn't

10      get out of hand, you know. We don't want this to

11      get out of hand. We don't want this thing to go

12      somewhere where it doesn't need to go, you know?

13      OFFICER: We want to keep this family together.

14      SERGEANT MASON: That's what we're trying to

15      say. We ain't trying to hurt somebody man. We

16      trying to help your family, your family is in a bad

17      situation.

18      MR. THOMAS: Why are you guys coming at me like

19      I got a rap sheet man.

20      SERGEANT MASON: This is frustrating man, we've

21      got a baby laying in the hospital almost dead.

22      MR. THOMAS: I know man, I want to be there

23      too. But what I'm saying is I'm down here in jail.

P000367

1      OFFICER: This ain't jail.  There's a screen on

2   the window and you're smoking cigarettes.

3      SERGEANT MASON: This ain't jail man.

4      MR. THOMAS: This the jailhouse.

5      OFFICER: We're on your side.

6      SERGEANT MASON: If we're coming off the wrong

7   way I apologize, we're on your side man.  We feel

8   for you.

9      MR. THOMAS: You said murder and slamming the

10  baby and somebody died.

11     SERGEANT MASON: You said you think it's

12  intentional, we think it's an accident.

13     MR. THOMAS: No because you said no the doctors

14  said somebody grabbed the baby - -

15     SERGEANT MASON: That's the doctor's words.

16  That's not our words.

17     OFFICER: I was reading you verbatim what the

18  doctor told me.

19     MR. THOMAS Because somebody my size he would

20  have had blood on his mouth, he would have - - eyes

21  popped out.

22     SERGEANT MASON: If you did it as hard as you

23  could.

P000368

```
1          MR. THOMAS: I didn't do that.  Why would I
2      throw a baby down on the bed or the couch?
3          OFFICER: I don't know why?
4          SERGEANT MASON: Why would you hit your
5      daughter with a belt?
6          MR. THOMAS: My daughter was you know, like I
7      said me and my wife - -
8          SERGEANT MASON: But you and your wife talked
9      about it and realized that's that's not something
10     that you should be doing.
11         MR. THOMAS: That's true.  I'm not even lying,
12     I said that's true.  I'm not denying it.
13         SERGEANT MASON: You for seven kids you 25
14     years old.
15         MR. THOMAS: As a matter of fact after 12:00
16     I'll be 26.
17         SERGEANT MASON: 26 years old, seven kids.
18         OFFICER: Happy Birthday.
19         MR. THOMAS: Happy Birthday, my son is dying
20     and I'm down at the jailhouse.
21         SERGEANT MASON: It ain't very happy. You ain't
22     in the jailhouse, we're just talking.
23         MR. THOMAS: I didn't do nothing man. You all
```

P000369

1    I didn't do nothing wrong you know what I'm saying?

2    I feel like my world is over man.

3       OFFICER: This wasn't here, now you're changing

4    everything on us.  You forgot about this?

5       MR. THOMAS: I never thought you know I would

6    be at the jailhouse explaining my day with my kids

7    you know what I'm saying? I feel real bad, man.

8       SERGEANT MASON: Adrian, let me ask you

9    something, all right because now we starting to get

10    to the point where we wanted to bring you home, all

11    right.  Something inside you is telling you - -

12       OFFICER: Like something - -

13       SERGEANT MASON: You want to explain this, you

14    want to get this off your chest.  You got to make

15    peace with yourself right now, you know what I

16    mean?

17       MR. THOMAS: You know if he die I feel real bad

18    who wouldn't.  But you guys telling me he might not

19    make it through the night.

20       SERGEANT MASON: That's what the doctor said.

21       MR. THOMAS: You know what I'm saying that's

22    real real bad.

23       OFFICER: We told you this two hours ago though

**APPENDIX**

STATE OF NEW YORK

COUNTY OF RENSSELAER

---

PEOPLE OF THE STATE OF NEW YORK,

       Versus

ADRIAN THOMAS,

                          Defendant.

---

POLICE INTERVIEW

**DATES:**        September 22, 2008

**PLACE:**        Troy Police Department
                  Troy, New York

Interview of Defendant by:

Sergeant Adam Mason
Troy Police Department

This proceeding was recorded via electronic sound recording and this transcript was provided by:

**BHI Business Services**
24 Indian Pipe Drive
Wynantskill, New York 12198
518-283-8888
email: bhitranscripts@gmail.com

Case 1:17-cv-00626-DJS Document 60-61 Filed 09/20/23 Page 9 of 3

1   SERGEANT MASON: Think, it's important, this is

2   important, man for your family.

3   MR. THOMAS: He's lying on the bed.

4   SERGEANT MASON: Did you get up and put him in

5   the crib?

6   MR. THOMAS: No the EMT found him in his own

7   bed.  When I found him he was on the bed.

8   SERGEANT MASON: He was on the bed, but before

9   he passed out, maybe you put him in the crib and

10  bumped his head again.

11  MR. THOMAS: I didn't put him in the crib

12  because when I laid down she laid him down also,

13  you know, that's when she took the temperature and

14  said that he was all right.  That's when I said OK,

15  that was it.  She woke me up and I found him laying

16  on the bed.

17  SERGEANT MASON: I got good news for you.

18  Remember yesterday when I told you he had a

19  fracture on the back of his skull?  Guess what,

20  that ain't true.  He doesn't have a fracture on his

21  skull.  His skull is ok.  That's good news.

22  There's light at the end of the tunnel, you hear

23  what I'm saying?

P000455

1       MR. THOMAS: So they don't have to do the

2       surgery on him?

3       SERGEANT MASON: I don't know, I'm not a

4       doctor, I'm just letting you know that.  Last night

5       they thought he had a fracture on the back of his

6       skull which is a very very serious thing.  Today, I

7       talked to the doctor and the doctor said that's not

8       what happened.  He does not have a fracture on the

9       back of his skull.  So whatever happened to put him

10      in this position, okay, it may not have been as

11      forceful as we originally thought.

12      MR. THOMAS: That's what I'm saying I only

13      bumped his head.

14      SERGEANT MASON: That was ten days ago.  All

15      right, now you need to think about yesterday

16      morning, okay?  We know something happened

17      yesterday morning and I know that - - you're half

18      way there man.

19      MR. THOMAS: No but he was on the bed when she

20      laid him down.

21      SERGEANT MASON: You're half way there Adrian.

22      You're half way there man.  You know you've got a

23      problem, you know you've got an anger problem, you

P000456

DEPOSITION OF A WITNESS                                    COURT

STATE OF NEW YORK
COUNTY OF RENSSELAER
CITY OF TROY

NAME __Wilabemina Hicks__                          DATE OF BIRTH _____

RESIDING AT _____ Troy, NY __          AGE __29__

OCCUPATION __Unemployed__

DEPOSE AND SAY: Several years ago when I was living in Georgia I got into an argument with my husband, Adrian Thomas. During the argument Adrian put his hands around my neck and choked me. Adrian has not put his hands on me again since then. Adrians form of discipline with our children is to whip them with a belt. Adrian has whipped all of our children with a belt, except M█████ and M█████. I have never seen Adrian physically discipline M████ or M███. Adrian has said that I spoil M████ and M███ and that I need to whip them with a belt, but then he said that he was just joking. On Saturday, September 20th at about 8 or 9 pm Adrian was in the bedroom with M████. I could hear M████ crying and I yelled into the room "Adrian, why is Matthew crying." And he said "he is alright, he is asleep now" and I walked into the room and I saw Adrian and M████ lying on the bed and M████ was asleep. I did not notice anything wrong with M████ until about 3 or 4 in the morning when he was running a fever of about 100.4. M████ has had a slight fever and diarreah since Friday night. I decided that I was going to bring M████ to the hospital on Sunday morning. M████ had been crying more than usual also. I woke up at around 8 am Sunday morning and I checked on M████. I picked M████ up out of the crib and he was limp and he was having a problem breathing. I woke Adrian up and told him that something was wrong with M████ and I told him to call 911. Adrian called 911 and gave me the phone. I handed M████ to Adrian and talked to

FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A CLASS "A" MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE PENAL LAW OF THE STATE OF NEW YORK.

DATE __9/23/08__          TIME: __1407__          SIGNED _____

WITNESS: __Sgt. Adam Mason__

CONTROL # _____

**APPENDIX**

PHONE

HOME _____

WORK _____

**1834**

# DEPOSITION OF A WITNESS

COURT

STATE OF NEW YORK
COUNTY OF RENSSELAER
CITY OF TROY

NAME ___Wilhemina Hicks___

DATE OF BIRTH _____

RESIDING AT _____ Troy, NY

AGE ___28___

OCCUPATION ___Unemployed___

DEPOSE AND SAY: the people on the phone. I told Adrian to put ___ on the bed and I performed CPR on ___ A little while later the ambulance arrived. When I was up with ___ at 3 or 4 AM I told Adrian that I was going to bring ___ to the hospital in the morning and that I was going to call my mother. Adrian said "dont call her, she might think that I did something to the baby" Adrian has been acting different lately. His mood has been very bad lately and he has been making mean comments to me. Adrian told me that something had to change or he was out of here. Adrian told me that I pay too much attention to the kids and that I was not intimate with him enough. I think that Adrian was jealous of the kids and mostly the babies.

FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A CLASS "A" MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE PENAL LAW OF THE STATE OF NEW YORK.

DATE ___9/25/08___   TIME: ___1407___   SIGNED: ___Wilhemina Hicks___

WITNESS: ___Sgt. Adam Mason___

TPD 119F2

P001410

# APPENDIX

**1835**

CONTROL # _____ 86095-08

PHONE

HOME ▮▮▮▮▮▮▮▮

WORK _____

## DEPOSITION OF A WITNESS

STATE OF NEW YORK
COUNTY OF RENSSELAER
CITY OF TROY

COURT

NAME Adrian Thomas

RESIDING AT 2441. 21st St. 1 C

DATE OF BIRTH ▮▮▮▮▮▮▮

OCCUPATION Unemployed

AGE 26.

DEPOSE AND SAY: That about a week or so from today which now is 9-22-08 I remember while I was in the bathroom I had the door cracked my son M▮▮▮ was on the bed with I ▮▮▮ I don't no but I ▮▮▮ could have hit him in the head with a metal truck, another incident M▮▮▮▮ was falling off the bed couch and I snatched him up quick before he hit the ground. This was around a week ago. I also recall about 10 days or so putting M▮▮▮ in the crib and him smacking his head on the crib he started crying I picked him up and checked his head, on all these occasions I was responsible for my kids at these times my wife was not here.

statements

_Adrian Thomas_

FALSE STAT
AW OF THE STATE OF NEW YORK.

HABLE AS A CLASS "A" MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE PENAL

ATE: 9-23-08

TIME: 0141

TNESS:

SIGNED: X _Adrian Thomas_

**P001404**

# APPENDIX

VOLUNTARY STATEMENT

STATE OF NEW YORK
COUNTY OF RENSSELAER
CITY OF TROY

Page 1

DATE 09/22/08   TIME 2040  AM/PM, PLACE 55 State Street, Troy, NY

I, Adrian P. Thomas, AM 26 YEARS OF AGE, BORN ON ▮▮▮▮,

MY ADDRESS IS 2441 21st Street, #1-C, Troy, NY, MY OCCUPATION IS Unemployed

I HAVE BEEN DULY WARNED BY Sgt. Adam Mason, WHO HAS IDENTIFIED HIMSELF/
HERSELF AS, A Police Officer With The Troy Police Department, THAT I DO NOT HAVE TO MAKE ANY
STATEMENT AT ALL, AND THAT ANY STATEMENT I MAKE WILL BE USED IN EVIDENCE AGAINST ME IN A COURT
OF LAW, AND THAT I HAVE THE RIGHT TO TALK TO A LAWYER FOR ADVICE BEFORE MAKING THIS STATEMENT
OR ANSWERING ANY QUESTIONS, AND THAT I HAVE THE RIGHT TO HAVE AN ATTORNEY APPOINTED TO
REPRESENT ME IF I CANNOT AFFORD ONE BEFORE MAKING THIS STATEMENT OR ANSWERING ANY QUESTIONS,
AND THAT I CAN STOP GIVING THE STATEMENT OR STOP THE QUESTIONING AT ANY TIME FOR THE PURPOSE OF
CONSULTING AN ATTORNEY.  WITHOUT FEAR OR THREAT OF PHYSICAL HARM UPON ME OR ANOTHER PERSON,
I FREELY VOLUNTEER THE FOLLOWING STATEMENT TO THE AFORESAID PERSON. At

About 10 or 15 days ago I was home with my children. My wife was not
there. I was in the bathroom with the door closed. My son ▮ was in
my bedroom lying on my bed. ▮ was crying. I finished using the
bathroom and I went into my bedroom. ▮ was lying on the bed
crying and I ▮, my other son, was on the bed also. The door to my
bedroom was cracked a little and there was a blue and white toy truck
on the floor. I picked ▮ up while he was crying and I put ▮
in his crib while he was still crying. When I put ▮ in his crib I
accidentally dropped him about 5 or 6 inches into the crib and he hit his
head against the side of the crib. When I dropped ▮ he hit his
head pretty hard. If there is an old injury on ▮ head and there is old
blood on ▮ brain, I caused it when I accidentally dropped him. On

I have <u>read</u> this statement (had this statement read to me) consisting of 10 page(s) and the facts contained
herein are true and correct.  I have also been told and I understand that making a false written statement is
punishable as a Class A misdemeanor pursuant to Section 210.45 of the Penal Law of the State of New York.

Signed: Adrian Thomas Sr
Page 1 of 10 Page(s)

Witness: Sgt. Adam Mason

Witness: _____

P001415

<u>**VOLUNTARY STATEMENT**</u>

Page 1

Saturday, September 20th, 2008 at about 8 or 9 PM I was in my bedroom with my son ███ I had the door closed and no one else was in the bed room with us. I was sitting on the bed and I forgot how close ███ was behind me. I laid back and my head hit ███ head. My head hit ███ head pretty hard. ███ started crying and weezing and he was having trouble breathing. I laid down on the bed next to him and rubbed his side to let him know that I didnt mean to cause damage to him. ███ fell asleep. ███ stayed in my bed until he woke up at about 12. My wife fed ███ and put him back in the bed and he was still weezing a little and having a little bit of trouble breathing. ███ slept in the bed with us until he woke up again at about 3 or 4 in the morning. My wife fed ███ again. My other son ███ was also in the bed with us and I fed ███. ███ breathing was pretty bad now. My wife said that she was going to take him to the hospital in the morning. I started getting nervous

I have <u>read</u> this statement (had this statement read to me) consisting of __10__ page(s) and the facts contained herein are true and correct. I have also been told and I understand that making a false written statement is punishable as a Class A misdemeanor pursuant to section 210.45 of the Penal Law of the State of New York.

Signed _Adrian Thomas_

Page __2__ of __10__ Page(s)

Witness ___Sgt. Adam Mason___

Witness _____

## VOLUNTARY STATEMENT

Page 3

because I thought that M███ was having trouble breathing from me hitting him in his head. I was afraid to tell my wife about it, but I knew that M███ was having trouble breathing from me hitting him in the head. I thought that M███ would be alright until the morning when my wife brought him to the hospital. M███ was running a fever over the past two days and he has had diarrhea. I figured that I wouldnt tell my wife about the accident in the bedroom and she would just think that his breathing trouble was from him being a little sick. I knew that I hit him hard but I did think that it would lend to a life threatening situation. I made a mistake. My wife got M███ to fall back to sleep in the bed. He was weezing and his breathing was real noticeable that something was wrong. I went back to sleep because I figured M███ would be alright until my wife took him to the hospital in the morning. At about 8:30 or 9 AM my wife started yelling in the bedroom. She was saying "Adrian get up, M███ is not responding." There was

I have read this statement (had this statement read to me) consisting of ___10___ page(s) and the facts contained herein are true and correct. I have also been told and I understand that making a false written statement is punishable as a Class A misdemeanor pursuant to section 210.45 of the Penal Law of the State of New York.

Signed _Adrian Thomas sr_

Page _3_ of _10_ Page(s)

Witness _Sgt. Alan M███_

Witness _____

P001417

**VOLUNTARY STATEMENT**

Page 4

real panic in the room. I got up and grabbed ████ up from the bed real quick. I shook him up and down a little to see if he was going to wake up. ████ was not responding. I looked at his stomach to see if he was breathing. I did not see his stomach move. I laid ████ down on the bed and got some water from a jug and sprinkled some water on his face to see if he was going to wake up. ████ was still not responding. I called 911 on the phone and gave it to my wife and told her to calm down and talk to the operator. I started to check for a pulse on ████ and I did feel a slight pulse and I saw his chest moving. I also put my finger under his nose and I could feel a little bit of air coming from his nose. I told my daughter Thoin to come into the room to get ████ off of the bed. I picked ████ back up off of the bed real quick and I put him in the crib real fast. I was panicing and when I put ████ in his crib I dropped him about 5 or 6 inches

I have <u>read</u> this statement (had this statement read to me) consisting of **10** page(s) and the facts contained herein are true and correct. I have also been told and I understand that making a false written statement is punishable as a Class A misdemeanor pursuant to section 210.45 of the Penal Law of the State of New York.

Signed _Adrian Thomas_

Page **4** of **10** Page(s)

Witness _Sgt. Adam Mason_

Witness _____

**VOLUNTARY STATEMENT**

Page __5__

and he hit his head against the side of the crib. When I dropped ███ into the crib he hit his head pretty hard against the side of the crib. I was panicing and it was an accident. I left the room to get a cloth for ███ and when I came back in my wife was performing CPR on ███ on our bed. ███ was still not responding. When my wife hung up the phone I heard the sirens outside so I went to open the door for the EMT's. They took my wife and ███ to the hospital. I believe that ███ is in the hospital right now with injuries caused by me. I hurt ███ about 10-15 days ago when I dropped him in the crib, I hurt ███ on Saturday night when I struck his head with my head and I hurt ███ when I dropped him in the crib on Sunday morning. This is hard for me. I love my children. I never expected these accidents to lead up to this, my children being taken away and ███ being near death. I am very sorry for what I have done. I can barely live with

I have <u>read</u> this statement (had this statement read to me) consisting of __10__ page(s) and the facts contained herein are true and correct. I have also been told and I understand that making a false written statement is punishable as a Class A misdemeanor pursuant to section 210.45 of the Penal Law of the State of New York.

Signed ___Adrian Thomas___

Page __5__ of __10__ Page(s)

Witness ___Sgt. Adam Mann___

Witness _____

P001419

## VOLUNTARY STATEMENT

Page 6

myself. I feel real bad. I am here today telling Sgt. Mason what had happened because I want to be a man and take responsibility. I am responsible for M███ injuries. I am giving this statement voluntarily and Sgt. Mason has been fair with me while I was talking to him. (AT)

(AT) There are three other times that I hurt my son M███. I have been arguing with my wife alot lately. I am a little bit depressed, actually a whole lot depressed. I have low self esteem. I haven't worked since February. My wife has been telling me that she wants to find a new man. She makes me feel real low. I feel like nothing. The tension has been building up. Last Wednesday I was home arguing with my wife all day. The tension was building and I got real mad. I had M███ in my arms and he was crying. I walked into my bedroom and I slammed M███ down onto the bed. I was standing up and I slammed him on the bed pretty hard. M███ continued crying and I realized that I messed up. I came back to

I have <u>read</u> this statement (had this statement read to me) consisting of ___10___ page(s) and the facts contained herein are true and correct. I have also been told and I understand that making a false written statement is punishable as a Class A misdemeanor pursuant to section 210.45 of the Penal Law of the State of New York.

Signed _Adrian Thomas_

Page _6_ of _10_ Page(s)

Witness _Sgt. Adam McManus_

Witness _____

P001420

**VOLUNTARY STATEMENT**

Page ___1___

my senses and I picked him up and calmed him down. The next day, Thursday, I was arguing with my wife all day again. I had ████ in my arms again and he was crying again. It was about five o'clock in the evening. I was upset, I was real Teed off at my wife. I walked into the bedroom and slammed M████ down onto my bed. I slammed him down pretty hard. If M████ wasn't in my arms I probably would have punched a hole in the wall. I took my frustrations out on ████ As soon as I slammed M████ on the bed I came to my senses. I was still upset, I took a deep breath and I picked ████ up. He was still crying so I gave him a bottle to calm him down. On Saturday, September 20th at 8:00 or 8:30 I was in the bedroom with ████. I had been arguing with my wife real bad. She told me that I had to find a job in two months or I have to go. I was feeling even worse. ████ was not in my arms, he was lying on the bed. I sat down on the bed and

I have __read__ this statement (had this statement read to me) consisting of __10__ page(s) and the facts contained herein are true and correct. I have also been told and I understand that making a false written statement is punishable as a Class A misdemeanor pursuant to section 210.45 of the Penal Law of the State of New York.

Signed _Adrian Thomas_

Page __7__ of __10__ Page(s)

Witness _Sgt. Adam Mason_

Witness _____

**VOLUNTARY STATEMENT**

Page 8

When I laid back my head struck ███ head. He started crying and I was still upset. I had the door closed and I could still hear my wife low rate me through the door. It started elevating and I was real mad about what she was saying about me. ███ was still crying and it really got to me. I stood up from the bed and I picked ███ up from the bed and I threw ███ down on the bed real hard. He started crying even harder. My mind just went blank like I was in shock. My wife had asked me what was going on in there. I told her nothing. I know that I messed up and I didnt do it again. I picked ███ back up and settled him down. I laid down with him and started rubbing him down and I let him know that daddy didnt mean that. My wife came into the room and I got up and left the room. ███ was wearing and having difficulty breathing, but it wasnt bad enough to call a physician at the time. ███ fell asleep and seemed fine for a while. He woke up at about

I have <u>read</u> this statement (had this statement read to me) consisting of **10** page(s) and the facts contained herein are true and correct. I have also been told and I understand that making a false written statement is punishable as a Class A misdemeanor pursuant to section 210.45 of the Penal Law of the State of New York.

Signed _Adrian Thomas_

Page **8** of **10** Page(s)

Witness _Sgt. Adam Mason_

Witness _____

P001422

## VOLUNTARY STATEMENT

Page 9

midnight and took a bottle and went back to sleep. At about
3:30 or 4:00 in the morning my wife woke me up and told
me to go make the babies bottles. I did and I fed ▆▆▆
and my wife fed ▆▆▆. ▆▆▆ usually takes 4 ounces
but he only took about 3. He was weezing and having difficulty
breathing. His breathing was bad enough to say that you got to
take him to the hospital at sun up. I didn't tell my wife
about slamming ▆▆▆ down on the bed because I was
afraid of going to jail or that she might get some one
to kill me, ▆▆▆ fell back asleep. At about 8 or 9
AM my wife woke me up panicing like I already said. I
thought that she was going to pass out. I grabbed
▆▆▆ off of the bed and I threw him into his
crib. I was panicing too. When I threw ▆▆▆ into the
crib I probable threw him 15 inches and he hit his head on
the side of the crib. I was freaking out and I threw
▆▆▆ pretty hard into the crib. I am sorry for what I did

I have read this statement (had this statement read to me) consisting of _10_ page(s) and the facts
contained herein are true and correct. I have also been told and I understand that making a false written
statement is punishable as a Class A misdemeanor pursuant to section 210.45 of the Penal Law of the State
of New York.

Signed _Adrian Thomas_

Page _9_ of _10_ Page(s)

Witness _Sgt. Adam Mason_

Witness _____

P001423

# APPENDIX

**1845**

## VOLUNTARY STATEMENT

Page __10__

to ████████ I never meant to hurt him. I want to get help. Give me anger management, depression, low self esteem, I want the help. I am willing to go to counseling so I dont hurt anyone esle. I never intentionally meant to hurt my Kid. I love my Kids.

I have <u>read</u> this statement (had this statement read to me) consisting of __10__ page(s) and the facts contained herein are true and correct. I have also been told and I understand that making a false written statement is punishable as a Class A misdemeanor pursuant to section 210.45 of the Penal Law of the State of New York.

Signed __Adrian Thomas__

Page __10__ of __10__ Page(s)

Witness __Sgt. Adam Mason__

Witness _____

**APPENDIX**

**1846**

PHONE

CONTROL # ___86095-08___

HOME _____

WORK ___262-3125___

# DEPOSITION OF A WITNESS

STATE OF NEW YORK
COUNTY OF RENSSELAER
CITY OF TROY

NAME ___Walter Edge___████████████  DATE OF BIRTH ████████

RESIDING AT ████████████████████  AGE ___56___

OCCUPATION ___Doctor___

DEPOSE AND SAY: On September 21st 2008 I was working at Albany Medical Center in the Pediatric Intensive Care Unit. A child named █████ Thomas was brought into the unit. I examined █████ and he had a subdural hematoma on his head. Based on the family history I was concerned that █████ was a victim of child abuse. The injury (we) that █████ suffered is a high impact injury. This type of injury can be caused by very violent shaking or shaking and forced against a hard object. █████ also has brain swelling caused by severe trauma. █████ is currently brain dead and another brain death exam will be done tomorrow and █████ will be pronounced dead. This type of injury could not have been caused by merely bumping █████ head against a hard object, there needs to be severe acceleration prior to striking the hard object.

FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A CLASS "A" MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE PENAL LAW OF THE STATE OF NEW YORK.

DATE ___09/21/08___  TIME ___1312___  SIGNED ___Edge___

WITNESS ___Sgt. Robert Mann___

P001413



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
ADRIAN THOMAS,

                    Plaintiff,

        - against -

CITY OF TROY; ADAM R. MASON, Individually,
RONALD FOUNTAIN, Individually, TIM COLANERI,
Individually, RENSSELAER COUNTY, and
MICHAEL SIKIRICA, Individually,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
STATE OF NEW YORK: COURT OF CLAIMS
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
ADRIAN P. THOMAS,

                    Claimant,

        - against -

THE STATE OF NEW YORK,

                    Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Held at:
PATTISON, SAMPSON, GINSBERG & GRIFFIN, PC
22 First Street
Troy, New York

                    **September 11, 2019**
                    **1:55 p.m.**


        **DEPOSITION OF DEFENDANT TIM COLANERI,** held
        pursuant to Notice, before Joyce Babiskin,
        Shorthand Reporter and Notary Public in the
        State of New York.

APPEARANCES:


**For Plaintiff/Claimant:**

BRETT H. KLEIN, ESQ., PLLC
305 Broadway
Suite 600
New York New York  10007
By:  BRETT H. KLEIN, ESQ.


**For Defendants City of Troy, Adam Mason,**
**Ronald Fountain and Tim Colaneri:**

PATTISON, SAMPSON, GINSBERG & GRIFFIN, PC
22 First Street
Post Office Box 208
Troy, New York  12181-0208
By:  JOSEPH T. PERKINS, ESQ.


**For Defendants Rensselaer County**
**and Michael Sikirica:**

BAILEY, JOHNSON & PECK, P.C.
5 Pine West Plaza, Suite 507
Washington Avenue Extension
Albany, New York  12205
By:  CRYSTAL R. PECK, ESQ.


**For Defendant State of New York:**

LETITIA JAMES, Attorney General of
the State of New York
The Capitol
Albany, New York  12224
By:  CHRISTINA M. CALABRESE
     Assistant Attorney General
     Claims Bureau

     KATHERINE J. HAMILTON
     Legal Assistant
     Claims Bureau

1     a -- he was interviewing a man that may have

2     committed a murder, so I don't know Mr. Thomas'

3     mindset or if he was a violent person or not

4     violent.  I didn't remember anything, a criminal

5     background check or reading that prior to this

6     thing, so I was there more or less for Adam's

7     safety.

8          Q     Okay.  And also, so someone could

9     monitor the equipment to make sure it's

10    recording?

11         A     Correct.

12         Q     And while you were there, would it have

13    been your practice, even if you don't remember

14    specifically, for you to pay attention and to

15    help Adam as much as you could?

16         A     Correct.

17         Q     So, would you consider yourself to have

18    been personally involved in the seven-hour

19    interview, even if it was in a side role?

20               MR. PERKINS:  I object to the form.

21               You can answer.

22         A     I was involved, yes.

23         Q     Now, can you remember anything

1   about you going in, or was that something you did

2   on your own volition?

3        A    I think he probably said for me to go

4   in there.  I think so.

5        Q    So, tell me more about that.  What do

6   you recall about that?

7        A    I don't recall any of the conversation

8   about --

9        Q    What do you recall --

10       A    -- between Adam and I, just what I did

11  when I was there.

12       Q    What is your best informed belief about

13  why you would have gone in there?  Would he have

14  approached you to say, hey, I'm stuck here, I

15  need you to give this thing a boost and be tough

16  with this guy, play bad cop, or did you say

17  something to him that he needs to get more from

18  the subject, Mr. Thomas?  Did a supervisor say

19  that Adam needed to get more and you should go

20  in?  What, if anything, do you believe was the

21  reason for -- the basis for you going in?

22            MR. PERKINS:  I object to the form.

23            You can answer the question.

1    A    I don't know.  We just -- I went in

2    there.  I don't remember the conversations, if it

3    was a plan or if it was a spontaneous thing.  I

4    don't remember.  I haven't seen the video since

5    it was made, other than watching a clip from it

6    online at one point from the docu-drama or

7    whatever you want to call it.  So, with that

8    being said, I don't recall any type of plan or --

9    or anything like that that we made.

10    Q    Do you recall any circumstance that

11    arose during the interrogation where it became

12    apparent that you needed to go in, even if you

13    don't remember the specifics?  In other words,

14    did Mason say to you I need some help, or did you

15    say to him let me go in there and see if I could

16    give you some help, or something else?

17    A    No, I don't remember that.

18    Q    So, is it your testimony that you don't

19    recall the circumstances of you going in, just

20    that at some point you did?

21    A    Correct.

22    Q    And when you went in, you started off

23    with your discussion about being in Desert Storm,

1    I believe.  Is that correct?

2          A     That's correct.

3          Q     Were you in Desert Storm?

4          A     No.

5          Q     Have you ever served in the military?

6          A     No.

7          Q     Your son -- did you have a relative

8    serving in the military?

9                MR. PERKINS:  I object to the form.

10               You can answer.

11         A     I did have relatives serve in the

12   military, yes.

13         Q     So, how did you come up with that?  Was

14   it something you'd used before and you thought it

15   was effective or was it something you just came

16   up with on the spur of the moment?

17         A     Just spontaneous.

18         Q     Okay.  Did you discuss what you would

19   say with Detective Mason before you went in and

20   said it?

21         A     I don't remember that.

22         Q     So, you may have?

23         A     I may have, I may not.

1     Q   Do you know if it was planned with

2   Mason or did you just go in spontaneously?

3     A   I don't remember that.

4     Q   If I told you it was about four hours

5   into the second interrogation session --

6   Withdrawn.

7        You went in, and when you went into the

8   interrogation room, did you leave the video

9   monitor unattended for that period of time, or

10   was someone else taking your role of sitting at

11   the desk, watching the monitor?

12     A   I don't recall.  I know that Chris Kehn

13   did come up, I believe.  I don't know how long he

14   stayed or his other involvement, if he was

15   watching the monitor or not.

16     Q   And when you went in, did you claim you

17   had experience with head injuries during your

18   military experience in Operation Desert Storm?

19     A   Yes.

20     Q   And did you accuse Mr. Thomas of lying?

21     A   Yes.

22     Q   And would you say you did it angrily?

23     A   Yes.

1    Q    It was like a good cop/bad cop

2  situation?

3    A    Yes.

4    Q    Is that a good way to characterize it?

5    A    (Witness nods head.)

6    Q    Yes?

7    A    Yes.

8    Q    Where Mason was the good cop and you

9  went in saying you felt that Mr. Thomas was, in

10  sum and substance, deceiving or lying to

11  Detective Mason.  Correct?

12    A    Yes.

13    Q    So, and you then said -- is it fair to

14  say, is it your recollection that you then said

15  that M████'s injuries could only have resulted

16  from a far greater application of force than Mr.

17  Thomas had described up to that time in the

18  interview?

19    A    Correct.

20    Q    And did you state in sum and substance

21  that M████'s doctors informed you that the

22  child's head injuries were comparable to those

23  that would have been sustained by a passenger in

1    a high-speed car collision?

2        A    Correct.

3        Q    Was that true?

4        A    I believe at one point the doctor did

5    say that it was a rapid acceleration and a rapid

6    deceleration.

7        Q    Right.  But the high speed car

8    collision --

9        A    Yes.

10        Q    -- was that something that was told you

11    or is that something that you added to it?

12        A    Oh, I believe I may have overheard the

13    doctor saying that.

14        Q    Okay.  And after you left, that's when

15    Sergeant Mason told Mr. Thomas that he felt

16    betrayed by Adrian Thomas' untruthfulness and

17    that Mason was doing all he could do to stop his

18    superiors from having Adrian arrested.  Correct?

19    Do you remember that?

20        A    No.

21        Q    Okay.  Well, do you remember that your

22    entry into the room helped turn up the pressure

23    on Mr. Thomas?

 1           MR. PERKINS:  I object to the form.

 2           You can answer.

 3      A    I don't understand what you mean by

 4    pressure.

 5      Q    Well, what, if any, effect did your

 6    entry into the room and the words you said have

 7    on the interrogation, if any, in your view?

 8           MR. PERKINS:  I object to the form.

 9           You can answer.

10      A    I believe it made him tell Adam the

11    truth about what happened.

12      Q    Whether it was true or not, is it your

13    belief that, as a result of you going into the

14    room, it impelled Mr. Thomas to give further

15    statements that were then written on the

16    document?

17           MR. PERKINS:  I object to the form.

18           You can answer.

19      A    It made him give Adam more information,

20    yes.

21      Q    So, you would agree that your conduct

22    in stepping into the interrogation and saying

23    what you said had a direct impact on Mr. Thomas

# APPENDIX

1    making further incriminating statements?

2                MR. PERKINS:  I object to the form.

3                You can answer.

4        A    I believe it just gave Adam an

5    opportunity to talk to Mr. Thomas.  I didn't make

6    Mr. Thomas say anything.  In fact, I believe he

7    said he didn't do anything.  So, Adam talking to

8    him after that made Mr. Thomas confess.

9        Q    But you presented a scenario where you

10   were able to pit Adam between Adrian and Adam's

11   colleagues and gave Adam leverage with Mr.

12   Thomas.  Would you agree with that?

13               MR. PERKINS:  I object to the form.

14       Could you rephrase that?

15       Q    What was the purpose -- what would

16   you -- how would you describe the purpose of your

17   questions?  I mean, how would you describe the

18   effect of what you said to Mr. Thomas?  It

19   allowed Adam to have further leverage with Mr.

20   Thomas?

21               MR. PERKINS:  I object to the form.

22               You can answer.

23       A    It allowed Adam to further discuss

1    what's going on.  And you used the term
2    leverage.  I don't know if I would use that term.
3            Q    What term would you use?
4            A    Opportunity.
5            Q    Okay.  So, you would agree that your
6    presence in that room had what appeared to be a
7    positive impact on Adam getting a confession?
8            A    Correct.
9                 MR. PERKINS:  I object to the form.
10           Q    And in some regard, it contributed to
11   Adam getting a confession?
12                MR. PERKINS:  I object to the form.
13           A    Yes.
14           Q    Have you ever been aware of colleagues
15   of yours in the Troy PD obtaining a confession
16   that was found to have been a coerced confession
17   by any court?
18                MR. PERKINS:  I object to the form.
19                You can answer if you know.
20           A    No.
21           Q    Are you aware of any cases other than
22   this where the statements obtained by you or
23   colleagues of yours in the Troy PD, whether you

**APPENDIX**        **1859**

1

```
1   UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF NEW YORK
2   - - - - - - - - - - - - - - - - - - - - - - - - - - - -

3   ADRIAN THOMAS,

4                   Plaintiff,

5           - against -

6   CITY OF TROY, ADAM R. MASON, RONALD FOUNTAIN,
    TIM COLANERI,
7   RENSSELAER COUNTY, and MICHAEL SIKIRICA,

8                   Defendants.
    - - - - - - - - - - - - - - - - - - - - - - - - - - - -
9   NEW YORK STATE
    COURT OF CLAIMS
10  - - - - - - - - - - - - - - - - - - - - - - - - - - - -

11  ADRIAN P. THOMAS,

12                  Claimant,

13          - against -

14  THE STATE OF NEW YORK,

15                  Defendant.
    - - - - - - - - - - - - - - - - - - - - - - - - - - - -
16

17          CONTINUED DEPOSITION of Defendant, TIM

18  COLANERI, held on the 12th day of September 2019,

19  commencing at 8:07 a.m., at the Law Offices of Pattison

20  Sampson Ginsberg & Griffin, PLLC, 22 First Street,

21  Troy, New York, before Jeanne O'Connell, Registered

22  Professional Reporter and Notary Public in and for the

23  State of New York.
```

COPY

```
 1   APPEARANCES:

 2   Brett H. Klein, Esq.
     305 Broadway
 3   Suite 600
     New York, New York  10007
 4   Attorney for Plaintiff/Claimant

 5   Pattison Sampson Ginsberg & Griffin, PLLC
     22 First Street
 6   Troy, New York  12180
     By:  Joseph T. Perkins, Esq.
 7   Attorneys for City of Troy, Adam R. Mason,
     Ronald Fountain and Tim Colaneri
 8
     Bailey, Johnson & Peck, P.C.
 9   5 Pine West Plaza
     Washington Avenue Extension
10   Albany, New York 12205
     By:  Crystal R. Peck, Esq.
11   Attorneys for Michael Sikirica

12   New York State Office of the Attorney General
     The Capitol
13   Albany, New York 12224
     By:  Christina M. Calabrese, Assistant Attorney General
14
     Also present:  Katherine Hamilton
15

16

17

18

19

20

21

22

23
```

1            (Tim Colaneri - by Mr. Klein)

2      Q.  Did you go in and suggest that his head had to

3  have been slammed to the ground?

4      A.  I think so.  Yes.

5      Q.  Isn't it true that the idea of slamming came from

6  you and Detective Mason first, not from Adrian Thomas?

7      A.  Yes.  I would say for me.  I don't know about

8  Adam.

9      Q.  Would you agree that it wasn't until you

10  introduced the scenario of slamming that -- it wasn't

11  until after that that Adam determined that he had what

12  he believed was probable cause to arrest?

13      A.  Well, I think after Mr. Thomas admitted to it,

14  yeah.  I think he did have probable cause to arrest.

15      Q.  But it wasn't until that idea of slamming was

16  introduced that that changed, correct?

17      A.  Possibly.  Yes.

18      Q.  That's your recollection.

19      A.  That's my opinion.

20            (Discussion held off the record.)

21            (Thomas Exhibit 16 marked for

22         identification.)

23  BY MR. KLEIN:

1     (Tim Colaneri - by Mr. Klein)

2   involvement there was the introduction of the scenario

3   of Adrian slamming that we discussed earlier?

4          MR. PERKINS:  Object to the form.

5          You can answer.

6          THE WITNESS:  Could you repeat that

7       one?

8   BY MR. KLEIN:

9     Q.   Would you say that the key -- the most important

10  aspect to this interrogation overall of your role was

11  your suggestion of the scenario, you took that baby and

12  you slammed his head?

13         MR. PERKINS:  Object to the form.

14         You can answer.

15         THE WITNESS:  It was not just that.  It

16      was the entire thing with the

17      inconsistencies and going to see him.  And

18      it wasn't just one thing, but yeah, that's

19      part of it.  Absolutely part of it.

20  BY MR. KLEIN:

21    Q.   Introduction of that scenario by you of taking

22  that baby and slamming his head lead to like a

23  springboard for Mason to ask further questions about

                    (Tim Colaneri - by Mr. Klein)

1  that, correct?

2                MR. PERKINS:  Object to the form.

3                THE WITNESS:  Correct.

4  BY MR. KLEIN:

5      Q.  Did you feel, before going into that room, that

6  there was a need to introduce that scenario to the

7  conversation rather than letting Adrian continue to say

8  on his own what may have happened to cause the end

9  result?

10     A.  Yeah.

11     Q.  What was the reason for that need?

12     A.  Because I believe at one point they were speaking

13 to him the night before, and they were speaking to him

14 this night, and I don't know if anybody ever challenged

15 him and said, you did this.

16     Q.  Well, didn't introduction of that scenario of

17 slamming the head cross the line of what you talked

18 about, from your experience and your training, of risk

19 of a coerced confession, whether true or false, because

20 you're putting words into the person's -- you're giving

21 the factual pattern to the witness rather than letting

22 the witness tell you what caused the end result?

Case 1:17-cv-00626-DJS Document 64-17 Filed 09/20/21 Page 846 of 12

1    (Tim Colaneri - by Mr. Klein)

2 A. No.

3 Q. So my question is: What was the impetus for you

4 to go in and suggest to him that, you slammed this

5 baby's head?

6    I believe the testimony from Mason was there was

7 not probable cause prior to that entering the

8 conversation.

9    Do you agree with that?

10 A. Yes.

11 Q. So my question relates to that.

12    Did you consciously recognize that there wasn't

13 probable cause still, as of five or so hours into the

14 interview, as of when you went in, and felt that there

15 was a need to take the conversation to the next level?

16    MR. PERKINS: Object to the form.

17    Go ahead.

18    THE WITNESS: Yeah. I did need to,

19    like you say, take the conversation to the

20    next level, because he needed to be

21    challenged at that point.

22 BY MR. KLEIN:

23 Q. Because what he had been saying for hours prior

1                    (Tim Colaneri - by Mr. Klein)

2      was not enough from what you saw.

3          A.   That's correct.

4          Q.   To link it to any crime.

5          A.   That's correct.

6          Q.   Is there anything else about your personal

7      involvement in that interview that you can recall that

8      we haven't already discussed?

9          A.   No.  Other than just seeing the notes now.

10         Q.   I'm going to show you what's been marked as

11     Thomas Exhibit 17, and these are pages of notes that off

12     the record I had you look through the TPD file that was

13     given to us in discovery.  You had indicated that these

14     are the two pages that have your handwriting on them.

15              Could you please confirm that these are the two

16     pages --

17         A.   Yes.  These are.

18         Q.   Can you walk us through what's on these pages,

19     starting from the top of the first page.

20         A.   The top of the first page looks like an interview

21     with Wilahemina Hicks, the start, the Miranda time, the

22     time it ended, and when she signed the Miranda.

23         Q.   Sitting here today, do you recall being present

1          (Adam Mason - by Mr. Klein)

2     A.   Just the highlights.

3     Q.   So, on that date, do you recall having an

4  in-person meeting with CPS worker Nicole Noel?

5     A.   I do not.

6     Q.   You've heard the term "multidisciplinary team"?

7     A.   No.

8     Q.   Have you ever?

9          Well, were you working cooperatively with CPS in

10  this investigation?

11    A.   Yes.

12    Q.   Whatever information you obtained you were

13  willing to share with them to the extent that you were

14  able to from a law enforcement perspective, correct?

15    A.   Yes.

16    Q.   And vice versa.  Your understanding was that,

17  subject to state laws, that they would share their

18  investigation with you, correct?

19    A.   Yes.

20    Q.   They weren't an arm of the Troy PD, but you did

21  work in cooperation with them, correct?

22    A.   Yes.

23          (Discussion held off the record.)

1      (CONFIDENTIAL)

2          MR. KLEIN:  I'm going to ask you about

3      what's been marked as Thomas 8 on

4      September 11th, 2019.

5          For the record, the parties agree that

6      this document and questions about it will be

7      marked confidential on the record.  So

8      starting now, if we can mark confidential,

9      or if the reporter prefers, the parties can

10     review the transcript and let me know after

11     the fact.

12         MS. PECK:  I'd like if we mark it in

13     the record now.

14

15         (THE FOLLOWING PORTION OF THE

16     TRANSCRIPT IS MARKED AS CONFIDENTIAL UNTIL

17     OTHERWISE NOTED:)

18

19  BY MR. KLEIN:

20     Q.  So, I'm showing you Thomas A, and these, I'll

21  represent to you, are progress notes from CPS's case

22  management system.

23     A.  Okay.

(CONFIDENTIAL)

Q. On that date, there are two notes by Nicole Noel. One regards a phone contact and one regards an office meeting.

Take a look at the progress notes, particularly the narratives for each one, and when you're done let me know so I can ask you some questions about that.

A. (Witness complies.)

Q. Okay?

A. Yup.

Q. So, in addition to speaking with Nicole Noel and getting information from her as reflected in your DB follow-ups, according to Nicole Noel's notes, she reports that you informed her that Adrian was arrested earlier that morning for attempted murder.

A. Yes.

Q. And you informed her that Adrian admitted to slamming ▮▮▮▮ down on the bed from a standing position on three separate occasions, on 9/17/08, 9/18/08, and 9/20/08, and hitting ▮▮▮▮'s head on the side of the crib railing while throwing him in the crib on 9/20/08, correct?

A. Yes.

Case 1:17-cv-00625-DJS Document 115-23 Filed 09/20/21 Page 898 of 12

1      (CONFIDENTIAL)

2      Q.  Is it fair to say that those are the three dates

3   or four events that Adrian described after the idea of

4   slamming was introduced by Sergeant Colaneri and

5   yourself?

6           MR. PERKINS:  Object to the form.

7           You can answer.

8           THE WITNESS:  Yes.

9   BY MR. KLEIN:

10     Q.  So, you didn't actually note everything that was

11  said in the conversation, but even though it's not in

12  your report do you agree that you more likely than not

13  told her that information that day?

14     A.  Yes.

15     Q.  Do you remember anything else you told her about

16  the case, or is that generally what you told her?

17     A.  I don't recall if I told her anything else.

18     Q.  Those were the high points of your interview that

19  lead to the arrest, correct?

20     A.  Yes.

21     Q.  Then the bottom progress note on Thomas 8

22  reflects an in-person meeting with you, correct?

23     A.  Correct.

Case 1:17-cv-00626-DJS Document 175-23 Filed 09/20/21 Page 852 of 12

1    (CONFIDENTIAL)

2    Q.  So it doesn't say that specifically in your

3    follow-ups, but do you have any reason -- do you recall

4    that there was an in-person meeting or have any reason

5    to doubt it?

6    A.  I don't recall that there was, but I have no

7    reason to doubt it, either.

8    Q.  She said that you gave her the arrest report for

9    Adrian Thomas, his statement, Wilahemina's statement,

10    Dr. Edge's (attending physician) statement, and

11    M███████'s medical records from Albany Medical Center and

12    Samaritan Hospital.

13        Is that something you likely would have done?

14    A.  Yes.

15    Q.  That's pursuant to your cooperation with CPS as

16    co-investigatory agencies in this matter, correct?

17    A.  Yes.

18    Q.  And she also notes that you reported that you did

19    not currently plan to arrest Wilahemina for anything,

20    correct?

21    A.  Yes.

22    Q.  Was it still something that was an open

23    possibility, depending on how things progressed in the

ORIGINAL

1

**EBT of NICOLE NOEL**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------X
ADRIAN P. THOMAS,

               Plaintiff,

-against-

CITY OF TROY; ADAM R. MASON, Individually,
RONALD FOUNTAIN, Individually, TIM COLANERI,
Individually, RENSSELAER COUNTY, and MICHAEL
SIKIRICA, Individually,

               Defendants.
-----------------------------------------X
STATE OF NEW YORK:  COURT OF CLAIMS
-----------------------------------------X
ADRIAN P. THOMAS,

               Claimant,

-against-

THE STATE OF NEW YORK,

               Defendant.
-----------------------------------------X

    EXAMINATION BEFORE TRIAL of the Defendant,
Rensselaer County, by and through their
representative **NICOLE NOEL**, held on November 25,
2019, commencing at 10:05 a.m., at the offices of
Bailey, Johnson & Peck, P.C., 5 Pine West Plaza,
Suite 507, Washington Avenue Extension, Albany,
New York 12205, pursuant to Notice; before Susan
Florio, a Registered Professional Reporter and
Notary Public in and for the State of New York.

APPEARANCES:

        BRETT H. KLEIN, ESQ., PLLC
        Attorneys for Plaintiff
        305 Broadway, Suite 600
        New York, New York 10007
        BY:  BRETT H. KLEIN, ESQ.


        PATTISON, SAMPSON, GINSBERG & GRIFFIN, P.C.
        Attorneys for Defendants City of Troy,
         Adam Mason, Ronald Fountain and
         Tim Colaneri
        22 First Street, P.O. Box 208
        Troy, New York 12181-0208
        BY:  JOSEPH T. PERKINS, ESQ.


        BAILEY, JOHNSON, & PECK, P.C.
        Attorneys for Defendant Rensselaer County
         and Michael Sikirica
        5 Pine West Plaza, Suite 507
        Washington Avenue Extension
        Albany, New York 12205
        BY:  CRYSTAL R. PECK, ESQ.


        OFFICE OF THE RENSSELAER COUNTY ATTORNEY
        Attorney for Rensselaer County
        Rensselaer County Government Center
        1600 7th Avenue
        Troy, New York 12180
        BY:  CARL J. KEMPF, III, ESQ.

        LETITIA JAMES, ATTORNEY GENERAL OF THE
         STATE OF NEW YORK
        Attorney for the State of New York
        The Capitol
        Albany, New York 12224
        BY:  CHRISTINA M. CALABRESE, A.A.G.
             KATHERINE J. HAMILTON, Legal Assistant

Indexes............................. Pg. 140

*Susan Florio, RPR - Professional Reporting Service - (518)887-2733*

1    **[NICOLE NOEL - By Mr. Klein]**

2    So, they are based on our affidavits.

3      Q.   Okay.

4      A.   The foster care unit's sole purpose is to

5    return the children to the family if it is safe.

6      Q.   Okay.

7      A.   And follow the -- they would look at the

8    order of supervision.

9      Q.   Okay. So, I think we covered the 22nd.

10    You don't recall specifically anything --

11      A.   I don't.

12      Q.   How about the 23rd?

13      A.   I don't remember.

14      Q.   Okay. On the 23rd there's a note in the

15    detective's paperwork that says they met with you

16    and gave you copies of paperwork, including the

17    Adrian Thomas interview, Ms. Hicks' interview and

18    some other things. Do you recall such a meeting?

19      A.   I don't recall it. I just remember from

20    seeing it in my notes last week.

21      Q.   So, from seeing in your notes as well

22    you -- it refreshed your recollection that there

23    was a meeting even though you don't remember the

1    [NICOLE NOEL - By Mr. Klein]

2    particulars of it?

3        A.    Correct.

4        Q.    And did your notes confirm that they gave

5    you among other things Adrian Thomas's written

6    confession?

7        A.    Yes.

8        Q.    Okay.  What else do you recall they gave

9    you?

10       A.    I don't remember.

11       Q.    Okay.  And when you had such a meeting do

12   you recall from your notes or just independently

13   whether that was at your office that they gave

14   those documents to you or whether you went to the

15   Troy police headquarters or some other location?

16       A.    Well, I know that we had to have met up

17   in person because something like that I would

18   never ask to be faxed.  Just because of the

19   confidentiality of it.  So, I'm sure we met up

20   somewhere.

21       Q.    Could have been at your office, could

22   have been somewhere else?

23       A.    Yes.

1  [NICOLE NOEL - By Mr. Klein]

2  Q.   Okay.  And would Jasper Estaris have been

3  part of that meeting as the assigned caseworker?

4  A.   No.

5  Q.   No, not necessarily, or no, not at all?

6  A.   No, not necessarily.

7  Q.   Okay.  He may have been, you just don't

8  remember?

9  A.   Right.

10  Q.   Is that something you would have written

11  in your notes or not necessarily?

12  A.   Yeah.  I probably would have made note of

13  it.

14  Q.   Um-hmm.  Either way would you have shared

15  with Jasper, as the assigned caseworker, what you

16  learned in the meeting with the detectives, in

17  terms of what information you were given and what

18  paperwork you were given?

19  A.   At which point?

20  Q.   As soon as practical after meeting with

21  the police.

22  MS. PECK:  Objection.

23  A.   Not necessarily.

1  **[NICOLE NOEL - By Mr. Klein]**

2  Q.  Okay.  Would you have obtained a ten-page

3  confession of Mr. Thomas and not told or informed

4  Jasper of it for days?

5  A.  Not days, no.

6  Q.  Do you recall when you told him about it?

7  A.  I do not.

8  Q.  Okay.  Do you know if you told him about

9  it on the 23rd?

10  A.  I don't remember.

11  Q.  Okay.  Do you think -- is there any

12  reason why you wouldn't have told him about it on

13  the 23rd?

14  A.  Just if we didn't have a chance to speak

15  to one another if he was too busy, if I was too

16  busy.

17  Q.  Okay.  Weren't you speaking about this

18  case pretty much that whole day and the day

19  before?

20  A.  Probably.

21  Q.  Okay.  So, can you think of any reason

22  why you wouldn't have told him about it other

23  than if you were too busy?

1    [NICOLE NOEL - By Mr. Klein]

2        A.    No.

3        Q.    On something other than this case?

4        A.    No.

5        Q.    Okay.  And that was a pretty big fact

6    that Mr. Thomas apparently made a ten-page

7    statement detailing how the child got hurt to the

8    police, correct?

9        A.    Um-hmm.  Correct.

10       Q.    Okay.  So, it's something you would have

11   highlighted to Jasper as the caseworker, you

12   would have told him -- fair to say you would have

13   more than likely told him about that?

14       A.    I would have.

15       Q.    So, you are not saying you didn't tell

16   him about it on the 23rd, you just don't remember

17   when you told him about it?

18       A.    Correct.

19       Q.    Okay.  And, as the assigned caseworker,

20   you were keeping Jasper Estaris in the loop as to

21   what you found out in your calls and investigatory

22   steps and vice versa, correct?

23       A.    Correct.

# APPENDIX

**1878**

226868

1    STATE OF NEW YORK

2    COUNTY COURT                    COUNTY OF RENSSELAER

3    - - - - - - - - - - - - - - - - - - - - - - -- - - - X

4    THE PEOPLE OF THE STATE OF NEW YORK

5    - against -                    Indictment #08-1074

6    ADRIAN THOMAS,

7                Defendant.

8    - - - - - - - - - - - - - - - - - - - - - - - - - - X

9    *JURY TRIAL - VOLUME IX*

10                               County Courthouse
                                 Congress and Second Streets
11                               Troy, New York 12180
                                 October 9, 2009.
12
     B e f o r e:
13
             HONORABLE ANDREW G. CERESIA,
14           County Court Judge.

15   A p p e a r a n c e s:

16           **For the People:**
             RICHARD J. MC NALLY, JR., ESQ.,
17           District Attorney, Rensselaer County,
             By:  ARTHUR F. GLASS, JR., ESQ.,
18           and CHRISTA M. BOOK, ESQ., Assistant
             District Attorneys, of counsel,
19           Rensselaer County Courthouse,
             Troy, New York.
20
             **For the Defendant:**
21           JEROME K. FROST, ESQ.,
             Public Defender, Rensselaer County,
22           and INGRID EFFMAN, ESQ., Assistant Public
             Defender, of counsel,
23           Rensselaer County Courthouse,
             Troy, New York.
24
             ADRIAN THOMAS, Defendant, in person.
25

                    Judy A. DelCogliano
                 *Official Senior Court Reporter*

# APPENDIX

**1879**

1
                    INDEX TO WITNESSES

2
                        Direct    Cross    Redirect    Recross
3

4          For the People:

5
           IFEOMA OJUKWU        1456      1468      1478       1481
6
           MICHAEL SIKIRICA     1482      1529      1577       1584
7                                                   1586       1587
                                                    1589
8

9                       *          *           *

10                    INDEX TO EXHIBITS

11
                                    Identification    Evidence
12

13         For the People:

14
           27.  Seton Pediatrics
15         Medical Records (Ma▮▮▮▮▮)      1456           1460

16         28.  Seton Pediatrics
           Medical Records (M▮▮▮▮▮)       1456           1460
17

18         29.  Seton Pediatrics
           Medical Records (M▮▮▮▮)        1456           1460

19         30.  Seton Pediatrics
20         Medical Records (M▮▮▮▮)        1456           1460

21         31.  St. Mary's Hospital
           Medical Records (M▮▮▮▮)        1456           1460

22         32.  St. Mary's Hospital
           Medical Records (N▮▮▮▮)        1456           1460
23

           33.  Photograph               1481           1511
24
           34.  Death Certificate        1481           1525
25
           35.  Autopsy Report           1491           1527

*Judy A. DelCogliano*
*Official Senior Court Reporter*

Case 23-753, Document 62, 01/17/2024, 3604338, Page862 of 898

APPENDIX   1880
(Sikirica - People - Direct)

148

1    Q.   Are you familiar with a term or condition known as

2    sepsis, Doctor?

3    A.   Yes.

4    Q.   What is sepsis?

5    A.   Well, sepsis is basically an infection in the

6    bloodstream, not just the presence of the bacteria, but an

7    actual infection that leads to damage of organs throughout the

8    body.

9    Q.   And from your review of the records in anticipation

10   of the autopsy, did you conclude or did you determine that

11   ███████ T███ was septic or suffering from sepsis?

12   A.   Well, according to the records that came over from

13   Samaritan Hospital, he did have bacteria in his bloodstream.

14   He had streptococcus pneumoniae bacteria in his bloodstream

15   suggesting sepsis.

16   Q.   Do you know how that conclusion was arrived at?

17   A.   They had drawn blood cultures at the hospital

18   immediately on his arrival, and those cultures later, a few

19   days later, grew out the bacteria.  It takes several days

20   sometimes to get a culture, for the bacteria to grow out and

21   identify.

22   Q.   So, at the time he was at Samaritan Hospital, that

23   information was unknown?

24   A.   The exact cause of that was unknown, yes.

25   Q.   From your review of the records, was anything done t

Case 23-753, Document 62, 01/17/2024, 3604338, Page863 of 898

APPENDIX **1881**

(Sikirica - People - Direct)                                    149

```
 1            The heart was intact.  They hadn't taken the heart.

 2    That appeared to be a normal size and shape with a little bit

 3    of hemorrhage when I sectioned the heart on the endocardial

 4    surface beneath it.  That is hemorrhage inside the muscle just

 5    below the chambers of the heart, and that is basically a minute

 6    type of heart attack.  The aorta was okay where it remained.

 7    The liver and kidneys were removed, and the neck was examined,

 8    including a posterior incision along the neck, and there was no

 9    evidence of any trauma to the neck.

10         Q.   Okay.  Would you describe that condition of the

11    lungs, Doctor, as having evidence of pneumonia?

12         A.   Yes, grossly.

13         Q.   And would that be consistent with the substance that

14    was found on the blood culture?

15         A.   Yes.

16         Q.   So, would it be fair to state that, at the time of

17    death, M██████ T█████ was suffering from pneumonia?

18         A.   Yes.

19         Q.   And can you tell us, in lay terms, what pneumonia is?

20         A.   Pneumonia, of course, is just an infection of the

21    lungs caused by a variety of reasons.  Common one is

22    streptococcus and -- the same organism that was found in his

23    bloodstream.

24         Q.   Is that evidence of sepsis or a septic condition?

25         A.   Well, the pneumonia itself could lead to sepsis.
```

Judy A. **DelCogliano**
*Official Senior Court Reporter*

A000001366                          P004969

Case 23-753, Document 62, 01/17/2024, 3604338, Page864 of 898

1    Q.    Could you determine, based upon your examination and

2    your experience, whether or not some or all of those bleeds

3    went back as far as birth?

4              MS. EFFMAN:  Objection, leading.

5              THE COURT:  Overruled.

6    A.    None of the changes go back to the time of birth,

7    microscopic.

8    Q.    Now, you testified a little bit earlier that there

9    was an infection present, sepsis?

10   A.    There was pneumococcal in the blood and sepsis, yes.

11   Q.    What happens when there's sepsis in the body, Doctor?

12   A.    Well, the infection, because it's in the blood,

13   spreads everywhere.  It will spread to where ever there could

14   be blood.  It travels throughout the blood.  It spreads

15   everywhere.  It leads to damage of multiple organs.

16   Q.    And did sepsis damage the brain in this case?

17   A.    Well, sepsis was part of the damage to the brain, but

18   the main damage was traumatic injury.

19   Q.    Why do you say that?

20   A.    Because I think the sepsis was a secondary event.  I

21   think the trauma came first.  I think there were repeated bouts

22   of trauma to this brain that led to pneumonia and, eventually,

23   that pneumonia became sepsis.

24   Q.    Now, what happens to the brain when it's injured?

25   Does it continue to function normally?

Judy A. DelCogliano
*Official Senior Court Reporter*

*(Sikirica - People - Cross)*

Case 23-753, Document 62, 01/17/2024, 3604338, Page865 of 898

1    Q.   And that bacterial infection was present in his body

2    when he arrived at Samaritan Hospital; correct?

3    A.   Yes.

4    Q.   And streptococcus pneumoniae, if not treated quickly,

5    can lead to other illnesses and complications; correct?

6    A.   True.

7    Q.   In fact, it could be life threatening for a child who

8    is, although four months old, born two months premature;

9    correct?

10   A.   Yes.

11   Q.   And streptococcus pneumoniae can cause pneumonia;

12   correct, Doctor?

13   A.   Yes.

14   Q.   It can also cause bacteremia, bacteria in the blood;

15   correct?

16   A.   Typically, it occurs in the lungs first.  It has to

17   get into the organs somehow.  It begins in the lungs.

18   Q.   And that can cause bacteria in the blood; correct?

19   A.   Correct.

20   Q.   What happens if there's bacteria in the blood,

21   Doctor?

22   A.   Well, there is a condition called bacteremia, where

23   you just have bacteria in the blood, or you can have a more

24   severe condition called sepsis.

25   Q.   You can also end up with infection in the membranes

Judy A. **DelCogliano**
*Official Senior Court Reporter*

1    STATE OF NEW YORK

2    COUNTY COURT              COUNTY OF RENSSELAER

3    - - - - - - - - - - - - - - - - - - - - - - - - - - X

4    THE PEOPLE OF THE STATE OF NEW YORK

5    - against -              Indictment #08-1074

6    ADRIAN THOMAS,

7              Defendant.

8    - - - - - - - - - - - - - - - - - - - - - - - - - - X

9    *JURY TRIAL - VOLUME VI*

10                           County Courthouse
                             Congress and Second Streets
11                           Troy, New York 12180
                             June 5, 2014.
12
     B e f o r e :
13
              HONORABLE ANDREW G. CERESIA,
14            County Court Judge.

15   A p p e a r a n c e s :

16            **For the People:**
              ARTHUR F. GLASS JR., ESQ., Acting District
17            Attorney, Rensselaer County,
              By:  CHRISTA M. BOOK, ESQ., and KELLY L. EGAN,
18            ESQ., Assistant District Attorneys, of counsel,
              Rensselaer County Courthouse,
19            Troy, New York.

20            **For the Defendant:**
              STEPHEN R. COFFEY, ESQ.
21            54 State Street
              Albany, New York.
22
              JOHN C. TURI, ESQ., Public Defender,
23            Rensselaer County, and ARTHUR R. FROST, ESQ.,
              Assistant Public Defender, of counsel,
24            Rensselaer County Courthouse,
              Troy, New York.
25
              ADRIAN THOMAS, Defendant, in person.

*Judy A. DelCogliano*
*Official Senior Court Reporter*

1

## INDEX TO WITNESSES

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

For the People:

MICHAEL SIKIRICA     774     845     894     900
    902     902
    903

For the Defendant:

JEROME O. KLEIN     911     935


## INDEX TO EXHIBITS

|  | Identification | Evidence |
|---|---|---|

For the People:

| | | Identification | Evidence |
|---|---|---|---|
| 16. | Autopsy Photograph | | 821 |
| 17. | Autopsy Photograph | | 821 |
| 18. | Autopsy Photograph | | 821 |
| 19. | Autopsy Photograph | | 821 |
| 20. | Death Certificate | | 840 |
| 23. | Autopsy Report | 772 | 783 |
| 24. | Organ Transplant Documents | 941 | 952 |
| 25. | Medical Literature | 969 | |

For the Defendant:

| | | Identification | Evidence |
|---|---|---|---|
| E. | Samaritan Hospital Records | | 874 |

Court Exhibit V - Poster - Page 772

*Judy A. DelCogliano*
*Official Senior Court Reporter*

 1    his skull was not violated.  There wasn't a penetration into

 2    the skull, but there was damage to the brain - general term is

 3    closed head injury - and cerebral edema, which is swelling of

 4    the brain, and this was due as a result of blunt force trauma.

 5         Q.   Did you find any corresponding injury on the outside

 6    of M██████'s head?

 7         A.   No.

 8         Q.   Is that unusual?

 9         A.   Not in my experience.

10         Q.   Why not?

11         A.   Baby's skulls are fairly flexible.  So, you may find

12    some devastating internal injury with very little manifested

13    outside.

14         Q.   What type of force would have to be used to cause

15    injuries of this magnitude?

16         A.   This would be a moderate amount of force.

17         Q.   To cause death?

18         A.   Yes.

19         Q.   Now, you have already testified that you were aware

20    that M█████ had sepsis at the time of his death.  How are you

21    able to rule that out as the cause of his death?

22         A.   By looking at the sequence of events and

23    understanding the course of his illness.

24         Q.   What do you mean, the sequence of events and course

25    of his illness?

(Sikirica - People - Direct)

1   following the autopsy.

2               MS. BOOK:  Your Honor, at this time, I would

3       offer People's 20 for identification into evidence.

4               MR. COFFEY:  No objection with appropriate

5       redactions.

6               THE COURT:  People's 20 will be received at this

7       time.

8   (People's Exhibit 20 marked for identification received in

9   evidence and marked People's Exhibit 20 in evidence.)

10              THE COURT:  Ms. Book, may I see that at this

11      time?

12              MS. BOOK:  Yes.

13              THE COURT:  Thank you.

14              MS. BOOK:  May I just have one moment, Your

15      Honor?

16              THE COURT:  You may.

17      Q.   Doctor, if I told you that there's been evidence

18  elicited in this case, testimony elicited in this case that the

19  Defendant, Mr. Thomas, told an individual that he got into a

20  fight with his wife, his child, M█████ wouldn't stop crying

21  and he wanted him to stop crying, so he bounced him down onto a

22  bed (demonstrating).

23              MR. COFFEY:  I object to the way she's doing

24      this.  That isn't bouncing.  That is a throwing motion.

25              THE COURT:  The objection is overruled.

1        Q.   So, he bounced him onto a bed.  He still wouldn't

2   stop crying, so he bounced him harder, so hard, in fact, that

3   he fell onto the floor.  And if I further told you that there's

4   been evidence that this bed was only 17 inches up off of the

5   ground; that there was no bed frame.  There was just a box

6   spring and a mattress right directly on the ground.  Do you

7   have an opinion about whether or not that type of activity

8   could have caused the injuries to M███████ T██████ in this case?

9              MR. COFFEY:  Object as speculative.

10             MS. BOOK:  Your Honor, Dr. Sikirica is a

11        forensic pathologist.

12             MR. COFFEY:  Judge, I'm sorry.  My objection is

13        addressed to you.  It is not addressed to her, with all

14        due respect.

15             THE COURT:  The objection as to speculation is

16        overruled.

17   A.   Yes, I do.

18   Q.   What is that opinion?

19   A.   That kind of event would be sufficient to cause the

20   brain injuries.

21             MS. BOOK:  Nothing further.  Thank you.

22             THE COURT:  Okay.  Members of the jury, we are

23        going to break for lunch at this point in time.  We will

24        break until two o'clock.  During the course of this break,

25        please do not discuss the case among yourselves or with

1       Q.   Rensselaer County?

2       A.   Yes.

3       Q.   Herkimer County?

4       A.   Yes.

5       Q.   Montgomery County?

6       A.   Yes.

7       Q.   Columbia County?

8       A.   Yes.

9       Q.   Greene County?

10      A.   Yes.

11      Q.   Fulton County.

12      A.   Yes.

13      Q.   How many other counties?

14      A.   St. Lawrence, Clinton and Essex, Warren, Washington;

15  probably a few more.

16      Q.  And you have testified on all of those occasions for

17  the prosecution.  In the course of your experience, Doctor, I

18  would be correct, wouldn't I, if I were to say that you have

19  testified on behalf of the prosecution, as opposed to, say, the

20  accused, 99.9 percent of the time.  That would be about --

21      A.  I couldn't guarantee the 99.9, but the 99 sounds

22  good, yes.

23      Q.  So, understanding that you are a public servant -- we

24  understand that.  No one is quarreling with that.  I now want

25  to mention something or ask you something else, if I can.  On

P021482

1    the 25th when you performed the autopsy -- I think it was the

2    25th.  And if you need to look at the autopsy to refresh your

3    recollection --

4        A.    It was the 25th, sir.

5        Q.    Obviously, if I misstate that, you can correct me.

6        A.    No.  It was the 25th.

7        Q.    I think we have heard that M██████died, I think, the

8    23rd?

9        A.    Correct, sir.

10       Q.    Okay.  Now, he died the 23rd, and you performed the

11   autopsy on the 25th, two days later; right?

12       A.    Yes.

13       Q.    Now, there is a certain momentum in medicine, isn't

14   there, where one person comes up with a theory, and human

15   beings, who they are, other doctors, may follow that theory.

16   You have seen that; haven't you?

17       A.    Yes.

18       Q.    At the time that you performed your autopsy on the

19   25th, the police and the District Attorney's Office in this

20   county had identified this case, had they not, as a potential

21   murder?

22       A.    They don't use the term murder.  They use the term

23   homicide.

24       Q.    Fair enough.  As a potential homicide; correct?

25       A.    Correct.

*(Silirica - People - Cross)*

1    Q.  And when you performed the autopsy -- and you say

2    it's not unusual for a District Attorney.  But actually, tell

3    the jury how usual it is for you to perform an autopsy in which

4    the District Attorney, the chief prosecutor and two detectives

5    from a police department are present with you?  How many times

6    does that happen?

7    A.  Oh, maybe 20, 30.

8    Q.  Out of 10,000?

9    A.  Yes.

10   Q.  So, let's see.  A hundred out of 10,000 would be one

11   percent?

12   A.  Correct.

13   Q.  Thirty would be three-tenths of one percent?

14   A.  Correct, sir.

15   Q.  That's not a very big percentage; is it?

16   A.  Considering the fact that nobody comes to many of my

17   autopsies.

18   Q.  Fair enough.  So, considering the fact that not many

19   people come, you are now performing an autopsy, and right next

20   to you is the District Attorney, Mr. McNally, Ms. Book and two

21   police officers; right?

22   A.  Well, nobody gets next to me.

23   Q.  Okay.  But in the same room with you; weren't they?

24   A.  For part of the time, exactly, sir.

25   Q.  And you are having conversations with them; correct?

Case 1:17-cv-00626-DJS Document 84 Filed 09/20/21 Page 6 of 9

1    A.   With the police, with other people, yes.

2    Q.   They weren't there as, kind of, friends.  They were

3    there because -- to see what you were doing; right?

4    A.   Correct.

5    Q.   And you knew that; right?

6    A.   Correct.

7    Q.   Okay.  Now, Doctor, we have heard other people

8    testify, give us some information that they have testified in a

9    prior proceeding, as you have, involving Adrian Thomas;

10   correct?

11   A.   Correct.

12   Q.   And have you, prior to today, have you read his --

13   your testimony?

14   A.   Yes.

15   Q.   Okay.  Now, have you read the testimony of Dr.

16   Waldman?

17   A.   Dr. Waldman, yes.

18   Q.   Have you read the testimony of Dr. Jenny?

19   A.   Yes.

20   Q.   Whom you know very well; correct?

21   A.   I wouldn't say I know her very well.  I know her from

22   a little bit of time in Rhode Island, but I have no close

23   association.  I don't send her Christmas cards.  I don't know

24   her that well.

25   Q.   Okay.  Well, I assume there are people you know well

# CERTIFICATE OF DEATH

# APPENDIX

STATE FILE NUMBER

**1893**

REGISTER NUMBER

RESIDENCE

**1. NAME: FIRST** MIDDLE LAST

**2. SEX:** MALE □ 1 FEMALE □ 2

**3A. DATE OF DEATH:** MONTH DAY YEAR

NCHS

**4A. PLACE OF DEATH:** (Check one) HOSPITAL □ HOSPITAL ER □ HOSPITAL OUTPATIENT □ NURSING HOME □ PRIVATE RESIDENCE □ HOSPICE FACILITY □ OTHER (Specify) □

**4B. IF FACILITY, DATE ADMITTED:** MONTH DAY YEAR

4C

**4C. NAME OF FACILITY:** (If not facility, give address)

**4D. LOCALITY:** (Check one and specify) CITY □ VILLAGE □ TOWN □

**4E. COUNTY OF DEATH:**

4G

**4F. MEDICAL RECORD NO.**

**4G. WAS DECEDENT TRANSFERRED FROM ANOTHER INSTITUTION?** (If yes, specify institution name, city or town, county and state) NO □ YES □

**5. DATE OF BIRTH:** MONTH DAY YEAR

**6A. AGE IN YEARS:** yrs.

**6B. IF UNDER 1 YEAR ENTER:** months days

**6C. IF UNDER 1 DAY ENTER:** hours minutes

**7A. CITY AND STATE OF BIRTH:** (If not USA, Country and Region/Province)

**7B. IF AGE UNDER 1 YEAR, NAME OF HOSPITAL OF BIRTH:**

DECEDENT

7A

**8. SERVED IN U.S. ARMED FORCES?** (Specify years) NO □ 0 YES □ 1

**9. DECEDENT OF HISPANIC ORIGIN?** Check the boxes that best describe whether the decedent is Spanish/Hispanic/Latino.
A □ No, not Spanish/Hispanic/Latino
B □ Yes, Mexican, Mexican American, Chicano
C □ Yes, Puerto Rican
D □ Yes, Cuban
E □ Yes, Other Spanish/Hispanic/Latino (Specify)

**10. DECEDENT'S RACE:** Check one or more races to indicate what the decedent considered himself or herself to be:
A □ White/Caucasian
B □ Black or African American
C □ Asian Indian
D □ Chinese
E □ Filipino
F □ Japanese
G □ Korean
H □ Vietnamese
J □ Native Hawaiian
K □ Guamanian or Chamorro
M □ Samoan
□ American Indian or Alaska Native (specify)
P □ Other Asian (specify)
R □ Other Pacific Islander (specify)
S □ Other (specify)

7B

**11. DECEDENT'S EDUCATION:** Check the box that best describes the highest degree or level of school completed at the time of death.
1 □ ≤ 8th grade
2 □ 9th-12th grade; no diploma
3 □ High school graduate or GED
4 □ Some college credit, but no degree
5 □ Associate's degree
6 □ Bachelor's degree
7 □ Master's degree
8 □ Doctorate/Professional degree

SI

**12. SOCIAL SECURITY NUMBER:**

**13. MARITAL STATUS:** NEVER MARRIED □ 1 MARRIED □ 2 WIDOWED □ 3 DIVORCED □ 4 SEPARATED □ 5

**14. SURVIVING SPOUSE:** Enter name if married or separated. If surviving spouse is wife, enter maiden name.

**15A. USUAL OCCUPATION:** (Do not enter retired)

**15B. KIND OF BUSINESS OR INDUSTRY:**

**15C. NAME AND LOCALITY OF COMPANY OR FIRM:**

25

**16A. RESIDENCE:** (State or Country if not USA)

**16B. County or Region/Province if not USA:**

**16C. LOCALITY:** (Check one and specify) CITY □ VILLAGE □ TOWN □

**16F. IF CITY OR VILLAGE, IS RESIDENCE WITHIN CITY OR VILLAGE LIMITS?** □ YES □ NO IF NO, SPECIFY TOWN:

**16D. STREET AND NUMBER OF RESIDENCE:**

**16E. ZIP CODE:**

PARENTS

30

**17. NAME OF FATHER:** FIRST MI LAST

**18. MAIDEN NAME OF MOTHER:** FIRST MI LAST

31

**19A. NAME OF INFORMANT:**

**19B. MAILING ADDRESS:** (include zip code)

DISPOSITION

31B

**20A.** 1 □ BURIAL 2 □ CREMATION 3 □ REMOVAL 4 □ HOLD 5 □ DONATION 6 □ ENTOMBMENT

**20B. PLACE OF BURIAL, CREMATION, REMOVAL OR OTHER DISPOSITION.** MONTH DAY YEAR

**20C. LOCATION:** (City or town and state)

QR

**21A. NAME AND ADDRESS OF FUNERAL HOME:**

**21B. REGISTRATION NUMBER:**

QS

**22A. NAME OF FUNERAL DIRECTOR:**

**22B. SIGNATURE OF FUNERAL DIRECTOR:** ▶

**22C. REGISTRATION NUMBER:**

**23A. SIGNATURE OF REGISTRAR:** ▶

**23B. DATE FILED:** MONTH DAY YEAR

**24A. BURIAL OR REMOVAL PERMIT ISSUED BY:**

**24B. DATE ISSUED:** MONTH DAY YEAR

**ITEMS 25 THRU 33 COMPLETED BY CERTIFYING PHYSICIAN -- OR -- CORONER/CORONER'S PHYSICIAN OR MEDICAL EXAMINER**

QCOD

**25A. CERTIFICATION:** To the best of my knowledge, death occurred at the time, date and place and due to the causes stated.
Certifier's Name: *Michael Sikirica MD*
License No.: *222488*
Signature: ▶
Month *09* Day *25* Year *2008*

CANCER

**Certifier's Title:** □ Attending Physician □ Physician acting on behalf of Attending Physician □ Coroner ☑ Medical Examiner / Deputy Medical Examiner
Address: *50 Broad St, Waterford NY 12188*

**25B. If coroner is not a physician, enter Coroner's Physician's name & title:**
License No.:
Signature: ▶
Month Day Year

**25C. If certifier is not attending physician, enter Attending physician's name & title:**
License No.:
Address:

CERTIFIER

**26A. Attending physician attended deceased:** FROM Month Day Year TO Month Day Year

**26B. Deceased last seen alive by attending physician:** Month Day Year

**26C. Pronounced Dead** ON *09* *23* *2008* *1100 AM*

**27. MANNER OF DEATH:** NATURAL CAUSE □ 1 ACCIDENT □ 2 HOMICIDE □ 3 SUICIDE □ 4 UNDETERMINED CIRCUMSTANCES □ 5 PENDING INVESTIGATION □ 6

**28. WAS CASE REFERRED TO CORONER OR MEDICAL EXAMINER?** NO □ 0 YES ☑ 1

**29A. AUTOPSY** YES ☑ 0 NO □ 1 REFUSED □ 2

**29B. IF YES, WERE FINDINGS USED TO DETERMINE CAUSE OF DEATH?** □ NO □ YES

CONFIDENTIAL    SEE INSTRUCTION SHEET FOR COMPLETING CAUSE OF DEATH    CONFIDENTIAL

CAUSE OF DEATH

**30. DEATH WAS CAUSED BY:** (ENTER ONLY ONE CAUSE PER LINE FOR (A), (B), and (C).)

**PART I. IMMEDIATE CAUSE**

(A) *Severe Closed head injuries with* —

APPROXIMATE INTERVAL BETWEEN ONSET AND DEATH

**DUE TO OR AS A CONSEQUENCE OF:** (B) *Cerebral edema due to blunt* — *Days*

**DUE TO OR AS A CONSEQUENCE OF:** (C) *Force trauma*

**PART II. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RELATED TO CAUSE GIVEN IN PART I (A):**

**DID TOBACCO USE CONTRIBUTE TO DEATH?** 0 ☑ NO 1 □ YES 2 □ PROBABLY 3 □ UNKNOWN

**31A. IF INJURY, DATE:** MONTH *9* DAY *17* YEAR *2008*
HOUR *Unk*

**31B. INJURY LOCALITY:** (City or town, county and state) *Latham, Troy NY*

**31C. DESCRIBE HOW INJURY OCCURRED:** *Assaulted by Another (Repeatedly)*

**31D. PLACE OF INJURY:** *Residence*

**31E. INJURY AT WORK?** NO □ YES □

**31F. IF TRANSPORTATION INJURY, SPECIFY:** 1 □ Driver/Operator 2 □ Passenger 3 □ Pedestrian

**32. WAS DECEDENT HOSPITALIZED IN LAST 2 MONTHS?** NO □ YES □

**33A. IF FEMALE:** 1 □ Not pregnant within last year 2 □ Pregnant at time of death 3 □ Not pregnant, but pregnant within 42 days of death 4 □ Not pregnant, but pregnant 43 days to 1 year before death 5 □ Unknown if pregnant within last year

**33B. DATE OF DELIVERY:**

P001394

**APPENDIX**                                                                          **1894**

FINAL AUTOPSY REPORT

CASE #:                    MS-08-409
                          OCA-08-309 (Albany Medical Center)
                          08-09-76 (RCME)

DECEDENT:                 M███████ ████████

DATE OF BIRTH:            ████████████

DATE OF DEATH:            September 23, 2008

PRONOUNCEMENT TIME:       11:00 AM

DATE OF AUTOPSY:          September 25, 2008, 8:40 AM

PLACE OF AUTOPSY:         Albany Medical Center, Albany, NY

PROSECTOR:                Michael Sikirica M.D.

ASSISTING:                Mr. Michael Bourdon and Ms. Sarah Christian

INVESTIGATOR:             Ms. Jennifer Alibozek, Rensselaer County

MEDICAL EXAMINER:         Michael Sikirica, M.D., Rensselaer County


Cause of Death:           Severe closed head injuries with cerebral edema due to
                          blunt force trauma

Manner of Death:          Homicide


_Michael Sikirica, M.D./re_
DATE: ___4-22-09___

## External Description

The body is received in a white plastic body pouch. There is a tag attached to the pouch listing the decedent's name and the names of Rensselaer County and Investigator Alibozek. The pouch is also secured with a blue plastic lock #33584 and the lock is in place and intact. Notation is written on the pouch that it was secured on 9/24/08 at 8:30 hours by Sarah Christian. The body is that of an approximately 20 pound, 63.5 cm normally-developed, well nourished infant Black male appearing the reported age of 4-5 months with minimal rigor mortis and minimal posterior fixed livor mortis. The body temperature is cool to the touch after refrigeration. The general appearance of the body is of good health and hygiene.

The following measurements are obtained:

> Crown to rump length: 46 cm
> Head circumference: 49.5 cm
> Chest circumference: 42.4 cm
> Abdominal circumference: 38.5 cm
> Distance between the nipples: 10.5 cm
> Distance between the inner canthi: 3.2 cm
> Length of each foot: 9.6 cm

The body is received wearing only a dry appearing disposable diaper.

The scalp hair is black and curly measuring 1-2" in maximum length. The irides are brown. The right and left pupils each measure 3 mm in diameter. The corneas are clear and the sclerae and conjunctivae are unremarkable. There is bilateral conjunctival edema and slight yellow discoloration to the conjunctivae. The sclerae are unremarkable. The face is symmetric and the facial bones are intact to palpation but the soft tissues are somewhat boggy due to edema. There are no materials in the

mouth, nose or ears. The gums are edentulous consistent with age. There is no injury to the upper or lower frenulum. The neck is free from masses. The neck is free from masses. There are no unusual marks or lesions on the skin of the neck. The larynx is midline and the thyroid not palpable. The chest is of normal contour. The breasts are those of an infant male. The abdomen is flat. The posterior torso shows no significant abnormalities. The upper extremities are symmetric, and the fingernails are intact and show no foreign material. No clubbing or cyanosis is noted. The digits are well formed. The external genitalia are those of an infant male. There is no evidence of injury or abnormal secretions but the scrotum appears swollen. The buttocks and anus are unremarkable. The skin is black in color and smooth. There is an area of slight purplish pigmentation to the skin along the buttocks consistent with a nevus. There is no unusual odor about the body. The body hygiene is good.

## Evidence of Recent Medical Therapy

There is a nasogastric tube protruding outward from the right nostril. There is an endotracheal tube protruding outward from the oral cavity. There is a double lumen catheter inserted into the right neck and sutured in place. There are IV lines inserted into each antecubital area. There is a catheter inserted into the left groin and sutured in place. There are multiple small puncture wounds along the right groin consistent with attempted IV access. There is a hospital identification bracelet around the right ankle and a tag attached to the right ankle listing the decedent's name with the name of Dr. Edge with the time and date of death listed.

P001532

Case 1:17-cv-00626-DJS Document 64 Filed 09/20/21 Page 848 of 15
APPENDIX
MS-08-409
OCA-08-309/08-09-76
M███████ T██████
Page 4
**1897**

## Evidence of Postmortem Donation

There is a long incision extending down the chest from the menubrium into the upper midline of the abdomen and the incision is closed with black suture material.

## Evidence of Injury

There is no evidence of significant gross antemortem injury.

## Procedure and Specimens

The organs are exposed utilizing the standard Y-shaped incision modified by the preexisting transplant incision. Subdural blood, gastric contents, cavity blood and samples submitted from the tissue bank are taken and submitted to the Forensic Toxicology Laboratory at the Albany Medical Center. Included with the body are two small red top tubes labeled "9/24/08" with a time of 04:60 hours and illegible initials along with a small specimen cup labeled "9/24/08 04:50" containing approximately 3 ml of yellow urine. The cup also bears illegible initials. Additional lavender top blood sample tubes are retained from cavity blood with one transferred to the officer present from the Troy Police Department and the other maintained at Albany Medical Center for further testing if needed. Pulled scalp hair is also obtained along with a buccal scraping sample for possible DNA analysis. X-rays are not taken at the time of autopsy but numerous x-ray studies taken before death are digitally reviewed at the time of autopsy.

APPENDIX

Case 1:17-cv-00626-DJS Document 84-17 59-23 35 Filed 09/20/21 88 Page 858 of 15 **1898**

MS-08-409
OCA-08-309/08-09-76
M████ T████
Page 5

Present at the autopsy are Rensselaer County Senior Medicolegal Death Investigator Ms. Jennifer Alibozek, Evidence Technician David Farley of the Troy Police Department, Police Sergeant Adam Mason from Troy PD and District Attorney Richard McNally along with Assistant District Attorney Christa Book. Copies of medical records for the decedent are obtained from Albany Medical Center with a medical record #2257912. Copies of records from Samaritan Hospital are also obtained listing a medical record #1209357 with a date of admission of 9/21/08. A copy of a Troy Police Incident Report is obtained from the officers present with case #86095 and evaluated. Received with the report is a copy of a handwritten 10 page statement by Adrian Thomas Sr. with a date of birth of 9/22/82. Representative portions of the major viscera are retained in formalin and appropriate sections are processed for microscopic slides. The autopsy is assisted by Autopsy Assistants Mr. Michael Bourdon and Ms. Sarah Christian. No additional material is retained as evidence.

### Internal Examination

Thoracoabdominal incision reveals approximately 1 cm of normal appearing abdominal panniculus. The thoracic and abdominal viscera have normal anatomic relationships with evidence of postmortem donation but no evidence of trauma to the remaining organs.

**1899**

## Body Cavities

There are a few cc of bloody fluid in the pleural and peritoneal cavities. There are no adhesions.

## Musculoskeletal System

The skeletal muscles are firm and normally developed. There are no fractures noted. A large "Y" shaped incision is made along the back with extension upward to the basilar portion of the skull and there are no subcutaneous or intramuscular hemorrhages noted.

## Neck Organs

The larynx and thyroid gland are unremarkable. The thyroid is homogeneously tan/brown without nodularity. There is a slight amount of hemorrhage in the soft tissues of the lower right neck consistent with the overlying right jugular line. The carotid arteries and jugular veins are intact. The cervical spine is intact.

## Respiratory System

The right lung weighs 49 grams, the left 46 grams. Each lung is partially collapsed in its pleural cavity. The pleural surfaces are smooth and glistening. There is a slight greenish pink coloration to the pleural surface of each lung. Sectioning through the lungs reveals diffuse bilateral congestion. There is a small amount of mucoid slightly purulent material in the airways of each lung. The arterial trees of each lung are unremarkable. No aspirated material or thromboemboli are found.

## Cardiovascular System

The pericardial sac is intact and contains a few cc of normal serous fluid. The heart weighs 35 grams and has a normal external configuration with a glistening

Case 1:17-cv-00626-DJS Document 63-4 Filed 09/20/21 Page 882 of 15

**APPENDIX**

MS-08-409
OCA-08-309/08-09-76
M████████ T██████
Page 7

epicardial surface and a normal amount of epicardial fat. There are a few petechiae along the anterior and posterior portions of the heart. The myocardium is firm and brown but there is circumferential spotty hemorrhage in the myocardium throughout the left ventricle consistent with anoxia or ischemia. The cardiac chambers are of normal size and contain a trace of clotted blood. The right ventricle measures 2 mm and the left ventricle 7 mm in maximum thickness. The cardiac valves are normally formed and appear in good functional condition with thin pliable valve leaflets and thin discrete tendineae chordae. The mitral valve measures 3.6 cm, the tricuspid 4.2 cm, the pulmonary 2 cm and the aortic 2.5 cm in circumference. The endocardium is smooth and glistening without fibrosis but there is a 1.5 cm zone of subendocardial hemorrhage along the posterior left ventricle. The coronary arteries arise normally through unobstructed ostia and follow a normal distribution. Serial cross sections at approximately 2 mm intervals reveal no significant anomalies. The atria and appendages are normal. The aorta is of normal caliber and branching distribution and is intact along the upper thoracic portion with no evidence of anomaly. The vena cavae is intact and unremarkable at its juncture with the heart.

Brain

The scalp is retracted by an intermastoidal incision. There is a large zone of mottled predominately purple subgaleal hemorrhage along the frontal and anterior left and right parietal scalp. There is an approximately 1 cm greenish ecchymosis consistent with an old bruise along the lower right parietal and upper temporal region. There is a 1.5 cm fairly well circumscribed pink ecchymotic lesion along the right parietal zone. There is extensive splitting of the sutures of the skull including the

P001536

Case 1:17-cv-00626-DJS Document ... Filed 09/20/2488 Page 883 of 15

APPENDIX

MS-08-409
OCA-08-309/08-09-76
M█████ T█████
Page 8

1901

sagittal, coronal, lambdoidal and basilar sutures. The sutures measure up to 1-1.5 cm apart. There is approximately 60 ml of subdural blood collected along the right middle cerebral fossa and extending along the right temporal and parietal lobes. There is a small amount of adherent blood along the right aspect of the posterior fossa. There is no evidence of an epidural hemorrhage. There is diffuse subarachnoid hemorrhage along the basilar portion of the brain and along each superior hemisphere. The brain and dura tissues are removed for fixation and further sectioning. The left and right ocular bulbs are also removed and there is subarachnoid hemorrhage along each optic nerve sheath.

Additional Findings

Examination of the abdominal cavity is performed and the small and large bowels are intact and unremarkable. The appendix is present. The stomach is patent and contains approximately 5-10 ml of mucoid brownish gray material without identifiable digestate. There are no recognizable fragments of tablets or capsules. The mucosa and rugae are unremarkable. The small and large intestines and appendix have a normal configuration and are otherwise unremarkable. The liver, gallbladder, pancreas, adrenal glands, kidneys and spleen are all surgically absent.

Microscopic Sections

Slide A1, Section myocardium: Slight acute vascular congestion and a small focus of anoxic type change.

Slide A2, Section myocardium: Small zones of acute subendocardial hemorrhage.

P001537

MS-08-409
OCA-08-309/08-09-76
M█████ T█████
Page 9

Slide A3, Section myocardium: Areas of anoxic type change and small foci of acute hemorrhagic infarction. There is also myocyte degeneration and necrosis associated with the infarction.

Slides A4-A8, Sections lung: Severe atelectasis with near obliteration of the normal alveolar airspaces and chronic and acute pneumonia.

Slide A9, Section right temporal parietal subgaleal hemorrhage: Acute and chronic inflammation with degeneration red blood cells and fibrin consistent with resolving subgaleal hematoma.

Slide A10, Section thyroid gland: Unremarkable.

Slide A11, Section testes: Small foci of hemorrhage possibly consistent with acute infarction.

Slide A12, Section frontal scalp subgaleal hemorrhage: Acute and more chronic appearing subgaleal hemorrhage with extensive acute and chronic inflammation.

Slide A13, Section skull suture line: Normal appearing bone with adjacent fibrous tissue showing evidence of acute inflammation and hemorrhage.


## Gross Neuropathology Examination


The fixed brain weighs 920 grams. The cerebral hemispheres are extremely swollen and edematous with loss of the normal gyration pattern and extreme softening of the parenchyma. Portions of dura are included with a moderate amount of adherent brown subdural clot measuring up to 3-4 mm in thickness. There is a several cm zone of hemorrhage along the occipital cortex bilaterally but no other foci of parenchymal

P001538

Case 1:17-cv-00625-DJS Document 57228-2 Filed 09/20/21 Page 88 of 15

APPENDIX

MS-08-409
OCA-08-309/08-09-76
M███████ T███████
Page 10

T903

hemorrhage. The cerebral vasculature is intact and appears unremarkable with no evidence of vascular anomalies. Serial coronal sections through the cerebrum, cerebellum and brainstem reveal no evidence of focal hemorrhage or infarction but tightening of the ventricles bilaterally. There is loss of demarcation of the basal ganglia and the cortical ribbon and the myelination pattern appears consistent with age. Stripping the dura reveals no fractures but as noted there is severe splitting of the major suture lines.


## Microscopic Neuropathology Sections


Slide B1, Section frontal cortex: Resolving subarachnoid hemorrhage with large numbers of macrophages, occasional acute inflammatory cells and lymphocytes. There is severe breakdown of erythrocytes and the hemorrhage extends down into the Virchow Robin spaces. There is associated cerebral edema and small foci of hemorrhage and ischemic type change in the parenchyma.

Slide B2, Section parietal cortex: Resolving subarachnoid hemorrhage with large numbers of macrophages degenerating red blood cells with occasional inflammatory cells. There is also focal ischemic change in the parenchyma and adjacent cerebral edema.

Slide B3, Section midbrain: Severe cerebral edema and foci of intraparenchymal hemorrhage. There is subarachnoid hemorrhage and congestion of blood vessels. The subarachnoid hemorrhage displays both acute and resolving hemorrhage with loose fibrin type material, degenerating red cells and macrophages also present.

Slide B4, Section basal ganglia: Focal intraparenchymal hemorrhage, acute with patchy areas of cerebral edema.

Slide B5, Section occipital cortex: Severe acute intraparenchymal hemorrhage, with acute and resolving subarachnoid hemorrhage.

Slide B6, Section temporal cortex: Foci of resolving subarachnoid hemorrhage and areas of cerebral edema.

Slide B7, Section cerebellum: Diffuse anoxic type changes with Purkinje cell dropout and foci of resolving acute subarachnoid hemorrhage.

Slide B8, Section right parietal cortex: Foci of intraparenchymal hemorrhage, resolving subarachnoid hemorrhage and acute vascular congestion. There is focal cerebral edema.

Slide B9, Section dura: Predominantly acute subdural hemorrhage.

Slide B10, Section dura: Acute and more chronic subdural hemorrhage.

Slide B11, Section sagittal sinus: Severe acute congestion with adherent dura showing evidence of loose granulation tissue.

Slides B12-B14, Sections right eye: Severe acute retinal hemorrhage with predominantly chronic inflammation surrounding the optic nerve with abundant macrophages.

Slides B15-B18, Sections left eye: Severe acute retinal hemorrhage and foci of severe acute and chronic inflammation, older appearing hemorrhage and infarction of the optic nerve.

P001540

**1905**

## Anatomic Diagnoses

I.      Severe closed head injuries with cerebral edema due to blunt force trauma

    a.  Clinical history of subdural hematoma with severe cerebral edema

    b.  Radiographic evidence of bilateral subdural hematomas

    c.  Medical evidence of brain death

    d.  Splitting of the sutures of the skull consistent with cerebral edema

    e.  Extensive acute and resolving subarachnoid hemorrhage

    f.  Extensive acute and resolving hemorrhage in the optic nerve sheaths and acute retinal hemorrhage, bilateral

    g.  Fresher and older appearing areas of subgaleal hemorrhage

    h.  Reported history of decedent thrown forcibly downward on a mattress on several instances before eventually being found unresponsive

II.     Blood culture positive for streptococcus pneumonia on initial presentation to hospital (9/21/08)

    a.  Acute and chronic pneumonia with severe atelectasis (microscopic)

III.    Severe anoxic type changes of the heart (gross and microscopic)

IV.     Status post donation of multiple internal organs

**APPENDIX** **1906**

**FORENSIC TOXICOLOGY LABORATORY**
ALBANY MEDICAL CENTER, 43 NEW SCOTLAND AVENUE
ALBANY, NEW YORK 12208-3478     (518) 262-3523
N.Y.S. FORENSIC LABORATORY PERMIT # PFI 1899
ACCREDITED BY THE AMERICAN BOARD OF FORENSIC TOXICOLOGY

CERTIFYING TOXICOLOGISTS
Thomas G. Rosano PhD, DABFT (Director)          Thomas A. Swift PhD (Associate Director)

| | |
|---|---|
| SUBJECT NAME: T____S, M____ | LABORATORY CASE NUMBER: **13670** |
| COUNTY/REQUESTING AGENCY: **RENSSELAER** | SPECIMEN COLLECTION DATE: **9/25/2008** |
| COUNTY AUTOPSY NUMBER: **MS-08-409** | REPORT DATE: **11/18/2008** |

**PATHOLOGIST:**
DR. MICHAEL SIKIRICA
FORENSIC MEDICAL SERVICES, PC
50 BROAD STREET
WATERFORD, NEW YORK 12188

**REQUESTING AGENCY/AGENT:**
MEDICAL EXAMINER
RENSSELAER COUNTY
1600 7th AVENUE
TROY, NEW YORK 12180

| SPECIMEN | TEST | RESULT | POSITIVE THRESHOLD/UNITS | METHODOLOGY |
|---|---|---|---|---|
| Blood | | | | |
| | Ethanol | NEG | Threshold 0.010% w/v | Gas Chromatography |
| | Acetone | NEG | Threshold 0.010% w/v | Gas Chromatography |
| | Isopropanol | NEG | Threshold 0.010% w/v | Gas Chromatography |
| | Methanol | NEG | Threshold 0.015% w/v | Gas Chromatography |

Premortem blood collected on 9/21/08 at 16:45

I certify that the specimen identified by the name and I.D. number above has been examined upon receipt, handled and analyzed in accordance with New York State Health Department regulations, and that the results set forth are for that specimen. Chain of custody and confidentiality was maintained throughout collection, testing, and reporting, unless otherwise noted. Positive specimens are retained for a minimum of one year and all other specimens for a minimum of one month, unless otherwise requested.

Thomas A. Swift PhD
Certifying Toxicologist (Print)          Certifying Toxicologist (Signature)          Date 11-18-08

Thomas G. Rosano PhD, DABFT
Laboratory Director (Print)          Laboratory Director (Signature)          Date 11-18-08

P001542

# APPENDIX

**FORENSIC TOXICOLOGY LABORATORY**
ALBANY MEDICAL CENTER, 43 NEW SCOTLAND AVENUE
ALBANY, NEW YORK 12208-3478      (518) 262-3523
N.Y.S. FORENSIC LABORATORY PERMIT # PFI 1899
ACCREDITED BY THE AMERICAN BOARD OF FORENSIC TOXICOLOGY

CERTIFYING TOXICOLOGISTS

Thomas G. Rosano PhD, DABFT (Director)          Thomas A. Swift PhD (Associate Director)

| | |
|---|---|
| SUBJECT NAME: **TH████, M█████** | LABORATORY CASE NUMBER: **13670** |
| COUNTY/REQUESTING AGENCY: **RENSSELAER** | SPECIMEN COLLECTION DATE: **9/25/2008** |
| COUNTY AUTOPSY NUMBER: **MS-08-409** | REPORT DATE: **11/18/2008** |

**PATHOLOGIST:**
DR. MICHAEL SIKIRICA
FORENSIC MEDICAL SERVICES, PC
50 BROAD STREET
WATERFORD, NEW YORK 12188

**REQUESTING AGENCY/AGENT:**
MEDICAL EXAMINER
RENSSELAER COUNTY
1600 7th AVENUE
TROY, NEW YORK 12180

| SPECIMEN | TEST | RESULT | POSITIVE THRESHOLD/UNITS | METHODOLOGY |
|---|---|---|---|---|
| Blood | Amphetamines | NEG | Threshold  250 ng/ml | Immunoassay |
| | Barbiturates | NEG | Threshold  250 ng/ml | GC/MS |
| | Benzodiazepines | NEG | Threshold  150 ng/ml | Immunoassay |
| | Benzoylecgonine | NEG | Threshold  150 ng/ml | Immunoassay |
| | Methadone | NEG | Threshold  150 ng/ml | GC/MS |
| | Opiates | NEG | Threshold  150 ng/ml | Immunoassay |
| | Phencyclidine | NEG | Threshold  50 ng/ml | GC/MS |
| | Propoxyphene | NEG | Threshold  150 ng/ml | GC/MS |
| | Cannabinoids | NEG | Threshold  50 ng/ml | Immunoassay |
| | Tricyclic Antidepressants | NEG | Threshold  100 ng/ml | GC/MS |
| | Salicylate | NEG | Threshold  10 mg/dl | Colorimetric |
| | Acetaminophen | NEG | Threshold  10 mg/L | Immunoassay |
| | Ethanol | NEG | Threshold  0.010% w/v | Gas Chromatography |
| | Acetone | NEG | Threshold  0.010% w/v | Gas Chromatography |
| | Isopropanol | NEG | Threshold  0.010% w/v | Gas Chromatography |
| | Methanol | NEG | Threshold  0.015% w/v | Gas Chromatography |

Postmortem blood.
General drug screen by GC/MS: lidocaine detected.

I certify that the specimen identified by the name and I.D. number above has been examined upon receipt, handled and analyzed in accordance with New York State Health Department regulations, and that the results set forth are for that specimen. Chain of custody and confidentiality was maintained throughout collection, testing, and reporting, unless otherwise noted. Positive specimens are retained for a minimum of one year and all other specimens for a minimum of one month, unless otherwise requested.

| | | |
|---|---|---|
| Thomas A. Swift PhD | *Thomas Swift* | 11-18-08 |
| Certifying Toxicologist (Print) | Certifying Toxicologist (Signature) | Date |
| Thomas G. Rosano PhD, DABFT | | 11-18-08 |
| Laboratory Director (Print) | Laboratory Director (Signature) | Date |

P001543

**APPENDIX**                                                    **1908**

**FORENSIC TOXICOLOGY LABORATORY**
ALBANY MEDICAL CENTER, 43 NEW SCOTLAND AVENUE
ALBANY, NEW YORK 12208-3478      (518) 262-3523
N.Y.S. FORENSIC LABORATORY PERMIT # PFI 1899
ACCREDITED BY THE AMERICAN BOARD OF FORENSIC TOXICOLOGY

CERTIFYING TOXICOLOGISTS
Thomas G. Rosano PhD, DABFT (Director)      Thomas A. Swift PhD (Associate Director)

SUBJECT NAME:                   T███████, M██████      LABORATORY CASE NUMBER:   **13670**
COUNTY/REQUESTING AGENCY:  **RENSSELAER**           SPECIMEN COLLECTION DATE:  **9/25/2008**
COUNTY AUTOPSY NUMBER:     **MS-08-409**            REPORT DATE:               **11/18/2008**

**PATHOLOGIST:**                                  **REQUESTING AGENCY/AGENT:**
DR. MICHAEL SIKIRICA                              MEDICAL EXAMINER
FORENSIC MEDICAL SERVICES, PC                     RENSSELAER COUNTY
50 BROAD STREET                                   1600 7th AVENUE
WATERFORD, NEW YORK 12188                         TROY, NEW YORK 12180

| SPECIMEN | TEST | RESULT | POSITIVE THRESHOLD/UNITS | METHODOLOGY |
|---|---|---|---|---|
| Subdural | | | | |
| | Ethanol | NEG | Threshold 0.010% w/v | Gas Chromatography |
| | Acetone | NEG | Threshold 0.010% w/v | Gas Chromatography |
| | Isopropanol | NEG | Threshold 0.010% w/v | Gas Chromatography |
| | Methanol | NEG | Threshold 0.015% w/v | Gas Chromatography |

Subdural Blood

I certify that the specimen identified by the name and I.D. number above has been examined upon receipt, handled and analyzed in accordance with New York State Health Department regulations, and that the results set forth are for that specimen. Chain of custody and confidentiality was maintained throughout collection, testing, and reporting, unless otherwise noted. Positive specimens are retained for a minimum of one year and all other specimens for a minimum of one month, unless otherwise requested.

Thomas A. Swift PhD                  _Thomas Swift_               11-18-08
Certifying Toxicologist (Print)      Certifying Toxicologist (Signature)    Date

Thomas G. Rosano PhD, DABFT                                          11-18-08
Laboratory Director (Print)          Laboratory Director (Signature)    Date

P001544

Page 3 of 3

1  STATE OF NEW YORK
   COUNTY OF RENSSELAER
2  _____

3  THE PEOPLE OF THE STATE OF NEW YORK,

4                                    Plaintiff,

5          -against-

6  ADRIAN P. THOMAS,

7                                    Defendant.

8  _____

9  DATE:              September 26, 2008

10

11 PLACE:             Rensselaer County Courthouse
                      Rensselaer County Grand Jury Room
12                    Troy, New York 12180

13

14 BEFORE:            The Rensselaer County Grand Jury

15

16 APPEARANCES:   ARTHUR F. GLASS, First Assistant District Attorney
                  CHRISTA BOOK, Assistant District Attorney
17                KELLY EGAN, Assistant District Attorney
                  Rensselaer County Courthouse
18                Troy, New York 12180

19 WITNESSES:     ADAM MASON
                  MICHAEL SIKIRCA, M.D.

20

21

22

23

24

| | | |
|---|---|---|
| | WITNESSES | |

| WITNESS | | PAGES |
|---|---|---|
| MICHAEL SIKIRCA, M.D. | | 7-24 |
| ADAM MASON, M.D. | | 24-52 |

| | EXHIBITS | | |
|---|---|---|---|

| PEOPLE'S | DESCRIPTION | FOR ID | IN EVD |
|---|---|---|---|
| 1 | Waiver of Rights | 3 | 39 |
| 2 | Ten-page voluntary statement of Adrian P. Thomas | 3 | 39 |

Case 1:17-cv-00626-DJS Document 61-4 Filed 09/20/23 Page 3 of 5

1   We took some general measurements of M█████ at the time.  He

2   had been an organ donor, so the weight of M█████ was not

3   precise.  We --

4       Q.    Doctor, if I may ask you a question, why had M█████

5   been an organ donor?

6       A.    Well, that was at the request of the family.  We thought

7   that in this case we could allow it because M█████ had lived

8   several days in the hospital, had had a full work-up.  There

9   didn't appear to be any injuries to any lower organs.  He had a

10  skeletal survey, didn't show any bony fractures or anything.

11  The injury to the head seemed to be confined to the head.  So in

12  this case we were able to allow -- there are conditions where we

13  wouldn't allow it, but we felt comfortable enough to do it in

14  this case.

15      Q.    How many of M█████'s organs have been harvested?

16      A.    Well, his kidneys had been taken, his liver, the

17  pancreas, adrenal glands, spleen, were the major organs.

18      Q.    What organs were not taken?

19      A.    His heart and his lungs were not taken.

20      Q.    Why were they not taken, if you know?

21      A.    They were already damaged from what we call hypoxia or a

22  lack of blood flow and oxygen.  His lungs also showed evidence

23  of pneumonia that was developing and worsening, and his heart

24  showed evidence that it did not receive enough oxygen.  He was

1    basically starting to have small heart attacks from the lack of

2    oxygen to the muscle of the heart.

3        Q.    And, Doctor, if I can back track for just a moment, do

4    you know why M███████ was initially admitted to Albany Medical

5    Center?

6        A.    He was admitted with respiratory failure and evidence of

7    head trauma.

8        Q.    And do you know the date he was admitted to the Albany

9    Medical Center?

10       A.    He was admitted on the 21st.

11       Q.    Okay.  All right.  Doctor, if I could direct you back to

12   your external examination of M██████, what observations did you

13   make while conducting your external observations?

14       A.    Well, there was a tube in his mouth, what we call an

15   endotracheal tube, that was used to hook into a ventilator to

16   maintain his oxygenation.  He also had several IV lines inserted

17   into his arms, his right neck and his left groin.  There were

18   items of hospital identification, like a bracelet and a tag

19   attached to his ankle, and then there was a long incision

20   extending down his chest and his abdomen, which was due to the

21   organ harvesting.

22       Q.    Doctor, after completing your external observations of

23   M██████, what did you do next?

24       A.    We did look for any signs of injury.  We didn't really

```
1       Q.    And as a result of the autopsy, did you sign a death

2    certificate?

3       A.    Yes.

4       Q.    What did you list as the cause of death?

5       A.    Severe closed head injuries with severe edema due to

6    blunt force trauma.

7       Q.    Did you list this death as accidental or as a homicide?

8       A.    As a homicide.

9       Q.    And what led you to that belief that this was a

10   homicide?

11      A.    The findings at the autopsy, the medical records of

12   M█████ at Albany Medical Center and the statement of Adrian

13   Thomas.

14      Q.    Is there anything else of significance that you would

15   like to explain to the grand jury about M█████?

16      A.    Well, M█████ did have some evidence of pneumonia as he

17   came into the hospital at Samaritan.  They did work him up for

18   pneumonia, and it looked like he was developing pneumonia

19   initially when he came in.

20      Q.    Did M█████ die, or was he pronounced brain dead?

21      A.    He was pronounced brain dead.

22      Q.    Okay.  Do you know when that pronouncement was made?

23      A.    It was made at 11 o'clock on the 23rd.

24      Q.    And do we have the death certificate yet of M█████?
```

1    STATE OF NEW YORK
     COUNTY OF RENSSELAER
2    _____

3    THE PEOPLE OF THE STATE OF NEW YORK,

4                                    Plaintiff,

5         -against-

6    ADRIAN P. THOMAS,

7                                    Defendant.

8    _____

9    DATE:            September 26, 2008

10

11   PLACE:           Rensselaer County Courthouse
                      Rensselaer County Grand Jury Room
12                    Troy, New York 12180

13

14   BEFORE:          The Rensselaer County Grand Jury

15

16   APPEARANCES:   ARTHUR F. GLASS, First Assistant District Attorney
                    CHRISTA BOOK, Assistant District Attorney
17                  KELLY EGAN, Assistant District Attorney
                    Rensselaer County Courthouse
18                  Troy, New York 12180

19   WITNESSES:    ADAM MASON
                   MICHAEL SIKIRCA, M.D.
20

21

22

23

24

Case 1:17-cv-00626-DJS Document 61-17 Filed 09/20/21 Page 2 of 3

1

2

### WITNESSES

| WITNESS | PAGES |
|---|---|
| MICHAEL SIKIRCA, M.D. | 7-24 |
| ADAM MASON, M.D. | 24-52 |

### EXHIBITS

| PEOPLE'S | DESCRIPTION | FOR ID | IN EVD |
|---|---|---|---|
| 1 | Waiver of Rights | 3 | 39 |
| 2 | Ten-page voluntary statement of Adrian P. Thomas | 3 | 39 |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1   Miranda form?

2   A.   Yes, it does.

3   Q.   Does it appear to have been altered or changed in any

4   way?

5   A.   No, it does not.

6   Q.   Okay.  Thank you.  I'm going to show you what's been

7   marked as People's Exhibit Number 2 for the grand jury, and I'd

8   ask you to look at that.  Do you recognize that exhibit,

9   Sergeant Mason?

10  A.   Yes, I do.

11  Q.   What do you recognize it to be?

12  A.   This is the voluntary statement I took from Adrian

13  Thomas that day.

14  Q.   How long is that?

15  A.   There are ten pages total.

16  Q.   I think you indicated that you were together for six or

17  seven hours, I think?

18  A.   A little over seven hours, yes.

19  Q.   Okay.  Could you describe for the grand jury how that

20  exhibit came to be in existence?

21  A.   There came a point in the interview when I told him that

22  I would like to document on paper what he had told me about the

23  incident, and he agreed that we could do that.

24  Q.   Okay.  But let me ask you this:  Prior to creating that