# 23-753

IN THE

# United States Court of Appeals
# for the Second Circuit

---

ADRIAN THOMAS,
*Plaintiff-Appellant,*

— v. —

ADAM R. MASON, RONALD FOUNTAIN, TIM
COLANERI, AND MICHAEL SIKIRICA,
*Defendants-Appellee.*

---

On Appeal from the United States District Court
for the Northern District of New York
Case No. 1:17-cv-00626 (DJS)

---

## APPENDIX VOLUME 3 OF 3

# APPENDIX VOLUME 3 TABLE OF CONTENTS

ECF 156-31: Exhibit 31 ................................................................ 1917

ECF 156-32: Exhibit 32 ................................................................ 1927

ECF 156-33: Exhibit 33 ................................................................ 1930

ECF 156-34: Exhibit 34 ................................................................ 1932

ECF 156-35: Exhibit 35 ................................................................ 1942

ECF 156-36: Exhibit 36 ................................................................ 1945

ECF 156-37: Exhibit 37 ................................................................ 1948

ECF 163-1: Rhiannon I. Spencer Attorney Reply

Declaration .................................................................................. 1959

ECF 163-2: Exhibit "A" ............................................................... 1964

ECF 163-3: Exhibit "B" ............................................................... 1971

ECF 163-4: Exhibit "C" ............................................................... 1994

ECF 163-5: Exhibit "D" ............................................................... 2150

ECF 163-6: Exhibit "E" ............................................................... 2423

ECF 163-7: Reply to Plaintiff's "Counter Statement" .............. 2587

ECF 172: Decision and Order ..................................................... 2614

ECF 177: Transcript of Proceedings .......................................... 2659

```
 1    STATE OF NEW YORK

 2    COUNTY COURT            COUNTY OF RENSSELAER

 3    - - - - - - - - - - - - - - - - - - - - - - - - - X

 4    THE PEOPLE OF THE STATE OF NEW YORK

 5    - against -              Indictment #08-1074

 6    ADRIAN THOMAS,

 7             Defendant.

 8    - - - - - - - - - - - - - - - - - - - - - - - - - X

 9    JURY TRIAL - VOLUME VI

10                           County Courthouse
                             Congress and Second Streets
11                           Troy, New York 12180
                             June 5, 2014.
12

13    B e f o r e :

              HONORABLE ANDREW G. CERESIA,
14            County Court Judge.

15    A p p e a r a n c e s :

16            For the People:
              ARTHUR F. GLASS JR., ESQ., Acting District
17            Attorney, Rensselaer County,
              By:  CHRISTA M. BOOK, ESQ., and KELLY L. EGAN,
18            ESQ., Assistant District Attorneys, of counsel,
              Rensselaer County Courthouse,
19            Troy, New York.

20            For the Defendant:
              STEPHEN R. COFFEY, ESQ.
21            54 State Street
              Albany, New York.
22
              JOHN C. TURI, ESQ., Public Defender,
23            Rensselaer County, and ARTHUR R. FROST, ESQ.,
              Assistant Public Defender, of counsel,
24            Rensselaer County Courthouse,
              Troy, New York.
25
              ADRIAN THOMAS, Defendant, in person.
```

Case 1:17-cv-00062-DJS Document 22-21 Filed 06/26/21 Page 4 of 19

1

2                    **INDEX TO WITNESSES**

3                    <u>Direct</u>    <u>Cross</u>    <u>Redirect</u>    <u>Recross</u>

4

5       For the People:

6

        MICHAEL SIKIRICA        774        845        894        900
7                                                      902        902
                                                       903
8

9

        For the Defendant:
10

11      JEROME O. KLEIN         911        935

12

13                    **INDEX TO EXHIBITS**

14                              <u>Identification</u>    <u>Evidence</u>

15

16      For the People:

17

        16.  Autopsy Photograph                              821
18      17.  Autopsy Photograph                              821
        18.  Autopsy Photograph                              821
19      19.  Autopsy Photograph                              821
        20.  Death Certificate                               840
20      23.  Autopsy Report              772                 783
        24.  Organ Transplant Documents  941                952
21      25.  Medical Literature          969

22

        For the Defendant:
23

        E.  Samaritan Hospital Records                       874
24

25      Court Exhibit V - Poster - Page 772

                    *Judy A. DelCogliano*
                *Official Senior Court Reporter*

(Klein - Defendant - Direct)

921

1    let me do this, if I can.  Are you aware of the -- M███ and

2    what happened in Samaritan Hospital before Albany Medical

3    Center?

4         A.   I am.

5         Q.   And have you reviewed the records?

6         A.   Yes.

7         Q.   And you were present today when Dr. Sikirica

8    testified?

9         A.   I was.

10        Q.   Doctor, talk to us, if you would, about whether

11   M████ had septic shock?

12        A.   M████ had septic shock.  He had an overwhelming

13   bacterial infection that led to shock; that is, blood pressure

14   diminished, but there were also other elements in the severity

15   of his illness.  So, when he comes to Samaritan Hospital, it's

16   very important to identify that his white count, which usually,

17   normally, is five to ten thousand, was 1,000.  And that

18   indicated, in the context of his other signs, that the bone

19   marrow had been suppressed.  White cells turn over, so that you

20   have new white cells produced every 12 to 24 hours.  Now, if

21   you have them suppressed and no new cells are being formed,

22   then the white count starts dropping off, because they only

23   have old cells that are present, and that's a reflection of

24   sepsis, and it usually indicates that that process has been

25   going on for, perhaps, 12 to 24 hours and the initiator of that

Case 1:17-cv-00626-DUS Document 112-4 Filed 00/20/20 Page 4 of 10

1    sepsis element, suppressing bone marrow, has been present for

2    several days.

3          So then M█████ comes to the morning of the 21st, and

4    he is in severe distress with other elements of overwhelming

5    sepsis.  As an example, he's not able to maintain his oxygen

6    saturation, so his ability to have oxygen is measured and drops

7    steadily.  He's not able to maintain his temperature.  He

8    drops, and when he gets to Albany, it's 94.  He's not able to

9    maintain his blood pressure and, most important, his blood

10   pressure, including his white cells, which I mentioned are so

11   low, but he also starts to have a drift down of his platelets.

12   They are 115,000 in the Samaritan Hospital, but when he gets to

13   Albany, they get down as low as 25,000, and that means that

14   this picture of suppression from the overwhelming sepsis is

15   having its effect on the bone marrow.

16         He's also not able to maintain metabolic functions,

17   such as a decreased glucose.  His pH is down, and he is

18   overwhelmed by this infection and there's very little in that

19   picture of where survival is likely.  So, he is overwhelmed by

20   the infection, and the physicians do what they can to maintain

21   him, but it's inadequate because he's so overwhelmed by

22   infection, and he dies within two days.

23         Q.  Well, now, let's go back if we can.  First of all,

24   you have treated patients, little babies before who have gone

25   into septic shock?

Case 1:17-cv-00626-DJS   Document 88-911158314   Filed 09/26/21   Page 7 of 19

*(Klein - Defendant - Direct)*

1    hemorrhagic because of this phenomena.

2        Q.    How about the brain?  Is the brain affected by DIC?

3        A.    The DIC, the failure to clot, can occur anywhere; and

4    here we saw that there was bleeding in the testes, in the

5    heart, behind the retina, in terms of retinal hemorrhage, and

6    throughout the brain.  And the fact that this can be -- the way

7    we manage it is we try to replenish platelets, give

8    fresh-frozen plasma, but that's like putting your finger in a

9    dike.  The process continues to flood the system and may cause

10   continued bleeding.

11       Q.    Can DIC -- withdrawn.  Do you have an opinion in this

12   case -- and all of the opinions that I'm going to ask you are

13   based upon a reasonable degree of medical certainty.  Do you

14   have an opinion as to whether the sepsis caused DIC in this

15   case?

16       A.    Yes.

17       Q.    And do you have an opinion as to whether the DIC

18   caused swelling in the brain?

19       A.    Well, that's not quite right.

20       Q.    Okay.

21       A.    The DIC is different from the swelling in the brain.

22   Swelling in the brain is caused by the infection, and that

23   causes cerebral edema or swelling, and that can be pressure.

24   Now, in a four-month-old, the fontanelle is open, so the head

25   may be enlarged.  But in autopsy, it was noted that that

P021561

Case 1:15-cv-00626-DOS Document 155-41 Filed 09/20/2018 Page 8 of 10

1  fontanelle, that little soft spot, was bulging.  So, that's an

2  indicator of the increased pressure in the brain.

3      Q.   Caused by infection?

4      A.   Caused by this infection.

5      Q.   And this infection was sepsis?

6      A.   This infection was the pneumococcus.  The

7  pneumococcus caused the sepsis.

8      Q.   Okay.  Now, the pneumococcus causing the pressure on

9  the brain, what effect did that have upon the eyes?

10     A.   Upon the eyes?

11     Q.   Yes, the retina?

12     A.   Well, there's swelling.  So, the swelling can cause

13  pressure on different organisms.  Pressure can press blood

14  vessels or cause rupture of others.

15     Q.   Okay.  Did you see some photographs of the autopsy?

16     A.   I saw some of Dr. Leestma's photographs, and I did

17  see the medical examiner's pictures.

18     Q.   And did you see the eyes of the young baby?

19     A.   I don't recall.

20     Q.   Okay.  Now, Doctor, this process of sepsis, does --

21  and as the pressure builds and the infection, can that cause

22  hemorrhaging around the eyes?

23     A.   I would think it would cause pressure on all the

24  blood vessels, including those in the brain and behind the eye.

25     Q.   Now, we know in this case from the autopsy that there

Case 1:15-cv-00626-DLB Document 135-11 Filed 09/20/19 Page 8 of 10

(Klein - Defendant - Direct)

1     A.   Well, if you have an open wound - so you if have a

2     disruption of the integrity of the skin - then organisms can

3     find their way into that wound and then can cause sepsis, but

4     the sepsis is caused by bugs, not caused by trauma.

5     Q.   Now, Doctor, assume there's no evidence that on the

6     weekend before ██████ died or even a few days before that of

7     any open wounds, no open head wound, no open wound to his body

8     in his feet or any place.  Do you have an opinion, to a

9     reasonable degree of medical certainty, as to whether the

10    pneumococcal could have gotten into that -- how it could have

11    gotten into his body?

12    A.   The pneumococcus is a respiratory organism.  You put

13    it into your mouth, essentially, having had contact with

14    somebody who had the organism.  So, it's spread by droplets and

15    you inhale the droplets.  And in the vast majority of cases --

16    we all have had that experience.  We have all had experience

17    with pneumococcus, but there have been either no consequences

18    or there's been something mild, like a cold or otitis or

19    sinusitis.  In a very few instances, though, that respiratory

20    acquisition leads to the organism getting into the bloodstream;

21    and even then, the defense mechanisms are such that it's clear.

22    But this baby, at four months of age, it wasn't clear.  The

23    organisms multiplied, and he had the unfortunate consequences

24    of overwhelming sepsis causing death.

25    Q.   We have heard testimony that the sepsis was secondary

(Klein - Defendant - Direct)

1    to an aspiration which was secondary to the trauma.  Doctor,

2    what is aspiration?

3         A.   Aspiration is when you choke, essentially, and food

4    particles or other things that are present in your mouth go

5    down to your windpipe.  And in infants, there's a lot of

6    problems where they may take a small toy or another material

7    and swallow it, and it will go down into their windpipe and

8    they could choke.

9         Q.   Okay.  But in this instance, do you see any evidence

10   of aspiration?

11        A.   No.  There's no evidence in terms of clinical

12   history.  Often, these kids start coughing, choking.  They are

13   immediately evident to the parent, who brings the child to the

14   emergency room.  There's no evidence to that.  That's number

15   one.  Number two, there's no evidence on the x-ray.  Number

16   three, there's no evidence in the autopsy.

17        Q.   So, for anybody to say that there's aspiration here,

18   do you have an opinion, based upon a reasonable degree of

19   medical certainty, whether that is shear speculation?

20        A.   It is speculation.

21        Q.   There is objective and subjective elements in

22   medicine; correct?

23        A.   Yes.

24        Q.   We have used this example before.  Your temperature

25   is objective?

1    A.    It is.

2    Q.    If I say I'm in pain, that's subjective?

3    A.    Yes.

4    Q.    Did this baby have objective or subjective signs of

5    sepsis?

6    A.    He did.

7    Q.    Objective?

8    A.    Objective.  Well, you know, this is a four-month-old.

9    So, he's not going to have symptoms.  He's not going to tell

10   you that he had a headache.  So, everything is signs or

11   laboratory values.

12   Q.    And do you have an opinion, based upon a reasonable

13   degree of medical certainty, of the cause of death of this

14   baby?

15   A.    I do.

16   Q.    And what is it?

17   A.    He died of overwhelming bacterial sepsis due to the

18   pneumococcus.

19   Q.    And Doctor, based upon your experience, in the 485

20   articles that you have written, the hundreds of lectures that

21   you have delivered, the thousands of babies in Boston that you

22   have -- you are a clinician, as well; correct?

23   A.    Yes.

24   Q.    That you have treated and consulted on, the 40, over

25   40 years of vast experience that you have accumulated, do you

1    have an opinion, based upon your field of pediatric infectious

2    diseases, whether trauma played any part in the death of this

3    poor baby?

4        A.   No, it didn't.  This baby died, and the sequence of

5    events, where the baby is apparently well and that, soon after,

6    is critically ill, and then follows a deteriorating pathway to

7    death, is completely consistent with overwhelming pneumococcal

8    sepsis.

9                    MR. COFFEY:  One minute, if I might, Judge.

10   That's all I have, Your Honor.

11                    THE COURT:  Ms. Book?

12                    MS. BOOK:  Thank you, Your Honor.

13   **CROSS-EXAMINATION**

14   **BY MS. BOOK:**

15       Q.   Hi, Dr. Klein.  I'm Christa Book.  I'm an Assistant

16   District Attorney here.  How are you?

17       A.   I'm good.  Thank you.

18       Q.   Good.  Okay.  Now, I'm going to ask you a bunch of

19   questions.  If you don't understand, just ask me to repeat.

20   Sometimes I talk too fast.  If I am, just tell me.  Okay?

21       A.   I will.

22       Q.   Is there a subspecialty for infectious disease, in

23   that is there a board certification for it?

24       A.   There is.

25       Q.   Okay.  So, you are not board certified in infectious

1    research regarding this case.  Do not request or accept

2    any payment in return for supplying information regarding

3    this case.  Do not make any judgments regarding this case

4    until you have heard all of the evidence and I have

5    instructed you as to the law.  And if anyone attempts to

6    improperly influence you, please report that directly to

7    me without first discussing it with anyone else.  We will

8    take a break until 4:10.

9                    (Brief recess taken.)

10                   (Whereupon, the jury entered the courtroom.)

11                   COURT OFFICER:  Jury is entering.

12                   THE COURT:  Please be seated.  The People may

13   call their next witness.

14                   MS. BOOK:  Thank you, Your Honor.  The People

15   call India Hicks.

16   INDIA HICKS, after first having been duly sworn by the Clerk of

17   the Court, was examined and testified as follows:

18                   THE CLERK:  The sworn witness is India Hicks,

19   H-I-C-K-S.

20                   THE COURT:  Are you okay?  Do you want to take a

21   minute?

22                   MS. BOOK:  Do you want to sit with your mom for

23   a minute?  You do?

24                   (Brief pause in proceedings.)

25                   MS. EFFMAN:  Do we need a recess, Judge?

Case 23-753, Document 63, 01/17/2024, 3604341, Page14 of 788

# APPENDIX

*(I. Hicks - People - Direct)*                                    934

1      MS. EFFMAN:  Objection as to time frame, Judge.

2      MS. BOOK:  I'm going there now, Your Honor.

3      THE COURT:  Overruled.

4  Q.  Okay.  Did you ever see Adrian Thomas putting M▆▆

5  in the crib in the week before he died?

6  A.  The week before, the same week?

7  Q.  I'm sorry?

8  A.  The week before or the same week?

9  Q.  At any point during those two weeks?

10  A.  Yeah.

11  Q.  Was it the week before or the same week?

12  A.  When I saw him put the baby in the crib, it was the

13  same week.

14  Q.  The same week that M▆▆ died?

15  A.  Yes.

16  Q.  Okay, if you could talk up just a little bit louder

17  for me.  When you saw Adrian Thomas put M▆▆ in the crib the

18  week he died, can you tell me how he put him in the crib?

19  A.  Uh-huh.

20  Q.  How did he do it?

21  A.  He put him in the crib hard.

22  Q.  And what do you mean by hard?

23  A.  Like the baby's head bounced a little bit.

24  Q.  Did he put him all the way down to the crib and let

25  him go, or did he let go of him before he got to the bottom of

Judy A. DelCogliano
*Official Senior Court Reporter*

Case 23-753, Document 63, 01/17/2024, 3604341, Page15 of 788

APPENDIX   1929      935

(I. Hicks - People - Direct)

1    the crib?

2              MS. EFFMAN:  Objection, leading, Judge.

3              THE COURT:  Sustained, although I will grant her

4         some leeway with this witness.

5         Q.   India, can you tell me how he put him in the crib

6    exactly?

7         A.   He, like, right before, like -- it was like a few

8    inches, like, before he put the baby inside the crib, and then

9    he just let him go and his head bounced down.

10        Q.   How did M_____'s head bounce?

11        A.   Like that, and went down really hard (indicating).

12        Q.   And when he put him in the crib, did he put him down

13   hard or soft?

14             MS. EFFMAN:  Objection, leading.

15             THE COURT:  Overruled.

16        Q.   What did you say, India?

17        A.   He put him down hard.

18        Q.   Okay.  Now, do you remember -- how did M_____ -- how

19   was M_____ after he put him down in the crib?

20        A.   Like after he put him down, like, M_____, like, he

21   was, like, really -- he, like, started screaming really loud.

22   He was crying.

23        Q.   And how long did he cry for?

24        A.   Only, like, for a few minutes; like one minute or

25   two.

MA          30 20  India   ic  s
A
R      AIM

A  RIA    MA  ,

laimant,

laim  o.   28055

A            R ,

e endant.

I I        I  IA  I

A           o  em er 30, 2020

IM       0   7 a.m. to   5   a.m.

e

1          MA          30 20  India  ic  s
2
3       I          R              I
4   I   IA  I       worn
5     irect    amination   Ms.   ala rese        5
6   ross   amination   Mr.  lein          3
7   Redirect   amination   Ms.  ala rese
   Recross   amination   Mr.  lein          55
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1          MA          30 20  India   ic  s
2
3   A   ARA
4       R    AIMA
5     AI  ,
6         R     A     ,   .
7   R  IA          R,   .
8     i e ine  est  la a,  uite 507
   Al an  ,  ew  or   2205
9
10
11       R    I ,  .,
       R    I ,   .
12
13   305   roadwa  ,  uite  00,
   ew  or  ,  ew  or  0007
14
15
16   R                  I          R  A   A  R         RA
17       RI  I A A  A  R   , A.A. .
18     e  apitol
   Al an  ,  ew  or   222
19
20
21
22
23
24
25

1          MA          30 20  India   ic  s
2            I    A  I
3       I  I    R      I  A   A   A  R      and
4     etween t e  attorne s  or t e respecti e parties  ereto as
5     ollows
6         A  t e  ilin  o  t e transcript o t e
7   testimon   in t e   ount   ler 's o  ice e wai ed
8         A  all o  ections to   uestions e cept as to
9   t e  orm t ereo  e reser ed until t e time o  trial  and
10         A  t e transcript o  testimon  ma  e si ned
11    e ore an   otar   u lic or ot er o  icer aut ori ed to
12   administer oat s.
13
14
15
16
17
18
19
20
21
22
23
24
25

| | |
|---|---|
| 1       MA          30 20  India  ic  s | 1       MA          30 20  India  ic  s |
| 2       A.    ont' .  I  I was  ei  t  ears | 2    e  actl .   e was upset  ecause  e alwa s lost  is |
| 3   old. | 3    o  es, and   e couldn t  et a o .   e would  e |
| 4           .   i  t, o a .  And  es, ei  t and | 4   upset and come  ac  and do t  in  s to us. And t en |
| 5   a  al .  orr . | 5    one da  m  mom  ad told  im to lea  e me alone and  e |
| 6        A.  It's o a . | 6   alwa s used to tell  e  e did not want t em  a ies. |
| 7          .  I'm reall   ad wit  mat .   a . | 7   I would   et up in t e middle o t e ni  t to  et t em |
| 8    o  ou were ei  t and a  al  ears old and do  ou | 8   mil  and I remem er t and one ni  t I was so tired. |
| 9   remem er w ent  e twins were  orn | 9   And I loo ed across t e room, t e room was ri  t |
| 10       A.   es, I do. | 10   across  rom mine and  e  ust t rew t e a  down into |
| 11          .  And do  ou remem er t e | 11   t e  ed.   e didn't do an t in  to  im.   e  ust |
| 12    ears leadin  up to w en t e twins were  orn | 12   t rew  im into t e  ed.  And M[redacted] didn't do |
| 13       A.   ea . | 13   an t in  to an od .   e was  ust a a . |
| 14          .   a .  I'd li  e  ou to tal  wit | 14          .   ou remem er  ow close in time |
| 15   me a out   t e  e apartment t  ou were li in | 15   to w en M[redacted] died t at at  appened |
| 16   in w ent  e twins were  orn, do  ou remem er w ere it | 16       A.   es, t at was a out two wee s |
| 17   was located | 17    e ore,  ecause I remem er M[redacted]  ad e ers.   e |
| 18       A.   ea , it was, i  I'm not | 18    ad  ad e ers and  e was  ettin   oils on  is  ace. |
| 19   mista en, it was 2    irst   treet, it was t e   edar | 19   And t at was pro a l   rom t e  luid on  is  ace. |
| 20    ar  Apartments, apartment | 20    rom a  in   a  s a in s ndrome. M  mot er told |
| 21          .  And w en  ou were li in | 21   Adrian s e wanted to   rin  t e a  to t e  ospital, |
| 22   at t e  edar   ar  Apartments, apartment  , can  ou | 22   and  e re used. I remem er it clear as da  . It |
| 23   descri e w at  our relations ip wit  Adrian was li  e | 23   repla s in m  mind all t e time. |
| 24       A.  It was terri le.   e  eat me all | 24          .   ow o t er t an t e time t at |
| 25   t e time  ecause I wasn't  is c ild.  e molested. | 25    ou're descri in , two wee s  e ore M[redacted] died, did |
| Page 9 | Page 11 |

| | |
|---|---|
| 1       MA          30 20  India  ic  s | 1       MA          30 20  India  ic  s |
| 2   M  mot er  new,  ou  now. I  ad a  er   ard | 2    ou e er see  im interact in t at wa  wit  M[redacted] |
| 3    c ild ood.   e made it  er   ard and  e claimed  e | 3    ot er t an t at at time |
| 4    lo ed us.   e did not lo e us. I witnessed  im slam | 4       A.   es.   e would s ue t e |
| 5   m  rot er a ainst t e cri . I witnessed it.   e | 5    a ies.   e would s ue t e ot o t em.   is was |
| 6   admitted to it.   is is not ri t. | 6   li  e  somet in 's wron  wit   im.  ust  or no |
| 7          .   a et's ta e a moment India. | 7   reason. I don t understand. |
| 8       A.   et some water | 8          .  And w ere would  e put  is  ands |
| 9        ood.   et some water.  ell me | 9   on, on M[redacted] and M[redacted] w en  e would s ue e |
| 10   w en  ou're read .  a e  our time. | 10   t em |
| 11       A.  I'm read  to  o. | 11       A.   i e li e, ri t  ere.  i e |
| 12          .   o  ou  ust tal ed a out a | 12    on t eir  i s. |
| 13   lot o  in ormation t at we  a e to  o t rou  , o a . | 13          .   a , so  or t e record  ou're |
| 14   I at an  point in time  ou need a  rea ,  ou tell | 14   usin   our  and to point to t e area o   our stomac |
| 15   me, we're  onna ta e a  rea  or  ower  or lon   ou | 15   around  our waist |
| 16   need, o a .   ut I'm not  oin  to  now t at  ou need | 16       A.   es.  i er i t  ere. |
| 17   a  rea  unless  ou tell me, o a . | 17          .   our  i s |
| 18       A.   a . I will tell  ou. | 18       A.   ea ,  a o e li e t eir c est. |
| 19          .   a .   an  ou.  o  ou said | 19   Ri t near t eir c est,  e would s ue e. |
| 20   t at  ou witnessed  im do somet in  wit    wit t e | 20          .  And  ow o ten did  ou see |
| 21    a .  Are  ou tal in  a out M[redacted] | 21    im do t at to M[redacted] |
| 22       A.   es. | 22       A.   er o ten.   e would  ust  et |
| 23          .   a , tell me   we'll start | 23   mad and do cra   t in s. |
| 24   t ere.   ell me a out t at. | 24          .  And w at else did  ou |
| 25       A.   a . I remem er t e da | 25    o see  im do to M[redacted] |
| Page 10 | Page 12 |

# APPENDIX                                                    1932

1    STATE OF NEW YORK

2    COUNTY COURT                    COUNTY OF RENSSELAER

3    - - - - - - - - - - - - - - - - - - - - - - - - - - X

4    THE PEOPLE OF THE STATE OF NEW YORK

5    - against -                     Indictment #08-1074

6    ADRIAN THOMAS,

7              Defendant.

8    - - - - - - - - - - - - - - - - - - - - - - - - - - X

9    ***JURY TRIAL - VOLUME III***

10                              County Courthouse
                                Congress and Second Streets
11                              Troy, New York 12180
                                June 2, 2014.
12

13   B e f o r e :

14            HONORABLE ANDREW G. CERESIA,
              County Court Judge.

15   A p p e a r a n c e s :

16                    **For the People:**
                      ARTHUR F. GLASS JR., ESQ., Acting District
17                    Attorney, Rensselaer County,
                      By:  CHRISTA M. BOOK, ESQ., and KELLY L. EGAN,
18                    ESQ., Assistant District Attorneys, of counsel,
                      Rensselaer County Courthouse,
19                    Troy, New York.

20                    **For the Defendant:**
                      STEPHEN R. COFFEY, ESQ.
21                    54 State Street
                      Albany, New York.
22
                      JOHN C. TURI, ESQ., Public Defender,
23                    Rensselaer County, and ARTHUR R. FROST, ESQ.,
                      Assistant Public Defender, of counsel,
24                    Rensselaer County Courthouse,
                      Troy, New York.
25
                      ADRIAN THOMAS, Defendant, in person.

**Judy A. DelCogliano**
**Official Senior Court Reporter**

# APPENDIX

1933

144

1

## INDEX TO WITNESSES

2

3

4

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

5

6

7 For the People:

8

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| 9 MICHAEL BAYLY | 152 | 168 | 171 | |
| 10 KATRINA KARDOS | 173 | 206 | 233 & 241 | 238 & 242 |
| 11 IFEOMA OJUKWU | 247 | 265 | 280 | 284 |
| 12 WILLIAM TERRY | 306 | 316 | 370 & 379 | 376 |

13

14

15

16

17

18

19

20

21

22

23

24

25

Case Case 17-cv-00626 DJS Document 158-32 Filed 09/20/21 Page 8 of 10

1    Q.   Did you perform any other tests on M_____?

2    A.   We did a chest x-ray, blood work.  I believe that's

3    all.

4    Q.   Did the blood work show his white blood cell count?

5    A.   Yes.

6    Q.   Do you recall what that was?

7    A.   Yes.  It was 1.0.

8    Q.   Now, is that a normal white blood cell level for his

9    age?

10   A.   No, it's low.

11   Q.   Did the blood work show his platelet count?

12   A.   Yes.

13   Q.   And what was that?

14   A.   115,000.

15   Q.   Is that a normal level for his age?

16   A.   It's slightly low.

17   Q.   Now, what is DIC?

18   A.   DIC is a condition -- the letters stands for

19   disseminated intravascular coagulation.  It's a condition in

20   which the proteins in your body that help to control clotting

21   get used up rapidly.  As a result, you can get small clots that

22   can form in various parts of your body.  And as it progresses,

23   when the proteins that cause clotting get used up, you can

24   actually then bleed more excessively.

25   Q.   What are signs of DIC?  Let me rephrase that.  What

Case 1:17-cv-00626-DJS Document 158-33 Filed 09/20/22 Page 48 of 10

(Kardos - People - Cross)

1      Q.   Agreed.  So, when you take the blood at 9:13 or the

2    blood is taken, whatever testing of that blood is done at 9:13,

3    M▮▮▮▮▮ remained in the hospital for about two hours after

4    that; right?

5       A.   Yes.

6       Q.   So, anything that's going on in his blood that may

7    surface after 9:13 or 9:15, it's not going to be picked up

8    unless there's another blood test; correct?

9       A.   Yes.

10      Q.   Do you agree with me?

11      A.   Yes.

12      Q.   Again, are you hesitant about this or not?

13      A.   No.  I'm just trying to make sure I understand your

14    question.

15      Q.   Well, if you take my blood right now, it will take

16    whatever cells, whatever disease or bacteria I have; right?

17      A.   Yes.

18      Q.   But if at 12 o'clock, if there's a process going on

19    and something happened between 11:30 and 12:00, it won't pick

20    that up; correct?

21      A.   Correct.

22      Q.   So, therefore, if this baby were bleeding out after

23    9:15, this blood test would not pick that up; would it?

24      A.   No, it would not.

25      Q.   So, if this baby -- by the way, you learned later,

(Kardos - People - Cross)

1    didn't you, that he developed a disseminated intravascular

2    coagulopathy.  You learned that; didn't you?

3         A.    That I did not learn, no.

4         Q.    If I were to tell you that the Albany Medical Center

5    records reflect that, would you agree?  You wouldn't have any

6    reason to dispute that; would you?

7         A.    No.

8         Q.    And with regard to DIC -- disseminated means

9    throughout his body; correct?

10        A.    Correct.

11        Q.    And when a child or a person gets disseminated

12   intravascular coagulopathy, that bleeding occurs all through

13   the body; doesn't it?

14        A.    Typically.

15        Q.    It goes in the heart, the brain, the testes for a

16   boy?  Everywhere that that blood can't clot, that's where it's

17   bleeding; correct?

18        A.    I believe so.

19        Q.    Well, you told us before --

20        A.    I gave you the definition of DIC.  I actually don't

21   see that in the Emergency Department record because it's a

22   later finding.

23        Q.    Fair enough.  In any event, generally speaking, DIC

24   is when the blood doesn't clot and a person -- and I'm not

25   being demeaning to anyone.  The person is actually bleeding

(Kardos - People - Cross)

1    out; correct?

2         A.   First they clot too much.   Once those proteins are

3    used up, they have the inability to clot because they no longer

4    have the protein.

5         Q.   When they infarct too much -- do you know what

6    infarct is?

7         A.   Yes.

8         Q.   Can that create infarct?

9         A.   Yes.

10        Q.   And that's -- that can be a blockage of tissue;

11   correct?

12        A.   An infarct is when an area of tissue doesn't have

13   enough blood supply and the cells begin to die.

14        Q.   DIC is a very, very serious complication; isn't it?

15        A.   Yes.

16        Q.   And that blood, if it's bleeding, to your knowledge,

17   the person can bleed in the brain, correct, because it's not

18   clotting properly; right?

19        A.   Correct.

20        Q.   So, when you say that he did not have DIC, all you

21   are saying is that the 9:13 blood test didn't pick it up at

22   that point; correct?

23        A.   Yes.

24        Q.   But the 9:13 test that you did take did show a series

25   of very serious problems with him; correct?

Case Case:12-cv-00626-DJS Document 1-33-1 Filed 09/20/12 Page 8 of 10

1    A.  Yes.

2    Q.  Now, what happens when your body gets septic shock?

3    A.  You have many inflammatory mediators released, toxins

4    get released and they start to infect all different organs in

5    your body.

6    Q.  And you came up with a provisional diagnosis;

7    correct?

8    A.  Yes.

9    Q.  And tell us again what a provisional diagnosis is?

10   A.  It's a diagnosis that we come up with in the

11   Emergency Department when we have only limited time and limited

12   data to work with.

13   Q.  All right.  Now, your provisional diagnosis for this

14   baby was respiratory failure, leukopenia, hypotension,

15   tachycardia and brachycardia; correct?

16   A.  Yes.

17   Q.  And these conditions, are they caused by sepsis?

18   A.  Yes.

19   Q.  You found no evidence whatsoever, from your analysis

20   or your review - and I understand you were preliminary - of any

21   trauma to this baby; correct?

22   A.  Correct.

23   Q.  And Doctor, is it true that the likely cause of this

24   baby's problems was sepsis?

25   A.  Yes.

Case Case 1:17-cv-00626-DJS-Document 356-12 Filed 09/20/21 Page 8 of 10

1    Q.   So, as you sit here today, you would agree that the

2    likely cause of his problems was sepsis; correct?

3    A.   With the information that I had that day, yes,

4    absolutely.

5    Q.   Well, as you sit here today, you agree that the

6    likely cause was sepsis; correct?

7    A.   Yes.

8    Q.   Now, do you know what Gram staining is?

9    A.   Yes.

10   Q.   What does it mean to Gram stain something?

11   A.   It's when you take, in this case, the patient's blood

12   and you use different kinds of dye to see if you can identify

13   the presence or absence of bacteria in different cells.

14   Q.   And what is bacteremia?

15   A.   Bacteremia?  The presence of bacteria in the blood.

16   Q.   And how does bacteria get in the blood?

17   A.   Through a break in the skin or the mucosal surface of

18   the body.

19   Q.   So -- and bacteria -- let me ask you a little bit

20   about this in terms of -- I use the word pyramid.  You take

21   kids in a day care center or, say, a class of 20 kids.  A bunch

22   of those kids will have some kind of a staphylococcal

23   pneumonia; right?

24   A.   Staphylococcal is a common pneumonia.

25   Q.   That's a common bacteria; correct?

1    talking to me, that would be subjective; correct?

2        A.   Subjective, correct.

3        Q.   Now, there were·no objective signs at all that you

4    found of any trauma to this baby; correct?

5        A.   Correct.

6        Q.   The history of the diarrhea that you received from

7    Mom was within·the last two or three days; correct?

8        A.   Correct.

9        Q.   In fact, in your report or in the medical report,

10    it's specific, two or three days; correct?

11        A.   Correct.

12        Q.   You wouldn't have guessed at that.  That's what she

13    told you; correct?

14        A.   If I could look at it again.  I documented what she

15    told me.

16        Q.   Sure.

17        A.   I have that the mom states the patient has been

18    having diarrhea for, quote, a few days.

19        Q.   All right.  Let me -- I'm going to show you what's

20    part of Exhibit Number 8, "diarrhea for two or three days."

21    See the "two or three days"?

22        A.   That's the nursing documentation.

23        Q.   That's not the history provided to you?

24        A.   No.  That is what the nurse received.  This is what I

25    received.

Case 1:17-cr-00626-DWC Document 41-11 Filed 09/20/2022 Page 16 of 10

1    Q.   Okay.  You list a provisional diagnosis of

2  respiratory failure, leukopenia, hypotension, tachycardia and

3  bradycardia; correct?

4    A.   Yes.

5    Q.   Now, is a provisional diagnosis more defined than a

6  differential diagnosis?

7    A.   Yes.

8    Q.   It is; correct?

9    A.   Correct.

10   Q.   You have more information at that point?

11   A.   It's based on the data that I have at that point.

12   Q.   So, when M█████ left the hospital, that was your

13  diagnosis at that point; correct?

14   A.   Correct.

15   Q.   And all of those things were consistent with septic

16  shock; right?

17   A.   Correct.

18              MR. COFFEY:  One minute, if I might.  That's all

19        I have, Judge.  I have something I want to address with

20        you later, but that's all I have at this point.

21              THE COURT:  Ms. Egan, any redirect?

22              MS. EGAN:  Yes, Your Honor.

23  **REDIRECT EXAMINATION**

24  **BY MS. EGAN:**

25   Q.   I'm just going to grab Exhibit 7 and 8.  Dr. Kardos,

1    STATE OF NEW YORK

2    COUNTY COURT            COUNTY OF RENSSELAER

3    - - - - - - - - - - - - - - - - - - - - - - - - - - - X

4    THE PEOPLE OF THE STATE OF NEW YORK

5    - against -                 Indictment #08-1074

6    ADRIAN THOMAS,

7            Defendant.

8    - - - - - - - - - - - - - - - - - - - - - - - - - - - X

9    *JURY TRIAL - VOLUME V*

10                               County Courthouse
                                 Congress and Second Streets
11                               Troy, New York 12180
                                 October 5, 2009.
12   B e f o r e:

13           HONORABLE ANDREW G. CERESIA,
14           County Court Judge.

.15  A p p e a r a n c e s:

16

17           **For the People:**
             RICHARD J. MC NALLY, JR., ESQ.,
             District Attorney, Rensselaer County,
18           By:  ARTHUR F. GLASS, JR., ESQ.,
             and CHRISTA M. BOOK, ESQ., Assistant
19           District Attorneys, of counsel,
             Rensselaer County Courthouse,
20           Troy, New York.

21           **For the Defendant:**
             JEROME K. FROST, ESQ.,
22           Public Defender, Rensselaer County,
             and INGRID EFFMAN, ESQ., Assistant Public
23           Defender, of counsel,
             Rensselaer County Courthouse,
24           Troy, New York.

25           ADRIAN THOMAS, Defendant, in person.

*Judy A. DelCogliano*
*Official Senior Court Reporter*

# APPENDIX

948

### INDEX TO WITNESSES

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **For the People:** | | | | |
| WALTER EDGE | 954 | 981 | 1018 | 1029 |
| RONALD FOUNTAIN | 1044 | 1073 | 1119 | 1122 |
| ADAM MASON | 1127 | | | |

### INDEX TO EXHIBITS

|  |  | Identification | Evidence |
|---|---|---|---|
| **For the People:** | | | |
| 11. | Albany Medical Center Hospital Records | 970 | 1028 |
| 12. | Albany Medical Center Hospital Records | 1028 | 1028 |
| 13. | Albany Medical Center Hospital Records | 1028 | 1028 |
| 14. | Miranda Rights Form | 1043 | 1070 |
| 15. | Deposition of Witness | 1043 | 1070 |
| 16. | Miranda Rights Form | 1127 | |

*Judy A. DelCogliano*
*Official Senior Court Reporter*

Case 23-753, Document 63, 01/17/2024, 3604341, Page30 of 788

APPENDIX    1944

(Edge - People - Cross)    999

1    A.    Yes.

2    Q.    You noted in your report and in your testimony, too,

3    that this child was suffering from coagulopathy; right, Doctor?

4    A.    Yes.

5    Q.    And that means problems with blood clotting; right?

6    A.    Yes.

7    Q.    And when you have coagulopathy problems, that can

8    cause bleeding into -- bleeding into several different parts of

9    your body; correct?

10    A.    Yes.

11    Q.    Are you aware that the autopsy report showed or

12    indicates that this child had bleeding in the testes, bleeding

13    in the myocardium and bleeding in several cavities of his body?

14    A.    Yes.

15    Q.    Coagulopathy can be caused by sepsis; correct?

16    A.    Yes.

17    Q.    In your transfer discharge summary, Doctor, that you

18    signed off on, it was noted this child was suffering

19    respiratory wise from ARDS symptoms.  Is that correct?

20    A.    Yes.

21    Q.    And ARDS stands for acute respiratory distress

22    syndrome; right, Doctor?

23    A.    Yes.

24    Q.    Isn't the most common cause of acute respiratory

25    distress sepsis?

Judy A. DelCogliano
Official Senior Court Reporter

```
 1   STATE OF NEW YORK

 2   COUNTY COURT            COUNTY OF RENSSELAER

 3   - - - - - - - - - - - - - - - - - - - - - - - - X

 4   THE PEOPLE OF THE STATE OF NEW YORK

 5   - against -              Indictment #08-1074

 6   ADRIAN THOMAS,

 7           Defendant.

 8   - - - - - - - - - - - - - - - - - - - - - - - - X

 9   JURY TRIAL - VOLUME VII

10                          County Courthouse
                            Congress and Second Streets
11                          Troy, New York 12180
                            June 6, 2014.
12
     B e f o r e :
13
             HONORABLE ANDREW G. CERESIA,
14           County Court Judge.

15   A p p e a r a n c e s :

16           For the People:
             ARTHUR F. GLASS JR., ESQ., Acting District
17           Attorney, Rensselaer County,
             By:  CHRISTA M. BOOK, ESQ., and KELLY L. EGAN,
18           ESQ., Assistant District Attorneys, of counsel,
             Rensselaer County Courthouse,
19           Troy, New York.

20           For the Defendant:
             STEPHEN R. COFFEY, ESQ.
21           54 State Street
             Albany, New York.
22
             JOHN C. TURI, ESQ., Public Defender,
23           Rensselaer County, and ARTHUR R. FROST, ESQ.,
             Assistant Public Defender, of counsel,
24           Rensselaer County Courthouse,
             Troy, New York.
25
             ADRIAN THOMAS, Defendant, in person.
```

1                 **INDEX TO WITNESSES**

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **For the Defendant:** | | | | |
| JEROME O. KLEIN | | 997 | 1016 | |
| JAN EDWARD LEESTMA | 1038 | 1088 | 1139 | 1143 |
| (Voir Dire – 1048, 1052) | | | | |

                **INDEX TO EXHIBITS**

| | Identification | Evidence |
|---|---|---|
| **For the People:** | | |
| 26.  Photograph | 1135 | 1136 |
| **For the Defendant:** | | |
| H.  Documents | 1046 | |
| I.  CD | 1046 | 1049 |

1    in, please.

2              COURT OFFICER:  All rise.  Jury entering.

3              THE COURT:  Please be seated.  The sworn witness

4    remains Jan Leestma.  Doctor, I will remind you that you

5    are still under oath.  Mr. Coffey, you may proceed.

6              MR. COFFEY:  Thank you, Judge.

7    Q.   Doctor --

8    A.   Yes.

9    Q.   I want to ask you -- and I'm not going to go back to

10   the slides.  You have done that, and we appreciate that.  Tell

11   me:  Do you have an opinion, based upon a reasonable degree of

12   medical certainty - I'm not going to repeat that phrase in

13   every sentence but - as to this baby's cause of death?

14   A.   Yes.

15   Q.   And what is that opinion?

16   A.   The baby died from the effects of bacterial sepsis

17   from shock.

18   Q.   Dr. Sikirica, who was in the courtroom, indicated

19   that, in his opinion, M█████ died from a subdural or from

20   trauma.  Do you agree with that?

21   A.   A contributing cause.  There clearly was a subdural

22   fluid collection which imposed some stress on the brain.  And I

23   guess when we are listing something in a death certificate or a

24   report, we would put bacterial sepsis and so forth first, and

25   contributing cause would be intracranial pressure due to the

Case 1:17-cv-00626-DJS Document 155-37 Filed 09/20/23 Page 34 of 11

1  UNITED STATES DISTRICT COURT
   NORTHERN DISTRICT OF NEW YORK
2  - - - - - - - - - - - - - - - - - - - - - - - - - - -

3  ADRIAN THOMAS,

4                      Plaintiff,

5             - against -

6  CITY OF TROY, ADAM R. MASON, RONALD FOUNTAIN,
   TIM COLANERI,
7  RENSSELAER COUNTY, and MICHAEL SIKIRICA,

8                      Defendants.
   - - - - - - - - - - - - - - - - - - - - - - - - - - -
9  NEW YORK STATE
   COURT OF CLAIMS
10 - - - - - - - - - - - - - - - - - - - - - - - - - - -

11 ADRIAN P. THOMAS,

12                     Claimant,

13            - against -

14 THE STATE OF NEW YORK,

15                     Defendant.
   - - - - - - - - - - - - - - - - - - - - - - - - - - -

16

17             DEPOSITION of Non-Party Witness, JASPER

18 ESTARIS, held on the 21st day of August 2019, commencing

19 at 2:36 p.m., at the Law Offices of Bailey, Johnson &

20 Peck, P.C., 5 Pine West Plaza, Washington Avenue

21 Extension, Albany, New York 12205, before Jeanne

22 O'Connell, Registered Professional Reporter and Notary

23 Public in and for the State of New York.

# APPENDIX

**1949**

2

```
1   APPEARANCES:

2   Brett H. Klein, Esq.
    305 Broadway
3   Suite 600
    New York, New York  10007
4   Attorney for Plaintiff/Claimant

5   Pattison Sampson Ginsberg & Griffin, PLLC
    22 First Street
6   Troy, New York  12180
    By:  Joseph T. Perkins, Esq.
7   Attorneys for City of Troy, Adam R. Mason,
    Ronald Fountain and Tim Colaneri
8
    Bailey, Johnson & Peck, P.C.
9   5 Pine West Plaza
    Washington Avenue Extension
10  Albany, New York 12205
    By:  Crystal R. Peck, Esq.
11  Attorneys for Michael Sikirica

12  New York State Office of the Attorney General
    The Capitol
13  Albany, New York 12224
    By:  Christina M. Calabrese, Assistant Attorney General
14
    Also present:  Katherine Hamilton
15

16

17

18

19

20

21

22

23
```

```
 1              (Jasper Estaris - by Mr. Klein)

 2      Q.   So, Mr. Estaris, do you remember, at the time

 3   Mr. Thomas -- you did this interview of him, you had

 4   reason to know that he was facing charges involving his

 5   alleged commission of the death of his child, correct?

 6      A.   Yes.

 7              (Thomas Exhibit 1 marked for

 8         identification.)

 9   BY MR. KLEIN:

10      Q.   Before going into the meeting, did you have a

11   preinterview meeting with anyone in your office --

12      A.   No.

13      Q.   If you could just give me a second or so after

14   the question before you answer so the reporter can get

15   it down, okay?

16      A.   No.

17      Q.   Did anyone at any time, either that day of your

18   interview of Mr. Thomas or the day or days before,

19   advise you to ask him if he wanted an attorney present

20   during your interview with him?

21      A.   No.

22      Q.   You said you informed him of the death of his

23   child, correct?
```

```
 1                (Jasper Estaris - by Mr. Klein)

 2      A.  Yes.

 3      Q.  Do you believe you were the first person to tell

 4   him?

 5      A.  At that time, yes.

 6      Q.  What did you tell him, just that his son passed

 7   away?

 8      A.  I'm sorry.  Your son passed away.

 9      Q.  Did you tell him that before you asked him any

10   questions, or did you ask him questions about the

11   situation with M███████  first?

12      A.  No.  I told him before that.

13      Q.  And what was -- you said, I think, a couple

14   things, that he was comfortable, and that he wasn't

15   cuffed, and things like that, correct?

16      A.  Yes.

17      Q.  But you also said that he was distraught, right?

18      A.  Yes.

19      Q.  Did he become distraught when you told him his

20   son passed away?

21      A.  Yes.

22      Q.  Did he appear to be genuinely distraught at the

23   passing of his son?
```

```
 1                 (Jasper Estaris - by Mr. Klein)

 2      A.   Yes.

 3      Q.   When you say he was distraught, was he

 4  hysterically crying or sobbing or something else?

 5      A.   He was crying.

 6      Q.   I think you said you had tissues for him -- which

 7  was very nice of you -- correct?

 8      A.   Yes.

 9      Q.   For how long was he crying for before you were

10  able to speak with him and he was able to gain his

11  composure?

12      A.   I can't really recall the amount of minutes.

13  But, once he got his composure, we were able to conduct

14  the interview.

15      Q.   Did you offer to give him some time, given that

16  you just told him that his son died, to collect his

17  thoughts and speak with his counsel, now that this is,

18  in his mind, a new development --

19      A.   No.  We --

20                MS. PECK:  Objection to form.

21                MR. KLEIN:  I didn't finish the

22           question.

23                MS. PECK:  I thought you were done.
```

```
 1              (Jasper Estaris - by Mr. Klein)
 2   BY MR. KLEIN:
 3       Q.  Did you offer to -- given this development, given
 4   what you just told him, did you offer to give him time
 5   to either gather his thoughts before you interviewed him
 6   or to speak with his counsel or anyone else he wanted
 7   to?
 8       A.  We gave him some time to just relax.
 9       Q.  In your presence.
10       A.  Yes.
11       Q.  When you say in your presence, when I say in your
12   presence, I mean, your testimony is that your colleague
13   was with you?
14       A.  Kelly Barry was with me.
15       Q.  Do you have an independent recollection of her
16   being present for the interview with Adrian Thomas at
17   the time of the interview?
18       A.  Yes.
19       Q.  When you say the law library, where were you?
20           What was the layout of the law library?
21       A.  There was a table.  Adrian was there and the two
22   of us were here.
23       Q.  When you say that there was a table, were you on
```

```
 1                 (Jasper Estaris - by Mr. Klein)

 2    the opposite side of the table of Adrian?

 3        A.  Yes.

 4        Q.  Where was Kelly?

 5        A.  Beside me.

 6        Q.  Was she sitting even with you, or was she at some

 7    location behind you, or somewhere else in the room?

 8        A.  We were even.

 9        Q.  Was she with you during the entire interview,

10    including when you told Adrian that his son had passed,

11    or just a part of it?

12        A.  For the whole thing.

13        Q.  How long did that meeting last?

14        A.  I can't recall how long.

15        Q.  Do you know if it was minutes, hours, days?

16        A.  It was, I believe, close to an hour.

17        Q.  During that time of this interview, did you ever

18    offer or think to offer Adrian an opportunity to call an

19    attorney?

20        A.  No.

21                 MS. CALABRESE:  I'm sorry.  Can you

22            repeat that question and answer?

23                    (Question and answer repeated by
```

```
 1              (Jasper Estaris - by Mr. Klein)

 2              THE WITNESS:  Yes.

 3  BY MR. KLEIN:

 4     Q.  And you said at some point he gained his

 5  composure so that you could interview him?

 6     A.  Yes.

 7     Q.  Once he gained his composure, did he at any other

 8  time after that break out in tears or become sobbing or

 9  historical, or was he in a calmer mood after that?

10     A.  Calmer mood.

11     Q.  Do you recall whether there were any other CPS,

12  county, Troy, or any other officials or persons in the

13  law library at the time you spoke with Adrian Thomas

14  that day?

15     A.  No.

16     Q.  Were there any --

17     A.  I mean, Kelly Barry.  I'm sorry.

18     Q.  Other than Kelly Barry.

19     A.  Okay.

20     Q.  Were there any, for instance, county jail

21  officers assigned to the library or librarians or

22  anything else?

23     A.  Not that I remember.  No.
```

```
 1              (Jasper Estaris - by Mr. Klein)

 2      Q.   Your recollection is that it was just the three

 3  of you in that room?

 4      A.   Yes.

 5      Q.   Do you recall if there were any CCTV or other

 6  video surveillance equipment apparently in the room,

 7  whether or not it worked?

 8      A.   I can't recall, I mean.

 9      Q.   Was your interview recorded in any manner other

10  than what you claim to be notes of Kelly Barry?

11      A.   No.

12      Q.   Going back to the August 18, '08 incident.

13           Do you recall when you became aware of that

14  incident?  In other words, was it on August 18, '08, or

15  was it a day or two after that?

16      A.   When I got the report?

17      Q.   Yeah.

18      A.   The report was the 19th, I believe.

19      Q.   Were you made aware of the report that same day?

20      A.   Yes.

21      Q.   What did you do in response to that report coming

22  in?

23      A.   Can I take a look at my progress notes?
```

1                  (Jasper Estaris - by Mr. Klein)

2      A.  I mean, I read what's being said.

3      Q.  And so, what is your understanding of what caused

4  his death?

5                  MS. PECK:  Objection.

6                  MR. PERKINS:  Objection to the form.

7                  MS. CALABRESE:  Object to the form.

8                  Obviously, he can answer if he knows.

9                  Calls for expert conclusion.

10                  MR. KLEIN:  No.  I'm just asking -- he

11          said he read what was said.

12  BY MR. KLEIN:

13      Q.  So what did you read, that it was a bacterial

14  infection?

15      A.  I read that part.

16      Q.  But you just know what you read.  You don't know

17  either way --

18      A.  No, I don't.

19      Q.  You don't know whether trauma caused his death or

20  whether a bacterial infection caused his death.

21          You just conducted some interviews, correct?

22      A.  Right.

23      Q.  Your claim is that Mr. Thomas described about

1           (Jasper Estaris - by Mr. Klein)

2   four incidents, starting 10 or 15 days before M█████

3   going into the hospital, up until the morning of the

4   hospital, where he either threw M█████ on a bed or

5   bumped his head into M█████ on a bed, in sum and

6   substance, correct?

7       A.  Yes.

8           MS. PECK:  Objection to form.

9   BY MR. KLEIN:

10      Q.  You don't know whether those claims that are set

11  forth in Ms. Kelly's notes --

12      A.  Kelly Barry.

13      Q.  Ms. Barry's notes.

14          You don't whether those notes -- what's stated in

15  those notes, those incidents, whether they actually

16  happened or not, do you?

17          That's just what you claim you were told,

18  correct?

19              MS. PECK:  Objection to form.

20              THE WITNESS:  That's what Adrian told

21      me.

22  BY MR. KLEIN:

23      Q.  So, prior to going there that day, did you have

# APPENDIX

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

ADRIAN THOMAS,

                         Plaintiff,

                -against-

ADAM R. MASON, RONALD FOUNTAIN,
TIM COLANERI, and MICHAEL SIKIRICA,

                       Defendants.

_____

**ATTORNEY REPLY
DECLARATION**
Civil Action No.: 1:17-cv-626
(GTS/DJS)

**RHIANNON I. SPENCER, ESQ.**, under penalty of perjury, sets forth the following:

1.      I am an attorney duly licensed and admitted to practice in all Courts of the State of New York and I am admitted to practice in the United States District Court for the Northern District of New York.  I am employed by the law firm of Pattison, Sampson Ginsberg & Griffin, PLLC who are the attorneys for the above-named defendants Adam R. Mason, Ronald Fountain and Tim Colaneri (hereinafter referred to as the "City defendants").

2.      I submit this Reply Declaration, together with the accompanying Memorandum of Law in reply to the Plaintiff's Opposition to the City Defendants' Motion for Summary Judgement, and the City Defendants' Objection and Response to Plaintiff's purported Local Rule 56.1 Counter Statement.

3.      First, as argued in the accompanying Reply Memorandum of Law and in response to Plaintiff's purported Local Rule 56.1 Counter Statement, such submission is completely improper and fails to comply with the Local Rules. Based upon such failure to comply with the Local Rules, the Court ought to reject to consider the same.

4.     Next, Plaintiff basis a majority of his opposition to summary judgment upon the assertion that the Court must find that a question of *material* fact exists "regarding whether the entire narrative that a murder had occurred in the first was place was engineered by the TPD defendants, beginning with Fountain's false claim that Dr. Edge had told him that this was a murder, words Dr. Edge denied he would have ever uttered." (*See*, pg. 22 of E.C.F. Doc. No. 152).

5.     Critically though, such assertion is a misstatement because Dr. Edge <u>did not recall</u> whether he said verbatim "this is a murder" during a deposition some twelve years after the fact. (pp. 116, L. 14-18; 118, L. 21-24 of Edge EBT, Exhibit "F" to Spencer Moving Declaration).

6.     More importantly, whether Dr. Edge said verbatim the word "murder," or recalls saying such word, is irrelevant and does not support Plaintiff's assertion that a genuine issue of *material* fact exists.

7.     Irrespective of what words were precisely told to Defendant Fountain, Dr. Edge explicitly signed a witness deposition, one day after M.T. was admitted to AMC and before Plaintiff was interrogated the second time, that stated that Dr. Edge was concerned that M.T. was "a victim of child abuse" and that the injury that M.T. suffered, "typically is a high impact injury or other acceleration/ deceleration. This type of injury can be caused by very violent shaking or shaking and forced against a hard object." (Exhibit "B" to Mason Affidavit).

8.     Dr. Edge further stated, prior to Plaintiff's second interview, M.T. "also has brain swelling caused by severe trauma . . . [and] this type of injury could not have been caused by merely bumping [M.T.'s] head against a hard object, there needs to be severe acceleration prior to striking the hard object." (Id.).

9.     To accept Plaintiff's assertions that the City Defendants somehow engineered a

narrative regarding the injuries to M.T. would require this Court to find that there's a question of fact as to whether the City Defendants altered or manufactured such witness deposition that was obtained prior to Plaintiff's questioning.

10.     However, such finding would be in contravention to Dr. Edge's testimony that the "information that's contained in that deposition of a witness [is] accurate as far as [he] knows." (p. 66, L. 9-14, L. 24-p. 67, L. 9 of Exhibit "F" to Spencer Moving Declaration).

11.     Additionally, notations in M.T.'s medical records, which the police would not have had access to prior to Plaintiff's interview, confirm that the medical professionals or, at least Dr. Edge, were primarily concerned that such injuries to M.T. was criminal in nature, for example: on September 21, 2008, an entry at 14:03 (2:03PM, before the police even responded to the PICU at 2110): "Per MD, this is suspect injury." (AT 0220, attached as Exhibit "A" hereto).

12.     Furthermore, on September 22, 2008, another entry was made at 14:50, prior to Plaintiff's release from Samaritan Hospital and prior to his second interview, that stated "suspected child abuse." (Id.).

13.     It is submitted that the evidence in this matter defeats Plaintiff's assertion that the City Defendants somehow manufactured M.T.'s injuries.

14.     Additionally, in support of his assertion that a question of fact exits as to his conspiracy claim, the Plaintiff improperly distorted Dr. Sikirica's Testimony.

15.     For instance, the Plaintiff asserted that "Dr. Sikirica admitted that he omitted any mention of sepsis, despite his recognition of the presence of sepsis, because including the diagnosis would divert from his (and the TPD defendants') position that M.T. had died from trauma at the hands of Thomas." (E.C.F. Doc. No. 152, citing ¶¶69-73, 77-81 of his improper counter statement).

16.    Indeed, despite Plaintiff's Attorney's repeated attempts to get Dr. Sikirica to admit to such assertion, Dr. Sikirica repeatedly rebuffed such. Critical portions of Dr. Sikirica's testimony omitted by the Plaintiff, include:

Q. Do you feel that in retrospect you should have listed sepsis in the death certificate **as a contributing cause of death**? [emphasis supplied].

A. No.

Q. Why not?

A. Because I think it's confusing. I think it unnecessarily diverts the real cause of death from what is going to be the closed head injury with cerebral edema. [p. 209, L. 12-20 of Sikirica EBT attached as Exhibit "B" to Spencer Moving Declaration]

. . . . [p. 211, L. 4 of Sikirica EBT].  Q. Is that your understanding generally, a bacterial infection that caused the death?

A. That was an argument made by the defense that a bacterial infection did cause the death.

Q. Would it have been more transparent if you had put sepsis in your report?

[Sikirica]: A medical professional would have read my report and understood that the positive cultures indicated that he did have sepsis. I didn't use the word 'sepsis', but I did describe the positive cultures which are synonymous with sepsis.

Q. Well, I understood your answer before to be different, so correct me if I'm wrong. I thought the positive cultures are synonymous with streptococcus pneumoniae which is not in and of itself sepsis.

A. No. It is sepsis.

Q. So, strep –

A. Positive blood cultures are synonymous with either two things, bacteremia or sepsis.

Q. So streptococcus pneumoniae is bacteremia and sepsis both?

A. Streptococcus pneumoniae is the organism that was identified in his blood that was the cause of his sepsis that caused the blood to be infected with strep pneumoniae.

Q. So, given that that was the cause of his sepsis, saying he had streptococcus pneumoniae, does someone who has streptococcus pneumoniae necessarily have sepsis?

4

A. No.

Q. So, then, it would not be accurate that just putting the streptococcus pneumoniae in the report would lead someone to conclude that he had sepsis, is it?

A. If I said it was isolated from the blood it would be the same as saying he had sepsis.

Q. But you didn't say that.

A. Correct. I simply said it was isolated from the blood.

MS. CALABRESE: You did say that?

[Sikirica]: Streptococcus pneumoniae was isolated from the blood. Blood culture positive for streptococcus pneumoniae on initial presentation.

MS. PECK: So, you did say that.

[Sikirica]: I did say that it was in his blood. It is equivalent to sepsis.

BY MR. KLEIN: Q. That is the equivalent of saying he had sepsis?

A. Yeah. [p. 211, L. 4—p. 213, L. 9 of Sikirica EBT].

17.　　The Plaintiff's Opposition contains additional misrepresentations as to the facts in this matter which are disputed in the Defendants' detailed Reply to Plaintiff's Counter Statement.

18.　　Further, attached hereto as Exhibit "B" is copy of the criminal trial court's *Huntley* decision regarding Thomas' motion to suppress his statement.

19.　　Attached as Exhibits "C", "D" and "E" is a Copy of Defendant Fountain's, Defendant Mason's and Defendant Colaneri's deposition transcripts respectively.

Dated:　October 25, 2021.

Rhiannon I. Spencer, Esq.
**Pattison, Sampson, Ginsberg & Griffin, PLLC**
*Attorneys for Defendants, Adam R. Mason,*
*Ronald Fountain, and Tim Colaneri*
22 First Street - P. O. Box 208
Troy, New York 12181-0208

# Exhibit "A"



# ALBANY MED

DEPARTMENT – Health Information Services

43 New Scotland Avenue, MC-67, Albany, New York 12208-3497

P 518.262.3151
F 518.262.3624

This is a certification from Albany Med on the following patient:

Patient Name:
Medical Record #
Date of Birth:
Date Of Service:

The affiant is the duly authorized custodian or other qualified witness and has authority to make the certification;

1. To the best of the affiant's knowledge, after reasonable inquiry, the records or copies thereof are accurate versions of the documents described in the request that are in the possession, custody, or control of the person receiving the request;

2. To the best of the affiant's knowledge, after reasonable inquiry, the records or copies produced represent all the documents described in the request, or if they do not represent a complete set of the documents requested, an explanation of which documents are missing and a reason for their absence is provided; and

3. The records or copies produced were made by the personnel or staff of the business, or persons acting under their control, in the regular course of business, at the time of the act, transaction, occurrence or event recorded therein, or within a reasonable time thereafter, and that is was the regular course of business to make such records.

NAME     Susan Riley     *Susan Riley*
Title        Asa V11
Health Information Services
Albany Med
Sworn to before me this 16th the day of October 2020

DEBORAH JOHNSON
Notary Public State of New York
No 01JO6380197
Qualified in Rensselaer County
Commission Expires Sept 4, 20 22

*Deborah Johnson*
Notary Public

# APPENDIX

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ADRIAN THOMAS,

                    Plaintiff,

          -against-

CITY OF TROY, ADAM R. MASON, RONALD FOUNTAIN,
TIM COLANERI, COUNTY OF RENSSELAER and
MICHAEL SIKIRICA,

                    Defendants.

**SUBPOENA DUCES TECUM**
Civil Action No.: 1:17-cv-626
(GTS/DJS)

## THE PEOPLE OF THE STATE OF NEW YORK

To:   **Albany Medical Center**
      **Attn:  Medical Records**
      **43 New Scotland Avenue**
      **Albany, New York 12208**

          **WE COMMAND YOU**, pursuant to CPLR §2305(b), that all business and excuses being laid aside, and that you produce the following documents of the above-captioned matter at the Law firm of Pattison, Sampson, Ginsberg & Griffin, PLLC on or before **October 16, 2020 at 9:30 a.m.**

**Any and all documentation relating to** █████████

          Failure to comply with this subpoena is punishable as a contempt of Court and shall make you liable to the person on whose behalf this subpoena was issued for a penalty not to exceed fifty dollars and all damages sustained by reason of your failure to comply.

Dated:  October 1, 2020.

*Rhiannon I. Spencer*

Rhiannon I. Spencer, Esq.
**Pattison Samson Ginsberg & Griffin, PLLC**
*Attorney for Defendants,*
*City of Troy, Adam R. Mason and Tim Colaneri*
22 First Street, P.O. Box 208
Troy, New York 12180
Tel. (518) 266-1001

**AUTHORIZATION FOR RELEASE OF HEALTH INFORMATION PURSUANT TO HIPAA**

[This form has been approved by the New York State Department of Health]

| Patient Name | Date of Birth | Social Security Number |
|---|---|---|
| ████████ | ████████ | |

Patient Address
**Deceased**

I, or my authorized representative, request that health information regarding my care and treatment be released as set forth on this form:

In accordance with New York State Law and the Privacy Rule of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), I understand that:

1. This authorization may include disclosure of information relating to **ALCOHOL** and **DRUG ABUSE, MENTAL HEALTH TREATMENT**, except psychotherapy notes, and **CONFIDENTIAL HIV\* RELATED INFORMATION** only if I place my initials on the appropriate line in Item 9(a). In the event the health information described below includes any of these types of information, and I initial the line on the box in Item 9(a), I specifically authorize release of such information to the person(s) indicated in Item 8.

2. If I am authorizing the release of HIV-related, alcohol or drug treatment, or mental health treatment information, the recipient is prohibited from redisclosing such information without my authorization unless permitted to do so under federal or state law. I understand that I have the right to request a list of people who may receive or use my HIV-related information without authorization. If I experience discrimination because of the release or disclosure of HIV-related information, I may contact the New York State Division of Human Rights at (212) 480-2493 or the New York City Commission of Human Rights at (212) 306-7450. These agencies are responsible for protecting my rights.

3. I have the right to revoke this authorization at any time by writing to the health care provider listed below. I understand that I may revoke this authorization except to the extent that action has already been taken based on this authorization.

4. I understand that signing this authorization is voluntary. My treatment, payment, enrollment in a health plan, or eligibility for benefits will not be conditioned upon my authorization of this disclosure.

5. Information disclosed under this authorization might be redisclosed by the recipient (except as noted above in Item 2), and this redisclosure may no longer be protected by federal or state law.

6. **THIS AUTHORIZATION DOES NOT AUTHORIZE YOU TO DISCUSS MY HEALTH INFORMATION OR MEDICAL CARE WITH ANYONE OTHER THAN THE ATTORNEY OR GOVERNMENTAL AGENCY SPECIFIED IN ITEM 9 (b).**

7. Name and address of health provider or entity to release this information:
**Albany Medical Center, 43 New Scotland Avenue, Albany, New York 12208**

8. Name and address of person(s) or category of person to whom this information will be sent:
**Pattison, Sampson, Ginsberg & Griffin, PLLC, 22 First St., Troy, New York 12180**

9(a). Specific information to be released:
☑ Medical Record from (insert date) _____ to (insert date) _____
☑ Entire Medical Record, including patient histories, office notes (except psychotherapy notes), test results, radiology studies, films, referrals, consults, billing records, insurance records, and records sent to you by other health care providers.
❑ Other: _____

_____

Include: (Indicate by Initialing)

_Adrian Thomas_ **Alcohol/Drug Treatment**
_Adrian Thomas_ **Mental Health Information**
_Adrian Thomas_ **HIV-Related Information**

**Authorization to Discuss Health Information**

(b) ❑ By initialing here _____ I authorize _____
    Initials                              Name of individual health care provider
to discuss my health information with my attorney, or a governmental agency, listed here:

_____
(Attorney/Firm Name or Governmental Agency Name)

| 10. Reason for release of information:<br>☑ At request of individual<br>☑ Other: **Litigation** | 11. Date or event on which this authorization will expire:<br><br>**At the conclusion of litigation** |
|---|---|
| 12. If not the patient, name of person signing form:<br>**Adrian Thomas** | 13. Authority to sign on behalf of patient:<br>**Father of decedent** |

All items on this form have been completed and my questions about this form have been answered. In addition, I have been provided a copy of the form.

_____                                    Date: 10 / 01 / 2020 _____
Signature of patient or representative authorized by law.

\* **Human Immunodeficiency Virus that causes AIDS. The New York State Public Health Law protects information which reasonably could identify someone as having HIV symptoms or infection and information regarding a person's contacts.**





## Discharge Transition Plan

Patient Name: ▮▮▮▮▮▮     MR# :2257912     ▮▮▮▮▮▮     ID Plate:

| | | |
|---|---|---|
| Initial Assessment Date: 09/21/08 23:44 | DOB: ▮▮▮▮▮ | |
| Advanced Directive?: No | Adv Dir Date: | Discharge Plan Reason: |

Current DME / Home care Services:  None / No needs

Current Community Resources:  Child Protective

| | |
|---|---|
| Physical Function Level:  Infant | Mental Status:  Coma |
| Transportation:  Ambulance - ALS | Financial Resources:  Managed Medicaid |

Initial Assessments / Comments: Delamater, Adair SW  09/21/08 23:44  09212008 1920  SW was called by PICU staff, to meet with pt's mother to provide emotional support.  Pt is a 4 month old boy transferred to PICU from Samaritan Hospital on full life support.  His mother stated she found him limp when she got up this am, and pt was taken to Samaritan with c/o respiratory distress.  Pt has b/l subdural hematomas, and is in extremely critical condition.  A report to CPS was made earlier.  SW met with pt's mother and her brother, and the on-duty chaplin responded also.  SW stayed with pt's mother when Dr. Edge met with her to explain that pt's injuries are life threatening, and he does not believe pt will live.  At request of Dr. Edge, SW contacted the Troy police, and at 2110, Det. Ron Fountain responded to the PICU.  His diesk phone ▮▮▮▮▮ SW also spoke x 2 with on call CPS worker, Andrea Fandholt, to explain pt's grave condition, and extremely poor prognosis.  She confirmed that pt's six siblings, including his twin brother, have been removed from the home, and placed in foster care.  SW met with pt's mother, and maternal grandmother to confirm for them that the other children have been placed.  Pt's grandmother explained that there was already an open CPS case on pt.  She said the case worker is Jasper Esposit▮▮▮▮▮ SW met with charge nurse, and Peds resident.  There is to be no visitation other than immediate family, and that visitation must be supervised.  SW explained to charge nurse, and nurse caring for pt that a report must be made to the NYS Child Abuse and Neglect Hotline (1-800-635-1522) if pt expires.  The form and phone number was left on the front of pt's chart. Adair DeLamater, LMSW 4011

*Adair DeLamater LMSW*
*4011*

### Discharge Home Care Services / DME Needs Below

| Home Care Agency / DME Vendor | Phone | Order Date | Start / Delivery Date | Needs |
|---|---|---|---|---|
| | | | | |

HC / DME Notes:

#### Patient Family Interaction

09/21/08 14:03     By: Alexander, B SW 09-21-2008 1404: Called to PICU by the PEDS MD (Danielle Dunetz) regarding this baby.  He was apparently transferred from Samaritan Hospital.  Has head CT here which showed a bleed.  POssible skull fx(awaiting confirmation of this).  Per MD, this is a suspect injury.  Patient's Mother (Wilhemina Hicks accompanied patient but apparently fainted and was sent to the ED for evaluation.  Limited info available.  Per report, there are 6 other children in the home including this baby's twin.  CPS contacted and the case was taken (RE▮▮▮▮▮-worker Zewdie Tibebu)..  Will have SW follow up in the AM> BA

| Facility Referred To | Referral Date | Response Date | Response |
|---|---|---|---|
| | | | |

| Interaction date | Case Discussed at Multidisciplinary Rounds? |
|---|---|
| 09/21/08 14:03 | |

**APPENDIX** 1969



# Discharge Transition Plan

| Patient Name: ███████████ | MR# :2257912 | Acct No ███████████ | ID Plate: |
|---|---|---|---|

| Initial Assessment Date: 09/21/08 23:44 | | DOB ███████████ |
|---|---|---|

| Advanced Directive?: No | Adv Dir Date: | Discharge Plan Reason: |
|---|---|---|

Current DME / Home care Services:

Current Community Resources:  Child Protective

| Physical Function Level:  Infant | Mental Status: Coma |
|---|---|
| Transportation:  Ambulance - ALS | Financial Resources:  Managed Medicaid |

Initial Assessments / Comments: Delamater, Adair SW  09/21/08 23:44  09212008 1920  SW was called by PICU staff, to meet with pt's mother to provide emotional support.  Pt is a 4 month old boy transferred to PICU from Samaritan Hospital on full life support.  His mother stated she found him limp when she got up this am, and pt was taken to Samaritan with c/o respiratory distress.  Pt has b/l subdural hematomas, and is in extremely critical condition.  A report to CPS was made earlier.  SW met with pt's mother and her brother, and the on-duty chaplin responded also.  SW stayed with pt's mother when Dr. Edge met with her to explain that pt's injuries are life threatening, and he does not believe pt will live.  At request of Dr. Edge, SW contacted the Troy police, and at 2110, Det. Ron Fountain responded to the PICU.  His diesk phone ███████ SW also spoke x 2 with on call CPS worker, Andrea Fandholt, to explain pt's grave condition, and extremely poor prognosis.  She confirmed that pt's six siblings, including his twin brother, have been removed from the home, and placed in foster care.  SW met with pt's mother, and maternal grandmother to confirm for them that the other children have been placed.  Pt's grandmother explained that there was already an open CPS case on pt.  She said the case worker is Jasper Esposit███████SW met with charge nurse, and Peds resident.  There is to be no visitation other than immediate family, and that visitation must be supervised.  SW explained to charge nurse, and nurse caring for pt that a report must be made to the NYS Child Abuse and Neglect Hotline (1-800-635-1522) if pt expires.  The form and phone number was left on the front of pt's chart.  Adair DeLamater, LMSW 4011

## Discharge Home Care Services / DME Needs Below

| Home Care Agency / DME Vendor | Phone | Order Date | Start / Delivery Date | Needs |
|---|---|---|---|---|
| | | | | |

HC / DME Notes:

### Patient Family Interaction

09/21/08 14:03      By: Alexander, B SW 09-21-2008 1404:  Called to PICU by the PEDS MD (Danielle Dunetz) regarding this baby.  He was apparently transferred from Samaritan Hospital.  Has head CT here which showed a bleed.  POssible skull fx(awaiting confirmation of this).  Per MD, this is a suspect injury.  Patient's Mother (Wilhemina Hicks accompanied patient but apparently fainted and was sent to the ED for evaluation.  Limited info available.  Per report, there are 6 other children in the home including this baby's twin.  CPS contacted and the case was taken (RE███████-worker Zewdie Tibebu)..  Will-have SW follow up in the AM> BA

09/22/08 14:50      By: Jones, Kathy RN CM      4 month old infant transferrred from OSH to AMC PICU for HLOC eval and managment of bilateral SDH of varying ages and acute decline in mental status; respiratory failure.   Infant is unresponsive, no gag or pupil reflexes;  comatose.  Suspected child abuse.  Accepted CPS case Renselaer Cty.  CM/SW following for disposition.   *K.Gones RN CM B? 8780*

| Facility Referred To | Referral Date | Response Date | Response |
|---|---|---|---|
| | | | |

| Interaction date | Case Discussed at Multidisciplinary Rounds? |
|---|---|
| | |

# APPENDIX

**1970**



## Discharge Transition Plan

| Patient Name: | | MR# :2257912 | Acct No | ID Plate: |
|---|---|---|---|---|
| 09/21/08 14:03 | | | | |
| 09/22/08 14:50 | Reviewed at rounds | | | |
| CM Discharge Facility: | | | | |

Case 1:17-cv-00626-DJS Document 34-17/8821-y Filed 10/25/21 Page 58 of 23

Exhibit "B"

```
 1
 2   STATE OF NEW YORK              COUNTY COURT
     COUNTY OF RENSSELAER           CRIMINAL TERM
 3   ******************************************
     THE PEOPLE OF THE STATE OF NEW YORK,
 4
 5   - against -                    Indictment 08-1074
 6   ADRIAN THOMAS,
 7                   Defendant.
     ******************************************
 8                        Rensselaer County Courthouse
                          Congress and Second Streets
 9                        Troy, New York  12180
                          September 11, 2009
10
                         Decision
11
     B e f o r e :
12
         HONORABLE ANDREW CERESIA,
13                      County Court Judge
14   A p p e a r a n c e s :
15   For  THE PEOPLE OF THE STATE OF NEW YORK:
16       RICHARD J. McNALLY, JR., ESQ.
         Rensselaer County District Attorney
17       Rensselaer County Courthouse
         Congress and Second Streets
18       Troy, New York 12180
19       BY:  ARTHUR GLASS, ESQ.
              Assistant District Attorney
20
21   For  DEFENDANT:
22       JEROME K. FROST, ESQ.
         Rensselaer County Public Defender
23       Rensselaer County Courthouse
         Congress and Second Streets
24       Troy, New York 12180
25       BY:  INGRID EFFMAN, ESQ.
              Assistant Public Defender
```

**Cheryl M. Moore, Senior Court Reporter**

1 | **People v. Adrian Thomas**

2 | Also Present:

3 |     Adrian Thomas, Defendant
    Clerk of the Court

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  **People v. Adrian Thomas**

2          (In open court.)

3          THE COURT:   Please be seated.

4          (Whereupon, the defendant entered the

5  courtroom.)

6          THE COURT:   Okay.   We're back on the

7  record in the matter of the People versus

8  Adrian Thomas.

9          The Court will now deliver its

10  decisions -- its decision for each of the

11  hearings.

12          The Court will start with the **Dunaway**

13  hearing.   The following constitutes the

14  opinion, decision and order of the Court.

15          The defendant, claiming that the police

16  lacked probable cause to take him into

17  custody seeks to suppress his statements

18  subsequently obtained by law enforcement.

19          The People assert that the defendant

20  was not in custody until he was placed under

21  arrest, at which time, there was probable

22  cause for that arrest.

23          The People have the burden of proving

24  that the police had probable cause to take

25  the defendant into custody.

**Cheryl M. Moore, Senior Court Reporter**

1    **People v. Adrian Thomas**

2        With regard to the suppression of

3    evidence, the People have the burden of

4    going forward to show the legality of the

5    police conduct and the defendant then has

6    the ultimate burden of proof that the police

7    conduct was unlawful.

8        A pretrial suppression hearing was

9    conducted before this Court on September

10    9th, 10th and 11th, 2009.

11        The Court has reviewed the entire

12    videotaped interview of the defendant and

13    has also considered the testimony of

14    Sergeant Adam Mason and Detective Ronald

15    Fountain.

16        The Court makes the following findings

17    of fact.  In the late evening hours of

18    September 21, 2008, after having conducted a

19    preliminary investigation, Sergeant Mason

20    and Detective Fountain went to the

21    defendant's home and asked him if he would

22    be willing to accompany them to the police

23    station to speak to them.

24        The defendant voluntarily agreed and

25    was driven to the police station by the

**Cheryl M. Moore, Senior Court Reporter**

| | People v. Adrian Thomas |
|---|---|
| 2 | police officers in an unmarked vehicle. |
| 3 | At approximately 5:45 p.m. on September |
| 4 | 22, 2008, the defendant was released from |
| 5 | Samaritan Hospital, having been determined |
| 6 | not to be a threat to harm himself, which |
| 7 | was the sole reason for his hospitalization. |
| 8 | He met with Sergeant Mason and Sergeant |
| 9 | Joseph Centanni, who were waiting for him in |
| 10 | the lobby outside the Mental Health Unit. |
| 11 | Sergeant Mason asked the defendant if |
| 12 | he would be willing to return to the police |
| 13 | station to continue speaking with him. The |
| 14 | defendant voluntarily agreed and was driven |
| 15 | to the police station by the police officers |
| 16 | in an unmarked vehicle. |
| 17 | The Court makes the following |
| 18 | conclusions of law: As a general rule |
| 19 | custodial detention and interrogation can |
| 20 | only be justified upon a showing of probable |
| 21 | cause to arrest. However, when a defendant |
| 22 | voluntarily consents to accompany the police |
| 23 | to the police station for the purpose of |
| 24 | questioning, that consent obviates the need |
| 25 | to show that the officer had probable cause. |

**Cheryl M. Moore, Senior Court Reporter**

**People v. Adrian Thomas**

   Here, in both instances, the defendant voluntarily agreed to accompany the police officers to the police station for questioning. Accordingly, the defendant's motion to suppress his statements based upon a lack of probable cause is denied.

   The Court will now address the **Huntley** issue. The following constitutes the opinion, decision and order of the Court.

   The defendant, claiming to be aggrieved by an unlawful acquisition of evidence, has moved to suppress statements made by him on September 22nd of 2008 to Sergeant Adam Mason and Detective Ronald Fountain on the grounds that they were involuntarily made within Criminal Procedure Law 60.45.

   A confession, admission or statement is admissible at trial only if its voluntariness is established by the People beyond a reasonable doubt.

   A pretrial suppression hearing was conducted before this Court on September 9th, 10th and 11th, 2009.

   The Court has reviewed the entire

**Cheryl M. Moore, Senior Court Reporter**

**People v. Adrian Thomas**

1
2          videotaped interview of the defendant and

3          has also considered the testimony of

4          Sergeant Adam Mason and Detective Ronald

5          Fountain.

6              The Court makes the following findings

7          of fact:  In the late evening hours of

8          September 21, 2008, Sergeant Mason and

9          Detective Fountain went to the defendant's

10         home and asked him if he would be willing to

11         accompany them to the police station to

12         speak to them.

13             The defendant agreed to do so.

14             The defendant was driven to the police

15         station in an unmarked police vehicle.

16             Upon arriving at the police station the

17         police officers and the defendant went to an

18         interview room on the third floor.

19             The defendant was given his *Miranda*

20         warnings and signed a written waiver.

21             The defendant was interviewed for just

22         under two hours and then reviewed and signed

23         a one page written statement.

24             The defendant then indicated that he

25         felt like he could jump off of a bridge.

**Cheryl M. Moore, Senior Court Reporter**

**People v. Adrian Thomas**

The police asked him if he wanted to speak to someone about that. The defendant declined and then continued a brief conversation with the police.

The police again asked the defendant if he wished to speak to someone and the defendant then indicated that he would like to speak to a counselor.

The police prepared a mental hygiene form and then drove the defendant to Samaritan -- to the Samaritan Hospital Mental Health Unit.

Having been found by a doctor at Samaritan Hospital that he did not pose a threat to harm himself, the defendant was discharged at approximately 5:45 p.m. on September 22, 2008.

Upon his release from the hospital, the defendant asked the hospital staff if it would be all right for him to remain there until the police arrived to speak to him.

The defendant met with Sergeant Mason, who was already waiting for him in the lobby outside of the Mental Health Unit.

**Cheryl M. Moore, Senior Court Reporter**

| | |
|---|---|
| 1 | **People v. Adrian Thomas** |
| 2 | Sergeant Mason asked the defendant if |
| 3 | he would be willing to return to the police |
| 4 | station to continue speaking with him. The |
| 5 | defendant agreed and was driven to the |
| 6 | police station by the police officers in an |
| 7 | unmarked vehicle. |
| 8 | Upon arriving at the police station the |
| 9 | defendant was given **Miranda** warnings and |
| 10 | again signed a written waiver. |
| 11 | The defendant was interviewed for just |
| 12 | over seven hours during which time a ten |
| 13 | page statement was prepared. The defendant |
| 14 | reviewed and signed that statement. |
| 15 | The Court makes the following |
| 16 | conclusions of law: With respect to the |
| 17 | first interview, the defendant was not |
| 18 | subjected to custodial interrogation. The |
| 19 | defendant voluntarily agreed to accompany |
| 20 | the police officers to the police station to |
| 21 | talk to them. He was not forced or |
| 22 | threatened in any way to go with the police, |
| 23 | nor was he handcuffed, shackled or |
| 24 | restrained in any manner. |
| 25 | Also, the defendant was not searched or |

**Cheryl M. Moore, Senior Court Reporter**

Case 1:17-cv-00625-DJS Document 69-5 Filed 10/25/21 Page 78 of 23

**People v. Adrian Thomas**

frisked before being taken to the police

station.

He was driven to the police station in

an unmarked police car which had no

protective screen between the front and back

seats. Although the door to the interview

room at the police station was closed

throughout most of the interview, it was

never locked. Also, there was nothing

blocking the defendant's path of access to

the door.

At no point did the defendant ever ask

to leave or to stop the interview or to call

anyone, including a lawyer. The interview

lasted under two hours.

Under these circumstances, the Court

finds that a reasonable person in the

defendant's position, innocent of any crime,

would have felt that he or she was free to

leave.

The Court notes that, in any event,

even assuming that the defendant was in

custody, he was properly read his *Miranda*

warnings, voluntarily signed a written

**Cheryl M. Moore, Senior Court Reporter**

| 1 | **People v. Adrian Thomas** |
|---|---|
| 2 | waiver, and never unequivocally requested an |
| 3 | attorney. |
| 4 | Regarding the second interview, the |
| 5 | defendant was not subjected to custodial |
| 6 | interrogation. |
| 7 | The defendant voluntarily agreed to |
| 8 | accompany the police officers to the police |
| 9 | station to talk to them.  He was not forced |
| 10 | or threatened in any way to go with the |
| 11 | police, nor was he handcuffed, shackled or |
| 12 | restrained in any manner. |
| 13 | Also, the defendant was not searched or |
| 14 | frisked before being taken to the police |
| 15 | station. |
| 16 | He was driven to the police station in |
| 17 | an unmarked police car which had no |
| 18 | protective screen between the front and back |
| 19 | seats.  Although the door to the interview |
| 20 | room was closed during most of the |
| 21 | interview, it was never locked.  Also, there |
| 22 | was nothing blocking the defendant's |
| 23 | access -- path of access to the door. |
| 24 | At no point did the defendant ever ask |
| 25 | to leave, to stop the interview or to call |

| | People v. Adrian Thomas |
|---|---|
| 1 | |
| 2 | anyone. |
| 3 | Although the interview lasted |
| 4 | approximately seven hours, a lengthy |
| 5 | interrogation alone does not render a |
| 6 | defendant's statement involuntary where the |
| 7 | defendant is given breaks and does not |
| 8 | request food, water or the use of a |
| 9 | bathroom. |
| 10 | Here, the defendant was offered food, |
| 11 | drink and bathroom breaks, all of which he |
| 12 | declined. The defendant asked for and was |
| 13 | provided cigarette breaks. |
| 14 | Under these circumstances, a reasonable |
| 15 | person in the defendant's position, innocent |
| 16 | of any crime, would have felt that he or she |
| 17 | was free to leave. |
| 18 | The Court notes that, in any event, |
| 19 | even assuming that the defendant was in |
| 20 | custody, he was properly read his **Miranda** |
| 21 | warnings and voluntarily signed a written |
| 22 | waiver. |
| 23 | With respect to the defendant's signing |
| 24 | of the written waiver, the defendant's |
| 25 | statement that he did not feel safe and |

**Cheryl M. Moore, Senior Court Reporter**

**People v. Adrian Thomas**

1  

2      Sergeant Mason's response to that did not

3      impact the voluntariness of said waiver.

4         The defendant was simply referring to

5      his fear of retribution from his wife's

6      family, which had no bearing on his ability

7      to understand and waive his **Miranda** rights.

8         It is also noted that the defendant did

9      not request an attorney.

10         Although the defendant did mention a

11      lawyer at one point during the interview, it

12      is clear that he was merely inquiring

13      whether he would need an attorney for an

14      upcoming Family Court proceeding.

15         The defendant never invoked his right

16      to counsel for the present matter.

17         The defendant argues that the police

18      engaged in coercive tactics that created a

19      substantial risk he would falsely

20      incriminate himself.

21         Although there were several instances

22      throughout the videotaped interviews where

23      the police indicated that the defendant was

24      not going to be arrested at the present

25      time, a promise not to arrest a defendant at

**Cheryl M. Moore, Senior Court Reporter**

**People v. Adrian Thomas**

1
2           the present time does not constitute a

3           coercive police tactic.

4                 Significantly, the Court also notes

5           that when the defendant asked --

6           specifically asked Sergeant Mason, "So

7           what's the next step?  Will I be criminally

8           prosecuted?"  Sergeant Mason responded,

9           "I can't promise that's never going to

10          happen, because I don't know what's going to

11          happen, but, you know, it's not going to

12          happen right now."

13               Accordingly, the Court concludes that

14          no promises of leniency were made to the

15          defendant.

16              And, in addition, any lies that may

17          have been told to the defendant by the

18          police do not amount to coercive police

19          tactics.

20              Accordingly, the Court finds that the

21          police did not engage in any coercive

22          tactics that were so fundamentally unfair as

23          to deny the defendant due process.

24             The police did not engage in any

25          conduct which created a substantial risk

**Cheryl M. Moore, Senior Court Reporter**

**People v. Adrian Thomas**

that the Court (sic) would falsely incriminate himself.

The defendant argues that the fact that he was admitted to Samaritan Hospital for a psychological evaluation between the two police interviews rendered his statements involuntarily.

The defendant was taken to Samaritan Hospital for the limited purpose of evaluating his threat to harm himself and it was determined that he could safely be released because he was not a danger to himself.

During this period of evaluation there was no police questioning of the defendant.

The Court notes that the brief discussion that occurred between the defendant and the officers after the defendant initially stated that he felt like he could "jump off of a bridge" was initiated by the defendant.

The defendant volunteered certain statements that were not in response to police questioning. The police repeatedly

# APPENDIX

**1987**

| | People v. Adrian Thomas |
|---|---|
| 1 | |
| 2 | asked him whether or not he wanted to speak |
| 3 | to someone until the defendant eventually |
| 4 | stated he would like to speak to a |
| 5 | counselor. |
| 6 | At that point, all discussions ceased |
| 7 | and the defendant was brought directly to |
| 8 | Samaritan Hospital. |
| 9 | With respect to the preprinted mental |
| 10 | hygiene form which referenced the word |
| 11 | "custody", to the extent that it could be |
| 12 | argued that the defendant was in custody at |
| 13 | that point, any such custody was for the |
| 14 | limited purpose of transporting the |
| 15 | defendant to Samaritan Hospital and the |
| 16 | defendant was not in custody for the purpose |
| 17 | of any interrogation. |
| 18 | Moreover, the police transported -- the |
| 19 | Court notes that the police transported the |
| 20 | defendant to the hospital at his request. |
| 21 | Furthermore, during the second |
| 22 | interview, following the defendant's |
| 23 | hospitalization, the Court notes that the |
| 24 | defendant -- from having viewed the |
| 25 | videotape, the Court notes that the |

**Cheryl M. Moore, Senior Court Reporter**

| 1 | **People v. Adrian Thomas** |
|---|---|
| 2 | defendant remained coherent, alert and |
| 3 | aware. |
| 4 | The Court's review of the videotaped |
| 5 | interview revealed that the defendant did |
| 6 | not appear to be fatigued, nor did he ever |
| 7 | indicate or state that he was tired. |
| 8 | Therefore, under the totality of the |
| 9 | circumstances, the People have established, |
| 10 | beyond a reasonable doubt, that the |
| 11 | defendant's statements were voluntarily |
| 12 | made. |
| 13 | Accordingly, the defendant's motion to |
| 14 | suppress his oral and written statements is |
| 15 | denied. |
| 16 | The Court will now address the **Mapp** |
| 17 | hearing.  The following constitutes the |
| 18 | opinion, decision and order of the Court. |
| 19 | The defendant, claiming to be aggrieved |
| 20 | by an unlawful search and seizure, has moved |
| 21 | to suppress various household items that |
| 22 | were seized from his home at ▉▉▉▉▉▉ |
| 23 | Street, Apartment 1-C, Troy, New York |
| 24 | pursuant to two search warrants. |
| 25 | The People assert that the seizure of |

**Cheryl M. Moore, Senior Court Reporter**

# APPENDIX

**1989**

**People v. Adrian Thomas**

       the items were lawful because the search warrants were lawfully issued.

       The People have the burden in the first instance of going forward to show the legality of the police conduct.

       The defendant, however, bears the ultimate burden of proving by a preponderance of the evidence that the physical evidence should be suppressed.

       A pretrial suppression hearing was conducted before this Court on September 9th, 10th and 11th, 2009.

       The Court considered the testimony of Sergeant Adam Mason, Detective Ronald Fountain and Sergeant Joseph Centanni.

       The Court makes the following findings of fact: On September 22, 2008, Detective Fountain submitted a written search warrant application to the Troy City Court seeking to search the residence located at &#9608;&#9608;&#9608;&#9608; Street, Apartment 1-C in the City of Troy.

       He sought evidence of child abuse -- I'm sorry. The search warrant application sought evidence of child abuse or child

**Cheryl M. Moore, Senior Court Reporter**

# APPENDIX

**1990**

**People v. Adrian Thomas**

2      neglect, including, but not limited to, a

3      baby crib, a metal truck, a black and brown

4      belt, blood or any other evidence that child

5      abuse or child neglect has ever taken place

6      inside the residence.

7          The stated basis for the search warrant

8      included the injuries sustained by the

9      victim; a statement by Dr. Edge at Albany

10      Medical Center that it is typically a high

11      impact injury caused by violent shaking or

12      severe acceleration and deceleration on a

13      hard object; statements by the defendant,

14      including that the victim was probably

15      injured in his care; and statements made by

16      ████████ at the START Children's Center

17      that the defendant had thrown the victim

18      into the crib very roughly.

19          The search warrant was sworn to by

20      Detective Fountain and signed by Judge

21      Christopher Maier in Troy City Court.

22          On September 23, 2008, Sergeant

23      Centanni submitted a written search warrant

24      application to the Troy City Court seeking

25      to search the same premises.

**Cheryl M. Moore, Senior Court Reporter**

| | |
|---|---|
| 1 | **People v. Adrian Thomas** |
| 2 | He sought mattresses -- the search |
| 3 | warrant application searched mattresses, box |
| 4 | springs, sheets, comforters, pillows, pillow |
| 5 | cases and blankets. |
| 6 | The stated basis for the second search |
| 7 | warrant were identical to the first search |
| 8 | warrant application with one addition, that |
| 9 | addition being statements made by the |
| 10 | defendant that on three separate occasions, |
| 11 | on September 17th, 18th and 20th, 2008, he |
| 12 | had slammed the victim down on a mattress. |
| 13 | The second search warrant was sworn to |
| 14 | by Sergeant Centanni and signed by Judge |
| 15 | Maier in Troy City Court. |
| 16 | The Court makes the following |
| 17 | conclusions of law:  The search warrants |
| 18 | were not overly broad.  Rather, they were |
| 19 | limited to search household items that might |
| 20 | constitute evidence of child abuse or |
| 21 | neglect as ascertained from the police |
| 22 | investigation. |
| 23 | The search warrants were not unduly |
| 24 | vague.  Rather, they particularly described |
| 25 | the place to be searched, including the |

**Cheryl M. Moore, Senior Court Reporter**

**People v. Adrian Thomas**

 2    apartment number and each item to be seized.

 3        The search warrants were supported by

 4    reasonable cause.

 5        The allegations contained in the search

 6    warrant applications constituted reasonable

 7    cause to believe that evidence of child

 8    abuse and/or child neglect may be found on

 9    the premises to be searched.

10        Accordingly, the police conduct in

11    searching the defendant's home and seizing

12    items of personal property was reasonable,

13    and the defendant's motion to suppress those

14    items is denied.

15        Those three decisions constitute the

16    decisions and order of the Court.

17        This matter will now be adjourned for

18    trial.  Trial will commence on Tuesday,

19    September 29th.

20        Jury selection will begin at 10:00 a.m.

21        This matter is adjourned.

22        MR. GLASS:  Thank you, your Honor.

23        (Whereupon, the matter was adjourned.)

24

25

**Cheryl M. Moore, Senior Court Reporter**



People v. Adrian Thomas

CERTIFICATION

I, CHERYL M. MOORE, Senior Court Reporter for the Third Judicial District and Notary Public in and for the State of New York, do hereby certify:

The foregoing to be a true and accurate transcription, to the best of my ability, of the stenographic notes as taken by me of the aforesaid proceedings.

IN WITNESS WHEREOF, I have hereunto set my hand this 15th day of September, 2009.

CHERYL M. MOORE
Senior Court Reporter

**Cheryl M. Moore, Senior Court Reporter**

EXHIBIT "C"

```
 1   UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF NEW YORK
 2   - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

 3   ADRIAN THOMAS,

 4                         Plaintiff,

 5           - against -

 6   CITY OF TROY, ADAM R. MASON, RONALD FOUNTAIN,
     TIM COLANERI,
 7   RENSSELAER COUNTY, and MICHAEL SIKIRICA,

 8                         Defendants.
     - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
 9   NEW YORK STATE
     COURT OF CLAIMS
10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

11   ADRIAN P. THOMAS,

12                         Claimant,

13           - against -

14   THE STATE OF NEW YORK,

15                         Defendant.
     - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
16

17             DEPOSITION of Defendant, RONALD FOUNTAIN,

18   held on the 13th day of September 2019, commencing at

19   8:59 a.m., at the Law Offices of Pattison Sampson

20   Ginsberg & Griffin, PLLC, 22 First Street, Troy, New

21   York, before Jeanne O'Connell, Registered Professional

22   Reporter and Notary Public in and for the State of New

23   York.
```

```
 1   APPEARANCES:

 2   Brett H. Klein, Esq.
     305 Broadway
 3   Suite 600
     New York, New York  10007
 4   Attorney for Plaintiff/Claimant

 5   Pattison Sampson Ginsberg & Griffin, PLLC
     22 First Street
 6   Troy, New York  12180
     By:  Joseph T. Perkins, Esq.
 7   Attorneys for City of Troy, Adam R. Mason,
     Ronald Fountain and Tim Colaneri
 8
     Bailey, Johnson & Peck, P.C.
 9   5 Pine West Plaza
     Washington Avenue Extension
10   Albany, New York 12205
     By:  Crystal R. Peck, Esq.
11   Attorneys for Michael Sikirica

12   New York State Office of the Attorney General
     The Capitol
13   Albany, New York 12224
     By:  Christina M. Calabrese, Assistant Attorney General
14
     Also present:  Katherine Hamilton
15

16

17

18

19

20

21

22

23
```

APPENDIX **1997**

3

1                 S T I P U L A T I O N S

2     It is hereby stipulated and agreed by

3     and between the attorneys for the respective

4     parties hereto that, this examination may be signed and

5     sworn to before any Notary Public of the State of New

6     York.

7

8     It is further stipulated and agreed that the filing and

9     certification of the said examination shall be waived.

10

11    It is further stipulated and agreed that all objections

12    to questions, except as to form, shall be reserved for

13    the trial of this action.

14

15    It is further stipulated and agreed that there are no

16    objections to Notice of this Examination Before Trial

17    and the qualifications of the court reporter to take

18    this deposition and administer an oath or affirmation.

19

20

21

22

23

1              (Ronald Fountain - by Mr. Klein)

2              (Thomas Exhibits 19 through 23 marked for

3    identification.)

4    RONALD FOUNTAIN, after first having been duly sworn, was

5    examined and testified as follows:

6    EXAMINATION

7    BY MR. KLEIN:

8        Q.   Good morning, Mr. Fountain.

9        A.   Thanks.

10       Q.   My name is Brett Klein and I represent Adrian

11   Thomas in two civil actions.  One is pending in the New

12   York State Court of Claims, defended by Ms. Calabrese,

13   who you met before the proceedings today.  And one is in

14   US District Court for the Northern District of New York

15   in a case where you're represented by Mr. Perkins who's

16   here today, correct?

17       A.   Correct.

18       Q.   Also here today is Ms. Peck who's representing

19   Dr. Sikirica.

20       A.   Okay.

21       Q.   You're here today because we've asked you to be

22   produced to answer questions about your involvement in

23   the arrest and prosecution of Adrian Thomas.

Case 1:17-cv-00625-DJS Document 163-4 Filed 10/25/21 Page 86 of 156

1          (Ronald Fountain - by Mr. Klein)

2          Do you understand that's why you're here today?

3     A.   I do.

4     Q.   Do you know that the oath you took today is the

5     same oath that you would take as if you were in a court

6     of law?

7     A.   I understand that.

8     Q.   Any reason why you can't testify fully and

9     accurately today?

10    A.   No.

11    Q.   You've had sufficient time to prepare with Mr.

12    Perkins, your attorney?

13    A.   Sure.

14    Q.   And you feel well today.  Have you consumed any

15    medications, alcohol or anything else, that might impair

16    your ability to testify fully and accurately?

17    A.   No.

18    Q.   Other than today, have you ever been in a civil

19    deposition before?

20    A.   Yes.

21    Q.   How many times?

22    A.   Three or four.

23    Q.   You may have heard these rules, but I'm just

                    (Ronald Fountain - by Mr. Klein)
1
2   going to go over them briefly.
3        Even if you know an answer to a question, wait a
4   second, if you could, and just let me finish the
5   question.  This is so the reporter can take down the
6   questions and answers.  If we speak over each other,
7   which I sometimes do, then we'll just have to repeat
8   ourselves.
9      A.  Okay.
10     Q.  If you don't understand a question I ask you,
11  will you let me know?
12     A.  I will.
13     Q.  If you don't let me know and you answer a
14  question that you didn't understand, it will be assumed
15  for the record that you understood it, okay?
16     A.  Okay.
17     Q.  Also, if you'd like me to rephrase a question I'm
18  happy to do so.  Just let me know.  Okay?
19     A.  Okay.
20     Q.  Also, if you need a break, that's fine.  I'm just
21  going to ask that you answer any pending question before
22  you take a break.
23     A.  Okay.

1              (Ronald Fountain - by Mr. Klein)

2      Q.   Finally, at the conclusion of the proceedings,

3   couple days or a few weeks, there will be a transcript

4   generated by the reporter.  We'll provide a copy to

5   Mr. Perkins and ask that you review it and that you sign

6   it before a notary, okay?

7      A.   I understand.

8      Q.   If you find that there are any changes that you

9   wish to make in your testimony, you can note them on a

10   separate page.  Those changes should be notarized, okay?

11      A.   Yes.

12      Q.   Also, I want to advise you that we can ask you

13   about those changes maybe in a subsequent deposition or

14   at trial, okay?

15      A.   Sounds good.

16      Q.   Also, if you believe there are any transcription

17   errors in the transcript, you should note that as well

18   on a separate page and have those changes notarized,

19   okay?

20      A.   Yes.

21      Q.   In connection with today's deposition, have you

22   reviewed any documents --

23      A.   Yes.

1          (Ronald Fountain - by Mr. Klein)

2     Q.  -- videos, photos, or anything else to prepare

3   for the deposition?

4     A.  Yes.

5     Q.  Without telling me if any of it was discussed

6   with your attorney, I don't want to know about those

7   conversations, if you could just walk me through what

8   you looked at to prepare for the deposition.

9     A.  My trial transcript and some notes pertaining to

10   the case very briefly.

11     Q.  What were the notes from?

12     A.  My notes, I believe, from the case file of the

13   Adrian Thomas investigation.

14     Q.  Do you remember, whether generally or

15   specifically, what they were?

16          In other words, did they start at Albany Med and

17   go through the Thomas interview, the Start Center, or

18   anything else?

19     A.  There was some notes that I took at the Start

20   Center in there.  I believe all the other notes, as far

21   as what we did, was done by Adam Mason.

22          There was some other things in there that were

23   handwritten notes that I had done during the course of

```
 1              (Ronald Fountain - by Mr. Klein)
 2    the investigation.
 3        Q.   Did they refresh your recollection of anything
 4    that you didn't recall before looking at them recently?
 5        A.   A little bit.
 6        Q.   What?
 7        A.   I mean, I haven't looked at this in ten years.
 8        Q.   So, in other words, is there anything that
 9    looking at the file reminded you about your role or your
10    involvement that you didn't remember if I spoke to you a
11    month ago?
12        A.   I think I'll remember most of it.  There's going
13    to be some things I just tried to block out.
14        Q.   Like what?
15        A.   Like looking at a little dead baby, stuff like
16    that, still comes back.
17        Q.   Anything else?
18        A.   I mean, I didn't remember much of the Hicks
19    daughter, ███████████' statement, but I read a little
20    bit of what was said at the Start Center.
21        Q.   Anything else that was refreshed?
22        A.   Not really.
23        Q.   Have you looked at any videos or listened to any
```

Case 1:17-cv-00626-DJS Document 116-2024 Filed 10/25/21 Page 188 of 156

```
 1              (Ronald Fountain - by Mr. Klein)

 2  recordings or read any other transcripts?

 3     A.   No.

 4     Q.   Are you in possession of any documents relating

 5  to this case?

 6     A.   Just my transcript.

 7     Q.   Have you ever cut any press clippings, looked at

 8  the documentary, or anything else?

 9     A.   No.

10     Q.   You never saw the documentary?

11     A.   When I was still a police officer when it first

12  came out I peeked at the little things.  I never watched

13  the whole thing.  No.

14     Q.   You never saw it from beginning to end?

15     A.   No.  I did not.

16     Q.   Did you agree to do that on your own or were you

17  asked to appear in that?

18     A.   No.  I believe the chief told us we were allowed

19  to do it, so we all did it.

20     Q.   And was everything you said to the documentary

21  filmmakers true and correct?

22     A.   Yes.

23     Q.   Was there anything that you can recall that you
```

```
 1              (Ronald Fountain - by Mr. Klein)

 2   said to them that was not accurate?

 3       A.   I don't recall.

 4       Q.   You would have been truthful with them.

 5       A.   Yes.

 6       Q.   At that point that you gave that interview, Mr.

 7   Thomas was still convicted and his conviction had not

 8   yet been overturned, correct?

 9       A.   Correct.

10       Q.   Did you know, when you gave that interview, that

11   the DA would be speaking as well to the filmmakers?

12       A.   I did.

13       Q.   Did you confer with them or did they confer with

14   you or both about even just the idea of doing it?

15       A.   A little bit.

16       Q.   Was there a meeting about it?

17       A.   No.

18       Q.   What was the extent or nature of the contact

19   about it?

20       A.   I believe it was a general conversation when I

21   was over at the DA's office with Ms. Book and Mr. Glass

22   about how they were looking to do this documentary.  I

23   believe I might have -- I actually don't recall exactly
```

```
 1              (Ronald Fountain - by Mr. Klein)
 2   what went on.
 3       Q.   They were in favor of doing it, to the best of
 4   your recollection, meaning Ms. Book and Mr. Glass?
 5       A.   Yes.
 6       Q.   Were they present when you gave your interviews?
 7       A.   No.
 8       Q.   Did you testify in the grand -- during this case?
 9       A.   Yes.  I believe so.  Maybe I didn't.
10       Q.   You're not sure?
11       A.   I am not sure.
12       Q.   You haven't looked at the grand jury testimony.
13       A.   I believe just my trial testimony is what I
14   looked at.
15       Q.   You did testify at a Huntley hearing, correct, a
16   pretrial Huntley hearing?
17       A.   Probably.  I don't recall.
18       Q.   You did testify at trial in 2009?
19       A.   I did testify at trial.  I recall that.
20       Q.   After the 2009 trial and up until today, have you
21   given any sworn testimony in this case?
22       A.   No.
23       Q.   You didn't testify in connection with the
```

```
 1              (Ronald Fountain - by Mr. Klein)

 2  retrial, correct?

 3      A.  No, I did not.

 4      Q.  In connection with the first prosecution leading

 5  to the conviction, did you have meetings with the

 6  district attorney's office for prep?

 7      A.  Yes.

 8      Q.  Those are standard when you're getting ready for

 9  trial, correct?

10      A.  Correct.

11      Q.  Did you attend the autopsy in this case?

12      A.  I don't believe so.  I'm not sure.

13      Q.  Have you ever spoken with Dr. Sikirica about his

14  findings in this case?

15      A.  Maybe with Mr. Mason, Adam Mason, but I don't

16  recall.  I'm sure Adam was in charge, so.

17      Q.  So, what we don't want you to do is speculate.

18          So, if you don't remember --

19      A.  I don't recall.

20      Q.  And so, I'm just trying to gather who you've

21  given statements or spoken to in terms of the universe

22  of statements out there.

23          So, other than speaking with the DA, doing trial
```

1           (Ronald Fountain - by Mr. Klein)

2   prep, testimony at a hearing that I'm aware, at trial

3   that you're aware of, and testifying today, and then

4   speaking to the filmmakers, have you spoken with anyone

5   else about this case that you can recall?

6       A.   Probably.  I'm assuming, and I looked at some

7   notes, I spoke with child protective services during the

8   investigation.  That was probably more my part in the

9   investigation.

10      Q.   Do you recall what your part was in that

11  investigation?

12      A.   The entire investigation?

13      Q.   Yeah.

14      A.   I was assigned to the juvenile department, so I

15  was like the liaison between our department and child

16  protective.  So, I did a lot of work with them.

17      Q.   With the Thomas-Hicks matter?

18      A.   With every child matter.

19      Q.   But I'm asking specifically about this.

20           So, from the notes we have while -- there were

21  two interviews of Adrian Thomas, correct?

22      A.   Correct.

23      Q.   You were present for the first of the two.

1              (Ronald Fountain - by Mr. Klein)

2      A.    That is it.

3      Q.    Our understanding from the testimony in this case

4  is that during the second of two interviews you were, I

5  believe, at the Start Center conducting interviews of

6  the children or present for interviews.

7              MR. PERKINS:  Object to the form.

8              You can answer.

9  BY MR. KLEIN:

10     Q.    Do you recall that?

11     A.    I was not working that day.

12     Q.    There were some interviews conducted that week,

13  correct?

14     A.    Correct.

15     Q.    Were you present for interviews conducted after

16  that week with the Thomas-Hicks family?

17     A.    With the family, yes.

18     Q.    Did you have any DB followup reports or other

19  reports of those interviews that you did?

20     A.    Not to my knowledge.  Whatever you have is all

21  there is.

22     Q.    I'll show you the file that we were given and I

23  believe we just have notes from that week.  You will

```
 1              (Ronald Fountain - by Mr. Klein)

 2    confirm that.

 3       A.   Sure.

 4       Q.   I'm assuming there are no notes after what was

 5    discussed -- meetings you attended that week?

 6       A.   Correct.

 7       Q.   If there were subsequent interviews that you

 8    attended would you have taken notes?

 9       A.   Yes.

10       Q.   So any notes you took, would they have been

11    maintained as part of the Troy PD file for this case?

12       A.   Correct.

13       Q.   You didn't have your own separate file that you

14    would maintain?

15       A.   I did not.

16       Q.   When did you join the Troy PD?

17       A.   December of 1993.

18       Q.   Prior to that were you with the county?

19       A.   Yes.

20       Q.   What did you do with the county?

21       A.   I was a deputy sheriff.  And prior to that, I was

22    a corrections officer.

23       Q.   So, when did you -- was it with Rensselaer
```

```
 1              (Ronald Fountain - by Mr. Klein)

 2   County?

 3      A.  Yes.

 4      Q.  Was Rensselaer County corrections your first law

 5   enforcement job?

 6      A.  It was.

 7      Q.  What year did you start that job?

 8      A.  1988, June of 1988.

 9      Q.  You did that until '90?

10      A.  '93, when I went to Troy.

11      Q.  So, you started as is it a deputy sheriff with

12   the corrections department?

13      A.  No.  I started as a corrections officer.

14      Q.  Did you work at the Rensselaer County jail?

15      A.  I did.

16      Q.  What were your duties at the jail?

17          Security?

18      A.  Securing custodian of inmates in the Rensselaer

19   County jail.

20      Q.  At some point, while you worked for the county,

21   did you then become a deputy sheriff?

22      A.  I did.

23      Q.  What year was that?
```

Case 1:17-cv-00626-DJS Document 115 Filed 10/25/21 Page 98 of 156

```
 1                (Ronald Fountain - by Mr. Klein)

 2      A.   February of '90.

 3      Q.   Did your duties and responsibilities change?

 4      A.   They did.

 5           I became --

 6      Q.   Go ahead.

 7      A.   I became a deputy sheriff.  I was a road patrol

 8  officer.

 9      Q.   Did you attend a police academy before doing

10  that?

11      A.   Yes.

12      Q.   Was that like a New York State police academy?

13      A.   No.

14      Q.   Where did you attend?

15      A.   Zone five police academy.  At the time it was at

16  the Hudson Valley Community College.

17      Q.   Was that about a five and a half month course of

18  training?

19      A.   Six months, yes.

20      Q.   Included classroom training?

21      A.   Yes.

22      Q.   Topics for law, police science, and things like

23  that?
```

                    (Ronald Fountain - by Mr. Klein)

1

2       A.   Yes.

3       Q.   As well as range, automobile and other trainings

4    as well?

5       A.   Yes.

6       Q.   Did you pass all those courses?

7       A.   I did.

8       Q.   Why did you leave the county sheriff's office?

9       A.   Money.

10      Q.   You got a better paying job with the Troy PD?

11      A.   Correct.

12      Q.   When you left the sheriff's office, did you

13   resign voluntarily?

14      A.   Yes.

15      Q.   And did you thereafter have to enter an academy

16   before entering the Troy PD, or did your zone five

17   training with the county translate over to Troy PD?

18      A.   Same training.  Didn't have to take any other

19   training.

20      Q.   You didn't have to do it again.

21      A.   No.

22      Q.   When you went to your zone five training, did you

23   learn that -- generally about the constitution, fourth

1                    (Ronald Fountain - by Mr. Klein)

2    amendment, search and seizure, things like that?

3        A.   Yes.

4        Q.   Did you learn in the police academy generally

5    that law enforcement officers -- did you learn about

6    Miranda?

7        A.   Yes.

8        Q.   Did you learn that law enforcement officers have

9    to have -- can't coerce statements from witnesses that

10   they're speaking with?

11       A.   Yes.

12       Q.   Statements have to be voluntary, both to abide by

13   the constitution and to be admissible in court?

14       A.   Yes.

15       Q.   You knew that from training.

16       A.   Yes.

17       Q.   Did you also learn in training that all police

18   officers, regardless of what department you're in, have

19   an affirmative duty to intercede if they become aware of

20   or witness misconduct by other officers?

21       A.   Yes.

22       Q.   In other words, if you see an officer using

23   excessive force, you have an affirmative duty to stop

Case 1:17-cv-00625-DJS Document 76-4 Filed 10/25/21 Page 22 of 156

```
 1              (Ronald Fountain - by Mr. Klein)
 2    and/or report that officer.
 3       A.  Yes.
 4       Q.  Similarly with an interrogation, is it your
 5    understanding that would apply to that as well, or to an
 6    arrest?
 7           If you're aware that someone's conducting an
 8    arrest that was not warranted, you would have a duty to
 9    intercede or report that?
10       A.  Yes.
11       Q.  That is something that, to your knowledge, all
12    police officers learn in their training.
13       A.  Yes.
14       Q.  Was that an obligation that you understood from
15    your training to be required by the constitution?
16       A.  Yes.
17       Q.  Also, did the Troy PD have specific orders or
18    guidelines that said that any officer witnessing or
19    observing misconduct by another officer must report it?
20       A.  I don't know exactly what the regulations say.  I
21    couldn't tell you word for word.  But, yes, generally,
22    if you saw something wrong, you have to report it.
23       Q.  You were aware at Troy that you were under an
```

1              (Ronald Fountain - by Mr. Klein)

2    obligation.

3        A.   Yes.

4        Q.   To your knowledge, all your colleagues would have

5    been aware of that as well.

6        A.   To my knowledge.

7        Q.   So, when you joined the Troy PD, did you go right

8    to patrol?

9        A.   I did.

10       Q.   For how long were you assigned to patrol?

11       A.   I never really left the patrol division.  So, 23

12   years I was a patrol officer.

13       Q.   In November, I'm sorry, September of 2008,

14   specifically September 21st, do recall that being on or

15   about the date that the M█████ Thomas matter came into

16   the office?

17       A.   Yes.

18       Q.   You came to work that day, correct?

19       A.   Yes.

20       Q.   Were you assigned to the patrol bureau at that

21   time?

22       A.   I was a patrolman assigned to the detective

23   bureau.

1                    (Ronald Fountain - by Mr. Klein)

2        Q.  At some point, did your assignment change from

3    the patrol duties to the detective bureau?

4        A.  Yes.

5        Q.  When in your career did that happen?

6    Approximately.  Five, ten years in?  A couple months

7    before Thomas?

8        A.  Yeah.  A few months before Thomas.

9        Q.  What were the circumstances of that?

10           Did you put in for it, did someone ask you to, or

11   something else?

12       A.  So, basically, at Troy Police Department we bid

13   our positions by seniority.  There was a spot open in

14   the detective bureau as juvenile officer with very

15   flexible hours.  I bid that position based on seniority.

16       Q.  Did you get it the first time you requested it?

17       A.  So you don't request.

18       Q.  You bid.

19       A.  You bid, if that makes sense.

20       Q.  Was your bid accepted?

21       A.  They couldn't not accept it.

22       Q.  So, was it, to the best of your recollection,

23   sometime early in 2008 that you transferred to the

1          (Ronald Fountain - by Mr. Klein)

2     detective bureau?

3        A.   I believe it was 2008, 2007, 2008.

4        Q.   What were your duties as -- I think you said the

5     juvenile officer?

6        A.   Correct.

7        Q.   What were your duties and responsibilities?

8        A.   So, I was -- initially it had a lot to do with

9     school truancy and then I moved into where I was in

10    charge of -- I don't know.  Sorry.  I wasn't in charge.

11          I was being assigned to all cases having to do

12    with juveniles, whether they were the party that was

13    injured.  A lot of it had to do with sexual assaults and

14    then it blossomed from there as my career went on.

15       Q.   Was it the arrest and prosecution of juveniles

16    either in family or criminal court, or were you dealing

17    with juvenile victims, or both?

18       A.   Both.

19       Q.   So, if there was a sex crime involving, God

20    forbid, a juvenile victim, but there was an adult

21    defendant, you would be involved -- you might be

22    involved in that case?

23       A.   95 percent of them.

Case 1:17-cv-00625-DJS Document 76-24 Filed 10/25/21 Page 26 of 156

1          (Ronald Fountain - by Mr. Klein)

2      Q.   So, juvenile victim or juvenile defendant you

3  would be involved more likely than not?

4      A.   More likely.

5      Q.   Were there any other co-juvenile officers with

6  you or were you the primary?

7      A.   For about seven years I was the primary.

8      Q.   From about '07-'08 until about 2015-2016?

9      A.   Yes.

10     Q.   How did you become involved in the Thomas matter?

11          Was that part of your standard duties in the

12 detective bureau as the juvenile officer?

13     A.   No.

14     Q.   It was a one off or something else?

15          Why don't you tell me in your own words how that

16 came about.

17     A.   I was on call every sixth weekend.  Sadly, that

18 was my weekend on call.

19     Q.   So, when you were on call, did that mean that you

20 could be assigned to a non-juvenile matter if it came

21 in?

22     A.   Correct.

23     Q.   Had you ever worked on a homicide prior to that?

Case 17-cv-00625-DJS Document 167-14 Filed 10/25/21 Page 2736f 156

1              (Ronald Fountain - by Mr. Klein)

2      A.   I don't recall.

3      Q.   At the time it came in it was attempted -- it

4  went in as an attempted murder at the time of arrest,

5  correct?

6      A.   Correct.

7      Q.   But it evolved into a fatality, correct?

8      A.   Correct.

9      Q.   It was a homicide investigation, correct?

10     A.   Correct.

11     Q.   In terms of any detective bureau training, do you

12  recall if you had any specific training when you went

13  from the patrol bureau to the detective bureau?

14     A.   I was sent to different trainings throughout my

15  detective career, yes.

16     Q.   We were given a copy of your in-service training

17  record.

18     A.   Okay.

19     Q.   It looks like in June of 2008 you had

20  interrogation training.

21          Do you recall that?

22     A.   I do.

23     Q.   What do you recall about it?

Case 1:17-cv-00625-DJS Document 67-1 Filed 10/25/21 Page 286 of 156

1              (Ronald Fountain - by Mr. Klein)

2      A.   It was in Colonie.

3      Q.   It was called interview and interrogation course?

4      A.   Yes.

5      Q.   Is it Loudonville, New York?

6      A.   Correct.

7      Q.   Is that Colonie or is that different?

8      A.   Part of Colonie.

9      Q.   What do you recall about the course?  How many

10     days was it?  Do you know who gave it?

11     A.   The guest speaker's name fails me right now, but

12     it was put on by senior detectives throughout the state,

13     talking about interrogation and interviewing techniques

14     used through New York State.

15     Q.   Was that the first time you had received training

16     on interrogation techniques?

17     A.   Besides basic training at the police academy,

18     yes.

19     Q.   Do you know if Adam Mason went to that training

20     with you?

21     A.   I don't recall.

22     Q.   Did you receive any course materials during that

23     training?

Case 1:17-cv-00626-DJS Document 67-4 Filed 10/25/21 Page 108 of 156

1          (Ronald Fountain - by Mr. Klein)

2     A.   I don't recall.

3     Q.   Was it your practice to take them back to the

4  office or take them home with you if you did receive

5  them?

6     A.   Probably would have shoved them in my desk drawer

7  somewhere, yes.

8     Q.   What did the training consist of?  Was it just

9  lectures for two days?  Was it interactive where you had

10  to do some mock interrogations?  Or something else?

11     A.   Pretty much lectures.

12     Q.   Did you become familiar with any techniques that

13  you didn't know before, or was it just kind of guidance

14  in conducting interrogations?

15     A.   Type of guidance as far as I can recall.

16     Q.   Were there any techniques, theories or methods

17  that you learned that you implemented in the Adrian

18  Thomas case?

19     A.   Not that I recall.

20     Q.   Was there anything meaningful that you can recall

21  about that training that you did implement, even if it

22  was a very minor nuance in your technique?

23     A.   Not that I recall.

Case 1:17-cv-00625-DJS Document 69-24 Filed 10/25/21 Page 30 of 156

```
 1              (Ronald Fountain - by Mr. Klein)

 2      Q.   In the interrogation training, was there a

 3   discussion of the risks of obtaining coerced

 4   confessions?

 5      A.   Not that I recall.

 6      Q.   Was there guidance on ensuring voluntariness of

 7   statements so that they're admissible in court?

 8      A.   Not that I recall.

 9      Q.   Were you aware, prior to the Thomas interviews,

10   that voluntariness was always an issue with statements

11   of accused?

12      A.   I knew a voluntary statement was the best way to

13   go.

14      Q.   Well, the form was entitled "voluntary

15   statement", correct?

16      A.   Yes.

17      Q.   But did you know as a matter of law enforcement

18   practice, through your training and experience, that to

19   be lawful all statements had to be voluntary?

20      A.   Yes.

21      Q.   In other words, they couldn't be coerced.

22      A.   Correct.

23      Q.   They had to be from their own judgment and mind
```

Case 1:17-cv-00625-DJS Document 67-11 Filed 10/25/21 Page 31 of 156

1                    (Ronald Fountain - by Mr. Klein)

2    of the person.  You couldn't introduce your own judgment

3    for that person's judgment as the interrogator.

4         You couldn't put words in someone's mouth.  They

5    had to make a statement on their own volition, correct?

6              MR. PERKINS:  Object to the form.

7              You can answer.

8    A.  Yes.

9    Q.  So, you were aware of the concept of

10   voluntariness, that you couldn't coerce someone into

11   saying something.  They had to say it on their own for

12   it to be valid and legal, correct?

13   A.  Correct.

14   Q.  Other than that interrogation and training

15   technique in Loudonville, that was two days that you

16   said didn't really impact your interrogation in this

17   case, did you have any other interrogation training in

18   your career even if it was after?

19   A.  Yes.

20   Q.  How many times?

21   A.  Two, three.

22   Q.  Do you recall where they were?

23        Were they at Loudonville also or somewhere else?

Case 1:17-cv-00625-DJS Document 67-4 Filed 10/25/21 Page 32 of 156

1          (Ronald Fountain - by Mr. Klein)

2     A.   It was interviewing of children.  It was in

3  Albany.  And that was the New York State best practices

4  for the forensic interviewing of children.

5          And I believe later in my career I went to the

6  advanced best practice for interviewing children.

7     Q.   Were those different than interrogation

8  techniques of potential defendants?

9     A.   Yes.

10    Q.   So those were about speaking with child victims,

11 perhaps, in sensitive matters like sex crimes, correct?

12    A.   Not perhaps.  It was for sex crimes.

13    Q.   So, was the interrogation and training that you

14 had in 2008 the only one that dealt with the type of

15 interrogation that you did with Adrian Thomas?

16    A.   To the best of my knowledge, yes.

17    Q.   Do you know what the REID technique is?

18    A.   No.

19    Q.   Is that something that you recall learning in

20 training?

21    A.   I don't recall.

22    Q.   Just to be clear:  Whatever you learned at that

23 training, you exercised your own independent judgment in

```
 1              (Ronald Fountain - by Mr. Klein)
 2   how you conducted this interrogation with Adrian Thomas,
 3   correct?
 4              MR. PERKINS:  Objection to the form.
 5     Q.  When you conducted your interrogation of Adrian
 6   Thomas, interview one, you acted based on your
 7   instincts, not with regard to any specific training that
 8   you learned, correct?
 9              MS. CALABRESE:  Objection.
10              MR. PERKINS:  Object to the form.
11              You can answer.
12     A.  Yes.
13   BY MR. KLEIN:
14     Q.  Were you guided by any training or experience in
15   that interview, or was it just kind of you and Mason
16   went in and were kind of riffing off each other about
17   who would ask what about what to ask next?
18              MR. PERKINS:  Object to the form.
19              You can answer.
20     A.  I believe we were just bouncing off of each
21   other.
22     Q.  Had you ever had that type of interaction with
23   Mason before?
```

Case 1:17-cv-00625-DJS Document 76-4 Filed 10/25/21 Page 34 of 156

1          (Ronald Fountain - by Mr. Klein)

2     A.   I don't recall.

3     Q.   Did you work with him on any interrogations, kind

4  of like you and him together in tandem like that on any

5  subsequent cases?

6     A.   Yes.

7     Q.   How many?

8     A.   I don't recall.

9     Q.   In this case, were you aware, or did you become

10 aware, that the statements of Adrian Thomas were found

11 to violate the constitution by the New York State Court

12 of Appeals?

13    A.   Yes.

14    Q.   Did you read the decision?

15    A.   No.

16    Q.   Did anyone share with you the contents of it,

17 whether they read it to you and just said in sum and

18 substance, this is what the court said?

19    A.   Not like that, no.

20    Q.   What did you hear about it?

21    A.   I believe the district attorney's office said it

22 was coming back and they threw out the statements.

23    Q.   Other than that, do you remember hearing anything

Case 1:17-cv-00625-DJS Document 60 Filed 10/25/21 Page 35 of 156

```
 1              (Ronald Fountain - by Mr. Klein)

 2   else about the decision from the Court of Appeals?

 3      A.   Never looked at it.

 4      Q.   The court suppressed the statements, finding that

 5   they were coercive.

 6           Is this the first you're hearing about it in

 7   terms of the reason why it was suppressed?

 8      A.   I knew they were suppressed.  Exactly why, no.

 9      Q.   The court found that they weren't voluntary, they

10   were the products of coercion, and violated due process

11   and the 14th amendment.

12           Did anyone ever talk to you about guidance for

13   future interrogations after this decision came down?

14              MR. PERKINS:  Object to the form.

15              You can answer.

16      A.   No.

17      Q.   Did anything change within the department,

18   whether you knew it was from this case or not, with

19   regard to interrogation tactics and techniques, after

20   this decision came down?

21              MR. PERKINS:  Object to the form.

22              You can answer.

23      A.   Not to my recollection.
```

Case 1:17-cv-00625-DJS Document 69-1 Filed 04/10/25 Page 36 of 156

```
 1                    (Ronald Fountain - by Mr. Klein)

 2   BY MR. KLEIN:

 3      Q.   The court found that, among other things, where

 4   the police officers threatened that if the defendant

 5   continued to deny responsibility for his child's injury

 6   his wife would be arrested and removed from his ailing

 7   child's bedside, where he immediately agreed to "take

 8   the fall" in response to this threat.

 9            The officers told him 21 times that his

10   disclosure of circumstances --

11            MS. CALABRESE:  Can we mark that and admit

12   it?  We've been reading from it.  I think it should be

13   marked and entered.

14            MR. KLEIN:  I'm not done with my question.

15   Can I finish my question and then we'll do it.

16            MS. CALABRESE:  I apologize for interrupting

17   you.

18   BY MR. KLEIN:

19      Q.   The court found, among other holdings, that

20   incriminating statements by the murder defendant, which

21   is Mr. Thomas, were not voluntary, but were products of

22   coercion, in violation of the due process clause of the

23   14th amendment, where police officers threatened that if
```

Case 17-cv-00625-DJS Document 1-1 Filed 10/25/21 Page 786 of 156

1          (Ronald Fountain - by Mr. Klein)

2    the defendant continued to deny responsibility for his

3    child's injury, his wife would be arrested and removed

4    from his ailing child's bedside.  The defendant

5    immediately agreed to take the fall in response to the

6    threat.

7          Officers told the defendant 21 times that his

8    disclosure of circumstances under which he injured his

9    child was essential to assist doctors attempting to save

10   the child's life.

11         And officers assured the defendant that whatever

12   had happened was an accident, that he could be helped if

13   he disclosed all, and that once he had done so he would

14   not be arrested but would be permitted to return home.

15         Did you ever know that that was the gist of the

16   court's findings in the case?

17              MS. CALABRESE:  Object to the form.

18              MR. PERKINS:  Object to the form.

19              You can answer.

20   A.  I never read it.

21   BY MR. KLEIN:

22   Q.  Well, did anyone ever share with you -- other

23   than that the court sent the case back to be retried and

Case 1:17-cv-00625-DJS Document 60-1 Filed 10/25/21 Page 38 of 156

1            (Ronald Fountain - by Mr. Klein)

2  the statement wasn't coming in, did you know anything in

3  the nature of what I just read to you now, before now?

4      A.  To the best of my understanding, there was a

5  problem with the eight- or nine-hour interview that Adam

6  Mason did with Mr. Thomas and that was the reason it

7  came back, but I never read the entire thing and I don't

8  believe anyone ever read it to me like that, no.

9      Q.  You were present during the first interview when

10 he was told his wife would be arrested if he continued

11 to deny responsibility.

12          Do you recall that?

13     A.  No, I don't, but I believe you.

14     Q.  And I'll show you the testimony of you.

15     A.  That's fine.

16     Q.  He ultimately agreed to quote "take the fall" in

17 response to what the court called a threat during your

18 interview.

19          Do you recall that he said the word "I'll take

20 the fall"?

21     A.  I do.

22     Q.  He was told, during your first interview, that

23 the disclosure of the circumstances under which he

```
 1                  (Ronald Fountain - by Mr. Klein)

 2   injured the child were essential to assist the doctors

 3   to save M██████'s life, correct?

 4      A.   I believe either myself or Mason said that.  I

 5   don't know which one.

 6      Q.   You were present when either you or Mason or both

 7   assured him that whatever had happened was an accident.

 8      A.   Yes.

 9      Q.   I just recently reviewed that first statement.

10   There were numerous times where Mason said, it's an

11   accident, and if it's an accident you're going to go

12   home.

13           Do you recall that or words to that effect?

14      A.   Yes.

15      Q.   So, do you know who told you that it was the

16   second interview only that was a problem and not

17   starting with the first interview?

18      A.   I don't recall.

19      Q.   So, until now, you didn't know that it was the

20   whole chain of events that the court considered in its

21   decision that the statement was not voluntary?

22              MR. PERKINS:  Objection.

23              You may answer.
```

Case 1:17-cv-00625-DJS Document 767-24 Filed 10/25/21 Page 40 of 156

```
 1              (Ronald Fountain - by Mr. Klein)

 2     A.  I did not know that.

 3  BY MR. KLEIN:

 4     Q.  We'll go back to that in a few minutes and we'll

 5  mark it, as Christina asked, and give you a chance to

 6  review it and ask you some more questions about it.

 7          Were you involved, either as a lead officer or as

 8  an assisting officer, in any other case where any court,

 9  other than this court, found that a statement was not

10  voluntary or otherwise suppressed, a statement of an

11  accused?

12     A.  I don't know.

13     Q.  Not that you're aware of?

14     A.  Not that I'm aware of.

15     Q.  Has any court found, other than this court, found

16  that you or conduct attributed to you, in whole or in

17  part, has violated anyone's constitutional rights?

18     A.  Not to the best of my knowledge.

19     Q.  Did you continue to work on juvenile cases

20  through your departure from the department, with the

21  exception of your on-call days when you might get

22  non-juvenile cases?

23     A.  Yes.
```

1          (Ronald Fountain - by Mr. Klein)

2     Q.   And was it 2015 or '16 that you left the

3   department?

4     A.   Yes.

5     Q.   Which one?

6     A.   It's been three years and seven months.

7          Do you want me to backdate?  Let's go with '15.

8   No, 2016.  February.

9     Q.   What were the circumstances of your leaving?

10    A.   I was offered another job.

11    Q.   Where was that?

12    A.   Ready for this?  The Rensselaer County Sexual

13  Assault and Crime Victims Center.  The rest of it is at

14  Samaritan Hospital through St. Peter's Health Partners,

15  a Division of Trinity Health.

16    Q.   Was that a non-police department job?

17    A.   Yes.

18    Q.   Did you leave there when you were indicted?

19    A.   No.

20         MR. PERKINS:  Object to the form.

21    Q.   Did you get indicted around that time?

22         MR. PERKINS:  Object to the form.

23    Q.   Well, around 2015 or '16 did you get arrested?

Case 1:17-cv-00626-DJS Document 69-1 Filed 10/25/21 Page 42 of 156

```
1              (Ronald Fountain - by Mr. Klein)

2              MR. PERKINS:  Object to the form.  I'm going

3    to direct him not to answer.  I think we need to call

4    the judge.  These charges were dropped, they were

5    sealed.  They don't involve anything regarding

6    constitutional rights.

7              MR. KLEIN:  I want to ask him about it.

8       Q.  Had you ever been convicted of a crime?

9              MR. PERKINS:  Object to the form.

10             You know what?  You can answer that.  Go

11   ahead.

12      A.  No.

13   BY MR. KLEIN:

14      Q.  Did you leave the Troy PD voluntarily or was it

15   due to some administrative situation which I don't want

16   you to talk about.

17      A.  Totally voluntary.

18      Q.  So, did you resign from the PD with a full

19   pension or did you leave under different circumstances?

20             MR. PERKINS:  Object to the form.

21             You can answer.

22             MS. CALABRESE:  I'm going to also object

23   under Civil Rights Law 50A.
```

```
 1                   (Ronald Fountain - by Mr. Klein)

 2                   MR. KLEIN:  You can just say "objection".

 3                   MS. CALABRESE:  I'm making a record for

 4       myself.

 5                   I think this line of questioning violates

 6       Civil Rights Law 50A for the Court of Claims action.

 7       Mr. Klein can make an application to the court to elicit

 8       any of this information relating to any disciplinary or

 9       any purpose other than voluntarily leaving for whatever

10       reason the Troy Police Department.

11                   MR. PERKINS:  And I would note one further

12       objection for the record.

13                   The personnel file, the entire personnel

14       file of Mr. Fountain, was provided to Judge Stewart in

15       this action.  The judge reviewed and issued a text order

16       saying there was nothing of relevance involved.

17                   MR. KLEIN:  I'm asking about publicly

18       available and reported information.

19                   There was some information reported about

20       some criminal proceeding involving you, correct, in the

21       news.

22                   MR. PERKINS:  Object to the form.

23                   Don't answer.
```

```
 1                    (Ronald Fountain - by Mr. Klein)

 2               MR. KLEIN:  We'll mark it for a ruling.

 3               MS. PECK:  Hold on.  We did this the last

 4    time we marked it for a ruling.  All that means is we

 5    may end up coming back here.  Judge Stewart said that

 6    he's available to us today.

 7               MR. KLEIN:  Well, I will --

 8               MS. PECK:  Why not make the call?  He

 9    already made an order on part of this subject matter

10    anyway.

11               MR. KLEIN:  Well, because I want to see if

12    there's any other issues.  I didn't call last time

13    because I chose not to, but today I very likely will.  I

14    don't want to call the court piecemeal.  If there's

15    three or four questions, I want to raise them at once

16    and I will.  So, I could raise it in writing at a later

17    time.

18               MS. PECK:  It is also Joe's prerogative,

19    too, if he wants to call the Court and get a ruling on

20    it right now, not just yours.

21               MR. KLEIN:  Sure, yeah, but I'm not pursuing

22    the question.  I'm marking it.  I could call the Court.

23    I very well might.  I could also write the Court.  So,
```

```
 1            (Ronald Fountain - by Mr. Klein)
 2  let's take it step by step, one step at a time.
 3  BY MR. KLEIN:
 4     Q.  What were your duties when you went to the
 5  Rensselaer County Sexual Assault and Crime Victims
 6  Center?
 7     A.  I'm an educator.
 8     Q.  You teach a class or courses?
 9     A.  Many.
10     Q.  What do you teach?
11     A.  I talk to college students about consent.  I talk
12  to high school students about sexual harassment.  I talk
13  to kindergartners about safe and unsafe touches.  I talk
14  to fourth and fifth graders about standing up for each
15  other when it comes to somebody doing something sexually
16  offensive.
17     Q.  Is your background for that your law enforcement
18  training or did you have any additional training?
19     A.  I've had additional training.  Mostly was my law
20  enforcement training.
21     Q.  How long did you have that job for, or do you
22  still have it today?
23     A.  Yes.  Since I retired on a Friday, I started
```

Case 1:17-cv-00626-DJS Document 76-11 Filed 10/25/21 Page 46 of 156

```
 1              (Ronald Fountain - by Mr. Klein)
 2   there on a Monday, two days after I retired.
 3       Q.   You've been there ever since?
 4       A.   Swear to God.
 5            Sadly I'm not being paid right now because I'm
 6   here with you.
 7       Q.   You are being represented and indemnified by the
 8   City of Troy in this case, correct?
 9       A.   As far as I know.
10       Q.   Have you had any other employment since you left
11   the Troy PD?
12       A.   Yes.
13       Q.   What else?
14       A.   A friend of mine owns Earl B. Feiden Appliances.
15   I sell some on Friday afternoons.  I've known Brad
16   Feiden for about 30 years.
17       Q.   Any other jobs?
18       A.   No.
19       Q.   Have you had any other law enforcement jobs other
20   than what you've told me?
21       A.   No.
22       Q.   Have you ever served in military?
23       A.   No.
```

```
 1              (Ronald Fountain - by Mr. Klein)

 2         Do I look that old?  Date back to 1988 when I

 3   started.

 4     Q.   Directing your attention back to the Thomas

 5   incident.

 6         Were you working that day?  Or I think you said

 7   you were on call.

 8     A.   Correct.

 9     Q.   Can you walk us through your involvement in the

10   case, starting with getting the call, going in, what you

11   did.

12     A.   Okay.  I was at my nephew's birthday party when

13   the call came in.  I brought my one and three year old

14   home with my wife.  I went to the police department, met

15   up with Sergeant Mason, who advised me there was a child

16   victim of unknown circumstances at the time.

17         I believe we met with child protective about

18   going to a residence on 21st Street in Troy, where we,

19   along with child protective, removed some children.

20         After that, I went with Sergeant Mason I believe

21   to Albany Medical Center, where we interviewed the

22   mother.  And then sometime during the evening we got

23   back to the police station -- or I'm sorry -- we went
```

1             (Ronald Fountain - by Mr. Klein)

2    back to 21st Street, asked Mr. Thomas if he would come

3    down to the police station and talk to us about what

4    could have happened.

5         He came down.  We spoke until about 3 in the

6    morning.  I believe we brought him to Samaritan

7    Hospital, and after that I went home.

8    Q.   Let's pause there.

9         When you first got to work and heard the nature

10   of the call, do you recall Nicole Noel from CPS being at

11   the precinct?

12   A.   I believe she was at the desk waiting for us,

13   yes.

14   Q.   Had you worked with her prior to this incident?

15   A.   Yes.

16   Q.   Did you have a good working relationship with

17   Nicole?

18   A.   Yes.

19   Q.   Did she go with you to Samaritan, I believe it

20   was, or was it Albany Med you went to first?

21   A.   I believe Samaritan.  I don't recall if -- she

22   definitely didn't come with us in our car.  If she

23   followed us there first, I don't recall.

1          (Ronald Fountain - by Mr. Klein)

2     Q.  Who did you first speak with, if anyone,

3  regarding the case that day?

4     A.  Sergeant Mason or Captain Mason.

5     Q.  When you got to the hospital.

6     A.  I don't remember who we spoke to.

7     Q.  Have you looked at the detective bureau followups

8  for this case?

9     A.  Very briefly.

10     Q.  You can feel free to look at them today if you

11  wanted to help to remember.

12          Is there anything that would refresh your

13  recollection?

14     A.  If you'd like me to look at something, I'd be

15  more than happy to.

16     Q.  Sure.  Well, I'll tell you that we marked as

17  Thomas Exhibit 2 the followups in this case.  And on

18  9/21 it's noted by then Sergeant Mason that he and you

19  were called in for report of a baby at Albany Med.

20          You've said that, correct?

21     A.  Correct.

22     Q.  You were briefed by Nicole Noel from child

23  protective services.  You've indicated that as well.

```
 1              (Ronald Fountain - by Mr. Klein)
 2         Then Noel stated that you received the report
 3    from Albany Med about 2 p.m. that day.
 4         Does that sound about right?
 5     A.   Sounds about right.
 6     Q.   And the report was that a four month old baby was
 7    transported from his residence at the Thomas-Hicks
 8    household to Samaritan, and then later transferred to
 9    Albany Med.
10         Do you recall that?
11     A.   I do.
12     Q.   Initial report was that the baby was having
13    respiratory problems and hospital exams revealed trauma
14    to the head.
15         Do you recall that?
16     A.   I do.
17     Q.   Then, in sum and substance, CPS notified the PD
18    at about 5:20 p.m. of the incident and after that you
19    came in, correct?
20     A.   Correct.
21     Q.   Then it says IOs -- that's investigating
22    officers?
23     A.   Correct.
```

```
 1                (Ronald Fountain - by Mr. Klein)

 2      Q.  So, were you and now Captain Mason the two

 3   assigned officers or investigators to this case?

 4      A.  Correct.

 5      Q.  No one else.

 6          Was anyone else assigned?

 7      A.  I'm sure during the course of the investigation

 8   there was other detectives that were assigned to help

 9   out.

10      Q.  Do you recall?

11      A.  From what I read over the last couple days, when

12   I had a chance to peek, I saw now Captain Centanni, used

13   to be Sergeant Centanni's in there.  Sergeant Colaneri

14   is in there.  I don't know who else.  I'm sure there's

15   more that I didn't read.

16      Q.  But is it your understanding that you and Mason

17   were the lead investigators on this case?

18      A.  Yes.

19      Q.  It says that you guys went to Samaritan Hospital

20   first.

21          Any reason to doubt that?

22      A.  No.

23      Q.  It says the initial report was that the victim
```

Case 1:17-cv-00625-DJS Document 67-1 Filed 10/25/21 Page 53 of 156

```
 1              (Ronald Fountain - by Mr. Klein)
 2   was having respiratory problems and was unresponsive.
 3         Do you recall hearing that?
 4      A.  Yes.
 5      Q.  The victim left Samaritan, went to Albany Med at
 6   11:50.
 7         So this is information you were informed that
 8   day, correct?
 9      A.  Correct.
10      Q.  And you then responded to -- it says that the
11   doctor who saw the victim at Samaritan was Katrina
12   Kardos, MD.  She was off duty when you guys arrived
13   there.
14         So, do you recall that you didn't speak with any
15   doctors at Samaritan?
16      A.  I don't recall.
17      Q.  Then, it says IOs then responded to the victim's
18   residence along with CPS.
19         Were you part of that response?
20      A.  Yes.
21      Q.  So, did you go to the Thomas-Hicks household and
22   were you there for the removal of the children?
23      A.  Yes.
```

Case 1:17-cv-00626-DJS Document 67-11 Filed 10/25/21 Page 53 of 156

1          (Ronald Fountain - by Mr. Klein)

2      Q.  Is that when you first met Adrian Thomas?

3      A.  Yes.

4      Q.  Had you ever met him before that date?

5      A.  No.

6      Q.  Did you know anything about him prior to that

7  date from any investigations or jobs that you were

8  involved in?

9      A.  No.

10      Q.  Did you know anyone in the Hicks household prior

11  to that date?

12      A.  No.

13      Q.  Can you tell us what you observed at the

14  Thomas-Hicks household when you went there with CPS that

15  first day, if you recall?

16      A.  That it was an apartment in the Cedar Park

17  Apartments.  I've seen numerous of them.  I grew up

18  about a block from there.  They all kind of look the

19  same.  There's a living room, a little kitchen kind of

20  attached, a couple of bedrooms, and a bathroom in the

21  middle.

22      Q.  Small apartment for that many kids and two

23  parents, correct?

                     (Ronald Fountain - by Mr. Klein)

1    A.   I would say, yeah.

2    Q.   Was it in relatively neat and good condition?

3    A.   Yes.

4    Q.   Did the children appear to be well groomed and

5    otherwise physically okay?

6    A.   Yes.

7    Q.   Do you remember any of the kids who didn't seem

8    okay when you first went there?

9    A.   One of the children I remember was kind of

10   bopping around without a care in the world.  I noticed

11   other things, but...

12   Q.   What else did you notice?

13   A.   There was no toys.

14   Q.   Do you know if they had been -- if they were in a

15   bin somewhere in a closet, or did you look?

16   A.   I believe at the end we found them in a bin in a

17   closet up on top, but there just wasn't much there for

18   seven people.

19   Q.   Do you remember anything else that stood out?

20   A.   Just a lot of kids in a small space.

21   Q.   Then the children were removed from the home,

22   correct?

```
 1              (Ronald Fountain - by Mr. Klein)

 2      A.   Correct.

 3      Q.   Were you there as they were like physically

 4  escorted out?

 5      A.   Yes.

 6      Q.   Did you stay there after with Adrian Thomas for a

 7  few minutes?

 8      A.   Yes.

 9      Q.   How long was it, approximately?

10      A.   I don't recall.

11      Q.   What do you recall about Adrian at that time?

12      A.   I remember he was a big fellow sitting down

13  with...

14           He was -- his demeanor was fine.  He didn't seem

15  overly upset about anything.

16      Q.   Did he seem upset, though?

17      A.   I mean, I don't recall.

18      Q.   You don't recall him being in tears or bawling?

19      A.   Correct.

20      Q.   But you don't know that he wasn't.

21           He just didn't seem overly upset.

22      A.   Correct.

23      Q.   Do you know whether he was upset?
```

```
 1               (Ronald Fountain - by Mr. Klein)

 2               MR. PERKINS:  Object to the form.

 3     Q.  Do you know if he was the kind of person who

 4  expressed outwardly his emotions or whether he had them

 5  all bundled up for whatever reason?

 6               MS. PECK:  Objection to the form.

 7     A.  I didn't know him that well.

 8     Q.  You didn't know either way.

 9     A.  Didn't know.

10     Q.  What else do you recall about Adrian, if

11  anything, at that time?

12     A.  Not a lot.

13     Q.  What, if anything, was said, either by you, Mason

14  or Adrian at that time?

15     A.  I don't recall.

16     Q.  Was there an initial interview of him at that

17  time?

18     A.  Yes.

19     Q.  You don't remember it?

20     A.  The exact words of the interview, no, I don't.

21     Q.  How about in sum and substance, can you tell us

22  what you remember?

23          We're talking about the apartment.  Okay?
```

1        (Ronald Fountain - by Mr. Klein)

2    A.   Okay.

3    Q.   In the apartment, do you recall what was said

4    even if it's in sum and substance?

5    A.   I don't.

6    Q.   Did he tell you, in sum and substance, that all

7    he knew essentially was that he was woken up that

8    morning by his wife who was frantic, and that the baby

9    was not responsive.  They called 911 and did some CPR.

10        MR. PERKINS:  Object to the form.

11        You can answer.

12    Q.   Was that the sum and substance of what he told

13    you?

14    A.   Yes.

15    Q.   What happened after you spoke with him at the

16    residence after the children were removed?

17    A.   I don't know what he did.  We left.

18    Q.   You left.  What did you do next?

19    A.   I believe myself and sergeant -- Captain Mason

20    went to Albany Med.

21    Q.   According to the DB followup, at the residence,

22    Mr. Thomas told you guys that the victim had a fever and

23    diarrhea for the past two days.

1           (Ronald Fountain - by Mr. Klein)

2           Do you recall that?

3     A.   I do.

4     Q.   Was that corroborated by the mother when you

5  spoke with her as well?

6     A.   I believe so, yes.

7     Q.   Then the other things I just said.  Around 8:30

8  to 9 his wife woke him up because the victim was not

9  responding.

10          Do you recall that?

11    A.   Yes.

12    Q.   He sprinkled some water on the victim's face but

13  the victim was still unresponsive.

14          Do you recall that?

15    A.   Yes.

16    Q.   He called 911 from his cell phone and gave the

17  phone to his wife.

18          He told you that?

19    A.   He did.

20    Q.   His wife performed CPR and the ambulance came

21  after that.

22    A.   Yes.

23    Q.   At Albany Med, according to this, you got there

```
 1              (Ronald Fountain - by Mr. Klein)
 2   at around 9:30 p.m.
 3          Does that sound about right?
 4      A.  Sounds about right.
 5      Q.  M█████ Thomas was in the PICU, which is the E
 6   building, seventh floor.
 7          Do you recall that?
 8      A.  Yes.
 9      Q.  There's notes about a charge nurse, Rebecca
10   Peccano, who said that there was a bilateral subdural
11   hematoma and the baby was not likely to survive.
12          Do you recall whether you spoke with her or did
13   your partner?
14      A.  I don't recall who spoke with her.
15      Q.  Did you learn that that evening?
16      A.  Yes.
17      Q.  There appeared to be both old blood and new blood
18   on the victim's brain, indicating there's an old injury
19   as well as a new injury.
20          Do you recall being told that that night?
21      A.  Yes.
22      Q.  And then it says, the victim was initially
23   diagnosed with a skull fracture but that was later
```

1          (Ronald Fountain - by Mr. Klein)

2    determined to be inaccurate.

3          Is that true?

4      A.  Yes.

5      Q.  So, was there anything else that the doctors or

6    nurses told you that you later learned to be untrue that

7    you can recall?

8               MR. PERKINS:  Object to the form.

9               You can answer.

10     A.  That was found to be untrue?

11     Q.  Yeah.

12     A.  I don't recall.

13     Q.  That was a big one, though.

14              MR. PERKINS:  Object to the form.

15     A.  Right.

16     Q.  And it says around 9:45, so about 15 minutes

17   after getting there, you spoke with Walter Edge?

18     A.  Dr. Edge.

19     Q.  Do you remember Dr. Edge?

20     A.  Yes.

21     Q.  Had you ever spoken with him before the incident?

22     A.  No.

23     Q.  Did you ever speak with him on other cases after

1              (Ronald Fountain - by Mr. Klein)

2    this incident?

3        A.  I don't remember.

4        Q.  He stated to you that the injuries were typically

5    caused by a high speed impact or by slamming a very hard

6    object.

7            That's what this report says.  Is that what he

8    told you?

9        A.  Yes.

10       Q.  So what were the circumstances of your meeting

11   with Dr. Edge?  Where was it?  How long did you speak to

12   him for?  How did it go down?

13       A.  I believe it was the hallway.  It was very brief.

14   He said he was very busy.  I asked him if he could

15   conclude what happened.  I recall him saying this is a

16   homicide and telling me about the injury, and how the

17   speed of the impact would have had to have happened to

18   make this injury.

19       Q.  Did he also tell you that he hadn't slept for two

20   days?

21       A.  Yes.

22       Q.  Was he kind of walking or rushing around to get

23   out of there while you were speaking with him?

Case 1:17-cv-00625-DJS Document 69-1 Filed 10/25/21 Page 62 of 156

```
 1              (Ronald Fountain - by Mr. Klein)

 2      A.   He was definitely trying to get out.

 3      Q.   Tell me more about that.

 4           Did he seem harried or exhausted or what?

 5              MR. PERKINS:  Object to the form.

 6              You can answer.

 7      A.   He seemed very busy.

 8      Q.   What do you mean by "very busy"?

 9      A.   He had other matters involving very sick children

10   that he had to attend to and didn't have time to talk to

11   me.

12      Q.   So, how much of his time did he give you?

13           Was it like within a minute that he kind of

14   rolled off his opinions and you guys went separate ways?

15      A.   Maybe three or four minutes.

16      Q.   But you felt like it was hard to get his

17   attention.

18              MR. PERKINS:  Object to the form.

19              You can answer.

20      A.   I thought I had his attention.

21      Q.   How did you learn that he hadn't slept for two

22   days?

23           Did he volunteer that?
```

Case 1:17-cv-00625-DJS Document 76-24 Filed 10/25/21 Page 63 of 156

```
 1                (Ronald Fountain - by Mr. Klein)

 2      A.   Yes.

 3      Q.   How did it come up?  Was he saying, look, I'm not

 4  sure about this?  Did he say, I'm just exhausted?  Or

 5  how did he -- what were the circumstances in which he

 6  told you that?

 7                MR. PERKINS:  Object to the form.

 8                You can answer.

 9      A.   To the best of my current recollection, he said

10  he was very busy.  He hadn't slept in a couple days.

11  This was a homicide.  He had other matters to attend to

12  and he didn't have time to talk to me.

13      Q.   Do you recall anything else about that meeting

14  with him?

15      A.   No.

16      Q.   Then, at 10 p.m., do you recall interviewing

17  Wilahemina Hicks?

18      A.   Yes.

19      Q.   And that was at Albany Med.

20      A.   Yes.

21      Q.   Do you recall her relatives were there, her

22  mother and her sister?

23      A.   Yes.
```

1              (Ronald Fountain - by Mr. Klein)

2      Q.  According to this, you took a deposition from her

3   at around 11:10 p.m.

4          Do you recall that?

5      A.  Yes.

6      Q.  Was her mother and her sister present when you

7   took the deposition from her, or would you have spoken

8   with her just you and her privately or you and/or Mason

9   and her privately?

10     A.  I don't recall.

11     Q.  Do you recall what she told you, in sum and

12   substance?

13     A.  That the baby had been sick, about the vomiting,

14   about waking up in the morning and trying CPR, about

15   going to Samaritan Hospital a couple days before.  In

16   sum and substance, that was about it.

17     Q.  She didn't know, she wasn't aware of anything

18   that Adrian did to hurt the child.  She didn't tell you

19   anything about that, right?

20     A.  She did not.

21     Q.  Thomas Exhibit 19 is a two-page deposition of a

22   witness, of Wilahemina Hicks, dated 9/21/08 at 23:10.

23          Is that your signature at the bottom as a

1              (Ronald Fountain - by Mr. Klein)

2    witness?

3        A.   Yes.

4        Q.   Is this the two-page statement that you obtained

5    from Wilahemina Hicks at the hospital?

6        A.   Yes.

7        Q.   Did you write out the narrative or did she write

8    it out?

9        A.   The narrative I wrote out.

10       Q.   From there, you went back to Adrian Thomas'

11   house, correct?

12       A.   Correct.

13       Q.   What was the reason you went directly from the

14   hospital back to Adrian at that time rather than waiting

15   to the next day or something else?

16            Was there some urgency to it, or was it just that

17   you guys were on the job and you were going to continue

18   plugging away?

19       A.   Yes.  Continue plugging away.

20       Q.   And so when you went back to the home, did you

21   know if Adrian was there?

22            Did you call first?

23       A.   I don't believe so.  I don't recall.

1          (Ronald Fountain - by Mr. Klein)

2     Q.   What happened when you got back to the Thomas

3   household?

4     A.   We knocked on the door and asked Adrian if he

5   would come with us down to the police station to talk

6   for a little while.

7     Q.   Did you go into the apartment at all?

8     A.   I don't recall.

9     Q.   Other than telling him you wanted him to come

10  with you, do you recall anything else?

11    A.   I don't recall.

12    Q.   Was there a particular reason or reasons why he

13  was asked to come to the precinct rather than speaking

14  with him at his home given that he was alone?

15    A.   Just that's where we did our interviews, at the

16  police station on videotape, so that was where he was

17  brought.

18    Q.   So, at that time did you make a determination

19  that you wanted to videotape this next statement from

20  him, or was it Mason or was it a joint decision?

21    A.   I'll say it was Mason because he was in charge,

22  but I don't recall.

23    Q.   When you say Mason was in charge, just tell me

```
1                 (Ronald Fountain - by Mr. Klein)

2     what you mean by that.

3         A.  He's a sergeant and I'm not.

4         Q.  He was a higher rank?

5         A.  Correct.

6         Q.  Do you know if you or Mason checked with the

7     detective captain or the chief or anyone else about

8     going to the station house to do the interview at that

9     point in time?

10        A.  I believe we kept the chief of detectives

11    advised, but I'm not sure who spoke to him, whether it

12    was myself or Mason.

13        Q.  Would the chief of detectives or anyone like that

14    have made the call to bring him back to the precinct, to

15    the station house, or was that something that probably,

16    in your view, Mason more likely than not decided?

17        A.  I don't recall.

18        Q.  Thomas went with you cooperatively, correct?

19        A.  Correct.

20        Q.  He went in your vehicle?

21        A.  Front seat.

22        Q.  Do you remember -- were you driving?

23        A.  I was.
```

Case 1:17-cv-00625-DJS Document 76-2 Filed 10/25/21 Page 68 of 156

```
 1              (Ronald Fountain - by Mr. Klein)

 2      Q.  Do you remember anything he said or did during

 3  the ride?

 4      A.  I don't.

 5      Q.  Then you brought him right up to the third floor?

 6      A.  Yes.

 7      Q.  To the interrogation room?

 8      A.  Interview room.

 9      Q.  That's when the first video statement was

10  recorded over the next two hours or so, correct?

11      A.  Correct.

12      Q.  We'll get into the substance of that in a few

13  minutes, but when it ended it was about 1:45 a.m.,

14  correct?

15      A.  Correct.

16      Q.  That's when you determined that you would

17  transport him to Samaritan Crisis because of his

18  statements about jumping off a bridge?

19      A.  I didn't determine that, but it was determined.

20      Q.  Who made that determination?

21      A.  Either myself or Mason.  It was probably jointly,

22  I'll go with that.

23      Q.  Did you guys discuss it outside of Thomas'
```

Case 1:17-cv-00626-DJS Document 67-4 Filed 10/25/21 Page 69 of 156

```
 1              (Ronald Fountain - by Mr. Klein)
 2   presence or was it a judgment call made in the room with
 3   him?
 4      A.  I don't recall.
 5      Q.  So, the next day, Sergeant Mason was at Samaritan
 6   and then Albany Med doing interviews, but my
 7   understanding is you were not with him.
 8          Do you recall whether you were or were not with
 9   him the next day?
10      A.  I do recall.
11      Q.  What did you do the next day?
12      A.  I took care of my kids.
13      Q.  The entire day of 9/22/08?
14      A.  I mean, until my wife got home at 4 p.m. from
15   work, yes.
16      Q.  And then what happened?
17          Did you go back to work on the evening of
18   9/22/08?
19      A.  I don't recall.
20      Q.  When did you next go back to work?
21      A.  One day that week.
22      Q.  Well, Thomas gave his second interview when he
23   got back from Samaritan starting about 5 p.m., let's
```

Case 1:17-cv-00625-DJS Document 67-1 Filed 10/25/21 Page 70 of 156

```
 1              (Ronald Fountain - by Mr. Klein)

 2   say, on the 22nd.

 3        Do you recall that generally?

 4     A.   I wasn't there.

 5     Q.   Did you come to learn, either at the time or

 6   since, that after you dropped him off at Samaritan he

 7   then was met by Colaneri -- by Detective Mason and

 8   Centanni in the lobby of the hospital and they brought

 9   him back to the interview room?

10              MR. PERKINS:  Object to the form.

11              You can answer.

12     A.   I did learn that later on, yes.

13   BY MR. KLEIN:

14     Q.   Do you know if they kept you in the loop that day

15   or the next day, or did you find out like much later on?

16        When did you find out?

17     A.   That week.

18     Q.   And they then interviewed him from about 5 p.m.

19   until let's say 2 in the morning, and then he was placed

20   under arrest.

21        Were you generally aware of that?

22     A.   Not that day.

23     Q.   That week you were?
```

Case 1:17-cv-00626-DJS Document 67-24 Filed 10/25/21 Page 71 of 156

1          (Ronald Fountain - by Mr. Klein)

2     A.   Yes.

3     Q.   When he was placed in the morning, it was into

4  the morning of September 23, 2008.  He was processed and

5  booked by Sergeant Mason.

6          Did you come to work at any time while he was

7  being booked or processed?

8     A.   No.

9     Q.   What was your next involvement in the case?

10    A.   To the best of my recollection, it was

11 interviewing of the children.

12    Q.   When was that?

13         Do you know if it was on the 23rd?

14    A.   I don't recall.

15    Q.   Mason, just as a frame of reference, Mason was

16 arraigned on the 23rd and sent to the county jail on the

17 23rd.

18    A.   Thomas.

19    Q.   Thomas, I'm sorry.

20    A.   That's all right.

21    Q.   Do you know if it was around that time?

22    A.   I believe it was within the first few days of the

23 investigation that I started interviewing the kids.  I

Case 17-cv-00625-DJS Document 69-1 Filed 10/25/21 Page 72 of 156

1                  (Ronald Fountain - by Mr. Klein)

2    don't recall the exact date.

3         Q.   Did you interview the kids or did CPS interview

4    them and you stood by?

5         A.   CPS interviewed them and I stood by.

6         Q.   So, you were present for interviews of the kids.

7         A.   Correct.

8         Q.   What kids, what interviews were you present for?

9         A.   The ones that were verbal.  Some of the children

10   weren't.

11        Q.   Do you remember the names of the kids that you

12   were present for?

13        A.   I know ███████ was one.  I believe there was

14   an older boy I stayed for also.  I'm not sure what his

15   first name is.  Might have been two boys.  I'm unsure.

16   And there was one other girl.  It's a big family.

17        Q.   There was ████, who was born in ████.

18             You believe you were present for her interview?

19        A.   I was.

20        Q.   ███████ was born in ████?

21        A.   So, yes.

22        Q.   You believe you were present for hers?

23        A.   I believe so.  I don't believe there was any

1        (Ronald Fountain - by Mr. Klein)

2   substance or anything said, but yes.

3       Q.   The other kids were ███████████, ██████, born

4   in ███?

5       A.   Okay.

6       Q.   Do you recall whether you were present for an

7   interview of him?

8       A.   I'm sure I was.

9       Q.   There was ████████████ born in ███, so he would

10  have been about three and change at that time.

11       Do you know if he was interviewed or was he too

12  little?

13      A.   I don't know exactly.  I can honestly say I don't

14  recall.  I'm sure they tried to interview everybody and

15  I'm sure I stuck around.

16       But, again, there was no substance from a ████

17  year old and there was nothing to write down.

18      Q.   Whatever was of substance you wrote down in your

19  notes?

20      A.   Yes.

21      Q.   The notes that you looked at before this

22  deposition, you saw those notes?

23      A.   I did.

Case 1:17-cv-00625-DJS Document 69-11 Filed 10/25/21 Page 74 of 156

1              (Ronald Fountain - by Mr. Klein)

2     Q.  Because we're going to pull them out.  I just

3   want to make sure we have the same notes.

4          So, you said with ████ you don't recall

5   anything of substance.

6     A.  I just don't recall the interview.  I recall

7   ████.  That was about it.

8     Q.  How many interviews of ████ did you attend?

9     A.  I don't recall.

10    Q.  Do you know if it was more than one?

11    A.  I believe so.

12    Q.  Do you know if it was more than two?

13         Just trying to get a ballpark.

14    A.  I have no idea.  Don't recall.

15    Q.  Was it many?

16    A.  I don't recall.

17    Q.  Do you even know if it was more than one?

18    A.  I believe there was more than one interview of

19  ████.

20    Q.  What was the gist of it?

21         What do you remember she said?

22    A.  What sticks out in my head, I remember one of the

23  interviews of her saying how Adrian touched her

```
 1              (Ronald Fountain - by Mr. Klein)
 2  sexually.
 3      Q.   Did you ever learn that that was unfounded or
 4  that she had issues of credibility?
 5              MS. PECK:  Objection to the form.
 6              MR. PERKINS:  Object to the form.
 7              You can answer if you can.
 8  BY MR. KLEIN:
 9      Q.   Did you ever follow through on any investigation
10  of that?
11      A.   I did.
12      Q.   What was your role in that?
13      A.   I did an investigation into a sexual abuse and
14  handed what I had over to the DA's office.
15      Q.   Were there any charges brought for that?
16      A.   Not to the best of my knowledge.
17      Q.   What did you conclude?
18      A.   That he had sexually abused his daughter.
19      Q.   Did you speak with anyone other than her about
20  those allegations?
21              MR. PERKINS:  Object to the form.
22              You can answer.
23      A.   Not that I recall.
```

1           (Ronald Fountain - by Mr. Klein)

2    Q.  Whatever you gave to the DA's office about that

3  was not part of the M████ Thomas prosecution, that was

4  a separate matter, correct?

5    A.  Correct.

6    Q.  Other than interviewing ████ and giving whatever

7  you got to the DA's office, separate from the M████

8  Thomas investigation, did you do anything else in regard

9  to the ████ allegations?

10      Did you interview anyone else about it?

11        MR. PERKINS:  Object to the form.

12        You can answer if you remember.

13    A.  I don't recall.

14    Q.  Did you investigate any other allegations

15  relating to any of the other kids?

16    A.  Not that I recall.

17    Q.  On October 3, 2008 there was a video interview of

18  Wilahemina Hicks regarding her role, if any, in the

19  M████ Thomas incident.

20      Do you recall that?

21    A.  I don't.

22    Q.  In that interview she said that she, in sum and

23  substance -- she was interviewed for an hour.  You just

Case 1:17-cv-00625-DJS Document 63-1 Filed 10/25/21 Page 7 of 156

1                    (Ronald Fountain - by Mr. Klein)

2    don't recall that?

3        A.   I don't.

4        Q.   In sum and substance, she said that she didn't

5    know, had no idea, whether Adrian did anything to the

6    child.

7             Do you recall generally that that's what she

8    said?

9                 MR. PERKINS:   Object to the form.

10                You can answer.

11       A.   I don't recall the interview.  I do recall

12   Wilahemina, talking to her and her having no idea what

13   he could have done at some point in the investigation,

14   yes.

15       Q.   Having no idea what he could done.

16       A.   Correct.

17       Q.   Wilahemina, do you recall her telling you that to

18   her knowledge he had never abused the kids?

19       A.   I don't recall.

20       Q.   That she didn't think he would hurt the kids.

21            Do you remember her telling you that?

22       A.   I don't recall.

23       Q.   So, other than the Wilahemina Hicks interview,

1              (Ronald Fountain - by Mr. Klein)

2  which is in the paperwork, are there any other

3  interviews that you attended, even if you don't remember

4  them but you know from looking at the paperwork?

5      A.  I don't recall.

6      Q.  I'm showing you Thomas 21.

7          This is the pretrial Huntley hearing transcript.

8      A.  Yes.

9      Q.  If you haven't seen it, I'm just going to ask you

10  to take a few minutes to take a look at it.  If you have

11  seen it, just breeze through it.  If you didn't, in

12  fact, look at before today, in preparation for today,

13  let me know.

14     A.  (Witness complies.)

15     Q.  So I will represent to you Exhibit 21, which you

16  just looked at briefly, is your pretrial Huntley hearing

17  testimony.

18         Do you recall generally testifying in court at a

19  pretrial hearing?

20     A.  Not really.

21     Q.  Did you testify truthfully to all matters before

22  the court?

23     A.  Yes.

Case 17-cv-00625-DJS Document 67-4 Filed 10/25/21 Page 79 of 156

```
 1              (Ronald Fountain - by Mr. Klein)

 2      Q.   Is there anything that you recall that you

 3   testified to the court that was not accurate or you wish

 4   to clarify today?

 5      A.   Not that I recall.  No.

 6      Q.   Thomas 22 is, I'll represent to you, your 2009

 7   trial testimony.

 8           Have you had a chance to skim through that before

 9   coming here today?

10      A.   I did.

11      Q.   Was everything that you said before the court

12   accurate in that transcript?

13      A.   As far as I can recall, yes.

14      Q.   At the pretrial Huntley hearing, not only did

15   Edge tell you he was tired, but I think you testified

16   that he said he had to go to sleep and that's why he

17   couldn't spend much time talking to you.

18           Do you recall words to that effect?

19      A.   Yes.

20      Q.   I believe you said that you saw the baby at the

21   hospital.

22           Do you recall that?

23      A.   Yes.
```

Case 1:17-cv-00625-DJS Document 69-1 Filed 10/25/21 Page 80 of 156

1          (Ronald Fountain - by Mr. Klein)

2    Q.  And that you were six to eight feet away, about?

3    A.  Yes.

4    Q.  That there were no signs, outward signs, of

5  trauma to the baby that you saw.

6    A.  That I recall, yes.

7    Q.  You testified at the hearing that when there are

8  high speed crashes, like the type of impact that Dr.

9  Edge talked about, in your experience with like high

10  speed accident, there would be bleeding, broken bones,

11  marks and scratches and things like that.

12      But you didn't see any things like that in this

13  case to your eye.

14    A.  Correct.

15    Q.  During the interview -- and you testified to this

16  -- Adrian Thomas told you many, many times that he

17  didn't do anything, correct?

18    A.  Correct.

19    Q.  You didn't put that in the Thomas deposition of a

20  witness that was written out, did you?

21    A.  Not that I recall.

22    Q.  So, in that regard, in Thomas Exhibit 19 there's

23  a deposition of a witness of Adrian Thomas dated 9/22/08

```
 1              (Ronald Fountain - by Mr. Klein)

 2    at 1:41 a.m.

 3         It's not even a full page; is that right?

 4    A.  That's right.

 5    Q.  Is that the supporting -- is that the deposition

 6    of Adrian Thomas that you wrote out?

 7    A.  Yes.

 8    Q.  Are you the witness that signed at the bottom?

 9    A.  I am one of them.

10    Q.  Sergeant Mason was the other?

11    A.  Correct.

12    Q.  The other statement is the longer, ten-page

13    statement.

14         You were not present for that longer, ten-page

15    statement, correct?

16    A.  Correct.

17    Q.  You didn't put the fact that Adrian Thomas

18    repeatedly denied knowing what happened to the baby in

19    there.

20         Is that something that you continued to do

21    throughout your career in these types of statements, or

22    did you change that practice as time went on?

23              MR. PERKINS:  Objection to the form.
```

Case 1:17-cv-00625-DJS   Document 76-24   Filed 10/25/21   Page 82 of 156

```
 1              (Ronald Fountain - by Mr. Klein)

 2              MS. PECK:  Objection.

 3              MS. CALABRESE:  Objection.

 4  BY MR. KLEIN:

 5     Q.  What was your practice with regard to that as

 6  your career went on?  If you had denials of

 7  responsibility -- culpability from an accused, from a

 8  witness, would you put those in or generally you weren't

 9  concerned by it?

10              MR. PERKINS:  Object to the form.

11              You can answer.

12     A.  Generally, later on in my career, I didn't take a

13  statement at all.

14     Q.  Why not?

15     A.  Because it was on video.

16     Q.  No need to have it in writing if you had the

17  verbal.

18     A.  Correct.

19     Q.  Did someone instruct you that it was better just

20  to have the video and not go with the writing because

21  the writing makes things more complicated in court, or

22  was that just a conscious decision that you made based

23  on your experience?
```

Case 1:17-cv-00625-DJS Document 60-1 Filed 10/25/21 Page 83 of 156

1          (Ronald Fountain - by Mr. Klein)

2     A.   I'm going with a conscious decision.

3     Q.   It wasn't like some type of guidance that you

4  got.

5     A.   No.

6     Q.   Now, in that interview, the first video

7  interview, you told Adrian Thomas that a child couldn't

8  have done it, that Dr. Edge said it couldn't have been

9  by a child, it had to have been done by an adult,

10  correct?

11     A.   Correct.

12     Q.   That was a lie, correct?

13     A.   Correct.

14     Q.   Do you agree that you were the first person to

15  suggest that Thomas could have bumped the baby, perhaps

16  by bumping his head into the crib?

17     A.   Correct.

18     Q.   You are the one that suggested that scenario of

19  bumping before it was ever brought up by Adrian,

20  correct?

21     A.   Correct.

22     Q.   As we touched on earlier, Mason, I believe, kept

23  telling Thomas multiple times that you guys thought it

```
 1              (Ronald Fountain - by Mr. Klein)

 2    was an accident and that, in sum and substance, you guys

 3    were on his side.

 4          Do you remember that?

 5      A.  Correct.

 6      Q.  At the point in the interview where Adrian said

 7    he wanted to jump off the bridge, he felt bad, you

 8    continued to ask him questions like did his head bounce

 9    and other things like that, correct?

10      A.  Correct.

11      Q.  Did you do that because he was particularly

12    vulnerable at that point?

13          What was the reason you did that?

14              MR. PERKINS:  Object to form.

15              You can answer.

16      A.  Just going on with the interview.

17      Q.  Even though he said he wanted to jump off a

18    bridge.

19          In other words, was there any -- looking back at

20    that, would you have gone about it differently later in

21    your career?

22              MR. PERKINS:  Object to form.

23              You can answer.
```

```
 1              (Ronald Fountain - by Mr. Klein)

 2              MS. PECK:  Objection.

 3      A.  I don't know.

 4  BY MR. KLEIN:

 5      Q.  He did say he wanted to be with his son a couple

 6  times during the interview.

 7          Do you recall that?

 8      A.  I don't recall.

 9      Q.  ADA Glass was present -- I believe this came up

10  in the testimony -- was present with you during the

11  interview of the children, watching behind one-way

12  glass.

13      A.  Yes.

14      Q.  So, it wasn't that you gave your work product to

15  Glass.  He was present during the interviews himself,

16  correct?

17      A.  Correct.

18      Q.  Again, that's separate from the prosecution of

19  Adrian Thomas for M██████ T██████, correct?

20      A.  Correct.

21      Q.  Did Adam Mason have any involvement in that

22  separation investigation?

23      A.  I don't recall.
```

Case 1:17-cv-00625-DJS Document 64-1 Filed 10/25/21 Page 86 of 156

1           (Ronald Fountain - by Mr. Klein)

2       I...

3    Q.   Go ahead.

4    A.   Just to go back, I believe when Art Glass was

5  there, that was pertaining to the Thomas homicide, to

6  see if the kids had known anything.

7       I don't believe that had anything to do with a

8  different investigation at that time.  Just to clarify

9  that.

10    Q.   So, there were two investigations, or at least

11  two investigations.

12       One was M█████ Thomas and another was abuse

13  allegations?

14    A.   That came later.

15    Q.   How much later?

16    A.   I don't recall.

17    Q.   It was later.

18    A.   After the Thomas.  Thomas was our first priority.

19    Q.   Did you ever make efforts or seek authority to

20  arrest Adrian Thomas for the separate abuse allegations?

21          MR. PERKINS:  Object to the form.

22          You can answer.

23    Q.   Did that ever come up?

1             (Ronald Fountain - by Mr. Klein)

2    A.  I believe I ran it by the district attorney's

3  office.

4    Q.  It was declined?

5    A.  It was declined.

6    Q.  Do you know what the reason for the declination

7  was?

8    A.  Didn't ask.

9    Q.  So, any such matters, to your knowledge, given

10  that they were declined, are they sealed, to your

11  knowledge?

12    A.  I don't know.

13    Q.  Do you know if they were declined because of

14  credibility determinations relating to the child

15  witnesses?

16            MR. PERKINS:  Objection to the form.

17            You can answer.  It's a side irrelevant

18  investigation.  You can answer if you can recall.

19            MS. PECK:  Object to form.

20            THE WITNESS:  To the best of my

21  recollection, they didn't believe there was enough to

22  move forward with a new case.

23  BY MR. KLEIN:

Case 1:17-cv-00625-DJS Document 60-2 Filed 10/25/21 Page 88 of 156

1          (Ronald Fountain - by Mr. Klein)

2     Q.  With regard to the one-page statement, the

3 deposition of Adrian Thomas that you wrote out, is it

4 true that at that time you did not view anything he said

5 as contributing to the injuries that M██████ had

6 sustained that you were aware of?

7          MS. PECK:  Object to the form.

8     A.  Yes.

9 BY MR. KLEIN:

10    Q.  You just wanted to get something on paper rather

11 than nothing?

12    A.  Yes.

13    Q.  After that statement -- you didn't believe there

14 was probable cause to arrest him at that time, correct?

15    A.  Correct.

16    Q.  I think you said you didn't remember what was

17 said in the apartment.  At trial, you testified that you

18 guys asked him questions in the apartment, that he told

19 you that M█████ had been to a doctor, a bunch of

20 doctors in the past couple weeks, that he had diarrhea

21 for two days, and M██████ had taken a bottle from the

22 mother around 3, and he was woken up that morning with

23 M██████ nonresponsive, and 911 was called from his cell,

1            (Ronald Fountain - by Mr. Klein)

2    and the mother performed CPR.

3            Does that sound about right?

4       A.   Yes.

5       Q.   And that Adrian told you he didn't know why

6    M█████ was having breathing problems.  This is at the

7    apartment.

8            Does that sound right?

9       A.   Yes.

10      Q.   This is what you testified to.

11           Any reason to doubt that?

12      A.   No.

13      Q.   You testified at trial when you spoke to

14   Wilahemina later Sunday evening she confirmed that

15   M█████ had not been well for a few days, right?

16      A.   Correct.

17      Q.   You acknowledged at trial that questions about

18   slamming were first suggested by you, correct?

19      A.   Correct.

20      Q.   You suggested to him more than once that M████

21   was slammed on something hard, right?

22      A.   Yes.

23      Q.   Do you recall telling Adrian that you were going

Case 1:17-cv-00625-DJS Document 64-1 Filed 10/25/21 Page 90 of 156

1     (Ronald Fountain - by Mr. Klein)

2 to have to scoop up his wife because he was saying he

3 didn't do anything, so therefore she must have done

4 something?

5   A. I don't recall if I said that or not.

6   Q. Do you recall it being said in your presence,

7 either you said it or your partner said it?

8   A. Yes.

9   Q. You testified at trial that you really didn't

10 think Thomas was a danger to himself when you took him

11 to Samaritan.

12    Do you recall giving that testimony?

13   A. Vaguely.

14   Q. Is that your recollection?  You didn't think he

15 was a danger to himself?

16   A. I don't recall.

17   Q. Just to be more particular, in terms of

18 suggesting first to Thomas that the baby was slammed, as

19 opposed to Adrian saying it first, either you or Mason

20 suggested during the interview first that the baby had

21 been slammed on the bed or thrown on the bed, right?

22   A. Yes.

23   Q. I believe it was you that suggested multiple

Case 1:17-cv-00625-DJS Document 66-3 filed 10/25/21 Page 9 of 156

```
 1              (Ronald Fountain - by Mr. Klein)

 2   times that the baby had to have been whacked on the side

 3   of the crib, right?

 4      A.  As far as I can recall, yes.

 5      Q.  You were throwing out possible scenarios to see

 6   if Adrian would adopt them.

 7          Is that what you were doing?

 8              MR. PERKINS:  Object to the form.

 9              You can answer.

10      A.  Yes.

11   BY MR. KLEIN:

12      Q.  Your testimony is that -- correct me if I'm wrong

13   -- that Adrian wasn't in custody at the time?

14      A.  Correct.

15      Q.  Do you remember Adrian Thomas saying, on at least

16   one or two occasions, that he felt like he was in jail

17   at the time?

18      A.  I don't recall.

19      Q.  That he said, I'm in jail here.

20          He wanted to be with his son but he was in jail

21   here?

22      A.  I don't know.

23              MR. PERKINS:  Object to the form.
```

1          (Ronald Fountain - by Mr. Klein)

2    Q.  Do you have any reason to doubt that he said

3    that?

4    A.  I don't recall him ever saying that, but if you

5    say so.

6    Q.  Do you recall him saying, quote, it's my

7    birthday, spending my birthday in jail, or words to that

8    effect, when you guys said "happy birthday"?

9    A.  I don't recall.

10   Q.  So, whether or not you had him in custody, you

11   don't know whether or not he felt like he was in

12   custody, do you?

13          MR. PERKINS:  Object to the form.

14          You can answer if you can.

15          MS. CALABRESE:  Objection.

16   A.  I don't know what his feelings were.

17   BY MR. KLEIN:

18   Q.  The camera in the interview room, was it obvious

19   to anyone walking into the room that there was a camera

20   on the wall, or was it somewhat inconspicuous?

21   A.  I don't know.  I knew it was there.

22   Q.  Well, did you ever say that anyone walking in the

23   room, a layperson walking in the room, would not know it

1      (Ronald Fountain - by Mr. Klein)

2   was a camera.

3      A.  I don't know.

4      Q.  It wasn't like a -- something that looked like a

5   handheld or camera on a bracket, correct?

6      A.  Correct.

7      Q.  It was a piece of white plastic that looked like

8   it could have been some type of fixture or thermostat or

9   something else on the wall, correct?

10     A.  Yes.

11     Q.  If I told that you said you would not know it's

12  there, would you doubt that?

13     A.  No.  I wouldn't doubt that.

14     Q.  It wasn't obvious to anyone walking in unless you

15  knew what it was, correct?

16     A.  Unless you're looking for it, correct.

17     Q.  But if I'm looking for something that looks like

18  a camera, that didn't look like what traditionally you

19  would think would be a camera unless you knew what that

20  technology was specifically.

21          MR. PERKINS:  Object to the form.

22          You can answer.

23     A.  Correct.

Case 1:17-cv-00625-DJS Document 69-1 Filed 10/25/21 Page 173 of 156

```
 1              (Ronald Fountain - by Mr. Klein)

 2    BY MR. KLEIN:

 3        Q.  Is it true that you never used that camera or a

 4    recorded interview like this before this case?

 5        A.  I believe that was the first.

 6        Q.  Did you use it on any occasions after?

 7        A.  Yes.

 8        Q.  How many?  A few, dozen?

 9        A.  I would go with a dozen.

10        Q.  Do you know if it was Mason's first as well?

11        A.  I believe so.

12        Q.  You started off the interview with rapport

13    building, correct?

14        A.  Correct.

15        Q.  You talked to Adrian about what he did for work

16    and his kids and things like that, correct?

17        A.  Correct.

18        Q.  Did you say that Adrian sat in what you called

19    the king's chair in his home?

20        A.  Yes.

21        Q.  What did you mean by that?

22        A.  It seemed to me that there was a single big chair

23    in that house that was meant for Adrian, and it was his.
```

```
 1              (Ronald Fountain - by Mr. Klein)

 2        Q.  He was a big guy, right?

 3        A.  Correct.

 4        Q.  Do you know, did you ever speak to him when he

 5   was sitting in that chair or that was just the inference

 6   you drew from seeing the apartment?

 7        A.  I believe it was my inference.  I don't recall if

 8   I asked him about it.

 9        Q.  Did Dr. Edge tell you that the child is going to

10   die, or did he say the child was murdered?

11        A.  I believe exact words were "this is a homicide".

12   And then the substance afterwards -- I know I wrote it

13   down right after he told me, but I don't know exactly

14   what it was.

15        Q.  Well, did you ever interpret his words as a

16   statement that M████ was murdered?

17        A.  Yes.

18        Q.  Homicide could be an accident as well, correct?

19        A.  I thought homicide was an intentional death,

20   but...

21        Q.  Something at the hands of another, right?

22        A.  Correct.

23        Q.  There could be -- someone could --
```

```
 1              (Ronald Fountain - by Mr. Klein)

 2              MR. PERKINS:  Object to the form.

 3     Q.  I didn't finish the question.

 4          Someone could cause the death of someone else in

 5     self-defense, correct?

 6          You could -- someone could be in a domestic

 7     violence situation and they could be defending

 8     themselves against their accuser and caused the death of

 9     the accuser, and it could be a homicide but it may be

10     justified.

11              Do you agree with that?

12              MR. PERKINS:  Object to the form.

13              You can answer if you can.

14     A.  I don't know.

15     BY MR. KLEIN:

16     Q.  Well, do you remember whether Dr. Edge said

17     "homicide" or whether he said "murder"?

18     A.  I don't recall.

19     Q.  In your mind, was homicide the same as murder?

20     A.  Correct.

21     Q.  Is it fair to say that you interpreted the word

22     "homicide" and conveyed it to your colleagues as Dr.

23     Edge saying this is a murder?
```

Case 1:17-cv-00626-DJS Document 76-14 Filed 10/25/21 Page 97 of 156

1           (Ronald Fountain - by Mr. Klein)

2    A.  He might have said murder.  Whatever I wrote down

3  is what he said.

4    Q.  Well, if murder and homicide were interchangeable

5  to you, would you have written "murder"?

6    A.  I believe I wrote this child was murdered because

7  that's exactly what he told me.

8    Q.  But you're not sure.

9    A.  I am not sure exactly without looking at my

10  notes, which you have somewhere.

11    Q.  Okay, we will go through them.

12         Your notes say, quote, high speed impact.  Quote,

13  slamming very hard into a hard object.  Quote, this is a

14  murder.

15         Is it your belief that you wrote verbatim what he

16  told you?

17    A.  Yes.

18    Q.  During the first interview, was it your belief or

19  your focus that Adrian Thomas had done something to

20  M█████?

21    A.  Yes.

22    Q.  So you went into that first recorded interview

23  that led to the one-page statement not knowing what

```
 1              (Ronald Fountain - by Mr. Klein)
 2   happened but believing he did something?
 3      A.  Yes.
 4      Q.  Why did you believe he did something as opposed
 5   to Wilahemina or someone else or the kids or some other
 6   person?
 7      A.  Just the way everything came together, it seemed
 8   like it was him.
 9      Q.  Other than it seeming like it was him, is there
10   any factual basis for that other than your gut feeling?
11              MR. PERKINS:  Object to the form.
12              You can answer.
13      A.  The doctor said it was a murder.  Wilahemina was
14   very credible.  The kids probably couldn't have caused
15   that much damage according to what the doctor was
16   telling us.  Adrian seemed like the likely suspect in
17   the house.
18      Q.  You kind of -- is it called deduction?
19              You ruled out people who were less likely to have
20   done it and were left with Adrian?
21              MR. PERKINS:  Object to the form.
22              You can answer.
23      A.  I didn't rule anybody out, but Adrian was our
```

Case 1:17-cv-00625-DJS Document 69-1 Filed 10/25/21 Page 178 of 156

1          (Ronald Fountain - by Mr. Klein)

2    prime suspect.

3    Q.  He was your prime suspect going into that

4    recorded interview.

5    A.  Correct.

6    Q.  Is that why it was recorded?

7    A.  It was new technology at the police department

8    and the chief said to record it.

9    Q.  You would agree that none of the examples of how

10   M█████ could have gotten hurt in the one-page statement

11   that you wrote out were consistent with what Dr. Edge

12   said.

13          MR. PERKINS:  Object to the form.

14   Q.  Would you agree with that?

15          MR. PERKINS:  You can answer.

16   A.  Correct.

17   Q.  Did you tell Adrian that you had quit smoking two

18   packs a day earlier that year?

19   A.  Yes.

20   Q.  Was that true?

21   A.  Yes.

22   Q.  Telling Adrian repeatedly that you guys knew it

23   was an accident, you were on his side, he was going to

```
 1                (Ronald Fountain - by Mr. Klein)
 2   go home, was that a ploy, from an interrogation
 3   standpoint, to get him to feel comfortable speaking with
 4   you?
 5       A.  Yes.
 6       Q.  Saying it's you or your wife, was that another
 7   ploy from an interrogation tactic perspective?
 8       A.  Yes.
 9       Q.  Do you recall it was you that suggested that he
10   was slammed, bumped into the wall and possibly bumped
11   into the kitchen table, you asked him all of those
12   scenarios.
13       A.  To the best of my recollection.
14       Q.  You said to him, either you did it or your wife
15   did it, essentially, right?
16       A.  Yes.
17       Q.  Did you have any understanding at that time that
18   you could have caused a false confession based on the
19   techniques that you employed?
20               MR. PERKINS:  Object to the form.
21               You can answer.
22       A.  Not at that time.
23               MS. CALABRESE:  Objection.
```

1    (Ronald Fountain - by Mr. Klein)

2  Q. At any other time since then did you have that

3 understanding?

4    MR. PERKINS: Objection to the form.

5    You can answer.

6  A. I didn't think I did anything wrong since then.

7  Q. Well, did you say to Adrian, your wife must have

8 done this? If you didn't do it then your wife must have

9 done it?

10  A. Yes.

11  Q. After that first interview, did you come to work

12 and either read or watch the video of the second

13 interview?

14  A. I don't recall.

15  Q. As the coinvestigator on the file, on the case,

16 is it more likely than not that Sergeant Mason would

17 have conferred with you even if you were not at the

18 office to let you know what happens with the

19 interrogation?

20  A. He might have called me. I don't recall if we

21 actually talked that day or the next day.

22  Q. Were you consulted in the determination to arrest

23 Adrian after the second interview?

```
 1              (Ronald Fountain - by Mr. Klein)

 2      A.  To the best of my recollection, no.

 3      Q.  At any point, as the assigned investigator to the

 4  case, do you believe you would have watched the second

 5  video interrogation?

 6      A.  I can honestly say there's no way I watched an

 7  eight-hour interview.

 8      Q.  Can you honestly say that you watched portions of

 9  it?

10      A.  Not that I recall.

11      Q.  Did you review the ten-page statement?

12      A.  Very possible.

13      Q.  If you were still in the department and had the

14  same case come in, the same circumstances, would you

15  employ the same techniques today?

16              MS. PECK:  Objection.

17              MS. CALABRESE:  Objection.

18              MR. PERKINS:  Object to the form.

19              You know --

20              MR. KLEIN:  That's all you can do.

21              You can answer.

22              MR. PERKINS:  Don't answer.

23              MR. KLEIN:  You can't direct him not to
```

```
 1            (Ronald Fountain - by Mr. Klein)
 2   answer.
 3            MR. PERKINS:  I did.
 4            MR. KLEIN:  Mark that one for a ruling as
 5   well as the prior question.
 6   BY MR. KLEIN:
 7     Q.  Do you believe that anything you did was improper
 8   during the interrogation?
 9            MR. PERKINS:  Object to the form.
10            You can answer.
11     A.  No.
12     Q.  Did you testify at the first trial essentially
13   regarding your role in the events of Sunday the 21st and
14   your involvement in the interview early into the morning
15   hours of the 22nd?
16     A.  Yes.
17     Q.  So, your conduct in investigating this case and
18   speaking to Adrian Thomas during the first recorded
19   interview, that was information that was given to
20   prosecutors and that you testified at the trial,
21   correct?
22     A.  Correct.
23     Q.  You knew that even though the first interview
```

```
 1              (Ronald Fountain - by Mr. Klein)

 2   didn't lead to, in your view, fruit that Adrian

 3   committed the murder, it was a part of a process that

 4   lead ultimately to the second interview.

 5        Is that your understanding?

 6     A.  Yes.

 7     Q.  So, you were part of the chain of events that

 8   lead to Adrian ultimately giving a confession that was

 9   used by prosecutors to prosecute; is that right?

10              MS. PECK:  Objection.

11              MR. PERKINS:  Object to the form.

12              You can answer.

13     A.  If you say so.

14     Q.  Well, I'm asking you.  I mean, you testified, you

15   were called to testify about your role in the first

16   interview?

17     A.  Correct.

18     Q.  So, it was relevant in the prosecution as far as

19   you know, correct?

20     A.  Correct.

21              MS. CALABRESE:  Object to the form.

22     Q.  You knew that, when you testified against Adrian,

23   even though you weren't present for the second
```

```
 1              (Ronald Fountain - by Mr. Klein)

 2   interview, you were part of a case that was with the

 3   goal of convicting him of murder, correct?

 4              MR. PERKINS:  Object to the form.

 5              You can answer.

 6      A.  Yes.

 7      Q.  Other than his statements in police custody, plus

 8   the findings of Dr. Sikirica, are you aware of any other

 9   evidence that linked Adrian to the death of M███████

10   Thomas?

11      A.  Not that I know of.

12      Q.  In terms of the criminal court information in

13   this case, that's how the criminal case was started, to

14   your knowledge; is that right?

15      A.  If you say so.

16      Q.  Well, do you know that in the file is a criminal

17   court information that Sergeant Mason drafted charging

18   Adrian?

19      A.  I never read it, but yes, okay.

20      Q.  Only one person could be the officer that signs

21   off on the arrest paperwork, right?

22              Typically one arresting officer for the

23   paperwork?
```

1           (Ronald Fountain - by Mr. Klein)

2      A.   Sometimes a supervisor signs it afterwards.

3      Q.   But other than an approving sign off, it's one

4  officer that's the paperwork officer, correct?

5      A.   Usually.

6      Q.   You maintained responsibility for this file

7  through the first trial, correct?

8      A.   Absolutely not.

9      Q.   When did you stop working on the file?

10     A.   I never had the file in my office or my

11 possession.

12     Q.   You were the assigned -- one of two assigned

13 officers on the case, correct?

14     A.   I was the second officer assigned to the case.

15 Yes.

16     Q.   The arresting officer maintained the file?

17     A.   Sergeant Mason, also being the supervisor,

18 maintained everything.

19     Q.   But typically only one person on a team of

20 investigators maintains the file.

21          There's one file, correct?

22     A.   Typically.

23     Q.   So just because you didn't maintain a paper file

1          (Ronald Fountain - by Mr. Klein)

2     didn't mean that you weren't involved in the

3     prosecution, correct?

4               MR. PERKINS:  Object to the form.

5     Q.   You were personally involved in the prosecution

6     of Adrian Thomas, correct?

7               MR. PERKINS:  Object to the form.

8     A.   I did testify against him, yes, absolutely.

9     Q.   I'm going to show you what's been marked as

10    Thomas Exhibit 20.

11         These are the notes that I believe we were given

12    in the PD file.  There were some documents that aren't

13    notes there.  This is how it was given to us.

14         If you could stop at the first page that were

15    notes that you filled out.

16    A.   That's my writing.

17    Q.   For the record, this is a page that starts with

18    "Wilahemina Hicks" and there's a phone number, correct?

19    A.   Correct.

20    Q.   Halfway down the page it says Dave Merritt Matter

21    and works at Sam's Club at night?

22    A.   Yes.

23    Q.   So, this is a note about Adrian Thomas' friend?

```
 1              (Ronald Fountain - by Mr. Klein)

 2      A.  Correct.

 3      Q.  Just looking through --

 4      A.  That's all mine.

 5      Q.  On the next page, starting with the words "45 of

 6  46", girlfriend, white, 40s.  Dave question mark.  White

 7  large guy, shorter than six foot.  Sam's Club in Latham.

 8  Friend of Adrian.  Might know something.  Was hanging

 9  around house a lot.  Lives on ███ by ██████.  Have you

10  spoken with Adrian, Adrian's seat?

11      A.  Yes.

12      Q.  Do you know that what means?

13      A.  No.

14      Q.  Then it says neighbors find ████ CK neighbors.

15          Did I read that page accurately?

16      A.  Yes.

17      Q.  Does this appear to be notes that you took during

18  Wilahemina Hicks' interview?

19      A.  I don't recall.

20      Q.  Did you ever interview Dave?

21      A.  I don't recall.

22      Q.  On the next page is a document that says -- it's

23  a police form that reflects a meeting with Art Glass.
```

```
 1              (Ronald Fountain - by Mr. Klein)

 2         Is this Mason's notes or yours?

 3    A.   Mine.

 4    Q.   So, is it fair to say that it says on January 8,

 5    '09?

 6    A.   Date of this report, yes.

 7    Q.   That on that date, at 12:30 p.m., you were going

 8    through the case file with Art Glass, ADA?

 9    A.   Yes.

10    Q.   Regarding discovery needs, and you turned over to

11    him the 911 tapes.

12    A.   Correct.

13    Q.   Were you meeting with him alone or with Mason or

14    anyone else?

15    A.   I don't recall.

16    Q.   So, other than trial prep, you were involved in

17    meetings well before the trial with the DAs in this

18    case.

19    A.   Sure.

20    Q.   Do you recall any others?

21    A.   I don't recall.

22    Q.   Flipping through, there's then a meeting with the

23    New York State Police evidence team?
```

```
 1              (Ronald Fountain - by Mr. Klein)

 2      A.  Okay.

 3      Q.  You weren't present for that, were you?

 4      A.  I don't recall.

 5      Q.  Do you see your name on there, or your writing?

 6      A.  I don't see my name or my writing.

 7      Q.  Next page starts with a time of 4:10.

 8          Is this your writing?

 9      A.  Yes.

10      Q.  What is this note from?

11      A.  I believe this was the Start Center interview

12  with ██████████.

13      Q.  You're not sure?

14      A.  To the best of my knowledge.  I'm pretty sure.

15          The next one is ████████'s interview.

16      Q.  Starts at the top, it says, CPS Valerie Clayton?

17      A.  Yup.

18      Q.  That page is ████████?

19      A.  Yes.

20      Q.  And then, there's a page after that?

21      A.  Yes.

22      Q.  Then says mommy got hurt.

23          Is that part of ████████?
```

```
 1           (Ronald Fountain - by Mr. Klein)

 2      A.  Yes.

 3      Q.  There's a last page starting at 4:28.

 4          Do you see that?

 5      A.  You're right.

 6      Q.  Do you know whose interview that is?

 7      A.  I don't.

 8      Q.  Would reading it refresh your recollection of who

 9   it is?

10      A.  I am reading it.

11      Q.  Why don't you start at the ███ notes.

12          Are these notes, the one that says 4:10, are

13   these notes you took while watching CPS interview her?

14      A.  Correct.

15      Q.  Do you know if Art Glass was present for that

16   interview?

17      A.  I'm going to say yes.

18      Q.  Do you know if ███ was telling the truth during

19   that interview or you just were writing down what was

20   said?

21      A.  I believe she was telling the truth to the best

22   of my knowledge.

23      Q.  But you don't -- do you know either way?
```

```
 1                  (Ronald Fountain - by Mr. Klein)

 2                  MS. CALABRESE:  Objection.

 3                  MR. PERKINS:  Object to the form.

 4                  You can answer.

 5       A.  I don't know.

 6  BY MR. KLEIN:

 7       Q.  You didn't do like a lie detector test on her?

 8       A.  I didn't interview her.

 9       Q.  Right, so I'm saying you didn't go through --

10       A.  CPS did go through the best practices, procedures

11  of explaining to a child the difference between right

12  and wrong and trying to elicit them to tell the truth.

13       Q.  And then the page with ███████, do you know if

14  that interview was conducted on the same day as the

15  ██████ interview?

16       A.  I believe so.

17       Q.  It looks like ███████ started at 4:10, left, and

18  then came back at 4:20.

19           And it looks like ████████...

20       A.  3:30 ish.

21       Q.  3:30 ish.

22       A.  Goes to about 3:54.

23       Q.  And that's where it says ADA Art Glass?
```

1        (Ronald Fountain - by Mr. Klein)

2    A.  Yes.

3    Q.  Who are the other individuals there?

4    A.  Cara Chelsea is also a CPS worker.  Art Glass is

5  an ADA.  Renee Roman is the -- she's the grand poopa at

6  the Start Center, so she would be the executive

7  director, I believe.  Heather Frankoviak is a therapist

8  at the Start Children's Center.  And BCI Investigator

9  Gonzalez was, I believe he's retired now also, he was a

10  BCI State Police investigator assigned to the children's

11  Start Center.

12    Q.  So, other than what's in these notes, do you

13  remember anything about these interviews?

14    A.  No.

15    Q.  Are there any other notes that you looked at that

16  aren't in the packet we just reviewed that you can

17  recall?

18    A.  That I did?

19    Q.  Yes.  That relate to the M█████  Thomas

20  investigation.

21    A.  I'm sure there are other ones, but not that I

22  did.

23    Q.  That you did.

```
 1              (Ronald Fountain - by Mr. Klein)

 2      A.   Correct.

 3      Q.   So, there are no other ones that you did with

 4   regard to the M██████ Thomas investigation.

 5      A.   Correct.

 6      Q.   So, these kids were asked about things like

 7   corporal punishment, but they were also asked -- your

 8   understanding was that this related to M██████ as well,

 9   correct?

10      A.   Correct.

11      Q.   Your testimony is that you were involved in a

12   subsequent investigation that lead to charges that were

13   not prosecuted by the district attorney's office.

14      A.   Farther down the road.  Yes.

15      Q.   Was it months later or the following year?

16      A.   Could have been a year or two.

17      Q.   Did you ever testify in that matter?

18      A.   No.

19      Q.   It was just discussed with the DA and declined,

20   to the best of your knowledge?

21      A.   Correct.

22      Q.   Anything else about the notes that jogs your

23   memory other than what's said in them?
```

1        (Ronald Fountain - by Mr. Klein)

2    A.   No.

3    Q.   There are notes at the end of it that are in the

4 handwriting of someone else, not you, correct?

5    A.   Correct.

6    Q.   Do you know if this is a CPS worker or someone

7 else?

8    A.   I have no idea.

9    Q.   So you don't know whose notes those are.

10       And then there's another page right before that

11 -- well, there's additional notes here.  Let's go

12 through them.

13       After the Start Center interviews there's a page

14 that says "by Investigator Gonzalez".  Does that appear

15 to be notes of Investigator Gonzalez, even if you don't

16 know --

17    A.   His handwriting?  It appears to be.

18    Q.   Then after that there's a page that says -- looks

19 like number 8?

20    A.   At 8:00, spoke with 9 year old ████, 9 years of

21 age, ████.  Inconsistencies with asking if any problems

22 in front of ███████.

23    Q.   What did that mean?

Case 1:17-cv-00629-DDS Document 163024 Filed 10/25/21 Page 1168 of 156

1           (Ronald Fountain - by Mr. Klein)

2    A.  I spoke with her in front of her grandmother,

3  ███ , and she was inconsistent with whatever she was

4 telling me.

5      That was done at the apartment on ███ Street

6 because at 8:15 p.m. the kids are off the scene with

7 CPS.

8         MR. PERKINS:  You answered the question.

9 BY MR. KLEIN:

10    Q.  What was she telling you about and what was

11 inconsistent about it?

12    A.  I have no idea.

13         MS. CALABRESE:  Short break.

14         (Recess taken.)

15 BY MR. KLEIN:

16    Q.  So, going back to Thomas Exhibit 20, page

17 starting with 8.

18      It then goes on to say, "spoke with dad in his

19 apartment"?

20    A.  Yes.

21    Q.  Is that the initial interview with him after CPS

22 removed the kids?

23    A.  To the best of my knowledge, yes.

**APPENDIX**      **2110**

1          (Ronald Fountain - by Mr. Klein)

2    Q.  These are your contemporaneous notes at the time?

3    A.  These are my notes at the time.

4    Q.  I'm not going to read this all to you because I

5  think your handwriting is pretty clear, but this is

6  where he tells you what happened to M█████ at the

7  apartment, correct?

8    A.  Correct.

9    Q.  You wrote at the end of the notes on the second

10  page "who could have done this".

11       Did you write that in the apartment, if you know?

12    A.  I don't recall.  No.

13    Q.  There's notes about struck █, █████ with hand

14  on hand couple months ago.

15       Is that stuff that he told you at the apartment?

16    A.  To the best of my knowledge, yes.

17    Q.  He admitted to some corporal punishment type

18  stuff, correct?

19    A.  Correct.

20    Q.  Then the next page starts at 24:41, and there is

21  notes about baby M█████ T█████

22       Are these your notes?

23    A.  Yes.

```
 1              (Ronald Fountain - by Mr. Klein)

 2      Q.  Do you know when they were written, what they're

 3  from?

 4      A.  I have no idea.

 5      Q.  There's notes about Dr. Kardos.

 6          So, we discussed earlier you found out -- at some

 7  point you found out she was the doctor at Samaritan,

 8  correct?

 9      A.  Correct.

10      Q.  You might have been taking some information down

11  from people about the case, correct?

12      A.  I believe so, correct.

13      Q.  It says, 9:21, baby went to doctor within last

14  two weeks for vaccines.  8:30 to 9, baby not responding.

15  Diarrhea for two days.  Took bottle from mom, 3:00 a.m.

16  Called 911 from cell.  Tried to do CPR.

17          Who did you speak to when you took those notes?

18      A.  I don't know.

19      Q.  Do you know if that was Wilahemina at the

20  hospital?

21      A.  I don't recall.

22      Q.  This list of the family members and dates of

23  birth, is that your handwriting?
```

Case 1:17-cv-00626-DJS Document 163-24 Filed 10/25/21 Page 198 of 156

```
 1              (Ronald Fountain - by Mr. Klein)

 2      A.   Absolutely.

 3      Q.   Then there's a note at 9:30, Dr. Edge, attending.

 4           That's the next page, correct?

 5      A.   Correct.

 6      Q.   This is where you jotted down what he told you?

 7      A.   Correct.

 8      Q.   It says, "not very good will never".

 9           What does that mean?  Will never recover?

10      A.   To the best of my knowledge, yes.

11      Q.   The notes after that are the notes of someone

12   else.

13      A.   I have no clue.

14      Q.   It looks like pages of an interview at Start, but

15   they were taken by someone else?

16      A.   Correct.

17      Q.   Are there any other notes that you took, that

18   you're aware of, relating to the M████    T████

19   investigation?

20      A.   Not that I'm aware of.

21      Q.   When you interviewed Adrian during the interview

22   that lead to the one-page statement, did you take any

23   notes?
```

1              (Ronald Fountain - by Mr. Klein)

2         You seemed to have a notepad on your lap.

3    A.  I don't recall.

4         If I did, Sergeant Mason or Captain Mason would

5    have them.  They were all handed to him because he was

6    in charge of the whole thing.

7    Q.  In preparing for this deposition, are you aware

8    of any other notes or have you looked at any other notes

9    other than what I have showed you?

10   A.  No.

11   Q.  Detective Mason testified in the grand jury on

12   September 26th.

13        Do you know if you went with him?

14   A.  I don't recall.

15   Q.  The interview with Wilahemina Hicks that was on

16   video on October 3rd of 2008, did you have notes of that

17   interview?

18   A.  I don't believe so.  I don't recall.

19   Q.  There's a variety of news articles in the file.

20        Do you know if you were clipping those and

21   putting them in the files, or someone else?

22   A.  Was not me.

23   Q.  There was a Troy PD media release issued on the

```
 1              (Ronald Fountain - by Mr. Klein)

 2   23rd.

 3          Did you have any role in drafting that or

 4   disseminating that?

 5      A.  No.

 6      Q.  Did you attend M█████'s funeral?

 7      A.  No.

 8      Q.  This is the decision from People versus Adrian

 9   Thomas dated February 20th of 2014.  We were talking

10   about it before.

11          Do you recall that?

12      A.  I recall.

13      Q.  So, in one of the paragraphs of the decision it

14   says the following:  The premise of the interrogation

15   was that an adult within the Thomas-Hicks household must

16   have inflicted traumatic head injuries on the infant.

17          Do you agree with that statement?

18      A.  Yes.

19      Q.  It then says, indeed, one of the interrogating

20   officers told defendant that he had been informed by

21   M█████'s doctor that M█████ had been, quote, slammed

22   into something very hard.  It's like a high speed impact

23   in a vehicle.  This baby was murdered...  This baby is
```

1          (Ronald Fountain - by Mr. Klein)

2     going to die and he was murdered.

3          Do you agree that he was told that?

4     A.  Yes.

5     Q.  Do you recall it was you that told him that?

6     A.  Yes.

7     Q.  Then it says, the interrogators, however,

8     repeatedly reassured defendant that they understood

9     M████'s injuries to have been accidental.

10         Do you agree with that statement?

11    A.  Yes.

12    Q.  You were one of those interrogators, correct?

13    A.  Yes.

14    Q.  Then says, next, they said they were not

15    investigating what they thought to be a crime and that

16    once defendant had told them what had happened he could

17    go home.

18         Do you agree with that statement?

19    A.  Yes.

20    Q.  It then says, he would not, they reassured over

21    and again, be arrested.

22         Do you agree with that?

23    A.  Yes.

```
 1              (Ronald Fountain - by Mr. Klein)

 2       Q.  When, however, defendant continued to deny having

 3   hurt M████, even accidentally, the officers falsely

 4   represented that his wife had blamed him for M████'s

 5   injuries, and then threatened that, if he did not take

 6   responsibility, they would "scoop" Ms. Hicks out from

 7   the hospital and bring her in, since one of them must

 8   have injured the child.

 9           Do you agree with that statement?

10              MR. PERKINS:  Object to the form.

11              You can answer.

12       A.  Yes.

13       Q.  And you were the person that said she would be

14   scooped up, or words to that effect.

15           Do you recall that?

16       A.  I don't.  If you say I did, I'm fine with it.

17       Q.  By the end of the initial two-hour interrogation,

18   defendant agreed to "take the fall" for his wife.

19           You agree with that?

20       A.  Yes.

21              MR. PERKINS:  Object to the form.

22       Q.  He said that he had not harmed the child and did

23   not believe that his wife had either because "she is a
```

1          (Ronald Fountain - by Mr. Klein)

2    good wife", but that he would take responsibility to

3    keep her out of trouble.

4          Do you agree with that last sentence?

5               MR. PERKINS:  Object to the form.

6               You can answer.

7      A.   Yes.

8      Q.   The threat that if Adrian continued to deny

9    responsibility for his child's injury his wife would be

10   arrested and taken from the hospital where she was by

11   M█████'s bedside, do you believe that was a reasonable

12   threat?

13              MR. PERKINS:  Object to the form.

14              You can answer if you can.

15     A.   I don't remember saying it, but if it was said,

16   okay.

17     Q.   Did you know there was -- was there anything

18   wrong with saying that in your opinion?

19              MR. PERKINS:  Object to the form.

20              You can answer.

21     Q.   To him.

22     A.   No.

23     Q.   Did you make a conscious choice to say that to

```
 1              (Ronald Fountain - by Mr. Klein)

 2   him in this interview as part of your --

 3       A.  I don't recall if I said it or not.

 4       Q.  Well, whether it was said by Mason or you, you

 5   were aware that that was said, correct?

 6       A.  I just don't recall that being said.  I'm sorry.

 7   It could have been.

 8       Q.  I'll show you during the interview.

 9           Assuming it was said, did you have any problem

10   with it at the time that you can recall?

11       A.  No.

12       Q.  Did you have any problem with hearing it here

13   today?

14       A.  No.

15       Q.  Did you view Adrian Thomas' statement that he

16   would take the fall in response to the statements that

17   his wife would be brought in as a key turning point in

18   the interrogation?

19               MR. PERKINS:  Object to the form.

20               You can answer.

21       A.  No.

22       Q.  In retrospect, did you realize that it was?

23       A.  Not sure.
```

1     (Ronald Fountain - by Mr. Klein)

2     MR. PERKINS:  Object to the form.

3  Q.  Did you know either way whether it was?

4  A.  No.

5     MR. PERKINS:  Object to the form.

6  Q.  The representations made to Adrian that the

7 disclosure of the circumstances under which M█████ was

8 injured -- he injured M██████ was essential to assist

9 the doctors attempting to save the child's life, did you

10 believe that was a proper course of speaking to him at

11 the time?

12     MR. PERKINS:  Object to the form.

13     You can answer.

14  A.  Was that during the first interview?

15  Q.  Do you recall it?

16  A.  I don't.

17  Q.  Go back to that in a second.

18    The repeated assurances offered by you and Mason

19 or in each other's presence that whatever happened was

20 an accident, and that he could be helped if he disclosed

21 all, and that once he did so he wouldn't be arrested and

22 could go home, did you think that was proper?

23     MR. PERKINS:  Object to the form.

1              (Ronald Fountain - by Mr. Klein)

2      A.  Yes.

3      Q.  Do you still think that was proper looking back

4  at it today?

5              MR. PERKINS:  Object to the form.

6              You can answer.

7      A.  Yes.

8      Q.  Did you believe that Adrian relied on those

9  assurances when you spoke with him during your

10  interviews?

11             MR. PERKINS:  Object to the form.

12             You can answer.

13     Q.  That he could go home if he told you what you

14  wanted to hear.

15     A.  I have no idea what he believed.

16     Q.  The court found that every scenario of trauma

17  induced head injury equal to exploiting the infant's

18  symptoms was suggested to defendant by his

19  interrogators.

20         Do you agree with that as to your part of the

21  interview, that the bumping of the head on the crib,

22  bumping the head on the kitchen, bumping head on the

23  wall, those things were suggested by you first?

```
 1              (Ronald Fountain - by Mr. Klein)

 2      A.  Yes.

 3      Q.  Do you recall the part of the second interview,

 4  even though you weren't there?  Did you come to see it

 5  or hear about it where Colaneri went into the room and

 6  spoke with Adrian?

 7      A.  I heard about it.  I never watched it.

 8      Q.  How about the part where Adrian took the file

 9  folder and demonstrated throwing it to the ground after

10  Adam did it first?

11      A.  I believe Adam told me.

12      Q.  You never saw it once up until today?

13      A.  I don't recall ever watching the video.

14      Q.  How about seeing it on the news or TV?

15      A.  Maybe.  Maybe I saw it on that little clip that

16  was online with that little documentary.  That might

17  have been part of the clip now that you say it, but I...

18      Q.  Is it your understanding that Adam, that Sergeant

19  Mason, suggested to Adrian every scenario of trauma that

20  Adrian ended up admitting to as well?

21              MR. PERKINS:  Object to the form.

22              You weren't there and you didn't watch it.

23              MR. KLEIN:  He can say that or he can say he
```

```
 1              (Ronald Fountain - by Ms. Peck)

 2    knows.

 3              MR. PERKINS:  Object to the form.

 4              You can answer if you can.

 5              THE WITNESS:  I don't know.

 6              MR. KLEIN:  Two-minute break.

 7              (Recess taken.)

 8    BY MR. KLEIN:

 9       Q.  So, Mr. Fountain, is there anything else

10    regarding your role in the arrest and prosecution of

11    Adrian Thomas for the death of M█████  T█████  that you

12    can recall that we haven't discussed on the record

13    today?

14       A.  Not that I can recall.

15       Q.  Are there any other pertinent documents that

16    would be helpful for you to review that you haven't

17    looked at today to refresh your recollection?

18       A.  No.

19              MR. KLEIN:  I believe that's all I have for

20    now.

21    EXAMINATION

22    BY MS. PECK:

23       Q.  Officer Fountain, my name is Crystal Peck.  I'm
```

```
 1              (Ronald Fountain - by Ms. Peck)
 2   an attorney in the case representing County of
 3   Rensselaer and Dr. Sikirica.  I just have a couple
 4   questions for you.
 5        I believe you testified that you were not at the
 6   autopsy; is that accurate?
 7     A.   To the best of my knowledge, I don't remember
 8   being there.  I could have been.
 9     Q.   Have you had any conversations with Dr. Sikirica
10   about the autopsy of M█████  Thomas?
11     A.   No.
12     Q.   Have you had any conversations with Dr. Sikirica
13   about the arrest or prosecution of Adrian Thomas?
14     A.   Not to my recollection.
15     Q.   Have you had any conversations with Dr. Sikirica
16   about his autopsy findings regarding M██████ T██████?
17     A.   If I did, I don't remember.
18     Q.   Did you have any conversations with Dr. Sikirica
19   that would have been to the effect of what you thought
20   the injuries were for M██████ T██████?
21     A.   Not that I can recall.
22     Q.   Is that a conversation you would typically have
23   with Dr. Sikirica?
```

Case 1:17-cv-00626-DJS Document 173-4 Filed 10/25/21 Page 138 of 156

```
 1              (Ronald Fountain - by Ms. Calabrese)

 2      A.   Typically, but Sergeant Mason might have had it.

 3   I thought he was running point on that part of it.   I

 4   just don't remember.

 5      Q.   So, to your memory, Sergeant Mason would have had

 6   the primary contact with Dr. Sikirica with respect to

 7   this case.

 8      A.   I believe so, yes.

 9           MS. PECK:   No further questions.

10   EXAMINATION

11   BY MS. CALABRESE:

12      Q.   I just have a few questions.

13      A.   Fire away.

14      Q.   I think you mentioned you spoke with Nicole Noel

15   from CPS?

16      A.   Yes.

17      Q.   At any point in time did you direct her or

18   anybody else from CPS to do anything on your behalf or

19   on behalf of the Troy Police Department?

20      A.   Not to the best of my recollection, no.

21      Q.   That wouldn't be something you would do.

22      A.   No.

23      Q.   You wouldn't direct CPS to obtain statements from
```

```
 1          (Ronald Fountain - by Ms. Calabrese)

 2    a suspect in a case in order to further your

 3    investigation?

 4        A.  I would not.

 5        Q.  And you did not do that in this case, correct?

 6        A.  Correct.

 7        Q.  Anything that CPS did in this case was on their

 8    own behest and behalf?

 9              MR. KLEIN:  Objection.

10              MR. PERKINS:  You can answer.

11              MR. KLEIN:  If you know.

12        A.  Yes.

13    BY MS. CALABRESE:

14        Q.  You didn't tell them, nor are you aware that Adam

15    Mason or anyone else from your department told them to

16    do anything to further your investigation.

17        A.  Correct.

18        Q.  In talking about the written statements, two

19    written statements given by Adrian Thomas and the one

20    written statement given by Wilahemina Hicks, it's common

21    police practice for the investigator him- or herself to

22    write down what the witness is stating; isn't that

23    right?
```

1           (Ronald Fountain - by Ms. Calabrese)

2     A.   Because it was such a new thing with the

3   videotaping, we wanted to get something on paper because

4   we had no clue what was going to happen.

5           So, yes, we wanted something hard just to have a

6   basis of what happened in case we could never find it

7   again on the hard drive.

8     Q.   In writing that statement, it's commonplace for

9   the officer, himself or herself, to write it down rather

10  than ask the witness to do it.

11    A.   Absolutely.

12    Q.   Because it's a quicker, easier process?

13    A.   Correct.

14    Q.   However, you give the witness an opportunity to

15  review it.

16    A.   We do.

17    Q.   Make any changes that they want.

18    A.   Absolutely.

19    Q.   After they're satisfied with that statement, they

20  acknowledge that by initialing it in several places.

21    A.   Correct.

22    Q.   And signing it.

23    A.   Yes.

```
 1              (Ronald Fountain - by Ms. Calabrese)

 2      Q.  Verifying that that is, in fact, a true and

 3   accurate version of their events?

 4      A.  Correct.

 5              MR. KLEIN:  Object to the line of

 6   questioning as leading.  Objection to the form.

 7   BY MS. CALABRESE:

 8      Q.  You were asked questions about throwing out

 9   information to Adrian and suggesting information to

10   Adrian Thomas when you interviewed him.

11          Do you recall that?

12      A.  Yes.

13      Q.  That information was based on information that

14   you gathered from other members of law enforcement,

15   witnesses, and medical personnel?

16      A.  Correct.

17      Q.  You were asked questions about the information

18   that was contained in Adrian Thomas' two written

19   depositions.

20          Do you recall those questions?

21      A.  Yes.

22      Q.  Specifically that there was nothing in that

23   statement that said, I didn't do this or Adrian Thomas
```

1          (Ronald Fountain - by Ms. Calabrese)

2   didn't do this.

3          Do you recall that?

4      A.   The first one, yes.

5      Q.   Adrian Thomas had an opportunity to put in that

6   statement whatever he wanted to, correct?

7      A.   Correct.

8      Q.   What was put in that statement was exactly what

9   he wanted to be put in that statement.

10     A.   Correct.

11     Q.   He didn't ask you to add anything to it?

12     A.   He did not.

13     Q.   He didn't ask you to delete anything from it.

14     A.   Did not.

15     Q.   In fact, he acknowledged it by signing it and

16  initialing it, that it was a true and accurate version

17  of his events.

18     A.   Correct.

19     Q.   With regard to questions that you were asked

20  about the Court of Appeals decision that we marked as

21  Thomas 23, it wouldn't be commonplace for you, as a

22  police officer, to read a legal decision, would it?

23     A.   It would not.

1           (Ronald Fountain - by Ms. Calabrese)

2               MR. KLEIN:  Objection.

3     Q.  You would rely on your corporation counsel and/or

4     the district attorney's office to advise you of any and

5     all matters of law?

6               MR. KLEIN:  Objection.

7     A.  Correct.

8     Q.  When you were asked questions about things that

9     you did then and whether or not you would do them now,

10    as you sit here today, and as you sat in the interview

11    room with Adrian Thomas then, you believed him to be

12    guilty of the events that he was originally convicted

13    of?

14    A.  I do.

15              MR. KLEIN:  Objection.

16              MS. CALABRESE:  I have no further questions.

17              MS. PECK:  I have one follow up question.

18    FURTHER EXAMINATION

19    BY MS. PECK:

20    Q.  As a secondary officer on an investigation, would

21    you typically have the contact with the medical examiner

22    regarding autopsy findings, or would that be left to the

23    primary officer?

Case 1:17-cv-00626-DJS Document 183 Filed 10/25/21 Page 137 of 156

```
 1              (Ronald Fountain - by Mr. Klein)

 2     A.  I mean, I guess it depends on how we were

 3  working.  If we were together that day, we might have

 4  both went.  I just don't recall.  I believe it was Adam

 5  who did it, he was the point man, but I don't recall.

 6     Q.  But you wouldn't tell Dr. Sikirica what you think

 7  his findings should be on an autopsy.

 8     A.  I definitely would not tell Dr. Sikirica anything

 9  about what he does on his job.  I know no medical.  My

10  wife's a nurse.

11              MS. PECK:  Thank you.

12  FURTHER EXAMINATION

13  BY MR. KLEIN:

14     Q.  So, you were asked if you believe Adrian Thomas

15  is guilty, right?

16          After your interview with him, you didn't have

17  probable cause to arrest, correct?

18     A.  Correct.

19     Q.  You only know what you know about the subsequent

20  interview by being told it secondhand by Adam or other

21  colleagues, correct?

22     A.  Correct.

23     Q.  You do respect the rule of law, correct?
```

1          (Ronald Fountain - by Mr. Klein)

2     A.  Yes.

3     Q.  You do know that Adrian was found not guilty.

4     A.  I do.

5     Q.  In the eyes of the law, he is innocent.

6          Do you understand --

7               MS. CALABRESE:  Objection.  That's not

8     accurate.

9               He wasn't found innocent.  He was not

10    guilty.  There's a difference.

11              MR. KLEIN:  We're not going to have a

12    discussion about it.

13    Q.  You acknowledge he was acquitted after trial,

14    correct?

15    A.  Yes.

16    Q.  As of your personal involvement in the

17    investigation, you had no basis to know whether he was

18    guilty of anything.

19         You didn't even have probable cause, correct?

20    A.  Correct.

21    Q.  Your response to Ms. Calabrese's question that

22    you believe he's guilty is based on what your colleagues

23    told you?

Case 1:17-cv-00626-DJS Document 163-4 Filed 10/25/21 Page 138 of 156

```
 1              (Ronald Fountain - by Mr. Klein)

 2              MR. PERKINS:  Object to the form.

 3              You can answer.

 4     A.  Based on my belief.

 5  BY MR. KLEIN:

 6     Q.  That belief is based on the subsequent interview

 7  that you were informed about?

 8     A.  And the fact that I believe somebody killed that

 9  baby and I still believe it was him.

10     Q.  Did you become aware that there was a bacterial

11  infection that was proffered as a contributing cause of

12  death?

13     A.  Yes.

14     Q.  Did you ever look into those allegations either

15  on your own or speaking with your colleagues?

16     A.  No.

17     Q.  Do you know what caused the death?

18     A.  Do I know?

19     Q.  Yeah.

20     A.  No, I don't.

21     Q.  And do you know who caused the death, if anyone?

22              MR. PERKINS:  Object to the form.

23     A.  I believe Mr. Thomas.
```

Case 1:17-cv-00626-DLS Document 173024 Filed 10/25/21 Page 140 of 156

1          (Ronald Fountain - by Mr. Klein)

2     Q.  Right, but you don't know whether it was, in

3  fact, a bacterial infection or whether it was a --

4     A.  I don't know, no.  I'm not a medical person.

5             MR. KLEIN:  That's all the questions I have.

6  Thank you for your time.

7             (Deposition concluded at 11:38 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

```
1            Questions marked for a ruling:

2            1.  So, did you resign from the PD with a
             full pension or did you leave under
3            different circumstances?

4            2.  If you were still in the department and
             had the same case come in, the same
5            circumstances, would you employ the same
             techniques today?
6
                  INDEX OF EXHIBITS
7
     Thomas                                    Marked
8
        19  Deposition of Wilahemina Hicks        4
9
        20  Notes from Troy PD                    4
10
        21  Huntley hearing testimony             4
11
        22  2009 trial testimony                  4
12
        23  Court of Appeals decision             4
13

14

15

16

17

18

19

20

21

22

23
```

```
 1   STATE OF NEW YORK     )

 2   COUNTY OF

 3

 4   I, RONALD FOUNTAIN, do hereby certify that I have read

 5   the foregoing record of my testimony taken at the time

 6   and place noted in the heading hereof and that it is

 7   a true and correct transcript of the same and the whole

 8   thereof.

 9

10

11

12

13                    _____
                                  RONALD FOUNTAIN
14   Subscribed and sworn to

15   before me this _____ day

16   of _____, 2019

17

18

19

20

21   _____

22

23
```

1    <u>C E R T I F I C A T I O N</u>

2

3

4    I, Jeanne O'Connell, Registered Professional Reporter

5    and Notary Public in and for the State of New York, do

6    hereby certify that the foregoing to be a true and

7    accurate transcription of the stenographic notes as

8    taken by me of the aforesaid proceedings.

9

10

11

12   _____          _____

13      Date                                    Jeanne O'Connell

14

15

16

17

18

19

20

21

22

23

**'**

**'04** [1] - 72:4
**'05** [1] - 72:9
**'07-'08** [1] - 25:8
**'09** [1] - 108:5
**'15** [1] - 40:7
**'16** [2] - 40:2, 40:23
**'90** [2] - 17:9, 18:2
**'93** [1] - 17:10

**1**

**1** [1] - 140:2
**10** [1] - 62:16
**10007** [1] - 2:3
**10th** [1] - 107:9
**11:10** [1] - 63:3
**11:38** [1] - 139:7
**11:50** [1] - 51:6
**12180** [1] - 2:6
**12205** [1] - 2:10
**12224** [1] - 2:13
**12:30** [1] - 108:7
**13th** [1] - 1:18
**14th** [2] - 34:11, 35:23
**15** [1] - 59:16
**19** [4] - 4:2, 63:21, 79:22, 140:8
**1988** [3] - 17:8, 46:2
**1993** [1] - 16:17
**1999** [1] - 71:17
**1:41** [1] - 80:2
**1:45** [1] - 67:13

**2**

**2** [4] - 48:17, 49:3, 69:19, 140:4
**20** [3] - 106:10, 115:16, 140:9
**2003** [1] - 71:20
**2007** [1] - 24:3
**2008** [9] - 22:13, 23:23, 24:3, 26:19, 31:14, 70:4, 75:17, 119:16
**2009** [4] - 12:18, 12:20, 78:6, 140:11
**2014** [1] - 120:9
**2015** [2] - 40:2, 40:23
**2015-2016** [1] - 25:8
**2016** [1] - 40:8
**2019** [2] - 1:18, 141:16
**20th** [1] - 120:9
**21** [5] - 35:9, 36:7, 77:6, 77:15, 140:10

**21st** [5] - 22:14, 46:18, 47:2, 102:13, 115:5
**22** [4] - 1:20, 2:5, 78:6, 140:11
**22nd** [2] - 69:2, 102:15
**23** [5] - 4:2, 22:11, 70:4, 134:21, 140:12
**23:10** [1] - 63:22
**23rd** [3] - 70:13, 70:16, 70:17, 120:2
**24:41** [1] - 116:20
**26th** [1] - 119:12

**3**

**3** [3] - 47:5, 75:17, 87:22
**30** [1] - 45:16
**305** [1] - 2:2
**3:00** [1] - 117:15
**3:30** [2] - 111:20, 111:21
**3:54** [1] - 111:22
**3rd** [1] - 119:16

**4**

**4** [6] - 68:14, 140:8, 140:9, 140:10, 140:11, 140:12
**40s** [1] - 107:6
**45** [1] - 107:5
**46** [1] - 107:6
**4:10** [3] - 109:7, 110:12, 111:17
**4:20** [1] - 111:18
**4:28** [1] - 110:3

**5**

**5** [3] - 2:9, 68:23, 69:18
**50A** [2] - 41:23, 42:6
**5:20** [1] - 49:18

**6**

**600** [1] - 2:3

**8**

**8** [3] - 108:4, 114:19, 115:17
**8:00** [1] - 114:20
**8:15** [1] - 115:6
**8:30** [2] - 57:7, 117:14

**8:59** [1] - 1:19

**9**

**9** [4] - 57:8, 114:20, 117:14
**9/21** [1] - 48:18
**9/21/08** [1] - 63:22
**9/22/08** [3] - 68:13, 68:18, 79:23
**911** [5] - 56:9, 57:16, 87:23, 108:11, 117:16
**95** [1] - 24:23
**9:21** [1] - 117:13
**9:30** [2] - 58:2, 118:3
**9:45** [1] - 59:16

**A**

**a.m** [5] - 1:19, 67:13, 80:2, 117:15, 139:7
**▇▇▇** [5] - 71:20, 73:4, 109:18, 109:23, 111:13
**▇▇'s** [1] - 109:15
**▇▇..** [1] - 111:19
**abide** [1] - 20:12
**ability** [1] - 5:16
**absolutely** [5] - 105:8, 106:8, 118:2, 132:11, 132:18
**abuse** [3] - 74:13, 85:12, 85:20
**abused** [2] - 74:18, 76:18
**academy** [6] - 18:9, 18:12, 18:15, 19:15, 20:4, 27:17
**accept** [1] - 23:21
**accepted** [1] - 23:20
**accident** [9] - 36:12, 38:7, 38:11, 79:10, 83:2, 94:18, 98:23, 125:20
**accidental** [1] - 121:9
**accidentally** [1] - 122:3
**according** [4] - 56:21, 57:23, 63:2, 97:15
**accurate** [8] - 11:2, 78:3, 78:12, 129:6, 133:3, 134:16, 137:8, 142:7
**accurately** [5] - 5:9, 5:16, 107:15
**accused** [3] - 29:11, 39:11, 81:7

**accuser** [2] - 95:8, 95:9
**acknowledge** [2] - 132:20, 137:13
**acknowledged** [2] - 88:17, 134:15
**acquitted** [1] - 137:13
**acted** [1] - 32:6
**action** [3] - 3:13, 42:6, 42:15
**actions** [1] - 4:11
**ADA** [4] - 84:9, 108:8, 111:23, 112:5
**ADAM** [1] - 1:6
**Adam** [13] - 2:7, 8:21, 13:15, 13:16, 27:19, 37:5, 84:21, 127:10, 127:11, 127:18, 131:14, 136:4, 136:20
**add** [1] - 134:11
**additional** [3] - 44:18, 44:19, 114:11
**administer** [1] - 3:18
**administrative** [1] - 41:15
**admissible** [2] - 20:13, 29:7
**admit** [1] - 35:11
**admitted** [1] - 116:17
**admitting** [1] - 127:20
**adopt** [1] - 90:6
**ADRIAN** [2] - 1:3, 1:11
**Adrian** [80] - 4:10, 4:23, 8:13, 14:21, 28:17, 31:15, 32:2, 32:5, 33:10, 52:2, 54:6, 54:11, 55:10, 55:14, 63:18, 64:10, 64:14, 64:21, 65:4, 72:3, 73:23, 76:5, 79:16, 79:23, 80:6, 80:17, 82:7, 82:19, 83:6, 84:19, 85:20, 87:3, 88:5, 88:23, 89:19, 90:6, 90:13, 90:15, 93:15, 93:18, 93:23, 96:19, 97:16, 97:20, 97:23, 98:17, 98:22, 100:7, 100:23, 102:18, 103:2, 103:8, 103:22, 104:9, 104:18, 106:6, 106:23, 107:8, 107:10, 118:21, 120:8, 123:8, 124:15, 125:6, 126:8, 127:6, 127:8, 127:19, 127:20,

128:11, 129:13, 131:19, 133:9, 133:10, 133:18, 133:23, 134:5, 135:11, 136:14, 137:3
**Adrian's** [1] - 107:10
**adult** [3] - 24:20, 82:9, 120:15
**advanced** [1] - 31:6
**advise** [2] - 7:12, 135:4
**advised** [2] - 46:15, 66:11
**affirmation** [1] - 3:18
**aforesaid** [1] - 142:8
**afternoons** [1] - 45:15
**afterwards** [2] - 94:12, 105:2
**age** [1] - 114:21
**ago** [2] - 9:11, 116:14
**agree** [14] - 10:16, 82:14, 95:11, 98:9, 98:14, 120:17, 121:3, 121:10, 121:18, 121:22, 122:9, 122:19, 123:4, 126:20
**agreed** [8] - 3:2, 3:8, 3:11, 3:15, 35:7, 36:5, 37:16, 122:18
**ahead** [3] - 18:6, 41:11, 85:3
**ailing** [2] - 35:6, 36:4
**▇▇** [1] - 116:13
**Albany** [14] - 2:10, 2:13, 8:16, 31:3, 46:21, 47:20, 48:19, 49:3, 49:9, 51:5, 56:20, 57:23, 62:19, 68:6
**alcohol** [1] - 5:15
**allegations** [6] - 74:20, 75:9, 75:14, 85:13, 85:20, 138:14
**allowed** [1] - 10:18
**alone** [2] - 65:14, 108:13
**ambulance** [1] - 57:20
**amendment** [3] - 20:2, 34:11, 35:23
**answer** [59] - 4:22, 6:3, 6:13, 6:21, 15:8, 30:7, 32:11, 32:19, 34:15, 34:22, 36:19, 38:23, 41:3, 41:10, 41:21, 42:23, 56:11, 59:9, 61:6, 61:19, 62:8, 69:11, 74:7, 74:22, 75:12, 76:10,

81:11, 83:15, 83:23, 85:22, 86:17, 86:18, 90:9, 91:14, 92:22, 95:13, 97:12, 97:22, 98:15, 99:21, 100:5, 101:21, 101:22, 102:2, 102:10, 103:12, 104:5, 111:4, 122:11, 123:6, 123:14, 123:20, 124:20, 125:13, 126:6, 126:12, 128:4, 131:10, 138:3
**answered** [1] - 115:8
**answers** [1] - 6:6
**anyway** [1] - 43:10
**apartment** [14] - 52:16, 52:22, 55:23, 56:3, 65:7, 87:17, 87:18, 88:7, 94:6, 115:5, 115:19, 116:7, 116:11, 116:15
**Apartments** [1] - 52:17
**apologize** [1] - 35:16
**Appeals** [4] - 33:12, 34:2, 134:20, 140:12
**appear** [4] - 10:17, 53:5, 107:17, 114:14
**APPEARANCES** [1] - 2:1
**appeared** [1] - 58:17
**Appliances** [1] - 45:14
**application** [1] - 42:7
**apply** [1] - 21:5
**approving** [1] - 105:3
**arraigned** [1] - 70:16
**arrest** [13] - 4:23, 21:6, 21:8, 24:15, 26:4, 69:20, 85:20, 87:14, 100:22, 104:21, 128:10, 129:13, 136:17
**arrested** [8] - 35:6, 36:3, 36:14, 37:10, 40:23, 121:21, 123:10, 125:21
**arresting** [2] - 104:22, 105:16
**arrived** [1] - 51:12
**Art** [6] - 85:4, 107:23, 108:8, 110:15, 111:23, 112:4
**articles** [1] - 119:19
**Assault** [2] - 40:13, 44:5
**assaults** [1] - 24:13
**assigned** [14] - 14:14,

22:10, 22:20, 22:22, 24:11, 25:20, 50:3, 50:6, 50:8, 101:3, 105:12, 105:14, 112:10
**assignment** [1] - 23:2
**assist** [3] - 36:9, 38:2, 125:8
**Assistant** [1] - 2:13
**assisting** [1] - 39:8
**assumed** [1] - 6:14
**assuming** [3] - 14:6, 16:4, 124:9
**assurances** [2] - 125:18, 126:9
**assured** [2] - 36:11, 38:7
**attached** [1] - 52:20
**attempted** [2] - 26:3, 26:4
**attempting** [2] - 36:9, 125:9
**attend** [7] - 13:11, 18:9, 18:14, 61:10, 62:11, 73:8, 120:6
**attended** [3] - 16:5, 16:8, 77:3
**attending** [1] - 118:3
**attention** [3] - 46:4, 61:17, 61:20
**attorney** [3] - 5:12, 8:6, 129:2
**Attorney** [3] - 2:4, 2:12, 2:13
**attorney's** [3] - 13:6, 33:21, 86:2, 113:13, 135:4
**Attorneys** [2] - 2:7, 2:11
**attorneys** [1] - 3:3
**attributed** [1] - 39:16
**authority** [1] - 85:19
**automobile** [1] - 19:3
**autopsy** [6] - 13:11, 129:6, 129:10, 129:16, 135:22, 136:7
**available** [2] - 42:18, 43:6
**Avenue** [1] - 2:9
**aware** [22] - 14:2, 14:3, 20:19, 21:7, 21:23, 22:5, 29:9, 30:9, 33:9, 33:10, 39:13, 39:14, 63:17, 69:21, 87:6, 104:8, 118:18, 118:20, 119:7, 124:5, 131:14, 138:10

## B

**baby** [20] - 9:15, 48:19, 49:6, 49:12, 56:8, 58:11, 63:13, 78:20, 79:5, 80:18, 82:15, 89:18, 89:20, 90:2, 116:21, 117:13, 117:14, 120:23, 138:9
**backdate** [1] - 40:7
**background** [1] - 44:17
**bacterial** [2] - 138:10, 139:3
**bad** [1] - 83:7
**Bailey** [1] - 2:8
**ballpark** [1] - 73:13
**based** [8] - 23:15, 32:6, 81:22, 99:18, 133:13, 137:22, 138:4, 138:6
**basic** [1] - 27:17
**basis** [3] - 97:10, 132:6, 137:17
**bathroom** [1] - 52:20
**bawling** [1] - 54:18
**BCI** [2] - 112:8, 112:10
**became** [2] - 18:5, 18:7
**become** [6] - 17:21, 20:19, 25:10, 28:12, 33:9, 138:10
**bed** [2] - 89:21
**bedrooms** [1] - 52:20
**bedside** [3] - 35:7, 36:4, 123:11
**beginning** [1] - 10:14
**behalf** [3] - 130:18, 130:19, 131:8
**behest** [1] - 131:8
**behind** [1] - 84:11
**belief** [4] - 96:15, 96:18, 138:4, 138:6
**best** [23] - 12:3, 23:22, 29:12, 31:3, 31:6, 31:16, 37:4, 39:18, 62:9, 70:10, 74:16, 86:20, 99:13, 101:2, 109:14, 110:21, 111:10, 113:20, 115:23, 116:16, 118:10, 129:7, 130:20
**better** [2] - 19:10, 81:19
**between** [3] - 3:3, 14:15, 111:11
**bid** [5] - 23:12, 23:15,

23:18, 23:19, 23:20
**big** [5] - 54:12, 59:13, 71:16, 93:22, 94:2
**bilateral** [1] - 58:10
**bin** [2] - 53:16, 53:17
**birth** [1] - 117:23
**birthday** [4] - 46:12, 91:7, 91:8
**bit** [3] - 9:5, 9:20, 11:15
**blamed** [1] - 122:4
**bleeding** [1] - 79:10
**block** [2] - 9:13, 52:18
**blood** [2] - 58:17
**blossomed** [1] - 24:14
**bones** [1] - 79:10
**Book** [2] - 11:21, 12:4
**booked** [2] - 70:5, 70:7
**bopping** [1] - 53:11
**born** [4] - 71:17, 71:20, 72:3, 72:9
**bottle** [2] - 87:21, 117:15
**bottom** [2] - 63:23, 80:8
**bounce** [1] - 83:8
**bouncing** [1] - 32:20
**boy** [1] - 71:14
**boys** [1] - 71:15
**bracket** [1] - 92:5
**Brad** [1] - 45:15
**brain** [1] - 58:18
**break** [4] - 6:20, 6:22, 115:13, 128:6
**breathing** [1] - 88:6
**breeze** [1] - 77:11
**Brett** [2] - 2:2, 4:10
**bridge** [3] - 67:18, 83:7, 83:18
**brief** [1] - 60:13
**briefed** [1] - 48:22
**briefly** [4] - 6:2, 8:10, 48:9, 77:16
**bring** [2] - 66:14, 122:7
**Broadway** [1] - 2:2
**broken** [1] - 79:10
**brought** [8] - 46:13, 47:6, 65:17, 67:5, 69:8, 74:15, 82:19, 124:17
**building** [2] - 58:6, 93:13
**bumped** [3] - 82:15, 99:10
**bumping** [1] - 82:16, 82:19, 126:21, 126:22

**bunch** [1] - 87:19
**bundled** [1] - 55:5
**bureau** [10] - 22:20, 22:23, 23:3, 23:14, 24:2, 25:12, 26:11, 26:13, 48:7
**busy** [4] - 60:14, 61:7, 61:8, 62:10
**but..** [2] - 53:12, 94:20
**BY** [31] - 4:7, 15:9, 32:13, 35:2, 35:18, 36:21, 39:3, 41:13, 44:3, 69:13, 74:8, 81:4, 84:4, 86:23, 87:9, 90:11, 91:17, 93:2, 95:15, 102:6, 111:6, 115:9, 115:15, 128:8, 128:22, 130:11, 131:13, 133:7, 135:19, 136:13, 138:5

## C

**Calabrese** [2] - 2:13, 4:12
**CALABRESE** [18] - 32:9, 35:11, 35:16, 36:17, 41:22, 42:3, 81:3, 91:15, 99:23, 101:17, 103:21, 111:2, 115:13, 130:11, 131:13, 133:7, 135:16, 137:7
**Calabrese's** [1] - 137:21
**camera** [7] - 91:18, 91:19, 92:2, 92:5, 92:18, 92:19, 93:3
**Capitol** [1] - 2:12
**captain** [1] - 66:7
**Captain** [5] - 48:4, 50:2, 50:12, 56:19, 119:4
**car** [1] - 47:22
**Cara** [1] - 112:4
**care** [2] - 53:11, 68:12
**career** [9] - 23:5, 24:14, 26:15, 30:18, 31:5, 80:21, 81:6, 81:12, 83:21
**case** [49] - 4:15, 8:10, 8:12, 10:5, 12:8, 12:21, 13:11, 13:14, 14:5, 15:3, 16:11, 24:22, 28:18, 30:17, 33:9, 34:18, 36:16, 36:23, 39:8, 45:8,

46:10, 48:3, 48:8, 48:17, 50:3, 50:17, 70:9, 79:13, 86:22, 93:4, 100:15, 101:4, 101:14, 102:17, 104:2, 104:13, 105:13, 105:14, 108:8, 108:18, 117:11, 129:2, 130:7, 131:2, 131:5, 131:7, 132:6, 140:4

**cases** [5] - 24:11, 33:5, 39:19, 39:22, 59:23

**caused** [6] - 60:5, 95:8, 97:14, 99:18, 138:17, 138:21

**Cedar** [1] - 52:16

**cell** [3] - 57:16, 87:23, 117:16

**Centanni** [2] - 50:12, 69:8

**Centanni's** [1] - 50:13

**Center** [12] - 8:17, 8:20, 9:20, 15:5, 40:13, 44:6, 46:21, 109:11, 112:6, 112:8, 112:11, 114:13

**certification** [1] - 3:9

**certify** [2] - 141:4, 142:6

**chain** [2] - 38:20, 103:7

**chair** [3] - 93:19, 93:22, 94:5

**chance** [3] - 39:5, 50:12, 78:8

**change** [5] - 18:3, 23:2, 34:17, 72:10, 80:22

**changes** [5] - 7:8, 7:10, 7:13, 7:18, 132:17

**charge** [7] - 13:16, 24:10, 58:9, 65:21, 65:23, 119:6

**charges** [3] - 41:4, 74:15, 113:12

**charging** [1] - 104:17

**checked** [1] - 66:6

**Chelsea** [1] - 112:4

**chief** [5] - 10:18, 66:7, 66:10, 66:13, 98:8

**child** [21] - 14:7, 14:15, 14:18, 31:10, 36:9, 38:2, 46:15, 46:17, 46:19, 48:22, 63:18, 76:6, 82:7, 82:9, 86:14, 94:9,

94:10, 96:6, 111:11, 122:8, 122:22

**child's** [7] - 35:5, 35:7, 36:3, 36:4, 36:10, 123:9, 125:9

**children** [14] - 15:6, 31:2, 31:4, 31:6, 46:19, 51:22, 53:5, 53:10, 53:22, 56:16, 61:9, 70:11, 71:9, 84:11

**Children's** [1] - 112:8

**children's** [1] - 112:10

**choice** [1] - 123:23

**chose** [1] - 43:13

**Christina** [2] - 2:13, 39:5

**circumstances** [13] - 23:9, 35:10, 36:8, 37:23, 40:9, 41:19, 46:16, 60:10, 62:5, 101:14, 125:7, 140:3, 140:5

**CITY** [1] - 1:6

**City** [2] - 2:7, 45:8

**civil** [2] - 4:11, 5:18

**Civil** [2] - 41:23, 42:6

**CK** [1] - 107:14

**Claimant** [1] - 1:12

**Claims** [2] - 4:12, 42:6

**CLAIMS** [1] - 1:9

**clarify** [2] - 78:4, 85:8

**class** [1] - 44:8

**classroom** [1] - 18:20

**clause** [1] - 35:22

**Clayton** [1] - 109:16

**clear** [2] - 31:22, 116:5

**clip** [2] - 127:15, 127:17

**clipping** [1] - 119:20

**clippings** [1] - 10:7

**closet** [2] - 53:16, 53:18

**Club** [2] - 106:21, 107:7

**clue** [2] - 118:13, 132:4

**co** [1] - 25:5

**co-juvenile** [1] - 25:5

**coerce** [2] - 20:9, 30:10

**coerced** [2] - 29:3, 29:21

**coercion** [2] - 34:10, 35:22

**coercive** [1] - 34:5

**coinvestigator** [1] - 100:15

**Colaneri** [4] - 2:7, 50:13, 69:7, 127:5

**COLANERI** [1] - 1:6

**colleagues** [5] - 22:4, 95:22, 136:21, 137:22, 138:15

**College** [1] - 18:16

**college** [1] - 44:11

**Colonie** [3] - 27:2, 27:7, 27:8

**comfortable** [1] - 99:3

**coming** [4] - 33:22, 37:2, 43:5, 78:9

**commencing** [1] - 1:18

**committed** [1] - 103:3

**common** [1] - 131:20

**commonplace** [2] - 132:8, 134:21

**Community** [1] - 18:16

**complicated** [1] - 81:21

**complies** [1] - 77:14

**concept** [1] - 30:9

**concerned** [1] - 81:9

**conclude** [2] - 60:15, 74:17

**concluded** [1] - 139:7

**conclusion** [1] - 7:2

**condition** [1] - 53:3

**conduct** [2] - 39:16, 102:17

**conducted** [5] - 15:12, 15:15, 32:2, 32:5, 111:14

**conducting** [3] - 15:5, 21:7, 28:14

**confer** [2] - 11:13

**conferred** [1] - 100:17

**confession** [2] - 99:18, 103:8

**confessions** [1] - 29:4

**confirm** [1] - 16:2

**confirmed** [1] - 88:14

**connection** [5] - 7:21, 12:23, 13:4

**conscious** [3] - 81:22, 82:2, 123:23

**consent** [1] - 44:11

**considered** [1] - 38:20

**consist** [1] - 28:8

**consistent** [1] - 98:11

**constitution** [4] - 19:23, 20:13, 21:15, 33:11

**constitutional** [2] - 39:17, 41:6

**consulted** [1] - 100:22

**consumed** [1] - 5:14

**contact** [3] - 11:18, 130:6, 135:21

**contained** [1] - 133:18

**contemporaneous** [1] - 116:2

**contents** [1] - 33:16

**continue** [3] - 39:19, 64:17, 64:19

**continued** [7] - 35:5, 36:2, 37:10, 80:20, 83:8, 122:2, 123:8

**contributing** [2] - 87:5, 138:11

**conversation** [2] - 11:20, 129:22

**conversations** [5] - 8:7, 129:9, 129:12, 129:15, 129:18

**conveyed** [1] - 95:22

**convicted** [3] - 11:7, 41:8, 135:12

**convicting** [1] - 104:3

**conviction** [2] - 11:7, 13:5

**cooperatively** [1] - 66:18

**copy** [2] - 7:4, 26:16

**corporal** [2] - 113:7, 116:17

**corporation** [1] - 135:3

**Correct** [2] - 48:21, 103:20

**correct** [166] - 4:16, 4:17, 10:21, 11:8, 11:9, 12:15, 13:2, 13:9, 13:10, 14:21, 14:22, 15:13, 15:14, 16:6, 16:12, 19:11, 22:18, 24:6, 25:22, 26:5, 26:6, 26:7, 26:8, 26:9, 26:10, 27:6, 29:15, 29:22, 30:5, 30:12, 30:13, 31:11, 32:3, 32:8, 38:3, 42:20, 45:8, 46:8, 48:20, 49:19, 49:20, 49:23, 50:4, 51:8, 51:9, 52:23, 53:23, 54:2, 54:19, 54:22, 64:11, 64:12, 66:5, 66:18, 66:19, 67:10, 67:11, 67:14, 67:15, 71:7, 75:4, 75:5, 76:16, 79:14, 79:17, 79:18, 80:11, 80:15, 80:16, 81:18, 82:10, 82:11, 82:12, 82:13, 82:17, 82:20, 82:21, 83:5, 83:9, 83:10, 84:16, 84:17, 84:19, 84:20, 87:14,

87:15, 88:16, 88:18, 88:19, 90:12, 90:14, 92:5, 92:6, 92:9, 92:15, 92:16, 92:23, 93:13, 93:14, 93:16, 93:17, 94:3, 94:18, 94:22, 95:5, 95:20, 98:5, 98:16, 102:21, 102:22, 103:17, 103:19, 104:3, 105:4, 105:7, 105:13, 105:21, 106:3, 106:6, 106:18, 106:19, 107:2, 108:12, 110:14, 113:2, 113:5, 113:9, 113:10, 113:21, 114:4, 114:5, 116:7, 116:8, 116:18, 116:19, 117:8, 117:9, 117:11, 117:12, 118:4, 118:5, 118:7, 118:16, 121:12, 124:5, 131:5, 131:6, 131:17, 132:13, 132:21, 133:4, 133:16, 134:6, 134:7, 134:10, 134:18, 135:7, 136:17, 136:18, 136:21, 136:22, 136:23, 137:14, 137:19, 137:20, 141:7

**corrections** [4] - 16:22, 17:4, 17:12, 17:13

**corroborated** [1] - 57:4

**counsel** [1] - 135:3

**COUNTY** [2] - 1:7, 141:2

**county** [6] - 16:18, 16:20, 17:20, 19:8, 19:17, 70:16

**County** [7] - 17:2, 17:4, 17:14, 17:19, 40:12, 44:5, 129:2

**couple** [10] - 7:3, 23:6, 50:11, 52:20, 62:10, 63:15, 84:5, 87:20, 116:14, 129:3

**course** [7] - 8:23, 18:17, 27:3, 27:9, 27:22, 50:7, 125:10

**courses** [2] - 19:6, 44:8

**court** [27] - 3:17, 5:5,

20:13, 24:16, 29:7, 33:18, 34:4, 34:9, 35:3, 35:19, 36:23, 37:17, 38:20, 39:8, 39:9, 39:15, 42:7, 43:14, 77:18, 77:22, 78:3, 78:11, 81:21, 104:12, 104:17, 126:16

**COURT** [2] - 1:1, 1:9
**Court** [10] - 4:12, 4:14, 33:11, 34:2, 42:6, 43:19, 43:22, 43:23, 134:20, 140:12
**court's** [1] - 36:16
**CPR** [5] - 56:9, 57:20, 63:14, 88:2, 117:16
**CPS** [17] - 47:10, 49:17, 51:18, 52:14, 71:3, 71:5, 109:16, 110:13, 111:10, 112:4, 114:6, 115:7, 115:21, 130:15, 130:18, 130:23, 131:7
**crashes** [1] - 79:8
**credibility** [2] - 74:4, 86:14
**credible** [1] - 97:14
**crib** [3] - 82:16, 90:3, 126:21
**Crime** [2] - 40:13, 44:5
**crime** [3] - 24:19, 41:8, 121:15
**crimes** [2] - 31:11, 31:12
**criminal** [5] - 24:16, 42:20, 104:12, 104:13, 104:16
**Crisis** [1] - 67:17
**Crystal** [2] - 2:10, 128:23
**culpability** [1] - 81:7
**current** [1] - 62:9
**custodian** [1] - 17:18
**custody** [4] - 90:13, 91:10, 91:12, 104:7
**cut** [1] - 10:7

**D**

**DA** [3] - 11:11, 13:23, 113:19
**DA's** [4] - 11:21, 74:14, 75:2, 75:7
**dad** [1] - 115:18
**damage** [1] - 97:15
**danger** [2] - 89:10, 89:15

**DAs** [1] - 108:17
**Date** [1] - 142:12
**date** [8] - 22:15, 46:2, 52:4, 52:7, 52:11, 71:2, 108:6, 108:7
**dated** [1] - 63:22, 79:23, 120:9
**dates** [1] - 117:22
**daughter** [2] - 9:19, 74:18
**Dave** [4] - 106:20, 107:6, 107:14, 107:20
**days** [16] - 7:3, 27:10, 28:9, 30:15, 39:21, 45:2, 50:11, 56:23, 60:20, 61:22, 62:10, 63:15, 70:22, 87:21, 88:15, 117:15
**DB** [2] - 15:18, 56:21
**dead** [1] - 9:15
**dealing** [1] - 24:16
**dealt** [1] - 31:14
**death** [8] - 94:19, 95:4, 95:8, 104:9, 128:11, 138:12, 138:17, 138:21
**December** [1] - 16:17
**decided** [1] - 66:16
**decision** [13] - 33:14, 34:2, 34:13, 34:20, 38:21, 65:20, 81:22, 82:2, 120:8, 120:13, 134:20, 134:22, 140:12
**declination** [1] - 86:6
**declined** [5] - 86:4, 86:5, 86:10, 86:13, 113:19
**deduction** [1] - 97:18
**Defendant** [2] - 1:15, 1:17
**defendant** [14] - 24:21, 25:2, 35:4, 35:20, 36:2, 36:4, 36:7, 36:11, 120:20, 121:8, 121:16, 122:2, 122:18, 126:18
**defendants** [1] - 31:8
**Defendants** [1] - 1:8
**defended** [1] - 4:12
**defending** [1] - 95:7
**defense** [1] - 95:5
**definitely** [3] - 47:22, 61:2, 136:8
**delete** [1] - 134:13
**demeanor** [1] - 54:14
**demonstrated** [1] - 127:9

**denials** [1] - 81:6
**denied** [1] - 80:18
**deny** [5] - 35:5, 36:2, 37:11, 122:2, 123:8
**department** [13] - 14:14, 14:15, 17:12, 20:18, 34:17, 39:20, 40:3, 40:16, 46:14, 98:7, 101:13, 131:15, 140:4
**Department** [3] - 23:12, 42:10, 130:19
**departure** [1] - 39:20
**DEPOSITION** [1] - 1:17
**deposition** [15] - 3:18, 5:19, 7:13, 7:21, 8:3, 8:8, 63:2, 63:7, 63:21, 72:22, 79:19, 79:23, 80:5, 87:3, 119:7
**Deposition** [2] - 139:7, 140:8
**depositions** [1] - 133:19
**deputy** [4] - 16:21, 17:11, 17:21, 18:7
**desk** [2] - 28:6, 47:12
**Detective** [1] - 69:7
**detective** [11] - 22:22, 23:3, 23:14, 24:2, 25:12, 26:11, 26:13, 26:15, 48:7, 66:7, 119:11
**detectives** [1] - 27:12, 50:8, 66:10, 66:13
**detector** [1] - 111:7
**determination** [3] - 65:18, 67:20, 100:22
**determinations** [1] - 86:14
**determine** [1] - 67:19
**determined** [3] - 59:2, 67:16, 67:19
**diagnosed** [1] - 58:23
**diarrhea** [3] - 56:23, 87:20, 117:15
**die** [2] - 94:10, 121:2
**difference** [2] - 111:11, 137:10
**different** [6] - 26:14, 27:7, 31:7, 41:19, 85:8, 140:3
**differently** [1] - 83:20
**direct** [4] - 41:3, 101:23, 130:17, 130:23
**directing** [1] - 46:4
**directly** [1] - 64:13
**director** [1] - 112:7

**disciplinary** [1] - 42:8
**disclosed** [2] - 36:13, 125:20
**disclosure** [4] - 35:10, 36:8, 37:23, 125:7
**discovery** [1] - 108:10
**discuss** [1] - 67:23
**discussed** [5] - 8:5, 16:5, 113:19, 117:6, 128:12
**discussion** [2] - 29:3, 137:12
**disseminating** [1] - 120:4
**district** [5] - 13:6, 33:21, 86:2, 113:13, 135:4
**DISTRICT** [2] - 1:1, 1:1
**District** [2] - 4:14
**Division** [1] - 40:15
**division** [1] - 22:11
**doctor** [7] - 51:11, 87:19, 97:13, 97:15, 117:7, 117:13, 120:21
**doctors** [6] - 36:9, 38:2, 51:15, 59:5, 87:20, 125:9
**document** [1] - 107:22
**documentary** [5] - 10:8, 10:10, 10:20, 11:22, 127:16
**documents** [4] - 7:22, 10:4, 106:12, 128:15
**domestic** [1] - 95:6
**done** [15] - 8:21, 8:23, 35:14, 36:13, 76:13, 76:15, 82:8, 82:9, 89:3, 96:19, 97:20, 100:8, 100:9, 115:5, 116:10
**door** [1] - 65:4
**doubt** [5] - 50:21, 88:11, 91:2, 92:12, 92:13
**down** [19] - 6:5, 34:13, 34:20, 47:3, 47:5, 54:12, 60:12, 65:5, 72:17, 72:18, 94:13, 96:2, 106:20, 110:19, 113:14, 117:10, 118:6, 131:22, 132:9
**dozen** [2] - 93:8, 93:9
**Dr** [23] - 4:19, 13:13, 59:18, 59:19, 60:11, 79:8, 82:8, 94:9, 95:16, 95:22, 98:11, 104:8, 117:5, 118:3, 129:3, 129:9,

129:12, 129:15, 129:18, 129:23, 130:6, 136:6, 136:8
**drafted** [1] - 104:17
**drafting** [1] - 120:3
**drawer** [1] - 28:6
**drew** [1] - 94:6
**drive** [1] - 132:7
**driving** [1] - 66:22
**dropped** [2] - 41:4, 69:6
**due** [3] - 34:10, 35:22, 41:15
**duly** [1] - 4:4
**during** [25] - 8:23, 12:8, 14:7, 15:4, 27:22, 37:9, 37:17, 37:22, 46:22, 50:7, 67:2, 79:15, 84:6, 84:10, 84:15, 89:20, 96:18, 102:8, 102:18, 107:17, 110:18, 118:21, 124:8, 125:14, 126:9
**duties** [7] - 17:16, 18:3, 23:3, 24:4, 24:7, 25:11, 44:4
**duty** [4] - 20:19, 20:23, 21:8, 51:12

**E**

**Earl** [1] - 45:14
**early** [2] - 23:23, 102:14
**easier** [1] - 132:12
**Edge** [12] - 59:17, 59:18, 59:19, 60:11, 78:15, 79:9, 82:8, 94:9, 95:16, 95:23, 98:11, 118:3
**educator** [1] - 44:7
**effect** [5] - 38:13, 78:18, 91:8, 122:14, 129:19
**efforts** [1] - 85:19
**eight** [3] - 37:5, 79:2, 101:7
**eight-hour** [1] - 101:7
**either** [16] - 24:16, 38:4, 38:6, 39:7, 55:8, 55:13, 67:21, 69:5, 89:7, 89:19, 99:14, 100:12, 110:23, 122:23, 125:3, 138:14
**elicit** [2] - 42:7, 111:12
**emotions** [1] - 55:4
**employ** [2] - 101:15,

140:5
**employed** [1] - 99:19
**employment** [1] - 45:10
**end** [6] - 10:14, 43:5, 53:17, 114:3, 116:9, 122:17
**ended** [2] - 67:13, 127:20
**enforcement** [8] - 17:5, 20:5, 20:8, 29:17, 44:17, 44:20, 45:19, 133:14
**ensuring** [1] - 29:6
**enter** [1] - 19:15
**entered** [1] - 35:13
**entering** [1] - 19:16
**entire** [4] - 14:12, 37:7, 42:13, 68:13
**entitled** [1] - 29:14
**equal** [1] - 126:17
**errors** [1] - 7:17
**escorted** [1] - 54:4
**Esq** [3] - 2:2, 2:6, 2:10
**essential** [3] - 36:9, 38:2, 125:8
**essentially** [3] - 56:7, 99:15, 102:12
**evening** [4] - 46:22, 58:15, 68:17, 88:14
**events** [6] - 38:20, 102:13, 103:7, 133:3, 134:17, 135:12
**evidence** [2] - 104:9, 108:23
**evolved** [1] - 26:7
**exact** [3] - 55:20, 71:2, 94:11
**exactly** [8] - 11:23, 21:20, 34:8, 72:13, 94:13, 96:7, 96:9, 134:8
**Examination** [1] - 3:16
**examination** [2] - 3:4, 3:9
**EXAMINATION** [5] - 4:6, 128:21, 130:10, 135:18, 136:12
**examined** [1] - 4:5
**examiner** [1] - 135:21
**examples** [1] - 98:9
**exams** [1] - 49:13
**except** [1] - 3:12
**exception** [1] - 39:21
**excessive** [1] - 20:23
**executive** [1] - 112:6
**exercised** [1] - 31:23
**exhausted** [2] - 61:4, 62:4

**Exhibit** [6] - 48:17, 63:21, 77:15, 79:22, 106:10, 115:16
**Exhibits** [1] - 4:2
**EXHIBITS** [1] - 140:6
**experience** [4] - 29:18, 32:14, 79:9, 81:23
**explaining** [1] - 111:11
**exploiting** [1] - 126:17
**expressed** [1] - 55:4
**Extension** [1] - 2:9
**extent** [1] - 11:18
**eye** [1] - 79:13
**eyes** [1] - 137:5

## F

**face** [1] - 57:12
**fact** [6] - 77:12, 80:17, 133:2, 134:15, 138:8, 139:3
**factual** [1] - 97:10
**fails** [1] - 27:11
**fair** [2] - 95:21, 108:4
**fall** [6] - 35:8, 36:5, 37:16, 37:20, 122:18, 124:16
**false** [1] - 99:18
**falsely** [1] - 122:3
**familiar** [1] - 28:12
**family** [5] - 15:16, 15:17, 24:16, 71:16, 117:22
**far** [6] - 8:20, 28:15, 45:9, 78:13, 90:4, 103:18
**fatality** [1] - 26:7
**favor** [1] - 12:3
**February** [3] - 18:2, 40:8, 120:9
**feelings** [1] - 91:16
**feet** [1] - 79:2
**Feiden** [2] - 45:14, 45:16
**fellow** [1] - 54:12
**felt** [4] - 61:16, 83:7, 90:16, 91:11
**fever** [1] - 56:22
**few** [10] - 7:3, 23:8, 39:4, 54:7, 67:12, 70:22, 77:10, 88:15, 93:8, 130:12
**fifth** [1] - 44:14
**file** [20] - 8:12, 9:9, 15:22, 16:11, 16:13, 42:13, 42:14, 100:15, 104:16,

105:6, 105:9, 105:10, 105:16, 105:20, 105:21, 105:23, 106:12, 108:8, 119:19, 127:8
**files** [1] - 119:21
**filing** [1] - 3:8
**filled** [1] - 106:15
**filmmakers** [3] - 10:21, 11:11, 14:4
**finally** [1] - 7:2
**findings** [6] - 13:14, 36:16, 104:8, 129:16, 135:22, 136:7
**fine** [4] - 6:20, 37:15, 54:14, 122:16
**finish** [3] - 6:4, 35:15, 95:3
**fire** [1] - 130:13
**First** [2] - 1:20, 2:5
**first** [46] - 4:4, 10:11, 13:4, 14:23, 17:4, 23:16, 27:15, 34:6, 37:9, 37:22, 38:9, 38:17, 47:9, 47:20, 47:23, 48:2, 50:20, 52:2, 52:15, 53:9, 64:22, 67:9, 70:22, 71:15, 82:6, 82:14, 85:18, 88:18, 89:18, 89:19, 89:20, 93:5, 93:10, 96:18, 96:22, 100:11, 102:12, 102:18, 102:23, 103:15, 105:7, 106:14, 125:14, 126:23, 127:10, 134:4
**five** [5] - 18:15, 18:17, 19:16, 19:22, 23:6
**fixture** [1] - 92:8
**flexible** [1] - 23:15
**flipping** [1] - 108:22
**floor** [2] - 58:6, 67:5
**focus** [1] - 96:19
**folder** [1] - 127:9
**follow** [2] - 74:9, 135:17
**followed** [1] - 47:23
**following** [2] - 113:15, 120:14
**follows** [1] - 4:5
**followup** [2] - 15:18, 56:21
**followups** [2] - 48:7, 48:17
**foot** [1] - 107:7
**forbid** [1] - 24:20
**force** [1] - 20:23

**foregoing** [2] - 141:5, 142:6
**forensic** [1] - 31:4
**form** [76] - 3:12, 15:7, 29:14, 30:6, 32:4, 32:10, 32:18, 34:14, 34:21, 36:17, 36:18, 40:20, 40:22, 41:2, 41:9, 41:20, 42:22, 55:2, 55:6, 56:10, 59:8, 59:14, 61:5, 61:18, 62:7, 69:10, 74:5, 74:6, 74:21, 75:11, 76:9, 80:23, 81:10, 83:14, 83:22, 85:21, 86:16, 86:19, 87:7, 90:8, 90:23, 91:13, 92:21, 95:2, 95:12, 97:11, 97:21, 98:13, 99:20, 100:4, 101:18, 102:9, 103:11, 103:21, 104:4, 106:4, 106:7, 107:23, 111:3, 122:10, 122:21, 123:5, 123:13, 123:19, 124:19, 125:2, 125:5, 125:12, 125:23, 126:5, 126:11, 127:21, 128:3, 133:6, 138:2, 138:22
**forward** [1] - 86:22
**Fountain** [5] - 2:7, 4:8, 42:14, 128:9, 128:23
**FOUNTAIN** [5] - 1:6, 1:17, 4:4, 141:4, 141:13
**four** [4] - 5:22, 43:15, 49:6, 61:15
**fourth** [2] - 19:23, 44:14
**fracture** [1] - 58:23
**frame** [1] - 70:15
**Frankoviak** [1] - 112:7
**frantic** [1] - 56:8
**free** [1] - 48:10
**Friday** [2] - 44:23, 45:15
**friend** [3] - 45:14, 106:23, 107:8
**front** [3] - 66:21, 114:22, 115:2
**fruit** [1] - 103:2
**full** [3] - 41:18, 80:3, 140:2
**fully** [2] - 5:8, 5:16
**funeral** [1] - 120:6
**FURTHER** [2] - 135:18, 136:12

**foregoing** ... **future** [1] - 34:13

## G

**gather** [1] - 13:20
**gathered** [1] - 133:14
**general** [1] - 11:20
**General** [2] - 2:12, 2:13
**generally** [10] - 8:14, 19:23, 20:4, 21:21, 69:3, 69:21, 76:7, 77:18, 81:8, 81:12
**generated** [1] - 7:4
**Ginsberg** [2] - 1:20, 2:5
**girl** [1] - 71:16
**girlfriend** [1] - 107:6
**gist** [2] - 36:15, 73:20
**given** [12] - 12:21, 13:21, 15:22, 26:16, 65:14, 86:9, 102:19, 106:11, 106:13, 131:19, 131:20
**Glass** [8] - 84:9, 84:15, 85:4, 107:23, 108:8, 110:15, 111:23, 112:4
**glass** [3] - 11:21, 12:4, 84:12
**goal** [1] - 104:3
**God** [2] - 24:19, 45:4
**Gonzalez** [2] - 112:9, 114:15
**Gonzalez"** [1] - 114:14
**graders** [1] - 44:14
**grand** [4] - 12:8, 12:12, 112:5, 119:11
**grandmother** [1] - 115:2
**grew** [1] - 52:17
**Griffin** [2] - 1:20, 2:5
**groomed** [1] - 53:5
**ground** [1] - 127:9
**guess** [1] - 136:2
**guest** [1] - 27:11
**guidance** [5] - 28:13, 28:15, 29:6, 34:12, 82:3
**guided** [1] - 32:14
**guidelines** [1] - 21:18
**guilty** [5] - 135:12, 136:15, 137:3, 137:10, 137:18, 137:22
**gut** [1] - 97:10
**guy** [2] - 94:2, 107:7
**guys** [11] - 50:19, 51:12, 56:22, 61:14,

64:17, 67:23, 82:23, 83:2, 87:18, 91:8, 98:22

## H

**half** [1] - 18:17
**halfway** [1] - 106:20
**hallway** [1] - 60:13
**Hamilton** [1] - 2:14
**hand** [2] - 116:13, 116:14
**handed** [2] - 74:14, 119:5
**handheld** [1] - 92:5
**hands** [1] - 94:21
**handwriting** [4] - 114:4, 114:17, 116:5, 117:23
**handwritten** [1] - 8:23
**hanging** [1] - 107:8
**happy** [3] - 6:18, 48:15, 91:8
**harassment** [1] - 44:12
**hard** [8] - 60:5, 61:16, 88:21, 96:13, 120:22, 132:5, 132:7
**harmed** [1] - 122:22
**harried** [1] - 61:4
**head** [9] - 49:14, 73:22, 82:16, 83:8, 120:16, 126:17, 126:21, 126:22
**heading** [1] - 141:6
**Health** [2] - 40:14, 40:15
**hear** [3] - 33:20, 126:14, 127:5
**heard** [3] - 5:23, 47:9, 127:7
**hearing** [13] - 12:15, 12:16, 14:2, 33:23, 34:6, 51:3, 77:7, 77:16, 77:19, 78:14, 79:7, 124:12, 140:10
**Heather** [1] - 112:7
**held** [1] - 1:18
**help** [2] - 48:11, 50:8
**helped** [2] - 36:12, 125:20
**helpful** [1] - 128:16
**hematoma** [1] - 58:11
**hereby** [3] - 3:2, 141:4, 142:6
**hereof** [1] - 141:6
**hereto** [1] - 3:4
**herself** [2] - 131:21, 132:9

**Hicks** [21] - 9:18, 14:17, 15:16, 49:7, 51:21, 52:10, 52:14, 62:17, 63:22, 64:5, 71:13, 75:18, 76:23, 106:18, 109:12, 114:22, 119:15, 120:15, 122:6, 131:20, 140:8
**Hicks'** [2] - 9:19, 107:18
**high** [6] - 44:12, 60:5, 79:8, 79:9, 96:12, 120:22
**higher** [1] - 66:4
**himself** [4] - 84:15, 89:10, 89:15, 132:9
**Hold** [1] - 43:3
**holdings** [1] - 35:19
**home** [14] - 28:4, 36:14, 38:12, 46:14, 47:7, 53:22, 64:20, 65:14, 68:14, 93:19, 99:2, 121:17, 125:22, 126:13
**homicide** [12] - 25:23, 26:9, 60:16, 62:11, 85:5, 94:18, 94:19, 95:9, 95:17, 95:19, 95:22, 96:4
**homicide''** [1] - 94:11
**honestly** [3] - 72:13, 101:6, 101:8
**Hoosick** [1] - 107:9
**Hospital** [4] - 40:14, 47:7, 50:19, 63:15
**hospital** [2] - 48:5, 49:13, 64:5, 64:14, 69:8, 78:21, 117:20, 122:7, 123:10
**hour** [4] - 37:5, 75:23, 101:7, 122:17
**hours** [3] - 23:15, 67:10, 102:15
**house** [6] - 64:11, 66:8, 66:15, 93:23, 97:17, 107:9
**household** [6] - 49:8, 51:21, 52:10, 52:14, 65:3, 120:15
**Hudson** [1] - 18:16
**Huntley** [6] - 12:15, 12:16, 77:7, 77:16, 78:14, 140:10
**hurt** [5] - 63:18, 76:20, 98:10, 109:22, 122:3

## I

**I..** [2] - 85:2, 127:17
**idea** [9] - 11:14, 73:14, 76:5, 76:12, 76:15, 114:8, 115:12, 117:4, 126:15
**identification** [1] - 4:3
**immediately** [2] - 35:7, 36:5
**impact** [5] - 30:16, 60:5, 60:17, 79:8, 96:12, 120:22
**impair** [1] - 5:15
**implement** [1] - 28:21
**implemented** [1] - 28:17
**improper** [1] - 102:7
**in-service** [1] - 26:16
**inaccurate** [1] - 59:2
**incident** [6] - 46:5, 47:14, 49:18, 59:21, 60:2, 75:19
**included** [1] - 18:20
**inconsistencies** [1] - 114:21
**inconsistent** [2] - 115:3, 115:11
**inconspicuous** [1] - 91:20
**incriminating** [1] - 35:20
**indeed** [1] - 120:19
**indemnified** [1] - 45:7
**independent** [1] - 31:23
**INDEX** [1] - 140:6
**[15]** - 9:19, 71:13, 71:17, 73:7, 73:8, 73:19, 75:6, 75:9, 109:12, 110:11, 110:18, 111:15, 111:17, 114:20, 114:21
**indicated** [1] - 48:23
**indicating** [1] - 58:18
**indicted** [2] - 40:18, 40:21
**individuals** [1] - 112:3
**induced** [1] - 126:17
**infant** [1] - 120:16
**infant's** [1] - 120:16
**infection** [2] - 138:11, 139:3
**inference** [2] - 94:5, 94:7
**inflicted** [1] - 120:16
**information** [13] - 42:8, 42:18, 42:19,

51:7, 102:19, 104:12, 104:17, 117:10, 133:9, 133:13, 133:17
**informed** [3] - 51:7, 120:20, 138:7
**[2]** - 114:22, 115:3
**initial** [5] - 49:12, 50:23, 55:16, 115:21, 122:17
**initialing** [1] - 132:20, 134:16
**injured** [6] - 24:13, 36:8, 38:2, 122:8, 125:8
**injuries** [1] - 60:4, 87:5, 120:16, 121:9, 122:5, 129:20
**injury** [8] - 35:5, 36:3, 58:18, 58:19, 60:16, 60:18, 123:9, 126:17
**inmates** [1] - 17:18
**innocent** [2] - 137:5, 137:9
**instincts** [1] - 32:7
**instruct** [1] - 81:19
**intentional** [1] - 94:19
**interaction** [1] - 32:22
**interactive** [1] - 28:9
**intercede** [2] - 20:19, 21:9
**interchangeable** [1] - 96:4
**interpret** [1] - 94:15
**interpreted** [1] - 95:21
**interrogating** [1] - 120:19
**interrogation** [24] - 21:4, 26:20, 27:3, 27:13, 27:16, 29:2, 30:14, 30:16, 30:17, 31:7, 31:13, 31:15, 32:2, 32:5, 34:19, 67:7, 99:2, 99:7, 100:19, 101:5, 102:8, 120:14, 122:17, 124:18
**interrogations** [4] - 28:10, 28:14, 33:3, 34:13
**interrogator** [1] - 30:3
**interrogators** [3] - 121:7, 121:12, 126:19
**interrupting** [1] - 35:16
**interview** [79] - 8:17, 11:6, 11:10, 27:3, 32:6, 32:15, 37:5,

37:9, 37:18, 37:22, 38:16, 38:17, 55:16, 55:20, 66:8, 67:8, 68:22, 69:9, 71:3, 71:18, 72:7, 72:14, 73:6, 73:18, 75:10, 75:17, 75:22, 76:11, 76:23, 79:15, 82:6, 82:7, 83:6, 83:16, 84:6, 84:11, 89:20, 91:18, 93:4, 93:12, 96:18, 96:22, 98:4, 100:11, 100:13, 100:23, 101:7, 102:14, 102:19, 102:23, 103:4, 103:16, 104:2, 107:18, 107:20, 109:11, 109:15, 110:6, 110:13, 110:16, 110:19, 111:8, 111:14, 111:15, 115:21, 118:14, 118:21, 119:15, 119:17, 124:2, 124:8, 125:14, 126:21, 127:3, 135:10, 136:16, 136:20, 138:6
**interviewed** [7] - 46:21, 69:18, 71:5, 72:11, 75:23, 118:21, 133:10
**interviewing** [8] - 27:13, 31:2, 31:4, 31:6, 62:16, 70:11, 70:23, 75:6
**interviews** [21] - 12:6, 14:21, 15:4, 15:5, 15:6, 15:12, 15:15, 15:19, 16:7, 29:9, 66:9, 71:6, 71:8, 73:8, 73:23, 77:3, 84:15, 112:13, 114:13, 126:10
**introduce** [1] - 30:2
**investigate** [1] - 75:14
**investigating** [3] - 49:21, 102:17, 121:15
**investigation** [24] - 8:13, 9:2, 14:8, 14:9, 14:11, 14:12, 26:9, 50:7, 70:23, 74:9, 74:13, 75:8, 76:13, 84:22, 85:8, 86:18, 112:20, 113:4, 113:12, 118:19, 131:3, 131:16,

135:20, 137:17
**investigations** [3] -
52:7, 85:10, 85:11
**Investigator** [3] -
112:8, 114:14,
114:15
**investigator** [3] -
101:3, 112:10,
131:21
**investigators** [3] -
50:3, 50:17, 105:20
**involve** [1] - 41:5
**involved** [11] - 24:21,
24:22, 25:3, 25:10,
39:7, 42:16, 52:8,
106:2, 106:5,
108:16, 113:11
**involvement** [7] -
4:22, 9:10, 46:9,
70:9, 84:21, 102:14,
137:16
**involving** [3] - 24:19,
42:20, 61:9
**IOs** [2] - 49:21, 51:17
**irrelevant** [1] - 86:17
▮▮▮ [1] - 116:13
**ish** [2] - 111:20,
111:21
▮▮▮ [1] - 72:9
**issue** [1] - 29:10
**issued** [2] - 42:15,
119:23
**issues** [2] - 43:12,
74:4

**J**

**jail** [8] - 17:14, 17:16,
17:19, 70:16, 90:16,
90:19, 90:20, 91:7
**January** [1] - 108:4
**Jeanne** [3] - 1:21,
142:4, 142:12
**job** [8] - 17:5, 17:7,
19:10, 40:10, 40:16,
44:21, 64:17, 136:9
**jobs** [3] - 45:17, 45:19,
52:7
**Joe's** [1] - 43:18
**jogs** [1] - 113:22
**Johnson** [1] - 2:8
**join** [1] - 16:16
**joined** [1] - 22:7
**joint** [1] - 65:20
**jointly** [1] - 67:21
**Joseph** [1] - 2:6
**jotted** [1] - 118:6
**judge** [2] - 41:4, 42:15
**Judge** [2] - 42:14,

43:5
**judgment** [5] - 29:23,
30:2, 30:3, 31:23,
68:2
**jump** [2] - 83:7, 83:17
**jumping** [1] - 67:18
**June** [2] - 17:8, 26:19
**Junior** [1] - 72:3
**jury** [2] - 12:12, 119:11
**justified** [1] - 95:10
**juvenile** [12] - 14:14,
23:14, 24:5, 24:17,
24:20, 25:2, 25:5,
25:12, 25:20, 39:19,
39:22
**juveniles** [2] - 24:12,
24:15

**K**

**Kardos** [2] - 51:12,
117:5
**Katherine** [1] - 2:14
**Katrina** [1] - 51:11
**keep** [1] - 123:3
**kept** [3] - 66:10, 69:14,
82:22
**key** [1] - 124:17
**kids** [20] - 52:22, 53:8,
53:21, 68:12, 70:23,
71:3, 71:6, 71:8,
71:11, 72:3, 75:15,
76:18, 76:20, 85:6,
93:16, 97:5, 97:14,
113:6, 115:6, 115:22
**killed** [1] - 138:8
**kind** [11] - 28:13,
32:15, 32:16, 33:3,
52:18, 52:19, 53:10,
55:3, 60:22, 61:13,
97:18
**kindergartners** [1] -
44:13
**king's** [1] - 93:19
**kitchen** [3] - 52:19,
99:11, 126:22
**Klein** [3] - 2:2, 4:10,
42:7
**KLEIN** [48] - 4:7, 15:9,
32:13, 35:2, 35:14,
35:18, 36:21, 39:3,
41:7, 41:13, 42:2,
42:17, 43:2, 43:7,
43:11, 43:21, 44:3,
69:13, 74:8, 81:4,
84:4, 86:23, 87:9,
90:11, 91:17, 93:2,
95:15, 101:20,
101:23, 102:4,

102:6, 111:6, 115:9,
115:15, 127:23,
128:6, 128:8,
128:19, 131:9,
131:11, 133:5,
135:2, 135:6,
135:15, 136:13,
137:11, 138:5, 139:5
**knocked** [1] - 65:4
**knowing** [2] - 80:18,
96:23
**knowledge** [18] -
15:20, 21:11, 22:4,
22:6, 31:16, 39:18,
74:16, 76:18, 86:9,
86:11, 104:14,
109:14, 110:22,
113:20, 115:23,
116:16, 118:10,
129:7
**known** [2] - 45:15,
85:6
**knows** [1] - 128:2

**L**

**lap** [1] - 119:2
**large** [1] - 107:7
**last** [6] - 43:3, 43:12,
50:11, 110:3,
117:13, 123:4
**Latham** [1] - 107:7
**law** [13] - 5:6, 17:4,
18:22, 20:5, 20:8,
29:17, 44:17, 44:19,
45:19, 133:14,
135:5, 136:23, 137:5
**Law** [3] - 1:19, 41:23,
42:6
**lawful** [1] - 29:19
**layperson** [1] - 91:23
**lead** [7] - 39:7, 50:17,
103:2, 103:4, 103:8,
113:12, 118:22
**leading** [2] - 13:4,
133:6
**learn** [11] - 19:23,
20:4, 20:5, 20:8,
20:17, 21:12, 58:15,
61:21, 69:5, 69:12,
74:3
**learned** [4] - 28:17,
31:22, 32:8, 59:6
**learning** [1] - 31:19
**least** [2] - 85:10, 90:15
**leave** [5] - 19:8, 40:18,
41:14, 41:19, 140:2
**leaving** [2] - 40:9, 42:9
**lectures** [2] - 28:9,

28:11
**led** [1] - 96:23
**left** [10] - 19:12, 22:11,
40:2, 45:10, 51:5,
56:17, 56:18, 97:20,
111:17, 135:22
**legal** [2] - 30:12,
134:22
**less** [1] - 97:19
**liaison** [1] - 14:15
**lie** [2] - 82:12, 111:7
**life** [3] - 36:10, 38:3,
125:9
**likely** [8] - 25:3, 25:4,
43:13, 58:11, 66:16,
97:16, 97:19, 100:16
**line** [2] - 42:5, 133:5
**linked** [1] - 104:9
**list** [1] - 117:22
**listened** [1] - 9:23
**lives** [1] - 107:9
**living** [1] - 52:19
**lobby** [1] - 69:8
**look** [10] - 46:2, 48:10,
48:14, 52:18, 53:16,
62:3, 77:10, 77:12,
92:18, 138:14
**looked** [16] - 8:8, 9:7,
9:23, 10:7, 12:12,
12:14, 14:6, 34:3,
48:7, 72:21, 77:16,
92:4, 92:7, 112:15,
119:8, 128:17
**looking** [11] - 9:4, 9:9,
9:15, 11:22, 77:4,
83:19, 92:16, 92:17,
96:9, 107:3, 126:3
**looks** [6] - 26:19,
92:17, 111:17,
111:19, 114:18,
118:14
**loop** [1] - 69:14
**Loudonville** [3] - 27:5,
30:15, 30:23

**M**

**maintain** [2] - 16:14,
105:23
**maintained** [4] -
16:11, 105:6,
105:16, 105:18
**maintains** [1] - 105:20
**man** [1] - 136:5
**mark** [5] - 35:11, 39:5,
43:2, 102:4, 107:6
**Marked** [1] - 140:7
**marked** [7] - 4:2,
35:13, 43:4, 48:16,

106:9, 134:20, 140:1
**marking** [1] - 43:22
**marks** [1] - 79:11
**MASON** [1] - 1:6
**Mason** [49] - 2:7, 8:21,
13:15, 27:19, 32:15,
32:23, 37:6, 38:4,
38:6, 38:10, 46:15,
46:20, 48:4, 48:18,
50:2, 50:16, 55:13,
56:19, 63:8, 65:20,
65:21, 65:23, 66:6,
66:12, 66:16, 67:21,
68:5, 69:7, 70:5,
70:15, 80:10, 82:22,
84:21, 89:19,
100:16, 104:17,
105:17, 108:13,
119:4, 119:11,
124:4, 125:18,
127:19, 130:2,
130:5, 131:15
**mason** [1] - 13:15
**Mason's** [2] - 93:10,
108:2
**materials** [1] - 27:22
**matter** [9] - 14:17,
14:18, 22:15, 25:10,
25:20, 29:17, 43:9,
75:4, 113:17
**Matter** [1] - 106:20
**matters** [6] - 31:11,
61:9, 62:11, 77:21,
86:9, 135:5
**M**▮▮▮ [32] - 22:15,
58:5, 75:3, 75:7,
75:19, 84:19, 85:12,
87:5, 87:19, 87:21,
87:23, 88:6, 88:15,
88:20, 94:16, 96:20,
98:10, 104:9,
112:19, 113:4,
113:8, 116:6,
116:21, 118:18,
120:21, 122:3,
125:7, 125:8,
128:11, 129:10,
129:16, 129:20
**M**▮▮▮**'s** [6] - 38:3,
120:6, 120:21,
121:9, 122:4, 123:11
**MD** [1] - 51:12
**mean** [13] - 9:7, 9:18,
25:19, 54:17, 61:8,
66:2, 68:14, 93:21,
103:14, 106:2,
114:23, 118:9, 136:2
**meaning** [1] - 12:4
**meaningful** [1] - 28:20
**means** [2] - 43:4,

107:12
**meant** [1] - 93:23
**Med** [10] - 8:16, 47:20, 48:19, 49:3, 49:9, 51:5, 56:20, 57:23, 62:19, 68:6
**media** [1] - 119:23
**Medical** [1] - 46:21
**medical** [4] - 133:15, 135:21, 136:9, 139:4
**medications** [1] - 5:15
**meeting** [6] - 11:16, 60:10, 62:13, 107:23, 108:13, 108:22
**meetings** [3] - 13:5, 16:5, 108:17
**members** [2] - 117:22, 133:14
**memory** [2] - 113:23, 130:5
**mentioned** [1] - 130:14
**Merritt** [1] - 106:20
**met** [6] - 4:13, 46:14, 46:17, 52:2, 52:4, 69:7
**methods** [1] - 28:16
**Michael** [1] - 2:11
**MICHAEL** [1] - 1:7
**middle** [1] - 52:21
**might** [13] - 5:15, 11:23, 24:21, 39:21, 43:23, 71:15, 96:2, 100:20, 107:8, 117:10, 127:16, 130:2, 136:3
**military** [1] - 45:22
**mind** [2] - 29:23, 95:19
**mine** [3] - 45:14, 107:4, 108:3
**minor** [1] - 28:22
**minute** [2] - 61:13, 128:6
**minutes** [6] - 39:4, 54:7, 59:16, 61:15, 67:13, 77:10
**Miranda** [1] - 20:6
**misconduct** [2] - 20:20, 21:19
**mock** [1] - 28:10
**mom** [1] - 117:15
**mommy** [1] - 109:22
**Monday** [1] - 45:2
**money** [1] - 19:9
**month** [3] - 9:11, 18:17, 49:6
**months** [6] - 18:19, 23:6, 23:8, 40:6,

113:15, 116:14
**morning** [9] - 4:8, 47:6, 56:8, 63:14, 69:19, 70:3, 70:4, 87:22, 102:14
**most** [1] - 9:12
**mostly** [1] - 44:19
**mother** [6] - 46:22, 57:4, 62:22, 63:6, 87:22, 88:2
**mouth** [1] - 30:4
**move** [1] - 86:22
**moved** [1] - 24:9
**MR** [121] - 4:7, 15:7, 15:9, 30:6, 32:4, 32:10, 32:13, 32:18, 34:14, 34:21, 35:2, 35:14, 35:18, 36:18, 36:21, 38:22, 39:3, 40:20, 40:22, 41:2, 41:7, 41:9, 41:13, 41:20, 42:2, 42:11, 42:17, 42:22, 43:2, 43:7, 43:11, 43:21, 44:3, 55:2, 56:10, 59:8, 59:14, 61:5, 61:18, 62:7, 69:10, 69:13, 74:6, 74:8, 74:21, 75:11, 76:9, 80:23, 81:4, 81:10, 83:14, 83:22, 84:4, 85:21, 86:16, 86:23, 87:9, 90:8, 90:11, 90:23, 91:13, 91:17, 92:21, 93:2, 95:2, 95:12, 95:15, 97:11, 97:21, 98:13, 98:15, 99:20, 100:4, 101:18, 101:20, 101:22, 101:23, 102:3, 102:4, 102:6, 102:9, 103:11, 104:4, 106:4, 106:7, 111:3, 111:6, 115:8, 115:9, 115:15, 122:10, 122:21, 123:5, 123:13, 123:19, 124:19, 125:2, 125:5, 125:12, 125:23, 126:5, 126:11, 127:21, 127:23, 128:3, 128:6, 128:8, 128:19, 131:9, 131:10, 131:11, 133:5, 135:2, 135:6, 135:15, 136:13, 137:11, 138:2, 138:5, 138:22, 139:5
**MS** [34] - 32:9, 35:11,

35:16, 36:17, 41:22, 42:3, 43:3, 43:8, 43:18, 55:6, 74:5, 81:2, 81:3, 84:2, 86:19, 87:7, 91:15, 99:23, 101:16, 101:17, 103:10, 103:21, 111:2, 115:13, 128:22, 130:9, 130:11, 131:13, 133:7, 135:16, 135:17, 135:19, 136:11, 137:7
**multiple** [2] - 82:23, 89:23
**murder** [12] - 26:4, 35:20, 95:17, 95:19, 95:23, 96:2, 96:4, 96:5, 96:14, 97:13, 103:3, 104:3
**murdered** [4] - 94:10, 94:16, 96:6, 121:2
**murdered..** [1] - 120:23
**must** [6] - 21:19, 89:3, 100:7, 100:8, 120:15, 122:7

### N

**name** [6] - 4:10, 27:11, 71:15, 109:5, 109:6, 128:23
**names** [1] - 71:11
**narrative** [2] - 64:7, 64:9
**nature** [3] - 11:18, 37:3, 47:9
**neat** [1] - 53:3
**need** [3] - 6:20, 41:3, 81:16
**needs** [1] - 108:10
**neighbors** [2] - 107:14
**nephew's** [1] - 46:12
**never** [15] - 10:10, 10:12, 10:14, 22:11, 34:3, 36:20, 37:7, 76:18, 93:3, 104:19, 105:10, 118:9, 127:7, 127:12, 132:6
**never"** [1] - 118:8
**NEW** [4] - 1:1, 1:9, 1:14, 141:1
**new** [5] - 58:17, 58:19, 86:22, 98:7, 132:2
**New** [18] - 1:20, 1:22, 2:3, 2:6, 2:10, 2:12, 2:13, 3:5, 4:11, 4:14,

18:12, 27:5, 27:14, 31:3, 33:11, 108:23, 142:5
**news** [3] - 42:21, 119:19, 127:14
**next** [17] - 32:17, 56:18, 64:15, 65:19, 67:10, 68:5, 68:9, 68:11, 68:20, 69:15, 70:9, 100:21, 107:5, 107:22, 109:7, 109:15, 116:20, 118:4, 121:14
**Nicole** [4] - 47:10, 47:17, 48:22, 130:14
**night** [2] - 58:20, 106:21
**nine** [1] - 37:5
**nine-hour** [1] - 37:5
**Noel** [4] - 47:10, 48:22, 49:2, 130:14
**non** [3] - 25:20, 39:22, 40:16
**non-juvenile** [2] - 25:20, 39:22
**non-police** [1] - 40:16
**none** [1] - 98:9
**nonresponsive** [1] - 87:23
**Northern** [1] - 4:14
**NORTHERN** [1] - 1:1
**notarized** [2] - 7:10, 7:18
**Notary** [3] - 1:22, 3:5, 142:5
**notary** [1] - 7:6
**note** [6] - 7:9, 7:17, 42:11, 106:23, 109:10, 118:3
**noted** [2] - 48:18, 141:6
**notepad** [1] - 119:2
**notes** [50] - 8:9, 8:11, 8:12, 8:19, 8:20, 8:23, 14:7, 14:20, 15:23, 16:4, 16:8, 16:10, 58:9, 72:19, 72:21, 72:22, 73:3, 96:10, 96:12, 106:11, 106:13, 106:15, 107:17, 108:2, 110:11, 110:12, 110:13, 112:12, 112:15, 113:22, 114:3, 114:9, 114:11, 114:15, 116:2, 116:3, 116:9, 116:13, 116:21, 116:22, 117:5,

117:17, 118:11, 118:17, 118:23, 119:8, 119:16, 142:7
**Notes** [1] - 140:9
**nothing** [4] - 42:16, 72:17, 87:11, 133:22
**notice** [1] - 53:13
**Notice** [1] - 3:16
**noticed** [1] - 53:11
**notified** [1] - 49:17
**November** [1] - 22:13
**nuance** [1] - 28:22
**number** [2] - 106:18, 114:19
**numerous** [2] - 38:10, 52:17
**nurse** [1] - 58:9, 136:10
**nurses** [1] - 59:6

### O

**O'Connell** [3] - 1:21, 142:4, 142:12
**oath** [3] - 3:18, 5:4, 5:5
**object** [70] - 15:7, 30:6, 32:10, 32:18, 34:14, 34:21, 36:17, 36:18, 40:20, 40:22, 41:2, 41:9, 41:20, 41:22, 42:22, 55:2, 56:10, 59:8, 59:14, 60:6, 61:5, 61:18, 62:7, 69:10, 74:6, 74:21, 75:11, 76:9, 81:10, 83:14, 83:22, 85:21, 86:19, 87:7, 90:8, 90:23, 91:13, 92:21, 95:2, 95:12, 96:13, 97:11, 97:21, 98:13, 99:20, 101:18, 102:9, 103:11, 103:21, 104:4, 106:4, 106:7, 111:3, 122:10, 122:21, 123:5, 123:13, 123:19, 124:19, 125:2, 125:5, 125:12, 125:23, 126:5, 126:11, 127:21, 128:3, 133:5, 138:2, 138:22
**Objection** [1] - 103:10
**objection** [23] - 32:4, 32:9, 38:22, 42:12, 55:6, 74:5, 80:23, 81:2, 81:3, 84:2,

86:16, 91:15, 99:23, 100:4, 101:16, 101:17, 111:2, 131:9, 133:6, 135:2, 135:6, 135:15, 137:7
**objection"** [1] - 42:2
**objections** [2] - 3:11, 3:16
**obligation** [2] - 21:14, 22:2
**observed** [1] - 52:13
**observing** [1] - 21:19
**obtain** [1] - 130:23
**obtained** [1] - 64:4
**obtaining** [1] - 29:3
**obvious** [2] - 91:18, 92:14
**occasions** [2] - 90:16, 93:6
**October** [2] - 75:17, 119:16
**OF** [7] - 1:1, 1:6, 1:9, 1:14, 140:6, 141:1, 141:2
**offensive** [1] - 44:16
**offered** [2] - 40:10, 125:18
**office** [15] - 11:21, 13:6, 19:8, 19:12, 22:16, 28:4, 33:21, 74:14, 75:2, 75:7, 86:3, 100:18, 105:10, 113:13, 135:4
**Office** [1] - 2:12
**officer** [25] - 10:11, 16:22, 17:13, 18:8, 20:22, 21:2, 21:18, 21:19, 22:12, 23:14, 24:5, 25:12, 39:7, 39:8, 104:20, 104:22, 105:4, 105:14, 105:16, 128:23, 132:9, 134:22, 135:20, 135:23
**officers** [16] - 20:5, 20:8, 20:18, 20:20, 21:12, 25:5, 35:4, 35:9, 35:23, 36:7, 36:11, 49:22, 50:3, 105:13, 120:20, 122:3
**Offices** [1] - 1:19
**old** [7] - 46:2, 46:13, 49:6, 58:17, 58:18, 72:17, 114:20
**older** [1] - 71:14
**on-call** [1] - 39:21
**once** [6] - 36:13,

43:15, 88:20, 121:16, 125:21, 127:12
**one** [45] - 4:11, 4:13, 25:14, 31:14, 32:6, 38:5, 40:5, 42:11, 44:2, 46:13, 50:5, 53:10, 59:13, 68:21, 71:13, 71:16, 73:10, 73:17, 73:18, 73:22, 80:9, 82:18, 84:11, 85:12, 87:2, 90:16, 96:23, 98:10, 102:4, 104:20, 104:22, 105:3, 105:12, 105:19, 105:21, 109:15, 110:12, 118:22, 120:13, 120:19, 121:12, 122:7, 131:19, 134:4, 135:17
**one-page** [4] - 87:2, 96:23, 98:10, 118:22
**one-way** [1] - 84:11
**ones** [3] - 71:9, 112:21, 113:3
**online** [1] - 127:16
**open** [1] - 23:13
**opinion** [1] - 123:18
**opinions** [1] - 61:14
**opportunity** [2] - 132:14, 134:5
**opposed** [2] - 89:19, 97:4
**order** [3] - 42:15, 43:9, 131:2
**orders** [1] - 21:17
**originally** [1] - 135:12
**otherwise** [2] - 39:10, 53:6
**ourselves** [1] - 6:8
**outside** [1] - 67:23
**outward** [1] - 79:4
**outwardly** [1] - 55:4
**overly** [2] - 54:15, 54:21
**overturned** [1] - 11:8
**own** [10] - 10:16, 16:13, 25:15, 29:23, 30:2, 30:5, 30:11, 31:23, 131:8, 138:15
**owns** [1] - 45:14

## P

**P.C** [1] - 2:8
**p.m** [10] - 49:3, 49:18, 58:2, 62:16, 63:3, 68:14, 68:23, 69:18,

108:7, 115:6
**packet** [1] - 112:16
**packs** [1] - 98:18
**page** [30] - 7:10, 7:18, 63:21, 64:4, 80:3, 80:12, 80:14, 87:2, 96:23, 98:10, 101:11, 106:14, 106:17, 106:20, 107:5, 107:15, 107:22, 109:7, 109:18, 109:20, 110:3, 111:13, 114:10, 114:13, 114:18, 115:16, 116:10, 116:20, 118:4, 118:22
**pages** [1] - 118:14
**paid** [1] - 45:5
**paper** [3] - 87:10, 105:23, 132:3
**paperwork** [5] - 77:2, 77:4, 104:21, 104:23, 105:4
**paragraphs** [1] - 120:13
**parents** [1] - 52:23
**Park** [1] - 52:16
**part** [19] - 14:8, 14:10, 16:11, 25:11, 27:8, 39:17, 43:9, 51:19, 75:3, 103:3, 103:7, 104:2, 109:23, 124:2, 126:20, 127:3, 127:8, 127:17, 130:3
**particular** [2] - 65:12, 89:17
**particularly** [1] - 83:11
**parties** [1] - 3:4
**partner** [2] - 58:13, 89:7
**Partners** [1] - 40:14
**party** [2] - 24:12, 46:12
**pass** [1] - 19:6
**past** [2] - 56:23, 87:20
**patrol** [8] - 18:7, 22:8, 22:10, 22:11, 22:12, 22:20, 23:3, 26:13
**patrolman** [1] - 22:22
**Pattison** [2] - 1:19, 2:5
**pause** [1] - 47:8
**paying** [1] - 19:10
**PD** [15] - 16:11, 16:16, 19:10, 19:16, 19:17, 21:17, 22:7, 41:14, 41:18, 45:11, 49:17, 106:12, 119:23, 140:2, 140:9

**Peccano** [1] - 58:10
**Peck** [4] - 2:8, 2:10, 4:18, 128:23
**PECK** [16] - 43:3, 43:8, 43:18, 55:6, 74:5, 81:2, 84:2, 86:19, 87:7, 101:16, 103:10, 128:22, 130:9, 135:17, 135:19, 136:11
**peek** [1] - 50:12
**peeked** [1] - 10:12
**pending** [2] - 4:11, 6:21
**pension** [2] - 41:19, 140:2
**People** [1] - 120:8
**people** [3] - 53:19, 97:19, 117:11
**percent** [1] - 24:23
**performed** [2] - 57:20, 88:2
**perhaps** [3] - 31:11, 31:12, 82:15
**PERKINS** [73] - 15:7, 30:6, 32:4, 32:10, 32:18, 34:14, 34:21, 36:18, 38:22, 40:20, 40:22, 41:2, 41:9, 41:20, 42:11, 42:22, 55:2, 56:10, 59:8, 59:14, 61:5, 61:18, 62:7, 69:10, 74:6, 74:21, 75:11, 76:9, 80:23, 81:10, 83:14, 83:22, 85:21, 86:16, 90:8, 90:23, 91:13, 92:21, 95:2, 95:12, 97:11, 97:21, 98:13, 98:15, 99:20, 100:4, 101:18, 101:22, 102:3, 102:9, 103:11, 104:4, 106:4, 106:7, 111:3, 115:8, 122:10, 122:21, 123:5, 123:13, 123:19, 124:19, 125:2, 125:5, 125:12, 125:23, 126:5, 126:11, 127:21, 128:3, 131:10, 138:22
**Perkins** [4] - 2:6, 4:15, 5:12, 7:5
**permitted** [1] - 36:14
**person** [8] - 30:2, 55:3, 82:14, 97:6, 104:20, 105:19, 122:13, 139:4

**person's** [1] - 30:3
**personal** [1] - 137:16
**personally** [1] - 106:5
**personnel** [3] - 42:13, 133:15
**perspective** [1] - 99:7
**pertaining** [2] - 8:9, 85:5
**pertinent** [1] - 128:15
**Peter's** [1] - 40:14
**phone** [3] - 57:16, 57:17, 106:18
**photos** [1] - 8:2
**physically** [2] - 53:6, 54:3
**PICU** [1] - 58:5
**piece** [1] - 92:7
**piecemeal** [1] - 43:14
**Pine** [1] - 2:9
**place** [1] - 141:6
**placed** [2] - 69:19, 70:3
**places** [1] - 132:20
**Plaintiff** [1] - 1:4
**Plaintiff/Claimant** [1] - 2:4
**plastic** [1] - 92:7
**Plaza** [1] - 2:9
**PLLC** [2] - 1:20, 2:5
**ploy** [2] - 99:2, 99:7
**plugging** [2] - 64:18, 64:19
**plus** [1] - 104:7
**point** [13] - 11:6, 17:20, 23:2, 66:9, 76:13, 83:6, 83:12, 101:3, 117:7, 124:17, 130:3, 130:17, 136:5
**Police** [5] - 23:12, 42:10, 108:23, 112:10, 130:19
**police** [22] - 10:11, 18:9, 18:12, 18:15, 18:22, 20:4, 20:17, 21:12, 27:17, 35:4, 35:23, 40:16, 46:14, 46:23, 47:3, 65:5, 65:16, 98:7, 104:7, 107:23, 131:21, 134:22
**poopa** [1] - 112:5
**portions** [1] - 101:8
**position** [1] - 23:15
**positions** [1] - 23:13
**possession** [2] - 10:4, 105:11
**possible** [2] - 90:5, 101:12
**possibly** [1] - 99:10

**potential** [1] - 31:8
**practice** [6] - 28:3, 29:18, 31:6, 80:22, 81:5, 131:21
**practices** [2] - 31:3, 111:10
**precinct** [3] - 47:11, 65:13, 66:14
**premise** [1] - 120:14
**prep** [3] - 13:6, 14:2, 108:16
**preparation** [1] - 77:12
**prepare** [3] - 5:11, 8:2, 8:8
**preparing** [1] - 119:7
**prerogative** [1] - 43:18
**presence** [3] - 68:2, 89:6, 125:19
**present** [21] - 2:14, 12:6, 14:23, 15:6, 15:15, 37:9, 38:6, 63:6, 71:6, 71:8, 71:12, 71:18, 71:22, 72:6, 80:14, 84:9, 84:10, 84:15, 103:23, 109:3, 110:15
**press** [1] - 10:7
**pretrial** [5] - 12:16, 77:7, 77:16, 77:19, 78:14
**pretty** [3] - 28:11, 109:14, 116:5
**primary** [4] - 25:6, 25:7, 130:6, 135:23
**prime** [2] - 98:2, 98:3
**priority** [1] - 85:18
**privately** [2] - 63:8, 63:9
**probable** [3] - 87:14, 136:17, 137:19
**problem** [4] - 37:5, 38:16, 124:9, 124:12
**problems** [4] - 49:13, 51:2, 88:6, 114:21
**procedures** [1] - 111:10
**proceeding** [1] - 42:20
**proceedings** [3] - 4:13, 7:2, 142:8
**process** [4] - 34:10, 35:22, 103:3, 132:12
**processed** [2] - 70:4, 70:7
**produced** [1] - 4:22
**product** [1] - 84:14
**products** [2] - 34:10, 35:21
**Professional** [2] -

**proffered** [1] - 138:11
**proper** [3] - 125:10, 125:22, 126:3
**prosecute** [1] - 103:9
**prosecuted** [1] - 113:13
**prosecution** [10] - 4:23, 13:4, 24:15, 75:3, 84:18, 103:18, 106:3, 106:5, 128:10, 129:13
**prosecutors** [2] - 102:20, 103:9
**protective** [5] - 14:7, 14:16, 46:17, 46:19, 48:23
**provide** [1] - 7:4
**provided** [1] - 42:14
**Public** [3] - 1:22, 3:5, 142:5
**publicly** [1] - 42:17
**pull** [1] - 73:2
**punishment** [2] - 113:7, 116:17
**purpose** [1] - 42:9
**pursuing** [1] - 43:21
**put** [9] - 23:10, 27:12, 30:4, 79:19, 80:17, 81:8, 134:5, 134:8, 134:9
**putting** [1] - 119:21

**Q**

**qualifications** [1] - 3:17
**questioning** [2] - 42:5, 133:6
**Questions** [1] - 140:1
**questions** [18] - 3:12, 4:22, 6:6, 39:6, 43:15, 83:8, 87:18, 88:17, 129:4, 130:9, 130:12, 133:8, 133:17, 133:20, 134:19, 135:8, 135:16, 139:5
**quicker** [1] - 132:12
**quit** [1] - 98:17
**quote** [6] - 37:16, 91:6, 96:12, 96:13, 120:21

**R**

**raise** [2] - 43:15, 43:16
**ran** [1] - 86:2
**range** [1] - 19:3

**rank** [1] - 66:4
**rapport** [1] - 93:12
**rather** [4] - 64:14, 65:13, 87:10, 132:9
**read** [16] - 9:19, 10:2, 33:14, 33:17, 36:20, 37:3, 37:7, 37:8, 50:11, 50:15, 100:12, 104:19, 107:15, 116:4, 134:22, 141:4
**reading** [3] - 35:12, 110:8, 110:10
**ready** [2] - 13:8, 40:12
**realize** [1] - 124:22
**really** [5] - 9:22, 22:11, 30:16, 77:20, 89:9
**reason** [12] - 5:8, 34:7, 37:6, 42:10, 50:21, 55:5, 64:13, 65:12, 83:13, 86:6, 88:11, 91:2
**reasonable** [1] - 123:11
**reasons** [1] - 65:12
**reassured** [2] - 121:8, 121:20
**Rebecca** [1] - 58:9
**receive** [2] - 27:22, 28:4
**received** [2] - 27:15, 49:2
**recently** [2] - 9:4, 38:9
**Recess** [2] - 115:14, 128:7
**recollection** [15] - 9:3, 12:4, 23:22, 34:23, 48:13, 62:9, 70:10, 86:21, 89:14, 99:13, 101:2, 110:8, 128:17, 129:14, 130:20
**record** [8] - 6:15, 26:17, 42:3, 42:12, 98:8, 106:17, 128:12, 141:5
**recorded** [6] - 67:10, 93:4, 96:22, 98:4, 98:6, 102:18
**recordings** [1] - 10:2
**recover** [1] - 118:9
**reference** [1] - 70:15
**reflects** [1] - 107:23
**refresh** [4] - 9:3, 48:12, 110:8, 128:17
**refreshed** [1] - 9:21
**regard** [8] - 32:7, 34:19, 75:8, 79:22, 81:5, 87:2, 113:4, 134:19

**regarding** [8] - 41:5, 48:3, 75:18, 102:13, 108:10, 128:10, 129:16, 135:22
**regardless** [1] - 20:18
**Registered** [2] - 1:21, 142:4
**regulations** [1] - 21:20
**REID** [1] - 31:17
**relate** [1] - 112:19
**related** [1] - 113:8
**relating** [5] - 10:4, 42:8, 75:15, 86:14, 118:18
**relationship** [1] - 47:16
**relatively** [1] - 53:3
**relatives** [1] - 62:21
**release** [1] - 119:23
**relevance** [1] - 42:16
**relevant** [1] - 103:18
**relied** [1] - 126:8
**rely** [1] - 135:3
**remember** [33] - 8:14, 9:10, 9:12, 9:18, 13:18, 33:23, 48:6, 48:11, 53:8, 53:10, 53:20, 54:12, 55:19, 55:22, 59:19, 60:3, 66:22, 67:2, 71:11, 73:21, 73:22, 75:12, 76:21, 77:3, 83:4, 87:16, 90:15, 95:16, 112:13, 123:15, 129:7, 129:17, 130:4
**reminded** [1] - 9:9
**removal** [1] - 51:22
**removed** [6] - 35:6, 36:3, 46:19, 53:22, 56:16, 115:22
**Renee** [1] - 112:5
**RENSSELAER** [1] - 1:7
**Rensselaer** [7] - 16:23, 17:4, 17:14, 17:18, 40:12, 44:5, 129:3
**repeat** [1] - 6:7
**repeated** [1] - 125:18
**repeatedly** [3] - 80:18, 98:22, 121:8
**rephrase** [1] - 6:17
**report** [11] - 21:2, 21:9, 21:19, 21:22, 48:19, 49:2, 49:6, 49:12, 50:23, 60:7, 108:6
**reported** [2] - 42:18, 42:19
**reporter** [3] - 3:17,

6:5, 7:4
**Reporter** [2] - 1:22, 142:4
**reports** [2] - 15:18, 15:19
**represent** [3] - 4:10, 77:15, 78:6
**representations** [1] - 125:6
**represented** [3] - 4:15, 45:7, 122:4
**representing** [2] - 4:18, 129:2
**request** [1] - 23:17
**requested** [1] - 23:16
**required** [1] - 21:15
**reserved** [1] - 3:12
**residence** [5] - 46:18, 49:7, 51:18, 56:16, 56:21
**resign** [3] - 19:13, 41:18, 140:2
**respect** [2] - 130:6, 136:23
**respective** [1] - 3:3
**respiratory** [2] - 49:13, 51:2
**responded** [2] - 51:10, 51:17
**responding** [2] - 57:9, 117:14
**response** [6] - 35:8, 36:5, 37:17, 51:19, 124:16, 137:21
**responsibilities** [2] - 18:3, 24:7
**responsibility** [8] - 35:5, 36:2, 37:11, 81:7, 105:6, 122:6, 123:2, 123:9
**responsive** [1] - 56:9
**rest** [1] - 40:13
**retired** [3] - 44:23, 45:2, 112:9
**retrial** [1] - 13:2
**retried** [1] - 36:23
**retrospect** [1] - 124:22
**return** [1] - 36:14
**revealed** [1] - 49:13
**review** [5] - 7:5, 39:6, 101:11, 128:16, 132:15
**reviewed** [4] - 7:22, 38:9, 42:15, 112:16
**ride** [1] - 67:3
**riffing** [1] - 32:16
**rights** [2] - 39:17, 41:6
**Rights** [1] - 41:23, 42:6
**risks** [1] - 29:3

# APPENDIX

**road** [2] - 18:7, 113:14
**role** [7] - 9:9, 74:12, 75:18, 102:13, 103:15, 120:3, 128:10
**rolled** [1] - 61:14
**Roman** [1] - 112:5
**RONALD** [5] - 1:6, 1:17, 4:4, 141:4, 141:13
**Ronald** [1] - 2:7
**room** [11] - 52:19, 67:7, 67:8, 68:2, 69:9, 91:18, 91:19, 91:23, 127:5, 135:11
**rule** [2] - 97:23, 136:23
**ruled** [1] - 97:19
**rules** [1] - 5:23
**ruling** [5] - 43:2, 43:4, 43:19, 102:4, 140:1
**running** [1] - 130:3
**rushing** [1] - 60:22

## S

**sadly** [2] - 25:17, 45:5
**safe** [1] - 44:13
**Sam's** [2] - 106:21, 107:7
**Samaritan** [16] - 40:14, 47:6, 47:19, 47:21, 49:8, 50:19, 51:5, 51:11, 51:15, 63:15, 67:17, 68:5, 68:23, 69:6, 89:11, 117:7
**Sampson** [2] - 1:19, 2:5
**sat** [2] - 93:18, 135:10
**satisfied** [1] - 132:19
**save** [3] - 36:9, 38:3, 125:9
**saw** [10] - 10:10, 10:14, 21:22, 50:12, 51:11, 72:22, 78:20, 79:5, 127:12, 127:15
**scenario** [3] - 82:18, 126:16, 127:19
**scenarios** [2] - 90:5, 99:12
**scene** [1] - 115:6
**school** [2] - 24:9, 44:12
**science** [1] - 18:22
**scoop** [2] - 89:2, 122:6
**scooped** [1] - 122:14
**scratches** [1] - 79:11

**sealed** [2] - 41:5, 86:10
**search** [1] - 20:2
**seat** [2] - 66:21, 107:10
**second** [13] - 6:4, 15:4, 38:16, 68:22, 100:12, 100:23, 101:4, 103:4, 103:23, 105:14, 116:9, 125:17, 127:3
**secondary** [1] - 135:20
**secondhand** [1] - 136:20
**securing** [1] - 17:18
**Security** [1] - 17:17
**see** [9] - 20:22, 43:11, 79:12, 85:6, 90:5, 109:5, 109:6, 110:4, 127:4
**seeing** [2] - 94:6, 127:14
**seek** [1] - 85:19
**seem** [5] - 53:8, 54:14, 54:16, 54:21, 61:4
**seeming** [1] - 97:9
**seizure** [1] - 20:2
**self** [1] - 95:5
**self-defense** [1] - 95:5
**sell** [1] - 45:15
**senior** [1] - 27:12
**seniority** [2] - 23:13, 23:15
**sense** [1] - 23:19
**sensitive** [1] - 31:11
**sent** [3] - 26:14, 36:23, 70:16
**sentence** [1] - 123:4
**separate** [8] - 7:10, 7:18, 16:13, 61:14, 75:4, 75:7, 84:18, 85:20
**separation** [1] - 84:22
**September** [5] - 1:18, 22:13, 22:14, 70:4, 119:12
**Sergeant** [13] - 46:15, 46:20, 48:18, 50:13, 68:5, 70:5, 80:10, 100:16, 104:17, 119:4, 127:18, 130:2, 130:5
**sergeant** [5] - 48:4, 50:13, 56:19, 66:3, 105:17
**served** [1] - 45:22
**service** [1] - 26:16
**services** [2] - 14:7, 48:23

**seven** [3] - 25:7, 40:6, 53:19
**seventh** [1] - 58:6
**several** [1] - 132:20
**sex** [3] - 24:19, 31:11, 31:12
**Sexual** [2] - 40:12, 44:5
**sexual** [3] - 24:13, 44:12, 74:13
**sexually** [3] - 44:15, 74:2, 74:18
**shall** [2] - 3:9, 3:12
**share** [2] - 33:16, 36:22
**sheriff** [4] - 16:21, 17:11, 17:21, 18:7
**sheriff's** [2] - 19:8, 19:12
**short** [1] - 115:13
**shorter** [1] - 107:7
**shoved** [1] - 28:6
**show** [4] - 15:22, 37:14, 106:9, 124:8
**showed** [1] - 119:9
**showing** [1] - 77:6
**sick** [2] - 61:9, 63:13
**side** [4] - 83:3, 86:17, 90:2, 98:23
**sign** [2] - 7:5, 105:3
**signature** [1] - 63:23
**signed** [2] - 3:4, 80:8
**signing** [2] - 132:22, 134:15
**signs** [4] - 79:4, 104:20, 105:2
**SIKIRICA** [1] - 1:7
**Sikirica** [13] - 2:11, 4:19, 13:13, 104:8, 129:3, 129:9, 129:12, 129:15, 129:18, 129:23, 130:6, 136:6, 136:8
**similarly** [1] - 21:4
**single** [1] - 93:22
**sister** [2] - 62:22, 63:6
**sit** [1] - 135:10
**sitting** [2] - 54:12, 94:5
**situation** [2] - 41:15, 95:7
**six** [3] - 18:19, 79:2, 107:7
**sixth** [1] - 25:17
**skim** [1] - 78:8
**skull** [1] - 58:23
**slammed** [5] - 88:21, 89:18, 89:21, 99:10, 120:21
**slamming** [3] - 60:5,

88:18, 96:13
**sleep** [1] - 78:16
**slept** [3] - 60:19, 61:21, 62:10
**small** [2] - 52:22, 53:21
**smoking** [1] - 98:17
**someone** [13] - 23:10, 30:10, 81:19, 94:23, 95:4, 95:6, 97:5, 114:4, 114:6, 118:11, 118:15, 119:21
**sometime** [2] - 23:23, 46:22
**sometimes** [2] - 6:7, 105:2
**somewhat** [1] - 91:20
**somewhere** [4] - 28:7, 30:23, 53:16, 96:10
**son** [2] - 84:5, 90:20
**sorry** [5] - 22:13, 24:10, 46:23, 70:19, 124:6
**sound** [4] - 49:4, 58:3, 88:3, 88:8
**sounds** [3] - 7:15, 49:5, 58:4
**space** [1] - 53:21
**speaker's** [1] - 27:11
**speaking** [5] - 11:11, 13:23, 14:4, 20:10, 31:10, 60:23, 65:13, 99:3, 102:18, 125:10, 138:15
**specific** [3] - 21:17, 26:12, 32:7
**specifically** [5] - 8:15, 14:19, 22:14, 92:20, 133:22
**speculate** [1] - 13:17
**speed** [6] - 60:5, 60:17, 79:8, 79:10, 96:12, 120:22
**spend** [1] - 78:17
**spending** [1] - 91:7
**spoken** [6] - 13:13, 13:21, 14:4, 59:21, 63:7, 107:10
**spot** [1] - 23:13
**sprinkled** [1] - 57:12
**St** [1] - 40:14
**standard** [2] - 13:8, 25:11
**standing** [1] - 44:14
**standpoint** [1] - 99:3
**start** [2] - 8:16, 17:7, 110:11
**Start** [10] - 8:17, 8:19, 9:20, 15:5, 109:11,

112:6, 112:8, 112:11, 114:13, 118:14
**started** [8] - 17:11, 17:13, 44:23, 46:3, 70:23, 93:12, 104:13, 111:17
**starting** [6] - 38:17, 46:10, 68:23, 107:5, 110:3, 115:17
**starts** [4] - 106:17, 109:7, 109:16, 116:20
**state** [1] - 27:12
**STATE** [3] - 1:9, 1:14, 141:1
**State** [11] - 1:22, 2:12, 3:5, 4:12, 18:12, 27:14, 31:3, 33:11, 108:23, 112:10, 142:5
**statement** [35] - 9:19, 29:12, 29:15, 30:5, 37:2, 38:9, 38:21, 39:9, 39:10, 64:4, 65:19, 67:9, 80:12, 80:13, 80:15, 81:13, 87:2, 87:13, 94:16, 96:23, 98:10, 101:11, 118:22, 120:17, 121:10, 121:18, 122:9, 124:15, 131:20, 132:8, 132:19, 133:23, 134:6, 134:8, 134:9
**statements** [18] - 13:21, 13:22, 20:9, 20:12, 29:7, 29:10, 29:19, 33:10, 33:22, 34:4, 35:20, 67:18, 80:21, 104:7, 124:16, 130:23, 131:18, 131:19
**STATES** [1] - 1:1
**stating** [1] - 131:22
**station** [6] - 46:23, 47:3, 65:5, 65:16, 66:8, 66:15
**stay** [1] - 54:6
**stayed** [1] - 71:14
**stenographic** [1] - 142:7
**step** [3] - 44:2
**Stewart** [2] - 42:14, 43:5
**sticks** [1] - 73:22
**still** [9] - 9:16, 10:11, 11:7, 44:22, 57:13, 101:13, 126:3,

138:9, 140:4
**stipulated** [4] - 3:2, 3:8, 3:11, 3:15
**stood** [3] - 53:20, 71:4, 71:5
**stop** [3] - 20:23, 105:9, 106:14
**Street** [5] - 1:20, 2:5, 46:18, 47:2, 115:5
**struck** [1] - 116:13
**stuck** [1] - 72:15
**students** [2] - 44:11, 44:12
**stuff** [3] - 9:15, 116:15, 116:18
**subdural** [1] - 58:10
**subject** [1] - 43:9
**Subscribed** [1] - 141:14
**subsequent** [6] - 7:13, 16:7, 33:5, 113:12, 136:19, 138:6
**substance** [17] - 33:18, 49:17, 55:21, 56:4, 56:6, 56:12, 63:12, 63:16, 67:12, 72:2, 72:16, 72:18, 73:5, 75:23, 76:4, 83:2, 94:12
**sufficient** [1] - 5:11
**suggest** [1] - 82:15
**suggested** [9] - 82:18, 88:18, 88:20, 89:20, 89:23, 99:9, 126:18, 126:23, 127:19
**suggesting** [2] - 89:18, 133:9
**Suite** [1] - 2:3
**sum** [11] - 33:17, 49:17, 55:21, 56:4, 56:6, 56:12, 63:11, 63:16, 75:22, 76:4, 83:2
**Sunday** [2] - 88:14, 102:13
**supervisor** [2] - 105:2, 105:17
**supporting** [1] - 80:5
**suppressed** [4] - 34:4, 34:7, 34:8, 39:10
**survive** [1] - 58:11
**suspect** [4] - 97:16, 98:2, 98:3, 131:2
**sustained** [1] - 87:6
**swear** [1] - 45:4
**sworn** [4] - 3:5, 4:4, 12:21, 141:14
**symptoms** [1] - 126:18

**T**

**table** [1] - 99:11
**tactic** [1] - 99:7
**tactics** [1] - 34:19
**tandem** [1] - 33:4
**tapes** [1] - 108:11
**teach** [2] - 44:8, 44:10
**team** [2] - 105:19, 108:23
**tears** [1] - 54:18
**technique** [3] - 28:22, 30:15, 31:17
**techniques** [9] - 27:13, 27:16, 28:12, 28:16, 31:8, 34:19, 99:19, 101:15, 140:5
**technology** [2] - 92:20, 98:7
**ten** [5] - 9:7, 23:6, 80:12, 80:14, 101:11
**ten-page** [2] - 80:12, 80:14, 101:11
**terms** [5] - 13:21, 26:11, 34:7, 89:17, 104:12
**test** [1] - 117:4
**testified** [14] - 4:5, 78:3, 78:15, 79:7, 79:15, 87:17, 88:10, 88:13, 89:9, 102:20, 103:14, 103:22, 119:11, 129:5
**testify** [12] - 5:8, 5:16, 12:8, 12:15, 12:18, 12:19, 12:23, 77:21, 102:12, 103:15, 106:8, 113:17
**testifying** [2] - 14:3, 77:18
**testimony** [16] - 7:9, 12:12, 12:13, 12:21, 14:2, 15:3, 37:14, 77:17, 78:7, 84:10, 89:12, 90:12, 113:11, 140:10, 140:11, 141:5
**text** [1] - 42:15
**THE** [3] - 1:14, 86:20, 128:5
**themselves** [1] - 95:8
**theories** [1] - 28:16
**therapist** [1] - 112:7
**thereafter** [1] - 19:15
**therefore** [1] - 89:3
**thereof** [1] - 141:8
**thermostat** [1] - 92:8
**third** [1] - 67:5
**this"** [1] - 116:10

**Thomas** [91] - 4:2, 4:11, 4:23, 8:13, 8:17, 11:7, 14:17, 14:21, 15:16, 22:15, 23:7, 23:8, 25:10, 28:18, 29:9, 31:15, 32:2, 32:6, 33:10, 35:21, 37:6, 46:4, 47:2, 48:17, 49:7, 51:21, 52:2, 52:14, 54:6, 56:22, 58:5, 63:21, 65:2, 66:18, 68:22, 70:18, 70:19, 72:3, 72:9, 75:3, 75:8, 75:19, 77:6, 78:6, 79:16, 79:19, 79:22, 79:23, 80:6, 80:17, 82:7, 82:15, 82:23, 84:19, 85:5, 85:12, 85:18, 85:20, 87:3, 89:10, 89:18, 90:15, 96:19, 102:18, 104:10, 106:6, 106:10, 112:19, 113:4, 115:16, 116:21, 118:18, 120:9, 120:15, 128:11, 129:10, 129:13, 129:16, 129:20, 131:19, 133:10, 133:23, 134:5, 134:21, 135:11, 136:14, 138:23, 140:7
**THOMAS** [2] - 1:3, 1:11
**Thomas'** [5] - 64:10, 67:23, 106:23, 124:15, 133:18
**Thomas-Hicks** [6] - 14:17, 15:16, 49:7, 51:21, 52:14, 120:15
**threat** [5] - 35:8, 36:6, 37:17, 123:8, 123:12
**threatened** [3] - 35:4, 35:23, 122:5
**three** [8] - 5:22, 30:21, 40:6, 43:15, 46:13, 61:15, 72:10, 72:16
**threw** [1] - 33:22
**throughout** [3] - 26:14, 27:12, 80:21
**throwing** [3] - 90:5, 127:9, 133:8
**thrown** [1] - 89:21
**Tim** [1] - 2:7
**TIM** [1] - 1:6
**tired** [1] - 78:15
**today** [27] - 4:13, 4:16,

4:18, 4:21, 5:2, 5:4, 5:9, 5:14, 5:18, 12:20, 14:3, 43:6, 43:13, 44:22, 48:10, 77:12, 78:4, 78:9, 101:15, 124:13, 126:4, 127:12, 128:13, 128:17, 135:10, 140:5
**today's** [1] - 7:21
**together** [3] - 33:4, 97:7, 136:3
**took** [13] - 5:4, 8:19, 16:10, 63:2, 63:7, 68:12, 89:10, 107:17, 110:13, 117:15, 117:17, 118:17, 127:8
**top** [2] - 53:18, 109:16
**topics** [1] - 18:22
**totally** [1] - 41:17
**touched** [2] - 73:23, 82:22
**touches** [1] - 44:13
**toys** [1] - 53:14
**traditionally** [1] - 92:18
**training** [33] - 18:18, 18:20, 19:17, 19:18, 19:19, 19:22, 20:15, 20:17, 21:12, 21:15, 26:11, 26:12, 26:16, 26:20, 27:15, 27:17, 27:19, 27:23, 28:8, 28:21, 29:2, 29:18, 30:14, 30:17, 31:13, 31:20, 31:23, 32:7, 32:14, 44:18, 44:19, 44:20
**trainings** [2] - 19:3, 26:14
**transcript** [7] - 7:3, 7:17, 8:9, 10:6, 77:7, 78:12, 141:7
**transcription** [2] - 7:16, 142:7
**transcripts** [1] - 10:2
**transferred** [2] - 23:23, 49:8
**translate** [1] - 19:17
**transport** [1] - 67:17
**transported** [1] - 49:7
**trauma** [4] - 49:13, 79:5, 126:16, 127:19
**traumatic** [1] - 120:16
**trial** [22] - 3:13, 7:14, 8:9, 12:13, 12:18, 12:19, 12:20, 13:9, 13:23, 14:2, 78:7, 87:17, 88:13, 88:17,

89:9, 102:12, 102:20, 105:7, 108:16, 108:17, 137:13, 140:11
**Trial** [1] - 3:16
**tried** [3] - 9:13, 72:14, 117:16
**Trinity** [1] - 40:15
**trouble** [1] - 123:3
**TROY** [1] - 1:6
**Troy** [21] - 1:20, 2:6, 2:7, 16:11, 16:16, 17:10, 19:10, 19:16, 19:17, 21:17, 21:23, 22:7, 23:12, 41:14, 42:10, 45:8, 45:11, 46:18, 119:23, 130:19, 140:9
**truancy** [1] - 24:9
**true** [9] - 10:21, 59:3, 87:4, 93:3, 98:20, 133:2, 134:16, 141:7, 142:6
**truth** [3] - 110:18, 110:21, 111:12
**truthful** [1] - 11:4
**truthfully** [1] - 77:21
**trying** [5] - 13:20, 61:2, 63:14, 73:13, 111:12
**turned** [1] - 108:10
**turning** [1] - 124:17
**TV** [1] - 127:14
**two** [31] - 4:11, 14:21, 14:23, 15:4, 28:9, 30:15, 30:21, 45:2, 50:2, 52:22, 56:23, 60:19, 61:23, 63:21, 64:4, 67:10, 71:15, 73:12, 85:10, 85:11, 87:21, 90:16, 98:17, 105:12, 113:16, 117:14, 117:15, 122:17, 128:6, 131:18, 133:18
**two-hour** [1] - 122:17
**two-minute** [1] - 128:6
**two-page** [2] - 63:21, 64:4
**type** [8] - 28:15, 31:14, 32:22, 79:8, 82:3, 92:8, 116:17
**types** [1] - 80:21
**typically** [7] - 60:4, 104:22, 105:19, 105:22, 129:22, 130:2, 135:21

## U

**ultimately** [3] - 37:16, 103:4, 103:8
**under** [8] - 21:23, 36:8, 37:23, 41:19, 41:23, 69:20, 125:7, 140:2
**understood** [3] - 6:15, 21:14, 121:8
**unfounded** [1] - 74:3
**UNITED** [1] - 1:1
**universe** [1] - 13:21
**unknown** [1] - 46:16
**unless** [3] - 92:14, 92:16, 92:19
**unresponsive** [2] - 51:2, 57:13
**unsafe** [1] - 44:13
**unsure** [1] - 71:15
**untrue** [2] - 59:6, 59:10
**up** [21] - 12:20, 43:5, 44:14, 46:15, 52:17, 53:18, 55:5, 56:7, 57:8, 62:3, 63:14, 67:5, 82:19, 84:9, 85:23, 87:22, 89:2, 122:14, 127:12, 127:20, 135:17
**upset** [4] - 54:15, 54:16, 54:21, 54:23
**urgency** [1] - 64:16
**US** [1] - 4:14

## V

**vaccines** [1] - 117:14
**vaguely** [1] - 89:13
**Valerie** [1] - 109:16
**valid** [1] - 30:12
**Valley** [1] - 18:16
**variety** [1] - 119:19
**vehicle** [2] - 66:20, 120:23
**verbal** [2] - 71:9, 81:17
**verbatim** [1] - 96:15
**verifying** [1] - 133:2
**version** [2] - 133:3, 134:16
**versus** [1] - 120:8
**victim** [10] - 24:20, 25:2, 46:16, 50:23, 51:5, 51:11, 56:22, 57:8, 57:13, 58:22
**victim's** [3] - 51:17, 57:12, 58:18
**Victims** [2] - 40:13,
44:5
**victims** [2] - 24:17, 31:10
**video** [9] - 67:9, 75:17, 81:15, 81:20, 82:6, 100:12, 101:5, 119:16, 127:13
**videos** [2] - 8:2, 9:23
**videotape** [2] - 65:16, 65:19
**videotaping** [1] - 132:3
**view** [4] - 66:16, 87:4, 103:2, 124:15
**violate** [1] - 33:11
**violated** [2] - 34:10, 39:17
**violates** [1] - 42:5
**violation** [1] - 35:22
**violence** [1] - 95:7
**volition** [1] - 30:5
**voluntarily** [3] - 19:13, 41:14, 42:9
**voluntariness** [3] - 29:6, 29:10, 30:10
**voluntary** [9] - 20:12, 29:12, 29:14, 29:19, 34:9, 35:21, 38:21, 39:10, 41:17
**volunteer** [1] - 61:23
**vomiting** [1] - 63:13
**vulnerable** [1] - 83:12

## W

**wait** [1] - 6:3
**waiting** [2] - 47:12, 64:14
**waived** [1] - 3:9
**waking** [1] - 63:14
**walk** [2] - 8:7, 46:9
**walking** [5] - 60:22, 91:19, 91:22, 91:23, 92:14
**wall** [4] - 91:20, 92:9, 99:10, 126:23
**Walter** [1] - 59:17
**wants** [1] - 43:19
**warranted** [1] - 21:8
**Washington** [1] - 2:9
**watch** [2] - 100:12, 127:22
**watched** [5] - 10:12, 101:4, 101:6, 101:8, 127:7
**watching** [3] - 84:11, 110:13, 127:13
**water** [1] - 57:12
**ways** [1] - 61:14
**week** [7] - 15:12, 15:16, 15:23, 16:5, 68:21, 69:17, 69:23
**weekend** [2] - 25:17, 25:18
**weeks** [3] - 7:3, 87:20, 117:14
**West** [1] - 2:9
**whacked** [1] - 90:2
**white** [3] - 92:7, 107:6
**whole** [5] - 10:13, 38:20, 39:16, 119:6, 141:7
**wife** [20] - 35:6, 36:3, 37:10, 46:14, 56:8, 57:8, 57:17, 57:20, 68:14, 89:2, 99:6, 99:14, 100:7, 100:8, 122:4, 122:18, 122:23, 123:2, 123:9, 124:17
**wife's** [1] - 136:10
**Wilahemina** [1] - 62:17, 63:22, 64:5, 75:18, 76:12, 76:17, 76:23, 88:14, 97:5, 97:13, 106:18, 107:18, 117:19, 119:15, 131:20, 140:8
**wish** [2] - 7:9, 78:3
**with..** [1] - 54:13
**WITNESS** [2] - 86:20, 128:5
**witness** [10] - 20:20, 63:22, 64:2, 79:20, 79:23, 80:8, 81:8, 131:22, 132:10, 132:14
**Witness** [1] - 77:14
**witnesses** [3] - 20:9, 86:15, 133:15
**witnessing** [1] - 21:18
**woke** [1] - 57:8
**woken** [2] - 56:7, 87:22
**word** [4] - 21:21, 37:19, 95:21
**words** [15] - 8:16, 9:8, 20:22, 25:15, 29:21, 30:4, 38:13, 55:20, 78:18, 83:19, 91:7, 94:11, 94:15, 107:5, 122:14
**worker** [2] - 112:4, 114:6
**works** [1] - 106:21
**world** [1] - 53:11
**write** [7] - 43:23, 64:7, 72:17, 116:11,
131:22, 132:9
**writing** [10] - 43:16, 81:16, 81:20, 81:21, 106:16, 109:5, 109:6, 109:8, 110:19, 132:8
**written** [7] - 79:20, 96:5, 117:2, 131:18, 131:19, 131:20, 133:18
**wrote** [10] - 64:9, 72:18, 80:6, 87:3, 94:12, 96:2, 96:6, 96:15, 98:11, 116:9

## Y

**year** [8] - 17:7, 17:23, 46:13, 72:17, 98:18, 113:15, 113:16, 114:20
**years** [7] - 9:7, 22:12, 23:6, 25:7, 40:6, 45:16, 114:20
**YORK** [4] - 1:1, 1:9, 1:14, 141:1
**York** [18] - 1:21, 1:23, 2:3, 2:6, 2:10, 2:12, 2:13, 3:6, 4:12, 4:14, 18:12, 27:5, 27:14, 31:3, 33:11, 108:23, 142:5
**yup** [1] - 109:17

## Z

**zone** [3] - 18:15, 19:16, 19:22

EXHIBIT "D"

```
 1   UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF NEW YORK
 2   - - - - - - - - - - - - - - - - - - - - - - - - - - -

 3   ADRIAN THOMAS,

 4                         Plaintiff,

 5            - against -

 6   CITY OF TROY, ADAM R. MASON, RONALD FOUNTAIN,
     TIM COLANERI,
 7   RENSSELAER COUNTY, and MICHAEL SIKIRICA,

 8                         Defendants.
     - - - - - - - - - - - - - - - - - - - - - - - - - - -
 9   NEW YORK STATE
     COURT OF CLAIMS
10   - - - - - - - - - - - - - - - - - - - - - - - - - - -

11   ADRIAN P. THOMAS,

12                         Claimant,

13            - against -

14   THE STATE OF NEW YORK,

15                         Defendant.
     - - - - - - - - - - - - - - - - - - - - - - - - - - -
16

17            DEPOSITION of Defendant, ADAM R. MASON,

18   held on the 12th day of September 2019, commencing at

19   9:04 a.m., at the Law Offices of Pattison Sampson

20   Ginsberg & Griffin, PLLC, 22 First Street,

21   Troy, New York, before Jeanne O'Connell, Registered

22   Professional Reporter and Notary Public in and for the

23   State of New York.
```

```
 1   APPEARANCES:

 2   Brett H. Klein, Esq.
     305 Broadway
 3   Suite 600
     New York, New York  10007
 4   Attorney for Plaintiff/Claimant

 5   Pattison Sampson Ginsberg & Griffin, PLLC
     22 First Street
 6   Troy, New York  12180
     By:  Joseph T. Perkins, Esq.
 7   Attorneys for City of Troy, Adam R. Mason,
     Ronald Fountain and Tim Colaneri
 8
     Bailey, Johnson & Peck, P.C.
 9   5 Pine West Plaza
     Washington Avenue Extension
10   Albany, New York 12205
     By:  Crystal R. Peck, Esq.
11   Attorneys for Michael Sikirica

12   New York State Office of the Attorney General
     The Capitol
13   Albany, New York 12224
     By:  Christina M. Calabrese, Assistant Attorney General
14
     Also present:  Katherine Hamilton
15

16

17

18

19

20

21

22

23
```

1                    S T I P U L A T I O N S

2     It is hereby stipulated and agreed by

3     and between the attorneys for the respective

4     parties hereto that, this examination may be signed and

5     sworn to before any Notary Public of the State of New

6     York.

7

8     It is further stipulated and agreed that the filing and

9     certification of the said examination shall be waived.

10

11    It is further stipulated and agreed that all objections

12    to questions, except as to form, shall be reserved for

13    the trial of this action.

14

15    It is further stipulated and agreed that there are no

16    objections to Notice of this Examination Before Trial

17    and the qualifications of the court reporter to take

18    this deposition and administer an oath or affirmation.

19

20

21

22

23

```
 1              (Adam Mason - by Mr. Klein)

 2              ADAM R. MASON, after first having been

 3         duly sworn, was examined and testified as

 4         follows:

 5    EXAMINATION

 6    BY MR. KLEIN:

 7       Q.  Good morning, Captain Mason.

 8       A.  Good morning.

 9       Q.  My name is Brett Klein, and I represent Adrian

10    Thomas in actions that are related that are pending in

11    the New York State Court of Claims against the state,

12    and an action in US District Court for the Northern

13    District, alleging Section 1983 claims.

14              I'm here to ask you questions about your

15    involvement in Adrian's prosecution.  Do you understand

16    that's why you're here today?

17       A.  I do.

18       Q.  And do you understand that you just took an oath

19    to tell the truth?

20       A.  I do.

21       Q.  That oath you took is the same oath you would

22    take if you were in a court of law.

23              Do you understand that?
```

1                    (Adam Mason - by Mr. Klein)

2        A.   Understood.

3        Q.   Is there any reason why you can't testify fully

4    and accurately today?

5        A.   No.

6        Q.   Do you feel well today?

7        A.   I do.

8        Q.   Did you get enough sleep or did you work

9    overnight?

10       A.   I'm fine to testify.

11       Q.   Great.

12            You've had sufficient time to prepare with

13   Mr. Perkins?

14       A.   I have.

15       Q.   Are you on any medications, or do you have any

16   physical or mental condition that might impair your

17   ability to testify fully and accurately?

18       A.   I do not.

19       Q.   In terms of today's deposition, there are just

20   some rules that I'll ask you abide by.  First, that you

21   let me finish the question before you give an answer,

22   really for the sake of the court reporter, so that she

23   can take everything down, okay?

1                     (Adam Mason - by Mr. Klein)

2     A.   Yes.

3     Q.   And then also I ask that you continue to answer

4 with a verbal response rather than a gesture or a shake

5 of the head or an uh-huh, again, so the reporter can

6 take a clean record, okay?

7     A.   Okay.

8     Q.   If you don't understand a question I ask, will

9 you let me know?

10    A.   Yes.

11    Q.   If you don't understand but you don't let me know

12 and you give an answer, it will be assumed for the

13 record that you understood the question at the time of

14 trial, okay?

15    A.   Okay.

16    Q.   Finally, if you need a break, just let me know.

17 We'll just ask that you a take break after any pending

18 question has been answered, okay?

19    A.   Okay.

20    Q.   It's my understanding that you have given a

21 number of -- there been a number of occasions where

22 you've given sworn testimony related to this case,

23 correct?

```
 1                    (Adam Mason - by Mr. Klein)

 2      A.  Yes.

 3      Q.  One would be the grand jury?

 4      A.  Yes.

 5      Q.  Second would be the pre-2009 trial Huntley

 6  hearing?

 7      A.  Yes.

 8      Q.  And then approximately two different dates when

 9  you testified at trial on the direct case for the

10  prosecution?

11      A.  That's correct.

12      Q.  Then one day for rebuttal for the prosecution.

13      A.  Yes.

14      Q.  Other than those occasions and today, have you

15  given any sworn testimony about the Adrian Thomas

16  matter?

17      A.  No.

18      Q.  Did you ever testify in any other courts, such as

19  family court?

20      A.  No.

21      Q.  Other than today, and other than statements or

22  conversations with your attorneys which you should not

23  divulge, have you discussed the facts and circumstances
```

```
 1                  (Adam Mason - by Mr. Klein)

 2   of your role in this investigation with anyone else?

 3       A.  I've had casual conversations with other members

 4   of the police department at various times.

 5       Q.  Well, let's talk about the more formal

 6   conversations.

 7           You did have meetings with medical examiner,

 8   Michael Sikirica, correct?

 9           Did you attend the autopsy?

10       A.  I did.

11       Q.  There were inevitably, I would think, discussions

12   about the investigation?

13       A.  During the autopsy?

14               MS. PECK:  Objection.

15   BY MR. KLEIN:

16       Q.  Were there discussions about the investigation?

17           You can answer.

18       A.  Yes.  There was discussions about the autopsy.

19       Q.  So we'll get into these conversations.  I just

20   want to identify them.

21           And also for the record, in terms of

22   instructions, you may hear objections.  Lawyers will say

23   "objection" from time-to-time to preserve objections for
```

Case 1:17-cv-00625-DJS Document 63-1 Filed 10/25/21 Page 1086 of 273

1               (Adam Mason - by Mr. Klein)

2   trial or to note certain objections, but unless you're

3   told not to answer, you should give an answer.

4        A.  Okay.

5        Q.  If you need a question read back because there

6   was so much talking and you got distracted, you can ask

7   the reporter.  I think she can do that for you.

8        A.  Okay.

9        Q.  So, how many meetings did you have with the

10  medical examiner, Michael Sikirica, including the

11  autopsy?

12       A.  I wouldn't describe the autopsy as a meeting.

13           And to the best of my recollection, that's the

14  only time that I encountered him during this

15  investigation.  And as you said, there were discussions

16  about the investigation, about the autopsy, during that

17  autopsy.  And to the best of my recollection, that's the

18  only time that I encountered him during this

19  investigation.

20       Q.  For purposes of this question of who you've

21  spoken with about the case, it doesn't need to be a

22  formal meeting.  Just any encounter with anyone where

23  you've been asked or you've given information about this

```
 1                (Adam Mason - by Mr. Klein)

 2   case, okay?

 3      A.  Okay.

 4      Q.  So, in addition to attending the autopsy, did you

 5   have meetings with members of the Rensselaer County

 6   District Attorney's Office?

 7      A.  Yes, I did.

 8      Q.  On how many occasions, to the best of your

 9   recollection?

10      A.  I couldn't guess, but there were numerous

11   occasions.

12      Q.  What was the nature of these?

13          I would think some of them were trial prep,

14   correct?

15      A.  Yes.  Trial prep, as well as during the initial

16   stages of the investigation, after the arrest, there

17   were conversations.  I don't recall specifically what

18   they were, but I'm sure there were conversations leading

19   up to grand jury and leading up to the hearing, as well.

20      Q.  So, in the initial stages, conversations with

21   them leading up to the grand jury, leading up to the

22   hearings, and then prep before the trial, correct?

23      A.  Yes.
```

1                    (Adam Mason - by Mr. Klein)

2        Q.   Would you have taken notes at any of your

3    meetings with the district attorney's office?

4        A.   I don't believe so.

5        Q.   Did you meet with a particular assistant district

6    attorney like Christa Book, or would you have met with

7    multiple people at different times?

8        A.   No.  It would have been Christa Book and Art

9    Glass, as well.

10       Q.   Anyone else in that office, or that's it?

11       A.   Not to my recollection.

12       Q.   After the 2009 trial, did you have any meetings

13   with the district attorney's office from then up until

14   today about this case?

15       A.   After the...

16       Q.   Conviction.

17       A.   After the -- after it was overturned and then

18   there was some prep for the second trial.  I honestly

19   can't remember her name.  There was an ADA that

20   presented that case in court, and I met with her on an

21   occasion or two.

22       Q.   Did you testify at the second trial?

23       A.   I did not.

1          (Adam Mason - by Mr. Klein)

2      Q.  What was the reason, if you know?

3      A.  I honestly don't know the reason.  I know that

4  the interview was not allowed, and I think that that may

5  have been the reason, but I don't know for certain.

6      Q.  Was it your understanding that it wasn't allowed

7  pursuant to the Court of Appeals decision?

8      A.  Yes.

9      Q.  Did you ever personally read a copy of it?

10     A.  I've looked it over.

11     Q.  The ADA that you met with once or twice to

12  prepare for the second trial, it was a female?

13     A.  It was.

14     Q.  Do you know if it was Tracy Egan?

15     A.  I don't know.  That sounds familiar.  I don't

16  believe she's with the DA's office any longer.

17     Q.  So, other than discussing aspects of the

18  investigation at the autopsy with Sikirica, the number

19  of meetings with the district attorney's office, have

20  you given statements or discussed this matter in any

21  context with anyone else?

22     A.  No.

23     Q.  Did you give an interview that was in a

Case 1:17-cv-00625-DJS Document 67-3 Filed 10/25/21 Page 13 of 273

1              (Adam Mason - by Mr. Klein)

2    documentary?

3        A.  Yes, I did.

4        Q.  What were the circumstances of that?

5        A.  I was contacted by a company and they explained

6    that they were doing a documentary about the case and

7    asked if we would be interested in participating.

8        Q.  Did you consult with any counsel or supervisor to

9    get approval, or did you make your own decisions?

10       A.  I spoke with the chief of police.  He authorized

11   it.

12       Q.  Were you interviewed for that?

13       A.  I was.

14       Q.  Where were you interviewed?

15       A.  At the Troy Police Department.

16       Q.  And was Ronald Fountain interviewed, as well?

17       A.  Yes.

18       Q.  Anyone else?

19       A.  I don't know if anyone else was interviewed.

20       Q.  Was Ron Fountain interviewed in your presence?

21       A.  I don't believe so.

22       Q.  Was Ron Fountain present when you were

23   interviewed, if you know?

Case 1:17-cv-00625-DJS Document 67-4 Filed 10/25/21 Page 15 of 273

1                 (Adam Mason - by Mr. Klein)

2     A.  I don't believe so.

3     Q.  Did you tell the truth to the interviewers

4  regarding your role in the investigation?

5     A.  Yes.

6     Q.  Did you ever see the finished product?

7     A.  I did.

8     Q.  Do you own a copy of it?

9     A.  I do not.

10    Q.  Who showed it to you?

11    A.  I may have watched it.  I don't recall how.  I

12  may have watched it online somehow.

13    Q.  Can you recall specifically what you said, and if

14  not specifically, in sum and substance what you said?

15    A.  I don't recall specifically or in sum and

16  substance what I said.

17    Q.  Did you say in the video that you lied to Adrian

18  repeatedly?

19              MS. CALABRESE:  Objection.

20              MS. PECK:  Objection.

21              MR. PERKINS:  Object to the form.

22              You can answer.

23              THE WITNESS:  I don't know.  I don't

Case 1:17-cv-00625-DJS Document 167-1 Filed 10/25/21 Page 136 of 273

1          (Adam Mason - by Mr. Klein)

2          recall if I said that in the interview.

3     BY MR. KLEIN:

4        Q.   Sitting here today, you would state for this

5     record that you told the truth to those interviewers?

6        A.   Yes.

7        Q.   So whatever you said on that interview you were

8     being truthful?

9        A.   Yes.

10       Q.   Do you know if all of your statements were put

11    into the final version of the documentary or if parts

12    were edited out?

13       A.   I don't know.

14       Q.   How long were you interviewed for?

15       A.   I don't recall.

16       Q.   Do you know if it was like hours, a day, 20

17    minutes?

18       A.   I believe it was probably longer than 20 minutes.

19    I don't recall how many minutes it was.

20       Q.   No.  I'm not saying exact.

21       A.   It wasn't a full day.

22       Q.   Do you think it was a half day, or was it like --

23       A.   I met with them on a couple different occasions.

```
 1                    (Adam Mason - by Mr. Klein)

 2    And the interview that was going into the finished

 3    product was -- it was probably an hour, maybe two, but

 4    if you told me that you knew for a fact it was four, I

 5    wouldn't be surprised.

 6        Q.   Is there anything that you refused to tell the

 7    filmmakers that they asked you, or did you answer all of

 8    their questions to the best of your ability?

 9        A.   I believe I answered all their questions.

10        Q.   Was the chief or any supervisor from the

11    department present during your question-and-answer

12    session with the filmmakers?

13        A.   No.

14        Q.   Were you pleased with the final product?

15        A.   No.

16        Q.   Why not?

17        A.   I felt as though it was -- it was misrepresented

18    as to what their intentions were.

19        Q.   Whose intentions?

20        A.   The intentions of the people that made the

21    documentary.

22        Q.   What was your understanding of what their

23    intentions were?
```

Case 1:17-cv-00625-DJS Document 64-1 Filed 10/25/21 Page 186 of 273

1              (Adam Mason - by Mr. Klein)

2    A.  My understanding was that it was going to just be

3 a presentation of the facts of the case.  And when the

4 finished product came out, it appeared as though it was

5 pro-defendant as opposed to a non-biased version of the

6 facts of the case.

7    Q.  What about it lead you to feel that way?

8    A.  I don't recall.  I haven't watched it in ten

9 years.

10    Q.  When you watched it and felt that there was a

11 pro-defendant bias, did you reach out to the filmmakers

12 and let them know your thoughts or anyone else?

13    A.  I did not.

14    Q.  Other than the interviews with the filmmakers,

15 speaking to the district attorney's office, and

16 attending the autopsy, did you give statements or

17 discuss this matter with anyone else other than passing

18 conversation?

19    A.  No.

20    Q.  And other than your counsel?

21    A.  No.

22    Q.  Are you in possession of any documents that

23 relate to this matter?

```
 1                    (Adam Mason - by Mr. Klein)

 2        A.   Yes.

 3        Q.   What?

 4        A.   I have the -- my testimony from the hearings.  I

 5   was in possession of the case file, which I turned over

 6   to this office here.  And what remains in my possession

 7   are copies of my testimony.

 8        Q.   Did you review that testimony in preparation for

 9   today's deposition?

10        A.   Yes.

11        Q.   That would be the grand jury?

12        A.   Yes.

13        Q.   The Huntley hearing?

14        A.   Yes.

15        Q.   And the three different dates of your trial

16   testimony?

17        A.   Yes.

18        Q.   Are you in possession of any other documents or

19   materials?

20             And when I say materials, photos, videos, or any

21   other media that relate to this incident.

22        A.   I have a copy of the video in my office, which I

23   did not watch in preparation for this.
```

Case 1:17-cv-00625-DJS Document 43-4 Filed 10/25/21 Page 20 of 273

1                  (Adam Mason - by Mr. Klein)

2      Q.   When was the last time you had seen it?

3      A.   Several years.

4      Q.   Anything else?

5      A.   And I do have a copy of the case file that was

6   turned over to me by Mr. Perkins.

7      Q.   So, a copy of the case file that you turned over

8   to this office was given back to you?

9      A.   The copy of the case file that I turned over to

10  this office was substantial.  What I received back is

11  copies to review to prepare for this hearing today was

12  not substantial.  It was more of a -- maybe like an inch

13  wide of a stack.

14     Q.   What was in that stack?

15          Well, did you review that stack?

16     A.   I did review it.

17     Q.   What was in it?

18     A.   It was copies of the police report, notes, the

19  statements, depositions.  There may have been other

20  stuff in there, as well.

21     Q.   If you think of it, let me know.

22     A.   I will.

23     Q.   Did you meet with counsel, without saying what

1                    (Adam Mason - by Mr. Klein)

2    was said, to prepare for today?

3        A.    Yes.

4        Q.    So other than looking at the stack, meeting with

5    counsel, reviewing your testimony, have you spoken with

6    or done anything else to prepare for today's deposition?

7        A.    No.

8        Q.    Other than what you've told me, are you in

9    possession of any other documents or materials that

10   relate to this case?

11       A.    No.

12             There are copies of search warrants in that

13   stack, as well.

14       Q.    There were two in this case, right?

15       A.    I didn't review the search warrants, but they

16   were there.

17       Q.    Were you given an opportunity to review

18   transcripts of the two interviews of Adrian Thomas, not

19   his written statements, but the actual transcripts that

20   the DA prepared of the interview one and interview two?

21       A.    No.

22       Q.    The videos, you haven't watched them in several

23   years, correct?

Case 1:17-cv-00625-DJS Document 60-1 Filed 10/25/21 Page 227 of 273

1                    (Adam Mason - by Mr. Klein)

2        A.   That's correct.

3        Q.   Do you understand the first video to be about two

4    hours?

5        A.   Yes.

6        Q.   The second video to be how long, about seven or

7    seven and a half hours?

8        A.   Yes.

9        Q.   Can we call the first one video one?

10        A.   Yes.

11        Q.   And the second one video two?

12        A.   Yes.

13        Q.   The video that we've been given is the video that

14    I believe was used in the criminal case, the video

15    one -- well, withdrawn.

16             The video that we've referred to as video one,

17    were there any parts of that interview, that first

18    interview with Adrian Thomas, that were not depicted --

19    parts of your meeting with him that were not depicted on

20    that video, or did that video encompass the entire

21    interview with him?

22        A.   It did.

23        Q.   And video two, did that video record the entire

Case 17-2-00626 DJS Document 91-1 762354 Filed 10/25/21 Page 236 of 273

1              (Adam Mason - by Mr. Klein)

2    interview of him for round two of the interview?

3        A.   Yes.

4        Q.   Are there any other videos of Adrian Thomas that

5    exist?

6              MR. PERKINS:  Object to the form.

7              You can answer.

8    BY MR. KLEIN:

9        Q.   That you know of?

10       A.   Pertaining to me interviewing Adrian Thomas, no.

11       Q.   Pertaining to anything that you know of.

12             MR. PERKINS:  Same objection.

13             THE WITNESS:  I have no idea if there

14         were videos of Adrian Thomas that exist.

15   BY MR. KLEIN:

16       Q.   Well, that you would know of.

17       A.   That I know of, no.

18       Q.   Like, was there surveillance of him at some other

19   time that you have in your file or anything else?

20       A.   No.

21             (Recess taken.)

22   BY MR. KLEIN:

23       Q.   Other than today, have you ever given a

```
1              (Adam Mason - by Mr. Klein)

2    deposition in any civil case?

3       A.  I have not.

4       Q.  Other than this case, have you been named as a

5    party in any other civil case?

6       A.  Yes.

7       Q.  How many others?

8       A.  One.

9       Q.  What was that case?

10      A.  The plaintiff's name was Otis Bridgeforth.  It

11   was a -- it never got to the point where I was served

12   with the paperwork.  It never got to the point where I

13   had to participate in the deposition.

14      Q.  Do you know if that case was filed in federal

15   court or state court?

16      A.  Honestly, I have no idea.

17      Q.  Do you remember the nature of his allegation,

18   even if you vehemently dispute it, did he allege

19   excessive force or false arrest or auto accident or

20   something else?

21      A.  I don't recall the nature of his accusation.

22      Q.  Did the circumstances of his accusation arise out

23   of any case involving an interrogation?
```

Case 1:17-cv-00625-DJS Document 76-14 Filed 10/25/21 Page 260 of 273

```
 1              (Adam Mason - by Mr. Klein)

 2       A.  No.

 3       Q.  You've testified in criminal court, correct?

 4       A.  Yes.

 5       Q.  When I say criminal, is there a lower criminal

 6   court and a superior or supreme court here, or is it

 7   just one criminal court?

 8       A.  There's just one criminal court.

 9       Q.  For misdemeanors and felonies?

10       A.  There's the Troy police court and then there's

11   the county court.

12       Q.  And you've testified in both?

13       A.  Yes.

14       Q.  How many times have you testified in court in

15   your career?

16       A.  I have no idea.  Hundreds.

17       Q.  Is it hundreds?

18       A.  Yes.  If not thousands.

19       Q.  This case involved the interrogation of someone

20   leading to a written and a video statement, correct?

21       A.  Yes.

22       Q.  It resulted in ultimately a court saying that the

23   statements were obtained in violation of the
```

Case Case 1:17-cv-00625-DJS Document 60-1 Filed 10/25/21 Page 26 of 273

```
 1                  (Adam Mason - by Mr. Klein)
 2   Constitution, generally.
 3           Do you agree with that?
 4       A.   Can you repeat the question?
 5       Q.   That the court ultimately found that the
 6   statements were obtained in violation of the
 7   Constitution?
 8       A.   Yes.
 9       Q.   Has that ever happened in any other case that
10   you've been involved in?
11       A.   No.
12       Q.   Are you aware of any other case where that
13   happened within the department, not necessarily the
14   Court of Appeals, but where the trial court granted a
15   motion to suppress a statement because it was considered
16   involuntary or coerced or something else?
17               MR. PERKINS:  Object to the form.
18               You can answer.
19               THE WITNESS:  Other officers?
20               MR. KLEIN:  Yeah.  Colleagues of yours,
21           whether you knew about it firsthand,
22           anecdotally, or whatever.
23               THE WITNESS:  I'm not aware of it.
```

```
 1                    (Adam Mason - by Mr. Klein)

 2    BY MR. KLEIN:

 3       Q.  So is this the only case that you're aware of in

 4    the Troy PD where a court has said that a statement was

 5    obtained in violation of the rights of the accused?

 6       A.  Yes.

 7       Q.  Has any court or body ever found that you

 8    violated anyone's -- an individual's rights in any other

 9    case?

10       A.  No.

11       Q.  Have you ever brought any action against the Troy

12    Police Department?

13                MR. PERKINS:  Object to the form.

14                You can answer.

15                THE WITNESS:  No.

16    BY MR. KLEIN:

17       Q.  What is your highest level of education?

18       A.  I have an associate's degree.

19       Q.  From what school?

20       A.  Hudson Valley.

21       Q.  What year was that?

22       A.  1995.

23       Q.  What did you do after you got your associate's
```

Case 1:17-cv-00625-DJS Document 76-4 Filed 10/25/21 Page 286 of 273

```
 1              (Adam Mason - by Mr. Klein)

 2    degree?

 3        A.  I worked as a corrections officer in the

 4    Rensselaer County jail.

 5        Q.  How long after graduating Hudson Valley did you

 6    go to corrections?

 7            Was it right away?

 8        A.  I was actually working there while I was

 9    attending Hudson Valley part-time.

10        Q.  What was the associate's degree in, what subject?

11        A.  Applied sciences.

12        Q.  How long were you a corrections officer for the

13    Rensselaer County jail?

14        A.  Three years.

15        Q.  And why did you leave that job?

16        A.  Well, because I was hired at the Troy Police

17    Department.

18        Q.  What year was that?

19        A.  1997.

20        Q.  So did you resign from the corrections

21    department?

22        A.  Yes.

23        Q.  Have you ever served in the military?
```

Case 1:17-cv-00625-DJS Document 67-1 Filed 10/25/21 Page 296 of 273

1                   (Adam Mason - by Mr. Klein)

2        A.   No.

3        Q.   When you joined the Troy Police Department, you

4   had submitted a paper application?

5        A.   Yes.

6        Q.   Did you also have to undergo psychological

7   screening?

8        A.   Yes.

9        Q.   And a physical screening?

10       A.   Yes.

11       Q.   Did you pass all aspects of the exam?

12       A.   Yes.

13       Q.   The first time around?

14       A.   Yes.

15       Q.   Same with corrections, when you applied to

16   corrections did you undergo psychological screening and

17   a physical screening, etc.?

18       A.   Yes.

19       Q.   Did you pass all of that the first time?

20       A.   Yes.

21       Q.   When you got accepted to the Troy Police

22   Department, did you go right to work or did you enter an

23   academy?

Case 1:17-cv-00625-DJS Document 63-1 Filed 10/25/21 Page 30 of 273

1              (Adam Mason - by Mr. Klein)

2      A.   I went to the police academy.

3      Q.   Where was that located?

4      A.   That was located in Troy, on the Hudson Valley

5 Community College campus.

6      Q.   And who ran that training?

7           Was it the Troy PD or the state?

8      A.   No.  It was zone five, which is combination of

9 multiple PDs in the area.

10     Q.   Is that who does training today, or has that

11 changed since the time you were in training?

12     A.   The way it's run is the same.  The location is

13 changed.

14     Q.   What are the municipalities or police departments

15 that run the training, if you know, when you did it?

16     A.   When I went through the academy?

17     Q.   Yeah.

18     A.   I don't recall who was participating.

19     Q.   How long was the course of training?

20     A.   Five and a half months.

21     Q.   Were you considered a cadet at that point?

22          What was your title at that time?

23     A.   I guess I was considered a cadet.  That's what

Case 1:17-cv-00625-DJS Document 69-1 Filed 10/25/21 Page 31 of 273

1                    (Adam Mason - by Mr. Klein)

2    they consider them today.  I don't know what they

3    considered us back then.

4        Q.  Did the five and a half months entail a course of

5    classroom training?

6        A.  Yes.

7        Q.  Was it on a variety of topics, such as law?

8        A.  Yes.

9        Q.  Police science?

10       A.  Yes.

11       Q.  Anything else that you can remember?

12       A.  I don't recall.

13       Q.  You learned about constitutional law, among other

14   issues, like penal law, in the academy, correct?

15       A.  Yes.

16       Q.  You also had range training, auto training, and

17   other types of training as well, correct?

18       A.  Yes.

19       Q.  Did you pass all of your courses in the academy

20   the first time around?

21       A.  Yes.

22       Q.  Upon completion of the academy, what happened

23   next?

Case 1:17-cv-00626-DJS Document 69-1 Filed 10/25/21 Page 32 of 273

1                    (Adam Mason - by Mr. Klein)

2          Where were you assigned?

3     A.    Then there would have been a field training

4  program that I would have had to have gone through with

5  the police department.  I don't recall how long that

6  was.

7     Q.    Was that a period of time when you got experience

8  in different departments or commands of the police

9  department?

10    A.    Yes.

11    Q.    When that ended, what was your next assignment?

12    A.    Then I was assigned to patrol.

13    Q.    For how long were you assigned to patrol?

14    A.    I was in the patrol division from that point

15  until 2008, when I was promoted to sergeant.

16    Q.    What month, if you know, in 2008 were you

17  promoted to sergeant?

18    A.    April.

19    Q.    When you became sergeant, were you then a

20  detective sergeant or just a patrol sergeant?

21    A.    Actually, when I -- the way it works in the Troy

22  Police Department is, it's based on seniority.  So, I

23  was lucky enough that, when I was promoted to sergeant,

```
 1                    (Adam Mason - by Mr. Klein)

 2   that I was able to be a detective sergeant immediately.

 3   But not too long after there was a bid, and another

 4   sergeant who had seniority on me bid the position so I

 5   was bumped out for a period of time.

 6      Q.  So that was -- so due to seniority or seniority

 7   reasons you then became detective?

 8      A.  Then I became a patrol sergeant for a period of

 9   time.

10      Q.  In September of '08, at the time of the Adrian

11   Thomas investigation, were you a detective sergeant?

12      A.  Yes.

13      Q.  When you got promoted in April of '08, did you

14   have to take any type of exam to become a detective

15   sergeant?

16      A.  There was an exam to become a sergeant.  Nothing

17   specific for a detective sergeant, but yes.

18      Q.  So you passed the sergeant's exam?

19      A.  Correct.

20      Q.  Did you pass that the first time?

21      A.  Yes.

22      Q.  So, is it fair to say that, due to the way the

23   department handled promotions at that time, you were
```

Case 1:17-cv-00625-DJS Document 60-1 Filed 10/25/21 Page 436 of 273

1          (Adam Mason - by Mr. Klein)

2   fortunate enough to be promoted to sergeant but not just

3   a patrol sergeant but detective sergeant, as well?

4       A.   A detective sergeant is not considered a

5   promotion.  I was fortunate enough to get promoted to

6   sergeant.  And then it so happened that I was fortunate

7   enough to bid the detective sergeant position.

8       Q.   Was there any special training to become a

9   detective, or was that just a title change?

10      A.   It was just a title change.

11      Q.   So, from the time you joined the PD around '97 to

12  the time you were promoted in April of '08, you were

13  patrol, correct?

14      A.   Yes.

15      Q.   Just briefly, for the record, what were your

16  duties and responsibilities in patrol?

17      A.   I responded to calls, took reports, conducted

18  traffic, did preliminary investigations before it was

19  turned over to the detective bureau.

20      Q.   When you became a detective sergeant, how did

21  those duties and responsibilities change, if at all?

22      A.   I no longer responded to everyday calls.  Those

23  calls were -- after the preliminary investigation was

Case 1:17-cv-00626-DJS Document 60-1 Filed 10/25/21 Page 35 of 273

```
 1                  (Adam Mason - by Mr. Klein)

 2    done by the patrol officer, then the case was turned

 3    over to the members of the detective bureau for further

 4    investigation.

 5       Q.   In April of '08, how many other detectives were

 6    there in the detective bureau at the Troy PD,

 7    approximately?

 8            Was it like a hundred?  Was it like ten of you?

 9       A.   Probably 15 to 20 detectives.

10       Q.   And how did you guys break up the work?

11            Did you have different day tours and night tours

12    and things like that?

13       A.   Yes.

14       Q.   As a detective sergeant, did you have any

15    supervisory responsibilities over the other detectives

16    right away, or was that just a title but you had

17    supervisors that you responded to, reported to?

18       A.   The detective sergeant was a title, but there

19    were also patrolmen in the detective bureau that were

20    detectives, as well.  And there was no supervisory

21    function over those patrolmen, but there was a captain

22    in charge of the detective bureau who supervised the

23    entire unit.
```

Case 1:17-cv-00625-DJS Document 60-9 Filed 10/25/21 Page 36 of 273

1                    (Adam Mason - by Mr. Klein)

2       Q.   Is that what you do now?

3       A.   I do not supervise the detective bureau.  No.

4       Q.   Who was the captain who supervised the detective

5   bureau at the time of the Adrian Thomas matter?

6       A.   Robert Cipperly.

7       Q.   Is he still with the PD?

8       A.   He retired.

9       Q.   Was he the detective supervisor when you got

10  promoted in April of '08?

11      A.   Yes.

12      Q.   And continued to be the detective supervisor at

13  the time of the Adrian Thomas investigation?

14      A.   Yes.

15      Q.   Was he the detective supervisor at the time you

16  testified in 2009?

17      A.   I believe so.  I don't recall the year he

18  retired.

19      Q.   But do you recall anyone other than Robert

20  Cipperly being your direct supervisor during the time

21  that you were involved in the Adrian Thomas case?

22      A.   I do not.

23      Q.   Were there any other detective captains that you

```
 1                    (Adam Mason - by Mr. Klein)

 2    would have reported to other than Robert Cipperly during

 3    that time?

 4        A.   No.

 5        Q.   So, you were a detective sergeant starting in

 6    April of '08 until what year and approximately what

 7    month that you went back to patrol?

 8        A.   It was November.

 9        Q.   Of '08?

10        A.   I think it was November of '08.

11        Q.   Shortly after the, let's say, the indictment of

12    Adrian Thomas?

13        A.   Yes.

14        Q.   What happened when you went back to patrol?

15             Did you continue your detective duties or did you

16    resume patrol duties?

17        A.   I resumed patrol duties, but the case in question

18    was not handed off to another detective.  I still

19    maintained a role in that case through its conclusion.

20        Q.   We'll get into your paperwork in a little bit,

21    but the TPD investigation report that I have seems to

22    end on 11/05/08.

23             Do you recall that?
```

Case 1:17-cv-00625-DJS Document 76-4 Filed 10/25/21 Page 386 of 273

```
 1                    (Adam Mason - by Mr. Klein)

 2       A.  Yes.

 3       Q.  Is that around the time that you went back to

 4    patrol?

 5       A.  I don't recall which part of November, but it was

 6    somewhere in that month.

 7       Q.  So when you say that you continued to maintain

 8    responsibilities for the case after you were on patrol,

 9    other than meeting with the DA, preparing for Huntley

10    hearing, and trial, what, if anything else, did you do?

11       A.  I don't recall if there was anything else that I

12    did.

13       Q.  But it was your case?

14       A.  Correct.

15       Q.  For purposes of dealing with the district

16    attorney and any issues that came up?

17       A.  Yes.

18       Q.  Were you the lead investigator on this case?

19       A.  I shared that role with Detective Fountain.

20       Q.  Whose determination was it that you would be

21    assigned to this investigation with Detective Fountain,

22    if you know?

23       A.  It just happened that we were the two detectives
```

```
 1                    (Adam Mason - by Mr. Klein)

 2    on call when this incident occurred, so there was no

 3    formal determination made.  We were the ones that came

 4    in because we were the two detectives on call.  That's

 5    just the way it works.

 6        Q.  Did you know Fountain well prior to this job

 7    coming in?

 8                    MR. PERKINS:  Object to the form.

 9                    You can answer.

10                    THE WITNESS:  I did not know him --

11            prior to being hired at the Troy Police

12            Department or prior to this case?

13                    MR. KLEIN:  Prior to this case.

14                    THE WITNESS:  Yes, I did.  I did.

15    BY MR. KLEIN:

16        Q.  How many years had you known him for?

17        A.  I met him when I was hired in 1997.

18        Q.  Did you guys have a good working rapport?

19        A.  At that time, yes.

20        Q.  Was he a detective in the detective bureau?

21        A.  Yes.

22        Q.  Did he become detective before you or around the

23    same time or after you, if you know?
```

Case 1:17-cv-00626-DJS Document 76-254 Filed 10/25/21 Page 40 of 273

```
 1                    (Adam Mason - by Mr. Klein)

 2      A.   Before me, I believe.

 3      Q.   So in terms of the chain of command or seniority,

 4   was he the senior detective on this file, or did you

 5   guys maintain joint or coequal responsibility?

 6                    MR. PERKINS:  Object to the form.

 7                    You can answer.

 8                    THE WITNESS:  To answer the first part

 9             of your question, no, he was not considered

10             the senior detective on the case.  We were

11             considered pretty much equals.

12   BY MR. KLEIN:

13      Q.   And starting in November of '08, when you went

14   back to patrol, how long were you on patrol for before

15   your duties and responsibilities changed again?

16      A.   I don't specifically recall.  There was a period

17   of time where I supervised the street crimes unit and

18   while I was in patrol, which isn't necessarily the same

19   function as a patrol sergeant.

20             And then -- let me think.  Early 2010 -- so, it

21   was a little over a year before I came back into the

22   detective bureau and was a detective sergeant again.

23      Q.   And what were the circumstances of you getting
```

```
 1                 (Adam Mason - by Mr. Klein)

 2   that title back?

 3      A.  A position opened up for me to bid it again.

 4      Q.  Starting in early 2010, did you resume detective

 5   duties?

 6      A.  Yes.

 7      Q.  For how long did you maintain the rank of

 8   detective sergeant?

 9      A.  Until October of 2018.

10      Q.  What happened then?

11      A.  That's when I was promoted to captain.

12      Q.  What were the circumstances of that promotion?

13              MR. PERKINS:  Object to the form.

14   BY MR. KLEIN:

15      Q.  Did you take a test, or was it based on merit, or

16   something else?

17      A.  Similar to the process for being promoted to

18   sergeant.  There's a test and an interview process.

19      Q.  And did you pass that test the first time around?

20      A.  Yes.

21      Q.  And what are your duties and responsibilities

22   since you've been captain in October of '18?

23      A.  I presently am in charge of the internal affairs
```

```
 1                   (Adam Mason - by Mr. Klein)

 2    unit.

 3        Q.   And in that regard, what do you do and what does

 4    the IA do?

 5        A.   I conduct internal investigations.

 6        Q.   Of alleged violations of the rules and procedures

 7    of the department, of alleged crimes by officers?

 8             What do you investigate?

 9        A.   If there's an alleged violation of a policy and

10    procedure of an officer, then I will conduct that

11    investigation, whether it's something that's initiated

12    internally or if it's something that's initiated by a

13    civilian who comes in to file a civilian complaint

14    against an officer.  I will conduct that investigation.

15        Q.   And do you personally conduct it, or do you

16    supervise detectives or detective sergeants that do?

17        A.   I personally conduct it.

18        Q.   Are there any other members of the internal

19    affairs unit other than yourself that personally will

20    conduct the investigations?

21        A.   No.

22        Q.   So you are the internal affairs unit?

23        A.   I am.
```

Case 1:17-cv-00626-DJS   Document 67-4   Filed 10/25/21   Page 436 of 273

1          (Adam Mason - by Mr. Klein)

2     Q.   And who do you report to as your immediate

3     supervisor, if anyone?

4     A.   The chief of police.

5     Q.   Who is that?

6     A.   Brian Owens.

7     Q.   Did you receive any special training to be the

8     internal affairs unit captain?

9     A.   No.

10    Q.   Just on-the-job training, you learned how to do

11    the role as you did it?

12    A.   Yes.

13    Q.   The department has a process in their rules and

14    procedures that we received from your attorney where

15    there are awards and commendations and things like that,

16    right?

17    A.   Yes.

18    Q.   And there's a medal day each year?

19               MR. PERKINS:  Object to the form.

20               You can answer.

21               THE WITNESS:  Yes.

22    BY MR. KLEIN:

23    Q.   Have you ever received any medals or

Case 1:17-cv-00625-DJS Document 67-1 Filed 10/25/21 Page 436 of 273

```
 1                    (Adam Mason - by Mr. Klein)

 2    commendations?

 3        A.   Yes.

 4        Q.   Did you receive any related to the Adrian Thomas

 5    case?

 6        A.   I don't recall for certain, but I may have

 7    received a commendation or a noteworthy police

 8    performance or something of that matter for that case.

 9        Q.   In your mind's thinking about it today, is it

10    more likely right than wrong that you did receive some

11    type of commendation or you'd be speculating?

12                    MR. PERKINS:  Object to the form.

13                    You can answer.

14                    THE WITNESS:  Considering the level of

15            the case that was a homicide case, more

16            likely than not I received some form of

17            award for that.

18    BY MR. KLEIN:

19        Q.   And what were the two possibilities?

20        A.   Noteworthy police performance or a commendation.

21        Q.   And can you describe what a commendation is?

22        A.   It's basically recognition for doing a good job.

23        Q.   Is it a certificate or is it just an oral
```

```
 1                    (Adam Mason - by Mr. Klein)

 2    shout-out to you at a ceremony or something else?

 3                    MR. PERKINS:  Object to the form.

 4                    You can answer.

 5                    THE WITNESS:  It's a certificate.

 6    BY MR. KLEIN:

 7        Q.   And what is a noteworthy?

 8        A.   It's a certificate, as well.

 9        Q.   And are they presented in the course of your

10    regular duties, or are they presented at some type of

11    awards ceremony?

12        A.   They have an awards ceremony every year.

13        Q.   Do you keep copies of all your certificates of

14    commendation and other similar documents?

15        A.   Yes.

16        Q.   I would ask that you conduct a search for any

17    that relate to Adrian Thomas, if any, and preserve them

18    and give them to counsel, okay?

19                    MR. PERKINS:  Please mark the record.

20                    Do you want to write me a letter, or do

21            you want me to just rely on the record for

22            you making the request?

23                    MR. KLEIN:  Sure.  We're going to make
```

Case 1:17-cv-00625-DJS Document 60-1 Filed 10/25/21 Page 46 of 273

1          (Adam Mason - by Mr. Klein)

2     a request for production of any

3     commendations or other medals or similar

4     documents be produced.

5          MR. PERKINS:  And we'll take it under

6     advisement.

7          THE WITNESS:  Pertaining to this case

8     only?

9          MR. KLEIN:  Right.

10 BY MR. KLEIN:

11   Q.  Do you know if Ronald Fountain received any

12 medals, commendations, or other similar recognition for

13 his role in this case?

14          MR. PERKINS:  Objection.

15          THE WITNESS:  I don't know.

16 BY MR. KLEIN:

17   Q.  With regard to detective training, have you ever

18 received any training with regard to interrogation

19 techniques?

20   A.  Yes.

21   Q.  Did you receive that training before September of

22 2008?

23   A.  I've been to a couple different classes for

```
 1              (Adam Mason - by Mr. Klein)

 2  interrogation.  I don't recall exactly when they were.

 3     Q.   I have your training file that your counsel gave

 4  us.  I don't see any.  So I'm going to ask that maybe

 5  you could take at -- either take a look at the file and

 6  let us know and we can mark anything relevant as an

 7  exhibit, or we can just mark the whole file if all

 8  counsel here prefer to.

 9             MS. CALABRESE:  I will need a copy.

10         It's your preference.

11             MR. PERKINS:  Why don't we have him

12         flip through it first off the record.

13             THE WITNESS:  So are you saying that

14         you don't have any documentation in there

15         that I ever attended an interview or

16         interrogation course?

17             MR. KLEIN:  I don't believe I do.

18         That's why I want you to take a look.  It

19         may exist.

20             MR. PERKINS:  And we're Off the record.

21             (Discussion held off the record.)

22             MR. KLEIN:  Back on the record.

23  BY MR. KLEIN:
```

Case Case 1:17-cv-00625-DJS Document 69-1 Filed 10/25/21 Page 48 of 273

1               (Adam Mason - by Mr. Klein)

2     Q.  Captain, I'm going to show you what has been

3  produced in discovery.  It doesn't have Bates numbers,

4  but it's a folder given to us the other day that says,

5  "A. Mason."  And it starts with, "personnel record."

6  And it then has a series of documents that appear to be

7  either resumes of training courses taken or certificates

8  of -- and/or certificates of completion and other

9  certifications throughout your career.

10        If you could take a look at the folder, and let

11  me know if any of it relates to interrogation training.

12     A.  (Witness complies.)

13     Q.  Captain, you've had a chance to review the file

14  that was represented to me to be your personnel record

15  of your training history, correct?

16     A.  Yes.

17     Q.  And would you agree that there's apparently

18  nothing in there that relates to interrogation or that

19  would seem to be related to interrogation technique

20  training?

21     A.  I do agree to that.

22     Q.  But I believe you even testified at one of the

23  hearings that you had training regarding interrogations

Case 1:17-cv-00625-DJS Document 67-4 Filed 10/25/21 Page 49 of 273

```
 1                    (Adam Mason - by Mr. Klein)

 2    around -- was it May or June of that year?

 3        A.   I don't recall when I had the training.  I've

 4    attended at least one training in interview and

 5    interrogation.

 6        Q.   And do you recall where it was given?

 7        A.   I don't.

 8        Q.   Do you recall how long it was?

 9             Was it a day or a couple of hours?

10        A.   I don't.

11        Q.   Do you recall who gave the training, whether it

12    was Troy or some outside agency?

13        A.   It was not the Troy Police Department.

14        Q.   In your Huntley hearing, does it sound correct

15    that you said you had one course on interrogation in the

16    summer of 2008?

17        A.   If I said that, my recollection would have been

18    much better back then, as it was closer.  So that

19    particular time would be accurate.

20        Q.   I believe you said the course was at the station.

21             Was that a possible location for that course?

22        A.   As I said, if I said it then, then that likely

23    would be correct.
```

Case 1:17-cv-00626-DJS Document 67-4 Filed 10/25/21 Page 50 of 273

1            (Adam Mason - by Mr. Klein)

2    Q.  My question, though, is:  Would that be the Troy

3  Police Department station, when you say the station?

4    A.  That would be what that means.  Yes.

5    Q.  You said you didn't recall if you were taught

6  methods to use to gather information or to get

7  statements.

8          Is that true today that you don't recall whether

9  you were taught that, or do you recall?

10   A.  It's true that I don't recall.

11   Q.  And I believe you said quote, I don't recall the

12  seminar being very helpful to me personally.

13          Do you recall saying something to that effect?

14   A.  I do.

15   Q.  Is that your feeling about it today?

16   A.  Yes.

17   Q.  So, other than that training course -- let's say

18  that was in the summer of '08.  Let's call it that for

19  purposes of the record -- do you know if you had any

20  other interrogation training other than that one?

21   A.  I know that I attended more than one course on

22  interview and interrogation.

23   Q.  To the best of your knowledge, was there only one

```
1                    (Adam Mason - by Mr. Klein)

2   prior to the Thomas matter?

3      A.  I don't recall.

4      Q.  Is it more likely right than wrong that there was

5   one given if that's what you said in your Huntley?

6      A.  I would not likely have attended a course on

7   interview and interrogation prior to becoming a

8   detective.  And at this particular point, we're less

9   than six months where I was a detective.  That's

10  probably -- if I did attend one between April and

11  September, it was likely that there was one then, and

12  then maybe the other ones that I can't recall were after

13  that.

14              MR. KLEIN:  So we're going to ask that

15          the reporter note a request for production

16          of the 2008 training session.  And I had

17          previously asked for that in our discovery

18          demands.  I believe I sent an e-mail in

19          July.  I understand that a good-faith search

20          had been conducted, but I would just ask

21          that a further search be made.

22              THE WITNESS:  Now, you said -- when did

23          I say I took this course?
```

Case 1:17-cv-00625-DJS Document 1-8 Filed 10/25/21 Page 52 of 273

1          (Adam Mason - by Mr. Klein)

2          MR. KLEIN:  At the Huntley hearing, you

3      said you took it in the summer of 2008.

4          THE WITNESS:  Okay.

5   BY MR. KLEIN:

6   Q.  When you attended such courses, did you receive

7   certificates of completion personally, or were they just

8   mailed to the department, or both?

9   A.  It could have happened either way.

10  Q.  Did you maintain copies of your certificates of

11  completion either way?

12  A.  When I receive a copy, I like to maintain a copy.

13  Q.  So I would ask that you search your records as

14  well for records of any interrogation training courses.

15  And if you have them, please preserve and give them to

16  counsel so that we can -- he can produce them, as

17  requested.

18      Thank you.

19  A.  Okay.

20  Q.  Is there anything that you did find instructive

21  from the interrogation training techniques, or does your

22  practice involve your own instinct and intuition when

23  you do an interrogation?

```
 1              (Adam Mason - by Mr. Klein)
 2              MR. PERKINS:  Object to the form.
 3              You can answer.
 4              THE WITNESS:  I'm certain there were
 5         things that I did pick up in the couple
 6         courses that I attended, but I also go
 7         mostly on my own instincts.
 8  BY MR. KLEIN:
 9     Q.  I think you said at one point, perhaps in the
10  video, that you would speak with the person for hours
11  and hours, as long as you felt you needed to, that you
12  had the stamina to go on for hours.
13         Do you recall saying something to that effect?
14              MR. PERKINS:  Object to the form.
15              Is that the documentary video?
16  BY MR. KLEIN:
17     Q.  Did you say that at some point?
18         I'm just asking.
19              MR. PERKINS:  Well, what video are you
20         talking about?
21              MR. KLEIN:  I'll withdraw the question.
22  BY MR. KLEIN:
23     Q.  Did you say at some point that you were the type
```

1                    (Adam Mason - by Mr. Klein)

2    of detective that could speak with someone for hours and

3    hours to see where the interview went?

4                    MR. PERKINS:  Object to the form.

5                    You can answer.

6                    THE WITNESS:  I don't recall if I said

7            that, but that was my approach to

8            interviewing someone.  Yes.

9    BY MR. KLEIN:

10       Q.  As of 2008, based on your testimony in 2009 at

11   the Huntley, was it true that what you learned, at least

12   from that first training, you didn't find particularly

13   helpful?

14       A.  If that's what I said, then that would be

15   accurate.

16       Q.  So is it fair to say the techniques that you

17   employed with Adrian Thomas were based on your own

18   experience and instincts?

19       A.  The techniques that were employed with Adrian

20   Thomas were based on my own instincts.

21       Q.  And not really based on any training?

22       A.  That's correct.

23       Q.  So, the techniques that you employed, you made a

Case 1:17-cv-00625-DJS Document 60-1 Filed 10/25/21 Page 536 of 273

1                    (Adam Mason - by Mr. Klein)

2    conscious choice to employ them based on your own

3    instincts and experience, correct?

4        A.   Yes.

5        Q.   No one told you to approach it a certain way.

6             That was your own decision, correct?

7        A.   Yes.

8        Q.   There was no supervisor or detective captain or

9    colleague that said, Adam, why don't you go in there and

10   demonstrate slamming a folder to the ground.

11            That was your conscious choice to do that?

12       A.   That's correct.

13       Q.   We'll get into the interview later.  I wanted to

14   ask you more about this training and how that impacted

15   your technique.

16            So it's fair to say that training did not impact

17   your technique as of September of 2008?

18                 MR. PERKINS:  Object to the form.

19   BY MR. KLEIN:

20       Q.   In terms of interrogation practice, correct?

21                 MR. PERKINS:  Objection.

22                 Go ahead.

23                 THE WITNESS:  I agree that I didn't go

Case 1:17-cv-00625-DJS Document 64-1 Filed 10/25/21 Page 56 of 273

```
 1                    (Adam Mason - by Mr. Klein)

 2              into that interview with some preconceived,

 3              this is going to be my form because I was

 4              taught this.  I don't know that at any point

 5              in time did some portion of my training kick

 6              in, but for the most part, the interview was

 7              conducted based on my instincts.

 8   BY MR. KLEIN:

 9      Q.  At some point in your career did you learn,

10   whether from this case, from the Court of Appeals

11   decision, or from any other training or information you

12   received in your career, that there's risk in

13   interrogation practice that a confession can be coerced,

14   whether it's true or false, based on the tactics of the

15   questioner?

16              MR. PERKINS:  Object to the form.

17              You can answer.

18              THE WITNESS:  I have not learned that.

19   BY MR. KLEIN:

20      Q.  Well, is it your understanding, from reading the

21   Court of Appeals decision, that the court found that the

22   confession in this case was coerced?

23      A.  Yes.
```

Case 1:17-cv-00626-DJS Document 67-4 Filed 10/25/21 Page 57 of 273

```
 1                    (Adam Mason - by Mr. Klein)

 2      Q.   So you are aware that that can happen in an

 3   interrogation?

 4      A.   Yes.

 5      Q.   Did you receive any training after the Adrian

 6   Thomas case, either from Troy PD or any other source, to

 7   instruct you on the parameters of where the line is

 8   crossed from a voluntary confession to coerced

 9   confession?

10                 MR. PERKINS:  Object to the form.

11                 You can answer.

12                 THE WITNESS:  No.

13                 MR. KLEIN:  No.

14   BY MR. KLEIN:

15      Q.   So to this day you have not received any

16   clarification via any training you've gotten in that

17   regard?

18      A.   Correct.

19      Q.   As a result of the Court of Appeals decision or

20   any other information obtained by the Troy PD in this

21   case, did anyone instruct you or any other detectives in

22   the squad to modify interrogation techniques?

23                 MR. PERKINS:  Object to the form.
```

```
 1              (Adam Mason - by Mr. Klein)

 2              You can answer.

 3              MS. CALABRESE:  Objection.  Post

 4         remedial measures.

 5              MS. PECK:  Objection.

 6              THE WITNESS:  I can't speak for other

 7         members of the department.  I can only speak

 8         for myself, and I was not counseled or

 9         guided as to change my interview techniques.

10  BY MR. KLEIN:

11    Q.  Were you a detective in 2014 at the time the

12  Court of Appeals decision came down?

13    A.  Yes.

14    Q.  Were you a detective at the time of the second

15  trial resulting in the acquittal?

16    A.  Yes.

17    Q.  So, based on your experience in the Troy PD, is

18  it fair to say that this Court of Appeals decision had

19  no impact on the practices of the Troy PD in terms of

20  interrogation techniques?

21              MS. PECK:  I'm sorry, can you repeat

22         the question?  Thank you.

23              (Question read by reporter.)
```

1             (Adam Mason - by Mr. Klein)

2           MR. PERKINS:  Object to the form.

3           You can answer.

4           MS. CALABRESE:  Objection, post

5      remedial measures.

6           THE WITNESS:  I can't speak for other

7      officers.  I can only speak for myself.

8      There was nothing that came down through the

9      ranks instructing us to change our interview

10     techniques as a whole.

11          Does that answer your question?

12          MR. KLEIN:  Well, yeah.

13 BY MR. KLEIN:

14   Q.  Are you aware of, whether it's individually or

15 department-wide, were there any changes to the patrol

16 guide or detective manual or anything else as a result

17 of this case or not that you're aware of?

18   A.  I'm not aware of any changes within the

19 department as a result of this case.

20   Q.  We were given what I refer to as a patrol guide.

21     What do you refer to it as, department orders?

22   A.  General orders.

23   Q.  Is there a guide that's specific to the detective

Case 1:17-cv-00625-DJS Document 69-1 Filed 10/25/21 Page 60 of 273

1    (Adam Mason - by Mr. Klein)

2  squad, or do the general orders apply department-wide?

3    A.  Well, they apply department-wide, but within each

4  general order there are specifications for different

5  units as well.

6    Q.  Is there a manual or some other type of

7  publication, whether paper copy or electronically

8  stored, that sets forth procedures for interrogations

9  and investigations for the detective bureau?

10   A.  I'm not certain.

11   Q.  You're not certain if there's one today, correct?

12   A.  I'm not certain if there's one today.

13   Q.  Do you know if there was one back in 2008?

14   A.  I don't know.

15   Q.  You don't remember there being one?

16   A.  Correct.

17   Q.  Just sticking to the topic of training, you've

18  had a lot of training, but with regard to interrogation,

19  that's really what relates in this case, correct?

20        MR. PERKINS:  I'm sorry, what was the

21     question?

22        MR. KLEIN:  Withdrawn.

23  BY MR. KLEIN:

Case 1:17-cv-00625-DJS Document 63-1 Filed 10/25/21 Page 61 of 273

1     (Adam Mason - by Mr. Klein)

2  Q.  Back to the topic of training.

3   You've had a lot of training as evidenced by your

4 file, correct?

5  A.  Yes.

6  Q.  But one, possibly a few, relating to

7 interrogation, but only one of them before this

8 incident, correct?

9  A.  Yes.

10  Q.  Other than formal training, as the type that

11 we've discussed so far, did you have any on-the-job

12 training starting when you became a detective?

13   In other words, did you have a mentor or mentors

14 or other individuals that you would observe in terms of

15 their interrogation techniques, or were you your own

16 detective and you did your own thing?

17  A.  I did not have a mentor when I became a

18 detective.  On day one I just started becoming a

19 detective.  I mean, I don't have any specific moments

20 where I said, that's a teachable moment, I'm going to

21 use that in my interrogation, but I did absorb the

22 things that occurred around me.

23  Q.  So you just essentially went in there and did

1              (Adam Mason - by Mr. Klein)

2    what you -- followed your instinct in an interrogation.

3          Is that fair to say?

4       A.   That's correct.

5       Q.   Had you testified in any pretrial Huntley

6    hearings prior to interrogating Adrian Thomas in

7    September of '08, either as an officer or as a

8    detective?

9       A.   Yes.

10      Q.   How many?

11      A.   I don't recall.

12      Q.   Do you know if it was a handful or if it was

13   dozens?

14      A.   It could have been dozens.

15      Q.   Were they as police officer as well as detective,

16   or were they all when you were considered detective?

17      A.   As a police officer as well as detective.

18      Q.   Had you ever sat with a potential defendant like

19   Adrian Thomas or suspect and conduct a several-hour or

20   multi-hour interrogation like you did in this case prior

21   to this case?

22      A.   I don't recall.

23      Q.   Do you believe that this was the first such case?

Case 1:17-cv-00625-DJS Document 60-1 Filed 10/25/21 Page 63 of 273

1               (Adam Mason - by Mr. Klein)

2     A.  I believe that this is the longest interview that

3 I have ever conducted, but I have conducted other

4 interviews that were several hours in length.

5     Q.  Do you know if any of them were prior to Adrian

6 Thomas in that five-month period?

7     A.  I don't recall any specific.  I can't say for

8 certain.  I didn't do a two-hour interview prior to that

9 day.

10     Q.  Did you follow the press clippings on this case,

11 whether print press or TV news, as it was going?

12     A.  Some.  Yes.

13     Q.  Was that part of your duties and responsibilities

14 as case detective, or did you just do that out of

15 curiosity, or both?

16     A.  I think it's a good practice to follow your case

17 in the media to see if there's anything that should be

18 noted there.

19     Q.  In the file that we received, which we'll mark

20 and show, there's a series of press clippings.

21        Do you know whether you collected the press

22 clippings yourself as part of the Troy PD file?

23     A.  I don't recall if I specifically did.

Case 1:17-cv-00625-DJS   Document 67-1   Filed 10/25/21   Page 64 of 273

1                (Adam Mason - by Mr. Klein)

2     Q.   Is that something that you would have done

3   potentially in the course of your duties?

4     A.   It's something I would have done potentially,

5   yeah.

6     Q.   Would you have maintained them in the file?

7     A.   Yes.

8     Q.   Did you attend any part of the first trial other

9   than when you testified?

10    A.   No.

11    Q.   Did you attend any part of the second trial?

12    A.   No.

13    Q.   Have you learned anything, either on-the-job or

14  via formal training or from any other source, since the

15  Adrian Thomas interrogation, that would lead you to

16  approach that interrogation differently in the event

17  that case were to hypothetically land on your desk

18  tomorrow?

19              MR. PERKINS:  Object to the form.

20              You can answer it, if you know.

21              MS. CALABRESE:  Objection to form,

22        calls for post remedial measures.

23              THE WITNESS:  Considering that it has

```
 1              (Adam Mason - by Mr. Klein)

 2         been 11 years, I've learned a lot in my

 3         career.  So to say that if it were to happen

 4         again today that I would do it the exact

 5         same way, I don't know that that's fair,

 6         because I have learned other things, and I'm

 7         a different person and I have more knowledge

 8         now.

 9              So there may be other things that I

10         implemented during the interview, but

11         hypothetically, if I -- I don't feel as

12         though I learned anything during that

13         interview that would have me do it

14         differently today.  If I were to do it again

15         today, I would have no problem doing it the

16         exact same way.

17    BY MR. KLEIN:

18       Q.  Even though the Court of Appeals said what it

19    said about the manner in which you conducted it, you

20    would still do it the same way?

21              MR. PERKINS:  Object to the form.

22              THE WITNESS:  That's correct.

23    BY MR. KLEIN:
```

```
 1                    (Adam Mason - by Mr. Klein)

 2        Q.   So, with regard to the Adrian Thomas

 3    investigation, I'm going to talk to you first what about

 4    documents exist relating to the case, but before that,

 5    prior to September 21st, 2008, when the case came in,

 6    did you know anything about Adrian Thomas?

 7        A.   No.

 8        Q.   Did you know anyone in the Thomas-Hicks household

 9    through your duties or through -- in your private life?

10        A.   No.

11        Q.   Did any of your colleagues have any interactions

12    with the Thomas-Hicks household that you were aware of

13    prior to that date?

14        A.   I'm not aware of any.

15        Q.   Other than your involvement in Adrian Thomas'

16    case, have you heard anything or learned anything about

17    him since this case, not from your counsel?

18        A.   No.

19        Q.   Have you followed where he is since he got

20    acquitted or anything like that?

21        A.   I have not followed.

22        Q.   Have you learned or looked it up or anything like

23    that?
```

Case 1:17-cv-00625-DJS Document 62-4 Filed 10/25/21 Page 67 of 273

1                    (Adam Mason - by Mr. Klein)

2      A.   I have not looked it up.  No.

3      Q.   Have you heard anything or interacted in any way

4  with Wilahemina Hicks and her family since you testified

5  in 2009?

6                MR. PERKINS:  Object to the form.

7                You can answer.

8                THE WITNESS:  Yes.  I have encountered

9          Wilahemina Hicks since then.

10  BY MR. KLEIN:

11     Q.   On how many occasions?

12     A.   In the year or two afterwards, I saw her a couple

13  times over the past -- I'm trying to think.  The last

14  time I saw her was across the street at the YMCA.  I was

15  there maybe five years ago.  I bumped into her

16  coincidentally.  But in the couple years after the case,

17  myself and Detective Fountain spoke to her a couple

18  times to see how she was doing.

19     Q.   In the couple years after the 2009 trial or in

20  the couple of years after the 2014?

21     A.   The 2009 trial.

22     Q.   So you saw her a few times between 2009 and 2014

23  and about five years ago across at the YWCA was the last

Case 1:17-cv-00625-DJS Document 66-1 Filed 10/25/21 Page 68 of 273

1             (Adam Mason - by Mr. Klein)

2  time?

3    A.  I believe so.  Yes.

4    Q.  We'll talk about your interactions with her

5  during the investigation when we get to that, but the

6  couple of times you saw her after the investigation, can

7  you just tell us what you remember about those, to the

8  best of your recollection, even if it's not much?

9    A.  I don't remember where or when.  I just remember

10  seeing her and asking her how everything was going with

11  her personal life and how she was doing with the kids

12  and everything.

13    Q.  What do you recall her saying, if anything?

14    A.  I don't recall what she said.

15    Q.  Do you recall anything else about those times

16  that you saw her?

17    A.  No.

18    Q.  You say you were with Fountain on those

19  occasions?

20    A.  I believe so.

21    Q.  Were these planned, to the extent that you and

22  Fountain went out to check up on her, or was it just

23  coincidental that you would be with him when you met

Case 1:17-cv-00625-DJS Document 60-1 Filed 10/25/21 Page 69 of 273

1                    (Adam Mason - by Mr. Klein)

2    with her?

3        A.   I don't recall how it occurred.  I just remember

4    seeing her a couple times after 2009.  Whether it was

5    intentional or whether we were together and he said,

6    let's -- I don't recall how it happened.  I just

7    remember seeing her a few times after the 2009 trial.

8        Q.   And when you saw her across at the YMCA, did you

9    see her or did you speak with her?

10       A.   I stopped and spoke with her.

11       Q.   And what was discussed at that time?

12       A.   Just, hi, how are you doing.  She indicated she

13   was doing okay.

14       Q.   Have you seen or interacted with her since the

15   acquittal?

16       A.   I don't know if that was this time I'm referring

17   to the YMCA, if that was before or after the acquittal.

18       Q.   Have you had any interactions with anyone else in

19   the Thomas-Hicks household other than Wilahemina and

20   your involvement with Adrian in this case?

21       A.   No.

22       Q.   In this case did you prepare a Troy PD -- can we

23   call Troy PD TPD?

```
 1                    (Adam Mason - by Mr. Klein)

 2        A.  Uh-huh.

 3        Q.  Did you prepare a TPD investigation report?

 4        A.  Yes.

 5        Q.  What do you refer to those as on-the-job

 6    investigation reports, IRs?

 7        A.  We refer to them as a DB follow-up, possibly.

 8        Q.  I'm going to show you what's been marked as

 9    Thomas 2 on August 21st of 2019.

10                    (Discussion held off the record.)

11    BY MR. KLEIN:

12        Q.  Thomas Exhibit 2, are these detective bureau

13    follow-ups prepared for the Thomas matter?

14        A.  Yes.

15        Q.  This packet that you have here has entries

16    starting on September 21st and it's got six pages.  It

17    says one of six, two of six, three of six, four of six,

18    five of six, six of six.

19            Are these all the detective bureau follow-ups you

20    did for this case?

21        A.  Yes.

22        Q.  Were these entered directly on a computer or

23    would you have written them out first?
```

1                (Adam Mason - by Mr. Klein)

2      A.   I entered them directly into the computer.

3      Q.   Other than detective follow-ups, did you have

4    notes in this case?

5      A.   Yes.

6      Q.   Actually, what I'm going to do is, I'm going to

7    show you what's been produced in discovery by the City

8    of Troy Police Department counsel as what I believe to

9    be your file.  I'm going to ask you to take a look at

10   it.  And rather than mark the whole file and have

11   everyone copy it, if I refer to specific documents for a

12   question, I'll ask you about them specifically.

13         But for purposes of this initial exercise, take a

14   look at it, and I want you to let me know if it appears

15   to be all of your file or if you believe there's

16   anything in there that's not part of your file or if

17   there's anything that appears to be missing.

18              MR. PERKINS:  You want him to flip

19         through the notebook?

20              MR. KLEIN:  Yeah.

21              (Discussion held off the record.)

22   BY MR. KLEIN:

23     Q.   So have you had a chance to review the binder,

Case 1:17-cv-00626-DJS Document 69-21 Filed 10/25/21 Page 7 of 27
Case 1:19-cv-00626-DJS Document 162-54 Filed 10/25/21 Page 72 of 273
**APPENDIX** **2221**
71

```
 1                    (Adam Mason - by Mr. Klein)

 2    which I'll represent to you is, to the best of my

 3    knowledge, the file that was produced by your attorney

 4    in this case?

 5        A.   I have had a chance to review it.

 6        Q.   Does that appear to be the complete detective

 7    file for the case?

 8        A.   It does appear to be the complete file.

 9        Q.   Is there anything that you've identified in there

10    that appears to be extraneous that may have somehow got

11    in there but it's not part of the file?

12        A.   Didn't see anything.  No.

13        Q.   There's a record of sealing pursuant to CPL

14    160.50 that was entered after the acquittal.

15             Is that something that would be transmitted to

16    the Troy PD to be maintained as part of the file?

17        A.   Yes.

18        Q.   There are press articles in there.  Again, that

19    would be something that would typically be part of a

20    file?

21        A.   Yes.

22        Q.   There are medical records and death certificates

23    and such related to M█████ Thomas.  That would have
```

1                    (Adam Mason - by Mr. Klein)

2        been part of your file, as well?

3            A.  Yes.

4            Q.  There's a variety of notes which I'll go through

5        with you specifically.

6                Do you know if those are all the notes that

7        pertain to this case or not?

8            A.  They appear to be.

9            Q.  Did you copy the file yourself for your counsel,

10       or you gave your counsel the original file for them to

11       copy?

12           A.  I gave my counsel the original file.

13           Q.  There's a copy of the homicide statute.

14               Is that something that you would have copied or

15       someone would have copied as part of your file?

16           A.  Yes.

17           Q.  There's an arrest report.

18               Is that something that you created for this case?

19           A.  Yes.

20           Q.  Is that something you would have done online, or

21       is that something you would have typed, like, on a

22       typewriter?

23           A.  During the booking process, there's a way that

Case 1:17-cv-00625-DJS Document 69-2 Filed 10/25/21 Page 74 of 273

1                    (Adam Mason - by Mr. Klein)

2     you can fill in some of the fields.  And then, after you

3     print the sheet, there are some fields that you can also

4     fill in by hand.

5         Q.   There's an accusatory instrument for attempted

6     murder.

7              Is that something that you prepared or would the

8     district attorney have prepared that?

9         A.   I would have prepared that.

10        Q.   There's a final autopsy from M█████ Thomas in

11    the file.  That wasn't finalized until the spring of

12    2009.

13             Is that something that you would have received

14    and maintained in the file pursuant to your continuing

15    role as the assigned investigator?

16        A.   Yes.

17        Q.   There's a photo log of photos that were taken of

18    the parts of M█████'s body in the autopsy.

19             You were present at the autopsy, correct?

20        A.   Yes.

21        Q.   Did you take the photos or someone else did?

22        A.   Someone else.

23        Q.   Did you see those photos were in this file?

Case 1:17-cr-00626-DJS Document 69-1 Filed 10/25/21 Page 75 of 273

1                    (Adam Mason - by Mr. Klein)

2        A.    Yes.

3        Q.    There are also photos of the Thomas-Hicks

4    household, correct?

5        A.    Yes.

6        Q.    Were those taken during the search warrant

7    executions or some other time, if you know?

8        A.    Likely during search warrant executions.

9        Q.    And there's a photo log that reflects all of the

10   photos there, such as the kids' bedroom, the crib, etc.,

11   correct?

12       A.    Yes.

13       Q.    There's a Troy diagram/sketch of the apartment.

14             Would that have been created by the evidence

15   collection team or you?

16       A.    By the evidence technician.

17       Q.    Were you present when that was done?

18       A.    No.

19       Q.    Then there was serology reports that were

20   obtained when the items in the household that were

21   seized were tested, correct?

22       A.    Yes.

23       Q.    Those were part of your file, as well?

Case 1:17-cv-00625-DJS Document 60-9 Filed 10/25/21 Page 76 of 273

1           (Adam Mason - by Mr. Klein)

2     A.   Yes.

3     Q.   You have the New York State fire incident report

4 and prehospital care reports in here as well, correct?

5     A.   Yes.

6     Q.   Then there were search warrants.

7          Do you recall that, from looking at the file,

8 that there were two search warrants executed?

9     A.   Yes.

10    Q.   Do you know why there were two?

11    A.   I don't recall why.

12    Q.   Was something missed during the first warrant

13 where there was some discussion about a reason to go

14 back a second time?

15    A.   I don't recall exactly why.

16            MS. PECK:  Brett, since you're going

17         through it, we should probably just mark it.

18            MR. KLEIN:  We can off the record.

19            (Thomas Exhibits 18 and 19 marked for

20         identification.)

21            MR. KLEIN:  Back on the record.

22 BY MR. KLEIN:

23    Q.   The binder that contains what you've described as

Case 1:17-cv-00625-DJS Document 69-21 Filed 10/25/21 Page 776 of 273

1                    (Adam Mason - by Mr. Klein)

2    the Troy PD file for Adrian Thomas has been marked for

3    the record as Thomas Exhibit 19.  Just going through the

4    file again, generally.  We're up to search warrants.

5         You don't know why there were two; is that right?

6    A.   I don't recall exactly why.

7    Q.   Would looking at them remind you of the reasons

8    why there was a need for a first and then a second?

9    A.   Possibly.

10   Q.   So take a moment and look at them and just let me

11   know.  I flagged the page for the first one.

12   A.   Am I allowed to answer a question while I'm

13   looking at it, or do I have to memorize what's in there?

14   Because I'm just looking at what we're looking for in

15   each of the search warrants and I see the difference.

16        So, can I identify that?

17   Q.   Yeah.  Why don't you tell us on the record as

18   you're looking through it, if that helps, if that's

19   easier for you, what each warrant was looking for and

20   how they're different, if at all.

21        Go ahead?

22   A.   So, in the first search warrant, the officers

23   were looking for evidence of child abuse or child

Case 1:17-cv-00625-DJS Document 69-1 Filed 10/25/21 Page 786 of 273

1                    (Adam Mason - by Mr. Klein)

2    neglect, including, but not limited to, a baby crib, a

3    metal truck, a black-and-brown belt, blood, or any other

4    evidence that child abuse or child neglect has ever

5    taken place inside the residence.  And that was the

6    warrant executed on September 22nd.

7         Then the second one that was executed on

8    September 23rd, the officers were looking for

9    mattresses, box springs, sheets, comforters, pillows,

10   pillow cases, and blankets.

11        I don't recall specifically why the next day we

12   were looking for these additional items.  If I had to

13   guess I would say, during that 24 hours, in between the

14   two search warrants, there was information that was

15   discussed or received where we made a determination that

16   we wanted to go back and retrieve additional items.

17   Q.  I'll take that back from you.  Thanks.

18        After the search warrants in the file are

19   transcripts of the two Thomas interviews, interview one

20   and interview two, correct?

21   A.  Yes.

22   Q.  Who acquired these transcripts?

23        Did you get them made or did the DA's office?

Case 1:17-cv-00626-DJS Document 60-1 Filed 10/25/21 Page 79 of 273

1           (Adam Mason - by Mr. Klein)

2    A.  I did not have them made.  I believe the DA's

3  office had them made.

4    Q.  Then after that are photos, and they appear to be

5  the photos of the Thomas-Hicks household, the warrant,

6  and then photos of the autopsy.

7    A.  Yes.

8    Q.  Do these appear to be all of the photos that were

9  part of the Troy PD file?

10    A.  They do.

11    Q.  The actual videos would have been part of the

12  detective file as well, correct?

13    A.  Yes.

14    Q.  It was discussed by counsel today that there's a

15  video of an interview of Wilahemina Hicks that was taken

16  on October 3rd, 2008.

17        Do you recall that?

18    A.  Yes.

19    Q.  Would that have been part of the file as well?

20    A.  Yes.

21    Q.  Was that part of this homicide investigation?

22    A.  Yes.

23    Q.  Were there any video statements taken of anyone

Case 1:17-cv-00625-DJS Document 69-1 Filed 10/25/21 Page 806 of 273

1                    (Adam Mason - by Mr. Klein)

2    else other than Adrian Thomas and Wilahemina Hicks?

3        A.   No.

4        Q.   Do you recall the interview of Wilahemina Hicks

5    that was videotaped?

6        A.   I do not.

7        Q.   There were a couple of written supporting

8    depositions taken from her, correct?

9        A.   Yes.

10       Q.   And then, apparently, after the indictment and

11   the autopsy she was then interviewed in the

12   interrogation room at headquarters, correct?

13       A.   Yes.

14       Q.   What was the purpose of that interrogation, if

15   you know?

16            Was she a suspect or was there some other

17   purpose?

18       A.   I think the purpose was just to be thorough.

19       Q.   Do you remember what the results were of that

20   interview?

21            Did she provide anything helpful?

22       A.   I don't recall.

23       Q.   Was she represented by counsel?

```
 1                    (Adam Mason - by Mr. Klein)

 2      A.  No.

 3      Q.  Was she offered counsel and she declined to have

 4  counsel present?

 5              MR. PERKINS:  Object to the form.

 6              You can answer.

 7              THE WITNESS:  I don't recall if she was

 8          provided with Miranda or not prior to that.

 9  BY MR. KLEIN:

10      Q.  Have you seen that video or any notes of that

11  video since it happened in 2008?

12      A.  Well, since 2008, I may have looked at it

13  afterwards, but I have not looked at it in any of the

14  recent years.

15      Q.  Have you looked at it since the 2009 trial, to

16  your knowledge?

17      A.  I don't recall.

18      Q.  It sounds like you certainly haven't looked at it

19  in the last few years.

20      A.  No.  I have not gone back and reviewed any of the

21  video footage over the last several years.

22      Q.  Other than the video footage of Adrian Thomas and

23  Wilahemina Hicks, are there any other items, documents,
```

```
 1                  (Adam Mason - by Mr. Klein)

 2    photos, or other things that would be part of the

 3    detective file that are not in this Exhibit 19 in front

 4    of you today?

 5        A.   Nothing that I'm aware of.

 6        Q.   I'm going to show you what's been marked as

 7    Thomas Exhibit 18, the grand jury.

 8                  (Discussion held off the record.)

 9    BY MR. KLEIN:

10        Q.   Let me know if that appears to be the transcript

11    of your grand jury testimony.  You can just flip through

12    it.  I'm not asking for you to read it in detail right

13    now.

14        A.   Yes, it does.

15        Q.   Is that the transcript that you reviewed before

16    coming here today in preparation for today's

17    proceedings?

18        A.   I actually did not review the grand jury

19    testimony.  I reviewed the hearing and the trial

20    testimony.  I didn't review this one.

21        Q.   Can you take a moment or a few minutes, as long

22    as you need, to review it.

23        A.   Sir, would you like me to read the whole thing?
```

1                    (Adam Mason - by Mr. Klein)

2       Q.  I would.  It's a quick read.

3       A.  I don't know if this is a quick read.

4       Q.  It is.

5                    (Discussion held off the record.)

6   BY MR. KLEIN:

7       Q.  So, Captain Mason, referring to Thomas

8   Exhibit 18, does that appear to be a full copy of your

9   grand jury testimony?

10      A.  Yes.

11      Q.  Was everything that you said to the grand jury

12  true and correct?

13      A.  Yes.

14      Q.  Is there anything, reading it now, that you wish

15  to clarify or would you describe differently?

16      A.  No.

17      Q.  I'm showing you Thomas Exhibit 12.  This is your

18  pretrial Huntley hearing testimony.

19           Is this a transcript that you've reviewed before

20  coming here to this deposition?

21      A.  Yes.

22      Q.  Was everything in your Huntley hearing true and

23  correct?

Case 1:17-cv-06625-DJS Document 69-4 Filed 10/25/21 Page 84 of 273

1                      (Adam Mason - by Mr. Klein)

2       A.   Yes.

3       Q.   I'm showing you Thomas Exhibit 13, which is the

4    first session that you testified at trial, Thomas

5    Exhibit 14, which is the second session that you

6    testified at trial, and Thomas Exhibit 16, which is the

7    day that you were called on the rebuttal case for the

8    prosecution.

9            Just take a moment and just confirm that those

10   appear to be the transcripts that you reviewed as well

11   before testifying today.

12               (Off the record.)

13   BY MR. KLEIN:

14      Q.   So, Thomas Exhibit 12, the Huntley hearing

15   transcript, is this a full -- appear to be a full and

16   complete transcript of your Huntley testimony?

17      A.   Yes.

18      Q.   Is everything you said to the court under oath

19   that day true and correct?

20      A.   Yes.

21      Q.   Anything that you would change or clarify for the

22   record today?

23      A.   No.

1          (Adam Mason - by Mr. Klein)

2      Q.   Was everything in your first day of trial

3   testimony, Thomas Exhibit 13, true and correct?

4      A.   Yes.

5      Q.   Anything that you would change or clarify?

6      A.   No.

7      Q.   Same question for your second day of testimony,

8   started off with cross-examination, Thomas Exhibit 14,

9   is everything true and correct?

10      A.   Yes.

11      Q.   On your rebuttal testimony, Thomas Exhibit 16,

12   was everything true and correct?

13      A.   Yes.

14      Q.   In the file, there's an article by Jan Leestma,

15   who was one of the defendant's experts, and it's

16   entitled "Shaken Baby Syndrome."

17          Did you pull that article or was it given to you

18   by someone?

19      A.   I don't recall pulling it.

20      Q.   You don't recall.

21          Do you know if you got this during the trial or

22   anticipating -- like, what was the reason why?

23          Why did that article end up in the file, if you

1                  (Adam Mason - by Mr. Klein)

2    know?

3        A.   I'm not familiar with the file, with that being

4    in the file.  If it's in there then I likely put it

5    there, but I don't recall reviewing it or looking it up

6    or it being given to me.

7        Q.   It's possible, when you heard he was an expert in

8    the case, you may have done some research?

9        A.   I don't believe I did the research and pulled

10   that.

11       Q.   So, directing your attention to September 21st,

12   2008.

13           Did there come a time on that date, which was a

14   Sunday, that you became aware of this incident involving

15   M████  Thomas?

16       A.   Yes.

17       Q.   Can you walk us through your involvement?

18           Did you come in today for this job or were you on

19   the job already and got the call?

20       A.   No.  I was actually home and I received a call

21   that -- because I was on call for the weekend, and I

22   received a call that I needed to come into work.

23       Q.   You then responded to the --

Case 1:17-cv-00625-DJS Document 62-4 Filed 10/25/21 Page 87 of 273

```
 1              (Adam Mason - by Mr. Klein)

 2     A.   To the Troy Police Department.

 3     Q.   When you got there, was Fountain there as well?

 4     A.   Yes.

 5     Q.   What happened when you got there?

 6          Were you notified that you were being assigned to

 7   this call?

 8     A.   Yes.

 9     Q.   How did it come in?

10          Did it come in through CPS or through 911 or

11   something else?

12     A.   I believe it came in through CPS.

13     Q.   What was the first thing that you did in regards

14   to the investigation?

15     A.   We were just briefed at the station.  I believe

16   CPS was actually at the station.  And we were briefed on

17   what had happened.

18     Q.   When you say CPS, do you remember who was there

19   from CPS?

20     A.   Her name was Nicole Noel.

21     Q.   Was she with any of her colleagues?

22     A.   I don't recall.

23     Q.   Had you worked with Nicole Noel in her capacity
```

Case 1:17-cv-00626-DJS Document 60-9 Filed 10/25/21 Page 88 of 273

```
 1                    (Adam Mason - by Mr. Klein)

 2   as a CPS supervisor prior to this incident?

 3       A.  No.

 4       Q.  Was this the first time you met her?

 5       A.  Yes.

 6       Q.  What were you informed and what happened next

 7   when you met up with Nicole?

 8       A.  I don't recall what the conversation was.  I know

 9   that next we went to Samaritan Hospital in an attempt to

10   speak to anyone there that may have had information on

11   the condition of M████.

12            And then, from there, we went to the apartment of

13   M████  Thomas and Adrian Thomas.

14       Q.  That was all on September 21st?

15       A.  Yes.

16       Q.  When you went to the apartment -- well, what

17   happened when you went to Samaritan?

18            Did you speak with any doctors?

19       A.  No, I did not.

20       Q.  Who did you go to Samaritan with?

21       A.  Detective Fountain and the CPS worker.

22       Q.  Ms. Noel?

23       A.  Yes.
```

1          (Adam Mason - by Mr. Klein)

2     Q.  Did she drive with you in your vehicle or did you

3  go in her vehicle?

4     A.  We had separate vehicles.

5     Q.  You didn't speak with anyone at Samaritan, but to

6  your knowledge did Fountain or Ms. Noel get any

7  information from any nurses or doctors at Samaritan?

8     A.  I don't know if they spoke to anyone.

9     Q.  So, were you there briefly at Samaritan?

10    A.  Yes.

11    Q.  Had the baby been transferred already from

12  Samaritan to Albany Med?

13    A.  Yes.

14    Q.  So, from there, you went to the Thomas-Hicks

15  household?

16    A.  Yes.

17    Q.  What happened there?

18    A.  I believe CPS was going to remove -- there were

19  six other children in the residence, and CPS was going

20  to remove them pending their investigation.

21         And so, myself and Detective Fountain went there

22  as well, and we spoke to Adrian Thomas briefly at that

23  point.  And from there, we went to Albany Medical

Case 1:17-cv-00625-DJS Document 69-1 Filed 10/25/21 Page 90 of 273

1                    (Adam Mason - by Mr. Klein)

2    Center.

3        Q.   So you monitored the removal of the kids, spoke

4    with Adrian, and then left, in sum and substance?

5        A.   Yes.

6        Q.   The conversation with Adrian, how long did it

7    last for?

8        A.   I don't recall.

9        Q.   In your testimony, it may have been as much of an

10   hour, maybe less.

11            Is that about right?

12       A.   That sounds about right.

13       Q.   Were any notes taken during that interview?

14       A.   I don't recall.

15       Q.   Would it be your practice to take notes during

16   such an interview just for keeping track of something

17   that --

18       A.   It would be something that myself or Detective

19   Fountain would do, but if there was -- but I don't

20   recall if I did take notes or not for that particular

21   interview.

22       Q.   Looking through the file today, were there any

23   notes that you've seen, identified that were from that

Case 1:17-cv-00626-DJS Document 162-4 Filed 10/25/21 Page 91 of 273

1                    (Adam Mason - by Mr. Klein)

2    initial visit to the Thomas household?

3        A.   Nothing that I identified specifically for that

4    point in time.

5        Q.   Then, is it fair to say that during that first

6    interview with Adrian in the household he was not a

7    suspect?

8                    MR. PERKINS:   Object to the form.

9                    THE WITNESS:   That's correct.

10   BY MR. KLEIN:

11       Q.   He wasn't in custody?

12       A.   That's correct.

13       Q.   When you spoke with him, was he cooperative?

14       A.   Yes.

15       Q.   Did he tell you essentially that he was woken up

16   by his wife, who was frantic that the baby was not

17   responsive earlier that morning?

18       A.   Yes.

19       Q.   And that he had no knowledge of how the baby

20   became ill?

21       A.   Yes.

22       Q.   Is there anything else that he told you that

23   stands out other than what I just said?

1          (Adam Mason - by Mr. Klein)

2     A.   No.

3     Q.   He told you he sprinkled water on the baby's face

4 and 911 was called?

5     A.   Yes.

6     Q.   He did tell you that the child had been sick in

7 terms of having fever and diarrhea for a few days.

8     A.   Yes.

9     Q.   Did you have any familiarity with bacterial

10 infections, either from your own family, your own life

11 experience, or through your training as a police

12 officer?

13     A.   No.

14     Q.   How did you find Adrian's demeanor when you

15 interviewed him at that time, cooperative, was he sad

16 about his child, anything else?

17     A.   He was cooperative, and he appeared to be

18 somewhat sad.  Yes.

19     Q.   Concerned?

20     A.   Yes.

21     Q.   You then went to Albany Med.

22     A.   Yes.

23     Q.   You went there with Detective Fountain?

```
 1              (Adam Mason - by Mr. Klein)

 2      A.   Yes.

 3      Q.   Was Ms. Noel there as well?

 4      A.   I don't recall.

 5      Q.   What happened at Albany Med?

 6      A.   We went there to speak to anyone that may have

 7   had information on the situation regarding M████

 8   T████.   I think I may have spoke to Wilahemina Hicks at

 9   that point in time.

10      Q.   Anything else?

11      A.   Maybe I spoke to a nurse.

12      Q.   You can look at your notes, but according to your

13   notes, you spoke with the charge nurse, Rebecca Peccano.

14           Do you remember her?

15      A.   I don't remember her specifically.

16      Q.   But she told you that the child was injured?

17      A.   Yes.

18      Q.   And that there was blood in the brain.

19           Did she tell you that?

20      A.   Yes.

21      Q.   But you didn't speak to any doctors, apparently,

22   at that time; is that right?

23      A.   I did not speak to a doctor at that time.
```

1                 (Adam Mason - by Mr. Klein)

2    Q.   Did anyone else speak to a doctor?

3    A.   I think Detective Fountain may have spoken to a

4  doctor that evening.

5    Q.   But you're not sure.

6    A.   In reviewing my previous testimony, I thought

7  that's what I had said, that he spoke to Dr. Edge that

8  evening, but I did not.

9    Q.   Then was Dr. Edge at Albany or was he spoken to

10 by phone?

11        Was he a doctor at Samaritan?

12   A.   Well, he was a doctor at Albany Medical Center.

13 And I don't recall where or what -- by what means

14 Detective Fountain spoke to him.

15   Q.   In terms of Wilahemina Hicks, you actually took a

16 deposition from her that night, which is a written

17 statement, correct?

18   A.   A deposition is a written statement.

19        I don't know if I took it or if Detective

20 Fountain took it.

21   Q.   If Detective Fountain took it, does that mean he

22 spoke with her and facilitated either her writing it out

23 and signing it or he wrote it out and had her sign it?

```
 1                    (Adam Mason - by Mr. Klein)

 2       A.  Yes.

 3       Q.  Would you have been present for that or not

 4  necessarily?

 5       A.  I would have likely been present for that.

 6       Q.  We've heard testimony that, during the interview,

 7  CPS walked in, Ms. Noel and her caseworker, Jasper

 8  Estaris.

 9           Do you recall them walking into that interview?

10       A.  I do not.

11       Q.  After you were done they said that they spoke

12  with Ms. Hicks afterwards.

13           But you don't remember CPS being there?

14       A.  I don't.

15       Q.  Do you know who Jasper Estaris is?

16       A.  I remember -- I don't remember him being there on

17  the first day, but I do remember speaking to him -- or I

18  remember him being involved at some point.

19       Q.  Did you know at any point that he had -- that he

20  knew one of Wilahemina Hicks' relatives from college?

21       A.  I did not know that.

22               MR. PERKINS:  Object to the form of the

23           last question.
```

```
 1                   (Adam Mason - by Mr. Klein)

 2              MS. PECK:  Object to the form.

 3  BY MR. KLEIN:

 4     Q.  And then, did anything else happen at Albany Med

 5  that you can recall on the evening of the 21st of

 6  September 2008?

 7     A.  No.

 8     Q.  Then, from there, did you go to the Thomas

 9  household again?

10     A.  Yes.

11     Q.  You went right from the hospital to the Thomas

12  household to speak with Adrian, correct?

13     A.  Yes.

14     Q.  At that point did you make a determination,

15  either before you went to the Thomas household or at the

16  Thomas household -- withdrawn.

17              Was Adrian home when you went there?

18     A.  Yes.

19     Q.  And did you make a determination that you wanted

20  to bring him to the interrogation room at the Troy

21  Police Department?

22     A.  We made a determination that we wanted to

23  interview him in the Troy Police Department.
```

1               (Adam Mason - by Mr. Klein)

2    Q.  What was the reason for doing it there as opposed

3  to in his house?

4    A.  Because we have the capabilities to record audio

5  and video at the Troy Police Department.

6    Q.  And what was the purpose of -- was he a suspect

7  at that point?

8    A.  No.

9    Q.  What was the purpose of recording his interview

10  at that point?

11    A.  Because at that point I had no idea what had

12  happened to M███████.  And if for some reason what

13  happened came out, I wanted to make sure that it was on

14  video and audio recording.

15    Q.  So, is that something that you would typically do

16  in a case involving serious injuries or a fatality,

17  record an interview before you know whether or not there

18  was probable cause or evidence of a crime?

19    A.  Yes.

20    Q.  In testimony yesterday, it was discussion of a

21  guideline that was enacted in May of 2008 that required

22  video recording of interrogations for potential B

23  felonies and greater.

1            (Adam Mason - by Mr. Klein)

2        Are you familiar with that?

3    A.   Yes.

4    Q.   Is that part of the reason why you recorded this

5    interview, or you would have done it no matter what?

6    A.   That played absolutely no role in that decision.

7    Q.   In your report, your DB follow-up, you note that

8    Dr. Edge stated to Detective Fountain, this is a murder.

9    A.   Yes.

10   Q.   Did that create a sense of urgency for you and

11   Detective Fountain to go back to Adrian right away?

12   A.   That statement did not create the sense of

13   urgency.  The fact that we were called in and the fact

14   that M███████ was in the condition that he was in, we

15   were going to stay there and continue to work the case

16   regardless.

17   Q.   When you spoke with Wilahemina Hicks, is it fair

18   to say that she did not indicate to you that she

19   witnessed Adrian Thomas injure M██████ at any time,

20   correct?

21   A.   Yes.

22   Q.   When you went to Adrian's house, he was home

23   alone, correct?

1                    (Adam Mason - by Mr. Klein)

2        A.   Yes.

3        Q.   So you could have interviewed him there had you

4    wanted to, but you wouldn't have had the video

5    capabilities.

6        A.   That's correct.

7        Q.   Was the location of the interview in an

8    interrogation room at the precinct an important factor

9    as well for you to try to get as much information from,

10   at that point, an informant as possible?

11              Did you think he would be more serious with you

12   if he was in a police station as opposed to at his

13   house?

14       A.   I guess that's a typical thought process.

15       Q.   So you took into consideration the setting of the

16   interview, obviously, before bringing him to the

17   precinct.

18       A.   I think that's a common thought process when I'm

19   deciding I want to interview someone, but for this

20   particular incident, I don't know that that was a

21   discussion that Detective Fountain and I had.  I think

22   the more important feature was the audio and the video.

23       Q.   He was cooperative and went with you to

1                    (Adam Mason - by Mr. Klein)

2    headquarters, correct?

3        A.   Yes.

4        Q.   That's when he was brought to the third floor

5    interrogation room?

6        A.   Yes.

7        Q.   That's when you read him his Miranda rights and

8    he signed them in your presence?

9        A.   Yes.

10       Q.   And that's when you and Detective Fountain spoke

11   with him for about two hours and obtained video one,

12   correct?

13       A.   That's correct.

14       Q.   And as well as the first written statement, which

15   was a short written statement, correct?

16       A.   Yes.

17       Q.   That interview ended when he said he was going to

18   jump off a bridge if his son died, correct?

19       A.   Yes.

20       Q.   With that said, the interview continued after he

21   said that for a little bit, but then it was

22   discontinued, correct?

23       A.   So, we had planned to end the interview, and we

Case 1:17-cv-00626-DJS Document 163-4 Filed 10/25/21 Page 100 of 273

1                    (Adam Mason - by Mr. Klein)

2    were prepared to get up and leave when he made the

3    comment about jumping off a bridge if his son were to

4    die.  So, yeah, at that point there was a further

5    discussion.  Yes.

6    Q.  But there was further discussion about -- there

7    were further questions asked about how M█████ may have

8    been injured after he said he felt like he wanted to

9    hurt himself.

10   A.  Yes.

11   Q.  Why did you guys continue to ask questions after

12   he said he needed -- he felt suicidal?

13   A.  The fact that he felt suicidal, I thought maybe

14   there was more that he wanted to talk about.  So we

15   continued the discussion in an attempt to see, number

16   one, why he felt that way and if there was anything else

17   that he wanted to discuss.

18        We were attempting to end the interview when he

19   said that, so it sent a message to us that he wanted to

20   continue to talk about something.

21   Q.  During that interview, did anything he say give

22   you probable cause to arrest him?

23   A.  No.

Case 1:17-cv-00626-DJS Document 163-4 Filed 10/25/21 Page 102 of 273

1        (Adam Mason - by Mr. Klein)

2     Q.  Is it fair to say that anything he said in that

3  interview in terms of -- anything he said in that

4  interview with regard to possible injuries to M███████

5  was not consistent with what you were informed by

6  medical personnel and that Detective Fountain was

7  informed by medical personnel?

8     A.  Yes.

9     Q.  In terms of Adrian Thomas' demeanor, by the time

10  you spoke with him it was after midnight, correct?

11     A.  Yes.

12     Q.  To your knowledge, he had been up since 8:00 that

13  morning when the baby got up to go to the hospital,

14  correct?

15     A.  That's not an accurate statement.  I wasn't with

16  him that entire time.  So, to my knowledge, he could

17  have slept for the four hours.

18     Q.  You don't know either way.

19     A.  I don't know either way.

20     Q.  Did you have a sense of his level of education?

21     A.  I didn't have a -- I didn't know for a fact what

22  his education was, but he appeared that he could carry

23  on a conversation with us, an intelligent conversation.

```
1              (Adam Mason - by Mr. Klein)

2      Q.  Did you know whether he had any learning

3   disabilities or cognitive deficiencies or anything else?

4      A.  I don't know if he did or he didn't.

5      Q.  Did you draw any opinions just from speaking with

6   him that he was slow or had some other -- any other

7   cognitive or other disabilities?

8      A.  I did not draw that opinion.

9      Q.  When he expressed suicidal thoughts, did you feel

10  at that point he was vulnerable, and therefore you kept

11  talking to him because that might lead to further -- to

12  incriminating statements?

13             MR. PERKINS:  Object to the form.

14             You can answer.

15             MS. PECK:  Object to the form.

16             THE WITNESS:  I didn't feel as though

17         he was vulnerable.  I felt as though maybe

18         he sensed the interview was coming to an

19         end, maybe there was something that he

20         wanted to tell us that he wasn't telling us.

21             So, I thought that was an opportunity

22         for us to continue to talk to allow him to

23         get that off his chest if he had something
```

                    (Adam Mason - by Mr. Klein)

 2      else to say.

 3   BY MR. KLEIN:

 4      Q.  Did you discuss the first statement at the grand

 5   jury or just the second statement, if you recall?

 6      A.  I don't recall.

 7      Q.  In your file are the transcripts of the

 8   interviews.

 9          Have you reviewed those in anticipation of

10   today's deposition?

11      A.  I have not.

12      Q.  Did you review them back at the time of the

13   trial?

14      A.  I have reviewed them at some point.

15      Q.  To the best of your knowledge, were they

16   accurate?

17      A.  Yes.

18      Q.  In your file is a supporting deposition dated

19   September 21st, 2008, time 2310 hours, which is

20   11:10 p.m., correct?

21      A.  Yes.

22      Q.  And that was from Wilahemina Hicks, and that was

23   given at Albany Med, correct?

```
 1                    (Adam Mason - by Mr. Klein)

 2       A.   Yes.

 3       Q.   Do you remember her statement?

 4       A.   I don't remember what it says.

 5       Q.   She didn't incriminate Adrian in her statement,

 6   though, generally.

 7            Do you recall that?

 8       A.   I don't -- I recall that she did not.

 9       Q.   Then the next statement in the file is one from

10   Adrian Thomas dated 9/22/08, at 0141 hours, correct?

11       A.   Yes.

12       Q.   And that would be the written statement that

13   arose out of interview one, correct?

14       A.   Yes.

15       Q.   There's a related Miranda page, waiver page,

16   correct?

17       A.   Yes.

18       Q.   So Defendant's Exhibit C from August 20th, 2019,

19   is that the first statement?

20       A.   Yes.

21       Q.   Was that written -- the body of the statement,

22   was that written by Detective Fountain?

23       A.   Yes.
```

```
 1              (Adam Mason - by Mr. Klein)

 2      Q.  It was signed by Adrian Thomas?

 3      A.  Yes.

 4      Q.  Did you sign it as well?

 5      A.  I signed as a witness.  Yes.

 6      Q.  Then Adrian went to Samaritan Hospital after that

 7   interview, correct?

 8      A.  Yes.

 9      Q.  You brought him there as a voluntary admission,

10   correct?

11      A.  Yes.

12      Q.  You then left him at the hospital while he was

13   evaluated, correct?

14      A.  Yes.

15      Q.  What did you do after that?

16      A.  I don't think we did anything else pertaining to

17   this case after that.

18      Q.  You want to look in your notes?

19      A.  You're talking about after or that night?

20      Q.  No.  Well, you took him there in the morning of

21   September 22nd.

22          Did you then go home for the evening after that?

23      A.  Yes.  I believe we did as that point.
```

**APPENDIX** **2256**

```
 1                  (Adam Mason - by Mr. Klein)

 2      Q.  And then did you come back to work on the 22nd?

 3      A.  Yes.

 4      Q.  And then what did you do?

 5      A.  On the 22nd, I went to Samaritan Hospital and

 6  spoke to the doctor there, I believe.  I went to Albany

 7  Medical Center and spoke to the doctor there.

 8          And then ultimately, in the afternoon on the

 9  22nd, I went back to Samaritan Hospital and spoke to

10  Adrian Thomas again.

11      Q.  You had arranged with the hospital staff for them

12  to notify you when he was ready to be discharged,

13  correct?

14      A.  Yes.

15      Q.  You got a phone call and you went there, and you

16  were there to meet him when he was walking out.

17      A.  Yes.

18      Q.  From there, you brought him right back to the

19  headquarters, correct?

20      A.  Yes.

21      Q.  That's when you conducted -- you took him right

22  to the third floor interrogation room, Mirandized him,

23  and then started interview two, correct.
```

Case 1:17-cv-00626-DDS Document 123-4 Filed 10/25/21 Page 1088 of 273

1                    (Adam Mason - by Mr. Klein)

2       A.  Yes.

3       Q.  What's been marked as Defendant's Exhibit B on

4   August 20th, 2019, is this the ten-page statement that

5   arose out of interview two?

6       A.  Yes.

7       Q.  We'll get into the conduct of the interview in a

8   little bit, but in terms of after the interview was

9   completed, you then placed him under arrest, correct?

10      A.  Yes.

11      Q.  That was into the early morning of

12  September 23rd, correct?

13      A.  Yes.

14      Q.  Did you then go home or did you book him?

15          Were you involved in the arrest processing

16  through the early morning hours of the 23rd?

17      A.  I was involved in the arrest process.

18      Q.  What did that entail?

19      A.  That entailed getting his pedigree information

20  into the computer for an arrest sheet and fingerprint,

21  photograph, and securing property, and putting him in

22  the holding cell.

23      Q.  Did you do that alone or were you assisted by

Case 1:17-cv-00626-DJS Document 73-4 Filed 10/25/21 Page 108 of 273

1              (Adam Mason - by Mr. Klein)

2   anyone?

3      A.  I don't recall.  I was likely assisted by

4   someone.

5      Q.  When you walked out of that interrogation room,

6   where did you go with Adrian?

7         Did you bring him to your office or to the squad

8   office?

9      A.  My office at that time was on the second floor.

10  The interview room was on the third floor.  So, I went

11  to my office where my computer was to enter the pedigree

12  information and get the arrest sheet completed in that

13  office.

14     Q.  Was he handcuffed at that time?

15     A.  I don't recall.  I don't believe so.

16     Q.  When do you -- do you recall when he was

17  handcuffed?

18     A.  I don't know if I handcuffed him at all.

19     Q.  Was there a point in time where you said to

20  Adrian, either in these exact words or in sum and

21  substance, Adrian, you're now under arrest?

22     A.  Yes.

23     Q.  Was that in your office or at some other time?

Case 1:17-cv-00626-DLC Document 163-4 Filed 10/25/21 Page 108 of 273

1            (Adam Mason - by Mr. Klein)

2    A.  I don't recall where it was.

3    Q.  While you were getting pedigree from him, do you

4 know if you informed him of the fact that he was under

5 arrest, or did you say, I just need to get some

6 information from you?

7    A.  Well, at the point where I was getting the

8 pedigree information and completing the arrest sheet on

9 my computer, he was informed that he was under arrest.

10    Q.  And what was his reaction, if any, to that?

11    A.  I don't recall any significant reaction.

12    Q.  Did you have a colleague or colleagues with you

13 to assist you, whether for security or for any other

14 reason, while you were getting this information from

15 him?

16    A.  I know that, during the course of the interview,

17 Sergeant Colaneri was next door monitoring the

18 interview.  So, I don't specifically recall him being

19 there during the booking process, but I don't believe he

20 would have just left at that point in time.  I believe

21 he would have stayed with me and saw that through.

22    Q.  Before placing Adrian under arrest, did you have

23 to get approval or authorization from your captain, or

```
 1                    (Adam Mason - by Mr. Klein)

 2    was it your own independent determination to place him

 3    under arrest?

 4        A.   It was a determination that was made by myself

 5    and Sergeant Colaneri jointly.

 6        Q.   From looking at the video, it basically comes to

 7    an end, and Adrian is escorted out of the room.

 8             Is that fair to say?

 9        A.   Yes.

10        Q.   Is there a point in time where you and Colaneri

11    have a discussion where that determination is jointly

12    made to place Adrian under arrest?

13        A.   Yes.  Up until the point where the incriminating

14    statements were made by Adrian Thomas, I had no

15    intention of arresting him.  And when we completed --

16    because the statement was done in two parts, so it was

17    six pages.  And then, when the last four pages were

18    done, while he was reviewing those last four pages, I

19    left and went into the room next door where Sergeant

20    Colaneri was monitoring the interview.

21             And in sum and substance, my words to him were,

22    do I have to arrest him now?  Because that was not my

23    intention throughout that entire interview, to arrest
```

Case 1:17-cv-00626-DJS   Document 68-24   Filed 10/25/21   Page 117 of 273

```
 1                  (Adam Mason - by Mr. Klein)

 2    him.  And he looked at me, and he said, yeah, you have

 3    to.

 4         I knew I had to once he said that.  I didn't know

 5    that it was going to come to that.  And so, that was the

 6    conversation him and I had.

 7         Q.  Do you recall that Sergeant Colaneri made one

 8    appearance during the interview two where he started by

 9    saying he was in the Corps and then introduced the

10    concept of Adrian slamming M████ to the ground?

11         A.  Yes.

12         Q.  Was that conversation with Sergeant Colaneri

13    about, do I have to arrest him now, after Sergeant

14    Colaneri came into the room?

15         A.  Yes.

16         Q.  So, prior to Sergeant Colaneri coming in, did you

17    already have the six-page statement, six pages out of

18    the ten, approximately?

19         A.  I don't recall.

20         Q.  But you had a partial statement before Sergeant

21    Colaneri came in?

22         A.  I don't recall if he came in in between the two

23    statements or if -- I don't recall exactly which point
```

```
 1                    (Adam Mason - by Mr. Klein)

 2     that was.

 3        Q.  But is it your testimony that Adrian didn't make

 4     incriminating statements until after Sergeant Colaneri

 5     said what he said in the room and then left?

 6                    MR. PERKINS:  Object to the form.

 7                    You can answer.

 8                    THE WITNESS:  I think, in the first six

 9            and a half pages, if Sergeant Colaneri came

10            in after that, I don't know that -- I don't

11            know -- I don't know if there were

12            incriminating statements made in those first

13            six and a half pages or not.

14                I guess it would have been -- if it

15            ended there, those actions would have had to

16            have been further investigated to determine

17            if there was a criminal act committed there.

18     BY MR. KLEIN:

19        Q.  Well, my question is -- I think you said that up

20     until the time that Colaneri came in you didn't have

21     probable cause.

22                Is that right in your mind?

23        A.  Up until the time -- no.  That's not what I said.
```

```
 1                  (Adam Mason - by Mr. Klein)
 2          What I said was, up until the time, the
 3     conversation between Adrian Thomas and myself where he
 4     told me that he slammed M█████ on the bed three times,
 5     that's when I knew probable cause had been established.
 6     And that's when I knew that things had taken a turn.
 7       Q.  But those statements weren't made until after
 8     Colaneri introduced the concept of M█████ being
 9     slammed; is that right?
10                  MR. PERKINS:  Object to the form.
11                  You can answer.
12                  THE WITNESS:  That is correct.  It
13          occurred afterwards.
14     BY MR. KLEIN:
15       Q.  I'm just trying to understand generally in the
16     temporal time frame of the interview.
17          It was after Colaneri came in and introduced the
18     concept of M█████ being slammed that you spoke with
19     Adrian further and then spoke with Colaneri and said,
20     now I have to arrest him; is that right?
21       A.  Yes.
22       Q.  Prior to Colaneri coming in you didn't think you
23     were going to arrest him.
```

1        (Adam Mason - by Mr. Klein)

2    A.   Prior to him coming in I didn't think I was going

3    to arrest him.   That's correct.

4    Q.   Is the reason because, prior to Colaneri coming

5    in, the concept of M█████ being slammed had not been

6    uttered or discussed by Adrian up to that point?

7              MR. PERKINS:  Object to the form.

8              You can answer.

9              THE WITNESS:  The reason is because

10         Adrian hadn't told me that he slammed

11         M█████ on the bed three times prior to

12         that.

13   BY MR. KLEIN:

14   Q.   Would you agree that it was Sergeant Colaneri and

15   yourself who jointly introduced the concept of M█████

16   being slammed into the conversation?

17              MR. PERKINS:  Object to the form.

18              Go ahead.

19              THE WITNESS:  Yes.

20   BY MR. KLEIN:

21   Q.   Once Sergeant Colaneri first and then you

22   introduced that concept of M█████ being slammed, that's

23   when Adrian made statements about slamming M█████,

```
 1              (Adam Mason - by Mr. Klein)

 2  correct?

 3     A.  He made comments about slamming M█████ after

 4  that was introduced to him by myself and Sergeant

 5  Colaneri.  Yes.

 6     Q.  Correct.

 7         And he did other things after they were

 8  introduced by yourself as well, like the slamming of the

 9  folder, correct?

10     A.  There were other things that he did that were

11  introduced by myself, and there were things that he

12  stated that were not introduced by myself, as well.

13     Q.  Right.

14         The slamming of the folder as a demonstration was

15  introduced by yourself?

16     A.  Yes.

17     Q.  After Adrian admitted -- I think you said it was

18  three instances of slamming or four?

19     A.  Three.

20     Q.  That's when you then sat down and wrote the

21  remaining balance of the second part of the interview,

22  which is about four pages?

23     A.  That's correct.
```

Case 1:17-cv-00626-DJS Document 173-4 Filed 10/25/21 Page 178 of 273

1                    (Adam Mason - by Mr. Klein)

2      Q.   Once that was done, that's when he was placed

3    under arrest.

4      A.   Yes.

5      Q.   I'll get more into the interview, but I want to

6    get through your investigation on a macro level.

7            So, he goes to your office so you can take

8    pedigree and book him, correct?

9      A.   Yes.

10     Q.   Where does he go after that?

11     A.   Then we went down to the first floor, in the

12   back, where the detention area is.

13     Q.   He was lodged in a cell.

14     A.   Yes.

15     Q.   He was searched, presumably.

16     A.   Likely.

17     Q.   Did you confirm during that process that he had

18   no prior criminal record or history?

19     A.   We would have done a criminal history during the

20   booking process.

21     Q.   Do you recall that he had no history?

22     A.   I don't recall any criminal history.

23     Q.   And what else happened in terms of the booking

Case 1:17-cv-00626-DDS Document 162-34 Filed 10/25/21 Page 118 of 273

```
1              (Adam Mason - by Mr. Klein)

2    process, if anything?

3        A.  Fingerprinting, photographing.

4        Q.  You were involved with that?

5        A.  Yes.

6        Q.  Then what happened next?

7        A.  Then he would have been ultimately placed in a

8    cell.

9        Q.  Then, from there, what did you do?

10           This is already on the 23rd, right?

11       A.  Yes.

12       Q.  What happened next?

13       A.  After he was placed in a cell on that evening, I

14   don't recall what else I did.

15       Q.  Is that when you would have prepared the criminal

16   court information or complaint?

17       A.  Yes.

18       Q.  That was for attempted murder?

19       A.  Yes.

20       Q.  Did you do that in consultation with a DA or

21   ADAs, or would you have done that in the office first

22   and then forwarded it to them for review?

23       A.  After he was placed in a cell, I would have went
```

```
 1              (Adam Mason - by Mr. Klein)
 2   back to my office and typed that up.
 3      Q.   What else would you have typed up, or what else
 4   did you type up in this case or otherwise prepare
 5   related to the arrest, the arrest report?
 6      A.   Yup.
 7      Q.   What else?
 8      A.   Accusatory instrument.
 9           And I would have made photocopies of the
10   statement and attached that to go to court in the
11   morning.
12      Q.   Would that have been both statements or just the
13   second statement?
14      A.   The full ten pages.
15      Q.   In terms of statement one, which is Defendant's
16   Exhibit C, is it fair to say that one was not
17   incriminating or useful to you in terms of charging him
18   with attempted murder?
19      A.   That would not have been something that I
20   attached to the paperwork.
21      Q.   The basis of you charging him was what was said
22   in the second half of the interview, as we said earlier,
23   after Colaneri introduced the concept of slamming,
```

1                    (Adam Mason - by Mr. Klein)

2    correct?

3        A.  Yes.

4        Q.  Which is the last approximately four pages of the

5    written statement.

6        A.  Yes.

7        Q.  And once you prepared the criminal court

8    information, arrest report, and got the paperwork

9    together, what did you do next?

10            Would you have called the DA's office or...

11       A.  No.

12       Q.  What happened next?

13       A.  I believe at that point in time I would have went

14   home for the evening.

15       Q.  Would you have transmitted the paperwork to

16   anyone?

17            Like, did it follow Adrian through the -- in

18   other words, was Adrian on his way to the criminal court

19   at some point to be arraigned?

20       A.  Yeah.  The following morning he would have went

21   to Troy police court for arraignment, and the paperwork

22   would have went from the police department over there

23   with him.

(Adam Mason - by Mr. Klein)

1

2    Q.  Did you go to court the next morning for the

3    arraignment?

4    A.  No.

5    Q.  On the 23rd, which is the day that you processed

6    his arrest, the police department issued a press

7    release.

8        Do you recall that?

9    A.  Yes.

10   Q.  Whose determination was it to issue a press

11   clipping?

12   A.  I believe the press release was issued by Deputy

13   Chief McAvoy and it would have been his determination to

14   do that.

15   Q.  So at some point, though -- how did he become

16   aware of this?

17       At some point did you speak with him or did your

18   captain?

19   A.  I believe when I came into work the next morning

20   I would have spoke to my captain about it, and word

21   would have made its way to the chief.

22   Q.  Are press releases issued in all cases, or was

23   this for some reason high profile or...

Case 1:17-cv-00626-DdSm Document 163-34 Filed 10/25/21 Page 357 of 273

```
 1              (Adam Mason - by Mr. Klein)

 2    A.  They're not issued in all cases.

 3    Q.  What was the reason for it to be issued in this

 4  case?

 5              MR. PERKINS:  Object to the form.

 6              You can answer, if you know.

 7              MR. KLEIN:  If you know.

 8              THE WITNESS:  I wasn't involved in the

 9         decision for a press release.

10  BY MR. KLEIN:

11    Q.  Well, I mean, it was attempted murder of an

12  infant.

13         I mean, was this a case of public concern, or was

14  there some reason that you -- in your experience, where

15  the department would issue a press release?

16              MR. PERKINS:  Object to the form.

17              You can answer.

18              THE WITNESS:  So while I was not

19         involved in the decision nor counseled about

20         the press release, if I had to guess, I

21         would say because there was an infant that

22         was murdered, that that was something that

23         the chief thought was worthy of a press
```

Case 1:17-cv-00626-DJS Document 163-4 Filed 10/25/21 Page 128 of 273

```
 1              (Adam Mason - by Mr. Klein)

 2         release.

 3    BY MR. KLEIN:

 4      Q.   That was dated September 23rd, which is the same

 5    day that you processed Adrian Thomas' arrest, correct?

 6      A.   Yes.

 7      Q.   Do you know if he was arraigned in Troy City

 8    Court on the 23rd, or was that on the 24th?

 9      A.   I believe he would have been arraigned on the

10    23rd.

11      Q.   You didn't go to court that day for the

12    arraignment?

13      A.   No.

14      Q.   At some point prior to Adrian going to court, did

15    you or anyone at your office speak with the prosecutors,

16    or does he get arraigned based on police documents

17    submitted to the court?

18      A.   He does get arraigned based on the documents

19    submitted to the court, but I don't recall specifically

20    meeting with someone that day, but I imagine that I

21    probably did meet with someone from the DA's office on

22    that day to talk about the case.

23      Q.   And then what was your next steps in the
```

Case 1:17-cv-00626-DJS Document 83-4 Filed 10/25/21 Page 124 of 273

1                    (Adam Mason - by Mr. Klein)

2    investigation?

3        A.   After he was already arrested?

4        Q.   Correct.

5        A.   At some point I know I spoke to Wilahemina Hicks

6    again.

7        Q.   You obtained a second supporting deposition from

8    her, correct?

9        A.   Yes.

10       Q.   What was the purpose of the second meeting with

11   her?

12       A.   Just to continue to follow up on the case and be

13   thorough.

14       Q.   Did she incriminate Adrian in that second

15   statement?

16       A.   I don't believe so.

17       Q.   Was she cooperative, or how would you describe

18   her demeanor in your dealings with her during the first

19   and second interview?

20       A.   She was cooperative.

21       Q.   Was she concerned for Adrian, or did you have

22   any -- did you draw any opinion about her concern for

23   Adrian or lack thereof?

```
 1              (Adam Mason - by Mr. Klein)

 2      A.   I didn't draw an opinion either way.

 3      Q.   On the 23rd, do you recall becoming aware that

 4    Adrian was arraigned and remanded to the county jail?

 5      A.   Yes.

 6      Q.   You would have been following it to make sure

 7    that the arraignment went smoothly, correct?

 8      A.   I don't know that I followed it, but that's

 9    typically what happens.  And I think if something other

10    than that happened I would have known about it.  So I

11    think I just knew that was the process and that's what

12    was going to happen.

13      Q.   Once that happened, it looks like, pursuant to

14    your notes, that you spoke with Nicole Noel from CPS on

15    the 23rd?

16      A.   Yes.

17      Q.   So, after the interview was over early in the

18    morning of the 23rd, you then did the paperwork

19    throughout that morning?

20      A.   Yes.

21      Q.   In the early morning hours?

22      A.   Yes.

23      Q.   Did you then leave to go home and come back later
```

1              (Adam Mason - by Mr. Klein)

2    that day, or did you remain at the office all through

3    the 23rd?

4        A.  I would have left to go home and then came back

5    some point in the morning.

6        Q.  So, if your notes say 9/23/08 but no time that

7    you spoke with Nicole Noel, it would have been after you

8    came back after going home after the arrest process.

9        A.  Yes.

10       Q.  Do you remember speaking with Nicole Noel that

11   day on the 23rd?

12       A.  I don't remember what the context of the

13   conversation was.

14       Q.  Your notes say that she informed you that there

15   was a skeletal exam and ████████ had old rib fractures.

16           Do you recall that?

17       A.  Yes.

18       Q.  And information about that.

19           You also spoke to Dr. Edge.  Do you know if that

20   was in person or by phone?

21       A.  I never spoke to Dr. Edge by phone, so if I spoke

22   to him, it would have been in person.

23       Q.  He told you that the baby was brain dead that

```
 1                    (Adam Mason - by Mr. Klein)

 2    day, correct?

 3        A.  Yes.

 4        Q.  Then that's when Wilahemina Hicks gave consent to

 5    donate M██████'s organs that day, and you noted that in

 6    your report.

 7        A.  Yes.

 8        Q.  Then you spoke with Wilahemina and the

 9    grandmother, ████, correct?

10        A.  Yes.

11        Q.  Would that have been in person?

12        A.  Yes.

13        Q.  It says at 2:07 p.m. you deposed Wilahemina.

14            That meant you took a statement from her.

15        A.  Yes.

16        Q.  Where did you do that?

17        A.  I don't recall.

18        Q.  We'll call that Wilahemina's second statement,

19    right?

20        A.  Yes.

21        Q.  The first one was at Albany Med on the night of

22    the 21st.

23        A.  Yes.
```

```
 1                  (Adam Mason - by Mr. Klein)

 2      Q.   Then you then returned to CS.

 3           What is CS?

 4      A.   Central station.

 5      Q.   That's when you prepared a search warrant,

 6   correct?

 7      A.   Yes.

 8      Q.   Then, at 8:45 p.m., it says, "investigating

 9   officers and ET"?

10      A.   Evidence technician.

11      Q.   D. Marble executed the search warrant and seized

12   the mattress, box springs, and bedding.

13           So you were there for the search warrant?

14      A.   That's the second search warrant?

15      Q.   Well, it was at 8:45 p.m.  It doesn't say --

16      A.   I believe I was there for that one.

17      Q.   So that's all your notes say about the 23rd, in

18   sum and substance.

19           Do you agree with that?

20      A.   Yes.

21      Q.   So, do you record everything you do and everyone

22   you speak with in a particular day in your notes, or

23   just the highlights?
```

```
 1                  (Adam Mason - by Mr. Klein)

 2       A.   Just the highlights.

 3       Q.   So, on that date, do you recall having an

 4   in-person meeting with CPS worker Nicole Noel?

 5       A.   I do not.

 6       Q.   You've heard the term "multidisciplinary team"?

 7       A.   No.

 8       Q.   Have you ever?

 9            Well, were you working cooperatively with CPS in

10   this investigation?

11       A.   Yes.

12       Q.   Whatever information you obtained you were

13   willing to share with them to the extent that you were

14   able to from a law enforcement perspective, correct?

15       A.   Yes.

16       Q.   And vice versa.  Your understanding was that,

17   subject to state laws, that they would share their

18   investigation with you, correct?

19       A.   Yes.

20       Q.   They weren't an arm of the Troy PD, but you did

21   work in cooperation with them, correct?

22       A.   Yes.

23                  (Discussion held off the record.)
```

```
 1                    (CONFIDENTIAL)
 2          MR. KLEIN:  I'm going to ask you about
 3       what's been marked as Thomas 8 on
 4       September 11th, 2019.
 5          For the record, the parties agree that
 6       this document and questions about it will be
 7       marked confidential on the record.  So
 8       starting now, if we can mark confidential,
 9       or if the reporter prefers, the parties can
10       review the transcript and let me know after
11       the fact.
12          MS. PECK:  I'd like if we mark it in
13       the record now.
14
15          (THE FOLLOWING PORTION OF THE
16       TRANSCRIPT IS MARKED AS CONFIDENTIAL UNTIL
17       OTHERWISE NOTED:)
18
19  BY MR. KLEIN:
20    Q.  So, I'm showing you Thomas A, and these, I'll
21  represent to you, are progress notes from CPS's case
22  management system.
23    A.  Okay.
```

1                        (CONFIDENTIAL)

2      Q.  On that date, there are two notes by Nicole Noel.

3  One regards a phone contact and one regards an office

4  meeting.

5         Take a look at the progress notes, particularly

6  the narratives for each one, and when you're done let me

7  know so I can ask you some questions about that.

8      A.  (Witness complies.)

9      Q.  Okay?

10      A.  Yup.

11      Q.  So, in addition to speaking with Nicole Noel and

12  getting information from her as reflected in your DB

13  follow-ups, according to Nicole Noel's notes, she

14  reports that you informed her that Adrian was arrested

15  earlier that morning for attempted murder.

16      A.  Yes.

17      Q.  And you informed her that Adrian admitted to

18  slamming M███████ down on the bed from a standing

19  position on three separate occasions, on 9/17/08,

20  9/18/08, and 9/20/08, and hitting M███████'s head on the

21  side of the crib railing while throwing him in the crib

22  on 9/20/08, correct?

23      A.  Yes.

Case 1:17-cv-00626-DJS Document 63-4 Filed 10/25/21 Page 132 of 273

1                    (CONFIDENTIAL)

2     Q.   Is it fair to say that those are the three dates

3  or four events that Adrian described after the idea of

4  slamming was introduced by Sergeant Colaneri and

5  yourself?

6                MR. PERKINS:  Object to the form.

7                You can answer.

8                THE WITNESS:  Yes.

9  BY MR. KLEIN:

10    Q.   So, you didn't actually note everything that was

11  said in the conversation, but even though it's not in

12  your report do you agree that you more likely than not

13  told her that information that day?

14    A.   Yes.

15    Q.   Do you remember anything else you told her about

16  the case, or is that generally what you told her?

17    A.   I don't recall if I told her anything else.

18    Q.   Those were the high points of your interview that

19  lead to the arrest, correct?

20    A.   Yes.

21    Q.   Then the bottom progress note on Thomas 8

22  reflects an in-person meeting with you, correct?

23    A.   Correct.

(CONFIDENTIAL)

Q.  So it doesn't say that specifically in your follow-ups, but do you have any reason -- do you recall that there was an in-person meeting or have any reason to doubt it?

A.  I don't recall that there was, but I have no reason to doubt it, either.

Q.  She said that you gave her the arrest report for Adrian Thomas, his statement, Wilahemina's statement, Dr. Edge's (attending physician) statement, and M██████'s medical records from Albany Medical Center and Samaritan Hospital.

Is that something you likely would have done?

A.  Yes.

Q.  That's pursuant to your cooperation with CPS as co-investigatory agencies in this matter, correct?

A.  Yes.

Q.  And she also notes that you reported that you did not currently plan to arrest Wilahemina for anything, correct?

A.  Yes.

Q.  Was it still something that was an open possibility, depending on how things progressed in the

Case 1:17-cv-00626-DJS Document 163-4 Filed 10/25/21 Page 134 of 273

```
 1                    (CONFIDENTIAL)

 2   investigation, that she might be arrested, or was she

 3   not a suspect?

 4       A.   I hadn't considered it either way.  I didn't make

 5   a final decision either way.

 6       Q.   So, would you give police paperwork, any written

 7   statements like you obtained in this case, and medical

 8   records and information like this to CPS in the regular

 9   course in an investigation like this where there's

10   parallel investigations?

11       A.   You're asking me if I would do what this says I

12   did?

13       Q.   Yeah.

14       A.   I believe that that's possible that I did that.

15       Q.   I'm saying:  Is this something that you've done

16   in other cases as well?

17       A.   I don't specifically recall, but in a similar

18   situation I may have done a similar thing.

19       Q.   Do you know if she came to your office to get

20   this -- to pick up the documents or whether you went to

21   her office or met her someplace?

22       A.   I don't recall how it happened, but I don't think

23   that I would have said, hey, do you want this?  She
```

Case 1:17-cv-00626-DJS Document 163-4 Filed 10/25/21 Page 1358 of 273

```
 1                 (Adam Mason - by Mr. Klein)

 2    probably requested it for the CPS investigation and I

 3    agreed to give it to her.

 4                 MR. KLEIN:  We can go back off

 5           confidential into the regular record.

 6

 7                 (ENDING THE CONFIDENTIAL PORTION OF THE

 8           TRANSCRIPT)

 9

10    BY MR. KLEIN:

11       Q.  Do you recall anything else you did or anyone

12    else you spoke with on 9/23/08 other than what we've

13    discussed so far?

14       A.  I do not.

15       Q.  Directing your attending to the 24th.

16           Your records indicate that the organ donation

17    procedure took place in the early morning hours, right?

18       A.  Yes.

19       Q.  Did you attend that?

20       A.  No.

21       Q.  You just were informed of it and noted it in your

22    report?

23       A.  Yes.
```

1                    (Adam Mason - by Mr. Klein)

2     Q.   Around 11:00 a.m., you along with Detective

3  Centanni, went to the victim's residence to meet with

4  Wilahemina Hicks, right?

5     A.   Yes.

6     Q.   And it says, "no additional information was

7  obtained."

8          What happened specifically, if you know?

9     A.   I don't recall.

10     Q.   Then it says, "Nicole Noel CPS was also present

11  at the residence.  She advised that complete skeletal

12  exams were ordered for all the children and CT scans

13  were scheduled for Israel, Isaiah, and Adrian, Jr."

14          Do you recall Nicole Noel being there?

15     A.   I don't.

16     Q.   On the morning of September 24th, 2008, is it

17  your understanding that Adrian Thomas was in the custody

18  of the Rensselaer County jail?

19     A.   Yes.

20     Q.   Did you know, through Nicole Noel or any other

21  source, that CPS -- the CPS caseworker Jasper Estaris,

22  or just generally that CPS caseworkers were going to

23  speak with him in the jail that morning?

```
 1                 (Adam Mason - by Mr. Klein)

 2     A.   I never knew that was going to happen.

 3     Q.   Did you come to learn that it happened?

 4     A.   I did.

 5     Q.   When did you come to learn that?

 6     A.   I was at a -- Detective Fountain regularly

 7  attended child fatality meetings.  And I was invited to

 8  attend a child fatality meeting because of my role in

 9  this case.  And he was there.

10       That's the first time that I remember meeting

11  him, and that's the first time I remember hearing that

12  he went and interviewed Adrian Thomas, and that Adrian

13  had told him an account similar to what he told me about

14  what happened with M████.

15     Q.   What was your reaction when he told you that?

16       Were you surprised that they went in to speak

17  with someone who was arraigned and represented by

18  counsel, or did you have any other response or reaction?

19             MS. PECK:  Object to the form.

20             MR. PERKINS:  Object to the form.

21             You can answer.

22             THE WITNESS:  I don't know that I was

23         surprised, but I wasn't -- I didn't know
```

```
 1              (Adam Mason - by Mr. Klein)

 2          that that was happening.  So I guess it was

 3          something unexpected but not like, wow.

 4  BY MR. KLEIN:

 5      Q.  At this child fatality meeting, did Jasper

 6  introduce himself to you informally to tell you, by the

 7  way, I spoke with him and got this statement, or was it

 8  somehow introduced during the formal meeting?

 9      A.  It was introduced during the meeting.

10      Q.  And that's the meeting -- is that the meeting

11  reflected in your follow-up that took place on 11/05/08?

12      A.  I believe I attended two of those meetings.  So I

13  don't know if there was one in October.  I think -- did

14  I document that I attended two of those meetings?

15      Q.  I'll double-check.  We're going to take it

16  sequentially and we'll get to the meeting.

17          But I guess, just in terms of when he told you

18  that or when he -- he didn't tell just you that.  He

19  told the participants at the meeting that that happened?

20      A.  That's correct.

21      Q.  When he announced that, what, if anything else,

22  did you learn about it?

23          Did you obtain any copies of any notes from the
```

Case 1:17-cv-00626-DJS Document 163-4 Filed 10/25/21 Page 1398 of 273

1          (Adam Mason - by Mr. Klein)

2   meeting or any written statements by Jasper Estaris or

3   anyone else from CPS about that meeting?

4       A.  I did not.

5       Q.  You just were informed of it and took it in.

6       A.  Yes.

7       Q.  Do you know or did you ever come to learn whether

8   Jasper Estaris worked off of the written statement that

9   you gave to Nicole Noel on September 23rd during his

10  interview with Adrian Thomas on September 24th?

11      A.  I have no idea.

12      Q.  Did you know that, on September 24th, 2008, when

13  Adrian Thomas had been arraigned and was in the jail,

14  that he could not be interviewed without counsel

15  present, had you wanted to interview him?

16              MR. PERKINS:  Objection.

17              You can answer, though.

18              MS. PECK:  Objection to form.

19              THE WITNESS:  Yes.

20  BY MR. KLEIN:

21      Q.  Had you been made aware by CPS that they were

22  going to interview him in the jail at that time after

23  his arraignment, would you have had any response to

```
 1                    (Adam Mason - by Mr. Klein)

 2    that, or would you -- is it their decision to do what

 3    they want to do?

 4                    MS. PECK:  Object to form.

 5                    MR. PERKINS:  Objection to form.

 6                    You can answer.

 7                    THE WITNESS:  I honestly don't know.  I

 8             know that I would not have interviewed him

 9             at that point in time with the counsel

10             attached.

11    BY MR. KLEIN:

12       Q.  Well, based on your training and experience, what

13    was your determination about the propriety of what they

14    did?

15                    MR. PERKINS:  Objection.

16                    MS. PECK:  Objection.

17                    MS. CALABRESE:  Objection.

18    BY MR. KLEIN:

19       Q.  Were you aware of any problem with it or did you

20    think it was okay or you didn't know?

21                    MS. PECK:  Objection.

22                    MR. PERKINS:  Objection to the form.

23                    You can answer, if you can.
```

Case 1:17-cv-00626-DDD-JPM Document 183-4 Filed 10/25/21 Page 1488 of 273

```
 1              (Adam Mason - by Mr. Klein)

 2              THE WITNESS:  Well, I would see that

 3         their investigation was not necessarily

 4         criminal in nature.  So, them interviewing

 5         him, I would assume there would be different

 6         rules that apply.

 7    BY MR. KLEIN:

 8       Q.  You're not aware of them, though, are you?

 9       A.  I'm not.

10       Q.  Other than hearing Jasper relay the interview

11    during the child fatality meeting that you described,

12    did you ever discuss or hear him discuss his interview

13    with Adrian at any other time?

14       A.  No.

15       Q.  Did you ever ask CPS for a copy of their work

16    product from that meeting for your file?

17       A.  No.

18       Q.  In the file we have it doesn't appear to be part

19    of it, correct?

20       A.  Correct.

21       Q.  Did you ever see any of the work product from

22    that meeting?

23       A.  No.
```

Case 1:17-cv-00626-DJS Document 163-34 Filed 10/25/21 Page 142 of 273

1                    (Adam Mason - by Mr. Klein)

2     Q.  Was there a particular reason why it wasn't

3  requested?

4     A.  I have no reason why.

5     Q.  Like, in other words, after Adrian Thomas was

6  arraigned -- indicted and arraigned, you continued to

7  obtain documents that would be added to the file, like

8  the autopsy report, correct?

9     A.  Yes.

10    Q.  That was months later, correct?

11    A.  Yes.

12    Q.  So, was there any particular reason why the work

13  product of CPS was not shared with you?

14        Did they tell you you couldn't have it, or did

15  you just never ask?

16    A.  I didn't ask for it and I have no reason why I

17  didn't ask for it.

18    Q.  Who else was present at that child fatality

19  meeting that you can recall, other than Fountain?

20    A.  I don't recall who else was there.

21    Q.  Were any representatives from the district

22  attorney's office present?

23    A.  I don't recall.

```
 1              (Adam Mason - by Mr. Klein)

 2     Q.   CPS would have been there.

 3     A.   Yes.

 4     Q.   Other than Mr. Estaris, do you recall who else

 5   from CPS was there?

 6     A.   I do not.

 7     Q.   Was Ms. Noel there?

 8     A.   I don't recall.

 9     Q.   So, you don't recall meeting with Nicole Noel to

10   give her the statement on the 23rd?

11     A.   I don't recall that meeting.

12     Q.   So you don't recall whether Jasper Estaris was

13   present or anyone else with her when you transmitted the

14   documents?

15     A.   I do not.

16     Q.   You certainly don't know who she shared it with,

17   do you?

18     A.   I do not.

19     Q.   Did you ever make copies of the disks of the

20   video statements one and two for CPS?

21               MR. PERKINS:  Object to the form.

22               I don't understand the question.  Can

23        you just help me out?  Disks taken by who?
```

```
1                    (Adam Mason - by Mr. Klein)

2               MS. PECK:  Yeah.  I think we just

3          identified disks one and two.

4               MR. KLEIN:  Well, we did.  We're

5          referring to interview one as interview one.

6               MR. PERKINS:  I understand the

7          question.  Got it.

8               THE WITNESS:  I understand.

9               I don't recall ever making copies of

10         the disks for CPS.

11  BY MR. KLEIN:

12     Q.  And in your report, your follow-up, you refer to

13  burning copies of disks, correct?

14     A.  Yes.

15     Q.  So on the 24th, other than what we've said, you

16  obtained the 911 call and you copied the disks for the

17  DA's office, correct?

18     A.  Yes.

19     Q.  Then do you recall anything else that transpired

20  on the 24th?

21     A.  I do not.

22     Q.  Then on the 25th was the autopsy, correct?

23     A.  Yes.
```

Case 1:17-cv-00626-DJS Document 163-34 Filed 10/25/21 Page 1458 of 273

1           (Adam Mason - by Mr. Klein)

2      Q.  So, can you walk us through the autopsy and what,

3  if any, role you had at the autopsy?

4      A.  I don't specifically remember.

5      Q.  How many autopsies have you been to in your

6  career?

7      A.  A few.

8      Q.  As of September 25th, 2008, was this the first or

9  had you been to some before?

10     A.  I had been to some before.

11     Q.  What do you recall about this autopsy, if

12  anything, in terms of any discussions with Sikirica,

13  district attorney's office, or anyone else?

14     A.  I don't recall anything specific to this

15  particular autopsy.

16          In general, autopsies that I've attended, I

17  recall the process and how it would have gone, and that

18  people attending would stand there while Dr. Sikirica

19  performs the autopsy.  There wasn't a lot of discussion,

20  typically, in the autopsies that I've attended.  I don't

21  recall anything specific about this one.

22     Q.  In terms of the process of these autopsies, was

23  there any type of pre-autopsy briefing or meeting

Case 1:17-cv-00626-DJS Document 163-34 Filed 10/25/21 Page 146 of 273

```
 1                    (Adam Mason - by Mr. Klein)

 2    amongst the members, or just even you and Sikirica

 3    alone, where you would share any paperwork, the

 4    interviews, results, or anything else?

 5       A.  No meetings that I attended with anyone regarding

 6    that autopsy.

 7       Q.  He did have paperwork from the police department

 8    in his file.

 9           Would you have given that to him?

10       A.  So, I may have brought that with me and handed it

11    over to him at the autopsy.

12       Q.  Was there any discussion with him that your

13    belief was that this was trauma due to Mr. Thomas

14    slamming him to the ground, or he's in custody on

15    attempted murder, any allegations to any slams, or

16    anything to that effect?

17       A.  I don't recall having any conversation with

18    Dr. Sikirica at all.

19       Q.  But is it -- would it be typical for you to have

20    an introductory conversation with him to know if he

21    knows the nature of the charges that are pending?

22               MS. PECK:  Objection to form.

23               MR. PERKINS:  You can answer.
```

Case 1:17-cv-00626-DJS Document 163-4 Filed 10/25/21 Page 147 of 273

1              (Adam Mason - by Mr. Klein)

2              THE WITNESS:  I don't know that I've

3          done that on a regular basis and I don't

4          recall doing it for this case.

5   BY MR. KLEIN:

6      Q.  Well, in other words, do you know whether

7   Dr. Sikirica knew whether this child was in a car

8   accident or whether he was suspected to be the victim of

9   a traumatic assault?

10     A.  I don't know that -- I'm assuming, prior to the

11  autopsy, he would have gained that information somehow.

12  I don't specifically remember telling him.  I don't

13  specifically remember handing over the paperwork to him.

14  But I assume that he would have reviewed the paperwork

15  or he would have gained that knowledge at some point

16  prior to the autopsy.

17     Q.  In your file is a sign-in sheet for the autopsy,

18  and you're there, along with David Farley from the --

19  he's the evidence technician from Troy PD, correct?

20     A.  Yes.

21     Q.  Is the person who took the photos?

22     A.  Yes.

23     Q.  And Jennifer Alibosek is there.

```
 1                    (Adam Mason - by Mr. Klein)

 2            She's with the medical examiner's office, right?

 3      A.   Yes.

 4      Q.   Do you know her?

 5      A.   I know who she is.

 6      Q.   So, she works for Dr. Sikirica?

 7      A.   Yes.

 8      Q.   And Christa Book was there, correct?

 9      A.   Yes.

10      Q.   Did you ever work with Christa Book on any cases

11   prior to the Thomas case?

12      A.   Yes.

13      Q.   Did you get along with her?

14      A.   Yes.

15      Q.   The actual district attorney, Richard McNally,

16   was there, as well?

17      A.   Yes.

18      Q.   Did you know him before this case, as well?

19      A.   Yes.

20      Q.   And yourself, right?

21      A.   Yes.

22      Q.   Do you know if you had met with or spoken with

23   Christa, Mr. McNally, or anyone else from the DA's
```

```
 1                  (Adam Mason - by Mr. Klein)

 2   office prior to this meeting?

 3       A.  If I had met with them regarding the autopsy?

 4       Q.  Regarding Adrian Thomas and that he's being

 5   charged with attempted murder and now that the baby's

 6   dead that it's going to be upgraded to a murder?

 7       A.  I don't remember specifically, but I imagine I

 8   would have met with them prior.

 9       Q.  So even though that's not in your follow-up

10   reports, it's more likely right than wrong that you

11   would have spoken with them at that point?

12       A.  Yes.

13       Q.  Do you recall whether they had any discussion

14   with Dr. Sikirica, either before, during, or after the

15   autopsy, about the medical findings or any charges in

16   the case or both?

17       A.  I don't recall being aware of that.

18       Q.  So, do you recall anything that was discussed,

19   whether it's specific or general, during the autopsy?

20       A.  I don't.

21       Q.  Did you take notes during the autopsy?

22       A.  No.

23       Q.  In terms of the photos that were taken, who
```

```
 1                    (Adam Mason - by Mr. Klein)
 2   directed the photos?
 3         Like, did David Farley appear to know what to
 4   photograph, or would Dr. Sikirica tell him to take
 5   certain photos at certain angles?
 6       A.   I think it was a combination of both.  Officer
 7   Farley had been at autopsies in the past and I believe
 8   he was familiar with the routine.  But I believe,
 9   typically, there are points in time when Dr. Sikirica
10   would say, okay, come over and take a picture of this,
11   as well.
12       Q.   So, do you remember anything from the autopsy
13   other than the autopsy procedure itself?
14       A.   I don't.
15       Q.   Do you remember Dr. Sikirica commenting, in
16   realtime or at the conclusion of the meeting or at any
17   point, to you what his observations were or if he made
18   any determinations?
19       A.   I remember that he couldn't conduct a full
20   examination on the brain because it was liquified, and
21   he had to put it -- I don't know if it was in a freezer
22   or where he had to put it, until it became solid.  I
23   remember that specific detail for some reason.
```

1             (Adam Mason - by Mr. Klein)

2    Q.  Do you remember, did he explain why the brain had

3 become liquified?

4    A.  I don't recall.

5    Q.  What else do you remember, if anything?

6    A.  I don't recall anything else specific.

7    Q.  How about generally?

8    A.  I believe that he would have dictated certain

9 things throughout the autopsy, but I just can't recall

10 anything that he would have said.

11    Q.  Do you recall anything else that you did on the

12 26th as it relates to this case?

13    A.  I do not.

14    Q.  On the 26th, at around 10:00 a.m., you testified

15 in the grand jury, correct?

16    A.  Yes.

17    Q.  Prior to going to the grand jury, was there some

18 meeting with the DA's office to prepare you for your

19 testimony?

20    A.  Yes.

21    Q.  Was it that morning or would it have been on a

22 prior day?

23    A.  I don't recall.

1                    (Adam Mason - by Mr. Klein)

2      Q.  Do you recall anything else that transpired on

3   the 26th?

4      A.  I do not.

5      Q.  The next note in your follow-up is the 29th.

6           You went to the New York State Police lab with

7   Officer Farley, ADA Glass, and ADA Book to attend a

8   meeting regarding the evidence.

9           Do you recall that?

10     A.  I know that it happened.  I don't recall exactly

11  the conversations there.

12     Q.  Because your follow-up, your DB follow-up,

13  doesn't have anything between 9/26 and 9/29, does that

14  suggest that there were no investigatory actions taken

15  within those days?

16     A.  It does.

17     Q.  Are you aware of any?

18     A.  I'm not.

19     Q.  So what was the nature -- describe the meeting at

20  the New York State crime lab.

21     A.  Whenever there's a case like this where there's

22  evidence that needs to be submitted to a lab, to a state

23  police lab, we would have a meeting prior to discuss

Case 1:17-cv-00626-DJS Document 163-4 Filed 10/25/21 Page 158 of 273

```
 1                    (Adam Mason - by Mr. Klein)

 2    with them what tests may be able to be run and what

 3    evidence they would like as opposed to me sitting there

 4    and making these decisions on my own and just sending

 5    them a bunch of evidence.

 6            We have a meeting to discuss that and then they

 7    help us come to a conclusion as to what we should send

 8    and what test we should be looking for.

 9        Q.  And do you remember what the results of that

10    meeting were?

11        A.  I don't.

12        Q.  And then around 3:00 p.m. you went to Birch

13    Street with Officer Farley to collect DNA from M████

14    Thomas' twin, ████████?

15        A.  Yes.

16        Q.  What was the reason for that?

17        A.  I remember at some point there was some

18    confusion, perhaps, with the birth certificates, that

19    M██████  and ████████, who were twins, and maybe it was

20    actually ████████ who had been killed as opposed to

21    M██████.

22            I don't know all the details about it.  I just

23    remember that I needed to do that, something pertaining
```

```
 1              (Adam Mason - by Mr. Klein)
 2    to that.
 3       Q.   To dot the Is and cross the Ts to confirm that
 4    you had the right victim identified?
 5       A.   Yes.
 6       Q.   Then it says you obtained the supporting
 7    deposition from Ms. Moore -- who is apparently the
 8    foster parent?
 9       A.   The mother of the foster parent.
10       Q.   What was the reason for that supporting
11    deposition?
12       A.   Just to show that she was giving us permission to
13    take the sample.
14       Q.   Then it says on that date, the 29th of September,
15    that you made a copy of the Thomas interviews and to be
16    turned over to the DA's office.
17            You said that a few days earlier in your notes?
18    Did you have to make a second set?
19       A.   Second set because the defense attorney needed to
20    have a copy, as well.
21       Q.   Do you recall anything else on the 29th?
22       A.   I do not.
23       Q.   Then on the 30th of September, at around 4:15,
```

```
 1                (Adam Mason - by Mr. Klein)

 2   you went to meet with -- to obtain a DNA specimen from

 3   Wilahemina Hicks.

 4          What was the purpose of that?

 5      A.  I don't recall.

 6      Q.  Did anything ever come from that as it related to

 7   this investigation?

 8      A.  Nothing that I can remember.

 9      Q.  In terms of the serology testing, the testing --

10   there was testing done of the blankets and sheets and

11   such, was there any of that evidence that bore any fruit

12   as related to the murder charges against Adrian Thomas?

13      A.  I don't remember.

14      Q.  Not that you recall?

15      A.  Right.

16      Q.  Other than Adrian Thomas' statement, and

17   particularly in the last four pages and what was said

18   related to that in the last four pages of the written

19   statement, was there anything else -- any other

20   evidence, any physical evidence, linking him to the

21   crime?

22             MR. PERKINS:  Object to the form.

23             You can answer.
```

```
 1                    (Adam Mason - by Mr. Klein)

 2     BY MR. KLEIN:

 3         Q.  Or the alleged crime.

 4         A.  Not that I can remember.

 5         Q.  In other words, there were no fingerprints or

 6     blood work or anything else that incriminated

 7     Mr. Thomas, to your knowledge?

 8         A.  Correct.

 9         Q.  On October -- it says on that date you set up an

10     interview with Ms. Hicks for Friday, October 3rd, at

11     5:30, and that was setting up the interview that you

12     recorded, correct?

13         A.  Yes.

14         Q.  Now, what was the reason for having her come to

15     the office?

16             Was it so that it could be videotaped?

17         A.  Yes.

18         Q.  When you set it up with her on the 30th for

19     Friday, October 3rd, did you let her know that you

20     wanted it to be done there so it could be videotaped or

21     just that you prefer that it be more generally in the

22     office?

23         A.  I don't recall if I gave her that information or
```

1                  (Adam Mason - by Mr. Klein)

2    not.

3        Q.   Would you typically tell the subject of an

4    interview that it was going to be recorded?

5        A.   No.

6        Q.   In September of 2008, was the camera obvious to

7    anyone walking into the room, or was it hidden somehow?

8        A.   It was obvious.

9        Q.   Do you remember anything else you did on

10   September 30th in this case?

11       A.   I do not.

12       Q.   On October 1st, at around 11:00 p.m., you went to

13   Samaritan with Detective Sergeant Epstein to interview

14   and depose Katrina Kardos, who was the attending doctor

15   when the victim was brought in on 9/21.

16            Did someone tell you that this would be helpful,

17   or did you do this for some reason on your own

18   initiative?

19       A.   I think I had tried to talk to her previously,

20   but because of her busy schedule that was the first

21   opportunity that I had to talk to her.

22       Q.   And did you obtain a deposition from her?

23       A.   Yes.

Case 1:17-cv-00626-DJS  Document 163-34  Filed 10/25/21  Page 158 of 273

```
 1              (Adam Mason - by Mr. Klein)

 2       Q.   And that's in your file?

 3       A.   Yes.

 4       Q.   Other than what's in the deposition, do you

 5   recall anything about that meeting?

 6       A.   No.

 7       Q.   October 2nd of 2008 it says, at 10:00 a.m., you

 8   met with ADA Art Glass to review the disks and you

 9   turned over copies to them.

10            Do you recall that, or just that it's in your

11   notes?

12       A.   Yes.  I recall.

13       Q.   Did you watch all approximately nine hours of

14   video with him?

15       A.   I don't believe so.

16       Q.   What did you watch with him?

17       A.   I don't recall how much of what we watched.

18       Q.   Portions of it, though?

19       A.   Yes.

20       Q.   At any time during your meetings with Art Glass,

21   Christa Book, or anyone else, did anyone express any

22   concerns over the potential for the inadmissibility of

23   the videos?
```

1                    (Adam Mason - by Mr. Klein)

2        A.   No.

3        Q.   Did anyone from the district attorney's office

4    ever, whether you agreed with it or not, critique your

5    methods of interrogation?

6        A.   No.

7        Q.   Then, on October 3rd of 2008, your follow-up says

8    that, at 5:30 p.m., you and Detective Fountain

9    interviewed Wilahemina.

10            That's the video interview that we discussed

11   before, correct?

12       A.   Yes.

13       Q.   Sergeant Colaneri was in the room watching it --

14   monitoring it in the office?

15       A.   I don't recall if he was there.

16       Q.   Today he -- what's the word -- authenticated some

17   notes where he wrote down times.

18            Do you have any reason to doubt that he was

19   there?

20       A.   I do not.

21       Q.   Then there's just a few more notes in your

22   follow-up, and then we'll get into the interviews.

23            October 8th of '08, at 8:30 in the morning, that

1                    (Adam Mason - by Mr. Klein)

2     was the first child fatality team meeting.  And at noon,

3     you then went to Sam's Club to speak with Adrian Thomas'

4     friend.

5          So, is it fair to say that the meeting at the

6     county child fatality team lasted -- ended at some point

7     between 8:30 and noon?

8     A.  Yes.

9     Q.  How long was it, do you know?

10         Was it an hour, two hours?

11    A.  I don't recall.

12    Q.  Is it your belief that this was the meeting where

13    you learned about Jasper Estaris' interview with Adrian,

14    or may it have been the second, you just don't know?

15    A.  I believe it was that meeting.

16    Q.  What else do you recall learning during that

17    meeting, if anything?

18    A.  I don't recall anything else.

19    Q.  And then you interviewed -- you went to Sam's

20    Club, which then lead you to the home address of

21    Mr. Thomas' friend Mr. Maynard, correct?

22    A.  Yes.

23    Q.  You interviewed him, correct?

```
 1                    (Adam Mason - by Mr. Klein)

 2        A.   Yes.

 3        Q.   Did you get a deposition from him or just spoke

 4   with him orally?

 5        A.   I believe we just spoke to him.

 6        Q.   He had nothing helpful regarding this

 7   investigation, correct?

 8        A.   Yes.

 9        Q.   Then you spoke to some other individual, an Ian

10   Lapierre.

11             Who is that?

12        A.   I don't recall.

13        Q.   This was at Cedar Park Apartments.

14             Is he someone in the development where the

15   Thomases lived?

16        A.   Neighbors, I believe.

17        Q.   He told you that he never heard or observed any

18   inappropriate behavior associated with the Hicks-Thomas

19   family, correct?

20        A.   Yes.

21        Q.   Do you remember anything else he said in more

22   detail?

23        A.   I don't.
```

```
 1              (Adam Mason - by Mr. Klein)

 2      Q.  You spoke with Deb Groesback also in that

 3  development.

 4          Do you recall speaking to her?

 5      A.  I don't specifically recall a conversation, but I

 6  recall reviewing it in my notes.

 7      Q.  So she didn't corroborate anything related to

 8  Adrian Thomas' criminal case, right?

 9      A.  Correct.

10      Q.  She just would hear babies crying?

11      A.  Yes.

12      Q.  But that in and of itself was not suspicious.

13      A.  Correct.

14      Q.  Then you spoke with the office manager, who told

15  you she was aware of a complaint, but then no further

16  action was taken on it, correct?

17      A.  Yes.

18      Q.  Did you ever look into that complaint?

19      A.  No.

20      Q.  Did Ms. Noel ever speak to you about that

21  complaint?

22          Do you know if it was a complaint pending with

23  CPS?
```

1                 (Adam Mason - by Mr. Klein)

2      A.   I recall having conversations with her about

3  interactions they had previously, but I don't recall if

4  it was that specific one or which one it was.

5      Q.   Would that have been discussed at the child

6  fatality meeting as well?

7      A.   No.  That was discussed, I believe, prior to

8  that.

9      Q.   The next investigatory note in your follow-up is

10  six days later, October 14th of 2008.

11          Is it more likely than not that from the 8th

12  until the 14th there were no additional steps taken by

13  you in this case?

14      A.   Yes.

15      Q.   On that day Ms. Hicks came in to speak with you

16  to show you a letter that she got from Adrian, and that

17  was put in your file, correct?

18      A.   Yes.

19      Q.   That letter was not incriminatory or useful to

20  this investigation, was it?

21      A.   No.

22      Q.   It just says that he wanted her to come see him?

23      A.   Yes.

```
 1                    (Adam Mason - by Mr. Klein)

 2      Q.   That he didn't do anything wrong?

 3      A.   Yes.

 4      Q.   Then, on the 21st of October, you copied the

 5   Hicks disk and gave that to the DA's office.

 6      A.   Yes.

 7      Q.   Did you watch it with them or just gave it to

 8   them?

 9      A.   I believe I just gave it to them.

10      Q.   And then, on November 5th, you and Detective

11   Fountain attended a second county child fatality team

12   meeting, correct?

13      A.   Yes.

14      Q.   Do you recall anything that was said or that

15   transpired at that meeting?

16      A.   No.

17      Q.   Did you learn anything new at that meeting that

18   you didn't know previously?

19      A.   No.

20      Q.   Then, at around 12:30 that day, you provided

21   copies of the disk of the Wilahemina Hicks interview to

22   ADA Art Glass.

23           What was the reason for a second copy?  Was that
```

1                    (Adam Mason - by Mr. Klein)

2     so it could be provided to the defense, or did you not

3     know?

4         A.   If I did two copies, that would have been the

5     reason.  Yes.

6         Q.   In terms of documents and court appearances, prep

7     meetings, and things like that, are those things that

8     would typically go in your DB follow-ups, or not

9     necessarily?

10        A.   Not always.

11        Q.   In this case they did not?

12        A.   Yes.  That's correct.

13        Q.   Is it true that in this case your DB follow-ups

14    end at 11/05/08, or might there be additional DB

15    follow-ups that I do not have?

16        A.   I don't have an additional follow-up.  That's it.

17                    (Recess taken.)

18    BY MR. KLEIN:

19        Q.   Sitting here today, do you know that Rensselaer

20    County CPS has a practice of interviewing individuals

21    who may have criminal charges on them relating to child

22    abuse allegations while charges are pending?

23        A.   I don't know what their practices are.

1          (Adam Mason - by Mr. Klein)

2     Q.  I'm not asking if you know what their practices

3   are.

4        I'm asking:  Through your experience, extensive

5   experience in the police department as a detective, as a

6   captain, handling these types of cases, have you come to

7   learn that, in addition to the Thomas case, in other

8   cases as well where there are related criminal and CPS

9   child abuse charges, that they will go in and speak with

10  someone who has already been charged criminally?

11    A.  I'm not aware of any specific instances where

12  that had happened other than this case.  It doesn't mean

13  it doesn't happen.  I'm just not aware of a specific

14  time where it happened other than that.

15    Q.  In the grand jury, you were asked a question by a

16  grand juror, and you indicated that you didn't have the

17  intention of concluding the interview after the first

18  six pages, I believe.

19       And that, when the questioning continued,

20  additional facts came out, and they were -- I think you

21  said, quote, a little different from what he initially

22  wrote, correct?

23    A.  Yes.

```
 1                    (Adam Mason - by Mr. Klein)

 2        Q.   That refers just generally to the -- can we call

 3   it pre-Colaneri, introducing the slamming and

 4   post-Colaneri?

 5             So what you're referring to there is the

 6   post-Colaneri part of the interview?

 7        A.   Yes.

 8        Q.   When you say things were a little different from

 9   what was initially written -- because you wrote it, not

10   Adrian, correct?

11        A.   I did write it.

12        Q.   Things were initially a little different, that

13   refers to the fact that what was initially written, in

14   your view, was not incriminating.

15             And once the slamming was introduced, it became

16   incriminating?

17        A.   Just the fact pattern in general was different.

18        Q.   It became, in your mind, more consistent with the

19   injuries that M█████ -- you were aware that M█████

20   had?

21        A.   I don't know that I ever thought, okay, this is

22   more consistent or not.  What I meant by different was

23   that it was different.
```

Case 1:17-cv-00626-DJS  Document 173  Filed 10/25/21  Page 168 of 273

1                   (Adam Mason - by Mr. Klein)

2    Q.  Well, is it true that you said that you didn't

3  have probable cause before Colaneri was in the room?

4    A.  Correct.

5    Q.  So it's different in that you felt that there

6  was -- the facts after Colaneri came in gave you

7  probable cause, the additional facts?

8    A.  I don't know that's when I meant, but yes.  That

9  is the fact that the second part of that statement

10  provided probable cause for an arrest, whereas the first

11  part didn't.

12    Q.  In your view.

13    A.  Yes.

14    Q.  During the first interview with Adrian Thomas,

15  you would agree that you told him repeatedly that he was

16  not under arrest?

17    A.  Yes.

18    Q.  And that he would not be arrested.

19    A.  Yes.

20    Q.  I believe you said at the pretrial Huntley

21  hearing that there came a time when the actions went

22  from accidental to criminal, and that's when probable

23  cause was established.

```
1                (Adam Mason - by Mr. Klein)
2           Do you recall generally saying that?
3      A.   Yes.
4      Q.   And that would be after Colaneri -- the
5  post-Colaneri part of the interview, correct?
6      A.   Yes.
7      Q.   And the first time you heard Adrian Thomas say
8  that he slammed M█████, in sum and substance, out of
9  frustration was five hours into the interview,
10 approximately, correct?
11     A.   Yes.
12     Q.   There was some questions in the hearing about
13 whether you knew that M██████ Thomas had been sick since
14 the Friday before the Sunday that he woke up
15 unresponsive.
16          Did you know that at the time you were
17 questioning Adrian?
18     A.   I don't recall exactly when I became aware of
19 that.  He may have told me that the first night.
20 Wilahemina may have mentioned it at the hospital.  I
21 don't recall exactly when I became aware of that.
22          Are you asking me if I was aware of it during the
23 second interview with him?
```

```
 1               (Adam Mason - by Mr. Klein)

 2    Q.  Yes.

 3        In other words, did you speak with any -- were

 4   you aware of it and, relatedly, did you speak with any

 5   doctors about the cause of fevers and vomiting, fevers

 6   and diarrhea?

 7    A.  I did not.

 8               MS. CALABRESE:  Objection.

 9               MR. PERKINS:  You can answer.

10               THE WITNESS:  I did not speak to any

11          doctors about that, but either Adrian or

12          Wilahemina, I believe, had informed me that

13          M██████  had a fever at some point between

14          Friday and Sunday.

15   BY MR. KLEIN:

16    Q.  Did you ever inquire with any doctors as to

17   whether there was some nontrauma possible cause of

18   death?

19    A.  I did not.

20    Q.  Now, from the time of the first interview to the

21   time of the second interview, you learned that the

22   initial report of there being a skull fracture was

23   incorrect?
```

1                    (Adam Mason - by Mr. Klein)

2        A.   Yes.

3        Q.   Who initially reported or informed you that there

4    was a report of a skull fracture?

5             Did you get that firsthand from a doctor or a

6    nurse, or was that conveyed to you by Fountain?

7        A.   I don't recall.

8        Q.   Was it Dr. Edge that was incorrect or someone

9    else?

10       A.   I don't recall.

11       Q.   But whoever said it was incorrect.

12       A.   Ultimately, if someone said that, that was

13   incorrect.

14       Q.   So, did you ever question any of the other

15   medical findings, even if you didn't write it in any of

16   your reports, when you heard that the skull fracture was

17   incorrect, or you went with the suspicion that this was

18   a nonaccidental trauma?

19       A.   No.  The reason that the skull fracture was

20   deemed in the first place was because the skull plates

21   were not connected because the skull hadn't completely

22   formed.  So, there was separation in between the skull.

23            So, when I was told that it wasn't actually a

```
 1                  (Adam Mason - by Mr. Klein)

 2   skull fracture, I didn't look at that as a reason for me

 3   to further inquire about other things that I was told.

 4      Q.   When CPS was removing the kids and you were

 5   there, do you recall that Adrian told you that M█████

 6   had fever and diarrhea for two days?

 7      A.   At some point I became aware of that.  I don't

 8   know if it was at that point.  It could have been.

 9      Q.   The story that he told you at the apartment was,

10   in sum and substance, that he was woken up by his wife

11   at 8:30 to 9:00 a.m. because the child was not

12   responding.  He sprinkled water on the face.  911 was

13   call.  The wife performed CPR.  And an ambulance

14   arrived.

15           Was that generally his explanation of what he

16   knew about this incident?

17      A.   Yes.

18      Q.   He was consistently telling you that he didn't

19   know anything else until different scenarios were

20   introduced by you or Detective Fountain in the first

21   interview, correct?

22                  MR. PERKINS:  Object to the form.

23                  You can answer.
```

```
 1              (Adam Mason - by Mr. Klein)

 2              THE WITNESS:  Yes.

 3   BY MR. KLEIN:

 4      Q.   Even into the second interview, he continually

 5   would say he didn't do anything or he just -- all he

 6   knew was that he woke up and the child wasn't responding

 7   during the second interview, and only said other things

 8   when additional scenarios were introduced into the

 9   conversation by you and/or Colaneri, correct?

10      A.   Yes.

11      Q.   You would agree that, when you went to the

12   apartment on September 21st of 2008, it was in very good

13   condition?

14      A.   Yes.

15      Q.   Especially for a house that had several children

16   in it?

17      A.   Yes.

18      Q.   And was very small?

19      A.   Yes.

20      Q.   When you saw M████ Thomas -- I think I asked

21   you a little bit about this, so forgive me if I did.

22              But when you saw him in the hospital -- I believe

23   it was on the 22nd, after Adrian went to the Samaritan
```

Case 1:17-cv-00626-DJS Document 61-4 Filed 10/25/21 Page 174 of 273

```
 1                (Adam Mason - by Mr. Klein)

 2   and you went home and you came back.  You went to see

 3   M██████?

 4      A.  Yes.

 5      Q.  You approached the bed and Colaneri was there, as

 6   well as your brother?

 7          Do you have a brother or a relative in the

 8   department?

 9      A.  I have a relative.  It's not my brother.

10      Q.  What's his name?

11      A.  Mark.

12      Q.  What is Mark's relation to you?

13      A.  He's my uncle.

14      Q.  Was he there, as well?

15      A.  Yes.

16      Q.  Did Colaneri have any role in this investigation

17   other than what's been discussed, being present for the

18   seven-plus hour interview number two, coming into the

19   interview at some point, and being part of your

20   determination to arrest Mr. Thomas.

21          Did he have any other role in this case that you

22   can recall?

23               MR. PERKINS:  Object to the form.
```

```
 1                    (Adam Mason - by Mr. Klein)

 2                    You can answer.

 3                    THE WITNESS:  No.

 4   BY MR. KLEIN:

 5      Q.  Did Mark Mason have any role in this

 6   investigation other than just physically appearing at

 7   the hospital with Colaneri on that day, the 22nd?

 8      A.  No.

 9      Q.  When you saw M█████ in the hospital that day,

10   you were about six feet away from him?

11      A.  Yes.

12      Q.  You didn't see any bruises, right?

13      A.  Correct.

14      Q.  Any gashes?

15      A.  Correct.

16      Q.  Any bloody or matted hair or anything that was

17   outward signs of a trauma, correct?

18      A.  Correct.

19      Q.  During interview one, you told Adrian repeatedly

20   that he'd have to be arrested if he did anything on

21   purpose and -- correct?

22      A.  Yes.

23      Q.  You told him several times that if it was an
```

```
1                    (Adam Mason - by Mr. Klein)

2    accident he wasn't going to be arrested?

3       A.  Yes.

4       Q.  In your view, this was an appropriate tactic, and

5    it's still your view today, correct?

6       A.  Yes.

7       Q.  You've testified in court.

8            And would it be your testimony today that lies

9    during interrogations are in all circumstances okay?

10               MR. PERKINS:  Object to the form.

11               You can answer.

12               THE WITNESS:  I don't know about in all

13          circumstances.

14   BY MR. KLEIN:

15      Q.  Are there any lies that would have been

16   inappropriate in the Thomas case hypothetically that you

17   can think of?

18           In other words, you made many lies in interview

19   one and interview two, correct?

20      A.  Yes.

21      Q.  Perhaps dozens of lies, correct?

22      A.  Yes.

23      Q.  Your testimony is that you lied because you were
```

Case 1:17-cv-00626-DJS Document 63-4 Filed 10/25/21 Page 1788 of 273

```
 1                    (Adam Mason - by Mr. Klein)

 2    trying to find the truth, correct?

 3       A.  Yes.

 4       Q.  Based on your experience and/or any training that

 5    you've had, are there any -- and your experience, are

 6    there any lies that would have crossed the line in your

 7    view?

 8                 MR. PERKINS:  Object to the form.

 9                 You can answer, if you can.

10                 MS. CALABRESE:  Objection.

11                 THE WITNESS:  I don't believe that any

12          of the lies that I told during the

13          interviews of Adrian Thomas crossed the

14          line.

15                 Is there a line?  Yes.  But I can't

16          give you an example of where that line is.

17    BY MR. KLEIN:

18       Q.  When we talk about a line, is that a line of

19    what's consistent with due process and voluntariness?

20                 When you say "line", what are you referring to?

21                 MR. PERKINS:  Object to the form.

22                 You introduced the word "line."

23    BY MR. KLEIN:
```

1          (Adam Mason - by Mr. Klein)

2     Q.  Well, I'm asking -- would you agree that there's

3   a line of appropriate conduct as it relates to lying and

4   interrogations?

5     A.  What I'm saying is that, I don't believe that I

6   can tell any lie that anyone could come up with and it

7   would be acceptable.  I don't know an example of what

8   that would be.  And I don't even know that if you

9   provided me with an example if I could tell you, under

10   that given circumstance, if it's acceptable or not

11   because we're speaking of hypotheticals here.

12          What I'm saying is that, during that interview, I

13   don't believe that I crossed the line, and I believe

14   that every lie that I told him was appropriate and

15   acceptable.

16     Q.  One of the lies was that if he continued to deny

17   responsibility for his child's injury his wife would be

18   arrested and not allowed to be at his child's bedside.

19          Is that in sum and substance one of the lies?

20     A.  Yes.

21     Q.  Would you agree that you told him approximately

22   21 times that his disclosure of the circumstances under

23   which he injured M███████ was essential to assist doctors

```
 1              (Adam Mason - by Mr. Klein)

 2   attempting to save the child's life?

 3      A.  Yes.

 4      Q.  Was that a lie that, sitting here today, you

 5   still believe is appropriate?

 6      A.  Yes.

 7      Q.  Assuring him that whatever happened was an

 8   accident and could be helped if he disclosed all was

 9   another related lie, correct?

10      A.  Yes.

11      Q.  And you stand by that tactic today, correct?

12      A.  Yes.

13      Q.  Did you know going into this interview, interview

14   one and then interview two, that certain threats would

15   cross the line of legality and might result in a

16   confession not being valid?

17      A.  I had a general understanding that there are

18   things that you're allowed to do and things that you

19   weren't allowed to do.

20      Q.  So that's what I want to know.

21          What was that understanding that you had going

22   into this case?

23              MR. PERKINS:  Object to the form.
```

```
 1              (Adam Mason - by Mr. Klein)

 2              You can answer, if you can.

 3              THE WITNESS:  I don't know exactly

 4         what -- I can't give an example.  I just

 5         know that, if there was something that came

 6         across my mind that was inappropriate or

 7         illegal, I guess illegal, I would recognize

 8         this is illegal.  Please don't do that.  But

 9         I can't give you an example because it

10         didn't happen.

11  BY MR. KLEIN:

12     Q.  Did you know going into this interview that you

13  were not allowed to use highly coercive deceptions?

14              MR. PERKINS:  Object to the form.

15              You can answer.

16              THE WITNESS:  I don't know what that

17         word is.  I've never heard of that word

18         before, "highly coercive confessions."  I

19         know that deception is allowed.  I know that

20         coercion is not allowed.  So, you're

21         crossing the two.

22  BY MR. KLEIN:

23     Q.  So if deception crosses the line to coercion, is
```

```
 1                  (Adam Mason - by Mr. Klein)

 2   that a line that you knew going into this you shouldn't

 3   cross --

 4      A.  I knew that I should not cross the line of

 5   coercion.  Yes.

 6      Q.  Would you agree that coercion, in sum and

 7   substance, is when you nullify an individual's judgment

 8   so that they say something against their own will?

 9              MR. PERKINS:  Object to the form.

10              You can answer, if you can.

11              THE WITNESS:  I don't know the

12         definition of coercion.

13   BY MR. KLEIN:

14      Q.  What is your understanding of what coercion is,

15   just from all of your experience as a law enforcement

16   officer?

17         In other words, is it coercion when you get

18   someone to say something whether it's true or false?

19      A.  I guess if you force someone to do something,

20   then that's coercion.

21      Q.  Did you know going into this interview that if

22   you forced a confession from someone, whether it was

23   true or false, that would be wrong from a legal
```

# APPENDIX 2331

```
 1              (Adam Mason - by Mr. Klein)

 2    perspective?

 3              MR. PERKINS:  Object to form.

 4              You can answer, if you can.

 5              THE WITNESS:  Yes.

 6    BY MR. KLEIN:

 7      Q.  Do you believe that by telling Adrian repeatedly

 8    that what he did was an accident and he wouldn't be

 9    charged, do you believe that that contributed to

10    cajoling him into telling you things that ultimately

11    were part of his statements?

12              MR. PERKINS:  Object to the form.

13              You can answer, if you understand it.

14              THE WITNESS:  I don't necessarily

15         understand it.

16              By me repeatedly telling him that it

17         was an accident --

18              MR. KLEIN:  And he wouldn't be charged.

19              THE WITNESS:  -- and that he wouldn't

20         be charged, I had a thought that he knew

21         more than he was telling us.  And I didn't

22         know if it was accidental.  I didn't know if

23         it was criminal.  And my thought was that,
```

1                (Adam Mason - by Mr. Klein)

2        if I could minimize it, that it was an

3        accident, that it would make it easier for

4        him to talk about regardless of what it was.

5  BY MR. KLEIN:

6    Q.  Was it your sense during the interviews that he

7  relied on your assurances that he wouldn't be charged?

8    A.  Yes.

9    Q.  And I believe the court said that it was

10  approximately 67 times that he was told that what he did

11  to his son was an accident.

12      Does that sound approximately accurate to you?

13    A.  Yes.

14    Q.  And 14 times that he would not be arrested.

15      Does that sound about right?

16    A.  Yes.

17    Q.  And eight times that he would be going home.

18      Do you believe that to be approximately true?

19    A.  Yes.

20    Q.  And do you agree that those representations that

21  you made to him that we just discussed were instrumental

22  in Adrian making some of the damaging admissions that

23  you got from him?

Case 1:17-cv-00626-DjS mDocumCent 176 3534 Filed 10/25/21 Page 184 of 273

1              (Adam Mason - by Mr. Klein)

2     A.   I don't know what was on his mind and why he

3 ultimately did what he did.

4     Q.   Well, did you think if you didn't go through that

5 whole process of 67 times it was an accident, 14 times

6 you won't be arrested, eight times you'll go home, do

7 you think you would have gotten from him what you got

8 from him?

9              MR. PERKINS:  Object to the form.

10             You can answer.

11             THE WITNESS:  Well, obviously, if I

12        stopped the interview prior to those things

13        happening, prior to him telling me what he

14        did, then that would have never happened.

15             MR. KLEIN:  Right.

16 BY MR. KLEIN:

17    Q.   So, just so we're clear on this record, you made

18 a conscious choice to undertake each of those tactics.

19    A.   Yes.

20    Q.   There was no one -- you didn't have an earbud or

21 no one was telling you, from a supervisor or anyone

22 else, go back and keep telling him he's going to go

23 home, he's got nothing to worry about, that was your own

```
 1              (Adam Mason - by Mr. Klein)

 2    independent judgment.

 3       A.  That's correct.

 4       Q.  And to be clear, those tactics were not based on

 5    any training that you got.  That was just your own

 6    instinct as to the best way to extract a confession out

 7    of Mr. Thomas.

 8              MR. PERKINS:  Object to the form.

 9              You can answer.

10              THE WITNESS:  That's not accurate.

11         That was what I deemed to be the best way to

12         get the truth out of Mr. Thomas.

13              MR. KLEIN:  Got it.

14    BY MR. KLEIN:

15       Q.  But it was based on your own instinct.  It wasn't

16    based on anything that anyone taught you.

17              MR. PERKINS:  Object to the form.

18              You can answer.

19              THE WITNESS:  That's correct.

20    BY MR. KLEIN:

21       Q.  Have you ever learned of any tactics or

22    techniques or representations in your training that

23    could raise a substantial risk of false incrimination by
```

```
 1              (Adam Mason - by Mr. Klein)
 2   someone you're interviewing, or you're not aware of any?
 3              MR. PERKINS:  Object to the form.
 4   BY MR. KLEIN:
 5     Q.  Do you think that there are any tactics that
 6   could, in your experience and training, that could lead
 7   to a false incrimination?
 8              MR. PERKINS:  Like hitting someone with
 9         a phonebook?
10   BY MR. KLEIN:
11     Q.  Well, have you been taught of any not involving
12   physical force in terms of interrogation techniques?
13              MR. PERKINS:  Objection.
14              THE WITNESS:  I've never been taught
15         not to involve physical force.  I don't
16         know.  I think, if I was in training and
17         somebody told me that I'm not allowed to
18         strike someone to get a confession, I would
19         laugh at them.
20              MR. KLEIN:  Well, that's why I'm
21         telling your counsel I'm not asking you
22         that.  I'm not suggesting any physical
23         things.
```

```
 1              (Adam Mason - by Mr. Klein)

 2   BY MR. KLEIN:

 3      Q.  Are there nonphysical techniques, verbal tactics,

 4   interrogation tactics, that you've learned could elicit

 5   or raise a substantial risk of false incrimination?

 6      A.  I have not.

 7      Q.  And you didn't know of any then and you still

 8   don't know of any today?

 9      A.  Correct.

10      Q.  So basically, in your view, you could say to a

11   suspect in an interrogation anything that you feel is

12   appropriate to get out the truth.

13              MR. PERKINS:  Object to the form.

14              You can answer.

15              THE WITNESS:  I feel as though that I

16         can say what is legal, but I don't believe

17         that I can say whatever I want.

18   BY MR. KLEIN:

19      Q.  But in terms of making representations and false

20   assurances, are you aware of any limits on your ability

21   to do that as it relates to conducting a lawful

22   interrogation?

23              MR. PERKINS:  Object to the form.
```

```
 1                    (Adam Mason - by Mr. Klein)

 2              You can answer.

 3              THE WITNESS:  I can't give you an

 4         example.  So I don't know because I have not

 5         participated in anything as to what you're

 6         speaking.

 7  BY MR. KLEIN:

 8     Q.  Other than this case where the court found that

 9  it was wrong, right?

10     A.  After a jury and another court found that it was

11  appropriate and myself.  Yes.

12     Q.  Other than participating in any type of situation

13  where the conduct of the interrogation raised a

14  substantial risk of false incrimination, have you been

15  informed through training or by colleagues of any

16  scenarios where that could occur?

17              MR. PERKINS:  Object to the form.

18              MR. KLEIN:  Even if you didn't --

19              THE WITNESS:  Where what could occur?

20              MR. KLEIN:  Where there would be a

21         substantial risk of false incrimination

22         based on false assurances and

23         misrepresentations.
```

```
 1              (Adam Mason - by Mr. Klein)

 2              THE WITNESS:  I don't recall receiving

 3         any training or participating in any

 4         conversations where someone has told me this

 5         is something that would result in a false

 6         confession.

 7  BY MR. KLEIN:

 8     Q.  But it was clear to you, though, in September of

 9  2008, that you couldn't cross the line into conduct that

10  would coerce a false confession, correct?

11     A.  Yes.

12     Q.  Did you know that when you became a police

13  officer, was it something you learned when you became a

14  detective, or just you've always known that?

15     A.  I think it's commonsense.

16     Q.  The court said that there wasn't a single

17  inculpatory fact in Mr. Thomas' confession that was not

18  suggested to him.

19         Do you agree with that?

20              MR. PERKINS:  Object to the form.

21              You can answer.

22              Can you define "inculpatory" just for

23         the purposes of the question?
```

```
 1              (Adam Mason - by Mr. Klein)

 2              MR. KLEIN:  Yeah.  Facts where he

 3         accepted that --

 4              MS. CALABRESE:  Facts which suggested

 5         he caused the crime as opposed to exculpate.

 6              MR. PERKINS it's just a little --

 7              MR. KLEIN:  If you don't understand

 8         that's okay, but I think --

 9              MR. PERKINS:  No.  I do understand.

10              MR. KLEIN:  So then let the witness --

11              MR. PERKINS:  If you understand it, you

12         can answer.

13              THE WITNESS:  So, outside of the

14         confession?

15              MR. KLEIN:  No.

16    BY MR. KLEIN:

17       Q.  In the course of Mr. Thomas' statements, verbally

18    and what were written down, would you agree that the

19    inculpatory words that he stated, either that he wrote

20    and he signed or that he stated, were suggested to him?

21              MR. PERKINS:  Object to the form.

22              You can answer.

23              THE WITNESS:  I agree that what we've
```

```
 1              (Adam Mason - by Mr. Klein)

 2         gone over multiple times, of him slamming

 3         M█████ under the bed, was something that

 4         was suggested to him by myself and Sergeant

 5         Colaneri, if that's what you're asking.

 6   BY MR. KLEIN:

 7     Q.  The facts that he stated that, in your view, gave

 8   probable cause, were all facts that were suggested to

 9   him by either you or Colaneri, correct?

10              MS. CALABRESE:  Object to the form.

11              MR. PERKINS:  Objection to the form.

12              You can answer.

13              THE WITNESS:  Well, I think there were

14         more details provided.  It wasn't just that

15         I slammed M█████ on the bed three times,

16         period.  There were more details surrounding

17         his account of how it happened.

18              So I think that, in conjunction with

19         those additional details, made the story

20         very believable to select a probable cause.

21   BY MR. KLEIN:

22     Q.  But those details weren't given until the

23   inculpatory fact was first suggested to him, correct?
```

      (Adam Mason - by Mr. Klein)

  A. Yes.

  Q. Even during the first interview, it was Fountain and yourself that first introduced the idea of M█████ falling on a bed, correct?

  A. Yes.

  Q. Adrian never said that before or adopted that until you and/or Fountain said that first, correct?

  A. Yes.

  Q. It was at your request and pursuant to your instructions that Mr. Thomas demonstrated how he supposedly threw M█████ to the ground, correct?

  A. Yes.

  Q. When you told him not to sugarcoat it, it was only then that Adrian demonstrated a harder throw, correct?

  A. Yes.

  Q. Would you agree that Adrian did tell you during the interview that he wanted to be with his son?

  A. Yes.

  Q. Given that he wasn't in custody -- did he tell you that before he was, in your view, going to be taken into custody?

```
 1                (Adam Mason - by Mr. Klein)

 2      A.  Yes.

 3      Q.  Is there a particular reason why you didn't let

 4  him be with his son given the dire circumstances?

 5      A.  No.

 6      Q.  Did it cross your mind to let him see his son and

 7  then perhaps get him back to your office to continue the

 8  interrogation?

 9      A.  No.

10      Q.  Did you think letting him see his son would

11  somehow impede the flow of your interrogation or somehow

12  affect the investigation?

13      A.  No.

14      Q.  In retrospect, do you think it would have been

15  the right thing to do, to let him see his son in his

16  last moments?

17              MS. PECK:  Objection to form.

18              MR. PERKINS:  Objection to form.

19              You can answer.

20              THE WITNESS:  He made the one-to-one

21          comment.  Had he said, I'd like to get up

22          now and go out, would you drive me to

23          hospital, we would have done that.
```

```
 1              (Adam Mason - by Mr. Klein)
 2              And in retrospect, that maybe him
 3         seeing his son in that condition would have
 4         lead to a confession much earlier than after
 5         seven hours.
 6  BY MR. KLEIN:
 7     Q.  Or not.
 8              MR. PERKINS:  Object to the form.
 9              MS. PECK:  Objection.
10  BY MR. KLEIN:
11     Q.  I mean, you're speculating, right?
12     A.  As are you.
13     Q.  Well, I'm not answering questions now.  I'm
14  asking you.
15         You're speculating when you suggest that.
16              MR. PERKINS:  Is that a question?
17              MR. KLEIN:  Yes, it is a question.
18              THE WITNESS:  I am.
19  BY MR. KLEIN:
20     Q.  Do you recall, during the second interview, that
21  you prayed with Adrian, and you went over and touched
22  his back and prayed with him?
23     A.  Yes.
```

```
 1                    (Adam Mason - by Mr. Klein)

 2       Q.   Is that a tactic or technique that, looking back

 3    11 years, you still stand by as an appropriate

 4    technique?

 5       A.   Yes.

 6       Q.   You were praying for M██████'s recovery even

 7    though at the time you prayed with Adrian you knew that

 8    M██████ was dead.

 9            MS. CALABRESE:  Objection, facts not in

10          evidence.

11            MR. PERKINS:  Object to form.

12            MS. CALABRESE:  The child was not dead.

13          He was not dead when they did this

14          interview.

15    BY MR. KLEIN:

16       Q.   You prayed with Adrian during the second

17    interview.

18       A.   I believe I used the word "miracle."  I prayed

19    for a miracle.

20       Q.   He was brain dead at that point.

21       A.   There had been one brain death examination

22    performed.  Yes.

23       Q.   Right, and he was being kept alive for organ
```

Case 1:17-cv-00626-DJS Document 163-34 Filed 10/25/21 Page 196 of 273

```
 1                  (Adam Mason - by Mr. Klein)

 2   donation at that point?

 3      A.  That's not correct.

 4               MR. PERKINS:  Object to the form.

 5               THE WITNESS:  There was a second brain

 6          death contamination that was going to be

 7          conducted still.

 8   BY MR. KLEIN:

 9      Q.  But you knew he was not likely to be

10   resuscitated.

11      A.  I'm not a doctor.  I can't answer that question.

12      Q.  I think you've testified that you believe he

13   wasn't, though.

14      A.  I didn't believe he was going to survive, but we

15   prayed for a miracle.  And that would have been a

16   miracle had he survived.

17      Q.  When you told Adrian that Dr. Edge said that a

18   child couldn't have caused this, only an adult could

19   have caused this, that was a lie, correct?

20      A.  Yes.

21      Q.  When Fountain suggested in interview one, you put

22   him down in the crib half awake and could have whacked

23   his head off the edge of the crib, that was the first
```

1    (Adam Mason - by Mr. Klein)

2    mention of M█████ Thomas possibly hitting his head on

3    the crib from Fountain.

4        That didn't come from Adrian, correct?

5    A.  Yes.

6    Q.  And you made the first mention of M███ being

7    slammed on the bed, not Adrian?

8    A.  Yes.

9    Q.  In statement one, I think it's clear that not

10   everything is in that statement just like in statement

11   two, in particular Adrian's repeated denial of

12   responsibility.

13       You didn't put that in the statements, correct?

14   A.  Correct.

15   Q.  Any particular reason why not?

16   A.  No.

17   Q.  Is there, like, some sort of technique or

18   practice where you only put in what's potentially bad,

19   or are you required to put in the witness's full

20   statement?

21   A.  There's no requirement.  The video spoke for

22   itself.  And I think that what was documented on paper

23   were aspects that could have potentially put M█████

1              (Adam Mason - by Mr. Klein)

2    where he was.

3        Q.   Now, when Adrian came out of Samaritan and you

4    met him at the psych hospital, is it true that you

5    didn't inquire what his diagnosis was at discharge?

6        A.   Correct.

7        Q.   You didn't inquire whether he had been on any

8    type of medication that might impair his ability to

9    speak to you in a truthful and accurate way?

10       A.   I did not inquire.  No.

11       Q.   Did you ever come to learn, even up until today,

12   whether he was given any type of tranquilizer or

13   medication at the hospital?

14       A.   No.

15       Q.   Did you have any obligation to understand his

16   mental state going into the interview after he came out

17   of the psych hospital, or it wasn't a concern of yours

18   at the time?

19       A.   My assumption was that, since he was released,

20   that his mental state was okay.

21       Q.   I believe you testified that, when you picked him

22   up at the psych hospital and asked him to go with you,

23   he was a free man, correct?

1          (Adam Mason - by Mr. Klein)

2     A.   Yes.

3     Q.   Had he said to you then, Detective, I really need

4  to go home and get some sleep, can I speak to you

5  tomorrow morning, would you have let him?

6     A.   Yes.

7     Q.   When you brought him back to the police station

8  after Samaritan, I think you said he wasn't in police

9  custody very clearly, right?

10    A.   Yes.

11    Q.   You did Miranda, what, as a prophylactic measure?

12         Miranda's required if there's a custodial

13  interrogation, correct?

14    A.   Correct.

15    Q.   And so, the reason you did it was what, in the

16  event his statement became -- in the event the interview

17  became custodial?

18    A.   In the event the interview did exactly what

19  happened, because it's at the point where he confessed

20  to slamming M██████ on the bed.  I would have had to

21  stop the interview and Mirandize him at that point.

22         And I didn't want to interrupt the flow of the

23  interview, so I did it as a precautionary measure at the

1                 (Adam Mason - by Mr. Klein)

2    beginning.

3        Q.  Did you ever say to Adrian words that were, in

4    sum and substance, to the effect of, if you try to leave

5    we'll charge you with escape?

6        A.  No.

7        Q.  Did any of your colleagues say that to him?

8        A.  Not in my presence.

9        Q.  During the first interview, you had your firearm

10   on you, correct?

11       A.  Yes.

12       Q.  During the second one, you put it in a locker,

13   correct?

14       A.  Yes.

15       Q.  Was the reason because you anticipated there to

16   be -- what was the reason for checking your gun in the

17   locker?

18       A.  It's something that I typically do during an

19   interview, and I think it was just something that

20   slipped my mind on the first time.

21       Q.  The reason why you typically do it during an

22   interview is just for -- is it for comfort reasons or is

23   it because for the integrity of the statement, should it

Case 1:17-cv-00626-DDD Document 68-1 Filed 10/25/21 Page 2018 of 273

1               (Adam Mason - by Mr. Klein)

2  become needed in court, you want to show that it's a

3  less coercive environment, or is there some other

4  reason?

5     A.  No.  It's a safety issue, that I didn't want to

6  have a firearm in there and I didn't know where things

7  were going to go.

8     Q.  When you told Adrian that you just called the

9  doctors again and gave them that updated information

10  that Adrian told you, quote, so hopefully they could use

11  that to try to keep M███████ alive and to save his life,

12  that was a lie, correct?

13     A.  Yes.

14     Q.  You didn't call any doctors during the first

15  interview or during the second interview, correct?

16     A.  Correct.

17     Q.  When you told Adrian that the doctors needed

18  every bit of information so they could work on M███████,

19  you knew that M███████ was going to die at that point.

20     A.  I knew that it was not likely that he was going

21  to survive.

22     Q.  In your discussion with Wilahemina Hicks, she

23  never said that she heard any strange breathing in the

Case 1:17-cv-00626-DLS Document 68-4 Filed 10/25/21 Page 202 of 273

1                    (Adam Mason - by Mr. Klein)

2     middle of Saturday night going into Sunday morning; is

3     that correct?

4         A.   I don't recall if she said that.

5         Q.   I'll represent that I believe you testified to

6     that in your hearing.

7              Do you have any reason to doubt that?

8         A.   I don't.

9         Q.   During the second interview, you knew at that

10    point that it was approaching 24 hours since Adrian was

11    first in the precinct, correct, to give his first

12    interview?

13        A.   It was, but I didn't think to myself it was

14    approaching 24 hours, but yeah.  That's an accurate

15    statement that it was approaching 24 hours.

16        Q.   To your knowledge, he hadn't seen his wife since

17    she left shortly after M█████ went to the hospital?

18        A.   Yes.

19        Q.   Even though he wasn't asking you to see his wife

20    or M█████, nothing prevented you from letting him see

21    them, correct?

22        A.   That's correct.

23        Q.   There was a point in the interview when Adrian

Case 1:17-cv-00626-DDD Document 68-4 Filed 10/25/21 Page 2088 of 273

1               (Adam Mason - by Mr. Klein)

2    asked you if M█████ was moving, and you told him that

3    M█████ was breathing, and what struck you the most was

4    the absence of a skull fracture, so maybe this isn't as

5    bad as they thought.

6        That was a lie, correct?

7    A.  Yes.

8    Q.  It wasn't a lie that the absence of a skull

9    fracture, but it was a lie that maybe it wasn't as bad

10   as they thought, because M█████ was likely to die at

11   that point, correct?

12   A.  Yes.

13   Q.  Do you recall testifying at the Huntley hearing

14   that -- with regard to Colaneri's statement that he had

15   some sort of medical background, do you recall

16   testifying that he might have been a nurse at one point?

17   A.  I recall the defense attorney asking me if he was

18   a doctor or if he was a nurse, and it struck me at that

19   point that I don't know what he did before he became a

20   police officer.  So, he might have been a nurse.  I

21   don't know.

22   Q.  So you don't know.

23   A.  I don't know.

```
 1                    (Adam Mason - by Mr. Klein)

 2      Q.  In terms of the timing of, like, 24 hours that we

 3   talked about, about five or six hours into the interview

 4   that started at around 6:00 p.m. on Monday, the 22nd,

 5   was around getting close to midnight, correct?

 6      A.  Yes.

 7      Q.  And so, that was the time -- 24 hours from when

 8   Adrian first spoke with you the night before was around

 9   the time that Colaneri came into the room, correct?

10      A.  Yes.

11      Q.  During the first interview, when Adrian had

12   stated in sum and substance that he agreed to take the

13   fall for his wife, that didn't give you probable cause,

14   correct?

15      A.  Correct.

16      Q.  You had been having a discussion with him and

17   posited to him that it had to be either him or his wife,

18   and that, if he didn't step up, his wife would go to

19   jail, correct?

20      A.  In sum and substance, yes.

21      Q.  But he didn't admit to any conduct that was

22   consistent with M██████'s injuries at that point,

23   correct?
```

1                    (Adam Mason - by Mr. Klein)

2        A.    Correct.

3        Q.    During your testimony at the Huntley hearing, you

4    used the word "complexion," I believe.   The complexion

5    of the interview changed when Thomas told him, he,

6    quote, slammed his child down on the bed following an

7    argument with his wife.

8             That refers to the post-Colaneri part of the

9    interview, correct?

10       A.    Yes.

11       Q.    Is a fair explanation for the term "complexion"

12   that it went from accidental to a criminal situation?

13       A.    Yes.

14       Q.    Did you learn during the trial or at some point

15   after the investigation was closed that Dr. Edge and the

16   other doctors were treating M█████    for sepsis, which is

17   a bacterial infection?

18                    MR. PERKINS:   Object to the form.

19                    You can answer.

20                    THE WITNESS:   I didn't know they were

21         treating him for sepsis.

22   BY MR. KLEIN:

23       Q.    Never learned that?

Case 1:17-cv-00626-DJS Document 68-1 Filed 10/25/21 Page 206 of 273

```
 1                  (Adam Mason - by Mr. Klein)

 2      A.   No.

 3      Q.   At some point did you come to learn that?

 4      A.   I knew that sepsis was something that had been

 5  talked about amongst people involved in the case, but I

 6  didn't know that he was being treated for sepsis.  And

 7  to this moment, I don't know that that was happening.

 8      Q.   Well, do you know, from your knowledge of the

 9  evidence at the criminal trial, for instance,

10  Dr. Sikirica confirmed that there was sepsis even though

11  it wasn't in the autopsy?

12      A.   I know that the defense --

13                MS. CALABRESE:  Objection.

14                MR. KLEIN:  You can answer.

15                MS. CALABRESE:  No. I want to make a

16           record.  That statement is not correct.  The

17           fact that M█████ had sepsis was included in

18           the autopsy.

19                MR. KLEIN:  The word "sepsis" is not in

20           the autopsy.

21                You can answer.

22                You can just say "objection."  That's

23           it.
```

```
 1                    (Adam Mason - by Mr. Klein)

 2               MS. PECK:  Join the objection.

 3               MR. KLEIN:  Can you read back the

 4          question?

 5               THE WITNESS:  I don't need the question

 6          read back unless you do.

 7               I know that the defense's position was

 8          that M████ died of sepsis.  I don't recall

 9          anyone ever making me aware that M█████ was

10          actually being treated for sepsis.  I don't

11          recall that.

12   BY MR. KLEIN:

13      Q.  The autopsy refers to one of the diagnoses as

14   blood culture positive for streptococcus pneumonia on

15   initial presentation to hospital 9/21/08.

16          Do you recall any conversation about that aspect

17   of M████'s medical condition?

18      A.  No.

19      Q.  Back to the interview.

20          Is it true that you don't lie to everyone that

21   you interrogate?

22      A.  Yes.

23      Q.  I rattled off some numbers earlier that you
```

```
 1                   (Adam Mason - by Mr. Klein)

 2    acknowledged were approximately the number of certain

 3    statements that were lies, correct?

 4        A.  Yes.

 5        Q.  But would you agree that you don't even know how

 6    many lies you told in these interviews?

 7        A.  Correct.

 8        Q.  There was so many, correct?

 9        A.  Yes.

10        Q.  One of the lies was, we're trying to keep your

11    son alive right now.  Every bit of information is very

12    important right now.  They are trying to keep your son

13    alive.

14            That's one of the lies, correct?

15        A.  Yes.

16        Q.  We want to give the doctors every bit of

17    information we can to make sure your son stays alive and

18    that he better find that memory for his son's life?

19            That was a lie, correct?

20                MR. PERKINS:  Object to the form.

21                You can answer.

22                THE WITNESS:  Yes.

23    BY MR. KLEIN:
```

```
 1                    (Adam Mason - by Mr. Klein)

 2       Q.  When you told Adrian it wasn't about criminal

 3   charges, but instead it was about getting info to the

 4   doctors so they could try to save M█████'s life, that

 5   was a lie.

 6              MR. PERKINS:  Object to the form.

 7              You can answer.

 8              THE WITNESS:  Yes.

 9   BY MR. KLEIN:

10       Q.  You lied during the second interview when you

11   said you called the hospital.  I think we talked about

12   doctors, but you also said you called the hospital,

13   correct?

14              MR. PERKINS:  Object to the form.

15              You can answer.

16              THE WITNESS:  Yes.

17              MR. PERKINS:  Off the record.

18              (Discussion held off the record.)

19   BY MR. KLEIN:

20       Q.  You told Adrian that the doctors told you the

21   baby had healthy lungs, and that was a lie, correct?

22       A.  Yes.

23       Q.  When you told him that his wife said he must have
```

```
 1                    (Adam Mason - by Mr. Klein)

 2    slammed the baby last night, and that she had signed

 3    paper -- withdrawn.

 4         You told him that his wife said he must have

 5    slammed the baby last night, correct?

 6       A.  Yes.

 7       Q.  And that was a lie, correct?

 8       A.  Yes.

 9       Q.  You told him that she had already signed

10    paperwork to that effect.

11         That was not true, correct?

12       A.  Correct.

13       Q.  During all three interviews of Ms. Hicks, Sunday

14    the 21st, the deposition on the 23rd, and apparently in

15    October, you would agree that she never said that Adrian

16    slammed him to a bed or did anything to him that was

17    incriminating.

18       A.  Correct.

19       Q.  You lied to Adrian about Wilahemina Hicks's

20    statements in both the first and second interview,

21    correct?

22       A.  I don't recall.

23       Q.  In the second interview you told Thomas that
```

1           (Adam Mason - by Mr. Klein)

2   Wilahemina said that he had thrown the baby in the crib

3   like a rag doll.

4           Do you recall that?

5       A.  Yes.

6       Q.  That was a lie, correct?

7       A.  Yes.

8       Q.  You had told Adrian, when you left the room to

9   tape changes, you lied to him by saying things like the

10  chief wanted to talk to you, correct?

11      A.  Correct.

12      Q.  I'm showing you Defendant's Exhibit B.  This is

13  the ten-page statement from the interview two.

14          Can you identify in this exhibit where the first

15  part of the interview ended, the pre-Colaneri section,

16  and where --

17      A.  It's on page 6, about a third of the way down,

18  where his initials appear.

19      Q.  The initials are on the left margin?

20      A.  The right side, as well.

21      Q.  On the right side, as well.

22          So, where it starts saying, there are three other

23  times, and goes on for the rest of the page, is that the

```
 1                    (Adam Mason - by Mr. Klein)

 2    additional information that came out after Colaneri

 3    entered the room and then left?

 4       A.   Yes.

 5               MS. CALABRESE:  Can you please mark

 6          with a highlighter or something so we know

 7          what we're talking about when we get the

 8          transcript?

 9    BY MR. KLEIN:

10       Q.   I'm going to give you a yellow highlighter and

11    ask if you can just maybe mark the two sets of initials.

12    One set of initials marks the end of the first section

13    and the second one marks the beginning of the second

14    section.

15               Is that fair to say?

16       A.   Yes, it is.

17               MR. KLEIN:  I just want him to identify

18          whose notes are what.

19               Can we get a copy of this?

20               MR. PERKINS:  Sure.

21               (Discussion held off the record.)

22               (Thomas Exhibit 20 marked for

23          identification.)
```

```
 1              (Adam Mason - by Mr. Klein)
 2              MR. KLEIN:  Why don't you look at the
 3         marked exhibit.
 4    BY MR. KLEIN:
 5       Q.  Captain Mason, I'm showing you what's been marked
 6    as Thomas Exhibit 20.  Looking at the second page, after
 7    the first page says notes.
 8       A.  Uh-huh.
 9       Q.  Do you recognize the handwriting on that page?
10       A.  Yes.
11       Q.  Whose is it?
12       A.  That's mine.
13       Q.  And this is notes about Thomas's friend Dave
14    Maynard, who you went to visit, correct?
15       A.  Yes.
16       Q.  Then the other three names are the people that
17    you visited in the development where the Thomas-Hicks
18    household was located.
19       A.  Yes.
20       Q.  On the next page, where it's starting with "████
21    ██████," whose handwriting is that?
22       A.  That's mine.
23       Q.  And this is just pedigree information of
```

```
 1              (Adam Mason - by Mr. Klein)
 2   Mr. Thomas' relatives?
 3      A.  Yes.
 4      Q.  Do you know when you took this information down?
 5      A.  I do not.
 6      Q.  Most likely at the hospital Sunday night when you
 7   saw them?
 8      A.  It's possible.
 9      Q.  Then it says, "Melissa/Cedar Park," halfway down.
10          Do you know what that refers to?
11      A.  I do not.
12      Q.  Then it says, "Jennifer Taylor."
13          What does that mean?
14      A.  CP-12-5 -- I don't know who Jennifer Taylor is as
15   we sit here today.  But I know that CP-12-5 likely
16   refers to Corliss Park, which is an apartment complex in
17   Lansingburgh, building 12, apartment 5.
18      Q.  What relevance would that have had here?
19      A.  I honestly don't recall.
20      Q.  And then there's what looks like a phone number?
21      A.  Yes.
22      Q.  And then it says, "Freddie Treece."
23          Do you know who that is?
```

Case 1:17-cv-00626-DLS Document 163-4 Filed 10/25/21 Page 2766 of 273

1         (Adam Mason - by Mr. Klein)

2   A.  I don't.

3   Q.  Looking at the next page, starting with Nicole

4 Noel, do you know whose handwriting is on that page?

5   A.  That's mine, as well.  Well, the top part is.

6 The bottom part is not mine.

7   Q.  Where it says, "Adrian Thomas-being released," is

8 that the message from the hospital, Samaritan psych,

9 letting you know that they had called someone in your

10 office who had passed the message to you that he's being

11 released?

12   A.  That's what it appears to be.

13   Q.  The next page Tim Colaneri authenticated as

14 his -- on top -- his notes from the Wilahemina Hicks

15 interview?

16   A.  Yes.

17   Q.  And then at the bottom is the first page of his

18 notes from the second Thomas interview?

19   A.  Yes.

20   Q.  Looking at the next page at the top, where it

21 says, "13 walnut," do you know what that refers to?

22   A.  I believe this is in reference to when I went to

23 get a DNA sample from ████████.

**APPENDIX**          **2365**

```
 1                    (Adam Mason - by Mr. Klein)

 2        Q.   And then at the bottom we believe that's Tim

 3   Colaneri's continued notes of the interview.

 4             Does that appear to be right?

 5        A.   Yes.

 6        Q.   Looking at the next page, is that your

 7   handwriting starting with, "Linda Bell"?

 8        A.   Yes.

 9        Q.   This is information about Mr. Thomas' relatives

10   in Georgia?

11        A.   Yes.

12        Q.   Did you get that from Adrian or from someone

13   else, if you know?

14        A.   I don't recall.

15        Q.   You have Ms. Annipearl Black's phone number

16   there.

17             Did you ever speak with her or call her?

18        A.   I don't believe I did.

19        Q.   Next -- I think I mentioned this before -- is a

20   printout of the homicide statute.

21             Is this something you would have had for

22   reference in your file?

23        A.   Yes.
```

```
 1                 (Adam Mason - by Mr. Klein)

 2      Q.   Next is a page that says, "Wilahemina Hicks."

 3           Do you know whose handwriting is on this page?

 4      A.   I do not.

 5      Q.   Are these, like, messages that were left for you

 6  by someone in your office?

 7      A.   The one that says, "Adam, please call ███

 8  ███ ," that appears to be a message that was left for

 9  me in my office.

10      Q.   Dave Merritt?

11      A.   That looks like Detective Fountain's handwriting.

12      Q.   Do you know who that person is?

13      A.   This was in reference when we were looking for

14  one of Adrian Thomas' friends.

15      Q.   Next page.

16           Do you know whose handwriting that is, starting

17  with 45 or 46?

18      A.   That appears to be Detective Fountain's

19  handwriting.

20      Q.   Does this appear to be notes relating to the

21  search for Adrian Thomas' friend who worked at Sam's

22  Club?

23      A.   Yes.
```

Case 1:17-cv-00626-DJS Document 163-34 Filed 10/25/21 Page 188 of 273

1          (Adam Mason - by Mr. Klein)

2     Q.   Next page is a note that you were going through

3 the file with A. Glass, ADA regarding discovery needs

4 and you turned over to him the 911 tapes?

5     A.   Yes.

6     Q.   Is this your handwriting?

7     A.   It appears to be Detective Fountain's

8 handwriting.

9     Q.   And this is just that, on January 8th of 2009,

10 Detective Fountain met with Art Glass, correct?

11    A.   Yes.

12    Q.   Do you know if you were present at that meeting?

13    A.   I don't recall.

14    Q.   Next is the discharge transition plan for M█████

15 T█████ from Albany Med.

16         Are these, like, social worker notes?

17    A.   I don't know.

18    Q.   But these are records that made it into your

19 file.

20    A.   Yes.

21    Q.   Going next to the next handwritten notes,

22 starting with, "homicide meeting," 9/29/08, at NYSPFIC?

23    A.   Forensic investigation center.

1                     (Adam Mason - by Mr. Klein)

2        Q.   Are these notes that you took or someone else

3    took?

4        A.   This looks like a sign-in sheet from that meeting

5    that we had at the New York State police lab, I believe.

6        Q.   And it looks like your handwriting is just your

7    name, the fourth name down on that list, correct?

8        A.   Yes.

9        Q.   So, does this confirm that Christa Book and Art

10   Glass were also at the meeting?

11       A.   Yes.

12       Q.   Did the New York State Police have any role in

13   this investigation or prosecution other than their role

14   in testing any evidence?

15       A.   No.

16       Q.   Next page starting with number 4:10.

17            Do you know whose notes these are?

18       A.   These looks like Detective Fountain's notes.

19       Q.   Are these notes from his interviews with -- do

20   you know who they're notes from -- are they notes of his

21   interviews with the kids?

22       A.   I think that, when he was at Start Children's

23   Center, when they interviewed the other kids there,

Case 1:17-cv-00626-DJS Document 178-4 Filed 10/25/21 Page 220 of 273

1              (Adam Mason - by Mr. Klein)

2    these are the notes from that.

3        Q.   And is that why he wasn't with you during the

4    second interview?

5        A.   Yes.

6        Q.   Going to the page that says, "CPS, 9/22/08,

7    Valerie Clayton," at the top.

8              Do you see that?  Should be the next page with

9    writing on it.

10       A.   Yes.

11       Q.   Do you know whose notes these are?

12       A.   That appears to be Detective Fountain's notes, as

13   well.

14       Q.   Do these also appear to be from the Start Center?

15       A.   Yes.

16       Q.   Then the next page I have starts with the words,

17   "then Mommy got hurt"?

18       A.   Yes.

19       Q.   Those appear to be continued notes?

20       A.   Yes.

21       Q.   The page starting with 4:28, is that also

22   handwritten notes from Fountain?

23       A.   Yes.

1                    (Adam Mason - by Mr. Klein)

2        Q.  And the page starting with 9/22/08, that's also a

3    Start interview?

4        A.  Yes.

5        Q.  Then I have a page that says, "by Investigator

6    Gonzales."

7            Do you know who that is?

8        A.  It was a New York State Police investigator who

9    worked in the juvenile division, worked with Detective

10   Fountain a lot.  And I don't know if he was assigned to

11   the Start Children's Center or if he was just someone

12   that Detective Fountain had worked with, William

13   Gonzales.

14           So maybe he was present for the...

15       Q.  Start interviews?

16       A.  For those interviews, as well.

17       Q.  Do you know if this is his handwriting, or you

18   don't know?

19       A.  I don't know.

20       Q.  Next page, number 8, "spoke with ████████-old

21   ████  inconsistencies."

22           Is this Detective Fountain again?

23       A.  Yes.

1          (Adam Mason - by Mr. Klein)

2     Q.   Next page, "struck ██ for poop," is that

3  Detective Fountain?

4     A.   Yes.

5     Q.   Next page, 2441, "baby M████ T████," is that

6  also Detective Fountain?

7     A.   Yes.

8     Q.   Next page 930, "Dr. Edge attending."

9          Do you know whose notes these are?

10    A.   These look like Detective Fountain's notes, as

11  well.

12    Q.   Next page, "██████," with an arrow and the number

13  eight.

14         Do you know whose notes these are?

15    A.   I do not.

16    Q.   And it's three pages, apparently, correct?

17    A.   Yes.

18    Q.   Actually, it might be -- the pages I have say

19  one, three, and five on the top right, correct?

20    A.   Yes.

21    Q.   I don't know if it was double sided and we don't

22  have them all, but do you recall seeing these in your

23  file?

```
 1                    (Adam Mason - by Mr. Klein)

 2         A.   Yes.

 3         Q.   Do you know who gave them to you?

 4         A.   I think that these may have been from an employee

 5    at the Start Children's Center from the same interview

 6    that we just referred to that Detective Fountain was at.

 7         Q.   Did any of the evidence obtained from the Start

 8    Center interviews contribute to the prosecution of

 9    Adrian Thomas, to your knowledge, or was it, I think as

10    you said earlier, solely based on his confession

11    post-Colaneri?

12         A.   Correct.

13         Q.   Correct, it was based on the confession

14    post-Colaneri?

15         A.   Correct.

16         Q.   To your knowledge, anything that was said during

17    the Start interviews --

18                    MS. CALABRESE:  Can you read back the

19            last question, please?

20                    (Question read by reporter.)

21                    MS. CALABRESE:  Two questions.

22                    (Question read by reporter.)

23                    MS. CALABRESE:  Thank you.
```

```
 1                  (Adam Mason - by Mr. Klein)

 2    BY MR. KLEIN:

 3        Q.  And is it your understanding that of the

 4    information that was given or obtained during those

 5    interviews, none of it implicated or incriminated

 6    Mr. Thomas with murdering M██████?

 7                  MR. PERKINS:  Object to the form.

 8                  You can answer.

 9                  THE WITNESS:  Yes.

10    BY MR. KLEIN:

11        Q.  Since the 2014 acquittal, have you interacted

12    with Dr. Sikirica at all?

13        A.  No.

14        Q.  Haven't had any cases with him?

15        A.  Nothing that I can recall.

16        Q.  Have you had any occasion to speak with him about

17    what happened in this case?

18        A.  I have not.

19        Q.  Did you attend M██████ T██████' funeral?

20        A.  No.

21        Q.  Do you recall there being some evidence of some

22    blood on the sheets?

23        A.  Yes.
```

# APPENDIX

```
 1              (Adam Mason - by Mr. Klein)

 2      Q.  Was it ever determined whose blood that was or

 3   where it came from?

 4      A.  I don't recall if it was.

 5      Q.  To your knowledge, that didn't factor into the

 6   investigation here?

 7      A.  To my knowledge, it didn't.

 8      Q.  Captain Mason, have you told us everything you

 9   can recall about the investigation of M██████ T█████ --

10   about the investigation of the death of M██████ T█████?

11      A.  Yes.

12      Q.  Is there anything that you wish to add or change

13   for the record, now that we've talked about it all day

14   and your memory has been jogged a lot?

15      A.  No.

16              MR. KLEIN:  So I'm just going to make a

17           statement that it appears that there is a

18           video that was discovered today that I don't

19           believe I have and that --

20              MS. CALABRESE:  You have it now.  I

21           uploaded it to the cloud.

22              MR. KLEIN:  Right, but subject to the

23           right, which may not be necessary to
```

```
 1              (Adam Mason - by Mr. Klein)

 2          question about that video, I believe that's

 3          all the questions I have at this point.

 4              MS. CALABRESE:  I have just a couple

 5          follow-up questions, Captain.

 6    EXAMINATION

 7    BY MS. CALABRESE:

 8       Q.  You've seen the video?

 9       A.  Yes.

10       Q.  And it's accurate?

11       A.  Yes.

12       Q.  There is nothing that occurred off video that was

13    coercive in nature, for example, threats, beatings,

14    things of that nature?

15       A.  Correct.

16       Q.  And you were asked questions about preparing for

17    your testimony with the district attorney's office.

18          Isn't that common practice?

19       A.  Yes.

20       Q.  And you're expected to be prepared for testimony

21    when testifying in criminal court?

22       A.  Yes.

23       Q.  Earlier in your testimony, when asked about your
```

```
 1              (Adam Mason - by Ms. Calabrese)

 2  working relationship with Officer Fountain or Detective

 3  Fountain, you said that at that time it was a good

 4  working relationship.

 5          Has that changed?

 6                  MR. PERKINS:  Object to the form.

 7                  THE WITNESS:  He's no longer employed

 8          at the City of Troy Police Department.

 9  BY MS. CALABRESE:

10      Q.  So is that what you mean by that statement?

11      A.  Yes.

12      Q.  You were asked questions about press clippings.

13          Would it be unusual for any officer in your

14  department or any department anywhere to follow a case

15  that you were investigated in the press or that has been

16  publicized in the press?

17      A.  Correct.

18      Q.  There's nothing prohibiting you from doing that?

19      A.  Correct.

20      Q.  Then you mentioned you bumped into Wilahemina

21  Hicks approximately three times, two times around or

22  after the 2009 trial where Adrian Thomas was convicted,

23  and then five years ago, after the time that Adrian
```

```
 1            (Adam Mason - by Ms. Calabrese)
 2   Thomas would have been acquitted.
 3            Did she say anything to you with regard to her
 4   opinion about whether or not it was a fair acquittal or
 5   anything of that nature?
 6        A.  No.
 7        Q.  You were asked a lot of questions about
 8   conversations you may have had with CPS, including
 9   Nicole Noel and the child fatality review team members.
10            At any point in time did you direct any member of
11   child protective services to conduct a portion of your
12   investigation?
13        A.  No.
14        Q.  Did you direct them or tell them that they should
15   go receive a confession from Adrian Thomas?
16        A.  No.
17        Q.  Did you direct them or tell them that they should
18   go and obtain any kind of statement from Adrian Thomas?
19        A.  No.
20        Q.  Did you tell them to do anything relative to
21   their own investigation?
22        A.  No.
23        Q.  Isn't it common that the police department and
```

```
 1              (Adam Mason - by Ms. Calabrese)

 2   child protective services will liaise in cases involving

 3   child abuse?

 4      A.  Yes.

 5      Q.  Now, Adrian Thomas testified that, after M█████

 6   was removed from the house by ambulance but prior to

 7   his -- the other children being removed, he cleaned the

 8   house and performed other household duties.

 9          Based upon your how many years of experience?

10      A.  22.

11      Q.  -- 22 years of experience, would you consider

12   that odd?

13              MR. KLEIN:  Objection.

14   BY MS. CALABRESE:

15      Q.  A situation wherein a child who is gravely ill is

16   removed from the house and the caregiver is tending to

17   household chores, cleaning, cooking, things of that

18   nature, and not attempting to reach out to the sick

19   child.

20              MR. KLEIN:  Objection.

21              THE WITNESS:  I don't know if that

22          was -- people behave in different manners.

23          I don't know how I expected him to behave in
```

1               (Adam Mason - by Ms. Calabrese)

2       that situation, to be honest with you.

3  BY MS. CALABRESE:

4    Q.  When you arrived at the house, the house was

5  clean, you said?

6    A.  Yes.  It was.

7    Q.  You mentioned that after the first -- at the

8  conclusion of the first video, prior to Adrian Thomas

9  threatening to jump off a bridge, you were intending to

10  end the conversation with him; is that right?

11    A.  Yes.

12    Q.  Why at that point were you ending the

13  conversation?

14    A.  It had just come to a point where we thought it

15  was a good time to stop.

16    Q.  And that interview would be concluded at that

17  time.

18    A.  Yes.

19    Q.  And then he made the threats and that caused you

20  to intervene?

21    A.  Yes.

22    Q.  You were asked questions about Adrian Thomas'

23  educational level.

```
 1                (Adam Mason - by Ms. Calabrese)
 2          Did he appear to be giving you reasonable
 3     responses to the questions that you asked?
 4       A.   Yes.
 5       Q.   Did he appear to be lucid?
 6       A.   He appeared to be completely normal to me.
 7       Q.   Normal meaning like you and I are here today?
 8       A.   Yes.
 9       Q.   At any point in time did he tell you he didn't
10     understand what was going on?
11       A.   No.
12       Q.   Or that he didn't understand a question you had
13     asked?
14       A.   No.
15       Q.   Or he needed assistance in any form whatsoever in
16     going through the process of having this conversation
17     with you.
18       A.   No.
19       Q.   Did he tell you that he had only a portion of a
20     high school education?
21       A.   No.
22       Q.   Did he tell you that he had special needs of any
23     kind?
```

1                  (Adam Mason - by Ms. Calabrese)

2        A.   No.

3        Q.   Did he appear to have special needs of any kind?

4        A.   No.

5        Q.   At that point in time in your career, how many

6    people had you interviewed -- and I'm just asking for a

7    rough estimate -- hundreds, thousands?  Victims,

8    witnesses, and suspects.

9        A.   Hundreds.

10       Q.   Hundreds.

11            And have you interviewed people who have special

12   needs?

13       A.   Yes.

14       Q.   Do you feel that, based upon your training,

15   education, and experience, you have an ability when

16   talking to somebody to determine if they have what's

17   considered a normal IQ?

18       A.   Yes.

19       Q.   At no point in time did he ask for an attorney?

20       A.   That's correct.

21       Q.   How long was the break between when he was sent

22   to Samaritan and when he was returned to you,

23   approximately?

Case 1:17-cv-00626-DJS Document 163-4 Filed 10/25/21 Page 238 of 273

```
 1                  (Adam Mason - by Ms. Calabrese)

 2      A.   16 hours.

 3      Q.   When Adrian testified, he testified that the two

 4   written statements that he gave -- and you've already

 5   seen them today -- that none of those words were his

 6   words, that all of the words contained in that statement

 7   were your words; is that true?

 8      A.   That's not true.

 9      Q.   Who wrote the statement out?

10      A.   I wrote it out.

11      Q.   You wrote it out based upon the brevity -- or the

12   entire conversation that you had with him?

13      A.   Yes.

14      Q.   After you wrote it out, did you give Adrian

15   Thomas an opportunity to read it?

16      A.   Yes.

17      Q.   And did he read it?

18      A.   Yes.

19      Q.   Did you give him an opportunity to make changes,

20   alterations, or deletions to that statement?

21      A.   Yes.

22      Q.   And did he do that?

23      A.   No.
```

Case 1:17-cv-00626-DJS Document 18-34 Filed 10/25/21 Page 234 of 273

```
 1              (Adam Mason - by Ms. Calabrese)

 2      Q.  Did he initial each portion of the statement, as

 3   is written on the statement, acknowledging what he wrote

 4   in the statement?

 5      A.  Yes.

 6      Q.  Did he sign the statement?

 7      A.  Yes.

 8      Q.  Acknowledging that any false statements made

 9   would be subject to perjury and/or a class A

10   misdemeanor?

11      A.  Yes.

12      Q.  Prior to investigating Adrian Thomas, had you had

13   occasions to investigate other allegations of child

14   abuse or neglect?

15      A.  Yes.

16      Q.  Isn't it common that people who abuse children

17   generally are within the same household?

18      A.  Yes.

19              MR. KLEIN:  Objection.

20   BY MS. CALABRESE:

21      Q.  And have jobs?

22      A.  Yes.

23              MR. KLEIN:  Objection.
```

```
 1                    (Adam Mason - by Ms. Calabrese)

 2     BY MS. CALABRESE:

 3        Q.  And conduct themselves like regular citizens?

 4                    MR. KLEIN:  Objection.

 5                    THE WITNESS:  Yes.

 6     BY MS. CALABRESE:

 7        Q.  And those people generally don't have criminal

 8     histories?

 9                    MR. KLEIN:  Objection.

10                    THE WITNESS:  I can't say whether they do or

11     they don't generally have criminal histories.  Sometimes

12     they do; sometimes they don't.

13        Q.  Have you encountered other suspects of child

14     abuse that did not have criminal histories prior to you

15     interviewing them?

16        A.  I can't recall a specific time, but I have

17     encountered that.

18        Q.  So you can't say it's more so or not whether or

19     not those type of suspects have or don't have a criminal

20     history?

21            And what I mean by that is, generally, when

22     arresting somebody for drugs, they have a rap sheet for

23     similar offenses.  Generally, when investigating people
```

```
 1              (Adam Mason - by Ms. Calabrese)
 2    who abuse children, don't.
 3              Have you noticed that pattern?
 4         A.   Yes.
 5                   MR. KLEIN:   Objection to the form of
 6              the question.
 7    BY MS. CALABRESE:
 8         Q.   You were asked a lot of questions about
 9    conversations that you had with Nicole Noel.
10              At any point in time did you tell Nicole Noel
11    that she was to play a part or role in your
12    investigation?
13         A.   No.
14         Q.   Did you direct her to do anything?
15         A.   No.
16         Q.   Did you direct her to disclose any information to
17    anybody who may or may not be interviewing Adrian
18    Thomas?
19         A.   No.
20         Q.   Did you tell her to interview Adrian Thomas?
21         A.   No.
22         Q.   Did you ask her for assistance in the course of
23    your investigation?
```

Case 1:17-cv-00626-DJS Document 163-34 Filed 10/25/21 Page 2378 of 273

```
 1              (Adam Mason - by Ms. Calabrese)

 2      A.  No.

 3      Q.  The MDT or multidisciplinary team is, in fact, an

 4  information sharing opportunity; is that right?

 5      A.  I have never heard of that.

 6      Q.  Were you present at the child fatality review

 7  meeting; is that right?

 8          And the child fatality review team you were not

 9  on.

10      A.  I was not on the team.  No.

11      Q.  So, because you investigated the case involving

12  the fatality of M███████, you were asked to come and

13  present.

14      A.  Correct.

15      Q.  Was that the only time you presented at the child

16  fatality review team?

17      A.  The two months of September and October were the

18  only two times I've ever attended one of those meetings.

19              MR. KLEIN:  October and November.

20              THE WITNESS:  October, November, sorry.

21  BY MS. CALABRESE:

22      Q.  And at those meetings, you provided information

23  based upon what you learned during the course of your
```

Case 1:17-cv-00626-DJS Document 163-4 Filed 10/25/21 Page 2388 of 273

1                    (Adam Mason - by Ms. Calabrese)

2    investigation.

3        A.   Correct.

4        Q.   Did anybody direct you to do anything?

5        A.   No.

6        Q.   Did anybody tell you to conduct your

7    investigation one way versus another?

8        A.   No.

9        Q.   In one of your reports it mentions burning copies

10   of disks.

11           Isn't it likely that you did that for purposes of

12   a 7-10-30 arraignment?

13       A.   Yes.

14                    MR. KLEIN:   Objection to form.

15   BY MS. CALABRESE:

16       Q.   In one of Sergeant Colaneri's reports he

17   mentioned that, although he did not see any outward sign

18   of trauma on M█████ T█████, he couldn't quite be sure

19   because of, one, the pigment of M█████'s skin.

20           Is that something that you also noticed?

21       A.   Yes.

22       Q.   M█████'s skin was darker in color?

23       A.   Yes.

```
 1                (Adam Mason - by Ms. Calabrese)

 2      Q.   And wouldn't necessarily show any bruises?

 3      A.   I didn't observe any bruises.

 4      Q.   Sergeant Colaneri also mentioned in the report

 5   that he did notice that M██████'s eyes and head seemed

 6   swollen.

 7           Did you notice that?

 8      A.   Yes.

 9      Q.   In more cases than I can recite to you today,

10   isn't it true that deceit in the course of interviewing

11   a suspect is permitted?

12      A.   Yes.

13      Q.   You're permitted to lie to a suspect during the

14   course of your investigation?

15      A.   Yes.

16              MS. CALABRESE:  No further questions.

17              Thank you.

18   EXAMINATION

19   BY MS. PECK:

20      Q.   Captain Mason, my name Crystal Peck.  I represent

21   the County of Rensselaer and Dr. Sikirica in this

22   matter.  I only have a couple questions for you.

23           You had mentioned that you were at the autopsy of
```

Case 1:17-cv-00626-DJS   Document 68-24   Filed 10/25/21   Page 240 of 273

1                    (Adam Mason - by Ms. Peck)

2    M█████  Thomas, correct?

3      A.  Yes.

4      Q.  And other than the autopsy, did you have any

5    occasion or have you had any occasion to discuss the

6    death of M█████  T█████ or the arrest and prosecution of

7    Adrian Thomas with Dr. Sikirica?

8      A.  No.

9      Q.  When you were at the autopsy of M█████  T█████,

10   did you in any way tell Dr. Sikirica what you expected

11   his findings to be?

12     A.  No.

13     Q.  Did you at any time ask Dr. Sikirica to alter or

14   change what his findings might be?

15     A.  No.

16     Q.  Did Dr. Sikirica ever say to you, what results or

17   what type of findings do you need for conviction?

18     A.  No.

19     Q.  Did you tell Dr. Sikirica at the autopsy or at

20   any other -- or at any time before the autopsy regarding

21   M█████  T█████ what you expected M█████  T█████'

22   injuries to be?

23     A.  No.

```
 1              (Adam Mason - by Ms. Peck)

 2      Q.  Did you in any way conspire or discuss with

 3   Dr. Sikirica that you wanted to target Adrian Thomas for

 4   prosecution in this case?

 5      A.  No.

 6      Q.  Did Dr. Sikirica have any discussions with you

 7   about that?

 8      A.  No.

 9      Q.  You were asked a question by Mr. Klein that -- he

10   had asked you when reviewing your notes, which were

11   Thomas 20, whether the interviews at the Start Center

12   were the basis of the prosecution for Adrian Thomas.

13           Do you recall that question?

14      A.  Yes.

15              MR. KLEIN:  I asked if they were the

16           basis of any incriminating comment that was

17           charged.

18              MS. PECK:  Before that you said -- no.

19           It was the one she asked to be read back.

20   BY MS. PECK:

21      Q.  Once you make an arrest in a case, at that point

22   it's up to the district attorney as to whether they're

23   going to actually move forward with the prosecution;
```

1               (Adam Mason - by Ms. Peck)

2    isn't that accurate?

3        A.   That's correct.

4        Q.   So there may be instances in which you or any

5    police officer may make an arrest and the district

6    attorney's office may decide not to prosecute the case

7    for some reason.

8        A.   That could happen.  Yes.

9        Q.   So, when you were asked a question as to whether

10   those statements played a part in the prosecution of

11   Adrian Thomas, was it your understanding that you were

12   answering as to prosecution or arrest?

13       A.   I may have been confused by the question and I'm

14   not certain now how I answered it.

15       Q.   To your knowledge, was the only -- I think you

16   answered that the basis for prosecution was the

17   confession that had been elicited from Adrian Thomas.

18            Do you recall that being your answer?

19       A.   Yes.

20       Q.   In moving forward with the prosecution, though,

21   it's the district attorney that determines what the

22   basis of the prosecution would be.

23            Is that correct or accurate?

1               (Adam Mason - by Ms. Peck)

2    A.   That's correct.

3    Q.   So, your role as a police officer would be

4 determining what evidence is the basis of an arrest, and

5 then the district attorney's office would look at

6 everything and determine what evidence they can use to

7 prosecute a case; is that correct?

8    A.   Yes.

9           MS. PECK:  I have no further questions.

10          MR. KLEIN:  I have a few.

11          Do you have any?

12          MR. PERKINS:  No.

13          MR. KLEIN:  Just a few follow-ups.

14 FURTHER EXAMINATION

15 BY MR. KLEIN:

16    Q.   Captain Mason, was it clear to you, on

17 September 22nd, 2008, that you could not make assurances

18 and misrepresentations that would lead to a coerced

19 confession?

20          MR. PERKINS:  Object to the form.

21          You can answer.

22          THE WITNESS:  Yes.

23 BY MR. KLEIN:

1  (Adam Mason - by Mr. Klein)

2  Q.  You agree that Mr. Thomas was innocent until

3  proven guilty, correct?

4  A.  Yes.

5  Q.  Here, in your mind, would you agree he was

6  presumed innocent until such point that you felt you had

7  probable cause, correct?

8  A.  Yes.

9  Q.  You initiated the prosecution in this case

10 personally via your preparation and submission of the

11 criminal court information to -- was it the city court?

12          MR. PERKINS:  Object to the form.

13          MS. PECK:  Object to the form.

14          MR. PERKINS:  You can answer, if you

15     can.

16          THE WITNESS:  I initiated the legal

17     process.  I don't know at which point the

18     prosecution began, but I initiated the legal

19     process when I filed the accusatory

20     instrument with the court.

21 BY MR. KLEIN:

22 Q.  Right, you signed it, and to your knowledge, when

23 you say you initiated the legal process that means that

```
 1                (Adam Mason - by Mr. Klein)

 2   starts the court case, generates a docket number, etc.?

 3      A.  Yes.

 4      Q.  With regards to Dr. Sikirica and you having any

 5   type of agreement and such, you knew he would rely on

 6   your investigatory work product in the course of his

 7   forensic investigation, whether or not you had any

 8   discussions with him about the direction of his case,

 9   correct?

10             MR. PERKINS:  Objection to the form.

11             You can answer.

12             THE WITNESS:  No.  I assume that he

13         would rely on his own medical expertise to

14         make those determinations.

15   BY MR. KLEIN:

16      Q.  So you don't know whether or not he relied on

17   your statement?

18      A.  I don't know if he relied on it, or if he did,

19   how much.  No.

20      Q.  With regard to Ms. Peck's questions about the

21   Start Center investigation, the information received

22   pursuant to those interviews didn't provide grounds for

23   this prosecution of Adrian Thomas, correct?
```

```
 1                (Adam Mason - by Mr. Klein)

 2             MR. PERKINS:  Objection to the form.

 3             MS. PECK:  Objection to the form.

 4             MR. PERKINS:  And the reason I object

 5          is to just have a little distinction between

 6          prosecution and arrest.

 7             MR. KLEIN:  I'm asking about

 8          prosecution.

 9             MR. PERKINS:  Okay.  He's asking about

10          prosecution.

11   BY MR. KLEIN:

12      Q.  The information that was obtained at the Start

13   Center in Detective Fountain notes, etc., that wasn't

14   conveyed by you to prosecutors.  You conveyed the

15   substance of the confession to the prosecutors.

16          And that, along with Dr. Sikirica's autopsy, was

17   the basis of the charges, correct?

18             MS. PECK:  Objection.

19             THE WITNESS:  If you're referring to

20          prosecution, I conveyed my entire case file.

21          So what happened at those meetings would

22          have been included in the case file.  So

23          they would had that.  It was up to them
```

```
 1                (Adam Mason - by Mr. Klein)
 2          whether or not they used that as part of
 3          their prosection or not.
 4   BY MR. KLEIN:
 5     Q.   The prosecution -- he was literally prosecuted
 6   for attempted murder and then for murder, correct?
 7     A.   Yes.
 8     Q.   You didn't arrest him for anything other than
 9   initially attempted murder, which then became a murder
10   when M████ died, correct?
11     A.   Correct.
12     Q.   You didn't arrest him for any conduct that was
13   set forth in the Start Center interviews?
14     A.   Correct.
15     Q.   And you didn't draw up any accusatory instruments
16   that lead to a prosecution for any of the conduct that
17   came out during the Start Center interviews, correct?
18     A.   Yes.
19          MR. KLEIN:   That's all the questions I
20          have.   Thank you for your time.
21          (Deposition concluded at 3:56 p.m.)
22
23
```

Case 1:17-cv-00626-DJS Document 163-4 Filed 10/25/21 Page 248 of 273

1          List of requests:

2

3     1.  Commendations or other medals or
          similar documents

4

5     2.  2008 interrogation training session
          and any other interrogation training
          sessions

6

7                  INDEX OF EXHIBITS

    Thomas                                    Marked

8

9      18  Grand jury transcript              75

10     19  Troy PD file                       75

11     20  Troy PD notes                     211

12

13

14

15

16

17

18

19

20

21

22

23

Case 1:17-cv-00626-DJS Document 163-4 Filed 10/25/21 Page 249 of 273

1   STATE OF NEW YORK     )

2   COUNTY OF

3

4   I, ADAM R. MASON, do hereby certify that I have read the

5   foregoing record of my testimony taken at the time and

6   place noted in the heading hereof and that it is a true

7   and correct transcript of the same and the whole

8   thereof.

9

10

11

12

13                _____
                          ADAM R. MASON
14  Subscribed and sworn to

15  before me this _____ day

16  of _____, 2019

17

18

19

20

21  _____

22

23

1 <u>C E R T I F I C A T I O N</u>

2

3

4 I, Jeanne O'Connell, Registered Professional Reporter

5 and Notary Public in and for the State of New York, do

6 hereby certify that the foregoing to be a true and

7 accurate transcription of the stenographic notes as

8 taken by me of the aforesaid proceedings.

9

10

11

12 _____        _____

13     Date                               Jeanne O'Connell

14

15

16

17

18

19

20

21

22

23

**'**

**'08** [12] - 32:10, 32:13, 33:12, 34:5, 35:10, 36:6, 36:9, 36:10, 39:13, 49:18, 61:7, 158:23
**'18** [1] - 40:22
**'97** [1] - 33:11

**0**

**0141** [1] - 104:10

**1**

**1** [1] - 247:3
**10007** [1] - 2:3
**10:00** [2] - 150:14, 157:7
**11** [2] - 64:2, 194:3
**11/05/08** [3] - 36:22, 137:11, 164:14
**11:00** [2] - 135:2, 156:12
**11:10** [1] - 103:20
**11th** [1] - 129:4
**12** [3] - 82:17, 83:14, 213:17
**12180** [1] - 2:6
**12205** [1] - 2:10
**12224** [1] - 2:13
**12:30** [1] - 163:20
**12th** [1] - 1:18
**13** [1] - 83:3, 84:3, 214:21
**14** [4] - 83:5, 84:8, 182:14, 183:5
**14th** [2] - 162:10, 162:12
**15** [1] - 34:9
**16** [3] - 83:6, 84:11, 232:2
**160.50** [1] - 71:14
**18** [4] - 75:19, 81:7, 82:8, 247:8
**19** [4] - 75:19, 76:3, 81:3, 247:9
**1983** [1] - 4:13
**1995** [1] - 26:22
**1997** [2] - 27:19, 38:17
**1st** [1] - 156:12

**2**

**2** [3] - 69:9, 69:12, 247:4

**20** [7] - 15:16, 15:18, 34:9, 211:22, 212:6, 240:11, 247:10
**2008** [28] - 31:15, 31:16, 45:22, 48:16, 50:16, 51:3, 53:10, 54:17, 59:13, 65:5, 78:16, 80:11, 80:12, 85:12, 95:6, 96:21, 103:19, 135:16, 138:12, 144:8, 156:6, 157:7, 158:7, 162:10, 172:12, 188:9, 242:17, 247:4
**2009** [13] - 11:12, 35:16, 53:10, 66:5, 66:19, 66:21, 66:22, 68:4, 68:7, 73:12, 80:15, 217:9, 226:22
**2010** [2] - 39:20, 40:4
**2014** [4] - 57:11, 66:20, 66:22, 223:11
**2018** [1] - 40:9
**2019** [6] - 1:18, 69:9, 104:18, 107:4, 129:4, 248:16
**20th** [2] - 104:18, 107:4
**21** [1] - 177:22
**211** [1] - 247:10
**21st** [14] - 55:5, 69:9, 69:16, 85:11, 87:14, 95:5, 103:19, 126:22, 163:4, 172:12, 209:14
**22** [4] - 1:20, 2:5, 228:10, 228:11
**22nd** [9] - 77:6, 105:21, 106:2, 106:5, 106:9, 172:23, 174:7, 203:4, 242:17
**2310** [1] - 103:19
**23rd** [17] - 77:8, 107:12, 107:16, 117:10, 120:5, 122:4, 122:8, 122:10, 124:3, 124:15, 124:18, 125:3, 125:11, 127:17, 138:9, 142:10, 209:14
**24** [6] - 77:13, 201:10, 201:14, 201:15, 203:2, 203:7
**2441** [1] - 221:5
**24th** [7] - 122:8, 134:15, 135:16, 138:10, 138:12, 143:15, 143:20

**25th** [2] - 143:22, 144:8
**26th** [3] - 150:12, 150:14, 151:3
**29th** [3] - 151:5, 153:14, 153:21
**2:07** [1] - 126:13
**2nd** [1] - 157:7

**3**

**305** [1] - 2:2
**30th** [3] - 153:23, 155:18, 156:10
**3:00** [1] - 152:12
**3:56** [2] - 246:21
**3rd** [4] - 78:16, 155:10, 155:19, 158:7

**4**

**45** [1] - 216:17
**46** [1] - 216:17
**4:10** [1] - 218:16
**4:15** [1] - 153:23
**4:28** [1] - 219:21

**5**

**5** [2] - 2:9, 213:17
**5:30** [2] - 155:11, 158:8
**5th** [1] - 163:10

**6**

**6** [1] - 210:17
**600** [1] - 2:3
**67** [2] - 182:10, 183:5
**6:00** [1] - 203:4

**7**

**7-10-30** [1] - 237:12
**75** [2] - 247:8, 247:9

**8**

**8** [3] - 129:3, 131:21, 220:20
**8:00** [1] - 101:12
**8:30** [3] - 158:23, 159:7, 171:11
**8:45** [2] - 127:8, 127:15

**8th** [3] - 158:23, 162:11, 217:9

**9**

**9/17/08** [1] - 130:19
**9/18/08** [1] - 130:20
**9/20/08** [2] - 130:20, 130:22
**9/21** [1] - 156:15
**9/21/08** [1] - 206:15
**9/22/08** [3] - 104:10, 219:6, 220:2
**9/23/08** [2] - 125:6, 134:12
**9/26** [1] - 151:13
**9/29** [1] - 151:13
**9/29/08** [1] - 217:22
**911** [5] - 86:10, 91:4, 143:16, 171:12, 217:4
**930** [1] - 221:8
**9:00** [1] - 171:11
**9:04** [1] - 1:18

**A**

**a.m** [5] - 1:19, 135:2, 150:14, 157:7, 171:11
**abide** [1] - 5:20
**ability** [5] - 5:17, 16:8, 186:20, 197:8, 231:15
**able** [3] - 32:2, 128:14, 152:2
**absence** [2] - 202:4, 202:8
**absolutely** [1] - 97:6
**absorb** [1] - 60:21
**abuse** [9] - 76:23, 77:4, 164:22, 165:9, 228:3, 233:14, 233:16, 234:14, 235:2
**academy** [6] - 28:23, 29:2, 29:16, 30:14, 30:19, 30:22
**acceptable** [3] - 177:7, 177:10, 177:15
**accepted** [2] - 28:21, 189:3
**accident** [9] - 23:19, 146:8, 175:2, 178:8, 181:8, 181:17, 182:3, 182:11, 183:5
**accidental** [3] - 167:22, 181:22,

**204:12
according** [2] - 92:12, 130:13
**account** [2] - 136:13, 190:17
**accurate** [12] - 48:19, 53:15, 101:15, 103:16, 182:12, 184:10, 197:9, 201:14, 225:10, 241:2, 241:23, 249:7
**accurately** [2] - 5:4, 5:17
**accusation** [2] - 23:21, 23:22
**accusatory** [4] - 73:5, 118:8, 243:19, 246:15
**accused** [1] - 26:5
**acknowledged** [1] - 207:2
**acknowledging** [2] - 233:3, 233:8
**acquired** [1] - 77:22
**acquittal** [6] - 57:15, 68:15, 68:17, 71:14, 223:11, 227:4
**acquitted** [2] - 65:20, 227:2
**act** [1] - 112:17
**action** [4] - 3:13, 4:12, 26:11, 161:16
**actions** [4] - 4:10, 112:15, 151:14, 167:21
**actual** [3] - 20:19, 78:11, 147:15
**ADA** [7] - 11:19, 12:11, 151:7, 157:8, 163:22, 217:3
**ADAM** [5] - 1:6, 1:17, 4:2, 248:4, 248:13
**Adam** [3] - 2:7, 54:9, 216:7
**ADAs** [1] - 117:21
**add** [1] - 224:12
**added** [1] - 141:7
**addition** [3] - 10:4, 130:11, 165:7
**additional** [11] - 77:12, 77:16, 135:6, 162:12, 164:14, 164:16, 165:20, 167:7, 172:8, 190:19, 211:2
**address** [1] - 159:20
**administer** [1] - 3:18
**admission** [1] - 105:9
**admissions** [1] - 182:22

# APPENDIX

**admit** [1] - 203:21
**admitted** [2] - 115:17, 130:17
**adopted** [1] - 191:7
**Adrian** [143] - 4:9, 7:15, 14:17, 20:18, 21:18, 22:4, 22:10, 22:14, 32:10, 35:5, 35:13, 35:21, 36:12, 43:4, 44:17, 53:17, 53:19, 56:5, 61:6, 61:19, 62:5, 63:15, 65:2, 65:6, 65:15, 68:20, 76:2, 79:2, 80:22, 87:13, 88:22, 89:4, 89:6, 90:6, 95:12, 95:17, 97:11, 97:19, 101:9, 104:5, 104:10, 105:2, 105:6, 106:10, 108:6, 108:20, 108:21, 109:22, 110:7, 110:12, 110:14, 111:10, 112:3, 113:3, 113:19, 114:6, 114:10, 114:23, 115:17, 119:17, 119:18, 122:5, 122:14, 123:14, 123:21, 123:23, 124:4, 130:14, 130:17, 131:3, 132:9, 135:13, 135:17, 136:12, 138:10, 138:13, 140:13, 141:5, 148:4, 154:12, 154:16, 159:3, 159:13, 161:8, 162:16, 166:10, 167:14, 168:7, 168:17, 169:11, 171:5, 172:23, 174:19, 176:13, 181:7, 182:22, 191:7, 191:15, 191:18, 193:21, 194:7, 194:16, 195:17, 196:4, 196:7, 197:3, 199:3, 200:8, 200:10, 200:17, 201:10, 201:23, 203:8, 203:11, 208:2, 208:20, 209:15, 209:19, 210:8, 214:7, 215:12, 216:14, 216:21, 222:9, 226:22, 226:23, 227:15,

227:18, 228:5, 229:8, 229:22, 232:3, 232:14, 233:12, 235:17, 235:20, 239:7, 240:3, 240:12, 241:11, 241:17, 244:23
**ADRIAN** [2] - 1:3, 1:11
**Adrian's** [4] - 4:15, 91:14, 97:22, 196:11
**adult** [1] - 195:18
**advised** [1] - 135:11
**advisement** [1] - 45:6
**affairs** [4] - 40:23, 41:19, 41:22, 42:8
**affect** [1] - 192:12
**affirmation** [1] - 3:18
**aforesaid** [1] - 249:8
**afternoon** [1] - 106:8
**afterwards** [4] - 66:12, 80:13, 94:12, 113:13
**agencies** [1] - 132:16
**agency** [1] - 48:12
**ago** [3] - 66:15, 66:23, 226:23
**agree** [22] - 25:3, 47:17, 47:21, 54:23, 114:14, 127:19, 129:5, 131:12, 167:15, 172:11, 177:2, 177:21, 180:6, 182:20, 188:19, 189:18, 189:23, 191:18, 207:5, 209:15, 243:2, 243:5
**agreed** [7] - 3:2, 3:8, 3:11, 3:15, 134:3, 158:4, 203:12
**agreement** [1] - 244:5
**ahead** [3] - 54:22, 76:21, 114:18
■ [1] - 221:2
**Albany** [14] - 2:10, 2:13, 88:12, 88:23, 91:21, 92:5, 93:9, 93:12, 95:4, 103:23, 106:6, 126:21, 132:11, 217:15
**Alibosek** [1] - 146:23
**alive** [5] - 194:23, 200:11, 207:11, 207:13, 207:17
**allegation** [1] - 23:17
**allegations** [3] - 145:15, 164:22, 233:13
**allege** [1] - 23:18
**alleged** [4] - 41:6,

41:7, 41:9, 155:3
**alleging** [1] - 4:13
**allow** [1] - 102:22
**allowed** [10] - 12:4, 12:6, 76:12, 177:18, 178:18, 178:19, 179:13, 179:19, 179:20, 185:17
**alone** [3] - 97:23, 107:23, 145:3
**alter** [1] - 239:13
**alterations** [1] - 232:20
**ambulance** [2] - 171:13, 228:6
**anecdotally** [1] - 25:22
**angles** [1] - 149:5
**Annipearl** [1] - 215:15
**announced** [1] - 137:21
**answer** [74] - 5:21, 6:3, 6:12, 8:17, 9:3, 14:22, 16:7, 16:11, 22:7, 25:18, 26:14, 38:9, 39:7, 39:8, 42:20, 43:13, 44:4, 52:3, 53:5, 55:17, 56:11, 57:2, 58:3, 58:11, 63:20, 66:7, 76:12, 80:6, 102:14, 112:7, 113:11, 114:8, 121:6, 121:17, 131:7, 136:21, 138:17, 139:6, 139:23, 145:23, 154:23, 169:9, 171:23, 174:2, 175:11, 176:9, 179:2, 179:15, 180:10, 181:4, 181:13, 183:10, 184:9, 184:18, 186:14, 187:2, 188:21, 189:12, 189:22, 190:12, 192:19, 195:11, 204:19, 205:14, 205:21, 207:21, 208:7, 208:15, 223:8, 241:18, 242:21, 243:14, 244:11
**answered** [4] - 6:18, 16:9, 241:14, 241:16
**answering** [2] - 193:13, 241:12
**anticipated** [1] - 199:15
**anticipating** [1] -

84:22
**anticipation** [1] - 103:9
**apartment** [7] - 74:13, 87:12, 87:16, 171:9, 172:12, 213:16, 213:17
**Apartments** [1] - 160:13
**Appeals** [8] - 12:7, 25:14, 55:10, 55:21, 56:19, 57:12, 57:18, 64:18
**appear** [19] - 47:6, 71:6, 71:8, 72:8, 78:4, 78:8, 82:8, 83:10, 83:15, 140:18, 149:3, 210:18, 215:4, 216:20, 219:14, 219:19, 230:2, 230:5, 231:3
**appearance** [1] - 111:8
**APPEARANCES** [1] - 2:1
**appearances** [1] - 164:6
**appeared** [4] - 17:4, 91:17, 101:22, 230:6
**appearing** [1] - 174:6
**application** [1] - 28:4
**applied** [2] - 27:11, 28:15
**apply** [3] - 59:2, 59:3, 140:6
**approach** [3] - 53:7, 54:5, 63:16
**approached** [1] - 173:5
**approaching** [3] - 201:10, 201:14, 201:15
**appropriate** [7] - 175:4, 177:3, 177:14, 178:5, 186:12, 187:11, 194:3
**approval** [2] - 13:9, 109:23
**April** [7] - 31:18, 32:13, 33:12, 34:5, 35:10, 36:6, 50:10
**area** [2] - 29:9, 116:12
**argument** [1] - 204:7
**arise** [1] - 23:22
**arm** [1] - 128:20
**arose** [2] - 104:13, 107:5
**arraigned** [10] -

119:19, 122:7, 122:9, 122:16, 122:18, 124:4, 136:17, 138:13, 141:6
**arraignment** [6] - 119:21, 120:3, 122:12, 124:7, 138:23, 237:12
**arranged** [1] - 106:11
**arrest** [42] - 10:16, 23:19, 72:17, 100:22, 107:9, 107:15, 107:17, 107:20, 108:12, 108:21, 109:5, 109:8, 109:9, 109:22, 110:3, 110:12, 110:22, 110:23, 111:13, 113:20, 113:23, 114:3, 116:3, 118:5, 119:8, 120:6, 122:5, 125:8, 131:19, 132:8, 132:19, 167:10, 167:16, 173:20, 239:6, 240:21, 241:5, 241:12, 242:4, 245:6, 246:8, 246:12
**arrested** [9] - 123:3, 130:14, 133:2, 167:18, 174:20, 175:2, 177:18, 182:14, 183:6
**arresting** [2] - 110:15, 234:22
**arrived** [2] - 171:14, 229:4
**arrow** [1] - 221:12
**Art** [6] - 11:8, 157:8, 157:20, 163:22, 217:10, 218:9
**article** [3] - 84:14, 84:17, 84:23
**articles** [1] - 71:18
**AS** [1] - 129:16
**aspect** [1] - 206:16
**aspects** [3] - 12:17, 28:11, 196:23
**assault** [1] - 146:9
**assigned** [7] - 31:2, 31:12, 31:13, 37:21, 73:15, 86:6, 220:10
**assignment** [1] - 31:11
**assist** [2] - 109:13, 177:23
**assistance** [2] - 230:15, 235:22

# APPENDIX

**Assistant** [1] - 2:13
**assistant** [1] - 11:5
**assisted** [2] - 107:23, 108:3
**associate's** [3] - 26:18, 26:23, 27:10
**associated** [1] - 160:18
**assume** [3] - 140:5, 146:14, 244:12
**assumed** [1] - 6:12
**assuming** [1] - 146:10
**assumption** [1] - 197:19
**assurances** [4] - 182:7, 186:20, 187:22, 242:17
**assuring** [1] - 178:7
**attached** [3] - 118:10, 118:20, 139:10
**attempt** [2] - 87:9, 100:15
**attempted** [9] - 73:5, 117:18, 118:18, 121:11, 130:15, 145:15, 148:5, 246:6, 246:9
**attempting** [3] - 100:18, 178:2, 228:18
**attend** [8] - 8:9, 50:10, 63:8, 63:11, 134:19, 136:8, 151:7, 223:19
**attended** [14] - 46:15, 48:4, 49:21, 50:6, 51:6, 52:6, 136:7, 137:12, 137:14, 144:16, 144:20, 145:5, 163:11, 236:18
**attending** [8] - 10:4, 17:16, 27:9, 132:10, 134:15, 144:18, 156:14, 221:8
**attention** [1] - 85:11
**attorney** [11] - 11:6, 37:16, 42:14, 71:3, 73:8, 147:15, 153:19, 202:17, 231:19, 240:22, 241:21
**Attorney** [3] - 2:4, 2:12, 2:13
**Attorney's** [1] - 10:6
**attorney's** [10] - 11:3, 11:13, 12:19, 17:15, 141:22, 144:13, 158:3, 225:17, 241:6, 242:5
**Attorneys** [2] - 2:7,

2:11
**attorneys** [2] - 3:3, 7:22
**audio** [3] - 96:4, 96:14, 98:22
**August** [3] - 69:9, 104:18, 107:4
**authenticated** [2] - 158:16, 214:13
**authorization** [1] - 109:23
**authorized** [1] - 13:10
**auto** [2] - 23:19, 30:16
**autopsies** [5] - 144:5, 144:16, 144:20, 144:22, 149:7
**autopsy** [45] - 8:9, 8:13, 8:18, 9:11, 9:12, 9:16, 9:17, 10:4, 12:18, 17:16, 73:10, 73:18, 73:19, 78:6, 79:11, 141:8, 143:22, 144:2, 144:3, 144:11, 144:15, 144:19, 144:23, 145:6, 145:11, 146:11, 146:16, 146:17, 148:3, 148:15, 148:19, 148:21, 149:12, 149:13, 150:9, 205:11, 205:18, 205:20, 206:13, 238:23, 239:4, 239:9, 239:19, 239:20, 245:16
**Avenue** [1] - 2:9
**awake** [1] - 195:22
**award** [1] - 43:17
**awards** [3] - 42:15, 44:11, 44:12
**aware** [30] - 25:12, 25:23, 26:3, 56:2, 58:14, 58:17, 58:18, 65:12, 65:14, 81:5, 85:14, 120:16, 124:3, 138:21, 139:19, 140:8, 148:17, 151:17, 161:15, 165:11, 165:13, 166:19, 168:18, 168:21, 168:22, 169:4, 171:7, 185:2, 186:20, 206:9

## B

**babies** [1] - 161:10

**baby** [11] - 77:2, 88:11, 90:16, 90:19, 101:13, 125:23, 208:21, 209:2, 209:5, 210:2, 221:5
**Baby** [1] - 84:16
**baby's** [2] - 91:3, 148:5
**background** [1] - 202:15
**bacterial** [2] - 91:9, 204:17
**bad** [3] - 196:18, 202:5, 202:9
**Bailey** [1] - 2:8
**balance** [1] - 115:21
**based** [24] - 31:22, 40:15, 53:10, 53:17, 53:20, 53:21, 54:2, 55:7, 55:14, 57:17, 122:16, 122:18, 139:12, 176:4, 184:4, 184:15, 184:16, 187:22, 222:10, 222:13, 228:9, 231:14, 232:11, 236:23
**basis** [8] - 118:21, 146:3, 240:12, 240:16, 241:16, 241:22, 242:4, 245:17
**Bates** [1] - 47:3
**beatings** [1] - 225:13
**became** [20] - 31:19, 32:7, 32:8, 33:20, 60:12, 60:17, 85:14, 90:20, 149:22, 166:15, 166:18, 168:18, 168:21, 171:7, 188:12, 188:13, 198:16, 198:17, 202:19, 246:9
**become** [7] - 32:14, 32:16, 33:8, 38:22, 120:15, 150:3, 200:2
**becoming** [3] - 50:7, 60:18, 124:3
**bed** [11] - 113:4, 114:11, 130:18, 173:5, 190:3, 190:15, 191:5, 196:7, 198:20, 204:6, 209:16
**bedding** [1] - 127:12
**bedroom** [1] - 74:10
**bedside** [1] - 177:18
**began** [1] - 243:18
**beginning** [2] - 199:2,

211:13
**behave** [2] - 228:22, 228:23
**behavior** [1] - 160:18
**belief** [2] - 145:13, 159:12
**believable** [1] - 190:20
**Bell** [1] - 215:7
**belt** [1] - 77:3
**best** [10] - 9:13, 9:17, 10:8, 16:8, 49:23, 67:8, 71:2, 103:15, 184:6, 184:11
**better** [2] - 48:18, 207:18
**between** [12] - 3:3, 50:10, 66:22, 77:13, 111:22, 113:3, 151:13, 159:7, 169:13, 170:22, 231:21, 245:5
**bias** [1] - 17:11
**biased** [1] - 17:5
**bid** [4] - 32:3, 32:4, 33:7, 40:3
**binder** [2] - 70:23, 75:23
**Birch** [1] - 152:12
**birth** [1] - 152:18
**bit** [7] - 36:20, 99:21, 107:8, 172:21, 200:18, 207:11, 207:16
**black** [1] - 77:3
**Black's** [1] - 215:15
**black-and-brown** [1] - 77:3
**blankets** [2] - 77:10, 154:10
**blood** [6] - 77:3, 92:18, 155:6, 206:14, 223:22, 224:2
**bloody** [1] - 174:16
**body** [3] - 26:7, 73:18, 104:21
**Book** [7] - 11:6, 11:8, 147:8, 147:10, 151:7, 157:21, 218:9
**book** [2] - 107:14, 116:8
**booking** [4] - 72:23, 109:19, 116:20, 116:23
**bore** [1] - 154:11
**bottom** [4] - 131:21, 214:6, 214:17, 215:2
**box** [2] - 77:9, 127:12
**brain** [7] - 92:18, 125:23, 149:20,

150:2, 194:20, 194:21, 195:5
**break** [4] - 6:16, 6:17, 34:10, 231:21
**breathing** [2] - 200:23, 202:3
**Brett** [3] - 2:2, 4:9, 75:16
**brevity** [1] - 232:11
**Brian** [1] - 42:6
**bridge** [3] - 99:18, 100:3, 229:9
**Bridgeforth** [1] - 23:10
**briefed** [2] - 86:15, 86:16
**briefing** [1] - 144:23
**briefly** [3] - 33:15, 88:9, 88:22
**bring** [2] - 95:20, 108:7
**bringing** [1] - 98:16
**Broadway** [1] - 2:2
**brother** [3] - 173:6, 173:7, 173:9
**brought** [7] - 26:11, 99:4, 105:9, 106:18, 145:10, 156:15, 198:7
**brown** [1] - 77:3
**bruises** [3] - 174:12, 238:2, 238:3
**building** [1] - 213:17
**bumped** [2] - 32:5, 66:15, 226:20
**bunch** [1] - 152:5
**bureau** [12] - 33:19, 34:3, 34:6, 34:19, 34:22, 35:3, 35:5, 38:20, 39:22, 59:9, 69:12, 69:19
**burning** [2] - 143:13, 237:9
**busy** [1] - 156:20
**BY** [115] - 4:6, 8:15, 15:3, 22:8, 22:15, 22:22, 26:2, 26:16, 38:15, 39:12, 40:14, 42:22, 43:18, 44:6, 45:10, 45:16, 46:23, 51:5, 52:8, 52:16, 52:22, 53:9, 54:19, 55:8, 55:19, 56:14, 57:10, 58:13, 59:23, 64:17, 64:23, 66:10, 69:11, 70:22, 75:22, 80:9, 81:9, 82:6, 83:13, 90:10, 95:3, 103:3, 112:18, 113:14, 114:13,

114:20, 121:10, 122:3, 129:19, 131:9, 134:10, 137:4, 138:20, 139:11, 139:18, 140:7, 143:11, 146:5, 155:2, 164:18, 169:15, 172:3, 174:4, 175:14, 176:17, 176:23, 179:11, 179:22, 180:13, 181:6, 182:5, 183:16, 184:14, 184:20, 185:4, 185:10, 186:2, 186:18, 187:7, 188:7, 189:16, 190:6, 190:21, 193:6, 193:10, 193:19, 194:15, 195:8, 204:22, 206:12, 207:23, 208:9, 208:19, 211:9, 212:4, 223:2, 223:10, 225:7, 226:9, 228:14, 229:3, 233:20, 234:2, 234:6, 235:7, 236:21, 237:15, 238:19, 240:20, 242:15, 242:23, 243:21, 244:15, 245:11, 246:4

**C**

**cadet** [2] - 29:21, 29:23
**cajoling** [1] - 181:10
**CALABRESE** [31] - 14:19, 46:9, 57:3, 58:4, 63:21, 139:17, 169:8, 176:10, 189:4, 190:10, 194:9, 194:12, 205:13, 205:15, 211:5, 222:18, 222:21, 222:23, 224:20, 225:4, 225:7, 226:9, 228:14, 229:3, 233:20, 234:2, 234:6, 235:7, 236:21, 237:15, 238:16
**Calabrese** [1] - 2:13
**camera** [1] - 156:6
**campus** [1] - 29:5
**capabilities** [2] - 96:4,

98:5
**capacity** [1] - 86:23
**Capitol** [1] - 2:12
**Captain** [3] - 4:7, 82:7, 225:5
**captain** [16] - 34:21, 35:4, 40:11, 40:22, 42:8, 47:2, 47:13, 54:8, 109:23, 120:18, 120:20, 165:6, 212:5, 224:8, 238:20, 242:16
**captains** [1] - 35:23
**car** [1] - 146:7
**care** [1] - 75:4
**career** [7] - 24:15, 47:9, 55:9, 55:12, 64:3, 144:6, 231:5
**caregiver** [1] - 228:16
**carry** [1] - 101:22
**case** [114] - 6:22, 7:9, 9:21, 10:2, 11:14, 11:20, 13:6, 17:3, 17:6, 18:5, 19:5, 19:7, 19:9, 20:10, 20:14, 21:14, 23:2, 23:4, 23:5, 23:9, 23:14, 23:23, 24:19, 25:9, 25:12, 26:3, 26:9, 34:2, 35:21, 36:17, 36:19, 37:8, 37:13, 37:18, 38:12, 38:13, 39:10, 43:5, 43:8, 43:15, 45:7, 45:13, 55:10, 55:22, 56:6, 56:21, 58:17, 58:19, 59:19, 61:20, 61:21, 61:23, 62:10, 62:14, 62:16, 63:17, 65:4, 65:5, 65:16, 65:17, 66:16, 68:20, 68:22, 69:20, 70:4, 71:4, 71:7, 72:7, 72:18, 83:7, 85:8, 96:16, 97:15, 105:17, 118:4, 121:4, 121:13, 122:22, 123:12, 129:21, 131:16, 133:7, 136:9, 146:4, 147:11, 147:18, 148:16, 150:12, 151:21, 156:10, 161:8, 162:13, 164:11, 164:13, 165:7, 165:12, 173:21, 175:16, 178:22, 187:8, 205:5, 223:17, 226:14, 236:11,

240:4, 240:21, 241:6, 242:7, 243:9, 244:2, 244:8, 245:20, 245:22
**cases** [10] - 77:10, 120:22, 121:2, 133:16, 147:10, 165:6, 165:8, 223:14, 228:2, 238:9
**caseworker** [2] - 94:7, 135:21
**caseworkers** [1] - 135:22
**casual** [1] - 8:3
**caused** [4] - 189:5, 195:18, 195:19, 229:19
**Cedar** [1] - 160:13
**cell** [5] - 107:22, 116:13, 117:8, 117:13, 117:23
**Centanni** [1] - 135:3
**Center** [14] - 89:2, 93:12, 106:7, 132:11, 218:23, 219:14, 220:11, 222:5, 222:8, 240:11, 244:21, 245:13, 246:13, 246:17
**center** [1] - 217:23
**central** [1] - 127:4
**ceremony** [3] - 44:2, 44:11, 44:12
**certain** [15] - 9:2, 12:5, 43:6, 52:4, 54:5, 59:10, 59:11, 59:12, 62:8, 149:5, 150:8, 178:14, 207:2, 241:14
**certainly** [2] - 80:18, 142:16
**certificate** [3] - 43:23, 44:5, 44:8
**certificates** [7] - 44:13, 47:7, 47:8, 51:7, 51:10, 71:22, 152:18
**certification** [1] - 3:9
**certifications** [1] - 47:9
**certify** [2] - 248:4, 249:6
**chain** [1] - 39:3
**chance** [3] - 47:13, 70:23, 71:5
**change** [9] - 33:9, 33:10, 33:21, 57:9, 58:9, 83:21, 84:5, 224:12, 239:14

**changed** [5] - 29:11, 29:13, 39:15, 204:5, 226:5
**changes** [4] - 58:15, 58:18, 210:9, 232:19
**charge** [4] - 34:22, 40:23, 92:13, 199:5
**charged** [7] - 148:5, 165:10, 181:9, 181:18, 181:20, 182:7, 240:17
**charges** [8] - 145:21, 148:15, 154:12, 164:21, 164:22, 165:9, 208:3, 245:17
**charging** [2] - 118:17, 118:21
**check** [2] - 67:22, 137:15
**checking** [1] - 199:16
**chest** [1] - 102:23
**chief** [6] - 13:10, 16:10, 42:4, 120:21, 121:23, 210:10
**Chief** [1] - 120:13
**child** [35] - 76:23, 77:4, 91:6, 91:16, 92:16, 136:7, 136:8, 137:5, 140:11, 141:18, 146:7, 159:2, 159:6, 162:5, 163:11, 164:21, 165:9, 171:11, 172:6, 194:12, 195:18, 204:6, 227:9, 227:11, 228:2, 228:3, 228:15, 228:19, 233:13, 234:13, 236:6, 236:8, 236:15
**child's** [3] - 177:17, 177:18, 178:2
**children** [6] - 88:19, 135:12, 172:15, 228:7, 233:16, 235:2
**Children's** [3] - 218:22, 220:11, 222:5
**choice** [3] - 54:2, 54:11, 183:18
**chores** [1] - 228:17
**Christa** [7] - 11:6, 11:8, 147:8, 147:10, 147:23, 157:21, 218:9
**Christina** [1] - 2:13
**Cipperly** [3] - 35:6, 35:20, 36:2
**circumstance** [1] - 177:10

**circumstances** [9] - 7:23, 13:4, 23:22, 39:23, 40:12, 175:9, 175:13, 177:22, 192:4
**citizens** [1] - 234:3
**CITY** [1] - 1:6
**City** [4] - 2:7, 70:7, 122:7, 226:8
**city** [1] - 243:11
**civil** [2] - 23:2, 23:5
**civilian** [2] - 41:13
**Claimant** [1] - 1:12
**Claims** [1] - 4:11
**CLAIMS** [1] - 1:9
**claims** [1] - 4:13
**clarification** [1] - 56:16
**clarify** [3] - 82:15, 83:21, 84:5
**class** [1] - 233:9
**classes** [1] - 45:23
**classroom** [1] - 30:5
**Clayton** [1] - 219:7
**clean** [2] - 6:6, 229:5
**cleaned** [1] - 228:7
**cleaning** [1] - 228:17
**clear** [5] - 183:17, 184:4, 188:8, 196:9, 242:16
**clearly** [1] - 198:9
**clipping** [1] - 120:11
**clippings** [4] - 62:10, 62:20, 62:22, 226:12
**close** [1] - 203:5
**closed** [1] - 204:15
**closer** [1] - 48:18
**cloud** [1] - 224:21
**Club** [3] - 159:3, 159:20, 216:22
**co** [1] - 132:16
**co-investigatory** [1] - 132:16
**coequal** [1] - 39:5
**coerce** [1] - 188:10
**coerced** [5] - 25:16, 55:13, 55:22, 56:8, 242:18
**coercion** [8] - 179:20, 179:23, 180:5, 180:6, 180:12, 180:14, 180:17, 180:20
**coercive** [4] - 179:13, 179:18, 200:3, 225:13
**cognitive** [2] - 102:3, 102:7
**coincidental** [1] - 67:23

**coincidentally** [1] - 66:16

**Colaneri** [45] - 2:7, 109:17, 110:5, 110:10, 110:20, 111:7, 111:12, 111:14, 111:16, 111:21, 112:4, 112:9, 112:20, 113:8, 113:17, 113:19, 113:22, 114:4, 114:14, 114:21, 115:5, 118:23, 131:4, 158:13, 166:3, 166:4, 166:6, 167:3, 167:6, 168:4, 168:5, 172:9, 173:5, 173:16, 174:7, 190:5, 190:9, 203:9, 204:8, 210:15, 211:2, 214:13, 222:11, 222:14, 238:4

**COLANERI** [1] - 1:6

**Colaneri's** [3] - 202:14, 215:3, 237:16

**colleague** [2] - 54:9, 109:12

**colleagues** [6] - 25:20, 65:11, 86:21, 109:12, 187:15, 199:7

**collect** [1] - 152:13

**collected** [1] - 62:21

**collection** [1] - 74:15

**college** [1] - 94:20

**College** [1] - 29:5

**color** [1] - 237:22

**combination** [2] - 29:8, 149:6

**comfort** [1] - 199:22

**comforters** [1] - 77:9

**coming** [9] - 38:7, 81:16, 82:20, 102:18, 111:16, 113:22, 114:2, 114:4, 173:18

**command** [1] - 39:3

**commands** [1] - 31:8

**commencing** [1] - 1:18

**commendation** [5] - 43:7, 43:11, 43:20, 43:21, 44:14

**commendations** [5] - 42:15, 43:2, 45:3, 45:12, 247:3

**comment** [3] - 100:3,

192:21, 240:16

**commenting** [1] - 149:15

**comments** [1] - 115:3

**committed** [1] - 112:17

**common** [4] - 98:18, 225:18, 227:23, 233:16

**commonsense** [1] - 188:15

**Community** [1] - 29:5

**company** [1] - 13:5

**complaint** [6] - 41:13, 117:16, 161:15, 161:18, 161:21, 161:22

**complete** [4] - 71:6, 71:8, 83:16, 135:11

**completed** [3] - 107:9, 108:12, 110:15

**completely** [2] - 170:21, 230:6

**completing** [1] - 109:8

**completion** [4] - 30:22, 47:8, 51:7, 51:11

**complex** [1] - 213:16

**complexion** [1] - 204:4, 204:11

**complies** [2] - 47:12, 130:8

**computer** [5] - 69:22, 70:2, 107:20, 108:11, 109:9

**concept** [7] - 111:10, 113:8, 113:18, 114:5, 114:15, 114:22, 118:23

**concern** [3] - 121:13, 123:22, 197:17

**concerned** [2] - 91:19, 123:21

**concerns** [1] - 157:22

**concluded** [2] - 229:16, 246:21

**concluding** [1] - 165:17

**conclusion** [4] - 36:19, 149:16, 152:7, 229:8

**condition** [6] - 5:16, 87:11, 97:14, 172:13, 193:3, 206:17

**conduct** [19] - 41:5, 41:10, 41:14, 41:15, 41:17, 41:20, 44:16, 61:19, 107:7, 149:19, 177:3,

187:13, 188:9, 203:21, 227:11, 234:3, 237:6, 246:12, 246:16

**conducted** [8] - 33:17, 50:20, 55:7, 62:3, 64:19, 106:21, 195:7

**conducting** [1] - 186:21

**confessed** [1] - 198:19

**confession** [19] - 55:13, 55:22, 56:8, 56:9, 178:16, 180:22, 184:6, 185:18, 188:6, 188:10, 188:17, 189:14, 193:4, 222:10, 222:13, 227:15, 241:17, 242:19, 245:15

**confessions** [1] - 179:18

**confidential** [3] - 129:7, 129:8, 134:5

**CONFIDENTIAL** [2] - 129:16, 134:7

**confirm** [4] - 83:9, 116:17, 153:3, 218:9

**confirmed** [1] - 205:10

**confused** [1] - 241:13

**confusion** [1] - 152:18

**conjunction** [1] - 190:18

**connected** [1] - 170:21

**conscious** [3] - 54:2, 54:11, 183:18

**consent** [1] - 126:4

**consider** [2] - 30:2, 228:11

**consideration** [1] - 98:15

**considered** [10] - 25:15, 29:21, 29:23, 30:3, 33:4, 39:9, 39:11, 61:16, 133:4, 231:17

**considering** [2] - 43:14, 63:23

**consistent** [5] - 101:5, 166:18, 166:22, 176:19, 203:22

**consistently** [1] - 171:18

**conspire** [1] - 240:2

**Constitution** [2] - 25:2, 25:7

**constitutional** [1] - 30:13

**consult** [1] - 13:8

**consultation** [1] - 117:20

**contact** [1] - 130:3

**contacted** [1] - 13:5

**contained** [1] - 232:6

**contains** [1] - 75:23

**contamination** [1] - 195:6

**context** [2] - 12:21, 125:12

**continually** [1] - 172:4

**continue** [6] - 6:3, 36:15, 97:15, 100:11, 100:20, 102:22, 123:12, 192:7

**continued** [9] - 35:12, 37:7, 99:20, 100:15, 141:6, 165:19, 177:16, 215:3, 219:19

**continuing** [1] - 73:14

**contribute** [1] - 222:8

**contributed** [1] - 181:9

**conversation** [20] - 17:18, 87:8, 89:6, 101:23, 111:6, 111:12, 113:3, 114:16, 125:13, 131:11, 145:17, 145:20, 161:5, 172:9, 206:16, 229:10, 229:13, 230:16, 232:12

**conversations** [12] - 7:22, 8:3, 8:6, 8:19, 10:17, 10:18, 10:20, 151:11, 162:2, 188:4, 227:8, 235:9

**conveyed** [4] - 170:6, 245:14, 245:20

**convicted** [1] - 226:22

**conviction** [2] - 11:16, 239:17

**cooking** [1] - 228:17

**cooperation** [2] - 128:21, 132:15

**cooperative** [6] - 90:13, 91:15, 91:17, 98:23, 123:17, 123:20

**cooperatively** [1] - 128:9

**copied** [4] - 72:14, 72:15, 143:16, 163:4

**copies** [14] - 18:7, 19:11, 19:18, 20:12, 44:13, 51:10,

137:23, 142:19, 143:9, 143:13, 157:9, 163:21, 164:4, 237:9

**copy** [20] - 12:9, 14:8, 18:22, 19:5, 19:7, 19:9, 46:9, 51:12, 59:7, 70:11, 72:9, 72:11, 72:13, 82:8, 140:15, 153:15, 153:20, 163:23, 211:19

**Corliss** [1] - 213:16

**Corps** [1] - 111:9

**correct** [224] - 6:23, 7:11, 8:18, 10:14, 10:22, 20:23, 21:2, 24:3, 24:20, 30:14, 30:17, 32:19, 33:13, 37:14, 47:15, 48:14, 48:23, 53:22, 54:3, 54:6, 54:12, 54:20, 56:18, 59:11, 59:16, 59:19, 60:4, 60:8, 61:4, 64:22, 73:19, 74:4, 74:11, 74:21, 75:4, 77:20, 78:12, 79:8, 79:12, 82:12, 82:23, 83:19, 84:3, 84:9, 84:12, 90:9, 90:12, 93:17, 95:12, 97:20, 97:23, 98:6, 99:2, 99:12, 99:13, 99:15, 99:18, 99:22, 101:10, 101:14, 103:20, 103:23, 104:10, 104:13, 104:16, 105:7, 105:10, 105:13, 106:13, 106:19, 106:23, 107:9, 107:12, 113:12, 114:3, 115:2, 115:6, 115:9, 115:23, 116:8, 119:2, 122:5, 123:4, 123:8, 124:7, 126:2, 126:9, 127:6, 128:14, 128:18, 128:21, 130:22, 131:19, 131:22, 131:23, 132:16, 132:20, 137:20, 140:19, 140:20, 141:8, 141:10, 143:13, 143:17, 143:22, 146:19, 147:8, 150:15, 155:8, 155:12, 158:11, 159:21, 159:23, 160:7, 160:19, 161:9,

161:13, 161:16, 162:17, 163:12, 164:12, 165:22, 166:10, 167:4, 168:5, 168:10, 171:21, 172:9, 174:13, 174:15, 174:17, 174:18, 174:21, 175:5, 175:19, 175:21, 176:2, 178:9, 178:11, 184:3, 184:19, 186:9, 188:10, 190:9, 190:23, 191:5, 191:8, 191:12, 191:16, 195:3, 195:19, 196:4, 196:13, 196:14, 197:6, 197:23, 198:13, 198:14, 199:10, 199:13, 200:12, 200:15, 200:16, 201:3, 201:11, 201:21, 201:22, 202:6, 202:11, 203:5, 203:9, 203:14, 203:15, 203:19, 203:23, 204:2, 204:9, 205:16, 207:3, 207:7, 207:8, 207:14, 207:19, 208:13, 208:21, 209:5, 209:7, 209:11, 209:12, 209:18, 209:21, 210:6, 210:10, 210:11, 212:14, 217:10, 218:7, 221:16, 221:19, 222:12, 222:13, 222:15, 225:15, 226:17, 226:19, 231:20, 236:14, 237:3, 239:2, 241:3, 241:23, 242:2, 242:7, 243:3, 243:7, 244:9, 244:23, 245:17, 246:6, 246:10, 246:11, 246:14, 246:17, 248:7
**corrections** [6] - 27:3, 27:6, 27:12, 27:20, 28:15, 28:16
**corroborate** [1] - 161:7
**counsel** [21] - 13:8, 17:20, 19:23, 20:5, 44:18, 46:3, 46:8,

51:16, 65:17, 70:8, 72:9, 72:10, 72:12, 78:14, 79:23, 80:3, 80:4, 136:18, 138:14, 139:9, 185:21
**counseled** [2] - 57:8, 121:19
**County** [6] - 10:5, 27:4, 27:13, 135:18, 164:20, 238:21
**county** [4] - 24:11, 124:4, 159:6, 163:11
**COUNTY** [2] - 1:7, 248:2
**couple** [14] - 15:23, 45:23, 48:9, 52:5, 66:12, 66:16, 66:17, 66:19, 66:20, 67:6, 68:4, 79:7, 225:4, 238:22
**course** [20] - 29:19, 30:4, 44:9, 46:16, 48:15, 48:20, 48:21, 49:17, 49:21, 50:6, 50:23, 63:3, 109:16, 133:9, 189:17, 235:22, 236:23, 238:10, 238:14, 244:6
**courses** [5] - 30:19, 47:7, 51:6, 51:14, 52:6
**court** [44] - 3:17, 4:22, 5:22, 7:19, 11:20, 23:15, 24:3, 24:6, 24:7, 24:8, 24:10, 24:11, 24:14, 24:22, 25:5, 25:14, 26:4, 26:7, 55:21, 83:18, 117:16, 118:10, 119:7, 119:18, 119:21, 120:2, 122:11, 122:14, 122:17, 122:19, 164:6, 175:7, 182:9, 187:8, 187:10, 188:16, 200:2, 225:21, 243:11, 243:20, 244:2
**COURT** [2] - 1:1, 1:9
**Court** [11] - 4:11, 4:12, 12:7, 25:14, 55:10, 55:21, 56:19, 57:12, 57:18, 64:18, 122:8
**courts** [1] - 7:18
**CP-12-5** [2] - 213:14, 213:15
**CPL** [1] - 71:13
**CPR** [1] - 171:13

**CPS** [35] - 86:10, 86:12, 86:16, 86:18, 86:19, 87:2, 87:21, 88:18, 88:19, 94:7, 94:13, 124:14, 128:4, 128:9, 132:15, 133:8, 134:2, 135:10, 135:21, 135:22, 138:3, 138:21, 140:15, 141:13, 142:2, 142:5, 142:20, 143:10, 161:23, 164:20, 165:8, 171:4, 219:6, 227:8
**CPS's** [1] - 129:21
**create** [2] - 97:10, 97:12
**created** [2] - 72:18, 74:14
**crib** [8] - 74:10, 77:2, 130:21, 195:22, 195:23, 196:3, 210:2
**crime** [9] - 96:18, 151:20, 154:21, 155:3, 189:5
**crimes** [2] - 39:17, 41:7
**criminal** [28] - 21:14, 24:3, 24:5, 24:7, 24:8, 112:17, 116:18, 116:19, 116:22, 117:15, 119:7, 119:18, 140:4, 161:8, 164:21, 165:8, 167:22, 181:23, 204:12, 205:9, 208:2, 225:21, 234:7, 234:11, 234:14, 234:19, 243:11
**criminally** [1] - 165:10
**critique** [1] - 158:4
**cross** [7] - 84:8, 153:3, 178:15, 180:3, 180:4, 188:9, 192:6
**cross-examination** [1] - 84:8
**crossed** [4] - 56:8, 176:6, 176:13, 177:13
**crosses** [1] - 179:23
**crossing** [1] - 179:21
**crying** [1] - 161:10
**Crystal** [2] - 2:10, 238:20
**CS** [2] - 127:2, 127:3

**CT** [1] - 135:12
**culture** [1] - 206:14
**curiosity** [1] - 62:15
**custodial** [2] - 198:12, 198:17
**custody** [6] - 90:11, 135:17, 145:14, 191:21, 191:23, 198:9

**D**

**DA** [3] - 20:20, 37:9, 117:20
**DA's** [10] - 12:16, 77:23, 78:2, 119:10, 122:21, 143:17, 147:23, 150:18, 153:16, 163:5
**damaging** [1] - 182:22
**darker** [1] - 237:22
**Date** [1] - 249:12
**date** [6] - 65:13, 85:13, 128:3, 130:2, 153:14, 155:9
**dated** [3] - 103:18, 104:10, 122:4
**dates** [3] - 7:8, 18:15, 131:2
**Dave** [2] - 212:13, 216:10
**David** [2] - 146:18, 149:3
**days** [5] - 91:7, 151:15, 153:17, 162:10, 171:6
**DB** [7] - 69:7, 97:7, 130:12, 151:12, 164:8, 164:13, 164:14
**dead** [6] - 125:23, 148:6, 194:8, 194:12, 194:13, 194:20
**dealing** [1] - 37:15
**dealings** [1] - 123:18
**death** [6] - 71:22, 169:18, 194:21, 195:6, 224:10, 239:6
**Deb** [1] - 161:2
**deceit** [1] - 238:10
**deception** [2] - 179:19, 179:23
**deceptions** [1] - 179:13
**decide** [1] - 241:6
**deciding** [1] - 98:19
**decision** [12] - 12:7, 54:6, 55:11, 55:21,

56:19, 57:12, 57:18, 97:6, 121:9, 121:19, 133:5, 139:2
**decisions** [2] - 13:9, 152:4
**declined** [1] - 80:3
**deemed** [2] - 170:20, 184:11
**Defendant** [2] - 1:15, 1:17
**defendant** [3] - 17:5, 17:11, 61:18
**Defendant's** [4] - 104:18, 107:3, 118:15, 210:12
**defendant's** [1] - 84:15
**Defendants** [1] - 1:8
**defense** [4] - 153:19, 164:2, 202:17, 205:12
**defense's** [1] - 206:7
**deficiencies** [1] - 102:3
**define** [1] - 188:22
**definition** [1] - 180:12
**degree** [3] - 26:18, 27:2, 27:10
**deletions** [1] - 232:20
**demands** [1] - 50:18
**demeanor** [3] - 91:14, 101:9, 123:18
**demonstrate** [1] - 54:10
**demonstrated** [2] - 191:11, 191:15
**demonstration** [1] - 115:14
**denial** [1] - 196:11
**deny** [1] - 177:16
**department** [25] - 8:4, 16:11, 25:13, 27:21, 31:5, 31:9, 32:23, 41:7, 42:13, 51:8, 57:7, 58:15, 58:19, 58:21, 59:2, 59:3, 119:22, 120:6, 121:15, 145:7, 165:5, 173:8, 226:14, 227:23
**Department** [15] - 13:15, 26:12, 27:17, 28:3, 28:22, 31:22, 38:12, 48:13, 49:3, 70:8, 86:2, 95:21, 95:23, 96:5, 226:8
**department-wide** [3] - 58:15, 59:2, 59:3
**departments** [2] - 29:14, 31:8

depicted [2] - 21:18, 21:19
depose [1] - 156:14
deposed [1] - 126:13
DEPOSITION [1] - 1:17
Deposition [1] - 246:21
deposition [18] - 3:18, 5:19, 18:9, 20:6, 23:2, 23:13, 82:20, 93:16, 93:18, 103:10, 103:18, 123:7, 153:7, 153:11, 156:22, 157:4, 160:3, 209:14
depositions [2] - 19:19, 79:8
Deputy [1] - 120:12
describe [5] - 9:12, 43:21, 82:15, 123:17, 151:19
described [3] - 75:23, 131:3, 140:11
desk [1] - 63:17
detail [3] - 81:12, 149:23, 160:22
details [5] - 152:22, 190:14, 190:16, 190:19, 190:22
Detective [39] - 37:19, 37:21, 66:17, 87:21, 88:21, 89:18, 91:23, 93:3, 93:14, 93:19, 93:21, 97:8, 97:11, 98:21, 99:10, 101:6, 104:22, 135:2, 136:6, 156:13, 158:8, 163:10, 171:20, 198:3, 216:11, 216:18, 217:7, 217:10, 218:18, 219:12, 220:9, 220:12, 220:22, 221:3, 221:6, 221:10, 222:6, 226:2, 245:13
detective [64] - 31:20, 32:2, 32:7, 32:11, 32:14, 32:17, 33:3, 33:4, 33:7, 33:9, 33:19, 33:20, 34:3, 34:6, 34:14, 34:18, 34:19, 34:22, 35:3, 35:4, 35:9, 35:12, 35:15, 35:23, 36:5, 36:15, 36:18, 38:20, 38:22, 39:4, 39:10, 39:22, 40:4, 40:8, 41:16, 45:17, 50:8,

50:9, 53:2, 54:8, 57:11, 57:14, 58:16, 58:23, 59:9, 60:12, 60:16, 60:18, 60:19, 61:8, 61:15, 61:16, 61:17, 62:14, 69:12, 69:19, 70:3, 71:6, 78:12, 81:3, 165:5, 188:14
detectives [8] - 34:5, 34:9, 34:15, 34:20, 37:23, 38:4, 41:16, 56:21
detention [1] - 116:12
determination [13] - 37:20, 38:3, 77:15, 95:14, 95:19, 95:22, 110:2, 110:4, 110:11, 120:10, 120:13, 139:13, 173:20
determinations [2] - 149:18, 244:14
determine [3] - 112:16, 231:16, 242:6
determined [1] - 224:2
determines [1] - 241:21
determining [1] - 242:4
development [3] - 160:14, 161:3, 212:17
diagnoses [1] - 206:13
diagnosis [1] - 197:5
diagram/sketch [1] - 74:13
diarrhea [3] - 91:7, 169:6, 171:6
dictated [1] - 150:8
die [3] - 100:4, 200:19, 202:10
died [3] - 99:18, 206:8, 246:10
difference [1] - 76:15
different [20] - 7:8, 11:7, 15:23, 18:15, 31:8, 34:11, 45:23, 59:4, 64:7, 76:20, 140:5, 165:21, 166:8, 166:12, 166:17, 166:22, 166:23, 167:5, 171:19, 228:22
differently [3] - 63:16, 64:14, 82:15
dire [1] - 192:4
direct [8] - 7:9, 35:20,

227:10, 227:14, 227:17, 235:14, 235:16, 237:4
directed [1] - 149:2
directing [2] - 85:11, 134:15
direction [1] - 244:8
directly [2] - 69:22, 70:2
disabilities [2] - 102:3, 102:7
discharge [2] - 197:5, 217:14
discharged [1] - 106:12
disclose [1] - 235:16
disclosed [1] - 178:8
disclosure [1] - 177:22
discontinued [1] - 99:22
discovered [1] - 224:18
discovery [4] - 47:3, 50:17, 70:7, 217:3
discuss [9] - 17:17, 100:17, 103:4, 140:12, 151:23, 152:6, 239:5, 240:2
discussed [14] - 7:23, 12:20, 60:11, 68:11, 77:15, 78:14, 114:6, 134:13, 148:18, 158:10, 162:5, 162:7, 173:17, 182:21
discussing [1] - 12:17
discussion [20] - 46:21, 69:10, 70:21, 75:13, 81:8, 82:5, 96:20, 98:21, 100:5, 100:6, 100:15, 110:11, 128:23, 144:19, 145:12, 148:13, 200:22, 203:16, 208:18, 211:21
discussions [7] - 8:11, 8:16, 8:18, 9:15, 144:12, 240:6, 244:8
disk [2] - 163:5, 163:21
disks [8] - 142:19, 142:23, 143:3, 143:10, 143:13, 143:16, 157:8, 237:10
dispute [1] - 23:18
distinction [1] - 245:5

distracted [1] - 9:6
District [3] - 4:12, 4:13, 10:6
district [16] - 11:3, 11:5, 11:13, 12:19, 17:15, 37:15, 73:8, 141:21, 144:13, 147:15, 158:3, 225:17, 240:22, 241:5, 241:21, 242:5
DISTRICT [2] - 1:1, 1:1
division [2] - 31:14, 220:9
divulge [1] - 7:23
DNA [3] - 152:13, 154:2, 214:23
docket [1] - 244:2
doctor [11] - 92:23, 93:2, 93:4, 93:11, 93:12, 106:6, 106:7, 156:14, 170:5, 195:11, 202:18
doctors [5] - 87:18, 88:7, 92:21, 169:5, 169:11, 169:16, 177:23, 200:9, 200:14, 200:17, 204:16, 207:16, 208:4, 208:12, 208:20
document [2] - 129:6, 137:14
documentary [5] - 13:2, 13:6, 15:11, 16:21, 52:15
documentation [1] - 46:14
documented [1] - 196:22
documents [16] - 17:22, 18:18, 20:9, 44:14, 45:4, 47:6, 65:4, 70:11, 80:23, 122:16, 122:18, 133:20, 141:7, 142:14, 164:6, 247:3
doll [1] - 210:3
donate [1] - 126:5
donation [2] - 134:16, 195:2
done [22] - 20:6, 34:2, 63:2, 63:4, 72:20, 74:17, 85:8, 94:11, 97:5, 110:16, 110:18, 116:2, 116:19, 117:21, 130:6, 132:13, 133:15, 133:18, 146:3, 154:10, 155:20, 192:23

door [2] - 109:17, 110:19
dot [1] - 153:3
double [2] - 137:15, 221:21
double-check [1] - 137:15
doubt [4] - 132:5, 132:7, 158:18, 201:7
down [14] - 5:23, 57:12, 58:8, 115:20, 116:11, 130:18, 158:17, 189:18, 195:22, 204:6, 210:17, 213:4, 213:9, 218:7
dozens [2] - 61:13, 61:14, 175:21
Dr [30] - 93:7, 93:9, 97:8, 125:19, 125:21, 132:10, 144:18, 145:18, 146:7, 147:6, 148:14, 149:4, 149:9, 149:15, 170:8, 195:17, 204:15, 205:10, 221:8, 223:12, 238:21, 239:7, 239:10, 239:13, 239:16, 239:19, 240:3, 240:6, 244:4, 245:16
draw [5] - 102:5, 102:8, 123:22, 124:2, 246:15
drive [2] - 88:2, 192:22
drugs [1] - 234:22
due [4] - 32:6, 32:22, 145:13, 176:19
duly [1] - 4:3
during [67] - 8:13, 9:14, 9:16, 9:18, 10:15, 16:11, 35:20, 36:2, 64:10, 64:12, 67:5, 72:23, 74:6, 74:8, 75:12, 77:13, 84:21, 89:13, 89:15, 90:5, 94:6, 100:21, 109:16, 109:19, 111:8, 116:17, 116:19, 123:18, 137:8, 137:9, 138:9, 140:11, 148:14, 148:19, 148:21, 157:20, 159:16, 167:14, 168:22, 172:7, 174:19, 175:9, 176:12, 177:12, 182:6,

191:3, 191:18, 193:20, 194:16, 199:9, 199:12, 199:18, 199:21, 200:14, 200:15, 201:9, 203:11, 204:3, 204:14, 208:10, 209:13, 219:3, 222:16, 223:4, 236:23, 238:13, 246:17
**duties** [13] - 33:16, 33:21, 36:15, 36:16, 36:17, 39:15, 40:5, 40:21, 44:10, 62:13, 63:3, 65:9, 228:8

**E**

**e-mail** [1] - 50:18
**earbud** [1] - 183:20
**early** [7] - 39:20, 40:4, 107:11, 107:16, 124:17, 124:21, 134:17
**easier** [2] - 76:19, 182:3
**Edge** [9] - 93:7, 93:9, 97:8, 125:19, 125:21, 170:8, 195:17, 204:15, 221:8
**edge** [1] - 195:23
**Edge's** [1] - 132:10
**edited** [1] - 15:12
**education** [5] - 26:17, 101:20, 101:22, 230:20, 231:15
**educational** [1] - 229:23
**effect** [5] - 49:13, 52:13, 145:16, 199:4, 209:10
**Egan** [1] - 12:14
**eight** [3] - 182:17, 183:6, 221:13
**either** [22] - 46:5, 47:7, 51:9, 51:11, 56:6, 61:7, 63:13, 91:10, 93:22, 95:15, 101:18, 101:19, 108:20, 124:2, 132:7, 133:4, 133:5, 148:14, 169:11, 189:19, 190:9, 203:17
**electronically** [1] - 59:7
**elicit** [1] - 186:4

**elicited** [1] - 241:17
**employ** [1] - 54:2
**employed** [4] - 53:17, 53:19, 53:23, 226:7
**employee** [2] - 222:4
**enacted** [1] - 96:21
**encompass** [1] - 21:20
**encounter** [1] - 9:22
**encountered** [5] - 9:14, 9:18, 66:8, 234:13, 234:17
**end** [9] - 36:22, 84:23, 99:23, 100:18, 102:19, 110:7, 164:14, 211:12, 229:10
**ended** [5] - 31:11, 99:17, 112:15, 159:6, 210:15
**ENDING** [1] - 134:7
**ending** [1] - 229:12
**enforcement** [2] - 128:14, 180:15
**entail** [2] - 30:4, 107:18
**entailed** [1] - 107:19
**enter** [1] - 28:22, 108:11
**entered** [4] - 69:22, 70:2, 71:14, 211:3
**entire** [7] - 21:20, 21:23, 34:23, 101:16, 110:23, 232:12, 245:20
**entitled** [1] - 84:16
**entries** [1] - 69:15
**environment** [1] - 200:3
**Epstein** [1] - 156:13
**equals** [1] - 39:11
**escape** [1] - 199:5
**escorted** [1] - 110:7
**especially** [1] - 172:15
**Esq** [3] - 2:2, 2:6, 2:10
**essential** [1] - 177:23
**essentially** [1] - 60:23, 90:15
**established** [2] - 113:5, 167:23
**Estaris** [7] - 94:8, 94:15, 135:21, 138:2, 138:8, 142:4, 142:12
**Estaris'** [1] - 159:13
**estimate** [1] - 231:7
**ET** [1] - 127:9
**etc** [4] - 28:17, 74:10, 244:2, 245:13
**evaluated** [1] - 105:13

**evening** [6] - 93:4, 93:8, 95:5, 105:22, 117:13, 119:14
**event** [4] - 63:16, 198:16, 198:18
**events** [1] - 131:3
**everyday** [1] - 33:22
**evidence** [21] - 74:14, 74:16, 76:23, 77:4, 96:18, 127:10, 146:19, 151:8, 151:22, 152:3, 152:5, 154:11, 154:20, 194:10, 205:9, 218:14, 222:7, 223:21, 242:4, 242:6
**evidenced** [1] - 60:3
**exact** [4] - 15:20, 64:4, 64:16, 108:20
**exactly** [9] - 46:2, 75:15, 76:6, 111:23, 151:10, 168:18, 168:21, 179:3, 198:18
**exam** [5] - 28:11, 32:14, 32:16, 32:18, 125:15
**examination** [5] - 3:4, 3:9, 84:8, 149:20, 194:21
**Examination** [1] - 3:16
**EXAMINATION** [4] - 4:5, 225:6, 238:18, 242:14
**examined** [1] - 4:3
**examiner** [2] - 8:7, 9:10
**examiner's** [1] - 147:2
**example** [7] - 176:16, 177:7, 177:9, 179:4, 179:9, 187:4, 225:13
**exams** [1] - 135:12
**except** [1] - 3:12
**excessive** [1] - 23:19
**exculpate** [1] - 189:5
**executed** [4] - 75:8, 77:6, 77:7, 127:19
**executions** [2] - 74:7, 74:8
**exercise** [1] - 70:13
**exhibit** [3] - 46:7, 210:14, 212:3
**Exhibit** [19] - 69:12, 76:3, 81:3, 81:7, 82:8, 82:17, 83:3, 83:5, 83:6, 83:14, 84:3, 84:8, 84:11, 104:18, 107:3, 118:16, 210:12,

211:22, 212:6
**Exhibits** [1] - 75:19
**EXHIBITS** [1] - 247:6
**exist** [4] - 22:5, 22:14, 46:19, 65:4
**expected** [4] - 225:20, 228:23, 239:10, 239:21
**experience** [16] - 31:7, 53:18, 54:3, 57:17, 91:11, 121:14, 139:12, 165:4, 165:5, 176:4, 176:5, 180:15, 185:6, 228:9, 228:11, 231:15
**expert** [1] - 85:7
**expertise** [1] - 244:13
**experts** [1] - 84:15
**explain** [1] - 150:2
**explained** [1] - 13:5
**explanation** [2] - 171:15, 204:11
**express** [1] - 157:21
**expressed** [1] - 102:9
**Extension** [1] - 2:9
**extensive** [1] - 165:4
**extent** [2] - 67:21, 128:13
**extract** [1] - 184:6
**extraneous** [1] - 71:10
**eyes** [1] - 238:5

**F**

**face** [2] - 91:3, 171:12
**facilitated** [1] - 93:22
**fact** [14] - 16:4, 97:13, 100:13, 101:21, 109:4, 129:11, 166:13, 166:17, 167:9, 188:17, 190:23, 205:17, 236:3
**factor** [2] - 98:8, 224:5
**facts** [11] - 7:23, 17:3, 17:6, 165:20, 167:6, 167:7, 189:2, 189:4, 190:7, 190:8, 194:9
**fair** [16] - 32:22, 53:16, 54:16, 57:18, 61:3, 64:5, 90:5, 97:17, 101:2, 110:8, 118:16, 131:2, 159:5, 204:11, 211:15, 227:4
**faith** [1] - 50:19
**fall** [1] - 203:13
**falling** [1] - 191:5

**false** [14] - 23:19, 55:14, 180:18, 180:23, 184:23, 185:7, 186:5, 186:19, 187:14, 187:21, 187:22, 188:5, 188:10, 233:8
**familiar** [2] - 12:15, 85:3, 97:2, 149:8
**familiarity** [1] - 91:9
**family** [4] - 7:19, 66:4, 91:10, 160:19
**far** [2] - 60:11, 134:13
**Farley** [5] - 146:18, 149:3, 149:7, 151:7, 152:13
**fatality** [15] - 96:16, 136:7, 136:8, 137:5, 140:11, 141:18, 159:2, 159:6, 162:6, 163:11, 227:9, 236:6, 236:8, 236:12, 236:16
**feature** [1] - 98:22
**federal** [1] - 23:14
**feet** [1] - 174:10
**felonies** [2] - 24:9, 96:23
**felt** [10] - 16:17, 17:10, 52:11, 100:8, 100:12, 100:13, 100:16, 102:17, 167:5, 243:6
**female** [1] - 12:12
**fever** [3] - 91:7, 169:13, 171:6
**fevers** [2] - 169:5
**few** [11] - 60:6, 66:22, 68:7, 80:19, 81:21, 91:7, 144:7, 153:17, 158:21, 242:10, 242:13
**field** [1] - 31:3
**fields** [2] - 73:2, 73:3
**file** [64] - 18:5, 19:5, 19:7, 19:9, 22:19, 39:4, 41:13, 46:3, 46:5, 46:7, 47:13, 60:4, 62:19, 62:22, 63:6, 70:9, 70:10, 70:15, 70:16, 71:3, 71:7, 71:8, 71:11, 71:16, 71:20, 72:2, 72:9, 72:10, 72:12, 72:15, 73:11, 73:14, 73:23, 74:23, 75:7, 76:2, 76:4, 77:18, 78:9, 78:12, 78:19, 81:3, 84:14, 84:23, 85:3, 85:4, 89:22,

103:7, 103:18, 104:9, 140:16, 140:18, 141:7, 145:8, 146:17, 157:2, 162:17, 215:22, 217:3, 217:19, 221:23, 245:20, 245:22, 247:9

**filed** [2] - 23:14, 243:19

**filing** [1] - 3:8

**fill** [2] - 73:2, 73:4

**filmmakers** [4] - 16:7, 16:12, 17:11, 17:14

**final** [4] - 15:11, 16:14, 73:10, 133:5

**finalized** [1] - 73:11

**finally** [1] - 6:16

**findings** [5] - 148:15, 170:15, 239:11, 239:14, 239:17

**fine** [1] - 5:10

**fingerprint** [1] - 107:20

**fingerprinting** [1] - 117:3

**fingerprints** [1] - 155:5

**finish** [1] - 5:21

**finished** [3] - 14:6, 16:2, 17:4

**fire** [1] - 75:3

**firearm** [2] - 199:9, 200:6

**First** [2] - 1:20, 2:5

**first** [70] - 4:2, 5:20, 21:3, 21:9, 21:17, 28:13, 28:19, 30:20, 32:20, 39:8, 40:19, 46:12, 53:12, 61:23, 63:8, 65:3, 69:23, 75:12, 76:8, 76:11, 76:22, 83:4, 84:2, 86:13, 87:4, 90:5, 94:17, 99:14, 103:4, 104:19, 112:8, 112:12, 114:21, 116:11, 117:21, 123:18, 126:21, 136:10, 136:11, 144:8, 156:20, 159:2, 165:17, 167:10, 167:14, 168:7, 168:19, 169:20, 170:20, 171:20, 190:23, 191:3, 191:4, 191:8, 195:23, 196:6, 199:9, 199:20,

200:14, 201:11, 203:8, 203:11, 209:20, 210:14, 211:12, 212:7, 214:17, 229:7, 229:8

**firsthand** [2] - 25:21, 170:5

**five** [11] - 29:8, 29:20, 30:4, 62:6, 66:15, 66:23, 69:18, 168:9, 203:3, 221:19, 226:23

**five-month** [1] - 62:6

**flagged** [1] - 76:11

**flip** [3] - 46:12, 70:18, 81:15

**floor** [5] - 99:4, 106:22, 108:9, 108:10, 116:11

**flow** [2] - 192:11, 198:22

**folder** [5] - 47:4, 47:10, 54:10, 115:9, 115:14

**follow** [27] - 62:10, 62:16, 69:7, 69:13, 69:19, 70:3, 97:7, 119:17, 123:12, 130:13, 132:3, 137:11, 143:12, 148:9, 151:5, 151:12, 158:7, 158:22, 162:9, 164:8, 164:13, 164:15, 164:16, 225:5, 226:14, 242:13

**follow-up** [13] - 69:7, 97:7, 137:11, 143:12, 148:9, 151:5, 151:12, 158:7, 158:22, 162:9, 164:16, 225:5

**follow-ups** [9] - 69:13, 69:19, 70:3, 130:13, 132:3, 164:8, 164:13, 164:15, 242:13

**followed** [4] - 61:2, 65:19, 65:21, 124:8

**following** [3] - 119:20, 124:6, 204:6

**FOLLOWING** [1] - 129:15

**follows** [1] - 4:4

**footage** [2] - 80:21, 80:22

**force** [4] - 23:19, 180:19, 185:12, 185:15

**forced** [1] - 180:22

**foregoing** [2] - 248:5, 249:6

**forensic** [2] - 217:23, 244:7

**forgive** [1] - 172:21

**form** [88] - 3:12, 14:21, 22:6, 25:17, 26:13, 38:8, 39:6, 40:13, 42:19, 43:12, 43:16, 44:3, 52:2, 52:14, 53:4, 54:18, 55:3, 55:16, 56:10, 56:23, 58:2, 63:19, 63:21, 64:21, 66:6, 80:5, 90:8, 94:22, 95:2, 102:13, 102:15, 112:6, 113:10, 114:7, 114:17, 121:5, 121:16, 131:6, 136:19, 136:20, 138:18, 139:4, 139:5, 139:22, 142:21, 145:22, 154:22, 171:22, 173:23, 175:10, 176:8, 176:21, 178:23, 179:14, 180:9, 181:3, 181:12, 183:9, 184:8, 184:17, 185:3, 186:13, 186:23, 187:17, 188:20, 189:21, 190:10, 190:11, 192:17, 192:18, 193:8, 194:11, 195:4, 204:18, 207:20, 208:6, 208:14, 223:7, 226:6, 230:15, 235:5, 237:14, 242:20, 243:12, 243:13, 244:10, 245:2, 245:3

**formal** [6] - 8:5, 9:22, 38:3, 60:10, 63:14, 137:8

**formed** [1] - 170:22

**forth** [2] - 59:8, 246:13

**fortunate** [3] - 33:2, 33:5, 33:6

**forward** [2] - 240:23, 241:20

**forwarded** [1] - 117:22

**foster** [2] - 153:8, 153:9

**Fountain** [48] - 2:7, 13:16, 13:20, 13:22, 37:19, 37:21, 38:6,

45:11, 66:17, 67:18, 67:22, 86:3, 87:21, 88:6, 88:21, 89:19, 91:23, 93:3, 93:14, 93:20, 93:21, 97:8, 97:11, 98:21, 99:10, 101:6, 104:22, 136:6, 141:19, 158:8, 163:11, 170:6, 171:20, 191:3, 191:8, 195:21, 196:3, 217:10, 219:22, 220:10, 220:12, 220:22, 221:3, 221:6, 222:6, 226:2, 226:3, 245:13

**FOUNTAIN** [1] - 1:6

**Fountain's** [6] - 216:11, 216:18, 217:7, 218:18, 219:12, 221:10

**four** [11] - 16:4, 69:17, 101:17, 110:17, 110:18, 115:18, 115:22, 119:4, 131:3, 154:17, 154:18

**fourth** [1] - 218:7

**fracture** [7] - 169:22, 170:4, 170:16, 170:19, 171:2, 202:4, 202:9

**fractures** [1] - 125:15

**frame** [1] - 113:16

**frantic** [1] - 90:16

**Freddie** [1] - 213:22

**free** [1] - 197:23

**freezer** [1] - 149:21

**Friday** [1] - 155:10, 155:19, 168:14, 169:14

**friend** [4] - 159:4, 159:21, 212:13, 216:21

**friends** [1] - 216:14

**front** [1] - 81:3

**fruit** [1] - 154:11

**frustration** [1] - 168:9

**full** [7] - 15:21, 82:8, 83:15, 118:14, 149:19, 196:19

**fully** [2] - 5:3, 5:17

**function** [2] - 34:21, 39:19

**funeral** [1] - 223:19

**FURTHER** [1] - 242:14

**G**

**gained** [2] - 146:11, 146:15

**gashes** [1] - 174:14

**gather** [1] - 49:6

**General** [2] - 2:12, 2:13

**general** [7] - 58:22, 59:2, 59:4, 144:16, 148:19, 166:17, 178:17

**generally** [16] - 25:2, 76:4, 104:6, 113:15, 131:16, 135:22, 150:7, 155:21, 166:2, 168:2, 171:15, 233:17, 234:7, 234:11, 234:21, 234:23

**generates** [1] - 244:2

**Georgia** [1] - 215:10

**gesture** [1] - 6:4

**Ginsberg** [2] - 1:19, 2:5

**given** [23] - 6:20, 6:22, 7:15, 9:23, 12:20, 19:8, 20:17, 21:13, 22:23, 47:4, 48:6, 50:5, 58:20, 84:17, 85:6, 103:23, 145:9, 177:10, 190:22, 191:21, 192:4, 197:12, 223:4

**Glass** [8] - 11:9, 151:7, 157:8, 157:20, 163:22, 217:3, 217:10, 218:10

**Gonzales** [2] - 220:6, 220:13

**good-faith** [1] - 50:19

**graduating** [1] - 27:5

**Grand** [1] - 247:8

**grand** [14] - 7:3, 10:19, 10:21, 18:11, 81:7, 81:11, 81:18, 82:9, 82:11, 103:4, 150:15, 150:17, 165:15, 165:16

**grandmother** [1] - 126:9

**granted** [1] - 25:14

**gravely** [1] - 228:15

**great** [1] - 5:11

**greater** [1] - 96:23

**Griffin** [2] - 1:20, 2:5

**Groesback** [1] - 161:2

**ground** [4] - 54:10,

111:10, 145:14,
191:12
**grounds** [1] - 244:22
**guess** [10] - 10:10,
29:23, 77:13, 98:14,
112:14, 121:20,
137:2, 137:17,
179:7, 180:19
**guide** [3] - 58:16,
58:20, 58:23
**guided** [1] - 57:9
**guideline** [1] - 96:21
**guilty** [1] - 243:3
**gun** [1] - 199:16
**guys** [4] - 34:10,
38:18, 39:5, 100:11

**H**

**hair** [1] - 174:16
**half** [8] - 15:22, 21:7,
29:20, 30:4, 112:9,
112:13, 118:22,
195:22
**halfway** [1] - 213:9
**Hamilton** [1] - 2:14
**hand** [1] - 73:4
**handcuffed** [3] -
108:14, 108:17,
108:18
**handed** [2] - 36:18,
145:10
**handful** [1] - 61:12
**handing** [1] - 146:13
**handled** [1] - 32:23
**handling** [1] - 165:6
**handwriting** [12] -
212:9, 212:21,
214:4, 215:7, 216:3,
216:11, 216:16,
216:19, 217:6,
217:8, 218:6, 220:17
**handwritten** [2] -
217:21, 219:22
**harder** [1] - 191:15
**head** [5] - 6:5, 130:20,
195:23, 196:2, 238:5
**heading** [1] - 248:6
**headquarters** [3] -
79:12, 99:2, 106:19
**healthy** [1] - 208:21
**hear** [3] - 8:22,
140:12, 161:10
**heard** [11] - 65:16,
66:3, 85:7, 94:6,
128:6, 160:17,
168:7, 170:16,
179:17, 200:23,
236:5

**hearing** [18] - 7:6,
10:19, 18:13, 19:11,
37:10, 48:14, 51:2,
81:19, 82:18, 82:22,
83:14, 136:11,
140:10, 167:21,
168:12, 201:6,
202:13, 204:3
**hearings** [4] - 10:22,
18:4, 47:23, 61:6
**held** [9] - 1:17, 46:21,
69:10, 70:21, 81:8,
82:5, 128:23,
208:18, 211:21
**help** [2] - 142:23,
152:7
**helped** [1] - 178:8
**helpful** [5] - 49:12,
53:13, 79:21,
156:16, 160:6
**helps** [1] - 76:18
**hereby** [3] - 3:2,
248:4, 249:6
**hereof** [1] - 248:6
**hereto** [1] - 3:4
**hi** [1] - 68:12
**Hicks** [34] - 65:8,
65:12, 66:4, 66:9,
68:19, 74:3, 78:5,
78:15, 79:2, 79:4,
80:23, 88:14, 92:8,
93:15, 94:12, 97:17,
103:22, 123:5,
126:4, 135:4, 154:3,
155:10, 160:18,
162:15, 163:5,
163:21, 200:22,
209:13, 212:17,
212:21, 214:14,
216:2, 216:8, 226:21
**Hicks'** [1] - 94:20
**Hicks's** [1] - 209:19
**Hicks-Thomas** [1] -
160:18
**hidden** [1] - 156:7
**high** [3] - 120:23,
131:18, 230:20
**highest** [1] - 26:17
**highlighter** [2] -
211:6, 211:10
**highlights** [2] -
127:23, 128:2
**highly** [2] - 179:13,
179:18
**himself** [2] - 100:9,
137:6
**hired** [3] - 27:16,
38:11, 38:17
**histories** [3] - 234:8,
234:11, 234:14

**history** [6] - 47:15,
116:18, 116:19,
116:21, 116:22,
234:20
**hitting** [3] - 130:20,
185:8, 196:2
**holding** [1] - 107:22
**home** [15] - 85:20,
95:17, 97:22,
105:22, 107:14,
119:14, 124:23,
125:4, 125:8,
159:20, 173:2,
182:17, 183:6,
183:23, 198:4
**homicide** [2] - 43:15,
72:13, 78:21,
215:20, 217:22
**honest** [1] - 229:2
**honestly** [5] - 11:18,
12:3, 23:16, 139:7,
213:19
**hopefully** [1] - 200:10
**hospital** [19] - 95:11,
101:13, 105:12,
106:11, 108:20,
172:22, 174:7,
174:9, 192:23,
197:4, 197:13,
197:17, 197:22,
201:17, 206:15,
208:11, 208:12,
213:6, 214:8
**Hospital** [5] - 87:9,
105:6, 106:5, 106:9,
132:12
**hour** [7] - 16:3, 61:19,
61:20, 62:8, 89:10,
159:10, 173:18
**hours** [29] - 15:16,
21:4, 21:7, 48:9,
52:10, 52:11, 52:12,
53:2, 53:3, 62:4,
77:13, 99:11,
101:17, 103:19,
104:10, 107:16,
124:21, 134:17,
157:13, 159:10,
168:9, 193:5,
201:10, 201:14,
201:15, 203:2,
203:3, 203:7, 232:2
**house** [9] - 96:3,
97:22, 98:13,
172:15, 228:6,
228:8, 228:16, 229:4
**household** [17] - 65:8,
65:12, 68:19, 74:4,
74:20, 78:5, 88:15,
90:2, 90:6, 95:9,

95:12, 95:15, 95:16,
212:18, 228:8,
228:17, 233:17
**Hudson** [4] - 26:20,
27:5, 27:9, 29:4
**hundred** [1] - 34:8
**hundreds** [5] - 24:16,
24:17, 231:7, 231:9,
231:10
**Huntley** [15] - 7:5,
18:13, 37:9, 48:14,
50:5, 51:2, 53:11,
61:5, 82:18, 82:22,
83:14, 83:16,
167:20, 202:13,
204:3
**hurt** [1] - 100:9,
219:17
**hypothetically** [3] -
63:17, 64:11, 175:16
**hypotheticals** [1] -
177:11

**I**

**IA** [1] - 41:4
**Ian** [1] - 160:9
**idea** [7] - 22:13, 23:16,
24:16, 96:11, 131:3,
138:11, 191:4
**identification** [2] -
75:20, 211:23
**identified** [5] - 71:9,
89:23, 90:3, 143:3,
153:4
**identify** [4] - 8:20,
76:16, 210:14,
211:17
**ill** [2] - 90:20, 228:15
**illegal** [2] - 179:7,
179:8
**imagine** [2] - 122:20,
148:7
**immediate** [1] - 42:2
**immediately** [1] - 32:2
**impact** [2] - 54:16,
57:19
**impacted** [1] - 54:14
**impair** [2] - 5:16,
197:8
**impede** [1] - 192:11
**implemented** [1] -
64:10
**implicated** [1] - 223:5
**important** [3] - 98:8,
98:22, 207:12
**in-person** [2] - 128:4,
131:22, 132:4
**inadmissibility** [1] -

157:22
**inappropriate** [3] -
160:18, 175:16,
179:6
**inch** [1] - 19:12
**incident** [8] - 18:21,
38:2, 60:8, 75:3,
85:14, 87:2, 98:20,
171:16
**included** [2] - 205:17,
245:22
**including** [4] - 9:10,
77:2, 227:8
**inconsistencies** [1] -
220:21
**incorrect** [5] - 169:23,
170:8, 170:11,
170:13, 170:17
**incriminate** [2] -
104:5, 123:14
**incriminated** [2] -
155:6, 223:5
**incriminating** [9] -
102:12, 110:13,
112:4, 112:12,
118:17, 166:14,
166:16, 209:17,
240:16
**incrimination** [5] -
184:23, 185:7,
186:5, 187:14,
187:21
**incriminatory** [1] -
162:19
**inculpatory** [4] -
188:17, 188:22,
189:19, 190:23
**independent** [2] -
110:2, 184:2
**INDEX** [1] - 247:6
■■■■■ [2] - 220:21,
221:12
**indicate** [2] - 97:18,
134:16
**indicated** [2] - 68:12,
165:16
**indicted** [1] - 141:6
**indictment** [2] - 36:11,
79:10
**individual** [1] - 160:9
**individual's** [2] - 26:8,
180:7
**individually** [1] -
58:14
**individuals** [2] -
60:14, 164:20
**inevitably** [1] - 8:11
**infant** [2] - 121:12,
121:21
**infection** [1] - 204:17

**infections** [1] - 91:10
**info** [1] - 208:3
**informally** [1] - 137:6
**informant** [1] - 98:10
**information** [39] -
9:23, 49:6, 55:11,
56:20, 77:14, 87:10,
88:7, 92:7, 98:9,
107:19, 108:12,
109:6, 109:8,
109:14, 117:16,
119:8, 125:18,
128:12, 130:12,
131:13, 133:8,
135:6, 146:11,
155:23, 200:9,
200:18, 207:11,
207:17, 211:2,
212:23, 213:4,
215:9, 223:4,
235:16, 236:4,
236:22, 243:11,
244:21, 245:12
**informed** [13] - 87:6,
101:5, 101:7, 109:4,
109:9, 125:14,
130:14, 130:17,
134:21, 138:5,
169:12, 170:3,
187:15
█ [3] - 126:9,
212:20, 216:7
**initial** [7] - 10:15,
10:20, 70:13, 90:2,
169:22, 206:15,
233:2
**initials** [4] - 210:18,
210:19, 211:11,
211:12
**initiated** [6] - 41:11,
41:12, 243:9,
243:16, 243:18,
243:23
**initiative** [1] - 156:18
**injure** [1] - 97:19
**injured** [3] - 92:16,
100:8, 177:23
**injuries** [5] - 96:16,
101:4, 166:19,
203:22, 239:22
**injury** [1] - 177:17
**innocent** [2] - 243:2,
243:6
**inquire** [5] - 169:16,
171:3, 197:5, 197:7,
197:10
**inside** [1] - 77:5
**instance** [1] - 205:9
**instances** [3] -
115:18, 165:11,

241:4
**instead** [1] - 208:3
**instinct** [4] - 51:22,
61:2, 184:6, 184:15
**instincts** [5] - 52:7,
53:18, 53:20, 54:3,
55:7
**instruct** [2] - 56:7,
56:21
**instructing** [1] - 58:9
**instructions** [2] -
8:22, 191:11
**instructive** [1] - 51:20
**instrument** [3] - 73:5,
118:8, 243:20
**instrumental** [1] -
182:21
**instruments** [1] -
246:15
**integrity** [1] - 199:23
**intelligent** [1] - 101:23
**intending** [1] - 229:9
**intention** [3] - 110:15,
110:23, 165:17
**intentional** [1] - 68:5
**intentions** [4] - 16:18,
16:19, 16:20, 16:23
**interacted** [2] - 66:3,
68:14, 223:11
**interactions** [4] -
65:11, 67:4, 68:18,
162:3
**interested** [1] - 13:7
**internal** [5] - 40:23,
41:5, 41:18, 41:22,
42:8
**internally** [1] - 41:12
**interrogate** [1] -
206:21
**interrogating** [1] -
61:6
**interrogation** [47] -
23:23, 24:19, 45:18,
46:2, 46:16, 47:11,
47:18, 47:19, 48:5,
48:15, 49:20, 49:22,
50:7, 51:14, 51:21,
51:23, 54:20, 55:13,
56:3, 56:22, 57:20,
59:18, 60:7, 60:15,
60:21, 61:2, 61:20,
63:15, 63:16, 79:12,
79:14, 95:20, 98:8,
99:5, 106:22, 108:5,
158:5, 185:12,
186:4, 186:11,
186:22, 187:13,
192:8, 192:11,
198:13, 247:4, 247:5
**interrogations** [5] -

47:23, 59:8, 96:22,
175:9, 177:4
**interrupt** [1] - 198:22
**intervene** [1] - 229:20
**interview** [146] - 12:4,
12:23, 15:2, 15:7,
16:2, 20:20, 21:17,
21:18, 21:21, 22:2,
40:18, 46:15, 48:4,
49:22, 50:7, 53:3,
54:13, 55:2, 55:6,
57:9, 58:9, 62:2,
62:8, 64:10, 64:13,
77:19, 77:20, 78:15,
79:4, 79:20, 89:13,
89:16, 89:21, 90:6,
94:6, 94:9, 95:23,
96:9, 96:17, 97:5,
98:7, 98:16, 98:19,
99:17, 99:20, 99:23,
100:18, 100:21,
101:3, 101:4,
102:18, 104:13,
105:7, 106:23,
107:5, 107:7, 107:8,
108:10, 109:16,
109:18, 110:20,
110:23, 111:8,
113:16, 115:21,
116:5, 118:22,
123:19, 124:17,
131:18, 138:10,
138:15, 138:22,
140:10, 140:12,
143:5, 155:10,
155:11, 156:4,
156:13, 158:10,
159:13, 163:21,
165:17, 166:6,
167:14, 168:5,
168:9, 168:23,
169:20, 169:21,
171:21, 172:4,
172:7, 173:18,
173:19, 174:19,
175:18, 175:19,
177:12, 178:13,
178:14, 179:12,
180:21, 183:12,
191:3, 191:19,
193:20, 194:14,
194:17, 195:21,
197:16, 198:16,
198:18, 198:21,
198:23, 199:9,
199:19, 199:22,
200:15, 201:9,
201:12, 201:23,
203:3, 203:11,
204:5, 204:9,
206:19, 208:10,

209:20, 209:23,
210:13, 210:15,
214:15, 214:18,
215:3, 219:4, 220:3,
222:5, 229:16,
235:20
**interviewed** [19] -
13:12, 13:14, 13:16,
13:19, 13:20, 13:23,
15:14, 79:11, 91:15,
98:3, 136:12,
138:14, 139:8,
158:9, 159:19,
159:23, 218:23,
231:6, 231:11
**interviewers** [2] -
14:3, 15:5
**interviewing** [8] -
22:10, 53:8, 140:4,
164:20, 185:2,
234:15, 235:17,
238:10
**interviews** [23] -
17:14, 20:18, 62:4,
77:19, 103:8, 145:4,
153:15, 158:22,
176:13, 182:6,
207:6, 209:13,
218:19, 218:21,
220:15, 220:16,
222:8, 222:17,
223:5, 240:11,
244:22, 246:13,
246:17
**introduce** [1] - 137:6
**introduced** [19] -
111:9, 113:8,
113:17, 114:15,
114:22, 115:4,
115:8, 115:11,
115:12, 115:15,
118:23, 131:4,
137:8, 137:9,
166:15, 171:20,
172:8, 176:22, 191:4
**introducing** [1] -
166:3
**introductory** [1] -
145:20
**intuition** [1] - 51:22
**investigate** [2] - 41:8,
233:13
**investigated** [3] -
112:16, 226:15,
236:11
**investigating** [3] -
127:8, 233:12,
234:23
**investigation** [54] -
8:2, 8:12, 8:16, 9:15,

9:16, 9:19, 10:16,
12:18, 14:4, 32:11,
33:23, 34:4, 35:13,
36:21, 37:21, 41:11,
41:14, 65:3, 67:5,
67:6, 69:3, 69:6,
78:21, 86:14, 88:20,
116:6, 123:2,
128:10, 128:18,
133:2, 133:9, 134:2,
140:3, 154:7, 160:7,
162:20, 173:16,
174:6, 192:12,
204:15, 217:23,
218:13, 224:6,
224:9, 224:10,
227:12, 227:21,
235:12, 235:23,
237:2, 237:7,
238:14, 244:7,
244:21
**investigations** [5] -
33:18, 41:5, 41:20,
59:9, 133:10
**Investigator** [1] -
220:5
**investigator** [3] -
37:18, 73:15, 220:8
**investigatory** [4] -
132:16, 151:14,
162:9, 244:6
**invited** [1] - 136:7
**involuntary** [1] - 25:16
**involve** [1] - 51:22,
185:15
**involved** [10] - 24:19,
25:10, 35:21, 94:18,
107:15, 107:17,
117:4, 121:8,
121:19, 205:5
**involvement** [4] -
4:15, 65:15, 68:20,
85:17
**involving** [6] - 23:23,
85:14, 96:16,
185:11, 228:2,
236:11
**IQ** [1] - 231:17
**IRs** [1] - 69:6
**IS** [1] - 129:16
**Isaiah** [1] - 135:13
**Israel** [1] - 135:13
**issue** [3] - 120:10,
121:15, 200:5
**issued** [5] - 120:6,
120:12, 120:22,
121:2, 121:3
**issues** [2] - 30:14,
37:16
**items** [4] - 74:20,

77:12, 77:16, 80:23
**itself** [3] - 149:13, 161:12, 196:22

## J

**jail** [8] - 27:4, 27:13, 124:4, 135:18, 135:23, 138:13, 138:22, 203:19
**Jan** [1] - 84:14
**January** [1] - 217:9
**Jasper** [9] - 94:7, 94:15, 135:21, 137:5, 138:2, 138:8, 140:10, 142:12, 159:13
**Jeanne** [3] - 1:21, 249:4, 249:12
**Jennifer** [3] - 146:23, 213:12, 213:14
**job** [9] - 27:15, 38:6, 42:10, 43:22, 60:11, 63:13, 69:5, 85:18, 85:19
**jobs** [1] - 233:21
**jogged** [1] - 224:14
**Johnson** [1] - 2:8
**join** [1] - 206:2
**joined** [2] - 28:3, 33:11
**joint** [1] - 39:5
**jointly** [3] - 110:5, 110:11, 114:15
**Joseph** [1] - 2:6
**Jr** [1] - 135:13
**judgment** [2] - 180:7, 184:2
**July** [1] - 50:19
**jump** [2] - 99:18, 229:9
**jumping** [1] - 100:3
**June** [1] - 48:2
**juror** [1] - 165:16
**jury** [15] - 7:3, 10:19, 10:21, 18:11, 81:7, 81:11, 81:18, 82:9, 82:11, 103:5, 150:15, 150:17, 165:15, 187:10, 247:8
**juvenile** [1] - 220:9

## K

**Kardos** [1] - 156:14
**Katherine** [1] - 2:14
**Katrina** [1] - 156:14

**keep** [5] - 44:13, 183:22, 200:11, 207:10, 207:12
**keeping** [1] - 89:16
**kept** [2] - 102:10, 194:23
**kick** [1] - 55:5
**kids** [5] - 67:11, 89:3, 171:4, 218:21, 218:23
**kids'** [1] - 74:10
**killed** [1] - 152:20
**kind** [8] - 227:18, 230:23, 231:3
**Klein** [3] - 2:2, 4:9, 240:9
**KLEIN** [154] - 4:6, 8:15, 15:3, 22:8, 22:15, 22:22, 25:20, 26:2, 26:16, 38:13, 38:15, 39:12, 40:14, 42:22, 43:18, 44:6, 44:23, 45:9, 45:10, 45:16, 46:17, 46:22, 46:23, 50:14, 51:2, 51:5, 52:8, 52:16, 52:21, 52:22, 53:9, 54:19, 55:8, 55:19, 56:13, 56:14, 57:10, 58:12, 58:13, 59:22, 59:23, 64:17, 64:23, 66:10, 69:11, 70:20, 70:22, 75:18, 75:21, 75:22, 80:9, 81:9, 82:6, 83:13, 90:10, 95:3, 103:3, 112:18, 113:14, 114:13, 114:20, 121:7, 121:10, 122:3, 129:2, 129:19, 131:9, 134:4, 134:10, 137:4, 138:20, 139:11, 139:18, 140:7, 143:4, 143:11, 146:5, 155:2, 164:18, 169:15, 172:3, 174:4, 175:14, 176:17, 176:23, 179:11, 179:22, 180:13, 181:6, 181:18, 182:5, 183:15, 183:16, 184:13, 184:14, 184:20, 185:4, 185:10, 185:20, 186:2, 186:18, 187:7, 187:18, 187:20, 188:7, 189:2, 189:7,

189:10, 189:15, 189:16, 190:6, 190:21, 193:6, 193:10, 193:17, 193:19, 194:15, 195:8, 204:22, 205:14, 205:19, 206:3, 206:12, 207:23, 208:9, 208:19, 211:9, 211:17, 212:2, 212:4, 223:2, 223:10, 224:16, 224:22, 228:13, 228:20, 233:19, 233:23, 234:4, 234:9, 235:5, 236:19, 237:14, 240:15, 242:10, 242:13, 242:15, 242:23, 243:21, 244:15, 245:7, 245:11, 246:4, 246:19
**knowledge** [19] - 49:23, 64:7, 71:3, 80:16, 88:6, 90:19, 101:12, 101:16, 103:15, 146:15, 155:7, 201:16, 205:8, 222:9, 222:16, 224:5, 224:7, 241:15, 243:22
**known** [3] - 38:16, 124:10, 188:14
**knows** [1] - 145:21

## L

**lab** [5] - 151:6, 151:20, 151:22, 151:23, 218:5
**lack** [1] - 123:23
**land** [1] - 63:17
**Lansingburgh** [1] - 213:17
**Lapierre** [1] - 160:10
**last** [16] - 19:2, 66:13, 66:23, 80:19, 80:21, 89:7, 94:23, 110:17, 110:18, 119:4, 154:17, 154:18, 192:16, 209:2, 209:5, 222:19
**lasted** [1] - 159:6
**laugh** [1] - 185:19
**Law** [1] - 1:19
**law** [6] - 4:22, 30:7, 30:13, 30:14,

128:14, 180:15
**lawful** [1] - 186:21
**laws** [1] - 128:17
**lawyers** [1] - 8:22
**lead** [10] - 17:7, 37:18, 63:15, 102:11, 131:19, 159:20, 185:6, 193:4, 242:18, 246:16
**leading** [5] - 10:18, 10:19, 10:21, 24:20
**learn** [1] - 55:9, 136:3, 136:5, 137:22, 138:7, 163:17, 165:7, 197:11, 204:14, 205:3
**learned** [17] - 30:13, 42:10, 53:11, 55:18, 63:13, 64:2, 64:6, 64:12, 65:16, 65:22, 159:13, 169:21, 184:21, 186:4, 188:13, 204:23, 236:23
**learning** [2] - 102:2, 159:16
**least** [2] - 48:4, 53:11
**leave** [4] - 27:15, 100:2, 124:23, 199:4
**Leestma** [1] - 84:14
**left** [12] - 89:4, 105:12, 109:20, 110:19, 112:5, 125:4, 201:17, 210:8, 210:19, 211:3, 216:5, 216:8
**legal** [5] - 180:23, 186:16, 243:16, 243:18, 243:23
**legality** [1] - 178:15
**length** [1] - 62:4
**less** [3] - 50:8, 89:10, 200:3
**letter** [4] - 44:20, 162:16, 162:19
**letting** [3] - 192:10, 201:20, 214:9
**level** [5] - 26:17, 43:14, 101:20, 116:6, 229:23
**liaise** [1] - 228:2
**lie** [16] - 177:6, 177:14, 178:4, 178:9, 195:19, 200:12, 202:6, 202:8, 202:9, 206:20, 207:19, 208:5, 208:21, 209:7, 210:6, 238:13
**lied** [5] - 14:17,

175:23, 208:10, 209:19, 210:9
**lies** [12] - 175:8, 175:15, 175:18, 175:21, 176:6, 176:12, 177:16, 177:19, 207:3, 207:6, 207:10, 207:14
**life** [7] - 65:9, 67:11, 91:10, 178:2, 200:11, 207:18, 208:4
**likely** [21] - 43:10, 43:16, 48:22, 50:4, 50:6, 50:11, 74:8, 85:4, 94:5, 108:3, 116:16, 131:12, 132:13, 148:10, 162:11, 195:9, 200:20, 202:10, 213:6, 213:15, 237:11
**limited** [1] - 77:2
**limits** [1] - 186:20
**Linda** [1] - 215:7
**line** [16] - 56:7, 176:6, 176:14, 176:15, 176:16, 176:18, 176:20, 176:22, 177:3, 177:13, 178:15, 179:23, 180:2, 180:4, 188:9
**linking** [1] - 154:20
**liquified** [2] - 149:20, 150:3
**List** [1] - 247:1
**list** [1] - 218:7
**literally** [1] - 246:5
**lived** [1] - 160:15
**located** [3] - 29:3, 29:4, 212:18
**location** [3] - 29:12, 48:21, 98:7
**locker** [2] - 199:12, 199:17
**lodged** [1] - 116:13
**log** [2] - 73:17, 74:9
**longest** [1] - 62:2
**look** [14] - 46:5, 46:18, 47:10, 70:9, 70:14, 76:10, 92:12, 105:18, 130:5, 161:18, 171:2, 212:2, 221:10, 242:5
**looked** [12] - 12:10, 65:22, 66:2, 80:12, 80:13, 80:15, 80:18, 111:2
**looking** [21] - 20:4,

75:7, 76:7, 76:13, 76:14, 76:18, 76:19, 76:23, 77:8, 77:12, 85:5, 89:22, 110:6, 152:8, 194:2, 212:6, 214:3, 214:20, 215:6, 216:13
**looks** [6] - 124:13, 213:20, 216:11, 218:4, 218:6, 218:18
**lower** [1] - 24:5
**lucid** [1] - 230:5
**lucky** [1] - 31:23
**lungs** [1] - 208:21
**lying** [1] - 177:3

**M**

**macro** [1] - 116:6
**mail** [1] - 50:18
**mailed** [1] - 51:8
**maintain** [5] - 37:7, 39:5, 40:7, 51:10, 51:12
**maintained** [4] - 36:19, 63:6, 71:16, 73:14
██████ [5] - 125:15, 152:14, 152:19, 152:20, 214:23
**man** [1] - 197:23
**management** [1] - 129:22
**manager** [1] - 161:14
**manner** [1] - 64:19
**manners** [1] - 228:22
**manual** [2] - 58:16, 59:6
**Marble** [1] - 127:11
**margin** [1] - 210:19
**Mark** [1] - 174:5
**mark** [11] - 44:19, 46:6, 46:7, 62:19, 70:10, 75:17, 129:8, 129:12, 173:11, 211:5, 211:11
**Mark's** [1] - 173:12
**Marked** [1] - 247:7
**MARKED** [1] - 129:16
**marked** [10] - 69:8, 75:19, 76:2, 81:6, 107:3, 129:3, 129:7, 211:22, 212:3, 212:5
**marks** [2] - 211:12, 211:13
**MASON** [5] - 1:6, 1:17, 4:2, 248:4, 248:13
**Mason** [9] - 2:7, 4:7, 47:5, 82:7, 174:5,

212:5, 224:8, 238:20, 242:16
**materials** [3] - 18:19, 18:20, 20:9
**matted** [1] - 174:16
**matter** [7] - 7:16, 12:20, 17:17, 17:23, 35:5, 43:8, 50:2, 69:13, 97:5, 132:16, 238:22
**M**██████ [72] - 71:23, 73:10, 85:15, 87:11, 87:13, 92:7, 96:12, 97:14, 97:19, 100:7, 101:4, 111:10, 113:4, 113:8, 113:18, 114:5, 114:11, 114:15, 114:22, 114:23, 115:3, 130:18, 136:14, 152:13, 152:19, 152:21, 166:19, 168:8, 168:13, 169:13, 171:5, 172:20, 173:3, 174:9, 177:23, 190:3, 190:15, 191:4, 191:12, 194:8, 196:2, 196:6, 196:23, 198:20, 200:11, 200:18, 200:19, 201:17, 201:20, 202:2, 202:3, 202:10, 204:16, 205:17, 206:8, 206:9, 217:14, 221:5, 223:6, 223:19, 224:9, 224:10, 228:5, 236:12, 237:18, 239:2, 239:6, 239:9, 239:21, 246:10
**M**██████**'s** [11] - 73:18, 126:5, 130:20, 132:11, 194:6, 203:22, 206:17, 208:4, 237:19, 237:22, 238:5
**mattress** [1] - 127:12
**mattresses** [1] - 77:9
**Maynard** [2] - 159:21, 212:14
**McAvoy** [1] - 120:13
**McNally** [2] - 147:15, 147:23
**MDT** [1] - 236:3
**mean** [9] - 60:19,

93:21, 121:11, 121:13, 165:12, 193:11, 213:13, 226:10, 234:21
**meaning** [1] - 230:7
**means** [3] - 49:4, 93:13, 243:23
**meant** [2] - 126:14, 166:22, 167:8
**measure** [2] - 198:11, 198:23
**measures** [3] - 57:4, 58:5, 63:22
**Med** [7] - 88:12, 91:21, 92:5, 95:4, 103:23, 126:21, 217:15
**medal** [1] - 42:18
**medals** [4] - 42:23, 45:3, 45:12, 247:3
**media** [2] - 18:21, 62:17
**medical** [13] - 8:7, 9:10, 71:22, 101:6, 101:7, 132:11, 133:7, 147:2, 148:15, 170:15, 202:15, 206:17, 244:13
**Medical** [4] - 88:23, 93:12, 106:7, 132:11
**medication** [2] - 197:8, 197:13
**medications** [1] - 5:15
**meet** [6] - 11:5, 19:23, 106:16, 122:21, 135:3, 154:2
**meeting** [52] - 9:12, 9:22, 20:4, 21:19, 37:9, 122:20, 123:10, 128:4, 130:4, 131:22, 132:4, 136:8, 136:10, 137:5, 137:8, 137:9, 137:10, 137:16, 137:19, 138:2, 138:3, 140:11, 140:16, 140:22, 141:19, 142:9, 142:11, 144:23, 148:2, 149:16, 150:18, 151:8, 151:19, 151:23, 152:6, 152:10, 157:5, 159:2, 159:5, 159:12, 159:15, 159:17, 162:6, 163:12, 163:15, 163:17, 217:12, 217:22, 218:4,

218:10, 236:7
**meetings** [15] - 8:7, 9:9, 10:5, 11:3, 11:12, 12:19, 136:7, 137:12, 137:14, 145:5, 157:20, 164:7, 236:18, 236:22, 245:21
**Melissa/Cedar** [1] - 213:9
**member** [1] - 227:10
**members** [7] - 8:3, 10:5, 34:3, 41:18, 57:7, 145:2, 227:9
**memorize** [1] - 76:13
**memory** [2] - 207:18, 224:14
**mental** [3] - 5:16, 197:16, 197:20
**mention** [2] - 196:2, 196:6
**mentioned** [7] - 168:20, 215:19, 226:20, 229:7, 237:17, 238:4, 238:23
**mentions** [1] - 237:9
**mentor** [2] - 60:13, 60:17
**mentors** [1] - 60:13
**merit** [1] - 40:15
**Merritt** [1] - 216:10
**message** [4] - 100:19, 214:8, 214:10, 216:8
**messages** [1] - 216:5
**met** [11] - 11:6, 11:20, 12:11, 15:23, 38:17, 67:23, 87:4, 87:7, 133:21, 147:22, 148:3, 148:8, 157:8, 197:4, 217:10
**metal** [1] - 77:3
**methods** [2] - 49:6, 158:5
**Michael** [3] - 2:11, 8:8, 9:10
**MICHAEL** [1] - 1:7
**middle** [1] - 201:2
**midnight** [2] - 101:10, 203:5
**might** [10] - 5:16, 102:11, 133:2, 164:14, 178:15, 197:8, 202:16, 202:20, 221:18, 239:14
**military** [1] - 27:23
**mind** [7] - 112:22, 166:18, 179:6, 183:2, 192:6,

199:20, 243:5
**mind's** [1] - 43:9
**mine** [4] - 212:12, 212:22, 214:5, 214:6
**minimize** [1] - 182:2
**minutes** [4] - 15:17, 15:18, 15:19, 81:21
**miracle** [4] - 194:18, 194:19, 195:15, 195:16
**Miranda** [4] - 80:8, 99:7, 104:15, 198:11
**Miranda's** [1] - 198:12
**Mirandize** [1] - 198:21
**Mirandized** [1] - 106:22
**misdemeanor** [1] - 233:10
**misdemeanors** [1] - 24:9
**misrepresentations** [2] - 187:23, 242:18
**misrepresented** [1] - 16:17
**missed** [1] - 75:12
**missing** [1] - 70:17
**modify** [1] - 56:22
**moment** [5] - 60:20, 76:10, 81:21, 83:9, 205:7
**moments** [2] - 60:19, 192:16
**Mommy** [1] - 219:17
**Monday** [1] - 203:4
**monitored** [1] - 89:3
**monitoring** [3] - 109:17, 110:20, 158:14
**month** [4] - 31:16, 36:7, 37:6, 62:6
**months** [5] - 29:20, 30:4, 50:9, 141:10, 236:17
**Moore** [1] - 153:7
**morning** [23] - 4:7, 4:8, 90:17, 101:13, 105:20, 107:11, 107:16, 118:11, 119:20, 120:2, 120:19, 124:18, 124:19, 124:21, 125:5, 130:15, 134:17, 135:16, 135:23, 150:21, 158:23, 198:5, 201:2
**most** [3] - 55:6, 202:3, 213:6
**mostly** [1] - 52:7
**mother** [1] - 153:9
**motion** [1] - 25:15

**move** [1] - 240:23
**moving** [2] - 202:2, 241:20
**MR** [252] - 4:6, 8:15, 14:21, 15:3, 22:6, 22:8, 22:12, 22:15, 22:22, 25:17, 25:20, 26:2, 26:13, 26:16, 38:8, 38:13, 38:15, 39:6, 39:12, 40:13, 40:14, 42:19, 42:22, 43:12, 43:18, 44:3, 44:6, 44:19, 44:23, 45:5, 45:9, 45:10, 45:14, 45:16, 46:11, 46:17, 46:20, 46:22, 46:23, 50:14, 51:2, 51:5, 52:2, 52:8, 52:14, 52:16, 52:19, 52:21, 52:22, 53:4, 53:9, 54:18, 54:19, 54:21, 55:8, 55:16, 55:19, 56:10, 56:13, 56:14, 56:23, 57:10, 58:2, 58:12, 58:13, 59:20, 59:22, 59:23, 63:19, 64:17, 64:21, 64:23, 66:6, 66:10, 69:11, 70:18, 70:20, 70:22, 75:18, 75:21, 75:22, 80:5, 80:9, 81:9, 82:6, 83:13, 90:8, 90:10, 94:22, 95:3, 102:13, 103:3, 112:6, 112:18, 113:10, 113:14, 114:7, 114:13, 114:17, 114:20, 121:5, 121:7, 121:10, 121:16, 122:3, 129:2, 129:19, 131:6, 131:9, 134:4, 134:10, 136:20, 137:4, 138:16, 138:20, 139:5, 139:11, 139:15, 139:18, 139:22, 140:7, 142:21, 143:4, 143:6, 143:11, 145:23, 146:5, 154:22, 155:2, 164:18, 169:9, 169:15, 171:22, 172:3, 173:23, 174:4, 175:10, 175:14, 176:8, 176:17, 176:21, 176:23, 178:23, 179:11, 179:14, 179:22,

180:9, 180:13, 181:3, 181:6, 181:12, 181:18, 182:5, 183:9, 183:15, 183:16, 184:8, 184:13, 184:14, 184:17, 184:20, 185:3, 185:4, 185:8, 185:10, 185:13, 185:20, 186:2, 186:13, 186:18, 186:23, 187:7, 187:17, 187:18, 187:20, 188:7, 188:20, 189:2, 189:6, 189:7, 189:9, 189:10, 189:11, 189:15, 189:16, 189:21, 190:6, 190:11, 190:21, 192:18, 193:6, 193:8, 193:10, 193:16, 193:17, 193:19, 194:11, 194:15, 195:4, 195:8, 204:18, 204:22, 205:14, 205:19, 206:3, 206:12, 207:20, 207:23, 208:6, 208:9, 208:14, 208:17, 208:19, 211:9, 211:17, 211:20, 212:2, 212:4, 223:2, 223:7, 223:10, 224:16, 224:22, 226:6, 228:13, 228:20, 233:19, 233:23, 234:4, 234:9, 235:5, 236:19, 237:14, 240:15, 242:10, 242:12, 242:13, 242:15, 242:20, 242:23, 243:12, 243:14, 243:21, 244:10, 244:15, 245:2, 245:4, 245:7, 245:9, 245:11, 246:4, 246:19
**MS** [56] - 8:14, 14:19, 14:20, 46:9, 57:3, 57:5, 57:21, 58:4, 63:21, 75:16, 95:2, 102:15, 129:12, 136:19, 138:18, 139:4, 139:16, 139:17, 139:21, 143:2, 145:22, 169:8, 176:10,

189:4, 190:10, 192:17, 193:9, 194:9, 194:12, 205:13, 205:15, 206:2, 211:5, 222:18, 222:21, 222:23, 224:20, 225:4, 225:7, 226:9, 228:14, 229:3, 233:20, 234:2, 234:6, 235:7, 236:21, 237:15, 238:16, 238:19, 240:18, 240:20, 242:9, 243:13, 245:4, 245:18
**multi** [1] - 61:20
**multi-hour** [1] - 61:20
**multidisciplinary** [2] - 128:6, 236:3
**multiple** [3] - 11:7, 29:9, 190:2
**municipalities** [1] - 29:14
**murder** [14] - 73:6, 97:8, 117:18, 118:18, 121:11, 130:15, 145:15, 148:5, 148:6, 154:12, 246:6, 246:9
**murdered** [1] - 121:22
**murdering** [1] - 223:6
**must** [2] - 208:23, 209:4

## N

**name** [8] - 4:9, 11:19, 23:10, 86:20, 173:10, 218:7, 238:20
**named** [1] - 23:4
**names** [1] - 212:16
**narratives** [1] - 130:6
**nature** [10] - 10:12, 23:17, 23:21, 140:4, 145:21, 151:19, 225:13, 225:14, 227:5, 228:18
**necessarily** [7] - 25:13, 39:18, 94:4, 140:3, 164:9, 181:14, 238:2
**necessary** [1] - 224:23
**need** [10] - 6:16, 9:5, 9:21, 46:9, 76:8, 81:22, 109:5, 198:3, 206:5, 239:17
**needed** [8] - 52:11,

85:22, 100:12, 152:23, 153:19, 200:2, 200:17, 230:15
**needs** [5] - 151:22, 217:3, 230:22, 231:3, 231:12
**neglect** [5] - 77:2, 77:4, 233:14
**neighbors** [1] - 160:16
**never** [14] - 23:11, 23:12, 125:21, 136:2, 141:15, 160:17, 179:17, 183:14, 185:14, 191:7, 200:23, 204:23, 209:15, 236:5
**NEW** [4] - 1:1, 1:9, 1:14, 248:1
**new** [1] - 163:17
**New** [17] - 1:21, 1:23, 2:3, 2:6, 2:10, 2:12, 2:13, 3:5, 4:11, 75:3, 151:6, 151:20, 218:5, 218:12, 220:8, 249:5
**news** [1] - 62:11
**next** [37] - 30:23, 31:11, 77:11, 87:6, 87:9, 104:9, 109:17, 110:19, 117:6, 117:12, 119:9, 119:12, 120:2, 120:19, 122:23, 151:5, 162:9, 212:20, 214:3, 214:13, 214:20, 215:6, 215:19, 216:2, 216:15, 217:2, 217:14, 217:21, 218:16, 219:8, 219:16, 220:20, 221:2, 221:5, 221:8, 221:12
**Nicole** [19] - 86:20, 86:23, 87:7, 124:14, 125:7, 125:10, 128:4, 130:2, 130:11, 130:13, 135:10, 135:14, 135:20, 138:9, 142:3, 227:9, 235:9, 235:10
**night** [10] - 34:11, 93:16, 105:19, 126:21, 168:19, 201:2, 203:8, 209:2, 209:5, 213:6
**nine** [2] - 157:13,

220:20
███████-old [1] - 220:20
**Noel** [23] - 86:20, 86:23, 87:22, 88:6, 92:3, 94:7, 124:14, 125:7, 125:10, 128:4, 130:2, 130:11, 135:10, 135:14, 135:20, 138:9, 142:7, 142:9, 161:20, 214:4, 227:9, 235:9, 235:10
**Noel's** [1] - 130:13
**non** [1] - 17:5
**non-biased** [1] - 17:5
**nonaccidental** [1] - 170:18
**none** [2] - 223:5, 232:5
**nonphysical** [1] - 186:3
**nontrauma** [1] - 169:17
**noon** [2] - 159:2, 159:7
**normal** [3] - 230:6, 230:7, 231:17
**Northern** [1] - 4:12
**NORTHERN** [1] - 1:1
**Notary** [3] - 1:22, 3:5, 249:5
**note** [8] - 9:2, 50:15, 97:7, 131:10, 131:21, 151:5, 162:9, 217:2
**notebook** [1] - 70:19
**noted** [4] - 62:18, 126:5, 134:21, 248:6
**NOTED** [1] - 129:17
**notes** [57] - 11:2, 19:18, 70:4, 72:4, 72:6, 80:10, 89:13, 89:15, 89:20, 89:23, 92:12, 92:13, 105:18, 124:14, 125:6, 125:14, 127:17, 127:22, 129:21, 130:2, 130:5, 130:13, 132:18, 137:23, 148:21, 153:17, 157:11, 158:17, 158:21, 161:6, 211:18, 212:7, 212:13, 214:14, 214:18, 215:3, 216:20, 217:16, 217:21, 218:2, 218:17, 218:18,

218:19, 218:20, 219:2, 219:11, 219:12, 219:19, 219:22, 221:9, 221:10, 221:14, 240:10, 245:13, 247:10, 249:7

**noteworthy** [4] - 43:7, 44:7

**Noteworthy** [1] - 43:20

**nothing** [12] - 32:16, 47:18, 58:8, 81:5, 90:3, 154:8, 160:6, 183:23, 201:20, 223:15, 225:12, 226:18

**notice** [2] - 238:5, 238:7

**Notice** [1] - 3:16

**noticed** [2] - 235:3, 237:20

**notified** [1] - 86:6

**notify** [1] - 106:12

**November** [7] - 36:8, 36:10, 37:5, 39:13, 163:10, 236:19, 236:20

**nullify** [1] - 180:7

**number** [12] - 6:21, 12:18, 100:15, 173:18, 207:2, 213:20, 215:15, 218:16, 220:20, 221:12, 244:2

**numbers** [2] - 47:3, 206:23

**numerous** [1] - 10:10

**nurse** [6] - 92:11, 92:13, 170:6, 202:16, 202:18, 202:20

**nurses** [1] - 88:7

**NYSPFIC** [1] - 217:22

## O

**O'Connell** [3] - 1:21, 249:4, 249:12

**oath** [5] - 3:18, 4:18, 4:21, 83:18

**object** [71] - 14:21, 22:6, 25:17, 26:13, 38:8, 39:6, 40:13, 42:19, 43:12, 44:3, 52:2, 52:14, 53:4, 54:18, 55:16, 56:10, 56:23, 58:2, 63:19, 64:21, 66:6, 80:5,

90:8, 94:22, 95:2, 102:13, 102:15, 112:6, 113:10, 114:7, 114:17, 121:5, 121:16, 131:6, 136:19, 136:20, 139:4, 142:21, 154:22, 171:22, 173:23, 175:10, 176:8, 176:21, 178:23, 179:14, 180:9, 181:3, 181:12, 183:9, 184:8, 184:17, 185:3, 186:13, 186:23, 187:17, 188:20, 189:21, 190:10, 193:8, 195:4, 204:18, 207:20, 208:6, 208:14, 223:7, 226:6, 242:20, 243:12, 243:13, 245:4

**Object** [1] - 194:11

**objection** [43] - 8:14, 8:23, 14:19, 14:20, 22:12, 45:14, 54:21, 57:3, 57:5, 58:4, 63:21, 138:16, 138:18, 139:5, 139:15, 139:16, 139:17, 139:21, 139:22, 145:22, 169:8, 176:10, 185:13, 190:11, 192:17, 192:18, 193:9, 194:9, 205:13, 205:22, 206:2, 228:13, 228:20, 233:19, 233:23, 234:4, 234:9, 235:5, 237:14, 244:10, 245:2, 245:3, 245:18

**objections** [5] - 3:11, 3:16, 8:22, 8:23, 9:2

**obligation** [1] - 197:15

**observations** [1] - 149:17

**observe** [2] - 60:14, 238:3

**observed** [1] - 160:17

**obtain** [5] - 137:23, 141:7, 154:2, 156:22, 227:18

**obtained** [15] - 24:23, 25:6, 26:5, 56:20, 74:20, 99:11, 123:7, 128:12, 133:7,

135:7, 143:16, 153:6, 222:7, 223:4, 245:12

**obvious** [2] - 156:6, 156:8

**obviously** [2] - 98:16, 183:11

**occasion** [4] - 11:21, 223:16, 239:5

**occasions** [9] - 6:21, 7:14, 10:8, 10:11, 15:23, 66:11, 67:19, 130:19, 233:13

**occur** [2] - 187:16, 187:19

**occurred** [5] - 38:2, 60:22, 68:3, 113:13, 225:12

**October** [17] - 40:9, 40:22, 78:16, 137:13, 155:9, 155:10, 155:19, 156:12, 157:7, 158:7, 158:23, 162:10, 163:4, 209:15, 236:17, 236:19, 236:20

**odd** [1] - 228:12

**OF** [9] - 1:1, 1:6, 1:9, 1:14, 129:15, 134:7, 247:6, 248:1, 248:2

**offenses** [1] - 234:23

**offered** [1] - 80:3

**office** [48] - 11:3, 11:10, 11:13, 12:16, 12:19, 17:15, 18:6, 18:22, 19:8, 19:10, 77:23, 78:3, 108:7, 108:8, 108:9, 108:11, 108:13, 108:23, 116:7, 117:21, 118:2, 119:10, 122:15, 122:21, 125:2, 130:3, 133:19, 133:21, 141:22, 143:17, 144:13, 147:2, 148:2, 150:18, 153:16, 155:15, 155:22, 158:3, 158:14, 161:14, 163:5, 192:7, 214:10, 216:6, 216:9, 225:17, 241:6, 242:5

**Office** [2] - 2:12, 10:6

**Officer** [4] - 149:6, 151:7, 152:13, 226:2

**officer** [15] - 27:3, 27:12, 34:2, 41:10,

41:14, 61:7, 61:15, 61:17, 91:12, 180:16, 188:13, 202:20, 226:13, 241:5, 242:3

**officers** [6] - 25:19, 41:7, 58:7, 76:22, 77:8, 127:9

**Offices** [1] - 1:19

**old** [2] - 125:15, 220:20

**on-the-job** [4] - 42:10, 60:11, 63:13, 69:5

**once** [8] - 12:11, 111:4, 114:21, 116:2, 119:7, 124:13, 166:15, 240:21

**one** [84] - 7:3, 7:12, 20:20, 21:9, 21:11, 21:15, 21:16, 23:8, 24:7, 24:8, 47:22, 48:4, 48:15, 49:20, 49:21, 49:23, 50:5, 50:10, 50:11, 52:9, 54:5, 59:11, 59:12, 59:13, 59:15, 60:6, 60:7, 60:18, 69:17, 76:11, 77:7, 77:19, 81:20, 84:15, 94:20, 99:11, 100:16, 104:9, 104:13, 111:7, 118:15, 118:16, 126:21, 127:16, 130:3, 130:6, 137:13, 142:20, 143:3, 143:5, 144:21, 162:4, 174:19, 175:19, 177:16, 177:19, 178:14, 183:20, 183:21, 192:20, 194:21, 195:21, 196:9, 199:12, 202:16, 206:13, 207:10, 207:14, 211:12, 211:13, 216:7, 216:14, 221:19, 236:18, 237:7, 237:9, 237:16, 237:19, 240:19

**one-to-one** [1] - 192:20

**ones** [2] - 38:3, 50:12

**online** [2] - 14:12, 72:20

**open** [1] - 132:22

**opened** [1] - 40:3

**opinion** [4] - 102:8,

123:22, 124:2, 227:4

**opinions** [1] - 102:5

**opportunity** [6] - 20:17, 102:21, 156:21, 232:15, 232:19, 236:4

**opposed** [6] - 17:5, 96:2, 98:12, 152:3, 152:20, 189:5

**or..** [2] - 119:10, 120:23

**oral** [1] - 43:23

**orally** [1] - 160:4

**order** [1] - 59:4

**ordered** [1] - 135:12

**orders** [3] - 58:21, 58:22, 59:2

**organ** [2] - 134:16, 194:23

**organs** [1] - 126:5

**original** [2] - 72:10, 72:12

**otherwise** [1] - 118:4

**OTHERWISE** [1] - 129:17

**Otis** [1] - 23:10

**outside** [2] - 48:12, 189:13

**outward** [2] - 174:17, 237:17

**overnight** [1] - 5:9

**overturned** [1] - 11:17

**Owens** [1] - 42:6

**own** [21] - 13:9, 14:8, 51:22, 52:7, 53:17, 53:20, 54:2, 54:6, 60:15, 60:16, 91:10, 110:2, 152:4, 156:17, 180:8, 183:23, 184:5, 184:15, 227:21, 244:13

## P

**P.C** [1] - 2:8

**p.m** [9] - 103:20, 126:13, 127:8, 127:15, 152:12, 156:12, 158:8, 203:4, 246:21

**packet** [1] - 69:15

**page** [34] - 76:11, 104:15, 107:4, 111:17, 210:13, 210:17, 210:23, 212:6, 212:7, 212:9, 212:20, 214:3, 214:4, 214:13,

214:17, 214:20, 215:6, 216:2, 216:3, 216:15, 217:2, 218:16, 219:6, 219:8, 219:16, 219:21, 220:2, 220:5, 220:20, 221:2, 221:5, 221:8, 221:12

**pages** [15] - 69:16, 110:17, 110:18, 111:17, 112:9, 112:13, 115:22, 118:14, 119:4, 154:17, 154:18, 165:18, 221:16, 221:18

**paper** [4] - 28:4, 59:7, 196:22, 209:3

**paperwork** [13] - 23:12, 36:20, 118:20, 119:8, 119:15, 119:21, 124:18, 133:6, 145:3, 145:7, 146:13, 146:14, 209:10

**parallel** [1] - 133:10

**parameters** [1] - 56:7

**parent** [2] - 153:8, 153:9

**Park** [3] - 160:13, 213:9, 213:16

**part** [36] - 27:9, 37:5, 39:8, 55:6, 62:13, 62:22, 63:8, 63:11, 70:16, 71:11, 71:16, 71:19, 72:2, 72:15, 74:23, 78:9, 78:11, 78:19, 78:21, 81:2, 97:4, 115:21, 140:18, 166:6, 167:9, 167:11, 168:5, 173:19, 181:11, 204:8, 210:15, 214:5, 214:6, 235:11, 241:10, 246:2

**part-time** [1] - 27:9

**partial** [1] - 111:20

**participants** [1] - 137:19

**participate** [1] - 23:13

**participated** [1] - 187:5

**participating** [4] - 13:7, 29:18, 187:12, 188:3

**particular** [12] - 11:5, 48:19, 50:8, 89:20,

98:20, 127:22, 141:2, 141:12, 144:15, 192:3, 196:11, 196:15

**particularly** [3] - 53:12, 130:5, 154:17

**parties** [3] - 3:4, 129:5, 129:9

**parts** [5] - 15:11, 21:17, 21:19, 73:18, 110:16

**party** [1] - 23:5

**pass** [5] - 28:11, 28:19, 30:19, 32:20, 40:19

**passed** [2] - 32:18, 214:10

**passing** [1] - 17:17

**past** [2] - 66:13, 149:7

**patrol** [21] - 31:12, 31:13, 31:14, 31:20, 32:8, 33:3, 33:13, 33:16, 34:2, 36:7, 36:14, 36:16, 36:17, 37:4, 37:8, 39:14, 39:18, 39:19, 58:15, 58:20

**patrolmen** [2] - 34:19, 34:21

**pattern** [2] - 166:17, 235:3

**Pattison** [2] - 1:19, 2:5

**PD** [19] - 26:4, 29:7, 33:11, 34:6, 35:7, 56:6, 56:20, 57:17, 57:19, 62:22, 68:22, 68:23, 71:16, 76:2, 78:9, 128:20, 146:19, 247:9, 247:10

**PDs** [1] - 29:9

**Peccano** [1] - 92:13

**PECK** [25] - 8:14, 14:20, 57:5, 57:21, 75:16, 95:2, 102:15, 129:12, 136:19, 138:18, 139:4, 139:16, 139:21, 143:2, 145:22, 192:17, 193:9, 206:2, 238:19, 240:18, 240:20, 242:9, 243:13, 245:3, 245:18

**Peck** [3] - 2:8, 2:10, 238:20

**Peck's** [1] - 244:20

**pedigree** [6] - 107:19, 108:11, 109:3, 109:8, 116:8, 212:23

**penal** [1] - 30:14

**pending** [6] - 4:10, 6:17, 88:20, 145:21, 161:22, 164:22

**people** [11] - 11:7, 16:20, 144:18, 205:5, 212:16, 228:22, 231:6, 231:11, 233:16, 234:7, 234:23

**performance** [2] - 43:8, 43:20

**performed** [3] - 171:13, 194:22, 228:8

**performs** [1] - 144:19

**perhaps** [4] - 52:9, 152:18, 175:21, 192:7

**period** [6] - 31:7, 32:5, 32:8, 39:16, 62:6, 190:16

**perjury** [1] - 233:9

**Perkins** [3] - 2:6, 5:13, 19:6

**PERKINS** [98] - 14:21, 22:6, 22:12, 25:17, 26:13, 38:8, 39:6, 40:13, 42:19, 43:12, 44:3, 44:19, 45:5, 45:14, 46:11, 46:20, 52:2, 52:14, 52:19, 53:4, 54:18, 54:21, 55:16, 56:10, 56:23, 58:2, 59:20, 63:19, 64:21, 66:6, 70:18, 80:5, 90:8, 94:22, 102:13, 112:6, 113:10, 114:7, 114:17, 121:16, 121:16, 131:6, 136:20, 138:16, 139:5, 139:15, 139:22, 142:21, 143:6, 145:23, 154:22, 169:9, 171:22, 173:23, 175:10, 176:8, 176:21, 178:23, 179:14, 180:9, 181:3, 181:12, 183:9, 184:8, 184:17, 185:3, 185:8, 185:13, 186:13, 186:23, 187:17, 188:20, 189:6, 189:9, 189:11, 189:21, 190:11, 192:18, 193:8, 193:16,

194:11, 195:4, 204:18, 207:20, 208:6, 208:14, 208:17, 211:20, 223:7, 226:6, 242:12, 242:20, 243:12, 243:14, 244:10, 245:2, 245:4, 245:9

**permission** [1] - 153:12

**permitted** [2] - 238:11, 238:13

**person** [10] - 52:10, 64:7, 125:20, 125:22, 126:11, 128:4, 131:22, 132:4, 146:21, 216:12

**personal** [1] - 67:11

**personally** [7] - 12:9, 41:15, 41:17, 41:19, 49:12, 51:7, 242:9

**personnel** [4] - 47:5, 47:14, 101:6, 101:7

**perspective** [2] - 128:14, 181:2

**pertain** [1] - 72:7

**pertaining** [5] - 22:10, 22:11, 45:7, 105:16, 152:23

**phone** [7] - 93:10, 106:15, 125:20, 125:21, 130:3, 213:20, 215:15

**phonebook** [1] - 185:9

**photo** [2] - 73:17, 74:9

**photocopies** [1] - 118:9

**photograph** [2] - 107:21, 149:4

**photographing** [1] - 117:3

**photos** [15] - 18:20, 73:17, 73:21, 73:23, 74:3, 74:10, 78:4, 78:5, 78:6, 78:8, 81:2, 146:21, 148:23, 149:2, 149:5

**physical** [7] - 5:16, 28:9, 28:17, 154:20, 185:12, 185:15, 185:22

**physically** [1] - 174:6

**physician** [1] - 132:10

**pick** [2] - 52:5, 133:20

**picked** [1] - 197:21

**picture** [1] - 149:10

**pigment** [1] - 237:19

**pillow** [1] - 77:10

**pillows** [1] - 77:9

**Pine** [1] - 2:9

**place** [7] - 77:5, 110:2, 110:12, 134:17, 137:11, 170:20, 248:6

**placed** [5] - 107:9, 116:2, 117:7, 117:13, 117:23

**placing** [1] - 109:22

**Plaintiff** [1] - 1:4

**plaintiff's** [1] - 23:10

**Plaintiff/Claimant** [1] - 2:4

**plan** [2] - 132:19, 217:14

**planned** [2] - 67:21, 99:23

**plates** [1] - 170:20

**play** [1] - 235:11

**played** [2] - 97:6, 241:10

**Plaza** [1] - 2:9

**pleased** [1] - 16:14

**PLLC** [2] - 1:20, 2:5

**plus** [1] - 173:18

**pneumonia** [1] - 206:14

**point** [72] - 23:11, 23:12, 29:21, 31:14, 50:8, 52:9, 52:17, 52:23, 55:4, 55:9, 88:23, 90:4, 92:9, 94:18, 94:19, 95:14, 96:7, 96:10, 96:11, 98:10, 100:4, 102:10, 103:14, 105:23, 108:19, 109:7, 109:20, 110:10, 110:13, 111:23, 114:6, 119:13, 119:19, 120:15, 120:17, 122:14, 123:5, 125:5, 139:9, 146:15, 148:11, 149:17, 152:17, 159:6, 169:13, 171:7, 171:8, 173:19, 194:20, 195:2, 198:19, 198:21, 200:19, 201:10, 201:23, 202:11, 202:16, 202:19, 203:22, 204:14, 205:3, 225:3, 227:10, 229:12, 229:14, 230:9, 231:5, 231:19, 235:10,

Case 1:17-cv-00626-DJS Document 163-4 Filed 10/25/21 Page 267 of 273

240:21, 243:6, 243:17
**points** [2] - 131:18, 149:9
**Police** [18] - 13:15, 26:12, 27:16, 28:3, 28:21, 31:22, 38:11, 48:13, 49:3, 70:8, 86:2, 95:21, 95:23, 96:5, 151:6, 218:12, 220:8, 226:8
**police** [32] - 8:4, 13:10, 19:18, 24:10, 29:2, 29:14, 30:9, 31:5, 31:8, 42:4, 43:7, 43:20, 61:15, 61:17, 91:11, 98:12, 119:21, 119:22, 120:6, 122:16, 133:6, 145:7, 151:23, 165:5, 188:12, 198:7, 198:8, 202:20, 218:5, 227:23, 241:5, 242:3
**policy** [1] - 41:9
**poop** [1] - 221:2
**portion** [4] - 55:5, 227:11, 230:19, 233:2
**PORTION** [2] - 129:15, 134:7
**portions** [1] - 157:18
**posited** [1] - 203:17
**position** [5] - 32:4, 33:7, 40:3, 130:19, 206:7
**positive** [1] - 206:14
**possession** [5] - 17:22, 18:5, 18:6, 18:18, 20:9
**possibilities** [1] - 43:19
**possibility** [1] - 132:23
**possible** [7] - 48:21, 85:7, 98:10, 101:4, 133:14, 169:17, 213:8
**possibly** [4] - 60:6, 69:7, 76:9, 196:2
**post** [9] - 57:3, 58:4, 63:22, 166:4, 166:6, 168:5, 204:8, 222:11, 222:14
**post-Colaneri** [6] - 166:4, 166:6, 168:5, 204:8, 222:11, 222:14
**potential** [3] - 61:18,

96:22, 157:22
**potentially** [4] - 63:3, 63:4, 196:18, 196:23
**practice** [8] - 51:22, 54:20, 55:13, 62:16, 89:15, 164:20, 196:18, 225:18
**practices** [3] - 57:19, 164:23, 165:2
**prayed** [6] - 193:21, 193:22, 194:7, 194:16, 194:18, 195:15
**praying** [1] - 194:6
**pre** [3] - 144:23, 166:3, 210:15
**pre-2009** [1] - 7:5
**pre-autopsy** [1] - 144:23
**pre-Colaneri** [2] - 166:3, 210:15
**precautionary** [1] - 198:23
**precinct** [3] - 98:8, 98:17, 201:11
**preconceived** [1] - 55:2
**prefer** [2] - 46:8, 155:21
**preference** [1] - 46:10
**prefers** [1] - 129:9
**prehospital** [1] - 75:4
**preliminary** [2] - 33:18, 33:23
**prep** [5] - 10:13, 10:15, 10:22, 11:18, 164:6
**preparation** [4] - 18:8, 18:23, 81:16, 243:10
**prepare** [9] - 5:12, 12:12, 19:11, 20:2, 20:6, 68:22, 69:3, 118:4, 150:18
**prepared** [10] - 20:20, 69:13, 73:7, 73:8, 73:9, 100:2, 117:15, 119:7, 127:5, 225:20
**preparing** [2] - 37:9, 225:16
**presence** [3] - 13:20, 99:8, 199:8
**present** [18] - 2:14, 13:22, 16:11, 73:19, 74:17, 80:4, 94:3, 94:5, 135:10, 138:15, 141:18, 141:22, 142:13, 173:17, 217:12, 220:14, 236:6, 236:13

**presentation** [2] - 17:3, 206:15
**presented** [4] - 11:20, 44:9, 44:10, 236:15
**presently** [1] - 40:23
**preserve** [3] - 8:23, 44:17, 51:15
**press** [16] - 62:10, 62:11, 62:20, 62:21, 71:18, 120:6, 120:10, 120:12, 120:22, 121:9, 121:15, 121:20, 121:23, 226:12, 226:15, 226:16
**presumably** [1] - 116:15
**presumed** [1] - 243:6
**pretrial** [3] - 61:5, 82:18, 167:20
**pretty** [1] - 39:11
**prevented** [1] - 201:20
**previous** [1] - 93:6
**previously** [4] - 50:17, 156:19, 162:3, 163:18
**print** [2] - 62:11, 73:3
**printout** [1] - 215:20
**private** [1] - 65:9
**pro** [2] - 17:5, 17:11
**pro-defendant** [2] - 17:5, 17:11
**probable** [12] - 96:18, 100:22, 112:21, 113:5, 167:3, 167:7, 167:10, 167:22, 190:8, 190:20, 203:13, 243:7
**problem** [2] - 64:15, 139:19
**procedure** [3] - 41:10, 134:17, 149:13
**procedures** [2] - 41:6, 42:14, 59:8
**proceedings** [2] - 81:17, 249:8
**process** [21] - 40:17, 40:18, 42:13, 72:23, 98:14, 98:18, 107:17, 109:19, 116:17, 116:20, 117:2, 124:11, 125:8, 144:17, 144:22, 176:19, 183:5, 230:16, 243:17, 243:19, 243:23
**processed** [2] - 120:5, 122:5
**processing** [1] -

107:15
**produce** [1] - 51:16
**produced** [4] - 45:4, 47:3, 70:7, 71:3
**product** [8] - 14:6, 16:3, 16:14, 17:4, 140:16, 140:21, 141:13, 244:6
**production** [2] - 45:2, 50:15
**Professional** [2] - 1:22, 249:4
**profile** [1] - 120:23
**program** [1] - 31:4
**progress** [3] - 129:21, 130:5, 131:21
**progressed** [1] - 132:23
**prohibiting** [1] - 226:18
**promoted** [10] - 31:15, 31:17, 31:23, 32:13, 33:2, 33:5, 33:12, 35:10, 40:11, 40:17
**promotion** [2] - 33:5, 40:12
**promotions** [1] - 32:23
**property** [1] - 107:21
**prophylactic** [1] - 198:11
**propriety** [1] - 139:13
**prosection** [1] - 246:3
**prosecute** [2] - 241:6, 242:7
**prosecuted** [1] - 246:5
**prosecution** [24] - 4:15, 7:10, 7:12, 83:8, 218:13, 222:8, 239:6, 240:4, 240:12, 240:23, 241:10, 241:12, 241:16, 241:20, 241:22, 243:9, 243:18, 244:23, 245:6, 245:8, 245:10, 245:20, 246:5, 246:16
**prosecutors** [3] - 122:15, 245:14, 245:15
**protective** [2] - 227:11, 228:2
**proven** [1] - 243:3
**provide** [2] - 79:21, 244:22
**provided** [7] - 80:8, 163:20, 164:2, 167:10, 177:9, 190:14, 236:22

**psych** [4] - 197:4, 197:17, 197:22, 214:8
**psychological** [2] - 28:6, 28:16
**public** [1] - 121:13
**Public** [3] - 1:22, 3:5, 249:5
**publication** [1] - 59:7
**publicized** [1] - 226:16
**pull** [1] - 84:17
**pulled** [1] - 85:9
**pulling** [1] - 84:19
**purpose** [8] - 79:14, 79:17, 79:18, 96:6, 96:9, 123:10, 154:4, 174:21
**purposes** [6] - 9:20, 37:15, 49:19, 70:13, 188:23, 237:11
**pursuant** [7] - 12:7, 71:13, 73:14, 124:13, 132:15, 191:10, 244:22
**put** [11] - 15:10, 85:4, 149:21, 149:22, 162:17, 195:21, 196:13, 196:18, 196:19, 196:23, 199:12
**putting** [1] - 107:21

## Q

**qualifications** [1] - 3:17
**question-and-answer** [1] - 16:11
**questioner** [1] - 55:15
**questioning** [2] - 165:19, 168:17
**questions** [24] - 3:12, 4:14, 16:8, 16:9, 100:7, 100:11, 129:6, 130:7, 168:12, 193:13, 222:21, 225:3, 225:5, 225:16, 226:12, 227:7, 229:22, 230:3, 235:8, 238:16, 238:22, 242:9, 244:20, 246:19
**quick** [2] - 82:2, 82:3
**quite** [1] - 237:18
**quote** [4] - 49:11, 165:21, 200:10, 204:6

# R

**rag** [1] - 210:3
**railing** [1] - 130:21
**raise** [2] - 184:23, 186:5
**raised** [1] - 187:13
**ran** [1] - 29:6
**range** [1] - 30:16
**rank** [1] - 40:7
**ranks** [1] - 58:9
**rap** [1] - 234:22
**rapport** [1] - 38:18
**rather** [2] - 6:4, 70:10
**rattled** [1] - 206:23
**reach** [2] - 17:11, 228:18
**reaction** [4] - 109:10, 109:11, 136:15, 136:18
**read** [17] - 9:5, 12:9, 57:23, 81:12, 81:23, 82:2, 82:3, 99:7, 206:3, 206:6, 222:18, 222:20, 222:22, 232:15, 232:17, 240:19, 248:4
**reading** [2] - 55:20, 82:14
**ready** [1] - 106:12
**really** [4] - 5:22, 53:21, 59:19, 198:3
**realtime** [1] - 149:16
**reason** [42] - 5:3, 12:2, 12:3, 12:5, 75:13, 84:22, 96:2, 96:12, 97:4, 109:14, 114:4, 114:9, 120:23, 121:3, 121:14, 132:3, 132:4, 132:7, 141:2, 141:4, 141:12, 141:16, 149:23, 152:16, 153:10, 155:14, 156:17, 158:18, 163:23, 164:5, 170:19, 171:2, 192:3, 196:15, 198:15, 199:15, 199:16, 199:21, 200:4, 201:7, 241:7, 245:4
**reasonable** [1] - 230:2
**reasons** [3] - 32:7, 76:7, 199:22
**Rebecca** [1] - 92:13
**rebuttal** [3] - 7:12, 83:7, 84:11

**receive** [8] - 42:7, 43:4, 43:10, 45:21, 51:6, 51:12, 56:5, 227:15
**received** [15] - 19:10, 42:14, 42:23, 43:7, 43:16, 45:11, 45:18, 55:12, 56:15, 62:19, 73:13, 77:15, 85:20, 85:22, 244:21
**receiving** [1] - 188:2
**recent** [1] - 80:14
**Recess** [2] - 22:21, 164:17
**recite** [1] - 238:9
**recognition** [2] - 43:22, 45:12
**recognize** [2] - 179:7, 212:9
**recollection** [6] - 9:13, 9:17, 10:9, 11:11, 48:17, 67:8
**record** [42] - 6:6, 6:13, 8:21, 15:5, 21:23, 33:15, 44:19, 44:21, 46:12, 46:20, 46:21, 46:22, 47:5, 47:14, 49:19, 69:10, 70:21, 71:13, 75:18, 75:21, 76:3, 76:17, 81:8, 82:5, 83:12, 83:22, 96:4, 96:17, 116:18, 127:21, 128:23, 129:5, 129:7, 129:13, 134:5, 183:17, 205:16, 208:17, 208:18, 211:21, 224:13, 248:5
**recorded** [3] - 97:4, 155:12, 156:4
**recording** [3] - 96:9, 96:14, 96:22
**records** [7] - 51:13, 51:14, 71:22, 132:11, 133:8, 134:16, 217:18
**recovery** [1] - 194:6
**refer** [6] - 58:20, 58:21, 69:5, 69:7, 70:11, 143:12
**reference** [3] - 214:22, 215:22, 216:13
**referred** [2] - 21:16, 222:6
**referring** [6] - 68:16, 82:7, 143:5, 166:5, 176:20, 245:19
**refers** [7] - 166:2, 166:13, 204:8,

206:13, 213:10, 213:16, 214:21
**reflected** [2] - 130:12, 137:11
**reflects** [2] - 74:9, 131:22
**refused** [1] - 16:6
**regard** [10] - 41:3, 45:17, 45:18, 56:17, 59:18, 65:2, 101:4, 202:14, 227:3, 244:20
**regarding** [10] - 14:4, 47:23, 92:7, 145:5, 148:3, 148:4, 151:8, 160:6, 217:3, 239:20
**regardless** [2] - 97:16, 182:4
**regards** [4] - 86:13, 130:3, 244:4
**Registered** [2] - 1:21, 249:4
**regular** [5] - 44:10, 133:8, 134:5, 146:3, 234:3
**regularly** [1] - 136:6
**relate** [4] - 17:23, 18:21, 20:10, 44:17
**related** [13] - 4:10, 6:22, 43:4, 47:19, 71:23, 104:15, 118:5, 154:6, 154:12, 154:18, 161:7, 165:8, 178:9
**relatedly** [1] - 169:4
**relates** [6] - 47:11, 47:18, 59:19, 150:12, 177:3, 186:21
**relating** [4] - 60:6, 65:4, 164:21, 216:20
**relation** [1] - 173:12
**relationship** [2] - 226:2, 226:4
**relative** [3] - 173:7, 173:9, 227:20
**relatives** [3] - 94:20, 213:2, 215:9
**relay** [1] - 140:10
**release** [6] - 120:7, 120:12, 121:9, 121:15, 121:20, 122:2
**released** [3] - 197:19, 214:7, 214:11
**releases** [1] - 120:22
**relevance** [1] - 213:18
**relevant** [1] - 46:6
**relied** [3] - 182:7, 244:16, 244:18

**rely** [3] - 44:21, 244:5, 244:13
**remain** [1] - 125:2
**remaining** [1] - 115:21
**remains** [1] - 18:6
**remanded** [1] - 124:4
**remedial** [3] - 57:4, 58:5, 63:22
**remember** [43] - 11:19, 23:17, 30:11, 59:15, 67:7, 67:9, 68:3, 68:7, 79:19, 86:18, 92:14, 92:15, 94:13, 94:16, 94:17, 94:18, 104:3, 104:4, 125:10, 125:12, 131:15, 136:10, 136:11, 144:4, 146:12, 146:13, 148:7, 149:12, 149:15, 149:19, 149:23, 150:2, 150:5, 152:9, 152:17, 152:23, 154:8, 154:13, 155:4, 156:9, 160:21
**remind** [1] - 76:7
**removal** [1] - 89:3
**remove** [2] - 88:18, 88:20
**removed** [3] - 228:6, 228:7, 228:16
**removing** [1] - 171:4
**RENSSELAER** [1] - 1:7
**Rensselaer** [6] - 10:5, 27:4, 27:13, 135:18, 164:19, 238:21
**repeat** [2] - 25:4, 57:21
**repeated** [1] - 196:11
**repeatedly** [5] - 14:18, 167:15, 174:19, 181:7, 181:16
**report** [18] - 19:18, 36:21, 42:2, 69:3, 72:17, 75:3, 97:7, 118:5, 119:8, 126:6, 131:12, 132:8, 134:22, 141:8, 143:12, 169:22, 170:4, 238:4
**reported** [4] - 34:17, 36:2, 132:18, 170:3
**reporter** [9] - 3:17, 5:22, 6:5, 9:7, 50:15, 57:23, 129:9, 222:20, 222:22
**Reporter** [1] - 1:22, 249:4

**reports** [9] - 33:17, 69:6, 74:19, 75:4, 130:14, 148:10, 170:16, 237:9, 237:16
**represent** [5] - 4:9, 71:2, 129:21, 201:5, 238:20
**representations** [3] - 182:20, 184:22, 186:19
**representatives** [1] - 141:21
**represented** [3] - 47:14, 79:23, 136:17
**request** [4] - 44:22, 45:2, 50:15, 191:10
**requested** [3] - 51:17, 134:2, 141:3
**requests** [1] - 247:1
**required** [3] - 96:21, 196:19, 198:12
**requirement** [1] - 196:21
**research** [2] - 85:8, 85:9
**reserved** [1] - 3:12
**residence** [4] - 77:5, 88:19, 135:3, 135:11
**resign** [1] - 27:20
**respective** [1] - 3:3
**responded** [4] - 33:17, 33:22, 34:17, 85:23
**responding** [2] - 171:12, 172:6
**response** [2] - 6:4, 136:18, 138:23
**responses** [1] - 230:3
**responsibilities** [7] - 33:16, 33:21, 34:15, 37:8, 39:15, 40:21, 62:13
**responsibility** [3] - 39:5, 177:17, 196:12
**responsive** [1] - 90:17
**rest** [1] - 210:23
**result** [5] - 56:19, 58:16, 58:19, 178:15, 188:5
**resulted** [1] - 24:22
**resulting** [1] - 57:15
**results** [4] - 79:19, 145:4, 152:9, 239:16
**resume** [2] - 36:16, 40:4
**resumed** [1] - 36:17
**resumes** [1] - 47:7
**resuscitated** [1] - 195:10
**retired** [2] - 35:8,

35:18
**retrieve** [1] - 77:16
**retrospect** [2] - 192:14, 193:2
**returned** [2] - 127:2, 231:22
**review** [20] - 18:8, 19:11, 19:15, 19:16, 20:15, 20:17, 47:13, 70:23, 71:5, 81:18, 81:20, 81:22, 103:12, 117:22, 129:10, 157:8, 227:9, 236:6, 236:8, 236:16
**reviewed** [8] - 80:20, 81:15, 81:19, 82:19, 83:10, 103:9, 103:14, 146:14
**reviewing** [6] - 20:5, 85:5, 93:6, 110:18, 161:6, 240:10
**rib** [1] - 125:15
**Richard** [1] - 147:15
**rights** [3] - 26:5, 26:8, 99:7
**risk** [5] - 55:12, 184:23, 186:5, 187:14, 187:21
**Robert** [2] - 35:6, 35:19, 36:2
**role** [17] - 8:2, 14:4, 36:19, 37:19, 42:11, 45:13, 73:15, 97:6, 136:8, 144:3, 173:16, 173:21, 174:5, 218:12, 218:13, 235:11, 242:3
**Ron** [2] - 13:20, 13:22
**RONALD** [1] - 1:6
**Ronald** [3] - 2:7, 13:16, 45:11
**room** [17] - 79:12, 95:20, 98:8, 99:5, 106:22, 108:5, 108:10, 110:7, 110:19, 111:14, 112:5, 156:7, 158:13, 167:3, 203:9, 210:8, 211:3
**rough** [1] - 231:7
**round** [1] - 22:2
**routine** [1] - 149:8
**rules** [4] - 5:20, 41:6, 42:13, 140:6
**run** [3] - 29:12, 29:15, 152:2

# S

**sad** [2] - 91:15, 91:18
**safety** [1] - 200:5
**sake** [1] - 5:22
**Sam's** [3] - 159:3, 159:19, 216:21
**Samaritan** [18] - 87:9, 87:17, 87:20, 88:5, 88:7, 88:9, 88:12, 93:11, 105:6, 106:5, 106:9, 132:12, 156:13, 172:23, 197:3, 198:8, 214:8, 231:22
**sample** [2] - 153:13, 214:23
**Sampson** [2] - 1:19, 2:5
**sat** [2] - 61:18, 115:20
**Saturday** [1] - 201:2
**save** [3] - 178:2, 200:11, 208:4
**saw** [11] - 66:12, 66:14, 66:22, 67:6, 67:16, 68:8, 109:21, 172:20, 172:22, 174:9, 213:7
**scans** [1] - 135:12
**scenarios** [3] - 171:19, 172:8, 187:16
**schedule** [1] - 156:20
**scheduled** [1] - 135:13
**school** [2] - 26:19, 230:20
**science** [1] - 30:9
**sciences** [1] - 27:11
**screening** [4] - 28:7, 28:9, 28:16, 28:17
**sealing** [1] - 71:13
**search** [20] - 20:12, 20:15, 44:16, 50:19, 50:21, 51:13, 74:6, 74:8, 75:6, 75:8, 76:4, 76:15, 76:22, 77:14, 77:18, 127:5, 127:11, 127:13, 127:14, 216:21
**searched** [1] - 116:15
**second** [48] - 7:5, 11:18, 11:22, 12:12, 21:6, 21:11, 57:14, 63:11, 75:14, 76:8, 77:7, 83:5, 84:7, 103:5, 108:9, 115:21, 118:13, 118:22, 123:7,

123:10, 123:14, 123:19, 126:18, 127:14, 153:18, 153:19, 159:14, 163:11, 163:23, 167:9, 168:23, 169:21, 172:4, 172:7, 193:20, 194:16, 195:5, 199:12, 200:15, 201:9, 208:10, 209:20, 209:23, 211:13, 212:6, 214:18, 219:4
**Section** [1] - 4:13
**section** [3] - 210:15, 211:12, 211:14
**securing** [1] - 107:21
**security** [1] - 109:13
**see** [22] - 14:6, 46:4, 53:3, 62:17, 66:18, 68:9, 71:12, 73:23, 76:15, 100:15, 140:2, 140:21, 162:22, 173:2, 174:12, 192:6, 192:10, 192:15, 201:19, 201:20, 219:8, 237:17
**seeing** [5] - 67:10, 68:4, 68:7, 193:3, 221:22
**seem** [1] - 47:19
**seized** [2] - 74:21, 127:11
**select** [1] - 190:20
**seminar** [1] - 49:12
**send** [1] - 152:7
**sending** [1] - 152:4
**senior** [2] - 39:4, 39:10
**seniority** [5] - 31:22, 32:4, 32:6, 39:3
**sense** [4] - 97:10, 97:12, 101:20, 182:6
**sensed** [1] - 102:18
**sent** [3] - 50:18, 100:19, 231:21
**separate** [2] - 88:4, 130:19
**separation** [1] - 170:22
**sepsis** [9] - 204:16, 204:21, 205:4, 205:6, 205:10, 205:17, 205:19, 206:8, 206:10
**September** [31] - 1:18, 32:10, 45:21, 50:11, 54:17, 61:7, 65:5,

69:16, 77:6, 77:8, 85:11, 87:14, 95:6, 103:19, 105:21, 107:12, 122:4, 129:4, 135:16, 138:9, 138:10, 138:12, 144:8, 153:14, 153:23, 156:6, 156:10, 172:12, 188:8, 236:17, 242:17
**sequentially** [1] - 137:16
**sergeant** [28] - 31:15, 31:17, 31:19, 31:20, 31:23, 32:2, 32:4, 32:8, 32:11, 32:15, 32:16, 32:17, 33:2, 33:3, 33:4, 33:6, 33:7, 33:20, 34:14, 34:18, 36:5, 39:19, 39:22, 40:8, 40:18, 158:13
**Sergeant** [18] - 109:17, 110:5, 110:19, 111:7, 111:12, 111:13, 111:16, 111:20, 112:4, 112:9, 114:14, 114:21, 115:4, 131:4, 156:13, 190:4, 237:16, 238:4
**sergeant's** [1] - 32:18
**sergeants** [1] - 41:16
**series** [2] - 47:6, 62:20
**serious** [2] - 96:16, 98:11
**serology** [2] - 74:19, 154:9
**served** [2] - 23:11, 27:23
**services** [2] - 227:11, 228:2
**session** [5] - 16:12, 50:16, 83:4, 83:5, 247:4
**sessions** [1] - 247:5
**set** [6] - 153:18, 153:19, 155:9, 155:18, 211:12, 246:13
**sets** [2] - 59:8, 211:11
**setting** [2] - 98:15, 155:11
**seven** [4] - 21:6, 21:7, 173:18, 193:5
**seven-plus** [1] - 173:18
**several** [7] - 19:3,

20:22, 61:19, 62:4, 80:21, 172:15, 174:23
**several-hour** [1] - 61:19
**shake** [1] - 6:4
**Shaken** [1] - 84:16
**shall** [2] - 3:9, 3:12
**share** [3] - 128:13, 128:17, 145:3
**shared** [3] - 37:19, 141:13, 142:16
**sharing** [1] - 236:4
**sheet** [7] - 73:3, 107:20, 108:12, 109:8, 146:17, 218:4, 234:22
**sheets** [3] - 77:9, 154:10, 223:22
**short** [1] - 99:15
**shortly** [2] - 36:11, 201:17
**shout** [1] - 44:2
**shout-out** [1] - 44:2
**show** [9] - 47:2, 62:20, 69:8, 70:7, 81:6, 153:12, 162:16, 200:2, 238:2
**showed** [1] - 14:10
**showing** [5] - 82:17, 83:3, 129:20, 210:12, 212:5
**sick** [3] - 91:6, 168:13, 228:18
**side** [3] - 130:21, 210:20, 210:21
**sided** [1] - 221:21
**sign** [6] - 93:23, 105:4, 146:17, 218:4, 233:6, 237:17
**sign-in** [2] - 146:17, 218:4
**signed** [8] - 3:4, 99:8, 105:2, 105:5, 189:20, 209:2, 209:9, 243:22
**significant** [1] - 109:11
**signing** [1] - 93:23
**signs** [1] - 174:17
**SIKIRICA** [1] - 1:7
**Sikirica** [25] - 2:11, 8:8, 9:10, 12:18, 144:12, 144:18, 145:2, 145:18, 146:7, 147:6, 148:14, 149:4, 149:9, 149:15, 205:10, 223:12, 238:21, 239:7,

239:10, 239:13, 239:16, 239:19, 240:3, 240:6, 244:4
**Sikirica's** [1] - 245:16
**similar** [9] - 40:17, 44:14, 45:3, 45:12, 133:17, 133:18, 136:13, 234:23, 247:3
**single** [1] - 188:16
**sit** [1] - 213:15
**sitting** [4] - 15:4, 152:3, 164:19, 178:4
**situation** [6] - 92:7, 133:18, 187:12, 204:12, 228:15, 229:2
**six** [19] - 50:9, 69:16, 69:17, 69:18, 88:19, 110:17, 111:17, 112:8, 112:13, 162:10, 165:18, 174:10, 203:3
**six-page** [1] - 111:17
**skeletal** [2] - 125:15, 135:11
**skin** [2] - 237:19, 237:22
**skull** [10] - 169:22, 170:4, 170:16, 170:19, 170:20, 170:21, 170:22, 171:2, 202:4, 202:8
**slammed** [14] - 113:4, 113:9, 113:18, 114:5, 114:10, 114:16, 114:22, 168:8, 190:15, 196:7, 204:6, 209:2, 209:5, 209:16
**slamming** [15] - 54:10, 111:10, 114:23, 115:3, 115:8, 115:14, 115:18, 118:23, 130:18, 131:4, 145:14, 166:3, 166:15, 190:2, 198:20
**slams** [1] - 145:15
**sleep** [2] - 5:8, 198:4
**slept** [1] - 101:17
**slipped** [1] - 199:20
**slow** [1] - 102:6
**small** [1] - 172:18
**smoothly** [1] - 124:7
**social** [1] - 217:16
**solely** [1] - 222:10
**solid** [1] - 149:22
**someone** [29] - 24:19, 53:2, 53:8, 72:15,

73:21, 73:22, 84:18, 98:19, 108:4, 122:20, 122:21, 136:17, 156:16, 160:14, 165:10, 170:8, 170:12, 180:18, 180:19, 180:22, 185:2, 185:8, 185:18, 188:4, 214:9, 215:12, 216:6, 218:2, 220:11
**someplace** [1] - 133:21
**sometimes** [2] - 234:11, 234:12
**somewhat** [1] - 91:18
**somewhere** [1] - 37:6
**son** [12] - 99:18, 100:3, 182:11, 191:19, 192:4, 192:6, 192:10, 192:15, 193:3, 207:11, 207:12, 207:17
**son's** [1] - 207:18
**sorry** [3] - 57:21, 59:20, 236:20
**sort** [2] - 196:17, 202:15
**sound** [3] - 48:14, 182:12, 182:15
**sounds** [2] - 12:15, 80:18, 89:12
**source** [3] - 56:6, 63:14, 135:21
**speaking** [8] - 17:15, 94:17, 102:5, 125:10, 130:11, 161:4, 177:11, 187:6
**special** [5] - 33:8, 42:7, 230:22, 231:3, 231:11
**specific** [14] - 32:17, 58:23, 60:19, 62:7, 70:11, 144:14, 144:21, 148:19, 149:23, 150:6, 162:4, 165:11, 165:13, 234:16
**specifically** [21] - 10:17, 14:13, 14:14, 14:15, 39:16, 62:23, 70:12, 72:5, 77:11, 90:3, 92:15, 109:18, 122:19, 132:2, 133:17, 135:8, 144:12, 146:12, 146:13, 148:7, 161:5
**specifications** [1] -

59:4
**specimen** [1] - 154:2
**speculating** [3] - 43:11, 193:11, 193:15
**spoken** [6] - 9:21, 20:5, 93:3, 93:9, 147:22, 148:11
**spring** [1] - 73:11
**springs** [2] - 77:9, 127:12
**sprinkled** [1] - 91:3, 171:12
**squad** [3] - 56:22, 59:2, 108:7
**stack** [5] - 19:13, 19:14, 19:15, 20:4, 20:13
**staff** [1] - 106:11
**stages** [2] - 10:16, 10:20
**stamina** [1] - 52:12
**stand** [3] - 144:18, 178:11, 194:3
**standing** [1] - 130:18
**stands** [1] - 90:23
**Start** [12] - 218:22, 219:14, 220:3, 220:11, 222:5, 222:7, 222:17, 240:11, 244:21, 245:12, 246:13, 246:17
**start** [1] - 220:15
**started** [5] - 60:18, 84:8, 106:23, 111:8, 203:4
**starting** [1] - 36:5, 39:13, 40:4, 60:12, 69:16, 129:8, 212:20, 214:3, 215:7, 216:16, 217:22, 218:16, 219:21, 220:2
**starts** [4] - 47:5, 210:22, 219:16, 244:2
**state** [8] - 4:11, 15:4, 23:15, 29:7, 128:17, 151:22, 197:16, 197:20
**STATE** [3] - 1:9, 1:14, 248:1
**State** [11] - 1:23, 2:12, 3:5, 4:11, 75:3, 151:6, 151:20, 218:5, 218:12, 220:8, 249:5
**statement** [58] - 24:20, 25:15, 26:4, 93:17,

93:18, 97:12, 99:14, 99:15, 101:15, 103:4, 103:5, 104:3, 104:5, 104:9, 104:12, 104:19, 104:21, 107:4, 110:16, 111:17, 111:20, 118:10, 118:13, 118:15, 119:5, 123:15, 126:14, 126:18, 132:9, 132:10, 137:7, 138:8, 142:10, 154:16, 154:19, 167:9, 196:9, 196:10, 196:20, 198:16, 199:23, 201:15, 202:14, 205:16, 210:13, 224:17, 226:10, 227:18, 232:6, 232:9, 232:20, 233:2, 233:3, 233:4, 233:6, 244:17
**statements** [29] - 7:21, 12:20, 15:10, 17:16, 19:19, 20:19, 24:23, 25:6, 49:7, 78:23, 102:12, 110:14, 111:23, 112:4, 112:12, 113:7, 114:23, 118:12, 133:7, 138:2, 142:20, 181:11, 189:17, 196:13, 207:3, 209:20, 232:4, 233:8, 241:10
**STATES** [1] - 1:1
**station** [8] - 48:20, 49:3, 86:15, 86:16, 98:12, 127:4, 198:7
**statute** [2] - 72:13, 215:20
**stay** [1] - 97:15
**stayed** [1] - 109:21
**stays** [1] - 207:17
**stenographic** [1] - 249:7
**step** [1] - 203:18
**steps** [2] - 122:23, 162:12
**sticking** [1] - 59:17
**still** [9] - 35:7, 36:18, 64:20, 132:22, 175:5, 178:5, 186:7, 194:3, 195:7
**stipulated** [4] - 3:2, 3:8, 3:11, 3:15
**stop** [2] - 198:21,

229:15
**stopped** [2] - 68:10, 183:12
**stored** [1] - 59:8
**story** [2] - 171:9, 190:19
**strange** [1] - 200:23
**street** [2] - 39:17, 66:14
**Street** [3] - 1:20, 2:5, 152:13
**streptococcus** [1] - 206:14
**strike** [1] - 185:18
**struck** [3] - 202:3, 202:18, 221:2
**stuff** [1] - 19:20
**subject** [5] - 27:10, 128:17, 156:3, 224:22, 233:9
**submission** [1] - 243:10
**submitted** [4] - 28:4, 122:17, 122:19, 151:22
**Subscribed** [1] - 248:14
**substance** [14] - 14:14, 14:16, 89:4, 108:21, 110:21, 127:18, 168:8, 171:10, 177:19, 180:7, 199:4, 203:12, 203:20, 245:15
**substantial** [6] - 19:10, 19:12, 184:23, 186:5, 187:14, 187:21
**sufficient** [1] - 5:12
**sugarcoat** [1] - 191:14
**suggest** [2] - 151:14, 193:15
**suggested** [7] - 188:18, 189:4, 189:20, 190:4, 190:8, 190:23, 195:21
**suggesting** [1] - 185:22
**suicidal** [3] - 100:12, 100:13, 102:9
**Suite** [1] - 2:3
**sum** [13] - 14:14, 14:15, 89:4, 108:20, 110:21, 127:18, 168:8, 171:10, 177:19, 180:6, 199:4, 203:12, 203:20

**summer** [3] - 48:16, 49:18, 51:3
**Sunday** [6] - 85:14, 168:14, 169:14, 201:2, 209:13, 213:6
**superior** [1] - 24:6
**supervise** [2] - 35:3, 41:16
**supervised** [3] - 34:22, 35:4, 39:17
**supervisor** [10] - 13:8, 16:10, 35:9, 35:12, 35:15, 35:20, 42:3, 54:8, 87:2, 183:21
**supervisors** [1] - 34:17
**supervisory** [2] - 34:15, 34:20
**supporting** [5] - 79:7, 103:18, 123:7, 153:6, 153:10
**supposedly** [1] - 191:12
**suppress** [1] - 25:15
**supreme** [1] - 24:6
**surprised** [3] - 16:5, 136:16, 136:23
**surrounding** [1] - 190:16
**surveillance** [1] - 22:18
**survive** [2] - 195:14, 200:21
**survived** [1] - 195:16
**suspect** [8] - 61:19, 79:16, 90:7, 96:6, 133:3, 186:11, 238:11, 238:13
**suspected** [1] - 146:8
**suspects** [3] - 231:8, 234:13, 234:19
**suspicion** [1] - 170:17
**suspicious** [1] - 161:12
**swollen** [1] - 238:6
**sworn** [5] - 3:5, 4:3, 6:22, 7:15, 248:14
**Syndrome** [1] - 84:16
**system** [1] - 129:22

**T**

**tactic** [3] - 175:4, 178:11, 194:2
**tactics** [7] - 55:14, 183:18, 184:4, 184:21, 185:5, 186:3, 186:4
**tape** [1] - 210:9

**tapes** [1] - 217:4
**target** [1] - 240:3
**taught** [6] - 49:5, 49:9, 55:4, 184:16, 185:11, 185:14
**Taylor** [2] - 213:12, 213:14
**teachable** [1] - 60:20
**team** [10] - 74:15, 128:6, 159:2, 159:6, 163:11, 227:9, 236:3, 236:8, 236:10, 236:16
**technician** [3] - 74:16, 127:10, 146:19
**technique** [6] - 47:19, 54:15, 54:17, 194:2, 194:4, 196:17
**techniques** [13] - 45:19, 51:21, 53:16, 53:19, 53:23, 56:22, 57:9, 57:20, 58:10, 60:15, 184:22, 185:12, 186:3
**temporal** [1] - 113:16
**ten** [6] - 17:8, 34:8, 107:4, 111:18, 118:14, 210:13
**ten-page** [2] - 107:4, 210:13
**tending** [1] - 228:16
**term** [2] - 128:6, 204:11
**terms** [23] - 5:19, 8:21, 39:3, 54:20, 57:19, 60:14, 91:7, 93:15, 101:3, 101:9, 107:8, 116:23, 118:15, 118:17, 137:17, 144:12, 144:22, 148:23, 154:9, 164:6, 185:12, 186:19, 203:2
**test** [4] - 40:15, 40:18, 40:19, 152:8
**tested** [1] - 74:21
**testified** [20] - 4:3, 7:9, 24:3, 24:12, 24:14, 35:16, 47:22, 61:5, 63:9, 66:4, 83:4, 83:6, 150:14, 175:7, 195:12, 197:21, 201:5, 228:5, 232:3
**testify** [5] - 5:3, 5:10, 5:17, 7:18, 11:22
**testifying** [4] - 83:11, 202:13, 202:16, 225:21
**testimony** [30] - 6:22, 7:15, 18:4, 18:7,

18:8, 18:16, 20:5, 53:10, 81:11, 81:19, 81:20, 82:9, 82:18, 83:16, 84:3, 84:7, 84:11, 89:9, 93:6, 94:6, 96:20, 112:3, 150:19, 175:8, 175:23, 204:3, 225:17, 225:20, 225:23, 248:5
**testing** [4] - 154:9, 154:10, 218:14
**tests** [1] - 152:2
**THE** [87] - 1:14, 14:23, 22:13, 25:19, 25:23, 26:15, 38:10, 38:14, 39:8, 42:21, 43:14, 44:5, 45:7, 45:15, 46:13, 50:22, 51:4, 52:4, 53:6, 54:23, 55:18, 56:12, 57:6, 58:6, 63:23, 64:22, 66:8, 80:7, 90:9, 102:16, 112:8, 113:12, 114:9, 114:19, 121:8, 121:18, 129:15, 131:8, 134:7, 136:22, 138:19, 139:7, 140:2, 143:8, 146:2, 169:10, 172:2, 174:3, 175:12, 176:11, 179:3, 179:16, 180:11, 181:5, 181:14, 181:19, 183:11, 184:10, 184:19, 185:14, 186:15, 187:3, 187:19, 188:2, 189:13, 189:23, 190:13, 192:20, 193:18, 195:5, 204:20, 206:5, 207:22, 208:8, 208:16, 223:9, 226:7, 228:21, 234:5, 234:10, 236:20, 242:22, 243:16, 244:12, 245:19
**the..** [2] - 11:15, 220:14
**themselves** [1] - 234:3
**therefore** [1] - 102:10
**thereof** [2] - 123:23, 248:8
**thinking** [1] - 43:9
**third** [4] - 99:4, 106:22, 108:10,

210:17
**Thomas** [132] - 4:10, 7:15, 20:18, 21:18, 22:4, 22:10, 22:14, 32:11, 35:5, 35:13, 35:21, 36:12, 43:4, 44:17, 50:2, 53:17, 53:20, 56:6, 61:6, 61:19, 62:6, 63:15, 65:2, 65:6, 65:8, 65:12, 68:19, 69:9, 69:12, 69:13, 71:23, 73:10, 74:3, 75:19, 76:2, 76:3, 77:19, 78:5, 79:2, 80:22, 81:7, 82:7, 82:17, 83:3, 83:4, 83:6, 83:14, 84:3, 84:8, 84:11, 85:15, 87:13, 88:14, 88:22, 90:2, 92:8, 95:8, 95:11, 95:15, 95:16, 97:19, 104:10, 105:2, 106:10, 110:14, 113:3, 129:3, 129:20, 131:21, 132:9, 135:17, 136:12, 138:10, 138:13, 141:5, 145:13, 147:11, 148:4, 153:15, 154:12, 155:7, 160:18, 165:7, 167:14, 168:7, 168:13, 172:20, 173:20, 175:16, 176:13, 184:7, 184:12, 191:11, 196:2, 204:5, 209:23, 211:22, 212:6, 212:17, 214:7, 214:18, 217:15, 221:5, 222:9, 223:6, 224:9, 224:10, 226:22, 227:2, 227:15, 227:18, 228:5, 229:8, 232:15, 233:12, 235:18, 235:20, 237:18, 239:2, 239:6, 239:7, 239:9, 239:21, 240:3, 240:11, 240:12, 241:11, 241:17, 243:2, 244:23, 247:7
**THOMAS** [2] - 1:3, 1:11
**Thomas'** [17] - 65:15, 101:9, 122:5, 152:14, 154:16,

159:3, 159:21, 161:8, 188:17, 189:17, 213:2, 215:9, 216:14, 216:21, 223:19, 229:22, 239:21
**Thomas's** [1] - 212:13
**Thomas-being** [1] - 214:7
**Thomas-Hicks** [7] - 65:8, 65:12, 68:19, 74:3, 78:5, 88:14, 212:17
**Thomases** [1] - 160:15
**thorough** [2] - 79:18, 123:13
**thoughts** [2] - 17:12, 102:9
**thousands** [2] - 24:18, 231:7
**threatening** [1] - 229:9
**threats** [3] - 178:14, 225:13, 229:19
**three** [16] - 18:15, 27:14, 69:17, 113:4, 114:11, 115:18, 115:19, 130:19, 131:2, 190:15, 209:13, 210:22, 212:16, 221:16, 221:19, 226:21
**threw** [1] - 191:12
**throughout** [4] - 47:9, 110:23, 124:19, 150:9
**throw** [1] - 191:15
**throwing** [1] - 130:21
**thrown** [1] - 210:2
**TIM** [1] - 1:6
**Tim** [3] - 2:7, 214:13, 215:2
**time-to-time** [1] - 8:23
**timing** [1] - 203:2
**title** [6] - 29:22, 33:9, 33:10, 34:16, 34:18, 40:2
**today** [40] - 4:16, 5:4, 5:6, 7:14, 7:21, 11:14, 15:4, 19:11, 20:2, 22:23, 29:10, 30:2, 43:9, 49:8, 49:15, 59:11, 59:12, 64:4, 64:14, 64:15, 78:14, 81:4, 81:16, 83:11, 83:22, 85:18, 89:22, 158:16, 164:19, 175:5, 175:8, 178:4,

178:11, 186:8,
197:11, 213:15,
224:18, 230:7,
232:5, 238:9
**today's** [5] - 5:19,
18:9, 20:6, 81:16,
103:10
**together** [2] - 68:5,
119:9
**tomorrow** [2] - 63:18,
198:5
**took** [20] - 4:18, 4:21,
33:17, 50:23, 51:3,
93:15, 93:19, 93:20,
93:21, 98:15,
105:20, 106:21,
126:14, 134:17,
137:11, 138:5,
146:21, 213:4,
218:2, 218:3
**top** [5] - 214:5,
214:14, 214:20,
219:7, 221:19
**topic** [2] - 59:17, 60:2
**topics** [1] - 30:7
**touched** [1] - 193:21
**tours** [1] - 34:11
**TPD** [3] - 36:21, 68:23,
69:3
**track** [1] - 89:16
**Tracy** [1] - 12:14
**traffic** [1] - 33:18
**training** [57] - 29:6,
29:10, 29:11, 29:15,
29:19, 30:5, 30:16,
30:17, 31:3, 33:8,
42:7, 42:10, 45:17,
45:18, 45:21, 46:3,
47:7, 47:11, 47:15,
47:20, 47:23, 48:3,
48:4, 48:11, 49:17,
49:20, 50:16, 51:14,
51:21, 53:12, 53:21,
54:14, 54:16, 55:5,
55:11, 56:5, 56:16,
59:17, 59:18, 60:2,
60:3, 60:10, 60:12,
63:14, 91:11,
139:12, 176:4,
184:5, 184:22,
185:6, 185:16,
187:15, 188:3,
231:14, 247:4, 247:5
**tranquilizer** [1] -
197:12
**TRANSCRIPT** [2] -
129:16, 134:8
**transcript** [9] - 81:10,
81:15, 82:19, 83:15,
83:16, 129:10,

211:8, 247:8, 248:7
**transcription** [1] -
249:7
**transcripts** [6] - 20:18,
20:19, 77:19, 77:22,
83:10, 103:7
**transferred** [1] - 88:11
**transition** [1] - 217:14
**transmitted** [3] -
71:15, 119:15,
142:13
**transpired** [3] -
143:19, 151:2,
163:15
**trauma** [4] - 145:13,
170:18, 174:17,
237:18
**traumatic** [1] - 146:9
**treated** [2] - 205:6,
206:10
**treating** [2] - 204:16,
204:21
**Treece** [1] - 213:22
**Trial** [1] - 3:16
**trial** [31] - 3:13, 6:14,
7:5, 7:9, 9:2, 10:13,
10:15, 10:22, 11:12,
11:18, 11:22, 12:12,
18:15, 25:14, 37:10,
57:15, 63:8, 63:11,
66:19, 66:21, 68:7,
80:15, 81:19, 83:4,
83:6, 84:2, 84:21,
103:13, 204:14,
205:9, 226:22
**tried** [1] - 156:19
**TROY** [1] - 1:6
**Troy** [41] - 1:21, 2:6,
2:7, 13:15, 24:10,
26:4, 26:11, 27:16,
28:3, 28:21, 29:4,
29:7, 31:21, 34:6,
38:11, 48:12, 48:13,
49:2, 56:6, 56:20,
57:17, 57:19, 62:22,
68:22, 68:23, 70:8,
71:16, 74:13, 76:2,
78:9, 86:2, 95:20,
95:23, 96:5, 119:21,
122:7, 128:20,
146:19, 226:8,
247:9, 247:10
**truck** [1] - 77:3
**true** [23] - 49:8, 49:10,
53:11, 55:14, 82:12,
82:22, 83:19, 84:3,
84:9, 84:12, 164:13,
167:2, 180:18,
180:23, 182:18,
197:4, 206:20,

209:11, 232:7,
232:8, 238:10,
248:6, 249:6
**truth** [6] - 4:19, 14:3,
15:5, 176:2, 184:12,
186:12
**truthful** [2] - 15:8,
197:9
**try** [4] - 98:9, 199:4,
200:11, 208:4
**trying** [5] - 66:13,
113:15, 176:2,
207:10, 207:12
**Ts** [1] - 153:3
**turn** [1] - 113:6
**turned** [9] - 18:5, 19:6,
19:7, 19:9, 33:19,
34:2, 153:16, 157:9,
217:4
**TV** [1] - 62:11
**twice** [1] - 12:11
**twin** [1] - 152:14
**twins** [1] - 152:19
**two** [48] - 7:8, 11:21,
16:3, 20:14, 20:18,
20:20, 21:3, 21:11,
21:23, 22:2, 37:23,
38:4, 43:19, 62:8,
66:12, 69:17, 75:8,
75:10, 76:5, 77:14,
77:19, 77:20, 99:11,
106:23, 107:5,
110:16, 111:8,
111:22, 130:2,
137:12, 137:14,
142:20, 143:3,
159:10, 164:4,
171:6, 173:18,
175:19, 178:14,
179:21, 196:11,
210:13, 211:11,
222:21, 226:21,
232:3, 236:17,
236:18
**two-hour** [1] - 62:8
**type** [14] - 32:14,
43:11, 44:10, 52:23,
59:6, 60:10, 118:4,
144:23, 187:12,
197:8, 197:12,
234:19, 239:17,
244:5
**typed** [3] - 72:21,
118:2, 118:3
**types** [2] - 30:17,
165:6
**typewriter** [1] - 72:22
**typical** [2] - 98:14,
145:19
**typically** [9] - 71:19,

96:15, 124:9,
144:20, 149:9,
156:3, 164:8,
199:18, 199:21

**U**

**ultimately** [7] - 24:22,
25:5, 106:8, 117:7,
170:12, 181:10,
183:3
**uncle** [1] - 173:13
**under** [14] - 45:5,
83:18, 107:9,
108:21, 109:4,
109:9, 109:22,
110:3, 110:12,
116:3, 167:16,
177:9, 177:22, 190:3
**undergo** [2] - 28:6,
28:16
**understood** [2] - 5:2,
6:13
**undertake** [1] - 183:18
**unexpected** [1] -
137:3
**unit** [6] - 34:23, 39:17,
41:2, 41:19, 41:22,
42:8
**UNITED** [1] - 1:1
**units** [1] - 59:5
**unless** [2] - 9:2, 206:6
**unresponsive** [1] -
168:15
**UNTIL** [1] - 129:16
**unusual** [1] - 226:13
**up** [57] - 10:19, 10:21,
11:13, 34:10, 37:16,
40:3, 52:5, 65:22,
66:2, 67:22, 69:7,
76:4, 84:23, 85:5,
87:7, 90:15, 97:7,
100:2, 101:12,
101:13, 110:13,
112:19, 112:23,
113:2, 114:6, 118:2,
118:3, 118:4,
123:12, 133:20,
137:11, 143:12,
148:9, 151:5,
151:12, 155:9,
155:11, 155:18,
158:7, 158:22,
162:9, 164:16,
168:14, 171:10,
172:6, 177:6,
192:21, 197:11,
197:22, 203:18,
225:5, 240:22,
245:23, 246:15

**updated** [1] - 200:9
**upgraded** [1] - 148:6
**uploaded** [1] - 224:21
**ups** [9] - 69:13, 69:19,
70:3, 130:13, 132:3,
164:8, 164:13,
164:15, 242:13
**urgency** [2] - 97:10,
97:13
**US** [1] - 4:12
**useful** [2] - 118:17,
162:19
**uttered** [1] - 114:6

**V**

**Valerie** [1] - 219:7
**valid** [1] - 178:16
**Valley** [4] - 26:20,
27:5, 27:9, 29:4
**variety** [2] - 30:7, 72:4
**various** [1] - 8:4
**vehemently** [1] -
23:18
**vehicle** [2] - 88:2, 88:3
**vehicles** [1] - 88:4
**verbal** [2] - 6:4, 186:3
**verbally** [1] - 189:17
**versa** [1] - 128:16
**version** [2] - 15:11,
17:5
**versus** [1] - 237:7
**via** [3] - 56:16, 63:14,
243:10
**vice** [1] - 128:16
**victim** [3] - 146:8,
153:4, 156:15
**victim's** [1] - 135:3
**victims** [1] - 231:7
**video** [41] - 14:17,
18:22, 21:3, 21:6,
21:9, 21:11, 21:13,
21:14, 21:16, 21:20,
21:23, 24:20, 52:10,
52:15, 52:19, 78:15,
78:23, 80:10, 80:11,
80:21, 80:22, 96:5,
96:14, 96:22, 98:4,
98:22, 99:11, 110:6,
142:20, 157:14,
158:10, 196:21,
224:18, 225:2,
225:8, 225:12, 229:8
**videos** [6] - 18:20,
20:22, 22:4, 22:14,
78:11, 157:23
**videotaped** [3] - 79:5,
155:16, 155:20
**view** [8] - 166:14,

167:12, 175:4, 175:5, 176:7, 186:10, 190:7, 191:22
**violated** [1] - 26:8
**violation** [4] - 24:23, 25:6, 26:5, 41:9
**violations** [1] - 41:6
**visit** [2] - 90:2, 212:14
**visited** [1] - 212:17
**voluntariness** [1] - 176:19
**voluntary** [2] - 56:8, 105:9
**vomiting** [1] - 169:5
**vulnerable** [2] - 102:10, 102:17

## W

**waived** [1] - 3:9
**waiver** [1] - 104:15
**walk** [2] - 85:17, 144:2
**walked** [2] - 94:7, 108:5
**walking** [3] - 94:9, 106:16, 156:7
**walnut** [1] - 214:21
**warrant** [11] - 74:6, 74:8, 75:12, 76:19, 76:22, 77:6, 78:5, 127:5, 127:11, 127:13, 127:14
**warrants** [8] - 20:12, 20:15, 75:6, 75:8, 76:4, 76:15, 77:14, 77:18
**Washington** [1] - 2:9
**watch** [4] - 18:23, 157:13, 157:16, 163:7
**watched** [6] - 14:11, 14:12, 17:8, 17:10, 20:22, 157:17
**watching** [1] - 158:13
**water** [2] - 91:3, 171:12
**weekend** [1] - 85:21
**West** [1] - 2:9
**whacked** [1] - 195:22
**whatsoever** [1] - 230:15
**whereas** [1] - 167:10
**wherein** [1] - 228:15
**whole** [6] - 46:7, 58:10, 70:10, 81:23, 183:5, 248:7
**wide** [4] - 19:13, 58:15, 59:2, 59:3

**wife** [12] - 90:16, 171:10, 171:13, 177:17, 201:16, 201:19, 203:13, 203:17, 203:18, 204:7, 208:23, 209:4
**Wilahemina** [29] - 66:4, 66:9, 68:19, 78:15, 79:2, 79:4, 80:23, 92:8, 93:15, 94:20, 97:17, 103:22, 123:5, 126:4, 126:8, 126:13, 132:19, 135:4, 154:3, 158:9, 163:21, 168:20, 169:12, 200:22, 209:19, 210:2, 214:14, 216:2, 226:20
**Wilahemina's** [2] - 126:18, 132:9
**William** [1] - 220:12
**willing** [1] - 128:13
**wish** [2] - 82:14, 224:12
**withdraw** [1] - 52:21
**withdrawn** [4] - 21:15, 59:22, 95:16, 209:3
**WITNESS** [82] - 14:23, 22:13, 25:19, 25:23, 26:15, 38:10, 38:14, 39:8, 42:21, 43:14, 44:5, 45:7, 45:15, 46:13, 50:22, 51:4, 52:4, 53:6, 54:23, 55:18, 56:12, 57:6, 58:6, 63:23, 64:22, 66:8, 80:7, 90:9, 102:16, 112:8, 113:12, 114:9, 114:19, 121:8, 121:18, 131:8, 136:22, 138:19, 139:7, 140:2, 143:8, 146:2, 169:10, 172:2, 174:3, 175:12, 176:11, 179:3, 179:16, 180:11, 181:5, 181:14, 181:19, 183:11, 184:10, 184:19, 185:14, 186:15, 187:3, 187:19, 188:2, 189:13, 189:23, 190:13, 192:20, 193:18, 195:5, 204:20, 206:5, 207:22, 208:8,

208:16, 223:9, 226:7, 228:21, 234:5, 234:10, 236:20, 242:22, 243:16, 244:12, 245:19
**Witness** [1] - 47:12
**witness** [3] - 105:5, 130:8, 189:10
**witness's** [1] - 196:19
**witnessed** [1] - 97:19
**witnesses** [1] - 231:8
**woke** [2] - 168:14, 172:6
**woken** [2] - 90:15, 171:10
**word** [8] - 120:20, 158:16, 176:22, 179:17, 194:18, 204:4, 205:19
**words** [17] - 60:13, 108:20, 110:21, 119:18, 141:5, 146:6, 155:5, 169:3, 175:18, 180:17, 189:19, 199:3, 219:16, 232:5, 232:6, 232:7
**worker** [3] - 87:21, 128:4, 217:16
**works** [3] - 31:21, 38:5, 147:6
**worry** [1] - 183:23
**worthy** [1] - 121:23
**wow** [1] - 137:3
**write** [3] - 44:20, 166:11, 170:15
**writing** [2] - 93:22, 219:9
**written** [21] - 20:19, 24:20, 69:23, 79:7, 93:16, 93:18, 99:14, 99:15, 104:12, 104:21, 104:22, 119:5, 133:6, 138:2, 138:8, 154:18, 166:9, 166:13, 189:18, 232:4, 233:3
**wrote** [11] - 93:23, 115:20, 158:17, 165:22, 166:9, 189:19, 232:9, 232:10, 232:11, 232:14, 233:3

## Y

**year** [10] - 26:21, 27:18, 35:17, 36:6,

39:21, 42:18, 44:12, 48:2, 66:12, 220:20
**years** [18] - 17:9, 19:3, 20:23, 27:14, 38:16, 64:2, 66:15, 66:16, 66:19, 66:20, 66:23, 80:14, 80:19, 80:21, 194:3, 226:23, 228:9, 228:11
**yellow** [1] - 211:10
**yesterday** [1] - 96:20
**YMCA** [3] - 66:14, 68:8, 68:17
**YORK** [4] - 1:1, 1:9, 1:14, 248:1
**York** [17] - 1:21, 1:23, 2:3, 2:6, 2:10, 2:12, 2:13, 3:6, 4:11, 75:3, 151:6, 151:20, 218:5, 218:12, 220:8, 249:5
**yourself** [9] - 41:19, 62:22, 72:9, 114:15, 115:8, 115:15, 131:5, 147:20, 191:4
**yup** [2] - 118:6, 130:10
**YWCA** [1] - 66:23

## Z

**zone** [1] - 29:8

Case 1:17-cv-00626-DJS Document 7-3 Filed 10/25/21 Page 186 of 164

EXHIBIT "E"

ORIGINAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
ADRIAN THOMAS,

                    Plaintiff,

        - against -

CITY OF TROY; ADAM R. MASON, Individually,
RONALD FOUNTAIN, Individually, TIM COLANERI,
Individually, RENSSELAER COUNTY, and
MICHAEL SIKIRICA, Individually,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
STATE OF NEW YORK: COURT OF CLAIMS
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
ADRIAN P. THOMAS,

                    Claimant,

        - against -

THE STATE OF NEW YORK,

                    Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Held at:
PATTISON, SAMPSON, GINSBERG & GRIFFIN, PC
22 First Street
Troy, New York

                    September 11, 2019
                    1:55 p.m.


        DEPOSITION OF DEFENDANT TIM COLANERI, held
    pursuant to Notice, before Joyce Babiskin,
    Shorthand Reporter and Notary Public in the
    State of New York.

APPEARANCES:


**For Plaintiff/Claimant:**

BRETT H. KLEIN, ESQ., PLLC
305 Broadway
Suite 600
New York New York  10007
By:  BRETT H. KLEIN, ESQ.


**For Defendants City of Troy, Adam Mason,**
**Ronald Fountain and Tim Colaneri:**

PATTISON, SAMPSON, GINSBERG & GRIFFIN, PC
22 First Street
Post Office Box 208
Troy, New York  12181-0208
By:  JOSEPH T. PERKINS, ESQ.


**For Defendants Rensselaer County**
**and Michael Sikirica:**

BAILEY, JOHNSON & PECK, P.C.
5 Pine West Plaza, Suite 507
Washington Avenue Extension
Albany, New York  12205
By:  CRYSTAL R. PECK, ESQ.


**For Defendant State of New York:**

LETITIA JAMES, Attorney General of
the State of New York
The Capitol
Albany, New York  12224
By:  CHRISTINA M. CALABRESE
     Assistant Attorney General
     Claims Bureau

     KATHERINE J. HAMILTON
     Legal Assistant
     Claims Bureau

S T I P U L A T I O N S


   IT IS HEREBY STIPULATED, by and between the attorneys for the respective parties hereto, that:

   All rights provided by the C.P.L.R., and Part 221 of the Uniform Rules for the Conduct of Depositions, including the right to object to any questions, except as to form, or to move to strike any testimony at this examination is reserved; and in addition, the failure to object to any question or to move to strike any testimony at this examination shall not be a bar or waiver to make such motion at, and is reserved to, the trial of this action.

   This deposition may be sworn to by the witness being examined before a Notary Public other than the Notary Public before whom this examination was begun, but the failure to do so or to return the original of this deposition to counsel, shall not be deemed a waiver of the rights provided by Rule 3116 of the C.P.L.R., and shall be controlled thereby.

   The filing of this deposition is waived.

   IT IS FURTHER STIPULATED, that a copy of this examination shall be furnished to the attorney for the witness being examined without charge.

1                          <u>TIM COLANERI</u>,

2            having been first duly sworn by the Notary

3            Public, was examined and testified as

4            follows:

5       EXAMINATION BY MR. KLEIN:

6            Q     Good morning, sir.

7            A     Good morning, sir.

8            Q     My name is Brett Klein and I represent

9       Adrian Thomas both in a federal civil rights case

10      pending in the US District Court for the Northern

11      District in which you've been named as a party,

12      as well as in a pending collateral matter in the

13      State of New York in the Court of Claims under

14      New York's Wrongful Conviction Law.

15            We're here today to ask you questions

16      today under oath concerning your knowledge and

17      involvement in the events surrounding Mr. Thomas'

18      prosecution.  Do you understand that that's why

19      you're here today?

20            A     Yes.

21            Q     Is there any reason why you can't

22      testify fully and accurately today?

23            A     No.

Case 1:17-cv-00626-DJS Document 84-17 Filed 10/25/21 Page 6 of 164

```
 1          Q     Have you had sufficient time to prepare

 2     with your attorney, Mr. Perkins, or other lawyers

 3     representing you?

 4          A     Yes.

 5          Q     Are you represented by anyone else

 6     presently other than Mr. Perkins?

 7          A     Not on this legal matter.

 8                MR. PERKINS:  I object to the form.

 9          Q     Previously, it was Mr. Shanley in this

10     office?

11          A     Correct.

12          Q     Okay.  Have you retained private

13     counsel to consult with for this case?

14          A     No.

15          Q     And are you being represented pursuant

16     to, like, a union agreement, or are you paying

17     out of pocket or is it pursuant to --

18          A     My union in the city.

19          Q     Are you being indemnified in this case,

20     as well?

21          A     I don't know.

22          Q     Okay.  Other than today, it's my

23     understanding that you testified at a criminal
```

Case 1:17-cv-00626-DJS Document 64-17 Filed 10/25/21 Page 78 of 164

1    trial, Mr. Thomas' first trial in 2009.  Other

2    than that trial, other than -- Withdrawn.

3              It's my understanding that other than

4    today you've testified under oath previously

5    regarding this matter in the 2009 criminal trial

6    against Mr. Thomas.  Is that correct?

7         A    Yes.

8         Q    Other than the 2009 criminal trial

9    resulting in the conviction and today, have you

10   testified under oath at any other time under any

11   other circumstance regarding this matter?

12        A    I don't know if I testified on the

13   Grand Jury or not.  I don't believe so.

14        Q    I don't believe so.  And you didn't

15   testify at any pretrial Huntley or other pretrial

16   hearings, to your knowledge?

17        A    No.

18        Q    Other than today and the September 2009

19   trial -- Withdrawn.  Other than today and the

20   2009 trial and other than conversations with your

21   counsel, which I don't want you to divulge, have

22   you discussed the case or given statements to

23   anyone else?

1      A    No.

2      Q    You did have meetings with prosecutors

3  at some point, or did you not?

4      A    Yes.

5      Q    Did you ever have meetings with

6  prosecutors?

7      A    Yes.  I believe so.

8      Q    When did you have them and with whom?

9      A    Prior the trial, and I'm not sure who

10 prosecuted the case.  I think it might have been

11 Shane Hug.

12     Q    Do you remember Christa Book?

13     A    Yes.

14     Q    Do you believe it was with Christa?

15     A    Yeah.  I don't remember.

16     Q    So, that was -- was that in connection

17 with trial prep?

18     A    Yes.

19     Q    Any conversations you had with the

20 prosecutor's office?

21     A    Not that I recall.

22     Q    Did you meet with them before you

23 testified to go over what they would ask you?

1      A    I think so, yes.

2      Q    Other than that, can you recall any

3  other meetings with anyone else that's not your

4  attorney, and not today's deposition, in which

5  you've spoken about the events, your involvement

6  in these events?

7      A    No.

8      Q    Have you ever spoken with the media,

9  filmmakers or anyone else regarding that?

10     A    No.

11     Q    In terms of testifying today, you said

12  you had sufficient time to prepare with counsel.

13  Is that right?

14     A    Yes.

15     Q    Did you have a chance to review your

16  testimony from the 2009 trial?

17     A    I don't think so, no.

18        MR. KLEIN:  He didn't testify in the

19     2009 trial.

20        MR. PERKINS:  Off the record.

21        (Discussion off the record.)

22  BY MR. KLEIN:

23     Q    I just want to clarify.  It's my

```
 1    understanding that you have not testified in any

 2    criminal proceeding regarding Adrian Thomas'

 3    prosecution.  Do you have a recollection of

 4    testifying at some point?

 5         A    No, I don't.

 6         Q    So, earlier, when you said you

 7    testified in 2009, was that a mistake?

 8         A    It may have been.  I may have done

 9    something at the Grand Jury, but I don't

10    remember.

11         Q    Even that you don't remember?

12         A    No.

13         Q    Okay.  And in terms of meetings with

14    prosecutors, do you know if you meet with them,

15    whether secondary, you know, as going down with

16    Mason or Fountain, or whether you met with them

17    independently, on your own, regarding this case?

18         A    No.  I don't remember any of that.

19         Q    Okay.  Did you create any writings in

20    connection with this matter, for instance any --

21         A    Any follow-ups?

22         Q    -- any Troy PD follow-ups or any other

23    paperwork?
```

Case 1:17-cv-00626-DJS Document 94 Filed 10/25/21 Page 186 of 164

1    A    I may have.  I looked at some of the

2    case file, and I didn't see anything with my name

3    on it.

4    Q    Okay.  So, you may have, but you're not

5    aware of anything right now?

6    A    Correct.

7    Q    Okay. Are you -- for what aspect of the

8    investigation would you have prepared a follow-up

9    about?

10    A    Standing by during the interview, going

11    down to see the infant with Adam and, I believe,

12    Mark Mason, they were both detectives with me,

13    down to Albany Med, and then sitting in on the

14    interview later on that night.

15    Q    Okay.  So, you became involved.  Just

16    taking each of those in turn, when you say going

17    down with Adam, that's, I'm sorry, with --

18    A    Detective Adam Mason and Detective Mark

19    Mason.

20    Q    Mark Mason.  And are they related?

21    A    Yes.  Mark is Adam's uncle.

22    Q    Okay.  And you went down with them, you

23    believe, to Albany Medical Center, on the evening

1    that the child was first taken to the hospital?

2         A    I believe it was the next morning.

3         Q    So, it was either -- if I told you the

4    child went to the hospital on September 21st of

5    2008, do you believe it was either late on the

6    21st or into the 22nd?

7         A    It was during the daytime, like after

8    8:00 in the morning.

9         Q    And that might be the subject of a

10   follow-up report that may have been prepared?

11        A    Yes.

12        Q    And what was your involvement in going

13   down to the hospital?

14        A    I just went down with Mark Mason.  Mark

15   and I were partners at the time.  We just went

16   down.  Adam was down there, so we figured we'd

17   just all go down there and see what was going on

18   with the case.

19        Q    Were you assigned to the case?

20        A    No.

21        Q    Who was assigned to the case?

22        A    Adam and Ron Fountain.

23        Q    Was Mark assigned to the case?

Case 1:17-cv-00626-DJS Document 91-1 Filed 10/25/21 Page 136 of 164

1       A    No.

2       Q    Okay.  So, why did Mark and you decide

3 to go down?  Just to see if they needed help?

4       A    Yeah.

5       Q    Had you been involved in the

6 investigation up that point?

7       A    No.

8       Q    You had heard about it, though, through

9 the office or directly from Mason himself?

10      A    Yeah.  Just that morning we heard about

11 it.

12      Q    And what did you hear that morning?

13      A    I -- I don't remember.

14      Q    If you don't specifically -- if you

15 know in sum and substance, let me know in sum and

16 substance.

17      A    I do not know.

18      Q    That there was some investigation and

19 they were at the hospital?

20      A    Correct.

21      Q    Is that fair?

22      A    Yes.

23      Q    Okay.  And you responded with Mark

Case 1:17-cv-00625-DJS Document 60-91 filed 10/25/21 Page 14 of 164

1    Mason to Albany Med?

2         A    Correct.

3         Q    Do you recall what, if anything,

4    transpired at Albany Med when you were there?

5         A    We went in.  I saw the infant on life

6    support.  We talked to a doctor briefly and that

7    was about it.  We didn't stay long or anything

8    like that.  At least Mark and I didn't stay

9    long.  I'm not sure if Adam stayed after we left.

10         Q    Do you remember if you took any notes?

11         A    No, I don't remember.

12         Q    Do you remember who the doctor was?

13         A    No.

14         Q    Do you remember if it was a doctor as

15    opposed to a nurse?

16         A    No.

17         Q    Do you remember if it was a man or a

18    woman?

19         A    I believe it was a man, I believe.

20         Q    Do you remember what you were told, if

21    anything?

22         A    No.

23         Q    Do you remember in sum and substance

Case 1:17-cv-00625-DJS Document 60-1 Filed 10/25/21 Page 15 of 164

1    what was discussed?

2       A    I believe the doctor said that the --

3    the injury the baby sustained was not

4    accidental.  It may have been intentional.

5       Q    Did he say how he knew that?

6       A    No.

7       Q    And do you recall anything else that

8    was said by anyone during that meeting at the

9    hospital?

10       A    No.

11       Q    Okay.  After that visit to the

12    hospital, did you have any further personal

13    involvement in the Thomas investigation, arrest

14    or prosecution?

15       A    I did.

16       Q    What was that?

17       A    I sat in and watched the interview on

18    the monitor.  Adam was upstairs.  Adam Mason's

19    office was on the third floor of the police

20    department and the interview room is adjacent to

21    his office, or maybe it's the next office over.

22    In any event, Adam was talking to this man who

23    was suspected of injuring a child by himself

Case 1:17-cv-00626-DJS Document 60-1 Filed 10/25/21 Page 16 of 164

1    while all the other officers were in and out of

2    the first floor, so there was nobody gonna be up

3    there with him, so I stood by and watched the

4    interview.

5        Q    And is it your understanding that there

6    were two interviews of Adrian Thomas taken in

7    that room in the course of this investigation.

8    One was shorter, then Mr. Thomas went to the

9    hospital, and then, when he returned, a longer

10   one was about seven hours?

11       A    I don't remember the -- I know they

12   said -- the first one, they didn't mention how

13   long it was, and then the second one, yeah, it

14   was about six, seven hours.

15       Q    So, was it the second one that you were

16   present for?

17       A    That's correct.

18       Q    Were you present for it from beginning

19   to end?

20       A    For most of it, yeah, besides the

21   bathroom breaks, getting drinks, things like

22   that.

23       Q    In other words, were you present in the

Case 1:17-cv-00625-DJS Document 60-9 Filed 10/25/21 Page 176 of 164

1    room where the monitor was located when the

2    interview commenced?

3         A    Yes.

4         Q    Did you know that Mr. Thomas had been

5    picked up at the hospital by detectives from the

6    squad, whether it was Mason or someone else?

7         A    No.

8         Q    Centeni?

9         A    No.  I didn't know that.

10             MR. PERKINS:  Objection to form.  He

11        said he was picked up at the -- oh, the

12        mental hospital.

13             MR. KLEIN:  Yeah.

14        Q    Do you know where he came from before?

15        A    No.

16        Q    But were you asked to stand by in the

17   video monitor room or did you take it upon

18   yourself to do that?

19        A    I was asked to stand by.

20        Q    By whom?

21        A    I would assume the Captain at the time,

22   because Ron Fountain either had other plans or

23   couldn't do that at that time, so I stood by.

Case 1:17-cv-00626-DJS Document 69-1 Filed 10/25/21 Page 17 of 164

1       Q    Do you know if Adam Mason asked you or

2    it would have been a supervisor?

3       A    I think it might have been a

4    supervisor.  I'm not sure if Adam asked me or

5    not.

6       Q    Who was the supervisor that day?

7       A    I'm not sure.  I've been through a lot

8    of Detective Captains.  I've been in the

9    Detective Bureau assigned since 1998, so --

10       Q    So, we'll get into the substance and

11    the details of that interview, but my

12    understanding, from what you've testified to, is

13    that you were there for several hours beginning

14    to end of that interview other than bathroom

15    breaks or to get some fresh air?

16       A    Correct.

17       Q    Other than being personally involved in

18    monitoring -- and at some point you walked into

19    the interview.  Correct?

20       A    Correct.

21       Q    Other than that, what, if any,

22    involvement did you have in Adrian Thomas'

23    investigation, arrest or prosecution after that

Case 1:17-cv-00626-DJS Document 60-9 Filed 10/25/21 Page 18 of 164

1 interview concluded?

2   A **That** was **p**retty much it for me.

3   Q When you say **p**retty much, did you

4 assist anyone with any investigatory tasks?  Did

5 you go to court, even if it was, in your mind,

6 minor or secondary to someone else's

7 involvement?  Is there anything else that you can

8 recall?

9   A I'm not sure if I went down to the

10 booking room with him or not.  I don't know or I

11 don't remember if there was any Grand Jury

12 testimony involved in any of this.  It's been

13 quite a while and it's not my first case.

14   Q Okay.

15   A I think I have, like, 3,500 cases I've

16 investigated since I've been a Detective.

17   Q So, what stands out in your mind is the

18 trip to the hospital during daytime hours,

19 speaking to a doctor, and then being present for

20 the second, longer interview?

21   A Correct.

22   Q Anything else that you can recall about

23 your involvement in the Thomas matter?

Case 1:17-cv-00626-DJS Document 90-4 Filed 10/25/21 Page 20 of 164

1      A    No.

2      Q    When it came down to the first trial, I

3  can represent to you that I believe Fountain and

4  Mason did testify at pretrial hearings and then

5  at trial.  Were you present either when they were

6  prepped or when they testified at trial at any of

7  those occasions?

8      A    I don't think so.

9      Q    You don't remember?

10      A    And I wasn't -- I didn't go to a

11  trial --

12      Q    Okay.

13      A    -- so --

14      Q    You didn't go, whether the prosecutor

15  asked you to or for moral support for your

16  colleagues or anything else?  You didn't go?

17      A    No.  I'm too busy.

18      Q    Business was good?

19      A    Business is always good.

20      Q    Okay.  So, did you go to the -- I think

21  this is assumed by your answer, but you didn't go

22  to the 2009 trial.  Did you go to the 2014 trial?

23      A    No.

1    Q    Did you follow either of both of them

2    either from speaking to your colleagues or on the

3    news?

4    A    I don't remember.

5    Q    Have you viewed any press or media

6    about this case?

7    A    I saw a portion of the video that was

8    made, that documentary, but that's about it.  I

9    didn't -- I don't have cable TV --

10    Q    Okay.

11    A    -- so --

12         MR. KLEIN:  Off the record.

13         (Discussion off the record.)

14    BY MR. KLEIN:

15    Q    And who showed you the documentary?

16    Was it the part involving you?

17    A    Yeah.  I just heard about it.

18    Actually, I didn't see the part about me.  I

19    spoke to Adam and spoke to Ron Fountain and

20    that's about it.  And I saw the cover of the BBD

21    and I'm not on it, so --

22    Q    You never watched it?

23    A    No.

1  Q There was a Court of Appeals decision

2 that came down that mentioned your conduct in

3 walking into the interview and things that you

4 said.  Are you aware of that?

5  A No.

6  Q Okay.  We'll mark that in two minutes.

7  So, you've never looked at the court

8 decision that found that the second -- that the

9 statements made by Mr. Thomas were

10 unconstitutional?

11  A No.  I didn't see that.

12  Q Did you know that a court made that

13 decision?

14  A No.

15  Q Did you know that in the second trial

16 all evidence of his statements in police custody

17 were not allowed in evidence?

18  A No.  I didn't know any of it.

19  Q So, until I posited that in this

20 question, you had no no idea?

21  A No.

22  MS. CALABRESE:  Off the record.

23  (Discussion off the record.)

```
 1              MR. KLEIN:  So, back on the record.
 2   BY MR. KLEIN:
 3       Q    When you spoke to Mr. Thomas during the
 4   interview, and we'll get into the details, I just
 5   want to talk generally, it was, in sum and
 6   substance, about the type of trauma that had to
 7   have been inflicted in order to cause the
 8   injuries to this baby, Ma███████ Thomas.  Is that
 9   right?
10       A    Correct.
11       Q    And was it your belief at the time,
12   either from speaking with your colleagues or
13   anyone else, that there was some type of trauma
14   inflicted on M█████w Thomas?
15       A    That's what the doctor was saying, yes.
16       Q    Did you know at the time that there was
17   a possibility that there was a bacterial
18   infection, as well?
19       A    No, I did not.
20       Q    Have you come to learn that it was his
21   defense in the criminal court case in 2009 as
22   well as 2014 that M██████ died of a bacterial
23   infection and not from trauma?
```

Case 1:17-cr-00626-DJS Document 60-9 Filed 10/25/21 Page 2 of 164

```
 1        A    I don't know what he died from.  I
 2   don't know what was determined.
 3        Q    You don't know either way?
 4        A    No.
 5        Q    But have you come to learn, either
 6   through your colleagues or anyone other than your
 7   counsel, that it was -- there was an alternative
 8   cause of death proffered by the defendant?
 9        A    No.
10        Q    Non-traumatic, you didn't know that?
11        A    No.
12        Q    This is the first you're hearing about
13   that?
14        A    Yeah, yeah.
15        Q    Okay.  Had you ever heard, whether from
16   rumors in the office or secondhand, hearing
17   conversations secondhand, or from some other
18   source that may be more official, that the baby
19   had sepsis or some type of bacterial infection?
20        A    No.  And I don't overhear things too
21   much.
22        Q    Why not?
23        A    I have hearing damage (indicating), so
```

Case 1:17-cv-00625-DJS Document 60-24 Filed 10/25/21 Page 536 of 164

```
 1    this is why I'm wearing these things.

 2         Q    And for the record, you're wearing ear

 3    buds in both ears?

 4         A    I am.  This is a device from Bose.

 5    It's more or less a hearing aid.  I can throw it

 6    in my phone.  And I can't afford the other ones

 7    yet, so I'm saving up.

 8         Q    Okay.  Do they help you amplify the

 9    sound?

10         A    They amplify the sound and -- all

11    around me or directly in front of me.

12         Q    Have you been able to hear me okay

13    today?

14         A    Yes, I have.

15         Q    Okay.  So, have you reviewed any

16    documents to refresh your recollection of your

17    involvement in this case, whether you created

18    them or anyone else, and when I say reviewed

19    documents, documents, photos, videos or anything

20    else to prepare for today's deposition?

21         A    I reviewed -- I had some type of

22    testimony that -- not -- or I read a document

23    where it had me asking questions to Mr. Thomas
```

1    with Adam Mason present in the room and I flipped

2    through the case file looking to see if I did a

3    follow-up and I couldn't find one.

4        Q    My understanding is there was a

5    transcript prepared of the two interviews, but

6    specifically the one with you in it would have

7    been the second interview.  So, did you look at a

8    transcript of the interrogation of Mr. Thomas

9    that you walked in on?

10        A    I did, but it wasn't in its entirety.

11    It was only maybe three pages' or four pages'

12    worth.

13        Q    It wasn't complete?

14            MR. PERKINS:  Off the record.

15            (Discussion off the record.)

16    BY MR. KLEIN:

17        Q    Other than those pages that set forth

18    your conversation with Mr. Thomas in the

19    interrogation room, did you review any other

20    documents?  And if you did, don't tell me what

21    your counsel told you about them.  Just, did you

22    review any?

23        A    Yes.

1       Q    What did you review?

2       A    There was a stack of paperwork that the

3   counsel gave me and I flipped through it looking

4   to see if my name was on anything that I filled

5   out.

6       Q    And was there anything in it?

7       A    I couldn't find it, no.

8       Q    Did it appear to be the TPD, Troy

9   Police Department, file in this case?

10      A    Yes.

11      Q    Other than flipping through that file

12   to see if there was anything with your name on it

13   and the transcript of the interrogation, have you

14   looked at anything else?

15      A    No.

16      Q    Have you spoken with anyone other than

17   your counsel to refresh your recollection of the

18   incident?  In other words, whether informally or

19   formally, have you spoken with Colaneri -- I'm

20   sorry -- with -- not yourself -- with Mason,

21   Fountain or anyone else to -- for whatever

22   reason, to jog your memory of the incident?

23      A    Yes.

1      Q    Who have you spoken with?

2      A    I've spoken with Adam Mason.

3      Q    When did you speak with him?

4      A    Well, four years ago, I think when we

5  first got served. I think it was four years ago.

6      Q    Okay.

7      A    It was just did you get served, yeah, I

8  got served, and that's pretty much it. And then

9  we just spoke about the proceedings going on and

10  not really the case, about when you're getting

11  your deposition done, did you do this yet, so --

12      Q    Have you discussed the substance of the

13  allegations against either Mr. Thomas or against

14  any of the police employees in this case with

15  Adam Mason since you became aware of this

16  lawsuit?

17         MR. PERKINS: I object to the form.

18         You can answer. You said the --

19         MR. KLEIN: The substance.

20         MR. PERKINS: -- allegations against

21  Mr. Thomas. Do you mean the criminal ones?

22         MR. KLEIN: Yes.

23         MR. PERKINS: I'm sorry. Go ahead.

# APPENDIX

```
 1        A    No.

 2        Q    Other than logistics of depositions

 3   and --

 4        A    No.  That's what we talked about.

 5        Q    Other than Adam Mason, have you

 6   discussed these events with anyone else other

 7   than your attorney?

 8        A    Yeah.  I had to tell my partner that

 9   I'm going over here to give a deposition and

10   that's about it.  He knows why, why the

11   deposition.

12        Q    For instance, your son is on the job?

13        A    Yes.

14        Q    Have you discussed your involvement or

15   the involvement of your colleagues, whether you

16   have any opinions about it or anything else, with

17   your son or anyone else?

18        A    No.

19        Q    Does your hearing issue prevent you

20   from testifying fully and accurately today?

21        A    No.

22        Q    Is there any other reason why you can't

23   testify fully and accurately today, if I didn't
```

Case 1:17-cv-00626-DJS Document 60-9 Filed 10/25/21 Page 30 of 164

```
 1    already ask you that?
 2         A    I don't think so, no.
 3         Q    Other than today, have you testified in
 4    any other civil lawsuits?
 5         A    Involving myself or just this case?
 6         Q    Involving any -- involving yourself.
 7         A    I don't think I ever testified in a
 8    civil lawsuit.
 9         Q    Have you been named in any other civil
10    lawsuits?
11         A    Yes.
12         Q    How many others?
13         A    One.
14         Q    What's the name of the plaintiff or --
15         A    I don't know.
16         Q    How long ago was it?
17         A    I was in patrol.  It was before I was
18    promoted, so it was prior to 1994.
19         Q    Okay.
20         A    It was a car accident with the police
21    car.
22         Q    Other than that car accident from the
23    '90s, have you been named in any other civil
```

Case 1:17-cv-00626-DJS Document 60-1 Filed 10/25/21 Page 3186 of 164

1    case, to your knowledge?

2         A    No.

3         Q    When did you join the Troy PD?

4         A    1984, I believe.  I'm coming up on 35

5    years next week.

6         Q    Congratulations.  Prior to the Troy PD,

7    did you have any law enforcement experience?

8         A    I worked security for a clothes

9    manufacturer.

10        Q    And what was your highest level of

11   education?

12        A    College and --

13        Q    Where --

14        A    -- the education that I received with

15   the police and the Municipal Council of Police

16   Training.

17        Q    Where did you go to college?

18        A    Hudson Valley.

19        Q    And did you get a two-year degree?

20        A    I got two of them.

21        Q    In what?

22        A    Criminal justice and security

23   administration.

Case 1:17-cv-00625-DJS Document 60-9 Filed 10/25/21 Page 32 of 164

1    Q    Were those Associate Degrees?

2    A    Yes.

3    Q    And was it -- did you have any further

4  college credits after that or did you go to your

5  security job and then the police?

6    A    I did.  I think I got college credits

7  for some of the training I received, but I'm not

8  pursuing any other degree.

9    Q    Okay.  When you applied to the Troy PD,

10  did you have to fill out some type of written

11  application?

12    A    Yes.

13    Q    And did you have to undergo a

14  psychological evaluation, as well?

15    A    Yes.

16    Q    What else?  Was there some type of

17  physical?

18    A    Yes, there was.

19    Q    Did you pass your application for

20  employment the first time that you applied?

21    A    Yes, I did.

22    Q    And when you were accepted to be

23  employed by the Troy PD, did you have to start a

1    course of training at a police academy?

2         A    Yes, I did.

3         Q    And who managed or ran the police

4    academy back in 1984?

5         A    Yes.  Colonie Police Department.

6         Q    C-O-L-O-N-I-E?

7         A    Correct.

8         Q    And does Colonie Police -- does the

9    Colonie Police Department still provide training

10   for the Troy PD, or has that changed?

11        A    It's changed and now it's the Zone 5

12   Academy and it's in Schenectady.

13        Q    Is Zone 5 run by the state or some

14   local or private agency?

15        A    I don't know.

16        Q    For how long did Colonie Police --

17   Withdrawn.  Was the Colonie Police Department the

18   sole provider of training for Troy officers back

19   in the 1980s?

20        A    No.  It was in Colonie, but there was

21   other people that came in, both federal, state

22   and other local teachers.

23        Q    Okay.  And was that the sole provider

Case 1:17-cv-00625-DJS Document 60-9 Filed 10/25/21 Page 34 of 164

1    of training at the time you went through

2    training?

3         A     Yes.

4         Q     And was that the sole provider of

5    training, to your knowledge, for a period of time

6    until it became different, like up until 2000, or

7    did it change at some point to Zone 5?

8         A     I suppose so.  I don't know.

9         Q     Okay.  And how long was your course of

10   training in the academy?

11        A     Three and a half months, I believe.

12        Q     Okay.  And did it consist, in part, of

13   classroom training?

14        A     Yes.

15        Q     And what were the topics of classroom

16   training that you received?  Was it like police

17   science?

18        A     I don't know.  I don't know.  I'd have

19   to think about that.

20        Q     Did you learn about law?

21        A     Yeah.  Constitutional law, penal law.

22   Talked about undercover drug operations.  That

23   stood out.  Vehicle stops, K-9 and other things.

Case 1:17-cv-00626-DJS Document 60-1 Filed 10/25/21 Page 35 of 164

1    Q    Did you learn about interrogation

2    techniques at the police academy or was that

3    something that was for detectives?

4    A    That was further training.

5    Q    And did you also have range training in

6    the academy?

7    A    Yes.

8    Q    And automobile training?

9    A    Yes.

10    Q    And physical training?

11    A    Yes.

12    Q    Okay.  And did you pass all of your

13    courses in the academy the first time?

14    A    Yes.

15    Q    And upon graduating the academy, did

16    you have something referred to like maybe an

17    appointment date or a first date of assignment to

18    a command?

19    A    Well, we went through field training

20    first.

21    Q    Field training.  When did you graduate

22    the academy and when did you start field

23    training?

```
 1        A     I think we had field training for two
 2   weeks and then we graduated.  I think that's how
 3   we did it.  It was --
 4        Q     Approximately when was it that you
 5   graduated and started your first detail as a
 6   police officer?
 7        A     I believe we graduated the end of
 8   December.
 9        Q     Of '84?
10        A     Of '84.  And then we went through
11   training in the different departments in our
12   police department, a couple of weeks on
13   midnights, a couple of weeks on the day shift, a
14   couple of weeks on afternoons.  We spent a week
15   in ID, a week in records, a week in our dispatch
16   where we dispatched our own calls.  It was the
17   911 Center.
18        Q     What is ID?
19        A     Identification Bureau.  Back then, we
20   used to develop our own film.  We'd take pictures
21   with Polaroids and develop our own film and place
22   arrest records with the photographs and the
23   fingerprints.
```

Case 1:17-cv-00625-DJS Document 60-3 Filed 10/25/21 Page 37 of 164

1     Q     And what did the Records Unit or Bureau

2  do?

3     A     I'm sorry?

4     Q     What was the Records Bureau?  What were

5  your duties there?

6     A     Okay.  The Records Bureau was

7  separating the different forms.  Back then, we

8  had a certain form for burglary, a certain form

9  for a fire, a certain form for criminal mischief,

10  and we would separate them and go through them

11  and then physically put them in files, not

12  electronically.

13     Q     Okay.  After you went through those

14  different periods of training in each of those

15  bureaus, where were you assigned?

16     A     I walked the beat.

17     Q     Is that referred to as patrol?

18     A     Yes.

19     Q     And how long were you assigned to

20  patrol for?

21     A     I was a patrol officer.  I was -- I was

22  promoted in -- give me a minute here -- '94, I

23  think.

Case Case 1:17-cv-00626-DJS Document 60-1 Filed 10/25/21 Page 38 of 164

1      Q    You were patrol for about nine or ten
2    years?
3      A    Yeah.  I think eleven years.  I was
4    promoted.
5      Q    And so what were your duties and
6    responsibilities, just briefly, for the record,
7    in patrol?
8      A    Well, I walked the beat my first
9    assignment.  I was a -- second assignment was a
10   radio relief, I believe, which is, you did
11   regular patrol stuff and then, if the dispatcher
12   needed time off or had a day off, you would fill
13   in.  And there were other people involved in it,
14   so we rotated.
15         I was an evidence technician for a
16   couple of years on different shifts.  I worked
17   afternoons and I worked days, mostly in patrol.
18   I was promoted in, I think, 1995 or 1996 to
19   Sergeant.  I went to sergeant training,
20   supervisor training.  In between that in 1990 I
21   was on the SWAT team and received training also,
22   and after I was promoted we had a tactical
23   supervisor school and I went to that --

1          I can go on and on all day about my
2     training.  Is there something specific?
3          Q    I want to know your commands, not your
4     training.  You were patrol --
5          A    Patrol supervisor.
6          Q    In '95 or so?
7          A    Yes.
8          Q    And then what were your duties as
9     patrol supervisor?
10          A    Overlook and make sure the officers
11     were answering their calls correctly; going
12     through the reports, doing reports correctly.
13     Making sure they had the details that were
14     necessary for follow-up by the detectives.  Any
15     statements that were taken, I would approve
16     that.  Any reports I would approve.  Go to fire
17     scenes.  You know, you would direct officers
18     where they should go, you know, for traffic and
19     things like that.  Any tactical maneuvers, that's
20     part of it, also.  You know, barricade a gunman,
21     things like that.
22          Q    For how long were you a patrol
23     supervisor, approximately?

Case 1:17-cv-00625-DJS Document 60-9 Filed 10/25/21 Page 406 of 164

| | | | |
|---|---|---|---|
| 1 | A | Until '98. | |
| 2 | Q | About two or three years? | |
| 3 | A | Yes. | |
| 4 | Q | And then what happened in 1998? | |
| 5 | A | I went to the Detective Bureau. | |
| 6 | Q | To go from patrol to Sergeant, did you | |

7    have to take some kind of an exam?

8        A    Yes.

9        Q    Was that a written exam?

10       A    Yes.

11       Q    Administered by the Troy PD or some

12   other agency?

13       A    Troy PD took it, but it was a statewide

14   exam.

15       Q    Did you pass that the first time?

16       A    Yes.

17       Q    To go from Sergeant to Detective, did

18   you have to take some type of an exam, or was

19   that some other type of promotion?

20       A    That was through seniority.  However, I

21   turned it down the first couple of times it was

22   offered.

23       Q    Prior to 1998?

Case 1:17-cv-00625-DJS Document 60-9 Filed 10/25/21 Page 436 of 164

1     A     Yes.

2     Q     Why did you turn it down?

3     A     Because I wanted to get more provided

4     experience in patrol.

5     Q     And in 1998, you felt you were ready to

6     accept the promotion to Detective?

7     A     Yes.

8     Q     Did you receive any special training

9     upon becoming a Detective?

10     A     Yes.

11     Q     What did the detective training consist

12     of?  First of all, let me ask you this.  Was it

13     like -- before you started your duties as

14     Detective, was there a period of, whether it's

15     week, a month or a year, where you had detective

16     training, or was it on the job?

17     A     Well, it's -- there's a two week basic

18     investigation course that I took.

19     Q     Did you take that prior to starting

20     your duties as a Detective?

21     A     No.  I took it years later.

22     Q     Did you take it before 2008, meaning,

23     before the incident with Adrian Thomas?

Case 1:17-cv-00625-DJS Document 90-1 Filed 10/25/21 Page 42 of 164

```
 1        A    Yes.

 2        Q    When did you take it between '98 and --

 3        A    2005.

 4        Q    And who provided that course?

 5        A    I'm not sure.  I think -- I believe it

 6   was through the state.  It was over on Wolf Road,

 7   I think.

 8        Q    Okay.  And did you receive some type of

 9   certificate of completion for that course?

10        A    Yes.

11        Q    In that course, did you receive

12   training on interrogation techniques or tactics

13   or procedures?

14        A    I'm not sure.

15        Q    Other than the two week basic

16   investigative course in around 1995 on Wolf Road,

17   did you receive any other training in connection

18   with being a Detective as opposed to standard

19   in-service training for all officers?

20        A    Yes.

21        Q    What?

22        A    I went to a post-blast investigation

23   school that the ATF put on.
```

Case 1:17-cv-00625-DJS Document 60-1 Filed 10/25/21 Page 436 of 164

1     Q     Post what?

2     A     Post blast.  After an explosion, to

3     look and determine what type of device was used

4     to make an explosion, whether it was a chemical

5     device, a liquid device.

6           MR. KLEIN:  Off the record.

7           (Discussion off the record.)

8           MR. KLEIN:  Back on the record.

9     BY MR. KLEIN:

10    Q     Other than that, what other training

11    specifically for being a Detective have you had

12    since --

13    A     Numerous places and numerous events at

14    the State Police Academy, between sexual assault

15    and -- and hate crimes investigation.  That's the

16    only one that sticks out.  I don't know.  I

17    probably been to close to three dozen different

18    trainings.

19    Q     Okay.  Have any of your trainings ever

20    dealt with interrogations, whether it's

21    interrogation techniques, guidelines, procedures

22    and such?

23    A     Yeah.

Case 1:17-cv-00625-DJS Document 60-9 Filed 10/25/21 Page 436 of 164

```
 1        Q      How many, if you, know, and which ones

 2    do you specifically recall?

 3        A      Maybe half a dozen.

 4        Q      And were they all in Albany on Wolf

 5    Road or different places?

 6        A      They were different places.  Some are

 7    private training.  I remember a retired Rochester

 8    police officer detective.  He gave a training

 9    about it.  Al Joseph his name was.

10               I remember a State Police officer.  He

11    was a current detective.  I believe his last name

12    was Hamil or Hamlin.

13               And then I received some informal

14    trainings from some other State Police officers

15    who were doing sex crimes at the time and I was

16    looking into a case and they were giving me some

17    assistance with it, just sitting down and --

18        Q      Doing, like, a role play?

19        A      Yes.

20        Q      Okay.  So, other than the retired

21    Rochester training -- the training by the retired

22    Rochester officer and the training by the current

23    New York State Police detective, was the other
```

Case 1:17-cv-00625-DJS Document 60 Filed 10/25/21 Page 456 of 164

1    training you had regarding interrogations
2    informal or were there any other formal
3    trainings?
4         A    There were other formal trainings.  I
5    just don't recall all of them.
6         Q    They would be in your training file?
7    They should be?
8         A    They should be, yes.
9         Q    Okay.  And what did you learn about
10   interrogation techniques?  Withdrawn.
11             Were all of these courses prior to
12   2008, or have you had any dealing specifically
13   with interrogation since the Thomas case?
14        A    I've had some since.
15        Q    Have the procedures, the training and
16   procedures and guidelines, changed since then,
17   since '08?
18        A    Not really.
19        Q    Okay.  And what is the -- what is it
20   that you can recall that you've been trained with
21   regard to interrogation, to the best of your
22   memory?
23        A    Never ask somebody a question that you

Case 1:17-cv-00625-DJS Document 60-1 Filed 10/25/21 Page 436 of 164

```
 1    don't know the answer to, and you get more flies

 2    with honey than you do with sugar -- or than you

 3    do with vinegar.

 4         Q     What does that mean?

 5         A     That means, generally, if you're nice

 6    to somebody and you sit down and talk to them and

 7    treat them with respect, they'll speak to you,

 8    more likely speak to you, than if you go in there

 9    and treat them like dirt.  And I've seen people,

10    you know, in examples at training, go in and

11    treat people like dirt.

12         Q     Okay.  Other than those two pieces of

13    information, never ask something you don't know,

14    you get more flies --

15         A     With honey.

16         Q     -- with honey than with --

17         A     Vinegar.

18         Q     -- vinegar, what else do you recall

19    about your training regarding interrogations?

20    Are there any techniques that you've learned in

21    terms of whether you can use trickery or

22    deception or lying to the subject?

23         A     Yes.  We do that.
```

```
 1        Q    So, tell me, to the best of your

 2   knowledge, what you recall about your training.

 3        A    We can use trickery and deceit to get

 4   somebody to confess to a crime.

 5        Q    Are there any limitations to that,

 6   based on your training and experience?

 7             MR. PERKINS:  I object to the form.

 8             You can answer.

 9        A    I put my limitations on myself of what

10   I would do.  I'm not sure what other detectives

11   do not in my presence.

12        Q    Well, when you put them on yourself,

13   are they limitations that you've learned from

14   training, experience or both?  Sounds like maybe

15   from your own experience.

16        A    Training, experience and my moral code.

17        Q    So, what are the limitations you impose

18   on yourself through all your years of training

19   and experience?

20        A    I don't threaten anybody.

21        Q    Okay.

22        A    I try to be a gentleman and be

23   respectful and tell people exactly what's going
```

Case 1:17-cv-00625-DJS Document 60-1 Filed 10/25/21 Page 486 of 164

1    on.  I use props now and then.

2         Q    Like what?

3         A    I'll walk in with a stack of paper like

4    this (indicating) and I'll put it in a case file

5    and just put it down and say here's evidence

6    here, you know.  I can go to somebody about it or

7    I can not go to somebody about it, but I just

8    need you to explain why this is going on.  So,

9    sometimes it works, sometimes it doesn't.

10        Q    Okay.  And the premise of what you just

11   said, it sounds like the foundation of that is

12   you ask open-ended questions?

13        A    That's correct.

14        Q    You start with the premise, I have

15   evidence, please tell me what happened that led

16   to this event.  Correct?

17        A    Correct.

18        Q    And you're not putting words in the

19   mouth of the person or suggesting that they --

20   suggesting ways they could explain to you how

21   they get from A to B, which is your evidence;

22   you're just asking them to tell you on their

23   own.  Correct?

```
 1        A     Right.
 2        Q     And so when -- in terms of, like, a
 3   moral code or from training or experience,
 4   whatever the basis, is the point where reasonable
 5   police officers are required to stop or take an
 6   interrogation too far when they start giving the
 7   information rather than asking open-ended
 8   questions?
 9             MR. PERKINS:  I object to the form.
10             You can answer if you understand the
11        question.
12             THE WITNESS:  May I have it read back?
13             (The record was read as requested.)
14        A     I guess it all depends on a
15   case-by-case basis.  Sometimes we do give
16   information.  We know what's going on, we know
17   what happened, there's proof and evidence about
18   that, and you have the person explain
19   themselves.
20        Q     Okay.  But you can't suggest to them
21   facts that aren't true, can you?
22             MR. PERKINS:  I object to the form.
23             THE WITNESS:  Can I answer that?
```

Case 1:17-cv-00625-DJS Document 61-17 Filed 10/25/21 Page 50 of 164

```
 1              MR. PERKINS:  Yes, you can.
 2         A     You can tell them facts that aren't
 3    true.
 4         Q     You can tell them conclusions but
 5    you're asking them to tell you the facts that led
 6    to the conclusions.  Am I understanding you
 7    correctly?
 8              MR. PERKINS:  I object to the form.
 9              You can answer.
10         Q     The purpose of the interrogation is to
11    get them to explain to you how --
12              MR. PERKINS:  Do you want an answer to
13         the last question or no?  He didn't answer
14         it.  Can you withdraw the last one?
15              MR. KLEIN:  I was rethinking it.
16              MR. PERKINS:  All right.
17         Q     The purpose of the interrogation, even
18    if you say I have a stack of evidence here, you
19    can tell me or I could find out from someone
20    else, you want them to tell you in their own
21    words, not in the words of you or your
22    colleagues.  Correct?
23         A     That's correct.
```

```
 1        Q    So, if an interrogation leads to an
 2   accused telling you in the words of you or your
 3   colleagues because you've suggested to them what
 4   the answers are, that is where you could have a
 5   situation of a coerced confession, whether true
 6   or false.  Correct?
 7             MR. PERKINS:  I object to the form.
 8             You can answer.
 9        A    Not in my experience.
10        Q    Have you learned about coerced
11   confessions and what you're to avoid having those
12   situations in your training?
13        A    I've heard examples of a coerced
14   confession.
15        Q    Not all of them are false.  Correct?
16   Some are true, some are false?
17        A    That's correct.
18        Q    You want to avoid a coerced confession,
19   certainly, that's false, but you also want to
20   avoid a coerced true confession.  Right?
21        A    If somebody wants to confess to me, I
22   want to hear it.  I want the truth.  Basically,
23   when it comes down to any interview or an
```

Case 1:17-cv-00625-DJS Document 67-1 Filed 10/25/21 Page 526 of 164

1    interrogation, the truth is what really matters.

2        Q    But you want it to be obtained in a way

3    that's admissible in court.  Correct?

4        A    That's correct.

5        Q    And so if a true confession,

6    hypothetically, is coerced, that is, obtained in

7    a way that's due to physical or mental pressure,

8    it may not be allowed in court.  Is that your

9    understanding?

10        A    Yes.

11        Q    So, it's your goal, obviously, to

12    obtain a confession that is not coerced, whether

13    it's true, or certainly whether it's false?

14        A    Yes.

15        Q    So, applying physical and mental

16    pressure, as you know through your training and

17    experience, is a way that leads to a potential

18    coerced confession?

19            MR. PERKINS:  I object to the form.

20            You can answer.

21        A    It all depends.  I don't use any

22    physical pressure.

23        Q    I'm just talking about generally.

Case 1:17-cv-00625-DJS Document 60-1 Filed 10/25/21 Page 536 of 164

1   Based on your training and experience, is it your

2   understanding that excessive physical and/or

3   emotional pressure on a subject of an

4   interrogation can lead to instances of a coerced

5   confession, generally?

6          MR. PERKINS:  I object to the form.

7          You can answer.

8      A    Yes.

9      Q    Okay.  And you certainly don't use

10  physical pressure?

11     A    No, I don't.

12     Q    And when you throw the paper down on

13  the table and say I have this evidence, that's a

14  form of psychological pressure, but you're not

15  taking it to a limit that you feel, morally or

16  through your training, is too far.  Correct?

17     A    That's correct.

18     Q    There is a point, from your training

19  and experience, that it does get too far.

20  Correct?

21     A    Yeah.  When it turns into a physical

22  type of thing.

23     Q    What about when it's non-physical?  Are

Case 1:17-cv-00625-DJS Document 60-31 07/16/2021 Page 54 of 164

1    you aware of instances in your training and

2    experience, either one or both, where instances

3    of mental or psychological pressure on someone

4    being interrogated are too much so that you know

5    that the manner in which it was obtained was

6    wrong?

7              MR. PERKINS:  I object to the form.

8              You can answer.

9        A    If it's a confession that they actually

10   did something, I would try that.  I think I

11   would.

12        Q    But what I'm asking is, there are

13   instances -- I think you said that you're aware

14   from your training and experience that there

15   could be instances where a valid confession is

16   obtained through coercion and therefore it risks

17   being inadmissible.  Correct?

18        A    That could happen.

19        Q    Let's say the person is verbally

20   threatened, although not physically harmed or

21   other things that will be determined by the court

22   to be too much pressure so that they violate the

23   rights of the person.  That could be a reason why

```
 1    the mental pressure could be too much and a
 2    confession can be considered coerced even if it's
 3    true.  Are you aware of that?
 4              MR. PERKINS:  I object to the form.
 5              MS. CALABRESE:  Objection.  Calls for
 6         an expert conclusion.
 7              MR. PERKINS:  You can answer.
 8              MR. KLEIN:  He's an expert.
 9         Q    I just want to note, based on your
10    training and experience, you would agree that
11    a -- an otherwise true confession, if it's
12    coerced through emotional stress on the subject
13    of the interrogation, risks the interrogation not
14    being admissible in court?
15              MR. PERKINS:  I object to the form.
16              MS. CALABRESE:  Objection.
17              MR. PERKINS:  You can answer.
18         A    That's not up to me to decide.  That's
19    up to the judge to decide.
20         Q    But it's your duty to conduct the
21    interrogation in a lawful manner and to have
22    evidence that's useful in court.  Correct?
23              MR. PERKINS:  I object to the form.
```

Case 1:17-cv-00625-DJS Document 69-1 Filed 10/25/21 Page 564 of 164

1          A     That is correct.

2          Q     So, are you aware in your training,

3     through your training, and maybe you're not, but

4     the question is, are you aware of how to toe the

5     line of where the mental stress of -- goes to the

6     line, crosses the line of being coercion?

7          A     It all depends on what individual it

8     is.  Different people react differently to

9     different stresses.

10          Q     In this case, Mr. Thomas was

11     sleep-deprived by the time of the second

12     interrogation that you were present at.  Were you

13     aware of that?

14          A     No.

15          Q     Is sleep deprivation a fact that a

16     trained investigator should consider when using

17     psychological stress on a subject of an

18     interrogation?

19               MS. CALABRESE:  Objection.  Calls for

20          an expert conclusion.

21               MR. PERKINS:  I object to the form.

22               You can answer if you can.

23          A     Are you talking about the suspect being

1      sleep-deprived or --

2              Q    Yes.

3              A    Not the detective?

4              Q    No.  The suspect.

5              A    I don't know.  Like I said, it all

6      depends on the individual.  I've conducted

7      interviews when I was sleep-deprived.

8              Q    I'm talking about the voluntariness of

9      the statement and whether it's true or false.

10     You want to have something that's true and that's

11     reliable and admissible in court.  Correct?

12             A    That's my goal.

13             Q    Right.  So, if the person hasn't slept

14     for two or three days, is that a factor that, in

15     your training and experience, you would

16     consider?  Maybe you'd let the person get some

17     sleep before you resume your interrogation?

18             MR. PERKINS:  Form.

19             MS. CALABRESE:  I'm going to make a

20         standing objection to this entire line of

21         questioning, as he's not an expert in the

22         field of voluntariness of confessions.

23             MR. KLEIN:  You can just object to

```
1        form.  He's very experienced and the court
2        will decide who's an expert and who's not.
3              MR. PERKINS:  I object to the form.
4              You can answer if you remember the
5        question.
6        Q    Is sleep deprivation a factor that, in
7   your training and experience, you consider in the
8   subject of an interrogation?  Like, if you know
9   that the person you're interrogating has been up
10  for two or three days, would you take that into
11  consideration and maybe let him get some rest
12  before you resume?
13       A    I don't know.  It depends on the case.
14       Q    Has it ever come up, in your
15  experience?  3,500, cases, I think you said.
16       A    I don't know.  I don't remember.  I
17  mean, I know that there's times I'm
18  sleep-deprived when I'm interrogating people,
19  so --
20       Q    But your statements aren't being used
21  against you to put you in jail for the rest of
22  your life.  Correct?
23             MS. PECK:  Objection.
```

Case 1:17-cv-00625-DJS Document 60-9 Filed 10/25/21 Page 58 of 164

```
 1              MR. PERKINS:  You can answer.

 2        Q    When you're sleep-deprived?

 3        A    Until this case.  I mean --

 4        Q    Well, no one is looking --

 5        A    You're talking about my career being in

 6   a problem here, so --

 7        Q    How would your career be in a problem?

 8        A    You just said that.

 9              MR. PERKINS:  I object to the form.

10        Q    I didn't say that.  I'm asking you.

11   You just said that.  I don't know what you mean.

12   If you want to explain, you're free to explain.

13              MR. PERKINS:  You answered.  Go ahead.

14        Q    What do you mean that your career is in

15   a problem?

16        A    You asked a question about something

17   about my career being in jeopardy or something.

18        Q    Nope.  I don't think so.

19              MR. PERKINS:  Can we take a quick

20        break?

21              MR. KLEIN:  Sure.

22              (A recess was taken at 2:44 p.m.  The

23        proceedings continued at 2:50 p.m. as
```

Case 1:17-cv-00625-DJS Document 91 Filed 10/25/21 Page 568 of 164

```
 1       follows:)

 2            (Exhibit Thomas 10 was marked for

 3       identification.)

 4            (The record was read as requested.)

 5   BY MR. KLEIN:

 6       Q    I don't believe I asked you anything

 7   about your career being in jeopardy.  Is there

 8   some reason why you think your career is in

 9   jeopardy?

10       A    No.

11       Q    Okay.  You haven't been suspended or

12   otherwise subject to any type of administrative

13   action because of this case, have you?

14            MS. CALABRESE:  Objection.  50-a

15       precludes the witness from responding to

16       this answer unless there has been a motion

17       made before the court and the court reviews

18       this officer's disciplinary records, if any,

19       and then discloses whatever material is

20       relevant.

21            MR. PERKINS:  I join in the objection

22       and I would note that all three individual

23       defendants' personnel files were provided
```

1       for an in camera inspection for Judge

2       Stewart, who has issued an order saying that

3       there was nothing relevant in them.

4            MS. PECK:  I join in the objection.

5            MR. KLEIN:  Okay.  So, he could say no,

6       I don't think there was.  If there was

7       anything about this matter, it would be yes.

8            MS. CALABRESE:  He shouldn't have to

9       respond.

10            MR. KLEIN:  Well, you don't represent

11       him.  This is a federal case.

12            MS. CALABRESE:  No, this is not just a

13       federal case.  This is going before the

14       Court of Claims.

15            MR. KLEIN:  He's a party in the federal

16       case, though.

17            MS. CALABRESE:  Right, but he's a

18       nonparty witness in the Court of Claims case

19       and I have a duty to state what is right

20       with the law.  And I can't direct him.  Only

21       Joe can direct him not to answer.  I'm

22       stating my position that he should not be

23       made to answer that question yes, no or

1     otherwise.

2        MR. KLEIN:  In your view, under State

3     law.  I disagree.  But Joe represents him in

4     the federal case governed by the Federal

5     Laws of Civil Procedure, and if there were a

6     relevant disciplinary about this case, I

7     believe it would have been disclosed.

8        And I just want to have a yes or no

9     answer.  I'm not asking him about any matter

10    that's not relevant.  I'm asking about this

11    case.  This case is clearly relevant.

12       MR. PERKINS:  Okay.

13       MR. KLEIN:  I think the answer is no,

14    so it's an easy question and answer.

15       MR. PERKINS:  The question is, should I

16    let him answer it anyway, because I expect

17    and I believe it is no, but I do think it's

18    an improper question.

19       MS. CALABRESE:  The problem with

20    allowing him to answer is that it opens the

21    door to Brett getting his entire

22    disciplinary file.  That's my position.

23       MR. KLEIN:  No, it doesn't.  If there's

Case 1:17-cv-00626-DJS Document 91 Filed 10/25/21 Page 636 of 164

1       a proceeding about this case that maybe we

2       didn't know about previously.  For instance,

3       I had a case with the AG's Office where they

4       just disclosed an investigation into the

5       subject incident that wasn't previously

6       known for a year or two, the litigation.

7            So if, for some reason, it wasn't

8       previously known that IA or some other

9       agency investigated this case, even if it

10      was unsubstantiated or something, it needs

11      to be disclosed to the court to review and

12      then we can determine its admissability, its

13      discoverability.

14           It's my understanding that there was

15      not one from this case, but I just want to

16      have an answer on the record.

17           MS. PECK:  Does he already have a

18      directive from the court to provide any

19      documentation that may be relative to a

20      disciplinary matter, not just in this but in

21      any way regarding Officer Colaneri?  That

22      information has already been provided to the

23      court.  The court has already issued an

Case 1:17-cv-00626-DJS Document 60-1 Filed 10/25/21 Page 64 of 164

```
 1          order in that respect.  Asking him for a yes

 2          or no answer with respect to whether

 3          something exists circumvents the court's

 4          order that has already been issued in this

 5          case.

 6               MR. PERKINS:  Well --

 7               MR. KLEIN:  I'm not asking for

 8          documents.  I'm just asking for the

 9          existence of the --

10               MR. PERKINS:  I know you're not asking

11          for documents, I agree, and I'm going to

12          direct him not to answer this.  Perhaps you

13          can call the judge.

14               MR. KLEIN:  Let's mark it for a ruling.

15               MR. PERKINS:  Thank you.

16               MR. KLEIN:  Your attorney will advise

17          you about that.

18               MR. PERKINS:  Thank you.

19               MR. KLEIN:  As you indicated, I don't

20          think there is one.  I just want to have a

21          complete record --

22               MR. PERKINS:  I understand.

23               MR. KLEIN:  -- because if there is one,
```

```
 1           we should know.
 2                 MR. PERKINS:  I understand your
 3           position, but the record has been marked.
 4                 MR. KLEIN:  So, okay.  So, let me take
 5           a moment to look for a document here that I
 6           want to mark.
 7                 MR. PERKINS:  Off the record.
 8                 (Discussion off the record.)
 9                 (Exhibit Thomas 11 was marked for
10           identification.)
11    BY MR. KLEIN:
12        Q     So, Thomas 11 is a General Order
13    pertaining to electronic recording of
14    interviews.  The effective date was May of '08.
15    Were you aware that that establishes guidelines
16    for electronic recording of interviews like the
17    one of Adrian Thomas?
18        A     Yes.
19        Q     And his interview was recorded?
20        A     Yes.
21        Q     Okay.  Other than this General Order
22    regarding electronic recording of certain
23    interviews, meaning certain criteria, are there
```

1    any other guidelines in the department's patrol

2    guide that instruct officers with regard to

3    procedures for interrogations or conducting

4    interviews or is that all from training?

5         A    I think it's all from training.

6         Q    Nothing in the GOs that you're aware

7    of?

8         A    No.  I don't think so, no.

9         Q    Okay.  I'll take that back.

10        A    (Offers.)

11        Q    Thank you.  Were any department

12   guidelines or procedures changed since the Thomas

13   case, whether as a result of the Thomas case or

14   any events that relate to interrogation

15   procedures?

16        A    I'm not sure.

17             MS. CALABRESE:  I'm going to object.

18        Post-remedial measures.

19             MR. KLEIN:  Noted.  I think I'm done

20        with this.

21             Off the record.

22             (Discussion off the record.)

23

BY MR. KLEIN:

Q    Going back to your career, you became a Detective in around 1998.  Correct?

A    Yes.

Q    And have you held the rank of Detective ever since, or have you attained a higher rank since then?

A    I did not attain a higher rank and I went back to patrol for about a year and a half during that time.

Q    Okay.  During what period of time was that?

A    Let's see.  In the year -- the beginning of the year 2001, my spot -- our spots were bid through seniority, so somebody with higher seniority at the time bid a day spot that I was working.  Because of child care issues I could not work afternoons, so I decided to take a midnight patrol spot, which was a big mistake at the time, but I did that for family reasons.

Q    Okay.  And have you held the rank of Detective ever since 1998 other than that time that you went back to patrol?

```
 1        A    Yes.

 2        Q    There was a publicly reported incident

 3   where you were put on desk duty about two years

 4   ago involving Detective Fountain, former Officer

 5   Fountain?

 6             MR. PERKINS:  I object to the form.

 7        Again, this is the same type of civil rights

 8        law, 50-s.  Objection, and I'm going to

 9        object to it and direct him not to answer.

10             MR. KLEIN:  But you know that doesn't

11        apply in this case.

12             MR. PERKINS:  I do know that --

13             MS. CALABRESE:  I join.

14             MR. KLEIN:  State law doesn't apply.

15             MR. PERKINS:  Even with the federal

16        court and the personnel files being turned

17        over, it's all the same or very similar

18        objections that we had made previously, and

19        I'm not going to let him answer that without

20        a court order.

21             MS. CALABRESE:  And I join in that

22        objection.

23             MS. PECK:  Join in the objection.
```

1          MR. KLEIN:  I don't think anyone has

2     standing.

3          MS. CALABRESE:  I have standing.

4          MR. KLEIN:  You don't represent this

5     defendant.

6          MS. CALABRESE:  It doesn't matter if I

7     represent him or not.  I'm entitled to make

8     that objection and I'm permitted to tell him

9     he shouldn't answer because he has a right

10    to know that you have to motion the court to

11    get that information, so I do have standing.

12         MR. KLEIN:  I don't agree, but --

13         MS. CALABRESE:  Let's call Judge DeBow

14    if this is going to continue to be an

15    issue.

16         MR. KLEIN:  I'm going to have to ask

17    that we not have a colloquy in front of the

18    witness and certainly no speaking

19    objections.  Objection to form and direct

20    him not to answer, say back on the record,

21    and that's sufficient and we can move on.

22         MR. PERKINS:  Maybe the colloquy could

23    help.  Maybe I'll just put the Sergeant in

1      another room for a few minutes and you guys

2      can talk, we can, so it's not in front of

3      the witness, because this does seem like

4      it's something that might reoccur.

5           MR. KLEIN:  No, I don't think so.

6           MR. PERKINS:  Okay, then.

7           MR. KLEIN:  I'm just asking him about

8      whether he's had any other rank for any

9      reason during this time.

10          MR. PERKINS:  Okay.

11     Q    So, had your rank changed in the last

12 five years?

13     A    No.

14     Q    Have you applied -- what's the next

15 rank above Detective?  Detective Sergeant?

16     A    Captain.

17     Q    Captain.  Have you applied -- how does

18 one go -- is there such a rank as Detective

19 Sergeant?

20     A    Well, that's what we're called.

21     Q    You're a Detective Sergeant?

22     A    Yes.

23     Q    And is there something called a squad

1      or a detective squad at the Troy Police

2      Department?

3           A     Detective Bureau.

4           Q     Detective Bureau.  Are all detectives

5      in the Detective Bureau, do they hold the rank of

6      Detective Sergeant?

7           A     No.

8           Q     So, what's the difference between a

9      Detective Sergeant and a -- is it a Detective?

10          A     Yes.

11          Q     What is the difference, if any?

12          A     Just that Sergeants are paid more.

13          Q     Okay.

14          A     We do basically the same job, but we

15     supervise units.  I supervise a domestic violence

16     unit.

17          Q     So, are you a Detective Sergeant

18     because you became a Sergeant before you were a

19     Detective?

20          A     Yes.

21          Q     Okay.  You didn't become a Detective

22     Sergeant simply by becoming a Detective?

23          A     Correct.

```
 1        Q    Okay.  So, based on documents provided
 2   by your counsel, you have a training history
 3   report.  It looks like it's on a document that
 4   says State of New York Division of Criminal
 5   Justice Services, and one of the courses was
 6   Interview and Interrogation and a certificate of
 7   completion was issued on June 26 of '08, which
 8   would have been about three or four months before
 9   this incident with Adrian Thomas.
10             Do you recall taking a course called
11   Interview and Interrogation in or around June of
12   2008?
13        A    Not around that time.  I mean, I may
14   have taken it, but I've had so much training that
15   I can't recall every single one.
16        Q    So, you don't recall the specifics of
17   interview and interrogation training?
18        A    It depends who the instructor was.  Was
19   it State Police?
20        Q    Well, let's see if I have more info on
21   it.  It just says graduated June 26 of '08 and it
22   was eight hours in duration.  The training date
23   was June 25th of '08.
```

Case 1:17-cv-00626-DJS Document 103-1 Filed 10/25/21 Page 736 of 164

1    A    I believe that was Al Joseph, the

2    instructor on that one.

3    Q    Were you given any course materials

4    during that training?

5    A    Maybe.  I'm not sure.

6    Q    Do you keep all that stuff?

7    A    No.

8    Q    No.  Would that have been on site at

9    Troy PD or would you have gone someplace off site

10   for that training?

11   A    I don't know.  We do --

12   Q    Could there be such training --

13   A    Yes.

14   Q    -- at Troy Police headquarters?

15   A    Yes, there could be.

16   MR. KLEIN:  I've already asked for

17   this, but I'm going to ask that a search be

18   made for those training materials, if they

19   exist, relating to interview, interrogation

20   and related matters.

21   MR. PERKINS:  And for the record, I

22   have looked at that and I've been told that

23   this is what we have.  I have no problem

```
 1        going back and double-checking, but that was
 2        done and I was told that -- that any
 3        training materials, this is it.  This is all
 4        the Troy Police Department keeps.
 5             MR. KLEIN:  Okay.
 6             MR. PERKINS:  But I have no trouble
 7        double-checking on that, but we have looked
 8        and we've been told this is it for the
 9        training files.
10             MR. KLEIN:  Okay.  Just to be specific,
11        among other relevant documents that may
12        exist, I'm just simply asking about a course
13        called Interview and Interrogation course in
14        June of 2008.
15             MR. PERKINS:  I would ask the
16        stenographer to mark the record there, just
17        to remind me to double up and recheck on
18        that.
19        Q    We were given a document in the same
20        file that has a certificate of completion of that
21        course at the D -- under the auspices of the DCJS
22        out of Loudonville, New York.  Does that mean you
23        would have taken it off site?
```

1    A    Yes.  That was probably at the State
2 Police Academy.
3    Q    And in December of 2007, you have a
4 certificate of attendance at a course called
5 Putting it All Together, an Update for Law
6 Enforcement and Medical Professionals.  It was
7 given at the Glen Sanders Mansion in Scotia, New
8 York.
9              MS. CALABRESE:  Off the record.
10             (Discussion off the record.)
11 BY MR. KLEIN:
12    Q    Do you know if that course had to do --
13 do you know if that course had anything do with
14 investigating fatalities?
15    A    I don't remember.
16    Q    Okay.  There is another certificate of
17 completion that says Interview and Interrogation
18 that you successfully completed, a two-day class
19 in interview and interrogation, plus Miranda and
20 other legal considerations, sponsored by the
21 Rotterdam Police Department, May 10th and 11th,
22 2004.  That one is signed by Al Joseph.
23    A    Okay.

Case 1:17-cv-00625-DJS Document 69-11 Filed 10/25/21 Page 76 of 164

1      Q     So, did you have one with Al Joseph or

2      more than one?

3      A     I believe I had two of them.

4           MR. KLEIN:  We call that a search be

5           made, and I accept your representation one

6           has been done, that a further search be made

7           to see if the underlying training materials

8           are available from that training.

9           MR. PERKINS:  And I would ask the

10          stenographer to include that on the page of

11          things that will be marked to looked at.

12          MR. KLEIN:  Off the record.

13          (Discussion off the record.)

14     BY MR. KLEIN:

15     Q     I'm showing you Thomas Exhibit 10.

16     I'll give you a moment to read it.  When you're

17     done, let me know.

18     A     (Witness peruses documents.)

19     Q     Is that a -- what is that document?

20     A     This is a follow-up that I did.  I

21     didn't see this before in the file.

22     Q     And does this reflect your visit to the

23     Albany Medical Center that you believe you

SUSAN FLORIO, RPR
PROFESSIONAL REPORTING SERVICE
(518) 887-2733

76

 1    recalled earlier?

 2         A    Yes, but I don't recall going to

 3    Samaritan and filing for the records, but

 4    apparently, I did.

 5         Q    And also, at the end, it talks about

 6    Detective Mason conducting an interview and

 7    obtaining a statement.  It doesn't really state

 8    your involvement, but it does reference that

 9    statement.  Correct?

10         A    Yes.

11         Q    Okay.  So, do you believe this to be

12    the one and only -- now that you've seen it, the

13    one and only detective follow-up report that you

14    created for this case?

15         A    Yes.

16         Q    Okay.  Now, directing your attention to

17    July -- I'm sorry -- to September 22nd of 2008,

18    do you recall what tour you were working on the

19    date that you were present for that second

20    interview?

21         A    I worked days.  However, I believe the

22    interview took place in the evening.

23         Q    So, would you have been on overtime

1    that evening?

2         A    Yes.

3         Q    When you say days, is that 8:00 to 4:00

4    or something else?

5         A    I have flex hours, but it was 8:00 to

6    4:00 in 2008.

7         Q    Okay.  And can you describe where the

8    video monitor is located that's attached to the

9    camera in the interrogation room that's located

10   on the third floor?  Is it on the second floor?

11        A    No.  It's on the third floor, but I

12   don't know where the -- the monitor is in a

13   separate room.

14        Q    That's what I mean.  Where is that room

15   located?

16        A    It was either directly next door to the

17   room or the room after that.

18        Q    So, on the third floor, there is an

19   interrogation room.  Correct?

20        A    Correct.

21        Q    Was there one or more than one at that

22   time?

23        A    There's only one there.

1     Q     And is there still one there today?

2     A     No.

3     Q     It's been changed?

4     A     We moved our Detective Bureau across

5     the street.

6     Q     Okay.

7     A     So that room still exists, but it's not

8     used for an interrogation room.

9     Q     So, at that time there, was an

10    interrogation room on the third floor.  Correct?

11    A     Correct.

12    Q     And what else -- what other rooms were

13    on the third floor?

14    A     Adam Mason had an office up there.  The

15    PBA has an office up there, our union, the

16    president. There is a training room located on --

17    in the building also on the third floor, in that

18    wing, I should say, and there's like a tech room

19    with supplies in it, electronic supplies, things

20    like that.  There was.

21    Q     And in 2008, there was a -- some sort

22    of video camera in the interrogation room.

23    Correct?

```
 1          A      Correct.

 2          Q      Can you describe the dimensions of the

 3     room at that time?  Do you remember what it was?

 4          A      Not off the top of my head.

 5          Q      Okay.

 6          A      I could guess.

 7          Q      To the best of your approximation.

 8     12 by 14?  10 by 12?  Something else?

 9          A      Probably 10 by 12.

10          Q      And we've all seen the video.  There's

11     a -- is there some kind of table along the side

12     wall?

13          A      Yes.

14          Q      When you walk in, it would be to your

15     left?

16          A      There's a computer on it, I think.

17          Q      What else, if anything, was in that

18     room?  Some chairs?

19          A      Yes.

20          Q      Okay.  Anything else?

21          A      There's a window.

22          Q      Okay.

23          A      A door.  I think there's a heater that
```

1      doesn't work or an air conditioner that didn't

2      work at the time or -- I'm sorry.  It does work,

3      but you had to get a pair of pliers to turn it

4      on.  The knob was missing.

5          Q      What, if anything else, was in that

6      room in 2008?

7          A      Nothing that I can recall.

8          Q      Still had a camera in the room?

9          A      Yes.

10         Q      Can you describe the camera?

11         A      No.

12         Q      Was it was it visible to anyone looking

13     at the camera itself or was it somehow disguised

14     or camouflaged?

15         A      I don't know.

16         Q      Was there obviously a camera on the

17     wall in some type of bracket or was it like

18     embedded in a photo or something like that?

19         A      Oh, no, it wasn't hidden.  There's no,

20     like, it-looks-like-a-clock-and-there's-a-camera

21     type thing.  There's a camera in the room, but I

22     don't recall what it looked like or anything like

23     that.

1    Q    To anyone walking in that room, if they

2    looked, would it be obvious to anyone looking

3    that there was a camera?

4    A    I think so, yes.

5    Q    And what was your understanding of the

6    status of the investigation when you were asked

7    either by Detective Captain or Mason to watch the

8    video camera, the monitor?  Did you have an

9    understanding of where the investigation was at

10   that point?

11   A    Just to stand by and watch the

12   interview.

13   Q    Were you informed of any of the

14   prior -- other than what you learned from

15   speaking to the doctors at the hospital, were you

16   aware of anything else about the case?

17   A    I was aware that there were -- other

18   children were in the household.  His wife's name

19   was Wilhemina, and I'm not even sure of the

20   address.

21   Q    By the way, prior to this date when you

22   became involved in this investigation, had you

23   ever seen or heard anything about Mr. Thomas?

1      A    I don't recall.

2      Q    Did you ever have any involvement with

3 the Hickses, the Thomas or the Hicks household

4 prior to these events?

5      A    I don't know.

6      Q    Okay.  Since the incident, have you had

7 any involvement with Adrian Thomas or the

8 Hickses, Wilhemina Hicks or her family?

9      A    I know that Wilhemina Hicks has been a

10 client of Unity House.  I have an office there.

11 I saw her on occasion, I can't remember how many

12 years ago.  I know who she is and I know that

13 she's having issues with her daughter at this

14 point.  There's been some domestic reports

15 filed.  And that's about it.  But there's -- I

16 don't believe there's been any arrests or

17 anything like that.

18      Q    What is Unity House?

19      A    Unity House is a -- it's -- my part of

20 it is a domestic violence intake area.  We also

21 have offices over there, myself and Mark

22 Millington.  We work with advocates.  They also

23 have an administrative building in Troy.  They

Case 1:17-cv-00626-DJS Document 60-1 Filed 10/25/21 Page 84 of 164

```
 1    have several different outreach programs

 2    involving children, people with mental

 3    disabilities, people with physical disabilities.

 4    There's, like, halfway houses, so to speak, for

 5    people who need to be supervised and have

 6    medication.  There's several of them around.  And

 7    there is a domestic violence shelter that I go to

 8    occasionally to interview victims of domestic

 9    violence.

10         Q    So, when you say you have an office

11    there, that's in your capacity as a Troy Police

12    Department Detective Sergeant?

13         A    Yes.  It's assigned of my unit.

14         Q    And who is Mark Millington?

15         A    Mark Millington is my partner with the

16    Domestic Violence Bureau now.

17         Q    Is this location -- I have to come up

18    with some kind of analogy -- like a special

19    victims unit or a place where you speak with

20    victims of sex crimes and other domestic violence

21    matters?

22         A    Mostly domestic violence.  I don't do

23    much of the sex crimes stuff anymore.
```

Case 1:17-cr-00626-DJS Document 60-1 Filed 10/25/21 Page 536 of 164

1      Q     Is that a good analogy for what this

2   location is?

3      A     Yes.  It's a softer interview area.

4      Q     Is that similar to what the START

5   center was back in the 2000s?  What was START?

6      A     START is sexual trauma abuse recovery

7   team.  They've had several different buildings.

8   They had one on Burdett Avenue.  They had one on

9   Pawling Avenue.  They had one on Sixth Avenue.

10   And right now they're located on Blooming Grove

11   Drive.

12      Q     Was that also like a softer location if

13   you need to speak to victims --

14      A     Yes.

15      Q     -- of sensitive crimes?

16      A     Yes.

17      Q     And what conversations have you had

18   with Wilhemina Hicks since the incident, if any,

19   when you've seen her at Unity House or anywhere

20   else?

21           MR. PERKINS:  I object to the form.

22           You can answer.

23      A     I haven't had any conversations with

1    her that I can recall.

2       Q    Have you overheard her having any

3    conversations with any of your colleagues or

4    anyone else?

5       A    No.

6       Q    Have you been there with Sergeant Mason

7    or Fountain and did either of them speak with her

8    in your presence?

9       A    They don't come to Unity House, and as

10   far as I know, they've never been there.

11      Q    Have you spoken with her or witnessed

12   any conversation with her?  Other than seeing

13   her, have you heard her say anything?

14      A    No.

15      Q    Okay.  So, the camera in the

16   interrogation room on the third floor of the Troy

17   Police Department in 2008 was connected by some

18   wire connection to a TV or a computer monitor.

19   Correct?

20      A    Yes.

21      Q    Okay.  And do you know what type of

22   system it was?

23      A    No.

Case 1:17-cv-00625-DJS Document 69-1 Filed 10/25/21 Page 87 of 164

1       Q    Was it a DVR system, if you know?  Do

2   you know anything about the technology of it?

3       A    No.  I know that there's a disk you put

4   in, and you press the button, record.

5       Q    The disk was like a DVD or a CD?

6       A    Yes.

7       Q    And was that disk drive part of the

8   monitor or did it look like a computer with a

9   monitor?

10       A    It was a computer with a monitor.

11       (Ms. Hamilton has left the deposition

12   room.)

13       Q    And you were able to watch the

14   real-time questioning as it occurred on the

15   monitor in addition to recording it on a DVD?

16       A    I think there was about a five-second

17   delay on it, but yes, you can watch it almost in

18   real time.

19       Q    Where is that office located in

20   relation to the interrogation room?  So, if I'm

21   looking into the interrogation room, would that

22   monitor be down the hall on the same side to your

23   right or left, or would it be on the opposite

1    side of the hallway?

2        A    If I'm looking inside the room, I

3    believe it's the office right to the left of it.

4        Q    Is there any type of window or viewing

5    from the monitor office, like a two-way window?

6        A    No.

7        Q    Okay.  On September 22nd, 2008, for the

8    second interview, who else was present with you

9    in that office with the monitor with the live

10   feed?

11       A    I think I might have been the only one

12   there.  I know that other detectives -- I think

13   Detective Kehn came up and talked to me briefly

14   or something like that or --

15       Q    What is Detective Kehn's first name?

16       A    Chris.

17       Q    And what, if any role, did he have in

18   this investigation?

19       A    I think he was just coming up to check

20   and see what was going on.  I know at one point I

21   believe he called Adam Mason out of the room and

22   just had a conversation with him, but I don't

23   remember the conversation off the top of my head.

Case 1:17-cv-00625-DJS Document 60-9 Filed 10/25/21 Page 88 of 164

1      Q     Other than Chris Kehn popping up at

2    some point and possibly speaking with Adam Mason,

3    do you remember whether any other detectives or

4    officers from Troy PD were present during the

5    second interview?

6      A     Not that I recall.

7      Q     Do you remember what time it started?

8      A     No.

9      Q     Other than being told to stand by and

10   watch the feed, were you given any other

11   instructions?

12           MR. PERKINS:  I object to the form.

13           You can answer.

14     A     No.

15     Q     You weren't told to stand by and watch

16   the feed?

17     A     Yes.

18     Q     And other than that computer with the

19   monitor with the live feed that has a desk, are

20   there any other officers in that room, or is that

21   room dedicated to that equipment?

22     A     I believe it was Adam Mason's office

23   there, I believe, at the time, and that was it.

1    I don't know if there's anybody else assigned to
2    it or not.
3         Q    So you, said he had a desk?
4         A    Yes.
5         Q    Okay.  So, what is your earliest
6    recollection of being involved in this
7    interview?  Being told to stand by or something
8    else?
9         A    Yeah.  If I can remain there, because
10   Ron Fountain couldn't do it for some reason.
11        Q    And you don't recall exactly who told
12   you, but you believe it was more likely than not
13   a supervisor?
14        A    Yes.
15        Q    What is the next thing you recall?
16        A    The interview itself.
17        Q    So, walk us through that step by step,
18   as much as you can recall, if anything.
19             MR. PERKINS:  Hang on.  I object to the
20        form.  It's like a seven-hour interview.
21        Could you just maybe ask him something a
22        little more specific?  I don't mind if it's
23        a general question.  But it was a seven-hour

Case 1:17-cv-00626-DJS Document 60-9 Filed 10/25/21 Page 9 of 164

1          interview; walk us through it?

2               MR. KLEIN:  I asked him what does he

3          remember next.  Does he remember shutting

4          the machine off and it's over or do you

5          remember specifically -- do you have an

6          independent recollection of Mason starting

7          the questioning even if you don't remember

8          what was said?

9          Q    What do you remember next?

10              MR. PERKINS:  Okay.  Answer his

11         question, but don't go on forever.  Just be

12         brief.  Go ahead.

13         Q    If it's responsive, go on.

14              MR. PERKINS:  No, don't.  He'll follow

15         up with further more specific questions.

16         A    Sergeant Mason was asking questions.

17         Q    Okay.  And do you recall -- have you

18    watched -- Withdrawn.  You recently read the

19    transcript of just your involvement in that

20    interrogation.  Correct?

21         A    Correct.

22         Q    Do you recall what Sergeant Mason was

23    speaking to Adrian Thomas about?

Case 1:17-cv-00625-DJS   Document 69-2   Filed 10/25/21   Page 91 of 164

1      A    He was talking about the death of --

2    not the death of his son, but the injury on his

3    son, Ma███████.

4      Q    Do you remember, as of the time of that

5    interview, whether Detective Mason knew that the

6    baby was brain dead or dead?

7      A    I believe he knew that already, yes.

8      Q    Okay.  And other than the general topic

9    of talking about the injuries to the baby, do you

10   recall anything specific that transpired during

11   the first portion of the interview?

12            MR. PERKINS:  I object to the form.

13            You can answer.

14     A    Not really, no.

15     Q    So, Mason -- is it fair to say that

16   Mason was sitting in the room opposite Mr. Thomas

17   pretty much for most of the interview?

18     A    Yes.

19     Q    And what else can you recall, whether

20   it's general or not?  Do you recall at some point

21   Mr. Thomas writing a statement out?  Do you

22   recall Mason coming out to see you, take a break,

23   change a disk?  What, if anything, do you recall,

Case 1:17-cv-00626-DJS Document 60-91 Filed 10/25/21 Page 93 of 164

1    even if it seems not important?

2         A    I know at one point we did have to

3    change a disk out.  It was full.

4         Q    But that would have happened after,

5    like, an hour or so?

6         A    A few hours.  A couple of hours, yes.

7         Q    So, before the changing of the first

8    disk, what, if anything, can you recall about the

9    interview other than you watching it?

10        A    Nothing, really.  Nothing outstanding.

11        Q    Did you take any notes?

12        A    No.

13        Q    Did Mason pop out at any time to ask

14   you your opinion or if you thought it was going

15   okay or if you had any advice or anything else?

16        A    I think he might have came out once or

17   twice.  I don't entirely remember.  I don't know,

18   like I said, if it was for a water break or a

19   bathroom break or whatever.

20        Q    Well, did you consider yourself there

21   to assist him with this interrogation?

22        A    I considered myself to just sit there

23   and watch to make sure that nothing happened like

Case 1:17-cv-00625-DJS Document 60-9 Filed 10/25/21 Page 94 of 164

1    a -- he was interviewing a man that may have

2    committed a murder, so I don't know Mr. Thomas'

3    mindset or if he was a violent person or not

4    violent.  I didn't remember anything, a criminal

5    background check or reading that prior to this

6    thing, so I was there more or less for Adam's

7    safety.

8        Q    Okay.  And also, so someone could

9    monitor the equipment to make sure it's

10   recording?

11       A    Correct.

12       Q    And while you were there, would it have

13   been your practice, even if you don't remember

14   specifically, for you to pay attention and to

15   help Adam as much as you could?

16       A    Correct.

17       Q    So, would you consider yourself to have

18   been personally involved in the seven-hour

19   interview, even if it was in a side role?

20            MR. PERKINS:  I object to the form.

21            You can answer.

22       A    I was involved, yes.

23       Q    Now, can you remember anything

Case 1:17-cr-00626-DJS Document 69-9 Filed 10/25/21 Page 95 of 164

1    specifically that Adam asked you other than

2    walking out for a drink **or s**omething before the

3    change of the first disk?

4         A    No.

5         Q    How many changes of disks were there?

6         A    I don't know.  There's at least one, I

7    believe.

8         Q    I think there were three disks.

9         A    Okay.

10             MR. KLEIN:  Do you guys agree with

11        that?

12             MR. PERKINS:  Off the record.

13             (Discussion off the record.)

14             MR. KLEIN:  Back on the record.

15   BY MR. KLEIN:

16        Q    After the change of the first disk, was

17   it another two or three hours until the change of

18   the next disk?

19        A    Yes.

20        Q    And what, if anything, can you recall

21   during this, we'll call it the next or second

22   phase of the interview?

23        A    Nothing outstanding.

Case 1:17-cv-00625-DJS Document 60-1 Filed 10/25/21 Page 96 of 164

1      Q    Okay.  Is that the phase of the
2   interview where you stepped into the room or
3   would that have been the final or third phase,
4   assuming there was a third disk?
5      A    I may have done that during that time,
6   during the midway point.
7      Q    Midway point.  Okay.  Is it your
8   recollection that there was a partial statement
9   written by the time you went in but -- and that
10  after you went in and left, additional --
11  additions were added to the original statement?
12     A    I don't remember that.
13     Q    Okay.  What do you remember about the
14  written statement in terms of the timing of it?
15  Was it all written after you walked in and left?
16     A    No, I don't remember.
17     Q    Okay.  Do you remember at some point
18  Adam Mason coming to speak with you or you
19  speaking with him someplace about what he had
20  obtained from Mr. Thomas prior to you going into
21  the room?
22     A    No, I don't remember that.
23     Q    At some point was there a conversation

```
 1    about you going in, or was that something you did

 2    on your own volition?

 3         A    I think he probably said for me to go

 4    in there.  I think so.

 5         Q    So, tell me more about that.  What do

 6    you recall about that?

 7         A    I don't recall any of the conversation

 8    about --

 9         Q    What do you recall --

10         A    -- between Adam and I, just what I did

11    when I was there.

12         Q    What is your best informed belief about

13    why you would have gone in there?  Would he have

14    approached you to say, hey, I'm stuck here, I

15    need you to give this thing a boost and be tough

16    with this guy, play bad cop, or did you say

17    something to him that he needs to get more from

18    the subject, Mr. Thomas?  Did a supervisor say

19    that Adam needed to get more and you should go

20    in?  What, if anything, do you believe was the

21    reason for -- the basis for you going in?

22              MR. PERKINS:  I object to the form.

23              You can answer the question.
```

Case 1:17-cv-00626-DJS Document 60-9 Filed 10/25/21 Page 986 of 164

1        A     I don't know.  We just -- I went in

2     there.  I don't remember the conversations, if it

3     was a plan or if it was a spontaneous thing.  I

4     don't remember.  I haven't seen the video since

5     it was made, other than watching a clip from it

6     online at one point from the docu-drama or

7     whatever you want to call it.  So, with that

8     being said, I don't recall any type of plan or --

9     or anything like that that we made.

10       Q     Do you recall any circumstance that

11    arose during the interrogation where it became

12    apparent that you needed to go in, even if you

13    don't remember the specifics?  In other words,

14    did Mason say to you I need some help, or did you

15    say to him let me go in there and see if I could

16    give you some help, or something else?

17       A     No, I don't remember that.

18       Q     So, is it your testimony that you don't

19    recall the circumstances of you going in, just

20    that at some point you did?

21       A     Correct.

22       Q     And when you went in, you started off

23    with your discussion about being in Desert Storm,

```
 1      I believe.  Is that correct?

 2          A    That's correct.

 3          Q    Were you in Desert Storm?

 4          A    No.

 5          Q    Have you ever served in the military?

 6          A    No.

 7          Q    Your son -- did you have a relative

 8      serving in the military?

 9               MR. PERKINS:  I object to the form.

10               You can answer.

11          A    I did have relatives serve in the

12      military, yes.

13          Q    So, how did you come up with that?  Was

14      it something you'd used before and you thought it

15      was effective or was it something you just came

16      up with on the spur of the moment?

17          A    Just spontaneous.

18          Q    Okay.  Did you discuss what you would

19      say with Detective Mason before you went in and

20      said it?

21          A    I don't remember that.

22          Q    So, you may have?

23          A    I may have, I may not.
```

```
 1        Q     Do you know if it was planned with

 2   Mason or did you just go in spontaneously?

 3        A     I don't remember that.

 4        Q     If I told you it was about four hours

 5   into the second interrogation session --

 6   Withdrawn.

 7              You went in, and when you went into the

 8   interrogation room, did you leave the video

 9   monitor unattended for that period of time, or

10   was someone else taking your role of sitting at

11   the desk, watching the monitor?

12        A     I don't recall.  I know that Chris Kehn

13   did come up, I believe.  I don't know how long he

14   stayed or his other involvement, if he was

15   watching the monitor or not.

16        Q     And when you went in, did you claim you

17   had experience with head injuries during your

18   military experience in Operation Desert Storm?

19        A     Yes.

20        Q     And did you accuse Mr. Thomas of lying?

21        A     Yes.

22        Q     And would you say you did it angrily?

23        A     Yes.
```

Case 1:17-cv-00626-DJS Document 173-34 Filed 10/25/21 Page 100 of 164

1        Q    It was like a good cop/bad cop

2 situation?

3        A    Yes.

4        Q    Is that a good way to characterize it?

5        A    (Witness nods head.)

6        Q    Yes?

7        A    Yes.

8        Q    Where Mason was the good cop and you

9 went in saying you felt that Mr. Thomas was, in

10 sum and substance, deceiving or lying to

11 Detective Mason. Correct?

12        A    Yes.

13        Q    So, and you then said -- is it fair to

14 say, is it your recollection that you then said

15 that M█████s injuries could only have resulted

16 from a far greater application of force than Mr.

17 Thomas had described up to that time in the

18 interview?

19        A    Correct.

20        Q    And did you state in sum and substance

21 that M█████s doctors informed you that the

22 child's head injuries were comparable to those

23 that would have been sustained by a passenger in

**APPENDIX**

1    a high-speed car collision?

2         A    Correct.

3         Q    Was that true?

4         A    I believe at one point the doctor did

5    say that it was a rapid acceleration and a rapid

6    deceleration.

7         Q    Right.  But the high speed car

8    collision --

9         A    Yes.

10        Q    -- was that something that was told you

11   or is that something that you added to it?

12        A    Oh, I believe I may have overheard the

13   doctor saying that.

14        Q    Okay.  And after you left, that's when

15   Sergeant Mason told Mr. Thomas that he felt

16   betrayed by Adrian Thomas' untruthfulness and

17   that Mason was doing all he could do to stop his

18   superiors from having Adrian arrested.  Correct?

19   Do you remember that?

20        A    No.

21        Q    Okay.  Well, do you remember that your

22   entry into the room helped turn up the pressure

23   on Mr. Thomas?

Case 1:17-cv-00626-DJS Document 163-4 Filed 10/25/21 Page 1038 of 164

1          MR. PERKINS:  I object to the form.

2          You can answer.

3     A    I don't **understand** what you mean by

4     pressure.

5     Q    Well, what, if any, effect did your

6     entry into the room and the words you said have

7     on the interrogation, if any, in your view?

8          MR. PERKINS:  I object to the form.

9          You can answer.

10    A    I believe it made him tell Adam the

11    truth about what happened.

12    Q    Whether it was true or not, is it your

13    belief that, as a result of you going into the

14    room, it impelled Mr. Thomas to give further

15    statements that were then written on the

16    document?

17         MR. PERKINS:  I object to the form.

18         You can answer.

19    A    It made him give Adam more information,

20    yes.

21    Q    So, you would agree that your conduct

22    in stepping into the interrogation and saying

23    what you said had a direct impact on Mr. Thomas

1    making further incriminating statements?

2           MR. PERKINS:  I object to the form.

3           **You** can answer.

4       A    I believe it just gave Adam an

5    opportunity to talk to Mr. Thomas.  I didn't make

6    Mr. Thomas say anything.  In fact, I believe he

7    said he didn't do anything.  So, Adam talking to

8    him after that made Mr. Thomas confess.

9       Q    But you presented a scenario where you

10   were able to pit Adam between Adrian and Adam's

11   colleagues and gave Adam leverage with Mr.

12   Thomas.  Would you agree with that?

13          MR. PERKINS:  I object to the form.

14       Could you rephrase that?

15       Q    What was the purpose -- what would

16   you -- how would you describe the purpose of your

17   questions?  I mean, how would you describe the

18   effect of what you said to Mr. Thomas?  It

19   allowed Adam to have further leverage with Mr.

20   Thomas?

21          MR. PERKINS:  I object to the form.

22          You can answer.

23       A    It allowed Adam to further discuss

Case 1:17-cv-00626-DJS Document 183-4 Filed 10/25/21 Page 105 of 164

 1   what's going on.  And you used the term

 2   leverage.  I don't know if I would use that term.

 3        Q    What term would you use?

 4        A    Opportunity.

 5        Q    Okay.  So, you would agree that your

 6   presence in that room had what appeared to be a

 7   positive impact on Adam getting a confession?

 8        A    Correct.

 9        MR. PERKINS:  I object to the form.

10        Q    And in some regard, it contributed to

11   Adam getting a confession?

12        MR. PERKINS:  I object to the form.

13        A    Yes.

14        Q    Have you ever been aware of colleagues

15   of yours in the Troy PD obtaining a confession

16   that was found to have been a coerced confession

17   by any court?

18        MR. PERKINS:  I object to the form.

19        You can answer if you know.

20        A    No.

21        Q    Are you aware of any cases other than

22   this where the statements obtained by you or

23   colleagues of yours in the Troy PD, whether you

Case 1:17-cv-00626-DJS Document 68-4 Filed 10/25/21 Page 1068 of 164

1     had heard about it firsthand or second- or

2     thirdhand, were suppressed by the court as being

3     involuntary?

4              MR. PERKINS:  I object to the form.

5              You can answer.

6        A    I don't know.  Other than this case?

7        Q    Yeah.

8        A    Not that I can recall off the top of my

9     head.  I'd have to do some research.

10       Q    Okay.  In this case, Mr. Mason

11    repeated, I believe it was 21 times in the course

12    of the interrogation, that disclosure of the

13    circumstances in which he injured -- Adrian

14    Thomas injured his child was essential to assist

15    the doctors attempting to save the child's life.

16    Do you recall that, those words being said?

17       A    I don't know if it was 21 times, but

18    yes, that was part of it.

19       Q    Okay.  And Adrian Thomas was told, I

20    believe it was documented 67 times, that what he

21    had done to his son was an accident.  Do you

22    recall Adrian being told over and over that this

23    was an accident?

Case 1:17-cv-00626-DJS Document 163-4 Filed 10/25/21 Page 1078 of 164

1    A    Not -- not entirely.  Not 61 times

2    but --

3    Q    Many times?

4    A    Yeah.  He said it.

5    Q    Okay.  So, with regard to the first

6    thing, that disclosure of the circumstances under

7    which the child was injured would be essential to

8    assist the doctors, in your experience, sitting

9    here today, did you see any problem with that --

10   A    No.

11   Q    -- that tactic?

12   Was that a common tactic used by the

13   Troy PD or was that just specific in this case

14   under these circumstances?

15   A    That was specific in this case.

16   Q    Okay.  Mr. Thomas being told that what

17   he did was an accident even though he was a

18   suspect in a homicide and that he would go home

19   and not be charged, was that something that was

20   an acceptable tactic in your experience?

21   A    Yes.

22   Q    Mr. Thomas was told, I believe it's

23   been documented 14 times, that he wouldn't be

Case 1:17-cv-00626-DJS Document 163-4 Filed 10/25/21 Page 108 of 164

```
 1    arrested and eight times that he would be going

 2    home.  Similarly, in your view and your

 3    experience, was that okay at that time, to do

 4    that?

 5         A    At that time --

 6         Q    Yeah.

 7         A    -- I believe so, yes.

 8         Q    And it's still good practice now?

 9         A    Yes.

10         Q    Is there anything that was done in

11    terms of ploys or promises that were made to Mr.

12    Thomas that you've come to believe, either from

13    your own views or because it was shared with you,

14    that went too far, either under, as you said, a

15    moral code or based on your experience?

16              MR. PERKINS:  I object to the form.

17              You can answer.

18         A    What do you mean by the word ploy?

19         Q    Well, there was a demonstration after

20    you left the room, as a for instance, by Adam

21    Mason of slamming a folder to the ground.  It was

22    only after Mason for the first time slammed the

23    folder to the ground and insisted that Adrian
```

1    show him how he slammed the baby to the ground

2    that Adrian did it.  So, it was only after it was

3    suggested to him that there was a slamming that

4    Adrian did it.  Did you ever think about or do

5    you have an opinion as to whether that went too

6    far?

7         A    I don't believe it went too far, no.

8         Q    Do you know if the court ruled that

9    that went too far?

10             MR. PERKINS:  I object to the form.

11             You can answer if you know.

12        A    I didn't read the court ruling, so --

13        Q    As a result of the court ruling in the

14   case, whether you read it or not, was there any

15   type of retraining or remedial training or any

16   other changes to the detective training --

17             MR. PERKINS:  I object to the form.

18             MS. CALABRESE:  Objection to the form.

19        Q    -- that you became aware of?

20             MR. PERKINS:  I object to the form.

21             MS. CALABRESE:  Objection to the form,

22        to post-remedial measures.

23             MR. PERKINS:  You can answer.

Case 1:17-cv-00626-DJS Document 183-34 Filed 10/25/21 Page 1708 of 164

1    A    I don't know if there's any changes

2    being made.

3    Q    None that you remember?

4    A    Not in this case, no.

5    Q    And you would agree that it was

6    false -- you knew at the time that it was false

7    that disclosure of the circumstances under which

8    Adrian injured his child would assist the

9    doctors, because the child was already brain

10   dead.  Right?

11   A    I knew that, yes.

12   Q    So, when you were watching Adam ask

13   those questions and make those assertions that we

14   need this information to help your child, when

15   you heard him say that, you knew that that was

16   false?

17   A    Yes.

18   Q    Similarly, when Adrian was promised

19   that he would go home, wouldn't be charged, you

20   knew that was false, as well?

21        MR. PERKINS:  I object to the form.

22        You can answer.

23   A    You said that he said several times.  I

```
 1    don't know if that was several times before or
 2    after he demonstrated how he slammed his child --
 3         Q    Okay.
 4         A    -- so --
 5         Q    Up until the time you went in the room,
 6    I believe there's testimony that Fountain -- that
 7    Mason said that there wasn't a probable cause to
 8    arrest Thomas.  Do you have a recollection of
 9    there not being probable cause until after he did
10    the physical demonstration?
11              MR. PERKINS:  I object to the form.
12              You can answer.
13         A    No, I don't remember that.
14         Q    Did there come a time when you became
15    aware that a probable cause determination was
16    made or discussed in your presence?
17         A    I don't remember.
18         Q    Do you recall Detective Mason telling
19    Adrian Thomas that if Adrian didn't take the fall
20    that his wife would be arrested?
21         A    No, I don't remember that.
22              MR. KLEIN:  How are you doing on time?
23              MS. CALABRESE:  A few more minutes.
```

Case 1:17-cv-00626-DJS Document 163-4 Filed 10/25/21 Page 128 of 164

1       How much longer do you have?

2           MR. KLEIN:  I think I have probably a

3  good 20, 30 minutes.

4           Off the record.

5           (Discussion off the record.)

6           (The deposition of Tim Colaneri was

7  adjourned at 3:52 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

STATE OF NEW YORK        )

COUNTY OF                )


        I have read or heard the foregoing
record of my testimony taken at the time and
place noted in the heading hereof, and I do
hereby acknowledge it to be a true and correct
transcript of same.


        _____
                TIM COLANERI


Sworn to before me this

_____ day of_____,


_____

# I N D E X   T O   E X H I B I T S

| EXHIBITS THOMAS | DESCRIPTION | PAGE |
|---|---|---|
| 10 | 9/23/08 Troy PD Investigation Report Narrative | 59 |
| 11 | General Order No. 04.28 | 64 |

Re: Thomas v City of Troy et al
Deposition of Tim Colaneri

    **QUESTIONS MARKED FOR A RULING ON 9/11/19**

1. You haven't been suspended or otherwise
subject to any type of administrative action
because of this case, have you? (Page 59)

Re: Thomas v City of Troy et al
Deposition of Tim Colaneri

### DOCUMENTS AND INFORMATION REQUESTED
### ON 9/11/19

1.    I'm going to ask that a search be made for those training materials, if they exist, relating to interview, interrogation and related matters just to be specific, among other relevant documents that may exist, I'm just simply asking about a course called Interview and Interrogation course in June of 2008. (Page 72-73)

2.    There is another certificate of completion that says Interview and Interrogation that you successfully completed, a two-day class in interview and interrogation, plus Miranda and other legal considerations, sponsored by the Rotterdam Police Department, May 10th and 11, 2004.  That one is signed by Al Joseph. We call that a search be made to see if underlying materials are available for that training. (Page 74-75)

Case 1:17-cv-00626-DJS Document 163-4 Filed 10/25/21 Page 1178 of 164

C E R T I F I C A T E

I, Joyce Babiskin, Notary Public
and Shorthand Reporter in the State of New York,
do hereby certify that I attended at the time and
place noted herein and reported stenographically
the proceedings and testimony in the
above-entitled matter, and that the foregoing is
a true and correct transcript thereof, to the
best of my knowledge and belief.

_____ 9/21/19
Joyce Babiskin
Notary Public

SUSAN FLORIO, RPR
PROFESSIONAL REPORTING SERVICE
(518) 887-2733

'08 [5] - 44:17, 64:14, 71:7, 71:21, 71:23
'84 [2] - 35:9, 35:10
'90s - 29:23
'94 [1] - 36:22
'95 [1] - 38:6
'98 [2] - 39:1, 41:2

**0**

04.28 [1] - 113:6

**1**

1 [2] - 114:5, 115:5
10 [5] - 59:2, 75:15, 79:8, 79:9, 113:4
10007 [1] - 2:5
10th [2] - 74:21, 115:12
11 [5] - 1:17, 64:9, 64:12, 113:6, 115:12
11th [1] - 74:21
12 [3] - 79:8, 79:9
12181-0208 [1] - 2:10
12205 [1] - 2:15
12224 [1] - 2:19
14 [2] - 79:8, 106:23
1980s - 32:19
1984 [2] - 30:4, 32:4
1990 [1] - 37:20
1994 [1] - 29:18
1995 [2] - 37:18, 41:16
1996 [1] - 37:18
1998 [6] - 17:9, 39:4, 39:23, 40:5, 66:3, 66:22
1:55 [1] - 1:18

**2**

2 [1] - 115:9
20 [1] - 111:3
2000 [1] - 33:6
2000s [1] - 84:5
2001 [1] - 66:14
2004 [2] - 74:22, 115:12
2005 [1] - 41:3
2007 [1] - 74:3
2008 [12] - 11:5, 40:22, 44:12, 71:12, 73:14, 76:17, 77:6, 78:21, 80:6, 85:17, 87:7, 115:8
2009 [10] - 6:1, 6:5, 6:8, 6:18, 6:20, 8:16, 8:19, 9:7, 19:22,

22:21
2014 [2] - 19:22, 22:22
2019 [1] - 1:17
208 [1] - 2:9
21 [2] - 105:11, 105:17
21st [2] - 11:4, 11:6
22 [1] - 1:16, 2:9
221 [1] - 3:5
22nd [3] - 11:6, 76:17, 87:7
25th [1] - 71:23
26 [2] - 71:7, 71:21
2:44 [1] - 58:22
2:50 [1] - 58:23

**3**

3,500 [2] - 18:15, 57:15
30 [1] - 111:3
305 [1] - 2:4
3116 [1] - 3:13
35 [1] - 30:4
3:52 [1] - 111:7

**4**

4:00 [1] - 77:3, 77:6

**5**

5 [4] - 2:14, 32:11, 32:13, 33:7
50-a [1] - 59:14
50-s [1] - 67:8
507 [1] - 2:14
59 [2] - 113:5, 114:6

**6**

600 [1] - 2:4
61 [1] - 106:1
64 [1] - 113:6
67 [1] - 105:20

**7**

72-73 [1] - 115:8
74-75 [1] - 115:14

**8**

8:00 [3] - 11:8, 77:3, 77:5

**9**

9/11/19 [1] - 114:3, 115:3
9/23/08 [1] - 113:4

911 [1] - 35:17

**A**

able [3] - 24:12, 86:13, 103:10
above-entitled [1] - 116:12
abuse [1] - 84:6
academy [8] - 32:1, 32:4, 33:10, 34:2, 34:6, 34:13, 34:15, 34:22
Academy [3] - 32:12, 42:14, 74:2
acceleration [1] - 101:5
accept [2] - 40:6, 75:5
acceptable [1] - 106:20
accepted [1] - 31:22
accident [5] - 29:20, 29:22, 105:21, 105:23, 106:17
accidental [1] - 14:4
accurately [3] - 4:22, 28:20, 28:23
accuse [1] - 99:20
accused [1] - 50:2
acknowledge [1] - 112:8
action [3] - 3:9, 59:13, 114:5
Adam [38] - 2:7, 10:11, 10:17, 10:18, 11:16, 11:22, 13:9, 14:18, 14:22, 17:1, 17:4, 20:19, 25:1, 27:2, 27:15, 28:5, 78:14, 87:21, 88:2, 88:22, 93:15, 94:1, 95:18, 96:10, 96:19, 102:10, 102:19, 103:4, 103:7, 103:10, 103:11, 103:19, 103:23, 104:7, 104:11, 107:20, 109:12
ADAM [1] - 1:5
Adam's [3] - 10:21, 93:6, 103:10
added [2] - 95:11, 101:11
addition [2] - 3:7, 86:15
additional [1] - 95:10
additions [1] - 95:11
address [1] - 81:20
adjacent [1] - 14:20
adjourned [1] - 111:7

Administered [1] - 39:11
administration [1] - 30:23
administrative [3] - 59:12, 82:23, 114:5
admissability [1] - 62:12
admissible [3] - 51:3, 54:14, 56:11
Adrian [22] - 4:9, 9:2, 15:6, 17:22, 40:23, 64:17, 71:9, 82:7, 90:23, 101:16, 101:18, 103:10, 105:13, 105:19, 105:22, 107:23, 108:2, 108:4, 109:8, 109:18, 110:19
ADRIAN [2] - 1:2, 1:10
advice [1] - 92:15
advise [1] - 63:16
advocates [1] - 82:22
afford [1] - 24:6
afternoons [3] - 35:14, 37:17, 66:18
AG's [1] - 62:3
agency [1] - 32:14, 39:12, 62:9
ago [5] - 27:4, 27:5, 29:16, 67:4, 82:12
agree [8] - 54:10, 63:11, 68:12, 94:10, 102:1, 103:12, 104:5, 109:5
agreement [1] - 5:16
ahead [2] - 27:23, 58:13, 90:12
aid [1] - 24:5
air [2] - 17:15, 80:1
Al [5] - 43:9, 72:1, 74:22, 75:1, 115:12
al [2] - 114:1, 115:1
Albany [8] - 2:15, 2:19, 10:13, 10:23, 13:1, 13:4, 43:4, 75:23
allegations [2] - 27:13, 27:20
allowed [4] - 21:17, 51:8, 103:19, 103:23
allowing [1] - 61:20
almost [1] - 86:17
alternative [1] - 23:7
amplify [2] - 24:8, 24:10
analogy [2] - 83:18, 84:1
AND [1] - 115:3
angrily [1] - 99:22

Answer [1] - 90:10
answer [51] - 19:21, 27:18, 45:1, 46:8, 48:10, 48:23, 49:9, 49:12, 49:13, 50:8, 51:20, 52:7, 53:8, 54:7, 54:17, 55:22, 57:4, 58:1, 59:16, 60:21, 60:23, 61:9, 61:13, 61:14, 61:16, 61:20, 62:16, 63:2, 63:12, 67:9, 67:19, 68:9, 68:20, 84:22, 88:13, 91:13, 93:21, 96:23, 98:10, 102:2, 102:9, 102:18, 103:3, 103:22, 104:19, 105:5, 107:17, 108:11, 108:23, 109:22, 110:12
answered [1] - 58:13
answering [1] - 38:11
answers [1] - 50:4
anyway [1] - 61:16
apparent [1] - 97:12
Appeals [1] - 21:1
appear [1] - 26:8
APPEARANCES [1] - 2:1
appeared [1] - 104:6
application [3] - 31:11, 31:19, 100:16
applied [4] - 31:9, 31:20, 69:14, 69:17
apply [2] - 67:11, 67:14
applying [1] - 51:15
appointment [1] - 34:17
approached [1] - 96:14
approve [2] - 38:15, 38:16
approximation [1] - 79:7
area [2] - 82:20, 84:3
arose [1] - 97:11
arrest [4] - 14:13, 17:23, 35:22, 110:8
arrested [2] - 101:18, 107:1, 110:20
arrests [2] - 82:16
aspect [1] - 10:7
assault [1] - 42:14
assertions [1] - 109:13
assigned [8] - 11:19, 11:21, 11:23, 17:9, 36:15, 36:19, 83:13,

# APPENDIX

89:1
**assignment** [3] - 34:17, 37:9
**assist** [5] - 18:4, 92:21, 105:14, 106:8, 109:8
**assistance** [1] - 43:17
**Assistant** [2] - 2:20, 2:22
**Associate** [1] - 31:1
**assume** [1] - 16:21
**assumed** [1] - 19:21
**assuming** [1] - 95:4
**ATF** [1] - 41:23
**attached** [1] - 77:8
**attain** [1] - 66:8
**attained** [1] - 66:6
**attempting** [1] - 105:15
**attendance** [1] - 74:4
**attended** [1] - 116:9
**attention** [2] - 76:16, 93:14
**Attorney** [2] - 2:18, 2:20
**attorney** [5] - 3:17, 5:2, 8:4, 28:7, 63:16
**attorneys** [1] - 3:3
**auspices** [1] - 73:21
**automobile** [1] - 34:8
**available** [2] - 75:8, 115:13
**Avenue** [4] - 2:14, 84:8, 84:9
**avoid** [3] - 50:11, 50:18, 50:20
**aware** [17] - 10:5, 21:4, 27:15, 53:1, 53:13, 54:3, 55:2, 55:4, 55:13, 64:15, 65:6, 81:16, 81:17, 104:14, 104:21, 108:19, 110:15

## B

**Babiskin** [3] - 1:20, 116:7, 116:17
**baby** [6] - 14:3, 22:8, 23:18, 91:6, 91:9, 108:1
**background** [1] - 93:5
**bacterial** [3] - 22:17, 22:22, 23:19
**bad** [1] - 96:16
**BAILEY** [1] - 2:13
**bar** [1] - 3:8
**barricade** [1] - 38:20
**Based** [1] - 52:1
**based** [4] - 46:6, 54:9,

71:1, 107:15
**basic** [2] - 40:17, 41:15
**basis** [3] - 48:4, 48:15, 96:21
**bathroom** [3] - 15:21, 17:14, 92:19
**BBD** [1] - 20:20
**beat** [2] - 36:16, 37:8
**became** [9] - 10:15, 27:15, 33:6, 66:2, 70:18, 81:22, 97:11, 108:19, 110:14
**become** [1] - 70:21
**becoming** [2] - 40:9, 70:22
**beginning** [3] - 15:18, 17:13, 66:14
**begun** [1] - 3:11
**belief** [4] - 22:11, 96:12, 102:13, 116:14
**best** [5] - 44:21, 46:1, 79:7, 96:12, 116:14
**betrayed** [1] - 101:16
**between** [7] - 3:2, 37:20, 41:2, 42:14, 70:8, 96:10, 103:10
**bid** [2] - 66:15, 66:16
**big** [1] - 66:19
**blast** [2] - 41:22, 42:2
**Blooming** [1] - 84:10
**Book** [1] - 7:12
**booking** [1] - 18:10
**boost** [1] - 96:15
**Bose** [1] - 24:4
**Box** [1] - 2:9
**bracket** [1] - 80:17
**brain** [1] - 91:6, 109:9
**break** [1] - 58:20, 91:22, 92:18, 92:19
**breaks** [1] - 15:21, 17:15
**BRETT** [2] - 2:3, 2:5
**Brett** [2] - 4:8, 61:21
**brief** [1] - 90:12
**briefly** [1] - 13:6, 37:6, 87:13
**Broadway** [1] - 2:4
**buds** [1] - 24:3
**building** [2] - 78:17, 82:23
**buildings** [1] - 84:7
**Burdett** [1] - 84:8
**Bureau** [13] - 2:21, 2:23, 17:9, 35:19, 36:1, 36:4, 36:6, 39:5, 70:3, 70:4, 70:5, 78:4, 83:16
**bureaus** [1] - 36:15

**burglary** [1] - 36:8
**Business** [2] - 19:18, 19:19
**busy** [1] - 19:17
**button** [1] - 86:4
**BY** [12] - 4:5, 8:22, 20:14, 22:2, 25:16, 42:9, 59:5, 64:11, 66:1, 74:11, 75:14, 94:15

## C

**C.P.L.R** [2] - 3:4, 3:13
**cable** [1] - 20:9
**CALABRESE** [21] - 2:20, 21:22, 54:5, 54:16, 55:19, 56:19, 59:14, 60:8, 60:12, 60:17, 61:19, 65:17, 67:13, 67:21, 68:3, 68:6, 68:13, 74:9, 108:18, 108:21, 110:23
**camera** [12] - 60:1, 77:9, 78:22, 80:8, 80:10, 80:13, 80:16, 80:20, 80:21, 81:3, 81:8, 85:15
**camouflaged** [1] - 80:14
**capacity** [1] - 83:11
**Capitol** [1] - 2:19
**Captain** [4] - 16:21, 69:16, 69:17, 81:7
**Captains** [1] - 17:8
**car** [5] - 29:20, 29:21, 29:22, 101:1, 101:7
**care** [1] - 66:17
**career** [7] - 58:5, 58:7, 58:14, 58:17, 59:7, 59:8, 66:2
**case** [55] - 4:9, 5:13, 5:19, 6:22, 7:10, 9:17, 10:2, 11:18, 11:19, 11:21, 11:23, 18:13, 20:6, 22:21, 24:17, 25:2, 26:9, 27:10, 27:14, 29:5, 30:1, 43:16, 44:13, 47:4, 48:15, 55:10, 57:13, 58:3, 59:13, 60:11, 60:13, 60:16, 60:18, 61:4, 61:6, 61:11, 62:1, 62:3, 62:9, 62:15, 63:5, 65:13, 67:11, 76:14, 81:16, 105:6, 105:10, 106:13, 106:15, 108:14,

109:4, 114:6
**case-by-case** [1] - 48:15
**cases** [3] - 18:15, 57:15, 104:21
**CD** [1] - 86:5
**Centeni** [1] - 16:8
**Center** [3] - 10:23, 35:17, 75:23
**center** [1] - 84:5
**certain** [5] - 36:8, 36:9, 64:22, 64:23
**certainly** [4] - 50:19, 51:13, 52:9, 68:18
**certificate** [6] - 41:9, 71:6, 73:20, 74:4, 74:16, 115:9
**certify** [1] - 116:9
**chairs** [1] - 79:18
**chance** [1] - 8:15
**change** [6] - 33:7, 91:23, 92:3, 94:3, 94:16, 94:17
**changed** [6] - 32:10, 32:11, 44:16, 65:12, 69:11, 78:3
**changes** [2] - 94:5, 108:16, 109:1
**changing** [1] - 92:7
**characterize** [1] - 100:4
**charge** [1] - 3:17
**charged** [2] - 106:19, 109:19
**check** [2] - 87:19, 93:5
**checking** [2] - 73:1, 73:7
**chemical** [1] - 42:4
**child** [10] - 11:1, 11:4, 14:23, 66:17, 105:14, 106:7, 109:8, 109:9, 109:14, 110:2
**child's** [2] - 100:22, 105:15
**children** [2] - 81:18, 83:2
**Chris** [3] - 87:16, 88:1, 99:12
**Christa** [2] - 7:12, 7:14
**CHRISTINA** [1] - 2:20
**circumstance** [2] - 6:11, 97:10
**circumstances** [5] - 97:19, 105:13, 106:6, 106:14, 109:7
**circumvents** [1] - 63:3
**City** [3] - 2:7, 114:1, 115:1
**city** [1] - 5:18

**CITY** [1] - 1:5
**civil** [6] - 4:9, 29:4, 29:8, 29:9, 29:23, 67:7
**Civil** [1] - 61:5
**claim** [1] - 99:16
**Claimant** [1] - 1:11
**Claims** [5] - 2:21, 2:23, 4:13, 60:14, 60:18
**CLAIMS** [1] - 1:9
**clarify** [1] - 8:23
**class** [1] - 74:18, 115:10
**classroom** [2] - 33:13, 33:15
**clearly** [1] - 61:11
**client** [1] - 82:10
**clip** [1] - 97:5
**clock** [1] - 80:20
**close** [1] - 42:17
**clothes** [1] - 30:8
**code** [3] - 46:16, 48:3, 107:15
**coerced** [12] - 50:5, 50:10, 50:13, 50:18, 50:20, 51:6, 51:12, 51:18, 52:4, 54:2, 54:12, 104:16
**coercion** [2] - 53:16, 55:6
**Colaneri** [2] - 2:7, 26:19, 62:21, 111:6, 114:1, 115:1
**COLANERI** [4] - 1:6, 1:19, 4:11, 112:12
**collateral** [1] - 4:12
**colleagues** [11] - 19:16, 20:2, 22:12, 23:6, 28:15, 49:22, 50:3, 85:3, 103:11, 104:14, 104:23
**College** [1] - 30:12
**college** [3] - 30:17, 31:4, 31:6
**collision** [2] - 101:1, 101:8
**colloquy** [2] - 68:17, 88:12
**Colonie** [6] - 32:5, 32:8, 32:9, 32:16, 32:17, 32:20
**COLONIE** [1] - 32:6
**coming** [4] - 30:4, 87:19, 91:22, 95:18
**command** [1] - 34:18
**commands** [1] - 38:3
**commenced** [1] - 16:2
**committed** [1] - 93:2
**common** [1] - 106:12

comparable [1] - 100:22

complete [2] - 25:13, 63:21

completed [2] - 74:18, 115:10

completion [5] - 41:9, 71:7, 73:20, 74:17, 115:9

computer [5] - 79:16, 85:18, 86:8, 86:10, 88:18

concerning [1] - 4:16

concluded [1] - 18:1

conclusion [2] - 54:6, 55:20

conclusions [2] - 49:4, 49:6

conditioner [1] - 80:1

conduct [3] - 21:2, 54:20, 102:21

Conduct [1] - 3:5

conducted [1] - 56:6

conducting [2] - 65:3, 76:6

confess [3] - 46:4, 50:21, 103:8

confession [16] - 50:5, 50:14, 50:18, 50:20, 51:5, 51:12, 51:18, 52:5, 53:9, 53:15, 54:2, 54:11, 104:7, 104:11, 104:15, 104:16

confessions [2] - 50:11, 56:22

Congratulations [1] - 30:6

connected [1] - 85:17

connection [4] - 7:16, 9:20, 41:17, 85:18

consider [5] - 55:16, 56:16, 57:7, 92:20, 93:17

consideration [1] - 57:11

considerations [2] - 74:20, 115:11

considered [2] - 54:2, 92:22

consist [2] - 33:12, 40:11

Constitutional [1] - 33:21

consult [1] - 5:13

continue [1] - 68:14

continued [1] - 58:23

contributed [1] - 104:10

controlled [1] - 3:13

conversation [6] - 25:18, 85:12, 87:22, 87:23, 95:23, 96:7

conversations [7] - 6:20, 7:19, 23:17, 84:17, 84:23, 85:3, 97:2

Conviction [1] - 4:14

conviction [1] - 6:9

cop [3] - 96:16, 100:1, 100:8

cop/bad [1] - 100:1

copy [1] - 3:16

Correct [43] - 5:11, 10:6, 12:20, 13:2, 17:16, 17:19, 17:20, 18:21, 22:10, 32:7, 47:16, 47:17, 47:23, 49:22, 50:6, 50:15, 51:3, 52:16, 52:20, 53:17, 54:22, 56:11, 57:22, 66:3, 70:23, 76:9, 77:19, 77:20, 78:10, 78:11, 78:23, 79:1, 85:19, 90:20, 90:21, 93:11, 93:16, 97:21, 100:11, 100:19, 101:2, 101:18, 104:8

correct [12] - 6:6, 15:17, 47:13, 49:23, 50:17, 51:4, 52:17, 55:1, 98:1, 98:2, 112:8, 116:13

correctly [3] - 38:11, 38:12, 49:7

Council [1] - 30:15

counsel [9] - 3:12, 5:13, 6:21, 8:12, 23:7, 25:21, 26:3, 26:17, 71:2

County [1] - 2:12

COUNTY [1] - 1:6, 112:2

couple [6] - 35:12, 35:13, 35:14, 37:16, 39:21, 92:6

course [19] - 15:7, 32:1, 33:9, 40:18, 41:4, 41:9, 41:11, 41:16, 71:10, 72:3, 73:12, 73:13, 73:21, 74:4, 74:12, 74:13, 105:11, 115:7, 115:8

courses [3] - 34:13, 44:11, 71:5

court [25] - 18:5, 21:7, 21:12, 22:21, 51:3, 51:8, 53:21, 54:14, 54:22, 56:11, 57:1,

59:17, 62:11, 62:18, 62:23, 67:16, 67:20, 68:10, 104:17, 105:2, 108:8, 108:12, 108:13

Court [5] - 4:10, 4:13, 21:1, 60:14, 60:18

COURT [2] - 1:1, 1:9

court's [1] - 63:3

cover [1] - 20:20

create [1] - 9:19

created [2] - 24:17, 76:14

credits [2] - 31:4, 31:6

crime [1] - 46:4

crimes [5] - 42:15, 43:15, 83:20, 83:23, 84:15

Criminal [2] - 30:22, 71:4

criminal [8] - 5:23, 6:5, 6:8, 9:2, 22:21, 27:21, 36:9, 93:4

criteria [1] - 64:23

crosses [1] - 55:6

CRYSTAL [1] - 2:15

current [2] - 43:11, 43:22

custody [1] - 21:16

**D**

damage [1] - 23:23

date [6] - 34:17, 64:14, 71:22, 76:19, 81:21

daughter [1] - 82:13

days [5] - 37:17, 56:14, 57:10, 76:21, 77:3

daytime [1] - 11:7, 18:18

DCJS [1] - 73:21

dead [3] - 91:6, 109:10

dealing [1] - 44:12

dealt [1] - 42:20

death [3] - 23:8, 91:1, 91:2

DeBow [1] - 68:13

deceit [1] - 46:3

deceiving [1] - 100:10

deceleration [1] - 101:6

December [2] - 35:8, 74:3

deception [1] - 45:22

decide [4] - 12:2, 54:18, 54:19, 57:2

decided [1] - 66:18

decision [2] - 21:1, 21:8, 21:13

dedicated [1] - 88:21

deemed [1] - 3:12

defendant [2] - 23:8, 68:5

Defendant [1] - 1:14, 2:17

DEFENDANT [1] - 1:19

Defendants [3] - 1:8, 2:7, 2:12

defendants' [1] - 59:23

defense [1] - 22:21

degree [2] - 30:19, 31:8

Degrees [1] - 31:1

delay [1] - 86:17

demonstrated [1] - 110:2

demonstration [2] - 107:19, 110:10

department [3] - 14:20, 35:12, 65:11

Department [10] - 26:9, 32:5, 32:9, 32:17, 70:2, 73:4, 74:21, 83:12, 85:17, 115:12

department's [1] - 65:1

departments [1] - 35:11

Deposition [2] - 114:1, 115:1

deposition [10] - 3:10, 3:12, 3:14, 8:4, 24:20, 27:11, 28:9, 28:11, 86:11, 111:6

DEPOSITION [1] - 1:19

depositions [1] - 28:2

Depositions [1] - 3:5

deprivation [1] - 55:15, 57:6

deprived [1] - 55:11, 56:1, 56:7, 57:18, 58:2

describe [5] - 77:7, 79:2, 80:10, 103:16, 103:17

described [1] - 100:17

DESCRIPTION [1] - 113:3

Desert [3] - 97:23, 98:3, 99:18

desk [4] - 67:3, 88:19, 89:3, 99:11

detail [1] - 35:5

details [3] - 17:11, 22:4, 38:13

detective [9] - 40:11, 40:15, 43:8, 43:11, 43:23, 56:3, 70:1, 76:13, 108:16

Detective [41] - 10:18, 17:8, 17:9, 18:16, 39:5, 39:17, 40:6, 40:9, 40:14, 40:20, 41:18, 42:11, 66:3, 66:5, 66:22, 67:4, 69:15, 69:18, 69:21, 70:3, 70:4, 70:5, 70:6, 70:9, 70:17, 70:19, 70:21, 70:22, 76:6, 78:4, 81:7, 83:12, 87:13, 87:15, 91:5, 98:19, 100:11, 110:18

detectives [8] - 10:12, 16:5, 34:3, 38:14, 46:10, 70:4, 87:12, 88:3

determination [1] - 110:15

determine [2] - 42:3, 62:12

determined [2] - 23:2, 53:21

develop [2] - 35:20, 35:21

device [4] - 24:4, 42:3, 42:5

died [2] - 22:22, 23:1

difference [2] - 70:8, 70:11

different [11] - 33:6, 35:11, 36:7, 36:14, 37:16, 42:17, 43:5, 43:6, 55:9, 83:1, 84:7

Different [1] - 55:8

differently [1] - 55:8

dimensions [1] - 79:2

direct [7] - 38:17, 60:20, 60:21, 63:12, 67:9, 68:19, 102:23

directing [1] - 76:16

directive [1] - 62:18

directly [3] - 12:9, 24:11, 77:16

dirt [2] - 45:9, 45:11

disabilities [2] - 83:3

disagree [1] - 61:3

disciplinary [1] - 59:18, 61:6, 61:22, 62:20

disclosed [1] - 61:7, 62:4, 62:11

discloses [1] - 59:19

disclosure [3] -

# APPENDIX

105:12, 106:6, 109:7
**discoverability** [1] - 62:13
**discuss** [2] - 98:18, 103:23
**discussed** [6] - 6:22, 14:1, 27:12, 28:6, 28:14, 110:16
**Discussion** [11] - 8:21, 20:13, 21:23, 25:15, 42:7, 64:8, 65:22, 74:10, 75:13, 94:13, 111:5
**discussion** [1] - 97:23
**disguised** [1] - 80:13
**disk** [10] - 86:3, 86:5, 86:7, 91:23, 92:3, 92:8, 94:3, 94:16, 94:18, 95:4
**disks** [2] - 94:5, 94:8
**dispatch** [1] - 35:15
**dispatched** [1] - 35:16
**dispatcher** [2] - 37:11
**DISTRICT** [2] - 1:1, 1:1
**District** [2] - 4:10, 4:11
**Division** [1] - 71:4
**divulge** [1] - 6:21
**doctor** [8] - 13:6, 13:12, 13:14, 14:2, 18:19, 22:15, 101:4, 101:13
**doctors** [5] - 81:15, 100:21, 105:15, 106:8, 109:9
**docu** [1] - 97:6
**docu-drama** [1] - 97:6
**document** [6] - 24:22, 64:5, 71:3, 73:19, 75:19, 102:16
**documentary** [2] - 20:8, 20:15
**documentation** [1] - 62:19
**documented** [2] - 105:20, 106:23
**DOCUMENTS** [1] - 115:3
**documents** [10] - 24:16, 24:19, 25:20, 63:8, 63:11, 71:1, 73:11, 75:18, 115:7
**domestic** [7] - 70:15, 82:14, 82:20, 83:7, 83:8, 83:20, 83:22
**Domestic** [1] - 83:16
**done** [9] - 8:2, 27:11, 65:19, 73:2, 75:6, 75:17, 95:5, 105:21, 107:10
**door** [3] - 61:21,

77:16, 79:23
**double** [3] - 73:1, 73:7, 73:17
**double-checking** [2] - 73:1, 73:7
**down** [22] - 9:15, 10:11, 10:13, 10:17, 10:22, 11:13, 11:14, 11:16, 11:17, 12:3, 18:9, 19:2, 21:2, 39:21, 40:2, 43:17, 45:6, 47:5, 50:23, 52:12, 86:22
**dozen** [2] - 42:17, 43:3
**drama** [1] - 97:6
**drink** [1] - 94:2
**drinks** [1] - 15:21
**Drive** [1] - 84:11
**drive** [1] - 86:7
**drug** [1] - 33:22
**due** [1] - 51:7
**duly** [1] - 4:2
**duration** [1] - 71:22
**during** [15] - 10:10, 11:7, 14:8, 18:18, 22:3, 66:10, 69:9, 72:4, 88:4, 91:10, 94:21, 95:5, 95:6, 97:11, 99:17
**During** [1] - 66:11
**duties** [5] - 36:5, 37:5, 38:8, 40:13, 40:20
**duty** [5] - 54:20, 60:19, 67:3
**DVD** [2] - 86:5, 86:15
**DVR** [1] - 86:1

## E

**ear** [1] - 24:2
**earliest** [1] - 89:5
**ears** [1] - 24:3
**easy** [1] - 61:14
**education** [2] - 30:11, 30:14
**effect** [2] - 102:5, 103:18
**effective** [2] - 64:14, 98:15
**eight** [2] - 71:22, 107:1
**either** [16] - 11:3, 11:5, 16:22, 19:5, 20:1, 20:2, 22:12, 23:3, 23:5, 27:13, 53:2, 77:16, 81:7, 85:7, 107:12, 107:14
**electronic** [4] - 64:13, 64:16, 64:22, 78:19
**electronically** [1] -

36:12
**eleven** [1] - 37:3
**embedded** [1] - 80:18
**emotional** [2] - 52:3, 54:12
**employed** [1] - 31:23
**employees** [1] - 27:14
**employment** [1] - 31:20
**end** [4] - 15:19, 17:14, 35:7, 76:5
**ended** [2] - 47:12, 48:7
**enforcement** [1] - 30:7
**Enforcement** [1] - 74:6
**entire** [2] - 56:20, 61:21
**entirely** [2] - 92:17, 106:1
**entirety** [1] - 25:10
**entitled** [2] - 68:7, 116:12
**entry** [2] - 101:22, 102:6
**equipment** [2] - 88:21, 93:9
**ESQ** [4] - 2:3, 2:5, 2:10, 2:15
**essential** [2] - 105:14, 106:7
**establishes** [1] - 64:15
**et** [2] - 114:1, 115:1
**evaluation** [1] - 31:14
**evening** [5] - 10:23, 76:22, 77:1
**event** [2] - 14:22, 47:16
**events** [7] - 4:17, 8:5, 8:6, 28:6, 42:13, 65:14, 82:4
**evidence** [10] - 21:16, 21:17, 37:15, 47:5, 47:15, 47:21, 48:17, 49:18, 52:13, 54:22
**exactly** [2] - 46:23, 89:11
**exam** [4] - 39:7, 39:9, 39:14, 39:18
**examination** [4] - 3:6, 3:8, 3:11, 3:16
**EXAMINATION** [1] - 4:5
**examined** [3] - 3:10, 3:17, 4:3
**examples** [2] - 45:10, 50:13
**except** [1] - 3:6
**excessive** [1] - 52:2

**Exhibit** [3] - 59:2, 64:9, 75:15
**EXHIBITS** [1] - 113:2
**exist** [4] - 72:19, 73:12, 115:5, 115:7
**existence** [1] - 63:9
**exists** [2] - 63:3, 78:7
**expect** [1] - 61:16
**experience** [24] - 30:7, 40:4, 46:6, 46:14, 46:15, 46:16, 46:19, 48:3, 50:9, 51:17, 52:1, 52:19, 53:2, 53:14, 54:10, 56:15, 57:7, 57:15, 99:17, 99:18, 106:8, 106:20, 107:3, 107:15
**experienced** [1] - 57:1
**expert** [5] - 54:6, 54:8, 55:20, 56:21, 57:2
**explain** [4] - 47:8, 47:20, 48:18, 49:11, 58:12
**explosion** [2] - 42:2, 42:4
**Extension** [1] - 2:14

## F

**fact** [2] - 55:15, 103:6
**factor** [2] - 56:14, 57:6
**facts** [3] - 48:21, 49:2, 49:5
**failure** [2] - 3:7, 3:11
**fair** [3] - 12:21, 91:15, 100:13
**fall** [1] - 110:19
**false** [10] - 50:6, 50:15, 50:16, 50:19, 51:13, 56:9, 109:6, 109:16, 109:20
**family** [2] - 66:20, 82:8
**far** [9] - 48:6, 52:16, 52:19, 85:10, 100:16, 107:14, 108:6, 108:7, 108:9
**fatalities** [1] - 74:14
**Federal** [1] - 61:4
**federal** [7] - 4:9, 32:21, 60:11, 60:13, 60:15, 61:4, 67:15
**feed** [4] - 87:10, 88:10, 88:16, 88:19
**felt** [3] - 40:5, 100:9, 101:15
**few** [3] - 69:1, 92:6, 110:23
**field** [4] - 34:19, 34:22, 35:1, 56:22

**Field** [1] - 34:21
**figured** [1] - 11:16
**file** [9] - 10:2, 25:2, 26:9, 26:11, 44:6, 47:4, 61:22, 73:20, 75:21
**filed** [1] - 82:15
**files** [4] - 36:11, 59:23, 67:16, 73:9
**filing** [2] - 3:14, 76:3
**fill** [2] - 31:10, 37:12
**filled** [1] - 26:4
**film** [2] - 35:20, 35:21
**filmmakers** [1] - 8:9
**final** [1] - 95:3
**fingerprints** [1] - 35:23
**fire** [2] - 36:9, 38:16
**first** [24] - 4:2, 6:1, 11:1, 15:2, 15:12, 18:13, 19:2, 23:12, 27:5, 31:20, 34:13, 34:17, 34:20, 35:5, 37:8, 39:15, 39:21, 87:15, 91:11, 92:7, 94:3, 94:16, 106:5, 107:22
**First** [3] - 1:16, 2:9, 40:12
**firsthand** [1] - 105:1
**five** [2] - 69:12, 86:16
**five-second** [1] - 86:16
**flex** [1] - 77:5
**flies** [2] - 45:1, 45:14
**flipped** [2] - 25:1, 26:3
**flipping** [1] - 26:11
**floor** [10] - 14:19, 15:2, 77:10, 77:11, 77:18, 78:10, 78:13, 78:17, 86:16
**folder** [2] - 107:21, 107:23
**follow** [10] - 9:21, 9:22, 10:8, 11:10, 20:1, 25:3, 38:14, 75:20, 76:13, 90:14
**follow-up** [6] - 10:8, 11:10, 25:3, 38:14, 75:20, 76:13
**follow-ups** [2] - 9:21, 9:22
**follows** [2] - 4:4, 59:1
**FOR** [1] - 114:3
**force** [1] - 100:16
**foregoing** [2] - 112:5, 116:12
**forever** [1] - 90:11
**Form** [1] - 56:18
**form** [50] - 3:6, 5:8,

16:10, 27:17, 36:8, 36:9, 46:7, 48:9, 48:22, 49:8, 50:7, 51:19, 52:6, 52:14, 53:7, 54:4, 54:15, 54:23, 55:21, 57:1, 57:3, 58:9, 67:6, 68:19, 84:21, 88:12, 89:20, 91:12, 93:20, 96:22, 98:9, 102:1, 102:8, 102:17, 103:2, 103:13, 103:21, 104:9, 104:12, 104:18, 105:4, 107:16, 108:10, 108:17, 108:18, 108:20, 108:21, 109:21, 110:11

**formal** [2] - 44:2, 44:4
**formally** [1] - 26:19
**former** [1] - 67:4
**forms** [1] - 36:7
**forth** [1] - 25:17
**foundation** [1] - 47:11
**FOUNTAIN** [1] - 1:6
**Fountain** [12] - 2:7, 9:16, 11:22, 16:22, 19:3, 20:19, 26:21, 67:4, 67:5, 85:7, 89:10, 110:6
**four** [5] - 25:11, 27:4, 27:5, 71:8, 99:4
**free** [1] - 58:12
**fresh** [1] - 17:15
**front** [3] - 24:11, 68:17, 69:2
**full** [1] - 92:3
**fully** [3] - 4:22, 28:20, 28:23
**furnished** [1] - 3:16
**FURTHER** [1] - 3:16

## G

**General** [5] - 2:18, 2:20, 64:12, 64:21, 113:6
**general** [3] - 89:23, 91:8, 91:20
**generally** [4] - 22:5, 45:5, 51:23, 52:5
**gentleman** [1] - 46:22
**GINSBERG** [2] - 1:15, 2:8
**given** [5] - 6:22, 72:3, 73:19, 74:7, 88:10
**Glen** [1] - 74:7
**goal** [2] - 51:11, 56:12
**gonna** [1] - 15:2

**GOs** [1] - 65:6
**governed** [1] - 61:4
**graduate** [1] - 34:21
**graduated** [4] - 35:2, 35:5, 35:7, 71:21
**graduating** [1] - 34:15
**Grand** [3] - 6:13, 9:9, 18:11
**greater** [1] - 100:16
**GRIFFIN** [2] - 1:15, 2:8
**ground** [3] - 107:21, 107:23, 108:1
**Grove** [1] - 84:10
**guess** [2] - 48:14, 79:6
**guide** [1] - 65:2
**guidelines** [5] - 42:21, 44:16, 64:15, 65:1, 65:12
**gunman** [1] - 38:20
**guy** [1] - 96:16
**guys** [2] - 69:1, 94:10

## H

**half** [3] - 33:11, 43:3, 66:9
**halfway** [1] - 83:4
**hall** [1] - 86:22
**hallway** [1] - 87:1
**Hamil** [1] - 43:12
**HAMILTON** [1] - 2:22
**Hamilton** [1] - 86:11
**Hamlin** [1] - 43:12
**Hang** [1] - 89:19
**harmed** [1] - 53:20
**hate** [1] - 42:15
**head** [6] - 79:4, 87:23, 99:17, 100:5, 100:22, 105:9
**heading** [1] - 112:7
**headquarters** [1] - 72:14
**hear** [3] - 12:12, 24:12, 50:22
**heard** [10] - 12:8, 12:10, 20:17, 23:15, 50:13, 81:23, 85:13, 105:1, 109:15, 112:5
**hearing** [5] - 23:12, 23:16, 23:23, 24:5, 28:19
**hearings** [2] - 6:16, 19:4
**heater** [1] - 79:23
**Held** [1] - 1:15
**held** [3] - 1:19, 66:5, 66:21
**help** [7] - 12:3, 24:8, 68:23, 93:15, 97:14, 97:16, 109:14

**helped** [1] - 101:22
**hereby** [2] - 112:8, 116:9
**HEREBY** [1] - 3:2
**herein** [1] - 116:10
**hereof** [1] - 112:7
**hereto** [1] - 3:3
**Hicks** [4] - 82:3, 82:8, 82:9, 84:18
**Hickses** [2] - 82:3, 82:8
**hidden** [1] - 80:19
**high** [2] - 101:1, 101:7
**high-speed** [1] - 101:7
**higher** [3] - 66:6, 66:8, 66:16
**highest** [1] - 30:10
**himself** [2] - 12:9, 14:23
**history** [1] - 71:2
**hold** [1] - 70:5
**home** [3] - 106:18, 107:2, 109:19
**homicide** [1] - 106:18
**honey** [3] - 45:2, 45:15, 45:16
**hospital** [11] - 11:1, 11:4, 11:13, 12:19, 14:9, 14:12, 15:9, 16:5, 16:12, 18:18, 81:15
**hour** [4] - 89:20, 89:23, 92:5, 93:18
**hours** [10] - 15:10, 15:14, 17:13, 18:18, 71:22, 77:5, 92:6, 94:17, 99:4
**House** [5] - 82:10, 82:18, 82:19, 84:19, 85:9
**household** [2] - 81:18, 82:3
**houses** [1] - 83:4
**Hudson** [1] - 30:18
**Hug** [1] - 7:11
**Huntley** [1] - 6:15
**hypothetically** [1] - 51:6

## I

**IA** [1] - 62:8
**ID** [2] - 35:15, 35:18
**idea** [1] - 21:20
**identification** [2] - 59:3, 64:10
**Identification** [1] - 35:19
**impact** [2] - 102:23, 104:7

**impelled** [1] - 102:14
**important** [1] - 92:1
**impose** [1] - 46:17
**improper** [1] - 61:18
**in-service** [1] - 41:19
**inadmissible** [1] - 53:17
**incident** [8] - 26:18, 26:22, 40:23, 62:5, 67:2, 71:9, 82:6, 84:18
**include** [1] - 75:10
**including** [1] - 3:5
**incriminating** [1] - 103:1
**indemnified** [1] - 5:19
**independent** [1] - 90:6
**independently** [1] - 9:17
**indicated** [1] - 63:19
**indicating** [2] - 23:23, 47:4
**individual** [3] - 55:7, 56:6, 59:22
**individually** [4] - 1:5, 1:6, 1:6, 1:7
**infant** [2] - 10:11, 13:5
**infection** [3] - 22:18, 22:23, 23:19
**inflicted** [2] - 22:7, 22:14
**info** [1] - 71:20
**informal** [2] - 43:13, 44:2
**informally** [1] - 26:18
**INFORMATION** [1] - 115:3
**information** [7] - 45:13, 48:7, 48:16, 62:22, 68:11, 102:19, 109:14
**informed** [3] - 81:13, 96:12, 100:21
**injured** [4] - 105:13, 105:14, 106:7, 109:8
**injuries** [5] - 22:8, 91:9, 99:17, 100:15, 100:22
**injuring** [1] - 14:23
**injury** [2] - 14:3, 91:2
**inside** [1] - 87:2
**insisted** [1] - 107:23
**inspection** [1] - 60:1
**instance** [4] - 9:20, 28:12, 62:2, 107:20
**instances** [5] - 52:4, 53:1, 53:2, 53:13, 53:15
**instruct** [1] - 65:2
**instructions** [1] -

88:11
**instructor** [2] - 71:18, 72:2
**intake** [1] - 82:20
**intentional** [1] - 14:4
**interrogated** [1] - 53:4
**interrogating** [2] - 57:9, 57:18
**Interrogation** [6] - 71:6, 71:11, 73:13, 74:17, 115:7, 115:10
**interrogation** [44] - 25:8, 25:19, 26:13, 34:1, 41:12, 42:21, 44:10, 44:13, 44:21, 48:6, 49:10, 49:17, 50:1, 51:1, 52:4, 54:13, 54:21, 55:12, 55:18, 56:17, 57:8, 65:14, 71:17, 72:19, 74:19, 77:9, 77:19, 78:8, 78:10, 78:22, 85:16, 86:20, 86:21, 90:20, 92:21, 97:11, 99:5, 99:8, 100:2, 102:7, 102:22, 105:12, 115:6, 115:11
**interrogations** [4] - 42:20, 44:1, 45:19, 65:3
**Interview** [6] - 71:6, 71:11, 73:13, 74:17, 115:7, 115:10
**interview** [41] - 10:10, 10:14, 14:17, 14:20, 15:4, 16:2, 17:11, 17:14, 17:19, 18:1, 18:20, 21:3, 22:4, 25:7, 50:23, 64:19, 71:17, 72:19, 74:19, 76:6, 76:20, 76:22, 81:12, 83:8, 84:3, 87:8, 88:5, 89:7, 89:16, 89:20, 90:1, 91:5, 91:11, 91:17, 92:9, 93:19, 94:22, 95:2, 100:18, 115:6, 115:11
**interviewing** [1] - 93:1
**interviews** [7] - 15:6, 25:5, 56:7, 64:14, 64:16, 64:23, 65:4
**investigated** [2] - 18:16, 62:9
**investigating** [1] - 74:14
**investigation** [14] - 10:8, 12:6, 12:18, 14:13, 15:7, 17:23, 40:18, 41:22, 42:15,

62:4, 81:6, 81:9, 81:22, 87:18

**Investigation** [1] - 113:4

**investigative** [1] - 41:16

**investigator** [1] - 55:16

**investigatory** [1] - 18:4

**involuntary** [1] - 105:3

**involved** [9] - 10:15, 12:5, 17:17, 18:12, 37:13, 81:22, 89:6, 93:18, 93:22

**involvement** [15] - 4:17, 8:5, 11:12, 14:13, 17:22, 18:7, 18:23, 24:17, 28:14, 28:15, 76:8, 82:2, 82:7, 90:19, 99:14

**Involving** [2] - 29:5, 29:6

**involving** [4] - 20:16, 29:6, 67:4, 83:2

**IS** [2] - 3:2, 3:16

**issue** [2] - 28:19, 68:15

**issued** [4] - 60:2, 62:23, 63:4, 71:7

**issues** [2] - 66:17, 82:13

**IT** [2] - 3:2, 3:16

**it-looks-like-a-clock-and-there's-a-camera** [1] - 80:20

**itself** [2] - 80:13, 89:16

### J

**jail** [1] - 57:21

**JAMES** [1] - 2:18

**jeopardy** [3] - 58:17, 59:7, 59:9

**job** [4] - 28:12, 31:5, 40:16, 70:14

**Joe** [2] - 60:21, 61:3

**jog** [1] - 26:22

**JOHNSON** [1] - 2:13

**Join** [1] - 67:23

**join** [5] - 30:3, 59:21, 60:4, 67:13, 67:21

**JOSEPH** [1] - 2:10

**Joseph** [5] - 43:9, 72:1, 74:22, 75:1, 115:12

**Joyce** [3] - 1:20, 116:7, 116:17

**judge** [2] - 54:19, 63:13

**Judge** [2] - 60:1, 68:13

**July** [1] - 76:17

**June** [6] - 71:7, 71:11, 71:21, 71:23, 73:14, 115:8

**Jury** [3] - 6:13, 9:9, 18:11

**justice** [1] - 30:22

**Justice** [1] - 71:5

### K

**K-9** [1] - 33:23

**KATHERINE** [1] - 2:22

**keep** [1] - 72:6

**keeps** [1] - 73:4

**Kehn** [3] - 87:13, 88:1, 99:12

**Kehn's** [1] - 87:15

**kind** [3] - 39:7, 79:11, 83:18

**Klein** [1] - 4:8

**KLEIN** [57] - 2:3, 2:5, 4:5, 8:18, 8:22, 16:13, 20:12, 20:14, 22:1, 22:2, 25:16, 27:19, 27:22, 42:6, 42:8, 42:9, 49:15, 54:8, 56:23, 58:21, 59:5, 60:5, 60:10, 60:15, 61:2, 61:13, 61:23, 63:7, 63:14, 63:16, 63:19, 63:23, 64:4, 64:11, 65:19, 66:1, 67:10, 67:14, 68:1, 68:4, 68:12, 68:16, 69:5, 69:7, 72:16, 73:5, 73:10, 74:11, 75:4, 75:12, 75:14, 90:2, 94:10, 94:14, 94:15, 110:22, 111:2

**knob** [1] - 80:4

**knowledge** [6] - 4:16, 6:16, 30:1, 33:5, 46:2, 116:14

**known** [2] - 62:6, 62:8

**knows** [1] - 28:10

### L

**last** [4] - 43:11, 49:13, 49:14, 69:11

**late** [1] - 11:5

**Law** [2] - 4:14, 74:5

**law** [8] - 30:7, 33:20, 33:21, 60:20, 61:3, 67:8, 67:14

**lawful** [1] - 54:21

**Laws** [1] - 61:5

**lawsuit** [2] - 27:16, 29:8

**lawsuits** [2] - 29:4, 29:10

**lawyers** [1] - 5:2

**lead** [1] - 52:4

**leads** [2] - 50:1, 51:17

**learn** [5] - 22:20, 23:5, 33:20, 34:1, 44:9

**learned** [4] - 45:20, 46:13, 50:10, 81:14

**least** [2] - 13:8, 94:6

**leave** [1] - 99:8

**led** [2] - 47:15, 49:5

**left** [9] - 13:9, 79:15, 86:11, 86:23, 87:3, 95:10, 95:15, 101:14, 107:20

**Legal** [1] - 2:22

**legal** [3] - 5:7, 74:20, 115:11

**less** [2] - 24:5, 93:6

**LETITIA** [1] - 2:18

**level** [1] - 30:10

**leverage** [3] - 103:11, 103:19, 104:2

**life** [3] - 13:5, 57:22, 105:15

**likely** [2] - 45:8, 89:12

**limit** [1] - 52:15

**limitations** [4] - 46:5, 46:9, 46:13, 46:17

**line** [4] - 55:5, 55:6, 56:20

**liquid** [1] - 42:5

**litigation** [1] - 62:6

**live** [2] - 87:9, 88:19

**local** [2] - 32:14, 32:22

**located** [7] - 16:1, 77:8, 77:9, 77:15, 78:16, 84:10, 86:19

**location** [3] - 83:17, 84:2, 84:12

**logistics** [1] - 28:2

**look** [4] - 25:7, 42:3, 64:5, 86:8

**looked** [8] - 10:1, 21:7, 26:14, 72:22, 73:7, 75:11, 80:22, 81:2

**looking** [8] - 25:2, 26:3, 43:16, 58:4, 80:12, 81:2, 86:21, 87:2

**looks** [2] - 71:3, 80:20

**Loudonville** [1] - 73:22

**lying** [3] - 45:22, 99:20, 100:10

### M

**machine** [1] - 90:4

**man** [4] - 13:17, 13:19, 14:22, 93:1

**managed** [2] - 32:3

**maneuvers** [1] - 38:19

**manner** [2] - 53:5, 54:21

**Mansion** [1] - 74:7

**manufacturer** [1] - 30:9

**Mark** [13] - 10:12, 10:18, 10:20, 10:21, 11:14, 11:23, 12:2, 12:23, 13:8, 82:21, 83:14, 83:15

**mark** [4] - 21:6, 63:14, 64:6, 73:16

**MARKED** [1] - 114:3

**marked** [4] - 59:2, 64:3, 64:9, 75:11

**Mason** [44] - 2:7, 9:16, 10:12, 10:18, 10:19, 10:20, 11:14, 12:9, 13:1, 16:6, 17:1, 19:4, 25:1, 26:20, 27:2, 27:15, 28:5, 76:6, 78:14, 81:7, 85:6, 87:21, 88:2, 90:6, 90:16, 90:22, 91:5, 91:15, 91:16, 91:22, 92:13, 95:18, 97:14, 98:19, 99:2, 100:8, 100:11, 101:15, 101:17, 105:10, 107:21, 107:22, 110:7, 110:18

**MASON** [1] - 1:5

**Mason's** [2] - 14:18, 88:22

**material** [1] - 59:19

**materials** [6] - 72:3, 72:18, 73:3, 75:7, 115:5, 115:13

**matter** [11] - 4:12, 5:7, 6:5, 6:11, 9:20, 18:23, 60:7, 61:9, 62:20, 68:6, 116:12

**matters** [4] - 51:1, 72:20, 83:21, 115:6

▮ 22:14, 22:22, 91:3 ▮

▮ 100:15, 100:21 ▮

**mean** [12] - 27:21, 45:4, 57:17, 58:3, 58:11, 58:14, 71:13, 73:22, 77:14, 102:3,

**103:17, 107:18**

**meaning** [2] - 40:22, 64:23

**means** [1] - 45:5

**measures** [2] - 65:18, 108:22

**Med** [3] - 10:13, 13:1, 13:4

**media** [2] - 8:8, 20:5

**Medical** [3] - 10:23, 74:6, 75:23

**medication** [1] - 83:6

**meet** [2] - 7:22, 9:14

**meeting** [1] - 14:8

**meetings** [4] - 7:2, 7:5, 8:3, 9:13

**memory** [2] - 26:22, 44:22

**mental** [7] - 16:12, 51:7, 51:15, 53:3, 54:1, 55:5, 83:2

**mention** [1] - 15:12

**mentioned** [1] - 21:2

**met** [1] - 9:16

**MICHAEL** [1] - 1:7

**Michael** [1] - 2:12

**midnight** [1] - 66:19

**midnights** [1] - 35:13

**midway** [1] - 95:6

**Midway** [1] - 95:7

**might** [6] - 7:10, 11:9, 17:3, 69:4, 87:11, 92:16

**military** [4] - 98:5, 98:8, 98:12, 99:18

**Millington** [3] - 82:22, 83:14, 83:15

**mind** [3] - 18:5, 18:17, 89:22

**mindset** [1] - 93:3

**minor** [1] - 18:6

**minute** [1] - 36:22

**minutes** [4] - 21:6, 69:1, 110:23, 111:3

**Miranda** [2] - 74:19, 115:11

**mischief** [1] - 36:9

**missing** [1] - 80:4

**mistake** [2] - 9:7, 66:19

**moment** [3] - 64:5, 75:16, 98:16

**monitor** [19] - 14:18, 16:1, 16:17, 77:8, 77:12, 81:8, 85:18, 86:8, 86:9, 86:10, 86:15, 86:22, 87:5, 87:9, 88:19, 93:9, 99:9, 99:11, 99:15

**monitoring** [1] - 17:18

month [1] - 40:15
months [2] - 33:11, 71:8
moral [4] - 19:15, 46:16, 48:3, 107:15
morally [1] - 52:15
morning [6] - 4:6, 4:7, 11:2, 11:8, 12:10, 12:12
most [2] - 15:20, 91:17
Mostly [1] - 83:22
mostly [1] - 37:17
motion [3] - 3:8, 59:16, 68:10
mouth [1] - 47:19
move [3] - 3:6, 3:7, 68:21
moved [1] - 78:4
MR [132] - 4:5, 5:8, 8:18, 8:20, 8:22, 16:10, 16:13, 20:12, 20:14, 22:1, 22:2, 25:14, 25:16, 27:17, 27:19, 27:20, 27:22, 27:23, 42:6, 42:8, 42:9, 46:7, 48:9, 48:22, 49:1, 49:8, 49:12, 49:15, 49:16, 50:7, 51:19, 52:6, 53:7, 54:4, 54:7, 54:8, 54:15, 54:17, 54:23, 55:21, 56:18, 56:23, 57:3, 58:1, 58:9, 58:13, 58:19, 58:21, 59:5, 59:21, 60:5, 60:10, 60:15, 61:2, 61:12, 61:13, 61:15, 61:23, 63:6, 63:7, 63:10, 63:14, 63:15, 63:16, 63:18, 63:19, 63:22, 63:23, 64:2, 64:4, 64:7, 64:11, 65:19, 66:1, 67:6, 67:10, 67:12, 67:14, 67:15, 68:1, 68:4, 68:12, 68:16, 68:22, 69:5, 69:6, 69:7, 69:10, 72:16, 72:21, 73:5, 73:6, 73:10, 73:15, 74:11, 75:4, 75:9, 75:12, 75:14, 84:21, 88:12, 89:19, 90:2, 90:10, 90:14, 91:12, 93:20, 94:10, 94:12, 94:14, 94:15, 96:22, 98:9, 102:1, 102:8, 102:17, 103:2, 103:13, 103:21,

104:9, 104:12, 104:18, 105:4, 107:16, 108:10, 108:17, 108:20, 108:23, 109:21, 110:11, 110:22, 111:2
MS [24] - 21:22, 54:5, 54:16, 55:19, 56:19, 57:23, 59:14, 60:4, 60:8, 60:12, 60:17, 61:19, 62:17, 65:17, 67:13, 67:21, 67:23, 68:3, 68:6, 68:13, 74:9, 108:18, 108:21, 110:23
Municipal [1] - 30:15
murder [1] - 93:2

**N**

name [9] - 4:8, 10:2, 26:4, 26:12, 29:14, 43:9, 43:11, 81:18, 87:15
named [3] - 4:11, 29:9, 29:23
Narrative [1] - 113:5
necessary [1] - 38:14
need [6] - 47:8, 83:5, 84:13, 96:15, 97:14, 109:14
needed [4] - 12:3, 37:12, 96:19, 97:12
needs [2] - 62:10, 96:17
Never [1] - 44:23
never [4] - 20:22, 21:7, 45:13, 85:10
NEW [4] - 1:1, 1:9, 1:12, 112:1
New [16] - 1:16, 1:21, 2:5, 2:10, 2:15, 2:17, 2:18, 2:19, 4:13, 4:14, 43:23, 71:4, 73:22, 74:7, 116:8
news [1] - 20:3
next [10] - 11:2, 14:21, 30:5, 69:14, 77:16, 89:15, 90:3, 90:9, 94:18, 94:21
nice [1] - 45:5
night [1] - 10:14
nine [1] - 37:1
nobody [1] - 15:2
non [1] - 52:23
Non [1] - 23:10
non-physical [1] - 52:23
Non-traumatic [1] -

23:10
None [1] - 109:3
nonparty [1] - 60:18
Northern [1] - 4:10
NORTHERN [1] - 1:1
Notary [6] - 1:20, 3:10, 3:11, 4:2, 116:7, 116:17
note [2] - 54:9, 59:22
Noted [1] - 65:19
noted [2] - 112:7, 116:10
notes [2] - 13:10, 92:11
Nothing [5] - 65:6, 80:7, 92:10, 94:23
nothing [2] - 60:3, 92:23
Notice [1] - 1:20
Numerous [1] - 42:13
numerous [1] - 42:13
nurse [1] - 13:15

**O**

oath [3] - 4:16, 6:4, 6:10
object [45] - 3:5, 3:7, 5:8, 27:17, 46:7, 48:9, 48:22, 49:8, 50:7, 51:19, 52:6, 53:7, 54:4, 54:15, 54:23, 55:21, 56:23, 57:3, 58:9, 65:17, 67:6, 67:9, 84:21, 88:12, 89:19, 91:12, 93:20, 96:22, 98:9, 102:1, 102:8, 102:17, 103:2, 103:13, 103:21, 104:9, 104:12, 104:18, 105:4, 107:16, 108:10, 108:17, 108:20, 109:21, 110:11
Objection [10] - 16:10, 54:5, 54:16, 55:19, 57:23, 59:14, 67:8, 68:19, 108:18, 108:21
objection [6] - 56:20, 59:21, 60:4, 67:22, 67:23, 68:8
objections [2] - 67:18, 68:19
obtain [1] - 51:12
obtained [6] - 51:2, 51:6, 53:5, 53:16, 95:20, 104:22
obtaining [2] - 76:7,

104:15
obvious [1] - 81:2
obviously [2] - 51:11, 80:16
occasion [1] - 82:11
occasionally [1] - 83:8
occasions [1] - 19:7
occurred [1] - 86:14
OF [8] - 1:1, 1:5, 1:9, 1:13, 1:19, 112:1, 112:2
offered [1] - 39:22
Offers [1] - 65:10
office [16] - 5:10, 7:20, 12:9, 14:19, 14:21, 23:16, 78:14, 78:15, 82:10, 83:10, 86:19, 87:3, 87:5, 87:9, 88:22
Office [2] - 2:9, 62:3
officer [5] - 36:6, 36:21, 43:8, 43:10, 43:22
Officer [2] - 62:21, 67:4
officer's [1] - 59:18
officers [10] - 15:1, 32:18, 38:10, 38:17, 41:19, 43:14, 48:5, 65:2, 88:4, 88:20
offices [1] - 82:21
official [1] - 23:18
ON [2] - 114:3, 115:3
once [1] - 92:16
One [2] - 15:8, 29:13
one [38] - 15:10, 15:12, 15:13, 15:15, 25:3, 25:6, 42:16, 49:14, 53:2, 58:4, 62:15, 63:20, 63:23, 64:17, 69:18, 71:5, 71:15, 72:2, 74:22, 75:1, 75:2, 75:5, 76:12, 76:13, 77:21, 77:23, 78:1, 84:8, 84:9, 87:11, 87:20, 92:2, 94:6, 97:6, 101:4, 115:12
ones [3] - 24:6, 27:21, 43:1
online [1] - 97:6
open [2] - 47:12, 48:7
open-ended [2] - 47:12, 48:7
opens [1] - 61:20
Operation [1] - 97:18
operations [1] - 33:22
opinion [2] - 92:14, 108:5
opinions [1] - 28:16

opportunity [1] - 103:5
Opportunity [1] - 104:4
opposed [2] - 13:15, 41:18
opposite [2] - 86:23, 91:16
order [5] - 22:7, 60:2, 63:1, 63:4, 67:20
Order [3] - 64:12, 64:21, 113:6
original [2] - 3:12, 95:11
otherwise [4] - 54:11, 59:12, 61:1, 114:5
outreach [1] - 83:1
outstanding [2] - 92:10, 94:23
overhear [1] - 23:20
overheard [2] - 85:2, 101:12
Overlook [1] - 38:10
overtime [1] - 76:23
own [9] - 9:17, 35:16, 35:20, 35:21, 46:15, 47:23, 49:20, 96:2, 107:13

**P**

P.C [1] - 2:13
p.m [4] - 1:18, 58:22, 58:23, 111:7
page [1] - 75:10
PAGE [1] - 113:3
Page [3] - 114:6, 115:8, 115:14
pages [1] - 25:17
pages' [2] - 25:11
paid [1] - 70:12
pair [1] - 80:3
paper [2] - 47:3, 52:12
paperwork [2] - 9:23, 26:2
Part [1] - 3:5
part [7] - 20:16, 20:18, 33:12, 38:20, 82:19, 86:7, 105:18
partial [1] - 95:8
parties [1] - 3:3
partner [2] - 28:8, 83:15
partners [1] - 11:15
party [2] - 4:11, 60:15
pass [3] - 31:19, 34:12, 39:15
passenger [1] - 100:23
Patrol [1] - 38:5

patrol [17] - 29:17, 36:17, 36:20, 36:21, 37:1, 37:7, 37:11, 37:17, 38:4, 38:9, 38:22, 39:6, 40:4, 65:1, 66:9, 66:19, 66:23

PATTISON [2] - 1:15, 2:8

Pawling [1] - 84:9

pay [1] - 93:14

paying [1] - 5:16

PBA [1] - 78:15

PC [2] - 1:15, 2:8

PD [14] - 9:22, 30:3, 30:6, 31:9, 31:23, 32:10, 39:11, 39:13, 72:9, 88:4, 104:15, 104:23, 106:13, 113:4

PECK [6] - 2:13, 2:15, 57:23, 60:4, 62:17, 67:23

penal [1] - 33:21

pending [2] - 4:10, 4:12

people [10] - 32:21, 37:13, 45:9, 45:11, 46:23, 55:8, 57:18, 83:2, 83:3, 83:5

Perhaps [1] - 63:12

period [4] - 33:5, 40:14, 66:11, 99:9

periods [1] - 36:14

Perkins [2] - 5:2, 5:6

PERKINS [78] - 2:10, 5:8, 8:20, 16:10, 25:14, 27:17, 27:20, 27:23, 46:7, 48:9, 48:22, 49:1, 49:8, 49:12, 49:16, 50:7, 51:19, 52:6, 53:7, 54:4, 54:7, 54:15, 54:17, 54:23, 55:21, 56:18, 57:3, 58:1, 58:9, 58:13, 58:19, 59:21, 61:12, 61:15, 63:6, 63:10, 63:15, 63:18, 63:22, 64:2, 64:7, 67:6, 67:12, 67:15, 68:22, 69:6, 69:10, 72:21, 73:6, 73:15, 75:9, 84:21, 88:12, 89:19, 90:10, 90:14, 91:12, 93:20, 94:12, 96:22, 98:9, 102:1, 102:8, 102:17, 103:2, 103:13, 103:21, 104:9, 104:12,

104:18, 105:4, 107:16, 108:10, 108:17, 108:20, 108:23, 109:21, 110:11

permitted [1] - 68:8

person [8] - 47:19, 48:18, 53:19, 53:23, 56:13, 56:16, 57:9, 93:3

personal [1] - 14:12

personally [2] - 17:17, 93:18

personnel [2] - 59:23, 67:16

pertaining [1] - 64:13

peruses [1] - 75:18

phase [3] - 94:22, 95:1, 95:3

phone [1] - 24:6

photo [1] - 80:18

photographs [1] - 35:22

photos [1] - 24:19

physical [11] - 31:17, 34:10, 51:7, 51:15, 51:22, 52:2, 52:10, 52:21, 52:23, 83:3, 110:10

physically [2] - 36:11, 53:20

picked [2] - 16:5, 16:11

pictures [1] - 35:20

pieces [1] - 45:12

Pine [1] - 2:14

pit [1] - 103:10

place [5] - 35:21, 76:22, 83:19, 112:7, 116:10

places [3] - 42:13, 43:5, 43:6

Plaintiff [1] - 1:3

plaintiff [1] - 29:14

Plaintiff/Claimant [1] - 2:2

plan [2] - 97:3, 97:8

planned [1] - 99:1

plans [1] - 16:22

play [2] - 43:18, 96:16

Plaza [1] - 2:14

pliers [1] - 80:3

PLLC [1] - 2:3

ploy [1] - 107:18

ploys [1] - 107:11

plus [2] - 74:19, 115:11

pocket [1] - 5:17

point [20] - 7:3, 9:4, 12:6, 17:18, 33:7,

48:4, 52:18, 81:10, 82:14, 87:20, 88:2, 91:20, 92:2, 95:6, 95:7, 95:17, 95:23, 97:6, 97:20, 101:4

Polaroids [1] - 35:21

Police [20] - 26:9, 30:15, 32:5, 32:8, 32:9, 32:16, 32:17, 42:14, 43:10, 43:14, 43:23, 70:1, 71:19, 72:14, 73:4, 74:2, 74:21, 83:11, 85:17, 115:12

police [14] - 14:19, 21:16, 27:14, 29:20, 30:15, 31:5, 32:1, 32:3, 33:16, 34:2, 35:6, 35:12, 43:8, 48:5

pop [1] - 92:13

popping [1] - 88:1

portion [2] - 20:7, 91:11

posited [1] - 21:19

position [3] - 60:22, 61:22, 64:3

positive [1] - 104:7

possibility [1] - 22:17

possibly [1] - 88:2

Post [4] - 2:9, 42:1, 42:2, 65:18

post [2] - 41:22, 108:22

post-blast [1] - 41:22

post-remedial [1] - 108:22

Post-remedial [1] - 65:18

potential [1] - 51:17

practice [2] - 93:13, 107:8

precludes [1] - 59:15

premise [2] - 47:10, 47:14

prep [1] - 7:17

prepare [3] - 5:1, 8:12, 24:20

prepared [3] - 10:8, 11:10, 25:5

prepped [1] - 19:6

presence [4] - 46:11, 85:8, 104:6, 110:16

present [10] - 15:16, 15:18, 15:23, 18:19, 19:5, 25:11, 55:12, 76:19, 87:8, 88:4

presented [1] - 103:9

presently [1] - 5:6

president [1] - 78:16

press [2] - 20:5, 86:4

pressure [11] - 51:7, 51:16, 51:22, 52:3, 52:10, 52:14, 53:3, 53:22, 54:1, 101:22, 102:4

pretrial [3] - 6:15, 19:4

pretty [4] - 18:2, 18:3, 27:8, 91:17

prevent [1] - 28:19

Previously [1] - 5:9

previously [5] - 6:4, 62:2, 62:5, 62:8, 67:18

private [3] - 5:12, 32:14, 43:7

probable [2] - 110:7, 110:9, 110:15

problem [6] - 58:6, 58:7, 58:15, 61:19, 72:23, 106:9

Procedure [1] - 61:5

procedures [7] - 41:13, 42:21, 44:15, 44:16, 65:3, 65:12, 65:15

proceeding [2] - 9:2, 62:1

proceedings [3] - 27:9, 58:23, 116:11

Professionals [1] - 74:6

proffered [1] - 23:8

programs [1] - 83:1

promised [1] - 109:18

promises [1] - 107:11

promoted [5] - 29:18, 36:22, 37:4, 37:18, 37:22

promotion [2] - 39:19, 40:6

proof [1] - 48:17

props [1] - 47:1

prosecuted [1] - 7:10

prosecution [4] - 4:18, 9:3, 14:14, 17:23

prosecutor [1] - 19:14

prosecutor's [1] - 7:20

prosecutors [3] - 7:2, 7:6, 9:14

provide [2] - 32:9, 62:18

provided [7] - 3:4, 3:13, 40:3, 44:4, 59:23, 62:22, 71:1

provider [3] - 32:18, 32:23, 33:4

psychological [1] -

31:14, 52:14, 53:3, 55:17

Public [6] - 1:20, 3:10, 3:11, 4:3, 116:7, 116:17

publicly [1] - 67:2

purpose [4] - 49:10, 49:17, 103:15, 103:16

pursuant [3] - 1:20, 5:15, 5:17

pursuing [1] - 31:8

put [10] - 36:11, 41:23, 46:9, 46:12, 47:4, 47:5, 57:21, 67:3, 68:23, 86:3

Putting [1] - 74:5

putting [1] - 47:18

### Q

questioning [3] - 56:21, 86:14, 90:7

QUESTIONS [1] - 114:3

questions [9] - 3:6, 4:15, 24:23, 47:12, 48:8, 90:15, 90:16, 103:17, 109:13

quick [1] - 58:19

quite [1] - 18:13

### R

radio [1] - 37:10

ran [1] - 32:3

range [1] - 34:5

rank [6] - 66:5, 66:6, 66:8, 66:21, 69:8, 69:11, 69:15, 69:18, 70:5

rapid [2] - 101:5

rather [1] - 48:7

Re [2] - 114:1, 115:1

react [1] - 55:8

read [9] - 24:22, 48:12, 48:13, 59:4, 75:16, 90:18, 108:12, 108:14, 112:5

reading [1] - 93:5

ready [1] - 40:5

real [2] - 86:14, 86:18

real-time [1] - 86:14

really [6] - 27:10, 44:18, 51:1, 76:7, 91:14, 92:10

reason [9] - 4:21, 26:22, 28:22, 53:23, 59:8, 62:7, 69:9,

89:10, 96:21
**reasonable** [1] - 48:4
**reasons** [1] - 66:20
**recalled** [1] - 76:1
**receive** [4] - 40:8, 41:8, 41:11, 41:17
**received** [5] - 30:14, 31:7, 33:16, 37:21, 43:13
**recently** [1] - 90:18
**recess** [1] - 58:22
**recheck** [1] - 73:17
**recollection** [8] - 9:3, 24:16, 26:17, 89:6, 90:6, 95:8, 100:14, 110:8
**record** [37] - 8:20, 8:21, 20:12, 20:13, 21:22, 21:23, 22:1, 24:2, 25:14, 25:15, 37:6, 42:6, 42:7, 42:8, 48:13, 59:4, 62:16, 63:21, 64:3, 64:7, 64:8, 65:21, 65:22, 68:20, 72:21, 73:16, 74:9, 74:10, 75:12, 75:13, 86:4, 94:12, 94:13, 94:14, 111:4, 111:5, 112:6
**recorded** [1] - 64:19
**recording** [5] - 64:13, 64:16, 64:22, 86:15, 93:10
**records** [4] - 35:15, 35:22, 59:18, 76:3
**Records** [3] - 36:1, 36:4, 36:6
**recovery** [1] - 84:6
**reference** [1] - 76:8
**referred** [2] - 34:16, 36:17
**reflect** [1] - 75:22
**refresh** [2] - 24:16, 26:17
**regard** [4] - 44:21, 65:2, 104:10, 106:5
**regarding** [9] - 6:5, 6:11, 8:9, 9:2, 9:17, 44:1, 45:19, 62:21, 64:22
**regular** [1] - 37:11
**relate** [1] - 65:14
**related** [3] - 10:20, 72:20, 115:6
**relating** [2] - 72:19, 115:5
**relation** [1] - 86:20
**relative** [2] - 62:19, 98:7
**relatives** [1] - 98:11

**relevant** [7] - 59:20, 60:3, 61:6, 61:10, 61:11, 73:11, 115:6
**reliable** [1] - 56:11
**relief** [1] - 37:10
**remain** [1] - 89:9
**remedial** [3] - 65:18, 108:15, 108:22
**remember** [54] - 7:12, 7:15, 9:10, 9:11, 9:18, 12:13, 13:10, 13:11, 13:12, 13:14, 13:17, 13:20, 13:23, 15:11, 18:11, 19:9, 20:4, 43:7, 43:10, 57:4, 57:16, 74:15, 79:3, 82:11, 87:23, 88:3, 88:7, 90:3, 90:5, 90:7, 90:9, 91:4, 92:17, 93:4, 93:13, 93:23, 95:12, 95:13, 95:16, 95:17, 95:22, 97:2, 97:4, 97:13, 97:17, 98:21, 99:3, 101:19, 101:21, 109:3, 110:13, 110:17, 110:21
**remind** [1] - 73:17
**RENSSELAER** [1] - 1:6
**Rensselaer** [1] - 2:12
**reoccur** [1] - 69:4
**repeated** [1] - 105:11
**rephrase** [1] - 103:14
**Report** [1] - 113:5
**report** [3] - 11:10, 71:3, 76:13
**reported** [2] - 67:2, 116:10
**Reporter** [2] - 1:20, 116:8
**reports** [4] - 38:12, 38:16, 82:14
**represent** [5] - 4:8, 19:3, 60:10, 68:4, 68:7
**representation** [1] - 75:5
**represented** [2] - 5:5, 5:15
**representing** [1] - 5:3
**represents** [1] - 61:3
**REQUESTED** [1] - 115:3
**requested** [2] - 48:13, 59:4
**required** [1] - 48:5
**research** [1] - 105:9
**reserved** [2] - 3:7, 3:8

**respect** [3] - 45:7, 63:1, 63:2
**respectful** [1] - 46:23
**respective** [1] - 3:3
**respond** [1] - 60:9
**responded** [1] - 12:23
**responding** [1] - 59:15
**responsibilities** [1] - 37:6
**responsive** [1] - 90:13
**rest** [2] - 57:11, 57:21
**result** [3] - 65:13, 102:13, 108:13
**resulted** [1] - 100:15
**resulting** [1] - 6:9
**resume** [2] - 56:17, 57:12
**retained** [1] - 5:12
**rethinking** [1] - 49:15
**retired** [3] - 43:7, 43:20, 43:21
**retraining** [1] - 108:15
**return** [1] - 3:12
**returned** [1] - 15:9
**review** [5] - 8:15, 25:19, 25:22, 26:1, 62:11
**reviewed** [3] - 24:15, 24:18, 24:21
**reviews** [1] - 59:17
**rights** [5] - 3:4, 3:13, 4:9, 53:23, 67:7
**risks** [2] - 53:16, 54:13
**Road** [3] - 41:6, 41:16, 43:5
**Rochester** [3] - 43:7, 43:21, 43:22
**role** [4] - 43:18, 87:17, 93:19, 99:10
**Ron** [4] - 11:22, 16:22, 20:19, 89:10
**RONALD** [1] - 1:6
**Ronald** [1] - 2:7
**room** [44] - 14:20, 15:7, 16:1, 16:17, 18:10, 25:1, 25:19, 69:1, 77:9, 77:13, 77:14, 77:17, 77:19, 78:7, 78:8, 78:10, 78:16, 78:18, 78:22, 79:3, 79:18, 80:6, 80:8, 80:21, 81:1, 85:16, 86:12, 86:20, 86:21, 87:2, 87:21, 88:20, 88:21, 91:16, 95:2, 95:21, 99:8, 101:22, 102:6, 102:14, 104:6, 107:20, 110:5

**rooms** [1] - 78:12
**rotated** [1] - 37:14
**Rotterdam** [2] - 74:21, 115:12
**Rule** [1] - 3:13
**ruled** [1] - 108:8
**Rules** [1] - 3:5
**ruling** [3] - 63:14, 108:12, 108:13
**RULING** [1] - 114:3
**rumors** [1] - 23:16
**run** [1] - 32:13

## S

**safety** [1] - 93:7
**Samaritan** [1] - 76:3
**SAMPSON** [2] - 1:15, 2:8
**Sanders** [1] - 74:7
**sat** [1] - 14:17
**save** [1] - 105:15
**saving** [1] - 24:7
**saw** [4] - 13:5, 20:7, 20:20, 82:11
**scenario** [1] - 103:9
**scenes** [1] - 38:17
**Schenectady** [1] - 32:12
**school** [2] - 37:23, 41:23
**science** [1] - 33:17
**Scotia** [1] - 74:7
**search** [5] - 72:17, 75:4, 75:6, 115:5, 115:13
**second** [16] - 15:13, 15:15, 18:20, 21:8, 21:15, 25:7, 37:9, 55:11, 76:19, 77:10, 86:16, 87:8, 88:5, 94:21, 99:5, 105:1
**secondary** [2] - 9:15, 18:6
**secondhand** [2] - 23:16, 23:17
**security** [3] - 30:8, 30:22, 31:5
**see** [18] - 10:2, 10:11, 11:17, 12:3, 20:18, 21:11, 25:2, 26:4, 26:12, 66:13, 71:20, 75:7, 75:21, 87:20, 91:22, 97:15, 106:9, 115:13
**seeing** [1] - 85:12
**seem** [1] - 69:3
**seniority** [3] - 39:20, 66:15, 66:16
**sensitive** [1] - 84:15

**separate** [2] - 36:10, 77:13
**separating** [1] - 36:7
**sepsis** [1] - 23:19
**September** [5] - 1:17, 6:18, 11:4, 76:17, 87:7
**Sergeant** [17] - 37:19, 39:6, 39:17, 68:23, 69:15, 69:19, 69:21, 70:6, 70:9, 70:17, 70:18, 70:22, 83:12, 85:6, 90:16, 90:22, 101:15
**sergeant** [1] - 37:19
**Sergeants** [1] - 70:12
**serve** [1] - 98:11
**served** [4] - 27:5, 27:7, 27:8, 98:5
**service** [1] - 41:19
**Services** [1] - 71:5
**serving** [1] - 98:8
**session** [1] - 99:5
**set** [1] - 25:17
**seven** [5] - 15:10, 15:14, 89:20, 89:23, 93:18
**seven-hour** [3] - 89:20, 89:23, 93:18
**several** [6] - 17:13, 83:1, 83:6, 84:7, 109:23, 110:1
**sex** [3] - 43:15, 83:20, 83:23
**sexual** [2] - 42:14, 84:6
**shall** [4] - 3:8, 3:12, 3:13, 3:16
**Shane** [1] - 7:11
**Shanley** [1] - 5:9
**shared** [1] - 107:13
**shelter** [1] - 83:7
**shift** [1] - 35:13
**shifts** [1] - 37:16
**shorter** [1] - 15:8
**Shorthand** [2] - 1:20, 116:8
**show** [1] - 108:1
**showed** [1] - 20:15
**showing** [1] - 75:15
**shutting** [1] - 90:3
**side** [4] - 79:11, 86:22, 87:1, 93:19
**signed** [2] - 74:22, 115:12
**SIKIRICA** [1] - 1:7
**Sikirica** [1] - 2:12
**similar** [2] - 67:17, 84:4
**Similarly** [2] - 107:2,

109:18
**simply** [3] - 70:22, 73:12, 115:7
**single** [1] - 71:15
**sit** [2] - 45:6, 92:22
**site** [3] - 72:8, 72:9, 73:23
**sitting** [5] - 10:13, 43:17, 91:16, 99:10, 106:8
**situation** [2] - 50:5, 100:2
**situations** [1] - 50:12
**six** [1] - 15:14
**Sixth** [1] - 84:9
**slammed** [3] - 107:22, 108:1, 110:2
**slamming** [2] - 107:21, 108:3
**sleep** [8] - 55:11, 55:15, 56:1, 56:7, 56:17, 57:6, 57:18, 58:2
**sleep-deprived** [5] - 55:11, 56:1, 56:7, 57:18, 58:2
**slept** [1] - 56:13
**softer** [2] - 84:3, 84:12
**sole** [3] - 32:18, 32:23, 33:4
**someone** [6] - 16:6, 18:6, 49:19, 53:3, 93:8, 99:10
**someplace** [2] - 72:9, 95:19
**sometimes** [2] - 47:9
**Sometimes** [1] - 48:15
**son** [6] - 28:12, 28:17, 91:2, 91:3, 98:7, 105:21
**sorry** [6] - 10:17, 26:20, 27:23, 36:3, 76:17, 80:2
**sort** [1] - 78:21
**sound** [2] - 24:9, 24:10
**Sounds** [1] - 46:14
**sounds** [1] - 47:11
**source** [1] - 23:18
**speaking** [8] - 18:19, 20:2, 22:12, 68:18, 81:15, 88:2, 90:23, 95:19
**special** [2] - 40:8, 83:18
**specific** [8] - 38:2, 73:10, 89:22, 90:15, 91:10, 106:13, 106:15, 115:6
**specifically** [8] -

12:14, 25:6, 42:11, 43:2, 44:12, 90:5, 93:14, 94:1
**specifics** [2] - 71:16, 97:13
**speed** [2] - 101:1, 101:7
**spent** [1] - 35:14
**spoken** [7] - 8:5, 8:8, 26:16, 26:19, 27:1, 27:2, 85:11
**sponsored** [2] - 74:20, 115:11
**spontaneous** [2] - 97:3, 98:17
**spontaneously** [1] - 99:2
**spot** [3] - 66:14, 66:16, 66:19
**spots** [1] - 66:14
**spur** [1] - 98:16
**squad** [3] - 16:6, 69:23, 70:1
**stack** [3] - 26:2, 47:3, 49:18
**stand** [6] - 16:16, 16:19, 81:11, 88:9, 88:15, 89:7
**standard** [1] - 41:18
**Standing** [1] - 10:10
**standing** [4] - 56:20, 68:2, 68:3, 68:11
**stands** [1] - 18:17
**START** [3] - 84:4, 84:5, 84:6
**start** [4] - 31:23, 34:22, 47:14, 48:6
**started** [4] - 35:5, 40:13, 88:7, 97:22
**starting** [2] - 40:19, 90:6
**state** [3] - 32:13, 32:21, 41:6, 60:19, 76:7, 100:20
**STATE** [3] - 1:9, 1:13, 112:1
**State** [14] - 1:21, 2:17, 2:18, 4:13, 42:14, 43:10, 43:14, 43:23, 61:2, 67:14, 71:4, 71:19, 74:1, 116:8
**statement** [7] - 56:9, 76:7, 76:9, 91:21, 95:8, 95:11, 95:14
**statements** [8] - 6:22, 21:9, 21:16, 38:15, 57:20, 102:15, 103:1, 104:22
**STATES** [1] - 1:1
**statewide** [1] - 39:13

**stating** [1] - 60:22
**status** [1] - 81:6
**stay** [2] - 13:7, 13:8
**stayed** [2] - 13:9, 99:14
**stenographer** [2] - 73:16, 75:10
**stenographically** [1] - 116:10
**step** [1] - 89:17
**stepped** [1] - 95:2
**stepping** [1] - 102:22
**Stewart** [1] - 60:2
**sticks** [1] - 42:16
**still** [4] - 32:9, 78:1, 78:7, 107:8
**Still** [1] - 80:8
**STIPULATED** [2] - 3:2, 3:16
**stood** [3] - 15:3, 16:23, 33:23
**stop** [2] - 48:5, 101:17
**stops** [1] - 33:23
**Storm** [3] - 97:23, 98:3, 99:18
**Street** [2] - 1:16, 2:9
**street** [1] - 78:5
**stress** [3] - 54:12, 55:5, 55:17
**stresses** [1] - 55:9
**strike** [2] - 3:6, 3:7
**stuck** [1] - 96:14
**stuff** [3] - 37:11, 72:6, 83:23
**subject** [10] - 11:9, 45:22, 52:3, 54:12, 55:17, 57:8, 59:12, 62:5, 96:18, 114:5
**substance** [9] - 12:15, 12:16, 13:23, 17:10, 22:6, 27:12, 27:19, 100:10, 100:20
**successfully** [2] - 74:18, 115:10
**sufficient** [3] - 5:1, 8:12, 68:21
**sugar** [1] - 45:2
**suggest** [1] - 48:20
**suggested** [2] - 50:3, 108:3
**suggesting** [2] - 47:19, 47:20
**Suite** [2] - 2:4, 2:14
**sum** [6] - 12:15, 13:23, 22:5, 100:10, 100:20
**superiors** [1] - 101:18
**supervise** [2] - 70:15
**supervised** [1] - 83:5
**supervisor** [10] - 17:2, 17:4, 17:6, 37:20,

37:23, 38:5, 38:9, 38:23, 89:13, 96:18
**supplies** [2] - 78:19
**support** [2] - 13:6, 19:15
**suppose** [1] - 33:8
**suppressed** [1] - 105:2
**surrounding** [1] - 4:17
**suspect** [5] - 55:23, 56:4, 106:18
**suspected** [1] - 14:23
**suspended** [2] - 59:11, 114:5
**sustained** [2] - 14:3, 100:23
**SWAT** [1] - 37:21
**sworn** [2] - 3:10, 4:2
**Sworn** [1] - 112:14
**system** [2] - 85:22, 86:1

**T**

**table** [2] - 52:13, 79:11
**tactic** [3] - 106:11, 106:12, 106:20
**tactical** [2] - 37:22, 38:19
**tactics** [1] - 41:12
**talks** [1] - 76:5
**tasks** [1] - 18:4
**teachers** [1] - 32:22
**team** [2] - 37:21, 84:7
**tech** [1] - 78:18
**technician** [1] - 37:15
**techniques** [5] - 34:2, 41:12, 42:21, 44:10, 45:20
**technology** [1] - 86:2
**ten** [1] - 37:1
**term** [3] - 104:1, 104:2, 104:3
**terms** [6] - 8:11, 9:13, 45:21, 48:2, 95:14, 107:11
**testified** [12] - 4:3, 5:23, 6:4, 6:10, 6:12, 7:23, 9:1, 9:7, 17:12, 19:6, 29:3, 29:7
**testify** [5] - 4:22, 6:15, 8:18, 19:4, 28:23
**testifying** [3] - 8:11, 9:4, 28:20
**testimony** [9] - 3:6, 3:8, 8:16, 18:12, 24:22, 97:18, 110:6, 112:6, 116:11
**THE** [3] - 1:13, 48:12, 48:23

**themselves** [1] - 48:19
**thereby** [1] - 3:13
**therefore** [1] - 53:16
**thereof** [1] - 116:13
**They've** [1] - 84:7
**they've** [1] - 85:10
**third** [10] - 14:19, 77:10, 77:11, 77:18, 78:10, 78:13, 78:17, 85:16, 95:3, 95:4
**thirdhand** [1] - 105:2
**THOMAS** [3] - 1:2, 1:10, 113:3
**Thomas** [57] - 4:9, 6:6, 14:13, 15:6, 15:8, 16:4, 18:23, 21:9, 22:3, 22:8, 22:14, 24:23, 25:8, 25:18, 27:13, 27:21, 40:23, 44:13, 55:10, 59:2, 64:9, 64:12, 64:17, 65:12, 65:13, 71:9, 82:7, 90:23, 91:16, 91:21, 95:20, 96:18, 99:20, 100:9, 100:17, 101:15, 101:23, 102:14, 102:23, 103:5, 103:6, 103:8, 103:12, 103:18, 103:20, 105:14, 105:19, 106:16, 106:22, 107:12, 110:8, 110:19, 114:1, 115:1
**Thomas'** [8] - 4:17, 6:1, 9:2, 17:22, 93:2, 101:16
**threaten** [1] - 46:20
**threatened** [1] - 53:20
**three** [9] - 25:11, 39:2, 42:17, 56:14, 57:10, 59:22, 71:8, 94:8, 94:17
**Three** [1] - 33:11
**throw** [2] - 24:5, 52:12
**Tim** [4] - 2:7, 111:6, 114:1, 115:1
**TIM** [4] - 1:6, 1:19, 4:1, 112:12
**timing** [1] - 95:14
**today** [16] - 4:15, 4:16, 4:19, 4:22, 5:22, 6:4, 6:9, 6:18, 6:19, 8:11, 24:13, 28:20, 28:23, 29:3, 78:1, 106:9
**today's** [2] - 8:4, 24:20
**toe** [1] - 55:4
**Together** [1] - 74:5

**took** [5] - 13:10, 39:13, 40:18, 40:21, 76:22
**top** [3] - 79:4, 87:23, 105:8
**topic** [1] - 91:8
**topics** [1] - 33:15
**tough** [1] - 96:15
**tour** [1] - 76:18
**TPD** [1] - 26:8
**traffic** [1] - 38:18
**trained** [2] - 44:20, 55:16
**Training** [2] - 30:16, 46:16
**training** [78] - 31:7, 32:1, 32:9, 32:18, 33:1, 33:2, 33:5, 33:10, 33:13, 33:16, 34:4, 34:5, 34:8, 34:10, 34:19, 34:21, 34:23, 35:1, 35:11, 36:14, 37:19, 37:20, 37:21, 38:2, 38:4, 40:8, 40:11, 40:16, 41:12, 41:17, 41:19, 42:10, 43:7, 43:8, 43:21, 43:22, 44:1, 44:6, 44:15, 45:10, 45:19, 46:2, 46:6, 46:14, 46:18, 48:3, 50:12, 51:16, 52:1, 52:16, 52:18, 53:1, 53:14, 54:10, 55:2, 55:3, 56:15, 57:7, 65:4, 65:5, 71:2, 71:14, 71:17, 71:22, 72:4, 72:10, 72:12, 72:18, 73:3, 73:9, 75:7, 75:8, 78:16, 108:15, 108:16, 115:5, 115:13
**trainings** [5] - 42:18, 42:19, 43:14, 44:3, 44:4
**transcript** [6] - 25:5, 25:8, 26:13, 90:19, 112:9, 116:13
**transpired** [2] - 13:4, 91:10
**trauma** [4] - 22:6, 22:13, 22:23, 84:6
**traumatic** [1] - 23:10
**treat** [3] - 45:7, 45:9, 45:11
**trial** [19] - 3:9, 6:1, 6:2, 6:5, 6:8, 6:19, 6:20, 7:9, 7:17, 8:16, 8:19, 19:2, 19:5, 19:6, 19:11, 19:22, 21:15

**trickery** [1] - 45:21, 46:3
**trip** [1] - 18:18
**trouble** [1] - 73:6
**TROY** [1] - 1:5
**Troy** [27] - 1:16, 2:7, 2:10, 9:22, 26:8, 30:3, 30:6, 31:9, 31:23, 32:10, 32:18, 39:11, 39:13, 70:1, 72:9, 72:14, 73:4, 82:23, 83:11, 85:16, 88:4, 104:15, 104:23, 106:13, 113:4, 114:1, 115:1
**true** [15] - 48:21, 49:3, 50:5, 50:16, 50:20, 51:5, 51:13, 54:3, 54:11, 56:9, 56:10, 101:3, 102:12, 112:8, 116:13
**truth** [3] - 50:22, 51:1, 102:11
**try** [2] - 46:22, 53:10
**turn** [4] - 10:16, 40:2, 80:3, 101:22
**turned** [2] - 39:21, 67:16
**turns** [1] - 52:21
**TV** [2] - 20:9, 85:18
**twice** [1] - 92:17
**two** [19] - 15:6, 21:6, 25:5, 30:19, 30:20, 35:1, 39:2, 40:17, 41:15, 45:12, 56:14, 57:10, 62:6, 67:3, 74:18, 75:3, 87:5, 94:17, 115:10
**two-day** [2] - 74:18, 115:10
**two-way** [1] - 87:5
**two-year** [1] - 30:19
**type** [20] - 22:6, 22:13, 23:19, 24:21, 31:10, 31:16, 39:18, 39:19, 41:8, 42:3, 52:22, 59:12, 67:7, 80:17, 80:21, 85:21, 87:4, 97:8, 108:15, 114:5

**U**

**unattended** [1] - 99:9
**uncle** [1] - 10:21
**unconstitutional** [1] - 21:10
**under** [11] - 4:13, 4:16, 6:4, 6:10, 61:2, 73:21, 106:6, 106:14, 107:14,

109:7
**undercover** [1] - 33:22
**undergo** [1] - 31:13
**underlying** [2] - 75:7, 115:13
**Uniform** [1] - 3:5
**union** [3] - 5:16, 5:18, 78:15
**Unit** [1] - 36:1
**unit** [3] - 70:16, 83:13, 83:19
**UNITED** [1] - 1:1
**units** [1] - 70:15
**Unity** [5] - 82:10, 82:18, 82:19, 84:19, 85:9
**unless** [1] - 59:16
**unsubstantiated** [1] - 62:10
**untruthfulness** [1] - 101:16
**up** [30] - 10:8, 11:10, 12:6, 15:2, 16:5, 16:11, 24:7, 25:3, 30:4, 33:6, 38:14, 54:18, 54:19, 57:9, 57:14, 73:17, 75:20, 76:13, 78:14, 78:15, 83:17, 87:13, 87:19, 88:1, 90:15, 98:13, 98:16, 99:13, 100:17, 101:22
**Up** [1] - 110:5
**Update** [1] - 74:5
**ups** [2] - 9:21, 9:22
**upstairs** [1] - 14:18
**US** [1] - 4:10
**useful** [1] - 54:22

**V**

**valid** [1] - 53:15
**Valley** [1] - 30:18
**Vehicle** [1] - 33:23
**verbally** [1] - 53:19
**victims** [4] - 83:8, 83:19, 83:20, 84:13
**video** [8] - 16:17, 20:7, 77:8, 78:22, 79:10, 81:8, 97:4, 99:8
**videos** [1] - 24:19
**view** [3] - 61:2, 102:7, 107:2
**viewed** [1] - 20:5
**viewing** [1] - 87:4
**views** [1] - 107:13
**vinegar** [2] - 45:3, 45:18
**Vinegar** [1] - 45:17
**violate** [1] - 53:22

**violence** [6] - 70:15, 82:20, 83:7, 83:9, 83:20, 83:22
**Violence** [1] - 83:16
**violent** [2] - 93:3, 93:4
**visible** [1] - 80:12
**visit** [2] - 14:11, 75:22
**volition** [1] - 96:2
**voluntariness** [2] - 56:8, 56:22

**W**

**waived** [1] - 3:15
**waiver** [2] - 3:8, 3:12
**walk** [4] - 47:3, 79:14, 89:17, 90:1
**walked** [5] - 17:18, 25:9, 36:16, 37:8, 95:15
**walking** [3] - 21:3, 81:1, 94:2
**wall** [2] - 79:12, 80:17
**wants** [1] - 50:21
**Washington** [1] - 2:14
**watch** [7] - 81:7, 81:11, 86:13, 86:17, 88:10, 88:15, 92:23
**watched** [4] - 14:17, 15:3, 20:22, 90:18
**watching** [7] - 92:9, 97:5, 99:11, 99:15, 109:12
**water** [1] - 92:18
**ways** [1] - 47:20
**wearing** [2] - 24:1, 24:2
**week** [7] - 30:5, 35:14, 35:15, 40:15, 40:17, 41:15
**weeks** [4] - 35:2, 35:12, 35:13, 35:14
**West** [1] - 2:14
**wife** [1] - 110:20
**wife's** [1] - 81:18
**Wilhemina** [4] - 81:19, 82:8, 82:9, 84:18
**window** [3] - 79:21, 87:4, 87:5
**wing** [1] - 78:18
**wire** [1] - 85:18
**withdraw** [1] - 49:14
**Withdrawn** [6] - 6:2, 6:19, 32:17, 44:10, 90:18, 99:6
**witness** [6] - 3:10, 3:17, 59:15, 60:18, 68:18, 69:3
**WITNESS** [2] - 48:12, 48:23

**Witness** [2] - 75:18, 100:5
**witnessed** [1] - 85:11
**Wolf** [3] - 41:6, 41:16, 43:4
**woman** [1] - 13:18
**word** [1] - 107:18
**words** [9] - 15:23, 26:18, 47:18, 49:21, 50:2, 97:13, 102:6, 105:16
**works** [1] - 47:9
**worth** [1] - 25:12
**writing** [1] - 91:21
**writings** [1] - 9:19
**written** [6] - 31:10, 39:9, 95:9, 95:14, 95:15, 102:15
**Wrongful** [1] - 4:14

**Y**

**year** [6] - 30:19, 40:15, 62:6, 66:9, 66:13, 66:14
**years** [12] - 27:4, 27:5, 30:5, 37:2, 37:3, 37:16, 39:2, 40:21, 46:18, 67:3, 69:12, 82:12
**YORK** [4] - 1:1, 1:9, 1:13, 112:1
**York** [15] - 1:16, 1:21, 2:5, 2:10, 2:15, 2:17, 2:18, 2:19, 4:13, 43:23, 71:4, 73:22, 74:8, 116:8
**York's** [1] - 4:14
**yourself** [7] - 16:18, 26:20, 29:6, 46:12, 46:18, 92:20, 93:17

**Z**

**Zone** [3] - 32:11, 32:13, 33:7

# APPENDIX

**2551**

Page ___ Line ___ From This _____

To This _____

Reason for change _____

Page ___ Line ___ From This _____

To This _____

Reason for change _____

Page ___ Line ___ From This _____

To This _____

Reason for change _____

Page ___ Line ___ From This _____

To This _____

Reason for change _____

Page ___ Line ___ From This _____

To This _____

Reason for change _____

Page ___ Line ___ From This _____

To This _____

Reason for change _____

Page ___ Line ___ From This _____

To This _____

Reason for change _____

Page ___ Line ___ From This _____

To This _____

Reason for change _____

____ No changes needed.

_____

Signature of Deponent/Witness

Sworn to before me this _____ day of _____, 2__.

_____

Notary Public State of New York

My Commission Expires: _____

Case 1:17-cv-00626-DJS Document 163-34 Filed 10/25/21 Page 1 of 164

```
 1   UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF NEW YORK
 2   - - - - - - - - - - - - - - - - - - - - - - - - - - - -

 3   ADRIAN THOMAS,

 4                        Plaintiff,

 5           - against -

 6   CITY OF TROY, ADAM R. MASON, RONALD FOUNTAIN,
     TIM COLANERI,
 7   RENSSELAER COUNTY, and MICHAEL SIKIRICA,

 8                        Defendants.
     - - - - - - - - - - - - - - - - - - - - - - - - - - - -
 9   NEW YORK STATE
     COURT OF CLAIMS
10   - - - - - - - - - - - - - - - - - - - - - - - - - - - -

11   ADRIAN P. THOMAS,

12                        Claimant,

13           - against -

14   THE STATE OF NEW YORK,

15                        Defendant.
     - - - - - - - - - - - - - - - - - - - - - - - - - - - -

16

17           CONTINUED DEPOSITION of Defendant, TIM

18   COLANERI, held on the 12th day of September 2019,

19   commencing at 8:07 a.m., at the Law Offices of Pattison

20   Sampson Ginsberg & Griffin, PLLC, 22 First Street,

21   Troy, New York, before Jeanne O'Connell, Registered

22   Professional Reporter and Notary Public in and for the

23   State of New York.
```

Case 1:17-cv-00626-DJS Document 163-4 Filed 10/25/21 Page 138 of 164

```
 1   APPEARANCES:

 2   Brett H. Klein, Esq.
     305 Broadway
 3   Suite 600
     New York, New York  10007
 4   Attorney for Plaintiff/Claimant

 5   Pattison Sampson Ginsberg & Griffin, PLLC
     22 First Street
 6   Troy, New York  12180
     By:  Joseph T. Perkins, Esq.
 7   Attorneys for City of Troy, Adam R. Mason,
     Ronald Fountain and Tim Colaneri
 8
     Bailey, Johnson & Peck, P.C.
 9   5 Pine West Plaza
     Washington Avenue Extension
10   Albany, New York 12205
     By:  Crystal R. Peck, Esq.
11   Attorneys for Michael Sikirica

12   New York State Office of the Attorney General
     The Capitol
13   Albany, New York 12224
     By:  Christina M. Calabrese, Assistant Attorney General
14
     Also present:  Katherine Hamilton
15

16

17

18

19

20

21

22

23
```

Case 1:17-cv-00626-DIS Document 163-4 Filed 10/25/21 Page 132 of 161

1               S T I P U L A T I O N S

2      It is hereby stipulated and agreed by

3      and between the attorneys for the respective

4      parties hereto that, this examination may be signed and

5      sworn to before any Notary Public of the State of New

6      York.

7

8      It is further stipulated and agreed that the filing and

9      certification of the said examination shall be waived.

10

11     It is further stipulated and agreed that all objections

12     to questions, except as to form, shall be reserved for

13     the trial of this action.

14

15     It is further stipulated and agreed that there are no

16     objections to Notice of this Examination Before Trial

17     and the qualifications of the court reporter to take

18     this deposition and administer an oath or affirmation.

19

20

21

22

23

```
 1                     (Tim Colaneri - by Mr. Klein)

 2                     TIM COLANERI, after first having been

 3             duly sworn, was examined and testified as

 4             follows:

 5   EXAMINATION

 6   BY MR. KLEIN:

 7      Q.   Good morning.

 8      A.   Good morning.

 9      Q.   Sir, since testifying yesterday, have you had a

10   chance to think about the case?

11             Is there anything about your testimony that you

12   wish to change, correct, or add to?

13      A.   No.

14      Q.   In reviewing the testimony of Adam Mason, he

15   indicated that you were taking notes of times and

16   perhaps other things during the video.

17             Do you recall that?

18      A.   No.

19      Q.   We'll take a look in a few minutes.

20             Did you attend a video statement of Wilahemina

21   Hicks a couple weeks after this thing happened?

22      A.   No.

23      Q.   No way?
```

```
 1                 (Tim Colaneri - by Mr. Klein)

 2        A.   I don't think so.

 3        Q.   So, do you have any medical background?

 4        A.   I took a first responders course in the basic

 5   police academy and I'm up on my first aid and CPR within

 6   the last two years, I think.

 7        Q.   So, other than what you've obtained through your

 8   police career, you have no independent medical or

 9   nursing training; is that correct?

10        A.   That's correct.

11        Q.   Do you recall that you were the first detective

12   to suggest that Adrian Thomas slammed M███████ head to

13   the ground when you went into that room?

14                MR. PERKINS:  Object to the form.

15                THE WITNESS:  I don't know.  I wasn't

16          present for the first interview.  So, I

17          really don't know.

18   BY MR. KLEIN:

19        Q.   Well, from the interview that you saw, up until

20   the time you went in, were you the first person to

21   suggest that M██████ head was slammed -- had to have

22   been slammed to the ground?

23        A.   I don't remember that.
```

```
 1              (Tim Colaneri - by Mr. Klein)

 2      Q.   Did you go in and suggest that his head had to

 3  have been slammed to the ground?

 4      A.   I think so.  Yes.

 5      Q.   Isn't it true that the idea of slamming came from

 6  you and Detective Mason first, not from Adrian Thomas?

 7      A.   Yes.  I would say for me.  I don't know about

 8  Adam.

 9      Q.   Would you agree that it wasn't until you

10  introduced the scenario of slamming that -- it wasn't

11  until after that that Adam determined that he had what

12  he believed was probable cause to arrest?

13      A.   Well, I think after Mr. Thomas admitted to it,

14  yeah.  I think he did have probable cause to arrest.

15      Q.   But it wasn't until that idea of slamming was

16  introduced that that changed, correct?

17      A.   Possibly.  Yes.

18      Q.   That's your recollection.

19      A.   That's my opinion.

20              (Discussion held off the record.)

21              (Thomas Exhibit 16 marked for

22          identification.)

23  BY MR. KLEIN:
```

```
 1            (Tim Colaneri - by Mr. Klein)

 2    Q.   I'm playing for you Thomas Exhibit 16, video file

 3    VTS_01_4.VOB, and it's starting at two hours, 39

 4    minutes, and five seconds into this file, and it's just

 5    a video of your involvement in the interview.

 6         I just want to confirm that this is what you've

 7    already testified was your role in the interview.

 8         Sergeant Colaneri, while we're looking and trying

 9    to get the video going, I just wanted to show it to you

10    because you haven't seen since 2008, correct?

11    A.   Correct.

12    Q.   I'm going to show you what's been previously

13    marked as Defendant's A on August 20, 2019.  This is the

14    transcript of the second interview that was prepared,

15    apparently, in advance of the first trial.

16         And on page 223 -- I'm sorry -- 222 of 298 of the

17    transcript, in the middle of the page it says, (man

18    enters a room and asks, can I talk to you a second?

19    After that it says, "Sergeant Mason:  Sergeant

20    Colligan."  Then it says, "Sergeant Colligan:  Hi.  How

21    are you doing?"

22         Is this the transcript that you reviewed?

23    A.   Yes.
```

# APPENDIX

## 2559

8

```
 1              (Tim Colaneri - by Mr. Klein)

 2      Q.  And to the best of your recollection, was it an

 3  accurate transcript of what you said and what was said

 4  in response during the interview?

 5      A.  Yes.

 6      Q.  And when it says Sergeant Colligan, is that a

 7  transcription error?

 8          It's really you, Sergeant Colaneri.

 9      A.  Yes.

10      Q.  I believe it goes up to page 226 of 298.

11          So take a look at 222, where it says, "man enters

12  a room," and read up to 226.  And let me know if that

13  appears to be the only time that you step into the room

14  and said something during this interview or if you think

15  there might be something else.

16              (Thomas Exhibit 17 marked for

17          identification.)

18  BY MR. KLEIN:

19      Q.  So you've you had a chance to review the few

20  pages of the transcript of your statements in the second

21  interview?

22      A.  Correct.

23      Q.  Was that an accurate recitation of what you said
```

```
1              (Tim Colaneri - by Mr. Klein)

2    and what was said in response?

3      A.   Yes.

4      Q.   In the interview, you say you were a corpsman in

5    the Marines.

6           That was not true, correct?

7      A.   That's correct.

8      Q.   You said you saw a lot of head injuries during

9    that time.

10          Also not true, correct?

11     A.   Correct.

12     Q.   You said you went down to the hospital today to

13   look at the baby and check over his head injuries.

14          That you did do at one point, correct?

15     A.   Yes.

16     Q.   You didn't notice any physical -- signs of

17   physical trauma to the baby, did you, outward trauma?

18          You saw a baby --

19     A.   I saw him all hooked up to everything.  So, I

20   didn't examine the baby.  I just was in the room and I

21   looked at the baby.

22     Q.   And when you looked at the baby, did you observe

23   any signs of blood, bruising, swelling, or other kinds
```

Case 1:17-cv-00626-DLC Document 163-34 Filed 10/25/21 Page 1398 of 164

1              (Tim Colaneri - by Mr. Klein)

2  of outward physical harm to the baby?

3    A.  I don't remember any of that.

4    Q.  And you said that you looked at the X-rays, but

5  that's not true?

6    A.  No.

7    Q.  You said, what you're telling us is not

8  consistent with what's on the X-rays and what's on his

9  injuries.

10       That is in a sense true, that what Adrian had

11  been telling you was not consistent with what the

12  doctors had described to you, correct?

13    A.  Correct.

14    Q.  And in response, Adrian said, "I didn't do

15  nothing," correct?

16    A.  Yes.

17    Q.  I mean, he maintained during that interview many,

18  many times that he didn't do anything, correct?

19    A.  Yes.

20    Q.  Then you told him, in sum and substance, that

21  what he's saying is not consistent, that he laid down.

22  And where -- it's not consistent with where the injuries

23  should be.  You said he was laying down, right?  And

# APPENDIX
# 2562

```
1              (Tim Colaneri - by Mr. Klein)
2   Adrian said, no, he was on his side, and I went back
3   like this.  And you said, not the back of his head,
4   though, and that's where most of the injury is.  It's
5   just not consistent.  You said, I spoke to the doctor.
6   I called him at his house.
7         That's not true, correct?
8      A.  No.
9      Q.  I'm more concerned about the recovery of M██████
10  than anything else right now.  That's also not true
11  because you knew that M██████ was, for all intents and
12  purposes, going to die at that point.  He was brain
13  dead.
14     A.  I knew he was brain dead, but I was still
15  concerned about him.
16     Q.  But it's not true that you were concerned about
17  his recovery.  You knew that was an impossibility.
18     A.  At that point I did know it was impossible.
19     Q.  And then you state you've been calling the
20  hospital back and forth for the last two hours.  There's
21  no change yet.  Okay.  That's all I can tell you.
22  There's no change from when I saw him this afternoon.
23         All that's false, correct?
```

```
 1                (Tim Colaneri - by Mr. Klein)

 2      A.   Correct.

 3      Q.   Then you said, I'm the senior sergeant.  It just

 4   doesn't make sense to me at all.  All right?

 5           Was it true that you were the senior sergeant or

 6   were you a co-worker in terms of rank?

 7      A.   The senior sergeant is not somebody in charge per

 8   se.  It's the one in the detective bureau with the most

 9   seniority.

10      Q.   Was that you at that time?

11      A.   Yes.

12      Q.   Had you ever taken that role before where you

13   walked into an interrogation such as this and played

14   like this good cop-bad cop situation to try to elicit

15   further responses out of the person being detained?

16      A.   Yes.

17      Q.   Then again Thomas says, I didn't do anything,

18   correct?

19      A.   Correct.

20      Q.   So then moving on, on page 224 of the transcript,

21   you said, I read the statement from last night that you

22   gave.  I looked at the consistencies from the daughter

23   and your wife, what she was saying and what you were
```

1              (Tim Colaneri - by Mr. Klein)

2      saying.

3              Apparently you knew there wasn't a first

4      statement given.  At that time you knew?

5          A.  I think so.  Yeah.

6          Q.  Sitting here today, you don't recall that?

7          A.  I don't recall at all.

8          Q.  Do you know if there were consistencies or

9      inconsistencies?

10         A.  No.  I don't remember.

11         Q.  Do you know whether you knew firsthand about the

12     statement or whether at some point someone briefed you

13     and said, hey, go in there and say you read the

14     statement and say it's inconsistent?

15             Do you know either way?

16         A.  I don't believe anybody briefed me and said that,

17     but I don't remember reading his statement or his wife's

18     or daughter's or anything like that.

19         Q.  Possible it may have been sitting on Mason's desk

20     while you were sitting at the monitor and could have

21     looked at it then.

22         A.  Yeah.  Sure.

23         Q.  Or you may not have seen it at all.

```
 1                  (Tim Colaneri - by Mr. Klein)

 2      A.   Yeah.

 3      Q.   Then again he says, I didn't do nothing, I swear

 4   to God, right?

 5      A.   Uh-huh.

 6      Q.   Yes.

 7      A.   Yes.

 8      Q.   Then you called him a liar a number of times,

 9   correct?

10      A.   I think I was speaking to Adam at some point

11   saying that he's a liar.

12      Q.   Then, again, Thomas says, I didn't do nothing to

13   the baby, correct?

14      A.   Yes.

15      Q.   Then it's at this point where you say, "you took

16   that baby and you slammed his head", correct?

17      A.   Correct.

18      Q.   That's the point in your involvement in the

19   interview where you introduce a scenario of how the harm

20   may have occurred, correct?

21               MR. PERKINS:  Objection to the form.

22               THE WITNESS:  Yes.

23   BY MR. KLEIN:
```

```
 1              (Tim Colaneri - by Mr. Klein)
 2     Q.  Prior to that, you were using trickery and deceit
 3  to say, look, we have a baby here that's injured.  Tell
 4  us how it happened.  I don't think you're telling the
 5  truth, in sum and substance, correct?
 6     A.  Yes.
 7     Q.  At this point, though, you then introduce a
 8  scenario that had not been introduced by Adrian Thomas
 9  up to that point, correct?
10              MR. PERKINS:  Object to the form.
11              You can answer.
12              THE WITNESS:  At least in that
13         interview.  I don't know what he said in the
14         first interview.
15              MR. KLEIN:  Right.
16  BY MR. KLEIN:
17     Q.  To your knowledge, you introduced a scenario of
18  Adrian taking that baby and slamming his head.
19         That, to your knowledge, had not been introduced
20  previously.
21              MR. PERKINS:  Object to the form.
22              You can answer.
23              THE WITNESS:  Yes.
```

```
 1                (Tim Colaneri - by Mr. Klein)
 2    BY MR. KLEIN:
 3      Q.  Again, Adrian said, I didn't do anything,
 4    correct?
 5      A.  Yes.
 6      Q.  And I swear to God I didn't do that to my kid,
 7    correct?
 8      A.  Yes.
 9      Q.  Then you go on to say, something happened all
10    right, and the injuries are not consistent with your
11    story.  So I'll tell you what.  Why don't you talk to
12    him a little more.  I've got to go down and cool off
13    because I've been up since like 8:00 this morning and
14    doing this all day long, back and forth to the hospital,
15    all right.  I know he was out here until 3:00 or 4:00 in
16    the morning.
17          When you said that you were referring to Mason?
18      A.  Yes.  I believe.
19      Q.  You talked to him for awhile and said, if you
20    need anything give me a call, period.
21          That was the end of the interview, correct?
22      A.  Yes.
23      Q.  So would you say the key point of your
```

```
 1                    (Tim Colaneri - by Mr. Klein)
 2   involvement there was the introduction of the scenario
 3   of Adrian slamming that we discussed earlier?
 4                    MR. PERKINS:  Object to the form.
 5                    You can answer.
 6                    THE WITNESS:  Could you repeat that
 7            one?
 8   BY MR. KLEIN:
 9     Q.  Would you say that the key -- the most important
10   aspect to this interrogation overall of your role was
11   your suggestion of the scenario, you took that baby and
12   you slammed his head?
13                    MR. PERKINS:  Object to the form.
14                    You can answer.
15                    THE WITNESS:  It was not just that.  It
16            was the entire thing with the
17            inconsistencies and going to see him.  And
18            it wasn't just one thing, but yeah, that's
19            part of it.  Absolutely part of it.
20   BY MR. KLEIN:
21     Q.  Introduction of that scenario by you of taking
22   that baby and slamming his head lead to like a
23   springboard for Mason to ask further questions about
```

Case 1:17-cv-00626-DLS Document 463-4 Filed 10/25/21 Page 1488 of 164

```
 1                    (Tim Colaneri - by Mr. Klein)

 2     that, correct?

 3                    MR. PERKINS:  Object to the form.

 4                    THE WITNESS:  Correct.

 5     BY MR. KLEIN:

 6        Q.   Did you feel, before going into that room, that

 7     there was a need to introduce that scenario to the

 8     conversation rather than letting Adrian continue to say

 9     on his own what may have happened to cause the end

10     result?

11        A.   Yeah.

12        Q.   What was the reason for that need?

13        A.   Because I believe at one point they were speaking

14     to him the night before, and they were speaking to him

15     this night, and I don't know if anybody ever challenged

16     him and said, you did this.

17        Q.   Well, didn't introduction of that scenario of

18     slamming the head cross the line of what you talked

19     about, from your experience and your training, of risk

20     of a coerced confession, whether true or false, because

21     you're putting words into the person's -- you're giving

22     the factual pattern to the witness rather than letting

23     the witness tell you what caused the end result?
```

```
 1            (Tim Colaneri - by Mr. Klein)

 2            MR. PERKINS:  Object to the form.

 3            You can answer.

 4            THE WITNESS:  No.  I don't think it did

 5        that.  I didn't think I crossed the line at

 6        all.

 7  BY MR. KLEIN:

 8      Q.  Did you make a conscious -- did you go in there

 9  following any type of training that you were given to

10  take that approach that you took, specifically by

11  saying, you slammed that baby's head, or was that a

12  conscious choice by you just to go in there just based

13  on your own instinct?

14      A.  It was more of an instinct.

15      Q.  Is it fair to say that you saw how the interview

16  had been going for about five or so hours at that point,

17  correct?

18      A.  Yes.

19      Q.  This was about five or six hours into the

20  interview, after six pages or so had been written of a

21  statement, correct?

22      A.  I know the hours.  I don't know how much was

23  written on the statement or not.
```

```
 1            (Tim Colaneri - by Mr. Klein)

 2     Q.  But do you recall that there were additional

 3  pages written after you went in and introduced the

 4  scenario of slamming?

 5     A.  Yes.

 6     Q.  That was in the last hour or so, correct?

 7     A.  Yes.

 8     Q.  It was only after that time that Mason placed

 9  Thomas under arrest, correct?

10     A.  Yes.

11     Q.  So, up until the time you went in, was it your

12  opinion, based on your training and experience, that

13  there wasn't enough there to link Adrian Thomas to the

14  child's injuries from what you knew of the injuries?

15            MR. PERKINS:  Object to the form.

16            You can answer.

17            THE WITNESS:  I don't know if there was

18        probable cause, but there was reasonable

19        suspicion to believe that he injured this

20        child and it was an intentional injury.  It

21        wasn't something by accident.

22  BY MR. KLEIN:

23     Q.  That's not enough to arrest, though, correct?
```

```
 1              (Tim Colaneri - by Mr. Klein)

 2      A.   No.

 3      Q.   So my question is:  What was the impetus for you

 4  to go in and suggest to him that, you slammed this

 5  baby's head?

 6           I believe the testimony from Mason was there was

 7  not probable cause prior to that entering the

 8  conversation.

 9           Do you agree with that?

10      A.   Yes.

11      Q.   So my question relates to that.

12           Did you consciously recognize that there wasn't

13  probable cause still, as of five or so hours into the

14  interview, as of when you went in, and felt that there

15  was a need to take the conversation to the next level?

16                MR. PERKINS:  Object to the form.

17                Go ahead.

18                THE WITNESS:  Yeah.  I did need to,

19           like you say, take the conversation to the

20           next level, because he needed to be

21           challenged at that point.

22  BY MR. KLEIN:

23      Q.   Because what he had been saying for hours prior
```

```
 1              (Tim Colaneri - by Mr. Klein)

 2   was not enough from what you saw.

 3      A.   That's correct.

 4      Q.   To link it to any crime.

 5      A.   That's correct.

 6      Q.   Is there anything else about your personal

 7   involvement in that interview that you can recall that

 8   we haven't already discussed?

 9      A.   No.  Other than just seeing the notes now.

10      Q.   I'm going to show you what's been marked as

11   Thomas Exhibit 17, and these are pages of notes that off

12   the record I had you look through the TPD file that was

13   given to us in discovery.  You had indicated that these

14   are the two pages that have your handwriting on them.

15           Could you please confirm that these are the two

16   pages --

17      A.   Yes.  These are.

18      Q.   Can you walk us through what's on these pages,

19   starting from the top of the first page.

20      A.   The top of the first page looks like an interview

21   with Wilahemina Hicks, the start, the Miranda time, the

22   time it ended, and when she signed the Miranda.

23      Q.   Sitting here today, do you recall being present
```

23

```
 1                  (Tim Colaneri - by Mr. Klein)

 2     for an interview with Wilahemina Hicks?

 3         A.   No.

 4         Q.   Here it says Wilahemina Thomas, correct?

 5         A.   I don't remember that, either.

 6         Q.   Is it your understanding that by Wilahemina

 7     Thomas you mean Wilahemina Hicks?

 8         A.   Yes.

 9         Q.   You have no recollection whatsoever of that?

10         A.   No.

11         Q.   Then, going below that, is that notes of the

12     second interview that we just discussed with Adrian

13     Thomas?

14         A.   Yes.

15         Q.   It says 9/22/08, correct?

16         A.   That's correct.

17         Q.   Then it says 08695?

18         A.   Correct.

19         Q.   What does that mean?

20         A.   That's the case number.

21         Q.   Then it says, Sergeant A. Mason interview of

22     Adrian Thomas, correct?

23         A.   Yes.
```

1              (Tim Colaneri - by Mr. Klein)

2      Q.  Then it says, 5:53 p.m. start of interview,

3   correct?

4      A.  Correct.

5      Q.  Did you know that Adrian had just come from the

6   psychiatric department at Samaritan Hospital prior to

7   the interview?

8      A.  I did know that.

9      Q.  Did you know that he hadn't slept more than an

10  hour or so since 8:00 the prior day when the baby woke

11  up sick?

12     A.  I don't remember.

13     Q.  So, for a day and a half -- from 8:00 a.m. on the

14  21st or 8:30 a.m., when the baby woke up sick, until

15  5:53 p.m. when he came for that interview, you didn't

16  know that he had barely slept?

17              MR. PERKINS:  Objection to the form.

18              THE WITNESS:  No.

19  BY MR. KLEIN:

20     Q.  Then what follows is a series of times and notes,

21  correct?

22     A.  That's correct.

23     Q.  So can you just walk us through?

```
 1              (Tim Colaneri - by Mr. Klein)

 2         Are they self-explanatory?

 3     A.  So, after the start of the interview, at

 4  7:40 p.m., Adrian had a cigarette.  At 8:30, I called --

 5  it says, phone call to A. Mason, which I believe I

 6  called him and said, it's time to change the DVD.  And

 7  at 8:32 there was a DVD change.  At 8:39, Adrian had

 8  another cigarette it looks like.  At 9:06, he refused

 9  soda or chips.  At 9:54, it says candy.  I don't know if

10  it was an offer of candy or he ate candy.  I don't

11  remember.  At 10:54, there was a review and a signed

12  statement.

13     Q.  Then, going on to the second page, towards the

14  middle of the page, is that a continuation of the notes?

15     A.  That is.

16         At 11:31, he was asked if there was a bathroom

17  break, if he wanted one.  No.  At 11:31, there was also

18  a change of the DVD.  11:33, we resume recording.

19         And there was an addition to the statement.

20     Q.  Was that addition to the statement, to the best

21  of your recollection, after you went in the room and

22  introduced the scenario of slamming to the ground,

23  slamming M█████████
```

```
 1              (Tim Colaneri - by Mr. Klein)

 2      A.   I believe so.  Yes.

 3           At 1:15 a.m., the interview ended.

 4      Q.   The notepad on top that says 13 walnut, is that

 5  your handwriting?

 6      A.   No.

 7      Q.   Other than these writings, did you notice any

 8  other writings in the file that were from you that I had

 9  shown you?

10      A.   No.  No.  Not in my handwriting.

11      Q.   Did you attend the autopsy of M██████ T███████

12      A.   I don't think so.

13           MR. KLEIN:  Off the record.

14           (Discussion held off the record.)

15      Q.   So, Sergeant Colaneri, is there anything else

16  that you can recall about Adrian Thomas and the

17  allegations against him that you're aware of, either

18  through your direct involvement or through speaking to

19  your colleagues, that we haven't stated on the record?

20      A.   No.

21           MR. KLEIN:  I believe that's all the

22        questions I have subject to the right to

23        reopen based on any additional information
```

Case 1:17-cv-00626-DJS Document 183-34 Filed 10/25/21 Page 156 of 164

```
 1              (Tim Colaneri - by Ms. Peck)

 2        that may arise.

 3   EXAMINATION

 4   BY MS. PECK:

 5     Q.  Sergeant Colaneri, my name is Crystal Peck.  I

 6   represent the County of Rensselaer and Dr. Sikirica in

 7   the federal lawsuit that was brought by Adrian Thomas

 8   against yourself and some other police officers in the

 9   Northern District of New York.

10         The same rules when Mr. Klein was questioning you

11   apply here.  So, verbal responses.  If you don't

12   understand any of my questions, please let me know and I

13   will rephrase.

14         Do you know Dr. Michael Sikirica?

15     A.  Yes, I do.

16     Q.  How do you know him?

17     A.  I've attended numerous autopsies that he

18   conducted.

19     Q.  So you know him as the medical examiner for

20   Rensselaer County; is that accurate?

21     A.  Yes.

22     Q.  Did you have any contact or discussions with

23   Dr. Sikirica in relation to the death of M▬▬▬ T▬▬▬?
```

1            (Tim Colaneri - by Ms. Peck)

2      A.   No.

3      Q.   You had no discussions or conversations with

4  Dr. Sikirica with respect to his autopsy or his findings

5  with respect to the death of M█████ T██████?

6      A.   No.

7            MS. PECK:   I have no further questions.

8            (Deposition concluded at 9:00 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

INDEX OF EXHIBITS

Thomas                                                    Marked


    16   Video file VTS_01_4.VOB                            6

    17   Troy PD notes                                      8

```
 1   STATE OF NEW YORK    )

 2   COUNTY OF

 3

 4   I, TIM COLANERI, do hereby certify that I have read the

 5   foregoing record of my testimony taken at the time and

 6   place noted in the heading hereof and that it is a true

 7   and correct transcript of the same and the whole

 8   thereof.

 9

10

11

12

13                    _____

14   Subscribed and sworn to      TIM COLANERI

15   before me this _____ day

16   of _____, 2019

17

18

19

20

21   _____

22

23
```

1                   <u>C E R T I F I C A T I O N</u>

2

3

4   I, Jeanne O'Connell, Registered Professional Reporter

5   and Notary Public in and for the State of New York, do

6   hereby certify that the foregoing to be a true and

7   accurate transcription of the stenographic notes as

8   taken by me of the aforesaid proceedings.

9

10

11

12   _____      _____

13     Date                          Jeanne O'Connell

14

15

16

17

18

19

20

21

22

23

# APPENDIX

## 0

**08695** [1] - 23:17

## 1

**10007** [1] - 2:3
**10:54** [1] - 25:11
**11:31** [2] - 25:16, 25:17
**11:33** [1] - 25:18
**12180** [1] - 2:6
**12205** [1] - 2:10
**12224** [1] - 2:13
**12th** [1] - 1:18
**13** [1] - 26:4
**16** [3] - 6:21, 7:2, 29:4
**17** [3] - 8:16, 22:11, 29:5
**1:15** [1] - 26:3

## 2

**20** [1] - 7:13
**2008** [1] - 7:10
**2019** [3] - 1:18, 7:13, 30:16
**21st** [1] - 24:14
**22** [2] - 1:20, 2:5
**222** [2] - 7:16, 8:11
**223** [1] - 7:16
**224** [1] - 12:20
**226** [2] - 8:10, 8:12
**298** [2] - 7:16, 8:10

## 3

**305** [1] - 2:2
**39** [1] - 7:3
**3:00** [1] - 16:15

## 4

**4:00** [1] - 16:15

## 5

**5** [1] - 2:9
**5:53** [2] - 24:2, 24:15

## 6

**6** [1] - 29:4
**600** [1] - 2:3

## 7

**7:40** [1] - 25:4

## 8

**8** [1] - 29:5
**8:00** [3] - 16:13, 24:10, 24:13
**8:07** [1] - 1:19
**8:30** [2] - 24:14, 25:4
**8:32** [1] - 25:7
**8:39** [1] - 25:7

## 9

**9/22/08** [1] - 23:15
**9:00** [1] - 28:8
**9:06** [1] - 25:8
**9:54** [1] - 25:9

## A

**a.m** [5] - 1:19, 24:13, 24:14, 26:3, 28:8
**absolutely** [1] - 17:19
**academy** [1] - 5:5
**accident** [1] - 20:21
**accurate** [4] - 8:3, 8:23, 27:20, 31:7
**action** [1] - 3:13
**Adam** [5] - 2:7, 4:14, 6:8, 6:11, 14:10
**ADAM** [1] - 1:6
**add** [1] - 4:12
**addition** [2] - 25:19, 25:20
**additional** [2] - 20:2, 26:23
**administer** [1] - 3:18
**admitted** [1] - 6:13
**ADRIAN** [2] - 1:3, 1:11
**Adrian** [18] - 5:12, 6:6, 10:10, 10:14, 11:2, 15:8, 15:18, 16:3, 17:3, 18:8, 20:13, 23:12, 23:22, 24:5, 25:4, 25:7, 26:16, 27:7
**advance** [1] - 7:15
**affirmation** [1] - 3:18
**aforesaid** [1] - 31:8
**afternoon** [1] - 11:22
**agree** [2] - 6:9, 21:9
**agreed** [4] - 3:2, 3:8, 3:11, 3:15
**ahead** [1] - 21:17
**aid** [1] - 5:5
**Albany** [2] - 2:10, 2:13
**allegations** [1] - 26:17
**answer** [6] - 15:11, 15:22, 17:5, 17:14, 19:3, 20:12
**APPEARANCES** [1] - 2:1
**apply** [1] - 27:11
**approach** [1] - 19:10
**arise** [1] - 27:2
**arrest** [4] - 6:12, 6:14, 20:9, 20:23
**aspect** [1] - 17:10
**Assistant** [1] - 2:13
**ate** [1] - 25:10
**attend** [2] - 4:20, 26:11
**attended** [1] - 27:17
**Attorney** [3] - 2:4, 2:12, 2:13
**Attorneys** [2] - 2:7, 2:11
**attorneys** [1] - 3:3
**August** [1] - 7:13
**autopsies** [1] - 27:17
**autopsy** [2] - 26:11, 28:4
**Avenue** [1] - 2:9
**aware** [1] - 26:17
**awhile** [1] - 16:19

## B

**baby** [15] - 9:13, 9:17, 9:18, 9:20, 9:21, 9:22, 10:2, 14:13, 14:16, 15:3, 15:18, 17:11, 17:22, 24:10, 24:14
**baby's** [2] - 19:11, 21:5
**background** [1] - 5:3
**bad** [1] - 12:14
**Bailey** [1] - 2:8
**barely** [1] - 24:16
**based** [3] - 19:12, 20:12, 26:23
**basic** [1] - 5:4
**bathroom** [1] - 25:16
**below** [1] - 23:11
**best** [2] - 8:2, 25:20
**between** [1] - 3:3
**blood** [1] - 9:23
**brain** [2] - 11:12, 11:14
**break** [1] - 25:17
**Brett** [1] - 2:2
**briefed** [2] - 13:12,

13:16
**Broadway** [1] - 2:2
**brought** [1] - 27:7
**bruising** [1] - 9:23
**bureau** [1] - 12:8
**BY** [15] - 4:6, 5:18, 6:23, 8:18, 14:23, 15:16, 16:2, 17:8, 17:20, 18:5, 19:7, 20:22, 21:22, 24:19, 27:4

## C

**Calabrese** [1] - 2:13
**candy** [3] - 25:9, 25:10
**Capitol** [1] - 2:12
**career** [1] - 5:8
**case** [2] - 4:10, 23:20
**caused** [1] - 18:23
**certification** [1] - 3:9
**certify** [2] - 30:4, 31:6
**challenged** [2] - 18:15, 21:21
**chance** [2] - 4:10, 8:19
**change** [6] - 4:12, 11:21, 11:22, 25:6, 25:7, 25:18
**changed** [1] - 6:16
**charge** [1] - 12:7
**check** [1] - 9:13
**child** [1] - 20:20
**child's** [1] - 20:14
**chips** [1] - 25:9
**choice** [1] - 19:12
**Christina** [1] - 2:13
**cigarette** [2] - 25:4, 25:8
**City** [1] - 2:7
**CITY** [1] - 1:6
**Claimant** [1] - 1:12
**CLAIMS** [1] - 1:9
**co** [1] - 12:6
**co-worker** [1] - 12:6
**coerced** [1] - 18:20
**COLANERI** [5] - 1:6, 1:18, 4:2, 30:4, 30:13
**Colaneri** [4] - 2:7, 7:8, 8:8, 26:15, 27:5
**colleagues** [1] - 26:19
**Colligan** [3] - 7:20, 8:6
**commencing** [1] - 1:19
**concerned** [3] - 11:9, 11:15, 11:16
**concluded** [1] - 28:8
**conducted** [1] - 27:18
**confession** [1] - 18:20

**confirm** [2] - 7:6, 22:15
**conscious** [2] - 19:8, 19:12
**consciously** [1] - 21:12
**consistencies** [2] - 12:22, 13:8
**consistent** [6] - 10:8, 10:11, 10:21, 10:22, 11:5, 16:10
**contact** [1] - 27:22
**continuation** [1] - 25:14
**continue** [1] - 18:8
**CONTINUED** [1] - 1:17
**conversation** [4] - 18:8, 21:8, 21:15, 21:19
**conversations** [1] - 28:3
**cool** [1] - 16:12
**cop** [2] - 12:14
**cop-bad** [1] - 12:14
**corpsman** [1] - 9:4
**correct** [50] - 4:12, 5:9, 5:10, 6:16, 7:10, 7:11, 8:22, 9:6, 9:7, 9:10, 9:11, 9:14, 10:12, 10:13, 10:15, 10:18, 11:7, 11:23, 12:2, 12:18, 12:19, 14:9, 14:13, 14:16, 14:17, 14:20, 15:5, 15:9, 16:4, 16:7, 16:21, 18:2, 18:4, 19:17, 19:21, 20:6, 20:9, 20:23, 22:3, 22:5, 23:4, 23:15, 23:16, 23:18, 23:22, 24:3, 24:4, 24:21, 24:22, 30:7
**COUNTY** [2] - 1:7, 30:2
**County** [2] - 27:6, 27:20
**couple** [1] - 4:21
**course** [1] - 5:4
**COURT** [2] - 1:1, 1:9
**court** [1] - 3:17
**CPR** [1] - 5:5
**crime** [1] - 22:4
**cross** [1] - 18:18
**crossed** [1] - 19:5
**Crystal** [2] - 2:10, 27:5

## D

**Date** [1] - 31:12

# APPENDIX

daughter [1] - 12:22
daughter's [1] - 13:18
dead [2] - 11:13, 11:14
death [2] - 27:23, 28:5
deceit [1] - 15:2
Defendant [2] - 1:15, 1:17
Defendant's [1] - 7:13
Defendants [1] - 1:8
department [1] - 24:6
Deposition [1] - 28:8
deposition [1] - 3:18
DEPOSITION [1] - 1:17
described [1] - 10:12
desk [1] - 13:19
detained [1] - 12:15
detective [2] - 5:11, 12:8
Detective [1] - 6:6
determined [1] - 6:11
die [1] - 11:12
direct [1] - 26:18
discovery [1] - 22:13
discussed [3] - 17:3, 22:8, 23:12
discussion [1] - 6:20, 26:14
discussions [2] - 27:22, 28:3
DISTRICT [2] - 1:1, 1:1
District [1] - 27:9
doctor [1] - 11:5
doctors [1] - 10:12
down [4] - 9:12, 10:21, 10:23, 16:12
Dr [4] - 27:6, 27:14, 27:23, 28:4
duly [1] - 4:3
during [5] - 4:16, 8:4, 8:14, 9:8, 10:17
DVD [3] - 25:6, 25:7, 25:18

## E

either [3] - 13:15, 23:5, 26:17
elicit [1] - 12:14
end [3] - 16:21, 18:9, 18:23
ended [2] - 22:22, 26:3
entering [1] - 21:7
enters [2] - 7:18, 8:11
entire [1] - 17:16
error [1] - 8:7
Esq [3] - 2:2, 2:6, 2:10
examination [2] - 3:4,

3:9
Examination [1] - 3:16
EXAMINATION [2] - 4:5, 27:3
examine [1] - 9:20
examined [1] - 4:3
examiner [1] - 27:19
except [1] - 3:12
Exhibit [4] - 6:21, 7:2, 8:16, 22:11
EXHIBITS [1] - 29:1
experience [2] - 18:19, 20:12
explanatory [1] - 25:2
Extension [1] - 2:9

## F

factual [1] - 18:22
fair [1] - 19:15
false [2] - 11:23, 18:20
federal [1] - 27:7
felt [1] - 21:14
few [2] - 4:19, 8:19
file [5] - 7:2, 7:4, 22:12, 26:8, 29:4
filing [1] - 3:8
findings [1] - 28:4
First [2] - 1:20, 2:5
first [12] - 4:2, 5:4, 5:5, 5:11, 5:16, 5:20, 6:6, 7:15, 13:3, 15:14, 22:19, 22:20
firsthand [1] - 13:11
five [4] - 7:4, 19:16, 19:19, 21:13
following [1] - 19:9
follows [2] - 4:4, 24:20
foregoing [2] - 30:5, 31:6
form [12] - 3:12, 5:14, 14:21, 15:10, 15:21, 17:4, 17:13, 18:3, 19:2, 20:15, 21:16, 24:17
forth [2] - 11:20, 16:14
Fountain [1] - 2:7
FOUNTAIN [1] - 1:6

## G

General [2] - 2:12, 2:13
Ginsberg [2] - 1:20, 2:5
given [3] - 13:4, 19:9, 22:13
God [2] - 14:4, 16:6

Griffin [2] - 1:20, 2:5
ground [4] - 5:13, 5:22, 6:3, 25:22

## H

half [1] - 24:13
Hamilton [1] - 2:14
handwriting [2] - 22:14, 26:5, 26:10
harm [1] - 10:2, 14:19
head [13] - 5:12, 5:21, 6:2, 9:8, 9:13, 11:3, 14:16, 15:18, 17:12, 17:22, 18:18, 19:11, 21:5
heading [1] - 30:6
held [3] - 1:18, 6:20, 26:14
hereby [3] - 3:2, 30:4, 31:6
hereof [1] - 30:6
hereto [1] - 3:4
hi [1] - 7:20
Hicks [4] - 4:21, 22:21, 23:2, 23:7
hooked [1] - 9:19
Hospital [1] - 24:6
hospital [3] - 9:12, 11:20, 16:14
hour [2] - 20:6, 24:10
hours [7] - 7:3, 11:20, 19:16, 19:19, 19:22, 21:13, 21:23
house [1] - 11:6

## I

idea [2] - 6:5, 6:15
identification [2] - 6:22, 8:17
impetus [1] - 21:3
important [1] - 17:9
impossibility [1] - 11:17
impossible [1] - 11:18
inconsistencies [2] - 13:9, 17:17
inconsistent [1] - 13:14
independent [1] - 5:8
INDEX [1] - 29:1
indicated [2] - 4:15, 22:13
information [1] - 26:23
injured [2] - 15:3, 20:19

injuries [7] - 9:8, 9:13, 10:9, 10:22, 16:10, 20:14
injury [1] - 11:4, 20:20
instinct [2] - 19:13, 19:14
intentional [1] - 20:20
intents [1] - 11:11
interrogation [2] - 12:13, 17:10
interview [27] - 5:16, 5:19, 7:5, 7:7, 7:14, 8:4, 8:14, 8:21, 9:4, 10:17, 14:19, 15:13, 15:14, 16:21, 19:15, 19:20, 21:14, 22:7, 22:20, 23:2, 23:12, 23:21, 24:2, 24:7, 24:15, 25:3, 26:3
introduce [3] - 14:19, 15:7, 18:7
introduced [7] - 6:10, 6:16, 15:8, 15:17, 15:19, 20:3, 25:22
introduction [3] - 17:2, 17:21, 18:17
involvement [5] - 7:5, 14:18, 17:2, 22:7, 26:18

## J

Jeanne [3] - 1:21, 31:4, 31:12
Johnson [1] - 2:8
Joseph [1] - 2:6

## K

Katherine [1] - 2:14
key [2] - 16:23, 17:9
kid [1] - 16:6
kinds [1] - 9:23
KLEIN [17] - 4:6, 5:18, 6:23, 8:18, 14:23, 15:15, 15:16, 16:2, 17:8, 17:20, 18:5, 19:7, 20:22, 21:22, 24:19, 26:13, 26:21
Klein [2] - 2:2, 27:10
knowledge [2] - 15:17, 15:19

## L

laid [1] - 10:21
last [4] - 5:6, 11:20, 12:21, 20:6

Law [1] - 1:19
lawsuit [1] - 27:7
laying [1] - 10:23
lead [1] - 17:22
least [1] - 15:12
letting [2] - 18:8, 18:22
level [2] - 21:15, 21:20
liar [2] - 14:8, 14:11
line [2] - 18:18, 19:5
link [2] - 20:13, 22:4
look [5] - 4:19, 8:11, 9:13, 15:3, 22:12
looked [5] - 9:21, 9:22, 10:4, 12:22, 13:21
looking [1] - 7:8
looks [2] - 22:20, 25:8

## M

maintained [1] - 10:17
man [2] - 7:17, 8:11
Marines [1] - 9:5
Marked [1] - 29:2
marked [6] - 6:21, 7:13, 8:16, 22:10
MASON [1] - 1:6
Mason [10] - 2:7, 4:14, 6:6, 7:19, 16:17, 17:23, 20:8, 21:6, 23:21, 25:5
Mason's [1] - 13:19
█████ [6] - 11:9, 11:11, 15:23, 26:11, 27:23, 28:5
█████ [2] - 5:12, 5:21
mean [3] - 10:17, 23:7, 23:19
medical [1] - 5:3, 5:8, 27:19
Michael [2] - 2:11, 27:14
MICHAEL [1] - 1:7
middle [2] - 7:17, 25:14
might [1] - 8:15
minutes [2] - 4:19, 7:4
Miranda [2] - 22:21, 22:22
monitor [1] - 13:20
morning [4] - 4:7, 4:8, 16:13, 16:16
most [3] - 11:4, 12:8, 17:9
moving [1] - 12:20
MR [28] - 4:6, 5:14, 5:18, 6:23, 8:18,

14:21, 14:23, 15:10, 15:15, 15:16, 15:21, 16:2, 17:4, 17:8, 17:13, 17:20, 18:3, 18:5, 19:2, 19:7, 20:15, 20:22, 21:16, 21:22, 24:17, 24:19, 26:13, 26:21
**MS** [2] - 27:4, 28:7

**N**

**name** [1] - 27:5
**need** [5] - 16:20, 18:7, 18:12, 21:15, 21:18
**needed** [1] - 21:20
**NEW** [4] - 1:1, 1:9, 1:14, 30:1
**New** [11] - 1:21, 1:23, 2:3, 2:6, 2:10, 2:12, 2:13, 3:5, 27:9, 31:5
**next** [2] - 21:15, 21:20
**night** [3] - 12:21, 18:14, 18:15
**Northern** [1] - 27:9
**NORTHERN** [1] - 1:1
**Notary** [3] - 1:22, 3:5, 31:5
**noted** [1] - 30:6
**notepad** [1] - 26:4
**notes** [8] - 4:15, 22:9, 22:11, 23:11, 24:20, 25:14, 29:5, 31:7
**nothing** [3] - 10:15, 14:3, 14:12
**Notice** [1] - 3:16
**notice** [2] - 9:16, 26:7
**number** [2] - 14:8, 23:20
**numerous** [1] - 27:15
**nursing** [1] - 5:9

**O**

**O'Connell** [3] - 1:21, 31:4, 31:12
**oath** [1] - 3:18
**object** [9] - 5:14, 15:10, 15:21, 17:4, 17:13, 18:3, 19:2, 20:15, 21:16
**objection** [2] - 14:21, 24:17
**objections** [2] - 3:11, 3:16
**observe** [1] - 9:22
**obtained** [1] - 5:7
**occurred** [1] - 14:20

**OF** [7] - 1:1, 1:6, 1:9, 1:14, 29:1, 30:1, 30:2
**offer** [1] - 25:10
**Office** [1] - 2:12
**officers** [1] - 27:8
**Offices** [1] - 1:19
**one** [6] - 9:14, 12:8, 17:7, 17:18, 18:13, 25:17
**opinion** [2] - 6:19, 20:12
**outward** [2] - 9:17, 10:2
**overall** [1] - 17:10
**own** [2] - 18:9, 19:13

**P**

**P.C** [1] - 2:8
**p.m** [3] - 24:2, 24:15, 25:4
**page** [8] - 7:16, 7:17, 8:10, 12:20, 22:19, 22:20, 25:13, 25:14
**pages** [7] - 8:20, 19:20, 20:3, 22:11, 22:14, 22:16, 22:18
**part** [2] - 17:19
**parties** [1] - 3:4
**pattern** [1] - 18:22
**Pattison** [2] - 1:19, 2:5
**PD** [1] - 29:5
**Peck** [3] - 2:8, 2:10, 27:5
**PECK** [2] - 27:4, 28:7
**per** [1] - 12:7
**perhaps** [1] - 4:16
**period** [1] - 16:20
**PERKINS** [11] - 5:14, 14:21, 15:10, 15:21, 17:4, 17:13, 18:3, 19:2, 20:15, 21:16, 24:17
**Perkins** [1] - 2:6
**person** [2] - 5:20, 12:15
**person's** [1] - 18:21
**personal** [1] - 22:6
**phone** [1] - 25:5
**physical** [3] - 9:16, 9:17, 10:2
**Pine** [1] - 2:9
**place** [1] - 30:6
**placed** [1] - 20:8
**Plaintiff** [1] - 1:4
**Plaintiff/Claimant** [1] - 2:4
**played** [1] - 12:13

**playing** [1] - 7:2
**Plaza** [1] - 2:9
**PLLC** [2] - 1:20, 2:5
**point** [13] - 9:14, 11:12, 11:18, 13:12, 14:10, 14:15, 14:18, 15:7, 15:9, 16:23, 18:13, 19:16, 21:21
**police** [3] - 5:5, 5:8, 27:8
**possible** [1] - 13:19
**possibly** [1] - 6:17
**prepared** [1] - 7:14
**present** [3] - 2:14, 5:16, 22:23
**previously** [2] - 7:12, 15:20
**probable** [5] - 6:12, 6:14, 20:18, 21:7, 21:13
**proceedings** [1] - 31:8
**Professional** [2] - 1:22, 31:4
**psychiatric** [1] - 24:6
**Public** [3] - 1:22, 3:5, 31:5
**purposes** [1] - 11:12
**putting** [1] - 18:21

**Q**

**qualifications** [1] - 3:17
**questioning** [1] - 27:10
**questions** [5] - 3:12, 17:23, 26:22, 27:12, 28:7

**R**

**rank** [1] - 12:6
**rather** [2] - 18:8, 18:22
**rays** [2] - 10:4, 10:8
**read** [4] - 8:12, 12:21, 13:13, 30:4
**reading** [1] - 13:17
**really** [2] - 5:17, 8:8
**reason** [1] - 18:12
**reasonable** [1] - 20:18
**recitation** [1] - 8:23
**recognize** [1] - 21:12
**recollection** [4] - 6:18, 8:2, 23:9, 25:21
**record** [6] - 6:20, 22:12, 26:13, 26:14, 26:19, 30:5
**recording** [1] - 25:18

**recovery** [2] - 11:9, 11:17
**referring** [1] - 16:17
**refused** [2] - 25:8
**Registered** [2] - 1:21, 31:4
**relates** [1] - 21:11
**relation** [1] - 27:23
**remember** [7] - 5:23, 10:3, 13:10, 13:17, 23:5, 24:12, 25:11
**RENSSELAER** [1] - 1:7
**Rensselaer** [2] - 27:6, 27:20
**reopen** [1] - 26:23
**repeat** [1] - 17:6
**rephrase** [1] - 27:13
**Reporter** [2] - 1:22, 31:4
**reporter** [1] - 3:17
**represent** [1] - 27:6
**reserved** [1] - 3:12
**respect** [2] - 28:4, 28:5
**respective** [1] - 3:3
**responders** [1] - 5:4
**response** [3] - 8:4, 9:2, 10:14
**responses** [2] - 12:15, 27:11
**result** [2] - 18:10, 18:23
**resume** [1] - 25:18
**review** [2] - 8:19, 25:11
**reviewed** [1] - 7:22
**reviewing** [1] - 4:14
**risk** [1] - 18:19
**role** [3] - 7:7, 12:12, 17:10
**Ronald** [1] - 2:7
**RONALD** [1] - 1:6
**room** [7] - 5:13, 7:18, 8:12, 8:13, 9:20, 18:6, 25:21
**rules** [1] - 27:10

**S**

**Samaritan** [1] - 24:6
**Sampson** [2] - 1:20, 2:5
**saw** [7] - 5:19, 9:8, 9:18, 9:19, 11:22, 19:15, 22:2
**scenario** [11] - 6:10, 14:19, 15:8, 15:17, 17:2, 17:11, 17:21,

18:7, 18:17, 20:4, 25:22
**se** [1] - 12:8
**second** [5] - 7:14, 7:18, 8:20, 23:12, 25:13
**seconds** [1] - 7:4
**see** [1] - 17:17
**seeing** [1] - 22:9
**self** [1] - 25:2
**self-explanatory** [1] - 25:2
**senior** [3] - 12:3, 12:5, 12:7
**seniority** [1] - 12:9
**sense** [2] - 10:10, 12:4
**September** [1] - 1:18
**sergeant** [6] - 7:8, 7:19, 12:3, 12:5, 12:7, 27:5
**Sergeant** [6] - 7:19, 7:20, 8:6, 8:8, 23:21, 26:15
**series** [1] - 24:20
**shall** [2] - 3:9, 3:12
**show** [3] - 7:9, 7:12, 22:10
**shown** [1] - 26:9
**sick** [2] - 24:11, 24:14
**side** [1] - 11:2
**signed** [3] - 3:4, 22:22, 25:11
**signs** [2] - 9:16, 9:23
**SIKIRICA** [1] - 1:7
**Sikirica** [5] - 2:11, 27:6, 27:14, 27:23, 28:4
**sitting** [4] - 13:6, 13:19, 13:20, 22:23
**situation** [1] - 12:14
**six** [2] - 19:19, 19:20
**slammed** [8] - 5:12, 5:21, 5:22, 6:3, 14:16, 17:12, 19:11, 21:4
**slamming** [10] - 6:5, 6:10, 6:15, 15:18, 17:3, 17:22, 18:18, 20:4, 25:22, 25:23
**slept** [2] - 24:9, 24:16
**soda** [1] - 25:9
**someone** [1] - 13:12
**sorry** [1] - 7:16
**speaking** [4] - 14:10, 18:13, 18:14, 26:18
**specifically** [1] - 19:10
**springboard** [1] - 17:23
**start** [3] - 22:21, 24:2, 25:3

starting [2] - 7:3, 22:19
state [1] - 11:19
STATE [3] - 1:9, 1:14, 30:1
State [4] - 1:23, 2:12, 3:5, 31:5
statement [11] - 4:20, 12:21, 13:4, 13:12, 13:14, 13:17, 19:21, 19:23, 25:12, 25:19, 25:20
statements [1] - 8:20
STATES [1] - 1:1
stenographic [1] - 31:7
step [1] - 8:13
still [2] - 11:14, 21:13
stipulated [4] - 3:2, 3:8, 3:11, 3:15
story [1] - 16:11
Street [2] - 1:20, 2:5
subject [1] - 26:22
Subscribed [1] - 30:14
substance [2] - 10:20, 15:5
suggest [4] - 5:12, 5:21, 6:2, 21:4
suggestion [1] - 17:11
Suite [1] - 2:3
sum [2] - 10:20, 15:5
suspicion [1] - 20:19
swear [2] - 14:3, 16:6
swelling [1] - 9:23
sworn [3] - 3:5, 4:3, 30:14

**T**

terms [1] - 12:6
testified [2] - 4:3, 7:7
testifying [1] - 4:9
testimony [4] - 4:11, 4:14, 21:6, 30:5
THE [12] - 1:14, 5:15, 14:22, 15:12, 15:23, 17:6, 17:15, 18:4, 19:4, 20:17, 21:18, 24:18
thereof [1] - 30:8
THOMAS [2] - 1:3, 1:11
Thomas [22] - 5:12, 6:6, 6:13, 6:21, 7:2, 8:16, 12:17, 14:12, 15:8, 20:9, 20:13, 22:11, 23:4, 23:7, 23:13, 23:22, 26:11,

26:16, 27:7, 27:23, 28:5, 29:2
Tim [1] - 2:7
TIM [5] - 1:6, 1:17, 4:2, 30:4, 30:13
today [3] - 9:12, 13:6, 22:23
took [4] - 5:4, 14:15, 17:11, 19:10
top [3] - 22:19, 22:20, 26:4
towards [1] - 25:13
TPD [1] - 22:12
training [4] - 5:9, 18:19, 19:9, 20:12
transcript [7] - 7:14, 7:17, 7:22, 8:3, 8:20, 12:20, 30:7
transcription [2] - 8:7, 31:7
trauma [2] - 9:17
trial [2] - 3:13, 7:15
Trial [1] - 3:16
trickery [1] - 15:2
TROY [1] - 1:6
Troy [4] - 1:21, 2:6, 2:7, 29:5
true [12] - 6:5, 9:6, 9:10, 10:5, 10:10, 11:7, 11:10, 11:16, 12:5, 18:20, 30:6, 31:6
truth [1] - 15:5
try [1] - 12:14
trying [1] - 7:8
two [5] - 5:6, 7:3, 11:20, 22:14, 22:15
type [1] - 19:9

**U**

under [1] - 20:9
UNITED [1] - 1:1
up [10] - 5:5, 5:19, 8:10, 8:12, 9:19, 15:9, 16:13, 20:11, 24:11, 24:14

**V**

verbal [1] - 27:11
Video [1] - 29:4
video [5] - 4:16, 4:20, 7:2, 7:5, 7:9
VTS_01_4.VOB [2] - 7:3, 29:4

**W**

waived [1] - 3:9
walk [2] - 22:18, 24:23
walked [1] - 12:13
walnut [1] - 26:4
Washington [1] - 2:9
weeks [1] - 4:21
West [1] - 2:9
whatsoever [1] - 23:9
whole [1] - 30:7
wife [1] - 12:23
wife's [1] - 13:17
Wilahemina [6] - 4:20, 22:21, 23:2, 23:4, 23:6, 23:7
wish [1] - 4:12
witness [2] - 18:22, 18:23
WITNESS [11] - 5:15, 14:22, 15:12, 15:23, 17:6, 17:15, 18:4, 19:4, 20:17, 21:18, 24:18
woke [2] - 24:10, 24:14
words [1] - 18:21
worker [1] - 12:6
writings [2] - 26:7, 26:8
written [2] - 19:20, 19:23, 20:3

**X**

X-rays [2] - 10:4, 10:8

**Y**

years [1] - 5:6
yesterday [1] - 4:9
YORK [4] - 1:1, 1:9, 1:14, 30:1
York [11] - 1:21, 1:23, 2:3, 2:6, 2:10, 2:12, 2:13, 3:6, 27:9, 31:5
yourself [1] - 27:8

# APPENDIX
## 2587

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ADRIAN THOMAS,

                           Plaintiff,

        -against-

ADAM R. MASON, RONALD FOUNTAIN,
TIM COLANERI, and MICHAEL SIKIRICA,

                         Defendants.
_____

**REPLY TO PLAINTIFF'S "COUNTER STATEMENT"**
Civil Action No.: 1:17-cv-626 (GTS/DJS)

The above-named defendants, Adam R. Mason, Ronald Fountain, and Tim Colaneri submit the foregoing in response to the Plaintiff's purported "Counter Statement"[1]:

1.     M.T., the four-month-old son of Adrian Thomas and Wilhelmina Hicks, was pronounced dead on September 23, 2008.  See Klein Decl. Ex. 1, Hicks 209 Trial 877:16-878:22; Ex. 9, Samaritan ER Rpt.; Ex. 27 Death Certificate.

     **RESPONSE:  Not disputed.**

2.     M.T. died from a streptococcus pneumoniae infection causing sepsis and meningitis. Maloney Decl. Ex. 2, Maloney Rpt. pp. 2,4.

     **RESPONSE:  Denied.  *See* Death Certificate.**

3.     M.T.'s death was erroneously labeled a crime, resulting in the wrongful conviction of Mr. Thomas. Johnson Decl. Ex. 2, Johnson Rpt. pp. 11-12.

     **RESPONSE: Denied.  *See* Death Certificate.**

---

[1] For the reasons outlined in the accompanying Reply Memorandum of Law, the Defendants object to Plaintiff's "Counter Statement" as the same is improper. The Defendants respectfully request that the Court reject all assertions made by the Plaintiff in such improper "Counter Statement" and for any such further relief as the Court deems just.

4.      M.T. was a twin, born prematurely at 33 weeks on May 4, 2008, during a complicated birth which necessitated the use of forceps. See Klein Decl. Ex. 1, Hicks 2009 Trial 879:3-25, 912 10-14; Ex. 2, Ojukwu 2009 Trial 146l:2-l1.

**RESPONSE: Not disputed.**

5.      During her pregnancy, Ms. Hicks, had gestational diabetes, high blood pressure, and pre-eclampsia. Id. at Ex. 1, Hicks 2009 Trial 879:11-13,910:11-16.

**RESPONSE: Not disputed.**

6.      Hicks was admitted to the hospital on May 1, 2008, where her water broke and showed evidence of meconium. Id. at Ex. 1, Hicks 2009 Trial 911:1-22; Ex.3, Leestma 2009 Tr. 2122:2-7.

**RESPONSE:  Not disputed.**

7.      The foregoing issues placed M.T. at risk for subdural bleeds. Id. at Ex.3, Leestma 2009 Trial 2121:11-2125:13.

**RESPONSE:  Not disputed.**

8.      After birth, M.T. was admitted to the neonatal intensive care unit at Albany Medical Center (hereinafter "AMC") and then transferred to St. Mary's Hospital, where he remained hospitalized until May 22,2008. *Id*, at Ex. 2, Ojukwu 2009 Trial 1460:23-1461:24,1464:2-3.

**RESPONSE: Not disputed.**

9.      As of September 2008, M.T. had only 1 of 4 pneumococcal vaccinations, and due to this and premature birth, was more susceptible to infections, including bacterial pneumoniae. Id. at Ex.2, Ojukwu 2009 Trial 1468:9-1469:23; Ex.6, Sikirica Dep. I, 112:17-1143; Ex.8, Klein 2009 Trial 1986:3-1988:11.

**RESPONSE: Not disputed.**

10.      After M.T. came home from the hospital, M.T. was primarily cared for by Ms. Hicks. *Id*. at Ex.4, Thomas Dep. I 73:25-74:8.

**RESPONSE: Not disputed.**

11.      On or about September 19, 2008, M.T. developed a fever with diarrhea, which lasted through Sunday. Id. at Ex.1, Hicks 2009 Trial 919:8-923:18.

**RESPONSE: Not disputed.**

12.      In the morning of September 21, 2008, Hicks discovered M.T. barely breathing in his crib. *Id*. at Ex.1, Hicks 2009 Trial 924:2-5; Ex. 4, Thomas Dep. I 129:16-21.

**RESPONSE: Not disputed.**

13.      Prior to that morning, M.T. had not exhibited any problems with his breathing. *Id*. at Ex. 1, Hicks 2009 Trial 924:2-5.

**RESPONSE: Not disputed.**

14.      Thomas called 911 and M.T. was transported to Samaritan hospital where he presented with symptoms of sepsis, and a blood culture was taken to confirm whether M.T. had a bacterial infection. *Id*. at Ex.4, Thomas Dep. I 129:16-21; Ex. 9, Samaritan ER Report; Ex. 10, Edge Dep. 86:4-25.

**RESPONSE: Not disputed.**

3

15.     M.T. was transferred to the care of Dr. Walter Edge at AMC. *Id*. at Ex.9, Samaritan ER Report; Ex. 11, Kardos 2009 Trial 849:9-850:14.

**RESPONSE: Not disputed.**

16.     Dr. Edge requested a neurology and an ophthalmology consult to look for a possible traumatic brain injury. *Id*. at Ex. 10, Edge Dep. 29:23-30:20; Ex. 12, Waldman Dep. 15:11-23.

**RESPONSE: Not disputed.**

17.     Dr. Edge was erroneously informed by the AMC neurosurgery consult that M.T.'s C.T. showed bilateral subdural hematomas and a skull fracture. *Id*. at Ex.6, Sikirica Dep. I 56:6-23, 57:12-19,85:19-86:14; Ex. 10, Edge Dep. 127:13-131:24.

**RESPONSE: Denied. This is a gross oversimplification of the true testimony. The Doctors treating M.T. are basing their assessment on a number of factors coming in during a short period of time while M.T. was in critical condition. The C.T. Scans and reports indicated that M.T. had "large bilateral extra axial fluid collections slightly larger on the right -- posteriorly on the right and over the upper aspect of the right convexity, the fluid [was] distinctly denser than on the left. Which probably indicates a large subdural collection on the right; it's unclear whether the fluid is subdural or merely subarachnoid. The distinction can be made with M.R.I. -- M.R.I." (p. 97, L. 23—p. 98, L. 8 of Edge EBT, Exhibit "F" to Spencer Moving Declaration). An MRI could not be conducted because M.T. was in critical condition. (p. 129, L. 23-p. 130, L. 7 of <u>Id.</u>). Based upon the C.T. report, the impression/ possible diagnosis was: "Large bilateral, extra axial fluid collections, probably subdural on the right and possibly the same on the left. M.R.I. is recommended to distinguish between subdural**

4

**collections and enlargement of subarachnoid spaces." (p. 98, L. 12-L. 16, <u>Id.</u>) However, once Dr. Sikirica performed the autopsy, which provides a completely different vantage point, he concluded that there was not a left-sided subdural hematoma. (p. 86, L. 12-14 of Exhibit "B" to Spencer Moving Declaration).**

18.     It was later determined that the diagnosis of a skull fracture was plainly incorrect while M.T. was still at AMC, and the CT results in fact showed bilateral "fluid collections", not hematomas. *Id.* at Ex. 10, Edge Dep. 127:13-131:24. Later, at autopsy, only a right sided hematoma was observed. *Id.* at Ex.6, Sikirica Dep. I 56:6-23,57:12-19,85:19-86:14.

**RESPONSE: Not disputed.**

19.     Nonetheless, based on the reported evidence of head trauma, both Child Protective Services (hereinafter "CPS") and the Troy Police Department (hereinafter "TPD") were notified out of a concern for possible child abuse. *Id.* at Ex. 10, Edge Dep. 61:19-62:14.

**RESPONSE: Not disputed.**

20.      Defendants Mason and Fountain were assigned the case and shared the role of lead investigator for the case. *Id*. at Ex. 13, Mason Dep. 37:18-19.

**RESPONSE: Not disputed.**

21.     Defendants Mason and Fountain first responded to Samaritan Hospital, where they were informed that the initial report at Samaritan was that M.T. was having respiratory problems and was unresponsive, and that M.T. had been transferred to AMC.  *Id*. at Ex. 14, TPD Rpt. P001398.

**RESPONSE: Not disputed.**

22.     Defendants Mason and Fountain escorted a CPS worker to Thomas' home for the purpose of removing Thomas and Hicks' other children from the home. *Id.* at Ex.14, TPD Rpt. P001398.

**RESPONSE: Not disputed.**

23.     Defendants Mason and Fountain learned from Thomas that M.T. had been sick with a fever and diarrhea for the past two days. *Id.*at Ex.4, Thomas Dep. I 139:5-140:18; Ex. 14, TPD Rpt. P001398.

**RESPONSE: Not disputed.**

24.     Defendants Mason and Fountain next went to AMC. *Id.* at Ex. 14, TPD Rpt. P001398.

**RESPONSE: Not disputed.**

25.     Defendant Fountain spoke to Dr. Edge. The conversation lasted only three to four minutes, during which Dr. Edge conveyed that M.T.'s head injury was the type typically caused by a high-speed impact or by slamming very hard into a hard object. *Id.* at Ex. 14, TPD Rpt. P001398; Ex. 15, Fountain Dep. 60:10-62:12.

**RESPONSE: Not disputed.**

26.     During the first visit to AMC, defendants Fountain and Mason were also incorrectly informed M.T. had a skull fracture. *Id.* at Ex.15, TPD Rpt. P001398; Ex. 16, Tr. Interrogation I, P000299-P000300.

**RESPONSE: Not disputed.**

27.     Defendant Fountain falsely claimed that during this conversation, Dr. Edge also told him that M.T. had been murdered. *Id*. at Ex. 15, TPD Rpt. P001398.

**RESPONSE: Denied. There is absolutely no evidence to support that Defendant Fountain "falsely" claimed. Dr. Edge stated he did not recall whether he in fact stated it was a murder however, Defendant Fountain's contemporaneously made notes indicate that Dr. Edge stated the same. (p. 116, L. 14; p. 118, L. 21-24 of Exhibit "F" to Spencer Moving Declaration;** *see***, Fountain Deposition attached as Exhibit "C" to Spencer Reply Affidavit, p. 95, L. 21-p. 96, L. 17).**

28.     Dr. Edge denied making any such statement regarding a murder. *Id*. at Ex. 10, Edge Dep. 117:6-120:2.

**RESPONSE: Denied. While Dr. Edge stated it would be odd from for him to say anything regarding a murder, Dr. Edge also stated that he did not recall whether he said it was a murder. (p. 116, L. 14; p. 118, L. 21-24 of Exhibit "F";** *see* <u>**Id.**</u>**).**

29.     Per Dr. Edge, his role as a physician is to diagnose, not determine a cause, or determine whether an injury is accidental or non-accidental. *Id*. at Ex.10, Edge Dep.138:7-139:4.

**RESPONSE:  Not disputed.**

30.     Defendant Fountain and Mason obtained a statement from Wilhelmina Hicks, which corroborated Adrian Thomas' claim that M.T. had been sick for the past few days, and did not contain any statements alleging abuse of M.T. by Mr. Thomas. *Id*. at Ex. 14, TPD Rpt. P001399; Ex. 15, Fountain Dep. 63:11-20;.Ex. 18, Hicks Statement P001409-P001410.

**RESPONSE: Not disputed.**

31. Defendant Mason never inquired with doctors about M.T.'s illness or whether there could be a non-trauma related cause of death. *Id*. at Ex. 13, Mason Dep. 168:12-169:19.

**RESPONSE: Not disputed.**

32. Defendants Fountain and Mason returned to Mr. Thomas' home and asked him to accompany them to the Troy Police Department headquarters. *Id*. at Ex. 14 TPD Rpt. P001399; Ex. 15, Fountain Dep. 64:13-65:6.

**RESPONSE: Not disputed.**

33. Going into the questioning, defendant Fountain believed that Mr. Thomas had done something to M.T. *Id*. at Ex.15, Fountain Dep. 96:18-97:8.

**RESPONSE: Not disputed.**

34. During the questioning, Mr. Thomas thought he could not leave, and repeatedly stated that he felt like he was in jail. *Id*. at Ex.4, Thomas Dep. I l5l:10-19; Ex. 5, Thomas Dep. II 384:6-22; Ex. 16, Tr. Interrogation I P000367-P000369, P000403.

**RESPONSE: Defendant's cannot respond to the operation of Mr. Thomas' mind however, it is undisputed that Mr. Thomas testified that he was never told that he couldn't leave. (Thomas EBT p. 151, L. 10-L. 23 of Exhibit "A" to Spencer Moving Declaration).**

35. Mr. Thomas was initially questioned for about two hours. *Id*. at Ex. 14, TPD Rpt. P001399.

**RESPONSE: Not disputed.**

36.     Defendant Mason and Fountain's interrogation technique of Mr. Thomas was based on their own instinct and was not based on any specific training. *Id*. at Ex. 13, Mason Dep. 54:13-55:7; Ex. 15, Fountain Dep.32:5-12.

**RESPONSE: Denied. Defendant Mason testified as follows: "I agree that I didn't go into that interview with some preconceived, this is going to be my form because I was taught this. I don't know that at any point in time did some portion of my training kick in, but for the most part, the interview was conducted based on my instincts." (p. 54, L. 23-p. 55, L. 7 of Exhibit "D" to Spencer Reply Declaration).**

37.     During the first interrogation, Fountain suggested to Mr. Thomas that he may have bumped M.T.'s head on the crib with the hope that Mr. Thomas would adopt this false suggestion. *Id*. at Ex. 15, Fountain 82:14-21, 89:23-90:10.

**RESPONSE: Denied. The cited testimony does not state that Defendant Fountain "hope[d] that Mr. Thomas would adopt this false suggestion." Indeed, Defendant Fountain testified that he wasn't aware that the techniques used could have caused a false confession. (p. 99, L. 17-L. 22 of Exhibit "C" to Spencer Reply Declaration). Defendant Fountain suggested possible scenarios to explain the injuries reported.**

38.     During the interrogation, Mr. Thomas stated, in sum and substance, that if his son died, he would jump off a bridge. *Id.* at Ex.4, Thomas Dep. I 147:12-15.

**RESPONSE: Not disputed.**

39.     Defendants Mason and Fountain continued to question Mr. Thomas after he made this statement. *Id*. at Ex. 13, Mason Dep. 99:17-20; Ex. 15, Fountain Dep. 83:6-10.

**RESPONSE: Not disputed.**

40.     After repeated denials that he had done anything to M.T., in a state of duress and emotional turmoil, and in response to threats that his wife would be arrested, Mr. Thomas eventually adopted defendant Fountain's false suggestion that he had bumped M.T.'s head on the crib, and agreed to sign a statement written by Fountain, which he in fact signed on September 22, 2008, at 7:41 a.m. *Id*. at Ex.5, Thomas Dep. II 415:14-416:14; Ex. 13, Mason Dep. 104:9-14; Ex. 15, Fountain Dep.79 15-18; Ex. 19, Thomas Statement I P001404.

**RESPONSE: Defendants cannot speak to the operation of Mr. Thomas' mind. Otherwise not disputed that after denying that he done anything to M.T., Mr. Thomas confessed to causing M.T.'s injuries and signed a statement that he reviewed and agreed was truthful. (Ex. 19 to Klein Declaration).**

41.     The first interview did not yield any statements or evidence that gave Mason and Fountain probable cause to arrest Mr. Thomas for any crime, or which were consistent with the information Fountain had learned from Dr. Edge. *Id*. at Ex. 13, Mason Dep. 100:21-101:8.

**RESPONSE: Not disputed.**

42.     As a result of Mr. Thomas' statement regarding jumping off a bridge, defendants Mason and Fountain brought Mr. Thomas to Samaritan Hospital for a mental health evaluation, where he remained under observation for fifteen hours. *Id*. at Ex.4, Thomas Dep. I 147:12-148:3; Ex. 5, Thomas Dep. II 383:23-384:5; People v. Thomas, 22 N.Y.3d 629, 646 (N.Y. 2014).

**RESPONSE: Not disputed.**

43.     Defendant Mason requested that Samaritan notify him when Mr. Thomas was ready to be released. Klein Decl., Ex. 13, Mason Dep. 106:11-14.

**RESPONSE: Not disputed.**

44.  On September 22, 2008, defendant Mason returned to AMC and spoke to Dr. Edge, obtaining a statement from him that M.T.'s injury would have required more than a bump on a crib. *Id*. at Ex. 2l, Edge Statement P001413.

**RESPONSE: Not disputed except to the extent such assertion attempts to reflect the whole statement made by Dr. Edge which speaks for itself.**

45.  Defendant Mason learned at this time that M.T. did not actually have a skull fracture. *Id*. at Ex. 17, Tr. Interrogation II, P000455-P000456.

**RESPONSE: Not disputed.**

46.  In the afternoon of September 22, 2008, Mr. Thomas, who was distraught and sleep deprived, was met and picked up from the hospital by defendant Mason. *Id.* at Ex.4, Thomas Dep. I 149:8-150:6, 168:8-19; Ex. 13, Mason 106:4-17.

**RESPONSE: Not disputed that Mr. Thomas states that he was sleep deprived however, Defendant Mason testified in response to the question, was Mr. Thomas lucid, that Mr. Thomas appeared completely normal during the interview. (p. 230, L. 5-L. 8 of Mason EBT attached as Exhibit "D" of Spencer Reply Declaration). Defendant Colaneri further testified that he was not aware that Mr. Thomas was sleep deprived as he now asserts. (p. 55, L. 10-L. 14 of Sept. 11 EBT, Exhibit "E" to Spencer Reply Declaration).**

47.  Defendant Mason brought Mr. Thomas back to the Troy Police Department headquarters for further questioning. *Id*. at Ex. 13, Mason Dep. 106:18-107:2.

**RESPONSE: Not disputed.**

11

48.     On the way to the interview room, defendant Mason told Mr. Thomas that once in the interview room, if he were to get up and go towards the door, he would be charged with escape. *Id*. at Ex.4, Thomas Dep. I 150:13-19.

**RESPONSE: Denied. Defendant Mason denies ever stating such. (p. 199, L. 3-L. 6 of Exhibit "D" to Spencer Reply). Furthermore, the Plaintiff never alleged that such threat was made to him during his criminal trial. (p. 11 of Exhibit "B" to <u>Id.</u>).**

49.     Defendant Mason interrogated Mr. Thomas for approximately 7 ½ hours. I*d*. at Ex. 13, Mason Dep.2l:6-22.

**RESPONSE: Not disputed.**

50.     Mr. Thomas had not slept since he was awoken by his wife on September 21,2008, at approximately 8:00 a.m. *Id*. at Ex. 4, Thomas Dep. I 168:8-19.

**RESPONSE: Not disputed that Mr. Thomas asserted at his Deposition that he hadn't slept.**

51.     Mr. Thomas did not feel he was free to leave during the interrogation. *Id*. at Ex. 5, Thomas Dep. II 301:15-1 8.

**RESPONSE: Defendants cannot speak to the operation of Mr. Thomas' mind however, it is undisputed that Mr. Thomas testified that he was never told that he couldn't leave. (Thomas EBT p. 151, L. 10-L. 23 of Exhibit "A" to Spencer Moving Declaration).**

52.     Defendant Colaneri watched and otherwise monitored the interview from a separate room and entered the room on one occasion. *Id.* at Ex. 22, Colaneri Dep. I, 93:20-93:22,96:23-97:21.

**RESPONSE: Not disputed.**

53.     Prior to defendant Colaneri entering the room, defendant Mason did not have probable cause to arrest Mr. Thomas for any crime. *Id.* at Ex. 13, Mason Dep. 113:15-114:19, 167:2-13; Ex.23, Colaneri Dep. II 2l:3-22:5.

**RESPONSE: Not disputed.**

54.     During the second interrogation, defendants Mason and Colaneri jointly introduced the concept of M.T. being slammed. *Id.* at Ex. 13, Mason Dep. 114:4-115:6, 17l:9-172:10, 195:21-196:8; Ex. 23, Colaneri Dep. II 6:5-19, 17:9-18:16.

**RESPONSE: Not disputed.**

55.     All of the statements made by Mr. Thomas regarding bumping, throwing, or slamming M.T. were first suggested to him by the defendants. *Id.* at Ex.4, Thomas Dep. I 169:17-170:19; *Thomas*, 22 N.Y.3d at 646.

**RESPONSE: Not disputed.**

56.     Mr. Thomas made the involuntary statements because he was, without limitation, tired, afraid, wanted to see his children and particularly his son, M.T., was afraid if he did not make the statement he or his wife would be arrested, and based on the false promise by the defendants that he would be released if he made the statement. See Klein Decl. Ex. 5, Thomas Dep. II 304:20-305:11; *Thomas*, 22 N.Y.3d 629.

**RESPONSE: Denied. Defendants cannot speak to the operation of Mr. Thomas' mind**

however, it is undisputed that Mr. Thomas reviewed and signed a document titled voluntary statement after going through it and agreeing it was true. (**See** **Miranda Waiver, Exhibit "C" to Mason Affidavit;** *see***, ⁋ 41 of Mason Affidavit;** *see also***, Statement attached as Exhibit "D" to Spencer Affidavit). Furthermore, the trial court specifically observed that Mr. Thomas did not appear fatigued, nor did he ever indicate or state he was. (***See***, p. 17 of Huntley Hearing, Exhibit "B" to Spencer Reply Declaration).**

57.    Defendant Fountain participated in the first two-hour interrogation and was personally involved in conduct which the Court of Appeals found to be coercive. See Klein Decl. Ex. 15, Fountain Dep. 37:16-38:8; *Thomas*, 22 N.Y.3d at 637-38.

**RESPONSE: Not disputed that Defendant Fountain only participated in the first-two hour interrogation. Remaining allegations denied.**

58.    Defendant Colaneri was personally involved in the second seven-hour interview. See Klein Decl. Ex. 22, Colaneri Dep. I 93:77-22, 97:10-104:8.

**RESPONSE: Not disputed.**

59.    Defendant Colaneri's conduct during the interrogation made Thomas give more information and contributed to Thomas's coerced false confession. Id. at Ex. 22, Colaneri Dep. I 102:21-104:13; *Thomas*, 22 N.Y.3d at 639.

**RESPONSE: Denied that Defendant's Colaneri's conduct *made* Thomas do anything as Mr. Thomas himself testified that Defendant Colaneri "came off aggressive, but that didn't - - that didn't cause me to sign or anything like that." (p. 310, L. 11-L. 22 of Thomas EBT attached as Exhibit "A" to Spencer Moving Declaration).**

60.   Although Thomas told the TPD defendants many times that he didn't do anything, neither officer documented such in the statements they wrote for Mr. Thomas to sign. See Klein Decl. Ex. 13, Mason Dep. 171:18-10; Ex. 15, Fountain Dep.79:15-21; Ex. 19, Thomas Statement I P001404; Ex.20, Thomas Statement II P001415-P001424.

**RESPONSE: Not disputed.**

61.   Purported probable cause to arrest Thomas was not established until the moment Thomas involuntarily adopted the TPD defendants' suggested and false narrative that he had slammed Matthew on the bed three times. Id. at Ex.4, Thomas Dep. I 169:3-170:19; Ex. 13, Mason Dep. 112:19-116:4; *Thomas*,22 N.Y.3d at 646.

**RESPONSE: Denied. Mr. Thomas stated that such narrative was truthful when he reviewed and signed the statement and such in connection with the reported injuries of M.T. provided probable cause to arrest.**

62.   In the early hours of September 23,2008, after Mr. Thomas signed a second 10-page coerced false statement, he was arrested by defendant Mason. Klein Decl. Ex. 4, Thomas Dep. I 172:12-16; Ex. 13, Mason Dep. 107:3-107:13,115:20-116:4; Ex.20, Thomas Statement II.

**RESPONSE: Not disputed.**

63.   The decision to arrest Thomas was made by defendants Mason and Colaneri jointly. *Id*. at Ex. 13, Mason Dep. 109:22-111:6.

**RESPONSE: Not disputed.**

15

64.     Defendant Mason prepared a criminal court information charging Mr. Thomas with attempted murder and attached only the second coerced false statement to it, leaving out the first inconsistent and non-incriminating statement. *Id.* at Ex. 13, Mason Dep. 117:15-118:20; Ex. 19, Thomas Statement I P001404; Ex.20, Thomas Statement II P001415-P001424.

**RESPONSE: Not disputed.**

65.     Mr. Thomas was arraigned based on the documents submitted by defendant Mason, and consequently, imprisoned in the Rensselaer County Jail. *Id.* at Ex. 4, Thomas Dep. I 172:17-18; Ex. 5, Thomas Dep. II 407:7-408:21; Ex. 13, Mason Dep.122:7-22.

**RESPONSE: Not disputed.**

66.     After Mr. Thomas had been arraigned and was represented by counsel, CPS worker Jasper Estaris met with Mr. Thomas in the Rensselaer County Jail. Id. at Ex.4, Thomas Dep. I 172:17-173:2; Ex.5, Thomas Dep. II 407:7-408:21. In this jail setting, where Mr. Thomas was upset after, among reasons, being for the first time informed by Estaris of the death of M.T., Mr. Thomas was questioned by Estaris without being offered an attorney and outside the presence of his attorney, and purportedly made statements about hurting M.T. Ex. 5, Thomas Dep. II 408:13-409:4; Ex. 37, Estaris Dep. 72:22-76:20, 81.20-82:4, 9l:23-92:7. Thomas denies having ever made any such statements. *Id.* at Ex. 4, Thomas Dep. I 172:19-177:18.

**RESPONSE: Not disputed that after Mr. Thomas was arraigned, CPS worker Jasper Estaris met with Mr. Thomas in the Rensselaer County Jail and that Mr. Estaris informed Mr. Thomas of the death of M.T. which Mr. Thomas was visibly upset about. The remaining statements are denied. The notes taken by CPS workers indicate that Mr. Thomas stated he did not have a lawyer. (p. 234, L. 5—L. 8 of Estaris**

**EBT, attached as Exhibit "D" to Spencer Moving Declaration). Defendants deny that Mr. Thomas "purportedly made statement about hurting M.T." as all records and evidence indicate that Mr. Thomas did in fact make such statements despite his denial.**

67.     CPS and TPD were working cooperatively and sharing information during the M.T. investigation, and notes from CPS confirm that defendant Mason informed CPS supervisor Nicole Noel of the coerced false admissions by Thomas regarding slamming M.T., and provided Thomas' statement, among other police documents, to Ms. Noel, who would have shared it with Estaris prior to CPS interviewing Thomas in jail without counsel. *Id.*at Ex.23, Mason Dep. 128:3-132:17:, Ex. 24, Noel Dep. 44:14-48:23.

**RESPONSE: All conjecture and improper characterization of the real evidence is denied. Not disputed that CPS and TPD worked cooperatively during the investigation into M.T.'s death and that CPS supervisor Nicole Noel was informed of Mr. Thomas' confession. Denied that Ms. Noel "would have shared [such] information with Estaris prior to CPS interviewing Thomas in jail. . ." Mr. Estaris testified that he was not informed about Mr. Thomas' confession to TPD prior to interviewing Mr. Thomas himself. (p. 93, L. 5-L. 22; p. 98, L. 6—L. 18 of Exhibit "C" to Spencer Moving Declaration). Furthermore, the deposition testimony of Ms. Noel cited by Plaintiff clearly indicates that Ms. Noel testified that she would "not necessarily" have given Mr. Estaris a copy of Mr. Thomas' confession, or informed him of the same, prior to Mr. Estaris interviewing Mr. Thomas at the Rensselaer County Jail.**

17

68.     On September 25, 2008, Dr. Sikirica performed the autopsy of M.T. *Id*. at Ex. 6, Sikirica Dep. I 121:21-122:3.

**RESPONSE: Not disputed.**

69.     Dr. Sikirica consulted with TPD Sergeant Mason, who was present during the autopsy, reviewed Thomas' coerced false statements that were provided to him by the TPD defendants, and was aware that Thomas had already been arraigned on attempted murder charges, and that his autopsy was being done in conjunction with a homicide investigation at the time he conducted the autopsy. *Id.* at Ex. 6, Sikirica Dep. I 166:3-167:22; Ex. 13, Mason Dep. 8:5-9:19; Ex. 26, Sikirica 2014 Trial 847:23-850:6.

**RESPONSE: Denied that "Dr. Sikirica consulted with TPD Sergeant Mason . . ." as Dr. Sikirica and Defendant Mason both testified that they had an "informal conversation." (p. 166, L. 12 of Sikirica EBT; p. 9, L. 12 of Mason EBT).**

70.     Defendant Sikirica neither took gram stains nor examined M.T.'s sinuses during the autopsy, forensic evaluations which would have been relevant to determining the cause and extent of M.T.'s infection and cause of death. *Id.* at Ex.3, Leestma 2009 Trial 2118:13-2120:12, 2158:8-2159:1.

**RESPONSE: Not disputed that Dr. Sikirica did not take gram stains, but it is disputed whether such forensic evaluation would have been relevant in this matter. Dr. Sikirica specifically denied this representation in his deposition. (p. 94, L, 21—p. 96, L. 14 of Exhibit "B" to Spencer Moving Declaration).**

71.     On September 25,2008, the lab results came back from the swabs taken at Samaritan Hospital, confirming that M.T. had a bacterial infection. *Id*. at Ex. 6, Sikirica Dep. I 93:8-17.

**RESPONSE: Not disputed.**

72.     Sikirica issued a death certificate on September 25, 2008, which listed the immediate cause of death as "severe closed head injuries with cerebral edema due to blunt force trauma" and further stated the cause of injury to be: "assaulted by another (repeatedly)." *Id*.at Ex. 27, Death Certificate P001394.

**RESPONSE: Not disputed.**

73.     Despite the positive lab test and other evidence of overwhelming sepsis including, without limitation, that M.T. presented at the hospital with low white blood cell count, low platelet count, hypothermia, respiratory distress, low blood pressure, coagulopathy, hypoglycemia, tachycardia, and pancytopenia, Dr. Sikirica neither listed sepsis as a contributory cause of death on the death certificate, nor as a finding in the later completed autopsy report which was prepared after the receipt of the positive lab report. *Id*. at Ex.6, Sikirica Dep. I 111:8-23,169:14-173:4, 181:15-182:11, 185:3-188:19.

**RESPONSE: Not disputed however, no evidence or testimony cited supports the notion that the evidence indicated "overwhelming sepsis."**

74.     On September 26,2008, defendants Mason and Sikirica testified in the grand jury. *Id*. at Ex.6, Sikirica Dep. I 121:4-19; Ex. 13; Mason Dep. 150:14-16.

**RESPONSE: Not disputed.**

75. During his grand jury testimony, defendant Sikirica testified to some evidence of developing pneumonia, despite later admitting that the same bacteria that was found in M.T.'s bloodstream causes pneumonia, and that the pneumonia had advanced to sepsis by the time of M.T.'s death. *Id.* at Ex.25, Sikirica 2009 Trial 1495:10-25 (P004969), 1519:8-23 (P004523); Ex. 29, Sikirica Grand Jury Tr. L11:20-12:2,17:14-19.

> **RESPONSE: Denied. This assertion is a gross oversimplification, and unclear representation, of the true testimony. Dr. Sikirica testified that the bacteria observed "can cause" pneumonia which "could advance" to sepsis.**

76. The l0-page coerced false confession was also introduced into evidence at the grand jury. *Id.* at Ex. 30, Mason Grand Jury Tr. 33:6-23; *Thomas*, 22 N.Y.3 d 629.

> **RESPONSE: Not disputed the confession was introduced into evidence at the grand jury. Objection to such legal conclusions.**

77. On April 22,2009, Dr. Sikirica issued an autopsy report in which he reported only that M.T.'s blood was positive for streptococcus pneumoniae. *Id*. at Ex.28, Autopsy Rpt. The report never mentioned sepsis. *Id.*

> **RESPONSE: Denied. Dr. Sikicia put in the autopsy report that: "streptococcus pneumoniae was isolated from the blood. Blood culture positive for streptococcus pneumoniae on initial presentation." Which Dr. Sikirica testified is "equivalent to [saying M.T. had] sepsis." (p. 323, L. 23—p. 213, L. 9 of Sikica EBT).**

78. Defendant Sikirica admits that streptococcus pneumoniae can cause pneumonia, meningitis, and sepsis. *Id.* at Ex.7, Sikirica Dep. II 290:12-291:3.

> **RESPONSE: Not disputed.**

79.     Defendant Sikirica admits that sepsis is more serious than the mere presence of the bacteria-which is all he listed in his autopsy report-and that it is an actual infection that leads to organ damage throughout the body, and that these conditions can cause death. *Id*. at Ex. 6, Sikirica Dep. I 172:13-17; Ex.7, Sikirica Dep. II 290:12-291:11; Ex. 25, Sikirica 2009 Trial 1489: l-15 (P004963), 1547:20-24 (P004551).

**RESPONSE: Not disputed.**

80.     Dr. Sikirica knew that his autopsy results would be relied on by police and prosecutors. *Id*. at Ex. 6, Sikirica Dep. I 229:12-19.

**RESPONSE: Not disputed.**

81.     Dr. Sikirica omitted the word sepsis from his report because he thought including the diagnosis would divert from what he assessed was the real cause of death. *Id*. at Ex.6, Sikirica Dep. I 209:12-20.

**RESPONSE: Denied. Dr. Sikirica testified that he did not list sepsis as a <u>contributing cause of death</u> "[b]ecause he think[s] it's confusing. [He] think[s] it unnecessarily diverts the real cause of death from what is going to be the closed head injury with cerebral edema. (p. 209, L. 12-20 of Sikirica EBT attached as Exhibit "B" to Spencer Moving Declaration) However, as discussed above in response to paragraph 77, Dr. Sikirica used the scientific term for sepsis in his report.**

82.     Dr. Sikirica, however, now concedes that while he listed the cause of M.T.'s death to be only blunt force trauma, that sepsis was a contributory cause of death, and that doctors could disagree as to his assessment as to the actual cause of death. *Id*. at Ex. 6, Sikirica Dep. I 207:22-208:18.

> **RESPONSE: Denied. This is an improper oversimplification of what Dr. Sikirica testified to. Dr. Sikirica testified that sepsis was not a substantial contributing factor to M.T.'s death. He explained that sepsis "was sequelae of the injury that he received." (p. 173, L. 11-L. 17 of Sikirica EBT). Dr. Sikirica agreed that "the trauma lead to the pneumonia, [that] lead to the sepsis." (p. 174, L. 20-L. 23 of Sikirica EBT). It is not disputed that Dr. Sikirica testified that doctors could disagree as to his assessment of the cause of death.**

83.     Other than Mr. Thomas' coerced false confession, and Dr. Sikirica's flawed findings, there was no other evidence linking Thomas to any crime. *Id*. at Ex. 13, Mason Dep. 154:16-155:8, Ex. 15, Fountain 104:7-11. Maloney Decl. Ex. 2, Maloney Rpt.; Ex. 3, Maloney Rebuttal Rpt. Johnson Decl. Ex.2, Johnson Rpt. 11-12.

> **RESPONSE: Denied. Dr. Sikirica's findings were not "flawed."**

84.     Defendant Fountain met with the District Attorney's Office, testified at a Huntley hearing, and his involvement in the first interrogation was part of the chain of events that led to Thomas' prosecution and conviction. *Id*. at Ex. 13, Mason Dep.2I7:2-11; Ex. 15, Fountain Dep. 12:15-19, 13:4-7, 77:15-78:13, 102:12-104:6; *Thomas*, 22 N.Y 3d at 637-38.

> **RESPONSE: Not disputed that Defendant Fountain met with the District Attorney's Office, testified at a Huntley hearing, and was involved in the first interrogation. Deny**

the remaining allegations as improper legal conclusions.

85.     Thomas was tried and convicted by a jury in2009 on charges of murder of his son. Klein Decl. Ex.4, Thomas Dep. I 208:9-18.

**RESPONSE: Not disputed.**

86.     Defendant Mason testified at the 2009 trial and evidence including Thomas' statement and portions of the second videotaped coerced confession were introduced into evidence. *Id.* at Ex. 13, Mason Dep. 6:20-7:13; *Thomas*, 22 N.Y.3d at 635.

**RESPONSE: Not disputed.**

87.     Defendant Sikirica testified during the first trial that based on his experience and participation in the autopsy and microscopic examinations of M.T., that M.T.'s injuries were consistent with having been slammed down on a mattress at a great force, and that the subgaleal hematoma was consistent with being slammed into a wooden rail of a crib. *Id.* at Ex. 25, Sikirica 2009 Trial 1582:13-24 (P004586).

**RESPONSE: Not disputed.**

88.     Thomas was sentenced to 25 years to life in prison, and thereafter transferred to Downstate Correctional Facility, and then to Auburn Correctional Facility. *Id*. at Ex.4, Thomas Dep. I 208:19-209:14, 212:13-213:16, 214:11-13.

**RESPONSE: Not disputed.**

89.     Thomas filed post-conviction motions to suppress his confession and to set aside

the verdict rendered against him, a remedy that was ultimately granted by the Court of Appeals on

February 20, 2014. *Thomas*, 22 N.Y.3d 629.

**RESPONSE: Not disputed.**

90.     The Court of Appeals found that defendants Mason, Fountain, and Colaneri had

engaged in coercive behavior, including inter alia, threatening that if Thomas continued to deny

responsibility for M.T.'s injury his wife would be arrested and removed from his ailing child's

bedside, repeating 2l times during the course of the interrogation "that his disclosure of the

circumstance under which he injured his child was essential to assist the doctors attempting to save

the child's life," and "the ubiquitous assurances offered by defendant's interrogators, that whatever

had happened was an accident, that he could be helped if he disclosed all, and that, once he had

done so, he would not be arrested, but would be permitted to return home" which included telling

Thomas "67 times that what had been done to his son was an accident, 14 times that he would not

be arrested, and eight times that he would be going home." *Id.* at 643-646.

**RESPONSE: Not disputed that the Court's Decision and Order speaks for itself.**

91.     The Court of Appeals further recognized that Thomas' "subsequent confession

provided no independent confirmation that he had in fact caused the child's fatal injuries" and that

"[e]very scenario of trauma induced head injury equal to explaining the infant's symptoms was

suggested to defendant by his interrogators" that that "not a single inculpatory fact in defendant's

confession that was not suggested to him." *Id.* at 646.

**RESPONSE: Not disputed that the Court's Decision and Order speaks for itself.**

# APPENDIX

92.     After the Court of Appeals remanded Thomas' case for retrial, Thomas was again imprisoned at the Rensselaer County Jail. Klein Decl. Ex. 4, Thomas Dep. I 231:21-232:20.

**RESPONSE: Not disputed.**

93.     Thomas was retried in 2014. *Id*. at Ex.4, Thomas Dep. I 233:7-8.

**RESPONSE: Not disputed.**

94.     Defendant Sikirica testified at Thomas' second trial. *Id*. at Ex. 26, Sikirica 2014 Trial.

**RESPONSE: Not disputed.**

95.     At the second trial, Sikirica testified that in his experience, the injuries could be consistent with a moderate amount of force, and that M.T.'s injuries were consistent with M.T. being bounced hard off of a bed and onto the ground. *Id.* at Ex.26, Sikirica 2014 Trial 837:14-18, 840:17-841:20.

**RESPONSE: Denied. Dr. Sikirica was asked a hypothetical regarding if such activity of throwing M.T. down on the bed resulting in him falling off the bed to the ground *could* have caused the observed injuries to M.T. Which Dr. Sikirica testified they could. Not that such was what occurred. (Ex.26, Sikirica 2014 Trial 840:17-841:20.)**

96.     Defendant Sikirica continued to attribute M.T.s death to Thomas even after Thomas' confession had been suppressed and despite the suppressed statement being the only link between Thomas and M.T.'s death. *Id*. at Ex.6, Sikirica Dep. I 125:9-19,129:7-23.

**RESPONSE: Denied. Dr. Sikirica testified that it is his personal opinion that Mr. Thomas caused the injuries to M.T. (Ex.6, Sikirica Dep. I 125:9-19,129:7-23).**

97.     At the conclusion of Thomas' second trial, Thomas was acquitted, and the matter was dismissed and sealed. Klein Decl. Ex.4, Thomas Dep. I 234:11.

**RESPONSE: Not disputed.**

98.     Plaintiff's expert in false confessions, Matthew B. Johnson, Ph.D., associate professor in the Department of Psychology at John Jay College of Criminal Justice-CUNY, whose work focuses on the interface of psychology and the legal system, opined, in relevant part, that plaintiff's malicious prosecution resulted from a process commonly referred to as "a misinformation effect (also called an 'anchoring effect', or a process of 'forensic confirmation bias', or 'bias cascade'), where an initial erroneous assumption or report is accepted as factual and misguides the ensuing investigation." Johnson Decl. ¶¶ 12; Ex. 2, Johnson Rpt. p. 11. Johnson further opined that in the case of plaintiff, the initial mistaken assessment by Albany Medical Center led the police to subject Thomas to a "prolonged, coercive, interrogation to confirm the erroneous medical assessment" and that "[t]he coerced false confession then influenced the medical examiner's autopsy report." *Id*. at Ex. 2, p, 11. Johnson also cited research recognizing that when an event is mislabeled a crime, "forward momentum often fueled by circular reasoning takes over" resulting in individuals being convicted of crimes that never occurred in the first place, as was the case here. *Id.* at Ex. 2, p. 3.

**RESPONSE: Not disputed that Dr. Johnson expressed his opinion on this matter. Disputed that such is undisputed based upon the conflicting opinion submitted by Michael Ranalli.**

26

99.     Plaintiff's medical expert, forensic pathologist Katherine F. Maloney, M.D.,
determined that M.T. died exclusively from streptococcus pneumoniae meningitis. *See* Maloney
Decl., Ex. 2, Maloney Rpt. p. 3. She further found that the scalp and subgaleal hemorrhages, retinal
hemorrhages, and subdural hemorrhage were not due to violent trauma, were not fatal injuries, and
did not explain the cause of death. *Id.* Rather the retinal hemorrhages were due to increased
intracranial pressure caused by the cerebral edema, and the subgaleal and subdural hemorrhages
resulted from coagulopathy due to the Streptococcus pneumoniae infection and from brain
swelling due to the loss of oxygen to the brain caused by the infection, which led to an
accumulation of fluid surrounding the brain. *Id.* at pp.2-3.

**RESPONSE: Not disputed that such is the expert opinion. Disputed that such is**
**undisputed based upon the conflicting opinions submitted by Dr. Sikirica and Dr.**
**Michael Baden.**

Dated: October 25, 2021.

Rhiannon I. Spencer, Esq.
**PATTISON, SAMPSON, GINSBERG & GRIFFIN, PLLC**
*Attorneys for Defendants*
*Adam Mason, Ronald Fountain, & Tim Colaneri*
22 First Street, P.O. Box 208
Troy, New York 12181-0208
(518) 266-1001

27

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

ADRIAN THOMAS,

                    Plaintiff,

                                                    1:17-CV-626
          v.                                        (DJS)

ADAM R. MASON, RONALD FOUNTAIN, TIM
COLANERI, and MICHAEL SIKIRICA,

                    Defendants.

---

**APPEARANCES:**                    **OF COUNSEL:**

OFFICE OF BRETT H. KLEIN, PLLC       BRETT H. KLEIN, ESQ.
Attorney for Plaintiff
305 Broadway
Suite 600
New York, New York 10007

PATTISON, SAMPSON, GINSBERG,         RHIANNON I. GIFFORD, ESQ.
& GRIFFIN                            JOSEPH T. PERKINS, ESQ.
Attorney for City of Troy Defendants
22 First Street
P.O. Box 208
Troy, New York 12181-0208

BAILEY, JOHNSON, & PECK, P.C.        CRYSTAL R. PECK, ESQ.
Attorney for Defendant Sikirica     JOHN W. BAILEY, ESQ.
5 Pine West Plaza
Suite 507
Albany, New York 12205

**DANIEL J. STEWART**
**United States Magistrate Judge**

# APPENDIX                                                    2615

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

This case presents troubling claims arising from a tragic death. The Complaint in this action was filed on June 12, 2017. Dkt. No. 1. Plaintiff subsequently filed an Amended Complaint, which is the operative pleading. Dkt. No. 31, Am. Compl. Defendants filed Motions to Dismiss the Amended Complaint which the District Court granted in part and denied in part. Dkt. No. 61. Following that motion practice, the following claims remain:

1) a malicious prosecution claim under 42 U.S.C. § 1983 against all Defendants;

2) a denial of the right to a fair trial claim under 42 U.S.C. § 1983 against all Defendants;[1] and

3) a conspiracy claim under 42 U.S.C. § 1983 against all Defendants.[2]

Presently pending are Motions for Summary Judgment on behalf of Defendants Colaneri, Fountain, and Mason ("City Defendants"), Dkt. No. 142, and Defendant Sikirica. Dkt. No. 143. Plaintiff opposes the Motions. Dkt. Nos. 152-158. Defendants filed replies. Dkt. Nos. 163-164. The Court held oral argument on these Motions on December 5, 2022. Text Minute Entry for Dec. 5, 2022. Following those arguments, Plaintiff and the City Defendants filed supplemental letter briefs. Dkt. Nos. 168 & 171. For the reasons that follow, the Motions for Summary Judgment are granted.

---

[1] The District Court initially dismissed this claim based on the statute of limitations, but following reconsideration the claim was reinstated. Dkt. No. 124.

[2] The Amended Complaint also included a section 1985 conspiracy claim which Plaintiff has now withdrawn. *See* Dkt. No. 154 at p. 13 n.2.

## II. FACTUAL BACKGROUND

On September 21, 2008, between 8:30 and 9:00 a.m., Plaintiff's infant son "M.T." was found unresponsive in his crib.  Dkt. No. 142-6 at p. 3; Dkt. No. 156-4 at p. 5.  Plaintiff dialed 911 and emergency services personnel responded to his residence in Troy, New York.  Dkt. No. 156-4 at p. 5; Dkt. No. 156-18.  M.T. was transported by ambulance to Samaritan Hospital in Troy where he underwent emergency evaluation.  Dkt. No. 156-9.  As a result of M.T.'s critical condition he was transferred to Albany Medical Center.  *Id.* at pp. 3-4.  Upon arrival at Albany Medical Center, M.T. was initially treated by Dr. Walter Edge.  Dkt. No. 142-9.  At some point on September 21, staff at Albany Medical Center, concerned that the child had been the victim of abuse, contacted Child Protective Services ("CPS").  *Id.*  Troy Police were eventually contacted and Defendants Fountain and Mason went to Albany Medical Center at around 9:00 p.m.  Dkt. No. 142-7 at ¶ 11.

At the hospital, police spoke with Dr. Edge and Wilhelmina Hicks, M.T.'s mother.  At one point during discussions with police, Dr. Edge reported that M.T.'s injuries were the result of "high impact," either from being shaken or having his head hit against a hard object.  Dkt. No. 156-21.  Detectives Mason and Fountain eventually went to Plaintiff's residence and asked Plaintiff to come to the police station for questioning.  Dkt. No. 142-2 at ¶ 21.  Mr. Thomas went with Defendants and was interviewed for approximately two hours.  *Id.* at ¶ 24.[3]  During that interview, Plaintiff expressed suicidal thoughts which led

---

[3] The entirety of Plaintiff's interrogation was recorded.  The recording is a part of the record on these Motions.  Dkt. No. 142-15.  The formatting of the video does not permit ready citation to timestamped portions of the video and so references to the recording of this video are cited simply by reference to the file name for the particular portion of the video being cited.

police to bring him to Samaritan Hospital where he remained hospitalized for psychiatric evaluation for the next fifteen hours. *Id.* at ¶¶ 27-28; Dkt. No. 142-5. Upon Plaintiff's release, he agreed to return to the police station for further questioning. Dkt. No. 142-7 at ¶ 34. That questioning, lasting over seven hours, concluded with Plaintiff signing a statement implicating himself in injuring M.T. *Id.* at ¶¶ 36 & 41. On September 23, Plaintiff was arrested and charged with the attempted murder of M.T. Dkt. No. 142-7 at ¶¶ 45-46. Later that day, M.T. was pronounced dead. Dkt. No. 156-27.

On September 25, 2008, Dr. Sikirica performed an autopsy on M.T. Dkt. No. 143-35 at ¶ 33. He concluded that the cause of M.T.'s death was homicide resulting from blunt force trauma. Dkt. Nos. 156-27 & 156-28.

On September 26, 2008, Plaintiff was indicted for murder in the second degree related to M.T.'s death. Prior to trial, Plaintiff's criminal defense counsel sought to suppress Plaintiff's statements made to Troy police investigators during the second interview on the ground that they were not voluntarily given. The trial court judge denied the motion. Dkt. No. 163-3 at pp. 6-17. Plaintiff then proceeded to trial. As relevant to the pending Motions, the trial involved extensive, and often conflicting, medical testimony between doctors called by the prosecution and defense regarding M.T.'s cause of death. *See, e.g.*, Dkt. Nos. 156-3, 156-9, 156-25, 156-26, 156-34, & 156-35. At the conclusion of the trial, Plaintiff was convicted.

On appeal, Plaintiff's conviction was affirmed by the Appellate Division. *People v. Thomas*, 93 A.D.3d 1019 (3d Dep't 2012). That court concluded, as part of its decision, that Plaintiff's incriminating statements to police "were voluntary and admissible." *Id.* at

1028.  Plaintiff sought leave to appeal to the New York Court of Appeals, which was granted.  19 N.Y.3d 1105 (2012).  The Court of Appeals ultimately reversed the conviction, finding that Plaintiff's confession had been coerced.  22 N.Y.3d 629 (2014). Plaintiff was retried and acquitted.

### III. LEGAL STANDARD FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. at 323.  To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial and cannot rest merely on allegations or denials of the facts submitted by the movant.  FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV. DISCUSSION

### A. The City Defendants' Motion for Summary Judgment[4]

#### 1. Effect of the New York Court of Appeals Ruling

In opposing the City Defendants' Motion for Summary Judgment, Plaintiff first argues that this Court must give "preclusive effect" to the Court of Appeals' finding that Plaintiff's confession was involuntary. Dkt. No. 152 at pp. 12-13. This Court is not obligated to do so for several reasons.

First, the very nature of the claim here makes affording the state court's finding preclusive effect inappropriate. While federal courts "normally give great deference to the factual findings of the state court. . . . the ultimate issue of voluntariness is a legal question requiring independent federal determination." *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991) (internal quotations, citations, and alterations omitted).

---

[4] Plaintiff's section 1983 conspiracy claim which is asserted against each Defendant is considered in Part IV(C) of this Opinion.

Second, in a section 1983 action, the Court must give a state court judgment the same effect it would be given under New York law. *Johnson v. Watkins*, 101 F.3d 792, 794 (2d Cir. 1996). "Under New York law, the doctrine of collateral estoppel, or issue preclusion, 'bars a party from relitigating in a subsequent proceeding an issue clearly raised in a prior proceeding and decided against that party where the party to be precluded had a full and fair opportunity to contest the prior determination.'" *Id.* (quoting *Weiss v. Manfredi*, 83 N.Y.2d 974, 976 (1994)). Here, Plaintiff seeks to preclude the individual Defendants from relitigating the question whether Plaintiff's confession was voluntary. Those Defendants were not parties to Plaintiff's criminal trial and thus had no opportunity to litigate the voluntariness of Plaintiff's conviction in state court. *McLaurin v. New Rochelle Police Officers*, 439 F. App'x 38, 39 (2d Cir. 2011); *Jenkins v. City of New York*, 478 F.3d 76, 85 (2d Cir. 2007). *Owens v. Treder*, 873 F.2d 604 (2d Cir. 1989), on which Plaintiff relies, is not to the contrary. In *Owens*, the issue before the court was whether the plaintiff could relitigate an issue decided during his criminal trial. 873 F.2d at 606. The Second Circuit held only that the requirements for applying collateral estoppel had not been met. *Id.* at 611-12. The same is true here. Defendants were not parties to Plaintiff's criminal prosecution and thus could not litigate their individual roles. As a result, collateral estoppel does not bar them from arguing that they did not violate Plaintiff's rights. *Jenkins v. City of New York*, 478 F.3d at 85.

## 2. Malicious Prosecution

Plaintiff's first cause of action is one for malicious prosecution. Am. Compl. at ¶¶ 84-93. Plaintiff alleges that Defendants lacked probable cause to arrest him because his

confession was the product of unlawful coercion and, without it, Defendants knew they lacked probable cause.  *Id.* at ¶ 50.

"To state a § 1983 malicious prosecution claim a plaintiff 'must show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law.'"  *Cornelio v. Connecticut*, 32 F.4th 160, 178 (2d Cir. 2022) (quoting *Manganiello v. City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010)). In New York, that substantive showing requires Plaintiff to prove "(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding and (4) actual malice."  *Kee v. City of New York*, 12 F.4th 150, 161-62 (2d Cir. 2021) (quoting *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 195 (2000)). No party contests that Plaintiff, given his acquittal, satisfies the favorable termination element.  *See McDonough v. Smith*, 139 S. Ct. 2149, 2160 n.10 (2019).  Defendants do, however, maintain that summary judgment is appropriate as to the remaining elements.

### a. Initiation of the Criminal Prosecution

It is "well settled that in order for an individual to initiate a prosecution for these purposes, . . . it must be shown that defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act."  *Rohman v. New York City Transit Auth.*, 215 F.3d 208, 217 (2d Cir. 2000) (internal quotations and alterations omitted) (citing cases).  An active role can be inferred when a defendant had the plaintiff arraigned, filled out a complaining and corroborating affidavit, or signed a felony complaint. *See Cameron v. City of N.Y.*, 598 F.3d 50, 63 (2d Cir. 2010); *Costello*

*v. Milano*, 20 F. Supp. 3d 406, 415 (S.D.N.Y. 2014). In this case, Mason filed the arrest report against Plaintiff. Dkt. No. 142-12. For purposes of the present Motion, that is sufficient to satisfy this element as to Mason. *Taylor v. City of New York*, 2022 WL 744037, at *16 (S.D.N.Y. Mar. 11, 2022); *Eldridge v. Hofstetter*, 2018 WL 5961289, at *3 (N.D.N.Y. Nov. 14, 2018).

In addition, "a defendant could have initiated a prosecution by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor." *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 605 (E.D.N.Y. 2017) (internal quotations omitted) (citing cases). This may include "some showing that the defendant distorted the process by which plaintiff was brought to trial." *Bailey v. City of New York*, 79 F. Supp. 3d 424, 449 (E.D.N.Y. 2015). Forwarding a confession obtained through coercion may support a finding that police officers initiated the prosecution. *See Pizarro v. City of New York*, 2015 WL 5719678, at *4 (E.D.N.Y. Sept. 29, 2015).

Defendant Fountain argues that he is entitled to summary judgment because while he was present early in the interrogation, he played no role in the later portion during which Plaintiff offered his ultimately excluded confession. Dkt. No. 142-16 at p. 12. In concluding that the interrogation was unduly coercive, the Court of Appeals referred several times to "the totality of the circumstances." *People v. Thomas*, 22 N.Y.3d at 642 & 645. In doing so, it rejected the attempt by the prosecutors, similar to that made by

Defendant Fountain here, to compartmentalize different portions of the interrogation,[5] finding that what happened early in the questioning "was pivotal to the course of the ensuing interrogation and instrumental to [Plaintiff's] final self-inculpation." *Id.* at 643. The summary judgment record does not suggest a basis for concluding otherwise at this stage of the proceedings. The recording of the portion of the interrogation for which Fountain was present demonstrates that he was an active participant. *See*, *e.g.*, Dkt. No. 142-15, 1st Interview at VTS_01_0 & VTS-01_1. Defendant Fountain contends that his sole relevant role was to testify at pretrial proceedings and Plaintiff's initial criminal trial and that under the rationale of *Costello v. Milano* this was insufficient to support initiation. Dkt. No. 142-16 at p. 12. *Costello*, however, specifically recognized that a police officer "can also initiate a prosecution by creating material, false information and forwarding that information to a prosecutor." *Costello v. Milano*, 20 F. Supp. 3d at 415. Fountain took part in nearly two hours of interrogation and is alleged to have been a part of doing exactly that. That is sufficient for purposes of this Motion.

Colaneri makes a similar argument, stating that he had only five minutes of interaction with Plaintiff during the hours-long interrogation and that this, coupled with the fact that he had no subsequent role during the criminal proceedings, means he cannot be said to have initiated the prosecution. Dkt. No. 142-16 at pp. 12-13. This argument fails for several reasons. First, as with Fountain, the Court declines to parse out individual roles in a lengthy interrogation that the Court of Appeals found to be coercive. Second,

---

[5] The Court of Appeals referenced "[t]he interrogation" which it found had been "broken into" two sessions. *People v. Thomas*, 22 N.Y.3d at 637. Fountain concededly took part in the first two hour session. Dkt. No. 142-2 at ¶ 24.

the record belies the suggestion that Colaneri had no significant role in the decision to arrest Plaintiff. Defendant Mason's deposition testimony indicates that Colaneri's role, though limited in time, was significant in bringing about statements leading to Plaintiff's arrest. Dkt. No. 156-13 at pp. 113-115. Moreover, Mason and Colaneri met after Plaintiff confessed and it was then that "it was determined that Mr. Thomas would be arrested and charged with attempted murder." Dkt. No. 142-7 at ¶ 45. Based upon these facts, a question of fact exists as to whether Colaneri assisted in the initiation of the prosecution.

"The record is replete with evidence that the detectives who interfaced with [Plaintiff] before, during, and after his interrogation were in coordination with one another." *Hincapie v. City of New York*, 2022 WL 2870411, at *10 (S.D.N.Y. July 21, 2022). A reasonable jury could infer from this evidence that each of the three Defendants played a role in the initiation of the prosecution. *Hincapie v. City of New York*, 2022 WL 2870411, at *10.[6]

### b. Probable Cause

"Probable cause is a complete defense to a malicious prosecution claim." *Kanderskaya v. City of New York*, 11 F. Supp. 3d 431, 436 n.1 (S.D.N.Y. 2014), *aff'd*, 590 F. App'x 112 (2d Cir. 2015). "[U]nder New York law, indictment by a grand jury creates a presumption of probable cause that may *only* be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police

---

[6] A jury might well conclude that the roles of Fountain and Colaneri in this investigation overall were so limited and distinct from the conduct during that part of the interrogation that ultimately resulted in Plaintiff's confession that they cannot be said to have initiated the prosecution. The Court holds here only that a reasonable jury might also conclude otherwise.

conduct undertaken in bad faith.'" *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983)). "[I]t is the plaintiff who bears the burden of proof in rebutting the presumption of probable cause that arises from the indictment." *Id.* at 73; *see also Dufort v. City of New York*, 874 F.3d 338, 352 (2d Cir. 2017); *Bernard v. United States*, 25 F.3d 98, 104 (2d Cir. 1994). Though that burden has been characterized as "heavy," *Cunny v. City of New York*, 2001 WL 863431, at *5 (S.D.N.Y. July 31, 2001) (citing *Simms v. Village of Albion*, 115 F.3d 1098, 1107 (2d Cir. 1997)), a plaintiff may do so by offering evidence "sufficient for a reasonable jury to find that his indictment was procured as a result of police conduct undertaken in bad faith." *Savino v. City of New York*, 331 F.3d at 73.

Plaintiff contends that Defendants lacked probable cause to arrest him, Am. Compl. at ¶ 50, and that the presumption of probable cause is rebutted by the Court of Appeals finding that Defendants coerced Plaintiff's confession. Dkt. No. 152 at p. 16. The Court has little difficulty concluding that the ultimate suppression of those statements based on a finding of coercion gives rise, at least, to questions of fact about whether Plaintiff's prosecution was the result of police conduct undertaken in bad faith. The significance of Plaintiff's confession cannot be understated on these facts. Defendant Mason testified regarding Plaintiff's incriminating statements "that's when I knew probable cause had been established." Dkt. No. 156-13 at p. 113. Indeed, Mason testified that at least part way through the interrogation "I didn't think I was going to arrest [Plaintiff]." *Id.* at pp. 113-114. The statements given by Plaintiff during the interrogation, therefore, were a critical component in forming probable cause to arrest Plaintiff. Without

the confession, a reasonable juror may conclude that police lacked probable cause to arrest Plaintiff. *Hincapie v. City of New York*, 2022 WL 2870411, at *14; *Niemann v. Whalen*, 911 F. Supp. 656, 668 (S.D.N.Y. 1996) ("the issue of whether [defendants] coerced plaintiff's confession is material to resolving the issue of probable cause.").

The City Defendants, while citing the presumption, make no real argument to the contrary that the facts alleged could not be sufficient to overcome it. Dkt. No. 142-16 at pp. 13-14. Plaintiff's allegations of misconduct, in the context of this case, are sufficient to overcome the presumption created by the indictment.

In considering probable cause, a court can set aside the evidence obtained from an arguably coerced confession and assess whether there was, in any event, probable cause for an arrest. *See Edwards v. Pretsch*, 180 F. Supp. 2d 499, 507 (S.D.N.Y. 2002). Despite Mason's testimony about the significance of Plaintiff's statements while being interrogated, Defendants maintain that there was probable cause sufficient to justify Plaintiff's arrest without reliance on these statements. First, the City Defendants rely on an alleged confession by Plaintiff to CPS workers after his arrest. Second, they maintain that Dr. Edge told police that M.T.'s death was "a murder." Finally, they maintain that the New York Court of Appeals decision to order a new trial, rather than dismissing the indictment outright, demonstrates that probable cause existed apart from Thomas's confession. None of these arguments represents a basis for granting summary judgment.

With regard to the first two arguments, material questions of fact preclude summary judgment. The City Defendants cite to evidence in the record that Plaintiff told CPS staff that he had harmed M.T. This allegedly occurred at the Rensselaer County Jail,

Case 1:17-cv-00626-DJS Document 194-7734 Filed 03/30/23 Page 148 of 45

sometime after being arrested. Dkt. No. 142-7 at ¶ 47. During his deposition Plaintiff, however, repeatedly denied having hurt M.T. in any way and making any statements about having done so to CPS staff. Dkt. No. 142-21 at pp. 173-180. Plaintiff's deposition testimony, in fact, alleged that CPS staff had fabricated the report of this interview with Plaintiff. *Id.* at pp. 179-180. Thus, a clear question of fact exists as to whether Plaintiff made these statements.

Defendants also maintain that statements from Dr. Edge provide probable cause for Plaintiff's arrest. Defendant Fountain's Affidavit recites a conversation with Dr. Edge at the hospital during which Dr. Edge purportedly stated that "this is a murder." Dkt. No. 142-2 at ¶ 15. During his deposition Dr. Edge testified that he did not recall ever having used the word murder when speaking with police officials. Dkt. No. 156-10 at p. 9. Later in his deposition, Dr. Edge testified that he was aware police officials had attributed that word to him, but specifically disputed that account by police. *Id.* at pp. 10 & 11. Whether Dr. Edge made that statement at all is, therefore, plainly in dispute and Defendants cannot rely on it to establish probable cause to arrest Plaintiff. The record does contain a statement from Dr. Edge, given September 22, 2008 indicating that he believed M.T.'s injuries had been caused by "severe trauma." Dkt. No. 142-9. But that statement unsurprisingly did not directly connect Plaintiff to the trauma and Defendants do not dispute that probable cause to arrest Plaintiff did not exist at the time of this statement. Dkt. No. 155-1 at ¶ 53; Dkt. No. 164-9 at ¶ 53 (noting that probable cause did not exist yet even at the early stages of Plaintiff's second interrogation session).

As to the final argument, the Court declines to accept the City Defendants' invitation to surmise what the Court of Appeals intended to say about the sufficiency of probable cause when it reversed Plaintiff's conviction. "[I]n New York, a conviction ultimately upset is accorded only the force of prima facie evidence of probable cause; this evidence can be surmounted in a suit for malicious prosecution if the plaintiff can show that the judgment was obtained by fraudulent or otherwise undue means." *Charlotten v. Heid*, 2011 WL 3423826, at *5 (N.D.N.Y. Aug. 4, 2011) (quoting *McCray v. City of N.Y.*, 2007 WL 4352748, at *22 (S.D.N.Y. Dec. 11, 2007)). Even assuming the Court of Appeals reversal suggests that probable cause to prosecute continued to exist, *see Pierre v. City of Rochester*, 2018 WL 10072453, at *12 (W.D.N.Y. Sept. 7, 2018), summary judgment would still not be appropriate on these facts. For purposes of this malicious prosecution claim, the relevant inquiry is whether Defendants had probable cause at the time they initiated a prosecution against Plaintiff. *Phillips v. DeAngelis*, 571 F. Supp. 2d 347, 354 (N.D.N.Y. 2008), *aff'd*, 331 F. App'x 894 (2d Cir. 2009). Defendant Mason continued to investigate this case and consider evidence long after Plaintiff's arrest and indictment. Dkt. No. 142-7 at ¶ 57. Evidence sufficient to establish probable cause apart from the confession could, therefore, have been developed in the investigation following Plaintiff's arrest. The record establishes that Plaintiff's confession was the principal evidence on which Defendants relied for moving forward with a prosecution of Plaintiff. Precluding that evidence raises at least a question of fact on the issue of whether probable cause existed at the time the prosecution was initiated against Plaintiff.

*c. Actual Malice*

The City Defendants also seek summary judgment on the ground that Plaintiff cannot establish any personal animus towards him that would warrant a jury finding the presence of actual malice. Dkt. No. 142-16 at pp. 14-15. However, "actual malice can be inferred when a plaintiff is prosecuted without probable cause." *Rentas v. Ruffin*, 816 F.3d 214, 221 (2d Cir. 2016). Here, the presence of factual questions regarding the existence of probable cause is sufficient to deny summary judgment on this ground as well. "Once we find an issue of material fact as to probable cause, the element of malice also becomes an issue of material fact as well." *Boyd v. City of New York*, 336 F.3d 72, 78 (2d Cir. 2003).

### 3. Right to a Fair Trial

Plaintiff's claim regarding the denial of a fair trial relates to the alleged coercion of a confession by the City Defendants. Am. Compl. at ¶¶ 94-97. This claim relies on a theory that Defendants developed their version of the events leading to M.T.'s hospitalization and then coerced Plaintiff into adopting those facts as his own. *Id.* at ¶¶ 35-50.

Criminal defendants have a constitutional right to a fair trial. *Ramchair v. Conway*, 601 F.3d 66, 73 (2d Cir. 2010). It is a violation of that right "[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). "To succeed on a fabricated-evidence claim, a plaintiff must establish that an (1) investigating official (2) fabricated information (3) that is likely to influence a jury's

verdict, (4) forwarded that information to prosecutors, and (5) the plaintiff suffered a deprivation of life, liberty, or property as a result." *Jeanty v. Cerminaro*, 2023 WL 325012, at *5 (2d Cir. Jan. 20, 2023) (quoting *Ashley v. City of New York*, 992 F.3d 128, 139 (2d Cir. 2021)).

Plaintiff alleges that the City Defendants fabricated his confession in violation of this fair trial right. The only real question presented on this Motion is whether the coercion Plaintiff alleges could be considered the equivalent to fabrication. There is no doubt that the confession was forwarded to prosecutors by investigating officials, that this confession would likely have influenced a jury's decision, and that Plaintiff suffered some deprivation as a result.

Coercion and fabrication are distinct. "There is clearly a difference between 'coercing witnesses to testify and fabricating witness testimony.'" *McDonough v. Smith*, 2022 WL 3279348, at *24 (N.D.N.Y. Aug. 11, 2022) (quoting *Petty v. City of Chicago*, 754 F.3d 416, 422 (7th Cir. 2014)). "Coerced testimony is testimony that a witness is forced by improper means to give; the testimony may be true or false." *Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014). "Fabricated testimony is testimony that is made up; it is invariably false." *Id.* Plaintiff's fair trial claim requires him to prove fabrication, evidence of coercion is not enough. The City Defendants maintain that unlike other cases where police officers wrote out a false statement which they then had a defendant adopt, *see Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, they did not "create" Plaintiff's statement. Dkt. No. 142-16 at p. 16. As a result, they contend that summary judgment is appropriate.

The Court disagrees, however, that there are insufficient facts in the record from which a jury could conclude that Defendants did indeed fabricate Plaintiff's statement. While the evidence of fabrication is slight, the Court must view the summary judgment record in the light most favorable to Plaintiff, *Donohue v. Hochul*, 32 F.4th 200, 206 (2d Cir. 2022), and in doing so concludes that Plaintiff has alleged enough to survive summary judgment on the merits.

Throughout much of his interrogation, Plaintiff consistently denied harming M.T. Dkt. No. 142-2 at ¶ 25. He maintained his innocence at two criminal trials and does so here. *See* Am. Compl. at ¶ 3. The Amended Complaint alleges that Defendant Mason repeatedly put forth a version of events regarding how M.T.'s injuries may have occurred that, as a result of coercion, Plaintiff ultimately adopted as his own. *See* Am. Compl. at ¶¶ 44-49. The parties agree that, as the Court of Appeals found, "[a]ll the statements made by Mr. Thomas regarding bumping, throwing, or slamming M.T. were first suggested to him by defendants." Dkt. No. 155-1 at ¶ 55; Dkt. No. 163-7 at ¶ 55; *People v. Thomas*, 22 N.Y.3d at 646. In Plaintiff's view, this was the equivalent of fabricating a story about M.T.'s death. If true, a jury could conclude that the City Defendants fabricated those facts and coerced Plaintiff to adopt them. *See Jocks v. Tavernier*, 316 F.3d 128, 138 (2d Cir. 2003) ("Although there was certainly not overwhelming evidence of falsification, a reasonable jury would be entitled to credit [Plaintiff's] testimony"). This is particularly true given Plaintiff's view that M.T.'s death was the result of sepsis, not trauma, *see* Dkt. No. 155-1 at ¶ 2, which the jury could also credit. *See*, *e.g.*, Dkt. No. 158 (Plaintiff's expert report concluding cause of death to be sepsis).

Implied in Defendants' Motion is the suggestion that the facts in Plaintiff's confession were not fabricated because, even if coerced, they were nonetheless true.  *See* Dkt. No. 142-16 at pp. 16-17.  Plaintiff's ultimate acquittal raises a question of fact on that point.  In a case such as this where the alleged fabrication is the coercion of a confession and questions of fact exist as to whether the confession was coerced, those same questions of fact are relevant to the fabrication question.  *Sedunova v. City of New York*, 652 F. App'x 29, 31 (2d Cir. 2016).

Upon hearing the facts regarding the interrogation, together with the other evidence known to Defendants at the time, a jury *could* conclude that Defendants' actions had the effect of creating a false confession from Plaintiff.  Summary judgment, therefore, is not appropriate on the merits.

### 4. Qualified Immunity

42 U.S.C. § 1983 was designed to enforce the provisions of the Fourteenth Amendment and to provide a remedy for those whose constitutional rights have been violated by state actors.  The "shall be liable" language of the statute is both succinct and direct and does not specifically provide for exceptions.   Nevertheless, subsequent interpretation of the statute by the courts, in particular with respect to the doctrine of qualified immunity, has developed such that the straightforward remedial command of the statute is no longer so direct.

The doctrine of qualified immunity provides an immunity from suit, and thus liability, for public officials acting reasonably under the circumstances presented.  "Qualified immunity attaches when an official's conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78-79 (2017) (internal quotation and citation omitted); *see also Behrens v. Pelletier*, 516 U.S. 299, 305 (1996). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation omitted); *see also Reichle v. Howards*, 566 U.S. 658, 664 (2012) ("To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right.") (internal quotations and citations omitted). "The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009).

### a. The Coercion Claim

Plaintiff's malicious prosecution claim against the City Defendants is premised on their alleged coercion of a confession from him. This is because clearly had Plaintiff's confession not been suppressed it would have provided probable cause to arrest Plaintiff. *White v. City of New York*, 2018 WL 1545676, at *5 (E.D.N.Y. Mar. 29, 2018) ("A confession can be used to establish probable cause"). On the contrary, "[a] known false confession does not provide probable cause to believe a criminal prosecution would be successful." *Ortiz v. Wagstaff*, 523 F. Supp. 3d 347, 365 (W.D.N.Y. 2021).

It was clearly established well before Plaintiff's interrogation that "police could not lawfully coerce incriminating statements from an in-custody criminal suspect." *Weaver v. Brenner*, 40 F.3d 527, 534 (2d Cir. 1994). That the right was clearly established

at this basic level, however, does not answer the question of Defendants' entitlement to qualified immunity. "The more complex question is whether a reasonable officer would understand the conduct to be a violation of Plaintiff's rights." *Tankleff v. Cnty. of Suffolk*, 2017 WL 2729084, at *17 (E.D.N.Y. June 23, 2017). Lower courts have consistently been reminded, if not reprimanded, that for purposes of qualified immunity, they should not consider the right at issue at too broad a level of generality. "It is important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also White v. Pauly*, 580 U.S. at 79 ("Today, it is again necessary to reiterate the longstanding principle that clearly established law should not be defined at a high level of generality.") (internal quotations and citations omitted).

For purposes of qualified immunity, Plaintiff's malicious prosecution claim "turn[s] on whether the defendant officers' probable cause determination was objectively reasonable - that is, whether there was 'arguable' probable cause to arrest." *Betts v. Shearman*, 751 F.3d 78, 83 (2d Cir. 2014). "Arguable probable cause exists 'if officers of reasonable competence could disagree on whether the probable cause test was met.'" *Dufort v. City of New York*, 874 F.3d 338, 354 (2d Cir. 2017) (quoting *Gonzalez v. City of Schenectady*, 728 F.3d 149, 157 (2d Cir. 2013)). "In short, if at least some reasonable officers in the defendant's position could have believed that the challenged conduct was within the bounds of appropriate police responses, the defendant officer is entitled to

qualified immunity." *Mara v. Rilling*, 921 F.3d 48, 69 (2d Cir. 2019) (internal quotation and citation omitted).

"Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). "It is difficult to determine whether a confession is voluntary; case law 'yield[s] no talismanic definition' for the term." *United States v. Taylor*, 745 F.3d 15, 24 (2d Cir. 2014) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 224 (1973)). "Whether a confession is a product of coercion may only be determined after a careful evaluation of the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991) (citing cases). Consideration of these facts leads to the conclusion that reasonable police officers could have believed that Plaintiff's interrogation was not unconstitutionally coercive. Or, at least, that they could reasonably disagree on the question. Accordingly, these Defendants are entitled to qualified immunity.

With regard to his personal characteristics, Plaintiff had no criminal record when he was questioned by police and was, therefore, likely unfamiliar with police interrogations. At the time of his interrogation, his son was in critical condition in the hospital. Moreover, Plaintiff's interrogation was interrupted by a period of psychiatric evaluation. These facts could certainly have made Plaintiff more susceptible to coercive tactics. Despite these personal characteristics, however, no facts suggest that the basic

Case 1:17-cv-00626-DJS Document 164-7/173-4 Filed 03/30/23 Page 238 of 45

circumstances of the interrogation itself was unduly coercive. Plaintiff was advised of his rights several times. He was not shackled or otherwise restrained at any time. At times the door to the interrogation room remained open. He never asked to leave or to speak with counsel. He was offered food and drink and provided cigarettes. No measure of physical intimidation or abuse is alleged or evident from the record. These facts all suggest a lack of coercion.

Plaintiff places much of his emphasis on the conduct of investigators themselves, and relies heavily on the New York Court of Appeals finding of coercion. *See* Dkt. No. 152 at pp. 23-25. This is entirely appropriate since this is often the most critical component of the inquiry. *Green v. Scully*, 850 F.2d 894, 902 (2d Cir. 1988). The Court of Appels decision identified a number of actions taken by Defendants that it concluded were problematic, which are discussed in more detail below. Before turning to the specifics of the conduct, however, it is important to make note of the scope of this Court's review. The Court of Appeals wrote a comprehensive and compelling decision. It is binding on police officers within the State of New York, and its powerful reasoning should be persuasive for federal courts. At no point is this Court stating its conclusion was in error. Rather, this Court is being called upon to make a vastly different determination; to view the conduct of the police officers at the time prior to the Court of Appeals decision, in light of then clearly established federal law, and consider whether any reasonable police officer could have concluded that the interrogation techniques used did not violate that law.

First, the Court of Appeals took exception to Defendants' tactic "to threaten that if defendant continued to deny responsibility for his child's injury, his wife would be arrested and removed from his ailing child's bedside." *People v. Thomas*, 22 N.Y.3d at 643. The Court of Appeals noted that "[t]he premise of the interrogation was that an adult within the Thomas-Hicks household must have inflicted traumatic head injuries on the infant." *People v. Thomas*, 22 N.Y.3d at 638. Given what the investigators knew about M.T.'s condition at the time, including that Plaintiff and his wife were the only adults in the household, it is hard to say that that premise was itself unreasonable. A number of district courts have held that absent probable cause to arrest a family member, such a threat may be unduly coercive. *See, e.g.*, *United States v. Melendez*, 2015 WL 3767178, at *5 (S.D.N.Y. June 17, 2015) (citing cases). In a related context, however, the Second Circuit has also recognized that "[p]leas in exchange for a promise by the government not to prosecute a third party are valid." *United States v. Shapiro*, 29 F. App'x 33, 35 (2d Cir. 2002). Defendants have not suggested that there was ever probable cause to charge M.T.'s mother regarding his injuries, but their decision at the time to highlight for Plaintiff that given their exclusive control over their children, one or the other of them was most likely responsible was not unreasonable. For purposes of a qualified immunity discussion, however, what is most critical is that "neither the Second Circuit nor the Supreme Court has 'squarely addressed whether threats to charge third-parties amount to coercion.'" *United States v. Zimmerman*, 480 F. Supp. 3d 446, 456 (E.D.N.Y. 2020) (quoting *Lewis v. Graham*, 2018 WL 3819557, at *4 (W.D.N.Y. Aug. 10, 2018) (citing

cases)).  The district court opinions expressing this view do not clearly establish the law for qualified immunity purposes. *Hawkins v. Steingut*, 829 F.2d 317, 321 (2d Cir. 1987).

Next, exception was taken to Defendants' repeated statements to Plaintiff that fully disclosing what happened to M.T. was necessary to assist in his treatment.  *People v. Thomas*, 22 N.Y.3d at 643.   The Court of Appeals found this tactic particularly problematic because the statements were not true; nothing Plaintiff said about causation would have helped M.T.  *People v. Thomas*, 22 N.Y.3d at 643.  This Court agrees with the Court of Appeals that such statements potentially played on the familial heartstrings in a way which could have been coercive.  *Id.*  But the mere fact that the police lie to a suspect to elicit his confession does not necessarily render it coerced.  *Santiago Ortiz v. Kelly*, 687 F. Supp. 64, 65 (E.D.N.Y. 1988).  The use of trickery, deception, or some form of ruse is a common practice, and does not automatically render a confession involuntary.  *United States v. Anderson*, 929 F.2d at 99; *Whitlatch v. Senkowski*, 344 F. Supp. 2d 898, 903 (W.D.N.Y. 2004) (citing cases); *see also Illinois v. Perkins*, 496 U.S. 292, 296 (1990) ("Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns."). District courts have denied qualified immunity to police officers accused of coercing a confession by "withholding medical treatment from an injured family member." *Matthews v. City of New York*, 889 F. Supp. 2d 418, 441 (E.D.N.Y. 2012).  However, this Court has found no controlling case issued prior to September 2008, holding that it was unlawfully coercive to tell a suspect undergoing interrogation that providing truthful information could assist in providing necessary medical treatment to a victim.

Significantly, Plaintiff also points to no such case either. *See Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) ("to show a violation of clearly established law, [plaintiff] must identify a case that put [defendant] on notice that his specific conduct was unlawful.")  Pointing to the general proposition that one cannot coerce a confession, *see* Dkt. No. 152 at pp. 23-24, is not enough. *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018).

Finally, Plaintiff refers to the countless times investigators told Plaintiff that they knew what had happened and that they were not going to arrest him as examples of inappropriate police conduct.  Promises of leniency, which this conduct most closely resembles, however, are not per se coercive. *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995); *United States v. Guarno*, 819 F.2d 28, 31 (2d Cir. 1987).  What the recording of the interrogation makes clear is that Defendants made numerous statements to the effect that police did not want to arrest Plaintiff and if he told them what happened he would be able to go home.  "A court will not, however, readily imply an improper promise or misrepresentation from vague or ambiguous statements by law enforcement officers." *United States v. Shores*, 2019 WL 2428774, at *7 (D. Vt. June 11, 2019) (citation omitted).  Significantly, as Plaintiff began to make incriminating statements, the tone of police comments changed and Defendant Mason made it clear to Plaintiff that he could not promise him that he would not be prosecuted.

The Court has little doubt that the police tactics may have felt coercive to Plaintiff, but the voluntariness inquiry is a purely objective one. *United States v. Dzionara-Norsen*, 2020 WL 1897179, at *7 (W.D.N.Y. Apr. 17, 2020), *report and recommendation adopted*, 2020 WL 3401267 (W.D.N.Y. June 18, 2020); *United States v. Ortiz*, 943 F.

Supp. 2d 447, 456 (S.D.N.Y. 2013). "[T]he single issue before the court is whether the statements were voluntary, *i.e.*, the 'product of an essentially free and unconstrained choice by [their] maker.'" *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018) (quoting *Schneckloth v. Bustamonte*, 412 U.S. at 225). Despite the tactics used and the emotional context of this interrogation, the Court concludes that some police officers could very reasonably believe that Defendants conduct did not have the effect of overbearing Plaintiff's will. Because reasonable police officers could disagree on the point, qualified immunity is appropriate.

The Court ends this analysis by recognizing that the state court judge presiding at Plaintiff's trial found that Plaintiff's inculpatory "statements were voluntarily made." Dkt. No. 163-3 at p. 18. A unanimous panel of the state's Appellate Division agreed, finding that the prosecution "satisfied their burden of demonstrating beyond a reasonable doubt that his statements were voluntary" and that "[t]he circumstances and atmosphere of the interviews fail to demonstrate involuntariness." *People v. Thomas*, 93 A.D.3d at 1026. "We cannot realistically expect that reasonable police officers know more than reasonable judges about the law." *Barts v. Joyner*, 865 F.2d 1187, 1193 (11th Cir. 1989). "To say the least, when a state court judge upholds the constitutionality of police actions, that alerts us to be particularly careful in concluding that the law was truly clearly established before we permit the officers to be held civilly liable." *Id.* at 1194. "If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." *Wilson v. Layne*, 526 U.S. 603, 618 (1999). "There is, as case law teaches, a line separating tolerable deception from

unconstitutional coercion." *United States v. Shehadeh*, 940 F. Supp. 2d 66, 74 (E.D.N.Y.

2012), *aff'd*, 586 F. App'x 47 (2d Cir. 2014). The state court judges who considered

Defendants' actions were split almost equally as to what side of that line the conduct fell.

That six state jurists, in the calm of their chambers with time to review the record and

hear arguments of attorneys, concluded that Defendants' actions were not coercive is

exceptionally strong evidence, in this Court's view, that Defendants themselves could

have reasonably believed in the moment that their actions were not transgressing

Plaintiff's clearly established rights.

Apart from the above analysis, the Court concludes that an additional factor

relevant to Colaneri independently entitles him to qualified immunity.

Colaneri participated in the interrogation for less than five minutes. *See* Dkt. No.

142-15, 2nd Interview-Part 2 at VTS_01_4. The video of the interrogation shows that he

took a more forceful approach with Plaintiff than Defendant Mason took during much of

the interview; the admitted "bad cop" to Mason's "good cop." *Id*; Dkt. No. 142-1 at ¶

14. During this portion of the interview, Colaneri told Plaintiff that he had served in a

medical role in the military during Operation Desert Storm and had significant experience

with head injuries and that he believed Plaintiff was lying about his role in causing M.T.'s

injuries.[7] "This evidence supports a conclusion that [Colaneri was] confrontational, but

it does not support a conclusion that [he was] coercive." *United States v. Artis*, 2010 WL

3767723, at *10 (D. Vt. Sept. 16, 2010). Defendant Mason concedes the importance of

---

[7] Colaneri admits that this was untrue, but was done to bolster his credibility on the subject to Plaintiff. Dkt. No.
142-1 at ¶ 16.

Colaneri's tactic in ultimately obtaining a confession, but the success of the tactic alone does not make it coercive. Nor would a reasonable police officer believe that such an exceedingly brief interaction of the nature Colaneri had with Plaintiff could possibly have been viewed as "the type of coercion that, without more, would overbear a normal person's will and cause him to confess involuntarily." *Diaz v. Senkowski*, 76 F.3d 61, 65 (2d Cir. 1996).

### b. The Fabrication Claim

The heart of Plaintiff's fair trial claim is that the individual police Defendants in this case developed their own "theory of death" to explain M.T.'s death and justify the prosecution of Adrian Thomas. *See* Dkt. No. 152 at p. 1. As a result, Plaintiff alleges that they "created false evidence" in the form of Plaintiff's confession. Am. Compl. at ¶ 95. While the Court agrees with Plaintiff that a reasonable juror might conclude that Defendants did so, it is also clear that given the evidence available to Defendants at the time of the investigation, a reasonable police officer could have believed that the working theory of the investigation was accurate and not a fabrication. As a result, qualified immunity is appropriate as to this claim.

That police officials may not, within the bounds of the Constitution, fabricate evidence was well-established at the time of Plaintiff's prosecution. *Zahrey v. Coffey*, 221 F.3d 342, 344 (2d Cir. 2000). As noted, however, that does not end the inquiry. "The relevant question in this case . . . is the objective (albeit fact-specific) question whether a reasonable officer could have believed [Defendants' conduct] to be lawful, in light of clearly established law and the information the . . . officers possessed" at the time of their

investigation. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). In other words, summary judgment for the defendant is required where "the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the [defendants'] conduct under the circumstances." *Cugini v. City of New York*, 941 F.3d 604, 615 (2d Cir. 2019).

M.T. was originally taken to Samaritan Hospital in Troy before being transferred for more acute care to Albany Medical Center. Dr. Edge was the treating doctor at Albany Med. Dr. Edge expressed a concern that M.T. might be the victim of child abuse. Dkt. No. 156-21. As a result, Child Protective Services and Troy Police were notified. It was after this notification that Defendants became involved in the case. Defendants spoke with Dr. Edge who told them that M.T.'s injury was the result of trauma, the likely result of a violent shaking or an "acceleration, deceleration injury." Dkt. No. 156-21; Dkt. No. 156-10 at p. 11. While Plaintiff was at Samaritan Hospital, Defendant Fountain observed the questioning of another one of Plaintiff's children. During that questioning, the child indicated that she had witnessed Plaintiff throw M.T. down on a bed. Dkt. No. 156-33 at p. 2; Dkt. No. 142-7 at ¶ 32. M.T.'s mother had also told Detectives that a few weeks prior she had witnessed Plaintiff "beating my daughter . . . with a belt." Dkt. No. 142-3.

As a result, Defendant Mason, who was primarily responsible for the interrogation had this information to work with: 1) medical providers treating M.T. believed his injuries were the result of trauma, perhaps shaking or hitting his head hard against an object; those providers did not believe M.T.'s injuries could be caused by "merely bumping" his head; 2) there was testimony from someone who told authorities that she had seen Plaintiff

throw M.T. onto a bed; 3) statements that Plaintiff had a few weeks earlier been seen "beating" a nine year old with a belt; and 4) reports that Plaintiff had what his own wife termed "anger issues when dealing with the kids." Given these facts, a police officer could, at that time, very reasonably have suspected that Plaintiff had, whether out of frustration or malice, injured M.T. Pursuing an interrogation strategy based on that theory was not unreasonable. And, whatever one makes of the tactics used during the interrogation, it cannot be said that reasonable police officers would have known that they were fabricating the version of events to which Plaintiff eventually admitted. Remember that the hallmark of fabricated evidence is that "it is invariably false. False testimony is the equivalent; it is testimony known to be untrue by the witness and by whoever cajoled or coerced the witness to give it." *Fields v. Wharrie*, 740 F.3d at 1110.

Plaintiff makes an impassioned plea in this case that his prosecution was a tragic error. That M.T. was not murdered, but instead died as a result of sepsis. The Court cannot, and need not, resolve that issue on these Motions. Much of the evidence on which Plaintiff now relies in support of that theory, however, developed after Plaintiff's interrogation and Plaintiff has offered no evidence in opposition to the police officers' Motion to establish that they were aware of it earlier. The availability of qualified immunity turns on "the facts known to police at the time" of the conduct in question. *Figueroa v. Mazza*, 825 F.3d 89, 99 (2d Cir. 2016); *see also Hanrahan v. Doling*, 331 F.3d 93, 98 (2d Cir. 2003) ("qualified immunity is analyzed from the perspective of the defendant at the time of the challenged conduct."). "A court must evaluate the objective reasonableness of the [Defendants'] conduct in light of the information the officers

possessed." *Zellner v. Summerlin*, 494 F.3d 344, 370 (2d Cir. 2007) (internal citations, alterations, and quotations omitted). In so doing, the Supreme Court has "cautioned against" evaluating qualified immunity with the "20/20 vision of hindsight in favor of deference to the judgment of reasonable officers on the scene." *Saucier v. Katz*, 533 U.S. at 205 (internal quotation omitted). Defendants had been told by medical personnel that M.T. was a trauma victim; that his injuries were the result of him having been shaken or hit with some velocity. There was an eyewitness report that M.T. had been thrown on a bed by Plaintiff days before being hospitalized. It simply cannot be said that reasonable police officers would have believed that Mason and the other Defendants were fabricating a story about M.T. having been thrown down by Plaintiff.

The Amended Complaint itself calls Dr. Edge's initial view of M.T.'s condition a "misdiagnosis," Am. Compl. at ¶ 4, but Plaintiff never disputes what Dr. Edge told officers about the likely cause of M.T.'s injuries and offers no reason for finding that they should have known of Dr. Edge's alleged error. None of the police officers sued here are medical professionals and they were most certainly entitled to rely on what they were being told by those who were. Given the information available to Defendants at the time of Plaintiff's interrogation, reasonable law enforcement officials would not have thought that the version of events pursued during that interrogation was a pure fabrication by Defendants. Accordingly, Defendants are entitled to qualified immunity with respect to Plaintiff's fair trial claim.

### B. Defendant Sikirica's Motion for Summary Judgment

The Amended Complaint alleges that Sikirica acted intentionally to render a "false medical opinion" regarding M.T.'s cause of death. Am. Compl. at ¶ 55. Defendant Sikirica seeks summary judgment on the ground that his autopsy report was not false or fabricated and, therefore, he cannot be liable for either malicious prosecution or denial of a fair trial. Dkt. No. 143-1 at pp. 8-12. In opposing summary judgment, Plaintiff identifies two slightly different arguments: 1) Sikirica specifically chose to downplay exculpatory explanations for M.T.'s death to aid the prosecution of Plaintiff, Dkt. No. 154 at pp. 11-12, and 2) his failure to identify sepsis as a cause of death "constituted an intentional withholding of exculpatory evidence." *Id.* at p. 12. Based on this record, these arguments are not a basis for denying summary judgment.

### 1. Fabrication of Evidence

"[A] coroner's reckless or intentional falsification of an autopsy report that plays a material role in the false arrest and prosecution of an individual can support a claim under 42 U.S.C. § 1983." *Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002); *see also Ferris v. City of Cadillac, Mich.*, 726 F. App'x 473, 478 (6th Cir. 2018). Defendant Sikirica does not dispute this general principal but argues that the record is devoid of evidence from which a reasonable juror could conclude that he fabricated the autopsy report for M.T. Dkt. No. 143-1 at pp. 8-12. The Court agrees.

Plaintiff has long maintained that M.T.'s death was the result of sepsis. Sepsis is variously defined in the record, but generally stated is the presence of a virus or bacteria in the bloodstream. Dkt. No. 143-14 at p. 14 (Sepsis is "[a] blood infection with

bacteria"); Dkt. No. 143-24 at p. 54 ("Sepsis is a probable or documented infection in the body that produces a systemic response.").  Plaintiff maintains that Dr. Sikirica's failure to identify sepsis as a cause of death in his autopsy report renders the report false or fabricated.  Though Sikirica did not use that specific term in his autopsy report, in the Anatomic Diagnoses section of the report Sikirica noted there was a "Blood culture positive for streptococcus pneumonia."  Dkt. No. 156-28 at p. 12.  There does not appear to be any dispute that this references a blood infection.  Sikirica himself has acknowledged that M.T. was septic.  Dkt. No. 143-35 at ¶ 57.  He testified to it as well during Plaintiff's criminal trial on both direct and cross examination.  Dkt. No. 143-18 at pp. 39, 76, & 93.  Dr. Klein, an expert witness for Plaintiff at his first criminal trial, testified that although the autopsy report did not specifically use the word sepsis, Dr. Sikirica recognized the presence of sepsis.  Dkt. No. 143-19 at p. 69 ("Q. And although [the autopsy report] doesn't mention the word sepsis, the medical examiner doesn't disagree that sepsis is there?  A. No, and he identifies the positive blood culture").  Dr. Jan Leestma, another expert for Plaintiff, also testified that the positive blood culture identified in the autopsy report was an indication of sepsis.  Dkt. No. 143-26 at p. 36.  Plaintiff offers no authority from which the Court can conclude that the fact that the word "sepsis" does not appear in the report itself is of constitutional significance.

What is left of Plaintiff's argument is that it was, in fact, sepsis, not trauma that caused M.T.'s death and so Sikirica's autopsy report must be false.  Dr. Sikirica concluded that M.T. died as the result of "[s]evere closed head injuries with cerebral edema due to blunt force trauma" and determined the manner of death to be homicide.

Dkt. No. 156-28 at p. 1. The autopsy report noted subgaleal and subdural hemorrhages. *Id.* at pp. 7-11. Dr. Michael Baden, retained as expert witness by Dr. Sikirica, agreed. Dkt. No. 143-3. In fact, Plaintiff's own expert recognized the presence of "scalp and subgaleal hemorrhages, retinal hemorrhages, and subdural hemorrhage," but determined only that they were not the result of trauma. Dkt. No. 158-2 at p. 4.

Multiple doctors testified at Plaintiff's criminal trials that the cause of death was trauma. Dr. Edge testified that it was his opinion that the cause of death was trauma. Dkt. 143-14 at p. 28.[8] Dr. Carole Jenny, an expert retained by the prosecution, testified that M.T.'s death was the result of trauma. Dkt. No. 143-16 at p. 101; *see also id.* at pp. 51-52 (Dr. Jenny's testimony that she agreed with the finding of Dr. Sikirica that M.T. died of head trauma). Dr. Waldman testified that the cause of M.T.'s death was "subdural hematomas." Dkt. No. 143-15 at p. 34. Even Dr. Jan Leestma, Defendant's expert in his criminal retrial, though testifying that M.T. died of sepsis, recognized that M.T. had also suffered from head trauma which he identified as "[a] contributing cause" of his death. Dkt. No. 143-26 at pp. 46 & 50.

A medical examiner's conclusion about the medical cause of death is a medical judgment. *See Manocchio v. Moran*, 919 F.2d 770, 779 (1st Cir. 1990). The record establishes, at best, a difference of opinion as to the medical judgment Sikirica rendered about the cause of M.T.'s death. It falls short of establishing any question of fact that he fabricated his conclusion. Several other doctors, who either directly treated M.T. or have

---

[8] He did note that sepsis may have contributed to the death as well.

acted as expert witnesses reached the same conclusion as Dr. Sikirica. *See* Dkt. No. 143-3 at p. 39 (Dr. Baden concluding that M.T.'s "death was caused by multiple homicidal blunt force impacts to his head that caused subdural hemorrhages and cerebral edema, and direct brain damage"); Dkt. No. 143-15 at 34 & 46 (Dr. Waldman testified at Plaintiff's 2009 criminal trial that the cause of M.T.'s death was "subdural hematomas" not sepsis); Dkt. No. 143-16 at pp. 51-52 (Dr. Jenny testified at the 2009 trial that M.T. died as a result of head trauma). Neither Waldman nor Jenny denied that M.T. was septic, but neither attributed the primary cause of death to sepsis. Dkt. No. 143-15 at p. 34; Dkt. No. 143-16 at p. 127.

Plaintiff has produced an expert report in this case from Dr. Katherine Maloney. That report clearly disputes Dr. Sikirica's findings regarding the cause of death. Dkt. No. 158. But that does not make them fabricated. In fact, Dr. Maloney confirms the medical finding of hemorrhages, but concluded in her medical judgment that they were "not due to violent trauma" and were not fatal. Dkt. No. 158-2 at p. 4. "The question for this court is not whether a self-interested litigant can find an expert to say the defendant[] got it wrong, but whether the evidence - including any expert opinions - creates a genuine issue of material fact that Defendant[] fabricated that evidence." *Ferris v. City of Cadillac, Mich.*, 726 F. App'x at 480-81. Here, the answer to that question is no. Dr. Maloney's opinion does not allege any fabrication on a part of Dr. Sikirica. *See* Dkt. No. 158-2. "Testimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong." *Rodriguez v. Derienzo*, 2020 WL 615052, at *3 (S.D.N.Y. Feb. 7, 2020). As a result, even accepting that there may be a question of

fact about the cause of M.T.'s death, there remains no evidence, beyond what are essentially conclusory allegations, that Dr. Sikirica fabricated his report to bolster the case being made by the police. To accept Plaintiff's theory that Dr. Sikirica's conclusion was fabricated would essentially also require the Court to conclude that multiple other medical professionals who reached a similar conclusion were also fabricating their findings. There is simply no basis on which any reasonable juror could reach that conclusion.

It is critical to recognize in considering this Motion that Plaintiff himself does not appear to allege that Dr. Sikirica falsified any actual medical finding. Instead, much of Plaintiff's claim relies on the allegation that Sikirica's conclusions were tailored to match the supposedly false narrative built from the City Defendants' interrogation of Plaintiff. This argument, however, appears to be entirely conclusory. The record establishes that Fountain, Colaneri, and Sikirica never discussed M.T.'s autopsy. Dkt. No. 145 at ¶¶ 84-85; Dkt. No. 155 at ¶¶ 84-85. Mason and Sikirica did briefly discuss the matter. *Id.* at ¶ 86. No allegation is made by Plaintiff that Dr. Sikirica contacted other testifying witnesses to have them coordinate their medical conclusions with his.

Finally, Plaintiff's reliance on Dr. Sikirica's alleged failure to follow what he contends were best practices regarding the conduct of the autopsy also does not provide a basis for denying summary judgment. Dkt. No. 154 at p. 15. Plaintiff offers no evidence to support that Sikirica deviated from accepted practice. Dr. Baden stated that "Dr. Sikirica's conclusions and procedures abided by all forensic pathology standards of practice." Dkt. No. 143-3 at p. 35. Dr. Maloney, Plaintiff's expert, does not specifically dispute this, saying only that she considers the matter "irrelevant." Dkt. No. 158 at ¶ 7.

Case 1:17-cv-00626-DJS Document 114-7 Filed 03/30/23 Page 388 of 45

Even if Sikirica had not complied with acceptable practices, "such allegations would rise at most to the level of negligence or malpractice, but neither is actionable as a § 1983 claim." *Freire v. Zamot*, 2016 WL 6330405, at *5 (E.D.N.Y. Oct. 27, 2016) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 and n.14 (1976)).

Medical judgments regarding cause of death will often involve some degree of uncertainty. *See Consolidation Coal Co. v. Necessary*, 272 F. App'x 273, 276 (4th Cir. 2008). Plaintiff has not come forward with any evidence on this Motion to demonstrate any question of fact from which a jury could conclude that fabrication, rather than an error in medical judgment, resulted in the allegedly false findings of Dr. Sikirica. Summary judgment for Dr. Sikirica is, therefore, warranted.

## 2. *Brady* Claim

Insofar as Plaintiff seeks to pursue a claim under *Brady v. Maryland* regarding Dr. Sikirica's alleged withholding of exculpatory evidence, that claim must also be dismissed. First, the Court notes that the Amended Complaint makes no reference to *Brady* or exculpatory evidence. *See generally* Am. Compl. Nor does the summary judgment record suggest that Plaintiff has ever before pursued any type of *Brady* claim.

Even if it were properly a part of this litigation, this claim is easily denied on the merits. "A classic *Brady* violation contains three elements: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 627

(E.D.N.Y. 2017) (quoting *Fappiano v. City of New York*, 640 F. App'x 115, 118 (2d Cir. 2016)) (internal quotation omitted). These elements are plainly not satisfied here.[9]

As Defendant Sikirica points out, there was extensive testimony about M.T.'s septic condition during Plaintiff's criminal proceedings. Multiple medical professionals acknowledged that the autopsy report provides evidence regarding sepsis. Plaintiff's own expert testified at the initial criminal trial that Dr. Sikirica had identified the presence of sepsis. That trial testimony alone defeats any claim that Sikirica withheld evidence. The prosecution questioned Sikirica about the presence of sepsis during the first trial. Dkt. No. 143-18 at pp. 9 & 39. He was also cross-examined about sepsis, *id.* at pp. 64-65, and the role it may have played in M.T.'s death. *Id.* at p. 94. So there appears to be no basis upon which to suggest that information in this regard was withheld from Plaintiff. Given the trial record in the state court, Plaintiff has no colorable claim that Sikirica withheld M.T.'s septic condition.

Nor has Plaintiff articulated a basis for finding prejudice. There is a "reasonable probability" of prejudice when the suppression of evidence "undermines confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Plaintiff was ultimately acquitted. "[T]o show prejudice the claimant 'must demonstrate a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have

---

[9] Defendant Sikirica does not challenge the assertion that he had some obligation independent of prosecutors under *Brady* to disclose exculpatory evidence, so the Court presumes solely for purposes of this Motion that he did. *But see D'Ambrosio v. Marino*, 2012 WL 4504523, at *4 (N.D. Ohio Oct. 1, 2012) ("the Court concludes that the duty of prosecutors to disclose exculpatory or impeachment evidence to criminal defendants does not extend to coroners.").

been different.'"  *Bellamy v. City of New York*, 914 F.3d 727, 751 (2d Cir. 2019) (quoting *United States v. Ulbricht*, 858 F.3d 71, 112 (2d Cir. 2017)).  "Thus, a § 1983 plaintiff proceeding on a *Brady* theory can succeed on his claim if he can demonstrate that, had the withheld information been disclosed prior to trial, he would have been acquitted based on reasonable doubt or convicted on a lesser charge."  *Jeanty v. Cerminaro*, 2023 WL 325012, at *4.  "When a criminal defendant is acquitted notwithstanding an alleged *Brady* violation, the criminal defendant has not suffered prejudice and *Brady* has not been implicated."  *Cannistraci v. Kirsopp*, 2012 WL 1801733, at *17 (N.D.N.Y. May 16, 2012).  Plaintiff's acquittal, therefore, is fatal to his purported *Brady* claim.

### 3. Qualified Immunity

Even were the record such that questions of fact precluded summary judgment on the merits of Plaintiff's claim against Sikirica, he is nonetheless entitled to qualified immunity.  As discussed above, that doctrine shields state actors from liability when a reasonable person in their position could not have known that their actions were unconstitutional.

It is not enough that Plaintiff identifies a question of fact regarding M.T.'s cause of death.  In the qualified immunity context, the Court must consider whether a reasonable individual in Dr. Sikirica's position could have known that he was violating Plaintiff's rights.  Several of the medical professionals who either treated M.T. or reviewed this tragic case reached the same conclusions about his death as did Dr. Sikirica.  Others did not.  The facts establish only that each did so based upon their own independent, reasoned medical judgment.  In light of that evidence, Dr. Sikirica is clearly entitled to qualified

immunity. To hold otherwise, based on a purely conclusory claim of misconduct, would "open the floodgates for civil rights claims against coroners by acquitted criminal defendants who believe a coroner made a mistake in performing an autopsy or in reaching a conclusion about the cause or causes of death of a victim." *Storey v. Chelan Cnty.*, 2011 WL 1575506, at *9 (E.D. Wash. Apr. 26, 2011). Given that multiple other doctors reached the same conclusion as Dr. Sikirica, that trauma, not sepsis, caused M.T.'s death, no reasonable medical professional would conclude that Dr. Sikirica's conclusion was the result of fabrication. "Defendant made a reasonable medical judgment, that even if mistaken, does not deprive him of qualified immunity." *Laurent v. Edwin*, 528 F. Supp. 3d 69, 92 (E.D.N.Y. 2021).

### C. Plaintiff's Section 1983 Conspiracy Claim

Finally, the Court addresses Plaintiff's claim alleging that the four individual Defendants "conspired to undermine Adrian Thomas' rights to be free from malicious prosecution and fabrication of evidence and/or deprivation of his right to a fair trial." Am. Compl. at ¶ 105.[10] All Defendants seek summary judgment on this claim. Dkt. No. 142-16 at pp. 17-18; Dkt. No. 143-1 at pp. 12-14.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors . . . ; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999); *see also Rasheen v. Adner*, 356 F. Supp. 3d

---

[10] Following the Motion to Dismiss Decision, this claim relates only to the malicious prosecution claim.

222, 235 (N.D.N.Y. 2019). "Conspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct evidence. Importantly, though, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Sotak v. Bertoni*, 501 F. Supp. 3d 59, 85 (N.D.N.Y. 2020) (internal quotations, citations, and alterations omitted). "[S]trictly conclusory" allegations of a conspiracy are insufficient to state a claim. *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002); *see also Pangburn v. Culbertson*, 200 F.3d at 72.

"A conspiracy requires an agreement or meeting of the minds to violate federally protected rights." *Bhatia v. Yale Univ.*, 2007 WL 2904205, at *1 (D. Conn. Sept. 30, 2007), *aff'd sub nom. Bhatia v. Yale Sch. of Med.*, 347 F. App'x 663 (2d Cir. 2009). In opposing these Motions, Plaintiff argues that "a jury could conclude that Dr. Sikirica rendered his medical opinion in conspiracy with, and to be consistent or 'congruent' with, Thomas' false coerced confession." Dkt. No. 152 at p. 21; *see also* Dkt. No. 154 at p. 13 ("Dr. Sikirica rendered his medical opinion to be consistent with Thomas' coerced false confession"). Plaintiff's opposition to the Motions speaks exclusively of conduct Sikirica is alleged to have taken. Dkt. No. 152 at pp. 21-22; Dkt. No. 154 at pp. 13-14. Plaintiff identifies no actions taken by any member of the Troy Police Department that he suggests were acts in furtherance of a conspiracy with Dr. Sikirica. Allegations of this sort on the part of Dr. Sikirica, even accepting them as true for purposes of the Motion, suggest, at most, a motive on his part to modify his own conduct to match that of others, not "a 'meeting of the minds' whose *conscious objective* was to deprive plaintiff[] of [his]

constitutional rights." *Farag v. United States*, 587 F. Supp. 2d 436, 470-71 (E.D.N.Y. 2008). Such a meeting of the minds is a requirement of a conspiracy claim under section 1983. That is an exceptionally thin read on which to base a claim, especially in light of the absence of any questions of fact suggesting Dr. Sikirica falsified his report.

Defendants Colaneri and Fountain expressly deny ever discussing M.T.'s case with Dr. Sikirica. Dkt. No. 142-1 at ¶ 24; Dkt. No. 142-2 at ¶ 35. Nothing in the record suggests to the contrary and the Court does not understand Plaintiff to maintain otherwise. As noted earlier, Plaintiff concedes that Fountain and Colaneri never spoke with Dr. Sikirica specifically about his autopsy of M.T. Dkt. No. 145 at ¶¶ 84-85; Dkt. No. 155 at ¶¶ 84-85. A conspiracy complaint "must contain 'enough factual matter (taken as true) to suggest that an agreement was made.'" *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 388 (S.D.N.Y. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

Plaintiff also concedes that Sikirica and Mason met only once about this case, at the autopsy. Dkt. No. 145 at ¶ 86; Dkt. No. 155 at ¶ 86. Mason admittedly was present at M.T.'s autopsy and spoke with Sikirica at that time. Dkt. No. 156-6 at pp. 166-167. The record establishes that the presence of officials from the Police Department was not unusual at the autopsy of a child. That fact alone, therefore, falls far short of establishing a conspiracy. *See*, *e.g.*, *Gutierrez v. New York*, 2021 WL 681238, at *19 (E.D.N.Y. Feb. 22, 2021) (conclusory allegation that defendants met to conspire against plaintiff insufficient). Plaintiff relies largely on his assumption that Sikirica's conduct was designed to assist the police officers in making a case against Plaintiff, but there simply

is little evidence to support that. His conclusory claim that as a result of this meeting Defendants "disregarded potentially exculpatory evidence, and shared information gained during their investigation" with the intent to conspire against Plaintiff "fall[s] short of the necessary facts sufficient to establish a meeting of the minds and an express or implied agreement to act in concert." *Butler v. Hesch*, 286 F. Supp. 3d 337, 363 (N.D.N.Y. 2018) (citing cases).

Taken together, Plaintiff offers nothing more than the sort of broad, conclusory allegations of a conspiracy that are clearly insufficient to survive summary judgment. "'Unsubstantiated speculation' will not defeat summary judgment as to a § 1983 conspiracy claim." *Faulk v. New York City Dep't of Corr.*, 2014 WL 239708, at *5 (S.D.N.Y. Jan. 21, 2014) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). Defendants' Motions for Summary Judgment are granted as to the section 1983 claims.

## V. CONCLUSION

**WHEREFORE**, it is hereby

**ORDERED**, that City Defendants' Motion for Summary Judgment (Dkt. No. 142) is **GRANTED**; and it is further

**ORDERED**, that Defendant Sikirica's Motion for Summary Judgment (Dkt. No. 143) is **GRANTED**; and it is further

**ORDERED**, that the Clerk is directed to enter judgment for Defendants, and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Decision and Order

upon the parties to this action.

Dated:   March 30, 2023
              Albany, New York


Daniel J. Stewart
U.S. Magistrate Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ADRIAN THOMAS,

                              Plaintiff,

                 -v-    17-cv-626

ADAM R. MASON, ET AL.,

                              Defendants.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE DANIEL J. STEWART
                      December 5, 2022
                445 Broadway, Albany, New York


FOR THE PLAINTIFF:

BRETT H. KLEIN, ESQ.
305 Broadway, Suite 600
New York, New York 10007


FOR DEFENDANTS MASON, FOUNTAIN & COLANERI

PATTISON SAMPSON GINSBERG & GRIFFIN PLLC.
By:  Michael Ginsberg, Esq.
     Rhiannon Gifford, Esq.
P.O. Box 208
Troy, New York 12180

FOR DEFENDANT RENSSELAER COUNTY

BAILEY, JOHNSON & PECK, P.C.
By:  William Firth, Esq.
5 Pine West Plaza, Suite 507
Albany, New York 12205

THOMAS v MASON, ET AL. - 17-cv-626

1          COURT CLERK:  Monday, December 5th, 2022,
2     11:02 a.m.  The case -- you want to do one case?
3          THE COURT:  Do Thomas.
4          COURT CLERK:  The case is Adrian Thomas versus
5     Adam R. Mason and others, case number 17-cv-626.
6              Appearances for the record, please.
7          MR. KLEIN:  Brett Klein, for the plaintiff.
8     Good morning, Judge.
9          THE COURT:  Good morning, Mr. Klein.
10         MR. FIRTH:  Good morning, your Honor.  William
11    Firth, on behalf of Dr. Sikirica.
12             THE COURT:  Good morning to you.
13         MR. GINSBERG:  Michael Ginsberg for Pattison,
14    Sampson, Ginsberg and Griffin, for the City of Troy and
15    the police officer defendants.
16         MS. GIFFORD:  Rhiannon Gifford, Pattison,
17    Sampson, Ginsberg and Griffin, on behalf of Adam R.
18    Mason, Ronald Fountain and Tim Colaneri.
19         THE COURT:  All right.  Thank you.  Rhiannon,
20    if I call your Rhiannon Spencer, I apologize in advance.
21         MS. GIFFORD:  I understand.  I still call
22    myself the wrong name.
23         THE COURT:  So what we are going to do -- I
24    want to have oral argument on both of these cases; we
25    will do Thomas first.  After we're done with Thomas, I'm

1  going to take a little break and talk with my chambers,

2  and we will come back out and we will do the second

3  case.

4       So, with regard to Adrian Thomas, we have got

5  two motions for summary judgment, one on behalf of the

6  City defendants and one on behalf of Dr. Sikirica.

7       So, why don't I have the City defendants go

8  first if they wish.

9       MR. GINSBERG:  Thank you, your Honor.  If it's

10  acceptable to the Court, I would just like to make a

11  quick comment or statement about this matter, and then

12  Ms. Gifford -- I had to make a note in my notes as well

13  not to refer to her as Spencer -- then Miss Gifford will

14  address the matters in detail if that's acceptable to

15  the Court.

16       THE COURT:  I have no objection to that.

17       MR. GINSBERG:  Your Honor, in this matter, the

18  Thomas matter, the plaintiff has failed to demonstrate

19  the existence of genuine issue of material facts so as

20  to avoid summary judgment.  I think it's important to

21  point out to the Court that with regard to violation of

22  the right to a fair trial or with regard to any other

23  right on the basis of the involuntary confession as

24  determined by the Court of Appeals, we can't ignore the

25  applicable standard.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    The standard is whether a reasonable police

2    officer in the same position would have understood that

3    their conduct was in violation of law.  We can't hold

4    the officers to a higher standard than the standard that

5    we hold the learned judges of the appellate division or

6    the trial judge to.  Those judges ruled that the

7    techniques used by the officer defendants in obtaining a

8    confession were not in violation of law.

9    How could the officers understand more than

10   the judges?

11   THE COURT:  Well, it was clearly established

12   at the time, however, that the police could not rely

13   upon the coerced confession in order to make a probable

14   cause determination.  Correct?

15   MR. GINSBERG:  Not at the time that it was

16   taken and certainly not --

17   THE COURT:  That was the state of the law,

18   right?  Back in -- trying to remember.  I'm sure I have

19   it.  So 2008 -- September of 2008 the state of the law

20   was the police couldn't rely on a coerced confession in

21   order to establish probable cause for a prosecution.

22   MR. GINSBERG:  On a coerced confession, yes,

23   your Honor.  But what constituted a coerced confession

24   is what was at issue, and neither the officers at that

25   time nor the trial judge nor the five members of the

THOMAS v MASON, ET AL. - 17-cv-626

1    panel at the appellate division considered the conduct

2    of the officers and techniques used to be a violation of

3    law to be coercive.

4            It wasn't until the Court of Appeals addressed

5    that issue and essentially rendered new law on that

6    matter in regard to the totality of the circumstances

7    and the techniques that were used.  So at the time that

8    those techniques were used, it was not settled law that

9    that constituted coercion.

10           THE COURT:  Well, are you conceding, then, for

11   purpose of the motion, that the confession was coerced?

12           MR. GINSBERG:  Not at the time that it was

13   taken.

14           THE COURT:  I mean as we sit here today, are

15   you conceding that this was a coerced confession?

16           MR. GINSBERG:  We concede that the Court of

17   Appeals determined that the techniques used in totality

18   constituted coercive behavior but only because it was

19   addressed at that time by the Court of Appeals and the

20   law then changed.

21           THE COURT:  Well, I mean, they relied upon

22   cases, Supreme Court cases that predated this event in

23   coming to their conclusion.  But what I'm trying to

24   figure out, because the plaintiff's counsel has made an

25   argument that the -- that you're collaterally estopped

THOMAS v MASON, ET AL. - 17-cv-626

1   from arguing that the confession was not coerced.  And I

2   understand what you're saying is the Court of Appeals

3   made the determination that they -- they made it also on

4   the basis of state law as well.

5          So, for purposes of -- if we have a trial in

6   this case, is one of the issues is going to be presented

7   at the trial as to whether this -- this confession was

8   coerced, are you conceding that it was coerced?

9          MR. GINSBERG:  Your Honor, we don't believe

10  that that's the inquiry that should be made here.  The

11  inquiry that should be made is whether or not the

12  officers at the time knew that the techniques and

13  behavior that they engaged in was in violation of law.

14         There was no way that they could have known

15  that because the judges who addressed the issues didn't

16  know it.  We can't hold the officers to a higher

17  standard.  So, yes, while perhaps ultimately the courts

18  determined that it was coercive, the officers did not

19  know and had no reason to believe that it was coercive

20  conduct at the time that they engaged in it and

21  therefore it cannot constitute a constitutional

22  violation.

23         THE COURT:  Wasn't there a Second Circuit

24  precedent about withholding medical cases of two

25  brothers with withholding medical treatment for the one

THOMAS v MASON, ET AL. - 17-cv-626

1    brother in order to get the other brother to confess to

2    the possession of the gun, they ruled that was

3    unconstitutional?  Isn't that a similar-type case?

4                MR. GINSBERG:  I don't believe so because no

5    medical attention was withheld here.

6                THE COURT:  Well, yeah, but the theory here is

7    that they're going to -- you know, Mr. Thomas, in

8    telling him you have to do this or else your child is

9    going to die and, therefore, that's why it's

10   involuntary.

11               MR. GINSBERG:  I believe what Mr. Thomas was

12   told by the officers was if you tell us what happened,

13   then the medical personnel will be in a better position

14   to help your son.

15               THE COURT:  Right.

16               MR. GINSBERG:  Not that they wouldn't provide

17   any medical attention to him unless he rendered a

18   confession.  I think that those are completely separate

19   issues.

20               THE COURT:  Okay.

21               MR. GINSBERG:  And Miss Gifford will address

22   the -- the particulars in more detail, your Honor.

23               THE COURT:  All right.

24               MS. GIFFORD:  I think the crux of the analysis

25   for the qualified immunity issue is really at what level

1    of generality does the Court define the relevant legal

2    right here.  And as you state, it is generally known

3    that a coerced confession cannot be used against a

4    defendant in a criminal trial.

5            THE COURT:  Let me start there, then.  Okay?

6    Assume for the moment that we extract the confession

7    from the probable cause analysis.  Was there probable

8    cause to arrest Mr. Thomas or prosecute Mr. Thomas in

9    the absence of that confession?

10           MS. GIFFORD:  Yes, I do believe there was.

11   There was significant evidence prior to the police even

12   being involved where the doctors at Albany Medical

13   Center stated that it was suspicious causes to the

14   injuries, that they are injuries that are typically only

15   found in acceleration and deceleration matters, shaking

16   of a child.  That raises a question as to what occurred

17   in questioning of the parents and individuals who had

18   access to the child is incredibly relevant.

19           And at that point, the children who were also

20   residing at the Thomas household were brought into this

21   CPS interview rooms and questioned.  During those

22   questioning, I believe one of the older children, India

23   Thomas, stated that she personally saw Mr. Thomas get

24   angry with the child and shake him and put him down in

25   the bed and his head hit the crib and his head hit the

 1   mattress.

 2          There were reports that Mr. Thomas utilized

 3   a stick to prop open a window to hit the top of the

 4   children's head.  There was the subsequent confession

 5   prior to the grand jury indictment where Mr. Thomas

 6   admitted to throwing the children to the bed to -- onto

 7   the bed to the CPS workers.

 8          THE COURT:  How long after -- when did

 9   that confession occur vis-a-vis the confession which the

10   Court of Appeals found was coerced?

11          MS. GIFFORD:  The confession to the CPS

12   workers was two days before the grand jury presentation,

13   and that was on the 26th.  So it was on or about the --

14   September 24th, 2008, which was the day after the

15   confession with the police officers.

16          THE COURT:  So it's your position that

17   whatever obtained was caused by that improper

18   questioning, that that's somehow dissipated in that

19   period of time?

20          MS. GIFFORD:  Yes.  That is the position, and

21   that he -- the statements made are properly considered

22   as far as the probable cause analysis at the time.  At

23   the time, there was no indication that the confession

24   was indeed coerced, and the additional statements made

25   by Mr. Thomas to the CPS workers who did not have

THOMAS v MASON, ET AL. - 17-cv-626

1   knowledge -- who stated they did not have knowledge of

2   any prior confession to the police and that they were

3   just doing their due diligence pursuant to CPS

4   investigations when Mr. Thomas made those incriminating

5   statements for a second time to them.

6          He made incriminating statements that almost

7   kind of were a little different than what he had said to

8   the police but still corroborated the statements of

9   throwing the child onto the bed, the same kind of

10   actions that Dr. Edge and Dr. Waldman had said at the

11   hospital were indicative of acceleration, deceleration

12   injuries and that Dr. Edge said that this was a homicide

13   in his opinion.  While not necessarily accurate maybe,

14   but that was his opinion at the time he was assessing

15   the children before the police.

16          THE COURT:  He denies ever making that

17   statement, correct?

18          MS. GIFFORD:  He did deny saying that.

19   Correct.  All of the police records and notes taken

20   contemporaneously during the investigation contained

21   notes of that nature.  Dr. Edge was deposed in 2015,

22   many years after the incident.  I think the

23   contemporaneously made notes are indicative of --

24          THE COURT:  That becomes a question of fact.

25          MS. GIFFORD:  Potentially.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

THOMAS v MASON, ET AL. - 17-cv-626

```
 1          THE COURT:  Okay.  All right.
 2          MS. GIFFORD:  Turning to the -- continuing
 3  with qualified immunity analysis, though, the rights
 4  needs to be clearly established.  The contours of the
 5  rights needs to be clearly established based upon the
 6  existence of current law.  Here, as the innocence that
 7  were repeatedly stated throughout their briefs,
 8  the Court of Appeals were in a unique position to
 9  finally address and create bright-line rules with regard
10  to the techniques used by police officers
11  in interrogating and interviewing and that's so because
12  at that time, when the police were interviewing
13  Mr. Thomas in 2008, there were no bright-line rules.
14  There was no out-of-contour define and there was no
15  ability to the police to be able to reject what they had
16  been taught.
17          The innocence network had even acknowledged
18  that this was a proper time to address what the police
19  are taught and what they have been learning at police
20  academies across the state.  These were the common
21  practices and the techniques used in 2008, and they
22  weren't rejected or questioned until it was brought up
23  on this case in 2015, many years after the techniques
24  were utilized.
25          And even if we were to, you know, say that the
```

THOMAS v MASON, ET AL. - 17-cv-626

1   rule was clearly established and the contours of the

2   rule were defined, there's still the alternative basis

3   for qualified immunity, which was that it was

4   objectively reasonable to believe the techniques were

5   permissible under settled principles.

6           You mentioned when you were speaking with

7   Mr. Ginsberg that the Court of Appeals relied upon

8   Supreme Court cases in New York State to render their

9   determination, but those Supreme Court cases were not on

10  point with what the Court was analyzing in the Thomas

11  decision.  Those Supreme Court cases -- I believe it was

12  Abonds (phonetic) and Garrity, they related to an

13  individual's right to seek jobs and to apply for

14  government positions.

15          And in one of the cases, the Court held that

16  it was improper to force the employee to testify at the

17  grand jury because he could lose his right to bid on

18  contracts later on in the process.

19          THE COURT:  Right.

20          MS. GIFFORD:  That's not any of the scenarios

21  here.  That's --

22          THE COURT:  It goes to the issue of

23  voluntariness.  In other words, the Garrity warnings

24  generally in employment cases go to the issue of whether

25  or not the statements are voluntary.  But you've relied

THOMAS v MASON, ET AL. - 17-cv-626

1   and Mr. Ginsberg pointed out, you know, the decisions of

2   the Appellate Division as a basis for qualified immunity

3   and generally, you know, we look to what's clearly

4   established federal law.  We don't necessarily look to

5   what a state court has determined or not determined.

6           So, wasn't it clearly established by the

7   Second Circuit that at least on a basic level that the

8   police could not falsify evidence and use that to

9   prosecute an individual, correct?

10          MS. GIFFORD:  Yes.  That level of generality

11  was defined at that time.  I believe that we're not

12  dealing with a falsified confession here.

13          THE COURT:  That's what the plaintiff is

14  maintaining.  In other words, I understand there's a

15  difference between something that's coerced and

16  something that's falsified.  So theoretically you could

17  have a coerced confession that's not falsified and also

18  the possibility exists it could be a coerced confession

19  that is falsified.

20          MS. GIFFORD:  Correct.  And in this case, we

21  do not have a identified coerced confession that was

22  falsified.  The cases where they have identified a

23  falsified confession were instances where the criminal

24  defendants stated I never made those statements.  I was

25  not -- I didn't say that I had no gun on me, I didn't

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    have drugs on me, they made that up.

2            THE COURT:  Right.  I absolutely agree with

3    you.  That's one possibility, where the police basically

4    write the whole statement, forge the person's signature

5    and says this is his confession.  Obviously that's

6    unconstitutional.

7            MS. GIFFORD:  Yes.

8            THE COURT:  But what -- you know, what if they

9    go in and basically hold a gun to the person's head and

10   basically say we need you to confess to owning the drugs

11   and the person says okay, I'll write this down?  He

12   wrote it down.  It's not the police manufactured it but

13   they manufactured in a sense that they coerced it.

14           MS. GIFFORD:  I would disagree and say that I

15   think the police did manufacture the confession in that

16   scenario that you presented because they are forcing the

17   individual by a threat of violence to adopt and make

18   statements that he never made or agreed to make.

19           Here, they -- the officers were sitting with

20   Mr. Thomas and having a conversation and then he agreed

21   to -- and made the statements himself and never stated

22   that there was conduct that was performed by the police

23   officers outside the confines of the recorded interview.

24           Each of the tactics and techniques that were

25   utilized by the police in this scenario were available

THOMAS v MASON, ET AL. - 17-cv-626

1   for review by the trial court judge and the Third

2   Department when they determined that the techniques used

3   were not so coercive or inappropriate to vitiate the

4   voluntariness of the confession.

5           In a scenario where the officers are holding a

6   gun to the individual's head, we obviously know that his

7   statements are not being made voluntarily because maybe

8   here the police determined -- or the Court of Appeals

9   determined that the totality amounted to a kind of

10  coercive technique but doesn't necessarily mean for --

11  and I submit that means it does not mean that at all,

12  that the police knew that those statements made by

13  Mr. Thomas and adopted by Mr. Thomas were in fact false.

14          When a cop is holding a gun to an individual,

15  it's pretty apparent, I think, that those statements

16  cannot be reliable at all.

17          THE COURT:  Isn't that kind of what the Court

18  of Appeals was saying?  In other words, each of the

19  statements that was elicited were statements that were

20  fed to Mr. Thomas and that, coupled with his mental

21  health status, coupled with the threat to his wife to

22  prosecute her, the threat with, you know, the -- the

23  threat with regard to the fact that the child wasn't

24  going to get proper medical attention unless he's -- you

25  know, his memory was -- got better, whatever the phrase

THOMAS v MASON, ET AL. - 17-cv-626

1    is that they used -- I know it's not a gun to the head
2    but isn't it along the same lines you're basically
3    feeding that information to the person, trying to coerce
4    them to agree with it so they can close the case?
5            MS. GIFFORD:  At that time, the police
6    officers were not aware -- there was no settled case law
7    that those techniques were inherently coercive to
8    overcome his voluntariness of the statement -- of the
9    statements.
10           Here, you know, ultimately the Court of
11   Appeals took a broader look and had the opportunity and
12   benefit of time to see that, you know, actually the
13   techniques that have been in use and permissible all the
14   way up until 2015 when they made the decision actually
15   maybe aren't as voluntary as we had always been holding
16   or acknowledging.
17           THE COURT:  Well, you're relying on the state
18   court case.  So, there may be federal -- I mean -- my
19   responsibility is to determine what the state of law
20   federally was at the time, not necessarily what the
21   appellate definition concluded at the time.
22           I'm just wondering whether or not a more
23   prudent thing would be to have a jury make a
24   determination as to whether it was coerced, whether --
25   how it was coerced, and then make a determination as to

                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

THOMAS v MASON, ET AL. - 17-cv-626

1    qualified immunity at that point in time once you have

2    that specific information because obviously plaintiff's

3    counsel is taking a different view with regard to the

4    level of misconduct of the pleas, and I'm wondering if

5    it creates a question of fact.

6            MS. GIFFORD:  I submit it does not create a

7    question of fact.  There is no federal court precedent

8    at least that I'm aware of or that I believe the

9    plaintiff argued or pointed to that did set forth the

10   bright-line or have a sufficient contour of the rule to

11   make it so that our officers at the time in 2018 were

12   aware that their techniques were in fact coercive and

13   potentially violation of Mr. Thomas's constitutional

14   rights.

15           I think the analysis is important to consider

16   the Third Department in the Huntley hearing and

17   what cases the Court of Appeals relied upon in the state

18   cases because those were relevant to how the police

19   understood what techniques were permissible.  From my

20   knowledge and at least I haven't seen or recall any

21   arguments to the contrary from the plaintiff's side

22   relying upon federal cases to overcome that.

23           THE COURT:  Okay.  As far as the Huntley

24   hearing goes, obviously your position is once the judge

25   makes a determination to admit the statement, that's an

THOMAS v MASON, ET AL. - 17-cv-626

1   intervening superseding cause which cuts off all

2   liability, correct?

3          MS. GIFFORD:  Correct.  That's the argument as

4   far as the causation element, and I think that the

5   prosecutor's decision to do -- to rely upon and admit

6   the confession and the portions of the reporting I

7   believe at the trial also overcomes and eliminates the

8   causation in this matter because they all made

9   independent judgment to admit and rely upon this

10  confession.

11         THE COURT:  Well, really comes down under

12  Townes, it comes down to what the judge makes an

13  independent determination.  So you -- I don't have it in

14  front of me but do you know at what point in time that

15  the Huntley hearing was made to allow it to come in?

16         MS. GIFFORD:  I did not write the date.  I

17  apologize.

18         THE COURT:  That's all right.  Obviously it's

19  sometime between September 2008 when the -- when the

20  matter went to trial in -- it was indicted

21  September 26th.  So October of 2009 was the trial.

22  Okay.  So you're looking at a year and a month.

23         MS. GIFFORD:  I'm sorry?

24         THE COURT:  I just said you're looking at a

25  year and a month.  In other words, under that scenario,

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    assuming that there was a constitutional violation, the

2    state defendants would be responsible for his

3    incarceration for a year and a month up until the time

4    that the -- it was admitted into evidence at which point

5    in time that's basically on the judge for allowing it to

6    come in.

7            MS. GIFFORD:  I would dispute that in that

8    other probable cause existed to prosecute absent the

9    confession.

10           THE COURT:  Okay.

11           MS. GIFFORD:  So that confinement was still

12   legal and justified based upon the additional probable

13   cause.

14           THE COURT:  Okay.

15           MS. GIFFORD:  That was available.

16           THE COURT:  All right.  Let me just check and

17   see if I had any other questions for you.  I think

18   that's it.

19           MS. GIFFORD:  Okay.  Thank you, your Honor.

20           THE COURT:  All right.  Let me hear from the

21   county defendants at this point in time.

22           MR. FIRTH:  Your Honor, good morning.

23           THE COURT:  Good morning.

24           MR. FIRTH:  I have the pleasure of being

25   before you on both cases today due to -- Crystal

THOMAS v MASON, ET AL. - 17-cv-626

1  unfortunately had a family member pass away.

2         THE COURT:  Okay.

3         MR. FIRTH:  So I am here in her place instead.

4         THE COURT:  All right.

5         MR. FIRTH:  If I'm -- go ahead, your Honor.

6         THE COURT:  You can go ahead.  I understand

7  your situation.

8         MR. FIRTH:  To that point, I was going to say

9  if I'm not able to field some of your more difficult

10 questions, then that's kind of my "get out of jail free"

11 card.

12        THE COURT:  Okay.  Well, tell me what your

13 position is with regard to the county defendants and, in

14 particular, Dr. Sikirica.

15        MR. FIRTH:  Yes, Judge, so I think the -- the

16 primary thing to keep in mind here from our perspective

17 is that we're dealing with a grand jury indictment.

18 Okay?  So we have a presumption of probable cause.

19        Plaintiff is required in that situation then

20 to come up with some evidence on the part of

21 Dr. Sikirica showing that he engaged in perjury or

22 suppression of evidence or fraud and were some type of

23 other bad faith conduct on his part and that just has

24 not been done.

25        Crystal articulated it best in her memorandum

Case 1:17-cv-00626-DJS Document 94-17 Filed 07/13/23 Page 18 of 44

THOMAS v MASON, ET AL. - 17-cv-626

1    of law in this case.  This comes down to a disagreement

2    of eight medical experts, doctors, in terms of the

3    interpretation of the objective findings on autopsy.

4    All agree essentially that M.T. suffered from subdural

5    hematoma and hemorrhaging as a result of trauma.

6              And to draw a parallel here, whether it's

7    appropriate or not, plaintiff argued just as he does in

8    the Davis case that the omission of the particular word

9    or a very collateral issue constitutes the suppression

10   of evidence; in this case, it's the condition of sepsis.

11   Even plaintiff's experts, the criminal -- the criminal

12   defendants' experts agree that the autopsy report very

13   sufficiently identified the condition of sepsis.

14             If anything, Dr. Sikirica would be guilty of

15   being overly verbose in his report, describing the

16   condition itself instead of just stating the work.  So,

17   you know -- and, regardless, the prosecution was aware

18   that M.T. had sepsis.  The criminal defendants' team was

19   well aware of the septic condition.  Everyone was well

20   aware.  It was heavily discussed, heavily litigated in

21   both trials And during the grand jury proceeding

22   Dr. Sikirica tested [sic] consistently.

23             There's just no question that sepsis was

24   present as a condition.  So, really, a nonissue for

25   purposes of this motion.

                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

THOMAS v MASON, ET AL. - 17-cv-626

```
 1          You know, and plaintiff also talks about
 2   Dr. Sikirica's consideration, I believe he does, of
 3   the inculpatory statement of Mr. Thomas, but
 4   Dr. Sikirica is neither law enforcement or an officer of
 5   the court.  He's entitled to consider all facts
 6   surrounding the manner of death and, in fact, he's
 7   charged to do that under county law.  That's exactly
 8   what he did in this case.
 9          THE COURT:  Any problem with the police
10   sitting in on the autopsy?
11          MR. FIRTH:  No, Judge.  Plaintiff's only
12   doctors testified that's appropriate.
13          THE COURT:  Any constitutional violation for
14   disclosing the statements or confession as we referred
15   it to here of the plaintiff to Dr. Sikirica?
16          MR. FIRTH:  On the part of the -- of the city
17   defendants?
18          THE COURT:  Right.
19          MR. FIRTH:  I don't think so, Judge.
20          THE COURT:  Okay.  Well, let me ask you.
21          MR. FIRTH:  I mean --
22          THE COURT:  You know, if you have a
23   pathologist who altered their findings in order to
24   comport with the police investigation where the outcome --
25   where the police wanted to and intentionally did that,
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    that would be a constitution violation, correct?

2            MR. FIRTH:  I would agree that it's

3    intentionally --

4            THE COURT:  And that would get over

5    the presumption of normalcy or whatever the grand jury

6    indictment gets over because you could say it's

7    fraudulent or false.

8            MR. FIRTH:  Tend to agree with you, Judge.

9    Certainly that's not what happened in this case.

10           THE COURT:  That's your position, is that this

11   is a dispute with regard to their analysis and what --

12   initial cause of death that he listed was what?  I mean,

13   he mentioned sepsis but the cause of death was

14   blunt-force trauma, correct?

15           MR. FIRTH:  Yes, Judge.  That is correct.

16           THE COURT:  All right.  So Dr. Waldron, Jenny

17   and Dr. Baden agree with that, right?

18           MR. FIRTH:  That is correct.

19           THE COURT:  Dr. Klein doesn't know,

20   Dr. Maloney disagrees and Dr. Seema (phonetic)?

21           MR. FIRTH:  Leestma.

22           THE COURT:  Okay.  Leestma indicates it was

23   trauma but really it was sepsis.

24           MR. FIRTH:  She agrees it was trauma, just

25   secondary to sepsis.  Right.

                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

1          THE COURT:  Okay.

2          MR. FIRTH:  Your Honor, yes.  Again, it's --

3     it's really just a case of, you know, Dr. Sikirica's

4     medical opinion through his extensive education and

5     experience conducting over 10,000 autopsies, this was

6     his opinion.  And some doctors agree with him.  At the

7     very least this is qualified immunity.

8          THE COURT:  All right.  Thank you.

9          MR. FIRTH:  Thank you, your Honor.

10          THE COURT:  All right.  Mr. Klein.

11          MR. KLEIN:  Thank you, Judge.  Thank you,

12     Counsel.

13          Your Honor, I guess I'm not going to go

14     through the whole brief, which we rely on and reiterate.

15     But to touch on a few things.  Adrian Thomas -- this

16     case does not involve any crime; I think that's what

17     makes this significant.

18          Looking at the case at this stage of the

19     proceeding, I think that the defendants kind of gloss

20     over the fact that is not a case where there was a crime

21     and it's just a -- a disputed -- as to who committed a

22     crime.  This is a case where in the light most favorable

23     to Mr. Thomas, there was no crime.

24          This is a child who died of natural causes,

25     who was septic, fever, vomiting, et cetera, for two days

1   before he was found unresponsive, and other than

2   Dr. Sikirica and the defendants, there was no evidence

3   linking Adrian Thomas to any purported time, which is a

4   disputed fact.  So I think --

5           THE COURT:  There was -- you know, as you

6   pointed out, I mean, all these cases have a particular

7   narrative but here it seems like -- based upon what I

8   have read here, that there was an inquiry and the

9   concern by Dr. Edge with regard to what happened here,

10  he alerted the authorities with regard to that.  He may

11  have been incorrect with regard to his assessment but

12  that's what started the ball rolling, it seems to me.

13          MR. KLEIN:  Right.  And they -- these are all

14  going to be credibility issues as to what we allege

15  through our -- what we intend to prove at trial through

16  our expert in coerced false confessions, whose testimony

17  in evidence before Your Honor and through our

18  pathologist, that this incorrect information is very

19  frequently how a -- what's referred to as a bias cascade

20  starts with law enforcement going down a road that

21  results in law enforcement doing what they did in this

22  case and what the Court of Appeals found was a -- a

23  clear -- a flagrant violation of due process to get the

24  result that they want.  And this is a phenomenon that

25  occurs unfortunately in other cases and it occurred

1  here.

2           So even with that flawed information, there

3  was no evidence linking Mr. Thomas to an acceleration or

4  deceleration injury.  It was the police who then made a

5  conscious choice to interrogate Mr. Thomas for two

6  hours, getting nothing but denials and credible and

7  consistent unawareness of any information that would

8  have led -- would have explained how the child died.

9           Giving a coerced statement that the Court of

10  Appeals found at the first two-hour session was part of

11  this larger coerced confession.

12           And the -- the officers conceding that the

13  information he gave didn't give them probable cause.  It

14  wasn't consistent with the flawed information from

15  Dr. Edge who, by the way, had been up for two days,

16  spoke with these officers for two minutes, disputes what

17  they attribute to him.

18           THE COURT:  He disputes the word murdered but

19  he doesn't dispute that he had a concern.  He relayed

20  the concern to the authorities.  What do you expect the

21  police to do?  They have to investigate.

22           MR. KLEIN:  They do but they don't have to --

23           THE COURT:  They didn't make this up out of

24  whole cloth.

25           MR. KLEIN:  Well, the part with Mr. Thomas

THOMAS v MASON, ET AL. - 17-cv-626

1    I -- we will show at trial, Judge, if the Court will

2    allow, what the Court of Appeals laid out as -- and we

3    think should be the law of the case.

4                THE COURT:  Let's talk about that for a

5    moment.  I mean, that's not the rule of the Second

6    Circuit law.  You know, it's not how is it the

7    collateral estoppel?

8                MR. KLEIN:  Judge, we think that the -- the

9    issues was squarely litigated.

10               THE COURT:  Was -- by whom?

11               MR. KLEIN:  By Mr. Thomas and by the -- you

12   know, the District Attorney on behalf of the --

13   defending the conduct of the police.

14               THE COURT:  Well, the police weren't

15   represented at that hearing.

16               MR. KLEIN:  Well, the -- their conduct -- they

17   were, in essence, represented by the prosecutors.

18               THE COURT:  But that's not what the Second

19   Circuit says.  Right?  Just read *Jenkins versus City of*

20   *New York*.  Detectives Maxshine, Shulman and Hunter and

21   Parrino were witnesses in but not parties to Jenkins'

22   criminal proceeding.  The detectives are no more in

23   privity with the state than the city was in Brown;

24   therefore, it was error for the district court to

25   preclude the defendants from asserting that they had

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

THOMAS v MASON, ET AL. - 17-cv-626

1   probable cause to arrest Jenkins.

2           So, clearly if Mr. Thomas had lost the issue,

3   that would be res judicata against him because he was

4   there, he litigated it, he had the opportunity, but not

5   against the police officers who were not parties to the

6   proceeding.

7           So it's a defense abuse of collateral

8   estoppel.  You can't use it in an offensive manner in

9   this circumstance I don't believe once unless you can

10  find --

11          MR. KLEIN:  We cite the Owens versus Treder

12  case, Second Circuit 1989.

13          THE COURT:  Yes, and that case involves the

14  determination against the plaintiff who is a party to

15  the proceeding.  It's not against the -- it's not

16  against the -- the police officers.

17          MR. KLEIN:  Well, I think that there is

18  privity in the District Attorney.  I -- you know, the

19  police were represented, in essence, by the state in

20  that case.  They were defending their conduct and

21  litigated the constitutionality of it.

22          THE COURT:  If I made that ruling, it would

23  take a split second for the Second Circuit to reverse

24  me, which they do like to do.

25          MR. KLEIN:  Which I don't want them to do.

1          THE COURT:  No.

2          MR. KLEIN:  None of us do.

3          THE COURT:  It may not be a huge issue but --

4   and that's why I asked Rhiannon with regard to it.  They

5   are not taking the position that they concede that this

6   was coercive in nature.  Obviously the Court of Appeals

7   made the decision but I don't think it's binding upon --

8   on the individual detectives who were not party to that

9   proceeding.

10          MR. KLEIN:  Well, Judge, even if you find that

11  it's not, which we hope that you do in a way that won't

12  be reversed on appeal, the -- the -- there clearly are

13  questions of fact here.  The plaintiff denies that he

14  engaged in any crime for all the reasons set forth in

15  that decision.  The dozens of times that -- in other

16  words, he was there for -- not just the first two hours

17  after being hospitalized for -- after expressing an

18  intent to kill himself because he was so distraught, he

19  was hospitalized for 12, 14 hours, I believe.

20          He's then picked up by one of the defendants

21  and taken back right to this interrogation room, with

22  his child still in the hospital and what condition he

23  didn't know at that point, cut off from his family, and

24  even more distraught, sleep deprived and all of that.

25  And also there was circumstances that Your Honor pointed

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

THOMAS v MASON, ET AL. - 17-cv-626

1    out about his mental state, his ability to comprehend

2    that I think the jury would have to evaluate, and he --

3    he -- and even there, the defendants concede for the

4    next several hours until I believe Defendant Colanari

5    comes in the room, up until that point he maintained

6    that he didn't do anything wrong, and they didn't have

7    probable cause.  It was only when there was

8    this additional threat for, you know, I'll call it, that

9    he was so distraught, so ready to -- to, you know, told

10   so many times you'll leave, we will let you go, you're

11   not in trouble.  You know, we need you to --

12           Making all these threats to his vital

13   interests, which were set forth in the Court of Appeals

14   decision -- his wife, his family, his overall

15   well-being, his kid's survival -- did he give them what

16   they suggested to him dozens and dozens of times and

17   they concede in their testimony that after the Court of

18   Appeals decision in this case, that everything that the

19   Court of Appeals found with regard to their -- their --

20   their conduct was accurate.

21           Yes, we -- we -- he did not say any of these

22   facts before we fed them to him and so these questions

23   of fact are profound.  There may be questions about

24   whether they should -- I don't think -- well, let's say

25   this.  I don't know that anyone would disagree that if

THOMAS v MASON, ET AL. - 17-cv-626

1    Dr. Edge rightly or wrongly expresses a concern that

2    there was some acceleration or deceleration of injury,

3    which is disputed that they would have a right to look

4    into it.

5            The question is whether they coerced a false

6    confession creating fabricated evidence as well as

7    maliciously prosecuting the plaintiff.  Those are

8    questions of fact that can't be resolved on summary

9    judgment as well as qualified immunity.

10            THE COURT:  How do we deal with the fact that

11   we have five judges in the appellate division who looked

12   at this and they're experienced judges -- Malone,

13   Spain -- all these judges I know looked at this and said

14   this is not impermissible.

15            MR. KLEIN:  Well, I don't know them as well as

16   you do, Judge, but I think, you know, there is -- these

17   are invalidated decisions.  So I'm not sure that we need

18   to concern ourselves with that here and that they are --

19   they are not binding decisions.  I think as you pointed

20   out, I'm not aware of -- of the standard of giving the

21   defendants a free pass on immunity because state court

22   decided, you know, and ultimately improperly in their

23   favor.  Courts make mistakes, respectfully, all the time

24   and -- and --

25            THE COURT:  If you are going to say -- I guess

THOMAS v MASON, ET AL. - 17-cv-626

1   this is another area, the qualified immunity is supposed

2   to protect all, plainly.  You've got five judges with

3   law degrees who felt that what they did was appropriate.

4          How can you say that the police officers

5   then -- that they knowingly violated the law?  That a

6   reasonable police officer would have known that they

7   were -- knowingly violated the law when judges on the

8   appellate division felt that they didn't?

9          MR. KLEIN:  Well, because I think that the

10  police officers' conduct was misleading, and I think the --

11  thank God the Court of Appeals got it right.  But I

12  think --

13         THE COURT:  It's not -- it's not misleading in

14  the sense that -- I mean, it was videotaped.  So they

15  knew what it was.  They're not -- they didn't lie about

16  it.  They didn't go in and say we never asked him any

17  leading questions.  He just blurted it out in the first

18  five minutes.  It wasn't -- that's not what you're

19  saying, right?

20         MR. KLEIN:  No, but the fact that it was --

21  what they did, Judge, was -- I think there was

22  discussion about briefs in the Court of Appeals about

23  how these are tried and true techniques.

24         The testimony in this case is not that there

25  were any tried and true techniques used.  The evidence

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

THOMAS v MASON, ET AL. - 17-cv-626

1    at trial will show, Judge, and I think before the Court

2    in this motion, that Detective Fountain, the lead here,

3    was a juvenile officer and that this was his first, I

4    believe, murder case and that he jumped in after going

5    to one -- a couple of hour training session on

6    interrogations, and he didn't remember the details of

7    that at that time and basically went on instinct and

8    intuition and that his colleagues went along with it.

9            And that they basically went to such lengths

10   that -- threatening interests, threatening in such a way

11   that were clearly established to reasonable police

12   officers that -- and --

13           THE COURT:  Clearly established by what

14   federal case as of 2006?  In other words, if I were to

15   ask you give me your four best cases that would put a

16   police officer on notice, which cases would you rely

17   upon?

18           MR. KLEIN:  I'm probably going to have to ask

19   you to let me send you a letter or follow up because we

20   have thousands of pages of materials we are using and

21   just don't have it off the top of my head to quote for

22   you.

23           THE COURT:  Okay.

24           MR. KLEIN:  But I think it's obvious that --

25   and the -- for the reasons in the Court of Appeals

THOMAS v MASON, ET AL. - 17-cv-626

1    decision that the threats made in this case, the

2    information created --

3            THE COURT:  The Court of Appeals decision was

4    after the fact.  So we are talking about what a

5    reasonable officer would have known at the time that

6    they did it.  They didn't have the benefit of the judges

7    of the Court of Appeals years later.

8            MR. KLEIN:  Right.  The police officers had

9    notice -- this is the -- I can think of a case that I

10   had in the Eastern District where Judge Chen denied

11   summary judgment on a case where the police were looking

12   for individuals who shot at them, and they obtained a

13   statement from a -- a purported witness that was alleged

14   to have been coerced and they said this was what the

15   witness told us and we relied on it, and the Court found

16   that that created a -- that -- that coercion created a

17   question of fact whether they created fabricated

18   evidence that was used to commit -- a prosecutor can

19   deprive a defendant of his liberty.

20           THE COURT:  I will give you time to submit, a

21   week or two weeks.  I want to make sure I get this right

22   but I have to concentrate on what was clearly settled

23   law at the time and how much of an on-force case do I

24   need?  Obviously that's a -- a shifting sands, depending

25   upon the Court of Appeals decision I read with you.

                     Lisa L. Tennyson, CSR, RMR, FCRR
                     UNITED STATES DISTRICT COURT - NDNY

1          MR. KLEIN:  Right.  Because there's --
2    there's, you know -- there's a lot of cases where it
3    doesn't have to be specifically that holding for the
4    Court to find that there's -- as long as they are on
5    notice.  But, Judge, I would say this in this case, the
6    evidence was that Adrian Thomas was involved was in fact
7    created by the officers.  They had no evidence.
8          THE COURT:  He was the custodial parent who
9    had -- with the child when -- when the child became
10   sick.
11         MR. KLEIN:  The mother was as well but they
12   zoomed in on him and -- and immediately removed him from
13   the home to headquarters and started with their tell us
14   what happened, tell us -- we know you did this.  The
15   doctor told us this baby was hit with a force of a bus.
16   You know, if you want to save his life, you've got to
17   tell -- if you want to see your wife, if you want to go
18   home, you know, you're not in trouble.  Just tell us.
19   And they wore this man down.
20         And so I think that -- that the creation of
21   this false, fabricated evidence, which is at this stage
22   the Court should has to credit as in the light most
23   favorable to the plaintiff, this was a coerced false
24   confession with evidence created by these officers who
25   concede.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

THOMAS v MASON, ET AL. - 17-cv-626

1        THE COURT:  You're using the word coerced and

2   false interchangeably.  You can have a coerced

3   confession and it could be true.

4        MR. KLEIN:   Correct.  This is a coerced and

5   false confession.  He -- it was coerced.  We think for

6   the reasons set forth in the Court of Appeals decision

7   that we have -- the officers concede that they suggested

8   all of the incriminating facts to plaintiff before he

9   ever said them independently.

10        And, two, that these facts were false.  The

11   plaintiff denies them, his expert validates that this

12   is exactly what happened here, and we think will -- you

13   know, can -- can convince a jury that more likely than

14   not that this was a coerced false confession and at

15   least are questions of fact.

16        THE COURT:  Do you concede that the point when

17   the judge allows a confession in that that breaks the

18   causal chain?

19        MR. KLEIN:  I don't.  I think we are talking

20   about Townes -- my understanding of Townes is it's a --

21   it's a case where someone was seeking damages for

22   malicious prosecution based on a bad stop and so, if I

23   recall correctly, the person was in the back of the cab

24   and had a gun.

25        THE COURT:  Yes.


              Lisa L. Tennyson, CSR, RMR, FCRR
              UNITED STATES DISTRICT COURT - NDNY

THOMAS v MASON, ET AL. - 17-cv-626

1        MR. KLEIN:  And so it was probable cause to --

2    grounds to -- or to arrest that person even --

3        THE COURT:  No grounds to stop.

4        MR. KLEIN:  To stop.  And so the individual

5    sought to benefit from the fruit of the poisonous tree

6    in seeking damages for a bad stop, and the Court said no

7    once that gun is recovered, we have grounds to prosecute

8    you.

9        THE COURT:  But the Court also said -- and I

10    agree with what you said there.  The Court also said

11    separately and independently that once -- when the judge

12    makes a determination to allow it in, that's a

13    superseding intervening cause and that cuts the causal

14    chain.  So that would end any type of damages at that

15    point.

16        MR. KLEIN:  I think -- that's, I think, a

17    different scenario where someone is seeking damages.

18    Yeah, I -- I -- my understanding is that the -- the --

19    the defendants' conduct reasonably and foreseeably

20    resulted in plaintiff being, you know, a -- a court

21    adopting this coerced false statement.  And so I don't

22    see how that can insulate them from the reasonable and

23    foreseeable consequences of their misconduct.

24        THE COURT:  Well, because -- as long as they

25    don't lie to the judge.  In other words, if they

THOMAS v MASON, ET AL. - 17-cv-626

1    don't -- you know, say we brought him in and he

2    voluntarily wrote this down in three minutes and we

3    never asked him a single question.  All right?

4              MR. KLEIN:  Never threatened him and the

5    threats are on tape or --

6              THE COURT:  As long as a judge is making an

7    independent decision.  If he makes a decision to allow

8    that into evidence and he's wrong about that, he should

9    have suppressed it but he did not, that is a superseding

10   and intervening cause by definition.  But let me --

11             MR. KLEIN:  If I could just make one final

12   point.

13             THE COURT:  Yes.

14             MR. KLEIN:  I think that what's different here

15   is this bias cascade that continues even after the

16   confession is suppressed, is thrown out by the Court of

17   Appeals.

18             THE COURT:  Let me ask you this question:  Why

19   didn't the Court of Appeals, if they suppressed a

20   confession, there's no probable cause for the

21   prosecution, why didn't they dismiss the case at that

22   point in time rather than set it down to be retried?

23             MR. KLEIN:  I don't know that they went to the

24   question of probable cause.  I think the motion was just

25   on the -- on the suppression.  So I'm not sure of the

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    logistics of that, whether the Court had that authority

2    or whether the Court weighed that or not.  But my

3    understanding is that the Court did not make any

4    determination of probable cause.  It just made a

5    determination that the -- the motion to suppress should

6    have been granted and -- and sent it back to the trial

7    court for further proceeding.

8              We don't think he should have been

9    re-prosecuted in the absence of any evidence linking him

10   to it, but that was part of the bias cascade in this

11   case.

12             Dr. Sikirica stuck to his theory, even in the

13   absence of the information that was given to him with --

14   within hours of the -- of the coerced false confession

15   being created, and he writes blunt-force trauma on the

16   death certificate, doesn't issue his autopsy for months

17   and months and months later and goes to a grand jury and

18   reports that to this theory that only came about via the

19   suggestions and coerced statements made by the

20   defendants.

21             THE COURT:  What's the proof of that?  It

22   seems that Dr. Sikirica did an autopsy and made his

23   conclusion, which some other doctors agree with and some

24   others disagree.

25             MR. KLEIN:  Others agree I think who are not

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

THOMAS v MASON, ET AL. - 17-cv-626

1   experts in the case.  After the fact maybe the -- the

2   neurologist was asked in a deposition what do you think

3   about this?  People -- I think there's a credibility

4   issues about --

5              THE COURT:  Do you have an expert opinion to

6   say that the doctor committed malpractice in that

7   determination?

8              MR. KLEIN:  In -- in essence, I don't think

9   the question of malpractice was asked of Dr. Maloney.

10  The deputy county medical examiner for Erie County,

11  New York, is our expert in this case, and she says

12  flat-out that this -- there's no evidence of trauma,

13  that this was sepsis leading to meningitis that resulted

14  in the -- the swelling and bleeding and -- and evidence

15  of subdural collection in the brain and that

16  Dr. Sikirica was flatly wrong.

17             There are post hoc questions or expert reports

18  from the defense but at this stage, yes, the plaintiff

19  does submit that that was flatly wrong, and combined

20  with the testimony of Doctor -- of plaintiff's

21  confession expert squares -- supports the inference that

22  can only be decided by a jury that this was a cascade, a

23  bias cascade.  Started with this premise that there

24  was a homicide, and whether that was right or wrong, the

25  defendants then endeavored to get plaintiff to, you

THOMAS v MASON, ET AL. - 17-cv-626

1  know, sign a coerced false confession that was then

2  shared with Dr. Sikirica, who then issues a cause of

3  death determination that's at odds with what our expert

4  says the evidence shows.

5              So we do think there are credibility issues

6  that can only be resolved at trial.

7              THE COURT:  Okay.  All right.  Why don't --

8  I'm going to take a break for a couple of minutes just

9  to talk with my staff, and we will come out and finish

10  this one and move on to the next one.  If you want to

11  take a break and get a drink of water or something, feel

12  free.

13              MR. KLEIN:  Thank you.

14              (Pause in proceeding, 11:58 a.m.)

15              (Following recess, 12:10 p.m.)

16              THE COURT:  Before I get the decision over to

17  Davis-Guider, any further arguments that anyone wants to

18  make that I haven't heard from?  Pretty extensive brief.

19  This one goes along.  All right.  Not hearing anything.

20              So -- and obviously for purposes of this oral

21  argument, I have heard -- we talked about general

22  principles of the law that are generally applicable to

23  coroners and police officers, so we probably don't need

24  to repeat that except as to the specifics.  But why

25  don't I -- I'm going to turn to the City and just have

THOMAS v MASON, ET AL. - 17-cv-626

```
 1    them summarize what your argument is in this case.

 2            MS. GIFFORD:  Thank you, your Honor.  The

 3    City's position in this case --

 4            THE COURT:  Before you do, I'll just call a

 5    different case.  So, with regard to this matter, we

 6    talked a little bit about giving plaintiff's counsel and

 7    defense counsel a short period of time if you want to

 8    submit to me.  What I'm looking for particular cases

 9    that deal with what was clearly established at the time

10    of this interrogation from a federal point of view that

11    you want to rely upon.

12            I'm not looking for hundreds of them but you

13    have three or four that are your best cases at the time,

14    Mr. Klein, can you do that within a week or so?

15            MR. KLEIN:  Yes.

16            THE COURT:  All right.  So seven days.  And

17    how about defense counsel?  Can I get those within a

18    week -- unless you want to rely upon what's in your

19    brief.

20            MR. GINSBERG:  To the extent that those cases

21    don't appear in the plaintiff's brief, we would like an

22    opportunity to at least see them and then respond to

23    them before the defense would have to submit.

24            THE COURT:  You made the motion for qualified

25    immunity.  So it's your obligation to tell me what the
```

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1  clearly established law was at the time.  So we will

2  just ask for whatever you give me.

3          MR. GINSBERG:  Certainly, your Honor.

4          THE COURT:  Okay.  Same for the --

5  Dr. Sikirica.

6          MR. FIRTH:  Yes.

7          THE COURT:  It may not be an issue with regard

8  to this whole issue of -- the confession is separate

9  from what your issue is?

10          MR. FIRTH:  That's correct, your Honor.

11          THE COURT:  All right.  So, feel free.  I just

12  want to give you an opportunity with regard to that.  So

13  that marks the end of the oral argument in the first

14  case and then going to transition over to the Michael

15  Davis-Guider case.

16          (Proceeding concluded.)

17              * * * * * * * * *

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N


    I, Lisa L. Tennyson, RMR, CSR, CRR, Federal

Official Realtime Court Reporter, in and for the United

States District Court for the Northern District of New

York, do hereby certify that pursuant to Section 753,

Title 28, United States Code, that the foregoing is a

true and correct transcript of the stenographically

reported proceedings held in the above-entitled matter

and that the transcript page format is in conformance

with the regulations of the Judicial Conference of the

United States.


                             /s/ Lisa L. Tennyson

                         Lisa L. Tennyson, RMR, RPR, FCRR


Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY